## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

CSX TRANSPORTATION, INC.,
individually and on behalf of NORFOLK
& PORTSMOUTH BELT LINE
RAILROAD COMPANY,

      Plaintiff,

v.                                      Civil Action No. __2:18cv530____

NORFOLK SOUTHERN RAILWAY
COMPANY, NORFOLK & PORTSMOUTH
BELT LINE RAILROAD COMPANY,
JERRY HALL, THOMAS HURLBUT,
PHILIP MERILLI, and CANNON MOSS,

      Defendants.

_____/

## COMPLAINT

Plaintiff CSX Transportation, Inc. ("CSXT"), individually and on behalf of

Norfolk & Portsmouth Belt Line Railroad Company ("NPBL"), by counsel, files this

Complaint against Defendants Norfolk Southern Railway Company ("NS"), NPBL,

Jerry Hall, Thomas Hurlbut, Philip Merilli, and Cannon Moss as follows:

### NATURE OF THE ACTION

1.      The NPBL is a terminal switching railroad operating in the cities of

Norfolk, Portsmouth, and Chesapeake, Virginia.  It was formed in 1896 by a

collection of railroads, who entered into an agreement "for the mutual benefit of each

1

in the interchange of business" to build and operate a belt line railway connecting various tracks of the eight railroads in Hampton Roads that would enable the interchange of cars among the railroads and connection to the port, among other facilities.  In building and operating the NPBL, the founders sought to ensure that all railroads would have ready access to industries and ports which would ensure competition for transportation services.  Toward that end, rail service to the Norfolk International Terminals ("NIT") was opened in 1917.

2.     As a result of mergers and acquisitions among the original eight railroads, by the end of the twentieth century the number of NPBL members had decreased to three.  In the late 1980's, the then-remaining three shareholders of NPBL—CSXT, Norfolk and Western Railway Company, and Southern Railway Company—agreed to reapportion the amount of amount of board seats associated with each shareholder.  Critically, this reapportionment did not result in any single shareholder possessing majority control of the board, and indeed no single shareholder at that time owned a majority of the shares.  After this reappointment, however, Norfolk and Western Railway Company and Southern Railway Company merged, with the result being that the new company, NS, owning 57% of the shares of NPBL, as compared to CSXT's 43%.  For at least the past ten years, NS has inserted former NS employees in all management positions of the NPBL and current or former NS employees in four of the six NPBL Board of Directors voting positions

and one non-voting director.  NS and these directors and the NPBL management they put in place have conspired to operate the NPBL in order to benefit NS at the expense of the profitability and viability of the NPBL, and to harm NS's competitor CSXT.

3.     NS and the NPBL's conspiracy to operate the NPBL to pursue illegitimate ends is nowhere more vividly demonstrated than at the NIT, the largest international shipping terminal in Virginia.  Only two entities have the ability to access NIT by rail: NPBL and NS.  Currently, NPBL must utilize NS tracks in order to reach NIT.  NS and the NPBL have used the NPBL as a chess piece to establish and maintain NS's monopolistic control over intermodal transportation[1] in and out of NIT by making it practically impossible for any other rail carriers to provide intermodal rail service to NIT.  This has kept out competitors, but it has come at the expense of NPBL's own interests.  NS and NPBL have acted in concert to have NPBL demand a rate designed to exclude competition in the relevant market, dispose of NPBL's key rail assets, and take other actions contrary to NPBL's business interests.  Though NIT has been rapidly expanding and increasing its revenues in recent years due to increased shipping, NPBL's revenues have tellingly remained flat or decreased.

---

[1] Intermodal is the use of two modes of freight, such as ship and rail, to transport goods from shipper to consignee.

4.     The Virginia Port Authority ("VPA") has indicated that the growing port would benefit from multiple rail carriers being able to access NIT because it would allow more volume to be moved at competitive prices.  And yet, at this point, competitors such as CSXT are practically precluded from using the NPBL to connect to NIT because the rate set by NPBL's board, in concert with NS, is prohibitively expensive and because NS refuses to allow NPBL to handle intermodal trains over its tracks on a regular basis.  The only modern example in which CSXT actually utilized NPBL to connect to NIT occurred in 2015 when, due to closures of other ports around the country, the NIT was inundated with excess containers and because of demands from its customers, CSXT was forced to pay the high rate charged by the NBPL.  This was the briefest of windows in which CSXT could feasibly pay these rates because the other port closures caused all costs associated with ocean shipping to temporarily skyrocket. Under normal business conditions, the NPBL's rate and its operating procedures effectively preclude competitor access to NIT.

5.     CSXT wants to compete on fair terms at NIT, but has been unable to do so.  This condition exists despite the fact that the NPBL was created for the very purpose of fostering cooperative access for railroad carriers.  CSXT's recent proposal to NPBL to set a competitive rate and improve its services—including by volunteering the use of CSXT's own engines and fuel to perform NPBL's services— was summarily quashed by NPBL's board and management despite the projections

that CSXT's proposal would have substantially increased NPBL's business and revenues.

6.     NS's actions have resulted in the loss of existing and prospective intermodal business for CSXT.  It has also harmed the market by foreclosing competition for intermodal transportation servicing NIT.  And it has reduced revenue and income to the NPBL, which earns revenue and income by charging fees for interchange of trains and the use of its track.

## PARTIES

7.     CSXT is a Class I railroad operating in the Eastern United States and Canada.  CSXT is headquartered in Jacksonville, Florida and is incorporated under Virginia law.  It brings this suit on its own behalf and also in a derivative capacity as a shareholder of NPBL.

8.     NS is also a Class I railroad operating in the Eastern United States and Canada.  NS is headquartered in Norfolk, Virginia and is incorporated under Virginia law.

9.     The NPBL is a Class III terminal switching railroad.  It is headquartered in Chesapeake, Virginia, and is incorporated under Virginia law.

10.     Individual Defendants Jerry Hall, Thomas Hurlbut, Philip Merilli, and Cannon Moss are voting members of the NPBL Board of Directors, who, *inter alia*, participated in the rejection of CSXT's most recent service proposal.  Hall, Hurlbut,

and Merilli are also employees of NS.  Moss is a former employee of NS and has been the President and General Manager of NPBL since 2011.  The Individual Defendants are named as party defendants in Count VI only, but the conduct of the Individual Defendants is relevant to the other counts of the Complaint.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because CSXT's claims against Defendants arise under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and therefore raise federal questions.

12.     The Court has supplemental jurisdiction over all state law claims under 28 U.S.C. § 1367(a).

13.     This Court has personal jurisdiction over the Defendants because they are residents of Virginia, regularly conduct business in Virginia, and/or caused injury by acts in Virginia.

14.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in this Court because a substantial part of the events giving rise to this dispute occurred within this District.

## FACTUAL ALLEGATIONS

*The Purpose and Structure of the NPBL*

15.     In 1896, eight railroads, including CSXT and NS's predecessors in interest, joined together to form the NPBL in order to provide an efficient means of interchanging the traffic of its owners between their lines and various marine

6

terminals and industries located along the NPBL's tracks.  In 1897, they signed the NPBL Operating Agreement, attached hereto as Exhibit A.  The joint agreement between the railroads was designed to ensure that all railroads would have ready access to NIT, which would ensure competition for transportation services.

16.     The NPBL Operating Agreement, as amended, governs the ownership and operation of the NPBL, and it creates and establishes various duties and obligations between and among the shareholders.

17.     In order to advance the purpose for which the NPBL was formed, the original shareholder companies, the predecessors of the current shareholders and parties to the NPBL Operating Agreement, expressly agreed therein that the NPBL would be a "separate organization in which all [railroads] are to be equally interested and each to have an equal representation." Ex. A at 1.  The shareholders agreed that it is in the best interest of all that each shareholder company have "equal representation" in the organization; and accordingly the Operating Agreement provides that each shareholder "shall have one representative on the Board" of the NPBL.  *Id.* at 1–2.

18.     The Operating Agreement further provides that each shareholder must "co-operate cordially in encouraging the business of the [NPBL] for which it is constructed."  *Id.* at 4.  Under the Operating Agreement, the NPBL anticipates that its shareholders will deliver to the NPBL all cars to be delivered to customers that

they cannot serve directly. *Id*. CSX thus has an expectation that the NPBL will provide it with an efficient means of interchanging its traffic including, without limitation, to and from the NIT. *Id.* at 6 (referencing "the intent" that the NPBL "shall perform the service for which it was built and said Company be directly responsible for the competent and efficient discharge of its every obligation to the parties hereto").

19.    Further, under the NPBL Operating Agreement, the members of the NPBL Board of Directors are obligated to vote for "such resolutions, by-laws or other proceedings as may be necessary to carry into effect the agreements made in" the NPBL Operating Agreement. *Id.* at 6.

20.    The NPBL currently operates over 26 miles of track in and around the Hampton Roads area of Virginia. A map of the NPBL and the tracks owned by other railroads in the area is attached hereto as Exhibit B. Crucially, the NPBL provides a means of access to the largest port in Virginia and one of the largest ports on the Eastern Seaboard, NIT. For any rail carrier other than NS, the only way to access NIT by rail is via NBPL. Being accessible by deep-draft ships and operating some of the world's largest cranes, NIT is uniquely positioned to handle some of the largest ships in the world. Yet NS, together with NPBL, through NPBL directors and managers, has essentially blocked access to this large and growing port facility for anyone but itself.

*The Supplemental Agreement*

21.     As a result of mergers and acquisitions among the original eight railroads, by the end of the twentieth century the number of NPBL members had decreased to three.  By 1989, the number of shareholder railroads owning the NPBL had declined to three—CSXT, Norfolk and Western Railway Company ("NW") and Southern Railway Company ("SR").

22.     In a Supplemental Agreement dated March 1, 1989, attached hereto as Exhibit C, the three railroads agreed that CSXT was afforded the right to appoint two representatives to the NPBL Board of Directors, and the other two companies, NW and SR, collectively between them were afforded the right to appoint three representatives to the NPBL Board. Ex. C ¶ 1.  The Supplemental Agreement further provided that other than the single sentence of the Operating Agreement specifically referenced, "[n]othing herein shall be deemed to amend, alter, or affect any other provision of the NPBL Agreement." *Id.* ¶ 2.

23.     The following year, NW and SR merged to form the single company now known as Norfolk Southern Railway Company.  The merger of those two companies left NS and CSXT as the only remaining shareholders of the NPBL. As a result, NS owns 57% of NPBL, and CSXT owns 43%.  Per the NPBL By-Laws, which have been effect in their current form since 1996, attached hereto as Exhibit

D, NS has appointed four voting members to the NPBL Board of Directors and CSXT has appointed two.

24. NPBL, a distinct corporation under Virginia law, remains an independent entity from its two remaining shareholders, NS and CSXT. It operates according to its own bylaws and with its own management and Board of Directors. The railroads and NPBL lack economic integration, and the interests of NPBL can diverge from its railroad shareholders where higher prices mean higher revenue for NS but more cost for NPBL. The conspiracy described below between NPBL and NS thus joined together separate decision-makers pursuing separate economic interests, depriving the marketplace of independent centers of decision-making.

*NPBL's Deteriorating Financial Condition*

25. Rather than abide by the original purposes of the Operating Agreement, including the requirement to cordially cooperate in encouraging the business of NPBL, NS and the management of the NPBL conspired to operate the NPBL to harm CSXT and the market, even at the expense of the NPBL's own business interests.

26. The NPBL Board of Directors currently consists of six voting members and one non-voting member. Three of those voting positions are filled with current NS employees designated by NS to serve as NPBL Directors: Defendants Hall, Hurlbut, and Merilli.

10

27.     Another voting position is held by the NPBL President, Cannon Moss, a former NS employee who in 2011 was nominated at NS's direction and elected by vote of NS's shares, and over CSXT's objection.  Defendant Moss's predecessor, David Stinson, was also a former NS employee and returned to work at NS after his tenure as NPBL President.  Donna Coleman, the current non-voting member of the Board of Directors and Vice President of NPBL, is also a former employee of NS. In addition, Bill O'Brien, the current Terminal Superintendent of NPBL, is also a former employee of NS.

28.     NS also has other connections with the management of the NPBL.  The management of NPBL all have NS email addresses, which they use to conduct the business of the NPBL.

29.     For at least 12 years, every President and VP of NPBL was a former NS employee.

30.     All of the individual Defendants have independent personal stakes in furthering NS's interests as Directors of NPBL, such as the expectation of future employment with NS and the expectation of future remuneration from NS.

31.     Collectively, Defendant Moss, in his capacity as a Director, along with Defendants Hall, Hurlbut, and Merilli constitute the four "Individual Defendants."

32.     NS in conspiracy with the NPBL, and through the Individual Defendants, have operated the NPBL as a vehicle for advancing NS's interests at the

expense of their contractual duties to CSXT.   The Individual Defendants, in advancing NS's interests regardless of the impact on NPBL, have further violated their fiduciary duties to NPBL.  Management of NPBL conspired with NS to harm CSXT and grow NS's market power.

33.   The NPBL's operating revenue is derived principally from switch operations, and is largely dependent upon the switch services being provided to the shareholders' companies, who in turn pay for those services.

34.   Defendants have caused the NPBL to establish and maintain unreasonably high rates for its switch services for intermodal freight.  The current line haul switch rate is dramatically higher than rates for comparable services charged by other short line railroads.  This rate was adopted by the Individual Defendants and/or their predecessors in 2009, over the objection of the other NPBL board members.

35.   The rates charged by the NPBL and other anticompetitive restrictions on CSXT's use of the NPBL have effectively foreclosed CSXT from moving containers to or from NIT on the NPBL.  Meanwhile, NS is able to access NIT directly via its own rail connections.

36.   The Defendants' actions as to NPBL are adversely affecting commerce in Hampton Roads and Virginia.  The VPA has expressly requested that NPBL "facilitate dual [rail] access [by CSXT and NS] for handling containers at NIT,"

because NPBL's current failure to provide "proper access to NIT by CSX puts Virginia at a competitive disadvantage." Indeed, the Defendants' activity is raising prices charged to shippers and, ultimately consumers, because NS has shut out the only other company who could compete to provide intermodal services.

37.     In part as a result of its excessive line haul switch rate, the NPBL's overall financial performance has been declining over the past several years and continues to deteriorate. NPBL's revenue has essentially been flat or down over the past several years, including in 2017. And, the bottom line revenue of NPBL is deceptive, however, because much of NPBL's revenue in recent years has been generated from the sale of real estate. Rail car volume has been essentially flat for years, and decreased in 2017. Current car volume on the NPBL as a whole is heavily dependent on a single customer (not at NIT) engaged in a single line of business. No new sources of substantial and recurring business have been added in recent years, nor do any appear to be planned. No excess cash flow is being generated that could be used for capital expenditures for maintenance, upgrades, or expansion.

*The Individual Defendants' Repeated Failures to Act in the Best Interest of the NPBL and to Abide by the NPBL Operating Agreement*

38.     In advance of the April 18, 2018 NPBL Board and stockholders meetings, CSXT presented a Service Proposal that would have significantly and rapidly increased the NPBL's revenue and operating income by nearly doubling the

volume of cars that the NPBL moves annually.  A copy of the Service Proposal is attached hereto as Exhibit E.

39.     The Service Proposal, which included a proposed substantially lowered switch rate per car, as well as a guarantee of a minimum annual volume of CSXT moving 18,000 cars to or from NIT, would have generated annually approximately $1,440,000 in incremental revenue and potentially $660,000 in incremental operating income for the NPBL.  The Service Proposal would have provided the NPBL with a consistent, long-term and substantial stream of much-needed additional income, and should have generated new revenue opportunities for the NPBL.

40.     Rather than engage in any discussions to advance that proposal and secure those financial benefits, the Individual Defendants and NPBL Management erected baseless and pretextual barriers to the NPBL without even considering or responding substantively to, much less adopting, the Service Proposal.  The Individual Defendants refused to even form an independent committee to evaluate it or allow a formal vote, and thus effectively rejected it.  Notably, at the April 18, 2018 Board and shareholder meetings, the Individual Defendants parroted the same pretextual reasons for denying the request as offered by NS in its responses to CSXT's Service Proposal.

41.     Additionally, in response to CSXT's proposal, Defendant Moss revealed that they were considering entering into a new agreement, ostensibly between the NPBL and NS, that effectively would impose a substantial increase in charges paid to NS for NPBL's usage of its rights of access to NS's track, which would, in turn, reduce the profitability of intermodal service for NPBL while ultimately raising the rates charged to NPBL customers.  Regardless of what the appropriate charge should be, the timing of this interest by NBPL in finalizing a new deal between NS and NPBL is highly suspicious and consistent with Defendants' other ploys using the NPBL to keep CSXT from servicing the NIT.

42.     By rejecting the Service Proposal, Defendants' actions have prevented NPBL from providing switch services necessary for CSXT to move intermodal containers by rail to and from NIT, thereby depriving CSXT of an efficient means of serving NIT, which in turn has impaired CSXT's business interests and prevented it from using the NPBL's services to and from NIT, causing the attendant loss in revenue and income to NPBL.

43.     NPBL's lost income from not providing the proposed service to CSXT in turn impairs NPBL's ability to finance and make capital investments in its infrastructure necessary to preserve and grow the railroad's business and serve its shareholders in the manner required by the Operating Agreement, and effectively

blocks the NPBL from providing a second ("dual") means of access by rail to NIT (in addition to service by NS itself), as expressly requested by the VPA.

44.     Defendants' imposition of unreasonable and anticompetitive rates harms everyone (including NPBL, CSXT, freight shippers, and other competitors) except NS.  Notably, NS itself has been able to avoid having to pay the unreasonable and anti-competitive NPBL rates set by the Individual Defendants for intermodal rail service because NS owns and operates over the sole rail line that connects to NIT, the same line that NPBL operates over to access NIT.

45.     This is not the first time that the Individual Defendants have, in conspiracy with NS and the NPBL, misused NPBL as a tool to serve NS's own interests.

46.     As one example, in response to a CSXT service proposal in 2010, NPBL refused to accept CSXT's offer to provide CSXT locomotives and free fuel to move cars for NPBL over the NPBL routes under any terms or circumstances (including without charge to NPBL for use of the locomotives or fuel), while permitting locomotives owned by NS to do so and causing NPBL to lease or contract with NS for use of NS's locomotives without competitive bidding.

47.     In 2008, NPBL took the necessary actions to commence the sale of productive NPBL property in Norfolk and an attempted sale in Portsmouth, and the termination of NPBL's access rights over NS tracks used for the proper delivery of

services that NPBL is obligated to provide to its shareholders (including the consent to NS's removal of a "diamond" key to NPBL providing adequate, reasonable, efficient and predictable access to NIT). The sale of property in Norfolk had the potential to further constrain NPBL's connection to NIT. The sale of property in Portsmouth, had it been successful, would have effectively limited CSXT's access to its own intermodal yard in Portsmouth. The removal of the "diamond" has resulted in having to move NPBL trains into NS's Portlock yard, where further movement of those NPBL trains is controlled and constrained by NS and NS's own trains, and then reversing the NPBL trains out of that yard to move to or from NIT.

48.     Through those same acts and practices, and others, the Individual Defendants and/or their predecessors have violated their fiduciary obligations to act in the best interests of the NPBL and, by conspiring with them to do so, NS has violated its contractual obligations to CSXT, including but not limited to its obligation to "encourage[e] the business of the [NPBL]."

*Relevant Markets*

49.     The relevant geographic market is the intermodal port facilities of Hampton Roads, Virginia. The Hampton Roads metropolitan area has three ports through which freight travels, Portsmouth Marine Terminal ("PMT"), Virginia International Gateway ("VIG"), and NIT. But, with very limited exceptions, PMT has not handled intermodal freight since 2011 and is not expected to going forward.

Ports outside of the Hampton Roads metropolitan area face significant barriers to competing with the Hampton Roads' ports. In particular, the distance between the port complexes on the East Coast effectively prevent such port complex from acting as viable potential competitors. For example, the closest port complex to the south of Hampton Roads is Charleston, South Carolina, more than 430 miles away. And the closest port complex to the north of Hampton Roads is Baltimore, Maryland, more than 230 miles away. Shippers choose which port complex to use based on geographic considerations—where the freight is coming from and headed.

50.     Freight transportation by rail in and out of the Hampton Roads' ports constitutes a distinct service market under the antitrust laws. Rail transportation is the only method that can achieve the level of throughput required for major shippers of freight. Indeed, major customers refuse to contract with carriers who cannot provide rail transportation in and out of the Hampton Roads' ports. Moreover, the market for freight transportation by rail in and out of the Hampton Roads ports is characterized by high barriers to entry. Development of rail connections requires significant capital investment and engineering. As such, there is no significant cross-elasticity of demand or reasonably interchangeable alternatives for freight transportation by rail in and out of the Hampton Roads' ports.

*Defendants' Anti-Competitive Actions to Achieve Dominance of Freight Transportation by Rail In and Out of the Hampton Roads' Ports*

18

51.     NS and the NPBL have used the NPBL as a chess piece to establish and maintain monopolistic control over intermodal transportation in and out of the Hampton Roads' ports.

52.     NS has monopoly power or a dangerous probability of achieving monopoly power in the relevant market described above.  NS is one of the nation's largest railroads, operating in 22 states.  In the relevant market, NS's market share exceeds 70%.  For the NIT, NS's market share is approximately 90%.  NS has the ability to control prices for intermodal transportation and exclude competition.  It benefits from a significant barrier to entry into the market for intermodal transportation in and out of Hampton Roads ports, namely the lack of accessible rail routes for competitors that are not owned by NS to the NIT.

53.     NS did not secure or maintain its monopoly power in Hampton Roads by virtue of its ingenuity or other salutary competitive behavior.  Rather, it has continually and deliberately engaged in a pattern of anticompetitive conduct that has eliminated or prevented competition.

54.     Among other anticompetitive acts, NS, in conspiracy with the Individual Defendants and NPBL, has caused the NPBL to reject, without any reasonable, meaningful and lawful consideration or negotiation, CSXT's Service Proposal, thereby effectively denying CSXT access to NIT by rail in competition with NS.

55.    When CSXT was forced to pay the NPBL's rates in 2015, due to closures of other ports around the country, NS directly, and through the NPBL, prioritized NS's shipping needs over those of CSXT.  NS failed to allow, in a reasonable and timely manner, the movement of cars delivered to NPBL by CSXT, sacrificing NPBL's own profits from the business CSXT would otherwise deliver.

56.    NS conspiring with NPBL, by and through the Individual Defendants, have discriminated against CSXT by refusing to allow NPBL to use CSXT's fully fueled locomotives to access NIT, requiring only NS-owned or supplied locomotives to be used by or on NPBL.

57.     NS conspiring with NPBL, by and through the Individual Defendants, have set (and maintained) NPBL's switch rates at levels designed to exclude competition in the relevant market, thereby dramatically raising CSXT's costs to serve intermodal rail customers, and diminishing the amounts of freight moved, and related revenues earned by NPBL.

58.    NS conspiring with NPBL, by and through the Individual Defendants, and/or their predecessors, mandated NPBL consent to the termination of its access rights to the track between NS Juncture and Carolina Juncture, *i.e.*, the "diamond" and connecting track (with NS then removing that track), and mandated NPBL cease and desist from requesting the reinstatement of the diamond, connecting track and related operating rights, all of which has severely impaired, and continues to severely

impair, NPBL's ability to efficiently and predictably provide CSXT with rail access to NIT.

59.     In response to CSXT's Service Proposal, NS and NPBL, by and through the Individual Defendants, threatened to enter into an agreement that would increase dramatically the charges that NPBL would pay for access to NS's track. This would have further raised the rate charged to NPBL's customers. This threat to increase rates was an attempt to pressure CSXT into abandoning its Service Proposal.

60.     NS and NPBL, by and through the Individual Defendants, have taken these and other actions with the intent and effect of denying CSXT and other competitors the ability to compete with NS to provide freight rail transportation in and out of the shipping ports in the Norfolk area.

61.     These acts are contrary to the independent profit-maximizing self-interest of NS and the NPBL, as they increased costs and reduced revenue for NPBL, of which NS is a majority owner.

62.     Rather than try to compete on the merits, Defendants, through this willful exclusionary conduct, have acted to acquire and wield power over price and to exclude competition, and thus to monopolize (and attempt to monopolize) intermodal transportation in and out of Hampton Roads' ports.

63.     Defendants' actions were within the flow of, and substantially affected, interstate and international commerce. Defendants also used instrumentalities of

interstate or foreign commerce (or both).   And their activities have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce.

*Harm to CSXT and Competition*

64.   The result of Defendants' actions has been a loss in existing and prospective business for CSXT and, in turn, for the NPBL.  Defendants, conspiring together, have pushed CSXT out of the market for intermodal transportation though NIT.

65.   In addition, Defendants' actions have harmed competition for intermodal transportation in and out of Hampton Roads' ports, with customers paying substantially higher prices for that transportation via rail service provided by NS, than they would absent Defendants' anticompetitive conduct.

66.   Defendants' actions have also resulted in reduced choice among shippers for intermodal options from Hampton Roads' ports.

*The Individual Defendants' Refusal to Remedy Defects in the NPBL's Current Corporate Governance Structure*

67.   CSXT also proposed, both before and at the April 2018 NPBL Board and shareholders' meetings, several remedial actions to address defects in NPBL's current corporate governance structure.  A copy of the proposal is attached hereto as Exhibit F.

68.    Those remedial actions would have 1) allowed for equal representation of NPBL shareholders on NPBL's Board; 2) added independent directors to a Board that currently has none; 3) mitigated NS's improper influence over the NPBL Board and management, which NS has used to its sole advantage and to cause NPBL and the Individual Defendants, together with NS, to violate fiduciary, contractual and statutory duties; and 4) ultimately allowed the NPBL to operate as a "separate organization," as required by the NPBL Operating Agreement.

69.    Among other things, CSXT proposed that each shareholder designate only one individual for election as a director; that the shareholders elect four independent directors to the NPBL Board; and that the Board and shareholders implement a plan for an orderly transition to independent management.

70.    At the April 2018 meetings, CSXT's shareholder representative asked the NPBL Board to adopt CSXT's proposals, and made a motion that the shareholders proceed to elect only one director designated by each shareholder and elect four independent directors.

71.    Prior to the meetings, CSXT also identified and proposed to NS eight candidates for election as independent directors to fill the remaining four positions on the NPBL Board.

72.    The Individual Defendants rejected CSXT's governance proposal in its entirety, voted against CSXT's motion, refused to nominate (much less elect) any

independent directors, and instead insisted upon, and NS voted to approve, a slate that included four (interested) directors designated by NS (three current NS employees, Defendant Cannon Moss, and Donna Coleman (as a non-voting director)) and only two directors designated by CSXT.

73.     The Individual Defendants have not offered any legitimate and valid reasons for their refusal to take any steps to remedy the NPBL's corporate governance failures, despite the fact that their position is contrary to the NPBL Operating Agreement and Virginia law barring interested director transactions, Va. Code § 13.1-691, and means that NPBL can no longer effectively operate as a corporation where NS and CSXT are at loggerheads and recent proposals to benefit NPBL are rejected out of hand.

74.     Instead, the Individual Defendants have merely parroted NS's self-serving and invalid argument that the changes CSXT proposed are "unnecessary."

75.     NS has conspired with NPBL, through the NPBL Board, management, and operation of the railroad, to exclude CSXT from the market.

76.     The Individual Defendants, in combination with NS, have acted in violation of the law and in breach of their fiduciary, contractual, and statutory duties to NPBL.

## COUNT I
### (Violation of Sherman Act § 1, 15 U.S.C. § 1: Conspiracy to Restrain Trade Against Defendants NS and NPBL)

77.    CSXT incorporates and realleges the allegations of paragraphs 1 through 76 of this Complaint as if fully set forth herein.

78.    Defendants NS and NPBL agreed to and did participate in anticompetitive conduct that unreasonably restrained trade and commerce.  Thus, Defendants engaged in combination and conspiracy and violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

79.    NS conspired with NPBL and the Individual Defendants to take actions and implement policies that effectively foreclosed CSXT from utilizing the NPBL to compete in the provision of multi-modal services at NIT.

80.    This conspiracy has served to enhance and further solidify NS's monopoly power in the relevant market, which has had the effect of severely restricting supply and increasing the prices charged to customers for intermodal transportation.

81.    Defendants' anticompetitive conduct is a *per se* violation of Section 1 of the Sherman Act.

82.    Alternatively, even if Defendants' anticompetitive conduct is judged under the antitrust Rule of Reason, there is no legitimate business justification for Defendants' actions and the conduct through which they adopted and implemented their combination and conspiracy.  Moreover, the anticompetitive effects of Defendants' conduct far outweigh any conceivable procompetitive benefits or

justifications. Even if such a justification existed, any possible procompetitive benefits could have been obtained by less restrictive alternatives.

83.    As a direct and proximate result of Defendants' combination and conspiracy, Defendants have unreasonably restrained trade and commerce. They have excluded actual and potential competition from the relevant market, and profited from their anticompetitive conduct by establishing and maintaining artificially high prices for intermodal transportation services provided to customers, and by otherwise reaping financial benefits from their combination and conspiracy.

84.    As a direct and proximate result of Defendants' combination and conspiracy, CSXT and consumers have been injured. The injury consists of paying artificially inflated prices for intermodal transportation—prices higher than consumers and CSXT would have paid absent Defendants' combination and conspiracy. Their injuries are what the antitrust laws were designed to prevent and flow directly from Defendants' conduct.

## COUNT II
### (Violation of Sherman Act § 2, 15 U.S.C. § 2: Conspiracy to Monopolize Against Defendants NS and NPBL)

85.    CSXT incorporates and realleges the allegations of paragraphs 1 through 84 of this Complaint as if fully set forth herein.

86.    Defendants NS and NBPL acted with a specific intent to combine or conspire to monopolize and to destroy competition in the relevant market.

Defendants devised and implemented a plan in furtherance of the conspiracy to systematically eliminate competition in the relevant market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

87.     NS conspired with NPBL and the Individual Defendants to willfully engaged in a course of exclusionary conduct in furtherance of the conspiracy to obtain a monopoly in the relevant market, including:

(a)     causing the NPBL to reject, without any reasonable, meaningful and lawful consideration or negotiation, CSXT's Service Proposal, thereby denying CSXT access to NIT by rail in competition with NS;

(b)     failing to allow the movement of, in a reasonable and timely manner, cars delivered to the NPBL by CSXT, sacrificing NPBL's own profits from the business CSXT would otherwise deliver;

(c)     discriminating against CSXT by refusing to allow NPBL to use CSXT's fully fueled locomotives to access NIT, while requiring NS-owned or supplied locomotives exclusively to be used by or on the NPBL;

(d)     setting the NPBL's switch rates at levels designed to exclude competition in the relevant market for comparable switch rates, thereby dramatically raising CSXT's costs to serve intermodal rail customers, and diminishing the amounts of freight moved, and related revenues earned by, NPBL;

27

(e)     causing NPBL to terminate its access rights to the track between NS Juncture and Carolina Juncture, i.e. the "diamond" track (with NS then removing that track), which has severely impaired NPBL's ability to efficiently and predictably provide CSXT and other competitors with rail access to NIT; and

(f)     threatening to enter into agreements with NPBL to increase dramatically the charges that NPBL would pay to NS for exercise of the NPBL's rights to access NS trackage, if NPBL provided the service to NIT proposed by CSXT.

88.     Defendants do not have a legitimate business purpose for any of their anticompetitive conduct in furtherance of the conspiracy.    Any claimed procompetitive benefit is pretextual in light of the obvious competitive circumstances and associated marketplace conduct inconsistent with any such benefit.  Defendants' conduct does not result in greater competition in the relevant market.   The only "benefit" that flows from Defendants' conduct is a reduction in competition, and that benefit inures only to NS's advantage, not to that of customers or competition in the relevant market.

89.     Defendants' anticompetitive acts in furtherance of the conspiracy to monopolize have injured competition in the relevant market, suppressed CSXT's provision of intermodal transportation, and the provision of intermodal

transportation of other rail carriers, diminished CSXT's future provision of intermodal transportation and the opportunities for provision of intermodal transportation of other competitors, and increased CSXT's operating costs and the operating costs of other competitors.

90.     Defendants' overall course of conduct has and will continue to, among other things, maintain rates designed to exclude competition in the relevant market, and otherwise deprive customers of their ability to make an unfettered choice of rail carriers on the merits.

## COUNT III
## (Violation of Sherman Act § 2, 15 U.S.C. § 2: Monopolization Against Defendant NS)

91.     CSXT incorporates and realleges all of the allegations of paragraphs 1 through 90 this Complaint as if fully set forth herein.

92.     Defendant NS's conduct constitutes the intentional maintenance of monopoly power in the relevant market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

93.     For the purpose of maintaining its monopoly power, NS committed numerous anticompetitive acts, including:

(a)     causing NPBL to reject, without any reasonable, meaningful and lawful consideration or negotiation, CSXT's Service Proposal, thereby denying CSXT access to NIT by rail in competition with NS;

29

(b)     failing to allow the movement of in a reasonable and timely manner, cars delivered to the NPBL by CSXT, sacrificing NPBL's own profits from the business CSXT would otherwise deliver;

(c)     discriminating against CSXT by refusing to allow NPBL to use CSXT's fully fueled locomotives to access the NIT, while requiring NS-owned or supplied locomotives exclusively to be used by or on the NPBL;

(d)     setting the NPBL's switch rate[s] at levels designed to exclude competition in the relevant market, thereby dramatically raising CSXT's costs to serve intermodal rail customers, and diminishing the amounts of freight moved, and related revenues earned by, NPBL;

(e)     causing NPBL to terminate its access rights to the track between NS Juncture and Carolina Juncture, i.e. the "diamond" track (with NS then removing that track), which has severely impaired NPBL's ability to efficiently and predictably provide CSXT and other competitors with rail access to NIT; and

(f)     threatening to enter into agreements with NPBL to increase dramatically the charges that NPBL would pay to NS for exercise of the NPBL's rights to access NS trackage, if NPBL provided the service to NIT proposed by CSXT.

94.    NS has excluded CSXT from the relevant market and has deprived consumers of the benefits of competition among rail carriers.

95.    NS does not have a legitimate business purpose for any of its anticompetitive conduct.  Any claimed procompetitive benefit is pretextual in light of the obvious competitive circumstances and associated marketplace conduct inconsistent with any such benefit. NS's conduct does not result in greater competition in the relevant market.  The only "benefit" that flows from NS's conduct is a reduction in competition, and that benefit inures only to NS's advantage, not to that of customers or competition in the relevant market.

96.    NS's monopolization has injured competition in the relevant market, suppressed CSXT's provision of intermodal transportation, and the provision of intermodal transportation of other rail carriers, diminished CSXT's future provision of intermodal transportation and the opportunities for provision of intermodal transportation of other competitors, and increased CSXT's operating costs and the operating costs of other competitors.

97.    NS's overall course of conduct has and will continue to, among other things, maintain rates designed to exclude competition in the relevant market, and otherwise deprive customers of their ability to make an unfettered choice of rail carriers on the merits.

## COUNT IV
## (Violation of Sherman Act § 2, 15 U.S.C. § 2: Attempted Monopolization Against Defendant NS)

98.     CSXT incorporates and realleges the allegations of paragraphs 1 through 97 of this Complaint as if fully set forth herein.

99.     Defendant NS acted with a specific intent to monopolize and to destroy competition in the relevant market.   NS devised and implemented a plan to systematically eliminate competition in the relevant market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

100.   NS willfully engaged in a course of exclusionary conduct to obtain a monopoly in the relevant market, including:

(a)     causing the NPBL to reject, without any reasonable, meaningful and lawful consideration or negotiation, CSXT's Service Proposal, thereby denying CSXT access to NIT by rail in competition with NS;

(b)     failing to allow the movement of, in a reasonable and timely manner, cars delivered to the NPBL by CSXT, sacrificing NPBL's own profits from the business CSXT would otherwise deliver;

(c)     discriminating against CSXT by refusing to allow NPBL to use CSXT's fully fueled locomotives to access the NIT, while causing NS-owned or supplied locomotives exclusively to be used by or on the NPBL;

(d)     setting the NPBL's switch rates at levels designed to exclude competition in the relevant market for comparable switch rates, thereby dramatically raising CSXT's costs to serve intermodal rail customers, and diminishing the amounts of freight moved, and related revenues earned by, NPBL;

(e)     mandating NPBL to terminate its access rights to the track between NS Juncture and Carolina Juncture, i.e. the "diamond" track (with NS then removing that track), which has severely impaired NPBL's ability to efficiently and predictably provide CSXT and other competitors with rail access to NIT; and

(f)     threatening to enter into agreements with NPBL to increase dramatically the charges that NPBL would pay to NS for exercising NPBL's rights to access NS trackage, if NPBL provided the service to NIT proposed by CSXT.

101.  NS does not have a legitimate business purpose for any of its anticompetitive conduct.  Any claimed procompetitive benefit is pretextual in light of the obvious competitive circumstances and associated marketplace conduct inconsistent with any such benefit.   NS's conduct does not result in greater competition in the relevant market.   The only "benefit" that flows from NS's

conduct is a reduction in competition, and that benefit inures only to NS's advantage, not to that of customers or competition in the relevant market.

102.   Throughout the time NS engaged in this exclusionary conduct, it had a dangerous probability of succeeding in gaining a monopoly in and controlling the relevant market and excluding its competitors.

103.   NS's attempts to destroy competition in the relevant market have injured competition in the relevant market, suppressed CSXT's provision of intermodal transportation, and the provision of intermodal transportation of other rail carriers, diminished CSXT's future provision of intermodal transportation and the opportunities for provision of intermodal transportation of other competitors, and increased CSXT's operating costs and the operating costs of other competitors.

104.   NS's overall course of conduct has and will continue to, among other things, maintain rates designed to exclude competition in the relevant market, and otherwise deprive customers of their ability to make an unfettered choice of rail carriers on the merits.

## COUNT V
### (Breach of Contract, against Defendant NS)

105.   CSXT incorporates and realleges the allegations of paragraphs 1 through 104 of this Complaint as if fully set forth herein.

106.   CSXT and Defendant NS are co-parties to the NPBL Operating Agreement, which establishes legally enforceable obligations owed by NS to CSXT.

These include, but are not limited to: 1) that shareholders shall maintain and operate NPBL as a "separate organization in which all are to be equally interested," 2) NS will "co-operate cordially in encouraging the business of the [NPBL] for which it is constructed," 3) NS shall "deliver to [NPBL] all cars to be interchanged with other [parties to the agreement]," 4) NS shall ensure its Directors "vote for such resolutions, by-laws or other proceedings as may be necessary to carry into effect" the NPBL Operating Agreement, and 5) the implied covenant of good faith and fair dealing.

107.   Defendant NS has breached these contractual obligations by, *inter alia*, effectively blocking CSXT's access to NS's trackage over which NPBL has rights, by refusing to consider proposals that would improve the revenues of NPBL, by failing to encourage the business of NPBL, and by inducing its employees and/or the Individual Defendants to vote for measures that are harmful to NPBL.

108.   NS's breaches have harmed CSXT, *inter alia*, by reducing the revenues of NPBL, of which CSXT is a shareholder, by causing CSXT to pay high rates when it has utilized the NPBL, and by causing CSXT to lose potential business due to its inability to economically access NIT by rail.

**COUNT VI (Derivative Claim)**
**(Breach of Fiduciary Duties, against Individual Defendants Hall, Hurlbut, Merilli, and Moss)**

109.   CSXT incorporates and realleges the allegations of paragraphs 1 through 108 of this Complaint as if fully set forth herein.

110.   CSXT, in its capacity as a shareholder in NPBL, brings this derivative action on behalf of NPBL and its shareholders, pursuant to Va. Code § 13.1-672.1, against the Individual Defendants for their breaches of fiduciary duties.  CSXT was a shareholder of NPBL at all times during the conduct complained of in this action, and it fairly and adequately represents the interests of NPBL in enforcing NPBL's rights.

111.   CSXT made a written demand to NPBL to take suitable action on June 22, 2018.  NBPL responded to CSXT on September 11, 2018, denying any illegal conduct and disagreeing that any action is warranted in response to CSXT's demand letter.

112.   The Individual Defendants have breached their fiduciary duties to NPBL, including their duties of good faith and loyalty and to act in an honest, fair and reasonable manner in the best interests of NPBL.  Instead of acting in the best interests of NPBL, they have acted predominately in the interests of NS at the expense of NPBL, by, for instance, denying CSXT's Service Proposal and proposal for reforms of NPBL's corporate governance structure, and by failing to appropriately manage NPBL, leading to its deteriorating financial condition.

113.   These breaches have damaged NPBL.  CSXT, on behalf of NPBL, specifically seeks injunctive relief as specified in the prayer for relief as to the Individual Defendants.

## COUNT VII
### (Tortious Interference with Business Expectancy, Against Defendants NS and NPBL)

114.   CSXT incorporates and realleges the allegations of paragraphs 1 through 113 of this Complaint as if fully set forth herein.

115.   As a shareholder of the NPBL, CSXT has reasonable business expectancies, including that the corporation will be managed and directed in a manner that is in accord with the Operating Agreement, allowing CSXT access to NPBL trackage in Hampton Roads.  CSXT reasonably expects economic benefit as a result of being a shareholder of NPBL, such as revenues from NPBL and its ability to access NPBL trackage and NPBL-served industries.  As the majority shareholder of NPBL, NS, and the Individual Defendants, respectively, have knowledge of CSXT's business expectancies.

116.   Defendants NS and NPBL have wrongfully employed improper methods in order to intentionally interfere with these expectancies, such as unfair competition, breach of fiduciary duty by the Individual Defendants, and using the NPBL as a means of self-dealing.

117.   Defendants' interference is without justification and privilege, and has caused CSXT damages, such as lost opportunities for contracts with shipping partners.  Additionally, because Defendants' conduct was intentionally undertaken with malice to harm CSXT and benefit themselves, CSXT is further entitled to punitive damages.

## COUNT VIII
### (Statutory Business Conspiracy, Va. Code § 18.2-499, Against Defendants NS and NPBL)

118.   CSXT incorporates and realleges the allegations of paragraphs 1 through 117 of this Complaint as if fully set forth herein

119.   In violation of Va. Code § 18.2-499, Defendant NS has conspired, by express agreement and tacit understanding, with Defendant NPBL, and with the Individual Defendants, in their capacity as directors and/or managers of NPBL, to intentionally, purposefully, and without lawful justification willfully and maliciously interfere with CSXT's reasonable business expectations, violate the individual Defendants' fiduciary duties to NPBL, and to breach NS's contract with CSXT.  Defendants acted without lawful justification.

120.   This conspiracy has harmed CSXT, *inter alia*, by reducing the revenues of NPBL, of which CSXT is a shareholder, and by causing CSXT to lose potential business with shipping companies, due to its inability to access NIT.

121.   In addition to compensatory damages, CSXT is entitled to treble damages, lost profits, punitive damages, attorneys' fees, and other relief pursuant to Va. Code § 18.2-500.

## COUNT IX
### (Civil Conspiracy, Against Defendants NS and NPBL)

122.   CSXT incorporates and realleges the allegations of paragraphs 1 through 121 of this Complaint as if fully set forth herein.

123.   Defendant NS has conspired, by express agreement and tacit understanding, with Defendant NPBL, and with the Individual Defendants, in their capacity as directors and/or managers of NPBL, to intentionally, purposefully, and without lawful justification willfully and maliciously interfere with CSXT's reasonable business expectations, violate the Individual Defendants' fiduciary duties to NPBL, and to breach NS's contract with CSXT.  Defendants acted without lawful justification.

124.   This conspiracy has harmed CSXT, *inter alia*, by reducing the revenues of NPBL, of which CSXT is a shareholder, and by causing CSXT to lose potential business with shipping companies, due to its inability to access NIT.

125.   In addition to compensatory damages, CSXT is entitled to punitive damages because the Defendants acted with malice.

## PRAYER FOR RELIEF

WHEREFORE, CSXT respectfully prays for the following:

1) That this Court render judgment in favor of CSXT, individually and on behalf of NPBL, and against Defendants;

2) That this Court award CSXT, individually and on behalf of NPBL, actual, consequential, and compensatory damages, and treble damages;

3) That this Court award CSXT punitive damages in amounts to be determined by the jury;

4) That this Court enter an injunction against Defendants from continuing to commit the above referenced violations of federal and state law;

5) That this Court enter an injunction against NS, NPBL, and the Individual Defendants, as appropriate, that restores CSXT's right as a co-equal shareholder and/or establishes an independent board structure as previously proposed by CSXT and that directs that NPBL approve CSXT's Service Proposal;

6) That this Court award CSXT its costs, attorneys' fees and litigation expenses; and

7) That this Court enter such other and further relief as it deems just and proper under the circumstances.

**CSXT requests trial by jury on all counts so triable.**

Dated:  October 4, 2018                    Respectfully submitted,


                                           **CSX TRANSPORTATION, INC.**

                                           *By Counsel*


                                           _____/s/_____
                                           Robert W. McFarland (VSB No. 24021)
                                           Benjamin L. Hatch (VSB No. 70116)
                                           E. Rebecca Gantt (VSB No. 83180)
                                           MCGUIREWOODS LLP
                                           World Trade Center
                                           101 West Main Street, Suite 9000
                                           Norfolk, Virginia  23510-1655
                                           Telephone: (757) 640-3716
                                           Facsimile:  (757) 640-3930
                                           E-mail: rmcfarland@mcguirewoods.com
                                                        bhatch@mcguirewoods.com
                                                        rgantt@mcguirewoods.com