# EXHIBIT F



Law Department
500 Water Street, J150
Jacksonville, Florida 32202
Tel. 904-359-1229
Email: Steven_Armbrust@csx.com

**Steven C. Armbrust**
Assistant General Counsel
Corporate & Transportation Law

Admitted in NY – Not Admitted in FL
FL Authorized House Counsel

April 6, 2018

**VIA ELECTRONIC MAIL AND OVERNIGHT MAIL**

Norfolk & Portsmouth Belt Line Railroad Company
1340 Truxton Street
Chesapeake, VA 23324

Norfolk Southern Railway
Three Commercial Place
Norfolk, VA 23510

Re:     Demand that the NBPL Board and Norfolk Southern Railway Take Remedial Actions at
        April 2018 Meetings of the Board and the NPBL Shareholders

To:     Members of the NPBL Board
        Norfolk Southern Railway

CSX Transportation, Inc. ("CSXT") demands that the Norfolk & Portsmouth Belt Line
Railroad Company ("NPBL"), through its Board of Directors (the "NPBL Board"), and Norfolk
Southern Railway ("NS") take remedial actions at the April 2018 meetings of the NPBL Board
and the NPBL Shareholders to address serious deficiencies in the policies, procedures, controls,
and governance structure of the NPBL.  As detailed below, as a direct result of these
deficiencies, CSXT has been deprived of its contractual right to equal representation on the
NPBL Board, and NS has impermissibly taken, exercised and maintained control of the NPBL,
the NPBL Board and management, and the operation of the NPBL's railroad.  The need for
change has been accentuated by recent events involving NPBL management's response to a new
rate and traffic proposal by CSXT.

Accordingly, CSXT demands that the NPBL and NS take all necessary actions to (i)
afford CSXT equal representation on the NPBL Board, including limiting the shareholder-
designated representatives on the NPBL Board to one director designated by each of NS and

CSXT as its representative (and with qualified independent directors filling the remaining Board seats); (ii) replace certain NPBL management with qualified individuals who are independent of both NS and CSXT; and (iii) adopt a proper corporate compliance program (including a Code of Ethics) that is prepared and made appropriate for the NPBL and independent of any program or code adopted by and for NS.

## CSXT Must be Afforded Equal Representation on the NPBL Board

As you are aware, CSXT and NS (collectively, the "Shareholders") are the holders of all of the issued and outstanding stock of the NPBL. CSXT and NS also, as successors to the original contracting parties, are the sole remaining parties to that certain Agreement dated July 7, 1897 between and among all of the original shareholders of the NPBL (as amended, the "NPBL Agreement"). The NPBL Agreement relates to and governs the ownership and operation of the NPBL and, *inter alia,* creates and establishes various duties and obligations (a) between and among the Shareholders, and (b) owed by the members of the NPBL Board and management (including its President and General Manager) to each Shareholder.

The NPBL Agreement provides that each Shareholder "shall have one representative on the Board" of the NPBL. Agreement at Art. 4. In a Supplemental Agreement dated as of March 1, 1989 (the "Supplemental Agreement"), the three rail carrier companies that comprised the NPBL's shareholders at that time -- CSXT, Norfolk and Western Railway Company ("NW") and Southern Railway Company ("SR") -- agreed to deviate from Article 4's requirement that the "number of directors of NPBL shall always be fixed to correspond to the number of companies owning stock in the NPBL." Pursuant to the Supplemental Agreement, and in view of the unique circumstances that then pertained with respect to NW and SR as separate rail carriers and companies with common corporate ownership, CSXT was afforded the right to appoint two representatives to the NPBL Board, and the other two companies, NW and SR, collectively between them were afforded the right to appoint only three representatives to the NPBL Board.

Years later, NW and SR merged to form the single company now known as NS. The merger of those two companies eliminated the purpose for which the Supplemental Agreement had been created and rendered the Supplemental Agreement's modifications to Article 4 of the NPBL Agreement unwarranted, moot, and contrary to the core organizing principle and intent of the original NPBL shareholders, as set forth in the NPBL Agreement that its railroad "should be constructed, maintained and operated under a separate organization in which all [shareholder companies] are to be equally interested and each to have an equal representation." Agreement p. 1 [first "WHEREAS" paragraph].

Notwithstanding that NW and SR ceased to exist as separate companies, and only two companies, CSXT and NS, are NPBL's sole Shareholders at the present time, CSXT has not been afforded equal representation on the NPBL Board or equal interest in the construction, maintenance and operation of the NPBL railroad, in direct contravention of CSXT's rights under the NPBL Agreement. The NPBL Board currently consists of six voting members and one non-voting member. By-Laws of the NPBL at Art. 3 (1996). NS (through its historic exercise of a greater number of votes as holder of a majority of NPBL's shares) has designated, voted for and controls five members of the NPBL Board (four voting members and one non-voting position), while allowing CSXT to designate only two members for election to the NPBL Board. All three of NS-designated voting non-management directors are current NS employees; the fourth NS-

designated director position is held by the individual serving as President and General Manager of the NPBL, who was appointed to that position by the three NS-designated non-management directors (over the objection of the CSXT-designated directors) and is a former NS employee; and the non-voting position, the Vice President, Comptroller and Corporate Secretary, is held by another former NS employee.  NS has thereby taken and exercises complete control of the NPBL Board, and the management and operation of the railroad, largely to the exclusion of CSXT and without participation by any independent director or officer.

The NPBL Board and NS must take immediate action to provide CSXT with equal representation in NPBL including, but not limited to, the remedial actions stated herein.

## NPBL Management Must be Replaced with Individuals who are Independent

As specified in the NPBL Agreement, the NPBL exists for the *mutual* and *equal* benefit of its shareholders to provide an efficient means of interchanging the traffic of its owners.  In order to advance the purpose for which the NPBL was formed, the original shareholder companies, including those whose successors are currently the Shareholders and parties to the NPBL Agreement, expressly agreed therein that it is in the best interest of all shareholders that each shareholder have equal representation in the NPBL, and committed that each shareholder will "co-operate cordially in encouraging the business of the [NPBL] for which it is constructed."  NPBL Agreement at 1.  The mission and purpose of the NPBL is to be carried out by the NPBL Board, in connection with the NPBL management, which includes the President and General Manager (who acts as both management and a voting member of the NPBL Board), Vice-President, Secretary and Comptroller and Treasurer.

Pursuant to the NPBL By-laws, the NPBL "Board of Directors shall elect from their own number a President and General Manager and shall appoint a Vice-President, a Secretary and Comptroller and a Treasurer."  By-Laws of the NPBL at Art. 4 (1996).  NS has exploited its unequal and improper control of the NPBL Board to appoint and elect an NS-controlled individual to the position of President and General Manager who, in turn, appoints NS-controlled individuals to other NPBL management positions.  Indeed, the current NPBL President, Cannon Moss, his immediate successor, President David Stinson, as well as the rest of the NPBL management, are all former employees of NS who act under and at NS's direction, and each has been reemployed by NS, or expected and/or has been led by NS to believe that they may be employed again by NS in the future.  As a result, the NPBL management, including Mr. Moss in his capacity as both NPBL President and General Manager and a director, are beholden to NS and have a vested interest to act in the best interest of NS, as opposed to both Shareholders and the NPBL's business interests.

Accordingly, the NPBL Board must take immediate action to remedy the conflicts of interests between NS and the NPBL's management including, but not limited to, the remedial actions stated herein.

## NPBL Must Establish a Corporate Compliance Program That Is Independent of NS (and CSXT) and Is Designed for NPBL's Particular Organization

In 2012, CSXT and NS performed a joint audit of the NPBL to evaluate the effectiveness of the NPBL's policies, procedures, controls, and governance structure.  In the Final Audit

Report dated November 27, 2012, CSXT and NS identified deficiencies with the NPBL's corporate governance and observed that (1) an NPBL "corporate compliance program does not exist and general operating policies and procedures are not documented," and (2) the NPBL's "contract approval and execution controls are not sufficient." The Final Audit Report states that these deficiencies create substantial (rated as "medium") and "unnecessary" risks and liabilities for "NPBL and its owners", explains those risks in some detail, and states that the "[a]udit observations will remain open until management's action plans are completed and validated." Final Audit Report at 3.

To remedy these deficiencies, the Final Audit Report contained several recommendations, including that the NPBL: (i) eliminate its reliance on NS's documentation for a compliance program, and policies and procedures; (ii) develop and implement a corporate compliance program appropriate for the company; (iii) develop a Code of Ethics for the NPBL, which is independent of NS's policies and procedures; and (iv) develop a formal process for each of the four types of contracts the NPBL primarily enters into (purchasing, real estate, lease, and right-of-way) that requires approval by more than one officer, as opposed to permitting a single individual to negotiate and execute contracts on the NPBL's behalf.

Despite the findings and recommendations of the audit, the NPBL management, as dominated and controlled by NS, has failed to rectify fully these deficiencies and obtain validation of completion of an effective action plan. The NPBL has also failed to take steps to address other deficiencies in its corporate governance, such as the complete absence of any independent, meaningful periodic review of the performance and compensation of the NPBL President and other members of its management.

Accordingly, the NPBL must take immediate action to remedy these corporate governance deficiencies, including, but not limited to, the remedial actions stated herein.

***

The deleterious effects of the foregoing are underscored by recent events involving the submission of a new rate and traffic proposal by CSXT. Initially, instead of responding to that commercial proposal, NPBL management deferred a response until after a "discussion" with the board at the next NPBL Board Meeting. When pressed for a response before the board meeting, NPBL management responded with numerous potential—though illusory—impediments to the proposal, as opposed to engaging on the terms towards the end of an agreement acceptable by both parties. This kind of response is inconsistent with an impartial management team whose primary purpose should be the success and growth of the business it is managing. Rather, the NPBL management's refusal to respond constructively to the latest proposal from CSXT follows the same pattern of delay and obstruction that the unchecked, NS-controlled NPBL Board and management has perpetrated for years. This practice not only unreasonably and unlawfully harms CSXT as a Shareholder in the NPBL and a competitor of NS, but also results in the NPBL acting contrary to its own interests.

**Requested Remedial Actions:**

CSXT demands that the NPBL Board and NS take any and all actions necessary in advance of, at and following the upcoming annual Shareholder Meeting in April 2018 (the "Shareholders' Meeting") and the contemporaneous meeting of the NPBL Board to:

a. Restructure the NPBL's governance systems to provide for equal representation of both of the Shareholders on the NPBL Board, and ensure that the NPBL is and remains "constructed, maintained and operated under a separate organization in which all [shareholder companies] are to be equally interested and each to have an equal representation." Necessary action by the NPBL Board and Shareholders include:

1. At the Shareholders' Meeting, voting the Shareholders' respective shares (i) to elect only one director designated by, respectively, each of NS and CSXT; and (ii) elect as voting directors four disinterested qualified individuals, each of whom is fully independent of both NS and CSXT (each an "Independent Director"). Each Independent Director shall meet the requirements for independence set forth on Exhibit A hereto, which requirements are based on those found in Section 303A.02 of the New York Stock Exchange Listed Company Manual.

2. At a meeting of the NPBL Board held during a temporary adjournment of the Shareholders' Meeting, immediately following the election of directors referenced above, the newly-elected directors must then elect and appoint, from among the four Independent Directors, a qualified individual to serve as President and General Manager of NPBL.

3. To facilitate the effective and fair implementation of items "a.1" and "a.2" above, within five business days of the date of this letter, the NPBL Board should establish a nominating committee to identify and nominate at least four candidates for election as Independent Directors. The nominating committee should be comprised of two current directors of the NPBL (only one of whom may be a director designated by NS and the other a director designated by CSXT), and the nominating committee should be authorized and directed to engage independent professionals as consultants to assist in identifying and qualifying candidates to serve as the four Independent Directors.

4. One of the Independent Directors identified above should be nominated for election and appointment by the NPBL Board with the expectation that this Independent Director will serve as President and General Manager of the NPBL. If no candidate for Independent Director can be identified who is qualified and willing to serve as President and General Manager by the April meetings, Cannon Moss may be elected to continue serving as a Director and appointed to continue serving as President and General Manager, provided it is understood and agreed (A) he will be continuing to serve in those positions on an interim basis and (B) he (x) promptly upon the approval of a new candidate for President and General Manager by the nominating committee described in "b" below and approved by a majority of the other voting Directors, or (y) immediately if a majority of the other voting Directors, in their sole discretion, conclude that Mr. Moss has taken

any material action or omitted to act in any way, for NPBL, that reflects a lack of independence from NS, will resign from the positions of Director, and President and General Manager of NPBL.

b. After establishing the new NPBL Board as provided in "a.1" above, establish (i) a standing nominating committee of the NPBL Board that includes no less than two Independent Directors, and both the CSXT- and the NS-designated Directors if either wants to participate on the committee, but shall not include the President and General Manager if Cannon Moss is then serving in that position; (ii) a policy setting forth the criteria for selection of candidates for the NPBL management positions and Independent Directors, which criteria shall include, without limitation, a requirement that the President and General Manager of the NPBL be selected from among the Independent Directors and must at all times be and remain independent of, and free of conflicts of interest concerning, both of the Shareholders and their respective Affiliates (including, without limitation, that such candidates would qualify as independent under the criteria set forth in Exhibit A); and (iii) a policy setting forth the qualifications and criteria for selection and appointment of the Vice-President, Secretary and Comptroller and Treasurer that would ensure that the individual appointed to and holding that position is independent of, and free of conflicts of interest concerning, both of the Shareholders and their respective Affiliates.

c. Fully and consistently implement a corporate compliance program appropriate for the NPBL that is independent of NS's policies and procedures.

d. Fully and consistently implement formal conflict of interest policies and procedures that are independent of NS's conflict of interest policies and procedures.

e. Develop and document a formal process for each of the four types of contracts the NPBL primarily enters into (purchasing, real estate, lease, and right-of-way) that eliminates single contract authorization, and provides for the review and approval of contracts by at least two officers prior to execution.

f. Establish a committee of Independent Directors charged with, no less than annually, reviewing the performance of the NPBL's President and General Manager, and all other officers, managers and superintendents, and with reviewing and determining the reasonable compensation for those executive and management employees.

Very truly yours,

Steven Armbrust

**ELECTRONIC MAIL DISTRIBUTION**

      Jermaine Swafford (Jermaine_Swafford@csx.com)

      Drew Glassman (Drew_Glassman@csx.com)

      Cannon Moss (Cannon.Moss@nscorp.com)

      Donna Coleman (Donna.Coleman@nscorp.com)

      Jerry Hall (Jerry.Hall@nscorp.com)

      Thomas Hurlbut (Thomas.Hurlbut@nscorp.com)

      Philip Merilli (Philip.Merilli@nscorp.com)

EXHIBIT A

INDEPENDENT DIRECTOR REQUIREMENTS

No person shall serve as an Independent Director of the NPBL if:

(i)  The person is, or has been within the last three years, an employee of a Shareholder or a Shareholder's Affiliate (as defined below), or an immediate family member is, or has been within the last three years, an executive officer, of a Shareholder or a Shareholder's Affiliate;

(ii) The person has received, or has an immediate family member who has received, during any twelve-month period within the last three years, more than $120,000 in direct compensation from a Shareholder or a Shareholder's Affiliate, other than director and committee fees and pension or other forms of deferred compensation for prior service (provided such compensation is not contingent in any way on continued service);

(iii) (A) The person is a current partner or employee of a partnership, company or other business organization (a "firm") that is a Shareholder or a Shareholder's Affiliate's internal or external auditor; (B) the person has an immediate family member who is a current partner of such a firm; (C) the person has an immediate family member who is a current employee of such a firm and personally works on a Shareholder or a Shareholder's Affiliate's audit; or (D) the person or an immediate family member was within the last three years a partner or employee of such a firm and personally worked on a Shareholder or a Shareholder's Affiliate's audit within that time;

(iv) The person or an immediate family member is, or has been with the last three years, employed as an executive officer of another company where any Shareholder's or Shareholder's Affiliate's present executive officers at the same time serves or served on that company's compensation committee;

(v) The person is a current employee, or an immediate family member is a current executive officer, of a company that has made payments to, or received payments from, a Shareholder or a Shareholder's Affiliate for property or services in an amount which, in any of the last three fiscal years, exceeds the greater of $1 million, or 2% of such other company's consolidated gross revenues; or

(vi) The person otherwise has a material relationship with a Shareholder or a Shareholder's Affiliate (either directly or as a partner, shareholder or officer of an organization that has a relationship with a Shareholder or a Shareholder's Affiliate).

As used herein, the term "Affiliate" means, when used with respect to a specified person or entity, another person or entity that either directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, the person or entity specified.  For purposes of this definition, "control" (and its derivatives) means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person or entity, whether through ownership of equity, voting or other interests, as trustee or executor, by contract or otherwise.