**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**CSX TRANSPORTATION, INC.,**
**individually and on behalf of**
**NORFOLK & PORTSMOUTH BELT LINE**
**RAILROAD COMPANY,**

**Plaintiff,**

v.                                    **Civil Action No. 2:18-cv-530-MSD-LRL**

**NORFOLK SOUTHERN RAILWAY COMPANY** *et al.*,

**Defendants.**


**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS BY**
**NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY**

Norfolk and Portsmouth Belt Line Railroad Company (the "Belt Line"), by counsel,

submits this Memorandum in Support of its Motion to Dismiss all claims asserted against it by

plaintiff CSX Transportation, Inc. ("CSXT").

James L. Chapman, IV, VSB No. 21983
W. Ryan Snow, VSB No. 47423
Darius K. Davenport, VSB No. 74064
David C. Hartnett, VSB No. 80452
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1500
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com
ddavenport@cwm-law.com
dhartnett@cwm-law.com
*Attorneys for Norfolk and Portsmouth Belt*
*Line Railroad Company*

## Table of Contents

Introduction and Background.............................................................................................................. 2

Standard of Review............................................................................................................................ 6

Argument ............................................................................................................................................ 7

*All Claims*

1.   All Counts against the Belt Line should be dismissed because CSXT cannot force the Belt Line to perform switching services at a preferential rate below the uniform rate. ................................................. 7

2.   All Counts against the Belt Line should be dismissed or stayed as preempted or precluded by the exclusive jurisdiction of the Surface Transportation Board under 49 U.S.C. § 10501(b). ...................... 9

*Federal Law Claims*

3.   The Belt Line cannot be liable for conspiracy with NS under § 1 or § 2 of the Sherman Act because there can be no conspiracy between a parent and its majority-owned subsidiary. .................... 12

    A.  Under *Copperweld* and its progeny, a parent and a majority-owned subsidiary cannot conspire with each other under § 1 or § 2. .................................................................. 12

    B.  CSXT alleges that the Belt Line is a majority-owned subsidiary of NS. ............................... 14

4.   Even if conspiracy were possible, the Belt Line cannot be liable under § 1 or § 2 of the Sherman Act because CSXT fails to allege (and cannot allege) that the Belt Line denied CSXT access to any market. .................................................................................................................. 15

*Virginia Law Claims*

5.   Counts VII, VIII and IX are time barred because CSXT claims to have first suffered damages more than five years ago. ........................................................................................................ 16

    A.  Under Virginia law, the statute of limitations starts to run when a plaintiff    suffers any injury, no matter how slight, resulting from the tortious    interference or conspiracy.................. 17

    B.  The statute of limitations began to run in 2008 when CSXT first suffered injury resulting from the alleged tortious interference and conspiracy. ................................................................ 19

6.   Count VII should be dismissed because CSXT fails to state a claim for tortious interference with a business expectancy under Virginia law. ........................................................................... 20

A.  CSXT's alleged business expectancy is a general interest shared by all stockholders and can be brought only as a derivative claim. ......................................................................................... 20

B.  Even if CSXT could bring the claim on its own behalf, it fails to allege a valid business expectancy. ............................................................................................................................ 20

7.  Counts VIII and IX should be dismissed because CSXT fails to state a claim for business conspiracy or common law conspiracy under Virginia law. .................................................. 21

A.  The Belt Line cannot have engaged in a business or civil conspiracy with NS because there can be no conspiracy between a parent and its majority-owned subsidiary. ................................. 21

B.  CSXT fails to plead a facially plausible conspiracy. .............................................................. 23

8.  The Court should decline to exercise supplemental jurisdiction over the Virginia law claims. .... 24

Conclusion ............................................................................................................................ 26

**Introduction and Background**

*The Belt Line*

The Belt Line was founded in 1896 by eight long-haul railroads that operated in Norfolk and Portsmouth.  From its beginning, it was established not to make a profit, but to more efficiently handle local rail traffic for its long-haul railroad owners.  As a result of mergers and consolidations approved by the former Interstate Commerce Commission ("ICC"), the Belt Line now has just two owners:  CSXT and Norfolk Southern Railway Company ("NS").  As explained below, this lawsuit is an attempt by the minority shareholder to obtain for itself a preferential service rate at the expense of the Belt Line, which contravenes the terms of the 1897 Operating Agreement that CSXT incorporated into its Complaint.  *See* Compl., Ex. A.

Today, the Belt Line is one of more than 500 short-line railroads in the United States.  It operates over less than 30 miles of track in the cities of Norfolk, Portsmouth and Chesapeake.  Its track connects with its owners' track, allowing the Belt Line to "interchange" freight cars with them for pickup and delivery of goods.  When it does so, the Belt Line is obligated to charge a uniform rate for handling those cars, regardless of the distance they travel.

Importantly, this uniform rate requirement is established in the very Operating Agreement upon which CSXT bases its Complaint, and can be adjusted only as prescribed in that agreement:

> *Ninth*.—That a uniform rate shall be fixed for the movement of freight cars over the said [Belt Line] railroad, regardless of distance, and that the rate per loaded freight car shall be so adjusted from time to time as to yield a net revenue sufficient to pay the interest upon the bonds outstanding and a dividend of six per cent on the stock.

Compl., Ex. A at 3-4 (emphasis added).[1]

---

[1]    The Belt Line was originally chartered by the Virginia General Assembly as the Southeastern and Atlantic Railroad Company, which appears in the language of the Operating Agreement.  *See* Compl., Ex. A.  The General Assembly amended the Charter in 1898 to rename the company Norfolk and Portsmouth Belt Line Railroad Company.

The current uniform rate is $210 per loaded freight car (the switch fee), established by the Board of Directors in 2009. *See* Compl., ¶ 34, Ex. E at 4 ("The past two decades have demonstrated that the NPBL general tariff charge of $210 per car….") and 11 ("Presently, the NPBL's switch rate of $210 per car…."). It is posted as part of the Belt Line's public tariff on its website.[2]

*The Belt Line's Trackage Rights and*
*The Pending STB Proceeding*

Since 1917, the Belt Line has had the right to operate its trains over rail lines now owned by NS extending from NS Junction in Chesapeake to West Junction in Norfolk, a distance of approximately 11 miles. These trackage rights form a connection between the main body of the Belt Line's rail system at NS Junction and an otherwise isolated Belt Line line that extends from West Junction into Norfolk International Terminal ("NIT"). NIT is a truck-rail-marine terminal to which the Belt Line has access via its NS trackage rights.

NS terminated the 1917 and related trackage rights agreements between itself and the Belt Line as of July 31, 2016. After those parties were unable to agree on new compensation terms for the Belt Line's ongoing operations over NS's lines, NS initiated a proceeding against the Belt Line at the U.S. Surface Transportation Board ("STB") to have the STB establish new terms and conditions governing the Belt Line's trackage rights.[3] *Norfolk Southern Railway Co. – Petition to Set Trackage Rights Compensation – Norfolk & Portsmouth Belt Line Railroad Co.*, Docket No.

---

[2]     A true copy of the published tariff showing the $210 rate (Item 70) is also attached to this Memorandum as **Exhibit 1**. *See Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) (in reviewing Rule 12(b)(6) motion, courts "may consider documents attached to the complaint, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic").

[3]     The STB was created by the ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 ("ICCTA"), which abolished the ICC and transferred its rail functions to the STB. ICCTA also recodified the provisions of the Interstate Commerce Act, 49 U.S.C. §§ 10101, *et seq.*

FD 36223 (STB, petition filed Sep. 13, 2018).[4]   The Belt Line responded to NS's petition on

October 3, 2018, agreeing to initiation of an STB proceeding but objecting to various elements of

the petition and NS's proposal for how the matter should be handled by the STB.

On the same day, CSXT filed a petition for leave to intervene in the STB proceeding,

asserting it had a "significant interest" in the STB matter.[5]   CSXT explained that "[a]s a user of

NPBL, CSXT plans to serve customers at or near NIT by handing traffic off to NPBL and receiving

traffic from NPBL for movements over the trackage rights.   When trackage rights fees are too

high, it becomes economically infeasible for CSXT to serve customers at or near NIT via NPBL."

CSXT Pet. to Intervene, at 6.   In a subsequent STB filing, CSXT reiterated that it "has a compelling

interest in participating in this proceeding," because NS's requested relief at the STB would "make

it even less likely that CSXT will be able to access those intermodal customers [at NIT] by rail in

the future."   STB Docket No. FD 36223, CSXT letter filing dated Oct. 26, 2018.[6]

The pending STB proceeding in Docket No. FD 36223 is based on the seminal Supreme

Court holding in *Thompson v. Texas Mexican Ry. Co.*, 328 U.S. 134 (1946).   That decision

established that: (1) even where an underlying trackage rights contract has expired or been

terminated, trackage rights operations must be allowed to continue unless and until their

discontinuance is authorized by the agency (*id*. at 144-46, citing former 49 U.S.C. § 1(18), now

49 U.S.C. § 10903); and (2) in those circumstances the agency has exclusive jurisdiction to

determine new compensation terms to govern the trackage rights arrangement (*id*. at 146-48, citing

former 49 U.S.C. 5(2)(a), now 49 U.S.C. § 11323(a)(6)).

---

[4]     A copy of NS's STB petition is attached as **Exhibit 2**.  This Court can take judicial notice
of the STB ruling under *Trimble Navigation*, 484 F.3d at 705.

[5]     A copy of CSXT's petition to intervene in the STB proceeding is attached as **Exhibit 3**.

[6]     A copy of CSXT's October 26, 2018 letter filing at the STB is attached as **Exhibit 4**.

*The Complaint*

Through its Complaint, filed the day after its petition to intervene in the STB proceeding, CSXT seeks to obtain for itself a below-cost rate of $80 per car for freight that it would prefer to move by rail (instead of truck) from Portsmouth to NIT.  Five counts are asserted against the Belt Line:  two federal antitrust claims (Counts I and II), and Virginia law claims for tortious interference with a business expectancy (Count VII), statutory business conspiracy (Count XIII), and common-law civil conspiracy (Count IX).

All claims are asserted jointly and severally against the Belt Line and its majority stockholder, NS.  All are also based on just four factual scenarios, which CSXT says evidence a concerted effort between the defendants to harm CSXT.  CSXT alleges that:

- The Belt Line's decision in 2008 to terminate certain track "access rights" has constrained its ability to operate efficiently, Compl., ¶¶ 47, 58, even though the decision was approved by both the Board of Directors and the STB.[7]

- The Belt Line's $210 switch fee excludes competition in the market and has raised CSXT's costs, *id.* at ¶¶ 34, 57, even though the Board of Directors lawfully adopted this rate in 2009 in compliance with the Operating Agreement.

- The Belt Line improperly rejected CSXT's proposal for a preferential rate in 2010, *id.* at ¶ 46, even though adopting such a rate would have violated the Operating Agreement.

- The Belt Line improperly rejected CSXT's Service Proposal in 2018 (essentially a reprisal of CSXT's 2010 proposal) to prevent CSXT from accessing NIT by rail, *id.* at ¶ 54, even though CSXT has never in fact been denied such access and the Complaint acknowledges CSXT's use of the Belt Line to access NIT as recently as 2015.  *Id.* at ¶¶ 4, 15.

---

[7]     STB authorization was issued in *Norfolk and Portsmouth Belt Line Railroad Co. – Discontinuance of Trackage Rights Exemption – In Chesapeake, VA*, Docket No. AB-1024X (STB served May 15, 2008), 73 Fed. Reg. 28188 [2008 WL 2047779], attached as **Exhibit 5**.  The exclusive forum for seeking further relief as to that matter is also the STB.  *See* 49 U.S.C. § 10501(b).  As the successor to the ICC, the STB oversees all aspects of rail operations subject to its jurisdiction, including the Belt Line.

The bulk of the Complaint is devoted to the fourth scenario.  CSXT alleges that "NS, in conspiracy with the Individual Defendants and NPBL, has caused NPBL to reject, without any reasonable, meaningful and lawful consideration or negotiation, CSXT's Service Proposal, thereby effectively denying CSXT access to NIT by rail in competition with NS."  *Id.* at ¶ 54.  Critically, CSXT does not allege that the Belt Line rejected CSXT's *access* to NIT.  In its carefully-worded allegation, CSXT alleges only that the Belt Line rejected CSXT's *Service Proposal*.

To be clear, CSXT's Service Proposal is that the Belt Line reduce its $210 uniform rate to give CSXT a preferential rate of $80.  *See* Compl., Ex. E at 3 ("We propose $80 per car…").  While CSXT touts the possibility of increased "revenue" for the Belt Line (as opposed to profit), it never reveals that, even assuming the Belt Line could reduce its uniform rate despite the Operating Agreement, the Belt Line would have to commit to handling some 18,000 railcars per year at a fraction of its designed-to-break-even tariff.

The relief CSXT seeks in the Complaint is intentionally vague.  CSXT asks for damages, but no damages are identified.  *Id.*, ¶¶ 2-3.  CSXT asks for an injunction "against Defendants from continuing to commit the above referenced violations of federal and state law," but no violations are identified.  *Id.*, ¶ 4.  CSXT asks for an injunction that "restores CSXT's right as a co-equal shareholder and/or establishes an independent board structure," but CSXT is not a co-equal shareholder.  *Id.*, ¶ 5.  CSXT is a minority shareholder, with no power to force the Belt Line to take economic risks that advance only CSXT's interests.

As set forth below, all of CSXT's claims against the Belt Line fail as a matter of law.

## **Standard of Review**

A motion to dismiss under Rule 12(b)(6) "challenges the legal sufficiency of a complaint considered with the assumption that the facts alleged are true." *Francis v. Giacomelli*, 588 F.3d

186, 192 (4th Cir. 2009) (citations omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"The inclusion of conclusory legal terms . . . does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint do not support the legal conclusion." *Trigon Ins. Co. v. Columbia Naples Capital, LLC*, 235 F.Supp.2d 495, 500 (E.D. Va. 2002). Once the Court has rejected "bare assertions" that amount to no more than a "formulaic recitation of the elements," *Twombly*, 550 U.S. at 546, the Court must conduct a "context-specific analysis" of the remaining allegations, drawing on "judicial experience and common sense" to determine whether the allegations "produce an inference of liability strong enough to nudge the plaintiff's claims across the line from conceivable to plausible." *Nemet Chevrolet, Ltd. v. Consumer-affairs.com, Inc.*, 591 F.3d 250, 256 (4th Cir. 2009) (internal quotations omitted).

## Argument

### All Claims

1.  **All Counts against the Belt Line should be dismissed because CSXT cannot force the Belt Line to perform switching services at a preferential rate below the uniform rate.**

    CSXT asks this Court for essentially two things: to force the Belt Line to accept CSXT's Service Proposal, and to award CSXT unspecified damages until the Belt Line allows CSXT to access NIT at a lower rate than the Belt Line's uniform tariff. *See* Compl., ¶ 40. CSXT's predecessors in the Operating Agreement long ago foreclosed this relief. *See* Compl., Ex. A.

    The premise underlying both demands is flawed. CSXT presumes that the Belt Line has the power to offer CSXT a rate different from the Belt Line's tariff, but the Belt Line has no such power. What is more, CSXT's predecessor railroads made sure of that over 120 years ago. In the

Operating Agreement, CSXT's predecessors unquestionably agreed that the Belt Line must charge a uniform rate for the movement of railcars.  Compl., Ex. A at 3-4 ("a uniform rate shall be fixed for the movement of freight cars over the said [Belt Line] railroad, regardless of distance. . ."). That agreement was reached to prevent the very sort of self-dealing that CSXT now seeks.

CSXT, as successor, also waived its right to seek a preferential rate when it executed the Supplemental Agreement in 1989, which preserved the uniform tariff.  *See* Compl., Ex. C at 4 ("Nothing herein shall be deemed to amend, alter, or affect any other provision of the NPBL [Operating] Agreement.").  Courts are not at liberty to rewrite a contract simply because one party believes it reaches an unfair result.  *See Verling v. Quarles*, 217 Va. 188, 191, 227 S.E.2d 684, 686 (1976) (reversing judgment that "made a material departure from the terms of the contract and, in effect, made an agreement for the parties and then sought to compel them to execute it"); *Bank of Southside Va. v. Candelario*, 238 Va. 635, 640, 385 S.E.2d 601, 603 (1989) ("Courts will not rewrite contracts; parties to a contract will be held to the terms upon which they agreed.").

The Belt Line can change its uniform rate only as authorized by its Board of Directors. Virginia law does not allow a party to modify through judicial action the unambiguous terms of an agreement.  *See Verling*, 217 Va. at 191, 227 S.E.2d at 686; *Candelario*, 238 Va. at 640, 385 S.E.2d at 603; *Barber v. VistaRMS, Inc.*, 272 Va. 319, 329-30, 634 S.E.2d 706, 712 (2006) (affirming dismissal of minority shareholder's writ of mandamus to compel modification of addendum to shareholder agreement).  The only permissible basis for the Board of Directors to change the uniform rate under the Operating Agreement is "to yield a net revenue sufficient to pay the interest upon the bonds outstanding and a dividend of six per cent on the stock."  Compl., Ex. A at 4.  CSXT does not allege that a rate change is needed to pay interest on bonds or a dividend. Its only allegation is that it desires a lower rate to improve its own profitability.  *See* Compl., ¶¶

64-66.  Because CSXT cannot force the Belt Line to accept that lower rate, all of its Counts against

the Belt Line fail to state claims upon which relief can be granted and should be dismissed.

**2.      All Counts against the Belt Line should be dismissed or stayed as preempted or precluded by the exclusive jurisdiction of the Surface Transportation Board under 49 U.S.C. § 10501(b).**

The relief CSXT seeks is exclusively within the jurisdiction of the STB and expressly

preempted.   Given the pendency of the trackage rights case at the STB, granting CSXT a

prescribed, preferential Belt Line switching rate would impermissibly and unreasonably interfere

with STB's exclusive regulatory functions.   Under ICCTA,

> The jurisdiction of the [Surface Transportation] Board over –
>
>> (1)      transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers . . .
>
> is exclusive.  Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b).

Where, as in the case of ICCTA, Congress has enacted an express preemption provision,

the scope of matters intended to be preempted is determined by looking primarily at the language

of the preemption provision and the statutory framework surrounding it.  *Medtronic, Inc. v. Lohr*,

518 U.S. 470, 486 (1996).  When state law is involved, preemption is based upon the Supremacy

Clause in Article VI, Clause 2 of the U.S. Constitution, which forbids the enforcement of any state

law that conflicts with a valid federal statute.  *Fidelity Fed. Sav. & Loan Ass'n. v. de la Cuesta*,

458 U.S. 141, 152-53 (1982).

Counts VII, VIII and IX of CSXT's Complaint allege state law claims of conspiracy and

tortious interference that are categorically preempted by ICCTA.  *Fayus Enterprises v. BNSF Ry.*

*Co.*, 602 F.3d 444, 454 (D.C. Cir. 2010) (allowing state law antitrust claims to proceed against defendant railroads impermissibly "resurrects in a different form state-level regulation of railroads, by inviting judicial supervision of the reasonableness and fairness of rates charged to shippers").[8] Accordingly, all of them should be dismissed as preempted.

Despite the literal language of 49 U.S.C. § 10501(b) (remedies under ICCTA "preempt the remedies provided under *Federal* or State law"), courts and the STB have generally used a more searching standard to determine if other federal laws are preempted by ICCTA.[9] "If an apparent conflict exists between ICCTA and another federal law, then the courts must strive to harmonize the two laws, giving effect to both laws if possible."[10]

CSXT's Counts I and II may not be categorically preempted as are its state law claims, but the relief CSXT seeks – a prescribed, preferential per-car switching rate to and from NIT – is exceedingly likely to conflict with the STB's role in prescribing the trackage rights compensation due from the Belt Line to NS, which will be a major cost element in the Belt Line's switching rates. That is, the trackage rights compensation terms that NS has asked the STB to prescribe directly inform the rate that the Belt Line may charge for its switching services going forward. And even CSXT recognizes that the STB's trackage rights prescription will affect the pricing and

---

[8]    Even before ICCTA, federal law "completely preempted state common law remedies for railroad price discrimination among shippers." *Fayus*, 602 F.3d at 451 (citing *G&T Terminal Packaging Co. v. Consol. R. Corp.*, 830 F.2d 1230, 1233-1236 (3d Cir. 1987), *cert. denied*, 485 U.S. 988 (1988)).

[9]    Whether one federal statute prevents application of another is a question of "preclusion," not "preemption." *See POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, ___, 134 S. Ct. 2228, 2236 (2014).

[10]    *Ass'n of Amer. Railroads v. South Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1097 (9th Cir. 2010); *See also United States Environmental Protection Agency – Petition for Declaratory Order*, Docket No. FD 35803 (STB served Dec. 30, 2014), slip op. at 8 [2014 WL 7392860, *7].

competitiveness of the Belt Line's service to CSXT, as evidenced by its STB filings.  *See* **Exhibits 3** and **4**.  This is a case where the remedies under another federal statute *would* be inconsistent with the STB's functions under ICCTA, and it is simply not possible to harmonize the statutory schemes to avoid the conflict.

Under 49 U.S.C. § 11321(a), any trackage rights arrangement between the Belt Line and NS that is approved by the STB "is exempt from the antitrust laws . . . as necessary to let that rail carrier, corporation or person carry out the transaction, hold, maintain, and operate property, and exercise control or franchises acquired through the transaction."[11]  The exemption protections of section 11321(a) reinforce the conflict between the pending STB proceeding and the federal remedies that CSXT seeks here.  By seeking to intervene in the STB proceeding – which the Belt Line has supported – CSXT would be able to advance its interests at the STB and can thereby influence the switching rates that the Belt Line subsequently would charge for services that depend upon the Belt Line's exercise of trackage rights over NS-owned lines.  Under the circumstances, there is good cause to find that ICCTA preempts both the federal and state law claims in CSXT's complaint, and that the Complaint should be dismissed.

In the alternative, this Court should stay this action pending completion of the STB's trackage rights compensation proceeding, an acknowledgement of the STB's exclusive jurisdiction to resolve the trackage rights dispute and its exclusive authority to prescribe compensation terms that necessarily will inform the Belt Line's switching charges.[12]

---

[11]     The STB's trackage rights compensation authority derives from 49 U.S.C. § 11323(a)(6), a provision governing transactions subject to the protections of section 11321(a).

[12]     *Thompson v. Texas Mexican Ry.*, 328 U.S. 134, 147 (1946) (citations omitted) (the STB is exclusively vested with the power to determine the terms and conditions under which trackage rights may be acquired, not the courts, and it is the function of the STB to prescribe terms where the parties to a trackage rights arrangement are unable to agree); *see also S.S.W., Inc. v. Air*

*Federal Law Claims*

3.     **The Belt Line cannot be liable for conspiracy with NS under § 1 or § 2 of the Sherman Act because there can be no conspiracy between a parent and its majority-owned subsidiary.**

Counts I and II should be dismissed because the Belt Line and NS are incapable of conspiring in violation of § 1 and § 2 of the Sherman Act as a matter of law. Section 1 provides that, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce … is declared to be illegal." 15 U.S.C. § 1. "Thus, to establish a § 1 violation, a plaintiff must show: (1) a contract, combination or conspiracy; (2) that imposed an unreasonable restraint of trade." *Am. Chiro. Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 223 (4th Cir. 2004). Section 2 provides that, "Every person who shall monopolize, or attempt to monopolize, any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony." 15 U.S.C. § 2. To state a claim for conspiracy to monopolize under § 2, a plaintiff must show (1) concerted action between two or more entities, (2) a specific intent to achieve an unlawful monopoly, and (3) commission of an overt act in furtherance of the conspiracy. *Masco Contractor Services E., Inc. v. Beals*, 279 F. Supp. 2d 699, 708 (E.D. Va. 2003). Both claims fail in the absence of a conspiracy.

A.   **Under *Copperweld* and its progeny, a parent and a majority-owned subsidiary cannot conspire with each other under § 1 or § 2.**

In *Copperweld Corp. v. Indep. Tube Corp.,* 467 U.S. 752 (1984), the U.S. Supreme Court held that a parent and its wholly-owned subsidiary are legally incapable of conspiring for purposes of the Sherman Act. *Id.* at 771. As the Court explained, when a parent and its wholly-owned

_____

*Transport Ass'n of America*, 191 F.2d 658 (D.C. Cir. 1951) (in the context of regulated industries, federal antitrust laws may be superseded by specific regulatory statutes in the presence of a potential conflict, and, therefore, an appropriate balancing of federal regulatory and antitrust statutes is best be accomplished by staying the antitrust action pending completion of a related administrative proceeding).

subsidiary take concerted action, there is "no sudden joining of economic resources that had previously served different interests, and there is no justification for § 1 scrutiny." *Id.* Their activity therefore "must be viewed as that of a single enterprise." *Id.*

Courts have since applied the *Copperweld* rationale to majority-owned subsidiaries like the Belt Line. In *Novatel Comm., Inc. v. Cellular Telephone Supply, Inc.*, 1986 WL 15507, *9 (N.D. Ga. 1986), for example, the court held that a 51% ownership interest made a parent and its subsidiary incapable of conspiring under the Sherman Act. Likening the situation to *Copperweld*, the court reasoned that majority ownership means a parent can legally control the subsidiary:

> The Court [in *Copperweld*] noted that, whether or not the parent keeps a tight reign over the subsidiary, the interests of the parent are always served by the wholly owned subsidiary and if the subsidiary fails to act in the parent's best interests, the parent may assert full control at any time. The same can be said about Novatel-Canada and its 51% owned subsidiary Carcom. The 51% ownership retained by Novatel-Canada assured it of full control over Carcom and assured it could intervene at any time that Carcom ceased to act in its best interests. Thus, Carcom and Novatel-Canada are incapable of conspiring for purposes of § 1 of the Sherman Act.

*Id.*

Other jurisdictions also have held that a parent's majority ownership is sufficient by itself to establish immunity. For example, in *Bell Atlantic Bus. Sys. Serv. v. Hitachi Data Sys. Corp.*, 849 F. Supp. 702, 706 (N.D. Cal. 1994), where a parent owned 80% of a subsidiary, the court stated, "Under the reasoning of *Copperweld* and its progeny, it is not necessary to conduct a factual inquiry to determine whether a parent and a subsidiary over which the parent has legal control can conspire in violation of § 1 of the Sherman Act." The court explained how "*Copperweld* found that a parent and a wholly-owned subsidiary are considered the 'same entity' for antitrust purposes because the parent has the power to exercise full control over its subsidiary," and concluded that, "*for the same reasons, a parent and a subsidiary over which the parent has legal control cannot*

*conspire to restrain trade*." *Id.* (emphasis added); *see also Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 344 (N.D. Ill. 1997) (parents and majority-owned subsidiaries are incapable of conspiring for purposes of the Sherman Act); *Coast Cities Truck Sales v. Navistar Int. Transp. Co.*, 912 F. Supp. 747, 765-66 (D.N.J. 1995) (holding that parent's 70% ownership established control over subsidiary).

While the Fourth Circuit has not directly addressed the majority-owned subsidiary issue, in *American Chiropractic*, it held that a health insurer "lacked the legal capacity" to engage in an antitrust conspiracy with medical doctors serving on a committee established by the insurer.  367 F.3d at 224.  Relying on *Copperweld*, the Fourth Circuit explained that the committee was "without question a corporate agent" of the insurer:  it was chaired by the insurer's employee and the insurer had "ultimate control" over the committee's actions, thus creating a "unity of interest."  *Id.*

Further, in the context of the Sherman Act, the intracorporate immunity doctrine under § 1 also excludes a claim of concerted monopolistic activity under § 2.  *See Oksanen v. Page Mem. Hosp.*, 945 F.2d 696, 710 (4th Cir. 1991).  In *Oksanen*, the Fourth Circuit held that, because hospital employees were incapable of conspiring with their employer to violate § 1 of the Sherman Act due to intra-enterprise immunity, they were also incapable of acting in concert to violate § 2. *Id.* at 710.  As the Fourth Circuit explained, "Because the hospital and medical staff lack the capacity to conspire under section 1, they also lack the capacity under section 2."  *Id.*; *see also Adv. Health-Care Serv. v. Radford Comm. Hosp.*, 910 F.2d 139, 150 (4th Cir. 1990); *Cooper v. Forsyth Cnty. Hosp. Auth., Inc.*, 789 F.2d 278, 280 n. 10 (4th Cir. 1986).

**B.    CSXT alleges that the Belt Line is a majority-owned subsidiary of NS.**

Here, the Complaint alleges, and the exhibits confirm, that NS owns 57% of the shares of the Belt Line, and a majority of the voting rights.  *See* Compl., ¶ 23, Ex. D.  The Belt Line is

therefore a majority-owned subsidiary of NS.  *See* Va. Code § 13.1-603.  Consistent with the

rationale of *American Chiropractic*, CSXT alleges that the Belt Line's Board of Directors is

controlled 4-2 by NS through the Supplemental Agreement and 1996 bylaws.  Compl., ¶¶ 22-23.

No factual inquiry is required to confirm these allegations on a motion to dismiss.  *Ashcroft*, 556

U.S. at 678.  As a matter of Virginia law, "[t]he holders of the majority of the shares of a

corporation have the right and the power, by the election of directors and by the vote of their stock,

to determine the policy of their corporation and to manage and control its action." *Fein v. Lanston*

*Monotype Mach. Co.*, 196 Va. 753, 766, 85 S.E.2d 353, 360 (1955).  In fact, unlike in many states,

the Virginia Supreme Court has declined to hold that a majority shareholder owes any fiduciary

duties to minority shareholders.  *See Willard v. Moneta Building Supply*, 258 Va. 140, 157, 515

S.E.2d 277, 288 (1999).

Accordingly, CSXT's express allegations establish that the Belt Line cannot conspire with

NS in violation of the Sherman Act, and this Court should dismiss Counts I and II.

**4.      Even if conspiracy were possible, the Belt Line cannot be liable under § 1 or § 2 of the Sherman Act because CSXT fails to allege (and cannot allege) that the Belt Line denied CSXT access to any market.**

To successfully state a violation of § 1 or § 2 of the Sherman Act, a plaintiff must allege

"that the conspiracy produced adverse, anti-competitive effects within the relevant product and

geographic market." *Black & Decker*, 801 F.3d at 432-33 (citations omitted).  In other words,

"[T]he plaintiff must allege not only an injury to himself, but an injury to the market as well." *Id*.

In its Complaint, CSXT defines the relevant market as the Port of Hampton Roads.  *See*

Compl., ¶ 51 ("NS and the NPBL have used the NPBL as a chess piece to establish and maintain

monopolistic control over intermodal transportation in and out of the Hampton Roads ports.").

There is no allegation whatsoever that CSXT has been shut out of the Port of Hampton Roads, or

that the Port of Hampton Roads is suffering as a result of any action of the Belt Line.  For this

reason alone, CSXT's Sherman Act claims should fail.

Yet even if the relevant market were reduced to NIT, CSXT still fails to allege that it has been shut out of the market.  The entirety of CSXT's allegations on this point are contained in ¶ 54:  "Among other anticompetitive acts, NS, in conspiracy with the Individual Defendants and NPBL, has caused NPBL to reject, without any reasonable, meaningful and lawful consideration or negotiation, *CSXT's Service Proposal*, thereby effectively denying CSXT access to NIT by rail in competition with NS."  Compl., ¶ 54 (emphasis added).

The only fact alleged in ¶ 54 is that the Belt Line rejected CSXT's *Service Proposal*.  *Id*. What ¶ 54 does not allege, because CSXT cannot allege it, is that the Belt Line rejected CSXT's *access* to NIT at the uniform tariff rate.  Just the opposite, the Complaint confirms that CSXT accessed NIT via the Belt Line at its tariff rate as recently as 2015.  *See* Compl., ¶¶ 4, 15.  The Complaint establishes only that the Belt Line declined to violate its Operating Agreement, or to put itself in financial jeopardy, by reducing its rate from $210 to $80 for some 18,000 promised railcars per year.  Business judgment does not equal anti-competitive conduct, and in the absence of actual anti-competitive conduct or effects on the market, CSXT's Sherman Act counts fail.

*Virginia Law Claims*

**5.     Counts VII, VIII and IX are time barred because CSXT claims to have first suffered damages more than five years ago.**

CSXT's Virginia law claims against the Belt Line should be dismissed as time barred.  The statute of limitations on a claim for tortious interference with business expectancy is five years. *See Dunlap v. Cottman Trans. Sys., LLC*, 287 Va. 207, 219 (2014) (applying five-year statute of limitations in Va. Code § 8.01-243(B)).  The statute of limitations on conspiracy claims is also five years.  *See Detrick,* 108 F.3d at 543; *Federated Graphics Cos. v. Napotnik*, 424 F. Supp. 291, 293-94 (E.D. Va. 1976).  The statute of limitations on the conduct alleged in Counts VII, VIII and

IX began to run more than five years before the Complaint was filed on October 4, 2018.

**A.    Under Virginia law, the statute of limitations starts to run when a plaintiff suffers any injury, no matter how slight, resulting from the tortious interference or conspiracy.**

Unlike states that apply the "last overt act" doctrine, in which the limitations period for a conspiracy claim runs from the date of the last overt act resulting in damage to the plaintiff, under Virginia law "a cause of action for conspiracy under Code § 18.2-500 accrues when one is 'injured in his business.'"  *Eshbaugh v. Amoco Oil Co.*, 234 Va. 74, 77, 360 S.E.2d 350, 351 (1987).  "A cause of action under the conspiracy statute accrues at the time the [plaintiff] first suffered any damages resulting from the acts committed in furtherance of the conspiracy."  *Detrick*, 108 F.3d at 543; *Int'l Surplus Lines Ins. Co. v. Marsh & McLennan, Inc.*, 838 F.2d 124, 129 (4th Cir. 1988) ("In Virginia, only the slightest injury is required to start the running of the limitations period…. It is of no consequence that the amount of damages [is] not ascertainable until a later date.").

Similarly, for tortious interference claims, "the statute of limitations begins to run as soon as a plaintiff suffers an injury sufficient to give rise to a cause of action, even if other injuries occur later in time." *L-3 Communications Corp. v. Servo, Inc.*, 2018 WL 1352093, at *5 (E.D. Va. Mar. 15, 2018).  "Under Virginia law, the statute of limitations does not accrue separately for each set of damages which results from a wrongful act."  *Brown v. Am. Broad. Co.*, 704 F.2d 1296, 1300 (4th Cir. 1983).  "Once a cause of action is complete and the statute of limitations begins to run, it runs against all damages resulting from the wrongful act, even damages which may not arise until a future date."  *Id.*

The Virginia Supreme Court confirmed this in *Eshbaugh*.  In *Eshbaugh*, a sublessee of gas station property alleged that he was fraudulently induced to cancel his sublease early as the result of a conspiracy between the property owner and lessee, but the Virginia Supreme Court affirmed

dismissal of his claims as time barred.  The sublessee signed the cancellation agreement on May 12, 1977, learned on May 19, 1977 that he would not be offered a new lease as promised, was ordered on May 31, 1977 to vacate the premises, and actually vacated on June 30, 1977.  234 Va. at 75, 360 S.E.2d at 350-51.  The sublessee filed suit on May 26, 1982.  *Id.*  The Virginia Supreme Court held that the accrual date for his conspiracy cause of action was May 12, 1977 when he canceled his existing lease, because that was the day he "first sustained injury to his business" as the result of the conspiracy (he lost the balance of his current leasehold term), even though the last overt act in furtherance of the conspiracy did not occur until later.  The Court explained:

> Eshbaugh correctly contends that a cause of action for conspiracy under Code § 18.2-500 accrues when one is "injured in his ... business."  Eshbaugh first sustained injury to his business on May 12, 1977, when he executed the cancellation agreement and gave up the balance of his leasehold term. *At that time, Eshbaugh's business incurred some, if not all, the damages resulting from the alleged conspiracy. A right of action accrues when any damage, however slight, is sustained.*  Accordingly, the trial court correctly concluded that the conspiracy action likewise was time-barred.

*Id.* at 77, 360 S.E.2d at 351 (citations omitted) (emphasis added).

Similarly, in *Detrick v. Panalpina, Inc.*, *supra*, trustees for the estates of warehouse operators asserted RICO and conspiracy causes of actions against a freight forwarder and others, and the Fourth Circuit held that the conspiracy claim was time barred, because the five-year statute of limitations had expired before suit was filed.  108 F.3d at 543.  Disputing when the statute of limitations began to run, the trustees pointed to the injury that was suffered at the culmination of the conspiracy.  The Fourth Circuit rejected the trustees' argument, finding the claim time barred:

> The Trustees do not challenge that in late 1988, and in early 1989, Panalpina demanded that the Detricks lower their rates and increase staffing at the warehouse. Hence, the Detricks' initial injury, albeit slight, occurred in early 1989 at the latest, and culminated in April 1990. *Virginia law is clear that the statute of limitations begins to run, when any injury occurs*, and thus, the district court properly concluded that the statute of limitations began to run in 1989, and consequently, the Trustees' lawsuit filed in March, 1995 was time barred….

*Id.* (emphasis added).

### B.   The statute of limitations began to run in 2008 when CSXT first suffered injury resulting from the alleged tortious interference and conspiracy.

Although the Complaint emphasizes rejection of CSXT's Service Proposal at the board meeting on April 18, 2018, it specifically alleges multiple connected examples of earlier injurious acts. *See* Compl., ¶ 45 ("This is not the first time that the Individual Defendants have, in conspiracy with NS and the NPBL, misused NPBL as a tool to serve NS's own interests").

- The Complaint alleges that, "In 2008, NPBL took the necessary actions to commence the sale of productive NPBL property in Norfolk and an attempted sale in Portsmouth, and the termination of NPBL's access rights over NS tracks used for the proper delivery of services that NPBL is obligated to provide to its shareholders…." *Id.* at ¶ 47. All of these events allegedly caused injury to CSXT by "constraining" the Belt Line's connection to NIT. *Id.*

- The Complaint alleges that the Belt Line and NS adopted a "dramatically high" uniform tariff rate in 2009, and that ever since they have maintained the rate at a level "designed to exclude competition in the relevant market, thereby dramatically raising CSXT's costs to serve intermodal rail customers, and diminishing the amounts of freight moved, and related revenues earned by NPBL." *Id.* at ¶¶ 34, 57, Ex. E at 4, 9.

- CSXT's 2018 Service Proposal specifically references a very similar proposal it made in 2010 to obtain a preferential rate below the $210 uniform tariff rate, which was not accepted. *Id.*, Ex. E at 3, 8-15. And it alleges that, in response to this proposal, "NPBL refused to accept CSXT's offer to provide CSXT locomotives and free fuel to move cars for NPBL over the NPBL routes under any terms or circumstances…." *Id*. at ¶ 46.

CSXT alleges that all these acts caused it at least some injury. Its causes of action for tortious interference and business and civil conspiracy therefore accrued in 2008, and 2010 at the latest. It makes no difference whether the alleged conspiracy culminated at the April 2018 board meeting. "Virginia law is clear that the statute of limitations begins to run when any injury occurs." *Detrick*, 108 F.3d at 543; *Servo*, 2018 WL 1352093, at *5 ("[T]he statute of limitations begins to run as soon as a plaintiff suffers an injury sufficient to give rise to a cause of action, even if other injuries occur later in time."). Accordingly, Counts VII, VIII and IX of the Complaint are

barred by the statute of limitations.

**6.    Count VII should be dismissed because CSXT fails to state a claim for tortious interference with a business expectancy under Virginia law.**

    **A.    CSXT's alleged business expectancy is a general interest shared by all stockholders and can be brought only as a derivative claim.**

CSXT lacks standing to pursue Count VII individually. Shareholders cannot pursue individual causes of action for wrongs or injuries to the corporation that result in diminution of the value of their stock. Instead, shareholders must pursue such claims as a derivative suit on behalf of the corporation. *See Simmons v. Miller*, 261 Va. 561, 573, 544 S.E.2d 666, 674 (2001).

In Count VII, CSXT alleges that its business expectancy derives solely from being a shareholder of the Belt Line. *See* Compl., ¶ 115 ("*As a shareholder of the NPBL*, CSXT has reasonable business expectancies.… CSXT reasonably expects economic benefit *as a result of being a shareholder of NPBL, such as revenues from NPBL* and its ability to access NPBL trackage and NPBL-served industries.") (emphasis added). Under Virginia law, CSXT lacks standing to sue individually for an alleged decline in corporate revenue. *See Keepe v. Shell Oil Co.*, 220 Va. 587, 591, 260 S.E.2d 722, 724 (1979); *see also Wright v. Dee*, 87 Va. Cir. 148 (2013) (dismissing shareholder's tortious interference claims because they were derivative claims, not direct claims that the shareholder could pursue); *Schur v. Sprenkle*, 84 Va. Cir. 418 (2012) (LLC member lacked standing to pursue tortious interference claims that belonged to company).

    **B.    Even if CSXT could bring the claim on its own behalf, it fails to allege a valid business expectancy.**

To the extent CSXT asserts a cause of action belonging solely to it, and not all shareholders, alleging general "lost opportunities for contracts with shipping partners" is insufficient to establish a valid business expectancy. Compl., ¶ 117. The Virginia Supreme Court has identified "several obvious principles that apply to the tort of wrongful interference with a prospective business or

economic advantage." *Commercial Bus. Sys., Inc. v. Halifax Corp.*, 253 Va. 292, 301, 484 S.E.2d 892, 897 (1997).  The first is that allegations of a business expectancy "must meet an objective test; proof of subjective expectations will not suffice."  *Id*.  "In other words, mere proof of a plaintiff's belief and hope that a business relationship will continue is inadequate to sustain the cause of action."  *Id*.  "Second, the proof must establish a 'probability' of future economic benefit to a plaintiff.  Proof of a 'possibility' that such benefit will accrue is insufficient."  *Id.*

In the context of a motion to dismiss under Rule 12(b)(6), these principles must be evidenced by more than conclusory allegations in order to "establish a claim 'beyond the level that is merely conceivable'."  *Bailey v. City of Chesapeake*, 2013 WL 6145718 at *7 (E.D. Va. Nov. 20, 2013) (quoting *Twombly*, 556 U.S. at 178); *see also NorthStar Aviation, LLC v. Alberto*, 332 F. Supp. 3d 1007 (E.D. Va. 2018) (similar application of *Twombly* standard to Virginia interference with business expectancy claim).

CSXT's general lost opportunity to contract with unidentified shipping partners constitutes only a "possibility" of a benefit, not a business expectancy under Virginia law.  Its subjective belief that adoption of its Service Proposal might enable it to engage shipping partners on better terms does not meet the test required to sustain the cause of action.

**7.     Counts VIII and IX should be dismissed because CSXT fails to state a claim for business conspiracy or common law conspiracy under Virginia law.**

**A.     The Belt Line cannot have engaged in a business or civil conspiracy with NS because there can be no conspiracy between a parent and its majority-owned subsidiary.**

Just as a conspiracy to restrain trade in violation of the Sherman Act requires at least two separate entities, business conspiracy and civil conspiracy in Virginia both require a combination of at least two separate persons or entities in a concerted action.  *See* Va. Code § 18.2-499(A) ("*Any two or more persons* who combine, associate, agree, mutually undertake or concert

together…") (emphasis added); *Commercial Business Systems, Inc. v. Bellsouth Services, Inc.*, 249 Va. 39, 48, 453 S.E.2d 261, 267 (1995) ("*A common law conspiracy consists of two or more persons* combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means.") (emphasis added).

As explained above, CSXT cannot satisfy the "two or more persons" requirement because a parent and its majority-owned subsidiary cannot conspire as a matter of law.  Counts VIII and IX are thus barred by the intracorporate immunity doctrine.  *See, e.g., Detrick v. Panalpina, Inc.*, 108 F.3d 529, 544 (4th Cir. 1997) ("The intracorporate immunity doctrine provides that a conspiracy cannot exist between the agents of a corporation and the corporation itself.").

Virginia courts have uniformly held in the context of business and civil conspiracy claims that wholly-owned subsidiaries are incapable of conspiring with their parent corporation as a matter of law.  *See Dator Corp. v. Rufus S. Lusk & Son, Inc.*, 57 F.3d 1065, at *1 (4th Cir. 1995) (unpublished) (affirming dismissal of claims that three affiliated corporations and their majority stockholder conspired to breach plaintiff's contract); *In re Ray Dobbins Lincoln-Mercury, Inc.*, 604 F. Supp. 203, 205 (W.D. Va. 1984) (applying *Copperweld* to dismiss Virginia business and civil conspiracy claims against a parent and subsidiary); *Derthick v. Bassett-Walker, Inc.*, 904 F. Supp. 510, 525 (W.D. Va. 1995) ("Even assuming that the claims [under Va. Code § 18.2–499(a)] are timely, the conspiracy between Bassett-Walker and its parent, VF Corporation, must fail under the intracorporate conspiracy doctrine."); *Saliba v. Exxon Corp.*, 865 F. Supp. 306, 313 (W.D. Va. 1994) ("[A] corporation cannot conspire with its wholly owned subsidiary" relative to a business conspiracy claim under Virginia law); *Zimpel v. LVI Energy Recovery Corp.*, 23 Va. Cir. 423, at *1 (Fairfax County 1991) (dismissing business conspiracy claim after discussing *Copperweld* and finding that the "Virginia Civil Conspiracy statute has likewise been construed to disallow

22

consideration of a parent and its wholly owned subsidiary as separate 'persons'").

For the same reasons as in the antitrust context, this rationale applies likewise to majority-owned subsidiaries. *See Fein*, 196 Va. at 766, 85 S.E.2d at 360 ("[t]he holders of the majority of the shares of a corporation have the right and the power, by the election of directors and by the vote of their stock, to determine the policy of their corporation and to manage and control its action."). Thus, based on CSXT's allegations, which are taken as true on a motion to dismiss, the Belt Line and NS are legally incapable of conspiring, and Counts VIII and IX should be dismissed.

### B.   CSXT fails to plead a facially plausible conspiracy.

To survive a motion to dismiss, a plaintiff must allege the existence of the elements of a conspiracy in more than "mere conclusory language." *Gov't Employees Ins. Co. v. Google, Inc.*, 330 F. Supp. 2d 700, 706 (E.D. Va. 2004). "[B]usiness conspiracy, like fraud, must be pleaded with particularity, and with more than mere conclusory language. The heightened pleading standard prevents every business dispute [from] becoming a business conspiracy claim." *Id.*

The Complaint does not plead any actual conspiracy, much less with particularly. It also fails to allege the requisite unlawful act. "Because there can be no conspiracy to do an act that the law allows, we have held that an allegation of conspiracy, whether criminal or civil, must at least allege an unlawful act or an unlawful purpose" to survive a motion to dismiss. *Dunlap*, 287 Va. at 215, 754 S.E.2d at 317 (citing cases). "[A]ctions for common law civil conspiracy and statutory business conspiracy lie only if a plaintiff sustains damages as a result of an act that is itself wrongful or tortious." *Id.*

The allegations in the Complaint do no more than describe lawful actions taken by a parent corporation with respect to its majority-owned subsidiary. *See Fein*, 196 Va. at 766, 85 S.E.2d at 360. And while the Virginia Supreme Court has held that breach of fiduciary duties and tortious interference may constitute unlawful acts, *see Dunlap*, 287 Va. at 218, 754 S.E.2d at 319, CSXT

23

fails to allege any facts that the Belt Line itself conspired with its own directors to breach their fiduciary duties.   Accordingly, because CSXT has not (and cannot) establish the necessary elements for business and civil conspiracy, Counts VIII and IX should be dismissed.

**8.    The Court should decline to exercise supplemental jurisdiction over the Virginia law claims.**

A court may refuse to exercise supplemental jurisdiction over a claim that meets the requirements of § 1367(a) if: "(1) the claim raises a novel or complex issue of state law; (2) the state law claim substantially predominates over the claim[s] with original jurisdiction; (3) all claims with original jurisdiction have been dismissed; or (4) in exceptional circumstances, there are compelling reasons for declining jurisdiction."   28 U.S.C. § 1367(c).

In this case, as discussed above, the Court should dismiss all of CSXT's federal question claims—the only claims that give this Court original jurisdiction—and so this Court can dismiss the remaining state law claims under § 1367(c)(3).   *See Arrington v. City of Raleigh*, 369 F. App'x 420, 423 (4th Cir. 2010) (affirming district court's dismissal of claims over which it could have exercised supplemental jurisdiction due to dismissal of underlying federal claim).   Such a dismissal would leave the responsibility of applying Virginia law to these claims to the Virginia courts, a desirable outcome.

Additionally, even if the Court decides not to dismiss all the federal claims, the issues of state law at play in this case are so complex as to warrant a refusal to exercise supplemental jurisdiction, as § 1367(c)(1) permits.   In *Arrington*, the state law claims in the case raised "intricate and important state law issues . . . .   A decision or ruling in this case could well bring waves of consequences to other North Carolina municipalities and governmental entities."   369 F. App'x at 423 n. 2.   Similar concerns must guide the Court in this case.

The state law claims CSXT asserts sound in some of the most disputed areas of Virginia

law.   The Virginia Supreme Court continues to find new and thorny questions in tortious interference and business conspiracy cases.   *See, e.g.*, *Francis Hosp., Inc. v. Read Properties, LLC*, __ Va. __, No. 170894, 2018 WL 6071381, at *3–4 (Va. Nov. 21, 2018) (overruling the trial court to hold that two parties to a contract cannot be liable for business conspiracy because of an agreement to interfere with that contract); *Schaecher v. Bouffault*, 290 Va. 83, 106-08, 772 S.E.2d 589, 601-02 (2015) (considering without deciding how indirect interference with a business expectancy can be and still properly allege a tortious interference claim); *Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. 207, 213-22, 754 S.E.2d 313, 316-21 (2014) (certified question from the Fourth Circuit regarding whether tortious interference can be the unlawful act in a business conspiracy).

Every time a federal court rules in these areas, it risks creating the same "waves of consequences" the Fourth Circuit found so undesirable in *Arrington*.   Of course, the Court is capable of interpreting and applying state law, but the possibility still exists that it will resolve a new question or apply existing law differently than the Virginia courts would.   Discretion consequently recommends against the federal courts wading into these areas so when it can be avoided.   The state law issues at play in this case are complex and, like those implicated in *Arrington*, of potentially great significance throughout the Commonwealth of Virginia.   This strongly suggests the court should refuse to hear these claims under its supplemental jurisdiction.

Because the Court can opt to refuse to exercise supplemental jurisdiction in this case under § 1367(c)(1) or (3), prudence counsels in favor of taking that option and leaving the questions of Virginia law to the Virginia courts.

## Conclusion

Neither federal law nor Virginia law permit the relief CSXT seeks.  CSXT's Complaint asks this Court to rewrite an Operating Agreement that has governed the break-even operation of the Belt Line for over a century, in a way that benefits only CSXT as the "remedy" for an alleged denial of access to NIT that has never actually occurred.  Because all of CSXT's claims against the Belt Line fail as a matter of law, the Belt Line respectfully asks this Court to dismiss those claims with prejudice.

Dated:  November 27, 2018

NORFOLK AND PORTSMOUTH
BELT LINE RAILROAD COMPANY


By:        /s/ James L. Chapman, IV
    James L. Chapman, IV, VSB No. 21983
    W. Ryan Snow, VSB No. 47423
    Darius K. Davenport, VSB No. 74064
    David C. Hartnett, VSB No. 80452
    CRENSHAW, WARE & MARTIN, P.L.C.
    150 W. Main Street, Suite 1500
    Norfolk, Virginia 23510
    Telephone: (757) 623-3000
    Facsimile: (757) 623-5735
    jchapman@cwm-law.com
    wrsnow@cwm-law.com
    ddavenport@cwm-law.com
    dhartnett@cwm-law.com
    *Attorneys for Norfolk and Portsmouth Belt*
    *Line Railroad Company*

## <u>CERTIFICATE OF SERVICE</u>

      I certify that on this 27th day of November 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a "Notice of Electronic Filing" to the following attorneys of record:

Robert W. McFarland, VSB No. 24021
Benjamin L. Hatch, VSB No. 70116
E. Rebecca Gantt, VSB No. 83180
McGuireWoods LLP
101 West Main Street, Suite 9000
Norfolk, Virginia 23510-1655
Telephone: (757) 640-3716
Facsimile: (757) 640-3930
rmcfarland@mcguirewoods.com
bhatch@mcguirewoods.com
rgantt@mcguirewoods.com
*Attorneys for CSXT Transportation, Inc.*

Craig T. Merritt, VSB No. 20281
Michael W. Smith, VSB No. 01125
Belinda D. Jones, VSB No. 72169
CHRISTIAN & BARTON, LLP
909 E. Main St., Suite 1200
Richmond, VA  23219
Telephone: (804) 697-4128
Facsimile: (804) 697-6128
cmerritt@cblaw.com
msmith@cblaw.com
bjones@cblaw.com
*Attorneys for NS Railway Company*

W. Edgar Spivey, VSB No. 29125
Clark J. Belote, VSB No. 87310
KAUFMAN & CANOLES, P.C.
150 W. Main Street, Suite 2100
Norfolk, VA  23510
Telephone: (757) 624-3196
Facsimile: (888) 360-9092
wespivey@kaufcan.com
cjbelote@kaufcan.com
*Attorneys for Cannon Moss*

Hugh M. Fain, III, VSB No. 26494
M. F. Connell Mullins, Jr., VSB No. 47213
John M. Erbach, VSB No. 76695
SPOTTS FAIN PC
411 E. Franklin St.
Richmond, VA 23219
Telephone: (804) 697-2000
hfain@spottsfain.com
cmullins@spottsfain.com
jerbach@spottsfain.com
*Attorneys for Jerry Hall, Thomas Hurlbut, and Philip Merilli*

               */s/ James L. Chapman, IV*
               James L. Chapman, IV, VSB No. 21983
               CRENSHAW, WARE & MARTIN, P.L.C.
               150 W. Main Street, Suite 1500
               Norfolk, Virginia 23510
               Telephone: (757) 623-3000
               Facsimile: (757) 623-5735
               jchapman@cwm-law.com