# BAKER & MILLER PLLC

ATTORNEYS and COUNSELLORS

2401 PENNSYLVANIA AVENUE, NW
SUITE 300
WASHINGTON, DC  20037

TELEPHONE:  (202) 663-7820
FACSIMILE:  (202) 663-7849

William A. Mullins

Direct Dial:  (202) 663-7823
E-Mail: wmullins@bakerandmiller.com

September 13, 2018



**VIA HAND DELIVERY**
Cynthia T. Brown, Chief
Section of Administration, Office of Proceedings
Surface Transportation Board
395 E Street, SW
Washington DC  20423-0001

Re:   FD 36223
Norfolk Southern Railway Company – Petition To Set Trackage
Rights Compensation – Norfolk & Portsmouth Belt Line Railroad
Company

Dear Ms. Brown:

Enclosed is an original and eleven copies of the petition of Norfolk Southern Railway Company ("NSR") to establish the compensation amount for the trackage rights that Norfolk & Portsmouth Belt Line Railroad currently operates over NSR's lines in Norfolk, VA, and Chesapeake, VA.  Please acknowledge receipt and filing of this petition by date stamping the enclosed eleventh copy and returning it to the courier for return to me.

Accompanying the petition and in accordance with 49 C.F.R. § 1002.2(f)(88) is a filing fee check in the amount of $300.  If there are any questions about this matter, please contact me directly, either by telephone:  (202) 663-7823 or by e-mail:  *wmullins@bakerandmiller.com*.

Sincerely,

William A. Mullins

cc:   Cannon Moss
President and General Manager
Norfolk & Portsmouth Belt Line Railroad

**EXHIBIT**
2

Contains Color Copies

BEFORE THE
SURFACE TRANSPORTATION BOARD

FD 36223

NORFOLK SOUTHERN RAILWAY COMPANY
– PETITION TO SET TRACKAGE RIGHTS COMPENSATION –
NORFOLK & PORTSMOUTH BELT LINE RAILROAD COMPANY



RECEIVED
SEP 1 3 2018

Garrett D. Urban
NORFOLK SOUTHERN CORPORATION
Three Commercial Place
Norfolk, VA 23510
Tel:   (757) 533-4939
Fax:   (757) 533-4872

William A. Mullins
Crystal M. Zorbaugh
BAKER & MILLER PLLC
2401 Pennsylvania Ave., NW
Suite 300
Washington, DC  20037
Tel:  (202) 663-7820
Fax:  (202) 663-7849

Attorneys for Norfolk Southern Railway
Company

Dated:  September 13, 2018

**BEFORE THE
SURFACE TRANSPORTATION BOARD**

**FD 36223**

**NORFOLK SOUTHERN RAILWAY COMPANY
– PETITION TO SET TRACKAGE RIGHTS COMPENSATION –
NORFOLK & PORTSMOUTH BELT LINE RAILROAD COMPANY**

**SUMMARY OF REQUESTED RELIEF**

Through a series of trackage and operating agreements dating back to 1917, including various amendments to those agreements, the Norfolk & Portsmouth Belt Line Railroad Company ("NPBL") currently possesses and operates trackage rights over several segments of Norfolk Southern Railway Company ("NSR") rail line located in Norfolk, VA and Chesapeake, VA. Pursuant to the terms of those agreements, NSR terminated those agreements effective 11:59 pm, July 31, 2016.[1] Since that time, NSR and NPBL (collectively, the "Parties") have been in negotiations for establishing new terms and conditions.

The Parties have reached agreement on all terms and conditions except for the level of compensation. Consistent with Thompson v. Texas Mexican R. Co., 328 U.S. 134 (1946) ("Thompson v. Tex Mex") and the Surface Transportation Board's ("STB") precedents setting terms and conditions for expired trackage rights agreements that are not discontinued,[2] NSR,

[1] Although the agreements have been terminated, the parties agreed to operate under the terms of the terminated agreements on a month-to-month basis while they negotiated a replacement agreement.

[2] See e.g., North Carolina Railroad Company – Petition To Set Trackage Compensation And Other Terms And Conditions – Norfolk Southern Railway Company, Norfolk & Western Railway Company, And Atlantic And East Carolina Railway Company, FD 33134 (STB served

- 1 -

pursuant to 49 C.F.R. §1117, requests the Board to set the level of compensation for NPBL's continued use of the NSR tracks. NSR proposes that the Board issue a decision authorizing a period of discovery, the simultaneous filing of evidence and argument by both parties setting forth each parties' proposed methodology and the appropriate compensation amount under that methodology, the simultaneous submissions of replies and rebuttals, and then issuance of a decision. NSR further requests that any compensation take effect retroactively to the date of filing of this Petition.

## BACKGROUND

Virginian Railway Company ("VRC"), a predecessor company of Norfolk Southern Railway Company ("NSR"), entered into an agreement dated July 26, 1917 whereby VRC granted Norfolk & Portsmouth Belt Line Railroad Company ("NPBL") trackage rights to use certain VRC tracks between Carolina Junction, currently located in the City of Chesapeake, Virginia, and Boush Junction, currently located in the City of Norfolk, Virginia (the "Carolina To Boush Agreement"). On July 27, 1917, Norfolk Southern Railroad Company, later known as Carolina and Northwestern Railway Company (the "Old Norfolk Southern"), entered into another agreement with NPBL governing NPBL's use of certain tracks between Belt Junction and Carolina Junction, currently located in the City of Chesapeake, Virginia (the "Belt To Carolina Agreement")(collectively, the Carolina To Boush Agreement, the Belt To Carolina Agreement, and the numerous supplements and amendments, constitute the "Agreement.").[3]

_____

May 28, 1997); and New England Central Railroad, Inc. – Trackage Rights Order – Pan Am Southern LLC, FD 35842 (STB served Oct. 31, 2017)("NECR v. Pan Am").

[3] The Carolina To Boush Agreement grants NPBL overhead trackage rights from Carolina Junction to West Junction. The Belt To Carolina Agreement, as amended and supplemented, grants NPBL trackage and operating rights between NSR Junction and Portlock Yard, between Carolina Junction and Portlock Yard, and between Belt Junction and Portlock Yard. The two

- 2 -

At the time NSR's predecessor companies initially entered into the Agreement, NPBL was owned by several shareholders. Subsequently, due to various mergers and consolidations, NPBL is now owned approximately 57% by NSR and 43% by CSX Transportation, Inc. ("CSXT"). NPBL is a Virginia corporation.

The Parties have operated under the Agreement for over a hundred years. However, like any agreement struck that long ago, certain provisions have not kept pace with the march of time and progress. As part of an overall examination of existing operations and cost efficiencies, NSR determined that the Agreement was antiquated and needed to be modernized, including the addition of insurance provisions and an update of the compensation amounts and methodologies. As a result, and fully consistent with the terms of the Agreement, NSR terminated the Agreement.

Since termination, the Parties have operated on a month-to-month basis as if the Agreement remained in effect. The Parties have also spent the past two years negotiating over new terms and conditions, including the appropriate compensation for NPBL's trackage rights over NSR. The negotiations have generally been positive and relatively non-contentious with respect to a substantial number of issues. For example, the Parties have combined the Carolina To Boush Agreement and the Belt To Carolina Agreement, including all amendments and supplements, into one new agreement to govern all future operations. The Parties have also worked to update many of the provisions, including the liability provisions and adding insurance protections and requirements. In fact, NSR and NPBL's management have reached agreement on all provisions except for the per-car compensation to be paid by NPBL to NSR for NPBL's

agreements have been amended and supplemented from time to time. See Exhibit A, which is a color map showing the scope of NPBL's existing trackage and operating rights over NSR's rail lines and that are governed by the Agreement.

- 3 -

use of NSR's tracks. The agreed upon new trackage rights agreement, with the compensation amount blank and the insurance amounts redacted, is attached as Exhibit B. Exhibit C is an email from NPBL's President and General Manager acknowledging agreement on all provisions except for the per-car compensation.

## REQUEST FOR RELIEF

When a trackage rights agreement expires and neither party has sought discontinuance authority or desires the trackage rights to cease, as is the case here, the Board has exclusive jurisdiction to set the terms and conditions under which a tenant railroad (NPBL) may continue to operate over a landlord's (NSR's) line. See 49 U.S.C. §10501(a), 49 U.S.C. §11323(a)(6), Thompson v. Tex Mex, and footnote 2, *supra*. The Parties have failed to reach an agreement on the appropriate compensation level, necessitating Board action on that sole issue.

Board involvement is necessary at this time. The compensation scheme and fees imposed by the Agreement date back over 100 years and are in need of significant revision. While the parties have sought to update and simplify the mechanism of payment to a singular per car or per car mile fee, in accordance with Board precedent, the parties have been unable to agree on the level of such compensation. NSR requests the Board to expeditiously issue a decision initiating a proceeding focused solely on the appropriate level of compensation for NPBL's trackage rights over NSR.

To expedite the proceeding, NSR proposes that there be a period of discovery, followed by simultaneous filing of the parties' evidence and argument setting out their proposed methodology and compensation terms calculated under that proposed methodology. The parties would then have the right to file simultaneous replies. There would then be a period for the

- 4 -

parties to prepare and file rebuttal. The record would then be complete. To implement this schedule, NSR suggests the following:

Decision Date ("DD)  Decision By Board Initiating Proceeding And Authorizing Discovery

DD + 60      Discovery Ends

DD + 105     Simultaneous Filing Of Opening Evidence And Proposed Compensation Terms

DD + 150     Parties File Simultaneous Replies

DD + 180     Parties File Simultaneous Rebuttal – Closing The Record

This proposal avoids the delay associated with parties first arguing over the appropriate methodology, having the Board set that methodology, having fights over discovery related to that methodology, and then presentation and argument of the record, all of which can lead to significant delay.[4]  Instead, under NSR's proposal, parties would be free to conduct discovery on any relevant information and then file their proposed compensation terms. Each party would then be allowed to file a reply and then rebuttal. This gives each party an equal opportunity to make its case and reply to the other's proposal.

## CONCLUSION

It is long standing precedent that when a trackage rights agreement expires, and absent agreement by the parties with respect to any new terms and conditions to govern future trackage rights operations, the Board has exclusive jurisdiction to set the new terms and conditions to govern the future trackage rights operations. Here, the Agreement has expired and has been terminated. NPBL and NSR have agreed upon all new terms and conditions for a new

[4] NECR v. Pan Am (STB served Feb. 12, 2016).

agreement, except for the appropriate level of per-car compensation to be paid by NPBL to NSR. The compensation is the only term left to be decided.

NSR is invoking the Board's exclusive jurisdiction to resolve the compensation issue and requests the Board to adopt NSR's proposed procedural schedule. NSR further requests that the Board's decision on compensation take retroactive effect to the date of this Petition.

Respectfully submitted,

Garrett D. Urban
NORFOLK SOUTHERN CORPORATION
Three Commercial Place
Norfolk, VA 23510
Tel:    (757) 533-4939
Fax:    (757) 533-4872

William A. Mullins
Crystal M. Zorbaugh
BAKER & MILLER PLLC
2401 Pennsylvania Ave., NW
Suite 300
Washington, DC  20037
Tel:   (202) 663-7820
Fax:  (202) 663-7849

Attorneys for Norfolk Southern Railway Company

September 13, 2018

- 6 -

BEFORE THE
SURFACE TRANSPORTATION BOARD

FD 36223

NORFOLK SOUTHERN RAILWAY COMPANY
– PETITION TO SET TRACKAGE RIGHTS COMPENSATION –
NORFOLK & PORTSMOUTH BELT LINE RAILROAD COMPANY

EXHIBIT A

EXHIBIT "A"

SCHEMATIC PLAN - Not to Scale, All Tracks Not Shown
Prepared by Norfolk Southern Railway Co. D&C Dr3/18 (D&B)

-8-

**BEFORE THE**
**SURFACE TRANSPORTATION BOARD**

---

**FD 36223**

---

**NORFOLK SOUTHERN RAILWAY COMPANY**
**– PETITION TO SET TRACKAGE RIGHTS COMPENSATION –**
**NORFOLK & PORTSMOUTH BELT LINE RAILROAD COMPANY**

---

**EXHIBIT B**

---

## TRACKAGE RIGHTS AGREEMENT

### Between

### NORFOLK SOUTHERN RAILWAY COMPANY

### And

### NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY

**THIS TRACKAGE RIGHTS AGREEMENT,** ("Agreement"), entered into as of this ___ day of ____ 2018 (the "Effective Date"), by and between and NORFOLK SOUTHERN RAILWAY COMPANY, ("NSR") a Virginia corporation and NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY, ("NPBL") Each of NSR and NPBL shall individually be referred to as a "Party" and collectively as the "Parties".

### WITNESSETH:

**WHEREAS,** NSR owns and operates a rail line between West Junction and Carolina Junction in Norfolk, Virginia ("NSR Line"); and

**WHEREAS**, NPBL has operated over the NSR Line since 1917 in accordance with trackage rights granted by agreement with predecessors of NSR dated July 26, 1917, as subsequently amended ("Prior Trackage Rights Agreement"); and

WHEREAS, NSR terminated the Prior Trackage Rights Agreement effective July 31, 2016, but NPBL has continued to operate over the NSR Line under the terms of the Prior Trackage Rights Agreement in the interim; and

**WHEREAS**, NPBL and NSR are agreeable to entering into an agreement granting NPBL trackage rights for the movement of NPBL traffic over the NSR Line for an additional term of years, subject to the terms and conditions set forth herein; and

**NOW, THEREFORE**, NPBL and NSR, intending to be legally bound, agree as follows:

## ARTICLE 1.      GRANT OF TRACKAGE RIGHTS

1.1      Subject to the terms and conditions herein provided, NSR hereby grants to NPBL overhead rights to operate its trains, locomotives, cars, and equipment with its own crews (hereinafter referred to as the "Trackage Rights") over the following segment of NSR's railroad (as shown on the exhibit attached hereto, made a part hereof and marked Exhibit "A"):

   (a) NSR's main and passing tracks between Carolina Junction at MP V4 + 1927.2' and West Junction at MP A7 + 1351.7', a distance of 9.329 miles; and

   (b) Over segments of the New Berkley Line  N-Line, and V-Line tracks  between the

division of maintenance located 60' west (railroad direction) of the edge of Industrial Avenue on the New Berkley Line, and Carolina Junction on the V-Line; provided that:

    a. The connection between the N-Line and V-Line will be over the Wye Track at or near the V-Line at Mile Post V4+4974.1', to its end at the point of switch for a left-hand turnout in the Switching Lead at Mile Post N3+1749.5'; provided, however, that due to the curvature of the Wye Track, NPBL must notify NSR's Portlock Yard Yardmaster if trains include cars in excess of 73 feet. Such trains will not use the Wye Track and will instead require a runaround move in NSR's Portlock Yard. Such NPBL runaround moves will be under the directions of NSR's Portlock Yard Yardmaster or such NSR transportation designee as appropriate.

(c) The segments of NSR's railroad described in this Article 1.1(a) through (b) are hereinafter referred to collectively as the "Subject Trackage", as further depicted in Exhibit A.

## ARTICLE 2.    USE OF SUBJECT TRACKAGE

2.1    NPBL's use of the Subject Trackage shall be in common with NSR and any other user of the Subject Trackage and NSR's right to use the Subject Trackage shall not be diminished by this Agreement. NSR shall retain the exclusive right to grant to other persons rights of any nature on the Subject Trackage.

2.2    Except as may be otherwise provided by this Agreement, NPBL shall not use any part of the Subject Trackage for the purpose of switching, storage, or servicing of cars or equipment, or the making or breaking up of trains, except that nothing contained herein will, upon prior approval of NSR, preclude the emergency use by NPBL of the Subject Trackage and such auxiliary tracks as may be designated by NSR for such purposes.

2.3    NSR shall have exclusive control of the management and operation of the Subject Trackage. NPBL shall not have any claim against NSR for liability due to loss or damage of any kind in the event the use of the Subject Trackage by NPBL is interrupted or delayed at any time from any cause.

2.4    NPBL shall have the right to operate in either direction over the Subject Trackage.

2.5    For purposes of compliance with federal law and/or regulations regarding Positive Train Control ("PTC"), NPBL shall provide the following information to NSR on a quarterly basis: (1) the gross tonnage NPBL is moving over the Subject Trackage; and (2) the volume of Toxic by Inhalation or Poisonous by Inhalation commodities NPBL is moving over the Subject Trackage, if any; provided, however, that this provision does not require NPBL to disclose, and NPBL shall not provide, any confidential or commercially sensitive information, such as customer identities or commercial terms, concerning such traffic.

**ARTICLE 3.**        **RESTRICTIONS ON USE**

3.1     The Trackage Rights herein granted are for the sole purpose of NPBL using same for
        overhead bridge traffic only between the endpoints of the Subject Trackage identified in
        Exhibit A and do not permit any other carrier to interchange with NPBL over NSR's
        Subject Trackage, and NPBL shall not perform any local freight service on the Subject
        Trackage; provided, however, that NPBL is permitted to provide service only to those
        industries on the Subject Trackage subject to reciprocal switching charges as specified in
        NSR Tariff 8001–A (as may be amended from time to time), and NPBL is permitted to
        enter and exit the Subject Trackage at the connection with Buckingham Branch Railroad
        at Coleman Place for purposes of interchange with Buckingham Branch Railroad.

3.2     Notwithstanding Section 3.1, if NPBL constructs any spur or side tracks connecting to
        the Subject Trackage pursuant to its rights under Article 7, NPBL may use the Trackage
        Rights to enter and exit the Subject Trackage via such connections.

3.3     NPBL shall not use the Trackage Rights for any movements of passenger or express cars,
        any coal or coke to be dumped from cars to boats, or any fruit or vegetable traffic
        originating from any location other than NPBL-owned track between West Junction and
        NPBL's Hampton Roads terminals.

3.4     NPBL may not grant rights of any nature on the Subject Trackage to other parties.

3.5     NPBL shall have one way access into Norfolk International Terminal ("NIT") via NSR's
        main track as noted on Exhibit A.

3.6     NPBL shall not use any part of the Subject Trackage in a way that would trigger a
        requirement under federal law and/or regulations for NSR to install PTC. Such
        restriction includes, but is not limited to, a prohibition on transporting any shipments of
        Toxic by Inhalation or Poisonous by Inhalation commodities or the shipment of such
        gross tonnage annually that, when aggregated with NSR's gross tonnage moving over the
        line, would trigger a PTC requirement. If NSR must install PTC on any portion of the
        Subject Trackage as a result of NPBL's use of these Trackage Rights, when NSR's
        operations alone would not trigger such a requirement, NPBL will be responsible for all
        costs associated therewith, including but not limited to installation and ongoing
        maintenance.

**ARTICLE 4.**        **COMPENSATION**

4.1     On or before the 15th day of each calendar month during the term of this Agreement, NPBL
        shall prepare and deliver to NSR a statement setting forth the number of cars and/or
        locomotives moved by NPBL pursuant to this Agreement. For NPBL's exercise of its
        Trackage Rights, NPBL shall pay to NSR _____ per car or locomotive,
        with intermodal cars counted for purposes of this section as one car per doublestack well

or conventional car platform capable of handling a 40' container (hereinafter referred to as the "Current Charge").

4.2   NPBL shall pay NSR a sum computed by multiplying: (i) the Current Charge by (ii) the number of cars (loaded or empty), locomotive and caboose units moved by NPBL with its own crews and power over the Subject Trackage used (the "Trackage Rights Charge").

4.3   The Current Charge set forth in Section 4.1 will be revised upward or downward each year, beginning with the bill rendered for the month of July of 2018, to compensate NSR for one hundred percent (100%) of any increase or decrease in the cost of labor and material, excluding fuel, as reflected in the Annual Indexes of Chargeout Prices and Wage Rates (1977=100), included in "AAR Railroad Cost Indexes" and supplements thereto, issued by the Association of American Railroads ("AAR"); provided, however, that under no circumstances will the Current Charge ever be reduced below the amount specified in Section 4.1 above. In making such a determination, the final "material prices, wage rates and supplements combined (excluding fuel)" indexes for the Eastern District will be used. The Current Charge will be revised by calculating the percent of increase or decrease in the index for the latest available calendar year as related to the index for the previous calendar year and applying that percentage (rounded to the nearest hundredth) to the Current Charge as may have been previously adjusted. In the event the AAR or any successor organization discontinues publication of the Annual Indexes of Chargeout Prices and Wage Rates, an appropriate substitute for determining the percentage of increase or decrease will be negotiated by the Parties hereto.

## ARTICLE 5.     PAYMENT OF BILLS

5.1   All payments called for under this Agreement shall be made by NPBL within thirty (30) days after receipt of bills therefor. No payments shall be withheld because of any dispute as to the correctness of items in the bills rendered, and any discrepancies reconciled between the Parties shall be adjusted in the accounts of a subsequent month. The records of each Party, insofar as they pertain to matters covered by this Agreement, shall be open at all reasonable times to inspection by the other Party for a period of three (3) years from the date of billing.

5.2   Bills rendered pursuant to the provisions of this Agreement, if any, other than those set forth in Article 4, shall include direct labor and material costs, together with the surcharges, overhead percentages and equipment rentals as specified by the performing party at the time any work is performed by one Party for the other Party.

## ARTICLE 6.     MAINTENANCE OF LINE

6.1   Except as provided by this Article, NSR shall be responsible for all maintenance of the Subject Trackage, including but not limited to track, bridges, signals, detectors and highway grade crossing equipment as applicable. NSR shall maintain the Subject Trackage

in reasonably good condition for the use herein contemplated, but NSR does not guarantee the condition of the Subject Trackage, or that operation thereover will not be interrupted. Furthermore, except as may be otherwise provided in Article 12 hereof, NPBL shall not by reason of failure or neglect on the part of NSR to maintain, repair, or renew the Subject Trackage, have or make any claim or demand against NSR or its parent corporation, subsidiaries and affiliates and any or all of their respective directors, officers, agents or employees for any injury to or death of any person or persons whomsoever, or for any damage to or loss or destruction of any property whatsoever, or for any damages of any nature suffered by a party resulting from any such failure or neglect. If the use of the Subject Trackage shall at any time be interrupted or traffic thereon is delayed for any cause, NSR shall with reasonable diligence restore the Subject Trackage for the movement of cars.

## ARTICLE 7.    NPBL CONSTRUCTION

7.1    NPBL shall have the right to build and maintain, at its own expense, for its own use, subject to the provisions hereof, such spur tracks and side tracks as it shall desire, from points on the Subject Trackage for the purpose of switching cars to, from, and between points on the Subject Trackage, and to, from, and between railway junction points now or hereafter established. NPBL shall not build any spur or side tracks unless the location thereof, and the connection with the Subject Trackage, has been approved by NSR, and such spur tracks and side tracks must be located in such way that will result in making the least practicable number of connections, crossings, cross-overs, or changes in the main tracks or passing tracks now or hereafter built.

   (a)    NPBL may use the right of way of NSR free of charge to the extent that such right of way is reasonably necessary for construction pursuant to this Section 7.1.

   (b)    NSR shall furnish the necessary labor and material, build, and maintain the switch connection to the Subject Trackage, for any spur and side tracks built pursuant to this Section 7.1 on the right of way of NSR, as well as furnish the necessary labor and material, build, and maintain any crossing or cross-over in the Subject Trackage that in NSR's sole opinion is required on account of such construction. NPBL shall pay to NSR the cost thereof, including: the expense of all labor, material, and supplies for the operation; maintenance, repairs, and renewals thereof; and taxies, levies, and assessments thereon. If, at any time, in NSR's sole opinion it is necessary to provide any safety, signaling or interlocking appliance on account of such connection, crossing, or cross-over, NSR shall provide the same, and NPBL shall pay to NSR the cost thereof.

7.2    NSR shall have the right to switch upon and use any tracks NPBL may build leading off of the Subject Trackage free of charge.

**ARTICLE 8.**      **ADDITIONS, RETIREMENTS, AND ALTERATIONS**

8.1      NSR, from time to time and at its sole cost and expense, may make such changes in, additions and betterments to, and retirements from the Subject Trackage as shall, in its judgment, be necessary or desirable for the economical or safe operation thereof or as shall be required by any law, rule, regulation, or ordinance promulgated by any governmental body having jurisdiction. Such additions and betterments shall become a part of the Subject Trackage and such retirements shall be excluded from the Subject Trackage.

8.2      Except as provided in Article 7, if NPBL requests NSR to make changes in or additions and betterments to the Subject Trackage, including without limitation changes in communication or signal facilities, for purposes required to accommodate NPBL's operations beyond that required for NSR's operation, NSR shall have the option, in its sole discretion, to either make such changes in or additions and betterments to the Subject Trackage, in which case NPBL shall pay to NSR the cost thereof, including the annual expense of maintaining, repairing, and renewing such additional or altered facilities, or to deny such request.

**ARTICLE 9.**      **MANAGEMENT AND OPERATIONS**

9.1      When operating over the Subject Trackage, NPBL's locomotives and crews will be equipped to communicate with NSR on radio frequencies normally used by NSR in directing train movements on the Subject Trackage.

9.2      Before its locomotives enter onto the Subject Trackage, NPBL shall request permission from NSR's dispatcher or other designated representative at NSR's rail traffic control center or such other location as NSR may designate. Further, NPBL shall ascertain that said Subject Trackage is clear and shall await confirmation from said representative that such permission has been issued to allow NPBL's movements on or over the Subject Trackage. Upon completing its operations and clearing the Subject Trackage, NPBL will notify NSR's designated representative that it has completed its operations and that its equipment has cleared the Subject Trackage.   Once NPBL has notified NSR's representatives that it has cleared the Subject Trackage, NPBL will not reenter the Subject Trackage without again obtaining permission from NSR's representative.  NPBL shall provide and maintain at its expense all communication facilities needed as may be required by NSR to permit NPBL to use NSR's trackage.

9.3      NPBL shall comply with the provisions of the Federal Railroad Safety Act, the Federal Locomotive Inspection Act, and the Federal Safety Appliance Act, as amended, and any other federal and state and local laws, regulations and rules respecting the operation, condition, inspection and safety of its trains, locomotives, cars, and equipment while such trains, locomotives, cars, and equipment are being operated over the Subject Trackage. NPBL shall indemnify, protect, defend, and save harmless NSR and its parent corporation, subsidiaries, and affiliates, and all of their respective directors, officers, agents and employees from and against all fines, penalties and liabilities imposed upon NSR and its

parent corporation, subsidiaries, and affiliates, and all of their respective directors, officers, agents and employees under such laws, rules, and regulations by any public agency, authority, or court having jurisdiction over the Subject Trackage or over NPBL's operations on the Subject Trackage, when attributable to the failure of NPBL to comply with its obligations in this regard.

9.4     NPBL in its use of the Subject Trackage shall comply in all respects with its own safety and general conduct rules, equipment operation and train handling rules, and hazardous materials instructions.  While using the Subject Trackage, NPBL shall comply in all respects with the operating rules, timetables, and special instructions of NSR, and the movement of NPBL's trains, locomotives, cars, and equipment over the Subject Trackage shall at all times be subject to the orders of the transportation officers of NSR; provided, however, that such operating rules, timetables, and special instructions and orders of the transportation officers of NSR shall not unjustly discriminate between the Parties.  NSR will not make any rule or restriction applying to NPBL's trains that does not apply equally to NSR's trains.  NPBL's trains shall not include locomotives, cars or equipment which exceed the width, height, weight or other restrictions or capacities of the Subject Trackage, and no train shall contain locomotives, cars or equipment which require speed restrictions or other movement restrictions below the maximum authorized freight speeds as provided by NSR's operating rules and regulations, without the prior consent of NSR.  The Parties shall make proper accommodation for exceptions, should that be reasonable, necessary and practicable.  All NPBL trains shall be powered to permit operation at the maximum track speed allowed for the Subject Trackage's class of track.

9.5     NPBL shall make such arrangements with NSR as may be required to have all of its employees who shall operate its trains, locomotives and cars over the Subject Trackage qualified for operation thereover, and NPBL shall pay to NSR upon receipt of bills therefor, any reasonable cost incurred by NSR in connection with the qualification of such employees of NPBL, as well as the reasonable cost of pilots furnished by NSR, until such time as such employees are deemed by the appropriate examining officer of NSR to be properly qualified for operation as herein contemplated, such determination not to be unreasonably withheld, conditioned or delayed.

9.6     NSR shall have the right to exclude from its tracks any employee of NPBL, except officers, determined by NSR to be in violation of NSR's rules, regulations, orders, practices, or instructions promulgated in the normal course of business in writing by NSR in its timetable or otherwise, and provided in advance to NPBL.  The decision to bar any employee of NPBL from its tracks will not be interpreted as a request for NPBL to fire the individual(s).  NPBL shall release, indemnify, defend, and save harmless NSR from and against any and all claims and expenses resulting from such exclusion.

9.7     The trains, locomotives, cars and equipment of NPBL, NPBL, and any other present or future user of the Subject Trackage or any portion thereof, will be operated without prejudice or partiality to any party and in such manner as shall afford the most economical and efficient manner of movement of all traffic.

9.8     NPBL shall insure that the locomotives are fueled to a capacity that enables NPBL's trains to traverse the Subject Trackage without having to be fueled.

9.9     In the event that (i) one of NPBL's trains is forced to stop on the Subject Trackage and is unable to proceed due to mechanical failure of NPBL's equipment or any other cause not resulting from an accident or derailment, (ii) one of NPBL's trains fails to maintain the speed required by NSR on the Subject Trackage; or (iii) in emergencies, crippled or otherwise defective cars are set out of NPBL's trains on the Subject Trackage, NSR will have the option to furnish motive power or such other assistance (including but not limited to the right to recrew NPBL's train) as may be necessary to haul, help or push such trains, locomotives or cars, or to properly move the disabled equipment off the Subject Trackage, and NPBL will reimburse NSR for the cost incurred by NSR in rendering any such assistance.

9.10    If it becomes necessary to make repairs to or adjust or transfer the lading of such crippled or defective cars in order to move them off the Subject Trackage, NSR will have the option to perform such work, and NPBL will reimburse NSR for the cost incurred by NSR with respect thereto.

9.11    In the event NSR and NPBL agree that NSR should retain employees or provide additional employees for the sole benefit of NPBL, the Parties will enter into a separate agreement under which NPBL will bear all cost and expense for any such retained or additional employees provided, including recruitment and training cost, and including without limitation all cost and expense associated with labor protective payments which are made by NSR and which would not have been incurred had the retained or additional employees not been provided.

## ARTICLE 10.     MILEAGE AND CAR HIRE

10.1    All mileage and car hire charges accruing on cars in NPBL's trains on the Subject Trackage shall be assumed by NPBL and reported and paid by NPBL directly to the owner(s) of such cars.

## ARTICLE 11.     CLEARING OF WRECKS

11.1    Whenever NPBL's use of the Subject Trackage requires rerailing, wrecking service or wrecking train service, NSR shall be responsible for the provision of such service, including the repair and restoration of roadbed, track and structures so as to minimize the impact on NSR and NPBL operations. The cost, liability and expense of the foregoing, including without limitation loss of, damage to, or destruction of any property whatsoever and injury to and death of any person or persons whomsoever or any damage to or destruction of the environment whatsoever, including without limitation land, air, water, wildlife, and vegetation, resulting therefrom, shall be apportioned in accordance with the provisions of Article 12 hereof. All locomotives, cars, and equipment and salvage from the same so picked up and removed which are owned by or under the management and

control of or used by NPBL at the time of such wreck, shall be promptly delivered to NPBL.

## ARTICLE 12.    LIABILITY

12.1    Without changing the responsibility for the provision of emergency services as set forth in Article 11, the responsibility and liability between the Parties for: (i) any personal injury or death of any person (including employees of the Parties and third persons), (ii) any real or personal property damage of any person (including property of the Parties and third persons), (iii) any damage or destruction to the environment (including land, air, water, wildlife and vegetation), and (iv) all cleanup and remedial expenses, court costs, settlements, claims, judgments, litigation expenses, and attorneys' fees resulting from the use of the Subject Trackage by either Party as described herein, all of which are collectively referred to as a "Loss", shall be allocated as follows:

(a)    If a Loss results from use of the Subject Trackage involving the trains, locomotives or other units of motive power (hereinafter in Article 12, "Locomotives"), cars, and/or equipment of only one Party, then such Party shall be solely responsible for the Loss, even if caused partially or completely by the other Party.

(b)    Losses involving the trains, Locomotives, cars, and/or equipment of both Parties.

(i)    Except as otherwise provided in Section 12.1(b)(ii), if a Loss results from use of the Subject Trackage involving the trains, Locomotives, cars, and/or equipment of both NSR and NPBL, then: (A) each Party shall be solely responsible for any Loss to its own employees, trains, Locomotives, equipment, and cars in its own account including lading and (B) responsibility for any Loss to the Subject Trackage and Loss sustained by third parties shall be divided equally between the two Parties, regardless of the proportionate responsibility between them as to the cause of the Loss.

(ii)    If any damage of the environment, including without limitation land, air, water, wildlife, and vegetation, results from use of the Subject Trackage involving both NSR and NPBL's trains, Locomotives, cars, and/or equipment, then as between themselves, (A) NSR shall be solely responsible for any damage or destruction to the environment and to third parties which results solely from a substance transported in such NSR's cars and equipment and/or NSR's Locomotive(s) from which there is a release, (B) NPBL shall be solely responsible for any damage or destruction to the environment and to third parties that results solely from a substance transported in such NPBL's cars and equipment and/or NPBL's Locomotive(s) from which there was a release, and (C) NSR and NPBL shall be responsible, in proportion to the total number of Locomotives, cars, and/or equipment of each Party from which there was a release, for any damage or destruction to the environment (including exacerbation of existing conditions) and to third parties that results from one or more

substances transported in cars or equipment in the revenue waybill and car hire accounts or Locomotives of both NSR and NPBL from which there were releases.

(c)     If a Loss results from use of the Subject Trackage involving the trains, Locomotives, cars, and/or equipment only one of the Parties and one or more third parties, then such Party hereto shall be solely responsible for such Loss (except as provided in subsection (a)) as between the Parties.

12.2    If a Loss occurs other than one resulting from the use of the Subject Trackage by the trains, Locomotives, cars, and/or equipment of either NSR or NPBL, then each of NSR and NPBL is solely responsible for any Loss to its own employees, trains, Locomotives, cars, and/or equipment, even if caused partially or completely by the other Party.

12.3    Except as provided in Section 9.6, each party agrees to indemnify and hold harmless the other Party and its parent corporation, subsidiaries and affiliates, and any or all their respective directors, officers, agents and employees from and against any and all costs and payments, including benefits, allowances and arbitration, administrative and litigation expenses, arising out of claims or grievances made by or on behalf of its own employees, either pursuant to a collective bargaining agreement or employee protective conditions imposed by a governmental agency upon the agency's approval or exemption of this Agreement.  It is the intention of the Parties that each Party shall bear the full costs of protection of its own employees under employee protective conditions that may be imposed, and of grievances filed by its own employee arising under its collective bargaining agreements with its employees. Similarly, each Party agrees to indemnify and hold harmless the other Party against any and all costs and payments, including judgments, damages, attorneys' fees and litigation expenses, arising out of claims, lawsuits and actions brought by or on behalf of its own employees pursuant to any provision of law, including common law, and based on employment arising out of the operations covered by this Agreement, except to extent otherwise specifically provided in this Agreement.

12.4    Whenever any Loss is assumed by or apportioned to a Party under the foregoing provisions, that Party shall forever protect, defend, indemnify, and save harmless the other Party and its parent corporation, subsidiaries and affiliates, and any and all of their respective directors, officers, agents, and employees from and against such Loss assumed by that Party or apportioned to it, regardless of whether caused in whole or in part by the fault, failure, negligence, misconduct, nonfeasance, or misfeasance of the indemnitee or its directors, officers agents, or employees.

12.5    In every case of death or injury suffered by an employee of either NPBL or NSR, when compensation to such employees or employee's dependents is required to be paid under any workmen's compensation, occupational disease, employers' liability or other law, and either of said Parties, under the provisions of this Agreement, is required to pay said compensation, if such compensation is required to be paid in installments over a period of time, such Party shall not be released from paying any such future installments by reason of the expiration or other termination of this Agreement prior to any of the respective dates

upon which any such future installments are to be paid.

12.6     For purposes of determining liability, pilots furnished by NSR to NPBL pursuant to this Agreement shall be considered as the employees of NPBL while such employees are on duty as pilots for NPBL.

12.7     If any suit or action shall be brought against either Party for damages which under the provisions of this Agreement are in whole or in part the responsibility of the other Party, said other Party shall be notified in writing by the party sued, and the party so notified shall have the right and be obligated to take part in the defense of such suit and shall pay a proportionate part of the judgment and costs, expense and attorneys' fees incurred in such suit according to its liability assumed hereunder. Nothing herein shall preclude a Party from appointing its own attorneys to defend its interests in such suit.

12.8     In the event of a Loss as set out herein, the Parties shall be bound by the Freight Claim Rules, Principles, and Practices of the AAR as to the handling of any claims for the loss or damage to lading.

12.9     Notwithstanding any provision of this Agreement to the contrary, for the purpose of this Article 12, the word "equipment" shall mean and be confined to (i) cabooses, (ii) vehicles and machinery which are capable of being operated on railroad tracks that, at the time of an occurrence, are being operated on the Subject Trackage, and (iii) vehicles and machinery that, at the time of an occurrence, are on the Subject Trackage or its right of way for the purpose of maintenance or repair thereof or the clearing of wrecks thereon.

12.10   Notwithstanding any and all of the forgoing provisions of this Article 12, in the event a Loss occurs while the Subject Trackage is being used by NSR and/or NPBL, and such Loss is attributable solely to the willful or wanton negligence of only one of the Parties to this Agreement, then the Party which was so willfully or wantonly negligent shall be solely responsible for such Loss.

12.11   Under no circumstances will either Party assert a claim for punitive or exemplary damages against the other Party related to the matters contemplated by this Agreement.

## ARTICLE 13.     CLAIMS

13.1     Except as provided in Section 13.1(a) below, all claims, injuries, death, property damages, and losses arising out of or connected with this Agreement will be investigated, adjusted, and defended by the Party bearing the liability, cost, and expense therefor under Article 12 of this Agreement.

      (a)     Each Party shall investigate, adjust and defend all freight loss and damage claims filed with it in accordance with U.S.C. § 11706 and 49 C.F.R. Section 1005, or in accordance with any applicable transportation contract filed pursuant to 49 U.S.C. § 10709.

-20-
A-11

(b)   In the event a claim or suit is asserted against NSR or NPBL which is the other's duty hereunder to investigate, adjust or defend, then, unless otherwise agreed, such other Party shall, upon request, take over the investigation, adjustment, and defense of such claim or suit.

(c)   All costs and expenses in connection with the investigation, adjustment and defense of any claim or suit under this Agreement shall be included as costs and expenses in applying the liability provisions set forth in this Agreement, except that salaries or wages of full-time agents, full-time attorneys and other full-time employees of either Party engaged directly or indirectly in such work shall be borne by such Party.

(d)   Excluding freight loss and damage claims filed in accordance with 49 U.S.C. § 11706 or 49 C.F.R. Section 1005, or in accordance with any applicable transportation contract filed pursuant to 49 U.S.C. § 10709, neither Party shall settle or compromise any claim, demand, suit or cause of action for which the other Party has any liability under this Agreement without the concurrence of such other party if the consideration for such settlement or compromise exceeds THIRTY-FIVE THOUSAND DOLLARS ($35,000).

13.2   It is understood that nothing in this Article 13 shall modify or waive the conditions, obligations, assumptions or apportionments provided in Article 12.

## ARTICLE 14.   **INDEMNITY COVERAGE**

14.1   As part of the consideration hereof, each Party hereby agrees that each and all of its indemnity commitments in this Agreement in favor of the other Party shall also extend to and indemnify the parent corporation, subsidiaries, and affiliates of such other Party, and all of their respective directors, officers, agents, and employees.

## ARTICLE 15.   **INSURANCE**

15.1   NPBL shall procure and maintain in effect during the life of this Agreement a policy or policies of insurance covering the liability to which it is or may be subject under Article 15 hereof. Such insurance shall provide minimum limits of          per occurrence but may be subject to an annual aggregate limit of          and a per occurrence deductible not in excess of          . Said policy or policies shall name NSR as an additional insured.

15.2   If the insurance provided under this Article 15 takes the form of a Claims Made Policy, NPBL agrees to purchase whatever supplemental coverage may be necessary to provide continuous supplemental coverage of its potential liability under this Agreement, with annual occurrence and annual aggregate limits no less than those required hereunder, for

-21-
A-12

a period of time at least five (5) years following the termination of this Agreement. NPBL further agrees to immediately give written notice to the Director Risk Management, Norfolk Southern Corporation, Three Commercial Place, Norfolk, Virginia 23510-2191, of any claim or notice of incident or notice of potential claim that is required to be reported to its liability insurance company.

15.3    On or before any anniversary date of this Agreement which occurs more than one (1) year after its Commencement Date, NSR may require an increase in the amount of insurance coverage required by this Article 15, or changes in the terms and conditions of the policy or policies, provided the amount of the increase does not exceed an average of ▮▮▮▮▮▮▮ for each year that this Agreement has been in effect. To the extent possible, NSR shall give NPBL at least thirty (30) days' notice, in writing, of any increase in the amount of insurance required.

15.4    Every policy of insurance obtained by NPBL pursuant to the requirements of this Article 15 shall contain provisions requiring that the insurance carriers give NSR at least thirty (30) days' notice, in writing, of any proposed policy cancellation and of any material modification of the terms and conditions of the policy. The terms and conditions of each policy of insurance obtained by NPBL to satisfy the requirements of this Article 15 will be subject to the approval of NSR.

15.5    Within thirty (30) days of execution of this Agreement, NPBL will furnish to the above referenced Director Risk Management an accurate copy of each policy of insurance obtained pursuant to the requirements of this Agreement. Compliance with this requirement will not relieve NPBL of any other obligation under this Agreement and will in no way limit or modify NPBL's obligation to provide the specific insurance coverage required by this Agreement. Evidence of subsequent renewal of such insurance or of any material change must be furnished to the above referenced Director Risk Management as stipulated in Subsection (b) above.

## ARTICLE 16.      TERM, TERMINATION, AND DEFAULT

16.1    This Agreement shall become effective (the "Effective Date") as of the first date executed by both of the Parties. However, NPBL operations over the Subject Trackage pursuant to this Agreement shall not commence until a date (the "Commencement Date") mutually agreed in writing between NPBL and NSR, which date shall not occur until the effective date of any required Surface Transportation Board ("STB") authorization or exemption of NPBL's trackage rights granted by this Agreement (including compliance with any condition(s) imposed by the STB in connection with such approval or exemption).

16.2    The Term of this Agreement shall be ten (10) years from the Commencement Date, provided NPBL has the option to renew the Agreement for one additional five (5) year term, which will occur automatically absent notice from NPBL.

16.3    Termination of this Agreement shall not relieve or release either Party hereto from any

obligations assumed or from any liability which may have arisen or been incurred by such Party under the terms of this Agreement prior to termination thereof.

16.4  In the event of any material failure on the part of NPBL to perform its obligations under this Agreement and the continuation of such failure for a period of sixty (60) days after written notice thereof by certified mail from NSR, NPBL shall have the right at its option and after first giving thirty (30) days' written notice thereof by certified mail, and notwithstanding any waiver by NSR of any prior breach thereof, to terminate the Agreement and NPBL's use of the Subject Trackage, subject to any regulatory approval or exemption that may be required under governing law. The exercise of such right by NSR will not impair its rights under this Agreement or any cause or causes of action it may have against NPBL for the recovery of damages.

## ARTICLE 17.    REGULATORY APPROVAL

17.1  Should implementation of this Agreement require the prior approval and authorization of the STB or other regulatory authority, NPBL, at its own cost and expense, will initiate and thereafter diligently pursue such approval and authorization or an exemption therefrom. Prior to making any submission to the STB, NPBL shall present said submission to NSR for NSR's review and approval prior to filing, which approval shall not be unreasonably withheld or delayed.

17.2  NPBL shall, within sixty (60) days of the date of termination or non-renewal of this Agreement or the date that the obligation to discontinue the Trackage Rights arises for any other reason under the terms of this Agreement, initiate and thereafter diligently prosecute any action to obtain approval from STB or other regulatory body having jurisdiction authorizing abandonment or discontinuance of the Trackage Rights herein granted. If NPBL fails to file within (60) days, NPBL hereby expressly authorizes NSR to file with the STB, or other regulatory body having jurisdiction, on behalf of NPBL to abandon or discontinue the Trackage Rights granted hereunder, and NPBL further agrees to reimburse NSR for all costs incurred.

## ARTICLE 18.    FORCE MAJEURE

18.1  The obligations, other than payment obligations, of the Parties to this Agreement shall be subject to force majeure (including Acts of God, floods, storms, earthquakes, hurricanes, tornadoes, or other severe weather or climatic conditions, acts of public enemy, war, blockade, insurrection, vandalism or sabotage, fire, accident, wreck, derailment, washout or explosion, strike, lockout or labor disputes experienced by the Parties hereto, embargoes or AAR service orders, Federal Railroad Administration (FRA) orders, or governmental laws, orders, or regulations, and other causes or circumstances beyond the control of the Party invoking such force majeure as an excuse for nonperformance), but only as long as, and to the extent that, such force majeure shall reasonably prevent performance of such obligations by the affected Party.

**ARTICLE 19.**     **ABANDONMENT**

19.1    Notwithstanding the provisions of Article 16 of this Agreement, NSR may abandon all or part of the Subject Trackage during the term of this Agreement, or any renewals hereof, upon giving NPBL not less than ninety (90) days' written notice of NSRs intent to abandon. In the event regulatory authority is required to effect such abandonment, NPBL will not interfere with or oppose NSR's actions to seek and to exercise such authority. In the event regulatory authority is required for NPBL to discontinue its own operations over the Subject Trackage, NPBL will seek and diligently pursue such regulatory authority at the same time that NSR seeks regulatory authority to abandon the Subject Trackage, or as soon thereafter as NPBL may do so in accordance with applicable statutes and regulations, unless NPBL intends to acquire the Subject Trackage from NSR pursuant to 49 U.S.C. § 10904 or other similar provision. NPBL hereby expressly reserves the right pursuant to 49 U.S.C. § 10904 or any similar provision which may be in effect to subsidize operations on or to acquire the Subject Trackage. Unless NPBL or another party acquires the Subject Trackage for continued rail use or subsidizes NSR's operations thereon, NPBL shall exercise its authority to discontinue its operations pursuant to this Agreement upon the date established by NSR for abandonment of the Subject Trackage by its aforesaid notice to NPBL, or upon the earliest authorized date of exercise of the regulatory authority to discontinue operations, whichever is later. If regulatory authority for discontinuance of NPBL's operations is not required, NPBL shall discontinue its operations hereunder on the date that NSR is authorized to abandon the Subject Trackage. Upon discontinuance of NPBL's operations, this Agreement shall terminate and be of no further force and effect, except that termination of this Agreement shall not relieve or release either party hereto from any obligations assumed or from any liability which may have arisen or been incurred prior to said termination As used herein, Subject Trackage means the entire Subject Trackage or any portion or portions thereof.

**ARTICLE 20.**     **SUCCESSORS AND ASSIGNS**

20.1    Neither party hereto may assign this Agreement, in whole or in part, or any rights granted herein, or delegate to another party any duties hereunder, except a subsidiary, or an affiliate, without the prior written consent of the other party.  Any transfer, assignment, or delegation of this Agreement, or of any rights or duties herein granted or imposed, whether voluntary, by operation of law, or otherwise, without such consent in writing, shall be absolutely void, and at the option of the party whose written consent should have been obtained, this Agreement may be terminated. Subject to this Article, this Agreement shall be binding upon and inure to the benefits of the Parties hereto, their successors and assigns.

**ARTICLE 21.**     **NOTICE**

21.1    Any notice required or permitted to be given by one Party to another under this Agreement shall be deemed given on the date sent by certified mail, or by such other means as the Parties may mutually agree, and shall be addressed as follows:

If to NPBL:

       Norfolk & Portsmouth Belt Line Railroad
       Attn: President & General Manager
       1340 Truxton Street
       Chesapeake, VA 23324

with a copy to:

       Crenshaw, Ware & Martin, PLC
       Attn: NPBL General Counsel
       150 W. Main Street, Suite 1500
       Norfolk, VA 23510

If to NSR:

       Norfolk Southern Railway Company
       c/o Norfolk Southern Corporation
       Attn: Executive Vice President Operations
       Three Commercial Place
       Norfolk, VA 23510-2191

with a copy to:

       Norfolk Southern Railway Company
       c/o Norfolk Southern Corporation
       Attn: Director – Joint Facilities
       1200 Peachtree Street, NE – Box 158
       Atlanta, Georgia 30309

Either Party may provide changes in the above addresses to the other Party by personal service or U.S. mail.

### ARTICLE 22.    GENERAL PROVISIONS

22.1    This Agreement and each and every provision hereof is for the exclusive benefit of the Parties and not for the benefit of any third party. Nothing herein contained shall be taken as creating or increasing any right of any third party to recover by way of damages or otherwise against either of the Parties.

22.2    This Agreement contains the entire understanding of the Parties and supersedes any and all oral understandings between the Parties.

22.3    No term or provision of this Agreement may be changed, waived, discharged, or terminated except by an instrument in writing and signed by both Parties.

22.4   No consent or waiver, expressed or implied, by a Party of any breach or default by the other Party in the performance by such other Party of its obligations hereunder shall be deemed or construed to be a consent to or waiver of any other breach or default in the performance hereunder by such other Party.  Failure on the part of a Party to complain of any act or failure of the other Party or to declare the other Party in default, irrespective of how long such failure continues, shall not constitute a waiver by such first mentioned Party of its rights hereunder.

22.5   All words, terms and phrases used in this Agreement shall be construed in accordance with the generally applicable definition or meaning of such words, terms, and phrases in the railroad industry.

22.6   All Article headings are inserted for convenience only and shall not affect any construction or interpretation of this Agreement.

22.7   As used in this Agreement, whenever reference is made to the trains, locomotives, cars, or equipment of, or in the account of, one of the Parties, such expression means the trains, locomotives, cars, and equipment in the possession of or operated by one of the Parties and includes such trains, locomotives, cars, and equipment which are owned by, leased to, or in the account of such Party.  Whenever such locomotives, cars, or equipment are owned or leased by one Party and are in the possession or account of the other Party, such locomotives, cars, and equipment shall be considered those of that other Party in whose possession or train such locomotives, cars and equipment are located.

22.8   This Agreement is the result of mutual negotiations of the Parties, neither of whom shall be considered the drafter for purposes of contract construction.

22.9   This Agreement shall be governed by and construed in accordance with the laws of Virginia without giving effect to any choice or conflict of laws provision or rule (whether Virginia or any other jurisdiction) that would cause the application of laws of any jurisdiction other than Virginia.

22.10  If any provision of this Agreement or the application thereof to any Party hereto or to any circumstance shall be determined by a court of competent jurisdiction to be invalid or unenforceable to any extent or for any reason, the remainder of this Agreement or the application of the provisions thereof to such Party or circumstance, other than those determined to be invalid or unenforceable, shall not be affected thereby and shall be enforced to the fullest extent permitted by law, and the Parties shall promptly enter into such other agreement(s) as their respective legal counsel may deem appropriate in order to replace such invalid or unenforceable provisions in a manner which produces a result which is substantially equivalent to the terms of this Agreement in all material respects.

22.11  This Agreement may be executed in several counterparts, each of which will be deemed an original, and such counterparts shall constitute one and the same instrument.

**ARTICLE 23.**     **CONFIDENTIALITY**

23.1     Except as provided by law or by rule, order, or regulation of any court or regulatory agency with jurisdiction over the subject matter of this Agreement or as may be necessary or appropriate for a Party to enforce its rights under this Agreement, during the term of this Agreement and during a period of three (3) years subsequent to termination of this Agreement, the terms and provisions of this Agreement and all information to which access is provided or obtained hereunder shall be kept confidential and shall not be disclosed by either NSR or NPBL to any party other than each Party's respective parent corporation, subsidiaries, and affiliates, and their respective directors, officers, agents, employees and attorneys, without the prior written approval of the other Party.


**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be duly executed as of the date first above written.

Witness for NBPL:                            NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY

_____        By:_____
                                            President and General Manager

Witness for NSR:                             NORFOLK SOUTHERN RAILWAY COMPANY

_____        By: _____
                                         Vice President Network & Service Management

**BEFORE THE**
**SURFACE TRANSPORTATION BOARD**

---

**FD 36223**

---

**NORFOLK SOUTHERN RAILWAY COMPANY**
**– PETITION TO SET TRACKAGE RIGHTS COMPENSATION –**
**NORFOLK & PORTSMOUTH BELT LINE RAILROAD COMPANY**

---

**EXHIBIT C**

---

**From:** Moss, Cannon <Cannon.Moss@nscorp.com>
**Sent:** Monday, August 27, 2018 12:25 PM
**To:** Hall, Jerry W. <Jerry.Hall@nscorp.com>; Merilli, Philip <Philip.Merilli@nscorp.com>; Hurlbut,
Thomas E. <Thomas.Hurlbut@nscorp.com>; Swafford, Jermaine <Jermaine_Swafford@CSX.com>; Burns,
Michael <Michael_Burns@csx.com>
**Cc:** Coleman, Donna <Donna.Coleman@nscorp.com>; Jim Chapman (jchapman@cwm-law.com)
<jchapman@cwm-law.com>
**Subject:** Update on negotiations with NS over trackage rights

Gentlemen:

This is to update you regarding the negotiation with NS over trackage rights to West Junction. Except
for the per car fee proposed by NS ($██), NPBL finds the other terms of the proposed agreement (as
revised) acceptable. We have informed NS that the per car fee should be $██, not $██.

Because we are unable to reach agreement on the price term, the matter needs to be submitted to the
STB to make an independent determination of reasonable compensation. NS will commence the
process by petitioning the STB. NPBL has retained counsel who specializes in STB matters. It is
anticipated that this may be a long process and, if you have questions at this time, we can schedule a
board meeting. Otherwise, an update will be provided at the next regular board meeting in December.

Cannon Moss
President & GM
Norfolk & Portsmouth Belt Line Railroad
1340 Truxton St.
Chesapeake, VA 23324

(O) 757-271-1756
(C) 757-237-0888

This email transmission and any accompanying attachments may contain CSX privileged and
confidential information intended only for the use of the intended addressee. Any dissemination,
distribution, copying or action taken in reliance on the contents of this email by anyone other
than the intended recipient is strictly prohibited. If you have received this email in error please
immediately delete it and notify sender at the above CSX email address. Sender and CSX accept
no liability for any damage caused directly or indirectly by receipt of this email.

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of Norfolk Southern Railway Company's petition to set trackage rights compensation terms for the trackage rights that Norfolk & Portsmouth Belt Line Railroad currently operates over NSR's lines in Norfolk, VA, and Chesapeake, VA, by mailing copies of the Petition via prepaid first class mail to the President and General Manager of the NPBL or by more expeditious means of delivery.

Dated at Washington, D.C. this 13th day of September, 2018.

William A. Mullins
Attorney for Norfolk Southern Railway Company

-30-