IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

CSX TRANSPORTATION, INC.,
individually and on behalf of
NORFOLK & PORTSMOUTH BELT LINE
RAILROAD COMPANY,

      Plaintiff,

v.                                           Civil Action No. 2:18-cv-530

NORFOLK SOUTHERN RAILWAY COMPANY,
NORFOLK & PORTSMOUTH BELT LINE
RAILROAD COMPANY, JERRY HALL,
THOMAS HURLBUT, PHILIP MERILLI,
and CANNON MOSS,

      Defendants.

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Defendant Cannon Moss ("Moss"), by counsel, states as follows in support of his Motion to Dismiss for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.

## I.      Introduction

Plaintiff CSX Transportation, Inc. ("CSXT") is both a customer and a minority shareholder of the Norfolk & Portsmouth Belt Line Railroad Company ("NPBL"). Unhappy with the switch rate it pays to the NPBL as a *customer*, CSXT has manufactured this lawsuit, and more particularly Count VI against Moss and other directors, in CSXT's role as a *shareholde*r, in an effort to improve its economic position vis-à-vis the NPBL's majority shareholder, Norfolk Southern Railway Company ("Norfolk Southern"). In doing so, CSXT has concocted a confusing mix of claims in which the NPBL is in the unusual position of being both a plaintiff and a

defendant, and individuals like Moss are dragged along into a federal antitrust fight to which they are not a party.

As is evident from the Complaint, CSXT's grievances are directed primarily at Norfolk Southern and at actions concerning the NPBL over the last ten or more years, not at the current members of the NPBL's Board of Directors. CSXT is using Moss as a pawn in its effort to lash out at Norfolk Southern, its arch rival. Because of the mismatch between CXST's federal-question claims against the NPBL and Norfolk Southern and its single state-law claim against Moss, the Court lacks supplemental subject matter jurisdiction over the state-law claim asserted against Moss under 28 U.S.C. § 1367(a). In the alternative, the Court should decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c).

Even if the Court exercises supplemental jurisdiction over Count VI, Count VI fails to state a claim upon which relief can be granted. The facts alleged by CSXT do not state a claim for breach of fiduciary duty as a matter of law. The foundational corporate organizational documents of the NPBL, which were attached to the Complaint, govern the duties and practices of the NPBL directors. In context, CSXT's strained allegations in the Complaint fail to plausibly allege that Moss committed any breach of the fiduciary duty that is informed by those foundational documents. As a result, Count VI should be dismissed.

## II.     Background

The NPBL was originally established in 1897 by the agreement of eight railroad companies to construct a "Belt Line Railroad from Pinner's Point, Virginia to a connection with the Norfolk and Western Railway in Berkley, Virginia . . . under the charter of The Southeastern and Atlantic Railroad Company."[1] Compl. Ex. A (ECF No. 1-1, at 3) (the "1897 Agreement"). Contrary to

---

[1] By act of the General Assembly dated January 12, 1898, the charter was amended to change the name to the NPBL. See 1896 Acts of Assembly Ch. 55.

CSXT's allegation that the 1897 Agreement "was designed to ensure that all railroads would have ready access to NIT . . .",  the 1897 Agreement, does not mention Norfolk International Terminal ("NIT") or ports at all. Compl. ¶ 15.

The 1897 Agreement is, by its own terms, central to the governance of the NPBL. Article Six of the 1897 Agreement provides that "the affairs of the Company shall be under the management of the President and Directors, and that the By-Laws of the Company to be adopted by them shall provide for carrying into effect the provisions of this Agreement." (ECF No. 1-1, at 4). Additionally, Article Seventeen of the 1897 Agreement provides that "each of the Companies parties hereto, agrees that the Director named by each to represent it in the Board of [the NPBL] shall and will vote for such resolutions, by-laws or other proceedings *as may be necessary to carry into effect the agreements made herein*." (ECF No. 1-1, at 8) (emphasis added).

The 1897 Agreement also features unique and important provisions addressing the business operations of the NPBL. Article Nine of the 1897 Agreement provides "[t]hat a *uniform* rate shall be fixed for the movement of freight cars over the said . . . railroad, regardless of distance, and that the rate per loaded freight car shall be so adjusted from time to time *as to yield a net revenue sufficient to pay the interest upon the bonds outstanding and six per cent on the stock*." Id. (ECF No. 1-1, at 5-6) (emphasis added).[2] Further, Article Fifteen of the 1897 Agreement provides that "[i]t is understood and agreed that the locomotives owned by the parties hereto are not to enter upon or use the tracks of the [NPBL] for any purpose whatever, excepting under such rules and regulations as may be established by the Board of Directors . . . the intent being that *the [NPBL] shall perform the service for which it was built . . . .*" (ECF No. 1-1-, at 7-8) (emphasis added).

---

[2] The capital stock of the NPBL was "fixed at Fifty Thousand Dollars." 1897 Agreement Art. One (ECF No. 1-1, at 3).

3

The 1897 Agreement also provided, in Article Four, that "the number of directors of the said [NPBL] shall always be fixed to correspond to the number of Companies holding stock therein . . . ." Id. (ECF No. 1-1, at 4). At the time of execution of the 1897 Agreement, there were eight companies holding stock therein. See Compl. ¶ 2.

However, in 1989, the then-existing shareholders, including CSXT, entered into a Supplemental Shareholders Agreement attached to the Complaint as Exhibit C, in which they agreed that "[n]otwithstanding the first sentence of Article Fourth of the NPBL Agreement, CSX shall have the right to appoint two representatives to the NPBL Board, and NW/SR shall have the right to appoint three representatives to the NPBL Board." See Compl. Ex. C (the "1989 Supplemental Agreement") (ECF No. 1-3, at 4). At the time the 1989 Supplemental Agreement was entered into, Norfolk Southern Corporation owned both the Norfolk and Western Railroad and the Southern Railway Company.[3] Thus, since 1989, Norfolk Southern Corporation, through its affiliates, has had the right to appoint three representatives to the NPBL Board.

The NPBL adopted its current By-Laws in 1996, which are attached to the Complaint as Exhibit D. They provide, among other things, that the "Board of Directors shall consist of six voting members and one non-voting member who shall be elected by the Stockholders . . . ." (ECF No. 1-4, at 3). The By-Laws also provide that "[n]o other locomotives than those of the Company shall be allowed to use its tracks, excepting under such rules and regulations as may be established

---

[3] On July 23, 1980, Norfolk Southern Corporation was incorporated under the laws of the Commonwealth of Virginia. See Form 10-K of Norfolk Southern Corporation, at 4 (Mar. 28, 1994) (excerpt attached as **Exhibit 1**), available at https://www.sec.gov/Archives/edgar/data/702165/ 0000702165-94-000008-index.html; see also Compl. ¶¶ 21, 23. "On June l, 1982, Norfolk Southern [Corporation] acquired control of two major operating railroads, Norfolk and Western Railway Company (NW) and Southern Railway Company (Southern)." Ex. 1 at 4. Then, "[e]ffective December 31, 1990, Norfolk Southern [Corporation] transferred all the common stock of NW to Southern, and Southern's name was changed to Norfolk Southern Railway Company." Ex. 1.; see Penn v. 1st S. Ins. Servs., Inc., 324 F. Supp. 3d 703, 713 (E.D. Va. 2018) (quoting Stoney Glen, LLC v. S. Bank & Tr. Co., 944 F. Supp. 2d 460, 464 (E.D. Va. 2013)) ("[A] court 'may consider official public records, documents central to a plaintiff's claim, and documents sufficiently referred to in the complaint, so long as the authenticity of these documents is not disputed,' without converting the motion into a motion for summary judgment.'").

by the President . . . subject to confirmation or rejection by the Board at any subsequent meeting." (ECF No. 1-4, at 6).

Since the 1990s, CSXT has apparently grown dissatisfied with the terms of the 1989 Supplemental Agreement. See generally Compl. ¶¶ 67-76. In addition, CSXT, as a customer of the NPBL, has grown dissatisfied with the NPBL's uniform rate charged for freight cars on the NPBL line. See, e.g., Compl. ¶¶ 38, 39, 42. On March 23, 2018, Tony DiDeo, CSXT's Director of Intercarrier Management Joint Facilities, sent a letter to Moss and Donna Coleman, the NPBL's Vice President, Comptroller and Corporate Secretary, conveying a business proposal for the NPBL and CSXT for long term rail service to NIT. Compl. Ex. E (ECF No. 1-5) (the "Rate Proposal"). In the Rate Proposal, CSXT urged a switch rate of $80 per car and certain guaranteed minimums from CSXT in volume of cars. Id. (ECF No. 1-5, at 4-5). The NPBL's current uniform rate, in place since 2009, is $210 per car. See id. (ECF No. 1-5, at 11). CSXT also offered, contrary to Article Fifteen of the 1897 Agreement, to "provide NPBL with the locomotives and fuel to handle movement of CSXT traffic at no charge to NPBL." (ECF No. 1-5, at 5).

On April 6, 2018, Steven C. Armbrust, CSXT's Assistant General Counsel, sent a letter to the NPBL Board and Norfolk Southern, demanding that the NPBL Board and Norfolk Southern restructure the NPBL's Board at the April 2018 meetings of the Board and the NPBL shareholders. Compl. Ex. F (ECF No. 1-6) (the "Demand Letter"). In the Demand Letter, CSXT argued that the merger of Norfolk and Western Railway and Southern Railway in late 1990 "eliminated the purpose for which the [1989] Supplemental Agreement had been created and rendered the [1989] Supplemental Agreement's modifications to Article 4 of the [1897] Agreement unwarranted, moot, and contrary to the core organizing principle and intent of the original NPBL shareholders . . . ." Id. (ECF No. 1-6, at 3). CSXT also proposed that – by some unspecified means – the NPBL should

5

require that CSXT and Norfolk Southern each have the right to elect only one director to the NPBL's Board, and the remainder be independent directors. See (ECF No. 1-6, at 6). CSXT also demanded that one of the independent directors be nominated to serve as President and General Manager, replacing Moss. See id. CSXT's demands were presumably directed at amending the 1989 Supplemental Agreement, but the Demand Letter only generally demands a "[r]estructure of the NPBL's governance systems." Id.

On April 18, 2018, the NPBL held a meeting of its Board of Directors and a meeting of its shareholders. The NPBL shareholders did not agree to the demands made in the Demand Letter, and the NPBL Board of Directors did not accept the Rate Proposal. See, e.g., Compl. ¶ 40.

On June 22, 2018, CSXT made a written demand, by letter, on the NPBL to take immediate action. Compl. ¶ 111. On October 4, 2018, CSXT, individually and derivatively on behalf the NPBL filed the Complaint commencing this action against Moss, Norfolk Southern, the NPBL, and other individual directors.

### III.   Argument and Authorities

**A.   The Court Lacks Subject Matter Jurisdiction Over Count VI, and Moss Should be Dismissed.**

1.   Rule 12(b)(1) Standard of Review

"A defendant may challenge subject-matter jurisdiction in one of two ways: facially or factually." Beck v. McDonald, 848 F.3d 262, 270 (4th Cir. 2017) (citing Kerns v. United States, 585 F.3d 187, 192 (4th Cir. 2009)). "In a facial challenge, the defendant contends 'that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based.'" Id. (quoting Kerns, 585 F.3d at 192). "Accordingly, the plaintiff is 'afforded the same procedural protection as she would receive under a Rule 12(b)(6) consideration,' wherein 'the facts alleged in the complaint are taken as true,' and the defendant's challenge 'must be denied if the complaint alleges sufficient

facts to invoke subject matter jurisdiction.'" Id. (quoting Kerns, 585 F.3d at 192). Here, Moss

raises a facial challenge.

       2.      Count VI Does Not Arise from the Same Case or Controversy as CSXT's Federal Question Counts.

In Count VI of the Complaint, CSXT, a Virginia corporation, alleges a Virginia state law

claim of breach of fiduciary duty, derivatively on behalf of the NPBL, a Virginia corporation,

against Moss, a Virginia citizen. CSXT alleges that the Court has supplemental jurisdiction over

Count VI. See Compl. ¶ 12.

The supplemental jurisdiction statute provides, in relevant part:

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise
by Federal statute, in any civil action of which the district courts have original
jurisdiction, the district courts shall have supplemental jurisdiction *over all other
claims that are so related to claims in the action within such original jurisdiction
that they form part of the same case or controversy under Article III of the United
States Constitution*. Such supplemental jurisdiction shall include claims that
involve the joinder or intervention of additional parties.
. . .

(c) The district courts may decline to exercise supplemental jurisdiction over a
claim under subsection (a) if--
    (1) the claim raises a novel or complex issue of State law,
    (2) the claim substantially predominates over the claim or claims over which
    the district court has original jurisdiction,
    (3) the district court has dismissed all claims over which it has original
    jurisdiction, or
    (4) in exceptional circumstances, there are other compelling reasons for
    declining jurisdiction.

28 U.S.C. § 1367 (emphasis added). Section 1367(a)'s "same case or controversy" standard

principally arose from the doctrine developed from United Mine Workers v. Gibbs, 383 U.S. 715

(1966) and pendent jurisdiction. "[T]he Supreme Court determined that once a district court had

valid jurisdiction over a federal claim, it could, *in its discretion*, exercise supplemental jurisdiction

over additional state claims if they [1] arose out of 'a common nucleus of *operative* fact' . . .",

White v. Cty. of Newberry, S.C., 985 F.2d 168, 171 (4th Cir. 1993) (quoting Gibbs, 383 U.S. at

725) (emphasis added), "and [2] are 'such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding.'" <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 349 (1988) (quoting <u>Gibbs</u>, 383 U.S. at 725).

Courts recognize that "[n]ot every dispute that arises between parties litigating a federal claim constitutes a part of the same Article III case." <u>Council of Unit Owners of Wisp Condo., Inc. v. Recreational Indus., Inc.</u>, 793 F. Supp. 120, 122 (D. Md. 1992). Here, the derivative claim asserted in Count VI against Moss is separate and distinct from CSXT's non-derivative federal antitrust claims asserted in Counts I, II, III, and IV. CSXT registers the former claim as a shareholder of the NPBL, whereas CSXT registers the latter claims as a customer of the NPBL and competitor of Norfolk Southern. With widely varying elements of proof involved in the respective claims, CSXT would not ordinarily be expected to try them all in one proceeding.

To establish a violation of § 1 of the Sherman Act, a plaintiff "must prove the following elements: (1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." <u>Dickson v. Microsoft Corp.</u>, 309 F.3d 193, 202–03 (4th Cir. 2002). And, for a section 2 violation, a plaintiff must show a "conspiracy to monopolize claim [which] must include allegations which, if proven true, would establish that the agreements . . . made . . . could have had an anticompetitive effect (when considered separately)." <u>Id.</u> at 211. To prove an unreasonable restraint of trade and/or attempted monopolization will require CSXT to generate and introduce expert testimony from economist(s) focused on the relevant railroad and transportation markets.

In contrast, Count VI targets the actions by individual directors like Moss. Count VI will likely require expert testimony regarding the standard of care of Virginia corporate board members and require context-specific factual evidence regarding the subjective intent of Moss. Indeed, the conduct of directors of a Virginia corporation is generally governed by Va. Code Ann. § 13.1-690,

which provides that "[a] director shall discharge his duties as a director, including his duties as a member of a committee, in accordance with his good faith business judgment of the best interests of the corporation." Va. Code Ann. § 13.1-690(A).

Under similar circumstances, other courts have found that such disparate claims are not part of the same case or controversy under Article III. Council of Unit Owners of Wisp Condo., Inc. is instructive. In that case, the plaintiff condo association asserted federal antitrust claims against the defendant ski resort company regarding sales of condo units at a ski resort in Western Maryland. 793 F. Supp. at 121. In addition to asserting antitrust claims, the plaintiff sought injunctive relief against the defendant based on a state-law breach of contract theory. See id. at 122. The Court held that it lacked supplemental jurisdiction over the state-law claim. The Court held that "[a]lthough this claim is part of an ongoing, nasty dispute between the parties, this Court does not think it is part of the same Article III case or controversy such that the claims would ordinarily be tried together." Id. As a result, the Court dismissed the request for injunctive relief.

Similarly, in N. Carolina Elec. Membership Corp. v. Carolina Power & Light Co., the court held that state law counterclaims (filed in response to Sherman Act claims) were permissive, rather than mandatory, under Rule 13, and as a result, there was no supplemental jurisdiction to support them. 85 F.R.D. 249, 251 (M.D.N.C. 1979). The court looked to the elements necessary for each claim, and held that "[i]t is clear from the above list of elements that the issues of law and fact involved in the antitrust and state law claims are separate and distinct." Id.

Here too, the evidence necessary to try CSXT's antitrust claims and CSXT's breach of fiduciary duty claims are separate and distinct, such that CSXT would not "ordinarily be expected to try them all in one judicial proceeding." Cohill, 484 U.S. at 349. CSXT brings its antitrust claims in its individual capacity focusing on the allegedly decades-long monopolization of "intermodal

transportation in and out of Hampton Roads' ports." Compl. ¶ 62, while CSXT has filed Count VI derivatively as a representative of the shareholders of the NPBL to address internal business decisions. As a result of the disparity between CSXT's federal and state law claims, the Court lacks supplemental jurisdiction over Count VI against Moss under § 1367(a). The Court should dismiss the claim accordingly.

3.   Even if the Court has Supplemental Jurisdiction Over Count VI, It Should Decline to Exercise Jurisdiction In Its Discretion.

Alternatively, the Court should exercise its discretion and decline, under § 1367(c), to exercise jurisdiction over Count VI. Exercising supplemental jurisdiction is always within the Court's discretion. As the Supreme Court has noted: "[o]ur decisions have established that pendent jurisdiction 'is a doctrine of discretion, not of plaintiff's right,' Gibbs, 383 U.S. at 726, and that district courts can decline to exercise jurisdiction over pendent claims for a number of valid reasons." City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 172–73 (1997) (citing Gibbs, 383 U.S. at 726–727; Cohill, 484 U.S. at 350 ("As articulated by *Gibbs,* the doctrine of pendent jurisdiction thus is a doctrine of flexibility, designed to allow courts to deal with cases involving pendent claims in the manner that most sensibly accommodates a range of concerns and values")). "Accordingly, [the Supreme Court] ha[s] indicated that 'district courts [should] deal with cases involving pendent claims in the manner that best serves the principles of economy, convenience, fairness, and comity which underlie the pendent jurisdiction doctrine.'" Id. (quoting Cohill, 484 U.S. at 357).

Section 1367(c)(4) codifies the wide discretion involved in a court's decision to exercise supplemental jurisdiction over state law claims. See, e.g., Gibbs, 383 U.S. at 726 ("It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to

10

litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them."). "Among the factors that inform this discretionary determination are convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir. 1995) (citing Cohill, 484 U.S. at 350 n.7); Growth Horizons, Inc. v. Delaware County, 983 F.2d 1277, 1284 (3d Cir. 1993)). "The doctrine of supplemental jurisdiction 'thus is a doctrine of flexibility, designed to allow courts to deal with cases involving pendent claims in the manner that most sensibly accommodates a range of concerns and values.'" Id. (quoting Cohill, 484 U.S. at 350). Accordingly, courts have declined supplemental jurisdiction to avoid the risk of jury confusion where certain claims had to be tried as a bench trial while others carried a jury right. Lewis v. United States, 812 F. Supp. 620, 624-25 (E.D. Va. 1993). And, courts have declined to exercise supplemental jurisdiction based on the complexity of the case. See Crocker v. Borden, Inc., 852 F. Supp. 1322, 1329-31 (E.D. La. 1994).

Here, the Court should decline to exercise supplemental jurisdiction over Count VI based on both the complexity of CSXT's antitrust claims and the jury confusion likely to result in trying all of CSXT's claims together. As the Complaint makes clear, CSXT's principal claims are the federal antitrust claims against Norfolk Southern, not the state-law claims against the Individual Directors of the NPBL. Dragging the narrowly focused Count VI, and Moss, into the wide-ranging antitrust claims would be neither fair nor efficient. As a result, the Court should decline to exercise supplemental jurisdiction over Count VI.

**B.    Count VI Fails to State a Claim Upon Which Relief Can Be Granted.**

Even if the Court declines to dismiss Count VI for lack of subject matter jurisdiction, the Court should dismiss Count VI because it fails to state a claim for relief as a matter of law. In

Count VI, CSXT alleges that three acts or omissions of Moss constituted a breach of his fiduciary duties owed to the NPBL. First, CSXT alleges that Moss breached his fiduciary duty as a director of the NPBL by "denying CSXT's Service Proposal." Compl. ¶ 112. Second, CSXT alleges that Moss breached his fiduciary duty as a director of the NPBL by "denying CSXT's . . . proposal for reforms of NPBL's corporate governance structure." Id. Third, CSXT alleges that Moss breached his fiduciary duty as a director of the NPBL by "failing to appropriately manage NPBL, leading to is deteriorating financial condition." Id. All three fail to make out a claim for breach of fiduciary duty.

       1.     Rule 12(b)(6) Standard of Review

A Rule 12(b)(6) motion "challenges the legal sufficiency of a complaint considered with the assumption that the facts alleged are true." Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir. 2009) (internal citations omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "The inclusion of conclusory legal terms . . . does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint do not support the legal conclusion." Trigon Ins. Co. v. Columbia Naples Capital, LLC, 235 F. Supp. 2d 495, 500 (E.D. Va. 2002).

Because the Court should not accept conclusory allegations in the Complaint as true, in considering this Motion it "can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Iqbal, 556 U.S. at 679. Once the Court has rejected "bare assertions" that amount to nothing more than a "formulaic recitation of the elements," Twombly, 550 U.S. at 546, the Court must conduct a "context-specific analysis" of the remaining allegations, drawing on "judicial experience and common sense" to determine

whether such allegations "produce an inference of liability strong enough to nudge the plaintiff's claims across the line from conceivable to plausible." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 256 (4th Cir. 2009) (internal quotations omitted).

> 2. **CSXT Fails to State a Claim for Breach of Fiduciary Duty Against Moss Based on the Rate Proposal.**

The NPBL's corporate governance documents define the scope and nature of the duties owed by the NPBL's directors to the NPBL, as supplemented by Virginia law. In its Complaint, CSXT ignores these documents, which make clear, amongst other things, that the NPBL is no ordinary profit-maximizing enterprise. The NPBL, as made evident by the 1897 Agreement, functions as a cost-of-capital corporation with specific objectives and limited profit targets. CSXT's complaints about the Rate Proposal, as a customer of the NPBL, do not constitute a breach of fiduciary duty claim. As a result, the facts alleged in the Complaint do not allow the Court, "drawing on judicial experience and common sense, to infer more than the mere possibility of misconduct." In re Capital One Derivative S'holder Litig., 952 F. Supp. 2d 770, 782 (E.D. Va. 2013) (quoting Nemet Chevrolet, Ltd., 591 F.3d at 255-56).

> a. The Corporate Documents Govern the Directors' Duties.

Virginia Code § 13.1-673 provides that "[a]ll corporate powers shall be exercised by or under the authority of, and the business and affairs of the corporation managed under the direction of, its board of directors, *subject to any limitation set forth in the articles of incorporation or in an agreement authorized under § 13.1-671.1*." Va. Code Ann. § 13.1-673(B) (emphasis added). Section 13.1-671.1 authorizes shareholder agreements, like the 1897 Agreement and the 1989 Supplemental Agreement. Among the provisions enforceable in shareholders agreements are those that "[g]overn[], in general or in regard to specific matters, the exercise or division of voting power by or between the shareholders and directors or by or among any of them, including use of

13

weighted voting rights or director proxies," Va. Code Ann. § 13.1-671.1(A)(4), and those that "[o]therwise govern[] the exercise of the corporate powers or the management of the business and affairs of the corporation or the relationship among the shareholders, the directors and the corporation, or among any of them, and is not contrary to public policy." Va. Code Ann. § 13.1-671.1(A)(8).

The governing documents of Virginia corporations, therefore, place important conditions and limitations on the duties, powers, and roles of the directors. In addition, "[w]hen challenged in the courts, management decisions concerning the internal affairs of a Virginia corporation will not be upset absent a showing of gross mismanagement or bad faith." Abella v. Universal Leaf Tobacco, Inc., 495 F. Supp. 713, 716–17 (E.D. Va. 1980) (citing Penn v. Pemberton & Penn, Inc., 189 Va. 649, 660 (1949)). "[I]n Virginia, a director's discharge of duties is not measured by what a reasonable person would do in similar circumstances or by the rationality of the ultimate decision. Instead, a director must act in accordance with his/her good faith business judgment of what is in the best interests of the corporation." Willard ex rel. Moneta Bldg. Supply, Inc. v. Moneta Bldg. Supply, Inc., 258 Va. 140, 151 (1999).

  b. The NPBL's Governing Documents Contradict Suppositions and Allegations in CSXT's Complaint, and Count VI Fails as a Result.

As set forth above, the overarching governing document for the NPBL, the 1897 Agreement, provides clear direction and limits on the operation of the NPBL by and through its Board of Directors. CSXT's claims in Count VI rest upon an erroneous premise that the NPBL is a profit-maximizing corporation. See Compl. ¶ 61. It is not. In addition, certain terms of the Rate Proposal are out and out barred by the constraints in the 1897 Agreement. As a result, CSXT's Count VI, when viewed in context, fails to plausibly allege a claim for breach of fiduciary duty. CSXT does not adequately allege a duty or a breach by Moss.

14

First, the Complaint fails to demonstrate a duty owed to CSXT from Moss, as none exists under Virginia law. In carrying out his duties, Moss owed a duty "to shareholders as a class and not individually." <u>Remora Investments, L.L.C. v. Orr</u>, 277 Va. 316, 323 (2009). That is, directors owe a duty to the corporation, not each shareholder. Despite this precept of Virginia corporate law, CSXT complains that it was injured as a result of the Board's failure to adopt its Rate Proposal. <u>See</u> Compl. ¶¶ 35, 42. This claim fails because Moss, and the NPBL directors, owed no direct duty to CSXT. Accordingly, CSXT fails to allege that Moss breached his fiduciary duties owed to the NPBL

Furthermore, CSXT fails to sufficiently allege any actual *breach* of a duty owed to the NPBL. The 1897 Agreement provides "[t]hat a *uniform rate* shall be fixed for the movement of freight cars over the said . . . railroad, regardless of distance, and that the rate per loaded freight car shall be so adjusted from time to time *as to yield a net revenue sufficient to pay the interest upon the bonds outstanding and six per cent on the stock*." <u>Id.</u> (ECF No. 1-1, at 5-6) (emphasis added). The clear directive from the 1897 Agreement, by which Moss and the NPBL Board operate, is that the NPBL's objective is to earn merely a net revenue sufficient to pay interest on the outstanding capital stock. And, the NPBL can only do so by charging a uniform rate. The Complaint does not allege that the NPBL failed to earn this dividend. Accordingly, CSXT fails to allege that Moss, in fact, breached his fiduciary duties owed to the NPBL.

In addition to failing as a matter of Virginia corporate law, CSXT's claim regarding the Rate Proposal fails to allege sufficient *facts* to state a claim upon which relief can be granted. CSXT alleges, in conclusory fashion, that CSXT offered a Rate Proposal to the NPBL "that would have significantly and rapidly increased the NPBL's revenue and operating income by doubling the volume of cars that the NPBL moves annually," Compl. ¶ 38, while cutting the price the NPBL

15

receives per car is cut by more than half.[4] These unadorned conclusions do not plausibly state a claim for relief under Iqbal. 556 U.S. at 678 ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.") (citation omitted); see also Morefield v. Bailey, 959 F. Supp. 2d 887, 898 (E.D. Va. 2013) (holding that allegations that "the Board's refusal of [plaintiff's] demand was 'wrongful and improper' . . . will not be accepted as sufficient to withstand a motion to dismiss."); see also KDW Restructuring & Liquidation Servs. LLC v. Greenfield, 874 F. Supp. 2d 213, 225 (S.D.N.Y. 2012) ("The plaintiffs have not adequately pled specific facts about Abada to demonstrate that he was interested, acting in bad faith, lacking a rational purpose, or grossly negligent.") (dismissing breach of fiduciary duty claim against director on a Rule 12(b)(6) motion); accord Gagliardi v. TriFoods Int'l, Inc., 683 A.2d 1049, 1052 (Del. Ch. 1996) ("Thus, to allege that a corporation has suffered a loss as a result of a lawful transaction, within the corporation's powers, authorized by a corporate fiduciary acting in a good faith pursuit of corporate purposes, does not state a claim for relief against that fiduciary no matter how foolish the investment may appear in retrospect."). Merely alleging that Moss committed a breach of his fiduciary duty does not make it so.

Moreover, these bare allegations are contradicted by the documents underlying and attached to the Complaint. "In the event of conflict between the bare allegations of the complaint and any attached exhibit, the exhibit prevails." U.S. ex rel. Constructors, Inc. v. Gulf Ins. Co., 313 F. Supp. 2d 593, 596 (E.D. Va. 2004). Despite the Complaint's guarantees of instant profits if the NPBL only adopted CSXT's Rate Proposal, the Rate Proposal itself contains no empirical, expert, or mathematical analysis and only "estimate[s] the service for CSXT [that CSXT] [is] proposing

---

[4] As a mathematical matter, this allegation makes little to no sense. If CSXT's Rate Proposal cuts the rate by more than half (from $210 per car, to $85 per car) and doubles car volume, the revenue will decline. E.g., (100 cars x $210 = $21,000; 200 cars x $85 = $17,000).

will generate for NPBL approximately $1,440,000 in incremental revenue and potentially $660,000 in incremental operating income." (ECF No. 1-5, at 3). CSXT does not allege that Moss ignored expert analysis or a comprehensive study. Nor does CSXT allege that Moss acted in bad faith. CSXT's mere "estimate" of increases in revenue does not present a business opportunity which, if declined, constitutes a breach of fiduciary duty. Without more, CSXT "fails to plead . . . facts that create a reasonable doubt as to the validity of the Board's exercise of judgment." Morefield, 959 F. Supp. 2d at 898.

Importantly, the Rate Proposal itself is barred by the directive of the 1897 Agreement. The entire premise of CSX's Rate Proposal is that CSXT receives a special rate for its use of the NPBL at NIT. Nothing about the Rate Proposal is *uniform*, as required by Article Nine of the 1897 Agreement. The Board of Directors is not free to disregard the 1897 Agreement. See Va. Code Ann. § 13.1-673; 1897 Agreement Art. 17 (ECF No. 1-1, at 8) ("[E]ach of the Companies parties hereto, agrees that the Director named by each to represent it in the Board of [the NPBL] shall and will vote for such resolutions, by-laws or other proceedings as may be necessary to carry into effect the agreements made herein."). As a corollary, Moss cannot breach his fiduciary duties by complying with the 1897 Agreement. CSXT's grievances are fairly addressed to Norfolk Southern at the next shareholders meeting, but they do not give rise to a breach of fiduciary duty claim against Moss.

Finally, the vague allegations concerning the April 2018 Board meeting do not allege that the NPBL Board actually voted on the Rate Proposal. See Compl. ¶¶ 38-40. CSXT does not allege that any director made a formal motion to adopt the Rate Proposal. Corporate boards of directors act through motions and votes. Accordingly, CSXT fails to allege how it made a particular effort to obtain the relief it sought from the Board. CSXT cannot bypass corporate formalities as it tries

to transform its customer grievance into a shareholder derivative suit. Without a formal motion and vote, CSXT has failed to allege concrete facts sufficient to plausibly show a breach of fiduciary duty.

At bottom, CSXT's dissatisfaction with the rejection of its Rate Proposal is a customer dispute, not a breach of fiduciary duty. Count VI should be dismissed accordingly.

3.    CSXT Fails to State a Claim for Breach of Fiduciary Duty Against Moss Based on the Corporate Governance Restructuring Proposal.

The shareholders, not the directors elected by the shareholders, control the corporate governance structure of a corporation. See, e.g., Va. Code Ann. § 13.1-671.1; 5 Fletcher Cyc. Corp. § 2104 ("The shareholders' inherent or nonjudicial control lies in the power of electing directors and in the inherent power, or the statutory power of removal, and in the power so to amend the charter as will accomplish the result, or to make or alter bylaws agreeable to the statutes and the charter regulating and controlling directorial action.") (internal citations omitted). CSXT's contention that Moss breached his fiduciary duties owed to the NPBL by declining to overhaul the corporate governance structure of the NPBL is wholly misplaced. Moss is not a shareholder of the NPBL. Moss is an officer and a director. As a result, CSXT's claim against Moss based on "denying CSXT's . . . proposal for reforms of NPBL's corporate governance structure" fails. Compl. ¶ 112; see Compl. 67 (alleging that Moss and the other Individual Defendants were bound by a fiduciary obligation to remedy "defects in NPBL's current corporate governance structure.").

The NPBL's Board of Directors is not empowered to amend the 1897 Agreement or the 1989 Supplemental Agreement. See Va. Code Ann. § 13.1-671.1 (stating the effectiveness conditions for shareholders agreements). "[T]he General Assembly has made this code section the exclusive means of affecting shareholders' rights to elect directors." Booker v. Humphreys, 73 Va. Cir. 543, 546 (Lancaster Cnty. 2005). Because Moss is not a shareholder of the NPBL, CSXT's

claim regarding corporate governance reforms does not lie against Moss. Appropriately and logically, there is no allegation that CSXT presented the Corporate Governance Proposal at the April 18, 2018 Board meeting. It was only presented to the shareholders. Moss is not liable for the decisions of the shareholders of the NPBL.

For these reasons, Count VI should be dismissed.

4.       CSXT Fails to State a Claim for Breach of Fiduciary Duty Against Moss Based on the Alleged Deteriorating Financial Condition of the NPBL.

Similar to the two other claims, CSXT's claim that Moss breached his fiduciary duties to the NPBL by creating a deteriorating financial condition of the NPBL fails to state a claim upon which relief can be granted. This vague contention lacks any concrete factual allegations concerning acts or omissions of Moss. Indeed, many of the allegations address actions taken before Moss even became a director and officer in 2011. See Compl. ¶¶ 27, 34 46, 47. Lacking in facts, the Complaint fails to plausibly allege a claim for breach of fiduciary duty.

Critically, the 1897 Agreement limits the authority of directors like Moss to alter business operations and defines the role of governance of the NPBL. Specifically, the 1897 Agreement requires the directors to "vote for such resolutions, by-laws or other proceedings as may be necessary to carry into effect the agreements made herein," (ECF No. 1-1, at 8), and to adjust the rate per loaded freight car "as to yield a net revenue sufficient to pay the interest upon the bonds outstanding and six per cent on the stock." Id. (ECF No. 1-1, at 5-6). Accordingly, the governing documents do not require a plan to maximize profits or a financial condition other than as the NPBL has maintained. That is, CSXT has not alleged a violation of the 1897 Agreement. That document controls the financial obligations and goals of the directors managing this unique corporation, not CSXT's abstract desire for its own preferential switch rate from NIT. As a result, the facts alleged fail to show any financial condition in violation of the controlling document, and

thus, in violation of any fiduciary duty of Moss. Moss cannot have breached his fiduciary duties as alleged. Count VI should be dismissed.

## IV.    Conclusion

Based on the foregoing, the Court should dismiss Count VI against Moss for lack of subject matter jurisdiction. In the alternative, the Court should decline to exercise supplemental jurisdiction and dismiss Count VI against Moss. In the alternative, the Court should dismiss Count VI against Moss because it fails to state a claim upon which relief can be granted.

**CANNON MOSS**

By____/s/ *Clark J. Belote*_____
                                 Counsel

W. Edgar Spivey (VSB No. 29125)
Clark J. Belote (VSB No. 87310)
Kaufman & Canoles, P.C.
150 W. Main Street, Suite 2100
Norfolk, VA 23510
(757) 624-3000
(888) 360-9092 Facsimile
Email: wespivey@kaufcan.com
Email: cjbelote@kaufcan.com
*Counsel for Cannon Moss*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 27th day of November, 2018, a true and correct copy of the foregoing was served via Notice of Electronic Filing by filing with the Court's CM/ECF System on all counsel of record.

/s/ *Clark J. Belote*

21