UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| CSX TRANSPORTATION, INC., | ) | |
| individually and on behalf of NORFOLK | ) | |
| & PORTSMOUTH BELT LINE | ) | |
| RAILROAD COMPANY, | ) | |
| | ) | Civil Action No.:  2:18cv530 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NORFOLK SOUTHERN RAILWAY | ) | |
| COMPANY, *et al.*, | ) | |
| | ) | |
| Defendants. | | |

NORFOLK SOUTHERN RAILWAY COMPANY'S MEMORANDUM IN SUPPORT OF
ITS MOTION TO DISMISS COUNTS V, VII, VIII, AND IX OF THE COMPLAINT

Norfolk Southern Railway Company ("NSR"), by counsel and pursuant to Fed. R. Civ. P.

12(b)(6), submits this memorandum in support of its Motion to Dismiss Counts V, VII, VIII, and

IX of Plaintiff CSX Transportation, Inc.'s ("CSXT") Complaint.

## INTRODUCTION

CSXT's Complaint represents the most recent in a series of meritless attempts to subvert

an agreement that, for over 120 years, has governed the organization and operation of the Norfolk

& Portsmouth Belt Line Railroad Company ("NPBL").  In 1897, eight railroads that operated in

the Hampton Roads area and were shareholders of NPBL, a newly formed "connecting" railroad,

entered into an agreement governing NPBL's operations (the "Operating Agreement").  The

Operating Agreement requires NPBL to set a "uniform rate" for its switching services and

prohibits the shareholders' locomotives from entering NPBL's tracks.  The uniform rate that NPBL

charges for its switching services applies to the switching services that NPBL provides between

connecting railroads[1] and to and from industries and facilities located on NPBL-served lines. The NPBL-served lines include the NSR-owned line that NPBL operates over pursuant to trackage rights first provided to NPBL in 1917 by NSR predecessors. These NSR-owned tracks allow NPBL to access the Norfolk International Terminal ("NIT"). Absent its rights to operate over these NSR-owned tracks, NPBL has no ability to switch rail traffic to NIT. Correspondingly, the only way CSXT's traffic originating or terminating at NIT can move by rail is by NPBL switching that traffic and collecting its uniform rate.

Through numerous mergers and acquisitions, the original eight shareholders of NPBL has been reduced to two: NSR (57%) and CSXT (43%). CSXT affirmed its minority ownership in 1989 when it executed an amendment to the Operating Agreement, which gave CSXT the right to appoint two of the directors of the NPBL board and gave affiliates Southern Railway Company (later renamed NSR) and Norfolk and Western Company (later merged into NSR) the right to collectively appoint three directors. While the ownership of NPBL has changed over the years, the Operating Agreement's requirement of a uniform rate and prohibition of shareholder locomotives on NPBL tracks has not.

This civil action arises out of the uniform rate set by NPBL in 2009. Throughout the Complaint, CSXT asserts that the uniform rate imposed by NPBL is "prohibitively expensive" and thus "practically preclude[s]" CSXT "from using NPBL to connect to NIT." For the past eight years, CSXT has complained about the uniform rate and demanded that NPBL provide it a special rate to and from NIT in contravention of the plain language of the Operating Agreement. NPBL has consistently refused to accept CSXT's proposals and instead has continued to charge a uniform

---

[1]   In addition to CSXT and NSR, NPBL connects with lines operated by Buckingham Branch Railroad and the Chesapeake & Albemarle Railroad.

rate in compliance with the Operating Agreement.  Having spent eight years unsuccessfully pressing NPBL to disregard the Operating Agreement, CSXT now invites the federal judiciary to effectively rewrite the Operating Agreement and restructure the governance of NPBL.  CSXT asserts a myriad of baseless claims against NSR and the other defendants, who have simply acted in conformance with the Operating Agreement.  CSXT concludes with a demand that this Court either redistribute the ownership of NPBL by making CSXT a co-equal shareholder with NSR or impose a new board structure for NPBL that eliminates NSR's right to elect a majority of the board members.

CSXT's Complaint, in sum, is leverage to extract a lower rate for CSXT for NPBL's switching services to and from NIT.  Under controlling standards, some averments in the Complaint as to the federal antitrust claims, though denied, cannot be reached by NSR's Motion. The state-law claims, however, are ripe for dismissal because they are clearly time-barred and foreclosed by the plain language of the Operating Agreement.

## SUMMARY OF RELEVANT ALLEGATIONS[2]

NPBL is a specialized "terminal switching railroad" operating in Norfolk, Portsmouth, and Chesapeake, Virginia.  (Compl. ¶ 1).  NPBL was formed in 1896 to connect eight railroads then operating in Hampton Roads.  (*Id*.)  The organization and operations of NPBL are governed by the Operating Agreement entered into by its shareholders in 1897.  (*Id*. ¶ 15-16 and Exh. A.)

NPBL connects railroads, industries, and ports in the Hampton Roads area through the 26 miles of track that it owns.  (*Id*. ¶ 20.)  It also has the right to operate on track that it does not own, including tracks that are owned by NSR.  (*Id*.)  Absent its trackage rights to operate over these

---

[2]   The Summary of Relevant Allegations is based on the allegations in the Complaint, which for purposes of this motion only, must be accepted as true.

NSR tracks, which cannot be terminated without regulatory approval, NPBL has no ability to provide rail service directly to NIT.  NSR may serve NIT by operating its own equipment on its own line.  (Compl. ¶ 20, 35.)  This is why "[f]or any rail carrier other than NS[R], the only way to access NIT by rail is via NPBL."  (*Id*. ¶ 20.)[3]

By 1989, the original eight owners of NPBL had effectively been reduced to two.  CSXT, Norfolk and Western Railway Company ("NW"), and Southern Railway Company ("SR") were the nominal shareholders under the Operating Agreement.  (*Id*. ¶ 21.)  However, by 1989, NW and SR had long been affiliates under the common ownership of Norfolk Southern Corporation ("NSC") pursuant to a merger approved by the Surface Transportation Board's predecessor agency, the Interstate Commerce Commission, in 1982.[4]  In 1989, NW, SR and CSXT entered into a Supplemental Agreement providing CSXT the right to appoint two directors of NPBL's board.  (Compl. ¶ 22 and Exh. C.)  NW and SR, which collectively owned a majority of the shares of NPBL, were provided the right to appoint three directors.  (*Id*.)  The next year, NSC restructured its subsidiaries, renaming SR as NSR, which became the sole shareholder of NW.  (*Id*. ¶ 23.)  NW was later fully merged into NSR.  Thus, NSR succeeded to the positions of NW and SR and became the sole majority shareholder of NPBL.  NSR, pursuant to the Supplemental Agreement, has had three board members elected to the NPBL board ever since.  (*Id*. ¶ 23.)  Currently, those directors are Defendants Hall, Hurlbut and Merilli.  (*Id*. ¶ 26.)

---

[3]  The Complaint does not state directly that NSR owns the line to NIT outright but acknowledges the fact repeatedly by averring that NPBL must pay NSR for access to track that NPBL does not own.  *See, e.g.*, *Id*. ¶¶ 41, 59, 87(f), 93(f), 107 (all referring to the fact that NPBL's access to NIT is based on payment to NSR for the right to use track owned by NSR); *see also* Compl. Exh. B (map showing NPBL trackage rights on line to NIT).

[4]  *See* Norfolk Southern Corp.—Control—Norfolk & W. Ry. Co., 366 I.C.C. 171 (1982).

The Operating Agreement requires that NPBL fix "a uniform rate . . . for the movement of freight cars." (*Id*. Exh. A, Article Ninth at 3.)  It also provides that "the locomotives owned by the parties hereto are not to enter upon or use" the NPBL tracks, except under rules and regulations set by the board, to ensure that the intent of the parties—that NPBL provide interchange service—not be undermined. (Compl. Exh. A, Article Fifteenth at 5; *see also id.* Exh. A, Article Tenth at 4 and NPBL Bylaws, Compl. Exh. D, Article Twelve.)  Pursuant to these requirements, NPBL charges a uniform switching rate (the "Uniform Rate") for traffic that it moves over the lines on which it operates.  These charges represent the principal source of income for the company. (*Id*. ¶¶ 33-34.)  In 2009, NPBL set the Uniform Rate at $210 per car. (*Id*. ¶ 34 and Exh. 5 at p. 11.) The Complaint asserts that the Uniform Rate was adopted by the NSR directors "over the objection of the other NPBL board members," *i.e.*, the CSXT directors. (*Id*.)

CSXT asserts that the Uniform Rate "is prohibitively expensive" and thus "practically preclude[s]" CSXT "from using NPBL to connect to NIT." (*Id*. ¶ 4.)  CSXT further asserts that the "excessive" Uniform Rate has caused a decline in NPBL's overall financial performance over the past several years. (*Id*. ¶ 37.)  In 2010, CSXT sought special relief from the Uniform Rate to mitigate what it claimed were its injurious consequences.  It submitted a proposal to NPBL (the "2010 Proposal") seeking a separate lower rate just for CSXT traffic moving to and from NIT because "the NPBL's switch rate of $210 per car is an economic barrier that prevents CSXT from being able to move any meaningful port freight by rail at NIT." (*Id*. ¶¶ 38, Compl. Exh. E.)[5] CSXT tried to justify a special lower rate by offering minimum volume guarantees and the use of CSXT locomotives on NPBL tracks.  In addition to benefitting CSXT's rail business directly

---

[5]   As the 2010 Proposal states, CSXT submitted a rate proposal to NPBL in October 2009 and resubmitted the proposal in 2010 with additional information requested by NPBL.

through a lower switching rate, CSXT suggested that the 2010 Proposal would increase NPBL's operating income by at least $149,452, which would benefit CSXT as a shareholder of NPBL. (*Id.* p. 4.) NPBL did not accept CSXT's 2010 Proposal or provide CSXT with a special, stand-alone rate to and from NIT. (Compl. ¶ 46.)

Eight years later, CSXT resubmitted its proposal to NPBL for an individual lower rate solely for CSXT to and from NIT (the "2018 Proposal"). (Compl. ¶ 38, Exh. E.) The 2018 Proposal reaffirmed CSXT's position that the Uniform Rate in effect since 2009 "remains prohibitive for normal movements of shipping containers to and from NIT." (2018 Proposal, Exh. 3, p. 2.) It further stated that the "unduly high rates … have made use of NPBL to move containers to or from NIT economically non-viable, or even effectively impossible." (*Id.*) Carrying forward elements of the 2010 Proposal, CSXT repeated proposed minimum volume guarantees and touted lower NPBL costs through the use of CSXT locomotives on NPBL tracks. CSXT suggested that the 2018 Proposal would provide at least $11 million in revenue to NPBL. (*Id.*) NPBL did not accept the 2018 Proposal and continues to charge a Uniform Rate to this day.

## LEGAL STANDARD

A motion to dismiss tests the sufficiency of the plaintiff's initial pleading and does not resolve contests surrounding the facts or the merits of a claim. *See Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). The Court need not accept as true the legal conclusions, unwarranted inferences, unreasonable conclusions, or arguments asserted in the complaint. *See E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship,* 213 F.3d 175, 180 (4th Cir. 2000). Furthermore, a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To survive dismissal for failure to state a claim under

Rule 12(b)(6), the "complaint's 'factual allegations must be enough to raise a right to relief above the speculative level' and have 'enough facts to state a claim to relief that is plausible on its face.'" *Demetry v. Lasko Prods.*, 284 F. App'x 14, 15 (4th Cir. 2008) (quoting *Twombly*, 550 U.S. at 555). Therefore, a claim is "facially plausible" when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *Moody v. City of Newport News,* 93 F. Supp. 3d 516, 525-26 (E.D. Va. 2015) (same).

In considering a Rule 12(b)(6) motion, the "'court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint.'" *Moody* at 526 (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d at 435, 448 (4th Cir. 2011)). A district court "may consider documents attached to the complaint or the motion to dismiss 'so long as they are integral to the complaint and authentic.'" *Id.* (quoting *Kensington Volunteer Fire Dep't v. Montgomery County*, 684 F.3d 462, 467 (4th Cir. 2012)). "In the event of conflict between the bare allegations of the complaint and any exhibit attached [to the complaint,] ... the exhibit prevails." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir.2013); *Moody*, 93 F. Supp. 3d at 527 (same).

## ARGUMENT

## I.     CSXT's state-law claims accrued in 2009 and are time-barred.

The Complaint asserts four state-law causes of action against NSR: (1) breach of the Operating Agreement (Count V); (2) tortious interference with business expectancy (Count VII); (3) statutory conspiracy under Virginia Code § 18.2-499 (VIII); and (4) civil conspiracy under Virginia common law (Count IX). As explained below, each of these claims is based on the same alleged wrongful conduct:  NSR has caused NPBL to set the Uniform Rate that "is prohibitively

expensive" and thus "practically preclude[s]" CSXT "from using NPBL to connect to NIT." (Compl. ¶ 4.) According to the Complaint, however, the Uniform Rate was set in *2009*, and CSXT has been claiming economic injury as a result ever since. (*Id.* ¶ 34.) Each of CSXT's state-law claims accrued when the rate was set in 2009, and thus CSXT had five years within which to file the claims. CSXT, however, waited eight years to file the state-law claims. As a result, the claims are time-barred and must be dismissed. *See Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017) (court may grant Rule 12(b)(6) motion to dismiss on statute of limitations ground when time bar "is apparent on the face of the complaint").

### A.   CSXT's state-law claims are based on the imposition of the Uniform Rate in 2009.

CSXT's complaints about the Uniform Rate and the alleged harm it has caused CSXT are not new. The CSXT-appointed directors of NPBL objected to the rate when NPBL set it in 2009. (Compl. ¶ 34.) CSXT immediately demanded that NPBL provide CSXT a special lower rate in its 2010 Proposal. NPBL kept the Uniform Rate, so approximately eight years later, CSXT again sought a lower rate for itself in its 2018 Proposal. CSXT's state-law claims are based on the same complaints that CSXT has been making about the Uniform Rate since 2010. For example, CSXT asserts that NSR breached the Operating Agreement by:

- "effectively blocking CSXT's access to NS[R]'s trackage over which NPBL has rights" by continuing to charge the rate;

- "refusing to consider proposals that would improve the revenues of NPBL" by agreeing to provide CSXT a lower rate;

- "failing to encourage the business of NPBL" by not agreeing to CSXT's proposals seeking a lower rate; and

- "inducing its employees and/or the Individual Defendants to vote for measures that are harmful to NPBL," including the rejection of CSXT's rate proposals. (Compl., ¶ 107.)

According to CSXT, these alleged breaches of the Operating Agreement have reduced the revenues of NPBL, caused CSXT to pay high rates when it has used the NPBL, and caused CSXT to lose potential business "due to its inability to economically access NIT by rail."  (*Id.* ¶ 108.)

CSXT's tort claims are predicated on the same alleged damages caused by the "prohibitively expensive" Uniform Rate.  CSXT claims that NSR has tortiously interfered with its purported expectancy to have "access to NPBL trackage in Hampton Roads," which CSXT claims not to have because of the Uniform Rate.  CSXT also asserts that NSR has interfered with its expectancy of "economic benefit as a result of being a shareholder of NPBL, such as revenues from NPBL," which are being curtailed because of the rate.  (*Id.* ¶ 115.)  With respect to CSXT's conspiracy claims, it alleges that NSR and NPBL conspired to set the "prohibitively expensive" rate so as to reduce the revenues of NPBL and cause "CSXT to lose potential business with shipping companies, due to its inability to access NIT."  (*Id.* ¶¶ 120, 124.)

**B.    The limitations period for each state-law claim accrued when NPBL set the Uniform Rate in 2009.**

Each of the state-law claims is subject to a five-year limitations period.  *See* Va. Code § 8.01-246(2) (breach of written contract); *Dunlap v. Cottman Transmission Sys.*, LLC, 287 Va. 207, 220-222 (2014) (holding that the five-year limitations period under Va. Code § 8.01-243(B) applies to claims for tortious interference with business expectancy); *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 543 (4th Cir. 1997) (five-year limitations period under Va. Code § 8.01-243(B) applies to statutory business conspiracy claim); *Hurst v. State Farm Mut. Auto. Inc. Co.*, No. 7:05-cv-776, 2007 U.S. Dist. LEXIS 21172, *17 (W.D. Va. March 23, 2007) (holding that limitations period for civil conspiracy is based on limitations period for underlying wrongful act).  Although the accrual rules differ among CSXT's state-law claims, all of the claims accrued when NPBL set the Uniform Rate in 2009.  Because all of the claims were filed more than five years after they

accrued in 2009, they are time-barred. *See Windows & Walls by Christine, LLC v. Xanterra Kingsmill, LLC*, No. 4:17-cv-131, 2018 U.S. Dist. LEXIS 61051, *10-11 (E.D. Va. March 21, 2018) (granting Rule 12(b)(6) motion to dismiss negligence claim because it was time-barred based on allegations in the complaint).

### i.    CSXT's contract claim is time-barred because the alleged breach occurred in 2009, more than five years ago.

A contract claim accrues, and thus the limitations period begins to run, "'when the breach of contract occurs.'" *Kerns v. Wells Fargo Bank, N.A.*, 296 Va. 146, 158 (2018) (quoting Va. Code § 8.01-230). As a result, "a right of action for a breach of contract could, in theory, be barred by the statute of limitations without regard to whether compensatory damages ever occur." *Id*. NSR allegedly breached the Operating Agreement when it caused NPBL, through the NSR-appointed directors, to set the Uniform Rate in 2009, which "effectively block[s] CSXT's access to NS[R]'s trackage over which NPBL has rights" and thus does not "encourage the business of NPBL." (Compl. ¶ 107.) Indeed, CSXT pleads that the imposition of the rate in 2009 caused all of CSXT's alleged contractual damages: (a) reduced revenues for NPBL; (b) paying high rates when CSXT has utilized the NPBL; and, (c) loss of potential business for CSXT "due to its inability to economically access NIT by rail." (*Id*. ¶ 108.) Based on CSXT's own allegations, CSXT's contract claim accrued in 2009. Despite complaining about the rate since 2010, CSXT waited to file the claim until 2018, well after the limitations period had expired. Therefore, the contract claim must be dismissed with prejudice.

CSXT may argue that its contract claim did not accrue until NPBL rejected its 2018 Proposal, constituting a distinct breach of the Operating Agreement. The argument, however, misconstrues the purpose of both CSXT's 2018 Proposal and its 2010 Proposal. CSXT sent the proposals because, according to CSXT, NSR had *already breached* the Operating Agreement by

causing NPBL to set the "prohibitively expensive" Uniform Rate in 2009.  The 2010 Proposal states that "*[p]resently*, the NPBL's switch rate of $210 per car is an economic barrier that prevents CSXT from being able to move any meaningful port freight by rail at NIT."  (emphasis added).  The 2018 Proposal states that "[t]he NPBL's general tariff rate, however, *remains* prohibitive for normal movements of shipping containers to and from NIT."  (emphasis added).  Thus, CSXT's proposals, by their own terms, were delivered to NPBL in an effort to mitigate injury allegedly caused by NSR's existing breach of the Operating Agreement—the imposition of the Uniform Rate in 2009.  NSR's alleged conduct has been constant since 2009:  supporting the imposition of the Uniform Rate as required by the Operating Agreement and, in turn, refusing to agree to a special rate just for CSXT in contravention of the Operating Agreement.

The Fourth Circuit's recent decision in *Fluor Fed. Sols., LLC v. PAE Applied Techs., LLC*, 728 Fed. Appx. 200 (4th Cir. 2018), is instructive.  Fluor contended that its contract with the defendant, PAE, allowed Fluor to bill PAE for general and administrative ("G&A") costs in excess of 2.3% of Fluor's direct costs.  PAE responded that the contract capped the G&A costs at 2.3%.  In 2004, Fluor began submitting invoices to PAE that included G&A costs in excess of 2.3%, which PAE rejected and only paid up to the 2.3% cap.  "Intermittently over the years, Fluor complained about the 2.3% cap, but PAE continued to pay pursuant to the 2.3% cap."  *Id.* at 202.  Nearly 12 years after PAE first refused to pay G&A costs in excess of 2.3%, Fluor filed suit, claiming that PAE's refusal to pay its actual G&A costs was a breach of their contract.  After a bench trial, the district court held the parties' contract capped the G&A costs at 2.3% and entered judgment in favor of PAE.

Fluor appealed.  PAE argued that the district court's holding was correct and further asserted that based on the holding, Fluor's contract claim was time-barred because the alleged

breach occurred in 2004, when it first refused to pay G&A costs in excess of 2.3%.  Applying

Virginia law, the Fourth Circuit observed that "[i]n cases like this in which an alleged breach spans

an extended period of time, courts have distinguished between acts that constitute a 'single

contin[uous] breach' and those that constitute a 'series of separate breaches.'"  *Id.* (quoting *Am.*

*Physical Therapy Ass'n v. Fed'n of State Bds. of Physical Therapy*, 271 Va. 481, 484 (2006)).  "A

single continuous breach occurs when 'the wrongful act is of a permanent nature' and 'produces

all the damage which can ever result from it.'  Conversely, when wrongful acts are not continuous

but occur only at intervals, each occurrence inflicts a *new injury* and gives rise to a new and

separate cause of action.'"  *Id.* (citation and internal quotation marks omitted) (emphasis in

original).  "If the alleged breach is a 'single continuous breach,' the limitations period runs from

the inception of that breach, even when the breach continues for years."  *Id.* (citing *Westminster*

*Investing Corp. v. Lamps Unlimited, Inc.*, 237 Va. 543 (1989)).

The Court contrasted two decisions of the Virginia Supreme Court:  *Westminster* and

*American Physical Therapy*.  In *Westminster*, the Virginia Supreme Court:

> held that failure to enforce a uniform business hours provision, required by the
> parties' lease, constituted a single continuous breach that accrued on the first day
> of the alleged breach despite the fact that the conduct continued for years.  The
> subsequent failures to enforce the business hours provision did not constitute *new*
> individual breaches because it was the initial wrongful conduct—failure to enforce
> business hours—that produced the plaintiff's harm.

> By contrast, in *American Physical Therapy*, the court held that a breach of contract
> claim was not a continuous breach where the defendant from time-to-time during a
> seven[-]year period increased licensure fees.  The crucial term in the contract stated
> that the defendant "shall establish prices for the Examination" periodically.  The
> court therefore explained that a distinct obligation arose *each time* the defendant
> periodically imposed a new fee.  Moreover, because each fee increase was
> determined based on the prior fee, the imposition of a new fee also beget a new
> injury, thereby creating separate, distinct breaches of contract.

*Id*. at 202-203 (internal citations omitted).  Based on this precedent, the Fourth Circuit held that Fluor "asserts a 'single continuous breach' of the Subcontract by PAE."  *Id*. at 203.  The Court noted that Fluor alleged that PAE wrongfully refused to pay more than the 2.3% cap for the term of the contract.  "In other words, Fluor alleges that PAE initially breached and continued to breach the contract in exactly the same manner for the next dozen years."  *Id*.  The court went on to state:

> Unlike *American Physical Therapy*, where each additional fee increase inflicted a new injury, PAE's imposition of a 2.3% cap on Fluor's G&A costs did not give rise to a new or distinct injury: ***Fluor's entire harm flowed directly from PAE's initial decision to cap G&A costs***.  ***That Fluor's alleged damages increased over the course of the contract does not alter the fact that the breach was single and continuous.***

*Id*. (emphasis added) (citing *Van Dam v. Gay*, 280 Va. 457, 463 (Va. 2010) ("[I]t is immaterial that all the damages resulting from the injury do not occur at the time of the injury.")).  Because Fluor did not file its contract claim until 12 years after PAE decided not to pay G&A costs in excess of 2.3%, the Fourth Circuit held that the claim was time-barred and affirmed the decision of the district court.

Based on the allegations in the Complaint, CSXT's "entire harm" flows directly from NSR's alleged involvement in setting the "prohibitively expensive" Uniform Rate in 2009: (a) reduction of the revenues of NPBL; (b) causing CSXT to pay high rates when it has utilized the NPBL; and (c) causing CSXT to lose potential business "due to its inability to economically access NIT by rail."  (Compl. ¶ 108.)  These allegations confirm that NSR's alleged breach of the Operating Agreement is a "single continuous breach" that accrued in 2009 when NPBL set the Uniform Rate.  As in *Fluor* and *Westminster*, CSXT's contract claim is predicated on a single act—the imposition of the rate—not multiple, separate acts as in *American Physical Therapy*.  *See also Hunter v. Custom Bus. Graphics*, 635 F. Supp. 2d 420, 422-23 (E.D. Va. 2009) (explaining that an employer's payment over an 11-year period to his employee of a fixed commission rate

lower than the higher rate set forth in the employment agreement constituted a single continuous breach). Like the plaintiff in *Fluor*, CSXT has complained about the rate since 2010, but NPBL has not changed it, nor has it agreed to give CSXT a special rate. Just as Fluor's repeated unsuccessful attempts to get PAE to pay above the 2.3% cap did not create new contract claims, CSXT's repeated, unsuccessful attempts to get NPBL to change the Uniform Rate does not create new claims.

As *Fluor* teaches, the fact that CSXT allegedly continues to suffer damages due to the imposition of the Uniform Rate, or that those damages may have increased over time, does not change the result. Moreover, NPBL's rejection of CSXT's 2018 Proposal did not constitute a new breach creating new injuries. It reflects a decision not to provide a demanded cure for the alleged 2009 breach of the Operating Agreement. CSXT waited nine years to assert its breach of contract claim based on this continuous conduct. Hence, the claim is time-barred, and Count V should be dismissed with prejudice.

> ### ii.     CSXT's tortious interference claim is time-barred based on the same accrual analysis.

A cause of action for tortious interference with a business expectancy, like a contract claim, accrues when the wrongful conduct occurred. *See Saleh v. Virginia State Univ.*, 1999 U.S. Dist. LEXIS 21842, No. 3:97-cv-460, *86 (E.D. Va. Feb. 25, 1999); *Unlimited Screw Products, Inc. v. Malm*, 781 F. Supp. 1121, 1129 (E.D. Va. 1991); *Arora v. Sahai*, 2004 U.S. Dist. LEXIS 32260, No. 1:04-cv-00030, *8 (W.D. Va. Oct. 26, 2004) (granting motion to dismiss, finding plaintiff's tortious interference claim time-barred because "the limitations period for tortious interference commences when the contract is breached"). As explained above, NSR allegedly interfered with CSXT's purported business expectancies when the Uniform Rate was set in 2009, which caused CSXT to lose "revenues from NPBL and its ability to access NPBL trackage and NPBL-served

industries."[6]  (Compl. ¶ 115.)  As a result, CSXT's tortious interference claim is time-barred as well and must be dismissed with prejudice.

> ### iii.  CSXT's conspiracy claims are time-barred because it first suffered its alleged damages when the Uniform Rate was imposed in 2009.

CSXT's conspiracy claims are subject to a different accrual rule than that applicable to its contract and tortious interference claims.  Those claims accrue when the plaintiff "first suffered any damages resulting from the acts committed in furtherance of the conspiracy."  *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 543 (4th Cir. 1997).  Further:

> [W]here an injury, though slight, is sustained in consequence of the wrongful or negligent act of another and the law affords a remedy therefor the statute of limitations attaches at once. It is not material that all the damages resulting from the act should have been sustained at the time and the running of the statute is not postponed by the fact that the actual or substantial damages do not occur until a later date.

*Stone v. Ethan Allen, Inc.*, 232 Va. 365, 369 (1986) (quoting *Housing Authority v. Laburnum Corp.,* 195 Va. 827, 839 (1954).  *See also International Surplus Lines Ins. Co. v. Marsh & McLennan, Inc.*, 838 F.2d 124, 129 (4th Cir. 1988) ("In Virginia, only the slightest injury is required to start the running of the limitations period . . . It is of no consequence that the amount of damages [is] not ascertainable until a later date.").

According to CSXT, NSR and NPBL acted in concert to impose the "prohibitively expensive" Uniform Rate.  (Compl. ¶ 4) ("competitors such as CSXT are practically precluded from using the NPBL to connect to NIT because the rate set by NPBL's board, in concert with NS[R], is prohibitively expensive").  This alleged conspiracy has caused a reduction in the

---

[6]  Even if the tortious interference claim (Count VII) was subject to the same accrual rule as CSXT's conspiracy claims (Counts VIII and IX, discussed in B.iii), the result would be the same because CSXT allegedly suffered these harms as soon as the Uniform Rate was set.

revenues of NPBL and caused "CSXT to lose potential business with shipping companies, due to its inability to access NIT."  (*Id*. ¶¶ 120, 124.)

CSXT first incurred these alleged damages as soon as the rate was imposed in 2009.  In its 2010 Proposal, CSXT complained that "the NPBL's switch rate of $210 per car is an economic barrier that prevents CSXT from being able to move any meaningful port freight by rail at NIT." (Compl., Exh. E, p. 3; Compl. ¶ 37) ("In part as a result of its excessive line haul switch rate, the NPBL's overall financial performance has been declining over the past several years and continues to deteriorate.").  Therefore, these conspiracy claims accrued, and the limitations period began to run, more than five years ago.  Because CSXT did not file these claims until now, they are time-barred and must be dismissed with prejudice.  *See Detrick*, 108 F.3d at 543 (finding Virginia statutory conspiracy claim time-barred because plaintiff filed suit more than five years after suffering initial injury caused by the alleged conspiracy, even though conspiracy continued and the purpose of the conspiracy had not yet been achieved).

## II.   CSXT's contract claim fails because it fails to identify a covenant in the Operating Agreement that has been breached, causing CSXT harm.

Were CSXT's contract claim not time-barred, it would nonetheless fail to state a claim for relief.  CSXT's Complaint does not identify any covenant in the Operating Agreement breached by NSR that caused CSXT the harm it claims to have suffered.  "The elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation."  *Navar, Inc. v. Fed. Bus. Council*, 291 Va. 338, 344 (2016).  CSXT has failed to connect the dots between an enforceable promise, a breach of the promise, and injury caused by the breach.

CSXT asserts that NSR breached the Operating Agreement by (a) "effectively blocking CSXT's access to NS[R]'s trackage over which NPBL has rights," (b) "refusing to consider proposals that would improve the revenues of NPBL," (c) "failing to encourage the business of NPBL," and (d) "inducing its employees and/or the Individual Defendants to vote for measures that are harmful to NPBL." (Compl. ¶ 107.)  CSXT bases its contract claim on three provisions of the Operating Agreement; none gives rise to an actionable claim as a matter of law.

*First*, CSXT points to language in a recital that NPBL shall be operated as a "separate organization in which all are to be equally interested." (Compl. ¶ 106.)  This language is contained in a recital in the Operating Agreement, and therefore does not bind NSR under Virginia law.  *See Virginia Fuel Corporation v. Lambert Coal Co.*, 291 Va. 89, 101 n.5 (2016) ("Recitals in a contract are not binding on the parties.").  What is more, CSXT, through the Supplemental Agreement, acknowledged its minority ownership of NPBL and, in turn, NW and SR's (now NSR's) right to appoint three board members of NPBL.

*Second*, CSXT cites language from the Operating Agreement that the parties would "co-operate cordially in encouraging the business of the" NPBL. (Compl. ¶ 106.)  It is manifest that a covenant to "co-operate cordially" is too indefinite to be enforced as a covenant under Virginia law, at least in this context.  This language does not "provide a basis for determining the existence of a breach [or give] an appropriate remedy."  Restatement (Second) of Contracts § 33 (1981).[7] Accordingly, "an agreement to 'negotiate open issues in good faith' to reach a 'contractual objective within [an] agreed framework' will be construed as an agreement to agree rather than a valid contract."  *Cyberlock Consulting, Inc. v. Info. Experts, Inc.*, 939 F. Supp. 2d 572, 578 (E.D.

---

[7]  The Virginia Supreme Court routinely follows the Restatement of Contracts.  *See, e.g., Rastek Constr. & Dev. Corp. v. Gen. Land Commer. Co., LLC*, 294 Va. 416, 425-26 (2017) (citing to Restatement for "traditional principles of contract law").

Va. 2013) (citations omitted); *see also Navar, Inc.*, 291 Va. at 347-48 (quoting and approving *Cyberlock* as accurate statement of Virginia law).   Further, no matter what CSXT believes this language requires, it cannot require that NSR disregard the clear mandate in the Operating Agreement that NPBL charge the Uniform Rate.

  *Third*, CSXT points to language that NSR shall ensure "its Directors 'vote for such resolutions, by-laws or other proceedings as may be necessary to carry into effect' the NPBL Operating Agreement."   (Compl. ¶ 106.)   CSXT does not specifically allege how NSR has breached this provision, but presumably it relates to NSR's alleged refusal "to consider proposals that would improve the revenues of NPBL," *i.e.*, CSXT's rate proposals.   The Operating Agreement, however, precludes a director from agreeing to CSXT's proposals even if they could produce revenue for NPBL, as CSXT alleges.   The Ninth term and condition clearly and unambiguously states that a "uniform rate shall be fixed for the movement of freight cars" over NPBL tracks.   (Compl. Exh. A at p. 3.)   The Fifteenth term and condition provides that "the locomotives of the" railroad shareholders of NPBL "are not to enter the tracks" of NPBL.   (*Id.* at p. 5.)   Therefore, to the extent that CSXT's contract claim is premised on its belief that it is entitled to a special non-uniform rate, or to special access for its locomotives, the claim is foreclosed by the plain language of the Operating Agreement.   *See United States Golf Learning Inst., LLC v. Club Managers Ass'n of Am.*, No. 1:11-cv-869, 2011 U.S. Dist. LEXIS 132592, *8, 16 (E.D. Va. Nov. 15, 2011) (granting motion to dismiss because plaintiff's allegations were based on an alleged contractual obligation that "clearly does not exist" in the contracts that plaintiff relied on, noting that where the "allegations in the complaint conflict with an exhibit...the exhibit prevails").   There is no promise in the Operating Agreement that CSXT would be entitled to its own non-uniform,

lower rate, or to locomotive access, so NSR and its elected directors had no obligation to support CSXT's proposals.

**Finally**, finding no support in the plain language of the Operating Agreement, CSXT reaches for the argument that NSR has breached the implied covenant of good faith and fair dealing. CSXT does not allege what the implied covenant required of NSR or how NSR breached the covenant. What is clear, however, is that just as the obligation to "co-operate cordially" or direct "its Directors" to achieve the goals of the contract cannot overcome a specific limit in the agreement—the requirement to establish a uniform rate—the covenant of good faith and fair dealing cannot be used as a pretext to rewrite the contract. *See Ward's Equip. v. New Holland N.Am.,* 254 Va. 379, 385 (1997) ("[W]hen parties to a contract create valid and binding rights, an implied covenant of good faith and fair dealing is inapplicable to those rights… Generally, such a covenant cannot be the vehicle for rewriting an unambiguous contract in order to create duties that do not otherwise exist."). Because CSXT does not adequately allege a breach of the implied covenant, and because CSXT cannot use the covenant to rewrite the Operating Agreement, this argument fails.[8]

## III.    CSXT fails to state a claim for tortious interference.

### A.    NSR cannot tortiously interfere with the Operating Agreement because NSR is a party to it.

CSXT characterizes Count VII as a claim for tortious interference with *business expectancy*, but the allegations in the Complaint plainly assert a claim for tortious interference with *contract*. CSXT alleges that "[a]s a ***shareholder*** of the NPBL, CSXT has reasonable business

---

[8]   CSXT also points to language in the Operating Agreement that would require NSR to "deliver to [NPBL] all cars to be interchanged" with other parties. (Compl. ¶ 106.) Yet, there is no allegation in the Complaint that NSR did not deliver cars to NPBL to be interchanged. Hence, this cannot form a basis for CSXT's contract claim.

expectancies, including that the corporation will be managed and directed in a manner ***that is in accord with the Operating Agreement***, allowing CSXT access to NPBL trackage in Hampton Roads." (Compl. ¶ 115) (emphasis added). In other words, CSXT's tortious interference claim is based on the benefits to which it claims to be entitled to under the Operating Agreement. This is no more than a claim for tortious interference with the Operating Agreement. Indeed, Plaintiff's breach of contract claim is based on the same alleged wrongful conduct. (Compl. ¶ 106-07.)

"Under Virginia law, it is axiomatic that a party cannot interfere with its own contract." *Canon U.S.A., Inc. v. Lease Group. Res., Inc.*, No. 1:03-cv-1192, 2007 U.S. Dist. LEXIS 37710, *31 (E.D. Va. May 21, 2007); *see also McCray v. Infused Sols., LLC*, No. 4:14-cv-158, 2018 U.S. Dist. LEXIS 88645, *28 (E.D. Va. May 25, 2018) (finding "[g]enerally, the alleged interferer cannot be a party to the business expectancy"). Instead, "a tortious interference claim requires the existence of three actors: two parties to the contract and a third-party who interferes with, or induces one of the parties to breach the contract." *McCray*, 2018 U.S. Dist. LEXIS 88645, at *28. Here, the alleged interferer—NSR—is a party to the Operating Agreement. As a result, NSR cannot have interfered with the Operating Agreement, as well as CSXT's purported expectancies that flow therefrom, as a matter law. For this reason, Count VII should be dismissed.

**B.   NSR did not tortiously interfere with the Operating Agreement because the agreement specifically authorizes the alleged interference.**

CSXT claims that NSR tortiously interfered with its expectation that NPBL "will be managed and directed in a manner that is in accord with the Operating Agreement." (Compl., ¶ 115.) NPBL, however, has been managed in accord with the Operating Agreement; namely, the imposition of the Uniform Rate, which precludes a special rate only for CSXT. Therefore, NSR did not tortiously interfere with the Operating Agreement as a matter of law. *See Fox v. Deese,* 234 Va. 412, 429 (1987); *Phoenix Renovation Corp. v. Rodriguez*, 461 F. Supp. 2d 411, 427-28

(E.D. Va. 2006) (stating that plaintiff could not establish claim for tortious interference of business expectancies without establishing that agreements had been violated), *aff'd*, 258 Fed. Appx. 526 (4th Cir. 2007).

### C. The economic loss rule bars CSXT's tortious interference claim.

CSXT's tortious interference claim is a simple repackaging of its breach of contract claim, which is not allowed under Virginia law. It is well-settled that tort law cannot "compensate parties for losses suffered as a result of a breach of duties assumed only by agreement." *Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.,* 236 Va. 419, 425 (1988); *Zurich Am. Ins. Co. v. Turbyfill*, No. 7:10-cv-282, 2010 U.S. Dist. LEXIS 110056 *12 (W.D. Va. Oct. 15, 2010) (noting that Virginia courts have a "long-standing distaste for 'turning every breach of contract into an actionable [tort] claim'") (citing *Station #2 LLC v. Lynch*, 280 Va. 166, 174 (2010)). Thus, "a tort claim normally cannot be maintained in conjunction with a breach of contract claim." *Goodrich Corp. v BaySys Techs., LLC*, 873 F. Supp. 2d 736, 747 (E.D. Va. 2012) (quoting *Erdmann v. Preferred Research, Inc.*, 852 F.2d 788, 791 (4th Cir. 1988)).

"Under the economic loss rule, 'losses suffered as a result of the breach of a duty assumed only by agreement, rather than a duty imposed by law, remain the sole province of contracts.'" *Goodrich,* 873 F. Supp. 2d. at 747) (quoting *Filak v. George*, 267 Va. 612, 613 (2004)). The relevant inquiry "is whether the source of the violated duty sounds in contract or tort." *Id*. (quoting *Pre-Fab Steel Erectors v. Stephens*, No. 6:09-cv-00039, 2009 U.S. Dist. LEXIS 26548, at *8 (W.D. Va. Apr. 1, 2009)).

It is plain that CSXT's alleged lost "business expectancies" are rooted in the rights that CSXT "as a shareholder of the NPBL" claims to enjoy as a party to the Operating Agreement. (Compl. ¶ 115.) CSXT explicitly alleges that the source of NSR's alleged duties (*i.e.* "allowing

CSXT access to NPBL trackage") is contractual.  The economic benefits associated with CSXT's purported expectancies flow entirely from, and represent the same damages it has allegedly suffered, as a result of NSR's alleged breach of the Operating Agreement.  *Compare* Compl, ¶ 115 (economic benefits include "revenues from NPBL and [CSXT's] ability to access NPBL trackage") *with* Compl. ¶ 108 (alleged breach of Operating Agreement has harmed CSXT by "reducing the revenues of NPBL … and by causing CSXT to lose potential business due to its inability to economically access NIT by rail").

CSXT has not pled a violation of any duty independent of those allegedly created by the Operating Agreement, nor can it.  Accordingly, CSXT's tortious inference claim fails as a matter of law and must be dismissed.  *See Goodrich,* 873 F. Supp. 2d at 748 (dismissing tortious interference claim as barred by the economic loss rule, finding that "[t]he source of this alleged violated duty, however, harkens back to [plaintiff's] contractual claims").

## <u>CONCLUSION</u>

For the reasons stated in this memorandum, the Court should dismiss with prejudice Counts V, VII, VIII and IX of the Complaint, with prejudice.

Date:   November 27, 2018        Respectfully submitted,


**NORFOLK SOUTHERN RAILWAY COMPANY**


/s/ Michael E. Lacy
Alan D. Wingfield (VSB 27489)
Michael E. Lacy (VSB 48477)
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Tel:  804-697-1200
Fax:  804-698-6061

Michael W. Smith (VSB 01125)
Craig T. Merritt (VSB 20281)
Belinda D. Jones (VSB 72169)
S. Perry Coburn (VSB 78372)
CHRISTIAN & BARTON, LLP
909 East Main Street, Suite 1200
Richmond, Virginia 23219
Tel.:  (804) 697-4100
Fax:  (804) 697-4112

*Attorneys for Defendant Norfolk Southern Railway Company*

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of November, 2018, I electronically filed a copy of

the foregoing with the Clerk of Court using the CM/ECF system, which sent a notification of

such filing (NEF) to the registered participants as identified on the NEF to receive electronic

service, including:

Robert W. McFarland, Esq.
Benjamin L. Hatch, Esq.
E. Rebecca Gantt, Esq.
McGuireWoods LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia 23510-1655
Telephone: (757) 640-3716
Facsimile: (757) 640-3930
rmcfarland@mcguirewoods.com
bhatch@mcguirewoods.com
rgantt@mcguirewoods.com

*Attorneys for CSX Transportation, Inc.*

James L. Chapman, IV, Esq.
W. Ryan Snow, Esq.
Darius K. Davenport, Esq.
David C. Hartnett, Esq.
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1500
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com

*Attorneys for Norfolk and Portsmouth Belt
Line Railroad Company*

Hugh M. Fain, III, Esq.
M. F. Connell Mullins, Jr., Esq.
John M. Erbach, Esq.
SPOTTS FAIN PC
411 E. Franklin St.
Richmond, VA 23219
Telephone: (804) 697-2000
hfain@spottsfain.com
cmullins@spottsfain.com
jerbach@spottsfain.com

*Attorneys for Jerry Hall, Thomas Hurlbut,
and Philip Merilli*

W. Edgar Spivey, Esq.
Clark J. Belote, Esq.
KAUFMAN & CANOLES, P.C.
150 W. Main Street, Suite 2100
Norfolk, VA 23510
Telephone: (757) 624-3196
Facsimile: (888) 360-9092
wespivey@kaufcan.com
cjbelote@kaufcan.com

*Attorney for Cannon Moss*

- 24 -

/s/ Michael E. Lacy
Alan D. Wingfield (VSB 27489)
Michael E. Lacy (VSB 48477)
TROUTMAN SANDERS, LLP
1001 Haxall Point
Richmond, Virginia 23219
Tel:  804-697-1200
Fax:  804-698-6061

37062030v6