**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

CSX TRANSPORTATION, INC.,
individually and on behalf of NORFOLK
& PORTSMOUTH BELT LINE
RAILROAD COMPANY,

   Plaintiff,

v.           Civil Action No. 2:18cv530

NORFOLK SOUTHERN RAILWAY
COMPANY, *et al.*,

   Defendants.

             /

**CSX TRANSPORTATION, INC.'S OPPOSITION TO MOTION TO DISMISS BY**
**NORFOLK & PORTSMOUTH BELT LINE RAILROAD COMPANY**

**INTRODUCTION**

  The Norfolk & Portsmouth Belt Line Railroad Company ("NPBL") is a terminal switching railroad formed in 1896 by eight railroads, including the predecessors to Plaintiff CSX Transportation, Inc. ("CSXT") and Defendant Norfolk Southern Railway Company ("NS"). NS and CSXT are now NPBL's only two shareholders. NPBL was formed to provide efficient and equal access for the shareholder railroads to the facilities to which NPBL connected, in recent years it has departed from this core purpose. Instead, it is now operated by a group of NS-appointed directors and officers who have conspired with NS to operate NPBL so to preclude competition at the growing Port of Virginia.

  For instance, NPBL is one of only two railroads with access to the Norfolk International Terminals ("NIT"). While the NIT has seen rapid growth in recent years due to its deep draft and large crane capabilities, NPBL's financial condition has stagnated or deteriorated despite its unique ability to access NIT. While CSXT—encouraged by the Virginia Port Authority—has made

1

proposals to NPBL that would correct its course by enabling efficient access to NIT, NPBL has rejected these attempts in order to preserve the market share of NS.

To remedy this unlawful conduct, CSXT filed its Complaint alleging violations of federal antitrust laws and raising claims under state law of conspiracy, tortious interference, and other unlawful conduct.  NPBL has moved to dismiss the two federal and three state law claims against it.  Doc. 27; Doc. 28.  NPBL's arguments are based on a stinted reading of the factual allegations in the Complaint, the introduction of facts that are not pled, and a misreading of applicable law. NPBL's Motion should be denied.

## BACKGROUND

### I.      NPBL History and Governance

NPBL is a for-profit stock corporation registered under Virginia law.   Complaint (hereinafter "Doc. 1") ¶ 9; Doc. 1-1 at 1, 3-4.  It is a terminal switching railroad that was formed in 1896 by agreement of eight original shareholder railroads and by legislative charter.  Doc. 1 ¶ 1; Doc. 1-1; 1895-96 Va. Acts. Ch. 706; 1897-98 Va. Acts. Ch. 55.  These eight railroads, which included CSXT's and NS's predecessors in interest, joined together to form NPBL in order to provide an efficient means of interchanging the railroads' traffic between their own lines and various marine and industrial facilities located along NPBL's tracks.  Doc. 1 ¶ 1.

This core purpose of providing efficient and equal access among the shareholder railroads is clearly stated in NPBL's founding documents.  The original 1897 Operating Agreement states that they joined together "for the mutual benefit of each in the interchange of business."  Doc. 1-1 at 1.  The railroads agreed to "co-operate cordially in encouraging the business of the [NPBL] for which it is constructed," and to "deliver to the [NPBL] all cars to be interchanged with other [shareholder railroads]."  *Id.* at 4.  The Operating Agreement also provided for the immediate construction of a railway that would connect various facilities and railroads in the Hampton Roads

2

area.  *Id.* at 3; *see also* Charter at 8 (referencing a connection across the Elizabeth River into the City of Norfolk).

Originally, all eight shareholder railroads each had one representative on NPBL's Board of Directors.  Doc. 1-1 at 2 (providing that "each of said Companies shall have one representative on the Board").  In 1989, the remaining three shareholder railroads entered into a Supplemental Agreement, which provided that CSXT would appoint two representatives to NPBL Board of Directors.  Doc. 1 ¶ 22.  The other two railroads—the Norfolk and Western and the Southern Railway Companies—could together appoint three.  *Id.*

At the time of the 1989 Supplemental Agreement, CSXT owned 43% of NPBL's stock. Doc. 1-3.  Each of the other two railroads owned half of the remaining 57%.  *Id.*  A series of corporate mergers and renaming occurred a year after the Supplemental Agreement, however, and since that time NS has been the majority shareholder of NPBL, owning 57% of NPBL's stock, and appointing three representatives to the Board of Directors.  Doc. 1 ¶ 23.

CSXT still has two voting representatives on the NPBL Board.  Individual Defendants Jerry Hall, Thomas Hurlbut, and Philip Merilli were, at the time of the filing of this lawsuit, NS employees that were the NS-appointed Directors on the NPBL Board.  Doc. 1 ¶ 10.  The sixth voting member of the Board of Directors is the NPBL President.  This position is elected by a majority of the Board of Directors and, for at least the past twelve years, has been filled by a former NS employee.  *Id.* ¶ 29; Doc. 1-4 Arts. Third & Fourth.  The current President, Cannon Moss, who is the fourth Individual Defendant, has been NPBL President since 2011, when he was nominated at NS's direction and elected over the objection of the CSXT-appointed Directors.  Doc. 1 ¶ 27. Moss replaced a former NS employee who returned to work at NS after his tenure at NPBL.  *Id.* NPBL's Vice President and Terminal Superintendent are also former NS employees.  *Id.*

3

## II.   NPBL's Recent Deteriorating Financial Condition

NPBL has had access rights to the Norfolk International Terminals ("NIT") for over 100 years.  Doc. 1 ¶ 1.  Indeed, NPBL and NS are the only two rail carriers with direct rail access to NIT.  *Id.* ¶ 3.  NIT is the largest international shipping terminal in Virginia and one of the largest ports on the Eastern Seaboard.  *Id.* ¶¶ 3, 22.  In recent years, NIT has continued to grow, as it is accessible to the newest deep-draft ships and operates some of the world's largest cranes.  *Id.* ¶ 20.

As one of only two railroads that can serve NIT, NPBL should be well positioned to take advantage of NIT's success.  But as the port has grown, NPBL's revenues have waned.  Doc. 1 ¶ 3.  NPBL's overall financial performance has been declining over the past several years, and it continues to deteriorate.  *Id.* ¶ 37.  NPBL's revenue has essentially been flat or down over the past several years, including in 2017.  *Id.*  Even this bottom line revenue of NPBL is deceptive because much of NPBL's revenue in recent years has been generated from the sale of real estate, a diminishing resource.  *Id.*  Rail car volume has been essentially flat for years, and decreased in 2017.  *Id.*  Current car volume on NPBL as a whole is heavily dependent on a single customer— that is not at NIT—engaged in a single line of business.  *Id.*  No new sources of substantial and recurring business have been added in recent years, nor do any appear to be planned.  *Id.*  No excess cash flow is being generated that could be used for capital expenditures on maintenance, upgrades, or expansion.  *Id.*

Amid these conditions, NPBL has set and maintained a rate that effectively precludes CSXT from using NPBL to access NIT.  Why would NPBL set a rate that precludes customers from buying its service?  The Complaint alleges the answer.

NS has direct access to NIT.  It can access NIT over its own tracks, and has achieved approximately 90% of the market share there.  Doc. 1 ¶ 52.  Through its own direct actions and through its conspiracy with NPBL and NPBL's officers and directors, NS has effectively blocked

4

competition from rail access to NIT.  This conspiratorial conduct was not limited to setting a preclusive rate for service, but also included actions such as infrastructure changes at NPBL and the failure to efficiently deliver CSXT cars.  *Id.* ¶ 87.

NPBL's operating revenue is derived principally from switch operations, and is largely dependent upon the switch services being provided to the shareholders' companies, who in turn pay for those services.  Doc. 1 ¶ 33.  NPBL's current line haul switch rate of $210 was adopted in 2009 over the objection of non-NS directors.  *Id.* ¶ 34; Doc. 28-1.  That rate has not been reviewed or approved by the Surface Transportation Board ("STB").  The rate is dramatically higher than rates for comparable services charged by other short line railroads.  Doc. 1 ¶ 34.  Because the rate is preclusively high—and because of other anticompetitive conduct described in the Complaint— CSXT has not used NPBL to access NIT in any significant respect, and NPBL's revenues have flagged.  *Id.* ¶ 4.

### III.   CSXT's Proposals

CSXT has tendered offers to NPBL that would have benefited both companies.  In March 2018, CSXT submitted a "Rate Proposal for Long Term Rail Service to NIT."  Doc. 1-5.  It proposed a switching rate of $80 per car combined with a minimum annual volume guarantee of 18,000 cars.  *Id.* at 3-4.  Based on its close study of the issues and NPBL's financial reports, CSXT estimated its proposal "would provide NPBL with a consistent, long term stream of additional income," to the tune of $1.4 million in incremental revenue and $660,000 in incremental operating income in the first year alone.  *Id.* at 2.  These estimated benefits were substantially higher than a 2010 CSXT proposal to NPBL that was rejected, which proposed a $37.50 one-way switching rate and a volume guarantee of 50 containers per round trip.  Doc. 1-5 Encl.

In light of NPBL management's initial disfavor to this proposal, in advance of the April 2018 meeting, CSXT also submitted a governance proposal to NPBL.  Doc. 1-6.  CSXT proposed

several remedial actions to address defects in NPBL's corporate governance structures, including limiting CSXT and NS to one designated director each and having the rest of the board composed of four independent directors. *Id*. CSXT also proposed the implementation of a corporate compliance program, conflict of interest policies, and other reforms. *Id*.

Although the Virginia Port Authority ("VPA") requested that NPBL facilitate expanded rail access for handling containers at NIT, and noted that NPBL's failure to provide "proper access to CSX puts Virginia at a competitive disadvantage," Doc. 1 ¶ 36, the Defendants rejected both proposals. In furtherance of its conspiracy with NS, the Individual Defendants refused to form an independent committee to evaluate the rate proposal or to allow a formal vote at the next scheduled Board of Directors meeting in April 2018. *Id.* ¶ 40. At that meeting, the Individual Defendants followed through on their conspiratorial commitments, parroting the same pretextual reasons for denying the rate request that NS had previously offered. *Id.* NPBL's rate remains unchanged today. At the April 2018 meeting, the Individual Defendants also rejected CSXT's governance proposal and voted to approve a slate of four NS-designated directors. *Id.* ¶ 72.

## ARGUMENT

### I.     Rule 12(b)(6) Legal Standard

Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief, Fed. R. Civ. P. 8(a)(2), so as to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Chesapeake Square Hotel, LLC v. Logan's Roadhouse, Inc.*, 995 F. Supp. 2d 512, 514 (E.D. Va. 2014) (internal quotations, punctuation, and citation omitted). In considering a Rule (12)(b)(6) motion to dismiss, "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). The court must "draw all reasonable inferences in favor of the plaintiff." *Chesapeake Square Hotel*, 995 F. Supp. 2d at 515.

A complaint must allege enough facts to state a claim for relief that is facially plausible.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Facial plausibility means that the facts pled "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## II.   All Claims (Counts I, II, and VII through IX)

NPBL raises two arguments to dismiss that apply to all of the claims against it.  First, it contends that these claims are barred by a provision in the agreement between CSXT and NS's predecessors pertaining to a "uniform rate."  Second, it avers that all the claims are preempted by the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. § 10101, *et seq.*, and a proceeding before the Surface Transportation Board ("STB").

### A.   The Operating Agreement's "uniform rate" provision does not bar the claims against NPBL.

The Operating Agreement that NS and CSXT's predecessors signed in 1897 states that the shareholder railroads agreed "[t]hat a uniform rate shall be fixed for the movement of freight cars over the [NPBL], regardless of distance."  Doc. 1-1 at 3-4 (Ninth).  Although it is not a party to this Agreement, NPBL claims that this single phrase categorically bars CSXT's claims because they seek to have NPBL impose a non-uniform rate.

First, NPBL nowhere identifies how this is an argument that CSXT has failed to state a claim so as to merit dismissal under Rule 12(b)(6).  This is at bottom a fact-based merits argument, which is not appropriate at the motion to dismiss stage.  As described further below, it relies on claims of meaning and practice that are disputed and must be subjected to discovery.

Second, NPBL's argument is no answer to CSXT's claims in any event because the claims challenge diverse conduct beyond the rate itself.  The federal antitrust claims, for instance, allege a number of instances of anticompetitive conduct, including the rejection of the Service Proposal

but also the failure to allow the timely and reasonable movement of CSXT's cars, terminating access rights to certain tracks, and discriminating against CSXT by refusing to allow the use of CSXT's locomotives while not imposing the same requirement on NS.  Doc. 1 ¶ 87.  Further, CSXT does not specifically demand relief that must be measured by reference to its 2018 Service Proposal.  It points, for instance, to damages caused by lost opportunities for contracts with shipping partners.  *Id.* ¶ 117.

Third, even as to the rate, CSXT's claims do not necessarily turn on an argument that the rates must be non-uniform.  Rather, the Complaint alleges – among other things – that the uniform rate was set at a preclusive level *for anticompetitive, conspiratorial and tortious reasons*.   To the extent NPBL attempts to hang this argument on CSXT's Service Proposal, there is nothing in CSXT's service proposal that requires only CSXT benefit from that rate structure.

Finally, there is sufficient ambiguity in the language NPBL points to, highlighted by the fact that NPBL has not consistently applied this interpretation in the past, to preclude this argument at the motion to dismiss stage.  As CSXT explained in its Service Proposal, NPBL has either espoused an interpretation contrary to the one it adopts now, or has allowed substantial exceptions to it.  "[T]he NPBL's tariff history demonstrates that NPBL has often published different switch charges for different commodities."  Doc. 1-5 at 3.  Indeed, the current tariff, attached to NPBL's brief, includes a number of varying switching rates, and not a single "uniform rate."  Doc. 28-1.  *United Transp. Union v. S.C. Public Ry. Com'n*, 130 F.3d 627, 635 (4th Cir. 1997) (holding that the district court should have considered "the parties' past practice . . . in interpreting the terms of the parties' agreement").

The relevant language states "[t]hat a uniform rate shall be fixed for the movement of freight cars over the [NPBL], regardless of distance."  Doc. 1-1 at 3-4 (Ninth).   The modifying

clause strongly suggests that the word "uniform" means uniform as to distance, which CSXT's Service Proposal is.  This textual ambiguity, reinforced by the parties' past practices under the Operating Agreement, precludes NPBL's uniform rate argument at this stage of the litigation.  *See Martin Marietta Corp. v. Int'l Telecomms. Satellite Org.*, 978 F.2d 140, 143 (4th Cir. 1992) ("[T]he construction of ambiguous contract provisions is a factual determination that precludes dismissal on a motion for failure to state a claim.").

NS and NPBL cannot conspire for improper reasons to invoke the Operating Agreement as a fig leaf to protect otherwise anticompetitive and tortious conduct.  CSXT has alleged that NS and NPBL engaged in diverse conspiratorial conduct for illegal and improper purposes and the Operating Agreement does not render legal what federal and state law prohibits.

**B.      The STB proceeding poses no obstacle to the adjudication of CSXT's claims.**

**1.      The federal antitrust claims are not "precluded."**

NPBL admits that federal antitrust claims such as CSXT's are not generally preempted by ICCTA.  Doc. 28 at 10.  Yet it contends that this Court should not adjudicate the federal antitrust claims against it because they conflict with an ongoing proceeding before the Surface Transportation Board ("STB").  Although NS initiated the STB proceeding, which concerns a proposed trackage rights agreement between NS and NPBL, NS notably does not join NPBL's arguments that this proceeding "precludes" the federal claims.

NPBL's argument as to the federal antitrust claims points to "the alleged preclusion of a cause of action under one federal statute by the provisions of another federal statute."  *POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2236 (2014).  Preclusion requires the application of the "traditional rules of statutory interpretation."  *Id*. at 2236.  Applying these principles, courts have routinely allowed federal antitrust claims to proceed against railroads.  *See*

*In re Rail Freight Fuel Surcharge Antitrust Litigation*, 593 F. Supp. 2d 29, 43 (D.D.C. 2008) (allowing federal antitrust claim to proceed and dismissing state claims on preemption grounds); *see also Truck-Rail Handling, Inc. v. Burlington Northern & Santa Fe Railway Co.*, 244 F. App'x 130 (9th Cir. 2007); *Springfield Terminal Railway Co. v. Canadian Pacific Ltd.*, 133 F.3d 103 (1st Cir. 1997).

NPBL cites no authority for an ongoing STB proceeding having a preclusive effect on federal claims. *POM Wonderful* rejected a similar argument that was based on an agency's specific engagement with the issue at hand, rather than a general purported facial conflict between laws. The United States argued as *amicus curiae* that Lanham Act suits are precluded by the FDCA only where FDA regulations have "specifically require[d] or authorize[d]" a challenged aspect of a label." *Id.* at 2240. But even this theory, the Court concluded, would contravene the ability of both statutes to exist in parallel and protect distinct interests. *Id.* at 2240-41. Similarly, there is no reason to conclude here that Congress intended the judicial enforcement of antitrust law to yield to the STB's consideration of an (at best) tangentially related matter.

In addition to its lack of legal support, the premise of NPBL's argument is unsound. NPBL contends that the STB proceeding "is exceedingly likely to conflict" with the federal antitrust claims in this lawsuit. Doc. 28 at 10. NPBL's "exceedingly likely to conflict" argument is a house built on speculation, with conjecture for its walls, and wishful thinking overhead. At the STB, NS and NPBL seek to have the STB determine the compensation that NPBL would pay NS for the rights to operate trains over NS's track. The STB proceeding thus concerns the *future* rates that NPBL would pay NS for the use of its track. This federal antitrust claims seek damages for past and continuing conduct that includes rates that customers would pay NPBL for the use of its track. All NPBL can argue is that the STB's later determination of trackage fees *could* have an impact

10

on what rate NS charges NPBL *in the future*. Of course, the STB may determine that the trackage fees should remain the same as they have historically been or be reduced, in which case there is little reason to think they would merit an *increase* to NPBL's rates. Even if the STB increases the trackage fees, it would remain for NPBL to decide whether that increased cost could be absorbed by it or merited an increase in switching rates. And *even if* the STB determined that increased trackage fees were warranted and *even if* NPBL decided to raise its switching rates in response, that still does not mean NPBL is entitled to escape liability for setting its rates for anticompetitive, conspiratorial and tortious reasons *today*.

Put differently, if the NPBL rate has been set for illegal and anticompetitive reasons, as CSXT alleges, then the *possibility* that NPBL may elect to raise its rates further in the future for other reasons has no effect on the violations and damages its rates (and other conduct) have caused to date. Moreover, as discussed above in response to NPBL's "uniform rate" argument, the federal antitrust claims turn on a much broader swath of conduct than simply NPBL's switching rate, making NPBL's conflict argument even further attenuated.

### 2. The state law claims are not preempted.

NPBL is the only defendant that argues that the state law claims against it are preempted, arguing that those claims invite judicial supervision of the reasonableness of its rates. Doc. 28 at 10. ICCTA provides that the STB has exclusive jurisdiction over both rail carrier "rates" and "practices." 49 U.S.C. § 10501(b). ICCTA preempts "those state laws that may reasonably be said to have the effect of 'managing' or 'governing' rail transportation," but it "does not preempt those state or local laws that have a more remote or incidental impact on rail transportation." *Norfolk Southern Ry Co. v. City of Alexandria*, 608 F.3d 150, 157-58 (4th Cir. 2010). Thus, ICCTA preempts claims that "are advanced as a means of challenging the substantive *reasonableness* of the rates." *Fayus Enterprises v. BNSF Ry. Co.*, 602 F.3d 444, 453 (2010).

All the state law claims CSXT has alleged are based on laws of general application that do not purport to manage or target rail transportation.  Thus, the claims are only preempted if they would "have the effect of managing or 'governing' rail transportation."  *Norfolk Southern Ry Co.*, 608 F.3d at 157-58.  Here, the state law claims in the Complaint do not have the effect of managing or governing rail transportation because the state law claims include theories of liability and damages that do not relate to rates or railroad practices.  For example, the state conspiracy claims may be proven by showing a malicious agreement to boycott or not deal with CSXT in order to preclude it from the market when, for example, it made its 2018 Service Proposal.  For purposes of that claim, the Court need not determine whether the existing rate was unlawful, but could resolve the claim by determining whether NS and NPBL agreed that NPBL would not deal with CSXT, and whether the reason they agreed was malicious, *i.e.*, to preclude CSXT's business.  As to damages for state law claims against NPBL, a measure of damages that turned on the calculation of what a lawful rate is would be preempted by ICCTA.  However, here there is available relief that does not turn on a rate calculation, such as compensatory damage for lost business and injunctive relief.  In sum, because there are grounds for liability and damages that do not rely on matters ICCTA preempts, there is no basis to dismiss the claims as preempted.

### 3.     A stay is unwarranted.

NPBL's alternative request to stay should likewise be denied.  NPBL cites no precedent of a court staying a matter pending disparate STB proceedings.  The STB trackage rights proceeding will not resolve CSXT's claims that NPBL has violated antitrust and conspiracy laws.  As CSXT's federal antitrust claims are not reserved to the STB's exclusive jurisdiction, and as NPBL's alleged conflict with the STB proceeding is illusory, there is no basis for a stay of CSXT's claims.  Notably, no other defendant joins in this request for a stay.

III.     **Federal Claims (Counts I and II)**

NPBL raises two arguments to dismiss CSXT's federal antitrust claims.  First, it contends that the antitrust claims are barred by the intracorporate-immunity doctrine.  Second, it claims CSXT has not alleged that NPBL denied CSXT access to any market.  As explained below, both of these arguments fail.

A.     **CSXT's Sherman Act claims are not barred by the intracorporate-immunity doctrine and the appropriate analysis requires discovery and a factual record.**

NPBL argues that *Copperweld*, or the intracorporate-immunity doctrine, applies to preclude CSXT's Sherman Act conspiracy claims simply because NPBL is a majority-owned subsidiary of NS.  Doc. 28 at 12-15.  *Copperweld* held that a parent corporation cannot conspire with its *wholly owned* subsidiary.  NPBL is not a wholly owned subsidiary of NS; in fact, it is only 57% owned by NS.  Cases after *Copperweld*, both from the Supreme Court and lower courts, have made clear that the analysis of whether a corporation can conspire with another company in which it owns only a majority interest requires a fact-intensive inquiry that is inappropriate at the motion-to-dismiss stage.  *See Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195-96 (2010).  Here, CSXT has provided factual detail to support its allegation that NPBL and NS have "separate economic interests" and that, by acting in concert, they have "depriv[ed] the marketplace of independent centers of decision-making."  Doc. 1 ¶ 24.  Indeed, NPBL's own motion demonstrates that its economic interests diverge from those of NS, as it recounts how NS *sued NPBL* at the STB because of disagreements over economic terms.  Doc. 28 at 3.  Notably, NS does not advance any argument for dismissal pursuant to *Copperweld* and instead concedes that CSXT's federal antitrust claims are well pled.  Doc. 35 at 3 ("Under controlling standards, some averments in the Complaint as to the federal antitrust claims, though denied, cannot be reached by NSR's Motion.").

1.   **A corporation's majority interest in another corporation does not preclude the two entities from conspiring under the Sherman Act.**

In *Copperweld*, the Supreme Court held that that a parent corporation was legally incapable of conspiring with its *wholly owned* subsidiary because such entities have a "complete unity of interest."  467 U.S. 752, 771 (1984).  "[T]he subsidiary acts for the benefit of the parent, its *sole* shareholder."  *Id.* at 771 (emphasis added).  Joint conduct by two such entities does not "depriv[e] the marketplace of independent centers of decisionmaking."  *Id.* at 769.  The Court took pains to make clear it was not deciding whether a company can conspire with another company in which it has only a majority interest.  *See id.* at 767 ("We do not consider under what circumstances, if any, a parent may be liable for conspiring with an affiliated corporation it does not completely own.").  Thus, *Copperweld* does not bar CSXT's conspiracy claims.

Though NPBL appeals to "*Copperweld* and its progeny," it surprisingly fails to even cite, much less address, *American Needle, Inc. v. National Football League*, 560 U.S. 183 (2010)—the most important Supreme Court case since *Copperweld* on the intracorporate-immunity doctrine. *See Robertson v. Sea Pines Real Estate Companies, Inc.*, 679 F.3d 278, 284 (4th Cir. 2012) (citing *Copperweld* and *American Needle* as the two cases guiding the concerted-action analysis). *American Needle* addressed whether NFL teams that had formed a joint venture, the NFLP, to manage the licensing of their trademarks could conspire in violation of the Sherman Act.  The Court held that the NFL teams could be guilty of conspiracy both with each other and with the NFLP.  560 U.S. at 199–200.  The Court explained that the Sherman Act treats "concerted behavior more strictly than unilateral behavior … because unlike independent action, concerted activity inherently is fraught with anticompetitive risk insofar as it deprives the marketplace of independent centers of decisionmaking that competition assumes and demands."  *Id.* at 190 (internal citation and quotation omitted). The intracorporate-immunity doctrine protects unilateral behavior, but its

application does not depend on "formalistic distinctions" such as the form of the corporate organization.  560 U.S. at 191, 193 ("[C]orporate interrelationships … are not determinative of the applicability of the Sherman Act because the Act is aimed at substance rather than form").  Instead, it depends on a fact-intensive inquiry that determines "how the parties involved in the alleged anticompetitive conduct actually operate." *Id* at 191.  This requires courts to examine various factors and determine whether the action at issue is between entities with "complete unity of interest" or between actors with "separate economic interests." *Id.* at 195–96.[1]

Consistent with *Copperweld*'s reservation of the issue, courts across the country have concluded that *Copperweld*'s holding does not require dismissal where a company's ownership is less than 100%.  *See, e.g., Leaco Enterprises, Inc. v. Gen. Elec. Co.*, 737 F. Supp. 605, 608 (D. Or. 1990), *order clarified*, No. CIV. 87-1026-FR, 1990 WL 200085 (D. Or. Nov. 27, 1990) (distinguishing *Copperweld* because the subsidiary was not wholly owned); *Sonitrol of Fresno, Inc. v. Am. Tel. & Tel. Co.*, No. 83-2324, 1986 WL 953, at *3 (D.D.C. Apr. 30, 1986) (same); *Tunis Bros. Co. v. Ford Motor Co.*, 763 F.2d 1482, 1495 (3d Cir. 1985), cert. granted, judgment vacated on other grounds, 475 U.S. 1105, 106 (1986) (same); *United States ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C.*, 318 F. Supp. 3d 680, 705 (S.D.N.Y. 2018), (denying motion to dismiss because the applicability of "intracoporate conspiracy doctrine" is a "question of fact" that court cannot resolve on a motion to dismiss); *Sumotext Corp. v. Zoove, Inc*., No. 16-CV-01370-

---

[1] Applying the fact-specific inquiry required by *American Needle*, the Fourth Circuit affirmed the denial of a motion to dismiss based on the intracorporate-immunity doctrine in *Robertson v. Sea Pines Real Estate Companies, Inc.*  There, the court considered whether the actions of board members of a multiple listing service ("MLS") were susceptible to Sherman Act conspiracy claims.  679 F.3d at 286.  The court noted that, under *American Needle*, substance not form controls.  It concluded that the complaint reasonably supported the inference that the defendants were "separate economic actors pursuing separate economic interests," in part because the defendants' had economic interests "that [were] distinct from [the MLS's] financial well-being." *Id.* at 286–87.

BLF, 2018 WL 1876937, at *4 (N.D. Cal. Apr. 19, 2018) (denying motion to dismiss because "the single-entity inquiry is fact-specific."); *Hanover Ins. Co. v. TMP Int'l, Inc.*, No. 4:04CV668 RWS, 2006 WL 13120, at *3 (E.D. Mo. Jan. 3, 2006) (denying motion to dismiss and because it was not appropriate to decide whether entities "were capable of conspiring . . . as a matter of law.").

For example, in *Aspen Title & Escrow, Inc. v. Jeld-Wen, Inc.*, the court denied a motion to dismiss because "only corporations which are owned 100% in common, or a *de minimis* amount less than 100%, are covered by the *Copperweld* rule." 677 F. Supp. 1477, 1486 (D. Or. 1987). The court concluded that the parent and its majority-owned subsidiary (75% ownership) were capable of conspiracy under the Sherman Act.

Similarly, in *American Vision. v. Cohen*, the court denied the plaintiff's motion to dismiss because the parent and its majority-owned subsidiary were capable of conspiracy. 711 F. Supp. 721, 723 (E.D.N.Y. 1989). The court explained that *Copperweld* "makes it clear that the Cohens may not escape liability merely because they owned 54% of the American Vision stock and acted as its directors and officers." Though the 54% ownership gave defendants' control, "the ultimate economic interests of a corporation are held by its stockholders, and the other 46% of the stock represented an economic interest different from that of the Cohens." *Id.*

All the cases NPBL cites, save one, *were decided on summary judgment*, rather than at the motion-to-dismiss stage, and all of them preceded *American Needle*. The one case in which the court granted a motion to dismiss—*Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330 (N.D. Ill. 1997)—is distinguishable from this case. In *Rohlfing*, the parent, Manor Care, Inc., operated its network of nursing homes through its subsidiaries, including the wholly owned Manor Healthcare Corp., and the 82.3% owned Vitalink Pharmacy Services, Inc. The court concluded that the defendants shared a "unity of interest" where the plaintiff's complaint did "not suggest" and the

court could not "discern, any manner in which the interests of Manor Care and its subsidiaries might diverge." *Id.* at 344–45.  By contrast, here, the Complaint alleges that the interests of NPBL and NS diverge in a host of ways, as described further below.  In fact, the NBPL has admitted that its interests diverged from NS so much that NS sued NPBL at the STB because of disagreements over economic terms.  Doc. 28 at 3.[2]

### 2.     CSXT has properly pled an antitrust conspiracy.

Particularly in the wake of *American Needle*, courts have considered various factors in evaluating whether the substance of corporate relationships (as opposed to the form) render them capable of conspiring.  Such factors include the legal relationship between the corporations, the makeup of the board of directors of the subsidiary, the corporate purposes of each of the corporations; and the amount of autonomy exercised by the subsidiary.  *See Leaco Enterprises, Inc. v. Gen. Elec. Co.*, 737 F. Supp. 605, 608 (D. Or. 1990), order clarified, No. CIV. 87-1026-FR, 1990 WL 200085 (D. Or. 1990).  As discussed above, courts consider these factors almost uniformly at the summary judgment stage.

Here, CSXT has alleged that NPBL and NS are separate legal entities, with separate economic interests, separate corporate purposes, and separate management, whose conspiracy "depriv[ed] the marketplace of independent centers of decision-making."  Doc. 1 ¶ 24.  The Operating Agreement provides "that NPBL would be a 'separate organization in which all [railroads] are to be equally interested and each to have an equal representation.'"  Doc. 1 ¶ 17.  It provides that NPBL was formed for a separate purpose—to "ensure competition for transportation

---

[2] NPBL also cites *American Chiropractic Association v. Trigon Healthcare, Inc.*, 367 F.3d 212 (4th Cir. 2004), which does not address application of the intracorporate-immunity doctrine to parents and subsidiaries.  Instead, it found that the doctrine applied to preclude conspiracy between an insurer and a committee established by the insurer because the committee was acting as the insurer's corporate agent.  That case has no relevance here.

services" among the railroads.  *Id.* ¶ 15.  It also provides that NPBL "operates according to its own bylaws and with its own management and Board of Directors."  *Id.* ¶ 24.  As such, "[T]he railroads and NPBL lack economic integration, and the interests of NPBL can diverge from its railroad shareholders."  *Id.* ¶ 24.  Indeed, NPBL is 43% owned by CSXT, who clearly has divergent economic interests from NS, as CSXT is a direct and vigorous competitor of NS.  *Id.* ¶¶ 4, 37–43.

Even NPBL's motion to dismiss shows that the entities have "separate economic interests," as it explains that in 2018 NS initiated legal action against the NPBL at the STB "to have the STB establish new terms and conditions governing the Belt Line's trackage rights."  Doc. 28. at 3.  That is not indicative of entities with "complete unity of interest."  *Copperweld*, 467 U.S. at 771. Instead, the STB dispute shows the two pulling in opposite directions, clearly unlike a "team of horses drawing a vehicle under the control of a single driver."  *Id.*

Finally, it bears note that NS has not claimed that the intracorporate-immunity doctrine applies, and in fact it concedes that CSXT's antitrust claims are well pled.  Doc. 35 at 3. While NPBL is not bound by NS's concession, NS's position in no way supports NPBL's position. Unusual results for entities supposedly with a unity of economic interest.  As CSXT's complaint amply pleads facts supporting the conclusion that NS and NPBL have "separate economic interests," the intracorporate-immunity doctrine does not apply.  Thus, this Court should deny NPBL's motion to dismiss CSXT's Sherman Act claims on the grounds of intracorporate immunity.

### B.     NBPL's anticompetitive behavior caused an antitrust injury.

The NBPL argues that it cannot be liable for Sherman Act violations because CSXT fails to allege that it has been completely "shut out of the Port of Hampton Roads, or that the Port of Hampton Roads is suffering as a result of any action of the Belt Line."  Doc. 28 at 15.  In fact, CSXT has adequately alleged an antitrust injury to both itself and the market.

The law does not require that a plaintiff allege that it was completely shut out of a market. Instead, to state a claim under either § 1 or § 2 of the Sherman Act, a plaintiff must allege an "antitrust injury." *See Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 702, 708 (4th Cir. 1991). An antitrust injury is a "business loss of the sort the antitrust laws were designed to prevent," *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 149 (4th Cir. 1990), namely loss resulting from anticompetitive effects of the defendant's behavior on the plaintiff and the market. *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 432 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015). "Anticompetitive effects" are not limited to being completely "shut out" of a market. *See E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 688 F. Supp. 2d 443, 460 (E.D. Va. 2009) (denying motion to dismiss where the plaintiff had alleged partial exclusion from market). Instead, "anti-competitive effects include, but are not limited to, reduction of output, increase in price, or deterioration in quality." *SD3, LLC*, 801 F.3d at 432 (internal quotations omitted); *see also Virginia Vermiculite, Ltd. V. W.R. Grace & Co.-Conn.*, 108 F. Supp. 2d 549, 593 (W.D. Va. 2000) ("[A]n action harms the competitive process 'when it obstructs the achievement of competition's basic goals—lower prices, better products, and more efficient production methods." (internal quotation marks omitted)).

Here, CSXT has alleged antitrust injury to both itself and the market resulting from NPBL's anticompetitive behavior. NS "benefits from a significant barrier to entry into the market for intermodal transportation in and out of Hampton Roads ports, namely the lack of accessible rail routes for competitors that are not owned by NS to the NIT." Doc. 1 ¶ 52. The NIT is "the largest international shipping terminal in Virginia." *Id.* ¶ 3. And "only two entities have the ability to access NIT by rail: NPBL and NS." *Id.*

The antitrust injury to CSXT is clear: "[C]ompetitors such as CSXT are practically

precluded from using NPBL to connect to NIT because the rate set by NPBL's board, in concert with NS, is prohibitively expensive and because NS refuses to allow NPBL to handle intermodal trains over its tracks on a regular basis." Doc. 1 ¶ 4. "The rates charged by NPBL and other anticompetitive restrictions on CSXT's use of NPBL have effectively foreclosed CSXT from moving containers to or from NIT on NPBL." *Id.* ¶ 35.

The antitrust injury to the market is clear as well: "The Defendants' actions as to NPBL are adversely affecting commerce in Hampton Roads and Virginia. The VPA has expressly requested that NPBL 'facilitate dual [rail] access [by CSXT and NS] for handling containers at NIT,' because NPBL's current failure to provide 'proper access to NIT by CSX puts Virginia at a competitive disadvantage.' Indeed, the Defendants' activity is raising prices charged to shippers and, ultimately consumers, because NS has shut out the only other company who could compete to provide intermodal services." Doc. 1 ¶ 36; *see also Id.* ¶¶ 64, 65. NPBL's actions "have also resulted in reduced choice among shippers for intermodal options from Hampton Roads' ports." *Id.* ¶ 66. Ultimately, "Defendants' imposition of unreasonable and anticompetitive rates harms everyone (including NPBL, CSXT, freight shippers, and other competitors) except NS." *Id.* ¶ 44.

Notably, courts routinely hold that whether a plaintiff has suffered an "antitrust injury" is not typically resolved through a motion to dismiss. *See e.g., Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 876 (3d Cir. 1995) ("[T]he existence of an 'antitrust injury' is not typically resolved through motions to dismiss."); *Cont'l Airlines, Inc. v. United Air Lines, Inc.*, 120 F. Supp. 2d 556, 569 (E.D. Va. 2000) (same) (internal quotation omitted); *Schuykill Energy Res., Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997) (same). It therefore comes as no surprise that NPBL offers virtually no legal support for its contention, and in its motion to dismiss, NS does not claim that CSXT fails to allege an antitrust injury. Doc. 35 at 3.

IV.   **Virginia Claims (Counts VII through IX)**

NPBL raises four arguments to dismiss CSXT's state law claims.  First, it contends that the state law claims are time barred.  Second, it claims that the tortious-interference claim fails because CSXT lacks standing and has failed to allege a valid business expectancy.  Third, it claims the intracorporate immunity doctrine precludes the state conspiracy claims and CSXT fails to plead a facially plausible conspiracy.  Finally, NPBL claims that the court should decline to exercise supplemental jurisdiction over the state law claim.  As explained below, all of these arguments fail, and all three counts should proceed.

A.   **No statute of limitations bars any of CSXT's claims.**

NPBL argues that CSXT's tortious-interference claim, statutory-conspiracy claim, and common-law conspiracy claim are time barred because CSXT suffered an injury in 2009 due to NPBL's wrongful conduct.  Doc. 28 at 16-19.  In fact, CSXT's claims are not time barred because CSXT alleges separate wrongful acts giving rise to their own distinct causes of action throughout the limitations period.  As such, NPBL cannot carry its burden to show that the statute-of-limitations defense applies.[3]  Indeed, given the variety and extent of wrongs alleged in this case, the limitations defense is fact bound and should not be resolved at the motion-to-dismiss stage.

Although "the statute of limitations does not accrue *separately for each set of damages* which results from a wrongful act," *Brown v. Am. Broad. Co.*, 704 F.2d 1296, 1300 (4th Cir. 1983) (emphasis added), the statute of limitations *does* accrue separately for each *separate wrongful act*. *See L-3 Commc'ns Corp. v. Serco, Inc.*, No. 1:15-CV-701, 2018 WL 1352093, at *5 (E.D. Va. Mar. 15, 2018) (finding "any act to interfere with the expectancy in each Task Order constituted

---

[3] The party raising the statute of limitations as an affirmative defense must prove that the other party's claims are time barred.  *See Heirs of Roberts v. Coal Processing Corp.*, 369 S.E.2d 188, 190 (Va. 1988).

an independent tort" with a new statute of limitations). As the Supreme Court of Virginia explained in *Hampton Roads Sanitation Dist. v. McDonnell*,

> "If the wrongful act is of a permanent nature and one that produces all the damages which can ever result from it, [then] the entire damages must be recovered in one action and the statute of limitations begins to run from the date of the wrongful act. Conversely, when wrongful acts are not continuous but occur only at intervals, each occurrence inflicts a new injury and gives rise to a new and separate cause of action."

234 Va. 235, 239 (Va. 1987) (internal citation omitted) (considering statute of limitations under the Virginia Conspiracy Act, Va. Code. §§ 18.2–499); *see also Union Labor Life Ins. Co. v. Sheet Metal Workers Nat'l Health Plan,* No. 90–2728, 1991 WL 212232, at *5 (D.D.C. Sept. 30, 1991) (Virginia statute of limitations accrued anew where "wrongful acts or breaches of duty" occurred "in distinct intervals or installments, as opposed to being continuous").[4]

Here, CSXT has alleged "separate and distinct occurrence[s]" that give rise to separate claims. *See Kancor Americas, Inc. v. ATC Ingredients, Inc.*, No. 15-CV00589-GBL-IDD, 2016 WL 740061, at *6 (E.D. Va. Feb. 25, 2016) (rejecting limitations defense and denying summary judgment where each transaction was a new potential breach). Among other things, CSXT has alleged that in 2018 NPBL and NS conspired to tortiously interfere with CSXT's business expectancy in the operation of NPBL by rejecting the Service Proposal that would have allowed CSXT and other competitors to access NIT. Doc. 1 ¶¶ 39–44, 70–75. CSXT has also separately alleged that in 2015, NPBL and NS conspired to prevent the reasonable and timely movement of cars delivered to NPBL by CSXT. *Id.* ¶ 55. CSXT has separately alleged that NPBL, conspiring with NS, "by and through the Individual Defendants, have discriminated against CSXT by refusing

---

[4] CSXT does not contend that the separate wrongful acts committed by NPBL are wholly unrelated. Obviously, they all relate to CSXT's claims in this case, including CSXT's claim that the actions of NPBL have precluded CSXT and others from effectively competing in the Hampton Roads market.

to allow NPBL to use CSXT's fully fueled locomotives to access NIT, requiring only NS-owned or supplied locomotives to be used by or on NPBL." *Id.* ¶ 56.  And CSXT has separately alleged that NPBL conspired with NS to threaten to enter into agreements "to increase dramatically the charges that NPBL would pay to NS for exercise of NPBL's rights to access NS trackage." *Id.* ¶ 87.  These separate wrongful acts give rise to separate causes of action arising within the limitations period.

NBPL relies on *Eshbaugh v. Amoco Oil Co.*, where the Court held that a cause of action accrues when "any damage, however slight, is sustained," 234 Va. 74, 77 (Va. 1987), to suggest that CSXT's claims must have accrued back in 2009 when it suffered damage at the hands of NPBL.  Even assuming CSXT had a cause of action that accrued in 2009, that does not prospectively vitiate new causes of action arising from separate wrongful acts that have accrued within the limitations period.  In *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 543 (4th Cir. 1997), on which NPBL also relies, the court, likewise, merely considered whether the plaintiff's cause of action accrued when an injury first occurred—it does.  The court did not consider whether a separate cause of action arose from later wrongful acts, as is the case here.

NPBL asks the court to dismiss these claims based on assumptions and inference.  It avers that CSXT's allegations of separate wrongful acts are actually "connected examples of earlier injurious acts" that "culminated at the April 2018 board meeting."  Doc. 28. at 19.  At this stage, all facts must be construed in the light most favorable to the plaintiff.  *See U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (noting that at the motion-to-dismiss state "we construe facts in the light most favorable to the plaintiff").  Whether all these are "connected examples" of one wrongful act or separate wrongful acts is a matter for resolution on a fully developed factual record.  *See Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4

F.3d 244, 250 (4th Cir. 1993) (finding that an affirmative defense should be considered at the motion-to-dismiss stage only in the rare circumstance where all facts necessary to the defense "clearly appear[] on the face of the complaint").

As CSXT has identified separate wrongful acts giving rise to causes of action within the limitations period, the Court should reject NPBL's statute-of-limitations defense.

**B. CSXT has standing to bring a tortious-interference claim and adequately alleges a valid business expectancy.**

**1. CSXT's has standing to bring a tortious-interference claim against NPBL.**

NBPL contends that CSXT lacks standing to pursue a tortious-interference claim against NPBL because CSXT is "a shareholder of the Beltline." Doc. 28 at 20. This argument presumes that CSXT is seeking to remedy harms to NPBL—a dramatic misreading of CSXT's tortious-interference allegations. In fact, CSXT has standing because CSXT is seeking relief for the harm that NPBL has caused CSXT by denying CSXT access to NPBL's trackage.

The cases relied upon by NPBL stand for the uncontested principle that "an action for injuries to a corporation cannot be maintained by a shareholder on an individual basis and must be brought derivatively." *Simmons v. Miller*, 261 Va. 561, 573 (Va. 2001); *Keepe v. Shell Oil Co.*, 220 Va. 587, 591 (Va. 1979) (holding stockholder has no standing for an injury to the corporation on the ground the injury caused a depreciation in the value of stock); *Wright v. Dee*, 87 Va. Cir. 148, 152 (2013) (finding complaint failed to state a cause of action for tortious interference because the plaintiff's business expectancy "flowed from his being a member of NLP and being entitled to the benefits therefrom"); *Schur v. Sprenkle*, 84 Va. Cir. 418 (2012) (finding that tortious-interference claim was the LLC's to assert, as the rights were due to the LLC, not plaintiff individually).

CSXT's tortious-interference claim does not seek relief for NPBL. Instead, as alleged in

the Complaint, "Defendants interference … has caused *CSXT damages*, such as lost opportunities for contracts with shipping partners." Doc. 1 ¶ 117 (emphasis added).  Further, CSXT seeks relief from NPBL's wrongful conduct, which has precluded CSXT from accessing "NPBL trackage and NPBL-served industries." *Id.* ¶ 115.  These are not harms to NPBL itself, and CSXT certainly has standing to seek redress for them.[5]

### 2.      CSXT has alleged a valid business expectancy.

NBPL claims that CSXT has not alleged a valid business expectancy.  Doc. 28 at 20.  In fact, as alleged, CSXT has a business expectancy that with access to NPBL trackage, it will enter into additional contracts with shipping partners that call on NIT.  Doc. 1 ¶ 117.

A valid business expectancy is one that has the probability of future economic benefit to the plaintiff.  *See Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 228 (4th Cir. 2004).  The expectancy must be one that the plaintiff is reasonably certain will be realized.  *See Commercial Bus. Sys., Inc. v. Halifax Corp.*, 253 Va. 292, 301 (Va. 1997).

In *Signature Flight Support Corp. v. Landow Aviation Ltd. Partnership*, the plaintiff alleged that the defendant had tortiously interfered with the plaintiff's "reasonable business expectancy" that it would provide services to aircraft at Dulles airport.  No. 1:08CV955 (JCC), 2009 WL 90851, at *3 (E.D. Va. Jan. 13, 2009).  The court noted that the plaintiff "has been, and is currently, engaged in ongoing business relationships with many transient aircraft utilizing Dulles."  *Id.*  Based on that ongoing business, the court denied the defendants' motion to dismiss, finding that the plaintiff had adequately alleged "a business expectancy . . . with a probability of future economic benefit to plaintiff."  The court rejected the defendants' argument that the plaintiff's allegations were insufficient because the plaintiff had not identified "exactly which

---

[5] In fact, CSXT has brought a separate derivative claim as a shareholder against the directors for harm to it as a shareholder.  *See* Doc. 1 ¶¶ 109–113.

aircraft it would service and what fees it would receive for its services." *Id.* The court noted that "a valid business expectancy is still merely an expectancy. It need not be absolutely guaranteed." *Id. See also Buffalo Wings Factory, Inc. v. Mohd*, 622 F. Supp. 2d 325, 337 (E.D. Va. 2007) (finding allegation that customers were being lured away by the defendant's trademark infringement sufficient to establish valid business expectancy).

CSXT has similarly alleged a valid business expectancy under Virginia law. As stated in the Complaint, NIT is one of three ports in Hampton Roads, and it is "the largest international shipping terminal in Virginia." Doc. 1 ¶¶ 3, 49. But "major customers refuse to contract with carriers who cannot provide rail transportation in and out of the Hampton Roads' ports," including NIT. *Id.* ¶ 50. And "[o]nly two entities have the ability to access NIT by rail: NPBL and NS." *Id.* ¶ 3. While CSXT has a significant presence at PMT and VIG (the other two ports in Hampton Roads), NS has a 90% market share at NIT. *Id.* ¶ 52. "[C]ompetitors such as CSXT are practically precluded from using NPBL to connect to NIT." *Id.* ¶ 4. As such, NPBL's wrongful conduct has caused CSXT to lose "opportunities for contracts with shipping partners." *Id.* ¶ 117.

If CSXT had access to NIT, it would undoubtedly provide additional service to its shipping partners and realize an economic benefit. CSXT is the only company who can "compete to provide intermodal services" at NIT. Doc. 1 ¶ 36. The Virginia Port Authority ("VPA") "has expressly requested that NPBL 'facilitate dual [rail] access [by CSXT and NS] for handling containers at NIT." *Id.* ¶ 36. The VPA has indicated that dual access "would allow more volume to be moved at competitive prices." *Id.* ¶ 4. In other words, the VPA has indicated that if CSXT had access, it would be moving freight by rail at NIT and reaping the economic benefits of such service. Indeed, the certainty of CSXT's business expectancy at NIT was confirmed in 2015. For a brief window, CSXT could feasibly pay NPBL's normally preclusive rates due to temporarily skyrocketing

shipping costs.  *Id.* ¶ 4.  CSXT immediately received customer demands to handle shipments in and out of NIT by rail.  *Id.* ¶ 4.  But for NPBL's wrongful conduct, CSXT would realize such opportunities on a regular basis.

CSXT has adequately alleged a probability of future economic benefit—a valid business expectancy—if NPBL ceases its wrongful conduct.  Thus, this Court should deny NPBL's motion to dismiss CSXT's tortious-interference claim.

### C.     CSXT's Virginia conspiracy counts state viable claims for relief.

#### 1.     Virginia intracorporate-immunity doctrine is no bar to CSXT's claims.

NPBL argues that the intracorporate-immunity doctrine bars CSXT's statutory-business conspiracy claim and common-law conspiracy claims under Virginia law.  Doc. 28 at 21.  NPBL's contention asks this court to create new law.  NPBL cites to no case, and CSXT has found none, holding that the intracorporate-immunity doctrine bars conspiracy claims under Virginia law merely because one corporation owns a majority interest in another corporation.

Courts considering the application of the intracorporate-immunity doctrine to statutory business conspiracy claims and common law conspiracy claims under Virginia law have looked to the Supreme Court's guidance in *Copperweld*, which applied the doctrine in the context of a wholly owned subsidiary.  *See, e.g., Zimpel v. LVI Energy Recovery Corp.*, 23 Va. Cir. 423 (1991); *In re Ray Dobbins Lincoln-Mercury, Inc.*, 604 F. Supp. 203, 205 (W.D. Va. 1984).   For the reasons discussed above, *see supra* at 13–19, *Copperweld* does not bar CSXT's claims.

#### 2.     NPBL's Motion to Dismiss CSXT's Virginia conspiracy counts based on a failure to plead a conspiracy fails because CSXT has pled that NPBL engaged in unlawful acts.

NPBL claims that the Complaint has not pled "any actual conspiracy" because the allegations "do no more than describe lawful actions taken."  Doc. 28 at 23.  In fact, CSXT has

pled that NPBL has conspired with NS in furtherance of unlawful acts, including breaches of fiduciary duty and tortious interference with business expectancy.

Because there can be no conspiracy to do an act that the law allows, "an allegation of conspiracy, whether criminal or civil, must at least allege *an unlawful act* or *an unlawful purpose*." *Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. 207, 215 (Va. 2014) (emphases added).  The Supreme Court of Virginia has held that breach of fiduciary duty and tortious interference constitute unlawful acts on which a conspiracy claim can rest.  *See Dunlap, LLC*, 287 Va. at 218 (tortious interference); *Feddeman & Co., C.P.A., P.C. v. Langan Assocs., P.C.,* 260 Va. 35, 46 (Va. 2000) (breach of fiduciary duty).  CSXT has adequately pled a claim for both.  *See* Doc. 1 ¶¶ 109–113, 114–17.

NPBL claims that CSXT "fails to allege any facts that the Belt Line itself conspired with its own directors to breach their fiduciary duties."  Doc. 28 at 24.  In fact, CSXT has alleged just that: "Defendants NS and NPBL have wrongfully employed improper methods in order to intentionally interfere with these expectancies, such as unfair competition, breach of fiduciary duty by the Individual Defendants, and using NPBL as a means of self-dealing." Doc. 1 ¶ 116.

As CSXT has pled that NPBL conspired with NS in furtherance of unlawful acts, the Court should deny NPBL's motion to dismiss CSXT's state-law conspiracy claims.

### D.    Supplemental jurisdiction

NPBL acknowledges that this Court has supplemental jurisdiction over CSXT's state law claims.  It nonetheless argues that this Court should decline to exercise its jurisdiction under 28 U.S.C. § 1367(c)(3) in the event that the Court dismisses all of the federal claims.  However, for the reasons stated above the federal claims against NPBL should not be dismissed.  Further, the federal claims in Counts III and IV are pled only against NS, and NS has not moved to dismiss them.  Thus, the federal claims will remain and there is no basis for dismissal under Section

1367(c)(3).

NPBL also argues that even if the federal claims remain, this Court should decline to exercise jurisdiction over the state law claims under Section 1367(c)(1), which applies where a claim "raises a novel or complex issue of State law."  Without pointing to anything specific about the claims in *this* case, NPBL vaguely notes that "[t]he Virginia Supreme Court continues to find new and thorny questions in tortious interference and business conspiracy cases."  Doc 28 at 25. However, it fails to identify any such "new and thorny questions" in the claims raised against it. Because CSXT's claims merely seek an application of state law, this Court should reject NPBL's suggestion to decline jurisdiction.  *See Winingear v. City of Norfolk*, No. 2:12cv560, 2013 WL 5672668, at *4 (E.D. Va. Oct. 16, 2013) (retaining jurisdiction where the defendant "simply notes" that a statutory provision has not been subject to judicial review and fails to "identify any language of the provision needing judicial interpretation").

## CONCLUSION

For the reasons stated above, CSXT respectfully submits that this Court should deny NPBL's Motion to Dismiss, in its entirety.

Dated:  December 21, 2018                    Respectfully submitted,

                                             **CSX TRANSPORTATION, INC.**
                                             *By Counsel*
                                             /s/_____
                                             Robert W. McFarland (VSB No. 24021)
                                             Benjamin L. Hatch (VSB No. 70116)
                                             E. Rebecca Gantt (VSB No. 83180)
                                             MCGUIREWOODS LLP
                                             World Trade Center
                                             101 West Main Street, Suite 9000
                                             Norfolk, Virginia  23510-1655
                                             Telephone: (757) 640-3716
                                             Facsimile:  (757) 640-3930
                                             E-mail: rmcfarland@mcguirewoods.com
                                                     bhatch@mcguirewoods.com
                                                     rgantt@mcguirewoods.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 21st day of December 2018, a true and correct copy of the foregoing was served on all counsel of record via Notice of Electronic Filing by filing with the Court's CM/ECF system.

<u>/s/</u>
Robert W. McFarland