IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

CSX TRANSPORTATION, INC.,
individually and on behalf of NORFOLK
& PORTSMOUTH BELT LINE
RAILROAD COMPANY,

   Plaintiff,

v.              Civil Action No. 2:18cv530

NORFOLK SOUTHERN RAILWAY
COMPANY, *et al.*,

   Defendants.

_____/

**CSX TRANSPORTATION, INC.'S OPPOSITION TO
MOTION TO DISMISS BY CANNON MOSS**

**INTRODUCTION**

  Defendant Cannon Moss is a former employee of Norfolk Southern Railway Company ("NS") who has been the President of the Norfolk & Portsmouth Belt Line Railroad Company ("NPBL") and a member of its Board of Directors since 2011. He has moved to dismiss the breach of fiduciary duty claim (Count VI) pleaded against him in the Complaint filed by Plaintiff CSX Transportation, Inc. ("CSXT"). *See* Doc. 29; Doc. 30. This claim is a derivative action on behalf of NPBL and its shareholders. Va. Code § 13.1-672.1.

  This Court should deny Moss's motion to dismiss. First, he contends that this Court lacks supplemental jurisdiction over the derivative claim, or in the alternative that it should decline to exercise jurisdiction. Although the Complaint includes a number of state law claims pleaded against six defendants in total, Moss is the only defendant to argue that this Court lacks jurisdiction. His argument is based on a misreading of the applicable legal standard, which requires that claims

1

be based on a common fact pattern. This standard is easily satisfied here. Nor should this Court decline the jurisdiction it possesses. Where Moss would be a critical witness for both the federal claims over which the Court has original jurisdiction and the state law claims against other defendants, it is far more efficient for the parties for this Court to adjudicate all the claims together.

Second, Moss argues that the Complaint fails to state a claim that he breached his fiduciary duties as an officer and director to NPBL and to its shareholders. The Complaint details how Moss and the other members of the NBPL Board of Directors that NS controls have acted exclusively in the interests of a single shareholder—NS—at the expense of the best interests of NPBL. Not only did Moss summarily reject a recent proposal that would have garnered NPBL significant revenue, he threatened in response to enter into an agreement with NS that would have increased NPBL's payments to NS. By blocking access to the largest port facility in Virginia, Moss has failed to ensure that NPBL continues to serve the purpose of efficient member access for which it was formed.

## BACKGROUND

### I.  NPBL History and Governance

NPBL is a for-profit stock corporation registered under Virginia law. Complaint (hereinafter "Doc. 1") ¶ 9; Doc. 1-1 at 1, 3-4. It is a terminal switching railroad that was formed in 1896 by agreement of eight original shareholder railroads and by legislative charter. Doc. 1 ¶ 1; Doc. 1-1; 1895-96 Va. Acts. Ch. 706; 1897-98 Va. Acts. Ch. 55. These eight railroads, which included CSXT's and NS's predecessors in interest, joined together to form NPBL in order to provide an efficient means of interchanging the railroads' traffic between their own lines and various marine and industrial facilities located along NPBL's tracks. Doc. 1 ¶ 1.

This core purpose of providing efficient and equal access among the shareholder railroads is clearly stated in NPBL's founding documents. The original 1897 Operating Agreement states

that they joined together "for the mutual benefit of each in the interchange of business." Doc. 1-1 at 1. The railroads agreed to "co-operate cordially in encouraging the business of the [NPBL] for which it is constructed," and to "deliver to the [NPBL] all cars to be interchanged with other [shareholder railroads]." *Id.* at 4. The Operating Agreement also provided for the immediate construction of a railway that would connect various facilities and railroads in the Hampton Roads area. *Id.* at 3; *see also* Charter at 8 (referencing a connection across the Elizabeth River into the City of Norfolk).

Originally, all eight shareholder railroads each had one representative on NPBL's Board of Directors. Doc. 1-1 at 2 (providing that "each of said Companies shall have one representative on the Board"). In 1989, the remaining three shareholder railroads entered into a Supplemental Agreement, which provided that CSXT would appoint two representatives to NPBL Board of Directors. Doc. 1 ¶ 22. The other two railroads—the Norfolk and Western and the Southern Railway Companies—could together appoint three. *Id.*

At the time of the 1989 Supplemental Agreement, CSXT owned 43% of NPBL's stock. Doc. 1-3. Each of the other two railroads owned half of the remaining 57%. *Id.* A series of corporate mergers and renaming occurred a year after the Supplemental Agreement, however, and since that time NS has been the majority shareholder of NPBL, owning 57% of NPBL's stock, and appointing three representatives to the Board of Directors. Doc. 1 ¶ 23.

CSXT still has two voting representatives on the NPBL Board. Individual Defendants Jerry Hall, Thomas Hurlbut, and Philip Merilli were, at the time of the filing of this lawsuit, NS employees that were the NS-appointed Directors on the NPBL Board. Doc. 1 ¶ 10. The sixth voting member of the Board of Directors is the NPBL President. This position is elected by a majority of the Board of Directors and, for at least the past twelve years, has been filled by a former

3

NS employee. *Id.* ¶ 29; Doc. 1-4 Arts. Third & Fourth. The current President, Cannon Moss, who is the fourth Individual Defendant, has been NPBL President since 2011, when he was nominated at NS's direction and elected over the objection of the CSXT-appointed Directors. Doc. 1 ¶ 27. Moss replaced a former NS employee who returned to work at NS after his tenure at NPBL. *Id*. NPBL's Vice President and Terminal Superintendent are also former NS employees. *Id.*

## II.     NPBL's Recent Deteriorating Financial Condition

NPBL has had access rights to the Norfolk International Terminals ("NIT") for over 100 years. Doc. 1 ¶ 1. Indeed, NPBL and NS are the only two rail carriers with direct rail access to NIT. *Id.* ¶ 3. NIT is the largest international shipping terminal in Virginia and one of the largest ports on the Eastern Seaboard. *Id.* ¶¶ 3, 22. In recent years, NIT has continued to grow, as it is accessible to the newest deep-draft ships and operates some of the world's largest cranes. *Id.* ¶ 20.

As one of only two railroads that can serve NIT, NPBL should be well positioned to take advantage of NIT's success. But as the port has grown, NPBL's revenues have waned. Doc. 1 ¶ 3. NPBL's overall financial performance has been declining over the past several years, and it continues to deteriorate. *Id.* ¶ 37. NPBL's revenue has essentially been flat or down over the past several years, including in 2017. *Id*. Even this bottom line revenue of NPBL is deceptive because much of NPBL's revenue in recent years has been generated from the sale of real estate, a diminishing resource. *Id.* Rail car volume has been essentially flat for years, and decreased in 2017. *Id.* Current car volume on NPBL as a whole is heavily dependent on a single customer—that is not at NIT—engaged in a single line of business. *Id.* No new sources of substantial and recurring business have been added in recent years, nor do any appear to be planned. *Id*. No excess cash flow is being generated that could be used for capital expenditures on maintenance, upgrades, or expansion. *Id*.

Amid these conditions, NPBL has set and maintained a rate that effectively precludes CSXT from using NPBL to access NIT. Why would NPBL set a rate that precludes customers from buying its service? The Complaint alleges the answer.

NS has direct access to NIT. It can access NIT over its own tracks, and has achieved approximately 90% of the market share there. Doc. 1 ¶ 52. Through its own direct actions and through its conspiracy with NPBL and NPBL's officers and directors, NS has effectively blocked competition from rail access to NIT. This conspiratorial conduct was not limited to setting a preclusive rate for service, but also included actions such as infrastructure changes at NPBL and the failure to efficiently deliver CSXT cars. *Id.* ¶ 87.

NPBL's operating revenue is derived principally from switch operations, and is largely dependent upon the switch services being provided to the shareholders' companies, who in turn pay for those services. Doc. 1 ¶ 33. NPBL's current line haul switch rate of $210 was adopted in 2009 over the objection of non-NS directors. *Id.* ¶ 34; Doc. 28-1. That rate has not been reviewed or approved by the Surface Transportation Board ("STB"). The rate is dramatically higher than rates for comparable services charged by other short line railroads. Doc. 1 ¶ 34. Because the rate is preclusively high—and because of other anticompetitive conduct described in the Complaint—CSXT has not used NPBL to access NIT in any significant respect, and NPBL's revenues have flagged. *Id.* ¶ 4.

### III.   CSXT's Proposals

CSXT has tendered offers to NPBL that would have benefited both companies. In March 2018, CSXT submitted a "Rate Proposal for Long Term Rail Service to NIT." Doc. 1-5. It proposed a switching rate of $80 per car combined with a minimum annual volume guarantee of 18,000 cars. *Id.* at 3-4. Based on its close study of the issues and NPBL's financial reports, CSXT estimated its proposal "would provide NPBL with a consistent, long term stream of additional

5

income," to the tune of $1.4 million in incremental revenue and $660,000 in incremental operating income in the first year alone. *Id.* at 2.  These estimated benefits were substantially higher than a 2010 CSXT proposal to NPBL that was rejected, which proposed a $37.50 one-way switching rate and a volume guarantee of 50 containers per round trip.  Doc. 1-5 Encl.

In light of NPBL management's initial disfavor to this proposal, in advance of the April 2018 meeting, CSXT also submitted a governance proposal to NPBL.  Doc. 1-6.  CSXT proposed several remedial actions to address defects in NPBL's corporate governance structures, including limiting CSXT and NS to one designated director each and having the rest of the board composed of four independent directors.  *Id*.  CSXT also proposed the implementation of a corporate compliance program, conflict of interest policies, and other reforms.  *Id*.

Although the Virginia Port Authority ("VPA") requested that NPBL facilitate expanded rail access for handling containers at NIT, and noted that NPBL's failure to provide "proper access to CSX puts Virginia at a competitive disadvantage," Doc. 1 ¶ 36, the Defendants rejected both proposals.  In furtherance of its conspiracy with NS, the Individual Defendants refused to form an independent committee to evaluate the rate proposal or to allow a formal vote at the next scheduled Board of Directors meeting in April 2018.  *Id.* ¶ 40.  At that meeting, the Individual Defendants followed through on their conspiratorial commitments, parroting the same pretextual reasons for denying the rate request that NS had previously offered.  *Id.* NPBL's rate remains unchanged today.  At the April 2018 meeting, the Individual Defendants also rejected CSXT's governance proposal and voted to approve a slate of four NS-designated directors.  *Id.* ¶ 72.

# ARGUMENT

## I. The Court has jurisdiction over the breach of fiduciary claim (Count VI).

### A. Rule 12(b)(1) Legal Standard

In a facial challenge to the Court's subject matter jurisdiction, "the court evaluates the facts in a complaint using the same standard used for a Rule 12(b)(6) motion to dismiss." *Brunelle v. Norfolk Southern Railway Co.*, No. 2:18cv290, 2018 WL 4690904 at *2 (E.D. Va. Sept. 28, 2018). Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief, Fed. R. Civ. P. 8(a)(2), so as to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Chesapeake Square Hotel, LLC v. Logan's Roadhouse, Inc.*, 995 F. Supp. 2d 512, 514 (E.D. Va. 2014) (internal quotations, punctuation, and citation omitted). In considering a Rule (12)(b)(6) motion to dismiss, "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). The court must "draw all reasonable inferences in favor of the plaintiff." *Chesapeake Square Hotel*, 995 F. Supp. 2d at 515. A complaint must allege enough facts to state a claim for relief that is facially plausible. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Facial plausibility means that the facts pled "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B. This Court has supplemental jurisdiction over Count VI.

Moss contends that this Court lacks supplemental jurisdiction over the breach of fiduciary duty claim because it is not sufficiently related to the federal claims over which the Court has original jurisdiction. Doc. 30 at 7-10. Although the Complaint pleads state law claims against all six defendants, Moss is the only defendant who contends that this Court lacks jurisdiction over any of the state law claims. He points to the fact that the federal antitrust claims have different

elements from the breach of fiduciary claim, and then asserts as a result that the claims do not arise out of a "common nucleus of operative fact," which is the applicable test for whether claims "form part of the same case or controversy" under the supplemental jurisdiction statute. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966); 28 U.S.C. § 1367(a).

Contrary to Moss's argument, the claims at issue evidently share a common nucleus of operative fact regardless of any difference in the legal elements of each claim. "[C]ourts require only a loose factual connection between the claims to satisfy the requirement that the claims arise from a common nucleus of operative fact." *Bennett v. Fastenal Co.*, 184 F. Supp. 3d 304, 308 (W.D. Va. 2016)(internal quotations omitted). As the Fourth Circuit has put it, "[t]he claims need only revolve around a central fact pattern." *White v. County of Newberry, S.C.*, 985 F.2d 168, 172 (4th Cir. 1993). This standard is easily satisfied here. The federal antitrust claims and the breach of fiduciary duty claim are closely related and all derive from the same "central fact pattern." For instance, although the Individual Defendants are not named as defendants in the federal antitrust claims, their conduct is part and parcel of those claims. *See e.g.*, Doc. 1 ¶ 10 ("[T]he conduct of the Individual Defendants is relevant to the other counts of the Complaint."); *Id.* ¶ 32 ("Management of NPBL conspired with NS to harm CSXT and grow NS's market power."); *Id.* ¶ 79 ("NS conspired with NPBL and the Individual Defendants to take actions and implement policies that effectively foreclosed CSXT from utilizing NPBL to compete in the provision of multi-modal services at NIT.").

For example, one of the antitrust claims alleges that NS and NPBL conspired with the Individual Defendants to "take actions and implement policies that effectively foreclosed CSXT from utilizing the NPBL." Doc. 1 ¶ 79. Another alleges that NS caused NPBL to reject CSXT's proposal—which it did through the actions of the Individual Defendants. *Id.* ¶ 93. Similarly, the

breach of fiduciary duty claim alleges that the Individual Defendants have acted in the interests of NS by denying CSXT's proposal. *Id.* ¶ 112. As the Ninth Circuit noted in a case where golf players sued the PGA for federal antitrust violations and the PGA director for state law breach of fiduciary duty, "[t]he facts giving rise to the pendent state claims for breach of the PGA director's fiduciary duties are identical to those which give rise to [the] . . . antitrust claims." *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 421 (9th Cir. 1991).

The two cases Moss cites are readily distinguishable. In one, the court found that it lacked supplemental jurisdiction over a state law claim for injunctive relieve because that claim alleged that the defendant engaged in conduct that fostered competition, while the federal antitrust claims alleged anti-competitive conduct. *Council of Unit Owners of Wisp Condo., Inc. v. Recreational Indus., Inc.*, 793 F. Supp. 120, 122 (D. Md. 1992). No such inconsistency in pleading exists here. The other concerned the application for whether a counterclaim is permissive or compulsory and did not even use the phrases "common nucleus" or "same case or controversy." *See generally N. Carolina Elec. Membership Corp. v. Carolina Power & Light Co.*, 85 F.R.D. 249 (M.D.N.C. 1979). This case was decided over a decade before Congress enacted 28 U.S.C. § 1367.

The applicable test for supplemental jurisdiction is easily satisfied as to the breach of fiduciary claim, and this Court should therefore hold that it does have jurisdiction over Count VI.

### C. This Court should exercise jurisdiction over Count VI.

Moss's backup argument as to jurisdiction is that even if this Court has jurisdiction over Count VI, it should decline to exercise it. He references 28 U.S.C. § 1367(c)(4), which states that a court may decline to exercise supplemental jurisdiction if "in exceptional circumstances, there are other compelling reasons for declining jurisdiction." Doc. 30 at 10.

Moss points to no "exceptional circumstances" or "compelling reasons" here. He states that the Court should decline to exercise jurisdiction for two reasons. Doc. 30 at 11. First, he

9

references the "complexity" of the federal antitrust claims. While the complexity of *state law* claims is a potential basis for a court's declining of supplemental jurisdiction, *see* 28 U.S.C. § 1367(c)(1), there is no reason why the complexity of the *federal* claims should impact the adjudication of the state claims, and Moss points to no authority for this proposition. To the extent Moss is arguing that the federal claims would predominate over the fiduciary duty claim, this again is another scenario expressly addressed by the supplemental jurisdiction statute, but it points in *favor* of retaining jurisdiction, not refusing it. *Id.* § 1367(c)(2) (court may decline supplemental jurisdiction where the state law claim substantially predominates over the federal claim).

Second, Moss references "jury confusion" but does not explain why a jury would be confused by the adjudication of the breach of fiduciary duty claims alongside the federal antitrust claims, all of which derive from the same core factual allegations. In any event, any "jury confusion" would fail to arise to the level of an exceptional circumstance that courts have found to merit the application of Section 1367(c)(4), such as "[t]he inclusion of a state law claim involving over 100 plaintiffs with a separate federal law claim involving a separate, distinct and smaller class [of plaintiffs]." *Zelaya v. J.M. Macias, Inc.*, 999 F. Supp. 778, 783 (E.D.N.C. 1998).

The values of "economy, convenience, fairness, and comity" that underlie Section 1367(c)(4) are far better served by adjudicating these closely related claims together. *Calderon v. GEICO General Ins. Co.*, 279 F.R.D. 337, 345 (D. Md. 2012). For instance, Moss would certainly be a deponent and trial witness for the federal antitrust and other state law claims, and it would thus be far more efficient for all parties to adjudicate all claims together. *See, e.g., Ford Motor Co. v. Wallenius Lines*, 476 F. Supp. 1362, 1370 (E.D. Va. 1979) (retaining jurisdiction where separating the state claim "would require the duplication of the federal trial in the state court").

## II. CSXT has adequately pled that Moss breached his fiduciary duties (Count VI).

### A. Rule 12(b)(6) Legal Standard

Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief, Fed. R. Civ. P. 8(a)(2), so as to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Chesapeake Square Hotel, LLC v. Logan's Roadhouse, Inc.*, 995 F. Supp. 2d 512, 514 (E.D. Va. 2014) (internal quotations, punctuation, and citation omitted). In considering a Rule (12)(b)(6) motion to dismiss, "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). The court must "draw all reasonable inferences in favor of the plaintiff." *Chesapeake Square Hotel*, 995 F. Supp. 2d at 515. A complaint must allege enough facts to state a claim for relief that is facially plausible. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Facial plausibility means that the facts pled "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B. Moss owes fiduciary duties to NPBL and its shareholders to act in the corporation's best interests and with good faith and loyalty.

Moss does not directly dispute, but instead largely ignores, the fiduciary duties that he owes to NPBL and its shareholders under Virginia law as an officer and director of NPBL. "The law of Virginia is clear that corporate directors have a fiduciary duty to the corporation and to its shareholders, and they must govern themselves accordingly." *In re James River Coal Co.*, 360 B.R. 139, 154 (Bkrtcy. E.D. Va. 2007). He is required to act in "good faith" and to "discharge his duties" in accordance with "the best interests of the corporation." Va. Code § 13.1-690(A). *See also DCG&T ex rel. Battaglia/Ira v. Knight*, 68 F. Supp. 3d 579, 587 (E.D. Va. 2014) (recognizing

11

that in Virginia, corporate directors must exercise good faith in their dealings with the corporation itself and shareholders). Directors also owe a duty of loyalty to the corporation, which duty "forbids the director from placing himself in a position where his individual interest clashes with his duty to his corporation." *Id.* (internal quotations omitted).

Moss makes much of his argument that the Operating Agreement also governs his fiduciary duties. To the extent Moss argues his alleged actions were required by the Operating Agreement, that is a merits argument that is not appropriate for resolution at the motion to dismiss stage. In any event, nothing in the Operating Agreement displaces or limits the duties under Virginia law just discussed. If anything the duties under the Operating Agreement are more specific and stringent. These duties complement the fundamental purposes for which NPBL was formed: to provide its members equal and efficient access to the facilities to which it connects. It is inherently a cooperative organization designed to benefit each shareholder railroad. Under the Operating Agreement, the NPBL directors are to "vote for such resolutions, by-laws or other proceedings as may be necessary to carry into effect the agreements herein made." Doc. 1-1 at 6 (Seventeenth). One such agreement is "encouraging the business of the [NPBL]." *Id.* at 4 (Tenth). The Operating Agreement also states that NPBL "shall perform the service for which it was built" and shall "be directly responsible for the competent and efficient discharge of its every obligation to the" shareholders. *Id.* at 5-6 (Fifteenth).

Most relevant here, nothing in the Agreement provides that the directors may act in the best interest of an individual shareholder at the expense of the corporation and its shareholders. Moss argues strenuously that NPBL is not a profit-maximizing corporation. Whether or not this is true, it does not impact the viability of the breach of fiduciary duty claim. NPBL is not a non-profit corporation, and it self-evidently must remain in sound financial condition to be able to

perform the services for which it was constructed. Further, even if the NPBL directors do not have a duty to maximize profits, that does not mean that certain of the directors were authorized to collude with one of the shareholders (NS) to maximize the profits of that entity at the expense of the other shareholder and NPBL.

Moss devotes a great number of pages to arguing what NPBL's corporate purpose is not, but neglects to discuss what its corporate purpose actually is. NS's and CSXT's predecessors formed NPBL to establish an accessible and efficient means of connection between their lines and facilities served by NPBL. Doc. 1 ¶ 15. As the Operating Agreement Moss argues he is bound by provides, NPBL is "directly responsible for the competent and efficient discharge of its every obligation to the parties." Doc. 1-1 at 6 (Fifteenth); *see also Id.* at 4 (Tenth) (shareholder railroads "will co-operate cordially in encouraging the business of [NPBL]"). Moss thus has a duty to act to enable NPBL to fulfill this purpose, but he manifestly has not because he has acted to block one of the shareholders (CSXT) from such access.

### C. The Complaint has sufficiently pled that Moss has breached his fiduciary duties as a director of NPBL.

The Complaint sufficiently pleads that the Individual Defendants, including Moss, breached their fiduciary duty to exercise their good faith judgment in the interest of NPBL and its shareholders as a class. Doc. 1 ¶ 112. As described further below, Moss, along with the other NPBL directors controlled by NS, have used NPBL as a tool to benefit one shareholder—NS—by excluding another shareholder—CSXT—from access to a substantial terminal that NPBL serves. Moss has thus intentionally failed to act in the best interest of NPBL by failing to fulfill its core purpose of efficient access, and by summarily rejecting or blocking proposals that would have improved its rapidly deteriorating financial condition. This condition does and will continue to prohibit NPBL from fulfilling its purposes.

For similar reasons, Moss violated his duty to the shareholders as a class. *Remora Investments, L.L.C. v. Orr*, 673 S.E. 2d 845, 848 (Va. 2009). Solely acting to benefit a single shareholder (NS) violates Moss's duty of loyalty to NPBL's shareholders as a class. *See Montgomery v. Aetna Plywood, Inc.*, 39 F. Supp. 2d 915, 936 (N.D. Ill. 1998) ("Directors must represent the interests of all shareholders alike and owe a fiduciary duty not to favor one shareholder over another.").

The Complaint alleges three principal specific instances of Moss's breaches of his fiduciary duties. Each is addressed in turn.

### 1. Rejection of the Service Proposal

First, the Complaint points to the directors' rejection of CSXT's 2018 Service Proposal. Doc. 1 ¶ 112. In this detailed proposal, CSXT proposed a rate adjustment and volume guarantee that "would provide the NPBL with a minimum of $660,000 of additional annual operating income," which it explained was "a substantial increase over 2016 total operating income for NPBL, with almost zero risk to the NPBL." Doc. 1-5 at 5. Despite the obvious benefits to NPBL, at the board meeting following CSXT's proposal, "the Individual Defendants parroted the same pretextual reasons for denying the request as offered by NS in its responses to CSXT's Service Proposal," refused to allow a formal vote on the proposal, and effectively rejected it. Doc. 1 ¶ 40.

Not only did Moss fail to accept or even consider this Service Proposal, but he leveraged a threat against CSXT in response, stating that NPBL was considering a revised agreement with NS under which NPBL would pay NS substantially more for the use of its track. Doc. 1 ¶ 41. This demonstrates the extent to which Moss has breached his duty of loyalty: in response to CSXT's Service Proposal, he responded by threatening to enter into an arrangement under which NPBL would pay NS even more money than it had in the past.

In response, Moss argues that he could not have approved the Service Proposal because to do so would violate the Operating Agreement's "uniform rate" requirement. CSXT's claim does not turn on an argument that the rates must be non-uniform. Rather, the Complaint alleges that the uniform rate has been maintained at a preclusive level that violated Moss's fiduciary duties. With respect to the Service Proposal specifically, there is nothing in CSXT's service proposal that requires only CSXT being granted the benefit of that rate structure.

Moreover, there is sufficient ambiguity in the language Moss points to, highlighted by the fact that NPBL has not consistently applied this interpretation in the past, to preclude this argument at the motion to dismiss stage. As CSXT explained in its Service Proposal, NPBL has either espoused an interpretation contrary to the one it adopts now, or has allowed substantial exceptions to it. "[T]he NPBL's tariff history demonstrates that the NPBL has often published different switch charges for different commodities." Doc. 1-5 at 3. Indeed, the current tariff, attached to NPBL's brief, includes a number of varying switching rates, and not a single "uniform rate." Doc. 28 Ex. 1. *United Transp. Union v. S.C. Public Ry. Com'n*, 130 F.3d 627, 635 (4th Cir. 1997) (holding that the district court should have considered "the parties' past practice . . . in interpreting the terms of the parties' agreement").

The relevant language states "[t]hat a uniform rate shall be fixed for the movement of freight cars over the [NPBL], regardless of distance." Doc. 1-1 at 3-4 (Ninth). The modifying clause strongly suggests that the word "uniform" means uniform as to distance, which CSXT's Service Proposal is. This textual ambiguity, reinforced by the parties' past practices under the Operating Agreement, precludes NPBL's uniform rate argument at this stage of the litigation. *See Martin Marietta Corp. v. Int'l Telecomms. Satellite Org.*, 978 F.2d 140, 143 (4th Cir. 1992) ("[T]he

15

construction of ambiguous contract provisions is a factual determination that precludes dismissal on a motion for failure to state a claim.").[1]

Moss's remaining arguments with respect to the Service Proposal contravene the applicable standard on a Rule 12(b)(6) motion. He first disputes whether the Service Proposal would in fact have actually had the benefits to NPBL that CSXT estimated, and also faults CSXT for failing to put forth "empirical, expert, or mathematical analysis" to support its calculations. Doc. 30 at 16. At this stage in the litigation, CSXT's allegations that the Service Proposal would have benefited NPBL must be taken as true. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). CSXT's Service Proposal, attached to the Complaint, is so detailed as to easily surpass the facial plausibility standard. No expert analysis is required at the motion to dismiss stage. *Baxter v. United States*, No. 1:15cv633, 2016 WL 5073725 at *3 (E.D. Va. Sept. 20, 2016) ("[A]n expert certification is not ordinarily required to be provided with a complaint.").

Finally, Moss's argument that the fiduciary duty claim fails absent an allegation that the NPBL directors "formally" voted on CSXT's Service Proposal is unsupported by any authority that such an allegation is a necessary element of a breach of fiduciary duty claim. Doc. 30 at 17-18. Moss points to nothing stating that an officer and director may act only through formal vote. *Kennerly v. Columbia Chemical Corp.*, 119 S.E. 265, 267 (Va. 1923) (holding that for a corporation to be bound "[a]s a general rule a vote *or other action* on the part of the board of directors need not be a formal resolution" (emphasis added)). His argument also falters in the face

---

[1] Similarly flawed is the suggestion that the Service Proposal's offer that CSXT use its own locomotives to save NPBL costs would violate the Operating Agreement. The Operating Agreement expressly provides that Directors may make exceptions to the use of NPBL locomotives. Doc. 1-1 at 5-6 (Fifteenth). As the Complaint alleges, NPBL has often made substantial exceptions in the past—for NS locomotives. Doc. 1 ¶¶ 46, 56.

of Virginia law allowing liability for inaction by a director. Va. Code § 13.1-690(C) (referencing director liability for "failure to take any action"). The detailed pleadings in the Complaint, Doc. 1 ¶¶ 40, 111, which must be taken as true at the motion to dismiss stage, allege that the proposal was in fact rejected. This is supported by the statements of Moss's co-defendants. NS's factual recitation, for instance, states that "NPBL did not accept the 2018 Proposal and continues to charge a Uniform Rate to this day," Doc. 35 at 6, and NPBL attaches its current published rates of which support the same. Doc. 28-1.

### 2. Rejection of the Governance Proposal

The second specific instance of Moss's breach of his fiduciary duties the Complaint referenced is the Board's failure to adopt measures suggested in CSXT's corporate governance proposal. This proposal suggested remedial measures that would have returned NPBL to its core purpose of providing efficient access to all of its shareholders, including the use of independent directors, the implementation of an appropriate corporate compliance program, the adoption of formal conflict of interest policies and procedures, and other measures. Doc. 1-6. Moss's failure to take any steps to consider or implement these measures and continuing to act in the best interests of NS instead of NPBL is a breach of his duty. Moss contends that he did not have the authority to amend the composition of the NPBL Board of Directors, but this ignores that he did have the authority to take steps to implement the other measures the proposal suggested, but did not. Moss also argues this proposal was not presented at the Board meeting, but the proposal itself requests action by the Board, and the Complaint further alleges that NPBL refused to take action in response to CSXT's subsequent demand letter. *Id.* at 1; Doc. 1 ¶ 111. As both a director and an officer of NPBL, Moss had the authority to act. *Byelick v. Vivadelli*, 79 F. Supp. 2d 610, 623 (E.D. Va. 1999) (noting that both directors and officers owe fiduciary duties).

17

### 3. Causing NPBL's Deteriorating Financial Condition

Finally, the Complaint alleges that Moss has breached his fiduciary duties by causing NPBL's deteriorating financial condition. Doc. 1 ¶ 112. The Complaint specifically details this condition, noting that NPBL's revenue has been flat or down over the past several years, including in 2017, and that even this revenue has been artificially inflated by NPBL's sales of the limited real estate it owns. *Id.* ¶ 37. Rail car volume has been essentially flat for years, decreasing in 2017. *Id.* ¶ 37. These failures are well within Moss's tenure, which began in 2011. *Id.* ¶ 27. Moss contends that nothing in the Operating Agreement requires him to "maximize profits." Doc. 30 at 19. But nothing in the Operating Agreement absolves him of his duty to act in the best interests of NPBL. Persisting with a business model that will not provide long term viability for NPBL because it is dependent on a single customer in a single commodity, Doc. 1 ¶ 37, and altogether ignoring NPBL's access to the rapidly growing largest port in Virginia, plainly does not constitute acting in the best interests of NPBL.

### CONCLUSION

For the reasons stated above, CSXT respectfully submits that this Court should deny Moss's Motion to Dismiss, in its entirety.

Dated:  December 21, 2018

Respectfully submitted,

**CSX TRANSPORTATION, INC.**
*By Counsel*

　　　/s/
Robert W. McFarland (VSB No. 24021)
Benjamin L. Hatch (VSB No. 70116)
E. Rebecca Gantt (VSB No. 83180)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia  23510-1655

Telephone: (757) 640-3716
Facsimile: (757) 640-3930
E-mail: rmcfarland@mcguirewoods.com
bhatch@mcguirewoods.com
rgantt@mcguirewoods.com

## CERTIFICATE OF SERVICE

      I certify that on this 21st day of December 2018, a true and correct copy of the foregoing was served on all counsel of record via Notice of Electronic Filing by filing with the Court's CM/ECF system.

      /s/ _____
      Robert W. McFarland