IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

CSX TRANSPORTATION, INC.,
individually and on behalf of NORFOLK
& PORTSMOUTH BELT LINE
RAILROAD COMPANY,

      Plaintiff,

v.                                            Civil Action No. 2:18cv530

NORFOLK SOUTHERN RAILWAY
COMPANY, *et al.*,

      Defendants.

## CSX TRANSPORTATION, INC.'S OPPOSITION TO
## MOTION TO DISMISS BY DEFENDANTS HALL, HURLBUT, & MERILLI

### INTRODUCTION

Defendants Jerry Hall, Thomas Hurlbut, and Phillip Merilli are current employees of Norfolk Southern Railway Company ("NS") who are also members of the Board of Directors of the Norfolk & Portsmouth Belt Line Railroad Company ("NPBL").[1]  They moved to dismiss the breach of fiduciary duty claim (Count VI) pleaded against them in the Complaint filed by Plaintiff CSX Transportation, Inc. ("CSXT").  *See* Doc. 31; Doc. 32.  This claim is a derivative action on behalf of NPBL and its shareholders.  Va. Code § 13.1-672.1.

This Court should deny their motion to dismiss.  First, the Individual Defendants contend that the Complaint fails to state a claim that they breached their fiduciary duties as directors to

---

[1] For purposes of this brief, Hall, Hurlbut, and Merilli will be referred to as the Individual Defendants.  There is one other individual defendant, Cannon Moss, in this litigation, who has filed a separate Motion to Dismiss (Doc. 29) that CSXT is responding to separately.

1

NPBL and to the shareholders as a class. The Complaint details how the Individual Defendants have acted exclusively in the interests of a single shareholder—NS—at the expense of the best interests of NPBL and its shareholders by rejecting proposals that would bolster NPBL's deteriorating financial condition. By blocking access to the largest port in Virginia over NPBL to ensure NS's dominance at that port, the Individual Defendants have also failed to ensure that NPBL continues to serve the purpose of efficient member access for which it was formed.

Second, the Individual Defendants contend that this Court should decline to exercise supplemental jurisdiction over Count VI. But this claim requires only the application of settled Virginia law to the facts of this case. Moreover, the facts underlying Count VI are so closely linked to those underlying the federal claims that it is far more efficient for this Court to adjudicate all the claims together. This is particularly so when the Individual Defendants will be deponents and witnesses in both the federal claims over which this Court has original jurisdiction and the other state law claims that are plead against other defendants.

## BACKGROUND

### I.    NPBL History and Governance

NPBL is a for-profit stock corporation registered under Virginia law. Complaint (hereinafter "Doc. 1") ¶ 9; Doc. 1-1 at 1, 3-4. It is a terminal switching railroad that was formed in 1896 by agreement of eight original shareholder railroads and by legislative charter. Doc. 1 ¶ 1; Doc. 1-1; 1895-96 Va. Acts. Ch. 706; 1897-98 Va. Acts. Ch. 55. These eight railroads, which included CSXT's and NS's predecessors in interest, joined together to form NPBL in order to provide an efficient means of interchanging the railroads' traffic between their own lines and various marine and industrial facilities located along NPBL's tracks. Doc. 1 ¶ 1.

This core purpose of providing efficient and equal access among the shareholder railroads is clearly stated in NPBL's founding documents. The original 1897 Operating Agreement states

that they joined together "for the mutual benefit of each in the interchange of business." Doc. 1-1 at 1.  The railroads agreed to "co-operate cordially in encouraging the business of the [NPBL] for which it is constructed," and to "deliver to the [NPBL] all cars to be interchanged with other [shareholder railroads]." *Id.* at 4.  The Operating Agreement also provided for the immediate construction of a railway that would connect various facilities and railroads in the Hampton Roads area.  *Id.* at 3; *see also* Charter at 8 (referencing a connection across the Elizabeth River into the City of Norfolk).

Originally, all eight shareholder railroads each had one representative on NPBL's Board of Directors.  Doc. 1-1 at 2 (providing that "each of said Companies shall have one representative on the Board").  In 1989, the remaining three shareholder railroads entered into a Supplemental Agreement, which provided that CSXT would appoint two representatives to NPBL Board of Directors.  Doc. 1 ¶ 22.  The other two railroads—the Norfolk and Western and the Southern Railway Companies—could together appoint three.  *Id.*

At the time of the 1989 Supplemental Agreement, CSXT owned 43% of NPBL's stock.  Doc. 1-3.  Each of the other two railroads owned half of the remaining 57%.  *Id.*  A series of corporate mergers and renaming occurred a year after the Supplemental Agreement, however, and since that time NS has been the majority shareholder of NPBL, owning 57% of NPBL's stock, and appointing three representatives to the Board of Directors.  Doc. 1 ¶ 23.

CSXT still has two voting representatives on the NPBL Board.  Individual Defendants Jerry Hall, Thomas Hurlbut, and Philip Merilli were, at the time of the filing of this lawsuit, NS employees that were the NS-appointed Directors on the NPBL Board.  Doc. 1 ¶ 10.  The sixth voting member of the Board of Directors is the NPBL President.  This position is elected by a majority of the Board of Directors and, for at least the past twelve years, has been filled by a former

3

NS employee. *Id.* ¶ 29; Doc. 1-4 Arts. Third & Fourth. The current President, Cannon Moss, who is the fourth Individual Defendant, has been NPBL President since 2011, when he was nominated at NS's direction and elected over the objection of the CSXT-appointed Directors. Doc. 1 ¶ 27. Moss replaced a former NS employee who returned to work at NS after his tenure at NPBL. *Id*. NPBL's Vice President and Terminal Superintendent are also former NS employees. *Id.*

## II. NPBL's Recent Deteriorating Financial Condition

NPBL has had access rights to the Norfolk International Terminals ("NIT") for over 100 years. Doc. 1 ¶ 1. Indeed, NPBL and NS are the only two rail carriers with direct rail access to NIT. *Id.* ¶ 3. NIT is the largest international shipping terminal in Virginia and one of the largest ports on the Eastern Seaboard. *Id.* ¶¶ 3, 22. In recent years, NIT has continued to grow, as it is accessible to the newest deep-draft ships and operates some of the world's largest cranes. *Id.* ¶ 20.

As one of only two railroads that can serve NIT, NPBL should be well positioned to take advantage of NIT's success. But as the port has grown, NPBL's revenues have waned. Doc. 1 ¶ 3. NPBL's overall financial performance has been declining over the past several years, and it continues to deteriorate. *Id.* ¶ 37. NPBL's revenue has essentially been flat or down over the past several years, including in 2017. *Id*. Even this bottom line revenue of NPBL is deceptive because much of NPBL's revenue in recent years has been generated from the sale of real estate, a diminishing resource. *Id.* Rail car volume has been essentially flat for years, and decreased in 2017. *Id.* Current car volume on NPBL as a whole is heavily dependent on a single customer— that is not at NIT—engaged in a single line of business. *Id.* No new sources of substantial and recurring business have been added in recent years, nor do any appear to be planned. *Id*. No excess cash flow is being generated that could be used for capital expenditures on maintenance, upgrades, or expansion. *Id*.

Amid these conditions, NPBL has set and maintained a rate that effectively precludes CSXT from using NPBL to access NIT. Why would NPBL set a rate that precludes customers from buying its service? The Complaint alleges the answer.

NS has direct access to NIT. It can access NIT over its own tracks, and has achieved approximately 90% of the market share there. Doc. 1 ¶ 52. Through its own direct actions and through its conspiracy with NPBL and NPBL's officers and directors, NS has effectively blocked competition from rail access to NIT. This conspiratorial conduct was not limited to setting a preclusive rate for service, but also included actions such as infrastructure changes at NPBL and the failure to efficiently deliver CSXT cars. *Id.* ¶ 87.

NPBL's operating revenue is derived principally from switch operations, and is largely dependent upon the switch services being provided to the shareholders' companies, who in turn pay for those services. Doc. 1 ¶ 33. NPBL's current line haul switch rate of $210 was adopted in 2009 over the objection of non-NS directors. *Id.* ¶ 34; Doc. 28-1. That rate has not been reviewed or approved by the Surface Transportation Board ("STB"). The rate is dramatically higher than rates for comparable services charged by other short line railroads. Doc. 1 ¶ 34. Because the rate is preclusively high—and because of other anticompetitive conduct described in the Complaint—CSXT has not used NPBL to access NIT in any significant respect, and NPBL's revenues have flagged. *Id.* ¶ 4.

### III.   CSXT's Proposals

CSXT has tendered offers to NPBL that would have benefited both companies. In March 2018, CSXT submitted a "Rate Proposal for Long Term Rail Service to NIT." Doc. 1-5. It proposed a switching rate of $80 per car combined with a minimum annual volume guarantee of 18,000 cars. *Id.* at 3-4. Based on its close study of the issues and NPBL's financial reports, CSXT estimated its proposal "would provide NPBL with a consistent, long term stream of additional

income," to the tune of $1.4 million in incremental revenue and $660,000 in incremental operating income in the first year alone. *Id.* at 2. These estimated benefits were substantially higher than a 2010 CSXT proposal to NPBL that was rejected, which proposed a $37.50 one-way switching rate and a volume guarantee of 50 containers per round trip. Doc. 1-5 Encl.

In light of NPBL management's initial disfavor to this proposal, in advance of the April 2018 meeting, CSXT also submitted a governance proposal to NPBL. Doc. 1-6. CSXT proposed several remedial actions to address defects in NPBL's corporate governance structures, including limiting CSXT and NS to one designated director each and having the rest of the board composed of four independent directors. *Id*. CSXT also proposed the implementation of a corporate compliance program, conflict of interest policies, and other reforms. *Id*.

Although the Virginia Port Authority ("VPA") requested that NPBL facilitate expanded rail access for handling containers at NIT, and noted that NPBL's failure to provide "proper access to CSX puts Virginia at a competitive disadvantage," Doc. 1 ¶ 36, the Defendants rejected both proposals. In furtherance of its conspiracy with NS, the Individual Defendants refused to form an independent committee to evaluate the rate proposal or to allow a formal vote at the next scheduled Board of Directors meeting in April 2018. *Id.* ¶ 40. At that meeting, the Individual Defendants followed through on their conspiratorial commitments, parroting the same pretextual reasons for denying the rate request that NS had previously offered. *Id.* NPBL's rate remains unchanged today. At the April 2018 meeting, the Individual Defendants also rejected CSXT's governance proposal and voted to approve a slate of four NS-designated directors. *Id.* ¶ 72.

## ARGUMENT

### I. Rule 12(b)(6) Legal Standard

Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief, Fed. R. Civ. P. 8(a)(2), so as to give the defendant fair notice of what the claim

is and the grounds upon which it rests." *Chesapeake Square Hotel, LLC v. Logan's Roadhouse, Inc.*, 995 F. Supp. 2d 512, 514 (E.D. Va. 2014) (internal quotations, punctuation, and citation omitted). In considering a Rule (12)(b)(6) motion to dismiss, "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). The court must "draw all reasonable inferences in favor of the plaintiff." *Chesapeake Square Hotel*, 995 F. Supp. 2d at 515. A complaint must allege enough facts to state a claim for relief that is facially plausible. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Facial plausibility means that the facts pled "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

    **II.**    **CSXT has adequately pled that the Individual Defendants breached their fiduciary duties (Count VI).**

        **A.**    **The Individual Defendants owe fiduciary duties to NPBL and its shareholders to act in the corporation's best interests and with good faith and loyalty.**

The Individual Defendants argue that CSXT fails to state a claim for breach of fiduciary duties because under Virginia law, directors of a corporation owe duties to shareholders as a class and cannot perform "special" duties to CSXT. Doc. 32 at 11-13. But that proposition demonstrates precisely why the Individual Defendants' conduct is unlawful: they have favored a single shareholder (and their employer)—NS—rather than acting in the best interests of *all* the NPBL shareholders and the corporation itself. Their consistent actions favoring NS over CSXT and NPBL are unlawful. *See Montgomery v. Aetna Plywood, Inc.*, 39 F. Supp. 2d 915, 936 (N.D. Ill. 1998) ("Directors must represent the interests of all shareholders alike and owe a fiduciary duty not to favor one shareholder over another.").

"The law of Virginia is clear that corporate directors have a fiduciary duty to the corporation and to its shareholders, and they must govern themselves accordingly." *In re James River Coal Co.*, 360 B.R. 139, 154 (Bkrtcy. E.D. Va. 2007). A director is required to act in "good faith" and to "discharge his duties" in accordance with "the best interests of the corporation." Va. Code § 13.1-690(A). *See also DCG&T ex rel. Battaglia/Ira v. Knight*, 68 F. Supp. 3d 579, 587 (E.D. Va. 2014) (recognizing that in Virginia, corporate directors must exercise good faith in their dealings with the corporation itself and shareholders). Directors also owe a duty of loyalty to the corporation, which duty "forbids the director from placing himself in a position where his individual interest clashes with his duty to his corporation." *Id.* (internal quotations omitted).

Nothing in the Operating Agreement displaces or limits these duties under Virginia law. If anything the duties under the Operating Agreement are more specific and stringent. These duties complement the fundamental purposes for which NPBL was formed: to provide equal and efficient access to the facilities to which it connects. It is inherently a cooperative organization designed to benefit each shareholder railroad. Under the Operating Agreement, the NPBL directors are to "vote for such resolutions, by-laws or other proceedings as may be necessary to carry into effect the agreements herein made." Doc. 1-1 at 6 (Seventeenth). One such agreement is "encouraging the business of the [NPBL]." *Id.* at 4 (Tenth). The Operating Agreement also states that NPBL "shall perform the service for which it was built" and shall "be directly responsible for the competent and efficient discharge of its every obligation to the" shareholders. *Id.* at 5-6 (Fifteenth). Most relevant here, nothing in the Agreement provides that the directors may act in the best interest of one individual shareholder at the expense of the corporation and shareholders.

8

        **B.**      **Taking action such as that outlined in CSXT's proposals would not have violated the Operating Agreement.**

The Individual Defendants contend that adopting the measures outlined in CSXT's Service Proposal would violate the Operating Agreement's "uniform rate" requirement. The Operating Agreement that NS and CSXT's predecessors signed in 1897 states that the shareholder railroads agreed "[t]hat a uniform rate shall be fixed for the movement of freight cars over the [NPBL], regardless of distance." Doc. 1-1 at 3-4 (Ninth). The Individual Defendants nowhere identify how this is an argument that CSXT has failed to state a claim for breach of fiduciary duty so as to merit dismissal under Rule 12(b)(6). This is at bottom a merits argument, which is not appropriate at the motion to dismiss stage. As described further below, it relies on claims of meaning and practice that are disputed and must be subjected to discovery.

The Individual Defendants' argument is no answer to CSXT's claims in any event because CSXT's claim does not turn on an argument that the rates must be non-uniform. Rather, the Complaint alleges that the uniform rate has been maintained at a preclusive level that violated the Individual Defendants' fiduciary duties. With respect to the Service Proposal specifically, there is nothing in CSXT's Proposal that requires only CSXT being granted the benefit of that rate structure.

Moreover, there is sufficient ambiguity in the language the Individual Defendants point to, highlighted by the fact that NPBL has not consistently applied this interpretation in the past, to preclude this argument at the motion to dismiss stage. As CSXT explained in its Service Proposal, NPBL has either espoused an interpretation contrary to the one it adopts now, or has allowed substantial exceptions to it. "[T]he NPBL's tariff history demonstrates that the NPBL has often published different switch charges for different commodities." Doc. 1-5 at 3. Indeed, the current tariff, attached to NPBL's brief, includes a number of varying switching rates, and not a single

9

"uniform rate." Doc. 28-1. *United Transp. Union v. S.C. Public Ry. Com'n*, 130 F.3d 627, 635 (4th Cir. 1997) (holding that the district court should have considered "the parties' past practice . . . in interpreting the terms of the parties' agreement").

The relevant language states "[t]hat a uniform rate shall be fixed for the movement of freight cars over the [NPBL], regardless of distance." Doc. 1-1 at 3-4 (Ninth). The modifying clause strongly suggests that the word "uniform" means uniform as to distance, which CSXT's Service Proposal is. This textual ambiguity, reinforced by the parties' past practices under the Operating Agreement, precludes NPBL's uniform rate argument at this stage of the litigation. *See Martin Marietta Corp. v. Int'l Telecomms. Satellite Org.*, 978 F.2d 140, 143 (4th Cir. 1992) ("[T]he construction of ambiguous contract provisions is a factual determination that precludes dismissal on a motion for failure to state a claim.").

Similarly flawed is the Individual Defendants' argument that the Service Proposal's offer that CSXT was willing to use its own locomotives to save NPBL costs would violate the Operating Agreement. The Operating Agreement expressly provides that Directors may make exceptions to the use of NPBL locomotives. Doc. 1-1 at 5-6 (Fifteenth). As the Complaint alleges, NPBL has often made substantial exceptions in the past—for NS locomotives. Doc. 1 ¶¶ 46, 56. In light of these past practices, any objection now on this basis is pretextual.

The Individual Defendants also argue that the adoption of the Governance Proposal would contravene provisions in the Operating and Supplemental Agreements regarding the composition of the Board of Directors, and thus that they did not have the authority to adopt the reforms set forth in the Governance Proposal. This contention ignores that as directors, the Individual Defendants did have the authority to take steps to implement other measures the proposal asked the Board to take, such as the implementation of a corporate compliance program and robust

conflict of interest protocols. Doc. 1-6. The Individual Defendants also argue this proposal was not presented at the Board meeting, but the proposal itself requests action by the Board, and the Complaint further alleges that NPBL refused to take action in response to CSXT's subsequent demand letter. *Id.* at 1; Doc. 1 ¶ 111.

        **C.**    **The Complaint alleges improper action by the Individual Defendants that, taken as true, states a claim for breach of their fiduciary duties.**

The Complaint sufficiently pleads that the Individual Defendants breached their fiduciary duty to exercise their good faith judgment in the best interest of NPBL and its shareholders as a class. Doc. 1 ¶ 112. The Individual Directors have purposely used NPBL as a tool to benefit one shareholder—NS—by excluding another shareholder—CSXT—from access to a substantial terminal that NPBL serves. The Individual Defendants have thus also intentionally failed to act in the best interest of NPBL, by failing to fulfill its core purpose of efficient access and by summarily rejecting or blocking proposals that would have improved its rapidly deteriorating financial condition, which condition will prohibit it from fulfilling the purposes for which it was formed.

The Complaint alleges three principal instances of Individual Defendants' breaches of their fiduciary duties. First, it points to the directors' rejection of CSXT's 2018 Service Proposal. Doc. 1 ¶ 112. In this detailed proposal, CSXT proposed a rate adjustment and volume guarantee that "would provide the NPBL with a minimum of $660,000 of additional operating income," which it explained was "a substantial increase over 2016 total operating income for NPBL, with almost zero risk to the NPBL." Doc. 1-5 at 5. Despite the obvious benefits to NPBL, the board meeting following CSXT's proposal, "the Individual Defendants parroted the same pretextual reasons for denying the request as offered by NS in its responses to CSXT's Service Proposal," refused to allow a formal vote on the proposal, and effectively rejected it. Doc. 1 ¶ 40.

The Individual Defendants' argument that the NPBL directors did not reject CSXT's Service Proposal ignores both the detailed pleadings in the Complaint, Doc. 1 ¶¶ 40, 111, which must be taken as true at the motion to dismiss stage, and the statements of their co-defendants. NS's factual recitation, for instance, states that "NPBL did not accept the 2018 Proposal and continues to charge a Uniform Rate to this day," Doc. 35 at 6, and NPBL attaches the current published rates of NPBL which support the same. Doc. 28-1.

The Individual Defendants also argue NPBL is not a profit-maximizing corporation. Whether or not this is true, this does not impact the viability of the breach of fiduciary duty claim. NPBL is not a non-profit corporation, and it self-evidently must remain in sound financial condition to be able to perform the services for which it was constructed. Nothing in the Operating Agreement absolves the Individual Defendants of their duty to act in the best interests of NPBL. Persisting with a business model that will not provide long term viability for NPBL because it is dependent on a single customer in a single commodity, Doc. 1 ¶ 37, and altogether ignoring NPBL's access to the rapidly growing largest port in Virginia, plainly do not constitute acting in the best interests of NPBL. Further, even if the NPBL directors do not have a duty to maximize profits, that does not mean that certain of the directors were authorized to collude with one of the shareholders (NS) to maximize the profits of that entity at the expense of the other shareholder and the corporation.

The argument that profit maximization is not the purpose of NPBL both begs the question of why the corporation was formed and acknowledges that the directors have a duty to fulfill that purpose. Doc. 1-1 at 6 (Fifteenth) (agreeing that NPBL "shall perform the service for which it was built"). NS's and CSXT's predecessors formed NPBL to establish an accessible and efficient means of connection between their lines and facilities served by NPBL. Doc. 1 ¶ 15. Instead of

furthering that purpose, the Individual Defendants have acted to block one of the shareholders (CSXT) from such access.

The second specific instance of the Individual Defendants' breach of their fiduciary duties the Complaint referenced is the Board's failure to adopt measures suggested in CSXT's corporate governance proposal. This proposal suggested remedial measures that would have returned NPBL to its core purpose of providing efficient access to all of its shareholders, including the use of independent directors, the implementation of an appropriate corporate compliance program, the adoption of formal conflict of interest policies and procedures, and other measures. Doc. 1-6. The Individual Defendants' failure to take any steps to consider or implement these measures and continuing to act in the best interests of NS instead of NPBL is a breach of their duty.

The Individual Defendants claim that it is not alleged that they were NPBL directors in 2008 and 2010, but the focus of Count VI is their actions in recent years. The Complaint specifically alleges that the Individual Defendants themselves rejected CSXT's 2018 Service and Governance Proposals. Doc. 1 ¶¶ 40, 72.

Finally, the Complaint alleges that the Individual Defendants breached their fiduciary duties by causing NPBL's deteriorating financial condition through their mismanagement. Doc. 1 ¶ 112. The Individual Defendants states this allegation is "vague," but the Complaint specifically details this condition, noting that NPBL's revenue has been flat or down over the past several years, including in 2017, and that even this revenue has been artificially inflated by NPBL's sales of the limited real estate it owns. *Id.* ¶ 37. The Complaint also alleges that NPBL is nearly solely dependent on a single customer in a single commodity for its operating income, and that rail car volume has been essentially flat for years, decreasing in 2017. *Id.* ¶ 37. These allegations easily satisfy the requisite pleading standard. *Iqbal*, 556 U.S. at 678.

### III. The Court should not decline to exercise its supplemental jurisdiction over Count VI.

The Individual Defendants do not dispute that this Court has supplemental jurisdiction over the breach of fiduciary duty claim, but instead contend that the Court should decline to exercise that jurisdiction under 28 U.S.C. § 1367(c)(1) and (c)(4).

Section 1367(c)(1) states that a court may reject its supplemental jurisdiction if a state law claim "raises a novel or complex issue of State law." Notably, the other defendant in Count VI, Cannon Moss, does not argue that CSXT's breach of fiduciary duty claim implicates unsettled issues of state law that merit declining supplemental jurisdiction. The Individual Defendants' arguments are predominately an ineffective re-packaging of their arguments discussed above. They do not specifically cite any unsettled issues of Virginia law that this Court would be required to decide in adjudicating Count VI, alluding only to Virginia law being different from that of other states. Because the Individual Defendants point to nothing but the application of settled Virginia law to the facts of this case, they fail to show that a refusal of jurisdiction is warranted under Section 1367(c)(1).

Section 1367(c)(4) states that a court may decline to exercise supplemental jurisdiction if "in exceptional circumstances, there are other compelling reasons for declining jurisdiction." The Individual Defendants point to no "exceptional circumstances" or "compelling reasons" here. They suggest that this standard is satisfied because the federal claims predominate over the fiduciary duty claim, but this scenario is expressly addressed by the supplemental jurisdiction statute and points in favor of retaining jurisdiction, not refusing it. *Id.* § 1367(c)(2) (court may decline supplemental jurisdiction where the state law claim substantially predominates over the federal claim). They also note that the Individual Defendants are not defendants in any other of the claims. But the values of "economy, convenience, fairness, and comity" that underlie Section

1367(c)(4) are far better served by adjudicating these closely related claims together.  *Calderon v. GEICO General Ins. Co.*, 279 F.R.D. 337, 345 (D. Md. 2012).  For instance, the Individual Defendants would certainly be deponents and trial witnesses for the federal antitrust and other state law claims, and it would thus be far more efficient for all parties to adjudicate all claims together. *See, e.g.*, *Ford Motor Co. v. Wallenius Lines*, 476 F. Supp. 1362, 1370 (E.D. Va. 1979) (retaining jurisdiction where a separating the state claim "would require the duplication of the federal trial in the state court").[2]

## CONCLUSION

For the reasons stated above, CSXT respectfully submits that this Court should deny Hall, Hurlbut, and Merilli's Motion to Dismiss, in its entirety.

Dated:  December 21, 2018

Respectfully submitted,

**CSX TRANSPORTATION, INC.**
*By Counsel*

 /s/
Robert W. McFarland (VSB No. 24021)
Benjamin L. Hatch (VSB No. 70116)
E. Rebecca Gantt (VSB No. 83180)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia  23510-1655
Telephone: (757) 640-3716
 Facsimile:  (757) 640-3930
E-mail: rmcfarland@mcguirewoods.com

---

[2] The Individual Defendants seek to "incorporate by reference the arguments of any other Defendants in this case to the extent applicable." Doc. 32 n. 10.  However, the only other defendant that raises arguments with respect to the breach of fiduciary duty claim, the only count pleaded against the Individual Defendants, is Cannon Moss, and his arguments largely mirror those of the Individual Defendants.  To the extent they differ and to the extent the Court allows such incorporation by reference on the part of the Individual Defendants, CSXT incorporates its responses to Defendant Moss's Motion to Dismiss.

bhatch@mcguirewoods.com
rgantt@mcguirewoods.com

## CERTIFICATE OF SERVICE

I certify that on this 21st day of December 2018, a true and correct copy of the foregoing was served on all counsel of record via Notice of Electronic Filing by filing with the Court's CM/ECF system.

/s/
Robert W. McFarland