**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

CSX TRANSPORTATION, INC.,
individually and on behalf of NORFOLK
& PORTSMOUTH BELT LINE
RAILROAD COMPANY,

        Plaintiff,

v.                                    Civil Action No. 2:18cv530

NORFOLK SOUTHERN RAILWAY
COMPANY, *et al.*,

        Defendants.

_____/

**CSX TRANSPORTATION, INC.'S OPPOSITION TO
MOTION TO DISMISS BY NORFOLK SOUTHERN RAILWAY COMPANY**

**INTRODUCTION**

Defendant Norfolk Southern Railway Company ("NS") and Plaintiff CSX Transportation, Inc. ("CSXT") are the two shareholders of the Norfolk & Portsmouth Belt Line Railroad Company ("NPBL"). NS and CSXT's predecessors formed NPBL over a hundred years ago to provide the shareholder railroads with equal and efficient access over NPBL to the facilities to which NPBL connects. In contravention of this core purpose, NS has conspired with NPBL to have NPBL serve as in effect an anti-competitive shield that enables NS monopolization of the largest port of Virginia. To redress this unlawful conduct, CSXT sued NS, NPBL, and certain individual defendants under federal and state law.

NS accuses CSXT of attempting to "subvert" the agreement that formed NPBL through this lawsuit. Quite the opposite. This lawsuit is necessary to remedy NS's own subversion of NPBL by using NPBL as a means to its own illicit ends. In recent years, NPBL has become

1

stagnant and inefficient, despite its unique access to one of the largest ports on the Eastern Seaboard.  While CSXT has sought to return NPBL to the function for which it was formed—to provide equal and efficient access to the facilities to which it connects—NS has blocked these attempts at every turn.

In its Motion to Dismiss, NS only challenges the state law claims raised against it.  Doc. 34; Doc. 35.  It concedes the federal antitrust claims—Counts I through IV—are properly pled, including the two claims in which it is the sole defendant.  Doc. 35 at 3.

With respect to the state law claims, NS first argues that the claims should be dismissed as time barred based on NS's convenient assumption that they all arise from one wrongful act—the imposition of an heightened rate by NPBL in 2009.  In fact, CSXT's claims are not time barred because the Complaint contains allegations of separate and distinct wrongful acts giving rise to their own causes of action within the limitations period.

Second, NS contends that CSXT has failed to plead a claim for breach of contract with respect to the agreement forming NPBL.  In that agreement, however, the shareholder railroads agreed that they would "co-operate cordially in encouraging the business of the [NPBL], for which it is constructed."  NS has failed to cooperate and it has failed to encourage the business of NPBL. Instead, NS has sacrificed NPBL's financial viability and the very purpose for which NPBL was created in order to garner maximum profits for itself.  The actions of the NS-controlled individuals on the NPBL board of directors and in NPBL management have precluded NPBL from serving the purposes for which it was formed.

Third and finally, NS misconstrues CSXT's claim for tortious interference with business expectancy as a claim for tortious interference with contract, and then provides a variety of reasons why a tortious-interference-with-contract claim fails.  In fact, the Complaint plainly states a claim

2

that NS tortiously interfered with CSXT's business expectancy that, with access to NPBL trackage, it will enter into additional contracts with shipping partners that call on NIT.  As such, NS's arguments against a phantom tortious interference with contract claim are irrelevant.

**BACKGROUND**

I.   <u>**NPBL History and Governance**</u>

NPBL is a for-profit stock corporation registered under Virginia law.  Complaint (hereinafter "Doc. 1") ¶ 9; Doc. 1-1 at 1, 3-4.  It is a terminal switching railroad that was formed in 1896 by agreement of eight original shareholder railroads and by legislative charter.  Doc. 1 ¶ 1; Doc. 1-1; 1895-96 Va. Acts. Ch. 706; 1897-98 Va. Acts. Ch. 55.  These eight railroads, which included CSXT's and NS's predecessors in interest, joined together to form NPBL in order to provide an efficient means of interchanging the railroads' traffic between their own lines and various marine and industrial facilities located along NPBL's tracks.  Doc. 1 ¶ 1.

This core purpose of providing efficient and equal access among the shareholder railroads is clearly stated in NPBL's founding documents.  The original 1897 Operating Agreement states that they joined together "for the mutual benefit of each in the interchange of business."  Doc. 1-1 at 1.  The railroads agreed to "co-operate cordially in encouraging the business of the [NPBL] for which it is constructed," and to "deliver to the [NPBL] all cars to be interchanged with other [shareholder railroads]."  *Id.* at 4.  The Operating Agreement also provided for the immediate construction of a railway that would connect various facilities and railroads in the Hampton Roads area.  *Id.* at 3; *see also* Charter at 8 (referencing a connection across the Elizabeth River into the City of Norfolk).

Originally, all eight shareholder railroads each had one representative on NPBL's Board of Directors.  Doc. 1-1 at 2 (providing that "each of said Companies shall have one representative on the Board").  In 1989, the remaining three shareholder railroads entered into a Supplemental

3

Agreement, which provided that CSXT would appoint two representatives to NPBL Board of Directors.  Doc. 1 ¶ 22.  The other two railroads—the Norfolk and Western and the Southern Railway Companies—could together appoint three.  *Id.*

At the time of the 1989 Supplemental Agreement, CSXT owned 43% of NPBL's stock. Doc. 1-3.  Each of the other two railroads owned half of the remaining 57%.  *Id.*  A series of corporate mergers and renaming occurred a year after the Supplemental Agreement, however, and since that time NS has been the majority shareholder of NPBL, owning 57% of NPBL's stock, and appointing three representatives to the Board of Directors.  Doc. 1 ¶ 23.

CSXT still has two voting representatives on the NPBL Board.  Individual Defendants Jerry Hall, Thomas Hurlbut, and Philip Merilli were, at the time of the filing of this lawsuit, NS employees that were the NS-appointed Directors on the NPBL Board.  Doc. 1 ¶ 10.  The sixth voting member of the Board of Directors is the NPBL President.  This position is elected by a majority of the Board of Directors and, for at least the past twelve years, has been filled by a former NS employee.  *Id.* ¶ 29; Doc. 1-4 Arts. Third & Fourth.  The current President, Cannon Moss, who is the fourth Individual Defendant, has been NPBL President since 2011, when he was nominated at NS's direction and elected over the objection of the CSXT-appointed Directors.  Doc. 1 ¶ 27. Moss replaced a former NS employee who returned to work at NS after his tenure at NPBL.  *Id*. NPBL's Vice President and Terminal Superintendent are also former NS employees.  *Id.*

## II.     NPBL's Recent Deteriorating Financial Condition

NPBL has had access rights to the Norfolk International Terminals ("NIT") for over 100 years.  Doc. 1 ¶ 1.  Indeed, NPBL and NS are the only two rail carriers with direct rail access to NIT.  *Id.* ¶ 3.  NIT is the largest international shipping terminal in Virginia and one of the largest ports on the Eastern Seaboard.  *Id.* ¶¶ 3, 22.  In recent years, NIT has continued to grow, as it is accessible to the newest deep-draft ships and operates some of the world's largest cranes.  *Id.* ¶ 20.

As one of only two railroads that can serve NIT, NPBL should be well positioned to take advantage of NIT's success.  But as the port has grown, NPBL's revenues have waned.  Doc. 1 ¶ 3.  NPBL's overall financial performance has been declining over the past several years, and it continues to deteriorate.  *Id.* ¶ 37.  NPBL's revenue has essentially been flat or down over the past several years, including in 2017.  *Id.*  Even this bottom line revenue of NPBL is deceptive because much of NPBL's revenue in recent years has been generated from the sale of real estate, a diminishing resource.  *Id.*  Rail car volume has been essentially flat for years, and decreased in 2017.  *Id.*  Current car volume on NPBL as a whole is heavily dependent on a single customer— that is not at NIT—engaged in a single line of business.  *Id.*  No new sources of substantial and recurring business have been added in recent years, nor do any appear to be planned.  *Id.*  No excess cash flow is being generated that could be used for capital expenditures on maintenance, upgrades, or expansion.  *Id.*

Amid these conditions, NPBL has set and maintained a rate that effectively precludes CSXT from using NPBL to access NIT.  Why would NPBL set a rate that precludes customers from buying its service?  The Complaint alleges the answer.

NS has direct access to NIT.  It can access NIT over its own tracks, and has achieved approximately 90% of the market share there.  Doc. 1 ¶ 52.  Through its own direct actions and through its conspiracy with NPBL and NPBL's officers and directors, NS has effectively blocked competition from rail access to NIT.  This conspiratorial conduct was not limited to setting a preclusive rate for service, but also included actions such as infrastructure changes at NPBL and the failure to efficiently deliver CSXT cars.  *Id.* ¶ 87.

NPBL's operating revenue is derived principally from switch operations, and is largely dependent upon the switch services being provided to the shareholders' companies, who in turn

pay for those services.  Doc. 1 ¶ 33.  NPBL's current line haul switch rate of $210 was adopted in 2009 over the objection of non-NS directors.  *Id.* ¶ 34; Doc. 28-1.  That rate has not been reviewed or approved by the Surface Transportation Board ("STB").  The rate is dramatically higher than rates for comparable services charged by other short line railroads.  Doc. 1 ¶ 34.  Because the rate is preclusively high—and because of other anticompetitive conduct described in the Complaint— CSXT has not used NPBL to access NIT in any significant respect, and NPBL's revenues have flagged.  *Id.* ¶ 4.

### III.   CSXT's Proposals

CSXT has tendered offers to NPBL that would have benefited both companies.  In March 2018, CSXT submitted a "Rate Proposal for Long Term Rail Service to NIT."  Doc. 1-5.  It proposed a switching rate of $80 per car combined with a minimum annual volume guarantee of 18,000 cars.  *Id.* at 3-4.  Based on its close study of the issues and NPBL's financial reports, CSXT estimated its proposal "would provide NPBL with a consistent, long term stream of additional income," to the tune of $1.4 million in incremental revenue and $660,000 in incremental operating income in the first year alone.  *Id.* at 2.  These estimated benefits were substantially higher than a 2010 CSXT proposal to NPBL that was rejected, which proposed a $37.50 one-way switching rate and a volume guarantee of 50 containers per round trip.  Doc. 1-5 Encl.

In light of NPBL management's initial disfavor to this proposal, in advance of the April 2018 meeting, CSXT also submitted a governance proposal to NPBL.  Doc. 1-6.  CSXT proposed several remedial actions to address defects in NPBL's corporate governance structures, including limiting CSXT and NS to one designated director each and having the rest of the board composed of four independent directors.  *Id.*  CSXT also proposed the implementation of a corporate compliance program, conflict of interest policies, and other reforms.  *Id.*

Although the Virginia Port Authority ("VPA") requested that NPBL facilitate expanded rail access for handling containers at NIT, and noted that NPBL's failure to provide "proper access to CSX puts Virginia at a competitive disadvantage," Doc. 1 ¶ 36, the Defendants rejected both proposals.  In furtherance of its conspiracy with NS, the Individual Defendants refused to form an independent committee to evaluate the rate proposal or to allow a formal vote at the next scheduled Board of Directors meeting in April 2018.  *Id.* ¶ 40.  At that meeting, the Individual Defendants followed through on their conspiratorial commitments, parroting the same pretextual reasons for denying the rate request that NS had previously offered.  *Id.* NPBL's rate remains unchanged today.  At the April 2018 meeting, the Individual Defendants also rejected CSXT's governance proposal and voted to approve a slate of four NS-designated directors.  *Id.* ¶ 72.

## ARGUMENT

### I.  <u>Rule 12(b)(6) Legal Standard</u>

Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief, Fed. R. Civ. P. 8(a)(2), so as to give the defendant fair notice of what the claim is and the grounds upon which it rests."  *Chesapeake Square Hotel, LLC v. Logan's Roadhouse, Inc.*, 995 F. Supp. 2d 512, 514 (E.D. Va. 2014) (internal quotations, punctuation, and citation omitted).  In considering a Rule (12)(b)(6) motion to dismiss, "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff."  *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).  The court must "draw all reasonable inferences in favor of the plaintiff."  *Chesapeake Square Hotel*, 995 F. Supp. 2d at 515.  A complaint must allege enough facts to state a claim for relief that is facially plausible.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Facial plausibility means that the facts pled "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## II.     Statute of Limitations (Counts V and VII through IX)

NS argues that all CSXT's state-law claims are time barred based on NS's erroneous assumption that they all arise from one wrongful act—the imposition of an increased NPBL rate in 2009.  Doc. 35 at 7–16.  CSXT's claims are not time barred because NS also committed separate and distinct wrongful acts giving rise to their own causes of action within the limitations period. The party raising the statute of limitations as an affirmative defense must prove that the other party's claims are time barred.  *See Heirs of Roberts v. Coal Processing Corp.*, 369 S.E.2d 188, 190 (Va. 1988).  NS cannot carry *its burden* to show that the statute-of-limitations defense applies *as a matter of law* on the facts as alleged and dismissal is inappropriate at this early stage of the litigation.

While "the statute of limitations does not accrue *separately for each set of damages* which results from a wrongful act," *Brown v. Am. Broad. Co.*, 704 F.2d 1296, 1300 (4th Cir. 1983) (construing Virginia law) (emphasis added), the statute of limitations *does* accrue separately for each *separate wrongful act.  See L-3 Commc'ns Corp. v. Serco, Inc.*, No. 1:15-CV-701, 2018 WL 1352093, at *5 (E.D. Va. Mar. 15, 2018) (finding "plaintiffs had an expectancy in each independent Task Order, and thus any act to interfere with the expectancy in each Task Order constituted an independent tort" with a new statute of limitations).  As the Supreme Court of Virginia explained in *Hampton Roads Sanitation Dist. v. McDonnell*,

> If the wrongful act is of a permanent nature and one that produces all the damages which can ever result from it, [then] the entire damages must be recovered in one action and the statute of limitations begins to run from the date of the wrongful act. Conversely, when wrongful acts are not continuous but occur only at intervals, each occurrence inflicts a new injury and gives rise to a new and separate cause of action.

234 Va. 235, 239 (Va. 1987) (internal quotations and citations omitted) (considering statute of limitations under the Virginia Conspiracy Act, Va. Code. §§ 18.2–499).  *See also Union Labor Life Ins. Co. v. Sheet Metal Workers Nat'l Health Plan,* No. 90–2728, 1991 WL 212232, at *5

(D.D.C. Sept. 30, 1991) (Virginia statute of limitations accrued anew each time defendant was unjustly enriched by underpaying its periodic insurance: "wrongful acts or breaches of duty which occur in distinct intervals or installments, as opposed to being continuous, cause distinct and severable injuries. Consequently, each breach gives rise to new and separate cause of action and the statutes of limitations . . . run separately for each."). Indeed, the new cause of action may look "remarkably like an earlier one but is nonetheless a standalone claim in its own right." *Forest Lakes Cmty. Ass'n, Inc. v. United Land Corp. of Am.*, 293 Va. 113, 124 (Va. 2017).

Here, CSXT has alleged "separate and distinct occurrence[s]" that give rise to separate claims. *See Kancor Americas, Inc. v. ATC Ingredients, Inc.*, No. 15-CV00589-GBL-IDD, 2016 WL 740061, at *6 (E.D. Va. Feb. 25, 2016) (denying summary judgment as to claim that the plaintiff's claims were time barred because each transaction was a new potential breach).[1]

CSXT addresses the application of these principles to the challenged claims below. Initially, however, it must be noted that the limitations defense is fact dependent and not susceptible to resolution on a motion to dismiss in this case. *See Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) ("[A] motion to dismiss filed under Federal Rule of Procedure 12(b)(6), which tests the sufficiency of the complaint, generally cannot reach the merits of an affirmative defense, such as the defense that the plaintiff's claim is time-barred."). In addition to having the burden of proof to show that the statute-of-limitations defense applies as a matter of law, *see Heirs of Roberts v. Coal Processing Corp.*, 369 S.E.2d 188, 190 (Va. 1988), at this stage, all facts must be construed in the light most favorable to CSXT. *See U.S. ex rel. Oberg v. Pa.*

---

[1] CSXT does not contend that the separate wrongful acts committed by NPBL are wholly unrelated. Obviously, they all relate to CSXT's claims in this case, including CSXT's claim that the actions of NPBL have precluded CSXT and others from effectively competing in the Hampton Roads market.

9

*Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (noting that on motion to dismiss "we construe facts in the light most favorable to the plaintiff") (internal quotations omitted).  Thus, a limitations defense can only succeed at the motion to dismiss stage where the "complaint sets forth *on its face* the facts necessary to conclude that plaintiff's claims are barred by the statute of limitations."  *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007).  Here, CSXT has alleged separate wrongful acts that give rise to separate causes of action within the limitations period.  NS asks the Court to assume that these are all part of one continuous wrongful act that began in 2009.  But the facts set forth in the Complaint do not support, and certainly do not compel, that conclusion.  Indeed, whether CSXT's allegations constitute one wrongful act or separate wrongful acts is a matter for resolution on a fully developed factual record.

## A. CSXT's contract claim (Count V) is not time barred.

NS asserts that CSXT's breach of contract claim is time barred because it breached the Operating Agreement in 2009.  Doc. 35 at 10.   In fact, CSXT has alleged separate wrongful breaches of the Operating Agreement within the applicable five-year limitations period.  *See* Va. Code § 8.01-246(2) (providing five-year statute of limitations for contract claims).

The Operating Agreement established a host of legally enforceable obligations owed by NS to CSXT.  These include, but are not limited to: 1) that shareholders shall maintain and operate NPBL as a "separate organization in which all are to be equally interested," 2) NS will "co-operate cordially in encouraging the business of the [NPBL] for which it is constructed," 3) NS shall "deliver to [NPBL] all cars to be interchanged with other [parties to the agreement]," 4) NS shall ensure its Directors "vote for such resolutions, by-laws or other proceedings as may be necessary to carry into effect" the NPBL Operating Agreement, and 5) the implied covenant of good faith and fair dealing.  Doc. 1 ¶ 106.

In 2018, NS breached the Operating Agreement by refusing to consider the Service Proposal put forward by CSXT, which would have "significantly and rapidly increased the NPBL's revenue and operating income by nearly doubling the volume of cars that the NPBL moves annually." Doc. 1 ¶¶ 38, 107.  In 2015, NS breached the Operating Agreement by acting to prevent the reasonable and timely movement of cars delivered to NPBL by CSXT.  *Id.* ¶ 55.  NS also breached the Operating Agreement by "refusing to allow NPBL to use CSXT's fully fueled locomotives to access NIT, requiring only NS-owned or supplied locomotives to be used by or on NPBL."  *Id.* ¶ 56.  And in 2018 NS breached the Operating Agreement by threatening to enter into agreements "to increase dramatically the charges that NPBL would pay to NS for exercise of NPBL's rights to access NS trackage."  *Id.* ¶ 87.

NS claims that its rejection of the Service Proposal in violation of the Operating Agreement cannot be construed as a distinct breach because the Service Proposal sought to modify the rate for use of the NPBL's track.  Doc. 35 at 10.  But NS's rejection of the Service Proposal was not part of a single continuous breach.  Instead, it was a separate wrongful act that gives rise to its own cause of action.  By rejecting the Service Proposal, NS thwarted the purpose of the NPBL, which is to provide shareholder railroads with equal and efficient access over the NPBL to the facilities to which the NPBL connects.  And it did this by preventing the directors from voting for the Service Proposal.  Thus, in 2018, NS violated a distinct obligation under the Operating Agreement, namely NS's obligation to ensure its Directors "vote for such resolutions, by-laws or other proceedings as may be necessary to carry into effect" the NPBL Operating Agreement.  Doc. 1 ¶ 106.  In further violation of the Operating Agreement, NS "attempt[ed] to pressure CSXT into abandoning its Service Proposal" by threatening "to enter into an agreement that would increase dramatically the charges that NPBL would pay for access to NS's track."  *Id.* ¶ 59.

11

NS relies heavily on *Fluor Fed. Sols., LLC v. PAE Applied Techs., LLC*, 728 F. App'x 200 (4th Cir. 2018), an unpublished, per curiam decision of the Fourth Circuit.  There, the Fourth Circuit concluded that the plaintiff's breach of contract claim was time barred because the alleged breach occurred outside the limitations period.  Notably, the defendant in *Fluor* did not raise the limitations defense at the motion-to-dismiss stage, and the court rejected the defense on summary judgment.  In fact, the Fourth Circuit only barred the plaintiff's claim by relying on positions the plaintiff had itself taken in the appeal.  *Id.* at 203 (relying on statement made in appellant's briefing).  Regardless, the facts in *Fluor* are not analogous to the facts here.  In *Fluor*, the Fourth Circuit concluded that both sides agreed that there was only one alleged wrongful act at issue— PAE's refusal to pay Fluor for the work Fluor had done.  *Id.* at 202.  The court found that Fluor's claim was time barred because "Fluor alleges that PAE initially breached and continued to breach the contract *in exactly the same manner* for the next dozen years."  *Id.* at 203 (emphasis added).

Here, NS has not "continued to breach the [Operating Agreement] in exactly the same manner" since 2009.  Instead, it has committed "separate and distinct" wrongful acts that give rise to separate breach claims.  *See Kancor Americas, Inc. v. ATC Ingredients, Inc.*, No. 15-CV00589-GBL-IDD, 2016 WL 740061, at *6 (E.D. Va. Feb. 25, 2016) (denying summary judgment as to claim that the plaintiff's claims were time barred because each transaction was a new potential breach).  In 2018, NS breached the Operating Agreement by rejecting the Service Proposal that would have allowed CSXT and other competitors to access NIT.  Doc. 1 ¶¶ 39–44, 70–75.  In 2015, NS breached the Operating Agreement by acting to prevent the reasonable and timely movement of cars delivered to NPBL by CSXT.  *Id.* ¶ 55.  NS also breached the Operating Agreement by "refusing to allow NPBL to use CSXT's fully fueled locomotives to access NIT, requiring only NS-owned or supplied locomotives to be used by or on NPBL."  *Id.* ¶ 56.  And NS

12

breached the Operating Agreement by threatening to enter into agreements "to increase dramatically the charges that NPBL would pay to NS for exercise of NPBL's rights to access NS trackage." *Id.* ¶ 87.  These separate wrongful acts give rise to separate causes of action arising within the limitations period.

> **B.   CSXT's tortious-interference claim (Count VII) and conspiracy claims (Counts VIII & IX) are not time barred.**

NS argues that CSXT's tortious-interference claims and conspiracy claims are time barred because they both arise from NS and the NPBL's tortious interference with CSXT's business expectancies in 2009.  Doc. 35 at 14–16.  In fact, CSXT has alleged separate wrongful acts of tortious interference and conspiracy within the five-year limitations period.

Among other things, CSXT has alleged that in 2018 the NPBL and NS conspired to tortiously interfere with CSXT's business expectancy in the operation of the NPBL by rejecting the Service Proposal that would have allowed CSXT and other competitors to access NIT.  Doc. 1 ¶¶ 39–44, 70–75.  CSXT has also separately alleged that in 2015, the NPBL and NS conspired to prevent the reasonable and timely movement of cars delivered to NPBL by CSXT.  *Id.* ¶ 55.  CSXT has separately alleged that the NPBL, conspiring with NS, "by and through the Individual Defendants, have discriminated against CSXT by refusing to allow NPBL to use CSXT's fully fueled locomotives to access NIT, requiring only NS-owned or supplied locomotives to be used by or on NPBL."  *Id.* ¶ 56.  And CSXT has separately alleged that the NPBL conspired with NS to threaten to enter into agreements "to increase dramatically the charges that NPBL would pay to NS for exercise of the NPBL's rights to access NS trackage."  *Id.* ¶ 87.  These separate wrongful acts give rise to separate causes of action for tortious interference and conspiracy arising within the limitations period.

NS relies on *Stone v. Ethan Allen, Inc.*, 232 Va. 365 (1986) and *Detrick v. Panalpina, Inc.*, 108 F.3d 529 (4th Cir. 1997), to suggest that CSXT's claims must have accrued back in 2009 when it suffered damage at the hands of NS.  Those cases merely considered whether a cause of action accrues when an injury first occurs.  Those cases did not consider whether a separate cause of action arises from later wrongful acts, as is the case here.  Even assuming CSXT had a cause of action for tortious interference or conspiracy that accrued in 2009, that does not prospectively vitiate new causes of action arising from separate wrongful acts that have accrued within the limitations period.

### III.   CSXT has stated a claim for breach of contract (Count V).

NS and CSXT's eight predecessors created NPBL so that each would have joint access to the various facilities to which NPBL connects.  *See* Doc. 1-1 at 3; 1895-96 Va. Acts Ch. 706, 1897-98 Va. Acts Ch. 55.  They expressly agreed to establish the short line terminal switching railroad "for the mutual benefit of each in the interchange of business."[2]  Doc. 1-1 at 1.  The function of this railroad is essentially to enable traffic from multiple railroads over its line to access key facilities.  By its very nature, it is a coordinated effort to enable efficient access to eliminate the necessity of the shareholder railroads building their own tracks.  NS's use of NPBL—the very entity the Operating Agreement formed—as a tool to injure CSXT by prohibiting it from using NPBL to access a facility that NPBL serves, is a clear breach of the Operating Agreement that undermines the heart of that contract and the purpose for which NS and CSXT's predecessors joined together in privity.

---

[2] NS argues this prefatory language is not binding, Doc. 35 at 17, but "recitals are often helpful in the construction of contracts and throw light on the meaning and intent of the parties."  *Scott v. Albemarle Horse Show Ass'n*, 104 S.E. 842, 846 (Va. 1920).

Under Virginia law, "[t]he elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004). NS does not dispute that the Operating Agreement creates legally binding obligations between it and CSXT, or that CSXT has sufficiently alleged injury. Rather, it contends that none of its actions amounted to a breach of a provision of the Operating Agreement. Doc. 35 at 16-19.

At bottom, NS's arguments concern whether its conduct amounted to a breach of the Operating Agreement. That is a classic merits argument not appropriate for resolution at the motion to dismiss stage. *See T.G. Slater & Son, Inc. v. Donald P. and Patricia A Brennan LLC*, 385 F.3d 836, 843 (4th Cir. 2004) (holding that questions of contract interpretation including custom or trade usage, the statute of frauds, and the parties to a contract are issues that "must wait until the parties have had an opportunity to develop the facts").

Setting this aside, NS's arguments fail on their own terms. The Tenth Article of the Operating Agreement clearly states that the parties to the agreement "will co-operate cordially in encouraging the business of the [NPBL] for which it is constructed." Doc. 1-1 at 4. NS does not dispute that CSXT has sufficiently alleged NS's failure to cooperate with CSXT and to encourage the business of NPBL, but instead would have the Court disregard this language entirely as "too indefinite." Doc. 35 at 17. The authority NS cites for this argument does not support its proposition, however. NS references only 1) an inapposite section of the Restatement (Second) of Contracts about whether a contract as a whole has been formed, and 2) a case addressing the same question where the relevant language concerned agreeing to negotiate a subcontract in the event a prime contract was won. *Id.* Here, there is no dispute the Operating Agreement is a valid contract;

nor is there conditional language in the Tenth Article that makes it an unenforceable agreement to agree.

NS's argument contravenes the principle that "[c]ourts are to construe contracts as a whole without omitting any words or paragraphs, and they are to give effect to every provision supplied if possible." *ESCgov, Inc. v. BMC Software, Inc.*, No. 1:13cv1344, 2015 WL 12765989 at *2 (E.D. Va. July 2, 2015). The nature of NPBL is to be mutually beneficial to and cooperative with its shareholder railroads. As language throughout the Operating Agreement indicates, the very nature of NPBL is an entity designed for a special and cooperative purpose. CSXT has sufficiently pled that NS has failed to co-operate with CSXT to encourage the business of NPBL, NS has blocked CSXT from using NPBL, has failed to act on proposals that would encourage the business of NPBL, and has instead insisted on actions that would harm NPBL. And by inducing its directors to take these same actions, NS has also violated another provision of the Operating Agreement. Doc. 1-1 at 6 (Seventeenth) ("[E]ach of the Companies parties hereto, agrees that the Director named by each to represent it in the Board of the [NPBL] shall and will vote for such resolutions, by-laws or other proceedings as may be necessary to carry into effect the agreements herein made.").

The Complaint also sufficiently pleads a timely breach of the implied covenant of good faith and fair dealing, which every contract contains under Virginia law. *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 450 (E.D. Va. 2009). To the extent any of NS's actions are potentially not in express violation of the Operating Agreement, NS is nonetheless liable for breach of the Agreement if it exercised its "contractual discretion in bad faith." *Morrison v. Wells Fargo Bank, N.A.*, 30 F. Supp. 3d 449, 456 (E.D. Va. 2014). Courts have also held that the covenant is breached where a party has "act[ed] in such a matter as to prevent the other party from performing

16

his obligations under the contract." *Eastern Shore Markets, Inc. v. J.D. Assocs. Ltd. Partnership*, 213 F.3d 175, 183 (4th Cir. 2000). At the least, NS has prevented CSXT from "deliver[ing] to the [NPBL] all cars to be interchanged with other Companies." Doc. 1-1 at 4.

NS contends it cannot have breached the Operating Agreement because the Agreement requires uniform rates and use of its own locomotives, contrary to CSXT's Service Proposal. As to the locomotives, the Operating Agreement expressly provides that the NPBL Board of Directors may allow shareholder railroads to use their own locomotives. Doc. 1-1 at 5-6 (Fifteenth). CSXT also alleges that NPBL has in the past routinely allowed NS to use *its* own locomotives. Doc. 1 ¶¶ 46, 56; Doc. 1-5 at 4-5. *United Transp. Union v. S.C. Public Ry. Com'n*, 130 F.3d 627, 635 (4th Cir. 1997) (holding that the district court should have considered "the parties' past practice . . . in interpreting the terms of the parties' agreement").

As to the uniform rate, NS's argument is no answer to CSXT's breach of contract claim because the claim challenges conduct beyond the rate itself, encompasses a much broader scope of conduct than just NS's rejection of its 2018 Service Proposal, and seeks relief that is not limited to the adoption of the rate that CSXT proposed. The breach of contract claim points, for instance, to NS's "effectively blocking CSXT's access to NS's trackage over which NPBL has rights" and "failing to encourage the business of NPBL." Doc. 1 ¶ 107. Further, CSXT does not specifically demand relief that must be measured by reference to its 2018 Service Proposal. It alleges, for instance, NS's breaches harm CSXT by "causing CSXT to lose potential business" from other shippers. *Id.* ¶ 108.

Even as to the rate, CSXT's claim does not turn on an argument that the rates must be non-uniform. Rather, CSXT has alleged that the preclusive, uniform rate NS has set has breached its obligations under the Operating Agreement. To the extent NS attempts to hang this argument on

CSXT's 2018 Service Proposal, there is nothing in CSXT's service proposal that requires only CSXT being granted the benefit of the proposed rate structure.

Finally, there is sufficient ambiguity in the language NS points to, highlighted by the fact that NPBL has not consistently applied this interpretation in the past, to preclude this argument at the motion to dismiss stage. The relevant language states "[t]hat a uniform rate shall be fixed for the movement of freight cars over the [NPBL], regardless of distance." Doc. 1-1 at 3-4 (Ninth). The modifying clause strongly suggests that the word "uniform" means uniform as to distance, which CSXT's Service Proposal is. This textual ambiguity, reinforced by the parties' past practices under the Operating Agreement, precludes NPBL's uniform rate argument at this stage of the litigation. *See Martin Marietta Corp. v. Int'l Telecomms. Satellite Org.*, 978 F.2d 140, 143 (4th Cir. 1992) ("[T]he construction of ambiguous contract provisions is a factual determination that precludes dismissal on a motion for failure to state a claim.").

Past practices under the Operating Agreement further support that NS's reading of the uniform rate provision is incorrect. As CSXT explained in its Service Proposal, NPBL has either espoused an interpretation contrary to the one it adopts now, or has allowed substantial exceptions to it. "[T]he NPBL's tariff history demonstrates that NPBL has often published different switch charges for different commodities." Doc. 1-5 at 3. Indeed, the current tariff, attached to NPBL's brief, includes a number of varying switching rates, and not a single "uniform rate." Doc. 28-1.

## IV. CSXT has stated a claim for tortious interference (Count VII).

NS makes three arguments in support of its assertion that CSXT's tortious interference claim fails. However, all three arguments arise from a fundamental misreading of the Complaint. Namely, NS misconstrues CSXT's claim as one for tortious interference with contract, rather than tortious interference with business expectancy, as stated in the Complaint.

First, NS argues that CSXT fails to state a claim for tortious interference because NS cannot tortiously interfere with a contract, the Operating Agreement, to which it is a party. Doc. 35 at 19. Second, NS claims CSXT fails to state a claim for tortious interference because NS did not violate the Operating Agreement. *Id.* at 20. Third, NS argues that the economic-loss rule bars CSXT's tortious interference claim because it is based on an underlying breach of contract. *Id.* at 21.

These arguments fail because CSXT does not plead a claim for tortious interference with the Operating Agreement. CSXT has clearly stated a claim for "tortious interference with business expectancy." Doc. 1 ¶¶ 114–17. In particular, CSXT has alleged that NS has tortiously interfered with CSXT's business expectancy that, with access to NPBL trackage, it will enter into additional contracts with shipping partners that call on NIT. *Id.* ¶ 117.

As stated in the Complaint, NIT is one of three ports in Hampton Roads, and it is "the largest international shipping terminal in Virginia." Doc. 1 ¶¶ 3, 49. But "major customers refuse to contract with carriers who cannot provide rail transportation in and out of the Hampton Roads' ports," including NIT. *Id.* ¶ 50. And "[o]nly two entities have the ability to access NIT by rail: NPBL and NS." *Id.* ¶ 3. While CSXT has a significant presence at PMT and VIG (the other two ports in Hampton Roads), NS has a 90% market share at NIT. *Id.* ¶ 52. "[C]ompetitors such as CSXT are practically precluded from using the NPBL to connect to NIT." *Id.* ¶ 4. As such, the NS's wrongful conduct has caused CSXT to lose "opportunities for contracts with shipping partners." *Id.* ¶ 117.

If CSXT had access to NIT, it would undoubtedly provide additional service to its shipping partners and realize an economic benefit. CSXT is the only company who can "compete to provide intermodal services" at NIT. Doc. 1 ¶ 36. The Virginia Port Authority ("VPA") "has expressly requested that NPBL 'facilitate dual [rail] access [by CSXT and NS] for handling containers at

NIT." *Id.* ¶ 36. The VPA has indicated that dual access "would allow more volume to be moved at competitive prices." *Id.* ¶ 4. In other words, the VPA has indicated that if CSXT had access, it would be moving freight by rail at NIT and reaping the economic benefits of such service. Indeed, the certainty of CSXT's business expectancy at NIT was confirmed in 2015. For a brief window, CSXT paid the NPBL's preclusive rates due to temporarily shipping exigencies. *Id.* CSXT immediately received customer demands to handle shipments in and out of NIT by rail—though even these efforts were delayed and impeded by NS's anti-competitive conduct. *Id.*

These allegations plainly show that CSXT is not alleging that NS has tortiously interfered with the Operating Agreement. Instead, NS has tortiously interfered with CSXT's business expectancy—but for NS's wrongful conduct, CSXT would realize opportunities to handle shipments at NIT on a regular basis. Thus, it is irrelevant to CSXT's tortious-interference claim that NS is a party to the Operating Agreement and that NS claims it did not violate the Operating Agreement (which CSXT denies via its contract claim). Further, because CSXT's claim is based on interference with business expectancy, not contract, the economic-loss doctrine does not apply. *See Abi-Najm v. Concord Condo., LLC*, 280 Va. 350, 362 (Va. 2010) (rejecting application of economic-loss doctrine where the plaintiff alleged that the defendant "breached a duty existing independent of the Contracts"); *Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. 207, 218 (Va. 2014) (finding that the duty not to tortiously interfere with business expectancy "arises outside of contract).

## CONCLUSION

For the reasons stated above, CSXT respectfully asks that this Court deny NS's Motion to Dismiss, in its entirety.

Dated:  December 21, 2018                  Respectfully submitted,

                                           **CSX TRANSPORTATION, INC.**
                                           *By Counsel*


                                           _____/s/_____
                                           Robert W. McFarland (VSB No. 24021)
                                           Benjamin L. Hatch (VSB No. 70116)
                                           E. Rebecca Gantt (VSB No. 83180)
                                           MCGUIREWOODS LLP
                                           World Trade Center
                                           101 West Main Street, Suite 9000
                                           Norfolk, Virginia  23510-1655
                                           Telephone: (757) 640-3716
                                           Facsimile:  (757) 640-3930
                                           E-mail: rmcfarland@mcguirewoods.com
                                                   bhatch@mcguirewoods.com
                                                   rgantt@mcguirewoods.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 21st day of December 2018, a true and correct copy of the foregoing was served on all counsel of record via Notice of Electronic Filing by filing with the Court's CM/ECF system.

/s/_____
Robert W. McFarland

22