IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

CSX TRANSPORTATION, INC.,
individually and on behalf of
NORFOLK AND PORTSMOUTH BELT LINE
RAILROAD COMPANY,

      Plaintiff,

v.              Civil Action No. 2:18-cv-530-MSD-LRL

NORFOLK SOUTHERN RAILWAY COMPANY *et al.*,

      Defendants.

## REPLY IN SUPPORT OF MOTION TO DISMISS BY NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY

Norfolk and Portsmouth Belt Line Railroad Company (the "Belt Line"), by counsel, submits this Reply in support of its Motion to Dismiss all claims asserted against it by plaintiff CSX Transportation, Inc. ("CSXT").

James L. Chapman, IV, VSB No. 21983
W. Ryan Snow, VSB No. 47423
Darius K. Davenport, VSB No. 74064
David C. Hartnett, VSB No. 80452
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1500
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com
ddavenport@cwm-law.com
dhartnett@cwm-law.com
*Attorneys for Norfolk and Portsmouth Belt Line Railroad Company*

**Table of Contents**

Summary ........................................................................................................................................ 1

Argument ...................................................................................................................................... 2

*All Claims*

1.      All of CSXT's claims hinge on the rate charged by the Belt Line, and this Court cannot rewrite the Operating Agreement to grant CSXT a preferential rate. ............................................. 2

2.      All counts against the Belt Line should be dismissed or stayed as preempted or precluded by the exclusive jurisdiction of the Surface Transportation Board. ................................ 5

*Federal Law Claims*

3.      NS has the power to exercise complete control over the Belt Line as a majority shareholder and therefore cannot conspire with it in violation of the Sherman Act ....................... 7

4.      Even if conspiracy were possible, the Belt Line cannot be liable under the Sherman Act because CSXT's allegations of injury do not match its allegations of the relevant market. ........ 10

*Virginia Law Claims*

5.      CSXT ignores controlling Virginia Supreme Court and Fourth Circuit precedent in arguing for a "last over act" rule for its Virginia tort claims against the Belt Line. ..................... 12

6.      Count VII fails as a matter of law because CSXT has no standing to bring a tortious interference claim for lost shareholder revenue, and its claim for unspecified lost contracts with shipping partners fails to plead a valid business expectancy. ....................................................... 14

      A.  CSXT's alleged business expectancy is solely "as a result of being a shareholder of NPBL". ............................................................................................................................ 14

      B.  Even if CSXT could bring the claim on its own behalf, it fails to allege a valid business expectancy. ............................................................................................................ 15

7.      Contrary to CSXT's arguments, NS and the Belt Line cannot conspire and CSXT fails to allege any actual unlawful act to support a conspiracy between them. .................................... 16

      A. As a matter of law, the Belt Line and NS cannot conspire to harm CSXT. ............... 16

      B. CSXT fails to plead a facially plausible conspiracy. .................................................. 16

## Summary

CSXT's Opposition Brief argues a case that CSXT has not pled. Its Complaint pleads that NS and the Belt Line have such a unity of purpose that NS has forced the Belt Line to "effectively" exclude CSXT from rail access to NIT, even to the point of the Belt Line's financial ruin. Yet, when confronted with the fact that this allegation—which must be accepted as true on a motion to dismiss—destroys CSXT's conspiracy counts under the intracorporate immunity doctrine, CSXT embraces external facts to argue a contrary position in its Opposition Brief. It now contends that NS and the Belt Line are diametrically opposed to each other on the very topic about which CSXT claims they conspired—freight car rates at NIT—based on the Belt Line's opposition to NS's effort to raise those rates in concurrent proceedings before the Surface Transportation Board.

CSXT cannot have it both ways. Its Complaint fails because the facts alleged do not add up to any wrongdoing by the Belt Line. CSXT's true aim is to secure a competitive advantage over its rival, NS, which it cannot achieve through its minority ownership interest in the Belt Line alone. The Belt Line is an unfortunate pawn in CSXT's business parlay, being used to prop up a conspiracy theory that has no basis in law or fact.

The Belt Line has not conspired with anyone. It has not sought to harm CSXT, nor would that make any sense. The Belt Line has done nothing but honor the uniform rate that its directors lawfully set in 2009, in accordance with the Operating Agreement that its owners signed more than 120 years ago to prevent the very kind of special rate preference that CSXT seeks here.

CSXT's case against the Belt Line fails as pled and should be dismissed.

**Argument**

*All Claims*

1. **All of CSXT's claims hinge on the rate charged by the Belt Line, and this Court cannot rewrite the Operating Agreement to grant CSXT a preferential rate.**

Black letter Virginia law prevents a court from rewriting a contract or changing terms that one party finds unfair. *See Bank of Southside Va. v. Candelario*, 238 Va. 635, 640 (1989) ("Courts will not rewrite contracts; parties to a contract will be held to the terms upon which they agreed."); *Verling v. Quarles*, 217 Va. 188, 191 (1976) (reversing judgment that "in effect, made an agreement for the parties and then sought to compel them to execute it"); *Barber v. VistaRMS, Inc.*, 272 Va. 319, 329-30 (2006) (affirming dismissal of minority shareholder's writ of mandamus seeking to compel modification of addendum to shareholder agreement).

CSXT attempts to avoid this law by arguing that: (1) the meaning of the Operating Agreement is a "fact-based" question that cannot be decided under Rule 12(b)(6); (2) CSXT's "claims challenge diverse conduct beyond the rate itself"; (3) the current rate, even if uniform, was set for anti-competitive purposes; and (4) the contract language itself is ambiguous. None of these arguments saves CSXT's Complaint.

CSXT's first and fourth arguments turn on its strained efforts to reinterpret the Operating Agreement. Contrary to CSXT's argument, "the question whether a contract is ambiguous is not one of fact but one of law." *Wilson v. Holyfield*, 227 Va. 184, 187 (1984). "Contracts are not rendered ambiguous merely because the parties disagree as to the meaning of the language employed by them in expressing their agreement." *Id.* (citations omitted). "The guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares." *Meade v. Wallen*, 226 Va. 465, 467 (1984).

2

There is nothing ambiguous about the uniform rate requirement in Article Ninth of the Operating Agreement: "<u>That a uniform rate shall be fixed for the movement of freight cars over the said [Belt Line] railroad, regardless of distance</u>, and that the rate per loaded freight car shall be so adjusted from time to time as to yield a net revenue sufficient to pay the interest upon the bonds outstanding and a dividend of six per cent on the stock." Compl., Ex. A at 3-4 (emphasis added). CSXT argues that "[t]he modifying clause strongly suggests that the word 'uniform' means uniform as to distance," Opp. at 8-9, but it offers no citation or explanation for its construction. The plain language requires a uniform rate "regardless of" distance, not "limited to" distance. The Belt Line cannot offer CSXT a special rate any more than it can offer NS a special rate, nor can this Court rewrite that requirement. *See Candelario*, 238 Va. at 640.

What is more, the parties' practices do not (and cannot) alter the language in the contract. *See Wilson*, 227 Va. at 187 ("The question for the court is what did the parties agree to as evidenced by their contract."). While CSXT points to the Belt Line's tariff as evidence of ambiguity, the tariff supports the opposite conclusion. For "line haul switching," where freight is moved over the Belt Line's track for a line haul carrier (the only service at issue here), the tariff states a single uniform rate, regardless of distance, at $210 per car. *See* Tariff, Item 70 (D.E. 28-1). All other rates for other services are likewise uniform, regardless of distance. CSXT knows this, as its 2018 Service Proposal addresses only the "line haul switching" rate, proposing $80 instead of $210. *See* Compl., Ex. E at 3 (citing "NPBL general tariff charge of $210 per car" and stating "We propose $80 per car. . .").

CSXT also cannot avoid the Operating Agreement based on its second argument about other "diverse conduct." *See* Opp. at 7-8. In its Opposition Brief, CSXT argues that a portion of its Complaint should survive, even if the Operating Agreement bars the 2018 Service Proposal,

because other "diverse conduct" still hooks the Belt Line in the case. Even a cursory examination of the "diverse conduct" proves CSXT wrong. CSXT claims that NS barred the Belt Line from efficiently moving CSXT's cars over NS's rail line into NIT, but the Belt Line is not liable for NS's conduct. *See* Compl., ¶ 47 (acknowledging "movement of those NPBL trains is controlled and constrained by NS and NS's own trains"). CSXT also claims that the Belt Line harmed CSXT by taking the "diamond" out of service in 2008, but even if CSXT could avoid the STB's exclusive jurisdiction in approving that arrangement, *see* 49 U.S.C. § 10501(b), its complaint comes more than *10 years* after the fact, meaning it is time-barred under every count CSXT asserts. CSXT further claims that the Belt Line discriminated against it by "refusing to allow the use of CSXT's locomotives" while leasing locomotives from NS, but the Belt Line is not obligated to lease locomotives from anyone. *See* Opp. at 8; Compl., ¶ 46. CSXT cites no authority that this "diverse conduct" amounts to a violation of anything.

CSXT's third argument that the Operating Agreement is irrelevant because the uniform rate was set for "anticompetitive, conspiratorial and tortious reasons" is likewise time-barred. Opp. at 8. The current uniform rate was set in 2009. The longest possible statute of limitations in this case is 5 years, but CSXT waited 9 years to challenge the rate. *See Dunlap v. Cottman Trans. Sys., LLC*, 287 Va. 207, 219 (2014) (5-year statute of limitations for tortious interference with business expectancy); *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 543 (4th Cir. 1997) (5-year statute of limitations for Virginia law conspiracy claims).

The reality is that all of CSXT's claims hinge on the current uniform rate charged by the Belt Line. The Belt Line cannot grant CSXT a preferential rate, and under Virginia law, this Court cannot rewrite the Operating Agreement to do so either.

### 2. All counts against the Belt Line should be dismissed or stayed as preempted or precluded by the exclusive jurisdiction of the Surface Transportation Board.

CSXT incorrectly argues that its federal and state law claims and remedies—seeking a preferential, reduced per car rate for its traffic handled by the Belt Line to NIT—are not precluded or preempted by the exclusive jurisdiction of the STB. *See* 49 U.S.C. § 10501(b) (ICCTA). CSXT would have this Court ignore that the Belt Line's switching charges to NIT are fundamentally shaped by the Belt Line's costs of providing service, and in turn by the trackage rights compensation matters that are pending before the STB.[1]

CSXT has told the STB a very different story. In seeking to intervene at the STB to protect what it calls its "significant" and "compelling" interest, CSXT has insisted that "[w]hen trackage rights fees are too high, it becomes economically infeasible for CSXT to serve customers at or near NIT via NPBL." CSXT Pet. to Intervene at 6 (D.E. 28-3); CSXT Letter Filing (D.E. 28-4). Given CSXT's request that this Court fashion remedies to afford CSXT more economically favorable terms of access to NIT via the Belt Line, its assertion that the trackage rights compensation issue in the STB is, "at best," a "tangentially related matter" rings completely hollow. Opp. at 10.

In pinning its anti-preclusion argument on the holding of *POM Wonderful*, CSXT misses the point. *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102 (2014). The Belt Line has not argued that railroads are categorically immune from every federal antitrust cause of action. Rather, the Belt Line pointed out that remedies available under federal antitrust statutes give way (are precluded) where they conflict irreconcilably with remedies exclusively within the province of the

---

[1] *Norfolk Southern Railway Co. – Petition to Set Trackage Rights Compensation – Norfolk & Portsmouth Belt Line Railroad Co.*, Docket No. FD 36223 (STB, petition filed Sep. 13, 2018).

STB.[2] *POM Wonderful* embraces the construct that where the application of two federal statutory regimes to the facts of a case presents an irreconcilable conflict between the two, standards of preclusion apply. 573 U.S. at 112. Where, as here, a prospective switching fee remedy under the antitrust laws would conflict with the STB's exclusive role in prescribing the trackage rights compensation terms that underpin the Belt Line's switching charges, this Court should find preclusion. Barring preclusion, the interconnectivity between the Belt Line's rate and the trackage rights compensation issue before the STB supports a stay. *See Thompson v. Texas Mexican Ry.*, 328 U.S. 134, 147 (1946); *S.S.W., Inc. v. Air Transport Ass'n*, 191 F.2d 658 (D.C. Cir. 1951).

CSXT's state law conspiracy claims are likewise preempted under ICCTA, even under CSXT's proposed standard of asking whether the relief sought would "have the [proscribed] effect of managing or governing [interstate] rail transportation" Opp. at 12. CSXT argues that *Fayus Enterprises v. BNSF Ry. Co.*, 602 F.3d 444 (D.C. Cir. 2010) does not provide a blanket preemption of state law antitrust claims, but only supports preemption if the claims and remedies sought by CSXT would have the effect of regulating the Belt Line's railroad operations and its economic terms of service.[3] CSXT specifically acknowledges that, to the extent its state law claims "relate to rates or railroad practices" and to the extent that it seeks to have this Court determine "whether the existing rate was unlawful," Opp. at 12, such would be preempted under ICCTA. It nonetheless

---

[2]     *E.g.*, *United States Environmental Protection Agency – Petition for Declaratory Order*, Docket No. FD 35803 (STB served Dec. 30, 2014), slip op. at 8 [2014 WL 7392860, *7] ("[O]ther federal statutes may directly conflict with the purposes and regulatory scheme under the Interstate Commerce Act. When such a conflict occurs, the Board or a court must determine whether the two federal statutes and their applicable regulatory schemes can be harmonized.").

[3]     "State statutes or regulations that are not categorically preempted may still be impermissible if, as applied, they would have the effect of unreasonably burdening or interfering with rail transportation." *Delaware v. Surface Transportation Board*, 859 F.3d 16, 19 (D.C. Cir. 2017) (citation omitted).

argues that its state law claims seek nowhere to regulate the Belt Line's rates or operations.

CSXT's argument is fundamentally incorrect. Its state law claims seek to regulate the Belt Line's switching charges and operations in support of CSXT freight traffic. Indeed, the conduct that CSXT challenges in this Court includes operational decisions by the Belt Line that were specifically *authorized* by the STB. CSXT Compl., ¶¶ 47, 58 (discontinuance of diamond); Belt Line Mem. at 5 and n.7 (D.E. 28). Whether seeking damages for prior actions or prescription for future ones, the preemption mandate is the same. *See, e.g., Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 521 (1992) ("[State] regulation can be as effectively exerted through an award of damages as through some form of preventive relief.") (internal quotation omitted); *Pace v. CSX Transp., Inc.*, 613 F.3d 1066, 1070 (11th Cir. 2010) ("[T]o permit monetary liability to accrue under a state law nuisance claim where that liability is based on decisions the ICCTA purposefully freed from outside regulation would contradict the language and purpose of the ICCTA."); *Thomas Tubbs, et al. – Petition for Declaratory Order*, Docket No. FD 35792 (STB served Oct. 29, 2014) [2014 WL 5508153, at *4] ("[D]amages awarded under state tort laws can manage or regulate a railroad as effectively as the application of any other type of state statute or regulation."). In keeping with *Fayus*, CSXT's state law claims are entirely preempted and must be dismissed.

*Federal Law Claims*

3. **NS has the power to exercise complete control over the Belt Line as a majority shareholder and therefore cannot conspire with it in violation of the Sherman Act.**

CSXT's argument against intracorporate immunity contradicts its Complaint. CSXT cannot establish its conspiracy claims by alleging that NS is a chess master, directing its majority-owned subsidiary as a pawn to fix rates at NIT, then later seek to escape the bar of intracorporate immunity by arguing exactly the opposite in its Opposition Brief.

*Copperweld* controls a federal court's application of intracorporate immunity in Sherman

7

Act cases.[4] Opp. at 14 (citing *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984)). Under *Copperweld*, a conspiracy between a parent and a wholly-owned subsidiary is impossible. 467 U.S. at 771. Two such entities "have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. . . . They share a common purpose whether or not the parent keeps a tight rein over the subsidiary; the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests." *Id.* at 771-72.

Under Virginia law, NS's majority ownership of the Belt Line, as pled by CSXT, has the same legal effect for intracorporate immunity as ownership in full under *Copperweld*. *See, e.g.*, *Fein v. Lanston Monotype Mach. Co.*, 196 Va. 753, 766 (1955) ("The holders of the majority of the shares of a corporation have the right and the power, by the election of directors and by the vote of their stock, to determine the policy of their corporation and to manage and control its action."). Unlike in other jurisdictions, majority shareholders in Virginia may drive a corporation to their sole benefit, just as if they owned it in full, owing no fiduciary obligation to minority shareholders. *Compare Willard v. Moneta Building Supply*, 258 Va. 140, 157 (1999), *with Lerner v. Lerner Corp.*, 750 A.2d 709, 720 (Md. Ct. Spec. App. 2000). No fact-based inquiry is required to establish this (or even warranted) since just like in *Copperweld*, a majority shareholder of a Virginia corporation "may assert full control at any moment." *Copperweld*, 467 U.S. at 772.

---

[4] CSXT creates a strawman out of *American Needle v. National Football League*, 560 U.S. 183, 196-97 (2010). *American Needle* is inapposite because it deals with conspiracies between dozens of NFL team owners and a subsidiary in which none of them owned a controlling interest—the League itself. *Id.* As explained below, the utility of *American Needle* here is only in showing that the Supreme Court has eschewed a "formalistic" approach to applying the doctrine, such as that taken by the district court in the earlier case cited by CSXT. *See American Vision v. Cohen*, 711 F. Supp. 721, 723 (D. Or. 1987) (refusing to apply intra-corporate immunity solely because majority shareholder did not own 100% of subsidiary).

8

Yet even if Virginia law did not alone foreclose CSXT's conspiracy claims, CSXT has pled itself out of its own argument. The facts alleged in the Complaint do not reflect two independent entities pursuing distinct economic interests. They paint the Belt Line as acting completely under the direction of NS, and for NS's sole benefit. CSXT alleges that the Belt Line is such a pawn of NS that the Belt Line is suffering financially as a result. According to CSXT, "NS and these directors and the NPBL management they have put in place have conspired to <u>operate the NPBL in order to benefit NS at the expense of the profitability and viability of the NPBL</u> and to harm NS's competitor CSXT." Compl., ¶ 2 (emphasis added). "NS and the NPBL have <u>used the NPBL as a chess piece to establish and maintain NS's monopolistic control</u> over intermodal transportation in and out of NIT . . . . [As a result,] NPBL's revenues have tellingly remained flat or decreased." Compl., ¶ 3 (emphasis added). All the defendants "<u>have operated the NPBL as a vehicle for advancing NS's interests</u>." Compl., ¶ 32 (emphasis added). This includes, according to CSXT, setting rates and selling property to the Belt Line's own financial harm. Compl., ¶¶ 38-48.

CSXT changes course only in its conclusory allegation that, "The conspiracy described below between NPBL and NS thus joined together separate decision-makers <u>pursuing separate economic interests</u>, depriving the marketplace of independent centers of decision-making." Compl., ¶ 24 (emphasis added). This conclusory allegation contradicts the entire thrust of CSXT's Complaint, which is that the Belt Line does *not* have "separate economic interests," and is being used instead as a pawn to advance NS's economic interests with respect to CSXT, even to the point of its own financial ruin. The Court is not bound by such a conclusory allegation. "The inclusion of conclusory legal terms . . . does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint do not support the legal conclusion." *Trigon Ins. Co. v. Columbia Naples Capital, LLC*, 235 F. Supp. 2d 495, 500 (E.D. Va. 2002).

And the two cases on which CSXT chiefly relies for its argument against intracorporate immunity fail to save its Complaint. The first is too cursory to offer meaningful guidance. In *American Vision v. Cohen*, the trial court summarily refused to apply intracorporate immunity simply because the majority shareholder did not own 100% of the subsidiary. 711 F. Supp. 721, 723 (D. Or. 1987). This is precisely the sort of "formalistic" approach the Supreme Court has since eschewed. *See Am. Needle*, 560 U.S. 183 at 191-92 (2010) (holding inquiry on intracorporate immunity turns not on form but on whether the relationship between the alleged conspirators erodes "independent centers of decision-making").

The second case, *American Vision Centers, Inc. v. Cohen*, concerns application of intracorporate immunity under New York law. 711 F. Supp. 721, 722 (E.D.N.Y. 1989). The court held that intracorporate immunity did not bar a conspiracy between a corporation and its 53% owners, because majority owners owe a fiduciary duty under New York law to minority shareholders. *Id.; see also Gjuraj v. Uplift Elevator Corp.*, 973 N.Y.S.2d 172, 173–74 (App. Div. 2013). Under Virginia law, NS can direct the actions of the Belt Line without any fiduciary obligation to CSXT—just as if NS owned the Belt Line in its entirety. *See Willard*, 258 Va. at 157. Consequently, whether or not CSXT alleges valid individual claims against NS, it asserts no viable claim of anti-trust conspiracy against the Belt Line.[5]

4. **Even if conspiracy were possible, the Belt Line cannot be liable under the Sherman Act because CSXT's allegations of injury do not match its allegations of the relevant market.**

While it may be true, as CSXT argues, that disputes over the *extent* of an anti-trust injury are not typically resolved on a motion to dismiss (*see* Opp. at 20), CSXT's Complaint fails more

---

[5] For reasons of its own, NS did not move to dismiss any federal anti-trust counts. Dismissal of the conspiracy counts will not affect CSXT's claims against NS in Counts III through V.

10

fundamentally: its allegations of injury do not match its allegations of the relevant market.

Under this Court's precedent, "inadequate allegations regarding [the] scope of [the] relevant market are proper grounds for Rule 12(b)(6) dismissal." *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 688 F. Supp. 2d 443, 457 (E.D. Va. 2009). General allegations about the relevant market that are contradicted by more specific allegations are self-defeating, internally inconsistent, and should be disregarded. *Id.*

CSXT alleges in its Complaint that it has been "effectively" foreclosed from NIT (Compl., ¶¶ 4, 35), yet none of CSXT's allegations defines the relevant market as NIT. NIT is but one of six terminals that make up the Port of Virginia and only one of four such terminals in Hampton Roads.[6] In its Complaint, CSXT defines the relevant market as the Port of Hampton Roads. *See* Compl., ¶ 49 (describing relevant market as "the intermodal port facilities of Hampton Roads, Virginia"); ¶ 51 (describing relevant market as "the Hampton Roads ports"). In its Opposition Brief, CSXT calls the relevant market "Hampton Roads and Virginia." Opp. at 20.

To successfully state a violation of § 1 or § 2 of the Sherman Act, "[i]n addition to establishing a conspiracy, a successful plaintiff must also show . . . <u>that the conspiracy produced adverse, anti-competitive effects within the relevant product and geographic market</u>." *SD3 II LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 432 (4th Cir. 2018) (emphasis added, ellipses in original). CSXT's sweeping allegations of general market harm cannot overcome its specific allegations of the relevant market. *E.I. DuPont*, 688 F. Supp. 2d at 457. CSXT defines the relevant

---

[6] *See* Port of Virginia, "Facilities," http://www.portofvirginia.com/facilities/ (last visited January 3, 2019). "The Court possesses the inherent authority under the Federal Rules of Evidence to take judicial notice of such facts that are 'generally known within the territorial jurisdiction of the trial court.'" *Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538, 567 (E.D. Va. 2000) (citing Fed. R. Evid. 201(b)); *Greenhouse v. MCG Capital Corp.,* 392 F.3d 650, 655 n. 4 (4th Cir. 2004) (taking judicial notice of published stock prices); *United States v. Lossiah,* 537 F.2d 1250, 1251 (4th Cir. 1976) (approving judicial notice of a town's location within an Indian reservation).

market as the Port of Hampton Roads. It identifies an injury only at NIT. Because CSXT fails to allege harm in the relevant market, as pled in its own Complaint, its Sherman Act counts should be dismissed.

*Virginia Law Claims*

**5. CSXT ignores controlling Virginia Supreme Court and Fourth Circuit precedent in arguing for a "last over act" rule for its Virginia tort claims against the Belt Line.**

All three tort claims against the Belt Line are time-barred. The statute of limitations for tortious interference, business conspiracy, and civil conspiracy is 5 years. *See Dunlap*, 287 Va. at 219 (5-year statute of limitations for tortious interference claims); *Detrick*, 108 F.3d at 543 (5-year statute of limitations for Virginia conspiracy claims). Virginia does not apply the "last overt act" doctrine to such claims. Under Virginia law, the limitations period starts to run when the plaintiff first suffers any damages, no matter how slight, resulting from the acts committed in furtherance of the conspiracy or tortious interference. *Id*.

According to the Complaint, CSXT first suffered damages from the alleged interference and conspiracies in 2008. The Complaint alleges that the Belt Line (1) sold property and limited access rights to NIT by way of the diamond that was discontinued in 2008, (2) adopted the uniform tariff rate in 2009, and (3) rejected CSXT's 2010 Service Proposal. Compl., ¶¶ 34, 46-47, 57 and Ex. E. According to the Complaint, each of these actions harmed CSXT.

In its Opposition Brief, unlike in its Complaint, CSXT argues that these allegations actually show "'separate and distinct occurrence[s]' that give rise to separate claims," including a claim that accrued in 2018 when its Service Proposal was rejected. Opp. at 22. For example, even though Counts VIII and IX of the Complaint refer to all of the alleged unlawful acts collectively and identify only a single overarching conspiracy, Compl., ¶¶ 118-25, and even though CSXT concedes in a footnote that the alleged acts are not "wholly unrelated," CSXT now maintains that

12

there were multiple conspiracies (at least four) between the Belt Line and NS, each with a singular purpose. *See* Opp. at 22-23 and n.4.

At the Rule 12(b)(6) stage, courts do not have to accept as true unwarranted or unreasonable inferences or conclusions. *Trigon*, 235 F. Supp. 2d at 500. To accept CSXT's argument would mean that CSXT could unilaterally extend the accrual period indefinitely, just by repeatedly submitting a service proposal for a preferential rate. Virginia law prohibits such tactics. *See Dunlap*, 287 Va. at 219; *Detrick*, 108 F.3d at 543.

Only one of the cases that CSXT cites to support its "separate wrongful act" theory involved tortious interference or conspiracy claims. *See L-3 Communications Corp. v. Serco, Inc.*, No. 1:15cv701, 2018 WL 1352093 at *3 (E.D. Va. Mar. 15, 2018).[7] In that case, the court rejected the very argument advanced by CSXT here. The plaintiff in *L-3* argued that three separate acts committed by the defendant competitor and former employees—first reaching agreement to form a separate company, then accepting compensation from their employer while stealing its trade secrets, and later successfully bidding on contracts using the misappropriated information—constituted separate claims with separate injuries. The court rejected that argument and held the business and civil conspiracy counts time-barred, properly recognizing that the allegedly separate

---

[7] CSXT claims that in *Hampton Roads Sanitation Dist. v. McDonnell*, 234 Va. 235 (1987), the Court considered the "statute of limitations under the Virginia Conspiracy Act, Va. Code §§ 18.2-499." Opp. at 22. That is simply wrong. There were no conspiracy allegations in that case. It was a negligence action involving the 5-year statute of limitations for property damage under Va. Code § 8.01-243(B). The other cases CSXT cites involved breach of contract, quantum meruit, unjust enrichment, and conversion. *See* Opp. at 21-22 (also citing *Union Labor Life Ins. Co. v. Sheet Metal Workers Nat. Health Plan*, 1991 WL 212232 (D.D.C. Sept. 30, 1991); *Kancor Americas, Inc. v. ATC Ingredients, Inc.*, 2016 WL 740061, at *5-6 (E.D. Va. Feb. 25, 2016). The distinction is significant because for each of those causes of action, the accrual period runs from the date of each non-contiguous breach. Here, the Virginia Supreme Court has mandated that the accrual period runs from the first date the plaintiff suffers any damages resulting from the acts committed in furtherance of the conspiracy. *See Detrick*, 108 F.3d at 543.

injuries "stemmed directly from the conspiracies at issue." *Id*. at *9.

The acts in the Complaint likewise do not constitute multiple conspiracies with separate injuries and accrual periods. The Complaint itself refers to a single conspiracy "to operate the NPBL in order to benefit NS at the expense of the profitability and viability of the NPBL, and to harm NS's competitor CSXT." Compl., ¶ 2. CSXT's argument that each act in furtherance of that conspiracy is actually a separate conspiracy would prevent the statute of limitations from ever expiring. Virginia law does not allow that result, and the Court should dismiss Counts VII-IX.

6. **Count VII fails as a matter of law because CSXT has no standing to bring a tortious interference claim for lost shareholder revenue, and its claim for unspecified lost contracts with shipping partners fails to plead a valid business expectancy.**

   A. **CSXT's alleged business expectancy is solely "as a result of being a shareholder of NPBL."**

Under Virginia law, a minority shareholder like CSXT cannot pursue an individual cause of action for injuries to the corporation that diminish the value of its stock. Such claims must be brought derivatively. *See Simmons v. Miller*, 261 Va. 561, 573-74 (2001); *Keepe v. Shell Oil Co.*, 220 Va. 587, 591 (1979). CSXT asserts a derivative claim against several of the Belt Line's directors in Count VI of its Complaint, but in Count VII it impermissibly tries to assert a tortious interference claim against the Belt Line for the same alleged wrongs.

CSXT's Opposition Brief incorrectly portrays the Belt Line's alleged lost revenue and trackage access as individual claims of CSXT. *See* Opp. at 24-25. The Complaint states that these claims derive exclusively from CSXT "being a shareholder of NPBL":

> 115. <u>As a shareholder of the NPBL</u>, CSXT has reasonable business expectancies, including that the corporation will be managed and directed in a manner that is in accord with the Operating Agreement, allowing CSXT access to NPBL trackage in Hampton Roads. <u>CSXT reasonably expects economic benefit as a result of being a shareholder of NPBL, such as revenue from NPBL and its ability to access NPBL trackage and NPBL-served industries</u>. As the majority shareholder of NPBL, NS, and the Individual Defendants, respectively, have knowledge of CSXT's business expectancies.

14

Compl., ¶ 115 (emphasis added).  Because the claims asserted in Count VII may be brought only derivatively, if at all, Count VII must be dismissed.

      **B.**      **Even if CSXT could bring the claim on its own behalf, it fails to allege a valid business expectancy.**

Even if CSXT could assert an individual claim, alleging general "lost opportunities for contracts with shipping partners" is insufficient to establish a valid business expectancy.  Compl., ¶ 117.  CSXT argues in its Opposition Brief that it is enough to allege a subjective expectancy that the plaintiff believes will be realized.  *See* Opp. at 25 ("The expectancy must be one that the plaintiff is reasonably certain will be realized.") (citing *Commercial Bus. Sys. v. Halifax Corp.*, 253 Va. 292, 301 (1997)).  To the contrary, courts considering tortious interference claims at the motion to dismiss stage have consistently applied an objective standard in determining whether an alleged business expectancy is plausible.  *See Peterbilt of Bristol v. Mac Trailers, Mfg.*, No. 1:09-cv-58, 2009 WL 4063663, at *3 (W.D. Va. Nov. 23, 2009) (granting Rule 12(b)(6) motion) ("The mere possibility of a future business relationship is not enough to satisfy the tort's first and third elements.  Rather, a plaintiff must meet an objective standard and establish 'a probability of future economic benefit.'"); *Williams v. Reynolds*, No. 4:06-cv-20, 2006 WL 3198968, at *5 (W.D. Va. Oct. 31, 2006) (granting Rule 12(b)(6) motion) ("[M]ere subjective expectations that a business relationship will continue or appear are not enough to make a case for tortious interference."); *NorthStar Aviation, LLC v. Alberto*, 332 F. Supp. 3d 1007, 1019 (E.D. Va. 2018) (applying objective standard and granting Rule 12(b)(6) motion where amended complaint "does not allege facts suggesting that the business expectancy at issue was reasonably certain").

CSXT's general lost opportunity to contract with unidentified shipping partners constitutes only a "possibility" of a benefit, not an objectively valid business expectancy.  The case cited by

15

CSXT, *Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship*, is inapposite. There, the plaintiff alleged a valid expectation of further business with those customers with whom it had a current, ongoing relationship at the airport. 2009 WL 90851, at *3 (E.D. Va. Jan. 13, 2009). Here, CSXT's Complaint does not name even a single shipping partner. Its subjective belief that adoption of its 2018 Service Proposal might enable it to engage potential customers on better terms does not meet the objective test required to sustain this claim.

7. **Contrary to CSXT's arguments, NS and the Belt Line cannot conspire and CSXT fails to allege any actual unlawful act to support a conspiracy between them.**

   A. **As a matter of law, the Belt Line and NS cannot conspire to harm CSXT.**

The first element for both business and civil conspiracy claims in Virginia is the combination of at least two separate persons or entities in a concerted action. *See* Va. Code § 18.2-499(A); *Commercial Bus. Sys. v. Bellsouth Servs, Inc.*, 249 Va. 39, 48 (1995). As explained above, CSXT cannot satisfy this requirement because a parent and its majority-owned subsidiary cannot conspire as a matter of law. *See Fein*, 196 Va. at 766; *Willard*, 258 Va. at 157.

CSXT argues that this Court should not apply the *Copperweld* rationale simply because no other Virginia court has considered the issue. *See* D.E. 39 at 27. This Court does not have to await a decision by another court because *Copperweld* is consistent with Virginia corporate law. Virginia law makes no distinction between a parent's power to exercise control over a wholly-owned subsidiary and a majority-owned subsidiary. Accordingly, NS and the Belt Line cannot conspire as a matter of law and Counts VIII and IX should be dismissed.

   B. **CSXT fails to plead a facially plausible conspiracy.**

Counts VIII and IX should also be dismissed because CSXT fails to allege any actual unlawful act to support a conspiracy between them. *See Gov't Employees Ins. Co. v. Google, Inc.*, 330 F. Supp. 2d 700, 706 (E.D. Va. 2004); *Dunlap*, 287 Va. at 215. The allegations in the

16

Complaint do no more than describe lawful actions taken by a parent corporation with respect to its majority-owned subsidiary. *See Fein*, 196 Va. at 766.

CSXT is correct that tortious interference and breach of fiduciary duty may constitute an unlawful act in Virginia. *See Dunlap*, 287 Va. at 218. As explained above, however, CSXT fails to allege a valid business expectancy to support a tortious interference claim. Likewise, CSXT fails to allege any facts that the Belt Line conspired with its own directors to breach their fiduciary duties. While CSXT claims that the Complaint contains such facts, it cites only a single conclusory allegation: "Defendants NS and NPBL have wrongfully employed improper methods in order to intentionally interfere with these expectancies, such as unfair competition, breach of fiduciary duty by the Individual Defendants, and using NPBL as a means of self-dealing." Opp. at 28 (citing Compl., ¶ 116). Conclusory allegations are not facts, and it is not even possible for the Belt Line to use itself "as a means of self-dealing." *Id*. Given the wholesale lack of facts to establish plausible conspiracy claims, the Court should dismiss Counts III and IX.

## Conclusion

CSXT's allegations in its Complaint do not establish wrongdoing by the Belt Line under federal law or Virginia law, and the conspiracy it alleges cannot exist as a matter of law. The Belt Line respectfully asks this Court to dismiss all claims against the Belt Line with prejudice.

|  |  |
|---|---|
| Dated: January 7, 2019 | NORFOLK AND PORTSMOUTH<br>BELT LINE RAILROAD COMPANY |
|  | By:      /s/ James L. Chapman, IV<br>James L. Chapman, IV, VSB No. 21983<br>W. Ryan Snow, VSB No. 47423<br>Darius K. Davenport, VSB No. 74064<br>David C. Hartnett, VSB No. 80452<br>CRENSHAW, WARE & MARTIN, P.L.C. |

> 150 W. Main Street, Suite 1500
> Norfolk, Virginia 23510
> Telephone: (757) 623-3000
> Facsimile: (757) 623-5735
> jchapman@cwm-law.com
> wrsnow@cwm-law.com
> ddavenport@cwm-law.com
> dhartnett@cwm-law.com
> *Attorneys for Norfolk and Portsmouth Belt Line Railroad Company*

## CERTIFICATE OF SERVICE

I certify that on this 7th day of January 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a "Notice of Electronic Filing" to all counsel of record who have consented to electronic service.

> /s/ James L. Chapman, IV
> James L. Chapman, IV, VSB No. 21983
> CRENSHAW, WARE & MARTIN, P.L.C.
> 150 W. Main Street, Suite 1500
> Norfolk, Virginia 23510
> Telephone: (757) 623-3000
> Facsimile: (757) 623-5735
> jchapman@cwm-law.com