UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| CSX TRANSPORTATION, INC., )<br>individually and on behalf of NORFOLK )<br>& PORTSMOUTH BELT LINE )<br>RAILROAD COMPANY, )<br>  ) <br>         **Plaintiff,**  )<br>  )<br>v.  )<br>  )<br>NORFOLK SOUTHERN RAILWAY )<br>COMPANY, *et al.*, )<br>  )<br>         **Defendants.**  ) | Civil Action No.:  2:18cv530 |

### NORFOLK SOUTHERN RAILWAY COMPANY'S
### REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS

Norfolk Southern Railway Company ("NSR"), by counsel and pursuant to Fed. R. Civ. P. 12(b)(6), submits this reply brief in further support of its Motion to Dismiss Counts V, VII, VIII, and IX of Plaintiff CSX Transportation, Inc.'s ("CSXT") Complaint.

### INTRODUCTION

CSXT does not claim that NPBL or NSR has barred CSXT's physical access to Norfolk International Terminal ("NIT").  Indeed, CSXT acknowledges again in its Opposition that it used NPBL to move CSXT rail traffic to and from NIT in 2015. (Opp. at 2.)  Rather, as framed, this case is about CSXT's repeated, unsuccessful efforts to escape the application of the Uniform Rate established by NPBL in 2009 (the "2009 Uniform Rate").  CSXT's Complaint states over and over again that its case is based on the "prohibitively expensive" 2009 Uniform Rate, which "practically preclude[d]" CSXT "from using NPBL to connect to NIT" since then. (Compl. ¶ 4;

*see also id.* ¶ 3, 34, 35, 37, 44, 55, 57, 87, 90, 93, 97, 100, 104, 108.)[1] When opposing NSR's Motion to Dismiss, however, CSXT retreats from its pled reliance on the 2009 Uniform Rate in an effort to avoid dismissal of its state-law claims on statute of limitations grounds. CSXT now contends that its claims are based on other alleged "separate and distinct wrongful acts giving rise to their own causes of action within the limitations period." (Opp. at 2.) By doing so, CSXT effectively concedes that its state-law claims, as pled in the Complaint, are based on the establishment of the 2009 Uniform Rate and thus are time-barred. Notwithstanding CSXT's improper effort to recharacterize its claims in its Opposition, *see Shapiro v. Regent Univ.*, No. 2:09-cv-605, 2010 U.S. Dist. LEXIS 53172 *6, n.3 (E.D. Va. May 26, 2010) ("Plaintiff is not permitted to assert new claims by raising them in his brief in opposition to the [d]efendant's motion."), the enumerated separate and distinct wrongful acts are not, in fact, separate and distinct, nor do they give rise to actionable claims as a matter of law.

CSXT's effort to obscure the 2009 Uniform Rate as the source of its claims—*i.e.*, its attempt to recharacterize its state-law claims as originating separately from the establishment of the 2009 Uniform Rate—cannot save the claims from dismissal. CSXT states no less than 15 times in the Complaint that its claims are, in fact, based on the injury inflicted by the 2009 Uniform Rate, and that all of CSXT's alleged damages flow from it. Even if, *arguendo*, some of CSXT's

---

[1] To be clear, NPBL cannot access NIT solely via its own tracks, but instead must operate over trackage rights over a line owned independently by NSR. CSXT's Complaint does not state directly that NSR owns track connecting NPBL's tracks to the NIT outright, but acknowledges the fact repeatedly by averring that NPBL must pay NSR for access to track that NPBL does not own. *See, e.g.*, Compl. ¶¶ 41, 59, 87(f), 93(f), 107 (all referring to the fact that NPBL's access to NIT is based on payment to NSR under a trackage rights agreement between NPBL and NSR that governs NPBL's right to use the NSR track); *see also* Compl. Exh. B (map showing NPBL trackage rights on the NSR track to NIT).

claims are "separate and distinct," they fail as a matter of law based on the plain language of the Operating Agreement and applicable law.

## ARGUMENT

**I.     CSXT's state-law claims—as pled in the Complaint—are based on the 2009 Uniform Rate and thus are time-barred.**

In the Complaint, CSXT makes clear that its state-law claims are predicated on the establishment of the 2009 Uniform Rate and thus the claims are time-barred. CSXT admits that it ***"has alleged that the preclusive, uniform rate NS[R] has set has breached its obligations under the Operating Agreement."*** (Opp. at 17) (emphasis added.) It further admits that "the Complaint alleges – among other things – *that the uniform rate was set at a preclusive level for anticompetitive, conspiratorial and tortious reasons*." *See* Doc. 39 at 8 (emphasis added). *See Goodman v. PraxAir, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (a limitations defense may be reached on a motion to dismiss "if all facts necessary to the affirmative defense clearly appear[] *on the face of the complaint*") (internal quotations omitted).

CSXT does not dispute that the limitations period for each of its state-law claims is five years. (Opp. at 10, 13.) Nor does it dispute that its contract claim accrues at the time of breach, and that its tort claims accrued when CSXT first suffered any damages resulting from the alleged tortious conduct. *See* Va. Code § 8.01-230 (a contract claim accrues "when the breach of contract occurs."); *International Surplus Lines Ins. Co. v. Marsh & McLennan, Inc.*, 838 F.2d 124, 129 (4th Cir. 1988) ("In Virginia, only the slightest injury is required to start the running of the limitations period . . . It is of no consequence that the amount of damages [is] not ascertainable until a later date.").

Applying the undisputed law to CSXT's allegations, CSXT's contract claim accrued in 2009 when NSR allegedly "breached its obligations under the Operating Agreement" by allowing

NPBL to establish "the preclusive, [U]niform [R]ate." (Opp. at 17.) Its conspiracy and tortious interference claims also accrued in 2009 because CSXT immediately suffered its alleged damages as a result of the establishment of the 2009 Uniform Rate. *See* Compl., ¶¶ 115, 117 (alleged tortious interference caused CSXT damages such as "lost opportunities for contracts with shipping partners" due to its inability to access NIT); *Id*. ¶¶ 120, 124 (alleged conspiracy caused "CSXT to lose potential business with shipping companies, due to its inability to access NIT"). Therefore, CSXT's state-law claims are time-barred and must be dismissed with prejudice. *See Westminster Investing Corp. v. Lamps Unlimited*, *Inc.,* 237 Va. 543, 547 (1989) ("Where there exists any doubt, it should be resolved in favor of the operation of the statute of limitations.") (quoting *Burns v. Stafford County*, 227 Va. 354, 359 (1984)).

## II. CSXT's reliance in its Opposition on the purported "separate and distinct wrongful acts" cannot save its state-law claims from dismissal.

In its Opposition, CSXT abandons its as-pled state-law claims, substituting four purported "separate and distinct wrongful acts" that, according to CSXT, are not time-barred:

1. NPBL's refusal to vote on CSXT's 2018 Proposal;

2. NSR "acting to prevent the reasonable and timely movement of cars delivered to NPBL by CSXT";

3. NSR "refusing to allow NPBL to use CSXT's fully fueled locomotives to access NIT"; and

4. NSR "threatening to enter into agreements 'to increase dramatically the charges that NPBL would pay to NS[R] for exercise of NPBL's rights to access NS[R] trackage." (Opp. at 11.)

CSXT's attempt to replead its state-law claims in its Opposition does not change the fact that its claims are time-barred because they are *all* based on the establishment and continued application of the 2009 Uniform Rate. *See Shapiro, supra*. Moreover, each of these newly stated theories independently fails as a matter of law to state a claim upon which relief can be granted.

- 4 -

> **A.     NPBL's failure to accept the 2018 Proposal in place of the 2009 Uniform Rate is a continuation of NSR's alleged wrongful conduct that began in 2009, which renders the claim time-barred.**

NSR had anticipated that CSXT would argue that its state-law claims are not time-barred by emphasizing NPBL's decision not to accept the 2018 Proposal. Thus, NSR explained in its brief why NPBL's decision is merely a continuation of conduct that began when NPBL established the 2009 Uniform Rate. (Doc. 35 at 10-14.) NPBL continues to reject any efforts by CSXT to avoid the application of the 2009 Uniform Rate. As it turns out, CSXT's main effort to save its state-law claims does hinge on the failure of NPBL's board of directors to act upon CSXT's 2018 Proposal. CSXT argues that NPBL's conduct "thwarted the purpose of the NPBL, which is to provide shareholder railroads with equal and efficient access over the NPBL to the facilities to which the NPBL connects." (Opp. at 11.)

As a threshold matter, CSXT's stakes its statute of limitations argument on a 2018 event that did not happen – an alleged rejection of the 2018 Proposal. The NPBL board took no vote on the proposal, even though CSXT's representative directors could have required a vote by motion and secondment. In sum, CSXT did not plead that a new act even occurred in 2018.

In any event, the Complaint makes clear that CSXT's theory is that it does not have "equal and efficient access" over NPBL *because of the 2009 Uniform Rate*. *See* Compl. ¶ 4 (NSR caused NPBL to set and maintain the "prohibitively expensive" 2009 Uniform Rate that "practically preclude[s]" CSXT "from using NPBL to connect to NIT."). However, CSXT concedes in its Opposition that CSXT can and has accessed NIT through the use of NPBL's switching services when CSXT has willingly paid the 2009 Uniform Rate. (Opp. at 20.)

Just as NSR explained in its opening brief, CSXT sent the proposals because, according to CSXT, NSR had *already breached* the Operating Agreement by causing NPBL to set the

- 5 -

"prohibitively expensive" 2009 Uniform Rate. CSXT's 2010 Proposal states that "*[p]resently*, the NPBL's switch rate of $210 per car is an economic barrier that prevents CSXT from being able to move any meaningful port freight by rail at NIT." (emphasis added). The 2018 Proposal states that "[t]he NPBL's general tariff rate, however, *remains* prohibitive for normal movements of shipping containers to and from NIT." (emphasis added). Thus, CSXT's proposals, by their own terms, were delivered to NPBL in a repeated effort to avoid application of the 2009 Uniform Rate, thereby mitigating the alleged injury caused by the existing breach of the Operating Agreement—the establishment of the 2009 Uniform Rate.

CSXT further argues that NSR "prevent[ed] the [NPBL] directors from voting for the [2018 Proposal]," which violated NSR's obligation under the Operating Agreement to "vote for such resolutions, by-laws or other proceedings as may be necessary to carry into effect" the Operating Agreement. (*Id*.) This recharacterization of the claim does not take it outside of NSR's statute of limitations defense. NPBL's refusal to accept the 2018 Proposal did not create any new harm to CSXT; rather, CSXT continued to suffer the same alleged harm caused by the establishment and continued application of the 2009 Uniform Rate: "reducing the revenues of NPBL, of which CSXT is a shareholder, [] causing CSXT to pay high rates when it has utilized the NPBL, and [] causing CSXT to lose potential business due to its inability to economically access NIT by rail." (Compl. ¶ 108.) CSXT does not allege any distinct injury resulting from the denial of the 2018 Proposal beyond that the 2009 Uniform Rate continued to be in effect. Thus, it is clear that CSXT's claims, as well as the damages that allegedly flow from them, arise out of the establishment and continued application of the 2009 Uniform Rate, not from subsequent events.

Under Virginia law, NPBL's refusal to accept the 2018 Proposal is not a separate breach of the Operating Agreement (if it is a breach at all), but rather is part of a "single continuous

- 6 -

breach" based on the establishment of the 2009 Uniform Rate. *See Fluor Fed. Sols., LLC v. PAE Applied Techs., LLC*, 728 Fed. Appx. 200 (4th Cir. 2018); *Westminster Investing Corp. v. Lamps Unlimited, Inc.*, 237 Va. 543 (1989); *Hunter v. Custom Bus. Graphics*, 635 F. Supp. 2d 420, 422-23 (E.D. Va. 2009). In *Fluor*, PAE refused to pay Fluor G&A costs over 2.3% of direct costs, which Fluor contended was a breach of the parties' contract. Fluor complained about the breach "[i]ntermittently over the years," but PAE continued to refuse to pay G&A costs above the 2.3% cap and thus "continued to breach the contract in exactly the same manner for the next dozen years." *Id.,* 728 Fed. Appx. at 202, 203. The Fourth Circuit held that the PAE's refusal to pay G&A costs above the 2.3% cap over the 12-year period was a "single continuous breach" of the contract because "Fluor's entire harm flowed directly from PAE's initial decision to cap G&A costs." *Id*. at 203. Because Fluor did not sue within five years of the first instance in which PAE refused to pay over the 2.3% cap, its contract claim was time-barred.[2]

Similarly, in *Westminster*, the primary case on which *Fluor* relies, the defendant committed a single continuous breach of a lease by failing to enforce a uniform business hours provision over the course of several years. The Virginia Supreme Court held that the defendant's intermittent failures to enforce the business hours provision did not constitute new individual breaches because the failure to enforce the provision produced all of the plaintiff's harm. The court dismissed the contract claim as time-barred because the plaintiff did not file its contract claim within five years of the defendant's failure to enforce the provision.

In *Hunter*, the defendant employer stopped paying Hunter a monthly auto allowance in 1990 and stopped paying monthly commissions at the rate of 50% in 1997, both of which breached

---

[2] The fact that *Fluor* is based on a trial record does not matter because the untimeliness of CSXT's contract claim "is apparent on the face of the complaint." *Goodman, supra*.

Hunter's employment contract.  The court rejected Hunter's argument that the employer breached the contract each month it failed to pay the allowance and the proper commission rate.  The court held that the employer's breaches were continual, as they were "always the same, and the [employer] never looked back to the previous pay cycle to adjust or evaluate Hunter's commission or monthly auto allowance.  Rather, the [employer] regularly and systematically applied the same rates and terms of compensation as the result of the breaches which occurred in 1990 and 1997, respectively."  635 F. Supp. 2d at 433.

As in these cases, the establishment of the 2009 Uniform Rate is a single continuous breach of the Operating Agreement.  CSXT's "entire harm" flowed directly from NPBL's establishment of the "prohibitively expensive" 2009 Uniform Rate, which "practically preclude[s]" CSXT "from using NPBL to connect to NIT."  NPBL's refusal to accept the 2018 Proposal did not give rise to a new or distinct injury.  CSXT continued to suffer the same alleged harm, *i.e.*, its purported inability to access NIT because of the "prohibitively high" 2009 Uniform Rate.  CSXT does not allege any new or distinct harm from the denial of the 2018 Proposal beyond that caused by the continued application of the 2009 Uniform Rate.  Further, like in *Fluor* and *Westminster*, CSXT's repeated attempts to get NPBL to not apply the 2009 Uniform Rate and instead provide CSXT with a special, lower rate—and thus cure NSR's alleged breach—did not create new claims.  At bottom, NSR allegedly has "continued to breach the [Operating Agreement] in exactly the same manner" for the past nine years.  *See Fluor, supra*.  Because CSXT did not file its lawsuit within five years of the establishment of the Uniform Rate, its claims are time-barred.

CSXT argues that the Court should disregard *Fluor* and follow *Kancor Americas, Inc. v. ATC Ingredients, Inc.*, 2016 U.S. Dist. LEXIS 23325 (E.D. Va. Feb. 25, 2016), in which the court found separate breaches of contract, not a continuous one.  *Kancor* is easily distinguishable.  The

plaintiff in *Kancor* sought to recover proceeds from separate sales. The amount due to the plaintiff for each sale was based in part on the commission for the sale, which was applied "on a case-by-case basis for each transaction." *Id.* at *18. "Each time Defendant allegedly withheld more than its agreed-upon commission from sales proceeds, it committed a new potential breach." *Id.* at *19. Indeed, the amount of damages caused by each breach depended on the specific terms of each individual transaction, not the continued application of a set dollar amount.

Here, there are no separate transactions, just the establishment of a set rate, the 2009 Uniform Rate. NPBL's founders decided in 1897 to require a uniform rate, and consistent with that requirement, NPBL established the 2009 Uniform Rate, which caused all of CSXT's alleged harm. NPBL's subsequent refusal to stop applying the 2009 Uniform Rate, including its refusal to accept the 2018 Proposal, is part of the same single, continuous alleged breach of the Operating Agreement.

### B. Even if not time-barred, CSXT fails to state a claim against NSR based on NPBL's failure to accept the 2018 Proposal.

CSXT claims that NSR had a contractual duty to cause NPBL to accept the 2018 Proposal. CSXT extracts a handful of passages from the Operating Agreement, and then attempts to impose its own subjective belief of how that language could be interpreted. While a contract must be construed as a whole, a party's belief as to the purpose of the contract cannot override the specific terms therein, and a plaintiff must plead that the defendant breached an actual obligation set forth in the contract to survive dismissal. *See MSSI Acquisition, LLC v. Azmat Consulting, Inc.*, No. 1:11-cv-01312, 2012 U.S. Dist. LEXIS 117745, *13 (E.D. Va. July 19, 2002) ("Under Virginia law, a plaintiff properly pleads a breach of contract claim where he alleges that the defendant (1) had a legally enforceable obligation, (2) materially breached that obligation, and (3) such breach

caused the plaintiff damage."). CSXT has failed to do this, which requires dismissal of its contract claim.

*First*, CSXT does not contest the fact that NSR cannot breach the Operating Agreement's recital that NPBL shall be operated as a "separate organization in which all are to be equally interested." (Compl. ¶ 106); *Virginia Fuel Corporation v. Lambert Coal Co.*, 291 Va. 89, 101 n.5 (2016) ("Recitals in a contract are not binding on the parties."). Rather, it merely mentions in a footnote that a recital is often helpful in the construction of contracts. (Opp. at 14 n.14.)

*Second*, the language in Article Tenth that the parties would "co-operate cordially in encouraging the business of the" NPBL is too indefinite to be enforced. Trying to define—and enforce—the contours of what constitutes cordial cooperation among shareholders is a fool's errand. While the Operating Agreement on whole remains valid, the vague language in Article Tenth is unenforceable. *See Nuline Indus. v. Media Gen., Inc.*, 32 Va. Cir. 352, 355 (Spotsylvania 1994) ("Although one part of the contract may be unenforceable because it is nothing more than an agreement to agree, the rest of the contract may be readily enforceable.") (quoting 17A Am. Jur. 2d, Contracts, § 35); *Glenn Distribs. Corp. v. Sanford, LP*, No. 12-513, 2014 U.S. Dist. LEXIS 55454, *10 (E.D. Pa. April 22, 2014) ("Even terms to which the parties agreed may be too indefinite to be enforced.") (citing Restatement (Second) of Contracts § 33).

*Third*, CSXT does not allege in the Complaint how NSR violated a duty of good faith and fair dealing. It asserts in its Opposition that NSR "has prevented CSXT from "deliver[ing] to the [NPBL] all cars to be interchanged with other Companies." (Opp. at 17) (internal quotations omitted). Yet, there is no allegation of fact in the Complaint that would support this baldly-stated conclusion.

*Finally*, CSXT argues that the Operating Agreement's requirement of a Uniform Rate set forth in Article Ninth is somehow ambiguous, which precludes dismissal of its contract claim. The article states in relevant part: a "uniform rate shall be fixed for the movement of freight cars over the [NPBL] railroad, regardless of distance." (Compl. Exh. A at p. 3.) The language is unambiguous and clearly means that NPBL has to charge a uniform rate for switching freight cars to/from connecting carriers, including a prohibition on differentiating based on the distance the cars are moved. There is simply no other reasonable interpretation of this language, and CSXT's unsupported assertion of ambiguity does not make it so. *See Babcock & Wilcox Co. v. Areva NP, Inc.*, 292 Va. 165, 179 (2016) ("'[a] contract is not ambiguous simply because the parties to the contract disagree about the meaning of its language.'") (quoting *Pocahontas Mining L.L.C. v. Jewell Ridge Coal Corp.*, 263 Va. 169, 173 (2002)). CSXT's reference to the rates that NPBL currently charges does not help its argument. While NPBL's tariff contains different rates for different services, it only has one switching rate—the 2009 Uniform Rate—for moving any freight cars to/from connecting railroads. CSXT, however, refuses to pay this 2009 Uniform Rate and instead has instituted this action to get a non-uniform contract rate,[3] notwithstanding the plain language of the Operating Agreement.

### C. The other new claims based on "separate and independent acts" on which CSXT now relies fail to state a claim even if not barred by the statute of limitations.

CSXT's last-gasp effort to avoid the bar of the statute of limitations relies on three other purported "separate and independent" acts for purposes of its Opposition. To be clear, none of

---

[3] CSXT disingenuously claims in passing for the first time in its Opposition that "nothing in CSXT's service proposal that requires only CSXT being granted the benefit of the proposed rate structure." (Opp. At 18.) CSXT has never proposed adjusting the 2009 Uniform Rate for all NPBL traffic, so by definition its proposal for a lower rate for NIT traffic, replete with CSXT specific volume commitments and service terms, is a request for a non-uniform rate for CSXT.

these acts are included in the detailed list of NSR's alleged breaches of the Operating Agreement set forth in Paragraph 107 of the Complaint. CSXT's retreat from the alleged breaches that it pled in the Complaint only reinforces the fact that its state-law claims are based on the establishment and continued application of the 2009 Uniform Rate and thus the claims are time-barred. What is more, the three "separate and independent acts" noted in the Opposition are meritless and fail as a matter of law.

*First*, CSXT asserts that NSR breached the Operating Agreement by "fail[ing] to allow, in a reasonably and timely manner, the movement of cars **delivered to NPBL by CSXT**, sacrificing NPBL's own profits from the business CSXT would otherwise deliver." (Compl. ¶ 55) (emphasis added). However, Article Tenth of the Operating Agreement does not impose any duty on NSR regarding rail cars that have been delivered to NPBL by other entities for interchange. Hence, CSXT has not pled a breach of any contractual duty by NSR based on this alleged conduct. *See MSSI, supra.*

*Second*, CSXT asserts that NSR breached Article Fifteenth of the Operating Agreement by "refusing to allow NPBL to use CSXT's fully fueled locomotives to access NIT." (Opp. at 11.) This Article prohibits shareholders' locomotives from entering upon or using the tracks of NPBL "for any purpose whatsoever," except "under such rules and regulations as may be established by" NPBL's Board of Directors. In other words, it prohibits NPBL's use of shareholder locomotives on NPBL's tracks. Therefore, CSXT's allegation, even if true, does not constitute a breach of the Operating Agreement by NSR.

*Finally*, CSXT argues that NSR breached the Operating Agreement by "threatening to enter into agreements 'to increase dramatically the charges that NPBL would pay to NS[R] for exercise of NPBL's rights to access NS[R] trackage.'" (Opp. at 11.) Again, CSXT fails to point

to any enforceable obligation of NSR in the Operating Agreement that has been breached by this alleged conduct.  Rather, this "threat" relates to the separate trackage rights agreement between NPBL and NSR, to which CSXT is not a party.  As explained in NPBL's Motion to Dismiss, the trackage right agreement's fee is the subject of an ongoing proceeding before the United States Surface Transportation Board ("STB"), which will determine the rate NPBL pays NSR for using NSR's track to NIT.  *See* Doc. 28 at 3-4.  There is simply no way NSR can breach the Operating Agreement based on a fee that is contained in a different agreement, and where the STB is exercising its exclusive jurisdiction to resolve a dispute between NPBL and NSR about the terms of that agreement.  Even if the alleged threat concerned the Operating Agreement, it would not constitute a breach as a matter of law.  *See Wootton Enters. v. Subaru of Am.*, 34 Fed. Appx. 57, 61 (4th Cir. 2002) ("Wootton's breach of contract claim based on an allegation of threats of termination is not cognizable because Subaru never did in fact terminate Wootton's dealership.").

In sum, CSXT's attempt to use its Opposition to replead its contract claim based on these newly alleged breaches fail because they are *all* based on the establishment and continuation of the 2009 Uniform Rate.  Therefore, Count V must be dismissed with prejudice.  For the same reasons, CSXT's state-law conspiracy claims (Counts VIII and IX), which now rely on these alleged breaches (*see* Opp. at 13), fail as a matter of law.

### IV. The Complaint fails to adequately allege a claim for tortious interference with business expectancy.

As explained in NSR's opening brief, Count VII of the Complaint plainly asserts a claim for tortious interference with *contract*: "As a ***shareholder*** of the NPBL, CSXT has reasonable business expectancies, including that the corporation will be managed and directed in a manner ***that is in accord with the Operating Agreement***, allowing CSXT access to NPBL trackage in Hampton Roads."  (Compl. ¶ 115) (emphasis added).  In its Opposition, however, CSXT insists

that Count VII is a claim for tortious interference with *business expectancy*. In doing so, CSXT again attempts, in effect, to recast its Complaint in its Opposition. Nonetheless, CSXT points only to the vaguest of allegations that allude to speculative future business that CSXT might obtain if it could avoid the application of the 2009 Uniform Rate, instead paying a lower, unique switching rate to NPBL.

"Proof of the business relationship/contractual expectancy and the intentional interference must meet an objective test, and mere subjective expectations that a business relationship will continue or appear are not enough to make a case for tortious interference." *Williams v. Reynolds*, No. 4:06CV00020, 2006 U.S. Dist. LEXIS 79178, *17 (E.D. Va. Oct. 31, 2006) (granting motion to dismiss tortious interference with business expectancy claim). "A case for tortious interference with prospective contract cannot be built on a 'mere possibility' of future economic benefit." *Id*. At best, CSXT has alleged a general expectancy that if NPBL charges CSXT an acceptable switching rate, it will get more business from its shipping partners. This is simply insufficient to state a claim for tortious interference with a business expectancy. *See Gov't Emples. Ins. Co. v. Google, Inc.*, 330 F. Supp. 2d 700, 705 (E.D. Va. 2004) ("'The evidence of an expectancy must establish expectancy by and between two parties at least, based upon something that is a concrete move in that direction.'") (quoting *Moore v. United Int'l Investigative Services, Inc.*, 209 F. Supp. 2d 611, 619-20 (E.D. Va. 2002)). Indeed, this Court has dismissed such claims as inadequately pled even when the plaintiff tries to identify the party with which it hopes to do business. *See McDonald's Corp. v. Turner-James*, No. 05-804, 2005 U.S. Dist. LEXIS 42755, *13 (E.D. Va. Nov. 29, 2005) ("merely identifying the parties with whom [plaintiffs] had discussions in 'several telephone calls' about 'various aspects of the restaurant and its operations' would still fall far short of what they must allege to proceed with their claim").

CSXT does not identify a single shipping partner in its Complaint (or its Opposition) that would do business with CSXT if it was able to force NPBL to not apply the 2009 Uniform Rate and instead set a rate that CSXT was willing to pay. Instead, it relies on "indications" of business from the Virginia Port Authority, which, to be clear, is not a shipper and thus cannot provide business to CSXT. At bottom, CSXT's claim is predicated on a series of aspirational, and downright speculative, assumptions: (1) NPBL will charge a lower switching rate; (2) that CSXT will deem it economical to pay to access NIT; (3) there is demand for CSXT's services at NIT; (4) CSXT will offer a price to provide those services that its unidentified shipping partners will accept; and (5) CSXT will make a profit on that business. The utter lack of specifics relating to CSXT's tortious interference claim requires its dismissal.

## **CONCLUSION**

CSXT had been complaining about NPBL's establishment of the 2009 Uniform Rate since 2010. Yet CSXT chose to sit on its right to file a lawsuit until 2018. Confronted with the clear bar of the statute of limitations, it has had to scramble to present arguments it thinks can save its state law claims. However, the bar is clear, and CSXT's arguments are without merit.

Therefore, the Court must dismiss with prejudice Counts V, VII, VIII and IX of the Complaint, with prejudice.

Date: January 7, 2019 　　　　　　　Respectfully submitted,

**NORFOLK SOUTHERN RAILWAY COMPANY**

<u>/s/ Michael E. Lacy</u>
Alan D. Wingfield (VSB 27489)
Michael E. Lacy (VSB 48477)
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Tel: 804-697-1200
Fax: 804-698-6061

Michael W. Smith (VSB 01125)
Craig T. Merritt (VSB 20281)
Belinda D. Jones (VSB 72169)
S. Perry Coburn (VSB 78372)
CHRISTIAN & BARTON, LLP
909 East Main Street, Suite 1200
Richmond, Virginia 23219
Tel.: (804) 697-4100
Fax: (804) 697-4112

*Attorneys for Defendant Norfolk Southern Railway Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 7th day of January, 2019, I electronically filed a copy of the foregoing with the Clerk of Court using the CM/ECF system, which sent a notification of such filing (NEF) to the registered participants as identified on the NEF to receive electronic service, including:

| | |
|---|---|
| Robert W. McFarland, Esq.<br>Benjamin L. Hatch, Esq.<br>E. Rebecca Gantt, Esq.<br>McGuireWoods LLP<br>World Trade Center<br>101 West Main Street, Suite 9000<br>Norfolk, Virginia 23510-1655<br>Telephone: (757) 640-3716<br>Facsimile: (757) 640-3930<br>rmcfarland@mcguirewoods.com<br>bhatch@mcguirewoods.com<br>rgantt@mcguirewoods.com<br><br>*Attorneys for CSX Transportation, Inc.* | Hugh M. Fain, III, Esq.<br>M. F. Connell Mullins, Jr., Esq.<br>John M. Erbach, Esq.<br>SPOTTS FAIN PC<br>411 E. Franklin St.<br>Richmond, VA 23219<br>Telephone: (804) 697-2000<br>hfain@spottsfain.com<br>cmullins@spottsfain.com<br>jerbach@spottsfain.com<br><br>*Attorneys for Jerry Hall, Thomas Hurlbut, and Philip Merilli* |
| James L. Chapman, IV, Esq.<br>W. Ryan Snow, Esq.<br>Darius K. Davenport, Esq.<br>David C. Hartnett, Esq.<br>CRENSHAW, WARE & MARTIN, P.L.C.<br>150 W. Main Street, Suite 1500<br>Norfolk, Virginia 23510<br>Telephone: (757) 623-3000<br>Facsimile: (757) 623-5735<br>jchapman@cwm-law.com<br>wrsnow@cwm-law.com<br><br>*Attorneys for Norfolk and Portsmouth Belt Line Railroad Company* | W. Edgar Spivey, Esq.<br>Clark J. Belote, Esq.<br>KAUFMAN & CANOLES, P.C.<br>150 W. Main Street, Suite 2100<br>Norfolk, VA 23510<br>Telephone: (757) 624-3196<br>Facsimile: (888) 360-9092<br>wespivey@kaufcan.com<br>cjbelote@kaufcan.com<br><br>*Attorney for Cannon Moss* |

/s/ Michael E. Lacy
Alan D. Wingfield (VSB 27489)
Michael E. Lacy (VSB 48477)
TROUTMAN SANDERS, LLP
1001 Haxall Point
Richmond, Virginia 23219
Tel: 804-697-1200
Fax: 804-698-6061

37301297v8