# Exhibit 1

Anthony J. LaRocca
202 429 8119
alarocca@steptoe.com



1330 Connecticut Avenue, NW
Washington, DC 20036-1795
202 429 3000 main
www.steptoe.com

April 18, 2019

**VIA E-FILING**

Ms. Cynthia T. Brown
Chief of the Section of Administration, Office of Proceedings
Surface Transportation Board
395 E Street, S.W.
Washington, DC 20423-0001

Re:   **Docket No. FD 36223, Norfolk Southern Railway Company—Petition to Set Trackage Rights Compensation—Norfolk & Portsmouth Belt Line Railroad Company**

Dear Ms. Brown:

Enclosed for e-filing on behalf of CSX Transportation, Inc. ("CSXT") is CSXT's Petition for Clarification or, if Necessary, Reconsideration, and Request to Hold Proceeding in Abeyance. Also enclosed (as a confidential document) is the authorization for payment of the applicable $300 filing fee, pursuant to 49 C.F.R. § 1002.2(f)(61)(i).

Please contact me with any questions.

Respectfully submitted,

Anthony J. LaRocca
Attorney for CSX Transportation, Inc.

Enclosures

Before the
SURFACE TRANSPORTATION BOARD

_____

Finance Docket No. 36223

NORFOLK SOUTHERN RAILWAY COMPANY
—PETITION TO SET TRACKAGE RIGHTS COMPENSATION—
NORFOLK & PORTSMOUTH BELT LINE RAILROAD COMPANY

_____

CSXT's Petition for Clarification or, if Necessary, Reconsideration,
and Request to Hold Proceeding in Abeyance

_____

Steven C. Armbrust
CSXT Transportation, Inc.
500 Water Street J-150
Jacksonville, FL 32202
(904) 359-1229

Louis E. Gitomer
Melanie B. Yasbin
Law Offices of Louis E. Gitomer, LLC
600 Baltimore Avenue, Suite 301
Towson, MD 21204
(410) 296-2250

Samuel M. Sipe, Jr.
Anthony J. LaRocca
Linda S. Stein
Peter W. Denton
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000

Attorneys for CSX Transportation, Inc.

Dated: April 18, 2019

Before the
SURFACE TRANSPORTATION BOARD

_____

Finance Docket No. 36223

NORFOLK SOUTHERN RAILWAY COMPANY
—PETITION TO SET TRACKAGE RIGHTS COMPENSATION—
NORFOLK & PORTSMOUTH BELT LINE RAILROAD COMPANY

_____

CSXT's Petition for Clarification or, if Necessary, Reconsideration,
and Request to Hold Proceeding in Abeyance

_____

Pursuant to 49 C.F.R. §1115.3, CSX Transportation, Inc. ("CSXT") hereby requests that the Surface Transportation Board ("STB" or "Board") clarify or, if necessary, reconsider several matters addressed in its March 29, 2019 decision ("Decision") in which the Board initiated a trackage rights compensation proceeding and granted CSXT's petition to intervene.  CSXT further requests that the Board consider holding the proceeding in abeyance while a pending federal antitrust case involving the parties to this proceeding is litigated.

## I.  Preface and Summary of Argument

CSXT has intervened in this proceeding to prevent Norfolk Southern Railway Company ("NSR") from using the Board's jurisdiction over trackage rights arrangements to further exclude CSXT from competing for intermodal traffic at one of the largest intermodal port facilities on the East Coast, the Norfolk International Terminal ("NIT").  NSR's Petition to Set Trackage Rights Compensation ("Petition") ignores the competitive issues raised by its request for a fee increase and treats the prescription of a new trackage rights fee as a simple exercise in arithmetic.  But the Supreme Court has made it clear that the Board's authority in this area involves "phases of the public interest."  *Thompson v. Texas Mexican Ry.*, 328 U.S. 134, 143

(1946) ("*Tex-Mex*").  It is not in the public interest for NSR to use the Board's fee prescription authority to exclude CSXT from a transportation market in which CSXT seeks to compete with NSR.  If NSR cannot show that its proposed increase in trackage rights compensation comports with the public interest in effective competition, the existing level of compensation, based on a trackage rights arrangement and fee-setting principles that have been in place for over 100 years, must remain in effect.

The Board issued its Decision establishing parameters for addressing NSR's petition to prescribe trackage rights fees before CSXT was admitted as a party to this proceeding and thus before CSXT had an opportunity to submit its views on how the proceeding should be structured.  While the Board properly recognized the need to address CSXT's competitive concerns, CSXT seeks clarification of some aspects of the Decision to ensure that those concerns can be properly addressed as the case proceeds.  CSXT does not believe that the requested clarifications are inconsistent with the overall thrust or framework of the Board's Decision, but to the extent that any of the requested clarifications is seen as in conflict with an element of the Decision, CSXT requests that the Board reconsider its Decision in that respect.

In particular, CSXT seeks clarification or reconsideration of the following issues:

**1. Showing of Competitive Effects.**  The Board's authority to prescribe trackage rights fees is subject to and requires consideration of the competitive effects of the proposed fee increase.  Accordingly, the Board should clarify that before any change in fees can be approved, NSR, as the proponent of a fee increase, has the burden to show that its proposed change in a long-standing trackage rights arrangement will not be anticompetitive.  If NSR fails to do so, its Petition must be

dismissed.  There would be no harm to the private or public interest in leaving in place a long-standing trackage rights compensation arrangement.

    **2.  Fee Prescription Methodology.**  The *SSW Compensation* methodologies discussed in the Decision are not a proxy for an assessment of competitive effects in a case like this, where the landlord has already excluded a competitor from the use of its lines through various anticompetitive means.  *SSW Compensation* is not a default mechanism that applies regardless of the competitive circumstances in a particular case.  The *SSW Compensation* methodologies were developed for a specific purpose – to preserve existing competition – that is not applicable here.  In the unusual circumstances here, where the landlord has used the line to restrict access to an important intermodal facility, the Board should recognize the possibility that the *SSW Compensation* methodologies will not be appropriate and it should give the parties freedom to advocate alternative methodologies if a party can show that the public's interest in effective competition requires a different approach.

    **3.  Discovery.**  The Board's regulations expressly authorize the conduct of discovery into matters relevant to the subject matter involved in a proceeding. Accordingly, the Board should clarify that it will permit discovery as to all matters potentially relevant to the impact of a prescribed trackage rights fee on competition and other public interest considerations that may be relevant under the governing statute.

    In addition to clarification or, if necessary, reconsideration of these three issues, the Board should consider holding this proceeding in abeyance while an antitrust case involving the parties is litigated.  CSXT's federal antitrust and state law claims in federal court in the Eastern District of Virginia are not before the Board.  However, public record evidence developed in the federal court on those claims could assist the Board in assessing the competitive effects of NSR's request

3

in this proceeding for an increased trackage rights fee. There is no urgency in this case to address a requested change in compensation terms. The parties have used the existing compensation arrangement with adjustments and escalation for many years. In addition, the volume of traffic using the trackage rights has been low and stable over the years, largely because NSR has managed to preclude competition over the line. Holding this proceeding in abeyance will cause no harm.

Following a brief discussion of the factual and procedural background to this proceeding, the grounds for CSXT's requests are discussed further below.

## II. Background

This proceeding involves a request by NSR for the Board to prescribe trackage rights fees for the use of certain NSR lines in the Norfolk area by the Norfolk & Portsmouth Belt Line Railroad Company ("NPBL"). NPBL was formed in 1896 by several railroads, including predecessors of NSR and CSXT, as a belt line railroad "for the mutual benefit of each" owner and in which "all [owners] are to be equally interested and each to have an equal representation."[1] Through a series of mergers and acquisitions, NPBL became currently owned by CSXT and NSR.

NPBL has had trackage rights over NSR lines serving what is now NIT since 1917.[2] With the development and rapid growth of intermodal traffic in recent years, the NIT has become one of the most important intermodal terminals serving ocean vessels on the East Coast. NSR's rail lines reach the NIT directly. NPBL has trackage rights over NSR lines, allowing NPBL to reach NIT. While CSXT does not have a rail line that accesses NIT directly, CSXT is able to access the NIT though switching services provided by NPBL, although CSXT has been precluded from such access for intermodal traffic by NSR's anticompetitive conduct.

---

[1] *See* ¶¶ 1, 17 of the antitrust complaint filed by CSXT with the Board on October 5, 2018. The antitrust complaint sets out the factual allegations underlying CSXT's claim that NSR has sought to exclude CSXT from competition.
[2] ¶ 1 of the antitrust complaint.

Notwithstanding the purpose of NPBL's creation, which was to provide equal access for NPBL's owners to facilities in the Portsmouth and Norfolk area, NSR has used its ownership of 57% of NPBL stock and control of the NPBL Board to manipulate the policies and practices of NPBL to advance NSR's interests and to prevent CSXT from becoming an effective competitor for intermodal traffic at NIT. NSR's predecessors obtained a 57% interest in NPBL based on a representation to the ICC that it would not control NPBL. *See NWS Enterprises,* Inc.—*Control—Norfolk & W. Ry. Co. and S. Ry. Co.*, FD No. 29430 (ICC served Oct. 1, 1980), *published at* 45 Fed. Reg. 66911, 66912 (Oct. 8, 1980) (noting that the companies subject to the control application, Norfolk & Western and Southern, each held less than 50% of various subsidiaries, including NPBL, and that they "do not now exercise control over such companies, and *have no intention of exercising control over these companies if the proposed transaction is approved.*") (emphasis added). NSR's predecessors never subsequently sought or obtained authority from the ICC or STB to control NPBL.[3]

In spite of its prior representation to the ICC, NSR has used NPBL to prevent CSXT from effectively competing for business at NIT, including:

- In 2008, NSR induced NPBL to agree to discontinue rail service and terminate access rights to a line segment between NS Junction at MP 1.40 and Carolina Junction at MP 2.30 that allowed efficient NPBL service between NIT and CSXT tracks.[4]

- In 2009, NSR induced NPBL, over CSXT's objection, to increase NPBL's switching rate for intermodal service to levels far above rates for comparable service charged by other short-line railroads.[5]

---

[3] CSXT reserves its right to challenge NSR's compliance with the statutory requirements governing a rail carrier's acquisition and exercise of control over another rail carrier.

[4] ¶ 58. *See Norfolk S. Ry. Co.—Discontinuance of Service Exemption—in Chesapeake, VA*, AB-290 (Sub-No. 299X), *Norfolk & Portsmouth Belt Line R.R. Co.—Discontinuance of Trackage Rights Exemption—in Chesapeake, VA*, AB-1024X (STB served May 15, 2008).

[5] ¶ 34 of the antitrust complaint.

- In 2010, NSR induced NPBL to reject a CSXT proposal for run-through intermodal service to NIT that would have allowed CSXT to compete for NIT traffic on a comparable basis with NSR.[6]

- In 2015, the only year in which CSXT has been able to move any intermodal traffic by rail to or from NIT, NSR used its control over the dispatching of traffic over the trackage rights line segment to impede the movement of CSXT's traffic.[7]

- In 2018, NSR induced NPBL to reject changes proposed by CSXT in NPBL switching rates that would have enabled CSXT to compete for NIT intermodal traffic.[8]

- Also in 2018, NSR induced NPBL to reject changes proposed by CSXT in the governance structure of NPBL that would ensure that NPBL decisions would be made in the interest of NPBL and all of its owners rather than in the interests of NSR.

The exclusionary actions by NSR led CSXT to file federal antitrust and state law claims in the United States District Court for the Eastern District of Virginia, on October 4, 2018, in Civil Action No. 2:18cv530. After CSXT sent a pre-suit demand letter, as required for breach of fiduciary duty claims, NSR filed on September 13, 2018, its Petition to Set Trackage Rights Compensation. The Petition said nothing about the purported need or justification for a change in the existing trackage rights fee. The only basis set out in the Petition for seeking Board intervention was that NSR wanted an increase in fees and NPBL did not agree to the increase. The Petition said nothing about the impact of an increase in trackage rights compensation on competition, market dynamics or shipper interests. NSR did not ask for an exemption from regulatory standards governing Board approvals of trackage rights arrangements. The theory of the Petition was that NSR is entitled to a prescribed trackage rights fee simply by asking for it.

---

[6] ¶ 46 of the antitrust complaint.
[7] ¶ 55 of the antitrust complaint.
[8] ¶ 40 of the antitrust complaint.

CSXT sought to intervene to prevent NSR from using the Board's jurisdiction over trackage rights to further NSR's anticompetitive objectives.  By opposing CSXT's intervention and complaining that CSXT may complicate the proceeding with evidence of NSR's anticompetitive conduct, NSR sought a free pass to increase trackage rights compensation and to keep the Board from considering the competitive implications of its request.  NSR is using the Board's fee-setting authority as a device to further secure its exclusive control over NIT intermodal traffic.  The Board should not allow itself to be misled.  The establishment of a new, higher trackage rights fee in this context would not be an innocuous regulatory act.  It would contravene the public interest in effective competition and would be a tacit accommodation of NSR's exclusionary practices.

In its Decision, the Board acknowledged that this proceeding arises in the context of a larger dispute over competition for intermodal traffic at NIT.  NSR, as the moving party, has the burden to establish that any change to the existing fee that it espouses is consistent with the public interest in effective competition.  The presumption at this point—with NSR having failed to assert an affirmative rationale for a new, prescribed fee and making it clear that it wants a higher fee—is that NSR seeks that higher fee as another measure to forestall competition from CSXT for NIT intermodal traffic.

## III.    Argument

### A.    The Board should clarify that NSR has the burden of demonstrating that its proposed increase in trackage rights compensation would not harm competition.

In the Decision, the Board correctly acknowledged that it has the authority to set compensation terms for trackage rights agreements.  As recognized in the cases cited by the Board, this authority is derived from the Board's authority under 49 U.S.C. §11323 to approve trackage rights agreements.  In *RailAmerica, Inc., Pet. To*

*Set Subsidy Terms Under 45 U.S.C. 744(c) & 49 CFR Part 1155*, FD 33285, slip op. at 5 (STB served June 24, 1998) ("*RailAmerica*"), the first case cited by the Board, the Board declined to set trackage rights compensation because the request did "not fall within the ambit of 49 U.S.C. 11323." In *Thompson v. Texas Mexican Ry.*, 328 U.S. 134, 146 (1946) ("*Tex-Mex*"), the second case cited by the Board, the Supreme Court explained that the power of the Interstate Commerce Commission ("ICC" or "Commission") to set trackage rights compensation derived from the requirement of Section 5(2)(a)(ii) of the Interstate Commerce Act, the predecessor to section 11323, that any trackage rights agreement must be approved by the Commission, now the Board.

*Tex-Mex* also established the public interest framework for prescribing trackage rights fees. As the Court explained in *Tex-Mex*, the exercise of the Commission's, now Board's, authority requires consideration of the public interest: "[t]hese matters involve not only the interests of the two parties to the trackage agreement but phases of the public interest as well." *Tex-Mex*, 328 U.S. at 143-44. The Court further explained that in setting trackage rights terms, "it is one of the [ICC's] high functions to protect the public interest against unfair or oppressive financial practices." *Id.* at 148.

Cases following *Tex-Mex* recognized that the setting of trackage rights compensation must be carried out based on considerations of the public interest. In *Atchison, T. & S. F. Ry. Co.—Operating Agreement*, 331 I.C.C. 367 (1967) ("*ATSF*"), an existing trackage rights agreement expired and the parties sought a prescription of new terms under the precursor to Section 11323(a)(6). The ICC undertook an extensive analysis of the public interest in the trackage rights arrangement and prescribed several terms and conditions, including compensation. *Id.* at 386. In *Great Northern Pac.—Merger—Great Northern*, 338 I.C.C. 782, 784-86 (1972), the ICC stated that it could not authorize trackage rights arrangements in a manner

that would cause the agency to "abdicate [its] responsibility to make the requisite findings of fact and the legal conclusion that the arrangements are consistent with the public interest.  Such a delegation would be unlawful." *Id.* at 785.

The statute governing the Board's public interest inquiry in trackage rights cases has evolved since these ICC decisions.  In 1980, the Staggers Act added current section 49 U.S.C. §11324(d) to address the public interest standard that applies to applications under section 11323 other than for the merger or control of Class I railroads.  Under section 11324(d), the public interest inquiry is focused, in the first instance, on the possibility of anticompetitive effects.  That section provides that the Board shall approve an application that does not result in a "substantial lessening of competition, creation of a monopoly, or restraint of trade" unless the anticompetitive effects are outweighed by the public interest in meeting a significant transportation need.  49 U.S.C. §11324(d).  Therefore, rather than applying a broad, open-ended public interest standard in effect pre-Staggers to consider transactions such as trackage rights agreements, now the Board's "primary focus is on the anticipated competitive effects."  *See Norfolk S. Ry. Co.—Acquisition & Operation—Certain Rail Lines of the Del. & Hudson Ry. Co., Inc.*, FD 35873, slip op. at 14 (STB served May 15, 2015).  If the Board finds adverse competitive impacts, then the public benefits of the transaction must outweigh those anticompetitive effects.  *Id.*

Specific findings on these public interest factors relating to competitive effects may not be necessary in fee-prescription cases – unlike this case – where a new trackage rights agreement has been approved, since the statutory requirements for Board action will likely already have been met.  Thus, in *RailAmerica*, the Board noted that it has "asserted jurisdiction to set terms and conditions of transactions that have been approved and authorized under 49 U.S.C. 11323."  *RailAmerica*, slip op. at 5.  In *N. Carolina R.R. Co.—Petition to Set*

9

*Trackage Compensation and Other Terms and Conditions—Norfolk S. Ry. Co.*, FD 33134, slip op. at 2, n.5 (STB served May 29, 1997) ("*North Carolina*"), the Board noted that the applicant had already received Board authorization for a transaction under Section 11323 prior to seeking a prescription of compensation terms for that authorized transaction.  In other cases, the Board previously addressed the statutory requirements and expressly allowed the parties to apply at a later time to the agency for modifications.  *See e.g.*, *New England Cent. R.R., Inc.—Trackage Rights Order—Pan Am S. LLC*, FD 35842, slip op. at 2 (STB served Oct. 31, 2017); *Atchison, Topeka & Santa Fe Ry. Co.—Operating Agreement—S. Pac. Transp. Co.*, 8 I.C.C.2d 297, 302-03 (1992) (modifying the order in *ATSF* discussed above).

NSR's Petition appears to assume that it can invoke the Board's jurisdiction to prescribe trackage rights fees simply by asking, without any discussion of competitive impact.  But as any applicant for Board authority must do, NSR must show that its proposed increase in existing trackage rights compensation terms is justified under the standards set out in the statute.  Indeed, the Board's rules regarding applications for Board authority under section 11323 require the applicant to present a prima facie case showing that the application is "consistent with the public interest."  49 C.F.R. §1180.4(c)(8).  The Board's rules further state that the applicant must provide information on "the effect of the transaction on inter- and intramodal competition, including . . . whether, as a result of the transaction, there is likely to be any lessening of competition, creation of a monopoly, or restraint of trade."  49 C.F.R. §1180.6(a)(2)(i).

While NSR is seeking new trackage rights terms, its Petition is devoid of any reference to these issues.  Unless and until the moving party shows that a new level of trackage rights compensation is in the public interest under the statutory standards, *Tex-Mex* and related cases make it clear that the existing arrangement

10

"remain[s] in effect" until the Board authorizes its discontinuance or approves a new trackage rights agreement. *North Carolina*, slip op. at 3.

As a result of NSR's failure to offer any discussion of competitive issues in support of its proposed change in trackage rights compensation, the Board could dismiss NSR's Petition on grounds that NSR ignored the statutory requirements for invoking the Board's authority.  However, if the Board chooses to address the competitive context of NSR's proposed increase in trackage rights fees at the same time that it addresses calculation alternatives – as it does, for example, when it addresses market dominance in rate reasonableness proceedings – the Board should clarify that NSR has the burden of showing that its proposed fee increase is not anticompetitive.  If NSR fails to make the required showing, the Board should dismiss NSR's Petition, allowing the existing compensation terms to remain in effect.

The competitive effects of the proposed fee increase will be a critical element in this case.  The existing trackage rights arrangement and fee-setting principles have been in place with adjustments and escalation for over 100 years without creating any impediment to NSR's ability to serve traffic on the line.  Very little traffic – none of which is intermodal – is now using the trackage rights at issue here precisely because NSR has been successful to date in excluding CSXT from access to NIT.  NSR's objective in setting a new, higher trackage rights fee is to cement, with the Board's imprimatur, its exclusion of CSXT from competition.  NSR will have a high burden to show that any increase in the trackage rights compensation is justified.

11

**B.    The Board should clarify that it will consider alternatives to the *SSW Compensation* methodology if necessary to address CSXT's competitive concerns.**

The Board stated that it "will establish compensation under the framework set forth in *SSW Compensation*," *Decision* at 5, and directed the parties to limit discovery and evidence "to the calculation methods recognized in *SSW Compensation* only," *id.* at 6.  The Board reached this decision noting that CSXT had not commented on the issue of calculation methodology, and that the other parties had not suggested an alternative to the *SSW Compensation* methodologies. *Decision* at 5-6, note 6.  CSXT did not comment on calculation methodologies because it had not yet been allowed to intervene in the proceeding.  And to the extent there was any discussion by other parties of the merits of the *SSW Compensation* approach or alternatives to it, it was at best in passing.[9]

The starting point for any consideration of an appropriate methodology is the Supreme Court's admonition in *Tex-Mex* that the prescription of trackage rights fees "involve[s] not only the interests of the two parties to the trackage agreement but phases of the public interest as well." *Tex-Mex,* 328 U.S. at 143-44.  In assessing the public interest, the statute requires that the proposed transaction not result in a "substantial lessening of competition, creation of a monopoly, or restraint of trade" unless the anticompetitive effects are outweighed by the public interest in meeting a significant transportation need.  49 U.S.C. §11324(d).

Nothing in the history of ICC or Board precedent involving trackage rights fees indicates that use of the *SSW Compensation* approach necessarily addresses these competitive factors.  None of the cases applying the *SSW Compensation* methodologies involves a fee increase by a landlord that has already succeeded in excluding a competitor from the line through other anticompetitive measures.  A

---

[9] *See, e.g.,* Reply of NPBL to Petition to Set Trackage Rights Compensation at 5, n.5 (filed Oct. 3, 2018); Reply of NSR to Motion to Strike and Mediation Request at 5, n.4 (filed Oct. 23, 2018).

technically accurate application of *SSW Compensation* would not amount to a showing that a new, higher trackage rights fee does not have anticompetitive effects under the circumstances here.  The *SSW Compensation* approach is not a default mechanism that applies regardless of the competitive circumstances in a particular case.  NSR's attempt to increase trackage rights fees as part of a larger anticompetitive scheme must be considered before concluding that the *SSW Compensation* methodologies, or other potential approaches, would be appropriate here.

Indeed, the *SSW Compensation* approach was developed for a particular objective in a very different setting, i.e., for use in merger proceedings to "preserve competition" that exists prior to a merger.  *See St. Louis Sw. Ry.—Trackage Rights Over Mo. Pac. R.R.—Kansas City to St. Louis*, 4 I.C.C.2d 668, 668-69 (1987).  In a typical horizontal merger case, a competitive transportation corridor exists pre-merger and the objective of the trackage rights fee prescription is to put a new carrier into the same competitive position as one of the incumbent carriers, whose competition will be eliminated by the merger.  The *SSW Compensation* approach was not developed to address a situation where the landlord has already managed to exclude competitors from use of the line.  An approach like *SSW Compensation* – specifically designed to preserve the competitive status quo – may satisfy the competitive requirements of the statute in most other trackage rights cases.  But in this case there is no competition to preserve. NSR has managed to exclude CSXT from competing for all intermodal traffic over the lines at issue.  If the *SSW Compensation* methodologies had the effect of contributing to that anticompetitive

13

situation by freezing the status quo into place, use of the *SSW Compensation* approach would clearly be anticompetitive.[10]

CSXT understands the Board's desire to manage this trackage rights compensation proceeding by providing guidance to the parties from the start. But it is unreasonable and premature for the Board to establish a rigid approach to the calculation methodology in this proceeding based on the sparse record that has been created until now. It also could be counterproductive, and potentially lead to more complicated proceedings, for the Board to establish rigid parameters for the submission of evidence at this time if it turns out that the *SSW Compensation* methodologies do not adequately address the unique competitive factors in this case.

The Board correctly noted that it has used the *SSW Compensation* methodologies in the past to set trackage rights compensation terms. *Decision* at 5-6. And if NSR meets its requirement to show a new trackage rights fee should be prescribed, CSXT understands why the Board would conclude that the *SSW Calculation* methodologies should be available to the parties in submitting proposed fee calculations, given their prior use in trackage rights proceedings. However, the Board also acknowledged the unique competitive issues raised by this proceeding and further noted that this is not a typical trackage rights compensation case where "the interests of shippers and connecting railroads would be expected to align with the interests of the trackage rights carrier (i.e., obtaining the lowest trackage rights fees possible)." *Decision* at 7.

The Board expressly stated that CSXT would be able to challenge particular *SSW Compensation* calculations based on their anticompetitive effect. *Decision* at

---

[10] The Board has recognized that the calculation methodology used to prescribe compensation may be driven by the particular competitive considerations raised in a particular case. *See, e.g., North Carolina*, slip op. at 3.

7.  But the Board failed to consider the possibility that *no* change in fees would be justified or that *no* calculations using the *SSW Compensation* methodologies would be appropriate to address the unique competitive circumstances in this case.[11] Therefore, CSXT respectfully requests that the Board allow the parties to present evidence and develop arguments for the use of alternative methodologies to *SSW Compensation* if a party can show that the public's interest in effective competition requires a different approach.

### C.  The Board should clarify that CSXT may pursue discovery on the statutory public interest factors, including the competitive effects of alternative trackage rights fees.

In accepting CSXT's Petition to Intervene, the Board noted that "CSXT has interests that might not be represented in the record absent its participation." *Decision* at 7.  The Board recognized CSXT's concern that "NSR's proposed increase in trackage rights fees, and potentially other terms in the draft trackage rights agreement, will make it even less likely that CSXT will be able to access [NIT] customers by rail in the future." *Id.* at 5.  The Board noted that CSXT was concerned that "a new trackage rights agreement could set compensation at a level that reduces the value of CSXT's ownership interest in NPBL and makes CSXT service to customers at NIT economically infeasible." *Id.* at 3.

The Board determined that CSXT must be able to address those concerns in the evidence filed in this proceeding, stating that "nothing in this decision limiting discovery to the framework set forth in *SSW Compensation* shall be construed to prohibit CSXT from arguing or submitting evidence that a particular *SSW*

---

[11] If the Board concludes that it must address CSXT's request under the standards governing reconsideration, CSXT's position is that since the Board recognized that CSXT had raised significant competitive concerns related to NSR's proposed trackage rights fee, it was material error for the Board not to give the parties sufficient flexibility to present evidence outside of the *SSW Compensation* framework if necessary to address those concerns.  *See* 49 C.F.R. §1115.3(b)(2).

*Compensation* calculation methodology could have an anticompetitive effect." *Id.* at 7.

The foregoing statements appropriately suggest that the competitive effect of new trackage rights fees will be an important consideration in this proceeding. Indeed, the statute requires consideration of the potential anticompetitive effects of a proposed transaction, potential changes in competitive dynamics, monopolization, and restraint of trade, and the possibility that, in some cases, those effects will be outweighed by other public interest considerations. But the Board then goes on to specify inexplicably narrow parameters for discovery. Specifically, the Decision also stated that "the parties should limit discovery to . . . the calculation methods recognized in *SSW Compensation* only." *Id.* at 6. The meaning of this latter statement is unclear. If the Board recognized the need for CSXT to submit evidence on the competitive effects of NSR's trackage rights fee proposal but also intended to prohibit CSXT from pursuing discovery on that subject, the Decision would be internally inconsistent and should be reconsidered.[12] Since the Board will have to assess the competitive effects of NSR's proposed increase in trackage rights compensation, as well as other potential public interest considerations, the Board should allow CSXT to pursue discovery relating to these considerations.

The Board's longstanding discovery standards permit discovery "regarding any matter, not privileged, which is relevant to the subject matter involved in a proceeding. . . ." 49 C.F.R. § 1114.21(a)(1). The statute defines the scope of considerations that will be relevant in this proceeding, including the competitive effects of NSR's proposed increase in trackage rights fees, and the Board should clarify that CSXT will be permitted to pursue discovery on those issues.

---

[12] Prohibiting discovery on public interest factors that are relevant to the Board's authority would amount to material error under 49 C.F.R. §1115.3(b)(2).

16

**D.    The Board should consider whether to hold this proceeding in abeyance pending resolution of the federal court antitrust claims.**

NSR's pleadings in this proceeding have already made it clear that NSR seeks to have the Board treat its request for a prescription of trackage rights compensation as a simple exercise in arithmetic, advancing its anticompetitive objectives under the radar without any scrutiny by the Board.  The Board should not, and cannot, carry out its regulatory functions in a compartmentalized fashion and ignore the competitive context in which NSR seeks regulatory intervention.  CSXT's concern over NSR's anticompetitive conduct involving one of the largest port facilities on the East Coast is so urgent that CSXT has filed antitrust claims against NSR in federal court.

CSXT expects that the federal antitrust case will permit a full examination of NSR's anticompetitive conduct and intent through discovery and the submission of fact and expert evidence in that case.  The evidence developed in that case could assist the Board in assessing the competitive issues relating to the NSR's request in this proceeding for a prescribed trackage rights fee.  The Board should therefore consider putting this proceeding in abeyance while the antitrust case is litigated.

CSXT acknowledges that abeyance might not be appropriate in a case where there was a demonstrated need for timely regulatory intervention.  But there is no urgency here to address NSR's fee prescription request.  NSR claims to have terminated the prior trackage rights agreement over two and a half years ago and the parties have continued to operate under the terms of the terminated agreement.  *Decision* at 2.  NSR has pointed to no commercial, operational, strategic or other factor requiring prompt action by the Board – indeed, NSR's petition contained no discussion at all of any purported need or justification for Board action other than the fact that NSR had chosen to terminate the existing trackage rights agreement

because it was "antiquated" and the parties to the agreement have not agreed on substitute compensation terms. NSR Petition at 3.

The Board has held compensation proceedings in abeyance in other cases where the resolution of collateral matters could inform the prescription of a fee for use of a carrier's line or obviate the need for a fee prescription, which CSXT believes is the appropriate outcome here. In the *North Carolina* proceeding, the Board held the lease compensation proceeding in abeyance to give the landlord an opportunity to negotiate a buy-out of the stock of minority shareholders and reopen lease negotiations with the tenant. *North Carolina*, slip op. at 4-5. That proceeding was eventually settled and was dismissed without the Board ever having to prescribe a fee.

## IV. Conclusion

For the reasons set out above, CSXT requests that the Board clarify or reconsider its March 29, 2019 Decision in this proceeding in the areas described above. Alternatively, CSXT requests that the Board hold this proceeding in abeyance pending the outcome of the federal antitrust case.

18

Respectfully submitted,

Steven C. Armbrust

CSXT Transportation, Inc.

500 Water Street J-150

Jacksonville, FL 32202

(904) 359-1229

    /s/ Anthony J. LaRocca    .

Louis E. Gitomer

Melanie B. Yasbin

Law Offices of Louis E. Gitomer, LLC

600 Baltimore Avenue, Suite 301

Towson, MD 21204

(410) 296-2250

Samuel M. Sipe, Jr.

Anthony J. LaRocca

Linda S. Stein

Peter W. Denton

Steptoe & Johnson LLP

1330 Connecticut Avenue, NW

Washington, DC 20036

(202) 429-3000

Attorneys for CSXT Transportation, Inc.

Dated: April 18, 2019

## CERTIFICATE OF SERVICE

I certify that on April 18, 2019, I have served copies of CSXT's Petition for Clarification or, if Necessary, Reconsideration, and Request to Hold Proceeding in Abeyance upon all parties of record in this proceeding, by email.

_____

Peter W. Denton