EXHIBIT 1

# BAKER & MILLER PLLC

ATTORNEYS and COUNSELLORS
2401 PENNSYLVANIA AVENUE, NW
SUITE 300
WASHINGTON, DC  20037
TELEPHONE:  (202) 663-7820
FACSIMILE:   (202) 663-7849

ENTERED
Office of Proceedings
May 8, 2019
Part of
Public Record

William A. Mullins

Direct Dial:  (202) 663-7823
E-Mail: wmullins@bakerandmiller.com

May 8, 2019

**VIA E-FILING**
Cynthia T. Brown, Chief
Section of Administration, Office of Proceedings
Surface Transportation Board
395 E Street, SW
Washington DC  20423-0001

Re:    FD 36223
       Norfolk Southern Railway Company – Petition To Set Trackage
       Rights Compensation – Norfolk & Portsmouth Belt Line Railroad
       Company

Dear Ms. Brown:

Enclosed is the Reply of Norfolk Southern Railway Company to CSX's Petition for
Clarification or, if Necessary, Reconsideration, and Request to Hold Proceeding in Abeyance.  If
there are any questions about this matter, please contact me directly, either by telephone:  (202)
663-7823 or by e-mail:  *wmullins@bakerandmiller.com*.

Sincerely,

William A. Mullins

cc:    Parties of Record

**BEFORE THE**
**SURFACE TRANSPORTATION BOARD**

———————————————

**DOCKET NO. FD 36223**

———————————————

**NORFOLK SOUTHERN RAILWAY COMPANY**
**– PETITION TO SET TRACKAGE RIGHTS COMPENSATION –**
**NORFOLK & PORTSMOUTH BELT LINE RAILROAD COMPANY**

———————————————

**REPLY OF NORFOLK SOUTHERN RAILWAY COMPANY TO CSX'S PETITION**
**FOR CLARIFICATION OR, IF NECESSARY, RECONSIDERATION, AND REQUEST**
**TO HOLD PROCEEDING IN ABEYANCE**

———————————————

Garrett D. Urban
NORFOLK SOUTHERN CORPORATION
Three Commercial Place
Norfolk, VA 23510
Tel:   (757) 533-4939
Fax:   (757) 533-4872

William A. Mullins
Crystal M. Zorbaugh
BAKER & MILLER PLLC
2401 Pennsylvania Ave., NW
Suite 300
Washington, DC  20037
Tel:  (202) 663-7820
Fax: (202) 663-7849

Attorneys for Norfolk Southern Railway
Company

Dated:  May 8, 2019

- 1 -

## TABLE OF CONTENTS

PREFACE AND SUMMARY OF ARGUMENT .....................................................................3

FACTUAL BACKGROUND....................................................................................................5

LEGAL STANDARD AND ARGUMENT ..............................................................................6

I.  THE PETITION SHOULD BE DENIED BECAUSE CSX'S ARGUMENTS FOR NON-SSW METHODOLOGIES AND EVIDENCE ARE UNTIMELY...............6

II.  IF THE BOARD IS INCLINED TO CONSIDER THE MERITS OF CSX'S ARGUMENTS, CSX'S APPROACH SHOULD BE REJECTED AS CONTRARY TO PRECEDENT AND BASED UPON UNSOUND THEORIES........................9

   A.  Not Material Error To Hold Board Precedent Requires Application Of SSW ............................................................................................................10

   B.  CSX's "Competitive Analysis" Standard Conflates and Misconstrues the Relevant Statutory Standards ....................................................................13

   C.  The Board Should Not Allow CSX To Use This Proceeding To Seek Competitive Access Without Complying With Section 11102...................16

III.  CSX CAN PURSUE ITS CONTRADICTING THEORIES THROUGH OTHER MEANS AND FORUMS........................................................................................17

   A.  A Section 11102 Competitive Access Claim....................................................18

   B.  An Antitrust Complaint...................................................................................19

CONCLUSION.........................................................................................................................19

**BEFORE THE**
**SURFACE TRANSPORTATION BOARD**

_____

**DOCKET NO. FD 36223**

_____

**NORFOLK SOUTHERN RAILWAY COMPANY**
**– PETITION TO SET TRACKAGE RIGHTS COMPENSATION –**
**NORFOLK & PORTSMOUTH BELT LINE RAILROAD COMPANY**

_____

**REPLY OF NORFOLK SOUTHERN RAILWAY COMPANY TO CSX'S PETITION**
**FOR CLARIFICATION OR, IF NECESSARY, RECONSIDERATION, AND REQUEST**
**TO HOLD PROCEEDING IN ABEYANCE**

_____

**PREFACE AND SUMMARY OF ARGUMENT**

On April 22, 2019, CSX Transportation, Inc. ("CSX") has filed what is, in effect, a

petition for reconsideration ("Petition") of the Board's March 29, 2019 decision ("Decision").[1]

The Petition is based upon an assertion of material error.[2] The premise of the alleged material

error is the Board's decision to limit the scope of this proceeding to the application of the SSW

methodology. CSX asks the Board to allow argument and evidence that a methodology other

than SSW should be applied. According to CSX, the Board should set the trackage rights fee

with only one permissible goal in mind: the trackage rights fee needs to be low enough that CSX

_____

[1] The Decision granted CSX's Petition to Intervene; rejected CSX's argument that the Board
must approve or exempt a new trackage rights agreement between Norfolk Southern Railway
Company ("NS") and Norfolk & Portsmouth Belt Line Railroad Company ("NPBL") prior to
establishing trackage rights; directed the parties to meet and confer on a non-bifurcated
procedural schedule; and directed the parties to limit discovery to and present evidence on
matters related to the calculation methods recognized in SSW only.

[2] CSX admits as much and notes that its petition for reconsideration is based upon material error.
See Petition, n. 11 ("[S]ince the Board recognized that CSX had raised significant competitive
concerns related to NSR's proposed trackage rights fee, it was material error for the Board not to
give the parties sufficient flexibility to present evidence outside of the SSW framework if
necessary to address those concerns.").

- 3 -

itself is satisfied that it will be able to avail itself of NPBL switching service to access the Norfolk Intermodal Terminal ("NIT") at a switching rate that CSX deems sufficient to be "competitive" with NS.

CSX's Petition should be denied. It was not material error to limit this proceeding to application of the SSW methodology. As an initial matter, CSX could have raised its argument in its earlier filings prior to the Board's Decision, especially because CSX knew that SSW and competitive issues were at the center of the dispute. CSX's failure to do so precludes it from asserting that the Board committed material error in failing to consider its unraised claims.

As for the merits, CSX has the burden of proof to establish there was material error in the Decision. Establishing material error is a high bar, and CSX has not met that standard. There is no basis in law or fact for applying any other methodology but SSW to set trackage rights compensation. It is undeniable, of course, that the Board considers the public interest and competitive standards of 49 U.S.C. § 11323 in determining whether to approve the initial acquisition of trackage rights. Here, however, the trackage rights were granted over one hundred years ago and are already subject to the STB's jurisdiction. As such, this is a simple fee prescription case no different than any other situation where the Board has been asked to set terms and conditions of an expired trackage rights agreement according to SSW.

In contrast, CSX's approach would expand this proceeding far beyond the establishment of the trackage rights fee under SSW and attempt to bring in issues of alleged anticompetitive conduct, examinations of market conditions, and arguments over what fee should be adopted based on the, at best, indirect effects of any compensation decision on the separate switching rate NPBL offers CSX. Those issues are more appropriate to raise in other proceedings or forums. Indeed, if CSX believes NS or NPBL is abusing market power, CSX can file a petition with the

- 4 -

Board seeking competitive access under 49 U.S.C. §11102.  Moreover, CSX already is seeking

to convince the court in its pending federal court complaint that NS or NPBL have violated

federal antitrust and other state laws.  Such issues, however, are not appropriate for consideration

in a trackage rights compensation proceeding, and it was not material error for the Board to limit

this proceeding to the SSW methodology.  The Board should reaffirm that discovery, evidence,

and argument should be limited to application of SSW, nothing more and nothing less.

## FACTUAL BACKGROUND

Although the Board is familiar with this proceeding, it is worth briefly restating the

factual predicate for this proceeding, given CSX's repeated mischaracterizations.  NPBL holds

trackage rights to operate over NS in Norfolk, Virginia, that date to 1917 agreements with NS's

predecessors.  However, those contractual agreements and their terms have been terminated since

2016.  NS and NPBL sought to negotiate a replacement agreement, but have been unable to

agree on compensation.  Accordingly, NS filed a request for the Board set the compensation for

NPBL's use of its trackage rights given the lack of any agreement.  NPBL concurred that the

Board should determine the trackage rights fee.

CSX, which does not operate over the subject line or pay the trackage rights

compensation at issue, intervened in the proceeding citing its interest as a connecting carrier.

CSX has expressed concern about the theoretical impact of the trackage rights fee determination

on the separate switch rate NPBL charges CSX for switching traffic to customers accessible via

NPBL's access over NS.  At the same time, CSX is pursuing a number of allegations under

federal antitrust law and various state causes of action in federal court against NS and NPBL.

## LEGAL STANDARD AND ARGUMENT

Regardless of how CSX captioned its filing, CSX's Petition, when boiled down to its essence, is a petition for reconsideration, not clarification, and it should be rejected. CSX has not met the standard for reconsideration. To prevail, CSX, as the proponent, carries the burden of demonstrating that the Board's decision "will be affected materially because of changed circumstances or new evidence," or that the Decision "involves material error."[3] 49 C.F.R. § 1115.3(b). See Can. Pac. Ry. – Control – Dakota, Minn.& E. R.R., FD 35081, slip op. at 4 (STB served May 7, 2009). The Board may grant reconsideration based on material error only when the petitioner fully establishes that the Board's analysis or findings in question were flawed after reconciling the record at the time of the Board's decision with applicable statutory provisions and precedent[4] In evaluating a petition for reconsideration, the Board and the courts engage in a backward-looking analysis of the information the agency had before it at the time it arrived at its decision. CSX has not established that the Board committed a material error because CSX has not proven that the Board's application of SSW is inappropriate in this case.

## I.     THE PETITION SHOULD BE DENIED BECAUSE CSX'S ARGUMENTS FOR NON-SSW METHODOLOGIES AND EVIDENCE ARE UNTIMELY

STB precedent is clear. A party cannot raise new arguments, offer new analysis, or newly-presented evidence in a petition for reconsideration and then claim it was material error

---

[3] Claims of material error must be substantiated. This requires more than a general allegation, restatement of arguments previously made, or expounding upon evidence previously submitted. See Canadian National Railway Company and Grand Trunk Corporation – Control – EJ&E West Company, FD 35087 (Sub-No. 8), slip op. at 3 (STB served Nov. 4, 2015) ("CN EJ&E").

[4] Moreover, the error must be one that "would mandate a different result." See Montezuma Grain Co. v. STB, 339 F.3d 535, 541-42 (7th Cir. 2003); Or. Int'l Port of Coos Bay – Feeder Line Application – Coos Bay Line of Cent. Or. & Pac. R.R., FD 35160, slip op. at 2 (STB served Mar.12, 2009).

for the Board to refuse to consider those arguments. See Sunbelt Chlor Alkali Partnership v.

Norfolk Southern Railway Company, NOR 42130, slip op. at 3-6 (STB served June 30, 2016);

reconsideration denied Sunbelt Chlor Alkali P'ship v. Surface Transp. Bd., 2018 U.S. App.

LEXIS 2064, at *7 (explaining Sunbelt cannot introduce a new argument (compensation

methodology) on reconsideration and claim the Board erred by not considering that argument

earlier).[5]  Yet that is precisely what CSX is seeking to do.  This should be rejected.

   CSX previously filed a petition to intervene in this proceeding ("Pet. To Intervene").  In

that Pet. To Intervene, CSX set forth various arguments about the merits of the proceeding and

why NPBL could not adequately represent its interests and/or would not raise CSX's competitive

and antitrust arguments.  Indeed, CSX (and NPBL) set forth substantial argument about why the

Board should "bifurcate" the proceeding to first allow debate about what SSW methodology

should apply.  Despite having "significant competitive concern," Petition at 15, n. 11, and

knowing full well that NS and NPBL advocated application of SSW, CSX chose not to comment

on the application of SSW.  Indeed, CSX may have anticipated taking the precise path that it

takes now, i.e., avoid comment, wait and see what the Board does, and then, after the fact, claim

material error if unsatisfied with the Board's decision.

   Such an approach should be rejected.  CSX stayed silent.  CSX chose not to raise any

concerns that SSW, the sole methodology being proposed to calculate trackage rights

compensation in the proceeding, is not appropriate because it might result in a compensation

level that CSX believes would limit its ability to access NPBL-served customers.   Having failed

---

[5] See Toledo, Peoria & W. Ry. v. Surface Transp. Bd., 462 F.3d 734, 2006 U.S. App. LEXIS
22783, at *753 (2006) (finding Board acted within discretion when it rejected evidence that
could have been raised earlier and stating nothing in the regulations obliges the agency to rethink
its decisions whenever a party wishes to try out a new theory or offer new information at a late
stage in the process.).

to raise the issue previously, it was not material error for the Board to issue a decision limiting

the proceeding to SSW. See New England Central Railroad, Inc. – Trackage Rights Order – Pan

Am Southern, LLC, FD 35842 (STB served April 26, 2018) ("PAS").

If not considered untimely raised, then CSX's newly created arguments regarding

application of the competitive standards of Section 11323 should be rejected on the basis that

they are simply re-packaging and re-arguing its previous "bifurcation" argument. CSX even asks

the Board to allow the parties to put in evidence and argument on whatever methodology they

choose after extensive discovery; forcing the other parties to then argue over that methodology

and then the application of that methodology. The Board has already considered such an

approach and rejected it.

CSX had an opportunity to object to SSW and advocate for another methodology, but

declined to do so, despite expressing concerns that a new trackage rights agreement could set

compensation at a level that would make NPBL's offering of switching services to NIT

economically infeasible. Pet. to Intervene at 6. Contrary to CSX's claims, nothing prohibited

CSX from raising concerns over the methodology to be applied by the Board in its Pet. to

Intervene. Having failed to raise its argument previously, even though it had an opportunity to

do so, the Board should reject CSX's attack on SSW as untimely.[6]

---

[6] CSX's statement that the Board ordered the parties to apply SSW before CSX had an
opportunity to submit its views is nothing more than CSX recognizing in hindsight that it erred in
failing to address application of SSW in its Pet. To Intervene. CSX could have done so at the
time, as NS and NPBL did in their briefing. CSX, in fact, made many other arguments,
including allegations of anticompetitive conduct and its inability to compete. CSX cannot blame
the Board for its failure to raise its newly proposed methodology and new arguments regarding
Section 11323.

The Board should also reject CSX's Petition because it is simply an attempt to broaden

the scope of and delay the resolution of the issues before the Board.[7]  Given that no party

objected to the application of <u>SSW</u>, and CSX had every opportunity to object, it was not material

error for the Board to order the parties to solicit discovery[8] and offer a methodology based solely

on <u>SSW.</u>

## II.    IF THE BOARD IS INCLINED TO CONSIDER THE MERITS OF CSX'S ARGUMENTS, CSX'S APPROACH SHOULD BE REJECTED AS CONTRARY TO PRECEDENT AND BASED UPON UNSOUND THEORIES

The substance of CSX's argument is that <u>SSW</u> should not be applied in setting a trackage

rights fee where a trackage rights agreement has expired and the two carriers cannot agree on a

new rate.  Instead, CSX wants to change over twenty-five years of precedent.  It now claims that

a rate prescribed between a landlord and tenant carrier should be set at a level that guarantees (to

CSX's satisfaction) that a third-party connecting carrier (CSX) can provide competitive service

via switching by the tenant carrier to one or more of the customers accessible via the trackage

rights line.  In CSX's mind, the only consideration in setting compensation should be the impact

on the third party connecting carrier (CSX) – not placing "a trackage rights tenant in the same

---

[7] Ironically, the Board granted CSX the right to intervene because it found doing so would not disrupt the schedule and would not unduly broaden the issues.  Yet CSX, in seeking to revisit bifurcation, present alternate methodologies, expand discovery, and adopt a protracted procedural schedule similar to that applied in stand-alone rate cases, is expressly seeking to broaden and delay resolution of the issues before the Board. These are the very reasons that NS objected to CSX's intervention in the first place.  The Board would be well within its rights to reconsider its decision to allow CSX intervention based on its disregard for the limits on its intervention.

[8] CSX wants discovery on "all matters potentially relevant to the impact of a prescribed trackage rights fee on competition and other public interest considerations." <u>See</u> CSX's Petition, at 3. This is an extremely broad standard and encompasses much more than the simple application of <u>SSW</u>.

position as a landlord;"[9] not a recovery of variable costs; not a proportionate share of expenses

on the line; not a return on invested capital; not ensuring competitive parity[10] and not any other

Rail Transportation Policy factor, such as the ability of a carrier to achieve adequate revenues.

Instead, CSX asserts that the Board should not allow any deviation from the expired trackage

rights rate – which CSX does not pay and applies to a line over which CSX does not operate – if

it would indirectly impact the economics of CSX's service to a particular customer.  CSX

mistakes the public interest with its own.  These arguments are contrary to long-standing

precedent and are unsound, both legally and economically.  They should be rejected.

> A.    Not Material Error To Hold Board Precedent Requires Application Of SSW

As an initial matter, both parties to the trackage rights agreement – NS and NPBL –

agreed that SSW was the appropriate methodology.  Decision at 5, n. 6.  The Board itself

affirmed application of SSW.  CSX wants the Board to reject such an approach, and, at a

minimum, keep the existing rate the same. But CSX fails to recognize that there is no

presumption that an expired contract rate (and escalation methodology) set in 1917 should

continue to apply in perpetuity.  Indeed, one of the underlying reasons that SSW was created was

precisely to establish a new rate that creates a level playing field between tenant and landlord.[11]

---

[9] W. Coal Traffic League v. STB, 169 F.3d 775, 781 (D.C. Cir. 1999); see also SSW I, 1 I.C.C.2d 776, 786 (1984) (purpose of SSW is "to set compensation for the trackage rights which will put the tenant in the same position as the owning carrier").

[10] PAS at 8.

[11] See PAS at 8 ("The purpose of SSW Compensation is to 'place a trackage rights tenant in the same position as a landlord.' W. Coal Traffic League v. STB, 169 F.3d 775, 781 (D.C. Cir. 1999).  Maintaining a fixed fee from 1990 as CSX advocates, and at a fraction of the fee appropriately calculated under SSW Compensation, would not accomplish the goal of putting the tenant and landlord on equal footing. See Union Pac. Corp.—Control & Merger—S. Pac. Rail Corp., FD 32760 (Sub-No. 21), slip op. at 11 (STB served Dec. 15, 2000) ("the landlord would end up subsidizing the tenant, it would not receive an adequate return, and there would be no

Indeed, since adoption of SSW, there is not a single case involving the setting of the trackage rights fee in an expired trackage rights agreement where SSW was not applied. Nor is there a single case (outside of a competitive access case), even going back to the adoption of the Tex Mex[12] doctrine itself, where the ICC or the STB allowed a third party not part of the trackage rights agreement to intervene in a trackage rights dispute and the Board set the trackage rights fee on the basis that the third parties' concerns should take precedence over all other legal and policy considerations. CSX necessarily ignores all of that in making its unsupported arguments.[13]

Most generously, CSX argues that SSW was originally created to be used in merger cases and provide for competition. In that sense, CSX is correct, but this is not a merger case.[14] Moreover, CSX overlooks the fact that the Board has consistently applied SSW in numerous merger and non-merger cases. For over twenty-five plus years, SSW has been applied when parties to a trackage rights arrangement, such as NS & NPBL, have ongoing trackage rights but

economic incentive for it to maintain or replace the line as necessary to continue efficient service.").

[12] Thompson v. Texas Mexican Ry., 328 U.S. 134, 147-150 (1946) ("Tex Mex").

[13] CSX wants the Board to allow it, as an intervenor, to use this proceeding as a fishing expedition to expand discovery, attack SSW, and prolong resolution of the issue before the Board all because CSX believes the methodology might yield a "level that makes CSX service to customers at the NIT economically infeasible (Pet. to Intervene, at 6)." Allegations and conjecture are not a valid basis for the Board to reverse its previous decision to apply SSW. See n. 3, CN/EJ&E.

[14] Even in a merger case where the Board has imposed trackage rights to ensure two carrier competition between a given origin and destination or to a particular shipper(s), the Board has applied SSW. It has not modified, changed, otherwise applied a different methodology, or undertaken a "competitive" analysis to determine that the SSW rate will actually foster competition. This is because inherent in SSW is the notion that landlord and tenant are being placed on equal footing. No one party is given an advantage over the other. CSX would change that equation and place its interests above NS's or NPBL's.

cannot agree on contractual terms and/or compensation.  As noted, there is not a single merger or trackage rights case (outside of a competitive access proceeding) where SSW was not applied.

CSX also fails to recognize that SSW is already pro-competitive because it was designed to place the landlord and tenant on a level playing field.  Put simply, SSW was not created to guarantee that a tenant could actually compete, but rather to give a tenant the opportunity to compete by ensuring that the landlord and the tenant both incur the same costs and investment requirements and then allowing the marketplace to control.[15]  Requiring the Board to ensure that the rate does not foreclose competition by connecting carriers (as CSX advocates) is fundamentally inconsistent with the very reason SSW has been consistently applied -- to ensure revenue adequacy and competitive parity in order to facilitate the goals embodied in the rail transportation policy of 49 U.S.C. § 10101.  See PAS at 10; and Burlington Northern Inc. and Burlington Northern Railroad Company – Control and Merger – Santa Fe Pacific Corporation and the Atchison, Topeka and Santa Fe Railway Company, 10 I.C.C. 2d 661, 1995 ICC Lexis 214 (STB served Aug. 16, 1995) (rejecting arguments that tenant should be given a competitive advantage and explaining that the purpose of SSW is to put the tenant in the same economic position as the landlord, which means the tenant must contribute to the variable costs imposed on the landlord by the tenant's operations, and a share of opportunity costs of capital on the landlord's threshold investment).

Imposing a terminated contractual rate dating to 1917, or applying some other "competitive analysis" standard, as advocated by CSX, fails these statutory and policy goals.

---

[15] See SSW I, 1 I.C.C.2d 776, 786 (1984).  The compensation established must "put the tenant on an equal footing with the landlord." See WCTL, 169 F.3d at 781.  Absent such a requirement, the landlord would end up subsidizing the tenant, it would not receive an adequate return, and there would be no economic incentive for it to maintain or replace the line as necessary to continue efficient service.  See also Missouri Pac. R. Co. v. ICC, 23 F.3d 531, 534 (D.C. Cir. 1994).

The simple truth is CSX's goal in this proceeding is to prevent NS from being compensated under the equitable <u>SSW</u> methodology developed by the Board. CSX admits as much. <u>See</u> Petition at 13 (asserting that a "technically accurate application of <u>SSW Compensation</u>" would not be satisfactory to CSX). That methodology ensures competitive parity (and promotes revenue adequacy). That methodology ensures that NS does not subsidize NPBL or connecting carriers (like CSX). Anything less than <u>SSW</u> would provide NPBL (and thus CSX) with a competitive advantage and place CSX's interests above any others.

 B. <u>CSX's "Competitive Analysis" Standard Conflates and Misconstrues the Relevant Statutory Standards</u>

 In arguing that <u>SSW</u> should not apply, CSX conflates the Board's authority to approve a transaction with its authority to fix the terms and conditions of an already approved trackage rights agreements when parties are unable to agree on continued compensation. The argument appears to be (although not explicitly so drafted -- perhaps in a deliberate attempt to conflate pre-1980 public interest standards with post-1980 standards) that because this trackage rights agreement was not approved post-Staggers Act, that NS and NPBL must first seek approval of the trackage rights agreement under the post-Staggers statutes by invoking the Board's jurisdiction to "approve" the trackage rights agreement under 49 U.S.C. §11323. Then, and only then, can the Board set the terms and conditions.[16] And in undertaking these steps, NS must somehow prove that the compensation to be set by the Board (as opposed to the acquisition of trackage rights itself) is in the public interest and would not substantial lessen competition, create a monopoly, or restrain trade, <u>i.e.</u>, make a Section 11323 showing. Of course CSX cites no cases

---

[16] Indeed, CSX's theory seems to imply (incorrectly under <u>Tex Mex</u>) that NS alternatively could discontinue the trackage rights without Board authority.

for such a theory or proposition, nor could it. Indeed, there are several problems with CSX's circular and sophistic argument.

As an initial matter, CSX's argument that "NSR's Petition appears to assume that it can invoke the Board's jurisdiction to prescribe trackage rights fee simply by asking, without any discussion of competitive impact," Petition at 10, has already been considered and rejected. The Board properly rejected CSX's "needs new approval" argument in its Decision by recognizing that the Supreme Court and the Board have long established that the Board has continuing jurisdiction over all trackage rights operations until that jurisdiction is removed. This jurisdiction includes the setting of compensation for trackage rights agreements, regardless of when that trackage rights agreement was initially approved.[17] This is so even for trackage rights agreements that were approved prior to the adoption of what is now 49 U.S.C. § 11323. See Toledo, Peoria & W. Ry.—Trackage Rights Compensation – Peoria & Pekin Union Ry., FD 26476 (Sub-No. 1), slip op. at 1-2 (ICC served Sept. 20, 1994) (involving an agreement approved in 1970); Arkansas & Missouri R. Co. v. Missouri Pacific R. Co., 6 I.C.C. 2d 619, 1990 ICC Lexis 110 (1990) ("A&M") (involving a 1968 agreement); and, ATSF,[18] a case cited by CSX, (involving a 1967 operating agreement).

In none of the above cases did the parties have to seek renewed acquisition authority for the pre-1980 approvals or submit to any form of competitive analysis or public interest standard under what is now Section 11323 for the Board to set new terms and conditions. Like those cases, here, there is simply no new acquisition transaction being proposed for which NS and NPBL need to seek authority for under Section 11323. Like those cases, this is a case to

---

[17] Decision at 5.

[18] Atchison, Topeka & Santa Fe Ry. Co.—Operating Agreement—S. Pac. Transp. Co., 8 I.C.C.2d 297, 302-03 (1992).

establish a new fee, not to approve or reject the acquisition of trackage rights.  In short, there is no basis to claim NS must "show that its proposed increase[19] in existing trackage rights compensation terms is justified under the standards set out" in Section 11323.  Petition at 10.

Second, CSX's argument is completely self-serving and self-selective in nature.  CSX notes that where a new trackage rights agreement has been approved, then the "[s]pecific findings on these public interest factors relating to competitive effects may not be necessary in fee-prescription cases."  Petition at 9.  It doesn't explicitly state when such trackage rights needed to have been approved in order to be able to skip CSX's new "competitive analysis" standard in the fee-prescription phase, although presumably the agreement needed to be approved under Section 11323 as that's the statute it cites to.  But, this case, CSX confidently asserts, is "unlike" those other cases where CSX's new test would not apply.  Here, according to CSX, the newly minted competitive analysis test should be applied – that's for sure – because this case is "unlike" those other cases.  Why is left unexplained.

Even if for inexplicable reasons this proceeding was "unlike" all other cases, and NS and NPBL did need to seek approval of its trackage rights agreement, it would be the acquisition of the trackage rights that would be the focus of the proceeding, not the fee level.  The Board should see CSX's argument for what it is – a self-serving attempt to apply its "competitive analysis" standard to NS and no other party or trackage rights arrangement.

Finally, even if NS and NPBL were required to meet the Section 11323 standards for approval of NPBL's trackage rights, those standards could easily be met.  It is important to note that CSX itself admits that absent these trackage rights, NPBL (and through it CSX) would be

---

[19] Note that because there is no current binding agreement on compensation, and no party has yet to present evidence and argument applicable to SSW, it is premature to make any characterization about the nature of the new compensation, which will be set by the Board.

unable to serve NIT.  Accordingly, granting NPBL trackage rights that permit it to serve NIT is, by its very nature, a pro-competitive action.  Certainly granting access to another carrier to an exclusively served point cannot result in a substantial lessening of competition, creation of a monopoly, or a restraint of trade.  No matter what the ultimate SSW rate, shippers who otherwise would have had access only to NS, will have (and do have) access to both NS and CSX through payment of the NPBL switch rate.  These trackage rights create competition, rather than foreclose it.  Indeed, it was precisely for these reasons that the Board allows trackage rights to be implemented via the notice of exemption process, i.e., the Board has found that the grant of trackage rights is inherently a pro-competitive action, so much so that there is a class exemption to quickly and easily achieve approval.

C.   The Board Should Not Allow CSX To Use This Proceeding To Seek Competitive Access Without Complying With Section 11102

CSX's argument that the Board must set a rate no higher than the existing rate ignores all precedents and puts its interests above all other considerations.  In effect, this argument is simply an attempt to turn a fee prescription case into a competitive access case.  However, CSX skips any form of competitive analysis and just assumes that NIT users are entitled to competitive access to CSX without CSX having to take the steps to file a Section 11102 petition.  In prior cases, the Board has rejected efforts to turn fee prescription cases into competitive access proceedings.  See A&M, 6 I.C.C. 2d 619, 622 (1990) (rejecting A&M's position that voluntary trackage rights that have expired should be determined under a competitive access standard rather than SSW).  The Board should likewise reject CSX's efforts to use the proceeding as a license for a free-ranging explanation of CSX's competitive allegations.  None of the competition arguments offered by CSX substantiate CSX's claims that the Board committed material error in the Decision to limit the methodology to SSW.

The Board should decline CSX's invitation to turn this proceeding into an examination of CSX's alleged inability to compete. Indeed, there is no indication that any element of CSX's alleged inability to compete result from the trackage rights fee at issue here. CSX's attempts through this proceeding (and its federal court action) to receive subsidized access over NS lines are transparent. Subsidizing CSX's operations, even indirectly, by forcing NS to maintain an artificially low trackage rights fee set in 1990 is bad public policy and contrary to precedent and the Rail Transportation Policy.[20]

## III.   CSX CAN PURSUE ITS CONTRADICTING THEORIES THROUGH OTHER MEANS AND FORUMS

CSX claims that NS and NPBL have undertaken anticompetitive conduct in an effort to foreclose CSX from competing. According to CSX, this anticompetitive conduct has resulted in, among other things, the establishment of a trackage rights fee that is already too high and has left CSX incapable of serving traffic to/from NIT.

Yet CSX pays NPBL's switch rate, not NS's trackage rights rate. And paradoxically, CSX's proposed remedy to supposed existing anticompetitive behavior by NS and NPBL is to, at a minimum, preserve the NS-NPBL trackage rights compensation at its prior level. CSX also does not explain how the setting of any prospective trackage rights compensation for NPBL, which CSX does not pay, bears on the unfounded allegations of past anticompetitive conduct that it has asserted in federal court.

---

[20] If the Board adopts CSX trackage rights fee proposal (which it should not do) and CSX is still not able to compete, would the Board begin yet another proceeding to lower the rate again? Where does it end? CSX simply wants a result oriented fee structure without having to comply with long standing precedent and policy.

CSX further suggests that this proceeding be held in abeyance while the antitrust case is litigated in the federal court in the Eastern District of Virginia.  But CSX does not deny that the Board, and not the court, holds exclusive jurisdiction to set trackage rights compensation.[21]  The considerations at issue in that proceeding are not necessary to establish SSW, and the record to be developed in that forum would not assist the Board in establishing SSW.  In short, abeyance would provide no benefit to adjudication of this proceeding, while further delaying and denying NS from the establishment of the terms and conditions for use of its lines.

Such dissonant arguments lay bare CSX's sole motive, which is to ensure that NS does not receive proper or timely compensation for use of its assets.  CSX's arguments (and motives) are not appropriate in a fee prescription case and do not warrant the Board granting reconsideration.  Rather, CSX can avail itself of other forums if it chooses to pursue its claims.

A.      A Section 11102 Competitive Access Claim

If, as CSX claims, NS or NPBL have undertaken anticompetitive monopolist behavior so as foreclose CSX from the market, as alleged in its antitrust complaint and its Petition, the Board has a procedural path for such allegations: file a competitive access case under 49 U.S.C. § 11102.  Indeed, the Board's Midtec[22] precedent was developed to address these precise types of allegations.  In such a proceeding, CSX is free to attempt to prove its case.  Yet rather than follow such a course of action, CSX seeks to avoid the burden of proof that would fall on CSX in

---

[21] See A&M, 6 I.C.C. 2d 619 (March 23, 1990).  See also North Carolina Railroad Company-- Petition to Set Trackage Compensation and Other Terms and Conditions – Norfolk Southern Railway Company, Norfolk & Western Railway Company, and Atlantic and East Carolina Railway Company, FD 33134 (STB served May 29, 1997).

[22] Midtec Paper Corp. v. Chicago & North Western Transportation Co., 3 I.C.C.2d 171 (1986), aff'd Midtec Paper Corp. v. United States, 857 F.2d 1487 (D.C. Cir. 1988) (switching or terminal access may be granted if a railroad has engaged in anticompetitive conducts by using its market power to extract unreasonable terms or showing a disregard for the shipper's needs by furnishing inadequate service.)

such a competitive access proceeding and invent a new burden for NS, in the context of fee prescription case, to prove that a new trackage rights fee is sufficiently "competitive." The Board should reject this end-run around the Board's procedures. A trackage rights proceeding simply is not the correct forum for these types of arguments. Certainly such arguments do not justify reconsideration of the Board's decision to limit this proceeding to application of <u>SSW</u>.

> B.    <u>An Antitrust Complaint</u>

In addition to misusing the Board's processes, CSX transparently seeks to litigate its antitrust allegations on a second front before the Board. CSX has already brought suit in federal court alleging that NS and NPBL have undertaken various anticompetitive actions. Whether those claims are properly before the court or have merit is for the court to decide. But the Board need not sweep away its precedents to give CSX multiple bites at the apple. If CSX wants to address anticompetitive and conspiracy claims, it should raise its concerns elsewhere.

<b>CONCLUSION</b>

CSX has failed to substantiate that the Board committed material error:

- First, all of CSX's arguments related to its "competitive" arguments could and should have been raised earlier. Having failed to raise those arguments earlier, it was not material error for the Board to limit this proceeding to application of the <u>SSW</u> methodology.

- Second, CSX's position that methodologies other than <u>SSW</u> – such as CSX's newly created "guarantee that I can compete" theory – is simply another attempt to reargue its bifurcation approach, which was previously considered and rejected.

- Third, CSX's argument that the trackage rights agreement must first be submitted for approval so that competitive issues could be considered is just a "repackaged" variant of its

previous argument that the agreement must first be approved before a fee prescription case

can proceed.  The Board previously considered and rejected that argument as well.

- Fourth, it was not material error to limit the scope of this proceeding to <u>SSW</u> in order to set

  trackage rights compensation.  Since its adoption, <u>SSW</u>, and only <u>SSW</u>, has been consistently

  applied in trackage rights disputes – even to set terms and conditions of trackage rights

  entered into long before the adoption of the Section 11323 standards.

- Last, even setting aside procedural deficiencies, the competitive issues raised by CSX do not

  justify clarification, reconsideration, or any other form of relief when analyzed on the merits.

In the end, the Board's finding that the parties have the right to argue for their preferred

<u>SSW</u> methodology is entirely consistent with the Board's evidentiary rules and prior precedent.

It is each party's burden in this proceeding to evaluate the evidence, make the case for

application of its chosen methodology, and critically address the methodologies offered by other

parties.

As such, the Board must reiterate its earlier instruction that (1) discovery be limited

solely to data necessary to calculate trackage rights compensation under the methodologies

recognized by <u>SSW</u>;[23] (2) the only evidence that may be submitted is evidence necessary to

calculate reasonable compensation under the existing <u>SSW</u> methodologies; and (3) that

compensation will be set by the Board from among the evidence of <u>SSW</u> methodologies

submitted.[24]  Anything else would be contrary to precedent, the statute, and unnecessarily expand

---

[23] This prescription necessarily precludes any grant of wide-ranging discovery to examine anticompetitive effects, monopolization, or restraint of trade.  Thus, CSX's plea to allow far ranging discovery, Petition at 16, should be denied.

[24] As the Board indicated, parties can make arguments for one <u>SSW</u> methodology over another, but extraneous evidence and argument expanding the scope of this proceeding should not be permitted.  Decision at 7.

this proceeding to issues more appropriately suited for a competitive access claim or the courts.

The Board should set a procedural schedule and discovery schedule based upon SSW and

expeditiously move this case forward.

Respectfully submitted,

Garrett D. Urban
NORFOLK SOUTHERN CORPORATION
Three Commercial Place
Norfolk, VA 23510
Tel:   (757) 533-4939
Fax:   (757) 533-4872

William A. Mullins
Crystal M. Zorbaugh
BAKER & MILLER PLLC
2401 Pennsylvania Ave., NW
Suite 300
Washington, DC  20037
Tel:  (202) 663-7820
Fax: (202) 663-7849

May 8, 2019

Attorneys for Norfolk Southern Railway Company

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of Norfolk Southern Railway Company's reply to CSX's Petition for Clarification or, if Necessary, Reconsideration, and Request to Hold Proceeding in Abeyance by mailing copies of this reply via prepaid first class mail to all parties of record or by more expeditious means of delivery.

Dated at Washington, D.C. this 8th day of May, 2019.

William A. Mullins
Attorney for Norfolk Southern Railway Company