UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division



FILED

SEP - 9 2019

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

CSX TRANSPORTATION, INC.
*individually and on behalf of
Norfolk & Portsmouth Belt Line
Railroad Company,*

           **Plaintiff,**

**v.**                            **Civil No. 2:18cv530**

**Norfolk Southern Railway Company,
Norfolk & Portsmouth Belt Line
Railway Company,
Jerry Hall,
Thomas Hurlbut,
Philip Merrilli,
Cannon Moss,**

           **Defendants.**

## OPINION AND ORDER

This matter is before the Court on the following four
Motions to Dismiss:

- (1) motion filed by Defendant Norfolk & Portsmouth Belt Line Railway Company ("Belt Line"), pursuant to Federal Rule of Civil Procedure 12(b)(6) and 49 U.S.C. § 10501(b), ECF No. 27;
- (2) motion filed by Defendant Cannon Moss ("Moss"), pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), ECF No. 29;
- (3) motion filed by Defendants Jerry Hall ("Hall"), Thomas Hurlbut ("Hurlbut"), Philip Merrilli ("Merrilli"),[1] pursuant to Federal Rule of Civil Procedure 12(b)(6) and 28 U.S.C. § 1367(c), ECF No. 31;

---

[1] Defendants Moss, Hall, Hurlbut, and Merrilli will be collectively referred to as "Individual Defendants."

1

- and (4) motion filed by Defendant Norfolk Southern Railway Company ("NS" or "Norfolk Southern") pursuant to Federal Rule of Civil Procedure 12(b)(6), ECF No. 34.[2]

For the reasons stated below, Defendants' Motions to Dismiss are **DENIED**, except with respect to Belt Line's motion to dismiss Count VII (tortious interference with a business expectancy) on the basis that Plaintiff has failed to state a claim, which is **GRANTED**.

## I. FACTUAL and PROCEDURAL HISTORY[3]

Plaintiff CSX Transportation, Inc. ("Plaintiff" or "CSX") is a railroad that operates in the eastern United States and Canada. Compl., ECF No. 1 ¶ 7. Norfolk Southern is also a railroad operating in the eastern United States and Canada. Id. ¶ 8. In 1896, eight railroads, including CSX and Norfolk Southern's predecessors in interest, joined together to form Belt Line. Id. ¶ 15. Belt Line is a terminal switching railroad that operates in the Hampton Roads area of Virginia. Id. ¶¶ 9, 15, 20. Belt Line's purpose was to connect the eight owner-railroads' tracks (and traffic carried by the railroads)

---

[2] Defendants Belt Line, Moss, Hall, Hurlbut, Merrilli, and Norfolk Southern will be collectively referred to as "Defendants."

[3] A motion to dismiss under Rule 12(b)(6) is generally limited to a review of the allegations in the complaint itself. Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 165-66 (4th Cir. 2016). However, courts may consider documents that are attached to the complaint as exhibits. Fed. R. Civ. P. 10(c). Thus, the facts recited here are drawn from the Complaint and attached exhibits. They are assumed true only to decide the motion to dismiss. The facts stated here are not factual findings for any purpose other than consideration of the pending motions. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint.").

to various marine terminals located along Belt Line's tracks. Id. ¶ 1, 15.  In 1917, Belt Line established a connection from several owner-railroads' tracks to the Norfolk International Terminals ("NIT").  Id. ¶ 1.  NIT is one of the largest marine terminal facilities in Virginia and one of the largest terminals on the East Coast.  Id. ¶ 20.

To govern this arrangement, the owner-railroads signed the Belt Line Operating Agreement in 1897, which sets forth the ownership and operation of Belt Line and various duties and obligations of the shareholders.  Id. ¶ 16, see also Ex. A.  The Belt Line Operating Agreement provides that Belt Line would be a "separate organization in which all [railroads] are to be equally interested and each to have an equal representation." Compl. ¶ 17; Ex. A at 1.  Specifically, the Operating Agreement provides that each shareholder "shall have one representative on the Board" of Belt Line.  Compl. ¶ 17; Ex. A at 1-2.  The Operating Agreement further provides that each shareholder must "co-operate cordially in encouraging the business of the [Belt Line] for which it is constructed."  Compl. ¶ 18; Ex. A at 4. The Operating Agreement also states that Belt Line anticipates that its shareholders will deliver to Belt Line all railroad cars that the shareholders cannot serve directly.  Compl. ¶ 18; Ex. A at 6 ¶ 10.  CSX alleges the Operating Agreement provided CSX with an expectation that Belt Line will provide it with an

3

efficient means of interchanging its traffic, including, without limitation, to and from the NIT. Compl. ¶ 18; Ex. A at 6 (providing that Belt Line "shall perform the service for which it was built and said Company be directly responsible for the competent and efficient discharge of its every obligation to the parties hereto"). Finally, the Operating Agreement provides that the members of the Belt Line Board of Directors are obligated to vote for "such resolutions, by-laws or other proceedings as may be necessary to carry into effect the agreements made in" the Belt Line Operating Agreement. Compl. ¶ 19; Ex. A at 6.

As a result of mergers and acquisitions among the original eight railroads, by the end of the 20th century, only three Belt Line member-owners remained: CSX, Norfolk and Western Railway Company, and the Southern Railway Company. Compl. ¶¶ 2, 21. In a Supplemental Agreement dated March 1, 1989, the three remaining shareholders agreed to reapportion the board seats: CSX was afforded the right to appoint two representatives to the Belt Line Board of Directors, and the other two companies were afforded the right to appoint three representatives to the Belt Line Board collectively. Id. ¶¶ 2, 22; Ex. C ¶ 1. The Supplemental Agreement further provided that, other than the reapportionment, "[n]othing herein shall be deemed to amend,

alter, or affect any other provision of the [Belt Line] Agreement." Id. ¶ 22; Ex. C ¶ 2.

Subsequently, Norfolk and Western Railway Company and the Southern Railway Company merged to form Norfolk Southern. Id. ¶ 23. The new company owns 57% of Belt Line, and CSX owns 43%. Per the revised 1996 Belt Line By-Laws, NS is able to appoint four voting members to the Belt Line Board of Directors and CSX appoints two. Id. ¶ 23. CSX alleges that for at least the past ten years, NS has inserted former NS employees in all management positions of Belt Line and appointed current or former NS employees in four of the six Belt Line Board of Directors voting positions and one non-voting director position. Id. ¶ 2, 26. Individual Defendants Hall, Hurlbut, and Merilli are all current NS employees and three of the current voting members of the Belt Line Board of Directors appointed by NS. Id. ¶ 10, 26. Defendant Moss is the fourth voting member of the Belt Line Board appointed by NS, the President and General Manager of Belt Line since 2011, and is a former employee of NS. Id. ¶¶ 10, 27. Moss's predecessor, David Stinson, was also a former NS employee and returned to work at NS after his tenure as Belt Line President. Id. ¶ 27. Donna Coleman, the current non-voting member of the Board of Directors and Vice President of Belt Line, is also a former employee of NS. Id. ¶ 27. In addition,

Bill O'Brien, the current Terminal Superintendent of Belt Line, is also a former employee of NS.  Id.

CSX alleges that Norfolk Southern has abused its position as majority shareholder, colluding with the Individual Defendants and Belt Line to deny competitors access to NIT.  Id. ¶¶ 3, 20, 25.  Norfolk Southern is able to access NIT directly via Norfolk Southern's tracks.  Other railroads can only access NIT through Belt Line's tracks because these tracks connect Norfolk Southern's railroad tracks leading to NIT with the tracks of other railroads.  See Map, ECF No. 1-2.  CSX alleges that Norfolk Southern, through its control of Belt Line, has blocked access to NIT by others.  Id.  Defendants have allegedly done so by causing Belt Line to establish and maintain unreasonably high rates for its switch services for intermodal freight,[4] which are dramatically higher than rates charged by comparable railroads.  Id. ¶ 34.  The rate was set in 2009, over the objection of the Belt Line board members not appointed by NS.  Id. ¶ 34.

Defendants' actions are alleged to have adversely affected commerce in Hampton Roads and Virginia.  The Virginia Port Authority has allegedly indicated that NIT would benefit from multiple rail carriers being able to access NIT because it would

---

[4] Intermodal refers to the use of two modes of freight, such as ship and rail, to transport goods from shipper to consignee.  Compl. at 3 n.1.

allow more volume to be moved at competitive prices, and has requested that Belt Line "facilitate dual [rail] access [by CSX and NS] for handling containers at NIT," because Belt Line's current failure to provide "proper access to NIT by CSX puts Virginia at a competitive disadvantage." Id. ¶¶ 4, 36.

The only recent example of CSX actually utilizing Belt Line to access NIT occurred in 2015 when, due to closures of other ports around the country, NIT was inundated with excess containers. Because of customer demand, CSX was forced to pay the high rate charged by Belt Line. This was the only period where CSX could pay the high rates, and that was only because the other port closures caused all costs associated with ocean shipping to temporarily skyrocket. Under normal business conditions, Belt Line's rate and its operating procedures preclude competitor access to NIT. Id. ¶ 4.

Defendants have allegedly further rejected any proposal to address Belt Line's financial state or Norfolk Southern's control of Belt Line. In advance of the April 18, 2018 Belt Line Board and stockholders meetings, CSX presented a Service Proposal that would have significantly and rapidly increased Belt Line's revenue and operating income by nearly doubling the volume of cars that Belt Line moves annually. Id. ¶ 38. The proposal included a lower switch rate per car with a guarantee of a minimum annual volume, with CSX moving 18,000 cars to or

from NIT, and it would have purportedly generated approximately
$1,440,000 annually in incremental revenue and potentially
$660,000 annually in incremental operating income for Belt Line.
Id. ¶ 39. CSX alleges Individual Defendants and Belt Line
Management refused to form an independent committee to evaluate
the proposal or allow a formal vote, and thus effectively
rejected it. Id. ¶ 40. Additionally, in response to CSX's
proposal, Moss revealed that Defendants were considering
entering into a new agreement that effectively would impose a
substantial increase in charges paid to NS for Belt Line's usage
of its rights of access to NS's track, and which would, in turn,
reduce the profitability of intermodal service for Belt Line,
thus increasing costs to Belt Line's customers. Id. ¶ 41.

CSX has also allegedly proposed, both before and at the
April 2018 Belt Line Board and shareholders' meetings, several
remedial actions to address defects in Belt Line's current
corporate governance structure. Id. ¶ 67. These proposals would
have permitted each shareholder to designate only one individual
for election as a director; permitted the shareholders to elect
four independent directors to the Belt Line Board; and permitted
the Board and shareholders to implement a plan for an orderly
transition to independent management. Id. ¶ 68-69. CSX also
identified and proposed to NS eight candidates for election as
independent directors to fill the remaining four positions on

the Belt Line Board. _Id._ ¶ 71. CSX's shareholder representative made a motion for the Belt Line Board to adopt CSX's proposals. _Id._ ¶ 70. CSX alleges the Individual Defendants rejected CSX's governance proposal in its entirety, voted against CSX's motion, refused to nominate (much less elect) any independent directors, and instead elected four directors designated by NS (three current NS employees and Defendant Cannon Moss) and only two directors designated by CSX. _Id._ ¶ 72. Donna Coleman who is also alleged to have an interest in NS, was also elected as a non-voting director. _Id._

As further evidence of this alleged collusion, CSX asserts that the management of Belt Line all have NS email addresses, which they use to conduct the business of the Belt Line, _id._ ¶ 28, and for at least 12 years, every president and vice president of Belt Line was a former NS employee. _Id._ ¶ 29. All of the Individual Defendants allegedly have interests in furthering Norfolk Southern's interests in their role as directors of Belt Line, with the expectation of future employment and remuneration from Norfolk Southern. _Id._ ¶ 30. In 2010, Belt Line refused to accept CSX's offer to provide its locomotives and fuel free of charge to Belt Line, while accepting a lease or contract to use NS's locomotives without competitive bidding. _Id._ ¶ 46. In 2008, Belt Line commenced the sale of property in Norfolk and attempted to sell property

in Portsmouth.   The sale of Norfolk property would have constrained Belt Line's access to NIT and the sale of Portsmouth property would have constrained CSX to its own intermodal yard in Portsmouth.   Belt Line also gave up its access rights to the track between NS Juncture and Carolina Juncture (the "diamond" track).   Doing so has required Belt Line trains to be moved into a trainyard controlled by NS.

CSX alleges this collusion by Belt Line management represents a breach of the contractual duty owed by Belt Line to CSX.   CSX also alleges that Individual Defendants are in breach of their fiduciary duties to Belt Line.   Id. ¶ 3, 32, 37.   This hurts Belt Line because Belt Line's operating revenue is derived principally from switch operations, which is dependent upon the switch services being provided to the shareholders' companies, who in turn pay for those services.   Id. ¶ 33.   Although NIT has been rapidly expanding and increasing its revenues in recent years due to increased shipping, Belt Line's revenues have tellingly remained flat or decreased.   Id. ¶¶ 3, 37.   Belt Line's rail car volume has been essentially flat for years, and decreased in 2017.   Current car volume on the Belt Line as a whole is heavily dependent on a single customer (not at NIT) engaged in a single line of business.   No new sources of substantial and recurring business for Belt Line have been added in recent years, nor do any appear to be planned.   Moreover, no

excess cash flow is being generated that could be used for capital expenditures for maintenance, upgrades, or expansion. Id. ¶ 37.

CSX filed the Complaint beginning this suit on October 4, 2018. ECF No. 1. CSX makes the following claims:

- Count I, conspiracy to restrain trade, in violation of 15 U.S.C. § 1, against Defendants Norfolk Southern and Belt Line;

- Count II, conspiracy to monopolize, in violation of 15 U.S.C. § 2, against Defendants Norfolk Southern and Belt Line;

- Count III, monopolization, in violation of 15 U.S.C. § 2, against Norfolk Southern;

- Count IV, attempted monopolization, in violation of 15 U.S.C. § 2, against Defendant Norfolk Southern;

- Count V, breach of contract, against Norfolk Southern;

- Count VI, a derivative claim in CSX's capacity as a shareholder in Belt Line, pursuant to Va. Code § 13.1-672.1, for breach of fiduciary duties, against Individual Defendants Hall, Hurlbut, Merilli, and Moss;

- Count VII, tortious interference with a business expectancy, against Norfolk Southern and Belt Line;

11

- Count VIII, statutory business conspiracy, in violation of Va. Code § 18.2-499, against Norfolk Southern and Belt Line;

- and Count IX, civil conspiracy, against Norfolk Southern and Belt Line.

On November 27, 2018, Defendants filed their respective motions to dismiss. Belt Line seeks to dismiss all counts against it (Counts I, II, VII, VIII, and IX). In its motion and accompanying memorandum, Belt Line argues that all such counts must be dismissed because: 1) CSX cannot force Belt Line to accept its proposed rate, 2) all counts are preempted by the jurisdiction of the Surface Transportation Board under 49 U.S.C. § 10501(b), or alternatively, 3) the case should be held in abeyance to permit the ongoing STB proceedings to conclude, 4) the federal claims against it (Counts I and II) must be dismissed because a parent and majority-owned subsidiary cannot conspire with each other, 5) the state law claims—Counts VII, VIII, IX—are time barred, and 6) because CSX fails to state a claim.

In its own individual motion and accompanying memorandum, Norfolk Southern also argues that: 1) the state law claims are time barred, 2) the breach of contract claim (Count V) fails because CSX fails to identify a covenant in the Operating Agreement that NS has breached, 3) CSX fails to state a claim

12

for tortious interference because NS is a party to the Operating Agreement and the economic loss rule bars a tortious interference claim. NS's motion does not seek to dismiss Counts I-IV, the federal claims.

In their separate motion and accompanying memorandum, Defendants Hall, Hurlbut, and Merilli argue that CSX fails to state a claim for breach of fiduciary duty, and the Court should decline to exercise supplemental jurisdiction. In his seperate motion and accompanying memorandum, Defendant Moss argues that: 1) the Court lacks subject matter jurisdiction over Count VI, as the breach of fiduciary duty does not arise from the same case or controversy as CSX's federal claims, 2) even if the Court has jurisdiction, it should decline to exercise supplemental jurisdiction, and 3) CSX fails to state a claim for breach of fiduciary duty.

Plaintiff filed a response to each of the motions, ECF Nos. 39-42, and Defendants filed their respective replies, ECF Nos. 44-47. Having been fully briefed, the motions to dismiss are ripe for review. The Court has reviewed the parties' submissions and concludes that a hearing is not necessary. Local Civil Rule 7(J); Fed. R. Civ. P. 78.

## II. STANDARD OF REVIEW

### A. Rule 12(b)(1)

Belt Line and Defendant Moss challenge the jurisdiction of the Court over various counts. These arguments are properly considered under Fed. R. Civ. P. 12(b)(1).

A motion to dismiss for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, may attack a complaint on its face, insofar as the complaint fails to allege facts upon which the court can base jurisdiction, or it may attack the truth of any underlying jurisdictional allegations contained in the complaint. Beck v. McDonald, 848 F.3d 262, 270 (4th Cir. 2017); Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). In the former situation, known as a facial challenge, the court is required to accept all of the complaint's factual allegations as true, "and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a 12(b)(6) consideration." Adams, 697 F.2d at 1219.

In the latter situation, involving a challenge to the truth of the jurisdictional allegations, also known as a factual challenge, "the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings." Velasco v. Gov't of Indonesia, 370 F.3d 392, 398 (4th Cir. 2004) (citing Adams, 697 F.2d at 1219). In explaining

14

how district courts should evaluate evidence presented in a factual challenge, the United States Court of Appeals for the Fourth Circuit has indicated that it depends on whether the jurisdictional facts are intertwined with the merits facts. Kerns v. United States, 585 F.3d 187, 196 (4th Cir. 2009). When jurisdictional facts are not intertwined with the merits, the trial court may weigh evidence and resolve factual disputes to determine its jurisdiction. See Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006); Adams, 697 F.2d at 1219. In such a case, the plaintiff bears the burden of proving jurisdiction by a preponderance of the evidence and may present "affidavit[s], depositions or live testimony" to meet its burden. Adams, 697 F.2d at 1219; accord United States ex rel. Vuyyuru v. Jadhav, 555 F.3d 337, 437-48 (4th Cir. 2009). When jurisdictional and merits facts are intertwined, "[i]t is the better view that . . . the entire factual dispute is appropriately resolved only by a proceeding on the merits." Adams, 697 F.2d at 1219; accord Kerns, 585 F.3d at 193, 196.

### B. Rule 12(b)(6)

Defendants all seek to dismiss the various counts pursuant to Fed. R. Civ. P. 12(b)(6). The well-established Rule 12(b)(6) standard of review permits dismissal when a complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A complaint fails to state a claim if it does not

15

allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Although a complaint need not be detailed, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." Id. at 555; see Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

A motion to dismiss tests the sufficiency of a complaint without resolving factual disputes, and a district court "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'" Kensington Volunteer Fire Dep't v. Montgomery Cty., 684 F.3d 462, 467 (4th Cir. 2012) (citation omitted). Although the truth of the facts alleged is presumed, district courts are not bound by the "legal conclusions drawn from the facts" and "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." E. Shore Mkts., Inc. v. Assocs. Ltd. P'ship, 213 F.3d 175, 180 (4th Cir. 2000); see Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must include 'more than an unadorned, the-defendant-unlawfully-

harmed-me accusation.'" Johnson v. Am. Towers, LLC, 781 F.3d 693, 709 (4th Cir. 2015) (quoting Iqbal, 556 U.S. at 678).

A motion to dismiss pursuant to Rule 12(b)(6) must be read in conjunction with Federal Rule of Civil Procedure 8(a)(2). Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), so as to ". . . give the defendant fair notice of what the . . . claim is and the grounds upon which it rests. . . ." Twombly, 550 U.S. at 555 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Fair notice is provided by setting forth enough facts for the complaint to be "plausible on its face" and "raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact). . . ." Id. at 555 (internal citations omitted).

And as discussed supra n.3, pursuant to Rule 12(d), if matters outside the pleadings are submitted in conjunction with or in opposition to a 12(b)(6) motion, the court generally must either exclude such materials from consideration or convert the motion into a motion for summary judgment. Fed. R. Civ. P. 12(d). However, a court may consider matters outside the pleadings expressly relied on in a complaint. See Lorenzo v. Rumsfeld, 456 F. Supp. 2d 731, 734 (E.D. Va. 2006) (citing Phillips v. LCI Int'l, Inc., 190 F.3d 609, 618 (4th Cir. 1999))

(finding that at the 12(b)(6) stage, "a court can consider documents outside of the pleadings, without converting the motion to one for summary judgment, so long as the documents are integral to and explicitly relied on in the complaint."); Davis v. George Mason Univ., 395 F. Supp. 2d 331, 335 (E.D. Va. 2005) (quoting Gasner v. County Dinwiddie, 162 F.R.D. 280, 282 (E.D. Va. 1995)) ("In the Eastern District of Virginia, 'when a plaintiff fails to introduce a pertinent document as part of his complaint, the defendant may attach the document to a motion to dismiss the complaint and the Court may consider the same without converting the motion to one for summary judgment.'").

Where a party has made both a Rule 12(b)(1) motion and a Rule 12(b)(6) motion, a court should address the 12(b)(1) issue first.  5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (3d ed. 2004).  If the court concludes there is no subject matter jurisdiction, it is appropriate to avoid a decision on the Rule 12(b)(6) motion because finding the absence of subject matter jurisdiction results in dismissal of the complaint, thereby mooting the remaining defenses and other arguments about the validity of the claims alleged.  Id.

### III. DISCUSSION

Belt Line is the only party that seeks to dismiss the federal claims. The Court begins by addressing Belt Line's four arguments that the federal claims should be dismissed.

### A. All Claims - Belt Line

Belt Line makes two arguments that all claims against it should be dismissed: first, that the claims against it are preempted by proceedings before the Surface Transportation Board ("STB") and second, Belt Line appears to make an argument that CSX has failed to state any claim because Belt Line has not committed a wrongful act.

#### 1. Preemption

First, Belt Line argues that the Court does not have subject matter jurisdiction over any of the counts against it because they are expressly preempted by the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"). The ICCTA created the STB.

> The STB is an economic regulatory agency that Congress charged with the fundamental missions of resolving railroad rate and service disputes and reviewing proposed railroad mergers. The STB is decisionally independent, although it is administratively affiliated with the Department of Transportation.

Overview of the STB, Surface Transportation Board, https://www.stb.gov/stb/about/overview.html. The ICCTA, in

19

particular 49 U.S.C. § 10501(b), grants exclusive jurisdiction

to the STB over:

> (1) transportation by rail carriers, and the remedies
> provided in this part with respect to rates,
> classifications, rules (including car service,
> interchange, and other operating rules), practices,
> routes, services, and facilities of such carriers; and
>
> (2) the construction, acquisition, operation,
> abandonment, or discontinuance of spur, industrial,
> team, switching, or side tracks, or facilities, even
> if the tracks are located, or intended to be located,
> entirely in one State,

49 U.S.C. § 10501(b). As alleged in the Complaint, Belt Line

and Norfolk Southern have negotiated an increase in the charges

Belt Line would pay to Norfolk Southern to access Norfolk

Southern's tracks that lead to the NIT. Compl. ¶ 41. The Court

notes that on July 25, 2019, Belt Line notified the Court that

the STB decided to hold its related proceeding in abeyance

pending resolution of this federal court proceeding including

any appeals. ECF No. 61. Norfolk Southern has petitioned the

STB for reconsideration. ECF No. 63.

In any event, Belt Line's jurisdictional argument is

meritless. The U.S. Court of Appeals for the Fourth Circuit has

found that the express preemption clause under 49 U.S.C. §

10501(b) preempts _regulation_ of the railroad industry with

respect to rates, locations, and the operation of railroad

tracks _by state and local governments_. _PCS Phosphate Co. v._

_Norfolk S. Corp._, 559 F.3d 212, 218-19 (4th Cir. 2009). The STB

also interprets this provision to preempt state and local actions that impact the regulation of railroads. See Green Mountain R.R. Corp. v. Vermont, 404 F.3d 638, 642 (2d Cir. 2005); Adrian & Blissfield Ry. Co. v. Vill. of Blissfield, 550 F.3d 533, 540 (6th Cir. 2008) (citing CSX Transp., Inc.—Petition for Declaratory Order, 2005 WL 1024490, at *2 (S.T.B. May 3, 2005) (the two "broad categories" of actions preempted by § 10501(b) are "state and local actions . . . denying a railroad the ability to conduct some part of its operations or to proceed with activities that the Board has authorized . . . [and any] state or local regulation of matters directly regulated by the Board—such as the construction, operation, and abandonment of rail lines; railroad mergers, line acquisitions, and other forms of consolidation; and railroad rates and service.")). Belt Line has not cited any case that supports the proposition that the ICCTA preempts other federal statutes like the antitrust claims before the Court.

Even assuming the ICCTA could preempt other federal statutes, with respect to both the federal and state law claims that are pled against Belt Line, courts have recognized that "Congress *narrowly tailored* the ICCTA preemption provision to displace only 'regulation,' i.e., those state laws that may reasonably be said to have the effect of 'managing' or 'governing' rail transportation, *while permitting the continued*

21

application of laws having a more remote or incidental effect on rail transportation." Fla. E. Coast Ry. Co. v. City of W. Palm Beach, 266 F.3d 1324, 1331 (11th Cir. 2001) (quoting Black's Law Dictionary 1286 (6th ed. 1990)) (emphasis added). The Fourth Circuit has found that "voluntary agreements" entered into by private railroad companies "are not presumptively regulatory acts," and are generally not preempted by the statute. PCS Phosphate, 559 F.3d at 218-19 ("If contracts were by definition 'regulation,' then enforcement of every contract with 'rail transportation' as its subject would be preempted as a state law remedy 'with respect to regulation of rail transportation.'"). Thus, when considering a preemption argument involving the STB, courts begin with a presumption that the acts are non-regulatory if they result from a private agreement like a contract, but courts must also look at whether the "allegations, if pursued, would directly interfere with the STB's exclusive jurisdiction" over the regulation of railroads. PCS Phosphate Co. v. Norfolk S. Corp., 520 F. Supp. 2d 705, 717 (E.D.N.C. 2007), aff'd, 559 F.3d 212 (4th Cir. 2009) (phosphate mining company brought claim against defendant railroad for misleading, unfair, and coercive threats to abandon a railroad line which plaintiff's business depended on; STB proceedings also adjudicated whether defendant railroad could abandon the railroad line, and thus, preempted the claim).

22

Here, the owner-shareholder companies, including Plaintiff and Norfolk Southern, formed Belt Line through contract. This is the type of "voluntary agreement" among parties that the Fourth Circuit has explained is not a "presumptively regulatory act." PCS Phosphate, 559 F.3d at 218-19. Moreover, Belt Line has not overcome the presumption, that a voluntary agreement is not regulatory, by demonstrating that the various federal and state law claims would affect the STB's exclusive jurisdiction over the regulation of railroads. The question before the STB is whether to approve the increased rate that Norfolk Southern will charge Belt Line for use of NS's tracks in the future. The question before this Court is whether Belt Line and Norfolk Southern engaged in illegal conduct up to this point in time that violated, for instance, federal antitrust laws or constituted a state law business conspiracy or breach of contract (in particular, by setting the Uniform Rate charged to access NIT too high in order to deter competition). If CSX were to prevail in this Court on the federal antitrust claims or state law business conspiracy claims in this suit, this Court may award damages for CSX's previous losses or injunctive relief to prevent Norfolk Southern and Belt Line from continuing to carry out such an antitrust or business conspiracy. In particular, the injunctive relief would prevent "Defendants from continuing to commit the above referenced violations of federal

and state law," restore CSX's shareholder rights, establish an independent board structure, and/or require approval of CSX's service proposal.  Compl., Prayer for Relief.  That is, any injunctive relief may prevent Defendants from continuing to engage in the conspiracy or make changes to Belt Line's governance.  However, the STB's jurisdiction would not be affected; that is, the STB may still approve or disapprove the pending rate increase that Norfolk Southern would charge Belt Line in the future.

In contrast, in the earliest PCS Phosphate case, the district court found, *inter alia*, that the plaintiff's claim brought under North Carolina's unfair and deceptive trade practices law, which was based in tort, sought treble damages for defendants' threats to abandon a railroad line.  PCS Phosphate, 520 F. Supp. 2d at 717.  If the court addressed the question of whether defendants had to continue operation of a railroad track, the court would have to adjudicate an issue that was within the exclusive jurisdiction of the STB—namely, the abandonment of railroad lines (and resultant damages). Therefore, the tort claim "managed" or "governed" the regulation of railroads, and the Court held that the ICCTA preempted state tort law on this issue.  Id. ("These allegations, if pursued, would directly interfere with the STB's exclusive jurisdiction over the abandonment of railroad tracks.  Accordingly,

24

plaintiff's UDTPA claim is preempted."). The court in <u>PCS Phosphate</u> also found that the plaintiff's claims for breach of contract, breach of an easement, and unjust enrichment did not intrude on the STB's jurisdiction because they related to prior conduct and agreements formed by the parties. <u>PCS Phosphate</u>, 520 F. Supp. 2d at 716 ("[T]he court holds that section 10501(b) does not preempt plaintiff's breach of contract and breach of easement covenants claims. These claims concern the performance of obligations under contracts voluntarily negotiated by the parties' predecessors in interest and do not have the effect of preventing or unreasonably interfering with railroad operations."). Here, for those same reasons, the various federal and state law claims do not intrude on the issue before the STB, which is compensation paid by Belt Line to Norfolk Southern to use Norfolk Southern's tracks.

For the reasons stated above, the Court finds that the claims against STB are not preempted by the ICCTA, and there is no compelling reason to stay this action.

## 2. The Proposal

Second, Belt Line argues that all the counts against it must be dismissed because Belt Line has not committed any wrongful act. Specifically, Belt Line notes that it cannot accept CSX's proposal to allow CSX to access NIT at a lower rate than Belt Line's Uniform Rate without violating its own

25

Operating Agreement, and Belt Line charged CSX the Uniform Rate to access NIT.[5]

At the outset, the Court notes that, to the extent that Belt Line is making a merits argument, such an issue is inappropriate to resolve on a 12(b)(6) motion. Gellman v. State of Md., 538 F.2d 603, 606 (4th Cir. 1976). Moreover, it is not clear what claims Belt Line asks this Court to dismiss as a result of its purported inability to accept CSX's rate proposal. To the extent that Belt Line argues that CSX has failed to state a claim against Belt Line for antitrust conspiracy, tortious interference, and conspiracy under state law, these arguments will be addressed in depth below as Belt Line makes more specific 12(b)(6) arguments. However, the Court briefly notes at this juncture that Belt Line apparently misunderstands CSX's proposal regarding the rate as alleged in the Complaint. Belt Line's Operating Agreement does state that Belt Line must provide a uniform rate for all shareholders. ECF No. 1-1 at 3-4 ¶ 9. However, neither the Complaint nor the rate proposal attached to the Complaint, which CSX proposed in 2018, states that CSX is seeking a lower preferential rate, below the Uniform Rate, for only itself. The service proposal states that "[p]resently, the Belt Line's switch rate of $210 per car is an

---

[5] As further discussed below, the Individual Defendants make a similar unavailing argument in seeking to dismiss the shareholder derivative claims alleged against them.

economic barrier that prevents CSXT from being able to move any meaningful port freight by rail at NIT. . . .  Accordingly, CSXT proposes the following, all to be memorialized in a formal agreement: One-way rate of $37.50 per container (empty or loaded) for a term of three years on movements handled by the Belt Line between Berkley Yard and NIT." ECF No. 1-5.  The service proposal does not state that the rate would be lowered for only CSX.  The lowered rate is not limited to CSX, at least as alleged in the Complaint and the rate proposal, but rather applies to any traffic by any company on Belt Line's tracks between "Berkley Yard and NIT."  Compl. ¶ 39; ECF No. 1-5. Therefore, the proposal is within the power of Belt Line and its directors to accept, and does not appear to violate the Operating Agreement.  It appears that CSX is not alleging it should have been given a preferential rate, but that it is alleging the Uniform Rate is set too high in order to benefit Norfolk Southern's interests at the expense of Belt Line's own interests and CSX's interests.  Compl. ¶ 41.  Although ultimately a merits question, courts have found that rejecting proposals which are in a company's own interest and within the company's power to accept may be evidence of, for instance, an antitrust conspiracy.  See, e.g., SourceOne Dental, Inc. v. Patterson Companies, Inc., 310 F. Supp. 3d 346, 357 (E.D.N.Y. 2018) (in denying summary judgment, the court found that

"evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators" is evidence of "a common motive to conspire"). As CSX is not arguing that Belt Line unlawfully failed to give CSX a preferential rate, but that Belt Line's rejection of the proposed reduced uniform rate is evidence of wrongdoing, Belt Line's argument, that the claims should be dismissed because CSX is seeking a preferential rate, misses the mark and seeks to dismiss a claim that was never asserted.

For the general reasons stated above, the Court finds that CSX has adequately alleged some form of wrongdoing by Belt Line that can support a claim. The Court further addresses below Belt Line's 12(b)(6) arguments specific to each claim.

## B. Federal Antitrust Claims - Belt Line

Next, the Court addresses Belt Line's two remaining arguments specific to Counts I-IV, the federal antitrust claims.

### 1. Parent-Subsidiary

Belt Line argues that Plaintiff has failed to state an antitrust claim because Norfolk Southern is the parent company of Belt Line, and cannot conspire with a subsidiary. Thus, Belt Line argues the antitrust conspiracy counts fail.

The Supreme Court has held that a corporation and its wholly owned subsidiary, as well as a corporation and an unincorporated division, must be viewed as a single entity for

28

purposes of § 1 of the Sherman Act, and therefore cannot conspire with each other. <u>Copperweld Corp. v. Independence Tube Corp.</u>, 467 U.S. 752, 770-71 (1984). The Court reasoned that, unlike concerted conduct among otherwise independent entities, which presents substantial anticompetitive risk and is therefore closely scrutinized by the Sherman Act, the internally coordinated conduct of a parent and its subsidiary presents no such risk because that conduct is basically assumed by one actor pursuing the economic interests of a single firm. <u>Id.</u> ("[T]here can be little doubt that the operations of a corporate enterprise organized into divisions must be judged as the conduct of a single actor. . . . A division within a corporate structure pursues the common interests of the whole rather than interests separate from those of the corporation itself."). That is, "[a] § 1 agreement may be found when the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement. But in reality a parent and a wholly owned subsidiary always have a unity of purpose or a common design. They share a common purpose whether or not the parent keeps a tight rein over the subsidiary; the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests." <u>Id.</u> at 771 (internal citations and quotations omitted).

Copperweld's bright-line rule is limited to antitrust conspiracies between a parent corporation and a wholly-owned subsidiary. However, even if the subsidiary is not wholly owned, courts have found that some related corporations, such as parents and majority-owned subsidiaries or "sister" subsidiaries of a common parent, have a sufficient unity of interest that they are incapable of conspiring for purposes of § 1 of the Sherman Act. Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1135 (3d Cir. 1995) (applying Copperweld and finding a "unity of interest" between corporation and its subcontractor hired to carry out "day-to-day" functions); City of Mt. Pleasant v. Associated Elec. Coop., Inc., 838 F.2d 268, 276–77 (8th Cir. 1988); Hood v. Tenneco Texas Life Ins. Co., 739 F.2d 1012, 1015 (5th Cir. 1984); see also Oksanen v. Page Mem'l Hosp., 945 F.2d 696, 706 (4th Cir. 1991) ("We recognize that a medical staff can be comprised of physicians with independent and at times competing economic interests. As a result, when these actors join together to take action among themselves, they are unlike a single entity and therefore they have the capacity to conspire as a matter of law.").

A sufficient unity of interest to prevent the formation of an antitrust conspiracy may be found when the parent owns a substantial majority of the subsidiary's stock. See, e.g., Rohlfing v. Manor Care, Inc., 172 F.R.D. 330, 344 (N.D. Ill.

1997) (in finding unity of interest between sister subsidiaries where a parent company owned 100% of one subsidiary and 82.3% of another, court stated that "[s]uch a unity of interest is very likely to be found when the parent owns a substantial majority the subsidiary's stock."). In determining whether parent and majority-owned subsidiaries can conspire for antitrust purposes, courts also look at whether the parent and subsidiary are inextricably intertwined in the same corporate mission, are bound by the same interests which are affected by the same occurrences, and exist to accomplish essentially the same objectives. For example, a parent that does not wholly own a subsidiary but nevertheless asserts total dominion over its actions, by way of management control, contractual obligations, economic incentives, or otherwise, is probably incapable of conspiring with that subsidiary for purposes of § 1 of the Sherman Act. Williams v. I.B. Fischer Nevada, 999 F.2d 445, 447 (9th Cir. 1993) (affirming summary judgment decision that held a franchisor and franchisee were a "common enterprise" incapable of conspiring to restrain trade); Siegel, 54 F.3d at 1135 (affirming summary judgment and finding unity of interest where one corporation was an "inseparable part" of the other's management).

Here, it is alleged that Norfolk Southern is the majority shareholder of Belt Line. However, it is also alleged that

Norfolk Southern only owns 57% of Belt Line, which is below what other courts have found necessary to find "a substantial majority." Compl. ¶ 23; see, e.g., Siegel Transfer, Inc. v. Carrier Exp., Inc., 54 F.3d 1125, 1133 (3d Cir. 1995) ("Although Bethlehem Steel did not own .08% of the Railroad's stock, the difference between its 99.92% ownership and the 100% ownership in Copperweld is de minimus."). Moreover, while it is alleged that Norfolk Southern has managed to insert current or former NS employees in Belt Line management positions, id. ¶ 38, it cannot be said that Norfolk Southern exerts total dominion, as CSX still retains the right to appoint two of the directors. Id. ¶¶ 2, 23, 26; see, e.g., Freeman v. San Diego Ass'n of Realtors, 322 F.3d 1133, 1146 (9th Cir. 2003), as amended on denial of reh'g (Apr. 24, 2003) (finding that competitor associations that separately appointed directors to a corporation were not part of a common enterprise).

Another important reason that the Court cannot grant the motion to dismiss, on the grounds that a parent and majority-owned subsidiary cannot conspire for antitrust purposes, is that the Plaintiff alleges that Norfolk Southern and Belt Line's interests diverge. Compl. ¶¶ 3, 24, 25, 32, 48, 112. Because Norfolk Southern allegedly conspired with Belt Line to maintain an inflated switch service rate in order to exclude competitor railways, and because Norfolk Southern is able to access NIT

through its own tracks, Norfolk Southern benefits by retaining a monopoly allowing it to handle all of the freight from NIT. Even if other railroads paid the inflated switch service rate to Belt Line in order to access NIT, Norfolk Southern still benefits because Belt Line, in turn, pays Norfolk Southern an inflated price for access to Norfolk Southern's tracks to NIT. Id. ¶¶ 34, 41. However, this hurts Belt Line's interests because Belt Line is charged higher fees by Norfolk Southern, which are passed on to its customers, and other railroads are less likely to use Belt Line's tracks, reducing Belt Line's volume. If a competitor railway were to use Belt Line's services to access NIT, Norfolk Southern still profits from the inflated switch rate that Belt Line must pay to use NS's tracks. Therefore, Norfolk Southern's interest in maintaining a higher switch service rate, so that it can allegedly retain a virtual monopoly, diverges from Belt Line's interest in encouraging the business of Belt Line for which it was formed. Operating Agreement, ECF No. 1-1 ¶ 15 (Belt Line was formed to "ensure competition for transportation services" among the railroads.).

For the reasons stated above, Belt Line's argument that the Complaint alleges it is a common enterprise with Norfolk

Southern, and therefore cannot conspire for the purposes of antitrust law, fails.[6]

## 2. Antitrust Injury

Finally, the Court addresses Belt Line's argument that CSX has failed to allege an antitrust injury because CSX is not alleged to have been denied access to the _entire_ relevant market (the Port of Hampton Roads), only NIT, one of several marine terminals that form the market.

In order to state a claim under either § 1 or § 2 of the Sherman Act, a plaintiff must allege an "antitrust injury," that is, a "business loss of the sort the antitrust laws were designed to prevent." Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp., 910 F.2d 139, 149 (4th Cir. 1990); SD3, LLC v. Black & Decker (U.S.) Inc., 801 F.3d 412, 432 (4th Cir. 2015), as amended on reh'g in part (Oct. 29, 2015) (finding that an antitrust injury is loss resulting from anticompetitive effects of the defendant's behavior on the plaintiff and the market). This Court has found that an antitrust injury is not limited to those situations where a competitor is completely shut out of an entire market, but may include "reduction of output, increase in price, or deterioration in quality." E.I.

---

[6] The Court notes that most of these cases were decided on summary judgment as the determination of whether a parent corporation shares "a unity of interest" with a subsidiary is a factual determination. Therefore, the Court will not prematurely reach such issue at the motion to dismiss stage of the litigation.

_DuPont de Nemours & Co. v. Kolon Indus., Inc._, 688 F. Supp. 2d 443, 460 (E.D. Va. 2009) (denying motion to dismiss where the plaintiff had alleged partial exclusion from market).

Here, CSX has alleged an antitrust injury. Although the injury is limited to only NIT, one of several port terminals that form the Port of Hampton Roads, CSX has alleged that, because the rate charged by Belt Line to potential customers like CSX to access Norfolk Southern's tracks to NIT is artificially high, this has resulted in reduced output. CSX also alleges that the Virginia Port Authority has stated that the Port would benefit from multiple rail carriers being able to access NIT because it would allow more volume to be moved, i.e. output has been reduced by the alleged anticompetitive activity. Further, the artificially and anticompetitive high prices are alleged to be passed on to customers, and such alleged increase in price is another form of antitrust injury. _Id._

For the reasons stated above, the Court finds that CSX has alleged an antitrust injury.

### C. State Tort and Contract Claims – Defendants

#### 1. Statute of Limitations

The Court now turns to Defendants' various arguments regarding CSX's state tort and contract law claims (i.e. Count V for breach of contract, Count VII for tortious interference with business expectancy, Count VIII for statutory business

35

conspiracy, and Count IX for civil conspiracy).  As with the federal claims, the Court must begin with challenges to its jurisdiction; Norfolk Southern and Belt Line both argue that the state law claims are time barred, thus depriving this Court of jurisdiction.

Count V for breach of contract, Count VII for tortious interference with business expectancy, Count VIII for statutory business conspiracy, and Count IX for civil conspiracy, are all subject to a five-year limitations period.  Va. Code § 8.01-246(2) (setting forth statute of limitations for breach of a written contract); Dunlap v. Cottman Transmission Sys., LLC, 287 Va. 207, 220-222 (Va. 2014) (holding that the five-year limitations period under Va. Code § 8.01-243(B) applies to claims for tortious interference with business expectancy); Detrick v. Panalpina, Inc., 108 F.3d 529, 543 (4th Cir. 1997) (applying five-year limitations period under Va. Code § 8.01-243(B) to statutory business conspiracy claims); Hurst v. State Farm Mut. Auto. Inc. Co., No. 7:05-cv-776, 2007 U.S. Dist. LEXIS 21172, *17 (W.D. Va. March 23, 2007) (holding that limitations period for civil conspiracy is based on limitations period for underlying wrongful act).  Defendants argue that the claims accrued in 2009, when Belt Line set the alleged artificially high Uniform Rate, and subsequent acts are continuations of the first wrongful act.  Plaintiff argues that each subsequent event

constitutes a new wrongful act giving rise to each cause of action anew.

Under Virginia law, the applicable statute of limitations accrues separately for each wrongful act. L-3 Commc'ns Corp. v. Serco, Inc., No. 1:15-CV-701, 2018 WL 1352093, at *5 (E.D. Va. Mar. 15, 2018) (applying Virginia law and finding "any act to interfere with the expectancy in each Task Order constituted an independent tort" with a new statute of limitations).   The Virginia Supreme Court has distinguished between wrongful acts and damages from a single and continuous wrongful act.  Hampton Roads Sanitation Dist. v. McDonnell, 234 Va. 235, 239 (Va. 1987) ("If the wrongful act is of a permanent nature and one that produces all the damages which can ever result from it, [then] the entire damages must be recovered in one action and the statute of limitations begins to run from the date of the wrongful act.  Conversely, when wrongful acts are not continuous but occur only at intervals, each occurrence inflicts a new injury and gives rise to a new and separate cause of action."); accord Union Labor Life Ins. Co. v. Sheet Metal Workers Nat'l Health Plan, No. 90-2728, 1991 WL 212232, at *5 (D.D.C. Sept. 30, 1991) (Virginia statute of limitations accrued anew where "wrongful acts or breaches of duty" occurred "in distinct intervals or installments, as opposed to being continuous.").

37

Defendants Belt Line and Norfolk Southern singularly focus on the establishment of the Uniform Rate in 2008, and argue that any damages flow from that singular alleged breach of contract, tortious interference, or conspiracy, and thus, actions grounded upon these violations are barred by the statute of limitations. However, that focus is misplaced. Here, Plaintiff has alleged multiple wrongful acts that may constitute a breach of contract, tortious interference with a business expectation, and/or common law or statutory conspiracy within the five-year statute of limitations. In particular, it is alleged that in 2018, CSX presented a proposal to Defendants at the Belt Line Board and Stockholders meeting, and the Defendants declined to evaluate or vote upon such proposal. The Complaint alleges that this constituted a new wrongful act, and the statute of limitations began accruing upon the wrongful act. New damages flow from this wrongful act — the Plaintiff's expectation damages, which is what Plaintiff's profits would have been if Defendants had accepted the proposal minus what Plaintiff's profits actually were. These damages are distinct from the Defendants' alleged 2008 wrongful act. The damages for the 2008 wrongful act of setting the Uniform Rate would be the difference in CSX's profit if the parties had set the Uniform Rate at a fair market rate in 2008 minus CSX's actual profit. The damages from establishing the 2008 Uniform Rate do not encompass the damages sought for

other alleged wrongful acts in this action.  Thus, this is not a case where a singular wrongful act results in continuing damages.  See Kancor Americas, Inc. v. ATC Ingredients, Inc., No. 15-CV00589-GBL-IDD, 2016 WL 740061, at *6 (E.D. Va. Feb. 25, 2016) (denying summary judgment because the various breach of contract, unjust enrichment, and conversion claims were not time barred as defendant's failure to pay back the money was a separate act each time defendant failed to pay, giving rise to a new cause of action, as opposed to a single act where the damages are permanent and continue accruing even if the defendant does not continue to act wrongfully).

While it is easy to see how these new actions constitute a new act of breaching the contract or tortiously interfering, it may be more difficult to see how it is a new act of conspiring because the alleged conspirators are the same and the alleged motivations are the same.  However, the Complaint alleges that in 2018, Defendants entered into a new agreement to increase the amount Belt Line pays to NS to access NS's tracks to NIT.  (In fact, this is the subject of proceedings before the STB).  Defendants Norfolk Southern and Belt Line fail to address this allegation, which reflects a new alleged conspiracy.  Any increase in the price that Norfolk Southern charges Belt Line would, in turn, be passed onto Belt Line's customers.  That is, it would lead to an increase in the Uniform Rate.  The Court

concludes that Plaintiff has alleged a new conspiracy within the statute of limitations period; this second attempt to raise the Uniform Rate is not a continuation of the same conspiracy to set the Uniform Rate at the 2008 level because the price is again increased. See Forest Lakes Cmty. Ass'n, Inc. v. United Land Corp. of Am., 293 Va. 113, 124 (Va. 2017) (in finding that multiple trespasses occurred, each of which was subject to the statute of limitations independently, the Supreme Court of Virginia cautioned courts to distinguish between recurring and indefinite injuries and repeated actions because the latter gives rise to causes of action that "look "remarkably like an earlier one but is nonetheless a standalone claim in its own right" and the statute of limitations in the latter scenario accrues from the new date of injury).

For the reasons stated above, the Court finds that Plaintiff has alleged wrongful acts within the statute of limitations period.  Therefore, as the claims are not untimely, the Court does not lack jurisdiction.

## 2. Breach of Contract

The Court now turns to Defendants' various arguments about the state law claims.  The Court begins with the breach of contract claim.  Count V, the breach of contract claim, is only alleged against Norfolk Southern.  Norfolk Southern argues that

CSX fails to state a claim because it has not identified a covenant in the Operating Agreement that NS has breached.

The contract in question is the Operating Agreement of Belt Line, which states that Belt Line would operate "for the mutual benefit of each [shareholder] in the interchange of business." ECF No. 1-1 at 1. Norfolk Southern attempts to argue that this language is merely a preamble, and not a binding term. Plaintiff has alleged that this term is the very overarching purpose of the Belt Line agreement. The Court does not need to determine whether this language constitutes a binding term of the contract at the motion to dismiss stage. Plaintiff's allegation is sufficient to overcome the motion to dismiss, as the language is either unambiguous and therefore a discernible contract term justifying denial of the motion to dismiss, or it is ambiguous such that the motion to dismiss should be denied as discovery would be necessary to determine the intention of the parties regarding this clause. See, e.g., Grubb & Ellis Co. v. Corkhill, No. 1:09-CV-974, 2009 WL 10689439, at *1 (E.D. Va. Oct. 15, 2009) (denying motion to dismiss because "[i]n this case the Court finds that the language of the contract is not unambiguous as the parties clearly interpret various provisions of the contract differently. Further, the Court believes that parol evidence may be necessary to determine the intent behind the terms of the contract.").

Further, Plaintiff notes that other articles of the Agreement contain covenants Norfolk Southern is alleged to have breached, as they state that the parties to the agreement "will co-operate cordially in encouraging the business of the [Belt Line] for which it is constructed." ECF No. 1-1 at 4. Contrary to Norfolk Southern's assertions, this clause is not indefinite. Under Virginia law, cooperation clauses are generally enforceable. See, e.g., Felman Prod., Inc. v. Indus. Risk Insurers, No. CIV.A. 3:09-0481, 2011 WL 4543966, at *4 (S.D.W. Va. Sept. 29, 2011) (finding that cooperation clause in insurance contract was enforceable). Here, Norfolk Southern has stated no reason why this clause would be any different.

For the reasons stated above, the motion to dismiss the breach of contract claim, on the basis that CSX has failed to identify a covenant in the Operating Agreement that Norfolk Southern has breached, is denied.

### 3. Tortious Interference with a Business Expectancy

Norfolk Southern next argues that CSX fails to state a claim for tortious interference with a business expectancy (Count VII) because Norfolk Southern is a party to the Operating Agreement and a party may breach, but cannot interfere with, its own contract. Further, Norfolk Southern argues that the economic loss rule bars a tortious interference claim. For its part, Belt Line argues that CSX's alleged business expectancy is

42

a general interest shared by all stockholders and a claim of interference with such a business expectation can be brought only as a derivative claim. Next, Belt Line argues that CSX has failed to state a valid business expectancy.

In Virginia, a party may recover for tortious interference with a business expectancy if it shows: "'(1) the existence of a business relationship or expectancy, with a probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship or expectancy; (3) a reasonable certainty that absent defendant's intentional misconduct, plaintiff would have continued in the relationship or realized the expectancy; and (4) damages to the plaintiff.'" Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 228 (4th Cir. 2004) (quoting Commercial Bus. Sys., Inc. v. Halifax Corp., 253 Va. 292, 484 S.E.2d 892, 896 (Va. 1997)).

Both Belt Line's first argument, that there can be no tortious interference with a business expectancy because any business expectancy is a general expectation shared by all Belt Line stockholders, and Norfolk Southern's first argument, that it cannot interfere with a contract to which it is a party, suffer from similar defects. The business expectation in question is not the savings to its shareholders that would result from Norfolk Southern charging a fair rate to Belt Line to access the tracks to NIT, and Belt Line then setting a lower

43

Uniform Rate.  CSX also is not alleging tortious interference with the Operating Agreement.  Rather CSX argues that Norfolk Southern and Belt Line have interfered with CSX's business expectancy from third party customers who would have paid CSX to transport goods from NIT.  That is not a general expectation shared by all Belt Line stockholders but one that is specific to CSX, and Norfolk Southern is not a party to any such anticipated business.

Norfolk Southern's second argument is that the economic loss rule bars any recovery by CSX for tortious interference with a business expectancy.  Under Virginia law, the economic loss rule provides that where a person is a party to a contract with another and has suffered purely economic losses related to the contract, rather than, for instance, physical injuries, that person may not recover damages in tort.  See Blake Construction Co. V. Alley, 353 S.E.2d 724, 727 (Va. 1987).  This is because "a plaintiff who suffers purely economic loss must sue in contract and cannot sue in tort."  Fix v. Eakin/Youngentob Assocs., Inc., 57 Va. Cir. 149, at *1 (Alexandria City, Va. Cir. 2001).  That is, the parties' recourse is through the agreement that they have signed rather than tort claims.  Here, CSX and NS have entered into a contract: the Operating Agreement of Belt Line.  Having only suffered economic damages, the economic loss rule prevents CSX from bringing a claim for tortious

44

interference, or any other tort, where any damage results from a breach of the Operating Agreement. However, "[t]he economic loss rule does not bar recovery [for] plaintiffs' claim for tortious interference with a prospective business or economic advantage." Fix, 57 Va. Cir. at 149. These damages are not related to the contract; therefore, CSX may still bring a tort claim although it has only suffered economic loss. For these reasons, Norfolk Southern's motion to dismiss Count VII-tortious interference with a business expectancy-fails.

However, Belt Line's second argument, that CSX has failed to state a sufficient business expectancy to survive a motion to dismiss, has greater merit. Courts have held that the mere possibility of a future business relationship is not enough to satisfy the tort's first and third elements—1) probability of future economic benefit to the plaintiff, and 3) but for the defendant's misconduct, the plaintiff would have realized the expectancy. Instead, a plaintiff must demonstrate that a future economic benefit is objectively probable. Am. Chiropractic, 367 F.3d at 228 (citing Commercial Bus. Sys., 484 S.E.2d at 897). In Peterbilt of Bristol, Inc. v. Mac Trailers, Mfg., the Western District of Virginia found that a local truck dealer failed to state a valid claim for tortious interference with a business expectancy because the complaint alleged merely that an out-of-state dealer illegally sold a truck to one of plaintiff's

existing customers, but failed to allege that the economic benefit was objectively probable by demonstrating that but for the interference, the customer would have purchased the truck from the plaintiff truck dealer. No. 1:09CV00058, 2009 WL 4063663, at *1 (W.D. Va. Nov. 23, 2009). Here, the business expectancy is even more tenuous than the one in Peterbilt.

CSX has failed to name or identify an actual third party with whom CSX would engage in business. CSX alleges that it has lost "opportunities for contracts with shipping partners." Compl. ¶ 117. The Complaint then relies on the Virginia Port Authority's assessment that having an additional railroad with access to NIT "would allow more volume to be moved at competitive prices," and the fact that CSX is the only other railroad that can "provide intermodal services" at NIT. Id. ¶¶ 4, 36. These allegations are insufficient to meet the objective probability standard set forth in Peterbilt. In Peterbilt, the third party also had a preexisting business relationship. Similarly, CSX has alleged a business relationship with its shipping partners (although they are unidentified). 2009 WL 4063663, at *1. However, the plaintiff in Peterbilt did not sufficiently allege that the plaintiff would have realized the economic benefit. That is, the plaintiff did not allege that, but for the out-of-state competitor's wrongdoing, the customer would have purchased the truck from plaintiff. Id. Similarly,

46

CSX has not alleged that it would realize the economic benefit by demonstrating, for instance, that its shipping partners also use NIT and would engage CSX if CSX were able to access NIT. Therefore, the Court finds that Plaintiff has failed to allege a plausible claim that it has suffered tortious interference with a business expectancy.

Although CSX does not request leave to amend any defective claims, after a dismissal under Fed. R. Civ. P. 12(b)(6), a court "normally will give plaintiff leave to file an amended complaint" because "[t]he federal rule policy of deciding cases on the basis of the substantive rights involved rather than on technicalities requires that plaintiff be given every opportunity to cure a formal defect in his pleading." Ostrzenski v. Seigel, 177 F.3d 245, 252-53 (4th Cir. 1999) (emphasis omitted). A court may grant such leave *sua sponte*. Edwards v. Murphy-Brown, L.L.C., 802 F. Supp. 2d 670, 673 (E.D. Va. 2011). However, "a district court may deny leave to amend if the amendment 'would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile.'" U.S. ex rel. Nathan v. Takeda Pharm. N. Am., Inc., 707 F.3d 451, 461 (4th Cir. 2013) (quoting Laber v. Harvey, 438 F.3d 404, 426 (4th Cir. 2006)).

Here, there has been no showing of prejudice, bad faith, or futility that would result from allowing Plaintiff to amend. Thus, Plaintiff is granted leave to amend the Complaint.

### 4. Statutory and Common Law Conspiracy

Next, Belt Line argues that Counts VIII and IX, alleging statutory and common law conspiracy, should be dismissed because Belt Line cannot conspire with Norfolk Southern as there can be no conspiracy between a parent and its majority-owned subsidiary. Alternatively, Belt Line argues the conspiracy is not plausible.

Belt Line's first argument rehashes the same argument it made with respect to the federal antitrust conspiracy claims, except it attempts to apply the argument to the state law conspiracy claims. As explained below, the Court rejects the argument for the same reasons discussed above in the antitrust conspiracy section. Compare Havird Oil Co. v. Marathon Oil Co., 149 F.3d 283, 292 (4th Cir. 1998) (finding that a parent and a non-wholly owned subsidiary could not be considered the same entity and therefore, could be liable under South Carolina state conspiracy law) with Zimpel v. LVI Energy Recovery Corp., 23 Va. Cir. 423 (Fairfax Cnty., Va Cir. 1991) (finding that because subsidiary was wholly owned it could not conspire with its parent for the purposes of a Virginia state law conspiracy).

Like its _Copperweld_ antitrust argument that a parent and subsidiary cannot conspire for antitrust purposes, Belt Line argues that the Virginia intracorporate immunity doctrine does not permit a single entity to conspire for the purposes of common law business or statutory conspiracy. The Virginia intracorporate immunity doctrine recognizes that conspiracy requires two or more persons, and therefore, a single entity, like a corporation, cannot conspire with itself. To determine whether two parties are "a single entity," Virginia courts have looked to the U.S. Supreme Court decision in _Copperweld_. _Zimpel v. LVI Energy Recovery Corp._, 23 Va. Cir. 423 (Fairfax Cnty., Va. Cir. 1991) ("The Virginia Civil Conspiracy statute has [like in _Copperweld_] been construed to disallow consideration of a parent and its wholly owned subsidiary as separate 'persons.'").

Here, Belt Line cannot satisfy the brightline rule established in _Copperweld_ because it is not a wholly-owned subsidiary of Norfolk Southern, and CSX alleges that Belt Line and Norfolk Southern have divergent interests. Further, as with federal law, under Virginia law, whether two parties are a single entity is a question of fact, and it would be inappropriate to resolve that issue definitively at this stage. _Peterson v. Fairfax Hosp._, No. 11188., 1993 WL 946248, at *10 (Loudoun Cnty., Va. Cir. Sept. 23, 1993) ("The Court has already overruled the Demurrer of the Defendants predicated on the

49

theory of intracorporate immunity. Such a defense to the conspiracy Count is best raised at a trial on the merits or by way of a motion for summary judgment.").

Belt Line next argues, with respect to the merits of the statutory and common law conspiracy counts, that CSX has failed to adequately allege such claims because CSX has not alleged Belt Line engaged in any unlawful acts. As with the antitrust conspiracy claims, Belt Line argues that it committed no wrongful act, and therefore all claims against it must be dismissed. As discussed above, *supra* at 25-27, CSX has already alleged plausible wrongful acts, for instance, the failure by Belt Line to adopt or even consider CSX's rate proposal. This is enough to allege a breach by Belt Line of its fiduciary duty to shareholders. Compl. ¶¶ 109-113, 114-117; <u>see specifically</u> <u>id.</u> ¶ 116 ("Defendants NS and [Belt Line] have wrongfully employed improper methods in order to intentionally interfere with these expectancies, such as unfair competition, breach of fiduciary duty by the Individual Defendants, and using Belt Line as a means of self-dealing."). Under Virginia law, a breach of fiduciary duty is an unlawful act on which a conspiracy claim can rest. <u>Feddeman & Co., C.P.A., P.C. v. Langan Assocs., P.C.</u>, 260 Va. 35, 46 (Va. 2000). Therefore, Plaintiff has alleged at least one wrongful act—breach of fiduciary duty upon which common law and statutory conspiracy claims may rest. Therefore,

50

Plaintiff has adequately alleged common law and statutory conspiracy claims.

For the reasons stated above, Belt Line's motion to dismiss the state law conspiracy counts fails.

### D. Derivative Claims

### 1. Jurisdiction

Finally, the Court addresses the Individual Defendants' challenges to Count VI-the shareholder derivative claim. The Court begins with Moss's jurisdiction challenge. Moss argues that Count VI should be dismissed for lack of subject matter jurisdiction because it does not arise out of the same case or controversy as the various federal antitrust, state law breach of contract, tortious interference and conspiracy claims against NS and Belt Line, and therefore provides no independent or related basis for jurisdiction.

The applicable statute provides that federal "courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they *form part of the same case or controversy* under Article III of the United States Constitution." 28 U.S.C. § 1367. For the claims to form part of the same case or controversy, the claims must "arise from the same set of facts." Eriline Co. S.A. v. Johnson, 440 F.3d 648, 653 (4th Cir. 2006). Here, the shareholder derivative claims are based on the

allegations that the Belt Line directors breached their various fiduciary duties by engaging in the federal antitrust, state breach of contract, and tort conspiracies, with the corporate Defendants. Moss argues that to prove a federal antitrust claim will require CSX to introduce expert testimony from economists, while the derivative claim will require expert testimony regarding the standard of care required from Virginia corporate board members and factual evidence regarding any violation of that standard.

"To determine whether state law claims and federal law claims arise from a common nucleus of operative fact, district courts consider whether the claims are based on 'the same facts, or involve similar occurrences, witnesses or evidence.'" Maria v. Projekt Prop. Restoration, Inc., No. 18-CV-61279, 2019 WL 1116187, at *2 (S.D. Fla. Jan. 23, 2019) (quoting Hudson v. Delta Airlines, Inc., 90 F.3d 451, 455 (11th Cir. 1996)). Although it is true that some elements of the various claims will require different evidence in this case, the factual evidence required to demonstrate that Belt Line and Norfolk Southern committed antitrust and state law business conspiracies, and that Moss breached his fiduciary duties, are essentially the same. To prove these claims, CSX will have to demonstrate that Moss colluded with the other Defendants, committing wrongful acts that constitute breaches of antitrust

and conspiracy law by Norfolk Southern and Belt Line, and breaches of fiduciary law by Moss. That is, the wrongful act that CSX alleged Moss committed is substantially linked to Norfolk Southern and Belt Line's alleged wrongful act; these wrongful acts merely constitute violations of different laws for each of the Defendants. However, this demonstrates that the claims against Moss still arise out of a common nucleus of operative fact as the claims against the other Defendants, in particular, the federal antitrust claims alleged against Norfolk Southern and Belt Line. For these reasons, Moss's jurisdictional argument fails.

### 2. Failure to State a Claim

All Individual Defendants argue that CSX has failed to allege a breach by the directors of their fiduciary duties.

In Virginia, a director has a duty to act in "good faith" and to "discharge his duties" in accordance with "the best interests of the corporation." Va. Code § 13.1-690(A); see also DCG&T ex rel. Battaglia/Ira v. Knight, 68 F. Supp. 3d 579, 587 (E.D. Va. 2014) (in Virginia, corporate directors must exercise good faith in their dealings with the corporation and its shareholders). Directors also owe a duty of loyalty, which "forbids the director from placing himself in a position where his individual interest clashes with his duty to his corporation." Id. (internal quotations omitted).

The Complaint alleges three purported breaches of these fiduciary duties: 1) the failure to consider and rejection of the service proposal, as to all Individual Defendants, 2) the failure to consider and rejection of the governance proposal, as to all Individual Defendants, and 3) the failure to staunch the deteriorating financial condition of Belt Line, as to Defendant Moss.

### a. Service Proposal

Individual Defendants argue that the first purported breach cannot be a breach because, if they had accepted the service proposal, they would have violated Belt Line's Operating Agreement. The Operating Agreement states that Belt Line must provide a uniform rate for all shareholders (Norfolk Southern and CSX). Defendants argue that CSX's proposal sought a rate for itself that was lower than the Uniform Rate that was set. However, as already discussed, the Complaint and the attached service proposal do not allege that CSX sought a lower preferential rate for itself. The lowered rate is not limited to CSX, but appears to be a proposal for a lower Uniform Rate. The proposal states clearly that "Presently, the [Belt Line's] switch rate of $210 per car is an economic barrier that prevents CSXT from being able to move any meaningful port freight by rail at NIT. . . . Accordingly, CSXT proposes the following, all to be memorialized in a formal agreement: One-way rate of $37.50

54

per container (empty or loaded) for a term of three years on movements handled by the [Belt Line] between Berkley Yard and NIT." ECF No. 1-5.

Nowhere in the proposal or the Complaint does it state that the rate would be lowered only for CSX. Again, Belt Line and its directors had the authority to accept the proposal; however, CSX has alleged that Belt Line and its directors failed to accept or even consider the proposal because of a conspiracy to keep the Uniform Rate artificially high in order to help Norfolk Southern maintain monopoly power over traffic to NIT. Such allegations are sufficient to allege a plausible breach of a director's various fiduciary duties under Virginia law. See, e.g., Glass v. Glass, 228 Va. 39, 47, 321 S.E.2d 69, 74 (1984) (engagement in a civil conspiracy may violate a director's duty to act in good faith); In re LandAmerica Fin. Grp., Inc., 470 B.R. 759, 797 (Bankr. E.D. Va. 2012) (citing Upton v. S. Produce Co., 133 S.E. 576, 580 (Va. 1926) (stating that officers may not abuse their positions for self-gain and profit as they "owed the duty of frankness and fair dealing as fiduciaries to [shareholders].").

### b. Governance Proposal

Because CSX has only alleged one count of breach of fiduciary duty, and the Court has found that CSX has alleged a plausible breach of fiduciary duty claim with respect to the

rejection and failure to consider CSX's service proposal, it is not <u>necessary</u> to decide whether CSX has plausibly alleged a breach of fiduciary duty based on Individual Defendants' failure to consider and rejection of the Governance proposal. However, the Court briefly addresses each remaining argument.

With respect to Individual Defendants' argument that Plaintiff failed to plausibly allege breaches of fiduciary duties because Individual Defendants did not have the power to change the corporate governance structure of Belt Line, that argument ignores the allegations that the directors individually breached their duties by refusing to <u>consider</u> the corporate governance proposal at all, and also breached their fiduciary duties by refusing to adopt other aspects of the proposal aside from changing the process of appointing directors, which were in the directors' power to accept. <u>See, e.g.</u>, <u>Stickley v. Stickley</u>, 43 Va. Cir. 123, at *21 (Rockingham Cnty., Va. Cir. 1997) (finding breach of fiduciary duty where officer acts solely for the interest of majority shareholder and inter alia, rejects various proposals and requests by minority shareholder). Therefore, it appears CSX has plausibly alleged a breach of fiduciary duty by Individual Defendants, and the motions to dismiss on these grounds are denied.

### c. Deteriorating Financial Condition

Next, Individual Defendant Moss argues that he had no duty to act in the financial best interest of Belt Line because Belt Line is not a profit maximizing corporation. Directors of for-profit corporations have a duty to maximize profits. <u>See generally</u> David B. Guenther, <u>The Strange Case of the Missing Doctrine and the "Odd Exercise" of Ebay: Why Exactly Must Corporations Maximize Profits to Shareholders?</u>, 12 Va. L. & Bus. Rev. 427, 429 (2018) (collecting cases).[7] The Complaint alleges, as discussed above, that Belt Line's Operating Agreement states the purpose of the corporation is "for the mutual benefit of each [owner-shareholder] in the interchange of business." ECF No. 1-1. This clause plausibly alleges that Belt Line did have to maximize profits because maximizing profits may be for the mutual benefit of its shareholders. In that case, Moss has a duty to act in the interest of Belt Line's shareholders by maximizing profits, and CSX has plausibly alleged that a failure by Moss to maximize profits is contrary to the interest of Belt Line's shareholders and violative of his fiduciary duties.

---

[7] The Court recognizes that there is a debate about the scope of this duty and <u>how</u> to maximize profits, as reflected in the most recent Principle of Corporate Governance as to the purposes of a corporation, issued by the Business Roundtable. <u>Statement on the Purpose of a Corporation</u>, Business Roundtable (Aug. 19, 2019), https://opportunity.businessroundtable.org/ourcommitment; <u>see also</u> Claudine Gartenberg & George Serafeim, <u>181 Top CEOs Have Realized Companies Need a Purpose Beyond Profit</u>, Harv. Bus. Rev., Aug. 20, 2019, https://hbr.org/2019/08/181-top-ceos-have-realized-companies-need-a-purpose-beyond-profit.

It is true that directors of social, environmental, and other charitable organizations do not have a duty to maximize profits. Guenther, *supra* at 429. However, the Complaint does not allege that Belt Line is a social, environmental, or charitable organization. Therefore, based on the allegations, the Court cannot conclude that Belt Line is not a profit-maximizing corporation per se, and that Moss did not owe a fiduciary duty to maximize profits.

For the reasons stated above, the Individual Defendants' motions to dismiss the derivative claims fail.

### 3. Supplemental Jurisdiction

Individual Defendants further ask the Court to decline to exercise supplemental jurisdiction over the shareholder derivative claims for breach of fiduciary duty because the antitrust claims are already complex and the combination of the two in one trial may lead to jury confusion. Under 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental jurisdiction if:

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

Individual Defendants have not demonstrated any of the factors above.  No novel or complex issues of state law are raised; the state law claims do not substantially predominate; and the Court has not dismissed any federal claims.  With respect to Individual Defendants' argument that the jury would be confused by trying all claims together, in these circumstances, such a jury confusion argument is not a compelling reason for declining jurisdiction as any confusion may be mitigated with careful jury instructions.  Wright's Well Control Servs., LLC v. Oceaneering Int'l, Inc., No. CV 15-1720, 2016 WL 740357, at *2 (E.D. La. Feb. 25, 2016) ("In every lawsuit involving multiple claims, jurors are required to weigh the evidence for each claim individually, and that obligation will present no undue burden on the jury in this case."); Guedry v. Marino, 164 F.R.D. 181, 186 (E.D. La. 1995) (noting that the risk of jurors becoming confused by the "sheer number of claims presented . . . can be addressed by instructions").  Further, shareholder derivative claims and antitrust claims are each complex.  In re Cendant Corp., Derivative Action Litig., 232 F. Supp. 2d 327, 337 (D.N.J. 2002) (describing shareholder derivative action as complex).  Therefore, the Individual Defendants have failed to explain why jurors may be capable of understanding the antitrust and derivative claims if tried separately, but would be confused by the same claims if faced with them in the same proceeding.

## IV. CONCLUSION

For the reasons stated above, the Motions to Dismiss of Defendants Moss, Hall, Hurlbut, Merrilli, and Norfolk Southern are **DENIED**. ECF Nos. 29, 31, 34. Defendant Belt Line's Motion to Dismiss is **GRANTED IN PART AND DENIED IN PART**. ECF No. 27. The Court **PROVIDES** Plaintiff with leave to amend the Complaint to cure defects with respect to Count VII-tortious interference-within ten (10) days after the entry of this Order. The joint motion for a hearing, ECF No. 43, is **DENIED**.

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

/s/ Mark S. Davis

Mark S. Davis
CHIEF UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
September 9 , 2019