AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Eastern District of Virginia

| | |
|---|---|
| CSX Transporation, Inc. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 2:18-cv-00530-MSD-LRL |
| Norfolk Southern Railway Company, et al. | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:      Virginia International Terminals, LLC c/o Jason Barlow, Registered Agent
101 West Main Street, Suite 600, Norfolk, VA  23510

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: Please see Schedule A attached hereto.

| Place: McGuireWoods LLP<br>101 West Main Street, Suite 9000<br>Norfolk, VA  23510 | Date and Time:<br>01/03/2020 10:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      12/06/2019

| CLERK OF COURT | OR | *[signature]* |
|---|---|---|
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
CSX Transporation, Inc. _____, who issues or requests this subpoena, are:

Robert W. McFarland, McGuireWoods LLP, 101 W. Main St., Ste. 9000, Norfolk, VA  23510, rmcfarland@mcguirewoods.com, (757) 640-3716

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   2:18-cv-00530-MSD-LRL

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❑ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____   on *(date)* _____ ; or

❑ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $      0.00      .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE A

### Rule 45 Subpoena for the Production of Documents

This schedule identifies the documents and tangible things requested by Plaintiff, CSX Transportation, Inc. under Federal Rule of Civil Procedure 45, that must be produced by third-party Virginia International Terminals, LLC for inspection and copying pursuant to the attached subpoena.

## DEFINITIONS

For purposes of these document requests, terms not specifically defined shall be given their ordinary meaning. If you do not understand the meaning of any term, please seek clarification immediately through CSXT's counsel. The following definitions apply to the document requests below:

1. "Action" means the lawsuit captioned *CSX Transportation, Inc., individually and on behalf of Norfolk & Portsmouth Belt Line Railroad Company v. Norfolk Southern Railway Company, Norfolk & Portsmouth Belt Line Railroad Company, Jerry Hall, Thomas Hurlburt, Philip Merilli, and Cannon Moss* (Case No. 2:18-cv-00530), pending in the Norfolk Division of the United States District Court for the Eastern District of Virginia.

2. "You" or "VIT" means and includes Virginia International Terminals, LLC, its subsidiaries, affiliates, all of its present and former officers, employees, agents, or anyone acting on behalf of the foregoing, individually, collectively, or in any combination and any agents acting on your behalf, individually, collectively, or in any combination.

3. "Plaintiff" or "CSXT" means CSX Transportation, Inc., the Plaintiff in the above-referenced Action, as well as CSX Corporation, its subsidiaries, and affiliates.

4. "Defendants" refers to Norfolk Southern Railway Company, Norfolk & Portsmouth

Belt Line Railroad Company, Jerry Hall, Thomas Hurlburt, Philip Merilli, and Cannon Moss.

5.       "NSR" refers to Defendant Norfolk Southern Railway Company, Norfolk Southern Corporation, and all persons acting on its behalf, including but not limited to, officers, management, directors, employees, agents, attorneys, and representatives.

6.       "NPBL" refers to Defendant Norfolk & Portsmouth Belt Line Railroad Company, and all persons acting on its behalf, including but not limited to, officers, management, directors, employees, agents, attorneys, and representatives.

7.       "Complaint" means the Complaint filed in this Action on October 4, 2018, attached as **Exhibit 1**.

8.        "VPA" means the Virginia Port Authority, a political subdivision of the Commonwealth of Virginia that owns the Port of Virginia, and all persons acting on its behalf at any point in time, including but not limited to, current or former officers, management, directors, employees, agents, attorneys, and representatives.

9.       "NIT" means Norfolk International Terminals, located in Norfolk, Virginia, and all persons acting on its behalf at any point in time, including but not limited to, current or former officers, management, directors, employees, agents, attorneys, and representatives.

10.      "VIG" means Virginia International Gateway, located in Portsmouth, Virginia, formerly known as APM Terminals Virginia, and all persons acting on its behalf at any point in time, including but not limited to, current or former officers, management, directors, employees, agents, attorneys, and representatives.

11.      "PMT" means Portsmouth Marine Terminal, located in Portsmouth, Virginia, and all persons acting on its behalf at any point in time, including but not limited to, current or former officers, management, directors, employees, agents, attorneys, and representatives.

12.     "East Coast Ports" means all major ocean ports and marine terminals on the Atlantic and Gulf coasts in the United States located east of the Mississippi River, including terminals located in the Port of New Orleans, Port of New York/New Jersey, Port of Baltimore, Port of Charleston, and Port of Savannah.

13.     The "Midwest" shall mean destinations in the Midwest of the United States, including, but not limited to, Illinois, Ohio, Indiana, Michigan, Wisconsin , Iowa, Missouri, and Nebraska.

14.     The terms "steamship line" or "shipping line" means any person or entity that provides cargo transportation services aboard vessels or is in the business of transporting cargo aboard ships.

15.     "Data file" shall mean a file or report that includes the requested information, in a usable form and format (i.e, a spreadsheet, a text file, or CSV file).  To the extent you have any questions about the production of a Data file, CSXT requests that VIT confer with CSXT regarding the format, availability of information, and any limitations.

16.     "Document" shall have the full meaning ascribed to it in Federal Rule of Civil Procedure 34(a)(1), and includes, but is not limited to, all of the items defined in Federal Rule of Evidence 1001, non-identical copies and preliminary and final drafts of any such item, electronically stored information, and all tangible embodiments, manifestations, or evidence of a communication, as defined below.  For the avoidance of doubt, any electronic Documents or data shall include associated "metadata."

17.     "Communication" or "communications" means and includes any and all forms of information transmission, exchange, or storage, including, but not limited to, written, oral, electronic, telephonic, video-graphic, or other inquiries, dialogues, discussions, conversations,

interviews, correspondence, consultations, negotiations, agreements, understandings, meetings, notes, telegrams, advertisements, computer mail and email, and all other documents and things evidencing any verbal or nonverbal interaction between persons and entities.

18. The term "agreement" means any contract, arrangement, understanding, or accord, whether or not reduced to a written instrument, whereby two parties agree or promise to act in a certain manner.

19. The terms "person" and "party" mean any natural individual in any capacity whatsoever or any business, legal, or governmental entity or organization, including but not limited to VIT and its affiliates, including divisions, subsidiaries, departments, and other units therein, and includes any officers, agents, or employees thereof; the terms "other person" and "third party" mean any person or party other than VIT.

20. The terms "concerning" and "regarding" mean comprising, containing, constituting, reflecting, discussing, showing, evidencing, embodying, describing, supporting, contradicting, refuting, identifying, summarizing, reporting, relating to, pertaining to, referring to, or in any way logically or factually connected with the stated matter.

21. As used herein, the singular of any word or phrase includes the plural and the plural of any word or phrase includes the singular, and "and" and "or" shall be construed conjunctively or disjunctively to bring within the scope of these Requests any information, documents, or tangible things that might otherwise be construed outside the scope of these Requests.

## INSTRUCTIONS

1. This subpoena requires you to produce all responsive documents that are in your actual or constructive possession, custody, or control within the meaning of Federal Rule of Civil Procedure 45(a)(1)(A)(iii).

2.      Pursuant to Federal Rules of Civil Procedure 34 and 45, the categories of documents, electronic files and other things identified below are to be (1) produced to Robert W. McFarland, McGuireWoods, LLP, 9000 World Trade Center, Norfolk, Virginia 23510-1655; or (2) made available for copying as they are kept in the usual course of business.

3.      Documents produced in response to these Requests may be produced subject to the Stipulated Protective Order in effect in this case (ECF No. 79), attached as **Exhibit 2**.  To the extent that material produced in response to these Requests is "Confidential" or "Confidential-Attorneys' Eyes Only" within the meaning specified in the Protective Order, you should affix the appropriate designation on each page of the document that contains such Protected Material.  Such Protected Material will be held confidential and protected from disclosure in accordance with the terms of the Protective Order.

4.      CSXT requests that VIT produce the Documents requested as they are kept in the usual course of business or organize and label them to correspond with the Requests to which they are responsive.  If there are no Documents responsive to any particular request, CSXT requests that VIT state so in writing rather than leave the Request unanswered.

5.      To the extent VIT considers any of the Requests objectionable, indicate the part of each Request for which you raise the objection, the grounds for each objection, and identify any information that is being withheld on the basis of the objection.

6.      Unless otherwise specified, these Requests cover the time period from January 1, 2007 to the present.

<u>**REQUESTS**</u>

1.      Documents sufficient to show intermodal port and rail infrastructure in and around Hampton Roads, Virginia.

2.      Data file(s) showing, for the time period from January 1, 2007 to the present, the following:

   a.   The capacity and freight volumes for both rail and trucks by carrier, port of origin, destination, and rates for freight shipped through NIT, VIG, and PMT;

   b.   Drayage of intermodal containers to or from NIT, VIG, and PMT to any intermodal facility where the containers were loaded on or off trains;

   c.   The costs of drayage per container at NIT, VIG, and PMT;

   d.   Container volumes loaded and unloaded from vessels at NIT, VIG, and PMT, by steamship line, alliance, or both;

   e.   Vessel calls at NIT, VIG, and PMT;

   f.   All rail traffic, including double-stack rail traffic out of NIT, VIG, and PMT; and

   g.   Wait times or other measures of congestion at NIT, VIG, and PMT.

3.      Documents sufficient to show the drayage capacity of NIT, VIG, and PMT, from January 1, 2007 to the present.

4.      Documents sufficient to show the intermodal container capacity at NIT, VIG, and PMT, from January 1, 2007 to the present.

5.      Documents reflecting your policies or practices with respect to making payments and/or providing subsidies towards drayage costs for intermodal freight out of NIT.

6.      All Documents and Communications between you and any party, including parties to this lawsuit and/or shipping lines, concerning the assignment of vessels to NIT, VIG, or PMT, including Documents showing how vessels are assigned to each Port of Virginia terminal.

7.      All Communications between you and any of the Defendants regarding the issues in this Action.

8.      All Communications between you and any steamship lines regarding rail access at NIT or the issues in this Action.

9.      All Documents and Communications showing rates or fees charged by VPA or VIT to rail carriers at NIT, including, but not limited to, intraplant switch rates and container lift charges.

10.     All Documents and Communications concerning VPA or VIT's acquisition of property from NPBL.

11.     All Documents and Communications concerning any acquisition or potential acquisition of any property for rail access at NIT, PMT, or VIG.

12.     All Documents concerning dual rail access at NIT, including any market studies or analyses regarding any benefit to the Port of Virginia as a result of multiple rail carriers having access to NIT, and all Documents concerning your representations that dual rail access is available at NIT.

13.     All Documents concerning the "Smart Stack" rail strategy, or any other strategy implemented by you regarding connections between NIT, VIG, and PMT and any railroad or railroad network.

14.     All Documents and Communications related to the Master Rail Plan for the Port of Virginia.

15.     All Documents comparing the volumes of intermodal freight by truck and rail in and out of the Port of Virginia with the volumes of intermodal freight by truck and rail in and out of other East Coast Ports.

16.     All Documents concerning switching rates of NPBL, Commonwealth Railway, or any other terminal switching railroads.

17.     All Documents showing the travel times of containers out of VIG, NIT, or PMT to the Midwest.

## CERTIFICATE OF SERVICE

I certify that on this 6th day of December, 2019, the foregoing was sent to the following counsel of record by Electronic Mail.

Alan D. Wingfield (VSB No. 27489)
Michael E. Lacy (VSB No. 48477)
TROUTMAN SANDERS, LLP
1001 Haxall Point
Richmond, Virginia 23219
alan.wingfield@troutman.com
michael.lacy@troutman.com

John C. Lynch (VSB No. 39267)
Elizabeth S. Flowers (VSB No. 78487)
Kathleen M. Knudsen (VSB No. 90845)
TROUTMAN SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, Virginia 23462
liz.flowers@troutmansanders.com
john.lynch@troutmansanders.com
kathleen.knudsen@troutman.com

Monica McCarroll
Redgrave LLP
14555 Avion Parkway, Suite 275
Chantilly, VA 20151
mmccarroll@redgravellp.com
*Counsel for Defendant Norfolk Southern Railway Company*

James L. Chapman, IV (VSB No. 21983)
W. Ryan Snow (VSB No. 47423)
Darius K. Davenport (VSB No. 74064)
David C. Hartnett (VSB No. 80452)
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1500
Norfolk, Virginia 23510
jchapman@cwm-law.com
wrsnow@cwm-law.com
ddavenport@cwm-law.com
dhartnett@cwm-law.com
*Counsel for Defendant Norfolk & Portsmouth Belt Line Railroad Co.*

W. Edgar Spivey (VSB No. 29125)
Clark J. Belote (VSB No. 87310)
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA 23510
wespivey@kaufcan.com
cjbelote@kaufcan.com
*Counsel for Defendant Cannon Moss*

Hugh M. Fain, III (VSB No. 26494)
M.F. Connell Mullins Jr. (VSB No. 47213)
John M. Erbach (VSB No. 76695)
SPOTTS FAIN P.C.
411 East Franklin Street, Suite 600
Richmond, VA 23219
hfain@spottsfain.com
cmullins@spottsfain.com
jerbach@spottsfain.com
*Counsel for Defendants Jerry Hall, Thomas Hurlbut,*
*and Philip Merilli*

**CSX TRANSPORTATION, INC.**
*By Counsel*

Robert W. McFarland (VSB No. 24021)
Benjamin L. Hatch (VSB No. 70116)
Jeanne E. Noonan (VSB No. 87863)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia  23510-1655
Telephone: (757) 640-3716
Facsimile:  (757) 640-3966
E-mail: rmcfarland@mcguirewoods.com
E-mail: bhatch@mcguirewoods.com
E-mail: jnoonan@mcguirewoods.com

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

CSX TRANSPORTATION, INC.,
individually and on behalf of NORFOLK
& PORTSMOUTH BELT LINE
RAILROAD COMPANY,

      Plaintiff,

v.                            Civil Action No. _2:18cv530_____

NORFOLK SOUTHERN RAILWAY
COMPANY, NORFOLK & PORTSMOUTH
BELT LINE RAILROAD COMPANY,
JERRY HALL, THOMAS HURLBUT,
PHILIP MERILLI, and CANNON MOSS,

      Defendants.
_____/

## COMPLAINT

Plaintiff CSX Transportation, Inc. ("CSXT"), individually and on behalf of

Norfolk & Portsmouth Belt Line Railroad Company ("NPBL"), by counsel, files this

Complaint against Defendants Norfolk Southern Railway Company ("NS"), NPBL,

Jerry Hall, Thomas Hurlbut, Philip Merilli, and Cannon Moss as follows:

### NATURE OF THE ACTION

1.    The NPBL is a terminal switching railroad operating in the cities of

Norfolk, Portsmouth, and Chesapeake, Virginia.  It was formed in 1896 by a

collection of railroads, who entered into an agreement "for the mutual benefit of each

1

in the interchange of business" to build and operate a belt line railway connecting various tracks of the eight railroads in Hampton Roads that would enable the interchange of cars among the railroads and connection to the port, among other facilities. In building and operating the NPBL, the founders sought to ensure that all railroads would have ready access to industries and ports which would ensure competition for transportation services. Toward that end, rail service to the Norfolk International Terminals ("NIT") was opened in 1917.

2. As a result of mergers and acquisitions among the original eight railroads, by the end of the twentieth century the number of NPBL members had decreased to three. In the late 1980's, the then-remaining three shareholders of NPBL—CSXT, Norfolk and Western Railway Company, and Southern Railway Company—agreed to reapportion the amount of amount of board seats associated with each shareholder. Critically, this reapportionment did not result in any single shareholder possessing majority control of the board, and indeed no single shareholder at that time owned a majority of the shares. After this reappointment, however, Norfolk and Western Railway Company and Southern Railway Company merged, with the result being that the new company, NS, owning 57% of the shares of NPBL, as compared to CSXT's 43%. For at least the past ten years, NS has inserted former NS employees in all management positions of the NPBL and current or former NS employees in four of the six NPBL Board of Directors voting positions

2

and one non-voting director.  NS and these directors and the NPBL management they put in place have conspired to operate the NPBL in order to benefit NS at the expense of the profitability and viability of the NPBL, and to harm NS's competitor CSXT.

3.     NS and the NPBL's conspiracy to operate the NPBL to pursue illegitimate ends is nowhere more vividly demonstrated than at the NIT, the largest international shipping terminal in Virginia.  Only two entities have the ability to access NIT by rail: NPBL and NS.  Currently, NPBL must utilize NS tracks in order to reach NIT.  NS and the NPBL have used the NPBL as a chess piece to establish and maintain NS's monopolistic control over intermodal transportation[1] in and out of NIT by making it practically impossible for any other rail carriers to provide intermodal rail service to NIT.  This has kept out competitors, but it has come at the expense of NPBL's own interests.  NS and NPBL have acted in concert to have NPBL demand a rate designed to exclude competition in the relevant market, dispose of NPBL's key rail assets, and take other actions contrary to NPBL's business interests.  Though NIT has been rapidly expanding and increasing its revenues in recent years due to increased shipping, NPBL's revenues have tellingly remained flat or decreased.

---

[1] Intermodal is the use of two modes of freight, such as ship and rail, to transport goods from shipper to consignee.

4.     The Virginia Port Authority ("VPA") has indicated that the growing port would benefit from multiple rail carriers being able to access NIT because it would allow more volume to be moved at competitive prices.  And yet, at this point, competitors such as CSXT are practically precluded from using the NPBL to connect to NIT because the rate set by NPBL's board, in concert with NS, is prohibitively expensive and because NS refuses to allow NPBL to handle intermodal trains over its tracks on a regular basis.  The only modern example in which CSXT actually utilized NPBL to connect to NIT occurred in 2015 when, due to closures of other ports around the country, the NIT was inundated with excess containers and because of demands from its customers, CSXT was forced to pay the high rate charged by the NBPL.  This was the briefest of windows in which CSXT could feasibly pay these rates because the other port closures caused all costs associated with ocean shipping to temporarily skyrocket. Under normal business conditions, the NPBL's rate and its operating procedures effectively preclude competitor access to NIT.

5.     CSXT wants to compete on fair terms at NIT, but has been unable to do so.  This condition exists despite the fact that the NPBL was created for the very purpose of fostering cooperative access for railroad carriers.  CSXT's recent proposal to NPBL to set a competitive rate and improve its services—including by volunteering the use of CSXT's own engines and fuel to perform NPBL's services— was summarily quashed by NPBL's board and management despite the projections

4

that CSXT's proposal would have substantially increased NPBL's business and revenues.

6.     NS's actions have resulted in the loss of existing and prospective intermodal business for CSXT.  It has also harmed the market by foreclosing competition for intermodal transportation servicing NIT.  And it has reduced revenue and income to the NPBL, which earns revenue and income by charging fees for interchange of trains and the use of its track.

## PARTIES

7.     CSXT is a Class I railroad operating in the Eastern United States and Canada.  CSXT is headquartered in Jacksonville, Florida and is incorporated under Virginia law.  It brings this suit on its own behalf and also in a derivative capacity as a shareholder of NPBL.

8.     NS is also a Class I railroad operating in the Eastern United States and Canada.  NS is headquartered in Norfolk, Virginia and is incorporated under Virginia law.

9.     The NPBL is a Class III terminal switching railroad.  It is headquartered in Chesapeake, Virginia, and is incorporated under Virginia law.

10.     Individual Defendants Jerry Hall, Thomas Hurlbut, Philip Merilli, and Cannon Moss are voting members of the NPBL Board of Directors, who, *inter alia*, participated in the rejection of CSXT's most recent service proposal.  Hall, Hurlbut,

and Merilli are also employees of NS.  Moss is a former employee of NS and has been the President and General Manager of NPBL since 2011.  The Individual Defendants are named as party defendants in Count VI only, but the conduct of the Individual Defendants is relevant to the other counts of the Complaint.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because CSXT's claims against Defendants arise under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and therefore raise federal questions.

12.    The Court has supplemental jurisdiction over all state law claims under 28 U.S.C. § 1367(a).

13.    This Court has personal jurisdiction over the Defendants because they are residents of Virginia, regularly conduct business in Virginia, and/or caused injury by acts in Virginia.

14.    Pursuant to 28 U.S.C. § 1391(b), venue is proper in this Court because a substantial part of the events giving rise to this dispute occurred within this District.

## FACTUAL ALLEGATIONS

*The Purpose and Structure of the NPBL*

15.    In 1896, eight railroads, including CSXT and NS's predecessors in interest, joined together to form the NPBL in order to provide an efficient means of interchanging the traffic of its owners between their lines and various marine

terminals and industries located along the NPBL's tracks.  In 1897, they signed the
NPBL Operating Agreement, attached hereto as Exhibit A.  The joint agreement
between the railroads was designed to ensure that all railroads would have ready
access to NIT, which would ensure competition for transportation services.

16.    The NPBL Operating Agreement, as amended, governs the ownership
and operation of the NPBL, and it creates and establishes various duties and
obligations between and among the shareholders.

17.    In order to advance the purpose for which the NPBL was formed, the
original shareholder companies, the predecessors of the current shareholders and
parties to the NPBL Operating Agreement, expressly agreed therein that the NPBL
would be a "separate organization in which all [railroads] are to be equally interested
and each to have an equal representation." Ex. A at 1.  The shareholders agreed that
it is in the best interest of all that each shareholder company have "equal
representation" in the organization; and accordingly the Operating Agreement
provides that each shareholder "shall have one representative on the Board" of the
NPBL. *Id.* at 1–2.

18.    The Operating Agreement further provides that each shareholder must
"co-operate cordially in encouraging the business of the [NPBL] for which it is
constructed." *Id.* at 4.  Under the Operating Agreement, the NPBL anticipates that
its shareholders will deliver to the NPBL all cars to be delivered to customers that

they cannot serve directly.  *Id.*  CSX thus has an expectation that the NPBL will provide it with an efficient means of interchanging its traffic including, without limitation, to and from the NIT.  *Id.* at 6 (referencing "the intent" that the NPBL "shall perform the service for which it was built and said Company be directly responsible for the competent and efficient discharge of its every obligation to the parties hereto").

19.     Further, under the NPBL Operating Agreement, the members of the NPBL Board of Directors are obligated to vote for "such resolutions, by-laws or other proceedings as may be necessary to carry into effect the agreements made in" the NPBL Operating Agreement. *Id.* at 6.

20.     The NPBL currently operates over 26 miles of track in and around the Hampton Roads area of Virginia.  A map of the NPBL and the tracks owned by other railroads in the area is attached hereto as Exhibit B.  Crucially, the NPBL provides a means of access to the largest port in Virginia and one of the largest ports on the Eastern Seaboard, NIT.  For any rail carrier other than NS, the only way to access NIT by rail is via NBPL.  Being accessible by deep-draft ships and operating some of the world's largest cranes, NIT is uniquely positioned to handle some of the largest ships in the world.  Yet NS, together with NPBL, through NPBL directors and managers, has essentially blocked access to this large and growing port facility for anyone but itself.

*The Supplemental Agreement*

21.    As a result of mergers and acquisitions among the original eight railroads, by the end of the twentieth century the number of NPBL members had decreased to three.  By 1989, the number of shareholder railroads owning the NPBL had declined to three—CSXT, Norfolk and Western Railway Company ("NW") and Southern Railway Company ("SR").

22.    In a Supplemental Agreement dated March 1, 1989, attached hereto as Exhibit C, the three railroads agreed that CSXT was afforded the right to appoint two representatives to the NPBL Board of Directors, and the other two companies, NW and SR, collectively between them were afforded the right to appoint three representatives to the NPBL Board. Ex. C ¶ 1. The Supplemental Agreement further provided that other than the single sentence of the Operating Agreement specifically referenced, "[n]othing herein shall be deemed to amend, alter, or affect any other provision of the NPBL Agreement." *Id.* ¶ 2.

23.    The following year, NW and SR merged to form the single company now known as Norfolk Southern Railway Company.  The merger of those two companies left NS and CSXT as the only remaining shareholders of the NPBL. As a result, NS owns 57% of NPBL, and CSXT owns 43%.  Per the NPBL By-Laws, which have been effect in their current form since 1996, attached hereto as Exhibit

D, NS has appointed four voting members to the NPBL Board of Directors and CSXT has appointed two.

24.   NPBL, a distinct corporation under Virginia law, remains an independent entity from its two remaining shareholders, NS and CSXT.  It operates according to its own bylaws and with its own management and Board of Directors. The railroads and NPBL lack economic integration, and the interests of NPBL can diverge from its railroad shareholders where higher prices mean higher revenue for NS but more cost for NPBL.  The conspiracy described below between NPBL and NS thus joined together separate decision-makers pursuing separate economic interests, depriving the marketplace of independent centers of decision-making.

*NPBL's Deteriorating Financial Condition*

25.   Rather than abide by the original purposes of the Operating Agreement, including the requirement to cordially cooperate in encouraging the business of NPBL, NS and the management of the NPBL conspired to operate the NPBL to harm CSXT and the market, even at the expense of the NPBL's own business interests.

26.   The NPBL Board of Directors currently consists of six voting members and one non-voting member.  Three of those voting positions are filled with current NS employees designated by NS to serve as NPBL Directors: Defendants Hall, Hurlbut, and Merilli.

27.     Another voting position is held by the NPBL President, Cannon Moss, a former NS employee who in 2011 was nominated at NS's direction and elected by vote of NS's shares, and over CSXT's objection.  Defendant Moss's predecessor, David Stinson, was also a former NS employee and returned to work at NS after his tenure as NPBL President.  Donna Coleman, the current non-voting member of the Board of Directors and Vice President of NPBL, is also a former employee of NS.  In addition, Bill O'Brien, the current Terminal Superintendent of NPBL, is also a former employee of NS.

28.     NS also has other connections with the management of the NPBL.  The management of NPBL all have NS email addresses, which they use to conduct the business of the NPBL.

29.     For at least 12 years, every President and VP of NPBL was a former NS employee.

30.     All of the individual Defendants have independent personal stakes in furthering NS's interests as Directors of NPBL, such as the expectation of future employment with NS and the expectation of future remuneration from NS.

31.     Collectively, Defendant Moss, in his capacity as a Director, along with Defendants Hall, Hurlbut, and Merilli constitute the four "Individual Defendants."

32.     NS in conspiracy with the NPBL, and through the Individual Defendants, have operated the NPBL as a vehicle for advancing NS's interests at the

expense of their contractual duties to CSXT.  The Individual Defendants, in advancing NS's interests regardless of the impact on NPBL, have further violated their fiduciary duties to NPBL.  Management of NPBL conspired with NS to harm CSXT and grow NS's market power.

33.    The NPBL's operating revenue is derived principally from switch operations, and is largely dependent upon the switch services being provided to the shareholders' companies, who in turn pay for those services.

34.    Defendants have caused the NPBL to establish and maintain unreasonably high rates for its switch services for intermodal freight.  The current line haul switch rate is dramatically higher than rates for comparable services charged by other short line railroads.  This rate was adopted by the Individual Defendants and/or their predecessors in 2009, over the objection of the other NPBL board members.

35.    The rates charged by the NPBL and other anticompetitive restrictions on CSXT's use of the NPBL have effectively foreclosed CSXT from moving containers to or from NIT on the NPBL.  Meanwhile, NS is able to access NIT directly via its own rail connections.

36.    The Defendants' actions as to NPBL are adversely affecting commerce in Hampton Roads and Virginia.  The VPA has expressly requested that NPBL "facilitate dual [rail] access [by CSXT and NS] for handling containers at NIT,"

because NPBL's current failure to provide "proper access to NIT by CSX puts Virginia at a competitive disadvantage." Indeed, the Defendants' activity is raising prices charged to shippers and, ultimately consumers, because NS has shut out the only other company who could compete to provide intermodal services.

37.   In part as a result of its excessive line haul switch rate, the NPBL's overall financial performance has been declining over the past several years and continues to deteriorate. NPBL's revenue has essentially been flat or down over the past several years, including in 2017. And, the bottom line revenue of NPBL is deceptive, however, because much of NPBL's revenue in recent years has been generated from the sale of real estate. Rail car volume has been essentially flat for years, and decreased in 2017. Current car volume on the NPBL as a whole is heavily dependent on a single customer (not at NIT) engaged in a single line of business. No new sources of substantial and recurring business have been added in recent years, nor do any appear to be planned. No excess cash flow is being generated that could be used for capital expenditures for maintenance, upgrades, or expansion.

*The Individual Defendants' Repeated Failures to Act in the Best Interest of the NPBL and to Abide by the NPBL Operating Agreement*

38.   In advance of the April 18, 2018 NPBL Board and stockholders meetings, CSXT presented a Service Proposal that would have significantly and rapidly increased the NPBL's revenue and operating income by nearly doubling the

volume of cars that the NPBL moves annually.  A copy of the Service Proposal is attached hereto as Exhibit E.

39.    The Service Proposal, which included a proposed substantially lowered switch rate per car, as well as a guarantee of a minimum annual volume of CSXT moving 18,000 cars to or from NIT, would have generated annually approximately $1,440,000 in incremental revenue and potentially $660,000 in incremental operating income for the NPBL.  The Service Proposal would have provided the NPBL with a consistent, long-term and substantial stream of much-needed additional income, and should have generated new revenue opportunities for the NPBL.

40.    Rather than engage in any discussions to advance that proposal and secure those financial benefits, the Individual Defendants and NPBL Management erected baseless and pretextual barriers to the NPBL without even considering or responding substantively to, much less adopting, the Service Proposal.   The Individual Defendants refused to even form an independent committee to evaluate it or allow a formal vote, and thus effectively rejected it.  Notably, at the April 18, 2018 Board and shareholder meetings, the Individual Defendants parroted the same pretextual reasons for denying the request as offered by NS in its responses to CSXT's Service Proposal.

41.   Additionally, in response to CSXT's proposal, Defendant Moss revealed that they were considering entering into a new agreement, ostensibly between the NPBL and NS, that effectively would impose a substantial increase in charges paid to NS for NPBL's usage of its rights of access to NS's track, which would, in turn, reduce the profitability of intermodal service for NPBL while ultimately raising the rates charged to NPBL customers.  Regardless of what the appropriate charge should be, the timing of this interest by NBPL in finalizing a new deal between NS and NPBL is highly suspicious and consistent with Defendants' other ploys using the NPBL to keep CSXT from servicing the NIT.

42.   By rejecting the Service Proposal, Defendants' actions have prevented NPBL from providing switch services necessary for CSXT to move intermodal containers by rail to and from NIT, thereby depriving CSXT of an efficient means of serving NIT, which in turn has impaired CSXT's business interests and prevented it from using the NPBL's services to and from NIT, causing the attendant loss in revenue and income to NPBL.

43.   NPBL's lost income from not providing the proposed service to CSXT in turn impairs NPBL's ability to finance and make capital investments in its infrastructure necessary to preserve and grow the railroad's business and serve its shareholders in the manner required by the Operating Agreement, and effectively

blocks the NPBL from providing a second ("dual") means of access by rail to NIT (in addition to service by NS itself), as expressly requested by the VPA.

44.    Defendants' imposition of unreasonable and anticompetitive rates harms everyone (including NPBL, CSXT, freight shippers, and other competitors) except NS. Notably, NS itself has been able to avoid having to pay the unreasonable and anti-competitive NPBL rates set by the Individual Defendants for intermodal rail service because NS owns and operates over the sole rail line that connects to NIT, the same line that NPBL operates over to access NIT.

45.    This is not the first time that the Individual Defendants have, in conspiracy with NS and the NPBL, misused NPBL as a tool to serve NS's own interests.

46.    As one example, in response to a CSXT service proposal in 2010, NPBL refused to accept CSXT's offer to provide CSXT locomotives and free fuel to move cars for NPBL over the NPBL routes under any terms or circumstances (including without charge to NPBL for use of the locomotives or fuel), while permitting locomotives owned by NS to do so and causing NPBL to lease or contract with NS for use of NS's locomotives without competitive bidding.

47.    In 2008, NPBL took the necessary actions to commence the sale of productive NPBL property in Norfolk and an attempted sale in Portsmouth, and the termination of NPBL's access rights over NS tracks used for the proper delivery of

services that NPBL is obligated to provide to its shareholders (including the consent to NS's removal of a "diamond" key to NPBL providing adequate, reasonable, efficient and predictable access to NIT). The sale of property in Norfolk had the potential to further constrain NPBL's connection to NIT. The sale of property in Portsmouth, had it been successful, would have effectively limited CSXT's access to its own intermodal yard in Portsmouth. The removal of the "diamond" has resulted in having to move NPBL trains into NS's Portlock yard, where further movement of those NPBL trains is controlled and constrained by NS and NS's own trains, and then reversing the NPBL trains out of that yard to move to or from NIT.

48. Through those same acts and practices, and others, the Individual Defendants and/or their predecessors have violated their fiduciary obligations to act in the best interests of the NPBL and, by conspiring with them to do so, NS has violated its contractual obligations to CSXT, including but not limited to its obligation to "encourage[e] the business of the [NPBL]."

*Relevant Markets*

49. The relevant geographic market is the intermodal port facilities of Hampton Roads, Virginia. The Hampton Roads metropolitan area has three ports through which freight travels, Portsmouth Marine Terminal ("PMT"), Virginia International Gateway ("VIG"), and NIT. But, with very limited exceptions, PMT has not handled intermodal freight since 2011 and is not expected to going forward.

Ports outside of the Hampton Roads metropolitan area face significant barriers to competing with the Hampton Roads' ports. In particular, the distance between the port complexes on the East Coast effectively prevent such port complex from acting as viable potential competitors. For example, the closest port complex to the south of Hampton Roads is Charleston, South Carolina, more than 430 miles away. And the closest port complex to the north of Hampton Roads is Baltimore, Maryland, more than 230 miles away. Shippers choose which port complex to use based on geographic considerations—where the freight is coming from and headed.

50.     Freight transportation by rail in and out of the Hampton Roads' ports constitutes a distinct service market under the antitrust laws. Rail transportation is the only method that can achieve the level of throughput required for major shippers of freight. Indeed, major customers refuse to contract with carriers who cannot provide rail transportation in and out of the Hampton Roads' ports. Moreover, the market for freight transportation by rail in and out of the Hampton Roads ports is characterized by high barriers to entry. Development of rail connections requires significant capital investment and engineering. As such, there is no significant cross-elasticity of demand or reasonably interchangeable alternatives for freight transportation by rail in and out of the Hampton Roads' ports.

*Defendants' Anti-Competitive Actions to Achieve Dominance of Freight Transportation by Rail In and Out of the Hampton Roads' Ports*

51.     NS and the NPBL have used the NPBL as a chess piece to establish and maintain monopolistic control over intermodal transportation in and out of the Hampton Roads' ports.

52.     NS has monopoly power or a dangerous probability of achieving monopoly power in the relevant market described above.  NS is one of the nation's largest railroads, operating in 22 states.  In the relevant market, NS's market share exceeds 70%.  For the NIT, NS's market share is approximately 90%.  NS has the ability to control prices for intermodal transportation and exclude competition.  It benefits from a significant barrier to entry into the market for intermodal transportation in and out of Hampton Roads ports, namely the lack of accessible rail routes for competitors that are not owned by NS to the NIT.

53.     NS did not secure or maintain its monopoly power in Hampton Roads by virtue of its ingenuity or other salutary competitive behavior.  Rather, it has continually and deliberately engaged in a pattern of anticompetitive conduct that has eliminated or prevented competition.

54.     Among other anticompetitive acts, NS, in conspiracy with the Individual Defendants and NPBL, has caused the NPBL to reject, without any reasonable, meaningful and lawful consideration or negotiation, CSXT's Service Proposal, thereby effectively denying CSXT access to NIT by rail in competition with NS.

55.    When CSXT was forced to pay the NPBL's rates in 2015, due to closures of other ports around the country, NS directly, and through the NPBL, prioritized NS's shipping needs over those of CSXT.  NS failed to allow, in a reasonable and timely manner, the movement of cars delivered to NPBL by CSXT, sacrificing NPBL's own profits from the business CSXT would otherwise deliver.

56.    NS conspiring with NPBL, by and through the Individual Defendants, have discriminated against CSXT by refusing to allow NPBL to use CSXT's fully fueled locomotives to access NIT, requiring only NS-owned or supplied locomotives to be used by or on NPBL.

57.    NS conspiring with NPBL, by and through the Individual Defendants, have set (and maintained) NPBL's switch rates at levels designed to exclude competition in the relevant market, thereby dramatically raising CSXT's costs to serve intermodal rail customers, and diminishing the amounts of freight moved, and related revenues earned by NPBL.

58.    NS conspiring with NPBL, by and through the Individual Defendants, and/or their predecessors, mandated NPBL consent to the termination of its access rights to the track between NS Juncture and Carolina Juncture, *i.e.*, the "diamond" and connecting track (with NS then removing that track), and mandated NPBL cease and desist from requesting the reinstatement of the diamond, connecting track and related operating rights, all of which has severely impaired, and continues to severely

impair, NPBL's ability to efficiently and predictably provide CSXT with rail access to NIT.

59.    In response to CSXT's Service Proposal, NS and NPBL, by and through the Individual Defendants, threatened to enter into an agreement that would increase dramatically the charges that NPBL would pay for access to NS's track.  This would have further raised the rate charged to NPBL's customers.  This threat to increase rates was an attempt to pressure CSXT into abandoning its Service Proposal.

60.    NS and NPBL, by and through the Individual Defendants, have taken these and other actions with the intent and effect of denying CSXT and other competitors the ability to compete with NS to provide freight rail transportation in and out of the shipping ports in the Norfolk area.

61.    These acts are contrary to the independent profit-maximizing self-interest of NS and the NPBL, as they increased costs and reduced revenue for NPBL, of which NS is a majority owner.

62.    Rather than try to compete on the merits, Defendants, through this willful exclusionary conduct, have acted to acquire and wield power over price and to exclude competition, and thus to monopolize (and attempt to monopolize) intermodal transportation in and out of Hampton Roads' ports.

63.    Defendants' actions were within the flow of, and substantially affected, interstate and international commerce.  Defendants also used instrumentalities of

interstate or foreign commerce (or both).   And their activities have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce.

*Harm to CSXT and Competition*

64.    The result of Defendants' actions has been a loss in existing and prospective business for CSXT and, in turn, for the NPBL.  Defendants, conspiring together, have pushed CSXT out of the market for intermodal transportation though NIT.

65.    In addition, Defendants' actions have harmed competition for intermodal transportation in and out of Hampton Roads' ports, with customers paying substantially higher prices for that transportation via rail service provided by NS, than they would absent Defendants' anticompetitive conduct.

66.    Defendants' actions have also resulted in reduced choice among shippers for intermodal options from Hampton Roads' ports.

*The Individual Defendants' Refusal to Remedy Defects in the NPBL's Current Corporate Governance Structure*

67.    CSXT also proposed, both before and at the April 2018 NPBL Board and shareholders' meetings, several remedial actions to address defects in NPBL's current corporate governance structure.  A copy of the proposal is attached hereto as Exhibit F.

68.     Those remedial actions would have 1) allowed for equal representation of NPBL shareholders on NPBL's Board; 2) added independent directors to a Board that currently has none; 3) mitigated NS's improper influence over the NPBL Board and management, which NS has used to its sole advantage and to cause NPBL and the Individual Defendants, together with NS, to violate fiduciary, contractual and statutory duties; and 4) ultimately allowed the NPBL to operate as a "separate organization," as required by the NPBL Operating Agreement.

69.     Among other things, CSXT proposed that each shareholder designate only one individual for election as a director; that the shareholders elect four independent directors to the NPBL Board; and that the Board and shareholders implement a plan for an orderly transition to independent management.

70.     At the April 2018 meetings, CSXT's shareholder representative asked the NPBL Board to adopt CSXT's proposals, and made a motion that the shareholders proceed to elect only one director designated by each shareholder and elect four independent directors.

71.     Prior to the meetings, CSXT also identified and proposed to NS eight candidates for election as independent directors to fill the remaining four positions on the NPBL Board.

72.     The Individual Defendants rejected CSXT's governance proposal in its entirety, voted against CSXT's motion, refused to nominate (much less elect) any

independent directors, and instead insisted upon, and NS voted to approve, a slate that included four (interested) directors designated by NS (three current NS employees, Defendant Cannon Moss, and Donna Coleman (as a non-voting director)) and only two directors designated by CSXT.

73.    The Individual Defendants have not offered any legitimate and valid reasons for their refusal to take any steps to remedy the NPBL's corporate governance failures, despite the fact that their position is contrary to the NPBL Operating Agreement and Virginia law barring interested director transactions, Va. Code § 13.1-691, and means that NPBL can no longer effectively operate as a corporation where NS and CSXT are at loggerheads and recent proposals to benefit NPBL are rejected out of hand.

74.    Instead, the Individual Defendants have merely parroted NS's self-serving and invalid argument that the changes CSXT proposed are "unnecessary."

75.    NS has conspired with NPBL, through the NPBL Board, management, and operation of the railroad, to exclude CSXT from the market.

76.    The Individual Defendants, in combination with NS, have acted in violation of the law and in breach of their fiduciary, contractual, and statutory duties to NPBL.

## COUNT I
### (Violation of Sherman Act § 1, 15 U.S.C. § 1: Conspiracy to Restrain Trade Against Defendants NS and NPBL)

77.   CSXT incorporates and realleges the allegations of paragraphs 1 through 76 of this Complaint as if fully set forth herein.

78.   Defendants NS and NPBL agreed to and did participate in anticompetitive conduct that unreasonably restrained trade and commerce.  Thus, Defendants engaged in combination and conspiracy and violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

79.   NS conspired with NPBL and the Individual Defendants to take actions and implement policies that effectively foreclosed CSXT from utilizing the NPBL to compete in the provision of multi-modal services at NIT.

80.   This conspiracy has served to enhance and further solidify NS's monopoly power in the relevant market, which has had the effect of severely restricting supply and increasing the prices charged to customers for intermodal transportation.

81.   Defendants' anticompetitive conduct is a *per se* violation of Section 1 of the Sherman Act.

82.   Alternatively, even if Defendants' anticompetitive conduct is judged under the antitrust Rule of Reason, there is no legitimate business justification for Defendants' actions and the conduct through which they adopted and implemented their combination and conspiracy.  Moreover, the anticompetitive effects of Defendants' conduct far outweigh any conceivable procompetitive benefits or

justifications. Even if such a justification existed, any possible procompetitive benefits could have been obtained by less restrictive alternatives.

83.   As a direct and proximate result of Defendants' combination and conspiracy, Defendants have unreasonably restrained trade and commerce. They have excluded actual and potential competition from the relevant market, and profited from their anticompetitive conduct by establishing and maintaining artificially high prices for intermodal transportation services provided to customers, and by otherwise reaping financial benefits from their combination and conspiracy.

84.   As a direct and proximate result of Defendants' combination and conspiracy, CSXT and consumers have been injured. The injury consists of paying artificially inflated prices for intermodal transportation—prices higher than consumers and CSXT would have paid absent Defendants' combination and conspiracy. Their injuries are what the antitrust laws were designed to prevent and flow directly from Defendants' conduct.

## COUNT II
### (Violation of Sherman Act § 2, 15 U.S.C. § 2: Conspiracy to Monopolize Against Defendants NS and NPBL)

85.   CSXT incorporates and realleges the allegations of paragraphs 1 through 84 of this Complaint as if fully set forth herein.

86.   Defendants NS and NBPL acted with a specific intent to combine or conspire to monopolize and to destroy competition in the relevant market.

Defendants devised and implemented a plan in furtherance of the conspiracy to systematically eliminate competition in the relevant market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

87.     NS conspired with NPBL and the Individual Defendants to willfully engaged in a course of exclusionary conduct in furtherance of the conspiracy to obtain a monopoly in the relevant market, including:

(a)     causing the NPBL to reject, without any reasonable, meaningful and lawful consideration or negotiation, CSXT's Service Proposal, thereby denying CSXT access to NIT by rail in competition with NS;

(b)     failing to allow the movement of, in a reasonable and timely manner, cars delivered to the NPBL by CSXT, sacrificing NPBL's own profits from the business CSXT would otherwise deliver;

(c)     discriminating against CSXT by refusing to allow NPBL to use CSXT's fully fueled locomotives to access NIT, while requiring NS-owned or supplied locomotives exclusively to be used by or on the NPBL;

(d)     setting the NPBL's switch rates at levels designed to exclude competition in the relevant market for comparable switch rates, thereby dramatically raising CSXT's costs to serve intermodal rail customers, and diminishing the amounts of freight moved, and related revenues earned by, NPBL;

27

(e)    causing NPBL to terminate its access rights to the track between NS Juncture and Carolina Juncture, i.e. the "diamond" track (with NS then removing that track), which has severely impaired NPBL's ability to efficiently and predictably provide CSXT and other competitors with rail access to NIT; and

(f)    threatening to enter into agreements with NPBL to increase dramatically the charges that NPBL would pay to NS for exercise of the NPBL's rights to access NS trackage, if NPBL provided the service to NIT proposed by CSXT.

88.    Defendants do not have a legitimate business purpose for any of their anticompetitive conduct in furtherance of the conspiracy.    Any claimed procompetitive benefit is pretextual in light of the obvious competitive circumstances and associated marketplace conduct inconsistent with any such benefit.  Defendants' conduct does not result in greater competition in the relevant market.   The only "benefit" that flows from Defendants' conduct is a reduction in competition, and that benefit inures only to NS's advantage, not to that of customers or competition in the relevant market.

89.    Defendants' anticompetitive acts in furtherance of the conspiracy to monopolize have injured competition in the relevant market, suppressed CSXT's provision of intermodal transportation, and the provision of intermodal

transportation of other rail carriers, diminished CSXT's future provision of intermodal transportation and the opportunities for provision of intermodal transportation of other competitors, and increased CSXT's operating costs and the operating costs of other competitors.

90.     Defendants' overall course of conduct has and will continue to, among other things, maintain rates designed to exclude competition in the relevant market, and otherwise deprive customers of their ability to make an unfettered choice of rail carriers on the merits.

### COUNT III
### (Violation of Sherman Act § 2, 15 U.S.C. § 2: Monopolization Against Defendant NS)

91.     CSXT incorporates and realleges all of the allegations of paragraphs 1 through 90 this Complaint as if fully set forth herein.

92.     Defendant NS's conduct constitutes the intentional maintenance of monopoly power in the relevant market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

93.     For the purpose of maintaining its monopoly power, NS committed numerous anticompetitive acts, including:

(a)     causing NPBL to reject, without any reasonable, meaningful and lawful consideration or negotiation, CSXT's Service Proposal, thereby denying CSXT access to NIT by rail in competition with NS;

(b)     failing to allow the movement of in a reasonable and timely manner, cars delivered to the NPBL by CSXT, sacrificing NPBL's own profits from the business CSXT would otherwise deliver;

(c)     discriminating against CSXT by refusing to allow NPBL to use CSXT's fully fueled locomotives to access the NIT, while requiring NS-owned or supplied locomotives exclusively to be used by or on the NPBL;

(d)     setting the NPBL's switch rate[s] at levels designed to exclude competition in the relevant market, thereby dramatically raising CSXT's costs to serve intermodal rail customers, and diminishing the amounts of freight moved, and related revenues earned by, NPBL;

(e)     causing NPBL to terminate its access rights to the track between NS Juncture and Carolina Juncture, i.e. the "diamond" track (with NS then removing that track), which has severely impaired NPBL's ability to efficiently and predictably provide CSXT and other competitors with rail access to NIT; and

(f)     threatening to enter into agreements with NPBL to increase dramatically the charges that NPBL would pay to NS for exercise of the NPBL's rights to access NS trackage, if NPBL provided the service to NIT proposed by CSXT.

94.   NS has excluded CSXT from the relevant market and has deprived consumers of the benefits of competition among rail carriers.

95.   NS does not have a legitimate business purpose for any of its anticompetitive conduct.  Any claimed procompetitive benefit is pretextual in light of the obvious competitive circumstances and associated marketplace conduct inconsistent with any such benefit. NS's conduct does not result in greater competition in the relevant market.  The only "benefit" that flows from NS's conduct is a reduction in competition, and that benefit inures only to NS's advantage, not to that of customers or competition in the relevant market.

96.   NS's monopolization has injured competition in the relevant market, suppressed CSXT's provision of intermodal transportation, and the provision of intermodal transportation of other rail carriers, diminished CSXT's future provision of intermodal transportation and the opportunities for provision of intermodal transportation of other competitors, and increased CSXT's operating costs and the operating costs of other competitors.

97.   NS's overall course of conduct has and will continue to, among other things, maintain rates designed to exclude competition in the relevant market, and otherwise deprive customers of their ability to make an unfettered choice of rail carriers on the merits.

## COUNT IV
### (Violation of Sherman Act § 2, 15 U.S.C. § 2: Attempted Monopolization Against Defendant NS)

98.    CSXT incorporates and realleges the allegations of paragraphs 1 through 97 of this Complaint as if fully set forth herein.

99.    Defendant NS acted with a specific intent to monopolize and to destroy competition in the relevant market.  NS devised and implemented a plan to systematically eliminate competition in the relevant market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

100.   NS willfully engaged in a course of exclusionary conduct to obtain a monopoly in the relevant market, including:

(a)    causing the NPBL to reject, without any reasonable, meaningful and lawful consideration or negotiation, CSXT's Service Proposal, thereby denying CSXT access to NIT by rail in competition with NS;

(b)    failing to allow the movement of, in a reasonable and timely manner, cars delivered to the NPBL by CSXT, sacrificing NPBL's own profits from the business CSXT would otherwise deliver;

(c)    discriminating against CSXT by refusing to allow NPBL to use CSXT's fully fueled locomotives to access the NIT, while causing NS-owned or supplied locomotives exclusively to be used by or on the NPBL;

(d)     setting the NPBL's switch rates at levels designed to exclude competition in the relevant market for comparable switch rates, thereby dramatically raising CSXT's costs to serve intermodal rail customers, and diminishing the amounts of freight moved, and related revenues earned by, NPBL;

(e)     mandating NPBL to terminate its access rights to the track between NS Juncture and Carolina Juncture, i.e. the "diamond" track (with NS then removing that track), which has severely impaired NPBL's ability to efficiently and predictably provide CSXT and other competitors with rail access to NIT; and

(f)     threatening to enter into agreements with NPBL to increase dramatically the charges that NPBL would pay to NS for exercising NPBL's rights to access NS trackage, if NPBL provided the service to NIT proposed by CSXT.

101. NS does not have a legitimate business purpose for any of its anticompetitive conduct.  Any claimed procompetitive benefit is pretextual in light of the obvious competitive circumstances and associated marketplace conduct inconsistent with any such benefit.  NS's conduct does not result in greater competition in the relevant market.  The only "benefit" that flows from NS's

conduct is a reduction in competition, and that benefit inures only to NS's advantage, not to that of customers or competition in the relevant market.

102.   Throughout the time NS engaged in this exclusionary conduct, it had a dangerous probability of succeeding in gaining a monopoly in and controlling the relevant market and excluding its competitors.

103.   NS's attempts to destroy competition in the relevant market have injured competition in the relevant market, suppressed CSXT's provision of intermodal transportation, and the provision of intermodal transportation of other rail carriers, diminished CSXT's future provision of intermodal transportation and the opportunities for provision of intermodal transportation of other competitors, and increased CSXT's operating costs and the operating costs of other competitors.

104.   NS's overall course of conduct has and will continue to, among other things, maintain rates designed to exclude competition in the relevant market, and otherwise deprive customers of their ability to make an unfettered choice of rail carriers on the merits.

## COUNT V
## (Breach of Contract, against Defendant NS)

105.   CSXT incorporates and realleges the allegations of paragraphs 1 through 104 of this Complaint as if fully set forth herein.

106.   CSXT and Defendant NS are co-parties to the NPBL Operating Agreement, which establishes legally enforceable obligations owed by NS to CSXT.

These include, but are not limited to: 1) that shareholders shall maintain and operate NPBL as a "separate organization in which all are to be equally interested," 2) NS will "co-operate cordially in encouraging the business of the [NPBL] for which it is constructed," 3) NS shall "deliver to [NPBL] all cars to be interchanged with other [parties to the agreement]," 4) NS shall ensure its Directors "vote for such resolutions, by-laws or other proceedings as may be necessary to carry into effect" the NPBL Operating Agreement, and 5) the implied covenant of good faith and fair dealing.

107.    Defendant NS has breached these contractual obligations by, *inter alia*, effectively blocking CSXT's access to NS's trackage over which NPBL has rights, by refusing to consider proposals that would improve the revenues of NPBL, by failing to encourage the business of NPBL, and by inducing its employees and/or the Individual Defendants to vote for measures that are harmful to NPBL.

108.    NS's breaches have harmed CSXT, *inter alia*, by reducing the revenues of NPBL, of which CSXT is a shareholder, by causing CSXT to pay high rates when it has utilized the NPBL, and by causing CSXT to lose potential business due to its inability to economically access NIT by rail.

## COUNT VI (Derivative Claim)
### (Breach of Fiduciary Duties, against Individual Defendants Hall, Hurlbut, Merilli, and Moss)

109.   CSXT incorporates and realleges the allegations of paragraphs 1 through 108 of this Complaint as if fully set forth herein.

110.   CSXT, in its capacity as a shareholder in NPBL, brings this derivative action on behalf of NPBL and its shareholders, pursuant to Va. Code § 13.1-672.1, against the Individual Defendants for their breaches of fiduciary duties.  CSXT was a shareholder of NPBL at all times during the conduct complained of in this action, and it fairly and adequately represents the interests of NPBL in enforcing NPBL's rights.

111.   CSXT made a written demand to NPBL to take suitable action on June 22, 2018.  NBPL responded to CSXT on September 11, 2018, denying any illegal conduct and disagreeing that any action is warranted in response to CSXT's demand letter.

112.   The Individual Defendants have breached their fiduciary duties to NPBL, including their duties of good faith and loyalty and to act in an honest, fair and reasonable manner in the best interests of NPBL.  Instead of acting in the best interests of NPBL, they have acted predominately in the interests of NS at the expense of NPBL, by, for instance, denying CSXT's Service Proposal and proposal for reforms of NPBL's corporate governance structure, and by failing to appropriately manage NPBL, leading to its deteriorating financial condition.

113.   These breaches have damaged NPBL.  CSXT, on behalf of NPBL, specifically seeks injunctive relief as specified in the prayer for relief as to the Individual Defendants.

## COUNT VII
## (Tortious Interference with Business Expectancy, Against Defendants NS and NPBL)

114.   CSXT incorporates and realleges the allegations of paragraphs 1 through 113 of this Complaint as if fully set forth herein.

115.   As a shareholder of the NPBL, CSXT has reasonable business expectancies, including that the corporation will be managed and directed in a manner that is in accord with the Operating Agreement, allowing CSXT access to NPBL trackage in Hampton Roads.  CSXT reasonably expects economic benefit as a result of being a shareholder of NPBL, such as revenues from NPBL and its ability to access NPBL trackage and NPBL-served industries.  As the majority shareholder of NPBL, NS, and the Individual Defendants, respectively, have knowledge of CSXT's business expectancies.

116.   Defendants NS and NPBL have wrongfully employed improper methods in order to intentionally interfere with these expectancies, such as unfair competition, breach of fiduciary duty by the Individual Defendants, and using the NPBL as a means of self-dealing.

117.   Defendants' interference is without justification and privilege, and has caused CSXT damages, such as lost opportunities for contracts with shipping partners.  Additionally, because Defendants' conduct was intentionally undertaken with malice to harm CSXT and benefit themselves, CSXT is further entitled to punitive damages.

**COUNT VIII**
**(Statutory Business Conspiracy, Va. Code § 18.2-499, Against Defendants NS and NPBL)**

118.   CSXT incorporates and realleges the allegations of paragraphs 1 through 117 of this Complaint as if fully set forth herein

119.   In violation of Va. Code § 18.2-499, Defendant NS has conspired, by express agreement and tacit understanding, with Defendant NPBL, and with the Individual Defendants, in their capacity as directors and/or managers of NPBL, to intentionally, purposefully, and without lawful justification willfully and maliciously interfere with CSXT's reasonable business expectations, violate the individual Defendants' fiduciary duties to NPBL, and to breach NS's contract with CSXT.  Defendants acted without lawful justification.

120.   This conspiracy has harmed CSXT, *inter alia*, by reducing the revenues of NPBL, of which CSXT is a shareholder, and by causing CSXT to lose potential business with shipping companies, due to its inability to access NIT.

121.   In addition to compensatory damages, CSXT is entitled to treble damages, lost profits, punitive damages, attorneys' fees, and other relief pursuant to Va. Code § 18.2-500.

## COUNT IX
### (Civil Conspiracy, Against Defendants NS and NPBL)

122.   CSXT incorporates and realleges the allegations of paragraphs 1 through 121 of this Complaint as if fully set forth herein.

123.   Defendant NS has conspired, by express agreement and tacit understanding, with Defendant NPBL, and with the Individual Defendants, in their capacity as directors and/or managers of NPBL, to intentionally, purposefully, and without lawful justification willfully and maliciously interfere with CSXT's reasonable business expectations, violate the Individual Defendants' fiduciary duties to NPBL, and to breach NS's contract with CSXT.  Defendants acted without lawful justification.

124.   This conspiracy has harmed CSXT, *inter alia*, by reducing the revenues of NPBL, of which CSXT is a shareholder, and by causing CSXT to lose potential business with shipping companies, due to its inability to access NIT.

125.   In addition to compensatory damages, CSXT is entitled to punitive damages because the Defendants acted with malice.

## PRAYER FOR RELIEF

WHEREFORE, CSXT respectfully prays for the following:

1) That this Court render judgment in favor of CSXT, individually and on behalf of NPBL, and against Defendants;

2) That this Court award CSXT, individually and on behalf of NPBL, actual, consequential, and compensatory damages, and treble damages;

3) That this Court award CSXT punitive damages in amounts to be determined by the jury;

4) That this Court enter an injunction against Defendants from continuing to commit the above referenced violations of federal and state law;

5) That this Court enter an injunction against NS, NPBL, and the Individual Defendants, as appropriate, that restores CSXT's right as a co-equal shareholder and/or establishes an independent board structure as previously proposed by CSXT and that directs that NPBL approve CSXT's Service Proposal;

6) That this Court award CSXT its costs, attorneys' fees and litigation expenses; and

7) That this Court enter such other and further relief as it deems just and proper under the circumstances.

**CSXT requests trial by jury on all counts so triable.**

Dated:  October 4, 2018        Respectfully submitted,


**CSX TRANSPORTATION, INC.**

*By Counsel*


_____/s/_____
Robert W. McFarland (VSB No. 24021)
Benjamin L. Hatch (VSB No. 70116)
E. Rebecca Gantt (VSB No. 83180)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia  23510-1655
Telephone: (757) 640-3716
Facsimile:  (757) 640-3930
E-mail: rmcfarland@mcguirewoods.com
      bhatch@mcguirewoods.com
      rgantt@mcguirewoods.com