# EXHIBIT A

*Provided by Louis Flora*

A/E - WP

STGP - 7

7/12/8 >

# Agreement

BETWEEN

NEW YORK, PHILADELPHIA & NORFOLK R. R. CO.,

SEABOARD AND ROANOKE R. R. CO.,

NORFOLK AND SOUTHERN R. R. CO.,

NORFOLK AND WESTERN RY. CO.,

ATLANTIC AND DANVILLE RY. CO.,

SOUTHERN RY. CO.,

NORFOLK AND CAROLINA R. R. CO.,

AND

CHESAPEAKE AND OHIO RY. CO.

DATED JULY 7, 1897.

IN RE: NORFOLK AND PORTSMOUTH BELT LINE R. R. CO.

AN AGREEMENT made and entered into on this Seventh day of July, A. D. 1897, by and between THE NEW YORK, PHILADELPHIA & NORFOLK RAILROAD COMPANY, THE SEABOARD & ROANOKE RAILROAD COMPANY, THE NORFOLK & SOUTHERN RAILROAD COMPANY, THE NOR-FOLK & WESTERN RAILWAY COMPANY, THE ATLANTIC & DANVILLE RAILWAY COMPANY, THE SOUTHERN RAILWAY COMPANY, THE NORFOLK & CAROLINA RAILROAD COM-PANY, and THE CHESAPEAKE & OHIO RAILWAY COMPANY.

WHEREAS each of the Companies above named desires to secure the construction of a Belt Line Railroad from Pinner's Point, Virginia, to a connection with the Norfolk and Western Railway in Berkley, Virginia, for the mu-tual benefit of each in the interchange of business, and it is conceded to be for the best interest of all that the same should be constructed, maintained and operated under a separate organization in which all are to be equally in-terested and each to have an equal representation, and it has been decided to construct, maintain and operate the same under the charter of The Southeastern and Atlantic Railroad Company.

*Now, Therefore, This Agreement Witnesseth* That the several companies hereinbefore named, each in considera-tion of the mutual agreements hereinafter made, do hereby mutually agree that the said The Southeastern and At-lantic Railroad Company shall be organized and its busi-ness and affairs conducted and maintained on the follow-ing terms and conditions, to wit:

*First.*—That the Capital Stock of the said Southeastern and Atlantic Railroad Company shall be fixed at Fifty Thousand Dollars.

2

*Second.*—That each of the Companies above named, parties hereto, doth hereby agree to subscribe to one-eighth of the Capital Stock of said Company, and to pay for the same at such time or times and in such amount or amounts as the same may be called by the Board of Directors of said Company.

*Third.*—That if the said Capital Stock should at any time hereafter be increased, the same will be subscribed for and taken in equal proportions by such of the Companies above named as may then hold stock in the said Southeastern and Atlantic Railroad Company.

*Fourth.*—That the number of Directors of the said Southeastern and Atlantic Railroad Company shall always be fixed to correspond to the number of Companies holding stock therein, so that each of said Companies shall have one representative on the Board, and that such representative shall in all cases be elected upon the nomination of the President or Vice-President of the Company holding such stock.   In case of a vacancy the Board of Directors shall fill the same at their first subsequent meeting upon the nomination of the President or Vice-President of the Company in whose representation the vacancy occurred.

*Fifth.*—That there shall be a President, a Vice-President, a Secretary and Treasurer, which two last named offices may be filled by one person, and such other officers and agents as may be from time to time elected by the Board of Directors of the Southeastern and Atlantic Railroad Company.

*Sixth.*—That the affairs of the Company shall be under the management of the President and Directors, and that the By-Laws of the Company to be adopted by them shall provide for carrying into effect the provisions of this Agreement.

3

*Seventh.*—That the Southeastern and Atlantic Railroad Company is to forthwith commence and is to complete as soon as practicable a Belt Line Railway from the point of connection of the New York, Philadelphia and Norfolk Railroad Company's terminal tracks with the tracks of the Norfolk and Carolina Railroad Company at Pinner's Point, Virginia, to a connection with the track of the Norfolk & Western Railway Company in Berkley, crossing and connecting with the tracks of the Seaboard and Roanoke Railroad Company, the Atlantic & Danville Railway Company and the Norfolk & Southern Railroad Company, and crossing the Southern branch of the Elizabeth River by a suitable bridge.

*Eighth.*—That to provide for the construction of the said Belt Line Railway, and for the future purposes of the Company, the Southeastern and Atlantic Railroad Company is to make a mortgage to secure an issue of forty year five per cent Gold Bonds, limited in the aggregate to Four Hundred Thousand Dollars, in denominations of One Thousand Dollars each, and that the said Company shall have the right to issue so many of such bonds as may be necessary for the construction and equipment of its railroad including right-of-way, roadbed, superstructures and bridges, not to exceed Two Hundred and Fifty Thousand Dollars, as the same may be required, but the remaining One Hundred and Fifty Thousand Dollars shall be issued under the direction of the Board of Directors only when necessary to provide in part the funds required for the acquisition of property and for additional construction and equipment purposes, and then to the extent only of seventy-five per cent of such expenditures, the remaining twenty-five per cent to be provided by the issue of additional Capital Stock, or otherwise as may be provided by the Board of Directors.

*Ninth.*—That a uniform rate shall be fixed for the movement of freight cars over the said Southeastern and At-

4

lantic Railroad Company's railroad, regardless of distance, and that the rate per loaded freight car shall be so adjusted from time to time as to yield a net revenue sufficient to pay the interest upon the bonds outstanding and a dividend of six per cent on the stock. In case arrangements shall hereafter be perfected for the handling of passenger traffic by the Belt Line the net revenues derived therefrom shall be divided equally among the lines, owners of the stock, as an extra dividend, quarterly semi-annually or annually, as the Directors may determine, it being understood that if the net revenue from the passenger business shall be sufficient to pay extra annual dividends of more than six per cent, then the Directors may reduce the rate per loaded freight car sufficiently to absorb such excess.

*Tenth.*—That the Companies hereinbefore named, parties to this agreement, will co-operate cordially in encouraging the business of the Southeastern and Atlantic Railroad Company, for which it is constructed, and that each of them will deliver to the said Company all cars to be interchanged with other Companies hereinbefore named, parties hereto, except where there are physical connections already existing.

*Eleventh.*—That each and all of the aforesaid Companies, parties hereto, are to make the rates of freight in full car load lots between points on the said Southeastern and Atlantic Railroad to points on or that can be reached by their respective lines, in both directions, no higher than those between Norfolk or Portsmouth and such points.

*Twelfth.*—That no one of the aforesaid Companies, parties hereto, will sell its stock in the Southeastern and Atlantic Railroad Company to any other person, persons, corporation or corporations, until it shall first have given to the other owners of the stock in said Company the

5

right to purchase the same in an amount *pro rata* to the amount held by each of them, and at a price not to exceed what may be offered by others, and that to accomplish this notice shall be given by any such stockholder which may desire to sell its interest, to the President and Directors of the Southeastern and Atlantic Railroad Company of its desire to sell, and that the stockholders in said Southeastern and Atlantic Railroad Company shall have at least thirty days from the delivery of such notice within which to purchase the same under the terms above set forth, and that the certificates of stock to be issued by the Southeastern and Atlantic Railroad Company shall provide that the same are not transferable except upon the conditions stated above.

*Thirteenth.*—That any and all vacancies that may occur in the Board of Directors shall be promptly filled, at once if nomination can be made and the Board be in session, and if not then at the succeeding meeting of the Board, such vacancies to be filled by the election of the nominee of the President or Vice-President of the Company whose representation may be vacant, and that such election shall take place when such nomination has been or may be made before any other business shall be transacted at the said meeting.

*Fourteenth.*—That none of the Companies, parties hereto, shall be in any way liable for any of the debts, obligations or liabilities of the said Southeastern and Atlantic Railroad Company beyond the amount of their subscriptions to its Capital Stock.

*Fifteenth.*—It is understood and agreed that the locomotives owned by the parties hereto are not to enter upon or use the tracks of the Southeastern and Atlantic Railroad Company for any purpose whatever, excepting under such rules and regulations as may be established by the Board of Directors of the Southeastern and At-

6

lantic Railroad Company by a vote of a majority of all the members of said Board, the intent being that the Southeastern and Atlantic Railroad Company shall perform the service for which it was built and said Company be directly responsible for the competent and efficient discharge of its every obligation to the parties hereto.

*Sixteenth.*—No other Railroad Company shall be admitted as a stockholder of the Southeastern and Atlantic Railroad Company excepting with the consent of a majority of all of the members of the Board of Directors.

*Seventeenth.*—That each of the Companies parties hereto, agrees that the Director named by each to represent it in the Board of the Southeastern and Atlantic Railroad Company shall and will vote for such resolutions, by-laws or other proceedings as may be necessary to carry into effect the agreements herein made.

7

*In Witness Whereof* the several Companies above named have each caused this agreement to be signed by its President, Vice-President or General Manager.

THE CHESAPEAKE & OHIO RWY. CO.
By

DECATUR AXTELL,
*and Vice-President.*

THE ATLANTIC & DANVILLE RY. CO.
By

CHAS. O. HAINES,
*Gen. Manager.*

THE NORFOLK & SOUTHERN R. R. CO.
By

W. B. DICKERMAN,
*President.*

THE NORFOLK & CAROLINA R. R. CO.
By

W. G. ELLIOTT,
*President.*

THE NEW YORK, PHILA. & NORFOLK R. R. CO.
By

A. J. CASSATT,
*President.*

THE NORFOLK & WESTERN RWY. CO.
By

HENRY FINK,
*President.*

SOUTHERN RAILWAY COMPANY,
By

A. B. ANDREWS,
*1st Vice-President.*

SEABOARD AND ROANOKE R. R. CO.
By

R. C. HOFFMAN,
*President.*

# EXHIBIT B



NORFOLK & PORTSMOUTH
BELT LINE RAILROAD
AND CONNECTIONS
JANUARY 1, 1981
SCALE

——————  N. & P.B.L.R.R.
- - - - - - -  N. & P.B.L.R.R. (TRACKAGE RIGHTS)
——————  NORFOLK SOUTHERN
——————  EASTERN SHORE RAILROAD
——————  CHESAPEAKE & ALBEMARLE R.R.
——————  CSX TRANSPORTATION
══════  TRACKAGE RIGHTS BY ANOTHER CARRIER OVER N. & P.B.L.R.R.

# EXHIBIT C



Dated: March 1, 1989

NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY

NPBL not made a party to this Agreement - Copy of Supplemental Agreement between Proprietary Companies of the Belt (line) AS INFORMATION

AMONG

CSX TRANSPORTATION

and

NORFOLK AND WESTERN

and

SOUTHERN RAILWAY

Copy of Supplemental Agreement between Proprietary Companies, relating to the NPBL Operating Agreement No. dated July 7, 1897, and No. 267 dated February 1, 1924.



**NORFOLK SOUTHERN**

Norfolk Southern Corporation
Law Department
Three Commercial Place
Norfolk, Virginia  23510-2191



Writer's Direct Dial Number

(804) 629-2818

Norfolk, VA – April 5, 1989

Mr. J. M. Donnelly
Vice President, Secretary and Comptroller
Norfolk and Portsmouth Belt Line Railroad Company
P. O. Box 3669
Norfolk, VA  23514

Dear Mr. Donnelly:

Enclosed for your information is a copy of the Supplemental Agreement dated March 1, 1989, among CSXT, Norfolk and Western, and Southern Railway, relating to the NPBL operating agreement dated July 7, 1897. The parties have agreed that, notwithstanding Article Fourth of the 1897 agreement, CSXT will continue to have the right to appoint two representatives to the NPBL Board of Directors, and NW and Southern will have the right to appoint a total of three representatives.

Very truly yours,

J. Gary Lane
General Attorney

Enclosure

CC L. W. FISHER

## SUPPLEMENTAL AGREEMENT

THIS SUPPLEMENTAL AGREEMENT, dated as of March 1, 1989, is between CSX TRANSPORTATION, INC., a Virginia corporation ("CSX"), NORFOLK AND WESTERN RAILWAY COMPANY, a Virginia corporation ("NW"), and SOUTHERN RAILWAY COMPANY, a Virginia corporation ("SR").

### WITNESSETH:

WHEREAS, CSX owns 216 shares of the common stock of Norfolk and Portsmouth Belt Line Railroad Company, a Virginia corporation ("NPBL");

WHEREAS, NW and SR each owns 144 shares of the common stock of NPBL;

WHEREAS, CSX, on the one hand, and NW and SR, on the other hand (NW and SR together being hereinafter referred to as "NW/SR"), are successors in interest to railroad companies that were parties to an Agreement dated July 7, 1897 (the "NPBL Agreement"), relating to the ownership and operation of NPBL;

WHEREAS, Article Fourth of the NPBL Agreement provides that the number of directors of NPBL shall always be fixed to correspond to the number of companies owning stock in NPBL;

WHEREAS, as of the date hereof, two of the directors of NPBL are representatives of CSX and three of the directors are representatives of NW/SR, and the parties hereto desire to retain such representation on the board of directors of NPBL ("NPBL Board") notwithstanding the provisions of Article Fourth of the NPBL Agreement;

NOW, THEREFORE, the parties hereto agree as follows:

1. Notwithstanding the first sentence of Article Fourth of the NPBL Agreement, CSX shall have the right to appoint two representatives to the NPBL Board, and NW/SR shall have the right to appoint three representatives to the NPBL Board.

2. Nothing herein shall be deemed to amend, alter, or affect any other provision of the NPBL Agreement.

−2−

        IN WITNESS WHEREOF, the parties have caused this
Supplemental Agreement to be executed by their duly authorized
officers.


                    CSX TRANSPORTATION, INC.

                    By: _____
                              ~~Vice President~~   Treasurer


                    NORFOLK AND WESTERN RAILWAY COMPANY

                    By: _____
                              Vice President


                    SOUTHERN RAILWAY COMPANY

                    By: _____
                              Vice President

# EXHIBIT D



# BY-LAWS

OF THE

# NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY

## AMENDED APRIL 10, 1996

B Y - L A W S

of the

NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY

———————————

### ARTICLE FIRST

The principal office of the Company shall be in the City of Portsmouth, Virginia.

### ARTICLE SECOND

The annual meeting of the Stockholders for election of Directors and for the transaction of such other business as may come before the meeting shall be held on the second Wednesday of April in each year hereafter.

Special meetings of the Stockholders shall be held whenever called by the President, the Board of Directors or the holders of not less than one-tenth of all the shares of stock entitled to vote at the meeting, as provided in §13.1-25 of the Code of Virginia of 1950 as amended.  All meetings of the Stockholders shall be held at the office of the Company in Portsmouth, Virginia or at such place as may be designated by the Board of Directors or by the party or parties who may call a special meeting as hereinabove provided.

Notice of annual and special meetings of the Stockholders shall be given in the manner provided by the laws of the State of Virginia.

At any meeting of the Stockholders each shareholder shall be entitled to one vote for each share of stock standing in its name on the books of the Company and may cast such vote in person or by proxy.

### ARTICLE THIRD

The Board of Directors shall consist of six voting members and one non-voting member who shall be elected by the Stockholders at this meeting and at all annual meetings thereafter.

Any vacancy occurring in the Board of Directors between elections of the Stockholders shall be filled by the remaining voting members of the Board at their first meeting after the vacancy shall have occurred.

-2-

Meetings of the Board of Directors shall be called by the Secretary, on order of the President, or at the request, in writing, of two or more voting members of the Board.

Four voting members of the Board of Directors shall constitute a quorum for the transaction of business.

The Directors shall continue in office until their successors have been elected and duly qualify.

The President of the Company shall preside at meetings of the Board of Directors and in his absence the Directors shall elect a President pro tem.

### ARTICLE FOURTH

At their first meeting after their election by the Stockholders, the Board of Directors shall elect from their own number a President and General Manager and shall appoint a Vice-President, a Secretary and Comptroller and a Treasurer.   The Board may then, or at any time, appoint an Assistant Secretary and an Assistant Treasurer, and such subordinate officers as they see fit.  All the said officers shall hold their offices during the pleasure of the Board.

### ARTICLE FIFTH

The President shall have the general supervision and direction of all the Company's activities, preside at all meetings of the Stockholders or Directors and perform such acts in the name of the Company as he may be authorized by the Directors to do and such other duties as generally are discharged by a President.

### ARTICLE SIXTH

The Vice-President shall act for the President in his absence and perform such other duties as may from time to time be assigned by the President or Directors.

### ARTICLE SEVENTH

The Secretary and Comptroller shall be present at the meetings of the Board of Directors and shall keep the minutes of the same.  He shall keep the stock and transfer ledgers and issue new certificates of stock.

-3-

He shall also be the custodian of the corporate seal of the Company, and shall perform all such other duties as appertain to the office of Secretary.  He shall have charge of the general accounting records of the Company and shall audit the accounts of the Treasurer monthly.  He shall see that all accounts of the Company are promptly settled and shall perform such other duties as appertain to the office of Comptroller.

### ARTICLE EIGHTH

The Treasurer shall be the custodian of all moneys and securities of the Company.  He shall keep accurate accounts of all receipts and disbursements and his books shall at all times be open to the inspection of Directors, the President, the Vice President and the Secretary and Comptroller.  Before entering upon the duties of his office the Treasurer shall give a bond in the sum of $25,000, with sureties to be approved by the Board of Directors, for the faithful discharge of his duties.  Said bonds shall be filed with the President.

### ARTICLE NINTH

All agents of the Company who may receive or disburse moneys on account of the Company shall give bonds, to be approved by the Board of Directors, in such sums as may be required by the Board of Directors, and all such bonds shall, when approved, be filed with the President.

### ARTICLE TENTH

All deeds, bonds, mortgages, and other instruments required to be under the seal of the Company shall be executed by the President, or Vice-President, in the name of the Company, and attested by the Secretary, and have the seal of the Company affixed.

### ARTICLE ELEVENTH

The Capital Stock of the Company is transferable only on the books of the Company in person or by attorney upon surrender of certificate, and no transfer of the same shall be made to any other person or persons, corporation or corporations until the other owners of the stock shall have first been given the right to purchase the same in an amount pro rata to the amount of stock held by each, and at a price not to exceed what may be offered by others.  Notice shall be given to the President and Board of Directors of this Company of the desire of any shareholder to sell its stock, the remaining stockholders to have thirty (30) days from the delivery of such notice within which to purchase the same under the terms set forth.  The certificates of stock to be issued by the Company shall provide that the same are transferable only upon these conditions.

-4-

## ARTICLE TWELFTH

No other locomotives than those of the Company shall be allowed to use its tracks, excepting under such rules and regulations as may be established by the President, and the President shall immediately report to each member of the Board any consent that may be given by him under this by-law for the use of the tracks by other locomotives, and any such arrangement shall be subject to confirmation or rejection by the Board at any subsequent meeting.

## ARTICLE THIRTEENTH

These by-laws may be amended at any annual meeting of the Stockholders or at any special meeting of the Stockholders called for the purpose.

-5-

Original By-Laws adopted by Stockholders July 28, 1897.

━━━━━━━━━━━━━

Amendments made as follows:

ARTICLE FIRST:         April  8, 1987

ARTICLE SECOND:        April  2, 1930
                       April  7, 1938
                       April  8, 1959
                       April 11, 1973
                       April 10, 1996

ARTICLE THIRD:         April  7, 1911
                       April  8, 1942
                       April 10, 1946
                       April 13, 1960
                       April 10, 1968
                       April 10, 1974
                       April 12, 1978
                       April 11, 1979
                       April  8, 1981
                       April  8, 1987
                       April 10, 1996

ARTICLE FOURTH:        April  8, 1942
                       April 10, 1946
                       April 13, 1960
                       April 12, 1972

ARTICLE FIFTH:         April  4, 1917
                       April  3, 1929
                       April  8, 1942
                       April 14, 1943
                       Repealed April 13, 1949
                       New Article Fifth adopted April 13, 1960

ARTICLE SIXTH:         April  8, 1942
                       April 13, 1960

ARTICLE SEVENTH:       April 13, 1960
                       April 12, 1972

ARTICLE EIGHTH:        April 13, 1960
                       April 12, 1972

ARTICLE NINTH:         April 13, 1960

ARTICLE THIRTEENTH: April  8, 1959

# EXHIBIT E



CSX Transportation, Inc.
500 Water Street, J-801
Jacksonville, Florida 32202
Tel. 904-359-7637
Email: Tony_DiDeo@csx.com

**Tony DiDeo**
**Director Intercarrier Management**
**Joint Facilities**

March 23, 2018

**VIA OVERNIGHT MAIL AND ELECTRONIC MAIL**

Mr. Cannon Moss
Director, President & General Manager
Norfolk and Portsmouth Belt Line Railroad Company
1340 Truxton Street
Chesapeake, VA 23324

Ms. Donna Coleman
Director, Vice President, Comptroller & Corporate Secretary
Norfolk and Portsmouth Belt Line Railroad Company
1340 Truxton Street
Chesapeake, VA 23324

**Re: Rate Proposal for Long Term Rail Service to NIT**

Dear Sir and Madam:

By this letter, CSX Transportation (CSXT) requests that NPBL management adopt the following proposal for long term rail intermodal service to Norfolk International Terminals (NIT), as described in detail below, and as consistent with the NPBL's purpose and interests.

A few years ago, NPBL handled several intermodal trains during a period of near historical shipping container congestion at the ports in Virginia and along the east coast. From those movements alone, we confirmed that consistently operating trains to NIT for CSXT is possible. During that short-lived crunch, CSXT was able to justify the extremely high cost of moving those trains via NPBL at its general tariff rate only because the Virginia Port Authority (VPA) and our customers were desperate to clear the backlog caused by the

unexpected container surge, and our drayage providers were completely overwhelmed. In other words, we had no other practical choice at the time.

The NPBL's general tariff rate, however, remains prohibitive for normal movements of shipping containers to and from NIT. NPBL has not handled a single intermodal train for CSXT since that period of extreme congestion (nor did it move any intermodal trains to NIT for CSXT prior to that time). This is principally because NPBL's unduly high rates, as well as operational constraints on its service to NIT that should not have existed, and in all events are avoidable or remediable, have made use of NPBL to move containers to or from NIT economically non-viable, or even effectively impossible.

We have been studying this issue closely, however, and remain confident that a rate package promptly can be negotiated and agreed-to that would provide the NPBL with a consistent, long term stream of additional income that could improve its financial position and sustain it into the future, while also being sufficiently reasonable that NPBL could attract sufficient additional traffic to support the rates profitably. In fact, we estimate the service for CSXT we are proposing will generate for NPBL approximately $1,440,000 in incremental revenue and potentially $660,000 in incremental operating income in the first year of service alone (estimates based on NPBL's 2016 Annual Report).

The following is a proposal of terms which can serve as the foundation for a definitive rail transportation agreement. We are open to discussion on all points, and welcome your input throughout the process, though we want to move this to conclusion swiftly and see no reason it cannot be.

### Background

On July 19, 2010, CSXT provided NPBL management with a formal rate proposal and operating plan (enclosed), which was the product of months of review with NPBL management and Virginia International Terminals (VIT). In particular, NPBL management provided financial and costing information that allowed CSXT to tailor its proposal in a manner that would have provided consistent additional operating income to the NPBL and would have been mutually beneficial for NPBL and CSXT. We expect much of the work and learning from that extensive review process is still relevant and useable, and can be replicated or updated to expedite development of a new mutually-beneficial arrangement. Similarly, we believe the commercial sensitivity and depth of historical information on hand would obviate the need for convening another rate committee, but we are willing to work again through this approach if necessary.

With respect to the operating plan, we are pleased to report that senior officers of CSXT have already met with VPA officers to discuss our objective. The VPA was very supportive of our plans and have committed to assisting us with this important endeavor. Thus, much like the rate committee, we expect any discussions with VIT regarding operations will be productive and can be arranged in short order.

2 | P a g e

## Summary of Proposed Rates and Contractual Terms

The past two decades have demonstrated that the NPBL general tariff charge of $210 per car (or per unit, in the case of articulated cars) remains an economic barrier for the NPBL to handle intermodal freight. This charge, whether absorbed by CSXT or passed through to the customer, is simply not competitive for any lane on our network and beyond. Although the NPBL's tariff history demonstrates that the NPBL has often published different switch charges for different commodities, we are aware of NPBL managements' past statements that it was not willing to offer different rates based on commodities. Similarly, we understand the NPBL has faced challenges from its Board and/or the other shareholder with respect to private contracts. More specifically, some Board members in the past have argued that an amendment to the NPBL bylaws would be required to permit the NPBL to enter into private freight contracts (even though the NPBL enters into private contracts for other services, such as locomotive leases, contractor services, etc.), and to allow use of non-NPBL owned or leased locomotives for movements over NPBL trackage. After reviewing case law and Virginia code extensively, we are not convinced this is an accurate interpretation of NPBL's bylaws or the law, generally. Nevertheless, we believe that we will be able to reach agreement on a long term transportation agreement that will be sufficiently beneficial to NPBL such that no reasonable person could refuse to take whatever action is necessary to allow NPBL to enter into such a contract, even if it would involve using locomotive power provided by CSXT or another company. By doing so, we might also be able to lay the groundwork for similar rates and services to be provided by NPBL for NS to reach Portsmouth Marine Terminal (PMT) going forward.

Even at an income-neutral level, we think aspects of how the NPBL operates need to be updated for it to remain viable and competitive, and able to fulfill its charter. Port traffic in Norfolk and Portsmouth is continuing to increase, and NIT is undergoing a radical expansion thanks in large part to a capital infusion of hundreds of millions of taxpayer dollars. If ever there was a time to demonstrate the NPBL's commitment to serve its shareholders and the community that supports it financially, and provide intermodal service to NIT, it is now. Failure to seize this opportunity virtually begs VPA to configure NIT in a manner that would effectively preclude NPBL from continuing to provide even nominal rail service to NIT.

### Rate:

We propose $80 per car (i.e., each articulated section of an articulated car), for loaded or empty cars, moved to or from NIT for the purpose of handling international containers. We think this rate will be sufficiently competitive to attract incremental rail intermodal freight to NIT, while allowing NPBL to earn additional revenue of $1,440,000, annually, based on the initial level of volume we describe below.

**Volume:**

CSXT proposes a minimum annual volume guarantee, with mutually agreed conditions, of moving 18,000 cars (i.e., each articulated section), loaded or empty, moving to or from NIT, on the NPBL per contract year. We are open to a gradual ramp up of volumes in the first years, to allow for less volume in the initial years, progressing (or even exceeding) the proposed volumes in this proposal letter. Finally, we are willing to negotiate mutually-suitable minimum and/or maximum train sizes (on a per car basis).

**Shortfall Fee:**

CSXT proposes a shortfall fee of $60 per car, based on a minimum volume commitment of 18,000 cars per year. Standard defenses or exceptions (e.g., force majeure) would apply.

**Days of Service:**

We have modeled our proposal based on 5 days per week service, consistent with the days of operation at NIT, in order to take advantage of the efficiency and safety benefits provided by fixed crew assignments. Over time, we would be interested in up to 7 days per week service (with a corresponding increase in guaranteed minimum volume), and are willing to consider a graduated "ramp up" to 7 days in the earlier stages of this service. We understand we will both need to consider labor costs, among other things, and are willing to work with you to maximize productivity.

**Start Date and Term:**

CSXT is ready, willing and able to commence service today. That said, we would be open to a commencement date within 30 days of the execution and delivery of the mutually agreed contract. With respect to the term of any agreement, CSXT is willing to negotiate a reasonable fixed term, including conditions for renewal, all to be mutually agreed.

**Locomotives and Fuel:**

CSXT is willing to provide NPBL with the locomotives and fuel to handle movement of CSXT traffic at no charge to NPBL. We understand there has been an objection to using CSXT power in the past, even though CSXT and NS locomotives operate on NPBL property every day. As noted above, we think we can reach a mutually agreed arrangement that is sufficiently attractive to motivate appropriate corporate action (if any is necessary) to remove any obstacles. Nevertheless, we are also willing to work with NPBL to adjust the

rates and operating plan to account for use of NPBL power and fuel, at least to the extent and for so long as any corporate formality actually requires NPBL to do so.

Regardless of which locomotives are used for the move, we would defer to NPBL's stated preference or requirements with respect to the minimum locomotive power (i.e., Horsepower per Ton Ratio).

### *Interchange Location, Time of Handoff, and Maximum Train Length:*

Here again, we would defer to the NPBL with respect to the interchange location, and are open to designation of multiple interchange locations (e.g., Berkley Yard and Portsmouth Yard) to be determined by the parties prior to each interchange event. Rates would remain the same, regardless of interchange location. Similarly, we are willing to work with you to determine operating windows for the exchange of interchange cars. We understand that, at least initially, the windows may vary on a weekly (if not daily) basis.

### *Documentation:* .

The foregoing terms would be subject to and become binding only upon memorialization in a mutually agreed written format (rail transportation contract or equivalent) duly signed for both NPBL and CSXT.

### Economic Impact on the NPBL

Based on CSXT's internal projections of the NPBL cost structure, and the use of CSXT's locomotives and fuel at no cost to NPBL, we estimate this proposal would provide the NPBL with a minimum of $660,000 of additional annual operating income (and an operating ratio for the service equal to 54%) starting in the first full year of operations. That would represent a substantial increase over 2016 total operating income for the NPBL, with almost zero risk to the NPBL.

It is worth emphasizing that there is nothing but upside to this proposal, especially with a baseline commitment from CSXT to move 18,000 cars per year. Given the estimated operating ratio NPBL would enjoy from this service, and CSXT's expectation that volumes will only grow once the parties can demonstrate consistent service, we believe this proposal could be a significant element of NPBL's long term strategy in Norfolk.

### Operating Plan

The requested services is for "drop and swap" intermodal single-stack or double-stack unit train service between Berkley Yard (or Portsmouth Yard) and NIT. We intend to

work with you to minimize direct expenses to the NPBL, to work with VIT to integrate with existing and planned operations inside the gate at NIT. We also recognize the need to work with NS to integrate with their operating needs, and we believe it is imperative for all parties to work together in order for NPBL to honor its longstanding obligation to provide service to its owners, to enjoy the use of its trackage rights, and to fulfill the purpose of its retained trackage rights from the sale of its property outside of NIT to the VPA in 2010.

We also note that the NPBL management endorsed the operating plan detailed in the July 19, 2010 rate proposal, and we are willing to work from that operating plan with such adjustments as may be deemed necessary to address any bona fide concerns raised by NS or VIT.

## Summary

During the eight years since CSXT's last proposal for long term rail intermodal service, CSXT has had no choice but to dray over one hundred thousand containers that easily could have been handled by the NPBL. Under the current proposal, and based solely on a minimum volume, the NPBL could earn at least $11 million in revenue and over $5 million in incremental operating income over the same period. As NIT continues work on its massive expansion project, nearly doubling its present throughput, the projected earnings from this proposal could increase tremendously.

As stated above, we are fully committed to work with the NPBL to address any concerns regarding the requested service and any other terms of this proposal. Given the opportunity presented by this proposal, and the downside if we must continue to rely on drayage, there can be no doubt that time is of the essence for both parties. To that end, we respectfully request a written response to this proposal no later than **April 2nd**.

We look forward to working with you on this important project.

Sincerely,

Tony DiDeo

Tony DiDeo

(Enclosure – July 19, 2010 Rate Proposal and Operating/Financial Plan)

<u>July 19, 2010 Rate Proposal & Operating/Financial Plan</u>

[Please see attached]



TRANSPORTATION

500 Water Street, J315
Jacksonville, FL 32202
(904) 359-3486
John_Booth@csx.com

J.N. Booth, III
Director Joint Facilities

July 19, 2010

**VIA ELECTRONIC MAIL**

Mr. David Stinson
Director, President & General Manager
Norfolk and Portsmouth Belt Line Railroad Company
P.O. Box 7545
Portsmouth, VA 23707

Ms. Donna Coleman
Director, Vice President, Comptroller & Corporate Secretary
Norfolk and Portsmouth Belt Line Railroad Company
P.O. Box 7545
Portsmouth, VA 23707

Re:   Rail Service Connection to NIT – Rate Proposal and Operating/Financial Plan

Dear Sir and Madam:

We refer to CSXT's October 15, 2009 rate proposal, which was rejected by the NPBL because it did not include a detailed operating plan and estimated financial impact on the NPBL. To address the NPBL's concerns, CSXT has consulted with the NPBL and Virginia International Terminals, Inc. (VIT) on the following operating plan, and has further examined relevant financial information, including information provided to the 2009 NPBL Rate Committee.

CSXT is now pleased to offer the following rate proposal, together with an operating plan and related financial information. As detailed below, and assuming NPBL elects to use CSXT locomotives at no charge, this rate proposal will provide the NPBL with at least $149,452 in risk-free incremental operating income in the first calendar year of operations alone.

**Operating Plan**

This operating plan is for intermodal single-stack unit train service between Berkley Yard and Norfolk International Terminals (NIT).  In addition to minimizing direct expenses to the NPBL, this operating plan is designed to integrate with existing and planned operations inside the gate at NIT.

At the onset, CSXT requests a drop & swap service three days per week, whereby the NPBL would complete services at NIT between 00:00 and 05:00 on Sunday, Tuesday, and Thursday.  For your convenience, Annex A to this letter proposal provides a visual overview of the rail movements in the operating plan described below:

- First, CSXT will deliver a locomotive, including sufficient fuel for the round-trip to NIT, and cars to Berkley Yard, by 18:00 on the preceding day.

- Between 18:00 and 21:00 on the days of CSXT's delivery to Berkley Yard, the NPBL will access NSRR tracks starting at NS Jct., as permitted by agreements between NPBL, NSRR and their respective predecessors dated: July 26, 1917, July 27, 1917, December 31, 1985 and January 1, 2008.

- At Port Lock Yard, the NPBL will pull into an available track, as designated by the NSRR Yard Master.  At this time, the NPBL crew will cut away from the front of this consist, run around to the tail, and reconnect.  NPBL will perform required brake testing prior to departing.  At this point, the NPBL will be staged and waiting for the NSRR Yardmaster to grant permission for movement to NIT.

- After departure from Port Lock Yard, the NPBL will arrive at NIT during the scheduled window from 00:00 to 05:00.  As the NPBL advances the 8 miles to QM Jct. (crossing the right leg of the switch), it will proceed past West Jct. onto the NPBL trackage, known as Sewells Point Yard.  Here, the crew will set off the consist onto the passing track near Hampton Blvd. and North Gate Road.

- The NPBL crew will then contact VIT for instructions relative to any outbound CSXT containers to be pulled from NIT.

  o If there is an outbound consist to be picked up at NIT, the NPBL crew will advance to NIT and retrieve the consist from the pickup track designated by VIT.

    ▪ The consist will already have been inspected and air tested by TTX, at no cost to the NPBL.

    ▪ The NPBL crew will backtrack over the same route returning to Berkley Yard for CSXT pick up between 13:00 and 17:00 same day.

  o If there is no outbound consist to be picked up at NIT, the NPBL crew would return the locomotive to Berkley during that same window.

2

Please note the following, which was incorporated into this operating plan:

- The NPBL management has expressed confidence that the proposed round-trip schedule can be completed efficiently with one scheduled crew start.

- This operating plan assumes the NPBL will use CSXT's locomotive between Berkley and NIT without cost or requirement to refuel.

  o This accommodation will not only simplify operations for these moves, it will enhance NPBL's profitability as noted in the first table below.  If NPBL elects to us its own power, the calculations shown in Table 2 will apply.

## Rates and Contractual Terms

In order for the NPBL to secure port-related traffic at NIT, its rates and operating requirements must be competitive.  Presently, the NPBL's switch rate of $ 210 per car is an economic barrier that prevents CSXT from being able to move any meaningful port freight by rail at NIT.

Here's why: under Item 125 of its public tariff, the Commonwealth Railway charges $35.61 per container (empty or loaded) for a similar movement from APM Terminals.  The difference between switch charges is considerable, and will only make the NPBL's rate less competitive now that VIT can shift traffic to APM Terminals in its discretion.

CSXT is not interested in placing the full burden on the NPBL to close this gap.  Our proposed operating plan, which provides substantial risk-free incremental operating income, demonstrates our willingness to make accommodations to help the NPBL in this effort.

Accordingly, CSXT proposes the following, all to be memorialized in a formal agreement:

- One-way rate of $37.50 per container (empty or loaded) for a term of three years on movements handled by the NPBL between Berkley Yard and NIT.  For operational convenience as necessary, the parties may mutually agree to interchange at Portsmouth Yard for the same rate.

- To minimize financial risk to the NPBL, CSXT commits to provide a minimum average volume (measured over each six month period during the term) of 50 containers per scheduled NPBL round-trip.  Assuming three days per week service, the NPBL would have a consistent revenue stream of $146,250 for 3,900 containers for that six month period.

- In consideration of CSXT's commitment, CSXT may request that scheduled service days be adjusted upon CSXT's prior written request.  Also upon prior written request, CSXT may request double-stack service at the same rate per container.

3

These adjustments, with allowance for proper notice, would give both parties adequate time to respond to changing market conditions.

- The NPBL's standard settlement and credit terms would apply to the covered traffic, with any potential container shortfall payment to be remitted in a reasonable time after each six month period.

- Mutually acceptable measures and standards of service, including incentives related thereto, would be incorporated into a formal agreement.

### Economic Impact on the NPBL

As shown below in Table 1, based on CSXT's internal analysis of the NPBL cost structure, and the use of CSXT's locomotives and fuel at no cost, this proposal would provide the NPBL with a minimum of $149,452 of additional annual operating income starting in the first full year of operations. That would represent an increase of 25% over 2009 total operating income for the NPBL, with almost zero risk to the NPBL.

It is worth emphasizing that there is nothing but upside to this proposal, especially with a baseline commitment of 50 containers. For example, if CSXT tenders 80 containers per round-trip (the "Project Volume"), the NPBL's incremental operating income would be $296,872 over the first full year of operations. This modest increase in volume is not an unreasonable projection, and yet it would represent almost a 50% increase to 2009 operating income.

[TABLES FOLLOW ON NEXT PAGE]

**Table 1**

|  | W/ CSXT Locomotives & Fuel | |
|---|---|---|
|  | Base Level | CSXT Projected |
| Avg. Containers Per Train (Scheduled Crew) | 50 | 80 |
| **Annual** | | |
| Container Volume | 7,800 | 12,480 |
| NPBL Revenue | $292,500 | $468,000 |
| Compensation & Benefits | $96,248 | $96,248 |
| Locomotive Expense | $0 | $0 |
| Fuel | $0 | $0 |
| Incremental Maintenance | $46,800 | $74,880 |
| Direct Expense* | $143,048 | $171,128 |
| Operating Income Impact | $149,452 | $296,872 |

\* Extrapolated from 2009 Rate Committee Meeting Package

**Table 2**

|  | W/ NPBL Locomotives & Fuel | |
|---|---|---|
|  | Base Level | CSXT Projected |
| Avg. Containers Per Train (Scheduled Crew) | 50 | 80 |
| **Annual** | | |
| Container Volume | 7,800 | 12,480 |
| NPBL Revenue | $292,500 | $468,000 |
| Compensation & Benefits | $96,248 | $96,248 |
| Locomotive Expense | $10,714 | $10,714 |
| Fuel | $19,000 | $19,000 |
| Incremental Maintenance | $46,800 | $74,880 |
| Direct Expense* | $172,762 | $200,842 |
| Operating Income Impact | $119,738 | $267,158 |

\* Extrapolated from 2009 Rate Committee Meeting Package

**Note to Table 2:** As noted above, CSXT's operating and financial plan contemplates the NPBL's use of CSXT locomotives and fuel at no charge. However, should the NPBL wish to use its own locomotives and fuel, Table 2 provides an estimate of the economic impact to the NPBL, which remains quite favorable.

If the NPBL elects not to use CSXT's locomotives and fuel, the NPBL would still make $119,738 in incremental operating income at the base-line volume commitment level in the first year of operations. And, using the Projected Volume, the NPBL would generate $267,158 of incremental operating income, which would represent an increase of approximately 45% over 2009 total operating income for the NPBL.

## Summary

CSXT reaffirms its belief that time is of the essence for the NPBL to consider this proposal, which is designed to enable both parties to attract intermodal port traffic at NIT. The outlined operating plan and projected financial gains respond to the NPBL's earlier concerns and provide the justification necessary for the NPBL management to support this endeavor.

CSXT also believes this proposal enables the NPBL to deliver on the commitments it has made, directly and indirectly, to the citizens of the Commonwealth, to create competitive dual rail service at NIT. We hope you agree and respectfully request a favorable response from you within thirty (30) days of this letter.

Very Truly Yours,

John Booth

## Operating Plan Support Maps



### Norfolk International Terminals



6

# EXHIBIT F



Law Department
500 Water Street, J150
Jacksonville, Florida 32202
Tel. 904-359-1229
Email: Steven_Armbrust@csx.com

**Steven C. Armbrust**
Assistant General Counsel
Corporate & Transportation Law

Admitted in NY – Not Admitted in FL
FL Authorized House Counsel

April 6, 2018

## VIA ELECTRONIC MAIL AND OVERNIGHT MAIL

Norfolk & Portsmouth Belt Line Railroad Company
1340 Truxton Street
Chesapeake, VA 23324

Norfolk Southern Railway
Three Commercial Place
Norfolk, VA 23510

Re:   Demand that the NBPL Board and Norfolk Southern Railway Take Remedial Actions at
       April 2018 Meetings of the Board and the NPBL Shareholders

To:   Members of the NPBL Board
       Norfolk Southern Railway

CSX Transportation, Inc. ("CSXT") demands that the Norfolk & Portsmouth Belt Line
Railroad Company ("NPBL"), through its Board of Directors (the "NPBL Board"), and Norfolk
Southern Railway ("NS") take remedial actions at the April 2018 meetings of the NPBL Board
and the NPBL Shareholders to address serious deficiencies in the policies, procedures, controls,
and governance structure of the NPBL.  As detailed below, as a direct result of these
deficiencies, CSXT has been deprived of its contractual right to equal representation on the
NPBL Board, and NS has impermissibly taken, exercised and maintained control of the NPBL,
the NPBL Board and management, and the operation of the NPBL's railroad.  The need for
change has been accentuated by recent events involving NPBL management's response to a new
rate and traffic proposal by CSXT.

Accordingly, CSXT demands that the NPBL and NS take all necessary actions to (i)
afford CSXT equal representation on the NPBL Board, including limiting the shareholder-
designated representatives on the NPBL Board to one director designated by each of NS and

CSXT as its representative (and with qualified independent directors filling the remaining Board seats); (ii) replace certain NPBL management with qualified individuals who are independent of both NS and CSXT; and (iii) adopt a proper corporate compliance program (including a Code of Ethics) that is prepared and made appropriate for the NPBL and independent of any program or code adopted by and for NS.

### CSXT Must be Afforded Equal Representation on the NPBL Board

As you are aware, CSXT and NS (collectively, the "Shareholders") are the holders of all of the issued and outstanding stock of the NPBL. CSXT and NS also, as successors to the original contracting parties, are the sole remaining parties to that certain Agreement dated July 7, 1897 between and among all of the original shareholders of the NPBL (as amended, the "NPBL Agreement"). The NPBL Agreement relates to and governs the ownership and operation of the NPBL and, *inter alia,* creates and establishes various duties and obligations (a) between and among the Shareholders, and (b) owed by the members of the NPBL Board and management (including its President and General Manager) to each Shareholder.

The NPBL Agreement provides that each Shareholder "shall have one representative on the Board" of the NPBL. Agreement at Art. 4. In a Supplemental Agreement dated as of March 1, 1989 (the "Supplemental Agreement"), the three rail carrier companies that comprised the NPBL's shareholders at that time -- CSXT, Norfolk and Western Railway Company ("NW") and Southern Railway Company ("SR") -- agreed to deviate from Article 4's requirement that the "number of directors of NPBL shall always be fixed to correspond to the number of companies owning stock in the NPBL." Pursuant to the Supplemental Agreement, and in view of the unique circumstances that then pertained with respect to NW and SR as separate rail carriers and companies with common corporate ownership, CSXT was afforded the right to appoint two representatives to the NPBL Board, and the other two companies, NW and SR, collectively between them were afforded the right to appoint only three representatives to the NPBL Board.

Years later, NW and SR merged to form the single company now known as NS. The merger of those two companies eliminated the purpose for which the Supplemental Agreement had been created and rendered the Supplemental Agreement's modifications to Article 4 of the NPBL Agreement unwarranted, moot, and contrary to the core organizing principle and intent of the original NPBL shareholders, as set forth in the NPBL Agreement that its railroad "should be constructed, maintained and operated under a separate organization in which all [shareholder companies] are to be equally interested and each to have an equal representation." Agreement p. 1 [first "WHEREAS" paragraph].

Notwithstanding that NW and SR ceased to exist as separate companies, and only two companies, CSXT and NS, are NPBL's sole Shareholders at the present time, CSXT has not been afforded equal representation on the NPBL Board or equal interest in the construction, maintenance and operation of the NPBL railroad, in direct contravention of CSXT's rights under the NPBL Agreement. The NPBL Board currently consists of six voting members and one non-voting member. By-Laws of the NPBL at Art. 3 (1996). NS (through its historic exercise of a greater number of votes as holder of a majority of NPBL's shares) has designated, voted for and controls five members of the NPBL Board (four voting members and one non-voting position), while allowing CSXT to designate only two members for election to the NPBL Board. All three of NS-designated voting non-management directors are current NS employees; the fourth NS-

designated director position is held by the individual serving as President and General Manager of the NPBL, who was appointed to that position by the three NS-designated non-management directors (over the objection of the CSXT-designated directors) and is a former NS employee; and the non-voting position, the Vice President, Comptroller and Corporate Secretary, is held by another former NS employee. NS has thereby taken and exercises complete control of the NPBL Board, and the management and operation of the railroad, largely to the exclusion of CSXT and without participation by any independent director or officer.

The NPBL Board and NS must take immediate action to provide CSXT with equal representation in NPBL including, but not limited to, the remedial actions stated herein.

**NPBL Management Must be Replaced with Individuals who are Independent**

As specified in the NPBL Agreement, the NPBL exists for the ***mutual*** and ***equal*** benefit of its shareholders to provide an efficient means of interchanging the traffic of its owners. In order to advance the purpose for which the NPBL was formed, the original shareholder companies, including those whose successors are currently the Shareholders and parties to the NPBL Agreement, expressly agreed therein that it is in the best interest of all shareholders that each shareholder have equal representation in the NPBL, and committed that each shareholder will "co-operate cordially in encouraging the business of the [NPBL] for which it is constructed." NPBL Agreement at 1. The mission and purpose of the NPBL is to be carried out by the NPBL Board, in connection with the NPBL management, which includes the President and General Manager (who acts as both management and a voting member of the NPBL Board), Vice-President, Secretary and Comptroller and Treasurer.

Pursuant to the NPBL By-laws, the NPBL "Board of Directors shall elect from their own number a President and General Manager and shall appoint a Vice-President, a Secretary and Comptroller and a Treasurer." By-Laws of the NPBL at Art. 4 (1996). NS has exploited its unequal and improper control of the NPBL Board to appoint and elect an NS-controlled individual to the position of President and General Manager who, in turn, appoints NS-controlled individuals to other NPBL management positions. Indeed, the current NPBL President, Cannon Moss, his immediate successor, President David Stinson, as well as the rest of the NPBL management, are all former employees of NS who act under and at NS's direction, and each has been reemployed by NS, or expected and/or has been led by NS to believe that they may be employed again by NS in the future. As a result, the NPBL management, including Mr. Moss in his capacity as both NPBL President and General Manager and a director, are beholden to NS and have a vested interest to act in the best interest of NS, as opposed to both Shareholders and the NPBL's business interests.

Accordingly, the NPBL Board must take immediate action to remedy the conflicts of interests between NS and the NPBL's management including, but not limited to, the remedial actions stated herein.

**NPBL Must Establish a Corporate Compliance Program That Is Independent of NS (and CSXT) and Is Designed for NPBL's Particular Organization**

In 2012, CSXT and NS performed a joint audit of the NPBL to evaluate the effectiveness of the NPBL's policies, procedures, controls, and governance structure. In the Final Audit

Report dated November 27, 2012, CSXT and NS identified deficiencies with the NPBL's corporate governance and observed that (1) an NPBL "corporate compliance program does not exist and general operating policies and procedures are not documented," and (2) the NPBL's "contract approval and execution controls are not sufficient." The Final Audit Report states that these deficiencies create substantial (rated as "medium") and "unnecessary" risks and liabilities for "NPBL and its owners", explains those risks in some detail, and states that that the "[a]udit observations will remain open until management's action plans are completed and validated." Final Audit Report at 3.

To remedy these deficiencies, the Final Audit Report contained several recommendations, including that the NPBL: (i) eliminate its reliance on NS's documentation for a compliance program, and policies and procedures; (ii) develop and implement a corporate compliance program appropriate for the company; (iii) develop a Code of Ethics for the NPBL, which is independent of NS's policies and procedures; and (iv) develop a formal process for each of the four types of contracts the NPBL primarily enters into (purchasing, real estate, lease, and right-of-way) that requires approval by more than one officer, as opposed to permitting a single individual to negotiate and execute contracts on the NPBL's behalf.

Despite the findings and recommendations of the audit, the NPBL management, as dominated and controlled by NS, has failed to rectify fully these deficiencies and obtain validation of completion of an effective action plan. The NPBL has also failed to take steps to address other deficiencies in its corporate governance, such as the complete absence of any independent, meaningful periodic review of the performance and compensation of the NPBL President and other members of its management.

Accordingly, the NPBL must take immediate action to remedy these corporate governance deficiencies, including, but not limited to, the remedial actions stated herein.

***

The deleterious effects of the foregoing are underscored by recent events involving the submission of a new rate and traffic proposal by CSXT. Initially, instead of responding to that commercial proposal, NPBL management deferred a response until after a "discussion" with the board at the next NPBL Board Meeting. When pressed for a response before the board meeting, NPBL management responded with numerous potential—though illusory—impediments to the proposal, as opposed to engaging on the terms towards the end of an agreement acceptable by both parties. This kind of response is inconsistent with an impartial management team whose primary purpose should be the success and growth of the business it is managing. Rather, the NPBL management's refusal to respond constructively to the latest proposal from CSXT follows the same pattern of delay and obstruction that the unchecked, NS-controlled NPBL Board and management has perpetrated for years. This practice not only unreasonably and unlawfully harms CSXT as a Shareholder in the NPBL and a competitor of NS, but also results in the NPBL acting contrary to its own interests.

**Requested Remedial Actions:**

CSXT demands that the NPBL Board and NS take any and all actions necessary in advance of, at and following the upcoming annual Shareholder Meeting in April 2018 (the "Shareholders' Meeting") and the contemporaneous meeting of the NPBL Board to:

a.  Restructure the NPBL's governance systems to provide for equal representation of both of the Shareholders on the NPBL Board, and ensure that the NPBL is and remains "constructed, maintained and operated under a separate organization in which all [shareholder companies] are to be equally interested and each to have an equal representation." Necessary action by the NPBL Board and Shareholders include:

1.  At the Shareholders' Meeting, voting the Shareholders' respective shares (i) to elect only one director designated by, respectively, each of NS and CSXT; and (ii) elect as voting directors four disinterested qualified individuals, each of whom is fully independent of both NS and CSXT (each an "Independent Director"). Each Independent Director shall meet the requirements for independence set forth on Exhibit A hereto, which requirements are based on those found in Section 303A.02 of the New York Stock Exchange Listed Company Manual.

2.  At a meeting of the NPBL Board held during a temporary adjournment of the Shareholders' Meeting, immediately following the election of directors referenced above, the newly-elected directors must then elect and appoint, from among the four Independent Directors, a qualified individual to serve as President and General Manager of NPBL.

3.  To facilitate the effective and fair implementation of items "a.1" and "a.2" above, within five business days of the date of this letter, the NPBL Board should establish a nominating committee to identify and nominate at least four candidates for election as Independent Directors. The nominating committee should be comprised of two current directors of the NPBL (only one of whom may be a director designated by NS and the other a director designated by CSXT), and the nominating committee should be authorized and directed to engage independent professionals as consultants to assist in identifying and qualifying candidates to serve as the four Independent Directors.

4.  One of the Independent Directors identified above should be nominated for election and appointment by the NPBL Board with the expectation that this Independent Director will serve as President and General Manager of the NPBL. If no candidate for Independent Director can be identified who is qualified and willing to serve as President and General Manager by the April meetings, Cannon Moss may be elected to continue serving as a Director and appointed to continue serving as President and General Manager, provided it is understood and agreed (A) he will be continuing to serve in those positions on an interim basis and (B) he  (x) promptly upon the approval of a new candidate for President and General Manager by the nominating committee described in "b" below and approved by a majority of the other voting Directors, or (y) immediately if a majority of the other voting Directors, in their sole discretion, conclude that Mr. Moss has taken

any material action or omitted to act in any way, for NPBL, that reflects a lack of independence from NS, will resign from the positions of Director, and President and General Manager of NPBL.

b.  After establishing the new NPBL Board as provided in "a.1" above, establish (i) a standing nominating committee of the NPBL Board that includes no less than two Independent Directors, and both the CSXT- and the NS-designated Directors if either wants to participate on the committee, but shall not include the President and General Manager if Cannon Moss is then serving in that position; (ii) a policy setting forth the criteria for selection of candidates for the NPBL management positions and Independent Directors, which criteria shall include, without limitation, a requirement that the President and General Manager of the NPBL be selected from among the Independent Directors and must at all times be and remain independent of, and free of conflicts of interest concerning, both of the Shareholders and their respective Affiliates (including, without limitation, that such candidates would qualify as independent under the criteria set forth in Exhibit A); and (iii) a policy setting forth the qualifications and criteria for selection and appointment of the Vice-President, Secretary and Comptroller and Treasurer that would ensure that the individual appointed to and holding that position is independent of, and free of conflicts of interest concerning, both of the Shareholders and their respective Affiliates.

c.  Fully and consistently implement a corporate compliance program appropriate for the NPBL that is independent of NS's policies and procedures.

d.  Fully and consistently implement formal conflict of interest policies and procedures that are independent of NS's conflict of interest policies and procedures.

e.  Develop and document a formal process for each of the four types of contracts the NPBL primarily enters into (purchasing, real estate, lease, and right-of-way) that eliminates single contract authorization, and provides for the review and approval of contracts by at least two officers prior to execution.

f.  Establish a committee of Independent Directors charged with, no less than annually, reviewing the performance of the NPBL's President and General Manager, and all other officers, managers and superintendents, and with reviewing and determining the reasonable compensation for those executive and management employees.

Very truly yours,

Steven Armbrust

**ELECTRONIC MAIL DISTRIBUTION**

      Jermaine Swafford (Jermaine_Swafford@csx.com)

      Drew Glassman (Drew_Glassman@csx.com)

      Cannon Moss (Cannon.Moss@nscorp.com)

      Donna Coleman (Donna.Coleman@nscorp.com)

      Jerry Hall (Jerry.Hall@nscorp.com)

      Thomas Hurlbut (Thomas.Hurlbut@nscorp.com)

      Philip Merilli (Philip.Merilli@nscorp.com)

## EXHIBIT A

### INDEPENDENT DIRECTOR REQUIREMENTS

No person shall serve as an Independent Director of the NPBL if:

(i)  The person is, or has been within the last three years, an employee of a Shareholder or a Shareholder's Affiliate (as defined below), or an immediate family member is, or has been within the last three years, an executive officer, of a Shareholder or a Shareholder's Affiliate;

(ii) The person has received, or has an immediate family member who has received, during any twelve-month period within the last three years, more than \$120,000 in direct compensation from a Shareholder or a Shareholder's Affiliate, other than director and committee fees and pension or other forms of deferred compensation for prior service (provided such compensation is not contingent in any way on continued service);

(iii) (A) The person is a current partner or employee of a partnership, company or other business organization (a "firm") that is a Shareholder or a Shareholder's Affiliate's internal or external auditor; (B) the person has an immediate family member who is a current partner of such a firm; (C) the person has an immediate family member who is a current employee of such a firm and personally works on a Shareholder or a Shareholder's Affiliate's audit; or (D) the person or an immediate family member was within the last three years a partner or employee of such a firm and personally worked on a Shareholder or a Shareholder's Affiliate's audit within that time;

(iv) The person or an immediate family member is, or has been with the last three years, employed as an executive officer of another company where any Shareholder's or Shareholder's Affiliate's present executive officers at the same time serves or served on that company's compensation committee;

(v) The person is a current employee, or an immediate family member is a current executive officer, of a company that has made payments to, or received payments from, a Shareholder or a Shareholder's Affiliate for property or services in an amount which, in any of the last three fiscal years, exceeds the greater of \$1 million, or 2% of such other company's consolidated gross revenues; or

(vi) The person otherwise has a material relationship with a Shareholder or a Shareholder's Affiliate (either directly or as a partner, shareholder or officer of an organization that has a relationship with a Shareholder or a Shareholder's Affiliate).

As used herein, the term "Affiliate" means, when used with respect to a specified person or entity, another person or entity that either directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, the person or entity specified.  For purposes of this definition, "control" (and its derivatives) means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person or entity, whether through ownership of equity, voting or other interests, as trustee or executor, by contract or otherwise.

JS 44 (Rev. 08/16)   Case 2:18-cv-00530-RAJ-LRL   Document 1-7   Filed 10/04/18   Page 1 of 2 PageID# 89

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
CSX TRANSPORTATION, INC., individually and on behalf of NORFOLK & PORTSMOUTH BELT LINE RAILROAD COMPANY

## DEFENDANTS
NORFOLK SOUTHERN RAILWAY COMPANY, NORFOLK & PORTSMOUTH BELT LINE RAILROAD COMPANY, JERRY HALL, THOMAS HURLBUT, PHILIP MERILLI, and CANNON MOSS

**(b)** County of Residence of First Listed Plaintiff    Duval County, Florida
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Robert W. McFarland; Benjamin L. Hatch, Rebecca Gantt; McGuireWoods LLP, 101 West Main St., Ste. 9000, Norfolk, VA 23510

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❏ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ❏ 2  U.S. Government Defendant
- ❏ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 365 Personal Injury – Product Liability | ❏ 690 Other | ❏ 423 Withdrawal 28 USC 157 | ❏ 376 Qui Tam (31 USC 3729(a)) |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability | ❏ 367 Health Care/ | | | ❏ 400 State Reapportionment |
| ❏ 140 Negotiable Instrument | ❏ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☒ 410 Antitrust |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | ❏ 330 Federal Employers' Liability | Product Liability | | ❏ 820 Copyrights | ❏ 430 Banks and Banking |
| ❏ 151 Medicare Act | ❏ 340 Marine | ❏ 368 Asbestos Personal Injury Product | | ❏ 830 Patent | ❏ 450 Commerce |
| ❏ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ❏ 345 Marine Product Liability | Liability | **LABOR** | ❏ 840 Trademark | ❏ 460 Deportation |
| | ❏ 350 Motor Vehicle | **PERSONAL PROPERTY** | ❏ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ❏ 470 Racketeer Influenced and Corrupt Organizations |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 355 Motor Vehicle Product Liability | ❏ 370 Other Fraud | ❏ 720 Labor/Management Relations | ❏ 861 HIA (1395ff) | ❏ 480 Consumer Credit |
| ❏ 160 Stockholders' Suits | ❏ 360 Other Personal Injury | ❏ 371 Truth in Lending | ❏ 740 Railway Labor Act | ❏ 862 Black Lung (923) | ❏ 490 Cable/Sat TV |
| ❏ 190 Other Contract | ❏ 362 Personal Injury - Medical Malpractice | ❏ 380 Other Personal Property Damage | ❏ 751 Family and Medical Leave Act | ❏ 863 DIWC/DIWW (405(g)) | ❏ 850 Securities/Commodities/ Exchange |
| ❏ 195 Contract Product Liability | | ❏ 385 Property Damage Product Liability | ❏ 790 Other Labor Litigation | ❏ 864 SSID Title XVI | ❏ 890 Other Statutory Actions |
| ❏ 196 Franchise | | | ❏ 791 Employee Retirement Income Security Act | ❏ 865 RSI (405(g)) | ❏ 891 Agricultural Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ❏ 893 Environmental Matters |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | **Habeas Corpus:** | | ❏ 870 Taxes (U.S. Plaintiff or Defendant) | ❏ 895 Freedom of Information Act |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | | ❏ 871 IRS—Third Party 26 USC 7609 | ❏ 896 Arbitration |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 510 Motions to Vacate Sentence | | | ❏ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ❏ 240 Torts to Land | ❏ 443 Housing/ Accommodations | ❏ 530 General | | | ❏ 950 Constitutionality of State Statutes |
| ❏ 245 Tort Product Liability | ❏ 445 Amer. w/Disabilities - Employment | ❏ 535 Death Penalty | **IMMIGRATION** | | |
| ❏ 290 All Other Real Property | ❏ 446 Amer. w/Disabilities - Other | **Other:** | ❏ 462 Naturalization Application | | |
| | ❏ 448 Education | ❏ 540 Mandamus & Other | ❏ 465 Other Immigration Actions | | |
| | | ❏ 550 Civil Rights | | | |
| | | ❏ 555 Prison Condition | | | |
| | | ❏ 560 Civil Detainee – Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*
- ☒ 1  Original Proceeding
- ❏ 2  Removed from State Court
- ❏ 3  Remanded from Appellate Court
- ❏ 4  Reinstated or Reopened
- ❏ 5  Transferred from Another District *(specify)*
- ❏ 6  Multidistrict Litigation - Transfer
- ❏ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. § 2
Brief description of cause:
Unlawful Monopolization

## VII. REQUESTED IN COMPLAINT:
❏ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ❏ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE   10/04/2018

SIGNATURE OF ATTORNEY OF RECORD   /s/ Robert W. McFarland

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   Nature of Suit. Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

**McGuireWoods LLP**
World Trade Center
101 West Main Street
Suite 9000
Norfolk, VA 23510-1655
Tel 757.640.3700
Fax 757.640.3701
www.mcguirewoods.com

**Benjamin L. Hatch**
Direct: 757.640.3731

## McGUIREWOODS

bhatch@mcguirewoods.com
Fax: 757.640.3947

October 4, 2018

Fernando Galindo, Clerk
Walter E. Hoffman
United States Courthouse
600 Granby Street
Norfolk, VA 23510

> Re:   CSX TRANSPORTATION, INC., individually and on behalf of NORFOLK
> & PORTSMOUTH BELT LINE RAILROAD COMPANY
> v.
> NORFOLK SOUTHERN RAILWAY COMPANY, NORFOLK &
> PORTSMOUTH BELT LINE RAILROAD COMPANY,
> JERRY HALL, THOMAS HURLBUT,
> PHILIP MERILLI, and CANNON MOSS

Dear Mr. Galindo:

Attached to this Complaint are proposed summons forms for the corporate defendants, Norfolk Southern Railway Company and Norfolk & Portsmouth Beltline Railroad Company. As to the individual defendants, Jerry Hall, Thomas Hurlbut, Philip Merilli, and Cannon Moss, Plaintiff intends to seek a waiver of service of process, and will file proposed summons if unable to obtain waivers.

Thank you for your assistance.

Sincerely,

Benjamin L. Hatch

BLH/mgm

Enc.

108054056_1

Atlanta | Austin | Baltimore | Brussels | Charlotte | Charlottesville | Chicago | Dallas | Houston | Jacksonville | London | Los Angeles - Century City
Los Angeles - Downtown | New York | Norfolk | Pittsburgh | Raleigh | Richmond | San Francisco | Tysons | Washington, D.C. | Wilmington, NC

# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| CSX TRANSPORTATION, INC., individually and on behalf of NORFOLK & PORTSMOUTH BELT LINE RAILROAD COMPANY, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 2:18-cv-00530-MSD |
| NORFOLK SOUTHERN RAILWAY COMPANY, NORFOLK & PORTSMOUTH BELT LINE RAILROAD COMPANY, JERRY HALL, THOMAS HURLBUT, PHILIP MERILLI, and CANNON MOSS, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

STIPULATED PROTECTIVE ORDER GOVERNING
THE HANDLING OF CONFIDENTIAL INFORMATION AND
THE NON-WAIVER OF INFORMATION SUBJECT TO ATTORNEY-CLIENT
PRIVILEGE AND/OR WORK PRODUCT PROTECTION
PURSUANT TO FED. R. EVID. 502(d)

THIS MATTER came before the Court on the Joint Motion for Entry of Stipulated Protective Order Governing the Handling of Confidential Information and the Non-Waiver of Information Subject to Attorney-Client Privilege and/or Work Product Protection Pursuant to Fed. R. Evid. 502(d) ("Joint Motion") filed by plaintiff CSX Transportation, Inc. ("CSXT"), and defendants Norfolk Southern Railway Company ("NS"), Norfolk & Portsmouth Belt Line Railroad Company ("NPBL"), Jerry Hall, Thomas Hurlbut, Philip Merilli, and Cannon Moss (each a "Party," and collectively, the "Parties"). Pursuant to Federal Rule of Civil Procedure 26(c) and Federal Rule of Evidence 502(e), the Parties, through their respective attorneys, hereby jointly request that the following Order be entered in the above-captioned case (the "Action") to govern:

(i) the exchange of discovery material by the Parties and/or by third parties, (ii) the use or exhibition of documents and things during discovery, (iii) testimony containing trade secrets or confidential or proprietary research, development, technical, financial, strategic, competitive, customer, or commercial information, as well as other kinds of commercially sensitive information within the meaning of Fed. R. Civ. P. 26(c)(1)(G), and (iv) the non-waiver of information subject to attorney-client privilege and/or work product protection.

The Parties and this Court agree that the disclosure of such commercially sensitive information poses a substantial risk of harm to the legitimate proprietary interests of the Parties and third parties. Therefore, good cause exists for entry of this Order to preserve the confidentiality of certain documents and information, to outline procedures for and reasonable restrictions on the disclosure of sensitive materials, and to permit discovery to proceed without delay. The Parties and this Court further agree that good cause exists for entry of this Order to protect the Parties to the Action, to the fullest extent permissible by law, against any waiver of any attorney-client privilege and/or work product protection in this or any other federal or state proceeding that might otherwise arise from the disclosure, production, or exchange of information in this Action, and to outline procedures for handling the clawback of such protected information.

Accordingly, the Court hereby enters the following Order, which shall control (i) the disclosure, dissemination, and use of confidential and/or proprietary information in this Action, and (ii) the clawback of information subject to attorney-client privilege or work product protection following the disclosure of the same, which shall be deemed a non-waiver:

## PROTECTION OF CONFIDENTIAL INFORMATION

1.      This Order shall govern confidential and/or proprietary information disclosed during discovery in this Action, including, but not limited to, documents, things, requests, and

2

responses to requests for production of documents and things, interrogatory answers, deposition testimony, answers to requests for admissions, expert reports, requests and responses to discovery demands, as well as any copies, notes, abstracts, or summaries of such information. The provisions of this Order shall not affect, and this Order does not limit, the use or admissibility of such protected information or material or references to such information or material as evidence at trial, or during a hearing or similar proceeding in this Action or as part of the record on appeal, provided that any Party may seek an appropriate Court Order to protect such material.

2.      Except with the prior written consent of the producing Party ("Producing Party"), any Material that the Producing Party designates as CONFIDENTIAL or CONFIDENTIAL— ATTORNEYS EYES ONLY shall be considered "Protected Material" and shall not be disclosed to any person or used for any purpose except as expressly permitted in this Protective Order. The Producing Party may designate as "CONFIDENTIAL" any Material that it produces in this Action which contains confidential, non-public financial, sales, marketing, customer or cost/pricing information, and confidential and proprietary internal business, strategic planning, or tactical information, as well as any other information or record that the Producing Party believes in good faith must or may be protected from disclosure in accordance with the Federal Rules of Civil Procedure or other applicable law (collectively "Confidential Material"). Any Party to this Litigation, or any third party who elects to be covered by this Protective Order, may designate Material as "CONFIDENTIAL—ATTORNEYS EYES ONLY" to the extent it qualifies for designation as CONFIDENTIAL and, in addition, if the designating Party believes in good faith that disclosure to the Parties would create a substantial risk of serious injury to the designating Party ("Confidential—Attorneys Eyes Only Material"). Confidential Material and Confidential – Attorneys Eyes Only Material are collectively "Protected Material" under this order.

3

3.      The Parties submit that the following categories of information that may be discovered under this Protective Order may qualify as trade secrets or some other properly demarcated category of legitimately confidential information and accordingly may be Confidential Material or Confidential—Attorneys Eyes Only Material, regardless of the form such information may take, including, but not limited to, documents, things, requests and responses to requests for production of documents and things, interrogatory answers, deposition testimony, answers to requests for admissions, expert reports, and other requests and responses to discovery demands, as well as any copies, notes, abstracts, or summaries of such information, whether produced informally or in response to requests for production of documents or things, interrogatories, requests for admissions, or other formal methods of discovery:

- Research and development data;
- Pricing information, including sales and profits;
- Financial data, including sales, marketing, and costs data;
- Confidential business information; and/or
- Identities and lists of customers and vendors.

4.      If discovery is sought from a non-party to this Action, the words "Party" and "Parties" herein shall be read to include that non-party once that non-party informs the Parties to this Action in writing or by e-mail that it is invoking the terms of this Protective Order. Any such non-party shall have all the rights and all the responsibilities set forth under this Protective Order, including the responsibilities with respect to any material designated CONFIDENTIAL or CONFIDENTIAL—ATTORNEYS EYES ONLY that it receives.  Additionally, any such non-party shall have standing to appear in this Action to file motions and oppose motions, as necessary, to protect such non-party's rights in its Confidential Material.

4

5.     Each Party and all other persons bound by the terms of this Protective Order shall use material designated CONFIDENTIAL or CONFIDENTIAL—ATTORNEYS EYES ONLY by any Party other than itself solely for the purpose of this Action, and not for any other purpose whatsoever.  The receiving Party ("Receiving Party") shall not make any copies, duplicates, extracts, summaries, or descriptions of Confidential Material except as may be reasonably necessary in the litigation of this Action.  This Order shall be fully applicable to all such copies, duplicates, extracts, summaries, or descriptions of Confidential Material.

6.     Confidential Material that is produced by a Party shall be clearly marked or stamped with the legend "CONFIDENTIAL" or "CONFIDENTIAL—ATTORNEYS EYES ONLY." Such legend shall be placed on every page of a multi-page document.  Such legend need not be placed on the original document of the Producing Party but instead may be placed upon copies produced or exchanged.  Subject to the exceptions set forth below in this Protective Order, as to each document or portion so marked, the Receiving Party shall not disclose such document or portion or the contents thereof to others unless by specific order of this Court or by written consent of the Producing Party.  All Confidential Material not reduced to documentary or tangible form or which cannot be conveniently designated in the manner set forth above, such as models or electronic files, shall be designated by the Producing Party by informing the Receiving Party in writing and/or by so labeling the media on which electronic files are produced.

7.     Interrogatories or the answers thereto, requests for admissions or the responses thereto, motions, briefs, memoranda, correspondence, and other documents prepared, produced, served, and/or filed in connection with this Action, or portions of the foregoing, containing Confidential Material or quoting or referring to the substance of any Confidential Material may be similarly designated or treated as CONFIDENTIAL in accordance with the provisions and

5

procedures of this Protective Order.

8.      All or part of any oral or written deposition testimony may be designated CONFIDENTIAL either (a) at the time the testimony is given, or (b) within eight (8) days following receipt of a transcript by written notice to the court reporter, with a copy of the notice to counsel for each Party to the Action of the specific pages and lines of the transcript that contain Confidential Material.  Such written notification shall then be attached by the Receiving Party and/or the reporter to the transcript and each copy thereof in its possession, custody, or control. All deposition transcripts shall be treated as CONFIDENTIAL in their entirety until eight (8) business days following receipt of the transcript unless receipt of confidentiality designations is received earlier.  Deposition exhibits previously designated CONFIDENTIAL need not be re-designated to retain their status as Confidential Material.  If a Party designates an entire deposition as CONFIDENTIAL, that Party shall, within eight (8) days of receiving a copy of the deposition transcript, de-designate any non-confidential portions or confirm in writing that the entire transcript shall remain designated CONFIDENTIAL.

9.      In the event the Producing Party elects to produce Confidential Material for inspection, as opposed to, for example, delivering documents or things, no marking need be made by the Producing Party in advance of the inspection if the Producing Party otherwise informs the Receiving Party of its intention to so designate the produced material, and all information produced for inspection shall be treated as CONFIDENTIAL during the inspection.  Thereafter, upon selection by the inspecting Party of specified documents or things for copying, the copies of such documents that contain Confidential Material shall be marked appropriately.

10.     Information that becomes available to a Party via inspection, measuring, analyzing, or testing of any sample or thing marked CONFIDENTIAL or which is prepared or derived by

6

utilizing such a sample or thing shall also be considered to be CONFIDENTIAL.

     11.    Absent written consent from the Producing Party or unless otherwise directed by the Court, Protected Material may be disclosed only to the following persons:

    a. Individuals who are Party to this action in their individual capacities;

    b. With respect to business entities who are Party to this action, no more than two individuals employed by the Receiving Party who are directly and actively involved in assisting with the prosecution or defense of this Litigation, whose identities have been previously disclosed to the Parties, and who must have agreed to be bound by this Protective Order by signing a confidentiality agreement substantially in the form of Attachment A (the "Business Personnel"), except that, upon the Receiving Party's identification of Business Personnel, the Producing Party shall have five (5) days to petition the Court to challenge such designation.  Until the Court issues a decision, no Confidential Material shall be disclosed to such Business Personnel without prior written consent of the Producing Party;

    c. Outside counsel of record for the Parties;

    d. In-house counsel for the Parties who are actively involved in assisting with the prosecution or defense of this Litigation;

    e. Outside experts or consultants who are not regular employees of a Party but are retained on behalf of any of the Parties by their outside counsel to assist in the preparation of this case;

    f. Outside photocopying, graphic production services or litigation support services employed by the Parties' counsel to assist in this Litigation, and computer service personnel performing duties in relation to a computerized litigation system;

  g. The Court, court reporters, videographers, stenographers, and court personnel;

  h. The direct staff of, and any contract support personnel employed or retained by, any of the foregoing persons, provided that such persons are actively involved in assisting with the prosecution or defense of this Litigation; and

  i. Any person who is an employee of the Producing Party, or a former employee of the Producing Party (if they were employed by the Producing Party when the Confidential Material was created).

  12. Absent prior written consent from the Producing Party or unless otherwise directed by the Court, Confidential-Attorneys Eyes Only Material may be disclosed only to the following persons:

  a. Outside counsel for the Receiving Party, their employees and outside photocopying, graphic production services or litigation support services assisting such counsel, and computer service personnel performing duties in relation to a computerized litigation system;

  b. The Court, court reporters, videographers, stenographers, and court personnel, as are necessarily incident to depositions, hearings or trial;

  c. Outside experts or consultants who are not regular employees of a Party but are retained on behalf of any of the Parties by their outside counsel to assist in the preparation of this case; and

  d. Any person who is an employee of the Producing Party, or a former employee of the Producing Party (if they were employed by the Producing Party when the AEO Material was created).

  13. If any Party believes in good faith that its in-house counsel who are actively

8

involved in assisting with the prosecution or defense of this Litigation, or if an individual, the Party himself, requires access to Confidential-Attorneys Eyes Only Material to effectively assist in this Litigation, the Party may provide written notice to the designating Party, identifying in good faith specific, limited Confidential-Attorneys Eyes Only Material to which it believes such access is required. The designating Party shall consider any such request in good faith and, to the extent feasible and not unduly burdensome, produce a second version of the specified Confidential-Attorneys Eyes Only Material that redacts discrete pieces of information, such as specific figures, statements, or information that the designating Party in good faith believes warrant a designation of CONFIDENTIAL—ATTORNEYS EYES ONLY. The redacted version shall be subject to the same restrictions and protections as Confidential-Attorneys Eyes Only Material, except that it may be disclosed to in-house counsel or individual defendant who is/are actively involved in assisting with the prosecution or defense of this Litigation. To the extent the Parties cannot after good faith efforts reach agreement on any such request, either Party may seek appropriate relief from the Court.

14.     Outside experts and consultants shall not be permitted access to material designated CONFIDENTIAL or CONFIDENTIAL—ATTORNEYS EYES ONLY unless and until they agree in writing to be bound by this Protective Order by signing a confidentiality agreement substantially in the form of Attachment A. Disclosing outside counsel shall retain the original of all executed confidentiality agreements.

15.     No disclosure of Confidential Material or Confidential-Attorneys Eyes Only Material shall be made by any person authorized to have access thereto to any person who is not authorized for such access under this Protective Order. The Parties shall safeguard all designated material to protect against disclosure to any unauthorized persons or entities.

16.     Should any Receiving Party file any Confidential Material or Confidential-Attorneys Eyes Only Material with the Court, that Party must file a separate and specific motion filing that material under seal pursuant to Local Civil Rule 5 of the United States District Court for the Eastern District of Virginia ("Local Civil Rules"). The filing Party must comply with Local Civil Rule 5 and its procedures. Further, with regard to material filed under seal, the Parties shall (a) follow the procedures set forth by this Court and Local Civil Rule 5 and (b) shall file a redacted version where possible of the filed document in compliance with the CM/ECF Procedures of the Court and Local Civil Rule 5.

17.     The Parties shall limit their CONFIDENTIAL or CONFIDENTIAL—ATTORNEYS EYES ONLY designations solely to information which they in good faith believe to fall within the scope of this Protective Order. No Receiving Party shall be under any obligation to object to the designation of any document or information at the time such designation is made or at any time thereafter, and no Party shall, by failure to object, be found to have acquiesced or agreed to such designation or be barred from objecting to such designation at any time.

18.     Should any material designated CONFIDENTIAL or CONFIDENTIAL—ATTORNEYS EYES ONLY under this Protective Order be disclosed through Inadvertent/Mistaken Disclosure by the Receiving Party to any person not entitled to receive the material, there shall be no waiver or loss of confidentiality. The inadvertently/mistakenly disclosing Party shall immediately inform counsel for the Producing Party of the Inadvertent/Mistaken Disclosure. The inadvertently/mistakenly disclosing Party shall also exercise all reasonable efforts to retrieve any such Confidential Material or to Confidential-Attorneys Eyes Only Material disclosed to persons not authorized to receive the Confidential Material or to Confidential-Attorneys Eyes Only Material under this Protective Order and to ensure

that no further or greater unauthorized or Inadvertent/Mistaken Disclosure and/or use thereof is made.

19.   A Party may object to the designation of particular "CONFIDENTIAL" or "CONFIDENTIAL—ATTORNEYS EYES ONLY" information by giving written notice to the Party designating the disputed information.  The written notice shall identify the information to which the objection is made.  If the Parties cannot resolve the objection, it shall be the obligation of the Party designating the information as "CONFIDENTIAL" or "CONFIDENTIAL—ATTORNEYS EYES ONLY" to file an appropriate motion within ten (10) business days after the notice is received requesting that the Court determine whether the disputed information should be subject to the terms of this Protective Order.  If such a motion is timely filed, the disputed information shall be treated as designated by the Producing Party under the terms of this Protective Order until the Court rules on the motion.  If the designating Party fails to file such a motion within the prescribed time, the disputed information shall lose its designation and shall not thereafter be treated in accordance with this Protective Order.  In connection with the motion filed under this provision, the Party designating the information as "CONFIDENTIAL" or "CONFIDENTIAL—ATTORNEYS EYES ONLY" shall bear the burden of establishing that good cause exists for the disputed information to be so designated and treated under the terms of this Protective Order.

20.   A designation of Confidential Material or Confidential-Attorneys Eyes Only Material may be made at any time as to materials produced during the litigation.  The inadvertent, mistaken, or unintentional disclosure ("Inadvertent/Mistaken Disclosure") by the Producing Party of Confidential Material or to Confidential-Attorneys Eyes Only Material without having so designated the material shall not be deemed a waiver in whole or in part of Producing Party's claim of confidentiality if written notice is given to the Receiving Party promptly after the

discovery of the Inadvertent/Mistaken Disclosure and/or non-designation.   Within five (5) business days of providing such written notice of the Inadvertent/Mistaken Disclosure and/or non-designation, the Producing Party shall re-produce appropriately designated materials, and the material that was inadvertently/mistakenly disclosed and/or non-designated and all copies thereof shall be immediately returned to the Producing Party or destroyed.   Upon receipt of written notice of Inadvertent/Mistaken Disclosure and/or non-designation under this paragraph, the Receiving Party shall exercise all reasonable efforts to retrieve and/or limit disclosure of the Confidential Material or to Confidential-Attorneys Eyes Only Material to persons not authorized to receive such materials under this Protective Order.

21.     The restrictions set forth in this Order regarding the protection of confidential information shall not apply or shall cease to apply to any material or information that:

a.  at the time of disclosure hereunder, was already lawfully in the possession of the Receiving Party and was not acquired from any third party under obligation of confidence to the Producing Party;

b.  after disclosure hereunder, is acquired by the Receiving Party from a third party lawfully possessing the same and having no obligation to the Producing Party hereunder;

c.  after disclosure hereunder, is developed by the Receiving Party independently of any Confidential Material or to Confidential-Attorneys Eyes Only Material obtained from the Producing Party;

d.  after disclosure hereunder, is disclosed to a third party by the Producing Party without an obligation of confidentiality;

e.  prior to the disclosure, was available to the public, or subsequent to the disclosure,

12

has become available to the public through no fault of the Receiving Party; or

f. that is used or admitted in open court without objection; the Parties shall be permitted to raise any objections until the Parties' deadline to file with the Court a notice of intent to request redaction of the transcript of the Court proceeding.

22. Nothing contained in this Order shall be construed to require production of Confidential Material or to Confidential-Attorneys Eyes Only Material deemed to be privileged or otherwise protected from discovery.

23. Nothing contained in this Protective Order shall be construed to require production of material the disclosure of which would breach an express or implied agreement by the disclosing Party with a third party to maintain such information in confidence, but such withheld materials will be properly identified by disclosing Party on a privilege log.

24. Nothing contained in this Protective Order shall prevent disclosure beyond the terms of this Protective Order if the Party designating the material CONFIDENTIAL or CONFIDENTIAL—ATTORNEYS EYES ONLY consents to such disclosure or if the Court orders such disclosure.

25. At the conclusion of this Action, including any appeals, the originals and all copies of Protected Material, including electronic copies and including those provided to outside experts and other third parties, but excluding those provided to the Court, shall be returned to the Producing Party or destroyed, at the election of the Producing Party, except that neither Party nor the Court shall be obliged to return or destroy any materials or any photocopies thereof that were: (a) admitted into evidence at trial or at any hearing; or (b) incorporated, as an exhibit, appendix, or otherwise, as part of a document filed with or submitted to the Court. To the extent the communication or information in question may exist on any computer or back-up media which

cannot be reasonably deleted, it may be retained until such time as the media is subject to routine deletion or destruction, provided that no person attempts to access the contents of the communication or information unless allowed under the terms of this Order. Notwithstanding this provision, counsel shall be entitled, without violating this Protective Order, to retain archival copies of pleadings, affidavits, declarations, motions, briefs, expert reports, correspondence (including email and internal correspondence), any other papers or materials filed with the Court, deposition transcripts, the trial record, and attorney work product (regardless of whether such materials contain or reference information designated CONFIDENTIAL or CONFIDENTIAL—ATTORNEYS EYES ONLY), and any attachments or exhibits to any such categories of documents, so long as the materials are governed by this Protective Order. Written certification of compliance with these post-conclusion requirements shall be provided to the Producing Party not later than sixty (60) days after final termination of this Action. Any Party's failure to provide such post-conclusion certification of compliance may be relied upon by the Producing Party as such certification.

26.     The terms of this Order shall survive the final termination of this Action to the extent that any Protected Material is not or does not become publicly available.

27.     This Order shall be binding upon the Parties hereto, upon their attorneys, and upon the Parties' and their attorneys' successors, executors, personal representatives, administrators, heirs, legal representatives, assigns, subsidiaries, divisions, officers, directors, employees, agents, and independent contractors and other persons or organizations over which they have control.

28.     Nothing in this Order shall bar or otherwise restrict any attorney herein from rendering advice to the attorney's party-client with respect to this Action, and in the course thereof, relying upon an examination of material designated CONFIDENTIAL—ATTORNEYS EYES

14

ONLY, provided that, however, in rendering such advice and in otherwise communicating with the party-client, the attorney shall not disclose any material designated CONFIDENTIAL—ATTORNEYS EYES ONLY or the substance of such material to anyone not authorized by this Protective Order to receive such material.

29.     This Order is not intended to govern the use of material designated CONFIDENTIAL or CONFIDENTIAL—ATTORNEYS EYES ONLY at the trial of this Action. Procedures governing the use of material designated CONFIDENTIAL or CONFIDENTIAL—ATTORNEYS EYES ONLY at trial will, if necessary, be established by separate order, pursuant to application to the Court by one or more of the Parties, after the Parties have met and conferred in a good faith attempt to reach agreement on the terms of such an order. Nothing in this Protective Order shall preclude any Party from moving the Court to seal the courtroom, trial exhibits, or trial transcript in order to preserve the confidential nature of any material designated as CONFIDENTIAL or CONFIDENTIAL—ATTORNEYS EYES ONLY.

30.     This Order may be amended by further order of the Court and is without prejudice to the rights of any Party to move for relief from any of its provisions or to seek or agree to different or additional protection for any particular material or information.

31.     If another court or an administrative agency subpoenas or orders production of material designated CONFIDENTIAL or CONFIDENTIAL—ATTORNEYS EYES ONLY that a Party has obtained under this Protective Order, such Party shall promptly notify the designating Party of the pendency of such subpoena or order.

32.     Each person or entity who receives any material designated CONFIDENTIAL or CONFIDENTIAL—ATTORNEYS EYES ONLY agrees to subject himself/herself to the jurisdiction of this Court for the purpose of any proceedings relating to the performance under,

15

compliance with, or violation of this Protective Order. This provision will not waive or be considered relevant to the subject matter and personal jurisdiction defenses raised by any defendant.

## NON-WAIVER OF PRIVILEGE AND OTHER PROTECTIONS

33.     Pursuant to Fed. R. Evid. 502(d), the disclosure or production of a communication or information protected by the attorney-client privilege, work product doctrine, and/or any other privilege or immunity that is made in connection with this Action shall not constitute a waiver of any claim of attorney-client privilege, work product protection, and/or other privilege or immunity available with respect to that communication or information in this or any other federal or state proceeding under any circumstances. This Order applies regardless of whether the communication or information disclosed or produced describes or relates to this Action.

34.     A Receiving Party is under a good faith obligation to promptly alert a Producing Party if a communication or information is disclosed or produced by the Producing Party that appears to be protected by the attorney-client privilege, work product doctrine, and/or any other privilege or immunity on its face or in light of facts known to the Receiving Party.

35.     To effectuate a clawback, upon learning of the production of privileged or otherwise protected communications or information, the Producing Party who made the disclosure shall send written notice of the production to all Receiving Parties. The Producing Party need not provide any explanation or evidence regarding the reasonableness of the efforts taken to prevent production, and the Receiving Parties agree not to challenge the reasonableness of such efforts. The notice shall identify the communication or information that was produced (including the format of the production—e.g., paper, electronically stored information) and the date(s) of production. If the Producing Party claims that only a portion of the communication or information

is protected, the Producing Party shall provide a new copy of the communication or information with the allegedly privileged or protected portions redacted.

36.     Within five (5) business days of sending the written notice, the Producing Party also shall provide the Receiving Parties with a privilege log for the communication or information providing the following information: date, author(s), custodian(s), recipient(s), file type, and subject (to the extent the subject does not reveal protected content). In addition, the Producing Party shall also provide for each document on their privilege log an identifier for the privilege being asserted (e.g., "ACP" for attorney-client privilege, "WP" for work product, or other descriptions as necessary based on the specific privilege being claimed), a description of the contents of the document that, without revealing information itself privileged or protected, is sufficient to understand the subject matter of the document and the basis of the claim of privilege or immunity, the Bates range for the document(s), and a unique document number/identifier that need not be formatted as, or consecutive with, Bates numbers of produced documents (e.g., "Def_Priv_00001").

37.     Upon determination that a communication or information received is privileged or protected in whole or in part, or upon receipt of notice from the Producing Party that a privileged or protected communication or information has been disclosed or produced, a Receiving Party must promptly: (a) return and/or destroy the original and all copies, including any electronic copies, of the protected communication or information; (b) destroy all notes or other work product reflecting or referring to the content of such material; and (c) certify in writing that the Receiving Party has complied with this section. To the extent the communication or information in question may exist on any computer or back-up media which cannot be reasonably deleted, it may be retained until such time as the media is subject to routine deletion or destruction, provided that no

person attempts to access the contents of the communication or information unless allowed under the terms of this Order. If a Receiving Party used, shared, or disclosed the communication or information prior to notification, it must take reasonable steps to retrieve and prevent further use or distribution of the communication or information. This duty expires only if this Court rules that the communication or information is not privileged or protected.

38.     If a Receiving Party contests the claim of privilege or other protection in good faith, then within ten (10) business days of receiving the Producing Party's notice, it may move for a ruling that the communication or information is not protected by the attorney-client privilege, work product protection and/or other privilege or immunity. Pending resolution of said motion, a Receiving Party may retain a single copy of the communication or information subject to the motion in a secure location, but it may not be used, shared or disclosed in any way prior to the Court's resolution of the motion, except among counsel for use as to the motion. If the Court denies the motion contesting the claim of privilege or other protection, then within ten (10) business days of the Court's Order, the Receiving Party must promptly (a) return and/or destroy the original and all copies, including any electronic copies, of the protected communication or information; (b) destroy all notes or other work product reflecting or referring to the content of such material; and (c) certify in writing that the Receiving Party has complied with this section.

39.     Nothing in this Order shall be construed to limit a Party's right to conduct a review of documents, ESI, or information (including metadata) for relevance and responsiveness and/or require the production of any communication or information that a Party contends is covered by the attorney-client privilege and/or the work product protection.

40.     Until such time as this Order has been entered by the Court, the Parties agree that, upon execution by the Parties, it will be treated as though it had been "So Ordered."

18

It is so ORDERED.

Date: _October 29, 2019_
Norfolk, Virginia

/s/
Lawrence R. Leonard
United States Magistrate Judge

United States Judge

<table>
<tr><td>

**CSX TRANSPORTATION, INC.**

Date:    October 25, 2019

By its attorneys,

/s/
_____
Robert W. McFarland (VSB No. 24021)
Benjamin L. Hatch (VSB No. 70116)
Jeanne E. Noonan (VSB No. 87963)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia 23510-1655
Tel. (757) 640-3716
Fax (757) 640-3930
rmcfarland@mcguirewoods.com
bhatch@mcguirewoods.com
jnoonan@mcguirewoods.com

</td><td>

**NORFOLK SOUTHERN RAILWAY COMPANY**

Date:    October 25, 2019

By its attorneys,

/s/
_____
Alan D. Wingfield (VSB No. 27489)
Michael E. Lacy (VSB No. 48477)
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Tel. (804) 697-1200
Fax (804) 698-6061
alan.wingfield@troutman.com
michael.lacy@troutman.com

John C. Lynch (VSB No. 39267)
Elizabeth S. Flowers (VSB No. 78487)
Kathleen M. Knudsen (VSB No. 90845)
TROUTMAN SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, Virginia 23462
Tel. (757) 687-7537
Fax (757) 687-1546
liz.flowers@troutman.com

Monica McCarroll (VSB No. 45622)
REDGRAVE LLP
14555 Avion Parkway, Suite 275
Chantilly, Virginia 20151
Tel. (703) 592-1154
Fax (703) 230-9859
MMcCarroll@redgravellp.com

</td></tr>
</table>

20

**NORFOLK & PORTSMOUTH BELT LINE RAILROAD COMPANY**

Date:    October 25, 2019

By its attorneys,

/s/
_____
James L. Chapman IV (VSB No. 21983)
W. Ryan Snow (VSB No. 47423)
Darius K. Davenport (VSB No. 74064)
David C. Hartnett (VSB No. 80452)
CRENSHAW, WARE & MARTIN, P.L.C.
150 West Main Street, Suite 1500
Norfolk, Virginia 23510
Tel. (757) 623-3000
Fax (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com
ddavenport@cwm-law.com
dhartnett@cwm-law.com

**JERRY HALL, THOMAS HURLBUT, and PHILIP MERILLI**

Date:    October 25, 2019

By its attorneys,

/s/
_____
Hugh M. Fain III (VSB No. 26494)
M.F. Connell Mullins Jr. (VSB No. 47213)
John M. Erbach (VSB No. 76695)
SPOTTS FAIN P.C.
411 East Main Street, Suite 600
Richmond, Virginia 23219
Tel. (804) 697-2000
Fax (804) 697-2100
hfain@spottsfain.com
cmullins@spottsfain.com
jerbach@spottsfain.com

**CANNON MOSS**

Date:    October 25, 2019

By his attorneys,

/s/
_____
W. Edgar Spivey (VSB No. 29125)
Clark J. Belote (VSB No. 87310)
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, Virginia 23510
Tel. (757) 624-3000
Fax (757) 360-9092
wespivey@kaufcan.com
cjbelote@kaufcan.com