# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

| | | |
|---|---|---|
| **CSX TRANSPORTATION, INC.,** | ) | |
| **individually and on behalf of NORFOLK** | ) | |
| **& PORTSMOUTH BELT LINE** | ) | |
| **RAILROAD COMPANY,** | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| **v.** | ) | **No. 2:18-cv-530** |
| | ) | |
| **NORFOLK SOUTHERN RAILWAY** | ) | |
| **COMPANY, NORFOLK &** | ) | |
| **PORTSMOUTH BELT LINE RAILROAD** | ) | |
| **COMPANY, JERRY HALL, THOMAS** | ) | |
| **HURLBUT, PHILIP MERILLI, and** | ) | |
| **CANNON MOSS,** | ) | |
| | ) | |
| *Defendants*. | ) | |

## DEFENDANT NORFOLK SOUTHERN RAILWAY COMPANY'S
## BRIEF IN SUPPORT OF ITS MOTION TO DISMISS,
## FOR JUDGMENT ON THE PLEADINGS, AND FOR REFERRAL OF
## ISSUES TO THE U.S. SURFACE TRANSPORTATION BOARD

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................... 1

II.    FACTUAL BACKGROUND ...................................................................................... 4

    A.     CSXT is seeking to impose a new contract rate on NPBL to facilitate CSXT's access to NIT. ......................................................................................... 4

    B.     The STB has exclusive jurisdiction over railroad rates, control issues, and terminal access. ...................................................................................................... 7

III.   ARGUMENT ............................................................................................................... 9

    A.     The Court should dismiss Counts I-IV and VIII-IX because NSR is exempt from liability under federal and state law. ............................................... 9

    B.     The Court should dismiss CSXT's claims because the Court cannot grant the relief sought by CSXT. ............................................................................... 13

        1.     The Court cannot grant CSXT access to NIT because the STB has exclusive authority to grant terminal access. ........................................... 13

        2.     Because the Court cannot enter an order fixing NPBL's Switching Rate, it cannot order NPBL to accept CSXT's Service Proposal. ........... 14

    C.     CSXT's challenge to the reasonableness of the Switching Rate must be decided by the STB under the doctrine of primary jurisdiction........................... 15

        1.     Determining the reasonableness of a railroad rate involves technical or policy considerations within the expertise and discretion of the STB and is not within the conventional experience of judges................................................................................................... 17

        2.     Referring the Switching Rate issue to the STB will promote uniformity on rulings related to the reasonableness of railroad rates. ....................................................................................................... 19

        3.     Referring the Switching Rate issue to the STB will materially aid the resolution of this proceeding............................................................. 20

    D.     The Court should stay this proceeding pending the determinations of the STB. .................................................................................................................... 22

IV.    CONCLUSION.......................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advamtel, LLC v. Sprint Commc'ns Co., L.P.*,
    125 F. Supp. 2d 800 (E.D. Va. 2001) ...................................................................17, 18, 19, 21

*Anderson v. Obama*,
    No. CIV. PJM 10-17, 2010 WL 3000765 (D. Md. July 28, 2010) .........................................14

*Archer v. Bd. of State Lands & Forestry*,
    907 P.2d 1142 (Utah 1995) ...............................................................................................21, 22

*AT&T Commc'ns, Inc. v. Conrail*,
    285 F. Supp. 2d 649 (E.D. Pa. 2003) .............................................................................11, 12, 22

*Burlington N. v. United States*,
    459 U.S. 131 (1982) ............................................................................................................2, 3, 15

*Cent. Power & Light Co. v. S. Pac. Transp. Co.*,
    2 S.T.B. 235 (S.T.B. served Apr. 30, 1997) ...........................................................................6

*Chi., Rock Island & Pac. R.R. Co. v. Furniture Forwarders of St. Louis, Inc.*,
    420 F.2d 385 (8th Cir. 1970) ................................................................................................15

*CSX Transp. Co. v. Novolog Bucks Cty.*,
    Civil Action No. 04-cv-04018 (E.D. Pa. June 22, 2006) .......................................................17

*Great N. Ry. Co. v. Merchants Elevator Co.*,
    259 U.S. 285 (1922) ...............................................................................................................3, 16

*Ill. Cent. R.R. v. S. Tec Dev. Warehouse*,
    No. 97 C 5720, 1999 WL 519042 (N.D. Ill. July 15, 1999) ....................................................16

*Kansas City S. Ry. Co. v. BNSF Ry. Co.*,
    970 F. Supp. 2d 542 (W.D. La. 2013) .....................................................................................12

*Mercury Motor Express, Inc. v. Brinke*,
    475 F.2d 1086 (5th Cir. 1973) ..........................................................................................15, 20

*Midtec Paper Corp., et al. v. Chi. & N.W. Transp. Co.*,
    3 I.C.C. 2d 171 (I.C.C. 1986)............................................................................................13, 14

*Midtec Paper Corp. v. United States*,
    857 F.2d 1487 (D.C. Cir. 1988) .....................................................................................5, 13, 21

*Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n,*
499 U.S. 117 (1991)......................................................................................12

*Norfolk & W. Ry. v. Brotherhood of R.R. Signalmen,*
164 F.3d 847 (4th Cir. 1998) .....................................................................8, 9

*Norfolk S. Corp.-Control-Norfolk & W. Ry. Co. & S. Ry. Co.,*
366 I.C.C. 173 (I.C.C. 1982)......................................................................2, 10

*Norfolk S. Ry. Co. v. Judge Warehousing, LLC,*
409 F. Supp. 3d 1350 (S.D. Ga. 2019)..........................................15, 19, 20, 22

*Pejepscot Indus. Park v. Me. Cent. R.R. Co.,*
215 F.3d 195 (1st Cir. 2000) ..........................................................................22

*Pittsburgh & Lake Erie R.R. v. ICC,*
796 F.2d 1534 (D.C. Cir. 1986) .....................................................................21

*Pittsburgh & W.V. R. Co. v. United States,*
41 F.2d 806 (N.D. Ohio 1929) ...................................................................2, 13

*Ry. Labor Execs.' Ass'n v. S. Pac. Transp. Co.,*
7 F.3d 902 (9th Cir. 1993) .....................................................................2, 11, 12

*Sierra v. City of Hallandale Beach, Fl.,*
904 F.3d 1343 (11th Cir. 2018) ......................................................................20

*Springfield Terminal Ry. Co. v. Fore River Warehousing & Storage Co.,*
No. CIV 07-52-P-S, 2007 WL 2344970 (D. Me. Aug. 15, 2007) ...........................19

*Texas & P. R. Co. v. Abilene Cotton Oil Co.,*
204 U.S. 426 (1907).......................................................................................20

*Thompson v. Tex. M. R. Co.,*
328 U.S. 134 (1946).......................................................................................18

*Union Pac. R.R. v. FMC Corp.,*
No. CIV.A. 99-CV-200, 2000 WL 134010 (E.D. Pa. Feb. 3, 2000) ......................15

*United States v. W. Pac. R.R. Co.,*
352 U.S. 59 (1965)..........................................................................12, 15, 16, 20

*V & S Ry., LLC v. Hutchinson Salt Co.,*
No. 08-1402 WEB, 2010 WL 5301031 (D. Kan. Dec. 20, 2010)...........................22

**Statutes & Rules**

49 U.S.C. § 10101(a) .....................................................................................13

49 U.S.C. § 10501(b) ................................................................................8, 9, 13

49 U.S.C. § 10704(a)(1) ............................................................................2, 8, 18

49 U.S.C. § 10706 ..................................................................................................7

49 U.S.C. § 10707 ...................................................................................2, 8, 18

49 U.S.C. § 10707(d)(1)(B) .................................................................................9

49 U.S.C. § 11102 ...................................................................................... *passim*

49 U.S.C. § 11102(a) .................................................................................. *passim*

49 U.S.C. § 11103 ...........................................................................................5, 21

49 U.S.C. § 11321(a) .................................................................................. *passim*

49 U.S.C. § 11323 ................................................................................................18

49 U.S.C. § 11323(a)(3) .........................................................................8, 10, 12

49 U.S.C. §11341(a) .............................................................................2, 10, 11

Interstate Commerce Act of 1887 .................................................................3, 7

Interstate Commerce Commission Termination Act of 1995 ..............7, 8, 13

Staggers Act .......................................................................................................21

Transportation Act ........................................................................................3, 13

U.S. Code Part A ..................................................................................................9

Fed. R. Civ. P. 12(b)(1) ......................................................................................1

Fed. R. Civ. P. 12(c) ...........................................................................................1

**Other Authorities**

*Office of Economics*,
   STB, https://prod.stb.gov/about-stb/offices/office-of-economics/ (last accessed
   Dec. 3, 2019) ..........................................................................................18, 19

*South-Tec Dev. Warehouse, Inc. & R.R. Donnelley & Sons Co. -- Petition for*
   *Declaratory Order - Ill. Cent. R.R. Co.*, STB Docket No. 42050, 2000 WL
   210698 (S.T.B. Feb. 14, 2000).....................................................................17

*Uniform Rail Costing System*,
   STB, https://prod.stb.gov/reports-data/uniform-rail-costing-system/ (last
   accessed Jan. 30, 2020) ............................................................................................................9

Defendant Norfolk Southern Railway Company ("NSR"), by counsel, files this Brief in Support of its Motion to Dismiss and for Judgment on the Pleadings regarding Counts I-IV (antitrust claims), Count VIII (statutory business conspiracy), and Count IX (civil conspiracy) of the Complaint under Rule 12(b)(1) and/or Rule 12(c) of the Federal Rules of Civil Procedure. NSR also moves the Court to refer one or more issues to the U.S. Surface Transportation Board (the "STB") and to stay this case pending the STB's determination of those issues.

## I.      INTRODUCTION

This case is about Plaintiff CSX Transportation, Inc.'s ("CSXT's") alleged inability to provide competitive rail service to shippers at the Norfolk International Terminal ("NIT").  Though CSXT routinely serves these shippers by moving freight (mostly intermodal containers) in and out of NIT by truck (or "dray") and bringing those containers to and from trains at nearby CSXT intermodal ramps, it complains that it cannot competitively serve NIT directly by rail on a regular basis because NSR "through its control of [Defendant Norfolk and Portsmouth Belt Line Railroad Company ("NPBL")] . . . has caused [NPBL] to establish and maintain unreasonably high rates for its switch services for intermodal freight, which are dramatically higher than rates charged by comparable railroads."  ECF No. 66, at 6.  CSXT argues that the $210 per car line haul switching rate contained in NPBL's Switching Tariff (the "Switching Rate") "practically precludes" CSXT "from using NPBL to connect to NIT" directly by rail because it is "prohibitively expensive" and "excessive."  ECF No. 1, at ¶ 4.  CSXT seeks damages under federal antitrust and state laws and an injunction to force NPBL to approve CSXT's service proposal, which will effectively set a special lower line haul switch rate for CSXT.

CSXT cannot obtain this relief as a matter of law.  NSR's control over NPBL was approved by the Interstate Commerce Commission ("ICC") (now the STB) as a result of the 1982 merger of Norfolk and Western Railway Company and Southern Railway Company (the "Merger").  *See*

1

*Norfolk S. Corp.-Control-Norfolk & W. Ry. Co. & S. Ry. Co.*, 366 I.C.C. 173, 177–78 (I.C.C. 1982) (approving Merger).  Therefore, by federal statute, NSR "is exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let [NSR] . . . exercise control . . . acquired through the [Merger]."  49 U.S.C. § 11321(a).  CSXT's federal antitrust and state law conspiracy claims should, therefore, be dismissed.  Moreover, if CSXT tries to challenge whether ICC authorized NSR's control of the NPBL, only the STB can clarify the scope of its approval of the Merger.  *See Ry. Labor Execs.' Ass'n v. S. Pac. Transp. Co.*, 7 F.3d 902, 906 (9th Cir. 1993) (holding that because STB approved a transaction, it "should have exclusive authority to clarify the scope of its own approval and the corresponding breadth of the section 11341(a) exemption").  Therefore, this Court would have to refer any issue relating to the scope of the STB's approval to the STB for clarification, if clarification is necessary at all.

Even if these claims were not barred by federal law, this Court is not able to grant the relief CSXT seeks.  This Court cannot order NPBL to accept CSXT's service proposal, which will effectively set a lower line haul switch rate, because "***a federal court has no jurisdiction to enter an order that operates to fix rates***."  *Burlington N. v. United States*, 459 U.S. 131, 140 (1982) (emphasis added).  Rather, that remedy is ***solely*** within the jurisdiction of the STB.  *See* 49 U.S.C. §§ 10704(a)(1) & 10707; ECF No. 66, at 24 (recognizing that the STB will set the trackage fee between NSR and NPBL).  Similarly, the STB has exclusive jurisdiction to grant a railroad access to terminal facilities, such as NIT, which is the ultimate outcome that CSXT seeks through this case.  *See* 49 U.S.C. § 11102(a).  As with its authority over control and rate questions, the STB's jurisdiction over such remedies is "exclusive and preempt[s] the remedies provided under Federal or State law."  *Id.* § 10502(b); *cf. Pittsburgh & W.V. R. Co. v. United States*, 41 F.2d 806, 810 (N.D. Ohio 1929), *aff'd,* 281 U.S. 479 (1930) (observing, with respect to the statutory predecessor

to Section 11102, that "Congress has acted in assuming control of the interchange of traffic and compulsory use of terminal facilities [and] that the duties of the carriers are defined by the Transportation Act . . .").

Additionally, CSXT's challenge to the reasonableness of the Switching Rate must be referred to the STB for determination. "[U]nder the Interstate Commerce Act, primary jurisdiction to determine the reasonableness of rates lies with the [STB]." *Burlington N.*, 459 U.S. at 141. Accordingly, when a party claims that a tariff rate is unreasonable—as CSXT has done here by challenging the Switching Rate—the presiding court must refer that specific issue to the STB for determination in the first instance. *See Great N. Ry. Co. v. Merchants Elevator Co.*, 259 U.S. 285, 291 (1922) ("Whenever a rate, rule or practice is attacked as unreasonable or as unjustly discriminatory, there must be a preliminary resort to the [STB].").

For these reasons, which are explained more fully below, NSR respectively requests that this Court grant this Motion and enter an Order:

1.   Dismissing with prejudice Counts I, II, III, IV, VIII, and IX of the Complaint because NSR is exempted from liability under 49 U.S.C. § 11321(a) and because only the STB can grant CSXT access to NIT under 49 U.S.C. § 11102(a); to the extent the Counts are not dismissed, refer to the STB for determination the following dispositive issue:  Whether the STB authorized NSR's control of NPBL in conjunction with the STB's approval of the Merger;

2.   Dismissing with prejudice CSXT's request for relief under all Counts that the Court enter an order directing NPBL to approve CSXT's Service Proposal;

3.   Referring to the STB for determination the following issue, which is essential to all Counts:  Whether the $210 line haul switching rate contained in NPBL's Switching Tariff 8100-J is unreasonable; and

4.   Staying this case in its entirety pending the STB's determination of the issue(s) referred to it by this Court.

## II.     FACTUAL BACKGROUND

**A.     CSXT is seeking to impose a new contract rate on NPBL to facilitate CSXT's access to NIT.**

NPBL's Operating Agreement "does state that [NPBL] must provide a uniform rate for all shareholders."  ECF No. 66, at 26 (citing NPBL's Operating Agreement at 3-4).  In accordance with this requirement, NPBL charges a uniform tariff rate to pick up and deliver freight from customer locations, including containers at NIT, and then interchange that freight to connecting carriers.  NPBL does that through the Switching Rate.[1]  NPBL charges the Switching Rate to all customers using its switching services, including its shareholders CSXT *and* NSR.  As alleged in the Complaint, CSXT paid the Switching Rate in 2015 when it tendered international intermodal shipments moving to and from NIT.  ECF No. 1, at ¶ 4.  Similarly, NSR also has to pay the Switching Rate if it uses NPBL's switching services to access the Portsmouth Marine Terminal ("PMT"), even though CSXT *does not* have to pay the Switching Rate to access PMT because (like NSR's direct access to NIT) CSXT has direct rail access to PMT.

NPBL set the Switching Rate at $210 in 2009, after an analysis by NPBL's rate committee.  For comparison, the Switching Rate is significantly lower than the rates CSXT charges NSR pursuant to CSXT's published reciprocal switching tariff, found in Section 9 of the CSXT 8100 Publication.  *See* **Exhibit B** (CSXT's 8100 Publication).   Indeed, the lowest published rate that NSR pays CSXT is $500, and the charges range as high as $750 per car.

Immediately after it was set at $210, CSXT claimed that the Switching Rate was unreasonable and too high to allow CSXT to provide a competitive through rate to access NIT by

---

[1]  A copy of NPBL's Switching Tariff containing the Switching Rate, which is published on NPBL's website, is attached as **Exhibit A**.  The Switching Tariff also contains other charges normally assessed by a rail carrier for additional services requested above and beyond the actual physical switch.

rail.  If CSXT believed in 2010 (as it alleges now) that NPBL was acting anticompetitively in concert with NSR in setting the Switching Rate, it should have sought relief from the STB.  *See* 49 U.S.C. § 11103; *Midtec Paper Corp. v. United States*, 857 F.2d 1487, 1502 (D.C. Cir. 1988) (switching or terminal access may be granted by the STB under § 11103 if a railroad has engaged in anticompetitive conduct by using its market power to extract unreasonable switching rate).  Moreover, as explained below, CSXT could have asked the STB to determine whether the Switching Rate is unreasonable.  Instead, in 2010 and again in 2018, CSXT sought to contract with NPBL for a special non-tariff line haul switching rate for movements to and from NIT.  CSXT asked that NPBL enter into a "rate package" or "rail transportation agreement", as CSXT called it, which proposed that NPBL charge CSXT a line haul switch fee of $80 per car moving in and out of NIT conditioned upon (a) NPBL agreeing to a "long-term" contract with CSXT for the "rate package"; (b) CSXT providing a minimum annual volume guarantee and a specific shortfall fee; and (c) CSXT providing NPBL with locomotives and fuel to handle CSXT's traffic.  *See* ECF No. 1-5, at 7 (CSXT's 2018 switching rate proposal) (the "Service Proposal").

To be clear, CSXT was not proposing that NPBL charge an alternative switching tariff to *all* customers for *all* movements.  Rather, under the plain language of the proposals, CSXT wanted to enter into a special, long-term contract with NPBL whereby CSXT would provide certain benefits to NPBL in exchange for NPBL charging CSXT—and only CSXT—a lower line haul switching fee for access to NIT.  Of course, CSXT knew that NPBL's Operating Agreement precluded NPBL from entering into the type of special rate contract proposed by CSXT, which is why its proposals acknowledged that the uniform rate requirement in the Operating Agreement

would have to be modified in some way.[2]  Further, a railroad is not obligated to provide a contract rate, nor can it be ordered to do so.  *See Cent. Power & Light Co. v. S. Pac. Transp. Co*., 2 S.T.B. 235 (S.T.B. served Apr. 30, 1997) ("[U]nder section 10709, contracting between rail carriers and shippers is permissive.  Because we cannot direct contracting, railroads' decisions to enter into contracts must necessarily be driven by market forces and other considerations, not regulation.").

Notwithstanding (a) the requirement in NPBL's Operating Agreement that NPBL charge a uniform rate to all shareholders, (b) the significant logistical and operational issues raised by what CSXT projected would be additional rail traffic (as rail would allegedly take market share away from trucks/drayage) contemplated by its proposals, and (c) the fact that the Switching Rate was a fully competitive and reasonable rate, NPBL did not reject CSXT's proposal out of hand and instead recommended that a rate committee "do a complete review of the tariff" in response to CSXT's Service Proposal.  *See* **Exhibit C** (April 5, 2018 email from Cannon Moss to Tony DiDeo).  Rather than allowing NPBL's rate committee to review the uniform tariff rate (*i.e.,* the Switching Rate) or requesting the STB review the Switching Rate or provide CSXT with competitive access (both of which are remedies available from the STB via Section 11102), CSXT filed this lawsuit, challenging the Switching Rate as unreasonable and asking the Court to set a lower line haul switch rate for CSXT to access NIT and to modify NPBL's Operating Agreement, which has governed NPBL's operations for over 100 years.

---

[2]  Specifically, on page three of its Service Proposal, CSXT's acknowledges that members of the NPBL Board of Directors "have argued that an amendment to the NPBL Bylaws would be required to private freight contracts … and to allow use of non-NPBL owned or leased locomotives for movements over NPBL trackage."  ECF No. 1-5, at 4.  While CSXT claims not be "convinced [that] this is an accurate interpretation of NPBL's bylaws or the law, generally," it suggested that it and the NPBL could enter into a "long term transportation agreement that will be sufficiently beneficial to NPBL such that no reasonable person could refuse to take whatever action is necessary to allow NPBL to enter into such a contract."  *Id.*

CSXT's assertion that the Switching Rate is unreasonable and prevents it from providing competitive rail service to NIT is essential to its claims. The purported unreasonableness of the Switching Rate appears throughout CSXT's Complaint. *See* ECF No. 1, at ¶ 3-4, 34-35, 37, 44, 55, 57, 87, 90, 93, 97, 100, 104, 108. And each of its claims is predicated on the assumption that the Switching Rate is unreasonably high. CSXT asserts that NSR has violated antitrust law by "setting the NPBL's switch rates at levels designed to exclude competition." ECF No. 1, at ¶ 87(d); 93(d). In support of its contract claim, CSXT alleges that NSR has caused NPBL to lose potential business "due to [CSXT's] inability to economically access NIT by rail." *Id*. at ¶ 108. CSXT's conspiracy claims allege that NSR and NPBL conspired to set the "prohibitively expensive" rate so as to reduce the revenues of NPBL and cause "CSXT to lose potential business with shipping companies, due to [CSXT's] inability to access NIT." *Id*. at ¶¶ 120, 124. And CSXT is asking the Court to "require approval of CSX's service proposal", which will effectively set a lower line hail switch rate. ECF No. 66, at 24; CSXT's Objections and Responses to NSR's Second Set of Interrogatories, at 3 ("CSXT also seeks an order directing NPBL to approve CSXT's Service Proposal.") (**Exhibit D**).

**B.**   **The STB has exclusive jurisdiction over railroad rates, control issues, and terminal access.**

Over 130 years ago, in 1887, Congress passed the Interstate Commerce Act, which regulated the railroad industry on a national level and created the ICC to provide regulatory oversight. *See* Interstate Commerce Act of 1887, ch. 104, 24 Stat. 379 (Feb. 4, 1887). In 1995, Congress passed the ICC Termination Act ("ICCTA"), which eliminated the ICC and created the STB, which retained many of the ICC's functions (and precedents). *See* ICC Termination Act of 1995, Pub. L. No. 104–88, 109 Stat. 803, codified in relevant part at 49 U.S.C. § 10706. Under the ICCTA, Congress granted the STB "***exclusive***" jurisdiction to regulate "transportation by rail

carriers, and the remedies provided in this part with respect to **rates**, classifications, rules . . . , practices, routes, services, and facilities of such carriers . . . ."  49 U.S.C. § 10501(b) (emphasis added).[3]

The ICA "grants '*exclusive*' authority to the STB to approve, in the public interest, mergers and acquisitions of transportation carriers within its jurisdiction.  A carrier participating in an approved transaction is 'exempt from the antitrust laws and from all other law . . . *as necessary to let that rail carrier . . . carry out the transaction*.'"  *Norfolk & W. Ry. v. Brotherhood of R.R. Signalmen*, 164 F.3d 847, 854 (4th Cir. 1998) (quoting 49 U.S.C. § 11321(a)) (emphasis in original).  The STB's authority to approve transactions includes the right to approve a railroad's acquisition of control over another rail carrier.  *See* 49 U.S.C. § 11323(a)(3).  If approved, the rail carrier acquiring control "is exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let that rail carrier … exercise control … acquired through the transaction."  49 U.S.C. § 11321(a).

This national regulatory scheme allows rail carriers to set reasonable rates, but if someone claims that the rate is *unreasonable*, Congress has commissioned the STB to "prescribe the maximum rate."  *See id.* § 10704(a)(1).  To determine whether a rate is unreasonably high, the STB must first determine (1) whether the carrier has "market dominance," and, if so, (2) whether the rate "exceeds a reasonable maximum."  *See id.* § 10707(b)-(c).  To determine market dominance, the STB maintains the Uniform Railroad Costing System ("URCS"), which has been used since 1989 to determine the reasonableness of railroad maximum rates.  *Id.*  URCS "has a prominent role in determining whether a rate is reasonable and what relief a rail shipper should

---

[3] A "rail carrier" within the meaning of the ICCTA is "a person providing common carrier railroad transportation for compensation . . . ."  *Id.* § 10102(5).

receive."   *See Uniform Rail Costing System (URCS)*, STB, https://prod.stb.gov/reports-data/uniform-rail-costing-system/ (last accessed Jan. 30, 2020); 49 U.S.C. § 10707(d)(1)(B).

The STB also has exclusive authority to order the remedies provided under 49 U.S.C. § 11102, which encompasses many of the remedies that CSXT is attempting to obtain from this Court.   Pursuant to Section 11102, the STB "may require rail carriers to enter into reciprocal switching agreements, where it finds such agreements to be practicable and in the public interest, or where such agreements are necessary to provide competitive rail service," and, if the carriers cannot agree, "the [STB] may establish such conditions and compensation" for the switching agreement.   *Id.* § 11102(c)(1).   The STB also may require terminal facilities "be used by another rail carrier" through terminal trackage rights if the use is "practicable and in the public interest without substantially impairing the ability of the rail carrier owning the facilities or entitled to use the facilities to handle its own business."   *Id.* § 11102(a).   The remedies afforded the STB under 49 U.S. Code Part A – Rail, which includes Section 11102, "are exclusive and preempt the remedies provided under Federal or State law." *Id.* § 10501(b).

## III.   ARGUMENT

**A.   The Court should dismiss Counts I-IV and VIII-IX because NSR is exempt from liability under federal and state law.**

CSXT has alleged federal antitrust and state law conspiracy claims against NSR arising from NSR's actions as majority owner of NPBL.   Under federal law, however, NSR is exempt from liability under these claims because the STB approved NSR's control over NPBL.

### 1.   NSR is exempt from liability under 49 U.S.C. § 11321(a).

As stated above, Congress granted the STB exclusive authority related to railroad mergers and all things incidental to such transactions, including the approval of a railroad's acquisition of control over another rail carrier.   *See Norfolk & W. Ry. v. Brotherhood of R.R. Signalmen*, *supra*;

9

49 U.S.C. § 11321(a); 49 U.S.C. § 11323(a)(3).[4]  If approved, the rail carrier acquiring control "***is exempt from the antitrust laws and from all other law, including State and municipal law***, as necessary to let that rail carrier . . . exercise control . . . acquired through the transaction."  49 U.S.C. § 11321(a) (emphasis added).

CSXT acknowledges that NSR's majority ownership of NPBL was the direct result of the Merger (Compl. ¶ 2), which was approved by the ICC (now the STB).  *See Norfolk S. Corp.-Control-Norfolk & W. Ry. Co. & S. Ry. Co.*, 366 I.C.C. at 177–78.  As part of approving this merger, the ICC considered the competitive effects of the merger, finding that the merger would "have a procompetitive effect" due to NSR's competition with CSXT, which previously did not have any single-system competitor across the eastern United States.  *Id.* at 229.

The Merger Application stated that "[a]s a result of the proposed transaction, [Norfolk Southern Corporation] will also acquire indirect control through stock ownership of all subsidiaries of NW and Southern."  *See* Application Volume 2, at 2, *NWS Enters., Inc.-Control-Norfolk & W. Ry. Co. & S. Ry. Co.*, Finance Docket No. 29430 (Sub-No. 1) (1980) (**Exhibit E**).  The Merger Application further listed the applicants' respective ownership of NPBL and the resulting 57.14% majority ownership that NSR would hold.  *Id.* at 83.  Accordingly, NSR's control of NPBL was a direct consequence of the STB's overall Merger approval.  As such, NSR's exercise of control over NPBL—which is directly at issue in this litigation—is exempt from the federal antitrust and state law conspiracy claims asserted by CSXT.  Accordingly, these claims should be dismissed.

---

[4]  This section was previously codified as 49 U.S.C. §11341(a).

          **2.**       **Any question as to the STB's approval of the Merger must be decided by the STB.**

To the extent there is any question as to whether the approval of the Merger included authorization of NSR's control over NPBL, only the STB can clarify the scope of its merger approval.  Because the STB had the exclusive authority to approve the Merger and thus exempt NSR "from any procedural or substantive law which might otherwise impede that merger, [the STB] should have exclusive authority to clarify the scope of its own approval and the corresponding breadth of the section 11341(a) exemption."  *Ry. Labor Execs.' Ass'n*, 7 F.3d at 906.

The decision in *AT&T Communications, Inc. v. Conrail*, 285 F. Supp. 2d 649 (E.D. Pa. 2003), is instructive.  In *Conrail*, AT&T alleged that Conrail breached a "most favored nations" provision in the parties' contract by entering into contracts with AT&T's competitors that required the competitors to pay a lower rate than that paid by AT&T.  One of the competitor contracts at issue was executed after the STB approved Conrail's acquisition by CSXT and NSR, which initially resulted in those rail companies operating former Conrail lines through newly created subsidiaries.

Conrail moved to dismiss the claim, arguing that the STB, not the court, had jurisdiction over the claim.  Alternatively, Conrail moved under the primary jurisdiction doctrine to refer to the STB whether the STB's approval of the merger preempted AT&T's claims.  The court rejected Conrail's subject matter jurisdiction argument, but it granted Conrail's motion to refer the issue to the STB and stayed a portion of the case pending the STB's determination.  The court ruled:  "[T]he issue of whether the § 11321(a) exemption applies to an STB-authorized transaction is within the agency's jurisdiction.  In addition, as the *Southern Pacific* court recognized, when the STB has the authority to approve a merger in the first place, it should be permitted to 'clarify the scope of its

own approval and the corresponding breadth of the section [11321] exemption.'" *Id*. at 662

(quoting *Southern Pac. Transp. Co.*, 7 F.3d at 806).  The court further held that

> the STB possesses the expertise necessary to resolve the instant dispute.  As Conrail
> notes, the STB has studied the [Conrail] Transaction; entertained public comment,
> hearings, and arguments on the [Conrail] Transaction; and memorialized its
> approval in a lengthy, detailed document.  As the [U.S.] Supreme Court has noted,
> when the issue presented requires a determination "reached ordinarily upon
> voluminous and conflicting evidence, for the adequate appreciation of which
> acquaintance with many intricate facts of transportation is indispensable, and such
> acquaintance is commonly found only in a body of experts," then the issue must go
> first to those experts.  *Western Pac.*, 352 U.S. at 66.

*Id*. at 662.  "The question of whether AT&T's claims are exempted under § 11321 begs this kind

of special competence."  *Id*.

Similarly, in *Kansas City Southern Railway Company v. BNSF Railway Company*, 970 F.

Supp. 2d 542 (W.D. La. 2013), the plaintiff railroad's complaint for declaratory judgment required

the court to determine the scope of the STB's orders approving the related merger of railroads.

The court dismissed the complaint for lack of subject matter jurisdiction because the STB had

exclusive jurisdiction to determine the scope of its merger orders:

> In order to declare that BNSF has "no lawful right" over these tracks, this Court
> would have to interpret the scope of STB Decisions No. 44 and 63 to determine
> what rights, if any, those decisions granted to BNSF.  As discussed above, such an
> analysis would encroach on the STB's "exclusive authority to examine, condition,
> and approve proposed mergers . . . ."

*Id*. at 547 (quoting *Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 119-120

(1991)).

For the same reasons set forth in *Conrail* and *BNSF*, only the STB can clarify whether the

Merger authorized NSR's control over NPBL under Section 11323(a)(3).  Therefore, to the extent

there is any question as to whether the approval of the Merger included authorization of NSR's

control over NPBL, the Court should refer the control issue to the STB and stay this case pending the STB's determination.

**B.**     **The Court should dismiss CSXT's claims because the Court cannot grant the relief sought by CSXT.**

In addition to being barred by federal law, CSXT's claims should be dismissed because this Court can neither grant CSXT railroad access to NIT nor force NPBL to accept CSXT's Service Proposal.

      **1.**     **The Court cannot grant CSXT access to NIT because the STB has exclusive authority to grant terminal access.**

CSXT's overall theme in this litigation is that it purportedly lacks direct competitive rail access to NIT.  The STB, however, has exclusive jurisdiction over resolving a railroad's complaint that it does not have competitive access to a terminal facility like NIT.

Under 49 U.S.C. § 10501(b), the STB has exclusive jurisdiction over the remedies provided by the ICCTA, including ordering a rail carrier to enter into a reciprocal switching agreement with another rail carrier, at a rate that may ultimately be set by the STB, for the use of a terminal facility. *Id.* § 11102(c); *Pittsburgh & W.V. R. Co.*, 41 F.2d at 810, *aff'd,* 281 U.S. 479 (1930) (observing, with respect to the statutory predecessor to Section 11102, that "Congress has acted in assuming control of the interchange of traffic and compulsory use of terminal facilities [and] that the duties of the carriers are defined by the Transportation Act . . .").  Under the STB's *Midtec* standard for competitive access, the STB will order a carrier to enter into a switching agreement when "switching is necessary to remedy or prevent an act that is either contrary to the competition policies of 49 U.S.C. § 10101(a) or otherwise anticompetitive."  *Midtec Paper Corp., et al. v. Chi. & N.W. Transp. Co.*, 3 I.C.C. 2d 171 (I.C.C. 1986), *aff'd Midtec Paper Corp.*, 857 F.2d 1487.  The STB also has the exclusive authority to impose trackage rights over the tracks of NPBL and NSR to provide CSXT with the ability to operate its trains directly to/from NIT without using NPBL's

switching services if the use is "practicable and in the public interest without substantially impairing the ability of the rail carrier owning the facilities or entitled to use the facilities to handle its own business." *Id.*; 49 U.S.C. § 11102(a).

CSXT should have filed for relief by the STB under the STB's competitive access protections and remedies given its allegations of anticompetitive behavior.  Instead, CSXT advanced federal antitrust and state law claims against NSR and NPBL in this Court, perhaps thinking it can somehow convince this Court to order remedies that are within the exclusive jurisdiction of the STB.  CSXT's filings make clear that part of the relief it seeks is for the Court to prescribe a switching agreement and rate with NPBL.  *See* ECF No. 66, at 24 (asking the Court to "require approval of CSX's service proposal"); Exhibit D at 3 ("CSXT also seeks an order directing NPBL to approve CSXT's Service Proposal.").  CSXT also seeks a remedy that would enable it to have direct rail access to serve NIT, like that of NPBL and NSR.  *See* ECF No. 1, at ¶ 35.  Regardless of whether CSXT ultimately asks this Court to order switching relief and prescribe a switching rate or order direct rail access, such remedies fall within the STB's exclusive jurisdiction and cannot be awarded by this Court.  Accordingly, the Court cannot grant CSXT the relief it seeks, even if it prevails in this case.  This means that the alleged injury is not redressable by this Court, and Counts I-IV and XIII-IX should be dismissed with prejudice.  *See, e.g.*, *Anderson v. Obama*, No. CIV. PJM 10-17, 2010 WL 3000765, at *2-3 (D. Md. July 28, 2010) (denying motion for preliminary injunction "because the Court lacks power to grant the requested relief").

### 2. Because the Court cannot enter an order fixing NPBL's Switching Rate, it cannot order NPBL to accept CSXT's Service Proposal.

One of the core forms of relief sought by CSXT is its request that the Court "direct[] that NPBL approve CSXT's Service Proposal."  ECF No. 1, at 40.  *See also* Exhibit D, at 3 ("CSXT also seeks an order directing NPBL to approve CSXT's Service Proposal.").  Requiring NPBL to

accept CSXT's Service Proposal will effectively set a lower Switching Rate.  The Court simply cannot grant this relief.  The United States Supreme Court has unequivocally ruled that "*a federal court has no jurisdiction to enter an order that operates to fix rates.*"  *Burlington N.*, 459 U.S. at 140 (emphasis added).  Therefore, CSXT's demand that NPBL be required to accept its Service Proposal must be dismissed with prejudice.  *See Anderson, supra.*

**C.**     **CSXT's challenge to the reasonableness of the Switching Rate must be decided by the STB under the doctrine of primary jurisdiction.**

The reasonableness of the Switching Rate is squarely at issue in this litigation.  CSXT's assertion that the Switching Rate is unreasonable and prevents it from providing competitive rail service to NIT is essential to each of its claims.  *See supra*, at 7.

**1.**     **Supreme Court precedent requires that the STB determine whether the Switching Rate is unreasonable, as alleged by CSXT.**

The United States Supreme Court has held time and again that "the question of tariff construction, as well as that of the reasonableness of the tariff as applied, [is] within the exclusive primary jurisdiction of the [STB]."  *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63 (1965); *Burlington N.*, 459 U.S. at 141 ("[P]rimary jurisdiction to determine the reasonableness of rates lies with the [STB]."). "Whenever a rate, rule, or practice is attacked as unreasonable or as unjustly discriminatory, there must be preliminary resort to the [STB]."  *Chi., Rock Island & Pac. R.R. Co. v. Furniture Forwarders of St. Louis, Inc.*, 420 F.2d 385, 388 (8th Cir. 1970) (citation and quotation marks omitted).  This is chiefly because the STB "possesses expertise in a specialized area," *i.e.*, determining the reasonableness of railroad rates, "with which the courts are relatively unfamiliar." *Mercury Motor Express, Inc. v. Brinke*, 475 F.2d 1086, 1092 (5th Cir. 1973) (quotation marks and citations omitted); *Norfolk S. Ry. Co. v. Judge Warehousing, LLC*, 409 F. Supp. 3d 1350, 1358 (S.D. Ga. 2019) ("[T]he STB has expertise in determining the reasonableness of rates and practices created by rail carriers."); *Union Pac. R.R. v. FMC Corp.*, No. CIV.A. 99-CV-200, 2000 WL

134010 at *1 (E.D. Pa. Feb. 3, 2000) ("The Surface Transportation Board is the administrative agency charged with expert skill and knowledge of the interstate transportation industry, including rail carriers.") (citations omitted).

For example, in *Illinois Central Railroad v. South Tec Development Warehouse*, No. 97 C 5720, 1999 WL 519042 (N.D. Ill. July 15, 1999), the plaintiff railroad filed suit to recover unpaid demurrage charges. In defense of the claim, the defendants argued that the railroad's demurrage charges were unreasonable and moved to refer the issue, as well as others, to the STB and to stay the litigation pending the STB's determination. The court granted the motion to refer determination of the reasonableness of the demurrage rate, finding that "the reasonableness of [the railroad's] rates fits squarely within the primary exclusive jurisdiction of the STB." *Id*. at *4-5. The court found that "the STB is uniquely qualified to resolve the present reasonableness issue . . . . [C]onsideration of the reasonableness of [the railroad's] demurrage charges requires close familiarity with the present circumstances, familiarity which is possessed not by the courts but by the agency which had the exclusive power to pass on the rate in the first instance." *Id*. at *5-6 (quotations and citations omitted).

CSXT cannot argue that its challenge to the reasonableness of the Switching Rate should not be referred to the STB under the doctrine of primary jurisdiction. In a recent case in which a party challenged the reasonableness of CSXT's demurrage tariffs, CSXT moved the court to refer the issue to the STB, arguing:

> The U.S. Supreme Court has long and repeatedly held that the STB, and its predecessor the Interstate Commerce Commission ("the ICC") has primary jurisdiction over the reasonableness of carriers' practices and rates. *See Great N. R. Co. v. Merchants Elevator Co.*, 259 U.S. 285, 42 S. Ct. 477 (1922). In the words of the U.S. Supreme Court, "the judicial process is suspended pending referral of such issues to the administrative body for its views." *United States v. Western Pacific Railroad Co.,* 352 U.S. 59, 64, 77 S. Ct. 161, 165 (1965).

*See* **Exhibit F**, at p. 23.[5]  In other words, CSXT is on record as agreeing with NSR's position, and

thus the reasonableness of the Switching Rate should be referred to the STB.[6]

> ## 2.    The factors that can be considered require referral of the rate issue to the STB.

In addition to the clear Supreme Court precedent requiring referral, the factors that courts

may consider when referring issues to the STB also require that the rate issue be referred to the

STB for determination.  These factors include:

> (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;
>
> (2) whether the question at issue is particularly within the agency's discretion;
>
> (3) whether there exists a substantial danger of inconsistent rulings; and
>
> (4) whether a prior application to the agency has been made.

*Advamtel, LLC v. Sprint Commc'ns Co., L.P.*, 125 F. Supp. 2d 800, 804–05 (E.D. Va. 2001).

> ### a.    *Determining the reasonableness of a railroad rate involves technical or policy considerations within the expertise and discretion of the STB and is not within the conventional experience of judges.*

The reasonableness of the Switching Rate is not "within the conventional experience of

judges"; rather, "it involves technical or policy considerations within [the STB's] particular field

---

[5] CSX Transportation Company's Brief in Opposition to Novolog Bucks County's Motion for Partial Reconsideration and in Support of its Cross Motion for Reconsideration, or in the Alternative, its Motion to Refer the Issues to the Surface Transportation Board, filed in *CSX Transportation Company v. Novolog Bucks County*, Civil Action No. 04-cv-04018 (E.D. Pa. June 22, 2006) (ECF No. 37-1).

[6] "The STB has noted that 'petitions for issuance of a declaratory order premised on referral from a federal court are routinely accepted and treated procedurally in the same manner as a complaint.'"  *Springfield Terminal Ry. Co. v. Fore River Warehousing & Storage Co.*, No. CIV 07-52-P-S, 2007 WL 2344970, at *6 n.4 (D. Me. Aug. 15, 2007) (quoting *South-Tec Dev. Warehouse, Inc. & R.R. Donnelley & Sons Co. -- Petition for Declaratory Order - Ill. Cent. R.R. Co.*, STB Docket No. 42050, 2000 WL 210698, at *1 (S.T.B. Feb. 14, 2000).

of expertise" and involves questions "particularly within the [STB's] discretion." *Id.* at 804 (outlining referral standard). "A tariff is not an abstraction. It embodies an analysis of the costs incurred in the transportation of a certain article and a decision as to how much should, therefore, be charged for the carriage of that article in order to produce a fair and reasonable return. Complex and technical cost-allocation and accounting problems must be solved in setting the tariff initially." *Western Pac. R.R.*, 350 U.S. at 66. The considerations bearing on the reasonableness of the Switching Rate, including rates charged under comparable circumstances, the economics of rail operations, and elements to be considered when creating or evaluating a rate, are recognized as not being within the general knowledge of federal and state courts.

By contrast, determining whether a rate is unreasonably high is within the core competence and primary jurisdiction of the STB. In other words, it is what the STB does. *See* 49 U.S.C. § 10704(a)(1) (authorizing the STB to set a maximum rate); 49 U.S.C. § 10707 (authorizing the STB to handle claims that a rate is "unreasonably high").[7] In fact, the STB has an entire department – the Office of Economics ("OE") – that performs "economic, cost, financial, and engineering analyses in railroad maximum-rate proceedings, . . . trackage rights cases, and other cases before the agency where such analysis is needed." *Office of Economics*, STB, https://prod.stb.gov/about-

---

[7] Relatedly, as this Court has recognized, determining trackage rights compensation when parties cannot agree is also what the STB does. *See* ECF No. 66, at 24 ("[T]he STB may still approve or disapprove the pending rate increase that Norfolk Southern would charge Belt Line in the future."); *Norfolk S. Ry. Co. – Petition to Set Trackage Rights Compensation – Norfolk & Portsmouth Belt Line R.R. Co.*, Docket No. FD 36223 (STB served Mar. 29, 2019) ("The Board has the authority to set terms and conditions for transactions that have been authorized under 49 U.S.C. § 11323, which includes setting compensation for trackage rights agreements."). Although the STB is currently holding the determination of the trackage rights rate that NPBL will pay NSR going forward for use of NSR's tracks in abeyance due to this litigation, denying the Court the benefit of the STB's evaluation of that issue, such determination is reserved exclusively to the STB. *See Thompson v. Tex. M. R. Co.*, 328 U.S. 134, 147 (1946) (stating the agency's jurisdiction over trackage rights "is exclusive").

stb/offices/office-of-economics/ (last accessed Dec. 3, 2019).  The OE staff includes economists, accountants, financial analysts, engineers, transportation industry analysts, and computer programmers.  *Id.*  Together, this specialized team oversees accounting and reporting requirements for regulated railroads, analyzes the financial condition of railroads and the railroad industry, and maintains the STB's extensive databases, including the URCS database that is used in determining maximum reasonable rates.  *Id.*  It is no surprise then that courts routinely hold that rate reasonableness determinations "implicate numerous elements of railway economics and industry practices that are better committed to the experience and expertise of the STB."  *Judge Warehousing*, 409 F. Supp. at 1350 (granting motion to stay case and refer eight questions to the STB pertaining to whether charges at issue were unreasonable).

      **b.**     ***Referring the Switching Rate issue to the STB will promote uniformity on rulings related to the reasonableness of railroad rates.***

A fundamental purpose of the primary jurisdiction doctrine is "'the desirable uniformity' that results when agencies make certain initial determinations and 'the expert and specialized knowledge' of agencies."[8]  *Yadkin Riverkeeper*, 141 F. Supp. 3d at 449.  Referring the reasonableness of the Switching Rate to the STB will promote uniform, consistent rulings regarding the reasonableness of railroad rates.  *See Sierra v. City of Hallandale Beach, Fl.*, 904 F.3d 1343, 1352 (11th Cir. 2018) ("We have recognized, for example, the importance of uniformity 'especially in cases involving reasonableness of tariffs or rates.'" (quoting *Mercury Motor*

---

[8]  There is no pending proceeding before the STB dealing with the reasonableness of the Switching Rate that NPBL charges its customers (not to be confused with NSR's request that the STB set the trackage rights fee that NSR charges to NPBL, which the STB is currently holding in abeyance).  Thus, the other two factors discussed in *Advamtel* – substantial danger of inconsistent rulings and whether a prior application to the agency has been made – are not directly applicable here.  However, those factors reflect the "desired uniformity" that underpins the primary jurisdiction doctrine.  As discussed, referral of the rate issue to the STB is necessary to achieve uniformity.

*Express*, 475 F.2d at 1092)).  The "judicial determination of rates, from one jurisdiction to another, would 'destroy the prohibitions against preferences and discrimination' and 'afford . . . a ready means by which, through collusive proceedings, the wrongs which the statute was intended to remedy could be successfully inflicted.'"  *Id.* (quoting *Texas & P. R. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 441 (1907)).  Referral to the STB under the doctrine of primary jurisdiction avoids misuse of the judicial system to circumvent Congress' choice of a single umpire over the reasonableness of railroad rates.

Clearly, under the cases cited above, determination of the reasonableness of the Switching Rate through a proceeding before the STB is required because the issue "[is] within the exclusive primary jurisdiction of the [STB]."  *W. Pac. R.R. Co.*, 352 U.S. at 63.  CSXT knows this precedent well, but instead chose to challenge the Switching Rate through this lawsuit in a backdoor attempt to avoid a rate reasonableness proceeding or a terminal access proceeding under Section 11102. Perhaps CSXT believes it has a better chance of convincing a jury, which lacks the industry knowledge and breadth of expertise of the STB, that the Switching Rate is unreasonable. Regardless of CSXT's motivations, the Court should reject CSXT's attempt to circumvent the STB—the railroad's commercial regulator—on this issue.  Otherwise, other parties will be able to follow CSXT's approach in trying to avoid the STB in favor of fact-finders who they believe have significantly less, if any, of the STB's expertise in these highly specialized areas, resulting in the kind of disparate decisions that the STB was created to prevent.

    **c.**    ***Referring the Switching Rate issue to the STB will materially aid the resolution of this proceeding.***

In addition to the factors listed by the *Advamtel* court, courts frequently consider whether an agency's input would materially aid in the resolution of the case.  *See Judge Warehousing*, 409 F. Supp. 3d at 1359 ("[R]eferral to the STB will aid this Court in reaching a decision expeditiously

once a final order is issued by the STB.").  Here, that is clearly the case, especially if CSXT's federal antitrust and state law conspiracy claims survive dismissal.

In determining whether the Switching Rate is unreasonable, the STB must first determine whether there is market dominance.  *See* 49 U.S.C. § 11103; *Pittsburgh & Lake Erie R.R. v. ICC*, 796 F.2d 1534, 1540 (D.C. Cir. 1986) ("Market dominance is a prerequisite for a finding of unreasonableness").  "[CSXT's] claim is really nothing more than a grievance that the [NPBL's] rates are too high.  As we have seen, however, a rate cannot be considered 'unreasonable' short of market dominance, and rates below the market dominant threshold cannot be regarded as anticompetitive or contrary to the competition policies of the Staggers Act."  *Midtec Paper Corp.*, 857 F.2d at 1508.

The STB's resolution of the questions of market dominance and reasonableness or unreasonableness of the Switching Rate (if necessary) would go a long way to resolving the issues in this case.  If the STB determines that there is no market dominance, or even if there is, that the Switching Rate is reasonable, then the parties likely would not have to expend significant resources litigating CSXT's antitrust claims, and, at a minimum, it could substantially narrow the matters at issue in this case.  *See Archer v. Bd. of State Lands & Forestry*, 907 P.2d 1142 (Utah 1995) (recognizing trial court's suspension of antitrust claims based on allegedly unreasonable tariff for shipping on pipeline so that ICC could determine reasonableness of rate in the first instance).  CSXT's antitrust claims "begin[] and end[] with the assumption that [the Switching Rate is] unreasonable, which is a determination that belongs exclusively to the [STB] and has not yet been made."  *Id*. at 1147.

CSXT's assertion that the Switching Rate is unreasonably high also permeates its state law claims.  CSXT has argued that it "has alleged that the preclusive, uniform rate NS[R] has set has

breached its obligations under the Operating Agreement." ECF No. 42, at 17. It further argues that "the Complaint alleges – among other things – that the uniform rate was set at a preclusive level *for anticompetitive, conspiratorial and tortious reasons*." ECF No. 39, at 8. Therefore, a determination of the reasonableness of the Switching Rate by the STB will assist in adjudicating CSXT's state law claims as well.

**D.      The Court should stay this proceeding pending the determinations of the STB.**

The Court should stay this proceeding pending the STB's determination of whether the Switching Rate is unreasonable and, if necessary, whether the STB authorized NSR's control of NPBL in conjunction with the STB's approval of the Merger. Courts routinely stay proceedings under the doctrine of primary jurisdiction and refer issues to the STB for an opinion before the court proceeds with its decision. *See, e.g.*, *Conrail*, *supra*; *Judge Warehousing*, 409 F. Supp. 3d 1350, at *6 (granting motion to stay case and refer eight questions to the STB pertaining to whether charges at issue were unreasonable); *V & S Ry., LLC v. Hutchinson Salt Co.*, No. 08-1402 WEB, 2010 WL 5301031, at *6 (D. Kan. Dec. 20, 2010) (granting motion to refer issues to the STB under the doctrine of primary jurisdiction and staying case pending STB decision); *Pejepscot Indus. Park v. Me. Cent. R.R. Co.*, 215 F.3d 195, 205-06 (1st Cir. 2000) (holding that district court should stay claim while referring it to STB because, *inter alia*, "the agency's determination would materially aid the district court").

Staying this matter would not prejudice CSXT. The Switching Rate, which allegedly was the product of NSR's control over NPBL, has been in effect since 2009, and CSXT has claimed that it is unreasonably high since 2010. Yet, CSXT never sought review of the Switching Rate by the STB, which it clearly could have done, nor did CSXT seek to avail itself of other available STB remedies, such as a prescribed reciprocal switch agreement available under Section 11102 or filing a declaratory order requesting clarification on whether NSR had the right to exercise control

of NPBL.  Instead, CSXT waited eight years to file this lawsuit.  CSXT should not be heard to complain about any delay given that it could have resolved these alleged issues years ago. Moreover, any possible prejudice associated with the referral is substantially outweighed by the substantial benefit the STB's determinations would have on the adjudication of this litigation. Therefore, this Court should stay this proceeding pending the STB's determinations.

### IV.   <u>CONCLUSION</u>

For the above reasons, NSR requests that this Court grant this Motion and enter an Order:

1. Dismissing with prejudice Counts I, II, III, IV, VIII, and IX of the Complaint because NSR is exempted from liability under 49 U.S.C. § 11321(a) and because only the STB can grant CSXT access to NIT under 49 U.S.C. § 11102(a); to the extent the Counts are not dismissed, refer to the STB for determination the following dispositive issue:  Whether the STB authorized NSR's control of NPBL in conjunction with the STB's approval of the Merger;

2. Dismissing with prejudice CSXT's request for relief under all Counts that the Court enter an order directing NPBL to approve CSXT's Service Proposal;

3. Referring to the STB for determination the following issue, which is essential to all Counts:  Whether the $210 line haul switching rate contained in NPBL's Switching Tariff 8100-J is unreasonable; and

4. Staying this case in its entirety pending the STB's determination of the issues referred to it by this Court.

Date:  January 31, 2020                    Respectfully submitted,

                                            **NORFOLK SOUTHERN RAILWAY COMPANY**

                                            /s/Michael E. Lacy

Alan D. Wingfield (VSB No. 27489)
Michael E. Lacy (VSB No. 48477)
TROUTMAN SANDERS, LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-1200
Facsimile: (804) 698-6061
Email: alan.wingfield@troutmansanders.com
Email: michael.lacy@troutmansanders.com

John C. Lynch (VSB No. 39267)
Kathleen M. Knudsen (VSB No. 90845)
TROUTMAN SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, VA  23462
Telephone: (757) 687-7759
Facsimile: (757) 687-7510
Email: john.lynch@troutman.com
Email: kathleen.knudsen@troutman.com

*Counsel for Defendant Norfolk Southern Railway Company*

24

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 31, 2020, I electronically filed a copy of the foregoing with the Clerk of Court using the CM/ECF system, which sent a notification of such filing (NEF) to the registered participants as identified on the NEF to receive electronic service, including:

Robert W. McFarland, Esq.
Benjamin L. Hatch, Esq.
E. Rebecca Gantt, Esq.
McGuireWoods LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia 23510-1655
Telephone: (757) 640-3716
Facsimile: (757) 640-3930
rmcfarland@mcguirewoods.com
bhatch@mcguirewoods.com
rgantt@mcguirewoods.com

*Attorneys for CSX Transportation, Inc.*

James L. Chapman, IV, Esq.
W. Ryan Snow, Esq.
Darius K. Davenport, Esq.
David C. Hartnett, Esq.
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1500
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com

*Attorneys for Norfolk and Portsmouth Belt Line Railroad Company*

Hugh M. Fain, III, Esq.
M. F. Connell Mullins, Jr., Esq.
John M. Erbach, Esq.
SPOTTS FAIN PC
411 E. Franklin St.
Richmond, VA 23219
Telephone: (804) 697-2000
hfain@spottsfain.com
cmullins@spottsfain.com
jerbach@spottsfain.com

*Attorneys for Jerry Hall, Thomas Hurlbut, and Philip Merilli*

W. Edgar Spivey, Esq.
Clark J. Belote, Esq.
KAUFMAN & CANOLES, P.C.
150 W. Main Street, Suite 2100
Norfolk, VA 23510
Telephone: (757) 624-3196
Facsimile: (888) 360-9092
wespivey@kaufcan.com
cjbelote@kaufcan.com

*Attorney for Cannon Moss*

/s/Michael E. Lacy
Alan D. Wingfield (VSB No. 27489)
Michael E. Lacy (VSB No. 48477)
TROUTMAN SANDERS, LLP
1001 Haxall Point
Richmond, Virginia 23219
Tel. (804) 697-1200
Fax (804) 698-6061
alan.wingfield@troutmansanders.com
michael.lacy@troutmansanders.com

40774793v15