**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

CSX TRANSPORTATION, INC.,
individually and on behalf of NORFOLK
& PORTSMOUTH BELT LINE
RAILROAD COMPANY,

       Plaintiff,

v.                            Civil Action No. 2:18cv530

NORFOLK SOUTHERN RAILWAY
COMPANY, *et al.*,

       Defendants.

_____/

**CSX TRANSPORTATION, INC.'S OPPOSITION TO NORFOLK**
**SOUTHERN RAILWAY'S MOTION TO DISMISS, FOR JUDGMENT ON THE**
**PLEADINGS, AND FOR REFERRAL OF ISSUES TO THE**
**U.S. SURFACE TRANSPORTATION BOARD**

     Plaintiff CSX Transportation, Inc. ("CSXT") hereby submits this response in opposition to

Defendant Norfolk Southern Railway Company's Motion to Dismiss, for Judgment on the

Pleadings, and for Referral of Issues to the U.S. Surface Transportation Board (hereinafter "the

Motion"). ECF 115. For the reasons stated herein, the Motion should be denied.

**INTRODUCTION**

     Over a year after the deadline for filing motions to dismiss, five months after this Court

ruled on those motions to dismiss, and while the parties are heavily engaged in discovery activity

pursuant to this Court's scheduling order, Defendant Norfolk Southern Railway Company ("NS")

attempts to take a second bite at the motion-to-dismiss apple. In its current Motion, NS does not

raise some newly discovered fact or novel legal argument but, instead, echoes issues and

1

arguments that its co-defendant the Norfolk & Portsmouth Belt Line Railroad Company ("NPBL") already raised at the motion to dismiss stage, and which this Court properly rejected. NS did not join NPBL's earlier motion to dismiss, despite all arguments being available to it at the time. Indeed, it *conceded* that CSXT had stated a claim against it with respect to all CSXT's antitrust claims. *See* ECF 35 at 3 ("Under controlling standards, some averments in the Complaint as to the federal antitrust claims, though denied, cannot be reached by NSR's Motion."); ECF 34 at 1 (moving only to dismiss the state law claims set forth in Counts V, VII, VIII, and IX of the Complaint).

Yet, NS would now, over a year later and with only four months remaining until trial, have this Court believe, that it lacks subject matter jurisdiction over this case. Now, NS takes the position that "by federal statute, NSR 'is exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let [NSR] . . . exercise control . . . acquired through the [Merger].'" ECF 116 at 2 (quoting 49 U.S.C. § 11321(a)). How a party could *concede* the sufficiency of antitrust claims at the motion to dismiss stage while supposedly assessing – though never indicating until now – that it actually possesses a full exemption from *those same claims* is a question NS never troubles to answer in its Motion.

Indeed, NS offers no explanation for why it brings this Motion now, and the timing is both curious and convenient given that the arguments NS advances are based on the Complaint and its own merger proceedings, which took place decades ago. NPBL – the entity which NS now claims it has a right to "control" pursuant to its merger proceedings in the 1980s – argued at the motion to dismiss stage that it was one-and-the-same entity with NS under the *Copperweld* doctrine. NS notably did not join NPBL's motion, and this Court denied the motion in that regard. Yet now NS suddenly claims that it "controls" NPBL, apropos of no developments in the case. NS makes this

argument right as CSXT prepares to conduct depositions in advance of the discovery cut-off and in advance of the deadline for disclosure of plaintiff's expert report.

NS styles its motion as one made under both Rules 12(b)(1) and (c) of the Federal Rules of Civil Procedure.  While a true question as to a court's subject matter jurisdiction can be raised at any time pursuant to Rule 12(b)(1), the issues NS raises are actually arguments that CSXT has failed to state a claim under Rule 12(b)(6).  Perhaps recognizing that these Rule 12(b)(6) arguments are woefully out of time, NS has attempted to shoehorn them into a Rule 12(b)(1) Motion.  As evidence of this, the Court need look no further than NPBL's motion to dismiss, which raised similar issues and arguments pursuant to a Rule 12(b)(6) motion *and was filed by the deadline for Rule 12(b)(6) motions, which deadline passed 14 months ago*.  *See* ECF 20, 28.  Similarly, Rule 12(c) motions are designed to test the sufficiency of a Complaint after an Answer has been made, using the same standard applicable under Rule 12(b)(6).  Here, NS has not cited to its Answer or any additional facts, nor raised any argument that would undermine the very Complaint that this Court has already found to be sufficient.

Regardless of NS's motives, its Motion should be denied on both procedural and substantive grounds.  Procedurally, this Motion is both untimely and unripe in turn.  It is untimely because all of NS's arguments have been available to it since the Complaint was filed in October 2018.  To the extent its arguments sound in any form of motion to dismiss, they sound in a Rule 12(b)(6) motion for failure to state a claim.  As such, they are out of time by *over a year*.  NS's styling of this Motion under Rule 12(b)(1) is simply an effort to bring Rule 12(b)(6) arguments out of time.  This Court clearly possesses subject matter jurisdiction.  The Complaint contains sufficient allegations to trigger the subject matter jurisdiction of this court – including federal question jurisdiction under Sections 1 and 2 of the Sherman Act and supplemental jurisdiction

3

over all state law claims under 28 U.S.C. § 1367(a).  The Motion is unripe to the extent NS appears to premise much of it on issues about the scope of appropriate remedies in this case.  CSXT has brought claims against NS for damages and injunctive relief and the Court can determine the appropriate scope of relief when the case proceeds to that stage – and can do so *on a full and appropriate record*.

Should this Court reach the substance of NS's motion, there is none.  CSXT's claims do not trespass on the exclusive authority of the U.S. Surface Transportation Board ("STB"); indeed, as this Court has already noted, the STB was tendered a copy of CSXT's Complaint and the STB indicated that CSXT's federal suit should proceed.  NS's Motion is built on a series of claims or suppositions about CSXT's Complaint that are not reflected in the Complaint itself and are inconsistent with this Court's and the STB's recognition that this suit can proceed consistent with STB's sphere of authority.  Additionally, to the extent NS raises arguments already forwarded by NPBL and rejected by this Court, the law of the case doctrine prevents NS from relitigating those issues.  As this Court has already recognized in its ruling on the motions to dismiss, ICCTA does not preempt the federal or state claims CSXT brings here.  ECF 66 at 23 ("If CSX were to prevail in this Court on the federal antitrust claims or state law business conspiracy claims in this suit, this Court may award damages for CSX's previous losses or injunctive relief to prevent Norfolk Southern and Belt Line from continuing to carry out such an antitrust or business conspiracy.").

## PROCEDURAL BACKGROUND

On October 4, 2018, CSXT filed its Complaint against Defendants NS, NPBL, Jerry Hall, Thomas Hurlbut, Phillip Merrilli, and Cannon Moss, alleging violations of federal antitrust law and state law.  ECF 1.  On November 27, 2018 – at the deadline set by the Court for motions to dismiss – all of the Defendants including NS and NPBL, filed Motions to Dismiss seeking to dismiss various of the claims against them.  ECF 27, 29, 31, 34.

4

Notably, NS *did not move to dismiss any of the federal antitrust claims against it*.  ECF 34, 35.  Indeed, NS *conceded* that CSX's antitrust claims were well plead – a striking concession for a party that now claims this Court lacks jurisdiction over the claims entirely.  *See* ECF 35 at 3 (agreeing that "some averments in the Complaint as to the federal antitrust claims, though denied, cannot be reached by NSR's Motion.").  NPBL did move to dismiss certain of the antitrust claims, but NS did not join that motion.

Of relevance to this Motion, NPBL moved the court, pursuant to Rule 12(b)(6), to dismiss all the claims against it.  ECF 27, 28.  Among several other arguments, NPBL claimed that the federal and state claims against it should be "dismissed or stayed as preempted or precluded by the exclusive jurisdiction of the Surface Transportation Board under 49 U.S.C. § 10501(b)." ECF 28 at 9.  NPBL noted that, because "the relief CSXT seeks . . . is exceedingly likely to conflict with the STB's role" in prescribing trackage rights compensation between NPBL and NS – which is a factor in the rates ultimately set by NPBL for CSXT and others – the remedies sought by CSXT "would be inconsistent with the STB's functions" such that the federal and state law claims should be dismissed.  *Id.* at 10-11.  Alternatively, NPBL sought a stay of this matter until the completion of the pending STB's trackage rights compensation proceeding to acknowledge "the STB's exclusive jurisdiction to resolve" trackage rights disputes and its "exclusive authority to prescribe compensation terms" that will necessarily inform NPBL's switching charges.  *Id.* at 11.

On September 9, 2019, the Court issued its thorough Opinion and Order, denying each claim raised by the Defendants, with the exception of NPBL's motion to dismiss one of the state law claims against it.  ECF 66.  Specifically, the Court noted the complete lack of authority for the proposition that the ICCTA preempts the type of antitrust claims made here.  *Id.* at 20-21. With respect to NPBL's argument that the remedies sought by CSXT are in conflict with the STB's

exclusive jurisdiction over the regulation of railroads, the Court noted that it could fashion broad relief – including damages for CSXT's losses and injunctive relief – without trampling upon STB's jurisdiction. *Id.* at 23-24. Notably, NPBL does not join NSR's current motion to dismiss.

Within a few weeks, Defendants served Answers, and the Court issued a Rule 26(f) Pretrial Order on September 27. ECF 72. By way of the Rule 16(b) Scheduling Order issued in October the court set trial in the matter for June 9, 2020, and directed an expeditious discovery schedule. ECF 78. CSXT must complete discovery, except as to expert witnesses, by March 3, 2020, and defendants by March 31. *Id.* at 2. On January 23, 2020, CSXT filed an emergency motion for an extension of time to complete discovery and amend the Scheduling Order, to which NS and NPBL responded on January 27 and 29. ECF 106, 111, 112. After a telephone conference to chambers, the Court granted CSXT's motion in part on February 5, 2020, extending by 15 days the deadlines pertaining to expert witnesses. ECF 118. CSXT's Expert Report Deadline is now set for February 25, 2020. *Id.*

## LEGAL STANDARD

A motion to dismiss for lack of subject matter jurisdiction, made pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, may attack a complaint on its face, insofar as the complaint fails to allege facts upon which the court can base jurisdiction, or it may attack the truth of any underlying jurisdictional allegations contained in the complaint. *Beck v. McDonald*, 848 F.2d 262, 270 (4th Cir. 2017). In the former situation, known as a facial challenge, the court is required to accept all of the complaint's factual allegations as true, "and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). The latter situation, known as a factual challenge, "the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004).

Because NS has not presented any new facts or challenged any of the facts alleged by CSXT, it appears NS is presenting a facial challenge to the Complaint. With respect to a facial challenge, a court should deny a 12(b)(1) motion "if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (noting that, in a facial challenge, the trial court "must apply a standard patterned on Rule 12(b)(6) and assume the truthfulness of the facts alleged."). At base, a Rule 12(b)(1) motion addresses whether the plaintiff "has a right to be in the district court at all and whether the court has the power to hear and dispose of his claim." *Holloway v. Pagan River Dockside Seafood, Inc.*, 669 F.3d 448, 452 (4th Cir. 2012).

Rule 12(c) provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c). A motion for judgment on the pleadings pursuant to Rule 12(c) is analyzed under the same standard as a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See Burbach Broad. Co. of Del. v. Elkins Radio Corp.*, 278 F.3d 401, 405-06 (4th Cir. 2002). Thus, the court assumes the factual allegations in the Complaint to be true, and draws all reasonable factual inferences in plaintiffs' favor as non-moving parties. *See id.* at 406. A motion to dismiss pursuant to Rule 12(b)(6) should be granted only if "it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). Unlike on a Rule 12(b)(6) motion, however, in the Rule 12(c) context, the court may consider the Answer as well. *See Alexander v. City of Greensboro*, 801 F. Supp. 2d 429, 433 (M.D.N.C. July 13, 2011). The factual allegations of the Answer are taken as true only to the extent they have not been denied or do not conflict with the Complaint. *Id.* (internal quotation omitted). At base, a Rule 12(c) motion "tests only the sufficiency of the complaint and does not resolve the merits of

the plaintiff's claims or any disputes of fact." *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014).

## ARGUMENT

NS argues that CSXT cannot obtain relief as a matter of law under 49 U.S.C. § 11321(a) because the Interstate Commerce Commission ("ICC"; the predecessor of the STB) approved the merger of the two railroads that would become NS.  Because § 11321(a) provides an exemption from "the antitrust laws and from all other law," NS avers that the claims against it fail.  NS also argues that this Court is unable to grant the relief sought by CSXT, because the STB has exclusive jurisdiction to set rates and grant access to railroad terminal facilities.  Finally, NS urges the Court to stay this case in its entirety and refer to the STB the question of whether NPBL's line haul switch rate is reasonable under the doctrine of primary jurisdiction.

CSXT responds below by reviewing this Court's prior rulings relevant to the issues raised now by NS.  Then CSXT addresses why this Motion is procedurally inappropriate.  Finally, CSXT addresses why the Motion is substantively baseless.

## I.    This Court has already decided key issues as to preemption and remedy that NS's Motion challenges.

During the motion to dismiss phase of the case, NS took a very different tack than NPBL.  NS challenged only the state law claims against it, conceding that the allegations in the Complaint "as to the federal antitrust claims, though denied, cannot be reached by NSR's Motion [to Dismiss]."  ECF 35 at 3.  NPBL did not join in this concession, instead attacking all the claims against it under Rule 12(b)(6).  NS, for its part, did not join NPBL challenges to the federal antitrust claims, which were ultimately unsuccessful.  Several aspects of this Court's ruling bear on this Motion.

NPBL argued that all federal and state claims against it must be dismissed or stayed

because such claims were expressly preempted by the Interstate Commerce Commission Termination Act (ICCTA), 49 U.S.C. § 10101, *et. seq.*  Specifically, NPBL made this motion pursuant to Rule 12(b)(6) and argued:   "The relief CSXT seeks is exclusively within the jurisdiction of the STB and expressly preempted."  ECF 28 at 9.  In so doing, NPBL cited to 49 U.S.C. § 10501(b), which defines STB's exclusive jurisdiction over transportation by rail carriers, and notes that the remedies provided "with respect to the regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law."  49 U.S.C. § 10501(b)(2).  NS did not join this argument at the time NPBL made it, but now seeks to find protection within that same statute, § 10501(b)(2).  *See* ECF 116 at 13.

This Court declared NPBL's jurisdictional argument to be "meritless."  ECF 66 at 20.  In so finding, the Court first noted that NPBL had "not cited any case that supports the proposition that the ICCTA preempts other *federal* statutes like the antitrust claims before the Court."  *Id.* at 20-21 (emphasis in original).  In considering an ICCTA preemption argument, a court must "begin with a presumption that the acts are non-regulatory if they result from a private agreement like a contract, but courts must also look at whether the allegations 'would directly interfere with the STB's exclusive jurisdiction over the regulation of railroads.'"  ECF 66 at 22 (citing *PCS Phosphate Co. v. Norfolk S. Corp.*, 520 F. Supp. 2d 705, 717 (E.D.N.C. 2007)).  The Court concluded, as the STB likewise had, that none of CSXT's federal and state law claims intruded upon the trackage rights compensation proceeding then-pending before the STB, thus finding that those claims were not preempted by the ICCTA.  *Id.* at 25.  This Court further concluded that "this Court may award damages for CSX's previous losses or injunctive relief to prevent Norfolk Southern and Belt Line from continuing to carry out such an antitrust or business conspiracy."  *Id.* at 23; *see also id.* at 23-24 (explaining forms of injunctive relief the Court could issue consistent

9

with the STB's jurisdiction).  Yet, now, NS argues that "[u]nder 49 U.S.C. § 10501(b), the STB has exclusive jurisdiction over the *remedies* provided by the ICCTA," including directing a rail carrier to enter into switching agreements and providing access to terminal facilities.  ECF 116 at 13 (emphasis added).

The law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988)).  Furthermore, when a rule of law has been decided adversely to one or more codefendants, the law of the case doctrine precludes all other codefendants from relitigating the legal issue.  *Id.*  As such, NS's ICCTA preemption argument must fail.  This Court has already concluded that ICCTA preemption does not bar this suit and that it can issue forms of relief consistent with ICCTA and those rulings are law of the case.

## II.    NS's Motion Is Procedurally Inappropriate.

### A.    NS's arguments are an out-of-time Rule 12(b)(6) motion simply styled as a Rule 12(b)(1) Motion.

The deadline set by the Court for filing motions to dismiss pursuant to Rule 12(b)(6) was November 27, 2018.  ECF 20.  This Motion is in substance a Rule 12(b)(6) Motion,[1] and as such it is roughly 14 months out of time.  NS makes no request for extension and it offers no grounds for good cause, because it cannot.  Rather, NS labels the Motion as brought pursuant to Rule 12(b)(1).  While a motion that truly raises issue with the Court's subject matter jurisdiction can be brought at any time, this Motion does no such thing.

The Complaint invokes federal question jurisdiction and alleges claims under federal

---

[1] As confirmation of this point, NPBL, as noted above, made similar arguments at the motion to dismiss stage, which arguments it brought under Rule 12(b)(6).

statutes, specifically the Sherman Act.  ECF 1 at ¶ 11.  NS, in its Answer to the Complaint, "admits that this Court has subject matter jurisdiction over claims that purport to arise under Sections 1 and 2 of the Sherman Act, Counts I through IV of the Complaint."  ECF 69 at ¶ 11.  NS goes on in that paragraph to invoke the primary jurisdiction doctrine, asserting that the Complaint sets forth facts and circumstances, and seeks relief for alleged anticompetitive acts, "that fall within the primary jurisdiction of the STB".  *Id.*  But the primary jurisdiction doctrine does not provide that this Court lacks jurisdiction over properly stated federal claims.  Primary jurisdiction is a doctrine specifically applicable to claims properly cognizable in court that contain some issue within the special competence of an administrative agency.  It "requires the court to enable a 'referral' to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling."  *Reiter v. Cooper*, 507 U.S. 258, 268 (1993).  Referral of an issue to the administrative agency "does not deprive the court of jurisdiction," instead leaving to the court's discretion whether to retain jurisdiction or dismiss the case without prejudice.  *Id.; see also Sierra v. City of Hallandale Beach, Florida*, 904 F.3d 1343, 1350 (11th Cir. 2018) (primary jurisdiction doctrine is prudential, not jurisdictional).  As such, a primary jurisdiction argument does not go to this Court's subject matter jurisdiction.

By its own terms, NS's Motion principally focuses on the types of *remedies* this Court could enter.  *See* ECF 116 at 2 ("this Court is not able to grant the relief CSXT seeks"); 9 ("The STB has exclusive authority to order the remedies provided under 49 U.S.C. § 11102, which encompasses many of the remedies that CSXT is attempting to obtain from this Court"); 14 (disputing that this Court has the authority "to order remedies that are within the exclusive jurisdiction of the STB").  That argument, in turn, appears to focus on what form of injunctive relief could be appropriate.  However, NS's argument does not appear to contest that the Court can

award damages.  As such, there is really no dispute – even on the erroneous grounds that NS presents – that this Court has subject matter jurisdiction over the case.  To the extent there is a question as to remedies, that question can be taken up at the remedial phase of the case and does not go to this Court's subject matter jurisdiction.

**B.**     **To the extent NS raises concerns about the ability to grant relief, those questions are not ripe.**

NS challenges the ability of this Court to grant the relief sought by CSXT, repackaging these arguments under the umbrella of Rule 12(b)(1).  ECF 116 at 13-15.  Specifically, it argues that the Court cannot grant CSXT access to the NIT, nor can it direct NBPL to accept CSXT's Service Proposal because such direction would be tantamount to setting a rate – a function best left to the STB.  As before, these remedial arguments are simply not ripe.

Arguments about remedies do not challenge this Court's subject matter jurisdiction to hear this case (as would be appropriate under Rule 12(b)(1)), or whether the Complaint sufficiently states a claim (as Rule 12(b)(6) permits a party to attack).  Also, to the extent NS argues that aspects of CSXT's request for relief would tread on the STB's jurisdiction, those issues can be resolved at the remedial phase of this case to the extent not already resolved by this Court's prior rulings.  CSXT has requested various available forms of relief, from damages to injunctive relief, and the Court can determine what is appropriate after disposition on the merits.  NS makes no claim, for example, that the STB can award damages for violations of the Sherman Act.

Whether or not this Court can grant a particular form of relief – and if that would be in conflict with the STB's jurisdiction – is a question that is simply premature.  Notably, however, the Court has already concluded that it may fashion relief that would not affect the STB's jurisdiction, and that ruling remains the law of the case.  *See* ECF 66 at 23-24 (noting that injunctive relief may prevent Defendants from continuing to engage in a conspiracy or to make

12

changes to NPBL's governance, but that "the STB's jurisdiction would not be affected; that is, the STB may still approve or disapprove" rate increases).[2]

### III.    NS's Motion Should Also Be Denied on the Merits.

For the foregoing reasons, NS's Motion should be denied on procedural grounds.  If the Court reaches the merits, however, the Motion should be denied as it fundamentally lacks merit.

#### A.    NS is Not Exempt from Antitrust or "All Other Law" under 49 U.S.C. § 11321(a).

NS asserts that it is exempt from federal antitrust and state law conspiracy claims under 49 U.S.C. § 11321(a) because the Interstate Commerce Commission (ICC) (the predecessor to the United States Surface Transportation Board) approved NS's control of NPBL when it approved the control of the Norfolk and Western Railway Company ("N&W") and Southern Railway Company ("SR") in 1982 by the newly created NWS Enterprises, Inc. – NS's predecessor.  ECF 116 at 1-2, 9-10.  This argument fails for several reasons.  First, the premise of the argument – that the ICC granted NS control over NPBL– is faulty because (a) NS *did not seek* authority to control NPBL since it did not include NPBL on the list of specific entities for which it sought control authority, and (b) the ICC *did not grant* control authority because NPBL is not on the list of subsidiaries over which NS was approved to exercise control.  NS's Motion betrays its knowledge of this fundamental weakness by suggesting that "[t]o the extent there is any question as to whether the approval of the Merger included authorization of NSR's control over NPBL, only the STB can clarify the scope of its merger approval."  ECF 116 at 11.  But there is nothing unclear about the

---

[2] To be clear, NPBL's motion on this point relied upon the then-pending trackage rights compensation proceeding before the STB.  Such proceeding has now been held in abeyance, *see* ECF 61, but the Court's reasoning is applicable to the arguments NS now raises.  Importantly, in choosing to hold the proceeding in abeyance, the STB noted that resolution of the federal district court case "may reduce the number of disputed issues between the parties in [the] proceeding, thereby promoting efficiency."  ECF 61-1 at 2.

scope of the ICC's control authorization.  Second, even though NS undisputedly gained a 57%

ownership interest in NPBL as a result of the merger, that ownership interest by itself did not

convey a general exemption from otherwise applicable antitrust and other laws.  STB did not

purport to rule that NS can use a majority ownership in NPBL for anticompetitive purposes in

violation of the Sherman Act.

### 1.     The ICC Did Not Approve NS's Control of NPBL.

When more than one railroad seeks to initiate a consolidation transaction under 49 U.S.C.

§ 11323, it must adhere to the procedures outlined in 49 C.F.R. § 1180, *et seq*.  Applicants must

provide competitive and market information, financial data about the railroads at issue, operational

information, and service assurance plans, among other data.  *See* 49 C.F.R. § 1180.0(a).  Upon

petition of a prospective applicant, the STB may waive or clarify certain procedures attendant to a

consolidation application.  *See* 49 C.F.R. § 1180.4(f).  Importantly, persons need to affirmatively

seek STB approval to acquire control of particular carriers.  *See* 49. U.S.C. §§ 11323(a) & (b).

The STB then publishes notices of its actions in the Federal Register.

On December 4, 1980, N&W and SR filed an application under 49 U.S.C. §§ 11343[3] and

11344 (referred to as a merger application or application for control) seeking ICC approval for

NSW Enterprises, Inc. (NS's predecessor) to acquire control of Norfolk & Western Railway

Company ("N&W"), the Southern Railway Company ("SR"), and their subsidiaries.  N&W and

SR attached a corporate chart listing the companies in which they had an ownership interest,

including NPBL.  This chart also listed the percentage of NPBL stock held by N&W and SR and

their subsidiaries, totaling 57.14%.

---

[3]  As part of the ICC Termination Act of 1995, the procedures for consolidation, merger, and acquisition of control were relocated from 49 U.S.C. § 11343 to § 11323.

On December 22, 1980, the ICC published in the *Federal Register* a notice that it had accepted NWS Enterprises, Inc.'s application to control N&W and SR and was seeking comments on the proposed transaction.  46 Fed. Register 1, 173-76 (Jan. 2, 1981) (noting that "The proposed transaction involves the acquisition of control, through stock ownership of NW and its subsidiary companies and of SR and its consolidated system companies, by NWS, a newly incorporated non-carrier holding company.").  This notice included two appendices listing the subsidiaries over which the new NWS Enterprises, Inc. would gain control.  NPBL was not listed on either appendix. *Id.* at 176.

Finally, on March 19, 1982, the ICC approved common control by NWS Enterprises, Inc. of N&W, SR, and their subsidiaries and consolidated companies.  *Norfolk S. Corp.—Control—Norfolk & W. Ry. Co. & S. Ry. Co.*, 366 I.C.C. 173 (1982).  Importantly, the ICC's decision approving this merger attached, as Appendix A, a list of the subsidiaries and consolidated companies that NS Corporation was authorized to control as a result of the merger.  *Id.* at 255-56. NPBL is not listed.

NS claims that, because the merger application listed that a total ownership of 57.14% of NPBL stock would be held by the new NSR, "NSR's control of NPBL was a direct consequence of the STB's overall Merger approval."  ECF 116 at 10.  This argument is simply wrong.  Prior decisions of the ICC establish that majority ownership of a rail carrier does not necessarily equate to control – and that whether a company has "control" is a fact-based inquiry.  *See, e.g., Union Pac. Corp., Union Pac. Ry. Co. & Mo. Pac. Ry. Co.—Control—Chicago & N.W. Holdings Corp. & Chicago & N.W. Transp. Co.*, 9 I.C.C.2d 939, 947 (1993) (the legal standard of control is a flexible one, based on the facts of each case); *Paducah & Louisville Ry., Inc.—Control Exemption—Paducah & Ill. R.R. Co.,* FD. 33362, 1997 WL 487405 at *2 (STB Served Aug. 25,

15

1997) ("In determining whether one person controls another, the Commission has rejected any arbitrary formula based upon percentage of stock ownership, and instead, looked to a number of additional factors, including distribution of the remaining stock, the ability to elect directors and otherwise control or influence decision-making machinery, and the existence of management, marketing, operating and financial ties.").  It is thus fair to say that NS's *majority ownership interest* in NPBL was a direct result of the ICC-approved merger; it is not correct to say that NS's "control" over NPBL was approved by the ICC.  Most tellingly, the ICC's decision approving common control specifically listed the subsidiaries and consolidated companies that NS Corporation was authorized to control as a result of the merger.  366 I.C.C. at 255-56.  NPBL is not on that list.

### 2. Even if the ICC did grant control over NPBL, NS is not exempt from the claims raised in the Complaint.

Under 49 U.S.C. § 11323(a)(3), acquisition of control of a rail carrier (such as NPBL) may be carried out "only with the approval and authorization of the Board."  Once approved, 49 U.S.C. § 11321(a), which provides an exemption from the antitrust laws and from all other law, including State and municipal law," as necessary to carry out the transaction and exercise control acquired through the transaction.  It is this exemption on which NS hangs its hat, claiming that its exercise of control over NPBL is exempt from federal antitrust and state law conspiracy claims.  ECF 116 at 10.

This argument fails as a matter of fact and law.  First, the exemption is predicated upon proper approval (or exemption) by the ICC.  *See* 49 U.S.C. § 11321(a) ("A rail carrier or corporation participating in . . . a transaction approved by or exempted by the Board . . .").  The ICC never approved NSR's control of NPBL – as evidenced by the glaring absence of NPBL from the 1980 merger petition and the 1982 Appendix A.  Certainly if N&W and SR thought they were

16

seeking control of NPBL, they would have filed to correct the appendices to the ICC decision listing the rail carrier subsidiaries and consolidated system carriers the new NS was permitted to control.

The argument is also irrelevant for the very simple reason that the STB's 1982 approval of NS's common control of N&W and SR does not exempt NS from the federal antitrust claims and state law claims presented in this case.  To the contrary, the exemption in 49 U.S.C. § 11321(a) allows the STB to decide, in some circumstances, that "it is necessary for a particular law to yield *in order for an approved transaction to take place*." *CSX Transp., Inc. v. Transp. Comm'ns Int'l Union*, 480 F.3d 678, 683-84 (4th Cir. 2007) (emphasis added).

The STB itself has explained that "the 'necessity' predicate [in § 11321(a)] is satisfied by a finding that some 'law' . . . is an impediment to the approved transaction.  In other words, the necessity predicate assures that the exemption is no broader than the barrier which would otherwise stand in the way of implementation" of the merger transaction or "subsequent transactions that are directly related to and fulfill the purposes of the principal transaction."  *CSX Corp.-Control-Chessie-Sys. Inc. & Seaboard Coast Line Indus., Inc.*, 8 I.C.C.2d 715, 721-22, 1992 WL 206172 (1992).  Here, NS has not alleged that CSXT's claims present an impediment to the 1982 merger and, indeed, CSXT is not attempting to challenge those merger proceedings in any respect.

The court in *Harris v. Union Pacific RR*, 141 F.3d 740 (7th Cir. 1998) provided an illustrative discussion on this point.  In *Harris*, two employees brought claims against a newly merged railroad under the Pregnancy Discrimination Act based on the railroad's failure to provide certain separation benefits negotiated during the merger process. 141 F.3d at 741-42.  The district court held that ICC's approval of the merger foreclosed these claims, but the Seventh Circuit reversed.  *Id.* at 742.  It explained that "[o]nly laws *that would block the transaction* give way"

under § 11321(a).  *Id.* at 743 (emphasis added).  Because "[n]one of the civil rights laws puts any obstacle in the way of Union Pacific's acquisition of the Chicago & North Western," the newly merged railroad was not exempt from claims brought under those laws.  *Id.*  As the *Harris* court explained, any contrary reading of § 11321(a)'s exemption would strain reason:

> On the railroad's understanding of § 11341(a), the Board is forever in charge of all legal disputes related to a merger. Is the railroad liable to a brakeman injured by failure of a coupler on a car that came from the acquired corporation? Does an easement on any of the carrier's rights of way survive the merger? Are the employees entitled to a Christmas bonus under the labor agreement? Some of these issues are resolved by arbitration or bargaining, others under state property law or the Safety Appliance Act. But if the Union Pacific were right, everything would be up for grabs. Who can tell which of these laws the Commission might have thought incompatible with the merger?

*Id.* at 744 (internal citations omitted).  The Fourth Circuit cited this reasoning from *Harris* approvingly in *CSXT Transportation, Inc.  See* 480 F.3d at 684 (holding that STB did not have exclusive jurisdiction over minor disputes that could not "frustrate the orderly execution of the terms of the implementing agreement" approved by the STB).

Here, there is no aspect of the claims that CSXT has brought that would pose "an impediment to the approved transaction."  *CSX Corp.-Control-Chessie-Sys. Inc. & Seaboard Coast Line Indus., Inc.*, 8 I.C.C.2d at 721-22.  NS did gain a majority ownership interest in NPBL as a result of the 1982 merger, but – as this Court has already concluded – that majority interest, standing alone, does not render NS and NPBL one entity for purposes of the *Copperweld* doctrine. ECF 66 at 33-34 (rejecting NPBL's argument that the Complaint alleges it is common enterprise with NS, and therefore cannot conspire for the purposes of antitrust law).  As the Court noted, "it cannot be said that Norfolk Southern exerts total dominion," as CSX still retains the right to appoint two of NPBL's directors.  *Id.* at 32.  Further, as CSX has alleged here, the interests of NS and the NPBL diverge.  *Id.* citing ECF 1 ¶¶ 3, 24, 25, 32, 48, 112.  None of these points are

inconsistent with NS having a 57% ownership interest, which CSXT itself pointed out in the Complaint.  ECF 1 ¶ 23.

### 3.      No clarification is needed and a stay is unwarranted.

No doubt because it recognizes that the actual documentation attendant to its 1980 merger application defeats its argument, NS asks this court to "refer the control issue to the STB and stay this case pending the STB's determination" to the extent there is any question about the scope of the STB's approval.  ECF 116 at 13.  The legal underpinnings for this motion are unclear.  If a motion to refer is grounded in an allegation that this Court lacks subject matter jurisdiction, then it must fail for the reasons outlined above.  If it is based on this Court's inability to grant the relief required by CSXT, then it is unripe at this juncture of the case.  More importantly, and as discussed above, whether or not the STB authorized NS to control NPBL is irrelevant to the issues before this Court.  NS's suggestion that CSXT's Complaint somehow challenges the STB's merger decision is a red herring.  CSXT is not challenging the merger; it is challenging what NS and NPBL did years after the merger, in violation of the Sherman Act and other laws.  The ICC did not grant NS an exemption from the antitrust laws – as NS itself must have recognized *when it declined to seek dismissal of any of CSXT's antitrust claims*.  ECF 34, 35.

Shortly before CSXT filed its Complaint, NPBL instituted a trackage rights compensation proceeding before the STB, asking the Board to set compensation for the trackage rights of NPBL over approximately eleven miles of NS's rail lines.  CSXT moved to intervene in that proceeding, citing this litigation and forwarding a copy of the Complaint to the Board.  In July 2019, STB chose to hold in abeyance the trackage rights compensation proceeding while the parties litigate this case, including any subsequent appeals.  ECF 61-1.  In so doing, it noted that allowing this case to proceed "may reduce the number of disputed issues between the parties in [the STB] proceeding, thereby promoting efficiency."  *Id.* at 2.  This is hardly the language of an agency that

believes the Complaint trespasses on its authority or orders.   Indeed, the Court has already recognized the STB's decision to defer further proceedings in light of this suit.  ECF 66 at 20 ("the STB decided to hold its related proceeding in abeyance pending resolution of this federal court proceeding including any appeals."), citing ECF 61.

In support of their argument that this Court should wait for the STB to rule on the control issue, NSR cites as "instructive" *AT&T Communications, Inc. v. Consolidated Rail Corp.*, 285 F. Supp. 2d. 649 (E.D. Pa. 2003).  There, Conrail moved under Rule 12(b)(1) to dismiss a breach of contract claim against it arguing that the STB, not the Court, had jurisdiction over the claim because STB approved Conrail's acquisition by two rail carriers, and the AT&T contract claims were based upon the scope of that approval.  The *Conrail* court rejected Conrail's subject matter jurisdiction argument, first noting that its "decision on the jurisdictional issue must turn at least in part on the degree to which [the plaintiff's] claims actually challenge the implementation of the STB-approved Transaction." *Id.* at 660.  Noting that the allegations in the complaint did not, on their face, directly implicate the merger transaction, and because the degree to which AT&T was "challenging the Transaction itself, or the STB's administration of the merger, is de minimis", the court concluded that it did have subject matter jurisdiction over the claims and denied the motion to dismiss.  *Id.* at 660-61; *see also id.* at 658-59 (noting that "it is not at all apparent that AT&T's claims go to the 'heart' of the STB's approval and supervision of the Transaction" and that "AT&T is not directly challenging any STB-approved action taken by Conrail.").  The court did grant Conrail's (timely) motion to refer the issue of whether the 11321(a) exemption applied to the STB-authorized transaction, noting that – unlike here – there was a parallel proceeding pending before the STB on issues identical to the issue before the court and that, because the STB had studied the Transaction in detail, it possessed the expertise necessary to resolve that dispute.  *Id.*

The only other case NS cites in support of this argument similarly does not lend support to its position. The plaintiff railroad in *Kansas City Southern Railway Co v. BNSF Railway Company*, 970 F. Supp. 2d 542 (W.D. La. 2013) sought a declaratory judgment that another rail company did not have a right to operate its locomotives on certain tracks without its permission. The issue squarely before the court was the scope of two STB decisions regarding the trackage rights of the two railroads; thus the court dismissed the complaint because the STB had exclusive jurisdiction over the scope of its merger orders. *Id.* at 548 (noting that in order to grant the declaratory judgment relief sought, "the Court would have to encroach upon the STB's exclusive jurisdiction to clarify the scope" of its decisions). Here, CSXT is not asking the Court to characterize or rule upon the scope of any STB decisions – and the relief it seeks is not within the STB's exclusive jurisdiction. *See supra* 9-10.

As noted above, *see supra* at 12-13, NS argues that the Court should dismiss CSXT's claims because they cannot grant certain forms of the relief sought in the Complaint – specifically, granting access to the NIT and requiring NPBL to accept CSXT's Service Proposal – as those remedies are within the exclusive jurisdiction of the STB. Notably, NPBL does not join in this motion, perhaps in recognition of the fact that the court has already ruled this argument to be meritless.

Despite NS's attempts to obfuscate the relief desired in this case, CSXT has not asked the Court to adjudicate trackage rights and set switching fees. Rather, CSXT seeks damages for past and continuing conduct in violation of the Sherman Act and state law, as well as injunctive relief to prevent further anticompetitive conduct. Such injunctive relief may include directing NPBL to accept CSXT's Service Proposal, restoring CSXT's shareholder rights, and establishing an independent board structure – all of which *would* lie within this Court's jurisdiction. As this Court

has noted, if CSXT were to prevail on the federal antitrust claims or state law business conspiracy claims, the Court *could* award damages for CSXT's previous losses or injunctive relief to prevent NS and NPBL from continuing to carry out such an antitrust or business conspiracy.  ECF 66 at 23.

> ### B.    The STB's jurisdiction to determine the reasonableness of rates does not bar the claims against NS.

NS asks this Court to invoke the doctrine of primary jurisdiction and stay these proceedings in order to refer to the STB the question of whether NPBL's switching rate is unreasonable.  Again, this request could have been brought at the outset of this case.  More importantly, while the switching rate is unreasonable, CSXT's claims assert a finer point:  that the Defendants have caused NPBL to establish and maintain unreasonably high switch rates in order to block competitors' access to the NIT.  *See* ECF 66 at 6, citing ECF 1 at ¶ 34.  In so doing, NS has "abused its position as majority shareholder [of NPBL], colluding with the Individual Defendants and Belt Line to deny competitors access to NIT."  *Id.*  A ruling from the STB is not needed for this Court to adjudicate the claims of anticompetitive and collusive conduct presented here.

NPBL's operating revenue is derived principally from switch operations, and is largely dependent upon the switch services being provided to the shareholders' companies, who in turn pay for those services.  ECF 1 at ¶ 33.  NPBL's current line haul switch rate of $210 per car was adopted in 2009 over the objection of non-NS directors on the NPBL Board.  *Id.* at ¶ 34; ECF 28-1.  To be clear, this rate has not been reviewed or approved by the STB, and is dramatically higher than rates for comparable services charged by other short line railroads.  *Id.*

The doctrine of primary jurisdiction is a discretionary doctrine that a Court may invoke to refer to an administrative agency a claim "properly cognizable in court," but containing an issue within the "special competence" of that agency.  *Reiter v. Cooper*, 507 U.S. 258, 268 (1993).

Referral of the issue to the administrative agency "does not deprive the court of jurisdiction; it has discretion either to retain jurisdiction or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice." *Id.* at 268-69. Despite what the term primary jurisdiction may imply, it "does not speak to the jurisdictional power of the federal courts. It simply structures the proceedings as a matter of judicial discretion, so as to engender an orderly and sensible coordination of the work of agencies and courts." *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1162 (3d. Cir 1993) (quoting *United States v. Bessemer & Lake Erie R.R. Co.*, 717 F.2d 593, 599 (D.C. Cir 1983)); *see also United States v. Philadelphia Nat. Bank*, 374 U.S. 321, 353 (1963) (upon referral to an administrative agency under the doctrine of primary jurisdiction, "Court jurisdiction is not thereby ousted, but only postponed."). If an agency's special expertise is not needed to decide a question of law, referral is not needed. *See Environmental Tech. Council v. Sierra Club*, 98 F.3d 774, 789 (4th Cir. 1996) (upholding district judge's refusal to refer question to Environmental Protection Agency under the doctrine of primary jurisdiction because there were no issues of fact). Once again, NS's framing of this issue is properly made under Rule 12(b)(6).

NS claims that Supreme Court precedent "requires that the STB determine whether the Switching Rate is unreasonable," and that this Court is unable to resolve this question, such that it should refer the reasonableness of the rate to the STB. ECF 116 at 15-17. Here, the Complaint alleges, among other things, that the Switching Rate was set at an unreasonable and preclusive level *for anticompetitive, conspiratorial and tortious reasons.* The focus of CSXT's claim here is on anticompetitive, conspiratorial, and tortious conduct that is the subject of the antitrust and state laws, not on the adjudication of a rate proceeding before the STB. As this Court has already stated, and as the STB has acknowledged in its decision to hold its proceedings in abeyance, those claims are properly brought in this federal court case. *See Philadelphia Nat. Bank*, 374 F.3d at 353-54

(finding the doctrine of primary jurisdiction inapplicable to civil antitrust lawsuit to enjoin proposed bank merger, noting that agency approval of the merger could not "confer immunity from the antitrust laws."). Indeed, even assuming some facets of the underlying dispute between CSXT and the defendants may be within the jurisdiction of the STB would "not dictate referral of the action" to the agency. *See Reynolds Metals Co. v. Commonwealth Gas Services, Inc.*, 682 F. Supp. 291, 295 (E.D. Va. 1988) (declining to refer claims to the FERC, noting that "The lack of any indication that adjudication of the antitrust claims would be in conflict with the regulatory scheme, as well as FERC's lack of authority to address the antitrust claims, indicate that primary jurisdiction in this case does not lie with the FERC.").[4]

The cases NS cites do not aid its position, as they deal with questions of tariff construction or recovery of unpaid demurrage charges, not allegations – as here – that the unreasonableness of a rate is evidence of other wrongdoing. Indeed, if the question of reasonableness of a tariff or rate is squarely before a court, as in the CSXT *Novolog Bucks County* case referenced in the motion, referral to the STB would be appropriate and helpful to the issues before the court. The claims in the Complaint, however, challenge diverse conduct beyond the rate itself. The federal antitrust claims, for instance, allege a number of instances of anticompetitive conduct, including the rejection of the Service Proposal, but also the failure to allow timely and reasonable movement of CSXT's cars, terminating access rights to certain tracks, and discriminating against CSXT by refusing to allow the use of CSXT's locomotives while not imposing the same requirement on NS. ECF 1 at ¶ 87.

---

[4] Referral to the STB is not appropriate, but it is particularly inappropriate at this time given that the parties are actively engaged in discovery and have been litigating this case for over one year.

Thus, to NS's point that STB's resolution on the question of reasonableness would ultimately save the parties "significant resources litigating CSXT's antitrust claims," that simply is not the case, because the federal and state claims would stand regardless.  ECF 116 at 21.  Again, while CSXT does allege that the switching rate is unreasonable, it is not true that the antitrust claims "begin and end with the assumption" that the switching rate is unreasonable.  *Id.*

## CONCLUSION

For the reasons stated above, CSXT respectfully asks that this Court deny NS's Motion to Dismiss, for Judgment on the Pleadings, and for Referral of Issues to the U.S. Surface Transportation Board in its entirety.

Dated:  February 14, 2020

Respectfully submitted,

**CSX TRANSPORTATION, INC.**

*/s/Benjamin L. Hatch*
Robert W. McFarland (VSB No. 24021)
Benjamin L. Hatch (VSB No. 70116)
Jeanne E. Noonan (VSB No. 87863)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia  23510-1655
Telephone: (757) 640-3716
Facsimile:  (757) 640-3930
E-mail: rmcfarland@mcguirewoods.com
E-mail: bhatch@mcguirewoods.com
E-mail: jnoonan@mcguirewoods.com

Ashley P. Peterson (VSB No. 87904)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia  23219-3916
Telephone:  (804) 775-1000
Facsimile:  (804) 775-1061
E-mail: apeterson@mcguirewoods.com

*Counsel for CSX Transportation, Inc.*

## CERTIFICATE OF SERVICE

I certify that on this 14th day of February, 2020, a true and correct copy of the foregoing was served on all counsel of record via Notice of Electronic Filing by filing with the Court's CM/ECF system.

*/s/Benjamin L. Hatch*

Robert W. McFarland (VSB No. 24021)
Benjamin L. Hatch (VSB No. 70116)
Jeanne E. Noonan (VSB No. 87863)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia  23510-1655
Telephone: (757) 640-3716
Facsimile:  (757) 640-3930
E-mail: rmcfarland@mcguirewoods.com
E-mail: bhatch@mcguirewoods.com
E-mail: jnoonan@mcguirewoods.com

Ashley P. Peterson (VSB No. 87904)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia  23219-3916
Telephone:  (804) 775-1000
Facsimile:  (804) 775-1061
E-mail: apeterson@mcguirewoods.com

*Counsel for CSX Transportation, Inc.*
