# EXHIBIT A

Page 1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

CSX TRANSPORTATION, INC.,
individually and on behalf of
NORFOLK & PORTSMOUTH BELT LINE
RAILROAD COMPANY,

    Plaintiff,

    vs.

NORFOLK SOUTHERN RAILWAY
COMPANY, NORFOLK & PORTSMOUTH
BELT LINE RAILROAD COMPANY,
JERRY HALL, THOMAS HURLBUT,
PHILIP MERILLI, and CANNON
MOSS,

    Defendants.

CIVIL ACTION FILE
NO. 2:18cv530

VIDEO DEPOSITION OF
STEVEN ARMBRUST, ESQ.
March 11, 2020
9:56 a.m.
McGuireWoods LLP
1230 Peachtree Street
Suite 2100
Atlanta, Georgia

Robyn Bosworth, RPR, CRR, CRC, CCR-B-2138

Page 15

1   of New York.
2        Q    Then when you started with Mayer Brown,
3   what type of work did you do?
4        A    I was in the banking and finance
5   department, and the corporate M&A department as
6   well.
7        Q    Is it fair to say those were transactional
8   departments, not litigation?
9        A    That is fair.
10       Q    And how long did you stay at Mayer Brown?
11       A    Five years.
12       Q    So in 2005 approximately you left Mayer
13  Brown?
14       A    That's correct.
15       Q    And where did you go to work?
16       A    CSX.
17       Q    And where?  What location at CSX?
18       A    In the Jacksonville headquarters.
19       Q    And is it fair to say from 2005 to the
20  present you've worked for CSX?
21       A    That's correct.
22       Q    Have you had any breaks in employment and

Page 16

1   worked at other places other than CSX from 2005 to
2   the present?
3        A    I have not had any breaks during -- since
4   I started.
5        Q    What was your first job at CSX?
6        A    My first job at CSX was -- all of it has
7   been in the law department.  My first job, though,
8   was in the regulatory side working on line sales and
9   abandonments.
10       Q    And how long did you hold that position?
11       A    I still handle line sales and
12  abandonments.
13       Q    If you could take me from 2005 forward.
14  You said you worked on line sales and abandonments.
15  What other duties did you have from 2005 I'll say
16  until 2010?
17       A    From 2005 to 2010, I worked on
18  intercompany matters, I worked for CSX Intermodal as
19  the temporary lead counsel, I worked on various
20  miscellaneous matters and commercial matters.
21       Q    Okay.  Still not in the litigation
22  section; is that a fair statement?

1    A    That's fair.
2    Q    Okay.  And then from 2010 to the present,
3  can you tell me what your job duties and roles have
4  been as an in-house counsel at CSX?
5    A    From 2010, I continued to work on
6  intermodal matters.  I also began working more on
7  joint facility matters, so intercarrier matters,
8  continued to work on commercial matters, and with
9  the exception of some insurance work and regulatory
10 matters, I held the same roles, just expanded.
11   Q    That's true through today?
12   A    That's true through today.
13   Q    And what is your official job title today
14 at CSX?
15   A    Assistant general counsel.
16   Q    When did you become assistant general
17 counsel?
18   A    I believe it was late 2011.
19   Q    And before that what was the title in the
20 legal department, just counsel or --
21   A    Before that I was senior counsel.
22   Q    You understand we're here about the

Page 18

1   Norfolk Portsmouth Belt Line that's part of the
2   case; you understand that from reading some of the
3   documents in preparation?
4       A    That's correct.
5       Q    And what's your understanding of the
6   Norfolk Portsmouth Belt Line?  What type of
7   organization is it?
8       A    The Norfolk Portsmouth Belt Line is a
9   terminal railroad.
10      Q    When was the first time at CSX you had any
11  interactions with the Norfolk Portsmouth Belt Line?
12      A    When you say interactions, do you mean
13  with officers or employees?
14      Q    Yeah, when -- as part of your job duties
15  at CSX, when was the first time you became aware of
16  the Norfolk Portsmouth Belt Line and started doing
17  any work related to it?
18           MR. JUSTUS:  Objection, compound.
19           You can answer if you understand.
20      A    As a lawyer in the CSX law department, it
21  was late 2008.
22  BY MR. LYNCH:

Page 29

1  Q    Did your work as an in-house counsel in
2  the year or two before attending NPBL meetings, was
3  that part of the calculus about why you became a
4  board member, to your knowledge?
5       MR. JUSTUS:  Objection to the extent it
6  calls for privileged communications.
7  A    Do I -- do I know why?  I don't -- I don't
8  know specifically why.
9  BY MR. LYNCH:
10 Q    Did you believe you were qualified to
11 serve as a board member at NPBL?
12 A    Despite it not being -- being my first
13 time, I guess I -- I was confident that I could
14 serve my duties there.
15 Q    It's fair to say you have been a lawyer
16 your whole life, right, adult life?
17 A    It feels like it, yes.  Yes.
18 Q    You've never had any type of businesses or
19 operational jobs for CSX or any other railroad,
20 correct?
21 A    That's correct.
22 Q    So you were -- the expertise you brought

Page 41

1   if they wanted to?
2            MR. JUSTUS:  Just object to clarify.  He
3   can answer this to the extent he's answering his
4   understanding as an NPBL board member --
5            MR. LYNCH:  Totally.
6            MR. JUSTUS:  -- but not as his
7   understanding as a CSX lawyer.
8   BY MR. LYNCH:
9       Q    Yeah, and all my questions right now are
10  directed to you as an NPBL board member, not as a
11  CSX in-house counsel.  And you were on the board
12  from 2010 to 2015, correct?
13      A    Correct.
14      Q    Okay.  And when you were a board member,
15  did you understand that -- when you first became a
16  board member, the two shareholders were CSX and
17  Norfolk Southern, correct?
18      A    Correct.
19      Q    And you understood, based on your reading
20  of the operating agreement, that Norfolk Southern
21  and CSX could sign an agreement changing whatever
22  term they wanted to in the operating agreement,

Page 45

1    Q    Okay, Article Ninth.  I know it's a little
2   odd.  So I'm going to ask you about certain portions
3   of this section.  The first part of ninth that I
4   want you to look at for me and I'm going to ask you
5   some questions is where it talks about a uniform
6   rate that shall be fixed for the movement of freight
7   cars.  Do you understand what a uniform rate is?
8        MR. JUSTUS:  Just to be clear, you know, I
9   don't think you're getting into anything else, but
10  to the extent he can answer in a nonprivileged way,
11  he will be answering as his understanding when he
12  was a member of the NPBL board, not any prior or
13  subsequent understanding.
14  BY MR. LYNCH:
15   Q    I'm asking you as a board member
16  presently.  When you were a board member, did you
17  understand what a uniform rate was?
18   A    While I was a board member, I understood
19  what a uniform rate was.
20   Q    Okay.  And in the context of this
21  agreement, didn't a uniform rate mean that the eight
22  owners of NPBL would all be charged the same rate?

Page 48

1   based on commodity in the operating agreement, do
2   you?
3           MR. JUSTUS:  Objection to form.
4       A   I haven't read the whole agreement, but in
5   Article Ninth?
6   BY MR. LYNCH:
7       Q   Yeah.
8       A   No.  There's a distinction, I suppose,
9   between loaded and empty at least.
10      Q   Okay.  We'll get to that in a second.  But
11  you'd agree with me that the uniform rate for moving
12  cargoes on freight cars, if it was $200 per freight
13  car for Chesapeake and Ohio, it needed -- it had to
14  be $200 for Norfolk and Carolina Railroad,
15  correct --
16          MR. JUSTUS:  Objection to form.
17  BY MR. LYNCH:
18      Q   -- that's what uniform rate means?
19          MR. JUSTUS:  Objection, calls for a legal
20  conclusion.
21  BY MR. LYNCH:
22      Q   You can answer based on your understanding

Page 49

1  as a board member at the time.
2      A   Sure.  I'm sorry, could you give the
3  example again, please?
4      Q   Yeah, for moving freight on a car on NPBL,
5  if it was $200 per freight car for Chesapeake and
6  Ohio, which is one of the shareholders, it had to be
7  $200 for the Norfolk and Carolina Railroad, which is
8  another shareholder, right?
9          MR. JUSTUS:  Same objection.  Also
10 objection, vague on what freight car means.
11     A   Yeah, I'd agree that as long as the
12 commodity is the same as well, then yes, I agree.
13 BY MR. LYNCH:
14     Q   But you'd agree, we've already asked you
15 this, commodity is not mentioned in section ninth,
16 correct, any distinguishing based on the uniform
17 rate?
18         MR. JUSTUS:  Objection to form.
19     A   I'd agree with you as a technical matter
20 it also meant -- references passengers, but I
21 never --
22 BY MR. LYNCH:

Page 50

1  Q   So, again, the uniform rate means all
2  these eight railroads in this operating agreement
3  should be charged the same thing, correct?  Isn't
4  that what uniform means to you?
5       MR. JUSTUS:  Objection, asked and
6  answered, argumentative, calls for legal conclusion.
7  BY MR. LYNCH:
8  Q   You can answer that question.
9  A   So in my capacity as a board member?
10 Q   Yes.
11 A   I couldn't get -- it would be difficult to
12 isolate even just this document from the many
13 documents I read before it including the tariffs and
14 the board minutes describing the desire to change
15 rates for various commodities.
16 Q   Taking away the commodity issue,
17 regardless of the commodity, even if it was the same
18 commodity let's say, the rate had to be the same for
19 each one of the shareholders, correct?
20      MR. JUSTUS:  Objection, vague.
21 A   I don't know how to take it -- out the
22 commodity and say that is correct.

1    NSR.

2    BY MR. LYNCH:

3        Q    And you would agree with me it would have
4    been inconsistent and a violation of the operating
5    agreement for that fee to be $100 for Norfolk
6    Southern and 210 for CSX, correct?

7            MR. JUSTUS:  Objection, calls for a legal
8    conclusion.

9    BY MR. LYNCH:

10       Q    That would be a violation of Article Ninth
11   of the operating agreement.

12           MR. JUSTUS:  Same objection.

13   BY MR. LYNCH:

14       Q    Wouldn't you agree?

15       A    As a board member, I would not agree that
16   CSX should have a different rate for a switch of a
17   car depending on what the commodity is.

18       Q    So depending if it was -- whatever
19   commodity it was, Norfolk Southern and CSX should
20   have the same rate while you were a board member.
21   You believe that to be consistent with Article Ninth
22   of the operating agreement, correct?

1  question. Other than 210 being too high, is
2  there --
3  BY MR. LYNCH:
4      Q    Yeah, you said you thought 210 was too
5  high because there wasn't sufficient intermodal
6  traffic at the Belt Line. That's what you said.
7      A    I said that there was no traffic that --
8  that I wasn't aware of the Belt Line handling any
9  intermodal traffic? True that I've said that, I'm
10 not aware of the Belt Line handling any intermodal
11 traffic.
12          The $210 over time appeared to be
13 something that either CSX or the customer or some
14 combination was able to absorb for nonrail traffic.
15 I'm not on the commercial side. I don't know
16 whether more traffic would have been moved, whether
17 it be grain, coal, what have you, or less, but the
18 distinction between some traffic moving versus zero
19 was how I would base my view that $210 was too high
20 for intermodal traffic.
21     Q    At that time while you were on the board,
22 did you advocate at all for CSX to have a lower line

Page 141

1  the customer paid it or the exact logistics of it.
2  Do you remember that?
3      A   Yes, I remember the statement, and what I
4  meant was that I don't know the -- it may vary by
5  customer, commodity, et cetera, whether the line
6  haul carrier absorbs the full $210, whether it
7  absorbs a portion, or whether it pays the 210
8  itself.  The Belt Line receives the payment, as I
9  understand it, regardless, it's just a question of
10 who's paying the -- ultimately whose pocket the $210
11 comes out of.
12     Q   When you were on the board, did you
13 believe the 210 line haul switching fee was
14 unreasonable and excessive under any of those
15 scenarios?
16     A   With respect to the commodity in
17 intermodal, yes, but I didn't know enough, frankly,
18 about how the commercial aspect worked in terms of
19 who's the freight payor to make that judgment, if
20 that's sufficiently clear.
21     Q   And CSX thought at the time you joined the
22 board and today that the 210 line haul switching fee

Page 165

1           MR. JUSTUS:  Take your time looking
2   through the rest of it if you need to get context.
3       A    Okay, I'm sorry.  You haven't asked a
4   question.
5   BY MR. LYNCH:
6       Q    I wanted to make sure you have enough time
7   to read.  I'm talking really directing you to the
8   last bullet or dash under opinion.
9       A    Yes.
10      Q    The last sentence says:  Our current plan
11  is forced to run single stack, and our operating
12  performance to Cleveland is 32 hours.
13           Do you see that?
14      A    Yes.
15      Q    Would you agree with me that from a
16  competitive standpoint with Norfolk Southern, you
17  were at a disadvantage out of NIT because you
18  couldn't double stack to that part of the country?
19           MR. JUSTUS:  Objection, lack of
20  foundation.
21      A    I don't -- again, I don't have -- I'm not
22  a commercial expert or market expert.  On the one

Page 248

1   A   Yes. I wouldn't know how long it would
2   take to conduct commercial and operational analysis,
3   and I don't believe that it would necessarily need
4   to go to a rate committee per se, but -- so I don't
5   have a useful answer, I guess, on that.
6   Q   Okay. So I'm going to ask you, this was
7   sent on March 23rd, correct? You could see it?
8   A   March 23rd, 2018.
9   Q   Yeah. Would you agree with me that this
10  proposal never went to an NPBL rate committee?
11      MR. JUSTUS: Objection, foundation, calls
12  for speculation.
13  BY MR. LYNCH:
14  Q   Based on your understanding, did it ever
15  go to -- do you have any knowledge of it ever going
16  to a rate committee?
17  A   I'm not aware of it going to a rate
18  committee, the March 28th --
19  Q   March 23rd.
20  A   -- March 23rd, 2018, proposal, no.
21  Q   Are you aware of the March 23rd proposal
22  going to a board of director --

1     A    Yes.

2     Q    Okay.  In those communications, how did
3 you alert the people at CSXT whether you were
4 communicating with them wearing your board of
5 directors Belt Line hat or your CSX in-house legal
6 hat?

7     MR. JUSTUS:  Objection, asked and
8 answered.

9     A    So going back, I don't recall having any
10 conversations with individuals as an NPBL board
11 member.  I don't know where that -- the only
12 occasion would really be to communicate with the
13 Belt Line management or fellow board members.

14 BY MR. SNOW:

15     Q    Am I to understand that all your
16 communications with CSXT about the Belt Line would
17 have been in your capacity as in-house counsel for
18 CSXT?

19     A    That's my recollection.

20     Q    After Fredrik Eliasson stepped off the
21 Belt Line board, he was replaced by another
22 gentleman.  Do you remember who that was?

Page 310

1   looking at a facility there.
2       Q   And that ultimately didn't happen, right?
3       A   That's correct.
4       Q   Had it happened and had Perdue built that
5   new facility, it would have meant less business for
6   the NPBL; am I right?
7       A   Not necessarily.  As far as I'm concerned,
8   and, again, I'm not the commercial person, but that
9   was not my understanding.
10      Q   Okay.  So do you have any more
11  recollection then as to how in any way Mr. Moss's
12  conduct in relationship to that Perdue episode
13  breached his duties to NPBL?
14      A   I can't answer that without speculating
15  based on vague memories.  As I --
16      Q   I don't want you to speculate.
17      A   I don't have memory of what the concern
18  was, but I don't know if my memory on that is -- is
19  accurate.
20      Q   Okay.  Anything else?
21      A   I'm not -- I'm not an operating person, so
22  I don't -- I don't really understand the