# EXHIBIT B

# In The Matter Of:

*CSX Transportation, Inc. v.*
*Norfolk Southern Railway Company, et als.*

---

*Jeffrey Scott Heller*
*March 10, 2020*
*Confidential*

---

*Zahn Reporting*

Original File 03102020shjh.txt
Min-U-Script® with Word Index

1   document, we were still experiencing significant,
2   significant operating issues throughout the Port of
3   Virginia.
4           And I don't recall what the CSX
5   involvement was, but we would have been careful to
6   ensure that any activity with the port did not displace
7   our own business that was already being displaced by
8   their operational challenges.
9       Q   Was your business at NIT being displaced
10  in April of 2014?
11      A   I actually don't recall the timing.
12          I do -- will take you back to the
13  discussion with John Reinhart about moving freight out
14  of Port of Virginia.
15      Q   And that was --
16      A   That was here.
17      Q   Two months prior.
18          (Heller Exhibit Number 16 marked.)
19          THE WITNESS: Okay.
20  BY MS. DOUGHERTY:
21      Q   Sir, Heller Exhibit 16 is a one-page
22  document bearing Bates Number NSR00005173. It appears
23  to be, at the top, a calendar invite from Carol
24  Sensenig --
25      A   Sensenig, my assistant.

Confidential

147

1   Q   -- on March 15, 2016, and below that is
2   an email from you to Mr. Elkins, copying Mr. Luebbers,
3   Mr. Joyner and Miss Sensenig. The subject is, "NIT
4   Expansion - Pilot Article 3-15."
5       You write, "Ed, we would ask that you and
6   Chris prepare an update of our strategy regarding NIT
7   access."
8       What is Norfolk Southern's strategy
9   regarding NIT access?
10  A   Our strategy is to ensure that we're able
11  to serve our customers as effectively as possible. And
12  that's based on on-and-off experiences with congestion
13  and the complexity associated with actually running a
14  train between the Portlock yard and NIT.
15  Q   You'd like him to prepare an update of
16  your strategy regarding NIT access to include the
17  latest on the trackage rights negotiation with the
18  NPBL.
19      Do you mean the Norfolk & Portsmouth
20  Belt Line with that acronym, sir?
21  A   Yes.
22  Q   And how was your strategy or
23  Norfolk Southern's strategy related to NPBL trackage
24  rights negotiation?
25  A   Being aware of how that's going.

**Confidential**

148

1          The trackage rights agreement was a
2 long-term, 100-year agreement that was up for
3 renegotiation, and we wanted to be aware of any
4 implications from that as a result of this discussion.
5        Q    How could the outcome of that negotiation
6 impact your strategy regarding NIT access?
7        A    It's just good information to know.
8 [REDACTED]
9
10
11
12
13
14
15        Q    Was there a time that there was announced
16 that there would be an expansion of the NIT facility?
17        A    There was. The port has invested since
18 the time -- since the time of the congestion issues
19 that they had back over this period of time, the port
20 has made a significant amount of investment in their --
21 their on-dock capabilities in the rail infrastructure
22 there.
23        Q    And referring to the subject line of the
24 email, which is "NIT Expansion - Pilot Article 3-15,"
25 do you recall that Pilot article and the expansion at

Confidential

149

1  NIT in March of 2016?
2       A       No, I don't recall the article.
3
4
5
6
7
8
9
10
11      Q       So expanding NIT, how could that harm
12  your capacity?
13      A       It shouldn't.  It's a good thing.
14      Q       Who would encroach upon your capacity?
15      A       I don't know.
16      Q       Were you concerned about CSX encroaching
17  upon your capacity?
18      A       We're always cognizant of activities
19  going on with our -- our competitor.
20              They were serving NIT at the time.  They
21  still serve NIT today.
22              And so we just need to be aware of any
23  infrastructure developments that are going on that
24  might change that.
25      Q       There was an indication that this -- our

1   A    I actually don't recall.  Somebody with
2  NS.
3   Q    How about Tracy Tidwell who's copied on
4  the originating email?
5   A    I don't recall.  I won't guess.  Sorry.
6   Q    The subject line of the email, "NPBL -
7  CSX.  David, Mr. Elswick and I had a meeting today with
8  the NPBL and they were inquiring about some time that
9  they could get into NIT so that they could give quotes
10 to the CSX for moving traffic into and out of NIT."
11       The first question is, does Norfolk &
12 Portsmouth Belt Line need to get permission from
13 Norfolk Southern to enter NIT?
14  A    No.
15       We do need to collaborate on an effective
16 operating plan, given the limitation on rail
17 infrastructure there and the potential for interaction
18 between our trains, literally, and their trains.
19  Q    When there's a potential for a conflict
20 of trains, does Norfolk Southern always prevail?
21  A    No.  I would say we work out -- we try to
22 work out an effective operating plan for both parties,
23 as we have done, at least in this time period, at least
24 one time before.
25  Q    It continues, "Cannon Moss with the

1  NPBL."
2          Who is Mr. Moss?
3      A   He is the president of the NPBL.
4      Q   Mr. Moss reported that, "They were
5  approached by the CSX and they wanted quotes for
6  traffic to NIT and Cannon told them they would discuss
7  at the NPBL board meeting, which is on April 18th.  Of
8  course we told them we could not accommodate a time for
9  them to go to or pull freight from NIT."
10         Were you aware of any prohibition on NPBL
11 coming in -- with going out of NIT?
12     A   No.
13         MS. REINHART:  Object to the form.
14 BY MS. DOUGHERTY:
15     Q   David Osborne forwards you this
16 information as information.
17         Was this something you typically asked
18 the people within your group to forward you?
19         MS. REINHART:  Objection to the form.
20         THE WITNESS:  No.
21 BY MS. DOUGHERTY:
22     Q   What was your understanding of why
23 Mr. Osborne forwarded you this information?
24     A   To keep me appraised of any activities
25 that might be going on in and around any port.  He

1  would do the same in Charleston, Savannah, Port of
2  New York. Just to stay on top of any competitive
3  activities.
4      Q    Had you been asked to have people report
5  to you about NPBL activities?
6      A    No.
7      Q    Had you gotten updates before from
8  Mr. Osborne about NPBL activities?
9      A    I don't recall.
10     Q    Do you know what Mr. Osborne's
11 relationship was to the NPBL?
12     A    He would -- I don't, other than in the
13 capacity of a service design person with
14 Norfolk Southern.
15          So he would be responsible for working
16 with any connecting carrier or another railroad that we
17 do business with to work out, again, an effective
18 operating plan in a geographic region.
19     Q    Prior to receiving this email, were you
20 aware that CSX wanted to -- quote, wanted additional
21 traffic to move into and out of NIT"?
22     A    I wasn't aware of the specific nature of
23 this.
24          They have access today. I believe the
25 Belt Line has rates for them, and that's between them

Confidential

173

1  and the Belt Line.

[lines 2-13 redacted]

14              (Heller Exhibit Number 22 marked.)
15              THE WITNESS:  Okay.
16  BY MS. DOUGHERTY:
17       Q      Heller Exhibit Number 22 a six-page
18  document from April 13, 2018 starting with NSR00076457.
19              The first-in-time email is an email from
20  John Reinhart to Cannon Moss -- we have identified
21  those two people already.
22       A      Yes.
23       Q      -- copying Jim Squires, Jim Foote and
24  Shannon Valentine.
25              Was Jim Squires still the CEO of

Norfolk                ZAHN COURT REPORTING      Richmond
(757) 627-6554                                (804) 788-8899

Confidential

204

1  agree with the operating plan to ensure it was good for
2  both railroads.
3  BY MS. DOUGHERTY:
4      Q    A few steps back in the chain you are
5  ultimately included on, Mike Irvin writes an email to
6  Mr. Sliger, "This is something that has never been done
7  before."
8           To the best of your knowledge, before
9  this April 2015 move, had CSX traffic ever been moved
10 to NIT by the Norfolk & Portsmouth Belt Line?
11          MS. REINHART:  Objection to the form.
12          THE WITNESS:  Not that I can recall.
13 BY MS. DOUGHERTY:
14     Q    We went through several Norfolk Southern
15 employees who served on the Norfolk & Portsmouth Belt
16 Line board.
17          Did you ever discuss NPBL matters with
18 any board member or officer of the NPBL?
19     A    Certainly in a non-NPBL board member
20 capacity, our VP of transportation, VPs of engineering
21 and VPs of finance are aware because we're engaged all
22 the time, especially at a department head -- on a
23 department head basis, that it's important for them to
24 be as involved as possible and aware of our business as
25 possible.

1    Q    Did you ever participate in a meeting at
2    which Norfolk & Portsmouth Belt Line matters were
3    discussed in advance of a board meeting?
4              MS. REINHART:  Objection to the form.
5    Vague and overbroad.
6              THE WITNESS:  No.
7              (Heller Exhibit Number 27 marked.)
8              THE WITNESS:  Okay.
9    BY MS. DOUGHERTY:
10   Q    Heller Exhibit Number 27 is a two-page
11   document, an email string in April 2009 starting at
12   NSR00027114.
13             The original message is from Mark Manion.
14   Who is Mark Manion?
15   A    At the time he was our chief operating
16   officer.
17   Q    He sends a message to you, copy to
18   several people in the copy line there, Mike McClellan,
19   Don Seale, Tim Drake, Jake Allison, Pamela Evans and Ed
20   Carbaugh.
21             Are certain of those individuals members
22   of the NPBL board?
23             MS. REINHART:  Object to the form.
24             You mean at the time of this email?
25             MS. DOUGHERTY:  I do, yes.

Confidential

206

1    Thank you, Counsel.
2    THE WITNESS: I don't believe so, but I'm
3  not sure.
4  BY MS. DOUGHERTY:
5    Q    Was Mark Manion on the NPBL board at the
6  time of this email?
7    A    No.
8
9
10
11
12
13
14
15
16
17
18
19    Q    What do you recall about the situation
20  around this email?
21    A    I really don't recall, other than our
22  chief operating officer asked for us to provide one of
23  our subject matter experts on costing of railroads and
24  rate making and, to some extent, the international
25  connectivity between ocean carrier business and other

1  railroads, asked me to supply someone who could
2  represent the company on NPBL rate committee.
3       Q     What was your understanding of the
4  purpose of the rate committee, why it was being
5  convened?
6       A     To review the rates of the Belt Line.
7       Q     Specifically for movement of CSX
8  intermodal business into NIT or all NPBL rates
9  generally?
10            MS. REINHART:  Objection to the form.
11            THE WITNESS:  I'm really not sure.
12            I'm not clear about the rate structure on
13 the Belt Line overall.  So it may be one and the same,
14 but I'm not sure.
15 BY MS. DOUGHERTY:
16      Q     So prior to recommending individuals to
17 participate in the committee, did you know what was
18 under consideration specifically?
19            MS. REINHART:  Objection to the form.
20            THE WITNESS:  Not really, no.
21 BY MS. DOUGHERTY:
22      Q     Later on in the chain you forward this
23 email string to CD.
24            Is that Mr. Luebbers?
25      A     That's Chris Luebbers, yes.

Confidential

208



```
15       Q     So it would be defense against CSX; is
16   that correct?
17             MS. REINHART:  Objection to the form.
18             THE WITNESS:  No.
19   BY MS. DOUGHERTY:
20       Q     What would you be defending against?
21             MS. REINHART:  Objection to the form.
22             Misstates his testimony.
23             THE WITNESS:  I said it was a poor choice
24   of words.
25
```

1 segments out into what is now the port's -- used to be
2 the Belt Line yard. Now it's the port's own yard --
3 across Hampton Boulevard again, and then our road power
4 potentially would put the train together and head out
5 of town.
6       It's all clockwise.
7     Q    So then what happens when another
8 railroad is introduced as wanting to access NIT and do
9 the same thing that Norfolk Southern has just done in
10 terms of loading up freight and getting back out onto
11 the main line?
12     A    Well, when the Belt Line gives us notice
13 that they have traffic to go to NIT, they would come up
14 the back gate and they would position -- the Belt Line
15 would position the cars in the Belt Line yard and they
16 would come in counterclockwise, so in opposition to the
17 Norfolk Southern operation, and VIT would have to do
18 something similar in terms of -- you know, the
19 Belt Line, they have rights to go over across the
20 street onto NIT, if there's room for them to go, or the
21 marine terminal would send their locomotive out and
22 pick it up.
23       The sensitivities are there. There need
24 to be windows for both railroads so that we don't
25 conflict with each other, particularly in the case

1  that's referred to in 2015 where there were trains
2  parked all over both of our railroads. CSX had the
3  same issues. And we really didn't have capacity
4  anywhere in a spontaneous way to provide a quick
5  operating plan to allow them to get in.
6           So we needed to make sure we didn't
7  conflict with each other so that both railroads could
8  actively service NIT.
9      Q    You said "quick operating plan."
10          How quickly do you recall CSX wanted to
11 move that train?
12     A    Well, my recollection is it was requested
13 from one night for operation the next day.
14     Q    Is that typical?
15     A    Well, I would say it's not typical, first
16 of all, in a perfect situation, and it's certainly
17 not -- would not be considered typical in the
18 environment that we were in and the amount of
19 congestion.
20     Q    In the instance that's related in
21 Exhibit 26, did the CSX train move and carry the cargo?
22     A    Yes. We provided them with an operating
23 plan, and CSX was successful. I don't recall exactly
24 how many times, but they were successful. The
25 Belt Line was successful in moving the CSX train in and

Confidential

259

```
 1   out.
 2          Q     So was this the only CSX train that moved
 3   across the NPBL?
 4          A     In this timeframe?
 5          Q     That's right.
 6          A     I believe there were three.  It may be
 7   more.  I don't recall the exact number.
 8          Q     You mentioned the congestion and a
 9   particular problem going on in 2015.
10                Was that a chronic problem or episodic?
11          A     I would say the Ports of Virginia
12   experienced it.  I would characterize it more --
13   depends on what you define as chronic.  It was over a
14   protracted period of time they experienced congestion.
15                At some point early in 2014, again, there
16   was a new administration and a new CEO.  We were
17   approached by the port to displace business that we had
18   helped secure in the Ports of Hampton Roads and to help
19   bail them out and move into another port.
20                We ultimately -- needless to say, that
21   was pretty inflammatory for them to ask us to do that.
22                We ultimately worked out a structure
23   which allowed us to keep the freight there.  But it was
24   an example and a sign that the port could not handle
25   the activity or the business they had already.
```