1                  IN THE UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF VIRGINIA
2                          NORFOLK DIVISION


3

4   CSX TRANSPORTATION, INC.         )
                                     )
5              Plaintiff,            )
                                     )
6   v.                               )     Civil Action No.:
                                     )        2:18cv530
7   NORFOLK SOUTHERN RAILWAY         )
    COMPANY                          )
8   and                              )
    NORFOLK AND PORTSMOUTH           )
9   BELTLINE RAILWAY COMPANY         )
                Defendant.           )
10

11

                  TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS
12
                          (Motions to Compel)
13

14                          Norfolk, Virginia
                            September 4, 2020
15

16

17  BEFORE:        THE HONORABLE LAWRENCE R. LEONARD
                   United States Magistrate Judge
18

19

20

21

22

23

24

25

```
 1   Appearances: (Via Zoom)

 2        MCGUIRE WOODS, LLP
                    By: ROBERT WILLIAM McFARLAND
 3                       V. KATHLEEN DOUGHERTY
                         BENJAMIN LUCAS HATCH
 4                       Counsel for Plaintiff

 5        TROUTMAN PEPPER HAMILTON SANDERS, LLP
                    By: ALAN DURRUM WINGFIELD
 6                       MICHAEL EDWARD LACY
                         JOHN C. LYNCH
 7        -- and --
          REDGRAVE, LLP
 8                    By: MONICA McCARROLL
                         Counsel for Defendant Norfolk Southern
 9                       Railway Company

10        CRENSHAW, WARE & MARTIN, P.L.C.
                    By: W. RYAN SNOW
11                       DAVID CALDWELL HARTNETT
                         Counsel for Defendant Norfolk & Portsmouth
12                       Belt Line Railway Company

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                     P R O C E E D I N G S

2

3           (Proceedings commenced at 2:02 p.m. as follows:)

4

5           THE COURT:  Good morning, Cristi.

6           COURTROOM DEPUTY CLERK:  Good afternoon, Judge

7    Leonard.  We are ready to go forward.

8           CSX Transportation, Incorporated v. Norfolk Southern

9    Railway Company, et al., civil Action No. 2:18cv530.

10          Are the parties ready to proceed?

11          MR. McFARLAND:  Good afternoon, Your Honor.  Robert

12   McFarland on behalf of plaintiff CSX Transportation, and we are

13   ready to proceed.

14          THE COURT:  Good afternoon, Mr. McFarland.

15          MR. LYNCH:  Your Honor, John Lynch for defendant

16   Norfolk Southern, and we are ready to proceed.  Thank you.

17          THE COURT:  Thank you, Mr. Lynch.

18          MR. SNOW:  Your Honor, this is Ryan Snow for the

19   Norfolk & Portsmouth Belt Line Company, and we are ready to

20   proceed.

21          THE COURT:  All right.  Good afternoon, Mr. Snow.

22   Good afternoon, everyone.

23          All right.  This matter is scheduled for a hearing for

24   two motions, the first is ECF No. 200, and that is the Belt

25   Line's motion to compel CSX to provide more fulsome

1   interrogatory answers to Interrogatories Nos. 3 and 4, and ECF

2   Number 203, which is CSX's motion to compel additional

3   depositions and to reopen two depositions involving Norfolk

4   Southern people based on its claim of late discovery, late

5   documents provided.

6            So let's start.  Chronologically we start with the

7   Belt Line's motion to compel.  I assume you'll be arguing on

8   behalf of your client, Mr. Snow?

9            MR. SNOW:  Yes, sir.

10           THE COURT:  All right.  I've read the pleadings and

11  the briefing.  Have there been any further negotiation or

12  discussion with CSX about providing more complete answers to

13  your satisfaction?

14           MR. SNOW:  No, sir.  Nothing beyond the meetings

15  and -- meet and confers that happened before the filing.

16           THE COURT:  All right.  Is there anything you'd like

17  to add or emphasize from the briefing that you submitted?

18           MR. SNOW:  Well, I would, if it please the Court, Your

19  Honor, because I think some context would help.

20           We have been accused of a decades-long conspiracy, and

21  we propounded these two interrogatories because the only claims

22  against the Belt Line are conspiracy claims.  That's the only

23  way we're in this case.  And so what we asked were two simple

24  things:  Identify the specific things we did wrong, the

25  communications and the acts.  And more than that actually, Your

1  Honor, we said identify the circumstances surrounding those so

2  that we can understand how they're conspiratorial.  And we got

3  the hodgepodge of Bates numbers that Your Honor has seen and the

4  documents that we sent to the Court.  And I thought that --

5  something outside the briefing, but to put it in context, if we

6  think of another Rule, Rule 26(a)(1), that's the initial

7  disclosures rule, that Rule requires you to identify documents

8  by category that support your claims.  That's what I got.  I

9  didn't need interrogatories to get that information.  That's all

10 I got from CSX.  But the interrogatories asked for more.  They

11 are pointedly targeted to the specific things that we did wrong.

12 And there's been a lot of talk about the indirect versus direct

13 evidence in CSX's brief.  That's their defense.  That's a red

14 herring.  What we want are answers to our interrogatories,

15 whether direct or indirect.  Tell us the specific things we did

16 wrong, and the circumstances that make them conspiratorial,

17 which we did not get, Your Honor.  I've looked through every

18 document they gave us, and I can't make heads or tails of it.

19 And they're very good writers, their opposition brief did a good

20 job of explaining a couple of these, at least what their

21 position is, and we may take issue on the merits, but at least I

22 learned something.  You can't replace an interrogatory with an

23 opposition brief though.  They need to supply the interrogatory

24 answers, and that's what they haven't done.  And that's what we

25 need.

```
 1          What we've -- I'll give you a great example, actually,
 2   beside anything we talked about in the briefs.  The two core
 3   things that CSX has complained about in their complaint are a
 4   2010 rate proposal and a 2018 rate proposal where they asked for
 5   lower rates for their movement.  It may surprise the Court to
 6   learn the Belt Line has never rejected either one of those.  We
 7   never did.  Why?  Because no board member ever moved for the
 8   Belt Line to accept either one, including the board members who
 9   were appointed by CSX.
10          So if you put yourself in the Belt Line's shoes for a
11   moment you say, where in the world is the conspiracy?  These
12   answers to these interrogatories were supposed to enlighten us.
13   Tell us what we've done wrong.  And they haven't, because I
14   don't think anything's there, but frankly, the case is massive,
15   the exposure to the Belt Line is massive, and to defend against
16   that at trial I've got to know the specific things that they
17   claim we did wrong.  More than a list of a hodgepodge of Bates
18   numbers where I have to put together the puzzle pieces to figure
19   out their contentions.  I shouldn't have to draw a sentence from
20   Page 4 and connect it to another document and then an attachment
21   to another document and figure out that CSX's contentions are
22   built with that puzzle.  The contention interrogatory rules, it
23   lets me ask them contention interrogatories so that I don't have
24   to put that puzzle together.
25          I know the case is big.  They filed it.  They have
```

```
 1   made these allegations of a 10-year, decades-long conspiracy,

 2   and frankly they need to tell us where they come from so that we

 3   can defend the case.

 4              THE COURT:  All right.  Thank you, Mr. Snow.

 5              I don't see Mr. McFarland on the camera anymore.  Who

 6   is going to argue?

 7              MS. DOUGHERTY:  I will be, Your Honor.

 8              MR. McFARLAND:  Ms. Dougherty will be arguing, Your

 9   Honor.  And Ben Hatch is also with us today in the Zoom call.

10              THE COURT:  All right.  Well, that's good.  I have two

11   former federal prosecutors who are going to explain why they

12   can't delineate overt acts of a conspiracy.  I'd like to hear

13   that, Ms. Dougherty.

14              MS. DOUGHERTY:  Your Honor, what the Belt Line has

15   asked us for is for specific communications and specific overt

16   acts that we contend form the basis of conspiracy.  They have

17   not asked us for direct evidence.  They have not asked us to

18   explain how each one of the communications we identified support

19   our theory.  Out of the 90,000 documents produced amongst the

20   three parties to this case, we identified about 100 of them that

21   we contend form the basis of the conspiracy alleged.  In their

22   motion and in their reply, the Belt Line indicates they have no

23   idea what they have done wrong and no idea how internal

24   communications between two Norfolk Southern employees would in

25   any way show a conspiracy with the Norfolk Portsmouth Belt Line.
```

1  I think in the documents we reviewed and explained in our

2  opposition we made clear how just because a communication is

3  between two Norfolk Southern employees doesn't mean that it

4  doesn't implicate or provide some evidence of a conspiracy.

5  Those are on Page 9 and 10 of our brief.  So I think at this

6  point, you know, we have answered the question they have asked

7  us.

8          In their reply brief they point to a particular case

9  where CSX was on the defense side, the In Re: Rail Freight

10  Surcharge Antitrust Litigation.  And in that case, CSX asked for

11  each communication among or between any two or more entities

12  that we contend, standing alone, itself constitutes an unlawful

13  agreement.  That's a specific request for direct evidence of the

14  conspiracy.  That's not what they have asked us for in this

15  case.  We believe that based on the categories, the way you

16  categorize the documents to tie to the specific allegations in

17  the complaint and the nature of the conspiratorial actions, I

18  think we've sufficiently answered their requests, and I don't --

19  I find it hard to believe that at this point in the litigation

20  they'd have no idea what we allege they have done wrong.

21          THE COURT:  What have they done wrong?  I mean, what

22  are the overt acts -- if you were going to prepare an

23  indictment, what overt acts would you identify as being evidence

24  of the conspiracy?

25          MS. DOUGHERTY:  The theory of our case, Your Honor, is

1  that Norfolk Southern used the Norfolk Portsmouth Belt Line

2  Board and communication with the Norfolk Portsmouth Belt Line

3  management to make it essentially a tool for them to gain an

4  upper hand at the Norfolk International Terminal.  So some of

5  these communications we've identified show communications with

6  Cannon Moss, the president of the Norfolk Portsmouth Belt Line,

7  an employee from -- an email, one of the ones we reference in

8  our brief, from Norfolk Southern employee Jeff Heller to Norfolk

9  Southern employee Ken Joyner asking Mr. Joyner what is Cannon

10  Moss telling you with respect to intelligence regarding the Port

11  Authority's primary goals to get NS -- CSX access into NIT.  So

12  you have two Norfolk Southern employees asking what intel, what

13  backstory we're getting from the Norfolk Portsmouth Belt Line

14  management.  We think that shows that they're communicating in

15  an attempt to block CSX.

16          THE COURT:  Well, I'm still not sure I have the answer

17  to my question.  See, Ms. Dougherty, I understand your position

18  at least with respect to communications, but you've been asked

19  to identify overt acts.  So that means more than just pointing

20  to a document.  That actually requires an explanation of what

21  the overt act is.  So I'm having a hard time understanding why

22  you couldn't provide that information.  Because after all,

23  pointing to documents shows what evidence is, but it doesn't

24  necessarily describe what the overt acts are that form the basis

25  of the conspiracy.  And I interpret Question 4 as asking for

1   that information.  So why can't you provide it?

2          MS. DOUGHERTY:  Your Honor, we believe that our

3   responses about the communications identify those specific overt

4   acts.  The rate proposal that we put forward in 2010, particular

5   actions with respect to the sale and disposition of real

6   property, communications about CSX's requests to move intermodal

7   containers to NIT by way of the Belt Line.  So we did not

8   provide a list of overt acts, but we believe the communications

9   we identified in response to Interrogatory 3 identify those

10  overt acts with sufficient particularity that it could be

11  responsive to this particular interrogatory.

12         THE COURT:  What do you think about the Belt Line's

13  argument that a party can't point to another party's records is

14  responsive in reliance on 33(d)?  In other words, you've got to

15  point to your own records.

16         MS. DOUGHERTY:  I think it's accurate that Rule 33(d)

17  is generally not an adequate means of responding to contention

18  interrogatories that ask a party to explain its position or

19  theory of the case.  But they didn't ask us to explain their

20  theory of the case.  They asked for specific communications,

21  including identities of the persons involved, the data -- the

22  dates and circumstances and documents themselves.  And all that

23  data is available on the face of the documents cited or in the

24  metadata attendant to it.  We do not have to explain our

25  reasoning or explain our reasons why each communication supports

1    our theory.  So the reliance on Rule 33 is a little misplaced in

2    this context.

3             THE COURT:  All right.  Well, I guess let me take a

4    step back then.  Is it your position that Interrogatory 3 and 4

5    are not contention interrogatories?

6             MS. DOUGHERTY:  I believe it's a closer question, Your

7    Honor, but I think that they have asked us -- I mean the word

8    contend appears in them.  I don't think they have asked us to

9    identify and explain how each communication supports our theory

10   of the case.

11            THE COURT:  Well, you all keep wanting to talk about

12   the communications and I keep wanting to talk about the next

13   interrogatory, the overt acts.  And is it your position that

14   Interrogatory No. 4 is or is not a contention interrogatory?

15   Let's see if we can get an opinion on that.

16            MS. DOUGHERTY:  Your Honor, we would agree that

17   Interrogatory No. 4 is a contention interrogatory, yes.

18            THE COURT:  Okay.  Then with respect to 33(d)'s

19   provision about relying on business records, do you agree with

20   the proposition that the business records that must be relied on

21   have to be the Portsmouth's own, the party's own records?

22            MS. DOUGHERTY:  We would agree with that point, Your

23   Honor, yes.  I would point out -- sorry.

24            THE COURT:  Well, if you want to point something out,

25   because I have another question, but go ahead.

1        MS. DOUGHERTY:  Your Honor, I think we have in our

2   possession very few records of what could be evidence of overt

3   acts between NS and NPBL; that is, we're relying on records

4   being produced to us to support our theories and what we believe

5   has happened in this case.  CSX has very few if any records that

6   would tend to show a conspiracy between the two defendants in

7   this case.

8        THE COURT:  Well, understood.  But CSX is being asked

9   to describe what specific overt acts that the Belt Line and

10  Norfolk Southern have engaged in that forms the basis of a

11  conspiracy.  And so it would seem to me that you're not entitled

12  to rely on their business records; you actually have to describe

13  what those acts are.  And I think the Advisory Committee note

14  when that paragraph of the rule was adopted back in 1970 -- it

15  was actually Paragraph C at the time -- specifically mentioned

16  that it was for a party producing their own records.  And the

17  cases cited by the Belt Line along with many others that I've

18  read all seem to support that notion.  So it doesn't seem like

19  CSX should be entitled to rely just pointing to records in this

20  context.

21        And that leads me to the next part of the Rule, which

22  says the burden on the party can't be any greater -- in other

23  words on the requesting party -- can't be any greater than the

24  burden on the producing party.  And you've heard Mr. Snow

25  explain that these various identification of records doesn't

1    actually explain -- I understand about communications, right now

2    I'm talking about overt acts -- doesn't actually explain what

3    the overt acts are that are alleged to form the basis of the

4    conspiracy.  So again, I'm not sure how pointing to documents

5    answers that question.

6            MS. DOUGHERTY:  I understand, Your Honor, and I

7    believe that our position when we responded to this

8    interrogatory was that Interrogatory 4 could be, could be

9    answered by reviewing the communication identified in response

10   to Interrogatory 3.  And I understand the point Your Honor is

11   making and also the points that Mr. Snow has made today.

12           THE COURT:  All right.  Well, I've reviewed a lot of

13   the documents that were cited and I had a hard time

14   understanding what particular conduct on the part of these other

15   two defendants form the basis of the conspiracy.  And I believe

16   that under Rule 33(d) that definitely Question 4 is a contention

17   interrogatory and it requires more than an identification of

18   documents.  So what I'm going to do is I'm going to order CSX to

19   provide a more complete response to Interrogatory No. 4.,

20   identifying the overt acts.  And I'm sorry to bring in to your

21   prosecutorial background and Mr. Hatch's as well, but you all

22   have done a number of indictments.  You know what overt acts are

23   and you know how to articulate them.  So this shouldn't present

24   too much of a problem.

25           Now, one of the things that the Rule also provides is

1    that the Court can order that the contention interrogatory be

2    responded to at the close of discovery.  And to the extent that

3    discovery is still ongoing, they may disclose that information.

4    And frankly this timing of requiring a response suggests to the

5    Court that it's tied up with the next motion, which is whether

6    or not CSX should be entitled to perform some additional

7    discovery.  So I'm willing to hear argument as to whether or

8    not, if I order CSX to respond more appropriately to

9    Interrogatory 4, whether or not you think that's something that

10   can be done now or whether that's something that should wait

11   until the close of discovery.

12          MS. DOUGHERTY:  Your Honor, I'm going to ask Mr.

13   McFarland to address that evidence.  As you pointed out, it is

14   bound up with his particular motion, argument on next motion, so

15   with that I'm going to ask Mr. McFarland to take the podium.

16          MR. McFARLAND:  Your Honor, I would certainly think

17   that for this contention interrogatory, No. 4, CSX needs to be

18   afforded the opportunity to continue with discovery and to wait

19   until discovery is either complete or very close to complete to

20   fully answer that question.  As Ms. Dougherty pointed out, we

21   can't point to much in the way of specific documents that the

22   Belt Line has produced that show its conspiratorial nature.  The

23   nature of a business conspiracy is it tends to be done in

24   secret, and there's not a lot of documents necessarily, true

25   smoking guns.  What we do find now in the supplemental

1  production of documents that we received some things which we

2  believe further support our claims.  And I think with -- and I

3  don't want to get the cart in front of the horse, Your Honor --

4  but if we're permitted to use those documents for the

5  depositions that we're speaking, I think we will be able to more

6  fully answer the interrogatory, and I think that's helpful for

7  the Belt Line as well.

8          I will say this:  In sort of watching this as

9  certainly not a neutral observer but an observer on this motion,

10 I don't think Mr. Snow is saying he can't take the depositions

11 now, he's saying he wants a *per se* concrete answer to

12 interrogatory -- I think in particular Interrogatory No. 4.  And

13 I appreciate where he's coming from.  But he's not hamstrung,

14 frankly, in what he's going to be able to do in depositions and

15 to maybe go a little farther down the road, Your Honor, with the

16 Court's permission, as we were when we deposed Norfolk

17 Southern's employees and management, because we didn't have all

18 the documents that we were entitled to and clearly needed.  So I

19 think the situations are different.  I think it would be better

20 for both sides to wait until discovery is much -- if you'll

21 pardon the pun -- much further down the track before we answer

22 that or supplement the answer.

23          MR. SNOW:  May I address that, Your Honor?

24          THE COURT:  I've got a lot of names on the screen.  I

25 didn't know who said that.  Was that you, Mr. Snow?

1        MR. SNOW:  Yes, it is, Your Honor.

2        THE COURT:  No, I do want you -- I'm planning on

3   getting back to you.  I want you to address a couple of things

4   that I've discussed with Ms. Dougherty and now Mr. McFarland's

5   comment.

6        Before we get to the need for discovery and everything

7   else, let's start with the one discrete issue that I questioned

8   Ms. Dougherty at length about, which is with respect to the

9   overt acts.  CSX's position -- and this is with respect to

10  Interrogatory No. 3 -- whether that's a contention interrogatory

11  is open to debate, and in fact since you just asked for

12  communications, pointing you to documents reflects those

13  communications.  What do you think about that?

14       MR. SNOW:  It's absolutely a contention interrogatory.

15  It asks them what communications they contend support the

16  conspiracy.  And frankly Rule 33(d), the business records rule,

17  it doesn't allow this answer for the overt acts any more than it

18  allows this kind of answer for the communications.

19       In the interrogatory we asked for the specific

20  communications and the circumstances.  I can't emphasize that

21  enough.  We asked for the circumstances so that we can

22  understand how they believe or contend those communications are

23  conspiratorial.  And I looked through all of those Bates

24  numbers.  I can't discern that just by looking at these

25  documents.  Most of them, from our standpoint as the Belt Line,

1    are just conveyances of information.  Meeting minutes, things

2    like this, to Norfolk Southern.

3          THE COURT:  Well, wait a minute.  Isn't that a

4    communication?

5          MR. SNOW:  It is.  But what are the circumstances

6    which we asked for that make it conspiratorial?  That demands a

7    narrative answer.  That's why 33(d) just cannot respond to that

8    even for communications because nobody can understand why those

9    communications are responsive or conspiratorial at all.  And if

10   you think about this, as I go into these depositions, I would

11   like to ask CSX's witnesses -- I'm entitled to, in fact -- I

12   propounded these interrogatories in advance so I would have an

13   answer before I get to those depositions, so I can ask them why

14   do you say this is something bad, you know?  Why did this

15   communication show up in your narrative answer?  Right now I

16   can't ask them anything except to put 100 sheets of paper in

17   front of them, some of which are six pages thick, and I'm

18   supposed to pull out one sentence?  The Rule doesn't require me

19   to do that.  33(d) does not allow them to identify our business

20   records, or our records at all, as the sole answer.  It requires

21   a narrative answer.

22         THE COURT:  But I think I understand CSX's argument to

23   be this:  33(d) is not really applicable to this question

24   because it asks for communications which would include dates and

25   the persons involved, which presumably these documents disclose.

```
1   So the rub here is circumstances of communications.  Now you're
2   saying circumstances mean an explanation of how those
3   communications tie into establishing the conspiracy.  Frankly I
4   didn't interpret "circumstances" that way.  I interpreted
5   "circumstances" to mean was this at a meeting?  Was this at a
6   board meeting?  Was this an email from one person to another?
7   So there seems to be a dispute between the parties as to the
8   basic import of this question.  And if it's as you say and
9   you're correct, I would think if "circumstances" mean how does
10  this communication establish the conspiracy, then that would
11  require a narrative explanation.  But if it's just merely, if
12  "circumstances" just merely means in the form of an email or
13  it's in the form of a letter from one person to another or it's
14  in the form of somebody memorializing minutes from a meeting,
15  those are circumstances under which the communication arose.  So
16  why should, why should I find that it's the way you say it is as
17  opposed to the way CSX says it is?
18              MR. SNOW:  Because the question asks for the identity
19  of the documents and circumstances that they contend support the
20  conspiracy.  If I don't have the identity of the circumstances
21  that they contend make this communication support the
22  conspiracy, I'm at a total loss.  I've gained nothing of value.
23  And we're back to Rule 26(a)(1) where they're supposed to
24  identify this stuff anyway.
25              A good example is in our opposition brief they
```

1  identify some of these Bates numbers where if you put one Bates

2  number together with another Bates number and read the sentence

3  on the second page of that one, then you have the communication.

4  That's the communication.  Well how, how would I know that?  How

5  will I know that unless Your Honor orders a narrative response

6  to our requests even for a communication so that I know that

7  they're not pulling a line off of Page 1 or Page 6 that this is

8  the communication and this was the circumstance that makes it

9  support a conspiracy.  That's the only way that interrogatory in

10  my view could be read and have value.  Because that's what a

11  contention interrogatory does.  Otherwise I'm getting nothing

12  more than what Rule 26(a)(1) already entitles me, and that's the

13  answer they gave me.

14         THE COURT:  Well, no, you're, you're getting, you're

15  getting evidence of communications.  Specific evidence of that

16  specific topic.  I don't think under Rule 26 they would be

17  required to stipulate this is evidence of one overt act, this is

18  evidence of the second overt act, this is evidence of a

19  communication between these two individuals, this is evidence of

20  a communication -- I don't think that kind of detail is required

21  under Rule 26.

22         The real thing I'm struggling with here, Mr. Snow, is

23  the notion that saying the dates and circumstances of the

24  communications somehow infers the circumstances of how this

25  communication proves a conspiracy.  I'm not sure that's what was

1   asked.  You may have thought you asked that, but I'm not sure I

2   read that question that way.

3          MR. SNOW:  The only thing --

4          THE COURT:  And if all they have are memos to file or

5   things like that, then that's also evidence that they don't have

6   a direct communication between some Belt Line person and

7   somebody at Norfolk Southern saying, hey, let's see what we can

8   do to get CSX out of the picture or something like that.  If

9   they haven't shown you anything like that and haven't reported

10  anything like that, then they don't have any evidence of that.

11         MR. SNOW:  And that's really what their interrogatory

12  answer ought to say.  Because if you read our interrogatory, the

13  very last phrase in it says "And all documents that support your

14  answer."  Well, that's what they gave me, but they didn't give

15  me the answer.  And I know they say that Rule 33(d) doesn't

16  apply to this one, but if it doesn't apply, it's the only

17  subsection of Rule 33 that allows you to just plain old identify

18  documents.  If it doesn't apply, where in the Rule is there

19  authority for just giving me a list of Bates numbers?

20         THE COURT:  Well, that's a point.

21         Talk to me about what the subject Mr. McFarland raised

22  about the need for when this information might be produced and

23  how it relates to your discovery.

24         MR. SNOW:  Certainly, Your Honor.  I take a different

25  position.  I think the answers ought to be ordered now based on

1    the information they have now.  They have completed their

2    depositions.  Your Honor may order more, I'm not really part of

3    that motion, but if you do, they have a duty to supplement.  And

4    they ought to supplement just like any other contention

5    interrogatory.  Tell us what your contentions are now.  And the

6    reason that's important is because we haven't gone into our

7    depositions of CSX's people except in the very beginning.  I

8    need this information to make those depositions effective.  At

9    least the information that CSX has to date.  They filed this

10   suit.  It's based on stuff that's happened for a decade.  I

11   can't imagine that new things are going to come.  But either

12   way, the rules provide answers now, and then you can supplement.

13   And I think that is the solution here, is to order them to

14   answer as we requested, and if they need to supplement as

15   discovery continues, then they should do that.  And the Rules

16   already solve that problem.

17        THE COURT:  All right.  Mr. McFarland, let me go back

18   to Mr. Snow raises a fair point that says if this is not a

19   contention -- I'm talking now about Interrogatory No. 3. -- if

20   this is not a contention interrogatory then the Rule doesn't

21   permit you to point to any records, business or otherwise.

22        You might be on mute because I can't hear you.

23        MS. DOUGHERTY:  Apologies, Your Honor.

24        I think that the particular phrase of their

25   interrogatory asking about the circumstances of the

communications we have addressed by categorizing the Bates

numbers into groups based on allegations, communications

regarding the particular service proposal, communications

regarding the sale and acquisition of real property.  So apart

from -- the best and most efficient way for them to understand

our answers to interrogatory is by looking at the documents

themselves which answer the question.  The dates, the person,

and the circumstances that pertain to each of the listed

categories that we broke out these documents into in responding

to Interrogatory No. 3.

        THE COURT:  All right.  Here's what I'm going to rule.

I'm going to grant the Belt Line's motion, and I'm going to find

that Rule 33 does not permit the responding party in this case,

CSX, to just point to the business records of the other side in

lieu of an answer.  I find persuasive both the Calhoon v.

Liberty Northwest Insurance Corporation case out of the Western

District of Washington, which is 789 F.Supp. 1540, and I also

find persuasive a case that nobody cited, which is United States

-- find it here, which is United States ex rel Landis v.

Tailwind Sports Corporation.  That's at 317 FRD 592.  It's out

of the District of Columbia.  That case has found that

Rule 33(d) cannot be used to respond to contention

interrogatories; that when the party who is more familiar with

the contentions than the government tries to rely -- excuse me,

when the party who is more familiar with contentions, their own

1   contentions than the other side, the burden is not equal in

2   having the other side try to figure out how those documents

3   respond to that.  And finally that Rule 33(d) in and of itself

4   should be found in the business records of the party who is the

5   requestor, the interrogator -- excuse me, the responder.  In

6   other words, you can cite to your own records, but you can't

7   cite to the records of the other side.

8           So I'm going to require CSX to respond to both of

9   those interrogatories by providing basically a narrative

10  response and explanation of what those communications are and an

11  explanation of what the overt acts are.  I think the Belt Line

12  is entitled to have that information.

13          Now I'm going to defer for a moment about when I'm

14  going to require those responses, because I want to talk about

15  the next motion, which is ECF No. 203.  That is CSX's motion to

16  compel depositions of Mr. Booth and Mr. Martinez and to reopen

17  the depositions of Mr. Heller and Mr. McClellan.  So who is

18  going to argue that motion on behalf of CSX?

19          MR. McFARLAND:  Good afternoon, Your Honor.  I am.

20  Robert McFarland.

21          THE COURT:  All right.  Mr. McFarland, I have again

22  read the pleading and I've read many of exhibits attached to

23  this motion, a lot of it is under seal.  I'll let you lead the

24  way about how much you want to talk about those matters which

25  are under seal, but why don't you go ahead and emphasize

1  anything you want to emphasize or add to any argument that you

2  made in your papers.

3          MR. McFARLAND:  Thank you, Your Honor.  And let me

4  say, we appreciate the opportunity to appear before the Court on

5  both motions and the Court making itself available as it has.

6          With respect to our motion to compel two new

7  depositions or additional depositions and to reopen two

8  depositions, it is first important to look at the context in

9  which we're making this motion and the background.  We began

10 discovery by propounding interrogatories and a Request for

11 Production of Documents in late October.  I believe it's

12 October 22nd.  But give or take, October 22nd of 2019.  Within

13 five days of when we could first really propound discovery under

14 the Court's scheduling order.  We didn't get documents for

15 months.  And when you look at the timeline of when documents

16 were produced, as of the end of January, we only had a few

17 thousand pages of documents.  The Court will recall that we were

18 very concerned about this because we saw our discovery cutoff

19 coming up in short order, and we couldn't even begin to take

20 depositions because we didn't have the documents that we needed.

21 And so we -- and it was a real, an insurmountable hindrance to

22 our expert to try to prepare an expert report because we didn't

23 have the documents.  So the Court will recall we filed a motion

24 with the Court asking both for an extension of our expert

25 witness report deadline and discovery.  We asked that our

1   discovery be extended to the same date the defendant's have.

2   Defendant's opposed that motion.  This Court, in ruling on the

3   discovery aspect of that motion, relied upon Norfolk Southern's

4   representation that it would substantially complete its

5   production of documents to the first request by February 7 of

6   2020.  By February 7 -- and we'll give them February 7., because

7   before the date of February 7 I think we had in the range of

8   3,500 documents.  By February 7 we had many more documents,

9   35,000; we still didn't have, though, what we -- much of what we

10  really needed.  And what turns out, as the Court will also

11  recall, we filed a second Request for Production on January 9th.

12  Now, Norfolk Southern wants to say, well, these documents that

13  we produced after February 7th all pertain to that second

14  request.  And by the way, it's 210,000 documents that were

15  produced after February 7th.  And the short answer is no, they

16  don't all pertain to the second request.  Because we were asking

17  about documents responsive to inquiries about the other ports on

18  the east coast repeatedly through the first Request for

19  Production of documents.  Did we get any documents that were

20  responsive to those by February 7th?  Those requests, no, we did

21  not.  We got 210,000 pages of documents while we were either in

22  depositions or after other depositions had been taken, such as

23  the 30(b)(6) representative of Norfolk Southern.

24          I would say this to the Court, because I think the

25  response is going to be, oh, no, these documents all went to the

```
 1   second one.  No. 1, the second request response was due

 2   February 10th.  What we got was a huge dump of documents on

 3   February 28th in the range of 95,000 documents.  By

 4   February 28th we were well into depositions.  Then we got an

 5   even larger production -- or dump as one might call it -- of

 6   105,000 documents on March 10th after our discovery cutoff had

 7   ended.  Now, what are we supposed to do?  And it turns out

 8   there's a lot of valuable, informative and evidentiary

 9   documents.  And we didn't get the chance to question people

10   about those documents.  Your Honor, I mean, regardless of if

11   they want to take the position, oh, they only pertain to the

12   second Request for Production, we still should have them by

13   February 10th.  But more importantly, it's 210,000 documents

14   that were produced.  In a purely good cause, which is our

15   standard here, purely good cause, that alone, regardless of

16   which production they go for, the fact that over two thirds of

17   their total production came after February 7th is grounds for

18   good cause for us to reopen these depositions.  And of course

19   under Rule 26, I think it's (a)(2), or -- it's their -- yeah,

20   it's 26(a)(2), it's their burden to show why the depositions

21   shouldn't be opened.  There's no prejudice to Norfolk Southern

22   from us taking two more depositions of new witnesses and

23   reopening, on the basis of what we were given, these two other

24   witnesses.

25              THE COURT:  Let me interrupt you, Mr. McFarland.  Let
```

1  me interrupt you for a moment.  You've used alternate terms to

2  describe what was produced.  You've variously said 210,000

3  documents and 210,000 pages.  Which is it?

4          MR. McFARLAND:  It should be pages, Your Honor.  And I

5  apologize.  It is 210,000 pages out of a total production of

6  approximately 300,000 pages.

7          THE COURT:  Okay.  Because I've noted that the parties

8  have sort of done that in their briefings.  They talked about

9  either how many documents they have produced or how many pages

10  they have produced.  And it makes that a little bit hard to

11  follow.  But go ahead.

12          MR. McFARLAND:  And with the timing of those

13  productions, Your Honor, we weren't able in any way to be able

14  to review them and incorporate the ones that we wanted into our

15  questioning of the witnesses.  And that is good cause.

16          This is not a novel issue.  We have cited to at least

17  a half dozen and maybe a dozen cases in which the courts under

18  these circumstances have let a party amend the scheduling order.

19  And I recognize we're here pursuant to 16(b), Your Honor, of the

20  Federal Rules, and then our corresponding Local Rule, but let

21  the party amend the scheduling order to take additional

22  depositions because they didn't have all the information they

23  were entitled to at the time.  And that's what we're asking.

24  The thing, if you will, Your Honor -- I mean, I'll point out,

25  it's not like we're asking for more depositions above and beyond

1  the 10 non-party depositions that one might receive, or some

2  great imposition here.

3          We also need to see where we are procedurally in this

4  case.  The case has been stayed, and we're trying to reopen

5  discovery in it and to get things moving again.  And that's

6  something maybe we can discuss with the Court in a bit.

7          But while this is going on, it's not as if we're

8  asking for more depositions at the expense of Norfolk Southern

9  not being able to take its depositions.  In fact, we would like

10  Norfolk Southern to begin taking depositions.  And I'll say this

11  to the Court:  The four depositions that we're seeking we'll

12  take them audio-visual.  I understand right now in the corona

13  world that precautions need to be taken and there are legitimate

14  safety concerns and people may not want to come in for an

15  in-person deposition.  I've done in-person, post-March 1st,

16  2020, but I've done a lot of video depositions.  We're willing

17  to do the video for these four.  I know Norfolk Southern has a

18  different point for when it comes to depose our people, but

19  we're willing to do video.

20          But Your Honor, I -- good cause is more than ample

21  here.  This Court didn't extend our discovery cutoff in February

22  because it thought that Norfolk Southern was going to comply and

23  produce what it said it would produce by February 7th, and it

24  hasn't.  I mean, there are specific documents that we're going

25  to use with these witnesses that we did not have on

1  February 7th.  And by the way, they were covered by our first

2  request.  And we need the opportunity to do that.

3          Mr. Snow is right:  This is a big case.  It's a

4  complex case.  It's our burden to prove our claims.  And to do

5  that, we're entitled to -- the rules absolutely provide that we

6  are entitled to the information that is responsive to our

7  requests and to be able to use that information.  And our hands

8  were tied, Your Honor.  We couldn't use the information that was

9  given to us during the depositions.  I mean, some of the

10 witnesses, Mr. Heller's deposition that morning, they show up

11 with thousand thousands of documents that pertain to Mr. Heller.

12 How are we possibly going to review those and incorporate them

13 into our questioning of Mr. Heller?  And that's what we've been

14 getting here, quite frankly.  And at this point we have moved

15 with diligence, we have acted with diligence, which is the

16 primary prong that the Court looks at in this circumstance.  You

17 don't really look at the prejudice to the defendant or the

18 non-moving party, you look at has the party that is seeking this

19 relief been diligent.  And my goodness, Your Honor, we acted, we

20 acted immediately when we were concerned back in January, the

21 Court said no, I think if they comply, you've got enough time.

22 Okay.  They didn't.  Once we had a chance to review the

23 literally 200,000 new documents and realize what was in there,

24 we came to this Court -- I mean, first we tried to work it

25 without Norfolk Southern.  We had numerous discussions, and what

1   they ended up saying -- and it's in their opposition so I'm not

2   inviting Rule 4:8 of the Federal Rules of Evidence -- is we'll

3   give you one 30(b)(6) deposition as to the documents.  Which

4   means we're going to produce somebody who's looked at the

5   documents and will tell you about them as essentially a third

6   party.  Well, that's not what we want.  We want the people who

7   either authored the documents or are on the documents and were

8   involved in creating them, discussing them and acting upon them.

9   A 30(b)(6) deposition doesn't fulfill our needs here, for

10  somebody to come in and say, well -- the best that person could

11  do is provide their hearsay third-party interpretation of the

12  document.

13          So Your Honor, and it's not -- although burden isn't

14  really a factor, this is not burdensome.  We are at a point

15  where the case is largely stayed, and we're saying let's use

16  some of this time to let us take some limited depositions based

17  on the information that we received tardily.

18          THE COURT:  All right.  Thank you, Mr. McFarland.

19          Who is going to argue on behalf of Norfolk Southern?

20          MR. LYNCH:  Your Honor, John Lynch is going to argue

21  for Norfolk Southern.  Thank you.

22          THE COURT:  There you are.  Good afternoon, Mr. Lynch.

23          MR. LYNCH:  Okay.  Judge, I'm glad that Mr. McFarland

24  and I agree on one point:  That diligence is the important issue

25  under the rules for determining this motion.  And we represent

1  to the Court that CSX was not diligent in pursuing this

2  discovery and they were not diligent in pursuing this motion.

3  And I'd like to give the Court some context on the discovery in

4  this case.

5          First of all, Judge, you know this case has been

6  pending since 2018, and then discovery didn't start until

7  December -- or I'm sorry October of 2019 because the motion to

8  dismiss hadn't been ruled on.  In late October and November, the

9  parties agreed on an ESI order, and they also agreed on 12

10  custodians.  Of the 12 custodians that Norfolk Southern offered,

11  Mr. Booth and Mr. Martinez were both identified in initial

12  disclosures and as custodians as early as November.  Also,

13  Judge, Norfolk Southern and CSX are competitors.  They own

14  companies together like this, the NPBL and other examples.

15  These companies know each other too.  So the case was pending

16  for a year, and both Mr. Martinez and Mr. Booth were identified

17  in November.

18          Talking about the first set of discovery requests,

19  Judge, and you heard Mr. McFarland talking during his

20  presentation, you didn't hear him mention one time the ESI order

21  or search terms.  When you -- obviously when you have document

22  requests in cases like this you sometimes ask for specific

23  documents.  Give me the contract, give me the memo.  But

24  largely, Judge, in a case like this, when you ask for

25  communications, when you have discovery between two big parties

1   in a case like this, the ESI order governs.  And under this ESI

2   order, you had to have search terms that were agreed upon by the

3   parties to proceed with the discovery, especially on the

4   communications that require going through all 12 of the

5   custodians.

6         So in this case, Judge, the first set, as Mr.

7   McFarland said, was propounded late October, early November.  We

8   had a negotiation on the search terms.  The search terms were

9   finally agreed upon, and we represented to Mr. McFarland and to

10  the Court when we opposed the motion for extension that we would

11  substantially comply with the documents and produce the

12  documents for the first set of document requests by

13  February 7th.  And we produced 91 percent of the documents that

14  were responsive to the first set by February 7th, and this Court

15  denied the motion for extension.

16        Going to the second set of discovery, which is really

17  what's at issue in this case, Judge, that was propounded on

18  January 9th, and that was also mentioned in the motion for

19  extension that you denied.  On January 17th, 8 days later,

20  Norfolk Southern proposed search terms, had a meet and confer on

21  January 21st, more communications, trying to get an agreement on

22  the search terms.  And during that time period, Judge, CSX took

23  14 depositions of Norfolk Southern and NPBL representatives,

24  including a 30(b)(6).  They did not agree at all to have the

25  search terms that we proposed be done until February 20th, and

1   their discovery cutoff was March 3rd.  So there was an agreement

2   on February 20th, during the time they were taking depositions,

3   that search terms were agreed upon.  So we have an agreement on

4   February 20th, our first document production after agreement on

5   search terms was February 28th, which was 15,000 documents, and

6   then our second production was March 10th, which was 13,588

7   documents.

8           Mr. McFarland says some of those documents were also

9   responsive to the first set of document requests, but they

10  weren't responsive in large part to the search terms that were

11  agreed upon.  The search terms governed the search and the

12  production that was made in the case.

13          Also, Judge, so the diligence here, when you're

14  talking about it, if they wanted those documents so bad when

15  they sent that second set of document requests, why did they

16  wait until February 20th to agree on search terms and tell us to

17  start the search?  We proposed the search terms one week later.

18  They waited for over a month and didn't file any motion, and we

19  finally agreed on the search terms on February 20th, and then we

20  produced all of the documents after the agreement on the search

21  terms within eight days and 19 days.  So Judge, it's important

22  for us to represent to the Court, we did not sandbag CSX.  We

23  did not delay.  Once we had the search terms, we produced the

24  documents promptly.

25          Mr. McFarland also mentioned the deposition of Jeff

1  Heller that he took on March 10th.  Two of the documents that

2  came from -- that he used during that deposition came from the

3  February 28th production.

4         We represent to the Court, Judge, when you're pursuing

5  discovery in a larger case and you have an ESI order and

6  sophisticated computer attorneys and companies on each side, and

7  you know it's going to require production of emails and

8  voluminous documents that are outside basic meeting minutes,

9  basic contracts, and you're trying to get emails, you've got

10 to -- in the Eastern District of Virginia and you have an ESI

11 order, you've got to act promptly, and they did not.  They were

12 not diligent at all in trying to get the documents from the

13 second set of production of documents.  Judge, they, I believe,

14 knew they weren't diligent and they knew they were having to

15 take the depositions.

16        Let me go to my second point about how they didn't

17 raise this issue with diligence and timeliness to this Court.

18        So Judge, as everyone knows, by March 13th we were

19 actually flying home with Mr. McFarland from taking depositions,

20 and that's kind of when the pandemic world hit as far as when we

21 had to put the brakes on the case.  We had taken a couple

22 depositions of CSX that week.  I think Mr. McFarland's last

23 deposition was March 10th of Mr. Heller.  And mid-March, we had

24 to, you know, stay the case because of the pandemic.  We had

25 calls, Judge, March, April, May, about, you know, should we be

extending the stay on the case and what should we be doing to

communicate with both you, Judge, and Judge Davis about this

case and whether the stay should be extended.  No time in March

did they file a motion or even mention this issue.  No time

during the entire month of April did they mention this issue.

During the entire month of May, they didn't mention this issue.

The first time they mentioned that they would need additional

depositions was in a phone call on June 2nd that was followed up

by a letter on June 5th.

So what we believe, Judge, is going on here, and

again, the pandemic has affected all of litigation, it's

affected all of us in our personal lives, but we don't believe

this situation with the pandemic should allow them to do a

do-over on depositions.  And first of all, they weren't diligent

in producing and seeking the documents under the first set of

discovery -- I mean the second set of discovery, because they

didn't agree on the search terms in time to get those documents

for the deposition.  This Court had already denied a discovery

extension.

Let me talk about Mr. Martinez and Mr. Booth, Judge.

These companies, like I said earlier, know each other.  We

identified Mr. Martinez and Mr. Booth back in October and

November.  They made a litigation choice that they were not

going to depose Mr. Martinez and Mr. Booth.  They were named as

custodians and they knew about them.  In the reply brief what

1    CSX has said, well, in your first response to the documents you

2    produced on February 7th, Mr. Martinez was in 1,500 documents,

3    but then in your late production, so-called late production on

4    February 20th -- or I mean February 28th and March 10th he was

5    in 2,500 pages.  So that's their argument that they get to

6    depose Mr. Martinez now because his name's referenced more in

7    the second production than the first production.  That's the

8    same argument with Mr. Booth.  They want a do-over now for the

9    depositions of Mr. Martinez and Mr. Booth.  They shouldn't be

10   allowed to use the pandemic to have a do-over for those two

11   people.

12           Then with respect to Mr. Heller and McClellan, Judge,

13   both those witnesses were deposed for seven hours.  They asked

14   all the questions they had about their claims.  If they had

15   other documents and other emails, frankly, Judge, in the context

16   of seven hours, you could never get through asking all these

17   witnesses about every single piece of paper.  They used, I

18   think, over 50 exhibits with both deponents and they already

19   spent their time with McClellan and Mr. Heller.  And we don't

20   believe, because they weren't diligent in pursuing their second

21   set of discovery, that these witnesses should be subjected to

22   another deposition who are having it reopened even for a

23   shortened period.

24           What we did, Judge -- and we had several phone calls

25   and a letter exchange -- and given the situation and to be fair,

1  we thought it was a generous offer -- to offer a 30(b)(6)

2  deposition on the documents that were produced.  And Judge, they

3  wouldn't, they flatly refused that.  We have several telephone

4  calls and several letters.  But we feel like that was -- we came

5  to the middle, and frankly they didn't come to the middle at

6  all, given a situation where we believed they weren't diligent

7  in pursuing the documents or frankly pursuing this issue, Judge.

8  They waited three months after the close of their own discovery

9  to even have a meet and confer on it.

10         So Judge, for that reason we'd ask for this motion to

11  be denied, and if the Court is leaning to give them any relief

12  on this issue, we think our proposal of a 30(b)(6) is the

13  appropriate thing to do.

14         THE COURT:  All right.  Thank you, Mr. Lynch.

15         Let me begin by asking you who authored the Norfolk

16  Southern's brief in opposition to CSX's Emergency Motion to

17  Amend the Scheduling Order and Extend its Expert Witness and

18  Discovery Deadline, ECF No. 111 that was filed on January the

19  27th?

20         MR. LYNCH:  Who authored it, Judge?

21         THE COURT:  Yes.

22         MR. LYNCH:  I don't know at this time.  I don't know

23  who -- when you say "who authored" --

24         THE COURT:  There's a lot of names on it, and that S

25  line is Michael Lacey.  And Mr. Lacey, did Mr. Lacey write this?

```
 1            MR. LYNCH:  Mr. Lacey's on the line.  I don't know if
 2   he authored it or not, and Judge, I would have to go back and
 3   look at that.  I candidly cannot tell you, Judge.
 4            THE COURT:  Well, I want to read you some things from
 5   that memo, Mr. Lynch, and I hope you can answer them, because
 6   I've got some concerns about what was represented to the Court
 7   then and what's being represented to the Court now.
 8            The first thing that's in here it says, on Page 2, it
 9   says "The ESI order was not delayed, nor has it delayed Norfolk
10   Southern's document production."  I don't get the sense that
11   that's the argument you're making now.  In fact, aren't you
12   arguing that the ESI order and the delay from CSX delayed your
13   document production?
14            MR. LYNCH:  What we're saying, Judge, is we're not
15   saying the order itself delayed it, we said the actions that
16   were required by CSX in agreeing on search terms is what delayed
17   it.
18            THE COURT:  Well then, let me go to page --
19            MR. LYNCH:  And, Judge, to be candid --
20            THE COURT:  Wait a minute, Mr. Lynch.  I want, I want
21   this to be addressed.  Because I told you I have concerns about
22   representations that were made.  And on Page 5 it's represented
23   that "CSX's motion spends significant time arguing that the
24   parties' disputes about search terms necessitate the extension
25   it seeks.  That is simply not true."
```

```
 1              Then later, "The parties have dealt with concerns with
 2    each other's search terms by offering to revisit the issue if
 3    the parties' production appears lacking, which is exactly what
 4    Norfolk Southern has suggested to CSX about its concerns
 5    regarding Norfolk Southern's communications with its customers.
 6    In short, Norfolk Southern has produced and will continue to
 7    produce responsive non-privileged ESI that results from running
 8    agreed-upon search terms against ESI collected from agreed-upon
 9    custodians."
10              That tells me that you all were saying we're not
11    letting the search terms stand in the way of our document
12    production and we are going full steam ahead with this
13    production.  But now I get the impression you're telling me
14    that, in fact, the failure to agree on search terms did
15    interfere with your production.  And I'm having a hard time
16    reconciling those two representations several months apart.
17              MR. LYNCH:  Judge, I guess how I would respond to that
18    is we certainly were going -- and Monica McCarroll is on the
19    line and she did the discovery on the ESI, and if she certainly
20    wants to say anything, she can.  I've got her here.  But the
21    answer to that case, Judge -- or to that question, is there are
22    certain aspects of the discovery when it was propounded to us
23    that we did continue to work on absent an agreement on ESI.  On
24    the search terms.  But there are certain things, Judge, you have
25    to have an agreement on the search terms to be able to run
```

1   those.  And Judge, did the length of time of discussing the

2   search terms delay some of the discovery, Judge?  Any case that

3   has an ESI order and there's a month or so discussion about

4   search terms would delay it.  If that wasn't the case, if

5   discovery was propounded in November you would have 30 days to

6   respond.  But in this type of case when you have a discussion

7   about search terms, certainly that -- I wouldn't be standing

8   here as an officer of the Court, Judge, of course the discussion

9   about search terms, the time period that takes, is some delay in

10  discovery.  And that -- I don't know if I can give you any more

11  specifics than that.  I don't think that's in contradiction to

12  what we said.  It might not have been fully explained, but

13  search terms are important in discovery in a case like this.

14          THE COURT:  Well, I certainly understand that.  But it

15  loops back to the representation made on Page 2 of this very

16  same brief.  And there it says "Norfolk Southern expects to

17  substantially complete its production in response to CSX's first

18  Request for Production of Documents by February 7th.  Norfolk

19  Southern just served its objections to CSX's second Request for

20  Production of documents on January 24 and its responses are not

21  due until February 10th."

22          Now, was the intent of that statement to give the

23  Court the impression that the documents would be responded to,

24  documents would be provided, and a fulsome response provided on

25  February 10th?

1          MR. LYNCH:  No, Judge.  The intent of that was to say

2  that the deadline was February 10th.  If an agreement on search

3  terms would have been done in a sufficient time to make that

4  production by February 10th, maybe that date could have been,

5  you know, satisfied.  But it couldn't have been satisfied when

6  there wasn't -- a full response to the second set of discovery,

7  Judge, could have never been met until there was an agreement on

8  the second set of search terms.

9          THE COURT:  Well, how come nobody said that in ECF No.

10  111 when I'm trying to determine whether or not discovery should

11  be extended, the deadline should be extended?  Why wasn't the

12  Court advised of that?  Certainly the impression that was left

13  with me was that discovery would be provided by February the

14  10th.

15          MR. LYNCH:  I guess, Judge, we, we were saying on the

16  first set it would be responded to, which we did, and

17  substantial compliance, 91 percent of the documents, by

18  February 7th, and the second set we were saying that was the

19  deadline.  We did not intend to represent to the Court that the

20  second set would be fully produced by February 10th, and if we

21  left that impression we apologize, because we did not intend to

22  say that.

23          THE COURT:  Well, was there anything in this pleading

24  that said we're going to produce what we can, but there may be

25  difficulty complying with a second request for production

```
 1  because search terms haven't been agreed to, and therefore take

 2  that into consideration when determining whether you should

 3  extend the discovery deadline?  Because I think that would have

 4  been helpful for the Court when weighing the merits and equities

 5  of whether or not a party needs additional time for discovery.

 6           MR. LYNCH:  I understand that, Judge.  And I'm

 7  confident we did not phrase any language in that brief saying it

 8  like you did.  I think we were just giving the deadline, and we

 9  had started the -- when we filed that, Judge, I don't have the

10  exact date it was filed, we had proposed our search terms.  We

11  didn't think it would take that long for them to say, yeah, we

12  agree.  They took over a month to tell us they agreed with the

13  search terms.  How is that diligent?

14           THE COURT:  Well, this is one of those things,

15  Mr. Lynch, where pointing the finger at the other side doesn't

16  solve the problem, necessarily.  There is the question of

17  diligence.  It's an issue the Court has to determine as to

18  whether or not there's good cause to reopen the discovery.  But

19  I have to tell you, I'm quite disappointed at the tenor of this

20  brief that was filed in January and the arguments that are being

21  made now as if this brief had never been filed.  Because I can

22  tell you, Mr. McFarland is exactly right:  The Court relied on

23  those representations and those impressions that discovery would

24  be sufficiently completed by Norfolk Southern so that CSX didn't

25  get an extension.  And it appears that that wasn't exactly
```

1  accurate.  And if I misinterpret it, I find my misunderstanding

2  completely understandable.  Because that's certainly the way I

3  read this pleading.  And I went back and read it and found it to

4  be not entirely consistent with what's being represented now,

5  and I have a problem with that.

6           Now I'd like to have a couple of specific questions

7  answered.  With respect to Mr. Heller's deposition, some of

8  these documents that were submitted, either on February the

9  28th, I doubt on March the 10th, but maybe, were any of those

10 documents that were produced on those dates used in either Mr.

11 Heller's or Mr. McClellan's deposition?

12          MR. LYNCH:  Judge, I'm going to tell you, I don't

13 think any were used in Mr. McClellan's deposition, and I believe

14 Heller Exhibit 5 and Heller Exhibit 9 were documents that were

15 produced on February 28th.

16          THE COURT:  All right.  And how about with respect to

17 Mr. Booth or Mr. Martinez?  I know they haven't been deposed

18 yet.  I guess this question is properly directed to Mr.

19 McFarland.

20          Mr. McFarland, are there specific documents that were

21 disclosed in either the February 28th or February or March the

22 10th disclosure that are the real genesis of why you feel you

23 need to depose Booth and Martinez?

24          MR. McFARLAND:  Yes, Your Honor.  To again put things

25 in a context, Norfolk Southern identified over 20 individuals of

1    its own people in its 26(a)(1) disclosures of people with

2    knowledge.

3         THE COURT:  Well, they actually disclosed 59 people in

4    their answer to an interrogatory of people with knowledge.

5         MR. McFARLAND:  Right.  But I'm just going by the

6    disclosures.  So from that point, we have to make -- I mean, my

7    client is a large corporation, but there is a budget here, Your

8    Honor, and we have to make certain decisions as to who we're

9    going to depose based on the information we have at the time.

10   So based on the limited documents that had been produced -- and

11   by the way, I just have to converge for a second.  Mr. Lynch is

12   just flat-out wrong that 91 percent of the documents were

13   produced for the first Request for Production.  Because not a

14   single document that relates to east coast ports were produced,

15   and yet there are thousands of those documents, and they were

16   specifically requested in the first request.

17        So when it came time for us to assess who we're going

18   to depose, based on what we had with Mr. Martinez and Mr. Booth,

19   yeah, in a perfect world with an unlimited discovery schedule as

20   defendants now want, yeah, we might have deposed them.  But our

21   cutoff was running fast.  We were taking depositions almost

22   daily in February and early March.  And so we made the choice at

23   that time, based on what we knew, that we would not depose

24   Mr. Martinez and Mr. Booth.  And I'll say to the Court, the same

25   for Mr. Heller, we're not, we're not going to reopen these and

1  use it as a second opportunity to, as a do-over, as Mr. Lynch

2  keeps saying.  We're going to ask these witnesses about the

3  information that we should have when we deposed them or could

4  have made a more intelligent decision to depose them if we had

5  it.  And that's what this is about.

6          And I will say, I take great umbrage at the idea that

7  CSX isn't diligent when it comes to this Court, and this Court

8  relies on representations that you're going to have the

9  documents to the first request you're going to have when we

10 substantially complete by February 7th, which turns out to be

11 horse hockey, and that we're going to respond to the second

12 request by March 10th -- I'm sorry, February 10th, because it

13 was propounded March 9th and we didn't get anything.  And it's

14 not just establish terms.  I mean, you still -- there's nothing

15 in the rules that I'm aware of that says, oh, you can stop

16 production altogether for documents you know are responsive

17 because we don't have an agreement on search terms.  That's not

18 what the rules provide.  And the ESI order doesn't even provide

19 for that.  I mean, this is a case of Norfolk Southern producing

20 literally 210,000 pages of documents at a time when we could not

21 possibly use them for our depositions.  Good cause dictates here

22 that we get to pursue -- we're not, you know, looking to reopen

23 the world here.  And by the way, why didn't we wait until May

24 and June?  Because we had to get through the documents.  The

25 case was stayed, and we wanted to see now that we've got the

documents, let's go back and look at the transcripts of the

people that we deposed.  Where are the gaps?  And we found them.

And once we found them and confirmed them, we tried to work this

out with Norfolk Southern and were not able to.  And I'll say

again, the idea of offering a 30(b)(6) on somebody who's not the

author of the documents and isn't directly involved with them is

just a shell game.  It's a snow job.  And it's not accurate

here.

         I'll say this to the Court too.  I mean, the Court can

tell I feel strongly about this:  This is an example of where

we're entitled to attorney's fees and costs.  And we will be

happy to submit a statement on that for what we've had to expend

to try and get to these depositions.  And there's going to be

additional costs.  I mean, if we had certainly the Heller or the

McClellan documents when we should have, we could have completed

their depositions with them.  But can't play hide the ball and

keep the documents out of our possession and then say, oh, no,

you don't get to use them ever again in a deposition.  That's

not what the Federal Rules provide.  It's not -- and I don't

mean to sound preaching, but it's not fair.  And we would ask

Your Honor that the motion be granted in full.

         And by the way, we've scaled back.  Originally we

wanted to reopen some additional depositions and to take some

other folks, one of whom is no longer a Norfolk Southern

employee, and we punted out and we agreed to give up on her.

1    And I think originally our request for was for six depositions,

2    which I think we were entitled to.  But you know, the world is

3    compromise and litigation is sometimes compromise, but it's not

4    compromise on your obligations to produce documents.  And that's

5    where the compromise has been here, Your Honor.  They

6    compromised our ability to undertake full discovery.

7              THE COURT:  All right.  Well, certainly some of these

8    documents seem to be particularly germane to the issues in this

9    case, and I think CSX is entitled to depose those folks who are

10   involved in those documents in order to find out the story

11   behind them.  So I'm going to grant CSX's motion.  I'm going to

12   find that the representations made by Norfolk Southern back in

13   January are such that agreement on search terms and the ESI

14   order did not impact, according to what they said, did not

15   impact their ability to produce those documents and they should

16   have been produced sooner than they were, and because of that,

17   CSX has established good cause to reopen the depositions of Mr.

18   Heller and Mr. McClellan and to take the depositions of

19   Mr. Booth and Mr. Martinez.

20             I'm also going to direct that CSX may file a motion to

21   recover attorney's fees, reasonable expenses associated with

22   pursuing this motion.  And of course Norfolk Southern will have

23   an opportunity to respond.

24             Mr. McFarland, you know the obligation of a party who

25   submits a motion under 37(a)(5)(A) to establish not just your

 1   entitlement but that the expenses are reasonable and the various

 2   Johnson factors.  So I expect those to be addressed in any

 3   motion that gets submitted.  If you want to pursue that motion,

 4   you should file that within 30 days.

 5          So I'm going to direct that the discovery that I've

 6   ordered be permitted.  I'm going to file a written order.  It's

 7   going to be short this afternoon.  It's going to just reflect

 8   that I've stated the reasons for my ruling on the record.

 9          Going back to CSX's obligation to answer those

10   interrogatories, I'm going to direct that those responses be

11   provided within 14 days.  To the extent that further depositions

12   reveal additional information that will necessitate

13   supplementation, then CSX will be under an obligation to

14   supplement their responses.  But they've had these documents for

15   a while now, and even without being able to drill down with

16   people involved in those documents through these additional

17   depositions, they should be able to articulate a reasonable

18   basis for why they -- for the communications that they're

19   alleging occurred and for the overt acts they allege occurred.

20   And as I said, if the depositions disclose additional

21   information, then they can supplement, and that supplementation

22   should be due by the close of discovery.

23          Now I know you all have pending a motion, or at least

24   the latest status report to Chief Judge Davis reflected that

25   there's disagreement about how you should proceed.  That status

1  report, of course, is with Judge Davis.  So as of now, it's my

2  understanding that he's going to deal with that in due course,

3  and so he'll make that determination.  I assume if he wants a

4  hearing about the best way forward, he'll do that as well.  But

5  to the extent that he refers the matter to me for resolution, at

6  least with respect to whether discovery should continue before

7  this pandemic eases, I will just tell you, I've been coming in

8  to work almost every day since this happened.  I have done a

9  whole lot of proceedings remotely, including detention hearings,

10 preliminary hearings, guilty pleas.  Those folks have liberty on

11 the line, and they have agreed to conduct those proceedings by

12 video teleconference.  It does the not strike the Court as

13 unreasonable to expect something similar here.  So for what

14 that's worth, you all can perhaps continue to negotiate how you

15 want to resolve that issue about going forward, but that matter

16 has not been referred to me so I'm not making any decision, I'm

17 just letting you know my thoughts on the matter.

18           All right.  Anything further from any of the counsel?

19           MR. SNOW:  No, Your Honor.

20           MR. McFARLAND:  Thank the Court's indulgence on one

21 final question?  And I understand what's in the status

22 conference report is not yet -- or has not been referred to Your

23 Honor, but with respect to the depositions that you've now

24 ordered that we're permitted to take, we'd like to take them in

25 the next 30 to 60 days.  And I think that would be consistent

1   with the Court's order.  I know Norfolk Southern doesn't want to

2   do any discovery right now, which kind of strikes me as weird,

3   because if there's ever a chance where people can have more time

4   and do discovery, that would be now.  But so be it.  But we

5   don't want to wait.  We don't want to sit on our hands.  We

6   would like to go forward with these depositions.  And I'm happy

7   to talk with counsel and see if they'll agree to produce the

8   people within the next 30 to 60 days.  But that's the time frame

9   we think is appropriate.

10          THE COURT:  Well, my understanding of the position of

11  the defendants was that they wanted to be able to do the

12  depositions that they took in person, since CSX was able to

13  conduct depositions in person.  If you're agreeable to

14  performing these remotely, then the depositions should be

15  performed remotely.  And if you believe that 60 days is

16  sufficient to get these witnesses produced and lined up for a

17  video teleconference deposition, then there's no reason to delay

18  that event.

19          MR. McFARLAND:  Thank you, Your Honor.

20          THE COURT:  All right.  Thank you, Counsel.

21          The Court will stand in recess.

22          (Whereupon, proceedings concluded at 3:22 p.m.)

23

24

25

1              *CERTIFICATION*

2

3         *I certify that the foregoing is a true, complete and*

4    *correct transcript of the proceedings held in the above-entitled*

5    *matter.*

6

7              _____

8                    Paul L. McManus, RMR, FCRR

9                    _____

10                         Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25