# Exhibit B

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | |
|---|---|
| **CSX TRANSPORTATION, INC.,** | : |
| **individually and on behalf of NORFOLK** | : |
| **& PORTSMOUTH BELT LINE** | : |
| **RAILROAD COMPANY,** | : |
| | : |
| *Plaintiff,* | : |
| | : |
| **v.** | :     **Civil Action No. 2:18-cv-530-MSD-LRL** |
| | : |
| **NORFOLK SOUTHERN RAILWAY** | : |
| **COMPANY,** *et al.,* | : |
| | : |
| *Defendants.* | : |
| | : |

## DECLARATION OF ALAN D. ALBERT

I, Alan D. Albert, do hereby declare as follows:

### *Background*

1.     This declaration is based on personal knowledge and, where indicated, upon my review of pleadings and proceedings in this matter and other materials specifically identified herein.  I am competent to make this declaration and would testify to the matters set forth herein if called as a witness.

2.     I have been a member of the Virginia Bar since October 1985, and have remained in good standing, holding license number 25142, continuously since that time.  I have actively practiced before this Court since 1989.  I am also a member in good standing of the bar of the State of Delaware, holding license number 6258, and regularly litigate complex civil matters, including corporate governance and fiduciary duty disputes, in the United States District Court for the District of Delaware and the Delaware Court of Chancery.

3.      In addition to this Court, I am a member in good standing of the bars of the Supreme Court of the United States, the United States Courts of Appeal for the Federal, Fourth and Eleventh Circuits, the United States District Court and Bankruptcy Courts of the District of Delaware and the Western District of Virginia, and the Bankruptcy Court of this District.  I have litigated as *pro hac vice* and associated counsel in a number of other courts across the country, including federal district courts in California, New York and North Carolina, and state courts in Florida, Maryland, and South Carolina.

4.      I am a graduate of Harvard College, the University of Oxford, and Harvard Law School, from which I received a J.D. decree, *cum laude,* in 1985, and at which I was an editor and the Developments in the Law Editor of the *Harvard Law Review,* as well as an editor of the *Harvard International Law Journal.*

5.      I am presently a partner in the firm of O'Hagan Meyer PLLC, a national firm of more than 160 lawyers, all but of a handful of whom are litigators handling complex cases, who are barred in a total of 24 states and the District of Columbia and conduct a nationwide practice from offices located in eight states, including Virginia, and the District of Columbia.  I have been a litigation partner, handling complex cases, in large law firms continuously since 1994.

6.      My practice is focused on complex civil and criminal litigation, primarily in federal courts.  I have had the good fortune to be recognized in various publications honoring practitioners in these fields, including by being listed in *The Best Lawyers in America* continuously since 1995-96 in the field of business litigation and, at present, in eight other, distinct fields, including various forms of intellectual property litigation, environmental litigation, and white collar criminal defense.  I have received similar recognitions in compilations such as the *Virginia Business* "Legal Elite" and *Super Lawyers.*  I have been named *Best Lawyers'* "Lawyer of the Year" with respect

to intellectual property litigation and specific types of intellectual property litigation (conducted almost exclusively in this Court) in this region on two different occasions, and by *Virginia Business* as its "Lawyer of the Year" in criminal law.  I am a Fellow of the American Bar Foundation and the Virginia Law Foundation.

7.      I have previously been qualified as an expert witness with respect to the issue of the reasonableness of attorneys' fees and costs incurred in complex civil litigation in this Court. *See, e.g., Lake Wright Hospitality, LLC v. Holiday Hospitality Franchising, Inc.,* 2009 WL 4841017  (E.D. Va. Oct. 23, 2009) (hereinafter cited as "*Lake Wright*").

8.      I have been retained by the Plaintiff, CSX Transportation, Inc. ("CSXT"), for the purpose of reviewing and providing an opinion regarding the reasonableness of attorneys' fees and costs incurred by Plaintiff in connection with the prosecution of a contested motion to reopen discovery and compel certain depositions in the wake of the production of a large number of documents by defendant Norfolk Southern Railway Company ("NSR") after a number of Plaintiff's depositions already had been taken.  That motion and related initial pleadings appear on the docket in this action as docket entries 203, 204, and 208 (collectively, the "Motion").  I am being compensated for this engagement at my regular hourly rate of $695 and my compensation is in no way related to or contingent upon the opinions I express.  With the exception of my engagement in this matter, I have not represented CSXT at any time.  With the exception of my engagement in this matter, I have, and have in the past had, no business or financial relationship with McGuireWoods.

9.      In furtherance of this engagement, I have reviewed pleadings relevant to the Motion (which include as exhibits a number of attorney communications preceding the filing of the Motion), the hearing transcript relating to the Motion, the detailed time records of Plaintiff's

counsel with respect to which counsel seeks an award of attorneys' fees, and information regarding the professional qualifications and experience of the legal professionals whose efforts are the subject of the Motion.  In addition to the materials reviewed, I rely upon personal knowledge gleaned by practicing before this Court and in this geographic market since 1989.

10.      In particular, the pleadings I have reviewed include, in addition to the full docket report for this case, the following:

- Plaintiff's Complaint and the Defendants' responsive pleadings;

- CSXT's Emergency Motion to Amend Scheduling Order, Memorandum in Support, and Notice of Request for Expedited Consideration of the same (Dkt. Nos. 106, 107, 108);

- NSR's Opposition to the Emergency Motion to Amend Scheduling Order (Dkt. 111);

- Defendant Norfolk & Portsmouth Belt Line Railroad Company's Opposition to the Emergency Motion to Amend Scheduling Order (Dkt. 112);

- CSXT's Reply in Support of the Emergency Motion to Amend Scheduling Order (Dkt. 113);

- The Court's February 5, 2020 Order (Dkt. 118);

- CSXT's Motion to Reopen and Compel Depositions and Memorandum in Support Thereof, and associated exhibits (Dkt. 203, 204, 208);

- NSR's Brief in Opposition to CSXT's Motion to Reopen and Compel Depositions, and associated exhibits (Dkt. 215);

- CSXT's Reply in Support of its Motion to Reopen and Compel Depositions (Dkt. 222);

- The Court's September 4, 2020 Order (Dkt. 237);

- Transcript of the September 4, 2020 Hearing on CSXT's Motion to Reopen and Compel Depositions (Dkt. 238);

- NSR's Objection to Magistrate Judge's Non-Dispositive Order, and associated exhibits (Dkt. 240);

- CSXT's Opposition to NSR's Objection, and associated exhibits (Dkt. 241); and

- NSR's Reply in Further Support of its Objection (dkt. 243)

11.     I have also reviewed the detailed billing records supporting the present application for an award of attorneys' fees.  These billing records are set out in a spreadsheet appended as Exhibit 1 to the Declaration of Robert W. McFarland, filed contemporaneously with this Declaration.

### *Preliminary Observations regarding this Action, the Motion and the Discovery Dispute that Gave Rise to the Motion*

12.     This action raises complex issues of antitrust law, corporate governance, the fiduciary duties of corporate directors, and business torts; both direct claims and derivative claims are asserted.  The principal litigants, CSXT and NSR, are Fortune 500 transportation companies whose annual revenues are measured in the tens of billions of dollars, and who historically have competed fiercely in common service territories, including Virginia.  The nominal defendant Norfolk & Portsmouth Belt Line Railroad (the "Belt Line") is a Class III[1] terminal switching railroad, currently operating over 26 miles of track; its principal business is to transfer traffic from long-haul rail lines to various marine terminal facilities in southeastern Virginia.  *See generally* Norfolk & Portsmouth Belt Line Railroad Co. website, http://www.npblrr.com/ (last accessed Oct. 3, 2020).  The Belt Line was initially jointly owned by eight railroads, but today it is wholly owned by NSR and CSXT, with NSR holding 57%, and CSXT 43%, of the shares of the company.  *See*

---

[1]     Class III railroads comprise the smallest class of rail companies in the United States; they definitionally have less than $20 million in annual operating revenues.  49 C.F.R. Part 1201, § 1-1.  Many are "short line" rail companies that serve specific rail branches or, like the Belt Line, specific interconnection needs.

---

Belt Line website, "About Us – History," *http://www.npblrr.com/about-us/history/* The relative

ownership shares give NSR the ability to choose a majority of the Belt Line's directors.

13.     The Motion sought a form of relief that is, in my experience, relatively rarely

necessary, sought or granted in this Court:  a substantial, *nonconsensual* reopening of discovery

as a result of late-breaking production of a substantial number of documents, responsive to requests

for production, after depositions already have occurred.  Because the time between the close of

discovery and the date of trial under the standard form of scheduling order long used in the Norfolk

and Newport News Divisions is so short, reopening discovery poses substantial difficulties for

completing other pretrial tasks in a timely matter, and poses the danger, from a scheduling point

of view, that requests to continue trial – strongly disfavored in this Court -- inevitably will follow.

As a result, in my experience, a movant who seeks such relief from this Court through a contested

motion generally must demonstrate clearly that it will suffer substantial prejudice in the absence

of the relief sought in order to prevail, and that the circumstances giving rise to the request for

relief clearly lay beyond the control of the movant.

14.     I also note, on the basis of more than three decades' experience litigating in this

Court, that circumstances such as those giving rise to the present motion – in particular, a very

large and very late production of documents, after depositions as to which there is a good faith

argument that the documents were substantially material – generally would lead counsel

experienced in litigating in this Court to reach an agreement regarding some reopening of

discovery, the conduct of follow-up depositions of previously-deposed witnesses, or similar relief

that would not necessitate contested motion practice.  Litigating at the unique and demanding pace

required in this Court depends upon counsel working together to make discovery work.  In my

experience, counsel facing a situation in which a substantial volume of material documents are

produced after depositions to which those documents would have materiality and relevance – regardless the reason for the timing of the production – typically would make substantial efforts to find some way to accommodate that development in order to avoid claims of substantial prejudice being raised and litigated through expedited discovery motions.  I do not find NSR's offer to permit CSXT to take a 30(b)(6) deposition on the documents produced, in return for letting NSR reopen the deposition of a CSXT in-house attorney reasonable or acceptable.  CSXT needs to depose the persons directly involved with the late-produced documents.  My observations are based in substantial part on personal experience from being in similar circumstances, from time to time as counsel in matters in this Court, with a production of documents made late in the discovery process as a result of, for instance, belated discovery of additional repositories or custodians of records, and after depositions to which those late-discovered documents were material.  In such circumstances, when I was counsel for the party making the late production, I have voluntarily offered the kind of relief ultimately ordered by the Court in the present case, both because it was my belief that fundamental fairness required doing so, and because I had little doubt that, were the issue litigated, this Court likely would come to same conclusion.  When the shoes have been reversed, and I have been counsel for the party seeking such relief, I have found that counsel experienced in litigating in this Court typically have reached an accommodation with me for the same reasons.  It is unusual, in my experience, for counsel to be unable to fashion *some* resolution of their own making in such situations, thus necessitating motion practice to achieve any resolution of the underlying dispute.

### The Fee Award Request

15.     Plaintiff seeks to recover a portion, but not all, attorneys' fees billed by its counsel, McGuireWoods, from June through September, 2020, with respect to the Motion and the issues

---

addressed by it.[2]  In particular, the fee application seeks to recover for time expended by five McGuireWoods attorneys and one senior paralegal, collectively totaling 98.50 hours.  At the rates utilized for this fee application, which (as set forth in the declaration of Robert McFarland, Esquire, filed contemporaneously, are lower than the rates actually billed), the total fee award sought is $43,924.50.  The following table summarizes the hours billed and fees sought in the present application with respect to each of these timekeepers:

### SUMMARY OF FEES SOUGHT IN THE PRESENT APPLICATION

| Timekeeper | Position | Hours Worked | Rate | Total Fees |
|---|---|---|---|---|
| Robert McFarland | Partner | 9.4 | $675.00 | $6,345.00 |
| Benjamin Hatch | Partner | 2.9 | $675.00 | $1,957.50 |
| V. Kathleen Dougherty | Counsel | 33.6 | $475.00 | $15,960.00 |
| Ashley Peterson | Senior Associate | 31.7 | $400.00 | $12,688.00 |
| Sean P. Walsh | Junior Associate | 17.8 | $350.00 | $6,230.00 |
| Krystal Gollogly | Senior Paralegal | 3.1 | $240.00 | $744.00 |
| **TOTAL** | | **98.5** | | **$43,924.50** |

### *Johnson/Barber Factors*

16.    In considering the reasonableness of the attorneys' fees and costs sought by Plaintiff with respect to the Motion, my analysis is guided by what are often referred to as the "*Johnson* factors," or, within the Fourth Circuit, as the "*Johnson/Barber* factors," first articulated

---

[2]    As explained in the McFarland Declaration, in making this application, counsel for Plaintiff have included only a subset of the detailed time entries actually billed with respect to the Motion, and are not seeking fees with respect to services provided by all timekeepers who participated in one way or another in prosecuting the Motion and addressing the issues that gave rise to it.

by the United States Court of Appeals for the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974), and adopted by the Fourth Circuit in *Barber v. Kimbrell's, Inc.,* 577 F.2d 216 (4th Cir. 1978).  This Court has summarized these factors as follows:

> In evaluating [attorney fee] submissions in order to determine both a reasonable rate and a reasonable number of hours expended, the lodestar analysis is guided by the following twelve factors (the "*Johnson* factors"):
>
>> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.
>
> *Barber v. Kimbrell's Inc.,* 577 F.2d 216, 226 n.28 (4th Cir. 1978) (adopting the twelve factors identified by the Fifth Circuit in *Johnson v. Ga. Highway Express Inc.,* 488 F.2d 714 (1974)); *cf. Perdue*, 559 U.S. at 550–52, 130 S. Ct. 1662 (explaining why the objective lodestar approach is superior to the subjective approach outlined in *Johnson*, but failing to hold that it is improper to be informed by the *Johnson* factors when performing a lodestar analysis).

*Denton v. PennyMac Loan Servs.,* 252 F. Supp. 3d 504, 511 (E.D. Va. 2017) (Davis, D.J.)

17.     The *Johnson/Barber* factors are part of a larger, three-step framework elaborated by the Fourth Circuit for calculating a reasonable attorney's fee when an entitlement to a fee award has been established:

---

The United States Court of Appeals for the Fourth Circuit has outlined a three step framework for calculating a reasonable attorney's fee:

> First, the court must "determine the lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate." *Robinson v. Equifax Info. Servs., LLC,* 560 F.3d 235, 243 (4th Cir. 2009). To ascertain what is reasonable in terms of hours expended and the rate charged, the court is bound to apply the factors set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir. 1974). Id. at 243–44.  Next, the court must "subtract fees for hours spent on unsuccessful claims unrelated to successful ones." *Id.* at 244. Finally, the court should award "some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff." *Id.*

*McAfee v. Boczar,* 738 F.3d 81, 88 (4th Cir. 2013), as amended.

*Denton,* 252 F. Supp. 3d at 510-11.  As I explain below, the potential discounting called for in the second and third steps of this three-step analysis do not come into play in the present case, in light of the absence of unsuccessful claims and the substantial success of plaintiff with respect to the Motion.

18.     While application of the *Johnson/Barber* factors to the present application is a matter ultimately for the Court, I provide my opinions for the consideration of the Court, particularly with respect to the first, second, third, fifth, seventh, eighth, ninth and twelfth of these factors.  I have organized these opinions under the following headings:

a.      the total hours expended, as to which an award of fees is sought, considered in light of the complexity (that is, the novelty and difficulty) of, and the time limitations and circumstances attendant to, the matter at hand (implicating the first, second, third and seventh factors);

b.      the allocation of effort as among higher-rate and lower-rate timekeepers (first and fifth factors);

c.      the reasonableness of the rates charged (fifth, ninth and twelfth factors);

d.      other timekeeping and billing practices, including the increments in which time is billed, the level of detail provided in the billing descriptions, and reductions made in time recorded for purposes of the present motion (first and fifth factors);

e.      the amount in controversy and the results obtained (eighth factor); and

f.      fee awards made in similar cases in this Court (twelfth factor).

### Total Hours Expended in Light of Novelty and Difficulty of, and Time Limitations and Circumstances Attendant to, this Matter

19.     The initial question to be addressed in assessing the reasonableness of the present application is whether the total number of hours as to which an award is sought – in this case, 98.5 hours -- is reasonable under the circumstances.

20.     It is important to note at the outset that a substantial part of the time at issue in the present application was undertaken in furtherance of seeking a *non*-litigated resolution of the acute discovery dispute occasioned by the timing of production of documents by NSR in relation to the timing of the depositions conducted.  In reviewing the detailed time entries submitted, I am of the opinion that the first 37 time entries (rows 2 through 38 of the supporting spreadsheet attached to Mr. McFarland's declaration), which account for 24.1 total timekeeper hours (24.4% of the total hours that are the subject of the application) and $11,528 (26%) of the fees sought, were spent in efforts to resolve the dispute *without* motion practice.  This is as it should be, particularly given that the Local Civil Rules of this Court expressly oblige counsel to meet and confer regarding discovery disputes prior to engaging in motion practice, and to certify their efforts to the Court. Local Civil Rule 37(E).  Because Fed. R. Civ. P. 37(a)(5)(A) establishes a presumption that a party successfully obtaining an order to compel discovery is entitled to recover "its reasonable expenses incurred in making the motion, including attorneys' fees" absent specific limiting circumstances, a party that is the subject of likely motion to compel, yet walks away from meet-and-confer

---

*Declaration of Alan D. Albert (Civ. Act. No. 2:18-cv-530-MSD-LRL)*                    *Page 11*

discussions without having reached any agreement to resolve the dispute, is choosing to incur the very real risk that an award of fees will issue.[3]

21.     The actual time spent in *preparing* and *prosecuting* the Motion, in the wake of the failure of extensive meet-and-confer efforts to resolve the discovery dispute at hand, is thus 74.4 hours, for which $32,396.50 in fees are sought.

22.     I am of the opinion that 74.4 hours represents a reasonable expenditure of time for the preparation and prosecution of this complex Motion following the failure of meet-and-confer efforts. As noted in my prefatory comments, the relief sought through the Motion is of a kind not lightly granted in this Court; counsel are expected by the Court to manage discovery within the tight timeframes provided in the scheduling order, and obtaining a substantial reopening of discovery requires that a persuasive case of prejudice, absent the reopening, be made, and that the movant demonstrate that the prejudice does not arise from any lack of diligence in pursuing the discovery matters at issue. Here, establishing the prejudice required Plaintiff's counsel to link the late-produced documents, and specific topics within them, to topics in depositions conducted prior to the production, as well as to make a persuasive case why a potential witness who was not initially deposed would have been if the documents had been in hand. That is a complicated, detailed argument to make, particularly when it is premised upon the contents of a large volume of documents and comparing those contents in a comprehensive and comprehensible manner to the content of a substantial number of completed depositions. Moreover, given the nature of the relief sought, the Motion had to be brought without delay. A third layer of complexity was added

---

[3]   In my experience, the cost of litigating motions to compel, and the risk of such an award of fees against the non-prevailing party, provide two of the most powerful incentives that explain the tendency of counsel practicing in this Court to resolve most discovery disputes on consensual terms, as described in ¶ 14, above.

---

by the necessity to file certain portions of the pleadings under seal, a process that, under Local Civil Rule 5, requires the preparation of a separate motion, a persuasive (not merely *pro forma*) non-confidential memorandum, notice and proposed order.  My opinion relies in part on my analysis of the reasonableness of the time expended on the phases of briefing and arguing the Motion described in the succeeding paragraphs.

23.     I am of the opinion that the time entries in rows 39 through 56 of the supporting spreadsheet relate to the preparation of these complex, and numerous, initial pleadings required to bring the motion forward on an expedited basis and partially sealed basis.  A total of 35.4 hours is sought for this set of tasks, with fees totaling $13,932.  As one who has drafted and supervised the preparation of similar pleadings hundreds of times, I find that the total time expended on these tasks was reasonable in light of the complexities of the issues and the multiple pleadings required to place the issues appropriately, and expeditiously, before the Court.

24.     The next task for Plaintiff's legal team was to review and formulate a reply to NSR's opposition to the Motion.  I am of the opinion that the time entries in rows 57 through 71 of the supporting spreadsheet describe tasks related to this phase of the briefing.  These entries account for 21.5 hours, and fees totaling $9,171.50.  I am of the opinion that this represents a reasonable commitment of time to the understanding of a detailed opposition to a complex motion, and the formulation of an appropriate rebuttal to it.

25.     The next phase of prosecution of the Motion is represented by time spent preparing for, and in, the hearing before the Court.  Rows 72 through 79 in the supporting spreadsheet describe these tasks, which total 16.2 hours (including time spent in the hearing) and represent $8,720 in fees.  I am of the opinion that this is a reasonable amount of time to have expended in

preparing for and appearing for the hearing on a Motion of this complexity and importance to the larger case.

26.     A final set of four time entries (rows 80 through 83 in the spreadsheet) represents 0.7 hours of paralegal time assembling time records for the purposes of the present application, and 0.6 hours of Mr. McFarland's time spent coordinating the new depositions ordered and reviewing NSR's objection to Judge Leonard's order on the Motion.[4]  I am of the opinion that these were reasonable fees for the tasks performed.

27.     I note that the present application does not seek any fees of attorneys for the preparation of the present application, notwithstanding ample precedent that reasonable fees and costs incurred in preparing such an application is recoverable as part of a fee award.  In this sense, the application is a conservative one, eschewing recovery for what I understand to be a not insubstantial subset of fees incurred that typically would be recoverable.

### Allocation of Effort among Timekeepers

28.     A central issue in assessing the reasonableness of fee applications, when multiple timekeepers' efforts are employed, is the allocation of responsibilities as between timekeepers of varying levels of experience and expertise.  This Court routinely has examined the division of labor employed in multiple-timekeeper applications to determine whether work has been "pushed down" to the most cost-effective timekeeper.  *See, e.g., Lake Wright,* 2009 WL 4841017, at *6-7 (analyzing tasks performed and holding that lower-rate timekeepers could have provided services).

---

[4]  While not part of the application in its present form, I note my opinion that fees incurred by Plaintiff in drafting a response to NSR's Objection would be properly recoverable.  Because the Objection, if sustained by the District Judge, would have the effect of negating the relief obtained, Plaintiff 's counsel are obliged, as part of fulfilling their ethical obligation of zealous representation of their client, to defend against the Objection vigorously.

29.     I am of the opinion that Plaintiff's counsel, in allocating responsibilities with respect to the Motion, has been quite effective in "pushing work down," appropriately, to lower-rate timekeepers.  Lead partner McFarland's hours account for less than 10% (9.4 hours out of a total of 98.5 hours for which recovery is sought) of the hours expended with respect to the Motion that are the subject of the present application, and all partner hours account for only 12.5% of the hours as to which recovery is sought.  By contrast, fully 50.2% of the hours for which an award is sought were expended by associates Peterson and Walsh, including 32.2% by senior associate Peterson and 18.1%% by junior associate Walsh.  A further 34% of the hours for which recovery is sought were expended by counsel Dougherty, who is 12 years out of law school and has both trial experience well "beyond her years," as a result of her extensive service as an Assistant United States Attorney, and expertise specific to this Court, as a former judicial law clerk to the Chief Judge.  A review of the specific time descriptions confirms that Mr. McFarland's time – fewer than 10 hours in total -- was principally devoted to setting strategy, reviewing and revising draft work product produced by lower-rate timekeepers, and preparing for the oral argument on the Motion.  This division of labor resulted in the highest-rate timekeepers spending their time in tasks in which their experience and expertise could be of greatest value – strategic thinking, reviewing and revising the draft work product of less experienced timekeepers, and arguing the Motion itself – and leaving the more time-intensive tasks of document analysis, legal research and drafting to lower-rate timekeepers.  Given the importance of the issues addressed in the Motion to the overall action, I am of the opinion that Mr. McFarland, in particular, could not reasonably have spent any less time engaged in the tasks he undertook without significantly depriving his client of the benefit of his experience and expertise.

30.     A statistical measure that can be helpful in assessing counsel's effectiveness in pushing work down to the most cost-effective level is to compute the so-called "blended rate" applicable to the total application.  In the present application, the effective blended rate of all timekeepers is $445.93 per hour, a figure that is less than the rates sought for counsel Dougherty ($475/hour) and senior associate Peterson ($450/hour), and approximately $70 more than the rate sought for junior associate Walsh ($375/hour).  It is slightly less than two-thirds of the partner rate sought in the application.[5]  As a general matter, in my experience, when the effective blended rate lies near the rates of the lower- and lowest-rate timekeepers, that is a strong indication that work is being pushed down effectively.  (By contrast, were the effective blended rate to hover nearer the partner rate sought, rather than the associate rates, that would suggest that the matter may be been staffed in a "top heavy" fashion.)

### *Reasonableness of Rates Charged*

31.     In assessing the reasonableness of the rates charged by specific timekeepers, the *Johnson/Barber* factors direct that consideration be given both to the "customary fee" for the services rendered, and the "experience, reputation and ability" of each timekeeper.

32.     Partner Robert W. McFarland's services are billed, for purposes of this motion, at $675 per hour.  Mr. McFarland is a 1984 graduate of the Georgetown University School of Law and spent his first year after law school as a judicial clerk in this Court, serving in the chambers of The Honorable John MacKenize.  He is a former President of the Federal Bar Association chapter for this region.  With 36 years of experience in civil litigation, much of it focused in this Court, Mr. McFarland is one of the most experienced civil litigation practitioners regularly appearing in

---

[5]  The effective blended rate for the attorney timekeepers (thus excluding the senior paralegal) is $452.63, only slightly higher than the rate computed for all timekeepers.  This reflects the modest amount of paralegal time sought in this application.

complex civil matters before Court.  I have known Mr. McFarland and had the opportunity to observe his work for more than three decades, and on the basis of that experience, am aware that he has a preeminent reputation for excellence, for integrity, and for handling the often trying demands of civil litigation in this Court with the utmost professionalism as well as a healthy dose of pragmatism.

33.    As reflected in Mr. McFarland's declaration submitted in support of the present application, the rate charged for Mr. McFarland's services for purposes of this motion, has been twice reduced below his ordinary hourly rate (once as part of a general reduction provided to Plaintiff, and a further reduction for purposes of the present fee application), to $675 per hour. Based on my experience, my own billing practices, and the rates charged by other practitioners in this market (with which I am familiar through a number of means, including published fee decisions and fee applications and inquiries I have made with similarly-situated practitioners in this legal market for purposes of arriving at these opinions), I am of the opinion that the rate charged for Mr. McFarland's services is a reasonable one for a practitioner of his extensive experience and specialized skill in handling complex matters before this Court. Such highly-experienced and skilled practitioners, based on my experience and inquiries, regularly charge $600 to $850 per hour for comparable services in complex actions in this Court.

34.    Partner Benjamin L. Hatch's very limited services with respect to the Motion (totaling 2.9 hours) are billed, for purposes of this motion, at the same partner rate as Mr. McFarland, $675 per hour.  Mr. Hatch is a 2002 graduate of Harvard Law School, graduating *magna cum laude,* and clerked at both the Fourth Circuit, for Judge J. Michael Luttig, and the Supreme Court of the United States, for the late Justice Antonin Scalia.  He developed extensive

---

trial experience as an Assistant United States Attorney serving in this division of the Court, as well as in the Richmond and Alexandria Divisions.

35.     Based on my experience, my own billing practices, and my knowledge of the rates charged by other practitioners in this market, I am of the opinion that the rate charged for Mr. Hatch's services is a reasonable one for a practitioner of his experience (including his exceptional judicial clerkship experience) and skill handling complex matters before this Court.[6]

36.     Counsel V. Kathleen Dougherty's services are billed, for purposes of this motion, at $475 per hour.  Ms. Dougherty is a 2008 graduate of the University of Virginia School of Law and was a judicial clerk in this Court, serving in the chambers of then-Chief Judge Smith.  Ms. Dougherty developed valuable trial experience as an Assistant United States Attorney in this Division for nine years, beginning her service as a member of the Attorney General's Honors Program.  Ms. Dougherty's skill and experience are well-known to this Court as a result of her lengthy service to it, both within chambers and as an Assistant United States Attorney.

37.     Based on my experience, and my knowledge of the rates charged by other practitioners in this market of similar experience and expertise, I am of the opinion that the rate charged for Ms. Dougherty's services is a reasonable one for a practitioner of her experience and skill handling complex matters before this Court.

38.     Senior associate Ashley Peterson's services are billed, for purposes of this motion, at $400 per hour.  Ms. Peterson is a 2014, *summa cum laude* graduate of the University of Richmond School of Law, where she was the recipient of the Charles T. Norman Award,

---

[6] I note that, while Mr. Hatch's rate for purposes of this application is the same as that sought for Mr. McFarland, who has a larger number of years of experience, I do not view this as a reason to believe that the rate sought for Mr. Hatch is too high.  To the contrary, I am of the opinion that a reasonable market rate for Mr. McFarland is $100 to $150 higher than that sought in this application, a level consistent with his regular rate that clients are billed and pay.

recognizing the top all-around student in the J.D. class.  Ms. Peterson clerked for Chief Judge Edward E. Carnes of the United States Court of Appeals for the Eleventh Circuit, and for then-Chief Judge Glen E. Conrad of the Western District of Virginia.  She has particular expertise in antitrust law and litigation, serving on McGuire Woods' national (and indeed, international) teams in this complex area of law.

39.     Based on my experience, my own billing practices with respect to associate attorneys working with me, and my knowledge of the rates charged by other law firms in this market for senior associate attorneys of similar experience and expertise, I am of the opinion that the rate charged for Ms. Peterson's services is a reasonable one for a practitioner of her experience and skill handling complex matters before this Court, and in particular for handling the kinds of complex antitrust issues raised in this action.

40.     Junior associate Sean Walsh's services are billed, for purposes of this motion, at $375 per hour.  Mr. Walsh is a 2014, *cum laude* graduate of the University of Florida School of Law, and earned Phi Beta Kappa honors during his undergraduate studies at the University. He came to McGuire Woods from a national firm specializing in labor and employment law

41.     Based on my experience, my own billing practices with respect to associate attorneys working with me, and my knowledge of the rates charged by other law firms in this market for associate attorneys of similar experience and expertise, I am of the opinion that the rate charged for Mr. Walsh's services is a reasonable one for a practitioner of his experience, practicing in this Court.

42.     Senior paralegal Krystal Lynne Gollogly's services are billed, for purposes of this motion, at $240 per hour.  Ms. Gollogly has more than 10 years of experience as a paralegal specializing in complex litigation, particularly in this and other federal courts.  Based on my

experience in this legal market, including as a practitioner utilizing a senior paralegal, specializing in complex federal litigation, whose skills are comparable to those of Ms. Gollogly, a typical billing rate for an experienced paralegal like Ms. Gollogly, with specialized experience in federal litigation, would fall in the range of $200 to $300 per hour.

43.     Based on my experience, my own billing practices with respect to senior, experienced paralegals who have worked with me, and the rates charged by other law firms in this market for paralegals with specialized expertise in complex federal litigation, I am of the opinion that the rate charged for Ms. Gollogly's services is a reasonable one for a paralegal of her experience and skill assisting in complex matters before this Court.

### *Other Billing Practices*

44.     In this section, I address several other aspects of timekeeping and billing practices that typically have been considered by this Court in weighing applications for attorneys' fee awards.

45.     I note first that Plaintiff's counsel records time in increments of one-tenth of an hour (that is, six minutes).  In my experience, the one-tenth hour convention has become the prevailing practice among law firms charging on an hourly-rate basis.  The use of a one-tenth-hour increment minimizes the effects of rounding that tend to be more pronounced, for instance, when billing is done in quarter-hour increments.  I am of the opinion that this practice is consistent with best practices in billing on an hourly basis.

46.     I also note that the detailed time entries submitted in support of the present application are comprised of single, task-specific entries rather than "block billing" in which multiple, different tasks are combined in a single entry, without itemizing the time expended on specific tasks.  In my experience, "block billing" is disfavored because it makes review of the time

expended on specific tasks difficult, if not impossible, and single-task billing is the preferred practice. *See, e.g., Denton,* 252 F. Supp. 3d at 525 (making deductions for block billing).

47.     Finally, I have reviewed the time entries for which recovery is sought to ascertain whether there has been duplication of effort by attorneys.  I find no evidence of undue duplication of effort in the time entries supporting this application.  I do note that multiple attorneys for Plaintiff were present at the hearing on the Motion, but given the division of labor employed in preparing the Motion, and the potentially detailed nature of questions that might arise at oral argument (for instance, the potential need to tie the justification for a second deposition of one witness and new deposition of another with respect to specific topics in specific documents drawn from the more than 200,000 pages produced near the end of plaintiff's discovery period), I find that the attendance of the attorneys most familiar with the details of those documents (Mr. Hatch, Ms. Dougherty and Ms. Peterson, whose time billed for attending the hearing totaled 4.6 hours) at the hearing was prudent.  Indeed, given the limited number of hours spent by Mr. McFarland in preparation of the Motion because of his "pushing down" of this work to lower-rate timekeepers, I am of the opinion that for him to have handled the oral argument without the ability to consult in real time, as needed, with those most familiar with the documents produced late in the discovery period would have been imprudent.

### *Results Obtained*

48.     Consideration of the eighth *Johnson/Barber* factor, the amount in controversy and the results obtained, is straightforward in this case.  In this complex antitrust and fiduciary duty action, substantial asserted damages (including treble damages under the Sherman Act) are at issue, and complex claims regarding the fiduciary duties of directors are at stake.  The principal litigants are Fortune 500 companies that measure their annual revenues in the tens of billions of

dollars.  They are fierce competitors in Virginia and elsewhere, and the Belt Line that is the focus

of this action is in essence an asset, control of which is shared between these competitors, with

Plaintiff now a minority equity holder with respect to the asset.  There can be little question that

this is high stakes litigation.  With respect to the Motion that is the focus of this application,

Plaintiff substantially prevailed before United States Magistrate Judge Leonard as to the principal

relief sought, the reopening of discovery and leave to conduct second depositions of a previously-

deposed witnesses and new depositions of two witnesses not previously noticed for deposition.[7]  I

accordingly am of the opinion that no discount is warranted on the basis of the results obtained.

### Fee Awards in Similar Cases

49.     In considering the twelfth *Johnson/Barber* factor, fee awards in similar cases, I find

it useful to address both the hourly rates approved by this Court in prior cases, and the overall size

of fee awards made in cases entailing similar disputes.

50.     In opining regarding the reasonableness of the rates utilized in the present

application, I have reviewed and taken into account other fee awards made in this judicial district

and focused principally, insofar as possible, on fee awards made in complex civil cases litigated

in the Norfolk and Newport News Divisions by highly experienced counsel.  I note that this Court

has approved rates for highly experienced partners, in complex civil cases in this division, in excess

of $600 per hour (and as much as $730 and $740 per hour) both in recently-decided cases and in

cases stretching back at least 11 years.  *See, e.g.,* Opinion & Order, Sept. 4, 2020, *Courthouse*

*News Service v. Schaefer,* Civ. Act. No. 2:18-cv-391-HCM-LRL [dkt. 130] (approving $1.979

---

[7] I note that Magistrate Judge Leonard's ruling is the subject of a pending objection before District
Judge Davis [dkt. 240] and stand ready to supplement this Declaration to the extent necessary to
take into account the costs of briefing the opposition to the objection and any ruling on the
objection that Judge Davis may issue while the present application is pending.

million fee award based upon partner rate of $730, senior associate rate of $590, junior associate

rate of $545, paralegal rate of $ 290) (Morgan, D.J.) (for ease of reference, a copy of this opinion,

rendered so recently that it may not be readily available in computerized legal research databases,

is appended as *Exhibit 1* to this Declaration); *Cobalt Boats, LLC v. Brunswick Corp.,* 296 F.3d

791, 808-09 (E.D. Va. 2017), *rev'd on other grounds,* 773 Fed. Appx. 611 (Fed. Cir. 2019)

(approving fee award for 32 timekeepers, with partner rate of $740 for experienced counsel in this

Court with ten fewer years' experience than Mr. McFarland, associate rates ranging to $385, and

paralegal rates ranging to $245) (Morgan, D.J.) (hereinafter "*Cobalt Boats*"); *Swimways Corp. v.*

*Tofasco of America, Inc*., 2009 WL 10690051, *5 (E.D. Va. Sept. 3, 2009) (*2009* fee award based

on $675 and $610 per hour for partners, $495 and $295 for associates, $245 for a nonlawyer

litigation specialist, and $175 and $155 for paralegals) (Jackson, D.J.) (hereinafter "*Swimways*").[8]

In reviewing prior fee awards made by this Court and in this Division, I also have taken into

account the steady rise in market rates, particularly among the "Am Law 100" firms that include

McGuire Woods and other firms that have been the recipients of the awards referenced above,

such as Hunton Andrews Kurth (*Lake Wright*, above), Troutman Pepper (*Cobalt Boats*), and Bryan

Cave (*Courthouse News Service*).  As an example of the importance of considering rate growth in

evaluating historical fee awards for present purposes, given a conservative estimation of rate

---

[8]  I have chosen these cases to highlight in this discussion because I find that the experience and
expertise of the attorneys who were the subject of the fee awards in those cases most closely
approximates those of the attorneys who are the subjects of the present application, and because
the issues in those cases entail levels of complexity most closely comparable to those placed at
issue in the present case.  There are certainly fee awards rendered in this Division that utilize lower
hourly rates – among them, for instance, consumer cases such as *Denton,* employment
discrimination and 42 U.S.C. § 1983 cases -- but I have concluded, after reviewing many such
cases, that they generally are not strictly comparable to the present case, both in terms of the
experience and expertise of counsel involved and the complexity of the matters at issue.

growth at 4%,[9] the $460 hourly rate approved for a senior, partner-level Hunton Andrews Kurth litigator whose experience is comparable to Mr. McFarland's in 2009, in *Lake Wright*, would be $662 if adjusted to current dollars with a 4% annual growth rate.  Similarly, the $675 hourly rate approved by this Court in *Swimways* in 2009 would be $972 when adjusted to current dollars at the same growth rate.  The table set out below compares the rates requested to the rates approved by this Court, in this Division, in these cases, with the entries for the two 2009 cases reflecting both actual rates approved and rates adjusted to reflect current-dollar equivalents.

**COMPARISON OF FEES SOUGHT AND FEES AWARDED IN SELECTED CASES**

| Timekeeper Type | Rate Presently Sought | Courthouse (2020) | Cobalt (2017) | Swimways (2009) | Lake Wright (2009) |
|---|---|---|---|---|---|
| Partner | $675 | $730 | $740 | $675 (972) | $500 (est.) (720) |
| Counsel | 475 | -- | 510 | -- | 350 (504) |
| Senior Associate | 400 | 590 | 385 | 435 (626) | |
| Junior Associate | 350 | 545 | 315 | 295 (425) | 200 (288) |
| Paralegal | 240 | 290 | 245 | 175 (252) | 100 (144) |

***Notes:*** (1) Rates in parentheticals reflect awarded rate adjusted to current dollars based on estimated 4% annual rate growth since decision.  (2) Partner and counsel rates set out for *Lake Wright* reflect Court's discussion of appropriate rate before downward adjustments to rates were made by Court to account for failure to "push work down" to lower-rate timekeepers.  The $350 rate for counsel is specifically set out as the appropriate rate prior to "push down" adjustment. With respect to the partner rate, the Court observed that the requested partner rate of $510 was "slightly excessive", and the $500 rate reflected here represents the estimated rate before adjustments for failure to push work down, which led Court to set a final rate of $465.  The current dollar equivalents for the lower rates ultimately used by the Court would be $670 and $432 for partner and counsel, respectively.

---

[9] *See, e.g.,* Bill Josten, *BigLaw Market Report:  Am Law 100 Firms Continue Strong Performance in Q1 2019,* available online at https://www.legalexecutiveinstitute.com/am-law-100-biglaw-report/# (last accessed Oct. 3, 2020) (reporting 4.4% year-to-year rate growth in Am Law 100 firms, 2019 Q1 as compared to Q1 2018, 3.8% growth in market as a whole).

51.     It is also instructive to consider the overall size of fee awards in other cases in which this Court and its sister Court in the Western District have awarded fees on an interlocutory basis within a larger action, such as discovery disputes resulting in issuance of an order compelling discovery pursuant to Fed. R. Civ. P. 37.  Three instructive examples are provided by the awards made in *Lismont v. Alexander Binzel Corp.*, 47 F. Supp. 3d 443, 459 (E.D. Va. 2014) ($33,469 in fees incurred for preparation of motion for entry of confidentiality order and associated tasks); *Stewart v. VCU Health System Authority*, No. 3:09cv738, 2012 WL 1120755, at *6 (E.D. Va. Apr. 3, 2012) ($28,547.25 in fees awarded against *pro se* plaintiff for repeated failures to comply with discovery obligations); *Sines v. Kessler*, No. 3:17cv72, 2020 WL 2736434 (W.D. Va. May 26, 2020) ($41,300 in fees incurred in preparing two motions for sanctions and preparing for, traveling to, and participating in, oral argument on both motions).  The present, proposed award, totaling slightly less than $44,000, is comparable.

### *Conclusion*

52.     For the reasons set forth in the preceding paragraphs, I am of the opinion that: (a) the number of hours for which recovery is sought, 98.5 total hours, is reasonable in light of the complexity of the matters entailed, the relatively unusual nature of the relief sought, and the importance of the issues entailed in the Motion to this high-stakes litigation between major railroads; (b) the allocation of work among the members of Plaintiffs' litigation team ensured that work was appropriately "pushed down" to lower-rate timekeepers; (c) the rates sought for the legal professionals providing services are reasonable in this legal market for practitioners and paraprofessionals of similar experience and expertise with respect to complex litigation in this Court; (d) the detailed time entries for which recovery is sought comply with billing best practices, such as billing in one-tenth hour increments and single-task billing; and (e) the amount of the rates

sought are consistent with rates utilized in comparable cases by this Court, in this Division, and the size of the total fee award sought is consistent with awards in comparable cases in which this Court has made an interlocutory award of attorneys' fees, including awards made with respect to discovery disputes and for contumacious behavior giving rise to a motion for contempt.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct with respect to factual matters and accurately reflects my opinions as stated.

Executed on the 5th day of October, 2020.

_____
Alan D. Albert