# Exhibit K

Page 1

1                    IN THE UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF VIRGINIA
2                          NORFOLK DIVISION
3                             No. 2:18cv530
4     CSX TRANSPORTATION, INC.,
      individually and on behalf
5     of NORFOLK & PORTSMOUTH BELT
      LINE RAILROAD COMPANY,
6                      Plaintiff,
7     v.
8     NORFOLK SOUTHERN RAILWAY COMPANY,
9     et al.,
10                     Defendants.
11    _____/
12                          Remote Proceedings
                            January 13, 2021
13                          9:38 a.m. - 6:40 p.m.
14
15           VIDEO DEPOSITION OF ROBERT GIRARDOT
16                    (via Teleconference)
17        Taken before SUZANNE VITALE, R.P.R., F.P.R.
18    and Notary Public for the State of Florida at Large,
19    pursuant to Notice of Taking Deposition filed in the
20    above cause.
21
22
23
24
25    Job No. CS4395739

Page 63

1    rate approved, you had to go to a rate committee.

2         Q.   But CSX understood that it could call a

3    special board meeting if it wanted to, to seek

4    approval of its 2010 proposals, right?

5         A.   They -- they -- they understood that, in

6    the absence of getting a simple rate proposal, an

7    operating proposal approved, you know, they

8    recognized that even that is kind of a very

9    unusual -- a very unusual hurdle for something that

10   simple.

11              But in the case of, you know -- that was

12   an unusual barrier.  But in the case of not being

13   able to get this very straightforward proposal

14   approved even by the rate committee, that that was

15   kind of the only remedy, to take a -- take a simple

16   rate issue all the way up to the board of directors.

17   Yeah, that was basically the only remedy.

18        Q.   So your testimony is that CSX's rate

19   proposal in 2010 would not need board approval?

20        A.   No, it wouldn't need the board approval,

21   no.

22        Q.   But the plan was to take it to the board,

23   right?

24              MR. HATCH:  Objection, asked and answered

25        and misstates the testimony.

Page 65

1      before?

2           A.    No, I have not.

3           Q.    Were you aware that a document known as

4      "Reference Guide for Affiliate Board Service"

5      existed?

6           A.    You know, there's just so many documents

7      involved with this.  So this is one I was not aware

8      of.

9           Q.    Okay.  I'd like to turn to page -- the

10     numbered page 3 of the reference guide, which is

11     Bates numbered CSXT0154800.

12          A.    Go to page 3 or section 3?

13          Q.    Section 2.  The number at the bottom is 3,

14     but there's also a Bates number, 800.

15          A.    Okay.  All right.  I got the right -- I

16     got the right page.  You're going to ask me

17     questions, so I'd like to ask to have time to review

18     the whole page.

19          Q.    I'm referencing specifically language that

20     appears in the middle of the page.  It says "A board

21     of directors should scrutinize and approve major

22     decisions such as:  Major contracts/transactions."

23                Do you see that?

24          A.    Yes, I see that.

25          Q.    As a general proposition, would you agree

Page 66

1 that for a shortline railroad, that the board of

2 directors should scrutinize and approve major

3 decisions such as major contracts and transactions?

4    MR. HATCH:  I'm going to object to that.

5    As a general proposition, that's vague and

6    calls for an opinion, and I think it's also

7    outside any of the 30(b)(6) topics.

8    But if you understand, Rob, you can

9    answer.

10    THE WITNESS:  Well, I mean, it says, you

11    know, that.  You read what it says.  So I would

12    view this in the context of, you know, the

13    board should supervise what management is

14    doing.  It doesn't necessarily mean ahead of --

15    beforehand.

16    Certainly -- so, you know, this wouldn't

17    mean to me that, before you made any, you know,

18    you made any -- the president of a railroad

19    could easily -- could even go up to the

20    president's level, could easily be able to make

21    a decision on a rate.

22    I mean, I think it's -- are you trying to

23    say that this says that if someone is making a

24    rate proposal to the railroad, that it should

25    go to the board of directors to be approved?

Veritext Legal Solutions

800-567-8658                973-410-4098

Page 67

1          Is that what you're asking?

2    BY MR. WINGFIELD:

3          Q.   Well, let's put it more sharply.

4          Do you think that CSX's rate proposal in

5    2010 should have gone to the board to be scrutinized

6    and approved as a major contract or transaction for

7    NPBL?

8          A.   No, I don't think it -- I don't think it

9    was something that really needed to go up to the

10   board of directors, no.

11         I think that was an artificial hurdle

12   that -- that was placed to obstruct reaching a

13   reasonable commercial contract that would vastly

14   increase the amount of business on NPBL.

15         Q.   Your testimony is that a -- the proposal

16   for CSXT would vastly increase the revenue for NPBL,

17   right?

18         A.   That's right.

19         Q.   But it's not necessary to take a contract

20   or vastly increased revenue to the board, in your

21   view, right?

22         A.   I don't think that's necessary, no.

23         Q.   Obviously, since you've never seen it

24   before, the reference guide, you didn't draft this,

25   right?

Page 68

1          A.    No, I did not.

2          Q.    You've never seen it before, right?

3          A.    That's correct.

4          Q.    So are you able to explain to me how I'm

5     supposed to reconcile the language in the reference

6     guide against your testimony as to how things should

7     work at NPBL?

8               MR. HATCH:  I'm going to object to that as

9          argumentative.

10              You can answer if you can, Rob.

11              THE WITNESS:  I just think that, you know,

12         it would be very unusual in a company that a

13         rate decision that was so clear like this, was

14         simple, it would have to be approved by a board

15         of directors, unless the purpose of that was to

16         obstruct growing the business.

17    BY MR. WINGFIELD:

18         Q.    Could taking a decision that would vastly

19    increase the revenues of NPBL to the board be simply

20    a matter of good basic corporate governance?

21              MR. HATCH:  I'm going to object,

22         hypothetical, asked for an opinion.

23              THE WITNESS:  I think that the president

24         already has the approval and scrutiny of the

25         board of directors.  They were given

Page 69

1            instructions by the board of directors to go

2            out and find more business to increase revenue.

3                 That's what this proposal did.  They

4            already had approval.  You didn't need to have

5            a board meeting to do that.

6    BY MR. WINGFIELD:

7            Q.   Isn't it true that the 2010 rate proposal

8    from CSX was never actually presented to the board

9    for a vote?

10           A.   You know, I'd have to look at the -- you

11   know, that's a very specific question.  I know --

12           Q.   It's proving a negative, right?

13                MR. HATCH:  I think the witness was still

14           finishing his answer.  If you could allow him

15           to finish, please.

16                THE WITNESS:  Could we look at the board

17           minutes together?

18   BY MR. WINGFIELD:

19           Q.   If I had an infinite amount of time with

20   you, we could because what we need to do is examine

21   a whole set of the minutes, meeting by meeting, and

22   see that there's no proposal, no vote, right?

23                What I'm struggling with is there's no

24   evidence that there ever was a vote on it.

25                So I'm just asking you, are you aware of

Page 171

1           Based on your knowledge, based on your

2      preparation for this deposition or any other source,

3      are you aware of some other spreadsheet or similar

4      kind of document that would tie in to and support

5      the numbers that appear in the rate proposal?

6           A.   No.  Again, I think, you know, we have a

7      lot of experience as to what are attractive rates to

8      shortlines, and this would be attractive to any

9      other shortline that I deal with.

10          Q.   Okay.  I want to go back to Girardot

11     Exhibit Number 6, which would be your tab 94.

12          A.   Okay.

13          Q.   In front of you is the printout from the

14     CSXT portal regarding Norfolk & Portsmouth Belt Line

15     Railroad Company Virginia entity vitals.

16               Do you see that?

17          A.   Yes.

18          Q.   So if you'll look down below business

19     purpose, this is number 1, and it says "Subject to

20     STB oversight?"

21               Do you see that?

22          A.   Yes, I do.

23          Q.   And the answer given to that is yes,

24     right?

25          A.   Yes.

Page 172

1          Q.    And STB, in railroad world, is the

2     Surface Transportation Board?

3          A.    That's correct, yes.

4          Q.    Is it true that the Surface Transportation

5     Board can handle disputes over rates involving

6     railroads within its jurisdiction?

7          A.    Yes.

8          Q.    If CSXT did not like the rates charged by

9     NPBL for its movement to NIT, it could have sought a

10    remedy with the STB, right?

11              MR. HATCH:  Objection, calls for a legal

12         conclusion.

13              THE WITNESS:  That's one, you know, that I

14         can't -- I think -- I'd say I -- I mean, you

15         want me to take a shot at it, Ben?  I mean, you

16         know, I'm not an STB lawyer.

17              MR. HATCH:  I guess, if you know the

18         answer, you can answer.

19              THE WITNESS:  I think that -- you know,

20         our problem here wasn't just the rate.  It was,

21         you know, all of the other behavior that went

22         along with the board behavior and the lack of,

23         you know, exercising their fiduciary duties and

24         the conspiracy between Norfolk Southern and

25         NPBL to block us to get out there that was --

1           that was the issue, and I don't think those are

2           issues that are within the STB's oversight.

3    BY MR. WINGFIELD:

4           Q.   Considering that CSXT did not even ask the

5    board to vote on the 2018 rate proposal, what did

6    the board of NPBL do to block that?

7           A.   I -- you know, I think it shows that the

8    rate proposal was discussed at the board.  And I

9    think it's telling that it's not a big, huge

10   highlight on the board meeting minutes, you know, a

11   pickup of this much business.

12              I think that's -- but I think -- so, I

13   mean, that's one example.  I think the board -- I

14   don't think that something like that needed to be

15   voted on by the board.

16              I think after they had that discussion,

17   they would have said go forth and conquer, go get

18   this new business.

19          Q.   Is CSXT complaining about something the

20   board didn't do, that is, didn't cheerlead the

21   proposal?

22              MR. HATCH:  Alan, could you state the

23          question again?  I didn't hear it all.

24   BY MR. WINGFIELD:

25          Q.   Is CSXT's complaint about the handling of