**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**CSX TRANSPORTATION, INC.,**

      **Plaintiff,**

  **v.**                               **Civil Action No. 2:18-cv-530-MSD-RJK**

**NORFOLK SOUTHERN RAILWAY**
**COMPANY, *et al.*,**

      **Defendants.**

**NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY'S**
**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant Norfolk and Portsmouth Belt Line Railroad Company (the "Belt Line"), by counsel, for its memorandum in support of its Motion for Summary Judgment against CSX Transportation, Inc. ("CSXT"), states as follows:

**Introduction**

This is a case about intermodal container traffic. CSXT claims that the Belt Line and Norfolk Southern Railway Company ("NS"), since at least 2007, have conspired to block CSXT from intermodal rail access at Norfolk International Terminal ("NIT"). CSXT asserts four counts against the Belt Line: two antitrust conspiracy claims and two state law conspiracy claims. All fail as a matter of law.

The Belt Line has not conspired with NS or harmed CSXT. CSXT's claims are all time-barred, and its current demand for a special rate for NIT traffic is no different from the demand it made, but did not pursue, in 2010. Its legal theory to establish a conspiracy contradicts settled law, its state law claims are missing the essential element of an unlawful act, and its antitrust claims ignore the Belt Line's undisputed costs, depending instead on invalid price comparisons.

**Background**

The Belt Line is a short line terminal switching railroad.  It was formed almost 125 years ago when eight long-haul railroads created a subsidiary to handle their local switching operations in Norfolk, Portsmouth, and then-surrounding counties.  The contract they signed in 1897 is the Belt Line's Operating Agreement.  The Belt Line's tracks connect with its owners' tracks, allowing it to "interchange" freight cars with them for pickup and delivery of cargo.

From its inception, the Belt Line was designed to operate at cost, not to profit from its owners.  Its Operating Agreement provides that, "a uniform rate shall be fixed for the movement of freight cars over the said [company's] railroad, regardless of distance..."  D.E. 1-1, p. 4, Art. Ninth (**Ex. 1**).  It also provides that the rate may be "adjusted from time to time," but only by an amount "sufficient" to cover the Belt Line's costs and pay a dividend to its owners.  *Id*.  In other words, no special deals – everyone pays the same rate.

In order for CSXT to access NIT by rail, it must use the Belt Line, as CSXT's own tracks do not reach NIT.  For that service, CSXT must pay the switching rate published in the Belt Line's public tariff (**Ex. 2**), or $210 per loaded railcar well. [1]  The switching rate has been the same since the Belt Line's Board set it in 2009.  For at least the last decade, however, with the exception of a few rail moves in 2015, CSXT has transported containers to and from NIT by truck, not by rail, ███████████████████████████████.

---

[1]      Specialized railcars carry intermodal containers.  The "well" of the railcar is where containers are set.  For efficiency, wells are commonly stacked with at least two containers (often two 40-foot containers), although a single well can hold three (two 20-foot containers topped by a 40-foot container).



To reach NIT, the Belt Line must travel over NS-owned tracks.  For that route, the Belt Line must coordinate with NS and pay NS a trackage rights fee.  It has paid such a fee since 1917. The Belt Line and NS are currently parties to a proceeding before the Surface Transportation Board ("STB") over the amount of the fee. [2]

CSXT and NS are the successors of the railroads that formed the Belt Line.  NS owns 57% of the Belt Line and CSXT owns 43%.  The Belt Line's current $210 switching rate is aligned with its operating costs.  ███████████████████████████████████████████

████████████████████ [3] ██████████████████████████████

CSXT and NS use the Belt Line to move non-intermodal railcars at the $210 rate all year.

███████████████████████████████████████████████████████████████████

███ [4]  The reason for this litigation is not the rate.  It is that CSXT does not want to pay the rate for a particular kind of traffic over a particular route:  specifically, intermodal traffic between CSXT's Portsmouth railyard and NIT. [5]  For that traffic over that route, CSXT complains the rate is too high, ████████████████████████████████████████████

In 1989, CSXT and NS's two predecessors, as all the Belt Line shareholders at the time, entered a Supplemental Agreement amending the Operating Agreement.  They did not change the

---

[2]     *See* D.E. 28-2, Norfolk Southern Railway Company Petition to Set Trackage Rights Compensation dated September 13, 2018, STB Docket No. FD 36223.  CSXT intervened in the proceeding after it was filed.  The STB then stayed the proceeding at CSXT's request.

[3]     *See* Expert Report of Thomas Crowley ("Crowley Report"), p. 5, Table, 1 (**Ex. 3**), compiling data from Belt Line's Annual Reports to Shareholders; *see also* Annual Reports from 2010-2020 (**Ex. 4**).

[4]     *See* Crowley Report, p. 23 (**Ex. 3**); *see also* Annual Reports for 2018 and 2019 (**Ex. 4**).

[5]     *See* March 23, 2018 CSXT rate proposal, p. 1 (**Ex. 5**) ("By this letter, [CSXT] requests that NPBL management adopt the following proposal *for long term rail intermodal service to Norfolk International Terminals* (NIT), as described in detail below…") (emphasis added).

uniform rate requirement. ███████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Since 2010, despite two Board meetings and one shareholder meeting every year, and despite CSXT sending the Belt Line proposals in 2010 and 2018, █████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

███████████████████████████  As a result, the uniform rate requirement in the 1897 Operating Agreement remains operative, with the rate set at $210 per loaded railcar well, as does the Board structure that the parties agreed to in the 1989 Supplemental Agreement.

This case is CSXT's effort to change those agreements – not through Board or shareholder action, but by judicial mandate.  Yet there is no antitrust violation here.  There is no conspiracy.  As set forth below, the Belt Line's rate is lower on a per mile basis than every comparable switching tariff rate on the East Coast or Gulf Coast.  ███████████████████████████████

█████████████████████████████████████████████████████████████████████

███████████████████████████████████████[6]

███████████████████████████████████████████████████████████████

███████████████████████████████  The reason CSXT moves tens of thousands of containers every year by truck instead of rail at NIT (█████████████████) is not a conspiracy between NS and NPBL; ██████████████████████████████████████████████████████

█████████████████████████████████████████████████████

---

[6] █████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████.  *See* D.E. 79.



The Belt Line has done nothing wrong here.  It remains willing and able to move CSXT traffic to and from NIT at its tariff switching rate.  Under settled law, it cannot be forced to operate below cost, ██████████████████████████████████████████████████
██████████████████████████

## Summary of the Argument

Four counts remain against the Belt Line.  Counts I and II assert federal antitrust conspiracy claims; Counts VIII and IX assert state law conspiracy claims.  Based on the undisputed facts, judgment should be entered for the Belt Line on all of them for the following reasons.

### *All Claims*

1.      All of CSXT's claims are time-barred.  CSXT identified as early as 2009 the same so-called conspiracy for which it seeks relief now.  CSXT's expert also traces all of CSXT's damages to 2009.  CSXT ascribes no separate damages to any other acts, and has admitted that the only other possibility to save its claims – a "new agreement [in 2018] to increase the amount the Belt Line pays to NS" – was never made.

2.      All of CSXT's claims also fail because CSXT has no evidence of a conspiracy, and its legal theory to end-run that flaw contradicts settled law.  CSXT bases its conspiracy claims on communications between the Belt Line's NS-appointed Board members and their NS colleagues.  Yet courts have uniformly rejected that approach, since individual Board members are not agents

of a company and cannot conspire on its behalf.  Put simply, NS employees talking to NS employees does not make the Belt Line a conspirator.

### *State Law Claims*

3.      CSXT's state law claims against the Belt Line fail because CSXT no longer asserts an unlawful act.  Under Virginia law, a conspiracy without an unlawful act is not actionable.  CSXT originally asserted tortious interference, but this Court dismissed that count and CSXT did not amend.  No other unlawful act supports CSXT's claims.

### *Federal Law Claims*

4.      All of CSXT's antitrust claims fail because, even if CSXT could show an agreement (it cannot), and even if CSXT could then prove a substantial anticompetitive effect in a properly-defined market (it cannot), CSXT still cannot overcome the Belt Line's procompetitive justification for its rate.  The Belt Line's rate is justified by its undisputed operating costs, and a price set at cost is by definition procompetitive.  CSXT cannot avoid this reality by relying on invalid price comparisons.

## **Statement of Undisputed Facts**

### *The Belt Line*

1.      The Belt Line is a short line railroad.  It operates approximately 30 miles of track in Norfolk, Portsmouth, and Chesapeake, Virginia.

2.      The Belt Line was formed in 1897 by eight railroads.  *See* D.E. 1-1.  The Operating Agreement that its owners signed in 1897 remains effective today.  *Id.*

3.      The Belt Line's primary business is to interchange freight cars, sometimes referred to as "switching."  It receives cars tendered by CSXT and NS and delivers them to locations on its tracks, or vice versa.  *See* Moss Dep. 30:12-18 (**Ex. 6**).

4.      Following mergers and consolidations, CSXT and NS are the Belt Line's only two owners now.  CSXT owns 43% of the Belt Line and NS owns 57%.  *See* D.E. 1, ¶ 23.

5.      In 1989, the Belt Line's owners entered into a Supplemental Agreement amending the Operating Agreement.  *See* D.E. 1-3 (**Ex. 7**).  They agreed that " ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████

6.      The Belt Line is not a competitor of either NS or CSXT.

*The Belt Line's Uniform Rate and Profit Restrictions*

7.      The Belt Line was set up to operate at cost.  *See* D.E. 1-1, p. 4, Article Ninth (**Ex. 1**).  Its Operating Agreement provides that, "[A] uniform rate shall be fixed for the movement of freight cars over the said [company's] railroad, regardless of distance ..."  *Id.*  The rate may be adjusted from time to time so "as to yield a net revenue sufficient to pay the interest upon the bonds outstanding and a dividend of six per cent on the stock."  *Id.*

8.      The switching rate in the Belt Line's published tariff today is $210 per loaded freight car.  *See* Belt Line Tariff, p. 4, Item 70 (**Ex. 2**); D.E. 1, ⁋ 34.  It has been the same since the Belt Line's Board set it at the December 2009 Board meeting.  *See* D.E. 1, ⁋ 34.

*Intermodal Traffic at the Port of Virginia*

9.      The Port of Virginia is the third largest international intermodal container port on the East Coast.  Until May 2020, it had three primary terminals at which ocean carriers could load or unload container cargo:  Portsmouth Marine Terminal, Virginia International Gateway ("VIG"), and Norfolk International Terminals ("NIT").  All are operated by VIT, the operating arm of the Port of Virginia.

10.     CSXT and NS are able to access all three terminals, although only VIG and NIT are currently used for international intermodal container traffic.

*VIG*

11.     A third-party short line railroad, Commonwealth Railway ("CWRY"), owns the only track leading into VIG.  NS and CSXT pay CWRY a switching fee for rail access at VIG. *See* Girardot Dep. (first) 99:18-99:24 (**Ex. 8**); Luebbers Dep. (first) 60:05-60:08 (**Ex. 9**).

12.     CWRY's public tariff switching rate for intermodal traffic is $210 per well, loaded or empty.  *See* CWRY Tariff, p. 2 (**Ex. 10**).

13.     ███████████████████████████████████████████████

████████████████████████████████     *See* Crowley Report, Table 2, n.1 (**Ex. 3**).

*NIT*

14.     NS has rail access at NIT over its own track leading into the terminal.  *See* Martinez Dep. 31:16-32:4 (**Ex. 11**)

15.     CSXT can access NIT two ways:  by rail via the Belt Line or by truck in the form of drayage, subsidized by VIT.  *See* MacDonald Dep. 42:3-6; 54:11-17 (**Ex. 12**).

16.     CSXT must pay the Belt Line's $210 switching rate to access NIT by rail.

17.     CSXT must pay VIT a drayage fee to dray containers between its rail yard and NIT.

████████████████████████████████████████████████████████████████

████     *See* Capozzi Dep. 79:16-80:10, 122:6-23 (**Ex. 13**).

18.     ███████████████████████████████████████     *See* Capozzi

Dep. 83:9-13.  ██████████████████████████████████████████

████████████     *See* Capozzi Dep. 248:4-24.  ████████████████████████

███████████████████████     *See* Expert Report of Howard Marvel ¶ 49 (**Ex. 14**).

*Discontinuance of the "Diamond" in 2007*

19.     In 2007, the Belt Line Board discontinued service over a portion of NS-owned track that CSXT calls the "diamond."  While CSXT now argues that the purpose was to make NIT access more difficult, CSXT was not using the Belt Line to access NIT at the time.  *See* Girardot Dep. 217:15-23 (**Ex**.**15**).  The December 2007 Board meeting minutes reflect that the reason was cost: "After discussion and consideration of an alternate route and associated costs of trackage rights the following resolution was, on motion duly made and seconded, adopted…"  Dec. 2009 Board Meeting Minutes, p. 5 (**Ex. 16**).

20.     The discontinuance was filed with the STB, with no objection by CSXT.  *See* STB Docket No. AB-290 (Sub-No. 299X), *NSR – Discontinuance of Service Exemption & NPBL – Discontinuation of Trackage Rights Exemption,* May 15, 2008 (**Ex. 17**).

*Establishment of the $210 Switching Rate in 2009*

21.     In 2009, the Belt Line's Board formed a rate committee to review its tariff.  The rate committee included representatives from the Belt Line's management and each of its owners. *See* Coleman Dep. 109:1-110:25 (**Ex. 18**).

22.     At the Belt Line's December 2009 Board meeting, following evaluation by the rate committee, the Belt Line's Board adopted a uniform $210 line haul switching rate, to take effect January 1, 2010.  *See* Dec. 2009 Board Meeting Minutes (**Ex**. **19**).

23.     In sworn deposition testimony, John Booth, CSXT's Director of Joint Facilities who spent 28 years working with switching railroads throughout the CSXT system, including the Belt Line, described the $210 rate as "in the neighborhood of what we had been expecting" in 2009, "kind of in the middle of the road," and "not an unusual number for a terminal switch carrier or an intermediate switch carrier. . ."  Booth Dep. 20-22; 141-42 (**Ex. 20**).

24. ███████████████████████████████████████████

███████████████████████████████ *See* Crowley Report, p. 23 (**Ex. 3**). ████████

█████████████████████████████████████████████

██████████████████████████ *Id.*

*CSXT's Rate Proposal in 2010*

25.     On July 23, 2010, CSXT sent a letter to the Belt Line proposing that the parties enter into a contract relating to the Belt Line's movement of CSXT's intermodal traffic to and from NIT.  *See* 2010 Rate Proposal (**Ex. 21**). ████████████████████████████

█████████████████████████ *Id.*

26.     In proposing the discounted rate, CSXT did not consider the Belt Line's costs for moving the trains.  *See* Booth Dep. 69:4-8, 123:4-24:17 (**Ex. 20**).

27. ████████████████████████████████████████████

█████████████████████ *See* April 2011 Board Meeting Minutes (**Ex**. **22**).

*Nine NIT Trains in 2015*

28.     With the exception of a single move in 2010, the first time CSXT asked the Belt Line to move intermodal traffic to or from NIT was March 27, 2015.  *See* MacDonald Dep. 142:6-19 (**Ex**. **12**).  The Belt Line worked diligently with CSXT, NS, and VIT to create an operating window for the move, which they established on March 31, 2015.  *Id*. at 144:20-25.

29.     The Belt Line successfully moved that first train on April 1, 2015.  *Id*. 144:20-25.

30. ████████████████████████████████████████████

███████████████████ *See* Moss Dep. 291:21-292:7 (**Ex. 6**); MacDonald Dep. 189:17-20 (**Ex. 12**); NPBL 028166 (**Ex. 23**).

31.     Tony MacDonald, the head of CSXT's Portsmouth operations in 2015, testified that the plan developed to move CSXT's NIT traffic in 2015 was a workable one.  *See* MacDonald Dep. 216:9-13 ("Q.  Did you think the operating plan, as it was developed in 2015, was a workable plan in terms of moving intermodal freight to and from NIT using the NPBL?  A. I did.").

32.     CSXT did not consult Mr. MacDonald about the 2015 rail moves before filing this lawsuit.  *See id*. at 220:13-16.

33.     ███████████████████████████████████████████████████

███████████████████████████████     *See* MacDonald Dep. 140:14-141:8 (**Ex**. **12**).

34.     CSXT has not asked the Belt Line to take any intermodal trains to or from NIT since 2015.  *See* Moss Dep. 291:21-292:7; MacDonald Dep. 189:17-20.

35.     The Belt Line has never refused to transport CSXT intermodal trains to or from NIT at its tariff rate.

*CSXT's Rate Proposal in 2018*

36.     On March 23, 2018, CSXT sent a letter to the Belt Line asking that the Belt Line adopt a special switching rate for CSXT intermodal traffic to and from NIT.  *See* 2018 Rate Proposal, D.E. 1-5 (**Ex. 5**); Armbrust Dep. 244:22-246:2 (**Ex**. **24**).  ████████████████████

█████████████████████████████████ *Id*. ████████████████████████

██████████████████████████████     *See* DiDeo Dep. 132:14-22 (**Ex. 25**).

37.     After receiving the 2018 rate proposal, the Belt Line's President, Cannon Moss, consulted with the Belt Line's Vice President, Donna Coleman, and recommended that a rate committee evaluate the proposal.  *See* Moss Dep. 242:3-243:7 (**Ex. 6**).

38.     Mr. Moss also met with VIT and NS to develop an operating plan to deliver CSXT trains to and from NIT.  *See* NPBL 006228 (**Ex. 26**); Moss Dep. 242:10-17 (**Ex. 6**).

39.     Mr. Moss also responded in writing to CSXT regarding concerns about the 2018 rate proposal, but no one at CSXT replied.  *See* Coleman Dep. Ex. 38 (**Ex. 27**).

40.     

*See* CSXT's Resp. to NPBL RFAs 10, 13, 15, 16 (**Ex. 28**); April 2018 Board Meeting Minutes (**Ex. 29**); CSXT 30(B)(6) Dep. 138:17-19 (**Ex. 15**).

*CSXT's Governance Proposal in 2018*

41.     In a letter dated April 6, 2018, CSXT demanded that the Belt Line take certain actions regarding its governance.  *See* 2018 Governance Proposal, D.E. 1-6 (**Ex. 30**).

*Id.*

42.

*See* April 2018 Shareholder Meeting Minutes (**Ex. 31**).

*Id.*

*The Belt Line's Operating Costs*

43.     The Belt Line's operating costs are reviewed and approved by its Board each year as part of the Belt Line's Annual Report, then adopted as part of the Annual Report by the shareholders.  *See* Annual Reports, 2010-2020 (**Ex. 4**).

44.     The Belt Line's $210 switching rate is at or below the Belt Line's average operating cost per car from 2010 to 2020.  *See* Crowley Report, pp. 5-6 (**Ex.3**).

45.

*See* Crowley Report, p. 5, Table, 1 (**Ex. 3**), compiling data from Annual

Reports; *see also* Annual Reports 2010-2020 (**Ex. 4**). ███████████████████

█████████████████████████████████ *Id.*

*Other East Coast and Gulf Coast Intermodal Switching Rates*

46.     The industry standard for comparing railroad rates on a common basis is to compare them "based on the length of haul between the interchange point and the marine terminal the switch carrier serves," also known as a "per mile" basis.  *See* Crowley Report, p. 12 (**Ex. 3**); Crowley Dep. 235:2-15 (**Ex. 32**).

47.     CSXT does not have a railroad rate expert in this case.  *See* Marvel Dep. 165:2-166:20 (**Ex. 33**).  CSXT's expert witness did not compare any rates on a per mile basis.

48.     When compared on a per mile basis, the Belt Line's switching rate per container is lower than the intermodal tariff rates offered by ███████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████     *See* Crowley Report, pp. 13-15, Tables 2 and 3 (**Ex. 3**).

49.     When compared on a per mile basis, the Belt Line's switching rate is also lower than the CWRY intermodal tariff rate because the CWRY rate of $210 per well applies to loaded and empty wells, whereas the Belt Line rate applies only to loaded wells.  *See* Belt Line Tariff, p. 4, Item 70 (**Ex. 2**); Coleman Dep. 155:25-157:1 (**Ex. 18**); CWRY Tariff, p. 3 (**Ex. 10**).

*Drayage*

50.     Intermodal container traffic can be transported multiple ways, including by rail or truck.  For rail, two to three containers are commonly loaded on a single railcar well.  *See* Crowley Report, p. 10 (**Ex. 3**).  This improves operating efficiency, as the more containers in a well, the

lower the cost per container.  *See* Kenney Dep. 41:20-42:1 (**Ex**. **34**); Strongosky Dep. (first) 45:14-46:3 (**Ex**. **35**); Picante Dep. 74:13-23 (**Ex**. **36**).

51.   *See* Girardot Dep. (second) 103:7-107:7 (**Ex**. **37**).  Since that time, CSXT's efficiency has improved.  *Id*.

52.   *See* Marvel Dep. 187:17-188:20 (**Ex**. **33**).

*Trackage Rights Proceeding at the STB*

53.  In 1917, NS and the Belt Line entered a Trackage Rights Agreement to allow the Belt Line to access NIT over NS's tracks.  ████████████████████  *See* CSXT 0044428 (**Ex**. **38**).

54.  ████████████████████████████  *See* CSXT's Resp. to NPBL RFAs 5, 8 (**Ex**. **28**).  The dispute is currently before the STB, which stayed the proceeding pending the outcome of this case.

## **Standard of Review**

Summary judgment is appropriate when there is no genuine issue as to any material fact and it appears from the pleadings and supporting affidavits or depositions that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The Court has an "affirmative obligation" to prevent "factually unsupported claims and defenses" from proceeding to trial.  *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1997).

To defeat a motion for summary judgment, the nonmoving party must show the existence of genuine factual disputes that are material to the issues to be decided.  *See Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  When the nonmoving party has the burden of proof and fails to provide sufficient evidence on an issue, then there is no genuine issue of material fact, as "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.  Furthermore, "on summary judgment motions in antitrust cases, the Supreme Court has instructed that when there is evidence of conduct that is consistent with both legitimate competition and an illegal conspiracy, courts may not infer that an illegal conspiracy has occurred without other evidence." *Thompson Everett, Inc. v. Nat'l Cable Advertising, L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

<u>Argument</u>

I.   **All of CSXT's claims against the Belt Line are either time-barred or not actionable.**

CSXT identifies six acts to support its claims, described below.  All but two are time-barred outright.  The remaining two are not actionable because CSXT identifies no damages that flow from them.  The only other possibility, a "new agreement" in 2018, which saved CSXT's claims on the Motions to Dismiss, never happened.

A.   **Four of the acts on which CSXT relies are time-barred.**

CSXT bases its claims on six alleged acts by the Belt Line and NS: ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████ *See* D.E. 1, ¶ 34; CSXT's 2nd Supp. Resp. to NPBL Interrog. 4.  As set forth below, the statute of limitations bars recovery of damages caused by the first four outright.

**1.     Federal law claims for acts before October 4, 2014 are time-barred.**

Counts I and II assert violations of Sections 1 and 2 of the Sherman Act.  Under that Act, damages are recoverable only if a plaintiff files suit within "four years after the cause of action accrued."  15 U.S.C. § 15b.  An antitrust cause of action "accrues and the statute begins to run whenever a defendant commits an act that injures a plaintiff's business."  *Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321, 338 (1971).  Consequently, CSXT's antitrust claims must be based on acts that occurred on or after October 4, 2014.  *See* D.E. 1 (filed October 4, 2018).

The first four acts alleged by CSXT occurred in 2007, 2009, and 2010.  Contemporaneous correspondence from CSXT to the Belt Line undisputedly reflects that CSXT was aware of its alleged injuries and prepared to bring suit over them at least as early as that time ███████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████ Ingram Dep., Ex. 7, p. 2 (**Ex. 39**) (emphasis added).

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████ *Id.*, Ex. 8, p. 1 (**Ex. 40**) (emphasis added).  He goes on: ████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████ *Id.*, p. 2 (emphasis added).  ████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████ *Id.*, Ex. 18, p. 1 (**Ex. 41**).

Others at CSXT were addressing the same issues in the same time period, including CSXT's Vice President of State Government and Community Affairs for Virginia, Quentin Kendall, and its head of Law and Public Affairs, Ellen Fitzsimmons.  *See* Kendall Dep. 170:5-174:7 (**Ex. 42**). ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████ Eliasson Dep., Ex. 10, p. 2 and 105:11-113:5 (**Ex. 43, 44**).

Yet CSXT did not file suit until October 4, 2018.  Based on that filing date, as a matter of law, CSXT cannot recover damages for any of the first four acts.  *See* 15 U.S.C. § 15b.

**2.      State law claims for acts before October 4, 2013 are time-barred.**

In Virginia, the limitations period for civil conspiracy is based on the limitations period for the underlying wrongful act.  *See* D.E. 66, p. 36 (citing *Hurst v. State Farm Mut. Auto. Ins.*, 2007 U.S. Dist. LEXIS 21172, at *17 (W.D. Va. 2007)).  For statutory business conspiracy, at least where the claim is based on tortious interference, the Virginia Supreme Court has applied a 5-year limitations period for property damage under Va. Code § 8.01-243(B).  *See Dunlap v. Cottman Transm. Sys.*, 287 Va. 207, 220-22 (2014).[7]  Consequently, at the earliest, CSXT's antitrust claims must be based on acts that occurred on or after October 4, 2013.

This Court previously held that CSXT does not assert a "single and continuous wrongful act."  D.E. 66, p. 37 (*citing Hampton Roads San. Dist. v. McDonnell*, 234 Va. 235, 239 (1987)).  Therefore, "Under Virginia law, the applicable statute of limitations accrues separately for each wrongful act."  D.E. 66, p. 37 (citing *L-3 Commc'ns Corp. v. Serco, Inc.*, 2018 WL 1352093 at *5

---

[7]      As explained below, CSXT no longer asserts an underlying act to support its state law claims.  Nevertheless, its first four acts fail even under the 5-year period applied in *Dunlap*.

(E.D. Va. 2018)).  The Fourth Circuit has held that "only the slightest injury is required to start the running of the limitations period."  *Int'l Surplus Lines Ins. Co. v. Marsh & McLennan, Inc*., 838 F.2d 124, 129 (4th Cir. 1988).  A conspiracy claim in Virginia accrues "at the time the [plaintiff] *first suffered any damages* resulting from the acts committed in furtherance of the conspiracy." *Detrick v. Panalpina, Inc*., 108 F.3d 529, 543 (4th Cir. 1997) (emphasis added).

For the same reasons that CSXT's antitrust claims based on the four acts from 2007 to 2010 are time-barred, so too are its state law claims.

**B.      CSXT fails to identify separate damages that flow from any other acts.**

That the first four acts are time-barred has crucial implications for the remaining two. CSXT relies exclusively on the Reply Report of its expert witness, Howard Marvel, to prove all of its damages.  *See* CSXT's 4th Supp. Fed. R. 26(a)(1) Discl. ("CSXT refers to the computation of damages included in the reply expert report of Dr. Howard P. Marvel, Ph.D.").  [8]  Yet Dr. Marvel's damages model undisputedly fails to apportion damages between any separate unlawful acts.  *See* Marvel Reply Report, pp. 58-63 (**Ex. 45**).

Instead, Dr. Marvel calculates CSXT's damages based on the combined injurious effect of the time-barred claims and the remaining two claims, making no distinction between them.  As he states in his Reply Report: ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████    *Id*.,

p. 60.  He emphasizes the point in response to a critique by NS's expert witness:  ███████████

---

[8]      The Belt Line previously moved to strike all of CSXT's damages for failure to timely identify any in its initial disclosures.  *See* D.E. 87.  That motion remains pending.

███████████████████████████████████████████████

███████████████████████████████████████████████

████  *Id*., p. 63 (emphasis in original).

This flaw is fatal to CSXT's claims.  It means one of two things:  either CSXT does, in fact, assert a "single and continuous wrongful act," contrary to this Court's understanding of the Complaint, in which case all of CSXT's claims are time-barred; or CSXT asserts distinct wrongful acts, in which case its damages model fails to support a recovery for any acts within the statute of limitations window.  Either way, CSXT has no viable claims.

Federal law and Virginia law are equally dispositive on this point.  The Supreme Court has held that, with respect to federal antitrust claims, when an alleged violation consists of a series of overt acts, the plaintiff can recover damages only for acts committed within the limitations period. *See Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. at 338 ("In the context of a continuing conspiracy to violate the antitrust laws … each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover *the damages caused by that act* and …, *as to those damages*, the statute of limitations runs from the commission of the act.") (emphasis added). "[T]he commission of a separate new overt act generally does not permit the plaintiff to recover for injuries caused by old overt acts outside the limitations period."  *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (analogizing RICO statute to antitrust cases).  An antitrust plaintiff thus "cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period."  *Id.* at 190.

Virginia law has the same restrictions.  Under Virginia law, "The gist of the civil action of conspiracy is *the damage caused by the acts committed in pursuance of the formed conspiracy* and not the mere combination of two or more persons to accomplish an unlawful purpose or use

unlawful means." *Gallop v. Sharp*, 179 Va. 335, 338 (1942).  Once a cause of action is complete

and the statute of limitations begins to run, it runs against all damages resulting from the wrongful

act, even damages which may not arise until a future date.  *See Street v. Consumers Mining Corp.*,

185 Va. 561 (1946); *Louisville & N.R. Co. v. Saltzer*, 151 Va. 165 (1928).

Indeed, this Court already found that CSXT's damages attributable to acts outside the

limitations period are "distinct" from CSXT's damages arising from acts inside that period.  *See*

D.E. 66, pp. 38-9.  In comparing the setting of the $210 rate in 2009 to the alleged failure to adopt

CSXT's proposal in 2018, this Court determined that, "New damages flow from this wrongful act

[in 2018] – the Plaintiff's expectation damages, which is what Plaintiff's profits would have been

if Defendants had accepted the proposal minus what Plaintiff's profits actually were."  D.E. 66, p.

38.  This Court continued: "These damages are distinct from the Defendants' alleged 2008 [*sic*,

2009] wrongful act."  *Id.*  "The damages for the 2008 wrongful act of setting the Uniform Rate

would be the difference in CSX's profit if the parties had set the Uniform Rate at a fair market rate

in 2008 minus CSX's actual profit."  *Id.*  Crucially, this Court concluded that, "The damages from

establishing the 2008 Uniform Rate *do not encompass the damages sought for other alleged*

*wrongful acts in this action.*"  *Id.* at 38-39 (emphasis added).

Despite this roadmap for how to apportion damages, Dr. Marvel does not even attempt to

do so.  Under his model, damages from setting the uniform rate in 2009 *do* encompass damages

sought for other alleged wrongful acts.  Nowhere in either of his reports does Dr. Marvel calculate

CSXT's alleged damages for either act that allegedly occurred within the limitations period.  At

no point does he address, for example, how many trains were actually "impeded" in 2015, for how

long, at what cost, and whether CSXT was able to cover elsewhere at some other cost.  Nor does

he calculate the expectation damages this Court identified for the alleged failure to adopt the 2018

proposal, much less what rate he might have used as a basis for comparison with the tariff rate in making such a calculation.

These flaws are incurable. Under the precedent above, CSXT cannot use the last two acts as a bootstrap to recover damages attributable to the first four, which are all time-barred. And it has no proof of separate damages flowing from the last two, an essential element of its claims. *See* 15 U.S.C. § 15(a); Va. Code § 18.2-500. As a result, all of its claims fail as a matter of law.

###### C.     The only possibility to salvage CSXT's claims never happened.

Based on its reading of the Complaint on the Motions to Dismiss, this Court determined that CSXT alleged a new act in 2018, which saved its state law conspiracy claims: "While it is easy to see how these new actions constitute a new act of breaching the contract or tortiously interfering, it may be more difficult to see how it is a new act of conspiring because the alleged conspirators are the same and the alleged motivations are the same." D.E. 66, p. 39. The Court continued, "However, the Complaint alleges that in 2018, Defendants entered into a new agreement to increase the amount Belt Line pays to NS to access NS's tracks to NIT." *Id.* The Court concluded that, "[CSXT] has alleged a new conspiracy within the statute of limitations period; this second attempt to raise the Uniform Rate is not a continuation of the same conspiracy to set the Uniform Rate at the 2008 level because the price is again increased." *Id.*, pp. 39-40.

CSXT subsequently admitted that no such agreement ever occurred. In response to the Belt Line's Request for Admission No. 3, CSXT admitted:



███████████████████████████████

CSXT's Resp. to NPBL RFA 3 (**Ex. 28**).

Because there was no new agreement to increase the trackage rights fee the Belt Line pays to NS, the alleged 2018 agreement that saved CSXT's claims previously cannot save them now.[9] Accordingly, judgment should be entered for the Belt Line on all claims.

## II.    All of CSXT's claims against the Belt Line require a conspiracy and CSXT cannot show one as a matter of law.

### A.    All counts against the Belt Line require proof of concerted action.

Concerted action is an essential element of all four conspiracy counts; *i.e.*, that the Belt Line entered into an unlawful contract, combination, or conspiracy with NS.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (stating standard as to Count I under 15 U.S.C. § 1); *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp*., 910 F.2d 139, 150 (4th Cir. 1990) (standard as to Count II under 15 U.S.C. § 2); Va. Code § 18.2-500 (standard as to Count VIII under Va. Code § 18.2-499); *Hechler Chevrolet, Inc. v. Gen. Motors Corp*., 230 Va. 396, 402 (1985) (standard as to Count IX under Virginia common law).

Under Virginia law, proof of a civil conspiracy requires "clear and convincing evidence" of concerted action for an unlawful purpose.  *See Dunlap v. Cottman Transm. Sys.*, 287 Va. 207, 215 (2014) (statutory business conspiracy); *Pierce Oil Corp. v. Voran*, 136 Va. 416, 430 (1923) (common law civil conspiracy).

Under federal law, to survive summary judgment, an antitrust plaintiff "must discharge a twofold evidentiary burden."  *Laurel Sand & Gravel, Inc. v. CSX Transp., Inc*., 924 F.2d 539, 543

---

[9]      In fact, the trackage rights fee is the subject of a pending dispute between the Belt Line and NS before the STB, which is currently stayed pending the outcome of this case.  *See* STB Docket No. FD 36223.

(4th Cir. 1991).  First, the plaintiff "must establish that [the alleged co-conspirators] had a 'conscious commitment to a common scheme designed to achieve an unlawful objective.'"  *Id*. (*quoting Monsanto Co. v. Spray-Rite Serv. Corp*., 465 U.S. 752, 768 (1984)).  Second, the plaintiff "must bring forward evidence that excludes the possibility that the alleged co-conspirators acted independently or based upon a legitimate business purpose."  *Id*.  Conduct that is "as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy."  *Id*. at 542 (*quoting Matsushita Elec. Ind. Co. v. Zenith Radio Corp*., 475 U.S. 574, 588 (1986).  CSXT cannot make any such showing here.

### B. CSXT fails to establish concerted action.

CSXT's claims are devoid of concerted action.  After this Court ordered CSXT to identify the "specific communication(s)" and "specific overt act(s)" it contends the Belt Line committed, CSXT revealed explicitly that it bases its conspiracy ███████████████████████████



███████  *See* Second Supp. Ans. to NPBL Interrogs. 3 (communications) and 4 (overt acts) (**Ex. 46**).  None establishes a conspiracy.

██████████████████████████████████████

█████████████████████████████████████████

████████████████████████████  *See* **Ex. 46**, p. 9, NSR 00027069 and 00027052. █████████████████████████████████

██████  *See* **Ex. 47**, p. 9, NSR 00062929. ████████████████████

██████████████████████████████████████



*See* Allan Dep. 190:6-193:20 ████

*See* **Ex. 48**.

CSXT's answer to Interrogatory No. 4 is equally devoid of conspiratorial conduct. ████

*See* **Ex. 46**, p. 23 ████

[10] If

anything, it shows prudent business judgment.  *See Laurel Sand*, 924 F.2d at 543 (evidence must exclude the possibility of independent action or a legitimate business purpose).

All of this underscores the fundamental problem with CSXT's conspiracy theory.  CSXT has not, under any standard, identified actual conspiratorial conduct by the Belt Line.  Instead, it relies on conduct by the Belt Line's Board members and rate committee members appointed by NS.  For example, in response to Interrogatory No. 3, CSXT identifies:

- "handwritten notes [on a 1999 letter] by Richard S. Johnson, *another NS appointed member of the NPBL Rate Structure Committee*" (p. 8);

- "notes from William J. Romig [in 1999], *an NS-appointed member of the NPBL Board*, ask[ing] NS employee Don Searle to share his view on the proposal" (p. 9);

---

[10] ████████████████████████ *See* 2017 Annual Report, p. 7 (**Ex. 4**). ████████████████ *Id*., p. 11.



[redacted]

[redacted]

**Ex. 46**, pp. 8-9 (emphasis added).

CSXT's answer to Interrogatory No. 4 makes its reliance on [redacted] to support its conspiracy theory even more explicit:

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]



**Ex. 46**, pp. 14-24 (emphasis added).

None of these "acts" is conspiratorial.  Under both Virginia and federal law, "there must be two persons to comprise a conspiracy, and a corporation, like an individual, cannot conspire with itself."  *Twombly*, 550 U.S. at 554; *Bowman v. State Bank of Keysville*, 229 Va. 534, 541 (1985) (same).  CSXT's legal theory that the Belt Line somehow acted through NS employees to conspire with other NS employees is totally unsupported.  In fact, Virginia courts foreclosed the idea at least 75 years ago.  *See Mosell Realty Corp. v. Schofield*, 183 Va. 782, 793 (1945).

Under Virginia law, individual Board members are not agents of a company and therefore cannot conspire on its behalf.  *See Mosell Realty*, 183 Va. at 793.  As the Virginia Supreme Court explained in reversing a lower court that found such an agency:  "[T]he fact that Kaplan and Banks owned a majority of the stock of the corporation, and constituted a majority of its board of directors, gave them no authority to bind the corporation in any such informal manner."  *Id*.  "It is elementary that the authority of the directors is conferred upon them as a board, and they can bind the corporation only by acting together as an official body."  *Id*.

The same rule appears in the Restatement (Second) of Agency:  "Neither the board of directors nor an individual director of a business is, as such, an agent of the corporation or of its members."  Rest. 2d of Agency 14C.  Directors bind the company only as a board.  *See Mosell Realty*, 183 Va. at 793; *see also* 18B Am. Jur. 2d Corporations § 1289 ("A corporate board of directors acts as a unit; an individual director may not act alone on behalf of the corporation without authority from the board.").

The reason for the rule is obvious.  A company like the Belt Line has no control over its Board members – appointed by NS or CSXT – any more than they individually have control over

the Belt Line.  *See, e.g.*, Restat. 2d of Agency § 14C, cmt b. ("An individual director, as such, has still less resemblance to an agent than has the board as a body.  He has no power of his own to act on the corporation's behalf, but only as one of the body of directors acting as a board.").

CSXT's own actions underscore the point.  CSXT-appointed Board members regularly communicated with other CSXT employees about the Belt Line the entire time that CSXT claims NS-appointed Board members were conspiring with NS.  As just one example, Michael Burns, a CSXT in-house attorney appointed to the Board on April 18, 2018, sent emails to other CSXT employees about the Belt Line on April 19 and 20, which CSXT identifies as prepared in anticipation of litigation.  *See* Burns Dep. 60:8-67:9 (**Ex. 52**).  In other words, just two days after his first Board meeting, at the same time he owed fiduciary duties to the Belt Line, Mr. Burns was working with his colleagues at CSXT on a lawsuit against the Belt Line.  *Id.*

> **C.**     **Even the two acts within the statute of limitations window cannot establish concerted action.**

CSXT's complaints about impeded train movements in 2015 and "rejection" of its rate proposal in 2018 also do not show concerted action.  Stated bluntly, the facts that CSXT alleged in its Complaint have proven untrue in discovery.

*2015 Rail Moves*.  CSXT's allegations of conspiracy to impede its intermodal trains at NIT in 2015 are demonstrably false.  As CSXT's expert witness confirmed in deposition, ███████ ██████████████████████████████████████████████████████████  *See* Marvel Dep. 177:2-178:24 (**Ex. 33**).  CSXT does not even identify how it was impeded, how long it was impeded, or how many trains it would have moved (if any) but for any impediments.

The facts are now indisputable that (1) with a single exception in 2010, CSXT never asked the Belt Line to handle intermodal traffic to or from NIT until 2015; (2) ███████████████ ████████████████████████████████████████████████████████████████

████████████ (3) after communications between NS and the Belt Line, the Belt Line successfully moved the train; (4) after the first train, the Belt Line set up an operating window with NS for CSXT trains between 2:00am and 4:00am on Tuesdays and Thursdays; and (5) ████

████████████████████████████████████████████████████████████████

████████████ *See* Moss Dep. 126:19-25 (**Ex. 6**); Moss Dep. Ex. 14 (**Ex. 49**); MacDonald Dep. 144:14-19, 189:17-20 (**Ex. 12**); NSR 0001393 (**Ex. 50**); NPBL 028166 (**Ex. 23**).

Nothing in 2015 evidences an unlawful conspiracy.  Had CSXT consulted its former employee, Tony MacDonald, who was in charge of CSXT's Portsmouth operations in 2015, it would have never made such unsupported claims: ████████████████████

████████████████████████████████████████████████████████████████

████████████ MacDonald Dep. 216:9-13 (**Ex. 12**).  Yet Mr. MacDonald testified that CSXT never interviewed him before filing suit.  *Id*. at 220:13-16.

*2018 Rate Proposal*.  Nor does the handling of CSXT's 2018 rate proposal establish any concerted action.  Contrary to the Complaint, the Belt Line never rejected CSXT's proposal.  *See* Moss Dep. 287:25-288:9 ("Q.  Did the NPBL ever reject the proposal made for a private contract by CSX?  A.  No.").  ████████████████████████████████████

████████████████████████████████████████ *See* CSXT's Resp. to NPBL RFAs 10, 13, 15-19 (**Ex. 28**); Armbrust Dep. 214:15-21 (**Ex. 24**) (████████████████

████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████ *See* CSXT's Resp. to NPBL RFAs 17-19 (**Ex. 28**); *see also* Moss Dep. 287:25-288:6 (**Ex. 6**) ("Q:  And in response to the 2018 proposal from CSX …, did anybody on the board ever move in response to management's

recommendation that a rate committee be established to evaluate the Belt Line's tariff?  A.  No.").

Simply put, CSXT never pursued its rate proposal, using it instead as an artifice (sent just before

filing suit) to avoid the statute of limitations at the pleadings stage.

The Belt Line took CSXT's proposal seriously.  Mr. Moss spoke with VIT, NS, and CSXT.

*See* Moss Dep. 242:3-243:7 (**Ex**. **6**).  He also determined that the existing $210 rate was less

expensive than drayage for the same route, ████████████████ *Id*. 246:3-4 (**Ex. 6**) ("So

with market conditions, we were cheaper.").   And he raised other considerations, including

whether the proposal "made any sense" while the Belt Line's trackage rights fee dispute with NS

remained unresolved.  *Id.* at 246:11-12 ████████████████████

████████████████████████████

████████████████████████ *Id.* at 244:10-15 ████

███████████████████████████

███████████████████████████

███████████████████████████

████████████████

None of this conduct is conspiratorial.  The consideration by Mr. Moss is indicative of

prudent business judgment, which cannot be the basis for a conspiracy claim.  *See Matsushita*, 475

U.S. at 588; *Laurel Sand*, 924 F.2d at 543.  And, of course, CSXT ignores the pending STB dispute

wherein the Belt Line and NS are adversaries, with the Belt Line opposing NS's effort to increase

the trackage rights fee for the route to NIT.  *See supra*.

The only other aspect of CSXT's 2018 proposals was a wholesale change to the Belt Line's

governance structure, which can be made only by the shareholders.  *See, e.g.*, 1989 Suppl. Agmt.,

D.E. 1-3 (**Ex. 7**).  And inaction by the Belt Line on a point where action is impossible cannot, as a matter of law, be evidence of a conspiracy.  *See Hechler Chevrolet*, 230 Va. at 402.

As a result, CSXT cannot support its conspiracy claims as a matter of law, whether under the "clear and convincing" standard of Virginia law or the exacting antitrust standard of federal law.  Judgment should be entered for the Belt Line on all of them.

III.    **All of CSXT's state law claims in Counts VIII and IX fail as a matter of law because CSXT no longer asserts an unlawful act.**

A.      **A conspiracy claim cannot exist without an underlying unlawful act.**

A conspiracy claim without an underlying unlawful act is not actionable in Virginia.  As the Virginia Supreme Court explained in *Dunlap*, "Because there can be no conspiracy to do an act that the law allows, *Werth*, 160 Va. at 855, we have held that 'an allegation of conspiracy, whether criminal or civil, must at least allege an unlawful act or an unlawful purpose' to survive demurrer."  *Dunlap*, 287 Va. at 215 (citing *Hechler Chevrolet, Inc. v. General Motors Corp*., 230 Va. 396, 402, (1985)).  The Court continued:  "In other words, actions for common law civil conspiracy and statutory business conspiracy lie *only if a plaintiff sustains damages as a result of an act that is itself wrongful or tortious*."  *Id*. (collecting cases).

B.      **CSXT no longer asserts any unlawful act to support its claims.**

CSXT's Complaint originally tracked the Virginia Supreme Court's opinion in *Dunlap*, where the Court recognized tortious interference as the requisite "unlawful act" for a statutory business conspiracy claim.  *See Dunlap*, 287 Va. at 218-19.  In fact, the entirety of CSXT's state law conspiracy allegations in the Complaint, both statutory and common law, are as follows:

> [¶¶ 119 and 123] …Defendant NS has conspired, by express agreement and tacit understanding, with Defendant NPBL, and with the Individual Defendants, in their capacity as directors and/or managers of NPBL, to intentionally, purposefully, and without lawful justification willfully and maliciously *interfere with CSXT's reasonable business expectations, violate the individual Defendants' fiduciary duties to NPBL, and to breach NS's contract with CSXT*.  Defendants acted without lawful justification.

D.E. 1, pp. 38, 39 (emphasis added).

None of these allegations is actionable now.  The first, tortious interference, cannot be the requisite unlawful act because this Court dismissed that count.  *See* D.E. 66, p. 2 (dismissing Count VII).  The second, breach of fiduciary duty, also cannot be the requisite unlawful act because it is a claim against individuals, not the Belt Line or NS.  *See* D.E. 1, p. 36.  Those claims also have been dismissed.  *See* D.E. 143; 159.  The third, breach of contract, cannot be the requisite unlawful act because breach of contract alone cannot form the basis for a conspiracy claim.  *See Station # 2, LLC v. Lynch*, 280 Va. 166, 174 (2010) (non-performance of a contract cannot be the requisite unlawful act for a conspiracy claim where the duties of the parties arise under the contract); *see also Dunlap*, 287 Va. at 217 (same).

The question, then, is what remains?  Even the most generous reading of CSXT's Complaint and discovery responses allows nothing else.  Having failed to amend Count VII, and having failed to identify separate damages for any acts within the statute of limitations window, CSXT's state law claims lack an underlying unlawful act now.  Because a conspiracy claim cannot exist without an unlawful act, CSXT's Counts VIII and IX fail as a matter of law.

**IV.    All of CSXT's antitrust claims fail because CSXT cannot show that the Belt Line unreasonably restrained trade or conspired with NS to monopolize rail traffic.**

CSXT's failures on its antitrust claims run deeper than its inability to show concerted action.  Even assuming *arguendo* that CSXT could show an agreement, and could then prove a substantial anticompetitive effect in a properly-defined market,[11] CSXT still cannot overcome the Belt Line's procompetitive justification for its rate.  It also cannot avoid that justification by relying on invalid price comparisons.

---

[11]    The Belt Line incorporates the arguments on this point made by NS in its Brief in Support of its Motion for Summary Judgment.

**A.    The Belt Line's switching rate cannot be anticompetitive because it is justified by the Belt Line's undisputed costs.**

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or [interstate] commerce …" 15 U.S.C. § 1.  To establish a violation, a plaintiff must show (1) a contract, combination, or conspiracy (2) that unreasonably restrained trade.  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984); *Standard Oil Co. v. U.S.*, 221 U.S. 1, 58-64 (1911); *N.C. State Bd. of Dental Exam'rs v. FTC*, 717 F.3d 359, 371 (4th Cir. 2013).  Section 2 prohibits a conspiracy to monopolize any part of trade or commerce.  15 U.S.C. § 2.  The elements are: (1) concerted action; (2) a specific intent to achieve an unlawful monopoly; and (3) commission of an overt act in furtherance of the conspiracy.  *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 211 (4th Cir. 2002).  As shown above, both of CSXT's counts fail on the first element.  Even so, CSXT cannot establish the others either.

CSXT's case hinges on its claim that the Belt Line's $210 switching rate is "exorbitant" and "prohibitive," preventing CSXT from accessing NIT.  CSXT relies on the rate to prove both an unreasonable restraint of trade in support of its Section 1 claim and an overt act in support of its Section 2 claim.  Because the Belt Line is not a direct competitor with either NS or CSXT, the Court must apply a "rule of reason" analysis.  *See Leegin Creative Leather Prods. v. PSKS, Inc*., 551 U.S. 877, 907 (2007).

In a rule of reason analysis, "the reasonableness of a restraint is evaluated based on its impact on competition as a whole within the relevant market." *Oksanen*, 945 F.2d at 708.  CSXT bears the initial burden of showing that the defendants' conduct has had a substantially harmful effect on competition.  *See Virginia Vermiculite, Ltd. v. W.R. Grace & Co*., 108 F. Supp. 2d 549, 575 (W.D. Va. 2000).  If CSXT meets its burden, the burden shifts to the Belt Line to "provide evidence that the restraints are justified by procompetitive virtues." *Id*.

Even ignoring CSXT's initial burden, CSXT cannot overcome the Belt Line's procompetitive justification – that the Belt Line's rate is set to cover its costs, just as its Operating Agreement requires.  *See* D.E. 1-1, p. 4, Art. Ninth (**Ex. 1**).  And critically, CSXT *does not dispute* the Belt Line's costs.  As CSXT's expert, Dr. Marvel, conceded in his deposition, he took the Belt Line's costs "as a given."  Marvel Dep. 91:17-24 (**Ex. 33**).  He did no independent analysis of them whatsoever:

> Q.   There were some questions about operational costs.  You did not do any analysis of the Belt Line's operational cost, correct?
>
> A.   That is correct.
>
> <div align="center">*   *   *</div>
>
> Q.   Did you do any analysis of the incremental costs of a move to NIT on the Belt Line?
>
> A.   Incremental cost to the Belt Line of a move to NIT?  That would be difficult because I don't think they have done much movement to NIT.
>
> Q.   So you have not done that analysis?
>
> A.   I have not done that.

*Id*. at 168: 9-25 (**Ex. 33**).

CSXT's failure to contest the Belt Line's costs is dispositive of its antitrust claims.  ■

████████████████████████████████████████████████████████████████

███████████████████   *See* D.E. 1-1, p. 4, Art. Ninth (**Ex. 1**); Wheeler Dep. 17:18-18:4 (**Ex. 51**); Allan Dep. 93:7-8-94; 117:1-7 (**Ex. 48**).  That is exactly what has occurred over the last decade, as evidenced by the Belt Line's operational expenses for every year since 2010:



*See* Crowley Report, p. 5, Table, 1 (**Ex. 3**), compiling data from the Belt Line's Annual Reports; *see also* Annual Reports from 2010-2020 (**Ex. 4**).

From 2010 to 2020, the Belt Line's average operating expense per car was ▮▮▮▮ and the weighted average was ▮▮▮▮. In other words, the Belt Line's $210 rate is not exorbitant at all, but actually *below cost*. Even excluding 2015, which involved a personal injury accrual, the simple average is ▮▮▮▮ and the weighted average is ▮▮▮▮. *Id.*, p. 6, n.11.

A price set at or below cost is by definition procompetitive. CSXT knows this firsthand. In *Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*, 704 F. Supp. 1309 (D. Md. 1989), *aff'd*, 924 F.2d 539 (4th Cir. 1991), an aggregates supplier and a short line railroad sued CSXT, accusing it of conspiring with a competitor supplier to keep the plaintiff out of the regional aggregates market. Whereas the competitor was located on CSXT's lines, and could directly access the market that way, the plaintiff supplier needed to travel along both the short line's tracks and CSXT's tracks,

and pay a fee to both railroads, to reach the market.  CSXT offered to reduce its rate to just $.01 over cost, which the plaintiff claimed was still too high.

The supplier sued CSXT under Section 1 of the Sherman Act for conspiring with its competitor and the short line sued CSXT under Section 2 for failing to offer trackage rights as an alternative.  *See Laurel Sand*, 704 F. Supp. at 1311.  The district court granted summary judgment in favor of CSXT and dismissed both counts, and the Fourth Circuit affirmed.

Pertinent here, the district court explained that, although the rate offered by CSXT "may not be workable in plaintiffs' plans, the service offered is an alternative to trackage rights so long as it is offered on a reasonable basis."  704 F. Supp. at 1323.  The court held that CSXT "*need not offer plaintiffs a rate below its cost* in order to provide plaintiffs competitive transportation costs…."  *Id.* (emphasis added).  The court further concluded that offering a rate of $.01 above cost was "reasonable under the circumstances," and thus could not amount to a denial of access. *Id.* at 1324.  The Fourth Circuit affirmed, holding that offering "a penny over the variable costs, was reasonable," and that "although trackage rights were preferable, that, alone, did not make the rate offer unreasonable."  924 F.2d at 544-45.

Here, the Belt Line's rate is undisputedly at or below its average operating cost, making it by definition procompetitive (especially considering the Belt Line's breakeven purpose).  An alternative holding would impose liability on the Belt Line for failing to price its services below cost, something the antitrust statutes do not support.  *See*, *e.g.*, *Laurel Sand*, 704 F. Supp. at 1323-24.  As the district court explained in *Laurel Sand*, "CSX is not responsible for the location of Laurel Sand & Gravel's quarry; *it need not offer plaintiffs a rate below its costs in order to provide plaintiffs competitive transportation costs* to Annapolis Junction."  *Id*. (emphasis added).

Nor can CSXT avoid this problem by manipulating the cost analysis.  CSXT's corporate witness testified in deposition that the Belt Line should treat CSXT's intermodal NIT traffic as merely "incremental" – that is, to consider only the costs directly associated with a move to NIT, ignoring all overhead and other fixed costs.  *See* CSXT 30(b)(6) Dep. 103:9-104:24 (**Ex. 15**).  In other words, CSXT would have the Belt Line cover its overhead and other fixed costs through other customers, or other business, so that CSXT can get a lower price to NIT.

Yet forcing the Belt Line's other customers to effectively subsidize CSXT's traffic at NIT presents the same problem in different clothes.  In CSXT's proposed scenario, the Belt Line would still offer CSXT a rate below cost, except the Belt Line would have to make up for the discount through other business.  Presumably, its next customer would want the same "incremental-only" rate, and the next, and the next, until only a core group of original customers cover all of the Belt Line's overhead, track maintenance, capital improvements, and the like.  The Belt Line's shareholders foreclosed this possibility more than a century ago in the Operating Agreement.  *See* D.E. 1-1, p. 4, Art.  Ninth (**Ex. 1**) (requiring a "uniform rate").

Because CSXT does not challenge the Belt Line's costs, and because it cannot show that the Belt Line has harmed CSXT any other way, the only permissible finding is that the Belt Line's rate is procompetitive, meaning CSXT's antitrust claims fail as a matter of law.

### B.    CSXT's allegations rely on improper rate comparisons and ignore the only direct alternative access to NIT.

CSXT cannot avoid the Belt Line's costs by relying on invalid rate comparisons, ignoring the only actual alternative for intermodal traffic at NIT, drayage by truck.  Under antitrust law, "Any inquiry into the reasonableness of the rate … must focus on the rate's reasonableness in the context of competition, *rather than from plaintiffs' perspective*."  *Laurel Sand*, 704 F. Supp. at 1323 (emphasis added); *see also FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944) (a

"reasonable" rate is one that permits the business to recover its costs and earn a reasonable profit). It makes no difference that the Belt Line's rate "may not be workable in [CSXT's] plans." *Laurel Sand*, 704 F. Supp. at 1323.

Presumably recognizing the correlation between the Belt Line's rate and its costs, CSXT attempts to nonetheless manufacture a Sherman Act violation by comparing the Belt Line's rate to ████████████████████████████████████████████████████████████. *See* Crowley Report, pp. 13-14 (██████████████████████████████████).

████████████████████████████████[12]████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████ *See* D.E. 79. ████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████and as a consequence it is not a valid price comparison. *See Laurel Sand*, 704 F. Supp. at 1323.

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ which is the industry standard for comparing railroad rates. *See* Crowley Report, pp. 12-15, Tables 2 and 3; Crowley Dep. 235:2-15 (**Ex. 32**). CSXT's expert witness admitted in deposition that he is not a railroad rate expert himself, or a railroad expert of any kind, nor does he know of any authority for challenging a "per mile" metric as a basis for comparison. *See* Marvel Dep. 165:2-166:20, 181:16-183:21 (**Ex. 33**).

The Belt Line's rate is also lower than the actual competitive alternative to NIT, drayage by truck, ████████████████████████████████. *See* Crowley Report pp. 18-24 (**Ex.**

---

[12]     CWRY's rate as published in its tariff is $210 per well, loaded or empty. *See* **Ex. 10**.

**3**).  And intermodal traffic, by definition, can move by both means of transport.  *Id.* ███████

████████████████████████████████████████████████████████████ even using

CSXT's assumptions.  *See* Crowley Dep. 227:3-229:18 (**Ex. 32**); *see also* Marvel Dep. 185:23-

189:11 (**Ex. 33**) (conceding that Belt Line rate is lower per container than drayage ███████

████████████████████████████████████.

In sum, CSXT cannot establish an antitrust violation as a matter of law.

## Conclusion

For the foregoing reasons, based on the undisputed facts, all of CSXT's claims against the

Belt Line fail as a matter of law.  The Belt Line respectfully prays that the Court enter judgment

for the Belt Line on all of them.

Dated:  April 12, 2021

NORFOLK AND PORTSMOUTH
BELT LINE RAILROAD COMPANY

By:  _____/s/ W. Ryan Snow_____
James L. Chapman, IV, VSB No. 21983
W. Ryan Snow, VSB No. 47423
David C. Hartnett, VSB No. 80452
Alex R. McDaniel, VSB No. 92398
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1500
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com
dhartnett@cwm-law.com
amcdaniel@cwm-law.com
*Attorneys for Norfolk and Portsmouth Belt
Line Railroad Company*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 12th day of April 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a "Notice of Electronic Filing" to all counsel of record who have consented to electronic service.

<div align="right">

_____/s/ W. Ryan Snow_____

W. Ryan Snow, VSB No. 47423
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1500
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
wrsnow@cwm-law.com

</div>