Page 1

```
               UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
                      NORFOLK DIVISION


    CSX TRANSPORTATION, INC.,
    individually and on behalf of
    NORFOLK & PORTSMOUTH BELT LINE
    RAILROAD COMPANY,

              Plaintiff,
                                     CIVIL ACTION FILE
              vs.
                                     NO. 2:18cv530
    NORFOLK SOUTHERN RAILWAY
    COMPANY, NORFOLK & PORTSMOUTH
    BELT LINE RAILROAD COMPANY,
    JERRY HALL, THOMAS HURLBUT,
    PHILIP MERILLI, and CANNON
    MOSS,
              Defendants.


                  VIDEO DEPOSITION OF
                       JOHN BOOTH
                    March 12, 2020
                      9:57 a.m.
                   McGuireWoods LLP
                 1230 Peachtree Street
                      Suite 2100
                   Atlanta, Georgia
        Robyn Bosworth, RPR, CRR, CRC, CCR-B-2138
```

EXHIBIT 20

Page 20

1   System and the Seaboard Systems were merged.  At
2   that time, I moved to Jacksonville.
3       Q   Okay.  Is that when you started working
4   for CSX Transportation?
5       A   Roughly.  The actual formation of the CSX
6   organization I think occurred not simultaneously but
7   very shortly thereafter.
8       Q   Okay.  How long were you in the joint
9   facilities department?
10      A   28 years.
11      Q   Okay.  And were you in that facility --
12  joint facilities department until you retired?
13      A   I was.
14      Q   All right.  And remind me when you
15  retired.  May 31st of --
16      A   2012.
17      Q   -- 2012?
18          And just so I'm clear, did you have a
19  single title -- job title while you were in the
20  joint facilities department or did your job titles
21  change?
22      A   My titles changed as we would go through

Page 21

1   reorganizations from time to time.
2       Q   And could you list your job titles in the
3   joint facilities department?
4       A   Manager joint facilities, assistant
5   director joint facilities, director joint
6   facilities.
7       Q   Okay. And when you were a director joint
8   facilities, would that -- does that mean you were
9   responsible for all the joint facilities in which
10  CSX was involved?
11      A   I don't know that I would characterize as
12  myself being responsible. I had a superior at all
13  times within whose purview joint facilities fell.
14      Q   Okay.
15      A   But I would be responsible for dealing
16  with any joint facilities that that individual asked
17  me to get involved with or that for some reason or
18  another, another railroad called me about with
19  questions and deal with those specific facilities.
20      Q   Understanding that you had someone you
21  were reporting to, when you were director of joint
22  facilities, were you responsible for that

Page 22

1  department?
2      Did you lead that department?
3   A   I led a small team of people who worked
4  closely with joint facility agreements and
5  arrangements.  The department had other
6  responsibilities as well.
7   Q   Okay.  So you led a certain segment of --
8   A   Yes.
9   Q   Okay.  And how long were you director of
10 joint facilities -- can you give me the date range
11 when you were director of joint facilities?
12  A   I don't recall when that title change was
13 made.
14  Q   Okay.  And was that your title when you
15 retired in 2012?
16  A   It was.
17  Q   Okay.  So obviously ended in 2012, you
18 just don't recall when it started; is that right?
19  A   Right.
20  Q   Do you know whether it started in the
21 '90s?
22  A   Well, the work that I was engaged in was

Page 69

1
2
3
4
5
6
7
8

9     Q    Okay. So you cannot verify that
10 Mr. Ingram's statement is correct?
11     A    Correct.
12     Q    All right. But he certainly is looking at
13 or comparing the Belt Line's tariff rate that would
14 apply for moving traffic to or from NIT with the
15 cost of doing so, correct?
16     A    Yes.
17     Q    All right. And then he does in the next
18 sentence refer to that $148.50 tariff rate, correct?
19     A    Yes.
20     Q    And if you look back at Exhibit 3, that's
21 the rate that was recommended by the rate committee
22 in 2006 and adopted by the Belt Line board in 2007,

Page 72

1
2
3
4
5
6

7  Q    And I think we've already established that
8  you have no knowledge as to whether that rate is, in
9  fact, far in excess of the cost of the Belt Line to
10 move freight from NIT, correct?
11 A    I have no such knowledge, that's correct.
12 Q    All right.  All right.  First page of
13 Exhibit 4, the last paragraph, the second sentence
14 reads:  This is best accomplished by offering rates
15 which provide competitive access to all NPBL
16 customers.
17      I'm going to stop there because who do you
18 consider to be NPBL's customers?
19 A    Any industry that is switched by NPBL.  It
20 might be Perdue.  It might be Lehigh Cement.  Those
21 are the ones I've heard of.  I'm sure there are
22 other one and -- one-car, two-car pulls and

Page 123

1  you don't recall whether you received this
2  information or not, right?
3       A    I don't recall seeing it, no.
4       Q    All right.  Did -- in your work on the
5  rate committee, did you ever inquire as to the costs
6  or expenses of the Belt Line associated with their
7  line haul switching services?
8       A    I don't recall doing so.
9       Q    All right.  Was that important to your
10 work?
11      A    It would have been relevant to the work of
12 the rate committee, but to what I was doing, only to
13 the extent that I would receive input from finance
14 or intermodal as to whether it was a viable charge.
15      Q    So let me make sure I understand.
16           You said it would be relevant to the work
17 of the rate committee, which you were on, right?
18      A    Yes.
19      Q    But I guess am I to understand what you're
20 saying is what you did on the rate committee, that
21 part of it you weren't concerned with the expenses
22 or costs of the Belt Line?

Page 124

1    A    That's correct.
2    Q    Okay.  Other folks on the committee, from
3    your perspective, dealt with that?
4    A    Yes.
5    Q    Okay.  You were trying to establish a rate
6    that CSX would pay to use the Belt Line for the
7    movement of intermodal freight?
8    A    Correct.
9    Q    Okay.  Looking at this financial
10   information --
11   A    I have to retract a statement I made a
12   short while ago.
13   Q    Okay.
14   A    I do recall looking at this line haul
15   revenue cost analysis for the first six months
16   because I was trying to figure out who some of these
17   customers were.
18   Q    Okay.
19   A    So I did look at it, I know that.
20   Q    So let's go there.  For the record, it's
21   Bates stamped NPBL 008787, correct?
22   A    Uh-huh.

Page 141

1   Q   Did CSX create any type of interactive
2   tool to assist the Belt Line in coming up with line
3   haul switching rates?
4   A   I think this was in the neighborhood of
5   what we had been expecting.  I don't know that we
6   gave them a specific number.
7   Q   So when you say -- are you referring to
8   the $210?
9   A   Yes.
10  Q   So that was in the neighborhood of what
11  you were expecting?
12  A   Uh-huh.
13  Q   From who?  From the Belt Line?
14  A   From the Belt Line.
15  Q   Why were you expecting a number like that?
16  A   That's not an unusual number for a
17  terminal switch carrier or an intermediate switch
18  carrier.
19  Q   When you say it's not unusual, do you mean
20  it's pretty standard?
21  A   I don't know how standard it is, but
22  switch charges can vary significantly.  This struck

Page 142

1 me as being kind of in the middle of the road.
2     Q   Okay. And when you say "this," you mean
3 the $210?
4     A   210, yes.
5     Q   Okay. All right.
6     (Defendant's Exhibit 11 was marked for
7 identification.)
8 BY MR. LACY:
9     Q   Mr. Booth, I'm going to pass you what's
10 been marked as Exhibit 11 to your deposition. And
11 this is a July 23, 2009, letter from Mr. Ingram to
12 Mr. Stinson, and I believe you are copied on the
13 letter.
14     A   Yes, I remember this.
15     Q   Okay. Did you help Mr. Ingram prepare
16 this letter?
17     A   I think I suggested some wording for
18 pieces of it.
19     Q   Okay. Do you recall which pieces?
20     A   I think it was the property over in the
21 vicinity of Pinners Point, which is on the second
22 page --

Page 143

1  Q  Uh-huh.
2  A  -- second paragraph.
3  Q  Let's start there because -- so this
4  letter is from Mr. Ingram. With respect to the
5  property at Pinners Point, he makes some pretty
6  serious accusations, and I'm trying to figure out
7  whether that's words you inserted and he signed or
8  whether he used that language himself. And what I'm
9  talking about is the first sentence of page 2 --
10 second paragraph on page 2, he says: With respect
11 to the NPBL property at Pinners Point, the
12 management decisions defy reason.
13       Then he goes on to say in the next
14 paragraph, first sentence: NPBL's actions at
15 Pinners Point are alarming in isolation, and when
16 considered together with the proposed NIT sale, they
17 create a pattern of questionable and reckless
18 conduct.
19       Are those the words you added?
20 A  "Defy reason" is my wording.
21 Q  Okay. And so why did the -- why did the
22 management decisions with respect -- or the -- with