**From:** "Coleman, Donna N." <Donna.Coleman@exchange.nscorp.com>

**To:** "Allison, Jake" <Jake.Allison@exchange.nscorp.com>, "Armbrust, Steven" <Steven_Armbrust@csx.com>, "Chapman, Jim" <jchapman@cwm-law.com>, "Coleman, Donna N." <Donna.Coleman@exchange.nscorp.com>, "Drake, Tim J." <Tim.Drake@exchange.nscorp.com>, "Fredrik Eliasson (fred_eliasson@csx.com)" <fred_eliasson@csx.com>, "Mike Hobson (mhobson@richmondcole.com)" <mhobson@richmondcole.com>, "Stinson, David" <david.stinson@nscorp.com>, "Wheeler, Mike" <Mike.Wheeler@exchange.nscorp.com>

**Subject:** Docket

**Date:** Tue, 24 Aug 2010 16:34:34 -0400

**Importance:** Normal

**Attachments:** Board_Docket-0910.pdf

---

Gentlemen,

Attached is the docket for the September 8th Board meeting.  Please let me know if you have any questions.

Thanks,

Donna

Donna Coleman

VP, Secretary & Comptroller

Norfolk & Portsmouth Belt Line Rail Road

757-393-2622

EXHIBIT

43

**Exhibit 0014**

NPBL007440

## NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY

Docket of Proceedings of Board of Director's
Meeting called to be held in Norfolk, Virginia

Wednesday, September 8, 2010
------------------------------------------------

### BOARD MEETING

### ITEMS OF ACTION:

1.   Approval of minutes of the Board Meeting held on April 14th, 2010.
     (Attachment)

2.   Proposed Bonus Plan 2010. (Memorandum)

3.   NS Information Technology Agreement. (Memorandum)

4.   CSXT Rate Proposal – Rail Service NIT. (Memorandum)

### ITEMS OF INFORMATION:

5.   Next meeting date and adjournment.

ITEM 1 – ACTION

## NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY

Crenshaw, Ware & Martin, PLC
12th floor conference room
1200 Bank of America Center
Norfolk, VA 23510
April 14, 2010

A regular meeting of the Board of Directors was held this day at 1:00 p.m.

PRESENT:  Mr. C. H. Allison
Mr. S. C. Armbrust
Mr. T. J. Drake  (by conference call)
Mr. F. J. Eliasson
Mr. D. H. Stinson, President
Mrs. D. N. Coleman, Vice President, Comptroller and Corporate

Secretary

Mr. J. L. Chapman, IV, representing the Company's General Counsel, and Greg Summy, NS counsel, were also present.

There being a quorum, the President called the meeting to order.

The minutes of the of the Board of Directors meetings held on October 5, 2009, October 26, 2009 and December 15, 2010, as previously corrected, were on motion duly made and seconded, approved as amended.

The Company's proposed Annual Report to Stockholders, including financial statements for the year ended December 31, 2009, was presented to the Board for its review. During the review of the Annual Report, management suggested that a joint audit may be appropriate for 2010. Board members agreed to request their Audit Departments schedule a joint audit for the first quarter of 2011 in lieu of the annual financial review. Following this discussion, it was moved that the Company's Annual Report for the year 2009, as submitted, be approved by the Board of Directors. The following resolution was, on motion duly made and seconded, adopted:

RESOLVED, that the Annual Report of the Board of Directors, hereby submitted, being for the year ended December 31, 2009, be accepted and

ordered presented to the Stockholders of the Company at the Annual Meeting.

On motion, the Board of Director's Meeting was adjourned.

D. N. Coleman
Secretary

<u>**ITEM 1 – ACTION (cont.)**</u>

**<u>NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY</u>**

> Crenshaw, Ware & Martin, PLC
> 12th floor conference room
> 1200 Bank of America Center
> Norfolk, VA 23510
> April 14, 2010

Following the Stockholder's Meeting, the Board of Director's Meeting was called to order.

Mr. C. H. Allison duly elected temporary Chairman and Mrs. D. N. Coleman acted as Secretary.

The Secretary reported elections by the Stockholders, at their Annual Meeting this date, of the following Directors:

> Mr. C. H. Allison
> Mr. S. C. Armbrust
> Mr. T. J. Drake
> Mr. F. J. Eliasson
> Mr. D. H. Stinson
> Mr. M. J. Wheeler
> Mrs. D. N. Coleman (non-voting)

Whereupon, the Board proceeded with the election and appointment of officers.

The Board then nominated and, on motion made and duly seconded, elected the following officers:

Mr. D. H. Stinson, President and General Manager
Mrs. D. N. Coleman, Vice President, Secretary and Comptroller
Mrs. P. D. Nelson, Treasurer

Mr. Stinson, thereupon took the chair.

Mr. Stinson presented a memorandum reviewing the major accomplishments of 2009 and performance related to company goals for the 2009 Bonus Program. The Board then went into executive session to consider compensation. The following bonuses for 2009 performance were approved:

| Position | Current Salary | Maximum Bonus % | % Bonus Earned | Bonus Amount |
|---|---|---|---|---|
| President and General Manager | $87,000 | Determined by Board | 34% | $29,580.00 |
| Vice-President Comptroller & Corporate Secretary | $86,250 | 25% | 21% | $18,112.50 |
| Terminal Superintendent | $85,250 | 20% | 7% | $5,967.50 |
| Treasurer | $71,700 | 15% | 13% | $8,781.00* |
| Administrative Assistant | $40,000 | 5% | 4% | $1,600.00 |
| Totals | $370,200.00 | | | $64,041.00 |

* The Treasurer's bonus was overpaid in 2008 by $540.00. The 2009 bonus was reduced by that amount.

The President presented the Board with a proposed Bonus Program for 2010. Following discussion the President was asked to revise the program with suggested changes and circulate the revised program via e-mail for further input and approval.

The President presented the Board with an update on the Company's current litigation status. General Counsel answered questions regarding litigation.

The President, by memorandum, presented the Board with an update on the Sewell's Point land sale. The Board was assured of Management's commitment to keep the Board informed of developments and consider input from the Board as negotiations proceed. Management was asked to revisit recommendations for a section 1031 exchange in relation to this sale.

The Board, by memorandum, was also updated on VDRPT rail rehabilitation projects, VRDPT signal upgrades, future management turnover, and conversion to NS revenue accounting systems.

The Board discussed NPBL's growth in traffic volume, operating income and cash reserves.  There was discussion regarding the tax impact from current trends.  Suggestions were made regarding the need for an updated budget and rate study.  Resources required for the study were discussed and Management will report to the Board following further analysis.

It was announced that the next meeting of the Board of Directors is hereby scheduled for 10:00 am, Wednesday, December 1, 2010 at the Law Offices of Crenshaw, Ware & Martin, located on the 12th floor at 1200 Bank of America Center, Norfolk, VA.

There being no further business, the meeting, on motion, adjourned.

D. N. Coleman
Corporate Secretary

## ITEM 2 – ACTION

### NPBL BONUS PROGRAM 2010

The Bonus Program will be solely based on Company Performance including the following metrics / criteria:

- 30%  Operating Expense / car
- 40%  Efficiency – cars/man-hour ratio
- 30%  Increase in Revenue Cars
  100% Maximum Bonus Earning Potential

The bonus award opportunity for awards at the various pay levels is included in the table below. All non-agreement full time employees of the NPBL are eligible to participate in the Bonus Program.

Employees must be in active service on December 31, 2010, to receive a bonus except in the case of death, retirement, leave of absence, long-term disability or returning to one of the parent companies. Bonus awards will be prorated for employees moving between non-agreement positions at different bonus levels or for employees promoted from agreement positions during the year. Employees who enter service with the NPBL on a non-agreement position during the year are eligible for a prorated bonus based on their NPBL service during the year. Employees who transfer from a non-agreement position to an agreement position during the year **will not remain eligible** for a prorated bonus based on their non-agreement earnings if they are in active service on December 31, 2010.

Bonus awards are lump-sum cash payments and are not added to base compensation. Any bonus awards under this Program will be paid after the Board of Directors meeting held in April.

The President and General Manager may recommend that the Board of Directors reduce or eliminate an employee's award because of unsatisfactory performance.

Nothing in this Program shall constitute any obligation on the part of the NPBL to continue an individual's employment or to pay a bonus award in a given year.

The President & General Manager is responsible for the administration and interpretation of this Program.

| Position and/or Job Title | Maximum Bonus Percent (%) |
|---|---|
| President & General Manager | Determined by Board of Directors |
| VP, Comptroller & Corporate Secretary | 25% |
| Superintendent of Terminal | 20% |
| Treasurer | 15% |
| Trainmaster | 15% |
| Administrative Assistant | 5% |

NPBL007449

NPBI ^7441

## 2010 Bonus Plan



| Category | Does not meet expectations | Below expectations | Meets expectations | Above expectations | Exceeds expectations | |
|---|---|---|---|---|---|---|
| Operating Expense /Car<br>goal: $183<br>30% | | 2nd qtr | 5 yr avg | 2009 | goal | weight x score= | 8% |
| Cars/Man-hour<br>goal: 1.11<br>40% | | 2nd qtr & 5 yr avg | | | 2009 & goal | weight x score= | 10% |
| Car Volume<br>goal: 22,206<br>30% | | | 2009 projected | goal | 3 yr avg | weight x score= | 16% |

Projected Bonus Payout  33%
(may not exceed 100%)

| | Does not meet expectations | Below expectations | Meets expectations | Above expectations | Exceeds expectations |
|---|---|---|---|---|---|
| Operating Expense /Car | >$200 | $190-$200 | $180-$190 | $170-$180 | $160-$170 |
| Cars/Man-hour | <1 | 1-1.05 | 1.06-1.09 | 1.09-1.11 | >1.12 |
| Car Volume | <21,000 | 21,000-21,999 | 21,000-22,999 | 22,000-23,999 | >24,000 |
| Performance Score | 0%-25% | 26%-50% | 51%-75% | 76%-100% | 101%-120% |

NPBL007444

## ITEM 3 – ACTION

## Information Technology Service Agreement

In May of 2010 the Norfolk Southern Information Technology Department, at the request of NPBL management as allowed by the Service Provider Agreement, moved NPBL data to a server hosed by Norfolk Southern.  This addressed issues of data availability, security and disaster recovery.  The attached agreement formalizes our understanding regarding these services.

DATA HOSTING AND TECHNOLOGY AGREEMENT

THIS DATA HOSTING AND TECHNOLOGY AGREEMENT made as of
_____, 2010 by and between Norfolk Southern Corporation ("NSC"); Norfolk
and Portsmouth Belt Line Railroad Company ("NPB") and CSX Transportation, Inc.
("CSX");

WHEREAS, NPB requires for NSC to host ("the Services") certain information of
NPB ("the Hosted Information") in NSC servers on behalf of NPB; and

WHEREAS, NSC agrees to provide the Services for NPB;

NOW THEREFORE, the parties hereto agree that NSC will provide specific
services and materials for which NPB will compensate NSC as described in Appendix 1
of this agreement.

1.  Invoices shall be submitted and payment made as provided for in the
Agreement. Timely payment is a material part of the consideration for the performance
of the Services. In the event that payment has not been made in accordance with the
terms of this Agreement, in addition to any other remedy which NSC may have under law
or equity, NSC may stop work, and/or terminate this Agreement.

2. NSC shall perform the Services utilizing the standard of care normally
exercised by firms  in the industry performing comparable services under similar
conditions. NSC MAKES NO OTHER WARRANTIES, EXPRESS OR IMPLIED,
EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT, INCLUDING
BUT NOT LIMITED TO THE WARRANTIES OF FITNESS FOR A PARTICULAR
PURPOSE AND MERCHANTABILITY.  The information provided by NSC is
provided "AS IS". NPB uses the Services solely at its own risk. NSC will use its best
efforts to provide accurate and complete information; however, NSC does not guarantee
or represent that the information provided through the Services will be free from error,
current, uninterrupted or complete.

3. (a) Each party shall handle the Hosted Information received from the other
party in the same manner as the receiving party handles its own proprietary information.
Disclosure of proprietary information shall be restricted to those individuals who need
access to such proprietary information as needed to ensure proper performance of the
Services.
        (b) Neither party shall be liable for disclosure or use of proprietary information
which: (l) was known by the receiving party at the time of the disclosure due to
circumstances or events unrelated to this Agreement; (2) is generally available to the
public without breach of this Agreement;  (3) is disclosed with the prior written approval
of the disclosing party; or (4) is required to be released by law or court order.
        (c) NSC shall restrict access to the Hosted Information to those employees and
agents of NSC acting as system administrators.

NPBL007451

4. (a)  NSC hereby agrees to indemnify and hold harmless NPB from and against any and all loss, cost, claim, expense or liability (including but not limited to attorney's fees) resulting from the loss of life of or personal injury to the officers, employees or agents of NSC or the damage to or loss of the property of NSC, its officers, employees or agents, arising from, incident to or occurring in connection with the performance by NSC of its obligations under this Agreement or the presence of its officers, employees or agents of NSC on the property of NPB; provided, however, the foregoing indemnification shall not extend to loss of life, personal injury or property loss or damage caused by the negligence of NPB.

(b)  Except as provided in subsection (a) above, each party hereto agrees to indemnify and hold harmless the other party from and against any and all loss, cost, claim, expense or liability (including but not limited to attorney's fees, resulting from the loss of life of or personal injury to any person or the loss of or damage to any property arising from, incident to or in connection with the negligent acts or omissions of the indemnifying party; provided, however, the responsibility of the indemnifying party to indemnify the other party shall be reduced in proportion to the negligence of the other party, if any, which proximately contributed to said loss of life, personal injury or property loss or damage.

(c)  NSC shall indemnify and hold harmless NPB  from and against any and all liabilities, damages, claims, suits, judgments, costs, and expenses (including, but not limited to, litigation costs and attorneys' fees) and losses resulting from any claim of infringement of patent rights or other intellectual property arising from the Services furnished by NSC in connection with this Agreement.

(d) REGARDLESS OF THE NATURE OF THE CAUSE OF ACTION, WHETHER IN TORT, CONTRACT, OR OTHERWISE, IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES WHATSOEVER (INCLUDING BUT NOT LIMITED TO LOST PROFITS OR INTERRUPTION OF BUSINESS) ARISING OUT OF OR RELATED TO THE SERVICES PROVIDED UNDER THIS AGREEMENT, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(e) EXCEPT AS PROVIDED IN SUBSECTION (a) AND (c) OF THIS SECTION AND   REGARDLESS OF THE NATURE OF THE CAUSE OF ACTION, WHETHER IN TORT, CONTRACT, OR OTHERWISE, SHALL THE LIABILITY OF NSC TO NPB UNDER THIS AGREEMENT EXCEED AN AMOUNT EQUAL TO THREE (3) MONTHS OF FEES RECEIVED BY NSC FROM NPB FOR SERVICES UNDER THIS AGREEMENT FOR THE THREE MONTHS OF SERVICE PRIOR TO THE OCCURRENCE OF THE INCIDENT GIVING RISE TO THE CAUSE OF ACTION.

(f) The indemnification extended by NSC to NPB under this Agreement shall extend not only to NSC but also to any  corporate affiliate or subsidiary of Norfolk Southern Corporation.

5. NPB acknowledges that NSC does or might provide similar services for a broad range of other clients and agrees that NSC shall be free to work for other clients in matters that do not involve the use of any Proprietary Information that has been disclosed

by the NPB under the terms of this Agreement or do not directly relate to the specific Services provided by the NSC to the NPB under this Agreement.

6. (a) Neither party shall be responsible for any delay or failure in performance, except obligations to make payments hereunder for work previously performed, to the extent that such delay or failure was caused by a force majeure event including act of God, war, civil disturbance, governmental action, labor dispute unrelated to the party claiming the force majeure event, computer virus, failure of third-party telecommunication services or any other event beyond the reasonable control of the claiming party.

(b) Performance under this Agreement shall resume promptly once the cause of delay or failure ceases and an equitable adjustment shall be made to the price and/or schedule of the Services.

7. Any dispute relating to this Agreement, which cannot be voluntarily resolved by the parties hereto, shall be submitted by the joint agreement of the parties to binding arbitration by a single arbitrator as provided hereunder. No written or oral representation made during the course of any panel proceeding or other settlement negotiations shall be deemed a party admission. The arbitration shall be conducted in accordance with the Rules and Procedures of the American Arbitration Association. The award rendered by the arbitrator shall be final and judgment may be entered upon it in accordance with the applicable law in any court having jurisdiction thereof. Each party shall be responsible for the costs and expenses of its own counsel and witnesses. The fees and expenses of the arbitrator shall be shared equally by NPB and NSC. The arbitration shall be conducted in Norfolk, Virginia.

8. The interpretation of the terms and conditions of this Agreement shall be governed by the laws of the Commonwealth of Virginia

9. (a) Either party may terminate this Supplemental Agreement for convenience upon the giving of not less than _____ prior written notice to the other party of the election to terminate. In the event of termination, NSC shall, after providing a complete copy of the Hosted Information to NPB, thereafter promptly remove and destroy all Hosted Information from its servers.

(b) In the event of a default by one party of its obligation under this Agreement, the other party shall notify in writing the defaulting party of its breach. Should the breach not be cured within sixty (60) days after receipt of the notice of default, the non-defaulting party may immediately terminate the agreement by giving notice to the defaulting party in writing.

(c) No termination of this Agreement shall relieve any party hereto from any obligations or liabilities incurred hereunder before the time of such termination, including, without limitation, NPB's obligation for payment of any fees set forth in this Agreement.

10. CSX consents to the rights and obligations assumed by NPB under this Supplemental Agreement.

11. Provisions of this agreement will be reviewed by NSC and NPB annually.

IN WITNESSETH WHEREOF, the parties hereto have executed this Data Hosting and Technology Agreement as of the date first set forth above.

NORFOLK SOUTHERN
CORPORATION

NORFOLK AND PORTSMOUTH BELT
LINE RAILROAD COMPANY

By:_____
Title:_____

By:_____
Title:_____

CSX TRANSPORTATION, INC.

By:_____
Title:_____

Appendix 1 (IT Computer Services/Support/Materials) to Data Hosting and Technology
Agreement dated_____2010 between Norfolk Southern Corporation (NSC) and
Norfolk Portsmouth Belt Line Railroad Company (NPB)

| 1. **IT Computer Service/Support** | **Cost Per Month** |
|---|---|
| | $1,500.00 |

Includes the following:
  Exchange client software (PC)
  Exchange server hardware
  Exchange server licensing
  Mainframe use
  Network management
  Network design
  Network installation
  NSS support
  Application support
  PC-LAN support
  Printer support
  Access to secured network storage
  Any additional software required to operate in the NS environment

| 2. **Network Circuits** | **Cost Per Month** |
|---|---|
| Primary circuit | As invoiced to NSC by |
| Secondary circuit | service provider |

**Note:** NSC will act as purchasing agent for NPB in matters pertaining to hardware and
circuits referenced in this agreement if requested.

| 3. **Hosting** | **Cost Per Month** |
|---|---|
| Hosted/Stored data | $20.80/Gb |

Back-up of data and retention for up to 2 months
**Notes:**
  - Volume of hosted/stored data will be determined at the sole discretion of NSC,
  either the maximum amount of data hosted at any one time during the previous 12
  months or the amount of data hosted at the time of billing.
  - Additional hosted/stored data will be available in 1 Gb increments.
  - Restoration of any data lost due to NS site disaster will be made on a best-effort
  basis and in accordance with NS priorities.

4. Equipment, services, and licenses not specified in this appendix are the sole responsibility of
NPB.

**ITEM 4 – ACTION**

## CSXT RATE POPOSAL

Attached is the CSXT rate proposal for rail service connection to NIT, forwarded

to the Board in July, along with management's comments sent August 5th.  As

stated in the comments, a special rate and use of foreign locomotives requires

approval of the shareholders/board of directors.



TRANSPORTATION

J.N. Booth, III
Director Joint Facilities

500 Water Street, J315
Jacksonville, FL 32202
(904) 359-3486
John_Booth@csx.com

July 23, 2010

**VIA ELECTRONIC MAIL**

Mr. David Stinson
Director, President & General Manager
Norfolk and Portsmouth Belt Line Railroad Company
P.O. Box 7545
Portsmouth, VA 23707

Ms. Donna Coleman
Director, Vice President, Comptroller & Corporate Secretary
Norfolk and Portsmouth Belt Line Railroad Company
P.O. Box 7545
Portsmouth, VA 23707

Re:   Rail Service Connection to NIT – Rate Proposal and Operating/Financial Plan

Dear Sir and Madam:

     After consultation with NPBL and Virginia International Terminal (VIT) to address operational concerns, CSXT submits the following formal rate proposal, together with an operating plan and related financial information.  As detailed below, and assuming NPBL elects to use CSXT locomotives at no charge, this rate proposal will provide the NPBL with at least $149,452 in guaranteed incremental operating income in the first calendar year of operations alone.

**Operating Plan**

     This operating plan is for intermodal single-stack unit train service between Berkley Yard and Norfolk International Terminals (NIT).  In addition to minimizing direct expenses to the NPBL, this operating plan is designed to integrate with existing and planned operations inside the gate at NIT.

     At the onset, CSXT requests a drop & swap service three days per week, whereby the NPBL would complete services at NIT between 00:01 and 05:00 on Monday, Wednesday and Friday.

- First, CSXT will deliver a locomotive, including sufficient fuel for the round-trip to NIT, and cars to Berkley Yard, between 23:00 the preceding day and 01:00 the same day.

- On the days of CSXT's delivery to Berkley Yard, the NPBL will access NSRR tracks starting at NS Jct., as permitted by agreements between NPBL, NSRR and their respective predecessors dated: July 26, 1917, July 27, 1917, December 31, 1985 and January 1, 2008.

- NPBL will arrive at NIT during the scheduled window from 00:01 to 05:00.

- The NPBL crew will then contact VIT for instructions relative to inbound placement and the outbound location of CSXT train to be pulled from NIT.

  - NPBL will deliver the inbound train to the designated NIT track. If there is an outbound consist to be picked up at NIT, the NPBL crew will retrieve the consist from the pickup track designated by VIT.

    - The outbound consist will already have been inspected and air tested by TTX, at no cost to the NPBL.

    - The NPBL crew will backtrack over the same route returning to Berkley Yard for CSXT pick up.

    - If for any reason, Berkley Yard is unavailable or CSXT does not have a crew ready for the pick up, the parties shall agree upon a mutually acceptable alternative pick up point.

  - If there is no outbound consist to be picked up at NIT, the NPBL crew would return the light locomotive to Berkley or other mutually agreed upon point for CSXT pick up.

Please note the following, which was incorporated into this operating plan:

- The NPBL management has expressed confidence that the proposed round-trip schedule can be completed efficiently with one scheduled crew start.

- This operating plan assumes the NPBL will use CSXT's locomotive between Berkley and NIT without cost or requirement to refuel.

  - This accommodation will not only simplify operations for these moves, it will enhance NPBL's profitability as noted in the first table below. If NPBL elects to us its own power, the calculations shown in Table 2 will apply.

2

NPBL007458

### Rates and Contractual Terms

In order for the NPBL to secure port-related traffic at NIT, its rates and operating requirements must be competitive. Presently, the NPBL's switch rate of $ 210 per car is an economic barrier that prevents CSXT from being able to move any meaningful port freight by rail at NIT.

Here's why: under Item 125 of its public tariff, the Commonwealth Railway charges $35.61 per container (empty or loaded) for a similar movement from APM Terminals. The difference between switch charges is considerable, and will only make the NPBL's rate less competitive now that VIT can shift traffic to APM Terminals in its discretion.

CSXT is not interested in placing the full burden on the NPBL to close this gap. Our proposed operating plan, which provides substantial asured incremental operating income, demonstrates our willingness to make accommodations to help the NPBL in this effort.

Accordingly, CSXT proposes the following, all to be memorialized in a formal agreement:

- One-way rate of $37.50 per container (empty or loaded) for a term of three years on movements handled by the NPBL between Berkley Yard and NIT.

- To minimize financial risk to the NPBL, CSXT commits to provide a minimum average volume (measured over each six month period during the term) of 50 containers per scheduled NPBL round-trip. Assuming three days per week service, the NPBL would have a consistent revenue stream of $146,250 for 3,900 containers for that six month period.

- In consideration of CSXT's commitment, CSXT may request that scheduled service days be adjusted upon CSXT's prior written request. Also upon prior written request, CSXT may request double-stack service at the same rate per container. These adjustments, with allowance for proper notice, would give both parties adequate time to respond to changing market conditions.

- The NPBL's standard settlement and credit terms would apply to the covered traffic, with any potential container shortfall payment to be remitted in a reasonable time after each six month period.

- Mutually acceptable measures and standards of service, including incentives related thereto, would be incorporated into a formal agreement.

NPBL007459

NPBL007461

**Economic Impact on the NPBL**

As shown below in Table 1, based on CSXT's internal analysis of the NPBL cost structure, and the use of CSXT's locomotives and fuel at no cost, this proposal would provide the NPBL with a minimum of $149,452 of additional annual operating income starting in the first full year of operations. That would represent an increase of 25% over 2009 total operating income for the NPBL.

It is worth emphasizing that there is nothing but upside to this proposal, especially with a baseline commitment of 50 containers.  For example, if CSXT tenders 80 containers per round-trip (the "Project Volume"), the NPBL's incremental operating income would be $296,872 over the first full year of operations. This modest increase in volume is not an unreasonable projection, and yet it would represent almost a 50% increase to 2009 operating income.

[TABLES FOLLOW ON NEXT PAGE]

4

NPBL007460

## Table 1

| | W/ CSXT Locomotives & Fuel | |
| --- | --- | --- |
| | Base Level | CSXT Projected |
| Avg. Containers Per Train (Scheduled Crew) | 50 | 80 |
| **Annual** | | |
| Container Volume | 7,800 | 12,480·· |
| NPBL Revenue | $292,500 | $468,000 |
| Compensation & Benefits | $96,248 | $96,248 |
| Locomotive Expense | $0 | $0 |
| Fuel | $0 | $0 |
| Incremental Maintenance | $46,800 | $74,880 |
| Direct Expense* | $143,048 | $171,128 |
| Operating Income Impact | $149,452 | $296,872 |

\* Extrapolated from 2009 Rate Committee Meeting Package

## Table 2

| | W/ NPBL Locomotives & Fuel | |
| --- | --- | --- |
| | Base Level | CSXT Projected |
| Avg. Containers Per Train (Scheduled Crew) | 50 | 80 |
| **Annual** | | |
| Container Volume | 7,800 | 12,480 |
| NPBL Revenue | $292,500 | $468,000 |
| Compensation & Benefits | $96,248 | $96,248 |
| Locomotive Expense | $10,714 | $10,714 |
| Fuel | $19,000 | $19,000 |
| Incremental Maintenance | $46,800 | $74,880 |
| Direct Expense* | $172,762 | $200,842 |
| Operating Income Impact | $119,738 | $267,158 |

\* Extrapolated from 2009 Rate Committee Meeting Package

**Note to Table 2:** As noted above, CSXT's operating and financial plan contemplates the NPBL's use of CSXT locomotives and fuel at no charge. However, should the NPBL wish to use its own locomotives and fuel, Table 2 provides an estimate of the economic impact to the NPBL, which remains quite favorable.

If the NPBL elects not to use CSXT's locomotives and fuel, the NPBL would still make $119,738 in incremental operating income at the base-line volume commitment level in the first year of operations. And, using the Projected Volume, the NPBL would generate $267,158 of incremental operating income, which would represent an increase of approximately 45% over 2009 total operating income for the NPBL.

5

NPBL007461

NPBL007461

## Summary

CSXT reaffirms its belief that time is of the essence for the NPBL to consider this proposal, which is designed to enable both parties to attract intermodal port traffic at NIT. The outlined operating plan and projected financial gains respond to the NPBL's earlier concerns and provide the justification necessary for the NPBL management to support this endeavor.

CSXT also believes this proposal enables the NPBL to deliver on the commitments it has made, directly and indirectly, to the citizens of the Commonwealth, to create competitive dual rail service at NIT. We hope you agree and respectfully request a favorable response from you on or before August 20.

Very Truly Yours,

John Booth

6

NPBL007462



**NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY**
1050 Virginia Av.
P. O. Box 7547
Portsmouth, VA 23707
(757) 397-2056
Fax (757) 399-4855

**D.H. Stinson**
PRESIDENT AND GENERAL MANAGER

August 16, 2010

**VIA ELECTRONIC MAIL**

Mr. J.N. Booth, III
Director Joint Facilities
CSX Transportation
500 Water Street, J315
Jacksonville, FL 32202

      Re:    Rail Service Connection to NIT – Rate Proposal dated July 23, 2010

Dear Mr. Booth:

    We have carefully considered the suggested rate proposal for carriage of single-stack intermodal traffic between Berkley Yard and Norfolk International Terminal (NIT) outlined in your letter of July 23, 2010.

    The basic assumption underlying the proposal is that NPBL can, with a single train crew during one eight hour (third) shift utilizing CSXT supplied power, take an inbound CSXT intermodal train from NPBL's Berkley Yard to NIT, drop it off, and return with an outbound CSXT intermodal train from NIT to the Berkley Yard. Management is interested in exploring whether it can undertake the requested service at a mutually agreeable rate. However, there are several unknowns and risks that need to be addressed in evaluating the proposal.

    First, the company's bylaws require that any agreement allowing foreign locomotives to operate over NPBL tracks must be reported immediately to the board of directors, and is subject to approval or disapproval of the board at any subsequent meeting. If the board does not approve the use of CSXT locomotives as proposed, NPBL will be required to use its own power to perform the requested service, resulting in additional expenses for locomotives and other services. To offset those expenses, and still achieve an additional $146,000 in incremental operating income, the per container rate would need to be higher.

    Second, assuming the locomotive issue can be resolved, NPBL would need to hire additional T&E personnel to take on the work. Costs of doing so indicate that incremental operating income would be approximately $85,000 annually, not $146,000 as estimated by CSXT. In order to obtain an additional $146,000 in incremental operating income, the per container rate would need to be higher.



**NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY**
1050 Virginia Av.
P. O. Box 7547
Portsmouth, VA 23707
(757) 397-2056
Fax (757) 399-4855

Third, there are several operational issues, all of which pose the financial risk to NPBL of having to devote more than one eight-hour crew to perform the requested service. These include CSX missing either the pick-up or drop-off interchange time windows, equipment not being ready at NIT for the return move, operational delays en route due to shared trackage with NS which runs several trains to NIT over the same tracks during the same limited midnight-to- 5:00am service window, and the suggested use of an alternate location for interchange. Financial consideration for these items will need to be addressed if we reach the point of a final contract.

Fourth, NPBL would need to make sure that the additional business did not interfere with its ability to serve existing customers adjacent to NIT. Management believes that this can be reasonably accommodated, though it will take time to ensure that traffic for those customers is not adversely affected.

Finally, the requested three-year term needs to allow for interim review and adjustment, including possible rate increases, to keep incremental income per container consistent.

A NPBL Board of Directors meeting is scheduled for September 8th to address this contract proposal. We thank you for the opportunity to consider the rate proposal and look forward to further discussing it with you to address the items noted.

Sincerely,

David H. Stinson
President

NPBL007448

## ITEM 5 – INFORMATION

### BOARD MEETING

The next meeting of the Board of Directors is hereby scheduled for 10:00 a.m., Wednesday, December 1, 2010 at the Law Offices of Crenshaw, Ware & Martin. Their office is located on the 12th floor at 1200 Bank of America Center, Norfolk, Virginia.

The Chair will now entertain a motion for adjournment.