# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

| | | |
|---|---|---|
| CSX TRANSPORTATION, INC., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NORFOLK SOUTHERN RAILWAY | ) | |
| COMPANY, *et al.*, | ) | Case No. 2:18-cv-530 |
| | ) | |
| *Defendants*. | ) | |
| | ) | |
| | ) | |
| | ) | |

## DEFENDANT NORFOLK SOUTHERN RAILWAY COMPANY'S
## <u>BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

Page

TABLE OF EXHIBITS ................................................................................................. iv

GLOSSARY OF WITNESSES ................................................................................... xii

INTRODUCTION ............................................................................................................ 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................... 3

    A.    The Parties ............................................................................................. 3

    B.    NS and CSX compete for international intermodal container business ................ 3

    C.    The Port of Virginia ............................................................................. 4

        1.    The Port of Virginia has operated three terminals ..................................... 4

        2.    VIT directs ocean carriers where to dock .................................................. 6

        3.    The Port of Virginia competes against other ports .................................... 6

        4.    CSX has a competitive advantage at the Port of New York/New Jersey ............................................................................................... 7

        5.    NS has a Competitive Advantage at the Port of Virginia ......................... 8

        6.    Trucks compete against railroads for traffic at the POV .......................... 9

    D.    NPBL charges a uniform switch rate per the Operating Agreement .................. 10

        1.    NPBL set the switch rate at $210/well to cover its operating expenses ................................................................................................ 11

        2.    There was no vote on CSX's 2010 Rate Proposal .................................. 11

        3.    CSX's 2018 Rate and Governance Proposals ......................................... 12

    E.    CSX was not foreclosed at NIT and used NPBL to move other freight ............. 13

    F.    NS and NPBL are litigating against each other regarding NS's request to have the STB set the trackage fee ...................................................................... 15

    G.    Efforts to sell Pinners Point and decommissioning of Diamond Track .............. 16

ARGUMENT ................................................................................................................. 16

I.    CSX'S CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS ................ 16

# TABLE OF CONTENTS
(continued)

Page

A.    Conduct beyond the limitations period cannot underpin claims or damages ...... 16

B.    CSX cannot identify any distinct damages from conduct occurring within the limitations period, so CSX is not entitled to any recovery ........................... 18

C.    The "continuing violation" doctrine cannot save CSX's antitrust conspiracy claims ........................................................................................ 19

I.    SUMMARY JUDGMENT ON CSX'S ANTITRUST CLAIMS IS WARRANTED ....................................................................................................... 20

    A.    CSX's failure to properly define a relevant market compels dismissal of all CSX's antitrust claims ................................................................................ 20

        1.    CSX cannot proffer evidence to prove that the relevant market pleaded in its Complaint is properly defined ............................................ 21

        2.    Regardless of which proposed definition is considered, CSX has improperly gerrymandered the relevant market..................................... 22

            i.    Relevant geographic market ....................................... 24

            ii.    Relevant service market ............................................... 26

    B.    CSX cannot establish a genuine issue of material fact on its Section 2 monopolization and attempted monopolization claims ..................................... 27

        1.    CSX's Section 2 monopolization and attempted monopolization claims reach only unilateral conduct by a single firm ............................. 28

        2.    CSX cannot prove exclusionary conduct under an "essential facilities" theory...................................................................................... 28

            i.    CSX was not denied access to NIT .............................. 31

            ii.    Antitrust scrutiny is not warranted because the Surface Transportation Board regulates rates ........................... 32

        3.    NS's conduct did not result in substantial foreclosure........................... 32

III.    NS IS ENTITLED TO SUMMARY JUDGMENT ON CSX'S FEDERAL AND STATE CONSPIRACY CLAIMS.................................................................. 33

    A.    CSX cannot show evidence of an agreement between NS and NPBL ............... 33

    B.    CSX cannot prove that trade was restrained unreasonably................................. 35

**TABLE OF CONTENTS**
(continued)

Page

C.      CSX cannot show any overt act in furtherance of the conspiracy ...................... 36

IV.    NS IS ENTITLED TO SUMMARY JUDGMENT ON CSX'S BREACH OF
       CONTRACT CLAIM .................................................................................... 37

A.      NS never blocked CSX's access to NIT in 2015 ................................. 38

B.      NS did not have a contractual duty to support CSX's 2018 Rate Proposal ........ 38

C.      NS had no contractual obligation to change NPBL's governance...................... 40

CONCLUSION.................................................................................................. 40

**TABLE OF EXHIBITS**

| Exhibit | Description | Citation | Confidentiality |
|---|---|---|---|
| 1 | NPBL Operating Agreement, 1897 | NSR_00104139 | Confidential |
| 2 | *Deposition Excerpt* - Cannon Moss | 30:12-18; 35:2-23; 49:22-50:3; 52:9-25, 58:2-6; 60:4-61:25; 62:1-13; 113:01-113:07; 114:7-16; 193:11-24; 202:14-18; 234:12-20; 242:10-17; 242:21-22; 244:2-15; 244:25-245:1; 250:16-21; 287:25-288:9; 291:21-24; 291:25-292:7 | Confidential<br><br>52:9-21;  58-2-6; 60:4-61:25; 62:1-13 |
| 3 | NPBL Supplemental Agreement, March 1, 1989 | CSXT0086318 | |
| 4 | *Deposition Excerpt* – Ken Joyner (as 30(b)(6) witness) | 25:1-3; 19:7-20:9; 128-129:19; | |
| 5 | *Deposition Excerpt* – Rob Girardot (first individual deposition) | 41:13-20; 184:12-25; 99:18-99:24; 64:17-20; 64:21-65:10<br><br>77:25-78:3; 217:5-12; 60:16-22; 62:7-17; 112:2-113:1 | 112:7-113:1 (AEO) |
| 6 | *Deposition Excerpt* – Rob Girardot (as 30(b)(6) witness) | 34:4-6, 35:19-36:7; 28:13-16; 143:22-144:2; 138:17-19 | |
| 7 | Prof. Marvel Report | ¶¶ 10, 12, 16-17 | AEO |
| 8 | *Deposition Excerpt* – Strongosky (first deposition) | 45:14-47:1; 62:21-63:23; 64:24-65:5; 69:15-70:1; 72:22-73:3; 83:05-83:13; 89:21-90:4; 104:13-15; 112:8-24; 117:7-13; 120:4-22;127:3-128:12; 195:2-9; 212:1-6 | AEO:<br>127:3-128:12; 212:1-6;   129:4-22; 104:13-15<br><br>Confidential:<br>89:21-90:4 |
| 9 | *Deposition Excerpt* – Jeffery Heller (first deposition) | 36:18-21; 257:7-258:8; 248:3-249:9 | Confidential |
| 10 (A & B) | Wright Report | ¶¶ 21, 37, 59, 61, 66-67, 70, 73, 74, 116, 119, 131, 136, 137, 138; Tbls. 1, 5, 6 | AEO |

| Exhibit | Description | Citation | Confidentiality |
|---|---|---|---|
| 11 | *Deposition Excerpt* – Kenney (first deposition) | 23:13-23, 28:21-23; 41:20-42:1, 47:12-21; 64:11-65:12; 117:5-15;141:17-20 | AEO: 117:5-15; 64:11-65:12; 23:13-23; 141:17-20; 141-142 |
| 12 | *Deposition Excerpt* – Piacente | 73:24-74:23; 86:7-16; 89:23-90:11 | |
| 13 | April 21, 2014 National Gateway & Virginia Avenue Tunnel: A Path Forward | CSXT0000897, at Slide 7 | AEO |
| 14 | 10-29-2015 Email re: Intl contracts | CSXT0001792 at -794 | AEO |
| 15 | Port Strategy Review – Intermodal | CSXT0124777 at -778 | AEO |
| 16 | *Deposition Excerpt* – Chris Luebbers (first deposition) | 60:05-60:08 | |
| 17 | *Deposition Excerpt* – Capozzi | 74:24-75:5; 105:1-6; 100:23-101:13, 193:24-194:6; 116-9-117:8; 172:23-173:9; 186-187:2; 187:15-188:2; 187:20-23; 220:23-221:2; | Confidential (entire transcript) |
| 18 | *Deposition Excerpt* – Dr. Rob Martinez | 31:20-21; 31:24-32:4 | AEO |
| 19 | *Deposition Excerpt* – Anthony MacDonald | 42:3-6, 73:20-25; 91:18-92:5; 92:21-93:1, 97:7-17; 112:6-10; 121:4-9; 131:8-133:3 134:16-135:9; 142:6-19; 144:20-25; 179:15-180:9; 189:17-20; | AEO: 134:16-135:9; 773:20-25; 142:6-8; 131:8-17; 132:2-3; 132:12-16; 132:23:133:3 |
| 20 | CSX CMA Virginia Options – Mar. 31, 2015 | CSXT0037049 at Slide 4 | AEO |
| 21 | *Deposition Excerpt* – Hall | 33:20-22 | Confidential |
| 22 | *Deposition Excerpt* – Eliasson | 81:6-9; 49:22-50:2; 130:24-131:14; 87:5-9 | |
| 23 | Dec. 12, 2016 Email from T. MacDonald to K. Manz re: Port of Virginia operating details | CSXT0050615 at -615 | AEO |

| Exhibit | Description | Citation | Confidentiality |
|---------|-------------|----------|-----------------|
| 24 | *Deposition Excerpt* – Tony DiDeo | 192:22-193:10 | Confidential |
| 25 | Mar. 1, 2011 Letter from J. Yates to D. Stinson | CSXT0126579 at -579 | Confidential |
| 26 | Mar. 31, 2015 Email from T. MacDonald to M. Kenney re: NIT Train | CSXT0001301 | Confidential |
| 27 | *Deposition Excerpt* – Cary Booth | 87:17-88:7 | Confidential |
| 28 | Mar.20, 2017 Email from R. Girardot to T. Hart re: ZIM-Norfolk NIT Activity | CSXT0117504 at -504 | AEO |
| 29 | Operation Plan, May 2010 | NSR_00306428 at -429 | Confidential |
| 30 | Mar. 27, 2015 Email from C. Matter to T. MacDonald re: NPBL to NIT | CSXT0001276 at -276 | AEO |
| 31 | CSX Operation Plan, May 20, 2010 | NPBL013648 at -649 | |
| 32 | *Deposition Excerpt* – Vick | 27:25-28:8; 75:23-76:4; 74:23-76:4; 48:17-49:6 | Confidential |
| 33 | Apr. 18, 2019 Email from T. Capozzi to J. Strongosky re: MISC and increased volume | CSXT0074449 at -449 | AEO |
| 34 | May 13, 2019 Email from T. Capozzi to C. Warren re: setting up CSX for growth at POV | CSXT0074914 at -915 | AEO |
| 35 | *Deposition Excerpt* – Carl Warren | 122:9-17; 72:12-73:5 | AEO: 122:9-17 |
| 36 | Nov. 16, 2016 Email from L. Creech to T. MacDonald re: CSX visit to Norfolk on Nov. 22 | CSXT0049507 at -508 | Confidential |
| 37 | Mar. 1, 2019 Email from A. Beazley to R. Girardot re: Port of VA Questions/Issues UPDATE | CSXT0073025 at -027 | AEO |
| 38 | Aug. 8, 2018 Email from C. Warren to S. Davis re: VPA Meeting | CSXT0067839 at -840 | AEO |
| 39 | *Deposition Excerpt* – Houfek | 19:13-20:4; 19:14-20:25; 141:7-16 | |

| Exhibit | Description | Citation | Confidentiality |
|---|---|---|---|
| 40 | Dec. 15, 2017 Email from R. Girardot to W. Barton re: NY to Pittsburgh | CSXT0063241 at -241 | AEO |
| 41 | Oct. 10, 2018 Email from J. Strongosky to M. Kenney re: West vs. East Breakdown | CSXT0069501 at -501 | AEO |
| 42 | Dec. 1, 2014 Email from C. Warren to D. Smith re: Intermodal rates to the Midwest | CSXT0034771 at -771-72 | AEO |
| 43 | May 26, 2016 Email from R. Girardot to J. Tuttle re: Inland pricing via Baltimore | CSXT0045124 at -124 | AEO |
| 44 | Jan. 11, 2018 Email from D. Piacente to R. Girardot re: One Pre-call discussion and then call with One to discuss bid status | CSXT0003542 | AEO |
| 45 | May 27, 2015 Email from B. McGlone to J. Strongosky re: Yang Ming | CSXT0038547 at -747 | AEO |
| 46 | Jun. 4, 2014 Email from C. Warren to T. Biscan re: VIT | CSXT0032388 at -388 | AEO |
| 47 | Aug. 1. 2016 to B. Kobza to B. McGlone re: WCSAM service dropping NY and calling Philadelphia | CSXT0046487 at -488 | AEO |
| 48 | Oct. 23, 2010 Memo from M. McClellan and J. Heller to D. Seale re: International Contract Strategy – 24 months | NSR_00026305 at -305 | AEO |
| 49 | *Deposition Excerpt* – Rob Girardot (second individual deposition) | 58:7-59:19 | AEO |
| 50 | Draft Howard Street Tunnel CSX Value Buckets | CSXT0159821 at Slide 4-5 | AEO |
| 51 | Apr 30, 2015 Email from T. Biscan to J. Strongosky re: CMA CSX | CSXT0038161 at -161 | AEO |

| Exhibit | Description | Citation | Confidentiality |
|---|---|---|---|
| 52 | Oct. 7, 2015 Email from R. Houfek to G. Van Tassel fwd. Oct. 5, 2015 Email to W. Wilby re: CSX lift agreement | CSXT0040736 | Confidential |
| 53 | Jan. 19, 2017 Email from B. McGlone to S. McGhahey re: "What If" from Maersk | CSXT0052080 at -802-083 | AEO |
| 54 | Feb. 19, 2019 Email from T. Capozzi to J. Strongosky re: MSC | CSXT0072702 at -702; | AEO |
| 55 | Feb. 1, 2018 Email from R. Girardot to S. Baker re: Imports | CSXT0003625 at -625; -627-28 | AEO |
| 56 | *Deposition Excerpt* – Kendall | 29:16-30:1; 33:14-34:14 | |
| 57 | Meeting with VPA and CSX, May 19, 2010 | VPA000793 | |
| 58 | Joseph Bonney, "CSX Raises the Roof," JOC.com, Oct. 18, 2010 | | |
| 59 | CSX NIT Access Discussion | CSXT0003603 | AEO |
| 60 | CSX Network and Terminal Expansions Support Growth | CSXT0074939 at Slide 3 | AEO |
| 61 | NS & CSX Schedule | CSXT0165126 | Confidential |
| 62 | 2013 Norfolk Southern East Coast Port Review | NSR_00000912 | AEO |
| 63 | CSX NIT Discussion | CSXT0003592 at Slide 11 | AEO |
| 64 | Oct. 12, 2016 Draft Letter to T. Capozzi | CSXT0096239 | AEO |
| 65 | CSX International Market Share | CSXT0046841 at Slide 8 | AEO |
| 66 | *Deposition Excerpt* – Strongosky (second deposition) | 70:17-71:3; 18:10-19:16; 32:15-18 | |
| 67 | Mar. 5, 2018 Letter from D. Piacente to Alexis/Michael | CSXT0159246 at -246-247 | AEO |
| 68 | CSX ZIM Integrated Shipping Services, Nov. 10, 2016 | CSXT0052366 at Slide 9 | AEO |
| 69 | CSX International Market Share | CSXT0024736 at -736 | AEO |
| 70 | *Deposition Excerpt* – Marvel (expert deposition) | 33:25-34:3; 33:13-23; 92:4-15; 102:12-24 | AEO |

| Exhibit | Description | Citation | Confidentiality |
|---|---|---|---|
| 71 | Marvel Reply Report | ¶¶ 40; 43, 124, Ex. 1; | AEO |
| 72 | May 6, 2014 Email from B. McGlone to T. Biscan re: Crowley Threads Meeting Results 4/30 | CSXT0032082 | AEO |
| 73 | *Deposition Excerpt* – Michael McClellan (first deposition) | 22-23; 119:4-120:18, 151 | |
| 74 | Port of Baltimore – Port Review, Jan. 24, 2018 | CSXT0159556 at -565 | AEO |
| 75 | Intermodal Activity Report Week Ending 8-4-2017 | NSR_00041595 at -597 | AEO |
| 76 | Heartland Corridor Overview | NS_00001839 at -840 | AEO |
| 77 | Sept. 7, 2017 Email from J. Strongosky to R. Giardot re: Syracuse inland Port | CSXT0097850 at -850 | AEO |
| 78 | Mar. 2, 2018 Letter from J. Aihie to M. Martinez | CSXT0159221 at -221 | AEO |
| 79 | Norfolk and Portsmouth Beltline Railroad Company Tariff NPB 8100-J | NPBL000220 | |
| 80 | *Deposition Excerpt* – Michael Wheeler | 17:18-18:4; 117:14-118:7 | Confidential |
| 81 | *Deposition Excerpt* – James Allan | 93:7-94:11, 117:1-7; 75:16-17, 90:4-7; 131:9-12, 15-18, 135:6 | Confidential: 131:9-18; 135:6 |
| 82 | *Deposition Excerpt* – Stinson | 128:8-22; 158 | Confidential |
| 83 | *Deposition Excerpt* – Donna Coleman | 39:17-40:6; 47:10-15; 87:13-16; 91:11-12; 104:6-8 | |
| 84 | NPBL Board Minutes, Apr. 9, 2008 | NPBL006936 at -957 | |
| 85 | NPBL Board Minutes, Oct. 5, 2009 | NPBL007095 | |
| 86 | Eliasson E-Mail (Feb. 14, 2011) | CSXT0004190 | Confidential |
| 87 | NPBL Board Minutes, Dec. 19, 2007 | CSXT0000001 at -005 | Confidential |

| Exhibit | Description | Citation | Confidentiality |
|---------|-------------|----------|-----------------|
| 88 | NPBL Board Minutes, Dec. 15, 2009 | CSXT0125260 | Confidential |
| 89 | Crowley Report | 5, Tbl. 1, 6 n.11 & Ex. 3 4 n.8; 23 | AEO |
| 90 | *Deposition Excerpt* – Tony Ingram | 169:2-6 | |
| 91 | CSX's 2010 Proposal | NPBL007431 | |
| 92 | *Deposition Excerpt* – John Booth | 248:10-249:8; 69, 72, 123-24 | |
| 93 | CSX's proposed contract | CSXT0109886 | Confidential |
| 94 | NPBL Board Minutes, Apr. 2011 | NPBL017933 at -938 | Confidential |
| 95 | NPBL Stockholder Minutes, Apr. 2011 | CSXT0000262 | Confidential |
| 96 | Ryan Houfek Email Regarding NPBL Rate Not Being "Too Onerous" | CSXT0082577 | AEO |
| 97 | June 1, 2015 email exchange between NPBL and VIT | CSXT0001537 | Confidential |
| 98 | NPBL 2018 Annual Report | NPBL026348 | Confidential |
| 99 | NPBL 2019 Annual Report | NPBL027926 | Confidential |
| 100 | Notice of Trackage Cancelation | CSXT0044428 | Confidential |
| 101 | Moss Email, Aug. 27, 2018 | NPBL005850 | |
| 102 | CSX Resp. NPBL's Req. Admis. Nos. 5 & 8 | | Confidential |
| 103 | CSX Resp. NPBL's Req. Admis. No. 3 | | Confidential |
| 104 | Privilege Log Excerpt (filtered Michael Burns) | | |
| 105 | CSX's 2018 Rate Proposal | CSXT0100329 | Confidential |
| 106 | Apr. 2, 2018 Email from J. Swafford to M. Burns re: Rate Proposal for Long Term Intermodal service to NIT | CSXT0119620 | AEO |

| Exhibit | Description | Citation | Confidentiality |
|---|---|---|---|
| 107 | April 5, 2018 Email from C. Moss to T. DiDeo re: Rate Proposal for Long Term Rail Service to NIT | NPBL006228 | |
| 108 | NPBL Board Minutes, Apr. 2018 | NPBL000745 | Confidential |
| 109 | *Deposition Excerpt* – Merilli | 55:2-8; 55:13-56:3 | Confidential |
| 110 | *Deposition Excerpt* – Armbrust | 214:15-21 | |
| 111 | CSX's 2018 Governance Proposal | CSXT0100552 | Confidential |
| 112 | NPBL Shareholder Minutes, Apr. 18, 2018 | CSXT0149075 | Confidential |
| 113 | Moss Ltr. Sept. 11, 2018 | NSR_00073843 | Confidential |
| 114 | Eliasson and Armbrust Memo | CSXT0025521 | AEO |
| 115 | NPBL Board Minutes, Sept. 4, 2009 | NPBL019887 | Confidential |
| 116 | MacDonald Email Re: NIT Train | CSXT0001301 | Confidential |
| 117 | Mar. 2, 2011 Letter Re: Operating Window | CSXT0126579 | Confidential |
| 118 | CSX 2d Supp. Resp. NPBL's Interrog. No. 4 | | Confidential |
| 119 | CSX's 2d Suppl. Resp. NS's 1st Interrog. 3 | | Confidential |
| 120 | CSX's 4th Suppl. Rule 26(a)(1) Disclosures | | |
| 121 | Chart of Documents Identified by CSX in its 2d Supp. Resp. NPBL's Interrog. No. 3 | | |

## GLOSSARY OF WITNESSES

| NAME | PARTY | POSITION |
|---|---|---|
| James **Allan** | CSX | Former Director of Network, Joint Facilities |
| Steven **Armbrust** | CSX | Assistant General Counsel; NPBL Board Member from April 2010 until June 2015 |
| Cary **Booth** | NS | Former Assistant Vice President of Intermodal and Automotive Operations |
| John **Booth** | CSX | Former Director Joint Facilities, Service Design, and Network Planning; member of 2009 NPBL rate committee |
| Thomas **Capozzi** | Virginia International Terminals | Chief Sales Officer |
| Donna **Coleman** | NPBL | Vice President |
| Tony **DiDeo** | CSX | Director, Intercarrier Management |
| Fredrik **Eliasson** | CSX | Former Chief Sales and Marketing Officer, NPBL Board Member from April 2010 until the fall of 2011 |
| Robert **Girardot** | CSX | Director-Strategy & Analytics; CSX Rule 30(b)(6) witness |
| Jerry **Hall** | NS | Former Vice President of Transportation; NPBL Board Member from February 2018 until November 2018 |
| Jeffrey **Heller** | NS | Vice President, Intermodal & Automotive |
| Ryan **Houfek** | CSX | Former Assistant Vice President Sales, Assistant Vice President Marketing |
| Tony **Ingram** | CSX | Former Chief Operations Officer; NPBL Board Member from 2009 until 2010 |
| Kenneth **Joyner** | NS | Group Vice President International Intermodal |
| Quintin **Kendall** | CSX | Former Vice President, State Government and Community Affairs; NPBL Board Member from April 2012 until January 2018 |
| Maryclare **Kenney** | CSX | Vice President of Intermodal and Automotive |
| Chris **Luebbers** | NS | Director of Intermodal Yield; member of 2009 NPBL rate committee |

| NAME | PARTY | POSITION |
|---|---|---|
| Tony **MacDonald** | CSX | Former Portsmouth Terminal Manager, CSX Intermodal Terminals, Inc. |
| Robert **Martinez, Ph.D.** | NS | Vice President Business Development & Real Estate |
| Howard P. **Marvel, Ph.D.** | | CSX Expert Witness |
| Michael **McClellan** | NS | Vice President of Strategic Planning |
| Philip **Merilli** | NS | Former Vice President of Engineering; NPBL Board Member from December 2015 until April 2019 |
| Cannon **Moss** | NPBL | President and General Manager |
| Dean **Piacente** | CSX | Former Vice President of Industrial Products |
| David **Stinson** | NS | Division Superintendent; NPBL President and General Manager from 2008 until 2011 |
| Jay **Strongosky** | CSX | Director, Sales & Marketing, Intermodal |
| Catherine **Vick** | Virginia Port Authority | Chief Development and Government Affairs Officer |
| Michael **Wheeler** | NS | Former Chief Operating Officer; NPBL Board Member from March 2010 until December 2015 |
| Matthew **Wright, Ph.D.** | | NS Expert Witness |

Defendant Norfolk Southern Railway Company ("NS"), by counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure, submits the following brief in support of its Motion for Summary Judgment on all claims of Plaintiff CSX Transportation, Inc. ("CSX").  For the following reasons,[1] NS's Motion should be granted.

## INTRODUCTION

CSX levels a serious, but false, charge.  CSX is a Class 1 railroad serving half of the country, with over $10 billion in annual revenue.  CSX claims that, for more than a decade, Defendants have blocked CSX from having rail access to the docks at a single ocean shipping port terminal in Virginia—Norfolk International Terminal ("NIT")—and that CSX's inability to move international intermodal shipping containers directly from that terminal by rail has resulted in harm reverberating through its entire business ████████████████████████████████████████

████.  But, in reality, CSX *does* have rail access to NIT via the Norfolk and Portsmouth Beltline Railroad Company ("NPBL"), and NPBL has never refused to move CSX's freight.  CSX has *chosen* to move its intermodal containers to and from NIT by truck instead of by rail ████████

████████████████████████████████  ████████████████████████████

████████████████████████████████████████████████████████

These undisputed facts lay plain that this case is not about CSX being blocked from NIT.  Rather, this case is about CSX's desire to avoid paying the going rate to access NIT by rail, namely NPBL's uniform $210 switch rate for rail traffic—a rate that any user of NPBL must pay; a rate

---

[1] NS also adopts and incorporates the arguments made in NPBL's brief that are readily transferable to NS.  *U.S. ex rel. LaCorte v. SmithKline Beecham Clinical Lab'ys, Inc.*, 149 F.3d 227, 237–38 (3d Cir. 1998) (recognizing incorporation of "readily transferrable" arguments between parties).  This includes all arguments regarding the lack of any conspiracy between NPBL and NS, whether antitrust, business conspiracy, or civil conspiracy.  NPBL's arguments equally apply to NS as the alleged other party to the conspiracy and are, thus, properly subject to adoption and incorporation.

that CSX has in fact paid without complaint on other portions of NPBL not at issue here; and a rate that has since 2010 barely covered NPBL's operating costs.  Though the available tariff rate is eminently justified, CSX seeks to use this lawsuit and the threat of treble antitrust damages to extract a special deal from NPBL that is well below the rate that NPBL's Operating Agreement requires it to charge.

In view of the undisputed facts, Defendants are entitled to summary judgment on all of CSX's claims.   As a threshold matter, well-established statute of limitations precedent demonstrates that CSX's claims are time-barred, or at minimum must be substantially narrowed on that basis.  Additionally, CSX's ill-conceived antitrust claims fail for a number of independent reasons.  *First*, CSX has gerrymandered its proposed relevant market—a required element for all of the antitrust claims—around its own circumstances rather than by reference to actual competitive conditions, ignoring that (a) trucking containers from port to destination is an alternative to moving them by rail for ocean carriers; and (b) ocean carriers can move intermodal containers through other terminals and ports to their ultimate destination.   *Second*, CSX's monopolization and attempted monopolization claims fail because CSX cannot satisfy the elements of the essential facilities claim it presses here.  *Third*, CSX's conspiracy-based antitrust claims fail because there is no conspiratorial agreement, and under the "rule of reason," CSX cannot prove the requisite substantial anticompetitive effect.  CSX's state law claims fare no better, and likewise cannot survive summary judgment for a litany of reasons, including because (1) NS assisted NPBL with moving CSX's intermodal trains to NIT in 2015, and (2) NS had no obligation to accept or consider CSX's 2018 request for a special low switch rate or corporate governance proposal.  For these reasons, this Court should grant NS's Motion and dismiss CSX's claims.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**A.     The Parties**

1.      NS and CSX are Class 1 railroads that operate in the eastern United States and Canada.  (ECF No. 66, at 2.)

2.      NPBL is a terminal switching railroad founded in 1896 by eight railroads that operates in the cities of Norfolk, Portsmouth, and Chesapeake, Virginia.  (Compl. ¶ 1).  NPBL's business and affairs are governed by an Operating Agreement, dated July 7, 1897 (the "Operating Agreement").  (**Ex. 1**, NSR_00104139).  NPBL's primary business is to interchange, or switch, freight cars for other railroads, primarily its owners.  *Id*.  NPBL takes cars tendered by other railroads and delivers them to locations on its rail line, or vice-versa.  (**Ex. 2**, Moss Dep. 30:12-18).

3.      Following mergers and acquisitions among the original nine railroads, the number of shareholder railroads eventually was reduced to only CSX, Norfolk and Western Railway Company ("NW"), and Southern Railway Company ("SR").  (Compl. ¶ 2).  By Supplemental Agreement dated March 1, 1989, CSX, NW, and SR amended the Operating Agreement to allow CSX to appoint two NPBL board members and NW and SR to collectively appoint three board members.  (*See* **Ex. 3**, CSXT0086318[2]).  NW and SR's merger left NS and CSX as the sole shareholders of NPBL, with 57% and 43% respective ownership interests.  (Compl. ¶ 23).

**B.     NS and CSX compete for international intermodal container business.**

4.      NPBL is not a competitor to either NS or CSX.  (**Ex. 4**, Joyner 30(b)(6) Dep. 25:1-3; **Ex. 5**, Girardot (first) Dep. 41:13-20; **Ex. 6**, CSX Corp. Rep. Dep. 34:4-6, 35:19-36:7; **Ex. 7**, Marvel Rep. ¶¶12, 16-17; **Ex. 8**, Strongosky (first) Dep. 72:22-73:3).

---

[2] In 1989, NW and SR had legally merged following ICC approval of the Merger in 1982 but were still working through the operational merger.   ECF No. 116, at 1.

5.      NS and CSX vigorously compete for the transportation of international intermodal containers delivered to or from ports on the East Coast.  (**Ex. 9**, Heller Dep. (first) 36:18-21).

6.      "International intermodal traffic" refers to the transportation of cargo containers that are either imported to or exported from the United States and use more than one mode of transportation on a single trip from origin to destination.  (**Ex. 10**, Wright Rep. ¶ 21).

7.      Railroads often utilize "double-stacked" trains to move intermodal containers.  A double-stacked train can hold up to three containers in a single well, as opposed to a single-stacked train that can hold only one container per well.  (**Ex. 5**, at 184:12-25).

8.      CSX executives acknowledge that double-stacked trains double a railroad's train capacity and create cost and operational efficiencies.  (**Ex. 11**, Kenney (first) Dep. 41:20-42:1, 117:5-15; **Ex. 8**, at 45:14-47:1, 148:17-149:19; **Ex. 12**, Piacente Dep. 73:24-74:23; **Ex. 13**, CSXT0000897 at Slide 6; **Ex. 14**, CSXT0001792 at -794; **Ex. 15**, CSXT0124777 at -778).

C.      **The Port of Virginia**

        1.      **The Port of Virginia has operated three terminals.**

9.      Until May 2020, the Port of Virginia ("POV") had three terminals supporting international intermodal traffic, Virginia International Gateway ("VIG"), Portsmouth Marine Terminal ("PMT"), and Norfolk International Terminals ("NIT").[3]  (**Ex. 7**, at ¶ 23).

10.     At VIG, CSX and NS have on-dock access via the Commonwealth Railway ("CWRY"), a short-line railroad.  (**Ex. 5**, at 99:18-99:24; **Ex. 16**, Luebbers Dep. (first) 60:05-60:08).  In 2019, VIG completed an expansion project and can now offer roughly the same capacity as NIT at 1.2 million containers annually.  (**Ex. 17**, Capozzi Dep. 220:23-221:2; **Ex. 10**, at ¶ 119).

11.     At PMT, NPBL owns the tracks leading to the terminal, which is located next to

---

[3]  These three terminals—NIT, VIG, and PMT—are sometimes collectively referred to as the "Hampton Roads ports" or the "Hampton Roads terminals."  *Id.*

CSX's Portsmouth Intermodal Yard.  (**Ex. 10**, at ¶ 37).  When operational, PMT could handle approximately 200,000 containers per year.  (*Id.* at ¶ 116).

12.     CSX had on-dock access to PMT through trackage rights over NPBL's tracks while PMT was operational.  (**Ex. 17**, at 74:24-75:5).  NS had on-dock access at PMT by using NPBL and paying NPBL the uniform switch rate.  (**Ex. 2**, at 113:01-113:07).

13.     PMT was temporarily shuttered between 2010 and 2014.  PMT was shuttered again in 2020 and remains closed today.  (**Ex. 17**, at 172:23-173:19; **Ex. 10**, Tbls. 5 & 6).

14.     At NIT, NS has on-dock access via tracks that it owns.  (**Ex. 18**, Martinez Dep. 31:20-32:04).  NPBL has trackage rights over NS's tracks.  *Id.*

15.     CSX has rail access to the on-dock facilities at NIT via NPBL, provided that CSX pays the NPBL switch rate.  (**Ex. 19**, MacDonald Dep. 42:3-6, 134:16-135:9; **Ex. 8**, at 195:2-9; **Ex. 20**, CSXT0037049 at Slide 4; **Ex. 21**, Hall Dep. 33:20-22, **Ex. 22**, Eliasson Dep. 81:6-9; **Ex. 23**, CSXT0050615 at -615).

16.     A railroad seeking access to NIT must coordinate an available operating window with NS.  (**Ex. 24**, DiDeo Dep. 192:22-193:10; **Ex. 25**, CSXT0126579 at -579; **Ex. 26**, CSXT0001301; **Ex. 9**, at 257:7-258:8; **Ex. 27**, C. Booth Dep. 87:17-88:7).

17.     NS and NPBL trains enter and move through NIT in different directions, meaning that two trains cannot be on the tracks at the same time.  (**Ex. 19**, at 92:21-93:1, 121:4-9; **Ex. 28**, CSXT0117504 at -504).  NS enters NIT through the southern main gate and travels in a continuous clockwise fashion as it moves into NIT, loads containers, and then exits NIT's northern back gate. (**Ex. 19**, at 91:18-92:5).  NPBL has trackage rights that allow it to enter and exit NIT through the northern back gate.  (**Ex. 29**, NSR_00306428 at -429; **Ex. 30**, CSXT0001276 at -276).  This requires NPBL to leave NIT through the same gate in which it enters.  (**Ex. 31**, NPBL013648 at -

649; **Ex. 19**, at 97:7-17).

        **2.**        **VIT directs ocean carriers where to dock.**

18.      Virginia International Terminals, Inc. ("VIT") is the private terminal operating subsidiary of the Virginia Port Authority ("VPA") that operates the POV.  (**Ex. 17**, at 105:1-6; **Ex. 32**, Vick Dep. 27:25-28:8).

19.      VIT actively manages port operations at the POV ███████████████

████████████████████████████████████████████████████

██████████████████████████████

20.      ███████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████

        **3.**        **The Port of Virginia competes against other ports.**

21.      Ports compete with one another for international intermodal "discretionary cargo," which is cargo that can move through more than one port to its ultimate destination.  (**Ex. 17**, at 186:4-187:2; **Ex. 15**, CSXT0124777 at -777).

22.      Ports along the West Coast of the United States compete with ports along the East Coast of the United States for discretionary international intermodal traffic for some origins and destinations, particularly in the Midwest.  (**Ex. 8**, at 62:21-63:23; **Ex. 11**, at 29:20-30:11; **Ex. 12**, at 89:23-90:11; **Ex. 39**, Houfek Dep. 19:13-20:4; **Ex. 40**, CSXT0063241 at -241; **Ex. 41**, CSXT0069501 at -501; **Ex. 42**, CSXT0034771 at -771-72; **Ex. 43**, CSXT0045124 at -124).

23.      The inland locations for which the POV has the greatest natural shipping advantage over other ports tend to be origins and destinations locations close to the port itself.  (**Ex. 10**, at ¶ 70; **Ex. 39**, at 19:14-20:25).

24.     The POV competes with Canadian ports and with the ports of Baltimore, Philadelphia, Savannah, Jacksonville, Charleston, and New York/New Jersey ("Port of NY/NJ") for discretionary international intermodal traffic.  (**Ex. 17**, at 187:15-188:2; **Ex. 19**, at 112:6-10; **Ex. 20**, at Slide 7; **Ex. 44**, CSXT0003542; **Ex. 45**, CSXT0038547 at -747; **Ex. 15**, at -777).

25.     CSX and NS consider how pricing affects an ocean carrier's decision to call at various ports.  (**Ex. 46**, CSXT0032388 at -388; **Ex. 8**, at 127:3-128:12; **Ex. 47**, CSXT0046487 at -488; **Ex. 48**, NSR_00026305 at -305; **Ex. 9**, at 117:6-13).  ███████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

### 4.     CSX has a competitive advantage at the Port of New York/New Jersey.

26.     The POV's main competitor for discretionary international intermodal cargo is the Port of NY/NJ, which is the East Coast port with the largest intermodal container business.  (**Ex. 10**, at ¶ 73; **Ex. 17**, at 187:20-23; **Ex. 5**, at 77:25-78:3; **Ex. 8**, at 212:1-6; **Ex. 53**, CSXT0052080 at -802-083; **Ex. 54**, CSXT0072702 at -702; **Ex. 46**, CSXT0032388 at -388; **Ex. 15**, CSXT0124777 at -777).

27.     The Port of NY/NJ is the first port of call on the East Coast for many ocean carriers, providing it with a speed-to-market advantage over the POV when serving overlapping inland destinations such as the Midwest.  (**Ex. 10**, at ¶ 73; **Ex. 32**, at 75:23-76:4; **Ex. 40**, at -241; **Ex. 55**, CSXT0003625 at -625).

28.     CSX has long prioritized the Port of NY/NJ as its main port for international intermodal traffic services.  (**Ex. 10**, at ¶ 74; **Ex. 56**, Kendall Dep. 29:16-30:1; **Ex. 57**,

VPA000793; **Ex. 58**, Joseph Bonney, "CSX Raises the Roof," JOC.com, Oct. 18, 2010, available at https://www.joc.com/maritime-news/csx-raises-roof_20101018.html ("You hear a lot about the Heartland Corridor. My statement is, 'Bring them on.' We can handle them here in New Jersey and beat them head-on, straight up every day."  (quoting Clarence Gooden, CSX's executive vice president and chief commercial officer)); **Ex. 59**, CSXT0024736 at -736).

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████

30.     CSX reaches the same major Midwest locations through the Port of NY/NJ that NS serves through the POV, including Chicago, Cleveland, Cincinnati, Columbus, Detroit, Louisville, Kansas City, and St. Louis.  (**Ex. 62**, NSR_00000912 at Slide 21; **Ex. 63**, CSXT0003592 at Slide 11; **Ex. 60**, at Slides 3-4; **Ex. 64**, CSXT0096239).

31.     ████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████

██  ███████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████

**5.     NS has a Competitive Advantage at the Port of Virginia.**

33.     NS completed its "Heartland Corridor" project in 2010, which gave NS double-stack service through the POV and the fastest and most direct routes to Midwest destinations from the POV.  (**Ex. 76**, NS_00001839 at -840; **Ex. 73**, McClellan Dep. 22-23, 151).  █████████████

█████████████████████████████████████████████████

██████████████████████████████████████

34.     CSX did not achieve double-stack capabilities from the POV until December 2016 when the Virginia Avenue Tunnel construction was completed, part of the National Gateway project.  (**Ex. 5**, at 217:5-12; **Ex. 12**, at 73:24-74:6; **Ex. 68**, CSXT0052366 at Slide 9; **Ex. 69**, CSXT0024736 at -736).  █████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

35.     ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

**6.     Trucks compete against railroads for traffic at the POV.**

36.     Between 2012 and 2019, trucks accounted for 60%-65% of all international intermodal traffic through the POV.  (**Ex. 10**, at ¶ 59, Chart 1).

37.     CSX and POV officials confirm that trucks and rail compete most closely for international intermodal traffic movements of up to 200 miles.  (**Ex. 71**, Marvel Reply Rep. ¶ 40; **Ex. 12**, at 86:7-16; **Ex. 5**, at 60:16-22; **Ex. 35**, at 72:12-73:5; **Ex. 32**, at 48:17-49:6; **Ex. 72**, CSXT0032082 at -082).

38.     CSX and NS executives confirm that trucks and rail also compete for international intermodal movements between 200 and 500 miles, and in certain circumstances, for movements longer than 500 miles.  (**Ex. 8**, at 112:8-24; **Ex. 73**, at 119:4-120:18; **Ex. 5**, at 62:7-17; **Ex. 11**, at 47:12-21; **Ex. 70**, at 33:13-23; **Ex. 74**, CSXT0159556 at -565; **Ex. 4**, at 19:7-20:9; **Ex. 10**, at ¶ 61; **Ex. 75**, NSR_00041595 at -597; **Ex. 40**, at -241; **Ex. 45**, at -747).

39.     ████████████████████████████████████████

████████████████████████████████████████

40.     Both NS and CSX set at least some of their international intermodal rates in order to remain competitive with trucks.  (**Ex. 10**, at ¶¶ 66-67; **Ex. 40**, at -241; **Ex. 8**, 120:4-22; **Ex. 9**, at 248:3-249:9; **Ex. 72**, at -082; **Ex. 77**, CSXT0097850 at -850; **Ex. 5**, at 112:2-113:1).  ███████

███████████████████████████████████████████████

███████████████████████

41.     Through CSX's Highway To Rail ("H2R") program, CSX actively seeks to convert trucking of international intermodal traffic to rail movement of those containers by CSX.  (**Ex. 11**, at 64:11-65:12; **Ex. 72**, at -083; **Ex. 8**, at 117:7-13).

**D.     NPBL charges a uniform switch rate per the Operating Agreement.**

42.     The Operating Agreement requires that NPBL fix a "uniform rate" for the NPBL's "movement of freight cars … regardless of distance."  (**Ex. 2**, at 114:7-16; **Ex. 1**, at art. 9; **Ex. 6**, at 28:13-16; **Ex. 22**, at 130:24-131:14).  The uniform rate is to be "adjusted from time to time" to pay a six percent dividend to shareholders.  (**Ex. 1**, at art. 9).  The uniform rate that NPBL charges to switch cars is referred to as its "switch rate."

43.     ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

44.     NPBL's switch rate is set through a published tariff.  (**Ex. 82**, Stinson Dep. 128:8-22; **Ex. 79**, NPBL000220).  Historically, NPBL has used rate committees to evaluate and propose adjustments to the switch rate to the NPBL Board for a vote.  (*Id.* at 158:21-25; **Ex. 83**, Coleman Dep. 47:10-15).

45.     Through its statutory authority, the Surface Transportation Board ("STB") has exclusive jurisdiction over the reasonableness of switch rates and the trackage rights agreement between NS and NPBL.  49 U.S.C. §§ 11102(a), (c)(1).

46.     NS provides administrative support to NPBL per contracts with NPBL.  (*See* **Ex. 2,** at 35:2-23 (leases three locomotives), 52:9-25 (billing and contract services), 58:2-6 (technology services), 60:4-61:25 (car management system), 62:1-13 (email addresses), 193:11-24 (benefits administration), 289:1-290:6 (locomotive maintenance)).

**1.     NPBL set the switch rate at $210/well to cover its operating expenses.**

47.     In 2009, the Board set NPBL's switch rate at $210 per well, effective January 1, 2010.  (**Ex. 88**, CSXT0125260).  The rate has remained the same since 2010.  (**Ex. 2**, at 202:14-18).

48.     The NPBL switch rate is based on NPBL's operating costs.  (**Ex. 89**, Crowley Rep. at 5, Tbl. 1; **Ex. 2**, at 234:12-20; **Ex. 83**, at 104:6-8).

49.     ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████

50.     It is "very relevant" to consider NPBL's actual costs in setting the switch rate.  (*See* **Ex. 81**, at 75:16-17, 90:4-7; **Ex. 22**, at 87:5-9; **Ex. 90**, Ingram Dep. 169:2-6).

51.     Since 2010, NPBL's Board has approved the annual budget presented by NPBL's officers, which includes NPBL's anticipated expenses for the following year.  (**Ex. 89**, at 4 n.8).

52.     CSX's expert testified that he did *not* take into account the NPBL's operating expenses when he analyzed the NPBL switch rate.  (**Ex. 70**, at 92:4-15).

**2.     There was no vote on CSX's 2010 Rate Proposal.**

53.     On July 23, 2010, CSX sent a letter to NPBL (the "2010 Proposal") proposing that the parties enter into a contract relating to NPBL's movement of CSX's intermodal freight to and

from NIT.  (**Ex. 91**, NPBL007431 at -433).  Among other things, CSX proposed that it pay NPBL

a switch rate of $37.50 per container.  *Id.*  The terms proposed by CSX were subject to negotiation

between CSX and NPBL.  *Id.*  CSX sent NPBL a draft contract as part of the negotiation.  (**Ex. 92**,

J. Booth Dep. 248:10-249:8; **Ex. 93**, CSXT0109886 at -886-908).

54.     The proposed discounted rate did not consider all of NPBL's costs for moving the

trains.  (*See* **Ex. 92**, at 69:4-8, 72:7-11, 123:19-124:1; **Ex. 81**, at 131:9-12, 15-18, 135:6 (proposal

not based on expenses); **Ex. 80**, at 117:14-118:7 (plan profitability was speculative and

unsupported)).

55.     NPBL's officers presented their analysis to the NPBL Board.  However, no board

member ever moved for a vote on whether NPBL should agree to the 2010 Proposal.  (*See* **Ex. 94**,

NPBL017933 at -938).  Nor did CSX, as a shareholder, make a motion at the April 13, 2011

shareholders meeting to agree to the 2010 Proposal.  (**Ex. 95**, CSXT0000262 at -262).

### 3.     CSX's 2018 Rate and Governance Proposals

56.     █████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████

57.     On March 23, 2018, CSX sent a letter to NPBL management proposing that the

parties enter into a contract relating to NPBL's movement of CSX's intermodal freight to and from

NIT.  (**Ex. 105**, CSXT0100329; **Ex. 106**, CSXT0119620; **Ex. 6**, at 143:22-144:2).  CSX said it

was "willing to work through [a rate committee] if necessary."  (**Ex. 105**).

58.     NPBL pursued the proposal.  Moss spoke with CSX about the proposal, met with

VIT as to port management, and consulted with NS regarding an operating plan for the movements

CSX proposed.  (**Ex. 107**, NPBL006228; **Ex. 2**, at 242:10-17).  ██████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████

59.     NPBL management raised CSX's proposal at the April 18, 2018 NPBL Board meeting.  (**Ex. 108**, NPBL000745).  Board members raised concerns that giving CSX a special, contract rate would violate the Operating Agreement's uniform rate provision.  (**Ex. 109**, Merilli Dep. 55:2-8).  These concerns led NPBL's management to recommend that the Board form a rate committee to fully investigate the proposal.  (**Ex. 2**, at 242:21-22).

60.     CSX was not interested in a rate committee.  (**Ex. 2**, at 244:25-245:1).  The CSX-appointed directors never moved to form a rate committee and *never* moved for a vote on the 2018 Rate Proposal at the April 18, 2018 Board meeting.  (**Ex. 6**, at 138:17-19; **Ex. 110**, Armbrust Dep. 214:15-21).  NPBL never rejected the rate proposal made by CSX.  (**Ex. 2**, at 287:25-288:9).

61.     On April 6, 2018, CSX sent a letter to NS and NPBL demanding that the NPBL Board be restructured to overturn the Supplemental Agreement's 3-2 allocation of board seats between the two parent railroads and for NPBL to adopt an ethics compliance program.  (**Ex. 111**, CSXT0100552).  But NPBL already maintained a code of ethics and conflicts of interest standards. (**Ex. 2**, at 49:22-50:3; **Ex. 83**, at 39:17-40:6, 214:2-8; **Ex. 109**, Merilli Dep. 55:13-56:3).

62.     CSX asked for a vote to restructure the Board at the shareholder meeting on April 18, 2018.  (**Ex. 112**, CSXT0149075).  NS voted its majority shares against the proposal.  (*Id.*; **Ex. 113**, NSR_000738434).  Shortly thereafter, CSX commenced this litigation.

**E.     CSX was not foreclosed at NIT and used NPBL to move other freight.**

63.     Prior to 2015, NPBL moved only one intermodal train to NIT at CSX's request. (**Ex. 19**, at 73:20-25).  In that instance, CSX recognized that the switch rate was not "too onerous." (**Ex. 96**, CSXT0082577 at -577).  CSX did not ask NPBL to move any other intermodal freight to

or from NIT until March 27, 2015.  (**Ex. 19**, at 131:8-133:3).

64.     After receiving CSX's request to move a train of intermodal freight to and from NIT on March 27, 2015, NS worked with NPBL, CSX, and VIT to create an operating window. (**Ex. 19**, at 142:6-19).  An operating window was agreed to on March 31, 2015, and NPBL moved the train on April 1, 2015.  (**Ex. 19**, at 144:20-25; **Ex. 116**, CSXT0001301).  Over the next couple of months, CSX asked NPBL to move eight more trains to and from NIT.  (**Ex. 2**, at 291:21-24; **Ex. 19**, at 189:17-20).  NPBL moved every train that CSX asked it to move.  (**Ex. 2**, at 291:25-292:7).

65.     As part of these movements, NS provided an operating window for NPBL to move the trains on NS's track to NIT on Tuesday and Thursday mornings, which was consistent with the operating window that NS provided NPBL on March 1, 2011.  (**Ex. 97**, CSXT0001537; **Ex. 117**, CSXT0126579; **Ex. 19**, at 179:15-180:9).

66.     CSX has not asked NPBL to move intermodal freight to or from NIT since July 2015.  NPBL has never refused to move CSX's intermodal freight to or from NIT.  (**Ex. 2**, at 291:21-292:7; **Ex. 19**, at 189:17-20; **Ex. 11**, at 28:21-23).

67.     CSX has used NPBL to move other freight.  ███████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████

68.     ████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████

69. 

70.

Both (i) the total volume of containers moving by rail in and out of the POV, and (ii) the total number of containers moved by CSX, have increased from 2009 to the present.  (**Ex. 10**, at Tbls. 5, 6).

71.

**F.     NS and NPBL are litigating against each other regarding NS's request to have the STB set the trackage fee.**

72.

73.     NPBL and NS could not agree on the amount of the trackage fee that NPBL would pay NS for use of NS's tracks.  (**Ex. 101**, NPBL005850; **Ex. 102**, CSX Resp. NPBL's Req. Admis. Nos. 5 & 8 (AEO) (admitting that NS has not increased the trackage fee and that NPBL opposed NS's request to increase the trackage fee)).

74.     As a result, on September 13, 2018, NS petitioned the STB to set the trackage rights compensation, a proceeding where NS and NPBL are adverse parties.  (*See* **Ex. 103**, CSX Resp. NPBL's Req. Admis.  No. 3 (admitting that Defendants did not enter into any trackage fee agreement)).

**G.     Efforts to sell Pinners Point and decommissioning of Diamond Track.**

75.     In 2008, NPBL began considering a sale of Port Norfolk Yard (also called Pinner's Point).  (*See* **Ex. 84**, NPBL006936 at -957).  CSX-appointed board members approved selling the property, but ultimately the Board agreed that NPBL should hold off on selling the property.  (*See* **Ex. 85**, NPBL007095, **Ex. 86**, Eliasson E-Mail (Feb. 14, 2011); (**Ex. 83**, at 87:13-16, 91:11-12).

76.     NPBL had trackage rights over a short segment of track formerly located between NS Junction and Carolina Junction in the Berkley area of South Norfolk (the "Diamond Track").  (*See* **Ex. 87**, Board Min., Dec. 19, 2007, CSXT0000001 at -005).  The decommissioning of the Diamond Track was presented to the Board, which approved it without objection. *Id.*

77.     NS requested that the STB approve discontinuance of service and trackage rights over the Diamond Track, certifying that no local traffic had moved over the line for at least two years.  The STB approved the discontinuance, *without objection from CSX*, effective June 14, 2008.  STB Docket No. AB-290 (Sub-No. 299X), *NSR – Discontinuance of Service Exemption & NPBL – Discontinuance of Trackage Rights Exemption*, May 15, 2008.

## ARGUMENT

## I.     CSX'S CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS.

### A.     Conduct beyond the limitations period cannot underpin claims or damages.

CSX's claims are based on its contention that NS, together with NPBL, prevented CSX from accessing NIT.  CSX relies on the following allegedly wrongful conduct:  (1) removal of the Diamond Track in 2008; (2) allegedly blocking CSX's attempt to purchase the Port Norfolk Yard in 2009; (3) setting the NPBL's switch rate at $210 per car in 2009; (4) purportedly "rejecting" the 2010 Service Proposal; (5) allegedly preventing CSX from using NBPL to move intermodal freight to and from NIT in 2015; and (6) allegedly refusing to adopt CSX's 2018 Service and Governance Proposals.  (Compl. ¶ 34; **Ex. 118**, CSX 2d Supp. Resp. NPBL's Interrog. No. 4).

Section 4B of the Clayton Act provides that any private antitrust cause of action is barred "unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b. An antitrust cause of action accrues "when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Rsch., Inc*., 401 U.S. 321, 338 (1971). The "commission of a separate new overt act" in furtherance of an antitrust conspiracy "generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997). Thus, an antitrust plaintiff "cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period." *Id.* at 190 (even where the plaintiff demonstrates the existence of new overt acts, the plaintiff may recover only for damages *caused by the new acts* that occurred during the limitations period).

CSX's state law contract and statutory business conspiracy claims against NS are subject to a five-year limitations period. (*See* ECF No. 66 at 36). *See also* Va. Code Ann. § 8.01-246; *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 543 (4th Cir. 1997). Its common law conspiracy claim is subject to a two-year limitations period governing breach of fiduciary duty claims.[4] *See Jones v. Shooshan*, 855 F. Supp. 2d 594, 602 (E.D. Va. 2012). As with its antitrust claims, each of these state law causes of action accrued when CSX first suffered damages, or injury, as a result of the alleged wrongful acts. *See Westminster Investing Corp. v. Lamps Unlimited*, 237 Va. 543, 546 (1989) (breach of contract claim accrues when plaintiff suffers damages, even if slight); *Detrick*, 108 F.3d at 543 (cause of action for either type of conspiracy accrues when the plaintiff suffers an

---

[4] CSX's tortious interference claim was dismissed (ECF No. 66 at 46-48), and its conspiracy claims cannot rest on a breach of the Operating Agreement. *See Station # 2, LLC v. Lynch*, 280 Va. 166, 174 (2010) (mere non-performance of a contract does not, on its own, establish a business conspiracy claim). Nor can CSX rest conspiracy claims on an alleged breach of fiduciary duty by the NPBL directors. *See* Argument Part III.C *infra*.

injury sufficient to give rise to the underlying tort claim).

As NPBL also explains, under any of these statutory periods, the first four alleged wrongful acts upon which CSX relies—as well as any damages that flow from those acts, whenever they may have been incurred—are time-barred.  The Court has already so held in ruling on NS's Motion to Dismiss.  (*See* ECF No. 66 at 38-40 (finding that CSX alleged "wrongful acts … *within the five-year statute of limitations*" allegedly produced damages "distinct" from those flowing from the actions NS took *before* 2014 (emphasis added))).  Even though the alleged wrongful acts occurring *outside* the statute of limitations may give rise to distinctly separate damages, as the Court recognized, these actions cannot support CSX's claims.  Further, any damages allegedly stemming from time-barred acts are unrecoverable regardless of when the damages accrued.

**B.    CSX cannot identify any distinct damages from conduct occurring within the limitations period, so CSX is not entitled to any recovery.**

CSX relies solely on the testimony of its expert, Professor Howard P. Marvel, for purposes of proving damages for *all* of its claims.  (*See* Ex. **119**, CSX's 2d Suppl. Resp. NS's 1st Interrog. 3; **Ex. 120**, CSX's 4th Suppl. Rule 26(a)(1) Disclosures).  Prof. Marvel's damages model asserts CSX suffered damages from 2009 through 2021, but he does not identity what specific damages were caused by the specific wrongful conduct alleged by CSX.  (**Ex. 71**, at ¶¶ 124-125).  For the reasons stated above, CSX cannot recover pre-2015 damages because those damages necessarily are based on allegedly wrongful conduct that took place outside the limitations period.

CSX also is barred from recovering any damages from 2015 forward because CSX cannot identify whether those alleged damages were caused by (a) time-barred conduct, (b) Defendants allegedly preventing CSX from using NBPL to move intermodal freight through NIT in 2015, or (c) Defendants' alleged refusal to adopt CSX's 2018 Service and Governance Proposals.  CSX may not use a unified damages theory that not only seeks to recover time-barred damages, but also

does not distinguish the alleged damages flowing from time-barred conduct from damages stemming from within-limitations-period conduct.  This is the type of bootstrapping that the law does not allow.  *See Klehr*, 521 U.S. at 188-90.  Thus, CSX's claims must be dismissed.

### C.    The "continuing violation" doctrine cannot save CSX's antitrust conspiracy claims.

CSX may claim that its antitrust conspiracy claims are saved by the continuing violation doctrine, which requires proof of an overt act occurring after October 4, 2014 that (1) is a new and independent act that is not merely a reaffirmation of a previous act, and (2) inflicts new injury on the plaintiff.  *See Kaw Valley Elec. Coop. Co. v. Kansas Elec. Power Coop., Inc.*, 872 F.2d 931, 933 (10th Cir. 1989) (both elements are necessary for the act to restart the statute of limitations); *accord Lancianese v. Bank of Mt. Hope*, 783 F.2d 467, 470 (4th Cir. 1986); *see also XY, LLC v. Trans Ova Genetics, L.C.*, 890 F.3d 1282, 1292 (Fed. Cir. 2018) (antitrust plaintiff bore burden on summary judgment to present evidence that it had suffered damages as a result of separate antitrust violations occurring within limitations period).   In other words, "a newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period, *not merely the abatable but unabated inertial consequences of some pre-limitations action*."   *Al George, Inc. v. Envirotech Corp.*, 939 F.2d 1271, 1274 (5th Cir. 1991) (citation omitted).

Neither NPBL's movement of trains in 2015 nor Defendants' purported failure to consider the 2018 Rate Proposal was a "new and independent act."  CSX undisputedly successfully used NPBL to access NIT in 2015.  (SOF ¶¶ 62-65).  CSX did not bring the 2018 Rate Proposal to a vote (*id.* ¶ 60), so Defendants took *no overt action* on the 2018 Rate Proposal.[5]  Nor does NS's vote against the Governance Proposal help CSX, as NS had the contractual right to insist that the

---

[5] If CSX argues that it did not bring its Rate Proposal for a vote because doing so would have been "futile," the proposal would alternatively fail to restart the statute of limitations as a futile proposal to deal.  *See Kaw Valley*, 872 F.2d at 934.

Supplemental Agreement be followed.  (*Id.* ¶ 62).  Thus, Defendants did not engage in any new and independent act sufficient to restart the statute of limitations.  *See Midwestern Mach. Co. v. Northwest Airlines, Inc.*, 392 F.3d 265, 271 (8th Cir. 2004) (defendant must take new anti-competitive action to restart the statute of limitations).

CSX also cannot show that it suffered new injury or damages as a direct result of any post-2014 action.  Instead, CSX merely relies on its expert report to claim damages for each year dating back to 2009.  CSX's failure to provide evidence that NS's allegedly unlawful 2015 and/or 2018 actions caused injury distinct from the "abatable but unabated inertial consequences" of NPBL's 2009 decision to set the switch rate at $210 means that CSX cannot demonstrate any overt act that is sufficient to restart the statute of limitations.  *See XY, LLC*, 890 F.3d at 1291 (affirming summary judgment where plaintiff failed to identify any new injury resulting from acts occurring within the limitations period).  CSX's antitrust claims are, thus, barred in their entirety.

## II.    SUMMARY JUDGMENT ON CSX'S ANTITRUST CLAIMS IS WARRANTED.

### A.    CSX's failure to properly define a relevant market compels dismissal of all CSX's antitrust claims.

All of CSX's antitrust claims require that it allege and prove the requisite degree of market power in a properly defined relevant antitrust market, that is, the "area of effective competition," within which "significant substitution in consumption or production occurs."  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) (hereinafter *AmEx*) (quoting *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965), and Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* § 5.02 (4th ed. 2017)).  Without a properly defined market, "there is no way to measure [the defendant's] ability to lessen or destroy competition." *Walker Process*, 382 U.S. at 177; *see also AmEx*, 138 S. Ct. at 2283-85 (recognizing that proper application of the rule of reason under Section 1 of the Sherman Act, 15 U.S.C. § 1, usually

requires "an accurate definition of the relevant market")[6]; *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 681 (4th Cir. 2016) (plaintiffs alleging monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2, must "identify[] exactly what market defendant is accused of monopolizing"); *Sun Microsystems, Inc. v. Microsoft Corp.*, 333 F.3d 517, 534 (4th Cir. 2003) (attempted monopolization "requires definition of the relevant market that the defendant is allegedly attempting to monopolize"), *abrogated on other grounds by eBay, Inc. v. MercExchange. L.L.C.*, 547 U.S. 388 (2006); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 211 (4th Cir. 2002) (conspiracy to monopolize under Section 2 of the Sherman Act requires allegations as to "market power or share of [the alleged conspirators] in the [relevant] market").

Here, CSX's relevant market allegations fail for two separate, independent reasons. *First*, CSX failed to offer evidence to prove that the market alleged in its Complaint is a properly defined relevant market. *Second*, the market proffered by Prof. Marvel, CSX's expert economist, is impermissibly narrow and does not account for the realities of competition. Courts routinely reject markets that are, as here, gerrymandered around the plaintiff's preferences, instead of being defined pursuant to accepted market definition principles. *See It's My Party*, 811 F.3d at 683 ("No party can expect to gerrymander its way to an antitrust victory without due regard for market realities."); *Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 495 (4th Cir. 1986) ("A market drawn too tightly . . . creates the illusion of market power where none may exist.").

1.      **CSX cannot proffer evidence to prove that the relevant market pleaded in its Complaint is properly defined.**

CSX's Complaint alleges a relevant market of "freight transportation by rail in and out of the Hampton Roads' ports." (Compl. ¶ 50). CSX made no attempt in discovery to adduce evidence in support of this purported relevant market and, thus, cannot carry its burden on this essential

---

[6]  *See* Section III.B., *infra*, explaining that CSX's Section 1 claim is a "rule of reason" claim.

element.  CSX's expert Prof. Marvel defines and analyzes a much narrower market for "on-dock rail access at NIT."  (*Compare* Compl. ¶¶ 49-50; *with* **Ex. 7**, Marvel Rep. ⁋ 12).  The two are very different.  The market defined in the Complaint contemplates rail service provided to ocean carriers from POV, whereas the market defined by Prof. Marvel contemplates rail access to NIT provided by NPBL.  CSX did not seek to amend its Complaint to define a relevant market consistent with Prof. Marvel's definition.  CSX may not now proceed on Prof. Marvel's narrower market definition, having failed to amend its complaint to reflect this more limited and very different theory.  *Cf. Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (a plaintiff's complaint must give the defendant fair notice of what the . . . claim is and the grounds upon which it rests" (citation omitted)); *accord Monsanto Co. v. Scruggs*, 342 F. Supp. 2d 568, 581-82 (N.D. Miss. 2004) (refusing to permit expert testimony on markets other than alleged in plaintiff's antitrust counterclaim), *aff'd*, 459 F.3d 1328 (Fed. Cir. 2006); *Bepco, Inc. v. Allied-Signal, Inc.*, 106 F. Supp. 2d 814, 824 (M.D.N.C. 2000) (proffer of contradictory expert evidence on relevant market "seriously compromise[d] [plaintiff]'s claim to have defined any relevant markets at all").

Without evidence to support its pleaded relevant market, CSX cannot carry its burden on this essential element.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (defendant can meet summary judgment burden by noting the "absence of evidence to support the nonmoving party's case"); *Berlyn Inc. v. Gazette Newspapers, Inc.*, 73 F. App'x 576, 582 (2003) ("The plaintiff in an antitrust case bears the burden of proof on the issue of the relevant . . . market[]." (quoting *Satellite Television & Assoc. Res., Inc. v. Cont'l Cablevision of Va., Inc.*, 714 F.2d 351, 355 (4th Cir. 1983)).

### 2.  Regardless of which proposed definition is considered, CSX has improperly gerrymandered the relevant market.

Both of CSX's proposed market definitions—the POV rail service market in the Complaint and the on-dock access to NIT market proffered by Prof. Marvel—suffer from a similar flaw.  Both

are tightly drawn around CSX's own circumstances, not by reference to traditional market definition principles.  Antitrust markets are defined along two dimensions: a relevant product or service market and a relevant geographic market.  *See e.g.*, *Berlyn*, 73 F. App'x. at 582; *Am. Online, Inc. v. GreatDeals.Net*, 49 F. Supp. 2d 851, 857-58 (E.D. Va. 1999).  Whether a service constitutes a distinct market depends on whether it is "reasonably interchangeable" with other services, or the "extent to which consumers will change their consumption of [that service] in response to a price change in another, i.e., the 'cross-elasticity of demand.'"  *It's My Party*, 811 F.3d at 683 (quoting *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 395 (1956), and *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 469 (1992)).  A relevant geographic market must be defined by the "area within which the defendant's customers . . . can practicably turn to alternative supplies if the defendant were to raise its prices." *Id.* at 682 (ellipsis in original) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 441 (4th Cir. 2011)).

Because CSX has alleged that the harm to competition is the harm to *ocean carriers* as a result of lessened competition between NS and CSX for intermodal contracts, (**Ex. 70**, at 21:22-22:6), the service and geographic dimensions of the relevant market must include alternative options that *ocean carriers* can substitute to transport their international intermodal containers.[7] *See, e.g.*, *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997) ("The test for a relevant market is not commodities reasonably interchangeable by a particular plaintiff, but 'commodities reasonably interchangeable by consumers for the same purposes.'") (quoting *E.I. du Pont*, 351 U.S. at 395); *Berlyn*, 73 F. App'x. at 583 (relevant market must identify the

---

[7] Despite alleging that ocean carriers were harmed by NS's conduct, CSX has offered no direct evidence from any ocean carrier confirming they were so harmed.

"proper consumer" and the products that those consumers may find reasonably interchangeable). Here, both of CSX's proposed markets are too narrow in that both (i) improperly omit other modes of transportation that plainly compete with rail transportation for ocean carriers' business; and (ii) improperly omit from their geographic scope ports beyond the POV that provide alternative options for ocean carriers to move their intermodal containers to their ultimate destination.  CSX's failure to properly define either the service dimension or the geographic dimension is fatal to its claims.

**i.      Relevant geographic market.**

The Complaint alleges a geographic market of "the intermodal port facilities of Hampton Roads, Virginia," (Compl. ¶ 49), and Prof. Marvel narrows this market further to only NIT.  (**Ex. 7**, at ¶ 40).  But here, not only are all *three* intermodal terminals at the POV reasonable alternatives,[8] so are other ports outside of the POV, most significantly the Port of NY/NJ.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████  Ocean carriers can, and do, use other POV terminals instead of NIT.  (*See* SOF ¶¶ 10, 12).  Indeed, there is no international intermodal traffic or customer that must move through NIT.  (SOF ¶ 69).

Moreover, the undisputed evidence demonstrates that ports compete with one another for the movement of international intermodal discretionary cargo—cargo that by definition can be

---

[8] CSX significantly increased its international intermodal container movements at both NIT and the POV as a whole during the relevant period.  (SOF ¶ 71).  PMT closed to international intermodal container traffic in April 2020.  (SOF ¶ 13).

moved through more than one port to its final destination.[9]  (SOF ¶¶ 21-22, 24).  The primary competitor of the POV is the Port of NY/NJ, (SOF ¶ 26), which benefits from often being the first port of call on the East Coast, providing that port with a speed-to-market advantage over the POV when serving inland destinations such as the Midwest compared to the POV. (SOF ¶ 27).  CSX and NS serve the same major Midwest locations through the Port of NY/NJ that they serve through the POV, including Chicago, Cleveland, Cincinnati, Columbus, Detroit, Louisville, Kansas City, and St. Louis. (SOF ¶ 30).  Further, CSX has long prioritized the Port of NY/NJ for its own international intermodal service, (SOF ¶ 28), having had double-stack capabilities out of the Port of NY/NJ for at least 10 years, ███████████████████████████████████████████████ ████████████████████████████████████████  ████████  ███████████████ █████████████████████████████████████████ Competition between the POV and the Port of NY/NJ means that ocean carriers can choose to route traffic through either port, as demonstrated ███████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████████

The POV also competes with other East Coast ports—Baltimore, Philadelphia, Savannah, Jacksonville, Charleston, and Canadian ports—for discretionary international intermodal traffic. (SOF ¶ 24).  These East Coast ports provide ocean carriers with additional options to reach some of the same origins and destinations served by NS and CSX at the POV.  (SOF ¶¶ 21, 24).

---

[9] The inland locations for which POV has the greatest natural shipping advantage tend to be close to the port, which in turn tend to be most efficiently served by trucks rather than rail.  (SOF ¶ 23).

[10] ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████

Similarly, West Coast ports compete with East Coast ports (including the POV) for discretionary cargo going to or from markets in the Midwest.  (SOF ¶ 22).  In fact, CSX evaluates how pricing at different ports affects ocean carriers' decisions about which ports to utilize to move intermodal freight.[11]  (SOF ¶ 25).  ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██   Both of CSX's proposed geographic markets are deficient as a matter of law because they fail to include reasonable geographic alternatives available to ocean carriers.

### ii.   Relevant service market.

Failure to properly define the service dimension of a relevant market is a separate and independent reason CSX's claims must be dismissed.  Here, CSX failed to include end-to-end truck transportation as a competitive alternative to rail for ocean carriers.  Trucks accounted for more than 60% of the international intermodal traffic at the POV during the 2012-2019 period.  (SOF ¶ 36).  While trucks dominate movements of cargo containers up to 200 miles, they also compete with rail for a portion of movements of 200 miles or more.  (SOF ¶¶ 37-38).  ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ Despite

---

[11] ████████████████████████████████████████████████

this undisputed evidence of competition between trucks and rail, and ocean carriers' ability to switch between them, CSX's market definition entirely fails to account for trucks and is thus inadequate as a matter of law.

**B.**     **CSX cannot establish a genuine issue of material fact on its Section 2 monopolization and attempted monopolization claims.**

A monopolization or attempted monopolization claim under Section 2 of the Sherman Act requires the plaintiff to prove that the alleged monopolist engaged in conduct not resulting from "growth or development as a consequence of a superior product, business acumen, or historic accident" and that is not explained by legitimate business justifications.[12]  *Loren Data Corp. v. GXS Inc.*, 501 F. App'x 275, 282 (4th Cir. 2012); *see also Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*, 924 F.2d 539, 544 (4th Cir. 1991).  Here, the gravamen of CSX's complaint is that NS, through its alleged control over NPBL, foreclosed CSX from on-dock rail access to NIT, which diminished CSX's ability to compete for ocean carriers' business.  CSX's claims fail on a number of grounds.[13]

_____

[12]  Monopolization requires: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 710 (4th Cir. 1974) (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 596 n.19 (1985)).  Attempted monopolization requires: (1) "specific intent to monopolize the market, [(2)] the defendant engaged in anti-competitive or predatory conduct designed to further that intent; and [(3)] a dangerous probability of success." *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 926 (4th Cir. 1990) (citing *White Bag Co. v. Int'l Paper Co.*, 579 F.2d 1384, 1387 (4th Cir. 1974)).  The same definition of exclusionary conduct applies to both claims. *Kolon Indus., Inc. v. E.I. Dupont de Nemours & Co.*, 748 F.3d 160, 178 (4th Cir. 2014) (quoting 3B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 806a (3d ed. 2008)).

[13]  As to CSX's Section 2 conspiracy-to-monopolize claims, CSX's failure to adequately allege a conspiracy for purposes of Section 1 of the Sherman Act (*see* Section __, *infra*) likewise dooms its Section 2 conspiracy-to-monopolize claims.  *See Dickson*, 309 F.3d at 211.

1.      **CSX's Section 2 monopolization and attempted monopolization claims reach only unilateral conduct by a single firm.**

Section 2's prohibitions on monopolization and attempted monopolization address *unilateral* conduct by a *single* firm.  *See Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 710 (4th Cir. 1991) ("[M]onopolization under section two involves the actions of a single firm to control a market.").  Here, however, CSX's monopolization and attempted monopolization claims depend in large part on conduct that was in fact engaged in by NPBL, supposedly at NS's direction.  Where CSX has argued that NS and NPBL are "separate legal entities, with separate economic interests, separate corporate purposes, and separate management" (Pl.'s Opp'n Def.'s Mot. Dismiss 17, ECF No. 39), CSX cannot simultaneously press single-firm monopolization and attempted monopolization claims premised on both firms' conduct.  *See, e.g.*, *Midwest Gas Servs., Inc. v. Indiana Gas Co.*, 317 F.3d 703, 713 (7th Cir. 2003) (plaintiff's Section 2 claims alleging co-defendant was "functionally under the control of [defendant]" were not proper where the court found entities to be "separate and distinct"); *Sun Dun, Inc. of Wash. v. Coca-Cola Co.*, 740 F. Supp. 381, 391 (D. Md. 1990) ("The idea that a monopoly is composed of a single economic entity is . . . reflected in the requirement . . . that the requisite market power be held by a single defendant.").  CSX's Section 2 monopolization and attempt claims fail for this reason alone.

2.      **CSX cannot prove exclusionary conduct under an "essential facilities" theory.**

CSX contends that NS violated Section 2 of the Sherman Act because by denying CSX access to NIT by rail, preventing CSX from competing with NS.[14]  But the Supreme Court has

---

[14]  *See* Compl. ¶ 93(a) (NS caused NPBL to reject CSX's Service Proposal, thereby denying access to NIT); ¶ 93(b) (failing to allow reasonable/timely movement of CSX rail cars delivered to NIT by NPBL); ¶ 93(c) (refusing to allow NPBL to use CSXT's locomotives to access NIT); ¶ 93(d) (NS set NPBL's switch rate at levels designed to exclude competition); ¶ 93(e) (NS caused NPBL to terminate access rights to the "diamond track").

long reiterated that competitors have no duty to help one another: the Sherman Act "does not restrict the long recognized right of [a] trader . . . engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP (Trinko)*, 540 U.S. 398, 408 (2004) (alternation in original) (quoting *United States v. Colgate & Co..*, 250 U.S. 300, 307 (1919)). While the Supreme Court has recognized certain exceptions to the *Colgate* doctrine, it has been "very cautious," in part "because of the uncertain virtue of forced sharing."[15] *Verizon Commc'ns*, 540 U.S. at 408; *see also id*. at 411 (declining to expand the "few existing exceptions from the proposition that there is no duty to aid competitors"); *Loren Data*, 501 F. App'x at 283.

CSX hopes to evade this long-standing rule by attempting to plead an "essential facilities" claim, which "[s]tated most generally" imposes liability "when one firm, which controls an essential facility, denies a second firm reasonable access to a product or service that the second firm must obtain in order to compete with the first." *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 542 (9th Cir. 1991). Moreover, the "central concern" in an essential facilities claim is whether the control over the facility "is being used to create or further a monopoly in another market." *Loren Data*, F. App'x at 284 (quoting *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 150 (4th Cir. 1990)). This matches CSX's theory of harm to competition here, namely, that NS's exclusionary conduct has caused downstream harm to ocean

---

[15] One narrow exception to the *Colgate* rule was established in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), a decision that the Supreme Court subsequently acknowledged to be "at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409. Under *Aspen Skiing*, Section 2 liability can attach where (i) the defendant-monopolist has ceased participation in a cooperative venture with a competitor; (ii) the defendant has unilaterally terminated a voluntary course of dealing; and (iii) the defendant is unwilling to provide access to the competitor "*even if compensated at retail price*." *Trinko*, 540 U.S. at 409; *see also Loren Data*, 501 F. App'x at 283. As explained in this section, CSX cannot demonstrate it was denied access.

carriers.  (**Ex. 70**, at 21:22-22:6).

The Supreme Court has "never recognized [the essential facilities] doctrine." *Trinko*, 540 U.S. at 411.  To the extent it remains viable after *Trinko*, a plaintiff must show: "(1) control by the monopolist of the essential facility; (2) the inability of the competitor seeking access to practically or reasonably duplicate the facility; (3) the denial of the facility to the competitor; and (4) the feasibility of the monopolist to provide the facility."  *Loren Data*, 501 F. App'x at 284 (quoting *Laurel Sand & Gravel*, 924 F.2d at 544).[16]

Moreover, the doctrine is cabined by several considerations.  First, the facility need not be made available "under whatever terms the competitor wishes."  *Loren Data*, 501 F. App'x at 284. Second, access need only be offered on reasonable terms, evaluated "in the context of competition, rather than from plaintiff's perspective," *Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*, 704 F. Supp 1309, 1323 (D. Md. 1989), *aff'd*, 924 F.2d 539 (4th Cir. 1991), and cannot "be read to mean the assurance of a profit" to the competitor seeking access.  *Laurel Sand & Gravel*, 924 F.2d at 545.  Third, "essential facilities claims should . . . be denied where a state or federal agency has effective power to compel sharing and regulate its scope and terms."  *Trinko*, 540 U.S. at 411 (quoting Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 773e (2003 Supp.)).  Here, CSX's monopolization and attempted monopolization claims fail as a matter of law because (i) the undisputed evidence shows that CSX at times *did* access NIT; and (ii) the STB regulates NPBL's switch rate if challenged as unreasonable.[17]

---

[16] While CSX has not explicitly identified NIT as an essential facility, that is indeed what it is alleging: the theory of harm developed by Prof. Marvel is that CSX's alleged lack of on-dock access to NIT has caused CSX to lose ocean carrier business across its entire network, not just at NIT or the POV.  (**Ex. 71**, at ¶ 124).

[17] While CSX primarily complains about the switch rate and supposed physical denial of access, it also cites a smattering of other acts in connection with its monopolization and attempted monopolization claims—none of which constitutes exclusionary conduct.  NS did remove a

### i.      CSX was not denied access to NIT.

CSX cannot establish that there was either a physical or economic denial of access to NIT.

*First*, the undisputed evidence shows that at times CSX *did* access NIT using NS's on-dock rail

access via NPBL.  (SOF ¶¶ 63-65); *Cf. Trinko*, 540 U.S. at 411 (where access exists, the essential

facilities doctrine "serves no purpose").  CSX complains that NS failed to timely move CSX train

cars when CSX did pay the switch rate.  (Compl. ¶ 93(b)).  But the undisputed facts show that (i)

with one exception, CSX only tried to move trains via NPBL in 2015, and (ii) in 2015, CSX

requested that NPBL move nine trains, NPBL accommodated every request, and CSX moved all

its trains successfully.[18]  (SOF ¶¶ 63-64).  NPBL has never refused to move CSX's freight to or

from NIT.  (SOF ¶ 66).  And CSX has not once sought NPBL service to access NIT since 2015.

*Id.*

*Second*, CSX cannot establish that the switch rate was so unreasonable as to constitute a

denial of access.  The price charged for the on-dock rail access to NIT is NPBL's switch rate, and

the same payment terms apply to any customer seeking to move freight on NPBL—including CSX

and NS—as is required by NPBL's Operating Agreement.  (SOF ¶ 42).  ███████████████████

████████████████████████████████████████████████████████████████████████

---

portion of its own track known as the "diamond track," in 2008; but only after the discontinuation
was approved without objection by the NPBL Board.  (SOF ¶ 76).  CSX also complains that NS
refused to allow NPBL to use CSX locomotives, but NPBL already leases three locomotives from
NS and receives operations assistance.  (SOF ¶ 46).  Finally, NPBL's rejection of CSX's rate
proposals do not constitute exclusionary conduct because (i) the CSX rate proposal would violate
NPBL's Operating Agreement (SOF  ¶¶ 42, 59), and (ii) CSX Board members effectively
abandoned the 2010 and 2018 proposals by failing to ask for a vote on those proposals.  (SOF
¶¶ 55, 60).  Indeed, rather than press for a vote, CSX instead opted to file the instant lawsuit.
(Compl. ¶ 93(a)).

[18] The 2015 movements show that CSX's use of NPBL to access NIT creates complexity at the
terminal.  Most terminals operate with trains entering and exiting in one direction, but at NIT CSX
trains enter and exit in the opposite direction to NS trains. (SOF ¶ 17).  That only one train can run
at a time limits on-track capacity and requires schedule coordination with NS.  (SOF ¶¶ 17, 65).

███████████████████████████████████████████

███████████████████████ The failure to consider the switch rate with respect to NPBL's

cost of providing the access is fatal, for the Fourth Circuit has recognized that where the price of

access is based on the cost of providing the access, the rate is reasonable as a matter of law.  *See*

*Laurel Sand & Gravel*, 924 F.2d at 544-45 (finding rate offer that was a penny over defendant's

variable costs to be reasonable).  CSX has willingly paid those same switch fees to utilize a

different portion of NPBL track that is not at issue in this litigation.  (SOF ¶ 67).

In sum, CSX's displeasure with the terms offered does not establish an exception to the

rule that there is no duty to aid competitors.  *See Loren Data*, 501 F. App'x at 283.

### ii.     Antitrust scrutiny is not warranted because the Surface Transportation Board regulates rates.

The fact of STB oversight further militates against antitrust intervention here.  *See Trinko*,

540 U.S. at 412.  The STB provides regulatory oversight of the railroad industry and has exclusive

authority to grant terminal access and determine the reasonableness of switch rates, like the one

charged by the NPBL.  (SOF ¶ 45; Defs.' Mot. Dismiss at 7-9, ECF No. 116.)  Because a regulator

has the ability to grant the relief CSX seeks, "it [is] less plausible that the antitrust laws contemplate

[the] additional scrutiny" that CSX contends is warranted here.  *Trinko*, 540 U.S. at 412.

### 3.     NS's conduct did not result in substantial foreclosure.

Separate from CSX's inability to prove it was denied access to an "essential facility," CSX

cannot show that it was excluded as a competitor.  *See, e.g.*, *Kolon Indus.*, 748 F.3d at 175.  As an

initial matter, CSX's own business performance repudiates the notion that it was foreclosed from

NIT.  Since 2009, CSX has significantly increased its volume of international intermodal container

movements at NIT, and the POV more broadly.  (SOF ¶¶ 70-71).  ████████████████

███████████████████████████████████████████

█████████████████████████   *Id.* CSX also complains mightily about the "excessive" rate that it supposedly faced in order to access NIT, ██████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████

## III.   NS IS ENTITLED TO SUMMARY JUDGMENT ON CSX'S FEDERAL AND STATE CONSPIRACY CLAIMS.

To prevail on CSX's four conspiracy claims (Counts I, II, VIII, and IX), CSX must prove that NS agreed to conspire with another party. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (requiring an agreement to show a conspiracy under 15 U.S.C. § 1); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 211 (4th Cir. 2002) (requiring an agreement for conspiracy to monopolize under Section 2); Va. Code § 18.2-499 (prohibiting combination, association, or agreement between two parties to injure another's reputation, trade, business or profession); Va. Code § 18.2-500 (providing for treble damages for violations of Va. Code § 18.2-499); *Hechler Chevrolet, Inc. v. Gen. Motors Corp.*, 230 Va. 396, 402 (1985) (requiring agreement between two parties for common law conspiracy).  Count I additionally requires proof that the agreement restrained trade unreasonably, *Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 508 (4th Cir. 2002), and Counts II, VIII, and IX also require some action in furtherance of the conspiracy.  *Hechler*, 230 Va. at 402; *Masco Contractor Servs. E., Inc. v. Beals*, 279 F. Supp. 2d 699, 708 (E.D. Va. 2003) (citing *Adv. Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 150 (4th Cir. 1990)). CSX cannot satisfy these elements for any of its conspiracy claims.

### A.    CSX cannot show evidence of an agreement between NS and NPBL.

As NPBL also explains, CSX cannot show that NS and NPBL acted in concert with one another.  CSX identified 96 communications as evidence of a conspiratorial agreement between

NS and NPBL.  (*See* **Ex. 121** (chart of communications)).  Only 15 of the communications are solely between both Defendants, and of those, only eight took place within the limitations period. *Id.*  Of these eight, (a) two lack any text due to technical issues; (b) four relate to NPBL's use of NS's tracks to move CSX's intermodal freight to NIT in 2015; and (c) two relate to Defendants' unsuccessful negotiations over a new trackage rights agreement, which resulted in NS initiating an action with the STB to set a new trackage fee.[19]  None of these communications show that Defendants entered into a conspiratorial agreement to harm CSX.

The rest of the communications cited by CSX are predominately between NS employees, which cannot support a conspiracy.  *See Fox v. Deese*, 234 Va. 412, 428 (1987) ("[A] single entity cannot conspire with itself.").  This is true even for internal communications that include NS employees serving on the NPBL board, as these are not communications with NPBL because the directors are not agents of NPBL unless they are acting collectively as NPBL's board.  *See Monacan Hills, Inc. v. Page*, 203 Va. 110, 116 (1961).  Even "[a] majority of [directors], in their individual names, cannot act for the board itself and bind the corporation."  *Mosell Realty Corp. v. Schofield*, 183 Va. 782, 793 (1945).  Indeed, CSX does not consider its internal communications, which include CSX-appointed NPBL Board members, to be communications with NPBL.  It withheld such communications as privileged, which it could not do if the communications included representatives of NPBL.  (**Ex. 104**, Privilege Log Excerpt).

Because there is no evidence of an agreement, NS is entitled to summary judgment on CSX's state law conspiracy claims.  *See DAG Petroleum Suppliers L.L.C. v. BP P.L.C.*, 452 F.

---

[19] The Court previously found that CSX's state law conspiracy claims were not time-barred based on CSX's allegation that in 2018, Defendants entered into "a new agreement to increase the amount [NPBL] pays to NS[R] to access NS[R]'s tracks to NIT." (ECF No. 66, at 39-40).  However, there is no agreement between Defendants regarding the trackage fee; NS filed a petition with the STB seeking to set a trackage fee that is higher than NPBL is willing to accept.  (SOF ¶¶ 73-74).

Supp. 2d 641, 650 (4th Cir. 2006) ("Where a plaintiff offers no evidence of an agreement or an intent to injure, summary judgment of a business conspiracy claim is proper.").  Similarly, because CSX's "evidence" of conspiracy is equally consistent with unilateral action, it is deficient as a matter of law for CSX's federal conspiracy claims.  *See Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 57 F.3d 1317, 1325 (4th Cir. 1995) (where claimed injury was caused by "the independent decision" of each defendant not to deal with plaintiff in its preferred manner, failure to prove conspiracy mandated summary judgment in defendants' favor).

**B.     CSX cannot prove that trade was restrained unreasonably.**

Even if CSX were able to prove the existence of a conspiracy (which it cannot), summary judgment in defendants' favor on Count I (Section 1 Sherman Act antitrust conspiracy) is independently warranted because CSX cannot prove that any such agreement restrained trade unreasonably.  *See Cont'l Airlines*, 277 F.3d at 508 (15 U.S.C. § 1 prohibits only "unreasonable" restraints of trade (citing *Standard Oil Co. v. United States*, 221 U.S. 1, 58 (1911)).

CSX contends that defendants' alleged agreement is a "*per se* [Sherman Act] violation," (Compl. ¶ 81)—that is, a type of agreement that almost "always or almost always tend to restrict competition and decrease output," *AmEx*, 138 S. Ct. at 2283 (citation omitted), and does not require further inquiry into the agreement's competitive effects.  But only a "small group of restraints," primarily agreements on price or output between horizontal (head-to-head) competitors, are classified as *per se* unlawful.  *Id.*  The "prevailing standard" for analyzing the reasonableness of Section 1 restraints is the so-called "rule of reason," which requires the court to conduct a fact-specific assessment of market power and market structure to assess the restraint's actual effect on competition.  *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977); *see also Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984).

Here, NS and NPBL are not horizontal, head-to-head competitors.  CSX's own executives

acknowledge that NPBL is not a direct competitor to CSX, and CSX has not bid against NPBL as CSX competes for business.  (SOF ¶ 4).  Similarly, ███████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████

Instead, NS and NPBL are in a vertical relationship.  The legal standard for evaluating the lawfulness of vertical agreements is the "rule of reason" standard.  *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 907 (2007); *see also Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 735-36 (1988) ("[A] vertical restraint is not illegal *per se* unless it includes some agreement on price or price levels."); *cf. Dickson*, 309 F.3d at 204-12, 216 (applying rule of reason, rejecting two separate vertical conspiracies and affirming summary judgment in defendants' favor); *R.J. Reynolds Tobacco Co. v. Philip Morris USA, Inc.*, 67 F. App'x 810, 811-12 (4th Cir. 2003) (per curiam) (affirming that district court's application of the rule of reason when assessing a non-price vertical restraint).

The rule of reason requires the court to conduct a fact-specific assessment of market power and market structure to assess the restraint's actual effect on competition in a properly defined relevant market.  Cont'l T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 49 & n.15 (1977); *see also Copperweld Corp.* v. Independent Tube Corp., 467 U.S. 752, 768 (1984).  As explained in Section II.A, *supra*, CSX cannot demonstrate a significant anticompetitive effect because it cannot prove the existence of a properly defined relevant market.  And as explained in Sections II.B.3, *supra*, the undisputed evidence shows that there has been no substantial anticompetitive effect flowing from the complained-of restraint.

### C.    CSX cannot show any overt act in furtherance of the conspiracy.

CSX also cannot show any overt act in furtherance of the purported conspiracy (as required by Counts II, VIII, and IX) for the multiple reasons discussed in Section IV, *infra*: (a) Defendants

did not block CSX's access to NIT in 2015; (b) there was no vote on the 2018 Rate Proposal; and (c) NS was within its rights to vote against the Governance Proposal.  *See Hechler Chevrolet,* 230 Va. at 402 ("There can be no conspiracy to do an act which the law allows.").

Further, CSX's state law conspiracy claims fail because they lack the requisite underlying tort.  *See Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. 207, 215 (2014) ("[A]ctions for common law civil conspiracy and statutory business conspiracy lie only if a plaintiff sustains damages as a result of an act that is itself wrongful or tortious.").  CSX's tortious interference claim was dismissed, (ECF No. 66), and NS's alleged breach of the Operating Agreement is insufficient.  *See Station # 2*, 280 Va. at 174 (holding that breach of contract does not "rise to the level of an 'unlawful act' under [Va.] Code [Ann.] § 18.2-500").  That only leaves CSX's breach of fiduciary duty claim against certain directors of NPBL, who have been dismissed as parties (ECF Nos. 143, 159).  Further, the NPBL board took *no action* regarding CSX's use of NPBL in 2015 or CSX's 2018 proposals.  Hence, even if CSX could still rely on its fiduciary duty claim, it cannot show any breach of the directors' duties.

## IV.   NS IS ENTITLED TO SUMMARY JUDGMENT ON CSX'S BREACH OF CONTRACT CLAIM.

In Count 5, CSX claims that NS breached its obligations under NPBL's Operating Agreement by (1) "effectively blocking CSXT's access to NS's trackage over which the NPBL has rights," (2) "by refusing to consider proposals that would improve the revenues of the NPBL," (3) "by failing to encourage the business of the NPBL," and (4) "by inducing its employees and/or the Individual Defendants to vote for measures that are harmful to [the] NPBL."  (Compl. ¶ 107).

To prevail on a breach of contract claim, CSX must demonstrate that NS had a legally enforceable obligation to CSX, that NS materially breached that obligation, and that NS's breach caused CSX damages.  *See Filak v. George*, 267 Va. 612, 619 (2004); *see also Horton v. Horton*,

254 Va. 111, 116 (1997). CSX cannot meet any all of these elements.[20]

Pre-2014 actions cannot be the basis for CSX's contract claim because they are time-barred. *See* Part A.1. *supra.* That leaves only (1) NPBL's use of NS's tracks in 2015, and (2) the alleged refusal to consider CSX's 2018 demands as possible bases for the claim. NS, however, never blocked CSX's access in 2015. Nor does NS have a contractual obligation to accept, or even consider, CSX's 2018 demands for a special rate or new governance structure.

## A.    NS never blocked CSX's access to NIT in 2015.

It is undisputed that (a) NPBL moved every intermodal train CSX asked it to move in 2015; (b) NS provided operating windows for NPBL to use NS's track to NIT for each of the movements; and (c) CSX has not asked NPBL to move intermodal freight to or from NIT since 2015. (SOF ¶¶ 63-64, 66). In fact, NPBL, CSX, VIT, *and* NS developed a workable operating plan that provided a twice-a-week operating window for NPBL to use NS's tracks to move CSX's intermodal trains to and from NIT. (SOF ¶ 65). Further, any contractual obligation that NS had regarding NPBL's use of NS's tracks to NIT is governed by the trackage rights agreement between NPBL and NS, *not* the Operating Agreement. Therefore, NPBL's use of NS's tracks in 2015 cannot give rise to a contract claim under the Operating Agreement.

## B.    NS did not have a contractual duty to support CSX's 2018 Rate Proposal.

CSX cannot claim that NS breached the Operating Agreement by not considering the 2018 Rate Proposal because, per CSX, only NPBL *management*, not the NPBL board or its shareholders, should have acted on its proposal. (SOF ¶ 57). Nor can CSX claim a breach based on NS's

---

[20] CSX cannot show damages resulting from NS's conduct as will be explained in a forthcoming Daubert motion.

purported failure to consider the proposal when CSX never sought a vote on it.  (SOF ¶ 60).[21]

Moreover, NS did not have a contractual obligation to accept CSX's 2018 Rate Proposal because it sought a special switch rate, inconsistent with the Operating Agreement's requirement that NPBL charge a "uniform rate for the movement of freight cars."  (SOF ¶ 42).  NS has the right to require adherence to the Operating Agreement's uniform rate provision.  *See id.*  Nor does the provision in the Operating Agreement requiring the shareholders to "co-operate cordially in encouraging the business of [NPBL]" save CSX's contract claim.  This is an obligation to encourage the business of *NPBL*, not CSX.  Therefore, NPBL, not CSX, would be the proper party to claim damages caused by a breach of the obligation.  Because CSX is not seeking to recover damages on behalf of NPBL, it cannot rely on this provision of the Operating Agreement.  (Compl. ¶ 108 (alleging harm to *CSX* (emphasis added))).

Moreover, this provision cannot be read to trump the uniform rate provision because doing so would violate the basic principle that no terms in a contract should be treated as meaningless. *See Ames v. Am. Nat'l Bank of Portsmouth*, 163 Va. 1, 39 (1934) ("No word or clause is to be treated as meaningless if any reasonable meaning consistent with the other parts of the contract can be given to it. . . .").  It is easy to see how these provisions work together.  CSX can pay the uniform $210 switch rate to have NPBL move its intermodal freight, which, contrary to CSX's drayage program, encourages the business of NPBL.  If the additional business results in excess profits for NPBL, then, consistent with the Operating Agreement, NPBL can reduce its switch rate.[22]

---

[21] This is likely because CSX's proposal was merely a pretext to setup litigation. ███████████

[22] CSX got the contractual procedure *backwards* for reducing the switch rate.  NPBL must set a uniform rate to (1) cover costs and (2) provide a six percent dividend to shareholders.  *See*

**C.     NS had no contractual obligation to change NPBL's governance.**

CSX's Governance Proposal demanded that NS agree to (a) equal representation on the NPBL board for CSX and NS; (b) the election of independent directors and officers for NPBL; and (c) adopt an ethics compliance program for NPBL.  Under Section 2 of the Supplemental Agreement, however, NS has the right to appoint its three representatives to the NPBL Board. Further, there is no requirement that any of NPBL's directors or its management be independent of its shareholders, and NPBL *already* maintained a code of ethics and conflicts of interest standards.  (SOF ¶ 61). Thus, NS properly exercised its shareholder right to vote down CSX's Governance Proposal.  CSX cannot use litigation to rewrite NPBL's agreed corporate structure.

In summary, NS is entitled to summary judgment on CSX's breach of contract claim because the record confirms that (1) NS did *not* block CSX's access to NIT, (2) NS did *not* have an obligation to consider the proposals, (3) there was *no* vote on the rate proposal, and thus (4) NS did *not* "fail to encourage" the NPBL's business.

## CONCLUSION

For the foregoing reasons, NS respectfully requests that the Court grant NS's Motion for Summary Judgment against CSX and grant any other relief the Court deems appropriate.

Date:  April 12, 2021                    Respectfully submitted,

                                         **NORFOLK SOUTHERN RAILWAY COMPANY**

                                         */s/ Michael E. Lacy*
                                         Alan D. Wingfield (VSB No. 27489)
                                         Michael E. Lacy (VSB No. 48477)
                                         Massie P. Cooper (VSB No. 82510)
                                         TROUTMAN PEPPER HAMILTON SANDERS LLP
                                         1001 Haxall Point
                                         Richmond, VA 23219

Telephone: (804) 697-1200
Facsimile: (804) 698-6061
Email: alan.wingfield@troutman.com
Email: michael.lacy@troutman.com
Email: massie.cooper@troutman.com

John C. Lynch (VSB No. 39267)
Kathleen M. Knudsen (VSB No. 90845)
TROUTMAN PEPPER HAMILTON SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, VA  23462
Telephone: (757) 687-7759
Facsimile: (757) 687-7510
Email: john.lynch@troutman.com
Email: kathleen.knudsen@troutman.com

Tara L. Reinhart
John R. Thornburgh II
Thomas R. Gentry
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005
Telephone: (202) 371-7000
tara.reinhart@skadden.com
john.thornburgh@skadden.com
thomas.gentry@skadden.com

*Counsel for Defendant Norfolk Southern Railway
Company*

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2021, I electronically filed a copy of the foregoing with the Clerk of Court using the CM/ECF system, which sent a notification of such filing (NEF) to the registered participants as identified on the NEF to receive electronic service, including:

Robert W. McFarland, Esq.
Benjamin L. Hatch, Esq.
E. Rebecca Gantt, Esq.
McGuireWoods LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia 23510-1655
Telephone: (757) 640-3716
Facsimile: (757) 640-3930
rmcfarland@mcguirewoods.com
bhatch@mcguirewoods.com
rgantt@mcguirewoods.com

*Attorneys for CSX Transportation, Inc.*

James L. Chapman, IV, Esq.
W. Ryan Snow, Esq.
Darius K. Davenport, Esq.
David C. Hartnett, Esq.
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1500
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com

*Attorneys for Norfolk and Portsmouth NPBL Railroad Company*

*/s/ Michael E. Lacy*
Alan D. Wingfield (VSB No. 27489)
Michael E. Lacy (VSB No. 48477)
Massie P. Cooper (VSB No. 82510)
TROUTMAN PEPPER HAMILTON SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-1200
Facsimile: (804) 698-6061
Email: alan.wingfield@troutman.com
Email: michael.lacy@troutman.com
Email: massie.cooper@troutman.com

114809767