# EXHIBIT 56

UNDER PROTECTIVE ORDER

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2           FOR THE EASTERN DISTRICT OF VIRGINIA
 3                 CASE NO.:  2:18cv530
 4
    CSX TRANSPORTATION, INC.,
 5  individually and on behalf of
    NORFOLK & PORTSMOUTH BELT LINE
 6  RAILROAD COMPANY,
 7              Plaintiff,
 8  vs.
 9  NORFOLK SOUTHERN RAILWAY
    COMPANY, et al.,
10
                Defendants.
11  _____/
12
13     TRANSCRIPT DESIGNATED UNDER PROTECTIVE ORDER
14              VIDEOTAPED DEPOSITION OF
15                  QUINTIN KENDALL
16            Thursday, January 14, 2021
                10:02 a.m. - 4:17 p.m.
17               Remote Proceedings
18
19
20
21
22
23
24          Stenographically Reported By:
            Gina Rodriguez, RPR, CRR, CCP
25          Job No. CS4385298
```

UNDER PROTECTIVE ORDER

Page 29

```
 1   gave in the work putting it back in.  But yes, we
 2   were able to run double-stacked by the time that I
 3   left.
 4        Q.   You consider the National Gateway project a
 5   success?
 6        A.   I think the fact that you undertake that
 7   many clearance projects with, and then terminal
 8   development and the coordination with federal, state
 9   and local government over a ten-year time dealing
10   with a very challenging regulatory atmosphere, the
11   fact that it was done, I think is a tremendous
12   success.
13        Q.   You said that the purpose was to try to
14   facilitate intermodal growth.  Did it -- did the
15   National Gateway accomplish that?
16        A.   It allowed our -- it allowed us to provide
17   double-stack clearance to the ports in the
18   Mid-Atlantic, specifically the Port of Virginia.  CSX
19   had double-stack clearance coming from New York, out
20   to the Midwest and from Savannah.  This allowed for
21   the Mid-Atlantic for CSX to create -- to create the
22   double-stack clearance would provide operational
23   efficiency and reduce logistics cost and provide
24   greater choice for CSX shipping companies -- company
25   partners on which ports that they would choose to
```

UNDER PROTECTIVE ORDER

Page 30

1  call.
2      Q.  In your time at CSX, did you ever play a
3  role in -- in intermodal sales for CSX?
4      A.  No.  I was -- I was on the state government
5  and community affairs team.  I wasn't on the sales
6  and marketing team.
7      Q.  Did you ever get involved in negotiating
8  contracts with ocean carriers?
9      A.  No.
10     Q.  Were you involved in the budget and finance
11 process for the intermodal group?
12     A.  No.
13     Q.  Who -- who did you report to when you were
14 the vice president for government community affairs?
15     A.  Ellen Fitzsimmons, executive vice
16 president, law and public affairs.
17     Q.  When you were resident vice president, did
18 you have interactions with the Port of Virginia?
19     A.  Yes.
20     Q.  Can you recall who your contacts were?
21     A.  Jerry Bridges, Jeff Keyber, Jeff Florin,
22 Joe Dordo, Joe Ruddy, Russ Held, another Russ.  There
23 were interactions with port officials on a very
24 regular basis at multiple levels.  Heather Wood was
25 there as well.  I mean, there were -- there was --

UNDER PROTECTIVE ORDER

Page 33

1   accomplish that.  If there was a specific commercial
2   or operational issue, there would be someone with me
3   who was responsible for commercial or operations.
4       Q.   You had -- you mentioned the APM terminal
5   earlier.
6       A.   Correct.
7       Q.   Let me describe that.  Did that become
8   known as VIG?
9       A.   Ultimately it did after the 2010 agreement
10  where the Commonwealth assumed responsibility.
11      Q.   CSX served, what became, VIG terminal when
12  you were at CSX?
13      A.   Yes.
14      Q.   Do you recall issues arising related to
15  CSX's service at VIG during your tenure?
16      A.   Yes, at the -- at the latter -- at the
17  latter stage, I believe around 2012, once CSX assumed
18  Maersk shipping business.  The business -- at that
19  point the double-stack clearance had not been
20  achieved on the National Gateway.  However, we
21  assumed, CSX assumed the business, and ran it through
22  Portsmouth at a -- on a single stack level.  And
23  that, as I recall, was problematic for operations at
24  the -- at the port facilities.
25      Q.   Do you recall why that was problematic for

UNDER PROTECTIVE ORDER

Page 34

1  operations?
2      A.   They didn't -- there wasn't sufficient
3  infrastructure within the port gate to deal with that
4  at the time.
5      Q.   And how did -- how -- how did -- strike
6  that?
7           What was your role in that issue?
8      A.   Again, facilitate, working with appropriate
9  officials within CSX here, who did operations in
10 sales and marketing and discussing, being part of
11 conversations as it relates to how we could improve
12 the flow.  Also, perhaps being part of meetings where
13 there were broader discussions about the flow of
14 traffic across the terminals at large.
15     Q.   You said that it was around 2012 when CSX
16 assumed Maersk's business.  Did CSX take that
17 business from Norfolk Southern?
18     A.   Maersk sought out a contract with CSX to
19 provide better service for their intermodal business,
20 and as them being the world's largest shipping --
21 shipping company, we happily accepted.
22     Q.   Would you know whether the Maersk business
23 switched from Norfolk Southern to CSX at that time?
24     A.   Yes, as I recall they were not happy with
25 the service that their -- that the incumbent was