# EXHIBIT 85

# NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY

Crenshaw, Ware and Martin, PLC,
12th floor conference room
1200 Bank of America Center
Norfolk, VA 23510

A special meeting of the Board of Directors was held October 5, 2009 at 10:00 a.m.

PRESENT:   Mr. C. H. Allison
Mr. W. Clement
Mr. T. J. Drake
Mr. T. L. Ingram
Mr. M. D. Manion
Mr. D. H. Stinson, Chairman
Mrs. D. N. Coleman

Mr. J. L. Chapman, IV, representing the Company's General Counsel, Steven Armbrust, CSX counsel and Greg Summy, NS counsel, were also present.

There being a quorum, the Chairman called the meeting to order.

The minutes of the April 8, 2009 and September 4, 2009 meetings of the Board of Directors were, on motion duly made and seconded, approved.

Mr. Stinson called for a motion on the sale of the Pinner's Point property proposed at the September 4, 2009 Board of Directors meeting. A motion was duly made and seconded to allow NPBL management to proceed with the sale. After discussion the motion was approved unanimously.

Mr. Stinson presented NPBL management's response to the Memorandum for Recordation presented by Tony L. Ingram and Bill C. Clement at the September 4, 2009 Board meeting, a copy of which is attached to these minutes as Appendix A. Mr. Ingram stated that CSXT would respond to NPBL management prior to the next Board meeting.

In response to an inquiry Mr. Stinson gave a brief update on the progress of the NPBL Rate Committee.

Management was requested to schedule a special meeting of the Board of Directors as soon as possible.

There being no further business, the meeting was adjourned.

*[signature]*

Donna N. Coleman
Corporate Secretary

Norfolk and Portsmouth Belt Line Railroad Company

Management response to Memorandum for Recordation
presented by Tony L. Ingram and Bill C. Clement
at September 4, 2009 Board Meeting

Tony L. Ingram and Bill C. Clement, directors of Norfolk and Portsmouth Belt Line Railroad Company ("NPBL"), representing the interests of CSX Transportation, Inc. ("CSXT"), a shareholder of NPBL, submitted a "Memorandum for Recordation in the Minutes of the Board Meeting" ("CSXT Memorandum") at the meeting of directors of NPBL held on September 4, 2009;

The CSXT Memorandum made certain statements and posed several questions captioned as "Issues for Consideration" and requested an answer to said questions for recording in the minutes of the meeting of the directors;

The CSXT Memorandum was presented in executive session and no officers of NPBL were present during said presentation;

The CSXT Memorandum appears in the opinion of NPBL management to be directed toward those directors of NPBL appointed by Norfolk Southern Corporation ("NS"), as provided in the March 1, 1989 Supplemental Agreement between NS and CSXT, but nonetheless poses certain questions regarding the conduct of the affairs of NPBL by management; and

NPBL management is of the opinion that the factual statements set forth in the CSXT Memorandum regarding the conduct of the affairs of NPBL are incorrect and/or incomplete and offers the following as the response of management.

Response to: "Background"

Management denies that NS has run NPBL as its alter ego. Management has at all times sought to conduct the affairs of NPBL in the best interests of NPBL. Simply because the conduct of the affairs of NPBL might be perceived by either NS or CSXT to not be in their own best interests does not mean that such conduct is not in the best interests of NPBL.

CSXT apparently perceives that it is entitled to special treatment from NPBL because it is a shareholder of NPBL. Management does not conduct the affairs of NPBL to favor one carrier over any other but strives at all times to operate within the parameters of the Agreement dated July 7, 1897 between the carriers that formed NPBL (formerly The Southeastern and Atlantic Railroad Company) for the interchange of their traffic.

Response to: "Issues for Consideration"

All of the issues for consideration posed by the CSXT Memorandum are phrased in inflammatory, accusatory and misleading rhetoric. Nonetheless, management offers its response to each as follows:

(1) The statement of this issue is based on an incorrect assumption that sale of two parcels of property by NPBL, both approved by the board of directors, will result in the loss of access to either PMT or NIT. Both sales will only be consummated upon the retention by NPBL of either fee simple ownership of the track or deeded easement of trackage rights with express approval by the Surface Transportation Board ("STB"). NPBL will still operate over said track and be entitled to earn switch revenues from such operations.

(2) It is unclear what is meant by "the objections of CSXT board members." The disposition of the property at Port Norfolk (referred to as Pinner's Point) was approved at a duly convened meeting of the directors of NPBL. The offer from the third party was made with the representation that "Rail traffic will present a major source of revenue and volume for the proposed distribution center which would be constructed by Ice Express on the site. Estimated rail boxcar traffic is 18,000 to 21,000m tons by the end of year once the facility is in operation sometime in 2009." (Copy attached.) Such rail traffic would have resulted in additional switch revenue to NPBL. Only one of four tracks would have been sold, permitting NPBL to continue to operate and serve its other customers, including CSXT, over the retained track. Contrary to the implication of the question, CSX Intermodal is not a customer of NPBL.

(3) The offer by CSX Real Property was approximately 20% lower than the offer from Ice Express and came with no representation that the sale would result in additional switch revenue to NPBL. The CSX Real Property offer proposed purchase of the track from the NPBL/CSX diamond at Pinner's Point, which would have eliminated any future payment to NPBL for trackage use by CSXT and virtually eliminated opportunities for NPBL to earn future switch revenue from CSXT for rail traffic carried by NPBL over the track. NPBL management sent correspondence to CSX Real Property advising that the offer was below appraised value on July 17, 2009 (copy attached) to which no response has been received. NS played no role in the decision to notify CSX Real Property that the offer was below appraised value.

(4) The statement of this issue is based on an incorrect assumption that sale of the property at NIT (Sewells Point) by NPBL will result in the loss of access to NIT. The sale will only be consummated upon the retention by NPBL of deeded easement of trackage rights with express approval by the STB. NPBL will still operate over said track and be entitled to earn switch revenues from such operations. It is unclear what concern CSXT has regarding trackage rights with NS since NPBL is the carrier that owns said track. However, NBPL management is unaware of any intention of NS to terminate any existing trackage rights granted to NPBL. The sales price of $5,100,000 approved by the board of directors is commercially reasonable and the proposed sale will not result in NPBL being foreclosed from accessing NIT. All directors, including those appointed by CSXT and NS, voted unanimously in favor of the sale when presented to the board of directors. Otherwise, NS played no role in the transaction. The sale will protect NPBL's ability to carry traffic over said track by deeded easement of trackage rights with STB approval. It is unclear why CSXT considers any of this to be a "problem" of which VIT needs to be made aware. The property will be sold to the Virginia Port Authority, which owns VIT.

2

(5) NPBL management denies that it has engaged in any unauthorized and unwarranted discussions with Perdue regarding CSXT's plans or that it was going to impose any increase in the charges NPBL would bill to Perdue. The only request known to NPBL management by Perdue was made to CSXT, NS and NPBL requesting that certain information be considered by NPBL's rate committee, which has membership from both CSXT and NS. (Copy attached). Whether there was any other communication by Perdue to CSXT or NS regarding freight rates is unknown to NPBL management, but is presumably a matter within the knowledge of the Class I carriers which serve Perdue. (Due to the large volume of Perdue traffic switched by NPBL, there is near daily dialogue and/or correspondence with Perdue on all manner of operational issues.) NPBL switch rates are approved by the board of directors and published by tariff to which Perdue (and any other customers of the Class I carriers) have access. NPBL management has made no assumptions regarding what switch rates may be approved by the board of directors in the future.

(6) NPBL management denies that it has engaged in any unauthorized and unwarranted discussions with any government agencies on any subject. While the statement of the issue does not identify who said what to whom, it appears that this issue is oriented toward discussions between NPBL and the Virginia Department of Rail and Public Transportation ("VDRPT") with respect to funding programs administered by VDRPT for rail preservation and enhancement. Most commonly, communications with VDRPT relate to anticipated future needs and grant applications to obtain funds under these programs. Such communications relate to the normal operation of NPBL and, to the extent that VDRPT indicates that program funds may or will become available requiring the submission of grant applications, then such information is presented to the board of directors to authorize the expenditure of NPBL funds to meet the matching grant requirements of the programs. As grant applications are ordinarily submitted in February of each year, the information is furnished to the directors in advance of the December meeting of the prior year to discuss and, if deemed appropriate, authorize the expenditure to obtain approval to request the matching funds.

(7) NPBL management has endeavored to provide complete and accurate information to all directors on a timely basis regarding matters requiring approval by the board. NPBL management has always acted under the assumption that all directors will have their votes counted and has actively sought to provide any further available information when requested by any director.

(8) NPBL management properly responded to "CSXT's Books and Records" request, which was dated July 23, 2009, the same day as a letter from Mr. Ingram containing several inflammatory and accusatory criticisms of the conduct of management. It was believed that the best interests of NPBL would be served by holding a meeting of the directors, the call for which was initially issued for August 5, 2009. Due to scheduling conflicts, the meeting was eventually held on September 4, 2009. It was at that meeting that Mssrs. Ingram and Clement provided clarification and guidance with respect to information sought by them. It took nearly 40 hours of work by management to amass the more than

3

1200 pages of documents requested by CSXT, which were then sent to all directors on September 16, 2009. Despite offering to provide any further information or answer questions regarding the information provided, no director has since requested any further information.

### Response to: "Immediate Action Requested"

NPBL management does not believe that the company's general counsel, Crenshaw, Ware & Martin, P.L.C. ("Crenshaw firm"), has any conflict of interest that would disqualify the firm from representing the interests of NPBL. Management believes that the Crenshaw firm has diligently, effectively and efficiently represented NPBL in all matters to which it has devoted substantive attention on behalf of NPBL. Having discussed the contents of the CSXT Memorandum with the Crenshaw firm, management confirms that NS has never sought the Crenshaw firm's advice regarding conflicts of interest between NPBL, NS and any other entity regarding any of the issues raised in the CSXT Memorandum.

### Response to: "Further Action Requested"

With the exception of action item (7), all of the actions requested in the CSXT Memorandum by CSXT can only be accomplished by a resolution of the directors of NPBL or action by NS. With respect to action item (7), management responds as follows:

(7) The current storage agreement with Perdue, which has been in effect since January 1, 2007, has led to certain operating inefficiencies, including excessive operating costs, without adequately compensating NPBL. Perdue has been given timely notice that the agreement will be cancelled effective December 31, 2009. While management remains open to the prospect of entering into a new storage agreement with Perdue, it must be on terms which are commercially reasonable to NPBL. Otherwise, storage and handling of Perdue's traffic by NPBL will be governed by the published tariff.

Finally, CSXT has requested that NPBL provide a detailed long range business plan and supporting information to allow the shareholders to evaluate NPBL's long term business and financial needs. Management provides to all directors a monthly report of operating performance and financial results, together with an annual report to shareholders. Because NPBL was created by its owners to provide an efficient means of interchanging their traffic and virtually all of NPBL's operating revenue is derived from such switch operations, the amount of traffic, and hence revenue generated, is almost entirely dependent upon the switch services provided to the owning carriers. Unless the owning carriers in the first instance provide to NPBL detailed long range projections of the nature and quantity of rail traffic they will interchange with NPBL, the ability of management to provide a detailed long range plan for NPBL will be a futile exercise. In addition, while the owning carriers have the staff resources to conduct such analysis, NPBL, with only five (5) non-agreement employees, does not have the resources to conduct any such analytical effort. Therefore, it would be necessary to engage outside consultants to perform the analysis and assist in developing a detailed long range business plan. The financial cost of such an engagement is unknown but management is prepared to carry out any directions provided to it by the directors on this subject.