# EXHIBIT 92

```
 1              UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
 2                    NORFOLK DIVISION
 3
 4   CSX TRANSPORTATION, INC.,
     individually and on behalf of
 5   NORFOLK & PORTSMOUTH BELT LINE
     RAILROAD COMPANY,
 6
             Plaintiff,
 7                                       CIVIL ACTION FILE
             vs.
 8                                       NO. 2:18cv530
     NORFOLK SOUTHERN RAILWAY
 9   COMPANY, NORFOLK & PORTSMOUTH
     BELT LINE RAILROAD COMPANY,
10   JERRY HALL, THOMAS HURLBUT,
     PHILIP MERILLI, and CANNON
11   MOSS,
12           Defendants.
13
14              VIDEO DEPOSITION OF
15                  JOHN BOOTH
16                March 12, 2020
17                   9:57 a.m.
18                McGuireWoods LLP
19             1230 Peachtree Street
20                   Suite 2100
21                Atlanta, Georgia
22       Robyn Bosworth, RPR, CRR, CRC, CCR-B-2138
```

Page 69

1   is in -- is far in excess of the cost to move
2   freight from NIT, right?
3       A    Yes.
4       Q    And I'm asking you, sir, whether you ever
5   determined or tried to determine what the cost to
6   move freight from the -- from NIT was for the Belt
7   Line.
8       A    I did not.
9       Q    Okay.  So you cannot verify that
10  Mr. Ingram's statement is correct?
11      A    Correct.
12      Q    All right.  But he certainly is looking at
13  or comparing the Belt Line's tariff rate that would
14  apply for moving traffic to or from NIT with the
15  cost of doing so, correct?
16      A    Yes.
17      Q    All right.  And then he does in the next
18  sentence refer to that $148.50 tariff rate, correct?
19      A    Yes.
20      Q    And if you look back at Exhibit 3, that's
21  the rate that was recommended by the rate committee
22  in 2006 and adopted by the Belt Line board in 2007,

Page 72

1  suggesting that rate of $148.50 is in -- is far in
2  excess of the cost of the Belt Line to move freight
3  from NIT, correct?
4       A    Those are his words, yes --
5       Q    Okay.
6       A    -- far in excess.
7       Q    And I think we've already established that
8  you have no knowledge as to whether that rate is, in
9  fact, far in excess of the cost of the Belt Line to
10 move freight from NIT, correct?
11      A    I have no such knowledge, that's correct.
12      Q    All right.  All right.  First page of
13 Exhibit 4, the last paragraph, the second sentence
14 reads:  This is best accomplished by offering rates
15 which provide competitive access to all NPBL
16 customers.
17           I'm going to stop there because who do you
18 consider to be NPBL's customers?
19      A    Any industry that is switched by NPBL.  It
20 might be Perdue.  It might be Lehigh Cement.  Those
21 are the ones I've heard of.  I'm sure there are
22 other one and -- one-car, two-car pulls and

1  you don't recall whether you received this
2  information or not, right?
3      A    I don't recall seeing it, no.
4      Q    All right. Did -- in your work on the
5  rate committee, did you ever inquire as to the costs
6  or expenses of the Belt Line associated with their
7  line haul switching services?
8      A    I don't recall doing so.
9      Q    All right. Was that important to your
10 work?
11     A    It would have been relevant to the work of
12 the rate committee, but to what I was doing, only to
13 the extent that I would receive input from finance
14 or intermodal as to whether it was a viable charge.
15     Q    So let me make sure I understand.
16          You said it would be relevant to the work
17 of the rate committee, which you were on, right?
18     A    Yes.
19     Q    But I guess am I to understand what you're
20 saying is what you did on the rate committee, that
21 part of it you weren't concerned with the expenses
22 or costs of the Belt Line?

Page 124

1  A    That's correct.
2  Q    Okay. Other folks on the committee, from
3  your perspective, dealt with that?
4  A    Yes.
5  Q    Okay. You were trying to establish a rate
6  that CSX would pay to use the Belt Line for the
7  movement of intermodal freight?
8  A    Correct.
9  Q    Okay. Looking at this financial
10 information --
11 A    I have to retract a statement I made a
12 short while ago.
13 Q    Okay.
14 A    I do recall looking at this line haul
15 revenue cost analysis for the first six months
16 because I was trying to figure out who some of these
17 customers were.
18 Q    Okay.
19 A    So I did look at it, I know that.
20 Q    So let's go there. For the record, it's
21 Bates stamped NPBL 008787, correct?
22 A    Uh-huh.

1    A    Correct.
2    Q    And so it was not certain what issues may
3    come up in that move, and it hadn't been done,
4    correct?
5    A    Right.
6         (Defendant's Exhibit 30 was marked for
7    identification.)
8    BY MR. LACY:
9    Q    Pass you Exhibit 30.
10        Mr. Booth, this is another e-mail chain
11   with an attachment, and the last e-mail is from you
12   to Mr. Armbrust and Mr. Eliasson dated November 1,
13   2010.
14        Do you recall this exchange?
15   A    Let's see, November 1. Yes, I recall
16   this.
17   Q    Okay. And the attachment looks to be a
18   draft NIT solid train interchange and rail
19   transportation agreement; is that right?
20   A    Yes.
21   Q    And is this a draft agreement that CSXT
22   prepared for the movement of intermodal freight by

Case 2:18-cv-00530-MSD-RJK   Document 310-20   Filed 04/12/21   Page 8 of 8 PageID# 6880

1  the Belt Line to and from NIT?
2      A   Yes.
3      Q   So, in other words, if the Belt Line ended
4  up agreeing to your proposal, this draft contract
5  would -- might not be the final version would -- but
6  is a proxy of what a contract between the Belt Line
7  and CSXT would look like, right?
8      A   Yes.
9      Q   Okay. Now, going back to the cover
10 e-mail, your forward to Mr. Armbrust says:
11 Confidential, attorney-client privilege, FYI.
12          I noticed when you were forwarding
13 documents to Mr. Armbrust before this time period,
14 you hadn't included the "confidential,
15 attorney-client privilege" moniker.
16          Is there a reason why you included it in
17 this one?
18     A   I don't recall what the reason was. I may
19 have been admonished by Mr. Armbrust for not having
20 included it earlier.
21     Q   Okay.
22     A   I don't know.