# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

CSX TRANSPORTATION, INC.,
individually and on behalf of NORFOLK
& PORTSMOUTH BELT LINE
RAILROAD COMPANY,

       Plaintiff,

       v.                         Civil Action No. 2:18-cv-530-MSD

NORFOLK SOUTHERN RAILWAY
COMPANY, *et al.*,

       Defendants.

_____/


**PLAINTIFF CSX TRANSPORTATION, INC.'S CONSOLIDATED
OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

                                                                          Page

TABLE OF EXHIBITS ................................................................................ viii

INTRODUCTION ........................................................................................ 1

STATEMENT OF DISPUTED MATERIAL FACTS ................................. 6

I.      The Parties ......................................................................................... 7

II.     "▬▬▬▬▬▬▬▬?": NS and NPBL Conspire to Block CSX at NIT ............... 9

        a.      Defendants Use NPBL's Switch Rate to Block CSX .......................... 10

        b.      The 2009 Rate Committee ................................................................ 11

        c.      CSX's 2010 Proposal ....................................................................... 15

        d.      Defendants Impose Logistical and Operational Obstacles to Access NIT .......... 20

        e.      Defendants' Ongoing Trackage Rights "Dispute" ............................... 25

        f.      CSX's 2018 Service & Governance Proposals ................................... 26

III.    NPBL's $210 Switch Rate is Preclusive and Exclusionary ........................... 29

IV.     The International Intermodal Transportation Market ..................................... 31

        a.      Drayage is Not an Adequate Substitute for On-Dock Rail at NIT ............. 33

        b.      Other Terminals are Not Adequate Substitutes for On-Dock Rail at NIT ........ 36

        c.      Trucks Do Not Compete with Rail for International Intermodal Freight ........... 38

V.      Harm to Competition and Damage to CSX ................................................. 39

STANDARD OF REVIEW ........................................................................... 41

ARGUMENT .............................................................................................. 41

I.      CSX's Claims are Timely. ............................................................................ 41

        a.      CSX's Sherman Act Claims are Timely (Counts I-IV). ....................... 42

        b.      CSX's State-Law Claims are Timely (Counts V, VIII, IX) ................... 47

        c.      CSX's Damages Calculation Methodology Does Not Govern Accrual. ....... 49

i

II. There is Ample Evidence Supporting CSX's Conspiracy Claims (Counts I, II, VII, IX). ................................................................................................................ 51

    a. The Record Contains Substantial Evidence of Agreement and Overt Acts......... 52

        1. NS's directors are agents of NPBL when acting in that capacity. ........... 54

        2. The record contains ample evidence of conspiracy between NS and NPBL, above and beyond the conduct of NS's NPBL directors. ............ 56

    b. CSX's state-law conspiracy claims are supported by ample record contains evidence of "wrongful or tortious" conduct (Counts VIII-IX). ....................... 57

III. CSX Has Properly Supported its Antitrust Claims (Counts I-IV). ................................. 58

    a. NS is not absolved of Section 2 liability merely because NPBL was involved................................................................................................................ 58

    b. The record shows that NS has maintained an illegal monopoly at NIT, not that NIT is an "essential facility" to which NS has denied access...................... 60

    c. NS and NPBL conspired to restrain trade in violation of Section 1. ................... 60

        1. Defendants' conduct is a per se violation of the Sherman Act. ............... 61

        2. Defendants' conduct is also a violation of the Sherman Act under the Rule of Reason. ............................................................................... 61

            (i) CSX has defined a relevant market, and NS's criticisms of that market turn on disputed facts. ............................................... 62

            (ii) NS's monopoly power is also shown through ample evidence of actual harm to competition. ..................................... 64

            (iii) CSX's expert's market definition matches the Complaint, and NS has shown no prejudice from any purported differences. .................................................................................. 65

        3. Defendants' argument that the NPBL rate is "justified" rests on disputed facts. ........................................................................................ 67

IV. CSX's Breach of Contract Claim (Count V) is Well-Supported ..................................... 69

CONCLUSION................................................................................................................ 70

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acordia of Va. Ins. Agency, Inc. v. Genito Glenn, L.P.*,
    560 S.E.2d 246 (Va. 2002) ................................................................ 54

*Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*,
    849 F.2d 1336 (11th Cir. 1987) ....................................................... 67

*Al George, Inc. v. Envirotech Corp.*,
    939 F.2d 1271 (5th Cir. 1991) ......................................................... 44

*Am. Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*,
    456 U.S. 556 (1982) .......................................................................... 55

*Blackwelder v. Millman*,
    522 F.2d 766 (4th Cir. 1975) ........................................................... 50

*Caribbean Broad. Sys. Ltd. v. Cable & Wireless PLC*,
    148 F.3d 1080 (D.C. Cir. 1998) ....................................................... 58

*City of Anaheim v. S. Cal. Edison Co.*,
    955 F.2d 1373 (9th Cir. 1992) ......................................................... 49

*City of New York v. Group Health, Inc.*,
    649 F.3d 151 (2d Cir. 2011) ...................................................... 21, 66

*Com. Bus. Sys., Inc. v. Bellsouth Servs., Inc.*,
    453 S.E.2d 261 (Va. 1995) ............................................................... 50

*Cont'l Airlines, Inc. v. United Air Lines, Inc.*,
    120 F. Supp. 2d 556 (E.D. Va. 2000) ............................................. 62

*Continental T.V., Inc. v. GTE Sylvania, Inc.*,
    433 U.S. 36 (1977) ........................................................................... 61

*Conwood Co., LP v. U.S. Tobacco Co.*,
    290 F.3d 768 (6th Cir. 2002) ........................................................... 59

*Cook v. John Hancock Life Ins. Co. (U.S.A.)*,
    No. 7:12–cv–00455, 2015 WL 178108 (W.D. Va. Jan. 14, 2015) ......... 54

*Davis v. Richmond, Fredericksburg and Potomac R. Co.*,
    803 F.2d 1322 (4th Cir. 1986) ......................................................... 48

iii

*Dial Corp. v. News Corp.*,
   165 F. Supp. 3d 25 (S.D.N.Y. 2016)..............................................................46, 49

*Dunlap v. Cottman Transmission Sys., LLC*,
   754 S.E.2d 313 (Va. 2014)......................................................................................57

*E. Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*,
   213 F.3d 175 (4th Cir. 2000) ..................................................................................70

*E.I. DuPont de Nemours and Co. v. Kolon Indus. Inc.*,
   637 F.3d 435 (4th Cir. 2011) ..................................................................................62

*E.I. DuPont de Nemours and Co. v. Kolon Indus. Inc.*,
   688 F. Supp. 2d 443 (E.D. Va. 2009) ................................................................62, 67

*Enomoto v. Space Adventures, Ltd.*,
   624 F. Supp. 2d 443 (E.D. Va. 2009) .....................................................................70

*Famous Knitwear Corp. v. Drug Fair, Inc.*,
   493 F.2d 251 (4th Cir. 1974) ..............................................................................54, 55

*Fed. Ins. Co. v. Locash*,
   No. 2:12cv504, 2014 WL 12588635 (E.D. Va. Feb. 18, 2014)..............................52

*Filak v. George*,
   594 S.E.2d 610 (Va. 2004).......................................................................................69

*Forest Lakes Community Ass'n, Inc. v. United Land Corp. of Am.*,
   795 S.E.2d 875 (Va. 2017).......................................................................................47

*Four Corners Nephrology Assoc., P.C. v. Mercy Med. Ctr. of Durango*,
   No. 05-2084, 2008 WL 2355533 (D. Colo. May 22, 2008) ....................................66

*FTC v. Ind. Fed'n of Dentists*,
   476 U.S. 447 (1986)..................................................................................................64

*Gelber v. Glock*,
   800 S.E.2d 800 (Va. 2017).......................................................................................58

*Graham v. Island Creek Coal Co.*,
   184 F. Supp. 2d 511 (W.D. Va. 2002) .....................................................................41

*Haines v. Local 149, UAW*,
   No. 99-122, 2000 WL 1100034 (Va. Cir. Ct. July 27, 2000) ..................................54

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
   392 U.S. 481, 502 n.15 (1968)............................................................................43, 44

*Kaw Valley Electric Cooperative Co. v. Kansas Electric Power Cooperative, Inc.*,
  872 F.2d 931 (10th Cir. 1989) ...............................................................................44

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179, 189 (1997) ........................................................................................44

*L-3 Commc'ns Corp. v. Serco, Inc.*,
  926 F.3d 85 (4th Cir. 2019) ....................................................................................58

*Lancianese v. Bank of Mount Hope*,
  783 F.2d 467 (4th Cir. 1986) ..................................................................................44

*Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*,
  704 F. Supp. 1309 (D. Md. 1989) ....................................................................68, 69

*Law v. Nat'l Collegiate Athletic Ass'n*,
  134 F.3d 1010 (10th Cir. 1998) ..............................................................................64

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) ..........................................................................................61, 62

*LePage's v. 3M*,
  324 F.3d 141 (3d Cir. 2003) ..............................................................................49, 68

*Louisville & N.R. Co. v. Saltzer*,
  144 S.E. 456 (Va. 1928) ..........................................................................................50

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
  998 F.2d 1144 (3d Cir. 1993) ..............................................................43, 44, 45, 49

*Lumber Liquidators, Inc. v. Cabinets To Go, LLC*,
  415 F.Supp.3d 703 (E.D. Va. 2019) .......................................................................61

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ................................................................................................41

*Mayor of Baltimore v. Actelion Pharms. Ltd.*,
  __ F.3d __, 2021 WL 1376980 (4th Cir. Apr. 13, 2021) ...........................42, 43, 45

*McAirlaids, Inc. v. Kimberly-Clark Corp.*,
  756 F.3d 307 (4th Cir. 2014) ..................................................................................41

*Midwest Gas Services, Inc. v. Indiana Gas Company*,
  317 F.3d 703, 713 (7th Cir. 2003) ..........................................................................59

*Monocan Hills, Inc. v. Page*,
  122 S.E.2d 654 (Va. 1961)..................................................................................54, 55

*Morrison v. Wells Fargo Bank, N.A.*,
  30 F. Supp. 3d 449 (E.D. Va. 2014) ..................................................70

*Mosell Realty Corp. v. Schofield*,
  33 S.E.2d 774, 778-79 (Va. 1945) ..............................................54, 55

*N.C. State Bd. of Dental Exam'rs v. FTC*,
  717 F.3d 359 (4th Cir. 2013) ........................................................60

*Nat'l Soc'y of Pro. Engineers v. United States*,
  435 U.S.679 (1978) ......................................................................61

*Novell, Inc. v. Microsoft Corp.*,
  731 F.3d 1064 (10th Cir. 2013) ....................................................59

*Oksanen v. Page Memorial Hospital*,
  945 F.2d 696, 710 (4th Cir. 1991) ................................................59

*Poster Exch'g, Inc. v. Nat'l Screen Serv. Corp.*,
  517 F.2d 117 (5th Cir. 1975) ........................................................50

*Precision Seed Co. v. Consol. Grain & Barge Co.*,
  No. 3:03cv079, 2006 WL 840377 (S.D. Ohio March 30, 2006) ..........66

*Ratino v. Med. Serv. of Dist. of Columbia (Blue Shield)*,
  718 F.2d 1260 (4th Cir. 1983) ......................................................62

*Robertson v. Sea Pines Real Est. Cos.*,
  679 F.3d 278 (4th Cir. 2012) ....................................................52, 56

*Schlegel v. Bank of Am., N.A.*,
  505 F. Supp. 2d 321 (W.D. Va. 2007) ..........................................52

*Starring v. Kemp*,
  188 S.E. 174 (Va. 1936) ..............................................................54

*Street v. Consumers Mining Corp.*,
  39 S.E.2d 271 (Va. 1946) ............................................................50

*Sun Dun, Inc. of Washington v. Coca-Cola Co.*,
  740 F. Supp. 381, 391 (D. Md. 1990) ............................................59

*U.S. v. Microsoft*,
  253 F.3d 34 (DC Cir 2001) ..........................................................59

*United States v. Dentsply Int'l, Inc.*,
  No. Civ. A. 99-005, 2001 WL 624807 (D. Del. Mar. 30, 2001), ..........42

*United States v. Lozano*,
    839 F.2d 1020 (4th Cir. 1988) ...................................................................47, 48

*United States v. Topco Assocs., Inc.*,
    405 U.S. 596 (1972)....................................................................................62

*Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)....................................................................................58

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010).......................................................................43, 44

*Williams v. Commonwealth*,
    407 S.E.2d 319 (Va. Ct. App. 1991) ............................................................47

*Wright v. Va. Peninsula Regional Jail Auth.*,
    No. 2:19cv189, 2021 WL 963496 (E.D. Va. March 15, 2021) ............................41

*Xechem, Inc. v. Bristol-Myers Squibb Co.*,
    372 F.3d 899 (7th Cir. 2004) .......................................................................42

*XY, LLC v. Trans-Ova Genetics*,
    890 F.3d 1282, 1292 (Fed. Cir. 2018)...........................................................45

*Zenith Radio Corp. v. Hazeltine Res., Inc.*,
    401 U.S. 321 (1971)....................................................................................49

*In re Zetia (Ezetimibe) Antitrust Litig.*,
    No. 2:18md2836, 2019 WL 6977405 (E.D. Va. Dec. 20, 2019) .........................47

**Statutes**

Norfolk Municipal Code § 25-262.......................................................................34

Sherman Act...................................................................................... *passim*

Va. Code § 18.2-499, -500.................................................................................51

**Other Authorities**

18B Am. Jur. 2d Corporations § 1264 .................................................................53

Fed. R. Civ. P. 56(a) .......................................................................................40

# TABLE OF EXHIBITS

| Ex. No. | Description | Confidentiality Designation |
|---|---|---|
| 1 | 6/29/19 Email Re: CSX-NIT with handwritten notes (NSR_00306367) | Filed Under Seal (AEO) |
| 2 | 5/14/09 Email Re: NPBL - Rate Committee (CONFIDENTIAL) (NSR_00084753) | Filed Under Seal (AEO) |
| 3 | 7/27/09 Email Re: CSX and NPBL - Letter to Manion, with attachment (NSR_00177916) | Filed Under Seal (Confidential) |
| 4 | Michael Wheeler, 2/24/20 Deposition Excerpts | Filed Under Seal (Confidential) |
| 5 | Donna Coleman, 3/24/20 Deposition Excerpts | Filed Under Seal (Confidential) |
| 6 | NS's Response to CSX's Interrogatory No. 1 | Filed Under Seal (AEO) |
| 7 | Deposition Excerpts of Cannon Moss | Filed Under Seal (Confidential) |
| 8 | 8/27/18 Email Re: Cannon Moss – NPBL (NSR_00005707) | Filed Under Seal (Confidential) |
| 9 | 6/12/15 Email Re: Personnel – (Confidential) (NSR_00071467) | Filed Under Seal (AEO) |
| 10 | Randall Hunt, 2/18/20 Deposition Excerpts | Filed Under Seal (AEO) |
| 11 | Robert Girardot 2d Declaration, dated 3/5/21 | Filed Under Seal (AEO) |
| 12 | Robert Girardot, 3/17/21 2d Deposition Excerpts | Filed Under Seal (AEO) |
| 13 | Thomas Capozzi, 1/22/21 Deposition Excerpts | Filed Under Seal (AEO) |
| 14 | CSX's 2d Supp. Responses to Defendant NPBL's Interrog. No. 3 and 4 | Filed Under Seal (AEO) |
| 15 | 7/19/1999 Letter to NPBL Rate Committee(NSR_00199530) | Filed Under Seal (Confidential) |
| 16 | 8/25/2019 NPBL letter with handwritten notes (NSR_00199524) | Filed Under Seal (Confidential) |
| 17 | Sept. 1999 NPBL consent forms (NSR_00199515) | Filed Under Seal (Confidential) |
| 18 | 1/1/17 Email Re: CSX intermodal doings (NSR_00071344) | Filed Under Seal (AEO) |
| 19 | 7/31/09 Email Re: Rate Committee Follow up, attaching NS Internal Meeting Notes dated 7/29/09 (NSR_00027070) | Filed Under Seal (Confidential) |
| 20 | 12/15/06 Letter enclosing 1/1/07 tariff (NSR_00306443) | Filed Under Seal (Confidential) |
| 21 | 12/27/02 Letter enclosing 2/1/03 tariff (NSR_00306377) | Filed Under Seal (Confidential) |

| Ex. No. | Description | Confidentiality Designation |
|---|---|---|
| 22 | 4/20/09 Letter from Coleman, with attachments (NPBL009639) | Filed Under Seal (AEO) |
| 23 | 3/29/99 Email Re: NPBL Rates (NSR_00199532) | Filed Under Seal (Confidential) |
| 24 | 9/26/02 Email Re: NPBL - Rate Structure Committee Recommendations (NS Portion) (NSR_00306424) | Filed Under Seal (AEO) |
| 25 | 10/24/06 Email Re: NPBL Rate Meeting (NSR_00306426) | Filed Under Seal (AEO) |
| 26 | 7/16/09 Email Re: Rate Committee Packet, attaching rate committee information (NSR_00074104) | Filed Under Seal (Confidential) |
| 27 | 6/16/09 Letter from T. Ingram to D. Stinson (CSXT0080856) | Filed Under Seal (Confidential) |
| 28 | 6/23/2009 Email Re: NPBL Information (NSR_00084730) | Filed Under Seal (Confidential) |
| 29 | 4/17/09 Email Re: NPBL (NSR_00027114) | Filed Under Seal (Confidential) |
| 30 | 4/24/09 Email Re: NPBL - Rate Committee (CONFIDENTIAL) (NSR_00011118) | Filed Under Seal (Confidential) |
| 31 | 9/24/09 NPBL Rate Committee Meeting Recap for NS Participants only (NSR_00035903) | Filed Under Seal (Confidential) |
| 32 | 10/15/09 Letter from J. Booth (CSXT0082145) | Filed Under Seal (Confidential) |
| 33 | 10/23/09 Email Re: NS Recommendations, with attachment (NSR_00035548) | Filed Under Seal (Confidential) |
| 34 | 8/5/10 Letter from D. Stinson Re: Rail Service Connection to NIT _ CSXT Rate Proposal dated July 23, 2010 (NPBL007438) | |
| 35 | David Stinson, 2/26/20 Deposition Excerpts | Filed Under Seal (Confidential) |
| 36 | 8/9/10 NPBL Board Meeting minutes, with handwritten notes (NSR_00000781) | Filed Under Seal (Confidential) |
| 37 | Steven Armbrust, 3/11/20 Deposition Excerpts | Filed Under Seal (Confidential) |
| 38 | 8/5/10 Email Re: CSX NIT Operation Proposal (NSR_00073997) | Filed Under Seal (Confidential) |
| 39 | 8/30/10 Email Re: CSX NIT Operation Proposal (NSR_00062857) | Filed Under Seal (Confidential) |
| 40 | 9/3/10 Email Re: CSX NIT Operation Proposal (NSR_00062844) | Filed Under Seal (Confidential) |
| 41 | 9/8/10 NPBL Board Meeting Minutes (NPBL019920) | Filed Under Seal (Confidential) |
| 42 | 12/8/10 Email Re: NPB (CSX) Intermodal Service to NIT (NPBL012305) | Filed Under Seal (AEO) |
| 43 | 12/27/10 Memorandum to NPBL Board Members Re: NPBL Management Response to CSXT Rate Proposal (NPBL012284) | Filed Under Seal (Confidential) |
| 44 | 12/29/10 NPBL Board Meeting Minutes (NSR_00000704) | Filed Under Seal (Confidential) |

| Ex. No. | Description | Confidentiality Designation |
|---|---|---|
| 45 | 3/1/11 Letter from J. Yates to D. Stinson (NPBL012988) | Filed Under Seal (AEO) |
| 46 | 4/12/11 Email Re: Agenda for Board of Directors Meeting (CSXT0110423) | Filed Under Seal (Confidential) |
| 47 | 4/13/11 NPBL Board Meeting Minutes (NPBL017933) | Filed Under Seal (Confidential) |
| 48 | 9/14/11 Email Re: NPBL - NS Response to MacDonald nomination (CSXT0127526) | Filed Under Seal (AEO) |
| 49 | 9/16/11 Memorandum and Resolution Re: Selection Process for NPBL President & General Manager (CSXT0027044) | Filed Under Seal (AEO) |
| 50 | 9/19/11 NPBL Board Meeting Minutes (CSXT0000508) | Filed Under Seal (Confidential) |
| 51 | 9/23/11 Board Meeting Minutes (CSXT0000509) | Filed Under Seal (Confidential) |
| 52 | James Allan, 3/13/20 Deposition Excerpts | Filed Under Seal (AEO) |
| 53 | Robert Girardot Declaration dated 2/21/20 | Filed Under Seal (AEO) |
| 54 | Master Rail Plan for The Port of Virginia (Senate Joint Resolution 69) | |
| 55 | Robert Girardot, 1/12/21 Deposition Excerpts | Filed Under Seal (AEO) |
| 56 | 4/27/09 Email Re: NPBL - Rate Committee (CONFIDENTIAL) (NSR_00011108) | Filed Under Seal (Confidential) |
| 57 | 4/3/09 Letter from R. Hood to D. Stinson Re: Proposed Purchase of Norfolk and Portsmouth Beltline Property (NPBL006972) | |
| 58 | 12/2/09 Docket of Proceedings of NPBL Board Meeting (NPBL007205) | |
| 59 | 7/5/09 Email Re: Port Norfolk Yard, attaching 6/29/09 Letter Re: Market Update (NPBL014367) | Filed Under Seal (AEO) |
| 60 | 4/2/08 Email Re: NPBL Port Norfolk Yard (NSR_00084773) | Filed Under Seal (AEO) |
| 61 | 3/31/15 Email Re: CSX Traffic to NIT via NPBL (NPBL010915) | Filed Under Seal (AEO) |
| 62 | 8/29/12 Email Re: Meeting with VPA, Purdue re PMT (NSR_00065318) | Filed Under Seal (AEO) |
| 63 | Ryan Houfek, 12/9/20 Deposition Excerpts | Filed Under Seal (AEO) |
| 64 | 3/31/15 Email Re: CSX Traffic to NIT via NPBL (SDT RES 000298) | Filed Under Seal (Confidential) |
| 65 | 4/9/15 Email Re: Request for Operating Window (NPBL005672) | |
| 66 | Anthony MacDonald, Deposition Excerpts | Filed Under Seal (Confidential) |

| Ex. No. | Description | Confidentiality Designation |
|---|---|---|
| 67 | 4/9/15 Email Re: Request for Operating Window (NPBL024288) | Filed Under Seal (Confidential) |
| 68 | David Luebbers, 2/25/20 Deposition Excerpts | Filed Under Seal (Confidential) |
| 69 | MaryClare Kenney, 12/11/20 Deposition Excerpts | Filed Under Seal (AEO) |
| 70 | 4/19/15 Email re: CSX move request--UPDATE; Information Only (CSXT0154004) | Filed Under Seal (Confidential) |
| 71 | 6/23/2016 Email Re: CSX move (NPBL005643) | |
| 72 | 7/29/09 NS Internal Meeting Notes - NPBL Rate Committee Meeting (NSR_00027071) | Filed Under Seal (Confidential) |
| 73 | 7/9/15 Email Re: NPBL Agreements (NSR_00047112) | Filed Under Seal (Confidential) |
| 74 | 5/21/15 Email Re: Plan for CSX Loading (CSXT0004998) | Filed Under Seal (Confidential) |
| 75 | 5/27/15 Email Re: Empties for NIT (CSXT0001528) | Filed Under Seal (Confidential) |
| 76 | 6/29/15 Email Re: CSX Cars (CSXT0154066) | Filed Under Seal (Confidential) |
| 77 | 7/31/15 Letter from R. Hunt to C. Moss Re: Notification of intent to cancel certain trackage rights agreements (NSR_00104581) | Filed Under Seal (AEO) |
| 78 | 4/18/16 Email Re: NPBL Term Sheet (Randy Edit) (NSR_00008141) | Filed Under Seal (Confidential) |
| 79 | 3/15/16 Meeting Invitation Re: Review Strategy Regarding NIT Access (NSR_00005173) | Filed Under Seal (Confidential) |
| 80 | D. Coleman notes (NPBL000189) | |
| 81 | 4/18/18 Email Re: Rate Proposal for Long Term Rail Service to NIT (NSR_00051329) | Filed Under Seal (Confidential) |
| 82 | 4/19/18 Email Re: NPBL Agreement Questions (NPBL005881) | Filed Under Seal (AEO) |
| 83 | 4/3/18 Email Re: NPBL – CSX (NSR_00006321) | Filed Under Seal (Confidential) |
| 84 | 4/5/18 Email Re: Rate Proposal for Long Term Rail Service to NIT (NPBL006228) | |
| 85 | 4/16/18 Letter from S. Armbrust Re: Election NPBL Directors at April 2018 Annual Meeting of the NPBL Shareholders (CSXT0101908) | Filed Under Seal (Confidential) |
| 86 | 4/24/19 Agenda for NPBL Annual Stockholders' Meeting (CSXT0158238) | Filed Under Seal (Confidential) |
| 87 | Phillip Merilli, 3/2/20 Deposition Excerpts | |
| 88 | Jerry Hall, 2/21/20 Deposition Excerpts | |
| 89 | Thomas Hurlbut, 2/21/20 Deposition Excerpts | |
| 90 | 5/18/18 Letter from S. Armbrust Re: Response of NPBL Management and Board to CSXT's Service Proposal (CSXT0142657) | Filed Under Seal (Confidential) |

| Ex. No. | Description | Confidentiality Designation |
|---|---|---|
| 91 | CSX Corporate Rep. (Robert Girardot), 1/13/21 Deposition Excerpts | |
| 92 | NS Corporate Rep. (Kenneth Joyner), 2/19/20 Deposition Excerpts | Filed Under Seal (AEO) |
| 93 | Jeffrey Heller, 3/10/20 Deposition Excerpts | Filed Under Seal (Confidential) |
| 94 | Carl Warren Declaration, dated 2/21/20 | Filed Under Seal (AEO) |
| 95 | 2/17/15 Email Re: February 19 Forecast Meeting (NSR_00128851) | Filed Under Seal (AEO) |
| 96 | Jay Strongosky, 12/8/20 Deposition Excerpts | |
| 97 | Excel - 2016 RFP (CSXT0050597) | Filed Under Seal (AEO) |
| 98 | Dean Piacente, 1/15/21 Deposition Excerpts | |
| 99 | Carl Warren, 1/6/21 Deposition Excerpts | Filed Under Seal (AEO) |
| 100 | 2/22/10 NS Ports and International Department Presentation (NPBL003225) | Filed Under Seal (Confidential) |
| 101 | 9/2/10 Email Re: Questions, with attachment (NSR_00031335) | Filed Under Seal (Confidential) |
| 102 | Robert Martinez, 10/23/20 Deposition Excerpts | Filed Under Seal (AEO) |
| 103 | Article: "*What's at Stake in North Charleston Rail Debate?*" | |
| 104 | VPA Corporate Rep. (Catherine Vick), 1/19/21 Deposition Excerpts | Filed Under Seal (AEO) |
| 105 | 12/16/15 Email Re: Follow-up (NSR_00122609) | Filed Under Seal (Confidential) |
| 106 | Cary Booth, 11/5/20 Deposition Excerpts | Filed Under Seal (Confidential) |
| 107 | Michael McClellan, 2/20/20 Deposition Excerpts | Filed Under Seal (Confidential) |
| 108 | Christopher Wagel, 12/7/20 Deposition Excerpt | |
| 109 | John Booth, 3/12/20 Deposition Excerpts | Filed Under Seal (Confidential) |
| 110 | 7/25/08 Email re: Routing Containers over Norfolk to Columbus (NSR_00157631) | Filed Under Seal (Confidential) |
| 111 | Jeffrey Heller, 10/30/20 2d Deposition Excerpts | Filed Under Seal (Confidential) |
| 112 | 3/22/17 Email Re ███ - Norfolk NIT Activity (CSXT0136053) | Filed Under Seal (AEO) |
| 113 | 6/19/09 Email Re: CSX and NIT (NSR_00027097) | Filed Under Seal (Confidential) |

| Ex. No. | Description | Confidentiality Designation |
|---|---|---|
| 114 | 6/19/09 Email Re: The Port of Virginia - New On-Dock Rail at NIT (NSR_00027098) | Filed Under Seal (AEO) |
| 115 | 3/1/17 Email Re: ▮ (CSXT0096961) | Filed Under Seal (AEO) |
| 116 | Excel – Account Notes 2019 (CSXT0013901) | Filed Under Seal (AEO) |
| 117 | Fredrik Eliasson, 1/8/21 Deposition Excerpts | Filed Under Seal (Confidential) |
| 118 | 4/13/18 Letter from J. Reinhart to C. Moss (CSXT0100756) | Filed Under Seal (Confidential) |

Plaintiff CSX Transportation, Inc. ("CSX"), by counsel, states as follows in opposition to the Motion for Summary Judgment filed by Defendant Norfolk Southern Railway Company ("NS") (ECF Nos. 307, 308) and the Motion for Summary Judgment filed by Defendant Norfolk & Portsmouth Beltline Railroad Company ("NPBL" or the "Belt Line") (ECF Nos. 296, 297):

## INTRODUCTION

*CSX's Evidence.* CSX is the victim of a decades-long effort by NS, on its own and in combination with NPBL, to exclude CSX from on-dock rail access at Norfolk International Terminal ("NIT"), the most important marine terminal in the Port of Virginia ("POV")—a critical entry point through which almost all major ocean carriers move international intermodal traffic. Defendants' efforts have so far succeeded, resulting in NS charging supracompetitive prices to ocean carriers who rely on NIT and inflicting hundreds of millions of dollars in harm to CSX in the form of lost business. NS has demonstrated an astonishing commitment to preventing CSX from gaining on-dock access at NIT via the NPBL, maintaining its monopoly through every means at its disposal.

In denying multiple motions to dismiss, this Court found CSX's detailed allegations about Defendants' scheme, except for one tortious interference count, were well-pleaded. *See* ECF No. 66. Now, after many months of discovery, Defendants claim that *no reasonable jury* could find those allegations substantiated. The record and the law disprove this remarkable assertion.

As Defendants' documents show, NS has long viewed its stranglehold on NIT as critical to its success. NS's own documents reveal the fundamental motivation underlying its conduct towards CSX since 1999: "█████████████████*?*" Other documents show not only that NS's strategy of blocking CSX was effectively executed, but also the many ways that NS, both independently and in combination with NPBL, inflicted harm on CSX and competition generally.

1

*As one example*, in 1999, after learning CSX initiated talks with Virginia International Terminals ("VIT"), the commercial entity that operates NIT, about "█████████████████████████████████████████" a senior NS executive asked an NS colleague: "█████████████████████████████████████████████" **CSX Ex. 1** (NSR_00306367). The colleague responded: "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" *Id.*

*As another example*, when NS learned in April 2009 that CSX was seeking a lower rate for NPBL services to NIT—which would have benefitted NPBL through significantly increased revenue—NS moved swiftly to block it through its appointed NPBL "rate committee" members and directors. An NS executive wrote to his colleagues: █████████████████████████████████████████████████████████████████████████████████████████████████." **CSX Ex. 2** (NSR_00084753 at -754) (emphasis added). As demonstrated by this email, NS saw CSX's access NIT as a threat to its monopoly and "██████████████████████████████████████████████████████" and NS's rate committee members worked to block it. NS was committed to the goal of blocking CSX, and saw the only "challenge" as justifying its blatantly anticompetitive acts. *Id.* at -753. As NS's Luebbers candidly put it, the NS-appointed rate committee members needed simply to "████████████████████████████████████████████████████████████████████████████████" *Id.*; *see also* **CSX Ex. 3** (NSR_00177916) (letter drafted by NS executives prior to NPBL rate committee meeting, urging NS-appointed directors to "███████████████████████████████████████████████████████████████████████████████████████").

Lest Defendants protest that these examples arise from earlier points in the conspiracy and thus support their statute of limitations arguments, the record also contains evidence of Defendants' actions to block CSX in later years, including 2015 and 2018. *For example*, when a surge in port congestion in early 2015 left CSX with no choice but to pay NPBL's exorbitant switch rate to move traffic to NIT via NPBL, NS-appointed NPBL directors and other NS personnel imposed unreasonable hurdles, making these moves operationally unviable. In total, NPBL moved only a handful of trains for CSX over a period of many months. Meanwhile, NPBL's Cannon Moss forwarded NS marketing personnel his communications with CSX, expressly so NS could protect its own competitive interests.

CSX knew when it brought this case that it had been precluded from rail access to NIT by Defendants' actions. But now Defendants' own documents have demonstrated just how far—and for how long—NS and NPBL have been willing to go to "block" CSX. As illustrated by the vignettes above, and the many more described herein, NS has pursued a decades-long campaign to keep CSX out of NIT via rail in order to preserve its own interests. It did this both *with* NPBL and also *at the expense of* NPBL, as the Complaint detailed and the evidence now shows.

The record amply supports CSX's claims and would certainly enable a reasonable jury to find for CSX with respect to both liability and relief. Summary judgment should be denied.

* * *

*Defendants' Arguments*. Defendants' arguments in favor of summary judgment rely on errors of law and assertions of fact that are, at the very least, disputed (if not directly contradicted by Defendants' own documents). Moreover, the Court should evaluate Defendants' current arguments against the backdrop of the inconsistent arguments, positions, and concessions they have previously advanced. Most strikingly, NPBL claimed at the motion to dismiss stage that it

was incapable of conspiring with NS because the Defendants were a unitary entity under the *Copperweld* doctrine. *See* ECF No. 66 at 29. After its first motion was denied, NS filed a new motion to dismiss, belatedly claiming it "control[led]" NPBL. That motion remains pending. *See* ECF No. 115. But these arguments appear to have been forgotten by Defendants, who now argue there is *no evidence* of collusion. Defendants never bother to explain how they can assert that, on the one hand, they are a solitary unit with one controlling the other, while on the other hand claim there is no evidence from which a reasonable jury could conclude they worked in concert.

NS's tardy, still-pending motion to dismiss and for judgment on the pleadings also asserts that "NSR's exercise of control over NPBL—which is directly at issue in this litigation—is exempt from the federal antitrust and state law conspiracy claims asserted by CSXT." ECF No. 116 at 10. This was a curious argument at the time, considering NS had conceded this point in its first, unsuccessful motion, but it is more curious still to see that NS has barely acknowledged this "exemption" argument in its current motion. Indeed, NS only notes briefly in passing that STB oversight "militates against antitrust intervention here." NS Br. at 32.

The arguments Defendants do advance at this stage fare no better, whether as a matter of fact or law. Defendants contend, for example, that CSX's antitrust claims are barred by the applicable limitations periods. It is well-settled, however, that Defendants cannot rely on the statute of limitations to escape the consequences of their continuing antitrust violations. Defendants' statute of limitations arguments as to CSX's other claims fail for the reasons this Court previously identified in ruling on Defendants' motions to dismiss, which are now borne out by the factual record. Defendants also claim that the actions of NS-appointed NPBL directors cannot be attributed to NPBL for purposes of conspiracy. This argument misstates basic tenets of agency law, which provides that an individual director can be found to act on behalf of the

corporation that he or she directs. It further ignores the substantial record evidence of conspiracy *not* involving the NS-appointed directors.

Defendants also argue that CSX has not properly supported its antitrust claims. NS's arguments about unilateral conduct and essential facilities are wrong on the law, and its protestations about the market ignore the realities of international intermodal transportation. NS—which maintains nearly 90 percent of international intermodal business at NIT and nearly 75 percent at the Port of Virginia ("POV") intermodal terminals—also suggests that CSX should not complain about the anticompetitive harm inflicted because "CSX's intermodal container traffic at NIT has *increased* by over 700% since 2010." NS Br. at 1. This statistic is misleading, as evidenced by the fact that such an increase in CSX's traffic has nonetheless failed to make a dent in NS's monopoly hold on the market. That NS would exaggerate the significance of CSX's growth at POV is unsurprising, in light of the substantial evidence showing NS's use of every tool at its disposal to combat CSX's efforts to economically access NIT. Between 2010 and 2020, the *total* volume of international intermodal business at the Port of Virginia increased substantially through infrastructure improvements and the expansion of the Panama Canal. CSX has competed vigorously for business wherever it can, despite the illegal constraints imposed by NS and NPBL. But CSX's share of international intermodal traffic at NIT remains a small fraction of NS's. Indeed, the empirical data show that the vast majority of CSX's gains in market share come from its success at POV's other container terminal, Virginia International Gateway ("VIG")—where CSX is able to offer on-dock rail service and thus compete on equal footing with NS.

Defendants remaining arguments hinge on disputed facts that must be resolved by a jury. For instance, Defendants insist that CSX has access to NIT via NPBL, but just chooses not to pay the rate to use it. The record evidence shows, however, that the rate is set at a level designed to

completely insulate NS from competition, and which has had the intended effect of making it economically infeasible for CSX to use NPBL for intermodal traffic. Defendants also suggest that NPBL could not accept CSX's proposals due to the "uniform rate" provision in its Operating Agreement—an argument this Court already rejected at the motion to dismiss phase. A reasonable jury clearly could find that CSX proposed a rate for intermodal service to NIT, which could have been published in a tariff and "uniformly" applied to other customers wanting to use the service. Moreover, missing from Defendants' briefs, despite their protestations that the $210 rate is required to cover NPBL's costs, is the fact that every time NPBL management evaluated CSX's proposals, it determined that it would *make a profit* at the rate proposed by CSX. Why would NPBL *not* adopt a proposal it considered profitable, that would mutually benefit itself *and* one of its owners, and that would be consistent with the purpose for which it was created? A reasonable jury could easily conclude on this record that the answer is the conspiracy between itself and NS. Not to mention, even when CSX paid NPBL's excessive rate to move trains in 2015, Defendants acted in concert to prevent CSX from reasonably accessing NIT at *any* price.

The record reflects overwhelming evidence of conspiracy and anticompetitive conduct, supporting CSX's timely claims and undermining Defendants' arguments. Though NS suggests NIT is fungible with any other port on the East Coast, the record evidence and its own actions belie that claim. The Court need look no further for evidence of monopoly power and exclusionary conduct than NS's own documents, which demonstrate its deliberate and persistent efforts to keep CSX out of NIT at all costs because, in its own words, it had "the most to lose."

Defendants' motions should be denied so that a jury may weigh the evidence.

## STATEMENT OF DISPUTED MATERIAL FACTS

Defendants' statements of fact overlap considerably. CSX responds to both in a consolidated

fashion here, with citations to the specific paragraph numbers from each. CSX does not dispute the

facts contained in NS SOF ¶¶ 1-3, 5-7, 13-14, 18, 46-47, 51, 53, and 57, or in NPBL SOF ¶¶ 1-5,

11-14, 16-17, 20-22, 34, and 37.[1] All other facts are disputed, as explained below.

## I. The Parties
*[Disputed: NS SOF ¶¶ 4, 16-17; NPBL SOF ¶ 6]*

1.     CSX and NS are Class 1 railroads operating in the eastern United States. NS SOF

¶ 1; ECF No. 66 at 2. NPBL is a terminal switching railroad (sometimes called a "short line") in

Hampton Roads, Virginia. NS SOF ¶ 2; NPBL SOF ¶¶ 1-2. NPBL is currently owned 57% by

NS and 43% by CSX. NS SOF ¶ 3; NPBL SOF ¶ 4.

2.     NPBL was founded by eight railroads in 1896 "for the mutual benefit of each [of

the railroads] in the interchange of business." ECF No. 1-1 at 3. NPBL's Operating Agreement

provides that each railroad will have "equal representation" in the Belt Line, *see id.*, and that each

must "co-operate cordially in encouraging the business of the [NPBL]," *id.* at 6.

3.     In 1989, the NPBL's then-existing owners—CSX, Norfolk and Western Railway

Company ("NW") and Southern Railway Company ("SR")—agreed to amend "Article Fourth" of

the Operating Agreement to allow CSX to appoint two directors and NW and SR to collectively

appoint three.[2] NS SOF ¶ 3, NPBL SOF ¶ 5. This agreement expressly did not "amend, alter, or

affect any other provision of the NPBL Agreement." NS Ex. 3 ¶ 2.

4.     NPBL's president is the sixth voting member of the Belt Line's Board. NPBL SOF

¶ 5. Since at least 2005, the NS-controlled NPBL Board has installed a former NS employee in

this position. *See* **CSX Ex. 4** (Wheeler Dep. 31:18-22); **CSX Ex. 5** (Coleman Dep. 27-17-21;

---

[1] CSX refers to its exhibits as "CSX Ex.," NS's as "NS Ex.," and NPBL's as "NPBL Ex."

[2] NW and SR subsequently finalized their merger, becoming NS. *See* NS SOF ¶ 3 & n.2.

53:11-13).  The two most recent past presidents, who served from 2005 to 2011, returned to work at NS following their tenures at the Belt Line.  *See* **CSX Ex. 4** (Wheeler Dep. 32:1-4); **CSX Ex. 6** (NS's Resp. to CSX's Interrog. No. 1 at 9, 14).  Current NPBL President Cannon Moss has made clear he intends to do the same.  *See* **CSX Ex. 7** (Moss Dep. 24:1-11); **CSX Ex. 8** (NSR_00005707); **CSX Ex. 9** (NSR_00071467).  Donna Coleman—NPBL's Vice President, Comptroller, and Corporate Secretary and a non-voting member of the NPBL Board—is also a former NS employee.  *See* **CSX Ex. 5** (Coleman Dep. 9:15-16, 20:6-9).

5.      Under the Operating Agreement, the Belt Line's purpose is to interchange railcars for its owners, meaning that NPBL receives cars from NS or CSX and delivers them to locations on its tracks, or vice versa.  NPBL SOF ¶ 3.

6.      One location for which NPBL provides switching services is Norfolk International Terminal ("NIT"), the largest marine terminal in Virginia and one of the most important terminals for international intermodal cargo on the East Coast.  *See* NS Ex. 7 ¶ 24 & Ex. 3; NS Ex. 71 ¶ 53 & Ex. 4.  NIT is owned by the VPA and operated by VIT.  *See* NS SOF ¶ 18.

7.      NS has access to on-dock rail at NIT over its own tracks.[3]  NS SOF ¶ 14.  NS currently travels through NIT in a continuous clockwise fashion, in part by traversing tracks owned by NPBL, for which NS pays a nominal trackage rights fee.  *See* **CSX Ex. 10** (Hunt Dep. 20:2-22:24); **CSX Ex. 7** (Moss Dep. 164:6-16).

8.      NPBL has on-dock access at NIT via trackage rights over NS's tracks.  NS SOF ¶ 14.  NPBL currently can enter and exit NIT using the terminal's "North Gate."  *See* NS SOF ¶ 17.  Railroads effectively manage operational patterns much like NPBL's at other terminals.  *See*

---

[3] The term "on-dock" refers to a railroad's ability to move its train into a marine terminal so that containers can be loaded onto railcars either on or near the dock itself.  *See* NS Ex. 10 ¶ 25.

**CSX Ex. 11** (2d Girardot Decl. ¶ 10); **CSX Ex. 12** (2d Girardot Dep. 86:24-93:12). Tom Capozzi, VIT's Chief Sales Officer (*see* NS SOF ¶ 18), testified that "███████████████████" about NPBL's route at NIT.[4] **CSX Ex. 13** (Capozzi Dep. 40:9-20).

9. Although NPBL does not compete for ocean carrier business, NS SOF ¶ 4; NPBL SOF ¶ 6, NPBL and NS are the only two means to access on-dock rail at NIT, *see* NS SOF ¶ 14.

**II.    "████████████████?": NS and NPBL Conspire to Block CSX at NIT**

10. For more than two decades, NS and NPBL have conspired to maintain NS's control of intermodal freight moving by rail through the Port of Virginia ("POV"). Defendants have produced *dozens* of internal documents and communications evidencing this conspiracy and the many overt acts committed to further it. *See* **CSX Ex. 14** (CSX's 2d Supp. Resp. to NPBL's Interrog. No. 3 & 4) (describing documents reflecting NPBL's participation in the conspiracy).

11. Defendants' goal is to block CSX's ability to access on-dock rail at NIT. For example, after learning CSX initiated talks with VIT "███████████████████ ████," NS VP of Intermodal Michael McClellan asked an NS colleague: "███████████ █████████████████?" **CSX Ex. 1** (NSR_00306367) (emphasis added). NS intermodal manager Augie Eckhardt responded: "████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████." *Id.* (emphasis added). Defendants eventually did increase the NPBL switch rate and formulate a trackage rights "dispute." *See* CSX SOF ¶¶ 56-61.

---

[4] Although NS suggests NS's and NPBL's varying routes mean "two trains *cannot* be on the tracks at the same time," none of the documents cited says that. *See* NS SOF ¶ 17. Moreover, as the cited testimony from CSX's former Portsmouth terminal manager Tony MacDonald shows, any challenges associated with NPBL's current route or coordination with NS trains could be alleviated by the Port or NS allowing NPBL to access NIT via the southern gate. *See* NS Ex. 19 at 93:9-14.

12.     As NS's VP of Strategic Planning has explained, CSX's ability to compete for international intermodal business is limited because ███████████████████████.**" CSX Ex. 18** (NSR_00071344) (emphasis added).

13.     NS has handled between █% and █% of international intermodal business at the Port of Virginia—and between █% and █% at NIT—between 2009 and 2020. *See* **CSX Ex. 6** (NS's Resp. to CSX's Interrog. No. 6); NS Ex. 71 ¶ 111 & Ex. 13.

### a. Defendants Use NPBL's Switch Rate to Block CSX
*[Disputed: NS SOF ¶¶ 42-44; NPBL SOF ¶¶ 7-8]*

14.     One way Defendants have blocked CSX's access to on-dock rail at NIT is through NPBL's switch rate. Although the NPBL Operating Agreement states that "a uniform rate shall be fixed for the movement of freight cars . . . regardless of distance," *see* NS SOF ¶ 42; NPBL SOF ¶ 7, the NPBL Board has the ability to and historically has "agree[d] to override" this provision, such as by approving rates that vary by commodity type and international versus domestic business. **CSX Ex. 5** (Coleman Dep. 137:21-138:8); *see also* **CSX Ex. 19** (NSR_00027070) ("[████████████████████████████████████ ████████████████████████████ **CSX Ex. 20** (NSR_00306443); **CSX Ex. 21** (NSR_00306377).

15.     The Operating Agreement also provides that the NPBL rate may be "adjusted from time to time as to yield a net revenue sufficient to pay . . . a dividend of six per cent" to its owners. ECF No. 1-1 at 6. Defendants suggest that this provision prohibits the Belt Line from earning any profit, *see* NPBL SOF ¶ 7; NS SOF ¶ 43, but nothing in the Operating Agreement prohibits NPBL from earning revenues in excess of the 6% dividend, and NPBL's own documents reflect that profitability is one of its goals. *See, e.g.*, NPBL Ex. 4 (NPBL Annual Reports 2010-2019, each describing intent to "█████████████████████████████").

16.     NPBL periodically convenes "rate committees," purportedly to "evaluate and propose adjustments to the switch rate to the NPBL Board for a vote." NS SOF ¶ 44; *see also* **CSX Ex. 22** (NPBL009639). Historically, these committees have been comprised of NPBL management and NS and CSX personnel. *See* **CSX Ex. 5** (Coleman Dep. 110:6-15).

17.     NS has long used NPBL rate committees to monitor CSX's activities in the region and preserve its control of NIT. *See, e.g.,* **CSX Ex. 23** (NSR_00199532) (1999 message from NS's Bob Belvin to members of the 1999 NPBL rate committee and NS-appointed NPBL directors, stating that ███████████████████████████████████████████████████ ██████████████████████████████████████████"); **CSX Ex. 24** (NSR_00306424) (email from NS intermodal market manager Chris Luebbers, summarizing 2002 rate committee meeting, including NS's concern that ████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████████████████"); **CSX Ex. 25 (**NSR_00306426 at - 427) (email from Luebbers, summarizing 2006 committee's recommended ███████████ ███████████████████████████████████████████████████████████████████ ████████████████████████").

**b.  The 2009 Rate Committee**

18.     In 2009, NPBL convened a rate committee "██████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████." **CSX Ex. 26** (NSR_00074104 at -107). ███████████████████ "██████████████████████████████████████████████████████. **CSX Ex. 19** (NSR_00027070 at -071). As part of the discussion, CSX recommended NPBL reduce its rate to allow for CSX intermodal traffic to NIT, which would increase NPBL's revenues. *See* **CSX**

**Ex. 27** (CSXT0080856) (June 2009 letter from CSX's Tony Ingram to NPBL's David Stinson); **CSX Ex. 19** (NSR_00027070 at -073).

19. The NS-appointed members of the NPBL rate committee had a different goal. As NS's Chris Luebbers explained in an April 2009 email to NS-appointed rate committee members Liesl McLemore and Gregg Cronk: *"*█████████████████████████████████████ █████████████████████████████████████* **CSX Ex. 2** (NSR_00084753 at -754) (emphasis added). According to Luebbers, the rate committee was a high priority for NS's intermodal group because "████████████████████████████████████ ████████████████████████████████████." *Id.* at -753.

20. NS rate committee members internally discussed how to combat CSX's position "████████████████████████████████████████ ████████████████████████." **CSX Ex. 28** (NSR_00084730) (emphasis added); *see also* **CSX Ex. 29** (NSR_00027114) (April 2009 email string with Luebbers, NS's VP of Intermodal & Automotive Jeff Heller, and NS-appointed NPBL director Mark Manion, discussing trackage at NIT, which Heller describes as "████████████████████████"); **CSX Ex. 30** (NSR_00011118) (April 2009 email from NS's Luebbers to NS rate committee members McLemore and Cronk, warning that a lower NPBL rate at NIT "███████████████████████████████████ ███████████████████████████████").

21. Two days before the rate committee's July 2009 meeting, NS intermodal executives drafted a letter to NS-appointed NPBL director Mark Manion and the other NS-appointed members of the NPBL Board, titled "████████████████████████████████████." **CSX Ex. 3** (NSR_00177916). The letter describes that "████████████████████████████ █████████████████████████████████████████████

█████████████████████████████████████████████████████████████ *Id.* at -917.

Though the rate committee had yet to meet, the letter included NS's assumption that ████████

█████████████████████████████████████████████████████████████████

███████████████████████. *Id.* It concludes: "████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████"[5] *Id.* at -918 (emphasis added).

    22.    At the July 29, 2009 rate committee meeting, NPBL management made several proposals to the committee. *See* **CSX Ex. 26** (NSR_00074104 at -123). First, management recommended replacing the existing $███████ rate and the $████████████ rate with a single $210 line-haul switch rate, not out of concern for any perceived violation of the NPBL Operating Agreement, but because the NS accounting systems used by the Belt Line could not handle the two-tiered structure. *See* **CSX Ex. 19** (NSR_00027070 at -073); *see also* **CSX Ex. 5** (Coleman Dep. 117:18-118:18) (NPBL wanted to eliminate dual rates because it could not distinguish between domestic and import/export traffic).

    23.    NPBL management also recommended adopting a $██ per car rate for "unit trains," i.e., trains moving more than forty cars to one destination under a single waybill. **CSX Ex. 19** (NSR_00027070 at -073). Management developed this rate by reviewing rates charged by other short lines for similar services and evaluating NPBL's costs in a "worst case" scenario. *See id.* CSX expressed interest in using this rate to move trains of intermodal freight to and from NIT,

---

[5] This is not the first time that NS personnel sought to influence the votes of NS-appointed NPBL directors to preserve NS's competitive position, without regard for NPBL's independent business interests. *See, e.g.*, **CSX Ex. 15** (NSR_00199530); **CSX Ex. 16** (NSR_00199524) (██████████

████████████████████████████████████████ *and* **CSX Ex. 17** (NSR_00199515) ██████████████████████████████████████████████████████████████ ").

though these moves involved multiple waybills. *See id.* NPBL management said that it was not opposed to dropping the "one waybill" requirement for this traffic. *See id.*

24. Within days of this meeting, NS's Luebbers sent NS rate committee members McLemore and Cronk his draft recommendations, including that the NPBL Board should " ████████ ██████████████████████████████████████"—a proposal that would *increase* the rate for CSX's traffic to NIT. **CSX Ex. 19** (NSR_00027070 at -070); *see* CSX SOF ¶ 17. Luebbers debated whether NS should recommend approving the $210 switch rate, but recommended "against the $█ unit train per car rate" proposed by NPBL management. *Id.* As he explained:



Id.

25. During the next rate committee meeting, CSX committee members supported the consolidated $210 rate *and* the ███ per car unit train rate proposed by NPBL management. **CSX Ex. 31** (NSR_00035903 at -905). CSX also explained that it wanted to develop an operating plan to move regular volumes to NIT at the $█ per car rate. *Id.*

26. NS rate committee members opposed the $█ rate, questioning whether the analysis conducted by NPBL management was sufficient. *Id.* After NS raised this issue, management suggested it would reconsider its evaluation, stating that " ████████████████████████████ ██████████████████████████████." *Id.* NS rate committee members encouraged NPBL to negotiate " ████████████████████████████████████████ ████████████████████" rather than incorporating the $█ rate into the tariff. *Id.*

27. Following this meeting, the CSX-appointed members of the NPBL rate committee submitted a formal recommendation to the NPBL Board, including an economic and operational

analysis supporting the ███ per car unit train rate proposed by Belt Line management. **CSX Ex. 32** (CSXT0082145 at -146). CSX also proposed adding a volume-based discount to the line-haul tariff, to increase NPBL's revenue and "sharply enhance [NPBL's] business prospects and competitive offerings." *Id.*

28. The NS-appointed rate committee members submitted a formal recommendation opposing the $██ rate. **CSX Ex. 33** (NSR_00035548). They recommended the NPBL Board disapprove this rate because "████████████████████████████████████████ ████████████████████████████████" *Id.* at -549.

29. In December 2009, NPBL management presented the Board with proposed tariff changes, including the $210 line-haul rate but *not* the $██ per car unit train rate or the volume-based discount proposed by CSX. *See* NPBL Ex. 19 at -302, -318. The three NS-appointed NPBL directors voted to adopt the changes in the NPBL proposed tariff "███████████████████ ████████████████████████" *See id.* at -302. Neither CSX-appointed director voted to approve the tariff. *Id.* The $210 rate became effective on January 1, 2010, and it remains in effect today. NS SOF ¶ 47; NPBL SOF ¶ 8.

    **c. CSX's 2010 Proposal**
    *[Disputed: NS SOF ¶¶ 54-55; NPBL SOF ¶¶ 25-27]*

30. In early 2010, in response to NS's purported desire to review a "█████████████ █████████████████████," *see* **CSX Ex. 33** (NSR_00035548 at -549), CSX developed a comprehensive plan to access on-dock intermodal container service at NIT via NPBL. *See* NS Ex. 91 (NPBL007431) ("2010 Proposal"). In the 2010 Proposal, CSX proposed paying NPBL $37.50 per container for intermodal traffic to and from NIT, a rate higher than that charged by Commonwealth Railway ("CWRY"), the short line providing switching services to NS and CSX at VIG, the terminal just across the Elizabeth River from NIT. *Id.* at -433. To reduce any risk to

NPBL, CSX included a volume commitment, *see id.*, and offered to allow NPBL to use CSX's locomotives and fuel *for free*, *id.* at -432. The 2010 Proposal also included a detailed operating plan. *Id.* Given NS's recommendation that NPBL should negotiate "███████" instead of a tariff, *see* **CSX Ex. 31** (NSR_00035903 at -905), CSX offered in the 2010 Proposal to memorialize the proposed terms in a contract, *see* NS Ex. 91 at -433; *see also* NS SOF ¶ 53, though nothing in the proposal was inconsistent with the rate being applied to other NPBL customers.

31.     David Stinson, then-president of the Belt Line, responded to the 2010 Proposal on August 5, 2010. *See* **CSX Ex. 34** (NPBL007438). Stinson stated that CSX's proposal would require hiring more personnel, which he projected would reduce NPBL's potential increased operating income under the proposal from $146,000 to $85,000. *See id.* at -438; *see also* **CSX Ex. 35** (Stinson Dep. 164:19-167:11) (NPBL management did no analysis suggesting the proposal would not generate positive operating income). Stinson also questioned whether the proposal complied with the Operating Agreement's "uniform rate" provision (*see* CSX SOF ¶ 14), and a prohibition on "foreign" locomotives in the NPBL by-laws. *See* **CSX Ex. 34** at -438. CSX promptly addressed Stinson's concerns, explaining that it was not opposed to the proposed rate being incorporated into NPBL's tariff or NPBL using its own locomotives (which are leased from NS). *See* **CSX Ex. 36** (NSR_00000781 at -819); **CSX Ex. 37** (Armbrust Dep. 203:1-14). Stinson testified that this response addressed his concerns. *See* **CSX Ex. 35** (Stinson Dep. 157:1-159:24).

32.     Shortly after CSX submitted the 2010 Proposal, NS began to "review" it. *See* **CSX Ex. 38** (NSR_00073997). NS's Chris Luebbers—an intermodal sales and marketing manager with no operational experience and no affiliation with NPBL (*see* **CSX Ex. 4** (Wheeler Dep. 123:5-13))—took the lead. Over the next several weeks, NS employees worked to identify economic

and operational barriers that could be used to "argue" against the proposal, including route timing and terminal congestion. *See* **CSX Ex. 39** (NSR_00062857); **CSX Ex. 40** (NSR_00062844).

33. At the September 8, 2010 NPBL Board meeting, NPBL management presented the 2010 Proposal to the Board. *See* **CSX Ex. 41** (NPBL019920). The Board directed management

"████████████████████████████████████████████████████████

████████████████████." *Id.* Management was to report back "in 30 days." *Id.* Despite these statements, handwritten meeting notes from an unidentified NS-appointed NPBL director reflect that NS had no intention of fairly assessing the proposal. *See* **CSX Ex. 36** (NSR_00000781 at -781) ("████████████████████████████████████").

34. On October 8, 2010, Stinson relayed to the NPBL Board that management had met with NS operations to evaluate the 2010 Proposal, and that he would update the Board within 30 days after receiving additional information from NS. *See* **CSX Ex. 42** (NPBL012305). Sixty days later, however, NS had still not produced Stinson the information. *See id.*

35. On December 27, 2010, the CSX-appointed members of the NPBL Board sent a memorandum to the Board, requesting that it (1) act to remove any barriers preventing fair consideration of the 2010 Proposal, and (2) direct NS to conclude its operational review of the 2010 Proposal no later than March 30, 2011. **CSX Ex. 43** (NPBL012284).

36. At the December 29, 2010 NPBL Board meeting, Stinson presented "█████████

████████████████████████████████████████████████████████

█████" **CSX Ex. 44** (NSR_00000704 at -712). Management's analysis showed that the proposal would result in positive net income to NPBL *under either scenario*. *See id.* at -736.

37. Following discussion, a motion was made and seconded that NPBL be allowed to use CSX locomotives in service to NIT. *Id.* at -712. Before a vote could be taken, however, NS-

17

appointed members of the NPBL Board moved to table the vote "█████████████████████████████████████████████████." *Id.* The motion at first did not pass because Stinson voted against it, along with the two CSX-appointed directors. *Id.* An amended motion to table the vote, which promised that █████████████████████████████████████████████████████████████████████ was unanimously approved. *Id.*

38.    On March 1, 2011, NS's Jeff Yates rejected Stinson's request for service to NIT in connection with the 2010 Proposal. *See* **CSX Ex. 45** (NPBL012988). This letter does not mention (much less "address") the locomotive issue discussed at the December Board meeting.

39.    On April 11, 2011—approximately eight months after CSX's proposal was tendered to NPBL for consideration—NS-appointed NPBL director Jake Allison emailed NPBL's Donna Coleman, stating for the first time that the NS-appointed directors believed ████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ **CSX Ex. 46** (CSXT0110423). Allison also said the NS directors did not believe the Board could ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████, *see* CSX SOF ¶¶ 14, 26.

40.    At the April 2011 NPBL Board meeting, a vote was requested on the motion about NPBL's use of CSX's locomotives. *See* **CSX Ex. 47** (NPBL017933 at -938). The motion did not pass because all NS-appointed Board members voted against it.[6] *Id.* Soon after, NS removed

---

[6] Defendants' suggestion that the 2010 Proposal was never raised for a vote (NS SOF ¶ 55; NPBL SOF ¶ 27) ignores the evidence reflecting multiple attempts by CSX to obtain a vote on core

Stinson as president and replaced him with current NPBL President Cannon Moss, who had been employed in a business development role at NS. *See* **CSX Ex. 7** (Moss Dep. 15:21-16:7).

41.     When NS first nominated Moss as Stinson's replacement, CSX expressed serious concerns about his qualifications based on his limited experience with rail operations. *See* **CSX Ex. 48** (CSXT0127526). CSX proposed a candidate with significantly more relevant experience, but the NS-appointed members of the NPBL Board refused to interview him and installed Moss over CSX's objections. *See* **CSX Ex. 49** (CSXT0027044) (Sept. 11, 2011 memorandum from CSX-appointed directors, asking the Board conduct interviews before selecting a new president); **CSX Ex. 50** (CSXT0000508) (Sept. 14, 2011 Board minutes reflecting Board agreed to table election pending interviews of proposed candidates); **CSX Ex. 51** (CSXT0000509) (Sept. 19, 2011 Board minutes installing Moss as president without conducting the requested interviews and without all CSX directors present).

42.     Defendants suggest that, in developing the 2010 Proposal, CSX did not consider NPBL's costs. NS SOF ¶ 54; NPBL SOF ¶ 26. None of the evidence cited supports this conclusion. First, all of the testimony from CSX witnesses relates to the 2009 rate committee, not the 2010 Proposal. *See* NS Ex. 92 at 69:4-8, 72:7-11, 123:19-124:4 (John Booth testifying that, in supporting the 2009 rate committee, he did not *personally* review NPBL's costs, because "[o]ther folks on the committee . . . dealt with that"), NPBL Ex. 20 at 124:2-4 (same); **CSX Ex. 52** (Allan Dep. 127:7-135:15) (CSX's James Allan testifying that the recommended volume-based discount was based on revenue, not cost, but also noting CSX *did* consider incremental costs to NPBL associated with additional traffic). The only cited testimony pertaining to the 2010 Proposal comes

---

elements of the proposal, as well as the evidence of artificial barriers constructed by NS to delay and ultimately prevent a vote. *See* **CSX Ex. 37** (Armbrust Dep. 211:17-213:7).

from NS's Mike Wheeler, who said that the NPBL Board ███████████████████████

███████████████████████████████████. *See* NS Ex. 80 at 117:14-118:7; *see also* **CSX Ex. 4**

(Wheeler Dep. 119:16-120:6) (███████████████████████████████████████

███████████████████"). The financial analysis requested by NS-appointed directors showed the

Belt Line would cover its costs *and* make money under either scenario. *See* CSX SOF ¶ 36.

### d. Defendants Impose Logistical and Operational Obstacles to Access NIT
*[Disputed: NS SOF ¶¶ 15, 63-67, 75-77; NPBL SOF ¶ 10, 15, 19, 28-33, 35]*

43. In 2008, NS discontinued service on a segment of track located near NIT, often

called the "Diamond," where NPBL had maintained trackage rights.[7] NS SOF ¶¶ 76-77; NPBL

SOF ¶¶ 19-20. The Diamond had allowed NPBL to access NIT via "an efficient, progressive

move." **CSX Ex. 53** (Girardot Decl. ¶ 7). Without it, NPBL trains carrying CSX intermodal

freight must travel a longer distance and move into NS's Portlock Yard, where engines have to be

attached to the back of the train before proceeding along NS's track (where NPBL has trackage

rights) to NIT. *Id.*; *see also* **CSX Ex. 7** (Moss Dep. 170:11-172:20); **CSX Ex. 10** (Hunt Dep.

159:3-160:7). As the Port of Virginia has recognized, this increases CSX's operational costs to

access NIT. *See* **CSX Ex. 54** at 23; *see also* **CSX Ex. 53** (Girardot Decl. ¶ 7) (removal of Diamond

results in long delays and unequal treatment relative to NS trains); **CSX Ex. 55** (Girardot Dep.

93:5-95:20) (describing burdensome operations required to access NIT via NPBL without the

Diamond); **CSX Ex. 56** (NSR_00011108) (2009 email from NS's Luebbers, explaining that the

Diamond "was conveniently removed when the Ford plant shut down").

44. In 2009, NPBL rejected CSX's offer to purchase the Belt Line's Port Norfolk Yard

---

[7] Although NPBL suggests the NPBL Board agreed to discontinue its trackage rights due to
"costs," NPBL SOF ¶ 19, the meeting minutes cited imply the Board discussed costs associated
with an "alternative route" to the Diamond. *See* NPBL Ex. 16 at -847.

(also known as "Pinner's Point"), despite its declining revenues and stated need to increase its cash flow. *See* **CSX Ex. 57** (NPBL006972); **CSX Ex. 58** (NPBL007205 at -213). NPBL's Stinson characterized CSX's opening offer as ███████████████████████████████████ ███████████████████████████████████████████. *See* **CSX Ex. 59** (NPBL014367 at -369). NS identified CSX's offer to purchase this property as a threat, because it would have ███████████████████████████████████████████████ **CSX Ex. 3** (NSR_00177916 at -917). NS personnel asked NS-appointed NPBL directors to "██████ ████████████████████████████████████" on this issue.[8]  **CSX Ex. 3** (NSR_00177916 at -918); see also **CSX Ex. 30** (NSR_00011118) (NS's Cronk: "████████ ███████████████████████████████████████████ NS's Luebbers: "█████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████); **CSX Ex. 60 (**NSR_00084773) (email between Heller and NS's John Friedmann, noting that NS was "████████████████████████████████████████████████ ██████████████████████████████).

45.  Apart from one unique instance in 2010,[9] NPBL moved no international intermodal

---

[8] NS's suggestion the NPBL Board collectively agreed that NPBL "should hold off on selling" the Pinner's Point property, NS SOF ¶ 75, misunderstands the timeline of events. After rejecting CSX's offer in 2009, NPBL executed an agreement to sell the property to a third party, but that sale eventually fell through. *See* NS Ex. 83 at 91:5-12. Nearly two years later, in connection with a *new* unsolicited purchase offer, the NPBL directors agreed selling was not in the best interests of NPBL. *See* NS Ex. 86.

[9] In January 2010, CSX paid the $210 rate to NPBL for the movement of a single train from NIT, to accommodate a customer's need for a one-time move of empty containers from Virginia to Wilmington, North Carolina.  **CSX Ex. 63** (Houfek Dep. 101:18-106:24).  CSX used this as a "PR" opportunity, including having professional photographs taken of the train. *Id.* at 105:16-21. These benefits, combined with the ability to "████████████████████████████ led one

traffic for CSX until March 2015. **CSX Ex. 5** (Coleman Dep. 179:10-19); **CSX Ex. 61** (NPBL010915). At that time, during a period of extreme port congestion across the East Coast, CSX paid NPBL's $210 rate to move backlogged freight at NIT, recognizing that doing so under these circumstances would "█████████████████████████████████." **CSX Ex. 52** (Allan Dep. 172:16-173:9); *see also* NPBL SOF ¶ 33.[10]

46.     To move this traffic, NPBL President Cannon Moss requested that NS provide a window during which NPBL could operate a CSX train across its tracks to NIT. **CSX Ex. 61** (NPBL010915). This request met with a negative reaction within NS, culminating in NS's VP of Transportation and NS-appointed NPBL Board member Terry Evans responding: "████████████ █████████████████████████████████████████████" *Id.* at -915.

47.     Although NS eventually agreed to provide an operating window for this train, it voiced "████████████████████████████████████████████████████████ █████████████████████." *Id.* at -917; *see also id.* ("[████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████."). NS outlined strict parameters restricting how and when NPBL and VIT were to move this single train. *Id.* VIT's Tom Capozzi testified that ██████████████████████████████." **CSX Ex. 13** (Capozzi Dep. 238:12-239:9); **CSX Ex. 64** (SDT RES 000298) ("███████████,

---

person at CSX to conclude that the $210 rate for this single train was "███████████." *Id.* 106:16-106:24 (describing the various "strategic benefits" of operating this train).

[10] NPBL's cites CSX's MacDonald's testimony for the proposition that CSX paid the NPBL's tariff only for "loaded wells," *see* NPBL SOF ¶ 33; however, neither the cited testimony nor any other evidence proffered by NPBL confirms that the rate does not also apply to empty wells. *See* NPBL Ex. 12 at 140:14-141:8. In fact, MacDonald testified that the $210 switch charge applied to loaded *and* empty cars moving to NIT. *See* **CSX Ex. 66** (MacDonald Dep. at 136:17-138:1). At a minimum, this is a disputed fact.

███████████████████████████ ."). According to Capozzi, ██████████████████████

██████████████████████████ . *See* **CSX Ex. 13** (Capozzi Dep. 238:23-24).

48.     After the first train in April 2015, CSX tried to use NPBL to move other international intermodal freight to and from NIT, but NS imposed serious difficulties, repeatedly refusing to provide operating windows based on vague, unexplained "proprietary issues." *See, e.g.*, **CSX Ex. 65** (NPBL005672) (NPBL unable to provide operating window due to NS's claimed "proprietary operational issues").

49.     When CSX's Portsmouth terminal manager Tony MacDonald spoke with the NS trainmaster, he was told: "[P]roprietary means proprietary. If you don't work for the NS, then I can't help you with what the operating issue is, as they're proprietary operating issues." **CSX Ex. 66** (MacDonald Dep. 152:15-154:4). When MacDonald drove the length of NS's track, however, he identified no visible operating issue that would prevent NPBL's movement. *See id.*

50.     Moss kept NS's Chris Luebbers—an NS intermodal *sales* person—apprised of CSX's attempts to use NPBL to access NIT. *See* **CSX Ex. 67** (NPBL024288) (minutes after receipt of MacDonald's email, Moss forwards to Luebbers, commenting " ██████████████████████

██████████████████ "). Luebbers testified that Moss kept him informed in connection with his *sales* role at NS, so he would be aware of how CSX's attempts to move traffic via NPBL would impact NS's customers.[11] *See* **CSX Ex. 68** (Luebbers Dep. 281:24-282:14).

51.     CSX's efforts to use NPBL to move international intermodal traffic to and from NIT

---

[11] This was not the first time Moss shared CSX's commercial information with Luebbers. *See* **CSX Ex. 62** (NSR_00065318) (August 2012 email from Heller to NS's Rob Martinez, stating that, "███████████████████████████████████████████████████████████████████████████████████████

██████████████████████████ ").

during 2015 proved unworkable.[12]   *See, e.g.*, **CSX Ex. 66** (MacDonald Dep. 165:20-166:11) (describing that the "process of going back and forth to NIT [via NPBL] was melting down" because of the inability to get operating windows to move trains, and noting that CSX cars "ended up stuck over at NIT for 21 days"); *see also* **CSX Ex. 69** (Kenney Dep. 28:2-24).

52.     The situation escalated to the point that CSX's Senior VP of Operations personally called NS executives to request an operating window. **CSX Ex. 70** (CSXT0154004); **CSX Ex. 66** (MacDonald Dep. 171:21-173:17) (when a CSX train was "captive" at NIT, MacDonald called CSX's Senior VP of Operations, "asking her to make a phone call over to the guys in Atlanta or Norfolk to let the train go and quit quoting their proprietary issues").

53.     NPBL ultimately moved a small number—about which witness accounts vary—of international intermodal trains for CSX over a period of several months in 2015. **CSX Ex. 7** (Moss Dep. 128:6-129:4; 130:17-131:1) (NPBL moved intermodal traffic for CSX for a "one- or two-month period" ending before June 2015); **CSX Ex. 13** (Capozzi Dep. 39:18-21) (three trains); **CSX Ex. 55** (Girardot Dep. 232:6-20) (one train over the course of a month); **CSX Ex. 69** (Kenney Dep. 28:2-24) (one train).[13]  By contrast, NS moves multiple of its own trains *daily* at NIT.  *See* **CSX**

---

[12] NPBL cites testimony from MacDonald to suggest that the "operating plan" developed in 2015 was "workable."  *See* NPBL SOF ¶ 31.  But whether the plan on paper was "workable" is beside the point; the record contains substantial testimony from MacDonald and others reflecting that *implementation* of that plan was nothing short of a disaster.  *See* CSX SOF ¶¶ 48, 49, 51, 52.

[13] NS and NPBL suggest that NPBL moved nine trains for CSX in 2015, based on testimony from CSX's MacDonald.  *See* NS SOF ¶ 64, NPBL SOF ¶¶ 30, 33.  But several exhibits shown to MacDonald reflect *plans* to move CSX trains, not confirmed moves.  *See, e.g.*, **CSX Ex. 74** (CSXT0004998); **CSX Ex. 75** (CSXT0001528); **CSX Ex. 76** (CSXT0154066).  Moreover, several of these moves were non-revenue moves made at VIT's request.  At a minimum, MacDonald's testimony, these exhibits, and other record testimony show that the precise number of trains moved in 2015 is in dispute.  NPBL also suggests that CSX did not "consult" MacDonald "about the 2015 rail moves" before filing suit.  *See* NPBL SOF ¶ 32.  But MacDonald testified only that he was not engaged in the process of filing this litigation, *not* that he did not discuss these issues with anyone

Ex. 39 (NSR_00062857 at -860).

54.     Due to the onerous restrictions and inexplicable delays imposed by Defendants, CSX lost business from customers who could not be adequately and reliably serviced without on-dock access at NIT.  *See* **CSX Ex. 69** (Kenney Dep. 31:6-21; 104:4-18).

55.     In June 2015, NPBL's Moss emailed CSX's MacDonald to inquire whether CSX intended to continue moving intermodal freight to NIT via NPBL, because without revenue from these moves, Moss would have to lay off NPBL employees.  *See* **CSX Ex. 71** (NPBL005643).

### e. Defendants' Ongoing Trackage Rights "Dispute"
*[Disputed: NS SOF ¶¶ 72-74; NPBL SOF ¶¶ 53-54]*

56.     According to NPBL, the 1916 Joint Facility Agreement for NPBL to move over NS's tracks, "███████████████████████████████████████████."  **CSX Ex. 72** (NSR_00027071 at -074); **CSX Ex. 5** (Coleman Dep. 143:1-15).  Pursuant to this agreement, NPBL paid NS a fixed trackage rights fee that did not vary based on the number of cars moved.  *See* **CSX Ex. 10** (Hunt Dep. 123:23-127:14).  NPBL's Cannon Moss estimated this fee worked out to $█ per car, in addition to certain fixed costs.  *See* **CSX Ex. 7** (Moss Dep. 175:12-178:8).

57.     In July 2015, while CSX tried to access NIT using NPBL, NS internally worked to "███████████████████████████████████████████████ NPBL and NS.  **CSX Ex. 73** (NSR_00047112).  NS's Chris Luebbers recommended that "██████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████."  *Id.*

58.     NS provided notice to NPBL on July 31, 2015—not long after CSX's efforts to use

_____

at CSX.  *See* NPBL Ex. 12 at 220:13-16.  Moreover, as the record evidence demonstrates, many people at CSX were acutely aware of the obstacles imposed by Defendants during this period.

NPBL to access NIT—that it intended to cancel NPBL's trackage rights over NS leading into NIT, unless the parties could negotiate new agreements to preserve NPBL's access.  *See* **CSX Ex. 77** (NSR_00104581)

59.     Although NS stated externally that it intended for the parties' new trackage rights agreement to afford NPBL "materially the same access" to NS's tracks, *see* NS SOF ¶ 72, internally it made clear that its purpose was (1) ███████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

**CSX Ex. 78** (NSR_00008141).

60.     The trackage rights negotiation was part of NS's broader "strategy" related to CSX's NIT access—specifically NS's "███████████████████████████████████."  **CSX Ex. 79** (NSR_00005173).

61.     NS demanded a variable trackage rights fee of $██ per car.  *See* **CSX Ex. 10** (Hunt Dep. 123:23-127:14).  NPBL proposed $██ per car.  *See* **CSX Ex. 7** (Moss Dep. 175:12-177:18).

**f.   CSX's 2018 Service & Governance Proposals**
*[Disputed: NS SOF ¶¶ 58-62; NPBL SOF ¶¶ 36-42]*

62.     On March 23, 2018, CSX sent NPBL management a Rate Proposal for Long Term Rail Service to NIT.  *See* ECF No. 1-5 ("2018 Proposal").  CSX proposed a switch rate of $80 per car, loaded or empty, for international intermodal containers moving to or from NIT, with a guaranteed minimum of 18,000 cars per year.  *Id.*  The 2018 Proposal presented NPBL a consistent, long-term, and substantial stream of income, as well as new revenue opportunities.  *See id.*

63.     NPBL Vice President Donna Coleman did a "back-of-the envelope financial evaluation" of the 2018 Proposal, which she discussed with President Cannon Moss.  **CSX Ex. 5** (Coleman Dep. 181:13-25); **CSX Ex. 80** (NPBL000189 at -93).  Her calculations showed net revenue for NPBL per trip under the proposal would be $1,500, not including supervisor costs.

*Id.*; *see also* **CSX Ex. 5** (Coleman Dep. 188:9-190:8). She concluded there was enough "validity" to send the proposal to a rate committee. **CSX Ex. 5** (Coleman Dep. 189:19-22).

64. On March 28, 2018, NS called an internal meeting to discuss CSX's proposal, including how it would be impacted by NS's "███████████████████████████." **CSX Ex. 81** (NSR_00051329). During this internal meeting, NS recognized that the "████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████." *Id.* (emphasis added); *see also* **CSX Ex. 82** (NPBL005881 at -882) (April 2016 email from NS's Cheryl Jenkins, pressing NPBL's Cannon Moss to execute trackage rights agreement including NS's proposed trackage rights rate).

65. On April 3, 2018, NPBL personnel asked NS operations employees for permission to "████████████████████████████████████████████████████████████" **CSX Ex. 83** (NSR_00006321). NS reported internally: "████████████████████████ ███████████████████████████████." *Id.* (emphasis added).

66. On April 5, 2018, NPBL's Moss sent an email to CSX's Tony DiDeo, outlining a few "thoughts" about the 2018 Proposal. **CSX Ex. 84** (NPBL006228). Moss noted, among other things, that the "major factor in play are the windows NS would provide for NPBL to make our run to NIT" (i.e., the request NS denied two days earlier). *Id.* Moss also noted that the proposal would "require" two NPBL locomotives (leased from NS), and that NPBL management "would recommend to the board for a rate committee to do a complete review of the tariff." *Id.* Moss testified that, in addition to these purported concerns, he did not feel he could perform an in-depth analysis of CSX's proposal until he knew what NPBL was "going to be paying [NS] for trackage rates." **CSX Ex. 7** (Moss Dep. 244:2-8).

67.     On April 6, 2018, CSX sent a letter to NPBL and NS demanding remedial actions at the upcoming meetings of the NPBL Board and Shareholders, including affording CSX equal representation on the Board; adding qualified, independent directors to the Board; replacing members of NPBL management with qualified, independent individuals; and adopting a corporate compliance program independent of that adopted by NS.  *See* ECF No. 1-6.

68.     On April 16, 2018, CSX submitted a list of qualified candidates to serve as independent members of the NPBL Board of Directors, who CSX proposed be considered for election at the NPBL Shareholders meeting set for April 18.  *See* **CSX Ex. 85** (CSXT0101908).

69.     At the April 18 Shareholders' meeting, CSX proposed the governance changes outlined in its April 6 letter, and recommended interim officers be installed at NPBL until the transition was completed.  **CSX Ex. 86** (CSXT0158238).  The proposal failed when NS voted its 57% majority shares against it.  *Id.*

70.     One NS-appointed NPBL Board member conceded that several of CSX's requests for corporate governance changes were reasonable, but confirmed the Board ultimately took no action in response.  **CSX Ex. 87** (Merilli Dep. 57-21-58:20); **CSX Ex. 88** (Hall Dep. 49:15-50:22).

71.     At its April 18, 2018 meeting, the NPBL Board did not discuss the 2018 Proposal and did not vote to form a rate committee to analyze the tariff or the proposal.  **CSX Ex. 89** (Hurlbut Dep. 67:23-68:16); **CSX Ex. 87** (Merilli Dep. 75:11-21).  The CSX-appointed directors requested that the Board appoint an independent committee to review and evaluate the 2018 Proposal, but the NS-appointed directors refused, based on purported "conflicts" with NPBL's governing documents.  **CSX Ex. 90** (CSXT0142657 at -659); *but see* **CSX Ex. 5** (Coleman Dep. 110:6-15) (Coleman testifying that NPBL rate committees were "ad hoc" and "anybody" could be appointed); *see also* **CSX Ex. 37** (Armbrust Dep. 246:8-21) ("I understood the rate committee to

be essentially a farce to reject [CSXT's] proposal."); *id.* at 254:18-255:4 (only a committee of "independent experts" would be reasonable, based on his experience as an NPBL director).

## III.   NPBL's $210 Switch Rate is Preclusive and Exclusionary

*[Disputed: NSR SOF ¶¶ 8, 45, 47, 52, 67; NPBL SOF ¶¶ 23-24, 43-51]*

72.   The Belt Line's $210 switching rate is substantially higher than rates charged by other terminal switching railroads for similar services.[14]   *See* **CSX Ex. 53** (Girardot Decl. ¶ 2). The most obvious comparison is CWRY, which provides terminal switching services to NS and CSX at VIG.  *See* NS SOF ¶ 10; NPBL SOF ¶¶ 11-13.  In 2009, CWRY charged CSX ███ per container for switching services—nearly ███ *times less* than NPBL's $210 per well rate.  *See* NS Ex. 71 ¶ 60.  Today, NPBL's rate remains nearly ███ as high as CWRY's, even when accounting for the ability to "double-stack" containers.[15]  *See id.* at ¶ 62.  NPBL's $210 per well rate is also significantly higher than the rates charged by terminal switching railroads handling intermodal traffic at other East Coast ports, which generally range from $█ to $█ per container.  *See* **CSX Ex. 53** (Girardot Decl. ¶¶ 2-4); *see also* NS Ex. 7 ¶ 54; NS Ex. 71 ¶ 64.  NPBL's and NS's own documents confirm that the $210 rate is high.  *See* **CSX Ex. 30** (NSR_00011118 at -119); **CSX Ex. 68** (Luebbers Dep. 186:9-191:11) (acknowledging the NPBL switch rate was already

---

[14] NPBL cites CSX's John Booth's testimony that NPBL's $210 rate was "not unusual."  NPBL SOF ¶ 23.  As Booth explained, however, "switch charges can vary significantly."  NPBL Ex. 20 at 141:22.  Switch rates can also vary by commodity, and the economics of some commodities are that they can support a higher switch rate than intermodal.  *See* CSX SOF ¶ 75.

[15] "Double-stacking" refers to the ability to load more than one container on a railcar.  NS SOF ¶ 7.  CSX gained "double-stack" capabilities at POV in December 2016.  *See* NS Ex. 5 at 217:5-12.  NPBL suggests a double-stacked railroad "common[ly]" loads "two or three" containers in a single well.  *See* NPBL SOF ¶¶ 50-51.  But the record reflects that a variety of factors limit the number of containers loaded per well, and that CSX averages ██████ per well under normal operating circumstances.  *See* **CSX Ex. 11** (2d Girardot Decl.) ¶¶ 3-4; **CSX Ex. 12** (Girardot 2d Dep. 101:5-17, 109:23-110:8); *see also* NS Ex. 71 ¶¶ 61-62.  Thus, contrary to NS's suggestion, double-stacking does not "double" train capacity.  *See* NS SOF ¶ 8.

"[redacted]" *before* the Board raised it to $210 in 2009); **CSX Ex. 19** (NSR_00027070 at -074) (notes reflecting that NPBL's Coleman stated that the $[redacted] per car rate proposed by NPBL management in 2009 was "in line" with rates charged by other switching railroads).

73.     In trying to recast its rate as reasonable, NPBL suggests the "industry standard" for evaluating rail rates is on a "per mile" basis.[16] NPBL SOF ¶ 46 (citing NPBL Ex. 3). But NPBL's expert, Thomas Crowley, does not describe his "per mile" methodology as "industry standard," much less cite any industry publications or other authorities supporting that conclusion. *See* NPBL Ex. 3 at 12. At his deposition, Mr. Crowley testified only that this was an "acceptable" method. *See* NPBL Ex. 32 at 235:7-15. And, as NPBL's Donna Coleman testified, [redacted] [redacted]." **CSX Ex. 5** (Coleman Dep. 187:12-19); *see also* **CSX Ex. 11** (2d Girardot Decl.) ¶ 6.

74.     Defendants contend the Belt Line's rate was established to cover its operating costs, based on NPBL's purported "per car" expenses between 2010 and 2020. *See* NS SOF ¶¶ 48-50; NPBL ¶¶ 44-45 (both citing NPBL Ex. 3 at 5-6 & Tbl. 1). NPBL's cost analysis makes no attempt to distinguish between fixed and variable costs, or to consider that its operating expenses per car would decrease as the number of cars handled increased. *See* **CSX Ex. 7** (Moss Dep. 238:10-14) (agreeing that operating expenses per car would decrease as traffic increased); *see also* **CSX Ex. 5** (Coleman Dep. 104:9-18) (a "unit train" usually "costs less" than other moves); **CSX Ex. 91** (CSX Corporate Dep. 100:18-106:4) (discussing difference between fixed and variable costs). Contemporaneous analyses from both CSX *and NPBL* reflect that NPBL would cover its costs *and* gain new revenue if it charged a more competitive rate for intermodal traffic. *See* CSX SOF ¶¶

---

[16] NS, for its part, suggests NPBL's rate is governed by the Surface Transportation Board ("STB"). *See* NS SOF ¶ 45. This is an argument as to the law, not a statement of fact. And, as this Court has already held, STB jurisdiction does not prevent CSX's claims. *See* ECF No. 66 at 20.

30-31 (2010 Proposal); CSX SOF ¶¶ 62-63 (2018 Proposal); *see also* NS Ex. 71 ¶¶ 57-58.

75.     CSX has paid NPBL's $210 tariff rate to move "carload" or "dimensional" traffic. *See* NS SOF ¶ 67; NPBL SOF ¶ 24; *see also* **CSX Ex. 7** (Moss Dep. 125:15-126:10).  Comparing carload or dimensional freight to intermodal container traffic is "apples to oranges," however, because the markets for these commodities are different.  **CSX Ex. 7** (Moss Dep. 225:23-25); **CSX Ex. 91** (CSX Corporate Dep. 158:15-160:17).  NPBL could offer a reduced rate for intermodal traffic without lowering the switch rate applicable to other types of traffic.  *See* **CSX Ex. 91**.

## IV.     The International Intermodal Transportation Market

> *[Disputed: NS SOF ¶¶ 21-25]*

76.     CSX and NS compete for international intermodal shipping contracts.  NS SOF ¶ 5. Ocean carriers shipping containers of goods to and from the United States enter into multi-year contracts with a single railroad, under which that railroad handles the vast majority of rail movements for that carrier across a geographic portfolio (e.g., all containers moving by rail to and from East Coast ports).  *See* **CSX Ex. 92** (Joyner Dep. 42:1-44:11, 63:10-18); **CSX Ex. 93** (Heller Dep. 38:13-39:20); **CSX Ex. 94** (Warren Decl. ¶ 4); *see also* NS Ex. 7 ¶¶ 27-30.  Each of these contracts is worth tens—if not hundreds—of millions of dollars.[17]  *See, e.g.*, **CSX Ex. 95** (NSR_00128851 at -876).

77.     Ocean carriers issue Requests for Proposals ("RFPs") to CSX and NS, identifying a volume of international intermodal containers to be moved by rail in particular "lanes" (i.e., port to destination pairs).  *See* **CSX Ex. 92** (Joyner Dep. 43:9-45:4); **CSX Ex. 96** (Strongosky Dep. 77:9-78:18); **CSX Ex. 97** (CSXT0050597) (2016 ██ RFP); *see also* NS Ex. 7 ¶ 31.

---

[17] CSX and NS also compete for *domestic* intermodal business, which involves transportation of cargo between two points within the United States.  *See* NS Ex. 10 ¶ 21.  Domestic intermodal business is not at issue in this case.  *See id.*

78.     Ocean carriers' decisions about which ports to call depend on a variety of factors,

including ███████████████████████████████████████████. *See* **CSX Ex.**

**93** (Heller Dep. 245:5-246:14).  Vessel routing also depends in large part on ocean carrier alliances,

in which multiple carriers agree to share a single vessel to reduce costs and increase efficiency.

*See* NS Ex. 7 ¶¶ 36; NS Ex. 71 ¶¶ 80-81.

79.     Although *ports* may compete for "discretionary cargo" (NS SOF ¶¶ 21-25), this is

not relevant to the question of whether *railroads* can direct which port an ocean carrier selects to

unload their goods.  *See* **CSX Ex. 94** (Warren Decl. ¶¶ 3-7); *see also* NS Ex. 7 ¶¶ 22, 32-36; NS

Ex. 47 at -487 ("███████████████████████████████████.]").  As NS's

Jeff Heller testified, ███████████████████████████████████████████

███████████████████████████████.[18]  *See* **CSX Ex. 93** (Heller Dep. 245:5-246:14);

*see also* **CSX Ex. 98** (Piacente Dep. 45:22-46:17); NS Ex. 71 ¶¶ 45-54.  NS's and CSX's data

confirm that ocean carriers move international intermodal containers to and from the same inland

destinations through multiple ports.  *See* NS Ex. 71 ¶ 50-54 & Exs. 3 & 4.

---

[18] NS describes in detail competition among *ports* for international intermodal business, *see* NS
SOF ¶¶ 21-24, 26-27, 32, and states that CSX and NS "consider how pricing affects an ocean
carrier's decision to call at various ports," *id.* ¶ 25.  But competition among *ports* does not affect
whether *railroads* can influence ocean carriers' routing decisions.  The evidence cited by NS
reflects that port costs and characteristics—*not rail rates or routes*—influence these choices.  *See,
e.g.,* NS Ex. 46 at -388 (noting carrier might shift traffic to Norfolk to "███████████████
███████████"); **CSX Ex. 99** (Warren Dep. 111:5-113:10) (confirming this statement pertains to
port charges, not rail rates).  None of the cited evidence suggests that an ocean carrier has ever
diverted international intermodal freight based on rail rates or routes alone.  *See* NS Ex. 48 at -
305, -309 ███████████████████████████████; NS Ex. 51 at -162 (
█████); NS Ex. 52 █████
███████████████); NS Ex.
49 █████
███████████████); *see also* **CSX Ex. 12** (Girardot 2d Dep. 59:4-62:
12) (███████████████████████████████████
█████████████████.

80.     Simply put, railroads must take an ocean carrier's choice of ports as "given." *See* **CSX Ex. 92** (Joyner Dep. 35:19-36:11; 142:12-18); **CSX Ex. 69** (Kenney Dep. 39:25-40:13); **CSX Ex. 96** (Strongosky Dep. 44:17-45:5); **CSX Ex. 100** (NPBL003225 at - 240) ("████████████

████████████████████████████████████

████████████████████"). Thus, in order to be competitive for contracts with ocean carriers, CSX must offer competitive service at all major ports in a geographic region.

81.     A significant component of competitive rail service is whether a railroad can provide on-dock access at major marine terminals. *See, e.g.*, **CSX Ex. 94** (Warren Decl. ¶ 10). As NS Vice President for Business Development and Real Estate Rob Martinez has explained, on-dock service "██████████████████████████████████

██████████████████ **CSX Ex. 101** (NSR_00031335 at -342); *see also* **CSX Ex. 102** (Martinez Dep. 128:16-20); **CSX Ex. 103** ("What's at stake in North Charleston rail debate?," *Charleston Regional Business Journal* (July 19, 2010)) (Joyner Dep. Ex. 15) ("It would be a *considerable disadvantage* to not have direct rail access [to a marine terminal] when our competitor does."); **CSX Ex. 13** (Capozzi Dep. 78:16-79:14) (███████████████████

████████████████████████████████████); **CSX Ex. 104** (VPA Corporate Rep. Dep. 124:1-126:7, 149:19-150:4, 201:22-202:21).

   a.   **Drayage is Not an Adequate Substitute for On-Dock Rail at NIT**
        *[Disputed: NPBL SOF ¶¶ 18, 52]*

82.     Because Defendants have blocked CSX's access to on-dock rail, CSX must truck each container arriving at NIT individually to its rail yard in Portsmouth, where the container is then loaded onto a rail car—a process called "drayage." For exports, the process is reversed, with containers arriving in Norfolk by rail being individually drayed from CSX's Portsmouth yard to NIT. *See* NS Ex. 10 ¶ 25.

33

83. Drayage is an expensive and inefficient alternative to on-dock rail, especially at high-volume terminals like NIT. *See* **CSX Ex. 53** (Girardot Decl. ¶ 5); **CSX Ex. 94** (Warren Decl. ¶ 9); **CSX Ex. 96** (Strongosky Dep. 37:6-12); **CSX Ex. 92** (Joyner Dep. 31:23-33:12, 79:24-80:1) (NS "███████████████████████████████████████"); **CSX Ex. 102** (Martinez Dep. 56:13-57:20) (on-dock rail is less expensive and more efficient); **CSX Ex. 105** (NSR_00122609) (NS describing on-dock at NIT as "████████████████████████████████████████████████████████████████████"); **CSX Ex. 106** (C. Booth Dep. 59:19-65:6) (due to rail's efficiency, drayage is typically used only if on-dock rail is unavailable).[19]   Drayage adds "████████████████████████████████████████████" to container transit times. **CSX Ex. 13** (Capozzi Dep. 239:16-240:11).

84. Drayage is a particularly problematic at NIT. The drayage route between NIT and CSXT's Portsmouth yard follows Hampton Boulevard, a four-lane local road passing directly in front of the Old Dominion University campus. *See* NS Ex. 7 ¶ 45 & Ex. 7.   Local regulations prohibit trucks on Hampton Blvd. "between the hours of 4:00 p.m. and 6:00 a.m."   Norfolk Municipal Code § 25-262. Street congestion, gate delays, and the limited availability of truckers and chassis also limit the efficiency and reliability of drayage. *See* **CSX Ex. 108** (Wagel Dep. 42:8-21, 46:18-22); **CSX Ex. 109** (J. Booth Dep. 81:21-82:12); **CSX Ex. 104** (VPA Corporate Rep. Dep. 67:4-68:6).

85. VIT coordinates drayage at NIT and other POV terminals. *See* **CSX Ex. 13**

---

[19] In limited circumstances, NS and CSX use drayage at terminals where they have on-dock access. *See, e.g.*, **CSX Ex. 107** (McClellan Dep. 72:13-22) (describing NS's use of drayage in Jacksonville). NS does not view drayage as inferior in these locations, because the volume of containers handled is small. *See* **CSX Ex. 92** (Joyner Dep. 72:13-22); *see also* **CSX Ex. 69** (Kenney Dep. 69:22-70:9) (describing low volumes and straightforward drayage route in Jacksonville); **CSX Ex. 11** (Girardot 2d Decl. ¶ 9).

(Capozzi Dep. 122:14-15). ███████████████████████████████.[20] *See*
**CSX Ex. 13** (Capozzi Dep. 79:16-80:18). ███████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████. *See* **CSX Ex. 13** (Capozzi Dep.
241:8-15). ████████████████████████████████████████████████████
███████████████. *See* NS Ex. 71 ¶¶ 34-35.

      86.    Ocean carriers express a strong preference for on-dock rail and "view drayage as a
significantly inferior option." **CSX Ex. 94** (Warren Decl. ¶ 10) (former CSX executive explaining
he "████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████."); *see also*
**CSX Ex. 96** (Strongosky Dep. 37:6-12); **CSX Ex. 13** (Capozzi Dep. 76:16-78:15); **CSX Ex. 110**
(NSR_00157631 at -631) (████████████████████████████████████████████
████████████████████████████████); **CSX Ex. 111** (Heller 2d Dep. 25:20-27:6)
(████████████████████████████████████████████████████████████
█████████████████"); **CSX Ex. 112** (CSXT0136053) (████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████]").

      87.    NS aggressively protects its reputation as the sole provider of on-dock rail access
at NIT. *See, e.g.*, **CSX Ex. 113** (NSR_00027097) ("████████████████████████
████████████████████████████████████████████████████████████.");

---

[20] NPBL's suggestion that its rate is "████████████████████████████████," *see*
NPBL SOF ¶ 52, ignores the many non-monetary obstacles imposed by Defendants on CSX's
attempts to use NPBL to access NIT, *see* CSX SOF ¶¶ 43-44, 46-49, 51-54.

**CSX Ex. 114** (NSR_00027098) ("█████████████████████████████████
█████████████████████████████████.").

88.     CSX's lack of on-dock rail access at NIT has driven multiple ocean carriers to contract with NS rather than CSX, including in each of 2015, 2016, 2017, and 2019. *See* **CSX Ex. 69** (Kenney Dep. 20:8-21:4, 31:6-11) (████████); **CSX Ex. 94** (Warren Decl. ¶ 11) (████████ & ████); **CSX Ex. 99** (Warren Dep. 162:22-163:12) (████████); **CSX Ex. 115** (CSXT0096961 at -963) (████); **CSX Ex. 53** (Girardot Decl. ¶ 8) (████ & ███); **CSX Ex. 55** (Girardot Dep. 233:24-234:18; 271:13-272:12); **CSX Ex. 116** (CSXT0013901) (account notes indicating, with respect to ████ proposal, █████████████████████████████████
████████████████"). Ultimately, CSX's lack of on-dock access at NIT has reduced its market share across the entire East Coast. *See* **CSX Ex. 117** (Eliasson Dep. 40:12-41:10).

**b. Other Terminals are Not Adequate Substitutes for On-Dock Rail at NIT**
*[Disputed: NS SOF ¶¶ 9-12, 19, 20, 26-32, 69; NPBL SOF ¶ 9]*

89.     NIT is the largest and most important marine terminal at the Port of Virginia. *See* NS Ex. 10 ¶ 32. It has six berths, the largest number of any POV terminal. It is accessible by a 50-foot navigation channel and can accommodate the largest modern Post-Panamax class vessels. *See* **CSX Ex. 13** (Capozzi Dep. 95:18-24).

90.     A second terminal, VIG, is located across the Elizabeth River from NIT. Although a recent expansion increased VIG's annual throughput capacity to approximately 1.2 million containers (*see* NSR SOF ¶ 10), a level similar to NIT's, VIG remains more constrained because it has only three berths—half the number at NIT. *See* NS Ex. 71 ¶¶ 83-84; **CSX Ex. 13** (Capozzi Dep. 95:25-96:12). Both CSX and NS access on-dock rail at VIG via CWRY. *See* CSX SOF ¶ 72.

91.     A third terminal, Portsmouth Marine Terminal ("PMT"), is smaller and cannot accommodate the largest modern container ships. *See* NS Ex. 71 ¶ 88. PMT was closed from 2010

to 2013, but reopened in 2014 to handle "overflow" traffic while expansion efforts were underway at VIG and NIT. *See* **CSX Ex. 13** (Capozzi Dep. 172:23-173:19) (PMT was a "█████████"); **CSX Ex. 55** (Girardot Dep. 159:24) (PMT was an "emergency workaround Band-Aid"). PMT was closed again in 2018, and VIT has no plans to re-open it for container cargo. *See* **CSX Ex. 13** (Capozzi Dep. 172:23-173:19). When operational, PMT could handle only between ████ and ████ containers annually—a tiny fraction of VIG or NIT. *See* NS Ex. 10 ¶ 116; NS Ex. 71 ¶¶ 85-90. NS and CSX both had access to on-dock rail at PMT. *See* NS SOF ¶¶ 11-12.

92.     VIT determines at which terminal a vessel will call. *See* NS SOF ¶ 19; **CSX Ex. 13** (Capozzi Dep. 91:14-93:7; 94:12-104:19). In making this decision, the most important factor considered is ██████████, followed by ████████████████████████████████.



*See id.* at 91:25-93:7. After those factors, VIT considers █████████████████████████████████████████████████. *See id.* at 99:23-100:11. ████████████████████████████████████████████████████████. *See id.* at 193:10-17; *see also* **CSX Ex. 94** (Warren Decl. ¶ 5) (████████████████████████████████████████████████████); NS Ex. 71 ¶¶ 70-72. VIT retains discretion to ████████████████████████████████████████████████████████ ████████████████████████████████ *See* **CSX Ex. 13** (Capozzi Dep. 101:12-13; 243:15-24); **CSX Ex. 69** (Kenney Dep. 29:2-8).

93.     Although VIT has expressed a desire to steer CSX-aligned containers to VIG, the empirical data show that ocean carrier volumes do not shift from NIT to VIG following a change in alignment from NS to CSX. *See* NS Ex. 71 ¶¶ 77-79 & Ex. 5; *see also* **CSX Ex. 13** (Capozzi Dep. 182:15-185:23; 243:15-24) (VIT's Capozzi explaining it is "████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████, *see* CSX SOF ¶¶ 78, 92).

94.     NS suggests that no international intermodal traffic or customer "must" move through NIT, *see* NS SOF ¶ 69; however, the volume of containers moved through NIT each year could not realistically be shifted to other POV terminals, or to marine terminals at other ports, like the Port of NY/NJ. *See* NS Ex. 71 ¶¶ 50-54, 70-76, 80-81.

**c. Trucks Do Not Compete with Rail for International Intermodal Freight**
*[Disputed: NS SOF ¶¶ 36-41]*

95.     NS states that 60-65% of international intermodal containers at POV were moved by truck between 2012 and 2019. *See* NS SOF ¶ 36. This statistic does not distinguish between containers destined for local markets, which necessarily move by truck, and those traveling longer distances, which move by rail. *See* **CSX Ex. 69** (Kenney Dep. 44:9-45:14). VIT's Tom Capozzi confirmed that ████████████████████████████████████████████████████████

████████████████████████████████████. *See* **CSX Ex. 13** (Capozzi Dep. 164:25-166:2). This is a "████████████████████████████████████████████." *Id.*

96.     Trucking is a "very minor consideration" in competition for international intermodal cargo traveling more than 200 to 500 miles. *See* **CSX Ex. 98** (Piacente Dep. 64:2-16, 86:7-87:8) (200 miles); **CSX Ex. 99** (Warren Dep. 72:10-73:23) (150 to 200 miles); **CSX Ex. 104** (VPA Corporate Rep. Dep. 48:7-50:5) (100 to 140 miles); **CSX Ex. 55** (Girardot Dep. 60:16-61:15) (150 to 400 miles); **CSX Ex. 96** (Strongosky Dep. 112:16-24) (500 miles); **CSX Ex. 107** (McClellan Dep. 71:24-72:1) (500 miles); **CSX Ex. 92** (Joyner Dep. 19:7-20:9) (500 miles).

97.     Although NS suggests that "at least some" international intermodal rail rates are set "to remain competitive with trucks," NS SOF ¶ 40, the documents cited involve moves of less than 500 miles. *See* NS Ex. 40 (discussing rate from New York to Pittsburgh, less than 400 miles); NS

Ex. 72 (discussing rate from Jacksonville to Eden, N.C., less than 500 miles); NS Ex. 77 (discussing rate from Port of New York/New Jersey to Syracuse, less than 250 miles). The Midwest destinations competitively served by NS and CSX are farther than 500 miles from POV. *See* NS Ex. 10 Tbl. 1.

98. Contrary to NS's suggestion (NS SOF ¶ 41), CSX's Highway to Rail ("H2R") program primarily targeted converting *domestic* intermodal container volumes from truck to rail. *See* **CSX Ex. 69** (Kenney Dep. 65:6-12); *see also* NS Ex. 71 ¶¶ 40-41 (explaining differences between international and domestic intermodal competition).

## V.     Harm to Competition and Damage to CSX

*[Disputed: NS SOF ¶¶ 33-35, 70-71]*

99. CSX vigorously competes for international intermodal business at all major ports on the East Coast, including the Port of Virginia. *See* NS SOF ¶ 5. Although CSX's container volumes at POV have increased since 2009, *see* NS SOF ¶¶ 70-71, this expansion is almost entirely concentrated at VIG, where CSX has access to on-dock rail, *see* NS Ex. 71 ¶¶ 109-118.[21]

100. As John Reinhart, the CEO and Executive Director of the Virginia Port Authority ("VPA"), emphasized in a letter to NPBL President Cannon Moss, "███████████████████ ████████████████████████████████████████████████████ ████████. *See* **CSX Ex. 118** (CSXT0100756). Reinhart "██████████████████████ ████████████████████████████████████████████████████ ████████████████████████]" *Id.*; *see also* **CSX Ex. 54** at 21-26.

101. As CSX's expert, Dr. Howard P. Marvel, Dr. Howard P. Marvel—an economics

---

[21] NS points to completion of CSX's National Gateway Project in 2016, and certain purported service disruptions in 2019, to suggest CSX has a "competitive disadvantage" at POV. *See* NS SOF ¶¶ 33-35. The evidence makes clear, however, that CSX has competed vigorously at POV since at least 2009, and that it has had success, primarily at VIG. *See* NS Ex. 71 ¶¶ 109-119.

professor with more than forty years' experience—has confirmed, the empirical data show that NS's and NPBL's conduct harms ocean carriers. Because CSX cannot effectively act as a competitive constraint on NS at NIT, NS charges higher prices to carriers who use NIT intensively. *See* NS Ex. 7 ¶¶ 69-81. ███████████████████████████████████████████████ ████████████████████████████████████████. *See id.* ¶ 81. And because ocean carriers contract with NS for multiple lanes across a large geographic portfolio, the reverberations of this overcharge extend throughout the network. *See id.*

102.     Because ocean carrier RFPs cover multiple ports, CSX has lost substantial business across its entire network because of its lack of on-dock access at NIT. *See* CSX SOF ¶¶ 77-81, 86, 88. Dr. Marvel estimates that CSX's lost profits totaled more than $██ million between 2009 and 2020:



*See* NS Ex. 71 ¶¶ 120-126 & Exs. 14 & 15; *see also* NS Ex. 7 ¶¶ 85-100.

## STANDARD OF REVIEW

The Court can grant summary judgment to Defendants only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Because credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,'" the Court may evaluate the evidence only as needed to determine whether there is "sufficient disagreement to require submission to a jury." *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014). The Court should view all facts and permissible inferences from them in the light most favorable to CSX. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). If a reasonable jury could return a verdict for CSX, "then a genuine factual dispute exists and summary judgment is improper." *Wright v. Va. Peninsula Regional Jail Auth.*, No. 2:19cv189, 2021 WL 963496 at *2 (E.D. Va. March 15, 2021) (Davis, C.J.).

## ARGUMENT

### I.     CSX's Claims are Timely.

Though Defendants do not acknowledge it, they bear the burden of proof on the affirmative defenses of the statute of limitations. *See Graham v. Island Creek Coal Co.*, 184 F. Supp. 2d 511, 515 (W.D. Va. 2002) (noting that defendants "bear the burden of proof on the issue of whether the plaintiff's claims are barred by the statute of limitations," and denying summary judgment where the record contained disputed evidence as to the date on which plaintiff's injury occurred). The record does not support summary judgment on limitations grounds. As explained below, CSX alleges ongoing antitrust violations, which are timely so long as they continue into the limitations period, which CSX has shown. Accordingly these claims—including *all* evidence of Defendants' ongoing anticompetitive conduct—must be submitted to a jury. The same is true for CSX's state law claims, as detailed below.

### a. CSX's Sherman Act Claims are Timely (Counts I-IV).

Defendants' primary argument against CSX's antitrust claims is that they are barred by the applicable four-year statute of limitations. *See* NS Br. at 16-20; NPBL Br. at 15-21 (both citing 15 U.S.C. § 15b). Defendants contend that, because CSX did not sue within four years of their very first anticompetitive act, their ongoing monopoly and conspiracy are now unreachable, and they are free to block CSX's access to NIT, stifle competition, and overcharge ocean carriers in perpetuity with impunity.

Defendants' arguments misstate the law. Under the "continuing violation" doctrine—which NS only briefly acknowledges and NPBL ignores—"[t]he period of limitations for antitrust litigation runs from the most recent injury caused by the defendants' activities rather than from the violation's inception." *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 902 (7th Cir. 2004). And, contrary to NS's suggestion, this principle applies equally to CSX's antitrust conspiracy *and* monopolization claims. *See id.* (explaining, in applying continuing violation doctrine to monopolization claim, that "improperly prolonging a monopoly is as much an offense against the Sherman Act as is wrongfully acquiring market power in the first place"). As the Fourth Circuit reaffirmed *just one day* after Defendants filed their motions, "'in the context of a continuing conspiracy to violate the antitrust laws,' the statute of limitations begins to run from 'each time a plaintiff is injured by an act of the defendants.'" *Mayor of Baltimore v. Actelion Pharms. Ltd.*, __ F.3d __, 2021 WL 1376980, at *6 (4th Cir. Apr. 13, 2021) (citing *Zenith Radio Corp. v. Hazeltine Res., Inc.*, 401 U.S. 321, 338 (1971)); *see also United States v. Dentsply Int'l, Inc.*, No. Civ. A. 99-005, 2001 WL 624807, at *17 & n.18 (D. Del. Mar. 30, 2001), *aff'd sub nom. Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363 (3d Cir. 2005) (in Sherman Act monopoly case, denying motion for summary judgment based on the statute of

limitations after concluding that a jury could find certain conduct sufficient to restart the statute of limitations under the continuing violation doctrine).

This is true even if "the acts occurr[ing] within the limitations period were reaffirmations of decisions originally made outside the limitations period," *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 107 (3d Cir. 2010), and even if the conduct at issue is "intentional, concerted *inaction*" rather than affirmative acts, *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1172 (3d Cir. 1993) (emphasis added). For example, in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, the Supreme Court held that the plaintiff's claims were timely, even though the defendant's allegedly monopolistic leasing policy had been first adopted more than *forty years* before plaintiff sued. *See* 392 U.S. 481, 502 n.15 (1968). The Court explained: "We are not dealing with a violation which, if it occurs at all, must occur within some specific and limited time span. Rather, we are dealing with conduct which constituted a continuing violation of the Sherman Act and which inflicted continuing and accumulating harm." *Id.*

So too here. Although evidence produced in discovery shows that Defendants have engaged in anticompetitive and conspiratorial conduct for years, *see, e.g.*, CSX SOF ¶¶ 10, 17, the record contains ample evidence of overt acts and "intentional, concerted inaction" causing new injuries within the limitations period, *see, e.g., id.* ¶¶ 45-54 (operational challenges and CSX's payment of $210 rate in 2015), ¶¶ 56-61 (trackage rights); ¶¶ 62-71 (2018 proposal); *see also id.* ¶ 102 (injury to CSX).[22] Each of these acts is enough to "start[ ] the statutory period running again" on CSX's antitrust claims. *Actelion Pharms.*, 2021 WL 1376980, at *6.

---

[22] Defendants take a stinted view of the evidence, suggesting that CSX has pointed to only six examples of wrongful conduct since 2009. *See* NS Br. at 16; NPBL Br. at 15 (citing CSX's 2d Supp. Resp. to NPBL's Interrog. No. 4). To be clear, the interrogatory cited by Defendants asked CSX to identify "the specific overt act(s) *by NPBL* that you contend form the basis for the conspiracy alleged in Counts I, II, VIII, and IX of your Complaint." *See* NS Ex. 118 at 2 (emphasis

None of the authority Defendants cite is to the contrary. First, *Klehr v. A.O. Smith Corp.*, actually *refutes* their arguments. There, the Supreme Court analyzed a RICO claim by analogizing to the Sherman Act, explaining that "in the case of a continuing violation . . . , each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." 521 U.S. 179, 189 (1997).[23] In other words, when a continuing violation includes conduct within the limitations period that causes injury, the plaintiff may bring claims based on that conduct, regardless of when the conduct began. *See W. Penn Allegheny Health*, 627 F.3d 85 at 107 (holding, after *Klehr*, that "*Hanover Shoe* and *Lower Lake Erie* leave no room for [Defendants'] proposed rule. . . . [P]laintiff's suit was timely even though the acts that occurred within the limitations period were reaffirmations of decisions originally made outside the limitations period.").

The other cases cited by NS are inapposite. Both *Kaw Valley Electric Cooperative Co. v. Kansas Electric Power Cooperative, Inc.*, 872 F.2d 931, 933-35 (10th Cir. 1989), and *Lancianese v. Bank of Mount Hope*, 783 F.2d 467, 470 (4th Cir. 1986), held that the continuing violation doctrine did not apply because the plaintiff pointed to damages, but not *conduct*, within the limitations period. And in *Al George, Inc. v. Envirotech Corp.*, 939 F.2d 1271, 1275 (5th Cir.

---

added). It did not ask CSX to identify all wrongful conduct within the limitations period; nor did it ask for examples of action (or purposeful inaction) by NS. *See id.* at 2-3 (CSX's response, clarifying that it is "in no way intended as an exhaustive list of overt acts committed by NS in furtherance of the conspiracy"). CSX's response is thus not a catalogue of all evidence supporting its claims.

[23] In arguing that CSX's antitrust claims are time-barred, NPBL suggests CSX "was aware of its alleged injuries" in 2009. *See* NPBL Br. at 16-17. The evidence cited by NPBL does not support this conclusion, particularly in light of Defendants' repeated obfuscations during this period. *See* CSX SOF ¶¶ 18-41. Regardless, CSX's knowledge is immaterial, since each act in furtherance of Defendants' continuing violations restarts the limitations period on its claims, no matter what CSX knew or when. *See Klehr*, 521 U.S. at 189.

1991), the court determined that the last overt act occurred *outside* the limitations period. Here, as discussed above, CSX has identified both conduct *and* damages within the limitations period.

NS contends that Defendants' post-2014 conduct does not constitute "new and independent act[s]" that are "distinct from the 'abatable but unabated inertial consequences' of NPBL's 2009 decision to set the switch rate at $210." NS Br. at 20. As the Fourth Circuit recently reiterated, however, in cases involving anticompetitive pricing, each sale constitutes a new injury restarting the limitations period. *See Actelion Pharms.*, 2021 WL 1376980, at *6. So even if the $210 switch rate were the only conduct at issue—which it is not, as the Court has already recognized, *see* ECF No. 66 at 38-39—CSX's payment of that anticompetitive rate in 2015 would suffice to restart the statute of limitations on its claims. But those payments are just one piece of CSX's case—the record also contains plentiful evidence of Defendants' obstruction of CSX's efforts to access NIT via NPBL in 2015, NS's cancellation of NPBL's trackage rights and subsequent attempts to negotiate a prohibitively high rate between 2015 and 2018, and Defendants' rejection of CSX's 2018 service and governance proposals. All of these events constitute "new and independent" acts, distinct from the setting of the switch rate, that caused harm and thus restarted the statute of limitations.[24]

NS claims "Defendants took *no overt action* on the 2018 Rate Proposal." NS Br. at 19 (emphasis in original). But "overt action" for antitrust or conspiracy purposes need not be a formal Board vote denying CSX's request. Rather, impeding, delaying and effectively denying through inaction are all sufficient to restart the limitation period, whether those acts are characterized as

---

[24] For this reason, NS's citation to *XY, LLC v. Trans-Ova Genetics* is inapposite. In that case, the Federal Circuit affirmed summary judgment on limitations grounds because the plaintiff failed to identify *any* "new and accumulating" injury within the limitations period resulting from the alleged conspiracy. *See* 890 F.3d 1282, 1292 (Fed. Cir. 2018).

actions to impede or *purposeful inaction*. *See Lower Lake Erie*, 998 F.2d at 1172 (explaining that "continuing and accumulating damage may result from intentional, concerted inaction. The purposeful nature of the inaction . . . obviously constitutes an injurious act, although perhaps not an overt one in the commonly-understood sense"). It is undisputed that, pursuant to its charter, NPBL exists to connect its owner railroads to destinations on its network, including NIT. Barring Defendants' anticompetitive conduct, NPBL would have acted to facilitate CSX's access to NIT, as it has facilitated CSX's and NS's access to other points. By refusing to take action on CSX's proposals—which would have furthered NPBL's stated purpose and benefitted NPBL financially—Defendants actively blocked CSX's access to NIT, thus engaging in the very anticompetitive activity reflected in the record.

Most critically, NS's arguments underscore the many material disputes of fact at issue. *Compare* NS Br. at 19 (arguing CSX "successfully used NPBL to access NIT in 2015") *with* CSX SOF ¶¶ 46-49, 51-53 (describing substantial, unreasonable barriers imposed on CSX's access in 2015); NS Br. at 19 (arguing "Defendants took *no overt* action" on 2018 Proposal) *with* CSX SOF ¶¶ 64-71 (describing actions by NS and NPBL directors and management to prevent fair consideration of the 2018 Proposal); NS Br. at 19-20 (arguing that NS "had the contractual right" to reject CSX's Governance Proposal) *with* CSX SOF ¶ 2 & *infra* at 69-70 (disputing NS's interpretation of the relevant agreements). These factual disputes preclude summary judgment.[25]

---

[25] To the extent that Defendants suggest that *evidence* of pre-2014 conduct is not admissible to support CSX's claims, that argument fails. The trier of fact may consider all evidence of Defendants' continuing violations. *See, e.g.*, *Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 37-38 (S.D.N.Y. 2016) ("[A] monopoly which is 'maintained' during the damages period would need to be created before the damages period, and anticompetitive conduct before the limitations period may be material to a showing that Plaintiffs were injured during the damages period.").

**b. CSX's State-Law Claims are Timely (Counts V, VIII, IX).**

Defendants also contend that CSX's state law claims are time-barred, *see* NS Br. at 17-18; NPBL Br. at 17-18, but these arguments likewise miss the mark. The statute of limitations on CSX's state law claims is five years.[26] *See* ECF No. 66 at 36; NS Br. at 17; NPBL Br. at 17. The limitations period begins to run when a cause of action accrues. *See Forest Lakes Community Ass'n, Inc. v. United Land Corp. of Am.*, 795 S.E.2d 875, 881 (Va. 2017). Although a cause of action for property damage accrues when the damage is first incurred, "[i]t is possible for a new cause of action to accrue that looks remarkably like an earlier one but is nonetheless a stand-alone claim in its own right." *Id*. In such cases, "the damage accompanying the new cause of action sets new accrual starting blocks for a separate limitation period." *Id*.

Whether there is a single conspiracy or multiple conspiracies is a factual question. Indeed, because analysis of the "accrual starting blocks" in each case "depends so heavily on the factual context," it "def[ies] any attempts at formulaic applications." *Id.* at 881-82. Put differently, "[w]hether the evidence establishes a single conspiracy or multiple conspiracies is an issue for the jury." *United States v. Lozano*, 839 F.2d 1020, 1023 (4th Cir. 1988); *accord In re Zetia (Ezetimibe) Antitrust Litig.*, No. 2:18md2836, 2019 WL 6977405, at *4 (E.D. Va. Dec. 20, 2019); *Williams v. Commonwealth*, 407 S.E.2d 319, 322 (Va. Ct. App. 1991).

The record certainly contains facts from which a reasonable jury could find that Defendants engaged in a single, ongoing conspiracy throughout the relevant time period. *See, e.g.*, *supra* at 42-46. But there are also facts in the record from which a jury could conclude that Defendants'

---

[26] NS suggests that CSX's common law conspiracy claim is subject to a two-year statute of limitations, based on its misguided assumption that the only "wrongful act" underlying that claim is breach of fiduciary duty. *See* NS Br. at 17 & n.4. As explained below, however, CSX's state law conspiracy claims rely on multiple wrongful and unlawful acts, including Defendants' violations of federal antitrust law, in addition to individual directors' violations of fiduciary duties.

47

entered into a new conspiracy within the limitations period, as this Court outlined in denying Defendants' motions to dismiss:

> [I]n 2018, Defendants entered into a new agreement to increase the amount Belt Line pays to NS to access NS's tracks to NIT. . . . Any increase in the price that [NS] charges Belt Line would, in turn, be passed on to Belt Line's customers. That is, it would lead to an increase in the Uniform Rate. The Court concludes that Plaintiff has alleged a *new conspiracy* within the statute of limitations period; this second attempt to raise the Uniform Rate is not a continuation of the same conspiracy to set the Uniform Rate at the [2009] level because the price is again increased.

ECF No. 66 at 39-40 (emphasis added). CSX is entitled to proceed on alternate theories of liability at trial when both are supported by the record. *See, e.g.*, *Davis v. Richmond, Fredericksburg and Potomac R. Co.*, 803 F.2d 1322, 1327 (4th Cir. 1986) (affirming district court's decision to allow plaintiffs to proceed on two alternate theories of Title VII liability at trial). Whether there was one or more conspiracies is a factual matter for the jury to find.

In an attempt to discount this evidence, NPBL cites CSX's admission that "NPBL and NS did not enter a new agreement in 2018 to increase the amount NPBL pays NS to access NS's tracks to NIT." *See* NPBL Br. at 21-22; *see also* NPBL Ex. 28. But the fact that NS and NPBL have not executed a new trackage rights agreement is beside the point. To the contrary, as CSX alleged— and as the evidence now shows—Defendants have used their purported "dispute" over trackage rights as pretext to justify NPBL's artificially high rate and to reject CSX's proposal seeking a commercially reasonable rate. *See* CSX SOF ¶¶ 56-61. It was not necessary for Defendants to actually *agree* on a higher rate for their scheme to work, as they were able to delay and deny CSX's proposal based on the purported uncertainty surrounding this issue alone. And these actions— among others—constitute breaches of the NPBL Operating Agreement by NS occurring within the applicable limitations period. *See infra* at 69-70.

Because all of this evidence falls within the applicable limitations period, CSX's state law claims are timely. At a minimum, the Court cannot resolve these factual issues on summary judgment. *Lozano*, 839 F.2d at 1023.

### c. CSX's Damages Calculation Methodology Does Not Govern Accrual.

In trying to show that CSX's claims are time-barred, Defendants point to CSX's damages calculation methodology, which they criticize, based on a total of two federal decisions, as not "apportion[ing] damages between any separate unlawful acts." NPBL Br. at 18-19; *see also* NS Br. at 18-19. To be sure, CSX's expert, Dr. Howard Marvel, calculated profits CSX lost due to "the totality of NS's and NPBL's efforts to foreclose CSX" from on-dock rail at NIT. *See* CSX SOF ¶ 102. Most of these occurred in years *after* 2013—within the limitations periods. *See id.*

Defendants' argument that CSX must tie its damages calculation to specific overt acts "obfuscates the difference between, on the one hand, an 'overt act' necessary to show the existence of a conspiracy, and, on the other hand, an 'injurious act' causing damages within the limitations period." *Lower Lake Erie*, 998 F.2d at 1172. Although a plaintiff must identify at least one timely overt act causing injury in order to satisfy the statute of limitations, *Zenith Radio Corp.*, 401 U.S. at 338, its damages calculations need not be tied to that act, because "overt acts aren't what cause damage. *It is the effectiveness of the overall conspiracy that causes damages*." *Lower Lake Erie*, 998 F.2d at 1172 (emphasis added).

Particularly in monopoly cases like this one, "the relevant inquiry is the anticompetitive effect of [Defendants'] exclusionary practices considered together." *LePage's v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003); *see also City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect."). Thus, once the jury finds that

Defendants' unlawful conduct injured CSX, "damages may be determined without strict proof of what act caused the injury, as long as the damages are not based on speculation or guesswork." *3M*, 324 F.3d at 166; *see also Dial Corp*, 165 F. Supp. 3d at 38 (in monopoly case, rejecting summary judgment argument that plaintiff's damages model did not "sort out the effects of any particular form of anticompetitive conduct," explaining that "calculating damages in antitrust cases is not an exact science," and that "if a jury were to find [defendant's] actions taken as a whole to be a violation of Section Two of the Sherman Act, disaggregating the monopolist's lawful actions from its unlawful actions for the purpose of calculating damages may be unnecessary, if not impossible"); *Poster Exch'g, Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 125 (5th Cir. 1975) (approving "day by day calculation of accruing injury" in monopoly and conspiracy case "based on continuing antitrust behavior, not merely the continuing damage [plaintiff] feels from a single day's monopoly and refusal to deal").

The same is true of CSX's state law conspiracy claims. The Fourth Circuit has recognized that, under Virginia law, damages result from the totality of a conspiracy, not any particular overt act. *See Blackwelder v. Millman*, 522 F.2d 766, 776 (4th Cir. 1975) (reversing summary judgment where damages resulting from conspiracy continued into limitations period); *see also Com. Bus. Sys., Inc. v. Bellsouth Servs., Inc.*, 453 S.E.2d 261, 267 (Va. 1995) ("Whether a conspiracy caused the alleged damage ordinarily is a question for a jury."). None of the cases cited by NPBL suggest otherwise. *See* NPBL Br. at 19-20 (citing *Gallop v. Sharp*, 19 S.E.2d 84, 86 (Va. 1942) (providing only that "the damage produced must arise as the effective result of the conspiracy")).[27]

---

[27] The other Virginia cases cited by NPBL do not involve conspiracy claims. *See Street v. Consumers Mining Corp.*, 39 S.E.2d 271 (Va. 1946) (trespass); *Louisville & N.R. Co. v. Saltzer*, 144 S.E. 456 (Va. 1928) (negligence).

NPBL contends that this Court's decision denying Defendants' motions to dismiss provided a "roadmap" for CSX's calculation of damages. *See* NPBL Br. at 20-21 (citing ECF No. 66 at 38-39). But this Court explained that CSX's damages would arise from profits lost as a result of Defendants' ongoing anticompetitive and conspiratorial conduct. *See* ECF No. 66 at 38. It did not suggest, at the motion to dismiss phase of the case, that CSX must apportion those lost profits by contract or tie them to any singular overt act. *See id.* NPBL's argument to the contrary misunderstands the facts of the case. CSX's lost profits are not limited to the marginal difference between the switch rate proposed by CSX and the rate charged by NPBL; they are the profits lost as a result of ocean carriers choosing not to contract with CSX due to its inability to access on-dock rail at NIT, as a result of the totality of Defendants' anticompetitive and conspiratorial conduct. Indeed, that is the consequence of the Defendants' conspiracy: CSX cannot effectively access NIT via NPBL and has lost business and profits due to that constraint. The record contains evidence of this lost business, *see id.* ¶ 88, and CSX's expert, Dr. Marvel, has calculated CSX's lost profits by year, *see id.* at ¶ 102. Neither Defendant challenges Dr. Marvel's damages calculation methodology.

The record contains ample evidence of overt acts by Defendants during the limitations period. The quantum or method for calculating damages arising from the totality of Defendants' conduct does not affect the timeliness of CSX's claims.

## II.    There is Ample Evidence Supporting CSX's Conspiracy Claims (Counts I, II, VII, IX).

CSXT has asserted four conspiracy claims against Defendants. *See* ECF No. 1 ¶¶ 77-84 (conspiracy to restrain trade in violation of Sherman Act § 1); *id.* ¶¶ 85-90 (conspiracy to monopolize in violation of Sherman Act § 2); *id. id.* ¶¶ 101-121 (statutory business conspiracy under Va. Code § 18.2-499, -500); *id.* ¶¶ 122-125 (Virginia common law conspiracy). Although

these claims differ somewhat, Defendants challenge three overlapping elements: (1) whether there is evidence of an agreement; (2) whether there is evidence of overt acts in furtherance of the conspiracy; and (3) for CSX's state law claims, whether there is evidence of a wrongful act or tort. These challenges fail, because the record contains evidence supporting all three elements.

### a. The Record Contains Substantial Evidence of Agreement and Overt Acts.

The parties agree that, to recover on its conspiracy claims, CSX must prove that an unlawful agreement existed between NS and NPBL,[28] and that an overt act was committed to further that agreement. *See* NS Br. at 33-35, 36-37; NPBL Br. at 22-30. To defeat summary judgment, CSX need only present evidence that can "reasonably lead to the inference that [Defendants] positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *Fed. Ins. Co. v. Locash*, No. 2:12cv504, 2014 WL 12588635, at *9 (E.D. Va. Feb. 18, 2014). CSX is entitled to rely on both direct and circumstantial evidence of conspiracy. *See Robertson v. Sea Pines Real Est. Cos.*, 679 F.3d 278, 289-90 (4th Cir. 2012) ("Conspiracies are often tacit or unwritten in an effort to escape detection, thus necessitating resort to circumstantial evidence to suggest that an agreement took place.").

The record amassed in discovery has no lack of conspiracy evidence, including:

- As early as 2002, NS's Chris Luebbers—an NS intermodal market manager—served on NPBL rate committees. NS does not use NPBL for intermodal switching at NIT, so Luebbers' only purpose is clear: to ensure CSX did not obtain favorable rates or any other potential advantages via NPBL. *See* CSX SOF ¶ 17.

- In 2009, NS-appointed rate committee members (including Luebbers) developed pretextual justifications to reject the ███ per car unit train rate, including raising concerns about supposed '███████████████████████████████████████ *See* CSX SOF ¶¶ 18-29.

---

[28] NPBL challenges the existence of "concerted action," while NS argues there was no "agreement." NS Br. at 33-35; NPBL Br. at 22-30. These arguments are functionally the same. *See Schlegel v. Bank of Am., N.A.*, 505 F. Supp. 2d 321, 325-26 (W.D. Va. 2007).

- Ultimately, as described in a draft letter from NS intermodal to its appointed Board members, NS-appointed NPBL directors were to █████████████████████████████ ████████████████████████████████████████████████." *See* CSX SOF ¶ 21. NS-appointed director Mark Manion appointed the NS members of the NPBL rate committee, who in turn worked to recommend rejection of CSX's proposal. And NPBL, including through its NS-appointed directors did, voting to raise the rate to $210— even though the previous rate was already "██████████████"—and declining to approve CSX's competing proposals for a lower rate to NIT. *See* CSX SOF ¶ 72.

- In 2010, after a lengthy period of NS-induced delay, NS-appointed NPBL directors rejected CSX's service proposal by voting against a piece of it, despite NPBL management's profitability assessment, in part based on a pretextual argument that the NPBL Operating Agreement requires a "uniform rate," even though the NPBL Board had frequently "overridden" this purported restriction in the past, and CSX made clear that it had no objection to the rate being embodied in a tariff and offered to other intermodal customers. *See* CSX SOF ¶¶ 30-40.

- In 2015, Defendants imposed operational hurdles (framed as "proprietary issues") to impede CSX's ability to use NPBL to access NIT, even at the inflated rate. *See* CSX SOF ¶¶ 48, 49. NPBL's Moss kept NS's Luebbers apprised of CSX's attempted movements, so Luebbers could assess the impact on NS's customers. *See* CSX SOF ¶ 50.

- In 2015, NS canceled NPBL's trackage rights so it could "████████████████████ ██████, with the parties ultimately disagreeing about the rate. *See* CSX SOF ¶¶ 58-61. NPBL's Moss identified this "dispute" as one basis preventing NPBL from considering CSX's service proposal. *See* CSX SOF ¶ 66.

- In 2018, NPBL refused to establish an independent committee to assess CSX's proposal, purportedly because it would "conflict" with the NPBL Operating Agreement, even though rate committees are "ad hoc" and "anybody" can participate, and refused to accept CSX's proposal despite the fact that management concluded it would financially benefit NPBL. *See* CSX SOF ¶ 71.

In an attempt to discount all of this evidence, Defendants make two arguments: (1) that individual NS-appointed NPBL directors cannot be agents of NPBL, and (2) that there is no evidence of NPBL management's involvement in the conspiracy. *See* NS Br. at 33-34; NPBL Br. at 24-27. As explained below, Defendants' positions misstate the law and rely on contested facts. There is ample evidence of conspiracy here, including among NS employees, NS-appointed NPBL directors (who may act as agents of each of NS and NPBL), and NPBL management.

### 1. NS's directors are agents of NPBL when acting in that capacity.

Defendants are simply wrong to suggest that individual NPBL directors employed by NS cannot be deemed agents of NPBL when acting in that capacity. "Directors are agents of a corporation who must act within the scope of their authority." 18B Am. Jur. 2d Corporations § 1264; *see also Starring v. Kemp*, 188 S.E. 174, 177 (Va. 1936) (explaining that directors are agents of their corporation when conducting its business). Moreover, as the Supreme Court of Virginia has recognized, a person can act as an agent for one entity for one purpose while acting as an agent for another entity for a different purpose, depending on the facts of a particular case.[29] *See Cook v. John Hancock Life Ins. Co. (U.S.A.)*, No. 7:12–cv–00455, 2015 WL 178108, at *7 (W.D. Va. Jan. 14, 2015) (citing *Md. Cas. Co. v. Craig*, 194 S.E.2d 729 (Va. 1973) (analyzing an agent "acting in a dual capacity")); *see also Haines v. Local 149, UAW*, No. 99-122, 2000 WL 1100034, at *1 (Va. Cir. Ct. July 27, 2000) ("[A] person may be an agent of two persons" or entities). The "creation, duration, and scope of an agency relationship" is a question of fact for the jury. *Famous Knitwear Corp. v. Drug Fair, Inc.*, 493 F.2d 251, 253 (4th Cir. 1974); *Acordia of Va.*, 560 S.E.2d at 250.

Neither case cited by Defendants suggests otherwise. Indeed, neither involves a conspiracy claim. In *Mosell Realty Corp. v. Schofield*, the Supreme Court of Virginia held that a would-be buyer could not enforce a real estate contract authorized by two directors but "repudiated" by the third. 33 S.E.2d 774, 778-79 (Va. 1945). The Court reasoned that, under the facts presented, the directors did not have "inherent or implied authority" to undertake "extraordinary and unusual

---

[29] For this reason, Defendants cannot rely on conduct by CSX-appointed NPBL directors to support its desired blanket "no agency" rule. *See* NS Br. at 34; NPBL Br. at 27. Whether an individual acts as an agent of an entity in any given situation depends on the specific facts at issue. *See Acordia of Va. Ins. Agency, Inc. v. Genito Glenn, L.P.*, 560 S.E.2d 246, 250 (Va. 2002).

transactions such as the sale and purchase of real estate." *Id.* at 777. Here, neither NS nor NPBL argue that NS-appointed Board members lack authority to vote on CSX's various proposals; indeed, their argument is that only the Board could approve such things. Similarly, in *Monocan Hills, Inc. v. Page*, the Supreme Court of Virginia considered only whether, in a case seeking to compel transfer of stock, statements of individual directors were admissible as statements of the corporation. *See* 122 S.E.2d 654 (Va. 1961). Neither *Mosell Realty* nor *Monocan Hills* holds that actions by individual directors cannot be attributed to a corporation as a matter of law.

The Supreme Court's decision in *Am. Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.* is instructive. *See* 456 U.S. 556 (1982). In that case, an employee of a product manufacturer used his position on a subcommittee at a trade association, the American Society of Mechanical Engineers (ASME), to conspire *with his own company* against a competitor. *Id.* at 560-61. The Supreme Court affirmed a finding of conspiracy under the Sherman Act *against ASME*. *Id.* at 558-59. The Court held that facts were sufficient to confer conspiracy liability on ASME—particularly in the antitrust context—even though ASME's only conspiratorial conduct came from a single subcommittee member conspiring with his employer. *Id.* at 572. Like ASME, NPBL can be held liable for the conspiratorial conduct of its individual directors, even when those directors engage in that conduct with their employer, NS.

The record contains more than enough evidence to allow the trier of fact to determine that NS-appointed NPBL directors acted as agents of NPBL when conducting NPBL business or directing the actions of NPBL itself. At a minimum, this is a fact issue that cannot be resolved on summary judgment. *See Famous Knitwear*, 493 F.2d at 253.

### 2. The record contains ample evidence of conspiracy between NS and NPBL, above and beyond the conduct of NS's NPBL directors.

There is no question that CSX has adduced overwhelming evidence of the conspiratorial agreement between NS and NPBL, and overt acts in furtherance of that conspiracy, particularly when accounting for the conduct of NS-appointed NPBL directors that is attributable to NPBL. *See, e.g.*, CSX SOF ¶ 17 (evidence reflecting NS-appointed NPBL board member voting to disapprove rate that would benefit CSX at the behest of NS marketing personnel); *id.* ¶¶ 19-21, 24 (communications reflecting NS-appointed rate committee members' recommendations to NS-appointed NPBL directors to oppose favorable rate); *id.* ¶ 50 (communications between NPBL management and NS personnel regarding CSX's efforts to use NPBL to access NIT). This is more than enough to permit the trier of fact to reasonably conclude that Defendants entered into a conspiratorial agreement, and that at least one of them committed an overt act in furtherance of that agreement.[30] *See Robertson*, 679 F.3d at 289-90. Indeed, neither NS nor NPBL argues that there is insufficient evidence of a conspiracy if NS's NPBL Board members are agents of NPBL when they act in their Board capacity. *See* NS Br. at 33-35, NPBL Br. at 22-30.

Even without attributing the actions of NPBL Board members to NPBL, however, there remains ample evidence of conspiracy. Along with conduct by individual directors, CSX has identified evidence that the NS-controlled NPBL Board majority took actions—including official Board votes—in furtherance of Defendants' unlawful conspiracy. *See, e.g.*, CSX SOF ¶¶ 29, 40, 71. CSX also has identified evidence that Belt Line management (including NPBL President Cannon Moss) participated in the conspiracy. *See, e.g.*, CSX SOF ¶¶ 26, 50. NPBL's lengthy

---

[30] CSX must show only that *either* NS *or* NPBL committed an overt act in furtherance of the conspiracy. For this reason, NPBL's laser-like focus on CSX's answers to its Interrogatories Nos. 3 and 4 (*see* NPBL Br. at 23-27)—which asked CSX to identify only conspiratorial "communication(s)" and "overt act(s)" *by NPBL*—is misplaced.

arguments about what inferences should be drawn from this evidence (NPBL Br. at 23-24, 27-30) simply underscore that summary judgment is inappropriate on CSX's claims. *Compare, e.g.*, NPBL Br. at 28 (interpreting evidence related to CSX's attempts to move traffic via NPBL in 2015) *with* CSX SOF ¶¶ 45-54.

At base, given NPBL's purpose to connect its owners (NS and CSX) to terminals along its line, a jury could easily infer that NPBL's refusal to engage with CSX's proposals—which NPBL itself had concluded would make it money—are reflective of a conspiracy with NS, particularly given the evidence of NS's involvement. *See* ECF No. 66 at 27 ("Although ultimately a merits question, courts have found that rejecting proposals which are in a company's own interest and within the company's power to accept may be evidence of, for instance, an antitrust conspiracy.") (citing *SourceOne Dental, Inc. v. Patterson Companies, Inc.*, 310 F. Supp. 3d 346, 357 (E.D.N.Y. 2018) (in denying summary judgment, finding that "evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators" may reflect "a common motive to conspire")); ECF No. 66 at 33 ("Therefore, Norfolk Southern's interest in maintaining a higher switch service rate, so that it can allegedly retain a virtual monopoly, diverges from Belt Line's interest in encouraging the business of Belt Line for which it was formed.").

> **b. CSX's state-law conspiracy claims are supported by ample record contains evidence of "wrongful or tortious" conduct (Counts VIII-IX).**

In arguing that CSX has not identified evidence of "unlawful" acts to support its conspiracy claims, Defendants misunderstand the standard for "wrongful or tortious" conduct underpinning these claims. CSX alleged wrongful or tortious conduct to support its Virginia conspiracy claims, and it now has sufficient evidence to support those allegations.

First, Defendants argue that only conduct pled as a separate count can support a Virginia statutory business conspiracy claim. *See* NS Br. at 37, NPBL Br. at 30-31. The Court can quickly

dispense with this argument. The conduct underlying CSX's conspiracy claims need not be a "tort" taught in the first year of law school. Virginia law requires only that CSX show that it suffered damages from "an act that is itself *wrongful or tortious.*" *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 317 (Va. 2014) (emphasis added).

Moreover, contrary to Defendants' suggestion, CSX need not show that all conspirators engaged in the underlying misconduct. "The object of a civil conspiracy claim is to spread liability to persons other than the primary tortfeasor." *Gelber v. Glock*, 800 S.E.2d 800, 821 (Va. 2017). So "[t]here is no requirement that the party sued for civil conspiracy be the actual tortfeasor." *L-3 Commc'ns Corp. v. Serco, Inc.*, 926 F.3d 85, 92 (4th Cir. 2019) (applying Virginia law).

The record contains evidence of many "wrongful or tortious" acts, including NS's wrongful monopolization under the Sherman Act and the Belt Line's individual directors' violations of fiduciary duties.[31] The state law conspiracy claims must remain.

### III. CSX Has Properly Supported its Antitrust Claims (Counts I-IV).

#### a. NS is not absolved of Section 2 liability merely because NPBL was involved.

NS contends that CSX cannot assert monopolization and attempted monopolization claims under Section 2 of the Sherman Act, because that section addresses only "unilateral conduct by a single firm." NS Br. at 28. This argument fundamentally misunderstands CSX's monopoly claims and the relevant law.

A claim of monopolization under Section 2 of the Sherman Act requires, "in addition to the possession of monopoly power in the relevant market," proof that the defendant willfully

---

[31] Again, because the defendant in a conspiracy claim need not be the underlying tortfeasor, *L-3 Commc'ns*, 926 F.3d at 92, it does not matter that the individual defendants were voluntarily dismissed from the case. Those co-conspirators were not dismissed for failure to state a claim, and the Court has never ruled that they did *not* breach their fiduciary duties, as CSX alleged and as the record supports. *See* ECF Nos. 143 (dismissal order).

acquired or maintained its monopoly through anticompetitive means, "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 407 (2004). Although "[a]nticompetitive conduct can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties," *Caribbean Broad. Sys. Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998), Section 2 claims "usually involv[e] some assay by the monopolist into the marketplace—to limit the abilities of third parties to deal with rivals (exclusive dealing), to require third parties to purchase a bundle of goods rather than just the ones they really want (tying), or to defraud regulators or consumers." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013); *see, e.g.*, *Conwood Co., LP v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002) (upholding $1.5 billion total jury award on § 2 claims based in part on evidence that monopolist's sales representatives persuaded third party retailers to remove or destroy rival's product displays and exclude rival's products from sales); *U.S. v. Microsoft*, 253 F.3d 34, 71 (DC Cir 2001) (approving monopolization claim premised on licensing arrangements prohibiting customers from engaging with competitors).

NS cites no case suggesting otherwise. Neither *Oksanen v. Page Memorial Hospital* nor *Midwest Gas Services, Inc. v. Indiana Gas Company* considered whether a defendant could involve third parties in its monopolistic efforts, as both turned on other elements of a Section 2 claim. *See Oksanen*, 945 F.2d 696, 710 (4th Cir. 1991) (monopolistic intent); *Midwest* Gas, 317 F.3d 703, 713 (7th Cir. 2003) (antitrust injury). And in *Sun Dun, Inc. of Washington v. Coca-Cola Co.*, the court considered whether two competitors could engage in a "shared monopoly" for their *joint* benefit. *See* 740 F. Supp. 381, 391 (D. Md. 1990). That is not the situation here, where the

monopolist is NS, and the conduct at issue is not intended to benefit NPBL—in fact, NPBL has been *harmed* by NS's monopolistic actions.[32]

**b. The record shows that NS has maintained an illegal monopoly at NIT, not that NIT is an "essential facility" to which NS has denied access.**

NS argues at length that CSX cannot prove its monopoly claims under an "essential facilities" theory. *See* NS Br. at 28-33. But CSX has not pled—and need not rely on—a theory that NS has denied CSX access to an "essential facility" under its control. The parties agree that NIT, like other POV terminals, is owned by VPA and operated by VIT, both of which have endorsed CSX's efforts to obtain on-dock access at NIT. *See* CSX SOF ¶¶ 81, 86, 100. And CSX's efforts, as alleged in the Complaint and reflected in the record, have been in an attempt to access NIT *via NPBL*, not NS.

CSX has asserted straightforward monopoly claims based on NS's illegal maintenance of its monopoly at NIT, including through its conspiracy with NPBL to block CSX's access to on-dock rail at NIT. *See* ECF No. 1 ¶¶ 85-104. NS cannot avoid the consequences of its anticompetitive actions by attempting to recast CSX's claims under the "essential facilities" doctrine.[33]

**c. NS and NPBL conspired to restrain trade in violation of Section 1.**

Defendants' arguments about CSX's § 1 claim is also unpersuasive. To establish a

---

[32] This is yet another argument in which NS seeks to have it both ways. It claims, on the one hand, that it cannot be responsible for actions by a third party (NPBL), while at the same time arguing that its appointed majority of that third party's board "exercise control" over that third party. *See* ECF No. 116 at 9-10.

[33] NS suggests briefly that, even outside the "essential facilities" doctrine, CSX has not shown that it was "substantially foreclosed" by Defendants' conduct, because CSX has paid NPBL's switch rate in other contexts and CSX's market share increased over the relevant period. *See* NS Br. at 32-33. These are issues of disputed fact that cannot be resolved on summary judgment. *See* CSX SOF ¶¶ 75, 99.

violation of § 1 of the Sherman Act, CSX must prove "(1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." *N.C. State Bd. of Dental Exam'rs v. FTC*, 717 F.3d 359, 371 (4th Cir. 2013). The record contains substantial evidence of Defendants' conspiracy. *See supra* at 52-58. That concerted action has unreasonably restrained competition under either of the prevailing standards for evaluating challenged restraints: the per se standard or the "rule of reason." *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885-86 (2007).

### 1. Defendants' conduct is a per se violation of the Sherman Act.

NS contends that Defendants' conduct cannot be a per se violation of the Sherman Act because NS and NPBL are in a vertical relationship. *See* NS Br. at 35-36. Not so. It is undisputed that the only railroads capable of offering on-dock access at NIT are either NPBL or NS. In the context of that service, therefore, NS and NPBL are at a minimum *potential* horizontal competitors. Accordingly, their conspiracy to block CSX's access to on-dock rail at NIT is a horizontal agreement that is per se illegal. *See Lumber Liquidators, Inc. v. Cabinets To Go, LLC*, 415 F.Supp.3d 703, 712 (E.D. Va. 2019) (agreements between competitors or potential competitors to restrain trade are horizontal). That does not change simply because NPBL may have a vertical relationship to NS at other locations. Where, as here, the predominate nature of the restraint at issue is horizontal, the per se rule applies. *See Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 58 n.28 (1977) (certain restrictions originating from agreements between entities can be vertical in some contexts and horizontal in others).

### 2. Defendants' conduct is also a violation of the Sherman Act under the Rule of Reason.

Under the rule of reason, a factfinder must analyze "all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint

on competition." *Continental T. V.*, 433 U.S. at 49. The focus of this analysis is the impact on competitive conditions in the relevant market, *see Nat'l Soc'y of Pro. Engineers v. United States*, 435 U.S.679, 688-92 (1978), including "consideration of the facts peculiar to the business in which the restraint is applied, the nature of the restraint and its effect, and the history of the restraint and the reasons for its adoption," *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 607 (1972), and whether the defendants have market power in the relevant market, *Leegin Creative Leather Prods.*, 551 U.S. at 885-86; *see also E.I. DuPont de Nemours and Co. v. Kolon Indus. Inc.*, 688 F. Supp. 2d 443, 456 (E.D. Va. 2009).

### (i) CSX has defined a relevant market, and NS's criticisms of that market turn on disputed facts.

"[T]he definition of a relevant antitrust market is a highly fact-intensive inquiry," *Cont'l Airlines, Inc. v. United Air Lines, Inc.*, 120 F. Supp. 2d 556, 568 (E.D. Va. 2000), and NS's arguments about the relevant market turn on issues of disputed fact. "The market definition has two components—the relevant product market and the relevant geographic market." *E.I. DuPont de Nemours and Co. v. Kolon Indus. Inc.*, 637 F.3d 435, 441 (4th Cir. 2011). Each piece of this analysis is "a fact-intensive exercise centered on the commercial realities of the market and competition." *Id*. at 442, 443 n.3. Examining these "commercial realities" must include analyzing:

> where the parties market their products; the size, cumbersomeness, and perishability of the products; regulatory requirements impeding the free flow of competing goods into or out of the area; shipping costs and limitations; the area within which the defendant and its competitors view themselves as competing; and other factors bearing upon where customers might realistically look to buy the product.

*Id*. at 442-43. The broad range of the results of these analyses shows the importance of each case's particular facts. In part because of the "deeply fact-intensive inquiry" inherent in defining a market, *id*. at 443, "[t]he Supreme Court has counseled that summary judgment in antitrust

litigation should be used sparingly." *Ratino v. Med. Serv. of Dist. of Columbia (Blue Shield)*, 718 F.2d 1260, 1268 n.23 (4th Cir. 1983) (citation omitted).

NS seeks to paint a picture of a world in which ocean carriers can decide to send their ships to *any* port at *any* time and discharge their cargo to *any* form of transportation. Indeed, NS asserts that competition among ports along the East Coast invalidates CSX's market definition. *See* NS Br. at 25. This distortion of reality has the benefit of avoiding any consequences from Defendants' anticompetitive conduct to block CSX from on-dock access at NIT. But in the real world, ocean carriers demand service at the Port of Virginia—including NIT specifically—and CSX must have on-dock rail access at NIT to be competitive for their business. *See* CSX SOF ¶¶ 81-86 Ocean carriers do not, as NS suggests, make a decision about railroad alignment and then on that basis decide to discharge cargo at the Port of Baltimore, or even the Port of NY/NJ, instead of at Port of Virginia. *See* CSX SOF ¶¶ 79-80. To the contrary, carriers make sophisticated decisions about port routing on the basis of many factors other than railroad alignment, including port costs, vessel productivity, and carrier alliances. *See* CSX SOF ¶¶ 78-79. The same is true within the Port of Virginia. Terminal selection at POV is driven by a variety of considerations, the *least* of which is railroad alignment. *See* CSX SOF ¶ 92. Indeed, the empirical data confirm that container traffic *does not shift* between NIT and VIG based on changes in railroad alignment. *See* CSX SOF ¶ 93. Accordingly, CSX must take ocean carriers' choices of ports and terminals as given—and it must offer on-dock service at major terminals like NIT to compete for their business.

The parties disagree on the factual underpinnings of the relevant market definition. For example, NS contends that CSX's proffered geographic market disregards competition among various *ports* for discretionary cargo. *See* NS Br. at 24-26. But the record contains ample evidence that although *ports* may compete for this traffic, railroads have little ability to influence ocean

carriers' choices about at which ports to call. *See* CSX SOF ¶¶ 79-80. NS also argues that NIT is interchangeable with other POV terminals, because VIT decides at which terminal carriers call. *See* NS Br. at 24. PMT and VIG are not reasonable substitutes for NIT, however, because the record shows that many factors other than rail alignment influence terminal selection. *See* CSX SOF ¶¶ 89-91. Indeed, VIT candidly admits that it cannot steer all CSX-aligned traffic away from NIT—a fact that the empirical data confirm. *See* CSX SOF ¶¶ 92-93. Finally, NS contends that CSX's defined service market overlooks "end-to-end truck transportation" as a competitive alternative to rail. *See* NS Br. at 26. This argument ignores the great weight of the evidence, which reflects that trucks and rail do *not* compete for international intermodal freight traveling beyond local markets. *See* CSX SOF ¶¶ 95-98. As NS's expert acknowledges, the major Midwest markets served from NIT are all are further than 500 miles, meaning trucks are not a reasonable competitive alternative. *See* CSX SOF ¶¶ 96-97; *see also* NS Ex. 71 ¶¶ 38-44. All of these factual disputes preclude summary judgment.

> **(ii)  NS's monopoly power is also shown through ample evidence of actual harm to competition.**

Separate and apart from defining the relevant market, CSX can also prevail by demonstrating monopoly power directly. Defining the relevant market, and showing a defendant's power within that market, allows an antitrust plaintiff to establish anticompetitive effect indirectly. *See Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1019 (10th Cir. 1998). When the plaintiff can prove monopoly power "directly by showing *actual anticompetitive effects*, such as control over output or price," however, there is no need to precisely define the relevant market. *Id.*; *see also FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986) ("Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, 'proof of actual detrimental effects, such

as a reduction of output,' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.").  CSX need not specifically define the relevant market in this case, because the record shows that Defendants' actions have resulted in actual anticompetitive harm to ocean carriers, regardless of the precise metes and bounds of the market.  *See* CSX SOF ¶ 101; *see also* NS Ex. 7 ¶¶ 69-73, 78-81; NS Ex. 71 ¶¶ 78-81.

### (iii) CSX's expert's market definition matches the Complaint, and NS has shown no prejudice from any purported differences.

Finally, NS contends that the Court should grant summary judgment based on purported discrepancies between the market definition alleged in CSX's complaint and that set forth in its expert's report.  *See* NS Br. at 21-22.

As stated in CSX's Complaint, the relevant geographic and service market at issue is rail freight transportation into and out of Hampton Roads' intermodal port facilities.  ECF No. 1 ¶¶ 49-50.  As discussed at length in the Complaint, this case is about Defendants' efforts to deny CSXT on-dock rail access at NIT and the resultant harm to CSX and the market.  *Id.* ¶ 3 (Defendants have acted in concert to "maintain NS's monopolistic control over intermodal transportation in and out of NIT by making it practically impossible for any other rail carriers to provide intermodal rail service to NIT."); ¶ 54 (NS and NPBL have taken anticompetitve acts to "effectively deny[] CSXT access to NIT by rail in competition with NS"); ¶ 57 (Defendants conspired to set and maintain NPBL switch rates—which CSX must pay to access NIT—"at levels designed to exclude competition in the relevant market"); ¶ 79 (Defendants conspired to take actions to effectively foreclose CSX from using NPBL "to compete in the provision of multi-modal services at NIT," in violation of § 1 of the Sherman Act).

To the extent there was any question about the relevant market, CSX's expert put a finer point on it in his February 25, 2020 expert report: "[T]he provision of on-dock access to NIT is a

*relevant market*." NSR Ex. 7 at ¶ 12 (emphasis in original); *see also id.* ¶¶ 37-51 (describing the relevant market). NS's expert understood CSX's market definition and responded to it in his report, filed February 3, 2021. *See* NS Ex. 10 ¶ 49 ("This case involves the alleged foreclosure by NSR of CSXT's rail access to one terminal, NIT, at the Port of Virginia.") (citing ECF No. 1 ¶ 42). Given that CSX's market definition has been clear since the Complaint was filed in October 2018, NS's new protests that it has not been provided fair notice ring hollow.

Even if there were a difference between the market definition pled by CSX and that articulated by Dr. Marvel (which there is not), Defendants cannot show they have been prejudiced as a result. Dr. Marvel's description of the market is comfortably within the market defined by the Complaint, which not only referenced market share at NIT, but also contained numerous allegations related to NIT specifically—as this Court noted in assessing CSX's allegations of antitrust injury at the motion to dismiss stage. *See* ECF No. 66 at 35; *see also Four Corners Nephrology Assoc., P.C. v. Mercy Med. Ctr. of Durango*, No. 05-2084, 2008 WL 2355533, at *4 n.3 (D. Colo. May 22, 2008) (permitting plaintiffs to rely on a narrower market definition than plead in their complaint, given lack of prejudice to defendants).

Moreover, due to the long stay in this case, Defendants conducted substantially all of their fact discovery with the benefit of Dr. Marvel's report, including his detailed description and analysis of the relevant market. *See* ECF No. 254. NS's expert likewise had a full year to formulate his response to Dr. Marvel's report, and he *directly addressed* this issue. This is simply not a case in which a purported change to market definition surprised Defendants or prejudiced their defense in any way. *See City of New York v. Group Health, Inc.,* 649 F.3d 151, 157-58 (2d Cir. 2011) (affirming refusal to permit plaintiff to amend its complaint to alter its market definition, noting that defendant would be prejudiced because of the need to conduct new discovery on a

"different and much broader market"). Summary judgment is thus inappropriate. *See Precision Seed Co. v. Consol. Grain & Barge Co.*, No. 3:03cv079, 2006 WL 840377, at *11 (S.D. Ohio March 30, 2006) (refusing to grant summary judgment where market definition asserted by plaintiff's expert was different than that pled in the complaint, finding defendant would suffer no prejudice if "new" definition were offered at trial).

Further, the record contains ample evidence that NS dominates the market, whether evaluating its share at just NIT or at all Port of Virginia terminals. *See* CSX SOF ¶ 13 (NS has handled between ██% and ██% of international intermodal business at the Port of Virginia—and between ██% and ██% at NIT—between 2009 and 2020); *see also E.I. DuPont de Nemours and Co. v. Kolon Indus. Inc.*, 688 F. Supp. 2d 443, 456 (E.D. Va. 2009) (noting monopoly power has been found where "the defendant controlled seventy to one hundred percent of the relevant market"). Indeed, in response to criticisms from NS's expert, Dr. Marvel assessed harm to ocean carriers and calculated damages to CSX based on an alternative market definition comprising the Port of Virginia as a whole. *See* CSX SOF ¶¶ 101-102; NS Ex. 71 ¶¶ 122-23.

If this Court concludes, however, that there is a meaningful divergence between the market definition in CSX's Complaint and Dr. Marvel's report, CSX can readily and quickly amend its Complaint, with leave of Court, to modify its market definition—a course of action approved in antitrust matters even at the late stage of trial. *See*, *e.g.*, *Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*, 849 F.2d 1336, 1342-43 (11th Cir. 1987) (permitting plaintiffs to amend complaint to allege different market because defendant failed to show prejudice).

### 3. Defendants' argument that the NPBL rate is "justified" rests on disputed facts.

NPBL argues that CSX has not shown that Defendants' conduct "unreasonably restrained trade," because, in its view, NPBL's switch rate is "justified" by its costs. *See* NPBL Br. at 31-

36; *see also* NS Br. at 35. This argument fails. Contrary to NPBL's suggestion, CSX's claims do not "hinge" on the NPBL's switch rate.[34] As the record shows, Defendants have engaged in wide variety of anticompetitive conduct, including, but not limited to, setting and maintaining a switch rate excessive for intermodal traffic. When deciding whether Defendants' conspiracy unreasonably restrained trade in violation of the Sherman Act, the trier of fact must consider the *totality* of this conduct. *See 3M*, 324 F.3d at 162.

The record also contains substantial evidence refuting NPBL's suggestion that the $210 rate is needed to cover its costs for service to NIT. See NS Ex. 71 ¶¶ 57-58 (noting that, because average costs would decline with additional traffic, charging a price per car sufficient to cover current average costs is unreasonable). In analyzing the Belt Line's costs, NPBL's expert makes no attempt to distinguish between fixed costs, which would not increase with additional traffic, and variable costs, which would. See NPBL Br. at 34 (citing NPBL Ex. 3 at Tbl. 5). As NPBL's Cannon Moss testified, because fixed costs would not change, NPBL's total cost per car would decrease as the number of cars handled increased. See CSX SOF ¶¶ XX. And both CSX and NPBL repeatedly determined that NPBL could cover its costs and gain incremental income by moving intermodal containers at a lower switch rate. See CSX SOF ¶¶ XX. These disputes of fact preclude summary judgment.

NPBL's reliance on *Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*, 704 F. Supp. 1309, 1323 (D. Md. 1989), is misplaced. *See* NPBL Br. at 34-37. In *Laurel Sand*, the court considered whether, in the context of an essential facilities claim, CSX had to offer the plaintiff trackage rights in lieu of the switch rate offered. *See* 704 F. Supp. at 1323. It determined that the rate offered by CSX ($0.01 per ton above its *variable* costs) was not so unreasonable as to amount to a denial of

---

[34] Indeed, NS does not attempt to argue that this is the only conduct at issue. *See* NS Br. at 35-36.

access under an "essential facilities" theory.  *See id.*  As explained above, this is not an essential facilities case.  *See supra* at 60-61.  Nothing in *Laurel Sand* suggests that the Court can conclude that NPBL's rate is justified by its costs as a matter of law—much less that Defendants' conduct as a whole did not unreasonably restrain trade or improperly maintain NS's unlawful monopoly.

## IV.    CSX's Breach of Contract Claim (Count V) is Well-Supported

NS breached its obligations under the NPBL Operating Agreement.  Under Virginia law, "[t]he elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation."  *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004).  NS does not dispute that the Operating Agreement creates legally binding obligations between it and CSX; it contends that none of its actions breached a provision of the Operating Agreement.  NS Br. at 37-40.

NS has breached several provisions of the Operating Agreement.  For example, the Tenth Article states that the parties to the agreement—that is, NS and CSX—"will co-operate cordially in encouraging the business of the [NPBL] for which it is constructed."  ECF No. 1-1 at 6.  As this Court has noted, "cooperation clauses are generally enforceable."  ECF No. 66 at 42 (citing *Feldman Prod., Inc. v. Indus. Risk Insurers*, No. Civ.A. 3:09-0481, 2011 WL 4543966, at *4 (S.D.W. Va. Sept. 29, 2011)).  NS argues that NPBL, not CSX, would be the proper party to claim damages caused by a breach of this obligation—contrary to the express language of the Operating Agreement that NPBL operates "for the mutual benefit of each [shareholder] in the interchange of business."  NS Br. at 39; ECF No. 1-1 at 3.  Indeed, the record evidence establishes that NS has failed to co-operate with CSX to encourage the business of NPBL, blocked CSX from using NPBL,

failed to act on proposals that would encourage the business of NPBL, insisted on actions that would harm NPBL, and induced its directors to do the same.

NS has also breached the implied covenant of good faith and fair dealing, included in every contract governed by Virginia law. *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 450 (E.D. Va. 2009). In addition to certain of NS's actions expressly violating the Operating Agreement, NS is also liable for breach of the Agreement if it exercised its "contractual discretion in bad faith." *Morrison v. Wells Fargo Bank, N.A.*, 30 F. Supp. 3d 449, 456 (E.D. Va. 2014). Courts have also held that the covenant is breached when a party has "act[ed] in such a manner as to prevent the other party from performing his obligations under the contract." *E. Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 183 (4th Cir. 2000). At the least, NS has prevented CSX from "deliver[ing] to the [NPBL] all cars to be interchanged with other Companies." ECF No. 1-1 at 6. Ample evidence exists that NS breached the NPBL Operating Agreement.

## CONCLUSION

For all these reasons, the Court should deny Defendants' Motions.


Dated: May 3, 2021                    Respectfully submitted,

                                      **CSX TRANSPORTATION, INC.**
                                      *By Counsel*

                                      */s/ Benjamin L. Hatch*
                                      Robert W. McFarland (VSB No. 24021)
                                      Benjamin L. Hatch (VSB No. 70116)
                                      V. Kathleen Dougherty (VSB No. 77294)
                                      MCGUIREWOODS LLP
                                      World Trade Center
                                      101 West Main Street, Suite 9000
                                      Norfolk, Virginia 23510-1655
                                      Telephone: (757) 640-3716
                                      Facsimile: (757) 640-3930
                                      E-mail: rmcfarland@mcguirewoods.com
                                      E-mail: bhatch@mcguirewoods.com

E-mail: vkdougherty@mcguirewoods.com

J. Brent Justus (VSB No. 45525)
Ashley P. Peterson (VSB No. 87904)
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia  23219-3916
Telephone:  (804) 775-1000
Facsimile:  (804) 698-2026
E-mail: bjustus@mcguirewoods.com
E-mail: apeterson@mcguirewoods.com

# CERTIFICATE OF SERVICE

I certify that on this 3rd day of May, 2021, a true and correct copy of the foregoing was served on all counsel of record via Notice of Electronic Filing by filing with the Court's CM/ECF system.

*/s/ Benjamin L. Hatch*
Robert W. McFarland (VSB No. 24021)
Benjamin L. Hatch (VSB No. 70116)
V. Kathleen Dougherty (VSB No. 77294)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia 23510-1655
Telephone: (757) 640-3716
Facsimile: (757) 640-3930
E-mail: rmcfarland@mcguirewoods.com
E-mail: bhatch@mcguirewoods.com
E-mail: vkdougherty@mcguirewoods.com

J. Brent Justus (VSB No. 45525)
Ashley P. Peterson (VSB No. 87904)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219-3916
Telephone: (804) 775-1000
Facsimile: (804) 698-2026
E-mail: bjustus@mcguirewoods.com
E-mail: apeterson@mcguirewoods.com
