# Exhibit 58

## <u>NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY</u>

Docket of Proceedings of Board of Director's
Meeting called to be held in Norfolk, Virginia

Wednesday, December 2, 2009
-------------------------------------------------

### <u>BOARD MEETING</u>

<u>ITEMS OF ACTION</u>:

1. Approval of minutes of the Board Meeting held on October 5, 2009 and the Board Meeting held on October 26, 2009. (Memorandum and Attachment)

2. Corporate performance projected for year 2009 plus proposed budget for 2010. (Memorandum and Report)

3. Management recommendations for tariff changes. (Memorandum and Attachment)

4. Proposed Capital Expenditure Plan for year 2010. (Memorandum)

5. Proposed salary / merit increase for non-agreement employees for year 2010. (Memorandum)

6. Annual Dividend.

<u>ITEMS OF INFORMATION</u>:

7. Litigation status and update. (Memorandum and Attachment)

8. Safety process update. (Memorandum)

9. Company performance goals for 2010. (Memorandum)

10. Update on Non-Agreement employee status / turnover. (Memorandum)

NPBL007205

<u>**ITEM 1 – ACTION**</u>

<u>**MEMORANDUM**</u>

It is recommended that minutes of the October 5, 2009 and October 26, 2009 Board meetings (attached) be approved as recorded.

NPBL007206

**ITEM 1 – ACTION**

## NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY

Crenshaw, Ware and Martin, PLC,
12th floor conference room 1200
Bank of America Center Norfolk, VA
23510

A special meeting of the Board of Directors was held October 5, 2009 at 10:00 a.m.

PRESENT: Mr. C. H. Allison
Mr. W. Clement
Mr. T. J. Drake
Mr. T. L. Ingram
Mr. M. D. Manion
Mr. D. H. Stinson, Chairman
Mrs. D. N. Coleman

Mr. J. L. Chapman, IV, representing the Company's General Counsel, Steven Armbrust, CSX counsel and Greg Summy, NS counsel, were also present.

There being a quorum, the Chairman called the meeting to order.

The minutes of the April 8, 2009 and September 4, 2009 meetings of the Board of Directors were, on motion duly made and seconded, approved.

Mr. Stinson called for a motion on the sale of the Pinner's Point property proposed at the September 4, 2009 Board of Directors meeting.  A motion was duly made and seconded to allow NPBL management to proceed with the sale. After discussion the motion was approved unanimously.

Mr. Stinson presented NPBL management's response to the Memorandum for Recordation presented by Tony L. Ingram and Bill C. Clement at the September 4, 2009 Board meeting, a copy of which is attached to these minutes as Appendix A.  Mr. Ingram stated that CSXT would respond to NPBL management prior to the next Board meeting.

In response to an inquiry Mr. Stinson gave a brief update on the progress of the NPBL Rate Committee.

Management was requested to schedule a special meeting of the Board of Directors as soon as possible.

There being no further business, the meeting was adjourned.

Donna N. Coleman
Corporate Secretary

NPBL007207

Norfolk and Portsmouth Belt Line Railroad Company

Management response to Memorandum for Recordation
presented by Tony L. Ingram and Bill C. Clement at
September 4,2009 Board Meeting

Tony L. Ingram and Bill C. Clement, directors of Norfolk and Portsmouth Belt Line Railroad
Company ("NPBL"), representing the interests of CSX Transportation, Inc. ("CSXT"), a
shareholder of NPBL, submitted a "Memorandum for Recordation in the Minutes of the Board
Meeting" ("CSXT Memorandum") at the meeting of directors of NPBL held on September 4,
2009;

The CSXT Memorandum made certain statements and posed several questions captioned as
"Issues for Consideration" and requested an answer to said questions for recording in the minutes
of the meeting of the directors;

The CSXT Memorandum was presented in executive session and no officers of NPBL were
present during said presentation;

The CSXT Memorandum appears in the opinion of NPBL management to be directed toward
those directors of NPBL appointed by Norfolk Southern Corporation ("NS"), as provided in the
March 1,1989 Supplemental Agreement between NS and CSXT, but nonetheless poses certain
questions regarding the conduct of the affairs of NPBL by management; and

NPBL management is of the opinion that the factual statements set forth in the CSXT
Memorandum regarding the conduct of the affairs of NPBL are incorrect and/or incomplete and
offers the following as the response of management.

## Response to: "Background"

Management denies that NS has run NPBL as its alter ego. Management has at all times sought to
conduct the affairs of NPBL in the best interests of NPBL. Simply because the conduct of the
affairs of NPBL might be perceived by either NS or CSXT to not be in their own best interests
does not mean that such conduct is not in the best interests of NPBL.

CSXT apparently perceives that it is entitled to special treatment from NPBL because it is a
shareholder of NPBL. Management does not conduct the affairs of NPBL to favor one carrier over
any other but strives at all times to operate within the parameters of the Agreement dated July
7,1897 between the carriers that formed NPBL (formerly The Southeastern and Atlantic Railroad
Company) for the interchange of their traffic.

## Response to: "Issues for Consideration"

All of the issues for consideration posed by the CSXT Memorandum are phrased in
inflammatory, accusatory and misleading rhetoric. Nonetheless, management offers its response
to each as follows:

NPBL007208

(1) The statement of this issue is based on an incorrect assumption that sale of two parcels of property by NPBL, both approved by the board of directors, will result in the loss of access to either PMT or NIT. Both sales will only be consummated upon the retention by NPBL of either fee simple ownership of the track or deeded easement of trackage rights with express approval by the Surface Transportation Board ("STB"). NPBL will still operate over said track and be entitled to earn switch revenues from such operations.

(2) It is unclear what is meant by "the objections of CSXT board members." The disposition of the property at Port Norfolk (referred to as Pinner's Point) was approved at a duly convened meeting of the directors of NPBL. The offer from the third party was made with the representation that "Rail traffic will present a major source of revenue and volume for the proposed distribution center which would be constructed by Ice Express on the site. Estimated rail boxcar traffic is 18,000 to 21,000m tons by the end of year once the facility is in operation sometime in 2009." (Copy attached.) Such rail traffic would have resulted in additional switch revenue to NPBL. Only one of four tracks would have been sold, permitting NPBL to continue to operate and serve its other customers, including CSXT, over the retained track. Contrary to the implication of the question, CSX Intermodal is not a customer of NPBL.

(3) The offer by CSX Real Property was approximately 20% lower than the offer from Ice Express and came with no representation that the sale would result in additional switch revenue to NPBL. The CSX Real Property offer proposed purchase of the track from the NPBL/CSX diamond at Pinner's Point, which would have eliminated any future payment to NPBL for trackage use by CSXT and virtually eliminated opportunities for NPBL to earn future switch revenue from CSXT for rail traffic carried by NPBL over the track. NPBL management sent correspondence to CSX Real Property advising that the offer was below appraised value on July 17,2009 (copy attached) to which no response has been received. NS played no role in the decision to notify CSX Real Property that the offer was below appraised value.

(4) The statement of this issue is based on an incorrect assumption that sale of the property at NIT (Sewells Point) by NPBL will result in the loss of access to NIT. The sale will only be consummated upon the retention by NPBL of deeded easement of trackage rights with express approval by the STB. NPBL will still operate over said track and be entitled to earn switch revenues from such operations. It is unclear what concern CSXT has regarding trackage rights with NS since NPBL is the carrier that owns said track. However, NBPL management is unaware of any intention of NS to terminate any existing trackage rights granted to NPBL. The sales price of $5,100,000 approved by the board of directors is commercially reasonable and the proposed sale will not result in NPBL being foreclosed from accessing NIT. All directors, including those appointed by CSXT and NS, voted unanimously in favor of the sale when presented to the board of directors. Otherwise, NS played no role in the transaction. The sale will protect NPBL's ability to carry traffic over said track by deeded easement of trackage rights with STB approval. It is unclear why CSXT considers any of this to be a "problem" of which VIT needs to be made aware. The property will be sold to the Virginia Port Authority, which owns VIT.

NPBL007209

(5) NPBL management denies that it has engaged in any unauthorized and unwarranted discussions with Perdue regarding CSXT's plans or that it was going to impose any increase in the charges NPBL would bill to Perdue. The only request known to NPBL management by Perdue was made to CSXT, NS and NPBL requesting that certain information be considered by NPBL's rate committee, which has membership from both CSXT and NS. (Copy attached). Whether there was any other communication by Perdue to CSXT or NS regarding freight rates is unknown to NPBL management, but is presumably a matter within the knowledge of the Class I carriers which serve Perdue. (Due to the large volume of Perdue traffic switched by NPBL, there is near daily dialogue and/or correspondence with Perdue on all manner of operational issues.) NPBL switch rates are approved by the board of directors and published by tariff to which Perdue (and any other customers of the Class I carriers) have access. NPBL management has made no assumptions regarding what switch rates may be approved by the board of directors in the future.


(6) NPBL management denies that it has engaged in any unauthorized and unwarranted discussions with any government agencies on any subject. While the statement of the issue does not identify who said what to whom, it appears that this issue is oriented toward discussions between NPBL and the Virginia Department of Rail and Public Transportation ("VDRPT") with respect to funding programs administered by VDRPT for rail preservation and enhancement. Most commonly, communications with VDRPT relate to anticipated future needs and grant applications to obtain funds under these programs. Such communications relate to the normal operation of NPBL and, to the extent that VDRPT indicates that program funds may or will become available requiring the submission of grant applications, then such information is presented to the board of directors to authorize the expenditure of NPBL funds to meet the matching grant requirements of the programs. As grant applications are ordinarily submitted in February of each year, the information is furnished to the directors in advance of the December meeting of the prior year to discuss and, if deemed appropriate, authorize the expenditure to obtain approval to request the matching funds.

(7) NPBL management has endeavored to provide complete and accurate information to all directors on a timely basis regarding matters requiring approval by the board. NPBL management has always acted under the assumption that all directors will have their votes counted and has actively sought to provide any further available information when requested by any director.

(8) NPBL management properly responded to "CSXT's Books and Records" request, which was dated July 23,2009, the same day as a letter from Mr. Ingram containing several inflammatory and accusatory criticisms of the conduct of management. It was believed that the best interests of NPBL would be served by holding a meeting of the directors, the call for which was initially issued for August 5,2009. Due to scheduling conflicts, the meeting was eventually held on September 4,2009. It was at that meeting that Mssrs. Ingram and Clement provided clarification and guidance with respect to information sought by them. It took nearly 40 hours of work by management to amass the more than

1200 pages of documents requested by CSXT, which were then sent to all directors on September 16,2009. Despite offering to provide any further information or answer questions regarding the information provided, no director has since requested any further information.

Response to: "Immediate Action Requested"

NPBL management does not believe that the company's general counsel, Crenshaw, Ware & Martin, P.L.C. ("Crenshaw firm"), has any conflict of interest that would disqualify the firm from representing the interests of NPBL. Management believes that the Crenshaw firm has diligently, effectively and efficiently represented NPBL in all matters to which it has devoted substantive attention on behalf of NPBL. Having discussed the contents of the CSXT Memorandum with the Crenshaw firm, management confirms that NS has never sought the Crenshaw firm's advice regarding conflicts of interest between NPBL, NS and any other entity regarding any of the issues raised in the CSXT Memorandum.

Response to: "Further Action Requested"

With the exception of action item (7), all of the actions requested in the CSXT Memorandum by CSXT can only be accomplished by a resolution of the directors of NPBL or action by NS. With respect to action item (7), management responds as follows:

> (7) The current storage agreement with Perdue, which has been in effect since January 1, 2007, has led to certain operating inefficiencies, including excessive operating costs, without adequately compensating NPBL. Perdue has been given timely notice that the agreement will be cancelled effective December 31,2009. While management remains open to the prospect of entering into a new storage agreement with Perdue, it must be on terms which are commercially reasonable to NPBL. Otherwise, storage and handling of Perdue's traffic by NPBL will be governed by the published tariff.

Finally, CSXT has requested that NPBL provide a detailed long range business plan and supporting information to allow the shareholders to evaluate NPBL's long term business and financial needs. Management provides to all directors a monthly report of operating performance and financial results, together with an annual report to shareholders. Because NPBL was created by its owners to provide an efficient means of interchanging their traffic and virtually all of NPBL's operating revenue is derived from such switch operations, the amount of traffic, and hence revenue generated, is almost entirely dependent upon the switch services provided to the owning carriers. Unless the owning carriers in the first instance provide to NPBL detailed long range projections of the nature and quantity of rail traffic they will interchange with NPBL, the ability of management to provide a detailed long range plan for NPBL will be a futile exercise. In addition, while the owning carriers have the staff resources to conduct such analysis, NPBL, with only five (5) non-agreement employees, does not have the resources to conduct any such analytical effort. Therefore, it would be necessary to engage outside consultants to perform the analysis and assist in developing a detailed long range business plan. The financial cost of such an engagement is unknown but management is prepared to carry out any directions provided to it by the directors on this subject.

**CONTINENTAL REALTY SERVICES**

361 Southport Circle, Suite 200
Virginia Beach, VA 23452

:  757.491.2460
.  757.217.4221

May 5, 2008

Ms. Donna Coleman
Norfolk Portsmouth Belt Line
1050 Virginia Avenue
Portsmouth, Virginia 23707

Re:  21.83 Acre Site @ 1040 Virginia Avenue, Portsmouth, Va.

Donna,

      Enclosed for review and action by your corporate authorities, please find a Letter of Intent for the Purchase of the Net Useable Acreage of the Belt Line Property in Portsmouth.

      I am submitting the enclosed on behalf of Ice Express whose intention in purchasing the property is to utilize the location as a distribution/transload warehouse facility primarily for the import/export cargo moving the Ports of Virginia.  As the prime 3PL provider of service for Eimskip, there are existing contracts in place for import and export ocean cargo worldwide.  Rail traffic will present a major source of revenue and volume for the proposed distribution center which would be constructed by Ice Express on the site.  Estimated rail boxcare traffice is 18,000 to 21,000 m tons by the end of year one once the facility is in operation sometime in 2009.

      I look forward to working with you to effect the enclosed Letter of Intent and then to proceeding to a formal purchase contract.

      Please let me know of any questions as we proceed.

      Thank you and regards,

      Sincerely,

      CONTINENTAL REALTY SERVICES, INC.

By:    Gregg Christoffersen, CCIM SIOR
        Principal Broker

Enclosure

Cc:   Bob Gustafson

 **NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY**
1050 Virginia Av.
P. O. Box 7547
Portsmouth, VA 23707
(757) 397-2056

**D.H. Stinson**
PRESIDENT AND GENERAL MANAGER

July 17, 2009

Mr. Richard M. Hood
Assistant Vice President
Business Unit Services
CSX Real Property
301 W. Bay Street Suite 800, S/C J-915
Jacksonville, Florida 32202

Re: Proposed Purchase of Norfolk and Portsmouth Belt Line Property

Dear Mr. Hood:

This is in response to your letter dated April 3, 2009 regarding the purchase offer of trackage owned by the NPBL known as the Port Norfolk Yard containing 23.55 acres , more or less. Management of the Belt Line had the appraisal of this property recently updated. After carefully reviewing the appraisal, it was determined that the offer received was below market value despite the current economic environment. In addition the terms listed in the offer would require further discussion.

Please feel free to contact me anytime regarding this matter.

Sincerely yours,

David H. Stinson

Page 1 of 1

## Coleman, Donna N.

| | |
|---|---|
| **From:** | Coleman, Donna N. |
| **Sent:** | Monday, July 27, 2009 2:23 PM |
| **To:** | Luebbers, Chris D.; McLemore, Liesl, J.; Cronk, Gregg H.; 'Bennett, Vance'; 'cary_helton@csx.com'; 'john_booth@csx.com' |
| **Cc:** | Nelson, Diane P.; Stinson, David; Coleman, Donna N. |
| **Subject:** | FW: Perdue Informational Brief |
| **Attachments:** | NPB Rate Committee Info0709.docx |

All,
NPBL and members of your individual marketing groups received the attached from Perdue with a request that it be presented to the Rate Committee. This can be discussed at our upcoming meeting Wednesday if so desired.
Thanks,
Donna

Donna Coleman
VP, Secretary & Comptroller
Norfolk & Portsmouth Belt Line Rail Road
757-393-2622

**From:** Clark, Sharon [mailto:Sharon.Clark@Perdue.com]
**Sent:** Thursday, July 23, 2009 4:48 PM
**To:** Stinson, David; Coleman, Donna N.; Kraemer, John; Simonic, Pat; tim_mcnulty@csx.com; Johnson, Bill
**Cc:** Willey, Dick; Cassidy, John
**Subject:** Perdue Informational Brief

Good afternoon

Please find attached an informational brief that could be shared at the upcoming NPB Rate Committee meeting regarding the value an ag import/export facility brings, Perdue Agribusiness' Chesapeake operation, and potential recommendations to the committee.

We would appreciate everyone's assistance to continue to competitively grow our business.

Please do not hesitate to call with any questions.

Regards,
Sharon

9/9/2009

NPBL 000058

NPBL007214

July 23, 2009

TO:        David Stinson, Donna Coleman – NPB
           John Kraemer, Pat Simonic-NS
           Tim McNulty, Bill Johnson-CSXT

FROM:      Sharon Clark-Perdue AgriBusiness

RE:        **Information for upcoming NPB Rate Committee meeting**

**Consider the value of an Agricultural Import/Export Facility on the East Coast:**
- Enables NS, CSXT and NPB to participate in the growing world markets for agricultural products
- Provides rail access to imported commodities when supply dislocations result in U.S. product shortfalls
- Enables exports of product from the Mid-Atlantic region, creating a demand 'hole' for Midwest rail to fill
- Gives Eastern railroads a competitive import/export option versus the Gulf or PNW
- Agricultural rail traffic helps support operational assets and fixed costs

**Perdue AgriBusiness's Chesapeake import/export facility has a history of growth and is well-positioned to compete and continue to grow:**
- Chesapeake is one of two soybean crush plants located on deepwater in the U.S.
- It has been the largest U.S. supplier of wheat to Egypt for the past two of three years and is the largest U.S. supplier of soybeans to Cuba
- In 2009-2010, it will ship as much as 120,000 tons of wheat to Brazil
- Our export volume has increased 324% from 411,000 tons in 2001 to 1,745,100 tons in 2008
- Our container stuffing program has sold over 9,500 TEUS (190,000 tons of product) since 2007
- Perdue has invested more than $30 million in Chesapeake infrastructure since our purchase in 2000 and is prepared to invest in enhancements for future growth.

**Perdue AgriBusiness Overview**
- Perdue AgriBusiness (PAB) is among the nation's largest grain companies operating grain storage in excess of 60 million bushels
- Each year, PAB handles more than 250 million bushels of corn, soybeans, wheat and barley.
- PAB works with over 300 independent trucking companies, operates a dedicated fleet of more than 1500 railcars and manages a fleet of 14 barges.

**Recommendations for mutual benefit and growth:**
- Amend the NPB by-laws and publish a mileage (zone) or commodity based tariff structure.
- Grant NPB management permission to negotiate special storage/switch agreements.
- Extend Perdue's current storage/switching contract for the period of time it takes to complete build out of a 35-car track on-site Perdue and ~15,000 tons ingredient space, provided Perdue provides material proof the projects are proceeding per plan.
- Publish a special tariff item for a competitive switch rate from a storage track to a industrial lead to include a single car and 50 car or more block rate (unit train)

**ITEM 1 – ACTION**

## NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY

Crenshaw, Ware and Martin, PLC,
12th floor conference room
1200 Bank of America Center
Norfolk, VA 23510

A special meeting of the Board of Directors was held October 26, 2009 at 2:00 p.m.

PRESENT:    Mr. C. H. Allison
               Mr. W. Clement (by conference call)
               Mr. T. J. Drake (by conference call)
               Mr. T. L. Ingram (by conference call)
               Mr. M. D. Manion
               Mr. D. H. Stinson, Chairman
               Mrs. D. N. Coleman

Also present were Mr. J. L. Chapman, IV, representing the Company's General Counsel, Steven Armbrust, CSX counsel (by conference call) and Greg Summy, NS counsel.

There being a quorum, the Chairman called the meeting to order.

The minutes of the October 5, 2009 meeting of the Board of Directors were presented. There was a request that the minutes be amended in regards to the Rate Committee discussion and re-presented to the Board.

Mr. Chapman advised the directors of the October 9, 2009 decision of the Federal Court in favor of the NPBL against the vessel Marlin for damage caused to the fender of the Main Line Bridge.

Mr. Stinson presented NPBL management's recommendations for tariff changes, and the additional recommendations of the NPBL Rate Committee members. During discussion of the recommendations, Mr. Ingram requested that the minutes state that he proposes that a third party be hired to analyze the NPBL financial information and formulate a tariff recommendation, the costs of which would be split by CSXT and Norfolk Southern. No motion was made or action taken on the request.

Following discussion of proposed tariff changes, Mr. Chapman advised the directors of the need to consider the requirements of the Stockholder's Agreement and the By Laws to the extent that either may bear upon any proposed change to the tariff.

There being no further business, the meeting was adjourned.

Donna N. Coleman
Corporate Secretary

**ITEM 2 – ACTION**

## MEMORANDUM

Attached are the 2009 Projected Revenues and Expenses, 2009 and 2010 Projected Cash Flows, and the 2010 Proposed Budget.

As indicated in the 2009 Projected Revenues / Expenses, revenue cars will be approximately 21,876 which is a 2.2% increase compared to 2008.  Net Revenues from Operations are projected to increase $391,000.  Operating Revenues are projected to decrease by 3.2% while Operating Expenses are projected to decrease by 5.3% when compared with 2008.

The increase in operating revenue is primarily related to an increase in grain of 17.3% or 2,160 revenue cars.  Other commodities are projected to decrease by 1690 revenue cars.

The decrease in operating expenses is primarily attributable to a $207,000 decrease in purchased services and rents, a $187,000 decrease in compensation and benefits and a $94,000 decrease in fuel.  Operating expenses for 2008 were reduced by the reversal of $350,000 of the personal injury accrual.

Other Income for 2008 included gain on sale of land for $2,109,050.  The gain on sales realized in 2009 is expected to be $71,768; a reduction of $2,037,282.  Other Income for 2009 includes $315,000 expected in settlement in the Mainline Bridge litigation.  Total Net Income is projected to decrease by approximately $908,000 or 46.5% over 2008.  Income taxes are expected to decrease by $918,000 or 90.5% over 2008.

The budget for 2010, based on information provided by our existing customers, assumes traffic volumes increase by 5,349 revenue cars from the 2009 projection.  This would be a return to the volumes experienced in 2006 and 2007.  Demurrage revenues are expected to increase 151% from 2009.  Expenses are projected to increase 12% from projected 2009 operating expenses, with the largest increases expected in compensation and benefits, and fuel.  Net Income is expected to decrease by $360,000.  The 2010 budget does not include any gain on sales of land and is calculated at the existing tariff.  Should recommended tariff changes be approved, switching revenues are projected to increase to $5,643,750.

Cash and cash equivalents are expected to decrease to approximately $842,000 in 2009 as a result of a large stockholder dividend declared in 2008 and paid in 2009, a decrease in revenues and a capital expenditure plan encompassing two years of VDRPT grants.  Cash and cash equivalents are expected to further decrease to $371,000 in 2010.  The Projected Operating Ratio for 2009 is 88.1% and for 2010 is 90.1%.  As of October 31, 2009 the company's Current Ratio was 100.9% and is projected to stay above 100% through year end.

NPBL007217

**Norfolk and Portsmouth Belt Line RR**
**2009 Projected Revenues/Expenses**
(in thousands of dollars)

| | 2009 Projected | 2008 Actual | Incr(Decr) $ | % |
|---|---|---|---|---|
| **Operating Revenues** | | | | |
| Switching | $4,351 | $4,363 | ($12) | (0.3%) |
| Demurrage | $318 | $459 | ($141) | (30.7%) |
| **Total Operating Revenues** | **$4,669** | **$4,822** | **($153)** | **(3.2%)** |
| | | | | |
| **Operating Expenses** | | | | |
| Compensation & Benefits | 1,977 | $2,164 | ($187) | (8.6%) |
| Purchased services and rents | 1,518 | $1,725 | ($207) | (12.0%) |
| Fuel | 132 | $226 | ($94) | (41.6%) |
| Depreciation | 157 | $150 | $7 | 4.7% |
| Material and other | 17 | $80 | ($63) | (78.8%) |
| **Total Operating Expenses** | **3,801** | **$4,345** | **($544)** | **(12.5%)** |
| | | | | |
| **Net Revenue (Loss) from Operations** | **$868** | **$477** | **$391** | **82.0%** |
| | | | | |
| **Other Income(Expense)** | | | | |
| Other Income | 275 | $2,492 | ($2,217) | (89.0%) |
| Interest Income (expense) | (1) | ($1) | $0 | 0.0% |
| **Total Other Income** | **274** | **$2,491** | **($2,217)** | **(89.0%)** |
| | | | | |
| **Net Income (Loss) Before Taxes** | **$1,142** | **$2,968** | **($1,826)** | **(61.5%)** |
| Provision for Income Taxes | $96 | $1,014 | ($918) | (90.5%) |
| **Net Income (Loss)** | **$1,046** | **$1,954** | **($908)** | **(46.5%)** |
| | | | | |
| **Projections Include:** | | | | |
| **Revenue Cars Handled** | | | | |
| Grain | 14,620 | 12,460 | 2,160 | 17.3% |
| Aggregate and Cement | 2,712 | 3,700 | (988) | (26.7%) |
| Terminal | 2,971 | 3,589 | (618) | (17.2%) |
| All Other | 1,573 | 1,657 | (84) | (5.1%) |
| **Total Revenue Cars** | **21,876** | **21,406** | **470** | **2.2%** |
| | | | | |
| **Revenue Cars per T&E Manhour** | **1.13** | **1.07** | | |
| | | | | |
| **Avg Staffing Levels** | | | | |
| Non-contract | 5 | 6 | (1) | (16.7%) |
| Scheduled:          T & E | 14 | 15 | (1) | (6.7%) |
|                            Non T & E | 9 | 9 | 0 | 0.0% |
| **Total Avg Staff** | **28** | **30** | **(2)** | **(6.7%)** |
| | | | | |
| **Cash Balance at end of Period** | **$842** | **$2,632** | **($1,927)** | **(73.2%)** |

### Norfolk and Portsmouth Belt Line RR
### Projected Cash Flows 2009
(in thousands of dollars)

|  | 1st Qtr Actual | 2nd Qtr Actual | 3rd Qtr Actual | 4th Qtr Projected |
|---|---|---|---|---|
| **Beginning Balance** | **2,632** | **682** | **421** | **363** |
| Add: | | | | |
| Net Income | 115 | 59 | 205 | 1,046 |
| Non-Cash Expenses | | | | |
| Depreciation | (94) | 38 | 173 | 42 |
| Deferred Taxes | 34 | 13 | 77 | 65 |
| Changes Current Assets/Liab | (85) | 54 | (331) | (454) |
| Property/Investing Transactions | 151 | (393) | (89) | (197) |
| Pension Plan Funded | (50) | (50) | (47) | (48) |
| Other Financing Activities | (5) | 18 | (46) | 28 |
| Dividend Paid | (2,016) | 0 | | (3) |
| **Ending Balance** | **682** | **421** | **363** | **842** |

### Budgeted Cash Flows 2010
(in thousands of dollars)

|  | 1st Qtr Projected | 2nd Qtr Projected | 3rd Qtr Projected | 4th Qtr Projected |
|---|---|---|---|---|
| **Beginning Balance** | **842** | **812** | **396** | **248** |
| Add: | | | | |
| Net Income | 120 | 34 | 50 | 170 |
| Non-Cash Expenses | | | | |
| Depreciation | 37 | 37 | 37 | 37 |
| Deferred Taxes | 12 | 2 | 16 | 20 |
| Changes Current Assets/Liab | (100) | (150) | (50) | (10) |
| Property/Investing Transactions | (50) | (290) | (155) | (45) |
| Pension Plan Funded | (47) | (47) | (44) | (44) |
| Other Financing Activities | (2) | (2) | (2) | (2) |
| Dividend Paid | | | | (3) |
| **Ending Balance** | **812** | **396** | **248** | **371** |

2010 cash flows do not reflect proceeds of land sales or recommended tariff changes
See Action Item 4 for Property / Investing Transactions

NPBL007219

Confidential

## NORFOLK AND PORTSMOUTH BELT LINE RAILROAD CO.

## STATEMENT OF INCOME

## 2010 BUDGET

| | | |
|---|---|---:|
| Railway operating revenues: | | |
| Switching revenues | $ | 4,168,966 |
| Demurrage revenues | | 800,000 |
| Total railway operating revenues | | 4,968,966 |
| | | |
| Railway operationg expenses: | | |
| Compensation and benefits | | 2,369,019 |
| Purchased services and rents | | 1,542,500 |
| Fuel | | 167,000 |
| Depreciation | | 175,000 |
| Material and other | | 356,550 |
| Total railway operating expenses | | 4,610,069 |
| | | |
| Income from railway operations | | 358,897 |
| | | |
| Other income (expense): | | |
| Other income net | | 240,000 |
| Interest expense on debt | | (175) |
| Total other income (expense) | | 239,825 |
| | | |
| Income before income taxes | | 598,722 |
| | | |
| Provision for income taxes: | | |
| Current inc taxes | | 175,000 |
| Deferred inc taxes | | 50,000 |
| Total income taxes | | 225,000 |
| | | |
| Net income (loss) | $ | 373,722 |

11/17/2009

<u>**ITEM 3 - ACTION**</u>

<u>**Tariff**</u>

Management recommends changes to NPBL tariffs as presented at the October 26, 2009 Board of Directors meeting.  A summary of changes to the switching tariff is attached along with the recommended tariff (8100-I).  No rate changes are proposed for the demurrage/storage tariff, however recommended wording changes are attached in the proposed tariff (6400-A).

NPBL007221

**ITEM 3 - ACTION**

**NORFOLK & PORTSMOUTH BELT LINE RAILROAD**
**1050 VIRGINIA AVENUE - P. O. BOX 7547**
**PORTSMOUTH, VIRGINIA 23707**

QUICK REFERENCE OF NPBL SWITCHING TARIFF 8100-I - EFFECTIVE JANUARY 1, 2010

| TYPE OF SERVICE | ITEM | TARIFF RATES | |
|---|---|---|---|
| **UNAUTHORIZED APPROPRIATION** | 105 | $430.00 | |
| | | | |
| **HOLD FOR DISPOSITION** | 110 | $52.00 | Cars order to HFD |
| SET BACK FROM HFD | 110 | $220.00 | Cars order back to plant or to carrier |
| | | | |
| **INTRA-TERMINAL** | 120 a | $331.00 | |
| ON LEASED STORAGE TRACKS | 120 b | $295.00 | |
| MULTIPLE CAR (15 OR MORE) | 120 c | $258.00 | |
| | | | |
| **LINE-HAUL** | 125 a | $210.00 | (was $243) |
| **LINE-HAUL - IMPORT/EXPORT *** | 125 b | $148.50 | * Total Switching Charge including switch rate and reclaim |
| | | | |
| **INTER-TERMINAL (CROSS TOWN)** | 130 | $262.00 | |
| MULTIPLE CAR (15 OR MORE) | 130 a | $205.00 | |
| | | | |
| **INTERMEDIATE  SWITCHING** | 135 | $155.00 | |
| | | | |
| **WEIGHING** | | | |
| ON OWN SCALES (intra-plant) | 140 a | $50.00 | in addition to regular switching charges |
| ON OTHER SCALES (intra-terminal) | 140 b | $100.00 | in addition to regular switching charges |
| | | | |
| **CARS RECEIVED IN ERROR** | 150 | $262.00 | |
| **LOCOMOTIVES, CRANES, ETC** | 155 | $264.00 | |
| **(ALL MOVES) + COST OF PILOT** | | | |
| | | | |
| **INTRA-PLANT** | 160 a | $133.00 | |
| CARRIER RAILS USED | 160 b | $223.00 | |
| | | | |
| **SPECIAL SERVICE (PER HOUR)** | 165 | $350.00 | in addition to regular switching charges |
| SPECIAL TRAIN (8 HOUR CREW) | 165 | $3,500.00 | in addition to regular switching charges |
| TURNING (WITHIN INDUSTRY) | 170 a | $133.00 | in addition to regular switching charges |
| (OUTSIDE INDUSTRY) | 170 b | $331.00 | in addition to regular switching charges |
| OTHER THAN ORDINARY EQUIPMENT | | $300.00 | in addition to regular switching charges |

| |
|---|
| Changed |
| Deleted |
| Added |

NPBL007222

NPB 8100-I
Cancels
NPB 8100-H

**NORFOLK AND PORTSMOUTH BELT LINE**

**RAILROAD COMPANY**

**TARIFF NPB 8100-I**

**CANCELS**

**TARIFF NPB 8100-H**

**SWITCHING CHARGES**
**ALSO**
**CHARGES FOR MOVEMENT INVOLVING**
**WEIGHING AND RE-WEIGHING LIGHT OR LOADED CARS**
**AND**
**CHARGES FOR SPECIAL SERVICE OF ENGINE AND TRAIN CREW**
**AT**
**CHESAPEAKE, NORFOLK AND PORTSMOUTH, VA**
**AND VICINITY**

ISSUED **November 30, 2009**                    EFFECTIVE **January 1, 2010**

ISSUED BY

NORFOLK & PORTSMOUTH BELT LINE RAILROAD COMPANY
P. O. Box 7547
1050 Virginia Avenue
Portsmouth, VA 23707

TARIFF NPB 8100-I

### RULES AND OTHER GOVERNING PROVISIONS
### GENERAL RULES AND REGULATIONS

RULE I -- Following is list of Railroads connecting with Norfolk and Portsmouth Belt Line Railroad Company:

CSX Transportation, Inc.
Norfolk Southern Railway Company
Bay Coast Railroad

RULE 2 -- Switching charges named herein will include the placement of an empty car to be loaded, and return of the same car loaded, or the placement of a loaded car and the return of the same car empty.

RULE 3 -- Except as otherwise provided in this Tariff, the rates per loaded car published in this Tariff will also apply on empty cars, new or old, moving on revenue billing.

RULE 4 -- Settlement for detoured trains will be made in accordance with rules of Detour Agreement adopted by the Association of American Railroads for Detouring Trains.

RULE 5 -- If an empty car is ordered for loading and if the service of switching or placing it has been performed and the car is not loaded for movement over this railroad, the switching charge for a loaded car as shown in Item 120, will be collected from the person, firm or corporation ordering such car. Not applicable in connection with empty cars refused or rejected by shipper account defective or unfit for loading.

RULE 6 -- Charges published herein apply to or from sidings and industries served directly by the rails of the Norfolk and Portsmouth Belt Line Railroad Company, also to or from sidings and industries reached by the Norfolk and Portsmouth Belt Line Railroad Company under operating agreements with other railroads.

RULE 7 -- DEMURRAGE RATES AND REGULATIONS -- All cars handled under this Tariff will be subject to the established car demurrage rules and charges as published in Tariff NPB 6004 Series or successive issues thereof. (See Exception).

EXCEPTION -- Where switching service is performed on traffic moving under line-haul rates which are subject to special detention charges and rules, such traffic, loaded in rail cars will be subject to the same detention charges and rules as applicable in connection with line-haul rates.

RULE 8 -- APPLICATION OF SHIPMENTS LOADED IN ARTICULATED CARS -- When shipments are loaded in so-called articulated cars (two or more car units permanently or temporarily joined together), the switching charges published in this Tariff will apply separately to each unit of the articulated equipment.

For explanation of reference marks, see concluding page of this Tariff.

NPBL007224

TARIFF NPB 8100-I

**RULES AND OTHER GOVERNING PROVISIONS**
**GENERAL RULES AND REGULATIONS**

**ITEM 10**                          **STATION LISTS AND CONDITIONS**

This tariff is governed by the Official List of Open and Prepay Stations, ICC OPSL 6000-Series to the extent shown below:

PREPAY REQUIREMENTS AND STATION CONDITIONS
(A) For additions and abandonments of stations, and except as otherwise shown herein, for prepay requirements, changes in names of stations, restrictions as to acceptance or delivery of freight and changes in station facilities. When a station is abandoned as of a date specified in the above named tariff, the rates from and to such station as published in this tariff are inapplicable on and after that date.

GEOGRAPHICAL LIST OF STATIONS
(B) For geographical list of stations referred to in this tariff by station numbers.

STATION NUMBERS:
(C) For the identification of stations when stations are shown or referred to by numbers in this tariff.

**ITEM 20**                **REFERENCE TO TARIFFS, ITEMS, NOTES, RULES, ETC.**

(A) Where reference is made in this tariff to tariffs, items, notes, rules, etc., such references are continuous and include supplements to and successive issues of such tariffs and reissues of such items, notes, rules, etc.

(B) Where reference is made in this tariff to another tariff by STB Number, such reference applies also to such tariff to the extent it may be applicable on intrastate traffic.

**ITEM 40**                          **CONSECUTIVE NUMBERS**

Where consecutive numbers are represented in this tariff by the first and last numbers connected by the word "to" or a hyphen they will be understood to include both of the numbers shown. If the first number only bears a reference mark, such reference mark also applies to the last number shown and to all numbers between the first and last numbers.

**ITEM 75**                          **METHOD OF CANCELLING ITEMS**

As this tariff is supplemented, numbered items with letter suffixes will be used in alphabetical sequence starting with A. Example: Item 445-A cancels Item 445, and Item 365-B cancels Item 365-A in a prior supplement, which in turn cancelled Item 365.

**ITEM 100**          **METHOD OF DENOTING REISSUED MATTER IN SUPPLEMENTS**

Matter brought forward without change from one supplement to another will be designated as "Reissued" by a reference mark in the form of a square enclosing a number (or letter, or number and letter) being that of the supplement in which the reissued matter first appeared in its currently effective form. To determine its original effective date, consult the supplement in which the reissued matter first became effective.

For explanation of reference marks, see concluding page of this Tariff.

TARIFF NPB 8100-I

**RULES AND OTHER GOVERNING PROVISIONS**
**GENERAL RULES AND REGULATIONS**

**ITEM 105**          **PENALTY CHARGE FOR UNAUTHORIZED APPROPRIATION OF**
                            **RAILROAD-OWNED CARS FOR NON-REVENUE MOVEMENTS**

When a railroad-owned car is appropriated for the non-revenue movement of freight without a specific prior authorization from NPB, a penalty charge of $430.00 per car per movement will be assessed against the party appropriating such car. Such charge will be in addition to all other charges applicable to such car (See Note 1).

The payment of demurrage, detention, car storage or switching charges does not permit the unauthorized use or additional loading of empty or loaded cars which have been placed by this railroad for loading or unloading (See Note 2).

NOTE 1. This penalty charge does not apply to intraplant movements by other than railroad-owned power which are necessary to facilitate the loading or unloading of railroad-owned cars in connection with immediately prior or subsequent revenue movements, either switching or line-haul.

NOTE 2. Unauthorized use of a railroad-owned car refers to the unauthorized movement of a car by other than railroad-owned power beyond the confines of the industry where car was originally placed by this railroad for loading or unloading.

**ITEM 110**     **CARS MOVED FROM LOADING TRACKS WITHOUT BILLING AND HELD**
                      **ON CARRIER'S HOLD TRACKS AWAITING BILLING INSTRUCTIONS**

Except as otherwise provided for in this Tariff, when on shipper's order, cars are moved by carrier from industry or team tracks without billing and held on carrier's tracks awaiting forwarding instructions as defined in Item 200, Part 10. Tariff NPB 6004-Series, a charge of $52.00 per car will be assessed against the party responsible for furnishing such forwarding directions and the cars will remain on continuous demurrage or detention (See Note) in the demurrage account of the party in whose name the car was ordered until such forwarding directions are received by carrier's agent.  (See  Exception).

On car or cars removed from industry or team tracks on shipper's order and held awaiting billing instructions on carrier tracks and such car or cars are ordered back to the original industry or team tracks, the hold for disposition charge of $52.00 per car will be assessed for switch movement to the hold point on NPBL and a switching charge of $220.00 per car will be assessed for movement from hold point on NPBL back to original industry or team tracks. Provided that in case move is inter-terminal, the applicable inter-terminal switching charge will apply in each direction in addition to the holding charge of $52.00. In all cases of hold for disposition, cars will remain on continuous demurrage.

EXCEPTION  -- The charge of $52.00 per car will not apply when carrier's agent receives forwarding directions by noon of the day following performance of the service excluding Saturdays, Sundays and Holidays as defined in Item 200, Part 11, Tariff NPB 6004-Series.

NOTE -- On cars under special detention rules and charges, the same detention rules and charges will be applied as govern in connection with the line-haul rates.

For explanation of reference marks, see concluding page of this Tariff.

TARIFF NPB 8100-1

**SWITCHING CHARGES OF THE**
**NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY**

---

**ITEM 120**                 **INTRA-TERMINAL SWITCHING**

CHARGE PER CAR

A.  Except as provided in Paragraph B, between industries, sidings or tracks
located on or served by Norfolk and Portsmouth Belt Line Railroad Company .................... (1) $331.00

B.  Cars switched between private sidings and leased storage tracks
served by Norfolk and Portsmouth Belt Line Railroad ........................................................ (1) $295.00

---

**ITEM 125**                 **LINE HAUL SWITCHING**

CHARGE PER CAR

Between industries or sidings located on or served by Norfolk and Portsmouth
Belt Line Railroad Company and interchange tracks with connecting lines on
Shipments originating at or destined to points located beyond yard or switching
Limits of connecting lines:

A.  Applicable on all commodities ................................................................................. (1) $210.00

---

**ITEM 130**                 **INTER-TERMINAL SWITCHING**

CHARGE PER

CAR

Between industries or sidings located on or served by Norfolk and Portsmouth
Belt Line Railroad Company and interchange tracks with connecting lines: ........................ $262.00

---

**ITEM 135**                 **INTERMEDIATE SWITCHING**

CHARGE PER CAR

Between interchange tracks with connecting lines:

(a) Applicable on all commodities .................................................................................... $155.00

---

For explanation of reference marks, see concluding page of this Tariff.

TARIFF NPB 8100-I

### SWITCHING CHARGES OF THE
### NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY

---

### SWITCHING CHARGES, ALSO
### CHARGES FOR WEIGHING AND RE-WEIGHING LIGHT AND LOADED CARS
### CHARGES FOR SPECIAL SERVICE OF ENGINE AND TRAIN CREW
### NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY

---

**ITEM 140**                    **MOVEMENT INVOLVING WEIGHING**
(See Note A below)

CHARGE PER CAR

(A) Weighing cars on private scales located at the industry:

When weighed before placement ...................................................................$50.00
When weighed after placement and ................................................................$50.00
For weighing outbound cars loaded or empty before removal from
track of industry ............................................................................................$50.00

(B) Weighing cars on other private scales (See Note B below):

For weighing inbound loaded cars, when so requested before
actual, or constructive placement, or loaded outbound cars
when so requested before removal from loaded track and  .........................$100.00
For weighing empty cars, when so requested before placing
on loading track or removal from unloading track .......................................$100.00

NOTE A -- Charges shown in this item are for handling of car incidental to weighing
and are in addition to switching charges herein for the required handling.
Norfolk and Portsmouth Belt Line Railroad Company does not own or operate track scales.

NOTE B -- Those desiring the weighing on private scales must make their
own arrangements with the owners of the scales for their use.

---

**ITEM 150**            **SWITCHING CHARGE ON CARS RECEIVED IN ERROR**
**OR NO FORWARDING DIRECTIONS**

CHARGE PER CAR

Cars received by Norfolk and Portsmouth Belt Line Railroad Company,
in error or without necessary forwarding directions, will be handled in
accordance with AAR Car Service Rule 7.

If cars are returned to the tendering carrier, forwarded to the
proper carrier, or require holding, Norfolk and Portsmouth Belt Line
Railroad Company may assess the tendering carrier .......................................$262.00

---

For explanation of reference marks, see concluding page of this Tariff

NPBL007228

TARIFF NPB 8100-I

**SWITCHING CHARGES OF THE
NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY**

**ITEM 155**   **LOCOMOTIVES, STEAM SHOVELS, BONDING CARS, DERRICKS
ON CRANES, DEAD ON OWN WHEELS
LOCOMOTIVES, ON OWN WHEELS, UNDER STEAM IN CHARGE
OF PILOT. (See Note)**

CHARGE PER CAR

(A).   When handled between interchange tracks with connecting lines ........................................$264.00

(B).   When handled between interchange tracks with connecting lines and
industries or sidings located on or served by Norfolk and Portsmouth
Belt Line Railroad Company............................................................................................$264.00

(C).   When handled between industries or sidings located on or served
by Norfolk and Portsmouth Belt Line Railroad Company  ............................................$264.00

NOTE -- Cost of Pilot when furnished by Norfolk and Portsmouth Belt Line Railroad
Company will be in addition to the switching charge.

**ITEM 160**   **INTRA-PLANT SWITCHING**

CHARGE PER CAR

(A).   Except as provided in Paragraph B, for switching car between
two points on same track or from one track to another track entirely
within the confines of the same (single) plant or industry  ...............................................(1) $133.00

(B).   For switching car between two points on same track or from one track to
another track entirely within the confines of the same (single) plant or industry
when use of carrier rails is involved  ................................................................................(1) $223.00

**ITEM 165**   **SPECIAL SWITCHING SERVICE/SPECIAL TRAIN SERVICE**

(A).   For special switching service of engine and train crew, on request of industry, when
regularly assigned on duty switch crew is requested(*See Notes* ..................................$350.00  (per hr)
*Note 1.* Special Switching service is defined as switching other than required by ordinary
operating convenience.
*Note 2.* Special switching service will be provided subject to the availability of engine
and crews and will be provided at the sole discretion of the NPBL.
*Note 3.* The charge for special service is per hour with a minimum of 2 hours and will be
in addition to published tariff charges for cars switched.

(B).   For Special Train Service of engine and train crew, outside regular assigned duty,
furnished an industry for its use. ......................................................................... $3,500.00
*Note 1.* Charge will apply for a minimum of 8 hours or fraction thereof.
*Note 2.* An additional charge of $440.00 per hour or fraction thereof will apply for assignment
of engine and crew beyond eight (8) hours, with a maximum of twelve (12) hours for
each assignment.
*Note 3.* Charge will be computed from the time the crew starts duty at its home terminal until
the crew ends duty at its home terminal.
*Note 4.* Special Train service will be provided subject to the availability of engine and crews and
will be provided at the sole discretion and option of the NPBL.
*Note 5.* This charge will be in addition to published tariff charges for cars switched.
For explanation of reference marks, see concluding page of this Tariff.

NPBL007229

TARIFF NPB 8100-I

## SWITCHING CHARGES OF THE
## NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY

**ITEM 170**        **SWITCHING - TURNING OF CARS TO PERMIT LOADING AT STOP-OFF**
**POINTS OR UNLOADING AT STOP-OFF POINTS OR DESTINATIONS:**

1.  In instances where it is desired that freight in carloads be placed on delivery tracks for loading at stop-off points or unloading at stop-off points or destinations from one particular side or end of car, cars must be properly placarded on both sides and notation made on bill of lading and waybill substantially as follows:

### NOTICE TO CARRIER

Deliver Car for loading or unloading from door or end specified by placard.

2.  On freight in carloads, not properly placarded on both sides of car to load or unload from one particular side or end of car, which shipper or consignee, after initial placement of car directs carrier to turn and return to the same track for loading or unloading from opposite side or end of car, the following shall apply:

### CHARGES (See Note 1)

(A)   If the car is turned at a "Y" or a turntable within the confines of an industry apply the intra-plant switching charge published in Item 160.

(B)   If the car is turned at a "Y" or a turntable within the same switching district, but outside the confines of the industry, apply intra-terminal switching charge published in Item 120.

NOTE I -- If Bill of Lading carries notation that car has been placarded, and placard has disappeared before placement, the charge named herein will not apply.

### EXPLANATION OF ABBREVIATIONS

| ABBREVIATION | EXPLANATION |
|---|---|
| STB -------------------- | Surface Transportation Board. |
| Noibn-------------------- | The abbreviation "noibn" means that the description of which it is a part applies on articles included in the same "noibn" description in Tariff ICC UFC 6000-Series. |
| OPSL-------------------- | Official List of Open and Prepay Stations. |
| RER -------------------- | Railway Equipment Register. |
| RPS -------------------- | Railroad Publication Service. |
| STCC -------------------- | Standard Transportation Commodity Code. |
| Viz -------------------- | Namely. |

### EXPLANATION OF REFERENCE MARKS

| REFERENCE MARKS | EXPLANATION |
|---|---|
| A. | Increase. |
| (1) | Where this reference mark is referred to, the rates or charges published for application on intra-plant, intra-terminal, or inter-terminal switching service apply only when loaded in or on ordinary equipment. Ordinary Equipment Means: |

    1.   Box cars not exceeding 52 feet in length, inside measurement, but not including box cars of any length which are cushioned underframe, insulated or equipped with any type of loading devices or XF cars. Flat cars not exceeding 54 feet in length and having marked capacity not greater than 180,000 pounds; but not including flat cars of any length equipped with racks, frames, bulkheads, tie down devices, hoods, or other appurtenances extending above the deck of the car, nor on special type flat cars with mechanical designations "FD", "FG", "FW", "FM" as listed under the heading of Heavy Capacity and Special Type Flat Cars in Tariff ICC RER 6410-Series.

(Continued on following page)      For explanation of reference marks, see concluding page of this Tariff.

**TARIFF NPB 8100-I**

## SWITCHING CHARGES OF THE
## NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY

(Concluded)

<u>EXPLANATION OF REFERENCE MARKS</u>

3. Gondola cars having marked capacity not greater than 190,000 pounds, but not including gondola cars of any length equipped with covers, hoods, containers or cradle floors. (See Exception 2).
4. Open top hopper cars not exceeding 60 feet in length, inside measurement and having marked capacity not exceeding 180,000 pounds.
5. Cars other than described as ordinary equipment in Paragraphs I to 4, owned or leased by shipper or consignee.

When shipments that are both loaded and unloaded within the same switching district are loaded in or on cars that are other than ordinary equipment, the charge to apply will be the charge published herein for application to shipments loaded in or on ordinary equipment as described in Paragraphs I to 5 above, plus $300.00 per car for use of other than ordinary equipment (See Exception 1). On joint line movements, the fore going charge will be assessed only once regardless of the number of carriers used and will be divided $150.00 per carrier when two carriers are involved, and $100.00, $100.00 and $100.00 per carrier when three carriers perform the switching service. (See Exceptions 2 and 3).

EXCEPTION I -- These provisions will not apply on shipments of Coal, Coke (the direct product of Coal), or Iron-Ore.

EXCEPTION 2 -- These provisions will not apply on shipments of ferrous scrap when in gondola cars having a marked capacity greater than 190,000 pounds when such cars are furnished at carrier's convenience in lieu of ordinary gondola cars ordered by shipper provided that the following certification is made on the shipping document by shipper:
A. Ordinary gondola cars of 190,000 pounds capacity or less ordered by shipper and car over 190,000 pounds capacity furnished by carrier.
B. Shipment could have been loaded in size of car ordered.

EXCEPTION 3 -- These provisions will not apply on shipments of grain, soybeans, soybean meal, cement fertilizer or fertilizer material in covered hopper cars.

-THE END-

<u>**ITEM 3 - ACTION**</u>

NPB 6004-A
Cancels
NPB 6004

## <u>NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY</u>

### <u>TARIFF NPB 6004-A</u>

CANCELS

**TARIFF NPB 6004**

DEMURRAGE RULES AND CHARGES

———————————————

STORAGE RULES AND CHARGES

Applying at all NPB points in the South Hampton Roads Area

ISSUED November 30, 2009                    EFFECTIVE January 1, 2010

Issued By
NORFOLK  AND PORTSMOUTH BELT LINE RAILROAD COMPANY
1050 Virginia Avenue
P. O. Box 7547
Portsmouth, VA 23707

NPBL007232

ITEM 2 TABLE OF CONTENTS

| SUBJECT | ITEM |
|---|---|
| ALLOWANCES FOR RELIEF | 400 |
| CARS HELD FOR LOADING | 600 |
| CARS HELD FOR OTHER THAN LOADING AND UNLOADING | 800 |
| CARS HELD FOR UNLOADING | 700 |
| DEMURRAGE CALCULATION | 900 |
| DEMURRAGE PLAN | 850 |
| DEMURRAGE RULES AND CHARGES | 500 - 900 |
| GENERAL APPLICATION – DEMURRAGE | 500 |
| GENERAL TARIFF RULES | 5 - 450 |
| GLOSSARY OF TERMS | 200 |
| HAZARDOUS MATERIAL | 1000 |
| SECTION 1 DEMURRAGE RULES | 500 - 900 |
| SECTION 2 STORAGE, HAZARDOUS COMMODITIES | 1000 |
| SECTION 3 STORAGE RULES AND CHARGES | 1050 - 1450 |

**ITEM 5 - APPLICATION OF REFERENCE PUBLICATIONS**

The following publications contain rules, regulations, charges and allowances specifically referred to herein or may apply directly or indirectly along with the terms of demurrage, storage etc that is covered in this publication.

AAR 2 - Hazardous Materials Shipping Descriptions (49-series STCC numbers)
BOE 6000 Bureau of Explosives Rules
RER 6411 Official Railway Equipment Register
RPS 6740 Heavy Duty Flat Car Charges
OPSL 6000 Open and Prepay Station List
STCC 6001 Standard Transportation Commodity Code
UFC 6000 Uniform Freight Committee

**ITEM 20 - REFERENCE TO TARIFFS, ITEMS, NOTES, RULES, ETC.**

Where reference is made in this tariff to tariffs, items, notes, rules, etc. such references are continuous and include supplements to and successive issues of such tariffs and reissues of such items, notes, rules, etc.

**ITEM 40 - CONSECUTIVE NUMBER**

Where consecutive numbers are represented in this tariff by the first and last numbers connected by the word "to" or a hyphen they will be understood to include both of the numbers shown. If the first number only bears a reference mark such reference mark also applies to the last number shown and to all numbers between the first and last numbers.

**ITEM 75 - METHOD OF CANCELLING ITEMS**

As this tariff is supplemented, numbered items with letter suffixes will be used in alphabetical sequence starting with A. Example: Item 445-A cancels Item 445, and Item 365-B cancels Item 365-A in a prior supplement, which in turn cancelled Item 365.

**ITEM 100 - METHOD OF DENOTING REISSUED MATTER IN SUPPLEMENTS**

Matter brought forward without change from one supplement to another will be designated as "Reissued" by a reference mark in the form of a square enclosing a number (or letter, or number and letter) being that of the supplement in which the reissued matter first appeared in its currently effective form. To determine its original effective date, consult the supplement in which the reissued matter first became effective

**ITEM 200 - GLOSSARY OF TERMS**
FOR THE PURPOSE OF APPLYING PROVISIONS IN THIS PUBLICATION IN THE FOLLOWING ARE DEFINED AND SHALL GOVERN:

1. **Actual Placement: -** When a car is placed in an accessible position for loading or unloading or at a point designated by consignor or consignee.
2. **Allowance Days: -** Are days in addition to credits earned for which charges will not be assessed. Car Days are reduced by the number of allowance days.
3. **Car Days: -** A twenty four (24) hour period or fraction thereof commencing 0001 hours (Local time) after actual or constructive placement until the car is released and available to NPB.
4. **Closed Gate: -** When a car cannot be placed on consignee's siding at time of arrival due to siding having a locked gate-, door and/or standing instructions not to place any cars unless the consignee first contacts NPB for placement instructions.

NPBL007233

All cars are constructively placed at time of arrival.

5. **NPB Track:** - All tracks which NPB provides for its own uses and purposes and other tracks located inside of its right-of-way or yards and terminals.
6. **Consignee:** - The party to whom a shipment is consigned or the party entitled to receive the shipment.
7. **Consignor:** - The party in whose name cars are ordered.
8. **Constructive Placement:** - When a car cannot be actually placed because of any condition attributable to the consignor or consignee, such car will be held at an available hold point and notice will be given the consignor or consignee that the car is held awaiting instructions. Car Days will begin if instructions to NPB are not received before 0001 hours (See Car Days), of day following notification.
9. **Credit Day:** - Non-chargeable day. Credits can only be earned on those cars released from demurrage.
10. **Electronic Means:** - Any approved electronic device (i.e. approved computer application, e-mail, telephone, facsimile) used to communicate to CYO the disposition of a car.
11. **Forwarding Instructions:** - A bill of lading or other suitable order given to NPB, containing all of the necessary information to transport the shipment.
12. **Holidays:** - The following days will be considered NPB Holidays: New Year's Day, Labor Day, President's Day, Thanksgiving Day, Memorial Day, Christmas Day, Independence Day
13. **Loading:** -The complete or partial loading of a car in conformity with NPB loading and clearance rules, and the furnishing of forwarding instructions.
14. **Open Gate:** - When a consignee does not place any restrictions (physical or otherwise) on NPB to place cars on their siding upon arrival.
15. **Private Car:** - A car bearing other than railroad reporting marks and which is not a railroad controlled car.
16. **Private Track:** - Trackage assigned for individual use including privately owned or leased tracks.
17. **Public Delivery Track:** - Any accessible track open to the general public for loading or unloading.
18. **Railroad-Controlled Cars:** - A car provided to NPB directly, by car companies or others, for indiscriminate use by NPB in servicing any of its customers.
19. **Reload:** - When the same car is completely unloaded and then loaded. Reloading will be expressed (with cars unloading demurrage) from date of tender to date forwarding instructions are received.
20. **Stopped in Transit:** - When cars are held enroute because of any condition attributable to the consignor or consignee, or owner.
21. **Tender:** - When NPB gives notification that a car is available for unloading or loading by either actual or constructive placement to consignor or consignee.
22. **Unloading:** - The complete unloading of a car and notice from the consignee that the car is empty and available to NPB.
23. **Assignee:** - A shipper who has requested and has been assigned cars to a specific pool of cars for their uses.
24. **Assignee car:** - A car of any ownership specifically requested and assigned to a shipper-From a pool of assignment service cars.
25. **Free Day:** - A non-chargeable storage day.
26. **Storage Day:** - A 24 hour period, or part thereof.
27. **Time:** - Local time is applicable. Time is expressed on the basis of the 24-hour clock.  (EXAMPLE: 12:01 AM is expressed as 0001 hours.)

**ITEM 300 - NOTIFICATION REQUIREMENTS**

1. The following notifications (including by electronic means) will be furnished as indicated:
**Cars for Private Tracks**
(a.) Notification of constructive placement on all cars held on NPB tracks due to any condition attributable to consignee or consignor.
(b.) Delivery of car upon consignee tracks will constitute notification.
(c.) Delivery upon industrial interchange tracks of consignee or party entitled to receive same, will constitute notification.

**Cars for Public Delivery Tracks**
Notice of arrival will be given to party entitled to receive notification when car is actually placed.

**Cars Stopped In Transit**
Notice shall be sent or given to the consignee, consignor or owner ordering the car stopped upon arrival of car at the point of stoppage.

**Refused Carload Freight**
When advised of refusal of car at destination, notice will be sent or given to consignor or owner

2. Notification information provided:
(a.) Car Initial and Number
(b.) If contents transferred enroute. NPB will furnish car initial and number of the original car.

3. Methods and procedures for notification:
(a) Notification may be sent or given:
(1) In writing by U.S. mail. When claim is made that notice was mailed at a later date or delayed through postal service, the date of mailing shall be determined by the postmark, if no postmark or no date appear, the records of NPB shall govern.
(2) By personal telephone communication or electronic means. When consignor or consignee utilizes an electronic or mechanical device (either in written, oral or keyed data form) notification left on such device will be considered as having been given to consignor or consignee, as of the date and time transmitted.
(b) Notice of arrival shall be sent or given: - Upon arrival of cars at destination (notification is given 7 days a week) for all cars held under order notify or other provisions which require surrender of bill of lading or payment of lawful charges.

**ITEM 350 NOTIFICATION TO NPB:**
A. When NPB personnel are not on duty to receive forwarding instructions, empty release information other or other disposition, consignor/consignee will have until *0001* hours (See Car Days, item 200) of the next day personnel are on duty to furnish such instructions, and they will be considered as having been furnished at the date and time the instructions could have been furnished.
B. When electronic or mechanical devices are used to furnish notification to NPB, the recorded date and time that instructions are received by NPB designated point of contact will govern.

**ITEM 400 - ALLOWANCES PERMISSIBLE FOR RELIEF OF DEMURRAGE CHARGES:**
In order to be allowed relief as indicated, a claim must be presented to NPB, in writing, by the last day of the calendar month following the month in which the bill was issued, stating fully the conditions for which relief is claimed.

**1. Railroad Error: -** If, through railroad error, demurrage charges are assessed demurrage will be adjusted to the amount that would have accrued but for such error. (Run around and bunching of cars will not be considered as a railroad error.)
**2. Weather Interference: -** When because of earthquakes, tornadoes, hurricanes, floods or heavy snow, the operations of the consignor or consignee are disrupted, the demurrage directly chargeable thereto will be eliminated, provided the disruption exceeds two (2) days in duration.
**3. Strike Interference: -** When it is impossible to load or unload or receive cars from or make cars available to NPB because of strike interference at the point where the loading or unloading is to be accomplished, demurrage days will be charged for at the rate of $30.00 per day during the period of strike interference, provided:
(a) The disruption exceeds five (5) days in duration during one calendar month.
(b) The provisions of this item will not apply to: - (1) Cars for unloading when waybills are dated four (4) days after the beginning of strike interference. (2) Cars for loading when ordered after the beginning and prior to the ending of strike interference.
**4. Switching Delays:**
(a) This allowance will be calculated and deducted from car days for car ordered and all others held under constructive placement when all cars on the patron's siding are empty and available at the time a switch is missed or should have been made. If all cars on the patron's siding are not empty at the time of alleged switching failure, allowance will be for the car so ordered and not placed.
(b) When a car is ordered for placement or delivery and this is not accomplished because non-service, allowance will be given for delay in placement. This allowance will apply to the car ordered placed, when held under constructive placement on NPB tracks.
(c) The allowance day(s) will be deducted from the Car Days for all day(s) after which the placement order was given to, but not including, the day on which the car is actually placed.
(d) For example, if a car is ordered placed on day 3 of the month, but not actually placed until day 5 of the month, day 4 of the month will be an allowance day and not a chargeable demurrage day for that car and all cars held under constructive placement on NPB tracks during that time.

**ITEM 450 -** CARS AWAITING CUSTOMS INSTRUCTIONS PAYMENT OF DUTIES:

Cars delayed on carriers' tracks longer than forty-eight (48) hours, awaiting completion of customs documentation or payment of duties, will begin to accrue normal demurrage charges.

**Item 500 - CARS SUBJECT TO DEMURRAGE**

**GENERAL APPLICATION**

(A) Applicable at all points on NPB.

(B) The disposition of a car at its point of detention determines the purpose for which the car is held and the rules applicable thereto.

(C) All railroad controlled cars held for or by consignors or consignees for any purpose are subject to demurrage rules and charges in this section, except as follows:
(1) Cars moving under freight rates requiring application of special demurrage rules - When authorized in contracts or other agreements.
(2) Private cars are not subject to demurrage rules.
(3) Cars containing freight refused or unclaimed to be sold by NPB for the time held beyond legal requirements.
(4) Cars assigned to shippers returned to points of assignment under load when material is authorized to be returned without freight charges under provisions of freight publication.
(5) Cars assigned to shippers returned empty to point of assignment while subject to storage rules.
(6) Empty railroad equipment moving on own wheels under transportation charges as freight.
(7) Cars of railroad ownership, leased for storage of commodities, while held on lessee's tracks.
(8) Empty cars placed and not used for loading subject to switching charges, unless rejected and found as unsuitable for loading

**ITEM 600 - RULE GOVERNING CARS HELD FOR LOADING:**

**Loading: -** is the complete or partial loading of a car in conformity with NPB loading and clearance rules, including the furnishing of forwarding instructions.

**Tender: -** The notification, actual or constructive placement of an empty car placed on orders of the consignor.

**Release:**
(a) On date forwarding instructions are received; when received by U.S. mail, such instructions will be considered received after 0001 hours (See Car Days, Item 200) on date received.

(b) On empty cars placed on interchange tracks of consignor performing his own switching, time will also continue until cars are returned to an interchange track.
(c) On cars found to be overloaded or improperly loaded while at origin will not be considered released until the load has been adjusted.

**Computation:**
(a) Car Days will be computed from the first 0001 hours (See Car Days, Item 200) after tender (i) until released with forwarding instructions for Railroad Controlled Cars, or (ii) until placement is made for Private Cars.  In the case of Private Cars, the separate calculation for originating storage charge will be computed from the time that the loaded car is pulled and held on railroad controlled tracks by NPB without forwarding instructions to time of receipt of required forwarding instructions.
(b) On cars placed prior to date for which ordered, Car Days will be computed from the first 0001 hours (See Car Days, item 200) after ordered until release.
(c) On empty cars placed, without being ordered, will be considered as having been ordered and actually placed on that day.

**Credits**:
    (a)   Three (3) credits will be earned for each Railroad Controlled car released on which disposition is given.
    (b)   Two (2) credits will be earned for each private car under constructive placement.
    (c)   Zero (0) credits will be earned for each private car pulled for which forwarding instructions have not been received.
    (d)   Zero (0) credits will be earned when an empty private car is actually placed in lieu of being constructively placed.

Calculation:  See Demurrage/Storage Calculation Item 950

---

**ITEM 700 - RULES GOVERNING CARS HELD FOR UNLOADING:**

Unloading is the complete unloading of a car and advice from consignee to NPB that the car is empty and available or a car has been reloaded and forwarding instructions are received.

**Tender: -** The notification, actual or constructive placement of each loaded car.

**Release:**
(a) Date and time that NPB receives advice that the car is empty.
(b) Cars placed on interchange tracks of a consignee doing its own switching, must also be returned to the interchange track for release.
(c) When cars are unloaded by NPB, those cars will be released at the time the request to unload is received by NPB from the consignee.
(d) When the same car is unloaded and reloaded, when forwarding instructions are received.

**Computation:** Car Days will be computed from the first 0001 hours (See Car Days, Item 200) after tender until release.

**Credits:**
    (a)   Three (3) credits will be earned for each Railroad Controlled car released on which disposition is given.
    (b)   Two (2) credits will be earned for each private car under constructive placement.
    (a)   One (1) additional credit will be provided when the same car is reloaded.

---

**ITEM 800 - RULE GOVERNING CARS HELD FOR PURPOSES OTHER THAN LOADING OR UNLOADING**

Applicable to Cars Held:
(a) On orders of the consignee.
(b) While awaiting proper disposition from the consignee.
(c) As a result of conditions attributable to the consignee.

**Disposition:** That information, which allows NPB to either tender or release the car from the consignee's account.

**Tender:** The notification, actual or constructive placement of a loaded car.

**Release:** Date and time that NPB receives advice that the car is reloaded and on which disposition is given on cars.

Computation: Car Days will be computed from the first 0001 hours (See Car Days, Item 200).
(a) After tender until release, on cars: (1) Partially unloaded. (2) Reconsigned. (3) Stopped in transit.
(b) After tender until date of refusal on refused loaded cars (consignee).

**Credits:** No credit days will be earned for a car that is released.

---

**ITEM 900 – DEMURRAGE/STORAGE PLAN**

1. Billing will be tendered on a monthly basis for all cars released during a calendar month.
2. Customers having facilities at separate stations cannot be combined.
3. Credit days and car day charges for cars held for unloading or other purposes will be kept separately from cars held for loading.
4. Credit days earned in one calendar month cannot be carried over to another month.
5. Unless otherwise advised, in writing, demurrage charges will be assessed against the consignor at origin or consignee at destination who will be responsible for payment.

6. Customer having two or more facilities at the same station with NPB may combine the accounts into one if requested in writing.
7. All days count including Saturday and Sundays. Seven (7) holidays will not be subject to demurrage (See Holidays, Item 200).

---

**ITEM 950 – DEMURRAGE/STORAGE CALCULATION:**

A. 1. Total car days for all Railroad-Controlled cars will be added. (Car/days are net of holidays (See Holidays, Item 200) and non-service allowance days).
   2. Total credits for all Railroad-Controlled cars will be added.
   3. If total credits equal or exceed total net car days, demurrage charges will not be assessed.
   4. If total net car days exceed the total credits, calculation of charges will be made as follows:
     (a) Subtract total credit days from total car days to determine chargeable days.
     (b) The number of chargeable days will be assessed $60.00 per day.

B. 1. Total car days for all private cars will be added. (Car/days are net of holidays (See Holidays, Item 200) and non-service allowance days).
   2. Total credits for all private cars will be added.
   3. If total credits equal or exceed total net car days, storage charges will not be assessed.
   4. If total net car days exceed the total credits, calculation of charges will be made as follows:
     (a) Subtract total credit days from total car days to determine chargeable days.
     (b) The number of chargeable days will be assessed $20.00 per day.

---

**ITEM 1000 - STORAGE OF EXPLOSIVES, HAZARDOUS MATERIALS, SUBSTANCES OR WASTES (SUBJECT TO PUBLICATION BOE 6000 - hazardous materials regulations of the department of transportation)**

**Application:** This item applies to cars held on NPB tracks (excluding leased tracks) containing:
(a) Class A, B or C Explosives, named in Part 172 Commodity List, Publication BOE 6000.
(b) Hazardous materials, substances, or wastes requiring the use of 4-digit identification number on shipping document, placards or panels, as named in Part 11 Section 172.101, Publication BOE 6000.

Demurrage charges for railroad-controlled cars will be in addition to charges provided in this item and Storage Charges on private cars will be in addition to this item.

**Storage Days will Commence**: After the date of constructive placement and on each car, two free days are given to the Consignee. Storage days commence from the third day 0001 hours (See Time, Item 200) and continue until the car is ordered placed on private tracks or released.

**Storage Plan:**
1. Total car days for all hazardous material cars will be added. (Car/days are net of holidays (See Holidays, Item 200) and non-service allowance days).
2. Total credits for all hazardous material cars will be calculated as private cars (Item 700) and added.
3. If total credits equal or exceed total net car days, demurrage charges will not be assessed.
4. If total net car days exceed the total credits, calculation of charges will be made as follows:
     (a) Subtract total credit days from total car days to determine chargeable days.
     (b) The number of chargeable days will be assessed $50.00 per day.

NPBL007237

<u>ITEM 4 - ACTION</u>

<u>MEMORANDUM</u>

Year 2010 Capital Budget focuses on upgrading the East Fender System for our Mainline Bridge over the Elizabeth River and rehabilitating Bridge #1 located on the Southern Branch. The FY10 plan continues – all of which will be funded in part by Virginia Department of Rail and Public Transportation grants.

Management recommends approval.

### *PROPOSED 2010 CAPITAL EXPENDITURE PROGRAM*

| ITEM NO. | | TOTAL COST | VDRPT GRANT | NPBL NET COST |
|---|---|---|---|---|
| 1. | Industrial Turnout | $ 30,000 | | $ 30,000 |
| 2. | Annual NPBL Track Maintenance Program | $200,000 | | $200,000 |
| 3. | Rehabilitate the East Fender System on MLB | $650,000 | $455,000 | $195,000 |
| 4. | Rehabilitate Bridge No.1 on Sou. Branch | $200,000 | $140,000 | $ 60,000 |
| 5. | Miscellaneous Discretionary Items | $ 25,000 | | $ 25,000 |
| 6. | Replace Company Vehicle | $ 30,000 | | $ 30,000 |
| | **FY10   TOTAL:** | $1,135,000 | $595,000 | $540,000 |

**ITEM 4 - ACTION**

**APPROVED 2009 CAPITAL EXPENDITURE PROGRAM**

| ITEM NO. | | BOARD APPROVED | ACTUAL COST | VDRPT GRANT | NPBL NET COST |
|------|---|---|---|---|---|
| 1. | Portsmouth Blvd Crossing | $139,895 | $176,869 | $159,182 | $ 17,687 |
| 2. | Deep Creek Blvd Crossing | $109,981 | $123,810 | $111,429 | $ 12,381 |
| 3. | Berkley Track Maintenance (VDRPT 2009 grant) | $590,000 | $516,733 | $361,713 | $155,020 |
| 4. | Berkley Track Maintenance (VDRPT 2008 grant) | $350,000 | $265,418 | $185,792 | $ 79,626 |
| 5. | Annual Track Maint Program | $175,000 | $160,474 | $0 | $160,474 as of 10/31 |
| 6. | Liberty & Freeman Ave Xings* | $546,000 | $546,000 | $546,000 | $0 |
| 7. | Berkley Yard & MLB Maint* (VDRPT 2010 grant) | $844,846 | $844,846 | $591,392 | $253,454 |
| 8. | Voice Recorder System (misc. discretionary item) | $ 25,000 | $ 18,954 | $0 | $ 18,954 |
| | | $2,780,722 | $2,653,104 | $1,955,508 | $697,596 |

\* items to be carried over to 2010

<u>**ITEM 5 – ACTION**</u>

<u>**MEMORANDUM**</u>

The employees of the Belt Line have worked with **Zero** FRA reportable injuries through October 31, 2009. This is a major accomplishment and makes 1,247 consecutive days without a reportable injury. The company continues to fight frivolous litigation against the Belt Line and was given a favorable judgment for the company on an appeal to the Virginia Supreme Court.

**The following is a list of major accomplishments through October 31, 2009:**

1.)    Zero FRA reportable injuries.

2.)    8% decrease in total derailments (13 in 2008 vs. 12 in 2009).

3.)    Completed two VRDPT grant projects (FY08 / FY09) safely and under budget.

4.)    Ratio of revenue cars per man-hour efficiency maintained greater than 1.0 to 1.08.

5.)    Received approval grant from VRDPT for our FY10 project work for $844,845.

6.)    Projected 15.9% increase in income from operations

7.)    Added three new customers:  TransMontaigne Dry Bulk, American Protein, and Reed Minerals

Salary recommendations for Job Performance in calendar year 2009 are provided in the table on the following page.  Employee annual performance evaluations will be distributed for your review.

**ITEM 5 – ACTION**

| Position | Salary Range | | Proposed Increase | | |
| --- | --- | --- | --- | --- | --- |
| | Low Range | High Range | Current Salary | % of New Increase | New Salary |
| Vice-President Comptroller & Corporate Secretary | $68,200 | $95,000 | $86,250 | 4% | $89,700 |
| Terminal Superintendent | $68,200 | $95,000 | $85,250 | deferred | $85,250 |
| Treasurer | $45,000 | $81,000 | $71,700 | 3% | $73,850 |
| Trainmaster (vacant) | $45,000 | $78,000 | | | |
| Administrative Assistant | $30,000 | $50,000 | $40,000 | 3% | $41,200 |
| Totals | | | $283,200 | 2.4% | $290,000 |

Total cost of this 2010 annual compensation package to the company would be $6,800 in salary increases, representing a $2.4% merit increase. The one-time job performance bonus recommendations will be presented at the Annual Board / Stockholders meeting held in April 2010.

The President & General Manager's salary is $87,000.

NPBL007241

**ITEM 6 – ACTION**

**MEMORANDUM**

Management recommends a Stockholder dividend of 6% payable as of December 22, 2009 to stockholders of record as of December 15, 2009, in accordance with the stockholder agreement.

NPBL007242

**ITEM 7 – INFORMATION**

**MEMORANDUM**

Report by General Counsel James L. Chapman, IV.

Re:     Litigation Status

As of this date, there are two unscheduled lawsuits and one attorney's lien that may be scheduled for litigation in 2010.

An appeal was heard on the John Wilson FELA case earlier this year. The verdict on this case was for the plaintiff for $330,000. The Virginia Supreme Court reversed the decision and sent the case back to trial in Circuit Court that is scheduled for April 12, 2010 in Portsmouth.

The NPBL has filed for an injunction against an adjacent landowner to protect our property rights in Chesapeake, Va.

**Zero** reportable injures have been recorded through October 2009.

The company believes that its current reserves are sufficient to provide for settlement with the above cases. The Company's personal injury reserve at this time is $408,255 with no accrual.

**ITEM 8 – INFORMATION**

## MEMORANDUM

## SAFETY PROCESS UPDATE

The Company has not had an FRA reportable injury as of October 31, 2009.  The Company has gone 1247 days without a reportable injury. So far this year, there have been three non-reportable injuries reported.

The Company has reported two rule violation derailments and one FRA reportable derailment so far in 2009.

The Carrier injury rate based on 132,214 man-hours now stands at 0.00 / 200,000 man-hours for years 2007, 2008 and thru October 2009.

| AS OF 10/31/2009 | DAYS SINCE LAST INJURY | INJURIES THIS YEAR | LAST INJURY OCCURED |
|---|---|---|---|
| M. W. & S. | 3,566 | 0 | 1/26/2000 |
| Clerks | 7,792 | 0 | 7/1/1988 |
| Train Service | 1,247 | 0 | 6/2/2006 |
| Engine Service | 2,607 | 0 | 9/11/2002 |

<u>**ITEM 9 – INFORMATION**</u>

<u>**MEMORANDUM**</u>

Listed below are the 2010 company performance goals.

1. Zero FRA reportable injuries

2. Decrease rule violation derailments / incidents by 50%

3. Decrease industry related derailments by 25%

4. Increase efficiency of Revenue Cars / man hour by 10%

5. Reduce operating expense per car below $200

6. Reduce / eliminate current litigation case load

7. Operating ratio below 100%

8. Current ratio above 100%

9. Addition of one new customer

NPBL007245

ITEM 10 – INFORMATION

**MEMORANDUM**

The following list is the non-agreement and clerical employees' projected staffing needs. Management plans to eliminate the clerk position with the implementation of NS revenue accounting systems. IT has assigned a project number (45622EN) for CSX waybills within the TYES system. The recurring transactions billing project is projected for completion in January 2010. Management also plans to fill the vacant Trainmaster position to meet needs of the Company.

| NAME | POSITION | AGE DOB | HIRE DATE | YEARS OF SERVICE | PROJ. RET. |
|---|---|---|---|---|---|
| VACANT | TRAINMASTER | | | | |
| L. RODGERS | TERM. SUPT. | 59 5/26/50 | 06/28/71 | 38 | 2010 |
| PD NELSON | TREASURER | 58 8/14/51 | 10/05/70 | 39 | 2011 |
| G. BAKER | CLERK | 59 1/9/50 | 05/16/68 | 41 | 2010 |
| R. SEARS | ADMIN. ASST. | 24 | 07/16/08 | 16mo. | |

NPBL007246