# Exhibit 91

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

No. 2:18cv530

CSX TRANSPORTATION, INC., individually and on behalf of NORFOLK & PORTSMOUTH BELT LINE RAILROAD COMPANY,

Plaintiff,

v.

NORFOLK SOUTHERN RAILWAY COMPANY, et al.,

Defendants.

________________________________/

Remote Proceedings
January 13, 2021
9:38 a.m. - 6:40 p.m.

VIDEO DEPOSITION OF ROBERT GIRARDOT
(via Teleconference)

Taken before SUZANNE VITALE, R.P.R., F.P.R. and Notary Public for the State of Florida at Large, pursuant to Notice of Taking Deposition filed in the above cause.

Job No. CS4395739

believe it would also include -- there is a per-car trackage rights fee that NPBL has to pay to Norfolk Southern. And so that would be included in that cost because that would be -- so those would be the two incremental costs.

And, again, these are estimates. I think they're good estimates.

Q. In setting a rate, CSXT considers its own costs in delivering the service, right?

A. We -- on this particular one, we would consider what it costs us to do business with the NPBL, yes.

Q. I'm speaking more generally.

As a general matter, in setting a rate, CSXT would consider its own costs in delivering a service, right?

A. That's one consideration, yes.

Q. So would you agree, then, setting a rate, the railroad should consider its variable costs in setting that rate?

MR. HATCH: Objection, calls for opinion, and vague.

THE WITNESS: I think -- you know, I just said one of the things we would consider would be costs. And, you know, one component of cost

is variable cost.

BY MR. WINGFIELD:

Q. Given the objection, let's go through it a little bit.

So you have an MBA, right?

A. I don't understand.

Q. You have a degree, master's of business administration from a significant school, correct?

A. I have an MBA, yes.

Q. And as part of obtaining the MBA, you would have studied costs, right?

A. Yes. Yes, I did.

Q. And in your history as an employee of CSXT, you've been involved extensively in examining costs as they affect rates, right?

A. You know -- I mean, rates are determined by the market, right? So when you determine whether, you know, you could make money or not, you compare the market, which is the rate, to what your costs are.

Q. All right. In the world of costs, you just testified that it's appropriate to look at variable costs involving delivering a service.

What about fixed costs, is it appropriate to look at your fixed costs in determining what a

rate should be for service?

A. In some cases, it is. Other cases, it's not.

Q. Isn't it true that a company's fixed costs are real costs, and if they're not covered in the long run, that the company won't make money and could fail, right?

MR. HATCH: I'm going to object that it calls for an opinion.

And, you know, it would be helpful -- these are generalized questions. I'm not sure which of the topics that they relate to.

Alan, if you've got a particular one you think it relates to, I'd welcome the identification.

MR. WINGFIELD: Okay. This examination relates to topic number 8 in the deposition notice, which relates to the 2018 service proposal and the considerations weighed in formulating the proposal.

So now he's testified that NPBL's costs were weighed in consideration of formulating the proposal, so I want to explore this topic.

MR. HATCH: I think, respectfully, you can ask him what, from your topic, considerations

CSX took into account in formulating the 2018 proposal.

But these are hypothetical, general questions about how businesses operate. And I don't think they're tied to that.

So if you can tie it to that, Alan, I think that would be helpful.

BY MR. WINGFIELD:

Q. Mr. Girardot, did CSX include, as a calculation of the $780,000 incremental cost number and the $660,000 incremental operating income number, consideration of NPBL's fixed costs?

A. You'd have to get more specific on fixed costs. I mean, there's some -- tell me which fixed costs, and then I can --

Q. How about depreciation of assets?

A. I don't -- well, I don't think that that's one that we would have looked at because this business wouldn't have changed any of their depreciation schedules.

Q. NPBL owns tracks, correct?

A. That's correct.

Q. And NPBL owns locomotives -- excuse me -- strike that.

NPBL owns certain ancillary equipment to

be used for conducting its business, right?

A. That's correct.

Q. And it has ancillary buildings and office space that it maintains for conducting its business, right?

A. Yeah, that's correct. But we didn't see that how us running a train out to NIT would cause them to increase or decrease those items that you just mentioned.

Q. If there's no money in your proposal to cover these fixed costs, then where is the money supposed to come from to operate NPBL's business, to cover these fixed costs in the long run?

A. Well, first of all, there was going to be $660,000 left over of this that they could contribute towards having it -- you know, up until this point, Mr. Wingfield, is -- fixed costs was being covered by the current level of business that they handled, all right? So we were bringing incremental business, as we state here.

So all of that fixed cost was already being covered. So this new business would actually give them more coverage of those existing fixed costs.

Q. So your suggestion is that the $660,000

incremental operating income could, in part, be used to cover NPBL's fixed costs?

A. That's really an accounting question on how they decide to treat that incremental revenue.

Q. Would it have been fair for NPBL to consider its fixed costs in assessing the 2018 rate proposal?

MR. HATCH: Objection, calls for opinion and vague.

THE WITNESS: I was going to say I don't know what "fair" means, but I think -- I'll try and answer specifically.

Would it be a good business decision for them to -- it would only be a good business decision for them to consider any incremental fixed costs that this operation might generate.

BY MR. WINGFIELD:

Q. And that's because, in your view, its existing business would already be generating money to cover its fixed costs?

A. Well, I mean, the day before we made this proposal -- is all of NPBL's fixed costs was being covered by the existing business, and we didn't see any significant new fixed costs that this would generate. And so this would be -- this would be

incremental operating income, as we state there.

How you account -- you know, how an accountant would classify that is something I can't answer.

Q. Is it true that a railroad that owns a track using ties would have a regular maintenance program to repair and replace the ties?

MR. HATCH: I'm going to object again. I mean, this is a generic hypothetical question. I don't think it's covered by any of the topics.

MR. WINGFIELD: Let's focus on NPBL.

BY MR. WINGFIELD:

Q. NPBL owns track with ties, right?

A. Yes.

Q. And you would expect NPBL to have a regular maintenance program to repair and replace the ties on a regular, reasonable schedule?

Wouldn't you expect that?

A. Well, it depends on how you define, you know, "a reasonable schedule."

I mean, like, I mean, can you be more specific?

Q. Well, just as a general proposition, based on your knowledge of how railroads operate, wouldn't

Were you personally -- are you personally privy to any of those conversations, if any, that occurred between NPBL and any of its customers, shippers, others who pay you money about its rates?

A. Are you asking me in my personal capacity or my capacity as the CSX representative?

Q. Well, I'll ask you first in your personal capacity.

A. No, I'm not aware of it because in my personal capacity, I deal with the intermodal traffic, international intermodal traffic.

Q. Is your answer different in your capacity as CSX representative?

A. Yes.

Q. So what do you know about NPBL's communications with customers other than CSX, shippers, customers, however you want to phrase it, people paying money for services, about NPBL's rates?

A. Well, I mean, I think the thing that sticks out is the biggest carload customer on NPBL is -- is it Perdue? It's a grain customer.

Q. I believe it's Perdue.

A. In the process of preparing for this, I saw some NPBL communications about the terms of

service at Perdue where they were asking for improved economies.

Q. As experienced railroad executives, Mr. Girardot, wouldn't you think it would be likely that Perdue would come to NPBL and ask to get the same rate that CSX was getting?

A. No, not at all.

MR. HATCH: That is both hypothetical and unless you correct me, well outside any of the 30(b)(6) categories. So I'd object on those grounds.

THE WITNESS: Would you like me to answer that?

MR. HATCH: If you can.

THE WITNESS: Yeah. I think Perdue knows -- because they use tariffs on other shortline railroads, so they have different rates for intermodal traffic and carload traffic. Perdue does business in all kinds of places.

And so they know that that's apples and oranges. So that would not create an expectation with them to ask for lower rates.

BY MR. WINGFIELD:

Q. Is it your testimony, on behalf of CSXT,

that NPBL faced near-zero risk, that if NPBL gave CSXT a lower rate, that would result in cannibalization of revenues from existing customers?

MR. HATCH: Objection, hypothetical.

THE WITNESS: Yeah, well, there are no existing intermodal customers on the NPBL, so a specific term for intermodal traffic --

(Reporter clarification.)

THE WITNESS: The question is zero risk, you know, and, you know, the term I used was "near-zero risk." There's nothing in this world that's zero risk.

Being that they're entirely different commodities and being that NPBL has no other intermodal customers other than -- no other potential intermodal customers other than CSX, there's near-zero risk.

And I might add that the operating agreement requires that the rate be uniform, but it doesn't require that it be put in the tariff. You don't have to worry if it's visible for other customers, non-owner customers.

BY MR. WINGFIELD:

Q. Going back to the 2018 rate proposal,