IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

CSX TRANSPORTATION, INC.,

        Plaintiff,

v.                                                            Civil Action No. 2:18-cv-530-MSD-RJK

NORFOLK SOUTHERN RAILWAY
COMPANY, *et al.*,

        Defendants.

### NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY'S MEMORANDUM IN SUPPORT OF MOTION *IN LIMINE* #4 TO EXCLUDE EVIDENCE FROM CSXT WITNESSES WHO LACK PERSONAL KNOWLEDGE

Defendant Norfolk and Portsmouth Belt Line Railroad Company (the "Belt Line"), by counsel, states as follows for its memorandum in support of its Motion *in Limine* pursuant to Federal Rules of Evidence 602, 703 and 802 to (1) exclude specific testimony by past and present employees of CSX Transportation, Inc. ("CSXT") containing inadmissible hearsay or factual matters outside their personal knowledge, and (2) prohibit CSXT's expert witness from relaying such information to the jury.

### Introduction

The Belt Line anticipates CSXT will call current employees Robert Girardot and Chris Wagel and/or former employee Carl Warren to testify in support of CSXT's conspiracy claims in this case. All three provided declarations and deposition testimony. In their depositions, all three also admitted that they lack personal knowledge on certain key topics, conceding that their basis for knowledge was gained entirely from what they were told by others. Without personal knowledge, none of them should be allowed testify to the following topics:

      a.      The way the Belt Line's tariff works;

      b.      The preferences and practices of ocean carriers;

      c.      Lost business opportunities allegedly sustained by CSXT;

      d.      Calculations for average containers per railcar; and

      e.      Drayage as an inadequate alternative to on-dock rail access.

CSXT's expert, Howard Marvel, Ph.D., relied heavily on the declarations in drafting his reports. While Rule 702 allows an expert to rely on declarations in some instances, Rule 703 prohibits a party from using an expert witness as a vehicle to bypass the prohibition against hearsay. The prejudicial effect of admitting the hearsay here far outweighs any probative value, meaning the content of the declarations on the topics above must not be disclosed to the jury.

## Legal Standard

A motion *in limine* is a remedy designed to "increase trial efficiency and promote improved accuracy of evidentiary determinations by virtue of the more thorough briefing and argument of the issues that are possible prior to the crush of trial." *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 505 F. Supp. 1125, 1140 (E.D. Pa. 1980). A trial court is afforded discretion in deciding a Motion in Limine. A reviewing court will examine a trial court's decision for an abuse of that discretion. *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996).

The Federal Rules of Evidence prohibit a lay witness from testifying to a matter without personal knowledge. Fed. R. Evid. 602, 701 (lay witness testimony must be based on the witness's personal knowledge and perception). If the witness does not have personal knowledge, the Court must not allow the witness to testify to that matter as the "testimony would be speculative." *Steves & Sons, Inc. v. Jeld-Wen, Inc.*, 2018 U.S. Dist. LEXIS 5061, at *10 (E.D. Va. Jan. 10, 2018) (citing *MCI Telecommunications Corp. v. Wanzer*, 897 F.2d 703, 706 (4th Cir. 1990)).

Hearsay is an out of court statement offered at trial by someone other than the declarant to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Hearsay is not admissible, unless the proponent can show that it falls under a hearsay exception. Fed. R. Evid. 802; *see also Rambus, Inc. v. Infineon Techs. AG*, 222 F.R.D. 101, 105 (E.D. Va. 2004).

Rule 703 permits an expert to rely on inadmissible evidence only when two conditions are met: (1) the facts or data would be reasonably relied upon by other experts in the particular field; and (2) their probative value substantially outweighs their prejudicial effect. Fed. R. Evid. 703.

## Argument

### I. The declarants have no personal knowledge of the facts contained in their declarations and rely on hearsay to support their statements.

The declarations of Messrs. Girardot, Wagel, and Warren are riddled with factual statements beyond the declarants' personal knowledge. In their depositions, on the topics above, each of them conceded that they merely restated what other employees, unidentified customers, or employees of non-party Virginia International Terminals, LLC ("VIT") allegedly told them. In some instances, the hearsay was in fact double hearsay.

All of the anticipated testimony on numerous topics described below is inadmissible, as the declarants relay only hearsay statements or opinions from other people. *See* Fed. R. Evid. 602 (lack of personal knowledge), 802 (hearsay), 701 (lay opinion not based on first-hand knowledge) and 805 (double hearsay). Hearsay within hearsay is particularly troublesome. While technically admissible if an exception can be shown at each level, "experience suggests an inverse relationship between the reliability of the statement and the number of hearsay layers it contains." *U.S. v. Fernandez*, 892 F.2d 976, 984 (11th Cir. 1989), *cert. denied*, 495 U.S. 954 (1990); *see also Lewis v. Sentara Alternative Delivery Sys.*, 1998 U.S. App. LEXIS 3656, at *5-*6 (4th Cir. Mar. 2, 1998) (affirming exclusion of former employer's testimony for lack of personal knowledge because it

was received "fourth hand"). To the extent the anticipated testimony of these witnesses might constitute a form of disguised expert opinion, it is inadmissible as only Dr. Marvel has been identified by CSXT as its expert.

Identified below are instances in which Messrs. Girardot, Wagel, and Warren testified in deposition that their direct reports, other employees, or third parties gave them the information contained in their declarations, leaving them—at best—second- or third-hand accounts of those facts. All such instances should be excluded.

    a. **The way the Belt Line's tariff works.**

Mr. Girardot stated in his first declaration:



Girardot Decl. ¶ 2 (**Ex. A**) (emphasis added). In his deposition, however, Mr. Girardot did not even remember which Belt Line representative, if any, made such a statement, much less the date of the call or any participants.

> Q. And who do you remember – I'm sorry, I didn't mean to cut you off. But who do you remember from the NPBL that was on that call, sir?
>
> A. You know, I was a supporting player on the call. I didn't really -- you know, I don't remember who was on the other side.
>
>     \*    \*    \*
>
> Q. Do you remember the date of the call?
>
> A. No.
>
>     \*    \*    \*

> Q. You mentioned in your earlier testimony that there were various notes from that call. Did you personally take notes?
>
> A. No, I did not.
>
> Q. So you don't have anything that you recorded that would allow you to refresh your recollection of that call?
>
> A. No.

Girardot Dep. 262:8-25 (**Ex. B**).

In fact, Mr. Girardot is incorrect about the tariff, and the significance of his error is that it potentially doubles the cost of a rail move. The Belt Line's $210 switching rate applies only to loaded railcar wells, not empty ones. *See* Belt Line Tariff p. 4 (**Ex. C**). Under Rules 403 and 602, CSXT should not be permitted to confuse the jury with testimony from Mr. Girardot about his incorrect understanding of a published tariff rate, particularly when he has no actual knowledge of it and no recollection of how he acquired the false knowledge he relayed to CSXT's expert in his declaration. *See* Fed. R. Evid. 403 and 602.

### b. Preferences and practices of ocean carriers.

Mr. Girardot also states in his first declaration that "  " Girardot Decl. ¶ 6 (**Ex. A**). Yet he admitted in his deposition that he was "not the direct contact" for ocean carriers and obtained these statements from some other source:

> Q. Mr. Girardot, how often do you communicate with steamship line customers?
>
> A. Directly, you know -- you know, I mean, you know – I'd say -- you know, I'd say I talk to a steamship line -- actually directly to a steamship line customer, you know, on average, you know, maybe once a week. You know, but -- but *indirectly*, you know, in -- or together with, you know, our -- our sales team, all the time, you know, frequently.

5

> Q. Okay.
>
> A. You know, I'm not the direct contact.
>
> \* \* \*



Girardot Dep. 166:2-13, 222:18-223:2 (emphasis added) (**Ex**. **B**).

Similarly, Mr. Warren describes in his declaration the practices of ocean carriers with regard to their rail contract bidding processes:



Warren Decl. ¶ 7 (**Ex. D**). Yet in his deposition, Mr. Warren admitted that he did not have personal knowledge of shipping alliances and learned of the practices he relayed in his declaration from other sources.

> Q. What is your experience in dealing with a shipping alliance?
>
> A. My experience really is based more on what I've learned from colleagues at the company and colleagues in the industry than any direct work on my own. I was involved in roles that were more heavily focused on cargo traffic at the time that a lot of the alliance work started to happen.
>
> \* \* \*
>
> Q. So do I understand you correctly that the contents of paragraph 7 are based on what you've learned from colleagues and from others in the industry?

>   A. Yeah, I would say -- I would say so because I haven't had to deal with any of the alliances.

Warren Dep. 127:25-128:17; 156:12-157-7; 216:7-218:6 (**Ex**. **E**).

Mr. Warren also stated in his declaration "" Warren Decl. ¶ 10. Yet in his deposition, he admitted that he did not have personal knowledge of these concerns and allegedly heard them from other CSXT employees, VIT employees, or industry colleagues:

>   Q. Let's move on to paragraph 10 of your declaration. The second sentence of paragraph 10 says, "▇▇▇▇." Let's unpack that. What does "▇▇▇" mean?
>
>   A. Well, as you're aware, the roles I've had at CSX over the last few years involve interacting with CSX staff, port staff, folks around the industry. And so it's just -- hearing that would be, you know, from an account representative at CSX or a port partner. There's lot of different ways that you could find that information.
>
>   \* \* \*
>
>   Q. Well, you say you ▇▇▇▇
>
>   A. Some of that is not direct, so it would come from people on the CSX account team. But I don't have any ▇▇▇ that I can offer you to support that statement.

Warren Dep. 149:22-150:23 (**Ex**. **E**).

This testimony from both Mr. Girardot and Mr. Warren presents multiple layers of hearsay. Both witnesses attempt to relay the preferences of ocean carriers based on conversations and understanding of other people – an effort prohibited under the hearsay rules. *See* Fed. R. Evid. 802 and 805. The Belt Line cannot cross-examine the ocean carriers to test the veracity of Mr.

Girardot's or Mr. Warren's statements about their preferences, and Mr. Girardot and Mr. Warren themselves cannot even identify the sources of their second- or third-hand knowledge.

For these reasons, Mr. Girardot and Mr. Warren cannot testify to the preferences or practices of ocean carriers.

### c. Lost business opportunities allegedly sustained by CSXT.

Paragraph 8 of Mr. Girardot's first declaration is similarly based on hearsay. He states:



Girardot Decl. ¶ 8 (**Ex. A**).

Yet in his deposition, Mr. Girardot admitted that he was merely repeating what an ocean carrier apparently told someone else at CSXT:



Girardot Dep. 234:24-235:9 (**Ex. A**). As with the other statements, this testimony is pure hearsay. *See* Fed. R. Evid. 802.

For these reasons, Mr. Girardot cannot testify to the lost business opportunities allegedly sustained by CSXT.

### d. Calculations for average containers per railcar.

In Mr. Girardot's second declaration, he takes issue with the analysis of Thomas Crowley, the Belt Line's rate expert, on the average number of shipping containers that CSXT stacks in a railcar well for purposes of calculating the cost of a rail move. Mr. Girardot states:



Girardot Decl. (second) ¶ 3 (**Ex. F**).

In his second deposition, however, Mr. Girardot testified that that his assumption of 1.67 containers per railcar well is not based on personal knowledge at all. *See* Girardot Dep. (second) 101:5-17, 105:18-106:21 (**Ex. G**). It comes, instead, from some unspecified CSXT "general experience" and is used by unknown people at CSXT as a "ballpark" or "walking around number." *Id*. He was unable to explain where he got the number, much less how it was calculated, even though CSXT's expert later repeated it as fact in his report.

> Q. So where did the assumption of 1.67 containers per well come from?
>
> A. That's our general experience of the level of utilization that we were able to achieve in and out of ports at the -- at the time of that -- that analysis was done. That was our benchmark.
>
> &ast; &ast; &ast;
>
> Q. Okay. So I understand that's an assumption because that's what it says in your declaration. What is that assumption then based on?
>
> A. That's basically our -- our experience for international traffic going in and out of ports. That's -- you know, that time period probably would have been based on, you know, the prior year's results. You know, that's kind of the ballpark -- ballpark good walking around number, you know.

> Q. So my question is: What data did you pull to arrive at that determination of 1.67?
>
> \*   \*   \*
>
> A. That's just a good walking around number. I mean, that's just, like a, you know – it's just a general metric, you know.
>
> \*   \*   \*
>
> Q. That lives where in the CSX system?
>
> A. That's just based on experience. I mean –
>
> Q. Your personal experience?
>
> A. That's my personal experience and kind of eyeballing train consists and looking at how many, you know, cars and containers -- I mean, just – that's just a good number.
>
> Q. And I'm not suggesting that you're not a human calculator, Mr. Girardot, but I'm just trying to find out if there's any data -- real data that -- that you pulled or turned to -- to arrive at that number?
>
> A. No I -- I didn't, no.

Girardot Dep. (second) 101:5-17, 105:18-106:21 (**Ex. G**). In the absence of personal knowledge about the actual basis for the 1.67 "walking around number," Mr. Girardot's testimony about that number is only speculation. It does nothing to help the jury and can only unfairly prejudice the Defendants, particularly if repeated as fact by Dr. Marvel. *See* Fed. R. Evid. 602 and 403.

For these reasons, Mr. Girardot cannot testify to calculations or assumptions about the average number of containers per well.

### e. Drayage as an inadequate alternative to on-dock rail access.

No witness at CSXT is competent to testify to the capacity of VIT to orchestrate drayage of cargo to and from NIT. It is undisputed that CSXT does not operate the drayage program; VIT does as the operator of NIT. *See* Capozzi Dep. 23:12-24, 76:16-77:2 (**Ex. H**) ("CSX access to NIT is through a -- a drayage sub-service. And we -- we manage that dray service.").

Nevertheless, in Paragraph 3 of his declaration, Mr. Wagel states that ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Wagel Decl. ¶ 3 (**Ex. I**). In his deposition, however, Mr. Wagel admitted that this testimony was pure speculation off the top of his head:

> Q. How did you come up with that number?
>
> A. Off the top of my head, basically just looking at operation, what I've done before, what we -- what we can usually handle to get in and out, so --
>
> Q. Are there -- are there data that support that 200 container number --
>
> A. There's probably --
>
> Q. -- to your knowledge?
>
> A. *Probably no data. Just my gut.*
>
> Q. Is there a way that you tracked the number of containers that were moved per day?
>
> A. I mean, it could show up on a consist, the trains in and out. I'm just -- what I -- what I thought from my knowledge and my experience. No data to back it up per se, but just my experience.
>
> Q. Were you asked to look for data to support that 200 container number?
>
> A. No.
>
> Q. Were you asked to look for any other kinds of business records to --
>
> A. No.
>
> Q. -- support that 200 container number?

Wagel Dep. 39:23-45:7 (**Ex. J**) (emphasis added). Mr. Wagel further testified that he visited NIT only once (at night) and did not even know the number of interchange lanes.

> Q. Do you know how many interchange lanes NIT has for truck traffic coming in and out?

> A. At the port I do -- I don't know how many lanes they have at the port in and out. I don't know what their out gates look like or their in gates.
>
> Q. You only went there once, if I recall your testimony; is that correct?
>
> A. Like, once at night. So I don't know what their operations look like as far as their dray operations.

Wagel Dep. 100:3-11 (**Ex. J**).

Similarly, in Paragraph 9 of his declaration, Mr. Warren states that drayage is a "███ ███████████████████████████████████." Warren Decl. ¶ 9 (**Ex. D**). Yet in his deposition, Mr. Warren conceded that this statement was actually pieced together from multiple hearsay statements of unspecified local personnel and VIT sources:

> Q. So you start by saying, "████████████████████████████ █████████████████████████████████████████." Are you talking about drayage versus on-dock generally?
>
> A. I think that the principal applies at NIT.
>
> Q. What's your basis for saying the principal applies at NIT?
>
> A. Two things. One, you know, as I mentioned earlier, I interviewed local personnel to find out about those gate hours. And in discussing this with internal and industry colleagues, what's reflected in this paragraph is really the reason that steamship lines don't want to buy a drayage product from CSX at that location, because it's not resilient and scalable.
>
> \*   \*   \*
>
> Q. Did you talk to more than the local terminal manager?
>
> A. Well, I think as the correspondence illustrated, I have relationships with other people that work at the port. We were familiar with the operations there and with internal CSX contacts.
>
> Q. Who did you talk to besides the terminal manager who gave you the gate hours?
>
> A. I don't remember exactly all the names, but I had regular conversations with people at VIT that would have informed that perspective.
>
> Q. You don't recall who you talked to at VIT?

> A. The paragraph reflects an understanding from several conversations. It would be difficult to attribute each part of it.
>
> Q. So when did you have these several conversations with VIT personnel?
>
> A. I honestly don't remember the timing.

Warren Dep. 134:5-135:21 (**Ex. E**)

All of his testimony on this topic is inadmissible, as it relays only hearsay statements and opinions from other people about their own views of drayage. For these reasons, Mr. Wagel and Mr. Warren cannot testify that drayage is an inadequate alternative to on-dock rail access.

## II. The prejudicial effect of the declarant's testimony far outweighs its probative value in helping the jury understand Dr. Marvel's opinions.

The danger of the hearsay in the declarations of Messrs. Girardot, Warren, and Wagel is at least twofold. First, it will be improperly elicited by CSXT as testimony at trial by witnesses who lack personal knowledge, ringing a bell that cannot be unrung. Second, it will be improperly regurgitated as authoritative "fact" by CSXT's expert, Dr. Marvel.

In either instance, the Belt Line will be left at an impossible disadvantage. It cannot challenge the veracity of the statements with the people who made them—if anyone actually did—and it cannot do so through cross-examination of Dr. Marvel, since he will only be transmitting the statements to the jury under the pretense of sworn declarations.

Rule 703 expressly restricts this kind of inadmissible evidence from being repeated by an expert witness. *See* Fed. R. Evid. 703 (permitting expert to base opinion on inadmissible facts or data *only* where probative value "substantially outweighs" prejudicial effect). "Rule 703 does not authorize admitting hearsay on the pretense that it is the basis for expert opinion when, in fact, the expert adds nothing to the out-of-court statements other than transmitting them to the jury. In such a case, Rule 703 is simply inapplicable and the usual rules regulating the admissibility of evidence control." Charles Alan Wright & Victor James Gold, 29 Fed. Prac. and Proc. Evid. § 6273 (1997);

13

*see also Loeffel Steel Prods., Inc. v. Delta Brands, Inc.,* 387 F. Supp. 2d 794 (N.D. Ill. 2005) (barring economic expert's testimony because he was merely the mouthpiece for the defendant's employees); *Law v. Nat'l Collegiate Athletic Ass'n*, 185 F.R.D. 324, 341 (D. Kan. 1999) ("The NCAA basically presented [the expert] as a channeler, seeking to present non-expert, otherwise inadmissible hearsay through the mouth of an economist."); *In re Lake States Commodities, Inc.*, 271 B.R. 575, 585 (Bankr. N.D. Ill. 2002) (holding that otherwise inadmissible evidence relied upon by an expert "is not somehow transmogrified into admissible evidence simply because expert relies on it"); *Wantanabe Realty Corp. v. City of New York,* 2004 WL 188088 (S.D.N.Y. Feb. 2, 2004) ("But an expert may not act as a 'mere conduit' for the hearsay of another.").

Courts maintain a high level of scrutiny over inadmissible evidence presented by experts given the inherent danger of having an expert present evidence to the jury that would otherwise be inadmissible. *See Therasense, Inc. v. Becton Dickinson Co.*, 2008 U.S. Dist. LEXIS 124780, at *13 (N.D. Cal. May 22, 2008) (observing that "[o]ne of the worst abuses in civil litigation is the attempted spoon-feeding of client-prepared and lawyer-orchestrated 'facts' to a hired expert who then 'relies' on the information to express an opinion"); *In re Sulfuric Acid Antitrust Litig.*, 446 F. Supp. 2d 910, 915 (N.D. Ill. 2006) ("[T]he permissibility of reliance on the data from the third party who will not be testifying is a question answered by the Federal Rules of Evidence, not by Rule 26. . . . [W]hile Rule 703 was intended to liberalize the rules relating to expert testimony, it was not intended either to abolish the hearsay rule or to allow oblique evasions of it.").

Here, the probative value of the declaration content, if any, is far outweighed by its potential for prejudice. The statements of Messrs. Girardot, Wagel, and Warren above are not "facts or data." As confirmed in the depositions, they are unsupported speculation and hearsay, spoon-fed to CSXT's expert to advance CSXT's case. Yet there is significant danger they will be

received as fact by the jury if Dr. Marvel is allowed to repeat them. *See, e.g., Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (expert testimony "can be both powerful and quite misleading"); *see also Va. Vermiculite Ltd. v. W.R. Grace & Co.-Conn.*, 98 F. Supp. 2d 729, 735 (W.D. Va. 2000) ("Expert testimony with a greater potential to mislead than to aid the jury should be excluded.").

Under the Rules of Evidence and the settled precedent above, CSXT's witnesses should be prohibited from repeating their inadmissible testimony at trial, and CSXT should be prohibited from using Dr. Marvel as a back door to admit the otherwise inadmissible testimony.

## Conclusion

For the foregoing reasons, the Belt Line respectfully moves for entry of an order (1) excluding all testimony from Messrs. Girardot, Warren, and Wagel, as well as Dr. Marvel, and any other witness called by CSXT who does not first establish personal knowledge on the topics listed above; and (2) granting the Belt Line all other just relief.

Dated: May 7, 2021

NORFOLK AND PORTSMOUTH
BELT LINE RAILROAD COMPANY

By: \_\_\_\_\_/s/ W. Ryan Snow\_\_\_\_\_
James L. Chapman, IV, VSB No. 21983
W. Ryan Snow, VSB No. 47423
David C. Hartnett, VSB No. 80452
Alexander R. McDaniel, VSB No. 92398
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1500
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com
dhartnett@cwm-law.com
amcdaniel@cwm-law.com

*Attorneys for Norfolk and Portsmouth Belt Line Railroad Company*

### CERTIFICATE OF SERVICE

I certify that on this 7th day of May 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a "Notice of Electronic Filing" to all counsel of record who have consented to electronic service.

       /s/ W. Ryan Snow
W. Ryan Snow, VSB No. 47423
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1500
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
wrsnow@cwm-law.com