IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

CSX TRANSPORTATION, INC.,
individually and on behalf of NORFOLK
& PORTSMOUTH BELT LINE
RAILROAD COMPANY,

      Plaintiff,

v.                                                 Civil Action No. 2:18-cv-530-MSD

NORFOLK SOUTHERN RAILWAY
COMPANY, *et al.*,

      Defendants.

                                           /

**CSX TRANSPORTATION INC.'S MEMORANDUM IN SUPPORT OF ITS
MOTION IN LIMINE TO PRECLUDE MISCHARACTERIZATION
<u>OF CSXT'S RATE PROPOSALS</u>**

Plaintiff CSX Transportation, Inc. ("CSX"), by counsel, respectfully submits this Memorandum in Support of its Motion in Limine under Federal Rules of Evidence 401, 402, and 403 seeking to prohibit Defendants Norfolk Southern Railway Company ("NS") and Norfolk & Portsmouth Beltline Railroad Company ("NPBL") (collectively, "Defendants") from offering at trial any evidence and argument mischaracterizing CSXT's 2010 and 2018 Rate Proposals ("the Proposals"), including any suggestion that they violate the so-called "uniform rate" provision of NPBL's Operating Agreement. This evidence and argument should be excluded because it is incorrect, improper, irrelevant, and prejudicial.

1

**INTRODUCTION**

Throughout this litigation, Defendants have argued that NPBL could not accept CSX's 2010 and 2018 Proposals without violating NPBL's 1897 Operating Agreement.[1] That argument is improper and misleading, because the plain language of the Proposals is not exclusive of the proposed rates being "uniform" for any customer seeking the same service. This Court already concluded as much in denying NPBL's motion to dismiss some twenty months ago. *See* ECF No. 66 at 26-27 ("The [2018] service proposal does not state that the rate would be lowered for only CSX. The lowered rate is not limited to CSX, . . . but rather applies to any traffic by any company on Belt Line's tracks between "Berkley Yard and NIT.") (citing ECF No. 1 at ¶ 39; ECF No. 1-5). None of the evidence adduced in discovery undermines this conclusion. Indeed, the record reflects that NPBL has established different rates for different services in the past. It is thus clear from Defendants' own evidence that – however "uniform" may be defined in the 1897 Operating Agreement – it does *not* mean one rate for all services at all times. Accordingly, evidence and argument that CSX's Proposals would violate the NPBL Operating Agreement is incorrect, improper, irrelevant, and prejudicial, and should be excluded.

**LEGAL STANDARD**

"Although the Federal Rules of Evidence do not explicitly authorize in *limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n. 4 (1984). The purpose of a motion *in limine* is to permit the trial court "to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the

---

[1] CSXT's 2018 Proposal is attached as Exhibit E to the Complaint, *see* ECF No. 1-5 at 1-9, and the 2010 Proposal is attached to that document, *see id.* at 9-15.

trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) (quoting *Banque Hypothecaire Du Canton De Geneve v. Union Mines*, 652 F.Supp. 1400, 1401 (D. Md. 1987)).  Such motions serve important gatekeeping functions by allowing the trial judge to eliminate from consideration evidence that should not be presented to the jury.  *See Jonasson v. Lutheran Child and Family Servs.*, 115 F.3d 436, 440 (7th Cir. 1997).

Under the Federal Rules of Evidence, evidence that is not relevant is not admissible.  *See* FED. R. EVID. 402.  Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." FED. R. EVID. 401.  Evidence that is relevant may nonetheless be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403.

## ARGUMENT

### I. NPBL Has Considered and Maintained Non-Uniform Rates.

The Operating Agreement that NS and CSX's predecessors signed in 1897 states that the shareholder railroads agree "[t]hat a uniform rate shall be fixed for the movement of freight cars over the [NPBL], regardless of distance." ECF No. 1-1 at 3-4 (Ninth Article).  Both NS and NPBL have repeatedly asserted that this single phrase prevented NPBL from accepting CSX's Proposals, because those Proposals seek to have NPBL impose a "non-uniform" rate.

This argument is improper and prejudicial.  At best, the contractual language at issue is ambiguous.  But NPBL has not in the past interpreted this language to require one "uniform rate" for all services.  To the contrary, as CSX explained in its 2018 Proposal, NPBL has previously espoused a contrary interpretation, or at a minimum has allowed regular and substantial exceptions to this so-called "uniform rate" restriction.  *See* ECF No. 1-5 at 3 ("[T]he NPBL's tariff history

demonstrates that NPBL has often published different switch charges for different commodities.") . In 2009, for instance, NPBL management sought to replace the dual rate structure for domestic and import/export traffic[2] with a single $210 line-haul switch rate, not out of concern for any perceived violation of the Operating Agreement, but because the NS accounting systems used by the Belt Line could not handle the two-tiered structure. *See* Ex. 19 to ECF No. 324[3] (NSR_00027070 at -073); *see also* Ex. 5 to ECF No. 324 (Coleman Dep. 117:18-118:18) (NPBL wanted to eliminate dual rates because it could not distinguish between domestic and import/export traffic). NPBL management also recommended the adoption of a different, $75 per car rate for "unit trains," i.e., trains moving more than forty cars to one destination under a single waybill. Ex. 19 at ECF No. 324 (NSR_00027070 at -073). CSX expressed interest in using this rate to move trains of intermodal freight to and from NIT, though these moves involved multiple waybills. *See id.* NPBL management said that it was not opposed to dropping the "one waybill" requirement for this traffic. *See id*. NS opposed the $75 rate over purported concerns that NPBL "Management ha[d] not provided a detailed business, operating and financial plan outlining the benefits to NPBL . . . .[,]" Ex. 33 to ECF No. 324 (NSR_00035548 at -549), *not* because of any potential or perceived conflict with the "uniform rate" requirement in of the Operating Agreement. In fact, NS rate committee members suggested that NPBL should evaluate "special deals" varying from the tariff rate. *See* Ex. 31 to ECF No. 324 (NSR_00035903 at -905).

---

[2] Import/export traffic includes switching international intermodal traffic to and from NIT – the same service that was the subject of CSX's 2010 and 2018 Proposals. As of 2009, NPBL charged $243 per car for domestic line-haul switching and $148.50 per car for import/export. *See* Ex. 19 to ECF No. 324 (NSR_00027070 at -073).

[3] On May 3, 2021, CSX filed a Consolidated Opposition to Defendants' Motions for Summary Judgment. *See* ECF No. 324, 328. On May 12, 2021, the Court granted CSX's request to seal the Consolidated Opposition and certain exhibits thereto. *See* ECF No. 370.

Indeed, even the current NPBL tariff includes a number of varying switching rates, and not a single "uniform rate." ECF No 297-2. As the record of the case establishes that NPBL has previously offered different rates for different services, any argument that the Operating Agreement's "uniform rate" provision requires one rate for all services at all times rings hollow and would be misleading to the jury.

## II.     CSX Did Not Propose a Non-Uniform Rate in 2010 or 2018.

### A.     The 2010 Proposal.

In 2010, CSX developed a comprehensive plan to access on-dock intermodal container service at NIT via NPBL. *See* ECF No. 1-5 at 9-15; *see also* Ex. 91 to ECF No. 310 (NPBL007431). CSX proposed paying NPBL $37.50 per container for intermodal traffic to and from NIT. *Id.* at -433. To reduce any risk to NPBL, CSX included a volume commitment, *see id.*, and offered to allow NPBL to use CSX's locomotives and fuel for free, *id.* at -432. The 2010 Proposal also included a detailed operating plan. *Id.* Although CSX offered in the 2010 Proposal to memorialize the proposed terms in a contract, nothing in the proposal was inconsistent with the rate being applied to other NPBL customers.

When NPBL management and general counsel raised concerns that the 2010 Proposal would violate the Operating Agreement's "uniform rate" provision, as well as the prohibition on "foreign" locomotives in the NPBL by-laws. In response, CSX made clear that: (1) it would "expect that the NPBL would provide the same rate, or a substantially similar rate, for a comparable move for Norfolk Southern," and (2) it had "no objection to the rate being embodied in a tariff or contract, although all parties may find it more practical to negotiate these rates in a

5

contract."[4] Ex. 36 to ECF No. 324 (NSR_00000781 at -820). Then NPBL-president David Stinson testified that this addressed his concern regarding compliance with the operating agreement and the "next step would be [to] go to the board to vote on a tariff, not a contract." Ex. 35 to ECF No. 324 (Stinson Dep. 158:12-20).

However, NPBL did not engage further in any meaningful negotiations over the terms of the 2010 Proposal. To be clear, CSX did not subsequently alter the terms of the Proposal to require that the $37.50 per container rate would be *exclusive* to CSX, or to demand it be memorialized in a private contract. *See* **Exhibit 1** (Armbrust Dep. 139:2-12) (Steve Armbrust, who served as a CSXT-appointed member of the NPBL Board in 2010, explaining that CSXT did not have "a desire one way or the other" regarding whether the rate was memorialized in a contract or embodied in the NPBL tariff); **Exhibit 2** (Eliasson Dep. 131:10-132:6) (Fredrik Eliasson, who also served as a CSXT-appointed NPBL Board member in 2010, explaining that CSXT's proposal "was never intended to be a non-linear or non-uniform rate if [NS] had an interest in having the same rate"). NPBL did not accept the 2010 Proposal after all the NS-appointed Board members voted against a motion that would enable NPBL to use CSXT's locomotives—*not* any concern about any purported "non-uniform" rate. *See* Ex. 47 to ECF No. 324 (NPBL017933 at -937-38).

B.  **The 2018 Proposal.**

On March 23, 2018, CSX sent NPBL management a Rate Proposal for Long Term Rail Service to NIT. ECF No. 1-5 at 1-9. It proposed a switching rate of $80 per car combined with a minimum annual volume guarantee of 18,000 cars. *Id.* at 3-4. CSX estimated its proposal "would

---

[4] CSX also noted that it was "willing to proceed with the Rate Proposal without consideration of free CSX power" to address management's concern regarding the use of foreign power. Ex. 36 to ECF No. 324 (NSR_00000781 at -820). Stinson agreed in his deposition that if CSX's proposal did not include the use of CSX power, then it would not implicate the Bylaws' foreign power clause. Ex. 35 to ECF No. 324 (Stinson Dep. at 159:15-24).

provide NPBL with a consistent, long term stream of additional income," to the tune of $1.4 million in incremental revenue and $660,000 in incremental operating income in the first year alone. *Id.* at 2.

Upon receipt, NPBL Vice President Donna Coleman did a "back-of-the envelope financial evaluation" of the 2018 Proposal, which she discussed with President Cannon Moss. Ex. 5 to ECF No. 324 (Coleman Dep. 181:13-25); Ex. 80 to ECF No. 324 (NPBL000189 at -93). Her calculations showed net revenue for NPBL per trip under the proposal would be $1,500, not including supervisor costs. *Id.*; *see also* Ex. 5 to ECF No. 324 (Coleman Dep. 188:9-190:8). She concluded there was enough "validity" to send the proposal to a rate committee. *Id.* (Coleman Dep. 189:19-22). Coleman, notably, raised no concern that CSX's proposal would violate NPBL's Operating Agreement.

On April 5, 2018, NPBL's Moss sent an email to CSX's Tony DiDeo, outlining a few "thoughts" about the 2018 Proposal. Ex. 84 to ECF No. 324 (NPBL006228). Moss noted, among other things, that the "major factor in play are the windows NS would provide for NPBL to make our run to NIT" (i.e., the request NS denied two days earlier). *Id.* Moss also noted that the proposal would "require" two NPBL locomotives (leased from NS), and that NPBL management "would recommend to the board for a rate committee to do a complete review of the tariff." *Id.* Moss testified that, in addition to these purported concerns, he did not feel he could perform an in-depth analysis of CSX's proposal until he knew what NPBL was "going to be paying [NS] for trackage rates." Ex. 7 to ECF No. 324 (Moss Dep. 244:2-8). Notably, like Coleman, Moss did not raise any concern that CSX's proposal would violate the purported "uniform rate" provision of the Operating Agreement.

As in 2010, NPBL did not engage in any meaningful negotiations regarding the 2018 Proposal. At no time did CSX aver that the proposed $80 per car rate had to be exclusive to CSX. *See* **Exhibit 3** (DiDeo Dep. 153:14-155:17) (Tony DiDeo, who signed and transmitted the 2018 Proposal to NPBL management, explaining that "the rate itself doesn't have to be only with CSX," and that "there's nothing that would prevent NPBL from offering a similar rate to anyone else.") At the NPBL Board meeting following CSX's circulation of the 2018 Proposal, the NPBL Board did not discuss the Proposal, or vote to form a rate committee to analyze the tariff or the proposal. Ex. 89 to ECF No. 324 (Hurlbut Dep. 67:23-68:16); Ex. 87 to ECF No. 324 (Merilli Dep. 75:11-21). No one suggested at that meeting that the 2018 Proposal would violate NPBL's Operating Agreement.

The record confirms what a plain reading of the 2010 and 2018 Proposals supports: that neither proposal was exclusive of a "uniform" rate charged to any customer seeking switching service to NIT. Evidence and argument to the contrary is misleading and prejudicial and should be excluded.

### III. This Court Has Recognized that CSXT's 2018 Proposal Did Not Seek a Preferential, Non-Uniform Rate.

In the denying NPBL's Motion to Dismiss, this Court directly addressed NPBL's argument that it could not accept CSXT's 2018 Proposal because it was for a non-uniform rate and thus would violate the Operating Agreement. In rejecting NPBL's argument, the Court reasoned:

> [N]either the Complaint nor the rate proposal attached to the Complaint, which CSX proposed in 2018, states that CSX is seeking a lower preferential rate, below the Uniform Rate, for only itself. . . . The service proposal does not state that the rate would be lowered for only CSX. The lowered rate is not limited to CSX, at least as alleged in the Complaint and the rate proposal, but rather applies to any traffic by any company on Belt Line's tracks between "Berkley Yard and NIT." Compl. ¶ 39; ECF No. 1-5. Therefore, the proposal is within the power of Belt Line and its directors to accept, and does not appear to violate the Operating Agreement.

8

ECF No. 66 at 26-28 (describing NPBL's argument that CSX was "seeking a preferential rate" as "miss[ing] the mark"); *see also id.* at 54-55 (noting, based on the plain language of the proposal, that CSX's proposed rate for switching services to NIT "is not limited to CSX"). As outlined above, the evidence produced in discovery has only added support to this Court's conclusion some twenty months ago.

Any argument that either the 2010 or 2018 Proposal sought a "non-uniform" rate in violation of the NPBL Operating Agreement should be excluded. Such evidence is irrelevant because it goes to an issue outside the scope of this case. *See* FED. R. EVID. 401, 402. More importantly, it should be excluded under Rule 403 because there is a substantial danger that it could potentially mislead or confuse the jury, and unfairly prejudice CSX. CSX's concerns about Defendants' improper characterizations of the Proposals are not illusory. It would be factually and legally erroneous for the jury to disregard the Defendants' contemporaneous treatment of the Proposals based on their newly-minted (and also inaccurate and misleading) argument that the Proposals violated the Operating Agreement. The plain language of the Operating Agreement and all of the record evidence demonstrate that this is not the case, and Defendants should not be permitted to argue to the contrary at trial. .

## **CONCLUSION**

Based on the foregoing reasons, CSX respectfully requests an order prohibiting Defendants from offering at trial any evidence or argument that CSX's 2010 or 2018 Proposals were for a lower preferential rate and/or would have violated NPBL's Operating Agreement.

Dated: May 12, 2021

Respectfully submitted,

**CSX TRANSPORTATION, INC.**
*By Counsel*

*/s/ Benjamin L. Hatch*
Robert W. McFarland (VSB No. 24021)
Benjamin L. Hatch (VSB No. 70116)
V. Kathleen Dougherty (VSB No. 77294)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia 23510-1655
Telephone: (757) 640-3716
Facsimile: (757) 640-3930
E-mail: rmcfarland@mcguirewoods.com
E-mail: bhatch@mcguirewoods.com
E-mail: vkdougherty@mcguirewoods.com

J. Brent Justus (VSB No. 45525)
Ashley P. Peterson (VSB No. 87904)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219-3916
Telephone: (804) 775-1000
Facsimile: (804) 698-2026
E-mail: bjustus@mcguirewoods.com
E-mail: apeterson@mcguirewoods.com

**CERTIFICATE OF SERVICE**

I certify that on this 12th day of May, 2021, a true and correct copy of the foregoing was served on all counsel of record via Notice of Electronic Filing by filing with the Court's CM/ECF system.

/s/ Benjamin L. Hatch
Robert W. McFarland (VSB No. 24021)
Benjamin L. Hatch (VSB No. 70116)
V. Kathleen Dougherty (VSB No. 77294)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia 23510-1655
Telephone: (757) 640-3716
Facsimile: (757) 640-3930
E-mail: rmcfarland@mcguirewoods.com
E-mail: bhatch@mcguirewoods.com
E-mail: vkdougherty@mcguirewoods.com

J. Brent Justus (VSB No. 45525)
Ashley P. Peterson (VSB No. 87904)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219-3916
Telephone: (804) 775-1000
Facsimile: (804) 698-2026
E-mail: bjustus@mcguirewoods.com
E-mail: apeterson@mcguirewoods.com