**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

**CSX TRANSPORTATION, INC.,**

   **Plaintiff,**

 **v.**           **Civil Action No. 2:18-cv-530-MSD-RJK**

**NORFOLK SOUTHERN RAILWAY
COMPANY,** *et al.*,

   **Defendants.**

**NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY'S
<u>REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

## INTRODUCTION

Despite 118 exhibits and 102 paragraphs recast as its own statement of fact, CSXT still identifies no conspiratorial conduct whatsoever to establish its case against the Belt Line. CSXT's opposition relies on sweeping statements, not evidence of conspiratorial acts involving the Belt Line. CSXT repeatedly blurs its descriptors, describing concerted action by "Defendants" but identifying only acts by NS.

Perhaps most telling is that CSXT does not dispute the reasonableness of the Belt Line's uniform switching rate. It repeatedly describes the rate as "exorbitant," hoping that repetition will make it so, but offers no evidence to contradict that the rate is equal to the Belt Line's per car operating costs.

Even if there were a glimmer of truth to CSXT's biased complaints—which there is not— its claims against the Belt Line are all time-barred, all fraught with critically missing elements of proof, and all dependent on this Court ignoring ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, which is the true reason it uses trucks instead of rail to access NIT, not a contrived conspiracy.

Factual disputes require facts, not unsupported arguments. Without concerted action by the Belt Line, and without any evidence contradicting the Belt Line's cost-based switching rate, this case is ripe for summary judgment. The Belt Line cannot be forced to operate below cost, or punished for failing to do so, and its switching rate cannot be artificially judged against either ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Because CSXT cannot support its case, summary judgment should be granted for the Belt Line.

## REPLY TO CSXT'S STATEMENT OF DISPUTED MATERIAL FACTS

CSXT's opposition fails to comply with Local Rule 56(B) because it obfuscates what facts CSXT genuinely disputes.  While CSXT identifies 18 Belt Line facts that it does not dispute,[1] the presentation of the 36 it contends are disputed masks the fact that it identifies no evidence to contradict them.[2]  "[W]hile a court occasionally may forgive a litigant for failing to strictly comply with mere procedural formalities in the Local Rules, a violation of Local Rule 56(B) lies at the more serious end of the spectrum of non-compliance." *Certusview Techs., LLC v. S&N Locating Servs., LLC*, 2015 U.S. Dist. LEXIS 103982, at *15 (E.D. Va. 2015).  When a party fails to produce evidence to dispute a material fact, the court may assume the fact is admitted.  E. D. Va. Local Civ. R. 56(B); *see also Integrated Direct Marketing, LLC v. May*, 129 F. Supp. 3d 336, 345 (E.D. Va. 2015) (admitting defendant's statement of facts after plaintiff failed to offer evidence to dispute fact, instead making only argument based on its interpretation of facts).

Here, CSXT fails to produce evidence to support its "disputed" facts.  Critically, it fails to come forward with any evidence of (1) the Belt Line's participation in a conspiracy or (2) the Belt Line's $210 tariff rate exceeding its operating costs, despite claiming to dispute the Belt Line's facts about those issues.  Rather than dispute the Belt Line's facts with evidence, CSXT improperly argues its own interpretation of the facts.  That is insufficient to avoid summary judgment.

---

[1]     CSXT explicitly does not dispute Belt Line statements of fact 1-5, 11-14, 16-17, 20-22, 34, and 37.  *See* CSXT Br. at 7.

[2]     CSXT claims it disputes the Belt Line's remaining statements of fact, but on close reading, it fails to cite evidence to demonstrate any factual dispute of the following 33 Belt Line statements of fact: 6-10, 15, 18-19, 24-29, 31-36, 38-45, 47-54.  For three facts it has arguably proffered contradicting evidence, but the disagreements are not material.  *Compare* NPBL SOF ¶¶ 23, 30, 46, *with* CSXT SOF ¶¶ 72 n.14, 53 & 53 n.13, 73.  Summary judgment does not hinge on whether switch charges can vary, CSXT SOF ¶ 72 n.14; the exact number of trains the Belt Line moved in 2015, CSXT SOF ¶ 53 & 53 n.13; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  CSXT SOF ¶ 73.

**A. CSXT offers no evidence to show that the Belt Line conspired with NS.**

Concerted action is an essential element of a conspiracy, but CSXT does not identify, in any part of the voluminous record, concerted action by the Belt Line. Beginning with a long litany about what it complains occurred in 2008-2011, CSXT SOF ¶¶ 10-44, CSXT generically refers to actions by "Defendants" yet only identifies actions by NS employees. As but one example, CSXT describes how in 2010 its appointed director made a motion that the Belt Line be allowed to use CSXT locomotives (for free to move CSXT intermodal traffic to NIT, and complains that the three NS-appointed members of the Belt Line Board voted against it. CSXT SOF ¶ 40. CSXT specifically cites this as an example of "concerted action" by the Belt Line. *See* CSXT Br. at 56 (citing CSXT SOF ¶ 40). But CSXT avoids telling the Court that the Belt Line's then-president sided with the two CSXT-appointed Board members in favor of CSXT's proposal. *See* CSX Ex. 47. Plainly, there was no "concerted action" by the Belt Line, and CSXT's recitation of complaints about NS employees cannot make it so.

CSXT's allegations regarding the Belt Line's handling of container traffic in 2015, CSXT SOF ¶ 45-55, fare no better. The Belt Line successfully moved every train at NIT that CSXT requested. The Belt Line also coordinated with NS to set up regular twice weekly operating windows for such moves. CSXT offers no evidence to dispute those facts or any evidence to explain how it was harmed by the Belt Line successfully handling its NIT traffic that year.

CSXT similarly claims that another example of concerted action was avoiding a vote on CSXT's 2018 rate proposal. But the undisputed facts are that the Belt Line's management (1) analyzed the proposals, (2) provided its analysis to CSXT (to which it never responded), (3) recommended that the Board appoint a rate committee to further analyze the proposals; and (4) that the CSXT-appointed Board members never made a motion to approve the rate proposal or

even appoint a rate committee.  CSXT "disputes" these only by arguing that the Board did not vote

on the proposal, and that the NS-appointed directors opposed an "independent" rate committee.

Lastly, by CSXT's own admission, it is undisputed "that NPBL and NS did not enter a new

agreement in 2018 to increase the amount NPBL pays NS to access NS's tracks to NIT."  *See*

NPBL Br. at 21-22.  Yet CSXT devotes six paragraphs to a new contention that "Defendants" used

their purported "dispute" over trackage rights as pretext to justify NPBL's "artificially high rate"

and to reject CSX's proposal seeking a "commercially reasonable rate."  CSX SOF ¶¶ 56-61.

While none of those six paragraphs identify evidence of any involvement by the Belt Line, even if

they did, it is nothing but a repackaging of CSXT's complaint about the $210 rate set in 2010.

CSXT thus is barred from using it to contradict its admission.

### B.  CSXT offers no evidence to dispute the Belt Line's operating costs.

CSXT does not dispute that the Belt Line was created in 1897 as a break-even business.  It

claims to "dispute" that the Belt Line's switching rate is based on its operating costs, *see* NPBL

SOF ¶¶ 43-45, without identifying any evidence to contradict it.  In particular, the $210 rate has

consistently been ███████████████████████████████████████████, *see*

NPBL SOF ¶ 42, another fact CSXT does not dispute.  This is critical because the law does not

require ██████████████████████████████████████.  While CSXT claims

to "dispute" this, nowhere does it point to any contrary evidence, only arguing that the Belt Line's

operating costs for traffic at NIT should be treated as incremental costs at the expense of all its

other customers who pay the uniform tariff rate of $210 per car.  CSXT SOF ¶ 74.

CSXT thus fails to comply with Local Rule 56(B) for not supporting its claimed "disputed"

facts with evidence.  As a result, the Court should assume that the facts identified by the Belt Line

are admitted, which supports granting it summary judgment.

## ARGUMENT [3]

**I.    The statute of limitations bars CSXT's federal antitrust conspiracy claims.**

    **A.  When a plaintiff alleges a "decades-long" conspiracy, under federal antitrust law it may only recover damages for acts that occurred within the limitations period.**

CSXT suggests that the parties disagree about how the statute of limitations applies with respect to its two federal antitrust counts.  CSXT Br. at 42.  In fact, there is no disagreement.  The cases cited by both sides all hold the same thing:  a plaintiff cannot recover damages attributable to acts that occurred more than four years before suit was filed, but can recover those damages attributable to acts occurring within the limitations period.  CSXT simply does not realize that this rule is fatal to its damages model, which extends back to nine years before suit was filed and fails to tie its damages to alleged acts within the limitations period.

CSXT only cites half the analysis.  For example, in *Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321 (1971), the Supreme Court held that:

> In the context of a continuing conspiracy to violate the antitrust laws, such as the conspiracy in the instant case, this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act….

*Id.* at 338.  But CSXT omits the rest:  "…and that, *as to those damages*, the statute of limitations runs from the commission of the act."  *Id.* (emphasis added).

Likewise, both parties rely on *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997), but CSXT cites to it only for the proposition that "in the case of a continuing violation …, each overt act that is part of the violation and that injures the plaintiff … starts the statutory period running

---

[3]    Because CSXT filed a consolidated opposition to the motions for summary judgment filed by the Belt Line and NS, the Belt Line adopts and incorporates the arguments in NS's reply brief that are readily transferable to the Belt Line.  *U.S. ex rel. LaCorte v. SmithKline Beecham Clinical Labs, Inc.*, 149 F.3d 227, 237-38 (3d Cir. 1998).

again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times."

CSXT Br. at 42 (quoting *Klehr*).  CSXT again fails to include the most important part:

> But the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period…. *The plaintiff cannot use an independent, new predicate as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period*.

*Id.* at 189-90 (emphasis added).[4]

### B. CSXT's damages model cannot sustain a verdict because it forces the jury to speculate which of CSXT's damages are for acts within the limitations period.

Even if CSXT could show that an overt act in furtherance of a conspiracy was committed within the limitations period, CSXT is barred from recovering damages for earlier acts that occurred outside the limitations period.  CSXT filed suit on October 4, 2018, so the 4-year limitations period on its federal antitrust claims extends back to October 2014.  Yet CSXT's model only calculates aggregate damages caused by the entirety of the alleged conspiracy, including damages as far back as 2009 for acts allegedly committed in 2008.  *See* Marvel Reply Report (ECF No. 301-10) at ¶¶ 124, 126.  That leaves the jury to speculate as to CSXT's recoverable losses.  Even CSXT agrees a jury verdict awarding damages cannot be "based on speculation or guesswork."  CSXT Br. at 49-50 (quoting *LePage's v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003).

---

[4]    The other cases CSXT cites affirm this principle.  *See Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 502 (1968) (allowing antitrust claim in 1955 for conduct that began in 1912, but only permitting recovery of damages that accrued within limitations period); *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 902 (7th Cir. 2004) (for suit filed in 2003, plaintiff could recover damages for acts in 2000 and 2002 but not in 1997); *Mayor v. Actelion Pharms. Ltd.*, 2021 U.S. App. LEXIS 10531, at *21 (4th Cir. 2021) ("[E]ach time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act"); *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 107 (3d Cir. 2010) (plaintiff may only "recover damages for the acts that occurred within the limitations period").

CSXT relies exclusively on its expert to calculate its alleged damages. Its expert states unequivocally that he calculated an aggregate amount of damages that included damages allegedly suffered as far back as October 1, 2009. *See* Marvel Reply Report (ECF No. 301-10) at ¶¶ 124, 126 (stating that "in total" he calculated damage "from October 1, 2009 through December 31, 2020" and that "the source of the damages I estimate is the totality of NS's and NPBL's efforts to foreclose CSX, rather than NPBL's exorbitant switch rate alone").

CSXT concedes in its opposition that its expert includes damages attributable to acts accruing outside the limitations period, and that he fails to distinguish damages for acts within the limitations period: "To be sure, CSX's expert, Dr. Howard Marvel, calculated profits CSX lost due to 'the totality of NS's and NPBL's efforts to foreclose CSX' from on-dock rail at NIT. *Most of these occurred in years* after 2013—within the limitations periods." CSXT Br. at 49 (internal citations omitted) (emphasis added).

This is fatal to CSXT's federal antitrust conspiracy claims. When a plaintiff's evidence gives the jury no basis on which to consider or account for the effect of the statute of limitations on alleged damages, it would be error to submit it to the jury.[5] "[T]he jury would be left entirely

---

[5]     Failure to disaggregate damages is routinely fatal to a plaintiff's antitrust claims. *Cf. Ky v. Marathon Petroleum Co. Lp*, 464 F. Supp. 3d 880, 894-95, 897 (W.D. Ky. 2020) (granting summary judgment when plaintiff's expert report "did not specify what portion of the calculated damages figure stems from Defendants' legal conduct and what portion, if any, is caused by any of their allegedly illegal forms of conduct."); *In re Independent Serv. Orgs. Antitrust Litig.*, 114 F. Supp. 2d 1070, 1090-91 (D. Kan. 2000) (granting summary judgment because plaintiff failed to meet its burden to disaggregate the amount of losses caused by actionable conduct); *Vernon v. So. Cal. Edison Co.*, 955 F.2d 1361, 1372 (9th Cir. 1992) ("serious flaws in the only damage study which could be proffered to the jury placed [plaintiff] in the position of having no proper proof of damages at all"); *United States Football League v. NFL*, 842 F.2d 1335, 1378-79 (2d Cir. 1988); *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 808 (9th Cir. 1988); *Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1351 (9th Cir. 1985); *ILC Peripherals Leasing Corp. v. IBM Corp.*, 458 F. Supp. 423, 434 (N.D. Cal. 1978, *aff'd per curiam sub nom.*, *Memorex Corp. v. IBM Corp.*, 636 F.2d 1188 (9th Cir. 1980), *cert. denied*, 452 U.S. 972 (1981).

to speculation to determine [what damages were] triggered by acts that accrued before or after the limitations period began, or to assess what portion of [damages are] attributable to acts that caused harm within the limitations period." *Gumwood HP Shopping Partners L.P. v. Simon Prop. Grp., Inc.*, 221 F. Supp. 3d 1033, 1044-45 (N.D. Ind. Nov. 22, 2016) (excluding plaintiff's expert because he calculated aggregate damages partly attributable to acts outside the limitations period); *see also Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946) ("Once causation of damages has been established, the amount of damages may be determined by a just and reasonable estimate *as long as the jury verdict is not the product of speculation or guess work*") (emphasis added).

CSXT argues that its expert "calculated CSX's lost profits by year," as a potential way to salvage its model. CSXT Br. at 51 (citing Exhibits 15 and 16 of Marvel's Reply Report). That is meaningless because it is not just a matter of subtracting the damages he calculated for years prior to 2014. Like the excluded expert in *Gumwood*, Marvel improperly opines that the acts outside the limitations period (including the clearly-time barred acts dating back to 2008) caused part of the alleged yearly damages within the limitations period.

The cases on which CSXT relies are inapposite. For example, in *Poster Exchange, Inc. v. National Screen Service Corp.*, 517 F.2d 117 (5th Cir. 1975), where the court approved "day by day calculation of accruing injury," it was specifically only for injury accruing within the limitations period; the plaintiff expressly disclaimed any recovery of damages for acts outside the limitations period. *See id.* at 124. The court stressed that "a newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period, not merely the abatable but unabated inertial consequences of some pre-limitations action." *Id.* at 128.

The issue, therefore, is not that CSXT failed to "tie its damages calculation to specific overt acts," as CSXT frames it, *see* CSXT Br. at 49, but that CSXT failed to tie its damages to acts that occurred within the limitations period.  And on this, the failure is indisputable.

The argument advanced by CSXT in its opposition contradicts settled case law and would render the statute of limitations meaningless.  CSXT suggests the only thing it must do is pay the Belt Line's allegedly "exorbitant" rate one time during the limitations period, and then all of its damages for the entirety of the alleged conspiracy are back on the table.  CSXT Br. at 45.  Under that theory, the *Hanover Shoe* plaintiff could sue in 1955 and recover damages back to 1910 when the first act in furtherance of the conspiracy was committed.  The Supreme Court rejected such an absurd result, limiting recovery only of damages within the limitations period.  *See* 392 U.S. at 502.  CSXT is unable to do that here based on its damages model.  *See, e.g., Comcast Corp. v. Behrend*, 569 U.S. 27, 38 (2013) (plaintiffs' damages model, which calculated total damages from four alleged violations, was impermissibly overinclusive, because it could not establish damages attributable to the one violation that was still actionable after the other three were dismissed).

Because of CSXT's inability to present any competent evidence of its damages attributable to acts occurring within the limitations period, CSXT is missing an essential element of the federal antitrust claims against the Belt Line, entitling it to summary judgment on Counts I and II.

## C.  Even if CSXT's damages model was not overinclusive, there was no continuing violation or new overt act during the limitations period.

For CSXT to reach the jury on damages, it first must show (not just allege) that overt acts in furtherance of a conspiracy were committed within the limitations period.  CSXT has no evidence with which to make the requisite showing. Thus, all of CSXT's claims against the Belt Line are either time-barred or not actionable.

Last year, this Court ordered CSXT to identify all overt acts by the Belt Line it contends were committed in furtherance of the alleged conspiracy.  ECF No. 236.  In response, CSXT identified six: ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████. *See* Compl. ¶ 34; CSXT's 2nd Supp. Resp. to NPBL Interrog. 4 (NPBL Ex. 46, ECF No. 302-1).

The Belt Line explained in its motion for summary judgment how the first four alleged acts are time barred, and why the two acts in 2015 and 2018 are not actionable.  *See* NPBL Br. at 15-18, 27-30.  The Belt Line also pointed out how CSXT admitted that the only other alleged conspiratorial act—the "new agreement in 2018" to increase the trackage fee the Belt Line pays NS—never occurred.  *See id.* at 21-22 (citing CSXT's admission).

In a desperate attempt to avoid summary judgment, CSXT (1) proffers two new overt acts that were never disclosed in discovery, (2) mistakenly applies the continuing-violation doctrine to keep its antitrust claims alive, (3) now pleads an alternative set of facts to keep its state-law conspiracy claims alive, and (4) attempts to manufacture a genuine dispute of material fact about the two acts in 2015 and 2018 by relying on inadmissible hearsay evidence and declarations that are not based on personal knowledge. None are valid; all should be rejected.

1. **Only the six overt acts CSXT disclosed in discovery are at issue.  At this late date, CSXT cannot introduce new acts to escape summary judgment.**

Recognizing that four of the six overt acts it identified are time-barred, and that the other two are not actionable, CSXT contends for the first time in its opposition brief that there were two additional overt acts which are not time-barred:  (1) the Belt Line charged CSXT an "exorbitant" rate for moving intermodal containers in 2015, and (2) even though there was no "new agreement in 2018" over trackage fees, Defendants nonetheless used "their purported 'dispute' over trackage

rights as a pretext to justify NPBL's artificially high rate and to reject CSX's proposal seeking a commercially reasonable rate."  CSXT Br. at 43, 45, 48, 53.

CSXT is not permitted to assert new contentions of overt acts in response to a motion for summary judgment.  "It is well settled that a plaintiff may not advance a new argument in response to a summary judgment motion."  *Abuelyaman v. Illinois State Univ.*, 667 F.3d 800, 814 (7th Cir. 2011).  CSXT failed to disclose either of these alleged acts in discovery, despite a court order requiring it to do so.  The Belt Line's interrogatories asked CSXT to identify "the specific overt act(s) by NPBL" and "the specific communication(s) between the Belt Line and NS" that CSXT contends form the basis for the alleged conspiracy.  *See* NPBL Ex. 46 (ECF No. 302-1).  When CSXT objected to answering, Judge Leonard ordered it "to provide appropriate responses to NPBL's interrogatories 3 and 4…."  ECF No. 236.  CSXT responded by identifying the six overt acts discussed in the Belt Line's motion.  CSXT did not identify the two additional acts now raised in its opposition, nor did it identify communications between the Belt Line and NS about either.

CSXT therefore violated Rule 26(e) and Rule 37(c)(1), and is barred from using either act to oppose the Belt Line's motion.  *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information … as required by Rule 26(a) or (e), the party is not allowed to use that information … to supply evidence on a motion …, unless the failure was substantially justified or is harmless.").[6]

Tacitly acknowledging that its failure is not harmless, CSXT instead argues that it was "substantially justified."  It claims that interrogatory 4 "did not ask CSX to identify all wrongful conduct within the limitations period; nor did it ask for examples of action (or purposeful inaction)

---

[6]     The sanction of exclusion is "automatic."  Fed. R. Civ. P. 37 advisory committee notes, 1970 Amend. ("Paragraph (1) prevents a party from using as evidence any … information that, without substantial justification, has not been disclosed as required by Rules 26(a) and 26(e)(1). This automatic sanction provides a strong inducement for disclosure of material that the disclosing party would expect to use as evidence … on a motion, such as one under Rule 56.").

by NS.  CSX's response is thus not a catalogue of all evidence supporting its claims."  CSXT Br. at 43 n.22 (citing its interrogatory answer).  The interrogatory asked CSXT to

> Identify the specific overt act(s) by NPBL that you contend form the basis for the conspiracy alleged in Counts I, II, VIII, and IX of your Complaint, including the identities of the specific persons who you contend committed such act(s), the dates and circumstances of such act(s), and all documents that support your answer.

NPBL Ex. 46 (ECF No. 302-1).  It is impossible to interpret that as only asking about conduct outside the limitations period.  And both acts CSXT cites would be "examples of action by" the Belt Line, not NS.  The Belt Line charged the $210 switching rate to CSXT in 2015.  It is the Belt Line that CSXT alleges used the trackage rights dispute as pretext.

Because CSXT's failure is neither substantially justified nor harmless, it cannot introduce either of these acts as evidence to oppose summary judgment.  It is limited to the six overt acts it disclosed in discovery.

**2.  The continuing-violation doctrine that CSXT relies on to prevent the first four overt acts from being time-barred does not apply in this case.**

To avoid the four-year federal statute of limitations, CSXT invokes the continuing violation doctrine.  CSXT Br. at 42-46.  There is no continuing violation, though, because there was no overt act committed within the limitations period.  CSXT alleges there were two new overt acts after 2014—denial of a scheduling window in 2015 and failure to adopt CSXT's 2018 proposals—but offers no evidence to support them.  Accordingly, CSXT's claims are all time-barred.

"In the context of a continuing conspiracy to violate the antitrust laws, … each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act."  *Zenith*, 401 U.S. at 338.  Even when a plaintiff alleges a continuing violation, an overt act by the defendant is required to restart the statute of limitations and the statute

runs from the last overt act.  *See, e.g., Haier Am. Trading, LLC v. Samsung Elecs., Co.*, 2018 U.S. Dist. LEXIS 152676, at \*18 (N.D.N.Y. Sept. 7, 2018).  Two elements must exist for an overt act to restart the statute of limitations:  "(1) it must be a new and independent act that is not merely a reaffirmation of a previous act; and (2) it must inflict new and accumulating injury on the plaintiff." *Id.* (citation omitted) (granting motion to dismiss because plaintiff's allegations of four new overt acts within limitations period were not plausible to keep antitrust claims from being time-barred).

### a.  There was no new overt act in 2015.

In this case, there was no new overt act to restart the statute of limitations period.  CSXT claims that Defendants denied a scheduling window for the Belt Line to move CSXT's traffic into NIT in 2015.  But that allegation is shown to be false by the actual evidence.  *See Haier*, *supra*; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The undisputed facts are that (1) CSXT requested that the Belt Line move traffic at NIT in 2015, *see* CSXT SOF ¶ 45; (2) the Belt Line requested that NS provide an operating window to complete the move, *see* CSXT SOF ¶ 46; (3) "NS eventually agreed to provide an operating window for this train," *see* CSXT SOF ¶ 47; (4) the Belt Line successfully completed the move for CSXT, *see* CSXT SOF ¶ 48; (5) CSXT does not dispute that, after the first train, the Belt Line set up a regular operating window with NS for CSXT trains ████████████████████████ ██████████████████, *see* NPBL SOF ¶ 34; and (6) the Belt Line moved additional trains for CSXT in 2015.  *See* CSXT SOF ¶ 53.  In other words, it is undisputed that the Belt Line set up an operating window and successfully moved every train at NIT that CSXT requested.  None of that "inflict[ed] new and accumulating injury on the plaintiff" to constitute a continuing violation.[7]

---

[7]     CSXT's recitation of the facts shows it was not seeking a regular scheduling window into NIT in 2015.  CSXT states that the only reason it requested the Belt Line's help in the first place was because it was "during a period of extreme port congestion across the East Coast," and CSXT

CSXT's one complaint is that it lost business from one ocean carrier for "several weeks" in 2015.  CSXT Ex. 69 31:6-21.  But CSXT's testimony was explicit that it temporarily lost this business ████████████████████████████████████████  *Id.*  There is no correlation or causal link between this alleged new injury and any overt act by the Belt Line, because in fact CSXT's evidence is that the Belt Line helped resolve ███████████████.  *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (proof of an antitrust injury requires evidence that the injury "flows from that which makes defendants' acts unlawful").

Additionally, while Rule 37(c)(1) prevents CSXT from pointing to the rate charged by the Belt Line for the train moves at NIT in 2015 to oppose summary judgment, even if CSXT could rely on that evidence, it would not constitute a new overt act inflicting new and accumulating injury.  *Haier*, *supra*.  CSXT is seeking only lost profits for allegedly long-term foreclosed access at NIT; it has not requested a refund for an overcharge or identified any damage caused by the handling of its traffic by the Belt Line in 2015.  Thus, even if the payment could be considered as evidence, it would not trigger a continuing violation because it did not inflict any new or accumulating injury that CSXT seeks to recover.  If anything, it was reaffirmation of the time CSXT paid that same rate in 2010, CSXT SOF ¶ 45, and thus not a new overt act.  *Haier*, *supra*.

### b.  There was no new overt act in 2018.

The only other potential "new overt act" within the limitations period was the Board's allegedly unlawful failure to adopt CSXT's 2018 proposals.  This contention is also unavailing.  CSXT ignores the contractual handcuffs of the 1897 Operating Agreement's uniform rate provision that *does not allow the Belt Line to offer the different switch rate* CSXT sought.  The

---

wanted "to move backlogged freight at NIT."  Compl. ¶ 4; CSXT SOF ¶ 45.  Once that one-time issue was resolved, CSXT never again asked for the Belt Line to move its traffic at NIT.

Belt Line's shareholders would have to amend the Operating Agreement or waive compliance with that provision, as in the past instances CSXT cites. But that is not the course CSXT took. It admittedly never moved the Belt Line's Board to adopt either its rate proposal or its governance proposal, and never moved the shareholders to adopt its rate proposal. CSXT cannot manufacture a dispute about this when it admitted these facts in response to requests for admission. *See* CSXT's Resp. to NPBL RFAs 10, 13, 15-19 (ECF No. 300-8). CSXT does not suggest that the Board members it appointed were somehow prevented from moving for a vote, or that CSXT itself was prohibited from doing so at a shareholders meeting. In fact, one of the CSXT-appointed board members admitted during deposition that "███████████████████████████████" Armbrust Dep. (ECF No. 300-4) at 214:15-21. Thus, there was no motion made that Defendants ever rejected, which negates the idea of "purposeful" inaction.

The only case in which CSXT identifies "concerted inaction" as a new overt act is *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144 (3d Cir. 1993). That case involved "inaction" in the form of a boycott and refusal to sell or lease to the plaintiffs; *i.e.*, only acts that the defendants could have performed, regardless of input by the plaintiffs. Here, by contrast, CSXT's appointed directors at the meeting could have made a motion. CSXT cannot claim injury from inaction on an unmade motion that CSXT could have made but chose not to make.

CSXT cannot satisfy the elements for invoking the continuing-violation doctrine. Because the alleged 2015 and 2018 overt acts are not actionable, and because the first four acts are outside of the statute of limitations, the federal conspiracy claims against the Belt Line must be dismissed.

## II. The statute of limitations bars CSXT's state-law conspiracy claims.

Counts VIII and IX, CSXT's two state-law conspiracy claims, are also time-barred. Conspiracy causes of action under Virginia law accrue when the plaintiff first suffers any damages

resulting from the acts committed in furtherance of the conspiracy.  *See Detrick v. Panalpina, Inc.*, 108 F.3d 529, 543 (4th Cir. 1997).   CSXT's causes of action accrued in 2009, outside the limitations period, as that is when its expert claims the conspiracy first damaged CSXT.  *See* Marvel Reply Report (ECF No. 301-10) at ¶ 124.

### A.  There cannot be a continuing conspiracy only for the federal claims, and multiple, separate conspiracies for the state-law claims.

To prevent its state-law claims from being time-barred, CSXT does an about-face from its position with respect to the federal antitrust claims.  CSXT argues that events since 2013—within the five-year limitations period under state law—were not part of a continuing conspiracy after all. Instead, they are new conspiracies, disconnected from any earlier agreement to conspire.

CSXT argues that whether there was one continuing conspiracy—as CSXT has consistently averred in all its filings, except for this one section—or whether there were multiple conspiracies, each with its own statute of limitations, "is a factual matter for the jury to find." CSXT Br. at 47-48.  But CSXT does not offer any authority that would allow it to present two sets of facts in order to satisfy conflicting limitations regimes.  On the contrary, CSXT is conflating its factual contentions on the applicable statute of limitations with the well-recognized right to plead alternative legal theories.  *See, e.g., Witt v. CoreLogic Saferent, LLC*, 2016 U.S. Dist. LEXIS 110662, at *37-38 n.11 (E.D. Va. Aug. 18, 2016) ("The Court recognizes the right to plead alternative legal theories, *but is aware of no authority that allows the pleading of alternative facts where one set of which is entirely the opposite the other*.") (emphasis added).

Because CSXT is not permitted to temporarily abandon ship solely to prevent some claims from being sunk by the statute of limitations, all of its state-law claims are time-barred.

**B. Even if CSXT could rely on alternative sets of facts, that is contrary to its damages model and would force the jury to impermissibly speculate.**

In its haste to salvage its state-law claims, CSXT fails to recognize what it would mean for damages if there was a separate conspiracy after 2013. As explained earlier, CSXT's expert ties all of its alleged damages to acts committed both before and after 2013, without distinguishing them. Accepting CSXT's new position means an even more speculative—and unsustainable—damages verdict, because the jury would be left to guess at how much of CSXT's damages are attributable to the supposed new conspiracy(ies). *See* section I.B above.

CSXT cites *Blackwelder v. Millman*, 522 F.2d 766, 776-77 (4th Cir. 1975), for the proposition that, "under Virginia law, damages result from the totality of a conspiracy, not any particular overt act." CSXT Br. at 50. Reliance on *Blackwelder* is misplaced. There, the court held that damages resulting from a common-law conspiracy to commit fraud were recoverable because, under the facts of the case, the cause of action did not accrue until the defendants completed their conspiracy "by actions occurring well within the limitations period." 522 F.2d at 777. As the court explained, "the actionable damages as alleged here did not exist" until the last of those actions occurred. *Id.* at 776. Yet CSXT's damages model reaches all the way back to 2009 and is not predicated upon a new conspiracy by the Belt Line within the limitations period.

**C. There is no new conspiracy based on Defendants' trackage-rights dispute.**

As explained in the Belt Line's opening brief, the only potential state-law claim that was not time-barred was the allegation of a "new agreement in 2018" between Defendants to increase the trackage fee the Belt Line pays NS. NPBL Br. at 20-21. Accepting the Complaint's allegations as true, the Court stated in its order on the motions to dismiss that this could be a new conspiracy, "not a continuation of the same conspiracy to set the Uniform Rate at the 2008 level because the price is again increased." ECF No. 66 at 39-40. While CSXT's allegation may have led the Court

17

into believing that Defendants had actually increased the trackage fee in 2018, CSXT admitted in discovery that there was no truth to its allegation. *See* (ECF No. 300-8, Admission No. 3). Consistent with its admission that the alleged "new agreement" never occurred, CSXT did not identify it as a conspiratorial act in response to interrogatory 3 or 4.

CSXT now takes yet another position, contending that the lack of such an agreement was on purpose, that it was "pretext to justify NPBL's artificially high rate and to reject CSX's proposal seeking a commercially reasonable rate." CSXT Br. at 48. This position fails for three reasons.

First, as discussed earlier, CSXT is estopped from relying on such a contention that it failed to identify in response to a court order. Second, CSXT did not allege this conspiracy or unlawful act in its Complaint, *see* Compl. ¶¶ 119 and 123, further demonstrating the unfair prejudice to the Belt Line that would result if CSXT were able to rely on it. *See, e.g., Midco Int'l, Inc. v. Metro. Life Ins. Co.*, 2017 U.S. Dist. LEXIS 103296, at *11 n.3 (N.D. Ill. July 5, 2017) ("a new theory" of liability "raised for the first time in response to the motion for summary judgment" that "was not plaintiff's theory at the motion-to-dismiss stage" is "waived"). Third, the only "uncertainty surrounding this issue" was caused by CSXT itself. As set forth in Defendants' motions to dismiss, NS initiated the trackage rights proceeding at the U.S. Surface Transportation Board in September 2018, three weeks before CSXT filed its Complaint. The Belt Line and NS requested the STB give fast track consideration to the trackage rights proceeding, flatly contradicting CSXT's new claim they intentionally delayed resolving the dispute. *See* ECF No. 51. Further, CSXT was the party that intervened in that proceeding and requested the STB to stay the matter until this case is concluded, thereby prolonging the very uncertainty of which it now complains. *See id.*

### D.  CSXT never pleaded any other unlawful acts to support its state-law claims.

CSXT did not plead any other unlawful acts that would prevent its state-law claims from being time-barred.  The only other unlawful acts that CSXT pleaded in Counts VIII and IX of the Complaint were tortious interference, breach of fiduciary duty, and breach of contract.  *See* Compl. ¶¶ 119 and 123.  The tortious interference count was dismissed, as was the breach-of-fiduciary-duty count against the individual directors.  *See* ECF No. 66 at 2; ECF Nos. 143, 159.  And breach of contract, without more, cannot form the basis for a conspiracy claim.  *See Dunlap v. Cottman Transm. Sys.*, 287 Va. 207, 217 (2014) ("[T]he non-performance of a contract could not, without more, qualify as an 'unlawful' act.") (citing *Station #2, LLC v. Lynch*, 280 Va. 166, 174 (2010).

CSXT now argues that "[t]he record contains evidence of many 'wrongful or tortious acts" that could constitute the requisite unlawful act for purposes of the state-law conspiracy counts, "including NS's wrongful monopolization under the Sherman Act and the Belt Line's individual directors' violations of fiduciary duties."  CSXT Br. at 58.  NS's alleged monopoly cannot be the requisite unlawful act, though, because CSXT did not plead that in Count VIII or IX.  *See* ¶¶ 119 and 123.  CSXT's argument about the individual directors is a red herring, because any conspiracy between NS and them is separate from a conspiracy with the Belt Line.  *See id.* (alleging that NS conspired separately with the Belt Line and with the individual directors).  Nor could a conspiracy with the individual directors be considered one with the Belt Line.  The actions of the individual directors cannot be imputed to the Belt Line, because it never conferred authority on any of them to take the alleged acts on its behalf.  *See Monacan Hills, Inc. v. Page*, 203 Va. 110, 116 (1961).

None of CSXT's attempts to avoid its state-law claims from being time-barred are availing. The Court should therefore grant the Belt Line summary judgment on both state-law claims.

III.     **CSXT's claims fail because it cannot show a conspiracy involving the Belt Line.**

Even if CSXT's claims were not time barred, the four counts against the Belt Line still fail because CSXT cannot show that the Belt Line entered into a conspiratorial agreement with NS.

A. **Evidence of unauthorized conduct by individual NS-appointed Board members cannot be imputed to the Belt Line.**

"[T]here must be two persons to comprise a conspiracy, and a corporation, like an individual, cannot conspire with itself." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007); *Bowman v. State Bank of Keysville*, 229 Va. 534, 541 (1985). If anything, CSXT's opposition shows only concerted action between NS-appointed directors and other NS employees. As explained above, that conspiracy is not with the Belt Line, because individual Board members are not agents of a company and therefore cannot conspire on its behalf.[8] The Belt Line has no power over the individual Board members appointed by NS or CSXT. "[D]eclarations and admissions of individual directors when not acting as a board are not binding on the corporation nor admissible as evidence against it, unless they were acting as its authorized agents and within the scope of their authority." *Monacan Hills,* 203 Va. at 116 (citations omitted).

CSXT argues that *Monacan Hills* is distinguishable from the U.S. Supreme Court case it relies on, *American Society of Mechanical Engineers v. Hydrolevel Corp.*, 456 U.S. 556 (1982). *See* CSXT Br. at 54. In fact, *Hydrolevel* affirms the holding of *Monacan Hills*. In *Hydrolevel*, the Court found sufficient evidence of a conspiracy between two persons because the subcommittee members at issue were expressly authorized to act as agents of the standards-setting organization, and were found to have acted within the scope of their authority. *Id.* at 572-73.

---

[8]      *See also* Belt Line's Motion *in Limine* to Exclude Evidence and Argument Regarding Use of Internal NS Emails (ECF No. 349, 350), incorporated herein by reference.

Here, by contrast, the Belt Line's Board never conferred authority to any individual shareholder-appointed directors to act on the Belt Line's behalf in making any of the communications CSXT cites.  *See* CSXT Br. at 52-53.  Accepting CSXT's argument would mean the Belt Line could be found to have entered a conspiracy based on conduct that it did not authorize, did not know of, and has no way to prevent, in contravention of both Virginia law and federal law.  As a result, CSXT may not rely on the alleged NS-appointed director conduct cited in its opposition to show concerted action by the Belt Line.

**B.  CSXT's other evidence fails to show that the Belt Line entered into a federal antitrust conspiracy with NS.**

The only "evidence" of concerted action by the Belt Line that CSXT cites to other than alleged conduct of the NS-appointed Board members is the following:  (1) in 2009, the Board voted to adopt the $210 tariff switching rate, ███████████████████████ ███████████████████; (2) in 2011, the Board did not approve a motion for the Belt Line to use CSXT locomotives in service to NIT; (3) in 2018, the Board did not vote to form a rate committee to analyze CSXT's rate proposal; and (4) in 2015, the Belt Line's president emailed ███████ ████████████████████████████████████████████████████████ ███.  *See* CSXT Br. at 56-57 (citing ¶¶ 26, 29, 40, 50, 71).  None of it indicates a conspiracy.

First, CSXT concedes it supported the $210 rate in 2009, CSXT Br. at 14.  But CSXT never moved the Board to consider or adopt ████████████████████.  Not acting on a motion that was never made cannot establish an agreement to conspire.

Second, the 2011 locomotive-use motion did not pass because it was a tie vote with the Belt Line's president voting in favor of the motion.  CSXT Ex. 47 (NPBL017938).  A tie vote cannot constitute concerted action by the Belt Line.

21

Third, the reason the Board did not form a rate committee in 2018 to analyze CSXT's proposal is because no Board member, not even the CSXT-appointed ones, moved for a vote. This was despite President Moss's recommendation to form a rate committee. When CSXT fails to move for a vote, that is not evidence that the Belt Line agreed to conspire against CSXT.

Fourth, Moss's email ▓▓▓▓▓▓▓▓▓▓▓[9] does not evidence concerted action or conspiratorial intent by the Belt Line. Moss was notifying NS that CSXT was seeking additional operating windows on NS-controlled track. Luebbers stated that ▓▓▓▓▓▓▓▓▓▓



Because CSXT has no evidence of concerted action by the Belt Line, as a matter of law it cannot satisfy the first element of its federal antitrust conspiracy claims.

### C. CSXT fails to show "clear and convincing evidence" that the Belt Line entered into a state-law conspiracy with NS.

CSXT incorrectly argues that it only needs to present evidence reasonably leading to the inference of concerted action in order to defeat summary judgment. CSXT Br. at 52 (citing *Fed. Ins. Co. v. Locash*, 2014 WL 12588635, at *9 (E.D. Va. Feb. 18, 2014). Virginia law requires "clear and convincing evidence" to satisfy the element of concerted action for an unlawful purpose. *See Dunlap v. Cottman Transm. Sys.*, 287 Va. 207, 215 (2014); *Pierce Oil Corp. v. Voram*, 136 Va. 416, 430 (1923). "When, as here, the non-moving party must produce clear and convincing

---

[9]     In a footnote, CSXT also cites a 2012 email to suggest ▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓ CSXT Br. at 23 n.11. Because CSXT failed to disclose it in response to the Belt Line's interrogatory asking CSXT to identify conspiratorial communications, it cannot be considered. *See* ECF No. 236; Fed. R. Civ. P. 37(c)(1).

evidence to support its claim, that higher evidentiary burden is considered as part of the summary judgment calculus." *Wells v. Liddy*, 186 F.3d 505, 520 (4th Cir. 1999).

CSXT concedes its evidence only raises an inference of such an agreement. *See* CSXT Br. at 57. This is far short of the requisite "clear and convincing" evidence.

## IV. CSXT cannot overcome the cost justification for the Belt Line's switching rate.

CSXT argues that its claims do not hinge on the Belt Line's rate. CSXT Br. at 68. They necessarily do, however, because all of the other alleged anticompetitive conduct has conclusively been shown to be either time-barred or not actionable. Yet, as explained in the Belt Line's opening brief, this is a Rule of Reason case. CSXT cannot overcome the Belt Line's procompetitive cost justification—that the Belt Line's rate is set to cover its costs, just as its Operating Agreement requires. *See* NPBL Br. at 31-36; ECF No. 1-1, p. 4, Art. Ninth. The Belt Line's rate is therefore procompetitive, which means CSXT's antitrust claims fail as a matter of law.

To escape that, CSXT first argues that *per se* treatment applies. CSXT Br. at 61. That argument fails because there is no evidence that NS and the Belt Line are "potential horizontal competitors." *Id.* CSXT concedes that the Belt Line does not compete for ocean carrier business. *See* CSXT SOF ¶ 9. Nor does CSXT offer evidence that the Belt Line has the "necessary desire, intent, and capability to enter the market" as a competitor. *Lumber Liquidators v. Cabinets To Go, LLC*, 415 F. Supp. 3d 703, 712 (E.D. Va. 2019) (citation omitted).

Next, CSXT does not dispute any of the Belt Line's costs. The Belt Line cited *Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*, 704 F. Supp. 1309 (D. Md. 1989), for the unremarkable proposition that a price set at or below cost is by definition procompetitive. NPBL Br. at 34-35. CSXT argues this only applies in essential facilities cases, even though (1) *Laurel Sand* is not so

limited and (2) CSXT has postured this as an essential facilities case.[10]  In any event, CSXT fails to cite any contradictory legal authority suggesting that a rate that is below cost, like the Belt Line's, is anticompetitive.  That is because nothing in the law supports such a position.

Instead, CSXT suggests that even though the Belt Line's rate is set at cost, the rate is not needed to cover the specific cost of "service to NIT."  CSXT Br. at 68.  Its attempt to manipulate the cost analysis is hollow.  Its expert, who opines the $210 rate is "unreasonable," admitted he made no effort to evaluate the Belt Line's costs, fixed or variable.  *See* NPBL Ex. 33 at 168:9-25.

CSXT does not respond to the fact that its request for a rate that only covers "incremental" costs for service to NIT would mean forcing the rest of the Belt Line's customers to cover its overhead and fixed costs, all so CSXT could get a lower price for itself to NIT.  As the Belt Line's president explained, ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████  The Belt Line's shareholders foreclosed this possibility in the 1897 Operating Agreement with the uniform rate requirement.  ECF No. 1-1, p. 4, Art. Ninth.

Because the Belt Line's $210 rate ██████████████—which CSXT does not dispute—Counts I and II fail as a matter of law.

## V.    CSXT has no valid rate comparisons to show the Belt Line's rate is exorbitant.

"Any inquiry into the reasonableness of the rate … must focus on the rate's reasonableness in the context of competition, rather than from plaintiffs' perspective."  *Laurel Sand*, 704 F. Supp. at 1323; *see also FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944).  It makes no difference that the Belt Line's rate "may not be workable in [CSXT's] plans."  704 F. Supp. at 1323.

---

[10]     CSXT's expert ████████████████████████████████████████████████████████. *See* Marvel Report (ECF No. 299-1) at ¶¶ 40, 60.

CSXT has failed to demonstrate that a market for ████████████ exists; it has only provided its own.  And CSXT's market of "comparable rates" has been cherry-picked from ███ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████.[11]

In the absence of these improper comparisons, the Belt Line's switching rate is nearly identical to Commonwealth Railway's published $210 tariff rate, ██████████████████████ ██████████████████████████████████████████████████████████. *See* NPBL Br. at 37-38.

## CONCLUSION

Based on the undisputed facts, all four claims against the Belt Line fail as a matter of law. The Belt Line respectfully prays that the Court enter judgment for the Belt Line on all of them.

Dated:  May 13, 2021

**NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY**

By: _____*/s/ James L. Chapman, IV*_____
James L. Chapman, IV, VSB No. 21983
W. Ryan Snow, VSB No. 47423
David C. Hartnett, VSB No. 80452
Alex R. McDaniel, VSB No. 92398
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1500
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com
dhartnett@cwm-law.com
amcdaniel@cwm-law.com
*Attorneys for Norfolk and Portsmouth Belt Line Railroad Company*

---

[11]    *See also* Belt Line Motion *in Limine* to Exclude Evidence and Argument About CSXT's Private Switching Rates (ECF No. 353, 354), incorporated herein by reference.

## CERTIFICATE OF SERVICE

I certify that on this 13th day of May 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a "Notice of Electronic Filing" to all counsel of record who have consented to electronic service.

*/s/ James L. Chapman, IV*

James L. Chapman, IV, VSB No. 21983
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1500
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
*Attorney for Norfolk and Portsmouth Belt
Line Railroad Company*