**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | | |
|---|---|---|
| CSX TRANSPORTATION, INC., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No. 2:18-cv-530 |
| | ) | |
| NORFOLK SOUTHERN RAILWAY | ) | |
| COMPANY, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

**DEFENDANT NORFOLK SOUTHERN RAILWAY COMPANY'S**
**<u>REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................... 3

I.    CSX'S CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS ................... 3

    A.    CSX's conspiracy claims accrued more than five years ago. ............................... 3

    B.    CSX does not identify any new injury caused by post-2013 conduct. ................. 4

    C.    The continuing violation doctrine cannot save CSX's claims. ............................ 5

        1.    CSX cannot recover damages caused by conduct outside the limitations period. ...................................................................................... 6

        2.    The continuing violation doctrine can only be triggered by overt acts. ...................................................................................................... 6

        3.    CSX has no evidence of any wrongful overt act occurring within the limitations period. .............................................................................. 7

II.   CSX FAILS TO IDENTIFY ANY EVIDENCE OF AN ACTIONABLE CONSPIRACY BETWEEN DEFENDANTS ................................................................. 8

    A.    The time-barred conduct does not demonstrate a conspiracy. .............................. 9

    B.    No conspiracy can be inferred from the 2015 train movements or handling of the 2018 Rate Proposal. .................................................................................. 11

        1.    Successful 2015 train movements are not evidence of conspiracy.......... 11

        2.    A failure to vote for the 2018 Rate Proposal when CSX did not ask for a vote is not evidence of conspiracy................................................. 12

III.  NS IS ENTITLED TO SUMMARY JUDGMENT ON CSX'S ANTITRUST CLAIMS. .................................................................................................................. 13

    A.    CSX cannot prove a properly defined relevant market or the requisite degree of market power, which is fatal to all of its antitrust claims. ................... 14

        1.    CSX Incorrectly Contends it Need Not Define a Relevant Market. ........ 14

        2.    CSX Cannot Support the Relevant Market it Pled Because CSX Has No Expert Evidence to Support its Relevant Market....................... 15

        3.    The undisputed facts establish that either market is too narrow. ............. 18

## TABLE OF CONTENTS
(continued)

**Page**

B.     CSX cannot save its Section 2 attempted and actual monopolization claims. .............................................................................................. 19

     1.     CSX cannot demonstrate that NS engaged in exclusionary conduct ....... 19

     2.     CSX's inability to show foreclosure dooms its Section 2 claims. ........... 22

C.     CSX cannot demonstrate harm to competition under the Rule of Reason. ......... 22

IV.     NS IS ENTITLED TO SUMMARY JUDGMENT ON CSX'S BREACH OF CONTRACT CLAIM. ................................................................................................ 24

CONCLUSION.......................................................................................................... 25

**TABLE OF EXHIBITS**

| Exhibit | Description | Citation | Confidentiality |
|---------|-------------|----------|-----------------|
| 122 | CSX Corp. Dep. | 31:10-12 | |
| 123 | Mar. 28, 2018 CSX Email | CSXT0140145 | AEO |
| 124 | MacDonald Dep. | 216:9-13 | Confidential |
| 125 | J. Booth Dep. | 118:10-20 | Confidential |

Defendant Norfolk Southern Railway Company ("NS") submits this reply in support of its Motion for Summary Judgment (the "Motion" or "Mot.") (ECF No. 307) on all claims of Plaintiff CSX Transportation, Inc. ("CSX").  For the following reasons,[1] NS's Motion should be granted.

## INTRODUCTION

***CSX's claims now hinge on not getting a special, lower rate for intermodal traffic, which NPBL never rejected and is precluded by the Operating Agreement.***  Since its inception, CSX had based its case on the "unreasonableness" of the Switch Rate, which allegedly blocked CSX from accessing NIT.  CSX, however, concedes that it "***supported the consolidated $210 [switch] rate***" when it was set in 2009.  (CSX Opp. Br. Statement of Facts ("CSX SOF") ¶ 25, ECF No. 324.)  CSX now denies that its claims "'hinge' on NPBL's switch rate" (CSX Opp. Br. 68, ECF No. 324), as it must, because the rate is indisputably justified by NPBL's operating expenses, and CSX's assertion that the Switch Rate is unreasonable must be resolved by the Surface Transportation Board ("STB").  (*See* ECF Nos. 115, 329.)  Instead, CSX now focuses on NPBL's alleged failure to provide a special, lower rate for intermodal traffic.  (CSX Opp. Br. 68.)  But CSX never asked NPBL's Board to vote on its proposals for this special intermodal rate, and the special rate conflicts with the Operating Agreement's uniform rate provision, which NS has the right to rely on.  (CSX SOF ¶ 14.)

***CSX has failed to provide evidence of overt acts causing damage in the statute of limitations period, which renders its claims time barred.***  CSX relies heavily on pre-2013 conduct and communications between NS employees only, which unsurprisingly reflect NS's desire to maintain its competitive advantages based its ownership of the track to NIT.  CSX's reliance on

---

[1] NS also adopts and incorporates the arguments made in NPBL's reply brief that are readily transferable to NS.  *U.S. ex rel. LaCorte v. SmithKline Beecham Clinical Lab'ys, Inc.*, 149 F.3d 227, 237–38 (3d Cir. 1998).  NS also adopts the same abbreviations used in its Motion.

this old evidence only reinforces that the statute of limitations presumptively bars its claims and alleged damages.  These pre-2013 communications neither show any overt acts within the limitations period, nor change that fact that, in 2015, CSX paid the Switch Rate and accessed NIT using NPBL and track owned by NS.  And CSX accedes to the fact that CSX did not call for a vote by the NPBL Board on the 2018 Rate Proposal, and thus the proposal was never rejected.  What is more, CSX admits that its damages expert does not identify any new damages flowing from alleged overt acts within the limitations period, which renders CSX's claims time barred.

*CSX's arguments against dismissal of its antitrust claims are fleeting and meritless.* CSX's Opposition laid bare the weakness of its antitrust claims by giving only cursory treatment to Defendants' arguments.  CSX cannot rely on the relevant market sponsored by its expert because it is materially different than the relevant market alleged in its Complaint.  Even if CSX could rely on these different markets, the record confirms that both are so gerrymandered that they are plainly improper.  CSX cannot show exclusionary conduct or a conspiracy, and CSX's inability to show that it has been foreclosed from the alleged relevant market is likewise fatal to its claims.  In the end, the law does not impose an affirmative obligation on NS to facilitate CSX's access to NIT – yet that is precisely the thrust of CSX's claims.

*CSX does not trouble to defend its breach of contract claim*.  CSX treats NS's arguments for dismissal of its contract claim as a mere afterthought, not even addressing most of them.  CSX's remaining argument that general covenants can trump NS's specific rights should be rejected as a matter of basic contract law.  CSX's breach of contract claim should be dismissed.

*This case is ripe for summary judgment, as the material facts necessary for NS's Motion are not in dispute.*  As explained by NPBL, CSX failed to comply with Local Civil Rule 56(B),

and thus all of NS's Undisputed Statement of Facts are admitted.  LCR 56(B).[2]  CSX's response to NS's facts is just an alternative view of the undisputed facts supported by self-serving inferences and legal conclusions.  Nowhere does CSX offer evidence that disputes the material facts underpinning NS's Motion, including (a) NPBL moved every train tendered by CSX in 2015 (CSX SOF ¶ 53); (b) there was no vote on the 2018 Rate Proposal (CSX SOF ¶ 71); (b) Defendants did not enter into a new agreement in 2018 to increase the trackage fee (CSX SOF ¶¶ 56-61); (c) CSX experienced volume growth at NIT and POV (CSX SOF ¶ 99); (d) ports compete for discretionary cargo, and ocean carriers "move international intermodal containers to and from the same inland destinations through multiple ports." (CSX SOF ¶ 79); and (e) NS and NPBL do not compete for business (CSX SOF ¶ 9).

## ARGUMENT

## I.   CSX'S CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS

### A.   CSX's conspiracy claims accrued more than five years ago.

CSX's Opposition confirms that all its claims are based on acts that NS, individually or in concert with NPBL, allegedly took to block CSX from accessing NIT.  (CSX Opp. Br. 1.)  Through its expert, Prof. Marvel, CSX seeks to recover profits purportedly lost as a result of the alleged blockage on an annual basis from 2009 to the present.  (NS Ex. 71, at ¶¶ 124-125.)

As NS explained in its opening brief, all of CSX's claims accrued in 2009, when CSX says it first suffered damages caused by Defendants' allegedly wrongful conduct.  *See* NS Opening Br. 17.  All of CSX's claims are thus time barred because CSX did not file its Complaint until 2018, well after the applicable limitations periods had expired.

---

[2] CSX specifically concedes that the facts in 12 paragraphs of NS's Undisputed Statement of Facts ("SOF") are undisputed.  *See* CSX Opp. Br. 7 (identifying NS SOF ¶¶ 1-3, 5-7, 13-14, 18, 46-47, 51, 53, and 57 as undisputed).

## B. CSX does not identify any new injury caused by post-2013 conduct.

Seeking to avoid that outcome, CSX argues that the statute "begins to run from the most recent injury caused by the defendants' activities" (CSX Opp. Br. 42) and points to allegedly unlawful conduct occurring within the limitations period that allegedly caused new injury. (*Id.* at 45.) CSX's argument is belied by its own expert, who provides only a single calculation of profits that CSX has purportedly "lost due to 'the *totality* of NS's and NPBL's efforts to foreclose CSX' from on-dock rail at NIT." (CSX Opp. Br. 49) (emphasis added).

Prof. Marvel does not calculate any new injury caused by alleged overt acts within the limitations period. Rather, the lost profits CSX claims to have suffered since 2013 are more of the same lost profits that, according to Prof. Marvel, have been accruing since 2009. They are the result of the "unabated and inertial consequences of previous acts" that Defendants allegedly took outside of the limitations period. *Midwestern Mach. Co. v. Northwest Airlines, Inc.*, 392 F.3d 265, 271 (8th Cir. 2004). Therefore, CSX's claims are barred by the statute of limitations.

CSX cites *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144 (3d Cir. 1992), for the proposition that, although it must prove overt acts occurring within the limitations period, it need not tie its damages to those acts "because 'overt acts aren't what cause damage.'" (CSX Opp. Br. 49) (quoting *Lower Lake Erie*, 998 F.2d at 1172).[3] This position contravenes Supreme Court precedent relied on by CSX. *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971) (each time plaintiff is injured by an act of the defendant, a cause of action accrues "to

---

[3] The remaining cases cited by CSX do not aid its argument. They address proof of antitrust damages generally, not the recoverability of damages caused by pre-limitations acts. Neither case even discusses the statute of limitations. *See LePage's, Inc. v. 3M*, 324 F.3d 141, 166 (3d Cir. 2003) (once the jury has found that *the unlawful activity caused the antitrust injury*, damages may be determined without strict proof of what act caused the injury); *Anaheim v. Southern Calif. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1991) (addressing the combined effect of conduct in assessing whether there was a violation of Section 2).

recover the damages caused by *that act* ….") (emphasis added); *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190 (1997) (even if there is a continuing violation, the plaintiff cannot "recover for the injury caused by old overt acts outside the limitations period.").[4]  Just as in *Gumwood HP Shopping Partners L.P. v. Simon Prop. Grp., Inc.*, 221 F. Supp. 3d 1033 (N.D. Ind. 2016), no award of damages can be sustained where the jury "would be left entirely to speculation to determine [what damages were] triggered by acts that accrued before or after the limitations period began, or to assess what portion of [damages are] attributable to acts that caused harm within the limitations period." *Id.* at 1045.  Indeed, given how CSX has "structured its damage claim, there [is] no basis in the record for the jury to determine what the effect on damages would be if it found one or more of the challenged acts lawful.  Thus, if one of [Defendants'] acts [is] not a violation of the antitrust laws, much of the damage claim would become invalid." *ILC Peripherals Leasing Corp. v. International Business Machines Corp.*, 458 F. Supp. 423, 434 (N.D. Cal. 1978).

CSX argues that its "payment of [the Switch Rate] in 2015 would suffice to restart the statute of limitations on its claims."  (CSX Opp. Br. 45.)  Not so.  CSX is seeking to recover only "the profits lost as a result of ocean carriers choosing not to contract with CSX" due to Defendants' alleged conduct, *not* "the marginal difference between the switch rate proposed by CSX and the rate charged by NPBL."  (CSX Opp. Br. 51.)  Therefore, CSX cannot now claim its payment of the Switch Rate in 2015 is a new injury that saves its claims from dismissal.

## C.  The continuing violation doctrine cannot save CSX's claims.

CSX invokes the continuing violation doctrine to try to save its antitrust claims (CSX Opp. Br. 42, 45), but it has not met its "burden of proof to establish it." *XY, LLC v. Trans Ova Genetics*,

---

[4] Notably, *Lower Lake Erie* was decided before the Supreme Court's decision in *Klehr*, which made it clear that *only* damages flowing from acts taken within the limitations period are recoverable. *Klehr*, 521 U.S. at 189-90.

890 F.3d 1282, 1292 (Fed. Cir. 2018) (citation omitted).

> **1.    CSX cannot recover damages caused by conduct outside the limitations period.**

The continuing violation doctrine allows a plaintiff to assert an antitrust claim that otherwise would be time-barred if the plaintiff proves that the defendant took new actions within the limitations period that inflicted new injury. *Zenith*, 401 U.S. at 338 (in the context of a continuing conspiracy, each time a plaintiff is injured by an act of the defendants, a cause of action accrues). The doctrine does not permit CSX to recover antitrust damages flowing from any alleged pre-2013 conduct, as it attempts to do here. *See Gumwood*, 221 F. Supp. 3d at 1043 (damages flowing from acts occurring more than four years before antitrust suit was filed are not recoverable, even if damages continue to flow into the limitations period); *N.C. Elec. Membership Corp. v. Carolina Power & Light Co.*, 780 F. Supp. 322, 334 (M.D.N.C. 1991) (antitrust claims, and resulting damages, related to overt acts outside the limitations period were barred).

> **2.    The continuing violation doctrine can only be triggered by overt acts.**

CSX erroneously claims—based on *Lower Lake Erie*—that it can invoke the continuing violation doctrine to save its antitrust claims when there is "concerted inaction" continuing into the limitations period. (CSX Opp. Br. 43) (arguing that no affirmative act is required). But *Lower Lake Erie* is an outlier; as recently as last month, the Fourth Circuit held that for continuing violations to trigger new limitations periods, there must be (1) a *new and independent overt act* that (2) inflicts new and accumulating injury on the plaintiff. *See Mayor of Baltimore v. Actelion Pharms. Ltd.*, 995 F.3d 123, 131 (4th Cir. 2021) (continuing violation doctrine applies when overt acts injure the plaintiff); *Charlotte Telecasters v. Jefferson Pilot Corp.*, 546 F.2d 570, 572-73 (4th Cir. 1976) (there must be an overt act causing injury to plaintiff's business; silence does not constitute an overt act); *SD3, LLC. v. Black & Decker (U.S., Inc.)*, 215 F. Supp. 3d 486, 499 (E.D.

Va. 2016) (without evidence of new refusals to deal, there can be no continuing violation).  CSX cannot rely on purported "concerted inaction" here.

### 3.    CSX has no evidence of any wrongful overt act occurring within the limitations period.

The only alleged concerted action on which CSX relies that occurred within the limitations period is Defendants' purported obstruction of CSX's efforts to access NIT via NPBL in 2015, NS's attempts to negotiate a new trackage rate with NPBL, and Defendants' purported rejection of CSX's 2018 Service and Governance Proposals.[5]  (CSX Opp. Br. 45.)

The record firmly establishes that neither Defendant engaged in any overt act to block CSX from accessing NIT in 2015.  (NS Opening Br. 36-37; *see also* Part II.B *infra*.)  It is undisputed that CSX used NPBL to access NIT in 2015, and that ***NPBL moved every train tendered by CSX***. (NS SOF ¶¶ 64-66; CSX SOF ¶ 53.)  Moreover, neither party committed an overt act with respect to the 2018 proposals.  (NS Opening Br. 36-37; *see also* Part II.B.2 *infra*.)[6]  Even if NS and NPBL had "refused to take action" on its 2018 proposals, such so-called "purposeful inaction" cannot restart the statute of limitations.

---

[5] CSX asserts that NS takes too narrow a view of the "wrongful conduct" underpinning its claims. (CSX Opp. Br. 43 n.22 (claiming that CSX's response to NPBL's interrogatories is "not a catalogue of all evidence supporting its claims").)  But CSX is not permitted, on summary judgment, to refer vaguely to some other evidence of wrongful conduct that might exist.  Instead, "a party opposing a properly supported motion for summary judgment … must 'set forth *specific facts* showing that there is a genuine issue for trial.'"  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)) (emphasis added).

[6] CSX does not try to refute NS's legal argument that, as a shareholder, it had a contractual right to vote down CSX's Governance Proposal.  Instead CSX makes conclusory statements and attempts to cast this as a dispute of fact, not law.  *See* CSX Opp. Br. 46 (claiming a factual dispute between NS's argument that it "had the contractual right" to reject CSX's Governance Proposal and CSX's "disput[e with] NS's interpretation of the relevant agreements").  There is no *factual* dispute as to the vote on the proposal, and as NS explained in its opening brief, it had the contractual right to vote against it.  NS Opening Br. 40.  CSX offers no rejoinder on this point, and accordingly the Court should consider this legal issue conceded.

Finally, CSX's state law conspiracy claims evaded dismissal at the pleadings stage only because of the allegation that "in *2018*, Defendants entered into a **new agreement** to increase the amount the Belt Line pays to access NS's tracks to NIT." (ECF No. 66, at 39) (emphasis added). This alleged new agreement "is *not a continuation of the same conspiracy* to set the Uniform Rate at the [2009] level because the price is again increased." (*Id*. at 40) (emphasis added).

CSX now relies on these allegations to save its antitrust conspiracy claims too. However, it is undisputed that neither the trackage fee, nor the Switch Rate, has increased since 2009. The alleged price increase that saved CSX's conspiracy claims from dismissal, therefore, never happened. Moreover, CSX admits that Defendants did not enter into any such agreement in 2018 (ECF No. 300-8, RFA No. 3), and that "NPBL has opposed NS's request to increase the amount it charges to NPBL for use of NS's tracks to NIT." (NS SOF ¶¶ 72-74.) CSX is, therefore, unable to demonstrate any new conspiracy causing new injury relating to the trackage fee.

Faced with this admission, CSX now claims that "[i]t was not necessary for Defendants to actually *agree* on a higher rate for their scheme to work as they were able to delay and deny CSX's [2018] proposal based on the uncertainty surrounding this issue alone." (CSX Opp. Br. 48) (emphasis in original). But this theory ignores the Court's ruling and CSX's admissions, which conclusively show that there was no new agreement or resulting injury.[7] For all these reasons, CSX has no actual evidence of a new conspiracy or any overt act relating to the trackage fee, which requires dismissal of its claims.

## II.   CSX FAILS TO IDENTIFY ANY EVIDENCE OF AN ACTIONABLE CONSPIRACY BETWEEN DEFENDANTS

As NS predicted, CSX relies primarily on internal NS communications occurring outside

---

[7] Moreover, NS informed NPBL on July 31, 2015 that NS was cancelling the Trackage Rights Agreement as of its expiration date, July 31, 2016 – *almost two years before* CSX submitted its 2018 Proposal.

the limitations period as evidence of a conspiratorial agreement between Defendants.  (CSX Opp. Br. 52-57.)  Even assuming these NS communications show that NS wanted to block CSX from accessing NIT, CSX's state and federal conspiracy claims still should be dismissed.  These internal communications are between NS employees only and therefore are not evidence of concerted action or agreement between NS and NPBL.  CSX also fails to identify evidence of any overt act by Defendants *within* the limitations period on which to base its claims.

> A.     **The time-barred conduct does not demonstrate a conspiracy.**

The internal NS communications on which CSX relies relate to conduct outside of the limitations period, namely, the setting of the Switch Rate at $210 and the handling of the 2010 Rate Proposal.  But, CSX admits that its "[rate] committee members ***supported*** the consolidated $210 rate" as long as CSX got a separate, lower switch rate from NPBL to move intermodal freight to and from NIT.  (CSX Opp Br. ¶ 25) (emphasis added).  CSX's support of the $210 Switch Rate means it cannot now claim that the setting of that rate, and maintaining it at $210 per car, is evidence of a conspiracy to block CSX's access to NIT.  It also is undisputed that CSX, either as a shareholder of NPBL or through its appointed directors, never sought a vote on its 2010 Rate Proposal.  Hence, NPBL did not reject CSX's proposal; the alleged overt act never happened.

Further, the 2010 Rate Proposal proposed terms, including a private switching rate for intermodal traffic, that would "be memorialized in a formal agreement" between CSX and NPBL, *i.e.*, a private contract.  Similarly, the 2018 Rate Proposal sought a "definitive rail transportation agreement" between CSX and NPBL that included a private switching rate for intermodal traffic.  These private contracts conflict with the Operating Agreement's requirement that "a uniform rate shall be fixed for the movement of freight cars over [NPBL's] railroad," which prevents NPBL from entering into "a special deal that wasn't available to all of the other owners."  CSX Corp. Dep. 31:10-12, **Ex. 122**.

CSX tries to avoid the effect of the uniform rate provision by claiming that "nothing in the [2010] proposal was inconsistent with the *rate* being applied to other NPBL customers."  CSX Opp. Br. ¶ 30 (emphasis added).  Even accepting that proposition,[8] CSX never sought a Board vote on the special intermodal rate either.  Rather, CSX demanded that NPBL agree to a private contract with CSX.  (CSX Ex. 43) (demanding that ███████████████████████████████ ███████████████████████████████████████████); CSXT0140145, **Ex. 123** (demanding that ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████).  While CSX contends that the uniform rate provision can be overridden (CSX SOF ¶ 14), it makes no case that NS, as a shareholder, was required waive enforcement of the uniform rate provision with respect to the rate proposals.

Turning to the internal communications, CSX points to communications and activities— occurring outside of an NPBL Board meeting—of NS employees who also served on the NPBL Board.  (CSX Opp. Br. 52-57.)  This is not evidence of concerted action or agreement between NS and NPBL because, as a matter of law, the communications involve only one party: NS.  As NS explained in its Motion, "directors of a corporation have authority to bind [the corporation] *only when they act collectively as a board*."  (*See* NS Opening Br. 33-35 (*quoting Monacan Hills, Inc. v. Page*, 203 Va. 110, 116 (1961) (emphasis added)).  CSX cites *Starring v. Kemp*, 167 Va. 429 (1936), which adheres to the same core principle of Virginia law: "The directors of a corporation

---

[8]  In ruling on the motions to dismiss, the Court stated that the 2018 Rate Proposal "does not state that the rate would be lowered for only CSX" because it applied to any traffic by any company on Belt Line's tracks between "Berkley Yard and NIT."  ECF No. 66, at 27.  Practically, this special intermodal rate would only apply to CSX because NS does not need to use NPBL to move intermodal freight to or from NIT.  To the extent the Court understood the proposal to mean that the rate would apply to all freight moved by NPBL, reducing the Switch Rate from $210 to $80 would reduce the revenues NPBL receives for non-intermodal freight by over 60%.

must act in their corporate capacity, as a board in orderly procedure, *and not as individuals*; plainly one director cannot on his own" bind the corporation. *Id*. at 435 (emphasis added).

The only exception to this rule is if NS-appointed board members were communicating (1) while they were acting as NPBL's authorized agents with the consent of the NPBL Board, and (2) within the scope of their appointed authority. *Monacan*, 203 Va. at 116. CSX has not identified a *single* piece of evidence showing that any NS employee was conducting NPBL business when engaged in these internal communications, much less that NS employees were acting under authority granted to them by the NPBL Board. Hence, it was a legal impossibility for an individual NPBL Board member, cloaked only with the limited authority to participate in collective board actions, to engage in a conspiracy on NPBL's behalf.[9]

The same legal principles dictate that the activities of rate committee members also are not evidence of a conspiracy. The rate committee members had no power to bind NPBL; all they could do was make recommendations. In essence, the rate committee provided a forum for representatives of NPBL's shareholders to debate and try to reach consensus on rate issues.[10] But the rate committee as a group, much less its individual members, had no power to act for NPBL.

**B.     No conspiracy can be inferred from the 2015 train movements or handling of the 2018 Rate Proposal.**

**1.     Successful 2015 train movements are not evidence of conspiracy.**

The overarching theme of CSX's conspiracy claims is its assertion that it is a "victim of a decades long effort by NS, on its own and in combination with NPBL, to exclude CSX from on-

---

[9] As a result, *Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556 (1982), is inapplicable, as explained by NPBL and in NS's Motion in Limine, ECF No. 338.

[10] When asked if he was acting in NPBL's best interests on the 2009 rate committee, CSX committee member John Booth admitted that he was ██████████████████████████████ ████████████████████████████████ (J. Booth Dep. 118:10-20, **Ex. 125**) (emphasis added).

dock rail access at" NIT.  (CSX Opp. Br. 1.)  CSX somewhat contradictorily cites its use of NPBL to *access* NIT in 2015 in support of the alleged conspiracy, but in any event, CSX does not claim that there were trains that it wanted to move to or from NIT in 2015 that in fact were not moved.  As NPBL also explains, it is undisputed that NPBL moved every train tendered by CSX (*see* CSX SOF ¶ 53), which dooms CSX's reliance on the 2015 train moves as evidence of a conspiracy.

Instead, CSX self-servingly asserts that its "efforts to use NPBL to move international intermodal traffic to and from NIT during 2015 proved unworkable."  (CSX Opp. Br. ¶ 51.)  This is argument, not evidence, and the argument is meritless based on the undisputed fact that NPBL moved every train tendered by CSX.  Further, CSX employee Anthony MacDonald (in charge of moving the intermodal trains), agreed that the operating plan developed in 2015 by CSX, NPBL, NS, and VIT ███████████████████████████████████████████████████████ ███████  (MacDonald Dep. 216:9-13, **Ex. 124**.)

In sum, the record shows that NPBL moved every train that CSX tendered in accordance with an NS-provided operating window, and that there was no conspiracy to block CSX at NIT.

## 2. A failure to vote for the 2018 Rate Proposal when CSX did not ask for a vote is not evidence of conspiracy.

NPBL's handling of the 2018 Rate Proposal also is not evidence of a conspiracy.  Like the 2010 Rate Proposal, the NPBL Board never rejected the 2018 Proposal because, as the record confirms, CSX never put it to the NPBL Board for a vote, even though (like the 2010 Proposal), CSX and its appointed board members could have made NPBL's Board do so.  (CSX SOF ¶ 71.)  But unlike the 2010 Proposal, which CSX essentially dropped, CSX never intended to legitimately pursue its 2018 Proposal.  Instead, the proposal was an obvious set up for this litigation, which CSX began planning several weeks *before* sending the proposal to NPBL.  (NS SOF ¶ 56.)

It is undisputed that NPBL management engaged CSX on the proposal, including

suggesting that a rate committee be formed to analyze the 2018 Proposal, as the proposal itself contemplated.  (CSX SOF ¶ 66; NS SOF ¶¶ 58-59.)  But CSX did not pursue that either.  (CSX SOF ¶ 71.)  Instead, CSX demanded that NPBL change its governance structure.  As was its right, NS, as a shareholder, voted this proposal down.   (CSX SOF ¶¶ 67, 69.)

CSX also claims that it demanded that NPBL create an "independent" committee to evaluate its 2018 Proposal, which the NS-appointed Board members purportedly rejected (though the evidence CSX cited does not support this[11]).  (CSX SOF ¶ 71.)  Even assuming that happened, an "independent" committee would only make a recommendation to the NPBL Board, which would have the final authority to act (or not) on any such recommendation.  Because the NPBL Board never voted on the 2018 Proposal, and thus never rejected it, there was no overt act to which CSX can hitch its conspiracy claims.  Accordingly, NS is entitled to summary judgment.

## III.   NS IS ENTITLED TO SUMMARY JUDGMENT ON CSX'S ANTITRUST CLAIMS.

CSX argues that summary judgment should be used sparingly in antitrust cases, (CSX Opp. Br. 62-63), but ignores the Fourth Circuit's recognition that sorting out the "unusual entanglement" of legal and factual issues frequently seen in antitrust cases may be "particularly well suited for Rule 56 utilization."  *Thompson Everett, Inc. v. National Cable Advertising*, 57 F.3d 1317, 1324-26 (4th Cir. 1995).  Indeed, as shown in NS's Motion, the Fourth Circuit routinely affirms summary judgment for defendants in antitrust cases where the plaintiff cannot prove its case.[12]

---

[11] CSX appears to be inadvertently mixing its rate proposal with its governance proposal.

[12]  *See, e.g.*, *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016); *Kolon Indus., Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 162 (4th Cir. 2014); *Berlyn, Inc. v. The Gazette Newspapers, Inc.*, 73 F. App'x 576, 578 (4th Cir. 2003); *Thompson Everett,* 57 F.3d at 1324-26; *Oksanen v. Page Memorial Hosp.*, 945 F.2d 696, 708 (4th Cir. 1991) (en banc); *Laurel Sand & Gravel, Inc. v. CSX Transportation, Inc.*, 924 F.2d 539, 540 (4th Cir. 1991); *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 925 (4th Cir. 1990).

A.   **CSX cannot prove a properly defined relevant market or the requisite degree of market power, which is fatal to all of its antitrust claims.**

As NS explained, the undisputed facts demonstrate that CSX cannot prove the requisite market power in a properly defined relevant antitrust market—an element essential for all of its antitrust claims.  (NS Opening Br. 20-27.)  CSX's response only highlights the flaws in CSX's arguments.

1.   **CSX Incorrectly Contends it Need Not Define a Relevant Market.**

Perhaps aware of the weakness of its proposed relevant market, CSX claims in opposition that it "need not specifically define the relevant market in this case" because it can "demonstrat[e] monopoly power directly."  (CSX Opp. Br. 64.)  CSX is wrong on both the law and the facts.

*First*, contrary to CSX's contention, the Supreme Court recently confirmed that a relevant market is required even where a plaintiff proceeds exclusively by direct evidence of market power. *Ohio v. Am. Express Co.,* 138 S. Ct. 2274, 2284-85 & n.7 (2018) (hereinafter *AmEx*) (even where plaintiffs were relying exclusively on direct evidence, "defining the relevant market" was a first step and "disagree[ing]" with plaintiffs' contention that it was not necessary to define the relevant market); (*see also* NS Opening Br. 20).  CSX's reliance on *Law v. NCAA* is entirely misplaced, as that decision involved a horizontal price restraint under a "quick look" rule of reason analysis. *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1020-21 (10th Cir. 1998) (characterizing the NCAA's rule "to reduce the high cost of part-time coaches' salaries" a "naked restriction on price").  That type of naked horizontal agreement is not present here; we explain elsewhere in this brief why CSX's claim is vertical and subject to rule-of-reason review.  (*See* Part III.C, *infra*.) CSX is thus not excused from defining a relevant market to move forward with its antitrust claims.

*Second*, even if it CSX could proceed without a relevant market, the undisputed evidence of increasing output both at NIT and POV undermines CSX's ability to prove market power by

direct evidence.[13]  *See Intellectual Ventures I LLC v. Capital One Financial Corp.*, No. 1:13-cv-00740, 2013 WL 6682981, at *4 (E.D. Va. Dec. 18, 2013) (direct evidence of monopoly power requires proof of supracompetitive prices and restricted output); *Bepco, Inc. v. Allied Signal, Inc.*, 106 F. Supp. 2d 814, 830 (M.D.N.C. 2000) (defining monopoly power as "the ability to restrict output and thereby raise prices to supracompetitive levels").  Here, it is undisputed that CSX's output *increased* at both NIT and the POV as a whole during the relevant period.  (NS Opening Br. 23 n.7, 24 n.8.)  At NIT, CSX's volumes grew from ▮▮▮ movements in 2009 to ▮▮▮ movements in 2019, and at the POV as a whole, CSX's volumes grew from ▮▮▮ in 2009 to ▮▮▮ in 2019.  (NS SOF ¶¶ 70-71 (*citing* Wright Rep. Tbls. 5, 6).)  Critically, CSX *does not deny* that it has experienced growth at NIT, contending only that the majority of its growth at the POV has been concentrated at VIG.  (CSX SOF ¶ 99.)  CSX's undisputed volume expansion *both* at NIT and POV "suggest[s] that [NS] during that expansion lacked the market power to control marketwide output in the first place," and leaves CSX unable to prove market power through direct evidence.[14]  *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1441 (9th Cir. 1995).

## 2. CSX Cannot Support the Relevant Market it Pled Because CSX Has No Expert Evidence to Support its Relevant Market.

Turning to the relevant market, CSX's Opposition only amplifies the lack of evidence to support the impermissibly narrow and gerrymandered relevant market alleged in the Complaint. NS pointed out that CSX lacks expert evidence to support its as-pled relevant market, because its expert opined that the relevant market is much narrower.  (NS Opening Br. 21-22.)  CSX first

---

[13] Direct evidence of monopoly power is only rarely available and even more rarely, if ever, demonstrated. *Mylan Pharms., Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 434 (3d Cir. 2016); *Bepco*, 106 F. Supp. 2d at 830 ("[I]t is often quite difficult to determine through direct evidence whether monopoly power . . . exists.").

[14] The undisputed evidence demonstrates that NS's output at NIT and the POV as whole increased during this period as well.  (NS SOF ¶ 70 (*citing* Wright Rep. Tbls. 5, 6).)

contends that the two market definitions match, then argues that any differences between the two do not matter because there is no prejudice.  (CSX Opp. Br. 65-67.)  CSX is wrong on both counts.

*The Markets Do Not Match*.  The Court can quickly reject CSX's argument that the relevant market pled in its Complaint is the same market that Prof. Marvel identified.  CSX alleged that the relevant geographic market is "the intermodal port facilities of Hampton Roads," and identifies the three POV terminals used to move intermodal traffic during the relevant period: PMT, VIG, and NIT.[15]  (Compl. ¶ 49).  The Complaint defined the relevant service market as "[f]reight transportation by rail in and out of the Hampton Roads' ports," and the customers as "major shippers of freight." (*Id*.)  Prof. Marvel defined the relevant geographic market as ███████████ ████████████ (NS Ex. 7, at 21), where CSX is the customer ███████████████████ ███████████████████ (NS Ex. 7, at ¶ 12.)  Prof. Marvel's proposed relevant market is undeniably *narrower* than what CSX pled,[16] and contrary to CSX's claims, he has not attempted to show that the POV is a properly defined relevant market.  (*Cf.* CSX Opp. Br. 67.)  Both of his empirical analyses are built on alleged harm to CSX and at a single terminal, NIT.  (NS Ex. 71, at 41, 58.)  Nowhere does he represent that his damages calculations are "based on an alternative market definition comprising the [POV] as a whole," as CSX now claims.  (*Cf.* CSX Opp. Br. 67.) CSX thus has no expert economic support for the relevant market alleged in its Complaint.

*CSX Cannot Change Horses Mid-Stream*.  CSX next contends it can change its market definition because Defendants cannot show prejudice.  (CSX Opp. Br. 66-67.)  But CSX derives no support from the cases it cites.  In *City of New York*, the Second Circuit affirmed the conclusion

---

[15]  Although CSX's Complaint refers to these three facilities as *ports*, the parties in this case have commonly referred to the same facilities as *terminals*.  (*See* NS SOF ¶ 9.)

[16] The differences are: the geographic scope (a single terminal vs. three); the service (rail freight transport vs. on-dock rail access); and the customer(s) at issue (ocean carrier shippers vs. CSX).

that the plaintiff's alleged market was legally insufficient and found prejudice from the proposed amendment where, *inter alia*, the plaintiff had waited three years to seek an amendment, and did so only after confronted with a motion for summary judgment challenging its market definition. *See City of New York v. Group Health, Inc.*, 649 F.3d 151, 156, 158 (2d Cir. 2011).  In *Ad-Vantage*, the district court had allowed the plaintiff to amend its market definition to drop one of the two submarkets pled in the complaint, and to proceed solely on the other one—clearly, the defendant had been put on notice by the complaint's allegations.  *See Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*, 849 F.2d 1336, 1342-43 (11th Cir. 1987).  In *Four Corners*, CSX omits to mention that while the plaintiffs were allowed to rely on the narrower market definition put forward by their expert at summary judgment, there was no prejudice since the court granted summary judgment for defendants.  *See Four Corners Nephrology Assoc., P.C. v. Mercy Med. Ctr. Of Durango*, No. 05-2084, 2008 WL 235533, *5 (D. Colo. May 22, 2008).  In *Precision Seed*— an unpublished decision not cited by any other court—the court accepted a market that was differently-worded than in the complaint, but apparently not substantively different in scope.  *See Precision Seed Co. v. Consol. Grain & Barge Co.*, No. 3:03-cv-079, 2006 WL 840377, *11 (S.D. Ohio Mar. 30, 2006).

Regardless, for two-and-a-half years, Defendants have litigated this case premised on Plaintiff's Complaint, and it was only after NS pointed out the lack of expert evidence to support the as-pled relevant market that CSX pivoted to arguing (implausibly) that the two relevant markets match, and thus, either would do.[17]  (CSX Opp. Br. 66.)  CSX should be "saddled with [its] Complaint as filed in this Court."  *Cont'l Trend Res., Inc. v. OXY USA Inc.*, 44 F.3d 1465,

---

[17] Even accepting the argument that Defendants were on notice of CSX's revised market definition when its expert proffered his report, Defendants had no way of knowing which of CSX's two market definitions it planned to advance at trial until CSX filed its Opposition on May 3, 2021.

1482 n.19 (10th Cir. 1995), *judgment vacated on other grounds*, 517 U.S. 1216 (1996).

### 3.     The undisputed facts establish that either market is too narrow.

CSX's Opposition confirmed that any properly defined geographic market in this matter is clearly broader than just NIT or the POV, and that truck competition has inappropriately been excluded from the relevant service market.

*Geographic Market*.  NS explained that the relevant geographic market must be defined by the area within which the defendant's customers (the "proper consumer(s)") can practicably turn to alternative suppliers if the defendant were to raise its prices.  (NS Opening Br. 22-23 (*quoting Berlyn*, 73 F. App'x at 583).)  As CSX acknowledges, the "proper consumers" here are ocean carriers, (CSX SOF ¶ 101 (contending that "NS's and NPBL's conduct harms ocean carriers")), the relevant inquiry is the options available to ocean carriers to move their freight. *See Rebel Oil*, 51 F.3d at 1435 ("If consumers view the products as substitutes, the products are part of the same market."). While CSX seeks to downplay NS's focus on ocean carriers as a "disagreement on the factual underpinnings of the relevant market definition," contending that port competition has no bearing on the relevant market question (CSX Opp. Br. 63-64), CSX *acknowledges* that ports compete for discretionary cargo, and that ocean carriers "move international intermodal containers to and from the same inland destinations through multiple ports." (CSX SOF ¶ 79.)  CSX further protests that it "must take ocean carriers' choices of ports [] as given," (CSX Opp. Br. 63), but CSX's own documents show that pricing affects an ocean carrier's decision to call on a particular port, meaning that railroads can influence an ocean carrier's port choice through their rail pricing.[18] (NS SOF ¶ 25.)  The undisputed evidence thus demonstrates that ocean carriers have many options

---

[18] CSX points out that some of the documents NS relies on address ocean carriers' reactions to port costs, not just rail rates.  *See* CSX Opp. Br. n.18.  While true, it only supports NS's argument that ocean carriers consider numerous options, including port prices, when deciding through which port to move their discretionary cargo.

through which to move their freight to and from various inland destinations—including through the POV's closest competitor, the Port of NY/NJ (NS SOF ¶¶ 21, 22, 24, 30)—and the reality is that the impact of CSX's purported lack of on-dock access at NIT is imperceptible when the true (broader) market dynamics are taken into account.

_Service Market_.   NS explained that the undisputed evidence—including CSX's own documents and testimony—shows that "end-to-end truck transportation" is a competitive alternative to rail for movements of international intermodal freight of up to 500 miles (NS SOF ¶¶ 37-38), and that CSX's failure to account for this competition in either of its proposed service markets renders the relevant market deficient as a matter of law.  (NS Opening Br. 26-27.)  CSX ignores the undisputed evidence demonstrating rail-and-truck competition for destinations of up to 500 miles, suggesting instead that trucks do not compete with rail for movements "beyond local markets." (CSX Opp. Br. 64.)  But the 500-mile service radius in which trucks and rail indisputably compete goes well beyond any definition of "local,"[19] and CSX's attempt to wave away truck competition thus fails.  In light of the undisputed facts demonstrating that there are at least some destinations for which trucks and rail compete for movements of international intermodal freight, CSX's failure to account for truck transportation in its relevant service market in any way means the market is impermissibly narrow.

In sum, because CSX's evidence "cannot sustain a jury verdict on the issue of market definition," "summary judgment is appropriate."  *Rebel Oil*, 51 F.3d at 1435.

**B.      CSX cannot save its Section 2 attempted and actual monopolization claims.**

**1.      CSX cannot demonstrate that NS engaged in exclusionary conduct.**

NS's opening brief explained that exclusionary conduct is a core element of a Section 2

---

[19]  For example, a 500-mile radius from NIT would include Springfield, MA and Savannah, GA.

Sherman Act monopolization and attempted monopolization claim.  (NS Opening Br. 27-28.) CSX completely ignored or failed to squarely address most of NS's arguments.

As NS explained, the gravamen of CSX's complaint is its inability to access its competitor's facilities on its preferred terms.  (NS Opening Br. 27-29.)  CSX makes no effort to address the decades-old Supreme Court rule limiting the circumstances in which a firm must cooperate with its competitors, instead protesting that it has not pled an essential facilities claim. (CSX Opp. Br. 59.)  CSX may not like the label, but its allegations describe just such a scenario.

NS's Motion explained that an essential facilities claim—to the extent such a claim is even still available to a plaintiff in this Circuit—imposes liability when one firm, which controls an essential facility, denies a second firm reasonable access to a product or service that the second firm must obtain in order to compete with the first.  (NS Opening Br. 29.)  CSX's Opposition confirms that (i) CSX views on-dock access to NIT as essential in order to compete with NS (*see* CSX Opp. Br. 63 ("ocean carriers demand service at the Port of Virginia—including NIT specifically—and CSX *must* have on-dock rail access at NIT to be competitive for their business") (emphasis added)); and (ii) in order to provide on-dock access at NIT, CSX must utilize tracks that NS owns (and for which NS has provided trackage rights to NPBL).[20]  (NS SOF ¶¶ 14-15.)  The fact that VPA owns NIT (CSX Opp. Br. 60) is irrelevant where it is the NS-owned railroad tracks that CSX must utilize to obtain the allegedly essential on-dock rail access at that terminal.  Other than trying to avoid the classification, CSX made no effort to rebut NS's legal analysis or show why summary judgment in defendants' favor is inappropriate on an essential facilities theory.

CSX's next ambit is to argue vaguely that it should survive summary judgment because

_____

[20] CSX also cannot dispute that its expert endorses a relevant market consisting of a single means of accessing a single terminal (on-dock rail access at NIT) and a damages theory positing that lack of such access affects CSX's entire network.  (NS <u>Ex. 7</u>, at ¶ 40; NS <u>Ex. 71</u>, at ¶ 124).

anticompetitive conduct can come in many forms.  (CSX Opp. Br. 59.)  But CSX's own case law recognizes that "courts have been able to adapt the [general Section 2 inquiry] to particular circumstances," and to develop rules (and exceptions) to implement that inquiry.  *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072, 1073-74 (10th Cir. 2013) (citing the essential facilities doctrine as a "controversial" example of an exception to the rule protecting unilateral conduct).  CSX also attempts to avoid summary judgment by arguing that a monopolist's unilateral conduct can involve third parties (CSX Opp. Br. 60), but here it is clear that if CSX is unable to prove a conspiracy between NS and NPBL (which it cannot, *see* NS Opening Br. 33-36 and Part II, *supra*), the acts of NPBL would be those of a separate and independent firm and do not supply the exclusionary conduct element of a monopolization or attempted monopolization claims.[21]

Finally, CSX argues in passing that STB jurisdiction does not preclude its claims.  (CSX Opp. Br. 30 n.16.)  However, CSX ignores entirely that where a state or federal agency such as the STB here has the effective power to compel sharing and regulate its scope and terms, it is "less plausible" that the antitrust laws contemplate the additional scrutiny that CSX contended is warranted here.  (NS Opening Br. 32 (*citing Verizon Commc'ns, Inc. v.  Law Offices of Curtis V. Trinko LLP*, 540 U.S. 398, 407-08 (2004).)  Indeed, courts are typically reluctant to step in to regulate "forced sharing" which would require courts to "pick and choose the applicable terms and conditions" of dealing.  *Novell*, 731 F.3d at 1073 (citing *Trinko*, 540 U.S. at 407-08).

---

[21] CSX's cited cases are not to the contrary.  *Cf. Novell*, 731 F.3d at 1066 (finding lawful a refusal to provide rival with access to intellectual property despite previously agreeing to share); *Conwood Co, LP. v. U.S. Tobacco Co.*, 290 F.3d 768, 778 (6th Cir. 2002) (defendant engaged in conduct in third-party retailers' stores without retailers' permission); *United States v. Microsoft*, 253 F.3d 34, 60, 67 (D.C. Cir. 2001) (defendant engaged unaffiliated OEMs and internet access providers in restrictive licensing and exclusive dealing agreements); *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087, 1089 (D.C. Cir. 1998) (overturning dismissal of attempted monopolization claims on jurisdictional grounds and affirming dismissal of essential facilities claims).

### 2.     CSX's inability to show foreclosure dooms its Section 2 claims.

NS's opening brief demonstrated CSX's inability to show that it was foreclosed from the alleged relevant market.  (NS Opening Br. 32-33.)  CSX responds only in passing, contending that this issue presents "disputed issues of fact" (CSX Opp. Br. 60 n.33), but (i) as discussed in Part III.A.1, *supra*, CSX *does not deny* that it has experienced volume growth at NIT and POV (CSX SOF ¶ 99); and (ii) CSX did not dispute that it chose to pay the same $210 switch rate to move traffic elsewhere (CSX SOF ¶ 75)—or that its own executives *approved* that rate. (CSX SOF ¶ 25.) In addition, CSX's effort to distinguish *Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*, 924 F.2d 539 (4th Cir. 1991), and gin up a factual dispute about the *reasonableness* of the $210 switch rate is merely a distraction.  (CSX Opp. Br. 68-69.)  While CSX postulates a distinction between variable costs and fixed costs, here CSX's expert acknowledged that in concluding the rate was unreasonable, he made *no effort at all* to account for *any* of NPBL's costs, regardless of whether they were fixed or variable.  (NS SOF ¶ 52.)  There can be no foreclosure where, as shown here, the terms of access that are offered are *reasonable*, even if they are not "the terms and conditions [plaintiff] desires." *Loren Data Corp. v. GXS Inc.,* 501 F. App'x 275, 283-284 (4th Cir. 2012).

### C.     CSX cannot demonstrate harm to competition under the Rule of Reason.

NS's Motion explained that this is a rule of reason case because NS and NPBL are in a vertical relationship, and that CSX's claims would fail that analysis even if CSX were somehow able to demonstrate the existence of an agreement between NS and NPBL.[22]  (NS Opening Br. 36.)

CSX first argues that *per se* treatment is appropriate here because NS and NPBL are not in a vertical relationship but are rather "*potential* horizontal competitors."  (CSX Opp. Br. 61 (*citing Lumber Liquidators, Inc. v. Cabinets To Go, LLC*, 415 F. Supp. 3d 703 (E.D. Va. 2019).)  Such a

---

[22] As explained in Part II above, CSX fails to supply any evidence showing a conspiratorial agreement between NS and NPBL.  Therefore, CSX's conspiracy claims must be dismissed.

theory is contrary to all of the testimony in this case.  No witness has ever suggested NS and NPBL are competitors, potential or otherwise.  (NS SOF ¶ 4.)  Even under CSX's potential competitor theory (which was not pled in the Complaint), a firm must have "the 'necessary desire, intent, and capability to enter the market'" to qualify as a potential competitor.  *Lumber Liquidators,* 415 F. Supp. 3d at 712 (*quoting Engine Specialties, Inc. v. Bombardier, Ltd.*, 605 F.2d 1, 9 (1st Cir. 1979)).  NS and NPBL do not compete with one another for on-dock access to NIT because NS is the only company that can offer that access.  (NS Opening Br. 35-36; *see also* NS SOF ¶ 4.)  NS provides trackage rights to NPBL, which in turn provides the actual transportation of containers for railroads other than NS who wish to access NIT on-dock, but NPBL itself does not contract with ocean carriers.  (NS SOF ¶¶ 14-16; CSX SOF ¶ 9.)  The "potential competitor" test is thus inapposite because there is no record evidence suggesting that NPBL ever sought to contract with ocean carriers in competition with NS.[23]  Thus, because any NS-NPBL agreement must necessarily be a vertical one, it cannot fall into the "small group of restraints" that are *per se* unlawful.  (NS Opening Br. 35); *see also AmEx*, 138 S. Ct. at 2284.

CSX further contends that its Section 1 claims survive summary judgment because the resolution of whether the alleged NS-NPBL agreement unreasonably restrained trade rests on disputed questions of fact as to relevant market, market power, and whether the NPBL rate is justified.  (*See* CSX Opp. Br. 62-65, 67-69.)  NS addresses those arguments elsewhere in this brief.[24]

---

[23]  *Continental* also does not aid CSX here (*see* CSX Opp. Br. 61), as that case addressed a vertical franchisor-franchisee relationship and narrowed the categories of restraints that could be deemed *per se* unlawful.  *See Continental T.V., Inc. v. GTE Sylvania, Inc*., 433 U.S. 36, 49-59 (1977).

[24]  *See* Part III.A.2, *supra* (market definition); Part III.A.1, *supra* (market power); Part III.B.2 (foreclosure); and Part III.B.2 (reasonableness of the switch rate).

## IV.   NS IS ENTITLED TO SUMMARY JUDGMENT ON CSX'S BREACH OF CONTRACT CLAIM.

CSX's Opposition provides no answer to NS's Motion seeking summary judgment on the breach of contract claim.  First, CSX *cites no admissible evidence* in arguing against dismissal— indeed that section of CSX's Opposition does not contain a single record citation.  (CSX Opp. Br. 69-70.)  Moreover, CSX does not contest that it cannot base its contract claim on: (1) pre-2014 conduct, as it is barred by the statute of limitations; (2) an alleged lack of *physical* access to NIT, because that is governed by the trackage rights agreement, not the NPBL Operating Agreement; and (3) NS's shareholder vote against CSX's 2018 corporate governance proposals, as that is governed by NS's specific legal rights under 1989 Agreement.  (NS Opening Br. 37-40.)  CSX's failure to provide any evidence in response to NS's evidence, or argument on these points, merits summary judgment for NS on this claim.  *See Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) ("[o]nce the moving party makes a Rule 56 motion, '[t]he burden is on the nonmoving party to show that there is a genuine issue of material fact for trial . . . .'").

CSX instead resorts to broad legal conclusions and generic facts about its 2018 Rate Proposal, arguing that various contractual clauses required NS to override the Operating Agreement's uniform rate provision. (CSX Opp. Br. 69-70.) This argument is wholly unsupported. First, NS could not have breached the cordial cooperation clause by "refusing to consider proposals that would improve the revenues of NPBL," as CSX alleges, (Compl. ¶ 107), *because CSX never put its 2018 Rate Proposal to a vote*.  (NS SOF ¶ 60.)  As explained in Part II.B.2, *supra*, CSX never asked that NS *do* anything.  Further, CSX's attempt to use the general mutual benefit recital, cordial cooperation clause, and implied covenant of good faith to override NS's right to enforce the more specific uniform rate provision is contrary to clearly established Virginia law holding that "that which is specially directed to a particular matter controls in respect thereto over one

which is general in its terms." *Condo. Servs., Inc. v. First Owners' Ass'n of Forty Six Hundred Condo., Inc.*, 281 Va. 561, 573 (2011). NS could thus not have violated the Operating Agreement by upholding the uniform rate provision—CSX witnesses *admitted* as much. (NS Ex. 6, at 28:13-16, 23 (Q: "Does CSX agree that NSR would be within its rights to seek to uphold the agreement embodied in . . . the operating agreement?" A: "Yes."); NS Ex. 22, at 130:24-131:14 ("fully agree[ing]" that amendment or approval of an exception to the Operating Agreement is needed for NPBL to accept a CSX rate proposal for a contract rate).)

Finally, while every contract contains an implied duty to act in good faith, the Supreme Court of Virginia has established that this implied obligation does not – *and cannot* – override the specific terms of the contract. *Condo. Servs.*, 281 Va. at 573. This means that "the duty of good faith does not prevent a party from exercising its explicit contractual rights . . . ." *Va. Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 156 F.3d 535, 542 (4th Cir. 1998) (citation omitted). Put another way, a party with valid contractual rights does not breach any obligation of good faith and fair dealing by exercising those contractual rights. *Mahoney v. NationsBank*, 249 Va. 216, 219–21 (1995). As explained above, this is the precise situation here: NS had a right to enforce the uniform rate provision and exercise of that right could not, as a matter of law, violate the duty of good faith.

Accordingly, NS is entitled to summary judgment on CSX's claim that NS breached the NPBL Operating Agreement by failing to vote for the 2018 Rate Proposal. Because CSX failed to identify admissible evidence supporting its claim for breach of contract on any other ground, NS is entitled to summary judgment on the entirety of CSX's breach of contract claim.

## CONCLUSION

For the foregoing reasons, NS respectfully requests that the Court grant NS's Motion for Summary Judgment against CSX and grant any other relief the Court deems appropriate.

Date:  May 13, 2021                          Respectfully submitted,

                                             **NORFOLK SOUTHERN RAILWAY COMPANY**

                                             */s/ Michael E. Lacy*
                                             Alan D. Wingfield (VSB No. 27489)
                                             Michael E. Lacy (VSB No. 48477)
                                             Massie P. Cooper (VSB No. 82510)
                                             TROUTMAN PEPPER HAMILTON SANDERS LLP
                                             1001 Haxall Point
                                             Richmond, VA 23219
                                             Telephone: (804) 697-1200
                                             Facsimile: (804) 698-6061
                                             Email: alan.wingfield@troutman.com
                                             Email: michael.lacy@troutman.com
                                             Email: massie.cooper@troutman.com

                                             John C. Lynch (VSB No. 39267)
                                             Kathleen M. Knudsen (VSB No. 90845)
                                             TROUTMAN PEPPER HAMILTON SANDERS LLP
                                             222 Central Park Avenue, Suite 2000
                                             Virginia Beach, VA  23462
                                             Telephone: (757) 687-7759
                                             Facsimile: (757) 687-7510
                                             Email: john.lynch@troutman.com
                                             Email: kathleen.knudsen@troutman.com

                                             Tara L. Reinhart
                                             John R. Thornburgh II
                                             Thomas R. Gentry
                                             SKADDEN, ARPS, SLATE,
                                             MEAGHER & FLOM LLP
                                             1440 New York Avenue, N.W.
                                             Washington, DC 20005
                                             Telephone: (202) 371-7000
                                             tara.reinhart@skadden.com
                                             john.thornburgh@skadden.com
                                             thomas.gentry@skadden.com

                                             *Counsel for Defendant Norfolk Southern Railway*
                                             *Company*

                                                                                   115962626