UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

CSX TRANSPORTATION, INC.,
*individually and on behalf
of NORFOLK & PORTSMOUTH BELT
LINE RAILROAD COMPANY,*

               Plaintiff,

v.                                            Civil No. 2:18cv530

NORFOLK SOUTHERN RAILWAY COMPANY,
and

NORFOLK & PORTSMOUTH BELT LINE
RAILWAY COMPANY,

               Defendants.


## OPINION AND ORDER

This matter is before the Court on a motion to dismiss/motion for judgment on the pleadings/motion to refer filed by Defendant Norfolk Southern Railway Company ("NSR") prior to the close of discovery (and prior to the lengthy COVID-19 stay previously imposed in this case). ECF No. 115. As of the date of this Opinion and Order, discovery is now closed and summary judgment motions were recently filed by NSR and Norfolk & Portsmouth Belt Line Railway Company ("Belt Line"). A jury trial is currently scheduled to begin on July 13, 2021, although under this Court's COVID-19 operating procedures (which permitted the resumption of civil jury trials on May 3, 2021), regardless of the outcome of the instant motion, such trial date would be subject to further

continuance if there is not an available retrofitted courtroom to allow the Court to keep jurors socially distanced throughout all stages of the jury trial process.

The relevant background of the case is set forth in greater detail in this Court's September 9, 2019 Opinion and Order. ECF No. 66. In short, Plaintiff CSX Transportation, Inc. ("CSX") alleges that Defendants NSR and Belt Line committed federal antitrust violations, state law conspiracy offenses, and contractual breaches associated with the manner in which Belt Line, a company jointly owned by NSR and CSX, was operated. For the reasons set forth below, NSR's motion is **DENIED in part**, and **GRANTED in part,** as the Court refers one disputed issue to the U.S. Surface Transportation Board ("STB").

## I. Background

NSR's motion challenges the jurisdiction of this Court, seeks judgment on the pleadings based on a claim of immunity, or alternative to both requests, asks this Court to refer two issues to the STB. It should be noted at the outset that: (1) both Belt Line and NSR previously filed timely motions to dismiss in this case, ECF Nos. 27, 34; (2) Belt Line's prior motion advanced a related, though not identical, challenge to this Court's jurisdiction, with such earlier-in-time challenge deemed "meritless" by this Court, ECF No. 66, at 20; (3) NSR did not previously challenge this Court's jurisdiction or otherwise raise

an immunity defense—to the contrary, NSR previously acknowledged its inability to reach "some averments in the Complaint as to the federal antitrust claims," ECF No. 35, at 3, and <u>conceded</u> jurisdiction over such claims, ECF No. 69 ¶ 11; and (4) NSR did not previously request a transfer to the STB for the purposes of addressing an immunity defense or determining a reasonable "switching rate" for use of Belt Line's tracks.

NSR now asserts that it is immune from federal antitrust laws and state conspiracy laws with respect to its relationship with Belt Line <u>not</u> because of any recent developments in the case, or new facts learned during discovery, but rather, on the ground that NSR has been immune from such claims for decades based on a railway consolidation/merger occurring in 1982. While this Court again finds that it has jurisdiction over this case, and has reservations regarding the validity of such immunity defense, the Court will refer the immunity issue to the STB in light of its expertise regarding the process and scope of railroad company mergers.

## II. Jurisdictional Challenge

NSR first contends that this Court lacks jurisdiction over this case and thus seeks dismissal under Rule 12(b)(1). Because a Rule 12(b)(1) motion can be filed at any time, NSR contends that its motion, filed long after this Court denied the original round of Rule 12(b) motions, is timely.

In support of its jurisdictional challenge, NSR argues, among other things, that the parties' dispute arises out of a railway consolidation/merger, and that the STB, formerly the Interstate Commerce Commission ("ICC"): (1) has exclusive authority to approve mergers between rail carriers; and (2) that carriers participating in an approved merger are "exempt" from antitrust laws and other laws "as necessary to . . . carry out the transaction." ECF No. 116, at 8 (emphasis omitted); accord 49 U.S.C. § 11321(a).[1] While the Court agrees with NSR's recitation of the law, the STB's exclusive authority over rail carrier mergers implicates the doctrine of "primary jurisdiction," which—despite its name—is not "jurisdictional." Importantly, "[d]espite what the term [primary jurisdiction] may imply, [it] does not speak to the jurisdictional power of the federal courts. It simply structures the proceedings as a matter of judicial discretion, so as to engender an orderly and sensible coordination of the work of agencies and courts." Envt'l Tech. Council v. Sierra Club, 98 F.3d 774, 789 n.24 (4th Cir. 1996) (second and third alterations in original); see Stevens v. Bos. Sci. Corp., 152 F. Supp. 3d 527, 533 (S.D.W. Va. 2016) (explaining that the name of such doctrine "is a misnomer"). The doctrine is applicable when a claim cognizable in federal court "requires the resolution of issues

---

[1] 49 U.S.C. § 11321 was previously codified at 49 U.S.C. § 11341.

which, under a regulatory scheme, have been placed within the special competence of an administrative body," thus causing a district court to suspend the judicial process "pending referral of [specific] issues to the administrative body for its views." United States v. W. Pac. R.R. Co., 352 U.S. 59, 64 (1956); see Mulberry Hills Dev. Corp. v. United States, 772 F. Supp. 1553, 1561 (D. Md. 1991) (explaining that a district court should "refrain from exercising its judicial power so that an agency particularly equipped to address issues and charged with regulatory duties within its expertise may perform its functions").

Here, notwithstanding NSR's arguments to the contrary, this Court has jurisdiction over the federal antitrust claims in this case, and has supplemental jurisdiction over the related state law claims. NSR's Rule 12(b)(1) motion to dismiss for lack of jurisdiction is therefore **DENIED**.

### III. Rule 12(c) Dismissal or STB Referral - Immunity

NSR next argues that this Court should dismiss this matter on the pleadings pursuant to Rule 12(c) based on NSR's statutory immunity. Plaintiff challenges the timeliness of such argument, contending that NSR's argument seeking dismissal: (1) should have been advanced as a Rule 12(b)(6) motion and was filed many months after the 12(b)(6) deadline; (2) contradicts NSR's prior jurisdictional position; (3) duplicates Belt Line's prior failed

jurisdictional challenge, thereby conflicting with the "law of the case"; and (4) is unripe to the extent it separately asserts that certain potential remedies would invade the province of the STB's exclusive jurisdiction.  ECF No. 131, at 2-4.  NSR and Belt Line each counter that NSR's arguments in support of dismissal differ from Belt Line's prior arguments in that they rely on a different statutory provision (49 U.S.C. § 11321), ECF Nos. 132, 138, with NSR again noting that jurisdiction can be challenged at any time.

First, to the extent NSR argues that its Rule 12(c) motion to dismiss is timely and/or meritorious based on jurisdictional grounds, the Court rejects such claim without further analysis for the same reasons set forth above.  Second, as outlined below, to the extent NSR is seeking a Rule 12(c) dismissal, or alternatively, referral to the STB based on § 11321(a) immunity, the Court finds that although such claim was "delayed," it is not fatally untimely, and while dismissal is not appropriate, the request for referral to the STB on the immunity issue has merit.  Third, to the extent NSR seeks a referral to the STB for a rate setting determination, such request is denied at this time for the same reasons this Court previously concluded that it has authority to grant monetary and injunctive relief in this case.

## A. Timeliness of Motion

As to the timeliness of the immunity defense, CSX accurately highlights the fact that NSR's pending motion was filed during

discovery and several months after the original round of Rule 12(b) motions was resolved by the Court.  NSR fails to demonstrate why it did not raise such immunity defense earlier in the case,[2] or why it appeared to previously concede that it had no valid basis to challenge the federal antitrust claims at that stage of the case.  The delayed timing of NSR's immunity claim is especially notable because the defense is predicated on a merger that has <u>at all times</u> been within NSR's knowledge.

Notwithstanding NSR's delay, NSR appears correct both that CSX's complaint does not include the facts on which NSR bases its immunity defense[3] and that the motion, filed sufficiently in advance of the scheduled trial date, is timely under Rule 12(c). <u>See</u> Fed. R. Civ. P. 12(c) ("After the pleadings are closed--but early enough not to delay trial--a party may move for judgment on the pleadings."); Fed. R. Civ. P. 12(h)(2) (indicating that failure

---

[2] While NSR's Answer advances three affirmative defenses mentioning "immunity," none of these three theories is predicated on § 11321(a).  ECF No. 69.  CSX does not squarely assert a pleading error in response to the pending Rule 12(c) motion, although CSX does contend that NSR's motion has little relation to its answer.  <u>See</u> ECF No. 131, at 3.

[3] The complaint broadly references "mergers and acquisitions" over many decades involving multiple railways, ECF No. 1 ¶¶ 2, 21; however, it does not appear to discuss the 1982 merger, the ICC/STB's approval of it, or the fact that as of 1989, two of the three railway companies with an ownership interest in Belt Line were affiliates under common ownership due to the 1982 merger.  NSR's answer filled in the necessary facts regarding the 1982 merger and 1989 common ownership.  ECF No. 69 ¶ 2.  In fact, long prior to the filing of the answer, NSR reported such facts to the Court in its brief in support of its original dismissal motion, to include citing the STB's consolidation ruling.  <u>Norfolk S. Corp.—Control—Norfolk & W. Ry. Co. & S. Ry. Co.</u>, 366 I.C.C. 171 (1982).  Accordingly, it appears that NSR could have asked the Court to take judicial notice of the consolidation and argued its immunity defense at the outset of this case.

to state a claim can be raised in a Rule 12(c) motion or even at trial); see also 5C Wright & Miller, Federal Practice and Procedure § 1368 (3d ed. Apr. 2021 update) ("[C]ourts typically will construe . . . a late Rule 12(b) motion, or a Rule 12(b) motion that implicates affirmative defenses, as if it were brought under Rule 12(c).").[4]  Similarly, NSR's request seeking a stay and referral to the STB, while delayed, is not "untimely" under any applicable rule or practice argued by CSX.[5]

In the absence of a procedural bar to NSR's motion to dismiss or refer, the Court addresses the merits of such motion, further noting that this Court clearly has the authority (and potentially the obligation) to refer appropriate matters to the STB.  Although the COVID-19 pandemic and associated stays requested by the parties—followed by the continued effects of the pandemic on Court

---

[4]  The most relevant non-public evidence in support of NSR's dismissal/referral motion appears to be the consolidation/merger application that NSR attached as an exhibit to such motion.  ECF No. 116-5.  CSX does not challenge this exhibit as a matter that is not integral to the pleadings, nor is its authenticity challenged.  Accordingly, there does not appear to be a procedural obstacle to considering such document in conjunction with NSR's motion.  Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016).  Moreover, even if there is such an obstacle in conjunction with NSR's Rule 12(c) request for dismissal, the Court is unaware of any similar obstacle to the extent that NSR seeks referral to the STB.

[5]  Under the doctrine of "primary jurisdiction," the Court has the authority to make its own discretionary determination to refer a matter to the STB in order to "promot[e] proper relationships between the courts and administrative agencies."  W. Pac. R.R. Co., 352 U.S. at 63; see Stevens, 152 F. Supp. 3d at 534 (explaining that the Court can "invoke the doctrine [of primary jurisdiction] sua sponte").  Therefore, even though the doctrine of primary jurisdiction may be "waivable" in certain circumstances, CSX Transp., Inc. v. Transp.-Commc'ns Int'l Union, 413 F. Supp. 2d 553, 564 (D. Md. 2006), this Court also has discretion to consider a referral to the STB with or without a motion from the parties.

operations and litigation in this District—have delayed the
Court's resolution of NSR's motion, as explained below, the Court
nevertheless finds that the best course is to temporarily stay
this federal action pending referral of the immunity issue to the
STB as such issue is potentially dispositive of nearly all claims
for relief.

## B. Merits of Dismissal/Referral

### 1. Factual Background

Briefly reciting the most relevant facts associated with the
1982 consolidation/merger that forms the basis of NSR's immunity
defense, in December of 1980, NWS Enterprises, Inc. ("NWS") filed
an application with the ICC to control two existing railways,
Norfolk and Western Railway Company ("NW") and Southern Railway
Company ("SR"). ECF No. 116-5. Shortly thereafter, the ICC filed
a notice in the Federal Register describing the transaction as
involving "the acquisition of control, through stock ownership of
NW and its subsidiary companies and of SR and its consolidated
system companies, by NWS, a newly incorporated non-carrier holding
company." NWS Enters.; Application To Control Norfolk & W. Ry.
Co. and S. Ry. Co., 46 FR 173-02, at 174, 1981 WL 109712 (Jan. 2,
1981) (emphases added). "The rail carrier subsidiaries of NW and
the SR consolidated system carriers are set forth in the appendix"
of the notice, with the appendix listing nearly fifty subsidiaries.
Id. at 176. Notably absent from such list of subsidiaries is

defendant Belt Line.  The acquisition by the newly formed holding company was not technically considered a "merger," although "certain operating efficiencies among the carriers" were proposed, and the carriers that would be owned by NWS would "continue to operate . . . over the lines described [in the notice], subject to certain abandonments and <u>coordinated operations described in the application</u>."  <u>Id.</u> (emphasis added).  No coordination with respect to Belt Line was mentioned in the application.

Approximately a year later, the STB published a lengthy decision authorizing Norfolk Southern Corporation ("NSC")[6] to acquire "control . . . of Norfolk and Western Railway Company and its subsidiary companies and of Southern Railway Company and its consolidated companies . . . subject to conditions."  <u>Norfolk S. Corp.—Control—Norfolk & W. Ry. Co. & S. Ry. Co.</u>, 366 I.C.C. 173, 173, 1982 WL 28414 (1982).  Such decision again listed the numerous NW and SR subsidiary companies, which again did not include Belt Line, and further approved "[a]cquisition of a line of railroad and of certain trackage rights incorporated in the primary application."  <u>Id.</u> at 173, 255-57.  No mention was made of NSC acquiring control over Belt Line or the trackage rights controlled by Belt Line.  The decision did, however, note the statutory

---

[6] It appears that the holding company being created to "control" both NW and SR was initially going to be NWS, but was ultimately named NSC.  NSC is NSR's predecessor.

polices of "recent rail reform legislation," which included an emphasis on the retention of competition.  Id. at 190.

The Rule 12(c) record suggests that, after the 1982 consolidation, the Belt Line partnership continued to operate under its plan of shared governance, with Belt Line's Board of Directors continuing to be appointed by CSX, NW, and SR.  ECF No. 1-3.  In 1989, CSX, NW, and SR signed an agreement to modify the number of directors appointed by each company such that NW and SR (both owned by NSC) would collectively appoint three directors, with the parties also agreeing that no other provision of the 1897 Belt Line Agreement would be amended, altered, or affected.[7]

## 2. Discussion

"Congress has vested with the STB, 'the exclusive authority to examine, condition, and approve proposed mergers and consolidations.'"  CSX Transp., Inc. v. Transp.-Commc'ns Int'l Union, 413 F. Supp. 2d 553, 562 (D. Md. 2006) (quoting Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n, 499 U.S. 117, 119 (1991)).  Critical to the instant dispute, the Interstate Commerce

---

[7] According to the parties, NW and SR merged in 1990, and the number of Belt Line board members was amended again at some point after such merger.  While not critical to the Court's analysis, the Court notes for context that it appears from public records that the 1990 merger occurred pursuant to the "corporate family" exemption such that STB approval of such merger was not required, with the STB reporting in early 1991 that a notice of exemption had been filed, further indicating that such transaction would "not result in . . . a change in the competitive balance with carriers outside the corporate family."  56 Fed. Reg. 1541-03, 1991 WL 310251 (Jan. 15, 1991).  It was at that time that the newly merged company was renamed "Norfolk Southern Railway [C]ompany."  Id.

Act provides that "[a] rail carrier, corporation, or person participating in [an] approved . . . transaction is exempt from the antitrust laws and from all other law, including State and municipal law, <u>as necessary</u> to let that rail carrier, corporation, or person <u>carry out the transaction</u>, . . . and <u>exercise control or franchises acquired</u> through the transaction." 49 U.S.C. § 11321(a) (emphases added).  "The purpose of this provision, and the exemption from antitrust and other laws that it provides, is to ensure that efforts to merge and consolidate <u>are not obstructed</u>, and that <u>merger efficiencies can be achieved</u>." <u>CSX Transp., Inc.</u>, 413 F. Supp. 2d at 562-63 (emphases added) (citing <u>Train Dispatchers Ass'n</u>, 499 U.S. at 133).  The Supreme Court has held that the exemption from "all other law" extends to cover "any obstacle imposed by law," including certain contracts, as long as "an ICC-approved transaction requires abrogation" of such obligations.  <u>Train Dispatchers Ass'n</u>, 499 U.S. at 132-33.

While the Supreme Court has not expressly defined the contours of "necessity" in this context, a district court in this circuit has squarely addressed the issue, explaining as follows:

> The preclusive powers of the [Interstate Commerce Act] are not unlimited.  As the Supreme Court noted in <u>Train Dispatchers</u>, exemption from other laws is only allowed when it is "<u>necessary to carry out an ICC-approved transaction</u>."   499 U.S. at 132-33 (emphasis added). . . .
>
> Although the Supreme Court did not define the term "necessary" in <u>Train Dispatchers</u>, the ICC has stated

12

> that the ICA super[s]edes other law where there
> otherwise will be an impediment to the merger. <u>CSX
> Corp.—Control—Chessie Sys., Inc., and Seaboard Coast
> Line Indus., Inc.</u>, 8 I.C.C. 2d 715, 721–22, 1992 WL
> 206172 (1992) ("[T]he necessity predicate is satisfied
> by a finding that some 'law' (whether antitrust, RLA, or
> a collective bargaining agreement formed pursuant to the
> RLA) is an impediment to the approved transaction.  In
> other words, the necessity predicate assures that the
> exemption is no broader than the barrier which would
> otherwise stand in the way of implementation.").

<u>CSX Transp., Inc.</u>, 413 F. Supp. 2d at 568-69.  The district court went on to highlight the fact that the plaintiff in that case failed to demonstrate that a post-merger dispute over where certain railroad clerical work was to be performed was a "critical factor" that could "impede" a long since final merger, finding that "at some point, the STB's purview over a merger must end."  <u>Id.</u> at 569.  On appeal, the Fourth Circuit expressed its agreement, stating in a footnote that "[t]he amount of time that has passed since the approved transaction was successfully completed militates against our finding that the STB would have jurisdiction" over a labor dispute that can be traced back to the merger, noting that the STB's "predecessor, the ICC, as well as the Seventh Circuit, has indicated that the STB's jurisdiction over legal disputes related to a merger should not extend indefinitely." <u>CSX Transp., Inc. v. Transp. Commc'ns Int'l Union</u>, 480 F.3d 678, 685 n.5 (4th Cir. 2007) (citing <u>Del. & Hudson Ry. Co.-Lease & Trackage Rts. Exemption—Springfield Terminal Ry. Co.</u>, 8 I.C.C. 2d 839, 845,

1992 WL 46807 (1992); <u>Harris v. Union Pac. R.R.</u>, 141 F.3d 740, 744 (7th Cir. 1998)).

The Seventh Circuit's opinion in <u>Harris</u> is instructive regarding the breadth of authority appropriately ceded to the STB when post-merger disputes arise in situations where the ICC approved a merger but said nothing, <u>and implied nothing</u>, about it being "necessary" for a certain law, contract, or other "obstacle" to the merger to be set aside as a barrier to the merger. <u>Harris</u>, 141 F.3d at 743–44. The Seventh Circuit explained:

> If the Commission says that it is "necessary" for some law to give way, then we review its decision to determine whether it was arbitrary, capricious, or an abuse of discretion. If the Commission implies (but does not quite say) that some other law had to yield, then perhaps a court should refer the subject to the agency under the doctrine of primary jurisdiction. <u>See</u> <u>Railway Labor Executives' Ass'n v. United States</u>, 987 F.2d 806, 815 (D.C. Cir. 1993). But if the agency says nothing, a post-merger dispute is resolved under generally applicable laws. We added in <u>Burlington Northern</u> that "necessary", like "all", should be taken seriously. <u>Only laws that would block the transaction give way</u>. . . .
>
> On the railroad's understanding of § 11341(a), the Board is forever in charge of all legal disputes related to a merger. Is the railroad liable to a brakeman injured by failure of a coupler on a car that came from the acquired corporation? Does an easement on any of the carrier's rights of way survive the merger? Are the employees entitled to a Christmas bonus under the labor agreement? Some of these issues are resolved by arbitration or bargaining, others under state property law or the Safety Appliance Act. <u>See</u> <u>Norfolk & Western Ry. v. Hiles</u>, 516 U.S. 400 (1996). But if the Union Pacific were right, everything would be up for grabs. Who can tell which of these laws the Commission might have thought incompatible with the merger?

14

<u>Harris</u>, 141 F.3d at 743–44 (emphasis added).  While <u>Harris</u> and the 2006/2007 <u>CSX</u> case are instructive, those cases consider the necessity requirement in the context of ensuring the absence of an obstacle to "carry[ing] out the transaction," as contrasted with the portion of § 11321(a) addressing the need to "exercise control or franchises acquired through the transaction."

Here, the record clearly reveals that the ICC/STB said nothing about setting aside any state or federal law as an impediment to the 1982 consolidation with respect to Belt Line,[8] and in fact, said nothing about Belt Line in any respect.  Notably, as CSX argues, Belt Line is not included on the lengthy list of subsidiary companies in the appendix to the public notice that would be controlled by NSW/NSC if the consolidation was approved.  The record further suggests that the 1982 consolidation "applicants" never asked the ICC/STB to authorize "control" over Belt Line,[9] with the proposed consolidation plan stating as follows:

---

[8] NSR does not argue in its motion that, post-consolidation, it should also be freed from its contractual obligations set forth in the 1897 Belt Line Agreement.  This may be because the contract was re-ratified after 1982, or it may be because NSR recognizes that setting aside the contract is not "necessary" to the success of the merger.  <u>See</u> <u>City of Palestine v. United States</u>, 559 F.2d 408, 415 (5th Cir. 1977) ("Congress allowed the ICC significant power to effectuate approved transactions, but it did not authorize gratuitous destruction of contractual relations even when it serves the general public interest <u>when the destruction is irrelevant to the success of approved transactions</u>.") (emphasis added).  Regardless of the reason, such issue is not before this Court.

[9] Belt Line was listed by the applicants in an appendix to the application as an entity that NW, SR, and an SR subsidiary each held an ownership interest in, with the collection of these interests totaling to 57.14

(1)   The   proposed   transaction   involves Interstate
Commerce Commission (Commission) authorization under
Section 11343 et seq. of the Interstate Commerce Act (49
U.S.C. § 11343 et seq.) for NWS Enterprises, Inc. (NWS),
a newly-incorporated non-carrier holding company, to
acquire control through stock ownership of Norfolk and
Western Railway Company (NW) and its subsidiary carrier
companies, and of Southern Railway Company (Southern)
and its consolidated system companies (collectively SR).

(2) As a result of the proposed transaction, NWS will
also acquire indirect control through stock ownership of
all subsidiaries of NW and Southern, including Southern
Region Motor Transport, Inc. (SRMT), a motor carrier
subsidiary of a wholly owned rail carrier subsidiary of
Southern.

(3) By this application NWS is seeking Commission
authorization under § 11343 to acquire control of NW and
SR.

(4) The proposed transaction involves the acquisition of
control through stock ownership of Norfolk and Western
Railway Company and its subsidiary companies, and of
Southern Railway Company and its consolidated system
companies, by NWS Enterprises, Inc., a newly-
incorporated non-carrier holding company.

(5) Applicants respectfully submit that the transactions
proposed herein are in full accordance . . . with the
statutory criteria set forth in the Interstate Commerce
Act (49 U.S.C. §§ 11343-11347) . . . [and] Applicants
respectfully request that the Commission make the
following findings with respect thereto:

    In Finance Docket No. 29430 (Sub-No. 1), that the
following transactions are within the scope of 49 U.S.C.
§ 11343; are consistent with the public interest;
reflect terms and conditions which are just and

_____

percent. ECF No. 116-5, at 77. The seventeen-page chart that included Belt
Line among over 150 other companies was provided to the ICC in response to
a regulatory requirement that the applicants list the "measure of control
or ownership exercised by Applicants over other carriers," ECF No. 116-5,
at 77. It was not, therefore, a chart listing entities that NSC requested
control over as part of the transaction. While such chart was not a
"request" for control, it appears to illustrate that majority stock
ownership of Belt Line would result from consolidation.

16

> reasonable . . . <u>and will have no adverse impact upon, but rather will enhance competition among rail carriers in the affected region</u>:
>
> > [●] acquisition by NWS Enterprises, Inc., <u>of control of</u> Norfolk and Western Railway Company <u>and its carrier subsidiaries</u>, and of Southern Railway Company <u>and its consolidated system companies</u> . . . .

ECF No. 116-5, at 4-5, 15, 19, 35-36 (emphases added).  The second item listed above appears significant to the Court as it indicates that NWS/NSC provided an express notice that it would acquire "indirect control" over a motor carrier "as a result" of the proposed transaction, and it discussed such "control" and the further permissions that were required.  NSR does not highlight any similar reference in the application stating that NWS/NSC was seeking approval of "indirect control" over Belt Line because the combination of stock held by three different NSW/NSC subsidiaries would, <u>post-consolidation</u>, amount to more than a 50 percent ownership interest in Belt Line.[10]

The above facts, as interpreted by the Court, provide support for CSX's position that it is appropriate to draw a distinction between a transaction that led to NSR amassing a slight majority ownership position in Belt Line (a cooperative partnership formed to serve the interests of all owners), and a transaction involving

---

[10] The detailed STB authorization ruling broadly indicates that the STB considered the anticompetitive effects of the consolidation, <u>Norfolk S. Corp.—Control</u>, 366 I.C.C. at 190-91, 227-29; however, there is no indication, one way or the other, that Belt Line was part of such analysis.

the STB "approving" NSR to control Belt Line such that NSR was immune from antitrust/conspiracy law, thus freeing NSR (at least under such laws) to leverage its ownership of NW and SR in a coordinated effort to harm CSX. The concern about coordination purportedly designed to harm CSX is especially acute in light of the fact that Belt Line is, by design, a separate corporate entity with a mission of operating for the collective good of all owner railways.[11]

The consolidation documents before the Court[12] therefore suggest that the STB did not "announce" that NSC would control Belt Line, and it certainly did not announce that NSC was exempt from federal antitrust laws or state conspiracy laws. However, as to the latter point, the STB and federal courts have repeatedly held that § 11321 is not predicated on the agency "announcing that a particular exemption is necessary"; rather, the immunity

---

[11] As discussed in the Court's prior Opinion and Order, ECF No. 66, at 3-4, the 1897 Belt Line Agreement was originally executed by eight different railroad companies, ECF No. 1-1. "[E]ach of the Companies . . . desire[d] to secure the construction of a Belt Line Railroad" in Virginia "for the mutual benefit of each in the interchange of business" with all companies agreeing that it was "for the best interest of all" that the Belt Line Railroad "be constructed, maintained and operated under a separate organization in which all are to be equally interested and each to have an equal representation." ECF No. 1-1, at 3 (emphases added). The written agreement further provided that the named companies "will co-operate cordially in encouraging the business of the [newly formed] Railroad Company, for which it is constructed." Id. at 6 (emphasis added). Thus, there may not be the same "necessity" to control Belt Line as compared to a "typical" subsidiary beholden to the majority owner.

[12] The Court has only been provided "Volume 2/2A" from the consolidation application.

exemption is "self-executing." Consol. Coal Sales Co. v. Consol. Rail Corp., 2002 STB Lexis 317, at *9-10 (S.T.B. May 23, 2002) (quoting ICC v. Locomotive Eng'rs, 482 U.S. 270, 298 (1987) (Stevens, J., concurring)); see Soo Line R.R. Co. v. Consol. Rail Corp., No. 2:17cv106, 2018 WL 1566816, at *7 (N.D. Ind. Mar. 29, 2018) ("The statute makes the exemption self-executing whenever necessary to carry out an STB-approved transaction."); CSX Corp.— Control—Chessie Sys., 8 I.C.C. 2d at 723 n.12 (same).

While CSX acknowledges that the STB "approved" a transaction that resulted in NSC amassing a 57 percent ownership interest in Belt Line and obtaining the right to appoint the majority of Belt Line's Board of Directors, CSX argues that such occurrence is not the same as the STB approving "control." In this Court's view, the strongest support for such argument is that NSW/NSC did not request "control" over Belt Line in its application, the STB did not announce that Belt Line would be controlled in the public "notice" of the application, nor did the STB announce that such control was authorized in its approval. While the Court acknowledges that the STB need not "announce" that the self-executing immunity exemption applies to a specific merger transaction, this Court is unaware of any STB decision or other precedent suggesting that STB notices do not even need to identify the companies over which control is being requested and authorized. Cf. 49 U.S.C. § 11344(a) (1982) (indicating that an application

for control requires the Commission to "notify those carriers" involved in the proposed transaction).[13]

Notwithstanding CSX's facially strong position regarding the absence of evidence of STB authorization of "control," CSX's position appears weakest when it argues that 57 percent ownership coupled with the ability to dominate the board of directors does not constitute "control" under STB precedent.  While the parties agree that the concept of "control" is fact-based and varies with the circumstances, NSR effectively highlights CSX's inability to point to any ICC/STB decision finding that majority stock ownership coupled with an ability to appoint more than half of a board of directors can be interpreted as anything other than "control" over a subsidiary railway.  ECF No. 138, at 9-10.  Although addressing a slightly different issue, this Court has located a previous STB ruling that is relevant to the instant dispute.  In CSX's favor, the STB's analysis confirms that other facts relevant to "control" still must be analyzed on a case-by-case basis even when a railway owns more than half of the stock of another railway.  In NSR's favor, the STB's analysis appears to put significant emphasis on the ability to control the board of another railway.  <u>See</u> <u>Brotherhood of Ry. & Airline Clerks v. Burlington N. Inc.</u>, 671

---

[13] The "Historical and Revision" notes to 49 U.S.C. § 11344 indicate that subsection (a) was revised prior to 1982 to eliminate the need to also notify the applicant "since the applicant is on notice by filing the application."  Section 11344 has been replaced by 49 U.S.C. § 11324.

F.2d 1085, 1090 (8th Cir. 1982) (recounting the respondents'
arguments that "terminal and switching railroads are not subject
to control by any one carrier, but are more properly viewed as
'partnerships' in which no one partner has the ability to control
the destiny of the corporation" and that "the inherent nature of
the companies and of the service they provide makes control by any
one carrier impossible," but remanding such issue to the STB based
on an incomplete record); Burlington N., Inc.—Control & Merger—
St. Louis-San Francisco Ry. Co., 366 I.C.C. 862, 866 & Appx. C,
1983 WL 28006 (1983) (finding, on limited remand, that: (1)
Burlington Northern did not control various terminal and switching
companies in which it owned less than, or exactly, a 50 percent
interest and had an inability to dominate the board of directors;
but (2) a "switching railway" and a "bridge railway" in which
Burlington Northern held "an ownership interest in excess of 50
percent," and had an ability to dominate the board, among other
facts demonstrating integration, were "under the direct control
and management" of Burlington Northern); cf. 49 U.S.C. § 10102(3)
("'[C]ontrol', when referring to a relationship between persons,
includes actual control, legal control, and the power to exercise
control, through or by (A) common directors, officers,
stockholders, a voting trust, or a holding or investment company,
or (B) any other means."); Union Pac. Corp., Union Pac. R.R. Co.
& Mo. Pac. R.R. Co.—Control—Chicago & N. W. Holdings Corp. &

Chicago & N. W. Transp. Co., 9 I.C.C. 2d 939, 947 (I.C.C. Sept.
17, 1993) ("In determining whether one person controls another,
the Commission has rejected any arbitrary formula based upon
percentage of stock ownership, and instead, [has] looked to a
number of additional factors, including distribution of the
remaining stock, the ability to elect directors and otherwise
control or influence decision-making machinery, and the existence
of management, marketing, operating and financial ties.").

In light of all of the above, this Court finds that the STB
is the proper authority to clarify the contours of the 1982
consolidation at issue in this case.  The Court acknowledges the
apparent uniqueness of remanding an issue to the STB four decades
after a railway consolidation was finalized. However, the
alternative is for this Court to re-evaluate the details of the
very same forty-year-old railway merger and determine what was
requested, noticed, and approved by the ICC/STB during the
administrative consolidation process.  While precedent makes clear
that the STB should generally not retain jurisdiction many years
after a merger is complete with respect to new contracts, new
factual developments, or new legal disputes that are tangentially
related to a long-finalized merger, CSX Transp., Inc., 480 F.3d at
685 n.5; Harris, 141 F.3d at 744,[14] the dispute in this case is

---

[14] But see CSX Corp.-Control-Chessie Sys., 8 I.C.C. 2d at 724 n.14 (noting
that, in appropriate circumstances, "operational changes" made eight years

distinguishable from the labor dispute cases cited by CSX that are based on changing operations <u>after</u> a merger is completed. Here, there is not a new legal dispute tangential to the merger, but a dispute germane to the consolidation itself, with the genesis of the dispute grounded in the ICC/STB merger procedure and an associated factual dispute regarding the scope of what was actually approved/authorized by the ICC/STB in 1982. See <u>Envt'l Tech. Council</u>, 98 F.3d at 789 (noting that the purpose of the primary jurisdiction doctrine is "taking advantage of agency expertise and referring issues of fact not within the conventional experience of judges or cases which require the exercise of administrative discretion"); <u>Ry. Lab. Execs.' Ass'n v. S. Pac. Transp. Co.</u>, 7 F.3d 902, 906 (9th Cir. 1993) (indicating that the ICC "should have exclusive authority to clarify the scope of its own approval and the corresponding breadth of the section 11341(a) exemption"); <u>AT&T Commc'ns, Inc. v. Consol. Rail Corp.</u>, 285 F. Supp. 2d 649, 662 (E.D. Pa. 2003) (denying a dismissal motion, but granting a motion to stay a portion of the case and refer an issue to the STB because: (1) "the issue of whether the § 11321(a) exemption applies to an STB-authorized transaction is within the agency's jurisdiction"; and (2) "the STB possesses the expertise necessary to resolve" the dispute because "the STB has studied the

---

after a "Commission-approved merger" were causally tied to the merger itself).

Transaction; entertained public comment, hearings, and arguments on the Transaction; and memorialized its approval in a lengthy, detailed document"); cf. CSX Corp.-Control-Chessie Sys., 8 I.C.C. 2d at 722-23 ("The appropriate tribunal to determine whether the proposed change in the status quo is directly related to and grows out of, or flows from, a specifically authorized principal transaction is this Commission, or the arbitrator acting pursuant to the Commission's authority."). Referring back to the analysis in Harris, if, as NSR asserts, the STB did approve NSC's "control" over Belt Line in 1982, such approval at least "implie[d] (but d[id] not quite say) that [antitrust/conspiracy] law[s] had to yield," thereby rendering it appropriate for this Court to "refer the subject to the agency under the doctrine of primary jurisdiction." Harris, 141 F.3d at 743.

In addition to the open question regarding authorization of "control," the Court notes the lack of precedent/administrative guidance with respect to the parties' competing positions as to whether it was "necessary" for NSR to be freed from antitrust and conspiracy laws based on the railway consolidation at issue in this case. In CSX's favor, the large-scale consolidation approved in 1982 appeared to have nothing to do with Belt Line such that NSC's need to secure "control" over Belt Line uninhibited by antitrust/conspiracy laws was not necessary to achieve the efficiencies of consolidation. See CSX Transp., Inc., 413 F. Supp.

24

2d at 562-63 ("The purpose of [§ 11321(a)], and the exemption from antitrust and other laws that it provides, is to ensure that efforts to merge and consolidate <u>are not obstructed</u>, and that <u>merger efficiencies can be achieved</u>.") (emphases added); <u>CSX Corp.—Control—Chessie Sys.</u>, 8 I.C.C. 2d at 721 ("[T]he 'necessity' predicate is satisfied by a finding that some 'law' . . . is an impediment to the approved transaction."). Moreover, it appears from the current record that Belt Line may have successfully operated as a collective/partnership for years after the consolidation, further suggesting that it was not "necessary" to allow NSR to dominate Belt Line in the same way that a parent company often controls a "typical" subsidiary. However, on the other side of the equation, if, post-consolidation, the STB classifies Belt Line as a "franchise" acquired through the transaction, and if NSC "acquiring" Belt Line was in fact "approved" by the STB in 1982, then it is arguably "necessary" under the scheme implemented by Congress and the STB to permit NSC/NSR to exercise its majority control over its newly acquired subsidiary free from the confines of antitrust or state conspiracy law. <u>See</u> 49 U.S.C. § 11321(a).[15]   In light of such conflicting

_____

[15] The scope of the statutory phrase "control or franchises" is a matter that would benefit greatly from a consistent application as would occur through consideration by the STB in the first instance, as contrasted with a district-by-district evaluation by judges less familiar with the controlling regulatory scheme. <u>See</u> <u>Advamtel, LLC v. Sprint Commc'ns Co., L.P.</u>, 125 F. Supp. 2d 800, 804 (E.D. Va. 2001) (indicating that, "[a]s an aid" to determine whether the doctrine of primary jurisdiction applies, the

defensible positions regarding a matter squarely within the STB's expertise, referral to the STB is not only appropriate but arguably necessary.

Summarizing the above, NSR's motion to dismiss the antitrust and state conspiracy claims with prejudice is **DENIED**, but in light of the STB's primary jurisdiction, NSR's motion for a stay pending transfer of a single question to the STB regarding the applicability of § 11321(a) immunity is **GRANTED**.[16]

## IV. Rule 12(c) Dismissal or STB Referral - Remedies

Belt Line's original Rule 12(b) motion sought dismissal, in part, based on this Court's purported lack of jurisdiction to award certain damages, ECF No. 28, at 11, and NSR's current motion seeks dismissal and/or referral to the STB of certain matters relevant to damages based largely on the same theory, ECF No. 116, at 15-22.  Considering the timing of such motion, and considering the

---

court should consider, among other things, whether the issue "involves technical or policy considerations within the agency's particular field of expertise" and whether "there exists a substantial danger of inconsistent rulings," so as to "promote[] a uniform development of law and policy in the areas where Congress has delegated to an administrative agency the authority to develop and establish national rules").

[16] A stay is appropriate notwithstanding the late stage of this case because the STB's decision impacts the validity of a majority of the claims for relief in this case.  Additionally, as argued by NSR, it appears that CSX could have pursued a legal challenge to the reasonableness of the Belt Line switching rate in a proceeding before the STB for almost ten years before it filed suit, as the currently-in-place switching rate was established in 2009 and disputed by CSX as early as 2010.  As discovery is complete and summary judgment briefing was just completed, the Court will be in a position to address dispositive issues and expeditiously schedule a trial after the STB resolves the lone issue referred to it by this Court.

fact that such a determination is relevant to, but not controlling of, certain damages and/or the injunctive relief sought in this case, NSR's request is **DENIED** at this time. First, the Court agrees with CSX that the motion seeking dismissal/referral could have been brought at the time NSR filed its initial Rule 12(b)(6) motion, but as explained above, such motion is not fatally untimely. Second, NSR's request for dismissal/referral appears somewhat duplicative of arguments in Belt Line's earlier dismissal motion that have already been rejected by this Court. See ECF No. 66, at 21-25. Third, contrary to NSR's assertions, CSX's claims for relief do not appear to "begin and end" with a determination of whether the "switching rate" charged by Belt Line is "reasonable." Finally, a separate rate-setting proceeding before the STB has already been initiated, and the STB proceeding is currently stayed pending this Court's resolution of the antitrust and conspiracy claims at issue in this case, with the STB fully aware of the current litigation. NSR's motion fails to demonstrate the need for this Court to force the determination of a "reasonable rate" back to the STB at this time. Notably, the STB setting a new reasonable switching rate to be in place going forward will not resolve the contract, conspiracy, and antitrust claims pending in this case, id. at 24, which center on whether anticompetitive and collusive conduct in the past led to an artificially inflated switching rate designed to block NSR's competitors from accessing

Norfolk International Terminal by rail.  Similarly, NSR fails at this time to demonstrate that an STB re-evaluation of the reasonableness of the current switching rate would dictate what remedies are appropriate in this case and/or resolve whether antitrust or conspiratorial actions designed to harm CSX proximately caused the establishment of such switching rate.[17]

This Court, of course, has every intention of ensuring that the monetary or injunctive remedies secured in this case (if any) are within this Court's authority to award, and nothing in this Court's ruling precludes the Court from seeking further input from the STB at a later time should it be deemed necessary to determine damages.  The Court's decision not to refer the determination of a "reasonable" switching rate to the STB at this time is not tantamount to a finding that this Court has the authority to decide such a rate or to award CSX trackage rights.  Such decision is also not an indication of how this Court will rule on NSR's recently-filed, and still unripe, motion in limine seeking to exclude evidence and argument suggesting that Belt Line's switching rate is "unreasonable" or "excessive."  ECF No. 329. Rather, CSX alleges in this lawsuit that NSR and/or Belt Line committed federal and state law violations, and well as contractual breaches, by conspiring to manipulate a privately determined

---

[17] The current switching rate was established in 2009 without input from the STB, and CSX asserts that the establishment of such rate, and the maintenance of such rate over time, was the product of unlawful collusion.

switching rate for the purpose of harming CSX, and the Court finds,
consistent with its earlier ruling, that determining liability, as
well as at least some remedies associated with the alleged
liability, falls within this Court's authority.

## V. Conclusion

For the reasons outlined above: (1) NSR's motion to dismiss
on jurisdictional grounds is **DENIED;** (2) NSR's motion to dismiss
the antitrust and state conspiracy claims with prejudice is **DENIED**;
(3) NSR's motion to refer to the STB a determination of a
reasonable "switching rate" is **DENIED** at this time; and (4) in
light of the STB's primary jurisdiction, NSR's motion for a stay
pending transfer of the immunity dispute to the STB is **GRANTED**.
The following discrete question is **REFERRED** to the STB:

> Did the 1982 consolidation, whereby NSC acquired an
> indirect 57 percent interest in Belt Line, involve the
> ICC/STB granting NSC "approval" to control Belt Line, and
> if so, did such authorized "control" render it necessary
> for antitrust and/or state conspiracy laws to yield,
> whether because Belt Line was then deemed a "franchise"
> of NSC, or for any other reason?

After the STB rules, this Court will expeditiously resolve all
remaining summary judgment issues, to include the breach of
contract claim that is outside the referral to the STB.  In the
interim, the instant case will be **STAYED**.[18]  The trial date is

---

[18] The stay does not preclude counsel from coordinating with each other, and
the Magistrate Judge assigned to this case (to the extent the Magistrate
Judge determines it to be appropriate) to seek a resolution of any pending
sealing motions.

hereby released, and counsel are instructed to contact the undersigned judge's calendar clerk to schedule a new trial date as soon as the STB issues its ruling.

The Clerk is **DIRECTED** to forward a copy of this Opinion and Order to all counsel of record and to the U.S. Surface Transportation Board.

**IT IS SO ORDERED.**

 

 

_____ /s/ ⟨signature⟩

Mark S. Davis

CHIEF UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
May __18__, 2021