# EXHIBIT 1

51101
EB

SERVICE DATE – JUNE 17, 2022

SURFACE TRANSPORTATION BOARD

DECISION

Docket No. FD 36522

NORFOLK SOUTHERN RAILWAY COMPANY—
PETITION FOR DECLARATORY ORDER

Digest:[1]  In response to questions referred to the Board from the U.S. District Court for the Eastern District of Virginia, the Board finds that the Interstate Commerce Commission did not authorize Norfolk Southern Corporation to control Norfolk & Portsmouth Belt Line Railroad Company.

Decided:  June 17, 2022

On June 21, 2021, Norfolk Southern Railway Company (NSR) filed a petition for declaratory order requesting that the Board institute a proceeding to address the issues referred to the Board by the U.S. District Court for the Eastern District of Virginia in CSX Transportation, Inc. v. Norfolk Southern Railway, No. 2:18-cv-00530 (E.D. Va. May 18, 2021).  The District Court referred to Board the following questions:

> Did the 1982 consolidation, whereby [Norfolk Southern Corporation (NSC)] acquired an indirect 57 percent interest in [Norfolk & Portsmouth Belt Line Railroad Company (NPBL)], involve the [Interstate Commerce Commission (ICC)]/STB granting NSC "approval" to control [NPBL], and if so, did such authorized "control" render it necessary for antitrust and/or state conspiracy laws to yield, whether because [NPBL] was then deemed a "franchise" of NSC, or for any other reason?

CSX Transp., Inc., No. 2:18-cv-00530, slip op. at 29.

For the reasons explained below, the Board finds that the Board's predecessor, the ICC, did not authorize NSC to control NPBL.  Because control authority was never granted, the question of whether authorized control rendered it necessary for antitrust and/or state conspiracy laws to yield is moot.

---

[1]  The digest constitutes no part of the decision of the Board but has been prepared for the convenience of the reader.  It may not be cited to or relied upon as precedent.  See Pol'y Statement on Plain Language Digs. in Decisions, EP 696 (STB served Sept. 2, 2010).

Docket No. FD 36522

BACKGROUND

**Prior Related Board and Court Proceedings.** This proceeding arises from a broader dispute between NSR and CSX Transportation, Inc. (CSXT), concerning issues related to NPBL. CSXT filed the complaint from which the District Court referral arose on October 4, 2018, alleging that NSR and NPBL have taken actions to effectively prevent CSXT from using NPBL's switching services to access customers at the Norfolk International Terminals, a container terminal facility in Norfolk, Va., and that these actions constitute a violation of federal antitrust laws, a breach of contract, and a violation of state law in several respects. A few weeks before CSXT filed its court complaint, NSR had filed a petition with the Board asking it to set trackage rights compensation for NPBL's use of NSR rail lines; after CSXT was permitted to intervene, that proceeding was held in abeyance pending the resolution of the federal court litigation. See Norfolk S. Ry.—Pet. to Set Trackage Rts. Comp.—Norfolk & Portsmouth Belt Line R.R., FD 36223 (STB served Dec. 19, 2019). In a decision issued on May 18, 2021, the District Court referred to the Board the questions described above regarding the 1982 consolidation involving NSC and NPBL. CSX Transp., Inc., No. 2:18-cv-00530, slip op. at 29. On June 21, 2021, NSR filed a petition for declaratory order requesting that the Board institute a proceeding to address the issues referred to the Board by the District Court. The Board instituted this declaratory order proceeding on August 9, 2021.

**History of the Consolidation.** The 1982 railroad consolidation at issue here involved the ICC granting authority for NWS Enterprises, Inc. (NWS),[2] a noncarrier holding company, to acquire control of Norfolk & Western Railway Company (NW) and Southern Railway Company (SRC). As part of that proceeding on July 24, 1980, NW and SRC filed a petition (Petition) with the ICC seeking waiver and clarification of the ICC's railroad consolidation procedures in anticipation of a forthcoming application (Application) by NWS to acquire control of NW and SRC. NW & SRC Pet., July 24, 1980, NWS Enters., Inc.—Control—Norfolk & W. Ry., FD 29430. The Petition explained that SRC was a Class I railroad that controlled three Class III railroads and numerous terminal and other railroad companies, including Norfolk Southern Railway Company (Norfolk Southern),[3] and that NW was a Class I railroad that controlled five Class III railroads, one terminal company, and other non-operating railroad companies. Id. at 4, 6. The Petition sought a waiver for SRC to report the information required by the ICC's regulations on a consolidated system basis rather than reporting the information separately for SRC and for each individual carrier controlled by SRC. Id. at 7-10. Similarly, the Petition sought a waiver to exclude information regarding NW's subsidiaries except to the extent

---

[2] In 1981, NWS changed its name to Norfolk Southern Corporation (NSC). Norfolk S. Corp.—Control—Norfolk & W. Ry. (NSC Control), 366 I.C.C. 173, 173 n.2 (1982).

[3] In this decision, "Norfolk Southern" refers to the entity that was in existence at the time of the Petition and the Application and was a Class II subsidiary of SRC. "NSR" refers to the entity that has been in existence since December 31, 1990, when SRC merged Norfolk Southern into SRC and SRC changed its name to Norfolk Southern Railway Company.

that such information was maintained by NW on a consolidated system basis.[4]  Id.  The Petition claimed that with respect to SRC, the ICC had a long history of accepting consolidated system reporting as valid and accurate.  Id. at 5.  With respect to NW, the Petition asserted that excluding data from the NW subsidiaries, except to the extent that such data were maintained on a consolidated system basis, would not inhibit the ICC's analysis of the proposal because the operations of the subsidiaries of NW represented a very small part of the overall NW system.  Id. at 6-7.

The Petition also sought clarification regarding the term "applicant."  The Petition stated that the definition of "applicant" in the regulations referred to "all carriers with properties directly involved" in the transaction but that this definition also indicated that "applicant" was intended to apply only to the parties initiating the transaction and not subsidiaries of initiating parties.  Id. at 11.  The Petition asked the ICC to clarify that the term "applicant" applied only to NW, SRC, and the new holding company, which were the initiating parties, and to Delaware & Hudson Railway Company (D&H), whose stock was held by a wholly owned subsidiary of NW but was operated separately from NW.  Id.  The Petition also explained that in addition to the consolidated system companies, NW and SRC had interests in certain other railroad companies that they did not control (non-system companies).  Id. at 11-12.  According to the Petition, NW and SRC held 50 percent or less of the stock of the non-system companies, did not exercise control over such companies, and had no intention of exercising control over such companies if the proposed transaction were approved.[5]  Id. at 12.  The Petition stated that the records for the non-system companies were maintained separately from the NW and SRC consolidated system data.  Id.  The Petition argued that requiring data to be reported for the non-system companies would serve no useful purpose and would burden the record and therefore requested that the ICC clarify that the non-system companies would not be considered "applicants" under the ICC's regulations.  Id.  However, the Petition indicated that it would provide the information required by 49 C.F.R. § 1111.1(c)(8)[6] for these companies.

---

[4]  The carriers that comprised the NW system were listed in Appendix A to the Petition and the carriers that comprised the SRC system were listed in Appendix B to the Petition.  The pleadings and decisions in the consolidation proceeding generally refer to the subsidiaries within the SRC system as SRC's "consolidated system companies" but generally refer to the subsidiaries within NW's system as NW's "subsidiary companies."  This decision will refer to the combination of the subsidiaries within the NW system and the SRC system as "the consolidated system companies."

[5]  At that time, NW and SRC each owned a minority interest in NPBL.  However, the Petition did not refer to NPBL, or any of the other non-system companies, by name nor did it provide any information regarding the size or significance of their operations.

[6]  That regulation required applicants to provide information regarding "[t]he measure of control of ownership if any, now exercised by applicant over any carrier subject to the act, or over the properties of such carrier."  49 C.F.R. § 1111.1(c)(8) (1979).  Thus, it required applicants to provide information regarding all carriers subject to the ICC's jurisdiction in which they held an ownership interest regardless of whether applicants would control those carriers.

Docket No. FD 36522

On August 25, 1980, the ICC issued revised procedural regulations governing railroad consolidation proceedings.  On September 10, 1980, NW and SRC filed a supplement to the Petition requesting that the forthcoming application be considered under the revised regulations. See NWS Enters., Inc.—Control—Norfolk & W. Ry., 45 Fed. Reg. 66,911, 66,911 (Oct. 8, 1980).

In a decision served on October 1, 1980, the ICC granted the Petition.  The decision explained that the Application would be considered under the revised regulations, and the revisions to the regulations included revising the definition of "applicant" from "all carriers with properties directly involved" to "the parties initiating the transaction."  Id. at 66,911-912.  In addition, the ICC stated that it had long accepted system reporting and accounting by SRC and its consolidated companies and that practice would continue in the consolidation proceeding.  Id. at 66,912.  With respect to NW, the ICC noted that the revenues, expenses, income, and assets of NW's subsidiary companies represented a very small fraction of the NW system totals.  Id.  The ICC concluded that the benefit, if any, of separately reporting information for these companies would be outweighed by the difficulty in obtaining such information and that NW could report information individually or on a consolidated basis, where available.[7]  Id.  With respect to the railroad companies that were not part of the consolidated system, the ICC noted that NW and SRC did not hold a majority interest in these companies, had no intention of controlling these companies after the transaction, and that the records for these companies were maintained separately from the NW and SRC consolidated system data.  Id.  The ICC concluded that it would serve no useful purpose to require these companies to provide detailed information, other than providing the information required by 49 C.F.R. § 1111.1(c)(8).  The ICC also stated that it agreed with the petitioners that the subsidiaries of NW and SRC did not fall within the definition of the term "applicant" in its regulations.  Id.

On December 4, 1980, NWS, NW, SRC, and D&H filed their Application, which sought authorization for NWS to acquire "control through stock ownership of [NW] and its subsidiary carrier companies, and of [SRC] and its consolidated system companies. . ."  Application Vol. 2 at 1, Dec. 4, 1980, Norfolk S. Corp.—Control—Norfolk & W. Ry., FD 29430.  The Application made no mention of NPBL except in a chart attached as Appendix 2 to Volume 2 of the Application (Appendix 2) listing all the railroad companies in which NW and SRC held an ownership interest[8] and in a discussion of applicants' operating plan.  The operating plan explained where NW and SRC interchanged with NPBL prior to the transaction and stated that after the transaction, interchange with NPBL would be performed by consolidated crews of the

_____

[7]  The decision also stated that information for D&H could be reported on an individual basis or on a consolidated basis, if available.  NWS Enters., Inc.—Control—Norfolk & W. Ry., 45 Fed. Reg. 66,911, 66,911 (Oct. 8, 1980).

[8]  Appendix 2 indicated that NW owned 28.57% of NPBL, SRC owned 14.29% of NPBL, and Norfolk Southern, a wholly owned SRC subsidiary, owned 14.28% of NPBL, for a total of 57.14%.  It appears that NPBL is the only carrier listed in this Appendix in which either NW or SRC did not have a controlling interest prior to the transaction but which, after the transaction, would be indirectly controlled by NSC as a result of the combined ownership interests of NW and SRC.

Docket No. FD 36522

consolidated carriers in the same manner as NW and NPBL did prior to the transaction.  Id. at Vol. 4 at 184-187.

On January 2, 1981, the ICC accepted the Application for consideration.  NWS Enters.; Application to Control Norfolk & W. Ry. & S. Ry., 46 Fed. Reg. 173 (Jan. 2, 1981).  The decision stated that the "proposed transaction involves the acquisition of control, through stock ownership of NW and its subsidiary companies and of [SRC] and its consolidated system companies, by NWS . . ." Id. at 174.  An appendix to the decision listed the "rail carrier subsidiaries of NW and the [SRC] consolidated system carriers." Id.  NPBL was not listed in that appendix, id. at 176, and was not referenced anywhere else in the decision.

The ICC granted the Application on March 19, 1982.  The decision explained that the Application sought authority "for [NSC] to acquire control through stock ownership of NW and its subsidiary companies, and of [SRC] and its consolidated companies." NSC Control, 366 I.C.C. at 177.  Again, a list of the NW subsidiary companies and SRC consolidated companies was included in an appendix to the decision.  Id. at 177 n.3.  NPBL was not listed in that appendix, id. at 255-57, and was not referenced anywhere else in the decision.

In 1991, the ICC, pursuant to an exemption under 49 C.F.R. § 1180.2(d)(3) for transactions within a corporate family, granted SRC authority to directly control NW.  S. Ry.— Control Exemption—Norfolk & W. Ry., FD 31791 (ICC served Jan. 14, 1991).  At that time, SRC changed its name to Norfolk Southern Railway Company (i.e., "NSR").  (NSR Opening 13.)  In 1998, pursuant to another corporate family transaction exemption, the Board authorized the merger of NW into its parent, NSR (formerly SRC).  Norfolk S. Ry.— Exemption—Norfolk & W. Ry., FD 33648 (STB served Aug. 31, 1998).

**The Parties' Arguments:  CSXT**.  CSXT asserts that the ICC did not grant approval for NSC to control NPBL as part of the 1982 NSC Control transaction.  CSXT argues that the relevant statute requires an entity to explicitly seek control authority and that NSC's[9] statements and actions in the application process demonstrated that it did not request authority to control NPBL.  (CSXT Opening at 4, 23, 31.)  CSXT points out that, in the Petition, NSC stated that its application for control authority would be limited to railroad companies within the NW and SRC systems and that the appendices to the Petition listing such carriers did not include NPBL.  (Id. at 13.)  In addition, according to CSXT, the Petition sought clarification that carriers, such as NPBL, in which NW and SRC did not hold a majority interest would not be considered "applicants" by the ICC because NW and SRC did not seek to control those carriers, and thus data submitted about them would "serve no useful purpose."  (CSXT Reply 11.)  CSXT contends that the fact that an appendix to the Application indicated that NSC would indirectly own 57.14% of the stock of NPBL after the transaction was not sufficient to put the ICC or the public on notice that it was seeking authority to control NPBL, particularly given that the Petition stated that NSC was not going to control NPBL and given that the amount ownership interest is not dispositive on the issue of control.  (Id. at 12-14.)  CSXT further states that the Application did

---

[9]  As noted above, the entity that filed the Petition and the Application was NWS but that entity changed its name to Norfolk Southern Corp. before the ICC issued NSC Control.  To avoid confusion, the discussion below will refer to this entity only as NSC.

not provide any of the information that would have been required for the ICC to evaluate an NSC acquisition of control of NPBL under the applicable statutory standards, such as information regarding the potential impact on competition and operations. (CSXT Opening 19, 25.)

CSXT argues that the ICC decisions regarding the control transaction demonstrate that the agency did not apply the relevant statutory standards with respect to control of NPBL and never authorized NSC to control NPBL. (Id. at 20-21.) CSXT states that in granting the Petition, the ICC explained that petitioners did not need to provide information regarding carriers such as NPBL that were not already controlled by NW or SRC because the petitioners had stated that they did not intend to control such carriers. (Id. at 14-15; CSXT Reply 3.) In addition, according to CSXT, the appendices in the ICC decisions accepting the Application and granting the Application that listed the companies over which NSC sought control did not include NPBL and the decision granting the Application does not contain a single reference to NPBL.[10] (CSXT Opening 20-21.) CSXT further argues that subsequent ICC decisions approving reorganizations within the NSC corporate family could not have authorized control of NPBL since these decisions never mention NPBL and involved class exemptions which can only be invoked for transactions that have no competitive effect.[11] (CSXT Opening 26; CSXT Reply 18.) CSXT also argues that any actions by CSXT and NPBL's other owners since NSC Control that may suggest that the parties acknowledged NSC's right to control NPBL are not relevant to the question of whether the ICC granted NSC legal authority to control NPBL. (CSXT Reply 19.)

CSXT argues that because NSC was not granted authority to control NPBL, NSR does not have immunity under 49 U.S.C. § 11321 from CSXT's antitrust claims regarding NPBL. (CSXT Opening 29-31; CSXT Reply 20-21.) CSXT asserts that accepting NSR's arguments here would encourage applicants to abuse the Board's change in control processes by not accurately describing the transaction, requesting the necessary authority, or providing other relevant information but later attempting to claim immunity that the Board never intended or granted. (CSXT Reply 21-22.)

**NSR.** According to NSR, the waiver to submit the information required by the ICC's regulations on a system basis was sought to reduce the informational burden of the Application and was not intended to limit the scope of any subsequent ICC approval to cover only those specific railroads who were named applicants or whose systems were consolidated with the applicants. (NSR Reply 14-15.) NSR argues that the Petition's request for clarification regarding the term "applicant"—both with respect to excluding SRC's and NW's subsidiaries and with respect to excluding companies not controlled by SRC and NW—was also intended only to limit the informational requirements of the Application and not to limit the scope of the ICC's overall approval. (Id. 15-16.) NSR asserts that the statement that SRC and NW would not

---

[10]  CSXT states that the decision approving the Application contains a detailed discussion of the impact of the transaction in the Norfolk area that does not mention NPBL, much less the potential change in control over NPBL. (CSXT Opening 26.)

[11]  CSXT also notes that at the time of the Application, SRC and Norfolk Southern sought authority to construct and operate over a new connection track in the Norfolk area but did not suggest that NSC would assert control over NPBL, or that the consolidated NW/SRC system would interact with NPBL in any way different from before. (CSXT Reply 16-17.)

control the non-system companies after the transaction was simply a statement of fact because neither SRC standing alone nor NW standing alone would control the non-system companies, such as NPBL, in a post-transaction environment and the Petition never stated that NSC would not obtain control over the non-system companies.[12] (Id. at 16 n.13.)  NSR argues that when read in context, the statement regarding the current and future lack of control over the non-system companies was meant to emphasize how burdensome it would be to provide detailed information for these companies if they were considered "applicants." (Id. at 16-17.)  According to NSR, the ICC recognized that the request to clarify the term "applicant" with respect to the non-system companies was about reducing the informational burden rather than excluding these companies from any ICC authority granted.  (Id. at 17-18.)

NSR argues that information and discussion regarding NPBL was absent from the Application and the ICC decisions accepting and granting the Application because the waivers granted by the ICC allowed NSR to exclude information regarding NPBL from its Application. (NSR Reply 23-24.)  However, according to NSR, the fact that information regarding NPBL was absent from the Application did not mean that NPBL was not included in the scope of the Application.  (NSR Opening 5; NSR Reply at 24.)  NSR states that the ICC was fully aware that NSC would control 57.14% of NPBL after the transaction because this fact was disclosed in Appendix 2 that listed the ownership shares applicants held in other companies.  (NSR Opening 5.)  NSR contends that the Application generally speaks in terms of "systems" because that is how SRC and NW operated at the time but that the Application made clear that the proposed transaction included all subsidiaries and affiliates, whether owned in whole or in part, when it stated that NSC would "acquire indirect control through stock ownership of all subsidiaries of [NW] and [SRC]."  (NSR Reply 22-23.)

According to NSR, the ICC did not need to explicitly approve or announce the authorization for control of NPBL because authorizing NSC to indirectly control NPBL was a byproduct of the ICC's authorization for NSC to control SRC and NW.  (NSR Opening 10.)  NSR points to other decisions that it asserts granted control or merger approval that do not list every single entity that, absent a waiver, would have to be treated as an applicant or applicant carrier.  (NSR Opening 10-11.)  Moreover, according to NSR, in the decision approving the Application, the ICC granted authority for NSC to control NW, SRC "and their affiliated carriers."  (Id. at 12.)  NSR argues that the term "affiliated carrier" is generally understood to mean a carrier that was partially owned, as opposed to wholly owned and that this term therefore encompassed NPBL.  (Id.)

NSR further contends that in other cases where waivers have been granted to exclude subsidiaries from the definition of "applicant"—including cases where neither applicant had a controlling interest but would have a majority interest following the transaction—it was understood that these carriers were not excluded from the scope of the control authority granted. (NSR Reply 18-21.)  In addition, NSR asserts that there is no precedent supporting the

---

[12]  According to NSR, following the ICC's approval of the transaction, NPBL's operations were not consolidated into SRC's or NW's and NSC did not exercise control over or change NPBL's operations.  (NSR Reply 36.)  However, NSR indicates that NSC did control NPBL's management after the transaction.  (Id.)

proposition that an applicant must specifically request control authority for a particular subsidiary, whether owned in whole or in part, in order for that subsidiary to be included in the scope of the control authority granted.[13]  (NSR Reply 20 n.20.)

In addition, NSR argues that even if NSC Control did not authorize control of NPBL, subsequent ICC decisions resolved this issue.  (NSR Opening 14; NSR Reply 37.)  NSR states that a 1991 transaction approved by the ICC, pursuant to an exemption for transactions within a corporate family, granted SRC authority to directly control NW.  (NSR Reply 38.)  NSR explains that, at the time, SRC changed its name to Norfolk Southern Railroad Company (i.e., "NSR").  (Id.)  According to NSR, SRC directly owned a 14.29% interest in NPBL, SRC's subsidiary, Norfolk Southern, owned a 14.29% interest in NPBL, and NW owned a 28.57% interest in NPBL.  (Id.)  NSR therefore asserts that the 1991 transaction gave NSR (the renamed SRC) indirect majority ownership of NPBL and that the transaction authorized NSC to control NPBL.  (NSR Opening 14; NSR Reply 38.)  NSR further states that in 1998, pursuant to another corporate family transaction exemption, the Board authorized the merger of NW into its parent, NSR, giving NSR direct ownership of 57.14% of NPBL, thereby reaffirming NSR's authority to control NPBL.  (NSR Reply 39.)

NSR argues that because control over NPBL was granted to NSC by the ICC in 1982 and by the ICC and the Board in subsequent transactions, the exercise of such control is free from the confines of antitrust law pursuant to 49 U.S.C. § 11321(a).  (NSR Opening 15-16.)

**NPBL.**  NPBL argues that since the NSC Control decision, it has been under the control of NSC, and that such control was always mutually understood and accepted by all the parties in this proceeding.[14]  (NPBL Opening 1; NPBL Reply 2.)  In addition, NPBL states that on March 1, 1989, CSXT, NW and SRC entered into an agreement reciting each party's ownership of NPBL and agreed that, going forward and regardless of the number of railroad subsidiaries holding NPBL stock, NSC would be entitled to appoint three members of NPBL's board and CSXT would be entitled to appoint two.  (NPBL Opening at 3-4.)  NPBL also states that its owners took other actions confirming the common understanding that NSC obtained control of NPBL as a result of the NSC Control decision, such as consolidating its financial statements with those of NSC.  (Id. at 4.)  According to NPBL, if formal ICC authority for NSC to control NPBL was not granted, the lack of authorization appears to be no more than a technical, administrative matter and the Board "should retain this matter until such time as any required remedial control proceeding is completed, and, at which point, a full response to the matters referred by the District Court can be provided."  (NPBL Reply 4-5.)

---

[13]  NSR claims that other consolidations around the same time as NSC Control indicate that there was no requirement for in-depth competitive analysis of minor subsidiaries over which the consolidated holding company would gain a majority interest and that reporting on a system basis was an accepted practice.  Moreover, NSR suggests, excluding carriers outside the system from reporting requirements was also an accepted practice under which it was understood that those carriers were still part of the transaction approved by the ICC.  (NSR Reply 31-32.)

[14]  NSR similarly argues that since the NSC Control, CSXT has understood that NPBL was under the control of NSC and took actions indicating its acceptance of this control.  (NSR Reply 3-4.)

Docket No. FD 36522

DISCUSSION AND CONCLUSIONS

Under 5 U.S.C. § 554(e) and 49 U.S.C. § 1321, the Board has discretionary authority to issue a declaratory order to terminate a controversy or remove uncertainty.  See Bos. & Me. Corp. v. Town of Ayer, 330 F.3d 12, 14 n.2 (1st Cir. 2003); Intercity Transp. Co. v. United States, 737 F.2d 103 (D.C. Cir. 1984); Delegation of Auth.—Declaratory Ord. Procs., 5 I.C.C.2d 675 (1989).  It is appropriate here to issue a declaratory order to resolve the controversy concerning the questions referred to us by the District Court.  For the reasons explained below, the Board finds that the ICC did not authorize NSC to control NPBL.  Because the ICC did not authorize NSC to control NPBL, the District Court's question as to whether authorized control of NPBL rendered it necessary for antitrust and/or state conspiracy laws to yield is moot.

NSR does not claim here that explicit approval for its control of NPBL was ever sought, that either the ICC or the Board ever specifically considered the implications of such control, or that either agency issued a decision that expressly approved NSR control of NPBL.  Instead, NSR presents a series of arguments in an effort to establish that approval was either granted sub silentio or that the collective conduct of NPBL and its owners in the years following 1980 should be deemed sufficient to legally ratify a control transaction—and to retroactively confer antitrust immunity—even in the absence of ICC or Board action.  The Board is not persuaded.

As discussed above, the fact that the Petition sought a waiver to exclude the non-system companies from the definition of "applicants" so that information on these non-system companies would not need to be submitted to the ICC strongly supports the conclusion that NSR did not seek or obtain approval for control of NPBL.  The Petition did not name the non-system companies or provide any information about them except to state that NW and SRC held a 50% or less interest in these companies, did not control them, had no intention of controlling them after the transaction, and the records for these companies were maintained separately from the NW and SRC consolidated data.  NW & SRC Pet. 12, July 24, 1980, NWS Enters., Inc.—Control—Norfolk & W. Ry., FD 29430.  The Petition then went on to assert that "bringing into this proceeding data concerning these carriers (other than identifying them in the response required by Section 1111.1(c)(8)) would serve no useful purpose and would substantially burden the record." Id.  Indeed, the subsequently filed Application itself also described the transaction as seeking control of only the consolidated system companies.[15]  Taken together, these statements clearly demonstrate that NSR was not asking the ICC to review and approve its acquisition of control of the non-system companies (a group that included the unmentioned NPBL), but was arguing that submission of information should not be required because no review was, in fact, required or sought.

NSR claims that the statement in the Petition about NW and SRC lacking control over the non-system companies in the present and the future was made only to support an argument that obtaining information from these companies would be burdensome and was not intended to

_____

[15] Application Vol. 2 at 1, 16, Dec. 4, 1980, Norfolk S. Corp.—Control—Norfolk & W. Ry., FD 29430 (stating that the Application was seeking authorization for NSC to control NW and its subsidiary carrier companies and of SRC and its consolidated system companies).

9

indicate that control authority was not being sought for these companies.[16]  (NSR Reply 16-17.)  In addition, NSR claims that this statement indicates only that neither NW standing alone nor SRC standing alone would control the non-system companies after the transaction and that petitioners never stated that NSC would lack control of the non-system companies after the transaction.  (Id. at 16 n.13.)  NSR's interpretations, developed more than 40 years after the event, are implausible.  The Petition never explicitly stated that it would be difficult or burdensome for the applicants to obtain information from the non-system companies, just that the inclusion of this information would "burden the record."[17]  Moreover, if NSR were correct that the primary issue was burden, there would have been no reason for petitioners to state that NW and SRC would not control the non-system companies *after* the transaction.  The lack of *future* control by NW standing alone or SRC standing alone would have been irrelevant to the burden of producing information in the present.  In addition, if the statement about NW's and SRC's lack of control was meant only to emphasize how burdensome it would be to obtain information from the non-system companies, as NSR claims, there also would have been no reason for petitioners to argue that information regarding the non-system companies would "serve no useful purpose."  Lack of usefulness (or irrelevance) can be a reason for not imposing a burden, but has nothing to do with whether a burden exists in the first place or how extensive that burden is.  It appears that the Petition was arguing that detailed information on non-system companies would serve no useful purpose—and for that reason would burden *the record*—because petitioners would not control those companies.

Essentially, NSR would have the Board interpret the pleadings from 1980 to show that it asked the ICC—and the ICC agreed—to approve NSR's control of NPBL while at the same time relieving NSR of the burden of submitting evidence or otherwise presenting any case for the acquisition of control.  But the statements about NW and SRC lacking future control over the non-system companies and there being "no useful purpose" in providing information on the non-system companies make much more sense if read as an explanation that the post-transaction consolidated companies (i.e., NW and SRC combined) would lack control over the non-system companies following the transaction and information regarding these companies would therefore serve "no useful purpose" in the ICC's decision regarding control authority.  The only logical reading of the Petition is that petitioners were telling the Board that the non-system companies were outside the scope of the control authority being requested.  It is therefore not surprising that

---

[16]  NSC further states that the impetus for the statement about control was that smaller subsidiaries that do not greatly impact the overall operation or analysis of the initiating parties need not submit detailed information.  (NSR Reply 17 n.16.)  However, if this was the rationale for the waiver request, it was never communicated to the ICC.  The Petition does not name the non-system companies, nor does it provide any information about the nature or scope of their operations, much less claim that their operations were not significant enough to merit consideration by the ICC.

[17]  In any event, even if the Petition implied such a burden, it also clearly (and more importantly) conveyed to the ICC that petitioners would not control the non-system companies after the transaction and that, as explained below, those companies were outside the scope of the control authority being requested.

Docket No. FD 36522

in the decisions accepting and granting the Application, the ICC defined the Application as seeking authority to control only the consolidated system companies.[18]

Given this context, whether NSC's Application was required to explicitly request authority to control each individual subsidiary, or to provide information related to the potential competitive effects of acquiring each individual subsidiary, is not determinative of the outcome of this case. Nor is whether the ICC was required to explicitly analyze and announce control authority with respect to each individual subsidiary. Rather, the essential issues in this case are that petitioners/applicants told the ICC and the public that they had no intention of controlling the non-system companies post-transaction and the subsequent ICC decisions demonstrate the ICC's understanding that the control authority sought and granted was limited to the consolidated system companies. The Board and the public must be able to clearly understand the control authority sought and granted, particularly given the significance of the immunity from antitrust laws and other laws that comes with control authority. The Board's regulations at 49 C.F.R. § 1182.2(d) recognize this, in providing that if an application or supplemental pleading includes false or misleading information, the granted application is void ab initio.

NSR makes various additional arguments claiming that statements in the Application and the ICC's decisions indicate that, despite the control statements and failure to expressly discuss NPBL discussed above, it was understood that the non-system companies were within the scope of the authority sought and granted. As explained below, the Board finds these arguments unpersuasive.

NSR argues that its interpretation of the Petition is supported by the ICC's statements in response to the Petition. In particular, NSR quotes the following language from the decision granting the Petition:

> We believe it would serve no useful purpose to produce *detailed information* for these companies (other than identifying them as required by 49 CFR 1111.1(c)(8), which may be done on the corporate charts). <u>We agree with petitioners that the term 'applicant,' as used in our regulations, does not encompass such non-controlled carriers.</u>

(NSR Reply 18 (quoting <u>NWS Enters., Inc.</u>, 45 Fed. Reg. at 66,912) (emphasis added by NSR).)

---

[18] <u>NWS Enters.</u>, 46 Fed. Reg. at 174, 176 (stating that the "proposed transaction involves the acquisition of control, through stock ownership of NW and its subsidiary companies and of [SRC] and its consolidated system companies, by NWS" and listing those companies in an Appendix to the decision that did not include the non-system companies); <u>NSC Control</u>, 366 I.C.C. at 177, 255-257 (explaining that the Application sought authority "for [NSC] to acquire control through stock ownership of NW and its subsidiary companies, and of [SRC] and its consolidated companies" and listing those companies in appendices that did not include the non-system companies).

Docket No. FD 36522

According to NSR, this language was an explicit statement by the ICC that the waiver decision was about the burden on petitioners and not about excluding any entities from the scope of the ICC's control decision.  (NSR Reply 18.)  However, nothing in this language indicates that the ICC understood the Petition to be stating that the non-system companies were included in the scope of the control authority sought.[19]  The quoted language specifically references the exclusion of "non-controlled carriers."  Moreover, language in subsequent ICC decisions in the consolidation proceeding demonstrates that the ICC believed that the scope of the requested control authority did not include the non-system companies.  In the ICC decision accepting the Application, under the heading "Description of the Transaction," the ICC stated, "The proposed transaction involves the acquisition of control, through stock ownership of NW and its subsidiary companies and of SR[C] and its consolidated system companies, by [NSC]."  NWS Enters., 46 Fed. Reg. at 174.  The decision went on to state, "The rail carrier subsidiaries of NW and the [SRC] consolidated system carriers are set forth in the appendix."  Id.  The appendix did not include NPBL or other non-system companies.  Id. at 176.  Similarly, in the ICC decision granting the Application, the ICC stated that the Application sought authority for "[NSC] to acquire control through stock ownership of NW and its subsidiary carrier companies, and of [SRC] and its consolidated system companies."  NSC Control, 366 I.C.C. at 177.  The footnote to that sentence stated, "The affiliated companies of NW and [SRC] are set forth in appendix A."  Id. at 177 n.3.  Appendix A did not list NPBL or other non-system companies.  See id. at 255-57.  Thus, when the ICC explicitly defined what it understood to be the control authority sought by the Application, its definition excluded the non-system companies.[20]

---

[19]  It is not clear why NSR believes that the ICC's statement that it would serve no useful purpose to provide detailed information for the non-system companies is a statement about the burden of providing that information.  NSR seems to be suggesting that the ICC's reference to not providing "detailed information" rather than "information" suggests it was focused on the burden of providing details.  However, as noted above, the Petition sought an exclusion from the requirement to provide detailed information while indicating that applicants would provide certain limited information required by 49 C.F.R. § 1111.1(c)(8).  Thus, the reference to not providing "detailed information" was simply an accurate description of what the Petition requested and does not suggest that the ICC was focused on the burden of providing such information.  This conclusion is supported by the fact that the ICC explained that there would be "no useful purpose" in providing detailed information.  As noted above, the burden of obtaining information has no relationship to its usefulness.  In addition, the fact that the ICC explained that the term "applicant" in the ICC's regulations did not encompass the non-system companies does not suggest that the ICC viewed the Petition as discussing only the burden of producing information.  It appears that it was merely a statement by the ICC that, in addition to there being no purpose in providing detailed information on the non-system companies, the ICC's regulations did not require such information.

[20]  NSR also suggests that the fact that the ICC's decision granting the Petition stated that the Application should list all of the carriers in which applicants had an ownership interest indicates that the ICC understood that the scope of the Application included non-system companies.  (NSR Reply 33, 35.)  However, as noted above, 49 C.F.R. § 1111.1(c)(8) separately required disclosure in the application of any ownership interest in a carrier subject to the ICC's jurisdiction regardless of whether the carriers would be controlled by applicants.  The Petition noted that it was not seeking to have this requirement waived.

NSR further argues that the Application made clear that NSC would obtain control over NPBL when it stated on page 2, "As a result of the proposed transaction, [NSC] will also acquire indirect control through stock ownership of all subsidiaries of [NW] and [SRC]." (NSR Reply 23.) NSR claims that this statement about indirect control encompassed all subsidiaries, whether owned in whole or in part, including the non-system companies. (Id.) However, this statement could not have been intended to mean that NSC was obtaining indirect control over the non-system companies because Appendix 2 lists numerous railroad companies in which either NW or SRC (not both), directly or indirectly, held only a small ownership share (as low as 1.78%) and NSC would not be obtaining indirect control over those companies. (Id. at 16 n.13.) Rather, the term "subsidiaries" in that sentence appears to be a shorthand reference to NW and its subsidiary companies and SRC and its consolidated system companies. Indeed, one page prior on page 1 of Volume 2 of the Application and again on page 16, applicants stated that the proposed transaction involves ICC authorization for NSC to acquire control of NW and its subsidiary carrier companies and of SRC and its consolidated system companies. Application Volume 2 at 1, 16, Dec. 4, 1980, Norfolk S. Corp.—Control—Norfolk & W. Ry., FD 29430. Moreover, the Petition, the decision granting the Petition, and the decisions accepting and granting the Application all list the "subsidiaries" of NW, and these lists do not include the non-system companies.[21] This is further evidence that the use of the term "subsidiaries" on page 2 of the Application was not intended to encompass the non-system companies but to refer to the subsidiaries within the NW and SRC consolidated systems.

NSR also claims that, despite the many instances in which NSR disavowed any intention of acquiring control of non-system companies, the Application nevertheless put the ICC and the public on notice that NSC would be acquiring control of NPBL because the corporate chart in Appendix 2 showed that the combined ownership interest, direct and indirect, of NW and SRC in NPBL was 57.14%. (NSR Opening 10.) NSR thus relies on a few lines in a chart in an appendix to an application spanning thousands of pages to contend that the ICC and the public should have known that NSC would control NPBL after the transaction. This is despite the narrative portion of the Application describing the transaction in a manner that did not include the non-system companies such as NPBL and the previously-filed Petition plainly stating that the non-system companies would not be controlled by applicants. If applicants did in fact believe they were seeking authority to control NPBL, the statements made in the Petition and the narrative portion of the Application were, at best, misleading. Regardless, the Board does not agree that a single reference to NPBL in an appendix listing numerous companies that would not be controlled after the transaction was sufficient to put the ICC and public on notice of an applicant's intent to control a carrier on that list or that this single reference should be given more weight in interpreting the 1980 proceedings than the numerous statements that NSR did not intend to acquire control. The agency will not permit an applicant to give assurances that control will not be obtained in a transaction but then seek to achieve that control in any case through a passing reference concealed in the minutiae of the exhibits. Given the significance of the

---

[21] NW and SRC Pet. at Appendix A, July 24, 1980, NWS Enters., Inc.—Control—Norfolk & W. Ry., FD 29430; NWS Enters., Inc., 45 Fed. Reg. at 66,915; NWS Enters.; Application to Control Norfolk & W. Ry. & S. Ry., 46 Fed. Reg. at 176; NSC Control 366 I.C.C. at 255-57.

antitrust immunity and other immunity that comes with control authority, the Board and the public must be able to have a clear understanding of the scope of the authority being sought.

NSR also points to language in the ICC decision granting the Application stating that the ICC was granting authority to control NW and SRC "and their affiliated carriers." (NSR Opening 12.) According to NSR, the term "affiliated carrier" is generally understood to mean a carrier that is partially, as opposed to wholly, owned and the ICC's use of this term is undeniable evidence that the non-system companies were included within the scope of the control authority granted. (Id.) "General understanding" of a term does not control, however, when a narrower specific definition of the term has been provided in the decision. As noted above, the footnote to an earlier sentence defining the transaction states that the "affiliated companies" of NW and SRC are listed in appendix A to the decision, which does not include the non-system companies. NSC Control, 366 I.C.C. at 177 n.3, 255-57. Thus, the ICC was using "affiliated carriers" as a shorthand for NW's subsidiary carrier companies and SRC's consolidated system companies. This conclusion is reinforced by the very sentence quoted by NSR. The sentence referred to the granting of authority to control NW and SRC and "their affiliated carriers, the granting of related trackage rights among these carriers, and the acquisition of part of the main line of the Norfolk, Franklin and Danville Railway Company by [SRC], *all as discussed above*." (emphasis added). Id. at 249. Earlier in the decision, in multiple instances, the ICC had referred to the Application as seeking authority to control NW and its subsidiary carrier companies and SRC and its consolidated system companies, id. at 175, 177, 179, and had also defined the "affiliated companies" as those listed in Appendix A, id. at 177 n.3. Thus, the "affiliated carriers . . . as discussed above" did not include the non-system companies.[22]

NSR further argues that precedent establishes that a waiver to exclude a subsidiary from the definition of "applicant"—including a subsidiary in which no applicant presently owns more than a 50% interest but where applicants together would own more than a 50% interest after the transaction—does not exclude that subsidiary from the control authority granted. (NSR Reply 19-20.) In addition, NSR claims that there is no precedent supporting the proposition that unless an applicant specifically requests control authority for a particular subsidiary, whether owned in whole or in part, that subsidiary is therefore excluded from the scope of the approval. (Id. at 20 n.20.) However, in this case, the applicants did not simply seek a waiver to exclude NPBL from the definition of "applicant" or merely fail to explicitly request authority to control NPBL. Rather, the applicants specifically told the ICC that the non-system companies would not be controlled by petitioners after the transaction and the subsequent ICC decisions defined the control authority sought as being limited to the companies within the NW and SRC systems.

---

[22] NSR's argument is unpersuasive for other reasons as well. As explained above, Appendix 2 lists numerous railroad companies in which either NW or SRC held only a small ownership share (as low as 1.78%) and did not control and would not control after the transaction. If "affiliated carrier" is understood to refer only to carriers that are partially owned, then the ICC's reference to "affiliated carriers" would exclude from the scope of control authority the carriers within the NW and SRC systems that were wholly owned—i.e., those undoubtably under the control of NW and SRC—while at the same time including many companies which neither NW nor SRC had the ability to control before or after the transaction. That is an implausible interpretation.

NSR has cited no precedent in which an applicant informed the ICC or the Board that it would not control a particular carrier as a result of the transaction, and the ICC or the Board repeatedly described the authority sought in a manner that excluded that carrier, but where it was nonetheless understood that such a carrier was within the scope of the control authority that was granted.

Indeed, in the cases cited by NSR, the applicants make clear in their waiver requests which subsidiaries would and would not be controlled by applicants after the transaction.  For example, in Burlington Northern, Inc.—Control & Merger—Santa Fe Pacific Corp., Docket No. 32549, applicants sought a waiver or clarification that carriers in which they had non-controlling ownership interests of 50% or less, a list of which was provided, would not be considered "applicant carriers."  Burlington N., Inc.—Control & Merger—Santa Fe Pac. Corp., FD 32549 (ICC served Oct. 3, 1994).  Applicants separately requested a waiver or clarification that the Wichita Union Terminal Railway (WUTR) would not be considered an "applicant carrier."  Id.  The applicants explained that they each owned a 33.33% interest in WUTR and that, following the transaction, Burlington Northern, Inc. would own 66.66% of WUTR's stock and stated that the primary application would seek ICC approval for control of WUTR as a result of the primary transaction.  Id.  Similarly, in each of the other cases cited by NSR, applicants identified which of the carriers that were part of a petition for waiver would be and would not be controlled by applicants.[23]  Certainly, none of the cases cited by NSR support the proposition

---

[23]  In Santa Fe Southern Pacific Corp.—Control—Southern Pacific Transportation Co., Docket No. FD 30400, applicants sought a clarification that railroads in which the applicants would not have a controlling interest would not be considered "applicant carriers" and separately sought clarification that two other specifically identified railroads, in which applicants combined would have a controlling interest if the transaction were approved, would not be considered "applicant carriers."  Santa Fe S. Pac. Corp.—Control—S. Pac. Transp. Co., FD 30400, slip op. at 1 (ICC served Feb. 3, 1984).  In Union Pacific Corp.—Control & Merger—Southern Pacific Rail Corp., Docket No. FD 32760, applicants sought a waiver or clarification that the term "applicant carriers" did not include railroads in which they had interests of 50% or less Union Pac. Corp.—Control & Merger—S. Pac. Rail Corp., FD 32760 (ICC served Sept. 5, 1995).  Applicants separately sought a waiver or clarification that the term "applicant carriers" did not include five specifically identified carriers in which the applicants each held a 50% or less ownership interest but would hold a 50% or greater combined ownership interest following the transaction.  Id.  In Union Pacific Corp.—Control—Missouri Pacific Corp., Docket No. FD 30000 et al., the applicants requested clarification that the term "applicant" did not apply to carriers that were operated independently and not as part of the applicants' systems.  In doing so, they identified all of these carriers, provided a brief statement about the nature of their operations, and indicated the ownership interest of the applicants.  Union Pac. Corp. Pet. 11, Appendix B, May 2, 1980, Union Pac. Corp.—Control—Mo. Pac. Corp., FD 30000.  In Canadian National Railway—Control—Illinois Central Corp., Docket No. FD 33556, CSXT sought a waiver or clarification with respect to a responsive trackage rights application that the definition of "applicant carrier" was limited to Board-regulated rail carriers in which CSXT currently held an interest greater than 50%.  Canadian Nat'l Ry.—Control—Ill. Cent. Corp., FD 33556, slip op. at 3 (STB served Sept. 18, 1998).  This waiver would have excluded the

that an applicant can tell the ICC or the Board and the public that it will not control a carrier after a transaction but nonetheless expect that carrier to be within the scope of the control authority granted.

NSR asserts that even if <u>NSC Control</u> did not grant authority for NSC to control NPBL, subsequent decisions in 1991 and 1998 granted this authority. (NSR Reply 38-39.) In 1991, the ICC granted a corporate family transaction exemption pursuant to 49 C.F.R. § 1180.2(d)(3) for SRC to directly control NW through a corporate family exemption. <u>S. Ry.—Control Exemption—Norfolk & W. Ry.</u>, FD 31791 (ICC served Jan. 14, 1991). In 1998, the Board granted a corporate family transaction exemption for NW to be merged into the former SRC, which at that point had been renamed NSR. <u>Norfolk S. Ry.—Exemption—Norfolk & W. Ry.</u>, FD 33648 (STB served Aug. 31, 1998). NPBL was not mentioned in either of these proceedings. According to NSR, these decisions constituted grants of authority for NSC to control NPBL. (NSR Reply 38-39.) However, an exemption under 49 C.F.R. § 1180.2(d)(3) could not have been used to grant authority to any member of NSC's corporate family to control NPBL unless authority had previously been granted for some other member of that corporate family to control NPBL.

Exemptions for "[t]ransactions within a corporate family that do not result in adverse changes in service levels, significant operational changes, or a change in the competitive balance with carriers outside the corporate family" are permitted under 49 C.F.R. § 1180.2(d)(3). NSR argues that at the time of the 1991 and 1998 transactions, NPBL was unquestionably part of the corporate family, whether authorized or not. (<u>Id.</u>) NSR also states that there was no requirement in the notice of exemption rules that NSC or SRC specifically "declare" that NPBL would come under the direct control of SRC. (<u>Id.</u>) NSR's interpretation would allow the corporate family exemption to effectively nullify other Board requirements since parties could acquire control of a carrier without informing the Board in a transaction that would normally require an application or another type of exemption under the Board's rules and then cure that unauthorized acquisition by reorganizing the corporate family and seeking a corporate family transaction exemption. Moreover, under NSR's interpretation, the Board and the public might never even know that control authority was granted since, according to NSR, the party seeking the exemption is not required to name the entities over which the exemption would provide the new control authority. It is implicit in 49 C.F.R. § 1180.2(d)(3)'s requirement that the transaction be "within a corporate family" that the member of the corporate family whose ownership is changing as a result of the transaction was previously authorized to be controlled by a member of the corporate family. Accordingly, neither the ICC's 1991 decision nor the Board's 1998 decision could have provided authority for NSC to control NPBL.

Both NSR and NPBL argue that since <u>NSC Control</u>, CSXT has understood that NPBL was under the control of NSC, and CSXT raised no objections until now. (NSR Reply 3-4; NPBL Reply 2.) In fact, according to NSR and NPBL, CSXT has taken various actions

---

Lakefront Dock and Railroad Terminal Company (Lakefront), a carrier in which CSXT, at the time of its waiver request, held a 50% interest. <u>Id.</u> at 3 n.3. However, CSXT explained to the Board that Conrail was about to allocate its 50% interest in Lakefront to CSXT, which would give CSXT 100% ownership. <u>Id.</u>

acknowledging and accepting NSC's majority ownership and control of NPBL.  (NSR Reply 3-4; NPBL Opening 2-4.)  However, parties cannot create control authority through their actions and beliefs.  Control authority can only come from the Board, or previously from the ICC.  See 49 U.S.C. § 11323(a).  Thus, whether CSXT has acknowledged or accepted that NSC has a right to control NPBL is irrelevant to whether the ICC granted NSC authority to control NPBL.[24]

NPBL asserts that if the Board were to hold that NSC did not obtain authority to control NPBL, the Board should retain this matter and allow NSR to seek authority to now control NPBL.  (NPBL Reply 4-5.)  Addressing a new request for control authority would be beyond the scope of this proceeding and the District Court's referral.  Moreover, any future decision concerning control would benefit from the findings of the District Court.[25]

For the reasons explained above, the Board finds that NSC was never granted authority to control NPBL.

It is ordered:

1.  The issues in this declaratory order proceeding are resolved as described above.

2.  This decision is effective on its service date.

By the Board, Board Members Fuchs, Hedlund, Oberman, Primus, and Schultz.

---

[24]  The Board is concerned, however, about the possibility that the parties may have been aware of a potential defect regarding NSR's control of NPBL for some time and did not seek to remedy it or otherwise bring it to the Board's attention.  The Board expects stakeholders to bring such matters before the Board expeditiously and reminds the parties that a knowing violation of the Board's requirements can result in the imposition of civil penalties, and that, for certain violations, such penalties may be imposed for each day that the violation continues.  See 49 U.S.C. § 11901(a).

[25]  Given this decision, the Board expects the parties to take appropriate steps to address the unauthorized control issue immediately following resolution of the district court proceeding, including any appeals.