IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

**CSX TRANSPORTATION, INC.,**

      **Plaintiff,**

v.                                                Civil Action No. 2:18-cv-530-MSD-RJK

**NORFOLK SOUTHERN RAILWAY COMPANY,** *et al.*,

      **Defendants.**

## NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY'S OPPOSITION TO CSXT'S MOTION TO EXCLUDE THOMAS D. CROWLEY

Defendant Norfolk and Portsmouth Belt Line Railroad Company, by counsel, opposes CSXT's motion to exclude the Belt Line's expert witness, Thomas D. Crowley, as follows:

### Introduction

Crowley is one of the foremost railroad rate experts in the United States. His opinions that the Belt Line's switching rate is reasonable and that drayage is a reasonable substitute for on-dock rail at NIT are well-grounded in fact and industry standard analysis. CSXT's three arguments establish only why its own expert, Howard Marvel, should be excluded, not Crowley.

First, CSXT argues that Crowley is not qualified to opine that the Belt Line's switching rate is reasonable. In fact, this is Crowley's exact area of expertise. He has spent his entire 50+ year career evaluating railroad rates, costs, and operations, including in support of negotiating rail transportation contracts, *with the early part spent as an expert for CSXT*. Marvel, by contrast, is a retired professor who never evaluated any aspect of the railroad industry before this case and admits having no expertise on railroad rates, costs, or operations.

Second, CSXT claims that Crowley's rate opinion fails on methodology, arguing that: (1) he failed to apply a reliable method for assessing the Belt Line's rate, (2) his calculations are so basic the jury could make them on its own, and (3) he improperly relies on historical documents to address Marvel's opinions about the Belt Line's "uniform rate" requirement.

None of these arguments is valid. Crowley's method of analyzing the switching fee on a per-car, per-mile basis is the industry standard. It requires identification of appropriate costs, determination of the number of containers that can be moved per car, and analysis of movement miles for every operation. This is not the kind of knowledge a lay juror is expected to possess. It stands in stark contrast to the approach taken by Marvel, who simply compared the Belt Line's rate against ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, with no controls for differentiating factors like length of haul. The Rules of Evidence allow Crowley to testify on these points, and Rule 602 specifically permits him to rely on information outside his personal knowledge, such as historical documents, to help the jury understand the errors in Marvel's opinions.

Third, CSXT argues that Crowley failed to apply a reliable methodology to arrive at his opinion that drayage is a reasonable substitute for on-dock rail access at NIT. What CSXT ignores, and what it desperately wants to hide from the jury, is that Crowley properly accounts for ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the Belt Line is the lower-cost option for intermodal traffic—a revelation that completely undercuts CSXT's case. And it is undisputed that substitutes need not be perfectly interchangeable to be effective, only reasonably so. CSXT's complaint that Crowley emphasizes certain operational issues over others is an argument for the jury, not a basis for exclusion.

Because all of Crowley's proffered testimony passes scrutiny under Rule 702, this Court should deny CSXT's motion.

**Legal Standard**

District courts serve as gatekeepers for admission of expert testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The "objective of that requirement is to ensure the reliability and relevancy of expert testimony." *Kumho Tire,* 526 U.S. at 152.

The gatekeeping function is guided by Rule 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>> (b) the testimony is based on sufficient facts or data;
>> (c) the testimony is the product of reliable principles and methods; and
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The burden is on the party offering the expert testimony (here, the Belt Line) to demonstrate by a preponderance of the evidence that the expert's qualifications and opinions comply with Rule 702. *Daubert*, 509 U.S. at 592-93 (citations omitted); *see also Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001).

**Argument**

**I. Crowley is an expert on railroad rates, costs, and operations.**

At the outset, CSXT mischaracterizes Crowley's 50+ years of vast and varied experience as an economic consultant in the railroad industry. In particular, CSXT argues that his experience assessing the reasonableness of railroad rates is "primarily comprised of testimony before the Surface Transportation Board." CSXT Br. p. 2.

As described in Crowley's Statement of Qualifications, he has direct and meaningful experience evaluating just about every economic and operating issue associated with the railroad

3

industry in all parts of the United States, including rates, rate adjustments, services, capacity, costing, operations, damages, and contract negotiations. *See* Crowley Report, ECF 375-1 Ex. 1, pp. 1-5 (reproduced here as **Exhibit 1**). That this experience often ends up before the STB is hardly a disqualifier; the STB is the primary venue for many of the highest profile railroad rate disputes in the United States. *See* 49 U.S.C. § 10501(b) (setting forth exclusive STB jurisdiction "with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers") and 49 U.S.C. § 11323(a)(6) (setting forth STB jurisdiction over trackage rights compensation).

CSXT apparently highlights Crowley's STB experience only to argue that Crowley did not apply a particular STB formula in this case. Yet in the same breath, CSXT concedes that an STB formula for reasonableness does not apply. *See* CSXT Br. at 7 ("Yet, as Mr. Crowley concedes, the STB's reasonableness formula does not apply in this context, and he did not apply this formula in reaching his opinion with respect to NPBL's rates."). By CSXT's own admission, the STB formula is a red herring, not a disqualifier.

But CSXT does not stop at one red herring. It introduces two others in an effort to discredit Crowley based on prior testimony, neither of which is valid. *See* CSXT Br. p. 3. CSXT cites *Western Resources* from 22 years ago in an attempt to show that Crowley's testimony has been partially excluded in the past, but fails to provide any evidence of what part of the proposed testimony was challenged, why it was challenged, or any court analysis that might be relevant. *See Western Resources, Inc. v. Union Pac. RR Co.*, No. 2:00cv2043 (D. Kan. 2000) (CSXT Br. Ex. C).[1] CSXT also cites *Basell USA* from 17 years ago to show that NS moved to exclude Crowley's

---

[1] The docket sheet supplied by CSXT shows only that the motion was granted in part and denied in part.

opinion in that case, but Crowley was an opposing expert to NS, so the fact that NS filed a motion is neither surprising nor probative. *See Norfolk Southern Railway Co. v. Basell USA*, No. 05-CV-3419-BMS (E.D. Pa. 2005) (CSXT Br. Ex. G). The court never even ruled on the motion.

In contrast to those two cases, Crowley has competently testified and supplied opinions in federal courts, arbitration cases, and before the STB on railroad rate and operational issues for the bulk of his 50+ year career.[2] There can be no serious question that he is qualified to testify to the opinions he offers here. CSXT's arguments to the contrary only underscore the dearth of qualifications of its own expert, Marvel, who admits having no such experience.[3]

---

[2]   *See* Crowley Report, ECF 375-1 Ex. 1 (Statement of Qualifications), pp. 1-5 (**Exhibit 1**).

[3]   Marvel's opinions are not yet the subject of a motion to exclude, as his supplemental report is due on September 23, 2022 (ECF 410). He testified as follows about his own expertise:

> Q. Outside of this case, have you ever been hired as an expert on railroad switching rates before?
> A. No, sir.
> Q. Okay. Outside of this case, have you ever compared railroad switching rates before?
> A. No, sir.
>                    * * *
> Q. And when you were a professor, did you regularly deal with railroad switching rates at all?
> A. I did not.
> Q. Have you ever held yourself out as an expert on railroad switching rates?
> A. I am an economist, not an expert on a particular industry.
> Q. Okay. So is that a no?
> A. That is a no.
> Q. Thank you, sir. Are you a member of any railroad industry groups?
> A. No, I am not.
> Q. Okay. Do you subscribe to any railroad industry publications?
> A. Not for a number of years.
> Q. How long has it been?
> A. Maybe 40.
> Q. Okay. What was the publication 40 years ago?
> A. Trains and model railroading, both.
> Q. Have you ever costed out a railroad move?

## II. Crowley's rate analysis is grounded in reliable industry standard methodology.

In addition to CSXT's flawed attack on Crowley's qualifications, CSXT argues that Crowley's opinion on the reasonableness of the Belt Line's switching rate must be excluded on methodology because, according to CSXT, he applied an invalid comparison model, used only "basic arithmetic," and improperly took into account corporate documents and historical events in rebutting Marvel's opinions. None of these arguments is correct.

### A. Crowley applied his substantial expertise and an accepted industry standard analysis to evaluate the Belt Line's switching rate.

CSXT's principal criticism of Crowley's methodology is that he did not apply a variable costing model used in certain STB rate proceedings.[4] Yet CSXT's argument is belied by its concession (quoted above) that an STB formula does not apply in this case. *See* CSXT Br. at 7.

In fact, CSXT's discussion of STB proceedings only reinforces the validity of Crowley's conclusions. Most obviously, intermodal rail traffic is not subject to STB regulation (and STB rate reasonableness procedures) specifically because it is assumed to be inherently competitive with trucking. *See, e.g.*, Improvement of TOFC/COFC Regulation, 364 I.C.C. 731, 735 (1981); Improvement of TOFC/COFC Regulations (R.R.-Affiliated Motor Carriers & Other Motor Carriers), 3 I.C.C.2d 869, *27 (1987); Improvement of TOFC/COFC Regulations (Pickup &

---

> A. No, I haven't.
> Q. You don't consider yourself an expert on railroad operational costs either, do you?
> A. No, I do not.

Marvel Dep. 165:1-166:17 (**Exhibit 2**).

[4] A variable costing model is typically used to evaluate "Revenue to Variable Cost Ratios," or RVCs, which can be applied to determine STB jurisdiction. The STB, for example, has no rate authority over rail movements with RVCs below 180% because they are considered inherently competitive. *See* 49 U.S.C. § 10707(d)(1)(A).

Delivery), 6 I.C.C.2d 208, *8 (1989). In other words, the competitiveness of rail intermodal and drayage is an accepted bedrock principle of economic rail regulation, just like Crowley opines.

Equally important, the STB's variable costing formula that CSXT appears to favor requires specific data inputs to compute, including, notably, length of haul in miles. *See* Major Issues In Rail Rate Cases, STB E.P. No. 657, 33-34 (Sub No. 1) (STB served October 30, 2006) (explaining calculation using "system-wide route miles" to assess revenue allocation for cross-over traffic).[5] CSXT's argument, therefore, simultaneously asserts that: (1) Crowley should have used a costing formula that relies on miles as a key input, and (2) Crowley's per-car, per-mile methodology in this case is somehow unreliable. CSXT's own expert, of course, does not account for mileage at all, much less any other factors that might ensure his comparisons are valid.

Contrary to CSXT's arguments, Crowley's costing methodology is an accepted industry standard means for evaluating the reasonableness of switching rates like the Belt Line's here. As he repeatedly confirmed in deposition, which is the only testimony on this point, his methodology is "an accepted standard … in the railroad industry," "a common and accepted practice in analyzing whether a switching rate is reasonable," and "a common and recognized practice … when determining whether a switching rate like the Belt Line's rate is reasonable or not." Crowley Dep. 219:25-221:2; 235:2-15 (**Exhibit 3**).

Crowley explained his methodology in three parts:

1. He compared the Belt Line's uniform carload switching fee to the Belt Line's average operating expense per revenue car (or container) over annual intervals from 2010 to 2020 and then further compared the Belt Line's switching fee to the average operating expense over that entire period;

2. He compared the Belt Line's uniform switching fee to other terminal switching railroads of various sizes and in various locations, beyond just the limited set

---

[5]   Available at https://dcms-external.s3.amazonaws.com/MPD/62491/5C7E822CBDC68AD385257217005C5064/37406.pdf.

>   identified by CSXT's expert, using a per-container, per-mile metric to ensure an apples-to-apples comparison; and
>
> 3. He confirmed the conclusion of reasonableness from the first two inquiries by analyzing the Belt Line's purpose and history.

All of these analyses informed his opinion on reasonableness. And importantly, all three lead to the same conclusion—that the Belt Line's switching rate is reasonable, both in terms of the Belt Line's operating costs and in light of comparable rates of other railroads—which is what CSXT wants to keep from the jury. *See* Crowley Report, ECF 375-1 pp. 4-15 (**Exhibit 1**)

Despite this analysis, CSXT still argues that Crowley's opinion fails because he did not review the Belt Line's "variable" costs, STB proceeding or not. Yet Crowley undisputedly examined costs as part of his evaluation. Unlike Marvel—who did not examine *any* of the Belt Line's costs—Crowley examined exactly the costs that matter to the economic viability of the Belt Line's switching fee, which are the total operational costs contained in the Belt Line's annual reports. *Compare* Marvel Dep. 88:4-6, 92:4-10, 168:9-25 (**Exhibit 2**) *with* Crowley Report, ECF 375-1 pp. 4-7 (**Exhibit 1**). CSXT's criticism of the weight to be given to variable versus total costs is an argument for trial, not a basis for exclusion. *See Kumho Tire*, 526 U.S. at 153.

**B.    Crowley's expert opinion on the reasonableness of the Belt Line's switching rate is derived from more than "basic arithmetic."**

CSXT's next claim that Crowley's methodology "amounts to nothing more than basic arithmetic" is equally flawed. *See* CSXT Br. p. 11. While expert testimony must aid the trier of fact to understand the evidence or determine a fact in issue, *see* Fed. R. Evid. 702, Crowley's opinion encompasses more than mere math problems. The "basic arithmetic" in his comparative switching fee analysis involves first normalizing published tariff rates to reflect per-container fees and not per-railcar fees, then dividing the normalized per-container switching fees by mileage figures that had to be developed based on an understanding of multiple terminal rail networks'

physical plants and switching operations. *See* Crowley Report, ECF 375-1 pp. 10-15 (**Exhibit 1**). Although the ending arithmetic was simple (dividing the numerator switching fees by the denominator miles), developing the required inputs and evaluating the results was not.

With respect to Crowley's evaluation of the Belt Line's switching fee relative to its operating expenses, CSXT misstates his opinion. Crowley is not opining only to calculations, but rather to the overall reasonableness of the Belt Line's switching fee, which is based in part on calculations. An opinion on the reasonableness of the Belt Line's switching fee is well within the purview of expert testimony. *See Daugherty v. Ocwen Loan Servicing. LLC*, 701 Fed. Appx. 246, 255 (4th Cir. 2017) ("Reasonableness is a subject on which experts routinely testify") (citing *United States v. Barile*, 286 F.3d 749, 761 (4th Cir. 2002)).

CSXT's reliance on *Richard Parks*, *Advanced Drainage*, *Crawford*, and *LSQ* is therefore misplaced. All of those cases are distinct in that the experts opined on *computation* of damages. Here, Crowley's opinion is based on determining whether the tariff switching fee is *reasonable*. His computation of average costs from the Belt Line's cost data forms but one data point for that conclusion, along with his analysis of the operations involved, the historical background, and other terminal switching railroads using industry standard comparison metrics.

In *Richard Parks*, for example, the plaintiff's expert was excluded when the expert attempted to calculate lost profit by adding up only the plaintiff's revenues, without costs, and labeling it "lost profit." *Richard Parks Corrosion Tech., Inc. v. Plas-Pak Indus.*, 2015 U.S. Dist. LEXIS 130695, at *17-*24 (D. Conn. Sept. 29, 2015). In *Advanced Drainage*, the trial court excluded the expert's opinion on lost profits in a patent infringement case where the expert assumed each of defendant's sales of a competing product would have been a sale for the plaintiff, added up all the sales, and multiplied it by the plaintiff's profit margin. *Advanced Drainage Sys.*

9

*v. Quality Culvert, Inc.*, 2015 U.S. Dist. LEXIS 36067, at \*20-\*21 (S.D. Ohio Mar. 23, 2015). In *Crawford*, the trial court excluded a damages expert from opining on a loss of home equity when the expert's only methodology was to subtract the current value of the owed principal and interest from the home's appraised value. *Crawford v. Franklin Credit Mgmt. Corp.*, 2015 U.S. Dist. LEXIS 194360, at \*17-\*18 (S.D. N.Y. Jan. 22, 2015). And in *LSQ*, a damages expert opined that plaintiff's damages should be offset by undisputed amounts, offering no opinions that would aid the jury as the jury could subtract the amounts without the expert's assistance. *LSQ Funding Grp., L.C. EDS Field Servs.*, LLC, 879 F. Supp. 2d 1320, 1336-37 (M.D. Fla. 2012).

Crowley's opinion is entirely different. A lay juror is not expected to know how to determine reasonableness of a railroad switching rate. Crowley's experience and expertise allow him to make that determination, and to apply his method of assessment to the Belt Line's switching fee so he can explain it to the jury. His analysis shows that the Belt Line's switching fee is reasonable when compared to the Belt Line's operating costs, calculated on a per-revenue car basis, and when compared to other switching railroads, calculated on an equivalent per-container, per-mile basis, all against the backdrop of the Belt Line's history and purpose. *See* Crowley Report, ECF 375-1 pp. 4-9 (**Exhibit 1**). These conclusions involve far more than simple math.

### C. Crowley's review of the Belt Line's history and organizational documents is proper under Rule 602.

CSXT's argument that Crowley's testimony improperly relies on corporate documents and historical events is equally meritless. CSXT states that Crowley's testimony is unreliable because "he tenders facts to which he has no knowledge," CSXT Br. p. 14, but Rule 602 expressly permits experts to testify to matters outside their personal knowledge. *See* Fed. R. Evid. 602. And while CSXT accuses Crowley of "disregard[ing] substantial record evidence" to bolster the Belt Line's

10

position, CSXT cites *not one* instance in the record to support its incorrect assertion, other than reference to its own statement of facts in its summary judgment opposition brief.

The fact that Crowley relies on historical documents to rebut Marvel's interpretation of the Belt Line's "uniform rate" requirement, and that CSXT disputes Crowley's interpretation of those documents, is a matter for cross-examination, not exclusion. *See Kumho Tire*, 526 U.S. at 153.

**III.     Crowley's opinion about drayage is the product of reliable and accepted methods.**

In addition to his testimony on the reasonableness of the Belt Line's switching rate, Crowley also opines that drayage is a reasonable substitute for on-dock rail access at NIT. This should not be surprising to anyone familiar with the economic regulation of railroads in the U.S. Intermodal rail traffic is excluded from STB rate oversight precisely because of the presumption that it is inherently competitive with trucking. *See supra* (citing ICC decisions).

Crowley reaches his opinion in part based on the significant impact of ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. *Id*.

Because a single railcar holds more than one container, the Belt Line's uniform switching fee of $210 per car is actually the least expensive mode of transporting intermodal containers to and from NIT, but for ▉▉▉▉▉▉▉▉. *Id*. Based on this reality and an analysis of the related operational complexities, Crowley opines ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. *Id*. at 23-24. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉.

11

CSXT mischaracterizes Crowley's testimony in an effort to exclude it. CSXT argues that Crowley failed to account for other costs or operational hindrances that CSXT incurs besides price per drayed container. Instead, CSXT claims, Crowley only "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" CSXT Br. p. 15. CSXT argues that Crowley's expert opinion is therefore unhelpful to the jury because CSXT views his opinion as based on only basic subtraction.[6]

Crowley's analysis is not as narrow as CSXT argues. He did not rely exclusively on rates, but testified that he "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" as well as the operations, concluding, "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Crowley Dep. 190:14-191:3 (**Exhibit 3**). His report specifically rebuts Marvel's unverified claims of drayage's disadvantages and Marvel's wholesale failure to address the operational challenges of moving additional trains over the Belt Line's network through urban neighborhoods. *See* Crowley Report, ECF 375-1 pp. 18-21 (**Exhibit 1**) (noting that Marvel offers zero support for his claims that drayage lacks scalability, has a shortage of drivers, has longer dwell times, or has limited capacity).

That Crowley emphasizes certain operational issues over others is fodder for cross-examination, not a basis for exclusion. *See Kumho Tire*, 526 U.S. at 153 (stating that when an expert's testimony is within "the range where experts may reasonably differ," the jury, not the court, should be the one to "decide among the conflicting views of different experts.").

---

[6] Ironically, CSXT's criticism of comparing only numbers highlights why its own expert's analysis should be excluded, not Crowley's. Unlike Crowley, Marvel admitted that when he evaluated the Belt Line's switching fee, he compared only the amount of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to the Belt Line's uniform public switching fee, with no further analysis. *See* Marvel Dep. 89:12-89:17 (**Exhibit 2**) ("Q. For your comparison, what do you have besides the nominal dollars that each of these short lines charges? A. I have -- that is what I have. I have the dollars that each of these charges -- each of the lines charge.").

The fact that drayage and rail may not be perfectly interchangeable is also not a basis for exclusion. Substitutes need not be perfectly interchangeable to be effective; only reasonably interchangeable. *See FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 25 (D. D.C. 2015) ("[A] product market includes all goods that are reasonable substitutes, even though the products themselves are not entirely the same.").

Reasonable interchangeability depends on two factors: functional interchangeability and cross-elasticity of demand. *Id*. Functional interchangeability refers to whether other products exist that are similar in character or use to the product in question. *Id*. Cross-elasticity of demand examines whether increases or decreases in the price of product A affect the demand for product B. *See United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 400 (1956). Crowley's opinion addresses both. CSXT's objections merely address the weight.

CSXT's (and its expert's) view that drayage is an inferior alternative to rail is simply different from Crowley's opinion that, notwithstanding perceived inefficiencies, rail and drayage are functionally interchangeable. If consumers can substitute one product for another, then the products in question will be deemed functionally interchangeable, even if one product is superior to the others. *See FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1074 (D. D.C. 1997) (citing *E.I. du Pont de Nemours*, 351 U.S. at 399.

Indeed, the data in Crowley's report supports his conclusions. For example, data shows that in 2019, 63% of Virginia Port Authority cargo moved by truck, 34% by rail, and 3% by barge. *See* Port of Virginia, Port Stats, available at http://www.portofvirginia.com/about/port-stats. [7]

---

[7] The data shows that even between truck and rail, truck transportation is preferred nearly twice as much. CSXT's unsubstantiated argument that local truck moves must somehow be distinguished from longer distance moves is at best a matter for cross-examination, *see* CSXT Br. pp. 16-17, as the Belt Line's route between NIT and CSXT's intermodal facility in Portsmouth is a distance of just 17 miles, well within the ambit of local-market moves.

13

Crowley also examined the ease of entry into the drayage market, high number of drayage companies available, availability of desirable short haul routes, magnitude of the drayage operation at NIT, and cost savings to CSXT by reducing employees at its intermodal facility in Portsmouth. *See* ECF 375-1 pp. 18-24 (**Exhibit 1**).  Based on this analysis, he did not "███████████████████████████████████████████" *See* Crowley Dep. 202:9-13 (**Exhibit 3**).

Crowley also opined on the cross elasticity of demand between drayage and on-dock rail access at NIT.  His opinion that, but for ███████████████████████████████████████████, CSXT would use the Belt Line for its comparatively cheaper switching fee and rail efficiencies (leading to a decreased demand for product B) is directly on point. *See* Crowley Report, ECF 375-1, pp. 23-24 (**Exhibit A**).  ███████████████████, the demand for rail access via the Belt Line decreases, or in Crowley's terms, ███████████████████████████████. *Id.*, p. 23 ("███████████████████████████████████████████████████████████████████████████████████████████"). In fact, CSXT's use of ███████████ actually *demonstrates* the positive cross-elasticity of demand between drayage and on-dock rail, and *confirms* that drayage is, in fact, a substitute for on-dock rail.

In sum, Crowley's opinion that drayage is an effective substitute for on-dock rail access at NIT is anything but basic or circuitous:  CSXT uses drayage because ███████████████████████████████████████████████████████. Crowley's analysis on this point is sound and he reliably applies it to the facts of this case, exactly as permitted by Rule 702.

## Conclusion

Because all of Crowley's opinions pass scrutiny under *Daubert* and Rule 702, the Court should deny CSXT's motion and grant the Belt Line all other just relief.

14

Dated:  September 2, 2022

**NORFOLK AND PORTSMOUTH
BELT LINE RAILROAD COMPANY**

By:       */s/ W. Ryan Snow*
James L. Chapman, IV, VSB No. 21983
W. Ryan Snow, VSB No. 47423
Alexander R. McDaniel, VSB No. 92398
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com
amcdaniel@cwm-law.com
*Counsel for Norfolk and Portsmouth Belt
Line Railroad Company*

## CERTIFICATE OF SERVICE

I certify that on this 2nd day of September 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a "Notice of Electronic Filing" to all counsel of record who have consented to electronic service.

                                            */s/ W. Ryan Snow*
W. Ryan Snow, VSB No. 47423
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
wrsnow@cwm-law.com
*Counsel for Norfolk and Portsmouth Belt Line Railroad Company*