# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# Norfolk Division

| | |
|---|---|
| CSX TRANSPORTATION, INC., | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | )   Case No. 2:18-cv-530 |
| | ) |
| NORFOLK SOUTHERN RAILWAY | ) |
| COMPANY, *et al.*, | ) |
| | ) |
| *Defendants*. | ) |

**DEFENDANTS' OPPOSITION TO CSX TRANSPORTATION, INC.'S
MOTION IN LIMINE REGARDING THE UNIFORM RATE PROVISION**

Defendants Norfolk Southern Railway Company ("NS") and Norfolk and Portsmouth Beltline Railroad Company ("the Belt Line"), by counsel, submit this opposition in response to CSX Transportation, Inc.'s ("CSX") Motion in Limine to Preclude Mischaracterization of CSX's Rate Proposals (the "Motion") (ECF No. 378). For the following reasons, CSX's Motion should be denied.

## INTRODUCTION

A court should exclude evidence by granting a motion in limine only when "the evidence is **obviously inadmissible** on **all possible grounds**." *United States v. Gibson*, No. 2:17-cr-126, 2018 WL 4903261, at *2 (E.D. Va. Oct. 9, 2018) (citation omitted, emphasis added). CSX's Motion must be denied because the evidence it seeks to exclude is obviously admissible and strikes at the heart of CSX's case.

A critical plank to CSX's case is the premise that its 2010 and 2018 Rate Proposals were too good to turn down, and the failure of the Belt Line to automatically agree to them is evidence of conspiracy between Defendants. The record, however, establishes that while the Belt Line was interested in exploring new business, it raised legitimate concerns in response to both proposals. These included that the discounted switch rate CSX proposed could violate the Belt Line's Operating Agreement, specifically its "uniform rate" provision, and might also have a detrimental effect on the Belt Line's revenues. In the end, neither concern was addressed because CSX abruptly terminated discussions. Its documents show that its latest proposal was merely a piece of CSX's larger litigation strategy.

CSX seeks to prevent Defendants from offering at trial any evidence or argument regarding whether the proposals would violate the "uniform rate" provision of the Belt Line's Operating

Agreement.[1]  CSX claims that evidence and argument that its proposals violated the Operating Agreement would be "incorrect, improper, irrelevant, and prejudicial" because neither proposal explicitly stated that the proposed discounted switch rates could not be converted into a uniform tariff applicable to all of the Belt Line's customers.  CSX also makes an implicitly contradictory argument that the Belt Line's acceptance of a separate, non-uniform line haul switch rate would not actually violate the Operating Agreement because the Belt Line had offered "commodity" based rates in the past.  CSX is wrong both factually and legally.

As explained below, it is undisputed that with both proposals, CSX asked the Belt Line to enter into private contracts that included a lower line haul switch rate for CSX.  And it is undisputed that neither rate proposal made any mention of converting CSX's proposed private rate into a public tariff that would apply to all other customers of the Belt Line's switching services (although CSX suggested the possibility that NS could get its own special deal for movements to the now-closed Portsmouth Marine Terminal).  Yet, CSX now wants to preclude Defendants from arguing that its rate proposals sought a special, CSX-specific rate, even though *that is literally what the proposals say*.

Even if this Court thinks it is fair for CSX to argue that its proposals do not violate the uniform rate provision because they did not expressly state that the proposed rate was limited to CSX, it is equally fair to allow Defendants to argue the *opposite*:  that the proposals were indeed

---

[1] CSX broadly asks that the court preclude Defendants from "offering at trial **any** evidence and argument mischaracterizing CSXT's 2010 and 2018 Rate Proposals."  Pl.'s Opening Br. 1, ECF No.  379 (emphasis added).  However, CSX does not argue to preclude any specific evidence or argument <u>other than</u> the "suggestion that [CSX's Rate Proposals] violate the so-called 'uniform rate' provision of the Belt Line's Operating Agreement."  *Id.*  To the extent that CSX seeks more than an order precluding evidence and argument that its Rate Proposals violated the uniform rate provision of the Belt Line's Operating Agreement, CSX has failed to brief this argument and, accordingly, such a request must be denied.

intended to apply to CSX alone as shown by the plain language of the proposals and the financial projections used by CSX. Defendants have the right to explore and expose the full implications and contradictions of CSX's position regarding its rate proposal, including that:

- The rate proposals were for a special, CSX-only rate, which would violate the Operating Agreement's uniform rate provision; and/or

- If CSX was really proposing converting the special rate into a tariff (even though the proposals state no such thing), the financial benefits CSX projected were false, and, to the contrary, would have resulted in financial disaster for the Belt Line.

Clearly, CSX perceives the difficulties it faces in light of the evidence. Its solution is to seek an order binding the mouths of Defendants so that they are not allowed to expose the truths about CSX's proposals – *i.e.*, that it would get a special, CSX-only rate in violation of the Belt Line's uniform rate requirement – and to prevent the jury from knowing that CSX's litigation position that the rate could be extended to other users would make the financial projections in CSX's proposals misleading. This evidence and argument is highly probative and not "obviously inadmissible on all possible grounds."

## FACTUAL BACKGROUND

### A. The Operating Agreement

Founded in 1896 by eight railroads, including predecessors in interest to NS and CSX, the Belt Line is a terminal switching railroad that operates in the cities of Norfolk, Portsmouth, and Chesapeake, Virginia. (Compl. ¶ 1). The Belt Line's primary business is to interchange, or switch, freight cars for other railroads. *Id*. The Belt Line takes cars tendered by other railroads and delivers them to locations on its rail line, or vice-versa. (**Ex. 1**, Moss Dep. 30:12-18).

The Belt Line's business and affairs are governed by an Operating Agreement among the

shareholders of the company, dated July 7, 1897 (the "Operating Agreement"). (**Ex. 2**, NSR_00104139). The Operating Agreement requires that the Belt Line fix a "uniform rate" for "movement of freight cars … regardless of distance." (**Ex. 2**, at art. 9). The uniform rate is to be "adjusted from time to time" to pay a six percent dividend to shareholders. (**Ex. 2**, at art. 9). The uniform rate that the Belt Line charges to switch cars is referred to as its "switch rate," which is set through a published tariff. (**Ex. 3**, Stinson Dep. 128:8-22; **Ex. 4**, NPBL000220).

### B. The $210 Switch Rate

In 2009, the Belt Line Board of Directors set the Belt Line's switch rate at $210 per car, effective January 1, 2010. (**Ex. 5**, CSXT0125260). The $210 switch rate is based on the Belt Line's operating costs. (**Ex. 6**, Crowley Rep. at 5, Tbl. 1; **Ex. 1**, Moss Dep. 234:12-20 (the Belt Line is designed to "███████████████████"); **Ex. 7**, Coleman Dep. 104:6-8). Except for 2015, the Belt Line's operating expenses per car have ranged from ███████ between 2010 and 2020. (**Ex. 6**, Crowley Rep. at 5, Tbl. 1). In 2015, the Belt Line incurred a significant expense related to a personal injury accrual, which caused its operating expenses to be ███ per car. *Id.* Excluding the operating expenses for 2015, the Belt Line's operating expenses since 2010 have averaged ███ per car. (*Id.* at 6 n.11 & Ex. 3). The $210 switch rate to cover the Belt Line's average per car expenses has remained the same since 2010. (**Ex. 1**, Moss Dep. 173:14-15 ("[L]ast time we changed the rate was in 2010…."); 202:14-18 (discussing proposal to raise the $210 switch rate in light of recent expenses)).

### C. CSX's 2010 Proposal

On July 23, 2010, CSX sent a letter to the Belt Line (the "2010 Proposal") proposing that the parties enter into a contract relating to the Belt Line's movement of CSX's intermodal freight to and from NIT. (**Ex. 8**, NPBL007431, at -433). CSX sent the Belt Line a draft contract as part of the proposal negotiation. (**Ex. 9**, J. Booth Dep. 248:10-249:8; **Ex. 10**, NPBL008053). The

4

only parties to the draft contract were CSX and the Belt Line. (**Ex. 10**, NPBL008053, -053.

The draft contract explicitly stated that its purpose was "███████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████." (**Ex. 10**, NPBL008053, at -053) (emphasis added).

CSX's proposed contract set a one-way, single stack switch rate for CSX's trains. (**Ex. 10**, NPBL008053, at -057). As part of the contract, CSX proposed a volume commitment, in which CSX agreed to tender a certain number of containers within certain periods of time. (**Ex. 10**, NPBL008053, at -058). CSX's proposed rate did not consider all of the Belt Line's costs. (*See* **Ex. 9**, J. Booth Dep. 69:4-8 (did not consider cost to move freight)).

The 2010 proposal explicitly contemplated that CSX would get one rate, and other customers would a get a higher rate. According to the proposal, if CSX did not meet the volume commitment, it promised that it would pay the "current freight rate," *i.e.*, the Belt Line's $210 tariff rate: "███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████" (**Ex. 10**, NPBL008053, at -058). In other words, CSX was requesting a CSX-only rate, which differed from the higher tariff rate, in violation of the uniform rate provision.

D.  **CSX's 2018 Proposal**

CSX began planning for the instant litigation at least as early as February 1, 2018. *See* (**Ex. 11**, CSX Privilege Log Excerpt). A month and a half later, on March 23, 2018, CSX sent the 2018 Rate Proposal to the Belt Line management. (**Ex. 12**, CSXT0100329, at -330). In its March 23, 2018 letter, CSX proposed that CSX and the Belt Line enter into a "rail transportation agreement" relating to the Belt Line's movement of CSX's intermodal freight to and from NIT. *Id.*

5

Like in 2010, the proposal contemplated that CSX would work with the Belt Line management to develop a "‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌‌" (**Ex. 13**, CSXT0119620 (emphasis added); **Ex. 12**, CSXT0100329, at -333). CSX proposed to amend the Belt Line's operating documents to allow for a private contact. (**Ex. 12**, CSXT0100329, at -330). The amendment was necessary because such a private contract conflicted with the Operating Agreement's uniform rate provision.

### E. CSX knows the difference between a private contract and a uniform, public tariff, but proposed private contracts for its own benefit.

In the railroad industry, tariff rates are different from contract rates. Tariff rates are publicly available and apply equally to all customers. *See, e.g.*, NPBL Tariff NPB 8100-J, https://bit.ly/3Az0ky6. By comparison, contract rates are privately negotiated between two entities and may be quite different depending on the customer, commodity, distance, and volumes. (**Ex. 1**, Moss Dep. 285:9-24).

CSX based its 2018 Proposal, as it had its 2010 Proposal, on the concept that the CSX rate would be privately set and would be different and lower than the published tariff rate. This can be seen by understanding CSX's rosy financial projections included as part of the 2018 Proposal. CSX's projections of profit were premised on only CSX getting the lowest rate.

First, during discovery, it was established that CSX's projection of ▮▮▮▮▮▮ in incremental profit was based on the $80 rate only covering the variable costs of the move – additional personnel costs, etc. However, the calculation did not include any charge for the Belt Line's fixed costs – its investment in rails, bridges and infrastructure, for example. (**Ex. 1**, Moss Dep. 253:5-6 (identifying that for the Belt Line to make a profit on CSX's 2018 proposal, the calculation did not "include the fixed costs")). If the Belt Line had adopted CSX's proposals and applied the rate uniformly across all commodities and distances, the Belt Line's revenues would not have covered

its expenses or, put another way, other users of the Belt Line would subsidize CSX's discounted rate. (*See, e.g.*, **Ex. 6**, Crowley Rep. at 5, Tbl. 1 (showing the Belt Line's average per-car expenses are approximately $210); **Ex. 1**, Moss Dep. 253:9-10 (explaining that the Belt Line "would have lost money" under CSX's 2018 proposal when fixed costs were included in the calculations)).

Second, CSX's projections assumed that its low rate in fact would not have a negative impact on the Belt Line's revenues from existing traffic. CSX assured the Belt Line that it would ███████████████████████████████████████████████████████████████████████████████. (**Ex. 12**, CSXT0100329, at -330). But as testified by Mr. Moss, if CSX got a new, lower rate, another large volume customer of the Belt Line – ███████████████████████ ████████ – inevitably would demand that it receive the lower rate too. Losses of revenue from this shipper could exceed ████████ a year.

Mr. Moss observed in his deposition that "[i]t didn't take a whole lot of analysis to think about your other big customer and if you had to knock off $130 off their per car rate, how much you'd lose." (**Ex. 1**, Moss Dep. 248:4-7). In short, giving CSX a lower rate to try to achieve CSX's promised ████████ in incremental revenue would come at the cost of losing even *more* revenue from another shipper. Worse yet, if the Belt Line sought to comply with the uniform rate requirement of the Operating Agreement by offering CSX's special rate to all other users, the Belt Line's revenues from its line haul switch services would be reduced even more. And given the undisputed fact that the Belt Line's $210 switching rate, which has been in place since 2010, has barely covered its costs, such a drastic reduction in revenues and overall profits would be financially ruinous.

In light of the above, Mr. Moss asked CSX to follow through on its expressed willingness to convene a rate committee to look closely at the rate proposal. (**Ex. 1**, Moss Dep. 244:2-5).

7

Rather than going forward with a rate committee, and literally the day after Mr. Moss suggested that a rate committee be convened, CSX responded with accusations that the Belt Line was acting in bad faith. CSX never again attempted to pursue its rate proposal by negotiation. It even failed to bring up the 2018 rate proposal for consideration by the Belt Line board. (**Ex. 16**, Girardot Dep. 138:17-19; **Ex. 14**, Armbrust Dep. 214:15-21). Instead, CSX started what it was planning for all along – litigation.

### F. Defendants' Arguments Are Based on the Record.

The facts show that all parties understood at the time the proposals were made that the only way CSX's proposals could work for the Belt Line would be if only CSX could benefit from the rate. Therefore, the Belt Line rightly raised concerns that the proposals violated the uniform rate provision of the Belt Line's Operating Agreement. And CSX's litigation position that the proposals could have been saved by giving the rate to others not only is contrary to its actual position at the time, but if implemented, could have been a disastrous deal for the Belt Line.

### LEGAL STANDARD

"As a general matter, all relevant evidence is admissible unless there are constitutional, statutory, or rule-based exceptions preventing its admission." *Computer Scis. Corp. v. Maguire*, No. 116CV261JCCIDD, 2016 WL 7097545, at *1 (E.D. Va. Dec. 6, 2016). Evidence is inadmissible when it is irrelevant, or its probative value is outweighed by likelihood of prejudice. Fed. R. Evid. 402. Relevant evidence "has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." Fed. R. Evid. 401. Evidence is also inadmissible if its probative value "is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

## ARGUMENT

### I. THE OPERATING AGREEMENT REQUIRES A UNIFORM RATE REGARDLESS OF CUSTOMER, COMMODITY, OR DISTANCE.

#### A. The Operating Agreement's plain language requires a uniform rate regardless of customer, commodity, or distance.

The Operating Agreement is enforceable as a contract under Virginia law as an agreement among shareholders. *See Boyd, Payne, Gates & Farthing, P.C. v. Payne, Gates, Farthing & Radd, P.C.*, 244 Va. 418, 427 (1992). It requires that the Belt Line fix a "uniform rate" for "movement of freight cars … regardless of distance." (**Ex. 2**, at art. 9). The common definition of "uniform" is "the same; not changing or different in any way." *See Uniform*, The Cambridge Dictionary, https://bit.ly/3QWCMZz. Accordingly, the Operating Agreement requires that the Belt Line fix a rate that is "the same; not changing or different in any way."

This means that the Belt Line is required to charge the *same* rate regardless of the customer (*i.e.*, CSX must pay the same rate as anyone else using the Belt Line, including NS), commodity (*e.g.*, intermodal), or distance (*e.g.*, transfer to NIT). (*See* **Ex. 1**, Moss Dep. 114:7-16 (all the Belt Line customers pay the same rate); 196:18-25 (the Belt Line rate is currently the same regardless of distance)).

As such, under Virginia law, the Belt Line cannot approve a rate that is "different in any way" from the rates charged to other customers or a different rate based on commodity or distance, absent modification of the Operating Agreement by its shareholders. In discovery, **CSX witnesses admitted this**. (*See, e.g.*, **Ex. 15**, Eliasson Dep. 130:24-131:14 (stating that he "fully agreed" with the Belt Line president's statement that "[a]s proposed by CSXT, the handling of interchange traffic on the basis of a per-container rate would violate the terms of the operating agreement")).

9

### B. Prior waivers of contractual provisions do not preclude evidence and argument that CSX's rate proposals would have breached the Operating Agreement's uniform rate provision.

CSX contends that Defendants should be precluded from arguing that CSX's proposals violated the uniform rate provision because the Belt Line has considered and maintained a tiered rate system in the past. Pl.'s Opening Br. 5. According to CSX, arguing that the uniform rate provision "requires one rate for all services at all times rings hollow and would be misleading to the jury." *Id*.

CSX confuses the standard for precluding evidence with a jury's evaluation of the weight of evidence. Whether evidence or argument would "ring hollow" *is unequivocally for the jury to decide*. *Richmond v. Atl. Co.*, 273 F.2d 902, 916 (4th Cir. 1960) ("[U]nder the constitutional guaranty of trial by jury, it is for the jury to weigh the evidence and pass upon its credibility….") (citation omitted).

CSX also fails to identify any substantive reason why an argument that the Belt Line's Operating Agreement precluded CSX's rate proposals would be "confusing to the jury." CSX essentially argues that different rates in the past somehow *redefined* the meaning of the existing contractual provision forever—*i.e.*, modified the contract. *See* Pl.'s Opening Br. 3-5. Yet a waiver, even if true, does not equal a contract modification. The first can be revoked; the second cannot. *See* 13 Williston on Contracts § 39:20 (4th ed.) (distinguishing between waiver, which may be retracted, and modification that has been supported by new consideration, which is binding and "may not be retracted without mutual consent").

A simple illustration makes clear the problem with CSX's argument. Imagine someone hires a lawn maintenance service to cut their lawn every Monday, but one day it is storming on Monday and so the parties agree that the lawn service can be performed on Tuesday. In this instance, the customer knowingly *waived* the requirement that her lawn care was done on Monday

10

due to the circumstance. However, that waiver would not modify the contract's requirement that future lawn cuttings be done on Monday.

Finally, CSX states that the uniform rate argument "is improper and prejudicial." Pl.'s Opening Br. 3. Yet CSX does not explain why or how. Undoubtedly, Defendants' arguments and evidence are prejudicial to CSX because they undermine a primary tenant of CSX's claims. Other than the inherently prejudicial nature of a defense argument, CSX does not identify *any* way that the uniform rate argument's probative value "is substantially outweighed by a danger of . . . unfair prejudice…." Fed. R. Evid. 403.

## II.   CSX'S PROPOSALS WERE NOT FOR A UNIFORM RATE.

In recognition that the Belt Line's Operating Agreement does indeed require a uniform rate, CSX next argues that it "did not propose a non-uniform rate." Pl.'s Opening Br. 5. Without the double negative, CSX is claiming that it *proposed* a uniform rate. CSX's own arguments do not support this claim and it is factually inaccurate.

### A.   CSX did not propose a uniform rate that applied to all customers equally regardless of commodity or distance.

While CSX's headline claims it proposed uniform rates, CSX's argument is that its proposals did not *preclude* the Belt Line from offering the same rate to other customers. *See* Pl.'s Opening Br. 5-8. **This is completely different.**

Considerable evidence demonstrates that in both 2010 and 2018, CSX proposed private switch rates with the Belt Line for CSX's intermodal traffic. CSX even sent the Belt Line a *draft contract* as part its proposal negotiation in 2010. (**Ex. 9**, J. Booth Dep. 248:10-249:8; **Ex. 10**, NPBL008053). Likewise, CSX referred to its 2018 proposal as ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ (**Ex. 12**, CSXT0100329, at -330).

11

The nature of the move also shows that the discount rates were intended exclusively for CSX. CSX is the only Belt Line customer that moves intermodal containers to and from NIT, other than NS. Yet NS owns the track to NIT and thus would not use the Belt Line, leaving CSX the only practical beneficiary of its proposals.

The bottom line is this: **if the Belt Line had simply accepted CSX's proposals, a preferential contract switch rate** *that only applied to CSX* **would have been created**. Whether other customers could have negotiated the same rate in the future is *entirely speculative* and irrelevant because CSX's proposals themselves did not *include* discounted rates for other customers. *See* **Ex. 13**, CSXT0119620 (clearly stating that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮—*i.e.*, the Belt Line and CSX, not other customers).

    **B.**    **CSX's proposals were never meant to apply to other customers because doing so would have made CSX's projections false.**

In its Motion, CSX claims that this Court should exclude evidence and argument that the uniform rate provision precluded acceptance of CSX's proposals because "nothing in the [2010] proposal was inconsistent with the rate being applied to other the Belt Line customers," Pl.'s Opening Br. 6, and "[a]t no time did CSX aver that the proposed $80 per car rate [in the 2018 proposal] had to be exclusive to CSX," *id.* at 8. This is flatly wrong. Beyond the fact that CSX's proposals, as written, did not facially apply to other customers, for CSX to claim that "nothing in the … proposal was inconsistent with the rate being applied to other the Belt Line customers" contradicts basic math.

CSX's proposals claimed they would generate revenue sufficient to cover only the *additional, incremental* costs of running CSX's *additional* trains. There was no attempt to cover the Belt Line's fixed costs. This means that if CSX's proposed rate were uniformly applied, the

12

Belt Line's total expenses would not have been covered. The only way they could be covered was if other customers paid a higher rate.

Even more significant to the parties at the time, accepting CSX's proposal would have inevitably generated downward pressure on the line haul switching rate used with other customers. (**Ex. 1**, Moss Dep. 244:9-12 ("The other aspect is if we gave a rate of this magnitude to CSX, then our other largest customer that handled ▮▮▮▮▮▮ would probably want the same one, so we'd lose revenue from that aspect."); 247:20-23 ("[I]f we accepted this for CSX, then -- for our intermodal customer, then we had to accept it for our grain customer and our overall revenue would decrease.").

In sum, converting CSX's proposed, lower switch rate into a tariff rate would have effectively cannibalized the Belt Line's revenues, resulting in financial disaster for the Belt Line, as it would not have been able to cover its operating costs. NS and the Belt Line should not be forbidden from unmasking this reality for the jury.

### III. THIS COURT HAS NOT DECIDED THAT CSX'S PROPOSALS WERE FOR A UNIFORM RATE.

Finally, CSX argues that the Court should preclude NS from putting forward evidence and arguments based on a defense that CSX's proposals would violate the uniform rate provision because the Court already decided the issue on a Rule 12(b)(6) motion. Pl.'s Opening Br. 8.

This argument misconstrues the standard of review between a Rule 12(b)(6) motion and a motion in limine. In considering whether to dismiss CSX's claims outright, the Court held that "***at least as alleged in the Complaint***," CSX's proposed lowered rate "applies to any traffic by any company on Belt Line's tracks between 'Berkley Yard and NIT.'" *Id.* (citing ECF No. 66 at 26-28) (emphasis added).

13

The standard of review is completely different on CSX's current Motion. At trial, "***all relevant evidence is admissible*** unless there are constitutional, statutory, or rule-based exceptions preventing its admission." *Computer Scis. Corp.*, 2016 WL 7097545, at *1 (emphasis added); *see also* Fed. R. Evid. 402 ("Relevant evidence is admissible" unless precluded by the constitution, statute, or rule.).

It is impossible to argue that evidence of the Belt Line's inability to accept CSX's rate proposals is not *relevant* to CSX's claims that the Belt Line improperly refused to adopt CSX's rate proposals. Defendants have the right to argue at trial that CSX's proposals would have been improper because they were inconsistent with the Operating Agreement. This argument is well founded in fact and law. *In re Kang*, 664 F. App'x 336, 341 (4th Cir. 2016) ("Actions taken outside the authority conferred by the operating agreement are … ultra vires and without legal effect."); *Nettles v. Childs*, 100 F.2d 952, 956 (4th Cir. 1939) (recognizing that a shareholder – such as NS – may seek an injunction to stop an ultra vires act).

Even CSX witnesses have admitted that the Belt Line Board members had a fiduciary duty to abide by the Belt Line's governing documents. (*See, e.g.*, **Ex. 14**, Armbrust Dep. 34:9-13, 36:14-19). And, CSX cannot point to any obligation under federal or state law for NS as a shareholder to waive an express provision in the Operating Agreement. (*See* **Ex. 16**, Girardot Dep. 28:13-16, 23 (CSX corporate representative agreeing that "NSR would be within its rights to seek to uphold the agreement embodied in the … operating agreement")).

Because the evidence is indisputably relevant, CSX must show that there is a constitutional, statutory, or rule basis for excluding this relevant evidence. CSX has not made any such showing. Accordingly, based on the standard applicable to *this* Motion, CSX's request to exclude relevant evidence must be denied.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court deny CSX's Motion in Limine and grant any other relief the Court deems appropriate.

Date: September 2, 2022

Respectfully submitted,

**NORFOLK SOUTHERN RAILWAY COMPANY**

By: */s/ Michael E. Lacy*
Alan D. Wingfield (VSB No. 27489)
Michael E. Lacy (VSB No. 48477)
Massie P. Cooper (VSB No. 82510)
TROUTMAN PEPPER HAMILTON SANDERS LLP
1001 Haxall Point
Richmond, VA 23219
Telephone: (804) 697-1200
Facsimile: (804) 698-6061
Email: alan.wingfield@troutman.com
Email: michael.lacy@troutman.com
Email: massie.cooper@troutman.com

John C. Lynch (VSB No. 39267)
Kathleen M. Knudsen (VSB No. 90845)
TROUTMAN PEPPER HAMILTON SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, VA  23462
Telephone: (757) 687-7500
Facsimile: (757) 687-7510
Email: john.lynch@troutman.com
Email: kathleen.knudsen@troutman.com

Tara L. Reinhart
Thomas R. Gentry
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005
Telephone: (202) 371-7000
tara.reinhart@skadden.com
thomas.gentry@skadden.com

*Counsel for Defendant Norfolk Southern Railway Company*

**NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY**

By: */s/ W. Ryan Snow*
James L. Chapman, IV, VSB No. 21983
W. Ryan Snow, VSB No. 47423
Alexander R. McDaniel, VSB No. 92398
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1500
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com
amcdaniel@cwm-law.com

*Counsel for Norfolk and Portsmouth Belt Line Railroad Company*

116075210

16

**CERTIFICATE OF SERVICE**

I certify that on this 2nd day of September, 2022, a true and correct copy of the foregoing was served on all counsel of record via Notice of Electronic Filing by filing with the Court's CM/ECF system.

                                                       */s/ Michael E. Lacy*
                                                     Alan D. Wingfield (VSB No. 27489)
                                                     Michael E. Lacy (VSB No. 48477)
                                                     Massie P. Cooper (VSB No. 82510)
                                                     TROUTMAN PEPPER HAMILTON SANDERS LLP
                                                     1001 Haxall Point
                                                     Richmond, VA 23219
                                                     Telephone: (804) 697-1200
                                                     Facsimile: (804) 698-6061
                                                     Email: alan.wingfield@troutman.com
                                                     Email: michael.lacy@troutman.com
                                                     Email: massie.cooper@troutman.com