IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

**CSX TRANSPORTATION, INC.,**

      Plaintiff,

v.                                                    Civil Action No. 2:18-cv-530-MSD-RJK

**NORFOLK SOUTHERN RAILWAY
COMPANY,** *et al.*,

      Defendants.

### NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY'S CONSOLIDATED REPLY IN SUPPORT OF ITS MOTIONS IN LIMINE (D.E. 349, 353, 359, 365)

Defendant Norfolk and Portsmouth Belt Line Railroad Company, by counsel, for its Consolidated Reply in Support of its Motions in Limine (D.E. 349, 353, 359, 365), states as follows:

### Introduction

CSXT mischaracterizes the Belt Line's motions as seeking "blanket bans" on "broad categories of evidence." To the contrary, in a case where the parties have identified more than 50 witnesses, taken more than 40 depositions, and produced more than 500,000 pages of documents, the Belt Line filed just four motions seeking to exclude discrete items of evidence that, if improperly admitted, threaten to jeopardize the integrity of this jury trial. And while CSXT pleads with the Court to defer ruling on all of them, the very purpose of the motions is to guide the parties and witnesses *before* trial to prevent bells from being rung that cannot be unrung.

Because CSXT's arguments fail to salvage the inadmissible evidence, the Belt Line asks this Court to exclude or limit it as sought in the motions.

## Argument

I. **NS Internal Communications (D.E. 349).**

The Belt Line seeks to exclude specific documents listed on **Exhibit F** to D.E. 338 (and associated testimony or argument) on grounds that they cannot, as a matter of law, establish the conspiracy for which CSXT seeks to offer them. The only claims against the Belt Line are conspiracy claims, and the documents are internal NS communications, not Belt Line communications, which CSXT offers because they happen to include NS-appointed members of the Belt Line's Board of Directors. They are inadmissible under Rules 401, 402, and 403.

Contrary to CSXT's Opposition Brief, there is no mystery why CSXT seeks to use them at trial, which is why a motion in limine is particularly appropriate: CSXT intends to argue to the jury that a communication between two NS employees, one of whom was also a Belt Line Board member, equals a conspiracy between NS and the Belt Line.

In fact, CSXT made its intent explicit in response to the Belt Line's interrogatories. In Interrogatory 3, the Belt Line asked CSXT to, "Identify the **specific communication(s) between the Belt Line and NS** that you contend form the basis for the conspiracy alleged in Counts I, II, VIII, and IX of your Complaint. . ." **Exhibit A** hereto. In Interrogatory 4, the Belt Line asked CSXT to, "Identify the **specific overt act(s) by NPBL** that you contend form the basis for the conspiracy alleged in Counts I, II, VIII, and IX of your Complaint. . ." *Id*. CSXT's responses, which this Court ordered CSXT to provide (D.E. 236), identified the very documents that the Belt Line seeks to exclude now—communications internal to NS, not the Belt Line.

CSXT doubled-down on that intended use in its Opposition Brief, arguing unequivocally that it intends to show conspiratorial conduct through two NS employees. As CSXT states, "NPBL ***authorized its directors*** to direct the actions of and make business decisions for NPBL, ***and the***

2

*NS-appointed directors conspired with their own company, NS, to the detriment of CSX*." Opp. Br. p. 7 n. 1 (emphasis added). CSXT hinges admissibility of the evidence on this supposed "authorization."

Yet to support its accusation, CSXT states only that, "The record contains ample evidence from which the trier of fact could conclude that NS-appointed NPBL directors were agents of NPBL." Opp. Br. p. 6. CSXT offers no factual support, save for a single statement that, "their votes as NPBL Board members . . . are just a few examples of NS-appointed directors acting as agents of NPBL and also conspiring with their employer." Opp. Br. p. 7.

A vote, of course, is not the action of an agent of a company; it is the independent action of a single member of a board of directors. The law on this point is well settled:

> This rule has long been the law in Virginia: [The] directors of a corporation have authority to bind it only when they act collectively as a board. Individual directors are not its agents, and it is well settled, therefore, that ***declarations and admissions of individual directors when not acting as a board are not binding on the corporation nor admissible as evidence against it***, unless they were acting at the time as its authorized agents and within the scope of their authority.

*Monacan Hills, Inc. v. Page*, 203 Va. 110, 116 (1961) (quoting Fletcher, Cyclopedia Corporations, Vol. 2 (1954 Revised), § 741, at 1026-28) (emphasis added).

This law forecloses CSXT's efforts to use the communications, which is why CSXT seeks to end-run it by citing some kind of agency. But no such evidence exists. The point is inescapable that, if CSXT had evidence of agency authorization, it *must have identified it* when the Belt Line asked for all "overt acts" in furtherance of the conspiracy. *See* D.E. 236 (ordering CSXT to respond to Interrogatory 4). CSXT did not do so, and it cannot avoid settled law now by hinting that it might unveil some previously-undisclosed agency evidence in the middle of trial.

CSXT also cannot avoid that law by arguing that actions of NS-appointed Board members are only "circumstantial evidence" of a conspiracy that CSXT expects to show by other means.

CSXT identified no other means. According to CSXT's answer to Interrogatory 4, the actions of the NS-appointed Board members (all NS employees) are not circumstantial evidence at all. They are themselves <u>the</u> "discrete overt acts" that make up the conspiracy. *See* **Exhibit A**. This is why the evidence must be excluded, because as a matter of law that cannot be the case.

Nor is this the kind of situation that can be cured with a cautionary instruction. Where introduction of evidence carries a substantial risk of misleading the jury, a district court has a duty to exclude the evidence, not merely caution the jury. *See Steves & Sons, Inc. v. Jeld-Wen, Inc.*, 988 F.3d 690, 716 (4th Cir. 2021) (affirming exclusion under Rule 403 in antitrust case and holding that "the district court had a duty—which was especially salient in a long and complex trial like this one—to keep out weak evidence that carried a substantial risk of undue delay, confusing the issues, and misleading the jury"); *cf. Bruton v. United States*, 391 U.S. 123, 135 (1968) (holding that incriminating extrajudicial statements of a co-defendant were so devastating to defendant's case that a cautionary instruction was insufficient).

Here, whereas relevance against the Belt Line is nil, prejudice to the Belt Line and risk of misleading the jury would be tremendous. *See* Fed. R. Evid. 403. Allowing CSXT to introduce misleading evidence of NS communications as though they came from Belt Line "representatives" would expose the Belt Line to massive liability for actions it has no way to control. The Belt Line has no power over Board members appointed by NS (any more than it has power over Board members appointed by CSXT), nor is it privy to their internal communications.

For all these reasons, the Belt Line asks this Court to prohibit CSXT from offering at trial any of the referenced internal NS communications and associated testimony or argument.

## II. CSXT's Privately Negotiated Contract Switching Rates (D.E. 353).

CSXT also fails to justify use of its privately negotiated contract switching rates at other terminals as market comparisons against the Belt Line's public tariff rate at NIT. CSXT's private rates should be excluded as a matter of law because they are not valid comparators for antitrust analysis. In fact, because CSXT made its private rates subject to the Protective Order, D.E. 79, the Belt Line *does not even know them* so as to benchmark its rate against them.

To be clear, this is an issue of admissibility, not weight. CSXT's argument that challenging private rates goes to their weight ignores that a rate's reasonableness under antitrust law is determined "in the context of competition, not from the plaintiffs' perspective." *Laurel Sand & Gravel v. CSX Transp. Inc.*, 704 F. Supp. 1309, 1323 (D. Md. 1989), *aff'd*, 924 F.2d 539 (4th Cir. 1991). Private rates that apply only to the plaintiff, here CSXT, are not relevant because they do not show anything about the actual market for terminal switching rates.

In fact, CSXT conceded in its Opposition Brief that the Belt Line's rate "cannot be analyzed in a vacuum by reference to only one provider." D.E. 424 at 10. Yet CSXT's private rates, unlike published tariff rates, apply only to CSXT, and there is no evidence whatsoever of the trade-offs CSXT negotiated to obtain those rates. There also is no evidence that the same railroads offer the same rates to even a single other customer, much less the public generally.

Commonwealth Railway is a prime example. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* D.E. 366-1. CWRY's published tariff rate, available to any carrier, is $210, the same as the Belt Line's. The only difference between CWRY's tariff rate and the Belt Line's tariff rate is that CWRY's rate applies to both loaded and empty railcar wells, whereas the Belt Line's rate applies only to loaded wells, making the Belt Line's effectively lower on average.

In the absence of relevance as market comparators, CSXT's privately negotiated contract rates at other terminals have no bearing on this case. *See* Fed. R. Evid. 401, 402; *see also Laurel*

*Sand*, 704 F. Supp. at 1323. Put simply, they are inadmissible because they do not show anything about what exists "in the context of competition." *See Laurel Sand*, 704 F. Supp. at 1323. [1]

None of CSXT's cited cases diminishes the holding of *Laurel Sands*. In fact, while they confirm that comparison of *public* data generally requires weighing the evidence, they say nothing about admissibility of privately negotiated contract rates, particularly where an accused defendant does not even know the rates to benchmark against them. In *TFWS, Inc. v. Schaefer*, for example, the Fourth Circuit upheld an expert's comparison of *publically available* metropolitan alcohol prices in an antitrust case, 325 F.3d 234, 240 (4th Cir. 2003), but no party or expert in *TFWS* relied on private contract sales, as CSXT attempts to do here. *Id*. at 237-40. And in *Mt. Valley Pipeline, LLC v. 1.30 Acres of Land*, the trial court upheld the comparison of *public* real estate sales data to determine the value of a pipeline easement in an eminent domain case, 2013 WL 4306981 (W.D. Va. Sept. 11, 2019), but no party raised an issue of comparing confidential contract prices for a single customer, as CSXT seeks to introduce here. *Id*. at *5.

The *Smithfield Foods* case is similarly off base. *See Smithfield Foods, Inc. v. United Food & Commer. Workers Int'l Union*, 586 F.Supp.2d 632, 638 (E. D. Va. 2008). CSXT cites *Smithfield Foods* to show that in some instances, the probative value of evidence (there, a union's pattern of racketeering activities) can outweigh its tendency to confuse the jury. Here, however, there is no probative value as a matter of law, and CSXT's effort to introduce its privately negotiated rates will unquestionably confuse the jury about which rates actually apply as market comparisons "in the context of competition." *See Laurel Sand*, 704 F. Supp. at 1323.

---

[1] CSXT also claims that its private contract rates might be relevant to show what the Belt Line's tariff rate *could* be if the Belt Line anticipated additional future intermodal traffic from CSXT. *See* D.E. 424 at 9. That is an issue of cost, not market rates. Nothing about CSXT's private contract rates at other ports says anything about the costs (much less logistics) for the Belt Line to transport additional cargo to NIT.

**III.     VPA and VIT Testimony (D.E. 359).**

With respect to VPA and VIT, CSXT exaggerates the Belt Line's position in an effort to defeat it. The Belt Line does not seed to exclude VPA or VIT employees altogether. It carefully tailored its motion to limit testimony on just three topics: (1) VPA's/VIT's opinion on the reasonableness of the Belt Line's switching rate; (2) VPA's/VIT's opinion of whether CSXT has 'proper' or 'equitable' access at NIT; and (3) whether VPA and VIT 'support' or 'endorse' CSXT's claims in this lawsuit. None of this testimony is admissible, and all of it threatens to substantially prejudice the Belt Line while confusing and misleading the jury.

CSXT first claims the Belt Line's arguments are "wholly speculative" and "hypothetical." D.E. 424 at 12. Yet CSXT touted this very testimony in opposition to the Defendants' motions for summary judgment, so the parties know exactly what the expected trial testimony will be and how CSXT intends to use it. *See* D.E. 328 at 60, ¶¶ 81, 86, 100. There is no reason not to tell the third-party witnesses what they can or cannot say before they say it to the jury.

CSXT also claims that the Belt Line's motion seeks a "blanket bar" on a "broad category of information." D.E. 424 at 12. Yet the Belt Line acknowledged in its memorandum that VPA and VIT witnesses are permitted to testify to factual issues within their personal knowledge. *See* D.E. 360 at p. 2. What they cannot do is opine on the reasonableness of the Belt Line's switching rate, opine about 'proper' or 'equitable' access at NIT, or generally 'support' or 'endorse' CSXT's case. They have not been designated as expert witnesses, and they have confessed no personal knowledge on these topics in their depositions. *See* Fed. R. Evid. 602, 701.

Perhaps recognizing the point, CSXT nonetheless argues that VPA and VIT employees can express lay opinions about technical or specialized port and rail matters, and even offer general 'support' for CSXT's positions, as "contemporaneous observations and recommendations." D.E. 424 at 15. Rule 701(c), however, prohibits lay opinions on matters of "technical" or "specialized

7

knowledge," and the Fourth Circuit has made clear that courts must be "mindful to guard against lay witness testimony when it involves *meaningless assertions which amount to little more than choosing up sides*." *U.S. v. Offill*, 666 F.3d 168, 177-78 (4th Cir. 2011) (emphasis added).

The Belt Line's switching rate is an example. The reasonableness of that rate is one of the ultimate issues at trial. It is a matter for expert testimony, not lay opinion, which is why all parties have designated experts under Rule 702. *See, e.g., Daugherty v. Ocwen Loan Servicing. LLC*, 701 Fed. Appx. 246, 255 (4th Cir. 2017) ("Reasonableness is a subject on which experts routinely testify.") (citing *United States v. Barile*, 286 F.3d 749, 761 (4th Cir. 2002)). Even so, CSXT argues that VPA and VIT employees may testify to the reasonableness of the Belt Line's switch rate, without any analysis of the Belt Line's costs, simply because they are knowledgeable of the port or terminal generally. *See* D.E. 424 at 13-14. But without examining the Belt Line's costs or logistics, which they did not do, and without comparing the Belt Line's switch rates to other switch rates using a proper methodology, which they did not do, VPA and VIT are in no better position than the jury to evaluate whether the rate "precludes competition." D.E. 424 at 14 n.5. [2]

CSXT also claims that VPA and VIT employees can express opinions regarding the quality of CSXT's access at NIT. To be clear, CSXT plans to elicit testimony beyond traffic data and drayage or rail routes. It expects these quasi-governmental employees to opine on what is 'proper' or 'equitable' access for CSXT at NIT. *See* D.E. 424 at 14-16; D.E. 328 at 60, ¶¶ 81, 86, 100. Like the rate issue, these opinions are forbidden from a lay witness. *See* Fed.R.Evi. 701; *see also Offill*, 666 F.3d at 177-78.

---

[2] Footnote 5 of CSXT's opposition illustrates the moving target that CSXT creates with this proposed testimony. CSXT assures the Court that it is not asking the Court or jury to determine the rate's reasonableness (as the Surface Transportation Board might do), D.E. 424 at n.5, but at the same time, CSXT expects to ask the jury to conclude that the rate is too high and therefore precludes competition.

██████████████████████████████████████████████

██████████████████████████████████████. *See* D.E. 360-4. Once the jury hears the improper testimony and sees the inadmissible letter, the damage will be done.

Despite these dangers, CSXT tries one more tact, claiming, without legal support, that VPA or VIT employees can testify to anything about CSXT's case that they "perceive" to be true. *See* D.E. 424 at 12. Specifically, CSXT argues that VPA and VIT employees may testify to "how [they] perceive CSX's access at NIT, or [to] the comparison of NPBL's switching rate with the switching rate offered by the terminal railroad at VIG," because of their general "industry experience." *Id*. CSXT also argues that, "VPA and VIT represent the facility that CSX seeks to service—NIT—and thus they are particularly well positioned to testify regarding whether the NPBL switch rate is *precluding access* to their own facility. The same is true regarding the *quality of CSX's 'access' at NIT*." *Id*. at 14 (emphasis added).

None of this testimony is admissible from a lay witness. All of it amounts to lay opinion on "technical" and "specialized" issues as prohibited by Rule 701, whether cloaked in the guise of someone's "perception" or not. VPA's deposition testimony underscores the problem, since VPA acknowledged in its Rule 30(b)(6) deposition that it conducted no analysis of the Belt Line's switching rate, much less the Belt Line's costs. [3] *See* D.E. 360-2 at 122:24-123:6, 176:2-178:4, 180:1-181:12. A retained expert under Rule 702 would be barred from saying anything about the Belt Line's rate or the quality of CSXT's access for such deficiencies; CSXT should not be allowed to introduce the same testimony from a quasi-governmental lay witness under Rule 701.

---

[3] CSXT argues that a corporate representative may rely on knowledge available to anyone in the organization under the Rule 30(b)(6) of Federal Rules of Civil Procedure. D.E. 424 at p. 13 n.4. This is a deposition rule, not a trial rule; witnesses at trial must have personal knowledge. Fed. R. Evid. 602 (noting that only exception is expert testimony under Rule 703).

Lastly, CSXT fails to overcome the prohibition against testimony from witnesses regarding general endorsement of CSXT's position in this lawsuit. CSXT argues:

> *VPA's support* [of] giving CSX's improved access and attendant actions taken to further access by CSX to NIT are facts consistent with *VPA's and VIT's mission* of expanding and better serving the Port and its customers; those positions are relevant and germane to this litigation, including whether dual on-dock rail access at NIT would benefit competition at the Port of Virginia, whether NPBL can efficiently move containers in or out of NIT, and whether NPBL's switch rate is prohibitively expensive compare to rates charged by other switch lines for similar services. *VPA's support* of CSX accessing NIT via NPBL tends to refute NPBL's concerns that "VIT cannot achieve the same efficiency for NPBL as it does for NS and NIT."

D.E. 424 at 16 (emphasis added) (citations omitted).

Yet VPA's or VIT's 'endorsement' or 'support' for CSXT is not a matter for the jury to decide in this case, nor does it aid the jury in deciding any of the issues. *See Offill*, 666 F.3d at 177-78. VPA's or VIT's opinion of the reasonableness of the Belt Line's switching rate is also not a fact in issue. And VPA's or VIT's opinion on whether CSXT's access to NIT is 'proper' or 'equitable' is not a fact in issue. Nevertheless, if not limited before trial, VPA and VIT will express these opinions, postured as neutral and authoritative, and give the highly misleading clout of supposed governmental support to CSXT's claims without any proper analysis or disclosure. Curtailing such testimony is essential under Rules 402, 403, 602, and 701.

## IV. Witnesses who Lack Personal Knowledge (D.E. 365).

CSXT's opposition confirms that CSXT intends to introduce hearsay at trial from specific witnesses who lack personal knowledge. The anticipated testimony comes from statements made in declarations and depositions. When deposed, the declarants admitted they did not have personal knowledge of the facts and further admitted that many statements came entirely from unidentified sources. Worse still, CSXT's expert witness relied on the declarations, threatening irreparable harm if he regurgitates them to the jury.

The Belt Line identified the specific testimony in its motion. And while CSXT argues that the Belt line cites only "hand-picked statements," D.E. 424 at p. 17, that is exactly the point. The Belt Line selected the "hand-picked" testimony precisely because it is the testimony that should be excluded if introduced at trial. CSXT offers no statements that contradict the cited testimony, nor does CSXT demonstrate that the testimony is incorrect or out of context.

CSXT simply ignores the sources of its own witnesses' information. A witness is not permitted to function as spokesperson for 'facts' that another party cannot cross-examine. *See McNeill v. Butz*, 480 F.2d 314, 326 (4th Cir. 1973 (reversing district court for admitting evidence "which related the hearsay statements of nameless informers whom [a party] could not confront or cross-examine").

CSXT argues that Messers. Girardot, Warren, and Wagel can relay such information to the jury because it is not offered for the truth of the matter, citing *Agfa-Gevaert, A.G. v. A.B. Dick Co.*, 879 F. 2d 1518, 1523 (7th Cir. 1989). Yet all of the hearsay statements (relied on and repeated by CSXT's expert) *are* offered for their truth. Indeed, that is their entire value for CSXT's expert: he accepted the statements' truth as the basis for his own analysis.

Mr. Girardot's statements are a prime example. He stated he knew how the Belt Line's tariff operated in his declaration, not by examining the Belt Line's published tariff itself, but through conversation with some unnamed and unknown source under unknown circumstances. D.E. 366-1 at ¶ 2. His deposition testimony confirmed the basis for his information was solely that conversation, not his own experience. Girardot Dep. (1st) at 168:15-169-15 (**Exhibit B**).

Both Mr. Girardot and Mr. Warren also admitted that they do not interact with ocean carriers, yet nonetheless proclaimed the preferences of ocean carriers for on-dock rail access in their declarations. D.E. 366-1 at ¶ 6; D.E. 366-4 at ¶¶ 7, 10. In both of their depositions, they

11

confirmed that they were merely relaying what they heard from others. *See* D.E. 366-2, at 166:2-13, 222:18-223:2; D.E. 366-5 at 127:25-128:17, 149:22-150:23, 156:12-157:7, 216:7-218:6. The Belt Line has no opportunity to cross-examine the statements made by the ocean carriers, if they ever made them at all, and CSXT has not identified any ocean carrier witnesses.

CSXT also claims, through Mr. Girardot, that it lost business opportunities specifically because of the lack of on-dock rail access. D.E. 366-1 at ¶ 8. ███████████████████ ███████████████████████████████████████████████████████████ ███████████████████████. D.E. 366-2, at 234:24-235:9. His entire testimony on the point consists of parroting what someone else allegedly told someone at CSXT. *Id.* ("I just know what the customer told us."). This testimony may be permissible in a corporate deposition, *see* Fed. R. Civ. P. 30(b)(6), but it is not permissible at trial, *see* Fed. R. Evid. 602.

Mr. Girardot also stated in his second declaration (offered to contradict the findings of the Belt Line's expert) that he assumed CSXT ███████████████████████████ for calculating the cost of a rail move. D.E. 366-6 at ¶ 3. But Mr. Girardot confirmed in his deposition that he had no data to arrive at that assumption. D.E. 366-7 at 101:5-7, 105:18-106:21. He claims he arrived at it from CSXT's "general experience," citing no other support. *See* D.E. 366-7 at 105:15-106:21 (describing the figure as a "walking around number"). This assumption is inadmissible speculation prohibited by Rule 602, which CSXT's expert takes as true, then purports to strengthen by using it as the basis for mathematical equations.

Finally, Mr. Wagel and Mr. Warren stated in their declarations that drayage is not an adequate alternative to on-dock rail access at NIT. D.E. 366-9, at ¶ 3; D.E. 366-4, at ¶ 9. Mr. Wagel did not rely on data or documentation as the basis for any knowledge, just his "gut." D.E. 366-10, at 39:23-45:7. And Mr. Warren expressly stated in his deposition that he made his

12

statement based on conversations with unnamed local personnel and VIT sources.  D.E. 366-5 at 134:5-135-21.  All of this testimony shows the danger of supposition and hearsay:   none of the real witnesses can be cross-examined to test the actual sources of the information.  As Mr. Warren admitted about his own testimony, ███████████████████████████ ███████████████████████████ *Id*.

The Belt Line will be substantially prejudiced by this testimony if allowed at trial.  Once relayed to the jury, the statements cannot be unheard, especially as regurgitated by CSXT's expert.  *See Terasense, Inc. v. Becton Dickinson Co.*, 2008 U.S. Dist. LEXIS 124780, at 813 (N.D. Cal. May 22, 2008) (observing that "[o]ne of the worst abuses in civil litigation is the attempted spoon-feeding of client-prepared and lawyer-orchestrated 'facts' to a hired expert who then 'relies' on the information to express an opinion"); *In re Sulfuric Acid Antitrust Litig.*, 446 F. Supp. 2d 910, 915 (N.D. Ill. 2006) ("[W]hile Rule 703 was intended to liberalize the rules relating to expert testimony, it was not intended either to abolish the hearsay rule or to allow oblique evasions of it.").  This is precisely why the Belt Line seeks a ruling now.

## Conclusion

For all the foregoing reasons, the Belt Line asks the Court to grant its Motions in Limine (D.E. 349, 353, 359, 365) and award it all other just relief.

Dated:  September 23, 2022

NORFOLK AND PORTSMOUTH
BELT LINE RAILROAD COMPANY

By:     */s/ W. Ryan Snow*
James L. Chapman, IV, VSB No. 21983
W. Ryan Snow, VSB No. 47423
Alexander R. McDaniel, VSB No. 92398
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510

13

> Telephone: (757) 623-3000
> Facsimile: (757) 623-5735
> jchapman@cwm-law.com
> wrsnow@cwm-law.com
> amcdaniel@cwm-law.com
> *Counsel for Norfolk and Portsmouth Belt Line Railroad Company*

**CERTIFICATE OF SERVICE**

I certify that on this 23rd day of September 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a "Notice of Electronic Filing" to all counsel of record who have consented to electronic service.

>     */s/ W. Ryan Snow*
> W. Ryan Snow, VSB No. 47423
> CRENSHAW, WARE & MARTIN, P.L.C.
> 150 W. Main Street, Suite 1923
> Norfolk, Virginia 23510
> Telephone: (757) 623-3000
> Facsimile: (757) 623-5735
> wrsnow@cwm-law.com
> *Counsel for Norfolk and Portsmouth Belt Line Railroad Company*