**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

CSX TRANSPORTATION, INC.,
individually and on behalf of NORFOLK
& PORTSMOUTH BELT LINE
RAILROAD COMPANY,

      Plaintiff,

v.                                                   Civil Action No. 2:18-cv-530-MSD-RJK

NORFOLK SOUTHERN RAILWAY
COMPANY, *et al.*,

      Defendants.

                                         /

**CSX TRANSPORTATION INC.'S REPLY IN SUPPORT OF ITS
MOTION *IN LIMINE* TO PRECLUDE MISCHARACTERIZATION
OF CSXT'S RATE PROPOSALS**

      Plaintiff CSX Transportation, Inc. ("CSX"), by counsel, respectfully submits this reply in support of its Motion *in Limine* under Federal Rules of Evidence 401, 402, and 403 seeking to prohibit Defendants Norfolk Southern Railway Company ("NS") and Norfolk & Portsmouth Beltline Railroad Company ("NPBL") (collectively, "Defendants") from offering at trial any evidence or argument mischaracterizing CSX's 2010 and 2018 Rate Proposals ("the Proposals"), including any suggestion that they violate the so-called "uniform rate" provision of NPBL's Operating Agreement ("Motion") (ECF No. 378).

**INTRODUCTION**

      As an initial matter, Defendants, who have filed eight motions *in limine* in total as compared to CSX's two, agree that the standard to be applied to a motion in *limine* is that set forth in *Gibson*: evidence should be excluded only when it is "obviously inadmissible on all possible

1

grounds." *United States v. Gibson*, No. 2:17-cr-126, 2018 WL 4903261, at *2 (E.D. Va. Oct. 9, 2018) (Davis, C.J.).  This Court's reasoning in *Gibson* was that it will be better situated "during the actual trial to assess the value and utility of evidence," and to resolve potential issues pertaining to foundation, hearsay, or other questions requiring factual context.  *Id.* (internal citations omitted).

Unlike Defendants' sundry motions, CSX's Motion presents a discrete issue that does *not* depend on any such trial determinations.  Accordingly, the Court should resolve this issue in advance, to avoid extensive objections and arguments over this issue during trial.  Put simply, there is no value or relevance in Defendants' assertions of erroneous and misleading arguments and legal conclusions concerning the "uniform rate" provision of NPBL's Operating Agreement.

Defendants' joint Opposition to CSX's Motion highlights CSX's concerns: (1) Defendants continue to claim CSX's Rate Proposals violate the NPBL Operating Agreement, including by mischaracterizing the Rate Proposals as efforts to enter into private contracts and violate the agreement's "uniform rate" provision; and (2) Defendants assert—with no evidentiary support— that CSX's Proposals would cause "financial disaster for the Belt Line."  ECF No. 434 at 4.

First, Defendants' interpretation of the Operating Agreement is unsupported by the history of NPBL's actions, and has no basis in the record evidence.  Defendants do not dispute that prior NPBL tariffs established different rates for different services, including for international intermodal traffic.  Thus, their post-hoc interpretation of the Operating Agreement is improper and prejudicial.

Second, even assuming their post-hoc interpretation were arguable, CSX's Proposals did not propose non-uniform rates under that interpretation, as the Court has already concluded.  In their joint Opposition, Defendants argue "CSX now wants to preclude Defendants from arguing that its rate proposals sought a special, CSX-specific rate, even though *that is literally what the*

*proposals say.*"  *Id.* at 3 (emphasis in original).  This emphatic assertion is a prime example of the improper and misleading arguments Defendants will try to make at trial.  The 2010 and 2018 Rate Proposals are before the Court, and it is clear on their face that they do not depend on or require a special rate being offered only to CSX.  Indeed, the Court previously concluded as much: "The [2018] service proposal does not state that the rate would be lowered for only CSX.  The lowered rate is not limited to CSX, . . . but rather applies to any traffic by any company on Belt Line's tracks between Berkley Yard and NIT."  ECF No. 66 at 26–27.

Contrary to Defendants' assertions, CSX does not make any sort of "implicitly contradictory" argument in its Motion, nor have Defendants shown CSX is wrong "both factually and legally."  ECF No. 434 at 3.  The record evidence demonstrates that NPBL's tariff offers separate rates for separate services and has historically *offered a separate rate for the very service CSX was seeking*: intermodal switching designated on the tariff as import/export.  In other words, it is clear that the historical practice of NPBL and its consideration of the two relevant rate proposals by CSX have not followed the interpretation Defendants espouse here of the "uniform rate" provision.  And it is clear that CSX was not propounding a non-uniform rate even under Defendant's interpretation of the uniform rate provision.  Defendants should not be permitted to mislead the jury with claims that CSX's Proposals violate the NPBL Operating Agreement when they plainly do not.  Any evidence, testimony, or argument on the issue would amount to an incorrect conclusion of law, which would confuse the jury and prejudice CSX.  Accordingly, the Court should grant CSX's Motion.

## ARGUMENT

### I. The Operating Agreement Does Not Prohibit a Rate Specific to Intermodal, or Import/Export, Traffic.

NPBL has repeatedly maintained what Defendants now contend are "non-uniform" rates

3

in its tariffs within the last twenty years. In this litigation, however, both NS and NPBL argue the "uniform rate" language in Article 9 of the Operating Agreement prevents NPBL from accepting CSX's 2010 and 2018 Proposals.[1] *See* ECF No. 434-2. Nothing in the record evidence supports this interpretation, and Defendants should not be permitted to assert before the jury a violation of the Operating Agreement that does not exist.

According to Defendants, Article 9 requires the Belt Line to charge a single rate to all customers, regardless of the service performed or commodity at issue. *See* ECF No. 434 at 5. The record shows, however, that NPBL applies different rates for different services, as evidenced by its current tariff. *See* ECF No. 434-4. Prior versions of NPBL's tariff likewise demonstrate that NPBL previously had no issue with charging different switch rates for different commodities. *See* **Exhibit 1** (NSR_00035907 at -911).

For example, Tariff 8100-F, issued in 2003, . *See* Ex. 21 to ECF No 324. In 2006, the tariff was amended and included . *See* Ex. 20 to ECF No. 324. And in NPBL's 2008 tariff, there were two distinct line-haul switching rates: one for domestic commodities and one for import/export commodities *See* Ex. 1. This dual rate structure charged $243 per car for domestic line-haul switching and $148.50 per car for import/export (the switching of international intermodal traffic to and from NIT) line-haul switching. *See* Ex. 1.; *see also* Ex. 19, 20, and 21 to ECF No. 324 (NSR_00027070 at -073; NSR_00306444–48; NSR_00306377–

---

[1] CSXT's 2018 Proposal is attached as Exhibit E to the Complaint, *see* ECF No. 1-5 at 1-9, and the 2010 Proposal is attached to that document, *see id.* at 9-15.

82).

In 2010, NPBL adjusted the line-haul switch rates in its tariff to a single, $210 line-haul switch rate. *See* **Exhibit 2** (NPBL021736). The record evidence shows that this adjustment was not motivated by concerns about violating the Operating Agreement. *See* Ex. 19 to ECF No. 324. Rather, the primary impetus for the change was that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. *See id.*; *see also* Ex. 5 to ECF No. 324 (Coleman Dep. 117:18-118:18) (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇).

Defendants argue that the $210 switch rate is designed to cover NPBL's operating costs. *See* ECF No. 434 at 5. Defendants' assertion on this issue does not mean, however, that a lower rate for import/export or intermodal service would not also cover NPBL's operating costs or otherwise be of value. Indeed, whenever NPBL internally assessed CSX's Rate Proposals, it concluded they would result in *increased* revenue. In 2010, NPBL management determined that CSX's proposal ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. *See* Ex. 34, 35, and 44 to ECF No. 324 (NPBL007438; Stinson Dep. 164:19-167:11; NSR_00000704 at -736). In 2018, NPBL did a "back-of-the envelope financial evaluation" of the 2018 Proposal, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. *See* Ex. 5 and 80 to ECF No. 324 (Coleman Dep. 181:13-25; NPBL000189 at -93).

However, whether the $210 switch rate covers NPBL's operating costs generally is not at issue in CSX's Motion—it is the fact that Defendants' current definition of "uniform rate" is unsupported by NPBL's tariff history and the record evidence. The "uniform rate" that NPBL charges to switch cars has varied, and it has been adjusted over time to include more than one

5

switch rate for line-haul switching, including a rate for domestic freight and a separate rate for international intermodal freight, as well as a separate line-haul switching rate for services to different facilities. Defendants concede as much when they characterize the "different rates in the past" as a waiver. *See* ECF No. 434 at 11. But, this is not the brief waiver of a contractual term due to extenuating circumstances, as described by Defendants in their lawn care analogy. *See id.* at 10–11. Rather, NPBL has consistently allowed multiple switch rates by approving and amending its tariff. Allowing Defendants to argue otherwise at trial not only contradicts NPBL's own evidence, but would improperly mislead and confuse the jury.

Defendants contend, however, that NPBL "cannot approve a rate that is 'different in any way' from the rates charged to other customers or a different rate based on commodity or distance, absent modification of the Operating Agreement by its shareholders." ECF No. 434 at 10. Defendants go so far as to claim CSX witnesses have admitted this, citing the deposition of Frederick Eliasson. Defendants take Mr. Eliasson's testimony out of context. Mr. Eliasson testified that he "fully agreed" the Operating Agreement required the freight rates be uniform, and as such, "We were more than willing to offer the same agreement [] . . . to Norfolk Southern." *See* ECF No. 379-2 (Eliasson Dep. 131:10–132:6). He further explained "we fully respected the uniform rate principle," noting that the Operating Agreement did not contemplate intermodal trains, but "we were not trying to have a rate that was just available to us." *Id.* Mr. Eliasson further testified NPBL could have created a uniform rate for intermodal traffic. *See id.* The 2010 Proposal does not require that the rate be exclusive to CSX, or require that the rate be contained within a private contract. *See id.*; *see also* ECF No. 379-1 (Armbrust Dep. 139:2–12). In fact, this Proposal seeks a uniform rate for intermodal traffic, or, put another way, the Proposal seeks a uniform rate for traffic from Berkley Yard to NIT, i.e., intermodal or import/export traffic.

In addition to its lack of relevance, any argument or evidence regarding the interpretation of the Operating Agreement and whether CSX's Proposals would have violated Article 9 should be excluded under Rule 403. Defendants seek to introduce as evidence and argument, their positions on legal terms and their conclusions regarding the Operating Agreement that could confuse or mislead the jury. *See, e.g.,* ECF No 434 at 10–12. The Court has already noted that the 2018 Proposal does not state "that CSX is seeking a lower preferential rate, below the Uniform Rate, for only itself," and further indicated that the 2018 Proposal "does not state that the rate would be lowered for only CSX," but rather that the lowered rate "applies to any traffic by any company on Belt Line's tracks between 'Berkely Yard and NIT.'" ECF No. 66 at 26–28 (describing NPBL's argument that CSX was "seeking a preferential rate" as "miss[ing] the mark"); *see also id.* at 54–55. The Court had both the Operating Agreement and the 2018 Proposal before it when it concluded, "the proposal is within the power of Belt Line and its directors to accept, and does not appear to violate the Operating Agreement." *Id.* As such, any argument, testimony, or evidence from Defendants interpreting the Operating Agreement to require one rate or to define "uniform" in the manner advocated by Defendants improperly invades the province of the Court, is misleading, and should be precluded.

**II.     CSX's Proposals Do Not Violate the Uniform Rate Provision**

In both 2010 and 2018, CSX made rate proposals for rail service to NIT. The rates proposed by CSX, proffered in the context of business negotiations, do not violate the uniform rate provision because each proposes a rate for intermodal traffic. The rate could have been published in NPBL's tariff and applied uniformly to any other customer wanting to use the service.

Defendants' references to the 2010 and 2018 Proposals in the factual background section of their Opposition brief, however, demonstrate the potential for misleading the jury through

7

improper, irrelevant, and prejudicial arguments. *See* ECF No. 434 at 4–6. For example, Defendants focus on the proposed contract attached to the 2010 Proposal and assert, "The 2010 proposal explicitly contemplated that CSX would get one rate, and other customers would a get a higher rate. . . . In other words, CSX was requesting a CSX-only rate, which differed from the higher tariff rate, in violation of the uniform rate provision." ECF No. 434 at 6. With respect to the 2018 Proposal, Defendants similarly argue that an amendment to NPBL's operating documents "was necessary because such a private contract conflicted with the Operating Agreement's uniform rate provision." ECF No. 434 at 7.

These mischaracterizations are unsupported by the record evidence, including both documents and witness testimony. Nothing in the 2010 Proposal "explicitly contemplated" that CSX alone would receive the rate proposed, or that this was a preferential rate for CSX. *See* ECF No. 434 at 6, 12–13. As an initial matter, the 2010 and 2018 Proposals are not inconsistent with the rate being established in a tariff for import/export, or international intermodal, service, as NPBL has set previously. *See* Ex. 1. However, as Defendants concede in their Opposition, NS would not use NPBL to access NIT because NS prefers to utilize its own track for access. *See* ECF No. 434 at 13. That is NS's choice, but it does not negate that an import/export tariff rate would be "uniform" to all NPBL customers who wish to use it. A rate does not cease to be "uniform" simply because one customer chooses to utilize the service whereas another does not, and Defendants make no argument to the contrary. CSX of course knew that NS has its own access into NIT. By offering a similar rate for a comparable service, CSX was going above and beyond to agree that NS could benefit from a lower rate for an NPBL service that it does use elsewhere. And even still, that offer was rejected.

Also, as a part of its proposal and ensuing discussions and to answer questions related to

8

the Operating Agreement, CSX informed NPBL that it would "███████████████████████████████████████████████████████████████████," and that it had "████████████████████████████████████████████████████████████████████████████." Ex. 36 to ECF No. 324 (NSR_00000781 at -820); *see also* ECF No. 379-2.  Defendants have not disputed that when the 2010 Proposal was submitted, then NPBL-president David Stinson testified that this information addressed his concern regarding compliance with the Operating Agreement.  *See* Ex. 35 to ECF No. 324 (Stinson Dep. 158:12–20).

  Likewise, nothing in the 2018 Proposal indicated that CSX demanded a private contract requiring an amendment to NPBL's Operating Agreement.  *See* ECF No. 434 at 6–7.  Defendants argue that an "amendment was necessary because such a private contract conflicted with the Operating Agreement's uniform rate provision." ECF No. 434 at 7.  That is incorrect.  Rather, the idea of a private contract was brought up in anticipation of possible concerns NPBL might raise, based on prior experience.  *See* ECF No. 1-5 at 4.  The evidence also reflects that the NPBL Board never discussed any aspect of the 2018 Proposal in detail, much less any purported concerns about a potential violation of the Operating Agreement, and there was no vote to form a rate committee to analyze the tariff or the proposal.  *See* **Exhibit 3** (NPBL000745); Ex. 89 to ECF No. 324 (Hurlbut Dep. 67:23-68:16); Ex. 87 to ECF No. 324 (Merilli Dep. 75:11-21).

  Defendants would also dismiss the Court's statements regarding the 2018 Proposal in its ruling on NPBL's Motion to Dismiss. They argue that the Court was only ruling on a motion to dismiss and therefore had to accept the facts as pled in the Complaint as true, suggesting that limits the Court's conclusions here.  *See* ECF No. 434 at 14–15.  CSX agrees of course that the Court was ruling on a motion to dismiss, but the Operating Agreement and CSX's Rate Proposals were

9

attached to the Complaint and before the Court.  Thus, the Court's opinion reflected its review of these documents: "the proposal is within the power of Belt Line and its directors to accept, and does not appear to violate the Operating Agreement."  ECF No. 66 at 27.  As outlined in CSX's Memorandum in Support of its Motion *in Limine*, the evidenced produced in discovery has only confirmed the Court's conclusion.  *See* ECF No. 379.

Thus, the Operating Agreement does not preclude NPBL from adopting a uniform rate for intermodal traffic in its tariff, as NPBL has done so previously.  Defendants' argument rests on the concession by NS that it "owns the track to NIT and thus would not use the Belt Line" and the assertion that CSX's Proposals were part of an effort to privately contract with NPBL.  ECF No. 434 at 13.  CSX is plainly not the "only practical beneficiary" of the Proposals.  As discussed above, CSX proposed the idea of a private contract as part of a commercial proposal and related discussions, as a practical solution that would benefit all parties.  And CSX has never demanded that the rates it proposed be exclusive to CSX.  *See* Ex. 36 to ECF No. 324 (NSR_00000781 at -820)**;** Ex. 35 to ECF No. 324 (Stinson Dep. 158:12-20); ECF No. 379-1 (Armbrust Dep. 139:2-12); ECF No. 379-2 (Eliasson Dep. 131:10-132:6); and ECF No. 379-3 (DiDeo Dep. 153:14-155:17) (explaining that "the rate itself doesn't have to be only with CSX," and that "there's nothing that would prevent NPBL from offering a similar rate to anyone else.").  Accordingly, Defendants should be precluded from submitting evidence and argument to the contrary, as it is misleading and prejudicial to CSX.

### III. Defendants' Belated Assertions Regarding Hypothetical Financial Losses are Irrelevant to this Motion and Unsupported in any Event.

Defendants ultimately fall back on an argument that if CSX's Proposals for intermodal traffic were applied to every NPBL customer, it would be "financially ruinous" to NPBL.  *See* ECF No. 434 at 7–8.  This argument fails for two essential reasons.  First, it is not a basis on which to

deny CSX's Motion. CSX's Motion seeks to preclude Defendants from mischaracterizing CSX's rate proposals through evidence or argument. The thin reed on which Defendants' base this argument is Mr. Moss's testimony that if NPBL agreed to CSX's 2018 rate proposal, a grain customer "would probably want the same." ECF No. 434 at 14. Putting aside for the moment the pure speculation of that testimony, the key here is that Mr. Moss was not saying that due to the "uniform rate" provision of the agreement, which is the subject of CSX's Motion. Rather, Mr. Moss was making the much more pedestrian point that if one customer gets a lower rate, other customers may likewise seek to get a lower rate. Mr. Moss was not saying he would be forced to give the rate to the grain customer by virtue of the uniform rate provision of the operating agreement.

First, and notwithstanding this lack of evidence, Defendants' argument has no bearing on the issue in CSX's Motion. CSX does not seek to exclude evidence or argument regarding the financial implications of the Rate Proposals. CSX's concern is that Defendants will mischaracterize CSX's actions by improperly claiming CSX's Proposals would violate the Operating Agreement. Any argument, evidence, or testimony that either the 2010 or 2018 Proposal sought a "non-uniform" rate in violation of the NPBL Operating Agreement is without evidentiary foundation, is inconsistent with this Court's prior ruling, and should be excluded. This Court has already explained the 2018 Proposal did not seek a unique rate for CSX. Exclusion is also appropriate under Rule 403 because there is a substantial danger that a jury will be misled or confused. Unlike pure evidentiary motions, the die is cast here; CSX should not be prejudiced at trial by Defendants' attempts to mischaracterize CSX's Proposals and misinterpretation of the Operating Agreement.

Second, this argument is yet another post-hoc, imagination of Defendants' lawyers, and

not an argument that is actually supported by record evidence. Neither of CSX's rate proposals proposed the rate for all services offered by NPBL, and, as discussed above, NPBL has historically differentiated among services with different rates. Further, as discussed above, NPBL repeatedly concluded it would make money at the rate proposed by CSX for that service. Defendants rely only on Cannon Moss's speculative testimony that if NPBL accepted CSX's rate proposal, one of NPBL's grain customers "would probably want the same." ECF No. 434 at 14. But there is no actual evidence supporting this hypothetical concern—indeed, NPBL has historically charged different rates for different services and commodities without issue. Presumably if the grain customer requested such a rate, NPBL would be free to evaluate such a rate and either agree or deny it based on the merit of that request, which would include whether NPBL would make or lose money on the proposal. What the outcome of that evaluation would have been need not concern this Court because it never happened and would be entirely speculative.

Here, as discussed above, we know that NPBL did in fact evaluate that it would make money on CSX's rate proposals. Moreover, Mr. Moss admitted that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Ex. 7 to ECF No. 324 (Moss Dep. 238:10-14). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Notably, neither of Defendants' experts have examined whether NPBL's operating costs would be covered in this scenario, much less how NPBL would be harmed by applying a single rate across all customers and switching operations. *See, e.g.,* ECF No. 434-6 (Crowley Report). Defendants attempt to muddy the water by claiming that accepting CSX's Rate Proposals would require them to extend the proposed rate to non-intermodal customers, and speculating that non-intermodal customers would also demand a different rate, thereby causing financial losses for NPBL. In the absence of evidence in the record supporting this concern, it is

disingenuous and misleading for Defendants to suggest that CSX's proposals would cause financial harm to the Belt Line.

## CONCLUSION

For the foregoing reasons, CSX requests an order prohibiting Defendants from offering at trial any evidence or argument that CSX's 2010 or 2018 Proposals were for a lower preferential rate and/or would have violated NPBL's Operating Agreement.

Dated: September 23, 2022.                    Respectfully submitted,

**CSX TRANSPORTATION, INC.**
*By Counsel*

*/s/ Benjamin L. Hatch*
Robert W. McFarland (VSB No. 24021)
Benjamin L. Hatch (VSB No. 70116)
V. Kathleen Dougherty (VSB No. 77294)
Jeanne E. Noonan (VSB No. 87863)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia 23510-1655
Telephone: (757) 640-3716
Facsimile: (757) 640-3930
E-mail: rmcfarland@mcguirewoods.com
E-mail: bhatch@mcguirewoods.com
E-mail: vkdougherty@mcguirewoods.com
E-mail: jnoonan@mcguirewoods.com

J. Brent Justus (VSB No. 45525)
Ashley P. Peterson (VSB No. 87904)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219-3916
Telephone: (804) 775-1000
Facsimile: (804) 698-2026
E-mail: bjustus@mcguirewoods.com
E-mail: apeterson@mcguirewoods.com

**CERTIFICATE OF SERVICE**

I certify that on this 23rd day of September, 2022, a true and correct copy of the foregoing was served on all counsel of record via Notice of Electronic Filing by filing with the Court's CM/ECF system.

/s/ *Benjamin L. Hatch*
Robert W. McFarland (VSB No. 24021)
Benjamin L. Hatch (VSB No. 70116)
V. Kathleen Dougherty (VSB No. 77294)
Jeanne E. Noonan (VSB No. 87863)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia 23510-1655
Telephone: (757) 640-3716
Facsimile: (757) 640-3930
E-mail: rmcfarland@mcguirewoods.com
E-mail: bhatch@mcguirewoods.com
E-mail: vkdougherty@mcguirewoods.com
E-mail: jnoonan@mcguirewoods.com

J. Brent Justus (VSB No. 45525)
Ashley P. Peterson (VSB No. 87904)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219-3916
Telephone: (804) 775-1000
Facsimile: (804) 698-2026
E-mail: bjustus@mcguirewoods.com
E-mail: apeterson@mcguirewoods.com