# Exhibit 1

**NOT YET SCHEDULED FOR ORAL ARGUMENT**

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| Norfolk Southern Railway Co., | ) | |
| *Petitioner*, | ) | |
| | ) | |
| v. | ) | |
| | ) | No.  22-1209 |
| Surface Transportation Board and | ) | |
| United States of America, | ) | |
| | ) | |
| *Respondents*. | ) | |
| | ) | |

**INTERVENOR CSX TRANSPORTATION, INC.'S MOTION TO DISMISS
FOR LACK OF JURISDICTION
AND REQUEST FOR EXPEDITED CONSIDERATION**

## <u>TABLE OF CONTENTS</u>

**Page**

PROCEDURAL HISTORY ..................................................................................2

ARGUMENT .....................................................................................................8

    I.     Section 1336(b) Requires Dismissal. ....................................................9

    II.    This Court's Decision in *McCarty Farms* Supports Dismissal. ........12

CONCLUSION ................................................................................................14

i

(Page 2 of Total)

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Kaplan v. C. Bank of the Islamic Republic of Iran*,
   896 F.3d 501 (D.C. Cir. 2018)................................................................8

*Ex parte McCardle*,
   74 U.S. (7 Wall.) 506, 19 L.Ed. 264 (1868) ........................................9

*McCarty Farms, Inc. v. Surface Transp. Bd.*,
   158 F.3d 1294 (D.C. Cir. 1998)....................................8, 10, 12, 13, 14

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998)..............................................................................8, 9

**Statute**

28 U.S.C. § 1336(b) .....................................................1, 9, 10, 12, 13, 14

**Other**

*CSX Transportation, Inc. v. Norfolk Southern Railway, et al.*,
   Case No. 2:18-cv-00530 (E.D. Va.) ............................................3, 4, 5

*Norfolk S. Ry. Co. v. Surface Transp. Bd., et al.*,
   Case No. 2:22-cv-00385, ECF No. 1 (E.D. Va. Sept. 15, 2022)..........8

## <u>GLOSSARY</u>

| | |
|---|---|
| CSX/CSXT | CSX Transportation, Inc. |
| EDVA | United States District Court for the Eastern District of Virginia |
| ICC | Interstate Commerce Commission |
| NS/NSR | Norfolk Southern Railway Company |
| NSC | Norfolk Southern Corporation, predecessor of NS |
| NPBL | Norfolk & Portsmouth Belt Line Railroad Company |
| The Board or STB | United States Surface Transportation Board |

Petitioner Norfolk Southern Railway Company (NS) asks this Court to review two paragraphs in a unitary Surface Transportation Board (STB) decision issued in response to a question referred at NS's request by the District Court for the Eastern District of Virginia (EDVA).  28 U.S.C. § 1336(b) directs that exclusive jurisdiction to review a challenge to the STB's decision lies with the EDVA as the entire STB decision, including the portion of the decision addressed in NS's petition, clearly arose out of the EDVA's referral order.  NS's petition should therefore be dismissed for lack of jurisdiction.

Here, NS seeks to evade EDVA's jurisdiction under Section 1336(b) by seeking to challenge only that portion of the STB's decision that discussed transactions occurring in 1991 and 1998.  But Section 1336(b) does not support the artificial parsing of a unitary agency decision that NS attempts here.  As the STB's discussion and conclusion about the 1991 and 1998 transactions "aros[e] out of such referral" from the EDVA, Section 1336(b) directs that jurisdiction for this challenge rests with the EDVA.  Indeed, it was *NS* who instituted the STB proceedings on the express basis of resolving the referred question from the EDVA.  And it was *NS* that introduced the argument that the 1991 and 1998 transactions supported its position *on the referred question*.  The STB merely addressed—and correctly dispensed with—corollary arguments that NS introduced on the referred question.

This Court's decision in *McCarty Farms*, on which NS relies, only further

1

confirms that jurisdiction rests with EDVA. *McCarty Farms* dealt with a consolidated agency proceeding, in which different matters, claims, parties, and issues were joined in one agency proceeding. This Court concluded in *McCarty Farms* that the determinations in the consolidated agency proceeding that were not part of the district court's referred question and over which the district court itself had no jurisdiction were appropriate for appeal to this Court. Here, by contrast, there was a unitary agency proceeding whose sole purpose—as expressed by NS which instituted the proceeding—was to answer the referred question from the district court. The STB duly did just that, and jurisdiction as a result lies with EDVA.

CSX Transportation, Inc. (CSX) respectfully asks for expedited consideration of its motion to dismiss. CSX's EDVA lawsuit against NS is set for trial on January 18, 2023, and the case has been pending for four years. CSX has a vested interest in maintaining that trial date, which was set by the district court after the STB answered the referred question. Through its petition for review, NS apparently seeks to salvage its immunity claim and/or delay the trial. CSX is not seeking emergency relief, or to modify the briefing schedule set forth in Federal Rule of Appellate Procedure 27. CSX respectfully requests expedited consideration of this jurisdictional issue so that it may be resolved prior to the January 18 trial date.

## PROCEDURAL HISTORY

The procedural history of this matter demonstrates that the STB's order and

2

the issue NS raises on appeal arise out of the EDVA referral.  NS's suggestion that the STB somehow strayed beyond the EDVA referral is thoroughly refuted by the record and ignores that the STB only addressed the 1991 and 1998 proceedings because NS argued those proceedings were relevant to the referred question.

CSX brought suit against NS, Norfolk & Portsmouth Belt Line Railroad Company (NPBL), and certain individuals in the EDVA on October 4, 2018.  *CSX Transportation, Inc. v. Norfolk Southern Railway Co., et al.*, Case No. 2:18-cv-00530 (E.D. Va.) (hereinafter "the EDVA Litigation").  CSX has sued NS and NPBL for violations of federal antitrust law, state conspiracy laws, and breach of contractual obligations after NS, on its own and in combination with NPBL, excluded CSX from on-dock rail access at Norfolk International Terminals, one of the largest and most important marine terminals on the East Coast.

NS and NPBL moved to dismiss CSX's complaint on November 27, 2018.  Notably, NS did not move to dismiss any of CSX's antitrust claims, though it now seeks to claim that it is immune from the antitrust laws.  On September 9, 2019, the district court denied the majority of the motions to dismiss, granting them only with respect to CSX's claim for tortious interference under Virginia law.

As the EDVA Litigation proceeded through discovery, on January 31, 2020, NS filed a motion to dismiss, for judgment on the pleadings, and for referral of issues to the Board.  In that motion, NS argued, for the first time, that it was immune from

3

CSX's antitrust claims on the grounds that the Interstate Commerce Commission (ICC) had granted NS authority to "control" NPBL as a result of the 1982 merger between Norfolk and Western Railway Company and Southern Railway Company. As an alternative remedy, NS asked the district court to refer the "control" question to the STB.

On May 18, 2021, the district court denied NS's motion for judgment on the pleadings. After a thorough discussion of the 1982 consolidation, the district court did, however, grant NS's request to "refer the immunity issue to the STB in light of its expertise regarding the process and scope of railroad company mergers." *CSX Transp., Inc.*, No. 2:18-cv-00530, slip op. at 3 (attached hereto as Ex. 2).[1] The district court formulated the referred questions as follows:

> Did the 1982 consolidation, whereby [Norfolk Southern Corporation (NSC)] acquired an indirect 57 percent interest in [Norfolk & Portsmouth Belt Line Railroad Company (NPBL)], involve the [Interstate Commerce Commission (ICC)]/STB granting NSC "approval" to control [NPBL], and if so, did such authorized "control" render it necessary for antitrust and/or state conspiracy laws to yield, whether because [NPBL] was then deemed a "franchise" of NSC, or for any other reason?

---

[1] The district court specifically noted that "while not critical to the Court's analysis," there were subsequent actions taken after 1982, including a 1990 merger that occurred "pursuant to the 'corporate family' exemption such that STB approval of such merger was not required, with the STB reporting in early 1991 that a notice of exemption had been filed, further indicating that such transaction would 'not result in . . . a change in the competitive balance with carriers outside the corporate family.'" *Id.* at 11 n.7 (quoting 56 Fed. Reg. 1541-03, 1991 WL 310251 (Jan. 15, 1991)). This 1990 merger discussed by the district court is the same 1991 transaction referenced in NS's Petition for Review.

4

*Id.* at 29.  The district court stayed further proceedings pending the STB's decision.

On June 21, 2021, NS filed a petition for a declaratory order before the STB. NS's filing cover letter stated that its petition was "in response to a referral from the U.S. District Court for the Eastern District of Virginia in CSX Transportation, Inc. v. Norfolk Southern Railway, No. 2:18-cv-00530 (E.D. Va. Decided May 18, 2021)."  NS Petition for Declaratory Order, Cover Letter, ID-302570, Docket No. FD 36522 (entered June 21, 2021).  And NS's petition for a declaratory order stated in its first sentence that it brought its petition "to address the issues referred to the Board by the District Court in its May 18, 2021 decision."  NS Petition for Declaratory Order at 2.  The petition enclosed as Exhibit A the EDVA referral order. *See id.* at 5–35.  NS did not ask the STB to address or enter an order on any topic other than the EDVA referred questions.

On August 9, 2021, the STB issued a decision instituting the requested declaratory order proceeding and setting the schedule for the same.  In that decision, the STB noted that NS had filed its petition "to address the issues referred to the Board by the U.S. District Court for the Eastern District of Virginia in CSX Transportation, Inc. v. Norfolk Southern Railway, No. 2:18-cv-00530 (E.D. Va. May 18, 2021)."  Aug. 9, 2021 Decision, ID-50873 at 1, Docket No. FD 36522 (STB served Aug. 9, 2021).  The STB proceeded to quote the referred questions from the district court's May 18 referral order.  The STB concluded that: "The questions

5

above have been *referred by a court* of competent jurisdiction and otherwise appear to be within the Board's jurisdiction.  A proceeding therefore will be instituted to address *the issues referred by the district court*."  *Id.* at 2 (emphases added).

NS filed its opening statement in the STB proceedings on September 23, 2021. In the first sentence of that opening statement, NS reiterated that it had petitioned the STB "to address an issue that was raised in the context of litigation brought by CSX Transportation ("CSXT") in the U.S. District Court for the Eastern District of Virginia ("District Court") and referred to the Board."  NS Opening Statement, ID-303032 at 2, Docket No. FD 36522 (entered Sept. 23, 2021).  NS's opening statement focused on its argument that the 1982 merger granted it the authority to "control" NPBL and as a result it gained antitrust immunity.  But NS also posited that "NSC's indirect control [of NPBL] was further solidified and authorized again through two subsequent transactions, one in 1991 and the other in 1998."  NS Opening Statement at 3.  *See also id.* at 14 ("Even if one could argue that the 1982 Transaction somehow did not grant either NSC or NSR the ability to directly or indirectly control NPBL, these later transactions resolved that question."); *id.* at 15 ("This control of NPBL was further consolidated and reauthorized in both the 1991 transaction and the 1998 Transaction.").  It was thus NS who introduced into the STB proceedings the argument that the 1991 and 1998 transactions "further solidified" and "authorized again" the control it argued it had first obtained in 1982.

6

In a thorough decision, the STB rejected NS's argument that the ICC has authorized NS to "control" NPBL as a result of NS's 1982 merger.  *See Norfolk Southern Railway Company—Petition for Declaratory Order* (June 17, 2022 Decision), ID-51101, Docket No. FD 36522 (June 17, 2022) (attached hereto as Ex. 1).  The STB answered the first of the district court's questions adversely to NS.  As the Board found NS was not authorized to "control" NPBL, it held it was unnecessary for it to answer the second referred question, because the possibility of antitrust immunity only arose if NS had received "control" authority from the ICC.  June 17, 2022 Decision at 1 ("Because control authority was never granted, the question of whether authorized control rendered it necessary for antitrust and/or state conspiracy laws to yield is moot.").

The STB noted the 1991 and 1998 transactions briefly in the course of addressing and rejecting the various arguments that NS advanced.  In so doing, the STB reasoned that the 1991 and 1998 transactions "could not have been used to grant authority to any member of NSC's corporate family to control NPBL *unless authority had previously been granted* for some other member of that corporate family to control NPBL."  June 17, 2022 Decision at 16 (emphasis added).  As the Board concluded that the 1982 merger did not result in "control" authority, it logically stated that the 1991 and 1998 transactions likewise could not convey that authority.

7

After the STB's Decision, the district court lifted the stay of the EDVA Litigation and set a trial date of January 18, 2023.

On September 15, 2022, 90 days after the STB decision, NS filed a complaint in the EDVA against the STB and the United States. The complaint disclaims any challenge to the STB's decision with regard to the 1982 merger, and otherwise raises identical issues to NS's petition for review to this Court. *See Norfolk S. Ry. Co. v. Surface Transp. Bd., et al.*, Case No. 2:22-cv-00385, ECF No. 1 (E.D. Va. Sept. 15, 2022). NS states that it is filing the complaint "protectively," and asks that the complaint be held in abeyance pending the outcome of this appeal.

## **ARGUMENT**

CSX files this Motion in keeping with the deadline set by this Court for dispositive motions in its Order of August 16, 2022. This is a case where consideration of CSX's dispositive motion prior to briefing on the merits is appropriate because CSX's Motion presents a purely legal question of this Court's jurisdiction which can be decided without reaching the merits of NS's appeal.

Before reaching the merits of NS's petition, this Court "must assure itself of the existence of subject-matter jurisdiction." *Kaplan v. C. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 511 (D.C. Cir. 2018); *McCarty Farms, Inc. v. Surface Transp. Bd.*, 158 F.3d 1294, 1298 (D.C. Cir. 1998) ("[W]e must resolve all jurisdictional questions before proceeding to the merits"); *see also Steel Co. v.*

8

*Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) ("Without jurisdiction the court cannot proceed at all in any cause.") (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1868)).  An examination of 28 U.S.C. § 1336(b), the STB's Decision, along with the facts and circumstances giving rise to the referred question, and the interests of judicial economy all establish that the EDVA has exclusive jurisdiction to review NS's challenge to the Decision.  Thus, whether this Court has jurisdiction must first be determined before proceeding to the merits of NS's Petition for Review.  The burden of establishing this Court's jurisdiction is on the party asserting it—NS.  *See Steel Co.*, 523 U.S. at 103–04.

## I.    <u>Section 1336(b) Requires Dismissal.</u>

Under 28 U.S.C. § 1336(b), the "exclusive jurisdiction" to review the STB's Decision on a question or issue referred to the STB by a district court lies with the referring district court. 28 U.S.C. § 1336(b).  Congress' language in Section 1336(b) is clear: when a district court refers a "question or issue" to the STB, it is vested with the authority to "enforce, enjoin, set aside, annul, or suspend, *in whole or in part*, any order of the Surface Transportation Board *arising out of such referral*."  *Id.* (emphases added).  Here, NS seeks to challenge *in part* the STB's decision "arising out of such referral."  Section 1336(b) directs that jurisdiction for such challenge lies in the EDVA.

The entire STB decision, including the part NS seeks to carve out, arose out

9

of the referred question by the district court. *See McCarty Farms*, 158 F.3d at 1299 (interpreting the term "arise" in Section 1336 as "to originate"). NS's petition for a declaratory order, which began the proceeding, stated in its first sentence that NS filed the petition "to address the issues referred to the Board by the District Court in its May 18, 2021 decision." NS Petition for Declaratory Order at 2. In the first sentence of NS's opening statement, NS reiterated that it had petitioned the STB "to address an issue that was raised in the context of litigation brought by CSX Transportation ("CSXT") in the U.S. District Court for the Eastern District of Virginia ("District Court") and referred to the Board." NS Opening Statement at 2.

NS contends that although the declaratory proceeding itself was initiated as a result of the referred question, the issues concerning the 1991 and 1998 transactions are distinct. The EDVA referral order unquestionably framed the referred question around the 1982 merger. But it is likewise clear that the portion of the STB decision that addressed the 1991 and 1998 transactions also "aros[e] out of such referral." 28 U.S.C. § 1336(b). NS's opening brief before the STB was principally devoted to the 1982 merger. But NS also advanced a brief argument that "NSC's indirect control [of NPBL] was *further* solidified and authorized *again* through two subsequent transactions, one in 1991 and the other in 1998." NS Opening Statement at 3 (emphases added). *See also id.* at 14 ("Even if one could argue that the 1982 Transaction somehow did not grant either NSC or NSR the ability to directly or

10

indirectly control NPBL, these later transactions resolved that question."); *id.* at 15 ("This control of NPBL was further consolidated and reauthorized in both the 1991 transaction and the 1998 Transaction.").  In other words, NS argued that the 1991 and 1998 transactions further demonstrated that it had obtained "control" from the STB.  These arguments were advanced in support of its principal position regarding the 1982 merger.  They were not broken into separate counts for declaratory relief, nor were they even broken out into separate sections in the opening statement. Finally, they were nowhere identified by NS as being new or distinct issues separate from the referred question.

Unsurprisingly, the STB treated those transactions as NS addressed them, as supplemental contentions NS advanced in support of its position on the referred question.  The STB only addressed them in the course of identifying and responding to each argument NS presented.  The STB reasoned that "an exemption under 49 C.F.R. § 1180.2(d)(3) [pertinent to the 1991 and 1998 transactions] could not have been used to grant authority to any member of NSC's corporate family to control NPBL *unless authority had previously been granted* for some other member of that corporate family to control NPBL."  June 17, 2022 Decision at 16 (emphasis added). As the STB determined NS did not obtain authority to control NPBL in connection with the 1982 consolidation, the later proceedings could not have provided separate authority to control NPBL.  Thus, the STB's discussion of the 1991 and 1998

11

proceedings was not only related to its reasoning on the referred question regarding the effect of the 1982 merger, but directly stemmed from its decision on that referred question.

## II.     This Court's Decision in *McCarty Farms* Supports Dismissal.

NS contends that the Court has jurisdiction pursuant to its decision in *McCarty Farms, Inc. v. Surface Transportation Board*, 158 F.3d 1294 (D.C. Cir. 1998). *McCarty Farms* involved review of a very different agency proceeding and its holding supports dismissal here.  *McCarty Farms* considered a consolidated agency proceeding before the STB in which there were "three sets of claims" each with its own docket number designation and some of which had different parties in interest. *Id.* at 1296.  This Court applied Section 1336(b) to determine that the referring district court had jurisdiction over some of the claims whereas it had jurisdiction over others.

The first claim—involving "single-car wheat shipments moving before September 12, 1980"—had been included in McCarty Farms' federal court complaint prior to being referred to the ICC.  This Court readily concluded that it did not have jurisdiction over that claim in light of Section 1336(b).  *Id.* at 1298.

The second claim—involving "multiple-car and trainload shipments of wheat and barley"—arose out of a separate Montana Department of Agriculture complaint that had been consolidated in the STB proceedings but that was not part of the federal

12

district court litigation or referral order.  As a result, the parties agreed that this Court, and not the district court, had jurisdiction over an appeal of the agency's ruling on that claim.  That second claim involved a question distinct from the district court referral—multi-car versus single-car and shipments of wheat and barley versus only wheat—and was never part of the district court litigation.

The third claim—involving "single-car shipments of barley and single-car shipments of wheat moving after September 12, 1980"—presented a "more difficult" question.  *McCarty Farms*, 158 F.3d at 1298.  Ultimately, this Court determined that "[i]n no sense did the third category of claims originate in the district court's referral." *Id.* at 1299.  The third category originated in a separate complaint that McCarty Farms filed with the ICC, not the district court.  And, significantly, McCarty Farms "could not have filed the third category of claims in the district court, even if it had wanted to do so." *Id.*  Those claims related to "a prescription on future rates, a remedy not available in the district court." *Id.*  This Court therefore reasoned that "Congress did not intend to authorize litigants to expand the district court's jurisdiction beyond its legitimate scope by filing complaints with the ICC and then seeking review of those complaints by the district court pursuant to Section 1336(b)." *Id.*

Nothing procedurally or factually similar is found in NS's petition.  The *only* context for the STB's decision below is the referred question by EDVA.  NS raised

13

immunity as a grounds for dismissal of CSX's EDVA lawsuit, and argued it had achieved immunity by virtue of its 1982 merger.  Unlike *McCarty Farms*, concluding that jurisdiction for NS's challenge exists only in the EDVA does not in any way expand the jurisdiction of the district court.  To the contrary, NS's efforts to have antitrust immunity resolved by this Court seeks to circumvent the authority of the EDVA over the issue.  NS could have presented arguments regarding the 1991 and 1998 proceedings to the district court; indeed, the district court even noted the 1991 proceedings in its referral order.  Those arguments are part and parcel of NS's larger purported immunity defense, the only context of which is the pending EDVA litigation.  *Contra McCarty Farms*, 158 F.3d at 1298–99 (holding this Court had jurisdiction over claims arising out of complaint filed with the ICC, that could not have been brought before the district court, as it was divested of jurisdiction).  *NS* presented these arguments as support for its position on the referred question, not as separate proceedings that it instituted before the STB on an issue unrelated to the EDVA Litigation.

## <u>CONCLUSION</u>

CSX respectfully requests that the Court give its Motion to Dismiss expedited consideration in light of the upcoming January 18, 2023 trial of the EDVA Litigation, and grant its Motion to Dismiss and dismiss NS's appeal for lack of subject matter jurisdiction pursuant to 28 U.S.C. § 1336(b).

14

Dated: September 30, 2022          Respectfully submitted,

   */s/ Benjamin L. Hatch*
Benjamin L. Hatch (VSB No. 70116)
Robert W. McFarland (VSB No. 24021)
Jeanne E. Noonan (VSB No. 87863)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia 23510-1655
Telephone: (757) 640-3727
Facsimile: (757) 640-3947
E-mail: bhatch@mcguirewoods.com
E-mail: rmcfarland@mcguirewoods.com
E-mail: jnoonan@mcguirewoods.com
*Counsel for CSX Transportation, Inc.*

15

## <u>CERTIFICATE OF COMPLIANCE</u>

This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because:

- The motion contains 3,471 words, excluding the parts exempted by Fed. R. App. P. 27(a)(2)(B) and Fed. R. App. P. 32(f).

This motion complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because:

- The motion has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

 */s/ Benjamin L. Hatch*
Benjamin L. Hatch (VSB No. 70116)
*Counsel for CSX Transportation, Inc.*

16

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2022, I filed the foregoing with the

Clerk of the United States Court of Appeals for the District of Columbia Circuit

using the appellate CM/ECF system.  I also certify that on the same day, I sent a

copy of the foregoing through U.S. Mail, postage prepaid, to the following:

| | |
|---|---|
| Shay Dvoretzky | Craig M. Keats |
| Parker Rider-Longmaid | Anika Sanders Cooper |
| Hanaa Khan | Laura M. Wilson |
| Skadden Arps Slate Meagher & Flom LLP | Theodore L. Hunt |
| 1440 New York Avenue, NW | Surface Transportation Board |
| Washington, DC 20005 | (STB) Office of General Counsel |
| | 395 E Street, SW |
| | Washington, DC 20423-0001 |
| William A. Mullins | *Counsel for Respondent* |
| Crystal Michelle Zorbaugh | *the Surface Transportation Board* |
| Baker & Miller PLLC | |
| 2401 Pennsylvania Avenue, NW | |
| Suite 300 | Robert J. Wiggers |
| Washington, DC 20037-2318 | Robert B. Nicholson |
| *Counsel for Petitioner* | U.S. Department of Justice |
| *Norfolk Southern Railway Co.* | (DOJ) Antitrust Division, Appellate Section |
| | 950 Pennsylvania Avenue, NW |
| | Room 3224 |
| | Washington, DC 20530-0001 |
| | *Counsel for Respondent* |
| | *the United States of America* |

  */s/ Benjamin L. Hatch*
Benjamin L. Hatch (VSB No. 70116)
*Counsel for CSX Transportation, Inc.*

17

# Exhibit 1

51101                    SERVICE DATE – JUNE 17, 2022
EB

SURFACE TRANSPORTATION BOARD

DECISION

Docket No. FD 36522

NORFOLK SOUTHERN RAILWAY COMPANY—
PETITION FOR DECLARATORY ORDER

Digest:[1]  In response to questions referred to the Board from the U.S. District
Court for the Eastern District of Virginia, the Board finds that the Interstate
Commerce Commission did not authorize Norfolk Southern Corporation to
control Norfolk & Portsmouth Belt Line Railroad Company.

Decided:  June 17, 2022

On June 21, 2021, Norfolk Southern Railway Company (NSR) filed a petition for
declaratory order requesting that the Board institute a proceeding to address the issues referred to
the Board by the U.S. District Court for the Eastern District of Virginia in CSX Transportation,
Inc. v. Norfolk Southern Railway, No. 2:18-cv-00530 (E.D. Va. May 18, 2021).  The District
Court referred to Board the following questions:

Did the 1982 consolidation, whereby [Norfolk Southern Corporation (NSC)]
acquired an indirect 57 percent interest in [Norfolk & Portsmouth Belt Line
Railroad Company (NPBL)], involve the [Interstate Commerce Commission
(ICC)]/STB granting NSC "approval" to control [NPBL], and if so, did such
authorized "control" render it necessary for antitrust and/or state conspiracy laws
to yield, whether because [NPBL] was then deemed a "franchise" of NSC, or for
any other reason?

CSX Transp., Inc., No. 2:18-cv-00530, slip op. at 29.

For the reasons explained below, the Board finds that the Board's predecessor, the ICC,
did not authorize NSC to control NPBL.  Because control authority was never granted, the
question of whether authorized control rendered it necessary for antitrust and/or state conspiracy
laws to yield is moot.

_____

[1]  The digest constitutes no part of the decision of the Board but has been prepared for the
convenience of the reader.  It may not be cited to or relied upon as precedent.  See Pol'y
Statement on Plain Language Digs. in Decisions, EP 696 (STB served Sept. 2, 2010).

Docket No. FD 36522

## BACKGROUND

**Prior Related Board and Court Proceedings.**  This proceeding arises from a broader dispute between NSR and CSX Transportation, Inc. (CSXT), concerning issues related to NPBL. CSXT filed the complaint from which the District Court referral arose on October 4, 2018, alleging that NSR and NPBL have taken actions to effectively prevent CSXT from using NPBL's switching services to access customers at the Norfolk International Terminals, a container terminal facility in Norfolk, Va., and that these actions constitute a violation of federal antitrust laws, a breach of contract, and a violation of state law in several respects.  A few weeks before CSXT filed its court complaint, NSR had filed a petition with the Board asking it to set trackage rights compensation for NPBL's use of NSR rail lines; after CSXT was permitted to intervene, that proceeding was held in abeyance pending the resolution of the federal court litigation.  See Norfolk S. Ry.—Pet. to Set Trackage Rts. Comp.—Norfolk & Portsmouth Belt Line R.R., FD 36223 (STB served Dec. 19, 2019).  In a decision issued on May 18, 2021, the District Court referred to the Board the questions described above regarding the 1982 consolidation involving NSC and NPBL.  CSX Transp., Inc., No. 2:18-cv-00530, slip op. at 29. On June 21, 2021, NSR filed a petition for declaratory order requesting that the Board institute a proceeding to address the issues referred to the Board by the District Court.  The Board instituted this declaratory order proceeding on August 9, 2021.

**History of the Consolidation.**  The 1982 railroad consolidation at issue here involved the ICC granting authority for NWS Enterprises, Inc. (NWS),[2] a noncarrier holding company, to acquire control of Norfolk and Western Railway Company (NW) and Southern Railway Company (SRC).  As part of that proceeding on July 24, 1980, NW and SRC filed a petition (Petition) with the ICC seeking waiver and clarification of the ICC's railroad consolidation procedures in anticipation of a forthcoming application (Application) by NWS to acquire control of NW and SRC.  NW & SRC Pet., July 24, 1980, NWS Enters., Inc.—Control—Norfolk & W. Ry., FD 29430.  The Petition explained that SRC was a Class I railroad that controlled three Class III railroads and numerous terminal and other railroad companies, including Norfolk Southern Railway Company (Norfolk Southern),[3] and that NW was a Class I railroad that controlled five Class III railroads, one terminal company, and other non-operating railroad companies.  Id. at 4, 6.  The Petition sought a waiver for SRC to report the information required by the ICC's regulations on a consolidated system basis rather than reporting the information separately for SRC and for each individual carrier controlled by SRC.  Id. at 7-10.  Similarly, the Petition sought a waiver to exclude information regarding NW's subsidiaries except to the extent

---

[2]  In 1981, NWS changed its name to Norfolk Southern Corporation (NSC).  Norfolk S. Corp.—Control—Norfolk & W. Ry. (NSC Control), 366 I.C.C. 173, 173 n.2 (1982).

[3]  In this decision, "Norfolk Southern" refers to the entity that was in existence at the time of the Petition and the Application and was a Class II subsidiary of SRC.  "NSR" refers to the entity that has been in existence since December 31, 1990, when SRC merged Norfolk Southern into SRC and SRC changed its name to Norfolk Southern Railway Company.

2

Docket No. FD 36522

that such information was maintained by NW on a consolidated system basis.[4]  Id.  The Petition claimed that with respect to SRC, the ICC had a long history of accepting consolidated system reporting as valid and accurate.  Id. at 5.  With respect to NW, the Petition asserted that excluding data from the NW subsidiaries, except to the extent that such data were maintained on a consolidated system basis, would not inhibit the ICC's analysis of the proposal because the operations of the subsidiaries of NW represented a very small part of the overall NW system.  Id. at 6-7.

The Petition also sought clarification regarding the term "applicant."  The Petition stated that the definition of "applicant" in the regulations referred to "all carriers with properties directly involved" in the transaction but that this definition also indicated that "applicant" was intended to apply only to the parties initiating the transaction and not subsidiaries of initiating parties.  Id. at 11.  The Petition asked the ICC to clarify that the term "applicant" applied only to NW, SRC, and the new holding company, which were the initiating parties, and to Delaware & Hudson Railway Company (D&H), whose stock was held by a wholly owned subsidiary of NW but was operated separately from NW.  Id.  The Petition also explained that in addition to the consolidated system companies, NW and SRC had interests in certain other railroad companies that they did not control (non-system companies).  Id. at 11-12.  According to the Petition, NW and SRC held 50 percent or less of the stock of the non-system companies, did not exercise control over such companies, and had no intention of exercising control over such companies if the proposed transaction were approved.[5]  Id. at 12.  The Petition stated that the records for the non-system companies were maintained separately from the NW and SRC consolidated system data.  Id.  The Petition argued that requiring data to be reported for the non-system companies would serve no useful purpose and would burden the record and therefore requested that the ICC clarify that the non-system companies would not be considered "applicants" under the ICC's regulations.  Id.  However, the Petition indicated that it would provide the information required by 49 C.F.R. § 1111.1(c)(8)[6] for these companies.

––––––––––––––––––––

[4]  The carriers that comprised the NW system were listed in Appendix A to the Petition and the carriers that comprised the SRC system were listed in Appendix B to the Petition.  The pleadings and decisions in the consolidation proceeding generally refer to the subsidiaries within the SRC system as SRC's "consolidated system companies" but generally refer to the subsidiaries within NW's system as NW's "subsidiary companies."  This decision will refer to the combination of the subsidiaries within the NW system and the SRC system as "the consolidated system companies."

[5]  At that time, NW and SRC each owned a minority interest in NPBL.  However, the Petition did not refer to NPBL, or any of the other non-system companies, by name nor did it provide any information regarding the size or significance of their operations.

[6]  That regulation required applicants to provide information regarding "[t]he measure of control of ownership if any, now exercised by applicant over any carrier subject to the act, or over the properties of such carrier."  49 C.F.R. § 1111.1(c)(8) (1979).  Thus, it required applicants to provide information regarding all carriers subject to the ICC's jurisdiction in which they held an ownership interest regardless of whether applicants would control those carriers.

3

Docket No. FD 36522

On August 25, 1980, the ICC issued revised procedural regulations governing railroad consolidation proceedings. On September 10, 1980, NW and SRC filed a supplement to the Petition requesting that the forthcoming application be considered under the revised regulations. See NWS Enters., Inc.—Control—Norfolk & W. Ry., 45 Fed. Reg. 66,911, 66,911 (Oct. 8, 1980).

In a decision served on October 1, 1980, the ICC granted the Petition. The decision explained that the Application would be considered under the revised regulations, and the revisions to the regulations included revising the definition of "applicant" from "all carriers with properties directly involved" to "the parties initiating the transaction." Id. at 66,911-912. In addition, the ICC stated that it had long accepted system reporting and accounting by SRC and its consolidated companies and that practice would continue in the consolidation proceeding. Id. at 66,912. With respect to NW, the ICC noted that the revenues, expenses, income, and assets of NW's subsidiary companies represented a very small fraction of the NW system totals. Id. The ICC concluded that the benefit, if any, of separately reporting information for these companies would be outweighed by the difficulty in obtaining such information and that NW could report information individually or on a consolidated basis, where available.[7] Id. With respect to the railroad companies that were not part of the consolidated system, the ICC noted that NW and SRC did not hold a majority interest in these companies, had no intention of controlling these companies after the transaction, and that the records for these companies were maintained separately from the NW and SRC consolidated system data. Id. The ICC concluded that it would serve no useful purpose to require these companies to provide detailed information, other than providing the information required by 49 C.F.R. § 1111.1(c)(8). The ICC also stated that it agreed with the petitioners that the subsidiaries of NW and SRC did not fall within the definition of the term "applicant" in its regulations. Id.

On December 4, 1980, NWS, NW, SRC, and D&H filed their Application, which sought authorization for NWS to acquire "control through stock ownership of [NW] and its subsidiary carrier companies, and of [SRC] and its consolidated system companies. . ." Application Vol. 2 at 1, Dec. 4, 1980, Norfolk S. Corp.—Control—Norfolk & W. Ry., FD 29430. The Application made no mention of NPBL except in a chart attached as Appendix 2 to Volume 2 of the Application (Appendix 2) listing all the railroad companies in which NW and SRC held an ownership interest[8] and in a discussion of applicants' operating plan. The operating plan explained where NW and SRC interchanged with NPBL prior to the transaction and stated that after the transaction, interchange with NPBL would be performed by consolidated crews of the

---

[7] The decision also stated that information for D&H could be reported on an individual basis or on a consolidated basis, if available. NWS Enters., Inc.—Control—Norfolk & W. Ry., 45 Fed. Reg. 66,911, 66,911 (Oct. 8, 1980).

[8] Appendix 2 indicated that NW owned 28.57% of NPBL, SRC owned 14.29% of NPBL, and Norfolk Southern, a wholly owned SRC subsidiary, owned 14.28% of NPBL, for a total of 57.14%. It appears that NPBL is the only carrier listed in this Appendix in which either NW or SRC did not have a controlling interest prior to the transaction but which, after the transaction, would be indirectly controlled by NSC as a result of the combined ownership interests of NW and SRC.

4

Docket No. FD 36522

consolidated carriers in the same manner as NW and NPBL did prior to the transaction.  Id. at Vol. 4 at 184-187.

On January 2, 1981, the ICC accepted the Application for consideration.  NWS Enters.; Application to Control Norfolk & W. Ry. & S. Ry., 46 Fed. Reg. 173 (Jan. 2, 1981).  The decision stated that the "proposed transaction involves the acquisition of control, through stock ownership of NW and its subsidiary companies and of [SRC] and its consolidated system companies, by NWS . . ."  Id. at 174.  An appendix to the decision listed the "rail carrier subsidiaries of NW and the [SRC] consolidated system carriers."  Id.  NPBL was not listed in that appendix, id. at 176, and was not referenced anywhere else in the decision.

The ICC granted the Application on March 19, 1982.  The decision explained that the Application sought authority "for [NSC] to acquire control through stock ownership of NW and its subsidiary companies, and of [SRC] and its consolidated companies."  NSC Control, 366 I.C.C. at 177.  Again, a list of the NW subsidiary companies and SRC consolidated companies was included in an appendix to the decision.  Id. at 177 n.3.  NPBL was not listed in that appendix, id. at 255-57, and was not referenced anywhere else in the decision.

In 1991, the ICC, pursuant to an exemption under 49 C.F.R. § 1180.2(d)(3) for transactions within a corporate family, granted SRC authority to directly control NW.  S. Ry.— Control Exemption—Norfolk & W. Ry., FD 31791 (ICC served Jan. 14, 1991).  At that time, SRC changed its name to Norfolk Southern Railway Company (i.e., "NSR").  (NSR Opening 13.)  In 1998, pursuant to another corporate family transaction exemption, the Board authorized the merger of NW into its parent, NSR (formerly SRC).  Norfolk S. Ry.— Exemption—Norfolk & W. Ry., FD 33648 (STB served Aug. 31, 1998).

**The Parties' Arguments:  CSXT**.  CSXT asserts that the ICC did not grant approval for NSC to control NPBL as part of the 1982 NSC Control transaction.  CSXT argues that the relevant statute requires an entity to explicitly seek control authority and that NSC's[9] statements and actions in the application process demonstrated that it did not request authority to control NPBL.  (CSXT Opening at 4, 23, 31.)  CSXT points out that, in the Petition, NSC stated that its application for control authority would be limited to railroad companies within the NW and SRC systems and that the appendices to the Petition listing such carriers did not include NPBL.  (Id. at 13.)  In addition, according to CSXT, the Petition sought clarification that carriers, such as NPBL, in which NW and SRC did not hold a majority interest would not be considered "applicants" by the ICC because NW and SRC did not seek to control those carriers, and thus data submitted about them would "serve no useful purpose."  (CSXT Reply 11.)  CSXT contends that the fact that an appendix to the Application indicated that NSC would indirectly own 57.14% of the stock of NPBL after the transaction was not sufficient to put the ICC or the public on notice that it was seeking authority to control NPBL, particularly given that the Petition stated that NSC was not going to control NPBL and given that the amount ownership interest is not dispositive on the issue of control.  (Id. at 12-14.)  CSXT further states that the Application did

---

[9]  As noted above, the entity that filed the Petition and the Application was NWS but that entity changed its name to Norfolk Southern Corp. before the ICC issued NSC Control.  To avoid confusion, the discussion below will refer to this entity only as NSC.

5

Docket No. FD 36522

not provide any of the information that would have been required for the ICC to evaluate an NSC acquisition of control of NPBL under the applicable statutory standards, such as information regarding the potential impact on competition and operations.  (CSXT Opening 19, 25.)

CSXT argues that the ICC decisions regarding the control transaction demonstrate that the agency did not apply the relevant statutory standards with respect to control of NPBL and never authorized NSC to control NPBL.  (Id. at 20-21.)  CSXT states that in granting the Petition, the ICC explained that companies over which NSC sought control did not need to provide information regarding carriers such as NPBL that were not already controlled by NW or SRC because the petitioners had stated that they did not intend to control such carriers.  (Id. at 14-15; CSXT Reply 3.)  In addition, according to CSXT, the appendices in the ICC decisions accepting the Application and granting the Application that listed the companies over which NSC sought control did not include NPBL and the decision granting the Application does not contain a single reference to NPBL.[10]  (CSXT Opening 20-21.)  CSXT further argues that subsequent ICC decisions approving reorganizations within the NSC corporate family could not have authorized control of NPBL since these decisions never mention NPBL and involved class exemptions which can only be invoked for transactions that have no competitive effect.[11]  (CSXT Opening 26; CSXT Reply 18.)  CSXT also argues that any actions by CSXT and NPBL's other owners since NSC Control that may suggest that the parties acknowledged NSC's right to control NPBL are not relevant to the question of whether the ICC granted NSC legal authority to control NPBL.  (CSXT Reply 19.)

CSXT argues that because NSC was not granted authority to control NPBL, NSR does not have immunity under 49 U.S.C. § 11321 from CSXT's antitrust claims regarding NPBL.  (CSXT Opening 29-31; CSXT Reply 20-21.)  CSXT asserts that accepting NSR's arguments here would encourage applicants to abuse the Board's change in control processes by not accurately describing the transaction, requesting the necessary authority, or providing other relevant information but later attempting to claim immunity that the Board never intended or granted.  (CSXT Reply 21-22.)

**NSR.**  According to NSR, the waiver to submit the information required by the ICC's regulations on a system basis was sought to reduce the informational burden of the Application and was not intended to limit the scope of any subsequent ICC approval to cover only those specific railroads who were named applicants or whose systems were consolidated with the applicants.  (NSR Reply 14-15.)  NSR argues that the Petition's request for clarification regarding the term "applicant"—both with respect to excluding SRC's and NW's subsidiaries and with respect to excluding companies not controlled by SRC and NW—was also intended only to limit the informational requirements of the Application and not to limit the scope of the ICC's overall approval.  (Id. 15-16.)  NSR asserts that the statement that SRC and NW would not

---

[10]  CSXT states that the decision approving the Application contains a detailed discussion of the impact of the transaction in the Norfolk area that does not mention NPBL, much less the potential change in control over NPBL.  (CSXT Opening 26.)

[11]  CSXT also notes that at the time of the Application, SRC and Norfolk Southern sought authority to construct and operate over a new connection track in the Norfolk area but did not suggest that NSC would assert control over NPBL, or that the consolidated NW/SRC system would interact with NPBL in any way different from before.  (CSXT Reply 16-17.)

6

control the non-system companies after the transaction was simply a statement of fact because neither SRC standing alone nor NW standing alone would control the non-system companies, such as NPBL, in a post-transaction environment and the Petition never stated that NSC would not obtain control over the non-system companies.[12]  (Id. at 16 n.13.)  NSR argues that when read in context, the statement regarding the current and future lack of control over the non-system companies was meant to emphasize how burdensome it would be to provide detailed information for these companies if they were considered "applicants."  (Id. at 16-17.)  According to NSR, the ICC recognized that the request to clarify the term "applicant" with respect to the non-system companies was about reducing the informational burden rather than excluding these companies from any ICC authority granted.  (Id. at 17-18.)

NSR argues that information and discussion regarding NPBL was absent from the Application and the ICC decisions accepting and granting the Application because the waivers granted by the ICC allowed NSR to exclude information regarding NPBL from its Application.  (NSR Reply 23-24.)  However, according to NSR, the fact that information regarding NPBL was absent from the Application did not mean that NPBL was not included in the scope of the Application.  (NSR Opening 5; NSR Reply at 24.)  NSR states that the ICC was fully aware that NSC would control 57.14% of NPBL after the transaction because this fact was disclosed in Appendix 2 that listed the ownership shares applicants held in other companies.  (NSR Opening 5.)  NSR contends that the Application generally speaks in terms of "systems" because that is how SRC and NW operated at the time but that the Application made clear that the proposed transaction included all subsidiaries and affiliates, whether owned in whole or in part, when it stated that NSC would "acquire indirect control through stock ownership of all subsidiaries of [NW] and [SRC]."  (NSR Reply 22-23.)

According to NSR, the ICC did not need to explicitly approve or announce the authorization for control of NPBL because authorizing NSC to indirectly control NPBL was a byproduct of the ICC's authorization for NSC to control SRC and NW.  (NSR Opening 10.)  NSR points to other decisions that it asserts granted control or merger approval that do not list every single entity that, absent a waiver, would have to be treated as an applicant or applicant carrier.  (NSR Opening 10-11.)  Moreover, according to NSR, in the decision approving the Application, the ICC granted authority for NSC to control NW, SRC "and their affiliated carriers."  (Id. at 12.)  NSR argues that the term "affiliated carrier" is generally understood to mean a carrier that was partially owned, as opposed to wholly owned and that this term therefore encompassed NPBL.  (Id.)

NSR further contends that in other cases where waivers have been granted to exclude subsidiaries from the definition of "applicant"—including cases where neither applicant had a controlling interest but would have a majority interest following the transaction—it was understood that these carriers were not excluded from the scope of the control authority granted.  (NSR Reply 18-21.)  In addition, NSR asserts that there is no precedent supporting the

---

[12]  According to NSR, following the ICC's approval of the transaction, NPBL's operations were not consolidated into SRC's or NW's and NSC did not exercise control over or change NPBL's operations.  (NSR Reply 36.)  However, NSR indicates that NSC did control NPBL's management after the transaction.  (Id.)

7

proposition that an applicant must specifically request control authority for a particular subsidiary, whether owned in whole or in part, in order for that subsidiary to be included in the scope of the control authority granted.[13]  (NSR Reply 20 n.20.)

      In addition, NSR argues that even if NSC Control did not authorize control of NPBL, subsequent ICC decisions resolved this issue.  (NSR Opening 14; NSR Reply 37.)  NSR states that a 1991 transaction approved by the ICC, pursuant to an exemption for transactions within a corporate family, granted SRC authority to directly control NW.  (NSR Reply 38.)  NSR explains that, at the time, SRC changed its name to Norfolk Southern Railroad Company (i.e., "NSR"). (Id.)  According to NSR, SRC directly owned a 14.29% interest in NPBL, SRC's subsidiary, Norfolk Southern, owned a 14.29% interest in NPBL, and NW owned a 28.57% interest in NPBL.  (Id.)  NSR therefore asserts that the 1991 transaction gave NSR (the renamed SRC) indirect majority ownership of NPBL and that the transaction authorized NSC to control NPBL. (NSR Opening 14; NSR Reply 38.)  NSR further states that in 1998, pursuant to another corporate family transaction exemption, the Board authorized the merger of NW into its parent, NSR, giving NSR direct ownership of 57.14% of NPBL, thereby reaffirming NSR's authority to control NPBL.  (NSR Reply 39.)

      NSR argues that because control over NPBL was granted to NSC by the ICC in 1982 and by the ICC and the Board in subsequent transactions, the exercise of such control is free from the confines of antitrust law pursuant to 49 U.S.C. § 11321(a).  (NSR Opening 15-16.)

      **NPBL.**  NPBL argues that since the NSC Control decision, it has been under the control of NSC, and that such control was always mutually understood and accepted by all the parties in this proceeding.[14]  (NPBL Opening 1; NPBL Reply 2.)  In addition, NPBL states that on March 1, 1989, CSXT, NW and SRC entered into an agreement reciting each party's ownership of NPBL and agreed that, going forward and regardless of the number of railroad subsidiaries holding NPBL stock, NSC would be entitled to appoint three members of NPBL's board and CSXT would be entitled to appoint two.  (NPBL Opening at 3-4.)  NPBL also states that its owners took other actions confirming the common understanding that NSC obtained control of NPBL as a result of the NSC Control decision, such as consolidating its financial statements with those of NSC.  (Id. at 4.)  According to NPBL, if formal ICC authority for NSC to control NPBL was not granted, the lack of authorization appears to be no more than a technical, administrative matter and the Board "should retain this matter until such time as any required remedial control proceeding is completed, and, at which point, a full response to the matters referred by the District Court can be provided."  (NPBL Reply 4-5.)

---

      [13]  NSR claims that other consolidations around the same time as NSC Control indicate that there was no requirement for in-depth competitive analysis of minor subsidiaries over which the consolidated holding company would gain a majority interest and that reporting on a system basis was an accepted practice.  Moreover, NSR suggests, excluding carriers outside the system from reporting requirements was also an accepted practice under which it was understood that those carriers were still part of the transaction approved by the ICC.  (NSR Reply 31-32.)

      [14]  NSR similarly argues that since the NSC Control, CSXT has understood that NPBL was under the control of NSC and took actions indicating its acceptance of this control.  (NSR Reply 3-4.)

8

Docket No. FD 36522

DISCUSSION AND CONCLUSIONS

Under 5 U.S.C. § 554(e) and 49 U.S.C. § 1321, the Board has discretionary authority to issue a declaratory order to terminate a controversy or remove uncertainty.  See Bos. & Me. Corp. v. Town of Ayer, 330 F.3d 12, 14 n.2 (1st Cir. 2003); Intercity Transp. Co. v. United States, 737 F.2d 103 (D.C. Cir. 1984); Delegation of Auth.—Declaratory Ord. Procs., 5 I.C.C.2d 675 (1989).  It is appropriate here to issue a declaratory order to resolve the controversy concerning the questions referred to us by the District Court.  For the reasons explained below, the Board finds that the ICC did not authorize NSC to control NPBL.  Because the ICC did not authorize NSC to control NPBL, the District Court's question as to whether authorized control of NPBL rendered it necessary for antitrust and/or state conspiracy laws to yield is moot.

NSR does not claim here that explicit approval for its control of NPBL was ever sought, that either the ICC or the Board ever specifically considered the implications of such control, or that either agency issued a decision that expressly approved NSR control of NPBL.  Instead, NSR presents a series of arguments in an effort to establish that approval was either granted sub silentio or that the collective conduct of NPBL and its owners in the years following 1980 should be deemed sufficient to legally ratify a control transaction—and to retroactively confer antitrust immunity—even in the absence of ICC or Board action.  The Board is not persuaded.

As discussed above, the fact that the Petition sought a waiver to exclude the non-system companies from the definition of "applicants" so that information on these non-system companies would not need to be submitted to the ICC strongly supports the conclusion that NSR did not seek or obtain approval for control of NPBL.  The Petition did not name the non-system companies or provide any information about them except to state that NW and SRC held a 50% or less interest in these companies, did not control them, had no intention of controlling them after the transaction, and the records for these companies were maintained separately from the NW and SRC consolidated data.  NW & SRC Pet. 12, July 24, 1980, NWS Enters., Inc.— Control—Norfolk & W. Ry., FD 29430.  The Petition then went on to assert that "bringing into this proceeding data concerning these carriers (other than identifying them in the response required by Section 1111.1(c)(8)) would serve no useful purpose and would substantially burden the record."  Id.  Indeed, the subsequently filed Application itself also described the transaction as seeking control of only the consolidated system companies.[15]  Taken together, these statements clearly demonstrate that NSR was not asking the ICC to review and approve its acquisition of control of the non-system companies (a group that included the unmentioned NPBL), but was arguing that submission of information should not be required because no review was, in fact, required or sought.

NSR claims that the statement in the Petition about NW and SRC lacking control over the non-system companies in the present and the future was made only to support an argument that obtaining information from these companies would be burdensome and was not intended to

---

[15]  Application Vol. 2 at 1, 16, Dec. 4, 1980, Norfolk S. Corp.—Control—Norfolk & W. Ry., FD 29430 (stating that the Application was seeking authorization for NSC to control NW and its subsidiary carrier companies and of SRC and its consolidated system companies).

9

indicate that control authority was not being sought for these companies.[16]  (NSR Reply 16-17.)
In addition, NSR claims that this statement indicates only that neither NW standing alone nor
SRC standing alone would control the non-system companies after the transaction and that
petitioners never stated that NSC would lack control of the non-system companies after the
transaction.  (Id. at 16 n.13.)  NSR's interpretations, developed more than 40 years after the
event, are implausible.  The Petition never explicitly stated that it would be difficult or
burdensome for the applicants to obtain information from the non-system companies, just that
the inclusion of this information would "burden the record."[17]  Moreover, if NSR were correct
that the primary issue was burden, there would have been no reason for petitioners to state that
NW and SRC would not control the non-system companies *after* the transaction.  The lack of
*future* control by NW standing alone or SRC standing alone would have been irrelevant to the
burden of producing information in the present.  In addition, if the statement about NW's and
SRC's lack of control was meant only to emphasize how burdensome it would be to obtain
information from the non-system companies, as NSR claims, there also would have been no
reason for petitioners to argue that information regarding the non-system companies would
"serve no useful purpose."  Lack of usefulness (or irrelevance) can be a reason for not imposing
a burden, but has nothing to do with whether a burden exists in the first place or how extensive
that burden is.  It appears that the Petition was arguing that detailed information on non-system
companies would serve no useful purpose—and for that reason would burden *the record*—
because petitioners would not control those companies.

    Essentially, NSR would have the Board interpret the pleadings from 1980 to show that it
asked the ICC—and the ICC agreed—to approve NSR's control of NPBL while at the same time
relieving NSR of the burden of submitting evidence or otherwise presenting any case for the
acquisition of control.  But the statements about NW and SRC lacking future control over the
non-system companies and there being "no useful purpose" in providing information on the non-
system companies make much more sense if read as an explanation that the post-transaction
consolidated companies (i.e., NW and SRC combined) would lack control over the non-system
companies following the transaction and information regarding these companies would therefore
serve "no useful purpose" in the ICC's decision regarding control authority.  The only logical
reading of the Petition is that petitioners were telling the Board that the non-system companies
were outside the scope of the control authority being requested.  It is therefore not surprising that

---

[16]  NSC further states that the impetus for the statement about control was that smaller
subsidiaries that do not greatly impact the overall operation or analysis of the initiating parties
need not submit detailed information.  (NSR Reply 17 n.16.)  However, if this was the rationale
for the waiver request, it was never communicated to the ICC.  The Petition does not name the
non-system companies, nor does it provide any information about the nature or scope of their
operations, much less claim that their operations were not significant enough to merit
consideration by the ICC.

[17]  In any event, even if the Petition implied such a burden, it also clearly (and more
importantly) conveyed to the ICC that petitioners would not control the non-system companies
after the transaction and that, as explained below, those companies were outside the scope of the
control authority being requested.

in the decisions accepting and granting the Application, the ICC defined the Application as seeking authority to control only the consolidated system companies.[18]

Given this context, whether NSC's Application was required to explicitly request authority to control each individual subsidiary, or to provide information related to the potential competitive effects of acquiring each individual subsidiary, is not determinative of the outcome of this case. Nor is whether the ICC was required to explicitly analyze and announce control authority with respect to each individual subsidiary. Rather, the essential issues in this case are that petitioners/applicants told the ICC and the public that they had no intention of controlling the non-system companies post-transaction and the subsequent ICC decisions demonstrate the ICC's understanding that the control authority sought and granted was limited to the consolidated system companies. The Board and the public must be able to clearly understand the control authority sought and granted, particularly given the significance of the immunity from antitrust laws and other laws that comes with control authority. The Board's regulations at 49 C.F.R. § 1182.2(d) recognize this, in providing that if an application or supplemental pleading includes false or misleading information, the granted application is void ab initio.

NSR makes various additional arguments claiming that statements in the Application and the ICC's decisions indicate that, despite the control statements and failure to expressly discuss NPBL discussed above, it was understood that the non-system companies were within the scope of the authority sought and granted. As explained below, the Board finds these arguments unpersuasive.

NSR argues that its interpretation of the Petition is supported by the ICC's statements in response to the Petition. In particular, NSR quotes the following language from the decision granting the Petition:

> We believe it would serve no useful purpose to produce *detailed information* for these companies (other than identifying them as required by 49 CFR 1111.1(c)(8), which may be done on the corporate charts). <u>We agree with petitioners that the term 'applicant,' as used in our regulations, does not encompass such non-controlled carriers</u>.

(NSR Reply 18 (quoting <u>NWS Enters., Inc.</u>, 45 Fed. Reg. at 66,912) (emphasis added by NSR).)

---

[18]   <u>NWS Enters.</u>, 46 Fed. Reg. at 174, 176 (stating that the "proposed transaction involves the acquisition of control, through stock ownership of NW and its subsidiary companies and of [SRC] and its consolidated system companies, by NWS" and listing those companies in an Appendix to the decision that did not include the non-system companies); <u>NSC Control</u>, 366 I.C.C. at 177, 255-257 (explaining that the Application sought authority "for [NSC] to acquire control through stock ownership of NW and its subsidiary companies, and of [SRC] and its consolidated companies" and listing those companies in appendices that did not include the non-system companies).

Docket No. FD 36522

According to NSR, this language was an explicit statement by the ICC that the waiver decision was about the burden on petitioners and not about excluding any entities from the scope of the ICC's control decision. (NSR Reply 18.)  However, nothing in this language indicates that the ICC understood the Petition to be stating that the non-system companies were included in the scope of the control authority sought.[19]  The quoted language specifically references the exclusion of "non-controlled carriers."  Moreover, language in subsequent ICC decisions in the consolidation proceeding demonstrates that the ICC believed that the scope of the requested control authority did not include the non-system companies.  In the ICC decision accepting the Application, under the heading "Description of the Transaction," the ICC stated, "The proposed transaction involves the acquisition of control, through stock ownership of NW and its subsidiary companies and of SR[C] and its consolidated system companies, by [NSC]."  NWS Enters., 46 Fed. Reg. at 174.  The decision went on to state, "The rail carrier subsidiaries of NW and the [SRC] consolidated system carriers are set forth in the appendix."  Id.  The appendix did not include NPBL or other non-system companies.  Id. at 176.  Similarly, in the ICC decision granting the Application, the ICC stated that the Application sought authority for "[NSC] to acquire control through stock ownership of NW and its subsidiary carrier companies, and of [SRC] and its consolidated system companies."  NSC Control, 366 I.C.C. at 177.  The footnote to that sentence stated, "The affiliated companies of NW and [SRC] are set forth in appendix A."  Id. at 177 n.3.  Appendix A did not list NPBL or other non-system companies.  See id. at 255-57.  Thus, when the ICC explicitly defined what it understood to be the control authority sought by the Application, its definition excluded the non-system companies.[20]

_____

[19]  It is not clear why NSR believes that the ICC's statement that it would serve no useful purpose to provide detailed information for the non-system companies is a statement about the burden of providing that information.  NSR seems to be suggesting that the ICC's reference to not providing "detailed information" rather than "information" suggests it was focused on the burden of providing details.  However, as noted above, the Petition sought an exclusion from the requirement to provide detailed information while indicating that applicants would provide certain limited information required by 49 C.F.R. § 1111.1(c)(8).  Thus, the reference to not providing "detailed information" was simply an accurate description of what the Petition requested and does not suggest that the ICC was focused on the burden of providing such information.  This conclusion is supported by the fact that the ICC explained that there would be "no useful purpose" in providing detailed information.  As noted above, the burden of obtaining information has no relationship to its usefulness.  In addition, the fact that the ICC explained that the term "applicant" in the ICC's regulations did not encompass the non-system companies does not suggest that the ICC viewed the Petition as discussing only the burden of producing information.  It appears that it was merely a statement by the ICC that, in addition to there being no purpose in providing detailed information on the non-system companies, the ICC's regulations did not require such information.

[20]  NSR also suggests that the fact that the ICC's decision granting the Petition stated that the Application should list all of the carriers in which applicants had an ownership interest indicates that the ICC understood that the scope of the Application included non-system companies.  (NSR Reply 33, 35.)  However, as noted above, 49 C.F.R. § 1111.1(c)(8) separately required disclosure in the application of any ownership interest in a carrier subject to the ICC's jurisdiction regardless of whether the carriers would be controlled by applicants.  The Petition noted that it was not seeking to have this requirement waived.

12

NSR further argues that the Application made clear that NSC would obtain control over NPBL when it stated on page 2, "As a result of the proposed transaction, [NSC] will also acquire indirect control through stock ownership of all subsidiaries of [NW] and [SRC]."  (NSR Reply 23.)  NSR claims that this statement about indirect control encompassed all subsidiaries, whether owned in whole or in part, including the non-system companies.  (Id.)  However, this statement could not have been intended to mean that NSC was obtaining indirect control over the non-system companies because Appendix 2 lists numerous railroad companies in which either NW or SRC (not both), directly or indirectly, held only a small ownership share (as low as 1.78%) and NSC would not be obtaining indirect control over those companies.  (Id. at 16 n.13.)  Rather, the term "subsidiaries" in that sentence appears to be a shorthand reference to NW and its subsidiary companies and SRC and its consolidated system companies.  Indeed, one page prior on page 1 of Volume 2 of the Application and again on page 16, applicants stated that the proposed transaction involves ICC authorization for NSC to acquire control of NW and its subsidiary carrier companies and of SRC and its consolidated system companies.  Application Volume 2 at 1, 16, Dec. 4, 1980, Norfolk S. Corp.—Control—Norfolk & W. Ry., FD 29430.  Moreover, the Petition, the decision granting the Petition, and the decisions accepting and granting the Application all list the "subsidiaries" of NW, and these lists do not include the non-system companies.[21]  This is further evidence that the use of the term "subsidiaries" on page 2 of the Application was not intended to encompass the non-system companies but to refer to the subsidiaries within the NW and SRC consolidated systems.

NSR also claims that, despite the many instances in which NSR disavowed any intention of acquiring control of non-system companies, the Application nevertheless put the ICC and the public on notice that NSC would be acquiring control of NPBL because the corporate chart in Appendix 2 showed that the combined ownership interest, direct and indirect, of NW and SRC in NPBL was 57.14%.  (NSR Opening 10.)  NSR thus relies on a few lines in a lengthy chart in an appendix to an application spanning thousands of pages to contend that the ICC and the public should have known that NSC would control NPBL after the transaction.  This is despite the narrative portion of the Application describing the transaction in a manner that did not include the non-system companies such as NPBL and the previously-filed Petition plainly stating that the non-system companies would not be controlled by applicants.  If applicants did in fact believe they were seeking authority to control NPBL, the statements made in the Petition and the narrative portion of the Application were, at best, misleading.  Regardless, the Board does not agree that a single reference to NPBL in an appendix listing numerous companies that would not be controlled after the transaction was sufficient to put the ICC and public on notice of an applicant's intent to control a carrier on that list or that this single reference should be given more weight in interpreting the 1980 proceedings than the numerous statements that NSR did not intend to acquire control.  The agency will not permit an applicant to give assurances that control will not be obtained in a transaction but then seek to achieve that control in any case through a passing reference concealed in the minutiae of the exhibits.  Given the significance of the

---

[21]  NW and SRC Pet. at Appendix A, July 24, 1980, NWS Enters., Inc.—Control—Norfolk & W. Ry., FD 29430; NWS Enters., Inc., 45 Fed. Reg. at 66,915; NWS Enters.; Application to Control Norfolk & W. Ry. & S. Ry., 46 Fed. Reg. at 176; NSC Control 366 I.C.C. at 255-57.

antitrust immunity and other immunity that comes with control authority, the Board and the public must be able to have a clear understanding of the scope of the authority being sought.

NSR also points to language in the ICC decision granting the Application stating that the ICC was granting authority to control NW and SRC "and their affiliated carriers." (NSR Opening 12.)  According to NSR, the term "affiliated carrier" is generally understood to mean a carrier that is partially, as opposed to wholly, owned and the ICC's use of this term is undeniable evidence that the non-system companies were included within the scope of the control authority granted.  (Id.)  "General understanding" of a term does not control, however, when a narrower specific definition of the term has been provided in the decision.  As noted above, the footnote to an earlier sentence defining the transaction states that the "affiliated companies" of NW and SRC are listed in appendix A to the decision, which does not include the non-system companies.  NSC Control, 366 I.C.C. at 177 n.3, 255-57.  Thus, the ICC was using "affiliated carriers" as a shorthand for NW's subsidiary carrier companies and SRC's consolidated system companies.  This conclusion is reinforced by the very sentence quoted by NSR.  The sentence referred to the granting of authority to control NW and SRC and "their affiliated carriers, the granting of related trackage rights among these carriers, and the acquisition of part of the main line of the Norfolk, Franklin and Danville Railway Company by [SRC], *all as discussed above*." (emphasis added).  Id. at 249.  Earlier in the decision, in multiple instances, the ICC had referred to the Application as seeking authority to control NW and its subsidiary carrier companies and SRC and its consolidated system companies, id. at 175, 177, 179, and had also defined the "affiliated companies" as those listed in Appendix A, id. at 177 n.3.  Thus, the "affiliated carriers . . . as discussed above" did not include the non-system companies.[22]

NSR further argues that precedent establishes that a waiver to exclude a subsidiary from the definition of "applicant"—including a subsidiary in which no applicant presently owns more than a 50% interest but where applicants together would own more than a 50% interest after the transaction—does not exclude that subsidiary from the control authority granted.  (NSR Reply 19-20.)  In addition, NSR claims that there is no precedent supporting the proposition that unless an applicant specifically requests control authority for a particular subsidiary, whether owned in whole or in part, that subsidiary is therefore excluded from the scope of the approval.  (Id. at 20 n.20.)  However, in this case, the applicants did not simply seek a waiver to exclude NPBL from the definition of "applicant" or merely fail to explicitly request authority to control NPBL.  Rather, the applicants specifically told the ICC that the non-system companies would not be controlled by petitioners after the transaction and the subsequent ICC decisions defined the control authority sought as being limited to the companies within the NW and SRC systems.

---

[22]  NSR's argument is unpersuasive for other reasons as well.  As explained above, Appendix 2 lists numerous railroad companies in which either NW or SRC held only a small ownership share (as low as 1.78%) and did not control and would not control after the transaction.  If "affiliated carrier" is understood to refer only to carriers that are partially owned, then the ICC's reference to "affiliated carriers" would exclude from the scope of control authority the carriers within the NW and SRC systems that were wholly owned—i.e., those undoubtably under the control of NW and SRC—while at the same time including many companies which neither NW nor SRC had the ability to control before or after the transaction.  That is an implausible interpretation.

14

Docket No. FD 36522

NSR has cited no precedent in which an applicant informed the ICC or the Board that it would not control a particular carrier as a result of the transaction, and the ICC or the Board repeatedly described the authority sought in a manner that excluded that carrier, but where it was nonetheless understood that such a carrier was within the scope of the control authority that was granted.

Indeed, in the cases cited by NSR, the applicants make clear in their waiver requests which subsidiaries would and would not be controlled by applicants after the transaction. For example, in Burlington Northern, Inc.—Control & Merger—Santa Fe Pacific Corp., Docket No. 32549, applicants sought a waiver or clarification that carriers in which they had non-controlling ownership interests of 50% or less, a list of which was provided, would not be considered "applicant carriers." Burlington N., Inc.—Control & Merger—Santa Fe Pac. Corp., FD 32549 (ICC served Oct. 3, 1994). Applicants separately requested a waiver or clarification that the Wichita Union Terminal Railway (WUTR) would not be considered an "applicant carrier." Id. The applicants explained that they each owned a 33.33% interest in WUTR and that, following the transaction, Burlington Northern, Inc. would own 66.66% of WUTR's stock and stated that the primary application would seek ICC approval for control of WUTR as a result of the primary transaction. Id. Similarly, in each of the other cases cited by NSR, applicants identified which of the carriers that were part of a petition for waiver would be and would not be controlled by applicants.[23] Certainly, none of the cases cited by NSR support the proposition

_____

[23] In Santa Fe Southern Pacific Corp.—Control—Southern Pacific Transportation Co., Docket No. FD 30400, applicants sought a clarification that railroads in which the applicants would not have a controlling interest would not be considered "applicant carriers" and separately sought clarification that two other specifically identified railroads, in which applicants combined would have a controlling interest if the transaction were approved, would not be considered "applicant carriers." Santa Fe S. Pac. Corp.—Control—S. Pac. Transp. Co., FD 30400, slip op. at 1 (ICC served Feb. 3, 1984). In Union Pacific Corp.—Control & Merger—Southern Pacific Rail Corp., Docket No. FD 32760, applicants sought a waiver or clarification that the term "applicant carriers" did not include railroads in which they had interests of 50% or less Union Pac. Corp.—Control & Merger—S. Pac. Rail Corp., FD 32760 (ICC served Sept. 5, 1995). Applicants separately sought a waiver or clarification that the term "applicant carriers" did not include five specifically identified carriers in which the applicants each held a 50% or less ownership interest but would hold a 50% or greater combined ownership interest following the transaction. Id. In Union Pacific Corp.—Control—Missouri Pacific Corp., Docket No. FD 30000 et al., the applicants requested clarification that the term "applicant" did not apply to carriers that were operated independently and not as part of the applicants' systems. In doing so, they identified all of these carriers, provided a brief statement about the nature of their operations, and indicated the ownership interest of the applicants. Union Pac. Corp. Pet. 11, Appendix B, May 2, 1980, Union Pac. Corp.—Control—Mo. Pac. Corp., FD 30000. In Canadian National Railway—Control—Illinois Central Corp., Docket No. FD 33556, CSXT sought a waiver or clarification with respect to a responsive trackage rights application that the definition of "applicant carrier" was limited to Board-regulated rail carriers in which CSXT currently held an interest greater than 50%. Canadian Nat'l Ry.—Control—Ill. Cent. Corp., FD 33556, slip op. at 3 (STB served Sept. 18, 1998). This waiver would have excluded the

15

Docket No. FD 36522

that an applicant can tell the ICC or the Board and the public that it will not control a carrier after a transaction but nonetheless expect that carrier to be within the scope of the control authority granted.

NSR asserts that even if NSC Control did not grant authority for NSC to control NPBL, subsequent decisions in 1991 and 1998 granted this authority. (NSR Reply 38-39.)  In 1991, the ICC granted a corporate family transaction exemption pursuant to 49 C.F.R. § 1180.2(d)(3) for SRC to directly control NW through a corporate family exemption. S. Ry.—Control Exemption—Norfolk & W. Ry., FD 31791 (ICC served Jan. 14, 1991).  In 1998, the Board granted a corporate family transaction exemption for NW to be merged into the former SRC, which at that point had been renamed NSR. Norfolk S. Ry.—Exemption—Norfolk & W. Ry., FD 33648 (STB served Aug. 31, 1998).  NPBL was not mentioned in either of these proceedings. According to NSR, these decisions constituted grants of authority for NSC to control NPBL. (NSR Reply 38-39.)  However, an exemption under 49 C.F.R. § 1180.2(d)(3) could not have been used to grant authority to any member of NSC's corporate family to control NPBL unless authority had previously been granted for some other member of that corporate family to control NPBL.

Exemptions for "[t]ransactions within a corporate family that do not result in adverse changes in service levels, significant operational changes, or a change in the competitive balance with carriers outside the corporate family" are permitted under 49 C.F.R. § 1180.2(d)(3).  NSR argues that at the time of the 1991 and 1998 transactions, NPBL was unquestionably part of the corporate family, whether authorized or not. (Id.)  NSR also states that there was no requirement in the notice of exemption rules that NSC or SRC specifically "declare" that NPBL would come under the direct control of SRC. (Id.)  NSR's interpretation would allow the corporate family exemption to effectively nullify other Board requirements since parties could acquire control of a carrier without informing the Board in a transaction that would normally require an application or another type of exemption under the Board's rules and then cure that unauthorized acquisition by reorganizing the corporate family and seeking a corporate family transaction exemption. Moreover, under NSR's interpretation, the Board and the public might never even know that control authority was granted since, according to NSR, the party seeking the exemption is not required to name the entities over which the exemption would provide the new control authority. It is implicit in 49 C.F.R. § 1180.2(d)(3)'s requirement that the transaction be "within a corporate family" that the member of the corporate family whose ownership is changing as a result of the transaction was previously authorized to be controlled by a member of the corporate family. Accordingly, neither the ICC's 1991 decision nor the Board's 1998 decision could have provided authority for NSC to control NPBL.

Both NSR and NPBL argue that since NSC Control, CSXT has understood that NPBL was under the control of NSC, and CSXT raised no objections until now. (NSR Reply 3-4; NPBL Reply 2.)  In fact, according to NSR and NPBL, CSXT has taken various actions

───────────────

Lakefront Dock and Railroad Terminal Company (Lakefront), a carrier in which CSXT, at the time of its waiver request, held a 50% interest. Id. at 3 n.3.  However, CSXT explained to the Board that Conrail was about to allocate its 50% interest in Lakefront to CSXT, which would give CSXT 100% ownership. Id.

16

Docket No. FD 36522

acknowledging and accepting NSC's majority ownership and control of NPBL.  (NSR Reply 3-4; NPBL Opening 2-4.)  However, parties cannot create control authority through their actions and beliefs.  Control authority can only come from the Board, or previously from the ICC.  See 49 U.S.C. § 11323(a).  Thus, whether CSXT has acknowledged or accepted that NSC has a right to control NPBL is irrelevant to whether the ICC granted NSC authority to control NPBL.[24]

NPBL asserts that if the Board were to hold that NSC did not obtain authority to control NPBL, the Board should retain this matter and allow NSR to seek authority to now control NPBL.  (NPBL Reply 4-5.)  Addressing a new request for control authority would be beyond the scope of this proceeding and the District Court's referral.  Moreover, any future decision concerning control would benefit from the findings of the District Court.[25]

For the reasons explained above, the Board finds that NSC was never granted authority to control NPBL.

It is ordered:

1.  The issues in this declaratory order proceeding are resolved as described above.

2.  This decision is effective on its service date.

By the Board, Board Members Fuchs, Hedlund, Oberman, Primus, and Schultz.

---

[24]  The Board is concerned, however, about the possibility that the parties may have been aware of a potential defect regarding NSR's control of NPBL for some time and did not seek to remedy it or otherwise bring it to the Board's attention.  The Board expects stakeholders to bring such matters before the Board expeditiously and reminds the parties that a knowing violation of the Board's requirements can result in the imposition of civil penalties, and that, for certain violations, such penalties may be imposed for each day that the violation continues.  See 49 U.S.C. § 11901(a).

[25]  Given this decision, the Board expects the parties to take appropriate steps to address the unauthorized control issue immediately following resolution of the district court proceeding, including any appeals.

17

# Exhibit 2

Case 2:18-cv-00530-MSD-RJK   Document 463-1   Filed 10/03/22   Page 42 of 71 PageID# 10858

Case 2:18-cv-00530-MSD-RJK   Document 395   Filed 05/18/21   Page 1 of 30 PageID# 9825
USCA Case #22-1209   Document #1967024      Filed: 09/30/2022    Page 2 of 31

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

CSX TRANSPORTATION, INC.,
*individually and on behalf
of NORFOLK & PORTSMOUTH BELT
LINE RAILROAD COMPANY,*

    **Plaintiff,**

v.             Civil No. 2:18cv530

NORFOLK SOUTHERN RAILWAY COMPANY,
and

NORFOLK & PORTSMOUTH BELT LINE
RAILWAY COMPANY,

    **Defendants.**


## OPINION AND ORDER

   This matter is before the Court on a motion to dismiss/motion for judgment on the pleadings/motion to refer filed by Defendant Norfolk Southern Railway Company ("NSR") prior to the close of discovery (and prior to the lengthy COVID-19 stay previously imposed in this case). ECF No. 115. As of the date of this Opinion and Order, discovery is now closed and summary judgment motions were recently filed by NSR and Norfolk & Portsmouth Belt Line Railway Company ("Belt Line"). A jury trial is currently scheduled to begin on July 13, 2021, although under this Court's COVID-19 operating procedures (which permitted the resumption of civil jury trials on May 3, 2021), regardless of the outcome of the instant motion, such trial date would be subject to further

continuance if there is not an available retrofitted courtroom to allow the Court to keep jurors socially distanced throughout all stages of the jury trial process.

The relevant background of the case is set forth in greater detail in this Court's September 9, 2019 Opinion and Order. ECF No. 66. In short, Plaintiff CSX Transportation, Inc. ("CSX") alleges that Defendants NSR and Belt Line committed federal antitrust violations, state law conspiracy offenses, and contractual breaches associated with the manner in which Belt Line, a company jointly owned by NSR and CSX, was operated. For the reasons set forth below, NSR's motion is **DENIED in part**, and **GRANTED in part,** as the Court refers one disputed issue to the U.S. Surface Transportation Board ("STB").

## I. Background

NSR's motion challenges the jurisdiction of this Court, seeks judgment on the pleadings based on a claim of immunity, or alternative to both requests, asks this Court to refer two issues to the STB. It should be noted at the outset that: (1) both Belt Line and NSR previously filed timely motions to dismiss in this case, ECF Nos. 27, 34; (2) Belt Line's prior motion advanced a related, though not identical, challenge to this Court's jurisdiction, with such earlier-in-time challenge deemed "meritless" by this Court, ECF No. 66, at 20; (3) NSR did not previously challenge this Court's jurisdiction or otherwise raise

2

an immunity defense—to the contrary, NSR previously acknowledged its inability to reach "some averments in the Complaint as to the federal antitrust claims," ECF No. 35, at 3, and <u>conceded</u> jurisdiction over such claims, ECF No. 69 ¶ 11; and (4) NSR did not previously request a transfer to the STB for the purposes of addressing an immunity defense or determining a reasonable "switching rate" for use of Belt Line's tracks.

NSR now asserts that it is immune from federal antitrust laws and state conspiracy laws with respect to its relationship with Belt Line <u>not</u> because of any recent developments in the case, or new facts learned during discovery, but rather, on the ground that NSR has been immune from such claims for decades based on a railway consolidation/merger occurring in 1982.  While this Court again finds that it has jurisdiction over this case, and has reservations regarding the validity of such immunity defense, the Court will refer the immunity issue to the STB in light of its expertise regarding the process and scope of railroad company mergers.

## II. Jurisdictional Challenge

NSR first contends that this Court lacks jurisdiction over this case and thus seeks dismissal under Rule 12(b)(1).  Because a Rule 12(b)(1) motion can be filed at any time, NSR contends that its motion, filed long after this Court denied the original round of Rule 12(b) motions, is timely.

3

Case 2:18-cv-00530-MSD-RJK   Document 463-1   Filed 10/03/22   Page 45 of 71 PageID# 10861

Case 2:18-cv-00530-MSD-RJK   Document 395   Filed 05/18/21   Page 4 of 30 PageID# 9828
USCA Case #22-1209   Document #1967024       Filed: 09/30/2022   Page 5 of 31

In support of its jurisdictional challenge, NSR argues, among other things, that the parties' dispute arises out of a railway consolidation/merger, and that the STB, formerly the Interstate Commerce Commission ("ICC"): (1) has exclusive authority to approve mergers between rail carriers; and (2) that carriers participating in an approved merger are "exempt" from antitrust laws and other laws "as necessary to . . . carry out the transaction." ECF No. 116, at 8 (emphasis omitted); accord 49 U.S.C. § 11321(a).[1]  While the Court agrees with NSR's recitation of the law, the STB's exclusive authority over rail carrier mergers implicates the doctrine of "primary jurisdiction," which—despite its name—is not "jurisdictional."  Importantly, "[d]espite what the term [primary jurisdiction] may imply, [it] does not speak to the jurisdictional power of the federal courts.  It simply structures the proceedings as a matter of judicial discretion, so as to engender an orderly and sensible coordination of the work of agencies and courts." Envt'l Tech. Council v. Sierra Club, 98 F.3d 774, 789 n.24 (4th Cir. 1996) (second and third alterations in original); see Stevens v. Bos. Sci. Corp., 152 F. Supp. 3d 527, 533 (S.D.W. Va. 2016) (explaining that the name of such doctrine "is a misnomer").  The doctrine is applicable when a claim cognizable in federal court "requires the resolution of issues

---

[1] 49 U.S.C. § 11321 was previously codified at 49 U.S.C. § 11341.

4

which, under a regulatory scheme, have been placed within the special competence of an administrative body," thus causing a district court to suspend the judicial process "pending referral of [specific] issues to the administrative body for its views." United States v. W. Pac. R.R. Co., 352 U.S. 59, 64 (1956); see Mulberry Hills Dev. Corp. v. United States, 772 F. Supp. 1553, 1561 (D. Md. 1991) (explaining that a district court should "refrain from exercising its judicial power so that an agency particularly equipped to address issues and charged with regulatory duties within its expertise may perform its functions").

Here, notwithstanding NSR's arguments to the contrary, this Court has jurisdiction over the federal antitrust claims in this case, and has supplemental jurisdiction over the related state law claims. NSR's Rule 12(b)(1) motion to dismiss for lack of jurisdiction is therefore **DENIED**.

### III. Rule 12(c) Dismissal or STB Referral - Immunity

NSR next argues that this Court should dismiss this matter on the pleadings pursuant to Rule 12(c) based on NSR's statutory immunity. Plaintiff challenges the timeliness of such argument, contending that NSR's argument seeking dismissal: (1) should have been advanced as a Rule 12(b)(6) motion and was filed many months after the 12(b)(6) deadline; (2) contradicts NSR's prior jurisdictional position; (3) duplicates Belt Line's prior failed

5

Case 2:18-cv-00530-MSD-RJK   Document 463-1   Filed 10/03/22   Page 47 of 71 PageID# 10863

Case 2:18-cv-00530-MSD-RJK   Document 395   Filed 05/18/21   Page 6 of 30 PageID# 9830
USCA Case #22-1209   Document #1967024      Filed: 09/30/2022      Page 7 of 31

jurisdictional challenge, thereby conflicting with the "law of the case"; and (4) is unripe to the extent it separately asserts that certain potential remedies would invade the province of the STB's exclusive jurisdiction.   ECF No. 131, at 2-4.   NSR and Belt Line each counter that NSR's arguments in support of dismissal differ from Belt Line's prior arguments in that they rely on a different statutory provision (49 U.S.C. § 11321), ECF Nos. 132, 138, with NSR again noting that jurisdiction can be challenged at any time.

First, to the extent NSR argues that its Rule 12(c) motion to dismiss is timely and/or meritorious based on jurisdictional grounds, the Court rejects such claim without further analysis for the same reasons set forth above.   Second, as outlined below, to the extent NSR is seeking a Rule 12(c) dismissal, or alternatively, referral to the STB based on § 11321(a) immunity, the Court finds that although such claim was "delayed," it is not fatally untimely, and while dismissal is not appropriate, the request for referral to the STB on the immunity issue has merit.   Third, to the extent NSR seeks a referral to the STB for a rate setting determination, such request is denied at this time for the same reasons this Court previously concluded that it has authority to grant monetary and injunctive relief in this case.

## A. Timeliness of Motion

As to the timeliness of the immunity defense, CSX accurately highlights the fact that NSR's pending motion was filed during

Case 2:18-cv-00530-MSD-RJK   Document 463-1   Filed 10/03/22   Page 48 of 71 PageID# 10864

Case 2:18-cv-00530-MSD-RJK   Document 395   Filed 05/18/21   Page 7 of 30 PageID# 9831
USCA Case #22-1209   Document #1967024   Filed: 09/30/2022   Page 8 of 31

discovery and several months after the original round of Rule 12(b)

motions was resolved by the Court.  NSR fails to demonstrate why

it did not raise such immunity defense earlier in the case,[2] or

why it appeared to previously concede that it had no valid basis

to challenge the federal antitrust claims at that stage of the

case.  The delayed timing of NSR's immunity claim is especially

notable because the defense is predicated on a merger that has <u>at</u>

<u>all times</u> been within NSR's knowledge.

Notwithstanding NSR's delay, NSR appears correct both that

CSX's complaint does not include the facts on which NSR bases its

immunity defense[3] and that the motion, filed sufficiently in

advance of the scheduled trial date, is timely under Rule 12(c).

<u>See</u> Fed. R. Civ. P. 12(c) ("After the pleadings are closed--but

early enough not to delay trial--a party may move for judgment on

the pleadings."); Fed. R. Civ. P. 12(h)(2) (indicating that failure

---

[2]  While NSR's Answer advances three affirmative defenses mentioning
"immunity," none of these three theories is predicated on § 11321(a).  ECF
No. 69.  CSX does not squarely assert a pleading error in response to the
pending Rule 12(c) motion, although CSX does contend that NSR's motion has
little relation to its answer.  <u>See</u> ECF No. 131, at 3.

[3]  The complaint broadly references "mergers and acquisitions" over many
decades involving multiple railways, ECF No. 1 ¶¶ 2, 21; however, it does
not appear to discuss the 1982 merger, the ICC/STB's approval of it, or the
fact that as of 1989, two of the three railway companies with an ownership
interest in Belt Line were affiliates under common ownership due to the 1982
merger.  NSR's answer filled in the necessary facts regarding the 1982
merger and 1989 common ownership.  ECF No. 69 ¶ 2.  In fact, long prior to
the filing of the answer, NSR reported such facts to the Court in its brief
in support of its original dismissal motion, to include citing the STB's
consolidation ruling.  <u>Norfolk S. Corp.—Control—Norfolk & W. Ry. Co. & S.</u>
<u>Ry. Co.</u>, 366 I.C.C. 171 (1982).  Accordingly, it appears that NSR could have
asked the Court to take judicial notice of the consolidation and argued its
immunity defense at the outset of this case.

7

to state a claim can be raised in a Rule 12(c) motion or even at trial); see also 5C Wright & Miller, Federal Practice and Procedure § 1368 (3d ed. Apr. 2021 update) ("[C]ourts typically will construe . . . a late Rule 12(b) motion, or a Rule 12(b) motion that implicates affirmative defenses, as if it were brought under Rule 12(c)."). [4]  Similarly, NSR's request seeking a stay and referral to the STB, while delayed, is not "untimely" under any applicable rule or practice argued by CSX. [5]

In the absence of a procedural bar to NSR's motion to dismiss or refer, the Court addresses the merits of such motion, further noting that this Court clearly has the authority (and potentially the obligation) to refer appropriate matters to the STB. Although the COVID-19 pandemic and associated stays requested by the parties—followed by the continued effects of the pandemic on Court

---

[4]  The most relevant non-public evidence in support of NSR's dismissal/referral motion appears to be the consolidation/merger application that NSR attached as an exhibit to such motion.  ECF No. 116-5.  CSX does not challenge this exhibit as a matter that is not integral to the pleadings, nor is its authenticity challenged.  Accordingly, there does not appear to be a procedural obstacle to considering such document in conjunction with NSR's motion.  Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016).  Moreover, even if there is such an obstacle in conjunction with NSR's Rule 12(c) request for dismissal, the Court is unaware of any similar obstacle to the extent that NSR seeks referral to the STB.

[5] Under the doctrine of "primary jurisdiction," the Court has the authority to make its own discretionary determination to refer a matter to the STB in order to "promot[e] proper relationships between the courts and administrative agencies."  W. Pac. R.R. Co., 352 U.S. at 63; see Stevens, 152 F. Supp. 3d at 534 (explaining that the Court can "invoke the doctrine [of primary jurisdiction] sua sponte").  Therefore, even though the doctrine of primary jurisdiction may be "waivable" in certain circumstances, CSX Transp., Inc. v. Transp.-Commc'ns Int'l Union, 413 F. Supp. 2d 553, 564 (D. Md. 2006), this Court also has discretion to consider a referral to the STB with or without a motion from the parties.

8

operations and litigation in this District—have delayed the Court's resolution of NSR's motion, as explained below, the Court nevertheless finds that the best course is to temporarily stay this federal action pending referral of the immunity issue to the STB as such issue is potentially dispositive of nearly all claims for relief.

### B. Merits of Dismissal/Referral

#### 1. Factual Background

Briefly reciting the most relevant facts associated with the 1982 consolidation/merger that forms the basis of NSR's immunity defense, in December of 1980, NWS Enterprises, Inc. ("NWS") filed an application with the ICC to control two existing railways, Norfolk and Western Railway Company ("NW") and Southern Railway Company ("SR"). ECF No. 116-5. Shortly thereafter, the ICC filed a notice in the Federal Register describing the transaction as involving "the acquisition of control, through stock ownership of NW and its subsidiary companies and of SR and its consolidated system companies, by NWS, a newly incorporated non-carrier holding company." NWS Enters.; Application To Control Norfolk & W. Ry. Co. and S. Ry. Co., 46 FR 173-02, at 174, 1981 WL 109712 (Jan. 2, 1981) (emphases added). "The rail carrier subsidiaries of NW and the SR consolidated system carriers are set forth in the appendix" of the notice, with the appendix listing nearly fifty subsidiaries. Id. at 176. Notably absent from such list of subsidiaries is

9

defendant Belt Line.  The acquisition by the newly formed holding company was not technically considered a "merger," although "certain operating efficiencies among the carriers" were proposed, and the carriers that would be owned by NWS would "continue to operate . . . over the lines described [in the notice], subject to certain abandonments and <u>coordinated operations described in the application</u>."  <u>Id.</u> (emphasis added).  No coordination with respect to Belt Line was mentioned in the application.

Approximately a year later, the STB published a lengthy decision authorizing Norfolk Southern Corporation ("NSC")[6] to acquire "control . . . of Norfolk and Western Railway Company and its subsidiary companies and of Southern Railway Company and its consolidated companies . . . subject to conditions."  <u>Norfolk S. Corp.—Control—Norfolk & W. Ry. Co. & S. Ry. Co.</u>, 366 I.C.C. 173, 173, 1982 WL 28414 (1982).  Such decision again listed the numerous NW and SR subsidiary companies, which again did not include Belt Line, and further approved "[a]cquisition of a line of railroad and of certain trackage rights incorporated in the primary application."  <u>Id.</u> at 173, 255-57.  No mention was made of NSC acquiring control over Belt Line or the trackage rights controlled by Belt Line.  The decision did, however, note the statutory

_____

[6] It appears that the holding company being created to "control" both NW and SR was initially going to be NWS, but was ultimately named NSC.  NSC is NSR's predecessor.

(Page 50 of Total)

polices of "recent rail reform legislation," which included an emphasis on the retention of competition. Id. at 190.

The Rule 12(c) record suggests that, after the 1982 consolidation, the Belt Line partnership continued to operate under its plan of shared governance, with Belt Line's Board of Directors continuing to be appointed by CSX, NW, and SR. ECF No. 1-3. In 1989, CSX, NW, and SR signed an agreement to modify the number of directors appointed by each company such that NW and SR (both owned by NSC) would collectively appoint three directors, with the parties also agreeing that no other provision of the 1897 Belt Line Agreement would be amended, altered, or affected.[7]

## 2. Discussion

"Congress has vested with the STB, 'the exclusive authority to examine, condition, and approve proposed mergers and consolidations.'" CSX Transp., Inc. v. Transp.-Commc'ns Int'l Union, 413 F. Supp. 2d 553, 562 (D. Md. 2006) (quoting Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n, 499 U.S. 117, 119 (1991)). Critical to the instant dispute, the Interstate Commerce

---

[7] According to the parties, NW and SR merged in 1990, and the number of Belt Line board members was amended again at some point after such merger. While not critical to the Court's analysis, the Court notes for context that it appears from public records that the 1990 merger occurred pursuant to the "corporate family" exemption such that STB approval of such merger was not required, with the STB reporting in early 1991 that a notice of exemption had been filed, further indicating that such transaction would "not result in . . . a change in the competitive balance with carriers outside the corporate family." 56 Fed. Reg. 1541-03, 1991 WL 310251 (Jan. 15, 1991). It was at that time that the newly merged company was renamed "Norfolk Southern Railway [C]ompany." Id.

11

Case 2:18-cv-00530-MSD-RJK   Document 463-1   Filed 10/03/22   Page 53 of 71 PageID# 10869

Case 2:18-cv-00530-MSD-RJK   Document 395   Filed 05/18/21   Page 12 of 30 PageID# 9836
USCA Case #22-1209   Document #1967024      Filed: 09/30/2022      Page 13 of 31

Act provides that "[a] rail carrier, corporation, or person participating in [an] approved . . . transaction is exempt from the antitrust laws and from all other law, including State and municipal law, <u>as necessary</u> to let that rail carrier, corporation, or person <u>carry out the transaction</u>, . . . and <u>exercise control or franchises acquired</u> through the transaction." 49 U.S.C. § 11321(a) (emphases added). "The purpose of this provision, and the exemption from antitrust and other laws that it provides, is to ensure that efforts to merge and consolidate <u>are not obstructed</u>, and that <u>merger efficiencies can be achieved</u>." <u>CSX Transp., Inc.</u>, 413 F. Supp. 2d at 562–63 (emphases added) (citing <u>Train Dispatchers Ass'n</u>, 499 U.S. at 133). The Supreme Court has held that the exemption from "all other law" extends to cover "any obstacle imposed by law," including certain contracts, as long as "an ICC-approved transaction requires abrogation" of such obligations. <u>Train Dispatchers Ass'n</u>, 499 U.S. at 132–33.

While the Supreme Court has not expressly defined the contours of "necessity" in this context, a district court in this circuit has squarely addressed the issue, explaining as follows:

> The preclusive powers of the [Interstate Commerce Act] are not unlimited. As the Supreme Court noted in <u>Train Dispatchers</u>, exemption from other laws is only allowed when it is "<u>necessary to carry out an ICC-approved transaction</u>." 499 U.S. at 132–33 (emphasis added). . . .

> Although the Supreme Court did not define the term "necessary" in <u>Train Dispatchers</u>, the ICC has stated

12

that the ICA super[s]edes other law where there otherwise will be an impediment to the merger. <u>CSX Corp.—Control—Chessie Sys., Inc., and Seaboard Coast Line Indus., Inc.</u>, 8 I.C.C. 2d 715, 721–22, 1992 WL 206172 (1992) ("[T]he necessity predicate is satisfied by a finding that some 'law' (whether antitrust, RLA, or a collective bargaining agreement formed pursuant to the RLA) is an impediment to the approved transaction. In other words, the necessity predicate assures that the exemption is no broader than the barrier which would otherwise stand in the way of implementation.").

<u>CSX Transp., Inc.</u>, 413 F. Supp. 2d at 568–69. The district court went on to highlight the fact that the plaintiff in that case failed to demonstrate that a post-merger dispute over where certain railroad clerical work was to be performed was a "critical factor" that could "impede" a long since final merger, finding that "at some point, the STB's purview over a merger must end." <u>Id.</u> at 569. On appeal, the Fourth Circuit expressed its agreement, stating in a footnote that "[t]he amount of time that has passed since the approved transaction was successfully completed militates against our finding that the STB would have jurisdiction" over a labor dispute that can be traced back to the merger, noting that the STB's "predecessor, the ICC, as well as the Seventh Circuit, has indicated that the STB's jurisdiction over legal disputes related to a merger should not extend indefinitely." <u>CSX Transp., Inc. v. Transp. Commc'ns Int'l Union</u>, 480 F.3d 678, 685 n.5 (4th Cir. 2007) (citing <u>Del. & Hudson Ry. Co.-Lease & Trackage Rts. Exemption-Springfield Terminal Ry. Co.</u>, 8 I.C.C. 2d 839, 845,

13

1992 WL 46807 (1992); <u>Harris v. Union Pac. R.R.</u>, 141 F.3d 740, 744 (7th Cir. 1998)).

The Seventh Circuit's opinion in <u>Harris</u> is instructive regarding the breadth of authority appropriately ceded to the STB when post-merger disputes arise in situations where the ICC approved a merger but said nothing, <u>and implied nothing</u>, about it being "necessary" for a certain law, contract, or other "obstacle" to the merger to be set aside as a barrier to the merger.  <u>Harris</u>, 141 F.3d at 743–44.  The Seventh Circuit explained:

> If the Commission says that it is "necessary" for some law to give way, then we review its decision to determine whether it was arbitrary, capricious, or an abuse of discretion.  If the Commission implies (but does not quite say) that some other law had to yield, then perhaps a court should refer the subject to the agency under the doctrine of primary jurisdiction.  <u>See</u> <u>Railway Labor Executives' Ass'n v. United States</u>, 987 F.2d 806, 815 (D.C. Cir. 1993).  But if the agency says nothing, a post-merger dispute is resolved under generally applicable laws.  We added in <u>Burlington Northern</u> that "necessary", like "all", should be taken seriously.  <u>Only laws that would block the transaction give way</u>. . . .
>
> On the railroad's understanding of § 11341(a), the Board is forever in charge of all legal disputes related to a merger.  Is the railroad liable to a brakeman injured by failure of a coupler on a car that came from the acquired corporation? Does an easement on any of the carrier's rights of way survive the merger? Are the employees entitled to a Christmas bonus under the labor agreement? Some of these issues are resolved by arbitration or bargaining, others under state property law or the Safety Appliance Act.  <u>See</u> <u>Norfolk & Western Ry. v. Hiles</u>, 516 U.S. 400 (1996).  But if the Union Pacific were right, everything would be up for grabs. Who can tell which of these laws the Commission might have thought incompatible with the merger?

Harris, 141 F.3d at 743–44 (emphasis added).  While Harris and the 2006/2007 CSX case are instructive, those cases consider the necessity requirement in the context of ensuring the absence of an obstacle to "carry[ing] out the transaction," as contrasted with the portion of § 11321(a) addressing the need to "exercise control or franchises acquired through the transaction."

Here, the record clearly reveals that the ICC/STB said nothing about setting aside any state or federal law as an impediment to the 1982 consolidation with respect to Belt Line,[8] and in fact, said nothing about Belt Line in any respect.  Notably, as CSX argues, Belt Line is not included on the lengthy list of subsidiary companies in the appendix to the public notice that would be controlled by NSW/NSC if the consolidation was approved.  The record further suggests that the 1982 consolidation "applicants" never asked the ICC/STB to authorize "control" over Belt Line,[9] with the proposed consolidation plan stating as follows:

---

[8] NSR does not argue in its motion that, post-consolidation, it should also be freed from its contractual obligations set forth in the 1897 Belt Line Agreement.  This may be because the contract was re-ratified after 1982, or it may be because NSR recognizes that setting aside the contract is not "necessary" to the success of the merger.  See City of Palestine v. United States, 559 F.2d 408, 415 (5th Cir. 1977) ("Congress allowed the ICC significant power to effectuate approved transactions, but it did not authorize gratuitous destruction of contractual relations even when it serves the general public interest when the destruction is irrelevant to the success of approved transactions.") (emphasis added).  Regardless of the reason, such issue is not before this Court.

[9] Belt Line was listed by the applicants in an appendix to the application as an entity that NW, SR, and an SR subsidiary each held an ownership interest in, with the collection of these interests totaling to 57.14

15

(1) The proposed transaction <u>involves Interstate Commerce Commission (Commission) authorization</u> under Section 11343 <u>et seq.</u> of the Interstate Commerce Act (49 U.S.C. § 11343 <u>et seq.</u>) for NWS Enterprises, Inc. (NWS), a newly-incorporated non-carrier holding company, to <u>acquire control</u> through stock ownership of Norfolk and Western Railway Company (NW) <u>and its subsidiary carrier companies</u>, and of Southern Railway Company (Southern) <u>and its consolidated system companies</u> (collectively SR).

(2) <u>As a result</u> of the proposed transaction, NWS will also acquire <u>indirect control</u> through stock ownership of <u>all subsidiaries of NW and Southern</u>, including Southern Region Motor Transport, Inc. (SRMT), a motor carrier subsidiary of a wholly owned rail carrier subsidiary of Southern.

(3) By this application NWS is seeking Commission authorization under § 11343 <u>to acquire control of NW and SR</u>.

(4) The proposed transaction involves <u>the acquisition of control</u> through stock ownership <u>of Norfolk and Western Railway Company and its subsidiary companies</u>, and of <u>Southern Railway Company and its consolidated system companies</u>, by NWS Enterprises, Inc., a newly-incorporated non-carrier holding company.

(5) Applicants respectfully submit that the transactions proposed herein are in full accordance . . . with the statutory criteria set forth in the Interstate Commerce Act (49 U.S.C. §§ 11343-11347) . . . [and] Applicants <u>respectfully request that the Commission make the following findings</u> with respect thereto:

In Finance Docket No. 29430 (Sub-No. 1), that the following transactions are within the scope of 49 U.S.C. § 11343; are consistent with the public interest; reflect terms and conditions which are just and

---

percent. ECF No. 116-5, at 77. The seventeen-page chart that included Belt Line among over 150 other companies was provided to the ICC in response to a regulatory requirement that the applicants list the "measure of control or ownership exercised by Applicants over other carriers," ECF No. 116-5, at 77. It was not, therefore, a chart listing entities that NSC <u>requested</u> control over as part of the transaction. While such chart was not a "request" for control, it appears to illustrate that majority stock ownership of Belt Line would result from consolidation.

16

> reasonable . . . <u>and will have no adverse impact upon,
> but rather will enhance competition among rail carriers
> in the affected region</u>:
>
> > [●] acquisition by NWS Enterprises, Inc., <u>of
> > control of</u> Norfolk and Western Railway Company
> > <u>and its carrier subsidiaries</u>, and of Southern
> > Railway Company <u>and its consolidated system
> > companies</u> . . . .

ECF No. 116-5, at 4-5, 15, 19, 35-36 (emphases added). The second item listed above appears significant to the Court as it indicates that NWS/NSC provided an express notice that it would acquire "indirect control" over a motor carrier "as a result" of the proposed transaction, and it discussed such "control" and the further permissions that were required. NSR does not highlight any similar reference in the application stating that NWS/NSC was seeking approval of "indirect control" over Belt Line because the combination of stock held by three different NSW/NSC subsidiaries would, <u>post-consolidation</u>, amount to more than a 50 percent ownership interest in Belt Line.[10]

The above facts, as interpreted by the Court, provide support for CSX's position that it is appropriate to draw a distinction between a transaction that led to NSR amassing a slight majority ownership position in Belt Line (a cooperative partnership formed to serve the interests of all owners), and a transaction involving

---

[10] The detailed STB authorization ruling broadly indicates that the STB considered the anticompetitive effects of the consolidation, <u>Norfolk S. Corp.—Control</u>, 366 I.C.C. at 190-91, 227-29; however, there is no indication, one way or the other, that Belt Line was part of such analysis.

17

the STB "approving" NSR to control Belt Line such that NSR was immune from antitrust/conspiracy law, thus freeing NSR (at least under such laws) to leverage its ownership of NW and SR in a coordinated effort to harm CSX. The concern about coordination purportedly designed to harm CSX is especially acute in light of the fact that Belt Line is, by design, a separate corporate entity with a mission of operating for the collective good of all owner railways.[11]

The consolidation documents before the Court[12] therefore suggest that the STB did not "announce" that NSC would control Belt Line, and it certainly did not announce that NSC was exempt from federal antitrust laws or state conspiracy laws. However, as to the latter point, the STB and federal courts have repeatedly held that § 11321 is not predicated on the agency "announcing that a particular exemption is necessary"; rather, the immunity

_____

[11] As discussed in the Court's prior Opinion and Order, ECF No. 66, at 3-4, the 1897 Belt Line Agreement was originally executed by eight different railroad companies, ECF No. 1-1. "[E]ach of the Companies . . . desire[d] to secure the construction of a Belt Line Railroad" in Virginia "for the mutual benefit of each in the interchange of business" with all companies agreeing that it was "for the best interest of all" that the Belt Line Railroad "be constructed, maintained and operated under a separate organization in which all are to be equally interested and each to have an equal representation." ECF No. 1-1, at 3 (emphases added). The written agreement further provided that the named companies "will co-operate cordially in encouraging the business of the [newly formed] Railroad Company, for which it is constructed." Id. at 6 (emphasis added). Thus, there may not be the same "necessity" to control Belt Line as compared to a "typical" subsidiary beholden to the majority owner.

[12] The Court has only been provided "Volume 2/2A" from the consolidation application.

18

exemption is "self-executing." Consol. Coal Sales Co. v. Consol. Rail Corp., 2002 STB Lexis 317, at *9-10 (S.T.B. May 23, 2002) (quoting ICC v. Locomotive Eng'rs, 482 U.S. 270, 298 (1987) (Stevens, J., concurring)); see Soo Line R.R. Co. v. Consol. Rail Corp., No. 2:17cv106, 2018 WL 1566816, at *7 (N.D. Ind. Mar. 29, 2018) ("The statute makes the exemption self-executing whenever necessary to carry out an STB-approved transaction."); CSX Corp.— Control—Chessie Sys., 8 I.C.C. 2d at 723 n.12 (same).

While CSX acknowledges that the STB "approved" a transaction that resulted in NSC amassing a 57 percent ownership interest in Belt Line and obtaining the right to appoint the majority of Belt Line's Board of Directors, CSX argues that such occurrence is not the same as the STB approving "control."  In this Court's view, the strongest support for such argument is that NSW/NSC did not request "control" over Belt Line in its application, the STB did not announce that Belt Line would be controlled in the public "notice" of the application, nor did the STB announce that such control was authorized in its approval.  While the Court acknowledges that the STB need not "announce" that the self-executing immunity exemption applies to a specific merger transaction, this Court is unaware of any STB decision or other precedent suggesting that STB notices do not even need to identify the companies over which control is being requested and authorized. Cf. 49 U.S.C. § 11344(a) (1982) (indicating that an application

19

for control requires the Commission to "notify those carriers" involved in the proposed transaction).[13]

Notwithstanding CSX's facially strong position regarding the absence of evidence of STB authorization of "control," CSX's position appears weakest when it argues that 57 percent ownership coupled with the ability to dominate the board of directors does not constitute "control" under STB precedent.  While the parties agree that the concept of "control" is fact-based and varies with the circumstances, NSR effectively highlights CSX's inability to point to any ICC/STB decision finding that majority stock ownership coupled with an ability to appoint more than half of a board of directors can be interpreted as anything other than "control" over a subsidiary railway.  ECF No. 138, at 9-10.  Although addressing a slightly different issue, this Court has located a previous STB ruling that is relevant to the instant dispute.  In CSX's favor, the STB's analysis confirms that other facts relevant to "control" still must be analyzed on a case-by-case basis even when a railway owns more than half of the stock of another railway.  In NSR's favor, the STB's analysis appears to put significant emphasis on the ability to control the board of another railway.  See Brotherhood of Ry. & Airline Clerks v. Burlington N. Inc., 671

---

[13] The "Historical and Revision" notes to 49 U.S.C. § 11344 indicate that subsection (a) was revised prior to 1982 to eliminate the need to also notify the applicant "since the applicant is on notice by filing the application."  Section 11344 has been replaced by 49 U.S.C. § 11324.

20

Case 2:18-cv-00530-MSD-RJK   Document 463-1   Filed 10/03/22   Page 62 of 71 PageID# 10878

Case 2:18-cv-00530-MSD-RJK   Document 395   Filed 05/18/21   Page 21 of 30 PageID# 9845
USCA Case #22-1209   Document #1967024      Filed: 09/30/2022   Page 22 of 31

F.2d 1085, 1090 (8th Cir. 1982) (recounting the respondents' arguments that "terminal and switching railroads are not subject to control by any one carrier, but are more properly viewed as 'partnerships' in which no one partner has the ability to control the destiny of the corporation" and that "the inherent nature of the companies and of the service they provide makes control by any one carrier impossible," but remanding such issue to the STB based on an incomplete record); Burlington N., Inc.—Control & Merger—St. Louis-San Francisco Ry. Co., 366 I.C.C. 862, 866 & Appx. C, 1983 WL 28006 (1983) (finding, on limited remand, that: (1) Burlington Northern did not control various terminal and switching companies in which it owned less than, or exactly, a 50 percent interest and had an inability to dominate the board of directors; but (2) a "switching railway" and a "bridge railway" in which Burlington Northern held "an ownership interest in excess of 50 percent," and had an ability to dominate the board, among other facts demonstrating integration, were "under the direct control and management" of Burlington Northern); cf. 49 U.S.C. § 10102(3) ("'[C]ontrol', when referring to a relationship between persons, includes actual control, legal control, and the power to exercise control, through or by (A) common directors, officers, stockholders, a voting trust, or a holding or investment company, or (B) any other means."); Union Pac. Corp., Union Pac. R.R. Co. & Mo. Pac. R.R. Co.—Control—Chicago & N. W. Holdings Corp. &

Case 2:18-cv-00530-MSD-RJK   Document 463-1   Filed 10/03/22   Page 63 of 71 PageID# 10879

Case 2:18-cv-00530-MSD-RJK   Document 395   Filed 05/18/21   Page 22 of 30 PageID# 9846
USCA Case #22-1209   Document #1967024   Filed: 09/30/2022   Page 23 of 31

Chicago & N. W. Transp. Co., 9 I.C.C. 2d 939, 947 (I.C.C. Sept. 17, 1993) ("In determining whether one person controls another, the Commission has rejected any arbitrary formula based upon percentage of stock ownership, and instead, [has] looked to a number of additional factors, including distribution of the remaining stock, the ability to elect directors and otherwise control or influence decision-making machinery, and the existence of management, marketing, operating and financial ties.").

In light of all of the above, this Court finds that the STB is the proper authority to clarify the contours of the 1982 consolidation at issue in this case. The Court acknowledges the apparent uniqueness of remanding an issue to the STB four decades after a railway consolidation was finalized. However, the alternative is for this Court to re-evaluate the details of the very same forty-year-old railway merger and determine what was requested, noticed, and approved by the ICC/STB during the administrative consolidation process. While precedent makes clear that the STB should generally not retain jurisdiction many years after a merger is complete with respect to new contracts, new factual developments, or new legal disputes that are tangentially related to a long-finalized merger, CSX Transp., Inc., 480 F.3d at 685 n.5; Harris, 141 F.3d at 744,[14] the dispute in this case is

---

[14] But see CSX Corp.-Control-Chessie Sys., 8 I.C.C. 2d at 724 n.14 (noting that, in appropriate circumstances, "operational changes" made eight years

22

distinguishable from the labor dispute cases cited by CSX that are based on changing operations _after_ a merger is completed.  Here, there is not a new legal dispute tangential to the merger, but a dispute germane to the consolidation itself, with the genesis of the dispute grounded in the ICC/STB merger procedure and an associated factual dispute regarding the scope of what was actually approved/authorized by the ICC/STB in 1982.  See Envt'l Tech. Council, 98 F.3d at 789 (noting that the purpose of the primary jurisdiction doctrine is "taking advantage of agency expertise and referring issues of fact not within the conventional experience of judges or cases which require the exercise of administrative discretion"); Ry. Lab. Execs.' Ass'n v. S. Pac. Transp. Co., 7 F.3d 902, 906 (9th Cir. 1993) (indicating that the ICC "should have exclusive authority to clarify the scope of its own approval and the corresponding breadth of the section 11341(a) exemption"); AT&T Commc'ns, Inc. v. Consol. Rail Corp., 285 F. Supp. 2d 649, 662 (E.D. Pa. 2003) (denying a dismissal motion, but granting a motion to stay a portion of the case and refer an issue to the STB because: (1) "the issue of whether the § 11321(a) exemption applies to an STB-authorized transaction is within the agency's jurisdiction"; and (2) "the STB possesses the expertise necessary to resolve" the dispute because "the STB has studied the

---

after a "Commission-approved merger" were causally tied to the merger itself).

23

Transaction; entertained public comment, hearings, and arguments on the Transaction; and memorialized its approval in a lengthy, detailed document"); cf. CSX Corp.-Control-Chessie Sys., 8 I.C.C. 2d at 722-23 ("The appropriate tribunal to determine whether the proposed change in the status quo is directly related to and grows out of, or flows from, a specifically authorized principal transaction is this Commission, or the arbitrator acting pursuant to the Commission's authority."). Referring back to the analysis in Harris, if, as NSR asserts, the STB did approve NSC's "control" over Belt Line in 1982, such approval at least "implie[d] (but d[id] not quite say) that [antitrust/conspiracy] law[s] had to yield," thereby rendering it appropriate for this Court to "refer the subject to the agency under the doctrine of primary jurisdiction." Harris, 141 F.3d at 743.

In addition to the open question regarding authorization of "control," the Court notes the lack of precedent/administrative guidance with respect to the parties' competing positions as to whether it was "necessary" for NSR to be freed from antitrust and conspiracy laws based on the railway consolidation at issue in this case. In CSX's favor, the large-scale consolidation approved in 1982 appeared to have nothing to do with Belt Line such that NSC's need to secure "control" over Belt Line uninhibited by antitrust/conspiracy laws was not necessary to achieve the efficiencies of consolidation. See CSX Transp., Inc., 413 F. Supp.

24

2d at 562-63 ("The purpose of [§ 11321(a)], and the exemption from antitrust and other laws that it provides, is to ensure that efforts to merge and consolidate <u>are not obstructed</u>, and that <u>merger efficiencies can be achieved</u>.") (emphases added); <u>CSX Corp.—Control—Chessie Sys.</u>, 8 I.C.C. 2d at 721 ("[T]he 'necessity' predicate is satisfied by a finding that some 'law' . . . is an impediment to the approved transaction."). Moreover, it appears from the current record that Belt Line may have successfully operated as a collective/partnership for years after the consolidation, further suggesting that it was not "necessary" to allow NSR to dominate Belt Line in the same way that a parent company often controls a "typical" subsidiary. However, on the other side of the equation, if, post-consolidation, the STB classifies Belt Line as a "franchise" acquired through the transaction, and if NSC "acquiring" Belt Line was in fact "approved" by the STB in 1982, then it is arguably "necessary" under the scheme implemented by Congress and the STB to permit NSC/NSR to exercise its majority control over its newly acquired subsidiary free from the confines of antitrust or state conspiracy law. <u>See</u> 49 U.S.C. § 11321(a).[15]   In light of such conflicting

---

[15] The scope of the statutory phrase "control or franchises" is a matter that would benefit greatly from a consistent application as would occur through consideration by the STB in the first instance, as contrasted with a district-by-district evaluation by judges less familiar with the controlling regulatory scheme. <u>See</u> <u>Advamtel, LLC v. Sprint Commc'ns Co., L.P.</u>, 125 F. Supp. 2d 800, 804 (E.D. Va. 2001) (indicating that, "[a]s an aid" to determine whether the doctrine of primary jurisdiction applies, the

25

defensible positions regarding a matter squarely within the STB's expertise, referral to the STB is not only appropriate but arguably necessary.

Summarizing the above, NSR's motion to dismiss the antitrust and state conspiracy claims with prejudice is **DENIED**, but in light of the STB's primary jurisdiction, NSR's motion for a stay pending transfer of a single question to the STB regarding the applicability of § 11321(a) immunity is **GRANTED**.[16]

### IV. Rule 12(c) Dismissal or STB Referral - Remedies

Belt Line's original Rule 12(b) motion sought dismissal, in part, based on this Court's purported lack of jurisdiction to award certain damages, ECF No. 28, at 11, and NSR's current motion seeks dismissal and/or referral to the STB of certain matters relevant to damages based largely on the same theory, ECF No. 116, at 15-22. Considering the timing of such motion, and considering the

---

court should consider, among other things, whether the issue "involves technical or policy considerations within the agency's particular field of expertise" and whether "there exists a substantial danger of inconsistent rulings," so as to "promote[] a uniform development of law and policy in the areas where Congress has delegated to an administrative agency the authority to develop and establish national rules").

[16] A stay is appropriate notwithstanding the late stage of this case because the STB's decision impacts the validity of a majority of the claims for relief in this case. Additionally, as argued by NSR, it appears that CSX could have pursued a legal challenge to the reasonableness of the Belt Line switching rate in a proceeding before the STB for almost ten years before it filed suit, as the currently-in-place switching rate was established in 2009 and disputed by CSX as early as 2010. As discovery is complete and summary judgment briefing was just completed, the Court will be in a position to address dispositive issues and expeditiously schedule a trial after the STB resolves the lone issue referred to it by this Court.

26

fact that such a determination is relevant to, but not controlling of, certain damages and/or the injunctive relief sought in this case, NSR's request is **DENIED** at this time.   First, the Court agrees with CSX that the motion seeking dismissal/referral could have been brought at the time NSR filed its initial Rule 12(b)(6) motion, but as explained above, such motion is not fatally untimely.   Second, NSR's request for dismissal/referral appears somewhat duplicative of arguments in Belt Line's earlier dismissal motion that have already been rejected by this Court.   See ECF No. 66, at 21-25.   Third, contrary to NSR's assertions, CSX's claims for relief do not appear to "begin and end" with a determination of whether the "switching rate" charged by Belt Line is "reasonable."   Finally, a separate rate-setting proceeding before the STB has already been initiated, and the STB proceeding is currently stayed pending this Court's resolution of the antitrust and conspiracy claims at issue in this case, with the STB fully aware of the current litigation.   NSR's motion fails to demonstrate the need for this Court to force the determination of a "reasonable rate" back to the STB at this time.   Notably, the STB setting a new reasonable switching rate to be in place going forward will not resolve the contract, conspiracy, and antitrust claims pending in this case, id. at 24, which center on whether anticompetitive and collusive conduct in the past led to an artificially inflated switching rate designed to block NSR's competitors from accessing

Case 2:18-cv-00530-MSD-RJK   Document 463-1   Filed 10/03/22   Page 69 of 71 PageID# 10885

Case 2:18-cv-00530-MSD-RJK   Document 395   Filed 05/18/21   Page 28 of 30 PageID# 9852
USCA Case #22-1209   Document #1967024      Filed: 09/30/2022      Page 29 of 31

Norfolk International Terminal by rail.  Similarly, NSR fails at this time to demonstrate that an STB re-evaluation of the reasonableness of the current switching rate would dictate what remedies are appropriate in this case and/or resolve whether antitrust or conspiratorial actions designed to harm CSX proximately caused the establishment of such switching rate.[17]

This Court, of course, has every intention of ensuring that the monetary or injunctive remedies secured in this case (if any) are within this Court's authority to award, and nothing in this Court's ruling precludes the Court from seeking further input from the STB at a later time should it be deemed necessary to determine damages.  The Court's decision not to refer the determination of a "reasonable" switching rate to the STB at this time is not tantamount to a finding that this Court has the authority to decide such a rate or to award CSX trackage rights.  Such decision is also not an indication of how this Court will rule on NSR's recently-filed, and still unripe, motion in limine seeking to exclude evidence and argument suggesting that Belt Line's switching rate is "unreasonable" or "excessive."  ECF No. 329. Rather, CSX alleges in this lawsuit that NSR and/or Belt Line committed federal and state law violations, and well as contractual breaches, by conspiring to manipulate a privately determined

---

[17] The current switching rate was established in 2009 without input from the STB, and CSX asserts that the establishment of such rate, and the maintenance of such rate over time, was the product of unlawful collusion.

28

<u>switching rate</u> for the purpose of harming CSX, and the Court finds, consistent with its earlier ruling, that determining liability, as well as at least some remedies associated with the alleged liability, falls within this Court's authority.

## V. Conclusion

For the reasons outlined above: (1) NSR's motion to dismiss on jurisdictional grounds is **DENIED;** (2) NSR's motion to dismiss the antitrust and state conspiracy claims with prejudice is **DENIED**; (3) NSR's motion to refer to the STB a determination of a reasonable "switching rate" is **DENIED** at this time; and (4) in light of the STB's primary jurisdiction, NSR's motion for a stay pending transfer of the immunity dispute to the STB is **GRANTED**. The following discrete question is **REFERRED** to the STB:

> Did the 1982 consolidation, whereby NSC acquired an indirect 57 percent interest in Belt Line, involve the ICC/STB granting NSC "approval" to control Belt Line, and if so, did such authorized "control" render it necessary for antitrust and/or state conspiracy laws to yield, whether because Belt Line was then deemed a "franchise" of NSC, or for any other reason?

After the STB rules, this Court will expeditiously resolve all remaining summary judgment issues, to include the breach of contract claim that is outside the referral to the STB. In the interim, the instant case will be **STAYED**.[18]   The trial date is

---

[18] The stay does not preclude counsel from coordinating with each other, and the Magistrate Judge assigned to this case (to the extent the Magistrate Judge determines it to be appropriate) to seek a resolution of any pending sealing motions.

Case 2:18-cv-00530-MSD-RJK   Document 463-1   Filed 10/03/22   Page 71 of 71 PageID# 10887

Case 2:18-cv-00530-MSD-RJK   Document 395   Filed 05/18/21   Page 30 of 30 PageID# 9854
USCA Case #22-1209   Document #1967024   Filed: 09/30/2022   Page 31 of 31

hereby released, and counsel are instructed to contact the undersigned judge's calendar clerk to schedule a new trial date as soon as the STB issues its ruling.

The Clerk is **DIRECTED** to forward a copy of this Opinion and Order to all counsel of record and to the U.S. Surface Transportation Board.

**IT IS SO ORDERED.**

/s/

Mark S. Davis
CHIEF UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
May   18  , 2021

30