# Exhibit 2

[Oral Argument Not Yet Scheduled]

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————————————————————

No. 22-1209

—————————————————————

NORFOLK SOUTHERN RAILWAY COMPANY,
*Petitioner,*

v.

SURFACE TRANSPORTATION BOARD and
UNITED STATES OF AMERICA,
*Respondents*

—————————————————————

## RESPONDENT SURFACE TRANSPORATION BOARD'S
## MOTION TO DISMISS

—————————————————————

CRAIG M. KEATS
General Counsel

ANIKA SANDERS COOPER
Deputy General Counsel

LAURA M. WILSON
Attorney

Surface Transportation Board
395 E Street SW
Washington, DC 20423-0001
(202) 245-0275
laura.wilson@stb.gov

September 30, 2022

# INTRODUCTION

Petitioner Norfolk Southern Railway Company (Norfolk Southern) has asked this Court to review part of a declaratory order[1] that Respondent Surface Transportation Board (STB or the Board) issued upon a referral by the United States District Court for the Eastern District of Virginia. The STB moves to dismiss the petition for review on the ground that the Board's order is subject to review only by the District Court.

The Board's declaratory order arose out a referral by the District Court in <u>CSX Transportation, Inc. v. Norfolk Southern Railway Co.</u>, No. 2:18-cv-00530 (E.D. Va) (attached as Exhibit B). The District Court asked the Board to determine (1) whether the Board's predecessor agency, the Interstate Commerce Commission (ICC),[2] authorized Norfolk Southern to control Norfolk & Portsmouth Belt Line Railroad Company (the Belt Line) when the agency approved a 1982 consolidation among Norfolk Southern and unaffiliated companies; and (2) if so, whether

---

[1]  <u>Norfolk Southern Railway Co. – Petition for Declaratory Order</u>, FD 36522 (STB served June 17, 2022) (attached as Exhibit A).

[2]  In the ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803, Congress abolished the ICC, modified the Interstate Commerce Act, and transferred the ICC's remaining rail regulatory functions to the Board. Because the Board stepped into the shoes of the ICC, <u>see</u> 49 U.S.C. § 1302, this motion will use the term "agency" to refer to both the Board and the ICC and will treat decisions of the ICC as if they were those of the Board.

that authorization immunizes Norfolk Southern from antitrust and conspiracy claims that are pending before the District Court in <u>CSX Transportation</u>.

By statute, when a federal district court refers an issue to the STB, that court has exclusive jurisdiction over any civil action to set aside an order by the Board "arising out of such referral." 28 U.S.C. § 1336(b). Here, the circumstances and substance of the Board's order make clear that the order arose out of the District Court's referral, with the Board's proceedings below conducted solely to address the referral. The Board's resulting order (including each determination therein) addresses a matter of interest to the District Court: whether the agency authorized Norfolk Southern to control the Belt Line. In addressing that issue, the order informs whether Norfolk Southern is immune from the antitrust and conspiracy claims that are the crux of the litigation before the District Court.

Norfolk Southern does not here (or in any other court) challenge the Board's main finding: that the agency did not authorize control of the Belt Line in approving the 1982 consolidation. Rather, the only parts of the declaratory order that Norfolk Southern challenges are the Board's findings that, when the agency authorized two purely intra-corporate transactions that Norfolk Southern undertook after 1982, the agency neither *sub-silentio* authorized Norfolk Southern to control the Belt Line nor affirmed that the agency had authorized that control in 1982. The District Court had expressly mentioned one of these two "corporate family"

2

transactions in its referral order, and Norfolk Southern, in its pleadings to the Board, expressly characterized these two transactions as pertinent to the referral order.

Nonetheless, Norfolk Southern now argues that the Board's determinations regarding those two transactions did not arise out of the referral order. Contrary to Norfolk Southern's argument, it is clear from every angle – from the referral order, from the nature of the proceeding below, from the Board's discussion of the two post-1982 transactions, and from the nexus between the Board's determinations on those transactions and the litigation pending before the District Court – that the Board's determinations did indeed arise out of, *i.e.*, originate in, the referral order. Accordingly, under section 1336(b), jurisdiction to review those determinations rests squarely in the District Court.

Review by this Court of the Board's determinations on the two post-1982 transactions, as proposed by Norfolk Southern, would undermine both the letter and purpose of section 1336(b). If this Court reviewed the Board's determinations, the District Court would need to wait for this Court's ruling (and, in the event of a remand, for rulings on remand) before it could resolve the pending antitrust litigation. Congress chose through section 1336(b) to preclude that cumbersome outcome by providing for a referring court, once the Board has issued its decision on referral, to handle any challenge to the Board's decision. Congress thereby

3

ensured that a district court, in a matter before it, could take advantage of the

Board's expertise and, once the Board has acted, proceed with resolution of the

case as a whole. The district court's treatment of the case, including any challenge

to the Board's order, would then be subject to review in the court of appeals for

that circuit.

Here, by leaving review of the Board's order to the District Court as

required under section 1336(b) and by thus enabling the United States Court of

Appeals for the Fourth Circuit to review the entire case should an appropriate

appeal be filed, this Court would facilitate expeditious resolution of the litigation

before the District Court and would promote judicial economy at the circuit level.

## STATUTORY BACKGROUND

**1.    STB authorization of railroad consolidations**

The STB has economic oversight of the interstate freight rail industry.

See 49 U.S.C. § 10501. Changes in control involving rail carriers providing

transportation subject to the Board's jurisdiction may be undertaken only with STB

authorization. That authorization may be obtained, depending on the

circumstances, after a more extensive proceeding under section 11323 of the Act,

or through a summary "exemption" under 49 U.S.C. § 10502. Compare 49 C.F.R.

§ 1180.4 (regulations governing applications) with 49 C.F.R. § 1180.2(d)

(regulations governing "class" exemptions).

4

**2.** __Immunity from antitrust and state conspiracy laws__

The Board's authorization of a transaction, whether obtained through a full application proceeding or through an exemption, could affect the application of antitrust and conspiracy laws. Under 49 U.S.C. § 11321, a party that acquires control through an "approved or exempted transaction" is exempted from antitrust and state laws "as necessary" to allow the party to exercise that control:

> A rail carrier, corporation, or person participating in [an] approved or exempted transaction is exempt from the antitrust laws and from all other law, including state and municipal law, as necessary to let that rail carrier, corporation, or person . . . exercise control or franchises acquired through the transaction.

49 U.S.C. § 11321(a).

**3.** __Jurisdiction to review an order arising out of a referral to the Board__

The vast majority of the Board's decisions are reviewed in the federal courts of appeals pursuant to the exclusive jurisdiction conferred in the Hobbs Act, 28 U.S.C. §§ 2321(a), 2342(5). But there is a limited exception to that jurisdiction. When a federal district court refers an issue to the Board, that court has exclusive jurisdiction over any civil action that seeks to set aside an order arising out of the referral:

> When a district court or the United States Court of Federal Claims refers a question or issue to the Surface Transportation Board for determination, the court which referred the question or issue shall have exclusive jurisdiction of a civil action to enforce, enjoin, set aside,

> annul, or suspend, in whole or in part, any order of
> the Surface Transportation Board *arising out of such
> referral*.

28 U.S.C. § 1336(b) (emphasis supplied).

### THIS CASE

**1.    Proceedings in the Eastern District of Virginia**

In 2018, in the Eastern District of Virginia, CSX Transportation, Inc. (CSX) brought antitrust and state law conspiracy claims against Norfolk Southern and its partly-owned affiliate the Belt Line. CSX seeks damages in connection with a rate that the Belt Line established in 2009 – a rate that allegedly is not in the Belt Line's interest but that allegedly gives Norfolk Southern an unfair competitive advantage over CSX. According to CSX, the Belt Line established the rate under Norfolk Southern's influence in violation of antitrust and conspiracy laws. Exhibit B at 26 n.16, 29 n.17.

Norfolk Southern moved the District Court for dismissal and judgment on the pleadings, arguing that Norfolk Southern is immune from CSX' claims. Id. at 2. Norfolk Southern's argument focused on a 1982 consolidation among a group of unaffiliated companies, through which Norfolk Southern acquired an indirect, majority (57%) ownership interest in the Belt Line. Norfolk Southern argued that the ICC, which had approved the consolidation, also thereby approved Norfolk Southern's acquisition of control over the Belt Line. Norfolk Southern

6

concluded that, as a result of the ICC's alleged approval of Norfolk Southern's control over the Belt Line, the provisions of 49 U.S.C. § 11321(a) immunize Norfolk Southern from antitrust and conspiracy laws with regard to how Norfolk Southern exercises that control. Id. at 3.

CSX opposed Norfolk Southern's motion for dismissal and judgment on the pleadings. As here pertinent, CSX argued that the ICC did not approve Norfolk Southern's acquisition of control over the Belt Line in connection with the 1982 consolidation. CSX reasoned both that the Belt Line was not mentioned in the list of entities over which Norfolk Southern would acquire control and that the 1982 consolidation did not give Norfolk Southern managerial control over the Belt Line. Moreover, CSX argued, even if the ICC in 1982 had approved Norfolk Southern's acquisition of control over the Belt Line, it would not be "necessary" within the meaning of section 11321 to immunize Norfolk Southern from antitrust and conspiracy laws. Id. at 19, 24.

The District Court denied Norfolk Southern's motion for dismissal and judgment on the pleadings. Id. at 29. At the same time, the District Court initiated a referral to the Board under the doctrine of primary jurisdiction. Id. at 3, 6, 9. That doctrine allows a federal court to refer to an administrative agency an issue that falls within the agency's special expertise. Id. at 4-5, 8 n.5. The court's referral in those circumstances promotes "an orderly and sensible coordination of the work

7

of agencies and courts." Id. at 4 (citing Envt'l Tech. Council v. Sierra Club, 98 F.3d 774, 789 n.24 (4th Cir. 1996)). Here, the District Court, after considering the strengths and weakness of CSX' arguments about the proper interpretation of section 11321, found that it was "appropriate [and] arguably necessary" to refer "the matter" to the Board. Id. at 25-26.

The District Court reasoned in part that the Board, as the expert in railroad company mergers, is in the best position to interpret the scope of the agency's 1982 approval. "[The Board] is the proper authority to clarify the contours of the 1982 consolidation at issue in this case." Id. at 22. The District Court recognized that the Board has special expertise not only to interpret the scope of the 1982 approval, but to speak more broadly to the process and scope of railroad company mergers:

> While this Court . . . has reservations regarding the validity of [Norfolk Southern's] immunity defense, the Court will refer the immunity issue to the STB in light of its expertise regarding the process and scope of railroad company mergers.

Id. at 3.

The District Court further reasoned that, to date, there had been no administrative guidance on how to interpret section 11321 as relevant to the parties' arguments in this case. Particularly lacking, according to the District Court, was guidance on what it means, in this case, to "control" a rail carrier within the meaning of section 11321 and on whether, in this case, it is "necessary" under

section 11321 for antitrust and conspiracy laws to yield. Id. at 24-25. The District

Court concluded that the Board's guidance on these matters would help both to

resolve efficiently the litigation in CSX Transportation and to prevent inconsistent

rulings among district courts on how to interpret section 11321. Id. at 4-5, 25-26

n.15.

In a footnote, the District Court noted that Norfolk Southern had been

involved in a 1990 transaction within Norfolk Southern's holding company

structure. Through the 1990 transaction, one wholly-owned subsidiary of the

holding company acquired all of the common stock of a horizontal wholly-owned

subsidiary of the holding company. Id. at 11 n.7. This ministerial transaction,

which the agency authorized through a "corporate family exemption," by its terms

simply reorganized entities within Norfolk Southern. Characterizing the 1990

transaction as "not critical" to its analysis of the immunity issue, id., the District

Court described the immunity issue with emphasis on the 1982 consolidation:

> Did the 1982 consolidation, whereby [Norfolk Southern]
> acquired an indirect 57 percent interest in Belt Line,
> involve the ICC/STB granting [Norfolk Southern]
> "approval" to control Belt Line, and if so, did such
> authorized "control" render it necessary for antitrust
> and/or state conspiracy laws to yield, whether because
> Belt Line was then deemed a "franchise" of [Norfolk
> Southern], or for any other reason?

Id. at 29.

## 2.   <u>Proceedings at the Board</u>

Consistent with the practice in other similar proceedings, after the District Court issued its referral order, Norfolk Southern petitioned the Board to initiate a declaratory order proceeding on the referral.[3] After the Board initiated the proceeding, Norfolk Southern argued, in its opening statement, that the District Court had referred to the Board a question about immunity in connection with "several transactions" that previously had been "approved or authorized" by the agency.[4] The transactions to which Norfolk Southern referred were the 1982 consolidation, the 1990 "corporate family" transaction, and a second "corporate family" transaction in 1998. According to Norfolk Southern: (1) Norfolk Southern had obtained approval to acquire control over the Belt Line when the ICC approved the 1982 consolidation; (2) Norfolk Southern's control was "solidified and authorized again" through the 1990 and 1998 "corporate family" transactions; and (3) through those approvals and authorizations, Norfolk Southern obtained

---

[3] See STB Docket No. FD 36522, Petition by Norfolk Southern to Institute a Declaratory Order Proceeding and Establish a Procedural Schedule to Address the Issues Referred to the Board by the U.S. District Court for the Eastern District of Virginia, June 21, 2021, at 2 (excerpt attached as Exhibit C).

[4] See STB Docket No. FD 36522, Opening Statement of Norfolk Southern, Sept. 23, 2021, at 2 n.1 (excerpt attached as Exhibit D)

immunity from antitrust and conspiracy laws in exercising control over the Belt Line. Id. at 4, 13-17.

After submitting their own opening statements, CSX and the Belt Line each replied to Norfolk Southern's arguments.[5] CSX argued that Norfolk Southern had never sought or obtained authority to control the Belt Line and that, without that predicate, Norfolk Southern's immunity claims were without merit. Id. at 5-6. While acknowledging that the District Court's referral decision did not expressly ask the Board to address the 1990 and 1998 transactions,[6] CSX recognized the relevance of those transactions to the referral, addressing the transactions in both its opening statement and its reply statements to the Board.[7] CSX thus implicitly echoed Norfolk Southern's characterization of the District Court's referral order as encompassing all of the 1982 consolidation, the 1990 corporate family transaction, and the 1998 corporate family transaction. Exhibit D at 2 n.1.

In its declaratory order, the STB held that Norfolk Southern had never obtained regulatory authorization to acquire control over the Belt Line. Exhibit A

---

[5] The Belt Line argued that Norfolk Southern had exercised control over the Belt Line since 1982 with the acquiescence of all of the parties. Exhibit A at 8.

[6] See STB Docket No. FD 36522, Reply Statement of CSX, Oct. 25, 2021, at 18 (excerpt attached as Exhibit E).

[7] Id.; STB Docket No. FD 36522, Opening Statement of CSX, Sept. 23, 2021, at 7 n.3, 21-22 (excerpt attached as Exhibit F).

at 1, 16-17. The Board reasoned that a request to acquire control over the Belt Line had never been clearly presented to the agency by Norfolk Southern or its predecessors, whether in connection with the 1982 consolidation or in connection with the 1990 and 1998 corporate family transactions. Id. at 13-16. The Board viewed the lack of clarity as fatal to Norfolk Southern's claim that Norfolk Southern had received authorization as needed to confer immunity. Id. at 11.

Specifically with respect to the 1990 and 1998 corporate family transactions, the STB rejected Norfolk Southern's attempt to bootstrap itself into immunity using the associated notices of exemption. The Board found that those summary notices could not overcome Norfolk Southern's original failure to obtain approval to control the Belt Line. The STB reasoned that a party may not acquire control over a rail carrier without informing the Board, and then cure the unauthorized acquisition by reorganizing the corporate family and submitting a "corporate family" exemption. In Norfolk Southern's case, the notices of exemption did not even mention the entity (the Belt Line) over which Norfolk Southern allegedly obtained authorization to control. Id. at 16.

The Board, having concluded that Norfolk Southern had never obtained authority to acquire control over the Belt Line, did not reach some of the questions of statutory interpretation and application that the District Court had raised in its referral decision, including (1) whether the acquisition of a majority ownership

12

interest in a rail carrier, without the acquisition of managerial control, constitutes

the acquisition of "control" within the meaning of section 11321; and (2) whether

it would be "necessary" within the meaning of section 11321 to immunize Norfolk

Southern from antitrust and state conspiracy laws. Having found that no

authorization to control the Belt Line had been provided, the Board found that

those issues were moot. Id. at 1, 9.

**3.     The present proceeding**

Norfolk Southern asks this Court to review the Board's determinations that

Norfolk Southern did not, in connection with the 1990 and 1998 corporate family

transactions, obtain authorization to control the Belt Line. Petition for Review at 4.

According to Norfolk Southern, those determinations prevent Norfolk Southern

from establishing immunity from antitrust claims in the litigation that is pending

before the District Court in CSX Transportation. Id. at 3.

**4.     Additional proceedings before the District Court**

Shortly after Norfolk Southern filed its petition with this Court, Norfolk

Southern filed what it called a "protective" complaint against the Board and the

United States in the District Court. Like the petition before this Court, the

complaint asks the District Court to review only the Board's determinations about

the 1990 and 1998 corporate family transactions. The complaint asks the District

Court to review those determinations "[i]f the D.C. Circuit concludes that it does not have exclusive jurisdiction over [Norfolk Southern's] challenges."[8]

## ARGUMENT

## THE BOARD'S ORDER IS SUBJECT TO REVIEW ONLY IN THE EASTERN DISTRICT OF VIRGINIA.

The Court should dismiss Norfolk Southern's petition for review because, under 28 U.S.C. § 1336(b), jurisdiction to review the Board's order below lies exclusively with the District Court. The District Court's exclusive jurisdiction extends to the Board's entire order because the entire order arose out of the District Court's referral in CSX Transportation.

### A.   The Board's entire order arose out of the District Court's referral.

Under section 1336(b), when a district court refers an issue to the Board, that court has exclusive jurisdiction over any civil action to set aside any order "arising out of" the referral. 28 U.S.C. § 1336(b). This Court has held that an order could be said to "arise" out of a referral within the meaning of section 1336(b) when the order "originates" in the referral. McCarty Farms, Inc. v. Surface Transp. Bd., 158 F.3d 1294, 1299 (D.C. Cir. 1998). See also Railroad Salvage & Restoration v.

---

[8] Norfolk Southern Railway Co. v. Surface Transportation Board, No. 2:22-cv-385 (E.D. Va), Norfolk Southern Complaint, Sept. 15, 2022, at 4 (excerpt attached as Exhibit G).

Surface Transp. Bd., 648 F.3d 915, 921 (8th Cir. 2011) (the district court retains

jurisdiction over issues in the Board's decision that are within the essential scope

of the dispute in the district court); Union Pacific R.R. v. Ametek, 104 F.3d 558,

562 (3d Cir. 1997) (the Board's decision "arose out of" the district court's referral

because the decision originated in the "single dispute" that was before the Board

and the district court).

    As this Court explained in McCarty Farms, claims that "[i]n no sense" arise

out of a referral order should be reviewed by the courts of appeals under the Hobbs

Act, whereas issues that are expressly set out in a referral order belong in the

district court. McCarty Farms, 158 F.3d at 1299, 1300. The Court made clear that

whether a claim or other matter arises from a referral order must be considered

within the context of the referral order, including, as pertinent to McCarty Farms,

whether the claim had been raised in the district court, whether the district court

had the power to resolve that claim, and whether the district court retained

jurisdiction over that claim. Id. at 1298-99.

    Here, the chief concern in the District Court's referral order is whether

Norfolk Southern obtained agency authorization to control the Belt Line and, if so,

how that authorization, by operation of the immunity provisions of section 11321,

would impact the application of antitrust and state conspiracy laws to Norfolk

Southern. See Exhibit B at 3 ("While this Court . . . has reservations about the

validity of such immunity defense, the Court will refer the immunity issue to the STB"). See also id. at 6 ("the request for referral to the STB on the immunity issue has merit") and 9 ("the best course is to stay this federal action pending referral of the immunity issue to the STB"). The District Court sought the Board's guidance on the matter (which undeniably arose in the proceeding before the District Court and which fell within the District Court's power to resolve) without suggesting that the District Court thereby ceded jurisdiction over the matter.

Based on the parties' arguments to the District Court, the District Court understandably focused, in its questions about immunity, on whether the agency's treatment of the 1982 consolidation had provided authorization that could serve as the predicate for potential immunity. It is nevertheless clear that the referral order as a whole seeks simply to determine whether Norfolk Southern's claim of immunity could be grounded in an agency authorization. As reflected in Norfolk Southern's own arguments to the Board, that question necessarily implicates the 1990 and 1998 corporate family transactions, *one of which the referring court expressly addressed in its referral order*. Consistent with McCarty Farms, therefore, the Board's entire order below – including the Board's determinations on the 1990 and 1998 corporate family transactions – "arose out of," *i.e.*, originated in, the District Court's referral order and, under section 1336(b), is subject to review only by the District Court.

16

Norfolk Southern cannot credibly challenge this conclusion. Norfolk Southern specifically argued to the Board that the 1990 and 1998 corporate family transactions were relevant to whether Norfolk Southern has immunity and thus fell within the scope of the District Court's referral. Exhibit D at 2 n.2. Norfolk Southern repeatedly argued in both its opening and reply statements that, in case there was any doubt about the effect of the ICC's 1982 decision, Norfolk Southern's authorization to control the Belt Line was "solidified and authorized again" in connection with the 1990 and 1998 transactions.[9] Having asked the Board to address the 1990 and 1998 transactions as part of the referred issues, Norfolk Southern should not now be permitted to take an inconsistent position before this Court about the scope of the District Court's referral.

**B.    Norfolk Southern misreads this Court's decision in _McCarty Farms_.**

Norfolk Southern misreads, without context, the Court's statement in _McCarty Farms_ that only issues that are expressly set out in the district court's referral order are reviewed by the district court. Petition for Review at 4 (citing 158 F.3d at 1300). Under Norfolk Southern's reading, a district court must anticipate in its referral order every argument that a party might make in the agency's

---

[9] Exhibit D at 3; STB Docket No. FD 36511; Reply Statement of Norfolk Southern, Oct. 25, 2021, at 39 (excerpt attached as Exhibit H).

17

proceeding on referral. If the district court did not anticipate an argument, then, under Norfolk Southern's approach, the court would lose jurisdiction over the dispute to that extent – even though the argument goes to the heart of the dispute before the court.

The Court's objective in <u>McCarty Farms</u> was very different. There, the Board had issued a single order on multiple claims, each of which challenged a different set of rates by a rail carrier. Some of the claims had been brought in district court, whereas the other claims had been brought before the agency. The district court had referred to the agency the issue of "rate reasonableness" in connection with the claims that had been brought before the court. The agency consolidated the referral proceeding with the proceeding on the claims that had been brought before the agency, culminating in the Board's issuance of a single order on all of the claims. <u>McCarty Farms</u> at 1296-97.

The Court, in applying section 1336(b), sought to determine whether the claims that had been brought before the agency could be said, notwithstanding that fact, to have arisen out of the district court's referral. The Court noted, for this purpose, that the district court had not even mentioned the claims that were brought before the agency. The Court also noted that some of those claims would not have been within the district court's power to resolve. <u>Id.</u> at 1298-99.

The Court concluded that the claims that were brought before the agency – the claims of which the district court's referral order had made no mention – could not be said to have arisen out of the referral order. The Court concluded on that basis that it, rather than the district court, had exclusive jurisdiction to review the Board's treatment of those claims. Id. at 1299. The Court at the same time held that the district court had exclusive jurisdiction to review the Board's decision on the reasonableness of the rates that had been challenged in the district court.

Here, the task before this Court is simpler than the task in McCarty Farms, with its multiplicity of claims arising in multiple forums. Here, the Board's proceeding addressed only the District Court's referral order concerning Norfolk Southern's claim regarding authorization of control and hence possible immunity before the District Court. The District Court repeatedly expressed its intention to refer "the immunity issue" to the Board. In considering the immunity issue, the District Court expressly mentioned the 1990 corporate family transaction (which is essentially identical, for present purposes, to the 1998 transaction). Norfolk Southern itself presented the 1990 and 1998 corporate family transactions as part of the referral and as grounds for immunity. In these circumstances, the inescapable conclusion is that the Board's determinations on those transactions arose out of the District Court's referral and are subject to the District Court's exclusive jurisdiction to review.

19

Norfolk Southern's contrary reading of <u>McCarty Farms</u> would nullify the plain "arise out of" language of section 1336. And it would impose on the District Court the burden of anticipating, in its referral order, all angles that Norfolk Southern might pursue in attempting to show that the agency had authorized Norfolk Southern to control the Belt Line. Such a cramped reading of the law has no basis in the statute, its history, or its logic.

### C.    To leave review to the District Court, as required by section 1336(b), would promote judicial economy.

The approach prescribed by section 1336(b) promotes judicial economy in two ways. When the Board has issued a decision on referral, section 1336(b) calls for the matter to go back to the referring court so that the court may reach a final decision in the case before it, without having to wait for another court to rule. <u>Keller Industries, Inc. v. U.S.</u>, 304 F. Supp. 852, 854 (N.D. Fla. 1969) (citing S. Rep. No. 1394, 88th Cong., 2d Sess. 2 (1964); H.R. Rep. No. 1015, 88th Cong., 1st Sess. 2 (1964) U.S. Code Cong. & Admin. News, p. 3235). Section 1336(b) thus promotes the efficient administration of district court litigation and, in doing so, preserves the value to the district courts of the opportunity to refer issues to the Board.

Section 1336(b) also promotes judicial economy at the circuit level. When a party challenges an order under section 1336(b), the district court has the opportunity to review the Board's determination in reaching the court's decision in

the matter before it. The district court's resolution of the case (including its determination on the referred issues) is then subject to review in the circuit in which that district court sits. This sound progression through the courts serves judicial economy by permitting the referring court promptly to review the matter on which it sought guidance and by ensuring that the case has the attention of one circuit court at the appropriate time (rather than demanding the attention of two circuit courts, one before the district court has resolved the case).

Here, the District Court, despite its reservations about Norfolk Southern's claim of immunity, referred the matter to the Board to obtain the Board's expert guidance. The District Court's ruling, including its review of the Board's decision, will ultimately be subject to review in the Fourth Circuit. The efficient administration of justice calls for this Court to leave the matter to the District Court and the Fourth Circuit rather than intervening as sought by Norfolk Southern.

**CONCLUSION**

For the foregoing reasons, the Court should dismiss Norfolk Southern's

petition for review. Jurisdiction to review the Board's order below lies exclusively

in the Eastern District of Virginia.

Respectfully submitted,

/s/ *Laura M. Wilson*
LAURA M. WILSON
Attorney

CRAIG M. KEATS
General Counsel

ANIKA SANDERS COOPER
Deputy General Counsel
Surface Transportation Board
Washington, DC  20423-0001
(202) 245-0275
laura.wilson@stb.gov

September 30, 2022

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

Pursuant to D.C. Cir. Rules 27(a)(4) and 28(a)(l), Respondent the Surface Transportation Board states as follows:

**(A) Parties and Amici:**

The parties in this case are Norfolk Southern Railway Company, the Surface Transportation Board, the United States of America, and CSX Transportation, Inc. The administrative proceeding that resulted in the order below was initiated by Norfolk Southern. On the Service List for the proceeding before the Board, the following is also listed as a party of record: Norfolk and Portsmouth Belt Line Railroad Company.

**(B) Rulings Under Review:**

Norfolk Southern seeks review of a portion of a decision by the Board in Norfolk Southern Railway Co., Docket No. FD 36522 (June 17, 2022).

**(C) Related Cases:**

In CSX Transportation, Inc. v. Norfolk Southern Railway Co., No. 2:18-cv-00530 (E.D. Va), the district court referred to the Board the issue that the Board addressed in Norfolk Southern.

/s/ Laura M. Wilson
LAURA M. WILSON
Attorney
Surface Transportation Board

September 30, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2022, I electronically filed the

foregoing RESPONDENT'S MOTION TO DISMISS with the Clerk of the Court

for the United States Court of Appeals for the District of Columbia Circuit by

using the appellate CM/ECF system and that the participants in the case who are

registered CM/ECF users will be served by the appellate CM/ECF system.


/s/ *Laura M. Wilson*
LAURA M. WILSON
Attorney
Surface Transportation Board
395 E Street, SW
Washington, DC 20423-0001
laura.wilson@stb.gov


September 30, 2022

## CERTIFICATE OF COMPLIANCE
## WITH LENGTH LIMITATION AND TYPEFACE AND TYPE-STYLE REQUIREMENTS

This document complies with the word limit of Fed. R. App. P. 27(d)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4904 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word and New Times Roman font, size 14.

*/s/ Laura M. Wilson*
LAURA M. WILSON
Attorney
Surface Transportation Board
395 E Street, SW
Washington, DC 20423-0001
laura.wilson@stb.gov

September 30, 2022

# EXHIBIT A

51101
EB

SERVICE DATE – JUNE 17, 2022

SURFACE TRANSPORTATION BOARD

DECISION

Docket No. FD 36522

NORFOLK SOUTHERN RAILWAY COMPANY—
PETITION FOR DECLARATORY ORDER

Digest:[1]  In response to questions referred to the Board from the U.S. District Court for the Eastern District of Virginia, the Board finds that the Interstate Commerce Commission did not authorize Norfolk Southern Corporation to control Norfolk & Portsmouth Belt Line Railroad Company.

Decided:  June 17, 2022

On June 21, 2021, Norfolk Southern Railway Company (NSR) filed a petition for declaratory order requesting that the Board institute a proceeding to address the issues referred to the Board by the U.S. District Court for the Eastern District of Virginia in CSX Transportation, Inc. v. Norfolk Southern Railway, No. 2:18-cv-00530 (E.D. Va. May 18, 2021).  The District Court referred to Board the following questions:

> Did the 1982 consolidation, whereby [Norfolk Southern Corporation (NSC)] acquired an indirect 57 percent interest in [Norfolk & Portsmouth Belt Line Railroad Company (NPBL)], involve the [Interstate Commerce Commission (ICC)]/STB granting NSC "approval" to control [NPBL], and if so, did such authorized "control" render it necessary for antitrust and/or state conspiracy laws to yield, whether because [NPBL] was then deemed a "franchise" of NSC, or for any other reason?

CSX Transp., Inc., No. 2:18-cv-00530, slip op. at 29.

For the reasons explained below, the Board finds that the Board's predecessor, the ICC, did not authorize NSC to control NPBL.  Because control authority was never granted, the question of whether authorized control rendered it necessary for antitrust and/or state conspiracy laws to yield is moot.

---

[1]  The digest constitutes no part of the decision of the Board but has been prepared for the convenience of the reader.  It may not be cited to or relied upon as precedent.  See Pol'y Statement on Plain Language Digs. in Decisions, EP 696 (STB served Sept. 2, 2010).

Docket No. FD 36522

## BACKGROUND

**Prior Related Board and Court Proceedings.**  This proceeding arises from a broader dispute between NSR and CSX Transportation, Inc. (CSXT), concerning issues related to NPBL. CSXT filed the complaint from which the District Court referral arose on October 4, 2018, alleging that NSR and NPBL have taken actions to effectively prevent CSXT from using NPBL's switching services to access customers at the Norfolk International Terminals, a container terminal facility in Norfolk, Va., and that these actions constitute a violation of federal antitrust laws, a breach of contract, and a violation of state law in several respects.  A few weeks before CSXT filed its court complaint, NSR had filed a petition with the Board asking it to set trackage rights compensation for NPBL's use of NSR rail lines; after CSXT was permitted to intervene, that proceeding was held in abeyance pending the resolution of the federal court litigation.  See Norfolk S. Ry.—Pet. to Set Trackage Rts. Comp.—Norfolk & Portsmouth Belt Line R.R., FD 36223 (STB served Dec. 19, 2019).  In a decision issued on May 18, 2021, the District Court referred to the Board the questions described above regarding the 1982 consolidation involving NSC and NPBL.  CSX Transp., Inc., No. 2:18-cv-00530, slip op. at 29. On June 21, 2021, NSR filed a petition for declaratory order requesting that the Board institute a proceeding to address the issues referred to the Board by the District Court.  The Board instituted this declaratory order proceeding on August 9, 2021.

**History of the Consolidation.**  The 1982 railroad consolidation at issue here involved the ICC granting authority for NWS Enterprises, Inc. (NWS),[2] a noncarrier holding company, to acquire control of Norfolk and Western Railway Company (NW) and Southern Railway Company (SRC).  As part of that proceeding on July 24, 1980, NW and SRC filed a petition (Petition) with the ICC seeking waiver and clarification of the ICC's railroad consolidation procedures in anticipation of a forthcoming application (Application) by NWS to acquire control of NW and SRC.  NW & SRC Pet., July 24, 1980, NWS Enters., Inc.—Control—Norfolk & W. Ry., FD 29430.  The Petition explained that SRC was a Class I railroad that controlled three Class III railroads and numerous terminal and other railroad companies, including Norfolk Southern Railway Company (Norfolk Southern),[3] and that NW was a Class I railroad that controlled five Class III railroads, one terminal company, and other non-operating railroad companies.  Id. at 4, 6.  The Petition sought a waiver for SRC to report the information required by the ICC's regulations on a consolidated system basis rather than reporting the information separately for SRC and for each individual carrier controlled by SRC.  Id. at 7-10.  Similarly, the Petition sought a waiver to exclude information regarding NW's subsidiaries except to the extent

---

[2]  In 1981, NWS changed its name to Norfolk Southern Corporation (NSC).  Norfolk S. Corp.—Control—Norfolk & W. Ry. (NSC Control), 366 I.C.C. 173, 173 n.2 (1982).

[3]  In this decision, "Norfolk Southern" refers to the entity that was in existence at the time of the Petition and the Application and was a Class II subsidiary of SRC.  "NSR" refers to the entity that has been in existence since December 31, 1990, when SRC merged Norfolk Southern into SRC and SRC changed its name to Norfolk Southern Railway Company.

Docket No. FD 36522

that such information was maintained by NW on a consolidated system basis.[4]  Id.  The Petition claimed that with respect to SRC, the ICC had a long history of accepting consolidated system reporting as valid and accurate.  Id. at 5.  With respect to NW, the Petition asserted that excluding data from the NW subsidiaries, except to the extent that such data were maintained on a consolidated system basis, would not inhibit the ICC's analysis of the proposal because the operations of the subsidiaries of NW represented a very small part of the overall NW system.  Id. at 6-7.

The Petition also sought clarification regarding the term "applicant."  The Petition stated that the definition of "applicant" in the regulations referred to "all carriers with properties directly involved" in the transaction but that this definition also indicated that "applicant" was intended to apply only to the parties initiating the transaction and not subsidiaries of initiating parties.  Id. at 11.  The Petition asked the ICC to clarify that the term "applicant" applied only to NW, SRC, and the new holding company, which were the initiating parties, and to Delaware & Hudson Railway Company (D&H), whose stock was held by a wholly owned subsidiary of NW but was operated separately from NW.  Id.  The Petition also explained that in addition to the consolidated system companies, NW and SRC had interests in certain other railroad companies that they did not control (non-system companies).  Id. at 11-12.  According to the Petition, NW and SRC held 50 percent or less of the stock of the non-system companies, did not exercise control over such companies, and had no intention of exercising control over such companies if the proposed transaction were approved.[5]  Id. at 12.  The Petition stated that the records for the non-system companies were maintained separately from the NW and SRC consolidated system data.  Id.  The Petition argued that requiring data to be reported for the non-system companies would serve no useful purpose and would burden the record and therefore requested that the ICC clarify that the non-system companies would not be considered "applicants" under the ICC's regulations.  Id.  However, the Petition indicated that it would provide the information required by 49 C.F.R. § 1111.1(c)(8)[6] for these companies.

---

[4]  The carriers that comprised the NW system were listed in Appendix A to the Petition and the carriers that comprised the SRC system were listed in Appendix B to the Petition.  The pleadings and decisions in the consolidation proceeding generally refer to the subsidiaries within the SRC system as SRC's "consolidated system companies" but generally refer to the subsidiaries within NW's system as NW's "subsidiary companies."  This decision will refer to the combination of the subsidiaries within the NW system and the SRC system as "the consolidated system companies."

[5]  At that time, NW and SRC each owned a minority interest in NPBL.  However, the Petition did not refer to NPBL, or any of the other non-system companies, by name nor did it provide any information regarding the size or significance of their operations.

[6]  That regulation required applicants to provide information regarding "[t]he measure of control of ownership if any, now exercised by applicant over any carrier subject to the act, or over the properties of such carrier."  49 C.F.R. § 1111.1(c)(8) (1979).  Thus, it required applicants to provide information regarding all carriers subject to the ICC's jurisdiction in which they held an ownership interest regardless of whether applicants would control those carriers.

3

Docket No. FD 36522

On August 25, 1980, the ICC issued revised procedural regulations governing railroad consolidation proceedings.  On September 10, 1980, NW and SRC filed a supplement to the Petition requesting that the forthcoming application be considered under the revised regulations. See NWS Enters., Inc.—Control—Norfolk & W. Ry., 45 Fed. Reg. 66,911, 66,911 (Oct. 8, 1980).

In a decision served on October 1, 1980, the ICC granted the Petition.  The decision explained that the Application would be considered under the revised regulations, and the revisions to the regulations included revising the definition of "applicant" from "all carriers with properties directly involved" to "the parties initiating the transaction."  Id. at 66,911-912.  In addition, the ICC stated that it had long accepted system reporting and accounting by SRC and its consolidated companies and that practice would continue in the consolidation proceeding.  Id. at 66,912.  With respect to NW, the ICC noted that the revenues, expenses, income, and assets of NW's subsidiary companies represented a very small fraction of the NW system totals.  Id.  The ICC concluded that the benefit, if any, of separately reporting information for these companies would be outweighed by the difficulty in obtaining such information and that NW could report information individually or on a consolidated basis, where available.[7]  Id.  With respect to the railroad companies that were not part of the consolidated system, the ICC noted that NW and SRC did not hold a majority interest in these companies, had no intention of controlling these companies after the transaction, and that the records for these companies were maintained separately from the NW and SRC consolidated system data.  Id.  The ICC concluded that it would serve no useful purpose to require these companies to provide detailed information, other than providing the information required by 49 C.F.R. § 1111.1(c)(8).  The ICC also stated that it agreed with the petitioners that the subsidiaries of NW and SRC did not fall within the definition of the term "applicant" in its regulations.  Id.

On December 4, 1980, NWS, NW, SRC, and D&H filed their Application, which sought authorization for NWS to acquire "control through stock ownership of [NW] and its subsidiary carrier companies, and of [SRC] and its consolidated system companies. . ."  Application Vol. 2 at 1, Dec. 4, 1980, Norfolk S. Corp.—Control—Norfolk & W. Ry., FD 29430.  The Application made no mention of NPBL except in a chart attached as Appendix 2 to Volume 2 of the Application (Appendix 2) listing all the railroad companies in which NW and SRC held an ownership interest[8] and in a discussion of applicants' operating plan.  The operating plan explained where NW and SRC interchanged with NPBL prior to the transaction and stated that after the transaction, interchange with NPBL would be performed by consolidated crews of the

---

[7]  The decision also stated that information for D&H could be reported on an individual basis or on a consolidated basis, if available.  NWS Enters., Inc.—Control—Norfolk & W. Ry., 45 Fed. Reg. 66,911, 66,911 (Oct. 8, 1980).

[8]  Appendix 2 indicated that NW owned 28.57% of NPBL, SRC owned 14.29% of NPBL, and Norfolk Southern, a wholly owned SRC subsidiary, owned 14.28% of NPBL, for a total of 57.14%.  It appears that NPBL is the only carrier listed in this Appendix in which either NW or SRC did not have a controlling interest prior to the transaction but which, after the transaction, would be indirectly controlled by NSC as a result of the combined ownership interests of NW and SRC.

Docket No. FD 36522

consolidated carriers in the same manner as NW and NPBL did prior to the transaction. Id. at Vol. 4 at 184-187.

On January 2, 1981, the ICC accepted the Application for consideration. NWS Enters.; Application to Control Norfolk & W. Ry. & S. Ry., 46 Fed. Reg. 173 (Jan. 2, 1981). The decision stated that the "proposed transaction involves the acquisition of control, through stock ownership of NW and its subsidiary companies and of [SRC] and its consolidated system companies, by NWS . . ." Id. at 174. An appendix to the decision listed the "rail carrier subsidiaries of NW and the [SRC] consolidated system carriers." Id. NPBL was not listed in that appendix, id. at 176, and was not referenced anywhere else in the decision.

The ICC granted the Application on March 19, 1982. The decision explained that the Application sought authority "for [NSC] to acquire control through stock ownership of NW and its subsidiary companies, and of [SRC] and its consolidated companies." NSC Control, 366 I.C.C. at 177. Again, a list of the NW subsidiary companies and SRC consolidated companies was included in an appendix to the decision. Id. at 177 n.3. NPBL was not listed in that appendix, id. at 255-57, and was not referenced anywhere else in the decision.

In 1991, the ICC, pursuant to an exemption under 49 C.F.R. § 1180.2(d)(3) for transactions within a corporate family, granted SRC authority to directly control NW. S. Ry.— Control Exemption—Norfolk & W. Ry., FD 31791 (ICC served Jan. 14, 1991). At that time, SRC changed its name to Norfolk Southern Railway Company (i.e., "NSR"). (NSR Opening 13.) In 1998, pursuant to another corporate family transaction exemption, the Board authorized the merger of NW into its parent, NSR (formerly SRC). Norfolk S. Ry.— Exemption—Norfolk & W. Ry., FD 33648 (STB served Aug. 31, 1998).

**The Parties' Arguments: CSXT**. CSXT asserts that the ICC did not grant approval for NSC to control NPBL as part of the 1982 NSC Control transaction. CSXT argues that the relevant statute requires an entity to explicitly seek control authority and that NSC's[9] statements and actions in the application process demonstrated that it did not request authority to control NPBL. (CSXT Opening at 4, 23, 31.) CSXT points out that, in the Petition, NSC stated that its application for control authority would be limited to railroad companies within the NW and SRC systems and that the appendices to the Petition listing such carriers did not include NPBL. (Id. at 13.) In addition, according to CSXT, the Petition sought clarification that carriers, such as NPBL, in which NW and SRC did not hold a majority interest would not be considered "applicants" by the ICC because NW and SRC did not seek to control those carriers, and thus data submitted about them would "serve no useful purpose." (CSXT Reply 11.) CSXT contends that the fact that an appendix to the Application indicated that NSC would indirectly own 57.14% of the stock of NPBL after the transaction was not sufficient to put the ICC or the public on notice that it was seeking authority to control NPBL, particularly given that the Petition stated that NSC was not going to control NPBL and given that the amount ownership interest is not dispositive on the issue of control. (Id. at 12-14.) CSXT further states that the Application did

---

[9] As noted above, the entity that filed the Petition and the Application was NWS but that entity changed its name to Norfolk Southern Corp. before the ICC issued NSC Control. To avoid confusion, the discussion below will refer to this entity only as NSC.

Docket No. FD 36522

not provide any of the information that would have been required for the ICC to evaluate an NSC acquisition of control of NPBL under the applicable statutory standards, such as information regarding the potential impact on competition and operations.  (CSXT Opening 19, 25.)

CSXT argues that the ICC decisions regarding the control transaction demonstrate that the agency did not apply the relevant statutory standards with respect to control of NPBL and never authorized NSC to control NPBL.  (Id. at 20-21.)  CSXT states that in granting the Petition, the ICC explained that petitioners did not need to provide information regarding carriers such as NPBL that were not already controlled by NW or SRC because the petitioners had stated that they did not intend to control such carriers.  (Id. at 14-15; CSXT Reply 3.)  In addition, according to CSXT, the appendices in the ICC decisions accepting the Application and granting the Application that listed the companies over which NSC sought control did not include NPBL and the decision granting the Application does not contain a single reference to NPBL.[10]  (CSXT Opening 20-21.)  CSXT further argues that subsequent ICC decisions approving reorganizations within the NSC corporate family could not have authorized control of NPBL since these decisions never mention NPBL and involved class exemptions which can only be invoked for transactions that have no competitive effect.[11]  (CSXT Opening 26; CSXT Reply 18.)  CSXT also argues that any actions by CSXT and NPBL's other owners since NSC Control that may suggest that the parties acknowledged NSC's right to control NPBL are not relevant to the question of whether the ICC granted NSC legal authority to control NPBL.  (CSXT Reply 19.)

CSXT argues that because NSC was not granted authority to control NPBL, NSR does not have immunity under 49 U.S.C. § 11321 from CSXT's antitrust claims regarding NPBL.  (CSXT Opening 29-31; CSXT Reply 20-21.)  CSXT asserts that accepting NSR's arguments here would encourage applicants to abuse the Board's change in control processes by not accurately describing the transaction, requesting the necessary authority, or providing other relevant information but later attempting to claim immunity that the Board never intended or granted.  (CSXT Reply 21-22.)

**NSR.**  According to NSR, the waiver to submit the information required by the ICC's regulations on a system basis was sought to reduce the informational burden of the Application and was not intended to limit the scope of any subsequent ICC approval to cover only those specific railroads who were named applicants or whose systems were consolidated with the applicants.  (NSR Reply 14-15.)  NSR argues that the Petition's request for clarification regarding the term "applicant"—both with respect to excluding SRC's and NW's subsidiaries and with respect to excluding companies not controlled by SRC and NW—was also intended only to limit the informational requirements of the Application and not to limit the scope of the ICC's overall approval.  (Id. 15-16.)  NSR asserts that the statement that SRC and NW would not

_____

[10]  CSXT states that the decision approving the Application contains a detailed discussion of the impact of the transaction in the Norfolk area that does not mention NPBL, much less the potential change in control over NPBL.  (CSXT Opening 26.)

[11]  CSXT also notes that at the time of the Application, SRC and Norfolk Southern sought authority to construct and operate over a new connection track in the Norfolk area but did not suggest that NSC would assert control over NPBL, or that the consolidated NW/SRC system would interact with NPBL in any way different from before.  (CSXT Reply 16-17.)

Docket No. FD 36522

control the non-system companies after the transaction was simply a statement of fact because neither SRC standing alone nor NW standing alone would control the non-system companies, such as NPBL, in a post-transaction environment and the Petition never stated that NSC would not obtain control over the non-system companies.[12]  (Id. at 16 n.13.)  NSR argues that when read in context, the statement regarding the current and future lack of control over the non-system companies was meant to emphasize how burdensome it would be to provide detailed information for these companies if they were considered "applicants."  (Id. at 16-17.)  According to NSR, the ICC recognized that the request to clarify the term "applicant" with respect to the non-system companies was about reducing the informational burden rather than excluding these companies from any ICC authority granted.  (Id. at 17-18.)

NSR argues that information and discussion regarding NPBL was absent from the Application and the ICC decisions accepting and granting the Application because the waivers granted by the ICC allowed NSR to exclude information regarding NPBL from its Application. (NSR Reply 23-24.)  However, according to NSR, the fact that information regarding NPBL was absent from the Application did not mean that NPBL was not included in the scope of the Application.  (NSR Opening 5; NSR Reply at 24.)  NSR states that the ICC was fully aware that NSC would control 57.14% of NPBL after the transaction because this fact was disclosed in Appendix 2 that listed the ownership shares applicants held in other companies.  (NSR Opening 5.)  NSR contends that the Application generally speaks in terms of "systems" because that is how SRC and NW operated at the time but that the Application made clear that the proposed transaction included all subsidiaries and affiliates, whether owned in whole or in part, when it stated that NSC would "acquire indirect control through stock ownership of all subsidiaries of [NW] and [SRC]."  (NSR Reply 22-23.)

According to NSR, the ICC did not need to explicitly approve or announce the authorization for control of NPBL because authorizing NSC to indirectly control NPBL was a byproduct of the ICC's authorization for NSC to control SRC and NW.  (NSR Opening 10.) NSR points to other decisions that it asserts granted control or merger approval that do not list every single entity that, absent a waiver, would have to be treated as an applicant or applicant carrier.  (NSR Opening 10-11.)  Moreover, according to NSR, in the decision approving the Application, the ICC granted authority for NSC to control NW, SRC "and their affiliated carriers."  (Id. at 12.)  NSR argues that the term "affiliated carrier" is generally understood to mean a carrier that was partially owned, as opposed to wholly owned and that this term therefore encompassed NPBL.  (Id.)

NSR further contends that in other cases where waivers have been granted to exclude subsidiaries from the definition of "applicant"—including cases where neither applicant had a controlling interest but would have a majority interest following the transaction—it was understood that these carriers were not excluded from the scope of the control authority granted. (NSR Reply 18-21.)  In addition, NSR asserts that there is no precedent supporting the

--------

[12]  According to NSR, following the ICC's approval of the transaction, NPBL's operations were not consolidated into SRC's or NW's and NSC did not exercise control over or change NPBL's operations.  (NSR Reply 36.)  However, NSR indicates that NSC did control NPBL's management after the transaction.  (Id.)

Docket No. FD 36522

proposition that an applicant must specifically request control authority for a particular subsidiary, whether owned in whole or in part, in order for that subsidiary to be included in the scope of the control authority granted.[13]  (NSR Reply 20 n.20.)

In addition, NSR argues that even if NSC Control did not authorize control of NPBL, subsequent ICC decisions resolved this issue.  (NSR Opening 14; NSR Reply 37.)  NSR states that a 1991 transaction approved by the ICC, pursuant to an exemption for transactions within a corporate family, granted SRC authority to directly control NW.  (NSR Reply 38.)  NSR explains that, at the time, SRC changed its name to Norfolk Southern Railroad Company (i.e., "NSR"). (Id.)  According to NSR, SRC directly owned a 14.29% interest in NPBL, SRC's subsidiary, Norfolk Southern, owned a 14.29% interest in NPBL, and NW owned a 28.57% interest in NPBL.  (Id.)  NSR therefore asserts that the 1991 transaction gave NSR (the renamed SRC) indirect majority ownership of NPBL and that the transaction authorized NSC to control NPBL. (NSR Opening 14; NSR Reply 38.)  NSR further states that in 1998, pursuant to another corporate family transaction exemption, the Board authorized the merger of NW into its parent, NSR, giving NSR direct ownership of 57.14% of NPBL, thereby reaffirming NSR's authority to control NPBL.  (NSR Reply 39.)

NSR argues that because control over NPBL was granted to NSC by the ICC in 1982 and by the ICC and the Board in subsequent transactions, the exercise of such control is free from the confines of antitrust law pursuant to 49 U.S.C. § 11321(a).  (NSR Opening 15-16.)

**NPBL.**  NPBL argues that since the NSC Control decision, it has been under the control of NSC, and that such control was always mutually understood and accepted by all the parties in this proceeding.[14]  (NPBL Opening 1; NPBL Reply 2.)  In addition, NPBL states that on March 1, 1989, CSXT, NW and SRC entered into an agreement reciting each party's ownership of NPBL and agreed that, going forward and regardless of the number of railroad subsidiaries holding NPBL stock, NSC would be entitled to appoint three members of NPBL's board and CSXT would be entitled to appoint two.  (NPBL Opening at 3-4.)  NPBL also states that its owners took other actions confirming the common understanding that NSC obtained control of NPBL as a result of the NSC Control decision, such as consolidating its financial statements with those of NSC.  (Id. at 4.)  According to NPBL, if formal ICC authority for NSC to control NPBL was not granted, the lack of authorization appears to be no more than a technical, administrative matter and the Board "should retain this matter until such time as any required remedial control proceeding is completed, and, at which point, a full response to the matters referred by the District Court can be provided."  (NPBL Reply 4-5.)

---

[13]  NSR claims that other consolidations around the same time as NSC Control indicate that there was no requirement for in-depth competitive analysis of minor subsidiaries over which the consolidated holding company would gain a majority interest and that reporting on a system basis was an accepted practice.  Moreover, NSR suggests, excluding carriers outside the system from reporting requirements was also an accepted practice under which it was understood that those carriers were still part of the transaction approved by the ICC.  (NSR Reply 31-32.)

[14]  NSR similarly argues that since the NSC Control, CSXT has understood that NPBL was under the control of NSC and took actions indicating its acceptance of this control.  (NSR Reply 3-4.)

8

Docket No. FD 36522

DISCUSSION AND CONCLUSIONS

Under 5 U.S.C. § 554(e) and 49 U.S.C. § 1321, the Board has discretionary authority to issue a declaratory order to terminate a controversy or remove uncertainty.  See Bos. & Me. Corp. v. Town of Ayer, 330 F.3d 12, 14 n.2 (1st Cir. 2003); Intercity Transp. Co. v. United States, 737 F.2d 103 (D.C. Cir. 1984); Delegation of Auth.—Declaratory Ord. Procs., 5 I.C.C.2d 675 (1989).  It is appropriate here to issue a declaratory order to resolve the controversy concerning the questions referred to us by the District Court.  For the reasons explained below, the Board finds that the ICC did not authorize NSC to control NPBL.  Because the ICC did not authorize NSC to control NPBL, the District Court's question as to whether authorized control of NPBL rendered it necessary for antitrust and/or state conspiracy laws to yield is moot.

NSR does not claim here that explicit approval for its control of NPBL was ever sought, that either the ICC or the Board ever specifically considered the implications of such control, or that either agency issued a decision that expressly approved NSR control of NPBL.  Instead, NSR presents a series of arguments in an effort to establish that approval was either granted sub silentio or that the collective conduct of NPBL and its owners in the years following 1980 should be deemed sufficient to legally ratify a control transaction—and to retroactively confer antitrust immunity—even in the absence of ICC or Board action.  The Board is not persuaded.

As discussed above, the fact that the Petition sought a waiver to exclude the non-system companies from the definition of "applicants" so that information on these non-system companies would not need to be submitted to the ICC strongly supports the conclusion that NSR did not seek or obtain approval for control of NPBL.  The Petition did not name the non-system companies or provide any information about them except to state that NW and SRC held a 50% or less interest in these companies, did not control them, had no intention of controlling them after the transaction, and the records for these companies were maintained separately from the NW and SRC consolidated data.  NW & SRC Pet. 12, July 24, 1980, NWS Enters., Inc.—Control—Norfolk & W. Ry., FD 29430.  The Petition then went on to assert that "bringing into this proceeding data concerning these carriers (other than identifying them in the response required by Section 1111.1(c)(8)) would serve no useful purpose and would substantially burden the record."  Id.  Indeed, the subsequently filed Application itself also described the transaction as seeking control of only the consolidated system companies.[15]  Taken together, these statements clearly demonstrate that NSR was not asking the ICC to review and approve its acquisition of control of the non-system companies (a group that included the unmentioned NPBL), but was arguing that submission of information should not be required because no review was, in fact, required or sought.

NSR claims that the statement in the Petition about NW and SRC lacking control over the non-system companies in the present and the future was made only to support an argument that obtaining information from these companies would be burdensome and was not intended to

---

[15]  Application Vol. 2 at 1, 16, Dec. 4, 1980, Norfolk S. Corp.—Control—Norfolk & W. Ry., FD 29430 (stating that the Application was seeking authorization for NSC to control NW and its subsidiary carrier companies and of SRC and its consolidated system companies).

Docket No. FD 36522

indicate that control authority was not being sought for these companies.[16]  (NSR Reply 16-17.)  In addition, NSR claims that this statement indicates only that neither NW standing alone nor SRC standing alone would control the non-system companies after the transaction and that petitioners never stated that NSC would lack control of the non-system companies after the transaction.  (Id. at 16 n.13.)  NSR's interpretations, developed more than 40 years after the event, are implausible.  The Petition never explicitly stated that it would be difficult or burdensome for the applicants to obtain information from the non-system companies, just that the inclusion of this information would "burden the record."[17]  Moreover, if NSR were correct that the primary issue was burden, there would have been no reason for petitioners to state that NW and SRC would not control the non-system companies *after* the transaction.  The lack of *future* control by NW standing alone or SRC standing alone would have been irrelevant to the burden of producing information in the present.  In addition, if the statement about NW's and SRC's lack of control was meant only to emphasize how burdensome it would be to obtain information from the non-system companies, as NSR claims, there also would have been no reason for petitioners to argue that information regarding the non-system companies would "serve no useful purpose."  Lack of usefulness (or irrelevance) can be a reason for not imposing a burden, but has nothing to do with whether a burden exists in the first place or how extensive that burden is.  It appears that the Petition was arguing that detailed information on non-system companies would serve no useful purpose—and for that reason would burden *the record*—because petitioners would not control those companies.

Essentially, NSR would have the Board interpret the pleadings from 1980 to show that it asked the ICC—and the ICC agreed—to approve NSR's control of NPBL while at the same time relieving NSR of the burden of submitting evidence or otherwise presenting any case for the acquisition of control.  But the statements about NW and SRC lacking future control over the non-system companies and there being "no useful purpose" in providing information on the non-system companies make much more sense if read as an explanation that the post-transaction consolidated companies (i.e., NW and SRC combined) would lack control over the non-system companies following the transaction and information regarding these companies would therefore serve "no useful purpose" in the ICC's decision regarding control authority.  The only logical reading of the Petition is that petitioners were telling the Board that the non-system companies were outside the scope of the control authority being requested.  It is therefore not surprising that

---

[16]  NSC further states that the impetus for the statement about control was that smaller subsidiaries that do not greatly impact the overall operation or analysis of the initiating parties need not submit detailed information.  (NSR Reply 17 n.16.)  However, if this was the rationale for the waiver request, it was never communicated to the ICC.  The Petition does not name the non-system companies, nor does it provide any information about the nature or scope of their operations, much less claim that their operations were not significant enough to merit consideration by the ICC.

[17]  In any event, even if the Petition implied such a burden, it also clearly (and more importantly) conveyed to the ICC that petitioners would not control the non-system companies after the transaction and that, as explained below, those companies were outside the scope of the control authority being requested.

Docket No. FD 36522

in the decisions accepting and granting the Application, the ICC defined the Application as seeking authority to control only the consolidated system companies.[18]

Given this context, whether NSC's Application was required to explicitly request authority to control each individual subsidiary, or to provide information related to the potential competitive effects of acquiring each individual subsidiary, is not determinative of the outcome of this case.  Nor is whether the ICC was required to explicitly analyze and announce control authority with respect to each individual subsidiary.  Rather, the essential issues in this case are that petitioners/applicants told the ICC and the public that they had no intention of controlling the non-system companies post-transaction and the subsequent ICC decisions demonstrate the ICC's understanding that the control authority sought and granted was limited to the consolidated system companies.  The Board and the public must be able to clearly understand the control authority sought and granted, particularly given the significance of the immunity from antitrust laws and other laws that comes with control authority.  The Board's regulations at 49 C.F.R. § 1182.2(d) recognize this, in providing that if an application or supplemental pleading includes false or misleading information, the granted application is void ab initio.

NSR makes various additional arguments claiming that statements in the Application and the ICC's decisions indicate that, despite the control statements and failure to expressly discuss NPBL discussed above, it was understood that the non-system companies were within the scope of the authority sought and granted.  As explained below, the Board finds these arguments unpersuasive.

NSR argues that its interpretation of the Petition is supported by the ICC's statements in response to the Petition.  In particular, NSR quotes the following language from the decision granting the Petition:

> We believe it would serve no useful purpose to produce *detailed information* for these companies (other than identifying them as required by 49 CFR 1111.1(c)(8), which may be done on the corporate charts).  We agree with petitioners that the term 'applicant,' as used in our regulations, does not encompass such non-controlled carriers.

(NSR Reply 18 (quoting NWS Enters., Inc., 45 Fed. Reg. at 66,912) (emphasis added by NSR).)

_____

[18] NWS Enters., 46 Fed. Reg. at 174, 176 (stating that the "proposed transaction involves the acquisition of control, through stock ownership of NW and its subsidiary companies and of [SRC] and its consolidated system companies, by NWS" and listing those companies in an Appendix to the decision that did not include the non-system companies); NSC Control, 366 I.C.C. at 177, 255-257 (explaining that the Application sought authority "for [NSC] to acquire control through stock ownership of NW and its subsidiary companies, and of [SRC] and its consolidated companies" and listing those companies in appendices that did not include the non-system companies).

11

Docket No. FD 36522

According to NSR, this language was an explicit statement by the ICC that the waiver decision was about the burden on petitioners and not about excluding any entities from the scope of the ICC's control decision.  (NSR Reply 18.)  However, nothing in this language indicates that the ICC understood the Petition to be stating that the non-system companies were included in the scope of the control authority sought.[19]  The quoted language specifically references the exclusion of "non-controlled carriers."  Moreover, language in subsequent ICC decisions in the consolidation proceeding demonstrates that the ICC believed that the scope of the requested control authority did not include the non-system companies.  In the ICC decision accepting the Application, under the heading "Description of the Transaction," the ICC stated, "The proposed transaction involves the acquisition of control, through stock ownership of NW and its subsidiary companies and of SR[C] and its consolidated system companies, by [NSC]."  NWS Enters., 46 Fed. Reg. at 174.  The decision went on to state, "The rail carrier subsidiaries of NW and the [SRC] consolidated system carriers are set forth in the appendix."  Id.  The appendix did not include NPBL or other non-system companies.  Id. at 176.  Similarly, in the ICC decision granting the Application, the ICC stated that the Application sought authority for "[NSC] to acquire control through stock ownership of NW and its subsidiary carrier companies, and of [SRC] and its consolidated system companies."  NSC Control, 366 I.C.C. at 177.  The footnote to that sentence stated, "The affiliated companies of NW and [SRC] are set forth in appendix A."  Id. at 177 n.3.  Appendix A did not list NPBL or other non-system companies.  See id. at 255-57.  Thus, when the ICC explicitly defined what it understood to be the control authority sought by the Application, its definition excluded the non-system companies.[20]

---

[19]  It is not clear why NSR believes that the ICC's statement that it would serve no useful purpose to provide detailed information for the non-system companies is a statement about the burden of providing that information.  NSR seems to be suggesting that the ICC's reference to not providing "detailed information" rather than "information" suggests it was focused on the burden of providing details.  However, as noted above, the Petition sought an exclusion from the requirement to provide detailed information while indicating that applicants would provide certain limited information required by 49 C.F.R. § 1111.1(c)(8).  Thus, the reference to not providing "detailed information" was simply an accurate description of what the Petition requested and does not suggest that the ICC was focused on the burden of providing such information.  This conclusion is supported by the fact that the ICC explained that there would be "no useful purpose" in providing detailed information.  As noted above, the burden of obtaining information has no relationship to its usefulness.  In addition, the fact that the ICC explained that the term "applicant" in the ICC's regulations did not encompass the non-system companies does not suggest that the ICC viewed the Petition as discussing only the burden of producing information.  It appears that it was merely a statement by the ICC that, in addition to there being no purpose in providing detailed information on the non-system companies, the ICC's regulations did not require such information.

[20]  NSR also suggests that the fact that the ICC's decision granting the Petition stated that the Application should list all of the carriers in which applicants had an ownership interest indicates that the ICC understood that the scope of the Application included non-system companies.  (NSR Reply 33, 35.)  However, as noted above, 49 C.F.R. § 1111.1(c)(8) separately required disclosure in the application of any ownership interest in a carrier subject to the ICC's jurisdiction regardless of whether the carriers would be controlled by applicants.  The Petition noted that it was not seeking to have this requirement waived.

Docket No. FD 36522

NSR further argues that the Application made clear that NSC would obtain control over NPBL when it stated on page 2, "As a result of the proposed transaction, [NSC] will also acquire indirect control through stock ownership of all subsidiaries of [NW] and [SRC]."  (NSR Reply 23.)  NSR claims that this statement about indirect control encompassed all subsidiaries, whether owned in whole or in part, including the non-system companies.  (Id.)  However, this statement could not have been intended to mean that NSC was obtaining indirect control over the non-system companies because Appendix 2 lists numerous railroad companies in which either NW or SRC (not both), directly or indirectly, held only a small ownership share (as low as 1.78%) and NSC would not be obtaining indirect control over those companies.  (Id. at 16 n.13.)  Rather, the term "subsidiaries" in that sentence appears to be a shorthand reference to NW and its subsidiary companies and SRC and its consolidated system companies.  Indeed, one page prior on page 1 of Volume 2 of the Application and again on page 16, applicants stated that the proposed transaction involves ICC authorization for NSC to acquire control of NW and its subsidiary carrier companies and of SRC and its consolidated system companies.  Application Volume 2 at 1, 16, Dec. 4, 1980, Norfolk S. Corp.—Control—Norfolk & W. Ry., FD 29430.  Moreover, the Petition, the decision granting the Petition, and the decisions accepting and granting the Application all list the "subsidiaries" of NW, and these lists do not include the non-system companies.[21]  This is further evidence that the use of the term "subsidiaries" on page 2 of the Application was not intended to encompass the non-system companies but to refer to the subsidiaries within the NW and SRC consolidated systems.

NSR also claims that, despite the many instances in which NSR disavowed any intention of acquiring control of non-system companies, the Application nevertheless put the ICC and the public on notice that NSC would be acquiring control of NPBL because the corporate chart in Appendix 2 showed that the combined ownership interest, direct and indirect, of NW and SRC in NPBL was 57.14%.  (NSR Opening 10.)  NSR thus relies on a few lines in a lengthy chart in an appendix to an application spanning thousands of pages to contend that the ICC and the public should have known that NSC would control NPBL after the transaction.  This is despite the narrative portion of the Application describing the transaction in a manner that did not include the non-system companies such as NPBL and the previously-filed Petition plainly stating that the non-system companies would not be controlled by applicants.  If applicants did in fact believe they were seeking authority to control NPBL, the statements made in the Petition and the narrative portion of the Application were, at best, misleading.  Regardless, the Board does not agree that a single reference to NPBL in an appendix listing numerous companies that would not be controlled after the transaction was sufficient to put the ICC and public on notice of an applicant's intent to control a carrier on that list or that this single reference should be given more weight in interpreting the 1980 proceedings than the numerous statements that NSR did not intend to acquire control.  The agency will not permit an applicant to give assurances that control will not be obtained in a transaction but then seek to achieve that control in any case through a passing reference concealed in the minutiae of the exhibits.  Given the significance of the

---

[21]  NW and SRC Pet. at Appendix A, July 24, 1980, NWS Enters., Inc.—Control—Norfolk & W. Ry., FD 29430; NWS Enters., Inc., 45 Fed. Reg. at 66,915; NWS Enters.; Application to Control Norfolk & W. Ry. & S. Ry., 46 Fed. Reg. at 176; NSC Control 366 I.C.C. at 255-57.

Docket No. FD 36522

antitrust immunity and other immunity that comes with control authority, the Board and the public must be able to have a clear understanding of the scope of the authority being sought.

NSR also points to language in the ICC decision granting the Application stating that the ICC was granting authority to control NW and SRC "and their affiliated carriers." (NSR Opening 12.) According to NSR, the term "affiliated carrier" is generally understood to mean a carrier that is partially, as opposed to wholly, owned and the ICC's use of this term is undeniable evidence that the non-system companies were included within the scope of the control authority granted. (Id.) "General understanding" of a term does not control, however, when a narrower specific definition of the term has been provided in the decision. As noted above, the footnote to an earlier sentence defining the transaction states that the "affiliated companies" of NW and SRC are listed in appendix A to the decision, which does not include the non-system companies. NSC Control, 366 I.C.C. at 177 n.3, 255-57. Thus, the ICC was using "affiliated carriers" as a shorthand for NW's subsidiary carrier companies and SRC's consolidated system companies. This conclusion is reinforced by the very sentence quoted by NSR. The sentence referred to the granting of authority to control NW and SRC and "their affiliated carriers, the granting of related trackage rights among these carriers, and the acquisition of part of the main line of the Norfolk, Franklin and Danville Railway Company by [SRC], *all as discussed above*." (emphasis added). Id. at 249. Earlier in the decision, in multiple instances, the ICC had referred to the Application as seeking authority to control NW and its subsidiary carrier companies and SRC and its consolidated system companies, id. at 175, 177, 179, and had also defined the "affiliated companies" as those listed in Appendix A, id. at 177 n.3. Thus, the "affiliated carriers . . . as discussed above" did not include the non-system companies.[22]

NSR further argues that precedent establishes that a waiver to exclude a subsidiary from the definition of "applicant"—including a subsidiary in which no applicant presently owns more than a 50% interest but where applicants together would own more than a 50% interest after the transaction—does not exclude that subsidiary from the control authority granted. (NSR Reply 19-20.) In addition, NSR claims that there is no precedent supporting the proposition that unless an applicant specifically requests control authority for a particular subsidiary, whether owned in whole or in part, that subsidiary is therefore excluded from the scope of the approval. (Id. at 20 n.20.) However, in this case, the applicants did not simply seek a waiver to exclude NPBL from the definition of "applicant" or merely fail to explicitly request authority to control NPBL. Rather, the applicants specifically told the ICC that the non-system companies would not be controlled by petitioners after the transaction and the subsequent ICC decisions defined the control authority sought as being limited to the companies within the NW and SRC systems.

---

[22] NSR's argument is unpersuasive for other reasons as well. As explained above, Appendix 2 lists numerous railroad companies in which either NW or SRC held only a small ownership share (as low as 1.78%) and did not control and would not control after the transaction. If "affiliated carrier" is understood to refer only to carriers that are partially owned, then the ICC's reference to "affiliated carriers" would exclude from the scope of control authority the carriers within the NW and SRC systems that were wholly owned—i.e., those undoubtably under the control of NW and SRC—while at the same time including many companies which neither NW nor SRC had the ability to control before or after the transaction. That is an implausible interpretation.

Docket No. FD 36522

NSR has cited no precedent in which an applicant informed the ICC or the Board that it would not control a particular carrier as a result of the transaction, and the ICC or the Board repeatedly described the authority sought in a manner that excluded that carrier, but where it was nonetheless understood that such a carrier was within the scope of the control authority that was granted.

Indeed, in the cases cited by NSR, the applicants make clear in their waiver requests which subsidiaries would and would not be controlled by applicants after the transaction.  For example, in Burlington Northern, Inc.—Control & Merger—Santa Fe Pacific Corp., Docket No. 32549, applicants sought a waiver or clarification that carriers in which they had non-controlling ownership interests of 50% or less, a list of which was provided, would not be considered "applicant carriers."  Burlington N., Inc.—Control & Merger—Santa Fe Pac. Corp., FD 32549 (ICC served Oct. 3, 1994).  Applicants separately requested a waiver or clarification that the Wichita Union Terminal Railway (WUTR) would not be considered an "applicant carrier."  Id.  The applicants explained that they each owned a 33.33% interest in WUTR and that, following the transaction, Burlington Northern, Inc. would own 66.66% of WUTR's stock and stated that the primary application would seek ICC approval for control of WUTR as a result of the primary transaction.  Id.  Similarly, in each of the other cases cited by NSR, applicants identified which of the carriers that were part of a petition for waiver would be and would not be controlled by applicants.[23]  Certainly, none of the cases cited by NSR support the proposition

─────────────────

[23]  In Santa Fe Southern Pacific Corp.—Control—Southern Pacific Transportation Co., Docket No. FD 30400, applicants sought a clarification that railroads in which the applicants would not have a controlling interest would not be considered "applicant carriers" and separately sought clarification that two other specifically identified railroads, in which applicants combined would have a controlling interest if the transaction were approved, would not be considered "applicant carriers."  Santa Fe S. Pac. Corp.—Control—S. Pac. Transp. Co., FD 30400, slip op. at 1 (ICC served Feb. 3, 1984).  In Union Pacific Corp.—Control & Merger—Southern Pacific Rail Corp., Docket No. FD 32760, applicants sought a waiver or clarification that the term "applicant carriers" did not include railroads in which they had interests of 50% or less Union Pac. Corp.—Control & Merger—S. Pac. Rail Corp., FD 32760 (ICC served Sept. 5, 1995).  Applicants separately sought a waiver or clarification that the term "applicant carriers" did not include five specifically identified carriers in which the applicants each held a 50% or less ownership interest but would hold a 50% or greater combined ownership interest following the transaction.  Id.  In Union Pacific Corp.—Control—Missouri Pacific Corp., Docket No. FD 30000 et al., the applicants requested clarification that the term "applicant" did not apply to carriers that were operated independently and not as part of the applicants' systems.  In doing so, they identified all of these carriers, provided a brief statement about the nature of their operations, and indicated the ownership interest of the applicants.  Union Pac. Corp. Pet. 11, Appendix B, May 2, 1980, Union Pac. Corp.—Control—Mo. Pac. Corp., FD 30000.  In Canadian National Railway—Control—Illinois Central Corp., Docket No. FD 33556, CSXT sought a waiver or clarification with respect to a responsive trackage rights application that the definition of "applicant carrier" was limited to Board-regulated rail carriers in which CSXT currently held an interest greater than 50%.  Canadian Nat'l Ry.—Control—Ill. Cent. Corp., FD 33556, slip op. at 3 (STB served Sept. 18, 1998).  This waiver would have excluded the

Docket No. FD 36522

that an applicant can tell the ICC or the Board and the public that it will not control a carrier after a transaction but nonetheless expect that carrier to be within the scope of the control authority granted.

NSR asserts that even if <u>NSC Control</u> did not grant authority for NSC to control NPBL, subsequent decisions in 1991 and 1998 granted this authority.  (NSR Reply 38-39.)  In 1991, the ICC granted a corporate family transaction exemption pursuant to 49 C.F.R. § 1180.2(d)(3) for SRC to directly control NW through a corporate family exemption.  <u>S. Ry.—Control Exemption—Norfolk & W. Ry.</u>, FD 31791 (ICC served Jan. 14, 1991).  In 1998, the Board granted a corporate family transaction exemption for NW to be merged into the former SRC, which at that point had been renamed NSR.  <u>Norfolk S. Ry.—Exemption—Norfolk & W. Ry.</u>, FD 33648 (STB served Aug. 31, 1998).  NPBL was not mentioned in either of these proceedings. According to NSR, these decisions constituted grants of authority for NSC to control NPBL. (NSR Reply 38-39.)  However, an exemption under 49 C.F.R. § 1180.2(d)(3) could not have been used to grant authority to any member of NSC's corporate family to control NPBL unless authority had previously been granted for some other member of that corporate family to control NPBL.

Exemptions for "[t]ransactions within a corporate family that do not result in adverse changes in service levels, significant operational changes, or a change in the competitive balance with carriers outside the corporate family" are permitted under 49 C.F.R. § 1180.2(d)(3).  NSR argues that at the time of the 1991 and 1998 transactions, NPBL was unquestionably part of the corporate family, whether authorized or not.  (<u>Id.</u>)  NSR also states that there was no requirement in the notice of exemption rules that NSC or SRC specifically "declare" that NPBL would come under the direct control of SRC.  (<u>Id.</u>)  NSR's interpretation would allow the corporate family exemption to effectively nullify other Board requirements since parties could acquire control of a carrier without informing the Board in a transaction that would normally require an application or another type of exemption under the Board's rules and then cure that unauthorized acquisition by reorganizing the corporate family and seeking a corporate family transaction exemption. Moreover, under NSR's interpretation, the Board and the public might never even know that control authority was granted since, according to NSR, the party seeking the exemption is not required to name the entities over which the exemption would provide the new control authority. It is implicit in 49 C.F.R. § 1180.2(d)(3)'s requirement that the transaction be "within a corporate family" that the member of the corporate family whose ownership is changing as a result of the transaction was previously authorized to be controlled by a member of the corporate family. Accordingly, neither the ICC's 1991 decision nor the Board's 1998 decision could have provided authority for NSC to control NPBL.

Both NSR and NPBL argue that since <u>NSC Control</u>, CSXT has understood that NPBL was under the control of NSC, and CSXT raised no objections until now.  (NSR Reply 3-4; NPBL Reply 2.)  In fact, according to NSR and NPBL, CSXT has taken various actions

---

Lakefront Dock and Railroad Terminal Company (Lakefront), a carrier in which CSXT, at the time of its waiver request, held a 50% interest.  <u>Id.</u> at 3 n.3.  However, CSXT explained to the Board that Conrail was about to allocate its 50% interest in Lakefront to CSXT, which would give CSXT 100% ownership.  <u>Id.</u>

Docket No. FD 36522

acknowledging and accepting NSC's majority ownership and control of NPBL.  (NSR Reply 3-4; NPBL Opening 2-4.)  However, parties cannot create control authority through their actions and beliefs.  Control authority can only come from the Board, or previously from the ICC.  See 49 U.S.C. § 11323(a).  Thus, whether CSXT has acknowledged or accepted that NSC has a right to control NPBL is irrelevant to whether the ICC granted NSC authority to control NPBL.[24]

NPBL asserts that if the Board were to hold that NSC did not obtain authority to control NPBL, the Board should retain this matter and allow NSR to seek authority to now control NPBL.  (NPBL Reply 4-5.)  Addressing a new request for control authority would be beyond the scope of this proceeding and the District Court's referral.  Moreover, any future decision concerning control would benefit from the findings of the District Court.[25]

For the reasons explained above, the Board finds that NSC was never granted authority to control NPBL.

It is ordered:

1.  The issues in this declaratory order proceeding are resolved as described above.

2.  This decision is effective on its service date.

By the Board, Board Members Fuchs, Hedlund, Oberman, Primus, and Schultz.

---

[24]  The Board is concerned, however, about the possibility that the parties may have been aware of a potential defect regarding NSR's control of NPBL for some time and did not seek to remedy it or otherwise bring it to the Board's attention.  The Board expects stakeholders to bring such matters before the Board expeditiously and reminds the parties that a knowing violation of the Board's requirements can result in the imposition of civil penalties, and that, for certain violations, such penalties may be imposed for each day that the violation continues.  See 49 U.S.C. § 11901(a).

[25]  Given this decision, the Board expects the parties to take appropriate steps to address the unauthorized control issue immediately following resolution of the district court proceeding, including any appeals.

# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

CSX TRANSPORTATION, INC.,
*individually and on behalf
of NORFOLK & PORTSMOUTH BELT
LINE RAILROAD COMPANY,*

              Plaintiff,

v.                                      Civil No. 2:18cv530

NORFOLK SOUTHERN RAILWAY COMPANY,
and

NORFOLK & PORTSMOUTH BELT LINE
RAILWAY COMPANY,

              Defendants.

## OPINION AND ORDER

    This matter is before the Court on a motion to dismiss/motion for judgment on the pleadings/motion to refer filed by Defendant Norfolk Southern Railway Company ("NSR") prior to the close of discovery (and prior to the lengthy COVID-19 stay previously imposed in this case).  ECF No. 115.  As of the date of this Opinion and Order, discovery is now closed and summary judgment motions were recently filed by NSR and Norfolk & Portsmouth Belt Line Railway Company ("Belt Line").  A jury trial is currently scheduled to begin on July 13, 2021, although under this Court's COVID-19 operating procedures (which permitted the resumption of civil jury trials on May 3, 2021), regardless of the outcome of the instant motion, such trial date would be subject to further

continuance if there is not an available retrofitted courtroom to allow the Court to keep jurors socially distanced throughout all stages of the jury trial process.

The relevant background of the case is set forth in greater detail in this Court's September 9, 2019 Opinion and Order. ECF No. 66. In short, Plaintiff CSX Transportation, Inc. ("CSX") alleges that Defendants NSR and Belt Line committed federal antitrust violations, state law conspiracy offenses, and contractual breaches associated with the manner in which Belt Line, a company jointly owned by NSR and CSX, was operated. For the reasons set forth below, NSR's motion is **DENIED in part**, and **GRANTED in part,** as the Court refers one disputed issue to the U.S. Surface Transportation Board ("STB").

## I. Background

NSR's motion challenges the jurisdiction of this Court, seeks judgment on the pleadings based on a claim of immunity, or alternative to both requests, asks this Court to refer two issues to the STB. It should be noted at the outset that: (1) both Belt Line and NSR previously filed timely motions to dismiss in this case, ECF Nos. 27, 34; (2) Belt Line's prior motion advanced a related, though not identical, challenge to this Court's jurisdiction, with such earlier-in-time challenge deemed "meritless" by this Court, ECF No. 66, at 20; (3) NSR did not previously challenge this Court's jurisdiction or otherwise raise

Case 2:18-cv-00530-MSD-RJK   Document 463-2   Filed 10/03/22   Page 49 of 122 PageID# 10936
Case 2:18-cv-00530-MSD-RJK   Document 395   Filed 05/18/21   Page 3 of 30 PageID# 9827
USCA Case #22-1209   Document #1966943   Filed: 09/30/2022   Page 48 of 121

an immunity defense—to the contrary, NSR previously acknowledged its inability to reach "some averments in the Complaint as to the federal antitrust claims," ECF No. 35, at 3, and <u>conceded</u> jurisdiction over such claims, ECF No. 69 ¶ 11; and (4) NSR did not previously request a transfer to the STB for the purposes of addressing an immunity defense or determining a reasonable "switching rate" for use of Belt Line's tracks.

NSR now asserts that it is immune from federal antitrust laws and state conspiracy laws with respect to its relationship with Belt Line <u>not</u> because of any recent developments in the case, or new facts learned during discovery, but rather, on the ground that NSR has been immune from such claims for decades based on a railway consolidation/merger occurring in 1982. While this Court again finds that it has jurisdiction over this case, and has reservations regarding the validity of such immunity defense, the Court will refer the immunity issue to the STB in light of its expertise regarding the process and scope of railroad company mergers.

## II. Jurisdictional Challenge

NSR first contends that this Court lacks jurisdiction over this case and thus seeks dismissal under Rule 12(b)(1). Because a Rule 12(b)(1) motion can be filed at any time, NSR contends that its motion, filed long after this Court denied the original round of Rule 12(b) motions, is timely.

In support of its jurisdictional challenge, NSR argues, among other things, that the parties' dispute arises out of a railway consolidation/merger, and that the STB, formerly the Interstate Commerce Commission ("ICC"): (1) has exclusive authority to approve mergers between rail carriers; and (2) that carriers participating in an approved merger are "exempt" from antitrust laws and other laws "as necessary to . . . carry out the transaction." ECF No. 116, at 8 (emphasis omitted); accord 49 U.S.C. § 11321(a).[1]  While the Court agrees with NSR's recitation of the law, the STB's exclusive authority over rail carrier mergers implicates the doctrine of "primary jurisdiction," which—despite its name—is not "jurisdictional."   Importantly, "[d]espite what the term [primary jurisdiction] may imply, [it] does not speak to the jurisdictional power of the federal courts.   It simply structures the proceedings as a matter of judicial discretion, so as to engender an orderly and sensible coordination of the work of agencies and courts."   Envt'l Tech. Council v. Sierra Club, 98 F.3d 774, 789 n.24 (4th Cir. 1996) (second and third alterations in original); see Stevens v. Bos. Sci. Corp., 152 F. Supp. 3d 527, 533 (S.D.W. Va. 2016) (explaining that the name of such doctrine "is a misnomer").   The doctrine is applicable when a claim cognizable in federal court "requires the resolution of issues

---

[1] 49 U.S.C. § 11321 was previously codified at 49 U.S.C. § 11341.

which, under a regulatory scheme, have been placed within the special competence of an administrative body," thus causing a district court to suspend the judicial process "pending referral of [specific] issues to the administrative body for its views." United States v. W. Pac. R.R. Co., 352 U.S. 59, 64 (1956); see Mulberry Hills Dev. Corp. v. United States, 772 F. Supp. 1553, 1561 (D. Md. 1991) (explaining that a district court should "refrain from exercising its judicial power so that an agency particularly equipped to address issues and charged with regulatory duties within its expertise may perform its functions").

Here, notwithstanding NSR's arguments to the contrary, this Court has jurisdiction over the federal antitrust claims in this case, and has supplemental jurisdiction over the related state law claims.   NSR's Rule 12(b)(1) motion to dismiss for lack of jurisdiction is therefore **DENIED**.

### III. Rule 12(c) Dismissal or STB Referral - Immunity

NSR next argues that this Court should dismiss this matter on the pleadings pursuant to Rule 12(c) based on NSR's statutory immunity.   Plaintiff challenges the timeliness of such argument, contending that NSR's argument seeking dismissal: (1) should have been advanced as a Rule 12(b)(6) motion and was filed many months after the 12(b)(6) deadline; (2) contradicts NSR's prior jurisdictional position; (3) duplicates Belt Line's prior failed

Case 2:18-cv-00530-MSD-RJK   Document 463-2   Filed 10/03/22   Page 52 of 122 PageID# 10939
Case 2:18-cv-00530-MSD-RJK   Document 395   Filed 05/18/21   Page 6 of 30 PageID# 9830
USCA Case #22-1209   Document #1966943   Filed: 09/30/2022   Page 51 of 121

jurisdictional challenge, thereby conflicting with the "law of the case"; and (4) is unripe to the extent it separately asserts that certain potential remedies would invade the province of the STB's exclusive jurisdiction.  ECF No. 131, at 2-4.  NSR and Belt Line each counter that NSR's arguments in support of dismissal differ from Belt Line's prior arguments in that they rely on a different statutory provision (49 U.S.C. § 11321), ECF Nos. 132, 138, with NSR again noting that jurisdiction can be challenged at any time.

First, to the extent NSR argues that its Rule 12(c) motion to dismiss is timely and/or meritorious based on jurisdictional grounds, the Court rejects such claim without further analysis for the same reasons set forth above.  Second, as outlined below, to the extent NSR is seeking a Rule 12(c) dismissal, or alternatively, referral to the STB based on § 11321(a) immunity, the Court finds that although such claim was "delayed," it is not fatally untimely, and while dismissal is not appropriate, the request for referral to the STB on the immunity issue has merit.  Third, to the extent NSR seeks a referral to the STB for a rate setting determination, such request is denied at this time for the same reasons this Court previously concluded that it has authority to grant monetary and injunctive relief in this case.

### A. Timeliness of Motion

As to the timeliness of the immunity defense, CSX accurately highlights the fact that NSR's pending motion was filed during

discovery and several months after the original round of Rule 12(b) motions was resolved by the Court.  NSR fails to demonstrate why it did not raise such immunity defense earlier in the case,[2] or why it appeared to previously concede that it had no valid basis to challenge the federal antitrust claims at that stage of the case.  The delayed timing of NSR's immunity claim is especially notable because the defense is predicated on a merger that has <u>at all times</u> been within NSR's knowledge.

Notwithstanding NSR's delay, NSR appears correct both that CSX's complaint does not include the facts on which NSR bases its immunity defense[3] and that the motion, filed sufficiently in advance of the scheduled trial date, is timely under Rule 12(c).  <u>See</u> Fed. R. Civ. P. 12(c) ("After the pleadings are closed--but early enough not to delay trial--a party may move for judgment on the pleadings."); Fed. R. Civ. P. 12(h)(2) (indicating that failure

---

[2]  While NSR's Answer advances three affirmative defenses mentioning "immunity," none of these three theories is predicated on § 11321(a).  ECF No. 69.  CSX does not squarely assert a pleading error in response to the pending Rule 12(c) motion, although CSX does contend that NSR's motion has little relation to its answer.  <u>See</u> ECF No. 131, at 3.

[3]  The complaint broadly references "mergers and acquisitions" over many decades involving multiple railways, ECF No. 1 ¶¶ 2, 21; however, it does not appear to discuss the 1982 merger, the ICC/STB's approval of it, or the fact that as of 1989, two of the three railway companies with an ownership interest in Belt Line were affiliates under common ownership due to the 1982 merger.  NSR's answer filled in the necessary facts regarding the 1982 merger and 1989 common ownership.  ECF No. 69 ¶ 2.  In fact, long prior to the filing of the answer, NSR reported such facts to the Court in its brief in support of its original dismissal motion, to include citing the STB's consolidation ruling.  <u>Norfolk S. Corp.—Control—Norfolk & W. Ry. Co. & S. Ry. Co.</u>, 366 I.C.C. 171 (1982).  Accordingly, it appears that NSR could have asked the Court to take judicial notice of the consolidation and argued its immunity defense at the outset of this case.

Case 2:18-cv-00530-MSD-RJK  Document 463-2  Filed 10/03/22  Page 54 of 122 PageID# 10941
Case 2:18-cv-00530-MSD-RJK  Document 395  Filed 05/18/21  Page 8 of 30 PageID# 9832
USCA Case #22-1209    Document #1966943        Filed: 09/30/2022    Page 53 of 121

to state a claim can be raised in a Rule 12(c) motion or even at trial); see also 5C Wright & Miller, Federal Practice and Procedure § 1368 (3d ed. Apr. 2021 update) ("[C]ourts typically will construe . . . a late Rule 12(b) motion, or a Rule 12(b) motion that implicates affirmative defenses, as if it were brought under Rule 12(c)."). [4]  Similarly, NSR's request seeking a stay and referral to the STB, while delayed, is not "untimely" under any applicable rule or practice argued by CSX. [5]

In the absence of a procedural bar to NSR's motion to dismiss or refer, the Court addresses the merits of such motion, further noting that this Court clearly has the authority (and potentially the obligation) to refer appropriate matters to the STB. Although the COVID-19 pandemic and associated stays requested by the parties—followed by the continued effects of the pandemic on Court

---

[4]  The most relevant non-public evidence in support of NSR's dismissal/referral motion appears to be the consolidation/merger application that NSR attached as an exhibit to such motion. ECF No. 116-5. CSX does not challenge this exhibit as a matter that is not integral to the pleadings, nor is its authenticity challenged. Accordingly, there does not appear to be a procedural obstacle to considering such document in conjunction with NSR's motion. Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016). Moreover, even if there is such an obstacle in conjunction with NSR's Rule 12(c) request for dismissal, the Court is unaware of any similar obstacle to the extent that NSR seeks referral to the STB.

[5] Under the doctrine of "primary jurisdiction," the Court has the authority to make its own discretionary determination to refer a matter to the STB in order to "promot[e] proper relationships between the courts and administrative agencies." W. Pac. R.R. Co., 352 U.S. at 63; see Stevens, 152 F. Supp. 3d at 534 (explaining that the Court can "invoke the doctrine [of primary jurisdiction] sua sponte"). Therefore, even though the doctrine of primary jurisdiction may be "waivable" in certain circumstances, CSX Transp., Inc. v. Transp.-Commc'ns Int'l Union, 413 F. Supp. 2d 553, 564 (D. Md. 2006), this Court also has discretion to consider a referral to the STB with or without a motion from the parties.

operations and litigation in this District—have delayed the Court's resolution of NSR's motion, as explained below, the Court nevertheless finds that the best course is to temporarily stay this federal action pending referral of the immunity issue to the STB as such issue is potentially dispositive of nearly all claims for relief.

## B. Merits of Dismissal/Referral

### 1. Factual Background

Briefly reciting the most relevant facts associated with the 1982 consolidation/merger that forms the basis of NSR's immunity defense, in December of 1980, NWS Enterprises, Inc. ("NWS") filed an application with the ICC to control two existing railways, Norfolk and Western Railway Company ("NW") and Southern Railway Company ("SR"). ECF No. 116-5. Shortly thereafter, the ICC filed a notice in the Federal Register describing the transaction as involving "the acquisition of control, through stock ownership of NW and its subsidiary companies and of SR and its consolidated system companies, by NWS, a newly incorporated non-carrier holding company." NWS Enters.; Application To Control Norfolk & W. Ry. Co. and S. Ry. Co., 46 FR 173-02, at 174, 1981 WL 109712 (Jan. 2, 1981) (emphases added). "The rail carrier subsidiaries of NW and the SR consolidated system carriers are set forth in the appendix" of the notice, with the appendix listing nearly fifty subsidiaries. Id. at 176. Notably absent from such list of subsidiaries is

9

defendant Belt Line.  The acquisition by the newly formed holding company was not technically considered a "merger," although "certain operating efficiencies among the carriers" were proposed, and the carriers that would be owned by NWS would "continue to operate . . . over the lines described [in the notice], subject to certain abandonments and <u>coordinated operations described in the application</u>."  <u>Id.</u> (emphasis added).  No coordination with respect to Belt Line was mentioned in the application.

Approximately a year later, the STB published a lengthy decision authorizing Norfolk Southern Corporation ("NSC")[6] to acquire "control . . . of Norfolk and Western Railway Company and its subsidiary companies and of Southern Railway Company and its consolidated companies . . . subject to conditions."  <u>Norfolk S. Corp.—Control—Norfolk & W. Ry. Co. & S. Ry. Co.</u>, 366 I.C.C. 173, 173, 1982 WL 28414 (1982).  Such decision again listed the numerous NW and SR subsidiary companies, which again did not include Belt Line, and further approved "[a]cquisition of a line of railroad and of certain trackage rights incorporated in the primary application."  <u>Id.</u> at 173, 255-57.  No mention was made of NSC acquiring control over Belt Line or the trackage rights controlled by Belt Line.  The decision did, however, note the statutory

---

[6] It appears that the holding company being created to "control" both NW and SR was initially going to be NWS, but was ultimately named NSC.  NSC is NSR's predecessor.

Case 2:18-cv-00530-MSD-RJK   Document 463-2   Filed 10/03/22   Page 57 of 122 PageID# 10944
Case 2:18-cv-00530-MSD-RJK   Document 395   Filed 05/18/21   Page 11 of 30 PageID# 9835
USCA Case #22-1209   Document #1966943   Filed: 09/30/2022   Page 56 of 121

polices of "recent rail reform legislation," which included an emphasis on the retention of competition.  Id. at 190.

The Rule 12(c) record suggests that, after the 1982 consolidation, the Belt Line partnership continued to operate under its plan of shared governance, with Belt Line's Board of Directors continuing to be appointed by CSX, NW, and SR.  ECF No. 1-3.  In 1989, CSX, NW, and SR signed an agreement to modify the number of directors appointed by each company such that NW and SR (both owned by NSC) would collectively appoint three directors, with the parties also agreeing that no other provision of the 1897 Belt Line Agreement would be amended, altered, or affected.[7]

## 2. Discussion

"Congress has vested with the STB, 'the exclusive authority to examine, condition, and approve proposed mergers and consolidations.'" CSX Transp., Inc. v. Transp.-Commc'ns Int'l Union, 413 F. Supp. 2d 553, 562 (D. Md. 2006) (quoting Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n, 499 U.S. 117, 119 (1991)).  Critical to the instant dispute, the Interstate Commerce

---

[7] According to the parties, NW and SR merged in 1990, and the number of Belt Line board members was amended again at some point after such merger.  While not critical to the Court's analysis, the Court notes for context that it appears from public records that the 1990 merger occurred pursuant to the "corporate family" exemption such that STB approval of such merger was not required, with the STB reporting in early 1991 that a notice of exemption had been filed, further indicating that such transaction would "not result in . . . a change in the competitive balance with carriers outside the corporate family."  56 Fed. Reg. 1541-03, 1991 WL 310251 (Jan. 15, 1991). It was at that time that the newly merged company was renamed "Norfolk Southern Railway [C]ompany." Id.

Case 2:18-cv-00530-MSD-RJK   Document 463-2   Filed 10/03/22   Page 58 of 122 PageID# 10945
Case 2:18-cv-00530-MSD-RJK   Document 395   Filed 05/18/21   Page 12 of 30 PageID# 9836
USCA Case #22-1209      Document #1966943         Filed: 09/30/2022      Page 57 of 121

Act provides that "[a] rail carrier, corporation, or person participating in [an] approved . . . transaction is exempt from the antitrust laws and from all other law, including State and municipal law, <u>as necessary</u> to let that rail carrier, corporation, or person <u>carry out the transaction</u>, . . . and <u>exercise control or franchises acquired</u> through the transaction." 49 U.S.C. § 11321(a) (emphases added). "The purpose of this provision, and the exemption from antitrust and other laws that it provides, is to ensure that efforts to merge and consolidate <u>are not obstructed</u>, and that <u>merger efficiencies can be achieved</u>." <u>CSX Transp., Inc.</u>, 413 F. Supp. 2d at 562–63 (emphases added) (citing <u>Train Dispatchers Ass'n</u>, 499 U.S. at 133). The Supreme Court has held that the exemption from "all other law" extends to cover "any obstacle imposed by law," including certain contracts, as long as "an ICC-approved transaction requires abrogation" of such obligations. <u>Train Dispatchers Ass'n</u>, 499 U.S. at 132–33.

While the Supreme Court has not expressly defined the contours of "necessity" in this context, a district court in this circuit has squarely addressed the issue, explaining as follows:

> The preclusive powers of the [Interstate Commerce Act] are not unlimited. As the Supreme Court noted in <u>Train Dispatchers</u>, exemption from other laws is only allowed when it is "<u>necessary to carry out an ICC-approved transaction</u>." 499 U.S. at 132–33 (emphasis added). . . .

> Although the Supreme Court did not define the term "necessary" in <u>Train Dispatchers</u>, the ICC has stated

Case 2:18-cv-00530-MSD-RJK   Document 463-2   Filed 10/03/22   Page 59 of 122 PageID# 10946
Case 2:18-cv-00530-MSD-RJK   Document 395   Filed 05/18/21   Page 13 of 30 PageID# 9837
USCA Case #22-1209   Document #1966943       Filed: 09/30/2022     Page 58 of 121

> that the ICA super[s]edes other law where there otherwise will be an impediment to the merger. CSX Corp.—Control—Chessie Sys., Inc., and Seaboard Coast Line Indus., Inc., 8 I.C.C. 2d 715, 721–22, 1992 WL 206172 (1992) ("[T]he necessity predicate is satisfied by a finding that some 'law' (whether antitrust, RLA, or a collective bargaining agreement formed pursuant to the RLA) is an impediment to the approved transaction. In other words, the necessity predicate assures that the exemption is no broader than the barrier which would otherwise stand in the way of implementation.").

CSX Transp., Inc., 413 F. Supp. 2d at 568-69. The district court went on to highlight the fact that the plaintiff in that case failed to demonstrate that a post-merger dispute over where certain railroad clerical work was to be performed was a "critical factor" that could "impede" a long since final merger, finding that "at some point, the STB's purview over a merger must end." Id. at 569. On appeal, the Fourth Circuit expressed its agreement, stating in a footnote that "[t]he amount of time that has passed since the approved transaction was successfully completed militates against our finding that the STB would have jurisdiction" over a labor dispute that can be traced back to the merger, noting that the STB's "predecessor, the ICC, as well as the Seventh Circuit, has indicated that the STB's jurisdiction over legal disputes related to a merger should not extend indefinitely." CSX Transp., Inc. v. Transp. Commc'ns Int'l Union, 480 F.3d 678, 685 n.5 (4th Cir. 2007) (citing Del. & Hudson Ry. Co.-Lease & Trackage Rts. Exemption–Springfield Terminal Ry. Co., 8 I.C.C. 2d 839, 845,

1992 WL 46807 (1992); <u>Harris v. Union Pac. R.R.</u>, 141 F.3d 740, 744 (7th Cir. 1998)).

The Seventh Circuit's opinion in <u>Harris</u> is instructive regarding the breadth of authority appropriately ceded to the STB when post-merger disputes arise in situations where the ICC approved a merger but said nothing, <u>and implied nothing</u>, about it being "necessary" for a certain law, contract, or other "obstacle" to the merger to be set aside as a barrier to the merger. <u>Harris</u>, 141 F.3d at 743-44. The Seventh Circuit explained:

> If the Commission says that it is "necessary" for some law to give way, then we review its decision to determine whether it was arbitrary, capricious, or an abuse of discretion. If the Commission implies (but does not quite say) that some other law had to yield, then perhaps a court should refer the subject to the agency under the doctrine of primary jurisdiction. <u>See Railway Labor Executives' Ass'n v. United States</u>, 987 F.2d 806, 815 (D.C. Cir. 1993). But if the agency says nothing, a post-merger dispute is resolved under generally applicable laws. We added in <u>Burlington Northern</u> that "necessary", like "all", should be taken seriously. <u>Only laws that would block the transaction give way</u>. . . .
>
> On the railroad's understanding of § 11341(a), the Board is forever in charge of all legal disputes related to a merger. Is the railroad liable to a brakeman injured by failure of a coupler on a car that came from the acquired corporation? Does an easement on any of the carrier's rights of way survive the merger? Are the employees entitled to a Christmas bonus under the labor agreement? Some of these issues are resolved by arbitration or bargaining, others under state property law or the Safety Appliance Act. <u>See Norfolk & Western Ry. v. Hiles</u>, 516 U.S. 400 (1996). But if the Union Pacific were right, everything would be up for grabs. Who can tell which of these laws the Commission might have thought incompatible with the merger?

Case 2:18-cv-00530-MSD-RJK   Document 463-2   Filed 10/03/22   Page 61 of 122 PageID# 10948
Case 2:18-cv-00530-MSD-RJK   Document 395   Filed 05/18/21   Page 15 of 30 PageID# 9839
USCA Case #22-1209   Document #1966943      Filed: 09/30/2022   Page 60 of 121

Harris, 141 F.3d at 743–44 (emphasis added).  While Harris and the 2006/2007 CSX case are instructive, those cases consider the necessity requirement in the context of ensuring the absence of an obstacle to "carry[ing] out the transaction," as contrasted with the portion of § 11321(a) addressing the need to "exercise control or franchises acquired through the transaction."

Here, the record clearly reveals that the ICC/STB said nothing about setting aside any state or federal law as an impediment to the 1982 consolidation with respect to Belt Line,[8] and in fact, said nothing about Belt Line in any respect.  Notably, as CSX argues, Belt Line is not included on the lengthy list of subsidiary companies in the appendix to the public notice that would be controlled by NSW/NSC if the consolidation was approved.  The record further suggests that the 1982 consolidation "applicants" never asked the ICC/STB to authorize "control" over Belt Line,[9] with the proposed consolidation plan stating as follows:

---

[8] NSR does not argue in its motion that, post-consolidation, it should also be freed from its contractual obligations set forth in the 1897 Belt Line Agreement.  This may be because the contract was re-ratified after 1982, or it may be because NSR recognizes that setting aside the contract is not "necessary" to the success of the merger.  See City of Palestine v. United States, 559 F.2d 408, 415 (5th Cir. 1977) ("Congress allowed the ICC significant power to effectuate approved transactions, but it did not authorize gratuitous destruction of contractual relations even when it serves the general public interest when the destruction is irrelevant to the success of approved transactions.") (emphasis added).  Regardless of the reason, such issue is not before this Court.

[9] Belt Line was listed by the applicants in an appendix to the application as an entity that NW, SR, and an SR subsidiary each held an ownership interest in, with the collection of these interests totaling to 57.14

Case 2:18-cv-00530-MSD-RJK  Document 463-2  Filed 10/03/22  Page 62 of 122 PageID# 10949
Case 2:18-cv-00530-MSD-RJK  Document 395  Filed 05/18/21  Page 16 of 30 PageID# 9840
USCA Case #22-1209  Document #1966943  Filed: 09/30/2022  Page 61 of 121

(1) The proposed transaction involves Interstate Commerce Commission (Commission) authorization under Section 11343 et seq. of the Interstate Commerce Act (49 U.S.C. § 11343 et seq.) for NWS Enterprises, Inc. (NWS), a newly-incorporated non-carrier holding company, to acquire control through stock ownership of Norfolk and Western Railway Company (NW) and its subsidiary carrier companies, and of Southern Railway Company (Southern) and its consolidated system companies (collectively SR).

(2) As a result of the proposed transaction, NWS will also acquire indirect control through stock ownership of all subsidiaries of NW and Southern, including Southern Region Motor Transport, Inc. (SRMT), a motor carrier subsidiary of a wholly owned rail carrier subsidiary of Southern.

(3) By this application NWS is seeking Commission authorization under § 11343 to acquire control of NW and SR.

(4) The proposed transaction involves the acquisition of control through stock ownership of Norfolk and Western Railway Company and its subsidiary companies, and of Southern Railway Company and its consolidated system companies, by NWS Enterprises, Inc., a newly-incorporated non-carrier holding company.

(5) Applicants respectfully submit that the transactions proposed herein are in full accordance . . . with the statutory criteria set forth in the Interstate Commerce Act (49 U.S.C. §§ 11343-11347) . . . [and] Applicants respectfully request that the Commission make the following findings with respect thereto:

In Finance Docket No. 29430 (Sub-No. 1), that the following transactions are within the scope of 49 U.S.C. § 11343; are consistent with the public interest; reflect terms and conditions which are just and

---

percent. ECF No. 116-5, at 77. The seventeen-page chart that included Belt Line among over 150 other companies was provided to the ICC in response to a regulatory requirement that the applicants list the "measure of control or ownership exercised by Applicants over other carriers," ECF No. 116-5, at 77. It was not, therefore, a chart listing entities that NSC requested control over as part of the transaction. While such chart was not a "request" for control, it appears to illustrate that majority stock ownership of Belt Line would result from consolidation.

> reasonable . . . <u>and will have no adverse impact upon,
> but rather will enhance competition among rail carriers
> in the affected region</u>:
>
>> [●] acquisition by NWS Enterprises, Inc., <u>of
>> control of</u> Norfolk and Western Railway Company
>> <u>and its carrier subsidiaries</u>, and of Southern
>> Railway Company <u>and its consolidated system
>> companies</u> . . . .

ECF No. 116-5, at 4-5, 15, 19, 35-36 (emphases added).  The second item listed above appears significant to the Court as it indicates that NWS/NSC provided an express notice that it would acquire "indirect control" over a motor carrier "as a result" of the proposed transaction, and it discussed such "control" and the further permissions that were required.  NSR does not highlight any similar reference in the application stating that NWS/NSC was seeking approval of "indirect control" over Belt Line because the combination of stock held by three different NSW/NSC subsidiaries would, <u>post-consolidation</u>, amount to more than a 50 percent ownership interest in Belt Line.[10]

The above facts, as interpreted by the Court, provide support for CSX's position that it is appropriate to draw a distinction between a transaction that led to NSR amassing a slight majority ownership position in Belt Line (a cooperative partnership formed to serve the interests of all owners), and a transaction involving

---

[10]  The detailed STB authorization ruling broadly indicates that the STB considered the anticompetitive effects of the consolidation, <u>Norfolk S. Corp.—Control</u>, 366 I.C.C. at 190-91, 227-29; however, there is no indication, one way or the other, that Belt Line was part of such analysis.

17

the STB "approving" NSR to control Belt Line such that NSR was immune from antitrust/conspiracy law, thus freeing NSR (at least under such laws) to leverage its ownership of NW and SR in a coordinated effort to harm CSX.  The concern about coordination purportedly designed to harm CSX is especially acute in light of the fact that Belt Line is, by design, a separate corporate entity with a mission of operating for the collective good of all owner railways.[11]

The consolidation documents before the Court[12] therefore suggest that the STB did not "announce" that NSC would control Belt Line, and it certainly did not announce that NSC was exempt from federal antitrust laws or state conspiracy laws.  However, as to the latter point, the STB and federal courts have repeatedly held that § 11321 is not predicated on the agency "announcing that a particular exemption is necessary"; rather, the immunity

---

[11] As discussed in the Court's prior Opinion and Order, ECF No. 66, at 3-4, the 1897 Belt Line Agreement was originally executed by eight different railroad companies, ECF No. 1-1.  "[E]ach of the Companies . . . desire[d] to secure the construction of a Belt Line Railroad" in Virginia "for the mutual benefit of each in the interchange of business" with all companies agreeing that it was "for the best interest of all" that the Belt Line Railroad "be constructed, maintained and operated under a separate organization in which all are to be equally interested and each to have an equal representation."  ECF No. 1-1, at 3 (emphases added).  The written agreement further provided that the named companies "will co-operate cordially in encouraging the business of the [newly formed] Railroad Company, for which it is constructed."  Id. at 6 (emphasis added).  Thus, there may not be the same "necessity" to control Belt Line as compared to a "typical" subsidiary beholden to the majority owner.

[12] The Court has only been provided "Volume 2/2A" from the consolidation application.

exemption is "self-executing." Consol. Coal Sales Co. v. Consol. Rail Corp., 2002 STB Lexis 317, at *9-10 (S.T.B. May 23, 2002) (quoting ICC v. Locomotive Eng'rs, 482 U.S. 270, 298 (1987) (Stevens, J., concurring)); see Soo Line R.R. Co. v. Consol. Rail Corp., No. 2:17cv106, 2018 WL 1566816, at *7 (N.D. Ind. Mar. 29, 2018) ("The statute makes the exemption self-executing whenever necessary to carry out an STB-approved transaction."); CSX Corp.—Control—Chessie Sys., 8 I.C.C. 2d at 723 n.12 (same).

While CSX acknowledges that the STB "approved" a transaction that resulted in NSC amassing a 57 percent ownership interest in Belt Line and obtaining the right to appoint the majority of Belt Line's Board of Directors, CSX argues that such occurrence is not the same as the STB approving "control." In this Court's view, the strongest support for such argument is that NSW/NSC did not request "control" over Belt Line in its application, the STB did not announce that Belt Line would be controlled in the public "notice" of the application, nor did the STB announce that such control was authorized in its approval. While the Court acknowledges that the STB need not "announce" that the self-executing immunity exemption applies to a specific merger transaction, this Court is unaware of any STB decision or other precedent suggesting that STB notices do not even need to identify the companies over which control is being requested and authorized. Cf. 49 U.S.C. § 11344(a) (1982) (indicating that an application

Case 2:18-cv-00530-MSD-RJK   Document 463-2   Filed 10/03/22   Page 66 of 122 PageID# 10953
Case 2:18-cv-00530-MSD-RJK   Document 395   Filed 05/18/21   Page 20 of 30 PageID# 9844
USCA Case #22-1209   Document #1966943   Filed: 09/30/2022   Page 65 of 121

for control requires the Commission to "notify those carriers" involved in the proposed transaction).[13]

Notwithstanding CSX's facially strong position regarding the absence of evidence of STB authorization of "control," CSX's position appears weakest when it argues that 57 percent ownership coupled with the ability to dominate the board of directors does not constitute "control" under STB precedent.  While the parties agree that the concept of "control" is fact-based and varies with the circumstances, NSR effectively highlights CSX's inability to point to any ICC/STB decision finding that majority stock ownership coupled with an ability to appoint more than half of a board of directors can be interpreted as anything other than "control" over a subsidiary railway.  ECF No. 138, at 9-10.  Although addressing a slightly different issue, this Court has located a previous STB ruling that is relevant to the instant dispute.  In CSX's favor, the STB's analysis confirms that other facts relevant to "control" still must be analyzed on a case-by-case basis even when a railway owns more than half of the stock of another railway.  In NSR's favor, the STB's analysis appears to put significant emphasis on the ability to control the board of another railway.  See Brotherhood of Ry. & Airline Clerks v. Burlington N. Inc., 671

---

[13] The "Historical and Revision" notes to 49 U.S.C. § 11344 indicate that subsection (a) was revised prior to 1982 to eliminate the need to also notify the applicant "since the applicant is on notice by filing the application."  Section 11344 has been replaced by 49 U.S.C. § 11324.

F.2d 1085, 1090 (8th Cir. 1982) (recounting the respondents'
arguments that "terminal and switching railroads are not subject
to control by any one carrier, but are more properly viewed as
'partnerships' in which no one partner has the ability to control
the destiny of the corporation" and that "the inherent nature of
the companies and of the service they provide makes control by any
one carrier impossible," but remanding such issue to the STB based
on an incomplete record); Burlington N., Inc.—Control & Merger—
St. Louis-San Francisco Ry. Co., 366 I.C.C. 862, 866 & Appx. C,
1983 WL 28006 (1983) (finding, on limited remand, that: (1)
Burlington Northern did not control various terminal and switching
companies in which it owned less than, or exactly, a 50 percent
interest and had an inability to dominate the board of directors;
but (2) a "switching railway" and a "bridge railway" in which
Burlington Northern held "an ownership interest in excess of 50
percent," and had an ability to dominate the board, among other
facts demonstrating integration, were "under the direct control
and management" of Burlington Northern); cf. 49 U.S.C. § 10102(3)
("'[C]ontrol', when referring to a relationship between persons,
includes actual control, legal control, and the power to exercise
control, through or by (A) common directors, officers,
stockholders, a voting trust, or a holding or investment company,
or (B) any other means."); Union Pac. Corp., Union Pac. R.R. Co.
& Mo. Pac. R.R. Co.—Control—Chicago & N. W. Holdings Corp. &

Case 2:18-cv-00530-MSD-RJK   Document 463-2   Filed 10/03/22   Page 68 of 122 PageID# 10955
Case 2:18-cv-00530-MSD-RJK   Document 395   Filed 05/18/21   Page 22 of 30 PageID# 9846
USCA Case #22-1209   Document #1966943   Filed: 09/30/2022   Page 67 of 121

<u>Chicago & N. W. Transp. Co.</u>, 9 I.C.C. 2d 939, 947 (I.C.C. Sept. 17, 1993) ("In determining whether one person controls another, the Commission has rejected any arbitrary formula based upon percentage of stock ownership, and instead, [has] looked to a number of additional factors, including distribution of the remaining stock, the ability to elect directors and otherwise control or influence decision-making machinery, and the existence of management, marketing, operating and financial ties.").

In light of all of the above, this Court finds that the STB is the proper authority to clarify the contours of the 1982 consolidation at issue in this case.  The Court acknowledges the apparent uniqueness of remanding an issue to the STB four decades after a railway consolidation was finalized.  However, the alternative is for this Court to re-evaluate the details of the very same forty-year-old railway merger and determine what was requested, noticed, and approved by the ICC/STB during the administrative consolidation process.  While precedent makes clear that the STB should generally not retain jurisdiction many years after a merger is complete with respect to new contracts, new factual developments, or new legal disputes that are tangentially related to a long-finalized merger, <u>CSX Transp., Inc.</u>, 480 F.3d at 685 n.5; <u>Harris</u>, 141 F.3d at 744,[14] the dispute in this case is

---

[14] <u>But see</u> <u>CSX Corp.-Control-Chessie Sys.</u>, 8 I.C.C. 2d at 724 n.14 (noting that, in appropriate circumstances, "operational changes" made eight years

Case 2:18-cv-00530-MSD-RJK   Document 463-2   Filed 10/03/22   Page 69 of 122 PageID# 10956
Case 2:18-cv-00530-MSD-RJK   Document 395   Filed 05/18/21   Page 23 of 30 PageID# 9847
USCA Case #22-1209   Document #1966943        Filed: 09/30/2022   Page 68 of 121

distinguishable from the labor dispute cases cited by CSX that are based on changing operations <u>after</u> a merger is completed.  Here, there is not a new legal dispute tangential to the merger, but a dispute germane to the consolidation itself, with the genesis of the dispute grounded in the ICC/STB merger procedure and an associated factual dispute regarding the scope of what was actually approved/authorized by the ICC/STB in 1982.  <u>See</u> <u>Envt'l Tech.</u> <u>Council</u>, 98 F.3d at 789 (noting that the purpose of the primary jurisdiction doctrine is "taking advantage of agency expertise and referring issues of fact not within the conventional experience of judges or cases which require the exercise of administrative discretion"); <u>Ry. Lab. Execs.' Ass'n v. S. Pac. Transp. Co.</u>, 7 F.3d 902, 906 (9th Cir. 1993) (indicating that the ICC "should have exclusive authority to clarify the scope of its own approval and the corresponding breadth of the section 11341(a) exemption"); <u>AT&T Commc'ns, Inc. v. Consol. Rail Corp.</u>, 285 F. Supp. 2d 649, 662 (E.D. Pa. 2003) (denying a dismissal motion, but granting a motion to stay a portion of the case and refer an issue to the STB because: (1) "the issue of whether the § 11321(a) exemption applies to an STB-authorized transaction is within the agency's jurisdiction"; and (2) "the STB possesses the expertise necessary to resolve" the dispute because "the STB has studied the

---

after a "Commission-approved merger" were causally tied to the merger itself).

Transaction; entertained public comment, hearings, and arguments on the Transaction; and memorialized its approval in a lengthy, detailed document"); cf. CSX Corp.-Control-Chessie Sys., 8 I.C.C. 2d at 722–23 ("The appropriate tribunal to determine whether the proposed change in the status quo is directly related to and grows out of, or flows from, a specifically authorized principal transaction is this Commission, or the arbitrator acting pursuant to the Commission's authority."). Referring back to the analysis in Harris, if, as NSR asserts, the STB did approve NSC's "control" over Belt Line in 1982, such approval at least "implie[d] (but d[id] not quite say) that [antitrust/conspiracy] law[s] had to yield," thereby rendering it appropriate for this Court to "refer the subject to the agency under the doctrine of primary jurisdiction." Harris, 141 F.3d at 743.

In addition to the open question regarding authorization of "control," the Court notes the lack of precedent/administrative guidance with respect to the parties' competing positions as to whether it was "necessary" for NSR to be freed from antitrust and conspiracy laws based on the railway consolidation at issue in this case. In CSX's favor, the large-scale consolidation approved in 1982 appeared to have nothing to do with Belt Line such that NSC's need to secure "control" over Belt Line uninhibited by antitrust/conspiracy laws was not necessary to achieve the efficiencies of consolidation. See CSX Transp., Inc., 413 F. Supp.

2d at 562-63 ("The purpose of [§ 11321(a)], and the exemption from antitrust and other laws that it provides, is to ensure that efforts to merge and consolidate <u>are not obstructed</u>, and that <u>merger efficiencies can be achieved</u>.") (emphases added); <u>CSX Corp.—Control—Chessie Sys.</u>, 8 I.C.C. 2d at 721 ("[T]he 'necessity' predicate is satisfied by a finding that some 'law' . . . is an impediment to the approved transaction."). Moreover, it appears from the current record that Belt Line may have successfully operated as a collective/partnership for years after the consolidation, further suggesting that it was not "necessary" to allow NSR to dominate Belt Line in the same way that a parent company often controls a "typical" subsidiary. However, on the other side of the equation, if, post-consolidation, the STB classifies Belt Line as a "franchise" acquired through the transaction, and if NSC "acquiring" Belt Line was in fact "approved" by the STB in 1982, then it is arguably "necessary" under the scheme implemented by Congress and the STB to permit NSC/NSR to exercise its majority control over its newly acquired subsidiary free from the confines of antitrust or state conspiracy law.  <u>See</u> 49 U.S.C. § 11321(a).[15]   In light of such conflicting

---

[15] The scope of the statutory phrase "control or franchises" is a matter that would benefit greatly from a consistent application as would occur through consideration by the STB in the first instance, as contrasted with a district-by-district evaluation by judges less familiar with the controlling regulatory scheme.  <u>See</u> <u>Advamtel, LLC v. Sprint Commc'ns Co., L.P.</u>, 125 F. Supp. 2d 800, 804 (E.D. Va. 2001) (indicating that, "[a]s an aid" to determine whether the doctrine of primary jurisdiction applies, the

Case 2:18-cv-00530-MSD-RJK   Document 463-2   Filed 10/03/22   Page 72 of 122 PageID# 10959
Case 2:18-cv-00530-MSD-RJK   Document 395   Filed 05/18/21   Page 26 of 30 PageID# 9850
USCA Case #22-1209   Document #1966943        Filed: 09/30/2022     Page 71 of 121

defensible positions regarding a matter squarely within the STB's expertise, referral to the STB is not only appropriate but arguably necessary.

Summarizing the above, NSR's motion to dismiss the antitrust and state conspiracy claims with prejudice is **DENIED**, but in light of the STB's primary jurisdiction, NSR's motion for a stay pending transfer of a single question to the STB regarding the applicability of § 11321(a) immunity is **GRANTED**.[16]

### IV. Rule 12(c) Dismissal or STB Referral - Remedies

Belt Line's original Rule 12(b) motion sought dismissal, in part, based on this Court's purported lack of jurisdiction to award certain damages, ECF No. 28, at 11, and NSR's current motion seeks dismissal and/or referral to the STB of certain matters relevant to damages based largely on the same theory, ECF No. 116, at 15-22.  Considering the timing of such motion, and considering the

---

court should consider, among other things, whether the issue "involves technical or policy considerations within the agency's particular field of expertise" and whether "there exists a substantial danger of inconsistent rulings," so as to "promote[] a uniform development of law and policy in the areas where Congress has delegated to an administrative agency the authority to develop and establish national rules").

[16] A stay is appropriate notwithstanding the late stage of this case because the STB's decision impacts the validity of a majority of the claims for relief in this case.  Additionally, as argued by NSR, it appears that CSX could have pursued a legal challenge to the reasonableness of the Belt Line switching rate in a proceeding before the STB for almost ten years before it filed suit, as the currently-in-place switching rate was established in 2009 and disputed by CSX as early as 2010.  As discovery is complete and summary judgment briefing was just completed, the Court will be in a position to address dispositive issues and expeditiously schedule a trial after the STB resolves the lone issue referred to it by this Court.

Case 2:18-cv-00530-MSD-RJK   Document 463-2   Filed 10/03/22   Page 73 of 122 PageID# 10960
Case 2:18-cv-00530-MSD-RJK   Document 395   Filed 05/18/21   Page 27 of 30 PageID# 9851
USCA Case #22-1209   Document #1966943   Filed: 09/30/2022   Page 72 of 121

fact that such a determination is relevant to, but not controlling of, certain damages and/or the injunctive relief sought in this case, NSR's request is **DENIED** at this time.  First, the Court agrees with CSX that the motion seeking dismissal/referral could have been brought at the time NSR filed its initial Rule 12(b)(6) motion, but as explained above, such motion is not fatally untimely.  Second, NSR's request for dismissal/referral appears somewhat duplicative of arguments in Belt Line's earlier dismissal motion that have already been rejected by this Court.  See ECF No. 66, at 21-25.  Third, contrary to NSR's assertions, CSX's claims for relief do not appear to "begin and end" with a determination of whether the "switching rate" charged by Belt Line is "reasonable."  Finally, a separate rate-setting proceeding before the STB has already been initiated, and the STB proceeding is currently stayed pending this Court's resolution of the antitrust and conspiracy claims at issue in this case, with the STB fully aware of the current litigation.  NSR's motion fails to demonstrate the need for this Court to force the determination of a "reasonable rate" back to the STB at this time.  Notably, the STB setting a new reasonable switching rate to be in place going forward will not resolve the contract, conspiracy, and antitrust claims pending in this case, id. at 24, which center on whether anticompetitive and collusive conduct in the past led to an artificially inflated switching rate designed to block NSR's competitors from accessing

27

Case 2:18-cv-00530-MSD-RJK   Document 463-2   Filed 10/03/22   Page 74 of 122 PageID# 10961
Case 2:18-cv-00530-MSD-RJK   Document 395   Filed 05/18/21   Page 28 of 30 PageID# 9852
USCA Case #22-1209   Document #1966943       Filed: 09/30/2022   Page 73 of 121

Norfolk International Terminal by rail.  Similarly, NSR fails at this time to demonstrate that an STB re-evaluation of the reasonableness of the current switching rate would dictate what remedies are appropriate in this case and/or resolve whether antitrust or conspiratorial actions designed to harm CSX proximately caused the establishment of such switching rate.[17]

This Court, of course, has every intention of ensuring that the monetary or injunctive remedies secured in this case (if any) are within this Court's authority to award, and nothing in this Court's ruling precludes the Court from seeking further input from the STB at a later time should it be deemed necessary to determine damages.  The Court's decision not to refer the determination of a "reasonable" switching rate to the STB at this time is not tantamount to a finding that this Court has the authority to decide such a rate or to award CSX trackage rights.  Such decision is also not an indication of how this Court will rule on NSR's recently-filed, and still unripe, motion in limine seeking to exclude evidence and argument suggesting that Belt Line's switching rate is "unreasonable" or "excessive."  ECF No. 329.  Rather, CSX alleges in this lawsuit that NSR and/or Belt Line committed federal and state law violations, and well as contractual breaches, by conspiring to manipulate a privately determined

---

[17] The current switching rate was established in 2009 without input from the STB, and CSX asserts that the establishment of such rate, and the maintenance of such rate over time, was the product of unlawful collusion.

<u>switching rate</u> for the purpose of harming CSX, and the Court finds, consistent with its earlier ruling, that determining liability, as well as at least some remedies associated with the alleged liability, falls within this Court's authority.

### V. Conclusion

For the reasons outlined above: (1) NSR's motion to dismiss on jurisdictional grounds is **DENIED;** (2) NSR's motion to dismiss the antitrust and state conspiracy claims with prejudice is **DENIED**; (3) NSR's motion to refer to the STB a determination of a reasonable "switching rate" is **DENIED** at this time; and (4) in light of the STB's primary jurisdiction, NSR's motion for a stay pending transfer of the immunity dispute to the STB is **GRANTED.** The following discrete question is **REFERRED** to the STB:

> Did the 1982 consolidation, whereby NSC acquired an indirect 57 percent interest in Belt Line, involve the ICC/STB granting NSC "approval" to control Belt Line, and if so, did such authorized "control" render it necessary for antitrust and/or state conspiracy laws to yield, whether because Belt Line was then deemed a "franchise" of NSC, or for any other reason?

After the STB rules, this Court will expeditiously resolve all remaining summary judgment issues, to include the breach of contract claim that is outside the referral to the STB. In the interim, the instant case will be **STAYED.**[18]   The trial date is

---

[18] The stay does not preclude counsel from coordinating with each other, and the Magistrate Judge assigned to this case (to the extent the Magistrate Judge determines it to be appropriate) to seek a resolution of any pending sealing motions.

Case 2:18-cv-00530-MSD-RJK   Document 463-2   Filed 10/03/22   Page 76 of 122 PageID# 10963
Case 2:18-cv-00530-MSD-RJK   Document 395   Filed 05/18/21   Page 30 of 30 PageID# 9854
USCA Case #22-1209      Document #1966943         Filed: 09/30/2022      Page 75 of 121

hereby released, and counsel are instructed to contact the undersigned judge's calendar clerk to schedule a new trial date as soon as the STB issues its ruling.

The Clerk is **DIRECTED** to forward a copy of this Opinion and Order to all counsel of record and to the U.S. Surface Transportation Board.

**IT IS SO ORDERED.**

/s/

Mark S. Davis
CHIEF UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
May __18__, 2021

# EXHIBIT C

# BAKER & MILLER PLLC

ATTORNEYS and COUNSELLORS
2401 PENNSYLVANIA AVENUE, NW
SUITE 300
WASHINGTON, DC  20037

TELEPHONE:  (202) 663-7820
FACSIMILE:  (202) 663-7849

William A. Mullins

Direct Dial:  (202) 663-7823
wmullins@bakerandmiller.com

June 21, 2021

302570

<u>**VIA E-FILING**</u>
Cynthia T. Brown
Chief of the Section of Administration
Office of Proceedings
Surface Transportation Board
395 E Street, SW
Washington DC  20423-0001

ENTERED
Office of Proceedings
June 21, 2021
Part of
Public Record

      Re:    FD 36522
            <u>Norfolk Southern Railway Company -- Petition for a Declaratory Order and</u>
            <u>Request to Set a Procedural Schedule</u>

Dear Ms. Brown:

      Please find attached Norfolk Southern Railway Company's Petition for a Declaratory Order and Request to Set a Procedural Schedule in response to a referral from the U.S. District Court for the Eastern District of Virginia in <u>CSX Transportation, Inc. v. Norfolk Southern Railway</u>, No. 2:18-cv-00530 (E.D. Va. Decided May 18, 2021).  The required filing fee of $1,400.00 has been paid on pay.gov.  If there are any questions concerning this e-filing, please contact me by telephone at (202) 663-7823 or by e-mail at <u>wmullins@bakerandmiller.com</u>.  If I am unavailable, you may contact my associate, Crystal M. Zorbaugh, by telephone at (202) 663-7831 or by e-mail at <u>czorbaugh@bakerandmiller.com.</u>

                    Sincerely,

                    /s/ *William A. Mullins*

                    William A. Mullins

Enclosure
cc:    Anthony J. LaRocca
       Peter W. Denton
       Louis E. Gitomer
       T.J. Litwiler

FEE RECEIVED
June 21, 2021
SURFACE
TRANSPORTATION BOARD

F I L E D
June 21, 2021
SURFACE
TRANSPORTATION BOARD

**BEFORE THE**
**SURFACE TRANSPORTATION BOARD**
_____

**FD 36522**
_____

**NORFOLK SOUTHERN RAILWAY COMPANY -- PETITION FOR DECLARATORY**
**ORDER AND REQUEST TO SET A PROCEDURAL SCHEDULE**
_____

**BRIEF BACKGROUND OF RELATED STB PROCEEDING**

Pursuant to section 5(d) of the Administrative Procedure Act, 5 U.S.C. §554(e) and 49

C.F.R. § 1117.1, Norfolk Southern Railway Company ("NSR") hereby petitions for the Board to

institute a declaratory order proceeding and establish a procedural schedule to address the issues

referred to the Board by the District Court in its May 18, 2021 decision.[1] ("Petition").  Upon

judicial referral by a court, it is customary for one or more parties to jointly petition the Board to

issue a declaratory order to resolve the disputed issues. See Boston & Maine, 330 F.3d at 12

(STB served May 1, 2001)(setting a procedural schedule to resolve issues referred to the Board

on joint request of the parties.  See also Rail-Term Corp. v. R.R. Ret. Bd., FD 35582 (STB

served November 19, 2013)(setting a procedural schedule to resolve issues referred to the Board

based on primary jurisdiction at the request of one of the parties).

Accordingly, after reviewing the recent decision by the District Court and after

conferring with STB counsel for CSX Transportation, Inc. ("CSXT") and NPBL, NSR hereby

files this Petition.  This Petition is related to the proceeding currently being held in abeyance by

_____

[1] Upon a motion made by NSR based on the STB's primary jurisdiction, the U.S. District Court
for the Eastern District of Virginia ("District Court") issued an Opinion and Order on May 18,
2021, referring to the STB the issue of whether NSR was authorized to control the Norfolk &
Portsmouth Belt Line Railroad Company ("NPBL") and the applicability of antitrust immunity
("May 18th Decision").  The District Court's opinion is attached as Exhibit A.

the Board.  See <u>Norfolk Southern Railway Company – Petition to Set Trackage Rights Compensation – Norfolk & Portsmouth Belt Line Railroad Company</u>, FD 36223 ("FD 36223").

## DISTRICT COURT REFERRAL

Last month, the District Court issued a decision related to a motion to dismiss/motion for judgment on the pleadings/motion to refer ("NSR's Motion") filed by NSR prior to the close of discovery (and prior to the lengthy COVID-19 stay previously imposed in this case). ECF No. 115.  By the time the District Court issued the May 18th Decision, discovery had closed, and summary judgment motions had been filed by NSR and NPBL.  In the May 18th Decision, the District Court denied NSR's Motion in part, and granted it in part, by referring a disputed issue to the Board.  The parties are hereby petitioning the Board to institute a declaratory order proceeding and proposing a procedural schedule to resolve.

## JOINTLY-PROPOSED PROCEDURAL SCHEDULE

Based upon discussions with counsel, the parties have reached mutual agreement on the below-proposed schedule.  The parties do not believe discovery is necessary.  Counsel for NPBL and CSXT has authorized me to express their agreement on this proposal.  Under the schedule, the parties are jointly proposing to file two rounds of evidence: simultaneous opening statements and evidence and simultaneous reply statements and evidence per the schedule set forth below.

| Event | D+ |
|---|---|
| STB order instituting declaratory order and establishing procedural schedule | O |
| Simultaneous filing of opening statements and evidence (including expert reports) | 45 |
| Simultaneous filing of reply statements and evidence | 75 |

Respectfully Submitted,

/s/ *William A. Mullins*

William A. Mullins
Crystal M. Zorbaugh
BAKER & MILLER PLLC
Suite 300
2401 Pennsylvania Ave, N.W.
Washington, D.C. 20037
Phone:          (202) 663-7823
Facsimile:      (202) 663-7849

Attorneys for Norfolk Southern Railway
Company

**June 21, 2021**

# EXHIBIT D

# BAKER & MILLER PLLC

ATTORNEYS and COUNSELLORS
2401 PENNSYLVANIA AVENUE, NW
SUITE 300
WASHINGTON, DC  20037

TELEPHONE: (202) 663-7820
FACSIMILE:  (202) 663-7849

William A. Mullins

Direct Dial:  (202) 663-7823
wmullins@bakerandmiller.com

September 23, 2021

303032

**VIA E-FILING**
Cynthia T. Brown
Chief of the Section of Administration
Office of Proceedings
Surface Transportation Board
395 E Street, SW
Washington DC  20423-0001

ENTERED
Office of Proceedings
September 23, 2021
Part of
Public Record

Re:   **NORFOLK SOUTHERN RAILWAY COMPANY – PETITION FOR
DECLARATORY ORDER, FD 36522**

Dear Ms. Brown:

Please find attached Norfolk Southern Railway Company's ("NSR") Opening Statement in
the above-captioned proceeding.  If there are any questions concerning this e-filing, please contact
me by telephone at (202) 663-7823 or by e-mail at wmullins@bakerandmiller.com.  If I am
unavailable, you may contact my associate, Crystal M. Zorbaugh, by telephone at (202) 663-7831
or by e-mail at czorbaugh@bakerandmiller.com.

Sincerely,

/s/ *William A. Mullins*

William A. Mullins

Enclosure
cc:   Anthony J. LaRocca (CSXT)
      Peter W. Denton (CSXT)
      Lou Warchot (CSXT)
      T.J. Litwiler (NPBL)

**BEFORE THE**
**SURFACE TRANSPORTATION BOARD**

---

**FD 36522**

---

**NORFOLK SOUTHERN RAILWAY COMPANY – OPENING STATEMENT**

---

**INTRODUCTION AND SUMMARY OF ARGUMENT**

On June 21, 2021, Norfolk Southern Railway Company ("NSR") petitioned pursuant to section 5(d) of the Administrative Procedure Act, 5 U.S.C. §554(e), and 49 C.F.R. § 1117.1, for the Board to institute a declaratory order proceeding and establish a procedural schedule to address an issue that was raised in the context of litigation brought by CSX Transportation ("CSXT") in the U.S. District Court for the Eastern District of Virginia ("District Court") and referred to the Board.[1]  In a decision served August 9, 2021 ("August 9th Decision"), which instituted this proceeding, the Board posed the question as follows:

> Did the 1982 Transaction consolidation, whereby NSC[2] acquired an indirect 57 percent interest in Belt Line, involve the ICC/STB granting NSC "approval" to control Belt Line, and if so, did such authorized "control" render it necessary for antitrust and/or state conspiracy laws to yield, whether because Belt Line was then deemed a "franchise" of NSC, or for any other reason?

---

[1] Based on the STB's primary jurisdiction, the District Court issued an Opinion and Order on May 18, 2021, in CSX Transp., Inc. v. Norfolk S. Ry., No. 2:18-cv-00530 (E.D. Va. May 18, 2021) referring to the STB a question regarding the applicability of § 11321(a) immunity ("May 18th Decision") to several transactions previously approved or authorized by the Interstate Commerce Commission ("ICC") and the STB.  The outcome of this proceeding is related to a proceeding currently being held in abeyance by the Board.  See Norfolk S. Ry. Co. – Petition to Set Trackage Rights Compensation – Norfolk & Portsmouth Belt Line R.R. Co., FD 36223 ("FD 36223").

[2]  NSC = Norfolk Southern Corporation, the non-carrier parent company of NSR.

As NSR explains herein, the unequivocal answer to that question is:  Yes, the ICC's 1982 Transaction[3] approval authorized NSC to acquire indirect control of Norfolk and Portsmouth Belt Line Railroad ("NPBL" or "Belt Line"), and such control authority included immunity from the antitrust laws as necessary for NSC to exercise that control.

The 1982 Transaction authorized NSC to indirectly control NPBL by authorizing NSC to control Norfolk and Western Railway Company ("N&W") and Southern Railway Company ("SRC") directly and Norfolk Southern Railway Company ("Norfolk Southern")[4] indirectly.  It also included the authority to control any affiliated carriers of SRC, N&W, and Norfolk Southern, including NPBL, who was an affiliated carrier under the ICC's definitions and rules at the time.[5]  NSC's indirect control was further solidified and authorized again through two subsequent transactions, one in 1991 and the other in 1998,[6] the end result of which NSR was authorized to exercise direct control over NPBL.  Moreover, ICC and STB authorization of these

---

[3] See Norfolk S. Corp. – Control – Norfolk and W. Ry. Co. and S. Ry. Co., 366 ICC 173, FD 24930 (Sub-No.1), at 48. (I.C.C. served March 19, 1982) ("1982 Transaction").

[4] The use of "Norfolk Southern" is intended to reference the entity that was in existence in 1982 and was a Class II subsidiary of SRC.  The use of "NSR" is intended to refer to the entity that has been in existence since December 31, 1990, when SRC merged Norfolk Southern into SRC and SRC changed its name to NSR.

[5] In the 1982 Transaction, Norfolk Southern was at that time a Class II subsidiary of SRC that owned or co-owned shares in various rail carriers, including NPBL.  As is relevant to this declaratory order, the 1982 Transaction decision resulted in NSC owning and controlling 57.14% of the shares of NPBL, as follows: SRC (14.29%), N&W (28.57%), and Norfolk Southern (14.29%).

[6] See S. Ry. Co. – Control Exemption – Norfolk and W. Ry. Co., Chesapeake W. Ry., the Toledo Belt Ry. Co., and Wabash R.R. Co., FD 31791 (I.C.C. served Jan. 14, 1991); See Norfolk S. Ry. Co. –  Exemption – Norfolk and W. Ry. Co., FD 33648 (S.T.B. served Aug. 31, 1998).

3

transactions included immunity from the antitrust laws as necessary to exercise the control authority.[7]

### ARGUMENT

I.  **THE 1982 TRANSACTION AND SUBSEQUENT TRANSACTIONS UNEQUIVOCALLY AUTHORIZED NSC TO EXERCISE CONTROL OVER BOTH NPBL AND NSR**

A.  <u>NPBL Was Included In The Application And Was Part Of The Approved Transaction</u>

The 1982 Transaction sought approval for NSC to control SRC and its consolidated system companies and N&W and its subsidiary companies.  NWS[8] Enters.; Application To Control Norfolk & W. Ry. Co. and S. Ry. Co., 46 FR 173-02, at 174, 1981 WL 109712 (Jan. 2, 1981).  Ultimately, the ICC approved NSC's direct control of N&W and SRC and each of those carriers' respective systems and subsidiaries indirectly, including Norfolk Southern, which was owned by SRC and part of the SRC consolidated system.

The District Court's May 18th Decision questions whether the 1982 Transaction included NSC's acquisition of control over NPBL because NPBL was not specifically named in the application as an "applicant" for which NSC was seeking specific control authority.  The May 18th Decision devotes over a page and a half referencing passages and stating that it appears

---

[7] Once control authority has been authorized and exercised, there is no further need for antitrust immunity to apply to the actions of companies within the same corporate family.  It is not a violation of the antitrust laws for companies in the same corporate family to act cooperatively. <u>Copperweld Corp. v. Indep. Tube Corp.</u>, 467 U.S. 752 (1984); <u>see</u> <u>e.g.</u>, The U.S. Department of Justice's 1988 Antitrust Enforcement Guidelines for International Operations, stating: "In the Department's view, however, the policies underlying the Sherman Act (as discussed in <u>Copperweld</u> ) support the conclusion that a parent corporation and subsidiary corporation of which the parent owns more than 50 percent of the voting stock are a single economic unit under common control and are thus legally incapable of conspiring with one another within the meaning of section 1."

[8] NWS Enterprise was the merger entity that filed the notice of intent to file an application.  By the time the application was approved, NWS had changed its name to NSC.

Subsequently, there were several corporate changes—all of which further consolidated ownership of NPBL so that since 1998, the majority of NPBL's shares are owned directly by NSR.  NSR thus directly controls NPBL, and NSC, through its 100% ownership of NSR, indirectly controls NPBL.  After the 1982 Transaction, SRC (who directly owned and controlled Norfolk Southern) and N&W continued to operate as separate subsidiaries, although controlled by NSC.  In 1991, SRC was granted authority to directly control N&W.  See S. Ry. Co. – Control Exemption – Norfolk and W. Ry. Co., Chesapeake W. Ry., the Toledo Belt Ry. Co., and Wabash R.R. Co., FD 31791 (I.C.C. served Jan. 14, 1991).  At that time, SRC changed its name to Norfolk Southern Railway Company ("NSR"), which then directly controlled N&W and its subsidiaries.  Eight years later, in 1998, the Board authorized N&W's merger into its parent, NSR.  See Norfolk S. Ry. Co. – Exemption – Norfolk and W. Ry. Co., FD 33648 (S.T.B. served Aug. 31, 1998)("1998 Transaction").  There was no question that NSC could, and did, exercise its control authority over N&W, SRC, Norfolk Southern, and their affiliates and subsidiaries over this time.  Furthermore, since 1998, NSR has had direct control of NPBL.

This control was acknowledged and approved by CSX in a 1989 supplemental agreement, attached hereto as Exhibit B.  In that agreement, CSX, NW, and SRC signed an agreement to modify the number of directors appointed by each company such that NW and SRC (both owned by NSC) would collectively appoint three directors.  CSX would have the right to appoint two directors.  Absent the ability to agree with CSX on the sixth seat, NSC, given that it had the majority of directors, had the unilateral ability to appoint the sixth seat.  This gave NSC (and since 1998, NSR) the ability to control 4 out of six voting seats.[19]  There is no ICC or STB

---

[19] NPBL has six voting Directors and a seventh, non-voting director.  See Exhibit C, Bylaws as amended in 1996.

precedent known to NSR holding that a party that holds the majority of shares and the majority of director seats does not have control.[20]

Even if one could argue that the 1982 Transaction somehow did not grant either NSC or NSR the ability to directly or indirectly control NPBL, these later transactions resolved that question.  At the time of the 1991 transaction, SRC would have owned and controlled SRC's 14.29% and Norfolk Southern's 14.29% ownership of NPBL, giving SRC 28.58% ownership and control of NPBL.  N&W, which SRC was given authority to directly control in the 1991 notice, would have owned 28.57%.  This would have given NSR (the merged Norfolk Southern and SRC and renamed NSR) indirect control of NPBL.  Then, in the 1998 Transaction, which authorized the merger of N&W into its parent, NSR, NSR would have been given 57.14% direct control of NPBL.  Thus, since 1982, NSC has indirectly controlled NPBL, and since 1998, NSR has directly controlled NPBL.  Even if NSR was not given direct control of NPBL in the 1982 Transaction, NSR has had that direct control since 1998.[21]

---

[20]  NSR's ownership of the majority of the shares and the voting seats is the classic definition of control as defined by the STB.  "(b) Control (including the terms controlling, controlled by, and under common control with) means the possession directly or indirectly, of the power to direct or cause the direction of the management and policies of a company, whether such power is exercised through one or more intermediary companies, or alone, or in conjunction with, or pursuant to an agreement, and whether such power is established through a majority of minority ownership or voting of securities, common directors, officers or stockholders, voting trusts, holding trusts, associated companies, contract or any other direct or indirect means."  49 C.F.R. § 1201, Subpart A, Definition 5.

[21]  Accordingly, even if one could make an argument that the 1982 Transaction did not include control over NPBL, there is no doubt that the consolidation of 57.4% of NPBL's shares under the direct ownership and control of NSR in 1998 gave NSC and NSR control over NPBL and such control includes antitrust immunity as necessary for NSR to exercise its control over NPBL.  The current switching rate for which CSXT alleges competitive harm was established in 2009, well after NSR itself was granted authority to directly control NPBL.  As such, at a minimum, since 1998, NSR has had the authority to exercise its control over NPBL, including NPBL's rates and practices.  The establishment of the 2009 rate and the maintenance of that rate between two affiliated carriers/companies that are controlled by NSC and over which NSC and NSR were granted authority to control cannot, therefore, be the product of unlawful collusion.

To be clear, post-1982, carriers in the NSC corporate family collectively had a 57% ownership interest in NPBL, which gave NSC the ability to dominate the Board of Directors. NSC also had the authority to direct the NPBL Board as to whom to appoint as President, a fact that CSXT has also recognized as discussed above. The public was put on notice in the 1982 Transaction application that in a post-transaction environment, NSC would have a controlling interest in NPBL. NSC was given control over SRC, Norfolk Southern, N&W, and affiliated carriers (i.e., NPBL). This control of NPBL was further consolidated and reauthorized in both the 1991 transaction and the 1998 Transaction.

## II. HAVING BEEN INCLUDED IN THE APPLICATION (OR THE LATER CORPORATE FAMILY EXEMPTIONS), NSC'S CONTROL OVER NPBL IS ENTITLED TO ANTITRUST IMMUNITY FROM CAUSES OF ACTIONS RELATED TO NSC OR NSR EXERCISING CONTROL OVER NPBL

As explained in Section I above, NSC was given indirect control over NPBL and NSR was given direct control over NPBL as a result of the 1998 transaction. Having established that NSC and NSR have control over NPBL, and have exercised that control, the answer to the Court's question as to whether "NSC acquired an indirect 57 percent interest in Belt Line, involve[d] the ICC/STB granting NSC "approval" to control Belt Line?" is an unequivocal "yes." As to the second question, whether "such authorized 'control' render[s] it necessary for antitrust and/or state conspiracy laws to yield, whether because Belt Line was then deemed a "franchise" of NSC, or for any other reason?" that answer is "yes" as well.

The Court's language confirms this answer. The Court notes that the ICC did not "announce" that NSC would control Belt Line or that NSC was exempt from federal antitrust laws or state conspiracy laws to control NPBL. But the ICC didn't have to. Having granted NSC authority to control SRC, Norfolk Southern, and N&W, and their affiliated carriers, such approval comes with antitrust immunity. As the Court notes:

[T]he STB and federal courts have repeatedly held that § 11321 is not predicated on the agency "announcing that a particular exemption is necessary"; rather, the immunity exemption is "self-executing." Consol. Coal Sales Co. v. Consol. Rail Corp., 2002 STB Lexis 317, at *9-10 (S.T.B. May 23, 2002) (quoting I.C.C. v. Locomotive Eng'rs, 482 U.S. 270, 298 (1987) (Stevens, J., concurring)); see Soo Line R.R. Co. v. Consol. Rail Corp., No. 2:17cv106, 2018 WL 1566816, at *7 (N.D. Ind. Mar. 29, 2018) ("The statute makes the exemption self-executing whenever necessary to carry out an STB-approved transaction."); CSX Corp.— Control—Chessie Sys., 8 I.C.C. 2d at 723 n.12 (same).

Indeed, the 1982 Transaction decision specifically noted that its "approval of an agreement as part of a consolidation proceeding carries with it immunity from the operation of the antitrust laws pursuant to 49 U.S.C. § 11341 (a)." Norfolk S. Corp. – Control – Norfolk and W. Ry. Co. and S. Ry. Co., FD 24930 (Sub-No.1), slip op. at 58 (I.C.C. served March 19, 1982).

Moreover, because control over NPBL was acquired by NSC in the 1982 Transaction and subsequent transactions, transactions over which the ICC or STB approved, then, as the Court notes, "it is arguably 'necessary' under the scheme implemented by Congress and the STB to permit NSC/NSR to exercise its majority control over its newly acquired subsidiary free from the confines of antitrust or state conspiracy law." See 49 U.S.C. § 11321(a); CSX Corp.—Control— Chessie Sys., 8 I.C.C. 2d at 723 n.12.  Indeed, the whole purpose of ICC, and now STB, approval and the antitrust immunity flowing from such approval, is to allow for the consolidation, coordination, conglomeration, and control of the various carriers within the same corporate family, including affiliate carriers, free from the confines of the antitrust laws.

The Court's use of the word "franchise" does not change this analysis.  In asking its necessity and immunity question, the Court appears to be equating the word "franchise" with the word "subsidiary."  To the extent the word "franchise" means "subsidiary," then NSC and NSR were authorized to control NPBL as a result of the 1982 Transaction and the 1998 Transaction. Understandably, the Court used the phrase "franchise" because that word appears in the statutes

at both 49 U.S.C. §11321(a) and 49 U.S.C. §11323(a)(1).  Both statutes refer to exercising control over the acquired property or franchise and in granting antitrust immunity to exercise such control over the acquired property or franchise, but in ICC/STB practice, parties fully understand that in control cases, as opposed to assets purchases, control is being granted over companies and subsidiaries.  Regardless of whether NPBL is considered a franchise or subsidiary, the issue is whether control over NPBL was authorized, which it was.

The word "franchise" in the ICC and STB context is rarely used.  Where it has been specifically used, in context, it is generally understood as operating rights that may be bought and sold as property and almost always in the contest of an asset sale, not a transfer of control through stock purchase.  For this reason, it is often discussed using different terms as meaning a railroad lease, an easement; or operating rights. In perhaps the most recent case to use the word 'franchise', the STB equated the word to the use of an easement to transfer the rail operating rights from one party to another.  Port of Pend Oreille - Acquisition And Operation Exemption - BNSF, FD 33561, 2000 STB LEXIS 246, (S.T.B. served May 2, 2000).[22]  In another case, the ICC dropped a footnote addressing who has common carrier obligations where the seller keeps the real estate (and right of way) and sold everything else. The ICC noted that without the real estate lease agreement it could not comment on who has the common carrier obligation since the

---

[22] The term was used in 1991 in the context of a motor carrier case where the ICC treated the word to mean the ICC operating certificates held by the motor carriers.

> This transaction involves two regulated motor carriers and a purchase of property, namely, a franchise or "certificates of authority to operate."  The Commission has broad authority under § 11343 in connection with mergers or the purchase of operating rights. The purchase of operating rights only, whether entire or in portions, comes within the terms of the statute. See Bowman Transp., Inc. v. United States, 308 F.Supp. 1342 (3-judge court, N.D. Ala. 1970)."

Wash. Trucking - Purchase (Portion) Exemption - Maddox Transfer, 7 ICC 2d 372 (1991).

# EXHIBIT E

ENTERED
Office of Proceedings
October 26, 2021
Part of
Public Record

Before the
SURFACE TRANSPORTATION BOARD

_____

Finance Docket No. 36522

NORFOLK SOUTHERN RAILWAY COMPANY
—PETITION FOR DECLARATORY ORDER

_____

**CSXT's Reply Statement**

Michael S. Burns                    Anthony J. LaRocca
Erin O. O'Brien                     Peter W. Denton
John M. Paglio                      Onika K. Williams
CSX Transportation, Inc.            Sally Mordi
500 Water Street                    Steptoe & Johnson LLP
Jacksonville, FL 32202              1330 Connecticut Avenue, NW
(904) 359-1735                      Washington, DC 20036
                                    (202) 429-3000

                                    Louis E. Gitomer
                                    Law Offices of Louis E. Gitomer, LLC
                                    600 Baltimore Avenue, Suite 301
                                    Towson, MD 21204
                                    (410) 296-2250

Attorneys for CSX Transportation, Inc.

Dated: October 25, 2021

### 2.5   NSR did not obtain ICC/STB control authority over NPBL in later exemption proceedings.

The Court's May 18, 2021 referral decision did not ask the STB to address the effect of post-1982 regulatory proceedings on NSR's control over NPBL. Nevertheless, NSR argues that certain corporate reorganizations following the 1982 NW/SRC transaction "further consolidated ownership of NPBL." NSR Opening at 13. CSXT already identified each of these prior transactions and explained that neither NSR nor its predecessors ever requested or obtained ICC/STB authority to control NPBL in those later proceedings. *See* CSXT Opening Statement at 21-22, 26.

Applicants in those proceedings invoked an exemption from the otherwise applicable ICC/STB control authority requirements, established by the ICC/STB for a class of "corporate family" transactions that do not result in "a change in the competitive balance with carriers outside the corporate family." 49 C.F.R. § 1180.2(d)(3). Because NSC did not obtain ICC authority to control NPBL in connection with the 1982 NW/SRC consolidation, all later class exemption proceedings reorganizing NSC and later NSR could not and did not result in NSR obtaining ICC/STB authority to control NPBL. The exemption decisions could not have created control authority for the first time because the creation of new control authority would have been a "change in the competitive balance with carriers outside the corporate family," for which an exemption was not available. Indeed, NPBL is never even mentioned in the ICC and STB notifications of the exemption filings.

# EXHIBIT F

303030

Before the
SURFACE TRANSPORTATION BOARD

ENTERED
Office of Proceedings
September 23, 2021
Part of
Public Record

_____

Finance Docket No. 36522

NORFOLK SOUTHERN RAILWAY COMPANY
—PETITION FOR DECLARATORY ORDER

_____

**CSXT's Opening Statement**

Michael S. Burns
Erin O. O'Brien
John M. Paglio
CSX Transportation, Inc.
500 Water Street
Jacksonville, FL 32202
(904) 359-1735

Anthony J. LaRocca
Peter W. Denton
Onika K. Williams
Sally Mordi
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000

Louis E. Gitomer
Law Offices of Louis E. Gitomer, LLC
600 Baltimore Avenue, Suite 301
Towson, MD 21204
(410) 296-2250

Attorneys for CSX Transportation, Inc.

Dated: September 23, 2021

asking the ICC for control authority or providing the facts to enable that assessment – NSR nevertheless emerged from the proceeding with uncircumscribed control over NPBL and the broadest immunity possible from antitrust laws that would otherwise govern NSR's conduct with respect to NPBL.

The Board should not allow NSR to evade ICC/STB scrutiny of the competitive implications of its control of NPBL by failing ever to ask for control authority, and then belatedly attempt to cloak itself in ICA immunity after CSXT rightfully complained about NSR's transparently illegal and anti-competitive actions in coordination with NPBL.

## 2.    Background

### 2.1    NPBL is a terminal railroad created to provide its owners with access to terminal facilities in Norfolk.

Relevant background regarding NPBL is set forth in CSXT's complaint, attached hereto as Exhibit B. NPBL is a terminal switching railroad in Hampton Roads, Virginia. NPBL was founded by eight railroads in 1896 "for the mutual benefit of each [of the railroads] in the interchange of business." Compl. at para. 1, *CSX*, No. 2:18cv530 (E.D. Va. Oct. 4, 2018), ECF No. 1 [hereinafter Complaint]. Over the years, the consolidation of the original member railroads has resulted in the current ownership structure involving only two owners. NPBL is currently owned 57% by NSR and 43% by CSXT.[3]

---

[3] As described further below, Norfolk Southern Corporation ("NSC") acquired indirect ownership of 57% of the stock of NPBL in 1982 when NSC acquired 100% of the stock of SRC) and N&W. *Norfolk S. Corp.—Control—Norfolk & W. Ry. Co. & Southern Ry. Co.*, 366 I.C.C. 173 (1982). Then in 1992, SRC acquired direct control of N&W and indirect ownership of 57% of the stock of NPBL. *Southern Ry. Co.—Control—Norfolk & W. Ry. Co.*, FD 31791, et al. (I.C.C. served Jan. 14, 1991). Finally, in 1998, SRC (which had changed its name to NSR) and N&W merged, resulting in NSR's direct ownership of 57% of the stock of NPBL. *Norfolk S. Ry. Co.—Merger Exemption—Norfolk & W. Ry. Co.*, FD 33648 (ICC served Aug. 31, 1998).

OP-STMT-10

decision does not discuss at all any of the non-consolidated system independent railroads in which NW and SRC held an interest. Indeed, the ICC's approval decision does not contain a single reference to NPBL, let alone any substantive analysis of the competitive impact of control of NPBL by NWS/NSC.

Consequently, the ICC approval decision discusses and treats the transaction from a competition perspective as a combination of the NW and SRC consolidated railroad systems. *See id.* at 215–29 (discussing competitive issues related to the transaction in terms of NW and SRC systems). The decision discusses the "common point consolidation" of the NW and SRC systems at Norfolk, as described in the Application operating plan and summarized above in Section 2.3.2. *See id.* at 205. As with the Application, the decision never mentions NPBL in the context of its analysis of the competitive impacts of the transaction on the Norfolk terminal area or the competitive impacts of the transaction in any other geographic region or part of the transportation market.

### 2.3.4  Subsequent ICC/STB authorizations of corporate reorganizations of NSR and its predecessors do not mention NPBL.

While the question referred by the Court only refers to the 1982 ICC decision approving common control of NW and SRC, it is also clear that neither NSR nor its predecessors have ever requested or obtained ICC/STB authority to control NPBL in later proceedings. NPBL is never mentioned in later ICC and STB decisions authorizing corporate reorganization of NSR and its predecessors through control and merger transactions.

In 1990, SRC invoked a class exemption to obtain required ICC authority for SRC to control NW and rail carriers controlled by NW. *See*

OP-STMT-24

*Southern Ry. Co.—Control—Norfolk & W. Ry. Co.*, FD 31791, et al., Notice of Exemption (filed Dec. 14, 1990) [hereinafter SRC Notice of Exemption], attached hereto as Exhibit K. The transaction reorganized the NSR corporate structure and allowed SRC to exercise control of NW and NW's rail carrier subsidiaries.

Citing the ICC's 1982 NW/SRC control decision (which did not list NPBL as a carrier to be controlled by NSC), the SRC notice of exemption states that NSC "controls through stock ownership numerous rail carriers operated as a single rail system extending throughout the southeastern and midwestern United States." *Id.* at 3. SRC also asserted that "[t]he transaction involves only rail carrier subsidiaries of NS Corp. already commonly controlled and operated as part of a corporate family." *Id.* at 7. In connection with the reorganization, SRC also changed its name to the current NSR. The SRC notice says nothing about NPBL.

In 1998, NSR invoked a class exemption to merge NW into NSR. *Norfolk S. Ry. Co.—Merger Exemption—Norfolk & W. Ry. Co.*, FD 33648, Notice of Exemption (filed Aug. 13, 1998), attached hereto as Exhibit L. Again, the NSR notice of exemption did not mention NPBL.

**3.    Argument**

Because neither the ICC nor the STB has ever approved a transaction allowing NSR or its predecessors to control NPBL, the ICA cannot and does not immunize NSR from any otherwise applicable antitrust laws or other federal or state laws with respect to NSR's dealings with NPBL. If a railroad fails to seek or obtain required authorization to control another railroad, as here, there can be no immunity from antitrust and other laws because the

OP-STMT-25

predicate of ICC/STB approval has not been met. NSR cannot hide behind a control authorization that it never obtained. If NSR were to obtain antitrust immunity for actions to control NPBL, it could continue to monopolize the NIT, at harm to competition and shippers—all based on an ICC/STB authority that NSR never asked for, that the ICC/STB never examined, and that was never granted.

### 3.1    NSR has never obtained ICC or STB authority to control NPBL.

#### 3.1.1  The ICA requires that the ICC/STB affirmatively approve certain control transactions.

As relevant here, the ICA provides that prior STB approval and authorization is required for (1) acquisition of control of a rail carrier by any number of rail carriers, and (2) acquisition of control of at least two rail carriers by a person that is not a rail carrier. 49 U.S.C. §§ 11323(a)(3), (4). These current ICA requirements were substantially similar at the time of the NW/SRC control proceeding. *See* 49 U.S.C. §§ 11343(a)(3), (4) (1980).

Not only must the ICC/STB expressly authorize the acquisition of control, that authority is subject to statutory requirements that can only be satisfied based on extensive analysis of information relevant to the exercise of control. In particular, the ICA requires the STB to approve and authorize a control transaction "when it finds the transaction is consistent with the public interest." 49 U.S.C. § 11324(c). For "major" transactions such as the NW/SRC control proceeding, the ICA requires the STB to consider at least five factors, including "the effect of the proposed transaction on the adequacy of transportation to the public," "the effect on the public interest of including, or failing to include, other rail carriers in the area involved in the proposed

23

# EXHIBIT G

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | |
|---|---|
| NORFOLK SOUTHERN RAILWAY COMPANY, | CASE NO.: |
| Plaintiff, | **COMPLAINT** |
| v. | |
| SURFACE TRANSPORTATION BOARD and UNITED STATES OF AMERICA, | |
| Defendants. | |

WILLIAM MULLINS*
wmullins@bakerandmiller.com
CRYSTAL ZORBAUGH*
czorbaugh@bakerandmiller.com
BAKER & MILLER PLLC
2401 Pennsylvania Ave., NW, Ste. 300
Washington, DC 20037
Telephone: (202) 663-7820
Facsimile:  (202) 663-7849

ALAN D. WINGFIELD (VSB No. 27489)
alan.wingfield@troutman.com
MICHAEL E. LACY (VSB No. 48477)
michael.lacy@troutman.com
TROUTMAN PEPPER HAMILTON SANDERS LLP
1001 Haxall Point, Ste. 1500
Richmond, VA 23219
Telephone: (804) 697-1200
Facsimile: (804) 697-1339

JOHN C. LYNCH (VSB No. 39267)
john.lynch@troutman.com
KATHLEEN M. KNUDSEN (VSB No. 90845)
kathleen.knudsen@troutman.com
TROUTMAN PEPPER HAMILTON SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, VA  23462
Telephone: (757) 687-7500
Facsimile: (757) 687-7510

SHAY DVORETZKY*
shay.dvoretzky@skadden.com
TARA L. REINHART*
tara.reinhart@skadden.com
PARKER RIDER-LONGMAID*
parker.rider-longmaid@skadden.com
THOMAS R. GENTRY*
thomas.gentry@skadden.com
HANAA KHAN*
hanaa.khan@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: (202) 371-7000
Facsimile:  (202) 393-5760

*Pro hac vice motion forthcoming*

Attorneys for Plaintiff NORFOLK SOUTHERN RAILWAY COMPANY

Case 2:18-cv-00530-MSD-RJK   Document 463-2   Filed 10/03/22   Page 103 of 122 PageID# 10990
Case 2:22-cv-00385-EWH-LRL   Document 1   Filed 09/15/22   Page 2 of 14 PageID# 2
USCA Case #22-1209   Document #1966943      Filed: 09/30/2022   Page 102 of 121

Plaintiff Norfolk Southern Railway Company (NSR) alleges:

## INTRODUCTION

1.     This complaint challenges two rulings in the Surface Transportation Board's (STB or Board) decision in *Norfolk Southern Railway Company—Petition for Declaratory Order*, STB No. FD 36522, Decision, 2022 WL 2191932 (June 17, 2022) (STB Decision), attached as Exhibit A. In that decision, the STB erroneously held that its predecessor, the Interstate Commerce Commission (ICC), had not authorized NSR to control one of its subsidiaries, the Norfolk & Portsmouth Belt Line Railway Company (Belt Line). The STB Decision is contrary to ICC and STB regulations and inadequately explained, making it arbitrary, capricious, and invalid. *See* 5 U.S.C. § 706(2)(A). Although NSR believes that the United States Court of Appeals for the District of Columbia Circuit has exclusive jurisdiction to review challenges to the relevant STB rulings and thus has also challenged the STB Decision before that court, *see Norfolk S. Ry. Co. v. STB*, No. 22-1209 (D.C. Cir. Aug. 15, 2022), NSR files this complaint protectively given the 90-day window for seeking judicial review. *See* 28 U.S.C. § 1336(c).

2.     The STB Decision follows this Court's referral to the Board, in *CSX Transportation, Inc. v. Norfolk Southern Railway Co. et al.*, No. 2:18-cv-00530, ECF No. 395 (E.D. Va.) (Davis, C.J.), of questions relating to antitrust immunity. In *CSX*, CSX Transportation, Inc. (CSX), claims that NSR violated federal antitrust and state conspiracy laws by conspiring with Belt Line to deny CSX rail access to intermodal shipping at the Norfolk International Terminals. But those claims are barred by the statutory immunity for rail carriers participating in transactions approved or exempted by the ICC or STB. *See* 49 U.S.C. § 11321(a). NSR thus moved to dismiss CSX's complaint, or, in the alternative, to refer immunity-related questions to the STB. NSR explained that the ICC had authorized NSR to control Belt Line in 1982 when it approved a consolidation of rail carriers: the ICC granted NWS Enterprises, Inc. (NWS), a noncarrier holding

2

Case 2:18-cv-00530-MSD-RJK Document 463-2 Filed 10/03/22 Page 104 of 122 PageID# 10991
Case 2:22-cv-00385-EWH-LRL Document 1 Filed 09/15/22 Page 3 of 14 PageID# 3
USCA Case #22-1209 Document #1966943 Filed: 09/30/2022 Page 103 of 121

company, authority to control Norfolk and Western Railway Company (NW) and Southern Railway Company (SRC). (NWS was renamed Norfolk Southern Corporation (NSC) during the proceedings, and SRC became NSR and gained control through later transactions.) That approval, NSR continued, made NSR immune from claims arising from its control of Belt Line under § 11321(a).

3.      In response, this Court referred two questions to the STB:

[1] Did the 1982 consolidation, whereby NSC acquired an indirect 57 percent interest in Belt Line, involve the ICC/STB granting NSC "approval" to control Belt Line, and if so, [2] did such authorized "control" render it necessary for antitrust and/or state conspiracy laws to yield, whether because Belt Line was then deemed a "franchise" of NSC, or for any other reason?

*CSX*, No. 2:18-cv-00530, ECF No. 395, at 29. NSR then petitioned the STB to institute declaratory proceedings.

4.      Once the STB agreed to address NSR's petition on the referred questions, NSR also raised two additional questions not raised before this Court. This Court's referral order asked whether the ICC authorized NSC (and thus the later entity NSR) to control Belt Line in the 1982 consolidation. Before the STB, however, NSR additionally argued that the ICC and STB authorized NSR to control Belt Line in two subsequent transactions known as corporate-family-exemption transactions—one in 1991 and one in 1998.

5.      The STB rejected NSR's arguments. It concluded that the ICC did not authorize NSR to control Belt Line in the 1982 consolidation. It also concluded that neither the ICC, by approving the 1991 corporate-family-exemption transaction, nor the STB, by approving the 1998 corporate-family-exemption transaction, authorized NSR to control Belt Line.

6.      NSR now brings this complaint protectively under 28 U.S.C. § 1336(b), challenging the STB's rejection of its arguments about the 1991 and 1998 transactions. NSR first asks the Court to hold this appeal in abeyance pending the D.C. Circuit's resolution of *Norfolk*

Case 2:18-cv-00530-MSD-RJK   Document 463-2   Filed 10/03/22   Page 105 of 122 PageID# 10992
Case 2:22-cv-00385-EWH-LRL   Document 1   Filed 09/15/22   Page 4 of 14 PageID# 4
USCA Case #22-1209   Document #1966943      Filed: 09/30/2022   Page 104 of 121

*Southern Railway Co.*, No. 22-1209. If the D.C. Circuit concludes that it does not have exclusive

jurisdiction over NSR's challenges, however, then NSR asks the Court to review, vacate, and set

aside the STB Decision on the grounds that the STB's rejection of its 1991 and 1998 arguments

was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under

the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

## PARTIES

7.      Plaintiff NSR is a Class 1 railroad operating in the eastern United States. NSR is

incorporated under Virginia law and its principal place of business is in Atlanta, Georgia. Among

other things, NSR transports containers to and from East Coast ports, like the Port of Virginia,

where ships carry them in interstate and international commerce.

8.      Defendant STB is an independent federal agency charged with the economic

regulation of various modes of surface transportation, primarily freight rail. The STB replaced the

ICC in 1996.

9.      Defendant United States of America acted through its agency, the STB.

## JURISDICTION AND VENUE

10.     NSR brings this complaint protectively, believing that the D.C. Circuit has

exclusive jurisdiction and is the proper venue for NSR's claims under 28 U.S.C. §§ 2342(5) and

2343. If the D.C. Circuit does not have jurisdiction, however, then this Court must have jurisdiction

under 28 U.S.C. § 1336(b).

11.     Under 28 U.S.C. § 1336(b), a district court that "refers a question or issue to the

Surface Transportation Board for determination, … shall have exclusive jurisdiction of a civil

action to enforce, enjoin, set aside, annul, or suspend, in whole or in part, any order of the Surface

Transportation Board arising out of such referral." But for issues outside the scope of the referral,

"[t]he court of appeals … has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in

Case 2:18-cv-00530-MSD-RJK   Document 463-2   Filed 10/03/22   Page 106 of 122 PageID# 10993
Case 2:22-cv-00385-EWH-LRL   Document 1   Filed 09/15/22   Page 5 of 14 PageID# 5
USCA Case #22-1209   Document #1966943        Filed: 09/30/2022   Page 105 of 121

part), or to determine the validity of … all rules, regulations, or final orders of the Surface Transportation Board ….” 28 U.S.C. § 2342(5); *see also id.* § 2321. The D.C. Circuit has made clear that “issues expressly set out in the district court’s referral order are reviewed by the district court” under § 1336(b), while “[t]he court of appeals reviews all other issues” under §§ 2321(a) and 2342(5). *McCarty Farms, Inc. v. STB*, 158 F.3d 1294, 1300 (D.C. Cir. 1998).

12.     Because the 1991 and 1998 transactions were outside the scope of this Court’s referral of the 1982 question to the STB, NSR has filed a petition for review in the D.C. Circuit. *See* Pet. for Review, *Norfolk S. Ry. Co.*, No. 22-1209.

13.     If the D.C. Circuit does not have jurisdiction under §§ 2321(a) and 2342(5), however, then this Court has jurisdiction under § 1336(b) because the STB issued the conclusions as to the 1991 and 1998 transactions that NSR challenges in this complaint in the same decision in which it addressed the questions as to the 1982 consolidation referred to it by this Court. This complaint is proper to protect jurisdiction before a federal court given the possible jurisdictional dispute. *Cf. Western Union Tel. Co. v. FCC*, 773 F.2d 375, 380 (D.C. Cir. 1985) (urging parties to file protective petitions when jurisdictional questions arise); *Recreation Vehicle Indus. Ass’n v. EPA*, 653 F.2d 562, 569 (D.C. Cir. 1981) (“As a general rule, of course, counsel would be wise to file a protective petition for review ….”).

14.     If this Court has jurisdiction under § 1336(b), then venue is also proper in this Court under § 1336(b), because “the court which referred the question or issue shall have exclusive jurisdiction.” 28 U.S.C. § 1336(b).

## STATEMENT

### I.    Legal background

15.     By statute, “[a]cquisition of control of a rail carrier by any number of rail carriers” “may be carried out only with the approval and authorization of the Board.” 49 U.S.C.

Case 2:18-cv-00530-MSD-RJK   Document 463-2   Filed 10/03/22   Page 107 of 122 PageID# 10994
Case 2:22-cv-00385-EWH-LRL   Document 1   Filed 09/15/22   Page 6 of 14 PageID# 6
USCA Case #22-1209   Document #1966943      Filed: 09/30/2022   Page 106 of 121

§ 11323(a)(3). A carrier that obtains STB approval (or obtained ICC approval), or an exemption from STB or ICC approval, "is exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let that rail carrier … carry out the transaction, hold, maintain, and operate property, and exercise control or franchises acquired through the transaction." *Id.* § 11321(a).

16.    Under ICC/STB regulations in effect in 1991 and 1998 and today, "control" means

the possession directly or indirectly, of the power to direct or cause the direction of the management and policies of a company, whether such power is exercised through one or more intermediary companies, or alone, or in conjunction with, or pursuant to an agreement, and whether such power is established through a majority of minority ownership or voting of securities, common directors, officers or stockholders, voting trusts, holding trusts, associated companies, contract or any other direct or indirect means.

49 C.F.R. § 1201ii(5)(b). Indeed, the STB considers control a multifaceted, "flexible" inquiry, taking into account factors like "distribution of the remaining stock, the ability to elect directors and otherwise control or influence decision-making machinery, and the existence of management, marketing, operating and financial ties." *Paducah & Louisville Ry., Inc.—Control Exemption— Paducah & Ill. R.R.*, STB No. FD 33362, Decision, 1997 WL 487405, at 2 (Aug. 12, 1997).

17.    In 1991 and 1998, just as today, proposed transactions under § 11323 involving more than one common rail carrier were classified as major, significant, minor, or exempt. 49 C.F.R. § 1180.2 (1985). "Exempt" transactions did (and do) not require prior review and approval by the ICC or STB. *Id.* § 1180.2(d). Instead, the applicants must simply file a notice with the agency, *id.*, which would then publish a notice of exemption, thereby approving it, *id.* § 1180.4(g)(iii). One class of exempt transactions was (and is) "[t]ransactions within a corporate family that do not result in adverse changes in service levels, significant operational changes, or a change in the competitive balance with carriers outside the corporate family," also known as the corporate-family exemption. *Id.* § 1180.2(d)(3). In other words, rail carriers could (and can)

Case 2:18-cv-00530-MSD-RJK   Document 463-2   Filed 10/03/22   Page 108 of 122 PageID# 10995
Case 2:22-cv-00385-EWH-LRL   Document 1   Filed 09/15/22   Page 7 of 14 PageID# 7
USCA Case #22-1209   Document #1966943        Filed: 09/30/2022   Page 107 of 121

reorganize their corporate family structure when doing so did (or does) not risk certain harms to outside entities.

## II.    Factual background

### A.    The 1982 consolidation

18.    On December 4, 1980, NW and SRC, along with other initiating parties, filed an application asking the ICC to authorize NWS to acquire control of NW and its subsidiaries and SRC and its certain companies designated as "consolidated system companies." The application's appendix mentioned Belt Line along with all the other railroad companies in which NW or SRC held an ownership interest. It indicated that NW owned 28.57% of Belt Line, SRC owned 14.29%, and Norfolk Southern (a subsidiary of SRC) owned 14.28%, for a total of 57.14%.

19.    On March 19, 1982, the ICC granted the application.

20.    As the appendix to the application indicated, after the 1982 consolidation, NSC controlled 57.14% of Belt Line based on combined total shares. The 1982 consolidation also gave NSC the votes to elect the majority of the members on the Board of Directors of Belt Line and the ability to direct the Board whom to appoint as President.

### B.    The 1991 and 1998 transactions

21.    In 1991, SRC changed its name to NSR and the ICC granted NSR authority to directly control NW pursuant to the corporate-family exemption, 49 C.F.R. § 1180.2(d)(3). This transaction placed NSR in direct control of former-SRC's 28% of Belt Line and indirect control of NW's 28% share of Belt Line.

22.    In 1998, the STB (which had replaced the ICC in 1996) granted approval, again under the corporate-family exemption, for NW to merge into NSR. The transaction combined NW's 28% share of Belt Line with NSR's 28% share to give NSR direct control over 57% of Belt Line.

Case 2:18-cv-00530-MSD-RJK   Document 463-2   Filed 10/03/22   Page 109 of 122 PageID# 10996
Case 2:22-cv-00385-EWH-LRL   Document 1   Filed 09/15/22   Page 8 of 14 PageID# 8
USCA Case #22-1209   Document #1966943   Filed: 09/30/2022   Page 108 of 121

### III.    Procedural background

#### A.    CSX sues NSR and Belt Line for conspiring to deprive CSX of rail access to the Norfolk International Terminals.

23.    On October 4, 2018, CSX sued NSR and Belt Line in this Court, alleging antitrust, conspiracy, and contract law violations arising from NSR and Belt Line's alleged actions to deprive CSX of rail access to the Norfolk International Terminals. *CSX*, No. 2:18-cv-00530, ECF No. 1 (Davis, C.J.).

24.    NSR moved to dismiss, arguing that it is immune from CSX's antitrust and conspiracy claims under 49 U.S.C. § 11321(a) because the ICC had authorized it to control Belt Line as part of the 1982 railway consolidation. *CSX*, No. 2:18-cv-00530, ECF No. 116, at 9-10. Alternatively, NSR asked this Court to refer the questions to the STB. *Id.* at 11-13.

25.    On May 18, 2021, this Court referred questions about antitrust immunity from the 1982 consolidation to the STB. *CSX*, No. 2:18-cv-00530, ECF No. 395. The Court first noted that "the STB and federal courts have repeatedly held that § 11321 [immunity] is *not* predicated on the agency 'announcing that a particular exemption is necessary'; rather, the immunity exemption is 'self-executing.'" *Id.* at 18-19 (citation omitted). The Court concluded that the STB was the "proper authority to clarify the contours of the 1982 consolidation." *Id.* at 22. In the Court's view, the parties presented "conflicting defensible positions regarding a matter squarely within the STB's expertise," making referral "not only appropriate but arguably necessary." *Id.* at 25-26.

26.    The two questions the Court referred to the STB were:

[1] Did the 1982 consolidation, whereby NSC acquired an indirect 57 percentage interest in Belt Line, involve the ICC/STB granting NSC "approval" to control Belt Line, and [2] if so, did such authorized "control" render it necessary for antitrust and/or state conspiracy laws to yield, whether because Belt Line was then deemed a "franchise" of NSC, or for any other reason?

*Id.* at 29.

Case 2:18-cv-00530-MSD-RJK   Document 463-2   Filed 10/03/22   Page 110 of 122 PageID# 10997
Case 2:22-cv-00385-EWH-LRL   Document 1   Filed 09/15/22   Page 9 of 14 PageID# 9
USCA Case #22-1209   Document #1966943      Filed: 09/30/2022      Page 109 of 121

**B.      The STB determines that the ICC did not authorize NSC to control Belt Line.**

27.      On June 21, 2021, NSR filed a petition with the STB asking the Board to address in a declaratory order the issues this Court had referred to it.

28.      On August 9, 2021, the STB instituted a declaratory order proceeding to address those questions. STB No. FD 36522.

29.      Before the STB, NSR first argued that the ICC authorized it to control Belt Line in the 1982 consolidation, just as it had before this Court. NSR Opening Statement, STB No. FD 36522, 4-12; NSR Reply, STB No. FD 36522, 32-36; *see CSX*, No. 2:18-cv-00530, ECF No. 116, at 9-13.

30.      NSR additionally raised two issues it had not presented to this Court in *CSX*. NSR argued that the ICC in 1991 and the STB in 1998 had granted corporate-family-reorganization exemptions authorizing NSR to control Belt Line. NSR Opening Statement 13-14; NSR Reply 38-39. After the 1982 consolidation, NSC controlled Belt Line by owning a majority share and appointing the majority of the Board of Directors. In 1991, NSR explained, the ICC authorized it to control Belt Line through the corporate-family-exemption process by allowing NSR, which then directly owned 28.58% of Belt Line, to directly control NW, which owned 28.57% of Belt Line. NSR Opening Statement 13-14; NSR Reply 38-39. NSR further explained that the STB authorized NW to merge into NSR in 1998, giving NSR direct control of 57% of Belt Line. NSR Opening Statement 14; NSR Reply 39. In both the 1991 and 1998 transactions, the agency enabled NSR to further consolidate its control over Belt Line.

31.      Because the ICC and STB had authorized it to control Belt Line, NSR explained, NSR and Belt Line were immune from antitrust scrutiny and state conspiracy law in *CSX* under 49 U.S.C. § 11321(a). NSR Opening Statement 15-19.

32.    On June 17, 2022, the STB concluded that the ICC did not authorize NSR to control Belt Line and so the second question about immunity was moot. *See* Ex. A.

33.    The STB began by answering the first question referred by this Court, determining that the ICC did not grant NSR control over Belt Line in the 1982 consolidation because the applicants had only explicitly requested control authorization for the consolidated system companies.

34.    The STB then turned to NSR's arguments on the issues not referred—that the 1991 and 1998 transactions granted NSR control over Belt Line. The Board asserted without explanation that the corporate-family exemption contained an "implicit" requirement that "the member of the corporate family whose ownership is changing as a result of the transaction was previously authorized to be controlled by a member of the corporate family." STB Decision 16. The STB thus concluded that the exemption "could not have been used to grant authority to any member of NSC's corporate family to control [Belt Line] unless authority had previously been granted for some other member of that corporate family to control [Belt Line]." *Id.* In rejecting NSR's argument, the STB noted that "NSR's interpretation would allow the corporate family exemption to effectively nullify" other approval requirements and would undermine the STB and the public's notice of grants of control authorization. *Id.*

**C.    NSR petitions the D.C. Circuit for review of the STB's conclusions about the 1991 and 1998 transactions.**

35.    On August 15, 2022, NSR filed a petition for review before the D.C. Circuit of the STB's conclusions about the 1991 and 1998 transactions. *See* Pet. for Review, *Norfolk S. Ry. Co.*, No. 22-1209. NSR has asked the D.C. Circuit to review, vacate, and set aside the STB Decision on the grounds that the STB's rejection of its 1991 and 1998 arguments was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under the Administrative

Case 2:18-cv-00530-MSD-RJK   Document 463-2   Filed 10/03/22   Page 112 of 122 PageID# 10999
Case 2:22-cv-00385-EWH-LRL   Document 1   Filed 09/15/22   Page 11 of 14 PageID# 11
USCA Case #22-1209   Document #1966943       Filed: 09/30/2022   Page 111 of 121

Procedure Act, 5 U.S.C. § 706(2)(A). NSR did not seek review of the STB's resolution of the issue this Court referred to the STB—whether the 1982 consolidation authorized NSR to control Belt Line—and this protective complaint does not seek review of that referred issue, either. *See* Pet. for Review 4, *Norfolk S. Ry. Co.*, No. 22-1209.

36.     As explained in its petition, NSR believes that the D.C. Circuit has jurisdiction under 28 U.S.C. §§ 2321(a) and 2342(5). "[I]ssues expressly set out in the district court's referral order are reviewed by the district court" under 28 U.S.C. § 1336(b), while "[t]he court of appeals reviews all other issues" under §§ 2321(a) and 2342(5). *McCarty*, 158 F.3d at 1300.

37.     NSR files this complaint in an abundance of caution in case this Court instead has exclusive jurisdiction over NSR's claims under § 1336(b).

38.     CSX filed a notice of NSR's D.C. Circuit petition before this Court in *CSX*, No. 2:18-cv-00530, ECF No. 412.

## CAUSES OF ACTION

### COUNT I

**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A): Decision Contrary to Regulations**

39.     Plaintiff NSR repeats and realleges the allegations in paragraphs 1 through 38 as if fully set forth herein.

40.     The Administrative Procedure Act provides that "[t]he reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

41.     An agency acts in an arbitrary and capricious manner if its "application of the relevant standards was 'plainly erroneous or inconsistent with' the regulations." *Almy v. Sebelius*, 679 F.3d 297, 307 (4th Cir. 2012) (citation omitted).

Case 2:18-cv-00530-MSD-RJK   Document 463-2   Filed 10/03/22   Page 113 of 122 PageID# 11000
Case 2:22-cv-00385-EWH-LRL   Document 1   Filed 09/15/22   Page 12 of 14 PageID# 12
USCA Case #22-1209   Document #1966943      Filed: 09/30/2022   Page 112 of 121

42.     The STB's application of the corporate-family-exemption regulation, 49 C.F.R. § 1180.2(d)(3), was arbitrary and capricious. The regulation provides that "[a] transaction is exempt if it is within one of the nine categories described," including "[t]ransactions within a corporate family that do not result in adverse changes in service levels, significant operational changes, or a change in the competitive balance with carriers outside the corporate family." NSR's 1991 and 1998 corporate-family-exemption transactions fulfilled both criteria: both transactions were within NSR's corporate family and did not result in any of the prohibited changes. And ever since the 1982 consolidation, NSC or NSR has held control over Belt Line through its 57% ownership share and appointment of the majority of the Board of Directors. *See* 49 C.F.R. § 1201ii(5)(b). The 1991 transaction authorized NSR to control NW and therefore approved NSR's direct control of SRC's 28% of Belt Line and indirect control of NW's 28% share of Belt Line. The 1998 transaction enabled NW to merge into NSR, combining NW's 28% share of Belt Line with NSR's 28% share to give NSR direct control over 57% of Belt Line. Both the 1991 and 1998 transactions further consolidated NSR's control over Belt Line, and by allowing those transactions, the STB approved NSR's control over Belt Line.

43.     In rejecting NSR's arguments, the STB asserted that it was "implicit" in the corporate-family-exemption regulation "that the member of the corporate family whose ownership is changing as a result of the transaction was previously authorized to be controlled by a member of the corporate family." STB Decision 16. But the corporate-family-exemption regulation does not mention, much less purport to require, prior authorization of control.

44.     The STB's conclusion is arbitrary and capricious because it is erroneous and inconsistent with the regulation. *See Almy*, 679 F.3d at 307. The STB's reasoning adds a new requirement found nowhere in the regulation.

Case 2:18-cv-00530-MSD-RJK   Document 463-2   Filed 10/03/22   Page 114 of 122 PageID# 11001
Case 2:22-cv-00385-EWH-LRL   Document 1   Filed 09/15/22   Page 13 of 14 PageID# 13
USCA Case #22-1209   Document #1966943       Filed: 09/30/2022   Page 113 of 121

### COUNT II

**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A):
Failure to Explain or Otherwise Exercise Reasoned Decisionmaking**

45.      Plaintiff NSR repeats and realleges the allegations in paragraphs 1 through 44 as if fully set forth herein.

46.      "The 'requirement that agency action not be arbitrary and capricious'" under 5 U.S.C. § 706(2)(A) "includes a requirement that the agency adequately explain its result." *Snohomish County v. STB*, 954 F.3d 290, 301 (D.C. Cir. 2020) (quoting *Jost v. STB*, 194 F.3d 79, 85 (D.C. Cir. 1999)). The reviewing court "may not supply a reasoned basis for the agency's decision that the agency itself has not given." *Id.* (quoting *Jost*, 194 F.3d at 85).

47.      Even assuming that the corporate-family-exemption regulation contains an "implicit" requirement "that the member of the corporate family whose ownership is changing as a result of the transaction was previously authorized to be controlled by a member of the corporate family," STB Decision 16; *see* 49 C.F.R. § 1180.2(d)(3), the STB did not adequately explain that conclusion. In just a single paragraph, the STB determined that NSR's interpretation of the corporate-family-exemption regulation would cause absurd results, but the STB didn't reconcile its "implicit" additional requirement with the text of the regulation it was interpreting. *See* STB Decision 16.

48.      Because the STB did not "articulate the reasoning behind its decision with sufficient clarity to enable petitioners and this court to understand the basis for its decision," *Snohomish County*, 954 F.3d at 301 (citation omitted), the STB Decision is arbitrary and capricious.

13

## PRAYER FOR RELIEF

49.    NSR asks the Court to hold this case in abeyance pending the D.C. Circuit's resolution of *Norfolk Southern Railway Co.*, No. 22-1209.

50.    If the D.C. Circuit determines that it does not have jurisdiction in *Norfolk Southern Railway Co.*, No. 22-1209, then NSR asks the Court to set aside and vacate the STB Decision as arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).


Date:  September 15, 2022                    Respectfully submitted,

                                            **NORFOLK SOUTHERN RAILWAY COMPANY**

                                            */s/ Alan D. Wingfield*
                                            Alan D. Wingfield (VSB No. 27489)
                                            Michael E. Lacy (VSB No. 48477)
                                            TROUTMAN PEPPER HAMILTON SANDERS, LLP
                                            1001 Haxall Point
                                            Richmond, VA 23219
                                            Telephone: (804) 697-1200
                                            Facsimile: (804) 698-6061
                                            Email: alan.wingfield@troutman.com
                                            Email: michael.lacy@troutman.com

                                            John C. Lynch (VSB No. 39267)
                                            Kathleen M. Knudsen (VSB No. 90845)
                                            TROUTMAN PEPPER HAMILTON SANDERS LLP
                                            222 Central Park Avenue, Suite 2000
                                            Virginia Beach, VA  23462
                                            Telephone: (757) 687-7500
                                            Facsimile: (757) 687-7510
                                            Email: john.lynch@troutman.com
                                            Email: kathleen.knudsen@troutman.com

                                            *Counsel for Plaintiff Norfolk Southern Railway Company*

# EXHIBIT H

# BAKER & MILLER PLLC

ATTORNEYS and COUNSELLORS
2401 PENNSYLVANIA AVENUE, NW
SUITE 300
WASHINGTON, DC   20037

TELEPHONE:  (202) 663-7820
FACSIMILE:   (202) 663-7849

William A. Mullins

Direct Dial:  (202) 663-7823
wmullins@bakerandmiller.com

October 25, 2021

303126

**VIA E-FILING**
Cynthia T. Brown
Chief of the Section of Administration
Office of Proceedings
Surface Transportation Board
395 E Street, SW
Washington DC  20423-0001

ENTERED
Office  of  Proceedings
October 25, 2021
Part of
Public Record

Re:   **NORFOLK SOUTHERN RAILWAY COMPANY – PETITION FOR DECLARATORY ORDER, FD 36522**

Dear Ms. Brown:

Please find attached Norfolk Southern Railway Company's ("NSR") Reply to CSXT's Opening Statement in the above-captioned proceeding.  If there are any questions concerning this e-filing, please contact me by telephone at (202) 663-7823 or by e-mail at wmullins@bakerandmiller.com.  If I am unavailable, you may contact my associate, Erin Glavich, by telephone at (202) 663-7830 or by e-mail at eglavich@bakerandmiller.com.

Sincerely,

/s/ *William A. Mullins*

William A. Mullins

Enclosure
cc:    Anthony J. LaRocca (CSXT)
       Peter W. Denton (CSXT)
       Lou Gitomer (CSXT)
       T.J. Litwiler (NPBL)

BEFORE THE
SURFACE TRANSPORTATION BOARD

————————————

FD 36522

————————————

NORFOLK SOUTHERN RAILWAY COMPANY'S REPLY TO CSXT'S OPENING
STATEMENT

————————————

Joseph H. Carpenter, IV.                    William A. Mullins
Thomas E. Zoeller                           Erin A. Glavich
Hanna M. Chouest                            Crystal M. Zorbaugh
NORFOLK SOUTHERN CORPORATION                 BAKER & MILLER PLLC
650 West Peachtree St NW                     Suite 300
Atlanta, GA 30308                            2401 Pennsylvania Ave, N.W.
Tel:    (470) 463-6314                       Washington, D.C. 20037
                                            Telephone: (202) 663-7823
                                            Facsimile:  (202) 663-7849

                                            Attorneys for Norfolk Southern
                                            Railway Company

October 25, 2021

1

Decision, 366 I.C.C. at 215.  As was foretold, further consolidation and corporate changes did happen.  In 1991, SRC was granted authority to directly control N&W through a corporate family exemption.  At that time, SRC changed its name to Norfolk Southern Railway Company ("NSR"), which then directly controlled N&W and its subsidiaries.  This meant the newly renamed NSR held the shares of SRC and the former Norfolk Southern and controlled the shares held by N&W.

Again, assuming CSX is correct, NSC may not have been authorized to "control" NPBL in 1982, but there is no question that NSC exercised and did control NPBL (whether authorized or not) from 1982 forward, a fact NPBL admits in its Opening Comments.  CSX did not object to this "unauthorized" control and in fact, acquiesced in it.  So, at best, CSX's "evidence" may prove that even though NSC had and did exercise control over NPBL, it was not approved from 1982 to 1990.  However, through the corporate family exemption, which CSX did not object to, this "unauthorized" control was certainly remedied in 1991 when NSC, SRC, and N&W were "authorized" to undertake various corporate changes.

At the time the 1990 notice of exemption was filed, SRC would have owned and controlled SRC's 14.29% and Norfolk Southern's 14.29% ownership of NPBL, giving SRC 28.58% ownership.  This structure had been specifically approved by CSX in the 1989 Supplemental Agreement.  See 1989 Supplemental Agreement.  The 1991 approval brought N&W's 28.57% under the control of SRC.  This would mean that post the 1991 transaction, NSC's control of NPBL was certainly now "authorized."  In 1991, one could use the corporate family exemption if the transaction within the corporate family did not "result in adverse changes in service levels, significant operational changes, or a change in the competitive balance with carriers outside the corporate family."  49 C.F.R. §1180.2(d)(3).

At that time, there was no question that NPBL was part of the NSC corporate family (whether "authorized" or not).  Because NPBL was operated independently, and the transaction did not result in any changes in service, operations, or the competitive balance with other carriers, especially given that CSX was using NPBL to access NIT, NSC's and SRC's control of the shares of NPBL fit within the corporate family exemption.  As a result, the 1991 notice authorized the newly renamed NSR to control NPBL, who was a member of the corporate family and whose ownership shares were being rearranged as a result of the corporate changes.  There was no requirement in the notice of exemption rules that NSC or SRC specifically "declare" that NPBL would not come under the direct control of SRC.  The rules were simple, and NSC and SRC followed those rules.[32]

This control of NPBL was reaffirmed in 1998 when another corporate family exemption was filed.  In that transaction, the Board authorized N&W's merger into NSR.  Again, the requirements of Section 1180.2(d)(3) were met.  NPBL was part of the corporate family.  There would be no changes in service levels, operations, or the competitive balance with CSX because CSX would still have access.  Again, CSX did not object.  This was so even though this transaction would give NSR direct control of NPBL by bringing all of the former SRC, N&W, and Norfolk Southern shares in NPBL under the direct control of NSR.

As such, NSC's control of NPBL (and later NSR's direct control of NPBL) was authorized three times.  At no time did CSX ever object to these control transactions.  CSX cannot plausibly argue that the ICC or the Board did not authorize the control of NPBL, whether that was in 1982, 1991, or 1998.  It is only now, almost 40 years later, that CSX concocts a

---

[32] This is especially true because NSC and CSX, per the 1989 Agreement, already believed that NS had the authority to control NPBL.  There would not have been a need, or a requirement, to specifically point out that NPBL was now being "authorized" to be controlled.  But certainly, that notice did authorize such control.

theory that NSC was never authorized to control NPBL.  They have done so in a deliberate effort to avoid the Board's exclusive jurisdiction and remedies.  If NSR had indeed undertaken anticompetitive acts, which it has not, CSX can invoke its remedies under ICCTA or attempt to argue in the District Court that a parent, who has authority to control a subsidiary, somehow violates the antitrust laws when the parent exercises that control.

## IV.   THE ONLY QUESTION BEFORE THE BOARD IS WHETHER NSC HAS THE AUTHORITY TO CONTROL NPBL

The limited question before the Board is whether NSC has authority to control NPBL. Despite the limited nature of this proceeding, CSX spends at least three pages of its brief laying out its antitrust claim – a claim properly before the District Court, not the Board.  CSX submitted bullet-pointed "evidence" of unlawful actions, citing the Court's opinion on a motion to dismiss (a decision that itself noted  was issued without the benefit of discovery and based primarily on CSX's unsubstantiated allegations).  CSX further attached its Complaint and opposition to summary judgment.  This was done most likely in an attempt to prejudice the Board against NSR because neither exhibit is substantively necessary to the issue before the Board.  Only it is not a wonder; it is a temptation and a silent ask that the Board see NSR as a "bad actor," even though such allegations have not been proven in a court of law.  This serves to bias the STB against NSR and distracts the STB from focusing on the real issue, which is whether control was authorized or not.

CSX's numerous statements are unproven.  They are mere allegations framed in dramatic terms for optimal effect. See, e.g., Id. at 9 ("But CSXT has been thwarted at every step by NSR's and NPBL's manipulation of NPBL's rates and practices.").  While phrasing the issue in terms of a denial of access and essential facilities, loaded concepts in both antitrust and railroad regulation, CSX's antitrust claim rests on an alleged conspiracy between NSR and its subsidiary.

Virginia regarding the rights of minority shareholders, or for alleged violations of contract.  One thing CSX should be precluded from arguing is that NSC and NSR were not authorized to control NPBL.  They were.[35]

## CONCLUSION

CSX asks the Board to not only overturn a nearly 40-year-old decision, but to consequently potentially expose NSR to antitrust liability for a decision NSR relied upon for decades. In its Opening Statement, CSX repeats over and over that NSR "never obtained permission" to control NPBL.  But the basis for this statement looks through the lens of how applications are filed today, under the rules and requirements of today, with 40 years of hindsight and experience on how rules are interpreted, how they apply, and what information should be considered.  That is exactly what CSX wants the Board to do: a *de novo* consideration of an application filed in 1980 while ignoring the rules that were in place at the time.  The Board must reject CSX's attempt to undo what was approved almost four decades ago.  The Board should affirm that the 1982 Transaction (or the 1990 and 1998 transactions, at a minimum) did authorize NSC (and later NSR) to control NPBL.  The implications of such a finding should be left up to the District Court.

---

[35] The Board need not delve into the scope of the antitrust immunity to resolve the question as to whether control was authorized or not, although ICC and Board approval come with antitrust immunity.  The Board should not concern itself with the antitrust implications of its findings on control.  Those are matters for the court.

43