**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**CSX TRANSPORTATION, INC.,**

        **Plaintiff,**

**v.**                                     **Civil Action No. 2:18-cv-530-MSD-RJK**

**NORFOLK SOUTHERN RAILWAY**
**COMPANY, *et al.*,**

        **Defendants.**

**MEMORANDUM IN SUPPORT OF MOTION *IN LIMINE* #5**
**TO EXCLUDE TESTIMONY FROM PLAINTIFF'S EXPERT HOWARD MARVEL**

Table of Contents

Introduction ........................................................................................................... 3

Legal Standard ....................................................................................................... 4

Argument ............................................................................................................... 6

   I.     To the extent CSXT offers Marvel to express opinions on railroad operations, those opinions should be excluded under Rule 702 because he is not a railroad expert. ..................... 6

   II.    Marvel's liability opinions should be excluded under Rule 702(b) and (c) because they are not based on sufficient facts or data and are not the product of reliable principles and methods. .................................................................................................. 8

      A.    Marvel's opinion on the Belt Line's switching rate is inadmissible. .......................... 8

         1.   Marvel compares the Belt Line's public tariff rate to private contract rates exclusive to CSXT……………………………………………………………..……..8

         2.   Marvel fails to account for differentiating factors to ensure a reliable comparison……………………………………………………….……………10

         3.   Marvel ignores the Belt Line's costs in evaluating its rate………………………11

      B.    Marvel's opinion on removal of the "diamond" track is inadmissible. ...................... 14

      C.    Marvel's opinion on failure to offer a scheduling window is inadmissible. .............. 16

      D.    Marvel's opinion on drayage as an alternative to rail is inadmissible. ...................... 17

   III.   Marvel's damages opinion should be excluded under Rule 702(c) and (d) because he does not apportion damages to acts within the statute of limitations period. .......................... 20

Conclusion ............................................................................................................ 22

Defendant Norfolk and Portsmouth Belt Line Railroad Company, by counsel, states as follows in support of its motion in limine to exclude testimony of CSXT's proffered expert, Howard Marvel, Ph.D.:[1]

### Introduction

Marvel is an academic economist, not a railroad expert.  To the extent CSXT offers him to express opinions about railroad operations at trial— ███████████████████████████████ ████████████████████████████████████—those opinions are inadmissible under Rule 702 for lack of qualifications.  *See* Marvel Report at ¶ 59 (**Exhibit 1**).

Marvel's remaining opinions can be divided into two categories:  liability and damages. As explained below, his liability opinions are inadmissible under Rule 702 for insufficient foundation and unreliable methodology.  His damages opinion is inadmissible under Rule 702 for failure to apportion damages to acts within the statute of limitations period. [2]

CSXT retained Marvel to do three things:  (1) define the relevant market; (2) opine on whether Defendants' conduct was anticompetitive; and (3) calculate CSXT's damages.  *See* **Exhibit 1** at ¶ 6.

With respect to topic (1), Marvel defines the relevant market as on-dock rail access at NIT. *Id*. at ¶ 12.  He further opines that drayage is not an adequate substitute for on-dock rail access at NIT.  *Id*. at ¶¶ 12, 41-50.  With respect to (2), he opines that Defendants engaged in three specific anticompetitive acts:  (a) setting an "exorbitant" switching rate in 2009; (b) removing a "diamond" track in 2008; and (c) denying CSXT a scheduling window in 2015.  *Id.* at ¶¶ 54-62; Marvel Reply

---

[1]    Marvel provided his final supplemental report on September 23, 2022.  The final report responding to his opinions was served October 13, 2022 (yesterday), by NS's expert, Matthew Wright.  At this point, no further reports are expected under the Scheduling Order.

[2]    To the extent NS asserts additional reasons for exclusion of Marvel's testimony in a separate motion in limine, the Belt Line joins those reasons.

Report at ¶ 2 (**Exhibit 2**).  With respect to (3), he estimates CSXT's damages from October 1, 2009 to December 31, 2021 to be $793 million.  *See* Marvel Suppl. Report at ¶ 9 (**Exhibit 3**).

Marvel's liability opinions—those related to the allegedly anticompetitive acts and comparison of drayage to rail at NIT—rest on fatally flawed analyses under Rule 702.  Lacking expertise in railroad switching rates, he compares the Belt Line's public tariff rate not to other public tariff rates, but to private contract rates that CSXT alone negotiated at other terminals, with no controls for differentiating factors and no consideration of costs.  Having no expertise in railroad operations, he opines about railroad decisions on track removal and scheduling windows with only fractional information, not even realizing it is incomplete.  And having no expertise in intermodal transport, he opines that drayage is an inadequate alternative to rail at NIT without considering the single most important factor in the decision to use one versus the other— ████████████████████ ████████████████████████████████████████ .

Marvel's damages opinion is equally defective, even ignoring the other flaws in his analysis.  Whereas antitrust law permits damages only for acts within the statute of limitations period, Marvel's model fatally fails to identify which damages are attributable to acts within the limitations period and which damages are not, leaving the jury no way to reliably determine allowable damages, if any.  Courts have excluded expert opinions for this exact reason.

<u>Legal Standard</u>

District courts serve as gatekeepers for admission of expert testimony and must exclude testimony that is unreliable and irrelevant.  *Peters-Martin v. Navistar Int'l Transp. Corp.*, 410 F. App'x 612, 617 (4th Cir. 2011) (citing *Kumho Tire*, 526 U.S. 137, 141 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)).  The Supreme Court explained in *Kumho Tire* that "the objective of that requirement is to ensure the reliability and relevancy of expert testimony."

526 U.S. at 152.  "It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Id.*

The district court's role is especially significant because expert opinion "can be both powerful and quite misleading because of the difficulty in evaluating it."  *Daubert*, 509 U.S. at 595.  No other witness is free to opine about matters without any firsthand knowledge.  *See* Fed. R. Evid. 703.  The gatekeeping function is therefore guided by Rule 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

*Daubert* provides a nonexclusive checklist for evaluating the reliability of expert testimony that must be tailored to the facts of each case.  *See Kumho Tire*, 526 U.S. at 150 (citing *Daubert*, 509 U.S. at 593).  Those factors include testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant community.  *Daubert*, 509 U.S. at 593-94.

The burden is on the party offering the expert testimony (in this case, CSXT) to demonstrate by a preponderance of the evidence that the expert's qualifications and opinions comply with Rule 702.  *Daubert*, 509 U.S. at 592-93 (citation omitted); *see also Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001).

## Argument

I.  **To the extent CSXT offers Marvel to express opinions on railroad operations, those opinions should be excluded under Rule 702 because he is not a railroad expert.**

A proffered expert witness must have specialized "knowledge, skill, experience, training, or education" in each subject on which he will offer an opinion. *See* Fed. R. Evid. 702. "Part of the court's gatekeeping function is to ensure that an expert witness is qualified to testify about each component of his testimony." *McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 1005 (4th Cir. 2020). An expert is not qualified if the expert has "neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered." *Thomas Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989).

The Belt Line takes no issue with Marvel's qualifications as an economist. Nevertheless, he is not a railroad expert, and therefore is not permitted to express opinions at trial regarding his assessment of railroad operational decisions. So, for example, to the extent Marvel intends to testify that, in his opinion, ███████████████████████████████████████████████ ████████████, *see* **Exhibit 1** at ¶ 59, he should be precluded from doing so under Rule 702. Likewise, to the extent he intends to testify that, in his opinion, █████████████████████████ ██████████████████████████████████████████████████████████████████, *see id*. at ¶ 60, he should be precluded from doing so under Rule 702.

Courts have excluded opinions from economists in similar situations. *See Lantec, Inc. v. Novell, Inc.*, 2001 U.S. Dist. LEXIS 24816, at *10 (D. Utah 2001) *aff'd* 306 F.3d 1003, 1025-26 (10th Cir. 2002). In *Lantec*, an antitrust case, the Tenth Circuit Court of Appeals affirmed a district court's decision to strike an economist's testimony before trial for lack of knowledge regarding the technical aspects of the computer science at issue. *Id*. 2001 U.S. Dist. LEXIS, at *10-11. The

economist had no specific computer science expertise, and the trial court refused to allow him to turn generalized "anecdotal evidence" into expert testimony at trial.  *Id*. at *13-15.

Here, even Marvel himself does not dispute his lack of railroad qualifications.  He is a consultant on antitrust issues.  He has never worked, written, taught, or consulted in the railroad industry.  When asked about his railroad background, he conceded his lack of expertise:



Marvel Dep. 165:1-166:17 (**Exhibit 4**).

In other words, by his own admission, Marvel lacks the required qualifications under Rule 702 to express opinions as a railroad expert.  To the extent CSXT intends to present such testimony at trial, it should be excluded.

II.    **Marvel's liability opinions should be excluded under Rule 702(b) and (c) because they are not based on sufficient facts or data and are not the product of reliable principles and methods.**

Regardless of his lack of railroad qualifications, or perhaps owing to it, Marvel's liability analysis fails under Rule 702 for all three allegedly anticompetitive acts as well as his comparison of drayage to rail at NIT.

A.    **Marvel's opinion on the Belt Line's switching rate is inadmissible.**

Marvel's methodology with respect to the Belt Line's switching rate fails for three reasons: (1) he improperly compares the Belt Line's public tariff rate to private contract rates exclusive to CSXT; (2) he fails to consider any differentiating factors like length of haul, relying entirely on "nominal dollars;" and (3) he completely ignores costs.

1.    **Marvel compares the Belt Line's public tariff rate to private contract rates exclusive to CSXT.**

Under Rule 702, expert testimony must be "based on sufficient facts or data" and "the product of reliable principles and methods." Fed. R. Evid. 702(b) and (c). The Fourth Circuit has directed district courts to "consider whether the expert witness' theory or technique:  (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a high known or potential rate of error; and (4) is generally accepted within a relevant scientific community." *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017).

In his reports, Marvel opines that the Belt Line's switching rate is ███████████ ████████████████████████████████████████████████████████████████ ████████████   **Exhibit 1** at ¶¶ 13, 15, 18, 54, 55-58; **Exhibit 2** at ¶¶ 2, 55-59, 60-65, 126. [3]   Yet his

---

[3]    Marvel's descriptions of the Belt Line's tariff come largely from CSXT corporate designee Robert Girardot, who provided multiple declarations with identical self-serving descriptors. Those declarations, and others from CSXT, are replete with hearsay. The Belt Line has separately moved to prohibit CSXT, through Marvel or otherwise, from repeating or relying on such information at trial. *See* D.E. 366; *see also* Fed. R. Evid. 703.

8

method for reaching these opinions is to compare the Belt Line's public tariff rate, which all customers pay, against privately negotiated rates that CSXT alone pays to other railroads at other terminals. *See* **Exhibit 1** at ¶¶ 54 and 58. He cites no evidence, and CSXT has produced none, that any such railroads offer the same negotiated rates to even a single other customer.

None of the confidential rates is publicly disclosed. In fact, CSXT designated all mention of its private rates "Attorneys Eyes Only" under the Protective Order, meaning the Belt Line itself does not even know them. If Marvel's improper analysis is permitted at trial, the Belt Line's president will have to leave the courtroom while Marvel explains to the jury why he believes the Belt Line's rate is "██████████," despite being lower than every comparable *public* switching rate on the East Coast or Gulf Coast on a per mile basis. *See* Crowley Report at 12-15, Tables 2 and 3 (D.E. 297-3); Crowley Dep. 235:2-15 (D.E. 300-12).

As explained in other briefing,[4] under antitrust law, "[a]ny inquiry into the reasonableness of [a] rate … must focus on the rate's reasonableness in the context of competition, *rather than from plaintiffs' perspective*." *Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*, 704 F. Supp. 1309, 1323 (D. Md. 1989), *aff'd*, 924 F.2d 539 (4th Cir. 1991) (emphasis added). It makes no difference that the Belt Line's rate "may not be workable in [CSXT's] plans." *Id*.

Yet CSXT's private contract rates are unique to CSXT. They say nothing about the reasonableness of the Belt Line's public tariff rate in light of other public tariff rates, which Marvel chose to ignore. His analysis using those private CSXT contract rates, therefore, is not based on sufficient facts or data under Rule 702(b) and not reliable under Rule 702(c).

---

[4]     *See, e.g.*, D.E. 297 at 36-38 and D.E. 354 at 4-6.

2.      **Marvel fails to account for differentiating factors to ensure a reliable comparison.**

Compounding the flaw above, Marvel also fails to account for any differentiating factors that might ensure that his comparison of switching rates is apples-to-apples, despite his public versus private error.  He simply compares "nominal dollars" charged by the Belt Line to the dollars charged by other railroads in their private contracts with CSXT.  In fact, Marvel himself conceded this sticker price comparison is the only available metric he possessed:



**Exhibit 4** at 89:12-21 (emphasis added).

Even a cursory review of the report by Thomas Crowley, the Belt Line's railroad expert with over 50 years of experience in the industry, illustrates the flaw in Marvel's approach.  To ensure a valid comparison of switching rates, Crowley first normalized the public tariff rates to reflect per-container fees and not per-railcar fees (since a single railcar can hold multiple containers).  *See* Crowley Report at 10-15 (D.E. 297-3).  He then divided the normalized per-container fees by mileage figures based on each railroad's physical plant and switching operations.  *Id*.  He then used this data to determine a "per-container, per-mile" fee for each railroad that could be compared against the per-container, per-mile fee charged by the Belt Line.  *Id*.

Marvel did nothing of the sort.  He just compared two numbers.  Yet remarkably, CSXT moved to exclude *Crowley's* rate opinions described above on the basis that, "Opinions premised on *basic mathematical calculations* are not helpful to the trier of fact, because such calculations are readily comprehensible by lay jurors without expert testimony."  CSXT Memo. in Supp. of

Mot. to Exclude Crowley at 12 (D.E. 375).  While CSXT misapplied its statement to Crowley's

analysis, its logic perfectly justifies exclusion of Marvel's analysis.

In fact, Marvel himself identified the way he believes he should have done his analysis,

had he been presented proper information.  He testified that the comparison would start on a per-

container basis and then factor in scale economies with either miles or weights to see if those

would affect the comparison, such as taking into account substantial impediments to operating in

certain environments.  *See* **Exhibit 4** at 182:19-183:10.

Marvel performed no such analysis, however, by his own admission:



*Id.* at 183:11-21 (emphasis added).

In other words, Marvel not only failed to apply the industry standard methodology used by

Crowley, but also the very analysis that Marvel himself considers to be superior.  Under Rule 702,

his "nominal dollar" comparison must be excluded.

### 3.   Marvel ignores the Belt Line's costs in evaluating its rate.

An expert's omission of critical variables from his analysis goes to the admissibility of his

testimony, not its probative value.  *See Smith v. Va. Commonwealth Univ.*, 84 F.3d 672, 676-77

(4th Cir. 1996) (reversing summary judgment where trial court relied on expert's regression

analysis that failed to include critical factors).  "Nothing in either *Daubert* or the Federal Rule of

Evidence requires a district court to admit opinion evidence that is connected to existing data only

by the *ipse dixit* of the expert."  *Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997).  "[W]hen the

assumptions made by an expert are not based on fact, the expert's testimony is likely to mislead a

jury, and should be excluded by the district court." *Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 144 (4th Cir. 1994); *see also Eastern Auto Distrib., Inc. v. Peugeot Motors of Am., Inc.*, 795 F.2d 329, 338 (4th Cir. 1986).

Marvel never examined the Belt Line's or any other railroad's costs, much less how those costs might affect the reasonableness of the rate. His omission on this point is inexcusable. Had he conducted any analysis of the Belt Line's costs, he would have realized that the Belt Line's rate is set at cost, and therefore *per se* reasonable. *See* D.E. 297 at 34 (██████████████████████████ ██████████████████████████████████████████).

Marvel confirmed in his deposition that his analysis into the reasonableness of the Belt Line's rate was strictly limited to a comparison against other rates, without any consideration of costs or other underlying factors:



**Exhibit 4** at 88:4-6, 92:4-10, 168:9-25 (emphasis added).

Despite this failure, Marvel conceded that (1) ██████████████████████

████████████████, and (2) to properly analyze the switch rate, ████████████

██████████████████████:



*Id.* at 90:11-91:16 (emphasis added).

As he admitted above, however, he never analyzed anything related to the Belt Line's costs, much less factors that might "███████████████." Put differently, despite his acknowledgment that the Belt Line's rate should cover its costs, despite his "████████" seeing if the Belt Line's costs are what caused it to charge a $210 rate, and despite his opinion that the Belt Line's rate is too high, *Marvel never undertook an analysis* of whether costs have any bearing on the rate.

Because Marvel failed to consider the critical factor of cost, his opinions about the Belt Line's rate are not based on sufficient facts to make them reliable and must be excluded under Rule 702. *See Smith*, 84 F.3d at 676-77; *see also Sardis v. Overhead Door Corp.*, 10 F.4th 268, 291 (4th Cir. 2021) (holding that expert's opinion was unreliable under Rule 702 for failure to consider necessary data to test his theory).

**B.      Marvel's opinion on removal of the "diamond" track is inadmissible.**

An expert witness is "obligated to request all of the information necessary to form a well-reasoned opinion and to admit when he lacked sufficient information adequately to render such an opinion." *In re Brand Name Prescription Drugs Antitrust Litig.*, 1996 U.S. Dist. LEXIS 8752, at *5 (N.D. Ill. 1996).  It is incumbent upon an expert, "if independence is to be accorded to his status, to go beyond what was sent to him by his employing counsel in deciding whether he was in possession of all relevant information." *Id.* at *5-6.  When an expert fails to gather all necessary information to test his theories, the expert's opinion "may even be right, [but] it is no more than a hypothesis, and it thus is not knowledge, nor is it based upon sufficient facts or data or the product of reliable principles and methods applied reliably to the facts of the case." *Sardis*, 10 F.4th at 291 (4th Cir. 2021) (quoting *Nease v. Ford Motor Corp.*, 848 F.3d 219, 232 (4th Cir. 2017)).

According to Marvel,



."  **Exhibit 4** at 19:10-15.  But Marvel did not draw this conclusion based on "scientific, technical, or other specialized knowledge."  Fed. R. Evid. 702(a).  It came from reading the Complaint and viewing Google Maps. *See* **Exhibit 4** at 20:3-9.

Marvel himself admitted his conclusion is based on assumptions, not fact:





*Id.* at 111:20-112:19 (emphasis added).

Yet Marvel never got the full story from CSXT.  He asked for more information on the diamond exchange from CSXT's lawyers, never received it, and therefore conceded he does not "███████████████" of the diamond interchange:



**Exhibit 4** at 175:14-176:2 (emphasis added).

The result is that Marvel's hypothesis is completely inconsistent with the facts.  The "diamond" he opines about is a 0.9-mile stretch of track in South Norfolk that NS owned and the Belt Line had trackage rights to use.  In 2007, it lay unused for at least two years, so the Belt Line's Board agreed to discontinue it to stop paying "a lot of money" for trackage rights and maintenance. *See* Moss Dep. 173:1-6 (**Exhibit 5**); *see also* D.E. 312-6 ("After discussion and consideration of an alternate route *and associated costs of trackage rights* the following resolution was, on motion duly made and seconded, adopted…") (emphasis added).

CSXT had the ability to challenge that discontinuance at three levels—the Belt Line's Board, the U.S. Surface Transportation Board, and federal district court—*but chose not to do so*, a fact Marvel never even knew to explore. *See* NS Motion *in Limine*, D.E. 343, 344. At the meeting where the Belt Line's Board, which included two CSXT-appointed members, approved the discontinuance, CSXT not only did not object, but the CSXT-appointed members voted in favor. *Id.* When NS and the Belt Line sought approval from the STB, CSXT did not intervene or object there either, nor did CSXT seek judicial review of the STB's decision granting the request. *See* STB Docket No. AB-290 (Sub-No. 299X), *NSR – Discontinuance of Service Exemption & NPBL – Discontinuation of Trackage Rights Exemption*, May 15, 2008 (D.E. 299-4). [5]

Yet incredibly, without even minimal information about this background, or even a basic understanding of the cost and operational considerations, CSXT intends for Marvel to opine as an expert that the Belt Line should be liable for discontinuing the track. Based on his own testimony, Marvel lacks sufficient facts to opine on what happened, much less to opine that the discontinuance was anticompetitive. *See Joiner*, 522 U.S. at 146. His lack of knowledge to support his conclusion warrants exclusion under Rule 702.

### C.    Marvel's opinion on failure to offer a scheduling window is inadmissible.

According to Marvel, the third alleged anticompetitive act was denying CSXT a scheduling window into NIT in 2015. *See* **Exhibit 1** at ¶ 18. His opinion is based on his understanding that the Belt Line was able to move only one to three trains for CSXT at NIT in 2015, and that this, in his judgment, constituted " ███████████████████████████ ." **Exhibit 4** at 176:22-180:8.

---

[5]    In its summary judgment opposition brief, CSXT does not dispute the facts about the discontinuance of the diamond track, nor does it introduce facts suggesting it was done for anticompetitive reasons. *See* D.E. 328 at 20, ¶ 43.

The undisputed facts again belie Marvel's understanding.  *See Tyger Constr.*, 29 F.3d at 144; *Eastern Auto*, 795 F.2d at 338.  The Belt Line did not deny CSXT a scheduling window. CSXT conceded in its summary judgment briefing that the Belt Line set up a regular operating window to move CSXT's traffic, that NS agreed to this window, that the Belt Line moved every train that CSXT requested it to move, and that the Belt Line was prepared to move more of CSXT's traffic, but CSXT never again asked.  *See* D.E. 328 at ¶¶ 45-55.  These facts completely contradict the assumptions that drive Marvel's opinion.

At his deposition, Marvel agreed that if he was wrong on the facts, then his conclusions would be unsupported.  He was asked, "███████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████," **Exhibit 4** at 180:24-181:1.  He answered, "████████████████████████████████████ ███████████████████████████████████████████" *Id.* at 181:4-6.

Marvel is wrong on the facts, and he should not be permitted to express his unsupported opinion about 2015 operating windows at trial.  Rule 702's requirement of sufficient facts and data is designed to prevent exactly this kind of testimony.  *See Joiner*, 522 U.S. at 146; *Tyger Constr.* 29 F.3d at 144; *Eastern Auto*, 795 F.2d at 338.

### D. Marvel's opinion on drayage as an alternative to rail is inadmissible.

In addition to the flaws in Marvel's analysis of the three allegedly anticompetitive acts, he also fails to properly examine drayage as an alternative to on-dock rail access, ignoring the central decision-making factor for choosing drayage versus rail at NIT—██████████████████ ████████████████████████████████████████.  Based on his failure to consider this factor, Marvel incorrectly concludes that drayage is not an adequate substitute.  Rule 702 prevents an expert from presenting such a purposefully incomplete analysis at trial.  *See Sardis*, 10 F.4th at 291 (4th Cir. 2021); *Tyger Constr.* 29 F.3d at 144; *Eastern Auto*, 795 F.2d at 338.

Marvel's drayage opinion is part of his relevant market analysis.  Relevant market analysis examines the reasonable interchangeability of available substitutes in the relevant product market.[6] *See U.S. v. E.I. Du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956) ("That market is composed of products that have reasonable interchangeability"); *Eastman Kodak Co. v. Image Technical Servs.*, 504 U.S. 451, 482 (1992) (holding that when relevant market does not "encompass all interchangeable substitute products, the market is legally (rather than factually) insufficient").

Substitutes need not be perfectly interchangeable to be effective; only reasonably so.  *See FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 25 (D. D.C. 2015) ("[A] product market includes all goods that are *reasonable* substitutes, even though the products themselves are not entirely the same.") (emphasis added).  The relevant product market is defined by "the 'extent to which consumers will change their consumption of one product in response to a price change in another, *i.e.*, the "cross-elasticity of demand."'" *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016) (quoting *Eastman Kodak*, 504 U.S. 451, 469 (1992)).  When the demand for a product responds to price changes in another product, there exists a high cross-elasticity of demand between them, indicating interchangeability.

Marvel's methodology (analyzing only non-price factors) purposefully ignores the most central decision-making factor: . and shows exactly why CSXT does not use the Belt Line, even though CSXT professes to prefer rail.

---

[6]     The relevant market for antitrust analysis has two components—the relevant product market and the relevant geographic market.  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 441 (4th Cir. 2011).

Yet Marvel deliberately omits this critical factor—or any discussion on how lower prices affect CSXT decision-making—from his analysis. He claims drayage is not a valid substitute for on-dock rail access simply because drayage "[redacted]" considering only non-cost factors. **Exhibit 1** at ¶ 41; **Exhibit 2** at ¶ 22. Courts have consistently rejected Marvel's core thesis, holding that even inferior goods and services are reasonable substitutes. *Sysco Corp.*, 113 F. Supp. 3d at 25 ("[A] product market includes *all* goods that are *reasonable* substitutes, *even though the products themselves are not entirely the same.*") (emphasis added).

Marvel's reason [redacted] is obvious: [redacted], and explains why CSXT will not use the Belt Line to transfer containers at NIT. In fact, he admitted the real-world significance in his deposition:

[redacted]





**Exhibit 4** at 183:3-189-11 (emphasis added).

Evidence of these relative costs is "an essential consideration of any rational purchaser …

in making the decision to buy one product over another." *H.J., Inc. v. IT&T*, 867 F.2d 1531, 1539

n.3, 1540 (8th Cir. 1989) (holding that courts are incapable of determining the relevant product

market without showing all variables of price competition between products).  Marvel analyzed

only the non-price considerations of drayage and rail access at NIT.  His disregard of ▬▬▬▬▬

▬▬▬▬▬ is a crucial error in methodology that requires exclusion under Rule 702.

**III.    Marvel's damages opinion should be excluded under Rule 702(c) and (d) because he
does not apportion damages to acts within the statute of limitations period.**

Marvel's damages opinion must be excluded because he undisputedly fails to apportion

damages between any separate unlawful acts, some of which are outside the statute of limitations

window.  *See* **Exhibit 2** at 58-63.  The result of this failure leaves the jury no reliable way to

determine damages for alleged violations within the limitations period versus alleged violations outside the limitations period.

Courts have excluded damages opinions from experts for this exact reason. When an opinion allows no basis on which to account for a statute of limitations in determining damages, it is error to submit it to the jury. *See, e.g., Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp.*, 221 F. Supp. 3d 1033, 1043-45 (N.D. Ind. 2016) (excluding plaintiff's expert because he calculated aggregate damages partly attributable to acts outside the limitations period).[7] "[T]he jury would be left entirely to speculation to determine [what damages were] triggered by acts that accrued before or after the limitations period began, or to assess what portion of [damages are] attributable to acts that caused harm within the limitations period." *Id.* at 1044-45; *see also Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946) ("Once causation of damages has been established, the amount of damages may be determined by a just and reasonable estimate *as long as the jury verdict is not the product of speculation or guess work*") (emphasis added).

Here, Marvel opines that the Belt Line and NS committed multiple anticompetitive acts, some dating back to 2008. In his reports, however, Marvel calculates what he considers CSXT's total damages resulting from *all* acts, not just those within the statute of limitations:



**Exhibit 2** at ¶ 124 (emphasis added). His supplemental report increases that amount to $793 million, with similarly no breakdown. **Exhibit 3** at ¶ 9.

---

[7]     *See also* discussion on pages 5-9 of the Belt Line's Reply in Support of Its Motion for Summary Judgment (D.E. 382), incorporated herein by reference.

In fact, Marvel emphasizes his totality approach in in his Reply Report in response to a critique by NS's expert witness, Matthew Wright: "█████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████" **Exhibit 2** at ¶ 126 (emphasis in original).

Marvel's failure to identify which damages are attributable to acts within the limitations period and which are not is fatal to his opinion, rendering it inadmissible under Rule 702. *See Gumwood*, 221 F. Supp. 3d at 1043-45; *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) ("[T]he commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period."); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) ("[E]ach time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and … *as to those damages*, the statute of limitations runs from the commission of that act.") (emphasis added); *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 502 (1968) (allowing plaintiff to bring antitrust claim in 1955 for conduct that began in 1912, but permitting recovery of only damages that accrued within the limitations period).

## <u>CONCLUSION</u>

Because Marvel's opinions do not survive scrutiny under Rule 702 and *Daubert*, the Court should exclude all of his testimony at trial and grant the Belt Line all other just relief.

Dated:  October 14, 2022

          **NORFOLK AND PORTSMOUTH**
          **BELT LINE RAILROAD COMPANY**


By: _____*/s/ W. Ryan Snow*_____
    James L. Chapman, IV, VSB No. 21983
    W. Ryan Snow, VSB No. 47423
    Alexander R. McDaniel, VSB No. 92398

22

CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1500
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com
amcdaniel@cwm-law.com
*Counsel for Norfolk and Portsmouth Belt
Line Railroad Company*


## CERTIFICATE OF SERVICE

I certify that on October 14, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a "Notice of Electronic Filing" to all counsel of record who have consented to electronic service.

*/s/ W. Ryan Snow*

W. Ryan Snow, VSB No. 47423
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1500
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
wrsnow@cwm-law.com
*Counsel for Norfolk and Portsmouth Belt
Line Railroad Company*