**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

CSX TRANSPORTATION, INC.,
individually and on behalf of NORFOLK
& PORTSMOUTH BELT LINE
RAILROAD COMPANY,

       Plaintiff,

       v.                            Civil Action No. 2:18-cv-530-MSD-RJK

NORFOLK SOUTHERN RAILWAY
COMPANY, *et al.*,

       Defendants.

_____/


**PLAINTIFF CSX TRANSPORTATION, INC.'S CONSOLIDATED OPPOSITION TO
<u>DEFENDANTS' MOTIONS TO EXCLUDE HOWARD P. MARVEL, PH.D.</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

RELEVANT BACKGROUND .......................................................................... 5

    I.    Dr. Marvel's Opening Report ............................................................ 5

    II.    Dr. Marvel's Reply Report .............................................................. 7

LEGAL STANDARD ...................................................................................... 11

ARGUMENT .................................................................................................... 12

    I.    Dr. Marvel's opinions about ocean carriers' reliance on NIT are reliable and grounded in the record. .............................................................. 14

    II.    Dr. Marvel's regression models account for legitimate competitive differences. ..................................................................................... 20

    III.    Dr. Marvel's damages opinions are admissible. ............................... 25

        a.    Dr. Marvel's damages model is reliable. ................................. 25

        b.    Dr. Marvel need not apportion damages to specific conduct within the statute of limitations period............................................... 27

    IV.    Dr. Marvel properly evaluated relevant record evidence.................... 30

        a.    Dr. Marvel's opinions about NPBL's rate are admissible. ..................... 31

        b.    Dr. Marvel's opinion about the Diamond is admissible. ......................... 35

        c.    Dr. Marvel's opinion about operational impediments is admissible. ...... 36

        d.    Dr. Marvel's opinions about drayage are admissible............................. 38

    V.    Dr. Marvel does not purport to opine as a "railroad" expert. ............................ 39

CONCLUSION.................................................................................................. 41

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adv. Health-Care Servs., Inc. v. Radford Comm. Hosp.*,
  910 F.2d 139 (4th Cir. 1990) ...................................................30

*Basile Baumann Prost Cole & Assocs. V. BBP & Assocs. LLC*,
  No. 11-2478, 2012 U.S. Dist. LEXIS 103915 (D. Md. July 25, 2012) ..................................19

*Bazemore v. Friday*,
  478 U.S. 385 (1986)........................................................................20, 26

*Blue Dane Simmental Corp. v. Am. Simmental Ass'n*,
  178 F.3d 1035 (8th Cir. 1999) ...................................................21

*In re Brand Name Prescription Drugs Antitrust Litig.*,
  1996 U.S. Dist. LEXIS 8752 (N.D. Ill. 1996) ........................................36

*Bresler v. Wilmington Tr. Co.*,
  855 F.3d 178 (4th Cir. 2017) ...................................................18

*City of Anaheim v. S. Cal. Edison Co.*,
  955 F.2d 1373 (9th Cir. 1992) ...................................................28

*City of Tuscaloosa v. Harcros Chemicals, Inc.*,
  158 F.3d 548 (11th Cir. 1998) ...................................................13

*Conwood Co., L.P. v. U.S. Tobacco Co.*,
  290 F.3d 768 (6th Cir. 2002) ...................................................13, 20

*Cooper v. Smith & Nephew, Inc.*,
  259 F.3d 194 (4th Cir. 2001) ...................................................11, 20

*Covol Fuels No. 4, LLC v. Pinnacle Mining Co., LLC*,
  No. 5:12-CV-04138, 2016 WL 482804 (S.D. W. Va. Feb. 4, 2016)......................................18

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993)................................................................ *passim*

*Dial Corp. v. News Corp.*,
  165 F. Supp. 3d 25 (S.D.N.Y. 2016)......................................................28

*E. Auto Distrib., Inc. v. Peugeot Motors of Am., Inc.*,
  795 F.2d 329 (4th Cir. 1986) ...................................................37

*E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*,
  637 F.3d 435 (4th Cir. 2011) .......................................................................30

*Ford v. Dir., Va. Dep't of Corr.*,
  No. 7:13CV00482, 2014 WL 4923277 (W.D. Va. Sept. 30, 2014)........................14

*FTC v. Sysco Corp.*,
  113 F. Supp. 3d 1 (D. D.C. 2015) .....................................................................39

*Gen. Elec. v. Joiner*,
  522 U.S. 136 (1997)........................................................................................37

*In re High Fructose Corn Syrup Antitrust Litig.*,
  295 F.3d 651 (7th Cir. 2002) ....................................................................21, 24

*Langella v. Cercone*,
  No. 09-CV-312E, 2010 WL 2402940 (W.D. Pa. June 10, 2010) ...........................14

*Lantec, Inc. v. Novell, Inc.*,
  2001 U.S. Dist. LEXIS 24816 (D. Utah 2001) .......................................................41

*Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*,
  704 F. Supp. 1309 (D. Md. 1989) ....................................................................32

*LePage's v. 3M*,
  324 F.3d 141 (3d Cir. 2003).......................................................................25, 28

*In re Linerboard Antitrust Litig.*,
  497 F. Supp. 2d 666 (E.D. Pa. 2007) ..............................................................21, 23

*In re Live Concert Antitrust Litig.*,
  863 F. Supp. 966 (C.D. Cal. 2012) ....................................................................21

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
  998 F.2d 1144 (3d Cir. 1993)......................................................................27, 28

*In re Mushroom Direct Purchaser Antitrust Litig.*,
  No. 06-0620, 2015 WL 5767415 (E.D. Pa. July 29, 2015) .........................13, 21, 22

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*,
  998 F.2d 1224 (3d Cir. 1993).........................................................................13

*Pharmanetics, Inc. v. Aventis Pharms., Inc.*,
  No. 5:03-CV-817, 2005 WL 6000369 (E.D.N.C. May 4, 2005) ...........................19

*Pipitone v. Biomatrix, Inc.*,
  288 F.3d 239 (5th Cir. 2002) ...................................................................... *passim*

*In re Polypropylene Carpet Antitrust Litig.*,
    93 F. Supp. 2d 1348 (N.D. Ga. 2000) ..................................................................21, 23

*Poster Exch'g, Inc. v. Nat'l Screen Serv. Corp.*,
    517 F.2d 117 (5th Cir. 1975) ........................................................................................28

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    292 F. Supp. 3d 14 (D.D.C. 2017) ...............................................................................26

*Sardis v. Overhead Door Corp.*,
    10 F.4th 268 (4th Cir. 2021) .........................................................................................36

*SMD Software, Inc. v. EMove, Inc.*,
    945 F. Supp. 2d 628 (E.D.N.C. 2013) ..........................................................................19

*Smith v. Va. Commonwealth Univ.*,
    84 F.3d 672 (4th Cir. 1996) ..........................................................................................36

*Tassi v. Holder*,
    660 F.3d 710 (4th Cir. 2011) ........................................................................................40

*TFWS, Inc. v. Schaefer*,
    325 F.3d 234 (4th Cir. 2003) ........................................................................................33

*Thompson Everett, Inc. v. Nat'l Cable Advertising, L.P.*,
    57 F.3d 1317 (4th Cir. 1995) ........................................................................................30

*Tyger Constr. Co. v. Pensacola Constr. Co.*,
    29 F.3d 137 (4th Cir. 1994) ..........................................................................................37

*United States v. 14.38 Acres*,
    80 F.3d 1074 (5th Cir. 1996) .............................................................................12, 34, 39

*United States v. Crisp*,
    324 F.3d 261 (4th Cir. 2003) ........................................................................................11

*United States v. Moreland*,
    437 F.3d 424 (4th Cir. 2006) ........................................................................................11

*In re Urethane Antitrust Litig.*,
    No. 04-1616, 2012 WL 6681783 (D. Kan. Dec. 21, 2012) .................................21, 24, 27

*Verisign, Inc. v. XYZ.com, LLC*,
    No. 1:14-cv-01749, 2015 WL 7430016 (E.D. Va. Nov. 20, 2015) ...............................21

*Wilson v. PL Phase One Operations L.P.*,
    422 F. Supp. 3d 971 (D. Md. 2019) ..............................................................................14

*In re Wireless Tel. Servs. Antitrust Litig.*,
    385 F. Supp. 2d 403 (S.D.N.Y. 2005)....................................................................21

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
    401 U.S. 321 (1971)..........................................................................................27

*In re Zetia (Ezetimibe) Antitrust Litig.*,
    No. 2:18-MD-2836, 2022 WL 3337796 (E.D. Va. Aug. 3, 2022)........................18

**Other Authorities**

Fed. R. Evid. 702 ................................................................................ *passim*

Fed. R. Civ. P. 10(c) ...........................................................................................14

ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues*, Ch. 6, "Econometrics and Regression Analysis" 123 (3d ed. 2017)..........................27

Steven Berry, James Levinsohn, and Ariel Pakes, *Automobile Prices in Market Equilibrium*, 63 ECONOMETRICA, 841 (1995) ...........................................................26

Plaintiff CSX Transportation, Inc. ("CSX") states as follows in consolidated opposition to the Motions to Exclude CSX's expert witness, Dr. Howard P. Marvel, filed by Defendant Norfolk Southern Railway Company ("NS") (ECF No. 469), and Defendant Norfolk and Portsmouth Belt Line Railroad Company ("NPBL" or the "Belt Line") (ECF No. 474) ("Motions"):

## INTRODUCTION

For more than a decade, NS has, on its own and in combination with NPBL, engaged in a wide-reaching campaign to block CSX's access to on-dock rail at Norfolk International Terminal ("NIT"), the most important marine terminal in the Port of Virginia ("POV"). Defendants' long-running conspiracy has allowed NS to maintain an unlawful monopoly in the market for on-dock rail service at NIT, and it has prevented CSX from winning international intermodal business across its entire network. Free from competitive constraints, NS charges higher prices to ocean carriers that use NIT intensively. Empirical data show that a ██% increase in the share of a carrier's traffic through NIT results in a more than $█ increase in the average price per container charged by NS to that carrier across its entire network.

CSX's expert witness, Dr. Howard P. Marvel, easily satisfies the standard of Rule 702 and the Supreme Court's decision in *Daubert*. Dr. Marvel is an accomplished economist with nearly 50 years of experience analyzing antitrust issues like these. Dr. Marvel's economic analyses address three elements of CSX's antitrust claims. *First*, Dr. Marvel determined that the relevant antitrust market in which Defendants' conduct took place is the market for on-dock rail service at NIT. *Second*, Dr. Marvel determined that Defendants' conduct foreclosing CSX from on-dock rail at NIT has harmed competition by allowing NS to charge supracompetitive prices to ocean carriers that move a large percentage of their international

1

intermodal containers through NIT.   *Third*, Dr. Marvel determined that CSX has lost substantial international intermodal business because of its lack of on-dock access at NIT, totaling nearly $███ million in lost profits since 2009.

Dr. Marvel's opinions are based on a thorough investigation and rigorous economic analysis.  Dr. Marvel reviewed a large body of record evidence, including deposition transcripts, documents, and empirical data, as well as publicly available information on the intermodal freight industry.   Marvel Report ¶ 7.   He used this information to analyze the relevant market based on ocean carriers' demand patterns, vessel routing realities, and drayage constraints, among other factors.   *Id.* ¶¶ 26-51.   Dr. Marvel then built regression models that isolate and quantify the effect on competition of Defendants' anticompetitive conduct at NIT and the amount of business lost by CSX as a result.   *Id.* ¶¶ 78-100.

NS and NPBL seek to exclude Dr. Marvel's opinions under Rule 702 of the Federal Rules of Evidence.   Neither Defendant challenges Dr. Marvel's qualifications or experience, and neither suggests that his opinions are irrelevant to CSX's claims.   Instead, Defendants contend that Dr. Marvel's testimony is "unreliable" because he (1) purportedly "ignored" certain relevant evidence, (2) relies on regression models that allegedly do not account for all relevant information, and (3) lacks personal experience in the rail industry.   These arguments flow from Defendants' views of disputed record evidence and misinterpretations of Dr. Marvel's opinions.   At best, they amount to topics for cross-examination at trial—not reasons to exclude Dr. Marvel's opinions under Rule 702.

NS challenges—in a motion that NPBL adopts—Dr. Marvel's economic modeling.   NS contends that an assumption underlying Dr. Marvel's "causal theory" (*i.e.*, that certain ocean carriers rely intensively on NIT) is "unsupported and contradicted by the record."   NS Br. at 2, 10.

According to NS, ocean carriers have no preference among the marine terminals at POV, and whether a ship docks at NIT depends on efforts by POV's operating subsidiary, Virginia International Terminals ("VIT"), to "steer" NS-aligned traffic to NIT and CSX-aligned traffic to Virginia International Gateway ("VIG"), POV's other major marine terminal. *See id.* at 2. This argument ignores the substantial record evidence—including but not limited to empirical data, as well as testimony from VIT's corporate representative—showing that railroad alignment does *not* dictate whether an ocean carrier's traffic is concentrated at NIT. Indeed, VIT's Chief Sales Officer Tom Capozzi testified that ███████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████.[1] The divergence between railroad alignment and terminal assignment is ratified by Dr. Marvel's analysis of the empirical data, which shows that VIT ████████████████████████████████████████████████████████████ ██████. NS's disagreement with the disputed record evidence on which Dr. Marvel's relies is a matter for trial, not *Daubert*.

NS also claims that Dr. Marvel's models fail to address legitimate competitive differences between NS and CSX at POV, such as route structure, double-stack capabilities, or purported service issues. As Dr. Marvel has explained, however, his models are designed to measure the effect of Defendants' anticompetitive conduct *at NIT specifically*. These models include price- and port-specific variables that control for any legitimate competitive differences at POV. And though NS seems to suggest that Dr. Marvel should have *also* included a separate control variable for each of the purported competitive differences it identifies, it has not any proffered evidence demonstrating that doing so would undermine Dr. Marvel's analysis. NS's purported analytical

---

[1] *See* **Exhibit 1** (Capozzi Dep. at 91:14-93:7; 94:12-104:19; 182:15-185:23; 243:15-24).

concerns are thus properly addressed through cross-examination and the presentation of its own expert testimony at trial.

NS and NPBL both contend that Dr. Marvel's damages opinions should be excluded because he fails to "apportion" damages to specific acts by Defendants within the applicable limitations periods. NPBL Br. at 3; *accord* NS Br. at 27. As CSX has explained, however, its damages need not be tied to any particular wrongful act, because CSX has not been harmed by any discrete act in isolation. CSX's injury arises from Defendants' decades-long, far-reaching conspiracy to monopolize on-dock rail access at NIT, which has prevented CSX from obtaining business throughout its entire international intermodal network. Dr. Marvel has calculated CSX's lost profits by year, which provides the jury with ample evidence on which to base a damages award without resorting to "speculation" or "guesswork."

NPBL, for its part, contends—in a motion that NS partially adopts—that Dr. Marvel is not qualified to opine on "railroad operations," and also that he failed to consider certain evidence that NPBL deems relevant to these operational issues. NPBL Br. at 6. Dr. Marvel considered the evidence relevant to the *economic* opinions he offers about the relevant market and Defendants' actions excluding CSX from that market. Economic experts routinely offer opinions like these about industries in which they have no prior personal experience. Indeed, NS's expert, economist Matthew B. Wright, similarly lacks personal experience in the rail industry, yet he opines at length on drayage, truck competition, and other "operational" issues related to CSX's claims. NPBL takes no apparent issue with Dr. Wright's qualifications even though its arguments apply equally to him.

At bottom, Defendants' arguments raise, at best, issues that should be addressed through cross-examination or the presentation of contrary evidence at trial.  None justifies exclusion of Dr. Marvel's opinions.  The Motions should be denied.

## RELEVANT BACKGROUND

CSX designated Dr. Marvel as an expert on February 25, 2020.  *See* **NS Ex. 1** ("Marvel Report").  Dr. Marvel holds a Ph.D. in Economics from the University of Chicago, and he is currently Professor Emeritus of Economics at Ohio State University, which he first joined in 1973. *See id.* ¶ 1.  He was previously Professor of Economics in the Department of Economics at Ohio State and Professor of Law in its Michael E. Moritz College of Law.  *Id.*  Apart from his positions at Ohio State, Dr. Marvel has held appointments at Oxford University, Stanford University, and Osaka University.  *Id.*  He has taught undergraduate and graduate courses in Industrial Organization Economics, the field of economics concerned with how business firms are organized, how they relate to one another, how they compete, and how their organization impacts market performance.  *Id.*  Dr. Marvel has written and lectured extensively on topics related to antitrust, competition, and strategic interactions between firms.  *See id.* ¶ 2.  Dr. Marvel has consulted on and testified in antitrust disputes across many industries.  *Id.* ¶ 3.  In the past six years, he has prepared expert reports and offered deposition or trial testimony in more than a dozen cases.  *Id.* at App'x B.

## I.      Dr. Marvel's Opening Report

CSX retained Dr. Marvel to conduct economic analyses on three issues: (1) "[t]he relevant antitrust market in which Defendants' alleged conduct took place"; (2) "[w]hether Defendants' alleged conduct harmed competition and CSX"; and (3) "[t]he extent of harm to CSX, if any."  *Id.* ¶ 6.  To conduct these analyses, Dr. Marvel "applied standard economic principles and methods" to the relevant facts drawn from various materials, including, among other things, (1) "waybill"

data reflecting NS's and CSX's international intermodal container movements; (2) pleadings and discovery materials, including interrogatory responses and deposition transcripts; (3) discussions with knowledgeable industry participants; and (4) academic literature and other publicly available information about the intermodal freight industry.  *See id.* ¶ 7 & App'x C.[2]

On the first issue, Dr. Marvel determined that the relevant antitrust market is the provision of on-dock rail service at NIT.  *See* Marvel Report ¶¶ 12, 21-51.  Dr. Marvel based this opinion on substantial record evidence reflecting that:

- CSX and NS compete for international intermodal shipping contracts.  Ocean carriers shipping containers of goods to and from the United States typically enter into multi-million-dollar, multi-year contracts with a single railroad, under which that railroad handles the vast majority of that carrier's rail movements across a geographic portfolio (*e.g.*, all rail containers moving by rail between East Coast Ports and Midwest markets).  *See* Marvel Report ¶¶ 20, 27-31.

- Railroads have little ability to influence ocean carriers' choice of ports or terminals. To be competitive for contracts with ocean carriers, CSX must offer competitive service at major ports within a geographic region (e.g., POV).  This, in turn, requires CSX to provide "on-dock" rail service at important marine terminals within each port (e.g., NIT).  *See* Marvel Report ¶¶ 20, 25-26.

- Neither trucking nor port competition provides robust competitive constraints to international intermodal rail.  *See* Marvel Report ¶¶ 52-54.

- Neither drayage nor on-dock access at other marine terminals within POV provides an adequate substitute to on-dock rail at NIT.  VIT steers traffic to POV terminals based mainly on factors other than railroad alignment.  Moreover, alliances among ocean carriers and capacity constraints at other POV terminals mean CSX *must* offer on-dock rail at NIT to effectively compete. *See* Marvel Report ¶¶ 41-51.

On the second issue, Dr. Marvel determined that Defendants' conduct—including setting and maintaining the Belt Line's "extraordinarily high switching rate," as well as removing critical

---

[2] When Dr. Marvel's opening report was served in February 2020, fact discovery was ongoing. Indeed, only 7 of 46 fact depositions had been taken, and NS had not yet produced all of its relevant data and documents. *See, e.g.*, Marvel Report ¶ 8 (acknowledging that fact discovery was ongoing and reserving the right to update report "should new information become available"); *see also* ECF No. 253 (memorandum order affirming Judge Leonard's decision granting CSX's motion to re-open depositions based on NS's belated production of documents).

rail infrastructure and refusing to accommodate reasonable scheduling windows, among other things—has foreclosed CSX's ability to access on-dock rail at NIT. *See* Marvel Report ¶¶ 56-60. Dr. Marvel also concluded that lack of on-dock rail access at NIT has "hamstrung" CSX's ability to compete for international intermodal business. *See* Marvel Report ¶¶ 70-73. This opinion is grounded in substantial record evidence reflecting that ports, ocean carriers, and railroads all view lack of on-dock access as a competitive disadvantage. *See id.* Finally, Dr. Marvel analyzed empirical data using a regression model to determine that—consistent with economic theory—NS charges higher prices (and earns higher margins) for ocean carriers that move a large percentage of their volumes through NIT. *See* Marvel Report ¶¶ 69-81. In other words, Defendants' anticompetitive conduct has harmed competition.

On the third issue, Dr. Marvel determined that CSX has suffered substantial economic harm because of Defendants' anticompetitive conduct. *See* Marvel Report ¶¶ 85-86. To evaluate the volume of lost business, Dr. Marvel created a regression model of ocean carriers' decisions to align with CSX or NS, which accounts for factors affecting these decisions, including the railroads' relative advantages at different ports and their relative prices, as well as the effect of ocean carriers' reliance on NIT. *See* Marvel Report ¶ 88. The model generates a predicted probability that an ocean carrier would have chosen to align with CSX but-for CSX's competitive disadvantage at NIT due to Defendants' anti-competitive conduct. *See id.* The difference between these two probabilities, multiplied by the expected profits from winning that carrier's business, yields an estimate of the economic harm to CSX caused by Defendants' conduct blocking CSX's access to on-dock rail at NIT. *See id.*; *see also id.* ¶¶ 89-98. Dr. Marvel's model reflects that, between 2009 and 2021, CSX suffered $███ million in damages. *See* **NS Ex. 2** ("Marvel Supp. Report") ¶ 9.

## II.    Dr. Marvel's Reply Report

On March 5, 2021, after the close of fact discovery, Dr. Marvel submitted a reply report.

*See* **NS Ex. 42** ("Marvel Reply").  In preparing his reply report, Dr. Marvel explained that he reviewed evidence made available after his original report was filed.  *See id.* at ¶ 1.  As he explained, none of that evidence alters his opinions as expressed in his original report.  *See* Marvel Reply ¶¶ 2-9.

In his reply report, Dr. Marvel also rebutted the criticisms raised by NS's and NPBL's expert witnesses, which are echoed in the Motions.  *See id.*; *see also* **NS Ex. 5** (NS's Expert Report of Matthew B. Wright, Ph.D.) ("Wright Report"); ECF No. 297-3 (NPBL's Expert Report of Thomas D. Crowley) ("Crowley Report").  First, Dr. Marvel observes that neither Dr. Wright nor Mr. Crowley "put forward any procompetitive justification against which to weigh the obvious anticompetitive effect of denying CSX effective rail access to NIT."[3]  *Id.* ¶ 11.  Instead, Defendants' experts opined only that the anticompetitive conduct "was not so harmful as to drive CSX out of the market."  *Id.*  As Dr. Marvel observed:  "If limiting CSX's access to NIT was not effective in improving NS's competitive position in container transportation, why have NS and NPBL worked so hard for so long to inhibit that access?"  *Id.* ¶ 12.

Dr. Marvel also rebutted Dr. Wright's contention that Defendants' conduct has not harmed competition because CSX can effectively compete at NIT using drayage.  *See* Marvel Reply ¶¶ 22-36.  Dr. Marvel explains that Defendants' experts improperly ignore substantial record evidence—including testimony from CSX, NS, and POV witnesses, among other evidence—confirming that drayage is an inferior alternative to on-dock rail, in large part due to the delays and capacity limitations inherent to moving individual containers by truck.  *Id.* ¶ 25 (citing VPA

---

[3] As Dr. Marvel notes, NPBL's expert opines that NPBL's switch rate—*i.e.*, one aspect of Defendants' anticompetitive conduct—is "reasonable." *Id.* ¶ 11.  But, as Dr. Marvel observes, Mr. Crowley "fails to adequately address how that can be when, for most of the time period at issue, NPBL's rate was ███████████████████████████████████████████████ ██████████." *See id.* ¶ 11, 55-65; *see also infra* at 30-34.

corporate representative testimony); *see also id.* ¶¶ 23-31 (outlining non-monetary limitations on drayage that Defendants' experts disregarded, including local regulations, street congestion, and gate delays at NIT, among other factors).  Dr. Marvel also rebutted Dr. Wright's calculation that, *in theory*, CSX could dray up to ███ containers each year at NIT.  *See id.* ¶ 36.  As Dr. Marvel explains, this only underscores that CSX *cannot* effectively compete at NIT using drayage, since this is "only a fraction [of] NS's container volumes at NIT."  *Id.* (noting NS ████████ ██████████████████████████████).

Dr. Marvel next countered Dr. Wright's contention that competition from trucks and other ports pose adequate competitive constraints to intermodal rail pricing, thus preventing NS from charging supracompetitive prices to ocean carriers that rely heavily on NIT.  *See* Marvel Reply ¶¶ 37-44.  Dr. Marvel explained that Dr. Wright again ignored record evidence confirming that "the choice between trucking and rail is often determined by operational and business considerations that have little to do with price competition between these alternatives," including, importantly, whether the cargo at issue is *domestic* or *international* freight.  *Id.* ¶¶ 37-40.  Dr. Marvel also explained that, contrary to Dr. Wright's assertion, the evidence shows that ocean carriers would *not* react to an increase in prices at NIT by diverting their traffic to other ports.  *Id.* ¶¶ 48-54. Indeed, Dr. Marvel's analysis of the empirical data confirms that carriers ████████ ████████████████████████████████████████—further confirming that carriers do not (and likely cannot) divert all of their traffic to the port at which rail rates are cheapest.  *Id.*

Dr. Marvel also responded to Dr. Wright's suggestion that because ocean carriers purportedly do not require service at NIT specifically, CSX could avoid the harm caused by Defendants' anticompetitive conduct by simply "work[ing] with VIT to shift [additional business

obtained] to VIG" from NIT.  *Id.* ¶ 66 (citing Wright Report ¶ 124).  As Dr. Marvel explained, Dr. Wright's position ignores substantial evidence—including testimony from VIT representatives and other witnesses—reflecting that some carriers *do* demand service through NIT, and also that VIT *cannot* route all CSX traffic to VIG due to a number of more significant competing priorities. *See* Marvel Reply ¶¶ 67-90; *see also, e.g.*, **Exhibit 1** (Capozzi Dep. 91:14-93:7; 94:12-104:19; 182:15-185:23; 243:15-24); **Exhibit 2** (Warren Decl. ¶ 5).  Dr. Marvel also explains that empirical container movement data reflects that ███████████████████████████████████ ███████████████████████████████████████████████████████████████.  *See* Marvel Reply ¶¶ 69-79.  For all of these reasons, Dr. Wright's criticism does not undermine Dr. Marvel's conclusion that "CSX is forced to take a carrier's use of either NIT or VIG as given when bidding for its business," and that "CSX has lost bids for contracts with major ocean carriers due to doubts about CSX's ability to handle large volumes at NIT."  *Id.* ¶ 90; *see also* Marvel Report ¶ 68.

Finally, Dr. Marvel rebuts Dr. Wright's "ineffective empirical and conceptual criticisms" to his regression models.  *See* Marvel Reply ¶¶ 91-106.  First, Dr. Marvel addresses Dr. Wright's version of the regression model, which makes multiple modifications to Dr. Marvel's model in an attempt to "eliminate the NIT-intensity effect" reflected in Dr. Marvel's model.  *See id.* ¶¶ 93, 98. As Dr. Marvel explains, none of Dr. Wright's proposed modifications is supported by the record. *See id.* ¶¶ 94-98.  And, when any one of these unsupported modifications is omitted, the model again reflects Dr. Marvel's original finding "that NS leverages the handicap it has imposed on CSX at NIT to charge its customers higher prices."  *Id.* ¶ 98.

Dr. Marvel also responds to Dr. Wright's various other attempts to extend his regression analysis inappropriately.  *See* Marvel Reply ¶¶ 99-101.  For example, Dr. Wright "claims to find statistically significant relationships between port use intensity" and rail rates at ports and

terminals other than NIT.  *See* Marvel Reply ¶ 101 (citing Wright Report Tbl. 11).  As Dr. Marvel explains, this is precisely why his original model zeroes in on NIT-specific effects:  "[T]he differences in pricing at other ports may reflect legitimate differences in capabilities which each railroad was free to invest in and develop, whereas differences at NIT are primarily driven by NS's and NPBL's actions to impede CSX's on-dock rail access to the terminal."  *Id.*

## LEGAL STANDARD

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence.  To satisfy Rule 702 at trial, CSX must establish by a preponderance of proof that Dr. Marvel's opinions are "based on sufficient facts or data" and are "the product of reliable principles and methods."  FED. R. EVID. 702(b)-(c); *see also Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001).

Under Rule 702, trial judges act as "gatekeepers" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *see also United States v. Crisp*, 324 F.3d 261, 268 (4th Cir. 2003) ("The touchstones for admissibility under *Daubert* are two: reliability and relevancy.").  This does not require the trial judge to "determine that the proffered expert testimony is irrefutable or certainly correct."  *United States v. Moreland*, 437 F.3d 424, 431 (4th Cir. 2006).  To the contrary, the court's assessment should focus "solely on principles and methodology, not on the conclusions that they generate."  *Daubert*, 509 U.S. at 595.

As Defendants themselves argued in responding to CSX's motion to exclude NPBL's expert witness, if an expert's testimony is relevant and based on reliable methods, it should be tested through "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" at trial.  *See* ECF No. 429 at 8 (NPBL's brief in opposition, citing *Kumho Tire*, 526 U.S. at 153, to argue that CSX's "criticism of the weight to be given [to a

particular fact] is an argument for trial, not a basis for exclusion");  *see also* ECF No. 435 (NS

joining NPBL's opposition to CSX's motion to exclude NPBL's expert).  "[T]he trial court's role

as gatekeeper is not intended to serve as a replacement for the adversary system."  FED. R. EVID.

702 advisory committee notes (2000) (quoting *United States v. 14.38 Acres*, 80 F.3d 1074, 1078

(5th Cir. 1996)).

      This is especially true where, as here, expert testimony depends on disputed material facts.

As the advisory committee notes to Rule 702 explain:

> When facts are in dispute, experts sometimes reach different conclusions based on
> competing versions of the facts. The emphasis in the amendment on "sufficient
> facts or data" is not intended to authorize a trial court to exclude an expert's
> testimony on the ground that the court believes one version of the facts and not the
> other.

FED. R. EVID. 702 advisory committee notes (2000); *see also Pipitone v. Biomatrix, Inc.*, 288 F.3d

239, 249-50 (5th Cir. 2002) (reversing exclusion of expert testimony where "the answer to the

critical causation question will depend on which set of predicate facts the fact-finder believes,"

and explaining that "[t]he fact-finder is entitled to hear [the expert's] testimony and decide whether

it should accept or reject that testimony after considering all factors that weigh on credibility,

including whether the predicate facts on which [the expert] relied are accurate").  At bottom, an

expert's testimony is admissible as long as it falls within "the range where experts might

reasonably differ," and the jury may "decide among the conflicting views of different experts."

*Kumho Tire*, 526 U.S. at 153.

## ARGUMENT

      Neither NS nor NPBL challenges Dr. Marvel's qualifications as an economic expert.  Nor

could they.  Dr. Marvel has nearly fifty years of experience analyzing economic issues related to

market definition, foreclosure, and competitive restraints, and he has testified as an expert witness

in more than a dozen cases during the last six years—most of which involved antitrust claims.  The

substance of his opinions has never been excluded by any court in response to a *Daubert* motion. There is simply no question that Dr. Marvel is eminently qualified to testify as an economic expert in this case.

Nor do Defendants challenge the nature of Dr. Marvel's economic methodology. Rightly so. The multiple regression analysis used by Dr. Marvel is "one of the mainstream tools in economic study" and is "an accepted method of determining damages and injury in antitrust cases." *In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, 2015 WL 5767415, at *6 (E.D. Pa. July 29, 2015) (internal quotation marks and citation omitted); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1238 (3d Cir. 1993) (noting that "the scientific method used by the economists, multiple regression analysis, is reliable" and reversing exclusion of regression model); *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 566 (11th Cir. 1998) (explaining that "multiple regression analysis" is "a methodology that is well-established as reliable" in antitrust cases); *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 793 (6th Cir. 2002) (noting that "regression analyses" are "generally accepted methods for proving antitrust damages").

Rather than challenge Dr. Marvel's qualifications or his methodology, NS and NPBL argue that Dr. Marvel's opinions should be excluded as unreliable because he purportedly failed to take into account certain facts that Defendants deem relevant, and because he allegedly failed to reliably account for certain facts in the regression model he built to assess the harm to competition and to CSX caused by Defendants' anticompetitive conduct.[4] None of these challenges comes close to justifying the exclusion of Dr. Marvel's opinions, as explained in detail below.

_____

[4] NS and NPBL each purport to incorporate by reference some or all of one another's arguments. *See* NS Br. at 27 n.66; NPBL Br. at 3 n.2. NPBL also purports to "incorporate by reference" several pages of argument made in support of its summary judgment motion. *See* NPBL Br. at 21

## I.     Dr. Marvel's opinions about ocean carriers' reliance on NIT are reliable and grounded in the record.

NS first challenges the "causal theory" underlying Dr. Marvel's economic analysis—namely, his "assumption" that certain ocean carriers are "NIT users" with an "inherent" demand for service at NIT.  *See* NS Br. at 11-12 (citing Marvel Report ¶¶ 51, 78-81, 88-94).  Dr. Marvel has explained that NS can (and does) charge higher prices to "NIT users" since its anticompetitive conduct has hindered CSX's ability to compete for this business.  *See* Marvel Report ¶¶ 69-81, Marvel Reply ¶¶ 91-106.  Dr. Marvel has also determined that many "NIT users" would choose to align with CSX but-for CSX's competitive disadvantage at NIT—resulting in significant harm to CSX in the form of lost profits.  *See* Marvel Report ¶¶ 88-98; Marvel Supp. Report ¶ 9.

NS contends that Dr. Marvel's opinion that some ocean carriers demand service at NIT is "contradicted by the factual record," rendering his opinions unreliable and inadmissible under Rule 702.  NS Br. at 17; *see also id.* at 11.  According to NS, "an ocean carrier's use of NIT is *not* indicative of an inherent demand for NIT," but is "an effect of a number of factors, including significantly an ocean carrier's railroad alignment and the decision-making of [VIT]."  *Id.* at 12.

n.7.  NPBL provides no justification for doing so, but NS claims that this is permitted under Rule 10(c) of the Federal Rules of Civil Procedure.  *See* NS Br. at 27 n.66.  Not so.  Rule 10(c) permits a party to incorporate statements made in *pleadings*, which Rule 7(a) does not define to include a party's briefs.  *See Ford v. Dir., Va. Dep't of Corr.,* No. 7:13CV00482, 2014 WL 4923277, at *2 n.3 (W.D. Va. Sept. 30, 2014) (declining to allow party to incorporate previously filed motions, explaining that, "[w]hile Rule 10(c) allows incorporation by reference for a pleading, Ford's response to the motion to dismiss is not a pleading") (citing Fed. R. Civ. P. 7(a)) (identifying "pleadings").  Although some courts have interpreted Rule 10(c) expansively to allow for incorporation of arguments a party has made in prior motions, *see Wilson v. PL Phase One Operations L.P.,* 422 F. Supp. 3d 971, 978 (D. Md. 2019), NS and NPBL offer no authority that allows a party to incorporate *another* party's arguments—particularly when doing so would effectively extend their briefing beyond the court's page limits.  *See* L.A.R. 7(F)(3) (setting a 30-page limit for opening briefs).  Moreover, it is not a "[c]ourt's responsibility to search another party's motion to determine which, if any, of the arguments set forth in said motion are applicable to a different" party through incorporation by reference.  *Langella v. Cercone*, No. 09-CV-312E, 2010 WL 2402940, at *6 n.1 (W.D. Pa. June 10, 2010).

14

NS cites testimony from VIT's corporate representative and other fact witnesses suggesting that VIT personnel assign ships to specific marine terminals within POV, and that VIT seeks to route NS-aligned carriers to NIT and CSX-aligned carriers to VIG. *See id.* at 13-14. Thus, NS argues, "[i]ntensity of use of NIT is not an effect caused by NS and the NPBL's alleged conduct; it is caused by the Port steering ocean carriers to the various terminals within the Port and an ocean carrier's choice to contract with a given railroad." *Id.* at 2. NS's expert did not investigate whether the data agreed with the cherry-picked deposition testimony on which NS relies.

Contrary to NS's suggestion, Dr. Marvel did not "ignore" this evidence in forming his opinions. Dr. Marvel expressly considered this evidence—as well as other testimony, documents, and data—to reach a different conclusion. As Dr. Marvel explains, testimonial and documentary evidence *and* empirical data both show that some ocean carriers rely intensively on NIT. *See* Marvel Report ¶¶ 32-36, 68; Marvel Reply ¶¶ 69-79. Multiple fact witnesses have testified that certain ocean carriers expect service from particular terminals within POV. *See* **Exhibit 3** (Kenney Dep. 27:9:20) (CSX Vice President of Intermodal and Automotive, testifying that "a steamship line determines what terminal they go to"); **Exhibit 4** (Houfek Dep. at 57:21-58:12) (former CSX Assistant Vice President of Marketing, who also previously worked for ocean carrier CMA CGM, testifying that "these ocean carriers [], they sort of are aligned with certain terminals").

Moreover, despite VIT's proffered *desire* to "steer" ships to terminals based on whether carriers align with NS or CSX, the evidence shows that VIT's *actual routing decisions* "primarily reflect[ ] factors other than railroad alignment." Marvel Reply ¶¶ 66-81. As VIT's Tom Capozzi explained, " ███████████████████████████████████████████████████
███████████████████████████████████████████████. **Exhibit 1** (Capozzi Dep at 91:25-93:7). Only after accounting for those issues does VIT consider, when possible, the

railroad(s) with which the ocean carriers on a particular ship may be aligned. *Id.* at 92:24-93:7. The record also contains evidence of external factors—including carrier alliances and port and terminal capacity constraints—that make it impossible for VIT to reliably route NS-aligned traffic to NIT and CSX-aligned traffic to VIG. *See* Marvel Reply ¶¶ 74, 80-84; *see also* ECF No. 324 at SOF ¶¶ 76-81, 63-64 (identifying and describing disputed evidence related to ocean carrier routing issues). Indeed, if Defendants' anticompetitive conduct could be avoided merely by VIT directing the right ship to the right terminal based on railroad alignment, there would be no need for VIT to ███████████████████████████████████████████████████████████ ███████████████████. *See* **Exhibit 1** (Capozzi Dep. at 79:21-80:18).

Moreover, as Dr. Marvel illustrates in his reply report, the empirical data confirm that carriers' terminal use has remained remarkably stable throughout the relevant period—even when their business shifts from NS to CSX or vice versa:



*See id.* ¶¶ 70-72, 76-79.  Put simply, Dr. Marvel's conclusion that some carriers are "NIT users"

is firmly grounded in the record, and none of the evidence cited by NS compels a different

conclusion.[5]

---

[5] NS cites a single cherry-picked statement from Dr. Marvel's deposition to suggest that he "never reviewed contracts between CSX or NS and their ocean carrier customers," and was thus "unaware" that CSX and NS ███████████████████████████████████████████████████. *See* NS Br. at 16.  This argument is a red herring. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *See* Marvel Report ¶¶ 78-81.  To reach this conclusion, Dr. Marvel evaluated substantial record evidence, including detailed container movement data produced by NS and CSX reflecting the prices charged for every container moved through every relevant terminal during the relevant period, as well as witness testimony about how international intermodal contracting works.  *See id.* ¶¶ 27-31, 78-81.  There is no question Dr.

To be sure, NS and its expert interpret this evidence differently.  *See* NS Br. at 14-16.  But those disagreements only emphasize that Dr. Marvel's evidence-based opinions—and the "causal theory" and the economic models flowing from them—should not be excluded under Rule 702. *See Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017) ("[Q]uestions regarding the factual underpinnings of the [expert's] opinion affect the weight and credibility of the witness' assessment, not its admissibility.") (internal quotation marks and citation omitted); *In re Zetia (Ezetimibe) Antitrust Litig.*, No. 2:18-MD-2836, 2022 WL 3337796, at *7 (E.D. Va. Aug. 3, 2022) ("The disputed fact does not impact the experts' reliability but only the weight of their testimony. Instead of striking the expert, the court should allow the opposing party to test the accuracy of the expert's conclusions through cross-examination and the presentation of contrary evidence to the jury."); *Covol Fuels No. 4, LLC v. Pinnacle Mining Co., LLC*, No. 5:12-CV-04138, 2016 WL 482804, at *4 (S.D. W. Va. Feb. 4, 2016) (rejecting motion to exclude where the expert "made a careful investigation into" disputed facts and addressed them in his analysis, explaining that, because "the Defendant's disagreements ultimately lie with [the expert's] conclusions, rather than his methodology, . . . the appropriate tool for addressing these grievances is cross-examination").

For this reason, *It's My Party* does not support NS.  In that case, the district court excluded an expert's analysis of the market for amphitheater performances, concluding that "[e]ach piece of evidence" the expert cited to support his theory of demand "ha[d] been rebuked," and also that the analysis  was "not based on sound logic or reasoning."  *It's My Party v. Live Nat., Inc.*, 88 F. Supp. 3d 475, 488 (D. Md. 2015).  For example, the expert purportedly analyzed whether touring artists "strongly prefer" playing at amphitheater or non-amphitheater venues.  *Id.* at 487.  But in doing

---

Marvel had a thorough understanding of the parties' relevant pricing practices, regardless of whether he reviewed the details of any particular contract.

so, the expert relied on an overbroad data set including single-occasion performances, which improperly skewed the results of his analysis.  *Id.* at 487 n.9.  And, when implementing his analysis, the expert "change[d] how he defines that category of artists who 'prefer amphitheaters' . . . without providing significant explanation."  *Id.* at 487; *see id.* at 488 (observing that the expert "alter[ed] the rule for what constitutes 'preference' depending on which calculation best serves him").  Because the expert relied on flawed data and inconsistent, self-serving logic, the court found his opinions unreliable.  *Id.*

Unlike the expert in *It's My Party*, Dr. Marvel's opinion that certain ocean carriers demand service at NIT independent of railroad alignment is based on his assessment of substantial record evidence—including witness testimony and empirical data.  While some of those facts may be *disputed*, none has been "rebuked."  And unlike the expert in *It's My Party*, Dr. Marvel applied a consistent and reliable regression methodology to assess this evidence.  *See* Marvel Report ¶¶ 78-81, 88-100, Marvel Reply ¶¶ 91-106, 120-126; *see also infra* at 20-27.  Thus, unlike the expert in *It's My Party*, Dr. Marvel's opinions satisfy Rule 702.

The other cases cited by NS are also inapt—in all of them, the court excluded expert opinions after concluding they had *no* factual support in the record.  *See SMD Software, Inc. v. EMove, Inc.*, 945 F. Supp. 2d 628, 637 (E.D.N.C. 2013) (excluding expert opinion that made a "large unsupported leap" not supported by any record evidence); *Basile Baumann Prost Cole & Assocs. v. BBP & Assocs. LLC*, No. 11-2478, 2012 U.S. Dist. LEXIS 103915, at *14 (D. Md. July 25, 2012) (excluding damages model measuring lost goodwill where plaintiff "identified *no evidence*" that the loss resulted from the alleged misconduct) (emphasis added); *Pharmanetics, Inc. v. Aventis Pharms., Inc.*, No. 5:03-CV-817, 2005 WL 6000369, at *9 (E.D.N.C. May 4, 2005) (in Lanham Act case, rejecting damages model as unreliable where it assumed lost sales were

attributable to defendant's conduct, despite court's prior decision granting summary judgment to defendant on this issue based on undisputed record evidence to the contrary).

## II.   Dr. Marvel's regression models account for legitimate competitive differences.

NS next contends that Dr. Marvel's liability and damages opinions are inadmissible because his regression models purportedly do not distinguish between "the alleged anticompetitive conduct and ordinary, legitimately occurring competitive forces" in the market for on-dock rail at NIT.   NS Br. at 19; *see also id.* at 21 (arguing that Dr. Marvel's models "do not rule out the possibility that [NS's higher prices] reflect legitimate differences between NS and CSX in their capabilities").

Although NS suggests that the Court may exclude Dr. Marvel's opinions on the basis that he "fail[ed] to properly account for alternative explanations to explain the conduct in question," NS Br. at 19, the cases NS cites make clear that an expert "normally should *not* be excluded because the expert has failed to rule out every possible alternative cause."  *Cooper*, 259 F.3d at 203 (emphasis added) (in case involving medical expert's differential diagnosis, "alternative causes suggested by a defendant normally affect the weight that the jury should give the expert's testimony and not the admissibility of that testimony").   In other words, an expert's failure to address a potentially relevant variable "normally affect[s] the analysis' probativeness, not its admissibility." *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J., joined by all other members of the Court, concurring); *see also Conwood Co.*, 290 F.3d at 794 ("In order to be *admissible* on the issue of causation, an expert's testimony need not eliminate all other possible causes of the injury.") (affirming admission of expert testimony and $1 billion verdict on Sherman Act § 2 claim).

Indeed, an expert's statistical analysis should be excluded only in the "rare case where the regressions are so incomplete as to be irrelevant" because the expert fails to account for critical

variables.[6] *In re Linerboard Antitrust Litig.*, 497 F. Supp. 2d 666, 678 (E.D. Pa. 2007) (internal

quotation marks and citations omitted); *see also id.* at 679 (rejecting motion to exclude expert for

omitting purportedly critical variables because "the excluded variables were accounted for in his

model indirectly" through the model's construction); *In re Polypropylene Carpet Antitrust Litig.*,

93 F. Supp. 2d 1348, 1365 (N.D. Ga. 2000) ("Merely pointing to economic conditions that may

affect the dependent variable is not enough to call into question the reliability of an econometric

model.").

A defendant challenging the reliability of a regression based on allegedly omitted variables

"must introduce evidence to support its contention that the failure to include those variables would

actually *change the outcome of the analysis*."   *In re Mushroom*, 2015 WL 5767415, at *11

(emphasis added).   In making this factual showing, the defendant must attack an expert's

regression directly, rather than some reimagined or differently specified version of it.   *In re*

*Urethane Antitrust Litig.*, No. 04-1616-JWL, 2012 WL 6681783, at *6 (D. Kan. Dec. 21,

2012), *aff'd,* 768 F.3d 1245 (10th Cir. 2014) ("The fact that another test might yield different

results does not provide a basis for exclusion of testimony supported by a test that is admittedly

well-accepted in this field."); *see also In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d

---

[6] The cases cited by NS confirm as much.   *See Blue Dane Simmental Corp. v. Am. Simmental Ass'n*, 178 F.3d 1035, 1040-41 (8th Cir. 1999) (affirming exclusion of expert economist based in part on his failure to consider *any* potential alternative causes); *Verisign, Inc. v. XYZ.com, LLC*, No. 1:14-cv-01749, 2015 WL 7430016, at *5 (E.D. Va. Nov. 20, 2015) (in Lanham Act case, granting summary judgment to defendant in part because plaintiff's expert opined as to causation without accounting for *any* possible alternative causes identified in the record); *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 978 (C.D. Cal. 2012) (excluding plaintiff's economic expert based in part on failure to account for two "major variables" that might impact a nationwide market of ticket sales); *In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 428 (S.D.N.Y. 2005) (excluding expert whose regression analysis incorporated *no* independent variables).

651, 660-61 (7th Cir. 2002) (affirming denial of motion to exclude where parties' experts disagreed about variables that should be included in regression and reliability of results given variables used).

Dr. Marvel designed his model to answer a specific question: "What would the probability of [an ocean carrier aligning with CSX] have been but-for CSX's competitive disadvantage *at NIT*?" Marvel Report ¶ 96 (emphasis added). In other words, Dr. Marvel's model is designed to measure the effect of NS's competitive advantage at NIT specifically—i.e., the advantage gained from Defendants' anticompetitive conduct. The model isolates NIT-specific effects (as opposed to those attributable to any broader competitive differences between NS and CSX) in several ways. First, the model measures and incorporates the proportion of traffic each railroad handles through each major East Coast port, which accounts for any differences in overall rail network quality. *Id.* ¶¶ 88, 91. Second, the model accounts for differences in each railroad's pricing for the same routes. *Id.* ¶ 92. Third, "the model holds constant the ocean carriers' reliance on" POV as a whole, ensuring the model "truly captures a terminal-specific effect" for anticompetitive conduct *at NIT. Id.* ¶ 94.

NS criticizes Dr. Marvel for allegedly failing to investigate and account for certain purported "competitive differences" between CSX and NS—including variations in double-stack capacity, route structure, and alleged "service issues." *See* NS Br. at 22-24. NS's argument is essentially that Dr. Marvel's model should include a separately identifiable control variable for each of these alleged competitive differences. However, as noted above, these broad competitive differences are incorporated into the model's construction, which isolates NIT-specific effects from general competitive advantages, if any, between NS and CSX. Moreover, a regression model need not account for every potentially relevant variable—only those that would "actually change the outcome of the analysis." *In re Mushroom*, 2015 WL 5767415, at *11. NS has proffered no

22

evidence showing that any of the allegedly competitive differences it identifies would do so here. For example, the record evidence does not support NS's speculation that CSX "service issues" may have contributed to its disadvantage at NIT.  NS cites a handful of documents allegedly reflecting "service . . . complaints" from two ocean carriers—none of which are specific to NIT. *See* NS Br. at 24.  But the record shows that CSX ████████████████████████████████ ████████████████████████████████. *See* **Exhibit 5** (████████████████████████████ ████).  The empirical evidence thus betrays any suggestion that these "service issues" amount to a critical variable that would have changed the outcome of Dr. Marvel's analysis such that he *must* have accounted for it in his model.  *See In re Polypropylene*, 93 F. Supp. 2d at 1365 ("Merely pointing to economic conditions that *may* affect the dependent variable is not enough to call into question the reliability of an econometric model.") (emphasis added).

NS likewise points to no evidence demonstrating that the other alleged "competitive differences" it identifies (i.e., route structure to the Midwest and double-stack capability) would have changed Dr. Marvel's analysis.  All of these differences relate to competition between NS and CSX at POV generally, not NIT specifically.  Dr. Marvel properly accounted for these broader issues by constructing a model that isolates NIT-specific effects.[7]  That is more than sufficient to withstand NS's challenge under Rule 702.  *See In re Linerboard Antitrust Litig.*, 497 F. Supp. 2d at 679 (rejecting motion to exclude where challenged variables were addressed "indirectly" in expert's model).

---

[7] NS points to one alleged NIT-specific "competitive advantage"— its "routing advantage" *over NPBL* at NIT.  NS Br. at 24 (second quote) and 25 (first quote).  But this alleged "advantage" is counterfactual.  CSX does not rely on NPBL to access on-dock rail at NIT, because of the very anticompetitive conduct at issue in this case.  And ocean carriers and other industry participants are well aware of this fact.  *See, e.g.*, **Exhibit 3** (Kenney Dep. 20:8-21:4; 31:6-11); **Exhibit 6** (Warren Dep. 162:22-163:12).  So any route advantage NS may have over NPBL at NIT is not an "advantage" over CSX that could have any impact on Dr. Marvel's analysis.

23

NS's own expert made no effort to show that Dr. Marvel's model would produce contrary results if variables were introduced to account for any of the alleged "competitive differences" raised by NS. Instead, Dr. Wright produced a fundamentally different model using different variables altogether. *See* Marvel Reply ¶¶ 94-96. Dr. Wright used a different measure of ocean's carrier's reliance on NIT, and also changed multiple other "cherry picked" variables from Dr. Marvel's original model. *Id.* ¶ 94; Wright Report ¶ 188. Correcting any one of these cherry-picked changes results in replication of Dr. Marvel's original conclusions. Marvel Reply ¶ 96. This exercise shows only that a different model employing different variables and assumptions based on disputed evidence may produce different results. That is quintessential fodder for the trier of fact, and it does not undermine the reliability of Dr. Marvel's original model. *See In re Urethane Antitrust Litig.*, 2012 WL 6681783, at *6 ("The fact that another test might yield different results does not provide a basis for exclusion of testimony supported by a test that is admittedly well-accepted in this field."); *see also In re High Fructose Corn Syrup*, 295 F.3d at 660 (affirming rejection of attack by opposing expert who "added a couple of variables to the analysis of the plaintiffs' expert and, presto, the . . . variable ceased to be statistically significant").

NS contends that "a practical look at the marketplace over the relevant period shows [Dr.] Marvel's results are implausible." NS Br. at 26. To support this argument, NS cites *its own expert's analysis*, which reflects that CSX's market share at POV has grown over the relevant period, and his opinion that CSX could have avoided its damages by simply paying NPBL's switch rate. *See id.* Dr. Marvel has rebutted both of these arguments. *See* Marvel Reply ¶ 111 (explaining that CSX's growing market share at POV is largely attributable to its success with ocean carriers that call on VIG, where CSX is not hampered by Defendants' conduct); *id.* ¶ 136 (citing myriad non-price barriers imposed by Defendants). But ultimately, NS's arguments about its "practical"

24

view of the marketplace should be made to the jury—not offered as a basis to exclude Dr. Marvel's

testimony before trial. *See Pipitone*, 288 F.3d at 250 (where expert testimony depends on disputed

facts, a jury should decide whether to accept it after determining whether the "predicate facts"

relied on by the expert "are accurate").

### III.    Dr. Marvel's damages opinions are admissible.

### a.    Dr. Marvel's damages model is reliable.

NS contends that Dr. Marvel's damages model is unreliable because "it is bound to find

damages where ocean carriers use any port intensively." NS Br. at 27. This argument mainly

repackages NS's complaint about Dr. Marvel's opinion that certain ocean carriers have an

"inherent" demand for service at NIT. *Compare id.* at 13-18 *with id.* at 27. As explained above,

this issue turns on disputed facts that the jury must resolve. Moreover, Dr. Marvel is not required

to present a perfect measure of damages to the jury. *See LePage's v. 3M*, 324 F.3d 141, 166 (3d

Cir. 2003) ("[D]amages may be determined without strict proof of what act caused the injury, as

long as the damages are not based on speculation or guesswork.").

NS cites its expert's analysis, which purports to show that Dr. Marvel's empirical model is

unreliable because it "cannot distinguish whether an ocean carrier is likely to use NS at [POV]

because of NS's legitimate competitive advantages at [POV] or because of allegedly

anticompetitive conduct." NS Br. at 27. Dr. Wright purported to support this contention by using

Dr. Marvel's model to "calculate[ ] the effect of usage intensity at other ports on NS and CSX

rates." Marvel Reply ¶ 101 (citing Wright Report Tbl. 11).

As Dr. Marvel has explained, however, Dr. Wright's analysis is misguided, because "the

differences in pricing at other ports may reflect legitimate differences in capabilities which each

railroad was free to invest in and develop, whereas differences at NIT are primarily driven by NS's

and NPBL's actions to impede CSX's on-dock rail access to the terminal." Marvel Reply ¶ 101.

Put differently, Defendants' conduct is a clear source of unlawful advantage at NIT—and Dr. Marvel's model is designed to measure NIT-specific effects. *See supra* at 22. NS points to no legitimate, material competitive differences *specific to NIT* that are not accounted for by Dr. Marvel's models. *See* Marvel Reply ¶ 119. And, as explained above, Dr. Marvel's model *does* control for broader competitive effects through price and port-specific variables. *See supra* at 22. If NS believes the models do not adequately account for competitive differences between NS and CSX, that criticism goes to the weight of Dr. Marvel's testimony, not its admissibility. *Bazemore*, 478 U.S. at 400.

NS disingenuously suggests that Dr. Marvel has "admitted" that his damages model "is not supported by any economic literature." NS Br. at 30. But Dr. Marvel's actual testimony was that he could not identify any specific literature *off the top of his head in the deposition. See id.* at 30 n.70 (citing Marvel's testimony that he could not think of any supporting literature "right now"); *see also* Marvel Report ¶ 93 (citing literature supporting damages regression). Courts routinely recognize that regression models like Dr. Marvel's are an appropriate method to assess antitrust damages—as NS well knows. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 58 (D.D.C. 2017), *aff'd sub nom.* 934 F.3d 619 (D.C. Cir. 2019) ("[R]egression analysis is generally a reliable method for determining damages in antitrust cases and is a mainstream tool in economic study.") (internal quotation marks and citations omitted).

The specific logistic regression or "logit" method that Dr. Marvel used to construct his damages model is widely supported in economic literature on industrial organization, including as cited in his reports. *See, e.g.*, Marvel Report ¶ 161; *see also* Steven Berry, James Levinsohn, and Ariel Pakes, *Automobile Prices in Market Equilibrium*, 63 ECONOMETRICA, 841 (1995), attached as **Exhibit 7**. The economic literature also firmly supports that Dr. Marvel reliably applied that

model in this case.  *See* ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues*, Ch. 6, "Econometrics and Regression Analysis" 123 (3d ed. 2017), attached as **Exhibit 8**, at 131 ("The combination of: (1) a properly specified econometric model showing that an explanatory variable has a statistically significant partial effect on the dependent variable, holding constant other factors; and (2) a sound economic theory explaining why one would expect the explanatory variable to have a causal effect, can together provide evidence consistent with the existence of a causal relationship and an estimate of the magnitude of the effect.").  NS's criticisms about Dr. Marvel's methodology are thus not grounds for exclusion under Rule 702.  *See In re Urethane Antitrust Litig.*, 2012 WL 6681783, at *7 ("[A]rguments about which method is superior for use in this case . . . go only to the weight of [an expert's] opinions, and not to their admissibility.").

> **b.**   **Dr. Marvel need not apportion damages to specific conduct within the statute of limitations period.**

NS and NPBL both argue that Dr. Marvel's damages opinions should be excluded in their entirety because he "fails to apportion damages between any separate unlawful acts, some of which are outside the statute of limitations window."  NPBL Br. at 20; *see also* NS Br. at 27 (arguing that Dr. Marvel's "reliance on conduct occurring outside the limitations period in calculating purported damages requires that his damages opinions be excluded").

As CSX has explained, Defendants' argument that CSX must tie its damages calculation to specific overt acts "obfuscates the difference between, on the one hand, an 'overt act' necessary to show the existence of a conspiracy, and, on the other hand, an 'injurious act' causing damages within the limitations period."  *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1172 (3d Cir. 1993).  Although a plaintiff must identify at least one timely overt act causing injury to satisfy the statute of limitations, *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338

27

(1971), its damages calculations need not be tied to that (or any other) specific act, because "overt acts aren't what cause damage. *It is the effectiveness of the overall conspiracy that causes damages*." *Lower Lake Erie*, 998 F.2d at 1172 (emphasis added).

Particularly in monopoly cases like this one, "the relevant inquiry is the anticompetitive effect of [Defendants'] exclusionary practices considered together." *3M*, 324 F.3d at 162; *see also City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect."). Thus, once the jury finds that Defendants' unlawful conduct injured CSX, "damages may be determined without strict proof of what act caused the injury, as long as the damages are not based on speculation or guesswork." *3M*, 324 F.3d at 166; *see also Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 38 (S.D.N.Y. 2016) (in monopoly case, rejecting summary judgment argument that plaintiff's damages model did not "sort out the effects of any particular form of anticompetitive conduct," explaining that "calculating damages in antitrust cases is not an exact science," and that "if a jury were to find [defendant's] actions taken as a whole to be a violation of Section Two of the Sherman Act, disaggregating the monopolist's lawful actions from its unlawful actions for the purpose of calculating damages may be unnecessary, if not impossible") (internal quotation marks and citations omitted); *Poster Exch'g, Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 125 (5th Cir. 1975) (approving "day by day calculation of accruing injury" in monopoly and conspiracy case "based on continuing antitrust behavior, not merely the continuing damage [plaintiff] feels from a single day's monopoly and refusal to deal").

The cases cited by Defendants do not suggest otherwise. *See* NPBL Br. at 21; NS Br. at 27. First, in *Bigelow v. RKO Radio Pictures*, the Supreme Court *affirmed* a jury verdict awarding damages for an antitrust conspiracy despite uncertainty in calculating damages. 327 U.S. 251, 264

(1946). The Court emphasized that, although a damages award may not be based on pure "speculation" or "guesswork," a jury "may make a just and reasonable estimate of the damage based on relevant data," and in doing so may "act on probable and inferential as well as (upon) direct and positive proof" of damages. *Id.* (internal quotation marks and citation omitted). The *Bigelow* Court observed that "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Id.* at 265. And, although this "ancient" principle "is not restricted to proof of damage in antitrust suits, . . . their character is such as frequently to call for its application." *Id.* And in *Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp.*, the court excluded the plaintiff's damages expert because he failed to identify or evaluate "any particular violation" underlying his lump-sum damages analysis. 221 F. Supp. 3d 1033, 1038 (N.D. Ind. 2016). This, among other things, failed to provide the jury with sufficient information to assess "the effect of the statute of limitations on Gumwood's damages." *Id.* at 1043.

Dr. Marvel calculates CSX's damages as its lost profits based on "the totality of NS's and NPBL's [ongoing] efforts to foreclose CSX" from on-dock rail at NIT, including conduct within the limitations period. Marvel Reply ¶ 126; *see also* Marvel Supp. Report ¶ 9. Dr. Marvel has apportioned CSX's lost profits by year. *See id.* Thus, if the jury were to conclude that CSX may not recover lost profits that accrued outside the applicable limitations period, it could exclude those sums from its award without engaging in "guesswork" or "speculation." *See Bigelow*, 327 U.S. 251 at 264. Because Dr. Marvel's model provides the jury with an adequate "basis on which to evaluate the effect of the statute of limitations on his damages opinion," his damages model is admissible under Rule 702. *Gumwood*, 221 F. Supp. 3d at 1044-45.

29

IV.    **Dr. Marvel properly evaluated relevant record evidence.**

NPBL argues that Dr. Marvel's opinions about the Belt Line's rate and Defendants' other "allegedly anticompetitive acts" are inadmissible because they are not based on "sufficient facts and data" or "are not the product of reliable principles and methods."  NPBL Br. at 8 (citing FED. R. EVID. 702(b) and (c)).  NPBL claims that Dr. Marvel's opinions about the substitutability of drayage should be excluded for the same reasons.

NPBL's suggestion that Dr. Marvel's "liability" analysis turns on his assessment of three isolated "acts" by Defendants misunderstands the legal standards underpinning his opinions.  What matters, for purposes of CSX's antitrust claims, is whether (1) Defendants engaged in conduct "to foreclose competition, to gain a competitive advantage, or to destroy a competitor," *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 441 (4th Cir. 2011); and (2) this conduct harmed competition, *see Thompson Everett, Inc. v. Nat'l Cable Advertising, L.P.*, 57 F.3d 1317, 1325 (4th Cir. 1995) (noting that an antitrust claim requires proof of "damage to the competitive process").  Defendants' specific actions need not be inherently illegal or wrongful to constitute anticompetitive conduct supporting CSX's claims.  *See Kolon Indus.*, 637 F.3d at 441 ("Conduct that might otherwise be lawful may be impermissibly exclusionary under antitrust law when practiced by a monopolist."); *see also Adv. Health-Care Servs., Inc. v. Radford Comm. Hosp.*, 910 F.2d 139, 148 (4th Cir. 1990) (explaining that "[i]n analyzing this issue, it is appropriate to examine the economic effects of the challenged conduct on consumers, competitors, and the alleged violator itself").

Consistent with this legal framework, Dr. Marvel did not analyze each of Defendants' acts in a vacuum to determine whether it was "reasonable" or "justified."  He evaluated the *totality* of Defendants' conduct, along with other market factors like drayage, to determine that (1) CSX's lack of access to on-dock rail at NIT hinders its ability to compete for international intermodal rail

transportation contracts, and (2) that foreclosure harms competition by allowing NS to "charge ocean carriers higher prices than they would be able to if CSX was a stronger competitor" at NIT. *See* Marvel Report ¶¶ 55. NPBL's critiques about which evidence Dr. Marvel considered in conducting this analysis present, at best, fodder for cross-examination at trial. *See Daubert*, 509 U.S. at 596.

### a. Dr. Marvel's opinions about NPBL's rate are admissible.

CSX has alleged—and the record evidence has shown—that Defendants' efforts to set and maintain an "extraordinarily high switching rate" for NPBL's services to NIT is one element of Defendants' campaign to "foreclose[ ] CSX from obtaining on-dock rail access to NIT." Marvel Report ¶ 56. Dr. Marvel evaluated NPBL's $210 per railcar switch rate by:

- Comparing the Belt Line's switch rate to those charged by other East Coast terminal railroads that provide similar switching services. *See id.* ¶ 54. For example, the record reflects that Commonwealth Railway, which provides on-dock rail access at VIG, the POV terminal across the Elizabeth River from NIT, ██████████████ ████████████ *See id.* (also citing other comparable switch rates ███████████████).

- Evaluating record evidence of NPBL's repeated refusal to consider CSX's proposals "seeking mutually beneficial agreements for NPBL to provide CSX rail access to NIT at lower cost." *Id.* ¶ 57. As Dr. Marvel observed, NPBL's decision to reject proposals that its management predicted would cover costs and generate more revenue and operating income for NPBL "is consistent with NPBL maximizing NS's profits rather than its own." *Id.* ¶¶ 82-84.

- Considering that CSX "resort[s] to draying containers out of NIT despite the inferiority and additional costs of drayage," which shows, as an economic matter, "that the NPBL's switching rate is prohibitive." *Id.* ¶ 58.

Based on all of this, Dr. Marvel concludes that the Belt Line's switch rate is "extraordinarily high" and uncompetitive, thereby precluding CSX's ability to access on-dock rail at NIT. *See id.* ¶¶ 54, 56.

NPBL challenges Dr. Marvel's analysis of the Belt Line's switch rate on three grounds. First, NPBL contends that Dr. Marvel inappropriately compared the Belt Line's public tariff rate

to "private contract rates exclusive to CSX."  NPBL Br. at 8.  According to NPBL, these "private"

rates "say nothing about the reasonableness of the Belt Line's public tariff rate" because that

information is unavailable to NPBL management.  *Id.* at 9.

Initially, most of the comparative rates cited by Dr. Marvel *are* publicly available.  *See*

Marvel Report ¶ 54 n.97 (citing public tariff information for Wilmington, Savannah, Jacksonville,

and Mobile).  And although the CWRY switch fee is currently set by contract, when CSX made

its first proposal to NPBL in 2010, CWRY's public tariff rate was $35.61 per container—a

considerable difference from NPBL's $210 per car tariff charge.  *See* ECF No. 300-1.

In any event, NPBL makes no effort to explain why comparing the Belt Line's rate to

"private" switch rates renders Dr. Marvel's analysis unreliable under Rule 702.  NPBL cites a

single case to suggest that "inquiry into the reasonableness of [a] rate . . . must focus on the rate's

reasonableness in the context of competition, rather than from plaintiffs' perspective."  NPBL Br.

at 9 (quoting *Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*, 704 F. Supp. 1309, 1323 (D. Md.

1989), *aff'd*, 924 F.2d 539 (4th Cir. 1991)).  As CSX has previously explained, NPBL's reliance

on *Laurel Sand* is misplaced.[8]  But regardless, when deciding whether a particular rate is

reasonable, it is standard practice for an expert to evaluate the rate *actually charged* by similar

providers "in the context of competition."  *Laurel Sand*, 704 F. Supp. at 1323.  For some, like

NPBL, the rate charged is embodied in a tariff.  For others, it is set by contract.  Both are relevant

to the question of whether a rate is reasonable in the marketplace.  If NPBL believes that

---

[8] *See* ECF No. 324 at 60–61, 68–69; ECF No. 422 at 9.  In *Laurel Sand*, the district court
determined that the plaintiff could not show that the switch rate offered by CSX—$.01 above
CSX's variable costs—was "so unreasonable as to amount to a denial of access" under an
"essential facilities" theory.  704 F. Supp. at 1324.  Nothing in that case suggests that negotiated
rates are irrelevant to whether NPBL's switch rate is reasonable "in the context of competition."
*Id.* at 1323.

contractually set switch rates are not appropriate comparisons, that argument goes to the weight of Dr. Marvel's testimony, not its admissibility.  *See, e.g.*, *TFWS, Inc. v. Schaefer*, 325 F.3d 234, 240 (4th Cir. 2003) (finding challenge to expert's consideration of price comparisons was a challenge to the weight to be given the evidence, not its admissibility).

NPBL also contends that Dr. Marvel's rate analysis is unreliable because he did not account for certain "differentiating factors" among comparator railroads, such as route mileage, to ensure an "apples-to-apples" comparison.  NPBL Br. at 10.  To be clear, Dr. Marvel *did* draw "apples-to-apples" comparisons between the per-container rate charged by NPBL and those charged by other terminal railroads for similar switching services.  *See* Marvel Report ¶ 54 (stating that, even under the "best-case" scenario of two cars per well, NPBL's per-container rate would be $105, more than ████████████████████████████████████); Marvel Reply ¶¶ 62-64 (explaining that Dr. Crowley's 2.5-container-per-well assumption is "not realistic" given empirical data showing that ███████████████████████████████████████████████████████████████████ ████████████████).

NPBL argues that Dr. Marvel should have gone one step further, comparing "per mile per container" estimates.  *See* NPBL Br. at 10.  Although NPBL contends that doing so would be "industry standard," it cites nothing supporting that statement beyond its expert's *ipse dixit*.  *Id.* at 11; *see also* ECF No. 376 at 9-11 (CSX's motion to exclude NPBL's expert, in part because his "per mile per container" analysis of NPBL's rate is not based on any reliable, accepted methodology connected to the facts of the case or the realities of the industry).  As Dr. Marvel has explained, comparing switch rates on a "fee per mile per container" basis is misleading and unjustified, because the record reflects that terminal switching railroads generally do not tie their switch rates to route length given the short distances involved.  *See* Marvel Reply ¶ 64.

Finally, NPBL argues that Dr. Marvel's assessment of the Belt Line's rate is inadmissible under Rule 702 because he purportedly "ignore[d] the Belt Line's costs." NPBL Br. at 11. NPBL contends that an analysis of the Belt Line's costs would have revealed that "the Belt Line's rate is set at cost, and therefore *per se* reasonable." *Id.* at 12. But "[t]he relevant question is whether NPBL could cut its rate to its owners, CSX and NS, to a level that would generate CSX container traffic [to NIT], and not make less money by doing so." Marvel Reply ¶ 57. As Dr. Marvel explains, the answer to that question is "yes." The evidence shows that NPBL's fixed costs "██

████████████████████████████████████████████████████████████████

███████████████████████████████████████." *Id.* As a result, "█████

████████████████████████████████████████████████████████████████

███████████████████████████."[9] *Id.*; *see also* ECF No. 376 at 8 (arguing that NPBL's expert, Dr. Crowley, should be excluded in part because he disregarded the effect of variable costs when assessing the Belt Line's rate).

Ultimately, none of the issues raised by NPBL render Dr. Marvel's analysis of NPBL's switch rate unreliable or "misleading" under Rule 702. NPBL can address its purported concerns through cross-examination or in its own case at trial. *See 14.38 Acres of Land*, 80 F.3d at 1079 (explaining that "perceived flaws" in expert's testimony "are matters properly tested in the crucible of adversarial proceedings; they are not the basis for truncating that process").

---

[9] NPBL cites Dr. Marvel's deposition testimony to suggest that he for "failed to consider the critical factor of cost." NPBL Br. at 13. Not so. In the cited testimony, Dr. Marvel acknowledges, that, because NPBL's current costs are covered by existing traffic, the relevant analysis turns on whether the "costs of handling . . . additional traffic" would be covered by revenues derived from "the amount [of additional traffic] that was being offered." *Id.* And Dr. Marvel *did* consider the record evidence on this point. *See* Marvel Report ¶¶ 83-84; Marvel Reply ¶ 58 (noting that the record evidence reflects that CSX's proposals would have covered the costs of additional traffic to NIT and generated incremental revenue to NPBL).

b.      **Dr. Marvel's opinion about the Diamond is admissible.**

In assessing the totality of Defendants' anticompetitive conduct, Dr. Marvel observed that, in 2008, "NS and NPBL have impeded CSX's on-dock access to NIT by removing critical infrastructure," known as the "Diamond."  Marvel Report ¶ 59 (describing the decommissioning and removal of this track, which previously allowed NPBL to access NIT "through an efficient, progressive move").  Without the Diamond, CSX trains seeking to access NIT via NPBL must first be moved into NS's Portlock Yard, where engines would have to be attached to the back of the train before proceeding along NS's track (over which NPBL has trackage rights) to NIT.  *Id.*  As Dr. Marvel opines, ████████████████████████████████████████████ ████████████████████████████." *Id.*

NPBL does not challenge the accuracy or admissibility of any of the facts about the Diamond considered by Dr. Marvel, or his conclusion that decommissioning of the Diamond track made CSX's potential route to NIT via NPBL more difficult.  *See* NPBL Br. at 14.  NPBL still contends that these opinions are inadmissible, because Dr. Marvel allegedly did not request "all of the information necessary to form a well-reasoned opinion" on this issue.  NPBL Br. at 14. According to NPBL, Dr. Marvel should have considered (1) the Belt Line's alleged independent financial motivation for agreeing to discontinue its trackage rights over the Diamond track, and (2) CSX's failure to challenge the discontinuance at the STB.  *See id.* at 15-16.  NPBL claims that, without this information, Dr. Marvel's "hypothesis" is "completely inconsistent with the facts" and thus unreliable under Rule 702.  *Id.* at 15.

This argument highlights disputed facts that, at best, go to the weight of Dr. Marvel's opinions about the Diamond rather than their admissibility.  Although NPBL points to evidence that Defendants' conduct was legitimate, *see id.*, the record contains sufficient evidence from which the trier of fact could conclude that the decommissioning was exclusionary conduct

undertaken to further Defendants' anticompetitive objectives. *See, e.g.*, ECF No. 324 ¶ 43; Marvel

Reply ¶ 11.[10]  Under these circumstances, Dr. Marvel's opinions cannot be excluded before trial.

The jury must decide whether to accept Dr. Marvel's analysis, "after considering all factors that

weigh on credibility, including whether the predicate facts on which [he] relied are accurate."[11]

*Pipitone*, 288 F.3d at 250.  None of the cases cited by NPBL suggests otherwise.  *See Sardis v.*

*Overhead Door Corp.*, 10 F.4th 268, 291 (4th Cir. 2021) (excluding expert in products liability

case for failing to test his otherwise unsupported defect theory); *Smith v. Va. Commonwealth Univ.*,

84 F.3d 672, 676-77 (4th Cir. 1996) (addressing whether regression analysis alone was sufficient

basis for summary judgment, without analyzing admissibility under Rule 702); *In re Brand Name*

*Prescription Drugs Antitrust Litig.*, 1996 U.S. Dist. LEXIS 8752, at *5 (N.D. Ill. 1996) (excluding

expert who wrote his report in three-to-five days based solely on documents selected by counsel).

     c.    **Dr. Marvel's opinion about operational impediments is admissible.**

NPBL next contends that Dr. Marvel cannot conclude that NS "impeded CSX's on-dock

access to NIT" in 2015 "through its control of critical scheduling issues and operational plans for

trains moving to and from NIT," Marvel Report ¶ 59, because "[t]he undisputed facts" purportedly

"belie [Dr.] Marvel's understanding," NPBL Br. at 17.  According to NPBL, CSX has "conceded"

that "the Belt Line set up a regular operating window to move CSXT's traffic, that NS agreed to

this window, [and] the Belt Line moved every train that CSXT requested it to move."  *Id.*

---

[10] NPBL is simply wrong to suggest that, in opposing Defendants' motions for summary judgment, CSX did not introduce evidence of anticompetitive intent. *See, e.g.*, ECF No. 324 ¶ 43 (citing email from NS personnel ███████████████████████████████████████████████████████ ██████████████████████████████████████).

[11] Dr. Marvel acknowledged as much in his deposition. *See* NPBL Br. at 15 (citing Dr. Marvel's testimony that "*if it is found to be correct*, that [the Diamond] was destroyed in order to impair access, it would be a classic example of what you would call disruptive competition or taking on your rivals in an anticompetitive fashion.").

This argument is disingenuous at best.  Indeed, the record evidence *cited by NPBL* shows that NS repeatedly obfuscated and delayed establishing scheduling windows by citing vague, unexplained "proprietary issues."  ECF No. 324 ¶¶ 47-48.  VIT's Tom Capozzi testified that ███

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████.  *Id.* ¶ 47.  CSX's terminal manager testified that the impediments created by NS became so severe that he ████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████.  *Id.* ¶¶ 49-53.  And, although witness accounts vary, the evidence reflects that ████████████████████████████████████████████████████████████.

*Id.* ¶ 53.  By contrast, ██████████████████████████████████.  *Id.*  This is more than enough evidence from which the trier of fact could agree that, as Dr. Marvel opines, Defendants improperly "impeded" CSX's access to NIT via NPBL in 2015.[12]  *See Pipitone*, 288 F.3d at 250.

There is thus no basis to exclude Dr. Marvel's testimony under Rule 702.  And again, none of the cases cited by NPBL suggests otherwise.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (rejecting medical causation experts' reliance on studies that failed to establish a causal connection between exposure to PCBs and cancer); *Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 143 (4th Cir. 1994) (excluding expert whose proffered "no basis" for his opinions); *E. Auto Distrib., Inc. v. Peugeot Motors of Am., Inc.*, 795 F.2d 329, 338 (4th Cir. 1986) (excluding expert whose "assumption was not supported by any evidence presented at trial").

---

[12] NPBL again cites deposition testimony to imply that Dr. Marvel "admitted" to being "wrong on the facts."  *See* NPBL Br. at 17.  Not so.  In the cited testimony, Dr. Marvel simply acknowledged (correctly) that whether Defendants' conduct impeded CSX's access to NIT depends on "whether CSX trains were able to operate over [the] tracks" to NIT.  *Id.*  The record contains ample evidence from which the trier of fact could conclude that, because of Defendants' anticompetitive conduct, CSX trains were *not* able to reasonably "operate" over those tracks.

### d. Dr. Marvel's opinions about drayage are admissible.

In determining the relevant market for CSX's claims, Dr. Marvel concludes that drayage of containers by truck "is not an adequate substitute for on-dock access at NIT," because it is a "significantly inferior option" to on-dock rail. Marvel Report ¶¶ 41-49. In its Motion, NPBL does not challenge the myriad evidence cited by Dr. Marvel reflecting that drayage capacity is severely limited, or that ports, ocean carriers, and railroads all see drayage as a "considerable disadvantage" in comparison to on-dock rail. *See id.*; *see also* Marvel Reply ¶¶ 22-31. NPBL nonetheless contends that Dr. Marvel's opinion on drayage should be excluded, because he allegedly disregarded what NPBL claims to be CSX's "central decision-making factor for choosing drayage versus rail at NIT"— ████████████████████. NPBL Br. at 17. According to NPBL, this subsidy " ████████████████████████████████████████

████████████ , making drayage a "reasonable substitute" to on-dock rail. *Id.* at 18.

Initially, NPBL's argument misstates the applicable legal and economic framework. When defining a relevant market and considering potential substitutes, the appropriate question is whether a reasonable substitute exists *at the competitive price level. See* Marvel Report ¶ 49 (citing economic literature discussing the so-called "cellophane fallacy"). As Dr. Marvel explains:



*Id.*; *see also* Marvel Reply ¶¶ 23-36 (Dr. Marvel rebutting Defendants' critiques of his opinion that drayage is not a reasonable substitute for on-dock rail at NIT). The cases cited by NPBL confirm that, in the context of an antitrust market analysis, "substitution based on a reduction in price will

not correlate to a high cross-elasticity of demand *unless the switch can be accomplished without the consumer incurring undue expense or inconvenience*." *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 25 (D. D.C. 2015) (emphasis added).

NPBL's histrionics aside, Dr. Marvel did not "deliberately omit" VIT's drayage subsidy from his analysis, nor is his market analysis "purposefully incomplete" as a result. *See* NPBL Br. at 19, 17. First, there is no evidence or testimony in the record supporting NPBL's assertion that the ████████████████████████████████████████████████████. To the contrary, the record makes clear that CSX is forced to use drayage because Defendants' conduct has foreclosed their ability to reasonably access on-dock rail via NPBL.

Moreover, Dr. Marvel properly evaluated ████████████████████████████████ ████████████████████████████████—and determined that drayage is not a reasonable substitute, as an economic matter, for on-dock rail at NIT. This conclusion is amply supported by the record, including testimony from VIT's Tom Capozzi, who explained that ████ ████████████████████████████████████████████████████████████████ ██████████████████████ Marvel Reply ¶ 31 (citing Capozzi Dep. 254:8-15). As Dr. Marvel explains, "[a]n 'effective' substitute is not one that requires ████████████████████ ████████████████████████." *Id.*

If NPBL believes Dr. Marvel did not appropriately account for ████████████ in conducting his analysis, it can address that concern through cross-examination or presentation of its own evidence at trial. *See 14.38 Acres of Land*, 80 F.3d 1074 at 1079.

## V.   Dr. Marvel does not purport to opine as a "railroad" expert.

Although NPBL "takes no issue with [Dr.] Marvel's qualifications as an economist," it contends that he is not qualified to "express opinions at trial regarding his assessment of railroad operational decisions." NPBL Br. at 6. According to NPBL, Dr. Marvel may not testify about

Case 2:18-cv-00530-MSD-RJK   Document 489   Filed 11/04/22   Page 46 of 49 PageID# 12562


"railroad" issues, such as the Belt Line's decision to discontinue the "diamond" track in 2008, or whether certain scheduling windows offered in 2015 were "adequate for the movement of trains at NIT." *Id.*

NPBL's argument misconstrues the nature of Dr. Marvel's opinions. Dr. Marvel does not purport to "assess" the propriety of Defendants' conduct as a matter of "railroad operations." He offers *economic* opinions to define the relevant antitrust market (i.e., the market for on-dock rail service at NIT) and to determine whether Defendants' actions excluded CSX from that market and harmed competition. *See* Marvel Report ¶¶ 37-40, 55-60, 63-65, 74-81. Economic experts routinely offer opinions like these about industries in which they have no prior direct experience. Indeed, NS's expert, Dr. Wright, also testifies about railroad operations despite having no prior personal experience in the industry. *See* Wright Report ¶¶ 106-120.

All of Dr. Marvel's opinions related to railroad operations are firmly rooted in the record, including testimony from multiple witnesses with personal experience in the rail industry—which testimony CSX will introduce at trial.[13] *See, e.g.*, Marvel Reply ¶¶ 28-31, 48-49, 69-79. To be sure, NPBL disputes the meaning and significance of this evidence. *See, e.g.*, NPBL Br. at 14-20. But these disputes of fact do not render Dr. Marvel's testimony inadmissible. To the contrary, they underscore that his testimony should *not* be excluded before trial. *Pipitone*, 288 F.3d at 249-50 (trier of fact must decide whether to accept expert testimony after considering all factors

---

[13] NS and NPBL have moved in limine to exclude certain categories of this evidence, including on hearsay grounds. *See* ECF No. 329, 331, 343 (NS motions); ECF No. 353, 359, 365 (NPBL motions). Those motions should be denied for the reasons stated in CSX's opposition briefs. *See* ECF No. 417, ECF No. 422. But even if this evidence *were* excluded as hearsay, that would not preclude Dr. Marvel from testifying about his opinions. *See, e.g.*, *Tassi v. Holder*, 660 F.3d 710, 721 (4th Cir. 2011) ("[A]n expert is entitled to rely on factual underpinnings—including those based on hearsay—that are 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'") (quoting FED. R. EVID. 703).

weighing on credibility, including "whether the predicate facts on which [the expert] relied are accurate").

NPBL's reliance on *Lantec, Inc. v. Novell, Inc.*, 2001 U.S. Dist. LEXIS 24816, at *10 (D. Utah 2001), is therefore misplaced. NPBL suggests that the *Lantec* court excluded the plaintiff's expert because he lacked knowledge "regarding the technical aspects of the computer science at issue." *See* NPBL Br. at 6-7. But the court in *Lantec* did not disqualify the expert because he had no prior personal experience as a computer scientist. To the contrary, it held that the expert *was qualified* as an economist to offer opinions about the relevant market, despite having no prior personal experience in the field. *See* 2001 U.S. Dist. LEXIS 24816, at *10. The court excluded the expert's opinions because he did not obtain sufficient evidence to support his analysis, rendering it unreliable. *Id.* at *10, 18. As explained in detail above, that is simply not an issue here. Nothing in *Lantec* suggests that a well-informed expert economist may not offer economic opinions about an industry simply because he has no prior personal experience in that industry.

## CONCLUSION

For all of these reasons, Defendants' Motions should be denied.

Dated:  November 4, 2022.                    Respectfully submitted,

                                             **CSX TRANSPORTATION, INC.**
                                             *By Counsel*

                                             */s/ Benjamin L. Hatch*
                                             Robert W. McFarland (VSB No. 24021)
                                             Benjamin L. Hatch (VSB No. 70116)
                                             V. Kathleen Dougherty (VSB No. 77294)
                                             Jeanne E. Noonan (VSB No. 87863)
                                             MCGUIREWOODS LLP
                                             World Trade Center
                                             101 West Main Street, Suite 9000
                                             Norfolk, Virginia 23510-1655
                                             Telephone: (757) 640-3716

41

Facsimile: (757) 640-3930
E-mail: rmcfarland@mcguirewoods.com
E-mail: bhatch@mcguirewoods.com
E-mail: vkdougherty@mcguirewoods.com
E-mail: jnoonan@mcguirewoods.com

J. Brent Justus (VSB No. 45525)
Ashley P. Peterson (VSB No. 87904)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219-3916
Telephone: (804) 775-1000
Facsimile: (804) 698-2026
E-mail: bjustus@mcguirewoods.com
E-mail: apeterson@mcguirewoods.com

## CERTIFICATE OF SERVICE

I certify that on this 4th day of November, 2022, a true and correct copy of the foregoing was served on all counsel of record via Notice of Electronic Filing by filing with the Court's CM/ECF system.

/s/ Benjamin L. Hatch
Robert W. McFarland (VSB No. 24021)
Benjamin L. Hatch (VSB No. 70116)
V. Kathleen Dougherty (VSB No. 77294)
Jeanne E. Noonan (VSB No. 87863)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia 23510-1655
Telephone: (757) 640-3716
Facsimile: (757) 640-3930
E-mail: rmcfarland@mcguirewoods.com
E-mail: bhatch@mcguirewoods.com
E-mail: vkdougherty@mcguirewoods.com
E-mail: jnoonan@mcguirewoods.com

J. Brent Justus (VSB No. 45525)
Ashley P. Peterson (VSB No. 87904)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219-3916
Telephone: (804) 775-1000
Facsimile: (804) 698-2026
E-mail: bjustus@mcguirewoods.com
E-mail: apeterson@mcguirewoods.com

43