**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | |
|---|---|
| CSX TRANSPORTATION, INC., | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) Case No. 2:18-cv-530 |
| | ) |
| NORFOLK SOUTHERN RAILWAY | ) |
| COMPANY et al., | ) |
| | ) |
| *Defendants*. | ) |

**DEFENDANT NORFOLK SOUTHERN RAILWAY COMPANY'S**
**REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE**
**OPINIONS OF PROFESSOR HOWARD P. MARVEL**

## TABLE OF CONTENTS

Page

INTRODUCTION ......................................................................................................... 1

I.     Prof. Marvel's Models Produce Purported "Effects" and "Damages" But With No
       Ability to Know the Cause................................................................................. 3

II.    Prof. Marvel's Models Assume the Key Fact that Underpins the Causal Theory of
       Harm. ................................................................................................................. 5

III.   Prof. Marvel's Damages Model Would Impermissibly Require the Jury to
       Speculate Which Damages Are Caused by Conduct Inside the Statute of
       Limitations Period.............................................................................................. 6

IV.    CSX's Drummed-Up Factual Dispute Cannot Save Prof. Marvel's Flawed
       Models................................................................................................................ 7

CONCLUSION.............................................................................................................. 9

# TABLE OF AUTHORITIES

## CASES

*Cooper v. Smith & Nephew, Inc.*,
    259 F.3d 194 (4th Cir. 2001) ...........................................................................7

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993)............................................................................................7

*Gumwood HP Shopping Partners L.P. v. Simon Property Group, Inc.*,
    221 F. Supp. 3d 1033 (N.D. Ind. 2016) ............................................................7

*It's My Party v. Live Nation, Inc.*,
    88 F. Supp. 3d 475 (D. Md. 2015)......................................................................8

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997)............................................................................................6

*In re Wireless Telephone Services Antitrust Litigation*,
    385 F. Supp. 2d 403 (S.D.N.Y. 2005)................................................................4

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    401 U.S. 321 (1971)............................................................................................6

## RULES

Fed. R. Evid. 702 ....................................................................................................7, 8

## OTHER AUTHORITIES

Daniel L. Rubinfeld, Reference Guide on Multiple Regression 308 (3d ed. 2011) .......................1

2A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles
    and Their Application ¶ 392b (5th ed. 2020)...................................................4, 5

Defendant Norfolk Southern Railway Company ("NS") submits this reply in support of its Motion to Exclude the Opinions of Professor Howard P. Marvel (the "Motion" or "Mot.") (ECF No. 465). For the following reasons, NS's Motion should be granted.

## INTRODUCTION

Prof. Marvel uses regression analysis in his attempts to establish two required elements of CSX's antitrust claims. His Effects Models[1] purport to establish causation—that NS and the NPBL's alleged efforts to foreclose CSX from on-dock access at NIT caused harm to ocean carriers in the form of higher prices. The Damages Model[2] purports to quantify lost business and resulting damages to CSX from the alleged foreclosure. Contrary to CSX's assertion, NS and the NPBL do not criticize the concept of using regression analysis for these purposes. Due to the importance that regression modeling tends to play in antitrust cases, however, courts are cautioned that "[w]hen *inappropriately* used, regression analysis can confuse important issues while having little, if any, probative value." Daniel L. Rubinfeld, Reference Guide on Multiple Regression 308 (3d ed. 2011) (emphasis added). Here, the problem is that Prof. Marvel built in flaws in the models' design, rendering the models useless. There are three independent design flaws that compel exclusion of Prof. Marvel's models and related opinions.

First, Prof. Marvel's Effects Models purport to show harm to ocean carriers in the form of higher prices, but the models are *incapable* of showing that Defendants' alleged anticompetitive actions were the *cause* of those higher prices. Simply put, the Effects Models are not designed to

---

[1] ████████████████████████████████████████████████████████████████ NS Memorandum in Support of its Motion to Exclude Opinions of Prof. Howard P. Marvel (the "Memorandum" or "Mem.") at 1, (ECF No. 469).

[2] ████████████████████████████████████████████████████████████████████
████████████████████

exclude legitimate, natural competitive advantages as a reason for observed pricing differences. Because it incorporates the Effects Models, Prof. Marvel's Damages Model suffers from this same flaw. The Damages Model does not (and cannot) tell a jury whether the potential damages—here, lost profits to CSX—flow from illegal foreclosure or whether those "lost profits" simply flow from business that NS won due to its legitimate competitive advantages. For this reason alone, Prof. Marvel's models and related testimony should be excluded.

Second, Prof. Marvel's Effects Models are supposed to show that, ████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████ But the models do not show that. Instead, in circular fashion, both the Effects Models and Damages Model incorporate the ***assumption*** that there is inherent demand for NIT. Mem. at 11-18. To be blunt, the analysis assumes the very thing it is supposed to prove. Not only that, but the notion that there is inherent demand for NIT is completely unsupported in the factual record.

Third, Prof. Marvel's Damages Model requires the jury to speculate as to the amount of damages generated within the statute of limitations period caused by conduct within the period, as opposed to damages generated within the statute of limitations period from conduct preceding the period. This sort of speculative guesswork is improper for a jury, and it renders Prof. Marvel's Damages Model unsuitable to prove damages here.

Rather than grapple with these issues head on, CSX's Opposition (the "Opposition" or "Opp.") (ECF No. 487) attempts to distract the Court with a barrage of facts meant to contort NS's legitimate criticisms into mere factual disputes that can be resolved by a jury. Not so. These critical flaws are much more fundamental than simple factual disagreements. Indeed, the Court need not address *any* of the supposed factual disputes conjured up by CSX in order to exclude

Prof. Marvel's opinions on these issues.  Both the Effects Models and the Damages Model are invalid and unreliable, and accordingly, Prof. Marvel's opinions should be excluded.

**ARGUMENT**

**I.      Prof. Marvel's Models Produce Purported "Effects" and "Damages" But With No Ability to Show the Cause.**

The Effects Models are not a reliable indicator of causation because they are designed to show "harm" to competition—*i.e.*, higher prices to ocean carriers—regardless of the underlying reasons for the prices.  It is impossible to say, using the Effects Models, whether an ocean carrier paid higher prices because of legitimate, pro-competitive reasons leading the carriers to choose to align with NS or because of the alleged anticompetitive conduct.  Put simply, if an ocean carrier decided to do business with NS either in general or at the Port of Virginia because, for example, NS provided superior service compared to CSX, the results of Prof. Marvel's Effects Models would not change one iota.  The model would still spit out "effects" in the form of higher prices paid by the carrier. ██████████████████████████████████████████████ *See* Mem. at 22 n.44.  There is no fact dispute that needs to be resolved for this flaw to be fatal: a model that cannot isolate the cause of the alleged harmful effects is incapable of showing causation.

As CSX acknowledged in its Opposition, and Prof. Marvel opined in his Reply Report, "legitimate differences in capabilities which each railroad was free to invest in and develop" can affect pricing.  Opp. at 25.  But summarily, CSX and Prof. Marvel dismiss that possibility at NIT, and instead, assert *what they are required to demonstrate*, that the prices ocean carriers pay at NIT are "primarily driven by NS's and NPBL's actions to impeded CSX's on-dock rail access to the terminal."  Opp. at 25.  There is no basis to conclude that legitimate competitive differences impact ocean carrier prices at some ports, but not others.  Prof. Marvel did no analysis that would

permit such a conclusion.  Rather than build a model capable of showing that it was NS's alleged anticompetitive conduct at NIT rather than legitimate competitive advantages that *caused* higher prices to ocean carriers, Prof. Marvel *assumes* that the results of his models are due to anticompetitive conduct.  Prof. Marvel's Damages Model incorporates the same fatal flaw.  As a result, it is incapable of distinguishing whether CSX's "lost profit" damages are the result of NS's alleged illegal conduct or the result of NS's legitimate competition in the marketplace.

The Court need not resolve any factual dispute here.  The fatal flaw of the models is their inability to establish illegal conduct as the cause of the alleged harm to ocean carriers or damages to CSX.  The parties could argue at trial the extent to which NS's and CSX's competitive differences impact ocean carriers' decisions, but what cannot be argued is that they do have *some* impact.  By failing to account for legitimate competitive differences in the design of his models, Prof. Marvel's models will always produce "effects" and "damages" that flow from legitimate competition rather than anticompetitive conduct.  That flaw in and of itself renders Prof. Marvel's models useless for their purpose.  *See In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 427 (S.D.N.Y. 2005) ("Where an expert conducts a regression analysis and fails to incorporate major independent variables, such analysis may be excluded as irrelevant.").

Contrary to CSX's Opposition, Defendants are not asserting that Prof. Marvel may have missed a few variables or may have chosen variables poorly.  The flaw is a fundamental one: there are ***no*** variables in the Effects Models that could account for legitimate competitive differences between NS and CSX at NIT, the Port of Virginia, or anywhere else.  Any model that cannot, by its construction, distinguish between legitimate competition and illegal conduct is inherently unreliable and irrelevant.  *See* 2A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An

4

Analysis of Antitrust Principles and Their Application ¶ 392b (5th ed. 2020) ("[A]ntitrust damages calculation must isolate the effect of the antitrust violation.").

## II. Prof. Marvel's Models Assume the Key Fact that Underpins the Causal Theory of Harm.



For this theory to hold water, Prof. Marvel must show that such an inherent demand for service exists at NIT.  Rather than establish this inherent demand, Prof. Marvel's Effects Models are built on the ***assumption*** that inherent demand exists.  Thus, the analysis is circular.  The Effects Models are offered to show harm caused to carriers that have no choice but to use NS at NIT, but that inherent demand is an assumption built into the model.

A simple experiment conducted by Dr. Wright and described in NS's Motion confirms that Prof. Marvel's Damages Model suffers from the same flaw.  Mem. at 28.

This experiment merely makes the point that Prof. Marvel's models establish "effects" and "damages" if the ocean carriers using that terminal do most of their business with one railroad.  Therefore, it is unsurprising that Dr. Wright's experiment                                   where most containers for CSX-aligned ocean carriers are loaded and unloaded.  The design flaws ***guarantee*** that damages will be found for CSX as long as NS-aligned ocean carriers move most of their containers through NIT.  A model which guarantees damages is unreliable and should be excluded as such.

In an attempt to divert attention from this fatal flaw, CSX points to evidence that "some ocean carriers rely intensively on NIT," that "certain ocean carriers expect service from particular terminals within POV," and that "Dr. Marvel's conclusion that some carriers are 'NIT users' is firmly grounded in the record." Opp. at 15-17. The fact that some carriers are "NIT users" is not relevant, however. For Prof. Marvel's causation theory to succeed, he must show that "NIT users" do not have a competitive option, and that NIT usage—not competitive factors—causes ocean carriers to choose a specific railroad. Prof. Marvel does not do that, and CSX's attempt to create a factual dispute about whether some carriers use NIT "intensively" does not change that.

### III.    Prof. Marvel's Damages Model Would Impermissibly Require the Jury to Speculate Which Damages Are Caused by Conduct Inside the Statute of Limitations Period.

████████████████████████████████████████████████████

█████████████████████████████████████ Opp. at 2. Prof. Marvel's calculation is based on "the totality of NS's and NPBL's [ongoing] efforts," Opp. at 29 (insertion in original), including alleged lost profits due to alleged overt acts *outside* of the limitations period. And yet, it is well-settled that a plaintiff cannot "recover for the injury caused by old overt acts outside the limitations period." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997); *see also Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971).

CSX contends that because Prof. Marvel has "apportioned CSX's lost profits by year" from 2009 to 2021, the "[jury] could exclude those sums from its award without engaging in 'guesswork' or 'speculation.'" Opp. at 29 (citations omitted). CSX would have this Court believe that by simply limiting damages to the lost profits allocated to certain years, it can resolve Defendants' legal challenge to the use of conduct outside the statute of limitation as the basis for a jury award. CSX misses the point. It is not that simple. The jury could not merely strike, for example, a year of apportioned damages from the calculation. Instead, a jury would have to *guess*

which portion of the total lost profits in a given year resulted from conduct outside the limitations period and subtract that highly speculative figure from Prof. Marvel's "apportioned [] lost profits by year." *Id.* Thus, the award of damages would improperly "be left entirely to speculation to determine…what portion of [damages are] attributable to acts that caused harm within the limitations period." *Gumwood HP Shopping Partners L.P. v. Simon Prop. Grp., Inc.*, 221 F. Supp. 3d 1033, 1045 (N.D. Ind. 2016). Because a jury would be forced to speculate, Prof. Marvel's models should be excluded under Rule 702.

## IV.   CSX's Drummed-Up Factual Disputes Cannot Save Prof. Marvel's Flawed Models.

The Court is charged with exercising its "gatekeeper" role to exclude unreliable expert testimony from reaching the jury. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588(1993)). For the reasons stated above, the Court has ample reasons to exclude Prof. Marvel's opinions without resolving the supposed factual disputes asserted in CSX's Opposition. Nor is the Court required to put to a jury the task of deciding these factual issues where, as here, the expert's opinions are unreliable and unsupported for independent reasons. *Id.* But it is important to point out that what CSX frames as "factual disputes" are not truly disputed because CSX's positions lack any basis in the established factual record.

CSX argues that Prof. Marvel's opinions are "grounded in the record" but cites almost exclusively to his own reports to support their contention. *See* Opp. at 14. And in the few instances where CSX does rely on the record, CSX relies almost exclusively on the self-serving testimony of its own current and former employees. Take, for example, CSX's argument that "[m]ultiple fact witnesses have testified that certain ocean carriers expect service from particular terminals within POV." Opp. at 15. This is an argument CSX puts forward to justify its use of an inherent demand for NIT described *supra* Part II. But a close examination shows the "multiple fact

witnesses" who apparently testified that "certain ocean carriers expect service from particular terminals within POV" are nothing more than CSX's own witnesses. *See* Opp. at 15 (citing the testimony of Maryclare Kenney (CSX Vice President of Intermodal and Automotive) and Ryan Houfek (Former CSX Assistance Vice President of Marketing)). At no point does CSX cite to any evidence—documentary or testimony—from any ocean carrier that supposedly has this expectation of services at specific terminals at the Port of Virginia. When confronted with a theory that customers—here, ocean carriers—have an inherent demand for services at a specific venue— here, NIT—courts have been swift to exclude those theories under Rule 702 when they are unsound and unsupported by the established factual record. *See It's My Party v. Live Nation*, *Inc.*, 88 F. Supp. 3d 475 (D. Md. 2015).

CSX's attempt to distinguish *It's My Party* falls short. In *It's My Party*, an expert witness provided testimony and economic modeling purporting to establish that "a subset of artists 'prefer amphitheaters,' and would not substitute different venues for them." *Id.* at 486. The Court noted that "[t]he fact that [certain artists] enjoyed performing in amphitheaters more than in non-amphitheaters, however, did not result in the type of 'preference' that [plaintiffs' expert] argues artists have" and excluded the expert's opinions on that basis. *Id.* at 487-88. CSX argues that, unlike the expert in *It's My Party*, Prof. Marvel's opinion that ocean carriers have an inherent demand for NIT is "based on his assessment of substantial record evidence—including witness testimony and empirical data." Opp. at 19. But CSX misstates the facts. The expert in *It's My Party* relied on witness testimony from customers—in that case, musical artists—who testified to having an inherent preference for amphitheaters over other types of venues. *It's My Party* at 487. Here, Prof. Marvel did *less* than the expert in *It's My Party*. Unlike the expert in *It's My Party*, Prof. Marvel never talked to ocean carriers to see whether they had a preference for services at

NIT over other venues.  CSX's criticisms of the expert in *It's My Party* are a projection of its own expert's deficiencies and his "flawed data and inconsistent, self-serving logic," Opp. at 19, and for those same reasons Prof. Marvel's opinions are unreliable.

Even assuming CSX's flawed view of reality is correct, for the reasons discussed above, the fundamental flaws associated with the Effects Models and Damages Model are dispositive and independent of the factual questions.  The Court need not address these factual questions in order to exclude Prof. Marvel's opinions under any of the reasons stated above.

### CONCLUSION

For these reasons and the reasons cited in NS's Memorandum, NS's Motion to Exclude the Opinions of Prof. Howard P. Marvel should be granted.

*[Signatures on following page]*

Dated: November 14, 2022

Respectfully submitted,

*/s/ Alan Wingfield_____*

Alan D. Wingfield (VSB No. 27489)
Michael E. Lacy (VSB No. 48477)
TROUTMAN PEPPER
HAMILTON SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-1200
Facsimile: (804) 698-6061
Email: alan.wingfield@troutman.com
Email: michael.lacy@troutman.com

John C. Lynch (VSB No. 39267)
Kathleen M. Knudsen (VSB No. 90845)
TROUTMAN PEPPER
HAMILTON SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, VA 23462
Telephone: (757) 687-7759
Facsimile: (757) 687-7510
Email: john.lynch@troutman.com
Email: kathleen.knudsen@troutman.com

Tara L. Reinhart *(admitted pro hac vice)*
Thomas R. Gentry *(admitted pro hac vice)*
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 371-7000
Email: tara.reinhart@skadden.com
Email: thomas.gentry@skadden.com

*Attorneys for Norfolk Southern Railway
Company*

## CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2022, I electronically filed a copy of the foregoing with the Clerk of the Court using the CM/ECF system, which sent a notification of such filing (NEF) to the registered participants as identified on the NEF to receive electronic service, including:

Robert W. McFarland, Esq.
Benjamin L. Hatch, Esq.
V. Kathleen Dougherty, Esq.
MCGUIRE WOODS LLP
101 West Main Street, Suite 9000
Norfolk, Virginia 23510-1655
Telephone: (757) 640-3716
Facsimile: (757) 640-3930
Email: rmcfarland@mcguirewoods.com
Email: bhatch@mcguirewoods.com
Email: vkdougherty@mcguirewoods.com

J. Brent Justus, Esq.
Ashley P. Peterson, Esq.
MCGUIRE WOODS LLP
800 East Canal Street
Richmond, Virginia 23219-3916
Email: bjustus@mcguirewoods.com
Email: apeterson@mcguirewoods.com

*Attorneys for CSX Transportation, Inc.*

James L. Chapman, IV, Esq.
W. Ryan Snow, Esq.
David C. Hartnett, Esq.
Alexander R. McDaniel, Esq.
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1500
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
Email: jchapman@cwm-law.com
Email: wrsnow@cwm-law.com
Email: dhartnett@cwm-law.com
Email: amcdaniel@cwm-law.com

*Attorneys for Norfolk and Portsmouth Belt Line Railroad Company*

/s/ Alan Wingfield

Alan D. Wingfield (VSB No. 27489)
Michael E. Lacy (VSB No. 48477)
TROUTMAN PEPPER
HAMILTON SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-1200
Facsimile: (804) 698-6061
Email: alan.wingfield@troutman.com
Email: michael.lacy@troutman.com

*Attorneys for Norfolk Southern Railway Company*