1

```
 1                IN THE UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF VIRGINIA
 2                        NORFOLK DIVISION


 3


 4   CSX TRANSPORTATION, INC.,      )
                                    )
 5              Plaintiff,          )
                                    )
 6   v.                             )      Civil Action No.
                                    )         2:18cv530
 7   NORFOLK SOUTHERN, et al.,      )
                                    )
 8              Defendants.         )


 9


10                    TRANSCRIPT OF PROCEEDINGS

11           (Hearing on Motion for Summary Judgment)

12
                           Norfolk, Virginia
13                         December 1, 2022

14

15   BEFORE:   THE HONORABLE MARK S. DAVIS
                United States District Judge
16

17

18

19

20

21

22

23

24

25
```

2

```
 1   Appearances:

 2        McGUIRE WOODS, LLP
               By: Benjamin Lucas Hatch
 3                  Robert William McFarland
                    Ashley Partin Peterson
 4                  Jeanne Elizabeth Noonan
                    Johnny Brent Justus
 5                  Counsel for CSX Transportation, Inc.

 6        TROUTMAN PEPPER HAMILTON SANDERS LLP
               By: Michael Edward Lacy
 7                  Alan Durrum Wingfield
                    John C. Lynch
 8                  Kathleen Michelle Knudsen
                    Massie Payne Cooper
 9        -- and --
          REDGRAVE, LLP
10             By: Megan McConnell
          -- and --
11        SKADDEN ARPS SLATE MEAGHER & FLOM LLP
               By: Tara L. Reinhart
12                  Thomas R. Gentry
                    Counsel for Norfolk Southern Railway Company
13
          CRENSHAW, WARE & MARTIN, P.L.C.
14             By: W. Ryan Snow
                    James L. Chapman, IV
15                  Alexander Ryan McDaniel
                    Counsel for Norfolk & Portsmouth Belt Line
16                  Railway Company

17

18

19

20

21

22

23

24

25
```

1                        P R O C E E D I N G S

2

3              (Commenced at 10:03 a.m. as follows:)

4

5              COURTROOM DEPUTY CLERK:  In Case No. 2:18cv530, CSX

6    Transportation, Inc. v. Norfolk Southern Railroad Company and

7    Norfolk & Portsmouth Belt Line Railway Company.

8              Counsel for the plaintiff, are you ready to proceed?

9              MR. HATCH:  We're ready.  Good morning, Your Honor.

10             THE COURT:  Good morning.

11             MR. LACY:  Good morning.

12             THE COURT:  Would you like to introduce?

13             MR. HATCH:  So I have with me at counsel table Mr.

14   McFarland, Ms. Gollogly, our paralegal.  We also have present

15   today Mr. Brent Justus, Ms. Ashley Peterson and Mr. Cole Geddy,

16   all from our Richmond office.  And then Ms. Jeanne Noonan from

17   our Norfolk office.  And then on behalf of CSX Transportation,

18   Erin O'Brien from the in-house counsel department.

19             THE COURT:  All right.  Which one is Erin O'Brien?

20   Okay.  Thank you.

21             COURTROOM DEPUTY CLERK:  Counsel for Norfolk Southern,

22   are you ready to proceed?

23             MR. LACY:  Good morning, Your Honor.  Michael Lacy on

24   behalf Norfolk Southern.  With me at counsel table is Ms. Tara

25   Reinhart.  Also with us, Mr. John Lynch and Mr. Alan Wingfield.

1   We have Ms. Megan McConnell sitting first in the row.  Tommy

2   Gentry.  We have Mr. Mike McClellan, senior vice-president with

3   Norfolk Southern, and Joe Carpenter, in-house counsel at Norfolk

4   Southern.  We also have Ms. Kathleen Knudsen from our office.

5           THE COURT:  All right.  Thank you.

6           MR. LACY:  Thank you.

7           THE COURT:  Counsel for Norfolk & Portsmouth Belt

8   Line?

9           MR. SNOW:  Good morning, Your Honor.  Ryan Snow for

10  the Belt Line.  Just two people with me.  I have James Chapman

11  and I have Alex McDaniel.

12          THE COURT:  All right.  Thank you.

13          All right.  Well, thank you very much.

14          I would like to make some rather lengthy introductory

15  remarks that will hopefully help you in structuring your

16  argument, and you may want to just take notes about the

17  questions that I have, because I'm going to go completely

18  through it rather than stopping after each of the questions, so

19  that you have the benefit of completeness.

20          So I'm going to highlight some of my questions and my

21  concerns with the case and then the law applicable to the case

22  for the purposes of summary judgment.  There might be sufficient

23  genuine and material factual disputes to raise a jury question

24  regarding whether multiple actions by defendants in and around

25  2009 caused significant damages to CSX based on CSX's inability

```
 1  compete for certain intermodal contracts based upon my review of
 2  the record and the briefs.  However, even assuming that such
 3  evidence proved an antitrust conspiracy, it may be that CSX was
 4  harmed as a competitor no later than 2009, with the record
 5  possibly demonstrating that CSX was aware of the harm it was
 6  suffering in and around 2009, yet CSX did not file suit until
 7  2018.
 8          Arguably, but for the continuing violation exception
 9  and additional conduct allegedly occurring in 2015 and 2018,
10  CSX's antitrust claims would be time-barred as would its state
11  law claims.
12          Considering defendant's more recent acts, CSX points
13  to conduct in 2015 associated with defendant's purported
14  intentional delays when moving a relatively small number of CSX
15  trains to NIT, as well as certain acts by Norfolk Southern as a
16  shareholder and/or by the Belt Line Board or its president in
17  2018.  But for these two groups of events, the summary judgment
18  record appears devoid of any overt acts during the five years
19  preceding the filing of this lawsuit.
20          So zeroing in on some of my primary areas of concern,
21  first, consistent with the Fourth Circuit's ruling in Charlotte
22  Telecasters, it appears to me that the continuing violation
23  exception is available to CSX in this case because the switch
24  rates set in 2009 was not a final act excluding CSX from
25  competing in the relevant market, as there were established
```

1    channels for CSX to seek a modification to the rate through the

2    Belt Line Board and Rate Committees.

3              Second, on the assumption that the 2009 conduct was

4    effective but not really final, the Court considers whether

5    there were any overt acts during the limitations period that

6    would allow CSX to recover damages.  On that front, as to the

7    2015 conduct, the Court's preliminary view is that the acts of

8    intentionally delaying trains or complicating physical access to

9    NIT could be found by a jury to be an overt act in furtherance

10   of the federal antitrust claims.

11             As to the 2018 conduct, the Court is less convinced.

12   Importantly, the record does not appear to establish anything

13   more than a corporate governance decision made by Norfolk

14   Southern as a shareholder of the Belt Line, and the summary

15   judgment record appears to demonstrate that Norfolk Southern's

16   actions were in line with presently existing contract rights.

17             Although Norfolk Southern voted its shares to reject a

18   change to corporate governance rules and voted its shares to

19   reelect certain directors, it's my understanding from the record

20   that this conduct occurred at a shareholder's meeting, and does

21   not appear to reflect any action, nefarious or otherwise, by the

22   Belt Line Board or the president of the Belt Line.

23             When counsel are addressing the 2018 conduct today, I

24   ask that you be specific as to what the summary judgment

25   evidence shows, as it appears that CSX's filing may conflate

1    actions taken at the shareholder's meeting versus the board

2    meeting.

3            Furthermore, CSX's purported evidence of what occurred

4    at the 2018 board meeting may be limited to a letter that

5    purportedly recounts what occurred during such meeting, whereas

6    defendants cite to deposition testimony and the minutes from the

7    2018 board meeting to demonstrate contrary facts.  The Court,

8    therefore, has questions as to whether any factual dispute is

9    genuine.

10           Now moving on to the next area of concern, the third

11   area, proceeding on the assumption that the 2015 conduct was an

12   overt act, or, alternatively, that something occurring in 2018

13   could have been an overt act, the Court would next consider

14   whether there was any new and accumulating injury from the

15   highlighted acts.

16           As established by the Supreme Court's opinion in

17   Zenith, the limitations period will start anew for damages

18   caused by new acts within the limitations period, but a

19   plaintiff may not bootstrap damages suffered as the inertial

20   consequences from old time-barred acts merely because some new

21   act created some modicum of discrete new damages.

22           The Court notes it's not averse to the legal theory

23   suggested by CSX that the existence of an active -- and I want

24   to underscore, active -- conspiracy or monopoly that is

25   maintained during the limitations period through multiple

 1  different acts may alleviate a plaintiff's need to tie specific

 2  damages to individual overt acts.  However, when the overt acts

 3  are few and far between, potentially occurring only once during

 4  a five- to six-year period, and inflict only modest new damages,

 5  it appears that it would violate the anti-bootstrapping rule

 6  established by the Supreme Court in <u>Klehr</u> to allow a new overt

 7  act that creates specifically identifiable new but minor damages

 8  to permit recovery of an entirely different pool of damages that

 9  would otherwise be time-barred.

10          Drilling down on that point, it appears to the Court

11  potentially that CSX may have pointed to evidence that is

12  capable of demonstrating that it suffered two forms of new and

13  accumulating damages in 2015.

14          First, as Belt Line customer, CSX paid an excessive

15  rate to move a small but disputed number of trains in 2015,

16  arguably, and it is plain that antitrust case law generally

17  establishes that a customer-based overcharge claim would not be

18  time-barred.

19          Second.  As a competitor to Norfolk Southern, CSX

20  purportedly lost business from CMA in 2015 that it had otherwise

21  secured.  The record suggests that the loss of business was

22  temporary, perhaps several weeks, and the specific amount of

23  loss would presumably be easy to calculate.

24          On this point, it appears to the Court that, while

25  these damages could be recoverable under the continuing

1   violation exception and might not be time-barred, there are two

2   potential roadblocks to recovery in this case that the Court

3   would like to hear more about.

4          One.  It appears that CSX did not identify the

5   excessive rate charged by the Belt Line in 2015 as an overt act

6   in its response to Belt Line's discovery requests, and any

7   excessive rate was charged by Belt Line, not Norfolk Southern.

8          Two.  CSX does not appear to offer a damages

9   calculation or otherwise seek recovery for CMA business lost

10  during a multi-week period in 2015 but, rather, seeks recovery

11  for 100 percent of the intermodal contracts it allegedly lost

12  due to its alleged exclusion from the market; an exclusion that,

13  to the Court, appeared to become effective no later than the

14  2009 to 2011 time frame.

15         The Court therefore questions how CSX can proceed to a

16  jury trial on its antitrust claims to the extent its damages

17  model is predicated on time-barred conduct that excluded CSX

18  from participating in the relevant market.

19         And here I'll make a brief reference to a footnote in

20  the XY, LLC case that's discussed in the briefs, as the Federal

21  Circuit in that opinion noted that the counterclaim plaintiff in

22  that case had alleged only a single injury that resulted from

23  the counterclaim defendant's conduct:  Exclusion from the

24  relevant market.

25         To illustrate this concern in a slightly different

1  way, CSX's own evidence viewed in its favor demonstrates that it

2  was effectively excluded from the relevant market by sometime

3  around 2009, and when CSX acted to move trains to NIT in 2015,

4  CSX was still economically excluded from the market based on

5  conduct occurring years prior.  During the period of exclusion,

6  CSX elected to move a limited number of trains to NIT at what it

7  portrays was a short-term economic loss.  Therefore, even if

8  these trains had moved smoothly, CSX would have

9  remained excluded from the market due to conduct occurring years

10  prior.

11        Stated another way, the exclusion was 100 percent

12  effective based on pre-limitations conduct, and no additional

13  conduct was necessary by either defendant during the limitations

14  period to further effectuate the total competitive exclusion

15  from the market.

16        So I teed up my concerns about limitations and

17  damages, but before I turn things over to you for comments on

18  those reflections I'll offer a few additional questions, some

19  related to what I've already said, and some related to the other

20  issues that are presented here so that you can each address

21  those.

22        First.  Does CSX have the burden of proof on the

23  limitations issue as to the federal claims?  Typically, of

24  course, the burden would fall on defendants.  But when a

25  plaintiff relies on the continuing violation exception to the

```
 1   four-year antitrust limitations period, multiple federal courts,

 2   including the Tenth, Ninth and Sixth, as well as the Federal

 3   Circuit in a case arising in the Tenth Circuit have concluded

 4   that the burden falls on the plaintiff.

 5         Next, second, does CSX seek to recover at trial for

 6   the damages suffered as a Belt Line customer due to the

 7   excessive rate allegedly charged by the Belt Line in 2015?  If

 8   so, is this theory of relief barred by CSX's failure to identify

 9   this as an overt act in its discovery responses to the Belt

10   Line?

11         Third.  If the Court were to find that the only

12   non-time-barred overt act is the obstructive conduct in 2015 and

13   that controlling law precludes CSX from recovering damages based

14   on acts committed before 2013 to include the establishment of

15   the switch rate, has CSX somehow waived or otherwise

16   relinquished its right during discovery to proceed to trial to

17   recover for the temporary lost business in 2015, or in that

18   hypothetical circumstance, should this case proceed to trial

19   only on that limited damages theory?

20         Fourth.  Assuming that I conclude that there is a jury

21   question as to whether the 2015 obstructive conduct by Norfolk

22   Southern is an overt act, is there sufficient evidence to create

23   a jury question that the Belt Line participated in or is

24   otherwise responsible for that conduct due to Cannon Moss's

25   failure to push Norfolk Southern harder for windows to access
```

```
 1   NIT and/or based on the emails he sent to Norfolk Southern in
 2   2015.
 3          Five.  As to the state law claims I have several
 4   related concerns.
 5          First.  What damages were suffered by CSX as a result
 6   of Norfolk Southern's alleged breach of any contract provision
 7   in 2015?  And, relatedly, if the only damages are the temporary
 8   loss of business in 2015, has CSX abandoned this theory of
 9   recovery during discovery?  It's the same question as to the,
10   that you alluded to earlier as to the federal claims.
11          B.  Because the complaint identifies the purported
12   unlawful acts underpinning the state law conspiracy claims, and
13   many of the identified acts no longer appear actionable, CSX may
14   be left with only an allegation of a state law conspiracy to
15   breach a fiduciary duty as the identified unlawful act.  Should
16   the Court find there is no evidence of a wrongful act in 2018 by
17   the Belt Line Board or its management, would the state law
18   conspiracy claims be time-barred based on a two-year limitation
19   period because the most recent potential breach of a fiduciary
20   duty would be Cannon Moss's actions in 2015?
21          Six.  Why isn't the definition of the relevant market
22   a question for the jury, if the case makes it to the jury, based
23   on numerous disputed facts like effectiveness of drayage,
24   competitiveness of end-to-end trucking, port capacity
25   implications on whether traffic can be shifted, the VIT's
```

13

1   involvement in directing port traffic, as examples.

2           Relatedly, based on the fact that CSX's clarification

3   or narrowing of the claimed market was made in CSX's initial

4   expert report and was still in line with the exclusion expressly

5   identified in the complaint; that is, denial of rail access to

6   NIT, is there really a need for CSX to amend its complaint, and

7   if so, why shouldn't the Court allow that technical amendment?

8           Seven.  Finally, the summary judgment briefs do not

9   discuss injunctive relief, though it is sought in the complaint.

10  Assuming for the sake of argument that I ruled in favor of

11  defendants on the limitations issues as to money damages, would

12  we still need a trial on the claims for injunctive relief, or is

13  that no longer at issue in this litigation?  If it remains an

14  issue, does it make any sense to have a trial on injunctive

15  issues in January, when the Surface Transportation Board rate

16  case between Norfolk Southern and the Belt Line remains stayed,

17  and the resolution of that matter will have an immeasurable

18  impact on the competitive issues going forward between Norfolk

19  Southern and CSX, as well as a new switch rate that would

20  presumably be established by the Belt Line.

21          So those are the questions that the Court has.  And

22  perhaps because of the issues presented in those questions I

23  should have CSX address these issues first and then have

24  responses.

25          So who will be addressing this for CSX?

```
 1              MR. HATCH:  I will, Your Honor.

 2              THE COURT:  All right.  It's a lot, Mr. Hatch.  And I

 3   want -- I'm not taking anything away from you, but I want the

 4   answers to the questions from the people that may know the most

 5   about it.  So if you feel that you want to pass off to someone

 6   else on any particular questions, feel free to do so.  And I

 7   want you all to feel free to do that because, as I said, there's

 8   a lot.  But I'm sure you've mastered it all, Mr. Hatch.

 9              MR. HATCH:  Thank you, Your Honor.  We'll see.  We'll

10   see.  I appreciate that opportunity.  Good morning, Your Honor.

11   Ben Hatch on behalf of CSX.

12              I provided, before the Court came out, some

13   demonstrative slides, and I may -- I will address the Court's

14   questions, but some of the slides we had preprepared do relate

15   to some of those questions.  So I'll bring those up for the

16   Court's reference.  The Court should have a paper copy there,

17   and then also it will come up on screens.  And we provided

18   copies to defense counsel as well.

19              THE COURT:  All right.

20              MR. HATCH:  I'd like to start with the first --

21   unfortunately, the computer appears to be frozen.  If the Court

22   turns to Page 3.

23              THE COURT:  Did you provide it to --

24              MR. HATCH:  Yes, Your Honor.

25              THE COURT:  -- your colleagues?
```

15

```
 1              MR. HATCH:  Before the hearing.

 2              So this is the law.  The Court, I know, has already

 3    addressed several of these cases, but I want to start with the

 4    statute of limitations, because that's where the Court started,

 5    and I have the Court's list, and I'll make sure I get to every

 6    one, but if I miss any, please interrupt and let me know.

 7              THE COURT:  All right.

 8              MR. HATCH:  So to begin with, Your Honor, we have the

 9    Zenith case we've cited right there, which I think is the

10    most-directly-on-point Supreme Court case, talks about the

11    continuing violation doctrine, and it establishes that as long

12    as you have an overt act within the statutory period -- and I

13    can talk about them, there's, I think, an additional overt act

14    that I would add to the ones the Court walked through.  So I

15    will talk about that as well.

16              But as long as you have an overt act within the

17    statutory period, then you can recover the damages from the

18    monopolistic or conspiracy -- I might use those terms

19    interchangeably, we have both types of claims here -- you can

20    recover those damages for the period for the entire conspiracy

21    or monopoly.  So --

22              THE COURT:  An accumulating injury.

23              MR. HATCH:  Yes.  Yes, Your Honor.

24              THE COURT:  New and accumulating injury.

25              MR. HATCH:  New and accumulating injury.  So what did
```

1   <u>Zenith</u> say?  "We confront the issue whether it's consistent with

2   the controlling limitation statute to permit <u>Zenith</u> to recover

3   all of the damages it suffered during the years '59 to '63" --

4   which was the four-year limitations period in the case -- "even

5   though some undetermined portion of those damages was the

6   proximate result of conduct occurring more than four years prior

7   to the filing of the counterclaim.  HRI contends and the Court

8   of Appeals held that the statute permits the recovery only of

9   those damages caused by the overt acts committed during the

10  four-year period.  We do not agree."

11          So that's <u>Zenith</u>.  You get all the damages during that

12  period.

13          Why does that make sense?  I go back to the nature of

14  the causes of action here, Your Honor.  Monopolization, the

15  cause of action, is establishing or maintaining a monopoly.  You

16  don't just establish a monopoly, then if you were successful you

17  want to maintain that monopoly.  And so during our four-year

18  period, that monopoly was maintained.  And in <u>Zenith</u>, the

19  damages in <u>Zenith</u> were measured the way we have gone about them

20  in this case, which is essentially a market share proportion

21  evaluation.  And I can talk more about our damages.  But they

22  looked at the market share that the company would have had

23  during that '59 to '63 period, if -- but for the preclusive

24  conduct, but for the monopolistic conduct, and the Supreme Court

25  allowed all those damages in that four-year period, as we see,

1    not just the ones that flowed from specific overt acts because,

2    as we have in the law, it's the overt act -- the way I would

3    urge the Court to view it, the overt act maintains the

4    conspiracy within the limitations period.  In other words, if

5    you could show no conduct within the limitations period then you

6    would have a statute of limitations problem.  The overt acts

7    maintain the cause of action within the limitations period.

8            Then the question -- then you have a live cause of

9    action.  What's your cause of action?  Ours is for conspiracy

10   and monopolization to block you, and you get the full scope of

11   damages, as we say -- Lower Lake Erie says that very clearly.

12   Lower Lake Erie walks right through the Zenith analysis.  And

13   it's very clear, Zenith says you get the full scope of your

14   monopolistic damages during the limitations period.  So I think

15   those cases are very clear.

16           The Court mentioned Klehr.  So let me talk about

17   Klehr.  Klehr came later, of course.  It's a civil RICO case

18   from the Supreme Court, but it is applying in one aspect, or is

19   relating to the Clayton Act since they share the same statute of

20   limitations.  But I think Klehr is actually helpful.  Klehr

21   stands for the proposition if what hurt you only occurred

22   originally -- and I know the Court had some questions about what

23   happened in 2009, so I'd like to come and apply that.  But if

24   what hurt you only happened originally and you're just suffering

25   the consequences of that for several years, then that's not

1   going to refresh the statute of limitations.

2          An example of that would be I take a pill in year one,

3   it's a bad pill, it's going to hurt me for 10 years, I didn't

4   take more pills, I'm just suffering the unabated consequences in

5   years, six, seven of having taken that pill several years ago.

6   And Klehr was a bad silo.  They bought a bad, allegedly

7   defective silo in year one.  They said that's silo has continued

8   to spoil our grain and do other harms in years later.  That is

9   the unabated conduct of having bought a bad silo in year one.

10  Okay?

11         What do we have here?  It is not -- yes, there was

12  conduct in 2009, certainly, and the Court has seen that in our

13  brief and we learned about that in discovery.  But that conduct

14  is blocking us from NIT, okay?  That happens every time we're

15  not able to access NIT for business.  And that conduct has

16  occurred each year, each day they have maintained that switch

17  rate since.  It's not -- we didn't buy a silo in 2009 and then

18  we just have bad grain.  And this is a key point, Your Honor,

19  that, I think, is critical on understanding the interaction

20  between Zenith and Klehr:  Zenith also said it's appropriate for

21  them to get that full scope of damages in the statutory period,

22  because it would have been speculative if they had tried to sue

23  on all years on day one.

24         So let's take the Court's question and go back to

25  2009, and let's say we brought the suit that we have brought now

1  in 2009 and sought damages for the years all the way up to 2022.

2  They would have said that's entirely speculative.  And it would

3  have been.  Why would it have been speculative?  Because they

4  could have decided, just like they could decide now, to lower

5  that rate at any point.  If they lower it to an economical rate,

6  if we're able to get the access that the antitrust laws and

7  other laws say we should get, then that, that abates the

8  conduct, right?

9          So let's say we sued in 2009 and sought these years of

10 damages, and then the next year they lower the rate?  That would

11 have changed everything.

12         That's what Zenith is saying.  It's speculative to sue

13 on the full -- whereas with the silo it's not speculative.

14 You've got a bad silo, you know what the useful life of that

15 silo is going to be, you can have experts talk about, you know

16 what you're going to use it for, and therefore you could have

17 sued within the original statutory period for whatever your

18 expected damages are from purchasing that silo.

19         Here, every year, every day, we want to get into NIT,

20 they maintain that rate, that blocks us from NIT.  That's

21 another critical difference, right?  Maintaining the monopoly.

22 They could at any point decide to charge a lower rate.  And we

23 have specific points that we've teed up in the brief.  But they

24 could any day say, do you know what?  We like that business,

25 we'd like to charge an economical rate and reduce the rate.  And

1    so the decision to maintain that rate are new decisions, if you

2    will.  It's new preclusive activity throughout the whole period.__

3          Now, why does that -- the Court had several questions

4    about the overt acts, and I want to come to the specific ones

5    the Court talked about and add the one.

6          But why do the overt acts that occurred, why are

7    damages not just tied to those specific overt acts?  And it is

8    true our damages are based on our essentially projected share of

9    business we would have but for the illegal conduct that we've

10   alleged in the complaint.  It's because it blocks us from our

11   customers.  And our customers demand service through a portfolio

12   of ports.  And if you're not able to offer the service at NIT,

13   then you're not able to compete on fair terms for those

14   customers that use NIT intensely.  That's what our expert has

15   analyzed.

16         So by not being able to compete on fair terms, that's

17   known.  Let's take 2015 and what happened there as an example.

18         It was very clear that we were not able to move trains

19   in a timely and reasonable manner into NIT when we should have

20   been able to.  The Court already talked about the one specific

21   customer that had an impact on, but that impacts the whole

22   business, because it's seen, it's known that we are having

23   trouble serving NIT by rail.  And our witnesses talk about how

24   that impacts them and their efforts to get business.

25         And so that's why 2015 is kind of a showing of the

1    problem to all the world, to the customers, of not being able to

2    get rail access into NIT.  Norfolk Southern is moving multiple

3    trains daily, and the witness accounts vary of how many trains

4    CSX moved in that time, but it was a very small number over the

5    course of months.

6             So customers are going to see you can't really move

7    trains in there in any kind of efficient way.  When they're

8    trying to move freight, they don't want it sitting there for

9    weeks or months, they want that freight moved to its

10   destinations.  And so if you're not able to access the on-dock

11   rail efficiently, then you're precluded, you're harmed in your

12   business.

13            So the 2015 relates to much more than the CMA/CGM

14   account.

15            And if my answers trigger more questions, I hope the

16   Court will feel free to interrupt me.

17            Let me turn to the overt acts within the statutory

18   period.  Certainly there is the 2015 event.  And I will say,

19   Your Honor, in our interrogatory responses -- because that was a

20   question the Court had.  First of all, in our complaint in

21   Paragraph 55 it said we paid the rate in 2015.  So I think

22   that's been entirely clear from day one in this case that we,

23   that paying the rate in 2015 was an aspect of our case.

24            In our interrogatory response -- and this is to NPBL's

25   interrogatory No. 4, in which our answers -- excuse me.

1           This was supplemental answer per order of

2    September 4th, 2020.  We said "NPBL has charged and continues to

3    charge this unreasonable and prohibitive rate today despite

4    NPBL's declining revenues and precarious financial position."

5           So it may be in a long interrogatory response that

6    does also talk about the 2015 event, we didn't specifically then

7    go say and of course that also means we payed that rate that

8    day, but I think the interrogatory response covers that, of

9    course, paying that rate is part of our case.  It is one of the

10   overt acts.  There's a constellation of overt acts around those

11   movements, not just paying the rate, it's really also the

12   slowness of it.  There's also conspiratorial conduct where Mr.

13   Moss is telling Norfolk Southern's salespeople about our

14   movements.  They have no need to know that.  Mr. Luebbers is who

15   he talked to.  So that shows conspiracy in that time frame.

16          But returning, so that's 2015.  And I know the Court

17   talked about 2018, but let me come to conduct that happens in

18   between 2015 and 2018.  And if I could direct the Court to

19   Slide 4.

20          THE COURT:  So can you read me what Interrogatory 4

21   was?

22          MR. HATCH:  Yes, Your Honor.

23          "Identify the specific overt acts by NPBL that you

24   contend form the basis of the conspiracy alleged in Counts 1, 2,

25   8 and 9 of your complaint, including the identities of the

```
 1   specific persons who you contend committed such acts, the dates
 2   and circumstances of such acts, and all documents that support
 3   your answer.
 4           THE COURT:  And your supplemental answer stated that
 5   NPBL had continued to charge unreasonable and prohibitive rates
 6   and you treat the continuing charges as the overt acts?
 7           MR. HATCH:  Well, there's a lot of other information,
 8   but yes, Your Honor, I think that covers it.  In conjunction
 9   with our complaint that lists paying the rate in 2015 as part of
10   our complaint.  So I don't think there's any notice issue.  I
11   mean, that was in our original complaint, that -- I think the
12   record is that there was one train that was moved not really for
13   freight purposes over NPBL outside of this 2015 period.  So
14   literally the only time that there is --
15           THE COURT:  Is that the 2010?
16           MR. HATCH:  Yes, Your Honor.
17           THE COURT:  Okay.
18           MR. HATCH:  The one that was kind of done for demo
19   purposes, if you will.  So really the only time that we paid the
20   rate other than that one instance in 2010 would have been in
21   2015 for those trains.
22           THE COURT:  Okay.  Go ahead.
23           MR. HATCH:  I had just come back on that one, Your
24   Honor.  I do think the interrogatory covers it.  But there are
25   other overt acts in the 2015 evolution beyond just the rate.  So
```

1    I don't think at the end of the day that's material to whether

2    2015 counts as a within-statute overt act.

3               THE COURT:  Okay.  And then you're going to address

4    the damages component of what you're seeking, which is critical?

5               MR. HATCH:  Yes.

6               THE COURT:  Which is critical here?

7               MR. HATCH:  Yes, Your Honor.  But if I could walk

8    through the overt acts first then I'll come to the damages --

9               THE COURT:  Yes.

10              MR. HATCH:  -- in the order that the Court did it.

11              So if the Court still has the demonstratives in front

12   of it, if the Court turns to Page 4.  So this is just a list,

13   and these are in our brief as well, of some of the conduct

14   around that 2015 movement of trains over NPBL.  But the last

15   bullet on the list says "NS moved to cancel Norfolk & Portsmouth

16   Beltline's existing trackage rights two months later."  So

17   that's the intervening event between the 2015 movements and then

18   the 2018 service proposal that is also overt acts is these

19   actions to cancel the trackage rights that NPBL has.

20              And we see what does Norfolk Southern do?  We move a

21   modest number of trains over a long period of time in 2015.

22   That's one overt act, or constellation of them.  Norfolk

23   Southern couldn't stand even that.  And so what we see, they

24   then immediately move -- and if the Court turns to the next

25   page, that's a email within Norfolk Southern where they're

1   now -- this is in 2016 but the idea for this happened right

2   after the 2015 movements.  They did not want CSX trains on NPBL

3   coming into NIT, as they had never wanted, now they're saying

4   let's, NS, "to curtain" -- that might be "curtail, but --

5   "curtain NPBL's use of NS's tracks" -- that's the trackage

6   rights agreement -- "and then inflate the rate as much as we

7   can."

8           So that was the idea hatched in the wake of even the

9   modest number of trains moved in 2015.  Is let's yank the

10  trackage rights agreement, inflate that rate higher so that it's

11  even harder for NPBL to ever even try to move a train into NIT.

12          And that goes on then over 2015, 2016.  And on the

13  next page we have testimony from Mr. Moss of NPBL who says

14  ultimately Norfolk Southern wants -- according to his

15  calculation, the historic trackage rights agreement that had

16  existed between them was, amounted to about eight dollars per

17  car for the trackage rights.  Norfolk Southern is now demanding

18  seventy dollars a car.  And NPBL is offering thirty dollars a

19  car under those trackage rights.

20          So even under NPBL's, which is supposed to be helping

21  its two owners, which CSX is one, even under NPBL's proposal

22  they were proposing multiples of the existing trackage rights

23  amount.  So they were on board with increasing this with Norfolk

24  Southern.  Norfolk Southern wants almost 10 times the existing

25  amount.

1          And this is playing out in 2016.  And that was also in
2     our summary judgment opposition, I believe, starting at
3     Paragraph 56.  This evolution of acts.
4          As the Court knows or may recall from the motion to
5     dismiss stage, this ultimately -- and this is also in our
6     complaint -- that they threatened pulling the trackage rights
7     agreement as part of the acts.  So it was in our complaint.
8     It's an overt act here.
9          This ultimately results in that STB proceeding that
10    the Court had referenced before, where there's a, supposedly,
11    I'm going put air quotes, "dispute", between Norfolk Southern
12    and NPBL about what trackage rights fee NPBL would pay for its
13    trackage rights, and those trackage rights are necessary for
14    NPBL to access the NIT terminal.
15         And that dispute is still pending.  I say -- I put air
16    quotes around "dispute" because, as the Court also knows, they
17    have now separately claimed to you that they control NPBL and
18    they said that to the STB.  Not just legal control but that they
19    actually control them.  How it is that they could have a
20    legitimate litigated dispute between them when they also take
21    the position that they have controlled them for that whole time
22    I don't understand.  Perhaps that dispute was just a
23    manufactured dispute to provide another reason not to let us in.
24    But that's not just inference.  That is actually what happens.
25         So if we go to the 2018 proposal --

```
1              THE COURT:  This is Page 7?

2              MR. HATCH:  This is -- yeah, it's starting -- thank

3   you, Your Honor.  Starting on Page 7.

4              And this is still an internal NS email to Mr.

5   McClellan, who is here today.  This is Norfolk Southern reacting

6   to that proposal.  And it says the combination of high tariff

7   rate -- there's a lot in our briefs, Your Honor, about how this

8   rate's great, you know, it's not high, there's nothing -- you

9   know, covers our costs.  Their own documents, everybody in their

10  own documents calls this tariff rate high.  I'll come back to

11  that.  But even Norfolk Southern calls the NPBL tariff rate high

12  in their own documents.

13             "The combination of the high tariff rate and the

14  proposed trackage rights rate" -- that's, you know, air quotes

15  "dispute -- "make it economically difficult for CSX to access

16  NIT via NPBL.  And NS would also dictate operating windows" --

17  that's what we saw in 2015 -- "adding additional complexity to

18  the NPBL access."

19             I mean, if that's not direct evidence of

20  monopolization and attempts to preclude competition, I don't

21  know what is.  That's what they're doing in response to our 2018

22  proposal.

23             Mind you, NPBL has trackage rights that are approved

24  to go into NIT.  So it's not a question.  They say, NPBL's own

25  testimony, is that those rights give them 50 percent of the
```

1    tracks in there.  Fifty percent.  And the whole statutory time

2    we've moved a handful of most trains.  Again, witness accounts

3    vary.

4         THE COURT:  Right.  But at NIT these proprietary

5    issues that we've heard discussed or that are referenced

6    throughout, I'm sure they can be exaggerated, but does CSX

7    really dispute that there were proprietary issues, issues of

8    traffic flow, the absence of the complete joining -- you come --

9    the north -- north is different than south.  The south there's

10   no rights there.  So I mean, those are very practical problems.

11   And I don't deny what I've seen here from 2009 and forward.  I

12   don't deny any of that.  But on this point that you're

13   addressing, there certainly are some very practical problems

14   that would be encountered.

15        Now, I take your point about how they may have used

16   those, but you don't deny those practical issues, do you?

17        MR. HATCH:  What I would say, Your Honor, is certainly

18   you need to manage the network flow of trains on tracks.  You

19   don't want two trains colliding, or accidents.  So there's no

20   dispute about that.

21        There is a dispute of fact that we weren't going to

22   the jury about with whether those proprietary issues which are

23   not explained by them, the so-called proprietary issues, were

24   just a front to not let us in.  And I've got another document in

25   here, come to in a minute, but within six minutes --

1           THE COURT:  Is it just, is this just one rail line?

2           MR. HATCH:  It is.

3           THE COURT:  It's not two rail lines side-by-side?

4           MR. HATCH:  Correct.

5           THE COURT:  It's just one rail.  Two rails, in other

6    words?

7           MR. HATCH:  One rail line, and then when you get close

8    to NIT there becomes a loop, and that's the south and the north.

9    And that's what Your Honor alluded to, that Norfolk Southern can

10   go around that loop and NPBL would have to go in one way and

11   then come back out.  But both of them access NIT.

12          THE COURT:  So once you enter NIT you're saying there

13   are two rail lines?

14          MR. HATCH:  My understanding is that if this is -- if

15   I'm drawing the rail line, it comes, loops up within NIT and

16   then comes out and then reconnects.  So it's a loop at the end

17   of a rail line.

18          THE COURT:  Yeah, but I mean they're not two parallel

19   rail lines, that's what I'm asking.

20          MR. HATCH:  They're not.

21          THE COURT:  In NIT there are not two parallel rail

22   lines?

23          MR. HATCH:  My understanding is it's not.

24          THE COURT:  That reality is part of what you're

25   acknowledging is a traffic flow problem?

```
 1              MR. HATCH:  That -- yes.  You would not, you obviously
 2    don't want two trains going in different ways on the track, at
 3    the most simple level.  But the jury, with these documents,
 4    would be entitled to find that the reference -- again, keep in
 5    mind, Norfolk Southern moves multiple trains every day into NIT.
 6    NPBL says we have the right to 50 percent access on that track.
 7    That's what their trackage rights agreement is.  So if they're
 8    moving multiple, 50 percent, you know, whether it's one, two,
 9    however many they're moving should be what NPBL's able to move,
10    and you work through whatever the logistical issues are like in
11    any rail operation where you're moving trains.  And here, it's
12    not a matter of they moved three and we moved one in one day,
13    it's they're moving multiple, day after day.  And there's
14    witness testimony they only moved one of our trains.  Some
15    people say there's more.  I think there's a dispute of fact
16    around that.  But over months we only got a couple trains in
17    there.  So I think a jury would be amply entitled to say these
18    reference to proprietary issues, yes, of course there can be,
19    but this was a reference that was done as a means to block.
20              THE COURT:  What does it mean if there are -- if
21    traffic flow at NIT container traffic has increased, vessel
22    traffic concomitant has increased, to the extent that with NPBL
23    not having circular, completely circular rights, it compromises
24    the ability of NPBL or -- Norfolk Southern to provide
25    50 percent.  What does that mean to this, to the case and to
```

31

```
1   your claim?  That is, if you were exercising your rights over
2   the NPBL track, you enter at the north gate, come alongside the
3   dock, and then you have to exit --
4            MR. HATCH:  Back out.
5            THE COURT:  -- backwards.  And the 50 percent
6   agreement -- if Norfolk Southern is unable to meet its
7   obligations with the increasing traffic, how does that -- how do
8   those practicalities and these proprietary interests impact your
9   claim?
10            MR. HATCH:  Well, first of all I would say that is not
11   something that's established in this record.  They said
12   proprietary issues, that there were actual proprietary issues.
13   I mean, that would presumably be for them to establish.  And
14   there is at least a triable issue on whether that was just said
15   as a front or not.
16            And I would add to that, Your Honor, there's also in
17   our brief VIT, which of course operates NIT, Mr. Capozzi, who is
18   the witness for VIT, and CSX witness Mr. Gerardo both testified
19   that railroads can manage this pattern at other ports.  And
20   Mr. Capozzi said that NS concerns were exaggerated about the
21   proprietary issues -- or about the movements, that is.  That you
22   couldn't do the movements.
23            So this is why I said this is disputed fact.  They
24   said it.  If they want to come and try to call witnesses, it's
25   just you can't square that -- it's impossible -- keep in mind,
```

1  that's totally inconsistent with one of their other defenses,

2  which is we were here ready to operate and send you in whenever

3  you wanted to pay the rate.  That's NPBL's position.  Happy to

4  do that whenever you might pay the rate.

5          THE COURT:  Might say can't do 50 percent, but they're

6  ready?

7          MR. HATCH:  They haven't -- yeah.  Whether it's

8  50 percent -- I don't want to get hung up on that, Your Honor.

9  That's what they say their rights are.  They have never come to

10  one percent, okay?  So we're not even close to whether it should

11  be 40/60 or what have you.  They don't move any trains in there.

12  But their position is that we completely can move trains in.

13  When Mr. Reinhart who is the head of VPA at the time asked them

14  to lower -- and this letter's in the record, it was with our

15  complaint -- asked them to lower their rate so that there could

16  be dual rail access, Mr. Moss's response was we're happy to do

17  the business at the rate we have.  We're not lowering it.  That

18  was in 2018 as part of this service proposal.

19          So it's a fact and it's acknowledged that we have a

20  right through NPBL switching to access NIT, that's one of the

21  terminals that they connect to, and that we weren't meaningfully

22  able to do that in 2015, and that these trackage rights are

23  being torn up by Norfolk Southern and NPBL with a mutual goal of

24  increasing the amount that would be spent, which is, as the

25  Court has identified, they haven't finalized that, but almost

1    certainly then be used, we see from Norfolk Southern's

2    documents, to justify higher rates.  And that is conduct that

3    occurred 2015, 2016.

4         And then coming to 2018, as Your Honor talked about,

5    our proposal, yes, there is a governance aspect to the 2018

6    proposal, but there was also the service aspect to the 2018

7    proposal.  Offering a rate.  And one of the things -- this is on

8    Page 8 of the demonstratives the third bullet point -- Mr. Moss

9    testified that he cannot analyze the service proposal in depth

10   given the trackage rights dispute with Norfolk Southern.  In

11   other words, I don't know what I'm going to have to pay, so I

12   can't, you know, I can't answer this question, I've got the

13   trackage rights dispute out there.

14        So that thread from '15 really stretches all the way

15   up to '18.  We see here behind the scenes what's going on, and

16   the Court can know that that is a manufactured dispute, at least

17   according to their own representations, because they have said

18   that they controlled them throughout this entire period.

19        THE COURT:  And you're saying the trackage rights

20   dispute is the proprietary issues?  How would you define it?

21        MR. HATCH:  I would define -- no, I would say the

22   proprietary issues, Your Honor, were identified a few times I

23   think in the record, but primarily is as a reaction when we

24   tried to move trains in in 2015.  They said proprietary issues,

25   we can't tell you why we can't move your trains, okay?

34

```
 1            Then from the few trains, one or, you know, somewhat
 2  more, witness accounts vary, we moved in 2015, Norfolk Southern
 3  immediately says internally let's rip up that trackage rights
 4  agreement with NPBL.
 5            So that's, to me, separate, but it -- you would tell
 6  this all together to the jury, right?  Because they didn't even
 7  like the few trains we moved in, they couldn't stand it, so they
 8  say how else can we block them?  This is part of the monopoly,
 9  part of the conspiracy.  How else can we block them?  Oh, I
10  know.  The reason NPBL can get into NIT is by virtue of trackage
11  rights that have existed at this point for over 100 years.
12            THE COURT:  That they wanted to end.
13            MR. HATCH:  100 years at eight dollars per car, and
14  then all of a sudden when we move one train or a small number of
15  trains, now it's time to reassess the trackage rights agreement
16  after 100 years.  I mean, that is remarkable.  And you don't
17  even have to guess why it came to them.  That's the documents we
18  have that show right after that event let's rip up these rights.
19  And so then they proceed to do that.
20            And this ultimately culminates in the disputed, air
21  quotes, "dispute" in the STB between Norfolk Southern and NPBL
22  over what rights.  And that's perfect for them, right?  Because
23  this dispute can go on who knows how long?  You know, it could
24  be supposed litigation between one party that controls the
25  other, according to them.
```

```
 1            And then Mr. Moss tells us in our 2018 proposal, well,
 2   I don't know, that's uncertainty hanging over whether we can
 3   move, you know, do this deal, because I don't know how much I'm
 4   going to have to pay.
 5            So I think -- I hope I've answered the Court's
 6   questions, but that is connective tissue.  And I think it's also
 7   an example, Your Honor, of an overt act that is not tied to a
 8   particular customer.  And it just shows they are intent on
 9   blocking us from NIT from any customer that wants to go there.
10   They will do it by not moving trains, they will do it by ripping
11   up trackage rights agreements, and then when we come to 2018
12   they will do it by -- so for 2018 -- Your Honor's questions were
13   focused on the shareholder vote, and I'm happy to address the
14   shareholder vote, but an overt act is any act in furtherance of
15   a conspiracy.  It's not just the ultimate act.  They like to
16   focus on the shareholder vote, we were entitled by our rights to
17   vote the way that we wanted to vote.  You know, it's not just
18   the ultimate vote.  As the Court knows, I mean any overt act,
19   making phone call can be an overt act in furtherance of a
20   conspiracy.
21            So what do we have in 2018?  Well, we have what I was
22   just talking about with Mr. Moss saying I've got these trackage
23   rights dispute going on, I don't know, and I'll have to send it
24   to a rate committee.  Your Honor, I mean, we know what a rate
25   committee does.  That's from 2009 and 2010.  That is just
```

36

1   another way to delay and deny.

2          And they may argue, no, it could have been an open and

3   fair process.  That's fine.  That will be for the jury to

4   decide.  But he says no, we're going to have to send it to

5   another rate committee.

6          By the way, I have another slide on this.  Every time

7   NPBL analyzed internally whether they would make money on their

8   proposals that CSX put forward, so in 2009/10 and also in 2018,

9   every time they concluded that they would make money on CSX's

10  proposals.  And this Court said in the motion to dismiss

11  decision, "Although ultimately a merits question, courts have

12  found that rejecting proposals which are in a company's own

13  interest and within the company's power to accept may be

14  evidence of, for instance, an antitrust conspiracy."  That's at

15  Page 27 of the Court's decision.

16         That's exactly what we have here.  Imagine a world in

17  which NPBL acted like the independent company it's supposed to

18  be, helping its two owners connect to terminals, when they get a

19  proposal in 2018 by which they would increase their business,

20  make more money, by their own account, they would endeavor to

21  advance that proposal.  We do not see that happening.  We see

22  barriers erected to it.  We see, you know, well, we got this

23  trackage rights dispute.  We see them responding, you know, no,

24  we are not going to lower our rate to the port.  So there's also

25  the proposal side, Your Honor, I guess is what I'm saying.  It's

1    not just of the shareholder vote.

2           Now, about the shareholder vote, generally of course

3    if you have a contractual right to do something, then you can do

4    it under contract.  But you cannot engage in anti-competitive

5    activity.  And you can use contracts to engage in

6    anti-competitive activity.  For example, a classic antitrust

7    case is a patented product that is going to expire its patent,

8    it engages in settlements with generics, and by doing that,

9    extends its monopoly.  Well, it's totally lawful to engage in a

10   settlement generally, and it would be totally lawful to enforce

11   the terms of that settlement.  But when that is done pursuant to

12   a monopolistic conspiratorial enterprise, it is just the same

13   overt act as any other overt act in furtherance of it.  It goes

14   to their motive and intent, not whether they abstractly had, if

15   they didn't have those motives and intent, the right to do it.

16          Just taking a moment to look over the Court's notes,

17   if that would be okay?

18          THE COURT:  Sure.  Take your time.

19          MR. HATCH:  And there was -- I think this is, this was

20   in our summary judgment opposition, Your Honor, but there was

21   more conduct even at -- the Board refused to consider the

22   different proposals as well.  That is in our summary judgment

23   opposition.  There wasn't ultimately a vote at the Board level,

24   but there was refusal to consider or advance the proposals at

25   that level.

1           THE COURT:  Did the CSX members affirmatively raise it

2   during the meeting?

3           MR. HATCH:  Yes, Your Honor.  And I'll pull up our

4   opposition if I could here.

5           THE COURT:  They made a motion?

6           MR. HATCH:  They did not -- so that's their point, and

7   we concede it was not put to a vote.  But on -- our position

8   was, our position was we know -- we can see where this is going,

9   right?  The things you're already raising, rate committee, we

10  know that was used before to ultimately go nowhere and advance

11  the issue.  The trackage rights dispute, that was clearly a

12  pretext for this.  And so there needs to be somebody independent

13  who evaluates this fairly.  And ultimately at the shareholder

14  level that was voted not to have independent.  But at

15  Paragraph 71 of our opposition at its April 18, 2018 meeting,

16  the NPBL board did not discuss the 2018 proposal and did not

17  vote to form a rate committee to analyze the tariff or the

18  proposal.  The CSX appointed directors requested that the Board

19  appoint an independent committee to review and evaluate the 2018

20  proposal, but the NS appointed directors refused, based on

21  purported quote-unquote 'conflict' with NPBL's governing

22  documents."  So there was also discussion at the Board level,

23  albeit not a formal vote.

24          THE COURT:  Thank you.

25          MR. HATCH:  So ultimately I return Your Honor to the

1   point that the whole purpose of this monopolistic exercise in

2   the conspiracy is to keep CSX out of NIT.  That is maintaining

3   the monopoly.  And it is also doing it through a conspiracy that

4   hurts NPBL; would not be in its own independent interests.  And

5   that's evidence of conspiracy.

6            There were multiple overt acts within the statutory

7   period, and those overt acts had the effect of precluding us

8   from that market, which our expert has analyzed.  And the effect

9   of precluding us from that market is the damages our expert has

10  calculated.  And I think that's the damage approach and model

11  that was approved in Zenith.  Zenith does say, you know, you're

12  entitled to damages from that overt act, but it is not limited

13  to specifically that overt act.  It approves the market share

14  damages that were claimed in that four-year statutory period.

15           And Lower Lake Erie walks through that and confirms

16  that when you're talking about a monopoly that is set up and

17  blocking you and continuing to do so and refusing to, you know,

18  to deal, essentially, that that is precluding from the market,

19  and therefore you're entitled to your market damages, not just

20  the specific damage from a specific overt act.

21           And Your Honor asked about the XY, LLC decision at one

22  point, and the --

23           THE COURT:  Yes, how is -- distinguish their

24  determination there was no new accumulating damages.

25           MR. HATCH:  To me, the distinction is that -- and the

1  cases talk about this -- it's one thing if the monopolist

2  destroyed your business on day one, right?  That could be a form

3  of monopoly.  There's two competitors and this monopolist sends

4  you into bankruptcy.  Destroys your business.  Okay.  Fine.  You

5  know then you're done, your damages would be looking forward

6  from there because you're done as a business.

7         It's different though if they don't destroy you as a

8  business or do a one-time act.  Again, taking the pill that

9  hurts you still in year seven just like it hurts you in year

10  one.  They continue to do new things.  They continue the conduct

11  that precludes you from that market year over year.  I mean,

12  that's what you have to do as a monopolist.  If you haven't

13  killed your competitor, you have to continue to block them year

14  after year.

15         And Hanover Shoe, Zenith, all these cases say, okay,

16  maybe you can't recover for the out-of-statute damages, but what

17  we're not saying is that a monopolist who succeeds in not being

18  sued in the first four years of that monopoly gets penchant to

19  continue the monopoly into the future and not face the damages

20  they're doing to the market.  All the damages that are within

21  the statutory period are recoverable.  And that's, between

22  Hanover Shoe and Zenith, I think exactly where we are.

23         THE COURT:  And so how is this case different from XY?

24  Are you saying XY is wrong?

25         MR. HATCH:  No, I'm not saying XY is wrong.  Ours is

1   not a single act.  Your Honor, in your introductory statements,
2   said in 2009 arguably a rate was set and a rate was denied.
3   They set 210 and didn't do the 75 that we were asking for, and
4   has it just been that conduct that has carried through this
5   whole time and been what is attributable to our harm?  And the
6   answer is no, it's not.  Because they could have at any time
7   between then and now decided to lower that rate.  And in fact we
8   made in 2018 an effort, again, to get them to do that.  They did
9   not.  So by persisting in the rate, they're deciding to maintain
10  and establish and charge that rate each year, causing the market
11  damages.

12          And that is where I go back to Zenith, which says it
13  would have been speculative and unavailable to us to sue for a
14  decade's worth of damages in 2009, because they would have said
15  you haven't accumulated those, you don't know what will happen,
16  we could change the rate tomorrow, so it's speculative.  That is
17  certainly what they would have argued, and in Zenith the Supreme
18  Court said, yeah, you don't have to face front-end inflative
19  damages when they can change the conduct, which in that case was
20  precluding you from the market, just like it is here.

21          Your Honor asked about the burden of proof issue on
22  the affirmative defense, and I will confess, Your Honor
23  references cases from the Tenth, Ninth, Sixth and Fed Circuits.
24  I don't believe I have seen those, I'll confess that.  So I
25  probably can't speak to them well because I don't believe they

1    were relied on by either of the defendants.

2           They didn't acknowledge they bore the burden of proof

3    on this in their opening brief.  We pointed out in our response

4    that, as an affirmative defense, they bear the burden of proof

5    on it and I don't believe they have contested that point.  If

6    I'm wrong, I'm sure I'll be corrected.  But that's a key point,

7    because we see a lot of these cases, Zenith is an example, but

8    many of the other cases are assessing the statute of limitations

9    issue post-trial.  And in Zenith in fact, there was no statute

10   of limitations -- that was a bench trial.  There was no statute

11   of limitations defense made at trial, then the defendant lost,

12   and after trial they tried to amend their answer and assert a

13   statute of limitations defense.  And the Supreme Court commented

14   that that could very well have been a tactical decision on their

15   part not to assert the statute of limitations.  Why?  Because it

16   would be hard to tell a jury we didn't do it, but if we did it,

17   it was too old.  Which is exactly what they're trying to tell

18   the Court.  Their first argument is we did it and it's too old,

19   and their second argument is there's no evidence of a

20   conspiracy.  Those are a bit hard to square, but that's how

21   they're proceeding.  Will they assert the statute of limitations

22   defense to a jury on which they bear the burden of proof?  I

23   don't know.  If they do, then I think the Court at trial could

24   determine after hearing the evidence what the scope of that was

25   in terms of which years are within the damages period.  But it's

1    on them to assert it.  If they don't assert that affirmative

2    defense, which they could decide not to do tactically to a jury

3    or for other reasons, then there's no statute of limitations

4    defense.  It's a damages issue ultimately that goes to the jury.

5    Or for the Court to decide during jury instructions.

6          I would say as to the -- and again, not having read

7    the cases that the Court referenced, yes, we will need to

8    establish at trial that this was a conspiracy and monopolization

9    that occurred.  If they, if they assert a statute of limitations

10   and put forward evidence on that, then we would have the fight

11   about whether it was continuing within the statutory period and

12   that sort of thing.  There's certainly ample evidence in the

13   summary judgment record that it was continuing; that it was a

14   continuing conspiracy.  It's the same two parties, there is

15   continuity of persons over time, there's continuity of

16   objectives.  So I don't think there's really a serious dispute

17   about whether it was -- there's triable evidence about whether

18   it was a continuing conspiracy and they haven't claimed that

19   they don't bear the burden of proof on the affirmative defense.

20         The Court asked kind of a series of questions about

21   what damages we are claiming here.  And they're not, as is

22   probably clear from my prior discussion, but they're not limited

23   to the specific moves in 2015 and the differential between what

24   the rates should have been and what it was.  They are the lost

25   business and profits that we had by virtue of this conduct.  So

```
1   we have not at this point in the case separately calculated what

2   the specific lost business was in 2015.  I mean, I think we've

3   claimed all available damages, but we haven't endeavored to

4   calculate that because, frankly, our damages are much broader.

5   And one thing we, as the case developed.

6           THE COURT:  But are those damages tied to an overt act

7   within the limitations period --

8           MR. HATCH:  They are.

9           THE COURT:  -- such that it's an accumulated, it's

10  accumulating?

11          MR. HATCH:  They are, Your Honor, because again, the

12  damages are all tied -- and this is in our expert's report -- to

13  the loss of customer business by virtue of our inability to

14  offer on-dock railing at NIT.  These customers evaluate -- you

15  are based on your ability to offer on-dock rail.  Don't take our

16  word for it, that's clear in their own documents.  They like

17  trains to be able to pick up right where they drop off.  They

18  don't want to have to use trucks and the railroads can't tell

19  the customers where to go, they've got to take the business as

20  they find it.  So if we cannot offer on-dock rail, which is made

21  evident by all the difficulty in 2015, by the continued use of a

22  rate which is preclusive, and by the refusal in 2018 to consider

23  any other rate, and the continuation, then that's evident in our

24  basis.  An again going back to Zenith and Lower Lake Erie, this

25  is the preclusive effect within the market.  You could certainly
```

```
 1  calculate sub-aspects of those damages if you could calculate
 2  for a specific train move, but calculating lost business, lost
 3  market share is a common way to prove damages in an antitrust
 4  case.
 5          And I go back -- I think Your Honor referenced in the
 6  motion to dismiss ruling that we're entitled to expectation
 7  damages, which is what plaintiff's profits would have been if
 8  defendants had accepted the proposal minus what plaintiff's
 9  profits actually were.  And that is how we're establishing our
10  damages.  If you let us in, if we're able to provide on-dock
11  rail service at NIT, then we would have this market share, this
12  amount of business, you haven't throughout the statutory period,
13  and therefore these are our damages.
14          Your Honor asked a question about NPBL's participation
15  in the conspiracy within the statutory period, and I have
16  touched on that already with some of Mr. Moss' activity, but I
17  do want to make sure I respond to that one.
18          So in 2015 when where trying to move those trains, Mr.
19  Moss keeps Norfolk Southern's Chris Luebbers, an intermodal
20  salesperson, apprised of our attempt to move them in.  There is
21  no basis -- or at least the jury should determine why he did
22  that.  It's a salesperson, it's not -- Your Honor asked about
23  proprietary issues.  He doesn't run the trains, he never had an
24  operational job, his only job is to sell Norfolk Southern's
25  intermodal material.  And the record is replete with his efforts
```

```
1   over the years to keep us out of NIT.  So the jury could easily
2   infer conspiratorial communication between Mr. Moss and
3   Mr. Luebbers in that 2015 time frame.
4           Another one, Mr. Moss in the 2015 time frame asks
5   about an operational window, and I believe within six minutes of
6   being advised that NPBL was asking to get an operational window,
7   the vice-president of transportation for Norfolk Southern, the
8   vice-president of transportation, not a low-level person,
9   Mr. Terry Evans, wrote Cannon Moss, What is this and what are
10  the details, and until I fully understand, the answer is no,
11  exclamation point.
12          I mean, does that sound like 50-percent trackage
13  rights?  Does that sound like 40-percent?  You know, it sounds
14  like nothing.  That is what it is, okay?
15          Then we get the proprietary issues and we have
16  Mr. Capozzi's testimony in this time frame as well, which I
17  already referenced to the Court.
18          We have the fact that -- sorry, I have the wrong page.
19          We have a slide on this, actually.  Every time NPBL
20  has evaluated our rate proposals they have determined that they
21  would make money.  Ms. Coleman did so in 2018.  That was her
22  testimony.  Let me see if I can find that.
23          THE COURT:  I've read it.
24          MR. HATCH:  You've read it.  Okay.
25          So they have evaluated that they can make money.  I
```

1  always keep in mind what would a business that wasn't engaged in

2  conspiracy, that was trying to do the right thing do?  We can

3  make money?  Great, let's move forward with this business

4  opportunity.  We're not going to erect road blocks:  Rate

5  committee, trackage rights fees, et cetera.

6         And then of course there's the trackage dispute that I

7  already talked about, Your Honor.

8         So I think there is that connective tissue across all

9  three of these.  Mr. Moss was actually put into position by

10 Norfolk Southern as president of the NPBL after the former

11 president, Mr. David Stinson had actually evaluated, in the

12 2009/'10 period, that NPBL would make money.  And it's really

13 remarkable.  I know the Court's read the record.  We proposed

14 75, which is actually what they had proposed.  NPBL, after

15 saying we looked at what other comparable rates were and this is

16 the rate that works for our worse-case scenario, so we said

17 great, we'd like the 75.  Mr. Stinson went to the board and

18 said, yeah, we would make money on that rate.  Norfolk Southern

19 says you need to think about that more, I'm not sure you've

20 really considered a worst-case scenario.

21        Mr. Stinson goes back -- you know, I think they were

22 trying to send a message.  Mr. Stinson goes back, runs the

23 numbers again, he said nope, we'd still make money.  They say,

24 have you considered -- because we were offering to give them our

25 trains.  They would have free trains to move it in.  Well, if

1  you don't use their trains would you make money?  He comes back,

2  we would make money whether we used their trains or not.  He

3  raised that.  It goes nowhere over a long time thanks to

4  Mr. Luebbers' and thanks to the Norfolk Southern Board members

5  and thanks to other Norfolk Southern people who were defending

6  their position.

7          He is removed after that and Mr. Moss is put into

8  place, and then Mr. Moss is the one saying to us in 2018, well,

9  I think we better do a rate committee.

10         I think a jury is certainly able to draw their

11 inferences about where that's headed and what was going to

12 happen with that.

13         Thank you, Your Honor, for your indulgence.

14         Mr. McFarland reminded me of one more note going back

15 to 2015, and this relates to some of the state law claim

16 questions as well that the Court asked.

17         The reason we tried to move trains in 2015, and I

18 don't think this is disputed at all in the record, it was a time

19 of incredible port congestion.  There was some extraordinary

20 events going on and so there was an extraordinary need to try to

21 service customers even at a loss for us.  At that rate we would

22 lose money, but in the extraordinary circumstances to try to

23 service that.  And Norfolk Southern then is not cooperating.

24 They're not moving those trains and they're not allowing them to

25 run, and so therefore that is a breach of the contract on their

```
1    part because again, NPBL is entitled to those trackage rights.
2    It's entitled to be able to send trains in and Norfolk Southern
3    is not letting them come in.  And it's not letting them come
4    in -- you know, if you're a customer and you're looking at that,
5    you know, here I really need you to move these trains and you
6    haven't done it before, and what I'm seeing is that you can
7    barely move anything, and you certainly can't do it in a timely
8    manner.  And so that is going to impact our business, again,
9    much more broadly than that particular move because it just
10   demonstrates that you can't do -- we can't do on-dock rail
11   through NPBL either by virtue of the rate or by virtue of their
12   lack of ability to get and willingness to obtain an operating
13   plan from Norfolk Southern.
14           And that was also something that happened in 2010 but
15   it happened again in 2015 and in 2018, as we saw from the
16   Norfolk Southern document, you know, we don't want them coming
17   in.  That's been their position throughout, but they have done
18   it in different ways over time.
19           THE COURT:  Were you going to address the statute of
20   limitations in talking about the state claim, the two-year
21   statute of limitations and the damages issue that I raised?
22           MR. HATCH:  I think, Your Honor, that -- I think Your
23   Honor's question was if I don't find a breach of fiduciary duty
24   by the Norfolk Southern board members in 2018 by virtue of the
25   shareholder vote, is there no activity that's within the
```

50

1  statute.  And I believe I would rely on the same set of overt

2  acts that I've walked the Court through to say it is not just

3  the breach of fiduciary duty.  We also have other acts that

4  harmed us in our business done both by Norfolk Southern and NPBL

5  well within the statutory period.  And that's that same set of

6  both the 2015 moves, the trackage rights dispute, and then the

7  failure to give honest, fair consideration to our service

8  proposal.

9          Your Honor asked a question about the relevant market,

10 and I would just say unless the Court has other questions, yes,

11 the relevant market is a question for the jury in this case.

12 Each side has sponsored an economic -- or at least we and

13 Norfolk Southern have sponsored an economic expert, they have

14 differing opinions about the contours of that relevant market,

15 but that is certainly a jury question.

16         As we've quoted in our brief, the Supreme Court has

17 said these antitrust cases are highly fact-intensive cases and

18 they're not often susceptible to summary judgment.  So I

19 certainly view that as a trial issue.

20         I also think just briefly, certainly our complaint did

21 put them on notice of what the market was.  Our expert's

22 definition is, if anything, narrower than what the complaint's

23 is, but is well-encompassed within it.  So I don't see it as

24 necessary for us to amend our complaint.  We gave them notice.

25         Our expert has also calculated damages based on Port

51

```
1   of Virginia, not just NIT, so there's really no need to amend
2   the complaint.  And I think there's no credible claim that they
3   had a lack of notice or a prejudice.  They had roughly a year, I
4   think, between receiving our expert report and having to submit
5   their open due to the COVID extensions and stay that was in the
6   case at the time.
7           And with respect to injunctive relief, we certainly
8   think that there should be a trial, Your Honor, and that the
9   Court would take up injunctive relief after that trial.  The STB
10  proceeding on the trackage rights dispute are stayed, but again,
11  those are only proceedings about what rate NPBL would pay to
12  Norfolk Southern for the trackage rights, they're not directly
13  going to determine what switching rate NPBL would resultantly
14  charge, if that makes sense, to customers like CSX.
15          Court's indulgence?
16          (Plaintiff's counsel conferred.)
17          MR. HATCH:  Unless the Court has further questions at
18  this time, I'll cede to my co-counsel here.
19          THE COURT:  Well, for those of us of my age, I think
20  it's time to take a break.  So we'll take about a five-minute
21  break and come on back.
22          (Recess taken from 11:35 a.m. to 11:47 a.m.)
23          MR. LACY:  Good morning, Your Honor.  Again, Michael
24  Lacy on behalf of defendant Norfolk Southern.
25          In speaking with Mr. Snow, Belt Line's counsel, we
```

1  thought it would be helpful if we addressed the statute of

2  limitations damages issues questions raised by the Court.  I'll

3  do it on behalf of Norfolk Southern, and Mr. Snow will do it on

4  behalf of the Belt Line.  And then with the Court's permission,

5  Ms. Ryan will address the antitrust questions that the Court has

6  raised in terms of the market definition and perhaps on the

7  injunctive relief, if that's okay with the Court.

8            THE COURT:  Sure.  That's fine.

9            MR. LACY:  All right.  Thank you.

10           You know, Your Honor, I think the Court's questions

11  dovetailed nicely with the organization of our argument that we

12  wanted to present to the Court.  And I think we first need to

13  start, as it relates to the statute of limitations, with the

14  understanding of the damages model that CSX has put forward in

15  this case, because I think it answers many of the Court's

16  questions.

17           As the Court knows, the damages model is a annual

18  year-by-year calculation of profits that CSX believes it would

19  have been able to achieve but for their alleged inability to

20  access NIT by rail.

21           That damages model, which our papers point out is

22  their only evidence of damages in this case, is improper under

23  the Supreme Court's decision in Klehr.  I know the Court has

24  intentioned Zenith, and so did Mr. Hatch, but the Court also

25  mentioned Klehr, and Klehr is the case in which you have the

1    Supreme Court outlawing the bootstrapping that is plainly

2    evident here in this case that's being attempted by CSX.

3              Under Klehr, Your Honor, which I would say was decided

4    many years after Zenith and was decided after the Lower Lake

5    Erie case on which CSX relies -- and I would actually point out

6    that in Klehr the Court was actually rejecting the Third

7    Circuit's rule that CSX seeks to impose here.  And of course

8    Lower Lake Erie was a Third Circuit case.  So there's a lot of

9    symmetry here with Klehr.  But in Klehr, as Mr. Hatch said, it

10   was a RICO case, the RICO claims, but they used antitrust

11   statute of limitations law as an apt analogy.

12             And the primary issue in that case, as I said, was

13   whether the Third Circuit correctly held that a plaintiff can

14   recover damages caused by predicate acts that occurred outside

15   the limitations period merely because the defendant allegedly

16   committed an act, an overt act within the limitations period.

17             And of course the Supreme Court said, and I quote

18   "That is not a proper interpretation of the law."  That's at

19   Page 188 of the Klehr case.

20             What the Supreme Court held this Klehr, which is

21   directly applicable here, is that "the antitrust claim accrues

22   and the statute of limitations begins to run when the defendant

23   commits an act that injures plaintiff's business."  It also held

24   that "the commission of a separate new overt act generally does

25   not the permit the plaintiff to recover for injury caused by old

54

1    overt acts committed outside the limitations period."

2            Again, that means that plaintiff cannot use a

3    independent new predicate act as a bootstrap to recover damages

4    purportedly caused by acts committed outside the limitations

5    period.

6            Now, the next holding of Klehr is part and parcel with

7    the holding in XY that the Court has mentioned several times.

8    The plaintiff cannot only -- "A plaintiff cannot rely on a new

9    overt act within the limitations period unless it can show how

10   any new act could have caused them harm over and above the harm

11   that the earlier acts caused."

12           THE COURT:  Well what -- I heard this morning is, I

13   think, in 2009 I was -- my client was excluded from the market

14   by the rate.  And in 2015 my client was excluded from the market

15   physically.  I suppose you can argue that the damages are

16   overlapping, but under the construct requiring a new overt

17   act -- an overt act within the statute and new accumulating

18   damage, that's a very difficult question to answer.  Is that

19   what we're facing?  That's what is being argued to me, that even

20   though the client is -- you know, from 2009 the exclusion

21   starts.  And the thing that makes this case so very difficult is

22   there's a lot of good evidence that shows that your client did

23   it.  And that's troubling.

24           On the other hand, the Court deals in the law, and the

25   law of limitations has its purposes.  And just looking at one

55

 1   treatise, the Wolters Kluwer, you know, this is how they

 2   summarize it:  "Limitation serves the same functions in

 3   antitrust as elsewhere in the law:  To put old liabilities to

 4   rest, to relieve courts and parties from stale claims where the

 5   best evidence may no longer be available, and to create

 6   incentives for those who believe themselves wronged to

 7   investigate and bring their claims promptly, particularly when

 8   they are known or can be determined.  Repose is certainly

 9   valuable in antitrust where tests of legality are often rather

10   vague.  Where many business practices can be simultaneously

11   efficient and beneficial to consumers but also challengeable as

12   antitrust violations, where liability doctrines change and

13   expand, where damages are punitively trebled and where duplicate

14   trebled damages for the same offense may be threatened.  In

15   addition, relevant evidence may disappear over time.  Antitrust

16   liability depends not only on the parties' acts, but also on

17   many surrounding circumstance, including the behavior of rival

18   firms and general market conditions, matters that may be hard to

19   reconstruct long afterwards.  Moreover, the old evidence that

20   survives may be admitted even though incomplete."

21           Maybe that's something that I should have read to CSX.

22           But I think you, you know, you have to face head on

23   and parse for me this very specific issue of whether or not the

24   2015 physical exclusion from the market that they have argued --

25   I know you oppose it, but if there's a genuine issue of material

1  fact on that, does that get them to a jury?  And that is what I

2  am struggling with.

3          And in connection with what I just read to you, I

4  would ask you this:  Where much of the evidence is old evidence

5  outside the limitations period, bearing in mind what I just read

6  to you, when you have a lot of that evidence being old evidence

7  outside the limitations period, how does that affect the Court's

8  reliance on limitation and construction of limitation.  And in

9  this case -- you know I'll just, this is -- this is how I drew

10 it.  You've got two lines:  One from 2009 to right now.  It's

11 market rate exclusion.  Then Mr. Hatch argues that, from 2015

12 overlapping that, you have physical exclusion; a new overt act,

13 and he argues new accumulating harm.  And I'm left to deal with

14 what new accumulating harm means -- or new accumulating damages

15 mean when you've already had exclusion and you've got an act

16 that they say is new exclusion with new damages.

17         I think that's what I'm struggling with, as best I can

18 articulate it.  So I really need to hear from you on that, I

19 think.

20         MR. LACY:  And Your Honor, I welcome the opportunity

21 to speak to that.  First, obviously, we agree whole-heartedly

22 with the legal principles that the Court read from that

23 treatise.  We think it applies 100 percent to this situation.

24 And I would point out to the Court, and it's in the record

25 before the Court, that as early as 2009 and 2010, CSX not only

57

1  contemplated bringing this very lawsuit to try to adjust access

2  to NIT, it threatened both the Belt Line and NS, Norfolk

3  Southern, at that time that it was going to do that.  And that

4  can be found at Exhibits 114 and 115 in our summary judgment

5  papers.  So you know, this was a well -- at least this claim was

6  well known to CSX as early as 2010.

7              Now when you get to the 2015 moves, Mr. Hatch on the

8  one hand said it was operational foreclosure, if you will.  But

9  did he not explain to the Court --

10             THE COURT:  He says there's a genuine issue of

11  material fact on that point at the very least.

12             MR. LACY:  Absolutely.  At the very least.  And we'll

13  circle back, and I know Mr. Snow has something to say about the

14  2015 moves, but what Mr. Hatch did not tell you is how the

15  damages purportedly caused by this operational foreclosure are

16  any different from the damages purportedly caused by the setting

17  of the rate in 2009.

18             And if you look at their damages model -- and again,

19  Mr. Hatch conceded this -- it makes no effort to distinguish

20  what damages were caused by either act, assuming either act is

21  an overt act.

22             THE COURT:  What's he say about that?  What is his

23  response as you understood it on the damages issue?

24             MR. LACY:  As long as there is an overt act in the

25  limitations period he can recover whatever damages were caused

1   in the limitations period.

2          THE COURT:  Well, didn't he say, look, we claim this

3   whole body of exclusion, and the physical exclusion damages are

4   just a component of that, as opposed to -- think about it like

5   two circles.  Here is your circle of exclusion damages from 2009

6   to 2018.  So is -- are -- the 2015 physical exclusion damages a

7   subpart of that circle or a completely separate circle?  Is that

8   the question?  Is that the way we should be thinking about this?

9   Because there's two issues.  Legally is that the way we should

10  be thinking about it, and then how have they constructed their

11  case such that the Court should or should not hold them to what

12  they have said and done and what they have divulged in their

13  expert report?

14         MR. LACY:  Your Honor, let's look at it legally first.

15         Under Klehr and under Zenith, you cannot recover

16  damages suffered in the limitations period caused by conduct

17  outside the limitations period, okay?  That is absolute law.  I

18  don't think -- I don't think even CSX disagrees with that.

19         So then let's go to 2015, the damages model.  As

20  Mr. Hatch conceded, CSX has made no effort to try to distinguish

21  what damages were caused by conduct occurring outside the

22  limitations period -- the setting of the rate, for example, or

23  the purported rejection of the 2010 rate proposal -- as opposed

24  to damages caused by this, what I would call operational issues

25  with respect to the 2015 moves.  The damages model calculates

59

1  the same lost profits annually.

2          THE COURT:  What's your best case -- I'm sorry you're

3  getting the brunt of some of my thinking here on these

4  questions.  But what is your best case that supports that

5  proposition that it has to be separately divulged in discovery

6  that your expert has to identify it separately?

7          MR. LACY:  Multiple cases, Your Honor.  We've got the

8  XY case, we've got the Klehr case.  We've got the Gumwood case,

9  which is directly on point and was not distinguished by CSX.

10         And they dovetail even the cases that hold that when

11 you have conduct that's determined to be not illegal but you

12 fail to distinguish between damages caused by that conduct

13 versus conduct that may be illegal, that renders the damages

14 model inadmissible as well.  That's the Comcast decision from

15 the United States Supreme Court.  I mean, this is a

16 well-established body of law.  This bootstrapping idea is

17 well-established.

18         And Mr. Hatch doubles down on what the expert said.

19 The expert didn't say the damages -- let's take a year, for

20 example.  Let's take 2016.  The damages model does not say in

21 2016 we lost these contracts, the profits from these contracts

22 because of this act.  When you look at the number, the damages

23 figure for 2016 in their damages model, you have no idea whether

24 it's caused by the setting of the rate, this purported

25 operational blockage or some other reason.  And that is by

1  design.  Their expert says, oh, I didn't differentiate between

2  the acts, I based it on the totality of the conduct.

3          THE COURT:  How does that harm you?

4          MR. LACY:  What's that?

5          THE COURT:  How does that harm, hamper you in your

6  trial conduct?  In your preparation for trial.  How does that

7  failure on their part hamper you?

8          MR. LACY:  As all of these courts say, it leaves the

9  jury to speculate as to what damages are properly recoverable.

10 Because we know as a matter of law, damages caused by conduct

11 occurring outside the limitations period is not recoverable.

12 That's the bootstrapping.  That's Klehr and that's XY.  And when

13 you don't break it down, that renders the entire model

14 inadmissible.  They have offered no evidence.

15          And in fact, Mr. Hatch today conceded that it was not

16 just the rate that caused these lost profit damages, which is

17 clearly not recoverable, but it was these other things.  But the

18 jury has no evidence in the record, there is no evidence in the

19 record for the jury to determine that.  That's why these cases

20 that we've cited to the Court exclude these damages models.

21          THE COURT:  So if the Court did nothing but strike

22 their damages expert, what happens?

23          MR. LACY:  Well, they have no evidence of damages, and

24 so then there is -- they have no standing to bring their claims.

25          And this bleeds over into the injunction issue.  But

1  again, it becomes an Article III standing problem.  If you have

2  no evidence of damages, you cannot make out a claim.  Damages is

3  a *prima facie* element of each of their claims, both antitrust

4  and state law.

5          I'd also say to Your Honor that the cases we cite --

6  now we do have a *Daubert* motion pending that makes many of the

7  same arguments, and that's to be heard tomorrow, but the cases

8  that we cite, the Court grants summary judgment on these claims

9  for this very reason, because the damages model is legally

10 improper under well-established case law.

11         And the statute of limitations comes into play in a

12 second way too.  And that is, as the Court has pointed out and

13 asked Mr. Hatch multiple times, what is the new and accumulating

14 injury caused by these 2015 operational issues?  And again, the

15 same damages they claim in 2015 forward are the same damages

16 they're claiming prior to 2015.  They make no effort to

17 distinguish.

18         THE COURT:  What about CMA?

19         MR. LACY:  Pardon?

20         THE COURT:  What about CMA?

21         MR. LACY:  Your Honor, the damages model does not

22 identify the CMA contract.  It doesn't do that.  It says that

23 because we couldn't access NIT --

24         THE COURT:  So there's two levels of problems here,

25 right?  So one is what have they identified as damages and how

1    have they identified it, have they segregated it, and the other

2    is, at a higher level, is it a new accumulating -- is there

3    something new and accumulating?

4            MR. LACY:  That's right.

5            THE COURT:  Arguably had they broken it down we would

6    just be arguing about the first, the high-level issue?

7            MR. LACY:  True.  And then it would be about

8    causation, right?  Did the operational -- well, it would be is

9    there -- is this evidence of a conspiracy, an overt act, and did

10   it cause them, in fact, to lose a particular contract?  But we

11   don't have that.  We don't even get out of the gate because they

12   make no effort to segregate their damages.  And there are case

13   after case --

14           THE COURT:  Why didn't they?  Why do you think they

15   didn't?

16           MR. LACY:  Your Honor, I must admit, the Norfolk

17   Southern trial team and I don't want to speak for the Belt Line,

18   we had no idea why they came up with a damages model that starts

19   in 2009 and does not segregate out the harm.  Case law has been

20   around for years.  The bootstrapping is a well-established

21   principle of law.  It also shows, Your Honor, and the Court is

22   aware of this, that if the damage accrued in 2009, all of their

23   claims accrued in 2009, right?  All their claims are time-barred

24   on their face based on their damages model.

25           And to get to some of the Court's other questions,

1    they must rely on the continuing violation exception.  Now, we

2    cited the XY case in our papers saying it's their burden, and

3    they have cited no case -- their burden to prove the continuing

4    violation exception.

5            It is our burden to show that they're time-barred.

6    And that was easy for us, because we looked at their damages

7    model and it said oh, yeah, we've started losing profits in

8    2009.  Okay.  That's when your claims accrued.  So why aren't

9    they time-barred?  And it's their burden to show the continuing

10   exception principle applies, and they cannot do it.  And the

11   main reason they cannot do it, it goes back to the back damages

12   model, is because they have not shown what new and accumulating

13   injury was caused by any conduct within the limitations period.

14   It's more of the same.

15           You know we cite, Judge, another case from the Fifth

16   Circuit talking about the abatable but unabated natural

17   consequences of earlier acts.  And I think the Court said

18   something it that effect earlier.  That is exactly what we have

19   going on here.

20           And this isn't a situation, Your Honor -- you know,

21   this isn't a, what they call the Zenith Exception where they

22   didn't know what their damages were in 2009.  I mean they, they

23   have an expert that has calculated their damages.  That is

24   not -- they weren't beyond calculation.  I don't know why they

25   did it how they did, but they are stuck with their damages

1    model.

2            We asked in interrogatory, tell us your damages.  Tell

3    us how they're calculated.  They referred us to their expert.

4    We have the expert damages model.  It is fatal to their claims.

5    The damages model is legally improper.  And the Court picked up

6    on that time and time again with its statements.  And the case

7    law backs that up.  It's as simple as that, Your Honor.

8            Now even if you put aside the problems with the

9    damages model and look at the overt acts, purported overt acts

10   within the limitations period, again, under the continuing

11   violation theory they have to show the overt act that causes the

12   new and accumulating harm.  And I know the Court is very focused

13   on the 2015 rail moves, and of course we disagree

14   whole-heartedly with their characterization of how those rail

15   moves came to being.  We don't think there is any genuine issue

16   of material fact that there is not a single train that CSX asked

17   the Belt Line to move that the Belt Line didn't move.  And I

18   know, I know --

19            THE COURT:  But the evidence about 21 days, you're

20   saying that's not a genuine issue, that didn't create a genuine

21   issue of material fact?

22            MR. LACY:  What I would point the Court to is exactly

23   what Mr. Hatch said after conferring with Mr. McFarland:  NIT

24   was a mess in 2015.  A mess.  This is not a two-party or even a

25   three-party operation here.  It's not just CSX, Norfolk Southern

1  and the Belt Line.  You've got the port.  The meltdown was at

2  the port.  That's why even under their own pleadings they said

3  the port was so congested we had no choice but to use the Belt

4  Line.  Well, that's not true.  I mean, the port congestion is

5  true.  They always have a choice to use the Belt Line, but you

6  can't ignore the congestion at the port to suggest, you know,

7  it's our fault, solely our fault, that -- or our fault at all --

8  that their trains sat there for 21 days.

9        And I think a close reading of the deposition

10 testimony that we cite shows, even from Mr. MacDonald, I think

11 he uses the phrase "it was melting down."  The port was melting

12 down.

13       So again, even -- but you don't have to necessarily

14 decide that fact because they have not shown what damages, new

15 and accumulating damages, damages over and above the damages

16 that were caused -- the same lost profit damages that were

17 caused by the setting of the rate, or the rejection -- or the

18 purported rejection of the 2008 rate proposal, all of that

19 time-barred conduct for which they can claim no damage.

20       I'd also point out -- and I know Mr. Snow will have

21 something to say about this -- their issue with the 2015 train

22 moves appears to be just with Norfolk Southern.  Now, they claim

23 that Mr. Moss emailed Mr. Luebbers about their train movements

24 as if that was some state secret.  Your Honor, they're moving

25 the trains on our track.  It was not a state secret that they

1    were -- the Belt Line was operating on our track.

2              I'd also say with respect to the proprietary issues --

3    and I think the Court picked up on this -- it is a single track.

4    It is a very difficult move because the Belt Line can only go in

5    counter clockwise and then has to come back out.  It can't make

6    the loop.  Which is why, Your Honor, when they sent in their

7    2018 rate proposal --

8              THE COURT:  Why is that?  Why did the original

9    agreement not include the trackage rights for NPBL?  Was that

10   portion constructed later?  Was it not there?  Was it -- do you

11   know?  I'm just curious.

12             MR. LACY:  I don't know, Your Honor, so I don't want

13   to speculate, but I do want to get back to the trackage rights

14   agreement, but let me finish this thought first.

15             Your Honor, this is not -- as I said, this is not an

16   easy move.  There are obviously many operational issues that

17   have to be dealt with, which is why, with respect to each of

18   their rate proposals -- neither of which were rejected by the

19   Belt Line Board because there was no vote on either -- but both

20   proposals included operations plans, right?  There are proposed

21   operations plans.  And in response to the 2010 proposal, we

22   actually gave them an operations plan.  And it is not

23   coincidental that the operating window we gave them in response

24   to their 2010 proposal is the very operational window they used

25   in 2015.  I mean, it's just -- you know, again --

1          THE COURT:  Didn't add up to 50 percent, did it?

2          MR. LACY:  What's that?

3          THE COURT:  It didn't add up to 50 percent though.

4          MR. LACY:  No.  But the only way it gets to 50 percent

5    is if CSX uses the Belt Line, otherwise the Belt Line has no

6    reason to use our track.  We can't be hoisted on our own petard

7    because they don't use the Belt Line.  That doesn't work.

8          So Your Honor, the other thing I wanted to make clear

9    because Mr. Hatch mentioned it and it's in their brief, they

10   know they have a damages model problem caused by or created by

11   statute of limitations, which is why they pivoted in their brief

12   and said, well, we paid this exorbitant rate in 2015 and that's

13   good enough.

14         A couple things:  We now know that the rate is based

15   on the Belt Line's costs and is not exorbitant or excessive.

16   But putting that aside, that's not what their model reflects.

17   This is not a situation where you have a customer buying a

18   product at a supercompetitive price because of a monopoly.

19   Their damages model is based on a rival being shut out of a

20   market.  Foreclosure, lost profit damage.  Their model does not

21   seek to recover the $2,000 or whatever it is they paid to the

22   Belt Line to move those trains in 2015.  They cannot switch

23   their damages theory to avoid the statute of limitations.  This

24   is way too late in the ball game, way too late in the ball game.

25   That is not the theory they presented to us throughout this

```
 1  case.  It is not the theory that their expert opines on.  Their

 2  expert seeks or opines on lost profits damages, not prices paid.

 3           THE COURT:  All right.  I think I've -- go on.

 4           MR. LACY:  I did want to briefly address the 2018

 5  proposals, and I think the Court's comments aptly summed up the

 6  legal scenario there.

 7           The Belt Line Board was not asked and did not vote on

 8  the rate proposal in 2018.  That is admitted.  Mr. Hatch

 9  conceded that.

10           THE COURT:  Mr. Hatch said it was an overt act just

11  with the shareholder vote and it was an overt act when they

12  asked for it to be sent to the rate committee.  Didn't he say

13  that?

14           MR. LACY:  Your Honor, they didn't want a rate

15  committee.  The evidence in the record shows two things:  One,

16  the first sentence of their rate proposal says we want the Belt

17  Line management to approve or agree to this rate proposal.  Now,

18  it goes on to say if you want to have a rate committee we're

19  okay with that.  You can -- the proposal says that.

20           Now, what CSX ended up saying is we wanted a rate

21  committee of neutral individuals, just like they said they

22  wanted the Board of the Belt Line to be reconstituted, contrary

23  to the supplemental agreement that they agreed to, that CSX

24  agreed to in 1987.  And we have no obligation, under law or

25  otherwise, not to be able to rely on that agreement that the
```

69

1   parties followed for 30 years.  There is -- that is not an overt
2   act.
3           THE COURT:  Why is the distinction between -- in
4   evaluating whether or not an overt act took place in 2018, why
5   is it significant in the analysis to distinguish between the
6   shareholder vote by the shareholders versus absence of a motion
7   before the Board?
8           MR. LACY:  So of course with respect to the absence of
9   a motion or a vote shows that there's no overt act, period.
10  Okay?  But the distinction between Norfolk Southern acting as a
11  shareholder --
12          THE COURT:  No vote by the Board, you mean?
13          MR. LACY:  Yes, by the Board.
14          THE COURT:  So why wasn't the vote taken by the
15  shareholder's overt action?
16          MR. LACY:  Because Norfolk Southern as the shareholder
17  had the absolute legal right to vote down the corporate
18  governance proposal that sought to reconstitute the board of the
19  Belt Line in a manner that was wholly inconsistent with the
20  supplemental agreement that amended the operating agreement to
21  which CSX specifically agreed to and to which the parties had
22  operated under for over 30 years.
23          It is -- they cite no case law whatsoever that
24  suggests that it is incumbent upon any shareholder to act
25  inconsistently with the governing documents.

```
 1              THE COURT:  Okay.  Got it.
 2              MR. LACY:  Your Honor, give me a moment.  I did want
 3    to consult my -- I was feverishly --
 4              THE COURT:  Do you have any cases on that?  What's
 5    your best case on that point?
 6              MR. LACY:  Yes, it is -- I would suggest it's the -- I
 7    think it's the Ames case we cited which is really just the
 8    prospect that it is not illegal or improper to enforce a
 9    contractual right.  It's as simple as that.
10              THE COURT:  In the monopoly context?
11              MR. LACY:  In the monopoly context or otherwise.
12    Again, I would put it or say the inverse:  CSX has offered the
13    Court no case that suggests that contractual rights -- or
14    corporate governance needs to be disregarded in this context.
15              I would also say Your Honor it smacks of estoppel.  I
16    mean, they agreed to the Board composition.
17              Your Honor, you also asked about what damages -- with
18    respect to the state law claims, what damages would be
19    attributable to any breach of contract.  Again, they have this
20    single unitary damages theory that is their damages calculations
21    for every single one of their claims.  And the same
22    anti-bootstrapping principle applies equally with respect to
23    their state law claims:  Just as if -- or just as a plaintiff
24    can't come into this court seeking damages for and
25    out-of-limitations-period breach of contract, they cannot seek
```

1   damages for out-of-limitations-period damages.

2            THE COURT:  Do I have the discretion to allow them at

3   this point in the litigation to amend their expert report in

4   order to segregate?

5            MR. LACY:  No.  I would submit to the Court absolutely

6   not.  Your Honor, this case has been pending for three years.

7            THE COURT:  I asked you whether I had the discretion,

8   not whether I should.

9            MR. LACY:  Yeah, I understand.  Your Honor, discovery

10  has closed.  I, I, I can't say that I'm aware of any rule or

11  case that explicitly says that that would grant the Court the

12  discretion to do so.  But of course our position is it should

13  not, CSX should not be given an opportunity.  This case has been

14  pending for over three years.  These limitations issues, Your

15  Honor, have been front and center in this case since the moment

16  it was filed.  We raised it on the motion to dismiss.  The Belt

17  Line raised it on the motion to dismiss.

18           THE COURT:  When was your settlement conference?  When

19  was your last settlement conference in this case?

20           MR. LACY:  The spring of 2021.  The spring of 2021.

21           THE COURT:  Any ongoing discussions?

22           MR. LACY:  Your Honor, I can represent to the Court

23  that I believe the parties have made very extensive efforts to

24  try to settle, but unfortunately at the moment we're at an

25  impasse.

1          THE COURT:  And you don't think I should allow them to

2    amend their expert report?

3          MR. LACY:  Oh, no.  No, Your Honor.  We've set up our

4    entire case around this expert report.

5          THE COURT:  But more than that, you say even if I were

6    to allow them to do it and there was a segregation of damages

7    based on exclusion in, for example, 2015, that it doesn't

8    satisfy the case law standard because it overlaps with the

9    exclusion by rates?

10          MR. LACY:  That is absolutely right, Your Honor.  The

11   statute of limitations is fatal to CSX's claim in two ways:  The

12   damages model is foreclosed by the law, and they have not and

13   cannot meet their burden of proof of showing an overt act within

14   the limitations period that causes damage above and beyond the

15   damage caused outside of the limitations period.  Or the damages

16   caused by conduct taken outside the limitations period.

17          THE COURT:  Okay.  Have you addressed all of those

18   issues that were in your bailiwick?

19          MR. LACY:  I have.  Unless the Court has questions.

20          THE COURT:  No.  I think I've asked you everything

21   that I have.

22          MR. LACY:  All right.  Thank you, Your Honor.

23          THE COURT:  Thank you, Mr. Lacy.

24          Mr. Snow?

25          MR. SNOW:  May it please the Court, Your Honor.  Ryan

1  Snow on behalf of Norfolk & Portsmouth Belt Line Railroad

2  Company.  I should first say it's a pleasure to be here in

3  person.

4           THE COURT:  Not a lot of in-person hearings these

5  days, are there?

6           MR. SNOW:  There aren't, Your Honor.  There really

7  aren't.

8           If you'll indulge me, I'll put a fine point on a

9  couple of things and hopefully answer Your Honor's questions in

10 the process, but I don't intend to reiterate everything in our

11 brief.

12          Those things are, One, they can't show concerted

13 action for their conspiracy, which touches on a number of the

14 questions you asked.

15          Two, they can't show harm from any act within the

16 statute of limitations.  And I won't repeat what you all have

17 said, but I may add some thoughts to that.

18          And actually three, I think it's a very important

19 point in the discussion here:  They can't challenge the Belt

20 Line's rate because they don't dispute our operating costs.  And

21 I'll explain that.

22          But if the Court will, and I'll start with an

23 observation, and that is that the scenario that the Court

24 learned about in the complaint is very different from the

25 reality that has been borne out in discovery.  And I will show

1    Your Honor just a few examples so you'll understand what I mean,

2    because they lead directly to CSX's failures in its ability to

3    establish its claims here.

4          And I wonder if the court could put our laptop on the

5    screen and make sure that works?

6          Your Honor, is our screen showing on your screen?

7          THE COURT:  I see it.

8          MR. SNOW:  Very good.  I'll refer the Court to the

9    complaint, Paragraph 40, because this relates directly to a lot

10   of Mr. Hatch's comments.  It related to the, what I will

11   eventually call a house of cards that they built on this

12   conspiracy.

13         In Paragraph 40 the complaint alleged two things.  One

14   is that when the Belt Line received the 2018 rate proposal from

15   CSX, it didn't even consider it, much less respond substantively

16   to it.

17         And then they further say the individual

18   defendants, one of those was our president, Cannon Moss, refused

19   to even form an independent committee to evaluate it or allow a

20   formal vote and thus effectively rejected it.  I'll refer the

21   Court to an email from Mr. Moss dated April 5th, 2018.  This is

22   days after CSX sent the Belt Line the 2018 proposal.  Days

23   after.  And it's sent to Tony DiDeo at CSX, the very person who

24   sent us the proposal.  Keep in mind, CSX --

25         THE COURT:  Anything you're referencing is in the

```
 1    papers, I take it?

 2              MR. SNOW:  Yes.

 3              THE COURT:  As exhibits?

 4              MR. SNOW:  This is all within the evidence, yes, Your

 5    Honor.

 6              THE COURT:  That's before the Court?

 7              MR. SNOW:  I believe so.  Although I don't have the

 8    exhibit reference.  I know you'll ask me.

 9              But the point is, in the response he says "Tony, thank

10    you for taking time to talk with me."  So he's talked with him.

11    He's met with VIT.  He says "The operating plan outlined in the

12    2010 letter gives us a good starting point for the operation."

13              He says "If we formulated a similar plan, two crews

14    would be required.  Interchange would be at Berkeley Yard.

15    Starting maximum length of the train would be 4,000 feet.  We'd

16    require two locomotives.  Belt Line would need to hire nine

17    additional employees."  And at the bottom, "Belt Line Management

18    has reviewed the proposed rate and would recommend to the Board

19    for a rate committee to do a complete review of the tariff,"

20    which is exactly what CSX was asking.

21              This is exactly the opposite of what they told the

22    Court in the complaint that we did not respond to that proposal.

23              And I'll show Your Honor, Mr. Moss did exactly what he

24    said.  This is their admission.  17.  "Admit that at the NPBL

25    Board of Directors meeting on April 18, 2018, NPBL president
```

1  Cannon Moss" -- one of the individuals that they said never

2  pursued the rate committee -- "recommended the appointment of a

3  rate committee.  Admitted."

4          And of course Your Honor, it's undisputed that they

5  did not move for appointment of that committee.

6          So Cannon Moss, the Belt Line that they say is

7  conspiring against them, actually moved for the thing they

8  wanted and their people did not.

9          They also didn't move to accept that rate proposal.

10 That is undisputed.

11         And it's undisputed, I think, that there was no actual

12 rejection of the rate proposal dispute, what they said in the

13 complaint.

14         Now, they had also said there was a conspiracy because

15 all of our presidents came from NS.  Mr. Hatch repeated that

16 today.  I would show Your Honor, we asked them admissions on

17 this too going back to 1990.  "Admit that Dennis Walker" -- he

18 is the oldest one in the story -- "was unanimously elected from

19 1990 through 2005 and each year gets unanimously elected.

20 Response, Admitted."

21         The next president was David Gooden.  "Admit that he

22 was unanimously elected in 2005 and again, 2006, 2007 and 2008.

23 Admitted."

24         And now we're right into the time period that we've

25 all been talking about.

```
1              "Admit that the Board of Directors unanimously elected
2    David Stinson as president in 2008.  Again, 2009, '10 and '11."
3    It's admitted.
4              CSX's Board of Directors members appointed these
5    presidents.
6              And then there's one more, because Cannon Moss is a
7    central character in the story CSX tells.  We took the
8    admissions all the way to the year before they filed their
9    complaint.  "Admit that from 2012 through 2017" every year, "the
10   Board of Directors unanimously elected Cannon Moss as
11   president."  That is admitted.
12             And there's a carve-out to say that they abstained in
13   2011, not really requested, but they added that.
14             The point being, even though they cited that to the
15   Court as conspiratorial, turns out for 27 years straight, with
16   the exception of one abstention, they voted for these
17   presidents.  They put them in as president.
18             They had said that it was a conspiracy to use Norfolk
19   Southern locomotives, to lease those or to have email addresses
20   with nscorp.com at the end of them, but what they didn't tell
21   the Court in the complaint is that there's a service agreement
22   for that.  The Belt Line pays a fee for that.
23             And not only that, the service agreement was no secret
24   because CSX was a party to it.  The two shareholders agreed that
25   for efficiency the Belt Line could do that.  And to make sure
```

1   there's no doubt that they knew about it, that's their signature

2   on the agreement.  And yet those were alleged as conspiratorial

3   acts by the Belt Line.

4           And of course finally they had said that there was a

5   new agreement in 2018 to raise the trackage rates fee.  That

6   figured prominently in your decision on the motion to dismiss,

7   Your Honor.  We know, because of the request for admission that

8   we put in our briefing, that never happened.  That event just

9   never happened.

10          And if I can, I will add one other thing, because

11  there was discussion about the trackage rights fee in

12  Mr. Hatch's argument.  And there was an exhibit given to you, it

13  was Page 6 of CSX's submission, if you have that in front of

14  Your Honor.

15          This came up in the discussion of apparently a new

16  overt act, which is that the Belt Line and NS, in CSX's view,

17  pretextually created a dispute about the trackage rights and the

18  timing is a coincidence because it was -- or may be not a

19  coincidence -- because the timing was purposeful according to

20  CSX because it happened to coincide with right when they felt

21  like they were being pushed out of NIT.  And what was said was,

22  at the STB, NS wants seventy dollars for a trackage rights fee

23  per car.  That's correct; the Belt Line wants 30, that's

24  correct; but that under the 1917 agreement based on this

25  exhibit, it was just eight dollars a car.  So we're both way

1   over that.  Well, this is cut off, this testimony.

2           If you look at the full testimony, the eight dollars

3   is just a wheelage fee under this agreement.  The full testimony

4   from Mr. Moss is with the 1917 agreement, we were basically

5   paying eight dollars a car, but we had fixed costs built into

6   that agreement among some other joint facilities agreements

7   which are about a hundred thousand dollars worth of fixed costs

8   that would then get spread across all the cars that we ran up

9   there.  And it'll come out in the STB, but when you add up those

10  hundreds of thousands of dollars, it ends up about thirty

11  dollars a car.

12          So again, I relate these things to the Court because

13  they indicate what has been said versus what is real.  And it

14  leads directly to our complaint, my finer point, Your Honor,

15  that they cannot show concerted action by the Belt Line.

16          And I will -- it's important, I think, to understand

17  that for the state court -- there are only conspiracy claims

18  against us, the Court knows that.  There are four:  Two state

19  law and two federal law -- I mean two state law and two federal

20  law.

21          On the state conspiracy claim, they must show that by

22  clear and convincing evidence.  They must educe some facts that

23  show by clear and convincing evidence there is a conspiracy.

24          And on the antitrust counts there's a different

25  burden, it's preponderance, but there's an additional showing.

1  "The plaintiff" -- this is from the Monsanto case -- "must bring

2  forward evidence that excludes the possibility that the alleged

3  co-conspirators acted either independently or based upon a

4  legitimate business purpose."  That is their burden to bring

5  forward.  The Laurel Sand case says it's their burden as well in

6  the Fourth Circuit.  But they have to show that this conduct

7  cannot have been independent or with a legitimate business

8  purpose.

9          And we asked for all the evidence here.  Your Honor

10 has asked about our interrogatories.  If I get into a case where

11 we're accused of conspiring, I want to know how.  And so we

12 asked them, all communications, all overt acts, tell us what

13 those are.  And they didn't give it to us, frankly.  Judge

14 Leonard, on a motion to compel, had to order them to give it to

15 us.  And finally they gave us a narrative and they identified

16 the six things that we put in our brief.  And I respectfully

17 submit that those are the only six things that can be overt

18 acts, because they never supplemented that interrogatory answer,

19 and you can't supplement it in response to a motion for summary

20 judgment.  Discovery is closed.

21          The responses they gave us show that their case hinges

22 on what I call a false legal theory, which is two NS people

23 talking to each other equals Belt Line conspiracy as long as one

24 of them happened to be one of our board members or a rate

25 committee member.  And I didn't even hear Mr. Hatch talk about

81

```
 1   that today, I don't know if they concede the point, but they
 2   should, because the Virginia Supreme Court has said at least
 3   twice that that's wrong, most recently in the Monacan Hills case
 4   when it said "Directors of a corporation have authority to bind
 5   it only when they act collectively as a board.  Individual
 6   directors are not its agents, and it's well-settled, therefore,
 7   that declarations and admissions of individual directors, when
 8   not acting as a board, are not binding on the corporation" --
 9   not binding on the Belt Line" -- nor admissible as evidence
10   against it, unless they were acting at the time as its
11   authorized agents within their scope of their authority."
12            We cited that case.  They put forward no evidence that
13   there has been any grant of authority to anyone to go conspire
14   on our behalf.  And frankly there's a good reason for that Rule.
15   Because we don't control their board members.  We don't know
16   what they're doing when they're not in our board room.
17            Strip those away, and I think you're only left with
18   the 2015 moves that Your Honor asked about.  And I respectfully
19   submit that there's not even a genuine issue of fact about
20   whether the Belt Line was conspiring against CSX with those
21   moves.  There's really not an allegation.  Mr. Lacy pointed it
22   out:  This claim had never been made against us really until the
23   summary judgment briefing.  Their expert in his report says this
24   is all an NS thing.  NS blocking us.  Because it's true.  The
25   Belt Line tried to move mountains to make these things happen.
```

```
 1              And if you look at the undisputed facts, the facts
 2    that are before the Court now, the undisputed facts about the
 3    2015 moves are that Cannon Moss, the Belt Line -- and I refer to
 4    Page 10 of our opening brief with our statement of undisputed
 5    facts, that we were requested on March 27th, 2015 to move trains
 6    for CSX.  By March 31st, days later, we had come up with an
 7    operating plan, and then on April 1st we moved that train.
 8    That, in I think any objective view, is an incredibly quick
 9    turnaround on a request that even CSX admits had never been made
10    before except for one demo train for PR purposes in 2010.
11              And I know they pointed to an email from NS's
12    vice-president where he says until I know more about this, no,
13    exclamation point.  But that's not our email.  And frankly I
14    don't blame him for wanting to know more, because it hadn't been
15    done before.
16              And the Court is right to point out logistical issues
17    with this.  I think this is why it took a few days for that
18    first move, because our trackage rights are only through the
19    north end and the port goes clockwise.  South end inside, out
20    north end.  So what was being proposed --
21              THE COURT:  Do you know the answer to the question I
22    asked earlier about why you don't have trackage rights on the
23    south end?
24              MR. SNOW:  The only trackage rights we've ever been
25    given were to the north end.  So I don't know why in the
```

1  historical context we don't have those.  Maybe because we had

2  the north ones.  But that's all we've got.

3          THE COURT:  Okay.

4          MR. SNOW:  And so what we were dealing with was a

5  counterclockwise move that had not been done before except for

6  one PR instance, and we had to coordinate with not only NS

7  because we go up their tracks, but also have VIT because we're

8  going in NIT.  And again, that was all done in this span of four

9  days.  Four days we turned that around.  And in total we

10  moved -- there's a dispute about the number of trains, but it's

11  not material -- we moved multiple trains for CSX.

12          The only thing they pointed to with their 21 days that

13  stood out to me because Your Honor asked about it, that's not an

14  allegation against the Belt Line.  Their train was up at NIT.

15  But there's no allegation that it was our fault.  There's really

16  no allegation against the Belt Line at all except that Cannon

17  Moss sent an email to someone at NS named Chris Luebbers who, it

18  appears out of frustration, but did that harm anybody?  How many

19  people at NS already knew CSX wanted to make the move?  That was

20  no secret at all.  And I don't know how you get over a clear and

21  convincing hurdle or you get over a legitimate business purpose

22  hurdle for the time it took to make these moves.

23          I should say the one other email they pointed to was

24  where he said there were proprietary issues, but Your Honor saw

25  the text, I think.  He was forwarding that information

84

1  appropriate information from NS.  Again, their beef in 2015 is

2  with NS, it's not a conspiratorial act.

3        And so the only other things that have been alleged

4  are 2018, the rate, what the Belt Line did with the rate

5  proposal.  But as I showed Your Honor in the intro, the only

6  person who actually sought a rate committee to evaluate that

7  rate proposal was the Belt Line.  CSX didn't even do it.  It was

8  the Belt Line.  And I don't know how many times we can do those

9  things and it's all assumed to be pretext.  But that was the

10  only other thing they have mentioned.

11        And of course the 2018 increase in the trackage rights

12  fee we know didn't happen at all.

13        I should mention one thing about the new act of

14  apparently going to the STB on pretext because we had a dispute

15  about the trackage rights agreement, that was a 99-year

16  agreement.  It ended, and it happened to end in 2016.  When they

17  say the timing of that indicates foul play or conspiratorial

18  conduct, the conspiratorial conduct would have to go back 99

19  years, because that's what the agreement said, it was 99 years

20  long.  NS didn't renew it.  We're at the STB, and I honestly

21  don't know how we can be faulted for going to the one venue that

22  has jurisdiction over this that we can't control.  They're going

23  to do what they believe is the right thing.

24        But that was not identified in the interrogatory

25  answers.  They don't identify any new harm associated with that.

 1    Not any more than they identify new harm associated with the

 2    2015 blockage.  And so they're missing, Your Honor, an essential

 3    element of all of their claims against us, which is concerted

 4    action.

 5          I think your discussion with Mr. Lacy covered the

 6    waterfront on the statute of limitations and the damages.  If I

 7    may, though, I will point out just a couple of things about

 8    that.

 9          There is no dispute here that the damages model CSX

10    has constructed includes acts from outside the limitations and

11    acts from inside the limitations period.  There's no dispute

12    about that.  And I would point the Court to Page 49 of their

13    opposition brief where they say, and I'll quote -- and they're

14    talking about the acts within their damage claim "Most of these

15    occurred in years after 2013 within the limitations period."

16          Well, to me that makes the problem obvious.  The

17    conflict with Klehr obvious.  Is it 90 percent were within the

18    statute of limitations period?  Is it five percent?

19    28.3 percent?  Nobody knows.  I don't know, you don't know, the

20    jury won't know.  And so the jury is left only to speculate, and

21    it's a problem of their own making.  It's a problem of their own

22    making.

23          I will, if I may I, in addition, point Your Honor to

24    one part of the Klehr case that I think is significant to this

25    case, and that's on Page 190.  And I pulled it up on the screen,

```
 1   if Your Honor has that still available.  But this comes right
 2   after the Supreme Court has said the plaintiff cannot use an
 3   independent new predicate act as a bootstrap to recover for
 4   injuries caused by other earlier predicate acts that took place
 5   outside the limitations period.
 6          The court goes on in the section I've presented to
 7   Your Honor, "Thus, Klehr may point to new predicate acts that
 8   took place after August 1989."  Just like here.  CSX may point
 9   to new predicate acts.  "But that fact does not help them, for
10   as the Court of Appeals pointed out, they have not shown how any
11   new act would have caused them harm over and above the harm that
12   the earlier acts caused."
13          This, to me, is an explicit rejection of the damages
14   model that CSX has presented in this case because they have not
15   shown any harm, "over and above" the harm they identified
16   originally, and their expert doesn't even try to.
17          THE COURT:  So Mr. Hatch posited that's an
18   intellectually unsatisfying proposition in the antitrust
19   context; that it can't be -- if I understood his argument
20   correctly -- that someone can just go on and on and on engaging
21   in antitrust violations and there being no remedy.  I think
22   that's what I heard.  How do you interpret that?
23          MR. SNOW:  Certainly, Your Honor.  I think there would
24   be a remedy.  If you can identify -- you can't just identify an
25   overt act.  The case law is clear, the overt act must also cause
```

1  some injury that's over and above your other injury within the

2  statute of limitations.  But if you could do that then you would

3  have a claim.  They can't do that here.  They haven't done it.

4  And it's the model they have created.  So...

5          THE COURT:  But if the damage being alleged is an

6  exclusion from the market and it goes on for 20 years, they're

7  just, they're out of luck if they don't do something in the

8  first four years, you're saying?

9          MR. SNOW:  I don't think they're out of luck if they

10 can identify some new overt act.  But if, if -- the case law is

11 pretty clear on that point, that if -- for example, in our case,

12 if CSX had identified their exclusion from NIT in 2009, which we

13 show they did, yes, they did have to sue within four years,

14 unless they could show later on an overt act that -- not just an

15 overt act, but it has to be an overt act in furtherance of the

16 conspiracy -- that leads to new damages over and above the ones

17 they were already suffering.

18         THE COURT:  What would that be?  Give me an example.

19         MR. SNOW:  Well, for example, if they had indicated

20 any kind of damages from this 2015 move that was different from

21 the exclusion that they already felt.  And there are no damages

22 that they've identified.  There's no new story here.

23         THE COURT:  Well, I don't think Mr. Lacy would agree

24 with you on that, but we'll find out.  I think he would say you

25 can't identify any new damages because they're overlapping.

```
 1              MR. SNOW:  That's true.  That's true.  And I agree

 2    with that point.

 3              THE COURT:  Okay.  I was asking you about could be --

 4    it's not a fair question.

 5              MR. SNOW:  Yeah, might have misunderstood Your Honor.

 6         The point would be that the new damages have to be

 7    over and above the damages that already exist, and that's just

 8    not what was done here.  And again, I didn't build the model, I

 9    understand the Court's predicament and the like, but they built

10    the model.  They chose to do this.  And I think frankly it gave

11    them a really big number.  Gave them a really big number.  But

12    it doesn't stand up under the case law.  I don't think it gets

13    to the Belt Line in any event, because they can't show the

14    concerted action.  But I wanted to offer this piece of the Klehr

15    case because I think it assists the Court.

16         The state law claims, I think, are much easier.  Those

17    survive because of that 2018 increase in the trackage rates.  We

18    know that didn't happen now.  Under Virginia state law, the

19    overt act that triggers the statute of limitations is the first

20    overt act.  They cited the Blackwelder case that changes that,

21    but it was a unique case on its fact because the conspiracy

22    could only harm you after it was completed.  It was a sale of

23    land.  The sale had to be completed.  But the general rule under

24    the Detrick case, that's Fourth Circuit 108 F.3d 529 that we

25    cite, as it runs from the first act, and we know, just like the
```

1   Court recited on the motions to dismiss, that but for that 2018

2   new act, there is no new damage from anything to bring the state

3   law claims back to life.

4          The final point I will make, Your Honor, is this point

5   about our rate.  No one else has talked about it.  But our

6   operating costs are what they are.  There is no dispute about

7   our operating costs.  CSX doesn't dispute it.  Their expert

8   doesn't dispute it.  He took the costs for what they are.  And

9   for their restraint of trade claim, for their overt act claim

10  and for their state law conspiracy claims, this justification,

11  on the federal ones it's a pro-competitive justification.  It

12  overcomes all of those claims.

13         On the state law, it prevents us from having committed

14  any unlawful act because it's a reasonable rate.  And so that's

15  why I point it out, because it's dispositive of all their

16  claims, and they don't dispute our costs.  And when you look at

17  our costs over the years, we put in our brief it's about $220 a

18  car.  Well, our rate is $210 a car.  And the Laurel Sand case

19  helps on this point, says the rate set at cost are reasonable.

20  That is our rate.

21         The only way they seem to try to even avoid it is by

22  saying that, Judge, you should look at incremental costs of just

23  this one move.  But there's no case law that supports that, that

24  we can see.  And I don't think they have provided you any.  And

25  of course what that would do, if incremental costs were the

1   answer, it means that we would have to ignore overhead, ignore

2   capital improvements, ignore track maintenance, all these costs

3   that go into our operations, we'd ignore them for CSX for this

4   move and lower our rate.  And the result, of course, would be

5   that parties that are not before Your Honor, our other

6   customers, they would bear the brunt of our overhead costs

7   because we're giving CSX a special rate.  That, I think, does

8   not stand up under the law.

9           THE COURT:  Who are your other customers?

10          MR. SNOW:  Customers like Purdue Grain, for example, a

11  substantial customer, would be essentially subsidizing CSX's

12  moves, its intermodal moves up to NIT.

13          I feel like I should clarify, because you asked who

14  are our other customers.  A customer like Purdue Grain pays our

15  rate, they actually pay it to Norfolk Southern or CSX.  Our line

16  haul switching rate is built into that fee.  So all of those

17  customers that pay our line haul switching rate that's built

18  into that fee, they would be covering our overhead, which is

19  what our line haul switching rate is designed to do.  CSX would

20  not.

21          THE COURT:  But who is using your line?  Who are the

22  people using your line?  The entities that use the NPBL tracks?

23          MR. SNOW:  It's a series of customers along the

24  rivers.

25          THE COURT:  No, I mean the rail lines.  The railroads.

91

```
 1              MR. SNOW:  The railroads that use us are CSX and
 2  Norfolk Southern.
 3              THE COURT:  Just those?
 4              MR. SNOW:  There's occasionally a Buckingham Branch
 5  Line.  But I mean, if we're talking about the vast bulk of it,
 6  it's those two railroads.  And so what would happen is our
 7  operations, the operations we conduct now, would subsidize this
 8  new intermodal move up to NIT if we had to give a rate that was
 9  different, lower, than the rate for all our other operations.
10  And that's why our operations costs being undisputed are so
11  important, because there's no case law that supports looking at
12  something else that I'm aware of.  And if that's undisputed, we
13  have a pro-competitive justification that undermines the
14  antitrust claim against you, regardless of the statute of
15  limitations, regardless of the concerted action.  And we also
16  have a justification that prevents the state law conspiracy
17  claims.
18              I hope I explained that correctly.  Or in a way that
19  answered your questions.
20              You asked a few questions, and you may have all the
21  answers, Your Honor, and just tell me to move on, Mr. Snow, if
22  you do, but you asked who has the burden of proof on this
23  statute of limitations.  I submit that the answer is CSX,
24  because they must prove damages within the statutory window,
25  statute of limitations of window.  And that's really the issue
```

1   that we're pining out.  They're missing that element of their

2   claim.  It's their burden to prove it and to show it to Your

3   Honor.

4            You asked about the Belt Line's participation in 2015.

5   I think I have discussed that, Your Honor.  I think there really

6   is no claim against the Belt Line in 2015.

7            You asked about fiduciary duty claims to support the

8   state law claims if the 2018 act is out.  I think statute of

9   limitations is going to bar that.  That statute of limitations

10  is two years.  So if the 2018 acts are out, there will be no

11  state law claims.

12           And then you asked about the definition of the

13  relevant market, and I will defer to Ms. Reinhart on that.

14           There was a question about injunctive relief.  I don't

15  think injunctive relief is available if they don't have that

16  damages element of their claim.  I think they haven't satisfied

17  all the elements of the claim, and so I would submit that if

18  you're missing that element you don't get some other form of

19  relief.

20           If I have left anything out, Your Honor, please let me

21  know.  I want to make sure I can answer all your questions.

22  Otherwise, that's all I have.

23           THE COURT:  All right.  Thank you, Mr. Snow.

24           It's one o'clock, Counsel, and we're not near the end,

25  and so we're going to take a break.  Why don't we come back here

1    at 1:40.  It's one o'clock now.  We'll come back at 1:40 and

2    I'll hear more from you all.  Thank you.

3              (Recess taken from 1:00 p.m. to 1:48 p.m.)

4              THE COURT:  Okay.  Who is next?

5              MS. REINHART:  Good afternoon, Your Honor.  May it

6    please the Court, I'm Tara Reinhart for Norfolk Southern.

7              THE COURT:  Good to have you.

8              MS. REINHART:  It's a blessing and a curse to be going

9    at this stage of the hearing Your Honor.  I've heard so much.

10   But there needs to be clarity brought to everything from start

11   to finish, in my view, because this is about antitrust

12   allegations and foreclosure.

13             THE COURT:  Is that your specialty?

14             MS. REINHART:  It is, Your Honor.  I am an antitrust

15   lawyer.  I have been for more than two decades.

16             THE COURT:  Okay.

17             MS. REINHART:  Okay.  So I'm going to answer all three

18   of your final questions.

19             Your first question was why isn't the definition of

20   relevant market a question for the jury given the disputed

21   facts.  And Your Honor helpfully provided examples of drayage,

22   ports, trucks, competition, pretty much nailed the question

23   about relevant market.  I'm going to answer that question by

24   also probably touching on the second question as well, which is,

25   is there real a need for CSX to amend its complaint on relevant

94

 1   market to be able to go forward.

 2           I think Mr. Hatch answered that question basically,

 3   and I apologize to Mr. Hatch if I get this wrong -- but he

 4   basically said it's complicated so it should go to a jury.  The

 5   defendants are on notice, so no harm, no foul, and the expert

 6   has calculated damages on both of the relevant markets that have

 7   been offered up, and so there's nothing new that needs to be

 8   done.  And respectfully I completely disagree with that.

 9           We need to address these questions in the context of

10   what CSX has alleged in the complaint.  How that theory of harm

11   has changed with the advent of its expert, Professor Marvel, the

12   market realities that are presented here, and how this entire

13   marketplace works, and then of course the antitrust principles.

14           And I will say at the outset in terms of market

15   realities, Your Honor said the damages that are alleged by CSX

16   are for the exclusion from the market which went on for 20

17   years.  Now, this marketplace is not static.  It has not been

18   static for 20 years.  Things change all the time.  That's going

19   to be important when it comes to damages.  And there is a

20   *Daubert* motion that's going to be argued tomorrow, and so I

21   don't want to get too deep into that, but I can say that the

22   methodology that has been offered up, which is the only evidence

23   being offered for causation and damages, is woefully inadequate

24   not only just to address their alternative theories of harm --

25   which one are they putting up, which one are they not putting

1   up? -- but also just to test whether Norfolk Southern's conduct,

2   and the Belt Line by extension, harmed competition.  And that

3   takes us to the antitrust principles.

4          The laws are intended to protect competition, not

5   competitors.  As a general matter, Norfolk Southern does not

6   have an obligation to help out CSX or to open up its tracks to

7   CSX.  When antitrust is looking at whether there is a monopolist

8   or market player who has market power and what they're doing in

9   the marketplace, antitrust is looking at what choices did the

10  customers have?  The consumers?  We have two different markets

11  being alleged, one where the consumers are the ocean carriers

12  and one where it appears that CSX is the consumer, and we'll get

13  to that, but it's the ocean carriers that are at issue in this

14  case here in terms of what were the harms.  If you cannot define

15  a relevant market that shows us whether Norfolk Southern's

16  conduct was anti-competitive and harmed ocean carriers, meaning

17  harmed competition, then this case can't go to a jury.

18         Now, I said already this marketplace is not static.

19  CSX has alleged that this conduct went on for 20 years, but

20  today CSX's output at NIT, which is the nexus of one of their

21  relevant markets, is 10 times larger than it was in 2009.  Ten

22  times, Your Honor.  They have grown.  They have grown their

23  share in the face of this alleged conduct.

24         And as to the port, the Hampton Roads Ports, so that's

25  the nexus of their alleged relevant market, they have grown even

1   more.  They have grown 12 times what they were over 20 years.

2   How can it be that there is a monopolist playing in either of

3   those markets when CSX has thrived?

4          Now, I understand their argument is that CSX did not

5   do as well as they wanted to do or thought they should do, but

6   that's not the question that antitrust answers.  The question

7   is, did a player with market power act in an anti-competitive

8   way such that CSX was foreclosed?  And that is word that's been

9   used a lot today.  One of the reasons that we focus on relevant

10  market is because what is actually vigorous competition can

11  often be mistaken as anti-competitive conduct.  You can't tell

12  the difference.

13         And here there is a lot of chuckling about some 2015

14  emails where someone is saying, hey, I'm not providing them a

15  window until.  Well, is that anti-competitive or is that just

16  people doing their business?

17         What we know is that in 2015 nobody stopped the trains

18  from running.  There's not any evidence that CSX was prevented

19  from running any train that it asked to run.  That's not in

20  dispute.

21         These other documents, these emails that have been

22  displayed *ad nauseam*, a lot of them are subject to motions *in*

23  *limine*, and it's not clear that they would ever see the light of

24  day.  But we have to remember to look, distinguish between what

25  is said in an email and what actually happened.  It's just a

```
1   reminder here.
2          Now, as I said, the conduct has to be assessed from
3   the perspective of the consumers, and in this marketplace, that
4   is the ocean carriers.  There's lots of case law on that.  And
5   that's why the plaintiffs have to prove both the harm to
6   competition in addition to injury and damages to itself.
7          Two different things:  Just by defining a market where
8   CSX is the consumer, CSX cannot avoid showing harm to
9   competition otherwise.  It cannot be done.  And we'll get to
10  that when I talk a little bit about the essential facilities
11  doctrine.
12          THE COURT:  Can I ask you something about that?
13          MS. REINHART:  Yes.
14          THE COURT:  When we're looking at this statute of
15  limitations question and the requirement that there's an overt
16  act with new and accumulating damages, I think is the wording,
17  how does your argument about the conduct being viewed from the
18  perspective of the ocean carrier play into that question?  Or is
19  that apples and oranges?
20          MS. REINHART:  So the overt act discussion is looking
21  at the conduct of alleged conspirators, correct?  And the overt
22  acts that have been alleged here all have to do with CSX being
23  blocked.  The economic evidence really is what shows harm to
24  competition, and under the test, that economic evidence also has
25  to meet statute of limitations requirements.  In other words,
```

```
 1   again, we couldn't base harm to competition on what happened in
 2   2009.  I hope that answers the Court's question.
 3            THE COURT:  All right.
 4            MS. REINHART:  So when looking at how to define the
 5   market we look at what the consumers' choices are, what choices
 6   did the ocean carriers have to get their cargo where it needed
 7   to go.  This is, again, a very dynamic market.  Your Honor,
 8   you've seen the briefing, you've read all the papers.  That's
 9   quite clear.  These ocean carriers come from all over the world,
10   they berth in ports all along the East Coast, Canada, West
11   Coast, and they move their products, their cargo containers from
12   those ports to inland destinations, and then cargo containers
13   come back out from inland destinations to the ports to be
14   exported.
15            And so ocean carriers need to know, what options do
16   they have?  The question that economics asks is if one of the
17   market players who serves those ocean carriers raised its price
18   by, say, five to 10 percent, and the ocean carrier wanted to
19   move away from them, say, Norfolk Southern wanted to move away
20   from Norfolk Southern, where would they go?  And that's really
21   what has to be answered to define the relevant market.
22            There are two aspects to this:  Geographic and
23   product.  And CSX's definition of the market, no matter which
24   one you look at, is deficient and cannot be cured and cannot go
25   to a jury for a couple reasons.
```

1          One, on the geographic side, Your Honor, in the

2   complaint they define the market as freight transportation by

3   rail in and out of the Hampton Roads ports.  That's Paragraph 50

4   of their complaint, and I'm quoting it.  So in and out of the

5   Hampton Roads ports.  Where is the cargo going?  Is it going to

6   Richmond?  Washington, D.C.?  Chicago?  Maybe all of those

7   places, maybe a lot more places.  They don't define the origin

8   and the destination.  They simply say to and from Hampton Roads.

9          That market definition, the way they set it up, allows

10  them to avoid the question that can be answered with dispositive

11  facts right now what options do ocean carriers have?  If the

12  question is, ah, we're going to inland destinations, well, maybe

13  you have different options if you're going to Richmond than you

14  do if you're going to Chicago.

15         There is no dispute, no dispute, Your Honor, that for

16  some length of haul from Hampton Roads, inland trucks dominate.

17  It doesn't mean the railroads didn't also carry the freight, but

18  trucks dominate.  There's public data, it's in our record, from

19  the port.  Like 60-plus percent of the cargo carriers that are

20  moved through Hampton Roads go on trucks, not railroads.  And so

21  railroads have a hard time competing.  But that doesn't mean

22  they couldn't compete if the ocean carriers want to use them.

23         So for these shorter hauls, it doesn't matter where

24  the mileage cutoff is for purposes of this argument, it's just

25  some length of haul.  Maybe up to 500 miles.  We have cites in

1   the record to CSX testimony that says, ah, 200 miles, ah, 300,

2   500.  Doesn't matter.

3           THE COURT:  Well, how specific would CSX have had to

4   have been in the complaint?

5           MS. REINHART:  They would have had to define a market

6   that allows us to identify what the options are, and they didn't

7   do that.  They could have said --

8           THE COURT:  For example?

9           MS. REINHART:  So let's say Richmond.  What's the

10  options for between here and Richmond?  Trucks.  First and

11  foremost.  In fact, they probably do the bulk of it.  But the

12  railroads are part of that market too.

13          THE COURT:  But aren't there so many -- aren't there

14  so many potential destinations that there has to be some

15  generality?

16          MS. REINHART:  Sure.  They could have defined it the

17  way the routes are allowed with the contracts with the ocean

18  carriers.  That's less specific than I'm being in our

19  back-and-forth here, but it's a heck of a lot more specific than

20  their actual complaint, because they don't attempt, they don't

21  attempt to identify destinations.  They want to be able to say

22  trucks can't compete because they can't go to Chicago, ports

23  can't compete because they don't go to Richmond.

24          Now, the reality is, for the long hauls, Chicago,

25  Detroit, some of the other places in Ohio where you're getting

1   on to 600 miles, a thousand miles, what is very clear in the

2   record and not disputed, is that an ocean carrier will move,

3   move ports, it will move from Hampton Roads to New York in

4   particular if it doesn't like the service or the rates that it's

5   getting from either of the railroads out of Hampton Roads.  The

6   record is very clear.

7           THE COURT:  All right.  So you're telling me that

8   there's a deficiency --

9           MS. REINHART:  Yes.

10          THE COURT:  -- and you've pointed to the complaint so

11  far.  Is there more in the discovery about the market that

12  potentially remedies the deficiencies you're pointing to?

13          MS. REINHART:  That potentially remedies the

14  deficiency?

15          THE COURT:  Hm-hmm.

16          MS. REINHART:  No, Your Honor.

17          THE COURT:  Let's Say it can't remedy it.  Let's say

18  it can't remedy it:  Is what is stated in the discovery, had it

19  been in the complaint, sufficient?

20          MS. REINHART:  No, Your Honor.  They didn't attempt to

21  define a market properly.  That's just the bottom line.  If they

22  had attempted to define it properly we wouldn't be here now.

23  There would be no case.

24          One cannot look at this entire industry and say okay,

25  Norfolk Southern has a monopoly out of Hampton Roads.  You can't

1    say that.

2            THE COURT:  Why?

3            MS. REINHART:  Why?  Because, because market

4    definition needs to tell us how much market power Norfolk

5    Southern has, and if you don't know where the cargo is going,

6    you don't know what options the ocean carriers have.  It's just

7    that simple.  And we have lots of cases that we cited --

8            THE COURT:  And you're saying you needed that level of

9    specificity in order to defend against the case?

10           MS. REINHART:  They needed a level of specificity on

11   the very first flaw in their market definition, which is the

12   geographic side.  And it, it is not curable.  It is not curable.

13           If they wanted to, I suppose, allege a complaint that

14   has every route that you could possibly conceive of that the

15   ocean carriers would travel, they could have alleged that in the

16   first place.  But they didn't.  Instead, they changed completely

17   and alleged a different market.  A much narrower one.  And so

18   let's talk about that one.

19           By the way, the record is full of actually

20   not-disputed facts that show that, for those long haul trips,

21   New York/New Jersey is an alternative.  Every ocean carrier has

22   at least two choices of ports to take its cargo to and from for

23   those long-haul trips, and then of course under a certain level

24   of miles ocean carriers can use trucks instead of railroads.  In

25   either instance, Norfolk Southern cannot have market power.  And

1    that's why their case fails there.

2         So looking at the new market definition which came

3    only after a fact discovery and during expert discovery,

4    Professor Marvel, their expert economist, redrew the market and

5    redrew the theory of harm.  It's just not just that he narrowed

6    it.  The relevant market as stated by Professor Marvel is

7    on-dock access.  So that's referring to access by CSX or any

8    other railroad that will be serving ocean carriers, CSX being

9    the only one.

10        So what he has done is he's gone from the proper

11   inquiry to the extent he's asking -- CSX was asking in its

12   complaint what are the ocean carrier's options, he has now made

13   it a question of what are CSX's options.  Two very different

14   markets, different evidence, different analyses that should be

15   done to assess that question.  And I would submit not

16   appropriate under the antitrust laws except in the context of

17   the essential facilities doctrine, which is pretty much what

18   Professor Marvel is stating here, and that doctrine has never

19   been recognized by the Supreme Court and is very disfavored, and

20   we don't think that CSX can prove what they need to prove to

21   satisfy that.  They certainly can't get past summary judgment

22   for that.

23        So in this market as defined by Professor Marvel, the

24   geographic market is no longer origins and destinations for

25   ocean carriers, it's CSX's access to a single terminal in

1    Hampton Roads.  That's it.  And the question that Professor

2    Marvel wants us to answer is what are CSX's choices to serve its

3    customers, the downstream market, the ocean carriers, if they

4    don't have on-dock access.

5           Now, for CSX to take this to a jury, this Court would

6    have to agree that it does not have any other reasonable options

7    to serve its customers, the ocean carriers.  We know that's not

8    true.  Look at their share of the rail traffic coming out of NIT

9    and coming out of Port of Virginia more broadly.  They're

10   serving their customers.

11          We know that they use drayage.  Maybe there is some

12   facts about is drayage better or is it preferred or is it worse,

13   is it more costly?  Those questions do not need to be answered.

14   The fact is it's an option.  It's a reasonable option for CSX.

15   And they have proved it:  They have grown their share at NIT

16   through drayage.  They may not like that they're not making as

17   much money as they wanted to, but they kept doing it.  And by

18   the way, Professor Marvel has no analysis, he has not done the

19   work to show that somehow drayage is prohibitively expensive.

20   He hasn't done the work.  It's not in the analysis for purposes

21   of causation or damages.

22          We also know that CSX can and has used the NPBL to

23   access NIT, just pay the switch fee.  They have never been

24   denied when they have asked to move a train to NIT.  And they

25   haven't shown, not in the record, that they couldn't to it.

 1    They have some noise about what would happen if they tried to

 2    run so many trains through there.  They could do it.  We know

 3    that they do run on NPBL.  They pay that switch rate to go other

 4    places on the NPBL.  They move a lot of traffic under that

 5    switch rate.  A lot.  Thousands and thousands of cars.  Just not

 6    the international intermodal.  And they say it's because it's

 7    too expensive to do it on the intermodal side, the economics

 8    don't work.  That analysis has not been done.  It has not been

 9    done.  It appears nowhere in the record or in the expert

10    discovery.

11          We know that CSX can and does serve their customers

12    through the Virginia International Gateway, VIG.  That's the

13    terminal that's right across the river.  It's right there.  And

14    we know they have got the bulk of that traffic.  Between CSX and

15    Norfolk Southern at VIG, CSX dominates.  It's a fact.  The

16    numbers are clear.  There's no dispute.

17          And they increased their share at that terminal

18    12-fold over this period when supposedly they were shut out.

19    Their ocean carriers don't care whether the track moves from NIT

20    or VIG.  CSX will say that's a dispute.  The reality is, the

21    contracts with the carriers don't specify.  Says Hampton Roads.

22    The port steers the traffic one way or the other, everybody gets

23    served, the customers get their transportation through one or

24    the other terminals.

25          And then of course CSX can and does serve its

1   customers through the Port of New York.  Very ably.  So any

2   traffic that has to go to Chicago, Detroit, any of those upper

3   midwest places, CSX actually has the best route to get out of

4   New York.  They dominate the New York port.  They can move

5   business up there to service that part of their customers'

6   traffic.

7           So they redrew the scope of this relevant market.

8           Your Honor has asked a couple times why did CSX do

9   what it did?  My view on this is that they understood, they

10  understood that if they're alleging a straight-up relevant

11  market of traffic between Hampton Roads and actual destinations,

12  that there are truck options, there are port switches and

13  options.  They also of course understand that they have actually

14  improved their position significantly over the years, and so

15  what they have to do is show that they're shut out from NIT.

16  They can't do that unless they satisfy the essential facilities

17  test, which, happy to go through it in detail, but again, that

18  test looks at whether they're prevented from serving their

19  downstream customers, and that means ocean carriers.  I have

20  just shown that they're not.  They may not like the options that

21  they are using, but that does not make an antitrust violation.

22          THE COURT:  How much more expensive does it have to be

23  for it to be unreasonable?

24          MS. REINHART:  Well, that's a good question.  That's a

25  question that Professor Marvel should have looked into and did

```
 1   not.  It would have to be prohibitively expensive.  I mean, they
 2   have not even tried to show that they would be operating at a
 3   loss.  They have not attempted to do that analysis.  And it
 4   would be straightforward to do.
 5          They had, instead -- and again, I don't want to
 6   preview too much about tomorrow, but Professor Marvel has this
 7   model that looks at NIT traffic and basically says if the ocean
 8   carrier uses NIT more than it uses VIG, then it's beholden to
 9   Norfolk Southern because drayage by CSX isn't good enough.  Now,
10   that's the premise of the model.  And what he analyzes are the
11   movements out of NIT either by CSX or Norfolk Southern, just for
12   those carriers that do a lot of business at NIT and his machine
13   spits out an answer that he interprets as being that Norfolk
14   Southern is a monopolist, they charge higher prices and they
15   have higher margins because of this phenomenon at NIT.  It's the
16   Marvel Machine.  That's the problem this is coming tomorrow.
17   That Marvel Machine, if you look at VIG and you run the exact
18   same test, don't make a single change, CSX is the monopolist,
19   CSX can charge higher prices, CSX has higher margins, CSX has
20   the bulk of share over there at VIG.  We don't, we don't see how
21   Professor Marvel's model assesses the question of is Norfolk
22   Southern responsible for CSX's experience here.
23          What we know it does not do, it does not assess the
24   actual economic choice that CSX has and whether it was
25   reasonable for CSX to do what it's been doing for 20 years,
```

1    meaning using drayage, choosing not to pay the rate for

2    intermodal, and using VIG and serving its customers through New

3    York.

4            So back to Your Honor's original question on this, why

5    isn't the definition of relevant market a question for the jury

6    at this stage, the facts that are undisputed show that CSX had

7    options, reasonable options, options that actually did let them

8    serve their customers.

9            And if you're looking at the CSX relevant market

10   that's actually in the complaint, the ocean carriers had their

11   options as well.

12           And so the market -- either market is not defined

13   properly, and either market is not of the quality that would be

14   necessary for you to assess whether Norfolk Southern's conduct

15   was even anti-competitive, let alone whether it affected CSX.

16           Again, we have a number of cases, Your Honor, where

17   this very question was decided at summary judgment and the facts

18   were well developed.  There are facts that were cited by the

19   plaintiffs and facts cited by the defendants, and yet relevant

20   market was decided and not sent to a jury.  In Monsanto, It's My

21   Party, Pepco, Laurel Sand & Gravel, and I'm sure there are more.

22   Those are just the few that I could remember.

23           So that takes us to the second part of the question:

24   Is there really a need for CSX to amend?

25           It's too late, first of all, for them to amend.  This

1   isn't just about changing the words on the page in a filing,

2   this is about the work that the economist has done.

3          This goes to the damages question too, Your Honor.

4   Your Honor asked a question about Venn diagrams and the types of

5   damages that CSX is alleging here.  And the bottom line is that

6   Professor Marvel's modeling does not distinguish between the

7   kinds of damages that could come out of this conduct.  Whether

8   it's damages from old conduct, such as putting the switch rate

9   in effect, damages from the supposed exclusion in 2015 or

10  damages from 2018, it can't distinguish.

11         And this is important, because as I said, at the

12  outset, this is not a static marketplace.  Antitrust does not

13  look at causation or damages in a static way.  CSX, in late

14  2016, gained, after lots of investment, its ability to double

15  stack trains out of Hampton Roads.  That was a game-changer for

16  them.  Any analysis of Norfolk Southern's competitive conduct,

17  the NPBL situation, the port as a whole, cannot, cannot be done

18  properly and soundly without that kind of game-changing event

19  being considered as part of the analysis.  I mean, it did, it

20  changed the world for them.  They didn't have that.  They

21  couldn't complete with Norfolk Southern out of Hampton Roads.

22  Norfolk Southern already had the double-stack.  Again, this is

23  just the market reality.  Professor Marvel should have looked at

24  that sort of market event, should have looked at the things that

25  caused CSX to not be as strong in Virginia as they are in New

1  York, just like Norfolk Southern's not as strong in New York as

2  they are in Virginia?  He should have done an analysis.  Should

3  have analyzed the different types of conduct that would cause

4  different kinds of harm, and he didn't do it.  He simply used

5  that Marvel Machine, this strange regression analysis.  And I

6  say strange -- we're not against regression analysis, but this

7  one looks at some odd, odd components of the marketplace and

8  ignores all of the ones that actually make a difference.  He

9  shouldn't have done that.

10         So it's too late to amend.  Amendment wouldn't be

11 enough.  Professor Marvel's opinions are supposedly complete.

12 It is too late for him to do new analysis.  It is too late for

13 him to take what he would read in the transcript that I'm saying

14 today and supposedly fix things.

15         And by the way, it's not appropriate for this case to

16 go to a jury and at that time, in court, during the trial, have

17 him change, do no calculations, run up knew models.  It's just

18 not right.

19         I think that's all I would have on relevant market.

20         On the injunctive relief, I drew that straw as well.

21 I certainly agree with Mr. Snow that if there's no damages,

22 there's no injunction.  I was trying to think, Your Honor, of

23 how this would go.  It would at least -- there would at least

24 have to be some kind of evidentiary hearing, potentially

25 discovery.  It's not clear what the relief is going to remedy if

1   there are no damages, if there's no harm.  We do have the STB

2   proceeding.

3          A couple of options, Your Honor:  One would be to wait

4   for that to be decided, or another option is to do some briefing

5   on this question and get some clarity on how this would all

6   unfold.  But bottom line for me, Your Honor, is --

7          THE COURT:  So -- I think I know your bottom line.

8          So back to this argument about 2015.  If the Court

9   were to find that the temporary loss of business of CMA that is

10  alleged in 2015 was a sufficient overt act and that it was new

11  accumulating damage, can't be very much money.  But if I were to

12  find that, but the Court were to disallow the damages expert of

13  CSX, then could we proceed to trial on those limited CMA

14  damages, that loss of that client for some weeks, or on the

15  injunction relief claim?

16         MS. REINHART:  No.  We cannot proceed to trial on that

17  claim.  It's, first of all, completely different from the

18  alleged foreclosure occurring over a period of years.  There is

19  not a record that could go to the jury about causation.  There

20  is an email, perhaps maybe two emails.  That loss has to be put

21  into the context of, first of all, a properly defined relevant

22  market, and then, second of all, an analysis of causation.  Did

23  Norfolk Southern really cause that?  Did the NPBL moving the

24  trains as they were asked to move them really cause that?  I

25  mean that's, that's a record that is fully developed here and is

1    not sufficient to go to a jury.

2            I would go back to my first point though, Your Honor.

3    I'm rambling a little bit because it's an interesting question.

4    But it's not the same case.  It's not -- there's no expert

5    testimony that could come in for that particular limited claim.

6            THE COURT:  Okay.

7            MS. REINHART:  Yeah.

8            THE COURT:  So on the limited damages claim from the

9    CMA or the loss of the client CMA for that short period of time,

10   if I were to find that that was a new overt act with accruing

11   new accumulating damages, you don't, we couldn't go to trial,

12   you think, because there's no expert opinion on the, on the

13   what?

14           MS. REINHART:  There's no expert opinion on either

15   causation or damage that would show that Norfolk Southern or

16   NPBL is responsible.  The loss of one contract in the context of

17   this entire marketplace and CSX's performance in it is like a

18   pebble on a lake.  The analysis that has to be done to find out

19   if, No. 1, Norfolk Southern had market power sufficient to hurt

20   CSX; No. 2, actually did, meaning there's causation didn't

21   happen for some other reason.

22           And then damages.  That analysis has to be done in the

23   context of all the business.  What Your Honor is describing is a

24   claim that wasn't brought.  They could have brought that claim

25   for $2,000.

```
 1              THE COURT:  All right.  So change it up a little bit
 2    then.  That's the damages question.  What about injunctive
 3    relief?
 4              MS. REINHART:  If there's no ability to prove damages
 5    there should not be any injunctive relief.
 6              THE COURT:  Mr. Lacy said it was a standing issue.  I
 7    think.  If I recall correctly.
 8              MS. REINHART:  And I apologize that I don't recall,
 9    Your Honor, and perhaps maybe that's reason enough to have a
10    little follow-up work on this particular issue.
11              But in my view, if you don't have damages you don't go
12    to a jury with an injunction, because the question, the question
13    is what is the case?  What's the jury being asked to decide?
14              And by the way, to follow up on my later point,
15    thanks, Mr. Lacy, on the CMA question too, there is a hearsay
16    issue.  The evidence is from CMA and that is hearsay.  They're
17    not coming to trial.  In fact --
18              THE COURT:  Well, let me ask you -- no, I'm going ask
19    him about that.  I won't ask you.  I'll ask him.  Later.
20              MS. REINHART:  And one more point.  There's no
21    continuing harm to enjoin on the CMA question because CSX got
22    the business back after a very short period of time.
23              THE COURT:  All right.  Thank you, Ms. Reinhart.
24              MS. REINHART:  Thank you.
25              THE COURT:  Is that it?  Was there somebody else on
```

1  this side that was going to address a point?

2          Mr. Chapman, were you going address a point?  Or was

3  there -- I thought somebody said that there was another person.

4  Was that it?

5          MR. CHAPMAN:  I don't think anybody else is speaking

6  for the Belt Line.

7          THE COURT:  Okay.  Did you all have somebody else, Mr.

8  Lacy?

9          MR. LACY:  No, Your Honor.

10         THE COURT:  Okay.  Thank you.  So Mr. Lacy --

11         MR. LACY:  Yes, sir.

12         THE COURT:  -- let me ask you a few questions before I

13  go back to CSX.

14         MR. LACY:  Sure.

15         THE COURT:  You did say, I thought, that there would

16  be an absence of standing to proceed on injunctive relief if

17  there were no damages.

18         MR. LACY:  Yes, I did frame it as a standing issue,

19  Your Honor.  And the other thing I would add is what's the

20  injunctive relief sought here?  If it relates to the 2015 moves,

21  if that's what this case is about, that obviously happened in

22  the past, so there is no, you know, injunctive relief that can

23  change the past.  The question is what would the Court be asked

24  to enjoin in the future?  And I would submit to the Court that

25  you would essentially be sitting in the role of a train operator

1    to make sure whether, to the extent that the Belt Line is asked

2    to move trains in the future, that -- I don't know what.  What

3    would be the injunctive relief that...

4              It's just, it's, it's -- it's void for vagueness.

5              And I would add that in order for injunctive relief to

6    be awarded generally you have to show some irreparable harm,

7    right?  That is the standard for injunctive relief.  And we

8    would submit that CSX can't show irreparable harm.  Not only

9    for -- well, really for the reasons that Ms. Reinhart just laid

10   out, their share at both NIT and the Port of Virginia more

11   generally has continued to increase, you know.

12             So those are the, some of the many questions or

13   concerns about the Court's question.  And like Ms. Reinhart

14   mentioned, if that's all that's left here, I do think briefing

15   might be helpful.  But I still think it's a standing issue first

16   foremost.

17             THE COURT:  You say based on a case that...

18             MR. LACY:  Well, Your Honor, I don't think we cited a

19   case in our brief, but I base it on the fact that, you know,

20   traditional Article III standing requires damages, right?  And

21   you know, we're talking about potentially entering -- or

22   discussing entering an injunction about something that happened

23   now eight years ago.  And I don't see how or what the injunctive

24   relief would be at issue.  And so --

25             THE COURT:  So would the same thing apply -- if we're

1    looking at 2015 and, back to our earlier discussion, we're

2    trying to figure out if there's a new accumulating damage, one

3    could argue that the loss of CMA for a period of time would be a

4    component of damage that could potentially satisfy that

5    requirement.  But you could also argue, I suppose, that payment

6    of excessive prices during that year for the use of the terminal

7    would be a different kind of damage than the overlapping damage

8    that I was talking about earlier when I was discussing exclusion

9    by rate versus exclusion -- not versus, maybe.  And.  And

10   exclusion physically.  And so those are two potentially

11   different types of damages from 2015.  And is either of those

12   enough to seek injunctive relief?  And you are telling me that

13   damages is a traditional component of Article III standing.

14   So --

15             MR. LACY:  Your Honor --

16             THE COURT:  -- I guess you have to get over the hurdle

17   of can those damages be proven, have they been pled, have they

18   been disclosed properly, but if you can, if you get past that,

19   are they enough?

20             MR. LACY:  Well, Your Honor, I of course do not

21   believe they have been pled or proven.  To use the Court's Venn

22   diagram, let me take the payment of the switching rate by CSX in

23   2015 to move those trains.  You know, if you have a Venn diagram

24   that is based on the Marvel damages model, it's over here and

25   it's talking about lost profits caused by foreclosure, inability

```
 1   to access NIT, what the Court is talking about is something that
 2   there wouldn't be overlap because that's not -- they're talking
 3   about super-- allegedly supercompetitive prices that were paid
 4   in 2015 which is not part of the model at all.  They have not --
 5   they have not pled that, Your Honor.  They have not proven that.
 6           And that's a good segue to the other aspect of
 7   damages, CMA contract.
 8           THE COURT:  So had it been pled, had there been
 9   damages evidence, it might be sufficient for a new overt act
10   with accumulating damage.
11           MR. LACY:  And I would submit to the Court we probably
12   wouldn't be here for the $2,000 of switch rate fees that we
13   paid --
14           THE COURT:  All right.
15           MR. LACY:  -- okay?
16           But it's a good segue to the CMA contract.  As Ms.
17   Reinhart said, fundamentally there's a whole lot of causation
18   problems.  Because as I'm sure the Court picked up on when
19   reviewing the record in preparation for today's hearing, there
20   is not a single direct statement from an ocean carrier to say,
21   yes, we stopped using CSX in 2015 because of some delay in
22   moving trains out of NIT for a couple weeks.  In fact, you
23   won't, if -- it shouldn't go to trial, but if it does, you won't
24   see an ocean shipper.  You won't see anything from an ocean
25   shipper.  There's no depositions, no nothing.  It's all hearsay.
```

1  But let's put that to the side.  That is the subject of a motion

2  *in limine*.

3          The way the damages model is constructed, Professor

4  Marvel intentionally did not determine that the loss of the CMA

5  contract for that period of time, assuming that is true, was in

6  fact caused by the slowness of the movement of trains in 2015.

7  Nor did he attempt to quantify any type of damages.

8          So Your Honor, in a hypothetical world, had that been

9  done, perhaps.  Perhaps.  But it hasn't.

10          And you know, you asked me a question earlier about

11  whether the Court has discretion to allow some type of revision

12  with respect to CSX's damages model.  And I would point the

13  Court to Rule 37.  We looked at that at the break.  And Rule 37

14  does not grant the Court discretion *per se*, it talks about was

15  it reasonably justified that this damage was not disclosed in

16  the case or is it harmless?

17          Well, we submit that CSX can't satisfy either prong.

18  There is no reasonable justification that this specific question

19  about payment of switch rates in 2015 did not come up until

20  their opposition brief to our motion for summary judgment in a

21  single line, which I would add was contradicted by the next line

22  which said no, no, we are not relying just on that, we are

23  relying on the totality of the conduct.

24          And I would also say that obviously such amendment

25  wouldn't be harmless to Norfolk Southern.  And of course

1  Mr. Snow can speak for the Belt Line, but I think he would agree

2  it would be incredibly prejudicial.

3            THE COURT:  All right.  Let me switch gears on you.

4            MR. LACY:  Sure.

5            THE COURT:  I was asking earlier about -- I think it

6  was Mr. Snow -- what would be sufficient for a new accumulating

7  injury where, you know, Mr. Hatch says, look, you can't just let

8  this go on from 2009 forever.  And that can't be what antitrust

9  law permits.

10           MR. LACY:  If I may, can I just grab a case?  Because

11 I think --

12           THE COURT:  Sure.

13           MR. LACY:  I think the Klehr case, Your Honor, speaks

14 to this very issue, which of course really is the highlight of

15 the --

16           THE COURT:  You didn't let me finish my thought.

17           MR. LACY:  Sorry.  Sorry.

18           THE COURT:  So when testing the underlying, the

19 gravity of that argument by CSX, you know, I was trying to think

20 about what could be a new accumulating damage.  So let me ask

21 this:

22           Suppose in 2018 there had been a motion to the Board

23 of Directors of NPBL for a new rate to be considered, and I

24 guess a referral to a rate committee, and then there was a vote,

25 and Norfolk Southern's directors voted down a new rate.  And

1   maybe it doesn't matter whether CSX's people voted or not.  But

2   let's just say for the sake of argument they vote against it.

3   Then we might, we'd be in a different situation, wouldn't we?

4           MR. LACY:  Yes, we would, Your Honor.  That would be a

5   good old-fashioned business judgment rule case.

6           THE COURT:  And then this overlapping becomes this

7   with a new event?

8           MR. LACY:  Well, assuming it was a breach of fiduciary

9   duty.

10          THE COURT:  Assuming.

11          MR. LACY:  Yeah, assuming.

12          THE COURT:  But then you may get to reach all the way

13  back to 2009 for contextual facts, but not for damages?

14          MR. LACY:  I would suggest, Your Honor, that the Court

15  would follow the decision we -- one moment.

16          That dealt with this particular issue as it relates to

17  the evidentiary matters.  It is the case out of the Middle

18  District of North Carolina, the Mid Electric case.  In that

19  case, the judge said not only can you not rely on damages caused

20  by conduct occurring outside of the limitations period, you

21  can't rely on the evidence associated.

22          THE COURT:  Okay.  Well let's say the evidence is out.

23          MR. LACY:  Okay.

24          THE COURT:  But...

25          MR. LACY:  Okay.

```
 1              THE COURT:  For the sake of argument you can't refer
 2   to any of that.  We'll just say that.
 3              MR. LACY:  Sure.
 4              THE COURT:  But that vote would be a new overt act
 5   with accumulating...
 6              MR. LACY:  I would submit to the Court at that point
 7   you're so far afield from a continuing violation, a continuing
 8   conspiracy that it is not a new overt act.  That is --
 9              THE COURT:  That's just a new antitrust violation,
10   potentially?
11              MR. LACY:  No, Your Honor.  I don't think it rises to
12   the level of an antitrust violation.  As I said earlier, that's
13   a simple, garden-variety was that vote a breach of fiduciary
14   duty.  And that claim belongs to the Belt Line.  Certainly it
15   can brought derivatively by shareholders if the Belt Line
16   decides not to pursue it, but that is way far afield from an
17   antitrust violation.  That is corporate governance.
18              THE COURT:  Okay.  I think I understand the nuances of
19   your position.
20              MR. LACY:  Your Honor, in closing I just wanted to
21   point out, again, I rely a lot on Klehr, but you know, the
22   Supreme Court did address the competing principles of this
23   context of enforcing the statute of limitations and CSX's
24   position that how can you let this purported conspiracy go on
25   and on.  And I would point the Court to Page 187 of the Klehr
```

```
 1  decision, where the Court said that, they concluded that "The
 2  Third Circuit's rule is not an -- an improper interpretation of
 3  the law."  And they say for two basic reasons.  "First, that
 4  several other circuits have pointed out the last predicate act
 5  rule creates a limitations period that is longer than Congress
 6  could have contemplated."  And that's exactly what would happen
 7  here if these claims were allowed to go forward.  "Because a
 8  series of predicate acts including acts occurring at up to
 9  10-year intervals can continue indefinitely, such an
10  interpretation in principle lengthens the limitations period
11  dramatically.  It thereby conflicts with a basic objective
12  repose that underlines limitations periods."
13          So that harkens back to the treatise that the Court
14  read from probably a couple hours ago.  So...
15          THE COURT:  Okay.  So final question for you.
16          MR. LACY:  All right.
17          THE COURT:  Norfolk Southern has said that CSX can't
18  change its damage model to avoid the statute of limitations.
19  What discovery response can you point to that would allow the
20  Court to say that paying the high rate in 2015 or those CMA loss
21  of business damages have essentially been waived such that the
22  damages case should be shut down on summary judgment?
23          MR. LACY:  Sure, Your Honor.  We asked, and the Belt
24  Line did as well, an interrogatory that said provide us your
25  damages and how they're calculated.  That interrogatory
```

123

```
 1   answer -- and we refer to it in our summary judgment, it's part
 2   of the summary judgment record -- said see our expert report.
 3   That expert report, as we've discussed today, did not quantify
 4   those damages.  In fact, it specifically rejected the idea that
 5   CSX's damages were based on a single event.  Mister -- or
 6   Professor Marvel explicitly that stated his damages are based on
 7   the totality of the circumstances.  They specifically and
 8   intentionally did not do what the Court's hypothetical suggests
 9   they might have done.  They made that affirmative choice, they
10   have to live with it.
11            THE COURT:  All right.  I do have one more.  Sorry.
12            MR. LACY:  That's quite all right.
13            THE COURT:  One more.  So that letter that CSX
14   submitted from their then-Board member who is like an associate
15   counsel at CSX?
16            MR. LACY:  Mr. Armbrust.
17            THE COURT:  Mr. Armbrust.  That letter, it's not
18   sworn.  Does that have the ability to create a genuine issue of
19   material fact as it is?
20            MR. LACY:  No, sir.  That's no different -- it's
21   hearsay, and it's no different than CSX submitting a declaration
22   in opposition to our motion for summary judgment that they
23   create the factual issue.  The Board minutes say what they say.
24   Mr. Snow put up on the screen I believe the testimony about what
25   happened at that board meeting.  And so that is simply not
```

124

```
1    enough to create a genuine issue of material fact, Your Honor.

2    I don't think there's any question that the rate --

3              THE COURT:  Where it's opposed?

4              MR. LACY:  What's that?

5              THE COURT:  Where it's opposed?

6              MR. LACY:  Oh, certainly.  Yes.  We don't agree that

7    that is a correct recitation.  I mean, it is undisputed that no

8    member of the CSX -- of the Belt Line Board moved for adoption

9    or approval of the rate proposal at that board hearing.

10             THE COURT:  All right.  Thank you.

11             Matthew, would you let them know that my three o'clock

12   call needs to be moved back and I'll make it when we finish?

13   Thank you.

14             Well, Mr. Hatch.  We've come full circle.

15             MR. HATCH:  With the Court's indulgence, I'll come

16   full circle and start where we started with the statute of

17   limitations --

18             THE COURT:  Okay.

19             MR. HATCH:  -- Your Honor, which is where Mr. Lacy

20   started.

21             If I could, I think -- I didn't catch the word you

22   said, something to the effect that I offered a conceptual or

23   some type of word like that.  A better word, I'm sure.  But I'll

24   start with the conceptual framework and then I'll go right to

25   the cases.  But I think this explains all the cases the Court I
```

```
 1  know is reviewing around this issue.

 2          So proposition one:  You do not get to commit a

 3  monopoly or a conspiracy to monopoly into perpetuity just

 4  because you weren't sued in the first four years.  You'll find

 5  that all through the cases.  So the fact that you weren't sued

 6  in the first four years but you continue to conspire to

 7  monopolize, that is a antitrust violation, and as long as you're

 8  sued within that continuing time period, you're subject to

 9  antitrust suit.  Point one.

10          Your Honor's asked several questions about the 2015

11  move and whether there was some, you know, marginal damages

12  associated with paying the rate for the lost business to CMA.

13  And I think conceptually let's say that they monopolized

14  95 percent of the market outside the statute period, okay?  And

15  inside the statute period they say, you know what?  We want to

16  get 96.  So they do one more percent of monopolizing the market.

17  You're not limited to just -- that's an overt act, right?  They

18  had 95 percent, they took some additional overt act to get one

19  more percent of the market, you are not -- assuming you sue

20  timely on that overt act -- limited to just damages for the

21  one percent and you have to stick with the 95 percent.  And

22  that's in the cases I'll talk about in a second.

23          You may be limited and not able to recover for the

24  damages that are outside the statutory period plus four years

25  from when you brought suit, but within that period you're
```

```
 1   entitled to your antitrust damage.  And here's is the key last
 2   conceptual piece.
 3              THE COURT:  If you have the...
 4              MR. HATCH:  Overt act.
 5              THE COURT:  The new overt act.  And what?
 6              MR. HATCH:  And damages.
 7              THE COURT:  And new accumulating damages.
 8              MR. HATCH:  Yes.  But those do not need to be
 9   different in kind from damages you have suffered before.  And
10   this brings me to the point.
11              THE COURT:  Okay.
12              MR. HATCH:  The Court looks at damages which are
13   injury, and a court assesses injury and resultant damages based
14   on the cause of action.  If you're in a price-fixing case you're
15   looking at overpayment, right?  I should have paid this, you
16   price-fixed above it, that's the nature of my injury.
17              If you're in a trademark case, you're looking at
18   injury from theft or use of a trademark, that sort of thing.
19              Here, we're talking about monopolization and
20   maintenance of monopolization.  And I think that word
21   maintenance, which in the cause of action, is critical because a
22   monopoly works because you maintain it over time.
23              What does maintenance mean?  Well, it is fierce
24   competition.  These are the only two Class I railroads on the
25   East Coast.  It's fierce competition generally between them.
```

1    Every day CSX looks to compete and gain business against Norfolk

2    Southern and vice versa.  So every day they have to maintain

3    that monopoly position.  Every day that continues the action

4    that then causes the injury and the damages:  Maintaining the

5    monopoly position, foreclosing us from that market, which is

6    different --

7              THE COURT:  By overt acts.

8              MR. HATCH:  Overt acts bring it within the statute,

9    and what's in the statute is the damages that is caused by the

10   cause of action, which is monopolization.  So you don't lose the

11   cause of action as long as you sue within the statute.  And

12   we'll see that in the cases.  You may lose the old damages, we

13   recognize that, but you don't lose the cause of action.

14            That distinguishes it, and that's going to bring me to

15   Klehr, which Mr. Lacy talked about a lot, which is a RICO case.

16   And yes, Klehr is, we all have talked about, uses the Clayton

17   Act because they share the same, but the cause of action is

18   different.  That is a racketeering conspiracy, and you need to

19   have a certain number of predicate acts.  And there they bought

20   the silo that the plaintiffs bought outside the statutory

21   period.  And as I think Mr. Snow put up on the board when he

22   showed a portion of the case, what the court was saying is your

23   damage, which all flow from my buying that silo -- not trying to

24   buy new silos, not trying to compete for silos -- you bought a

25   silo, your damages were incurred when you bought the silo, the

1  predicate acts under RICO, not under -- different from overt

2  acts, antitrust -- the predicate RICO acts that you have pointed

3  to that are within the statute did not harm you, they were sales

4  to other farmers, you already had your silo, but you said you

5  sold silos to other farmers, and there were advertisements, but

6  you already had your silo.  So yes, they would be RICO predicate

7  acts, but no, they did not cause you any new or different harm.

8  You already had the silo that was causing you the harm.

9          I think that's critical, because there they're suing

10 for fraud, they're suing for a RICO on a silo they bought.

11 Here, we're suing for the type of market preclusion that you

12 have to maintain -- that's our allegation -- they maintained

13 each year during the statutory period.

14         And I want to get through the cases, but I will start

15 with -- and by the way I'll just quickly say on the XY, LLC

16 case, Your Honor, I think you'll also find that there, the

17 breach of contract that was the basis for the suit occurred

18 prior to the statutory period and the damages flowed from the

19 breach of contract, not here, ongoing preclusion from the

20 market.  So breach of contract was like the silo in the XY case.

21 I don't know if -- Your Honor may not have my demonstratives in

22 front of you still, but I didn't hear Mr. Lacy or Mr. Snow or

23 Ms. Reinhart ever take on that first quote on Page 3 from

24 Zenith.  In fact, I didn't hear anybody analyze the actual

25 language of the Zenith case.  That quote at the top of Page 3 on

1    <u>Zenith</u> is exactly what we are doing here:  We brought an action,

2    ongoing conspiracy, there's four years, do we need to show that

3    the proximate result of the conduct occurring more than four

4    years prior to the filing of the counterclaim, do we need to

5    disaggregate that from our damages?  To the Court's question, do

6    we need to show that somehow these are not damages from earlier

7    rate-setting or preclusion.

8              HRI contends and the Court of Appeals held that the

9    statute permits for recovery only if those damages caused by

10   overt acts committed during the four-year period.  That's the

11   proposition, they're saying.  You can only get the two-dollar --

12   you know.  "We do not agree."  They never addressed it.  That

13   cannot be clearer.  If you read the whole <u>Zenith</u> case, the

14   damages are what we did here.  They took four years that were

15   within the statute, not more -- you know, they weren't allowed

16   to proceed on the older damages for more than four years, they

17   took those four years, it was a measure of market share in the

18   Canadian market, there was some other markets involved, they

19   took that market share, which is basically what we have done

20   here, and they applied it.  And the Supreme Court approved that.

21             And the other piece that I think is so key about

22   <u>Zenith</u>, Your Honor, and Ms. Reinhart, I want to come to her

23   argument, I'll try to do these in order, but this was so

24   critical.  <u>Zenith</u> talks about whether your damage would have

25   been speculative if you sued at the beginning.  So let's imagine

1  we sued in 2009 when they first rejected the rate we proposed.

2  Ms. Reinhart told you they couldn't base their harm to

3  competition based on what happened in 2009.  It's a dynamic

4  market.  She told you we gained market share during that time.

5  And she also told you that double-stack capacity for CSX was a

6  game-changer.  Those are her words.  That occurred within the

7  statutory period.  It changed the world.  We couldn't compete

8  before.

9        I think that shows if you sue in 2009 what would they

10  have said?  We don't know what the damages will be, you're a

11  single-stack, we're double-stacking, you can't complete here,

12  you know, it's speculative.  That would have been the fight in

13  2009 because you would be looking totally forward on damages.

14        We have admissions the market is dynamic, the market

15  changes, the competitors change in their capability during the

16  statutory period and that's why you get to proceed on the

17  damages for preclusion within the Statutory period.

18        THE COURT:  That makes little sense to me, I'll tell

19  you.  Because if you have an expert who is able to look at the

20  market, knows what the market is and defines it properly, they

21  should be able to make which calculation year by year.  I mean,

22  that's the -- that's just the hard work that has to be done, and

23  it can be done.  I'm not sure that Norfolk Southern was

24  suggesting that that couldn't be done.  I think what they were

25  saying, what she was saying is that the expert has to do that

```
1    work.  Isn't that what she was saying?
2           MR. HATCH:  I think what she -- well, first of all, I
3    think she was saying that a lot has changed in the market over
4    the time period.
5           THE COURT:  And that the expert has to do the hard
6    work of delving into all that and giving a detailed opinion that
7    takes it all into account.
8           MR. HATCH:  I will grant you that she's also arguing
9    that, and I'd leak to address it.  But my point is, Your Honor
10   that's why Zenith talks about why you can get your
11   within-statute damages is because they would have been
12   speculative if you brought them at the very first act.  And I
13   think that just demonstrates they're saying the market changed,
14   you should look at all those different things, it would have
15   been speculative  how far out, for example, if we were to have
16   sued in --
17          THE COURT:  I get that.  If you go out more than four
18   years.
19          MR. HATCH:  Yeah.
20          THE COURT:  -- then you get into a realm where an
21   expert perhaps can't provide the kind of clarity that you want
22   in the law.
23          MR. HATCH:  So we have that for the last four years,
24   and we can talk -- I'll come to her arguments on the expert.
25   But we now have historical damages assessed, and you wouldn't
```

1    have been able to bring that in 2009.  That's what Zenith is

2    talking about.  They said, well, how do we bring the damages for

3    50 more years assuming they never abated, never changed their

4    conduct, that would have been totally speculative.

5            And so that's why you can get, what the cases say,

6    within the four-year period you can get the damages that you

7    have within that period.

8            One last thing on Klehr -- two last things, I guess.

9    Sorry, does Your Honor have a question?

10            THE COURT:  No, go ahead.

11            MR. HATCH:  Mr. Lacy mentioned, read from Klehr about

12    the predicate acts bringing it in.  I think that part of Klehr

13    would not be pertinent here.  That's talking about RICO

14    predicate acts over a 10-year period which are different from

15    overt acts within the antitrust context.

16            And Klehr did not purport to limit, change, in any

17    respect, Zenith.  So I really think Zenith is the most direct,

18    on-point case for antitrust in the specific way we've gone about

19    calculating damages here.

20            On this issue about who bears the burden of showing

21    continuing conspiracy versus an affirmative defense, I

22    respectfully submit that's immaterial at this stage.  We have

23    put evidence in the record to show a continuing conspiracy, so

24    that's established whether we bear the burden, whether they bear

25    the burden of an affirmative defense.

```
 1              Let me come to the 2015 events again.  The Court's
 2    asked a lot of questions, and Mr. Lacy talked, oh, that's just
 3    something totally separate or different, limited.  What 2015
 4    shows you, before they had the exorbitant rate that was
 5    preclusive by itself, what 2015 shows you is that they can't
 6    effectively move the trains -- or won't, by virtue of the
 7    actions, what we have alleged -- they can't even do it if you
 8    try, right?  They slowed us down.  It's not whether they
 9    ultimately delivered all the trains that were tendered.  The
10    time and efficiency are critical in industry.  And so the fact
11    that it wasn't operationally successful -- and we have plenty of
12    witnesses to talk about that from CSX's evidence, they can
13    dispute it at trial, but the fact it wasn't operationally
14    successful shows the world that it won't even work for them to
15    come in at the high rate.
16              And I would like to refer the Court, there was some
17    discussion about whether this is part of our damages, whether
18    this is within the scope.  Dr. Marvel does talk about this in
19    his report, Your Honor.  I'll just reference a couple parts, but
20    on Page 28, this is in a section entitled NS's and NPBL's
21    Alleged Conduct Forecloses CSX From Competing Effectively
22    Enabling NS To Raise Prices To Ocean Carriers, and he says "NS's
23    and NPBL's alleged conduct in the relevant market for the
24    provision of on-dock access" --
25              THE COURT:  Wait, wait --
```

1              COURT REPORTER:  Could you slow down, please?

2              THE COURT:  -- wait.  Slow down.

3              MR. HATCH:  I'm sorry, Mr. McManus.

4              I'll skip to the key part here, Your Honor.  I know

5    the Court has it in the record.  "First I show how NPBL's

6    extraordinary high switching rate and other measures aimed at

7    reducing NPBL's service quality foreclosed CSX from obtaining

8    on-dock rail access to NIT."  So rate and service quality.

9              THE COURT:  Does it say what those other measures

10   were?

11             MR. HATCH:  And then Paragraph 60, Your Honor, he

12   talks about -- this is on Page 30, "NS also impedes CSX's

13   on-dock access to NIT through its control of critical scheduling

14   and operational plans for trains moving to and from NIT.  In

15   2015, the one time that CSX attempted to move trains to NIT via

16   NPBL, it took several days to move these trains from a CSX yard

17   to NIT, which is only a 17-mile trip that would not normally

18   have taken more than 10 hours.  Correspondence between CSX and

19   NPBL reveals that the main impediment was; that NS prevented

20   NPBL's movement over to NIT because of operational issues'.  In

21   effect, NS appears to have the power to block CSX trains from

22   accessing NIT."

23             THE COURT:  Did he go on to segregate the damage from

24   those other measures?

25             MR. HATCH:  No.  He didn't.  And I don't make a claim

1  he segregated the damages.  He calculates the damages, again,

2  like in <u>Zenith</u>, market share by year.

3          To Your Honor's question, I'm jumping around a little

4  bit here, but you can establish damages through lay testimony.

5  And Your Honor had several questions back and forth with Ms.

6  Reinhart about if the damage model was excluded -- of course we

7  do not believe it should be -- but Dr. Marvel testifies to

8  relevant market, to harm to competition and to customers.  Those

9  are not damage calculations, those are assessments of harm to

10 competition.  And so this is testimony he's given that would

11 establish relevant market, does establish harm to competition

12 regardless of whether his damage computation model comes in, and

13 you can prove in the case of the CMA/CGM, you can prove that

14 through lay testimony as well.

15         THE COURT:  Okay.  So if you can prove it through lay

16 testimony, have you disclosed that in your discovery responses?

17         MR. HATCH:  I believe so.  Because as Mr. Lacy said,

18 we pointed them to our expert reports and the 2015 impediment is

19 in our expert reports.

20         THE COURT:  No, I mean have you pointed to what the

21 lay testimony is going to be about the specific damage?

22         MR. HATCH:  I don't believe we did that in the

23 interrogatory responses.

24         THE COURT:  All right.  Thank you.

25         MR. HATCH:  One thing I did not believe I heard Mr.

1  Lacy or Mr. Snow or Ms. Reinhart contest is that in the

2  antitrust context, like in typical conspiracy contexts, any act

3  can constitute an overt act in furtherance of the conspiracy.

4          Now, Mr. Lacy did talk about the Ames case, which he

5  asserted they have an absolute right to vote their shares.  Ames

6  is not an antitrust case, that's a Virginia law case.

7          You may have a -- this is, I think, where there's not

8  a meeting of the issues among us.  You may have a contractual

9  right, but then if you exercise that right pursuant to a

10  monopolistic or conspiratorial plan it can still be an overt act

11  in furtherance of the conspiracy.  Ames says nothing.  That's

12  not the case.  I would -- that was, I think, a stock broker suit

13  against a bank objecting to a contract with another bank.

14          I would direct the Court to the Kolon case, and there

15  the Court, in a Section II Sherman Act case, this is Dupont v.

16  Kolon, 637 F.3d 435, 2011, the Court said "To run afoul of

17  Section II, a defendant must be guilty of illegal conduct to

18  foreclose competition to gain a competitive advantage or to

19  destroy a competitor," citing Eastman Kodak.  "Conduct that

20  might otherwise be lawful may be impermissibly exclusionary

21  under the antitrust law when practiced by a monopolist.

22          "Indeed, a monopolist is not free to take certain

23  actions that a company in a competitive market may take because

24  there is no market constraint on a monopolist's behavior.  And

25  although not *per se* illegal, exclusive dealing arrangements can

```
 1    constitute an improper means of acquiring or maintaining a

 2    monopoly."

 3            So again, it's not per se illegal -- they're using the

 4    example of exclusive dealing arrangements -- to have those, but

 5    if you do it as a monopolist it can become illegal or it can

 6    become part of that cause of action.

 7            THE COURT:  You've heard me ask a question of Mr. Lacy

 8    about the 2018 conduct and the letter that you used from Mr.

 9    Armbrust.  Is that something that you think I can rely on to

10    show a genuine issue of material fact?

11            MR. HATCH:  Yes, Your Honor.  Mr. Armbrust was

12    disclosed.  He's a witness.  He was deposed in this case.  He

13    wrote this letter, and he's -- we've submitted his facts as

14    part -- I mean, they're not separately delineated, but they are

15    within the summary judgment material.  So I think that the Court

16    can rely on that.  We expect him to be a witness.

17            THE COURT:  So he said -- I'm sorry, he said in his

18    sworn deposition what's in the letter?

19            MR. HATCH:  I would need to confirm that, Your Honor.

20    I'll check with my colleagues in a moment.  I don't want to

21    misspeak on that.

22            THE COURT:  Okay.

23            MR. HATCH:  If I could get the Court's indulgence on

24    that?

25            Your Honor, I don't think there's an issue that he
```

1    will -- he's an available witness who was disclosed and, you

2    know, they have his information.

3            I also think there was no response from any of the

4    three defense counsel who argued -- I talked with the Court

5    about the trackage rights dispute.  That, I think, is another

6    overt act within the statutory period, and I didn't hear any of

7    them address how that dispute squares with their representations

8    that the one controls the other.  How they could have a

9    litigated dispute that wasn't pretextual.  So that's not to

10   resolve today, but it's an example of there may be disputed

11   facts about that that merit going to trial.  In other words,

12   I've never seen one business that literally controls another

13   that ends up in adverse litigation with them.  Didn't make any

14   sense.  They haven't tried to explain it.

15           Switching to Mr. Snow's argument -- although I'm happy

16   to address any question the Court may have if I didn't touch on

17   anything from Mr. Lacy -- Mr. Snow said there's no dispute

18   that -- he argued the Laurel Sand case and that their rate is

19   set at their costs and so there can't be a dispute.  The 210

20   rate may generally be set to cover costs, but that does not mean

21   that the lower rate for the specific service that we were

22   seeking does not also cover costs and generate revenue and

23   profits.  And in fact, before the 2009 rate committee they had

24   different rates in their tariff, this isn't disputed, for

25   service to NIT International intermodal service and other types

1    of service.  So they've had different rates before.  And it is

2    at least disputed, although there's really no evidence against

3    it, that every time NPBL assessed itself whether it would make

4    not just revenue but profit on CSX's proposals, it always

5    concluded that it would.  And that's collected on Slide 14 in

6    the demonstrative set that the Court has.  I won't belabor that.

7              The supposition that 210 covers costs does not mean

8    that another rate for the service will not also make them money.

9    That's what they've always assessed, and that's what we said.

10             Mr. Snow talked about the 2018 and showed our

11   admission that they did not reach a new agreement on trackage

12   rights.  We admitted they didn't reach a new agreement.  That

13   doesn't mean that it's not part of the conspiracy.  That's, I

14   think, the distinction there.  They didn't reach a new agreement

15   on what the trackage rights would be, and we talked about 70 and

16   30 and then going to the STB.

17             Our point is that that whole evolution of conduct is

18   part of the overt acts of the conspiracy.  They used the fact

19   that there's a dispute and the prospect of increased trackage

20   fees as a basis to both intend to raise the rate later and to

21   raise issues with our 2018 service proposal.

22             So the fact that they didn't reach agreement -- the

23   fact that it's in dispute and it's uncertain was used.  They

24   didn't need to reach a final agreement.  And our interrogatory

25   responses to the extent Mr. Snow suggests that the trackage

1  rights dispute was not in there, they are listed I think at

2  least twice in our evidence of the conspiracy between Norfolk

3  Southern and NPBL, which was one of their interrogatory

4  responses.

5          I want to say, just as a legal proposition, Mr. Snow

6  appropriately talked about what actions NPBL personnel did

7  within the statutory period.  Under the law, only one act by a

8  conspirator needs to be within the statutory period.  So we

9  don't actually need to show overt acts within the statutory

10  period by NPBL.  We need to show a conspiracy between the two,

11  for sure, but the overt act only needs be to by one of the

12  conspirators.  You would be within the statute just showing one,

13  it does not have to be a joint overt act, you don't have to do

14  one for one defendant and one for the other.

15          In that regard, the Norfolk Southern-appointed NPBL

16  board directors do qualify as agents of NPBL under Virginia law,

17  or at the very least it's an issue for the jury to assess based

18  on the facts.  Mr. Snow, for example, said we never authorized

19  them to engage in conspiratorial conduct.  I mean, that's not --

20  that might be a question he'd ask at trial, but that's not in

21  the record, what their authorization was.  What we do know is

22  that they served on that board, they took actions on that board

23  that were, we allege, part of the conspiracy, and it's at least

24  a question of fact whether those actions made them agents of

25  NPBL.  The board is itself the literal embodiment of the

1    corporation.

2            Mr. Snow's cases talk about that a board can act

3    collectively to bind the company, you know, through a formal

4    board resolution or action, but that's different, I would

5    submit, from qualifying as an agent of the company when you're

6    on its board when you're conducting business and that sort of

7    thing.

8            THE COURT:  So your position is that in 2018, absent

9    any motion by the CSX directors, there were other actions that

10   constituted overt acts?

11           MR. HATCH:  Correct, Your Honor.  So --

12           THE COURT:  Now, I mean, you've argued earlier that

13   the vote by the shareholders was an overt act.  I've heard the

14   response to that.  But beside the vote, what else was there?

15           MR. HATCH:  Well, I think the, besides the vote

16   there's of course Mr. Moss talking about, you know, we've got

17   this trackage rights dispute which is a continuation of that

18   trackage rights agreement.  There's the fact that NPBL did not

19   adopt that rate, right?  It doesn't -- they can't adopt the

20   rate, they don't adopt the rate, and then at the board meeting,

21   the shareholder meeting and then there's the board meeting, the

22   NS-appointed directors do not -- this is how I think about it:

23   If you are -- as a board director of NPBL, you are responsible

24   for exercising your fiduciary duties in favor of that company.

25   That means to look out for the company's interests, to do what's

```
 1   good for the company.  There's the business judgment rule.  But
 2   they had a proposal that was going to make them money and they
 3   took no action.  They're there to impede and to maintain the
 4   status quo that keeps us out.  And so yes, it's not necessarily
 5   a new action, but it's inaction that is causing us harm by not
 6   doing what a responsible director would do.
 7              THE COURT:  And that's a new overt act?
 8              MR. HATCH:  Purposeful inaction.
 9              THE COURT:  Inaction is a new overt act.
10              MR. HATCH:  In other words, I think in simple terms,
11   they're blocking us, right?  In the most simple terms.  We're
12   trying to get into NIT various ways.  Rate's too high, you know,
13   they're blocking us, blocking us, blocking us.  That's all part
14   of the monopoly.  When you're successfully blocking and someone
15   says I want to try to come in, doing nothing, denying that,
16   those are all ways to further the blocking.  And that's what
17   they have been doing this whole time.  It's the whole
18   constellation of facts around the 2018 proposal that
19   constitutes -- again, we can break them up different ways -- but
20   there are multiple overt acts, whether you attribute them to
21   NPBL, whether you attribute them to Norfolk Southern in that
22   time period.
23              And they did deny, Your Honor, the governance
24   question, which were wrapped up with achieving the rate in a
25   fair way.  So in other words, the business could have approved.
```

```
 1              THE COURT:  The shareholders denied.
 2              MR. HATCH:  They did.  Which is an overt act.  The
 3    business could have approved the rate by itself.  They say, oh,
 4    well, let's send it to the rate committee.  Okay.  How about a
 5    fair rate committee that would give this fair consideration?
 6    They say no.  That's the Kolon case.  Even if they're
 7    contractually obligated, if the reason they're doing that is to
 8    perpetrate their monopoly, which our evidence would support,
 9    then that's an overt act for the conspiracy.
10              Just briefly, I think Mr. Snow said it didn't matter
11    that Mr. Moss alerted Mr. Luebbers or communicated with
12    Mr. Luebbers around our train movements.  That's a classic fact
13    dispute for the injury jury.  In an antitrust case, the fact
14    that two people are communicating that didn't necessarily have
15    business to communicate is evidence, classic evidence of a
16    conspiracy.  So the fact that Mr. Moss is telling a Norfolk
17    Southern salesperson we're coming, even if he could have figured
18    that out otherwise, he's keeping him apprised, that is classic
19    evidence of conspiracy.  They can argue it was innocent, we'll
20    argue it's evidence of conspiracy.  Those are triable issues.
21              The Court asked a lot of questions, and I won't break
22    them up, about whether you need to have damage in order to
23    secure injunctive relief.  And I believe the answer to that is
24    no, you don't have to have -- injunctive relief is equitable and
25    monetary damages are compensatory damages.  You don't have to
```

144

```
1    have monetary damages to qualify for injunctive relief.  You can

2    seek a declaratory action and seek injunctive relief with a

3    declaratory action where you wouldn't have monetary damages.

4    What I do think we would need to show is that we have an

5    antitrust claim, right?  Even if there's -- even if, assuming,

6    we can.

7              THE COURT:  Does that mean with damages?

8              MR. HATCH:  No, it means you have antitrust injury,

9    which is distinct from damages.  So you can show that your --

10   and this is what Dr. Marvel, another element where I said he

11   testifies as to relevant market and also harm to competition and

12   antitrust injury and then also damages.  So I think we would --

13             THE COURT:  What you just said, if I understood you

14   correctly, is all you need to be able to move forward on your

15   injunctive relief claim is to be able to prove an antitrust

16   injury, not damages.  Is that right?

17             MR. HATCH:  That's correct, Your Honor.

18             Well, I guess I was speaking in shorthand.  I think

19   you need to prove the elements of an antitrust claim that would

20   then enable injunctive relief.  But injunctive relief is

21   equitable; damages is a separate form of relief.  So damages is

22   not an element of the antitrust claim necessary to trigger

23   injunctive relief.

24             THE COURT:  Do you have any case that you or your team

25   would point to for that proposition that, even if you can't
```

```
 1    recover antitrust damages, that you could still, I guess, go to

 2    trial on injunctive relief?

 3              MR. HATCH:  Candidly I don't.  I haven't sorted the

 4    cases that way as I stand here.  I'm happy to follow up in that

 5    regard with the Court.  But if you -- but if you just think --

 6    imagine in 2009 if they said we're going to set this high rate,

 7    and imagine that you brought a declaratory action at that

 8    time -- they hadn't set it but they had said -- you assume you

 9    meet the requirements for a declaratory action, right, case in

10    controversy -- you can bring a declaratory action and seek an

11    injunction prior to incurring any monetary harm.

12              We're happy to follow up in that regard, but I think

13    that's the basis for my answer to the Court's question.

14              Your Honor, regarding Ms. Reinhart's argument, I'm

15    happy to answer any questions, but I'll try to go quickly.  The

16    Court's been very indulgent with its time.  All that was factual

17    material disputed, in my view, and exactly what we would fight

18    about in front of the jury about the contours of the market.

19    And so I'm happy to answer any specific question about trucks

20    versus dray versus New York versus Norfolk, but that's all in

21    our expert reports.  Their expert disputes it.  That's

22    classic -- we cite it in our brief, that's why relevant market

23    is rarely a basis for summary judgment.  That's disputed factual

24    information.

25              There was a different thread of her argument that
```

146

1    focused on whether our complaint should have alleged it.  I

2    thought that was interesting because they didn't move to dismiss

3    our complaint in that regard, nor have ever claimed that it

4    failed to put them on notice.  It's notice pleading.  So they

5    did not file a 12(b)(6) motion to dismiss on lack of pleading

6    relevant market.  They did not, in their 12(b)(1), 12(c) motion

7    to dismiss raise that issue then.

8           I think this is the first time -- I've heard the

9    argument in the brief that there's a divergence between what the

10   complaint says and what Dr. Marvel says.  I think I've addressed

11   that.  But the notion that the complaint somehow doesn't put

12   them on notice as to what the relevant market is -- I think has

13   not been presented, and is amply supported by the complaint,

14   which analyzes the market and they didn't challenge it.

15          Ms. Reinhart talked about the antitrust law's purpose

16   being to protect competition not competitors.  I don't think

17   there's a dispute about that.  That's why we've educed evidence

18   that the ocean carriers are being hurt by this conduct.  They're

19   paying higher prices to Norfolk Southern by virtue of this

20   conduct.  That's all set out in Dr. Marvel's report.  It also

21   injures us, but we also have evidence that it injures the

22   customers, the ocean carriers.

23          She and Mr. Snow talked about no one stopped our

24   trains from running in 2015.  If you look back at our complaint,

25   the complaint does not allege that our trains literally could

1    not run; it alleges that they were impeded, delayed.  And in

2    this business, if you can't deliver on time, you're not

3    providing the service.  And I don't think that's disputed.  The

4    fact that a train gets from one place to another, if it take

5    five years, that's not an effective train.  You need to move

6    these trains.  And they really have not done anything to

7    question the factual disputes around whether those were impeded

8    or delayed, which is what is in our complaint.

9            There was some question about whether there were

10   allegations about market.  I mean, that is in the complaint and

11   that is also in Dr. Marvel's report.  And the market share,

12   whether you measure is just based on NIT or whether you measure

13   it based on the Port of Virginia, Norfolk Southern would have

14   monopoly market share either way you measure it.  That's all

15   been disclosed.  It's all in the complaint or in the discovery

16   material.

17           Just a quick correction, and I'm sure Ms. Reinhart

18   didn't mean to misspeak on this, I think she said Dr. Marvel's

19   report did not come until after fact discovery.  His report came

20   during fact discovery.  And fact discovery extended beyond that.

21           He did assess drayage.  That's all in there.  I don't

22   want to belabor those points, unless Your Honor has questions

23   about them.

24           The fact that there can be substitutes at margins or

25   in particular situations does not mean that you haven't defined

```
 1    a relevant market.  That's what the expert's looked at.  He

 2    looked at all the possible substitutes and determined the market

 3    that he did.

 4            I frankly -- she mentioned the VIG facility and how

 5    CSX competes at VIG.  I think that's the evidence of their

 6    anti-competitive conduct.  VIG is just across the river, it is

 7    fierce competition and open competition, each has on-dock rail

 8    at VIG.  You come across the river to NIT, it's completely

 9    different.  Why?  No on-dock rail for CSX.  And all these

10    proprietary issues and all these kinds of things, I think the

11    Court can just look at Mr. Reinhart's letter and the testimony

12    from the port officials.  They want CSX on-dock rail there.

13    They operate that track within the port.  They're not saying

14    it's proprietary, they're not saying it's going to be

15    operational issues, they're saying this is good for Virginia and

16    we want them in.  It's at least a triable fact.

17            There was a lot of talk about whether Marvel,

18    Dr. Marvel had analyzed whether the 210 rate was preclusive, he

19    does analyze that.  His report's based on evidence and

20    information from other witnesses in the case that it is

21    preclusive to CSX's business.  So that is in his report.

22            And finally, Your Honor, coming back to Mr. Lacy's

23    final discussion, the only thing I wanted to touch on, unless

24    the Court has any questions, is Mr. Lacy talked about there not

25    being direct statements from ocean carriers, that they weren't
```

1   deposed directly, that sort of thing.  There's ample evidence

2   from CSX personnel about what the carriers expect, what the

3   dynamics of the business are and how it impacts our business for

4   not having on-dock rail at NIT.

5          You don't have to take our word for it though.  As we

6   collected in the complaint, Norfolk Southern repeatedly talks

7   about the benefit of on-dock rail in the railroad competition

8   environment; that you have to go where your customers want you

9   to go; you can't tell them where to move their cargo.  On-dock

10  rail is better, and why would they work so hard to preclude

11  competition there if they weren't deriving the very significant

12  benefit that Dr. Marvel says they are.

13         THE COURT:  Let me take you out a bit.  Right now the

14  rate issue is at the STB?  The status of that?

15         MR. HATCH:  So I want to be specific.  The rate that

16  NPBL would pay to Norfolk Southern for trackage rights is at the

17  STB.

18         THE COURT:  And?

19         MR. HATCH:  And stayed.

20         THE COURT:  And CSX took a position there?

21         MR. HATCH:  My recollection is that that did not go

22  very far.  CSX did intervene in that proceeding.

23         THE COURT:  And asked it to be stayed?

24         MR. HATCH:  Correct.

25         THE COURT:  Why was that?

1           MR. HATCH:  I'm sorry?

2           THE COURT:  Why did CSX ask to stay that?

3           MR. HATCH:  I should say, Your Honor, maybe I could

4  check with my -- I forget who asked for it to be stayed.  I

5  don't want to misspeak on that one.  I know it was stayed

6  ultimately.

7           Mr. Snow says it was CSX, and I'm happy to take his

8  direction on that.

9           THE COURT:  All right.  Well, I won't press you.  If

10 you weren't sure which one it was, you probably don't know why.

11          MR. HATCH:  Well, we're not counsel in that case, Your

12 Honor.  I'm happy to follow up if that's important.

13          We had brought this case, of course as Your Honor

14 knows, and what the -- and I know the Court also knows this:

15 What the STB had said is this case should go forward, and has

16 also said we should come back to the STB after this case.  That

17 was from the referral order.

18          THE COURT:  All right.  Thank you.

19          MR. HATCH:  Thank Your Honor.

20          It's 3:30, and unless there's something really, really

21 big that we've missed, I think it's -- I'm done.  You all are

22 done.  Thank you.

23          Madam Clerk, when is the trial scheduled for?

24          COURTROOM DEPUTY CLERK:  Judge, I think it's

25 January 18th.

```
1              Yes, sir.  January 18th.

2              THE COURT:  How long is it down for?

3              COURTROOM DEPUTY CLERK:  Two weeks.

4              THE COURT:  All right.  And you all have an argument

5    tomorrow before Judge Krask on what?

6              MR. HATCH:  It's on two, essentially, Daubert motions,

7    Your Honor.  They have challenged Dr. Marvel on their part and

8    we have challenged NPBL's proffered expert, Mr. Crowley.

9              THE COURT:  Okay.

10             MR. SNOW:  Your Honor?

11             THE COURT:  Yes, Mr. Snow?

12             MR. SNOW:  I didn't mean to interrupt you, Your Honor.

13   I didn't know if you were finished, but I wanted to just make

14   clear on the record, I know you asked a lot of hypotheticals

15   about possibly allowing CSX to amend.  The Belt Line would

16   certainly object to allowing them to amend their damages or any

17   of their overt acts.  And I know they were hypotheticals, but I

18   wanted the record to be clear.

19             THE COURT:  Thank you for making that clear.

20             Well, I don't know that I can really tell you all any

21   more.  I think my opening signaled to you what my serious

22   concerns were, and I have tried to drill down on those today,

23   and I obviously need to look further at your responses.

24             After you meet with Judge Krask tomorrow do you have

25   any other outstanding motions that are scheduled to be ruled on?
```

1      MR. McFARLAND:  There are a number of pending -- good

2  afternoon, Your Honor.  Robert McFarland on behalf of CSX.

3      There are a number of pending motions, Your Honor, but

4  no hearing is scheduled on the motions *in limine*.  Competing

5  *Daubert* motions tomorrow, final pretrial conference next Tuesday

6  on December 6th.

7      THE COURT:  And on those pending motions do you, would

8  you describe any of them as not dispositive, but particularly

9  important?

10      MR. McFARLAND:  There are more from the defendants, so

11  I wouldn't want to mischaracterize on their behalf.

12      THE COURT:  From your side?

13      MR. McFARLAND:  I don't think any of them, Your Honor,

14  would necessarily -- whichever the ruling was -- from our side

15  would necessitate a delay in the trial, no.

16      THE COURT:  Okay.  Mr. Lacy?

17      From your side, Mr. Lacy, any of those motions that

18  you filed that are particularly important to the outcome in

19  preparing for trial?

20      MR. LACY:  Yes, Your Honor.  I'll name several.

21      First we have moved *in limine* to preclude CSX from

22  offering any argument or evidence that the Belt Line's switching

23  rate is unreasonable or excessive.  The grounds for those

24  motions as set forth -- the grounds for that argument is set

25  forth in the motion, but to be clear, and as the Court I think

```
 1    is aware from prior briefing and prior rulings, the STB is the
 2    sole authority to determine whether a rate is reasonable or not.
 3    And obviously one of the foundational pillars, if not the
 4    primary foundational pillar of CSX's case, is that rate is
 5    exorbitant, unreasonable.  They have used all sorts of
 6    descriptions.  And we believe that they are not able to do so
 7    based on the STB's primary authority.  So that's one.
 8            Second, similar to what's been argued here today, and
 9    I know Mr. Snow argued it primarily, we have moved *in limine* to
10    prevent argument that the internal email communications of
11    Norfolk Southern reflects communication -- the internal
12    communications of Norfolk Southern including an employee of
13    Norfolk Southern who also was a member of the Belt Line Board at
14    the time can be considered communications between Norfolk
15    Southern and the Belt Line based on those same corporate
16    governance principles that Mr. Snow outline today and the two
17    Virginia Supreme Court cases that we believe to be dispositive
18    on that point.
19            We have also moved *in limine* to prevent any argument
20    or evidence as to -- and I'm going paraphrase here, Your
21    Honor -- statements from ocean shippers.  As I mentioned
22    earlier, no ocean shippers were deposed, none are on the witness
23    list, you will not hear from an ocean shipper.
24            THE COURT:  Doesn't sound like we're going to hear
25    from them, according to Mr. Hatch.  He said there's plenty of
```

1  testimony coming separately on that.

2          MR. LACY:  Yes.  And the thrust of the motion is, and

3  as laid out in the motion, CSX wants to rely on, frankly, rumor

4  and hearsay.  You know, I heard from Ocean Shipper X that blah,

5  blah, blah, and introduce that evidence as if that is -- well,

6  offer it for the truth of the matter asserted.

7          THE COURT:  Well, I'm sure there'll be a hearsay

8  objection and it'll be ruled on.

9          MR. LACY:  Indeed.  Indeed.  But it does -- that is

10  a -- I don't mean to -- it's just foundational because, you

11  know, as Ms. Ryan so eloquently laid out, I mean, this theory of

12  harm requires them to show harm to the ocean carriers.

13          THE COURT:  Okay.

14          MR. LACY:  What else?  Oh.  We have moved *in limine* to

15  exclude any evidence or argument that the Diamond Track can be

16  considered wrongful conduct.  As the Court is aware from the

17  summary judgment record, that removal of that Diamond Track in

18  2008, it's obviously outside the limitations period, but it also

19  was approved by the Belt Line Board and then subsequently

20  approved by the STB.  And so it's our position that CSX should

21  not -- given the federal government agency responsible and

22  required to approve such removals, that cannot be considered an

23  overt act in furtherance of any wrongful conduct.

24          THE COURT:  Okay.  Well, thank you.  That's all?

25  Those are the main ones?  We'll say those are the main ones?

1           MR. LACY:  Yes, those are the main ones.

2           THE COURT:  All right.  Okay.  Thank you for your

3    arguments, and you will be hearing from me.

4           (Whereupon, proceedings concluded at 3:43 p.m.)

5

6                         *CERTIFICATION*

7

8        *I certify that the foregoing is a true, complete and*

9    *correct transcript of the proceedings held in the above-entitled*

10   *matter.*

11

12        _____

13              Paul L. McManus, RMR, FCRR

14              _____

15                    Date

16

17

18

19

20

21

22

23

24

25

Paul L. McManus, RMR, FCRR Official Court Reporter