```
 1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF VIRGINIA
 2                          Norfolk Division

 3

 4    - - - - - - - - - - - - - - - - - -
                                          )
 5    CSX TRANSPORTATION, INC.,           )
                                          )
 6            Plaintiff,                   )        CIVIL ACTION NO.
                                          )           2:18cv530
 7    v.                                   )
                                          )
 8    NORFOLK SOUTHERN RAILWAY             )
      COMPANY, et al.,                     )
 9                                         )
              Defendants.                  )
10    - - - - - - - - - - - - - - - - - -

11

12                  EXCERPT TRANSCRIPT OF PROCEEDINGS
                        (Daubert Hearing - Rulings)
13

14                        Norfolk, Virginia

                          December 2, 2022
15

16

17    BEFORE:  THE HONORABLE ROBERT J. KRASK
                United States Magistrate Judge
18

19

20

21

22

23

24

25
```

```
 1    APPEARANCES:

 2            MCGUIREWOODS LLP
                By:  Benjamin L. Hatch
 3                   Robert W. McFarland
                     Ashley P. Peterson
 4                   Counsel for CSX Transportation, Inc.

 5

 6            TROUTMAN PEPPER HAMILTON SANDERS LLP
                By:  Michael E. Lacy
                           - and -
 7            SKADDEN ARPS SLATE MEAGHER & FLOM LLP
                By:  Tara L. Reinhart
 8                   Counsel for Norfolk Southern Railway Company

 9

10            CRENSHAW WARE & MARTIN PLC
                By:  Alexander R. McDaniel
                     W. Ryan Snow
11                   Counsel for Norfolk & Portsmouth Belt Line
                     Railway Company

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        * * * * * * *

 2            THE COURT:  I am prepared to rule on the motion,

 3   which is ECF number 374, by CSX to exclude Thomas Crowley,

 4   and I'll start by starting with the case law that the

 5   attorneys from both sides have discussed.

 6            Rule 702 of the Federal Rules and the line of cases

 7   flowing from the Supreme Court's decision in Daubert governs

 8   both the challenge by the Belt Line and by Norfolk Southern

 9   to Mr. Crowley's testimony.

10            Rule 702 provides that an expert may testify in the

11   form of an opinion if the expert's scientific, technical, and

12   other specialized knowledge will help the jury understand the

13   evidence or determine a basic fact in issue, the testimony is

14   based on sufficient facts or data, it's a product of reliable

15   principles and methods, and the expert has reliably applied

16   those principles and methods to the facts of the case.

17            Application of Rule 702, as all of you know,

18   involves two primary inquiries; first, whether the proposed

19   testimony is reliable and, second, whether it's relevant.

20   And for that I cite the Kumho Tire case, 526 U.S. at 141 and

21   the Fourth Circuit's case in Forrest, 429 F.3d at 80.

22            Before allowing a jury to hear disputed expert

23   testimony, a Court must make those inquiries and exercise its

24   gatekeeping functions, as the Fourth Circuit discussed in

25   Nease vs. Ford Motor Company, 848 F.3d at 230 and page 231.
```

1                The Court assessing the relevance of an expert's

2       testimony reviews, quote, whether it is sufficiently tied to

3       the facts of the case and will aid the jury in resolving a

4       factual dispute.  And that's at *Daubert* at 591.

5                Expert testimony about matters coming within a

6       jury's knowledge and experience is not helpful and is barred

7       by Rule 702 as discussed in the *Persinger* case of the Fourth

8       Circuit.  It's a 1990 case at 920 F.2d at 1188.

9                To assess whether an expert's testimony will aid a

10      jury to understand the evidence and resolve disputed facts, a

11      Court must consider whether such testimony, quote, fits the

12      facts of the case by relating to the inquiry that the jury

13      has to make.  And that's *Daubert* at 591 again.

14               To be deemed reliable, expert testimony must be

15      grounded in, quote, scientific, technical, or other

16      specialized knowledge and not on belief or speculation, and

17      derived from the use of scientific or other valid methods.

18      And that, I'm quoting the *Oglesby* case at 190 F.3d at 250.

19      That's a Fourth Circuit case from 1999.

20               The *Daubert* decision identified what it referred to

21      as some non-exhaustive guideposts that may apply when

22      assessing reliability, to include testing, peer review,

23      publication, air rates, and general acceptance of the

24      methodology used.  And that is at 593 and page 954.

25               Whether those guideposts or other factors apply to

1    assess reliability often depends on the nature of the case,

2    the expertise applied, and the opinions at issue, as

3    discussed by the Fourth Circuit in the *Sardis* case discussed

4    by Mr. Snow.  That's at 10 F.4th at page 281.

5            As the Fourth Circuit noted in *Nease* at page 230,

6    the Supreme Court's decision in *Kumho Tire* made clear that

7    *Daubert* was not limited to the testimony of scientists, and a

8    nonscientist expert whose opinions arise from his experience

9    must explain, quote, how his experience leads to the

10   conclusion reached, why his experience is a sufficient basis

11   for the opinion, and how his experience is reliably applied

12   to the facts.  And I'm quoting there the *Peters-Martin* Fourth

13   Circuit case from 2011 at 410 F.App'x at 618.

14           Finally, the proponent of expert testimony, as you

15   all know, bears the burden of establishing by a preponderance

16   of the evidence that that testimony is admissible in

17   accordance with these principles.  And I'm citing *Cooper vs.*

18   *Smith & Nephew*, a 2001 Fourth Circuit case, 259 F.3d at 199.

19           As to Mr. Crowley's qualifications, I find that he

20   possesses the requisite knowledge, skills and experience,

21   education and training to render an opinion on the Belt Line

22   switching rate.

23           He has an economics degree, took graduate courses in

24   transportation, and has worked as a consultant since 1971

25   specializing in analyzing matters related to rail transport.

1    He's familiar with the operating practices and accounting

2    procedures that railroads use and has spent his career

3    evaluating railroad rates, costs, and operations including

4    the negotiation of rail and transport contracts.  He has also

5    testified before courts, regulatory bodies, and arbitration

6    panels.  So I find that he possesses the specialized

7    experience necessary to opine about the reasonableness of the

8    Belt Line's rate.

9            CSX argues Crowley's opinions on the reasonableness

10   of the rate are not reliable and relevant because, as we've

11   discussed here today:

12           First, he failed to apply an alternative coherent

13   methodology as opposed to the Surface Transportation Board's

14   reasonableness formula which everyone agrees does not apply.

15   And they contend he used simple math to reach his

16   conclusions;

17           Second, they argue that he failed to factor in the

18   Belt Line's variable costs;

19           Third, he allegedly relied only on revenue from

20   rates, ignoring other sources of Belt Line revenue;

21           Fourth, they complained that he made faulty

22   assumptions that CSX moved two-and-a-half containers per well

23   on average and rates are determined upon a per-mile basis;

24           Finally, they assert that he failed to consider

25   whether the Belt Line would have made money under CSX's

1   proposals.

2        The Court finds Crowley's opinions on the

3   reasonableness of the rate, including his opinion that

4   Dr. Marvel's opinions are based on incomplete analyses,

5   faulty comparisons, false presumptions, to be reliable and

6   relevant.

7        CSX's argument that Crowley's expertise is limited

8   to determining reasonableness using the Surface

9   Transportation Board's formula, which does not apply in this

10  case, is not persuasive.  Crowley's experience analyzing the

11  economics of the railroad industry qualifies him to opine

12  outside the standard used by the STB.

13       Crowley testified that he applied, quote, normal,

14  commonly used metrics to evaluate the rate based on his

15  experience and, quote, what shippers and railroads normally

16  look at in evaluating rates and revenues.  While Mr. Crowley

17  reached his conclusions by applying simple math to that data,

18  this does not render those opinions unhelpful to the jury.

19       He testified to retrieving data based on his

20  understanding of the metrics involved in determining costs

21  and rates.  He factored in his understanding of the location

22  of certain railroad terminals to determine the length of

23  various routes and researched Gulf Coast and East Coast ports

24  that ship international containers and use shortline

25  switching services.

1            He relied on his expertise to determine the data

2     that would be relevant to calculate a reasonable rate;

3     expertise that is not, quote, obviously within the common

4     knowledge of jurors, as the Fourth Circuit discussed in

5     *Lespier*.  It's a 2013 Fourth Circuit case at 725 F.3d at 449.

6            CSX next asserts the analysis is faulty because

7     Crowley failed to consider variable costs, instead relying on

8     total costs.  And CSX argues that he failed to account for

9     volume and that overall expenses per car decrease as volume

10    increases.  Crowley can defend his decision to rely on total

11    costs during cross-examination.  His decision to do so does

12    not render those opinions unreliable or irrelevant.

13            Similarly, while Crowley could be cross-examined

14    about the Belt Line's revenues from sources other than

15    switching fees, Cannon Moss of the Belt Line testified that

16    over 90 percent of its revenue derives from switching fees.

17    Mr. Crowley's failure to factor in revenue from a special

18    switch charge for handling windmill blades and from leasing

19    property is not a persuasive reason to exclude his opinions.

20            Next CSX argues that Crowley's assumption that CSX

21    could move two-and-a-half containers per well on average is

22    faulty, and CSX cites facts that CSX did not have

23    double-stack capacity between NIT and the Midwest until

24    December of 2016.

25            Crowley asserts that he relied on numbers used by

1   CSX witnesses, including their 30(b)(6) witness, to arrive at

2   the 2.5 number along with evidence from VIT, Virginia

3   International Terminal, that it loads three containers per

4   railcar well 90 percent of the time.

5        There is a dispute about the average number of

6   containers per railcar well loaded on CSX trains during the

7   relevant time frame, and this will have to be addressed at

8   trial.  That dispute doesn't render Mr. Crowley's opinions on

9   the matter excludable.

10        As for his consideration of cost on a per-mile

11   basis, CSX's argument that this warrants exclusion also

12   misses the mark.  While switching railroads may not tie their

13   rates to route length given the short distances involved,

14   that does not mean that the length of the route does not

15   affect the cost to the railroad to perform the service.

16        Crowley asserts that the length of the route factors

17   into the cost structure, including fuel consumption and

18   maintenance, and helps compare rates charged by switching

19   railroads with different route lengths.

20        He acknowledges that he was not retained to opine on

21   whether CSX's proposals could have made the Belt Line money,

22   and his report does not address that issue, and he will not

23   be permitted to testify on that at trial.  But that does not

24   also require excluding his remaining opinions.

25        Accordingly, I find his opinions on the

1    reasonableness of the Belt Line's rates are relevant and

2    reliable, fit the facts of the case, and will assist the

3    jury, and the motion to exclude those opinions is denied.

4         CSX next asserts that Crowley should not be allowed

5    to opine about historical facts or offer legal conclusions

6    about the Belt Line's governing documents.  And in pages 7

7    through 9 of Mr. Crowley's report, he discusses that 1897

8    Operating Agreement, the Belt Line's Bylaws, formation of a

9    rate committee in 2009, CSX's 2010 proposal, and its renewed

10   proposal in 2018 as well as actions taken by the Belt Line in

11   response to the proposals.

12        Mr. Crowley finds that CSX's proposals were outside

13   the parameters of the Operating Agreement and contrary to the

14   Bylaws.  He offers this as a counternarrative to Dr. Marvel's

15   assertion that the Belt Line rejected two proposals from CSX

16   that would have been profitable to the company.

17        Mr. Crowley has not tied his knowledge of railroad

18   rates, costs, and operations to his discussions of these

19   historical documents and events or to any legal conclusions

20   he may seek to draw.  His report cites the documents

21   themselves, board minutes, and deposition testimony of

22   Belt Line employees as bases for the history provided.

23        While he may rely on this information as grounds for

24   his opinions on a reasonable rate and refer to the Operating

25   Agreement to explain the reason he focuses on costs rather

1 than profit in his calculations, he cannot provide this

2 historical narrative to the jury.

3          Crowley will also not be permitted to opine that

4 CSX's proposals violate the Agreement and Bylaws.  And in

5 that regard, I cite the case of *United States vs. Offill*,

6 666 F.3d at 175.

7          As was done in depositions, the Belt Line employees

8 can provide the jury with the history surrounding the

9 proposals and the Belt Line's response.

10          CSX's motion to exclude Mr. Crowley's testimony

11 providing the historical narrative or legal conclusions about

12 whether those proposals were contrary to the Agreement and

13 Bylaws is granted.  Mr. Crowley will, however, be allowed to

14 rely on those documents to explain his approach to

15 calculating a reasonable rate.

16          With respect to the subject of drayage, I find that

17 Mr. Crowley's experience with railroad structure, operations,

18 costs, contracts, and tariffs over his lengthy economic

19 consulting practice qualifies him to render an opinion on

20 drayage as an alternative to rail service for CSX at NIT.

21          CSX asserts Crowley's opinions on drayage are not

22 reliable because, as just discussed, he allegedly relies on

23 simple math to compare the cost of drayage to on-dock rail

24 access while adding little to the analysis and because, they

25 argue, he ignores evidence in the record regarding

nonmonetary factors making drayage an unreasonable alternative and, finally, that he allegedly ignored evidence in the record that drayage is only cheaper than on-dock rail due to the alleged anticompetitive conduct.

Crowley opines that the subsidized drayage service that CSX uses to move containers between NIT -- Norfolk International Terminal -- and CSX's intermodal yard at Portsmouth, quote, is an effective alternative to all-rail service over NPBL to NIT, end quote.

He explains that rail and drayage services compete for intermodal shipments throughout the country including at the Virginia Port Authority terminals. Mr. Crowley discusses the economics of drayage versus on-dock rail access at NIT by addressing the VIT subsidy for drayage and how that lowers the cost to dray below the cost of using on-dock rail at NPBL.

He also faults Dr. Marvel for comparing Norfolk Southern's access at the Belt Line to CSX's because Norfolk Southern has its own track that creates efficiencies that cannot be reproduced by the Belt Line for CSX.

Next Mr. Crowley argues that Dr. Marvel downplays the role of trucking in the intermodal freight market, and he references, as discussed, the large number of trucking companies, 145, offering drayage services to the Port of Virginia and the barriers to entry into the trucking market

1    and fixed cost of operations are the lowest of any freight

2    mode.

3              He also argues, as Mr. McDaniel mentioned, that the

4    initiation of the PRO-PASS system for trucks at NIT which

5    became mandatory in April of 2018 drastically improved the

6    performance of drayage companies including a reduction in

7    wait times at the terminal gate.  He attacks Dr. Marvel's

8    reliance on discussions and data that predate this system at

9    NIT when finding drayage is not efficient.

10             Mr. Crowley testified that he considered operations,

11   quote, to the extent he could, unquote, along with the

12   economics of using drayage and found that the, quote,

13   operations seemed to favor dray as well.

14             CSX faults Mr. Crowley for failing to acknowledge

15   the capacity limitations on drayage and limited trucking

16   hours on that route.

17             Mr. Crowley asserts that the capacity of limitations

18   largely were addressed by implementing the PRO-PASS system.

19   He also asserts that CSX should have lobbied for extended

20   gate hours at NIT, and I note, although CSX asserts the

21   limitations are imposed due to local regulations and not NIT.

22             CSX also asserts that Crowley fails to address the

23   evidence of record as outlined in CSX's Statement of Facts in

24   support of its motion for summary judgment.  This, quote,

25   evidence of record consists in large part of assertions of

1    fact that are disputed.

2          Accordingly, I find Mr. Crowley relies on more than

3    simple math to arrive at his opinions regarding the

4    substitution of drayage for on-dock rail access at NIT.  If

5    CSX disagrees with the factors Mr. Crowley considered or

6    disregarded or used in arriving at his opinions, CSX can

7    cross-examine Mr. Crowley on those issues.

8          Accordingly, the motion to exclude Mr. Crowley's

9    opinions on whether drayage is an effective alternative to

10   on-dock rail at NIT is denied.

11         That's the Court's ruling on Mr. Crowley, and I

12   intend to make rulings on a number of the other motions that

13   have been filed, the motions in limine, and thankfully you

14   will find that my rulings on those are shorter than my ruling

15   on Mr. Crowley.

16         I am going to reserve on the Dr. Marvel motions,

17   and, also, I'm going to reserve on, I think it's one other

18   motion relating to that, the motion that's ECF number 337,

19   the motion regarding the use of internal e-mails.  And then

20   I'm going to reserve on ECF number 349, which is the motion

21   in limine to exclude evidence and argument regarding the

22   internal use of internal Norfolk Southern e-mails.

23         So I'll next take up Norfolk Southern's motion in

24   limine to exclude evidence and argument that the Belt Line

25   switch rate is unreasonable.

```
 1              Give me just a moment.

 2              (Pause in the proceedings.)

 3              THE COURT:  Norfolk Southern's motion in limine to

 4    exclude evidence and argument that the Belt Line switch rate

 5    is unreasonable is denied subject, of course, to the Court's

 6    ruling on the pending motions for summary judgment.

 7              The linchpin of Norfolk Southern's argument is that

 8    the Surface Transpiration Board, or STB, has sole

 9    jurisdiction to decide switch rates for Belt Line.  As a

10    result, Norfolk Southern argues that CSX may not ask the

11    trier of fact to assess the reasonableness of the Belt Line

12    switch rate, the Court may not remedy that rate, and the

13    switch rate is irrelevant and beyond the scope of this case.

14              As Chief Judge Davis explained in ruling on the

15    motion to dismiss with respect to this question of

16    jurisdiction, I quote the STB's exclusive authority over rail

17    carriers' mergers implicates the doctrine of, quote, primary

18    jurisdiction, which, despite its name, is not jurisdictional.

19              Importantly, despite what the term "primary

20    jurisdiction" may imply, it does not speak to the

21    jurisdictional power of the federal court; it simply

22    structures the proceedings as a matter of judicial discretion

23    so as to engender an orderly and sensible coordination of the

24    work of agencies and courts.  That's ECF 395 at 4, and he

25    quotes a Fourth Circuit case involving *Environmental*
```

1    *Technology Council*, 98 F.3d at 789, note 24.

2            Accordingly, the existence of STB authority to

3    decide whether the Belt Line switch rate is reasonable does

4    not mean that the Court lacks jurisdiction over CSX's claims.

5    Such claims are properly before the Court, and in view of the

6    need to consider, quote, the orderly and sensible

7    coordination of work of agencies and courts, it is also

8    noteworthy that the STB has stayed its proceeding pending the

9    resolution of the case before this Court, with the STB being

10   fully aware of this current litigation.

11           This leaves the question whether the evidentiary

12   grounds exist to bar CSX from offering evidence as well as

13   argument of an alleged excessive switch rate as proof in

14   support of CSX's pending antitrust conspiracy and contract

15   claims.

16           As noted by Chief Judge Davis, quote, CSX asserts

17   that the establishment of such rate in 2009, and the

18   maintenance of such rate over time, was the product of

19   unlawful collusion.  And that's ECF 395.  I'm missing the

20   page cite, but it's footnote 17.

21           In *Great Northern Railway Company*, the Supreme Court

22   stated that the determination of a past wrong of, quote, an

23   unreasonable or discriminatory rate is a judicial function.

24   And that is at 259 U.S. at 291.

25           Therefore, in the context of addressing CSX's

1   pending claims, the question of whether the switch rate was

2   excessive and used to block CSX from access to NIT is

3   squarely a judicial function.

4         Norfolk Southern seeks to bar such evidence on the

5   ground that only the STB is vested with authority to

6   determine the reasonableness of the switch rate and that

7   evidence directed to assessing whether it was excessive is

8   irrelevant.

9         The jury, however, is not going to be tasked with

10  adjudicating the proper switch rate.  The relevant question

11  in the context of the pending claims is whether the

12  defendants conspired and colluded to set the switch rate at

13  an inflated level so as to unlawfully and effectively

14  preclude CSX from gaining on-dock rail access to NIT.

15        Evidence tending to establish such facts appears at

16  this juncture to be of consequence to the pending claims.

17  Accordingly, the Court denies Norfolk Southern's motion for a

18  blanket exclusion order for such evidence.  Of course, the

19  admissibility of testimony and any individual items of

20  evidence remains to be addressed at trial.

21        Finally, if Norfolk Southern seeks a limiting

22  instruction concerning the proper use of any evidence about

23  the establishment of a switch rate, it should include a

24  proposed instruction as part of its proposed jury

25  instructions.

1             That brings me next to ECF number 331, which again
2    is Norfolk Southern's motion in limine to exclude evidence
3    and argument on the loss of customer contracts by CSX.
4             And the first issue raised in this motion in limine
5    is whether to prohibit CSX from presenting fact-witness
6    testimony that CSX lost or was not awarded contracts with
7    ocean carriers as a result of the defendant's conduct
8    pursuant to Rule 802 of the Rules of Evidence.
9             CSX's evidence regarding loss of contracts appears
10   to consist of hearsay evidence discussing what ocean carriers
11   told CSX employees, and the hearsay rules will likely prevent
12   the admission of this evidence.
13            However, the Court cannot rule categorically that
14   CSX cannot present evidence regarding lost contracts without
15   walking through each piece of evidence and hearing CSX's
16   arguments about why the evidence is not hearsay or meets some
17   kind of exception.  And for that, I cite *United States vs.*
18   *Gibson*, 2018 Westlaw 4903261 at *2.  That's an Eastern
19   District of Virginia case, October 9, 2018.
20            The second issue raised, assuming that Dr. Marvel is
21   permitted to testify, is whether to prohibit him from
22   presenting testimony that CSX lost or was not awarded
23   contracts with ocean carriers due to defendant's conduct
24   pursuant to Rule 703.
25            The relevant inquiry is, first, whether any

1    particular statement is hearsay or meets an exception;

2    second, whether Dr. Marvel would be parroting hearsay without

3    adding anything new to the statement; and, three, which side

4    the balancing test established in Rule 703 favors.

5         The second and third prongs of this inquiry appear

6    at this preliminary juncture to favor granting the motion,

7    but just as a blanket evidentiary ruling that CSX's counsel

8    and fact witnesses are precluded from testifying or arguing

9    that an ocean carrier has denied CSX's business due to the

10   lack of on-dock rail access at NIT is premature.  The same is

11   true regarding the scope of Dr. Marvel's potential testimony.

12        Accordingly, the motion is denied without prejudice

13   to timely objection at trial.  CSX is ordered to avoid

14   discussing hearsay statements during opening statements, and

15   should Dr. Marvel be allowed to testify, counsel for CSX is

16   also directed to exercise care in eliciting testimony from

17   him with an eye to the trial judge's rulings on the contested

18   evidence.

19        That brings me next to Norfolk Southern's motion in

20   limine regarding discontinuance of the Diamond Track.  That

21   motion seeks to prohibit CSX from offering at trial any

22   evidence or argument that the discontinuance of the Diamond

23   Track constituted anticompetitive conduct by the defendants.

24   And that motion is denied without prejudice and, of course,

25   subject to the Court's ruling on the motions for summary

1  judgment.

2      Norfolk Southern argues that CSX should not be

3  allowed to relitigate the final judgment of the STB in 2008

4  proving the discontinuance of the Diamond Track.  The Court

5  agrees that CSX does not have standing to contest that

6  decision and the Court does not have jurisdiction to overturn

7  it.

8      CSX asserts it will offer evidence of the Diamond

9  Track closure as one means by which Norfolk Southern sought

10  to block CSX's access to on-dock rail at NIT for

11  anticompetitive gain.

12      As addressed in the ruling on Norfolk Southern's

13  motion to dismiss, this Court has jurisdiction over the

14  antitrust and related state law claims pending before the

15  Court.

16      To the extent CSX can prove at trial that the

17  closure of the Diamond Track was undertaken to block CSX's

18  access to on-dock rail at NIT, the evidence, to the extent

19  that it's not time-barred, appears to be relevant to claims

20  at issue under Rule 401 of the Rules of Evidence.

21      Norfolk Southern's argument that this evidence will

22  confuse and mislead the jury is not persuasive.  The facts

23  surrounding the discontinuance of the track including the

24  Surface Transportation Board's approval of the closure and

25  CSX's failure to object at that time can be presented to the

1    jury.

2           Accordingly, the probative value of the evidence is

3    not substantially outweighed by dangers of confusing or

4    misleading the jury, and the evidence should not be excluded

5    pursuant to Rule 403.

6           Norfolk Southern further argues that any evidence

7    surrounding the Belt Line's meetings and Surface

8    Transportation Board proceedings addressing the Diamond Track

9    fall far outside the relevant time period, making the

10   evidence irrelevant and inadmissible as it relates to the

11   statute-of-limitations question.

12          That is a matter that the parties and the Court can

13   revisit as needed following the Court's ruling on the motions

14   for summary judgment.

15          Next I will address ECF number 353, which is the

16   Belt Line's motion in limine to exclude evidence and argument

17   about CSX's private switching rates.

18          The Belt Line's motion in limine to exclude evidence

19   or argument about other contractual switching rates paid by

20   CSX is denied.

21          Belt Line seeks to exclude that evidence and

22   argument on the grounds that it's not relevant and, even if

23   it were, it's unduly prejudicial pursuant to Rules 401, 402,

24   and 403 of the Rules of Evidence.  And, respectfully, I do

25   disagree on both points.

1          Belt Line's relevance argument mostly relies on the

2     *Laurel Sand* case that was discussed today, which is at

3     704 F.Supp. at 1323.  And although the Court there stated

4     that the reasonableness of a rate is determined, quote, in

5     the context of competition rather than from the plaintiff's

6     perspective, it nowhere indicated that negotiated contract

7     switching rates should be excluded from the determination of

8     whether a rate charged was anticompetitive; rather, it noted

9     that a plaintiff's inability to pay a certain rate does not

10    mean that the rate is anticompetitive.

11         Notably, the Court is *Laurel Sand* looked at the

12    defendant's costs and the rates it charged another company,

13    Millville Quarry, and determined that a rate offer slightly

14    in excess of variable cost was not an anticompetitive rate.

15    That's at Pages 1323 and -24.

16         CSX seeks to offer evidence about its contractually

17    negotiated rates with other switching railroads for services

18    allegedly similar to those provided by Belt Line.

19         As a general proposition, the Court agrees that such

20    evidence is relevant to the market price for switching rates

21    and whether the Belt Line's switching rate is

22    anticompetitive; nor is there any evidence that the contract

23    rates were negotiated in other than arm's length

24    transactions.

25         Belt Line's argument about any differences between

1    contractually negotiated and public tariff-based switching

2    rates goes to the weight, rather than the admissibility, of

3    such evidence.  It fails to support Belt Line's request for a

4    blanket order of exclusion.

5           To the extent that Belt Line claims it lacked

6    knowledge of CSX's contractually negotiated switch rates,

7    Belt Line may seek to offer evidence about what it knew and

8    the manner in which it set its public tariff switching rate,

9    and the jury may consider the same in assessing whether such

10   was excessive or anticompetitive.

11          Finally, nor is the admission of such evidence by

12   CSX, or argument, unlikely to engender unfair prejudice to

13   the defense by means of confusion or misleading the jury.

14          The Court is confident that a properly instructed

15   jury can assess all the evidence, including any differences

16   between the switch rates established by public tariffs and

17   those agreed to in contract negotiations.  Accordingly, the

18   probative value of the contested evidence is not

19   substantially outweighed by danger of unfair prejudice.

20          Next I will address ECF 359, which is the Belt

21   Line's motion in limine to exclude evidence and argument from

22   nonparties.  And by that they refer to Virginia Port

23   Authority and Virginia International Terminal officials.

24          The motion in limine to limit evidence and argument

25   from those nonparties is granted in part and denied in part

1   without prejudice.

2        The motion is denied without prejudice as to

3   testimony and evidence from current and former VPA and VIT

4   employees about, one, the Belt Line switch rate; two, CSX's

5   rail access to NIT; and, three, the April 13, 2018, letter

6   from John Reinhart to Cannon Moss described in the Belt

7   Line's motion.

8        The decision line between admissible versus

9   inadmissible testimony about such matters is likely to be a

10  fine one and cannot be made in a vacuum, essentially at a

11  motion in limine phase in this case, without understanding

12  the foundation laid for any such testimony, the question

13  asked, and the information sought to be elicited.

14       Although Belt Line may well be correct that such

15  witnesses should be foreclosed in characterizing the Belt

16  Line switching rate as unreasonable and the like, with a

17  proper foundation such witnesses may be allowed, for example,

18  to compare the Belt Line's rate to other switching rates.

19       Likewise, with timely and proper objections, such

20  witnesses may not be allowed to characterize CSX's rail

21  access as, quote, improper or, quote, inequitable.  However,

22  such witnesses may have personal knowledge of events that

23  permits them to offer less legally charged characterizations

24  of their observations concerning the extent of CSX's access

25  to NIT, and these questions are best addressed during trial.

1          For similar reasons, issues concerning the probative

2    value and any prejudice stemming from admission of the

3    April 13, 2018, letter are also reserved for trial.

4          Although CSX denies any intent to offer such

5    testimony, to the extent it may seek to elicit testimony from

6    such employees that they or the VPA or VIT, quote, support

7    CSX's legal claims in the case, the motion in limine is

8    granted; such testimony is irrelevant.

9          Further, as it falls to the jury to assess CSX's

10   legal claims and any defenses thereto, any such testimony

11   explicitly endorsing or vouching for CSX's legal claims by a

12   quasi-governmental agency or its employees would also be

13   highly prejudicial to the defense and subject to exclusion

14   under Rule 403.

15         The Court reserves for trial questions about the

16   admissibility of other testimony from such employees relating

17   to VPA and VIT's desire for the parties to find a solution to

18   facilitate greater use of NIT, and, finally, the proper scope

19   of any argument based on the actual testimony and other

20   evidence introduced through such employees is reserved for

21   trial.

22         Next up is ECF 365, which is the Belt Line's motion

23   in limine to exclude evidence and argument from CSX witnesses

24   who lack personal knowledge.  They reference some witnesses;

25   Robert -- I may not pronounce his name correctly -- Girardot,

1    Chris Wagel, and Carl Warren.

2              My question for you, Mr. Hatch, is does CSX intend

3    to call them to testify, or are we dealing with deposition

4    testimony from these witnesses?  Do you know?

5              MR. HATCH:  Your Honor, we will be calling

6    Mr. Girardot.  We will not be calling live Mr. Warren and not

7    as to Mr. Wagel either.

8              THE COURT:  Do you intend to present evidence from

9    them via depositions?

10             MR. HATCH:  Yes, Your Honor.

11             THE COURT:  Very well.  Thank you.

12             MR. HATCH:  Thank you.

13             THE COURT:  With respect to the Belt Line's motion

14   in limine to exclude evidence from the CSX witnesses who

15   reportedly lack personal knowledge, the motion is granted in

16   part and denied in part without prejudice.

17             And I grant the motion only in one respect; namely,

18   that Mr. Girardot is precluded from testifying about

19   statements, A, reportedly made by VIT management to Ocean

20   Network Express personnel about the capacity to reliably dray

21   containers between NIT and CSX's Portsmouth terminal and, B,

22   made by Ocean Network Express personnel indicating that that

23   carrier would have chosen CSX for business but for, or in

24   significant part due to, concerns about CSX's lack of on-dock

25   access at NIT.

1          This hearsay is inadmissible for the truth of the

2     matter asserted in the statements Mr. Girardot describes.

3     Similarly, because the probative value of such evidence does

4     not substantially outweigh the dangers of unfair prejudice

5     and risks that such evidence may mislead the jury, nor may

6     CSX solicit testimony from Dr. Marvel about those statements

7     if he's allowed to testify.

8          I have also considered the evidentiary arguments

9     concerning admission of the remaining evidence and testimony

10    identified in the Belt Line's motion concerning lost business

11    opportunities allegedly sustained by CSX, the operation and

12    application of the Belt Line's tariff, the preferences and

13    practices of ocean carriers, calculations of the average

14    number of shipping containers stacked by CSX in railcar

15    wells, and the inadequacy of drayage as an alternative to

16    on-dock rail access.

17         Having considered the affidavits at issue and the

18    deposition testimony in question, the Court finds that it

19    cannot conclude at this preliminary stage that all forms of

20    testimonial evidence about those subjects is inadmissible as

21    a matter of law.

22         To the contrary, questions of context, the knowledge

23    and experience of the witnesses in question, the adequacy of

24    any foundation laid for testimony about such topics, the

25    nature of the questions asked, the purpose for which any

1    testimony is offered, and ultimately the admissibility of any

2    such testimony are matters to be addressed at trial or, with

3    respect to any depositions, possibly during the pretrial

4    conference, and any deposition designations that are objected

5    to.

6           Accordingly, in all other respects, the Belt Line's

7    motion is denied without prejudice.

8           For the same reasons, and assuming for the purposes

9    of this motion that Dr. Marvel is allowed to testify, the

10   motion is also denied without prejudice to the extent that

11   Dr. Marvel bases his opinions on testimony and evidence about

12   the foregoing matters aside from those that I specifically

13   identified with respect to Mr. Girardot's statements.

14          Again, I caution counsel for CSX to exercise care in

15   eliciting testimony from Dr. Marvel with an eye to the trial

16   judge's or possibly my rulings on deposition designations

17   about whether testimony on the topics described is admitted

18   or denied.

19          Next I address ECF number 378, which is CSX's motion

20   in limine to preclude mischaracterization of its rate

21   proposals.  This motion is denied subject, of course, to the

22   Court's rulings on the pending motions for summary judgment.

23          CSX seeks to exclude such evidence and argument on

24   the ground that it is incorrect, improper, irrelevant, and

25   prejudicial pursuant to the Federal Rules of Evidence.

1          The Court has considered the arguments relating to

2    admissibility of evidence and argument concerning, first,

3    whether CSX's 2010 and 2018 proposals were nonuniform rate

4    proposals and, two, acceptance of CSX's proposals would have

5    violated the Belt Line's Operating Agreement.

6          To start, the Court does not find that its previous

7    order addressing the defendant's motion to dismiss -- and I

8    refer to ECF number 66 at pages 26 to 28 -- precludes

9    evidence and argument at trial about those two subjects.

10         At the present juncture, the Court is not tasked

11   with evaluating the sufficiency of CSX's claims and pleadings

12   but must decide whether to exclude broad categories of

13   evidence from trial.

14         If evidence of these two proposals is admitted, one

15   potential trial issue concerns whether the Belt Line and

16   Norfolk Southern's treatment, handling of, and reaction to

17   the 2010 and 2018 proposals constituted anticompetitive acts

18   and/or evidence of an unlawful conspiracy.

19         Statements and acts contemporaneous with those

20   events, including those addressing the formation of and

21   reaction to the proposals, the parties' understanding about

22   the proposals at the time, questions asked and answered and

23   provided at the time, and the parties' views at the time

24   about the interplay, if any, between the proposals and the

25   Operating Agreement appear at this juncture to be relevant to

1    issues of alleged anticompetitive and conspiratorial

2    behavior.

3          CSX's contention that the Belt Line previously

4    considered and allegedly maintained nonuniform rates does not

5    warrant a blanket exclusion of the types of evidence just

6    described.

7          If evidence that the Belt Line had nonuniform rates

8    exists, CSX may offer it to cast doubt upon the Belt Line's

9    interpretation of the Operating Agreement and/or its

10   treatment and handling of the two disputed proposals.

11         Finally, the admission of the evidence just

12   described by the Court, or argument reasonably based thereon,

13   would not unduly prejudice CSX by misleading or confusing the

14   jury as its probative value appears not to be substantially

15   outweighed by any prejudice ensuing from admission.

16         If, as CSX contends, one or both defendants attempt

17   to offer after-the-fact explanations and/or acts and

18   omissions not undertaken at or around the time the proposals

19   were submitted and considered, the Court can best address

20   that at trial by timely objection to the evidence when

21   offered or argument when made.

22         Let me check with my clerks a moment.

23         (Pause in the proceedings.)

24         THE COURT:  Aside from the motions that I have

25   reserved on, then, I think that concludes our business here

```
 1    today.  Thank you for your patience and efforts here this

 2    afternoon.  I appreciate your hard work on this case and your

 3    excellent briefing and argument.

 4              MR. HATCH:  Thank you, Your Honor.

 5              MR. SNOW:  Thank you, Your Honor.

 6              (The proceedings adjourned at 4:04 p.m.)

 7

 8                         CERTIFICATION

 9

10       I certify that the foregoing is a correct transcript

11    from the record of proceedings in the above-entitled matter.

12

13

14              _____/s/_____

15                   Carol L. Naughton

16                   December 6, 2022

17

18

19

20

21

22

23

24

25
```