**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | | |
|---|---|---|
| CSX TRANSPORTATION, INC., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No. 2:18-cv-530 |
| | ) | |
| NORFOLK SOUTHERN RAILWAY | ) | |
| COMPANY, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

**DEFENDANTS' JOINT BRIEF**
**ON THE ISSUES OF INJUNCTIVE RELIEF AND LACHES**

Defendants Norfolk Southern Railway Company ("NS" or "NSR") and Norfolk &

Portsmouth Belt Line Railroad Company ("Belt Line" or "NPBL"), by counsel and pursuant to the

Court's Order dated December 21, 2022 (ECF No. 548) (the "Order"), submit this joint brief

addressing the topics identified by the Court in the Order. For the reasons stated below, the record

shows as a matter of law that Plaintiff CSX Transportation, Inc. ("CSX") is not entitled to the

injunctive relief it has requested for multiple reasons, including because laches bars its claims for

injunctive relief.

I.      **Introduction.**

The Court directed the parties to address laches, stating:

> **[T]he Court finds it appropriate to provide the parties the opportunity to
> address laches, and how the legal analysis is similar, or different from, the
> limitations issues that have long been at issue in this case and were discussed
> at length during oral arguments on the respective summary judgment
> motions. In particular, the Court is interested in the relevance of laches to the
> claim of injunctive relief if the Court were to find that the record revealed the
> absence of evidence that NSR improperly used its majority interest on the [Belt
> Line] board during the last ten years.**

ECF No. 548, at 2.

CSX's 2018 request for injunctive relief, like its claim for damages, comes far too late and is barred by the doctrine of laches.  Even if CSX had acted promptly, as was its obligation, it still could not obtain the injunctive relief it seeks from this Court under 15 U.S.C. § 26,[1] as the requested relief is firmly within the jurisdiction of the Surface Transportation Board (the "STB").  As described in Defendants' briefs filed in response to the Court's December 13, 2022 Order (ECF Nos. 542 and 543), CSX's specific claims for injunctive relief are within the jurisdiction of the STB, and CSX could have sought relief from the STB long ago but did not.  CSX is not entitled to damages or a trial on injunctive relief in this case.  This matter should be dismissed with prejudice in its entirety.

## II.     Legal Standard for Laches.

### A.     *Defendants properly raised laches as a defense to CSX's request for injunctive relief.*

Each Defendant pled laches as an affirmative defense to CSX's claims for injunctive relief.  *See* ECF Nos. 69, at 23-24 (NS Answer); ECF No. 70, at 13 (NPBL Answer).  Laches is a proper defense to injunctive relief requests under the Clayton Act and Virginia state law.  *See Steves & Sons, Inc. v. Jeld-Wen, Inc*., 988 F.3d 690, 717 (4th Cir. 2021) (claims for injunctive relief under 15 U.S.C. § 26 are subject to the equitable defense of laches); *Int'l Tel & Tel. Corp. v. Gen. Tel. & Electronics Corp.*, 518 F.2d 913, 928 (9th Cir. 1975), *disapproved of on other grounds by California v. Am. Stores Co*., 495 U.S. 271 (1990) (same); *Princess Anne Hills Civic League, Inc. v. Susan Constant Real Estate Trust, et al.*, 243 Va. 53, 58 (1992) (holding that laches is a defense to equitable claims under Virginia law).  Like the statute of limitations, the defense "applies to preclude relief for a plaintiff who has unreasonably 'slept' on his rights," barring "claims where a

---

[1]  This statute is Section 16 of the Clayton Act.  For ease of reference, it will be referred to herein as "Section 26".

defendant is prejudiced by a plaintiff's unreasonable delay in bringing suit after the plaintiff knew of the defendant's violation." *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 121 (4th Cir. 2011).

"The doctrine of laches is premised upon the same principles that underlie statutes of limitation:  the desire to avoid unfairness that can result from the prosecution of stale claims." *Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 277 (8th Cir. 2004) (citation omitted). Statutes of limitation and laches

> are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.  The theory is that, even if one has a just claim, it is unjust not to put the adversary on notice to defend within the period of limitations and that the right to be free of stale claims in time comes to prevail over the right to prosecute them.

*Ord. of R.R. Telegraphers v. Ry. Express Agency*, 321 U.S. 342, 348-49 (1944).

As with the statute of limitations, when a party seeks an injunction against past conduct, or past conduct that is alleged to reoccur in the future, the laches period is measured from the initial claimed violation.  *See IT&T*, 518 F.3d at 928 ("[If] the relief sought in a [Section 26] suit is an injunction forbidding recurrence of the violation … it would seem proper, as a basic and initial proposition to measure the laches period from the time when the violation occurred[.]"); *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 991 (N.D. Ca. 2020) (where the feared violation is identical to alleged past violations, the doctrine of laches applies).

### B.   *The four-year limitations period for CSX's antitrust claims also applies to its request for injunctive relief.*

"[I]n applying laches, courts of equity 'usually act or refuse to act in analogy to[] the statute of limitations relating to actions at law of like character.'"  *Steves & Sons, Inc.*, 988 F.3d at 717 n.13 (*quoting King v. Richardson*, 136 F.2d 849, 862 (4th Cir. 1943)).  Indeed, "judicial uses of

laches to deviate from a statute of limitation particular to a substantive provision, such as the antitrust laws, is and should be fairly rare."  Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* § 320g (4th ed. Supp. 2022) (hereinafter "Antitrust Law").  This is so because "[t]he four-year limitation of . . . Section 4B for private antitrust actions for damages is long enough to enable potential plaintiffs to observe the actual effects and the possible antitrust violation and to calculate its potential defects."  *IT&T*, 518 F.2d at 929; *Menominee Indian Tribe of Wisconsin v. United States*, 614 F.3d 519, 531 (D.C. Cir. 2010) (the starting presumption is that an antitrust plaintiff must file its lawsuit within four years from the accrual of the claim); Antitrust Law § 320g & n.199 (collecting cases holding that "the four-year statutory limitation period for damage actions [is]. . . determinative of the equity result as well").

> ### C.   *CSX has the burden of showing that its delay is excusable and caused no prejudice.*

A defendant usually has "the ultimate burden of proving '(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.'"  *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990) (quoting *Costello v. United States*, 365 U.S. 265, 282 (1961)).  When, however, a claim for injunctive relief is brought outside the analogous limitations period, it creates a presumption that the plaintiff's delay is inexcusable and caused prejudice to the defendant, which the *plaintiff* must rebut.  *See PBM Prods.*, 639 F.3d at 122 (citing *Jarrow Formulas v. Nutrition Now*, 304 F.3d 829, 837 (9th Cir. 2002) ("We hold that the presumption of laches is triggered if any part of the claimed wrongful conduct occurred beyond the limitations period. To hold otherwise would effectively swallow the rule of laches, and render it a spineless defense."); *IT&T*, 518 F.2d at 926 ("[T]he bare fact of delay creates a rebuttable presumption of prejudice [to the defendant.]"); *Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1057 (5th Cir. 1982) (holding that the plaintiff who delays bringing suit must

show his delay was excusable and that there was no prejudice to the defendant); *Gruca v. United States Steel Corp.*, 495 F.2d 1252, 1259 (3d Cir. 1974) ("If a plaintiff sleeps on his rights for a period of time greater than the applicable statute of limitations, then 'the plaintiff (must) . . . come forward and prove that his delay was excusable and that it did not . . . prejudice the defendant.'") (citation omitted); *Conopco v. Campbell Soup Co*., 95 F.3d 187, 191 (2d Cir. 1996) (holding that where the conduct forming the basis of the complaint occurs outside the analogous statute of limitations, laches presumptively bars a plaintiff's claims absent a showing that delay was excusable and caused no prejudice to the defendant).

## III.    CSX's delay in seeking injunctive relief is inexcusable and prejudices Defendants.

Regardless of which party has the burden, the undisputed evidence in the record shows an inexcusable lack of diligence by CSX causing prejudice to Defendants.

### A.    CSX "sat on its rights" and was not diligent in pursing relief.

By this litigation, CSX is challenging what it contends is longstanding, improper conduct. It asserts that "*[f]or more than two decades*, NS and the Belt Line have conspired to maintain NS's control of intermodal freight moving by rail through the Port of Virginia ("POV")."  ECF No. 324, CSX's Opp. Summ. J., SOF ¶ 10 (emphasis added).

The foundation of this alleged conspiracy is the Belt Line's switch rate, which for over a decade CSX has claimed presents an economic barrier to moving international intermodal freight in and out of Norfolk International Terminal ("NIT").  *See id.* at 10 ("Defendants Use NPBL's Switch Rate to Block CSX"); ¶ 14 ("One way Defendants have blocked CSX's access to on-dock rail at NIT is through NPBL's switch rate.").   CSX's assertions that the switch rate is "anticompetitive" started at least as early as June 2009, even before the Belt Line set the rate at $210.  On June 16, 2009, Tony Ingram, CSX employee and Belt Line board member at the time, stated in a letter to the Belt Line: ████████████████████████████████████

██████████████████████████████████████████████ ECF No. 299,

NPBL Mot. Summ. J., Ex. 39, at 2 (emphasis added).  In another letter to the Belt Line dated July

23, 2009, Mr. Ingram stated: ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████ *Id.*, Ex. 40, at 1

(emphasis added).

It is undisputed that in December 2009, the Belt Line board voted to set a single, uniform

switch rate at $210 per car, which became effective January 1, 2010.  *See* ECF No. 324, SOF ¶ 29.

The two CSX-appointed board members voted against the $210 switch rate.[2]  *Id.*  At the same

time, CSX created a strategy to obtain relief from this allegedly improper conduct.  In April 2010,

the two CSX employees who served on the Belt Line board, Fredrik Eliasson and Steven

Armbrust,[3] prepared a memo setting forth CSX's strategy:



ECF No. 308, NS Mot. Summ. J., Ex. 114, at 2.  CSX submitted the 2010 Rate Proposal to the

Belt Line in October 2010, believing that the board's failure to accept it would trigger a claim.  *See*

ECF No. 299, Ex. 44, Eliasson Dep. 112:24-113:2 ████████████████████████████

---

[2]  Since 1989, the NPBL board has been composed of three NS-appointed board members, two
CSX-appointed board members, and the president of the NPBL.  *See* ECF No. 324, SOF ¶ 3.
[3]  It is worth noting that Mr. Armbrust is in-house counsel for CSX who "began providing legal
advice to CSX employees involved with Virginia ports and the NPBL in late 2008."  ECF No. 176,
at 2.



CSX complained to Defendants about the handling of its rate proposal by the Belt Line board and its management.  *See* ECF No. 324, Ex. 43.  Specifically, CSX:



*Id.*

As the record shows, however, *CSX never asked the board to vote on its 2010 Rate Proposal.*



Nor did CSX seek injunctive relief relating to composition of the Belt Line's board after CSX complained about the handling of the

2010 Rate Proposal or the hiring of Cannon Moss as NPBL president in September 2011. *See* ECF No. 324, SOF ¶¶ 40-41.

These facts, which are undisputed, show that (1) CSX knew it could have sought the same injunctive relief it seeks now back in 2010, eight years before it filed this lawsuit; (2) CSX failed to seek relief from any court or the STB; and (3) there is nothing excusing CSX's delay in seeking this injunctive relief. *See Gov't of P.R. v. Carpenter Co.*, 442 F. Supp. 3d 464, 474-75 (D.P.R. 2020) (where the allegations in the complaint demonstrated that the plaintiffs knew of the allegedly infringing conduct and the last injurious act occurred almost ten years ago, plaintiffs could not overcome the presumption that their claims under Section 26 were barred by laches); *Corizon LLC v. Wainwright*, Case No. 3:20cv00892, 2020 U.S. Dist. LEXIS 200752, at *21-23 (M.D. Tenn. Oct. 28, 2020) (finding laches barred plaintiff's claims where there was no evidence of action taken, after plaintiff chose not to file protest, indicating that plaintiff was actively pursuing its rights). Accordingly, laches bars CSX's request for injunctive relief in this case.

While CSX is not entitled to injunctive relief relating to the Belt Line's switch rate based on laches, and this Court cannot grant such relief under Section 26, CSX is not left without recourse. As this Court has noted, CSX can still challenge the rate before the STB, as it could have done over fourteen years ago. *See* ECF No. 396, at 26 n.16.

**B.**     ***Defendants were prejudiced by CSX's inexcusable delay.***

CSX's delay has prejudiced Defendants in multiple ways. First, the delay in seeking the requested injunctive relief has created "surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Ord. of R.R. Telegraphers*, 321 U.S. at 348-49. For example, the potential witnesses involved in the discontinuance of the Diamond Track have long since moved on. CSX has tried

to take advantage of this by arguing that "the STB application was misrepresented.  It was false.  It said that this could be removed and still maintain access – effective access to the industry.  So I think this was mispresented, even to the STB."  *See* CSX Rule 30(b)(6) Dep. 186:15-23 (**Exhibit A**).  Similarly, witnesses that the parties have been able to depose do not remember details about significant events or allegations.  For example, when asked about the statement in his June 16, 2009 letter that the Belt Line's tariff rate "serves as a direct barrier to fair and competitive access at NIT," Mr. Ingram could not explain why the rate did not provide competitive access: "I don't have the details.  I don't remember what happened 14 years ago."  *See* Tony Ingram Dep. 84:3-8 (**Exhibit B**).

Second, Defendants have relied on CSX's inaction to their detriment.  For example, given the lack of objection by CSX to discontinuance of the Diamond Track, and the STB's subsequent approval, the track was removed, only for CSX to now claim – more than a decade later – that the removal was part of a longstanding conspiracy.  Similarly, CSX failed to object to, or seek relief from, the Belt Line's current tariff, which included the $210 switch rate, when the Belt Line board reviewed its tariff and unanimously approved it in 2014.  *See* **Exhibit C**.  But CSX now wants to take advantage of its inexcusable delay by claiming that Defendants have engaged in a 20-year-old conspiracy by trying to link together isolated events separated by multiple years.  Indeed, the only way CSX can claim such a long-standing conspiracy is because it failed to act many years ago by seeking relief from the STB for its purported inability to access NIT.  In effect, CSX's delay has resulted in a so-far successful gambit to forum shop for its attack on the rate – it should have sought relief from the STB more than a decade ago as its own 2010 initial strategy recognized.  Having slept on its rights, CSX is now using its decision to give up on its strategy to justify bringing a belated challenge in the guise of an antitrust lawsuit in this Court.

Third, CSX is trying to take advantage of its inexcusable delay by claiming damages all the way back to 2009. But for CSX's lack of diligence, CSX would not be able to claim over 14 years of damages amounting to hundreds of millions of dollars, as it is trying to do here.

In sum, CSX's long delay and passage of the statute of limitations period raises a presumption of laches. CSX has the burden to show its delay was excusable and caused no prejudice, and, as a matter of law, it can show neither. Laches bars CSX's injunction claims.

**IV.    CSX's Memorandum raises no bar to dismissal of its requests for injunctive relief.**

**A.    *Defendants did not "waive" defenses to claims for injunctive relief.***

CSX claims that Defendants "waived" entitlement to summary judgment because they failed to specify in their initial summary judgment papers the argument that CSX "failed to allege or preserve claims for injunctive relief." (ECF No. 541, at 3.) CSX is wrong.

Defendants waived nothing. Rule 56 requires a party moving for summary judgment to identify the claims on which summary judgment is sought and to show that there is no dispute as to any material fact. Fed. R. Civ. P. 56(a). Both Defendants moved for summary judgment on all claims pending against them. *See* ECF Nos. 307, 296. As shown above, the record is replete with undisputed facts barring CSX's claim for injunctive relief, and indeed, the Court itself recognized that the facts related to CSX's delay "have long been at issue in this case." ECF No. 548, at 2. Furthermore, NS explained in its motion that the STB "has exclusive jurisdiction over the reasonableness of switch rates and the trackage rights agreement between NS and NPBL." *See* ECF No. 308, SOF ¶ 45. NS also argued that CSX's requested relief was not warranted because the "STB provides regulatory oversight of the railroad industry and has exclusive authority to grant terminal access and determine the reasonableness of switch rates, like the one charged by the NPBL." *Id*., at 32.

Defendants' arguments are no surprise given that each had clearly asserted defenses (including laches) to the equitable claims at issue. *See* ECF Nos. 69, at 23-24 (NS Answer); ECF No. 70, at 13 (NPBL Answer). And the Court has given CSX notice and an opportunity to be heard on whether its claim for injunctive relief can survive summary judgment issues, including under the doctrine of laches. *See* ECF Nos. 535, 548.

Nothing has been waived, Rule 56 has been followed, and dismissal of CSX's claims for injunctive relief is appropriate.

**B.     *Section 26 defeats CSX's claims for injunctive relief.***

CSX argues it has statutory standing to seek injunctive relief even absent quantified proof of damages, pointing to 15 U.S.C. § 26 as allowing for injunctive relief to prevent "threatened loss or damage by a violation of the antitrust laws." ECF No. 541, at 2 (quoting 15 U.S.C. § 26). CSX fails to mention, much less quote, the following portion of Section 26 that torpedoes its claims for injunctive relief:

> Provided, That nothing herein contained shall be construed to entitle any person, firm, corporation, or association, except the United States, to bring suit for injunctive relief against any common carrier subject to the jurisdiction of the Surface Transportation Board.

15 U.S.C. § 26.

As discussed in Defendants' initial briefs on injunctive relief (ECF Nos. 542, 543), this provision bars the injunctive relief that CSX seeks. *See Central Transfer Co. v. Terminal R. Ass'n of St. Louis*, 61 F.2d 546, 548 (8th Cir. 1932) ("[D]efendants are carriers subject to that act. The only question then is whether the suit by the plaintiff is 'in respect of any matter subject to the regulation, supervision, or other jurisdiction of the Interstate Commerce Commission."); *see also Truck-Rail Handling Inc. v. BNSF Railway Company*, Case No. C 02-02825 JSW, 2005 WL 8178364, at *4 n.5 (N.D. Cal. Mar. 8, 2005) (holding in a suit alleging violations of Sections 1 and

2 of the Sherman Act under a theory of foreclosure, that although "[n]either party has raised this issue; yet it appears undisputed that BNSF is a common carrier subject to the jurisdiction of the Surface Transportation Board.   Accordingly, as a matter of law, Plaintiffs cannot obtain an injunction against BNSF . . . ").

## C.   *CSX points to no violative conduct that is likely to recur in the future.*

CSX pins much of its argument on the purported "imminent" loss or damage it will suffer from ongoing harm in the form of lost customer contracts.  CSX's argument, intentionally or not, confuses the issue by (again) omitting consideration of the full text of Section 26.  Under this section, the plaintiff must show "threatened conduct that will cause loss or damage."  As the U.S. Supreme Court explained, this requires "a significant threat of injury *from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur.*  *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 130 (1969) (emphasis added).  *See also Gov't of P.R.*, 442 F. Supp. 3d at 466 ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects.").  Not just any type of threatened injury supports an injunction; rather, the threatened injury must arise from violative *conduct* likely to occur in the future, either in the form of a wholly new act in violation of the antitrust laws or an existing violation that is likely to continue in the future.

CSX cannot show this threat of future violative *conduct*.  For example, CSX holds hard to arguments that have been thoroughly debunked on summary judgment, such as the claim that NS is threatening to enter into a new trackage rights agreement with Belt Line, when in fact that agreement is before the STB for adjudication.  CSX also claims it is threatened by the existing $210 rate, but it is undisputed that the rate was set long ago.  And if the Court finds NS did nothing

wrong with its majority ownership of the Belt Line in the last 10 years, then it is necessary to also find that there is no *threat* of a future or continuing wrongdoing to enjoin.

In sum, Section 26 does not authorize injunctive relief to prevent harm that allegedly occurred long ago, but only to prevent genuinely threatened harm from new conduct that is likely to occur *in the future*.  CSX has not, and cannot, point to any such future violation.  As such, CSX is not entitled to injunctive relief.

> **D.** *CSX's remaining points merely rehash arguments made before, without actually answering the Court's questions.*

The remainder of CSX's initial brief warrants no detailed rejoinder, as CSX rehashes arguments made on summary judgment without actually answering the Court's questions.  For example, CSX spends much of its time arguing that it made an adequate showing of damages.  But CSX fails to cite any new cases or raise any new arguments to overcome the manifest problems caused by its attempt to recover damages from conduct occurring outside the statute of limitations period and/or failing to differentiate between the effects of procompetitive versus anticompetitive conduct.

CSX also argues that the STB is depending on this Court to make antitrust rulings, but that is exactly what this Court would be doing by granting Defendants' summary judgment motions.  CSX claims that Defendants have not put on evidence showing they have "ceased" anticompetitive conduct, but the very point of the pending motions was to show a lack of antitrust (and state law) violations.  In sum, Defendants counter these tired arguments by reference to their own summary judgment briefing and will forebear repeating those arguments in detail here.

## CONCLUSION

Defendants respectfully request that this case be dismissed in its entirety.  CSX has no cognizable damage claim, and its injunction claims fail for the reasons laid out in the record and briefing.

Dated: December 27, 2022                           Respectfully submitted,

**NORFOLK AND
PORTSMOUTH BELT LINE
RAILROAD COMPANY**

 /s/ W. Ryan Snow
James L. Chapman, IV, Esq.
W. Ryan Snow, Esq.
Alexander R. McDaniel, Esq.
CRENSHAW, WARE &
MARTIN, P.L.C.
150 W. Main Street, Suite 1500
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
Email: jchapman@cwm-law.com
Email: wrsnow@cwm-law.com
Email: amcdaniel@cwm-law.com

*Attorneys for Norfolk and Portsmouth Belt
Line Railroad Company*

**NORFOLK SOUTHERN RAILWAY
COMPANY**

/s/ Michael E. Lacy
Alan D. Wingfield (VSB No. 27489)
Michael E. Lacy (VSB No. 48477)
Massie P. Cooper (VSB No. 82510)
TROUTMAN PEPPER HAMILTON SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-1200
Facsimile: (804) 698-6061
Email: alan.wingfield@troutman.com
Email: michael.lacy@troutman.com
Email: massie.cooper@troutman.com

John C. Lynch (VSB No. 39267)
Kathleen M. Knudsen (VSB No. 90845)
TROUTMAN PEPPER HAMILTON SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, VA  23462
Telephone: (757) 687-7500
Facsimile: (757) 687-7510
Email: john.lynch@troutman.com
Email: kathleen.knudsen@troutman.com

Tara L. Reinhart
Thomas R. Gentry
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005
Telephone: (202) 371-7000
tara.reinhart@skadden.com
thomas.gentry@skadden.com

137994507