UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

CSX TRANSPORTATION, INC.,
*individually and on behalf*
*of NORFOLK & PORTSMOUTH BELT*
*LINE RAILROAD COMPANY,*

               Plaintiff,

v.

                                   Civil No. 2:18cv530

NORFOLK SOUTHERN RAILWAY COMPANY,
and NORFOLK & PORTSMOUTH BELT LINE
RAILWAY COMPANY,

               Defendants.

## OPINION AND ORDER

This matter is before the Court on motions for summary judgment filed by defendant Norfolk & Portsmouth Belt Line Railway Company ("NPBL"), ECF No. 296, and defendant Norfolk Southern Railway Company ("NSR," and together with NPBL, "Defendants"), ECF No. 307. A jury trial is currently scheduled to commence on January 18, 2023. On December 1, 2022, the Court conducted a hearing on the pending motions, and it thereafter received two sets of supplemental briefs from the parties on the issue of injunctive relief. For the reasons stated below, the Court **GRANTS in part**, and **DENIES in part**, summary judgment in favor of Defendants. The jury trial currently scheduled for January 18, 2023, will be converted to a bench trial on injunctive relief.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff CSX Transportation, Inc. ("Plaintiff" or "CSX") and defendant NSR are Class I railroads that operate in the eastern United States and Canada.   Defendant NPBL is a terminal and switching railroad that operates in Hampton Roads, Virginia.   NPBL was founded in 1896 as a joint venture by eight railroads, including predecessors of CSX and NSR, and it operates to provide its owners with access to NPBL's own tracks and tracks on which NPBL has rights to operate.   Due to industry consolidation, NPBL is now jointly owned only by CSX (43%) and NSR (57%).   Based on its majority position, NSR has appointed the majority of the NPBL Board for approximately thirty years.    During this time, there has been a pattern of the NPBL Board selecting a former NSR employee to serve as the NPBL President and of NSR rehiring its former employee after he serves as NPBL President for a few years. ECF No. 324-2.    Additionally, NSR provides various forms of administrative support to NPBL, including locomotive leases, billing and contract services, technology services, a car management system, email addresses,[1] benefits administration, and locomotive maintenance.

CSX and NSR vigorously compete for the domestic rail transportation of international "intermodal" containers delivered

---

[1] As a result of the email support, NPBL executives, including the company president, send and receive emails at the NSR domain "nscorp.com."

to and from various East Coast ports, including the Port of Virginia in Hampton Roads (the "POV"). Norfolk International Terminals ("NIT") is one of two primary POV terminals where international container ships offload their cargo. Critically, NSR has rail access to NIT over tracks that it owns, whereas CSX can only access NIT by rail through NPBL's contractual right to use NSR's tracks to access the terminal. Utilizing NPBL's trackage rights requires CSX to pay the NPBL "switch rate," which is the cost per train car "well" that NPBL charges customers to use its tracks/switching services. In 2009, the NPBL Board increased the switch rate to $210 per well, and that switch rate has remained the same ever since.[2] CSX's alternative to paying the $210 switch rate is transporting intermodal containers by truck from NIT to a local CSX railyard to be loaded onto a CSX train, a practice referred to as "drayage."

Adding further complication to the shared use of the single track to and from NIT, NSR owns tracks on the southern side of NIT

---

[2] The parties vehemently dispute whether the 2009 rate is an unreasonable barrier to CSX's ability to participate in the market. CSX has presented sufficient evidence on which a factfinder could conclude that the rate was viewed by NSR as a "high" rate that acted as an obstacle to CSX's ability to provide on-dock rail at NIT. CSX has also provided facially damaging evidence indicating that NSR acted to leverage its majority stake in NPBL to prevent CSX from securing a lower rate to access NIT in 2009 and shortly thereafter. CSX therefore has presented evidence supporting its claim that, in or around 2009, NSR and/or NSR in conjunction with NPBL, knowingly acted to preclude CSX from accessing NIT by rail even though NPBL exists for the purpose of providing its owners (including CSX) access to NPBL tracks and trackage rights. However, as discussed herein, nearly all of the claimed anti-competitive acts for which there is evidentiary support occurred prior to 2013.

that allow NSR trains to move through the terminal in a contiguous circle with its trains entering through the north gate and exiting through the south gate. In contrast, NPBL's more limited trackage rights require CSX trains moved by NPBL to enter and exit NIT through the north gate.

The crux of the instant lawsuit is whether NSR and NPBL committed monopolistic antitrust violations, or unlawfully colluded with each other in restraint of trade, in a manner that prevented CSX from fairly competing to transport international shipping containers destined for the POV, or more specifically for NIT, by preventing CSX from obtaining on-dock rail access at NIT.

Relevant to the dispute over rail access at NIT, both CSX and NSR have on-dock rail access at Virginia International Gateway ("VIG"), the other primary POV container terminal. VIG, however, has fewer berths capable of accepting large international containerships than does NIT.[3] The terminal operating company (Virginia International Terminals, hereinafter, "VIT") that operates the POV ultimately determines which terminal a containership will be routed to for docking and unloading.[4] As

---

[3] It is the Court's understanding that both terminals were recently expanded and upgraded, but it appears undisputed that VIG was significantly smaller than NIT during the years leading up to the filing of the instant lawsuit.

[4] During certain years withing the applicable limitations period there was a third smaller POV terminal that also received some international container cargo. However, the operation of such smaller terminal during certain relevant years does not appear to materially impact the matters pending on summary judgment.

4

such, CSX cannot guarantee to its international shipping customers that CSX will be able to provide on-dock rail access at both POV terminals because it cannot prevent VIT from routing those customers' vessels to NIT.  Various forms of record evidence demonstrate that NSR highly valued its position as the "sole" provider of on-dock rail access at NIT and that international shippers and VIT employees viewed CSX's lack of on-dock rail access at NIT as negatively impacting CSX's ability to compete for international shipping business at NIT.

CSX's lawsuit contends that, due to the share of POV intermodal business that is routed through NIT and due to NSR's monopolistic control over on-dock rail access at NIT, CSX is unlawfully precluded from fairly competing with NSR for intermodal traffic at NIT because: (1) on-dock rail access is critically important to international intermodal customers and that delays and/or unpredictability associated with drayage means that it is not a suitable commercial alternative beyond certain levels; (2) based on its on-dock rail access at VIG and NIT, only NSR can guarantee on-dock rail access to its international shipping customers; and (3) international shipping customers are harmed by elevated rates that NSR is able to charge and does charge due to its actions excluding CSX from competing at NIT.

Though VIG and NIT are in some ways "substitutes" within the same geographic market, as they provide the same service, CSX

points to evidence establishing that NSR, CSX, and international shipping companies are prevented from choosing to patronize one terminal over the other due to VIT's assignment of incoming vessels to a terminal based on berth availability and additional considerations other than railroad affiliation. CSX and its expert therefore contend that NIT and VIG are not truly "substitutes" within the same "market." Instead, CSX argues that the only way a railway serving the POV terminals can fairly compete for international shipping contracts is to offer on-dock rail access at both major terminals. CSX and its expert separately contend that relying on "drayage" services at NIT is not a valid substitute for on-dock rail access, and NSR's 2009 efforts to stop CSX from advertising that it had on-dock rail access at NIT provides circumstantial evidence for CSX's factual contention that on-dock rail access is critical to its ability to compete for international customers and that NSR took multiple steps to limit that access in and around 2009. See ECF Nos. 326-32 to 326-34; ECF No. 326-31. NSR strongly disputes all these claims, contending that CSX has not defined a relevant market due to available substitutes, to include VIG, drayage, other East Coast ports, and end-to-end truck transportation (meaning that international containers are transported from the port to their final destination without being placed on a train).

6

CSX filed its complaint in this action in October of 2018, alleging four federal antitrust claims and various state law claims. Following motions practice and dismissals, the remaining claims, all of which are disputed on summary judgment, are as follows: Count One, a § 1 Sherman Act conspiracy to restrain trade claim against NSR and NPBL; Count Two, a § 2 Sherman Act conspiracy to monopolize claim against NSR and NPBL; Counts Three and Four, § 2 Sherman Act monopoly and attempted monopoly claims against NSR; Count Five, a Virginia state law breach of contract claim against NSR; and Counts Eight and Nine, Virginia state law conspiracy claims against NSR and NPBL.

In March of 2020, the parties filed a joint motion to stay the case due to the COVID-19 pandemic, and several additional joint motions to stay for the same reason were subsequently filed and granted. A scheduling order establishing new deadlines was entered in October of 2020. In May of 2021, the Court entered an order referring a potentially dispositive issue to the U.S. Surface Transportation Board ("STB"), the federal agency charged with the economic regulation of freight rail. The case was again stayed until June of 2022 when the STB issued its decision. In August of 2022, an updated scheduling order was entered and a jury trial was scheduled for January 18, 2023.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that a district court shall grant summary judgment in favor of a movant if such party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The mere existence of some alleged factual dispute between the parties "will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247-48 (1986). "A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party." Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012).

"Because '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,'" the Court must only evaluate the evidence to the extent necessary to determine whether there is "sufficient disagreement to require submission to a jury or whether [the evidence] is so one-sided that one party must prevail as a matter of law." McAirlaids, Inc. v. Kimberly-Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (alteration in original) (quoting Anderson, 477 U.S. at 251-52, 255). In making its determination, "the district court must view the evidence in the

8

light most favorable to the nonmoving party." Jacobs v. N.C. Admin. Off. of the Cts., 780 F.3d 562, 568 (4th Cir. 2015) (internal quotation marks omitted).   The requirement that the district court construe all reasonable inferences in favor of the non-movant and avoid "weighing" evidence is not to be taken lightly, and a district court is obligated to deny summary judgment if "a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of evidence required by the governing law or that he did not." United States v. McClellan, 44 F.4th 200, 205 (4th Cir. 2022) (quoting Anderson, 477 U.S. at 254).

The United States Supreme Court has instructed district courts to cautiously apply summary procedures in federal antitrust cases, though such caution is particularly important at the motion to dismiss stage.   Poller v. Columbia Broad. Sys., Inc., 368 U.S. 464, 473 (1962). "Summary judgment clearly remains, however, an appropriate procedure in antitrust litigation." Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985).   As the Fourth Circuit noted long after Poller was decided, "because of the unusual entanglement of legal and factual issues frequently presented in antitrust cases, the task of sorting them out may be particularly well-suited for Rule 56 utilization." Thompson Everett, Inc. v. Nat'l Cable Advert., L.P., 57 F.3d 1317, 1322 (4th Cir. 1995).   This is, of course, especially true when dispositive matters do not turn on issues of motive or inferences

to be drawn from circumstantial evidence.  See id. (explaining, in
the context of an antitrust case, that "if the evidence is 'merely
colorable' or 'not significantly probative,' it may not be adequate
to oppose entry of summary judgment" (quoting Anderson, 477 U.S.
at 249-50)).

### III. DISCUSSION – STATUTE OF LIMITATIONS BACKGROUND

Defendants NSR and NPBL assert on summary judgment that CSX's
federal antitrust claims and related state law claims are all time-
barred.  It is undisputed that the longest applicable limitations
period for any claim in this case is five years (thus dating back
no earlier than October of 2013), with the federal antitrust claims
governed by a four-year limitations period.  See GO Computer, Inc.
v. Microsoft Corp., 508 F.3d 170, 173 (4th Cir. 2007) ("The statute
of limitations for federal antitrust claims bars any action 'unless
commenced within four years after the cause of action accrued,'
plus any tolling.") (quoting 15 U.S.C. § 15b).[5]  CSX's Virginia
common law conspiracy claim appears to have a two-year limitations
period to the extent it relies on an alleged breach of a fiduciary
duty.  See NorthStar Aviation, LLC v. Alberto, 332 F. Supp. 3d

---

[5] CSX's federal claims are advanced pursuant to § 1 and § 2 of the Sherman
Act, though the private right to enforce the Sherman Act and recover damages
is provided by a statutory provision adopted as part of the Clayton Act.
15 U.S.C. § 15. The Clayton Act expressly provides that private enforcement
actions seeking damages are subject to a four-year limitations period.  15
U.S.C. § 15b.   A separate provision of the Clayton Act provides for
injunctive relief based on threatened loss or damage.  15 U.S.C. § 26.

1007, 1015 (E.D. Va. 2018) (citing Va. Code § 8.01-248; <u>Singer v.</u>

<u>Dungan</u>, 45 F.3d 823, 827 (4th Cir. 1995).

     The "principal purpose of limiting statutes is the prevention

of stale claims," and as "the Supreme Court has explained, statutes

of limitations protect important rights and are primarily designed

to assure fairness to defendants."  <u>SD3, LLC v. Black & Decker</u>

<u>(U.S.), Inc.</u>, 215 F. Supp. 3d 486, 493 (E.D. Va. 2016) (quoting

<u>Goad v. Celotex Corp.</u>, 831 F.2d 508, 511 (4th Cir. 1987); <u>Burnett</u>

<u>v. New York Cent. R. Co.</u>, 380 U.S. 424, 428 (1965)).  As explained

in a leading antitrust treatise:

> Limitation serves the same functions in antitrust as
> elsewhere in the law: to put old liabilities to rest, to
> relieve courts and parties from "stale" claims where the
> best evidence may no longer be available, and to create
> incentives for those who believe themselves wronged to
> investigate and bring their claims promptly,
> particularly when they are known or can be determined.
> Repose is especially valuable in antitrust, where tests
> of legality are often rather vague, where many business
> practices can be simultaneously efficient and beneficial
> to consumers but also challengeable as antitrust
> violations . . . .

Phillip E. Areeda & Herbert Hovenkamp, <u>Antitrust Law</u> ¶ 320a (5th

ed. 2022).   In fact, the Supreme Court has expressly acknowledged

the need for enforcement of the limitations period in both the

RICO and Clayton Act contexts, explaining that:

> Both statutes share a common congressional objective of
> encouraging civil litigation to supplement Government
> efforts to deter and penalize the respectively
> prohibited practices. The object of civil RICO is thus
> not merely to compensate victims but to turn them into
> prosecutors, "private attorneys general," dedicated to

> eliminating racketeering activity. The provision for
> treble damages is accordingly justified by the expected
> benefit of suppressing racketeering activity, an object
> pursued the sooner the better. It would, accordingly,
> be strange to provide an unusually long basic
> limitations period that could only have the effect of
> postponing whatever public benefit civil RICO might
> realize. The Clayton Act avoids any such policy conflict
> by its accrual rule that "[g]enerally, a cause of action
> accrues and the statute begins to run when a defendant
> commits an act that injures a plaintiff's business,"
> <u>Zenith Radio Corp. v. Hazeltine Rsch., Inc.</u>, 401 U.S.
> 321, 338 (1971), and the Clayton Act analogy reflects
> the clear intent of Congress to reject a potentially
> longer basic rule under RICO.

<u>Rotella v. Wood</u>, 528 U.S. 549, 557-58 (2000) (footnote and citation omitted).

As further explained in the above-referenced treatise, the impetus to apply a policy that generally recognizes immediate accrual "is particularly strong in the case of 'public' acts challenged as antitrust violations," including "exclusionary practices that are known by those at whom they are directed." Areeda & Hovenkamp, <u>Antitrust Law</u> ¶ 320a. This is so because parties injured by so-called "public" acts "<u>are able to feel</u> and perhaps to assess their injuries almost immediately," and because assessing the full scope of antitrust consequences "is often difficult[,] . . . it is especially important that antitrust challenges be timely made, <u>thus minimizing the social costs of any antitrust violation</u> but giving the parties repose for conduct that is lawful." <u>Id.</u> (emphasis added).

## IV. DISCUSSION - FEDERAL STATUTE OF LIMITATIONS

### A. Standard Accrual Rule

Supreme Court precedent establishes that a Sherman Act "cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." Mayor of Baltimore v. Actelion Pharms. Ltd., 995 F.3d 123, 129 (4th Cir. 2021) (quoting Zenith, 401 U.S. at 338). Because a private action seeking to enforce the Sherman Act "vindicates one who is injured by a violation of the antitrust laws, it accrues when the plaintiff first suffers injury." Id. (second emphasis added) (citing Zenith, 401 U.S. at 339). Therefore, if "a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him." Id. (quoting Zenith, 401 U.S. at 339). When the injury at issue involves exclusion from an industry or market based on an antitrust violation, the excluded would-be competitor typically has knowledge of the "public" act of exclusion, and thus, the injury is felt immediately. See N. Carolina Elec. Membership Corp. v. Carolina Power & Light Co., 780 F. Supp. 322, 331 (M.D.N.C. 1991) ("Judge Posner, a former antitrust professor, has explained that to a potential competitor 'exclusion from a market is a conventional form of antitrust injury that gives rise to a claim for damages as soon as the exclusion occurs even though, in the nature of things, the victim's losses lie mostly in the

13

future.'"  (cleaned up) (emphasis added) (quoting Brunswick Corp. v. Riegel Textile Corp., 752 F.2d 261, 271 (7th Cir. 1984))).

### B. Continuing Violation Doctrine

A review of the summary judgment record reveals that CSX's litigation position is based on alleged injuries stemming from numerous acts committed by Defendants more than four years before this suit was filed.  NSR's summary judgment motion therefore anticipates CSX's reliance on the "continuing violation" doctrine applicable to certain § 1 and § 2 Sherman Act claims. Specifically, NSR argues that CSX cannot establish either that antitrust "overt acts" were committed during the limitations period or that it suffered new injuries from Defendants' conduct occurring during the limitations period.  ECF No. 308, at 19-20.[6] In opposition to Defendants' motions for summary judgment, CSX does in fact invoke the continuing violation doctrine.  ECF No. 328, at 41-46.  In their reply briefs, both Defendants seek to further refute the doctrine's applicability.  ECF No. 383, at 5-15; ECF No. 388, at 5-8.

Defendants, of course, bear the burden of proving that CSX's claims are time-barred.  David v. Alphin, 704 F.3d 327, 339 (4th Cir. 2013).  However, with respect to the federal antitrust claims, once Defendants illustrate that the claims are untimely but for

---

[6] The Court's citations to the parties' briefs are to the paginated numbers of the briefs, not the differently numbered ECF documents.

the application of the continuing violation exception, CSX bears the burden of establishing that the exception applies. See XY, LLC v. Trans Ova Genetics, 890 F.3d 1282, 1292 (Fed. Cir. 2018) (applying Tenth Circuit law); Kaw Valley Elec. Co-op. Co. v. Kansas Elec. Power Co-op., Inc., 872 F.2d 931, 933 (10th Cir. 1989); Varner v. Peterson Farms, 371 F.3d 1011, 1019-20 (8th Cir. 2004) (finding that the plaintiffs who wished to proceed under a "continuing violation" exception "failed to plead sufficient facts . . . to establish an exception to toll the statutes of limitations"); see also Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp., 828 F.2d 211, 219-20 (4th Cir. 1987) (noting that when a plaintiff seeks "to escape the statute" of limitations on the basis of fraudulent concealment, the plaintiff must plead the necessary facts to demonstrate fraudulent concealment); Akron Presform Mold Co. v. McNeil Corp., 496 F.2d 230, 233 (6th Cir. 1974) (noting that when invoked rules are "in avoidance of the statute of limitations, the party seeking the benefit of them has the burden of proof to establish them"). Although CSX disputed at oral argument whether Defendants timely asserted that CSX had the burden on this issue and/or whether the applicable law places the burden on CSX, the Court finds both that the matter is properly before the Court and that CSX must shoulder the burden to prove that this exception applies. Regardless, these findings are not determinative because the outcome of the Court's limitations

analysis would be the same no matter which party bears the burden of proof.

The "continuing violation" or "continuing conspiracy" doctrine applicable to claims under § 1 and § 2 of the Sherman Act is easily understood at a basic level. However, its application is exceedingly complex, and it applies differently across various types of antitrust cases. At base, the rule provides that "in the case of a 'continuing violation,' say, a price-fixing conspiracy that brings about a series of unlawfully high-priced sales over a period of years, 'each overt act that is part of the violation and that injures the plaintiff,' e.g., each sale to the plaintiff, 'starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.'" Klehr v. A.O. Smith Corp., 521 U.S. 179, 189 (1997) (quoting 2 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 338b, p. 145 (rev. ed. 1995)). Although the limitations period restarts as to new injuries flowing from new acts committed within the limitations period, "the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." Id. (citing Zenith, 401 U.S. at 338). Thus, as recognized by the Supreme Court in the context of both civil RICO cases and federal "antitrust cases, the plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate

acts that took place outside the limitations period." Id. at 190 (emphasis added). It is therefore "not sufficient that the plaintiff may have suffered the damages caused by the defendant's violation within the limitations period," Lancianese v. Bank of Mount Hope, 783 F.2d 467, 470 (4th Cir. 1986); rather, calculable damages that flow from time-barred acts are time-barred four years after the defendant committed the acts that caused calculable harm. In Zenith, the Court explained the renewed limitations period in the "continuing violation" antitrust context as follows:

> In the context of a continuing conspiracy to violate the antitrust laws, such as the conspiracy in the instant case, this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act. . . . Thus, if a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date. To recover those damages, he must sue within the requisite number of years from the accrual of the action.

Zenith, 401 U.S. at 338-39 (emphasis added).

Here, Defendants assert that — as established by the plain language of Zenith and further supported by the Supreme Court's subsequent anti-bootstrapping rule from Klehr — CSX must provide evidence "linking" its claimed damages to overt acts occurring during the limitations period. See GO Computer, Inc. v. Microsoft Corp., 508 F.3d 170, 174 (4th Cir. 2007) (citing Zenith for the

17

proposition that "each new injurious act in a continuing antitrust conspiracy starts a new limitations clock <u>as to that act</u>") (emphasis added); <u>In re Cotton Yarn Antitrust Litig.</u>, 505 F.3d 274, 290 (4th Cir. 2007) (citing <u>Zenith</u> and <u>Klehr</u>); <u>AGF, Inc. v. Columbia Gas Transmission Corp.</u>, No. CV 2:04-0870, 2009 WL 10688066, at *3 (S.D.W. Va. July 2, 2009) (granting summary judgment in the defendant's favor as the plaintiff failed to file suit within four years of being excluded from the market, and any acts by defendant after plaintiffs terminated their businesses "did not cause new injuries to them").

As another judge of this Court recently explained, based on the <u>Zenith</u> analysis governing continuing violations in antitrust cases, "each injury suffered gives rise to <u>a separate cause of action</u> that is <u>subject to its own limitations period</u>," and a plaintiff's damages "must be connected to the discrete injuries that caused them." <u>Steves & Sons, Inc. v. JELD-WEN, Inc.</u>, 292 F. Supp. 3d 656, 671 (E.D. Va. 2018). Therefore:

> [A]n action by defendants within the statutory period does not bring the entire alleged conspiracy, the vast majority of which occurred outside the statutory period, into that period. Rather, it will only give rise to a cause of action (a) if the action within the statutory period itself injures the plaintiffs and (b) as to damages stemming from that action.

<u>Litovich v. Bank of Am. Corp.</u>, 568 F. Supp. 3d 398, 434 (S.D.N.Y. 2021); <u>see</u> <u>United States v. Dentsply Int'l, Inc.</u>, Civ. No. 99-255-SLR, 2001 WL 624807, at *17 (D. Del. Mar. 30, 2001) (explaining

that the intra-limitations period "overt act alleged by a plaintiff must be causally related to the plaintiff's claimed injury").

## C. Special Accrual Rule - Speculative Damages ("Zenith Exception")

A special antitrust accrual rule, sometimes referred to as the "Zenith exception," applies in certain antitrust actions to delay the date of accrual. The Zenith exception only applies when, at the time of the exclusionary conduct (when a private antitrust action would normally accrue), the plaintiff's damages are so dependent on future events that they are "too speculative to recover." Actelion Pharms., 995 F.3d at 130 (citing Zenith, 401 U.S. at 339); see Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp., 546 F.2d 570, 573 (4th Cir. 1976) ("[A] cause of action for future damages does not accrue until the damages become reasonably ascertainable and, therefore, capable of proof."). The concept of "speculative" damages, however, must not be extended too far, lest it swallow the otherwise applicable accrual rule. Moreover, as recognized by the Fourth Circuit, "Zenith did not prescribe new standards for determining whether damages are too speculative to permit recovery." Charlotte Telecasters, 546 F.2d at 573. Rather, the precedent in place at the time Zenith was decided, "teach[es] that when the defendant's wrong has been proven, 'the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict

19

accordingly,'" and that juries may "'act upon probable and inferential, as well as direct and positive proof.'" Id. (quoting Bigelow v. RKO Pictures, Inc., 327 U.S. 251, 264 (1946)).

Accordingly, "[m]ere uncertainty as to the extent or amount of damage will not bar recovery under the antitrust laws." Aurora Enterprises, Inc. v. Nat'l Broad. Co., 688 F.2d 689, 694 (9th Cir. 1982) (citing Story Parchment Co. v. Paterson Paper Co., 282 U.S. 555, 562 (1931)). Stated another way, "the Zenith case does not require that the plaintiff have the best evidence possible of his damage, but rather only that the damages be provable," and while better evidence of damages may not be available until the future, "that does not mean at an earlier point in time, enough evidence of damage was not available to allow the issue to go to the jury." In re Multidistrict Vehicle Air Pollution, 591 F.2d 68, 74 (9th Cir. 1979) (quoting Monona Shores, Inc. v. United States Steel Corp., 374 F. Supp. 930, 936 (D. Minn. 1973)). In Charlotte Telecasters, the Fourth Circuit rejected the plaintiff's Zenith argument that its date of accrual should be delayed because its future damages were too speculative, noting that the plaintiff's prior submission of a five-year projection of future subscribers and gross receipts that would have occurred had the plaintiffs received a television franchise from the city council revealed that "the damages which [the plaintiffs] sought were not too speculative to prevent the cause of action from accruing at the

time of the last overt act." _Charlotte Telecasters_, 546 F.2d at
573; _see_ _N. Carolina Elec. Membership Corp._, 780 F. Supp. at 333
(discussing the difference between uncertain damage and uncertain
extent of damage, and indicating that "since _Zenith_ most circuit
courts have declined to label future damage claims speculative").

### D. CSX's Legal Construction of the Continuing Violation Doctrine

CSX advances two primary arguments in support of the
application of the continuing violation doctrine to the summary
judgment record. First, as set forth in its written brief and as
argued at the summary judgment hearing, CSX contends that proof of
an ongoing conspiracy during the limitations period as illustrated
by any overt act is enough to support recovery for _all damages_
caused by the conspiracy. Second, as advanced for the first time
at oral argument, CSX contends that the _Zenith_ exception governing
speculative damages applies in this case.

### 1. Proof of Ongoing Conspiracy

In its written brief, CSX relies on _In re Lower Lake Erie_
_Iron Ore Antitrust Litig._, 998 F.2d 1144 (3d Cir. 1993) for the
proposition that, in the context of an unlawful monopoly or
conspiracy in restraint of trade that extends into the limitations
period, the plaintiff need not link specific overt acts to specific
accumulating damages because "overt acts aren't what cause
damage," rather, "[i]t is the effectiveness of the overall

conspiracy that causes damages." Id. at 1172.  In Lower Lake Erie, the court expressly rejected the argument that "Zenith and its progeny limit recovery to damages resulting 'from injury-causing overt acts,'" explaining that such assertion "fails to recognize, in circumstances such as here, that continuing and accumulating damage may result from intentional, concerted inaction," meaning that purposeful inaction can be a sufficiently injurious act, even if "perhaps not an overt one in the commonly-understood sense." Id.  The Lower Lake Erie decision labeled the defendant's effort — to rely on Zenith's language linking the restarted limitations period to the damage caused by a new overt act — as an "overreading" of Zenith directing a "myopic gaze" at a rule that was not even at issue in Zenith.  Id.

After rejecting the need to link damages to current overt acts and allowing for a damages claim based on recent inaction, the Third Circuit went on to reject the defendant's reliance on Poster Exchange, Inc. v. National Screen Service Corp., 517 F.2d 117 (5th Cir. 1975), which was similarly cited for the proposition that damages needed to be linked to overt acts.  The Lower Lake Erie opinion explained that "far from requiring that the plaintiff tie its damages to specific acts, the [Poster Exchange] court acknowledged that a continuing conspiracy may give rise to 'continually accruing rights of action,' and the court simply required the plaintiff to support its allegation that the defendant

had 'continued during the period in suit to refuse to deal.'" 998 F.2d at 1173 (quoting Poster Exchange, 517 F.2d at 128).

While Lower Lake Erie offers CSX a favorable interpretation of Zenith in support of CSX's limitations and damages theories, it predated the Supreme Court's clarification of the anti-bootstrapping rule in Klehr. Further, subsequent case law from multiple circuits, including the Third and Fifth Circuits, has clarified that the plain language in Zenith means what it says. That is, the limitations period restarts for new and accumulating damages caused by new actions committed within the limitations period, and a plaintiff is barred from seeking damages based on long stale conduct that has inertial consequences felt inside the limitations period.

Having carefully considered CSX's reliance on Lower Lake Erie in the light of subsequent case law, the Court reaches two conclusions. First, as to Poster Exchange, the analysis in that case appears to address a slightly different question than Lower Lake Erie, as the primary issue addressed by the Fifth Circuit appeared to be why the repetition during the limitations period of acts that are the same or similar to acts committed outside the limitations period can restart the limitations period. The Fifth Circuit noted (1) that Zenith relied on case law that does not require "acts different in kind to set up a later accruing cause of action," and (2) the concern that a contrary rule would

"improperly transform the limitations statute from one of repose to one of continued immunity." _Poster Exchange_, 517 F.2d at 127.[7] Importantly, a subsequent case from the Fifth Circuit that more directly focused on the damages that are recoverable based on recent acts committed during the limitations period clarified that "[i]n the course of the _Poster Exchange_ opinion we were careful to sound two caveats," with the second caveat "emphasiz[ing] that where a defendant commits an act injurious to plaintiff outside the limitations period, and damages continue to result from that act within the limitation period, no new cause of action accrues for the damages occurring within the limitations period because no act committed by the defendant within that period caused them." _Imperial Point Colonnades Condo., Inc. v. Mangurian_, 549 F.2d 1029, 1035 (5th Cir. 1977) (emphasis added).   Therefore, the Fifth Circuit interprets its own holding in _Poster Exchange_ as reading

---

[7] Consistent with the holding in _Poster Exchange_, the Fifth and Third Circuits both allow new acts similar-in-kind to old time-barred acts to "restart" the limitations period, whereas several other circuits, including the Sixth, Ninth, and Tenth, take a contrary view. _See_ _Bell v. Dow Chem. Co._, 847 F.2d 1179, 1187 (5th Cir. 1988) (discussing disagreement with the Ninth Circuit regarding whether "reaffirmations" of refusals to deal restart the limitations period); _W. Penn Allegheny Health Sys., Inc. v. UPMC_, 627 F.3d 85, 106 (3d Cir. 2010) (declining to follow the Sixth Circuit's rule that "reaffirmations" of time-barred acts do not restart the limitations period because it was "inconsistent with controlling [Third Circuit] precedent"); _Kaw Valley Elec. Co-op. Co. v. Kansas Elec. Power Co-op., Inc._, 872 F.2d 931, 933 (10th Cir. 1989) (adopting the Ninth Circuit's rule).   As discussed below, in this Court's view, the best way to synthesize such case law is to focus on whether the time-barred conduct excluding a company from participating in an industry was "final and irrevocable" (subsequent reaffirmations do not restart the limitations period) or whether it was non-final and subject to reconsideration (subsequent reaffirmation does restart the limitations period).

Zenith as follows: "Under Zenith, where defendants are alleged to have committed acts injurious to a plaintiff pursuant to an unlawful conspiracy, and where defendants committed some such acts more than four years before plaintiff commenced suit, and other such acts less than four years before plaintiff commenced suit, the plaintiff is allowed to recover damages resulting only from those acts committed less than four years before commencement of his suit." Id. at 1034 (emphasis added).

Second, notwithstanding the Third Circuit's pre-Klehr statements in Lower Lake Erie interpreting Zenith, the Third Circuit has more recently cited Zenith for the proposition that "in the context of a continuing conspiracy to violate the antitrust laws, . . . each time a plaintiff is injured by an act of the defendants a cause of action accrues to [it] to recover the damages caused by that act and . . . as to those damages, the statute of limitations runs from the commission of the act." W. Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 106 (3d Cir. 2010) (emphasis added). In that same case, the Third Circuit further explained: "On a straightforward reading of Zenith, it therefore appears that [the plaintiff] may, consistent with the statute of limitations, recover damages for the acts that occurred within the limitations period." Id. at 106 (emphasis added).

Accordingly, a careful reading of the cases cited by CSX causes this Court to reject CSX's contention that it only needs to

point to a single act illustrating the continuance of the conspiracy or monopoly during the limitations period to broadly restart the limitations period and recover antitrust damages for any and all harm suffered during the limitations period, to include harm that is the inertial consequence of conduct occurring many years ago. This contention by CSX conflicts with the case law outlined above and is out of step with the law governing limitations in antitrust actions generally, which seeks to "encourage[] parties to bring suits earlier . . . to minimize the public harm that might arise from harmful monopolies." Z Techs. Corp. v. Lubrizol Corp., 753 F.3d 594, 603 (6th Cir. 2014). Instead, this Court finds that the limitations period restarts only as to the new damages arising from new overt acts committed during the limitations period. Such finding is aptly articulated as an anti-bootstrapping rule in Klehr, and it has been effectively summarized by the Sixth Circuit:

> We have held that an "antitrust cause of action accrues each time a defendant commits an act that injures the plaintiff's business." DXS, Inc. v. Siemens Med. Sys., Inc., 100 F.3d 462, 467 (6th Cir. 1996) (citing Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338 (1971)). "The focus is on the timing of the causes of injury, i.e., the defendant's overt acts, as opposed to the effects of the overt acts." Peck v. Gen. Motors Corp., 894 F.2d 844, 849 (6th Cir. 1990) (per curiam) (emphasis added). "[T]he fact that injuries have a rippling effect into the future only establishes that plaintiffs might have been entitled to future damages." Id.

*In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 902 (6th Cir. 2009) (cleaned up).  In other words, an overt act committed in 2009, that excludes a company from competing in a market and causes harm <u>beginning</u> in 2009 and continuing through 2020, may <u>not</u> be the basis for an antitrust suit filed in 2018.  What matters is the timing of <u>the overt acts</u>, not the length of time that such overt acts cause anti-competitive consequences.  Of course, there are several exceptions to this general rule, such as when damages are unduly speculative or the harm is fraudulently concealed.  However, in the absence of such exceptions, a competitor that is excluded from a market and sleeps on its rights loses its ability to recover monetary damages stemming from conduct occurring before the limitations period.

## 2. Applicability of the <u>Zenith</u> Exception

At oral argument, CSX offered a second and distinct argument in support of its limitations position predicated on a quote from <u>Zenith</u> and/or the application of the <u>Zenith</u> exception.  The quote from <u>Zenith</u> reads as follows: "[The defendant] contends, and the Court of Appeals held, that the statute permits the recovery only of those damages caused by overt acts committed during the four-year period.  We do not agree."  <u>Zenith</u>, 401 U.S. at 333.

CSX's attempted reliance on this portion of <u>Zenith</u> to support its damages case can be disposed of swiftly.  Though the quote from <u>Zenith</u> appears powerful on its face, when it is read in the

context of the entire opinion, such statement is best understood as only supporting what has been referred to herein as the "Zenith exception." That is, the broadly phrased prefatory statement made by the Supreme Court does not trump the Court's later discussion of "general" antitrust accrual rules as provided in that same opinion. It is that general discussion that establishes the accrual rule that has been applied and extended by countless federal circuit cases following Zenith. In contrast, the special "Zenith exception" has been applied relatively narrowly following Zenith only in cases when future damages are impossible to determine without resorting to speculation.

The Zenith exception is a unique legal theory applicable in unique circumstances, but it is not applicable here. Further, CSX did not argue for the application of this exception in its brief in opposition to summary judgment. More importantly, however, CSX has not at any time pointed to evidence in the record suggesting that CSX's damages could not have been calculated in or around 2009 without resort to speculation, and this Court is not independently aware of any such evidence. To the contrary, it appears clear from the record that a major railroad like CSX, with decades of experience competing with NSR across the Eastern United States and Canada, including competing for international intermodal traffic in Hampton Roads, could, in or around 2009, have reasonably estimated the recent and future damages it suffered

because of its alleged exclusion from on-dock rail access at NIT. See Charlotte Telecasters, 546 F.2d at 573 (rejecting the plaintiff's claim that future damages based on exclusion from the industry were speculative); N. Carolina Elec. Membership Corp., 780 F. Supp. at 333 ("[T]he statute of limitations is not tolled [by operation of the Zenith exception] simply in order to wait and see the condition of the particular market. Indeed, since Zenith most circuit courts have declined to label future damage claims speculative." (citing cases) (internal citation omitted)); Samsung Elecs. Co. v. Panasonic Corp., 747 F.3d 1199, 1204 (9th Cir. 2014) ("[T]he key question in determining whether damages were overly speculative such that recovery would be unavailable at the time of the initial act is whether the existence of the harm is determinable, not the specific dollar value of that harm.").[8] Furthermore, past and future damages would have been even easier to calculate in 2011 or 2012 after a record of exclusion was established, yet suit was not filed until 2018. In sum, CSX's attempt at oral argument to rely on the result reached in Zenith, or the favorable language therefrom, without pointing

---

[8] In Samsung, the Court found the harm speculative because, at the time an initial written license was adopted, the plaintiff was not even in the "SD card" market and none of the parties "could have known for certain whether [the plaintiff] would enter that market." Samsung, 747 F.3d at 1204-05. In contrast, here, CSX was serving intermodal customers by rail at the POV in 2009, and was even serving customers at NIT by draying containers to a nearby rail yard where they were then loaded onto a train for transport.

to any evidence illustrating why CSX's damages could not be reasonably estimated without resort to speculation, is rejected.

### E. Additional Antitrust Principles Impacting Limitations

This Court's analysis above seeks to illustrate the complexities in this area of the law. For example, the above discussion about the manner in which Zenith has been applied is consistent with observations from leading scholars, who note that the application of limitations rules in antitrust case law is guided by circuit court rulings that "are inconsistent and often hypertechnical, which makes analysis of the general problem difficult." Areeda & Hovenkamp, Antitrust Law ¶ 320a. These leading commentators have further opined that there is a more recent trend "toward increased strictness against plaintiffs who knew or should have known of a violation but delayed bringing their suit," moving away from an arguable "casual[ness] about plaintiffs who sat on their rights" as illustrated by Supreme Court case law decided before 1970. Id. Therefore, it is helpful to review several relevant antitrust concepts and how they may differ across various types of cases before addressing the overt acts identified by CSX in opposition to summary judgment.

### 1. "Reaffirmations" and "Final" Acts

The circuit split over whether a "reaffirmation" of a prior bad act should restart the limitations period reflects a disagreement over whether acts within the limitations period must

be "independent" from prior bad acts.  Compare W. Penn Allegheny Health, 627 F.3d at 106 (2010) (reaffirmations restart the limitations period) with Kaw Valley Elec. Co-op. Co. v. Kansas Elec. Power Co-op., Inc., 872 F.2d 931, 933 (10th Cir. 1989) (new act that is "merely a reaffirmation of a previous act" will not restart the limitations period) (citation omitted). The parties' briefs do not focus extensively on this issue, nor does the summary judgment record render such distinction notably relevant to most of the conduct before this Court, as neither Defendants' alleged 2015 conduct (delayed train movements) nor NSR's alleged 2016 conduct (termination of contracts) is a "reaffirmation" of past conduct.  However, a portion of NSR's 2018 conduct (a rejection of CSX's effort to modify the NPBL Board structure) is a "reaffirmation," as NSR relied on the continued existence and enforceability of a decades-old contract.

In this Court's view, the better rule is that, at least in the context of a final decision reflected in a voluntary contract that arises out of historical mergers, later reaffirmation of long memorialized final contract terms is not an actionable "overt act" capable of restarting the limitations period. See, e.g., Z Techs., 753 F.3d at 599 ("Observations from our sister circuits, as well as limited guidance from the Supreme Court, support our conclusion that price increases in the merger-acquisition context do not extend the statute of limitations," because in an antitrust

conspiracy "each price increase requires further collusion between multiple parties to maintain the monopoly; in a merger-acquisition case, however, the cause of harm is the merger itself."); Areeda & Hovenkamp, Antitrust Law ¶ 320c1 (explaining, when addressing the disagreement among federal courts regarding whether recent "reaffirmations" of prior unlawful acts should restart the limitations period, that "the most reliable way to predict outcomes is to separate situations where an injured plaintiff had actual knowledge of a violating act and had suffered sufficient injury (statute not tolled) from those where the plaintiff had no knowledge or its knowledge was incomplete or imperfect (statute tolled)"); Varner v. Peterson Farms, 371 F.3d 1011, 1019 (8th Cir. 2004) (finding, consistent with the Sixth, Ninth, and Tenth Circuits, that reaffirmations are not actionable); 1 Health Care and Antitrust L. § 9:10 (2022) ("In general, to start a new statute-of-limitations period, an act must . . . be a new and independent act that is not merely a reaffirmation of a previous act."); see also Martin v. Sw. Virginia Gas Co., 135 F.3d 307, 310 (4th Cir. 1998) (explaining, in the context of an unlawful discrimination disability claim, that "[a]n employer's refusal to undo a discriminatory decision is not a fresh act of discrimination") (citation omitted).  As discussed below, the "reaffirmation" of the contract in this case, even if potentially actionable, would also fail to restart the limitations period to

the extent it did not result in any new sales at monopolistic prices, directly extend CSX's exclusion from the market, or otherwise proximately cause any other new and accumulating harm.

Relatedly, and to avoid any confusion, the Court does not question CSX's ability to demonstrate that Defendants' conduct is potentially covered by the continuing violation doctrine even though historical mergers appear to be what facilitated the harm at issue in this case. In certain circumstances, federal courts have held that a sufficiently "final" act of exclusion committed prior to the limitations period renders the doctrine legally inapplicable. See Z Techs. Corp., 753 F.3d at 598 (refusing to extend the continuing violation theory to antitrust cases involving "price increases following a merger or acquisition," because "the cause of harm is the merger itself"); Garelick v. Goerlich's Inc., 323 F.2d 854, 855 (6th Cir. 1963) (finding that a letter indicating that the defendant would "cease doing business" with a former distributor, followed by ceasing such business as announced, was the final actionable act in the antitrust conspiracy); Al George, Inc. v. Envirotech Corp., 939 F.2d 1271, 1274-75 (5th Cir. 1991) (agreeing with the Ninth Circuit's analysis regarding the impact of "final, immutable act[s]" (quoting Pace Indus., Inc. v. Three Phoenix Co., 813 F.2d 234, 238-39 (9th Cir. 1987))); Steves & Sons, 292 F. Supp. 3d at 672 (citing cases calling into question whether the doctrine applies

33

outside of conspiracy and monopolization cases or when the harm is predicated on "a single act").

Here, CSX remains NSR's active competitor for international intermodal containers arriving at NIT, and more importantly, CSX had an established avenue to seek re-evaluation of the condition (the excessive NPBL switch rate) that most directly excluded CSX from the industry for many years. See Charlotte Telecasters, 546 F.2d at 572 ("[E]xclusion from participation in an industry constitutes a continuing conspiracy, unless the exclusion is final in its impact."). Stated another way, although CSX's evidence reveals that the economic exclusion of CSX from on-dock rail access at NIT became effective at some point in or around 2009/2010, such exclusion was not "final" or "immutable" because CSX remains an owner of NPBL, and NPBL has procedures in place that allow CSX to seek modification of the switch rate through convening a NPBL rate committee. Thus, like the fact pattern in Charlotte Telecasters where the city council denied the plaintiff's application for a cable television license but "adopted a non-exclusive ordinance and left open the possibility of granting additional franchises," 546 F.2d at 573 (emphasis added), the fact that CSX could "re-apply" to NPBL to seek a modified rate that would allow competition at NIT establishes that the prior rate was a not a final, immutable decision.

Therefore, the continuing violation doctrine is, as a general matter, "available" to CSX. Nonetheless, in order for CSX to demonstrate that the statute of limitations period restarted, the record must demonstrate that an overt act occurred "within the four years preceding the filing of the complaint," id., and as discussed at length above, CSX may recover only for the damages arising from the new conduct committed within the limitations period.[9] See Lancianese v. Bank of Mount Hope, 783 F.2d 467, 470 (4th Cir. 1986) ("[E]ach time a plaintiff is injured by a defendant's act in a continuing conspiracy to violate the antitrust laws, a cause of action accrues to him to recover damages caused by that act") (emphasis added); Barnosky Oils, Inc. v. Union Oil Co. of California, 665 F.2d 74, 81 (6th Cir. 1981) ("[P]laintiffs may sue only for damages that result from acts committed by the defendants within the four years preceding commencement of suit." (quoting Imperial Point, 549 F.2d at 1044)).

## 2. Customer vs. Competitor Damages

A seemingly less controversial issue is the fact that the limitations period for antitrust damages is generally treated differently when the plaintiff is a customer forced to pay a

---

[9] Several of the other pre-limitations overt acts purportedly committed by Defendants in furtherance of the conspiracy/monopoly, such as NPBL's discontinuance of certain tracks or acts associated with a decision not to sell a certain property to CSX, are the types of "final" acts that are not subject to reconsideration, and thus must be sued upon, if at all, within four years.

supracompetitive price due to an antitrust conspiracy or monopoly, than when the plaintiff is a competitor suffering harm due to partial or total exclusion from an industry.  As explained in what appears to be the leading case on this distinction, "[a]lthough the business of a monopolist's rival may be injured at the time the anticompetitive conduct occurs, a purchaser, by contrast, is not harmed until the monopolist actually exercises its illicit power to extract an excessive price."  Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 295 (2d Cir. 1979); see also Areeda & Hovenkamp, Antitrust Law ¶ 320c4 (explaining that when a monopolist's customer is injured through paying higher prices, the customer may "rely on pre-limitation conduct in order to establish the exclusionary practices portion of a monopolization claim" but can only collect damages for the excess price paid "for the four years prior to filing" suit).

The distinction between damages suffered by a customer and by a competitor was recently recognized by the Fourth Circuit in Actelion Pharms, 995 F.3d at 131-33.  In that case, the defendants argued that a new limitations period should not begin for each drug sale made at "supracompetitive prices" because such sales were "merely a holdover 'effect'" of settlement agreements reached with generic drug manufacturers outside the limitations period. Id. at 131.  In rejecting that argument, the Fourth Circuit explained that although defendants labeled the case as a refusal-

to-deal case, "[t]he plaintiffs did not allege that [defendant's] refusals to deal excluded them 'from participation in an industry,' as they would have to allege to state a refusal-to-deal claim; they alleged that they are customers of [defendants] not competitors." Id. at 132. Accordingly, consistent with "[v]irtually every court faced with similar [customer-based] allegations," the Fourth Circuit held that the plaintiffs had alleged sufficient facts "to demonstrate that their claims were timely filed." Id. at 132-33.

The differing treatment between these two types of claims is grounded in the concept that, unlike an excluded rival who is injured as soon as the exclusion begins, a customer is not injured until a sale occurs, and it suffers a new and accumulating injury each time a subsequent supracompetitive price is paid. Therefore, in customer cases, new causes of action continue to accrue and new limitations periods begin running with each sale. Of course, even in these customer cases, the anti-bootstrapping rule allows only for the recovery of damages stemming from sales within four years of when suit is filed.

This key distinction further underscores the significance of the "type" of antitrust case brought by CSX, as well as its damages theory, to this summary judgment analysis. Antitrust cases generate an exceedingly complex decision tree. Even within one "type" of case, federal courts often differ as to the correct

approach when deciding limitations issues and the applicability of the "continuing violation" theory. Here, though much of the challenged conduct in this case was facilitated by railroad mergers occurring decades before the limitations period, CSX points to allegations that NSR more recently acted improperly to exclude CSX from the relevant market through conspiratorial or monopolistic manipulation of NPBL. Care must be taken in reviewing the record, however, because NSR has a lawful right to "compete" with CSX, and it is important to ensure that NSR's lawful competitive conduct, even if aggressive, is not mistaken as an antitrust act merely because NSR has evidenced an extreme opposition to facilitating the business of its direct competitor. This Court thus reviews the summary judgment record in the context of the specific antitrust theory advanced by CSX and agrees with Defendants that the lone theory of recovery of antitrust damages is that CSX was harmed as a competitor to NSR. That is, CSX's lone antitrust damages theory is that it was excluded as a competitor from on-dock rail access at NIT, purportedly causing CSX to suffer hundreds of millions of dollars of damages beginning in 2009 when its exclusion from the market became effective.

### 3. New and Accumulating Injury

Turning next to an issue that appears to be dispositive with respect to the antitrust damages claimed by CSX in this case, it is well-established in the continuing violation context that acts

38

committed during the limitations period will constitute "overt acts" that restart the limitations period only if they are new acts that "inflict new and accumulating injury on the plaintiff." Kaw Valley, 872 F.2d at 933 (quoting Pace Indus., 813 F.2d at 238); see Varner v. Peterson Farms, 371 F.3d 1011, 1019 (8th Cir. 2004) (requiring "new and accumulating injury on the plaintiff"); DXS, Inc. v. Siemens Med. Sys., Inc., 100 F.3d 462, 467 (6th Cir. 1996) (same); see also Lehman v. Lucom, 727 F.3d 1326, 1331 (11th Cir. 2013).

Illustrating the "new injury" requirement, in XY, LLC v. Trans Ova Genetics, LC, No. 13-CV-0876-WJM-NYW, 2015 WL 5579551, at *2 (D. Colo. Sept. 23, 2015), the district court reconsidered a dispute over whether new instances of exclusionary conduct committed during the limitations period were actionable under the continuing violation theory, comparing Kaw Valley and Champagne Metals v. Ken-Mac Metals, Inc., 458 F.3d 1073, 1088 (10th Cir. 2006), to illustrate the difference between final and non-final acts of exclusion. XY, LLC, 2015 WL 5579551, at *2. Importantly, however, in clarifying its earlier ruling, the district court explained that it had not previously relied on the finality of the primary act of exclusion at issue in that case (a termination letter), but rather, had "assumed" that the letter terminating the parties' business relationship "was not a final act that permanently excluded [the plaintiff] from the market." Id.

(emphasis added). The Court nevertheless concluded that the plaintiff's claims were time-barred based on the plaintiff's failure to "meet the threshold requirement to show that any subsequent acts [committed during the limitations period] caused new injuries." Id. The Federal Circuit, applying Tenth Circuit law, affirmed the district court's ruling, noting that the plaintiff "failed to identify any 'new and accumulating injury' resulting from any of [the defendant's] post-termination acts." XY, LLC v. Trans Ova Genetics, 890 F.3d 1282, 1291 (Fed. Cir. 2018). The Federal Circuit further indicated in a footnote that the plaintiff's summary judgment brief "alleged only a single injury that resulted from [the defendant's] conduct: exclusion from the relevant market covered by [the defendant's] patents." Id. at 1292 n.3; see Garelick, 323 F.2d at 856 (explaining that while the disputed conduct from within the limitations period "might be overt acts," the plaintiffs "were not in any way injured or damaged thereby," and the district judge therefore correctly held that the four-year antitrust limitations period "barred the right to sue").

Courts have elucidated this same concept — that a new overt act is only actionable to the extent it causes new and accumulating harm beyond the damages flowing from the inertial consequences of time-barred conduct — in a number of ways in the antitrust context. See Xechem, Inc. v. Bristol-Myers Squibb Co., 372 F.3d 899, 902

(7th Cir. 2004) ("Each discrete act with <u>fresh adverse consequences</u> starts its own period of limitations." (emphasis added)); <u>Rite Aid Corp. v. Am. Exp. Travel Related Servs. Co.</u>, 708 F. Supp. 2d 257, 271 (E.D.N.Y. 2010) (finding that "unilateral increases to . . . merchant discount fees . . . satisfy both parts of the overt act test," as they were "new and independent acts" and they "inflicted new and accumulating harm" as the fee increase "inflicted <u>a greater quantum of damages</u>" (emphasis added)); <u>cf.</u> <u>Klehr</u>, 521 U.S. at 190 (describing the plaintiff's failure to demonstrate, in a civil RICO action, "how any [recent] new act could have caused them harm <u>over and above</u> the harm that the earlier acts caused" even though the new acts arguably illustrated new nefarious conduct (emphasis added)). This concept is consistent with case law and commentary discussed throughout this opinion indicating that each overt act causing new antitrust injury is assigned its own limitations period. <u>See, e.g.</u>, 1 Health Care and Antitrust L. § 9:10 (2022) ("Where a 'continuing violation' exists . . . [e]ach overt act that is part of a conspiracy and that injures the plaintiff generates a new and separate cause of action and starts a new limitations period," meaning that "several limitations periods may run at the same time."); <u>Vincent v. Reynolds Mem'l Hosp., Inc.</u>, 881 F.2d 1070, 1989 WL 87633, *4 (4th Cir. 1989) (unpublished table opinion) ("<u>[E]ach act</u> of a defendant <u>which injures</u> a plaintiff during the course of a conspiracy to violate the antitrust laws

constitutes <u>a separate cause of action</u> for which the plaintiff may recover damages.") (emphasis added).  Phrased a slightly different way, and contrary to CSX's position in this lawsuit, "[i]njury and damage in a civil conspiracy action flow from the overt acts, not from the mere continuance of a conspiracy."  <u>Kadar Corp. v. Milbury</u>, 549 F.2d 230, 234 (1st Cir. 1977) (quotation marks and citation omitted).[10]

### 4. Tracing Harm to Overt Acts

Before the Court addresses the specific acts relied on by CSX as "overt acts" and the damages purportedly stemming therefrom, the Court notes, as it did at oral argument, that it does not reject wholesale CSX's legal contention that a plaintiff providing evidence of an <u>active</u> conspiracy involving multiple intertwined overt acts causing various types and/or multiple instances of new and accumulating injury need not tie specific overt acts to specific forms of harm.  Importantly, as long as the plaintiff can demonstrate that the harm supporting a damages claim collectively flows from unlawful acts <u>committed during the limitations period</u>, all of the damages are recoverable.[11]  <u>See City of Vernon v. S.</u>

---

[10] <u>Kadar Corp.</u> is not itself an antitrust case, but it did cite to and rely on <u>Zenith</u> in discussing the accrual date and limitations period in civil conspiracy cases.  <u>Kadar Corp.</u>, 549 F.2d at 234.

[11] Similarly, if a defendant engages in a new act that supersedes all time-barred conduct in that it creates an identifiable new harm that occupies the field of all harm going forward, a plaintiff could easily demonstrate that the ongoing harm is <u>attributable to conduct occurring within the limitations period</u>.  <u>See Xechem</u>, 372 F.3d at 902 (discussing recent acts

California Edison Co., 955 F.2d 1361, 1371 (9th Cir. 1992) (indicating in a case where the statute of limitations was <u>not</u> at issue that when "damages arise from a series of unlawful acts intertwined with one another," and "<u>causation</u> of damages has been established," the law does not require "strict disaggregation of damages among the various unlawful acts" (quoting <u>MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.</u>, 708 F.2d 1081, 1161 (7th Cir. 1983))). However, when a decades-old conspiracy causes current harm that flows from time-barred acts and one or more recent overt acts, well-established antitrust law (including <u>Klehr</u>'s anti-bootstrapping rule) precludes a plaintiff from recovering the damages felt during the past four years that are consequences of conspiratorial or monopolistic acts committed years or decades earlier.[12]  <u>Cf.</u> <u>MCI</u>, 708 F.2d at 1161-63 (explaining that when one portion of damages are recoverable because they result from

---

that allegedly extended the unlawful period of patent exclusivity for an additional thirty months).

[12] As described in <u>Midwestern Machinery Co. v. Nw. Airlines, Inc.</u>, 392 F.3d 265, 269 (8th Cir. 2004), "[t]he typical antitrust continuing violation occurs in a price-fixing conspiracy, actionable under § 1 of the Sherman Act, <u>see</u> 15 U.S.C. § 1, when conspirators continue to meet to fine-tune their cartel agreement." Here, there is no horizontal price fixing "cartel," but even if there were, there is no evidence of "fine-tuning" or continued actions necessary to keep CSX out of the relevant market beyond 2011. Rather, even assuming that NSR and NPBL conspired to prevent CSX from accessing NIT by rail by discontinuing tracks, blocking CSX from acquiring property, and setting a switch rate that economically foreclosed CSX from providing on-dock rail service at NIT, this scheme was a resounding success by 2009, or alternatively, by 2011. Notably, CSX admits that when it decided to move a small number trains in 2015 due to a necessity created by a unique situation, it did so at a <u>financial loss</u> due to the <u>pre-existing barriers of entry</u> to the NIT market.

43

unlawful conduct, and another portion of damages are not recoverable because they result from lawful competition, the plaintiff must prove that the damages it seeks were caused by the "unlawful acts of the defendant") (emphasis in original).

### F. Case-Specific Overt Acts and Flawed Damages Model

CSX's brief in opposition to summary judgment highlights three groups of conduct that CSX relies on as "overt acts" occurring during the four years preceding suit. The summary judgment record reveals that the 2015 conduct could be interpreted as an overt act causing two types of harm to CSX, but CSX has not sought recovery for this harm in this case. As to the 2016 and 2018 conduct, CSX has not demonstrated that any of the acts it points to is a new overt act that inflicted new and accumulating harm. Although CSX's current efforts to state a timely cause of action for damages point to recent activity, and counsel for CSX has presented well-articulated arguments in this complex area of the law, controlling legal principles reveal that CSX is attempting to breathe life into time-barred claims in the absence of any new harm linked to any recent overt acts. Finally, even if the Court found that the 2015 conduct was potentially actionable, CSX relies exclusively on a damages model that is fatally flawed, and Defendants therefore demonstrate that they should prevail on the damages claim as a matter of law. As explained in greater detail below, even when CSX's evidence is viewed in the light most

favorable to CSX, the evidence is insufficient for a reasonable juror to conclude that the entirety of CSX's lost customer contracts, or a majority of its lost contracts, or a notable minority percentage of its lost contracts, <u>or even a non-speculative de minimis percentage</u> of its lost contracts, is predicated on actionable overt acts occurring after 2012.

### 1. 2015 Conduct

Breaking down the 2015 conduct, CSX argues in opposition to summary judgment that NSR and NPBL conspired to obstruct CSX's efforts to move a limited number of trains to NIT during 2015. CSX asserts that unique circumstances existed for a brief period during 2015 that caused CSX to rely on NPBL to access NIT, despite the commercially unreasonable switch rate established in 2009.[13] Defendants counter that every train CSX requested was moved by NPBL, noting the absence of a genuine dispute of fact on that point. Nonetheless, CSX has identified a factual dispute with respect to whether NSR, or NSR as assisted by NPBL, took affirmative steps to complicate or delay CSX's operational use of the track to NIT for one or more trains.[14]

---

[13] Defendants dispute any characterization of the switch rate as unreasonable, and the Court's references above should not be viewed as a finding of fact, but rather, an acceptance of CSX's version of the facts for the purposes of summary judgment.

[14] As argued by NPBL at oral argument, the speed at which NPBL acted to secure an "operating window" to move the first train requested by CSX following CSX's years of non-use of the track to NIT arguably favors Defendants, even in the face of NSR's visceral reaction in opposition to

It is undisputed that 2015 was a period of "extreme port congestion across the East Coast," ECF No. 324, at 22, and that shipping containers were stacking up at NIT to a degree that CSX's process of serving its current NIT intermodal customers through drayage was failing. Therefore, according to CSX's own version of events, "CSX paid NPBL's $210 rate to move backlogged freight at NIT, recognizing that doing so under these circumstances would result in short-term economic losses for the greater good." Id. (emphasis added). Stated another way, CSX's version of the facts indicates that in 2015 it remained economically barred from competing for contracts with international shippers that wanted on-dock rail access at NIT because of the market barriers that Defendants had erected prior to the limitations period, but that CSX decided to move a small number of trains out of necessity even though it would lose money doing so.

How many of these small number of train moves actually occurred and how efficient they were is a matter of disputed fact. Accepting CSX's version of the facts supported by reasonable inferences that a factfinder could make in CSX's favor, the following could be found: (1) CSX paid a supracompetitive price to NPBL in 2015, and the law applicable to antitrust harm suffered by

---

CSX's initial request. Furthermore, CSX has not pointed to evidence demonstrating how many trains were delayed, intentionally or otherwise, though its evidence is sufficient to demonstrate that at least one CSX train was materially delayed.

46

customers would generally allow CSX, as a customer of NPBL, to recover for the excessive price it paid during 2015; and (2) NSR, and possibly NPBL, acted to obstruct, or aided in the obstruction of, CSX's train movements during 2015, with this obstruction resulting in CSX's temporary loss of business from one of its existing customers for a period of several weeks. However, even viewing the disputed facts and inferences in CSX's favor, there is simply no record evidence, direct or circumstantial, suggesting that any delay of a commercially unviable train in 2015 impacted CSX's ability to compete for international intermodal customer contracts at NIT.

First, addressing the elevated switch rate CSX paid to NPBL in 2015, the Court finds that CSX has waived the ability to recover such damages because it did not identify the overcharge as an overt act during discovery when squarely asked by NPBL to identify all of NPBL's overt acts. See ECF No. 303-31. Notably, CSX was compelled by the Court to answer this interrogatory, ECF No. 236, and it is too late for CSX to identify a new undisclosed overt act in an effort to avoid summary judgment on limitations grounds. Furthermore, assuming for the sake of argument that this claim was not waived, CSX has not advanced a theory of antitrust harm in this case predicated on the payment of a supracompetitive price in 2015 as a NPBL customer; CSX advances only a competitor claim based on its exclusion from the market. Finally, CSX offers no damages

47

model whatsoever to calculate the harm it suffered by paying an excess fee for an unknown number of train cars.   The record is therefore insufficient as a matter of law to extend the limitations period based on "customer" harm flowing from the payment of a supracompetitive price.

Second, assuming in CSX's favor that NPBL conspired with NSR to obstruct CSX,[15] and assuming in the alternative that NSR acted unilaterally as a monopolist to unlawfully obstruct or delay CSX's access to NIT in 2015, CSX at best demonstrates that it suffered the minimal harm of <u>temporarily</u> losing the business of a single customer for a few weeks in 2015.   ECF No. 325-30.   However, CSX has failed to seek any antitrust damages for this harm.   Rather, as discussed herein, CSX's theory of antitrust harm only seeks damages for its total exclusion from the market, not any ancillary harm it purportedly suffered when <u>participating in the market</u> at a financial loss for a brief period in 2015.   Furthermore, CSX has failed to advance a damages model predicated on such temporary loss, instead relying exclusively on a model seeking to recover

---

[15] NPBL President Cannon Moss timely responded to CSX's requests to access NIT in 2015 by contacting NSR and taking steps to arrange for "windows" to move CSX trains.   NSR initially pushed back at NPBL's request, but windows were obtained and trains were moved.   Material factual disputes exist regarding whether either Defendant conspired or acted to cause intentional delays, or whether delays resulted from the extreme port congestion and/or the operational issues associated with the conflicting "flow" of NPBL's train traffic at NIT due to its legal right to access only NIT's north gate. Because the conflicting characterization of these facts creates a genuine dispute, the Court accepts CSX's version of events for summary judgment purposes.

hundreds of millions of dollars of lost customer contracts. Because CSX has not sought damages based on what could be a single delayed train for a single customer, or offered a damages model on which a reasonable juror could calculate a non-speculative award for the short-term loss of business from this customer, there is not a triable issue based on the facts alleged by CSX.

Third, and critically important to CSX's efforts to restart the limitations period in 2015, CSX has not offered any evidence, direct or circumstantial, suggesting that Defendants' alleged actions to obstruct or delay CSX from utilizing NPBL to move one or more of its trains to NIT in 2015 resulted in any "new and accumulating injury." CSX itself argues that it was economically excluded from providing on-dock rail at NIT — before, during and after the 2015 events — due to acts occurring in and around 2009 and that, because of this exclusion, CSX's use of NPBL to access NIT by rail in 2015 came at a financial loss to CSX.[16] See ECF No. 324, at 22 (reflecting CSX's factual assertion that moving the trains in 2015 would result in "economic losses"); ECF No. 303-26 (revealing CSX's Chief Operating Officer's view that, in 2009, before the switch rate was increased to $210, the then-current

---

[16] CSX's opposition to summary judgment characterizes certain pre-2009 events (discontinuation of a segment of NSR track, NPBL refusal to sell a rail yard to CSX) as "operational" obstacles not "economic" obstacles. ECF No. 324, at 20-21. But the fact remains that, based on CSX's own theory of the case, by 2009, these final operational events coupled with the elevated switch rate precluded CSX from providing economically viable on-dock rail access to its customers, thereby excluding it from the relevant market.

rate of $148.50 served as "a direct barrier to fair and competitive access at NIT") (emphasis added).

Thus, CSX's own factual assertions make clear that, although CSX continued to suffer inertial and unabated harm from Defendants' exclusionary acts committed in and around 2009 (some of which were final events), CSX cannot demonstrate that in 2015, it suffered new and accumulating harm to its ability to compete for contracts with international intermodal customers that purportedly demand on-dock rail access at NIT. Notably, in response to Defendants' summary judgment motions, CSX does not point to any evidence suggesting that the events of 2015 contributed in any way to CSX's inability to secure contracts with international shippers.[17]

For all of these reasons, the Court finds that CSX has failed to identify an overt act committed by either Defendant in 2015 causing new and accumulating harm sufficient to restart the otherwise expired limitations period.[18] Rather, in support of its antitrust damages claim, CSX has alleged only a single injury,

---

[17] CSX does not point to any direct evidence (such as an affidavit or deposition testimony from any international shippers), or indirect evidence, suggesting that CSX had a harder time negotiating contracts in 2016, 2017, or thereafter, as a result of any NIT trains that were delayed in 2015.

[18] The Court separately notes that, with respect to the allegations against NPBL, CSX's evidence is insufficient for a reasonable factfinder to conclude that there was an "agreement" in restraint of trade or an agreement to assist NSR in establishing a monopoly but for CSX's reliance on the pre-limitations conduct, as made relevant by the continuing violation theory.

"exclusion from the relevant market," <u>XY, LLC</u>, 890 F.3d at 1292 n.3, and the record evidence, interpreted in CSX's favor, demonstrates that such exclusion took effect in or around 2009. CSX is therefore legally precluded from using the alleged short-term delays of one or more trains in 2015 to bootstrap hundreds of millions of dollars of damages wholly untethered to such acts and that instead flow from the previously established market exclusion. In the context of the damages case presented by CSX, the 2015 acts do not restart the limitations period.

The Court separately concludes that even if the record is interpreted as revealing some modicum of "new and accumulating harm" to CSX's ability to compete in the market, the record still supports entry of summary judgment on damages. As explained herein, CSX's damages model is fundamentally flawed in that it does not even attempt to separate harm stemming from the limited conduct within the limitations period (physical delays of economically unviable trains) from the <u>established inertial effects</u> of the acts committed prior to, or during the 2009-2011 period. This is not a case where the plaintiff has admissible evidence supporting its damages claim separate and apart from its damages expert. Here, CSX has limited itself to a <u>singular</u> theory of recovery, and that theory is unsupported by the law. <u>See Imperial Point</u>, 549 F.2d at 1044 (adhering "to the rule that plaintiffs may sue only for damages that result from <u>acts committed</u>

by the defendants within the four years preceding commencement of suit") (emphasis added).

CSX's election to proceed on a unitary theory seeking recovery for all anti-competitive acts, regardless of when they occurred, dooms its ability to present to the jury a non-speculative damages case arising from the 2015 conduct.  Though offered in the context of a motion in limine rather than a motion for summary judgment, Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc., 221 F. Supp. 3d 1033, 1045 (N.D. Ind. 2016), provides a helpful articulation of the flaws in a plaintiff's damages model that applies with similar force here:

> [The plaintiff's expert] gives the jury no basis on which to evaluate the effect of the statute of limitations on his damages opinion . . .  As discussed above, he did not tie his damages opinion to any particular injury. Nor did he indicate which . . . events would have triggered the snowball effect [where the loss of one customer leads to the loss of additional customers], or otherwise offer any basis to determine when the snowball would have begun accumulating.  Thus, even granting [the plaintiff's expert's] opinion that the snowball effect occurred and led to his damages figure, the jury would be left entirely to speculation to determine whether any snowball effect was triggered by acts that accrued before or after the limitations period began, or to assess what portion of the snowball was attributable to acts that caused harm within the limitations period. No award of damages based on that sort of speculation could be sustained.

Id. at 1044-45.  In most scenarios where damages are uncertain, the lack of clarity does not rise to the level of a defect that should preclude consideration by a jury; but here, CSX has pointed

to no record evidence on which a jury could reasonably estimate the damages stemming from the short-term delay of trains in 2015 (as contrasted with the time-barred economic exclusion from NIT). See Comcast Corp. v. Behrend, 569 U.S. 27, 36-38 (2013) (reversing the appellate court's certification of a large class in a case involving alleged violations of federal antitrust laws, holding that "[t]here is no question that the [plaintiff's damages] model failed to measure damages resulting from the particular antitrust injury on which petitioners' liability in this action is premised," noting in its conclusion that "[t]he first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event" (quoting Federal Judicial Center, Reference Manual on Scientific Evidence 432 (3d ed. 2011))); City of Vernon, 955 F.2d at 1373 (affirming the district court's grant of summary judgment based on the "serious flaws in the only damage study [that] could be proffered to the jury" which placed the plaintiff "in the position of having no proper proof of damages at all"); Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic, 152 F.3d 588, 594-95 (7th Cir. 1998) (affirming the district court's ruling on summary judgment "throw[ing] out the damages claim," but reversing its decision rejecting the injunction claim, explaining that "no reasonable jury could estimate the plaintiff's damages from the reports of plaintiff's experts," nor could the "nonexpert evidence" support

a reasonable damages award, noting that although the plaintiff may have lost money as a result of the antitrust violation, there is a critical difference "between an actual and a quantifiable harm and also between a quantifiable and a quantified harm") (emphasis added); cf. Allegheny Pepsi-Cola Bottling Co. v. Mid-Atl. Coca-Cola Bottling Co., 690 F.2d 411, 415 (4th Cir. 1982) (explaining, post-trial, that the first damages theory was flawed because the damages calculation "did not consider" the impact of predatory pricing as required to prove which portion of the price reduction was "caused by the defendants' unlawful conduct"; and the second damages theory was "not sufficient to establish antitrust injury" for the same reason the district court excluded the proposed expert testimony, the plaintiff was asking the Court to "infer" injury to its competitive position in the market).  Therefore, the faulty model is sufficient to undermine CSX's damages claim as a matter of law.

## 2. 2016 Conduct

CSX's opposition to summary judgment next points to unilateral actions by NSR beginning in 2015 and continuing into 2016.  In July of 2015, NSR provided NPBL one year's notice that NSR was electing to cancel certain trackage rights agreements, including the 1917 trackage rights agreement by which NPBL has access to NIT, with that agreement's 99-year term set to expire in 2016.  In 2016, NSR informed NPBL that it intended to negotiate a

single contract to govern all trackage rights going forward (which would establish the rate NPBL is required to pay NSR for access to the tracks leading to NIT). CSX alleges that although NSR externally stated its intent to provide NPBL with "materially the same access" to its tracks, emails reveal that NSR employees internally discussed a desire to "curtain NPBL's use of NSR's tracks (define actual times of use if possible and limit that as well) in the new agreement(s)" and "inflate the rate as much as NSR can," through a rate structured "as high as reasonable based on what [NSR] charge[s] other railroads in similar circumstances." ECF No. 326-7. To be clear, the rate at issue is the rate that NPBL pays NSR to use tracks owned by NSR. NSR, of course, has every right to seek to profit from the use of its tracks, and NSR's interests run counter to NPBL's interests. Additionally, a federal agency, the STB, has jurisdiction over any dispute between NSR and NPBL on this issue, and will act as a "check" to ensure that NSR charges NPBL a reasonable rate for what in essence will be a form of "forced sharing" of NSR's own tracks. Indeed, an expedited proceeding to establish this rate was brought before the STB in 2018, with NSR and NPBL as adversaries, but the proceeding was stayed at CSX's request to allow the instant litigation to be resolved before the new rate is determined.[19] Because of this

---

[19] Any future "switch rate" that NPBL charges to CSX to access NIT will necessarily include the NSR-NPBL rate as a cost factor because NPBL will have to pay NSR that rate for each car moved to NIT. Thus, this "expense"

stay, the NSR-NPBL rate that will apply <u>in the future</u> has yet to be established.

First, the Court concludes CSX has failed to demonstrate that a reasonable juror could find that NPBL committed an overt act (conspiratorial or monopolistic) or any other unlawful act associated with NSR's decision to cancel its contracts with NPBL at the conclusion of the contractual terms. CSX points to no evidence, direct or circumstantial, suggesting that NSR's actions on this issue were within the scope of a prior or then-existing conspiracy, or in furtherance of an <u>unlawful</u> monopoly. NSR has a legitimate competitive business interest in being paid a reasonable fee for the use of its tracks, and NSR's actions to update and maintain a reasonable fee paid by NPBL are separate from its alleged manipulation of NPBL.

Second, CSX fails to allege that it has suffered any harm from the cancellation of such contracts because NSR and NPBL continue to operate under the terms of the canceled contracts in light of the rate dispute pending at the STB.[20]  Thus, it appears that the prior contract rate that NPBL pays to NSR remains in full force, and any "anticipated" future harm that CSX could suffer

_____

will essentially be transferred to NPBL's customers, as are NPBL's other operating costs.

[20] CSX has admitted that: (1) the NPBL switch rate has not increased since the contracts expired on July 31, 2016; and (2) "any increase in the amount NS[R] charges to NPBL for use of NS[R]'s tracks to NIT would have to be approved by the Surface Transportation Board."  ECF No. 312-17.

from an increase in the rate that NSR charges NPBL has not yet accrued and may never accrue, revealing the absence of any new and accumulating harm.[21]

CSX has suggested, without citation to evidence, that the rate dispute between NPBL and NSR is fabricated as a means to further delay CSX's access to NIT; however, it is CSX that intervened in the rate dispute before the STB and requested a stay of that proceeding pending the result of this litigation.[22] Finally, even assuming that CSX could establish that the contract cancellations were an overt act by NSR, and that CSX was harmed by the purportedly "delayed" resolution of the rate dispute, CSX has not presented a damages model in response to the detailed discovery request in this case that would allow a factfinder even to roughly estimate harm without resort to guesswork and speculation.

For all of these reasons, the Court finds that CSX has failed to point to record evidence demonstrating that NSR's unilateral actions in 2015/2016 are overt acts in support of the alleged

---

[21] CSX's efforts to illustrate at oral argument that NPBL has somehow capitulated to a significant increase in the rate it pays NSR as part of a conspiratorial arrangement was facially uncompelling. CSX's citation to a truncated excerpt from NPBL President Cannon Moss's deposition testimony excluded the portion explaining that NPBL's "opening" position before the STB regarding the new rate to be paid to NSR is lower than the average per car rate that NPBL currently pays. See ECF No. 297-6. CSX points to no contrary evidence.

[22] To the extent that CSX seeks to rely on an inference that the 2016 conduct was intended to extend CSX's exclusion from the relevant market, there is no evidence that CSX took any steps to re-enter the market in 2016 or 2017, nor that CSX asked NPBL to modify its rate during 2016 or 2017.

conspiracy or <u>unlawful</u> monopoly associated with this case. Notably, the potentially actionable conduct alleged in this case is NSR's manipulation of NPBL or NPBL's legal rights in a manner that restrains trade and/or creates or preserves an <u>unlawful</u> monopoly. NSR, who owns the tracks accessing NIT, must in essence "share" those tracks with NPBL pursuant to NPBL's contractual rights and STB requirements in this uniquely regulated industry. However, in doing so, NSR need <u>not</u> act in a manner designed to encourage the business of its rival.   Importantly, as CSX acknowledges, this case was <u>not brought</u> under an "essential facilities" theory, which appears to be a now-disfavored "asset-based [doctrine] holding that mere ownership of a bottleneck asset may obligate a firm to share the asset with others."   Herbert Hovenkamp, <u>Federal Antitrust Policy: the Law of Competition and its Practice</u> § 7.7, at 401 (6th ed. 2020).   The doctrine is problematic because firms "may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers," and "compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities."   <u>Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP</u>, 540 U.S. 398, 407–08 (2004).   Moreover, federal courts are "ill suited" to dictate the terms of "[e]nforced

sharing" as it requires them to "act as central planners, identifying the proper price, quantity, and other terms of dealing." Id. at 408. To the extent this doctrine remains applicable in limited circumstances, it does not apply where, as here, "a state or federal agency has effective power to compel sharing and to regulate its scope and terms." Id. at 411 (quoting Areeda, Antitrust Law, p. 150 ¶ 773e (2003 Supp.)). Here, that agency is the STB, and NSR can aggressively defend the terms of its dominating use of its own tracks before the STB; what NSR may not do under federal antitrust law (assuming that other prerequisites are established) is deny CSX the legal right it does have to use those tracks, whether such right is available by contract or by STB decree.

Therefore, NSR has the unilateral right to renegotiate the terms of expiring historical contracts, and the right to seek a rate "as high as reasonable" under the circumstances, particularly when: (1) the reasonableness of such rate will be scrutinized by a government agency; and (2) the rate is for shared access to tracks owned by NSR. See Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp., 910 F.2d 139, 147 n.14 (4th Cir. 1990) ("A firm, even one with monopoly power, is not guilty of predatory exclusionary conduct when it is simply exploiting the competitive advantages legitimately available to it."); Loren Data Corp. v. GXS, Inc., 501 F. App'x 275, 282 (4th Cir. 2012) (explaining that

the Sherman Act "directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself" (emphasis added) (quoting Spectrum Sports Inc. v. McQuillan, 506 U.S. 447, 458 (1993))); cf. Trinko, 540 U.S. at 407 ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system."). NSR also has the right, particularly in a case where the NPBL's lack of legal access to NIT's southern gate interferes with NSR's efficient use of its own tracks, to seek clarity regarding when it is required give NPBL access to NSR's tracks.   NSR may not, of course, unlawfully interfere with NPBL's operations in a manner designed to restrain trade or to further an unlawful monopoly; however, none of CSX's evidence suggests that the 2016 conduct can reasonably be interpreted as NSR acting in furtherance of a conspiracy or illegal monopoly, even if it acted in a manner that does ultimately prove detrimental to its rival, CSX.

Based on the record as presented on summary judgment, the Court easily concludes that no reasonable factfinder could find that the 2015/2016 unilateral conduct by NSR was an overt act that caused new and accumulating harm so as to restart the limitations period for an antitrust cause of action that otherwise accrued in or around 2009.   This is so for all the reasons discussed above, as well as the fact that CSX's purported "harm" relies on

speculation as to future events, as it is possible that the STB, with or without considering NSR's historical objectionable conduct, will fashion a new rate beneficial to NPBL and/or CSX.

### 3. 2018 Conduct

The purported overt acts in 2018 arise out of a new CSX "service proposal" for a reduced rate that CSX would pay NPBL to access NIT, thus allowing CSX to re-enter the relevant market. At base, it is clear to the Court that if this proposal was denied, and if there were any evidence, direct or circumstantial, that the denial arose from an unlawful monopoly or conspiracy, there would be triable issues both as to whether there was an overt act causing new and accumulating harm and whether such harm occupied the field of market exclusion going forward. However, for the reasons explained below, CSX fails to demonstrate that its service proposal was denied, either expressly or implicitly, further failing to point to evidence capable of demonstrating that any presumed denial or implicit denial by NPBL was based on anything other than lawful business concerns or historic NPBL operating procedures.

### a. Factual Background

Though the evidence of what actually occurred in 2018 is disputed, the version of events that most favors CSX is that CSX presented a new service and governance proposal to NPBL shortly before the April 2018 meetings of the NPBL shareholders and Board of Directors. CSX's proposal sought to establish a new switch

rate of "$80 per car" for "Long Term Rail Service to NIT" and commit CSX to move a minimum annual volume of train cars, thus purportedly generating new profitable business for NPBL. ECF No. 1-5. CSX's own evidence indicates that NPBL President Cannon Moss was outwardly receptive to this proposal, with NPBL management's preliminary calculations suggesting that it might be financially viable for NPBL, such that it merited being sent to the NPBL Board to evaluate through a "rate committee." ECF No. 324, at 26-27; ECF No. 328-15. CSX's written proposal reflects a desire to avoid proceeding through a rate committee due to prior rate analysis performed in response to CSX's 2010 rate request, but states that CSX is willing to go through a rate committee if necessary. ECF No. 1-5, at 2.

Thereafter, CSX's evidence demonstrates: (1) NSR <u>internally discussed</u> the proposal as demonstrated by NSR emails;[23] and

---

[23] CSX also points to an internal NSR email indicating that on April 3, 2018, NPBL/Cannon Moss had discussions with NSR personnel about "some time that [NPBL] could get into NIT, so that they could give quotes to . . . CSX for moving traffic into and out of NIT." ECF No. 326-11. The email also indicates that Mr. Moss had purportedly told CSX that the proposal would be discussed "at the NPBL Board meeting which is on April 18." <u>Id.</u> The email then concludes: "Of course we told them we could not accommodate a time for them to go to or pull freight from NIT." <u>Id.</u> Though this email provides facial evidence of NSR's continued desire to keep CSX from accessing NIT by rail, it does not illustrate (nor does CSX otherwise assert) that NSR actually obstructed NPBL or CSX from accessing NIT <u>to develop a rate proposal</u>. It also does not demonstrate any other form of new and accumulating harm. Moreover, an April 5, 2018 email from Mr. Moss to CSX indicates that he spoke with VIT (the company that operates NIT) on April 5, 2018 in response to CSX's proposal. ECF No. 328-15. The existence of the April 3 email, therefore, is insufficient to demonstrate a new overt act <u>causing new and accumulating injury</u>, though it is unquestionably helpful to CSX's injunctive relief claim.

(2) NPBL President Cannon Moss reviewed the proposal and sent an email response to CSX on April 5, 2018, identifying his "thoughts" about the proposal, including that NPBL management "would recommend to the board for a rate committee to do a complete review of the tariff." ECF No. 328-15. Nothing in Mr. Moss's email can reasonably be interpreted as suggesting that NPBL management was opposed to the proposal. On the contrary, it evinces NPBL management's view that the proposal warranted further evaluation. Id. CSX separately highlights Cannon Moss's deposition testimony which reveals that he had two key business concerns with CSX's proposal: (1) he felt in 2018 that he could not perform an in-depth financial analysis of CSX's proposal because he did not know what rate NPBL would have to pay NSR to use the track to NIT under the yet-to-be established new trackage rights contract; and (2) he was concerned that if NPBL negotiated a special reduced rate specific to CSX, NPBL's other major customer would want the same reduced rate. ECF No. 324, at 26-27; ECF No. 324-7. CSX suggests that it is reasonable to infer from Mr. Moss's first statement that NPBL intentionally sought to delay adoption of CSX's proposal, but that inference is unsupported by the evidence. The acknowledgment of such an obvious business concern in response to a long-term service proposal from CSX does not support a reasonable inference of an intent to delay.

The day after Cannon Moss sent his email to CSX indicating NPBL management's intent to recommend that the NPBL Board form a rate committee to review CSX's proposal, CSX's Assistant General Counsel sent a letter to the members of the NPBL Board "demand[ing]" that NSR, as well as NPBL through its Board of Directors, "take remedial actions at the April 2018 meetings" of the NPBL shareholders and the NPBL Board to "address serious deficiencies in the policies, procedures, controls and governance structure of the NPBL." ECF No. 1-6. Specifically, CSX demanded that all necessary actions be taken by NSR and NPBL to: (1) "afford CSX equal representation on the NPBL Board"; (2) replace NPBL management with "qualified individuals who are independent of both NS[R] and CSX[]," and (3) adopt a new corporate compliance program independent of NSR. Id.

On April 18, 2018, NPBL held both a shareholders meeting and a board meeting. The board meeting started first, was temporarily suspended for the shareholders meeting, and then reconvened thereafter. CSX's statement of facts asserts that during the shareholders meeting, CSX proposed the governance changes outlined in its letter, but NSR voted its shares against the proposal. ECF No. 324, at 28. As highlighted by NSR, NSR's action to reject the proposal to change the established board structure was merely a retention of its contractual right to appoint three directors pursuant to NSR's 1989 contract with CSX. The minutes from the

April 2018 shareholders meeting, which are uncontested, list the motions/action items handled during the meeting. Among the listed action items is CSX's proposal for changing the procedure for designating directors to require independent directors and an independent NPBL President, and for providing interim officers until the transition was completed; the proposal was voted on and was "not approved." ECF No. 312-24, at 2.

CSX further asserts in its statement of facts that at the April 18, 2018 NPBL Board meeting, the "CSX appointed directors requested that the Board appoint an independent [rate] committee to review and evaluate the 2018 Proposal, but the NS-appointed directors refused, based on purported conflicts with NPBL's governing documents." ECF No. 324, at 28. As evidence in support of this factual claim, CSX points to a May 18, 2018 letter written by CSX's assistant general counsel, which indicates: (1) that CSX had objected to "NPBL's 'management's' suggestion and the NS[R]'s representative's insistence that the NPBL Board establish a 'rate committee' comprised of interested director members to evaluate the Service Proposal"; (2) that "CSX[] demanded that an independent special committee be established to evaluate and respond to that proposal"; and (3) that the "NS[R]-controlled Board at the April 2018 meetings, nonetheless <u>rejected</u> CSX[]'s request to form an independent committee to review the Service Proposal." ECF No. 326-14 (emphasis added).

The Defendants challenge CSX's facts as unsupported by the record evidence.[24]   While the Court must view the facts in the light most favorable to CSX as the non-movant on summary judgment, CSX must present evidence sufficient to demonstrate a genuine issue of material fact; mere factual assertions, unsupported by the record evidence, are insufficient to withstand summary judgment. Here, a careful review of the competing allegations reveals that both CSX's proffered version of the facts in its brief and CSX's cited evidence in support of those facts fail to undercut NPBL's factual contention that the NPBL Board never voted in April 2018 on whether a rate committee (independent or otherwise) should be formed, and never voted on CSX's new service proposal for an $80 per car switch rate.   The second contention (no vote on the service proposal) is admitted by CSX, so the Court focuses on the first contention.

Importantly, Defendants' summary judgment motions expressly rely on the 2018 NPBL Board minutes in support of their factual claims, and CSX did not, in opposition, challenge the accuracy of what is reflected in the minutes.   The minutes indicate that Cannon Moss discussed CSX's proposal regarding intermodal traffic to NIT

---

[24] NPBL also challenges the manner in which CSX advances it facts, arguing that CSX has not directly responded to NPBL's facts as required by this Court's Local Rules, and by doing so, has admitted NPBL's version of the facts.   Although the Court does not find that CSX has "admitted" NPBL's facts based on the method of its response, NPBL is correct that CSX cannot merely "object" to NPBL's evidence, but must instead present responsive counter evidence sufficient to demonstrate a material dispute of fact.

and management's ongoing review of it, but the minutes do <u>not</u> <u>indicate</u> that any motion, action item, vote, or other <u>board action</u> was taken by NPBL with respect to a rate committee. ECF No. 303-19. This, of course, stands in contrast to the other action items listed in the <u>Board</u> minutes (multiple "motions" were approved) as well as the duly recorded vote regarding "independence" listed in the <u>shareholders meeting</u> minutes. Therefore, CSX's evidence <u>at</u> <u>best</u> demonstrates that there was <u>a discussion</u> at the NPBL Board meeting regarding a rate committee, and that the NSR-appointed directors revealed that they did not want to form a "special" rate committee as purportedly "demanded" by the CSX-appointed directors.[25]

The absence of a genuine factual dispute as to whether the NPBL Board voted on the issue of an independent rate committee appears to be separately illustrated by testimony from a CSX-affiliated NPBL director. <u>See</u> ECF No. 328-19 (Q: "Do you know if that was discussed at the April 18th, 2018 board meeting, conducting a tariff review or having a committee do it? A: I do

---

[25] CSX's statement of facts asserts that NPBL "rejected" the request for an independent rate committee due to a purported "conflict" with NPBL corporate governance documents. However, as highlighted in NSR's reply brief, CSX appears to conflate this issue with a different "conflict" purportedly voiced by certain NPBL directors when discussing the terms of CSX's <u>new</u> <u>service proposal</u>. A review of the May 18, 2018 letter offered by CSX as support for the purported rate committee "conflict" reveals <u>no mention of</u> <u>a "conflict"</u> associated with <u>the independence of the rate committee</u>, and thus, there is no evidence supporting any inference that a false "conflict" was manufactured by the NSR-affiliated board members to reject an independent rate committee.

not recall anything being presented to the board for their -- as an action item.  I am not sure if anyone mentioned a rate committee at that meeting."); cf. ECF No. 310-3 (indicating that after Cannon Moss stated in his early April email that NPBL management would recommend that the board form a rate committee that, as far as the CSX 30(b)(6) witness knew, CSX never "at any point sa[id] yes, thank you, we would like the rate committee").  It is likewise supported by the deposition testimony of Cannon Moss.  See ECF No. 324-7 (indicating that, after Mr. Moss relayed NPBL management's recommendation to the board that a rate committee examine CSX's proposal, "[t]here was no interest from either side to have a rate committee"); cf. ECF No. 310-23 (reflecting the testimony of the CSX in-house counsel who authored the May 2018 letter indicating that "as I recall from the -- there was not a desire to proceed with a rate proposal without approval of an independent board as well").

The Court, of course, does not "weigh" or balance the evidence on summary judgment.  The Court must, however, carefully review the record evidence to determine whether a genuine factual dispute exists.  In doing so, it is appropriate for the Court to carefully consider the words chosen by CSX's in-house counsel in the April 2018 letter, and CSX's litigation counsel in its statement of facts, both of which do not assert that the NPBL Board "voted" down a proposal for an independent rate committee at the 2018 Board

meeting, or that the Board otherwise took an active affirmative step as a Board in response to a "motion" or other "action item." Therefore, the Court finds that that there is no genuine factual dispute as to whether the NPBL Board acted on behalf of NPBL to reject a special rate committee.  Similarly, CSX admits that the NPBL Board never voted on the CSX 2018 long-term rate proposal.

Alternatively, as discussed below, even if the Court assumes an informal rejection of CSX's request for a rate committee comprised of individuals with no ties to NPBL, such fact is insufficient to demonstrate a new injury-causing overt act.  There would be "new harm" to CSX that excludes it from the market if there was a new vote by the NPBL Board denying CSX the ability to reenter the market at a lower rate.  However, preliminary disagreements over how to determine the new rate do not amount to "new harm."  Tellingly, any "new rate" established by the Board after referral to a rate committee could be higher or lower than the current rate based on legitimate factors wholly unrelated to unlawful motivations. CSX improperly seeks to build one inference upon the other, assuming both that NPBL would reject its request for a reduced rate and that such rejection would not be based on legitimate market factors, including NPBL's actual operating costs.  See Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party . . . cannot create a genuine issue of material

fact through mere speculation or the building of one inference upon another.").

### b. The Shareholder Proposal is Not an Overt Act Causing New and Accumulating Harm

As outlined above, the proposal considered by the NPBL shareholders, as evidenced by the meeting minutes and related evidence, was a "corporate governance" request from CSX that essentially sought to eliminate NSR's contractual right to appoint three NPBL directors of its choosing. As established during this case, NSR and CSX's relative ownership percentages were the result of historical railroad mergers, and the 3-2 director nomination power imbalance was the result of a written 1989 contract between NSR's two predecessors and CSX. ECF No. 310-1.

As Defendants argue, CSX has failed to demonstrate that NSR's vote denying a request that it surrender its explicit contractual rights in 2018 was an actionable overt act capable of restarting the limitations period.[26] Rather, NSR's action in 2018 to retain this long-established contractual right is at most a "reaffirmation" of its decades-old written agreement with CSX, and is therefore insufficient to restart the limitations period. See Varner, 371 F.3d at 1019; Kaw Valley Elec., 872 F.2d at 933; Pace

---

[26] Both NSR and CSX have, for many years, appointed their respective employees to the NPBL Board of Directors, such that the Board is routinely composed of three NSR-affiliated directors, and two CSX-affiliated directors. Additionally, the NPBL President, typically a former NSR employee, constitutes the sixth voting member of the Board.

Indus, 813 F.2d at 238; DXS, Inc., 100 F.3d at 467.  This finding is further supported conceptually by case law finding that the continuing violation doctrine is typically inapplicable to inertial consequences that arise from a merger because the harm to competition occurs when the merger is effectuated.  See Z Tech, 753 F.3d at 599; see Areeda & Hovenkamp, Antitrust Law ¶ 320c (distinguishing between the "'inertial consequences' of a merger" (which do not restart the limitations period), and ongoing meetings by a cartel to adjust its prices (which do), noting that federal courts show more reluctance to extend the limitations period in cases involving "vertical arrangements involving refusal to deal, tying, or exclusive dealing").  To the extent CSX suffered harm solely as a result of the contractual power imbalance, CSX's claim would have accrued in 1989 or shortly thereafter when NSR's predecessors merged.  Alternatively, if active abuse of the power imbalance was required, CSX's claim accrued when the unequal balance of power was leveraged by NSR in or around 2009 to secure NPBL action that excluded CSX from the relevant market.  Applicable antitrust law precludes CSX from establishing an overt act in 2018 based on NSR's recent vote against modifying a contract that had been final for three decades and had been actively utilized to exclude CSX from the market nearly a decade earlier.  See Aurora Enterprises, Inc. v. Nat'l Broad. Co., 688 F.2d 689, 694 (9th Cir. 1982) (explaining that "not every act by an antitrust defendant is

sufficient to restart the statute of limitations" and the "mere fact that defendants receive a benefit today as a result of a contract executed" more than fifteen years earlier "is not enough to restart the statute of limitations"); US Airways, Inc. v. Sabre Holdings Corp., 938 F.3d 43, 69 (2d Cir. 2019) ("A contract is a vehicle for determining at the time of contracting what should happen at some time thereafter.").

Alternatively, even assuming NSR's shareholder vote as prompted by CSX's governance proposal could be interpreted under applicable antitrust law as an overt act, rather than a mere reaffirmation, the record evidence fails as a matter of law to demonstrate that NSR's conduct caused any new and accumulating harm to CSX such that the limitations period restarts.[27]   Any potential new antitrust harm that CSX conceivably could have felt in and after 2018 would have resulted from the actions of the NPBL Board excluding CSX from the on-dock rail market at NIT, not from NSR's preliminary step of maintaining its long-established contractual right to appoint three NPBL Board members.   Stated another way, the preliminary step of appointing a board member to

---

[27] CSX, for its part, speculates that the NPBL Board members appointed in 2018, would breach their fiduciary duties and restrain trade at the first opportunity.   Cf. Hearing Tr. 35 ("I mean, we know what a rate committee does.   That's from 2009 and 2010.").   Such assertion is not grounded in any record evidence and runs contrary to this Court's responsibility to draw reasonable inferences in favor of CSX on summary judgment.   New actionable injury must be based on new acts impacting competition, not supposition and conjecture about how a party would act if it acted.

make decisions for a company does not itself cause new damages. It is instead the board's _actions_ on behalf of the company _after_ the director's appointment that a factfinder would have to scrutinize to determine: (1) whether they were legitimate actions or actionable antitrust violations; and (2) whether they caused new and accumulating injury. _See Conwood Co., L.P. v. U.S. Tobacco Co._, 290 F.3d 768, 788-89 (6th Cir. 2002) ("An antitrust plaintiff bears the burden of showing that the alleged violation was a material cause of its injury, a substantial factor in the occurrence of damage or that the violation was the proximate cause of the damage"); _see also Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp._, 828 F.2d 211, 219 (4th Cir. 1987) (discussing, within the context of an antitrust standing analysis, the "principled limits" on the otherwise "unbounded reach" of the antitrust damage remedy, to include "the causal connection between the alleged violation and the harm suffered," and finding that the indirect harm the plaintiff suffered from certain contract terminations was insufficient to support either antitrust damages or injunctive claims because the "chain of causation" was "too attenuated to be considered proximate").

A preliminary step, even if presumed to be taken with a monopolistic or conspiratorial mindset, does not constitute an injury-causing overt act sufficient to restart the limitations period in the absence of a subsequent act causing harm to the

73

market or a competitor.   See Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n, 623 F.3d 281, 285 (6th Cir. 2010) (noting that because the defendant dropped proposed rule changes "before they ever went into effect" such rules "cannot be challenged because they necessarily did not cause (nor do they threaten to cause) any injury to [plaintiff] or anyone else"); see Hoffman v. Halden, 268 F.2d 280, 296-97 (9th Cir. 1959), overruled in part on other grounds by Cohen v. Norris, 300 F.2d 24 (9th Cir. 1962) (explaining, in the context of a civil rights conspiracy case, that "injury and damage must flow from the overt acts" and when "the gravamen of the injury complained of is commitment to an institution by court order," in most cases it is the "order of the court," and not the "[v]arious preliminary steps . . . which lead to the order" that cause injury from imprisonment or restraint). A contrary rule would allow for the recovery of damages based on the mere presumed intent to cause antitrust injury even in the absence of any actual injury.   CSX thus fails to demonstrate that NSR's actions at the April 2018 shareholders meeting are sufficient to restart the long-expired limitations period.

### c. Board Never Voted on a Rate Committee or the Service Proposal, and "Inaction" is Insufficient

As outlined above, CSX fails to demonstrate that the NPBL Board took a formal vote, or otherwise acted as a corporate body on behalf of NPBL at the April 2018 Board meeting, to reject any

request that may have been made seeking an independent rate committee.[28] CSX therefore fails to demonstrate a new overt act causing new and accumulating harm. Moreover, even if the Court presumes against the record evidence that CSX's request for an independent committee was rejected by the NPBL Board, CSX fails to demonstrate that such action can restart the limitations period in the absence of evidence capable of establishing that the Board directly <u>or indirectly</u> rejected CSX's service proposal or indicated that NPBL would not analyze the economic viability of the proposal. It is the rejection of the service proposal that had the potential to cause new and accumulating harm, but only if such rejection was itself an antitrust violation and not based on a legitimate economic analysis.

As CSX cannot demonstrate new harm flowing from any 2018 acts, CSX contends that new actionable harm can flow from <u>inaction</u>. Even

---

[28] Consistent with Defendants' argument that a corporation is not bound by the statements of individual directors, the Supreme Court of Virginia has explained that the "manner in which a corporation should conduct its affairs is prescribed by statute, as implemented by the by-laws of the corporation," and that "[o]rdinarily, an[] action designed to affect the property and business of a corporation should be taken only by formal resolution of the board of directors, at a duly constituted meeting." <u>Brewer v. First Nat'l Bank of Danville</u>, 202 Va. 807, 812 (1961); <u>see also</u> <u>Monacan Hills, Inc. v. Page</u>, 203 Va. 110, 116 (1961) ("[The] directors of a corporation have authority to bind it only when they act collectively as a board." (alteration in original) (citation omitted)). An exception to this general rule can be made for a corporation whose directors, officers, or shareholders routinely "ignore the requirements of the statutes and corporate by-laws, and conduct its business in an informal manner." <u>Brewer</u>, 202 Va. at 812-13. However, this exception is inapplicable here, where no party has sought such an exception and record evidence indicates that the NPBL Board conducted its business in a formal manner in keeping with Virginia statutory requirements. The general rule requiring a corporation to act through formal board resolutions consequently applies to NPBL.

if this legal theory were available, on this record, CSX relies on
the stacked assumptions that the NSR-appointed board members <u>would</u>
— in the future — both reject CSX's proposal and do so in disregard
of their fiduciary duty to fairly evaluate the service proposal
based on NPBL costs and other legitimate business considerations.
However, even after extensive discovery, CSX points to no evidence,
direct or circumstantial, suggesting that the 2018 NPBL Board or
its members had engaged in conspiratorial conduct in connection
with the 2018 events.  As such, CSX's claim that it suffered new
actionable harm in 2018 based on inaction is grounded in
speculation.[29]

CSX's efforts to restart the limitations period based on a
theory of "purposeful inaction" is also legally flawed.  As argued
by Defendants, this Court finds that proper interpretation of the
relevant case law requires that an overt act capable of restarting
the limitations period must be based on affirmative action, not
inaction.  Such proposition appears to be generally accepted within
federal antitrust precedent, including precedent from the Fourth
Circuit.  <u>Charlotte Telecasters</u>, 546 F.2d at 572-73.

In <u>Charlotte Telecasters</u>, the Charlotte City Council had
elected not to award a television franchise to the plaintiff in

---

[29] Based on the record presented on summary judgment, CSX's suggestion that
the NPBL had an independent obligation to reduce its switch rate to $80 per
car in mid-2018 before the underlying NS-NPBL rate dispute was resolved is
similarly unavailing.

March of 1967.  Upon request, the City Council reconsidered its decision in August of that same year, noting both that it "would leave [the original decision] as it is," and that the Council "will give some thought to" what the plaintiff's spokesman had said at the August meeting.  Id. at 573.  The plaintiff argued that the City Council's final comments and silence following the meeting "was an overt act of refusal" as it was equivalent to rejecting the request for a franchise after a period of further thought. Id. The Fourth Circuit rejected this argument, noting that the city council had not promised further consideration and that silence following the meeting did "not constitute an overt act." Id.   The Fourth Circuit then cited to Poster Exchange, which provides that a plaintiff "is obliged to demonstrate some act of the defendants during the limitations period foreclosing or interfering" with its participation in the market, as contrasted with the "abatable but unabated inertial consequences of some pre-limitations action."  Poster Exchange, 517 F.2d at 128 (emphasis added).

Here, the undisputed facts demonstrate (1) that NPBL management was receptive to CSX's 2018 proposal and recommended that it be sent to a "rate committee" for further evaluation, but (2) purported disagreements between NPBL Board members as to who should sit on a rate committee ultimately led to the Board's failure to vote either way regarding the makeup of the rate

committee or regarding the service proposal itself, with the instant lawsuit being filed six months after the 2018 Board meeting. Moreover, during this same period of time, the rate that NPBL would pay NSR for track access going forward (a critical input for analyzing CSX's service proposal) was being negotiated and was presented to the STB for expedited review, placing NSR and NPBL in opposition on this issue. There is, however, no evidence in the summary judgment record suggesting NSR and NPBL were colluding to abuse the STB process, and it is CSX that acted to halt (i.e., delay) that process. These facts are insufficient, as a matter of law, to demonstrate an overt act through action or inaction.[30]

Therefore, notwithstanding CSX's citation to Lower Lake Erie for the proposition that purposeful inaction can constitute an overt act in certain circumstances, there is no direct or circumstantial evidence of purposeful inaction here because CSX only sought a review of its proposal for a new service rate/conditions if such review were conducted on CSX's own terms. The Court rejects any suggestion from CSX that a "new" act or "new"

---

[30] This Court does not adopt the "purposeful inaction" standard argued for by CSX, but even if it did, CSX fails to demonstrate an overt act or damages flowing therefrom, as it merely speculates that fiduciary duties would be violated if the CSX proposal were considered. Defendants, for their part, argue that CSX's privilege log for this litigation predates the April 2018 events, contending that the 2018 proposal was made by CSX in an effort to manufacture an overt act. This Court does not address such allegation, but instead focuses on whether the evidence in the summary judgment record would allow a reasonable juror to conclude that NSR and or NPBL engaged in an overt act in 2018 that caused new and accumulating harm, finding that it does not.

injury manifested, as soon as CSX made its new proposal, based on speculative allegations of intentional delay or an unsupported assumption that a "standard" NPBL rate committee would have rejected the proposal.  Notably, even if the proposal was rejected by the NPBL Board following referral to a rate committee, CSX would need to demonstrate that the denial was the <u>result of an antitrust violation</u> and not the proposal's lack of merit.  The absence of a decision regarding both who would evaluate the proposal and whether it was economically viable for NPBL when all of NPBL's operational costs were considered precludes a finding that Defendants committed a new overt act causing new and accumulating harm.

The Court's analysis on this point should not be read to suggest that the makeup of the NPBL Board did not create an apparent risk of an adverse decision, but to recover damages, CSX must prove that it was <u>actually damaged</u> during the limitations period, not that the evidence suggests a likelihood of damage had additional events transpired.  CSX has therefore failed to point to evidence, or reasonable inferences therefrom, that could support a finding that NPBL (or NSR) committed an injury-causing overt act in 2018.  See <u>SD3, LLC v. Black & Decker (U.S.), Inc.</u>, 215 F. Supp. 3d 486, 499 (E.D. Va. 2016) ("Without any evidence of new refusals to deal, there can be no continuing violation and no tolling of the statute of limitations.").

In sum, CSX's efforts to demonstrate an overt act — through speculation about how a vote on a rate committee or on the 2018 service proposal would have caused harm had such votes occurred — are insufficient as a matter of law.[31] Allowing a plaintiff to rely on inaction coupled with inferences about future conduct and resulting future harm based on long-stale misdeeds of a similar character would turn the legal test for damages on its head by allowing a plaintiff that has slept on its rights for years to resurrect a time-barred claim on the basis of supposition rather than evidence.

In summary, CSX fails to demonstrate that an overt act causing new and accumulating harm was committed by either Defendant during the limitations period. Defendants, therefore, carry their ultimate burden to demonstrate that CSX's federal antitrust damages claim is time-barred as a matter of law. Summary judgement is therefore **GRANTED** in Defendants' favor as to damages.

### V. DISCUSSION - FEDERAL INJUNCTIVE RELIEF

#### A. Court-Raised Issues

In light of the legal hurdle that CSX appeared to be facing due to the timing of the acts on which it has relied to establish

---

[31] CSX appears to have taken steps similar to a television franchise applicant walking into a city council meeting and suggesting that several council members recuse themselves before a new franchise application is considered. After the council members discussed such matter and several voiced their view that recusal was unnecessary (but never voted on a formal recusal request) the applicant then walked out of the meeting without seeking a ruling on recusal or on the application itself.

antitrust damages, the Court asked the parties during the summary judgment hearing what effect, if any, a defense-favorable limitations ruling would have on any injunctive relief claims remaining in this case. Defendants took the position that such injunctive relief claims would be barred, while CSX argued that an injunctive relief trial would be necessary, even if its damages case failed.

The Court thereafter provided the parties with two opportunities to file simultaneous briefs on the issue of injunctive relief. ECF Nos. 535, 548. The second briefing order specifically requested analysis on the interplay of limitations and laches principles (Defendants did <u>not</u> raise laches in their first brief on injunctive relief, addressing it only after the Court did so) and offered the parties the opportunity to respond to the arguments made in the first round of briefing. All parties provided detailed and well-argued papers despite the expedited briefing schedule.

As argued by CSX in its second supplemental brief, ECF No. 549, the timing of the additional briefing periods was both short and overlapping with December holidays, and neither injunctive relief generally, nor laches, were previously raised by either Defendant in support of summary judgment. Consistent with CSX's position on this issue, the Court finds that court-initiated summary judgment should <u>not</u> be granted in favor of either Defendant

on the issue of injunctive relief, which has different elements and is governed by a different federal statute than CSX's antitrust damages claim. See 15 U.S.C. § 26. Though CSX does not challenge the Court's ability to raise a summary judgment issue sua sponte if the parties are provided sufficient time to present all relevant materials, Fed. R. Civ. P. 56(f), it effectively argues that the complexity of the factual and legal issues pertinent to this court-raised issue do not support entry of summary judgment based on the expedited schedule that occurred after the summary judgment hearing. Importantly, while there is an extensive evidentiary record before the Court, CSX's detailed responsive evidence in opposition to summary judgment was — appropriately — not tailored to be "responsive" to assertions about the availability of injunctive relief, because Defendants had advanced no such claim.[32] Moreover, the supplemental briefs and the Court's further research sufficiently reveal that, in the context of this case, CSX's injunctive relief claims do not simply "rise and fall" with the outcome of its damages claim. Summary judgment is therefore **DENIED** with respect to CSX's claim for injunctive relief.

---

[32] Defendants advanced certain challenges to CSX's case that would have been dispositive of all forms of relief, including injunctive relief (e.g., the absence of a conspiracy, or the failure to define a relevant market), but the Court denies summary judgment on these grounds due to genuine and material factual disputes.

## B. Bench Trial Independently Warranted

Alternatively, even if a sufficiently fulsome period to develop the record on injunctive relief issues is assumed, CSX has demonstrated, at least for summary judgment purposes, that it has standing to seek injunctive relief and that the existing record does not support entry of summary judgment in favor of Defendants.[33] As discussed in detail above, NSR has for many years filled the majority of the NPBL Board seats with current NSR employees, who have then voted to elect a former NSR employee as the NPBL President. Though this may have been an "equitable" arrangement initially notwithstanding NSR's _opportunity_ to place its thumb on the scale of NPBL matters, CSX provides facially strong evidence that NSR manipulated its opportunity to dominate the NPBL Board in the years leading up to 2009 and extending into 2010 or 2011. CSX has likewise pointed to other more recent evidence, though much of it circumstantial and subject to competing inferences, suggesting that NSR may not have abandoned its willingness to use its "control" over NPBL for the purpose of benefiting NSR above all else. CSX therefore anticipates asking this Court to, in essence, equitably modify the balance of power at NPBL, by ordering NSR and

---

[33] Though the Court does not squarely analyze Defendants' reasserted arguments that this Court lacks authority to grant certain injunctive relief in this case due to the STB's regulatory authority, consistent with the prior rulings of both this Court and the STB, Defendants' supplemental briefs do not convince the Court that it lacks authority to enjoin unlawful collusion or similar activities that violate federal antitrust laws.

CSX to have equal votes on corporate governance issues[34] or by issuing an injunction that requires Defendants to establish a sufficiently "independent" NPBL Board or management structure.[35]

A necessary element for injunctive relief is a threatened or prospective injury, as opposed to a past injury that can be compensated with damages. ECF No. 543, at 2. "Because 'past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects,' a plaintiff seeking 'declaratory or injunctive relief must establish an ongoing or future injury in fact.'" Davison v. Randall, 912 F.3d 666, 677 (4th Cir. 2019) (cleaned up) (emphasis added) (quoting Kenny v. Wilson, 885 F.3d 280, 287-88 (4th Cir. 2018)). Allegations of future injuries "may suffice if the threatened injury is certainly

---

[34] Such relief may not require the Court to change the dividends received by CSX or NSR based on the percentage of ownership of NPBL, but instead tailor the relief to eliminate the power imbalance when it comes to corporate governance issues, board makeup, or the affiliations of corporate officers. Because federal courts have the authority to unwind completed mergers and divest ownership interests in response to federal antitrust violations, Steves & Sons, Inc. v. JELD-WEN, Inc., 988 F.3d 690, 703 (4th Cir. 2021), NSR fails to demonstrate at this time that the less intrusive injunctive remedies proposed by CSX are unavailable as a matter of law.

[35] To the extent that NPBL challenges whether CSX can obtain injunctive relief against NPBL (rather than NSR), such arguments were not previously raised on summary judgment and are insufficient at this time. Furthermore, it is unclear from the summary judgment record that injunctive relief would necessarily be directed only at NSR, as the Court could presumably require NPBL's directors to take specific steps to avoid future collusion with NSR, such as by ensuring that the Board elects an independent NPBL President.

impending, or there is a substantial risk that the harm will occur." Id.

Here, one of the relevant considerations for injunctive relief is whether there is a substantial risk that NSR will, in the future, engage in anti-competitive efforts to manipulate NPBL or otherwise unlawfully prevent CSX from utilizing the NPBL's tracks to NIT — this must not, of course, be confused with NSR's lawful competitive efforts to profit from other entities' use of its tracks. As discussed throughout this opinion, CSX's strongest evidence of past wrongs is based on acts committed in and around 2009; however, emails and other evidence highlighted by CSX from 2015 and 2018, as well as the CSX-favorable inferences that can be drawn therefrom, when considered in the context of the past conduct, present a triable issue as to whether NSR will use its ability to control the NPBL Board to harm CSX in the future in the same way it allegedly did so in the past.[36]  Furthermore, NSR's purported representations to the STB after this case was filed regarding its legal right to control NPBL, pursuant to past mergers, may be relevant to the likelihood of future harm. Finally, the impending need for NPBL to act on issues critical to CSX's future access to NIT is clear, as NPBL is currently adverse to NSR in an STB proceeding over the rate NSR will charge NPBL in

---

[36] CSX, of course, contends that it continues to suffer from past violations committed before the limitations period and that Court-ordered injunctive relief is necessary to end the ongoing harm.

the future to access NIT.  As such, NPBL will need to reassess the switch rate charged to CSX and other customers _after_ the STB resolves the stayed NSR-NPBL dispute.

In summary, because (1) disputed facts require this Court to assume for summary judgment purposes that there was a violation of antitrust laws in and around 2009, and (2) there is nothing to indicate that "the threat to [CSX] inherent in the [past] conduct would cease in the foreseeable future," _Zenith Radio Corp. v. Hazeltine Rsch., Inc._, 395 U.S. 100, 131 (1969), it would be improper to grant summary judgment on injunctive relief at this time.  _See_ _Machovec v. Council for Nat. Reg. of Health Serv. Providers in Psychology, Inc._, 616 F. Supp. 258, 266-67 (E.D. Va. 1985) ("[T]o be entitled to injunctive relief, plaintiffs 'need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur' that proximately resulted from defendants' putative antitrust violations." (quoting _Zenith_, 395 U.S. at 130 (1969)).

Turning to the issue of laches, this defense was not raised by Defendants on summary judgment, in the proposed final pretrial order, or in their first supplemental briefs on injunctive relief. Additionally, a valid basis for granting summary judgment on laches is not evident to the Court at this time, even assuming that — as Defendants suggest — CSX should bear the burden to prove the

absence of prejudice based on the fact that it waited more than four years after it was allegedly harmed to file suit.

As an equitable defense, laches requires considering the harm suffered by Defendants due to any delay, but the narrowly tailored version of injunctive relief that CSX espouses suggests the absence of any such prejudice.[37] Here, contrary to cases asking a district court to unwind a complex merger after corporate integration, the fact that the NPBL Board is reconstituted every year suggests that CSX's delay would not prejudice either Defendant's business operations. Furthermore, this case has similarities to the laches analysis in Steves & Sons, Inc. v. JELD-WEN, Inc., 988 F.3d 690, 707, 716-18 (4th Cir. 2021), where the Fourth Circuit reviewed the findings of another judge of this Court who had noted the temporal gap between the date of a merger and the date the merged entity took steps to manipulate the market. Any delay here should not date back to the 1989 contract, but rather, the activities occurring in and around 2009-2011, and potentially thereafter. Though the Court acknowledges Defendants' argument in their joint

---

[37] The Court does not take up the parties' newly raised dispute over whether CSX "waived" its right to seek injunctive relief in the form of a court-compelled "service agreement" based on CSX's failure to include that request in the final pretrial order. The Court does, however, refer the parties to the above discussion of the essential facilities doctrine and expressly notes its wholesale adoption of the Supreme Court's observations that both antitrust law and this Court are "ill suited" to dictate the terms of forced sharing to include "the proper price, quantity, and other terms of dealing." Trinko, 540 U.S. at 408. This is especially so in such a uniquely regulated industry where the STB itself can resolve disputes over rates and likely dictate other terms associated with the forced sharing of tracks.

second supplemental brief that CSX's delay has caused witnesses to become unavailable or memories to fade, (1) CSX has not had an opportunity to rebut such arguments due to Defendants' failure to raise them earlier, (2) the degree of prejudice asserted by Defendants is not enough to bar the injunctive claim entirely and can instead be addressed at trial, and (3) CSX points to more recent evidence, including emails from 2015 and 2018, that could support its claim for injunctive relief. Finally, the Court recognizes the needed flexibility of the requested injunctive remedy and the need to ensure that the interplay between limitations and laches does not immunize longstanding federal antitrust violations (or the potential reaffirmations of those violations) to the detriment to the public and the relevant industry:

> The best solution to the problem of long-term contracts that are unlawful, if at all, from the beginning but also known to the plaintiff, is to use the statute of limitation to bar the tardy damage action but to give flexibility in equity to permit the injunction against continued enforcement. To illustrate, suppose that the defendant imposes a 20-year requirements contract on the plaintiff that was challengeable as exclusive dealing from its inception. The purchaser who suffers injury but delays its damage action for six years has lost its opportunity to collect damages; but the public as well as the purchaser still profit from the termination of an anticompetitive arrangement. The court should permit an action declaring the contract unlawful and unenforceable. This approach may be precluded if the court woodenly adopts the principle that the period for determining whether laches bars an injunction is the same as that for the statute of limitation.

Areeda & Hovenkamp, <u>Antitrust Law</u> ¶ 320c3. For all of these reasons, summary judgment on the issue of injunctive relief is alternatively **DENIED** based on the state of the record currently before this Court.

## VI. ADDITIONAL CHALLENGES TO FEDERAL CLAIMS

Defendants advance several additional challenges to CSX's ability to prevail at trial on its federal antitrust claims, which if successful, would preclude a trial on injunctive relief. Those include challenges to: (1) CSX's definition of the relevant market; (2) whether an "agreement" to restrain trade or to establish or maintain an unlawful monopoly was ever entered into by Defendants; and (3) whether two firms can collectively form a monopoly. The Court is largely in agreement with CSX's summary judgment position on these issues, and finds that genuine and material factual disputes preclude summary judgment on most of these arguments and subarguments, and that all such claims fail to demonstrate that summary judgment should be entered in favor of Defendants.

### A. Relevant Market

NSR accurately argues that CSX's complaint defines the "relevant market" for antitrust purposes as encompassing rail transportation in and out of Hampton Roads ports (of which NIT and VIG are the two primary port terminals), while CSX's antitrust case is now tailored more narrowly to identify the relevant market as on-dock rail access <u>at NIT</u>. However, as argued by CSX, ECF No.

324, at 65-67, the <u>narrowing</u> of the market by CSX's expert, which is consistent with other portions of the complaint that identify the market exclusion as predicated on CSX's exclusion <u>from NIT</u>, has been long-known to Defendants.   CSX's expert defined the narrowed market in February of 2020, and Defendants' expert response, provided a year later in February of 2021, directly responded to this definition of the relevant market.   Fact discovery also continued after CSX's initial expert report. Defendants fail to identify any prejudice from this narrowing of the market definition in light of the timing of its disclosure in this case.   Consequently, the court finds that this narrowing does not support a defense-favorable ruling on summary judgment.[38]

NSR separately argues that CSX's definition of the relevant market as "on-dock rail access at NIT" is improperly narrow and therefore fails as a matter of law.   Though NSR raises some valid questions regarding the viability of the market as defined by CSX, its argument fails at the summary judgment stage due to the factual complexities outlined in the briefs regarding how ocean carriers choose a geographic port (Hampton Roads vs. New York vs.

---

[38] Though this Court does not find that an amendment to the complaint is necessary due to the timing of CSX's disclosure of its narrowed definition and the fact that the complaint expressly reveals that the exclusion at the POV was factually predicated on CSX's exclusion <u>from NIT</u>, <u>see</u> ECF No. 1, at 3 ("NS[R] and the NPBL have used the NPBL as a chess piece to maintain NS[R]'s monopolistic control over intermodal transportation in and out of NIT"), the Court would allow CSX to amend its complaint if the Court believed such amendment was necessary.

Baltimore), how they choose an individual terminal if they are able to choose such terminal, and the impact that a rail carrier has on an international shipper's decision to select a specific port or terminal.  Additionally, the summary judgment record reveals that, while international shippers might take steps to align themselves with a specific POV terminal, they cannot truly control which terminal they patronize due to VIT's role in routing containership traffic.  Therefore, one reasonable interpretation of the summary judgment record is that VIG is not a true "alternative" to NIT.  In light of these and other relevant disputed factors (including the proper scope of the geographic market when the "product" at issue involves transportation), the Court finds that disputed facts preclude summary judgment on this basis.  See Cont'l Airlines, Inc. v. United Air Lines, Inc., 120 F. Supp. 2d 556, 568 (E.D. Va. 2000) ("The definition of a relevant antitrust market is a highly fact-intensive inquiry."); E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 442 (4th Cir. 2011) (describing the inquiry into the relevant "geographic market" as "a fact-intensive exercise centered on the commercial realities of the market and competition").

For the same reason, the Court rejects NSR's related contention that the market identified by CSX is improper as a matter of law because it fails to consider either "drayage" as an alternative to on-dock rail at NIT, or the impact that end-to-end

truck transportation purportedly has on the relevant calculus. Disputed facts and conflicting expert opinions interpreting those facts reveal genuine disputes regarding the propriety of CSX's market definition, as illustrated by the factual dispute concerning the degree to which drayage is a <u>suitable</u> alternative to on-dock rail based on capacity limitations and/or international shippers' desire to avoid relying on drayage.

### B. Monopoly

A similar analysis is applicable to NSR's contention that CSX has not presented adequate evidence of monopoly power within the relevant market. Accepting for purposes of summary judgment CSX's narrowed definition of the market, NSR fails to demonstrate that either CSX's efforts to compete at NIT through drayage, or the evidence demonstrating an increase in CSX's NIT business over time, fatally undercuts the contrary evidence of NSR's apparent market dominance at NIT. In short, factual disputes require a trial.

NSR separately argues that CSX's theory of the case violates the federal antitrust requirement that a Sherman Act monopolization claim be predicated on the unilateral conduct of a single firm. This claim, however, likewise fails. CSX's theory of the case is that <u>NSR is the sole entity</u> that operates as a "monopolist," and the summary judgment record does not suggest otherwise. The evidence before the Court does not reveal that NPBL competes in the relevant market or that it conducts any

92

business with international shippers.[39]   Rather, CSX claims that
NPBL conspired with and assisted NSR in creating and/or defending
NSR's unlawful monopoly.

### C. Conspiratorial Agreement

Both NPBL and NSR argue that CSX's evidence is insufficient
as matter of law to demonstrate that NPBL entered into an agreement
with NSR in support of a monopoly or an unlawful restraint on
trade.   The Court, however, finds that the record evidence is
sufficient to raise a factual dispute regarding the existence of
such an agreement.   CSX has identified sufficient direct and
circumstantial evidence of an agreement between NSR and NPBL in
and around 2009 that was aimed (and may have unlawfully succeeded)
at erecting barriers to CSX's ability to provide on-dock rail
service at NIT.   See Robertson v. Sea Pines Real Est. Companies,
Inc., 679 F.3d 278, 289–90 (4th Cir. 2012) ("Conspiracies are often
tacit or unwritten in an effort to escape detection, thus
necessitating resort to circumstantial evidence to suggest that an
agreement took place.").   As a result, this argument and
Defendants' other arguments addressed immediately above fail to
carry Defendants' burden to demonstrate that summary judgment

---

[39] CSX asserts that NSR has handled between 84% and 98% of the international
intermodal business at NIT between 2009 and 2020.   There is no record
evidence suggesting that NPBL has any contracts with any international
shippers.

should be entered in their favor, and summary judgment is therefore DENIED.[40]

## VII. DISCUSSION – VIRGINIA STATE LAW CLAIMS

In keeping with their federal law arguments, Defendants assert that CSX's Virginia state law claims[41] are time-barred or otherwise fail as a matter of law.  These arguments, and CSX's responses, are substantially underdeveloped compared to the parties' extensive federal antitrust arguments.  Nonetheless, this Court has endeavored to fully analyze the state law claims.  Cf. Steves & Sons, 988 F.3d at 727 (explaining that it "is not the obligation of [the Court of Appeals] to research and construct legal arguments open to parties, especially when they are represented by counsel") (citation omitted).  Because the parties' state law arguments rely heavily on their respective federal law arguments, the Court's analysis follows suit where appropriate. For the reasons set forth below, the Court finds that there is no genuine dispute as to any material fact regarding CSX's state law claims and that Defendants are entitled to judgment as a matter of law with respect to those claims.

---

[40] To the extent the parties' briefs address the propriety of an "essential facilities" claim, CSX does not advance a claim under this special antitrust theory, and it is therefore unnecessary to analyze it here.

[41] Following motions practice and dismissals, CSX's remaining Virginia state law claims are as follows: Count Five, a breach of contract claim against NSR; and Counts Eight and Nine, statutory and common law conspiracy claims against NSR and NPBL.

## A. Background – Accrual and Limitations under State Law

Defendants argue, as they do in the federal antitrust context, that CSX's state law claims are time-barred.  The parties agree that a five-year limitations period applies to both the breach of contract and statutory business conspiracy claims.  ECF No. 303, at 17; ECF No. 308, at 17; ECF No. 324, at 47.  However, as NSR argues, CSX's Virginia common law conspiracy claim appears subject to a two-year limitations period to the extent it relies on an alleged breach of a fiduciary duty.  See NorthStar Aviation, LLC v. Alberto, 332 F. Supp. 3d 1007, 1015 (E.D. Va. 2018) (citing Va. Code § 8.01-248; Singer v. Dungan, 45 F.3d 823, 827 (4th Cir. 1995)).  The Court need not determine which limitations period in fact applies to CSX's common law conspiracy claim because it fails even under the more generous five-year limitations period.

Just as under federal law, the limitations period for a Virginia cause of action begins to run when that cause of action accrues.  Forest Lakes Comty. Ass'n, Inc. v. United Land Corp., 795 S.E.2d 875, 881 (Va. 2017).  Each of the state law causes of action alleged by CSX accrues when the plaintiff first suffers the alleged harm.  Westminster Investing Corp. v. Lamps Unlimited, Inc., 379 S.E.2d 316, 317 (Va. 1989) (breach of contract); Detrick v. Panalpina, Inc., 108 F.3d 529, 543 (4th Cir. 1997) (conspiracy).  Though the parties agree on this basic premise, they disagree regarding when CSX's claims accrued.

Defendants, falling back on their federal antitrust arguments, argue that all of CSX's claims are time-barred because the damages CSX seeks stem from time-barred conduct. CSX, in turn, presents its state law causes of action as a series of distinct claims, presumably to cut its post-2013 allegations loose from the plainly time-barred pre-2013 acts. As CSX highlights, the Virginia Supreme Court has explained that "[i]t is possible for a new cause of action to accrue that looks remarkably like an earlier one but is nonetheless a stand-alone claim in its own right." Forest Lakes, 795 S.E.2d at 881. Where this doctrine applies, each such stand-alone claim is subject to its own limitations period, dating from when that individual claim accrues. Id.

## B. Conspiracy

CSX argues that the summary judgment record contains facts "from which a jury could conclude that Defendants entered into a new conspiracy within the limitations period."[42] ECF No. 324, at 47-48. The Court disagrees. As NPBL argues without opposition, Virginia civil conspiracy claims are subject to a heightened

---

[42] This theory of liability stands in obvious contrast to CSX's federal antitrust theory of liability, which relies on the <u>continuing</u> violation doctrine to seek to recover for the <u>totality</u> of antitrust damages suffered during the pre-suit limitations period, regardless of when the offending conduct occurred. Anticipating criticism on this point, CSX argues that it is "entitled to proceed on alternate theories of liability at trial when both are supported by the record. . . . Whether there was one or more conspiracies is a factual matter for the jury to find." ECF No. 324, at 48. This Court need not address Defendants' challenge to the propriety of CSX proceeding on conflicting <u>factual</u> theories because CSX's state law conspiracy claims fail as a matter of law even if properly presented.

evidentiary standard, requiring "clear and convincing evidence" of concerted action for an unlawful purpose. Dunlap v. Cottman Transm. Sys., 754 S.E.2d 313, 317 (Va. 2014) (statutory conspiracy); Pierce Oil Corp. v. Voran, 118 S.E. 247, 251 (Va. 1923) (common law conspiracy). First, CSX marshals no record evidence capable of satisfying its burden, instead relying only on this Court's prior ruling finding that CSX's complaint had sufficiently alleged a new conspiracy in 2018. ECF No. 324, at 48 (quoting ECF No. 66, at 39-40). This argument, of course, fails to illustrate how Defendants' conduct in 2015 and 2016 could be found to constitute one or more separate conspiracies. Further, the Court's prior finding regarding the sufficiency of the complaint is irrelevant at the summary judgment stage, where CSX must establish that record evidence is capable of supporting its claim. Failing to cite to the evidentiary record at all, CSX has not met this burden.

Second, the Court's own review of the summary judgment record, as necessitated to evaluate the federal claims, plainly reveals that no reasonable juror could conclude that there is clear and convincing evidence that Defendants entered into a new agreement to harm CSX between 2015 and 2018. In sum, to the extent that CSX's statutory and common law conspiracy claims are based on allegations of new conspiracies between 2015 and 2018 that are separate from the alleged conspiracy beginning in 2009, both causes

of action fail based on the record evidence, even when viewed in the light most favorable to CSX (and regardless of the heightened evidentiary standard). To the extent that CSX's statutory and common law conspiracy claims are based on allegations of a conspiracy that began in 2009 and continued through 2018, both causes of action are time-barred. Therefore, Defendants' summary judgment motions are **GRANTED** with respect to the Virginia statutory and common law conspiracy claims.

## C. Breach of Contract

Presumably due to the complexity of the antitrust issues, NSR's and CSX's summary judgment briefs devote limited attention to CSX's breach of contract claim. NSR — despite asserting that all of CSX's state law claims are time-barred — fails to articulate how CSX's allegations of post-2013 contractual breaches could be time-barred claims (instead arguing that CSX's damages model is based on time-barred conduct). CSX — despite focusing its limitations analysis on its conspiracy claims — appears to apply its Forest Lakes argument to the breach of contract claim as well, presumably taking the position that each alleged wrongful act by NSR constitutes a separate cause of action in contract with a separate limitations period. NSR offers a more fulsome argument in its reply brief, but again fails to address clearly the scope of its limitations defense and instead pivots to the merits.

In keeping with the Court's analysis above, CSX cannot maintain a breach of contract claim based on pre-October 2013 conduct.  To the extent CSX alleges that NSR's actions in 2015, 2016, or 2018 breached NPBL's Operating Agreement,[43] the breach of contract claim is not procedurally barred by the statute of limitations.  See Forest Lakes, 795 S.E.2d at 881 (noting that new causes of action can "look[] remarkably like an earlier one").  However, CSX cannot sustain its breach of contract claim based on these recent acts because none of the alleged breaches can satisfy all required elements of a Virginia breach of contract claim: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation."  Filak v. George, 594 S.E.2d 610, 614 (Va. 2004).

The Court turns first to the alleged 2018 conduct, which the Court analyzed in detail in Part IV.F.3 above.  These allegations cannot sustain a breach of contract claim because a reasonable

---

[43] CSX's complaint describes the alleged breaches as follows: "effectively blocking CSX[]'s access to NS[R]'s trackage over which NPBL has rights, by refusing to consider proposals that would improve the revenues of NPBL, by failing to encourage the business of NPBL, and by inducing its employees and/or the [now-dismissed] Individual Defendants to vote for measures that are harmful to NPBL."  ECF No. 1 ¶ 107.  Although the complaint does not identify specific timeframes for the alleged breaches, these allegations reasonably (or at least arguably) encompass CSX's allegations regarding NSR's conduct in 2015 (delaying CSX's rail access to NIT), 2016 (canceling contracts with NPBL, prompting an STB rate dispute and delaying the establishment of a new NPBL switch rate); and 2018 (shutting down CSX's alternate governance and rate proposals).

factfinder, viewing the evidentiary record in the light most favorable to CSX, could not conclude that NSR violated any legally enforceable obligation owed to CSX.  On the contrary, NSR and CSX's 1989 contract revising the Operating Agreement gave NSR the <u>explicit contractual right</u> to appoint three of NPBL's directors. NSR's decision to exercise this specific contractual right cannot form the basis of a breach of contract claim.

CSX seeks to sidestep NSR's explicit contractual right by arguing that NSR breached the Operating Agreement by exercising its "contractual discretion in bad faith."  ECF No. 324, at 70 (quoting <u>Morrison v. Wells Fargo Bank, N.A.</u>, 30 F. Supp. 3d 449, 456 (E.D. Va. 2014)).  But, as the Court's discussion in <u>Morrison</u> makes clear, the implied covenant of good faith and fair dealing does not apply to "activity governed by express contractual terms." 30 F. Supp. 3d at 456 (quoting <u>Bennett v. Bank of Am., N.A.</u>, No. 3:12CV34-HEH, 2012 WL 1354546, at *10 (E.D. Va. Apr. 18, 2012)); <u>see also</u> <u>Charles E. Brauer Co. v. NationsBank of Virginia, N.A.</u>, 466 S.E.2d 382, 386 (Va. 1996) ("When, as here, parties to a contract create valid and binding rights, one party does not breach the U.C.C.'s obligation of good faith by exercising such rights."); <u>Virginia Vermiculite, Ltd. v. W.R. Grace & Co.- Connecticut</u>, 156 F.3d 535, 542 (4th Cir. 1998).[44]

---

[44] Further, NSR exercised this contractual right in 2018 in the exact same way it had done for decades.  Even accepting that this exercise <u>could</u> be a breach of the Operating Agreement (which it is not), such a claim would have

Turning next to the 2016 conduct, those allegations cannot support CSX's contract claim because CSX fails to allege a breach or resulting damages. First, there is no allegation that NSR lacked the right to cancel the relevant contracts with adequate notice, and CSX does not allege a breach associated with the manner of cancellation.[45] Second, CSX fails to demonstrate that it suffered any injury or damage from NSR's cancellation of its contracts with NPBL. As discussed in Part IV.F.2 above, NSR and NPBL have continued to operate under the canceled contracts, and it is CSX, not NSR, that has delayed resolution of the pending STB dispute. Without any harm flowing from the act of cancellation, CSX fails to point to evidence capable of demonstrating a required element of this claim.

Turning last to the 2015 conduct, the record evidence (as discussed at length in Part IV.F.1 above) could reasonably support finding that NSR acted to obstruct CSX's train movements in 2015, with this obstruction resulting in CSX's temporary loss of business from one of its existing customers for a period of several weeks.

---

accrued in or around 1989, or in or around 2009. See Westminster Investing Corp., 379 S.E.2d at 319 (holding that shopping center tenant's breach of contract cause of action against landlord for repeatedly failing to enforce uniform business hours for all tenants as required by contract was time-barred because the cause of action had accrued the first time the landlord breached the contract).

[45] Absent speculation, there is likewise no evidence that NSR exercised its right in bad faith when NSR sought to renegotiate the fee it receives when other companies use NSR's own assets (the track to NIT).

CSX's limited argument on this issue highlights only one contract provision that the record could support as potentially applicable to this conduct: the provision requiring NSR and CSX to "co-operate cordially in encouraging the business of the [NPBL], for which it is constructed." ECF No. 324, at 69 (quoting ECF No. 1-1, at 6).

Assuming, without deciding, that a reasonable factfinder (viewing the summary judgment record in the light most favorable to CSX) could conclude that NSR breached an enforceable obligation to "co-operate cordially" by obstructing CSX's rail access to NIT in 2015, this breach of contract claim nonetheless fails as a matter of law because CSX's discovery responses did not advance a damages theory based on this harm, which is ancillary to CSX's sole damages theory. While CSX has suggested that it lost long-term customer contracts due, at least in part, to the obstruction of its trains in 2015, the summary judgment record is devoid of even a scintilla of evidence supporting that assertion. Moreover, CSX has failed to advance a damages model or supporting evidence predicated on any short-term financial loss from one customer in 2015. Thus, for the same reasons that these 2015 allegations do not present a triable issue of fact regarding CSX's antitrust causes of action, the record cannot sustain CSX's breach of contract claim.

In sum, and in keeping with the conspiracy analysis above, the Court finds that Defendants are entitled to summary judgment

as a matter of law with respect to the breach of contract claim because the underlying allegations are time-barred and/or are unsupported by the record evidence as a matter of law.[46] Defendants' motions are therefore **GRANTED** as to this claim.

## VIII. CONCLUSION

For the reasons set forth above, Defendants' motions for summary judgment are **GRANTED** in part, and **DENIED** in part. ECF Nos. 296, 307. Additionally, summary judgment is denied as to the court-raised issue of injunctive relief. The jury trial scheduled to commence on January 18, 2023, will be converted into a bench trial on injunctive relief. Counsel are instructed to confer to determine whether agreement can be reached on a schedule to submit proposed findings of fact and conclusions of law. Counsel should also immediately contact the Magistrate Judge assigned to this case to schedule the resumption of the final pretrial conference.

---

[46] Though the Court does not directly reach the issue at this time due to Defendants not having raised injunctive relief on summary judgment, it does not appear that a state law injunctive remedy claim could remain viable in this case, in contrast to CSX's federal antitrust claims. In the federal antitrust context, the injunctive remedy provided by the Clayton Act is clearly not subject to the same statute of limitations as the damages remedy. No party has even suggested, let alone argued, that there is any state law parallel that would allow a time-barred conspiracy or contract claim to proceed in equity. Similarly, the record appears to support Defendants' contention that even if a contractual breach occurred in 2015 due to one or more delayed trains, damages at law would be the only available remedy. Carbaugh v. Solem, 302 S.E.2d 33, 35 (Va. 1983). Regardless, as CSX notes, the availability or unavailability of any state law injunctive relief has no impact (i.e., does not limit) the breadth of the injunctive remedy available under federal law.

The Clerk is **DIRECTED** to send a copy of this Opinion and Order
to all counsel of record.

**IT IS SO ORDERED.**

_____ /s/ _____

Mark S. Davis
CHIEF UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
January **3**  , 2023