UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| CSX TRANSPORTATION, INC., | ) | |
| | ) | |
|          *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No. 2:18-cv-530 |
| | ) | |
| NORFOLK SOUTHERN RAILWAY COMPANY, *et al.*, | ) ) ) | |
| | ) | |
|          *Defendants*. | ) | |

**DEFENDANTS' JOINT BRIEF ON THE ISSUES OF THE
IMPACT OF THE COURT'S SUMMARY JUDGMENT
ORDER ON DEFENDANTS' PENDING MOTIONS**

Defendants Norfolk Southern Railway Company ("NS" or "NSR") and Norfolk & Portsmouth Belt Line Railroad Company ("Belt Line" or "NPBL"), by counsel and pursuant to the Court's Order dated January 6, 2023 (ECF No. 564) (the "Order"), submit this joint brief addressing the impact of the Court's Summary Judgment Opinion and Order (ECF No. 559) (the "Summary Judgment Order") on Defendants' pending Motions *in Limine* and *Daubert* Motion (ECF Nos. 337, 349, 465, and 473). For the reasons below, Defendants' motions are ripe for adjudication and the Court's Summary Judgment Order compels granting them.

**I.     Introduction.**

The Court directed the parties to file "supplemental briefing…addressing the effect the summary judgment ruling has on the pending motions *in limine*" including NS's Motion to Exclude Opinions of Professor Howard P. Marvel (ECF No. 465), and the Belt Line's Motion *in Limine* #5 to Exclude Testimony from Plaintiff's Expert Howard Marvel (ECF No. 473). ECF No. 564, at 2. The Order also asked the parties to address NS's Motion *in Limine* Regarding Use

of Internal Emails (ECF No. 337), and the Belt Line's Motion *in Limine* #1 to Exclude Evidence and Argument Regarding the Use of Internal NS Emails (ECF No. 349). *Id.*

The trial is now limited to CSX's request for injunctive relief, and CSX must prove that there is "a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 130 (1969). This standard not only requires CSX to satisfy the traditional elements for injunctive relief, but also prove the required elements of its antitrust claims, including harm to competition and harm to CSX caused by the alleged conduct. *See United Nat. Maintenance, Inc. v. San Diego Convention Ctr. Corp.*, No. 07-cv-2172, 2012 WL 3861946, at *9 (S.D. Cal. Sept. 5, 2012). Because CSX relies upon Prof. Marvel's analysis for proof of the antitrust elements, Defendants' motions to exclude Prof. Marvel's opinions remain ripe. That the trial is now a bench trial does not change the *Daubert* analysis, nor does it require that the District Judge uncover the same flaws in Prof. Marvel's opinions that the Defendants already identified in their motions. The Court's Summary Judgment Order compels that Prof. Marvel opinions be excluded and the *Daubert* motions be granted before trial. Additionally, the Summary Judgment Order includes language that requires that Defendants' motions relating to NS's internal emails be granted.

**II.      Fed. R. Evid. 702 and *Daubert* apply in a bench trial.**

Two of the motions seek exclusion of Prof. Marvel's opinions under the admissibility requirements of Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). *See* ECF Nos. 465 and 473. The most instructive authority on this point in a bench trial is the Third Circuit's opinion in *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 833 (3d Cir. 2020) (vacating judgment and remanding where, "in sidestepping Rule 702 altogether and declining to perform any assessment of [an expert's] testimony before trial, the District Court ignored the rule's clear mandate"). As the Court of Appeals explained:

> We start with a clarification about the role Rule 702 plays in bench trials. As we have explained, "a trial judge acts as a gatekeeper to ensure that any and all expert testimony or evidence is not only relevant, but also reliable." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (internal quotation marks omitted). As gatekeeper, a trial judge has three duties: (1) confirm the witness is a qualified expert; (2) check the proposed testimony is reliable and relates to matters requiring scientific, technical, or specialized knowledge; and (3) ensure the expert's testimony is "sufficiently tied to the facts of the case," so that it "fits" the dispute and will assist the trier of fact. *Daubert*, 509 U.S. at 591 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)). The text of Rule 702 contains no exception to these requirements, so if they are not satisfied, an expert cannot testify before the "trier of fact." Fed. R. Evid. 702.

*UGI Sunbury*, 949 F.3d at 832. The Court continued:

> Rule 702 applies whether the trier of fact is a judge or a jury. By using the term "trier of fact," rather than specifying judge or jury, Rule 702 does not distinguish between proceedings. Contrast that language with Federal Rule of Evidence 403, permitting a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . misleading the jury." Fed. R. Evid. 403. Given that Rule 702 was "amended in response to *Daubert* . . . and to the many cases applying *Daubert*, including *Kumho Tire*," and its text continues to employ the broad "trier of fact" instead of the more specific "jury," district courts must apply Rule 702 to assess an expert's qualifications, reliability, and fit before weighing the expert's opinions to decide a triable issue. Fed. R. Evid. 702 advisory committee's note to 2000 amendments ("The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted."); *see also* Fed. R. Evid. 1101(a) (applying the Federal Rules of Evidence to proceedings before district courts).

*UGI Sunbury*, 949 F.3d at 832-33. Thus, while a district court has discretion in determining how to evaluate an expert's proposed testimony, the reliability requirements of Rule 702 and *Daubert* still apply in a bench trial, and the district court still must conduct the assessment.

Here, of course, an additional reason supports a ruling on Defendants' motions, which is that the referral to the Magistrate Judge for resolution of the *Daubert* motion under Rule 72 and 28 U.S.C. § 636(b) remains in place, with the attendant trial efficiencies that come with pretrial rulings on referred issues.

**III.     The Summary Judgment Order compels exclusion of Prof. Marvel's damages model.**

Defendants' *Daubert* motions seek exclusion of Prof. Marvel's opinions that CSX was damaged from Defendants' actions by losing out on ocean carrier business. ECF No. 465. These claimed damages amounted to a large sum in purportedly lost profits beginning in 2009.[1] *Id.*

In the Summary Judgment Order, the Court found that "CSX relies exclusively on a damages model that is ***fatally flawed***, and Defendants therefore demonstrate that they should prevail on the damages claim as a matter of law." Summ. J. Order 44, ECF No. 559 (emphasis added). The Court explained that "[CSX's] damages model is fundamentally flawed in that it does not even attempt to separate harm stemming from the limited conduct within the limitations period (physical delays of economically unviable trains) from the established inertial effects of the acts committed prior to, or during the 2009-2011 period." *Id.* at 51.

Defendants' *Daubert* motions seek exclusion of the same damages model for the same reasons. Therefore, the motions must be granted, and Prof. Marvel's damages model must be excluded, consistent with the Summary Judgment Order. Additionally, while excluding damages, the Court held that CSX could pursue injunctive relief based in part on CSX proving there is "threatened or prospective injury, as opposed to a past injury that can be compensated with damages." *Id.* at 84. Of course, a "fatally flawed" damages model that purports to prove *past injury* is not probative of whether there will be threatened or prospective injury *in the future*. A damages model that cannot accurately quantify past injury, as this model attempts to do, cannot be a reliable measure of future injury to CSX.

---

[1]     Importantly, harm to CSX is a separate element of CSX's antitrust claims from the requirement to show harm to ocean carriers discussed below. Prof. Marvel's damages model does not purport to prove anything regarding harm to ocean carriers. The damages model solely attempts (unsuccessfully) to quantify the lost profits CSX purportedly experienced.

4

NS's expert, Dr. Matthew Wright, succinctly demonstrated the shortcomings of CSX's damages model that apply equally in a trial regarding threatened or prospective injury. By taking Prof. Marvel's damages model and changing two elements—(1) substituting NIT for VIG, and (2) substituting CSX for NS, and nothing else—you are left with over $200 million in damages to NS between 2015 and 2019. This simple test of Prof. Marvel's damages model shows that the model does not predict anything, is nonsensical, and is improper for trial. Accordingly, and consistent with the Summary Judgment Order, the Court should exclude Prof. Marvel's fatally flawed damages model from trial.

### IV. Professor Marvel's Effects Models purporting to show harm to ocean carriers are inadmissible because they did not account for legitimate competitive differences.

On pages 59 and 60 of the Order, the Court cited to and relied on cases that make clear that courts need to carefully distinguish between acts which are competitive from conduct that is actionable under the antitrust laws. An act to obtain and exploit competitive advantages "is not only not unlawful; it is an important element of the free market system." Summ. J. Order 60 (quoting *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko*, LLP, 540 U.S. 398, 407 (2004). *See also* Summ. J. Order 59-60 (citing A*dvanced Health-Care Servs., Inc. v. Radford Cmty. Hosp*., 910 F.2d 139, 147 n.14 (4th Cir. 1990) ("A firm, even one with monopoly power, is not guilty of predatory exclusionary conduct when it is simply exploiting the competitive advantages legitimately available to it."); *Loren Data Corp. v. GXS, Inc*., 501 F. App'x 275, 282 (4th Cir. 2012) (explaining that the Sherman Act "directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself" (emphasis added) (quoting *Spectrum Sports Inc. v. McQuillan*, 506 U.S. 447, 458 (1993))). This admonition emphasizes the inadmissibility of Prof. Marvel's Effects Models because he admittedly did not distinguish between procompetitive differences and allegedly anticompetitive effects.

CSX offered Prof. Marvel's Effects Models to establish that there has been harm to competition caused by Defendants' actions. *See* ECF No. 469, at 9. CSX alleges that the harm to competition at issue here is harm to ocean carriers. According to Prof. Marvel's Effects Models, NS's prices to ocean carriers using NIT "intensively", and NS's profits related to those carriers, are higher than they would be but for the alleged conduct and, thus, purportedly establish that the alleged conduct causes harm to ocean carriers. As shown in Defendants' briefs and at oral argument, however, the Effects Models are not capable of establishing causation because Prof. Marvel did not analyze legitimate competitive differences. Therefore, the models must be excluded as evidence of harm to competition. *See Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001) ("[I]f an expert utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative cause was not the sole cause, a district court is justified in excluding the expert's testimony.").

Prof. Marvel himself plainly admitted this shortcoming:

> Q: …Just to confirm, your damages model, like your [Effects Model], does not distinguish between anticompetitive effects and legitimate competitive differences, right?
>
> A: It does not, no.

ECF No. 469, at 22. This is a critical failure. There are any number of legitimate reasons that ocean carriers using NIT might pay higher prices that are wholly unrelated to the allegations of anticompetitive conduct levied here. If an ocean carrier decided to do business with NS either in general or at the Port of Virginia because, for example, NS provided superior service compared to CSX, the results of the Effects Models would not change one iota. Absent a correlation between anticompetitive conduct and higher prices to ocean carriers, the Effects Models do not actually prove anything. And importantly, Prof. Marvel cannot explain these results based on any non-

6

speculative qualitative findings because he did not talk to any ocean carriers about any supposed harm they incurred or review any ocean carrier contracts with CSX or NS:

> Q: Did you talk to any ocean carriers?
>
> A: I did not.
>
> […]
>
> Q: You said that you concluded that ocean carriers were harmed by the conduct alleged in this case. Wouldn't it be a good idea to hear directly the views of the ocean carriers?
>
> A: I would find that valuable.
>
> \*\*\*
>
> Q: Are you aware that CSX does not differentiate its pricing between NIT and VIG?
>
> A: I am not. I have not looked at those contracts, if they – what they are asking for is prices to – to and from Norfolk.
>
> Q. Are you aware that Norfolk Southern does not differentiate its pricing between NIT and VIG?
>
> A. No, I'm – I'm not aware of that.

ECF No. 469, at 16 and n.40. Moreover, Prof. Marvel offered in his reply report that natural competitive advantages could explain why his effects models suggest that at VIG, CSX's pricing and margins appear to be supracompetitive, like NS's at NIT. Marvel Reply Report ¶ 101.

Prof. Marvel simply cannot prove there has been harm to ocean carriers using the Effects Models. As Chief Judge Davis remarked with respect to Prof. Marvel's damages models, he "did not do the hard work that has to be done." Dec. 1, 2020 Hearing Trs., at 130:18-131:01. And Prof. Marvel cannot revive the results of his Effects Models with qualitative findings based on his experience with ocean carriers or the international intermodal business more generally because such evidence is non-existent and therefore speculative as to any potential harm. The combination of an invalid model and concessions that natural competitive advantages could explain the

railroads' pricing and margins renders Prof. Marvel's opinions on causation and effects unreliable, and they should be excluded.

**V.     Prof. Marvel's opinions that CSX and ocean carriers suffered harm is inadmissible because it is based on false and legally irrelevant "facts."**

Similar to Prof. Marvel's failure to account for causal factors that he was required to consider is Prof. Marvel's inappropriate inclusion of a factor that he is required to exclude.

**A.     Prof. Marvel's causation opinions are based on a false assumption, making the opinions inadmissible.**

Dr. Marvel's testimony as to the Effects Model not only is that ocean carriers using NIT "intensively" pay more, but that they pay more *because* NS and NPBL have successfully excluded CSX on dock rail access at NIT. To support this opinion, Prof. Marvel points to three acts that excluded CSX: removal of the Diamond Track, the $210 switch rate, and failure to give operating windows in 2015. The Court found, however, that "there is simply no record evidence, direct or circumstantial, suggesting that any delay of a commercially unviable train in 2015 impacted CSX's ability to compete for international intermodal customer contracts at NIT." Summ. J. Order 47. Prof. Marvel's causation testimony that the 2015 moves had a long-lasting impact on competition at NIT is based on a false assumption, and under black-letter *Daubert* law his causation testimony must be excluded. Even if an expert's methodology is sound, testimony should be excluded under Fed. R. Civ. Evid. 702(b) when, as here, "it is based on unsound or incorrect assumptions." *It's My Party, Inc. v. Live Nation, Inc.*, 88 F. Supp. 3d 475, 483 (D. Md. 2015), *aff'd*, 811 F. 3d 676 (4th Cir. 2016) (citing *Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir. 1994)); *see also SMD Software, Inc. v. EMove, Inc.*, 945 F. Supp. 2d 628, 638 (E.D.N.C. 2013) ("[F]lawed assumptions undermine [] reliability.").

8

### B. Prof. Marvel's opinions are based on legally irrelevant facts, making the opinion inadmissible.

The Opinion also negates yet another of the three legs to Prof. Marvel's causation testimony, the use of the Diamond Track removal to bolster Prof. Marvel's causation opinions. The Court held that CSX's claim that the removal of the Diamond Track "constituted an overt act committed in furtherance of the conspiracy/monopoly" was a "final" act that "must be sued upon, if at all, within four years." Summ. J. Order 35 n.9. In sum, the removal of the Diamond Track cannot, as a matter of law, be tied to the portions of CSX's antitrust claims that survived summary judgment. Therefore, the Diamond Track facts are irrelevant and inadmissible to prove a current antitrust violation, and, as a matter of law, facts that cannot be used by Prof. Marvel for his causation opinion as to current harm. Put another way, he was required to exclude any effect of the removal of the Diamond Track from his theories, as opposed to including it, given that as a matter of law it cannot form any part of the current claim. The assumed fact that the Diamond Track has actionable current effect, therefore, renders his causation opinion unreliable and inadmissible, in the same way that his assumption of a false fact renders his opinion inadmissible.

## VI. Prof. Marvel's remaining opinions should be excluded.

While the Summary Judgment Order does not address Prof. Marvel's remaining opinions, those opinions still must be excluded. In particular:

- Prof. Marvel's relevant market analysis is critically flawed because he eliminates drayage as an alternative without considering the essential component of price, even though price is the central variable he considers when concluding that the Belt Line's switching rate is too high. *See Sardis v. Overhead Door*, 10 F.4th 268, 291 (4th Cir. 2021) (purposefully incomplete analysis requires exclusion, not cross-examination); *H.J., Inc. v. IT&T*, 867 F.2d 1531, 1539-40, n.3 (8th Cir. 1989) (holding that, in antitrust relevant market analysis, "[w]ithout a comparison of relative

9

costs, bare conclusions of one product's superior quality are meaningless"). Price is a particularly substantive omission here not only because it is the comparator Prof. Marvel uses for rail, but because it is undisputed that CSX extensively uses the alternative that Prof. Marvel concludes is not an alternative, drayage by truck, and the only reason, since he considers it a qualitatively poorer option, appears to be the subsidized *price*. Because Prof. Marvel ignores price altogether, the issue is one of admissibility, not weight, and it is fatal to his relevant market opinion.[2]

- Prof. Marvel also improperly attempts to express railroad opinions when he is not a railroad expert and when he was given only incomplete information at best—specifically, that NS and the Belt Line should not have discontinued the Diamond Track and that NS provided inadequate scheduling windows for CSX rail moves in 2015. As counsel articulated at the hearing, describing the outcome that the Summary Judgment Order now compels:

> . . . [I]magine – I'm not presupposing anything – but imagine if he didn't have his damages opinion. Imagine if that got excluded. Could he still say these two things? Could [CSX] still call him as their only expert and say, Dr. Marvel, I want to ask you about these two railroading things. What is your opinion on whether these were good ideas? I think the answer is certainly no. The answer is certainly no. And if it can't stand up alone, there's no reason that it should stand up just because he also has a damage opinion.

Dec. 2, 2022 Hrg. Trans. 78:13-23.

- Other arguments against Prof. Marvel's opinions are set forth in the briefs and Defendants will not repeat them here, but respectfully still require a ruling.

---

[2] Prof. Marvel attempts to explain his purposefully incomplete analysis by identifying a purported "Cellophane Fallacy," but the existence of a Cellophane Fallacy is a *conclusion* that an expert might reach after rigorous analysis of price and other factors; it is not something that can be assumed, then used as a justification for avoiding the analysis in the first place.

10

**VII.     The Summary Judgment Order requires that Defendants' Motions regarding NS's internal emails be granted.**

Both NS and NPBL filed Motions in Limine to exclude CSX from arguing or eliciting testimony that emails involving only NS employees constitute communications between NS and NPBL in support of a conspiracy between the two corporate entities.  ECF Nos. 337 & 349.

As explained in NS's briefing on this Motion, when CSX was asked to identify the specific communications and overt acts that form the basis of the alleged conspiracy in Counts I, II, VIII and IX, CSX identified 96 documents.  *See* NS's Mot. for Summ. J. Ex. 121, ECF No. 310-25.  Yet, all but 15 of these documents are *solely internal* NS communications.  CSX took the position that these internal NS communications were evidence of a conspiratorial agreement between NS and NPBL because they involve NS employees who were also members of the NPBL Board.  *See* Opening Br. 2, ECF No. 338 (identifying CSX's responses to interrogatories and citing Chart of Documents Identified by CSX in its 2d Supp. Resp. NPBL's Interrog. No. 3, Mot. Summ. J. Ex. 121, ECF No. 310-25).  Defendants argued in their Motions in Limine that CSX's position was improper because under Virginia law individual directors of NPBL are not agents of NPBL and cannot *individually* bind the corporation.  To the contrary, NPBL can act *only* through its Board.

In ruling on summary judgment, the Court has now ***adopted the Defendants' position*** as the law of the case.  The Court held that NPBL directors acted only through formal board action, not individual emails sent or received by NPBL directors.  The Court ruled:

> Consistent with Defendants' argument that a ***corporation is not bound by the statements of individual directors***, the Supreme Court of Virginia has explained that the "manner in which a corporation should conduct its affairs is prescribed by statute, as implemented by the by-laws of the corporation," and that "[o]rdinarily, an[] action designed to affect the property and business of a corporation should be taken only by formal resolution of the board of directors, at a duly constituted meeting." *Brewer v. First Nat'l Bank of Danville*, 202 Va. 807, 812 (1961); *see also Monacan Hills, Inc. v. Page*, 203 Va. 110, 116 (1961) ("[The] directors of a corporation have authority to bind it only when they act collectively as a board." (alteration in original) (citation omitted)).  An exception to this general rule can be

11

> made for a corporation whose directors, officers, or shareholders routinely "ignore the requirements of the statutes and corporate by-laws, and conduct its business in an informal manner." *Brewer*, 202 Va. at 812-13. However, this exception is inapplicable here, where no party has sought such an exception and record evidence indicates that the NPBL Board conducted its business in a formal manner in keeping with Virginia statutory requirements. ***The general rule requiring a corporation to act through formal board resolutions consequently applies to NPBL***.

Summ. J. Order 75 n.28 (emphasis added).

Because the communications relied on by CSX are between NS employees only, not NPBL even if the NS employees also served as NPBL board members, the communications *cannot* – as a matter of law – be evidence of a conspiratorial agreement between NS and NPBL. As NPBL aptly pointed out, "[a]llowing such evidence or argument would improperly expose the Belt Line to liability for communications that it did not authorize and cannot control." ECF No. 349. Based on the Court's summary judgment holding, all CSX's proposed use of internal NS communications to evidence agreement for a conspiracy must be excluded.

## CONCLUSION

Defendants respectfully request that the Court grant each of Defendants' motions in their entirety.

Dated: January 9, 2023

Respectfully submitted,

**NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY**

**NORFOLK SOUTHERN RAILWAY COMPANY**

/s/ W. Ryan Snow
James L. Chapman, IV, Esq.
W. Ryan Snow, Esq.
Alexander R. McDaniel, Esq.
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1500

/s/ Michael E. Lacy
Alan D. Wingfield (VSB No. 27489)
Michael E. Lacy (VSB No. 48477)
Massie P. Cooper (VSB No. 82510)
TROUTMAN PEPPER HAMILTON SANDERS LLP
1001 Haxall Point

<div style="display: flex;">
<div>

Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
Email: jchapman@cwm-law.com
Email: wrsnow@cwm-law.com
Email: amcdaniel@cwm-law.com

*Attorneys for Norfolk and Portsmouth Belt Line Railroad Company*

</div>
<div>

Richmond, Virginia 23219
Telephone: (804) 697-1200
Facsimile: (804) 698-6061
Email: alan.wingfield@troutman.com
Email: michael.lacy@troutman.com
Email: massie.cooper@troutman.com

John C. Lynch (VSB No. 39267)
Kathleen M. Knudsen (VSB No. 90845)
TROUTMAN PEPPER HAMILTON SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, VA 23462
Telephone: (757) 687-7500
Facsimile: (757) 687-7510
Email: john.lynch@troutman.com
Email: kathleen.knudsen@troutman.com

Tara L. Reinhart
Thomas R. Gentry
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005
Telephone: (202) 371-7000
tara.reinhart@skadden.com
thomas.gentry@skadden.com

</div>
</div>

138854202