```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                       Norfolk Division

 3

 4   - - - - - - - - - - - - - - - - - - -
                                         )
 5   CSX TRANSPORTATION, INC.,           )
                                         )
 6           Plaintiff,                  )    CIVIL ACTION NO.
                                         )       2:18cv530
 7   v.                                  )
                                         )
 8   NORFOLK SOUTHERN RAILWAY            )
     COMPANY, et al.,                    )
 9                                       )
             Defendants.                 )
10   - - - - - - - - - - - - - - - - - - -

11

12               TRANSCRIPT OF PROCEEDINGS
                    (Daubert Hearing)
13
                  Norfolk, Virginia
14
                 December 2, 2022
15

16

     BEFORE:  THE HONORABLE ROBERT J. KRASK
17           United States Magistrate Judge

18

19

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2           MCGUIREWOODS LLP
             By:  Benjamin L. Hatch
 3                Robert W. McFarland
                  Ashley P. Peterson
 4                Counsel for CSX Transportation, Inc.

 5
             TROUTMAN PEPPER HAMILTON SANDERS LLP
 6           By:  Michael E. Lacy
                        - and -
 7           SKADDEN ARPS SLATE MEAGHER & FLOM LLP
             By:  Tara L. Reinhart
 8                Counsel for Norfolk Southern Railway Company

 9
             CRENSHAW WARE & MARTIN PLC
10           By:  Alexander R. McDaniel
                  W. Ryan Snow
11                Counsel for Norfolk & Portsmouth Belt Line
                  Railway Company
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Proceedings commenced at 11:10 a.m.)
 2              THE CLERK:  CSX Transportation, Incorporated vs.
 3    Norfolk Southern Railway Company, et al.
 4              Is plaintiff ready to proceed?
 5              MR. HATCH:  Good morning, Your Honor.  Plaintiff CSX
 6    Transportation is ready to proceed.
 7              THE COURT:  Good morning.
 8              THE CLERK:  Are defendants ready to proceed?
 9              MR. SNOW:  Good morning, Your Honor, Ryan Snow for
10    the Belt Line.  We're ready to proceed.
11              THE COURT:  Good morning.
12              MR. LACY:  Good morning, Your Honor, Michael Lacy
13    for Norfolk Southern.  We're ready to proceed.
14              THE COURT:  Good morning.
15              If you'll give me just a minute to get squared away
16    on the bench.  I apologize for the late start.  Apparently
17    the court has labor issues involving court reporters, just
18    like the railroads are having some labor issues these days,
19    but I'm grateful that attorneys never go on strike.
20              So my plan today would be to start with -- as I
21    understand, we have three Daubert motions, Norfolk Southern's
22    motion to exclude opinions from Dr. Marvel, the Belt Line's
23    motion to exclude testimony from Dr. Marvel, and then we have
24    CSX's motion in limine relating to Thomas Crowley.
25              I thought we probably would proceed in that order,
```

```
 1    start with Dr. Marvel and Norfolk Southern, but before we
 2    proceed with argument, let me ask first:
 3            Do any of the parties anticipate putting on witness
 4    testimony or evidence today?  Mr. Hatch?
 5            MR. HATCH:  The plaintiff does not.
 6            THE COURT:  Thank you.
 7            MR. SNOW:  We do not, Your Honor.
 8            MS. REINHART:  Norfolk Southern does not, Your
 9    Honor.
10            THE COURT:  Okay.  Thank you for clarifying that.
11            So with that, then, I think we'll start with Norfolk
12    Southern's motion.  I'll be happy to hear from you.
13            Are there any kind of audiovisuals, and do you have
14    copies for me?
15            MS. REINHART:  No, Your Honor.
16            THE COURT:  Thank you.
17            MS. REINHART:  Good morning.  May it please the
18    Court.  I'm Tara Reinhart for Norfolk Southern.
19            Your Honor, we're here today because we're close to
20    trial, as Your Honor knows, and this case, brought by CSX, is
21    largely an antitrust case, a couple other claims thrown in,
22    but CSX is alleging that Norfolk Southern and NPBL foreclosed
23    them from some marketplace and that that foreclosure harmed
24    them and caused lost profits across their entire business.
25    So it's a very serious, very broad claim that they are
```

1    bringing under the antitrust laws.

2         Yesterday we were in front of Judge Davis, and we

3    were making some legal arguments on summary judgment that go

4    to the same issues that we're facing here.  Here we're

5    focused on the economics.  There's some overlap.  They don't

6    necessarily depend on each other, but it's important, I

7    believe, for the Court to understand what the overall issues

8    are before we get into the nitty-gritty.

9         And so with the Court's indulgence, what I would

10   like to do is to first give an overview of the claims and the

11   economics involved because of the antitrust principles and

12   then go into the failures of Professor Marvel's modeling and

13   talk about what that means.

14        Our view is that Professor Marvel should be excluded

15   from the jury, all of his opinions, and all of his modeling

16   should be excluded, because it simply fails.  It's invalid;

17   it's not probative; it's not helpful.  And I have case law

18   that I will be citing to specifically to support our

19   argument.

20        So starting at the beginning, antitrust is intended

21   generally to protect competition, and that means consumers.

22   CSX is a competitor of Norfolk Southern.  The antitrust laws

23   do not go out of their way to protect competitors.  Norfolk

24   Southern under the antitrust laws, as a general proposition,

25   does not have an obligation to help CSX or to make sure it's

1    not harmed, and even if Norfolk Southern were a monopolist,

2    which we don't believe it is, they are allowed to compete

3    vigorously, and under the antitrust laws and under the

4    economics that go along with applying the principles, it's

5    often difficult to tell the difference between vigorous

6    competition and conduct that would be anticompetitive if

7    Norfolk Southern had market power and exercised it

8    improperly.

9         And so for that reason, economics are a big part of

10   the case and a big part of this Court's responsibility to

11   make sure that the jury is not misled by the expert testimony

12   that's being offered.  And here CSX is offering Professor

13   Marvel for relevant market, causation, and damages.  Those

14   are three required elements.  If either one of them is not

15   satisfied, then the entire case is out the window.  And so a

16   lot is riding on his opinions and his analysis.

17        Let me give you his theory.  This is going to be

18   running through all three of his obligations that he's taken

19   on related to relevant market, causation, and damages.

20        His theory is that Norfolk Southern took steps to

21   exclude CSX from one marine terminal here in Hampton Roads.

22   It's called the -- I might get this wrong -- National --

23             THE COURT:  NIT, correct.

24             MS. REINHART:  NIT, thank you, Your Honor.

25             -- NIT and that because of that exclusion, CSX was

1    harmed not only at NIT, where supposedly it can't serve its

2    customers, but also the rest of Hampton Roads.  For the

3    entire relevant period, there were one, sometimes two other

4    terminals that serve ocean carriers, but also that it was

5    harmed more broadly across its entire intermodal network.

6         And so CSX and Norfolk Southern both serve ocean

7    carriers who come from all over the world.  They dock at

8    different ports.  Sometimes they start in New York, work

9    their way down, go to Baltimore, Hampton Roads, Wilmington,

10   Savannah, Jacksonville -- Jacksonville, I might have the

11   wrong city there -- CSX would correct me if I'm wrong -- but

12   they also go to Canadian ports; they go over to West Coast

13   ports.

14        Their cargo, which is in containers that are built

15   intentionally to be carried on carriers, trains, trucks, and

16   barges, those cargo containers then are dispersed across the

17   country.  Sometimes they are filled up, sent back to the

18   ports and exported.  But by their nature, they are intended

19   to travel on multiple modes of transportation, not just

20   trains.  And so these ocean carriers will, every several

21   years, enter into contracts with railroads to handle the rail

22   portion of their cargo carrying.

23        THE COURT:  How long are those contracts typically?

24   Is it two to three years, or three to four, or is there a

25   fixed time period, or do they vary?

1          MS. REINHART:  They vary.  And I would say three to

2     five years, they tend to be.  And the carriers do tend to

3     enter into contracts with one railroad to handle the bulk of

4     their business on the East Coast.

5          So, for example, they'll negotiate with Norfolk

6     Southern, and they will negotiate rates, terms of service,

7     rates, terms of service, rates, rates, rates, terms of

8     service; but they will negotiate, and they will end up using

9     Norfolk Southern, same with CSX, for the bulk of whatever

10    business they end up agreeing to.

11         THE COURT:  And the choices these days, at least

12    with respect to the intermodal traffic that's going a fair

13    distance, are Norfolk Southern and CSX, correct?

14         MS. REINHART:  So we would disagree with that, Your

15    Honor, and this actually was a big part of our discussion

16    with Judge Davis yesterday.

17         Just to put a fine point on it, the destinations

18    inland are, as Your Honor understands, a variety of distances

19    away.  So Richmond and Washington, D.C., are a couple hundred

20    miles -- hundred miles to a couple hundred miles, and then

21    Chicago, of course, is more like a thousand miles away from

22    here.

23         And so ocean carriers, in terms of their choices --

24    and this is important for the relevant market -- if they are

25    shipping some local distance -- and we don't have to agree on

1    the facts.  This Court does not have to decide what the

2    correct distance is, but some distance between 200 and 500

3    miles, trucks are absolutely an option in addition to Norfolk

4    Southern and CSX.  And, in fact, in this particular

5    marketplace, Hampton Roads, the port always publicizes these

6    statistics; about 60 percent or more of the traffic coming

7    out of Hampton Roads goes on trucks, not rail.

8            When you talk about the long distances, then Your

9    Honor is correct in terms of rail choices, Norfolk Southern

10   and CSX, but they also have choices of ports.  And this is a

11   big part of the record.  I don't think it's in dispute.

12           For example, the Port of New York and New Jersey is

13   actually the best location if you want to get to Chicago

14   fast, and so ocean carriers tend to disembark their cargo

15   containers that are destined for Chicago out of New York.

16   They can also do it out of Norfolk, and of course, there's a

17   lot of competition, not only between Norfolk Southern and

18   CSX, but also between the ports for that kind of business.

19           So port competition is actually an option for long

20   distances, and it's a real option.

21           So let me very quickly get through Professor

22   Marvel's theory here.  His theory is that because Norfolk

23   Southern took these steps allegedly to block CSX from NIT,

24   the carriers that called on NIT with a lot of their

25   traffic -- in other words, they used NIT for more than 50

1    percent of their traffic that comes through Hampton Roads --

2    those carriers were beholden to Norfolk Southern.  They did

3    not have a choice.  All of the choices that I just described

4    to the Court, according to CSX, don't exist, and those

5    carriers had to work with Norfolk Southern, and as a result,

6    Norfolk Southern has market power at NIT, and that means that

7    Norfolk Southern has the ability to increase prices to the

8    carriers and increase its margins, all at the expense of the

9    carriers and CSX.  That's his theory.

10          And his theory is encompassed in his relevant market

11   work that he did.  I'm not going to call it analysis.  He did

12   not do a relevant market analysis.  He described the market

13   and determined it is what it is.  But it also carries through

14   his causation and his damages analyses as well.

15          So this Court's role in addressing Professor Marvel

16   is to be a gatekeeper.  And that's what *Daubert* -- I think

17   the actual pronunciation is *"Daubert,"* but I'm going to put

18   the "T" in there for the court reporter -- *Daubert*, the case

19   that's been around for several decades, says that the Court

20   has a responsibility, and that responsibility is because,

21   even though expert testimony is very common now, and common

22   especially in antitrust cases, CSX can't prove its claims in

23   this case without expert testimony on the economics.

24          Expert witnesses have the potential to be, quote,

25   both powerful and quite misleading, close quote.  That's from

```
 1    It's My Party, 88 F.Supp.3d, 475 at 483.  That's a case that
 2    I would suggest Your Honor pay close attention to.  We're
 3    going to focus on it a little bit later.
 4             THE COURT:  I have read it.
 5             MS. REINHART:  Thank you.  Thank you, Your Honor.
 6             THE COURT:  And I'm familiar with that case law.
 7             MS. REINHART:  Excellent.
 8             So that concern could not be more true here where,
 9    by any standard, if you look at what actually happened to CSX
10    over the past 20 years, if you look at their experience in
11    the marketplace, they've succeeded.
12             During the same period of time, when supposedly
13    Norfolk Southern is a monopolist exercising improperly its
14    market power to exclude/foreclose CSX from NIT, CSX increased
15    its business at NIT tenfold, increased its business at
16    Hampton Roads' ports by 12 times.
17             So that's why Professor Marvel's testimony is so
18    important and why it's so important for this Court to
19    consider whether he actually can show that whatever CSX's
20    experience was -- and we think it's pretty darn good, not
21    bad -- it's not caused by Norfolk Southern's conduct, and
22    they're not entitled to damages.
23             THE COURT:  That seems like a merits argument.  Can
24    we kind of dial into Dr. Marvel and your critiques of his
25    analysis?
```

1          MS. REINHART:  Absolutely.  Absolutely.

2          So Professor Marvel designed two models that he says

3     together show that there is harm to ocean carriers and also

4     to CSX.  And that harm in the sense of antitrust injury

5     affects causation.  In other words, the experience is caused

6     by Norfolk Southern's conduct.

7          The problem is that those two effects models, they

8     are designed the same way.  One of them looks at the business

9     of ocean carriers that use NIT intensively and looks at

10    Norfolk Southern's pricing.  The second one does the same

11    thing but looks at Norfolk Southern's margins, and he says

12    that those show that there's causation, but there are two

13    major problems, and either one is fatal.

14          The first problem is that Marvel -- he's offered to

15    prove causation, but he doesn't attempt to show it.  He

16    assumes it.  His model, the way it's designed, simply assumes

17    that there's causation.  He doesn't study it through his

18    model.

19          THE COURT:  Let me ask you about that so I can at

20    least maybe dial into some of the questions that the Court

21    has, and one of them is this notion of, and he testifies,

22    that he didn't consider -- his model doesn't seek to account

23    for anticompetitive versus legitimate competitive factors

24    that you've discussed in your filing.

25          I guess the question I have is can he do that in

1    other ways using his economic expertise?  Can he make, in

2    effect, a qualitative judgment so he, you know, posits this

3    model that creates a quantitative finding that Norfolk

4    Southern has the power to raise prices if you use -- if a

5    carrier uses NIT more intensively?  So that's his

6    quantitative finding, and the question is can he marry that

7    with a qualitative finding based on his economic expertise?

8    What is your position on that.

9            MS. REINHART:  So, first of all, he could not marry

10   his current quantitative model with other evidence because

11   it's completely insufficient.  It fails.  It's invalid.  If

12   he had done a different empirical analysis, a different

13   quantitative analysis, certainly he could marry that with

14   probative and -- what's the word? -- with qualified evidence

15   that would establish causation.

16           What he should have looked at is the entire body of

17   economic evidence that tells us what is the ocean carrier's

18   experience, assuming that Norfolk Southern is a monopolist,

19   and what is their experience if Norfolk Southern is just

20   competing?

21           So that includes looking at all of the options of

22   the carriers, looking at the costs of the railroads to

23   provide their services, looking at the competitive conditions

24   over time that changed the competitive dynamic, one being,

25   for example, in the end of 2016, CSX, after a lot of

1    investment, was able to double-stack their trains out of
2    Hampton Roads.  That makes a difference.  Economic
3    conditions, downturns, upturns -- those make a difference.
4           He should have analyzed the whole body.  He didn't
5    have to use a regression analysis.  There are other ways to
6    do it.  His other evidence that he points to -- and there are
7    a lot of words in his report where he gives a narrative -- he
8    gives a narrative about these issues -- he bases it on
9    hearsay, he bases it on self-serving declarations of CSX
10   folks who gave their declarations during this litigation.
11   And that's almost it.
12          I mean, there's very little substance behind his
13   additional evidence.  It's anecdotal.  It's not complete.
14   It's simply his observations of some things that he's picking
15   out.  Others would call it cherry-picking.  But it's not a
16   complete analysis.  So, no, Your Honor, he could not have
17   done that.
18          So as Your Honor said, Professor Marvel himself
19   acknowledged that his model does not assess whether
20   anticompetitive conduct or natural procompetitive advantages
21   caused CSX's experience.  Again, I'm not going to say "harm"
22   because I don't think that's what this shows.  It's
23   experience.  So that means that it's entirely possible that
24   CSX's experience, and that of the ocean carriers, is a result
25   of all of these other things.

1        It's possible that part of what Professor Marvel is

2    seeing is because of Norfolk Southern's conduct.  We don't

3    know how much.  We're not going to know how much.  And this

4    is the problem.

5        THE COURT:  Let me ask you that.  So that raises

6    another question, which is does he have to quantify?  Let's

7    say, just assume for the sake of argument, he creates this

8    regression model, and he quantifies that Norfolk Southern has

9    pricing power as a result of intensity of use.  He makes a

10   qualitative judgment based on his economic expertise.  Let's

11   just assume he's able to be rely on all that evidence he

12   relies on for the sake of this question, that there is a

13   connection between that pricing power -- some connection, not

14   quantifying it, but some connection between that pricing

15   power and anticompetitive conduct.  If you assume all that,

16   my question is this:

17       Does he have to quantify the extent of the harm at

18   this first step in saying there's harm to carriers and it's

19   due to anticompetitive conduct?

20       MS. REINHART:  Your Honor, he does.  He has to

21   estimate -- that's the word that the economists use,

22   "estimate."  It's not perfect.  We acknowledge that.  But he

23   has to estimate, number one, the effects on the ocean

24   carriers, first and foremost, and that would be through an

25   empirical analysis that would show that they're paying prices

1    that are higher than they would be but for this alleged
2    conduct.  He has not done that.  And then he has to, at this
3    stage, estimate that there's injury to CSX.
4           THE COURT:  It says that he can't qualitatively make
5    that judgment, that there's harm based on that some portion
6    of that increased pricing power -- can you cite me a case
7    that says he has to quantify that item?  I don't think I saw
8    that in your brief.
9           MS. REINHART:  Your Honor, I think it is in our
10   brief, and perhaps not in the words that Your Honor is using,
11   but he needs to show that there is -- sorry.  I just lost the
12   Court's question.
13          THE COURT:  Sure.  Sorry.  I'm happy to repeat it.
14          MS. REINHART:  Thank you.
15          THE COURT:  Do you have case law that says he has to
16   quantify the extent of the harm?  If he makes a judgment that
17   there's harm due to anticompetitive conduct at the first
18   step, does he have to make a quantification of that harm to
19   the carriers?
20          His second step is to say CSX was harmed as well and
21   here's my quantification of it, and we'll get to that later,
22   I assume, but at that first step, does he have to do that?
23   Is there a case that says that?
24          MS. REINHART:  And, Your Honor, I will find a case
25   for you that makes the point that Your Honor is asking us to

1   make.  I want to make sure we're not saying two different

2   things, because the Court is using the word "quantify" as

3   though it's damages.  That's not what I'm talking about.  I'm

4   talking about a matter of degree.

5            THE COURT:  Yes.  His model says there's harm, and

6   he says it's because of anticompetitive conduct.  You're

7   saying all of that, or some of that, or none of that could be

8   due to competitive reasons that are independent of any kind

9   of anticompetitive conduct, and I'm asking you do we need to

10  know is it 2 percent?  Is it 98 percent?  Is it 50 percent?

11  Is just a finding of harm sufficient?

12           MS. REINHART:  He needs to be able to separate out

13  that which is not caused by the conduct, and I do have a case

14  cite here in my notes, which I will get to, and I will --

15  with the Court's indulgence, I will provide it as I get to

16  it.

17           THE COURT:  Is that the *Comcast* case?  Is that what

18  you're thinking of?

19           MS. REINHART:  It's probably one of them, Your

20  Honor.

21           THE COURT:  Okay.  But I guess I'm wondering does

22  that apply at this first step, or does that apply at the

23  second step as it relates to quantifying damages and harm to

24  CSX?

25           MS. REINHART:  So the case that I'm thinking of

1    actually says that at the causation stage, the expert must be

2    able to segregate the innocent from -- and that's my word,

3    not the case's word -- but the competitive from the

4    anticompetitive.  And, again, that is here somewhere in my

5    notes.  I apologize.

6            THE COURT:  I'll trust you to find it, when

7    Mr. Hatch is talking to me later, and give it to me.  I don't

8    want to take you off your argument.

9            MS. REINHART:  Sure.

10           Let's move forward, because I think Your Honor has

11   been asking questions that have moved us actually quite

12   quickly through all of the points I was going to make.

13           What we see in his analysis is that he's got cause

14   and effect backward.  In other words, he basically says that

15   because some ocean carriers are -- I'm going to quote --

16   "primary NIT users" -- those are his words -- they are

17   beholden to Norfolk Southern because they have no choice,

18   they have to use NIT, they have to use Norfolk Southern

19   because CSX allegedly is not there.

20           And since they're beholden, they have no choice but

21   to use NIT, and their prices are higher.  Okay.  That's the

22   theory.  That's not actually the cause and effect that he

23   should be studying.  The cause and effect that he should be

24   studying is to look at the ocean carriers and why do they use

25   one of the railroads or the other?  Do they use trucks?  Do

1    they use ports?  But why?  What are they doing?  What are the

2    economic drivers of their decisions?

3            And if you look at the evidence, certainly what you

4    see is that the carriers choose the railroad before they

5    choose anything else.  In other words, the terminals within

6    the port is not something that they choose.  I think that we

7    have clear evidence on that point, that the port chooses

8    where a carrier is going to go, whether it's NIT or VIG.

9            The contracts --

10           THE COURT:  Let me -- while you're on that point, so

11   CSX responds, and I think there's some deposition testimony.

12   That name escapes.  I don't know if it was Mr. Capozzi or

13   not, but there was deposition testimony kind of reciting

14   factors that affect where the port steers carriers as they're

15   bringing their ships in.

16           And if I'm recalling that testimony right, it was

17   that the railroad alignment was down the list of not among

18   the top three or four factors.  It was about the fourth or

19   fifth factor.

20           So how does that align with your argument or affect

21   your argument that the port is making the decision based on

22   which terminal or which railroad it's at?

23           MS. REINHART:  Sure.  I don't think it affects my

24   argument, Your Honor.  The market shares, if you want to call

25   them market shares, between VIT and VIG are pretty clear.

Carol L. Naughton, Official Court Reporter

1    There's a lot of confidentiality here, so I don't want to say

2    the numbers.  They are in the briefs.  But the bulk of the

3    CSX traffic is actually at VIG.  The bulk of Norfolk

4    Southern's is at NIT, and that's the way the port divides it

5    up.

6           The share, Norfolk Southern's share at NIT is based

7    on decisions that are made after the carrier chooses Norfolk

8    Southern, if that makes sense.  In other words, this is all

9    about what comes first; it's the chicken-or-the-egg issue.

10          So ocean carriers may choose Norfolk Southern for

11   legitimate procompetitive reasons, but they may end up at NIT

12   because that's where the port sends them, or that's where

13   they want to go, or that's where Norfolk Southern wants them

14   to go.

15          But what is important is that the model interprets

16   the fact that the ocean carriers going to NIT is

17   anticompetitive, and that's where his model is backward.

18   He's basically saying I'm going to study the effects between

19   Norfolk Southern's pricing and margins and the intensity of

20   usage of NIT, but then he's actually not studying what he

21   says he's studying.

22          THE COURT:  All right.

23          MS. REINHART:  So I don't mean to spend time on

24   this, but the ocean carriers and their contracts with the two

25   railroads don't specify NIT or VIG.  They say Hampton Roads.

1    So that's where they're going.  That's what matters to them.
2    That's where they're coming into.
3              And at this stage, the question becomes why didn't
4    Professor Marvel study the ocean carriers themselves?  Didn't
5    speak to them.  Didn't ask to speak to them.  CSX didn't
6    attempt to get discovery from them.  This is really all
7    about, as I've said -- to take you back to the very beginning
8    of my talking here, this is all about the choices and the
9    ocean carriers' choices.
10             We asked him this in his deposition:  "Did you talk
11   to any ocean carriers?"
12             He said:  "I did not."
13             We asked:  "You said that you concluded that ocean
14   carriers were harmed by the conduct alleged in this case.
15   Wouldn't it be a good idea to hear directly the views of the
16   ocean carriers?"
17             Answer:  "I would find that valuable."
18             But he didn't do it.
19             THE COURT:  This is really more curiosity on my
20   part, but if I accept your argument that legitimate
21   competitive differences are the reason for the pricing
22   results that Dr. Marvel comes up with, why are prices going
23   up?
24             MS. REINHART:  Why are prices going up?
25             THE COURT:  Yeah.  You're saying, look, he didn't

1    consider legitimate competitive factors, and they explain

2    this, and I guess the question I have is, just out of

3    curiosity, why do prices go up under that circumstance?

4           MS. REINHART:  I'm actually not quite sure I

5    understand the question, Your Honor.  Are we talking

6    specifically in terms of --

7           THE COURT:  Well, his model says that Norfolk

8    Southern has pricing power and can charge more by virtue of a

9    carrier's intensity of use of NIT, and you're saying, look,

10   that's due to competitive reasons, and I'm asking, well, why

11   are the prices going up under those circumstances?

12          MS. REINHART:  It's a function of the model and the

13   way he designed it, and what Your Honor will see -- and this

14   is in our expert's report.  And we're not into a battle of

15   the experts.  We don't need to get there, but this is how his

16   model functions.

17          It's basically to the extent that at any port if

18   there is a set of shippers that rely on one of the two,

19   Norfolk Southern or CSX, and you identify that intensity of

20   use and basically analyze the market the way that Professor

21   Marvel did, you will see that CSX itself has the same issue.

22          So, for example, if you look at VIG, CSX is -- has

23   high prices, has high margins, is basically in the same

24   position as Norfolk Southern and NIT with the carriers.  I

25   can say that a little more clearly.

1          THE COURT:  I understand what you're saying.  You're

2     jumping to the damages model, but I understand what you're

3     saying.

4          MS. REINHART:  But it all comes out of the first two

5     models.  It's not just the damages model.  It comes out of

6     this first model.  It's the way that it's designed.

7          THE COURT:  Let me ask you, I guess, since you say

8     that and you make this point, I'm curious what you and CSX

9     have to say about this, but this notion that the models are

10    connected -- are they?  Is that really the truth?  Because

11    I'm not entirely clear on that.  Is he taking something from

12    the first model, the liability and harm model, and plugging

13    that into the damages model --

14         MS. REINHART:  Yes.

15         THE COURT:  -- and if so, what is that?  Can you

16    explain that to me?  I know he's looking at intensity of use

17    as being a significant factor, but is he taking any part of

18    what he's built into his first model and saying I'm using

19    these results and plugging them into my second model?

20         MS. REINHART:  Yes.  The models that show -- the

21    models that show the causation, in his words, actually

22    underlie the damages model.  They are built in.  They are --

23    think of it as a foundation.  Everything that's done in those

24    first models actually is built into the damages model.

25         THE COURT:  How so?

```
 1              MS. REINHART:  I'll get to my notes.

 2              So his -- in the margins model, basically the

 3     dependent variable -- sorry, the dependent variable in the

 4     pricing model is Norfolk Southern's revenues; in the margins

 5     model, it's Norfolk Southern's profits.  The key explanatory

 6     variable is the percentage of the carriers' payments to both

 7     Norfolk Southern and CSX annually, and he includes the key

 8     explanatory variable as being the NIT intensity of use.

 9              And so what this means is that in his initial

10     models, he is basically simply measuring the NIT usage and

11     assigning to that the outcome that -- I'm going to have to

12     start over, Your Honor.  I'm sorry.  I'm struggling

13     with this.

14              THE COURT:  That's all right.  I understand.  In the

15     first one, he's saying if a carrier intensively uses NIT,

16     that there's a statistically significant relationship between

17     that and Norfolk Southern's pricing power --

18              MS. REINHART:  That's right.  And if you run the

19     same model --

20              THE COURT:  -- as opposed to the same model.

21              MS. REINHART:  If you run the same model at any

22     port, whichever of the two railroads has the better business,

23     the bigger business, you're going to get the same results in

24     that direction.  So that modeling is built in.  I look at it

25     as a floor built in to the damages model, and it is indeed
```

1    dependent on that assignment, if you will, assignment of the

2    intensity of use to the particular railroad.  I'm probably

3    not being articulate.

4              THE COURT:  You're talking about the damages model?

5              MS. REINHART:  That's right.

6              THE COURT:  Understood.

7              MS. REINHART:  It is actually incorporated.  The

8    model itself is incorporated.

9              THE COURT:  Well, that's where I'm having problems

10   going with you to that step.  I'm not sure -- I think he's

11   looking at something -- he's using a similar kind of

12   analysis, but he's not taking the analysis from the first

13   piece and plugging it into the second, is my understanding,

14   and I'm happy to be, you know, proven wrong about that.

15             MS. REINHART:  And perhaps I can help if we -- after

16   the CSX team stands up, but I am having a hard time

17   articulating what I'm trying to articulate.  So I apologize,

18   Your Honor.

19             THE COURT:  Let me just ask you.  So at least one of

20   the arguments you see in the case law is that if there's a

21   problem with Dr. Marvel's liability or harm model, that the

22   other side's expert would take that same model and just add

23   another independent variable and try to test the results that

24   were obtained.

25             Did Dr. Wright do that here with respect to the harm

1    model?

2          MS. REINHART:  Did he just try to tweak it and make

3    it work?

4          THE COURT:  Did he test it by using the primary

5    metrics that Dr. Marvel used to show that the model is

6    invalid?

7          MS. REINHART:  He did a number of things to test

8    Professor Marvel's models, and the most important is that for

9    both of his models, he simply ran CSX experience through the

10   model as though CSX itself were the monopolist that Norfolk

11   Southern is being accused of.

12         And in our view, that -- there's just no way that

13   you could get those results.  They are call spurious results

14   in the economics world.  And this is not setting up a battle

15   of experts, by the way.  This is simply showing that those

16   results are not reliable at all.  They cannot be put in front

17   of a jury, because if you have models, whether it's the

18   effects model or the damages model, and you find effects and

19   you find damages, no matter who you run it against, then a

20   jury simply cannot make heads or tails of what is going on.

21   It's not competent.

22         There's a lot of evidence in the record, Your Honor,

23   that kind of explains why this is so wrong, the way they're

24   doing it, first of all, and Professor Marvel knows this.  We

25   asked him about it.  But Norfolk Southern charges the same

1    prices to ocean carriers whether it's at NIT or VIG; CSX, the

2    same, their prices are the same regardless.

3          And Professor Marvel wasn't even aware, when we

4    asked him, that that's the case.  It's difficult to

5    understand and explain how one of the terminals in Hampton

6    Roads could be the result of anticompetitive conduct and the

7    other one be competitive when the competitors are both

8    charging the same prices there.  In other words, you would

9    expect to see -- as an economist, you would expect to see a

10   price differentiation.

11         And then, of course, we also know that if you run

12   the same models, whether it's the effects models or the

13   damages models, you're going to get the same results.  It's

14   designed to get results.  The models are designed to show

15   causation or designed to show damages.

16         Professor Marvel did not consider alternative

17   hypotheses, and that is a fair -- that is *Virginia*

18   *Vermiculite*, 98 F.Supp.2d, 729 at 736, and that is a large

19   part of our concern about his models, is that they assume the

20   result.

21         When we questioned him about the fact that his model

22   would show damages in Norfolk Southern's favor at VIG,

23   because it shows CSX as a monopolist, he simply dismissed

24   those results by saying, well, that's because at VIG, CSX has

25   natural competitive advantages.

1          Now, that's an argument that we've made that he
2     should consider, whether Norfolk Southern has natural
3     competitive advantages that caused the results in the
4     operations of his models, and he says his models don't do
5     that.  And his answer, when we asked him about CSX's
6     advantages at VIG, he says:  "Sure, they could have an
7     advantage that explains these results."  You can't have it
8     both ways.
9          THE COURT:  Is there an argument there that because
10    they both have access via Commonwealth Railway to VIG, that
11    that's a different comparison and, therefore, you're dealing
12    with more of an apples to apples versus NIT where you have --
13    Norfolk Southern has its own trackage and on-dock access, and
14    CSX has to go through the Belt Line?
15         MS. REINHART:  It's a possibility, and it was not
16    studied.  Professor Marvel simply did not study that, so we
17    don't know the answer to that.  We don't know the answer to
18    the question whether CSX is actually paying more.  In other
19    words, he hasn't studied their costs across these terminals
20    to make a determination whether drayage is prohibitively
21    expensive.  Obviously it's not because they've succeeded in
22    gaining share.
23         He's not studied the relative differences between
24    the costs of accessing VIG, which both railroads do, versus a
25    shortline, the Commonwealth Railroad, and all of the other

1    ports where he simply says it's cheaper to use the shortline

2    railroad than it is to use the Belt Line.  He hasn't done any

3    of that analysis.

4         Now, again, there were a lot of words in his report

5    that show he's looking at the question, but he's simply

6    reporting the nominal differences between the prices that are

7    paid at the terminals.  He's not analyzing the underlying

8    cost, and that is a critical failure.

9         In fact, there's a case, *H.J., Inc.*, 867 F.2d 1531

10   at 1539.  Without a comparison of relevant costs, the

11   conclusions are meaningless.  He should have analyzed the

12   entire marketplace, beginning with the ocean carriers'

13   experience.  Were they paying more than they would have if

14   there was not this alleged conduct?  He didn't do that.

15        He should have analyzed the differences between CSX

16   and Norfolk Southern at all of these ports.  He didn't do

17   that.  He didn't even analyze relevant market.  He simply

18   looked at some documents and made a conclusion that the

19   relevant market is appropriately CSX's on-dock access at NIT.

20        The failures, Your Honor, are undeniable; first, not

21   being able to distinguish between competitive and

22   anticompetitive effects in his effects model, it absolutely

23   fails as a causation model, and then, second, this

24   intensity-of-use problem that we've described in our briefs,

25   those are incorporated into the damages model as well, and

1    the damages model fails on its own for that reason alone.

2          Professor Marvel himself conceded that even his most

3    recent iteration of his damages model, which he created after

4    seeing criticism from our expert, does not consider

5    legitimate advantages that Norfolk Southern may have had in

6    the Norfolk terminals that would have affected these

7    outcomes.

8          THE COURT:  Let me ask you about that.  He did

9    testify to that, but yet when you read his original report,

10   he seems to say something different.  So I'm curious about

11   how and whether those things can be reconciled.

12         I'm looking at paragraph 88 of his original report,

13   and on the damages side, he says, I did account for things

14   that arguably would have flowed from competitive --

15   legitimate competitive differences between Norfolk Southern

16   and CSX, and he talks about -- let's see here.  It says "the

17   railroad's relative advantages at different ports."  He

18   models, let's see here, the relative prices and the lanes.

19         It would appear that he, at least, took those

20   factors into -- in compiling his dataset from 2009 until,

21   what is it, 2020 or 2019, by the time he got to the reply

22   report, he's looking and banking some of those factors in.  I

23   understand what he testified to, but his report seems to

24   suggest something else, and it's kind of an odd disparity.

25         MS. REINHART:  It is, Your Honor, and I think I can

```
 1   explain it.
 2          First of all, in his original model, his original
 3   damages model, even though he does include variables for the
 4   various ports and he says that that takes into consideration
 5   competitive differences, the flaws or failures, if you were,
 6   in the effects model are brought into that modeling.  And so
 7   they do not -- his using some variables for the ports in the
 8   damages portion does not cancel out the problems that are
 9   brought in, incorporated in from the effects models.
10          In his reply brief, when he does his revised model,
11   he cancels out the part of the effects -- the part of the
12   port variables that he included to those shows differences --
13          THE COURT:  Right.  He omits the NIT covariant.
14          MS. REINHART:  That's right.  And it makes all the
15   difference.  It makes all the difference.
16          THE COURT:  He says he gets the same results, that
17   there's a statistically significant relationship shown by his
18   regression model that as use of -- in the second go-round,
19   use of the Port of Virginia or Hampton Roads ports goes up,
20   that the likelihood of alignment with CSX goes down.
21          MS. REINHART:  So, Your Honor, he attempts to solve
22   his problems, and what he says is actually not the outcomes
23   that you see in the model.  You still see the same problems.
24   He has a matter of degree in there.  But he still has the
25   same fatal flaws.  His modeling cannot tell why the results
```

1    are the way they are because he does not incorporate any

2    effects models, which are brought in, what he needs to do, to

3    consider whether there's anything out there, in all the

4    reasons that affect pricing, anything out there, other than

5    this intensity of use would affect the price.  None of that

6    has changed.

7           THE COURT:  Well, if I'm taking him at his word, he

8    says he looks at ports, network advantages, pricing and

9    builds that into this second regression model dataset.  I

10   hear you saying no, he didn't, but that's what he said he

11   looked at.  And to some extent, that seems to account for at

12   least some of your arguments, not all of them, but some of

13   your arguments about whether or not he considered legitimate

14   differences.  How do you respond?

15          MS. REINHART:  It's tough, because I agree with you

16   the words on the page that he's saying, he's saying that he

17   did these things.  But the results contain the same problems.

18   In other words, you run the model on a supposedly competitive

19   port, and you're going to get damages.  You get damages in

20   Norfolk Southern's favor, for example.  And that continues.

21   That problem never goes away because the models are built to

22   have the output come out the way that it does.

23          Candidly, Your Honor, I believe that's why CSX has

24   abandoned the relevant market that is defined in the

25   complaint.  That relevant market looks at competition within

1    Hampton Roads.  And they define it improperly.  We don't have

2    to get there today, but it looks at competition within

3    Hampton Roads, looks at the ocean carriers' options, and all

4    of a sudden Professor Marvel completely changes it, and he

5    designs a relevant market that looks at CSX's options at NIT.

6         Everything in his modeling flows from that decision.

7    Everything in his modeling flows from, if there's a carrier

8    that uses NIT intensively, it's going to be aligned with

9    Norfolk Southern, and that is what is going to generate

10   so-called effects and damages.

11        And that is a design decision that he made, and it

12   carries through even his most recent models, and it accounts

13   for the damages -- and I will make finger quotes there --

14   that are found wherever you look, wherever there's intensity

15   of use.  Wherever the carriers that use a port intensively,

16   use one of the railroads instead of the others, you get that

17   result.

18        THE COURT:  Do you want to address the other

19   argument about apportionment and failure to apportion

20   relative to any -- the applicability of any statute of

21   limitations?  I don't want to cut you off.

22        MS. REINHART:  I'm happy to go there, Your Honor.

23        I would say that for the discussion that we've just

24   been having, the *It's My Party* cases are very instructive

25   here, and those cases are about economist work in the context

1    of relevant market, but it's applicable.  It applies across

2    all of the questions that this Court has to decide.

3          So Professor Marvel's damages model, which is

4    opaque, by the way -- if you or I were to look at it, we

5    would not understand what it's doing.  It's opaque.  But the

6    model --

7          THE COURT:  I agree the way he explains it is

8    opaque.

9          MS. REINHART:  Right.

10         So the model is designed to be a unitary damages

11   model.  That's one theory.  It's the lost profits theory, and

12   the calculation is the same regardless of which year and

13   which damages are calculated and regardless of what the

14   theory of harm is at any given time.

15         And based on the complaint and the allegations here,

16   the conduct that allegedly harmed CSX changes over time.

17   There's a rate, the NPBL rate.  There's alleged failures to

18   move trains on time in 2015.  There's conduct alleged in

19   2018.

20         And there's more than that, but the point is that

21   regardless of the type of harm that's alleged, Professor

22   Marvel's damages model addresses it in the same way, and

23   that's a problem for statute-of-limitations purposes, and we

24   spent a significant amount of time with Judge Davis on this

25   yesterday.  We don't need to go into the legal issues.

1           But it's a problem for statute of limitations

2    because there's no way for Professor Marvel to segregate harm

3    that results from conduct that's legitimately within the

4    statute of limitations as opposed to being outside.  It

5    doesn't do it, and it's not appropriate simply to lop off

6    years of damages to address this failure.

7           Professor Marvel should have built damages models

8    based on conduct that is clearly within the statute and

9    conduct that may be within the statute, depending on how a

10   court rules, and he didn't do it.  But it's more than that.

11   It's not just the statute of limitations at issue here.  It's

12   the conduct.

13          The damages would be different depending on whether

14   CSX is overcharged by the NPBL by paying the switch rate or

15   by having to pay for drayage, which they say is more

16   expensive than access on dock would be.  That theory of harm

17   yields a different way of looking at damages from lost

18   profits.

19          CSX yesterday described loss of reputation in 2015

20   that caused them to lose business.  There's no way that

21   Professor Marvel's models can account for that particular

22   kind of damages, and so what we see is the same methodology

23   year after year regardless of the harm that's allegedly

24   occurring, the type of harm, whether it's within the statute

25   or not, and not depending on anything that's going on in the

1    marketplace, whether there's an economic downturn or whether

2    CSX becomes more efficient after getting double-stacked,

3    et cetera.

4            His modeling is exactly the same.  It's based on

5    Norfolk Southern's pricing and Norfolk Southern's margins,

6    and what he does is he simply says, but for this conduct, CSX

7    would have Norfolk Southern's experience, and so he

8    calculates the difference between the output -- the output

9    that is in -- based on Norfolk Southern's experience and that

10   which he says CSX should have.

11           So this is our problem with the damages models, and

12   it's not just statute of limitations.  It's terms of

13   identifying the proper measure for the particular harm that's

14   being alleged.

15           Unless Your Honor has any further questions...

16           THE COURT:  No.  I think we'll leave it there for

17   now.  Thank you.

18           I'd be happy to hear from CSX.

19           MR. HATCH:  Would Your Honor prefer --

20           I don't know, Mr. Snow, whether you're going to

21   argue?

22           THE COURT:  Let's leave the Belt Line arguments for

23   later, maybe, because I know that he does touch on the

24   statute of limitations, but the other arguments seem to be

25   more distinct.  If you want to argue on the

1    statute-of-limitations piece now, we could, I guess.

2              MR. HATCH:  Whatever Your Honor prefers.

3              THE COURT:  Mr. Snow, what's your pleasure?

4              MR. SNOW:  I'm happy to hear from Mr. Hatch first,

5    Your Honor.

6              THE COURT:  Fair enough.  Thank you.

7              MR. McFARLAND:  Your Honor, CSX does have a

8    demonstrative handout.  I brought copies for your clerks.

9              THE COURT:  Thank you.

10             MR. HATCH:  And hand them to other defense counsel

11   as well.

12             THE COURT:  Thank you.

13             MR. HATCH:  Thank you, Your Honor.  Ben Hatch on

14   behalf of CSX, and I won't necessarily plan to march through

15   the demonstrative.  I'll try to tailor my comments to the

16   questions the Court has asked and the arguments of opposing

17   counsel, but I will use some of those slides, and I hope it's

18   helpful in the course of the discussion.

19             Your Honor, I think to begin with, a lot of the

20   argument the Court heard, in my opinion, goes to merits

21   issues, disputes among our expert and their expert, and we

22   have not moved under *Daubert* as to their expert, Mr. Wright,

23   and we certainly don't agree with them.

24             We certainly don't agree with them, but we

25   understand a lot of the issues that Ms. Reinhart has outlined

1    are fodder for cross-examination, both, them for Dr. Marvel

2    at trial and us for Mr. Wright at trial.

3            I don't know if we can get that demonstrative up on

4    the screen.  With the Court's permission?

5            THE COURT:  Yes.

6            MR. HATCH:  The Court has a copy, whatever way, of

7    course is easiest to look at, but the first --

8            Second page, please, Ms. Gollolgy.

9            This is just -- the Court, I can tell, obviously has

10   been through the record very closely.  There is no challenge

11   to Dr. Marvel's qualifications here, just to start with that

12   point, and he is offering opinions in the same area as

13   Mr. Wright.

14           He is more qualified in the field, I would submit,

15   but in any event, they are offering the same types of

16   opinions with similar economic backgrounds.  There's no

17   dispute that use of regression analysis is an appropriate

18   econometric term.

19           Their only disputes are with certain variables he

20   used or how he went about it.  Those types of things

21   Dr. Marvel addressed in his reply report, and I do want to

22   talk about a couple of the issues the Court flagged, but

23   those are classic battle of the expert.  It's not a *Daubert*

24   ground to exclude Dr. Marvel.  And as we put on the slide

25   here, he testifies frequently and has not been excluded on

1    *Daubert* grounds.

2         I would just say, at a really introductory

3    commonsense level -- and this touches on something that was

4    raised -- there's all this argument "how can we know what's

5    going on at NIT?  Dr. Marvel didn't analysis that."  Yes, he

6    did.  I'll come to that.

7         But at the most commonsense level, right across the

8    river is VIG, where both railroads have the same rail access

9    through the Commonwealth Railway, and there's vigorous

10   competition.  And the Court knows the geography.  I mean,

11   it's just across the Elizabeth River.  There is vigorous

12   competition there.  They have the same access.

13        On the NIT side, which has a greater capacity --

14   it's a larger terminal -- there is very little or there's no

15   on-dock rail competition, and the only competition CSX has

16   been able to eke out is through drayage.  And at the most gut

17   level, if you want to look at what the market would do if

18   there was not impediments to CSX's access, just look at VIG.

19        So I wanted to talk a little bit about the contracts

20   with the ocean carriers, Your Honor, because I do think this

21   goes into the market that he has defined.  And I'll just

22   touch briefly -- slide 3.  And I know the Court has all this

23   law before it, but these are just some pertinent, I think,

24   quotes about the limited function of *Daubert*.

25        If we go to slide 4.  So Dr. Marvel did look and

1    observe, of course, that there are five carriers who use NIT

2    extensively for 80 percent of their business, but he didn't

3    stop there.  But this is data.  This isn't opinion.  This is

4    data that shows these carriers use NIT extensively.

5          Their, I think, first argument they raised, Your

6    Honor, is there's VIG, there's other ports, they can go

7    anywhere, it's all the same.  But the data shows that these

8    carriers use NIT extensively, they use it over time, and

9    Ms. Reinhart told you these contracts that are entered into

10   are three- to five-year contracts, and so when the ocean

11   carriers are contracting, they are doing that ex-ante.

12         They don't determine -- and the Court referenced

13   Mr. Capozzi's testimony.  They don't determine where a ship

14   is going to call one week later, or three years later,

15   between VIG or NIT.  So they have to contract in the ex-ante

16   world, and what they know in that world is, of course, NIT is

17   a huge capacity, it's always going to be a huge capacity in

18   Hampton Roads, and so they have to account for that when

19   making their decisions.  And that shows naturally why -- and

20   there's other evidence of this that Dr. Marvel talks about,

21   but that's naturally why it's important to them whether you

22   can service that capacity.

23         I'll come back to drayage, but of course, drayage --

24   and Dr. Marvel examines that.  Drayage, it's not just whether

25   you can get from point A to point B.  It's whether you can do

1    it efficiently and in a timely fashion.

2            And an example -- when there's a merger, for

3    example, when two airlines want to merge, DOJ will define the

4    market as flight routes between Washington, D.C., and

5    New York.  Right?  That would be a relevant market if two

6    aircraft companies wanted to merge.  There may be other

7    routes that are relevant markets, but that would be a

8    relevant market.

9            You can drive from Washington to New York.  You

10   could walk from Washington to New York.  You can take a boat.

11   There's other ways to get there, but the fact that

12   substitutes exist does not mean that you don't have a

13   relevant market for customers who demand that service.  And

14   at the core of what Dr. Marvel is talking about is there are

15   customers who demand service at NIT that's well supported in

16   the record and that underpins his market definition.

17           THE COURT:  Would it be fair to state, or is it your

18   argument, that Dr. Marvel's analysis is that they're not

19   functionally interchangeable?

20           MR. HATCH:  That's correct.  And he did look at --

21   you have to take your customer where you find them.  And in

22   his report, which I know the Court has been through multiple

23   times -- don't take our word for it -- NS's own documents say

24   we don't tell our customers -- and this is in Dr. Marvel's

25   report -- we don't tell our customers where to move their

1    freight.  They tell us.  They come to us with an ROP.  They

2    say you need to move this much freight through these

3    destinations.  You have to service that.  You don't say,

4    gees, we'd love to have your business, but we need you to

5    move that projected freight up through a different port.

6              That's not how the market works, and that's what he

7    looked at, and it supports that there's not -- for the

8    business that we're in, which is moving intermodal freight by

9    rail, there are no substitutes when there's this level of

10   demand among this level of customers at a particular

11   terminal.

12             THE COURT:  But to go back to my question, my

13   question was relating to drayage and rail transport of

14   containers.  Is it Dr. Marvel's opinion that they are not

15   functionally interchangeable?

16             MR. HATCH:  Yes, Your Honor.  Yes, that's right.  I

17   mean, these two businesses are competing for rail service,

18   and sometimes, to listen to Norfolk Southern's argument, it

19   sounds like they wish they were in the trucking business.

20             But the documents in the discovery and what

21   Dr. Marvel replies on are replete.  There is not -- drayage

22   is not viewed as an adequate substitute for on-dock rail, and

23   the port says that too.  The ports say they want on-dock rail

24   as well.  Virginia wants that.

25             THE COURT:  Just while we're on this point, because

1    it relates to relevant market -- I don't know, this may be
2    relating to Mr. Snow's arguments, and Belt Line's argument
3    just a little bit, but did Dr. Marvel conduct any kind of
4    analysis, or do you concede he did not conduct an analysis of
5    the cross price elasticity of demand?
6          MR. HATCH:  Between drayage and the on-dock rail,
7    the way he looked at it, he did not do a specific cross
8    elasticity of demand.  What he looked at was is this an
9    effective substitute for on-dock rail, and he evaluated it in
10   terms of capacity, in terms of timeliness, and just -- and
11   this is in his report, but I think this really hammers it
12   home.  Mr. Wright says you can move, I think it's 100,000 and
13   change containers, you know.  We disagree with how much you
14   can move by drayage.  But if you took -- if you granted
15   Mr. Wright's assessment --
16         THE COURT:  Is it Dr. Wright?
17         MR. HATCH:  I apologize.  Dr. Wright.
18         THE COURT:  Just so the record is clear.  I don't
19   want to sell him short on his education.
20         MR. HATCH:  I apologize to Dr. Wright.
21         If you took the total, even his number, which we
22   don't agree with, it wouldn't even amount to one of the
23   customers that Norfolk Southern has a year at NIT.  And they
24   have all of these customers.
25         In other words, even if you took their best case

1    scenario, we couldn't even move one of their customers'

2    annual NIT freight through drayage.  That is a capacity

3    limitation that inhibits you from competition.

4          And another thing Dr. Marvel says is the fact that

5    the port has to subsidize you to even use an inferior means

6    of access is not evidence of equality of competition.  In

7    fact, that's evidence of what the monopolist has done, that

8    the port is helping you to even get in there through drayage

9    is not evidence in their favor.  It's evidence of how

10   effectively they have excluded through on-dock rail.

11         The Court asked some questions about Dr. Marvel's

12   accounting for procompetitive -- you know, competitive

13   analysis and his deposition, and I would like to turn to

14   those.  It came up a couple times, and I think maybe I can do

15   it together.

16         THE COURT:  It might be helpful -- and I want you to

17   turn to that, but it might be helpful if we just keep the

18   discussion first on the liability model and then talk

19   separately about the damages model, but I'm happy to hear

20   you.

21         MR. HATCH:  Sure.  Well, first of all, to the extent

22   the Court has questions, returning to liability, about

23   whether he could use qualitative findings, he certainly can.

24   I did not hear any case that says he can't make qualitative

25   assessments.  He's extremely experienced in the field of

1   economics.

2          The way his assessment works is he looks at the

3   market, he looks at alternatives, whether it be other ports,

4   whether it be trucking, whether it be drayage.  He looks at

5   all those things and makes an assessment that on-dock rail

6   service at NIT is a relevant market.  That his experience.

7   It's based on literature that guides that experience.  Then

8   it turns to the impact on the ocean carriers and that

9   regression analysis.

10          And I'll just turn -- I don't know if the Court has

11   a copy of the report in front of it --

12          THE COURT:  I do.

13          MR. HATCH:  -- I may reference.

14          THE COURT:  Paragraph 80?

15          MR. HATCH:  Yes.  You got it.  You beat me to it.

16   Thank you, Judge.  Paragraph 80.

17          So here's where he's building the regression for

18   assessing damage to the ocean carriers through the increases

19   of price, and the part I wanted to point the Court to in this

20   one is he says toward the end of that paragraph "I also

21   include a measure of the proportion of the ocean carriers'

22   traffic that goes through NIT in each calendar year to proxy

23   for the leverage generated by CSX's lack of on-dock access at

24   NIT and NS's resulting pricing power."

25          And this is in addition to other factors, lanes --

 1    Ms. Reinhart talked about differences in market over time.

 2    That's discussed also in this paragraph, but I draw the

 3    Court's attention to that part because that is factoring in a

 4    measure.  So I already observed anticompetitive conduct

 5    within the market at this point in his assessment.

 6          And so what he's saying is let me see if there is a

 7    price increase, and he's factoring into his calculations this

 8    proxy for the bargaining power that would be the result of

 9    the anticompetitive conduct he's already discussed.

10          THE COURT:  And that proxy -- tell me if I'm wrong.

11    Is that the independent variable, the percent of traffic at

12    NIT?  Is it the same thing, or are we talking about something

13    different?

14          MR. HATCH:  Yes.  This is the proportion.  So what

15    he's doing is saying this -- it's a proxy, which is allowed

16    in regression.  You don't have to have a perfect variable for

17    every situation, but he's using it to say, okay, if you are a

18    heavy NIT user, you are -- it's a proxy.  You are more

19    beholden to Norfolk Southern, who is engaging in the

20    anticompetitive monopolization; and, therefore, what effect

21    does that have on your prices?

22          So, to me, this is critical.  They can argue it's

23    not a good proxy, maybe he should have used some other proxy,

24    but this is a proxy that brings into his ocean-carrier harm

25    assessment what you would expect to find.  Right?

1          I mean, he talks about that earlier.  If you

2    monopolize, you expect to find increased prices, that would

3    be my expectation, I apply this, I find, in fact, a

4    controlling for other factors, including route -- he says

5    that earlier -- container size, whether they're loaded or

6    empty, and the lane travel; for example, Savannah.  So he's

7    accounting and holding those variables constant as well as

8    the size.

9          So I do believe his harm to the ocean carrier

10   assessment does have a proxy for the anticompetitive effect

11   that he's observing.

12         THE COURT:  Well, I guess that's the question,

13   because then he's asked -- I guess to take it to the next

14   step, he's asked at deposition does your rate regression

15   model account for also legitimate competitive differences or

16   distinguish between them, and I'm not -- it's at Page -- in

17   the 150s in his deposition, and he says no, I don't try to

18   sort out where the responsibility lies.

19         And so the question -- I think Ms. Reinhart's

20   argument is that he has to factor in causation into the harm

21   regression model, and he hasn't done that, and that's a

22   reason to exclude him.  How do you respond to that?

23         MR. HATCH:  That's great.  Thank you.  I'll go right

24   there, Your Honor.

25         So what I believe he was saying in that deposition

1   testimony -- and then we also have his reports, of course,

2   that cover this.  And if you read his reply report, there's a

3   difference between -- and what he's trying to measure, first

4   he determines relevant market; on-dock, NIT.  Okay, what is

5   the effect within that market?

6           He builds his models to measure the effect within

7   that market at NIT, and so when he says I didn't measure

8   procompetitive.  He's talking about specific to NIT versus

9   the competitive differentials across the networks that may

10  pertain.

11          In other words, to put it differently, he's trying

12  to focus and isolate the NIT effect.  So he's saying it would

13  be relevant if there was a procompetitive difference at NIT

14  specifically, and I think that's what he's addressing.  And

15  in his reply report, he says I'm surprised because Dr. Wright

16  didn't identify any procompetitive justification for the

17  behavior where it's analyzed.  I have no procompetitive

18  explanation for what we're analyzing.  The only explanation

19  is, well, they should just go somewhere else; they should

20  service other ports, they should drive trucks, whatever.

21          They offer no procompetitive justification that is

22  specific to NIT.  Procompetitive justifications that apply

23  across the network are accounted for by virtue of the lanes

24  used.  Right?  So to take an example -- and some of this also

25  applies to the damages model.  I'll try not to repeat on

1   these things.

2          But, you know, certainly to certain destinations in

3   the Midwest, one carrier or the other may have a relative

4   advantage; you have a shorter route, you can get there

5   faster, that sort of thing.  They have differential pricing.

6          But that is all, if you will, west of Hampton Roads.

7   They have their lines.  Once you pick up from VIG or NIT,

8   both carriers are going to consolidate and go on the same

9   lines on their own track out to those destinations.  So when

10  he's saying they didn't give me any procompetitive

11  justification specific to NIT, so that's what -- there's been

12  none identified, and so that is not what is built into his

13  analysis.

14         And I think we see that, as Your Honor already

15  indicated, in paragraph 88 -- excuse me, not 88.

16         THE COURT:  I think that's the damages model,

17  though.

18         MR. HATCH:  Right.  On the damages model --

19         THE COURT:  It looks like -- I don't mean to cut you

20  off, but it looks like his damages model analysis and what he

21  bakes into that dataset is different from what he's doing on

22  the harm model.

23         MR. HATCH:  There is some difference.  And Your

24  Honor also asked about whether the first model is an input to

25  the second model at one point, and my understanding is that

1    they share some variables that are input to them; for

2    example, the degree of NIT usage variable.

3         THE COURT:  Is that the only one they share, though?

4    That's sort of my understanding, is that that's really the

5    only thing they share, and he kind of, you know -- that

6    intensity of use is a product of revenues going to NS and CSX

7    for container traffic.

8         MR. HATCH:  They certainly share that.  I'm trying

9    to think what other ones they might share.  I'm not sure I

10   have a comprehensive list, Your Honor.  They do also look at

11   different lanes, but I do think they look at those

12   differently in the two models, because the purpose of the

13   first model, as the Court is well aware, is we're looking at

14   whether there was harm to the ocean carriers, right?  To

15   Ms. Reinhart's point, you know, the antitrust laws don't

16   protect -- the protect competition, not competitors.

17        And no -- I didn't hear a case, and I'll be

18   interested if she has one that says you have to quantify that

19   to a specific dollar amount.  Maybe if you were a carrier

20   claiming damages, of course, in that suit you would want to

21   do that for your damages, but you just need to show harm to

22   competition.

23        THE COURT:  Do you have a case going the other way

24   and, also, a case that he can make a qualitative judgment as

25   an economist about this anticompetitive effect?  I'd be happy

1   to have those as well.

2         MR. HATCH:  Okay.  I may follow up in a second with

3   those, Your Honor.  I think the fact that experts can make

4   qualitative judgments I think is right in the heartland of

5   *Daubert*, and I'll be happy to follow up with a specific case

6   on that.

7         THE COURT:  Let me ask you about that.  I want to

8   follow up on this first, the harm model, because in his

9   deposition he says, well, there's obvious anticompetitive

10  effects, and he's asked about this, well, what about the fact

11  that Norfolk Southern had double-stacking?  What about the

12  fact that Norfolk Southern has better routes out of Hampton

13  Roads?  What about CSX service issues, if you will, that he

14  talks about?

15        And he says, well, those things, they may apply, but

16  they all sit beneath this anticompetitive problem, and that

17  has kind of the ring of being sort of ipse dixit.  What is

18  the Court to make of that, this damage or the liability phase

19  when he says that?  Because he's asked, well, it's obvious,

20  and these are all things that could be variables, but the big

21  one is this anticompetitive thing.  I hate to reduce it to

22  that, but to some extent, that sounds like what he's saying;

23  "well, this is the big problem."  Well, what is that based

24  on?

25        MR. HATCH:  Right.  And I think this is where, Your

1    Honor -- the cases say, first of all, for *Daubert*, regression
2    analysis and the econometric analysis, you can always fight
3    about whether there should be another variable that's put
4    into the analysis, and they don't need to be perfect, they
5    need to be defensible to go to the jury.  So I just start
6    with that standard.
7            They have not come forward with a variable.  They
8    say what you need to do is say I found the variable that, if
9    applied to your model, destroys it.  And that is what they've
10   not done.  They've said there could be this, that, and the
11   other possible things, but they haven't come forward and
12   established that.
13           THE COURT:  I don't think that's correct.
14   Dr. Wright doesn't challenge Dr. Marvel's model on its own
15   terms as it comes to liability.
16           MR. HATCH:  And I think that's really the end of the
17   analysis for *Daubert*.
18           THE COURT:  Except for this question of causation.
19   Does his model take into account causation?
20           MR. HATCH:  It certainly does.  And the way it does
21   that is by virtue of his analysis of the anticompetitive
22   conduct within the market that he's found, which I think is
23   very defensible, and then he looks to determine whether there
24   has been an impact on ocean carriers, and in this regard, he
25   does quantify it.  He does find a price increase for ocean

```
 1   carriers that use it intensely.

 2            And the connective tissue I would make to Your

 3   Honor's point about causation is he's using that degree of

 4   use there coupled with his assessment of lack of substitutes,

 5   which he otherwise lays out in both reports, as a proxy for

 6   the increased bargaining power of Norfolk Southern by virtue

 7   of the exclusive conduct.

 8            Would you touch on that point about whether or not

 9   he needs to put a number on it?  Ms. Reinhart says he does,

10   and you say no, he doesn't.

11            MR. HATCH:  Yes, Your Honor.  It's an element to

12   show that there's been harm to competition in the relevant

13   market.  I don't think you -- that is to the ocean carriers.

14   We agree on that part.  It's not -- damages are with respect

15   to CSX.  That's why there is different models for those two

16   analyses.

17            But harm to competition -- first of all, I think

18   it's patent.  I mean, I go back to the commonsense thing,

19   which is also in his report.  You can see the difference in

20   competition between these two immediate terminals, and you

21   can also see -- I've got another very interesting set of

22   charts, which is in his reply report to this point about

23   whether there is substitution among all the East Coast ports,

24   and I want to stay on Your Honor's question, but on Pages 23

25   and 24 of his reply report, he's got a couple of graphs that
```

```
 1    show -- there's differential pricing between New York, New
 2    Jersey, and Hampton Roads, and that seems to persist even
 3    over differences in volume.  You would not expect to see
 4    that, right, if these things were ready substitutes.
 5            You do not expect to see this type of differential
 6    pricing that is reflected.  They have to move -- ocean
 7    carriers decide to move a certain amount of freight
 8    through -- or international intermodal freight through NIT,
 9    and that is where we have to find the customer.
10            What we find is a percentage of the market there
11    that Norfolk Southern has that is indicative of monopoly
12    power.  They have stratospheric percentage of that service at
13    NIT, and then you look to see through his model whether
14    that -- there is also what you'd expect to see, increased
15    prices, and he finds that.
16            I don't think it's necessary -- that's the -- that
17    supports the harm to competition.  It is not necessary that
18    it be a perfect calculation for it to go to the jury.
19            And I would just cite the Court to the *Conwood*
20    *Company* case, which is in the briefs, at 794.  "In order to
21    be admissible on the issue of causation, an expert's
22    testimony need not eliminate all other possible causes of the
23    injury."
24            And so -- and this is really where I think there's
25    the dynamic between the two reports.  This was his
```

1    assessment.  They did not come forward with a procompetitive

2    justification to measure.  And as Your Honor already

3    indicated, they said, no, you should look at the larger VIG

4    as well, the Port of Hampton Roads terminals.  He did that,

5    and he still measures the effect, because the market power of

6    Norfolk Southern across those would still meet the relevant

7    thresholds, even across the two ports.

8            Unless Your Honor has any -- let me look over my

9    note here, if you would.

10           THE COURT:  Please take a minute.  I'm going to look

11   over my questions as well.

12           (Pause in the proceedings.)

13           MR. HATCH:  Your Honor, just to give a cite to a

14   reference I made earlier, I talked about don't take our word

15   for it, Norfolk Southern's own analysis shows they need to

16   serve their customers at these different locations, and

17   that's in Paragraph 32 of Dr. Marvel's report.

18           I'll turn to the apportionment issue now, unless the

19   Court has any other questions?

20           THE COURT:  No.  That's appropriate.

21           MR. HATCH:  Thank you.

22           So as Ms. Reinhart said, this did come up

23   extensively yesterday at the summary judgment hearing, and I

24   suppose there is overlap.  They make similar arguments here.

25   I really don't think it's, the first point, a *Daubert*

1    challenge to say he didn't apportion his damages

2    appropriately with the statute of limitations, but they do

3    make the argument.

4         The case I would direct the Court to is the *Zenith*

5    case from the Supreme Court, which the Court is likely

6    already familiar with, and I'll just read from the *Zenith*

7    decision.

8         So the issue is -- to step back before we go into

9    *Zenith* -- if you have a claim that could have been brought

10   outside the statute, which is, for antitrust purposes, four

11   years, so let's assume 2009 for sake of argument here.

12        If you could have brought a claim in 2009 and you

13   didn't bring one until 2018, can you get damages for the

14   statutory period of the ongoing monopolization or conspiracy

15   that is within the statute, question one; and, question two,

16   do you need to try to apportion those damages, pull them out

17   between something that could have happened from outside the

18   statutory period, or do you get all of your damages?

19        So *Zenith* is a monopolization case from the Supreme

20   Court, and what they say very clearly on Page 333:  "We

21   confront the issue of whether it is consistent with the

22   controlling limitations statute, 15 USC Section 15b, to

23   permit *Zenith* to recover all of the damages it suffered

24   during the years 1959-1963" -- I'll say parenthetically that

25   was the four statutory years -- "even though some

1    undetermined portion of those damages was the proximate
2    result of conduct occurring more than four years prior to the
3    filing of the counterclaim.  HRI contends, and the Court of
4    Appeals held, that the statute permits the recovery only of
5    those damages caused by overt acts committed during the
6    four-year period."  That is their argument.  "We do not
7    agree."  U.S. Supreme Court.
8         In that case, they got their four years of
9    essentially market profit.  Our market share would have been
10   this but for the anticompetitive conduct.  That is our manner
11   of calculating damages here as well.
12        They got the full four years because the Supreme
13   Court says you don't have to try.  And part of that is the
14   nature, and this goes to a case I'm sure they'll discuss, the
15   *Claire* case, which comes later from the Supreme Court.
16   You've got to look at the underlying nature of the cause of
17   action to explain these cases.
18        In *Zenith*, it is monopolization.  Monopolization
19   hurts you every year the monopoly is maintained.  That is the
20   word of the cause of action; "establish," "maintain" a
21   monopoly.  So not just when it starts but also as it's
22   maintained.  Our businesses want to compete every day.  They
23   want to compete fairly and hard.  Every day that you maintain
24   the monopoly, you are causing the damages of that
25   monopolization.

1          We recognize if they assert statute of limitations
2     at trial, you may not be able to get the damages that are
3     outside the four-year period, but the damages from that
4     monopolization that occurred within the four-year period
5     under *Zenith*, you certainly can.
6          The other point I would say about *Zenith*, if you go
7     to the 341 to 342 range, they explain why that is, and why
8     that is, is because if you brought your suit -- let's say in
9     this case we brought our suit in 2009, when this first rate
10    was set, could we have claimed damages up to 2022?  We could
11    have, maybe.  But they would say that's all speculative.
12    Tomorrow, we could abate this rate and change everything.
13    Ms. Reinhart will tell you the dynamics -- the market's
14    dynamic, it will change.
15         So looking forward, what do you look forward over,
16    10, 20 years?  How long will the conduct continue?  You don't
17    know at the beginning.  After the conduct has occurred, the
18    Supreme Court says now you have a record of what the market
19    shares were.  You can have experts talk about what the market
20    share should be, and you can apportion that within the
21    statutory period.  That's just what we've done here.
22         Just a quick note on the *Claire* case.  *Claire* is a
23    civil RICO case, which does use the same statute of
24    limitations.  It does not purport to overrule *Zenith* in any
25    respect.  In fact, it relies on *Zenith* for the Clayton Act

1    analysis as pertinent to the RICO cases there.  But the

2    difference is in the cause of action and in the underlying

3    harm.

4         In *Claire* they bought a silo on day one.  That silo

5    was alleged to harm those plaintiffs over the course of its

6    life.  They got bad grain out of it.  And so you suffered an

7    injury on day one that had predictable ongoing results to you

8    from that day forward.  As long as you kept putting grain in

9    that silo, it would be bad grain, et cetera.

10        They tried to bring it within the statute, because

11   of course under RICO you need a series of predicate acts.

12   And they tried to use predicate acts even though their

13   purchase of the silo was outside the statute.  They said, ah,

14   but there were sales to other farmers of silos.  There were

15   advertisements, even though we had already bought ours.

16   That's in the statute, that should be allowed to bring it in.

17        And what the Supreme Court said is, no, you can't

18   bootstrap.  Your injury occurred at the beginning outside of

19   the statutory period, and the fact that, you know, you have

20   to show RICO predicates and you can find a predicate that's

21   within the statute, that wasn't injury to you.

22        That's critically different from what we have here

23   where over our entire statutory period, the injury is very

24   much to CSX not being able to compete on fair terms and have

25   access to NIT.

 1          So that's the capsule on apportionment.  I'm happy
 2   to answer any questions the Court may have.
 3          THE COURT:  I don't think I have any additional
 4   questions relating to that.  Thank you.
 5          MR. HATCH:  Thank you, Your Honor.
 6          THE COURT:  All right.  We have been at it for a
 7   good while.  Would this be a convenient time to take a break?
 8   Maybe we can see if we can get the air conditioning turned up
 9   a little bit in here as well.
10          THE COURT SECURITY OFFICER:  Yes, Your Honor.
11          THE COURT:  Thank you.
12          We'll come back and take up the Belt Line's motion.
13          Is 1:30 okay?  Is that enough time for people to get
14   lunch and come back and be ready to go?
15          MR. HATCH:  Yes, Your Honor.
16          THE COURT:  Great.  Thank you very much.  The Court
17   will be in recess.
18          (Recess from 12:42 p.m. to 1:32 p.m.)
19          THE COURT:  Okay.  Mr. Snow, if you're ready to go,
20   I'm happy to hear from you.
21          MR. SNOW:  Thank you, Your Honor.
22          May it please the Court, Your Honor, Ryan Snow on
23   behalf of Norfolk and Portsmouth Belt Line Railroad Company.
24          Your Honor, I have four things to talk about in our
25   motion.  I'll do my best not to repeat the brief, but the

1  four things -- and I'll put them in an order so that I can

2  pick up on the discussion that you were just having with

3  Mr. Hatch.  But damages, they are overinclusive; drayage,

4  they don't consider costs; our rate, they don't properly

5  analyze it; and then I had two specific liability opinions

6  that I don't think Dr. Marvel can express.

7         So if that order works for you, Your Honor, I'll

8  start with damages.

9         THE COURT:  Please.

10        MR. SNOW:  The fact is that the way Dr. Marvel has

11 created his model, they have no damages that they can

12 establish in this case, and that's because this case is

13 controlled by the *Claire* decision in the United States

14 Supreme Court.  And I know Mr. Hatch told you *Zenith*.  Let's

15 look at *Zenith*.

16        Well, *Claire* cites *Zenith*.  *Zenith* remains good law.

17 It's a different case, though.  *Zenith* is a forward-looking

18 case.  It's about accrual, and you look forward if your

19 damages are too speculative at the time that an overt act

20 starts.  And potentially, in the future when the damages

21 culminate, your cause of action then accrues, and then you

22 can sue.

23        Well, there's a reason they call it the *Zenith*

24 exception.  And if you look at all of the antitrust case law,

25 it's called the *Zenith* exception, because the real rule is

1    that in order to have damages that are actionable, you have

2    to have not only an overt act within the statute of

3    limitations, but it must cause some new harm over and above

4    whatever old harm you had.  And that came to a head in the

5    *Claire* case.  We cite that in our brief.  *Claire* is 1997.

6              And I should point out that although Mr. Hatch

7    didn't mention it, another case that he cites in his brief is

8    called *Lower Lake Erie*.  They put a great deal of weight in

9    *Lower Lake Erie* from the Third Circuit, a 1993 case, four

10   years before *Claire*.

11             And Your Honor probably noticed, in the *Claire* case,

12   although it was a RICO case -- even though it's a similar

13   RICO case, the Supreme Court said they were basing their

14   decision on the Clayton Act antitrust law, because that was

15   the backbone for the RICO statute.

16             And what they did, and it's poignant here, they

17   rejected the rule that was being used in the Third Circuit

18   for accrual issues where there are acts that were caused -- I

19   think they called them late-occurring acts.

20             And what *Claire* does is it says, okay, if you can

21   prove that overt act in furtherance of a conspiracy which

22   causes new harm over and above the previous harm, you can

23   potentially recover for that, but you cannot use that as a

24   bootstrap to recover for harm due to acts before the statute

25   of limitations.

1              The Court is clear about that.  The commission of a

2    separate new overt act generally does not permit the

3    plaintiff to recover for the injury caused by old overt acts

4    outside the limitations period.  And it says "generally"

5    because the Court recognized there is a *Zenith* exception,

6    where if you don't know your damages, if it's a rare

7    circumstance where they just can't be known, you may be able

8    to get around that rule, but that's not the case here.

9              There is no representation at all that back in 2009,

10   when CSX first thought all of this was happening, it couldn't

11   have sued then, and Dr. Marvel could have come up with the

12   same model he's come up with now back then.  There's been no

13   representation that that wouldn't have been possible.

14             And so --

15             THE COURT:  Let me just ask you a question about

16   that.  I probably should ask Mr. Hatch this question as well,

17   but he can perhaps follow up.

18             If we -- the complaint takes you back four years to

19   2014, and this new alleged conduct giving rise to an accrued

20   injury is 2015 but the injury results from the same type of

21   exclusionary conduct, can you get damages back to 2014, even

22   though this new conduct, you know, that kind of breathed life

23   into the alleged antitrust conspiracy started in 2015, under

24   your analysis of the cases?

25             MR. SNOW:  Well, not under *Claire*, Your Honor,

1    unless you could show some new harm over and above that

2    previous harm that you indicated.  But their damages model

3    just doesn't do that.  I can't do that for them here.  I have

4    to deal with the damages model that they created, and the

5    problem is the damages model they created, it's almost

6    described in *Claire* because *Claire* says that the plaintiff

7    there could have alleged a new overt act within the statute

8    of limitations.

9            Hypothetically if they did it, would that help them?

10   The Court says no.  That's Page 190 of the opinion, and what

11   they say is it wouldn't have helped them because their damage

12   model didn't identify any new harm, quote, over and above any

13   existing harm that they had.

14           That's our case.  That's the machine that Dr. Marvel

15   has built.  I view it as one of those Dr. Seuss-type machines

16   where you put in a lot of data and, pop, here comes a number

17   out of it, right?  We only get one number.  There's no

18   telling what went into that number in terms of damages

19   causing certain acts.

20           And there's no dispute about this, I should say.

21   Dr. Marvel himself says that the number he comes up with for

22   each year is due to the totality of the defendant's conduct.

23   We pressed him on that, and he was candid about it, that's

24   what it is.

25           And it's undisputed, I'll submit, Your Honor, that

1    that number that he churns out for even the four years that

2    are within the statute of limitations, for each of those four

3    years, it was undisputed that that number includes some

4    damages due to acts outside the limitations period, some

5    amount due to acts inside the limitations period.

6           And I say that because -- and I'll point Your Honor

7    to this reference -- in the defendant's summary judgment

8    opposition brief -- it was a consolidated brief.  It's at

9    docket entry 328.  If you look at Page 49, they discuss the

10   damages that went into each of those years.  And this is what

11   they say, quote:  "Most of these occurred in years after

12   2013," within the limitations period.  "Most of these

13   damages."

14          And of course, the unstated admission there is that

15   some of these did not.  And so we have the problem of a

16   single clump of damages, if you will, that contains amounts

17   due to acts inside the statute of limitations and acts

18   outside the statute of limitations.

19          And the problem of confronting that model against

20   the *Claire* decision from the United States Supreme Court

21   becomes obvious when you try to figure out what does "most of

22   those damages" mean?  Pick a year.  2017.  "Most of the

23   damages were due to acts inside the statute of limitations."

24   Well, how many?  Was it 90 percent of the damages that year?

25   Was it 7?  Was it 63?  Nobody knows.  I don't know.  The

1    Court won't know.  The jury won't know.  And that's why the
2    damages model breaks down.
3         THE COURT:  Is your contention, then, if we just
4    tease this out a little bit, that if a contract -- CSX did
5    not get a contract in 2012 that Norfolk Southern got and that
6    was running five years, that the damages or the lost profits
7    associated with that contract would run into the statute of
8    limitations, and we don't know how to account for that in
9    looking at Dr. Marvel's numbers?
10        MR. SNOW:  It could really be any number of things
11   similar to what Your Honor is talking about.  It couldn't be
12   that, I will tell you that, because we propounded an
13   interrogatory in this case that asked them to identify the
14   overt acts that they rely upon to show the conspiracy.  That
15   example Your Honor gave is not one of the overt acts.
16        But, for example, one of the overt acts is removal
17   or discontinuance of a track called the Diamond Track, right,
18   in 2008.
19        What portion of the harm that they suffered in 2016
20   was due to removal of that Diamond Track versus other acts?
21   No one knows because the machine, the model that Dr. Marvel
22   built doesn't tell us, and that's no shortcoming on the
23   defendants.  That's the way they built that model on the
24   plaintiff's side.
25        And I submit, Your Honor, we cited a case in our

1   brief, the *Gumwood* decision from Indiana.  It's a district

2   court, but it's really squarely on point, and that's 2016.

3   It explains *Zenith*.  It explains *Claire*.  And it says that

4   the expert in that case, who did just what the expert did in

5   this case, must be excluded because you can't present that

6   kind of model to the jury and just tell them to guess.

7          THE COURT:  Didn't he just come up with a lump-sum

8   number and say -- he came up with the real Dr. Seuss number.

9   Here's one number, and it applies to all of the conduct

10  associated with these competing shopping centers and whatever

11  misdeeds were committed.

12         MR. SNOW:  Absolutely.  He did that.

13         And I'll concede the machine here looks a lot more

14  complicated than his machine, but the end result is the same.

15  It pops out one number, and there's no way for the jury to

16  tell what's in it and what's not.  And the concession I read

17  to Your Honor from their summary judgment brief makes that

18  clear.

19         Some damages are okay, some damages are not, even if

20  you accepted that they were legitimate damages, and that's

21  the defect, and that is why we moved to exclude on that

22  point.  And I raised that first because I think that's fatal

23  to the whole model.

24         Unless Your Honor has questions, I will talk about

25  drayage.

```
 1              THE COURT:  Let's talk drayage.
 2              MR. SNOW:  Yes, sir.  Drayage is another issue that
 3   I believe breaks the machine, and this is why I say that:
 4              One of the components of Dr. Marvel's model, one of
 5   the things he had to do that they hired him to do was define
 6   the relevant market.  And Ms. Reinhart knows much more than I
 7   do about relevant markets, but I know two things.  The
 8   relevant market has two components.  It's got a geographic
 9   component, and it's got a product/services component.
10              So here, for example, Ms. Reinhart described how the
11   geographic component has shrunk dramatically.  It started
12   Port of Virginia.  Then it became Hampton Roads.  And now in
13   Dr. Marvel's report, it's just on-dock rail access at NIT.
14   It doesn't even account for VIG right across the water.
15              I'm not explaining that defect.  I know she has
16   already done that.  But where I get to the defect is the
17   product/services component of the relevant market, because
18   his conclusion, in order to make the machine operate the way
19   it does, is that drayage is not a reasonably effective
20   substitute for rail.
21              And of course we cited the case.  It doesn't have to
22   be a perfect substitute.  It has to be a reasonable
23   substitute.  His conclusion is that it's not, but he doesn't
24   do the homework to make that conclusion admissible.
25              And we pointed to the *H.J., Inc.* case.  This is out
```

1   of the Eighth Circuit.  It's in our brief, but it's

2   867 F.2d 1531, and the discussion is really at 1539.  This is

3   a 1989 case, and they talk about the relevant market.  It's

4   actually a case about submersible manure pumps.  I have never

5   seen one, and I don't want to, but it was a big deal in that

6   case.

7          The plaintiff tried to define the market.  There

8   were a lot of other kinds of pumps that these farmers could

9   use out in the northern Midwest.  The plaintiff tried to

10  define the market as just that submersible pump.  And he

11  said, functionally just this submersible pump is not like

12  these other things, so it's really its own market.

13         And the Eighth Circuit said -- rejecting the

14  expert's analysis, they said, hang on.  You never accounted

15  for cost.  You never accounted for the price of this thing.

16  How can you do your cross elasticity of demand analysis

17  without accounting for cost?  And so they rejected that

18  opinion.

19         And the language of the case is telling here:

20  Without a comparison of relative costs, their conclusions of

21  one product's superior or inferior quality are meaningless.

22  I added "inferior," because that's kind of what we have got

23  here.  But they go on in the footnote.

24         "The question of relative costs is not merely

25  academic.  It is an essential consideration of any rational

purchaser," here the dairy farmer, "in making the decision to
buy one product over another."

THE COURT:  What if that submersible pump, you know,
the alleged substitute could only pump 5 gallons a day, and
the other pump can pump 10,000 gallons a day?  Does that make
a difference?

MR. SNOW:  It probably does.  It doesn't excuse not
looking at costs at all.  I don't know any case that would
say that that functionality difference excuses not looking at
costs at all.

THE COURT:  Well, let me ask you about that because
that was -- we touched on this a little bit earlier I think
with Ms. Reinhart and Mr. Hatch, about that question.
There's two components of that.  One is, you know, functional
interchangeability.  The other is cross elasticity.  And as I
understand CSX's position, Dr. Marvel didn't look at costs.
It seems not much disputed, so the question is, you know, can
they ride that functional interchangeability horse across the
finish line to say that's sufficient to make a judgment that
these are not reasonable substitutes?

MR. SNOW:  I don't think you can, and I'll tell you
why.  Because consider our rate, Belt Line's rate.  When he
evaluates the Belt Line's movement of trains to NIT, what
does he evaluate?  He evaluates the cost of the move.  That
is what he evaluates to determine whether that's

1    anticompetitive or not.  He's looking at the cost of the
2    move.
3            So when he looks at reasonable alternatives in the
4    market, there's no way to ignore cost of the move.  That's
5    his central component for analyzing our move.  It's got to be
6    his central component for analyzing theirs.  So what has
7    happened is we're being judged against a mode of transport
8    with a complete blind eye to the price, when we know price
9    matters because CSX uses it to the tune of many, many, many
10   railcars each year.  I'm trying to be sensitive to the
11   confidentiality, but we put that in our brief.
12           And we also know that there's an arrangement there
13   which indicates that the cross elasticity of demand -- it's a
14   very high indicator that it exists.  These two modes of
15   transport are interchangeable.  And, frankly, I could add a
16   third point, which is there's a reason they call it
17   intermodal transport, because it can be transported by
18   multiple modes of transportation.
19           So I think, like in the Eighth Circuit case, his
20   analysis that turns a blind eye to that cannot be admissible.
21   His market definition fails on that ground.
22           And I point, Your Honor, just for support for that
23   point, not only to the Eighth Circuit case, but to the *Sardis*
24   case.  We cite that a couple of times in our brief.  That
25   came out of the Fourth Circuit in 2021, so just last year.

1   And it's not an antitrust case, I know, but it's about
2   experts.  It's a product liability case.
3           And what the Fourth Circuit said there is that if an
4   expert turns a blind eye to something that is essential to
5   his analysis, that should be excluded.  It's not a matter for
6   cross-examination.  It should be excluded.  And so the expert
7   in that case, for example, he was an accident reconstruction
8   expert.  It was about garage doors and containers that's held
9   them.  And Your Honor probably saw on Page 291, they talk
10  about this.
11          He failed to test his theory.  He had a theory about
12  why the design was wrong and what could have been better.  He
13  failed to test it on an actual container.  He failed to
14  create a computer model of the container, even though he
15  could have.  And the defendants even gave him three offers of
16  creating some exemplar for him.  He said, no, I don't want
17  those.  He purposefully ignored something that could have
18  tested his model.
19          And I think the analogy here is that Dr. Marvel
20  purposely ignored cost, even though he found it to be a
21  central component in evaluating our rate, and that is why we
22  move to exclude his opinion on drayage as a substitute for
23  rail.
24          Unless you have questions, Your Honor, I would like
25  to talk about his analysis of our rate itself.  We take

1    serious issue with his comparisons of our rate, and I
2    described in our brief him having some liability-like
3    opinions and having some damages-like opinions.  And I
4    realize he's an economist, and there's a lot of leeway given
5    to economists to testify on certain things that relate to
6    their economic opinions.  But I will tell you, even with that
7    kind of leeway, they still have to meet the foundational
8    requirements of *Daubert* in Rule 702.
9         And there are three reasons why his comparison of
10   our rate doesn't work:  He compares it to private rates, not
11   public ones; he doesn't control for differentiating factors;
12   and he totally ignores our costs.
13        And the end result, and I'll get into each of those,
14   but putting yourself in our position, we are being judged by
15   private contracts that we have no idea exist -- they're
16   attorneys' eyes only, so my client hasn't even seen them --
17   with no consideration of our costs, and no consideration of
18   differences between our railroad and the railroads we're
19   being compared against.  That's how Marvel did his analysis.
20        And I submit to you, Your Honor, the *Laurel Sand*
21   case supports us here.  That's the Fourth Circuit case,
22   District Court in Maryland, and it involved railroad rates.
23   And they said an inquiry into the reasonableness of a rate
24   must focus on the rate's reasonableness in the context of
25   competition rather than from the plaintiff's perspective.

 1           So if you dig into Dr. Marvel's report, you'll see
 2    that he does have some rates in there that he compares ours
 3    against, the key one being Commonwealth Railway.
 4           Now, the public tariff rate for Commonwealth Railway
 5    is 210.  Our rate is 210.  Our rate is actually cheaper
 6    because it only applies to loaded containers.  Commonwealth's
 7    actually applies to loaded and empties, right?  So depending
 8    what you are shipping, you could save money over the Belt
 9    Line, all other things being equal.
10           But he doesn't evaluate our rate against that
11    because that would break down his machine again.  He
12    evaluates it against the private contract rate that CSX has.
13    He does the same thing with the Port of Mobile.  The Port of
14    Mobile has a $240 tariff, above ours, and yet he doesn't
15    evaluate our rate against that.  Inexplicably, he evaluates
16    it against only CSX's contract rate.
17           And so he concludes in paragraph 58 of his report,
18    NPBL's switching rate is strikingly higher than the switching
19    rate that the Commonwealth Railway charges CSX.
20           Well, that would be news to the Belt Line, because
21    they can't benchmark themselves against contract rates they
22    don't know about.  And what is more, we don't know how the
23    contract rates that he points to came about.  We have some
24    information on Commonwealth's Railway, but what about the
25    Port of Mobile?  What was given in exchange for that?  Does

1    that railroad offer the same rate to anybody else besides

2    CSX?  Because that's where they need to show a market, right,

3    not just what they pay.

4           And so what we end up with is a series of railroads

5    that we've been compared against that the Belt Line doesn't

6    know, and that we don't know the terms for, and that don't

7    indicate anything about the market.  That's the flaw on the

8    comparison to private rates.

9           THE COURT:  Did you all do discovery to try and sus

10   that out about whether there were market differences, or

11   whether CSX was exerting its market power to get special

12   rates?

13          MR. SNOW:  Well, that's the other defect here,

14   because Dr. Marvel didn't know.  He doesn't know that

15   information, because all he was given was the raw number,

16   right?  And so I'm not going to do his homework for him

17   necessarily.

18          THE COURT:  But you're making an argument that could

19   be construed as simply fodder for cross-examination, and then

20   suggesting that you need to know what the markets were

21   relative to these other rates to say that they're not

22   comparable.

23          MR. SNOW:  I mean, if the methodology crossed the

24   threshold in the first place, potentially that would be the

25   case, but there's no case law that supports the idea that in

 1    the context of identifying a market rate, you can look at

 2    only the plaintiff's own private contract rate.  So I don't

 3    think we will get to the point of me needing to cross-examine

 4    him.

 5             The problem becomes really stark when you think

 6    about even the other public railroad rates that he used.

 7    What's the difference between those railroads and ours?  Do

 8    they have cost differences?  Is the mileage different on the

 9    track?  Mileage is very important in these things because

10    acquisition, construction, maintenance of track is very

11    expensive, and it bears on the rate.  He compared none of

12    that.

13             You will see in our expert, Thomas Crowley, he does

14    control for the mileage.

15             Dr. Marvel took numbers that they gave him, and he

16    compared it.  There's literally no methodology at all.  And

17    then perhaps the worst thing is, and I say this because he's

18    an economist, he completely ignored the money.  He ignored

19    our cost of providing the services.

20             And if he had considered our cost, if that had gone

21    into his analysis like it should have, he would have found

22    that, like Thomas Crowley did, our cost over this 10-year

23    span, from 2010 to 2020, is about $219, $220, depending on if

24    it's weighted.  And of course our rate is 210.  And if you go

25    to the *Laurel Sand* decision, they actually say rates set at

1    cost is reasonable.

2              So adding together the aggregate of all those

3    failures, I'll submit to Your Honor, this is not a matter of

4    cross-examination at all.  This is a wholesale failure of the

5    expert to do the homework that he really needed to do if he

6    wanted to determine whether our rate was reasonable because

7    everything else indicates that it is.

8              If Your Honor has questions, I'll be happy to answer

9    them, but if not...

10             THE COURT:  No, I don't.

11             MR. SNOW:  My last points, Your Honor, and these are

12   two opinions that he expresses that we call railroading

13   opinions.  They are in paragraph 59 of his opinion.

14             One opinion he says, NS and NPBL have impeded CSX's

15   en banc access to NIT by removing critical infrastructure --

16             THE COURT:  The Diamond Track.

17             MR. SNOW:  -- so the decision to remove that

18   critical infrastructure -- yes, sir, that's the Diamond

19   Track.

20             And then the other one is in 2015, when he expresses

21   an opinion in the same paragraph that the scheduling windows

22   provided to CSX-T essentially were not adequate.

23             I think no matter how you slice those, they come

24   down to decisions made by railroaders about railroad

25   operations.  He's not a railroad expert, so he fails on

1   qualifications, and he admits that, but he also fails on

2   foundation and methodology for both of those because -- and

3   he conceded this, really, in his deposition -- he barely knew

4   any of the facts about either one.  He asked for it.  He was

5   given only what he was given.  But he didn't have even the

6   basic information to make those determinations.

7           And so what I don't want, Your Honor, is for him to

8   sit on the witness stand in front of the jury and say, "In my

9   expert opinion, they did a bad thing by -- they made a bad

10  decision by removing that track."  "They made a bad decision

11  by offering these particular windows."  It's not something he

12  can do.

13          And I think, if I may, to help the Court appreciate

14  my concern, imagine -- I'm not presupposing anything -- but

15  imagine if he didn't have his damages opinion.  Imagine if

16  that got excluded.  Could he still say these two things?

17  Could they still call him as their only expert and say,

18  Dr. Marvel, I want to ask you about these two railroading

19  things.  What is your opinion on whether these were good

20  ideas?  I think the answer is certainly no.  The answer is

21  certainly no.  And if it can't stand up alone, there's no

22  reason that it should stand up just because he also has a

23  damage opinion.

24          That's all I have, Your Honor, unless the Court has

25  questions.

1          THE COURT:  I don't.  Thank you, Mr. Snow.

2          MR. SNOW:  Thank you, Your Honor.

3          THE COURT:  Mr. Hatch.

4          MR. HATCH:  Good afternoon, Your Honor.  I'll try to

5    follow the order of Mr. Snow, if that works for the Court.

6          THE COURT:  Please.

7          MR. HATCH:  So he started with the statute of

8    limitations.  I've already touched on that.  I'll try to only

9    talk about what he raised.

10         We could not have generated this model in 2009.  We

11   wouldn't have had the historical data about exclusion and

12   relative market share, and it would have been viewed as

13   speculative in 2009, because you were looking forward.  I

14   mean, that goes back to the point I made.

15         So then what would they concede in 2009, that we

16   could have asked for 30 years in the future of damages?

17   Would they concede now that we could ask for 30 years in the

18   future of damages because we brought a timely action now for

19   at least the last four years?  I really doubt it.  They would

20   say, oh, you don't know what could happen.  We could lower

21   our rate, shipping lines could shift, they could build out a

22   bigger, even bigger expansion at another port.  That's all

23   speculative.

24         And that's what *Zenith* is talking about, and that's

25   the case I rely on.  And you, I think, have heard very little

1    from them about the *Zenith* case.  It's directly on point,

2    never been overruled in the antitrust context, and they can't

3    address it.  They can rely on *Claire* which doesn't overrule

4    it in any respect.

5          There's an additional case I would direct Your Honor

6    to, it's the *Poster Exchange* case, which is from the Fifth

7    Circuit, a 1975 case.  And if the Court would permit, I'll

8    just cover a couple of the points in *Poster Exchange*.

9          In antitrust cases and monopoly cases, you get your

10   damages going four years back for the monopoly that operates

11   during that time, and that was -- Your Honor said I should

12   ask Mr. Hatch for that.  You get your damages for the full

13   monopoly going back four years.

14         THE COURT:  In this case, that's your argument that

15   if you prove an overt act, and let's say it's the 2015

16   alleged conduct, that you get to go back to 2014 and collect

17   damages?  Is that CSX's position?

18         MR. HATCH:  Correct, Your Honor.  You get all of the

19   damages that were within the statutory period, and that's

20   because unlike -- let's say I take a pill, and that pill I

21   allege harms me, and I say maybe it harms me over a course of

22   ten years.  My damages are all flowing from the one event of

23   taking the pill, and they are projectable out for ten years.

24         In a monopoly case, each day, each year that

25   monopolist is maintaining the language of the statute,

1    maintaining their monopoly position, and the damages that

2    flow from that flow to customers, and they flow to -- they

3    flow to competitors who can prove their damage, and that

4    damage is from the exclusion.  That exclusion -- and the

5    exclusion that happened in 2014, 2015, 2016, did not happen

6    in 2009.  They could have decided to cease that monopoly

7    behavior at any time in between.

8            So that's the difference.  Your cause of action,

9    maintaining the monopoly, is occurring each year.  And yes,

10   you may not be able to get the damages that are more than

11   four years old, but within that four years, you get the whole

12   set.

13           And with *Poster* --

14           THE COURT:  I guess the question that follows from

15   that is, is that true if the 2015 conduct gives rise to an

16   injury that's separate, apart from the old exclusion back in

17   2009, or the pricing, the rate issue in 2009?

18           MR. HATCH:  Well, the way I would answer that, if I

19   understand Your Honor's question, is the conduct complained

20   of is monopolization or conspiracy to monopolize.  There are

21   different ways you can affect that, right?  One way we have

22   alleged is through the prohibitive switch rate.  In 2015,

23   what we saw is during a time of, you know, unprecedented port

24   congestion, when we actually tried to pay their rate and get

25   into NIT, they slowed our trains down.  They wouldn't do them

1    on a timely basis, and therefore not only are you paying that

2    exorbitant rate when you try it, but you're not getting

3    timely, effective service, so that's a new aspect.  You can't

4    even get the operating windows.  You can't get in there in a

5    timely fashion.

6         But those are just different aspects of what the

7    monopolist is doing.  The monopoly is to maintain that

8    monopoly position at the port.  You can do that through a

9    high rate.  You can do that through lack of operating

10   windows.  You can do that through renegotiating a new

11   trackage rates agreement, which is another act we have in our

12   summary judgment.  And you can do that through not agreeing

13   to our 2018 rate proposal.

14        So the monopolist is monopolizing, and they are

15   doing that through any effort to get in there, and that is

16   why your damages are the damages that flow from being

17   precluded in that time that the monopolist is precluding you

18   from the market.

19        The *Poster Exchange* case, and I don't know if the

20   Court has that case handy, but I --

21        THE COURT:  I don't.

22        MR. HATCH:  Okay.  This one may, I don't recall, may

23   have been cited in the summary judgment briefs as opposed to

24   in the *Daubert* briefs.  I apologize if Your Honor doesn't

25   have a copy.  We can certainly tender one after the hearing.

1    I'd give you mine, but it's marked up, so it's probably not

2    best.

3              THE COURT:  That's fine.

4              MR. HATCH:  It's *Poster Exchange versus National*

5    *Screen Service Corporation*, 517 F.2d 117, 1975.

6              So it comes out fairly soon after *Zenith,* and it

7    actually talks about how *Zenith* had changed the rule in the

8    Fifth Circuit, which had not allowed you to recover your

9    whole set of damages.

10             But it starts with -- the discussion I want to begin

11   with is on Page 126, and it talks about the *Hanover Shoe*

12   decision from the Supreme Court.  There the antitrust

13   defendant had exercised its monopoly power since 1912 to

14   force the plaintiff to lease and not buy its machinery at

15   monopoly rates, but the plaintiff did not sue until 1955.

16             The Court held that the antitrust action was not

17   barred by the statute of limitations with respect to the

18   period 1951 to 1955, because "We're not dealing with a

19   violation" -- this is quoting Hanover now -- "We're not

20   dealing with a violation which, if it occurs at all, must

21   occur within some specific and limited time span upon" -- and

22   it cites a case there, the *Emich* case -- "upon which the

23   defendant relies.  Rather, we are dealing with conduct which

24   constituted a continuing violation of the Sherman Act and

25   which inflicted continuing and accumulating harm on the

1    plaintiff."  And that is exactly where we are in this case.

2            And that was also an exclusion case, and it allowed

3    the exclusion damages for, again, that four-year statutory

4    period.

5            Just to read another passage from it, and now I'm on

6    Page 127:  "Here, *Poster* complains that during the four-year

7    period sued upon, it has been continually injured by

8    Columbia's and National Screen's conspiratorial foreclosure

9    of *Poster* from access to supplies.  Under *Zenith*, we are

10   obliged to recognize *Poster's* continued accruing cause of

11   action during this period.  Moreover, aside from the

12   conclusive effect of these authorities, any other result here

13   would, we think, improperly transform the limitation statute

14   from one of repose to one of continued immunity."  And that's

15   a key concept.

16           Under their argument, because they successfully

17   monopolized starting in 2009, and were not sued, they get to

18   continue monopolizing into the future forever and not face

19   damages from the monopolization that occurred earlier, and

20   that's what *Poster Exchange* and *Zenith* say you can't do.

21           One last point on the statute of limitations.  We're

22   not trying to recover for old damages, and by "old" I mean

23   damages that would be outside the four-year period.  We

24   realize if they assert the statute of limitations at trial --

25   and I think they need to assert it -- we may not be able to

1    recover for those damages that are outside the statutory

2    period.

3            Mr. Snow talked about a statement in our summary

4    judgment opposition where we said most of these damages are

5    within the statutory period, and that reference is not to

6    saying that our damages are somehow mixed with the earlier

7    damages.  As Your Honor knows, Dr. Marvel calculated damages

8    on an annual basis.  And what that reference was in our

9    summary judgment opposition is that most; i.e., the biggest

10   volume of damages, if you look at the chart, are within the

11   statutory period.

12           So there were smaller -- he calculates smaller

13   amounts of exclusion damages in the early years.  The largest

14   volume of damages were within the statutory period.  So I

15   wanted to be clear about that.  We're not saying the damages

16   are mixed.  They are calculated by year and could be

17   presented that way, if they assert the statute-of-limitations

18   defense.  And within those years, those are new damages for

19   exclusion.  Each year, that's business that you did not get

20   to do under Marvel's methodology that you should have gotten

21   to do due to the monopolist conduct.

22           I'll transition to drayage, unless the Court has any

23   questions about the statute.

24           THE COURT:  No, I don't.  Thank you.

25           MR. HATCH:  Just quickly on drayage, because I think

1    Dr. Marvel did discuss this fairly extensively in both of his
2    reports, Your Honor.  Mr. Snow talked about cross elasticity
3    of demand, and Your Honor pointed out there is the functional
4    interchangeability, which certainly there is not, and Marvel
5    analyzed that and concluded on that.
6           With regard to cross elasticity of demand, and here
7    I'm looking at the *FTC versus Sysco Corporation* case,
8    113 F.Supp.3d 1.  It discusses on Page 25 to 26 -- for the
9    cross elasticity of demand, I agree he did not do that
10   analysis from a pricing standpoint in his report.
11          But the only thing I wanted to say about cross
12   elasticity of demand is, of course, price is one element that
13   can go into cross elasticity of demand.  But as this, the *FTC*
14   case says, price is not, however, the only variable in
15   determining the cross elasticity of demand between products.
16   Cross elasticity of demand also depends on the, quote, "ease
17   and speed with which customers can substitute the product and
18   the desirability of doing so," unquote.
19          Thus, substitution based on a reduction in price
20   will not correlate to a high cross elasticity of demand
21   unless the switch can be accomplished without the consumer
22   incurring undue expense or inconvenience.
23          So that goes back to the point he has analyzed that
24   drayage is just not an adequate substitute, as he lays out in
25   his report, because it can't substitute for what you could do

1    with on-dock rail.

2          Briefly on the rate issues that Mr. Snow talked

3    about, to the extent there's any argument about discovery

4    there, I don't -- this has all been disclosed, so I'll put

5    that one to the side there.

6          With regard to *Laurel Sand*, which he talks about

7    that you, kind of, per se, you can charge a rate that covers

8    your cost, this is just a fact dispute for trial or perhaps

9    ships passing in the night.  They say 210 covers our cost,

10   and they've got evidence on that.  That's fine.  We have

11   proposed lower rates for the NIT service.  And don't take our

12   word for it, every time we propose that, the Belt Line itself

13   analyzed it and concluded that it would make money on that

14   rate.

15         And this is also in our summary judgment papers, but

16   in 2009, NPBL itself proposed the $75 rate for a unit train,

17   a train traveling on one waybill, and it said it did that

18   after assessing other similar rates charged by other belt

19   lines for similar services, and it considered NPBL's worst

20   case for cost.  That's Exhibit 19 to our summary judgment

21   opposition.  So that was its own proposal originally on the

22   75.

23         CSX said we'd like to use the 75 for the service to

24   NIT, and the president of the Belt Line, Mr. David Stinson at

25   the time, assessed that the proposal would earn NPBL $85,000

1    in operating income, which were Exhibits 34 and 35 to our

2    summary judgment opposition.

3            And the Norfolk Southern board members on NPBL said

4    have you really thought about that enough?  Maybe you are

5    really not thinking of a worst case financial situation, I

6    believe trying to send a message, you shouldn't be saying

7    this rate won't work.

8            And Mr. Stinson, to his credit, reported back that

9    NPBL would earn net income.  Part of the proposal then was

10   that they could even use our trains.  You can just use our

11   power.  You don't even -- trying to make it easy for them.

12   And Mr. Stinson said whether or not we use their trains,

13   we'll still make money.  That's Exhibit 44 to our summary

14   judgment opposition.

15           And then in 2018 Ms. Donna Coleman at the Belt Line

16   assessed that the 2018 proposal -- she said she did a

17   back-of-the-envelope whether an NPBL 1,500 in net revenue per

18   trip, excluding supervisor costs, and that's Exhibits 5 and

19   8.  So -- and that's fine.

20           They can argue about that, but every time the Belt

21   Line has looked at whether the rate we proposed would work,

22   they have always concluded they would make money.  That's

23   part of Dr. Marvel's analysis.  You would expect a business

24   that is not operating in a competitive exclusive environment

25   to adopt proposals that make it money.

1           THE COURT:  Does he simply rely on the Belt Line's
2    analysis relative to the 2018 proposal?  And, I guess,
3    Mr. Snow's critique is he never sort of crunches the numbers
4    himself to kind of, you know, talk about marginal costs and
5    how they would go down with volumes and so forth or relies
6    on, I'm sorry, CSX's analysis in submitting these proposals
7    as well?
8           MR. HATCH:  To my knowledge, Your Honor, no one has
9    ever assessed that the Belt Line would lose money on CSX's
10   proposals.  Even their own Mr. Crowley says, well, I think
11   they'd make less money than what you've projected.  Okay.
12   You know, we can, I guess, fight about that.  Nobody has ever
13   said they would lose money.
14          The argument that they would lose money from the
15   Belt Line is this, and I think it's important, as I
16   understand it:  We're not saying we'd lose money at the rate
17   CSX has proposed for NIT service.  We're saying we would lose
18   money if we took that rate and applied it to our entire
19   network.
20          THE COURT:  Right.  It's the uniform rate argument.
21          MR. HATCH:  It's the uniform rate argument.  That's
22   an argument about the merits of what they can do, but it's
23   not an argument that for the service we proposed and the rate
24   we proposed, they would make money.  Everyone has said that.
25   Our proposal said that, NPBL always said that, and that's

1    what Dr. Marvel is relying on.

2           THE COURT:  But did Dr. Marvel ever do any kind of

3    analysis if you lower the rate uniformly, what the net result

4    is going to be?

5           MR. HATCH:  No.  He did not because there's no need

6    to do that.  Before 2009, when they raised that rate to 210,

7    there was a differential rate for service to NIT, and it's

8    called an import/export rate; so intermodal.  Okay.  That's

9    part of this conduct we're complaining of, is they had

10   differential rates before.  Now they would tell you we can

11   only have one rate, it's got to be across everything.  That's

12   fine.  That's a litigating position for them.  We can have

13   that out at trial.

14          Historically they had different rate for it.  Then

15   they raised the general rate to 210.  And that's fine.  CSX

16   was okay with 210 if there was 75 for the NIT service, but

17   then that's where the problems happen, that they said, no,

18   we're just going to do 210 generally, and that was the

19   exclusive -- you know, that was the beginning of this.

20          THE COURT:  Talk to me about -- I don't want to cut

21   you off there, but I'd like to hear briefly on the Diamond

22   Track.  I think Mr. Snow suggested that Dr. Marvel did a

23   little more than kind of spitball it and pretty much admitted

24   that he didn't really explore the facts in any meaningful way

25   to conclude or opine as an economist that the Belt Line and

1    Norfolk Southern impeded CSX.

2            MR. HATCH:  Yes, Your Honor.

3            THE COURT:  What is your response to that?

4            MR. HATCH:  My response to that is that the expert

5    report summarizes both his opinions and the bases for those

6    opinions, and I agree he's not a railroad expert.  He's an

7    economist.  And he's looking at conduct over the whole course

8    of this and assessing whether that conduct is part of --

9    there's a relevant market, but also whether it's preclusive

10   or monopolistic conduct.

11           And so in doing that, he takes input from facts,

12   right, in the trial.  He will sit and watch the witnesses,

13   and when he sees things that strike him as being inconsistent

14   with separate action, right, conspiracy, why would the Belt

15   Line not take an offer that makes it money?  Right?  Perhaps

16   it's part of exclusionary conduct.

17           So, to me, the Diamond is just one of several events

18   he identifies that are consistent with exclusionary conduct,

19   and he bases that not on his own independent assessment of

20   the history of the Diamond, but he bases that on fact

21   testimony that we anticipate adducing at trial, and we'll

22   opine about that what would mean from an antitrust or

23   economic standpoint.

24           THE COURT:  Thank you.  Is it true that CSX wasn't

25   using the Diamond interchange before it was discontinued?

```
 1          MR. HATCH:  I believe that is true, at least for the
 2   immediate time frame, Your Honor, and I'll check that in a
 3   second.  If I'm wrong, I'll report that.  I don't know how
 4   far back historically that goes.
 5          THE COURT:  I think, and Mr. Snow can correct me if
 6   I'm wrong, but I think the assertion was that it hadn't been
 7   used for a couple years.  Is that correct, Mr. Snow?
 8          MR. SNOW:  That's correct, Your Honor.
 9          MR. HATCH:  That's correct.  I mean, part of this is
10   that we've never, during the life of this, been effectively
11   able to use their service for NIT, and this was an early act
12   that contributed to it becoming, what later was clear, a less
13   effective service by virtue of the conspiracy and the
14   monopoly.
15          THE COURT:  Now, there's been some contention also
16   that CSX representatives on the Belt Line's board voted in
17   favor of or did not object to the discontinuation of the
18   Diamond Track in 2008, or 2007, I guess the end of 2007.  Is
19   that correct?
20          MR. HATCH:  Yes, Your Honor, and our position on
21   that is that things that at the time you did not identify
22   with collusive or monopolistic behavior could have been part
23   of that, and we've found in discovery -- I'm sure the Court
24   may have read our complaint.  The complaint, I would say, is
25   focused on the recent events, and we found in discovery
```

1    there's a ton of evidence from earlier years about Norfolk

2    Southern's plan to just block us at every step of the way.

3          And so, yes, I think we can put on evidence from

4    earlier years about things that were a part of a plan that

5    you learned about through discovery, and they'll say you

6    voted for it, and that's fine, that can be, again, something

7    that would be presented at trial, in my view.

8          The other, I guess last point, I kind of touched on

9    it, or Your Honor did with the Diamond, is he is not offering

10   railroad opinions.  He's not offering operational opinions.

11   He's taking facts from other witnesses and saying what that

12   means from an economic perspective.

13         And so his report recites that evidence repeatedly,

14   but that would be evidence about those that, again, would be

15   presented at trial, and then he can opine about what that

16   means from an economic perspective.  That's how we view the

17   testimony as coming in.

18         Unless the Court has any further questions...

19         THE COURT:  Nothing.  Thank you.

20         Mr. Snow?

21         MR. SNOW:  Just three points quickly, Your Honor.

22   The first one is I understood Mr. Hatch to describe their

23   motion for summary judgment quote that I read to Your Honor

24   to say that it meant something that I didn't interpret it to

25   mean, and if that's correct -- I'll take his word for it if

1    that's what they meant.

2          I don't think, however, that it changes the analysis

3    because Dr. Marvel himself, of course, says that each year of

4    damages reflects the totality of the defendant's conduct, and

5    that really goes back to 2009 under his analysis.

6          So point two is, based on that, it's not a *Zenith*

7    case.  It's not a *Zenith* exception case.  Mr. Hatch said they

8    couldn't have sued back in 2009, like I suggested, because

9    they wouldn't have had four years of data at that point.

10   Well, if that's true and you needed four years of data, why

11   didn't you sue in 2013 after you had four years of data?

12         They didn't.  They waited until 2018, and we are

13   squarely in the teeth of the *Claire* case as a result, and

14   *Claire* says you cannot recover for old acts outside the

15   statute of limitations.  That is the rule, and that is what

16   their model tries to do.

17         Point three.  There were discussions about the rate,

18   and what we think of the rate and what other people think of

19   the rate.  Those are arguments for trial, for sure, for CSX.

20   But they do not excuse Dr. Marvel's failed methodology.

21   We're here on a *Daubert* motion.  The focus is his methodology

22   and his analysis of our rate, and he failed in the sense that

23   he compared it with private rates that are only for the

24   plaintiff.  He used no controls for differentiating factors,

25   and he didn't explore costs or examine them whatsoever.

1        Those are failures at a *Daubert* motion on his methodology.

2                THE COURT:  Thank you, Mr. Snow.

3                MR. SNOW:  Yes, sir.

4                MS. REINHART:  Your Honor, may I answer the Court's

5        earlier question and make a few more points?

6                THE COURT:  Very briefly.  It's getting late.  We've

7        got to get to Mr. Crowley.

8                MS. REINHART:  To answer Your Honor's question about

9        cases where a court found that you have to quantify causation

10       at the time of the causation analysis, the cases I was

11       thinking of are not at the narrow analysis of causation.

12               They are analyses of damages and causation at the

13       same time, and so the quantification that I'm thinking of was

14       actually the Court taking down the quantification of damages

15       because the entire set of models that are used to identify

16       both causation and damages cannot tell whether there is

17       causation or to the extent there is causation.

18               And that's what we have with Professor Marvel's

19       modeling.  He has separate models, of course.  He has effects

20       models, and he has a damages model.  He has not jettisoned

21       those effects models.  They are still required for him to

22       incorporate into his damages model, and so that's part and

23       parcel of his damages.  The damages model itself cannot tell

24       us if there is causation or to the extent to which Norfolk

25       Southern harmed CSX.  And we know this.

1           We talked a bit about the difficulty with his
2    testimony and his report not being clear and what he did in
3    his revised report, but, Your Honor, we know from
4    Dr. Wright's supplemental report that when you run the VIG
5    analysis, just as Dr. Wright did against Dr. Marvel's
6    original model, you still get damages in favor of Norfolk
7    Southern in that revised model.
8           So the inherent NIT demand problem is still built
9    in.  That variable drives damages, and it still drives
10   damages in the revised damages model.  And for that reason,
11   the whole thing has to go.
12          And counsel himself, Mr. Hatch, made very clear
13   today before the Court that VIG is competitive and NIT is
14   not.  None of Professor Marvel's models show any sort of
15   damages for anyone at VIG, and the fact that they do just
16   makes the point that I made earlier.
17          The reason that we have this problem is because
18   Professor Marvel got his process backward, his cause and
19   effect backward.  He started in his process, his analyses to
20   look for where there's a conspiracy.
21          In the complaint the allegation was a market
22   consisting of Hampton Roads, all of the terminals there, and
23   he couldn't find conspiracy there so he said, no, the
24   relevant market would be NIT, or that's where the conspiracy
25   was.

```
 1              Then he asked the question, where's the harm?  Well,
 2    there's not harm at NIT.  There's only harm because CSX
 3    doesn't have on-dock access to NIT.  And we see that because
 4    CSX successfully drayed at NIT.  So the harm has to be from
 5    the lack of on-dock.  As a result, that's the very narrow
 6    relevant market that Professor Marvel chose.  His reasoning
 7    is circular.
 8              THE COURT:  I think I get that point.
 9              MS. REINHART:  I would just cite Virginia
10    Vermiculite for that proposition that he did not consider
11    alternative hypotheses, and that's what his circular
12    reasoning shows.
13              THE COURT:  Thank you, Ms. Reinhart.
14              All right.  It's 3:30.  Are we ready to jump into
15    Mr. Crowley?
16              MR. SNOW:  Yes, Your Honor.  Alex McDaniel will be
17    arguing the opposition.  It's your motion.
18              THE COURT:  I'm going to ask you to focus on the
19    main points with respect to Mr. Crowley.
20              MR. HATCH:  Your Honor, this is Ms. Peterson from
21    our Richmond office who's going to argue.
22              THE COURT:  Thank you.
23              MR. McFARLAND:  We have a handout, Your Honor.
24              MS. PETERSON:  Good afternoon, Your Honor.
25              THE COURT:  Good afternoon.
```

1          MS. PETERSON:  Ashley Peterson, again, on behalf of

2     plaintiff CSX.

3          And, of course, as you know, this is our motion to

4     exclude NPBL's expert, Mr. Crowley.  I know we've talked a

5     lot about many issues that bear at least somewhat on

6     Mr. Crowley's opinions, as well as Dr. Marvel's.  So I'm

7     happy to answer questions and go to the points that you're

8     most interested in, but I will just take a quick second, and

9     if we flip to the second slide.

10         The Court is, of course, very familiar with all of

11    the law on Rule 702 and *Daubert*, but I'll just flag for you

12    that we view this motion differently in that this is squarely

13    a question of whether the analyses that Mr. Crowley has

14    performed are based on a reliable foundation and whether they

15    are relevant to the questions that the jury is going to be

16    asked in this case, and especially whether they're going to

17    be helpful on any of the facts that are at issue and whether

18    they actually provide expert opinions that are outside of the

19    common knowledge of the jurors and that would actually be

20    helpful to them.

21         So happy to talk a little bit -- we talked a lot

22    about the assessment of NPBL's rates and what Mr. Crowley did

23    versus what Dr. Marvel did.  I just want to note that

24    Dr. Marvel -- of course, Mr. Crowley is responding to

25    Dr. Marvel when he assesses NPBL's rates, and he's responding

1    in particular to Dr. Marvel's assessment that NPBL's rate is

2    extraordinarily high in comparison to the other rates charged

3    for similar services by other switch lines and that NPBL

4    could have made money at a lower rate, right, under CSX's

5    proposals.

6           I know we've already talked about all of that, so we

7    don't need to go through it all again.  But just to flag, the

8    analysis of that rate needs to be from the perspective of the

9    party paying the rate, right.  So in this case it would be

10   CSX.

11          Mr. Crowley's rate analysis --

12          THE COURT:  What do you mean by that?  I'm not sure

13   I understand.

14          MS. PETERSON:  So -- I actually think I'll take that

15   back.  I think it's a point I'd like to make in terms of

16   drayage instead.  Apologies.  I've got a Post-it note that

17   went in the wrong place.

18          So, first, with respect to the rate, our position is

19   that Mr. Crowley's rate analysis is not premised on any

20   coherent, reliable methodology that's within the scope of his

21   experience.  And as the Court knows, Mr. Crowley is

22   experienced in the railroad industry.  He has a lot of

23   experience assessing rail rates at the STB, which uses this

24   defined formula to determine whether or not a rail rate is

25   reasonable.

1          We all agree that that formula doesn't apply here,

2   and we all agree that Mr. Crowley didn't apply it.  The issue

3   is that Mr. Crowley hasn't identified any other coherent

4   guiding principles to apply in assessing the rate instead.

5   All he's doing --

6          THE COURT:  That's the question I have, and I

7   understand you're suggesting that this isn't exhibiting real

8   expertise, but I have a hard time thinking a jury could pull

9   this off, and part of being an expert is trying to figure out

10  where is the data?  What do I collect?  What do I need to

11  look at?  How do I make these determinations about the number

12  of cars?  And I guess I'm skeptical that that's something

13  that a jury could just break out their calculators in the

14  jury room after trial and say, all right, we're going to get

15  to the bottom of this.

16          I sort of feel like this is within the wheelhouse of

17  an expertise, particularly an economist and someone who has

18  extensive experience in the rail business or looking at

19  railroads and their work product.

20          MS. PETERSON:  So if I understand your question

21  correctly, I do -- I take your point that the jury should not

22  be expected to just go back into the jury room with a bunch

23  of data and try to figure things out on their own.  But what

24  Mr. Crowley did here, if you -- it's in his report at Pages 4

25  and 5.  I've also reproduced it.  It's on slide 3 of the

1    materials.

2         So what Mr. Crowley did is he took the high-level

3    summary expense figures from NPBL's annual reports, and he

4    added up the totals of these broad categories, things like

5    materials and other, right, and then he divided that by the

6    total of number of cars that NPBL moved each of those years

7    to come up with a cost per car.

8         That's just addition and division, and it is also

9    presumably the kind of thing that NPBL management undertakes

10   in the ordinary course of business and certainly something

11   that NPBL's fact witnesses would be perfectly able to testify

12   about at trial in terms of the figures in their own annual

13   reports, the number of cars they moved each year.

14        So they -- there are certainly ways for the NPBL to

15   put that evidence in, assuming they're able to lay a proper

16   foundation, which I have no reason to think that they

17   wouldn't be able to put on a witness at trial to do that.

18   And they can put all of that evidence in without it having a

19   guise of expert testimony when really all it is is adding

20   things up and then dividing.

21        The other point to make there is that Mr. Crowley,

22   in doing this, doesn't take into account at all whether some

23   of these summary-level costs are variable costs or whether

24   some of them are fixed costs, and I know you've seen this,

25   and we've talked about it some already today, so I won't

1   belabor the point too much.  But the issue here is not simply

2   whether NPBL's rate is reasonable in a vacuum or whether it's

3   calibrated to cover its existing costs.

4           The relevant question, in terms of whether or not

5   the rate is set high to further the anticompetitive conduct,

6   is whether NPBL could have lowered its rate to, say, a level

7   that CSX had proposed in one of its proposals or the $75 unit

8   train rate that you heard Mr. Hatch talk about earlier and

9   could have moved the traffic to NIT at that lower rate while

10  still covering its costs and earning additional revenue.

11          And without any assessment of whether some of those

12  costs are variable, there's no way to know the answer to that

13  question because, of course, as fixed expenses decrease, the

14  number -- fixed expenses would decrease as the number of cars

15  interchanged increased.  I won't belabor that if you feel --

16  if you're familiar.

17          THE COURT:  I don't think I need any more on that.

18  Thank you.

19          MS. PETERSON:  Sure.

20          And, again, we've already -- of course, Mr. Hatch

21  has already talked about this as well.  But on slide 5,

22  there's plenty of evidence that any time anyone has assessed

23  that question, the answer has been that NPBL could do so.

24          And then we can talk a little bit about rate

25  comparisons.  I know that Mr. Snow talked earlier about

1    criticisms that he has about the comparisons that Mr. Marvel

2    makes to Commonwealth and to other railways, and, of course,

3    this is where I want to insert my point here, which is that

4    when we're assessing the rates that are being charged in the

5    marketplace, in terms of whether or not the markets -- in

6    terms of the relevant market, the question is whether the

7    consumer -- what is the rate the consumer pays in the market?

8         So in this instance, the question is what does CSX

9    pay?  Right?  What is actually being charged to CSX when it

10   is obtaining switching services from these various switch

11   lines?  So the criticism that we should not be looking at a

12   contract rate just doesn't hold water in terms of the

13   antitrust market analysis because what matters is what CSX is

14   paying.

15        THE COURT:  Or presumably other railroads at any

16   location, right?

17        MS. PETERSON:  That could be relevant as well,

18   potentially.

19        THE COURT:  I guess the point is, if I understand

20   your point, if you're getting the same service, which is

21   switching railcars, that it doesn't matter whether it's a

22   public tariff or a private contract?

23        MS. PETERSON:  Yes.  Exactly.  What matters is the

24   rate that is actually being paid for those switching

25   services.  So that's why, looking at the rate that is

1    actually paid at Commonwealth, which, by the way, at the time

2    of the -- when the rate at NPBL was changed to 210, the

3    Commonwealth had the tariff rate that was significantly

4    lower, and that is laid out in our summary judgment briefing

5    as well.

6             But the contract rate is, of course, lower, and

7    that's true not only at Commonwealth, but, of course, as

8    Mr. Snow pointed out, at the Port of Mobile as well, which

9    Mr. Crowley doesn't take into account on his report Exhibit 4

10   where he's comparing the various rates.

11            So if you take a look at Exhibit 4, which is on

12   slide 6 of the chart, and, of course, you also have it in

13   Mr. Crowley's report -- let's see.  The six comparators at

14   the top of the list, meaning all of those that are less

15   expensive than the Belt Line, those are all the shortline

16   railways that Dr. Marvel looked at, and the reason that

17   Dr. Marvel selected those is because the record evidence

18   shows that those are the switching railroads that CSX uses

19   for international intermodal container traffic.

20            The other railways listed from 9 down were selected

21   by Mr. Crowley as additional comparators, or I think you may

22   say that there are additional comparators or better

23   comparators or ones that Dr. Marvel ought to have considered.

24            The problem is that these are misleading and

25   unreliable comparators.  First, for the first several, Port

1    of Galveston, Brownsville or Port Jersey, none of those

2    switching railroads move any appreciable amount of intermodal

3    traffic.  So they are simply not comparable to NPBL or the

4    other terminal switching railroads cited by Dr. Marvel.

5            For example, the Port of Jersey, or the Port Jersey

6    rail, which is listed as a part of Port of New York/New

7    Jersey, all the intermodal switching in New York or New

8    Jersey is done by Conrail.  There is no dispute about that.

9    And the Port Jersey rail provides mostly barge service across

10   the Hudson River and also provides some limited rail

11   switching services to local warehouses right in that

12   immediate area.

13           So it's certainly not a comparator for the switching

14   services that are being provided by NPBL and for that

15   international intermodal traffic that's traveling from the

16   East Coast ports to the Midwest destinations.

17           As I mentioned, the record reflects CSX doesn't pay

18   the tariff rate at Port of Mobile.  So it has a negotiated

19   contract rate similar to what it has with the Commonwealth.

20   There was no discovery done on that, and Mr. Crowley didn't

21   ask whether CSX pays the tariff rate for any of these

22   comparators.  He didn't ask what those contractual rates

23   were, but the record shows that the rate that CSX pays at

24   Port of Mobile is significantly less than the listed tariff

25   that Mr. Crowley uses in his comparison.

```
 1              Then the last thing that I'll flag there is that
 2    Mr. Crowley adds $10 to the rate charged by the Commonwealth
 3    Railway.  He flags that in the third footnote of his
 4    Exhibit 4.  He cites that as covering locomotives and fuel,
 5    but he doesn't give us any justification, doesn't cite to any
 6    basis for why he thinks that those locomotives and fuel,
 7    which CSX provides pursuant to the contract with
 8    Commonwealth -- he doesn't offer any basis for why that
 9    should result in a $10 upcharge on the contract rate.  And
10    the evidence in the record shows that it's actually much
11    lower.
12              THE COURT:  I don't want to -- I don't think I need
13    to hear any argument on the historical events.  If you want
14    to touch briefly on the drayage, I'll be happy to hear you on
15    that.
16              MS. PETERSON:  Sure.  Absolutely.
17              Can I make one more point on the rate comparison?
18    Apologies.  Very briefly, Your Honor.
19              THE COURT:  Sure.
20              MS. PETERSON:  I just wanted to note quickly -- and
21    this is in our briefing so I won't go into detail, but
22    Mr. Crowley cuts down the NPBL's rate slowly, right, by
23    saying, well, it should be assessed on a per-container basis,
24    and then it should be assessed on a per-container, per-mile
25    basis.  He doesn't really offer any justification for why
```

1    that would be appropriate to do.

2          The evidence that we do have in the record suggests

3    that shortline railroads generally don't assess their rates

4    on a per-container, per-mile metric.  They assess -- or

5    excuse me, their costs, they assess them on a per-shift

6    basis.

7          And he also has a bunch of incorrect assumptions in

8    terms of making -- conducting the analysis of NPBL's rate on

9    a per-container basis.  He uses 2.5 containers per rail.

10   We've laid out in our briefing, and Dr. Marvel lays out in

11   his reply report, that that's just not possible under the

12   facts and the realities of the industry.

13         Nearly 70 percent of intermodal containers are 40

14   feet long, which can only be stacked, at most, two to a well.

15   And on top of that, of course, as has already been discussed

16   today, CSX didn't gain double-stack capacity out of the Port

17   of Virginia until December of 2016, and that's a fact that's

18   publicly available.  It's a fact defendants have relied on

19   extensively, but it's one that Mr. Crowley was unaware of and

20   didn't take into account.

21         I'll turn to drayage, if that's okay with you.

22         THE COURT:  Please.  Briefly, though.

23         MS. PETERSON:  Of course.

24         So -- just trying to think of how to be most

25   efficient in this.

1          Mr. Crowley's opinion that drayage is fungible with

2   on-dock rail depends solely on the economics of the move.  He

3   briefly -- NPBL cites in their opposition papers a general

4   statement in his deposition that he considered operations,

5   but there's no evidence in his report suggesting that he

6   considered any of the operational issues that impact drayage

7   and limit its ability to be a reasonable substitute with

8   on-dock rail.

9          And Mr. Hatch talked about a lot of those.  I don't

10  need to go into all of them in detail, unless you have

11  questions about any of them.

12         THE COURT:  No, I don't.

13         MS. PETERSON:  Okay.  So the primary way that NPBL

14  has attempted to salvage this opinion on drayage is by

15  suggesting that the cost, the lower cost, allows -- well,

16  what they claim to be a lower cost based on the VIT subsidy

17  creates a situation where drayage is cheaper and so,

18  therefore, that's why CSX uses it.

19         There's no evidence in the record from any CSX

20  witnesses or any VIT witnesses that that's the purpose of the

21  subsidy or that that's the reason that they used drayage.

22         The testimony in the record shows that the subsidy

23  is intended to make drayage tolerable, right, so that there

24  can be some level of competitive access at NIT.  The reason

25  that the Port of Virginia has attempted to -- has provided

1     the subsidy in an attempt to create that dual access is

2     because the port recognizes how important it is, but it is

3     woefully inadequate in terms of an actual substitute in the

4     market.

5              So first, in terms of an analysis of cross

6     elasticity of demand, Mr. Crowley is not an antitrust

7     economist.  He has no experience conducting that kind of an

8     analysis, and he made no real effort to conduct that analysis

9     here.  You've already heard from Mr. Hatch about the fact

10    that he didn't consider any of the non-operational factors

11    that -- or, excuse me, non-price factors that go into the

12    unsubstitutability of drayage.

13             And then I'll just flag that in order for drayage to

14    be a reasonable substitute, it would have to be a substitute

15    at the competitive price level, right, and Mr. Crowley makes

16    no effort to determine what the competitive price for drayage

17    would be absent defendant's conduct, and he also makes no

18    effort to explain how CSX can access and use drayage without

19    undue expense or inconvenience.  He ignores the gate hour

20    limitations, he doesn't discuss the limited availability of

21    chassis or the volume issues that we're already discussed

22    today.

23             So without doing any of that, he doesn't offer an

24    opinion that is at all helpful in terms of cross elasticity

25    of demand.

1          I'm happy to answer other questions, but I don't
2    want to take up too much more time.
3          THE COURT:  I don't have any other questions.  Thank
4    you, Ms. Peterson.
5          Why don't we take a brief break now.  It's 10 of
6    3:00.  Let's take 15 minutes, and we'll pick up from there.
7    Thank you.
8               (Recess at 2:49 p.m. to 3:12 p.m.)
9          THE COURT:  Good afternoon.
10         MR. McDANIEL:  Good afternoon, Your Honor.  Just let
11   me know when you're ready.
12         THE COURT:  I'm ready.
13         MR. McDANIEL:  May it please the Court.  My name is
14   Alex McDaniel.  I represent the Norfolk Portsmouth Belt Line
15   Railway Company.
16         CSX makes three arguments in support of its motion
17   to exclude Crowley.  All of those go to the weight of his
18   testimony, not to admissibility.
19         First, they discuss his qualifications, but there
20   really is no serious dispute over those qualifications, so
21   I'm going to jump right to his rate opinions.
22         CSX said that Mr. Crowley has no method or
23   methodology with which to judge the rate, but he does.  It's
24   got three parts to it.  The first part is he compared the
25   Belt Lines' 210 rate to its average operating expense per

1    container annually from 2010 to 2020 and also compared that

2    rate to the ten-year average.

3            Second, he compared the Belt Line's 210 rate to

4    other switching railroads using a per-container, per-mile

5    metric.

6            Third, he confirmed those conclusions of one and two

7    by analyzing the Belt Line's purpose and history, namely, the

8    Belt Line's Operating Agreement.

9            While this doesn't fit into CSX's case in chief, the

10   reason why it's important is that it goes directly to the

11   Belt Line's procompetitive justification at NIT in that its

12   undisputed costs justify its rate.

13           CSX argues that Crowley did not identify any

14   authority for his methodology to evaluate the rates'

15   reasonableness.  The 702 does not require Crowley to pull his

16   methodology from a textbook or an industry publication.  He

17   can and did rely on his experience in the railroad industry,

18   which is voluminous.

19           He testified that it's a common and accepted way to

20   do that, and there's -- he had testified also in his

21   deposition that he used that same methodology in a federal

22   case in Texas in 2018 or 2019.  There is no contrary

23   testimony to his approach that that methodology is not common

24   or accepted.

25           But most important, there's a logic behind the

1    approach.  First, you look internally at the rate compared to

2    its cost.  Second, you look externally and create an

3    apples-to-apples comparison with other comparable switch

4    rates; and then, third, you have the history as a

5    check-behind.

6            CSX cites *Advanced Drainage* and a few other cases

7    for the proposition that Mr. Crowley just uses basic

8    arithmetic.

9            That's not the case.  Mr. Crowley's opinions are to

10   the reasonableness of the rate, and without that expert

11   testimony, jurors will not know to examine the relationship

12   of the tariff to the operating costs and why it's important

13   to have that internal look.

14           The jurors will not know which costs to compare the

15   Belt Line's $210 rate and how to do so.  The jurors will not

16   know which other railroad rates to compare the Belt Line's

17   rate and why those railroads; and, finally, the jurors will

18   not know how to compare those rates and why comparing it on a

19   per-container, per-mile basis ensures an apples-to-apples

20   comparison.

21           All of CSX's objections to Mr. Crowley's rate

22   analysis goes merely to its weight, not its admissibility.

23           Turning to drayage, Crowley's opinion is a direct

24   refutation of Marvel's definition of the relevant market.  He

25   does compare the price per container for on-dock rail access

```
1    to the price per container for drayage as only part of his
2    analysis.
3            Mr. Crowley -- well, CSX argues that Crowley did not
4    evaluate the operations of drayage and only the cost, but
5    that's not true.
6            In Mr. Crowley's report at Part IV, he outlines a
7    number of issues with drayage.  One of those is the barriers
8    to entry being low for the trucking industry, the low fixed
9    costs of the operations.  He talks about the short-haul
10   drivers -- or short-haul routes that allow drivers to return
11   home.  Those are priority routes for the drivers.
12           It talks about the Virginia Port Authority's
13   PRO-PASS system which tries to speed up the trucks going in
14   and out of NIT, and also that it's a 28-minute dray time to
15   get a container to or from NIT via drayage.  But he also
16   opines that the drayage and the on-dock rail access at NIT
17   are fungible, in addition to that, because CSX's access over
18   the Belt Line's trackage rates goes through in a -- not the
19   normal -- I'll put air quotes -- not the normal way that NS
20   operates.
21           NS operates and goes through the south gate, comes
22   out of NIT through the north gate, and makes a loop back
23   down.  The Belt Line has to go through a different
24   operational route.  It must go into the north gate and come
25   back out through the north gate.
```

1          So those additional operations considerations inform
2    Mr. Crowley's opinion that drayage is something that is
3    functionally interchangeable with -- the drayage and rail
4    operations are functionally interchangeable.
5          So to your question, Your Honor, that can Dr. Marvel
6    ride the functional interchangeability horse?  No.
7    Mr. Crowley would say no.  You need both the cross elasticity
8    of demand, which Mr. Crowley does provide, and you need the
9    functional interchangeability portion as well.
10          So in conclusion, Mr. Crowley is one of the foremost
11    railroad rate experts in the United States, and his opinions
12    are well-grounded in fact and common and accepted industry
13    analysis, which satisfies Rule 702.  Thus, all of CSX
14    arguments go to the weight of his opinions, not their
15    admissibility.
16          Any questions from Your Honor?
17          THE COURT:  No.  Thank you, Mr. McDaniel.
18          MR. LACY:  Your Honor, just for the record, Michael
19    Lacy on behalf of Norfolk Southern.  We, of course, filed a
20    motion in opposition to the motion to exclude Dr. Crowley,
21    and we join in on the Belt Line's agreements.
22          THE COURT:  Thank you.
23          Ms. Peterson, I'll give you two minutes if you care
24    to respond.
25          MS. PETERSON:  I think we've already responded in

1   our brief and argument, so nothing further from us.

2          THE COURT:  Thank you very much.

3          I am prepared to rule on the motion, which is ECF

4   number 374, by CSX to exclude Thomas Crowley, and I'll start

5   by starting with the case law that the attorneys from both

6   sides have discussed.

7          Rule 702 of the Federal Rules and the line of cases

8   flowing from the Supreme Court's decision in *Daubert* governs

9   both the challenge by the Belt Line and by Norfolk Southern

10  to Mr. Crowley's testimony.

11         Rule 702 provides that an expert may testify in the

12  form of an opinion if the expert's scientific, technical, and

13  other specialized knowledge will help the jury understand the

14  evidence or determine a basic fact in issue, the testimony is

15  based on sufficient facts or data, it's a product of reliable

16  principles and methods, and the expert has reliably applied

17  those principles and methods to the facts of the case.

18         Application of Rule 702, as all of you know,

19  involves two primary inquiries; first, whether the proposed

20  testimony is reliable and, second, whether it's relevant.

21  And for that I cite the *Kumho Tire* case, 526 U.S. at 141 and

22  the Fourth Circuit's case in *Forrest*, 429 F.3d at 80.

23         Before allowing a jury to hear disputed expert

24  testimony, a Court must make those inquiries and exercise its

25  gatekeeping functions, as the Fourth Circuit discussed in

1    *Nease vs. Ford Motor Company*, 848 F.3d at 230 and page 231.

2            The Court assessing the relevance of an expert's

3    testimony reviews, quote, whether it is sufficiently tied to

4    the facts of the case and will aid the jury in resolving a

5    factual dispute.  And that's at *Daubert* at 591.

6            Expert testimony about matters coming within a

7    jury's knowledge and experience is not helpful and is barred

8    by Rule 702 as discussed in the *Persinger* case of the Fourth

9    Circuit.  It's a 1990 case at 920 F.2d at 1188.

10           To assess whether an expert's testimony will aid a

11   jury to understand the evidence and resolve disputed facts, a

12   Court must consider whether such testimony, quote, fits the

13   facts of the case by relating to the inquiry that the jury

14   has to make.  And that's *Daubert* at 591 again.

15           To be deemed reliable, expert testimony must be

16   grounded in, quote, scientific, technical, or other

17   specialized knowledge and not on belief or speculation, and

18   derived from the use of scientific or other valid methods.

19   And that, I'm quoting the *Oglesby* case at 190 F.3d at 250.

20   That's a Fourth Circuit case from 1999.

21           The *Daubert* decision identified what it referred to

22   as some non-exhaustive guideposts that may apply when

23   assessing reliability, to include testing, peer review,

24   publication, air rates, and general acceptance of the

25   methodology used.  And that is at 593 and page 954.

Carol L. Naughton, Official Court Reporter

1          Whether those guideposts or other factors apply to

2     assess reliability often depends on the nature of the case,

3     the expertise applied, and the opinions at issue, as

4     discussed by the Fourth Circuit in the *Sardis* case discussed

5     by Mr. Snow.  That's at 10 F.4th at page 281.

6          As the Fourth Circuit noted in *Nease* at page 230,

7     the Supreme Court's decision in *Kumho Tire* made clear that

8     *Daubert* was not limited to the testimony of scientists, and a

9     nonscientist expert whose opinions arise from his experience

10    must explain, quote, how his experience leads to the

11    conclusion reached, why his experience is a sufficient basis

12    for the opinion, and how his experience is reliably applied

13    to the facts.  And I'm quoting there the *Peters-Martin* Fourth

14    Circuit case from 2011 at 410 F.App'x at 618.

15         Finally, the proponent of expert testimony, as you

16    all know, bears the burden of establishing by a preponderance

17    of the evidence that that testimony is admissible in

18    accordance with these principles.  And I'm citing *Cooper vs.*

19    *Smith & Nephew*, a 2001 Fourth Circuit case, 259 F.3d at 199.

20         As to Mr. Crowley's qualifications, I find that he

21    possesses the requisite knowledge, skills and experience,

22    education and training to render an opinion on the Belt Line

23    switching rate.

24         He has an economics degree, took graduate courses in

25    transportation, and has worked as a consultant since 1971

1    specializing in analyzing matters related to rail transport.

2    He's familiar with the operating practices and accounting

3    procedures that railroads use and has spent his career

4    evaluating railroad rates, costs, and operations including

5    the negotiation of rail and transport contracts.  He has also

6    testified before courts, regulatory bodies, and arbitration

7    panels.  So I find that he possesses the specialized

8    experience necessary to opine about the reasonableness of the

9    Belt Line's rate.

10           CSX argues Crowley's opinions on the reasonableness

11    of the rate are not reliable and relevant because, as we've

12    discussed here today:

13           First, he failed to apply an alternative coherent

14    methodology as opposed to the Surface Transportation Board's

15    reasonableness formula which everyone agrees does not apply.

16    And they contend he used simple math to reach his

17    conclusions;

18           Second, they argue that he failed to factor in the

19    Belt Line's variable costs;

20           Third, he allegedly relied only on revenue from

21    rates, ignoring other sources of Belt Line revenue;

22           Fourth, they complained that he made faulty

23    assumptions that CSX moved two-and-a-half containers per well

24    on average and rates are determined upon a per -mile basis;

25           Finally, they assert that he failed to consider

1    whether the Belt Line would have made money under CSX's

2    proposals.

3          The Court finds Crowley's opinions on the

4    reasonableness of the rate, including his opinion that

5    Dr. Marvel's opinions are based on incomplete analyses,

6    faulty comparisons, false presumptions, to be reliable and

7    relevant.

8          CSX's argument that Crowley's expertise is limited

9    to determining reasonableness using the Surface

10   Transportation Board's formula, which does not apply in this

11   case, is not persuasive.  Crowley's experience analyzing the

12   economics of the railroad industry qualifies him to opine

13   outside the standard used by the STB.

14         Crowley testified that he applied, quote, normal,

15   commonly used metrics to evaluate the rate based on his

16   experience and, quote, what shippers and railroads normally

17   look at in evaluating rates and revenues.  While Mr. Crowley

18   reached his conclusions by applying simple math to that data,

19   this does not render those opinions unhelpful to the jury.

20         He testified to retrieving data based on his

21   understanding of the metrics involved in determining costs

22   and rates.  He factored in his understanding of the location

23   of certain railroad terminals to determine the length of

24   various routes and researched Gulf Coast and East Coast ports

25   that ship international containers and use shortline

1    switching services.

2         He relied on his expertise to determine the data

3    that would be relevant to calculate a reasonable rate;

4    expertise that is not, quote, obviously within the common

5    knowledge of jurors, as the Fourth Circuit discussed in

6    *Lespier*.  It's a 2013 Fourth Circuit case at 725 F.3d at 449.

7         CSX next asserts the analysis is faulty because

8    Crowley failed to consider variable costs, instead relying on

9    total costs.  And CSX argues that he failed to account for

10   volume and that overall expenses per car decrease as volume

11   increases.  Crowley can defend his decision to rely on total

12   costs during cross-examination.  His decision to do so does

13   not render those opinions unreliable or irrelevant.

14        Similarly, while Crowley could be cross-examined

15   about the Belt Line's revenues from sources other than

16   switching fees, Cannon Moss of the Belt Line testified that

17   over 90 percent of its revenue derives from switching fees.

18   Mr. Crowley's failure to factor in revenue from a special

19   switch charge for handling windmill blades and from leasing

20   property is not a persuasive reason to exclude his opinions.

21        Next CSX argues that Crowley's assumption that CSX

22   could move two-and-a-half containers per well on average is

23   faulty, and CSX cites facts that CSX did not have

24   double-stack capacity between NIT and the Midwest until

25   December of 2016.

1        Crowley asserts that he relied on numbers used by

2    CSX witnesses, including their 30(b)(6) witness, to arrive at

3    the 2.5 number along with evidence from VIT, Virginia

4    International Terminal, that it loads three containers per

5    railcar well 90 percent of the time.

6        There is a dispute about the average number of

7    containers per railcar well loaded on CSX trains during the

8    relevant time frame, and this will have to be addressed at

9    trial.  That dispute doesn't render Mr. Crowley's opinions on

10   the matter excludable.

11       As for his consideration of cost on a per-mile

12   basis, CSX's argument that this warrants exclusion also

13   misses the mark.  While switching railroads may not tie their

14   rates to route length given the short distances involved,

15   that does not mean that the length of the route does not

16   affect the cost to the railroad to perform the service.

17       Crowley asserts that the length of the route factors

18   into the cost structure, including fuel consumption and

19   maintenance, and helps compare rates charged by switching

20   railroads with different route lengths.

21       He acknowledges that he was not retained to opine on

22   whether CSX's proposals could have made the Belt Line money,

23   and his report does not address that issue, and he will not

24   be permitted to testify on that at trial.  But that does not

25   also require excluding his remaining opinions.

1          Accordingly, I find his opinions on the
2    reasonableness of the Belt Line's rates are relevant and
3    reliable, fit the facts of the case, and will assist the
4    jury, and the motion to exclude those opinions is denied.
5          CSX next asserts that Crowley should not be allowed
6    to opine about historical facts or offer legal conclusions
7    about the Belt Line's governing documents.  And in pages 7
8    through 9 of Mr. Crowley's report, he discusses that 1897
9    Operating Agreement, the Belt Line's Bylaws, formation of a
10   rate committee in 2009, CSX's 2010 proposal, and its renewed
11   proposal in 2018 as well as actions taken by the Belt Line in
12   response to the proposals.
13         Mr. Crowley finds that CSX's proposals were outside
14   the parameters of the Operating Agreement and contrary to the
15   Bylaws.  He offers this as a counternarrative to Dr. Marvel's
16   assertion that the Belt Line rejected two proposals from CSX
17   that would have been profitable to the company.
18         Mr. Crowley has not tied his knowledge of railroad
19   rates, costs, and operations to his discussions of these
20   historical documents and events or to any legal conclusions
21   he may seek to draw.  His report cites the documents
22   themselves, board minutes, and deposition testimony of
23   Belt Line employees as bases for the history provided.
24         While he may rely on this information as grounds for
25   his opinions on a reasonable rate and refer to the Operating

1    Agreement to explain the reason he focuses on costs rather

2    than profit in his calculations, he cannot provide this

3    historical narrative to the jury.

4         Crowley will also not be permitted to opine that

5    CSX's proposals violate the Agreement and Bylaws.  And in

6    that regard, I cite the case of *United States vs. Offill*,

7    666 F.3d at 175.

8         As was done in depositions, the Belt Line employees

9    can provide the jury with the history surrounding the

10   proposals and the Belt Line's response.

11        CSX's motion to exclude Mr. Crowley's testimony

12   providing the historical narrative or legal conclusions about

13   whether those proposals were contrary to the Agreement and

14   Bylaws is granted.  Mr. Crowley will, however, be allowed to

15   rely on those documents to explain his approach to

16   calculating a reasonable rate.

17        With respect to the subject of drayage, I find that

18   Mr. Crowley's experience with railroad structure, operations,

19   costs, contracts, and tariffs over his lengthy economic

20   consulting practice qualifies him to render an opinion on

21   drayage as an alternative to rail service for CSX at NIT.

22        CSX asserts Crowley's opinions on drayage are not

23   reliable because, as just discussed, he allegedly relies on

24   simple math to compare the cost of drayage to on-dock rail

25   access while adding little to the analysis and because, they

argue, he ignores evidence in the record regarding nonmonetary factors making drayage an unreasonable alternative and, finally, that he allegedly ignored evidence in the record that drayage is only cheaper than on-dock rail due to the alleged anticompetitive conduct.

Crowley opines that the subsidized drayage service that CSX uses to move containers between NIT -- Norfolk International Terminal -- and CSX's intermodal yard at Portsmouth, quote, is an effective alternative to all-rail service over NPBL to NIT, end quote.

He explains that rail and drayage services compete for intermodal shipments throughout the country including at the Virginia Port Authority terminals. Mr. Crowley discusses the economics of drayage versus on-dock rail access at NIT by addressing the VIT subsidy for drayage and how that lowers the cost to dray below the cost of using on-dock rail at NPBL.

He also faults Dr. Marvel for comparing Norfolk Southern's access at the Belt Line to CSX's because Norfolk Southern has its own track that creates efficiencies that cannot be reproduced by the Belt Line for CSX.

Next Mr. Crowley argues that Dr. Marvel downplays the role of trucking in the intermodal freight market, and he references, as discussed, the large number of trucking companies, 145, offering drayage services to the Port of

1    Virginia and the barriers to entry into the trucking market
2    and fixed cost of operations are the lowest of any freight
3    mode.
4           He also argues, as Mr. McDaniel mentioned, that the
5    initiation of the PRO-PASS system for trucks at NIT which
6    became mandatory in April of 2018 drastically improved the
7    performance of drayage companies including a reduction in
8    wait times at the terminal gate.  He attacks Dr. Marvel's
9    reliance on discussions and data that predate this system at
10   NIT when finding drayage is not efficient.
11          Mr. Crowley testified that he considered operations,
12   quote, to the extent he could, unquote, along with the
13   economics of using drayage and found that the, quote,
14   operations seemed to favor dray as well.
15          CSX faults Mr. Crowley for failing to acknowledge
16   the capacity limitations on drayage and limited trucking
17   hours on that route.
18          Mr. Crowley asserts that the capacity of limitations
19   largely were addressed by implementing the PRO-PASS system.
20   He also asserts that CSX should have lobbied for extended
21   gate hours at NIT, and I note, although CSX asserts the
22   limitations are imposed due to local regulations and not NIT.
23          CSX also asserts that Crowley fails to address the
24   evidence of record as outlined in CSX's Statement of Facts in
25   support of its motion for summary judgment.  This, quote,

1    evidence of record consists in large part of assertions of

2    fact that are disputed.

3           Accordingly, I find Mr. Crowley relies on more than

4    simple math to arrive at his opinions regarding the

5    substitution of drayage for on-dock rail access at NIT.  If

6    CSX disagrees with the factors Mr. Crowley considered or

7    disregarded or used in arriving at his opinions, CSX can

8    cross-examine Mr. Crowley on those issues.

9           Accordingly, the motion to exclude Mr. Crowley's

10   opinions on whether drayage is an effective alternative to

11   on-dock rail at NIT is denied.

12          That's the Court's ruling on Mr. Crowley, and I

13   intend to make rulings on a number of the other motions that

14   have been filed, the motions in limine, and thankfully you

15   will find that my rulings on those are shorter than my ruling

16   on Mr. Crowley.

17          I am going to reserve on the Dr. Marvel motions,

18   and, also, I'm going to reserve on, I think it's one other

19   motion relating to that, the motion that's ECF number 337,

20   the motion regarding the use of internal e-mails.  And then

21   I'm going to reserve on ECF number 349, which is the motion

22   in limine to exclude evidence and argument regarding the

23   internal use of internal Norfolk Southern e-mails.

24          So I'll next take up Norfolk Southern's motion in

25   limine to exclude evidence and argument that the Belt Line

1    switch rate is unreasonable.

2           Give me just a moment.

3           (Pause in the proceedings.)

4           THE COURT:  Norfolk Southern's motion in limine to

5    exclude evidence and argument that the Belt Line switch rate

6    is unreasonable is denied subject, of course, to the Court's

7    ruling on the pending motions for summary judgment.

8           The linchpin of Norfolk Southern's argument is that

9    the Surface Transpiration Board, or STB, has sole

10   jurisdiction to decide switch rates for Belt Line.  As a

11   result, Norfolk Southern argues that CSX may not ask the

12   trier of fact to assess the reasonableness of the Belt Line

13   switch rate, the Court may not remedy that rate, and the

14   switch rate is irrelevant and beyond the scope of this case.

15          As Chief Judge Davis explained in ruling on the

16   motion to dismiss with respect to this question of

17   jurisdiction, I quote the STB's exclusive authority over rail

18   carriers' mergers implicates the doctrine of, quote, primary

19   jurisdiction, which, despite its name, is not jurisdictional.

20          Importantly, despite what the term "primary

21   jurisdiction" may imply, it does not speak to the

22   jurisdictional power of the federal court; it simply

23   structures the proceedings as a matter of judicial discretion

24   so as to engender an orderly and sensible coordination of the

25   work of agencies and courts.  That's ECF 395 at 4, and he

1    quotes a Fourth Circuit case involving *Environmental*
2    *Technology Council*, 98 F.3d at 789, note 24.
3        Accordingly, the existence of STB authority to
4    decide whether the Belt Line switch rate is reasonable does
5    not mean that the Court lacks jurisdiction over CSX's claims.
6    Such claims are properly before the Court, and in view of the
7    need to consider, quote, the orderly and sensible
8    coordination of work of agencies and courts, it is also
9    noteworthy that the STB has stayed its proceeding pending the
10   resolution of the case before this Court, with the STB being
11   fully aware of this current litigation.
12       This leaves the question whether the evidentiary
13   grounds exist to bar CSX from offering evidence as well as
14   argument of an alleged excessive switch rate as proof in
15   support of CSX's pending antitrust conspiracy and contract
16   claims.
17       As noted by Chief Judge Davis, quote, CSX asserts
18   that the establishment of such rate in 2009, and the
19   maintenance of such rate over time, was the product of
20   unlawful collusion.  And that's ECF 395.  I'm missing the
21   page cite, but it's footnote 17.
22       In *Great Northern Railway Company*, the Supreme Court
23   stated that the determination of a past wrong of, quote, an
24   unreasonable or discriminatory rate is a judicial function.
25   And that is at 259 U.S. at 291.

1        Therefore, in the context of addressing CSX's

2   pending claims, the question of whether the switch rate was

3   excessive and used to block CSX from access to NIT is

4   squarely a judicial function.

5        Norfolk Southern seeks to bar such evidence on the

6   ground that only the STB is vested with authority to

7   determine the reasonableness of the switch rate and that

8   evidence directed to assessing whether it was excessive is

9   irrelevant.

10        The jury, however, is not going to be tasked with

11   adjudicating the proper switch rate.  The relevant question

12   in the context of the pending claims is whether the

13   defendants conspired and colluded to set the switch rate at

14   an inflated level so as to unlawfully and effectively

15   preclude CSX from gaining on-dock rail access to NIT.

16        Evidence tending to establish such facts appears at

17   this juncture to be of consequence to the pending claims.

18   Accordingly, the Court denies Norfolk Southern's motion for a

19   blanket exclusion order for such evidence.  Of course, the

20   admissibility of testimony and any individual items of

21   evidence remains to be addressed at trial.

22        Finally, if Norfolk Southern seeks a limiting

23   instruction concerning the proper use of any evidence about

24   the establishment of a switch rate, it should include a

25   proposed instruction as part of its proposed jury

1    instructions.

2         That brings me next to ECF number 331, which again

3    is Norfolk Southern's motion in limine to exclude evidence

4    and argument on the loss of customer contracts by CSX.

5         And the first issue raised in this motion in limine

6    is whether to prohibit CSX from presenting fact-witness

7    testimony that CSX lost or was not awarded contracts with

8    ocean carriers as a result of the defendant's conduct

9    pursuant to Rule 802 of the Rules of Evidence.

10        CSX's evidence regarding loss of contracts appears

11   to consist of hearsay evidence discussing what ocean carriers

12   told CSX employees, and the hearsay rules will likely prevent

13   the admission of this evidence.

14        However, the Court cannot rule categorically that

15   CSX cannot present evidence regarding lost contracts without

16   walking through each piece of evidence and hearing CSX's

17   arguments about why the evidence is not hearsay or meets some

18   kind of exception.  And for that, I cite *United States vs.*

19   *Gibson*, 2018 Westlaw 4903261 at *2.  That's an Eastern

20   District of Virginia case, October 9, 2018.

21        The second issue raised, assuming that Dr. Marvel is

22   permitted to testify, is whether to prohibit him from

23   presenting testimony that CSX lost or was not awarded

24   contracts with ocean carriers due to defendant's conduct

25   pursuant to Rule 703.

1          The relevant inquiry is, first, whether any

2    particular statement is hearsay or meets an exception;

3    second, whether Dr. Marvel would be parroting hearsay without

4    adding anything new to the statement; and, three, which side

5    the balancing test established in Rule 703 favors.

6          The second and third prongs of this inquiry appear

7    at this preliminary juncture to favor granting the motion,

8    but just as a blanket evidentiary ruling that CSX's counsel

9    and fact witnesses are precluded from testifying or arguing

10   that an ocean carrier has denied CSX's business due to the

11   lack of on-dock rail access at NIT is premature.  The same is

12   true regarding the scope of Dr. Marvel's potential testimony.

13         Accordingly, the motion is denied without prejudice

14   to timely objection at trial.  CSX is ordered to avoid

15   discussing hearsay statements during opening statements, and

16   should Dr. Marvel be allowed to testify, counsel for CSX is

17   also directed to exercise care in eliciting testimony from

18   him with an eye to the trial judge's rulings on the contested

19   evidence.

20         That brings me next to Norfolk Southern's motion in

21   limine regarding discontinuance of the Diamond Track.  That

22   motion seeks to prohibit CSX from offering at trial any

23   evidence or argument that the discontinuance of the Diamond

24   Track constituted anticompetitive conduct by the defendants.

25   And that motion is denied without prejudice and, of course,

1    subject to the Court's ruling on the motions for summary

2    judgment.

3         Norfolk Southern argues that CSX should not be

4    allowed to relitigate the final judgment of the STB in 2008

5    proving the discontinuance of the Diamond Track.  The Court

6    agrees that CSX does not have standing to contest that

7    decision and the Court does not have jurisdiction to overturn

8    it.

9         CSX asserts it will offer evidence of the Diamond

10   Track closure as one means by which Norfolk Southern sought

11   to block CSX's access to on-dock rail at NIT for

12   anticompetitive gain.

13        As addressed in the ruling on Norfolk Southern's

14   motion to dismiss, this Court has jurisdiction over the

15   antitrust and related state law claims pending before the

16   Court.

17        To the extent CSX can prove at trial that the

18   closure of the Diamond Track was undertaken to block CSX's

19   access to on-dock rail at NIT, the evidence, to the extent

20   that it's not time-barred, appears to be relevant to claims

21   at issue under Rule 401 of the Rules of Evidence.

22        Norfolk Southern's argument that this evidence will

23   confuse and mislead the jury is not persuasive.  The facts

24   surrounding the discontinuance of the track including the

25   Surface Transportation Board's approval of the closure and

1    CSX's failure to object at that time can be presented to the

2    jury.

3              Accordingly, the probative value of the evidence is

4    not substantially outweighed by dangers of confusing or

5    misleading the jury, and the evidence should not be excluded

6    pursuant to Rule 403.

7              Norfolk Southern further argues that any evidence

8    surrounding the Belt Line's meetings and Surface

9    Transportation Board proceedings addressing the Diamond Track

10   fall far outside the relevant time period, making the

11   evidence irrelevant and inadmissible as it relates to the

12   statute-of-limitations question.

13             That is a matter that the parties and the Court can

14   revisit as needed following the Court's ruling on the motions

15   for summary judgment.

16             Next I will address ECF number 353, which is the

17   Belt Line's motion in limine to exclude evidence and argument

18   about CSX's private switching rates.

19             The Belt Line's motion in limine to exclude evidence

20   or argument about other contractual switching rates paid by

21   CSX is denied.

22             Belt Line seeks to exclude that evidence and

23   argument on the grounds that it's not relevant and, even if

24   it were, it's unduly prejudicial pursuant to Rules 401, 402,

25   and 403 of the Rules of Evidence.  And, respectfully, I do

1    disagree on both points.

2         Belt Line's relevance argument mostly relies on the

3    *Laurel Sand* case that was discussed today, which is at

4    704 F.Supp. at 1323.  And although the Court there stated

5    that the reasonableness of a rate is determined, quote, in

6    the context of competition rather than from the plaintiff's

7    perspective, it nowhere indicated that negotiated contract

8    switching rates should be excluded from the determination of

9    whether a rate charged was anticompetitive; rather, it noted

10   that a plaintiff's inability to pay a certain rate does not

11   mean that the rate is anticompetitive.

12        Notably, the Court is *Laurel Sand* looked at the

13   defendant's costs and the rates it charged another company,

14   Millville Quarry, and determined that a rate offer slightly

15   in excess of variable cost was not an anticompetitive rate.

16   That's at Pages 1323 and -24.

17        CSX seeks to offer evidence about its contractually

18   negotiated rates with other switching railroads for services

19   allegedly similar to those provided by Belt Line.

20        As a general proposition, the Court agrees that such

21   evidence is relevant to the market price for switching rates

22   and whether the Belt Line's switching rate is

23   anticompetitive; nor is there any evidence that the contract

24   rates were negotiated in other than arm's length

25   transactions.

1          Belt Line's argument about any differences between

2    contractually negotiated and public tariff-based switching

3    rates goes to the weight, rather than the admissibility, of

4    such evidence.  It fails to support Belt Line's request for a

5    blanket order of exclusion.

6          To the extent that Belt Line claims it lacked

7    knowledge of CSX's contractually negotiated switch rates,

8    Belt Line may seek to offer evidence about what it knew and

9    the manner in which it set its public tariff switching rate,

10   and the jury may consider the same in assessing whether such

11   was excessive or anticompetitive.

12         Finally, nor is the admission of such evidence by

13   CSX, or argument, unlikely to engender unfair prejudice to

14   the defense by means of confusion or misleading the jury.

15         The Court is confident that a properly instructed

16   jury can assess all the evidence, including any differences

17   between the switch rates established by public tariffs and

18   those agreed to in contract negotiations.  Accordingly, the

19   probative value of the contested evidence is not

20   substantially outweighed by danger of unfair prejudice.

21         Next I will address ECF 359, which is the Belt

22   Line's motion in limine to exclude evidence and argument from

23   nonparties.  And by that they refer to Virginia Port

24   Authority and Virginia International Terminal officials.

25         The motion in limine to limit evidence and argument

1    from those nonparties is granted in part and denied in part

2    without prejudice.

3            The motion is denied without prejudice as to

4    testimony and evidence from current and former VPA and VIT

5    employees about, one, the Belt Line switch rate; two, CSX's

6    rail access to NIT; and, three, the April 13, 2018, letter

7    from John Reinhart to Cannon Moss described in the Belt

8    Line's motion.

9            The decision line between admissible versus

10   inadmissible testimony about such matters is likely to be a

11   fine one and cannot be made in a vacuum, essentially at a

12   motion in limine phase in this case, without understanding

13   the foundation laid for any such testimony, the question

14   asked, and the information sought to be elicited.

15           Although Belt Line may well be correct that such

16   witnesses should be foreclosed in characterizing the Belt

17   Line switching rate as unreasonable and the like, with a

18   proper foundation such witnesses may be allowed, for example,

19   to compare the Belt Line's rate to other switching rates.

20           Likewise, with timely and proper objections, such

21   witnesses may not be allowed to characterize CSX's rail

22   access as, quote, improper or, quote, inequitable.  However,

23   such witnesses may have personal knowledge of events that

24   permits them to offer less legally charged characterizations

25   of their observations concerning the extent of CSX's access

1    to NIT, and these questions are best addressed during trial.

2            For similar reasons, issues concerning the probative

3    value and any prejudice stemming from admission of the

4    April 13, 2018, letter are also reserved for trial.

5            Although CSX denies any intent to offer such

6    testimony, to the extent it may seek to elicit testimony from

7    such employees that they or the VPA or VIT, quote, support

8    CSX's legal claims in the case, the motion in limine is

9    granted; such testimony is irrelevant.

10           Further, as it falls to the jury to assess CSX's

11   legal claims and any defenses thereto, any such testimony

12   explicitly endorsing or vouching for CSX's legal claims by a

13   quasi-governmental agency or its employees would also be

14   highly prejudicial to the defense and subject to exclusion

15   under Rule 403.

16           The Court reserves for trial questions about the

17   admissibility of other testimony from such employees relating

18   to VPA and VIT's desire for the parties to find a solution to

19   facilitate greater use of NIT, and, finally, the proper scope

20   of any argument based on the actual testimony and other

21   evidence introduced through such employees is reserved for

22   trial.

23           Next up is ECF 365, which is the Belt Line's motion

24   in limine to exclude evidence and argument from CSX witnesses

25   who lack personal knowledge.  They reference some witnesses;

1    Robert -- I may not pronounce his name correctly -- Girardot,

2    Chris Wagel, and Carl Warren.

3              My question for you, Mr. Hatch, is does CSX intend

4    to call them to testify, or are we dealing with deposition

5    testimony from these witnesses?  Do you know?

6              MR. HATCH:  Your Honor, we will be calling

7    Mr. Girardot.  We will not be calling live Mr. Warren and not

8    as to Mr. Wagel either.

9              THE COURT:  Do you intend to present evidence from

10   them via depositions?

11             MR. HATCH:  Yes, Your Honor.

12             THE COURT:  Very well.  Thank you.

13             MR. HATCH:  Thank you.

14             THE COURT:  With respect to the Belt Line's motion

15   in limine to exclude evidence from the CSX witnesses who

16   reportedly lack personal knowledge, the motion is granted in

17   part and denied in part without prejudice.

18             And I grant the motion only in one respect; namely,

19   that Mr. Girardot is precluded from testifying about

20   statements, A, reportedly made by VIT management to Ocean

21   Network Express personnel about the capacity to reliably dray

22   containers between NIT and CSX's Portsmouth terminal and, B,

23   made by Ocean Network Express personnel indicating that that

24   carrier would have chosen CSX for business but for, or in

25   significant part due to, concerns about CSX's lack of on-dock

1  access at NIT.

2       This hearsay is inadmissible for the truth of the

3  matter asserted in the statements Mr. Girardot describes.

4  Similarly, because the probative value of such evidence does

5  not substantially outweigh the dangers of unfair prejudice

6  and risks that such evidence may mislead the jury, nor may

7  CSX solicit testimony from Dr. Marvel about those statements

8  if he's allowed to testify.

9       I have also considered the evidentiary arguments

10  concerning admission of the remaining evidence and testimony

11  identified in the Belt Line's motion concerning lost business

12  opportunities allegedly sustained by CSX, the operation and

13  application of the Belt Line's tariff, the preferences and

14  practices of ocean carriers, calculations of the average

15  number of shipping containers stacked by CSX in railcar

16  wells, and the inadequacy of drayage as an alternative to

17  on-dock rail access.

18       Having considered the affidavits at issue and the

19  deposition testimony in question, the Court finds that it

20  cannot conclude at this preliminary stage that all forms of

21  testimonial evidence about those subjects is inadmissible as

22  a matter of law.

23       To the contrary, questions of context, the knowledge

24  and experience of the witnesses in question, the adequacy of

25  any foundation laid for testimony about such topics, the

1   nature of the questions asked, the purpose for which any

2   testimony is offered, and ultimately the admissibility of any

3   such testimony are matters to be addressed at trial or, with

4   respect to any depositions, possibly during the pretrial

5   conference, and any deposition designations that are objected

6   to.

7          Accordingly, in all other respects, the Belt Line's

8   motion is denied without prejudice.

9          For the same reasons, and assuming for the purposes

10  of this motion that Dr. Marvel is allowed to testify, the

11  motion is also denied without prejudice to the extent that

12  Dr. Marvel bases his opinions on testimony and evidence about

13  the foregoing matters aside from those that I specifically

14  identified with respect to Mr. Girardot's statements.

15         Again, I caution counsel for CSX to exercise care in

16  eliciting testimony from Dr. Marvel with an eye to the trial

17  judge's or possibly my rulings on deposition designations

18  about whether testimony on the topics described is admitted

19  or denied.

20         Next I address ECF number 378, which is CSX's motion

21  in limine to preclude mischaracterization of its rate

22  proposals.  This motion is denied subject, of course, to the

23  Court's rulings on the pending motions for summary judgment.

24         CSX seeks to exclude such evidence and argument on

25  the ground that it is incorrect, improper, irrelevant, and

1    prejudicial pursuant to the Federal Rules of Evidence.

2          The Court has considered the arguments relating to

3    admissibility of evidence and argument concerning, first,

4    whether CSX's 2010 and 2018 proposals were nonuniform rate

5    proposals and, two, acceptance of CSX's proposals would have

6    violated the Belt Line's Operating Agreement.

7          To start, the Court does not find that its previous

8    order addressing the defendant's motion to dismiss -- and I

9    refer to ECF number 66 at pages 26 to 28 -- precludes

10   evidence and argument at trial about those two subjects.

11         At the present juncture, the Court is not tasked

12   with evaluating the sufficiency of CSX's claims and pleadings

13   but must decide whether to exclude broad categories of

14   evidence from trial.

15         If evidence of these two proposals is admitted, one

16   potential trial issue concerns whether the Belt Line and

17   Norfolk Southern's treatment, handling of, and reaction to

18   the 2010 and 2018 proposals constituted anticompetitive acts

19   and/or evidence of an unlawful conspiracy.

20         Statements and acts contemporaneous with those

21   events, including those addressing the formation of and

22   reaction to the proposals, the parties' understanding about

23   the proposals at the time, questions asked and answered and

24   provided at the time, and the parties' views at the time

25   about the interplay, if any, between the proposals and the

1    Operating Agreement appear at this juncture to be relevant to

2    issues of alleged anticompetitive and conspiratorial

3    behavior.

4            CSX's contention that the Belt Line previously

5    considered and allegedly maintained nonuniform rates does not

6    warrant a blanket exclusion of the types of evidence just

7    described.

8            If evidence that the Belt Line had nonuniform rates

9    exists, CSX may offer it to cast doubt upon the Belt Line's

10   interpretation of the Operating Agreement and/or its

11   treatment and handling of the two disputed proposals.

12           Finally, the admission of the evidence just

13   described by the Court, or argument reasonably based thereon,

14   would not unduly prejudice CSX by misleading or confusing the

15   jury as its probative value appears not to be substantially

16   outweighed by any prejudice ensuing from admission.

17           If, as CSX contends, one or both defendants attempt

18   to offer after-the-fact explanations and/or acts and

19   omissions not undertaken at or around the time the proposals

20   were submitted and considered, the Court can best address

21   that at trial by timely objection to the evidence when

22   offered or argument when made.

23           Let me check with my clerks a moment.

24           (Pause in the proceedings.)

25           THE COURT:  Aside from the motions that I have

Carol L. Naughton, Official Court Reporter

```
 1   reserved on, then, I think that concludes our business here
 2   today.  Thank you for your patience and efforts here this
 3   afternoon.  I appreciate your hard work on this case and your
 4   excellent briefing and argument.
 5           MR. HATCH:  Thank you, Your Honor.
 6           MR. SNOW:  Thank you, Your Honor.
 7           (The proceedings adjourned at 4:04 p.m.)
 8
 9                          CERTIFICATION
10
11       I certify that the foregoing is a correct transcript
12   from the record of proceedings in the above-entitled matter.
13
14
15           _____/s/_____
16                      Carol L. Naughton
17                      January 6, 2023
18
19
20
21
22
23
24
25
```