| 110TH CONGRESS<br>2d Session | HOUSE OF REPRESENTATIVES | REPT. 110–860<br>Part 1 |
|---|---|---|

# RAILROAD ANTITRUST ENFORCEMENT ACT OF 2008

SEPTEMBER 18, 2008.—Ordered to be printed

Mr. CONYERS, from the Committee on the Judiciary,
submitted the following

# R E P O R T

[To accompany H.R. 1650]

[Including cost estimate of the Congressional Budget Office]

The Committee on the Judiciary, to whom was referred the bill (H.R. 1650) to amend the Federal antitrust laws to provide expanded coverage and to eliminate exemptions from such laws that are contrary to the public interest with respect to railroads, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

## CONTENTS

| | Page |
|---|---|
| The Amendment | 1 |
| Purpose and Summary | 3 |
| Background and Need for the Legislation | 4 |
| Hearings | 8 |
| Committee Consideration | 9 |
| Committee Votes | 9 |
| Committee Oversight Findings | 9 |
| New Budget Authority and Tax Expenditures | 9 |
| Congressional Budget Office Cost Estimate | 9 |
| Performance Goals and Objectives | 10 |
| Constitutional Authority Statement | 11 |
| Advisory on Earmarks | 11 |
| Section-by-Section Analysis | 11 |
| Changes in Existing Law Made by the Bill, as Reported | 13 |

## THE AMENDMENT

The amendment is as follows:
Strike all after the enacting clause and insert the following:

69–006



2

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Railroad Antitrust Enforcement Act of 2008".

**SEC. 2. APPLICATION OF THE ANTITRUST LAWS TO RAIL COMMON CARRIERS.**

(a) APPLICATION OF THE ANTITRUST LAWS.—The antitrust laws shall apply to a common carrier by railroad that is subject to the jurisdiction of the Surface Transportation Board under subtitle IV of title 49, United States Code, without regard to whether such common carrier filed a rate or whether a complaint challenging a rate is filed.

(b) DEFINITION.—The term "antitrust laws" has the meaning given it in subsection (a) of the 1st section of the Clayton Act (15 U.S.C. 12(a)), but includes section 5 of the Federal Trade Commission Act to the extent such section 5 applies to unfair methods of competition

**SEC. 3. MERGERS AND ACQUISITIONS OF RAILROADS.**

The last undesignated paragraph of section 7 of the Clayton Act (15 U.S.C. 18) is amended by inserting "(excluding transactions described in section 11321 of title 49 of the United States Code)" after "Surface Transportation Board".

**SEC. 4. ANTITRUST ENFORCEMENT AUTHORITY.**

Section 11(a) of the Clayton Act (15 U.S.C. 21(a)) is amended by inserting "(excluding agreements described in section 10706 of such title and transactions described in section 11321 of such title)" after "Code".

**SEC. 5. INJUNCTIONS AGAINST RAILROAD COMMON CARRIERS.**

The proviso in section 16 of the Clayton Act (15 U.S.C. 26) is amended by inserting "(excluding a common carrier by railroad)" after "Board".

**SEC. 6. REMOVAL OF PRIMARY JURISDICTION AS LIMITATION.**

The Clayton Act (15 U.S.C. 12 et seq.) is amended by adding at the end thereof the following:

"SEC. 29. In any civil action against a common carrier railroad under section 4, 4A, 4C, 15, or 16, the district court shall not be required to defer to the jurisdiction of the Surface Transportation Board.".

**SEC. 7. UNFAIR METHODS OF COMPETITION.**

Section 5(a)(2) of the Federal Trade Commission Act (15 U.S.C. 45(a)(2)) is amended by adding at the end the following:

"For purposes of this paragraph with respect to unfair methods of competition, the term 'common carrier' excludes a common carrier by railroad that is subject to jurisdiction of the Surface Transportation Board under subtitle IV of title 49 of the United States Code.".

**SEC. 8. TERMINATION OF EXEMPTIONS IN TITLE 49.**

(a) IN GENERAL.—Section 10706 of title 49, United States Code, is amended—
 (1) in subsection (a)—
  (A) in the 3d sentence of paragraph (2)(A) by striking ", and the Sherman Act (15 U.S.C. 1 et seq.)," and all that follows through "or carrying out the agreement",
  (B) in paragraph (4)—
   (i) by striking the 2d sentence, and
   (ii) in the 3d sentence by striking "However, the" and inserting "The", and
  (C) in paragraph (5)(A) by striking ", and the antitrust laws set forth in paragraph (2) of this subsection do not apply to parties and other persons with respect to making or carrying out the agreement",
 (2) in subsection (d) by striking the last sentence, and
 (3) by striking subsection (e) and inserting the following:

"(e) Nothing in this section exempts a proposed agreement described in subsection (a) from the application of the antitrust laws (as defined in subsection (a) of the 1st section of the Clayton Act, but including section 5 of the Federal Trade Commission Act to the extent such section 5 applies to unfair methods of competition).

"(f) In reviewing any proposed agreement described in subsection (a), the Board shall take into account, among any other considerations, the impact of the proposed agreement on shippers, consumers, and affected communities. The Board shall make findings regarding such impact, which shall be—
 "(1) made part of the administrative record;
 "(2) submitted to any other reviewing agency for consideration in making its determination; and
 "(3) available in any judicial review of the Board's decision regarding such agreement.".

(b) COMBINATIONS.—Section 11321 of title 49, United States Code, is amended—
  (1) in subsection (a)—
    (A) by striking "The authority" and inserting "Except as provided in sections 4, 4A, 4C, 15, and 16 of the Clayton Act, the authority"; and
    (B) in the 3d sentence by striking "is exempt from the antitrust laws and from all other law," and inserting "is exempt from all other law (except the laws referred to in subsection (c)),", and
  (2) by adding at the end the following:
"(c) Nothing in this subchapter exempts a transaction described in subsection (a) from the application of the antitrust laws (as defined in subsection (a) of the 1st section of the Clayton Act, but including section 5 of the Federal Trade Commission Act to the extent such section 5 applies to unfair methods of competition). The preceding sentence shall not apply to any transaction relating to the pooling of railroad cars approved by the Surface Transportation Board or its predecessor agency pursuant to section 11322.
"(d) In reviewing any transaction described in subsection (a), the Board shall take into account, among any other considerations, the impact of the transaction on shippers and affected communities.".
  (c) CONFORMING AMENDMENTS.—
    (1) HEADING.—The heading for section 10706 of title 49, United States Code, is amended to read as follows: "**Rate agreements**".
    (2) ANALYSIS OF SECTIONS.—The analysis of sections of chapter 107 of such title is amended by striking the item relating to section 10706 and insert the following:

"10706. Rate agreements.".

**SEC. 9. EFFECTIVE DATE.**
  (a) IN GENERAL.—Except as provided in subsection (b), this Act and the amendments made by this Act shall take effect on the date of enactment of this Act.
  (b) LIMITATION.—A civil action under section 4, 4A, 4C, 15, or 16 of the Clayton Act, or a complaint under section 5 of the Federal Trade Commission Act (15 U.S.C. 45) to the extent such section 5 applies to unfair methods of competition, may not be filed with respect to any conduct or activity that—
    (1) occurs before the expiration of the 180-day period beginning on the date of enactment of this Act; and
    (2) was exempted from the antitrust laws (as defined in subsection (a) of the 1st section of the Clayton Act (15 U.S.C. 12(a)), but including section 5 of the Federal Trade Commission Act (15 U.S.C. 45) to the extent such section 5 applies to unfair methods of competition) by an order of the Interstate Commerce Commission or the Surface Transportation Board issued before the date of the enactment of this Act and pursuant to law.

PURPOSE AND SUMMARY

H.R. 1650, the Railroad Antitrust Enforcement Act of 2008, will eliminate certain carve-outs from the Federal antitrust laws enjoyed by railroad common carriers, thereby subjecting railroad industry practices to the pro-competitive influence of the antitrust laws. The carve-outs are a holdover from a bygone period in which railroads were subject to extensive regulation. In the modern environment of deregulation that commenced more than thirty years ago with the passage of the Railroad Revitalization and Regulatory Reform (4R) Act[1] and the Staggers Rail Act,[2] these carve-outs work primarily to subvert the free-market dynamics that would otherwise prevail in the industry.

The bill will extend to the railroad industry remedies and enforcement mechanisms generally applicable to other industries under the Federal antitrust laws. Those harmed by antitrust violations perpetrated by a rail carrier will now have the full range of remedies available under the Federal antitrust laws. The Federal Trade Commission (FTC) and the Department of Justice (DOJ) (col-

---

[1] Pub.L. No. 94–210 (1976).
[2] Pub.L. No. 96–448 (1980).

4

lectively, the Agencies) and State attorneys general acting in *parens patriae* on behalf of their citizens will be able to enforce the Federal antitrust laws with respect to anticompetitive business practices and mergers and acquisitions in the railroad industry.

The bill is prospective in effect. Any merger or acquisition consummated prior to the date of the bill's enactment, or conduct that will have occurred prior to that date and that was immunized under an order by the Surface Transportation Board (STB) or its predecessor, the Interstate Commerce Commission, will not become subject to antitrust action as a result of this bill. Any merger or acquisition or conduct taking place after passage of the bill, however, will be subject to the bill's provisions.

There is an additional 180-day grace period for conduct that began pursuant to immunity under the previous law and that is continuing at the date of enactment. After the expiration of that 180-day period, however, that conduct will also become subject to the new law.

Except with respect to conferring antitrust immunity, the bill fully preserves the STB's regulatory authority. With respect to reviewing railroad mergers and acquisitions, the STB will retain its public interest authority alongside the Agencies' antitrust authority. The two reviews will be conducted concurrently yet separately.

## Background and Need for the Legislation

By eliminating Federal antitrust exemptions from the railroad industry, H.R. 1650 would subject railroad industry practices to appropriate antitrust enforcement. This completes a process begun nearly three decades ago with the procompetitive deregulation of the railroad industry. Absent the bill's corrective measures, the railroad industry can only partially achieve the pro-competitive benefits of deregulation.

## BACKGROUND

The railroad industry is in its third decade of deregulation after a long history as a regulated industry. In the 1920's, while the industry was still heavily regulated, Congress granted the industry a number of antitrust immunities. Thirty years ago, the industry was largely deregulated following enactment of the 4R Act and the Staggers Act, which provided carriers with greater flexibility in setting their own rates. However, many of the industry's antitrust exemptions remained in place.

As a result, the Agencies are limited in their ability to enforce the Federal antitrust laws in the railroad industry. STB-approved transactions under 49 U.S.C. § 11321–11328 (consolidations, mergers, acquisitions, some leases, trackage rights, pooling arrangements, and agreements to divide traffic) are exempt from antitrust enforcement. Certain rate- and charge-related agreements approved by the STB under 49 U.S.C. § 10706 are similarly exempt.

Under current law, the STB has the exclusive authority to approve a railroad merger or acquisition (including other forms of consolidation or market divisions that would alter the competitive landscape). The Board evaluates mergers and acquisitions under a broad "public interest" standard, which differs markedly from the standard used by the Agencies in performing an antitrust review.

5

Because common carrier mergers subject to the STB's jurisdiction are expressly exempt from the FTC Act, the FTC has no authority to review them. And, DOJ's role is limited to submitting advisory recommendations to the STB for its consideration, which the STB is free to reject.

Private parties are similarly precluded from relying on the antitrust laws to protect themselves against or seek remedies for anticompetitive harm caused by the railroads. Under Section 16 of the Clayton Act,[3] injunctive relief against a common carrier subject to the STB's jurisdiction is available only in a suit filed by the Federal Government. In addition, the so-called Keogh Doctrine[4] precludes private parties from recovering damages.

Businesses that ship by rail argue that the antitrust exemptions have enabled railroads to engage in a number of anticompetitive practices. Some shippers claim that the rates charged when the shippers have no competing rail options (i.e., when they are "captive shippers") are unfairly inflated, and that the rate appeal process at the STB favors the rail carriers. In addition, certain practices by the rail carriers—such as entering into contracts with operators of connecting short line tracks that unduly punish them for doing business with competing carriers (also known as "paper barriers") and refusals to segment long-haul transportation quotes so as to permit interconnecting rail carriers to compete on some portions (a.k.a. "bottlenecks")—may be resulting in anticompetitive rates that are ultimately passed on to consumers in the form of higher prices. In fact, in a September 2004 letter, the DOJ indicated that these practices could very well violate Federal antitrust laws.[5]

ANTITRUST ANALYSIS

This bill will enhance competition by enabling the Agencies to enforce the antitrust laws in the railroad industry and by providing private parties with the full panoply of relief and remedies available under the antitrust laws.

*Empowering Federal Agencies to Enforce Antitrust Laws*

Enactment of this legislation would enable the Agencies to enforce the antitrust laws in the railroad industry. Under current law, DOJ, the agency traditionally charged with antitrust oversight of railroad mergers and acquisitions, can offer little more than a defanged advisory evaluation of railroad industry mergers and acquisitions. DOJ lacks antitrust enforcement authority over railroad mergers and acquisitions because 49 U.S.C. § 11321 provides that a "rail carrier, corporation, or person participating in [an STB-] approved or exempted transaction is exempt from the antitrust laws and from all other law including State and municipal law, as necessary to let that rail carrier, corporation, or person carry out the transaction . . ."

The STB evaluates rail carrier mergers and acquisitions under a broad public interest standard outlined in 49 U.S.C. § 11324. This public interest standard is broader and more diffuse than the anti-

---

[3] 15 U.S.C. § 126.
[4] Keogh v. Chicago & Northwestern Railway, 260 U.S. 152 (1922).
[5] Letter from Assistant Attorney General William E. Moschella to Rep. F. James Sensenbrenner, Jr. (September 27, 2004).

6

trust standard, which is focused on preventing mergers and acquisitions that substantially lessen competition, resulting in restrictions on output or increases in price.

Although section 11324(d)(2) requires the STB, in making its determination regarding a proposed rail carrier merger or acquisition, to "accord substantial weight to any recommendations of the Attorney General," the STB remains free to disregard any such recommendation. The STB's 1996 decision approving the Union Pacific/Southern Pacific merger over DOJ's vigorous objections, subsequently affirmed on appeal by the Eighth Circuit,[6] starkly demonstrates the limits of DOJ's current role under the antitrust laws. The STB ruled that its statutory mandate "sharply contrasts with the approach to mergers taken by the DOJ and the Federal Trade Commission. The policies embodied in the antitrust laws provide guidance, but are not determinative. . . . Thus the [STB] can . . . approve transactions even if they otherwise would violate the antitrust laws."[7]

Passage of the bill would subject railroads to the same kind of concurrent oversight by both a Federal enforcement agency and a regulatory body found in other partially-regulated industries, including electricity transmission in interstate commerce, the operation of liquid natural gas import terminals, the transportation of natural gas by interstate pipeline, and the transportation of oil by interstate common carrier pipelines. While the STB would continue to maintain oversight over a variety of other operational issues related to the operation of the railroad industry, antitrust enforcement by the Agencies as warranted would operate alongside the regulatory authority.

*Enhanced Ability of Shippers to Challenge Anticompetitive Rail Rates*

So-called "captive" shippers (rail carrier customers with a single carrier option for part of, or all of, a shipping route they depend on) are frequently charged higher rates due to a lack of competition among rail carriers and the ability of carriers to charge differential pricing under the Staggers Act. Some of these rating practices might violate the antitrust laws; under current law, however, neither shippers nor the Agencies have any effective recourse under the antitrust laws. The bill would give shippers additional avenues by which to challenge anticompetitive rail practices.

According to an October 2006 U.S. Government Accountability Office report, the volume of traffic traveling at significantly noncompetitive rates (defined as more than 300% of variable cost) has increased since 1985.[8] The rates paid by these captive shippers are, on average, 20.9% higher, costing captive shippers an estimated excess of $1.3 billion on an annual basis.[9]

---

[6] Union Pac. Corp., 1 S.T.B. 233, 1996 WL 467636 (Aug. 12, 1996), *petition for review denied*, Western Coal Traffic League v. STB, 169 F. 3d 775 (1999), *opinion clarified*, Union Pac. Corp., 2002 WL 335181 (Feb. 28, 2002).
[7] Union Pac. Corp., 1 S.T.B. at 86–88.
[8] October 2006 United States Government Accountability Office Report to Congressional Requesters, "Freight Railroads: Industry Health Has Improved, but Concerns about Competition and Capacity Should Be Addressed," *available at* http://www.gao.gov/new.items/d0794.pdf. Because the total number of rail shippers has increased over the past twenty years, the *percentage* represented by captive shippers has decreased, but not their actual number.
[9] *The Status of Economic Railroad Regulation: Hearing before the H. Comm. on Transportation and Infrastructure, Subcommittee on Railroads,* 108th Cong. 1 (2004) (Statement of Dr. Curtis Grimm, Professor of Supply Chain and Strategy, University of Maryland).

7

*Subjecting "Bottlenecks" to Antitrust Scrutiny*

Enactment of this legislation would subject so-called "bottlenecks" to appropriate antitrust scrutiny. Bottlenecks are shipping situations in which customers have only a single rail line transportation option to a point of interconnection with other carriers. Oftentimes, the rail carrier operating the bottleneck will quote the shipper a single quote for the entire, or "long haul," route, and will refuse to offer the alternative of a separate price for the single-carrier portion of the route. This practice, which was upheld by the STB in a 1996 decision and affirmed by the Eighth Circuit,[10] denies captive shippers the benefits of competition on the other portions of the route where they are not otherwise captive.

There is no justifiable logistical or practical reason preventing rail carriers controlling bottleneck situations from offering compartmentalized rates other than a calculated business decision— legal under current law—to use their monopoly power in the segment they control to extract the maximum profit possible from shippers who must depend on that segment. The higher cost borne by the shippers ultimately translates into higher costs for consumers for the goods being transported.

H.R. 1650 would subject bottleneck pricing to the antitrust laws. In a 2004 letter to then-Chairman Sensenbrenner, the Department of Justice stated that "[i]f [bottlenecking] were subject to the antitrust laws, it could be evaluated as a refusal to deal in possible violation of Section 2 of the Sherman Act, or as a tying arrangement in possible violation of Section 1 of the Sherman Act."[11]

*Subjecting "Paper Barriers" to Antitrust Scrutiny*

Enactment of this legislation would subject so-called "paper barriers" to appropriate antitrust scrutiny. "Paper barriers," also known as "interchange commitments," are a range of contractual obligations between smaller railways (so-called "short line" railroads) and the owners of the larger interstate (or "trunk line") railways off of which the short lines branch. Many of these contracts limit the short line railroads from doing meaningful business with any major rail carrier other than the one from which they leased or purchased their track.

The terms of these leases can be anticompetitive in their effect. The rent due on the track leases typically decreases markedly with increasing volumes of traffic sent to the trunk line. This has the effect of substantially lessening the competitive presence of other railways that connect to the short line, and effectively eliminating the competitive options available to shippers using the short line.

H.R. 1650 would subject paper barriers to the antitrust laws. In its 2004 letter to then-Chairman Sensenbrenner, DOJ stated that "[i]f paper barriers were subject to the antitrust laws, they would be evaluated under section 1 of the Sherman Act. The Department would examine whether the restraint is ancillary to the sale of the

---

[10] *See* Central Power & Light Co. v. Southern Pacific Transportation Co., 1 S.T.B. 1059 (1996), *clarified* at 2 S.T.B. 235 (1997), *aff'd* by the US Court of Appeals for the Eighth Circuit, MidAmerican Energy Co. v. STB, 169 F.3d 1099 (8th Cir. 1999). Note that the Eighth Circuit's review was limited to determining whether there were compelling indications that the Board's interpretations of the applicable statutes were not correct. 169 F.3d at 1106.

[11] Letter from Assistant Attorney General William Moschella to Hon. F. James Sensenbrenner, Jr. (September 27, 2004).

8

trackage—i.e., whether the restraint is reasonably necessary to achieve the pro-competitive benefits of the sale."[12]

*Effectuating Recommendations of the Antitrust Modernization Commission*

Removal of these antitrust immunities would follow the recommendations of the Antitrust Modernization Commission established by Congress to assess and make recommendations regarding antitrust issues warranting attention. According to the Commission, "[s]tatutory exemptions from the antitrust laws undermine, rather than upgrade, the competitiveness and efficiency of the U.S. economy" in that they "reduce the competitiveness of the industries that have sought antitrust exemptions."[13] The railroad industry is precisely the type of industry envisioned by the Commission as benefiting from heightened competition following the removal of statutory antitrust exemptions.

Passage of H.R. 1650 would open industry practices to scrutiny by the Agencies, which should result in more competitive rates for shippers and, ultimately, lower prices for end consumers. Private parties such as rail shippers who are harmed by anticompetitive rail carrier practices would be able to seek appropriate monetary remedies and injunctive relief. The Agencies would have authority to investigate rail carrier mergers and acquisitions and conduct and, where appropriate, bring enforcement actions to prevent or remedy anticompetitive results. In addition, State attorneys general will also be able to bring actions in Federal court in *parens patriae* challenging actions by railroad common carriers in violation of the Federal antitrust laws.

The bill is carefully written to be prospective in its effect. Mergers that will have taken place prior to the bill's enactment and were exempted from antitrust scrutiny under the current standards would remain exempt. Conduct that will have taken place before the bill's enactment and was exempted would not become subject to retroactive antitrust enforcement. Mergers and acquisitions that take place after the bill's enactment will be subject to the antitrust laws, as will conduct that takes place after the bill's enactment. Under a special grace period, parties who continue to engage in conduct previously exempted by STB approval prior to the bill's passage have 180 days to discontinue such conduct, after which any continuing conduct will becomes subject to the antitrust laws.

## Hearings

The Committee on the Judiciary Task Force on Antitrust and Competition Policy held a one-day hearing on February 25, 2008 on H.R. 1650. Testimony was received from Representative Tammy Baldwin (D-WI); Susan M. Diehl, Senior Vice President for Logistics and Supply Chain Management, Holcim, Inc.; Terry Huval, Director of Utilities, Lafayette Utilities System (Lafayette, Louisiana) and Chairman, American Public Power Association; G. Paul Moates, Partner, Sidley Austin LLP on behalf of the Association of American Railroads; and Dr. Darren Bush, Associate Professor of Law, University of Houston Law Center (Houston, Texas).

---

[12] *Id.*
[13] Antitrust Modernization Commission, Report and Recommendations, 335 (2007).

9

### COMMITTEE CONSIDERATION

On April 30, 2008, the Committee met in open session and ordered the bill, H.R. 1650, favorably reported, as amended, by voice vote, a quorum being present.

### COMMITTEE VOTES

In compliance with clause 3(b) of rule XIII of the Rules of the House of Representatives, the Committee advises that there were no recorded votes during the Committee's consideration of H.R. 1650.

### COMMITTEE OVERSIGHT FINDINGS

In compliance with clause 3(c)(1) of rule XIII of the Rules of the House of Representatives, the Committee advises that the findings and recommendations of the Committee, based on oversight activities under clause 2(b)(1) of rule X of the Rules of the House of Representatives, are incorporated in the descriptive portions of this report.

### NEW BUDGET AUTHORITY AND TAX EXPENDITURES

Clause 3(c)(2) of rule XIII of the Rules of the House of Representatives is inapplicable because this legislation does not provide new budgetary authority or increased tax expenditures.

### CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

In compliance with clause 3(c)(3) of rule XIII of the Rules of the House of Representatives, the Committee sets forth, with respect to the bill, H.R. 1650, the following estimate and comparison prepared by the Director of the Congressional Budget Office under section 402 of the Congressional Budget Act of 1974:

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC, September 9, 2008.*

Hon. JOHN CONYERS, Jr., *Chairman,*
*Committee on the Judiciary,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has prepared the enclosed cost estimate for H.R. 1650, the Railroad Antitrust Enforcement Act of 2008.

If you wish further details on this estimate, we will be pleased to provide them. The CBO staff contact is Leigh Angres, who can be reached at 226–2860.

　　　　Sincerely,

PETER R. ORSZAG,
DIRECTOR.

Enclosure

cc:　Honorable Lamar S. Smith.
　　 Ranking Member

10

*H.R. 1650—Railroad Antitrust Enforcement Act of 2008.*

H.R. 1650 would expand the authority of the Department of Justice (DOJ) and the Federal Trade Commission (FTC) to prosecute, under the Sherman and Clayton Acts, certain antitrust violations relating to railroads. Currently, the Surface Transportation Board (STB) has the primary authority to regulate mergers, acquisitions, rate-setting, and pooling arrangements under the Interstate Commerce Act. The roles of DOJ and FTC are generally limited to investigating potential violations and providing advice to the STB.

Based on information provided by DOJ, CBO estimates that implementing H.R. 1650 would have no significant effect on the federal budget. We expect that DOJ would continue to perform investigations of railroads, but that very few of those investigations would result in enforcement actions. (CBO also expects that DOJ, rather than FTC, would handle antitrust enforcement matters specified under the bill; thus, we do not anticipate that FTC would incur significant additional enforcement costs.) Anyone convicted of antitrust violations specified in the bill would be subject to criminal fines, which are recorded as revenues, deposited in the Crime Victims Fund, and later spent. Thus, enacting H.R. 1650 could increase revenues and direct spending, but CBO estimates that any such effects would be insignificant given the small number of cases involved.

H.R. 1650 contains no intergovernmental mandates as defined in the Unfunded Mandates Reform Act (UMRA) and would impose no costs on State, local, or tribal governments.

H.R. 1650 would impose a private-sector mandate, as defined in UMRA, on railroads by eliminating exemptions from certain antitrust laws. It is unclear how making railroads subject to provisions of those antitrust statutes would affect current business practices, if at all. The extent to which railroad carriers would have to forgo business opportunities and what the value of those lost opportunities would be are also uncertain. Because of these uncertainties, CBO has no basis for estimating the cost to railroads and whether that cost would exceed the annual threshold established in UMRA for private-sector mandates ($136 million in 2008, adjusted annually for inflation).

On November 21, 2007, CBO transmitted a cost estimate for S. 772, the Railroad Antitrust Enforcement Act of 2007, as ordered reported by the Senate Committee on the Judiciary on September 20, 2007. S. 772 and H.R. 1650 are similar, and CBO's estimates of costs are the same.

The CBO staff contacts for this estimate are Leigh Angres (for federal costs), who can be reached at 226–2860, and Jacob Kuipers (for the private-sector impact), who can be reached at 226–2940. This estimate was approved by Theresa Gullo, Deputy Assistant Director for Budget Analysis.

PERFORMANCE GOALS AND OBJECTIVES

The Committee states that pursuant to clause 3(c)(4) of rule XIII of the Rules of the House of Representatives, H.R. 1650 will bring the pro-competitive benefits of the antitrust laws into the railroad industry by eliminating certain antitrust exemptions from current law.

11

CONSTITUTIONAL AUTHORITY STATEMENT

Pursuant to clause 3(d)(1) of rule XIII of the Rules of the House of Representatives, the Committee finds the authority for this legislation in article I, section 8, clause 3 of the Constitution.

ADVISORY ON EARMARKS

In accordance with clause 9 of rule XXI of the Rules of the House of Representatives, H.R. 1650 does not contain any congressional earmarks, limited tax benefits, or limited tariff benefits as defined in clause 9(d), 9(e), or 9(f) of Rule XXI.

SECTION-BY-SECTION ANALYSIS

The following discussion describes the bill as reported by the Committee.

*Section 1. Short Title.* Section 1 sets forth the short title of the bill as the "Railroad Antitrust Enforcement Act of 2008."

*Section 2. Application of the Antitrust Laws to Rail Common Carriers.* This section amends the Clayton Act to overturn the filed rate doctrine, or Keogh Doctrine. This doctrine, created by the Supreme Court during the era of pervasive regulation of the rail industry, limits damages recoverable in a civil antitrust suit to the railroad's filed rate.[14] Section 2 of the bill will make standard damages available regardless of whether the railroad has filed rates.

*Section 3. Mergers and Acquisitions of Railroads.* This section modifies section 7 of the Clayton Act to empower the Agencies to enforce the Federal antitrust laws against certain STB-approved rail carrier rate agreements.

Section 7 of the Clayton Act prohibits mergers and acquisitions that are likely to substantially lessen competition. The sixth undesignated paragraph of section 7 exempts "transactions duly consummated pursuant to the authority" of specified agencies, including the STB. Section 3 of the bill removes that exemption as to STB-approved agreements described in 49 U.S.C. § 11321, which covers agreements among rail carriers "to pool or divide traffic or services or any part of their earnings" pursuant to 49 U.S.C. § 11322 as well as consolidations, mergers, and acquisitions of control pursuant to 49 U.S.C. § 11323. Under this bill, these transactions will now be subject to review under the Federal antitrust laws even if approved by the STB.

*Section 4. Antitrust Enforcement Authority.* This section amends the Clayton Act to authorize the FTC to enforce certain sections of the Clayton Act against railroad common carrier transactions described in 49 U.S.C. § 10706 (STB-approved agreements among two or more rail carriers relating to rates) and 49 U.S.C. § 11321 (STB-approved agreements or combinations).

Section 11(a) of the Clayton Act extends enforcement authority for sections 2, 3, 7, and 8 of the Clayton Act to the STB with respect to common carriers subject to its jurisdiction, which removes those common carriers from the residual clause in section 11(a) that would otherwise give the FTC that authority. Section 4 of the bill carves out from the authority extended to the STB agreements

---

[14] Keogh v. Chicago & Northwestern Railway, 260 U.S. 152 (1922).

12

described in 49 U.S.C. § 10706 and 49 U.S.C. § 11321, thereby bringing those agreements within coverage of the residual clause.

Other sections of the bill make agreements now covered by 49 U.S.C. § 10706 and 49 U.S.C. § 11321 subject to antitrust enforcement, and the change to section 11(a) of the Clayton Act ensures that the antitrust enforcement authority is vested in the FTC as well as the DOJ.

*Section 5. Injunctions Against Railroad Common Carriers.* This section modifies section 16 of the Clayton Act to remove the prohibition on private parties seeking injunctive relief against a railroad common carrier for a violation of the antitrust laws.

Section 16 of the Clayton Act permits private parties threatened with loss or damage by a violation of the Federal antitrust laws to sue for injunctive relief. Under current law, section 16 exempts common carriers subject to the jurisdiction of the STB from suit for injunctive relief by anyone except the United States. Section 5 of the bill removes this carve-out with respect to railroads, situating the railroad industry identically to all other industries subject to section 16 of the Clayton Act.

*Section 6. Removal of Primary Jurisdiction as Limitation.* This section adds a new section 29 to the Clayton Act, clarifying that in a civil antitrust action brought against a common carrier railroad, either by a private party seeking treble damages or injunctive relief or by the United States or by a State attorney general, the Federal district court in which the case is brought need not defer to the jurisdiction of the STB on these or related issues. Specifically, this section rejects the doctrine of primary jurisdiction, which suggests or requires Federal district courts to defer to regulatory bodies on the adjudication of certain issues that were considered to be within the special competence of an administrative body.

*Section 7. Unfair Methods of Competition.* This section eliminates the carve-out in the FTC Act preventing enforcement of the FTC Act with respect to railroads.

Section 5(a)(2) of the FTC Act prohibits the FTC from enforcing the FTC Act's prohibition against "unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce" in certain industries. Among the industries excluded by this section 5(a)(2) are "common carriers subject to the Act to regulate commerce." Section 7 of the bill removes from this exclusion, with respect to unfair methods of competition, railroad common carriers subject to the STB's jurisdiction under subtitle IV of 49 U.S.C., enabling antitrust scrutiny of the railroad industry by the FTC under the FTC Act. The scope of the FTC's enforcement authority regarding unfair and deceptive acts or practices is not affected.

*Section 8. Termination of Exemptions in Title 49.* This section eliminates antitrust exemptions currently in title 49 of the United States Code that apply to rail carriers. These include exemptions pertaining to STB-approved rate agreements in 49 U.S.C. § 10706(a)(2)(A); agreements that provide "solely for compilation, publication, and other distribution of rates in effect or to become effective" in 49 U.S.C. § 10706(a)(4); STB-approved discussions among shippers regarding compensation to be paid by rail carriers for the use of rolling stock owned or leased by the shippers in 49 U.S.C. § 10706(a)(5)(A); and mergers and acquisitions and agree-

13

ments referred to in 49 U.S.C. § 11321. In addition, section 8 of the bill eliminates a requirement for reporting to the FTC and DOJ, and substitutes provisions clarifying that the Federal antitrust laws apply to all proposed agreements described in 49 U.S.C. § 10706(a). Furthermore, section 8 specifies a reporting requirement for the STB; that such report shall become a part of the administrative record of any lawsuit against the STB's decision; that such report shall be made available to any other reviewing agency; and that such report shall be available in any judicial review of the Board's decision regarding such agreement.

Section 8(b) of the bill clarifies that the exemption for STB-approved pooling agreements under 49 U.S.C. § 11322 is preserved.

*Section 9. Effective Date.* This section establishes the bill's effective dates. The bill is prospective in effect, with a special grace period for continuing conduct.

Pursuant to this section, mergers and acquisitions that will have taken place prior to the bill's enactment and were exempted from antitrust scrutiny under the current standards would remain exempt. Conduct that will have taken place before the bill's enactment and was exempted would not become subject to retroactive antitrust enforcement. Mergers and acquisitions that take place after the bill's enactment will be subject to antitrust laws, as will conduct that takes place after the bill's enactment. Under the special grace period, parties who are engaging in conduct previously-exempted by STB approval prior to the bill's passage will have 180 days to discontinue such conduct, after which such conduct will become subject to the antitrust laws to the extent it continues.

CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3(e) of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italics, existing law in which no change is proposed is shown in roman):

**CLAYTON ACT**

\* \* \* \* \* \* \*

SEC. 7. That no person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

\* \* \* \* \* \* \*

Nothing contained in this section shall apply to transactions duly consummated pursuant to authority given by the Secretary of Transportation, Federal Power Commission, Surface Transportation Board *(excluding transactions described in section 11321 of title 49 of the United States Code)*, the Securities and Exchange

14

Commission in the exercise of its jurisdiction under section 10 of the Public Utility Holding Company Act of 1935, the United States Maritime Commission, or the Secretary of Agriculture under any statutory provision vesting such power in such Commission, Board, or Secretary.

\* \* \* \* \* \* \*

SEC. 11. (a) That authority to enforce compliance with sections 2, 3, 7, and 8 of this Act by the persons respectively subject thereto is hereby vested in the Surface Transportation Board where applicable to common carriers subject to jurisdiction under subtitle IV of title 49, United States Code *(excluding agreements described in section 10706 of such title and transactions described in section 11321 of such title)*; in the Federal Communications Commission where applicable to common carriers engaged in wire or radio communication or radio transmission of energy; in the Secretary of Transportation where applicable to air carriers and foreign air carriers subject to the Federal Aviation Act of 1958; in the Federal Reserve Board where applicable to banks, banking associations, and trust companies; and in the Federal Trade Commission where applicable to all other character of commerce to be exercised as follows:

\* \* \* \* \* \* \*

SEC. 16. That any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections two, three, seven and eight of this Act, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue: *Provided,* That nothing herein contained shall be construed to entitle any person, firm, corporation, or association, except the United States, to bring suit for injunctive relief against any common carrier subject to the jurisdiction of the Surface Transportation Board *(excluding a common carrier by railroad)* under subtitle IV of title 49, United States Code. In any action under this section in which the plaintiff substantially prevails, the court shall award the cost of suit, including a reasonable attorney's fee, to such plaintiff.

\* \* \* \* \* \* \*

*SEC. 29. In any civil action against a common carrier railroad under section 4, 4A, 4C, 15, or 16, the district court shall not be required to defer to the jurisdiction of the Surface Transportation Board.*

─────────

**FEDERAL TRADE COMMISSION ACT**

\* \* \* \* \* \* \*

SEC. 5. (a)(1) \* \* \*

(2) The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations, except banks, savings and loan institutions described in section 18(f)(3), Federal credit unions described in section 18(f)(4), common carriers subject to the Acts to regulate commerce, air carriers and foreign air carriers subject to the Federal Aviation Act of 1958, and persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act, 1921, as amended, except as provided in section 406(b) of said Act, from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce. *For purposes of this paragraph with respect to unfair methods of competition, the term "common carrier" excludes a common carrier by railroad that is subject to jurisdiction of the Surface Transportation Board under subtitle IV of title 49 of the United States Code.*

\* \* \* \* \* \* \*

## TITLE 49, UNITED STATES CODE

\* \* \* \* \* \* \*

## Subtitle IV—INTERSTATE TRANSPORTATION

\* \* \* \* \* \* \*

## PART A—RAIL

\* \* \* \* \* \* \*

## CHAPTER 107—RATES

Sec.
10701.   Standards for rates, classifications, through routes, rules, and practices.

\* \* \* \* \* \* \*

[10706.   Rate agreements: exemption from antitrust laws.]
*10706.   Rate agreements.*

\* \* \* \* \* \* \*

### § 10706. [Rate agreements: exemption from antitrust laws] *Rate agreements*

(a)(1) In this subsection—
    (A) \* \* \*

\* \* \* \* \* \* \*

(2)(A) A rail carrier providing transportation subject to the jurisdiction of the Board under this part that is a party to an agreement of at least 2 rail carriers that relates to rates (including charges between rail carriers and compensation paid or received for the use of facilities and equipment), classifications, divisions, or rules related to them, or procedures for joint consideration, initiation, publication, or establishment of them, shall apply to the Board for approval of that agreement under this subsection. The Board shall approve the agreement only when it finds that the making and carrying out of the agreement will further the trans-

16

portation policy of section 10101 of this title and may require compliance with conditions necessary to make the agreement further that policy as a condition of its approval. If the Board approves the agreement, it may be made and carried out under its terms and under the conditions required by the Board[, and the Sherman Act (15 U.S.C. 1, et seq.), the Clayton Act (15 U.S.C. 12, et seq.), the Federal Trade Commission Act (15 U.S.C. 41, et seq.), sections 73 and 74 of the Wilson Tariff Act (15 U.S.C. 8 and 9), and the Act of June 19, 1936 (15 U.S.C. 13, 13a, 13b, 21a) do not apply to parties and other persons with respect to making or carrying out the agreement]. However, the Board may not approve or continue approval of an agreement when the conditions required by it are not met or if it does not receive a verified statement under subparagraph (B) of this paragraph.

\* \* \* \* \* \* \*

(4) Notwithstanding any other provision of this subsection, one or more rail carriers may enter into an agreement, without obtaining prior Board approval, that provides solely for compilation, publication, and other distribution of rates in effect or to become effective. [The Sherman Act (15 U.S.C. 1 et seq.), the Clayton Act (15 U.S.C. 12 et seq.), the Federal Trade Commission Act (15 U.S.C. 41 et seq.), sections 73 and 74 of the Wilson Tariff Act (15 U.S.C. 8 and 9), and the Act of June 19, 1936 (15 U.S.C. 13, 13a, 13b, 21a) shall not apply to parties and other persons with respect to making or carrying out such agreement. However, the] *The* Board may, upon application or on its own initiative, investigate whether the parties to such an agreement have exceeded its scope, and upon a finding that they have, the Board may issue such orders as are necessary, including an order dissolving the agreement, to ensure that actions taken pursuant to the agreement are limited as provided in this paragraph.

(5)(A) Whenever two or more shippers enter into an agreement to discuss among themselves that relates to the amount of compensation such shippers propose to be paid by rail carriers providing transportation subject to the jurisdiction of the Board under this part, for use by such rail carriers of rolling stock owned or leased by such shippers, the shippers shall apply to the Board for approval of that agreement under this paragraph. The Board shall approve the agreement only when it finds that the making and carrying out of the agreement will further the transportation policy set forth in section 10101 of this title and may require compliance with conditions necessary to make the agreement further that policy as a condition of approval. If the Board approves the agreement, it may be made and carried out under its terms and under the terms required by the Board[, and the antitrust laws set forth in paragraph (2) of this subsection do not apply to parties and other persons with respect to making or carrying out the agreement]. The Board shall approve or disapprove an agreement under this paragraph within one year after the date application for approval of such agreement is made.

\* \* \* \* \* \* \*

(d) The Board may begin a proceeding under this section on its own initiative or on application. [Action of the Board under this section—

17

  〔(1) approving an agreement;
  〔(2) denying, ending, or changing approval;
  〔(3) prescribing the conditions on which approval is granted; or
  〔(4) changing those conditions,
has effect only as related to application of the antitrust laws referred to in subsection (a) of this section.
  〔(e)(1) The Federal Trade Commission, in consultation with the Antitrust Division of the Department of Justice, shall prepare periodically an assessment of, and shall report to the Board on—
    〔(A) possible anticompetitive features of—
      〔(i) agreements approved or submitted for approval under subsection (a) of this section; and
      〔(ii) an organization operating under those agreements; and
    〔(B) possible ways to alleviate or end an anticompetitive feature, effect, or aspect in a manner that will further the goals of this part and of the transportation policy of section 10101 of this title.
  〔(2) Reports received by the Board under this subsection shall be published and made available to the public under section 552(a) of title 5.〕
  *(e) Nothing in this section exempts a proposed agreement described in subsection (a) from the application of the antitrust laws (as defined in subsection (a) of the 1st section of the Clayton Act, but including section 5 of the Federal Trade Commission Act to the extent such section 5 applies to unfair methods of competition).*
  *(f) In reviewing any proposed agreement described in subsection (a), the Board shall take into account, among any other considerations, the impact of the proposed agreement on shippers, consumers, and affected communities. The Board shall make findings regarding such impact, which shall be—*
    *(1) made part of the administrative record;*
    *(2) submitted to any other reviewing agency for consideration in making its determination; and*
    *(3) available in any judicial review of the Board's decision regarding such agreement.*

\*　　\*　　\*　　\*　　\*　　\*　　\*

## CHAPTER 113—FINANCE

\*　　\*　　\*　　\*　　\*　　\*　　\*

SUBCHAPTER II—COMBINATIONS

### § 11321. Scope of authority

  (a) 〔The authority〕 *Except as provided in sections 4, 4A, 4C, 15, and 16 of the Clayton Act, the authority* of the Board under this subchapter is exclusive. A rail carrier or corporation participating in or resulting from a transaction approved by or exempted by the Board under this subchapter may carry out the transaction, own and operate property, and exercise control or franchises acquired through the transaction without the approval of a State authority. A rail carrier, corporation, or person participating in that approved or exempted transaction 〔is exempt from the antitrust laws and

18

from all other law,**]** *is exempt from all other law (except the laws referred to in subsection (c)),* including State and municipal law, as necessary to let that rail carrier, corporation, or person carry out the transaction, hold, maintain, and operate property, and exercise control or franchises acquired through the transaction. However, if a purchase and sale, a lease, or a corporate consolidation or merger is involved in the transaction, the carrier or corporation may carry out the transaction only with the assent of a majority, or the number required under applicable State law, of the votes of the holders of the capital stock of that corporation entitled to vote. The vote must occur at a regular meeting, or special meeting called for that purpose, of those stockholders and the notice of the meeting must indicate its purpose.

\* \* \* \* \* \* \*

*(c) Nothing in this subchapter exempts a transaction described in subsection (a) from the application of the antitrust laws (as defined in subsection (a) of the 1st section of the Clayton Act, but including section 5 of the Federal Trade Commission Act to the extent such section 5 applies to unfair methods of competition). The preceding sentence shall not apply to any transaction relating to the pooling of railroad cars approved by the Surface Transportation Board or its predecessor agency pursuant to section 11322.*

*(d) In reviewing any transaction described in subsection (a), the Board shall take into account, among any other considerations, the impact of the transaction on shippers and affected communities.*

\* \* \* \* \* \* \*

○