# Calendar No. 19

| 112TH CONGRESS<br>*1st Session* | SENATE | REPORT<br>112–38 |
|---|---|---|

## THE RAILROAD ANTITRUST ENFORCEMENT ACT OF 2011

JULY 18, 2011.—Ordered to be printed

Mr. LEAHY, from the Committee on the Judiciary,
submitted the following

# R E P O R T

[To accompany S. 49]

[Including cost estimate of the Congressional Budget Office]

The Committee on the Judiciary, to which was referred the bill (S. 49), to amend the Federal antitrust laws to provide expanded coverage and to eliminate exemptions from such laws that are contrary to the public interest with respect to railroads, having considered the same, reports favorably thereon, without amendment, and recommends that the bill do pass.

## CONTENTS

|  |  | Page |
|---|---|---|
| I. | Background and Purpose of the Railroad Antitrust Enforcement Act of 2011 | 1 |
| II. | History of the Bill and Committee Consideration | 10 |
| III. | Section-by-Section Summary of the Bill | 11 |
| IV. | Congressional Budget Office Cost Estimate | 13 |
| V. | Regulatory Impact Evaluation | 15 |
| VI. | Conclusion | 15 |
| VII. | Changes to Existing Law Made by the Bill, as Reported | 15 |

## I. BACKGROUND AND PURPOSE OF THE RAILROAD ANTITRUST ENFORCEMENT ACT

### A. INTRODUCTION

The purpose of S. 49, the Railroad Antitrust Enforcement Act of 2011, is to remove current exemptions and subject the American freight railroad industry to all the provisions of the Nation's antitrust laws. This legislation will ensure that interested parties suffering from anti-competitive railroad practices that would other-

99–007


EXHIBIT
4

2

wise be actionable under U.S. antitrust law will have access to those causes of action in Federal district court. In addition, Government enforcement agencies, including the United States Department of Justice and the Federal Trade Commission (FTC), as well as state attorneys general acting on behalf of their citizens, will be able to fully enforce the antitrust laws to prevent anti-competitive mergers and anti-competitive business practices.

Under current law, the railroad industry is exempted from antitrust law in most respects. Virtually no other industry enjoys such a broad exemption from the antitrust laws. There is no basis for this broad antitrust immunity, especially since the railroad industry has been largely deregulated since the passage of the Staggers Rail Act in 1980.

The bill is prospective, but will apply to any current anti-competitive practices that continue after 180 days following the date of enactment of this Act. The purpose of the grace period is to give the freight railroad carriers time to cure their previously exempt conduct. The bill will allow the Justice Department and the FTC to sue to enjoin any future railroad merger or acquisition, whether or not approved by the Surface Transportation Board (STB), if the Justice Department or FTC believes that merger or acquisition violates the antitrust laws. After the enactment of S. 49, anti-competitive business practices engaged in by railroads will be subject to antitrust scrutiny and could be subject to civil actions for treble damages and injunctive relief. Among these are two current practices that rail customers believe to be anti-competitive—so-called "paper barriers" and so-called "bottlenecks," as explained below.

B. NEED FOR LEGISLATION

*1. The Staggers Rail Act of 1980*

This legislation is needed because there is a lack of competition in the national freight rail system today.[1] In 1980, Congress passed the Staggers Rail Act, the purpose of which was to partially deregulate the Nation's railroad industry and replace government regulation with market competition to the extent possible. When the legislation was passed, Congress did not remove the antitrust exemptions protecting the railroad industry. These antitrust exemptions had been extended to the Nation's railroads when they were subject to a pervasive regulatory system in which prior approval by the Interstate Commerce Commission (ICC) was required for most of their actions and transactions, a regulatory system that was no longer in place after the 1980 legislation.

The new regulatory system provided by Congress in the Staggers Rail Act of 1980 recognized that some customers who require railroad service would continue to have access to service by a single freight railroad and that these "captive" customers could be subject to railroad monopoly power. The ICC, which was replaced by the STB of the United States Department of Transportation through

---

[1] This legislation addresses freight railroads, and is not intended to have any effect on the passenger operations of Amtrak. While Amtrak is deemed a "railroad" for the purpose of certain Federal laws, most of the provisions of subtitle IV of title 49 do not apply to Amtrak. *See* 49 U.S.C. § 24301(c). Specifically, the bill does not affect 49 U.S.C. § 24301(j) (Section 306(e) of Pub. L. No. 91–518 (1970), recodified without substantive change by Pub. L. No. 103–272 (1994)), which provides that agreements entered into by Amtrak for the joint use or operation of facilities and equipment necessary for the provision of expeditious and efficient passenger service are exempt from the antitrust laws.

3

the ICC Termination Act of 1995, was directed by Congress to ensure rail customer access to competition where possible and protect rail customers from unreasonable rates and practices where competition is not available. The directions to the ICC, now the STB, for implementing the Staggers Rail Act of 1980 are contained in 49 U.S.C. § 10101 and stress the pro-competitive policy that was to guide implementation of the Act.

### 2. Lack of competition in the national rail system

Despite the directive of Congress in 1980, the United States Senate Committee on the Judiciary received significant evidence that there is a lack of competition in the national rail system today. An October 2006 Government Accountability Office (GAO) report reviewing the effectiveness of the Staggers Rail Act of 1980 found that there remains a lack of competition in the freight rail industry resulting in the continued existence of captive rail customers. That report found that shippers in many geographic areas "may be paying excessive rates due to a lack of competition in these markets."[2]

Additionally, a September 2010 staff report of the Senate Committee on Commerce, Science and Transportation makes clear how railroads have benefited from the unique combination of deregulation and large-scale antitrust immunity. Since 2004, Class I railroads—that is, large railroads with extensive route structures—have been increasing prices by an average of five percent a year above inflation. And even during the recent recession, while other modes of freight transportation cut their rates, the Class I railroads have been able to push year-over-year price increases onto their customers. The Report stated: "The four class I railroads that today dominate the U.S. rail shipping market are achieving returns on revenue and operating ratios that rank them among the most profitable businesses in the U.S. economy."[3] The four largest railroads nearly doubled their collective profit margins in the last decade to 13 percent, ranking the railroad industry the fifth most profitable industry according to Fortune magazine.[4] The Commerce Committee Report concluded that "Class I freight railroads have regained the pricing power they lacked in the 1980s, and now are some of the most highly profitable businesses in the U.S. economy."[5]

These unjustified cost increases cause harm throughout the economy. Consumers suffer higher electricity bills because a utility must pay for the high cost of transporting coal; manufacturers who rely on railroads to transport raw materials charge a higher price for their goods; and American farmers who ship their products by rail pass on these cost increases in the form of higher food prices. The 2006 GAO Report also found that the STB is not exercising its powers effectively to ensure rail customers access to competition. In addition, a 2010 Morgan Stanley analysis of the rail industry echoed the GAO noting that in the current environment of strong

[2] U.S. Government Accountability Office, Report to Congressional Requesters, "FREIGHT RAILROADS: Industry Health Has Improved, but Concerns about Competition and Capacity Should Be Addressed," Report #GAO–07–94 (October 2006) at 43.

[3] Senate Committee on Commerce, Science, and Transportation. "The Current Financial State of The Class I Freight Rail Industry." Staff Report for Chairman Rockefeller, September 15, 2010 ("2010 Commerce Committee Freight Rail Report"), at 1, 8.

[4] Id. at 4–5.

[5] Id. at 8.

4

railroad pricing power, "[r]ate negotiations continue to be difficult for shippers and competition remains minimal."[6]

The GAO's and Commerce Committee's findings were echoed by the Attorneys General of 20 states and the District of Columbia. In a March 2009 letter to Congress calling for an abolition of the railroad antitrust exemption, the Attorneys General wrote: "The antitrust exemption currently enjoyed by the railroad industry does not seem to have benefited competition. . . . In this concentrated market, shippers have reported that they are subjected to supra-competitive rates on monopoly routes."[7]

The severe consolidation in the railroad industry has greatly exacerbated this lack of competition. In 1976, there were 30 independent Class I railroad systems operating in the Nation, consisting of 63 Class I railroads. Today, there are only seven Class I railroads operating in the Nation, only four of which carry 90 percent of all freight railroad traffic in the United States. In 2008, these four railroads accounted for over 90 percent of Class I freight shipments and over 92 percent of Class I railroads' $61 billion in revenues.[8] The evidence received by the Committee indicates that the current lack of competition in the national freight rail system is the result of this drastic consolidation as well as several rulings by the ICC and the STB that have allowed a number of anti-competitive practices to exist.

### 3. Disparate treatment of the railroad industry from other regulated industries

One important purpose of S. 49 is to have the railroad industry treated the same as other regulated industries, including transportation industries. Many industries in our economy are subject to regulation—including notably the telecommunications sector, extensively regulated by the Federal Communications Commission—yet enjoy no antitrust exemption. Telecommunications mergers, for example, are reviewed by the FCC under a public interest standard, yet are fully subject to antitrust law and also reviewed by the Justice Department under the Clayton Act.

Importantly, even transportation industries similarly situated to the railroad industry enjoy no antitrust exemption. For example, the aviation industry comes under the regulatory supervision of the Transportation Department and Federal Aviation Administration, and the Transportation Department is empowered under the Transportation Act to take action to prevent an "unfair method of competition" in aviation.[9] Still, the aviation industry is generally subject to antitrust law and aviation mergers are reviewed by the Justice Department under the Clayton Act.

---

[6]*Id.* at 9.

[7]March 17, 2009 Letter from the Attorneys General of Arizona, Arkansas, California, Connecticut, Delaware, Idaho, Iowa, Kentucky, Maine, Maryland, Massachusetts, Minnesota, Montana, New Jersey, New Mexico, North Carolina, North Dakota, Oklahoma, South Dakota, and Utah to Majority Leader Harry Reid, Minority Leader Mitch McConnell, Speaker Nancy Pelosi, and Minority Leader John Boehner.

Additionally, the American Bar Association's Section of Antitrust Law expressed support for the enactment of the Railroad Antitrust Enforcement Act (S. 772 in the 110th Congress, identical to the present S. 49 in the 112th Congress), stating that the "Section supports these steps and encourages Congress to move forward quickly to dismantle the antitrust exemption for the railroad industry, through the Railroad Antitrust Enforcement Act." December 10, 2008 Comments of the ABA Section of Antitrust Law on the Railroad Antitrust Enforcement Act, at 1.

[8]2010 Commerce Committee Freight Rail Report, at 3.

[9]49 U.S.C. § 41712.

5

Other transportation industries that are subject to the supervision of the STB—such as trucking and domestic marine shipping—do not enjoy the same broad antitrust exemption as that enjoyed by the railroad industry. Removal of the special railroad antitrust exemption will result in the railroad industry being treated in the same manner under antitrust law as other industries subject to regulatory oversight.

*4. Mergers and acquisitions*

Under current law, Section 7 of the Clayton Act, which bans mergers which may substantially "lessen competition" or "tend to create a monopoly" does not apply to the railroad industry. Instead, the STB decides whether and under what conditions mergers and acquisitions of railroads may occur pursuant to a "public interest" test. The Justice Department's role is limited to filing comments with the STB, which are not binding in any respect and which the STB is free to ignore. On at least one occasion since 1980, the Justice Department filed comments with the STB against a proposed merger, but the comments were ignored and the merger approved (the 1996 merger of the Union Pacific Railroad and the Southern Pacific Railroad). On a number of other occasions, the Justice Department filed comments with the STB recommending certain conditions on proposed mergers that were not adopted by the STB. In all of these cases, neither the Justice Department nor the FTC was empowered to sue in Federal district court to ensure that the merger or acquisition was consistent with the Nation's antitrust laws.

The Railroad Antitrust Enforcement Act of 2011 will bring railroad mergers inside the ambit of Section 7 of the Clayton Act and empower the antitrust enforcement agencies (likely the Justice Department)[10] to file suit to block anti-competitive mergers and acquisitions. It will therefore ensure that future railroad mergers and acquisitions need not merely meet the "public interest" test implemented by the STB but also meet the merger standard of the Nation's antitrust laws.[11] The STB will retain its jurisdiction to review and approve or disapprove mergers and acquisitions pursuant to its "public interest" test. However, the merger also will have to satisfy antitrust law, and will be subject to antitrust enforcement in Federal court by the Justice Department, regardless of what the STB determines under its public interest test. In this regard, mergers and acquisitions in the railroad industry will be treated in an identical manner to mergers and acquisitions in many other industries subject to Federal regulatory review. For example, mergers and acquisitions in the telecommunications industry are reviewed under a public interest test by the Federal Communications Commission, while also being subject to antitrust law and challenge by the Justice Department under the Clayton Act. There is no reason for the railroad industry to be treated any differently.

---

[10] Although both the Justice Department and the Federal Trade Commission have the authority to enforce the antitrust laws, traditionally the Justice Department reviews mergers in the transportation sector.

[11] These provisions providing for review of mergers and acquisitions by the Justice Department under Section 7 of the Clayton Act apply only to mergers and acquisitions occurring after the date of enactment of the bill. *See* section 8(b)(1) of S. 49, which expressly states that a civil action under the Clayton Act "may not be filed with respect to any conduct or activity that occurred prior to the date of enactment of this Act that was previously exempted from the laws."

6

*5. Bottlenecks or refusal to quote rates*

Many rail customers are served by a single railroad at either the origin or the destination of their rail shipment, the so-called "captive shippers." These customers do not have the benefit of competition and often face very high rail rates. Even though they are "captive" to a single railroad at origin or destination, often a competing railroad is available for at least part of the distance between origin and destination through an interconnection with the railroad that holds the customer captive. In the mid-1990s the question arose before the STB of whether the railroad that holds the customer captive at origin or destination must provide a rate for moving the customer's freight to the competing railroad. Stated simply, does a railroad have an obligation to allow its captive customer to have access to the competing railroad or can a railroad hold the customer captive for the entire length of the shipment?

This question was decided by the STB on December 27, 1996, in a case referred to as the "bottleneck" decision.[12] In this case, the STB ruled that the rail carrier providing single line service to the customer was not required to provide a rate that would allow the customer to reach a competing rail line. Such conduct would be subject to antitrust scrutiny, were it not for the railroad antitrust exemption.

In 2004, the then-Chairman of the House Judiciary Committee, Congressman F. James Sensenbrenner, Jr., asked the Justice Department to comment on whether the practice of refusing to provide rates to points of competition would violate the Nation's antitrust laws if the railroad industry exemption from those laws did not exist. On September 27, 2004, Assistant Attorney General William E. Moschella responded as follows:

> The first practice is the refusal by a railroad that controls one segment of a freight movement to quote rates separately for that "bottleneck" segment, instead quoting rates only for the entire freight movement. You note that this practice denies shippers the benefits of competition on segments of the move where an alternative carrier might compete for the business. Because of the Surface Transportation Board's involvement in approving these rates, and its acceptance of this practice, relief may not be available under the antitrust laws. If this practice were subject to the antitrust laws, it could be evaluated as a refusal to deal in possible violation of section 2 of the Sherman Act, or as a tying arrangement in possible violation of section 1 of the Sherman Act. Whether it would constitute an antitrust violation would depend on the particular facts.

The Committee believes that this conduct should properly be subject to scrutiny under the antitrust laws. The Railroad Antitrust Enforcement Act of 2011 will remove the freight railroad industry's exemption from the antitrust law and allow a plaintiff to bring an

---

[12] The decision was made in case No. 41242, *Central Power and Light Company* v. *Southern Pacific Transportation Company* and covered two other cases with which it was consolidated: No. 41295, *Pennsylvania Power and Light Company* v. *Consolidated Rail Corporation,* and No. 41626, *MidAmerican Energy Company* v. *Union Pacific Railroad Company and Chicago and North Western Railway Company.*

7

antitrust lawsuit to seek to enjoin this practice in Federal district court as a violation of the Sherman Act.[13]

## 6. Paper barriers or tying agreements

One of the objectives of the Staggers Rail Act of 1980 was to allow the Class I railroads increased flexibility to rationalize their systems by discarding under-utilized and excess rail capacity. The railroad industry responded by petitioning the ICC, later the STB, to allow the abandonment of tens of thousands of miles of track. In addition, the Class I railroads began to transfer the operating rights of other tracks to "short line" railroads, many of which were created to operate track formerly operated by a major railroad. Each of these transactions required approval of the ICC, later the STB, but the agreements between the major railroad and the short-line railroad were kept confidential as part of the public review of the transaction. In many cases, the short-line railroad involved had the physical ability to deliver freight to more than one Class I railroad.

Often long after the transaction was approved by the ICC or the STB, customers of the short line railroad found that there were provisions in the agreement between the Class I and short line railroad that prevented the short line from delivering or receiving a meaningful amount of freight from any Class I railroad except the Class I railroad with which it had the operating agreement. Thus, even though the short line has the physical ability to deliver or receive freight from more than one Class I railroad, a "paper barrier" or "tying agreement" prevents access to a competing railroad.

In his 2004 letter, then-House Judiciary Committee Chairman Sensenbrenner asked the Justice Department about these "paper barriers." The September 27, 2004 response by Assistant Attorney General Moschella states:

> The second industry practice you describe is "paper barriers." Paper barriers are created when Class I railroads spin off segments of their trackage to short-line or low-density carriers with contractual terms that prohibit the acquiring carriers from competing with the Class I railroads for business. Since these contractual terms are part of an underlying sale transaction that is reviewed and approved by the Surface Transportation Board, they may be exempted from the reach of the antitrust laws, depending on the scope of the approval language in each of the Board's relevant orders. If paper barriers were subject to the antitrust laws, they would be evaluated under section 1 of the Sherman Act. The Department would examine whether the restraint is ancillary to the sale of the trackage—i.e. whether the restraint is reasonably necessary to achieve the pro-competitive benefits of the sale.

The Committee believes that that these "paper barriers" should be subject to scrutiny under the antitrust laws. The Railroad Antitrust Enforcement Act of 2011 will remove the railroad industry's

---

[13] As is plain from the text of S. 49, the bill does not create a presumption that any railroad conduct or practice specified herein is or is not illegal; whether or not any conduct or practice is illegal will be determined by the application of substantive antitrust law.

8

antitrust exemption, allowing a plaintiff to bring an antitrust action to seek to enjoin these restrictive provisions—or obtain treble damages for losses caused by these provisions—in a Federal district court.

### 7. Removal of STB primary jurisdiction

The Railroad Antitrust Enforcement Act of 2011 also removes any requirement that a district court defer to the primary jurisdiction doctrine of the STB in railroad antitrust cases. Without this provision, parties may be able to avoid antitrust scrutiny by convincing a court it is required to defer to the STB. Clarifying the law in this area is necessary to ensure that the elimination of the antitrust exemptions is effective.[14]

Moreover, the need for an express statement that the courts need not defer to the administrative agency is necessary in light of recent Supreme Court decisions involving the role of antitrust law in regulated industries, including its 2007 ruling that antitrust law was preempted by a regulatory scheme when the law was silent regarding a conflict between antitrust law and the regulation of the securities industry.[15]

The Committee believes that the STB's shortcomings in its efforts to protect consumers from anti-competitive actions by regulated railroads, including mergers and acquisitions, warrants making the Federal courts, applying antitrust law, the primary protectors of competition in all aspects of the rail freight industry. If courts were required to defer to the STB under the primary jurisdiction doctrine, then the whole purpose of S.49 would be undermined because antitrust scrutiny may be avoided. Railroads would be able to use the STB's primary jurisdiction as a kind of "stealth preemption" of the antitrust courts' newly-restored role. The STB has no experience in applying antitrust law and many of its decisions reach results contrary to antitrust principles. For this reason, section 4 of S.49 provides that in any antitrust action, a Federal district court is not required to defer to the primary jurisdiction of the STB.

### C. EFFECT OF LEGISLATION

The elimination of the railroad antitrust exemption will change the law in several respects. Private plaintiffs (such as rail customers) will be able to bring complaints in Federal district court for treble damages and/or injunctive relief that specific actions of the railroads violate the antitrust laws. Unlike under current law, whether or not the Surface STB has reviewed or approved railroad conduct will be irrelevant to the application of antitrust law. The fact that railroad conduct is approved by the STB will no longer di-

---

[14] Without congressional action, the primary jurisdiction doctrine would apply in the antitrust cases that S.49 would make possible. First, the lead case on the general primary jurisdiction doctrine involved the ICC: *United States* v. *W. Pac. R.R. Co.*, 352 U.S. 59, 64–65, 65–66 (1956) (mandating suspension of judicial proceedings pending referral to the ICC). Second, the doctrine is applicable in antitrust cases. See e.g. *Ricci* v. *Chicago Mercantile Exch.*, 409 U.S. 289 (1973). The Ricci case tries to reconcile cases in which the Supreme Court has held that the doctrine does not apply in some antitrust cases (e.g., *California* v. *Federal Power Comm'n*, 369 U.S. 482 (1962); *Silver* v. *New York Stock Exch.*, 373 U.S. 341 (1963)), but does apply in others. Thus, the primary jurisdiction doctrine has become a substantial obstacle for the application of antitrust law in regulated industries.

[15] See *Credit Suisse Sec* v. *Billing*, 127 S. Ct. 2383 (2007); *see also Verizon Commc'n* v. *Trinko*, 540 U.S. 398 (2004).

9

vest courts from jurisdiction over the application of antitrust law to that conduct.

Conduct subject to such private antitrust litigation will include (but not be limited to) actions challenging: arrangements where major railroads spin off or lease segments of their tracks to short line carriers with contractual terms that prohibit the acquiring carrier from competing with the major railroads (known as "paper barriers," as described above); situations where there is competition for a portion, but not all, of the journey, and railroads refuse to quote rates for the "bottleneck" portion of the trip (the "bottleneck" situation, as described above); and the practice of railroads publicly disclosing tentative prospective shipping rates, which could facilitate collusion among competing railroads and result in increased prices.[16]

The Federal antitrust enforcement agencies (the Justice Department and FTC) will also be empowered to bring antitrust lawsuits in Federal court to enjoin conduct by railroads which violates the antitrust laws. The legislation removes the railroad common carrier exemption prohibiting the FTC from bringing antitrust lawsuits against the railroads, so both the FTC and Justice Department will have full authority to enforce the antitrust laws with respect to the railroad industry. In addition, state attorneys general could bring actions in Federal court on behalf of their citizens challenging allegedly anti-competitive railroad practices as violative of antitrust law.

The legislation will also allow the Justice Department,[17] state Attorneys General, and private citizens to challenge under antitrust law in Federal district court railroad mergers and acquisitions, regardless of whether they are approved by the STB. This is a substantial change from current law under which only the STB may take action to block or modify a railroad merger or acquisition, and which divests authority from the Justice Department to file suit under the Clayton Act to enjoin a railroad merger or acquisition.

The bill is intended to apply prospectively, including to any ongoing conduct previously immunized from antitrust law that is still in place 180 days after enactment of the legislation. The bill provides in section 8 that no antitrust action may be brought with respect to any on-going conduct exempted from antitrust law by the STB, or its predecessor the ICC, unless the conduct is still ongoing 180 days after enactment of the legislation. This provision is intended to give those affected by the termination of the railroad antitrust exemption six months to bring their conduct into compliance with antitrust law.

---

[16] However, one type of railroad industry practice, if reviewed and approved by the STB, will continue to be exempt from the application of antitrust law—specifically, any transaction relating the pooling of railroad cars approved by the STB pursuant to 49 U.S.C. §11322. Railroad car pooling arrangements are generally efficiency enhancing because they integrate economic activity in a way that promotes competition.

[17] Because of the bill's removal of the railroad common carrier exemption that currently prevents the FTC from enforcing antitrust law against railroad common carriers, the FTC would also have jurisdiction to review railroad mergers and acquisitions. *See supra* at 5–6. Traditionally, however, the Justice Department is the agency that reviews mergers and acquisitions in transportation industries (for example, the aviation industry). Which agency ultimately assumed this responsibility would be decided by the Justice Department and FTC.

10

D. SUMMARY

The objective of the Railroad Antitrust Enforcement Act is simply to remove the antitrust exemption protecting the railroad industry and allow antitrust enforcement of railroad industry practices. The current antitrust exemption enjoyed by the railroad industry is unwarranted due to the substantial de-regulation of the railroad industry in recent decades, and has resulted in anti-competitive behavior harming railroad customers and consumers. The bill will remove this outmoded exemption so that the railroad industry is treated for purposes of antitrust law like virtually every other industry in the economy.

By requiring railroads to comply with the antitrust laws like other major industries operating service networks, S.49 will restore to railroad customers the benefits of open competition that prevail elsewhere in the economy, resulting in lower prices and more efficient and more economical rail transportation of grain, coal, chemicals and other products essential to the Nation's domestic and foreign commerce.

## II. HISTORY OF THE BILL AND COMMITTEE CONSIDERATION

The Railroad Antitrust Enforcement Act was first introduced in the 109th Congress by Senator Kohl on June 29, 2006 (S. 3612).[18] The bill had one co-sponsor (Senator Feingold). It was referred to the Committee on the Judiciary. No further action was taken on S. 3612 in the 109th Congress.

On March 6, 2007, Senator Kohl introduced the Railroad Antitrust Enforcement Act in the 110th Congress (S. 772). The legislation had 11 co-sponsors (Senators Feingold, Coleman, Rockefeller, Vitter, Leahy, Harkin, Dorgan, Biden, Schumer, Lincoln and Klobuchar). The bill was reported favorably, with a technical amendment, by the Committee on the Judiciary by voice vote on September 20, 2007.

A hearing on the bill titled "An Examination of S.772, the Railroad Antitrust Enforcement Act" was held by the Committee on the Judiciary's Subcommittee on Antitrust, Competition Policy and Consumer Rights on October 3, 2007.

On January 6, 2009, the Railroad Antitrust Enforcement Act of 2011 (S. 49) was introduced in the 111th Congress by Senator Kohl. The bill had 13 co-sponsors (Senators Leahy, Vitter, Feingold, Hatch, Schumer, Klobuchar, Kaufman, Franken, Rockefeller, Dorgan, Harkin, Tim Johnson, and Tester). The language of the bill was identical to the bill as reported by the Judiciary Committee in the 110th Congress on September 20, 2007. It was referred to the Committee on the Judiciary.

In its business meeting of March 5, 2009, the Committee voted to report the Railroad Antitrust Enforcement Act of 2009, without amendment, favorably to the Senate. The Committee proceeded by roll call vote as follows:

Tally: 14 Yeas, 0 Nays, 5 Pass.

*Yeas (14):* Leahy (D–VT), Kohl (D–WI), Feinstein (D–CA), Feingold (D–WI), Schumer (D–NY), Durbin (D–IL), Cardin (D–MD),

---

[18] S. 3612 in 109th Congress was identical to S. 772 as introduced in the 110th Congress, with the sole exception that the version introduced in the 109th Congress did not include section 8 of the current legislation ("Effective Date").

11

Whitehouse (D–RI), Wyden (D–OR), Klobuchar (D–MN), Kaufman (D–DE), Hatch (R–UT), Grassley (R–IA), Kyl (R–AZ).

*Pass (5):* Specter (R–PA), Sessions (R–AL), Graham (R–SC), Cornyn (R–TX), Coburn (R–OK).

On January 25, 2011, the Railroad Antitrust Enforcement Act of 2011 (S. 49) was introduced in the 112th Congress by Senator Kohl. The bill has seven co-sponsors (Senators Leahy, Vitter, Schumer, Hatch, Klobuchar, Franken, and Tester). The language of the bill was identical to the bill as reported by the Judiciary Committee in the 111th Congress on March 5, 2009. It was referred to the Committee on the Judiciary.

In its business meeting of March 3, 2011, the Committee voted to report the Railroad Antitrust Enforcement Act of 2009, without amendment, favorably to the Senate. The Committee proceeded by roll call vote as follows:

Tally: 14 Yeas, 1 Nay, 3 Passes.

*Yeas (14):* Leahy (D–VT), Kohl (D–WI), Feinstein (D–CA), Schumer (D–NY), Durbin (D–IL), Cardin (D–MD), Whitehouse (D–RI), Klobuchar (D–MN), Coons (D–DE), Blumenthal (D–CT), Grassley (R–IA), Hatch (R–UT), Kyl (R–AZ), Lee (R–UT).

*Nay (1):* Cornyn (R–TX).

*Pass (3):* Sessions (R–AL), Graham (R–SC), Coburn (R–OK).

### III. Section-by-Section Summary of the Bill

*Section 1. Short title*

This section provides that the legislation may be cited as the "Railroad Antitrust Enforcement Act."

*Section 2. Injunctions against railroad common carriers*

Section 2 of the bill amends section 16 of the Clayton Act of 1914 (15 U.S.C. § 26), which sets forth the principal remedies available for violations of the Federal antitrust laws. Section 16 permits private parties threatened with loss or damage by a violation of the Federal antitrust laws to sue for injunctive relief against such violations by a civil action in the courts of the United States. Section 16, however, presently contains a proviso that this fundamental antitrust remedy is not available against common carriers subject to regulation by the STB, successor to the functions of the former ICC under subtitle IV of Title 49 of the United States Code. Section 2 of the bill revises this proviso so that it will apply only to non-railroad common carriers subject to STB jurisdiction. It thereby makes injunctive relief available to parties threatened with economic injury by antitrust violations of railroad common carriers.

*Section 3. Mergers and acquisitions of railroads*

Section 3 amends section 7 of the Clayton Act of 1914, which incorporates the Cellar-Kefauver Antimerger Act of 1950 (15 U.S.C. § 18), to make railroad combinations subject to its provisions. Section 7 bars anticompetitive mergers, consolidations and acquisitions. It declares unlawful acquisitions of the stock or assets of persons engaged in or affecting interstate commerce "where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to a monopoly." Proposed or consummated transactions that are

12

unlawful under section 7 can be enjoined by Federal courts in civil actions by Federal antitrust authorities or private parties. The fifth paragraph in section 7, however, provides that nothing contained in that section shall apply to transactions duly approved by a number of Federal agencies acting under other statutes authorizing such approvals. Among the agencies listed in the fifth paragraph is the STB, which has statutory authority to approve railroad combinations under 49 U.S.C. §§ 11322 (combinations relating to the pooling or division of traffic and earnings) and 11323 (consolidations, mergers, and acquisitions of control). Section 3 creates an exception to the fifth paragraph that eliminates this exemption with respect to STB-approved transactions described in 49 U.S.C. § 11321, i.e. STB-approved rate agreements or combinations subject to §§ 11322 and 11323.

*Section 4. Limitation of primary jurisdiction*

Section 4 removes any requirement that a Federal district court defer to the primary jurisdiction of the STB in any civil antitrust action against a common carrier railroad (1) by a private party seeking treble damages (15 U.S.C. § 15); (2) by the United States seeking an injunction (15 U.S.C. § 25); or (3) by a private party seeking an injunction (15 U.S.C. § 26).

*Section 5. Federal Trade Commission enforcement*

Section 5 changes existing law so that the FTC may enforce the antimerger and other provisions of the Clayton Act against railroad common carriers. Section 11(a) of the Clayton Act, 15 U.S.C. § 21(a), presently vests such authority in the STB. Section 5 of the bill amends this provision to create an exception to the STB's enforcement jurisdiction under the Clayton Act with respect to two categories of transactions: STB-approved agreements among two or more rail carriers relating to rates subject to 49 U.S.C. § 10706; and transactions described in 49 U.S.C. § 11321, i.e., STB-approved agreements or combinations subject to §§ 11322 and 11323. Since section 11(a) of the Clayton Act vests in the FTC authority to enforce its provisions where enforcement authority is not assigned to other agencies, the exceptions from the STB's authority enacted by section 5 will fall within the jurisdiction of the FTC.

*Section 6. Expansion of treble damages to rail common carriers*

Section 6 eliminates the judicially-created barrier against recovery of private antitrust damages from railroad carriers under the "Keogh Doctrine," which holds that shippers injured by a railroad's antitrust violations are limited to the railroad's filed rate.[19] Section 6 of the bill adds a new subsection to the treble damage provision in section 4 of the Clayton Act. It provides that treble damages shall be available in civil antitrust suits to parties injured by railroad antitrust violations without regard to whether such railroads have filed rates or whether a complaint challenging rates has been filed.

---

[19] *Keogh* v. *Chicago & Northwestern Railway*, 260 U.S. 152 (1922).

*Section 7. Termination of antitrust exemptions in title 49*

Section 7 eliminates certain exemptions from the antitrust laws presently enjoyed by railroad common carriers under subchapter IV of Title 49. First, 49 U.S.C. § 10706(a)(2)(A), (4) and (5) currently exempt from the antitrust laws ratemaking agreements among railroads that are approved by the STB. Section 7(a)(1) of the bill amends this provision by striking the exemption. Second, 49 U.S.C. § 10706(e) currently provides for a periodic report by the FTC and the Antitrust Division of the Department of Justice on possible anti-competitive features of railroad rate agreements approved by or submitted to the STB. Section 7(a)(2) of the bill strikes this provision and substitutes a command that nothing in section 10706 exempts proposed agreements described in section 10706 from the antitrust laws, and a requirement that the STB and any other reviewing agency consider the impact of the proposed agreement on shippers and on affected communities. Third, 49 U.S.C. § 11321 currently exempts from the antitrust laws transactions described therein, i.e., STB-approved railroad agreements or combinations subject to 49 U.S.C. § 11322 (combinations relating to the pooling or division of traffic and earnings), or to 49 U.S.C. § 11323 (consolidations, mergers, and acquisitions of control). Section 7(b)(1) strikes this exemption. However, any transaction relating the pooling of railroad cars approved by the STB pursuant to 49 U.S.C. § 11322 is excluded from this language; such railroad car pooling arrangements will continue to be exempt from antitrust law. Section 7(b)(2) adds to 49 U.S.C. § 11321 a new subsection (c) mandating that nothing in section 10706 exempts proposed agreements described in section 10706 from the antitrust laws, and requiring that the STB consider the impact of the proposed agreement on shippers and on affected communities.

*Section 8. Effective Date*

Section 8 provides that a civil action under sections 4, 15, or 16 of the Clayton Act, or section 5 of the Federal Trade Commission Act (the antitrust laws revived with respect to railroads by this bill) may not be filed with respect to conduct exempted from the antitrust laws by the STB or ICC. However, under subsection (b) of section 8, such an action may be brought with respect to previously exempted conduct or activity that is continued subsequent to the date of enactment of this Act when such a civil action is filed 180 days after the date of enactment of the Act.

IV. Congressional Budget Office Cost Estimate

The Committee sets forth, with respect to the bill, S. 49, the following estimate and comparison prepared by the Director of the Congressional Budget Office under section 402 of the Congressional Budget Act of 1974:

14

MARCH 25, 2011.

Hon. PATRICK J. LEAHY,
*Chairman, Committee on the Judiciary,*
*U.S. Senate, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has prepared the enclosed cost estimate for S. 49, the Railroad Antitrust Enforcement Act of 2011.

If you wish further details on this estimate, we will be pleased to provide them. The CBO staff contact is Martin von Gnechten.

Sincerely,

DOUGLAS W. ELMENDORF.

Enclosure.

*S. 49—The Railroad Antitrust Enforcement Act of 2011*

S. 49 would expand the authority of the Department of Justice (DOJ) and the Federal Trade Commission (FTC) to prosecute, under the Clayton Act, certain antitrust violations relating to railroads. Currently, the Surface Transportation Board (STB) has the primary authority to regulate mergers, acquisitions, rate-setting, and pooling arrangements under the Interstate Commerce Act. The roles of DOJ and FTC generally are limited to investigating potential antitrust violations and providing advice to the STB.

Based on information provided by DOJ, CBO estimates that implementing S. 49 would have no significant effect on the federal budget. Enacting S. 49 could increase direct spending and revenues; therefore, pay-as-you-go procedures apply. However, CBO estimates that any such changes would be insignificant in any year.

CBO expects that DOJ would continue to perform investigations of railroads (investigations under current law are similar to those that would be performed under the bill), and that few of those investigations would result in enforcement actions. Accordingly, CBO expects that DOJ's workload would not increase substantially under the bill. CBO also expects that DOJ, rather than FTC, would handle antitrust enforcement matters specified under the bill; thus, we do not anticipate that FTC would incur significant additional enforcement costs. Anyone convicted of the antitrust violations specified in the bill would be subject to criminal fines, which are recorded as revenues, deposited in the Crime Victims Fund, and later spent. Thus, enacting S. 49 could increase revenues and direct spending, but CBO estimates that any such effects would be insignificant given the small number of cases that would likely be affected.

S. 49 would impose a private-sector mandate, as defined in the Unfunded Mandates Reform Act (UMRA), by eliminating railroads' exemptions from certain antitrust laws. It is unclear how making railroads subject to the standards of those antitrust statues would affect current business practices, if at all. The extent to which railroad carriers would have to forgo business opportunities and the value of those lost opportunities are also uncertain. Because of those uncertainties, CBO has no basis for estimating the costs to railroad carriers or whether those costs would exceed the annual threshold established in UMRA for private-sector mandates ($142 million in 2011, adjusted annually for inflation).

15

S. 49 contains no intergovernmental mandates as defined in UMRA and would impose no costs on state, local, or tribal governments.

The CBO staff contacts for this estimate are Martin von Gnechten (for federal costs) and Sam Wice (for the private-sector impact). The estimate was approved by Theresa Gullo, Deputy Assistant Director for Budget Analysis.

### V. REGULATORY IMPACT EVALUATION

In compliance with rule XXVI of the Standing Rules of the Senate, the Committee finds that no significant regulatory impact will result from the enactment of S. 49.

### VI. CONCLUSION

The Railroad Antitrust Enforcement Act of 2011, S. 49, will remove current exemptions and subject the freight railroad industry to the provisions of the Nation's antitrust laws. By requiring railroads to comply with the antitrust laws like other major industries operating service networks, S. 49 will restore to railroad customers the benefits of open competition that prevail elsewhere in the economy.

### VII. CHANGES TO EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with paragraph 12 of rule XXVI of the Standing Rules of the Senate, changes in existing law made by S. 49 as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, and existing law in which no change is proposed is shown in roman):

# UNITED STATES CODE, TITLE 15—COMMERCE AND TRACE

## CHAPTER 1—MONOPOLIES AND COMBINATIONS IN RESTRAINT OF TRADE

\*      \*      \*      \*      \*      \*      \*

**SEC. 15. SUITS BY PERSONS INJURED**

(a) AMOUNT OF RECOVERY; PREJUDGMENT INTEREST.—Except as provided in subsection (b) of this section, any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. The court may award under this section, pursuant to a motion by such person promptly made, simple interest on actual damages for the period beginning on the date of service of such person's pleading setting forth a claim under the antitrust laws and ending on the date of judgment, or for any shorter period therein, if the court finds that the award of such interest for such period is just in the circumstances. In determining whether an award of interest under

16

this section for any period is just in the circumstances, the court shall consider only—

(1) whether such person or the opposing party, or either party's representative, made motions or asserted claims or defenses so lacking in merit as to show that such party or representative acted intentionally for delay, or otherwise acted in bad faith;

(2) whether, in the course of the action involved, such person or the opposing party, or either party's representative, violated any applicable rule, statute, or court order providing for sanctions for dilatory behavior or otherwise providing for expeditious proceedings; and

(3) whether such person or the opposing party, or either party's representative, engaged in conduct primarily for the purpose of delaying the litigation or increasing the cost thereof.

*(b) Subsection (a) shall apply to a common carrier by railroad subject to the jurisdiction of the Surface Transportation Board under subtitle IV of title 49, United States Code, without regard to whether such railroads have filed rates or whether a complaint challenging a rate has been filed.*

⟦(b)⟧*(c)* AMOUNT OF DAMAGES PAYABLE TO FOREIGN STATES AND INSTRUMENTALITIES OF FOREIGN STATES.—

(1) Except as provided in paragraph (2), any person who is a foreign state may not recover under subsection (a) of this section an amount in excess of the actual damages sustained by it and the cost of suit, including a reasonable attorney's fee.

(2) Paragraph (1) shall not apply to a foreign state if—

(A) such foreign state would be denied, under section 1605(a)(2) of title 28, immunity in a case in which the action is based upon a commercial activity, or an act, that is the subject matter of its claim under this section;

(B) such foreign state waives all defenses based upon or arising out of its status as a foreign state, to any claims brought against it in the same action;

(C) such foreign state engages primarily in commercial activities; and

(D) such foreign state does not function, with respect to the commercial activity, or the act, that is the subject matter of its claim under this section as a procurement entity for itself or for another foreign state.

⟦(c)⟧*(d)* DEFINITIONS.—For purposes of this section—

(1) the term "commercial activity" shall have the meaning given it in section 1603(d) of title 28, and

(2) the term "foreign state" shall have the meaning given it in section 1603(a) of title 28.

\*      \*      \*      \*      \*      \*      \*

**SEC. 7. ACQUISITION BY ONE CORPORATION OF STOCK OF ANOTHER (15 U.S.C. § 18).**

No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of com-

17

merce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

No person shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of one or more persons engaged in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition, of such stocks or assets, or of the use of such stock by the voting or granting of proxies or otherwise, may be substantially to lessen competition, or to tend to create a monopoly.

This section shall not apply to persons purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition. Nor shall anything contained in this section prevent a corporation engaged in commerce or in any activity affecting commerce from causing the formation of subsidiary corporations for the actual carrying on of their immediate lawful business, or the natural and legitimate branches or extensions thereof, or from owning and holding all or a part of the stock of such subsidiary corporations, when the effect of such formation is not to substantially lessen competition.

Nor shall anything herein contained be construed to prohibit any common carrier subject to the laws to regulate commerce from aiding in the construction of branches or short lines so located as to become feeders to the main line of the company so aiding in such construction or from acquiring or owning all or any part of the stock of such branch lines, nor to prevent any such common carrier from acquiring and owning all or any part of the stock of a branch or short line constructed by an independent company where there is no substantial competition between the company owning the branch line so constructed and the company owning the main line acquiring the property or an interest therein, nor to prevent such common carrier from extending any of its lines through the medium of the acquisition of stock or otherwise of any other common carrier where there is no substantial competition between the company extending its lines and the company whose stock, property, or an interest therein is so acquired.

Nothing contained in this section shall be held to affect or impair any right heretofore legally acquired: Provided, That nothing in this section shall be held or construed to authorize or make lawful anything heretofore prohibited or made illegal by the antitrust laws, nor to exempt any person from the penal provisions thereof or the civil remedies therein provided.

Nothing contained in this section shall apply to transactions duly consummated pursuant to authority given by the Secretary of Transportation, Federal Power Commission, Surface Transportation Board *(except for transactions described in section 11321 of title 49, United States Code)*, the Securities and Exchange Commission in the exercise of its jurisdiction under section 79j of this title, the United States Maritime Commission, or the Secretary of Agri-

18

culture under any statutory provision vesting such power in such Commission, Board, or Secretary.

\*      \*      \*      \*      \*      \*      \*

**SEC. 11. ENFORCEMENT PROVISIONS (15 U.S.C. § 21).**

(a) COMMISSION, BOARD, OR SECRETARY AUTHORIZED TO ENFORCE COMPLIANCE.—Authority to enforce compliance with sections 13, 14, 18, and 19 of this title by the persons respectively subject thereto is vested in the Surface Transportation Board where applicable to common carriers subject to jurisdiction under subtitle IV of title 49 *(except for agreements described in section 10706 of that title and transactions described in section 11321 of that title);* in the Federal Communications Commission where applicable to common carriers engaged in wire or radio communication or radio transmission of energy; in the Secretary of Transportation where applicable to air carriers and foreign air carriers subject to part A of subtitle VII of title 49; in the Board of Governors of the Federal Reserve System where applicable to banks, banking associations, and trust companies; and in the Federal Trade Commission where applicable to all other character of commerce to be exercised as follows:

\*      \*      \*      \*      \*      \*      \*

**SEC. 16. INJUNCTIVE RELIEF FOR PRIVATE PARTIES; EXCEPTION; COSTS (15 U.S.C. § 26).**

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue: Provided, That nothing herein contained shall be construed to entitle any person, firm, corporation, or association, except the United States, to bring suit for injunctive relief against any common carrier *that is not a railroad* subject to the jurisdiction of the Surface Transportation Board under subtitle IV of title 49. In any action under this section in which the plaintiff substantially prevails, the court shall award the cost of suit, including a reasonable attorney's fee, to such plaintiff.

\*      \*      \*      \*      \*      \*      \*

**SEC. 29.**

*In any civil action against a common carrier railroad under section 4, 4C, 15, or 16 of this Act, the district court shall not be required to defer to the primary jurisdiction of the Surface Transportation Board.*

# FEDERAL TRADE COMMISSION ACT
## (15 U.S.C. § 41 et seq.)

\*      \*      \*      \*      \*      \*      \*

19

**SEC. 5. UNFAIR METHODS OF COMPETITION UNLAWFUL; PREVENTION BY COMMISSION (15 U.S.C. § 45).**

(a) DECLARATION OF UNLAWFULNESS; POWER TO PROHIBIT UNFAIR PRACTICES; INAPPLICABILITY TO FOREIGN TRADE.—

(1) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful.

(2) The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations, except banks, savings and loan institutions described in section 57a(f)(3) of this title, Federal credit unions described in section 57a(f)(4) of this title, common carriers, *except for railroads,* subject to the Acts to regulate commerce, air carriers and foreign air carriers subject to part A of subtitle VII of title 49, and persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act, 1921, as amended (7 U.S.C. 181 et seq.), except as provided in section 406(b) of said Act (7 U.S.C. 227(b)), from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce.

(3) This subsection shall not apply to unfair methods of competition involving commerce with foreign nations (other than import commerce) unless—

(A) such methods of competition have a direct, substantial, and reasonably foreseeable effect—

(i) on commerce which is not commerce with foreign nations, or on import commerce with foreign nations; or

(ii) on export commerce with foreign nations, of a person engaged in such commerce in the United States; and

(B) such effect gives rise to a claim under the provisions of this subsection, other than this paragraph.

If this subsection applies to such methods of competition only because of the operation of subparagraph (A)(ii), this subsection shall apply to such conduct only for injury to export business in the United States.

\*      \*      \*      \*      \*      \*      \*

# TITLE 49, UNITED STATES CODE— TRANSPORTATION

\*      \*      \*      \*      \*      \*      \*

## Subtitle IV—Interstate Transportation

## PART A—RAIL

\*      \*      \*      \*      \*      \*      \*

# CHAPTER 107—RATES

## Subchapter I—General Authority

\*       \*       \*       \*       \*       \*       \*

**SEC. 10706. [RATE AGREEMENTS: EXEMPTION FROM ANTITRUST LAWS]** *RATE AGREEMENTS.*

(a)(1) IN THIS SUBSECTION—

(A) the term "affiliate" means a person controlling, controlled by, or under common control or ownership with another person and "ownership" refers to equity holdings in a business entity of at least 5 percent;

(B) the term "single-line rate" refers to a rate or allowance proposed by a single rail carrier that is applicable only over its line and for which the transportation (exclusive of terminal services by switching, drayage or other terminal carriers or agencies) can be provided by that carrier; and

(C) the term "practicably participates in the movement" shall have such meaning as the Board shall by regulation prescribe.

(2)(A) A rail carrier providing transportation subject to the jurisdiction of the Board under this part that is a party to an agreement of at least 2 rail carriers that relates to rates (including charges between rail carriers and compensation paid or received for the use of facilities and equipment), classifications, divisions, or rules related to them, or procedures for joint consideration, initiation, publication, or establishment of them, shall apply to the Board for approval of that agreement under this subsection. The Board shall approve the agreement only when it finds that the making and carrying out of the agreement will further the transportation policy of section 10101 of this title and may require compliance with conditions necessary to make the agreement further that policy as a condition of its approval. If the Board approves the agreement, it may be made and carried out under its terms and under the conditions required by the Board[, and the Sherman Act (15 U.S.C. 1, et seq.), the Clayton Act (15 U.S.C. 12, et seq.), the Federal Trade Commission Act (15 U.S.C. 41, et seq.), sections 73 and 74 of the Wilson Tariff Act (15 U.S.C. 8 and 9), and the Act of June 19, 1936 (15 U.S.C. 13, 13a, 13b, 21a) do not apply to parties and other persons with respect to making or carrying out the agreement]. However, the Board may not approve or continue approval of an agreement when the conditions required by it are not met or if it does not receive a verified statement under subparagraph (B) of this paragraph.

(B) The Board may approve an agreement under subparagraph (A) of this paragraph only when the rail carriers applying for approval file a verified statement with the Board. Each statement must specify for each rail carrier that is a party to the agreement—

(i) the name of the carrier;

(ii) the mailing address and telephone number of its headquarter's office; and

(iii) the names of each of its affiliates and the names, addresses, and affiliates of each of its officers and directors and of each person, together with an affiliate, owning or controlling any debt, equity, or security interest in it having a value of at least $1,000,000.

21

(3)(A) An organization established or continued under an agreement approved under this subsection shall make a final disposition of a rule or rate docketed with it by the 120th day after the proposal is docketed. Such an organization may not—

(i) permit a rail carrier to discuss, to participate in agreements related to, or to vote on single-line rates proposed by another rail carrier, except that for purposes of general rate increases and broad changes in rates, classifications, rules, and practices only, if the Board finds at any time that the implementation of this clause is not feasible, it may delay or suspend such implementation in whole or in part;

(ii) permit a rail carrier to discuss, to participate in agreements related to, or to vote on rates related to a particular interline movement unless that rail carrier practicably participates in the movement; or

(iii) if there are interline movements over two or more routes between the same end points, permit a carrier to discuss, to participate in agreements related to, or to vote on rates except with a carrier which forms part of a particular single route. If the Board finds at any time that the implementation of this clause is not feasible, it may delay or suspend such implementation in whole or in part.

(B)(i) In any proceeding in which a party alleges that a rail carrier voted or agreed on a rate or allowance in violation of this subsection, that party has the burden of showing that the vote or agreement occurred. A showing of parallel behavior does not satisfy that burden by itself.

(ii) In any proceeding in which it is alleged that a carrier was a party to an agreement, conspiracy, or combination in violation of a Federal law cited in subsection (a)(2)(A) of this section or of any similar State law, proof of an agreement, conspiracy, or combination may not be inferred from evidence that two or more rail carriers acted together with respect to an interline rate or related matter and that a party to such action took similar action with respect to a rate or related matter on another route or traffic. In any proceeding in which such a violation is alleged, evidence of a discussion or agreement between or among such rail carrier and one or more other rail carriers, or of any rate or other action resulting from such discussion or agreement, shall not be admissible if the discussion or agreement—

(I) was in accordance with an agreement approved under paragraph (2) of this subsection; or

(II) Concerned an interline movement of the rail carrier, and the discussion or agreement would not, considered by itself, violate the laws referred to in the first sentence of this clause. In any proceeding before a jury, the court shall determine whether the requirements of subclause (I) or (II) are satisfied before allowing the introduction of any such evidence.

(C) An organization described in subparagraph (A) of this paragraph shall provide that transcripts or sound recordings be made of all meetings, that records of votes be made, and that such transcripts or recordings and voting records be submitted to the Board and made available to other Federal agencies in connection with their statutory responsibilities over rate bureaus, except that such

22

material shall be kept confidential and shall not be subject to disclosure under section 552 of title 5, United States Code.

(4) Notwithstanding any other provision of this subsection, one or more rail carriers may enter into an agreement, without obtaining prior Board approval, that provides solely for compilation, publication, and other distribution of rates in effect or to become effective. ⟦The Sherman Act (15 U.S.C. 1 et seq.), the Clayton Act (15 U.S.C. 12 et seq.), the Federal Trade Commission Act (15 U.S.C. 41 et seq.), sections 73 and 74 of the Wilson Tariff Act (15 U.S.C. 8 and 9), and the Act of June 19, 1936 (15 U.S.C. 13, 13a, 13b, 21a) shall not apply to parties and other persons with respect to making or carrying out such agreement. However, the⟧ *The* Board may, upon application or on its own initiative, investigate whether the parties to such an agreement have exceeded its scope, and upon a finding that they have, the Board may issue such orders as are necessary, including an order dissolving the agreement, to ensure that actions taken pursuant to the agreement are limited as provided in this paragraph.

(5)(A) Whenever two or more shippers enter into an agreement to discuss among themselves that relates to the amount of compensation such shippers propose to be paid by rail carriers providing transportation subject to the jurisdiction of the Board under this part, for use by such rail carriers of rolling stock owned or leased by such shippers, the shippers shall apply to the Board for approval of that agreement under this paragraph. The Board shall approve the agreement only when it finds that the making and carrying out of the agreement will further the transportation policy set forth in section 10101 of this title and may require compliance with conditions necessary to make the agreement further that policy as a condition of approval. If the Board approves the agreement, it may be made and carried out under its terms and under the terms required by the Board⟦, and the antitrust laws set forth in paragraph (2) of this subsection do not apply to parties and other persons with respect to making or carrying out the agreement⟧. The Board shall approve or disapprove an agreement under this paragraph within one year after the date application for approval of such agreement is made.

(B) If the Board approves an agreement described in subparagraph (A) of this paragraph and the shippers entering into such agreement and the rail carriers proposing to use rolling stock owned or leased by such shippers, under payment by such carriers or under a published allowance, are unable to agree upon the amount of compensation to be paid for the use of such rolling stock, any party directly involved in the negotiations may require that the matter be settled by submitting the issues in dispute to the Board. The Board shall render a binding decision, based upon a standard of reasonableness and after taking into consideration any past precedents on the subject matter of the negotiations, no later than 90 days after the date of the submission of the dispute to the Board.

(C) Nothing in this paragraph shall be construed to change the law in effect prior to October 1, 1980, with respect to the obligation of rail carriers to utilize rolling stock owned or leased by shippers.

(b) The Board may require an organization established or continued under an agreement approved under this section to maintain

23

records and submit reports. The Board may inspect a record maintained under this section.

(c) The Board may review an agreement approved under subsection (a) of this section and shall change the conditions of approval or terminate it when necessary to comply with the public interest and subsection (a). The Board shall postpone the effective date of a change of an agreement under this subsection for whatever period it determines to be reasonably necessary to avoid unreasonable hardship.

(d) The Board may begin a proceeding under this section on its own initiative or on application. Action of the Board under this section—

> (1) approving an agreement;
> (2) denying, ending, or changing approval;
> (3) prescribing the conditions on which approval is granted; or
> (4) changing those conditions, has effect only as related to application of the antitrust laws referred to in subsection (a) of this section.

⟦(e)(1) The Federal Trade Commission, in consultation with the Antitrust Division of the Department of Justice, shall prepare periodically an assessment of, and shall report to the Board on—

> ⟦(A) possible anticompetitive features of—
>
>> ⟦(i) agreements approved or submitted for approval under subsection (a) of this section; and
>> ⟦(ii) an organization operating under those agreements; and
>
> ⟦(B) possible ways to alleviate or end an anticompetitive feature, effect, or aspect in a manner that will further the goals of this part and of the transportation policy of section 10101 of this title.

⟦(2) Reports received by the Board under this subsection shall be published and made available to the public under section 552(a) of title 5.⟧

*(e) APPLICATION OF ANTITRUST LAWS.—*

> *(1) IN GENERAL.—Nothing in this section exempts a proposed agreement described in subsection (a) from the application of the Sherman Act (15 U.S.C. 1 et seq.), the Clayton Act (15 U.S.C. 12, 14 et seq.), the Federal Trade Commission Act (15 U.S.C. 41 et seq.), section 73 or 74 of the Wilson Tariff Act (15 U.S.C. 8 and 9), or the Act of June 19, 1936 (15 U.S.C. 13, 13a, 13b, 21a).*
>
> *(2) ANTITRUST ANALYSIS TO CONSIDER IMPACT.—In reviewing any such proposed agreement for the purpose of any provision of law described in paragraph (1), the Board shall take into account, among other considerations, the impact of the proposed agreement on shippers, on consumers, and on affected communities.*

\*     \*     \*     \*     \*     \*     \*

## CHAPTER 113—FINANCE

\*     \*     \*     \*     \*     \*     \*

24

## Subchapter II—Combinations

\*     \*     \*     \*     \*     \*     \*

**SEC. 11321. SCOPE OF AUTHORITY.**

(a) ⟦The authority⟧ *Except as provided in sections 4 (15 U.S.C. 15), 4C (15 U.S.C. 15c), and section 16 (15 U.S.C. 26) of the Clayton Act (15 U.S.C. 21(a),* the authority of the Board under this subchapter is exclusive. A rail carrier or corporation participating in or resulting from a transaction approved by or exempted by the Board under this subchapter may carry out the transaction, own and operate property, and exercise control or franchises acquired through the transaction without the approval of a State authority. A rail carrier, corporation, or person participating in that approved or exempted transaction ⟦is exempt from the antitrust laws and from all other law,⟧ *is exempt from all other law (except the antitrust laws referred to in subsection (c)),* including State and municipal law, as necessary to let that rail carrier, corporation, or person carry out the transaction, hold, maintain, and operate property, and exercise control or franchises acquired through the transaction. However, if a purchase and sale, a lease, or a corporate consolidation or merger is involved in the transaction, the carrier or corporation may carry out the transaction only with the assent of a majority, or the number required under applicable State law, of the votes of the holders of the capital stock of that corporation entitled to vote. The vote must occur at a regular meeting, or special meeting called for that purpose, of those stockholders and the notice of the meeting must indicate its purpose.

(b) A power granted under this subchapter to a carrier or corporation is in addition to and changes its powers under its corporate charter and under State law. Action under this subchapter does not establish or provide for establishing a corporation under the laws of the United States.

*(c) APPLICATION OF ANTITRUST LAWS.—*

*(1) IN GENERAL.—Nothing in this section exempts a proposed agreement described in subsection (a) from the application of the Sherman Act (15 U.S.C. 1 et seq.), the Clayton Act (15 U.S.C. 12, 14 et seq.), the Federal Trade Commission Act (15 U.S.C. 41 et seq.), section 73 or 74 of the Wilson Tariff Act (15 U.S.C. 8 and 9), or the Act of June 19, 1936 (15 U.S.C. 13, 13a, 13b, 21a). The preceding sentence shall not apply to any transaction relating to the pooling of railroad cars approved by the Surface Transportation Board or its predecessor agency pursuant to section 11322 of Title 49, United States Code.*

*(2) ANTITRUST ANALYSIS TO CONSIDER IMPACT.—In reviewing any such proposed agreement for the purpose of any provision of law described in paragraph (1), the Board shall take into account, among other considerations, the impact of the proposed agreement on shippers, on consumers, and on affected communities.*

○