1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
2                     Norfolk Division

3

4   - - - - - - - - - - - - - - - - - - -
                                      )
5   CSX TRANSPORTATION, INC.,          )
                                      )
6          Plaintiff,                  )
                                      )   CIVIL ACTION NO.
7   v.                                 )   2:18cv530
                                      )
8   NORFOLK SOUTHERN RAILWAY           )
    COMPANY, et al.,                   )
9                                      )
           Defendants.                 )
10  - - - - - - - - - - - - - - - - - - -

11

12

13                TRANSCRIPT OF PROCEEDINGS

14                   Norfolk, Virginia

15                   January 10, 2023

16

17  BEFORE:  THE HONORABLE ROBERT J. KRASK
            United States Magistrate Judge

18

19

20

21

22

23

24

25

JODY A. STEWART, Official Court Reporter

```
1    APPEARANCES:

2            MCGUIREWOODS LLP
             By:  Benjamin L. Hatch
3                 Robert W. McFarland
                  Jeanne E. Noonan
4                 V. Kathleen Dougherty
                  William C. Geddy
5                 Counsel for CSX Transportation, Inc.

6

7            TROUTMAN PEPPER HAMILTON SANDERS LLP
             By:  Michael E. Lacy
                  Alan D. Wingfield
8                      - and -
             SKADDEN ARPS SLATE MEAGHER & FLOM LLP
9            By:  Tara L. Reinhart
                  Counsel for Norfolk Southern Railway Company
10

11           CRENSHAW WARE & MARTIN PLC
             By:  Alexander R. McDaniel
12                W. Ryan Snow
                  Counsel for Norfolk & Portsmouth Belt Line
13                Railway Company

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Hearing commenced at 3:33 p.m.)

2          THE COURT:  Good afternoon, everybody.  This is

3     Judge Krask.

4          Madam clerk, if you will call the case.

5          THE CLERK:  CSX Transportation, Incorporated, versus

6     Norfolk Southern Railway Company, et al., civil case action

7     number 2:18cv530.

8          Are the parties ready to proceed?

9          MR. McFARLAND:  Good afternoon, Your Honor.  This is

10    Robert McFarland on behalf of Plaintiff CSX, and we are

11    certainly ready to proceed.

12         MR. LACY:  Good afternoon, Your Honor.  Michael Lacy

13    on behalf of Defendant Norfolk Southern, and we are ready to

14    proceed.

15         MR. SNOW:  Good afternoon, Your Honor.  This is Ryan

16    Snow and Alexander McDaniel on behalf of the Belt Line, and

17    we are ready.

18         THE COURT:  Good afternoon, everybody.  Let me just

19    start by reminding everyone that the operation of recording

20    technology other than by the court reporter or the

21    broadcasting of this conference by anyone is prohibited

22    pursuant to local Rule 83.3.

23         I received the parties' filings today that were

24    docketed as ECF Number 576 and various subparts of that.  I

25    have one question about the proposed stipulated order on

1   trial schedule, I believe that is ECF Number 576-5, and I

2   wanted to ask the parties if I'm misunderstanding the last

3   paragraph of Page 2 of that document or whether something's

4   missing.

5            MR. WINGFIELD:  Your Honor, this is Alan Wingfield

6   for Norfolk Southern.  If you would like me to address the

7   rationale for that language, maybe I might provide

8   clarification of what we are trying to accomplish there.

9            THE COURT:  Please.

10           MR. WINGFIELD:  So the parties endeavored to reduce

11  the amount of deposition designations in this case, and the

12  low-hanging fruit was not to use deposition designations for

13  witnesses that are going to end up appearing live at trial.

14  So the parties agreed to withdraw deposition designations of

15  witnesses that appear live at trial.  We have a list of those

16  live witnesses that have been exchanged from the parties, and

17  the submission of the deposition designations that you

18  receive today eliminated order of magnitude 14 to 15

19  deposition transcripts altogether based on this approach.

20           Of course, we are lawyers, and we worry about

21  worst-case scenario, and the worst-case scenario is what if

22  one of these live witnesses gets sick, doesn't show up,

23  whatever, right, we worry that, you know, that the

24  opportunity of this necessary evidence as a live witness,

25  instead of using the deposition designation, fall through

1   through accident or fate.

2         So this paragraph is intended to address that

3   situation, and what this paragraph intends to say is that if

4   disaster strikes, in the unlikely event that some live

5   witness does not show up, for whatever reason, is not

6   available, have evidence taken from them, that's when at that

7   point the parties are allowed, notwithstanding the withdrawal

8   of the deposition designations, to pull that deposition

9   designation back into the record and use that instead.

10         Now, and we were also proposing, given the

11   unlikelihood of having to use these deposition designations,

12   that we also not -- not necessary or at least would be

13   something we would be happy not to do, and that is go through

14   the objections pretrial on the depositions.  So, you know,

15   frankly, there is a little bit of, you know, risk here that

16   one witness might not show up, or we have to use the

17   deposition designations, objections have not been brought

18   through on that deposition, but, you know, in terms of cost

19   benefits and the risk of it all, we think it is, you know,

20   readily unlikely that we will actually have a problem of any

21   live witnesses and need to bring forth the deposition

22   designations.

23         Let's say if we have a problem with one witness,

24   and, therefore, one transcript, that Judge Davis could just

25   deal with objections in the context at trial that then

1    prevail.  In that sense there will be a lot of dynamics about

2    simplifying the presentation, et cetera, at that point.

3           So this paragraph was designed to place in the

4    record that a party can bring a withdrawn deposition

5    designation forward to be used at trial if a live witness

6    doesn't show up, and that we are not going to have rulings on

7    objections of designations pretrial because of this

8    arrangement designed to save time and energy for everybody on

9    a process, and it really should not need to be done at any

10   kind of use for these deposition designations, and,

11   therefore, resolution of objections thereto.

12          So that's the thought process.  It was discussed

13   thoroughly between counsel multiple times, and we are trying

14   to reduce the use of depositions, especially in light of

15   Judge Davis' requirement that all depositions be done live at

16   trial, and also practical dynamics, it is much preferable to

17   be using live witnesses anyway, so a lot of tactical judgment

18   and compromising did go into this conversation.  There are

19   things in the deposition designations that, you know, might

20   be helpful, et cetera, but the parties made a rudimentary

21   judgment that this is the way to go for the good of the case.

22          THE COURT:  Thank you for that explanation.

23          Mr. McFarland.

24          MR. McFARLAND:  Your Honor, one clarification.  It

25   is CSX's position that in the event a witness who was

 1    supposed to appear live to testify is not able to, and his or

 2    her deposition has been submitted, CSX agrees we will just

 3    withdraw our objections; the transcript goes in.  The

 4    defendants are taking the position that they want to preserve

 5    the objections in the event the transcript goes in.  That's

 6    their position.

 7            We are willing to, for this accommodation, to say,

 8    particularly in a bench trial, we will waive our objections.

 9    So we would have no objections for Judge Davis under the

10    scenario that Mr. Wingfield just described, we would have no

11    objections to any depositions that are offered in this

12    context.

13            THE COURT:  Understood.  It just appears to me, and

14    I appreciate you explaining the rationale for this paragraph,

15    but it looks like you've left out perhaps part of the

16    sentence that you say, "In the unlikely event that a witness

17    who has been disclosed by any party as appearing live,"

18    something is missing.  It's unable to attend or something

19    like that.  I think that may be what confused me about the

20    provision.

21            MR. McFARLAND:  I think that's correct, and we can

22    certainly add that in.  We just caught that ourselves.  With

23    all that's been going on, maybe we are not going to get

24    A-pluses on our proofreading today, Your Honor.

25            THE COURT:  That's all right.  I know you have been

1  very busy, so that's fine.  I guess what I would suggest is

2  to the extent that the unthinkable happens, and somebody is

3  expected to be live, can't make it for some reason, if there

4  are deposition objections to be addressed, certainly my

5  strong preference would be that, given the number of lawyers

6  that you have, that the parties submit that deposition to me,

7  and I'll rule on the objections independent of what's

8  happening in the courtroom, if there are any remaining

9  objections, and we not trouble Judge Davis with any of that

10 during the midst of the trial.  So that would be my guidance

11 on that point.

12         MR. McFARLAND:  Will do, Your Honor.  Thank you.

13         THE COURT:  All right.  Thank you very much.

14         Then that brings us to the remaining motions that

15 are at least pending before me at this time, and I want to

16 rule on those.  I will start with Norfolk Southern's motion

17 to exclude Dr. Marvel's opinions, which is ECF Number 465.

18         On December 2nd, the Court ruled from the bench upon

19 CSX's motion *in limine* to exclude the Belt Line's expert,

20 Thomas Crowley.  In so ruling, I discussed the pertinent

21 legal inquiry required by Rule 702 and caselaw addressing

22 challenges to proposed expert testimony.  I have applied the

23 same precepts and burden of proof in analyzing the defense

24 challenges -- and that, of course, includes the Belt Line's

25 motion, as well, which I will get to in a moment -- to the

1    proposed testimony of CSX's expert, Dr. Howard Marvel.

2    Because I am reciting my rulings regarding Dr. Marvel in this

3    conference now, I incorporate by reference my introductory

4    discussion in ruling upon the motion directed to

5    Mr. Crowley's testimony, without need to recite it again

6    today.

7         To the extent that certain aspects of the

8    defendant's challenges to Dr. Marvel's analysis have been

9    effectively resolved by the Court's summary judgment ruling,

10   I do not intend to address them as part of this ruling.

11        Also, due to the summary judgment ruling, this

12   matter is now set for a bench rather than a jury trial.

13   Although Rule 702 continues to apply, the flexibility

14   inherent in the *Daubert* inquiry is expanded, as the main

15   purpose of that inquiry is to protect a jury from the

16   improper influence of dubious expert testimony.  For that I

17   cite *Nease versus Ford Motor Company*, 848 F.3d 219 at 231,

18   that is a Fourth Circuit case from 2017, which is citing an

19   Eighth Circuit case from 2011, which is *In re Zurn Pex*

20   *Plumbing Products Liability Litigation* that is at 644 F.3d

21   604 at 613.  As the Court is now the trier of fact at the

22   bench trial, the need for gatekeeping is somewhat diminished,

23   as the Court is well-situated to access issues regarding the

24   relevance and reliability of Dr. Marvel's testimony during

25   and in the context of the trial.  For this I cite, by way of

1    example, *Herndon versus Huntington Ingalls Industry, Inc.*,

2    which is case number 4:19cv52, that is found at 2020 Westlaw

3    5809965 at *4.  That is an Eastern District of Virginia

4    ruling from August 28th, 2020.  It was a report and

5    recommendation that was subsequently adopted at 2020 Westlaw

6    5809996 on September 29, 2020.  I also cite the case of

7    *Traxys North America, LLC, v. Concept Mining, Incorporated*,

8    at 808 F.Supp.2d 851 at 853.  That is a Western District of

9    Virginia case from 2011.

10            With that background, I rule as follows:  I begin

11   again with Norfolk Southern's motion to exclude Dr. Marvel's

12   opinions.  Norfolk Southern argues that Dr. Marvel's claim

13   that carrier making intensive use of NIT (that is, moving a

14   substantial portion of their container traffic through NIT)

15   are beholden to Norfolk Southern, rests upon a faulty

16   assumption that there exists inherent carrier demand for and

17   a need to use NIT.  Norfolk Southern asserts this assumption

18   lacks factual support and that other causes, primarily

19   railroad alignment and decision by Port of Virginia

20   officials, explain carrier usage of NIT.  These factors,

21   Norfolk Southern asserts, rather than the lack of viable

22   substitute terminals or transportation options, including

23   drayage, or the misconduct alleged by CSX, explain the

24   intensity of NIT usage and establish that Dr. Marvel's

25   pricing and profitability model is unreliable.

1          CSX argues that the record shows, and Dr. Marvel

2     relied upon, other facts establishing that some carriers make

3     intensive use of NIT for reasons independent of simply

4     railroad alignment and Port of Virginia decision-making.

5          The Court agrees that there appears to be admissible

6     facts to support such an insertion.  The record indicates

7     that, although railroad alignment and Port of Virginia

8     decisions play a role in carriers' use of NIT, a variety of

9     other factors are also at work.  These include:  One, NIT's

10    capacity to handle greater volumes of containers (leaving

11    aside the effects of more recent terminal upgrades), that is

12    at ECF 469-1 at 23, note 51.

13         Second, NIT's greater berth capacity, namely, six

14    versus three at Virginia International Gateway), and for that

15    I cite ECF Number 487-1 at 9 and ECF Number 469-36 at

16    Paragraph 83; and, third, port structure, carrier alliances,

17    the number of containers at issue, the size of a carrier's

18    ship, the day of the week (berth window), and weather, ECF

19    Number 469-15 at 5 and ECF number 487-1 at Pages 6 and 7.

20         Indeed, although a Port of Virginia witness

21    testified that the port attempts to assign a carrier to a

22    terminal based on railroad alignment, he also listed various

23    factors, with the railroad party being the fourth in apparent

24    order of importance.  That is at ECF 469-14 at 3 and ECF

25    Number 487-1 at Pages 6 through 14 (describes berth window,

1   volume of containers (move count), estimated rail and gate or

2   truck volume and looking at "rail breakdown" -- "how much are

3   those ocean carriers Norfolk Southern and/or CSX."

4          Further, other witnesses, including Mary Clare

5   Kenney and Ryan Houfek, have testified that the carriers and

6   the port decide which terminals to use, ECF Number 47-3 at 5,

7   and that some carriers are "sort of aligned with certain

8   terminals," ECF Number 487-4 at 4, and I also direct the

9   parties to see ECF Number 469-36 at Paragraph 74, ECF Number

10  487-2 at 3 (Carl Warren's declaration identifying several

11  ocean carriers as "primary NIT users)."  I also cite ECF

12  Number 469-1 at Paragraph 34 and 41 through 49 (discussing

13  again "primary NIT users").

14         Dr. Marvel's reply report, ECF Number 469-36 at

15  Paragraph 66 through 90, also supplies factual bases for his

16  contention that factors other than railroad alignment are the

17  primary drivers of port and terminal utilization and support

18  his assessment that CSX could not "simply steer traffic to

19  VIG or PMT, the Portsmouth Marine Terminal."  His report

20  identifies, among other things:  First, data indicating that

21  carriers' use of Port of Virginia terminals, including NIT,

22  has been "quite stable," and that several carriers have

23  consistently and primarily used NIT, at Paragraph 70.

24  Second, he identified data showing that such stability has

25  existed even when carriers switched railroad alignment to and

1    from Norfolk Southern and CSX.  That's Paragraph 76 through

2    79.  Third, he identified the significance of carrier

3    alliances in supporting that stability of use, regardless of

4    railroad alignment, Paragraphs 80 and 81.  Fourth, he

5    identifies capacity constraints that limit the ability to

6    bring new business to Virginia International Gateway,

7    Paragraph 84; and, fifth, that the Portsmouth Marine

8    Terminal, in spite of its on-dock rail access, was not a

9    viable substitute for NIT or VIG, as indicated by Norfolk

10   Southern's limited use of the same and by the decision to

11   "mothball" it after 2010, and its limited restart in 2014 to

12   deal with capacity constraints at VIG, and that's at

13   Paragraphs 85 through 90.

14          Thus, factual bases exist to support Dr. Marvel's

15   contention that railroads have limited ability to steer

16   carriers' freight at NIT to other terminals or to influence

17   carriers' decisions regarding the choice of ports.  See ECF

18   number 469-1 at Paragraph 51.  The existence of disputes

19   about such facts and the causes of carriers' usage of NIT is

20   not a basis for excluding Dr. Marvel's testimony.  For that I

21   cite Rule of Evidence 702 and specifically the Advisory

22   Committee Notes from the 2000 Amendments which note that

23   experts may reach different conclusions based upon how they

24   weigh certain disputed facts, but a Court may not exclude

25   testimony based on its belief as to which set of disputed

1    facts is correct.

2         The Court reaches no conclusion about whether

3    Dr. Marvel's analysis is correct.  Rather, it finds that the

4    issue raised by Norfolk Southern about the facts underpinning

5    his assessments regarding the intensity and stability of

6    carrier use of NIT go to the weight and not the admissibility

7    of Dr. Marvel's testimony, which in this respect has been

8    shown by a preponderance of evidence to be reliably based

9    upon sufficient facts.  For that I cite the case of *Blesler*

10   *Versus Wilmington Trust Company* at 855 F.3d 178 at Page 195

11   of the Fourth Circuit case from 2017.

12        Norfolk Southern next argues that Dr. Marvel's

13   models are unreliable because they "fail to distinguish

14   between the alleged anti-competitive conduct and ordinary,

15   legitimately occurring competitive forces," and that's at

16   Page 28 of their motion.

17        As to alleged harm to competition/liability,

18   Dr. Marvel began by reviewing the facts, which he opined

19   effectively foreclosed on-dock rail access by CSX to NIT.  He

20   then hypothesized that CSX's lack of access to NIT would

21   enable Norfolk Southern to charge higher price to those ocean

22   carriers most reliant on NIT.  He next reviewed empirical

23   evidence consistent with this hypothesis showing that the

24   average price charged by Norfolk Southern to move a 40-foot

25   container from NIT to Chicago was higher for an ocean carrier

sending a certain percentage of its traffic in 2017 through
NIT than for another carrier, who he specifically identified,
sending less traffic through NIT for the same route.

The carriers, dollar amounts, and percentages are
noted in Paragraph 79 of his initial report.  Dr. Marvel then
engaged in regression analysis to examine the relationship,
if any, between Norfolk Southern's per-container pricing and
profitability (revenue/cost ratio) (both of which are
dependent variables) and ocean carriers' intensity of use of
NIT (the independent variable).  Based on this analysis, he
opined that ocean carriers that were more heavily reliant on
NIT paid higher container prices to Norfolk Southern and were
thereby harmed, and Norfolk Southern's profit margins were
higher for such carriers.

Norfolk Southern argues that this regression
analysis failed to consider whether the effects or harms
posited were due to alleged anticompetitive conduct or to
other legitimate competitive factors, such as Norfolk
Southern's earlier double-stacking capability, CSX's alleged
service problems from 2016 through 2020, and Norfolk
Southern's routing advantages from the Port of Virginia to
the Midwest (including its routing advantage at NIT).

For *Daubert* purposes, the key is whether the
expert's regression model failed to account for critical
explanatory variables, and for that I cite *In re Linerboard*

*Antitrust Litigation* at 497 F.Supp.2d 666 at Page 678.  That is an Eastern District of Pennsylvania case, and as opposed to less important variables that go to the weight but not the admissibility of the analysis, and I cite there *Smith versus Virginia Commonwealth University*, which is a Fourth Circuit 1996 case at 84 F.3d 672 at 676 and '77 (notes that "common sense" and Supreme Court caselaw indicate that a regression model should account for the major explanatory factors), and that case cites *Bazemore v. Friday*, a Supreme Court case from 1986 with the cite of 478 U.S. 385 at 400.

Dr. Marvel then testified that his "rate regression did not distinguish between anticompetitive effects and legitimate competitive differences."  That is at ECF 469-3 at 19.  Though acknowledging that his model did not rule out other factors as contributing to Norfolk Southern's higher pricing and margins, and that is cited at Page 18 of the same exhibit, Dr. Marvel identified the "most obvious" factors supporting the higher pricing and margins to be the anticompetitive conduct alleged by CSX, and that is at Pages 17 and 18 of that same exhibit.  When asked whether his model accounted for legitimate differences in railroad capabilities, Dr. Marvel elaborated that the "differences with NIT is that there you have got...significant and competitive restraints that are in place that are operating on top of any effects of leading one to prefer one carrier

1    over another."  That is at ECF Number 469-3 at Pages 18 and

2    19.  He described this anticompetitive behavior primarily in

3    Paragraph 56 through 62 of his initial report, cited at ECF

4    Number 469-1 at Paragraphs 56 through 62.

5          Although Norfolk Southern points to facts supporting

6    its contrary claims, there is no competing regression model

7    before the Court examining the significance of legitimate

8    competitive differences in the pricing and margins about

9    which Dr. Marvel opines.  There appears to be little dispute

10   that Dr. Marvel's pricing and margin model does not

11   distinguish between anticompetitive and legitimate

12   competitive factors.  Thus, his conclusion about harm to

13   competition (specifically ocean carriers) is not supported by

14   testing as he, himself, acknowledged.  For that I cite to

15   Paragraph 80.  Nor is there any claim regarding peer review,

16   publication, or general acceptance of the specific

17   methodology used by Dr. Marvel here.

18         That leaves the question whether Dr. Marvel, as an

19   academic and economist, may opine based on his education,

20   training, knowledge, and professional experience, described

21   in ECF 469-1 in Paragraphs 1 through 4, that the

22   anticompetitive actions he identified as effectively

23   foreclosing CSX from on-dock rail access at NIT were the main

24   reasons for the pricing and margin effects shown by his

25   regression analysis.  In spite of some reservations, I

conclude that he may so opine on the grounds discussed below, and because this case is to be tried by the Court, and the flexibility inherent in the *Daubert* inquiry is enhanced by the fact that there will be a bench trial.

To begin, Dr. Marvel's proposed testimony about the result of his regression analysis should not be divorced from the remainder of his reported opinions and analysis upon which they rest. For example, Dr. Marvel discussed the economics of dual rail terminal access and its favorable effect, among others, upon freight transportation pricing at Paragraphs 70 through 71 of his initial report. He also discussed factors affecting carrier demand for intermodal services, including the desire to concentrate most container traffic with a single, aligned railroad, with reliable service and the ability to handle specified volumes of container traffic. That's at Paragraphs 11, 26 and 32 of his report. He discussed how, absent dual access and when a competing railroad can only offer a higher cost and less-attractive option like drayage, competition is limited, permitting the sole railroad with on-dock access to charge a higher price for its superior product. That's at Paragraph 71 of his report.

Dr. Marvel then opined that CSX was a "hamstrung" competitor, effectively foreclosed from accessing on-dock rail at NIT, due to the defendants' anticompetitive acts,

including the excessive switch rate allegedly charged by Belt
Line.  Here I cite Paragraphs 15, 52 through 54 and 56 of his
initial report.  He also advised that this alleged
anticompetitive behavior impacted and raised CSX's costs,
thereby enhancing Norfolk Southern's pricing behavior.
That's Paragraph 73.  The defendants' acts, he opined,
restricted competition, weakened CSX, restricted output, and
enabled Norfolk Southern to charge higher prices to carriers.
Dr. Marvel summarized this analysis in a three-step chain of
causality described in Paragraph 55 of his initial report.
In contrast to CSX's "hamstrung" situation at NIT, Dr. Marvel
found that, in 2018 CSX was able to capture well in excess of
50 percent of container traffic for those carriers who used
NIT for a small portion of their container movements, a
percentage far exceeding its overall share of container
movements for all ocean carriers.  There I cite Paragraphs 20
and 85 of his initial report.  This latter, albeit somewhat
crude measure, arguably suggests not only that CSX was able
to compete with Norfolk Southern when it was not otherwise
"hamstrung," but also that the legitimate competitive
differences cited by Norfolk Southern are not the primary
drivers of the pricing behavior revealed by Dr. Marvel's
regression model.

          In responding to Dr. Wright's critiques of his
analysis, Dr. Marvel also indirectly addressed some of the

1  legitimate competitive differences relied upon by Norfolk

2  Southern.  For example, in his reply report, Dr. Marvel

3  opines that, "CSX's impediment to growth was not its lack of

4  investment in infrastructure...but [the defendants'] refusal

5  to give CSX on-dock rail access to NIT," and that is ECF

6  Number 469-36 at Paragraph 109.  In doing so, Dr. Marvel

7  addressed Dr. Wright's assertion that CSX operated at a

8  competitive disadvantage due to its inability to offer

9  double-stack service until the end of 2016, by examining

10  CSX's ability to compete for carriers relying mainly on VIG

11  versus NIT, and that is at Paragraph 118, and by examining

12  the sizable differences in CSX's "muted growth at NIT"

13  relative to the growth in its share of container movements at

14  VIG, and I cite there Paragraphs 109 through 115.

15         Moreover, to the extent that Norfolk Southern relies

16  upon its double-stacking capability and its reported shorter

17  routes for moving containers to the Midwest, there is no

18  evidence that any such advantages translated into reduced

19  costs and pricing.  This arguably supports Dr. Marvel's

20  assertion that the increased pricing he observed primarily

21  resulted from anticompetitive conduct.  Further, to the

22  extent that Norfolk Southern contends that it had a

23  legitimate competitive routing advantage at Norfolk

24  International Terminal, by virtue of using its own tracks to

25  efficiently move trains through the terminal, this difference

1    is arguably bound up in the dispute about whether the alleged

2    anticompetitive acts effectively foreclosed CSX from making

3    cost-effective and efficient use of the Belt Line's access to

4    NIT.

5            Dr. Marvel also addressed Dr. Wright's critique of

6    his regression model as to pricing and profitability.  After

7    substituting for Dr. Wright's use of absolute container

8    volume at NIT by means of the proportion of containers at

9    NIT, Dr. Marvel continued to find statistically significant

10   and positive relationships between NIT traffic volume and

11   Norfolk Southern's pricing, and that is at Paragraphs 94

12   through 96 of his reply report.

13           Dr. Marvel also analyzed and concluded that drayage,

14   as well as access to other Port of Virginia terminals by CSX,

15   were inadequate substitutes for on-dock access to NIT.  Here

16   I cite his initial report at Paragraphs 41 through 51, as

17   well as his reply report at Paragraphs 37 through 44, which

18   discuss the inferiority of drayage.  He also considered

19   whether the availability of competing alternatives for

20   container transport, such as trucking or the usage of other

21   ports, effectively restrained Norfolk Southern's use of

22   pricing power and concluded otherwise, and that is in his

23   reply report at Paragraph 37 through 54.

24           Finally, Dr. Marvel also took note of the fact that

25   the defense experts offered no procompetitive justifications

1    for the defendants' actions.  He suggested that this

2    confirmed that his opinions that the defendants'

3    anticompetitive behavior led to the container transport

4    pattern shown in his report, and that is in his reply report

5    at Paragraph 3, 11 and 20.  Dr. Marvel reiterated that

6    anticompetitive conduct restricted the output of container

7    traffic by rail at NIT, thereby enabling Norfolk Southern to

8    raise prices to carriers using that terminal, and that is at

9    Paragraph 20.

10           Thus, in conjunction with his regression model,

11   Dr. Marvel addressed various factors bearing upon whether the

12   pricing power (and margins) identified by the model were

13   primarily caused by the defendants' alleged anticompetitive

14   conduct or were due to other competitive and market factors.

15   Though concluding that Norfolk Southern's on-dock conduct

16   service at NIT was superior to the other poor substitutes

17   available to CSX, he opined that this result primarily

18   stemmed from the alleged anticompetitive acts and efforts of

19   the defendants that effectively foreclosed CSX from accessing

20   NIT by rail.  That is at Paragraph 101.  Although it is a

21   close call, and as this matter is to be tried by the Court, I

22   conclude that CSX has carried its burden to establish that

23   this aspect of Dr. Marvel's testimony is reliable.

24   Accordingly, the parties' dispute about which explanation

25   controls, falls to the Court in its consideration of the

1    competing facts to be marshaled at trial.  For that I cite

2    the *Pipitone versus Biomatrix, Incorporated*, case, Fifth

3    Circuit case from 2002 at 288 F.3d 239 at Pages 249-50, which

4    parenthetically specifies that where "the answer to the

5    critical causation question will depend on which set of

6    predicate facts the fact finder believes...the fact finder is

7    entitled to hear [the expert's] testimony and decide whether

8    it should accept or reject that testimony" based upon the

9    metrics typically employed for that purpose at trial,

10   including competing factual narratives.

11           This brings me to the damages model of Dr. Marvel.

12   In briefing following the Court's summary judgment rulings,

13   the parties appear to agree that it remains for CSX to

14   establish not only harm to competition but also antitrust

15   injury, threatened or prospective to CSX.  For this I cite

16   the most recent filings, ECF Number 565 at Pages 3 through 4

17   and ECF Number 566 at Page 2.  Because CSX may seek to rely

18   upon Dr. Marvel's analysis to satisfy that burden, the Court

19   also addresses Norfolk Southern's challenges to Dr. Marvel's

20   damages model.

21           Norfolk Southern argues that Dr. Marvel's damages

22   model is unreliable because it is bound to find damages where

23   carriers use any port intensively.  This argument rests in

24   significant part upon Dr. Wright's contention that terminal

25   usage is driven mostly by VIT's assignment of carrier traffic

1    based on railroad alignment.  As the Court has already

2    decided, however, the facts supporting such a conclusion are

3    disputed and will have to be addressed at trial.  In response

4    to Dr. Wright's criticism of his model, Dr. Marvel's reply

5    report indicates that he ran a similar regression analysis by

6    omitting the NIT covariate, and after doing so continued to

7    obtain results indicating that a carrier's reliance on

8    Hampton Roads as a whole made the carrier less likely to

9    align with CSX, and that is in his reply report at Paragraphs

10   119 through 125.  Thus, even discounting for Dr. Wright's

11   contention that carrier use of NIT is a product of railroad

12   alignment and assignment, Dr. Marvel's model continued to

13   generate similar results.

14           Norfolk Southern also argues that Dr. Marvel's

15   damages model and opinions, like the pricing/profitability

16   model, fail to sort among legitimate competitive differences

17   and the defendants' alleged anticompetitive conduct.  Leaving

18   aside whether Dr. Marvel's results are correct, however, the

19   Court finds that the damages model attempts to isolate

20   effects that are NIT specific and independent of legitimate

21   competitive differences relating to the use of particular

22   ports, routing and railroad network structure, and pricing.

23   Among other things, the dataset compiled by Dr. Marvel

24   examined international intermodal container movement for both

25   CSX and Norfolk Southern from 2009 to 2020 for approximately

1    29 carriers, and looked at revenues, costs, container origins

2    and destinations, and container size.  That's discussed in

3    his initial report at Paragraphs 88 through 89, as well as in

4    his reply report at Paragraph 120.  His model also calculated

5    and incorporated the proportion of container traffic both

6    railroads handled through major East Coast ports (including

7    Hampton Roads, the Port of New York and New Jersey, Savannah,

8    Charleston and Jacksonville).  That is at Paragraph 91 of his

9    initial report.  Also, Dr. Marvel calculated and incorporated

10   into his model the relative prices charged by the two

11   railroads on the lanes used by the carrier, thereby

12   accounting for differences in pricing for the same routes,

13   and that is at Paragraph 92 of his report.  Ultimately, the

14   trier of fact will have to decide, but these steps arguably

15   account for the main competitive differences that Norfolk

16   Southern contends Dr. Marvel ignored.  Nor has the Court

17   received any competing model and results accounting for such

18   differences within the confines of Dr. Marvel's damages

19   model.  To the extent Dr. Marvel's model fails to account for

20   any routing advantage that Norfolk Southern has over the Belt

21   Line (and by extension CSX) at NIT, as previously noted, that

22   arguably goes to the heart of the pending dispute.  Thus, it

23   appears that Dr. Marvel's damages regression model reliably

24   accounts for major explanatory variables.  To the extent that

25   Norfolk Southern contends that other explanatory variables

1    (including issues relating to CSX's ability to service

2    traffic at Hampton Roads) play a role in the results

3    obtained, such criticisms go to the weight and not the

4    admissibility of Dr. Marvel's opinions and are for trial.

5    For that I cite the *Smith* case previously noted, 84 F.3d at

6    676 and '77.  I also cite the *In re Linerboard Antitrust*

7    *Litigation* case at 497 F.Supp.2d at 678.  Moreover, the fact

8    that Dr. Wright's critiques of Dr. Marvel's damages model

9    rely on significant changes to the models does not provide a

10   basis for excluding the latter, but is instead a matter for

11   trial.  For that I cite *In re Urethane Antitrust Litigation*,

12   Page number 04-1616 at 2012 Westlaw 6681783 at *6, which is a

13   District of Kansas decision from 2012, which was affirmed by

14   the Tenth Circuit in 2014 at 768 F.3d 1245.

15           Finally, Dr. Marvel's deposition testimony that he

16   could not then think of literature supporting the use of his

17   model as constructed does not warrant exclusion.  The use of

18   regression analysis as a tool in antitrust disputes has long

19   been recognized.  For that I cite, for example, *In re Rail*

20   *Freight Fuel Surcharge Antitrust Litigation* at 292 F.Supp.3d,

21   Page 14, pinpoint cite 58, a District of Columbia decision

22   from 2017, which was affirmed in 2019 by the D. C. Circuit at

23   934 F.3d 619.  I also cite *Conwood Company, L.P., versus U.S.*

24   *Tobacco Company*, 290 F.3d 763 at 793, a Sixth Circuit case

25   from 2002.  Moreover, Dr. Marvel's report cites to literature

1   supporting the use of logistic regression modeling, and that

2   is at his initial report at Page 47, note 161.

3        Therefore, the Court declines to exclude

4   Dr. Marvel's opinions based on Norfolk Southern's arguments

5   that his analysis will always find damages and because they

6   fail to account for competitive differences.

7        That brings me to the Belt Line's motion to exclude

8   testimony from Dr. Marvel, which is ECF Number 473.  The Belt

9   Line seeks to exclude Dr. Marvel's opinion on "railroad

10  operations" because he lacks expert or specialized knowledge

11  about the same.  Belt Line posits that, "To the extent" that

12  Dr. Marvel intends to opine that:  (a) Belt Line should not

13  have approved discontinuance of the so-called "diamond" track

14  in 2008; and (b), scheduling windows provided by Belt Line to

15  CSX for moving trains in 2015 to and from NIT were

16  inadequate...such opinions fall outside of Dr. Marvel's

17  expertise and should be precluded, and that is at Page 6 of

18  their filing.  Notably, the portions of Dr. Marvel's report

19  cited by Belt Line did not contain the two recited opinions.

20  Instead, in Paragraphs 59 and 60 of his report, Dr. Marvel

21  opined that:  (a) Norfolk Southern and Belt Line impeded

22  CSX's on-dock access by removing critical infrastructure,

23  namely, the diamond track in 2008; and (b) Norfolk Southern

24  impeded CSX's on-dock access to NIT in 2015 via its control

25  of scheduling and operational plans for trains moving to and

1    from NIT.  There I cite his initial report, Paragraphs 59 and

2    60.  The factual bases for these opinions are noted in

3    Dr. Marvel's report, and Belt Line does not challenge them in

4    arguing about Dr. Marvel's lack of railroad expertise.  If

5    suitably factually predicated and the product of the

6    application of his economic expertise (as I'll discuss in a

7    moment), Dr. Marvel may opine as an economist about the

8    market for on-dock rail access at NIT and whether such

9    alleged acts were anticompetitive and interfered with CSX's

10   on-dock rail access at NIT.  The Court, therefore, rejects

11   this argument.

12        Next I turn to switch rates.  The Court denies Belt

13   Line's motion to exclude Dr. Marvel's opinions regarding the

14   reasonableness of Belt Line's switch rate, in all but one

15   respect.  The Court addresses Belt Line's arguments one at a

16   time.  First, to the extent that Dr. Marvel assesses

17   reasonableness by looking to negotiated contract rates for

18   switching services by terminal railroads, rather than public

19   tariff rates, the Court finds that such goes to the weight to

20   give to Dr. Marvel's testimony and opinions, not its

21   admissibility.  In both instances, the service being

22   provided -- the switching of railcars by terminal

23   railroads -- is the same.  Therefore, consideration of

24   contracted for switch rates at various ports and terminals

25   appears to speak to and is relevant to pricing in the context

of competition.  Further, Dr. Marvel also identified other
public tariff rates for such switching services that were
less than Belt Line's public tariff switching rate.  There I
cite Paragraph 54 of his initial report.

Second, Belt Line's complaint that Dr. Crowley's
approach of distilling the rate charged for purposes of
comparison to a per-container, per-mile fee for each railroad
better accords with the exercise of economic and railroad
expertise also goes to the weight and not the admissibility
of Dr. Marvel's opinions.  As an initial matter, Dr. Marvel's
reports do discuss and analyze Belt Line's rates, both in
terms of per railcar, as well as in terms of an effective
rate per container, and there I cite Paragraph 54 of his
initial report and Paragraphs 60 through 64 of his reply
report.

Further, Dr. Marvel also cites the evidence (and
testified) that given the shorter distances traveled by
terminal railroads and the substantial fixed costs per
container, regardless of mileage, that consideration of
mileage was effectively unnecessary.  That is at ECF Number
474-4 at Pages 24 and 25, as well as Paragraph 65 of his
reply report.

To the extent that Dr. Marvel also testified that
one way to make a proper comparison of terminal switch rates
between providers would have been to look at per-container

rates and consider economies of scale (relating to miles and rates) and route and operational impediments, and acknowledged that his analysis did not factor in scale economies or route impediments, and that is at his deposition cited at ECF 474 at Pages 25 and 26, this is fodder for cross-examination and does not render his analysis unreliable or unhelpful.

Belt Line's complaints regarding Dr. Marvel's failure to consider Belt Line's costs in analyzing whether its switching rate was reasonable presents a somewhat closer question.  Dr. Marvel's general characterization of Belt Line's switching rate as "exorbitant," "extraordinarily high," "strikingly" or "unduly high," "prohibitive," and the like, at Paragraphs 13, 15 and 18, and 54 through 58 of his initial report, and also in Paragraphs 2, 55 through 59 and 60 through 65 of his reply report, prompt the question...relative to what?  Dr. Marvel answers primarily by reference to rates (public or contracted) for switching charged by other terminal railroads, citing the same paragraphs.  Belt Line argues, however, that Dr. Marvel needed, but failed, to consider Belt Line's costs in opining about whether they were excessive, and this is at ECF Number 474 at 11 through 13.  Dr. Marvel conceded, among other things, that he did not analyze Belt Line's operational costs or the incremental cost of a move on Belt Line's lines to

1    NIT, and did not have information to assess how the costs of

2    other terminal railroads impacted their switch rates.  This

3    is at ECF number 474-4 at Pages 8, 12 and 17.

4           In response to Mr. Crowley's reporting on the Belt

5    Line's average operating expense per car, that's ECF Number

6    303 at 34, and his opinion that his railcar switching rate

7    was therefore reasonable, ECF Number 303-1 at Page 5,

8    Dr. Marvel's reply report suggests reframing the analysis and

9    poses as the relevant question whether Belt Line "could cut

10   its rates to its owners, CSX of Norfolk Southern, to a level

11   that would generate CSX container traffic and not make less

12   money doing so."  That's Dr. Marvel's reply report at

13   Paragraph 57.

14          Dr. Marvel then opines that, as Belt Line appears to

15   be covering its current costs with existing traffic, and

16   because the marginal cost of handling additional traffic will

17   necessarily be less than its current average costs, it would

18   be unreasonable to charge a price per car sufficient to cover

19   current average costs, as those costs would decline with

20   additional traffic.  That also cites to Paragraph 57.  He

21   further opines that Mr. Crowley's analysis itself reveals the

22   feasibility of a Belt Line rate cut per CSX, and doing so as

23   proposed by CSX in 2018 would have generated substantial

24   additional net revenue for Belt Line, and that's in Paragraph

25   58.

1        The Court concludes that, notwithstanding Belt

2   Line's argument about the validity of Dr. Marvel's opinions

3   about the nature of Belt Line's rate, the metric he used to

4   assess Belt Line's switch rate is based on sufficient facts

5   and data and will assist the trier of fact in assessing that

6   rate.  One measure of the reasonableness of the switch rate

7   is what others in the same industry are charging to provide a

8   similar service.  To be sure, other measures exist, including

9   those that assess the rates charged in relation to the

10  provider's costs.  Dr. Marvel's failure to assess Belt Line's

11  costs, however, goes to the weight, not the admissibility of

12  his opinions and testimony on this point.  To avoid

13  misleading or confusing the trier of fact about his analysis,

14  however, the Court grants Belt Line's motion in one limited

15  respect.  Specifically, Dr. Marvel is precluded from

16  generally characterizing Belt Line's switching rate as

17  exorbitant, strikingly or unduly high, extraordinary,

18  prohibitive, or the like.  That is neither relevant nor

19  helpful.  Instead, Dr. Marvel is limited to opining about

20  Belt Line's rates only in relation to the switching rates

21  described in his reports.  For example, he may opine that the

22  Belt Line switching rate is extraordinarily high in relation

23  to the rate charged by Commonwealth Railway to CSX for

24  switching Services.  In all other respects, Belt Line's

25  motion regarding Dr. Marvel's opinions about the switch rate

1    is denied.

2            Next up is the diamond track.

3            The Court grants Belt Line's motion to exclude

4    Dr. Marvel's opinions on the removal of the "diamond" track

5    or interchange.

6            In his initial report, Dr. Marvel opined that

7    "Norfolk Southern and Belt Line have impeded CSX's on-dock

8    access to NIT by removing critical infrastructure."  That's

9    at Paragraph 59.  Dr. Marvel describes the infrastructure in

10   question as the 2008 discontinuance of Norfolk Southern's

11   service and Belt Line's trackage rights between the "Norfolk

12   Southern juncture" and the "Carolina juncture" referred to as

13   the "diamond."  That quotes the same paragraph.  In his reply

14   report, Dr. Marvel also refers to the decommissioning of

15   these rail lines (and the destruction of the diamond

16   interchange) as one of several "anticompetitive actions"

17   taken by Norfolk Southern and the Belt Line, and that is his

18   reply report in Paragraphs 2 and 10 through 11.  In so

19   opining, Dr. Marvel primarily relied upon the declaration of

20   CSX's Robert Girardot, ECF Number 367-1.  That declaration

21   describes what the diamond interchange was, the fact that its

22   use was discontinued in 2008 and the track removed, and that

23   subsequent route to be used by Belt Line and CSX for

24   accessing NIT was via Norfolk Southern's Portlock Yard and

25   was longer and less efficient than the diamond connecting

1    line, and created the potential for long delays for CSX due

2    to its conflicts with Norfolk Southern's trains and Norfolk

3    Southern's likely prioritization of their movement.  That's

4    at Paragraph 7 of that declaration.

5         At deposition, when reviewing the bases for his

6    opinions, Dr. Marvel testified that:  (a) he wanted to know

7    more about how and why the use of the diamond interchange was

8    discontinued or was no longer in play; (b) that he did not

9    have a full understanding of the issue and had asked lawyers

10   for information about it; (c) he did not know whether CSX or

11   the Belt Line had used the diamond interchange to access NIT;

12   and (d) he just knew that it had been destroyed.  That is ECF

13   Number 474-4 at Pages 13 and 14 and 18 and 19.  Dr. Marvel

14   also testified that, "If it is found to be correct that this

15   was destroyed to impair access, it would be a classic example

16   of...disruptive competition...in an anticompetitive fashion."

17   That is at the same cite at Page 14.

18        This deposition testimony reveals that Dr. Marvel's

19   opinion classifying acts pertaining to the diamond

20   interchange as anticompetitive is little more than

21   *ipse dixit.*  Mr. Girardot's declaration describes the effects

22   of the discontinuance of the diamond interchange but provides

23   few details about the events leading to that decision.

24   Moreover, Mr. Girardot himself testified that, prior to the

25   removal of the diamond interchange, Belt Line did not move

1    any revenue traffic for CSX.  That's at ECF Number 303-10 at

2    Page 3.  Further, when Belt Line's board of directors

3    considered and agreed to the proposal to release its trackage

4    rights to the diamond interchange, there is no evidence that

5    even the directors from CSX objected to the same, and that is

6    at ECF 303-11 at 5.  And at the hearing on Belt Line's

7    motion, counsel for CSX agreed that there was no objection

8    that was lodged.  For his part, Dr. Marvel asked for but

9    apparently received no information about and conducted little

10   to no investigation into those events on its own.  With

11   proper predication, Dr. Marvel may opine as a qualified

12   economist as to whether to classify certain acts as

13   anticompetitive or legitimate competition.  But here,

14   Dr. Marvel's opinion lacks a sufficient factual or other

15   basis in data as a necessary predicate.  And for that, I cite

16   the *Sardis versus Overhead Door Corporation* decision of the

17   Fourth Circuit from 2021 at 10 F.4th 268 at page 291.

18   Dr. Marvel's speculative opinion that the discontinuance of

19   the diamond interchange (and the ensuing track removal) was

20   an anticompetitive act that impeded CSX's access to NIT is

21   unreliable and unhelpful to the trier of fact.  Accordingly,

22   the Court grants Belt Line's motion to preclude him from so

23   testifying.

24           Next we discuss the scheduling window.

25           Belt Line also attacks Dr. Marvel's opinion

1    identifying Norfolk Southern's acts in allegedly "preventing
2    [Belt Line] from switching CSX trains in and out of NIT by
3    denying...the required scheduling windows" as another
4    anticompetitive act, and this is in his initial report,
5    Paragraphs 18 and 60.
6           Belt Line asserts that this opinion is not supported
7    by the facts, which show that a scheduling window to move
8    CSX's trains had been established and that Belt Line moved
9    all of the traffic CSX had and was prepared to do more, but
10   CSX did not make any such requests, and that is at Page 17 of
11   their motion.  Having reviewed the parties' submissions, the
12   Court finds that the facts underlying Dr. Marvel's opinion
13   about the 2015 events are disputed.  Some facts do exist
14   which support Dr. Marvel's opinion that Norfolk Southern's
15   activities at the time impeded CSX's efforts to utilize Belt
16   Line's services for on-dock rail access to NIT.  Further, the
17   undersigned declines the defendant's invitation to read the
18   Court's summary judgment ruling, which addressed CSX's
19   damages and state law claims and not matters of injunctive
20   relief, as precluding Dr. Marvel from opining regarding the
21   2015 conduct.  See ECF Number 566 at Page 8.  Therefore, the
22   Court denies Belt Line's motion to exclude this opinion.
23          Lastly, that brings us to the matter of drayage.
24          Belt Line also challenges the admissibility of
25   Dr. Marvel's opinion that drayage is not an adequate

substitute for on-dock rail access to NIT, contending that

his analysis is unreliable and insufficient for failure to

consider the subsidies CSX receives to dray.  Belt Line

contends that CSX's decision to dray containers from NIT,

rather than using the rails, is driven by the fact that

drayage is cheaper than utilizing rail by the Belt Line.

In part, Belt Line's arguments about drayage rests

upon its contention that Dr. Marvel's conclusion about the

adequacy of drayage as a substitute is simply incorrect.  The

Court's task in addressing a *Daubert* challenge, however, is

not to decide whether an expert's opinion is correct but to

assess the relevance and reliability, and for that I cite the

Fourth Circuit decision from 1999, *Westberry versus Gislaved*

*Gummi AB* at 178 F.3d 257 at Page 261.  Belt Line's challenge

also raises questions about CSX's true rationale for using

one form of transportation to move containers to and from

NIT, which is a matter for trial.

In discussing the relevant market and whether to

include drayage, Dr. Marvel notes that any price comparison

between rail and drayage must be at the competitive price

level, rather than at Belt Line's allegedly inflated rail

switching rate resulting from anticompetitive acts, and

that's at Paragraph 49 of his initial report.  Dr. Marvel

acknowledges that drayage competes at the margin with rail at

the alleged anticompetitive rate but asserts that when

1   considering switching rates at the competitive level, rail is

2   a significantly improved and more efficient option, such that

3   drayage is not a competitive alternative.  He also opines

4   that non-price factors, including the general recognition of

5   the inferiority of drayage compared to the efficiency of rail

6   access, market preference for rail access, regulatory and

7   other difficulties associated with draying containers from

8   NIT to CSX's yard in Portsmouth, and capacity issues,

9   demonstrate that drayage is an inferior and unviable

10  substitute for moving containers to and from NIT via on-dock

11  rail.  Thus, Dr. Marvel opines that the two services are

12  neither functionally interchangeable nor easily substituted

13  for one another without undue expense, delay, and

14  inconvenience because, when given a genuine choice between

15  the two and in light of the unique situation at NIT, a

16  customer will not substitute drayage for rail service.  Here

17  I cite the *FTC versus Sysco Corporation* case at 113

18  F.Supp.3d, Page 1, at Page 25.  That is a District of

19  Columbia trial court decision from 2015 which (discusses

20  functional interchangeability and cross-elasticity of

21  demand).  The subsidization of drayage to make it at least

22  tolerable to customers, as described by a VIT witness,

23  Dr. Marvel opines, does not transform it into a suitable

24  substitute for rail for purposes of relevant market analysis.

25  To the extent that Dr. Wright and Mr. Crowley reach different

1    conclusions, Dr. Marvel sufficiently responds to them in his

2    reply report.  As Dr. Marvel's analysis is sufficiently based

3    on facts and data that he reliably applies to opine about

4    drayage, Belt Line's motion to exclude Dr. Marvel's opinion

5    about the same is denied.

6            That is the Court's ruling on the motion *in limine*

7    directed to Dr. Marvel, and that brings me to the two motions

8    *in limine* regarding the exclusion of use of internal Norfolk

9    Southern e-mails, which are ECF Number 337 and ECF Number

10   349.

11           Norfolk Southern's motion *in limine* regarding the

12   use of internal e-mails, and the Belt Line's motion *in limine*

13   to exclude evidence and argument regarding the use of

14   internal e-mails, are denied without prejudice.

15           As outlined in the opinion and order addressing

16   defendants' motions to dismiss, ECF Number 66, at Pages 28

17   through 34, some related corporations have a sufficient unity

18   of interest such that they are incapable of entering into an

19   antitrust conspiracy, and for this, I cite the *Copperweld*

20   *Corporation versus Independence Tube Corporation* case at

21   467 U.S. 752 at Pages 770-71, a 1984 case from the Supreme

22   Court, as well as a Ninth Circuit case from 2003, which is

23   *Freeman versus San Diego Association of Realtors*, 322 F.3d at

24   1133, pinpoint cite 1146.  Whether two corporations share a

25   unity of interest is a factual determination that is reserved

1    to the trial judge.

2          In addition, the Court has recognized that CSX may

3    rely on direct and circumstantial evidence to prove a

4    conspiracy, ECF Number 559, at 93, (citing *Robertson versus*

5    *Sea Pines Real Estate Companies, Incorporated*, at

6    679 F.3d 278, Pages 289-90, which is a Fourth Circuit case

7    from 2012 which states, ("Conspiracies are often tacit or

8    unwritten in an effort to escape detection, thus

9    necessitating resort to circumstantial evidence to suggest

10   that an agreement took place.)"

11         Further, defendants' arguments would not preclude

12   admission of these e-mails to prove the Sherman Act,

13   Section 2, unlawful monopoly claims, which remain viable

14   following the Court's ruling on summary judgment.  In fact,

15   Norfolk Southern indicated it was not seeking to prevent CSX

16   from using e-mails for this purpose, and that is at ECF

17   Number 442 at Pages 6 through 7.

18         So that concludes the Court's rulings on those four

19   motions.  I will enter a brief order memorializing those

20   rulings, and I think that leaves us with our restarting the

21   Final Pretrial Conference, then, tomorrow morning at

22   9:00 a.m.

23         Unless there's anything further, I look forward to

24   seeing you all tomorrow morning.

25         MR. McFARLAND:  Thank you, Your Honor.  This is

```
 1   Robert McFarland for CSX, and we will be there bright,
 2   earlier, and bushy-tailed.
 3            MR. LACY:  Your Honor, Michael Lacy for Norfolk
 4   Southern.  We will see you in the morning.
 5            MR. SNOW:  Yes, sir.  This is Ryan Snow.  We'll see
 6   you in the morning.  Thank you, Your Honor.
 7            THE COURT:  Thank you.  Court will be in recess.
 8            (Hearing adjourned at 4:40 p.m.)
 9                          CERTIFICATION
10
11       I certify that the foregoing is a correct transcript
12   from the record of proceedings in the above-entitled matter.
13
14
15        X_____/s/_____x
16                      Jody A. Stewart
17            X_____1-11-2023 _____x
18                          Date
19
20
21
22
23
24
25
```

JODY A. STEWART, Official Court Reporter