## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

**CSX TRANSPORTATION, INC.,**

      **Plaintiff,**

**v.**                            **Civil Action No. 2:18cv530**

**NORFOLK SOUTHERN RAILWAY COMPANY,** *et al.*,

      **Defendants.**

### DEFENDANTS' JOINT PRELIMINARY PROPOSED
### <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

James L. Chapman, IV, Esq.
W. Ryan Snow, Esq.
Alexander R. McDaniel, Esq.
CRENSHAW, WARE &
MARTIN, P.L.C.
150 W. Main Street, Suite 1500
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
Email: jchapman@cwm-law.com
Email: wrsnow@cwm-law.com
Email: amcdaniel@cwm-law.com

*Attorneys for Norfolk and Portsmouth Belt Line Railroad Company*

Alan D. Wingfield (VSB No. 27489)
Michael E. Lacy (VSB No. 48477)
Massie P. Cooper (VSB No. 82510)
Troutman Pepper Hamilton Sanders LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-1200
Facsimile: (804) 698-6061
Email: alan.wingfield@troutman.com
Email: michael.lacy@troutman.com
Email: massie.cooper@troutman.com

John C. Lynch (VSB No. 39267)
Kathleen M. Knudsen (VSB No. 90845)
Troutman Pepper Hamilton Sanders LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, VA 23462
Telephone: (757) 687-7500
Facsimile: (757) 687-7510
Email: john.lynch@troutman.com
Email: kathleen.knudsen@troutman.com

Tara L. Reinhart
Thomas R. Gentry
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005
Telephone: (202) 371-7000
tara.reinhart@skadden.com
thomas.gentry@skadden.com

*Attorneys for Norfolk Southern Railway Company*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

FINDINGS OF FACT .......................................................................................... 2

    A.    The Parties ................................................................................................. 2

    B.    NS has majority board representation at NPBL by agreement. ............................. 3

    C.    NPBL has smoothly operated for decades with NS and CSX as joint owners. ........................................................................................................ 5

    D.    NS and CSX vigorously compete for international intermodal container business. .................................................................................................... 6

    E.    The Port of Virginia ................................................................................... 7

        1.    CSX and NS have on dock rail access to all three intermodal terminals operated at the Port of Virginia. ................................................... 7

        2.    Rail access to NIT requires a detailed operating plan. ........................... 9

        3.    VIT directs ocean carriers where to dock. ............................................. 10

        4.    The Port of Virginia competes against other ports, particularly the Port of NY/NJ . ................................................................................. 11

    F.    NS and CSX each have competitive advantages at different ports across their rail networks. ............................................................................ 13

        1.    CSX has competitive advantages at multiple ports, including the Port of NY /NJ. ..................................................................................... 13

        2.    NS has competitive advantages at the Port of Virginia. ......................... 16

        3.    Trucks compete against railroads for traffic at the POV. ....................... 17

        4.    Some shippers do not align with any particular railroad, using both CSX and NS. ............................................................................. 19

    G.    NPBL charges a uniform switch rate per the Operating Agreement. ................. 19

        1.    NPBL set and has maintained the switch rate at $210/well to cover its operating expenses. ............................................................. 19

        2.    NPBL's switch rate is consistent with other short line switch rates. ..................................................................................................... 22

H.   CSX has proposed – and abandoned – discounted switch rate contracts for its intermodal traffic with NPBL. ........................................................ 22

1.   NS did not defeat CSX's 2010 Rate Proposal; CSX dropped it. ............ 22

2.   CSX Sought a Vote on its 2018 Governance Proposal, but Not Its 2018 Rate Proposal. ........................................................... 23

I.   No NPBL director has moved to approve a new line haul switch rate to NIT or a convene a rate committee for the last decade........................................ 27

J.   CSX was not foreclosed at NIT, and in fact, used NPBL to move other freight ........................................................................ 27

1.   CSX acted consistent with access at NIT, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. ....................................... 27

2.   CSX regularly uses trucks to dray from NIT. ........................... 28

3.   NPBL moved all CSX intermodal traffic that it requested in 2015........................................................................ 30

K.   NS and NPBL are litigating NS's request to have the STB set the trackage fee........................................................................ 33

L.   Efforts to sell Pinners Point and decommissioning of the Diamond Track........ 35

M.   Procedural Posture of this Litigation ................................... 36

CONCLUSIONS OF LAW ........................................................ 36

A.   The Court's Prior Holdings................................................ 36

B.   The Court Lacks Jurisdiction to Grant An Injunction. ...................... 39

1.   The Court Lacks Jurisdiction to Grant an Injunction under 15 U.S.C. § 26........................................................... 39

2.   Even if CSX Could Pursue Injunctive Relief under 15 U.S.C. § 26, the Relief it Seeks is Within the Exclusive Jurisdiction of the STB. ........................................................... 42

a.   The Court lacks jurisdiction to grant injunctive relief relating to rates, operations, or access under 49 U.S.C. § 10501(b)................................................... 42

b.      This Court Lacks Jurisdiction to Grant an Injunction Changing Ownership or Control of One Railroad Over Another ......................................................................... 44

C.   Even If This Court Had Jurisdiction to Grant Injunctive Relief, CSX Cannot Satisfy The Elements For Such Relief. .................................................. 47

1.      CSX Cannot Demonstrate it has Standing to Pursue Injunctive Relief. ................................................................................................. 47

a.      CSX Cannot Demonstrate the Existence of an "Impending" Violation of the Antitrust Laws .................................................... 48

b.      There is No Evidence of a "Contemporary Violation" or Continuing Conspiracy. .............................................................. 49

c.      There is No Evidence that a Violation of the Antitrust Laws Will "Recur" ................................................................................. 52

d.      CSX's Cannot Demonstrate a Threat of Future Harm Because It Cannot Show Antitrust Injury. .................................... 53

2.      CSX Cannot Demonstrate Irreparable Injury or that Damages are Inadequate. ..................................................................................... 54

3.      The Court Cannot Grant Injunctive Relief that is Narrowly Tailored to Redress the Specific Injury Alleged by CSX. ...................... 57

a.      CSX is Not Entitled to a Nonspecific "Sin-no-More" Injunction. .................................................................................... 58

b.      An Injunction Ordering NPBL to Restructure its Board Will Not Redress the Antitrust Injury Claimed by CSX. ............ 60

4.      Laches Bars CSX's Claims .................................................................. 60

a.      Because CSX's Legal Claims are Barred by the Statute of Limitations, Laches Presumptively Bars its Equitable Claims. ........................................................................................ 63

b.      CSX's Delay is Inexcusable ......................................................... 64

c.      CSX Has Failed to Rebut the Presumption of Prejudice to NS Caused by its Long and Inexcusable Delay. .......................... 65

D.   Antitrust Conclusions of Law ............................................................................ 66

1.      CSX Bears the Burden of Proof on Each of Its Antitrust Claims. ........... 67

2.    CSX Must Prove a Properly Defined Relevant Market for Each of Its Antitrust Claims. ........................................................................ 69

     a.    CSX Cannot Prove Its Relevant Service Market. ....................... 74

     b.    CSX Cannot Prove Its Relevant Geographic Market. ................ 75

3.    CSX Cannot Prove that Defendants' Conduct had an Adverse Effect on Competition in a Properly Defined Relevant Market ............. 77

4.    CSX Cannot Prevail on Its Section 1 Claim ............................................ 78

     a.    CSX Cannot Prove a "Contract, Combination, or Conspiracy." ............................................................................. 78

     b.    CSX Cannot Prove Any Unreasonable Restraint of Trade. ......... 82

5.    CSX Cannot Prevail on Its Section 2 Claim. ......................................... 87

     a.    Monopolization ........................................................................ 87

          1)    CSX Cannot Prove Monopoly Power in a Relevant Market. ..................................................................... 88

          2)    CSX Cannot Prove Exclusionary Conduct. .................... 89

               i.    The Switch Rate ................................................... 90

               ii.    The 2015 Train Movements ................................. 92

               iii.    The Diamond Track, Port Norfolk Yard, and Rejection of Service Proposals ........................... 93

               iv.    CSX Cannot Prove Anticompetitive Effect / Harm to Consumers ............................................ 93

               v.    CSX Cannot Prove It Was Excluded From Competition. .......................................................... 94

     b.    Attempted Monopolization ........................................................ 94

          1)    CSX Cannot Prove Specific Intent or Exclusionary Conduct. ..................................................................... 95

          2)    CSX Cannot Prove Dangerous Probability of Success. ...................................................................... 95

     c.    Conspiracy to Monopolize ........................................................ 96

1)      CSX Cannot Prove a Conspiracy. ..................................... 96

2)      CSX Cannot Prove Specific Intent. ................................. 96

3)      CSX Cannot Prove Anticompetitive Effect. .................... 96

Defendant Norfolk Southern Railway Company ("NS" or "NSR") and Norfolk and Portsmouth Belt Line Railroad ("NPBL"), by counsel, hereby submits its preliminary proposed findings of fact and conclusions of law, pursuant to the Court's Order of January 5, 2023 (ECF No. 560). Based on controlling law and the evidentiary record, NS is entitled to judgment in its favor on all claims asserted by CSX Transportation, Inc. ("CSX").

## INTRODUCTION

1.      These Findings of Fact and Conclusions of Law follow this Court's prior rulings on Defendants' respective Motions to Dismiss (ECF Nos. 34, 27), and Defendants' Motions for Summary Judgment (ECF Nos. 307, 296). In ruling on the Motions to Dismiss, this Court dismissed Count VII of the Complaint (ECF No. 66 at 2). All claims under Count VI were dismissed by consent (ECF No. 143, 159). In ruling on summary judgment (ECF No. 559), this Court dismissed CSX's claims for damages under all remaining claims, and dismissed all remaining state law claims. The Court subsequently held a bench trial on the remaining issue of injunctive relief on CSX's antitrust claims.

2.      At the outset, the Court recognizes that in federal antitrust cases, no right to injunctive relief exists independently of the statutory authority in 15 U.S.C. § 26. *See Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 634 n.5 (1977) ("Prior to the enactment of [15 U.S.C. § 26], private injunctive relief was not authorized for antitrust violations.").

3.      The Court also reiterates its prior holding that "NSR has a lawful right to 'compete' with CSX, and it is important to ensure that NSR's lawful competitive conduct, *even if aggressive*, is not mistaken as an antitrust act merely because NSR has evidenced an extreme opposition to facilitating the business of its direct competitor." (Summ. J. Op. & Order 36, ECF No. 559) (hereafter "Summ. J. Op.") (emphasis added).

4.      In "what has become an antitrust commonplace, [] if conduct is not objectively

1

anticompetitive[,] the fact that it was motivated by hostility to competitors … is irrelevant." *Olympia Equipment Leasing Co. v. Western Union Tel. Co.*, 797 F.2d 370, 379 (7th Cir. 1986).

5.     For the reasons set for below, the Court finds and concludes that it lacks jurisdiction to enjoin Defendants under 15 U.S.C. § 26 because, undisputedly, they are common carriers subject to the jurisdiction of the Surface Transportation Board (the "STB").  In fact, the STB is the exclusive forum to address the non-monetary relief sought by CSX in this case.

6.     Even if the Court had jurisdiction to entertain CSX's claim for injunctive relief under antitrust law, and for the reasons stated below, the Court finds and concludes CSX has not carried its burden to show a violation of the antitrust laws, that its alleged antitrust harm is irreparable and not compensable, or that narrowly tailored injunctive relief would redress the alleged harm.  Even if CSX could satisfy its burden on these issues, the Court finds that the doctrine of laches bars its claim for injunctive relief.

7.     Therefore, CSX's remaining antitrust claims, and the case as a whole, will be dismissed with prejudice.

## FINDINGS OF FACT[1]

### A.     THE PARTIES

8.     NS and CSX are Class 1 railroads that operate in the eastern United States and Canada.  Summ. J. Op. 2; Stip. Undisputed Facts ¶ 2, ECF No. 517-1 (hereafter "Stip. Facts").  For decades, these major railroads have aggressively competed "across the Eastern United States and

---

[1] Throughout this proposed Preliminary Findings of Fact and Conclusions of Law, Defendants cite to documents put forth by Plaintiff as proposed exhibits that, in fact, support Defendants' defenses in this matter.  However, Defendants' citation to Plaintiff's proposed exhibits in this document does not waive any objections to Plaintiff's use of such documents at trial.  These citations merely show that even Plaintiff's own purported evidence justifies judgment for Defendants.

Canada, including competing for international intermodal traffic in Hampton Roads." (Summ. J. Op. 28; Stip. Facts ¶ 2).

9.      NPBL is a terminal switching railroad founded in 1896 by eight railroads that operates in Hampton Roads, Virginia.  (Summ. J. Op. 2; Stip. Facts ¶¶ 3-4).  It provides its owner railroads and the local industries that it serves with connecting service to various destinations on NPBL's own tracks and tracks over which NPBL has trackage rights.  (Summ. J. Op. 2; Stip. Facts ¶¶ 3-4).

10.      All the outstanding voting common stock of NPBL is owned by CSX and NS.  CSX currently owns 43 percent and NS owns 57 percent of the voting common stock of NPBL. (Stip. Facts ¶¶ 3-4).

11.      It is undisputed that NS and NPBL are common carriers subject to the jurisdiction of the STB.

**B.      NS HAS MAJORITY BOARD REPRESENTATION AT NPBL BY AGREEMENT.**

12.      NPBL's business is governed by an Operating Agreement, dated July 7, 1897 (the "Operating Agreement"), as amended.  (**J003**, NPBL000028; **NS013**, CSXT0000761; Stip. Facts ¶ 5).

13.      Under the Operating Agreement, oversight and management of NPBL was vested in a board of directors and officers.

14.      The Operating Agreement allowed each of the eight founding railroads to designate one member of the board of directors of NPBL.  The board of directors would appoint officers of NPBL, particularly its president.

15.      By 1989, the NPBL board consisted of six voting members, one of which would be the president appointed by the board of directors, and five members appointed by the shareholders of NPBL.

16.     Following mergers and acquisitions among the original railroads that founded NPBL, by 1989, the number of shareholder railroads eventually was reduced to only CSX, Norfolk and Western Railway Company ("NW"), and Southern Railway Company ("SR").   (**J008**, NPBL010366).  The shares of some original shareholders that ceased being owners were redeemed by NPBL or divided among surviving the remaining owner railroads.

17.     Prior to 1989, CSX and NS had engaged in a course of conduct whereby upon a combination of multiple railroads all holding NPBL shares and a right to board representation, the surviving railroad would succeed to the NPBL shares and board representation rights of the combining railroads.  By 1989, by this practice CSX had accumulated the right to designate, and exercised the right to designate, two seats on the board, and NW and SR, by then under common ownership, had the right to designate, and exercised the right, to designate three seats on the NPBL board.

18.     By Supplemental Agreement dated March 1, 1989, CSX, NW, and SR amended the Operating Agreement to ratify the practice that CSX would appoint two NPBL board members and NW and SR collectively would appoint three board members.  (**J008**, NPBL010366[2]); Summ. J. Op. 70 ("NSR and CSX's relative ownership percentages were the result of historical railroad mergers, and the 3-2 director nomination power imbalance was the result of a written 1989 contract between NSR's two predecessors and CSX."); Summ. J. Op. 70 n.26 (noting that both NS and CSX have historically appointed their own employees as NPBL board members); Stip. Facts ¶ 6). NW and SR merged, leaving NS and CSX as the sole owners of NPBL.  (Summ. J. Op. 2).

---

[2] In 1989, NW and SR had legally merged following ICC approval of the Merger in 1982 but were still working through the operational merger.   ECF No. 116, at 1.

C.    **NPBL HAS SMOOTHLY OPERATED FOR DECADES WITH NS AND CSX AS JOINT OWNERS.**

19.    From April 2007 to April 2022, the NPBL Board has unanimously approved 113 items of Belt Line business including sales of real property, approval of capital expenditures, approval of operating budgets, election of officers, and payments of dividends. (**J027-J079**).  During the same time, there were only 11 items of business decided by a divided vote of the NPBL Board.  (*Id*.)

20.    From 1986 to present, over a span of 35 years, NPBL has had only five presidents, only two of whom worked for NS after leaving NPBL.  (Anticipated testimony of Cannon Moss, NPBL).[3]  David Gooden was president of NPBL from September 29, 2005 to June 17, 2008, a period of less than three years, and returned to work for NS.  (**J033**, NPBL017828).  David Stinson was president of NPBL from June 17, 2008 to September 23, 2011, a period of only three years, and returned to work for NS.  (**J047**, NPBL017946).

21.    Between 1989 and 2017, NPBL's Board of Directors has unanimously elected NPBL's President and General Manager every year except 2011.  (CSX Ans. to NPBL RFAs 24, 25, 27, 28, 30, 31, 33).

22.    Donna Coleman was NPBL's Vice President, Comptroller, and Corporate Secretary and was employed by NPBL since 2006 and retired January 31, 2022, a period of approximately 16 years.  (**J078**, NPBL028656).  Coleman did not return to NS following her retirement from NPBL.  (Anticipated testimony of Donna Coleman, NPBL).

---

[3] As a help to the Court, Defendants have identified witnesses may provide supporting testimony for various points throughout this submission.  However, trial testimony is subject to change and these designations not meant to limit in any way Defendants' ability to demonstrate these facts at trial.

23.     Cannon Moss was unanimously reelected by the directors as President and General Manager of NPBL every year from 2012 to 2017. (CSX Resp. to NPBL RFA 33).  The Board also increased his salary every year from 2011 to 2022.  (**J048**; **J051**; **J054**; **J057**; **J060**; **J063**; **J066**; **J069**; **J072**; **J076**; **J078**).  From 2011 to 2017 and 2021 to 2022, the vote to increase his salary was unanimous; from 2018 to 2020, the Board minutes do not reflect any objection by CSX.  On top of his salary increases, the Board also voted to give him a performance bonus every year from 2011 to 2022.  (Expected testimony from Cannon Moss, NPBL).

24.     Since 2012, NPBL has held a meeting of its Board of Directors and its Shareholders at least once per year.  (CSX Ans. to NPBL RFAs 11, 12).

25.     Per contractual agreements, NS provides operational and administrative support services to NPBL, including locomotive leases and fueling, billing and contract services, technology services, car inspection and repair services, email addresses, benefits administration, and locomotive maintenance.  (Summ. J. Op. 3; Anticipated testimony by Cannon Moss, NPBL President).

26.     In this litigation, CSX attempts to rely on internal NS-only communications as evidence of conspiratorial conduct.  (CSX Supp. Resp. to NPBL Interrog. #3).

**D.     NS AND CSX VIGOROUSLY COMPETE FOR INTERNATIONAL INTERMODAL CONTAINER BUSINESS.**

27.     NS and CSX vigorously compete for the transportation of international intermodal containers delivered to or from ports on the East Coast.  *See* Summ. J. Op. 2-3.  NPBL does not compete with either NS or CSX.  (Anticipated testimony by Rob Girardot, CSX; Anticipated testimony by Jay Strongosky, CSX).

28.     "International intermodal traffic" refers to the transportation of cargo containers that are either imported to or exported from the United States and use more than one mode of transportation on a single trip from origin to destination.  (**ECF No. 308-6 & 7**, Wright Rep. ¶ 21).

29.     Railroads often utilize "double-stacked" trains to move intermodal containers.  A double-stacked train can hold multiple containers in a single car well, as opposed to a single-stacked train that can hold only one container per well.  (Anticipated testimony by Rob Girardot, CSX).

30.     Double-stacked trains increase a railroad's train capacity and create economic and operational efficiencies.   (Anticipated testimony by Maryclare Kenney, CSX; Anticipated testimony by Jay Strongosky, CSX; **NS0314**, CSXT0000897 at Slide 6; **NS0415**, CSXT0001792 at -794; **NS0064**, CSXT0124777, at -778).

### E.     THE PORT OF VIRGINIA

#### 1.     CSX and NS have on dock rail access to all three intermodal terminals operated at the Port of Virginia.

31.     Until May 2020, the Port of Virginia ("POV"), through its operating subsidiary, Virginia International Terminals, Inc. ("VIT"), operated three terminals supporting international intermodal traffic, Virginia International Gateway ("VIG"), Portsmouth Marine Terminal ("PMT"), and Norfolk International Terminals ("NIT").  (Summ. J. Op. 3-4; **ECF No. 308-6&7**, Wright Rep. at ¶ 23).

32.     At VIG, both CSX and NS have on-dock rail access via the Commonwealth Railway ("CWRY"), a short-line railroad.   (Summ. J. Op. 4; Anticipated testimony by Rob Girardot, CSX; Anticipated testimony by Dr. Rob Martinez, NS).

33.     The NPBL's physical plants are largely different from CWRY's, including:

     a.   NPBL's route includes a lift bridge with 140 feet of air draft over the southern branch of the Elizabeth River.  CWRY has no such structures.  (Anticipated testimony by Tom Crowley, NPBL Expert).

     b.   NPBL's route also goes through heavily populated areas of Norfolk and Portsmouth.  CWRY's route travels through rural Suffolk.  (Anticipated testimony by Tom Crowley, NPBL Expert).

34.     CSX's on dock rail access to VIG was only made possible by NS selling a property easement to CSX so that CSX could adequately connect its rail network to CWRY to gain direct on dock rail access VIG.  (Anticipated testimony by Dr. Rob Martinez, NS).

35.     At the time that NS facilitated CSX's on dock rail access to VIG, CSX contends that NS was engaged in an anticompetitive conspiracy and monopolization conduct at the POV. NS's conduct to enable CSX's on dock rail access to VIG belies this contention.

36.     In 2019, VIG completed an expansion project and now can offer roughly the same capacity as NIT at 1.2 million containers annually.  (Anticipated testimony by Tom Capozzi, VIT; **ECF No. 308-6&7**, Wright Rep. at ¶ 119; Summ. J. Op. 4 (noting that VIG had been "recently expanded and upgraded")).

37.     NPBL owns the tracks leading to PMT, which is located next to CSX's Portsmouth Intermodal Yard.  (**ECF No. 308-6&7**, Wright Rep. at ¶ 37).   PMT could handle approximately 200,000 containers per year while operational.  (*Id.* at ¶ 116).

38.     While PMT was operational, CSX had on-dock access to PMT through trackage rights over NPBL's tracks.  (Anticipated testimony by Tom Capozzi, VIT).  NS had on-dock access at PMT by using NPBL and paying NPBL's tariff switch rate discussed below.  (Anticipated testimony by Cannon Moss, NPBL President).  PMT was shuttered between 2010 and 2014, and

ultimately closed in 2020.  (Anticipated testimony by Tom Capozzi, VIT; **ECF No. 308-6&7**, Wright Rep. Tbls. 5 & 6).

39.     At NIT, NS has on-dock rail access via a combination of tracks that it owns and trackage rights.  (Summ. J. Op. 3).  There is a small section of track at NIT between the north end of the terminal and where NS tracks begins at West Junction. NS pays NPBL for trackage rights to move trains along this small section of track before NS trains continue along NS-owned track. (Anticipated testimony of Jeffrey Heller).  NPBL has access to NIT via trackage rights over NS's tracks and NPBL's own tracks.  (Summ. J. Op. 3).

40.     CSX has rail on dock access to NIT via NPBL, provided that CSX pays NPBL's tariff switch rate, "which is the cost per train car 'well' that NPBL charges customers to use its tracks/switching services."  (Summ. J. Op. 3; Anticipated testimony by Jay Strongosky, CSX; **NS0357**, CSXT0037049 at Slide 4; **NS0465**, CSXT0050615 at -615).

**2.     Rail access to NIT requires a detailed operating plan.**

41.     NPBL has an agreement with NS providing NPBL "trackage rights" to use NS' tracks to take trains to the back gate of NIT.  Under the agreement, NPBL can use NS's tracks; however, NS has the right to control movements on the tracks.

42.     When NPBL seeks to run a train to NIT, it must coordinate an available operating window with NS.  (**NS0240**, CSXT0126579 at -579; **NS0351**, CSXT0001301; Anticipated testimony by Jeff Heller, NS).

43.     NS and NPBL trains enter and move through NIT in different directions, meaning that two trains cannot be on the tracks at the same time.  *See* Summ. J. Op. 3 (observing the "complication[s] to the shared use of the single track to and from NIT").  NS enters NIT through the southern main gate and travels in a continuous clockwise fashion as it moves into NIT, loads containers, and then exits NIT's northern back gate.  (Summ. J. Op. 3).  NPBL's limited trackage

rights allow it to only enter and exit NIT through the northern back gate.  (Summ. J. Op. 3; **NS0164**, NSR_00306428 at -429; **NS0343**, CSXT0001276 at -276; **P250**, NPBL013644, at -649).

### 3.    VIT directs ocean carriers where to dock.

44.    Virginia International Terminals, Inc. ("VIT") is the private terminal operating subsidiary of the Virginia Port Authority ("VPA") that operates the POV.  (Summ. J. Op. 4; Anticipated testimony by Tom Capozzi, VIT; Anticipated testimony by Catherine Vick, VPA).

45.    VIT actively manages port operations at the POV and directs ocean carriers to a specific POV terminal.   (Summ. J. Op. 4; Anticipated testimony by Tom Capozzi, VIT; Anticipated testimony by Rob Girardot, CSX; **NS0676**, CSXT0074449 at -449; **NS0681**, CSXT0074914, at -915).

46.    VIT uses a number of factors in deciding to which terminal to assign a ship, including the "alignment" of an ocean carrier with CSX or NS.  If an ocean carrier primarily uses CSX, VIT will favor assignment of the carrier's ship to VIG.  If an ocean carrier primarily uses NS, VIT will favor assignment of the carrier's ship to NIT. (Anticipated testimony by Tom Capozzi, VIT).

47.    VIT also periodically moves intermodal containers between its three Port of Virginia container terminals by barge.  (**NS001**, SDT RES N 00001).

48.    ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

██████████    ████████████████████████████████████

49.     There is no international intermodal traffic or customer that *must* move through NIT as opposed to VIG or other ports.

50.     CSX encourages VIT to direct its aligned ocean carriers to VIG.  (Anticipated testimony by Jay Strongosky, CSX; Anticipated testimony by Tom Capozzi, VIT; Anticipated testimony by Rob Girardot, CSX; **NS0458**, CSXT0049507, at -508; **NS0666**, CSXT0073025, at -027; **NS0629**, CSXT0067839, at -840; **P392**, CSXT0049507 ████████████████ ████████████████████████████████████████████████).

51.     CSX has a preference to use VIG as it believes that it is less costly to use the services of CWRY to move intermodal containers through VIG than to use NPBL or trucks to move intermodal containers through NIT.

52.     No ocean carrier has provided any testimony regarding the impact (economic, operational, or otherwise) of the alleged anticompetitive acts in this matter.  Furthermore, the economic modeling developed by CSX expert Professor Howard Marvel that purports to show ██ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████ (Anticipated testimony by Professor Howard Marvel, CSX Expert).

> **4.      The Port of Virginia competes against other ports, particularly the Port of NY/NJ .**

53.     Ports compete with one another for international intermodal "discretionary cargo," which is cargo that can move through more than one port to its ultimate destination.  (Anticipated testimony by Tom Capozzi, VIT; Anticipated testimony by Michael McClellan, NS; **NS0064**,

CSXT0124777; **NS359**, CSXT0001308 (████████████████████████████
████████████████████████████████); Bill Mongelluzzo, *Infrastructure Key in Battle for Discretionary Cargo*, JOC.com (Apr. 3, 2014), *available at* www.joc.com/port-news/us-ports/infrastructure-key-battle-discretionary-cargo_20140403.html; *Canadian ports and terminal operators target Midwest*, Am. Journal of Transportation (Sept. 10, 2018), *available at* www.ajot.com/premium/ajot-canadian-ports-and-terminal-operators-target-midwest).

54.     United States ports along the West Coast compete with ports along the East Coast for discretionary international intermodal traffic for some origins and destinations, particularly in the Midwest.   (Anticipated testimony by Jay Strongosky, CSX; Anticipated testimony by Maryclare Kenney, CSX; Anticipated testimony of Matthew Wright, NS Expert; **NS0504**, CSXT0063241, at -241; **NS0651**, CSXT0069501, at -501; **NS0330**, CSXT0034771, at -771-72; **NS0439**, CSXT0045124, at -124; *see also* Ari Ashe and Hugh R. Morley, "US East Coast ports investing to capture more intermodal cargo," JOC.com, January 27, 2020, *available at* www.joc.com/rail-intermodal/intermodal-shipping/us-east-coast-ports-investing-capture-more-intermodal-cargo_20200127.html).

55.     The inland locations for which the POV has the greatest natural shipping advantage over other ports tend to be origin and destination locations geographically close to the port itself. (**ECF No. 308-6&7**, Wright Rep. at ¶ 70).

56.     In addition to West Coast ports, the POV competes with ports in Canada and with the ports of Baltimore, Philadelphia, Savannah, Jacksonville, Charleston, and New York/New Jersey ("Port of NY/NJ") for discretionary international intermodal traffic.  (Anticipated testimony by Tom Capozzi, VIT; **NS0357**, at Slide 7; **NS0505**, CSXT0003542; **NS0392**, CSXT0038547 at -747; **NS0064**, at -777; **P469**, NSR_00026277 (showing direct competition with Port of NY/NJ)).

12

57.     Ocean carriers have at least one port option besides the POV for all major Midwest destinations, and the POV competes most heavily with Port of NY/NJ for those Midwest destinations.  (Anticipated testimony by Tom Capozzi, VIT).

58.     ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████.

59.     In sum, there is no admissible non-hearsay evidence from the ocean shippers showing (a) that they prefer a particular terminal at POV, or (b) that they have been harmed by NS's conduct or pricing.

**F.     NS AND CSX EACH HAVE COMPETITIVE ADVANTAGES AT DIFFERENT PORTS ACROSS THEIR RAIL NETWORKS.**

**1.     CSX has competitive advantages at multiple ports, including the Port of NY /NJ.**

60.     The POV's main competitor for discretionary international intermodal cargo is the Port of NY/NJ, which is the East Coast port with the largest intermodal container business.  (**ECF No. 308-6&7**, Wright Rep. at ¶ 73; Anticipated testimony by Tom Capozzi, VIT; Anticipated testimony by Rob Girardot, CSX; Anticipated testimony by Jay Strongosky, CSX; **NS0469**, CSXT0052080, at -802-083; **NS0664**, CSXT0072702, at -702; **NS0320**, CSXT0032388, at -388; **NS0064**, CSXT0124777, at -777).

61.     The Port of NY/NJ is the first port of call on the East Coast for many ocean carriers, providing it with a speed-to-market advantage over the POV when serving overlapping inland

destinations such as the Midwest.   (**ECF No. 308-6&7**, Wright Rep. at ¶ 73; **NS0504**, CSXT0063241, at -241; **NS0518**, CSXT0003625 at -625; Anticipated testimony by Catherine Vick, VPA).

62.   CSX has long prioritized the Port of NY/NJ as its primary port for international intermodal traffic services.  (**ECF No. 308-6&7**, Wright Rep. at ¶ 74; CSX; **NS0163**, VPA000793; **NS0805**, Joseph Bonney, "CSX Raises the Roof," JOC.com, Oct. 18, 2010, available at https://www.joc.com/maritime-news/csx-raises-roof_20101018.html ("You hear a lot about the Heartland Corridor. My statement is, 'Bring them on.' We can handle them here in New Jersey and beat them head-on, straight up every day." (quoting Clarence Gooden, CSX's executive vice president and chief commercial officer)); **NS057**, CSXT0024736, at -736); **NS270**, CSXT0027483, at -487: ("Superior Eastern Network. The former Conrail assets acquired by CSX in 1999 provide the fastest, most efficient high capacity route between New York/New Jersey and the Midwest & Ohio Valley. With Northwest Ohio, CSX has greatly enhanced the natural route capability of the former Conrail network to serve new markets like Montreal and Louisville, and to serve all markets more reliably.")).   In fact, by 2012, ███████████████████████ █████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ (**NS600**, CSXT0101159).

63.   CSX has faster routes than NS between the Port of NY/NJ and Midwest locations. (**ECF No. 308-6&7**, Wright Rep. at ¶ 74; Anticipated testimony by Jay Strongosky, CSX; **NS0515**, CSXT0003603, at -616; **NS0684**, CSXT0074939, at Slide 3; **NS0688**, CSXT0165126).

64.   CSX reaches the same major Midwest locations through the Port of NY/NJ that NS serves through the POV, including Chicago, Cleveland, Cincinnati, Columbus, Detroit, Louisville,

Kansas City, and St. Louis.  (**NS0292**, NSR_00000912, at Slide 21; **NS0511**, CSXT0003592, at Slide 11; **NS0684**, at Slides 3-4; **NS0454**, CSXT0096239).

65.     Between 2009 and 2020, CSX handled ███████████████████████████████

████████████████████████████████████████████████████████████████████████

██████  (**ECF No. 308-6&7**, Wright Rep. at ¶ 74; **NS0445**, CSXT0046841, at Slide 8).

66.     The POV lost container traffic to the Port of NY/NJ as a result of the raising of the Bayonne Bridge, which allowed some larger vessels to reach the Port of NY/NJ for the first time. (Anticipated testimony by Catherine Vick, VPA; Anticipated testimony by Jay Strongosky, CSX; **NS0518**, CSXT0003625, at -625, -627, -628; **NS620**, NSR_00059656 (noting that "(r)ecent articles have shown that carriers are putting larger vessels into New York since the Bayonne Clearance Project" and that "there has been a significant shift from Norfolk to New York" in container volume to Chicago); Ari Ashe, "Rail lift gains show deeper East Coast port reach," JOC.com, February 7, 2019, *available at* www.joc.com/port-news/us-ports/port-savannah/rail-lift-gains-show-deeper-east-coast-port-reach_20190207.html (Shawn Tibbetts, chief operating officer for the VPA, said the following: "The raising of the [Bayonne] bridge made the competition to serve the Midwest more pronounced.")).

67.     In addition to the competitive advantages at the Port of NY/NJ, CSX also has competitive advantages at other ports.  For example, only CSX has on-dock rail access at Dames Point, the largest container terminal at the Port of Jacksonville, whereas NS must dray containers between its Jacksonville rail facility and the port. (Anticipated testimony of Jeffrey Heller).

68.     ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

69.

**2.      NS has competitive advantages at the Port of Virginia.**

70.     As an early investment into bringing intermodal traffic to the POV, in 2010, NS completed its "Heartland Corridor" project, giving NS double-stack service through the POV and the fastest and most direct routes to Midwest destinations from the POV.  (**NS228**, NS_00001839, at -840; Anticipated testimony by Mike McClellan, NS).  NS retains a route advantage over CSX to major midwestern destinations for rail transport originating or departing the POV.  (Anticipated testimony by Jay Strongosky, CSX; **NS688**, CSXT0165126).

71.     CSX did not achieve double-stack capabilities from the POV until December 2016 when the Virginia Avenue Tunnel construction was completed as part of the National Gateway project.  (Anticipated testimony by Rob Girardot, CSX; **NS475**, CSXT0052366 at Slide 9; **NS057**,

16

CSXT0024736, at -736).  As a result, CSX faced a competitive disadvantage for intermodal service at POV.  CSX's single-stack service at the POV increased port congestion and created operational issues.  In fact, CSX internally recognized that ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

72.     ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

### 3.     Trucks compete against railroads for traffic at the POV.

73.     Between 2012 and 2019, trucks accounted for ████████ of all international intermodal traffic through the POV.  (**ECF No. 308-6&7**, Wright Rep. at ¶ 59, Chart 1).

74.     In addition to competing with each other, CSX and NS compete with trucks, or "drayage", for the movement of international intermodal containers at the POV.  "In many cases, the shipper may substitute economically between transportation by rail and transportation by truck. (In fact, on the rail side this is one of the most important market definition questions.)"  *Market Definition in Antitrust*, at 234 (ABA Book Publishing 2012).

75.     Trucks and rail compete most closely for international intermodal traffic movements of up to 200 miles.  (Anticipated testimony by Dean Piacente, CSX; Anticipated testimony by Rob Girardot, CSX; Anticipated testimony by Catherine Vick, VPA; Anticipated

testimony by Carl Warren, CSX; Anticipated testimony by Prof. Marvel, CSX Expert; **NS0316**, CSXT0032082, at -082).

76.     Trucks and rail also compete for international intermodal movements between 200 and 500 miles, and in certain circumstances, for movements longer than 500 miles.  (Anticipated testimony by Jay Strongosky, CSX; Anticipated testimony by Mike McClellan, NS; Anticipated testimony by Rob Girardot, CSX; Anticipated testimony by Maryclare Kenney, CSX; **NS0584**, CSXT0159556 at -565; **ECF No. 308-6&7**, Wright Rep. at ¶ 61; **NS0491**, NSR_00041595, at -597; **NS0504**, CSXT0063241, at -241; **NS0392**, CSXT0038547, at -747).

77.     Nearly every intermodal container shipment by rail includes at some point a local truck movement of the container between the rail terminal and the ultimate inland origin or destination of the container. (Anticipated testimony of Matthew Wright, NS Expert; Anticipated testimony of Jeffrey Heller, NS).

78.     Between 2009 and 2020, ██████ of NS's container movements through the POV were to destinations within 500 miles or less.  (**P594**, Prof. Marvel, Reply Report, Ex. 1).

79.     ████████████████████████████████████████████████

████████████████████ (**ECF No. 308-6&7**, Wright Rep. at ¶¶ 66-67; **NS0504**, CSXT0063241, at -241; Anticipated testimony by Jay Strongosky, CSX; Anticipated testimony by Jeff Heller, NS; **NS0316**, CSXT0032082, at -082; **NS0494**, CSXT0097850, at -850; Anticipated testimony by Rob Girardot, CSX). ██████████████████████████████████████████

████████████████████ (**NS0531**, CSXT0159221, at -221).

80.     Through CSX's Highway To Rail ("H2R") program, CSX works to convert trucking of international intermodal freight to rail movement of those containers by CSX.

(Anticipated testimony by Maryclare Kenney, CSX; **NS0316**, CSXT0032082, at -083; Anticipated testimony by Jay Strongosky, CSX).

### 4. Some shippers do not align with any particular railroad, using both CSX and NS.

81. ███████████████████████████████████████████████████████████████

████████████████████████████████████████████ (Anticipated testimony of Jeffrey Heller, NS).

### G. NPBL CHARGES A UNIFORM SWITCH RATE PER THE OPERATING AGREEMENT.

82. The Operating Agreement requires that NPBL fix a "uniform rate" for the NPBL's "movement of freight cars … regardless of distance." (**J003**, at art. 9; Anticipated testimony by Cannon Moss, NPBL President). The uniform rate is to be "adjusted from time to time" to pay a six percent dividend to shareholders. (**J003**, at art. 9). The uniform rate that NPBL charges to switch cars is referred to as its "switch rate."

83. Pursuant to the Operating Agreement, NPBL is to be operated as a "breakeven" business that generates only enough profit to pay the six percent dividend to its shareholders. (Anticipated testimony by Cannon Moss, NPBL President).

84. NPBL's switch rate is set through a published tariff. (Anticipated testimony by Cannon Moss, NPBL President; **NS0331**, NPBL000220).

85. "NPBL has procedures in place that allow CSX to seek modification of the switch rate through convening a NPBL rate committee." (*See* Summ. J. Op. 34; Anticipated testimony by Cannon Moss, NPBL President; Anticipated testimony by Donna Coleman, NPBL).

### 1. NPBL set and has maintained the switch rate at $210/well to cover its operating expenses.

86. In 2009, the Board set NPBL's switch rate at $210 per loaded well, which is set forth in NPBL's public tariff. (Summ. J. Op. 3.; **NS141**, CSXT0125260). There is no charge for

an empty railcar well.  (**J001**, NPBL000220).  The rate has remained the same since 2010.[4] (Summ. J. Op. 3).

87.     The $210 switch rate set forth in NPBL's public tariff took effect on February 1, 2010, based on the recommendation of NPBL's rate committee, which reviewed projected revenues and expenses for 2010.  (**J001**, NPBL000220; **J039**; NPBL017882; **P162**, NPBL021736; **NS0114**, NSR_00074093).   The rate committee included representatives from NPBL's management as well as each of NPBL's owners.

88.     Since 2010, NPBL's Board has approved the annual budget presented by NPBL's officers, which includes NPBL's anticipated expenses for the following year.   (**NPBL016**, Crowley Rep. at 4 n.8).

89.     Additionally, on December 10, 2014, NPBL's Board unanimously approved amendments to NPBL's tariff that did not involve rate changes, reaffirming the $210 switch rate without opposition by CSX.  (**J057**, NPBL018011).

90.     The NPBL switch rate is based on NPBL's operating costs.  (**NPBL016**, Crowley Rep. at 5, Tbl. 1; Anticipated testimony by Cannon Moss, NPBL President; Anticipated testimony by Donna Coleman, NPBL).

91.     The evidence reflects the following NPBL operating expenses on an annual basis:

    a.  In 2010, NPBL's operating expense per railcar was ████. (**J015**).

    b.  In 2011, NPBL's operating expense per railcar was ████ (**J016**).

    c.  In 2012, NPBL's operating expense per railcar was ████ (**J017**).

---

[4] In an effort to keep this cost as low as possible, NPBL's switch rate has not been increased for inflation over the last decade. To have simply kept up with inflation, the $210 rate set in 2009 would need to have been increased to $291.71 in 2023. *See* CPI Inflation Calculator, *available at* https://www.in2013dollars.com/us/inflation/2009?amount=210.

d.   In 2013, NPBL's operating expense per railcar was ██████ (**J018**).

e.   In 2014, NPBL's operating expense per railcar was ██████ (**J019**).

f.   In 2015, NPBL's operating expense per railcar was ██████.  In 2015, a personal injury accrual occurred, which increased operating expenses.  (**J020**).

g.   In 2016, NPBL's operating expense per railcar was ██████. (**J021**).

h.   In 2017, NPBL's operating expense per railcar was ██████. (**J022**).

i.   In 2018, NPBL's operating expense per railcar was ██████. (**J023**).

j.   In 2019, NPBL's operating expense per railcar was ██████. (**J024**).

k.   In 2020, NPBL's operating expense per railcar was ██████. (**J025**).

92.   The simple average operating expense during this time was ██████ and the weighted average was ██████.  The weighted average operating expense per car excluding 2015 is ██████, and the simple average, excluding 2015, is ██████.

93.   CSX has not disputed NPBL's annual operating expenses.

94.   It is undisputed that it is "very relevant" to consider NPBL's actual costs in setting the switch rate.  (*See* Anticipated testimony by James Allan, CSX; Anticipated testimony by Fredrik Eliasson, CSX; Anticipated testimony by Tony Ingram, CSX).

95.   However, CSX's expert did *not* consider NPBL's operating expenses when he analyzed the NPBL switch rate.  (Anticipated testimony by Prof. Marvel, CSX Expert).

96.   CSX understands that there is significant cost to switching, ██████████████ ████████████████████████████████████████████████ ████████████████████ (**P568**, CSXT0156200).

2. **NPBL's switch rate is consistent with other short line switch rates.**[5]

97.     hen compared on a per mile basis, NPBL's switching rate per container is lower than the intermodal tariff rates offered by Wilmington Terminal Railroad, Savannah Port Terminal Railroad, Jacksonville Port Terminal Railroad, Port of Mobile Terminal Railway, Palmetto Railways - Charleston Subdivision and North Charleston Subdivision, New Orleans Public Belt Railroad, Galveston Railroad, Brownsville & Rio Grande International Railroad, and Port Jersey Rail.  (Anticipated testimony of Tom Crowley, NPBL Expert).

98.     When compared on a per mile basis, NPBL's switching rate is also lower than the CWRY intermodal tariff rate at VIG because the CWRY rate of $210 per well applies to both loaded and empty wells, whereas NPBL rate applies to only loaded wells.  (Anticipated testimony of Tom Crowley, NPBL Expert).

**H.    CSX HAS PROPOSED – AND ABANDONED – DISCOUNTED SWITCH RATE CONTRACTS FOR ITS INTERMODAL TRAFFIC WITH NPBL.**

**1.    NS did not defeat CSX's 2010 Rate Proposal; CSX dropped it.**

99.     CSX claims that NPBL's switch rate is an economic barrier to access NIT, and CSX first threatened to bring legal action based on the switch rate as early as 2009.  (**NS0157**, CSXT0025521; **NS0097**, NPBL019887; **P228**, NSR_00074086 (deciding to forgo litigation)).

100.    On July 23, 2010, CSX sent a letter to NPBL (the "2010 Proposal") proposing that the parties enter into a contract relating to NPBL's movement of CSX's intermodal freight to and from NIT.  (**NS0179**, NPBL007431, at -433).  Among other things, CSX proposed that it pay NPBL a switch rate of $37.50 per container, which translated to potentially $112.50 per well (three

---

[5]  As set forth below, though the parties introduced evidence comparing NPBL's switch rate to rates charged by other railroads, only the STB has jurisdiction to determine whether the switch rate is unreasonable.  Additionally, because the STB has not been asked to determine the reasonableness of the rate, CSX cannot claim that the rate is unreasonable in support of its claims.

containers in a well).  *Id.*  The terms proposed by CSX were subject to negotiation between CSX and NPBL.  *Id.*  As part of the negotiation, CSX sent NPBL a draft contract for negotiation. (**NS0212**, CSXT0109886, at -886-908).

101.   CSX's proposed discounted rate did not consider NPBL's costs for moving the trains.  (*See* Anticipated testimony by Michael Wheeler, NS (plan profitability was speculative and unsupported)).

102.   NPBL's officers presented their analysis to the NPBL Board.  However, no board member ever moved for a vote on CSX's 2010 rate proposal.  (**NS0247**, NPBL017933, at -938). Nor did CSX, as a shareholder, make a motion at the April 13, 2011 shareholders meeting (or any subsequent shareholder meeting) to approve the 2010 Proposal.  (**NS0249**, CSXT0000262, at -262).

103.   At the April 2011 NPBL Board meeting, a vote was requested on a motion regarding NPBL's use of CSX locomotives for CSX traffic.  The motion ultimately did not pass, but David Stinson, the then-NPBL President and General Manager, voted in favor of it with CSX-appointed board members.  (**J044**, NPBL017933).

### 2.   CSX Sought a Vote on its 2018 Governance Proposal, but Not Its 2018 Rate Proposal.

104.   CSX began preparing for the instant lawsuit by at least February 1, 2018.  (**NS0751**, Privilege Log Excerpt).

105.   On March 23, 2018, CSX sent a letter to NPBL management proposing that the parties enter into a contract relating to NPBL's movement of CSX's intermodal freight to and from NIT.  (**NS0540**, CSXT0100329; **NS0550**, CSXT0119620; Anticipated testimony by Rob Girardot, CSX; Summ. J. Op. 61).  The Service Proposal suggested a new switch rate of $80 per well for CSX intermodal freight. (Summ. J. Op. 61-62).  The proposal was meant to begin a negotiation

with NPBL for the potential terms of a new contract switch rate for CSX.  (Anticipated testimony of Rob Girardot).

106.    NPBL pursued the proposal.  "CSX's own evidence indicates that NPBL President Cannon Moss was outwardly receptive to this proposal … [and it] merited being sent to the NPBL Board to evaluate through a 'rate committee.'"  (Summ. J. Op. 62; Summ. J. Op. 77 ("NPBL management was receptive to CSX's 2018 proposal and recommended that it be sent to a 'rate committee' for further evaluation[.]")).  CSX said it was "willing to work through [a rate committee] if necessary" on the proposal.  (Summ. J. Op. 62; **NS0540**, CSXT0100329).

107.    Moss spoke with CSX about the proposal, met with VIT as to port management, and consulted with NS regarding an operating plan for the movements CSX proposed. (**NS0557**, NPBL006228; Anticipated testimony by Cannon Moss, NPBL President; Summ. J. Op. 62-63 & n.23).  On April 5, 2018, Moss wrote to CSX regarding the proposal, including identifying potential issues and expressing concern that the proposal may not "make sense" for NPBL because NPBL had not reached an agreement with NS regarding the new trackage fee, and that, if NPBL accepted the lower switch rate proposed by CSX, other customers would demand the same rate, and NPBL would "lose revenue."  (Anticipated testimony by Cannon Moss, NPBL President; *accord* Summ. J. Op. 63 (rejecting CSX's proposed inference that Moss's concern reflected that "NPBL intentionally sought to delay adoption of CSX's proposal" because "acknowledgment of such an obvious business concern in response to a <u>long-term</u> service proposal from CSX does not support a <u>reasonable</u> inference of an intent to delay")).  "Nothing in Mr. Moss's email can reasonably be interpreted as suggesting that NPBL management was opposed to the proposal. On the contrary, it evinces NPBL management's view that the proposal warranted further evaluation." (Summ. J. Op. 63).

108.     "The day after Cannon Moss sent his email to CSX indicating NPBL management's intent to recommend that the NPBL Board form a rate committee to review CSX's proposal, CSX's Assistant General Counsel sent a letter to the members of the NPBL Board 'demand[ing]' that NSR, as well as NPBL through its Board of Directors, 'take remedial actions at the April 2018 meetings' of the <u>NPBL shareholders</u> and the <u>NPBL Board</u> to 'address serious deficiencies in the policies, procedures, controls and governance structure of the NPBL.'" (Summ. J. Op. 64).  This letter demanded that the NPBL Board be restructured to overturn the Supplemental Agreement's 3-2 allocation of board seats between the two parent railroads to provide equal representation between the minority and majority shareholders, replace NPBL management with "qualified individuals" independent of CSX and NS, and for NPBL to adopt an ethics compliance program. (**<u>NS0566</u>**, CSXT0100552; Summ. J. Op. 64).  NPBL already maintained a code of ethics and conflicts of interest standards.   (Anticipated testimony by Cannon Moss, NPBL President; Anticipated testimony by Donna Coleman, NPBL).

109.     "On April 18, 2018, NPBL held both a <u>shareholders'</u> meeting and a <u>board</u> meeting. The board meeting started first, was temporarily suspended for the shareholders meeting, and then reconvened thereafter." (Summ. J. Op. 64).

110.     At the shareholders' meeting, CSX asked for a vote on its proposal to restructure the NPBL Board with equal representation for the minority and majority shareholders through independent directors and an independent NPBL president.  (**<u>P136</u>**, NSR_00000845; Summ. J. Op. 64-65).  NS voted its majority shares against the proposal, resulting in the proposal being "not approved."  (**<u>P136</u>**, NSR_00000845; Summ. J. Op. 64-65).

111.    At the April 18, 2018 NPBL Board meeting, NPBL management raised CSX's proposal.  (**NS0589**, NPBL000745).  NPBL's management recommended that the Board form a rate committee to fully investigate the proposal.  (Anticipated testimony by Cannon Moss).

112.    However, CSX was not interested in a rate committee.  (Summ. J. Op. 68 (quoting deposition of Cannon Moss, ECF No. 324-7, stating that there "was no interest from either side to have a rate committee" in response to NPBL management's recommendation); Anticipated testimony by Cannon Moss, NPBL President).  The CSX-appointed directors never moved to form a rate committee and *never* moved for a vote on the 2018 Rate Proposal at the April 18, 2018 Board meeting.  (CSX Ans. to NPBL RFAs 18, 19 (conceding CSX-appointed directors did not move for a rate committee at the NPBL Board meetings on April 18, 2018 or April 24, 2019); Summ. J. Op. 68; Summ. J. Op. 77 (noting the "Board's failure to vote either way" regarding the rate committee or the service proposal)).

113.    NPBL never voted on, and thus never rejected, the rate proposal made by CSX.  (Summ. J. Op. 74-75 (finding that CSX fails to demonstrate that the NPBL Board took a formal vote, or otherwise acted as a corporate body on behalf of NPBL at the April 2018 Board meeting, to reject any request that may have been made seeking an independent rate committee"); Anticipated testimony by Cannon Moss, NPBL President).

114.    "Moreover, during this same period of time, the rate that NPBL would pay NSR for track access going forward (a critical input for analyzing CSX's service proposal) was being negotiated and was presented to the STB for expedited review, placing NSR and NPBL in opposition on this issue." (Summ. J. Op. 78).

I. **NO NPBL DIRECTOR HAS MOVED TO APPROVE A NEW LINE HAUL SWITCH RATE TO NIT OR A CONVENE A RATE COMMITTEE FOR THE LAST DECADE.**

115.    Since the NPBL Board of Directors voted in December 2009 to implement the $210

switch rate, no member of the NPBL Board of Directors has moved to approve a new rate for line

haul switching service to NIT at any NPBL Board of Directors meeting.  (CSX Ans. to NPBL RFA

13).

116.    Since the 2009 rate committee completed its work, no member of the NPBL Board

of Directors has moved for the appointment of a rate committee at any NPBL Board of Directors

meeting or NPBL Shareholders meeting.  (CSX Ans. to NPBL RFAs 15, 16).

J. **CSX WAS NOT FORECLOSED AT NIT, AND IN FACT, USED NPBL TO MOVE OTHER FREIGHT .**

1.    **CSX acted consistent with access at NIT,** ███████



117.    ███████████████████████████████

██████████████████████

118.    ███████████████████████████████

███████████████████████████████

███████████

119.    Since 2010, CSX has moved ██████████ of *non*-intermodal railcars over

NPBL annually paying the $210 switch rate.

  a.    For example, in 2018, CSX paid NPBL $210 per car to switch ██████████.
        (**J023**, NPBL026348).

  b.    In 2019, CSX paid NPBL $210 per car to switch ██████████ (**J024**,
        NPBL027926, at -935-936 (Annual Report); **NPBL016**, Crowley Rep. at 23; **P238**,
        NPBL026348,  at  -355,  -359;   **P044**,  CSXT0025121;   **P045**,  CSXT0025122



(▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮)).

120.     CSX has used NPBL to access customers near NIT, paying the $210 switch rate and benefitting from NPBL's use of NS's tracks in the process.

### 2.     CSX regularly uses trucks to dray from NIT.

121.     Intermodal container traffic can be transported multiple ways, including by rail, truck, or barge.  (Anticipated testimony of Tom Crowley, NPBL Expert).  Rail and drayage are the primary competitors for intermodal container traffic. (Anticipated testimony of Tom Crowley, NPBL Expert).

122.     Drayage is a reasonable substitute for on-dock rail access at NIT.  (Anticipated testimony of Tom Crowley, NPBL Expert).

    a.   The trucking market has low barriers to entry and low fixed costs of operations, which means that it is not difficult to enter or exit the trucking industry or change the menu of services offered.  (Anticipated testimony of Tom Crowley, NPBL Expert).

    b.   Short haul routes that allow drivers to return home each night are coveted by operators.  (Anticipated testimony of Tom Crowley, NPBL Expert).

    c.   POV's PRO-PASS system, a Radio-Frequency Identification ("RFID") tag reader system, allows truckers to conduct administrative tasks online prior to arriving at NIT, which saves time.  PRO-PASS RFID tags are mandatory at NIT.  (Anticipated testimony of Tom Crowley, NPBL Expert).  Using PRO-PASS, shippers can check container availability, vessel schedules, see holds, and schedule truck arrivals.  This allows for more efficient and balanced truck arrival patters throughout the day, reduced truck queues, and lower wait time because of the more efficient processing

28

of trucks and containers at NIT.  (Anticipated testimony of Tom Crowley, NPBL Expert).

d.  NPBL's route to NIT, entering through NIT's north gate and leaving the same way, is an inefficiency that trucks do not encounter when entering or exiting NIT. (Anticipated testimony of Tom Crowley, NPBL Expert).

e.  The drayage route is fourteen miles, involves 20 stoplights, but only takes 28 minutes to complete.  (Anticipated testimony of Tom Crowley, NPBL Expert).  On the other hand, it takes NPBL ten to twelve hours to move a train approximately seventeen miles though a metropolitan area on high-use tracks.  (Anticipated testimony by Bill O'Brien, NPBL; Anticipated testimony by Cannon Moss, NPBL President).

123.  To shippers, ███████████████████████████████████████████ ███████████████████████████████ (Anticipated testimony of Tom Crowley, NPBL Expert).

124.  ███████████████████████████████████████████


125.  A high cross-elasticity of demand exists between drayage ██████████████ and on-dock rail access at NIT.  (Anticipated testimony of Tom Crowley, NPBL Expert).

126.    If CSX drays its containers to or from NIT, it must pay VIT a drayage fee to dray containers between its rail yard and NIT. ██████████████████████████████████
████████████████████████████████

127.    ███████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████

128.    In 2019 alone, CSX drayed approximately ███████████████████████████
█████████████████████████████ (**NS001**, VIT Drayage Data, SDT RES N 000001).
████████████████████████████████████████████████████████████

██████████████████████████

129.    For rail, two to three containers are commonly loaded on a single railcar well.  This improves operating efficiency, as more containers in a well lowers the cost per container.

130.    As of 2017, CSX generally achieved an efficiency of ████ containers per railcar well on average.  (Anticipated testimony of Robert Girardot, CSX). ██████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████████ (Anticipated testimony of Thomas Capozzi, VIT).

131.    ████████████████████████████████████████████████████████
███████████████████████████████ (Anticipated testimony of Tom Crowley, NPBL Expert).

### 3.    NPBL moved all CSX intermodal traffic that it requested in 2015.

132.    Prior to 2015, NPBL moved only ████ intermodal train to NIT at CSX's request. In that instance, CSX recognized that the switch rate was not ████████████ (**NS0143**,

CSXT0082577, at -577).  CSX did not contact NPBL about moving any other intermodal freight to or from NIT until March 27, 2015.

133.   During 2015, there was a "period of 'extreme port congestion across the East Coast," which caused there to be a backlog of intermodal containers at NIT.  (Summ. J. Op. 46; **P358**, CSXT0154004 (stating CSX's understanding as of April 18, 2015 that NIT "is in fact a mess on the rail, truck and barge side")).

134.   During this time, CSX requested NPBL "to move backlogged freight at NIT." (Summ. J. Op. 46) (citation omitted).  "NPBL President Cannon Moss timely responded to CSX's requests to access NIT in 2015 by contacting NSR and taking steps to arrange for 'windows' to move CSX trains."  (Summ. J. Op. 48 n.15).

135.   With respect to the initial train moves, the evidence demonstrated the following:

   a.   On the evening of March 30, 2015, CSX told NPBL that it wanted to use NPBL to move international intermodal freight to NIT.  (**P347**, NPBL010906).

   b.   On March 31, 2015, at 4:34 pm, NS provided NPBL and VIT with an approved operating window and operating plan for the movement of CSX's freight to NIT. (**NS362**, NPBL010896).

   c.   NPBL discussed the proposed operating plan with employees in NS's transportation department on the evening of March 31. (**P347**, NPBL010906).

   d.   NPBL delivered the CSX freight to NIT on April 1.  (**NS0351**, CSXT0001301).

   e.   On April 2, at 11:51 am, NPBL asked NS if it could pull an NPBL train with CSX international intermodal freight from NIT on the morning of April 3.  (**NS362**, NPBL010896).

    f.   On April 2, at 3:25 pm, NS confirmed that NPBL could accommodate NPBL's request to move its train between 4 am – 8 am on April 3.  (**NS362**, NPBL010896).

136.    In total, NPBL moved ███ intermodal trains to and from NIT for CSX in 2015. (Anticipated testimony by Cannon Moss, NPBL President; CSX; ████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████).  NPBL moved every train that CSX asked it to move. (Anticipated testimony by Cannon Moss, NPBL President; Summ. J. Op. 48 n.15 (finding that, at minimum, "windows were obtained and trains were moved")).

137.    As part of NPBL's moves for CSX, NS provided an operating window for NPBL to move the trains on NS's track to NIT on Tuesday and Thursday mornings, which was consistent with the operating window that NS had previously provided NPBL on March 1, 2011.  (**NS0396**, CSXT0001537; **NS0240**, CSXT0126579).

138.    During this time, internal communications at CSX concede that █████████ ████████████████████████████████ (**NS353**, CSXT0089992).

139.    Since July 2015, CSX has not asked NPBL to move intermodal freight to or from NIT.

140.    NPBL has never refused to move CSX's intermodal freight to or from NIT. (Anticipated testimony by Cannon Moss, NPBL President; Anticipated testimony by Maryclare Kenney, CSX).

141.    ████████████████████████████████

████████████████████████████████████████



(Summ. J. Op. 3; **ECF No. 308-6&7**, Wright Rep. at ¶ 136).

142.    There is "no record evidence, direct or circumstantial, suggesting that any delay of a commercially unviable train in 2015 impacted CSX's ability to compete for international intermodal customer contracts at NIT." (Summ. J. Op. 47; *id.* at 50 & n.17 ("CSX does not point to any evidence suggesting that the events of 2015 contributed in any way to CSX's inability to secure contracts with international shippers.")).

143.    ████████████████████████ (Anticipated testimony by Maryclare Kenney, CSX; **ECF No. 308-6&7**, Wright Rep. at ¶¶ 137, 138; Anticipated testimony by Jay Strongosky, CSX; **NS0651**, CSXT0069501, at -501). ████████ ███████████████████████████████████████ (**ECF No. 308-6&7**, Wright Rep. at Tbls. 5, 6).

144.    Despite NS's natural advantages at the POV, ████████████ ████████████████████████████████████████ (Anticipated testimony by Prof. Marvel, CSX Expert; **NS0801**, Wright Suppl. Rep., Chart 1 (████████████████████████ ████████████████████████).

**K.    NS AND NPBL ARE LITIGATING NS'S REQUEST TO HAVE THE STB SET THE TRACKAGE FEE.**

145.    On April 26, 2016, NS gave NPBL notice of cancellation of the Trackage Rights Agreement between the parties, which was set to expire on July 31, 2016, as provided in the Agreement. (**P113**, NSR_00007168; Summ. J. Op. 54-55). NS stated that it intended to "provide

NPBL materially the same access to NS[]'s property that it enjoys today at a cost that is similar to NPBL's costs under the existing agreements," but wanted to update the agreement with a flat rate, per car access fee to replace the antiquated system of tax allocation, operator costs, and per car fees in the legacy contract.  (**P113**, NSR_00007168).

146.    "NSR, of course, has every right to seek to profit from the use of its tracks, and NSR's interests run counter to NPBL's interests."  (Summ. J. Op. 55).

147.    NPBL and NS could not agree on the amount of the trackage fee that NPBL would pay NS for use of NS's tracks, but it is undisputed that "the NPBL switch rate has not increased since the contracts expired on July 31, 2016."  (Summ. J. Op. 56 n.20).

148.    "[T]he STB, has jurisdiction over any dispute between NSR and NPBL on this issue…." (Summ. J. Op. 55).

149.    Accordingly, on September 13, 2018, NS petitioned the STB to set the trackage rights compensation, a proceeding where NS and NPBL are adverse parties.  (Summ. J. Op. 78 (finding "no evidence … suggesting NSR and NPBL were colluding to abuse the STB process")). In fact, NPBL took the position that "the new rate to be paid to NSR [should be] lower than the average per car rate that NPBL currently pays." (Summ. J. Op. 57 n.21).  But the proceeding was stayed at CSX's request pending the resolution of this litigation.  (Summ. J. Op. 55; *id.* at 57 (noting that it was "it is CSX that intervened in the rate dispute before the STB and requested a stay of that proceeding")).  Further, CSX has already publicly stated that it plans to appeal the Court's summary judgment decision, which means any action by the STB is delayed for the foreseeable future.  (Mike Scarcella, *U.S. judge scraps CSX jury trial in rail antitrust case*, Reuters.com (Jan. 4, 2023 5:47 PM), *available at* www.reuters.com/legal/litigation/us-judge-

scraps-csx-jury-trial-rail-antitrust-case-2023-01-04/ (citing spokesperson for CSX commenting on ruling)).

150. The STB "will act as a 'check' to ensure that NSR charges NPBL a reasonable rate for what in essence will be a form of 'forced sharing' of NSR's own tracks." (Summ. J. Op. 55; *id.* at 56 n.20 (noting that CSX had admitted that "'any increase in the amount NS[R] charges to NPBL for use of NS[R]'s tracks to NIT would have to be approved by the Surface Transportation Board'") (citation omitted)).

151. "Any future 'switch rate' that NPBL charges to CSX to access NIT will necessarily include the NSR-NPBL rate as a cost factor because NPBL will have to pay NSR that rate for each car moved to NIT. Thus, this 'expense' will essentially be transferred to NPBL's customers, as are NPBL's other operating costs." (Summ. J. Op. 55-56 n.19).

**L.    EFFORTS TO SELL PINNERS POINT AND DECOMMISSIONING OF THE DIAMOND TRACK.**

152. In 2008, NPBL began considering a sale of Port Norfolk Yard (also called Pinner's Point). (**NS0035**, NPBL006936 at -957). CSX-appointed board members approved selling the property, but ultimately the NPBL Board unanimously agreed that it should hold off on selling the property. (**P222**, NPBL007095, **NS0235**, CSXT0004190; Anticipated testimony by Donna Coleman, NPBL).

153. NPBL had trackage rights over a short segment of NS-owned track formerly located between NS Junction and Carolina Junction in the Berkley area of South Norfolk (the "Diamond Track"). (**J029**, NPBL017773, at -777). The track was not being used and so to save maintenance costs, NS proposed decommissioning the track. The proposed decommissioning of the Diamond Track was presented to the NPBL Board, which approved it without objection. *Id.*

35

154.    NS then requested that the STB approve discontinuance of service and trackage rights over the Diamond Track, certifying that no local traffic had moved over the line for at least two years.  CSX did not object to the discontinuance.  The STB approved the discontinuance effective June 14, 2008.  STB Docket No. AB-290 (Sub-No. 299X), *NSR – Discontinuance of Service Exemption & NPBL – Discontinuance of Trackage Rights Exemption*, May 15, 2008.

**M.    PROCEDURAL POSTURE OF THIS LITIGATION**

155.    Following motions practice and dismissals, the Court granted summary judgment in favor of Defendants on CSX's antitrust claims for damages under the Sherman Act in Counts One through Four, and it granted Defendants summary judgment on CSX's breach of contract claim in Count Five, and CSX's conspiracy claims in Counts Eight and Nine.  (Summ. J. Op. 103; *id.* at 94 ("[T]he Court finds that there is no genuine dispute as to any material fact regarding CSX's state law claims and that Defendants are entitled to judgment as a matter of law with respect to those claims.")).  No party has suggested that injunctive relief could conceivably be available on the state law claims, (Summ. J. Op. 103 n.46), leaving only the federal antitrust claims for injunctive relief to be decided in a bench trial.  (Summ. J. Op. 103).

156.    In its answer to NS's Interrogatory Number 9, CSX stated that it was seeking three forms of injunctive relief: (1) a prohibitory order "preventing NSR and NPBL from continuing to carry out any violations of federal or state law," (2) an order "restoring CSXT's shareholder rights, and/or establishing an independent board structure of the NPBL," and (3) an order forcing NPBL to "approve" CSX's 2018 rate proposal.

## CONCLUSIONS OF LAW

**A.    THE COURT'S PRIOR HOLDINGS.**

1.    NS has a lawful right to vigorously compete with CSX.

2.      NS is not obligated to support CSX's business.  Summ. J. Op. 58 ("NSR, who owns the tracks accessing NIT, must in essence 'share' those tracks with NPBL pursuant to NPBL's contractual rights and STB requirements in this uniquely regulated industry. However, in doing so, NSR need not act in a manner designed to encourage the business of its rival.").

3.      This Court has already found that there was no "'agreement' [between NPBL and NSR] in restraint of trade or an agreement [by NPBL] to assist NSR in establishing a monopoly" subsequent to 2011.  *See* Summ. J. Op. 50 n.18 ("CSX's evidence is insufficient for a reasonable factfinder to conclude that there was an 'agreement' in restraint of trade or an agreement to assist NSR in establishing a monopoly but for CSX's reliance on the prelimitations conduct….").

4.      Likewise, this Court has already found that there was no conspiracy between NS and NPBL regarding cancelation of the trackage rights agreements upon their expiration. "CSX has failed to demonstrate that a reasonable juror could find that NPBL committed an overt act (conspiratorial or monopolistic) or any other unlawful act associated with NSR's decision to cancel its contracts with NPBL at the conclusion of the contractual terms."  *See* Summ. J. Op. 56.  Further, there is "no evidence, direct or circumstantial, suggesting that NSR's actions on this issue were within the scope of a prior or then-existing conspiracy, or in furtherance of an unlawful monopoly." *Id.*

5.      "NSR has a legitimate competitive business interest in being paid a reasonable fee for the use of its tracks, and NSR's actions to update and maintain a reasonable fee paid by NPBL are separate from its alleged manipulation of NPBL." *See* Summ. J. Op. 56.

6.      Moreover, CSX has not "suffered any harm from the cancellation of [NS's trackage rights] contracts [with NPBL] because NSR and NPBL continue to operate under the terms of the canceled contracts in light of the rate dispute pending at the STB."  *See* Summ. J. Op. 56.

7. With respect to the NPBL shareholder vote in 2018, "NSR's action to reject [CSX's] proposal to change the established board structure was merely a retention of its contractual right to appoint three directors pursuant to NSR's 1989 contract with CSX." Summ. J. Op. 64.

8. "NSR also has the right, particularly in a case where the NPBL's lack of legal access to NIT's southern gate interferes with NSR's efficient use of its own tracks, to seek clarity regarding when it is required give NPBL access to NSR's tracks." Summ. J. Op. 60.

9. Internal email correspondence among employees of NS is not, as a matter of law, evidence of a conspiratorial agreement with NPBL. *See* Summ. J. Op. 75 n.28 (holding that NPBL only "act[ed] through formal board resolutions," not through individual correspondence by NPBL directors). Accordingly, the Court finds that individual NPBL directors, including those appointed by NS, acting outside of formal board resolutions did not conspire with NS.

10. Any argument that CSX was harmed by Defendants "in 2018 based on [their] inaction is grounded in speculation." Summ. J. Op. 76 ("CSX points to no evidence, direct or circumstantial, suggesting that the 2018 NPBL Board or its members had engaged in conspiratorial conduct in connection with the 2018 events."). NPBL had no "independent obligation to reduce its switch rate to $80 per car in mid-2018 before the underlying NS-NPBL rate dispute was resolved." Summ. J. Op. 76 n.29.

11. To the contrary, "even when CSX's evidence is viewed in the light most favorable to CSX, the evidence is insufficient for a reasonable [factfinder] to conclude that the entirety of CSX's lost customer contracts, or a majority of its lost contracts, or a notable minority percentage of its lost contracts, or even a non-speculative de minimis percentage of its lost contracts, is predicated on actionable overt acts occurring after 2012." Summ. J. Op. 44-45.

12.     CSX's theory of injury is exclusion from the relevant market based on "operational" obstacles and "economic" obstacles improperly imposed by NS and NPBL on CSX's ability to compete for intermodal traffic. Summ. J. Op. 49 n.16. The operational obstacles include "discontinuation of a segment of NSR track" and "NPBL refusal to sell a rail yard to CSX." *Id.* The operational obstacles were set by 2009. *Id.* The economic obstacle is the switch rate being set at $210 in 2010.

13.     NS did not commit any wrongdoing by seeking to renegotiate the NPBL trackage rights agreements. Summ. J. Op. 59 ("NSR has the unilateral right to renegotiate the terms of expiring historical contracts, and the right to seek a rate 'as high as reasonable' under the circumstances….").

14.     Finally, NS as a shareholder and NPBL Board members requiring any rate proposal to be consistent with NPBL's Operating Agreement's "uniform rate" requirement is not unlawful because it merely enforces an explicit provision of NPBL's governing documents.

## B.     THE COURT LACKS JURISDICTION TO GRANT AN INJUNCTION.

### 1.     The Court Lacks Jurisdiction to Grant an Injunction under 15 U.S.C. § 26.

15.     Although Section 16 of the Clayton Act (15 U.S.C. § 26) allows a private plaintiff in an antitrust action to seek injunctive relief "against threatened loss or damage by a violation of the antitrust laws," "nothing herein contained shall be construed to entitle any person…except the United States, to bring suit for injunctive relief against any common carrier subject to the jurisdiction of the Surface Transportation Board under subtitle IV of title 49." 15 U.S.C. § 26.

16.     In antitrust cases, no right to injunctive relief exists independently of the statutory authority in 15 U.S.C. § 26. *See Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 634 (1977) (analyzing injunctive relief under 15 U.S.C. § 26). As the Supreme Court explained in *Vendo*,

"Prior to the enactment of § 16, private injunctive relief was not authorized for antitrust violations. As far as the legislative history indicates, the sole purpose of § 16 (§ 14 in the original drafts) was to extend to private parties the right to sue for injunctive relief."  *Id.* at n.5 (internal citation omitted).  Thus, the only source of power to grant such relief is 15 U.S.C. § 26.

17.     Because the authority to grant injunctive relief in antitrust cases derives solely from the statute, it follows that, where Congress has *not* granted such authority, or has expressly prohibited it, no such authority exists.  *See* 15 U.S.C. § 26; *see also Vendo*, 433 U.S. at n.5 (absent grant of authority in statute, "private injunctive relief [is] not authorized for antitrust violations") and at 651 ("The *scope of the jurisdictional grant* is just as broad as the definition of a violation of the antitrust laws.") (dissenting opinion, emphasis added).

18.     It is undisputed that NS and NPBL are common carriers subject to the jurisdiction of the STB, which means as a matter of law that this Court has no authority to grant the remaining relief in this case.

19.     The analysis as to the parties authorized to bring a claim for injunctive relief against a common carrier begins with the statutory text.  As the Supreme Court has explained, "The starting point in discerning congressional intent is the existing statutory text, and not the predecessor statutes.  It is well established that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms."  *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004) (citations omitted).

20.     The statutory text of 15 U.S.C. § 26 related to common carriers changed meaningfully in 1995 with the termination of the Interstate Commerce Commission.  Before 1995, the jurisdictional carve-out from the injunction power in 15 U.S.C. § 26 stated as follows:

*Provided*, That nothing herein contained shall be construed to entitle any person, firm, corporation, or association, except the United States, to bring suit in equity for injunctive relief against **any common carrier subject to the provisions of the Act** to regulate commerce, approved February fourth, eighteen hundred and eighty-seven, **in respect of any matter subject to the regulation, supervision, or other jurisdiction of the Interstate Commerce Commission**. 15 U.S.C. § 26 (1995) (emphasis added).

21.     Thus, the pre-1995 statute required two inquiries to determine whether injunctive relief was prohibited: (1) whether the defendant was a common carrier subject to the Interstate Commerce Act (the ***kind of defendant*** inquiry); and (2) whether the relief sought was "in respect of any matter subject to the regulation, supervision, or other jurisdiction of the Interstate Commerce Commission" (the ***kind of relief*** inquiry).  Injunctive relief was prohibited only if both were answered affirmatively.  *See generally Georgia*, 324 U.S. 439 at 455-55.

22.     The statute changed in 1995, effective January 1, 1996.  As a result, the jurisdictional carve-out from the injunction power in 15 U.S.C. § 26 now states as follows:

*Provided,* That nothing herein contained shall be construed to entitle any person, firm, corporation, or association, except the United States, to bring suit for injunctive relief against **any common carrier subject to the jurisdiction of the Surface Transportation Board** under subtitle IV of title 49, United States Code.

23.     The current statute focuses solely on the *kind of defendant* to be enjoined, not the *kind of relief* requested.

24.     Courts cannot alter a statute to grant themselves power that Congress omitted.  *See, e.g.*, *Lamie*, 540 U.S. at 542 (courts will not redraft statutes "to provide for what we might think … is the preferred result.") (ellipses in original; *quoting United States* v. *Granderson*, 511 U.S. 39, 68 (1994)).

25.     Under 15 U.S.C. § 26 today, based on the plain language of the statute, a federal court has no authority to grant injunctive relief to a private plaintiff in any antitrust case where the defendant is a common carrier subject to the jurisdiction of the STB.

26.     This is an antitrust case and CSX's antitrust counts provide the sole remaining basis for the injunctive relief that CSX seeks.

27.     As a result, under 15 U.S.C. § 26, CSX cannot pursue injunctive relief, this court cannot grant injunctive relief, and the case should be dismissed. *See Central Transfer Co. v. Terminal R. Ass'n of St. Louis*, 61 F.2d 546, 548 (8th Cir. 1932) ("[D]efendants are carriers subject to that act. The only question then is whether the suit by the plaintiff is 'in respect of any matter subject to the regulation, supervision, or other jurisdiction of the Interstate Commerce Commission.'"); *see also Truck-Rail Handling Inc. v. BNSF Railway Company*, Case No. C 02-02825 JSW, 2005 WL 8178364, at *4 n.5 (N.D. Cal. Mar. 8, 2005) (in a suit alleging violations of Sections 1 and 2 of the Sherman Act under a theory of foreclosure, the Court stated that although "[n]either party has raised this issue; yet it appears undisputed that BNSF is a common carrier subject to the jurisdiction of the Surface Transportation Board. Accordingly, as a matter of law, Plaintiffs cannot obtain an injunction against BNSF . . . .").

### 2.     Even if CSX Could Pursue Injunctive Relief under 15 U.S.C. § 26, the Relief it Seeks is Within the Exclusive Jurisdiction of the STB.

### a.     The Court lacks jurisdiction to grant injunctive relief relating to rates, operations, or access under 49 U.S.C. § 10501(b).

28.     Even if CSX, like the federal government, could pursue injunctive relief against Defendants under 15 U.S.C. § 26, it still is not entitled to the injunctive relief it seeks in this case because the relief is within the exclusive jurisdiction of the STB.

29.     As a starting point, the STB has broad and "exclusive" jurisdiction over many aspects of railroading, and its remedies "are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C. § 10501(b).  The STB has jurisdiction over "rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers" (§ 10501(b)); new rail construction projects (§ 10901); rail line

42

discontinuances (§ 10903); the "reasonableness" of rail carrier rates (§ 10701), "competitive access" to rail carrier facilities (§ 11102); reciprocal switching services (§ 11102), and mergers and acquisitions (§ 11321). As for abandonment of railroad lines, prior STB approval is required, and then "only if the Board finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance." 49 U.S.C.§ 10903(d).

30. Under 49 U.S.C. § 10501(b), the STB has exclusive jurisdiction over the remedies provided by the ICCTA, including whether to order a rail carrier to enter into a reciprocal switching agreement with another rail carrier, at a rate that may ultimately be set by the STB, for the use of a terminal facility. *Id.* § 11102(c); *Pittsburgh & W.V. R. Co.*, 41 F.2d at 810, *aff'd,* 281 U.S. 479 (1930) (observing, with respect to the statutory predecessor to Section 11102, that "Congress has acted in assuming control of the interchange of traffic and compulsory use of terminal facilities [and] that the duties of the carriers are defined by the Transportation Act . . ."); Summ. J. Op. 59 (holding that CSX has not brought the instant case under the disfavored "essential facilities" theory and noting that the essential facilities theory is at odds with the procompetitive goals of antitrust law and impracticality of making federal courts dictators of the terms for "[e]nforced sharing" of economically beneficial facilities).

31. Through its statutory authority, the STB has exclusive jurisdiction over the reasonableness of switch rates and the trackage rights agreement between NS and NPBL. 49 U.S.C. §§ 11102(a), (c)(1).

32. The STB also has the exclusive authority to impose trackage rights over the tracks of NPBL and NS to provide CSX with the ability to operate its trains directly to/from NIT without using NPBL's switching services if the use is "practicable and in the public interest without substantially impairing the ability of the rail carrier owning the facilities or entitled to use the

facilities to handle its own business." *Midtec Paper Corp., et al. v. Chi. & N.W. Transp. Co.*, 3 I.C.C. 2d 171 (I.C.C. 1986), *aff'd Midtec Paper Corp.*, 857 F.2d 1487; 49 U.S.C. § 11102(a).

33.     Indeed, "federal courts are 'ill suited' to dictate the terms of '[e]nforced sharing,' as it requires them 'to act as central planners, identifying the proper price, quantity, and other terms of dealing.'" Summ. J. Op. 58-59 (quoting *Verizon Commc'ns Inc. v. L. Offs. Of Curtis V. Trinko*, 540 U.S. 398, 08 (2004)); 58 (noting that sharing of tracks is subject to STB requirements); 59 (rejecting essential facilities claim as inapplicable here where the federal agency has power to compel sharing and regulate its scope and terms).

34.     Finally, the STB has exclusive authority over railroad rates.  The Supreme Court has unequivocally ruled that *"a federal court has no jurisdiction to enter an order that operates to fix rates."  Burlington N.*, 459 U.S. at 140 (emphasis added).

35.     This Court recognized as much when it noted that the railroad industry is a "uniquely regulated industry where the STB itself can resolve disputes over rates and likely dictate other terms associated with the forced sharing of tracks." Summ. J. Op. 87 n.37; 55 (the STB has jurisdiction over issues related to the trackage rate to be charged by NS to NPBL), 56 n.20 (CSX admits that any increase in the amount NS charges to NPBL would have to be approved by the STB); 59 (the reasonableness of the rate will be scrutinized by the STB).

36.     Directing NPBL to approve CSX's 2018 service proposal would directly conflict with the STB's jurisdiction and authority, and therefore, the Court cannot award this relief under Section 26.  The proper forum to seek this relief is the STB.

      **b.     This Court Lacks Jurisdiction to Grant an Injunction Changing Ownership or Control of One Railroad Over Another**

37.     The main focus of the injunctive relief requested by CSX and contemplated by the Court is the reconfiguration of the NPBL Board of Directors to address NS's ability to control

NPBL through its majority ownership, whether exercised or not. Summ. J. Op. 83-84 (noting that CSX argues that NSR may not have abandoned its willingness to use its "control" over NPBL for the purposes of benefitting NS and therefore anticipates asking the Court to "in essence, equitably modify the balance of power at NPBL, by ordering NSR and CSX to have equal votes on corporate governance issues or by issuing an injunction that requires Defendants to establish a sufficiently 'independent' NPBL Board of management structure." ).

38.     The STB has exclusive jurisdiction over the control of one rail carrier by another rail carrier, and over the control of more than one rail carrier by a non-carrier.   49 U.S.C. §§ 11323(a)(3), (4) and (5); 11323(b).   Those provisions are "part of a comprehensive legislative scheme designed to place ownership, management, and operational control over common carriers within the regulatory jurisdiction of the [Interstate Commerce] Commission [now STB]." *Gilbertville Trucking Co. v. U.S.*, 371 U.S. 115, 122 (1962).

39.     "Control" in this context is broadly defined to include "actual control, legal control, and the power to exercise control, through or by (A) common directors, officers, stockholders, a voting trust, or a holding or investment company, or (B) any other means."   49 U.S.C. § 10102(3).[6] The STB has explained that the "[c]ontrol of a carrier for which [49 U.S.C. §] 11323 authorization

---

[6] The use of the word "control" in this Section of the Conclusions of Law, as well as in briefing in the matter referred to the STB by the Court, refers to the fact that NS possesses the ability to control NBPL through its ownership of a majority of the shares of stock in NPBL. NS vehemently denies any anti-competitive behavior.  Instead, the STB proceedings are reflective only of a railroad's ability to appropriately utilize its majority share.  There is no evidence in record that NS dominates the actions of NPBL.  Virtually every vote of the NPBL board had been unanimous.  The record shows only three votes – relevant to this case – that were not.  The first was a vote in 2011 regarding whether NPBL could use CSX locomotives, which ended in a 3-3 tie, with the NPBL president voting with the CSX-appointed directors.  The second was the initial vote to elect Moss as president of NPBL, in which the two CSX-appointed directors abstained from voting.  Lastly, NS voted its majority shares against CSX's corporate governance proposal in 2018, which NS had the right to do, given the 1989 Agreement and the long-standing history of NPBL shareholders being able to appoint a number of directors consistent with its equity position.

is required embraces the power or authority to manage, direct, superintend, restrict, regulate, govern, administer or oversee the day-to-day affairs of that carrier." *Soo Line Railroad Company – Petition for Declaratory Order*, Docket No. FD 33350 (STB served Feb. 4, 1998), 1998 WL 43797, at *8 (citing *Coletti – Control – Comet Freight Lines*, 38 M.C.C. 95, 97 (1942), *aff'd sub nom. City of Ottumwa v. Surface Transportation Board*, 153 F.3d 879 (8th Cir. 1998). The Supreme Court has similarly "construed this language to encompass every type of control in fact and have left to the agency charged with enforcement the determination from the facts whether 'control' exists, subject to normal standards of review." *Gilbertville Trucking*, 371 U.S. at 125 (citations omitted).

40.     Any remediation of NS's allegedly unauthorized control of NPBL is plainly within the scope of the STB's authority and cannot be the subject of injunctive relief 15 U.S.C. § 26.

41.     The STB has broad "equitable powers to expunge" unlawful control violations that, indeed, largely mirror those possessed by courts when ordering relief in antitrust cases. *See Gilbertville Trucking*, 371 U.S.C. at 130. Thus, "[t]he power of the Commission to respond to conditions of illegal control is practically plenary under the Interstate Commerce Act." *Illinois Cent. R. Co. v. U.S.*, 263 F. Supp. 421, 428 (N.D. Ill. 1966), *aff'd*, 385 U.S. 457 (1967) (per curiam).

42.     The injunctive relief the Court would be asked to impose here overlaps significantly, if not completely, with remedial measures imposed and utilized by the STB to address unlawful rail carrier control situations.

43.     Consequently, the Court's use of injunctive powers to alter the nature of the control relationship at NPBL (whether or not exercised) would directly implicate the jurisdiction and

46

authority of the STB over precisely the same matters and is therefore within the proscription of 15 U.S.C. § 26.

### C.   EVEN IF THIS COURT HAD JURISDICTION TO GRANT INJUNCTIVE RELIEF, CSX CANNOT SATISFY THE ELEMENTS FOR SUCH RELIEF.

44.   Even if this Court had jurisdiction under 15 U.S.C. § 26 to enjoin Defendants, awarding CSX injunctive relief in this matter is inappropriate because CSX cannot show that it is entitled to such relief.

#### 1.   CSX Cannot Demonstrate it has Standing to Pursue Injunctive Relief.

45.   Before considering the traditional equitable factors, the Court must assess whether the plaintiff has standing to seek injunctive relief. *Steves & Sons, Inc. v. Jeld-Wen, Inc*., 345 F. Supp. 3d 614, 651 (E.D. Va. 2018).

46.   To have standing to sue for injunctive relief, a party must: (1) have suffered an injury-in-fact; (2) establish a causal connection between the injury-in-fact and a complained-against defendant's conduct; (3) show that it is likely, not merely speculative, that a favorable decision will redress the injury-in-fact; and (4) demonstrate either continuing harm or a real and immediate threat of repeated injury in the future. *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1285 (5th Cir. 1992); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 111, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983).

47.   Similarly, seeking prospective injunctive relief under Section 16 requires that a plaintiff "demonstrate a significant threat of [antitrust] injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith Radio Corp. v. Hazeltine Rsch., Inc*., 395 U.S. 100, 130 (1969*); see In re New Motor Vehicles Canadian Antitrust Litig*., 522 F.3d 6, 14 (1st Cir. 2008) ("Section 16 dovetails with Article III's requirement that in order to obtain forward-looking relief, a plaintiff must face a threat of injury that is both

real and immediate, not conjectural or hypothetical.").

> **a.    CSX Cannot Demonstrate the Existence of an "Impending" Violation of the Antitrust Laws**

48.    There is no evidence of any "impending violation" of the antitrust laws.

49.    Even if actionable (and it is not), the setting of NPBL's switch rate at $210 occurred almost thirteen years ago.

50.    Nor is there any impending violation associated with the cancellation of the trackage rights agreement.  As the Court ruled on summary judgment, the cancellation, and Defendants pending case before the STB to determine the trackage fee, cannot "reasonably be interpreted as NSR acting in furtherance of a conspiracy or illegal monopoly, even if it acted in a manner that does ultimately prove detrimental to its rival, CSX." Summ J. Op. 60; *see also* 56 ("CSX points to no evidence, direct or circumstantial, suggesting that NSR's actions on this issue were within the scope of a prior or then-existing conspiracy, or in furtherance of an *unlawful* monopoly.") (emphasis in original).

51.    CSX cannot show any imminent risk of future injury due to the cancellation either. "[T]he prior [trackage rights] contract rate that NPBL pays to NSR remains in full force, and any 'anticipated' future harm that CSX could suffer from an increase in the rate that NSR charges NPBL has not yet accrued and may never accrue…." *See* Summ J. Op. 56-57; 59-61 (identifying that any purported harm to CSX from the STB's evaluation of the trackage rights rate "relies on speculation as to future events, as it is possible that the STB, with or without considering NSR's historical objectionable conduct, will fashion a new rate beneficial to NPBL and/or CSX").

52.    Additionally, as the Court ruled on summary judgment, the events relating to CSX's 2018 service and corporate governance proposals are not evidence of any impending violation.

53.    The Court has already held that any such threat is "speculative," not certain or

imminent. *See* Summ J. Op. 72 n.27 (rejecting CSX's speculation that "NPBL Board members appointed in 2018, would breach their fiduciary duties and restrain trade at the first opportunity" because "[s]uch assertion is not grounded in any record evidence" and "runs contrary to … reasonable inferences in favor of CSX," leaving any purported injury to be solely based on "supposition and conjecture about how a party would act if it acted"); *see also* 76 (holding that it would be merely "stacked assumptions" to think "that the NSR-appointed board members would – in the future – both reject CSX's proposal and do so in disregard of their fiduciary duty to fairly evaluate the service proposal based on NPBL costs and other legitimate business considerations").

54.     Likewise, CSX cannot show any imminent risk of future injury or harm due to discussions in 2018 related to CSX's service proposal. Summ J. Op. 78 n.30 (finding that CSX "merely speculates that fiduciary duties would be violated if the CSX proposal were considered").   This is because it is entirely speculative what a new rate, if ultimately adopted by NPBL, would be.  *Id*., at 69 ("Tellingly, any 'new rate' established by the Board after referral to a rate committee could be higher or lower than the current rate based on legitimate factors wholly unrelated to unlawful motivations.").

55.     CSX's claimed right to injunctive relief, therefore, rests solely on its assertion that NS is engaged in an "ongoing" conspiracy or "contemporary violation" of the antitrust laws that is "likely to continue or recur." *Zenith Radio*, 395 U.S. at 130.

> **b.     There is No Evidence of a "Contemporary Violation" or Continuing Conspiracy.**

56.     As a general rule, "past wrongs are not enough for the grant of an injunction." *Fed. Trade Comm'n v. Qualcomm, Inc*., 969 F.3d 974, 1005 (9th Cir. 2020) (citation omitted); In re Nifedipine Antitrust Litig., 335 F. Supp. 2d 6, 19 (D.D.C. 2004) ("In the context of injunctive relief, however, lingering monetary injury, without any ongoing threat of recurrent violations is

not sufficient to confer standing to seek an injunction). Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974).

57.     CSX has not presented any evidence supporting its claim that there is a "contemporary violation" or "ongoing conspiracy" to exclude CSX from on-dock rail access at NIT that is continuing to cause antitrust harm.

58.     The NPBL switch rate was set more than ten years ago. Summ J. Op. 85. The thrust of the Court's opinion on summary judgment is that CSX has failed to offer evidence of any overt act occurring after 2011, at the latest, that caused CSX to suffer antitrust injury. *See New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 30 (D.D.C. 2021) (Facebook's violations were not ongoing or "contemporary" when the last action occurred more than five years ago).

59.     As noted above, the Court held that "there is no evidence of 'fine-tuning' or continued actions necessary to keep CSX out of the relevant market beyond 2011." Summ J. Op. 43 n.12. Moreover, the Court noted that "CSX's evidence is insufficient for a reasonable factfinder to conclude that there was an 'agreement' in restraint of trade or an agreement to assist NSR in establishing a monopoly but for CSX's reliance on the pre-limitations conduct, as made relevant by the continuing violation theory." *Id.*, at 50 n.18; *see also* 60 ("[N]one of CSX's evidence suggests that the 2016 conduct can reasonably be interpreted as NSR acting in furtherance of a conspiracy or illegal monopoly ...."). In short, neither the 2016 nor the 2018 conduct cited by CSX supports a "continuing violation."

60.     CSX also cannot demonstrate that the alleged delay of trains in 2015 is evidence of the existence of any "continuing violation" that imminently threatens ongoing or future antitrust

harm.  Instead, the only evidence is that CSX sought to move trains in 2015 due to unexpected and "extreme port congestion across the East Coast." Summ J. Op. 46.

61.     Further, as the Court held, "there is simply no record evidence, direct or circumstantial, suggesting that any delay of a commercially unviable train in 2015 impacted CSX's ability to compete for international intermodal customer contracts at NIT." *Id*. at 47; *Cargill, Inc.*, 479 U.S. at 113 (1986) (the threatened loss of damage must be of the type that flows from that which makes defendants' acts unlawful).

62.     Moreover, CSX has not sought injunctive relief that would address these operational issues, nor could the Court grant such relief because, as explained above, it would be in the exclusive jurisdiction of the STB.

63.     What CSX seeks in this case is an injunction to remedy the ongoing monetary effects of past conduct.  CSX Br. on Injunctive Relief, ECF 549, at 9 (alleging that, as a result of the current $210 switch rate, CSX will suffer *ongoing loss or damage* in the future). CSX's claim is not that it expects to incur future *injury* from ongoing violations of the antitrust laws, but that it will continue to "absorb the effects of past injuries into the future …." *In re G-fees Antitrust Litig*., 584 F. Supp. 2d 26, 35 (D.D.C. 2008).  In other words, CSX expects to suffer future *damages*, not that it will suffer from future, non-speculative *conduct* by NS that threatens to injure CSX. *Id.*

64.     The lingering monetary effects of a past violation – without any ongoing threat of a recurrent violation is not enough to confer standing. *In re Nifedipine Antitrust Litig*., 335 F. Supp. 2d 6, 18 (D.D. C. 2004); *In re G-fees,* 584 F. Supp. 2d at 35 (holding that any injury to the plaintiffs occurred "when they obtained their mortgages, and plaintiffs' predicament is one of future damages, not future injury."); *see also, Duty Free Americas, Inc. v. Estee Lauder Companies, Inc*., 797 F.3d 1246, 127—72 (11th Cir. 2015) (affirming dismissal of Section 16 claims for injunctive

relief based on alleged antitrust violations that occurred four years before case was filed and that were unlikely to affect plaintiff again).

65.     CSX cannot rely solely on purported future damages resulting from conduct that occurred more than ten years ago to support injunctive relief. *See, e.g.*, Summ J. Op. 28 (rejecting CSX's claim that its damages were impossible to calculate).

c.     **There is No Evidence that a Violation of the Antitrust Laws Will "Recur"**

66.     The Court has essentially recognized that CSX's entitlement to injunctive relief depends on proof that the violation will "recur." Summ J. Op. 85 (identifying the "triable issue" as "whether NSR will use its ability to control the NPBL Board to harm CSX in the future in the same way it allegedly did in the past."). Thus, to obtain injunctive relief, CSX must demonstrate that the alleged violation will recur – *i.e.*, NS will use its position on the NPBL Board in the future to cause the NPBL Board to take action adverse to CSX.

67.     The Court has already held that CSX's theory of *past* damages was "fatally flawed," and accordingly that Defendants prevailed against CSX's damages claims as a matter of law. Summ. J. Op. 44.  Correspondingly, as the Court has already held, any threat of *future* harm due to NPBL Board composition was "speculative," not certain or imminent. *See* Summ J. Op. 72 n.27 (rejecting CSX's speculation that "NPBL Board members appointed in 2018, would breach their fiduciary duties and restrain trade at the first opportunity" because "[s]uch assertion is not grounded in any record evidence" and "runs contrary to … reasonable inferences in favor of CSX," leaving any purported injury to be solely based on "supposition and conjecture about how a party would act if it acted"); *see also* 76 (holding that it would be merely "stacked assumptions" to think "that the NSR-appointed board members would – in the future – both reject CSX's proposal and

52

do so in disregard of their fiduciary duty to fairly evaluate the service proposal based on NPBL costs and other legitimate business considerations").

68.    Likewise, CSX cannot show any imminent risk of future injury due to discussions in 2018 related to CSX's service proposal. Summ J. Op. 78 n.30 (finding that CSX "merely speculates that fiduciary duties would be violated if the CSX proposal were considered").   This is because it is entirely speculative what a new rate, if ultimately adopted by NPBL, would be. *Id.*, at 69 ("Tellingly, any 'new rate' established by the Board after referral to a rate committee could be higher or lower than the current rate based on legitimate factors wholly unrelated to unlawful motivations.").

69.    To the extent CSX points to purported train delays in 2015 as likely recur in the future, CSX cannot prove that any similar delays are likely to create a significant threat of future injury. As noted above, CSX has no direct evidence or indirect evidence, "suggesting that CSX had a harder time negotiating contracts in 2016, 2017, or thereafter, as a result of any NIT trains that were delayed in 2015" Summ J. Op. 50 n.17.

70.    Additionally, the record shows that NS has provided an operating plan and operating window to NPBL to move CSX freight to NIT, and NPBL has moved CSX freight every time it has been asked to do so.

### d.    CSX's Cannot Demonstrate a Threat of Future Harm Because It Cannot Show Antitrust Injury.

71.    To seek injunctive relief under Section 16, "a private plaintiff must allege threatened loss or damage 'of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'" *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 113 (1986) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Matic, Inc.*, 429 U.S. 477, 489 (1977)); *California v. Am. Stores Co.*, 495 U.S. 271, 295-96 (1990) (holding that a "private litigant,

however, must have standing—in the words of § 16, he must prove 'threatened loss or damage' to his own interests in order to obtain relief").

72.     When the plaintiff cannot show itself to have suffered some actual antitrust injury from a purportedly anticompetitive practice in which the defendant has allegedly engaged for a substantial portion of time, the plaintiff is presumed to be unable to establish the existence or a threat of future injury arising from that same conduct in the future. *Drug Mart Pharm Corp. v. American Home Prods. Corp*., Case No. 93-cv-5148, 2007 U.S. Dist. LEXIS 93493, at * (E.D.N.Y. Dec. 20, 2007); *Machovec v. Council for the Nat'l Reg. of Health Serv. Providers in Psych., Inc*., 616 F. Supp. 258, 267 (E.D. Va. 1985) (where the plaintiffs are unable to prove antitrust injury or damages, no inference can be drawn to support future threat of harm).

73.     As set forth more fully below, CSX has been unable to demonstrate the existence of any antitrust injury. Instead, the evidence shows that ████████████████████ ████████████████████████████████████████████ ██████████████████████████████████ Moreover, CSX has not asked NPBL to move an intermodal train to NIT since 2015.

74.     Because CSX cannot demonstrate any harm to competition, or damages it has suffered, it also cannot prove a significant threat of future harm and therefore is not entitled to injunctive relief. *Machovac*, 616 F. Supp. at 266-67 (inability to prove damages from which a reasonable inference of future damages or injury could be drawn warranted dismissal of injunctive relief claim).

### 2.     CSX Cannot Demonstrate Irreparable Injury or that Damages are Inadequate.

75.     Before a plaintiff can be entitled to a permanent injunction, it must first "meet a heavy burden" to establish that it satisfies the prerequisite requirements of injunctive relief, which

"is a high bar, as it should be." *SAS Institute, Inc. v. World Programming Ltd*., 874 F.3d 370, 385 (4th Cir. 2017).

76.    In addition to proving standing, a plaintiff also must satisfy a four-factor test. To obtain injunctive relief for an antitrust violation a plaintiff must demonstrate: "(1) that it [faces a significant threat of] irreparable [antitrust] injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Steves and Sons, Inc. v. JELD-WEN, Inc*., 988 F.3d 690, 719 (4th Cir. 2021) (citing *eBay, Inc. v. MercExchange, L.L.C*., 547 U.S. 388, 391 (2006)).

77.    The first two prongs of the inquiry are interrelated. Whether a plaintiff has an adequate remedy at law "inevitably overlaps" with whether it has suffered or is likely to suffer irreparable harm. *Steves & Sons*, 345 F. Supp. 3d at 653.

78.    Here, CSX cannot satisfy the crucial first two elements of the test and, therefore, is not entitled to injunctive relief.

79.    Generally, an injury is irreparable when monetary damages are difficult to ascertain or are inadequate. *Id.* at 653 (quoting *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc*., 193 F. Supp. 3d 566, 574 (E.D. Va. 2016)).

80.    Likewise, to obtain equitable relief, a plaintiff must show that it has no adequate remedy at law, *i.e*., its harm cannot be compensated by money damages. *Id.*  Where a plaintiff has expressed its harm in the form of monetary damages, that is a factor weighing against a finding that the harm is not compensable by money damages. *Id.*, at 656; *Taleff v. Southwest Airlines Co*., 828 F. Supp.2d 1118, 1123 (N.D. Ca. 2011) (when the harm plaintiff alleged would result from a

merger was expressed in terms of monetary damages, the court found that the plaintiffs failed to demonstrate no adequate remedy at law).

81.     CSX cannot prove that money damages are inadequate to compensate it for any alleged future injury.  The only damages it sought were lost profits identified by its expert who asserted that but for the alleged conduct, CSX would have secured the ocean shipper contracts won by NS, and used NS's profits from those contracts as CSX's alleged damages.  CSX has offered no rationale for why future damages could not also be calculated.

82.     With respect to the 2015 train moves, CSX had an adequate remedy at law to compensate it for this alleged harm.  CSX could have sought in this case to recover the damages associated with the short-term loss of business identified in the Court's question but chose not to.

83.     As noted above, this Court has rejected CSX's contention that CSX's lost profits damages are speculative or incapable of calculation.

84.     Instead, CSX's damages problems arise from the fact that it is unable to point to any overt act causing new injury within the statute of limitations period, not from an inability to calculate lost profits. CSX purported to create a model estimating the damages it suffered and strenuously argued that its model accurately calculated damages.  The fact that CSX's model was constructed in such a faulty manner to be legally improper does not mean there is an inadequate remedy; it simply means that CSX failed to prosecute its case appropriately.

85.     CSX also has failed to show that it has no other legal remedies. A party's failure to exhaust administrative remedies precludes it from seeking injunctive relief from a court.  11A Charles Alan Wright, Arthur R. Miller and Mary Kay Kayne, *Federal Practice and Procedure* § 2944, p. 81 (2013) (hereinafter "Wright & Miller") (absent special circumstances, "plaintiff must show that there is no adequate legal remedy and, when applicable, that any available administrative

remedies have been exhausted before the court will issue an injunction"); *see also Renegotiation Bd. v. Bannercraft Clothing Co., Inc.,* 415 U.S. 1, 19 (1974) (plaintiff "is obliged to pursue its administrative remedy and, when it fails to do so, may not attain its ends through the route of judicial interference").

86.    Here, CSX can seek the same relief before the STB.  Indeed, as set forth above more fully, the STB is the only entity with jurisdiction to grant the relief CSX seeks.

87.    Because CSX cannot demonstrate a likelihood that it will suffer irreparable harm without entry of an injunction, and because CSX has adequate remedies at law – including damages, CSX is not entitled to injunctive relief.

### 3.    The Court Cannot Grant Injunctive Relief that is Narrowly Tailored to Redress the Specific Injury Alleged by CSX.

88.    Even if CSX is able to demonstrate the existence of a "contemporary violation," as opposed to a violation that occurred, at the latest, in 2010 when NPBL set the switch rate, the injunctive relief sought cannot remedy the specific injury claimed by CSX.

89.    An injunctive remedy for an antitrust violation should be tailored "to cure the ill effects of the illegal conduct and assure the public freedom from its continuance." *United States v. Glaxo Grp., Ltd.*, 410 U.S. 52, 64 (1973) (cleaned up); *accord Steves & Sons, Inc.*, 988 F.3d at 720; *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968) (noting injunctive relief should end illegal antitrust acts, deprive violators of the benefits of their illegal antitrust acts, and ensure they do not recur).

90.    Hence, the relief sought needs to be based on preventing the specific violation proven or threatened.  *See CASA de Maryland, Inc. v. Trump*, 971 F.3d 220, 262 (4th Cir. 2020), *reh'g en banc granted*, 981 F.3d 311 (4th Cir. 2020) ("As the Supreme Court has repeatedly cautioned, '[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury.'")

(quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018)).

91.     The importance of the connection between the alleged violation and the requested injunctive relief is further evidenced by the constitutional redressability requirement, which dictates that the risked injury "is likely to be redressed by a favorable decision." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc*., 454 U.S. 464, 472 (1982); Allen v. Wright, 468 U.S. 737, 751 (1984), abrogated on other grounds (requiring that the injury is "likely to be redressed by the requested relief"); *accord City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983) (holding that a plaintiff lacked standing for injunctive relief); *Anderson v. Obama*, No. CIV. PJM 10-17, 2010 WL 3000765, at *2-3 (D. Md. July 28, 2010) (denying motion for preliminary injunction "because the Court lacks power to grant the requested relief" based on the reasoning that the "relief Plaintiffs seek is also nonredressable" since "[t]he Court has no jurisdiction to issue an injunction against the President in his official capacity and in the performance of non-ministerial actions").

92.     The nature of a redressability inquiry "focuses . . . on whether the injury that a plaintiff alleges is likely to be redressed through the litigation." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc*., 554 U.S. 269, 286-87, (2008) (citation omitted). To satisfy the redressability requirement, a plaintiff must establish that "it is likely and not merely speculative that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit[]." Id. at 273-74 (cleaned up).

### a.     CSX is Not Entitled to a Nonspecific "Sin-no-More" Injunction.

93.     As an initial matter, Federal Rule of Civil Procedure 65 requires that the Court, in every order granting injunctive relief must:

(A) state the reasons why it issued;

(B) state its terms specifically; and

58

(C) describe in reasonable detail—and not by referring to the complaint or other

document—the act or acts restrained or required.

Fed. R. Civ. P. 65(d)(1).

94.     Unspecific "obey the law" injunctions "uniformly are found to violate the

specificity requirement" of Fed. R. Civ. P. 65.  Wright & Miller § 2955, p. 361; *see also New York,*

*N.H. & H.R. Co. v. Interstate Com. Comm'n*, 200 U.S. 361, 404 (1906) (Congress did not give

courts authority to enter injunction against defendant based on antitrust violation that would

"command it in general terms not to violate the act in the future in any particular" so that the

defendant "must thereafter conduct all its business under the jeopardy of punishment for contempt

for violating a general injunction"); *Williams v. Recovery Sch. Dist*., 859 F. Supp. 2d 824, 833

(E.D. La. 2012) (equitable claims that contain language such as 'stop all violations' or 'take all

necessary steps to ensure' result in fatally overbroad injunction requests that cannot be enforced);

*MGM Studios, Inc. v. Grokster, Ltd*., 518 F. Supp. 2d 1197, 1226 (C.D. Cal. 2007) (injunctions

should be "coterminous" with injury and "narrowly tailored to fit the specific legal violations")

(quoting *Waldman Pub. Corp. v. Landoll, Inc*., 43 F.3d 775, 785 (2d Cir. 1994)).

95.     Accordingly, the Court cannot merely enjoin NS and NPBL from engaging in future

violations of the antitrust laws.  The other two categories of injunctive relief CSX seeks are (1)

structural change to the NPBL board, and (2) requiring NPBL to accept the 2018 service proposal.

Summ. J. Op. 83-84 ("CSX anticipates asking the court to equitably modify the balance of power

at NPBL, by ordering NSR and CSX to have equal votes on corporate governance issues or by

issuing an injunction that requires Defendants to establish a sufficient "independent" NPBL Board

or management structure."); see also, 84 n.35 (indicating that the Court may tailor relief to

eliminate the power imbalance when it comes to corporate governance issues, board makeup, or the affiliation of corporate officers).

        b.     **An Injunction Ordering NPBL to Restructure its Board Will Not Redress the Antitrust Injury Claimed by CSX.**

96.      CSX's request for injunctive relief to change the NPBL Board structure will not remedy the alleged exclusion from NIT allegedly caused by the 2010 setting of a $210 switch rate. Nor would it change NPBL's switch rate. *See In re G-fees*, 584 F. Supp. 2d at 35 (injunction prohibiting future "collusion" would not provide relief because it would have no effect on future damages plaintiffs expect to experience due to past injury).

97.      As set forth above, and as the Court recognized in its Option and Order on Summary Judgment, it is speculative to assume that the NPBL Board would act in any particular way in the future and, particularly given the ongoing trackage rights dispute, it is impossible to determine what a future switch rate may look like.  Summ. J. Op. 69-70, 72 n.27.  As the Court recognized, any resetting of the switch rate, or consideration of a rate proposal, cannot realistically occur until the STB sets the trackage fee. Summ. J. Op. 55 n.19.

98.      Nor can the NPBL Board resolve operational issues relating to NPBL's use of NS's track to NIT.

        4.     **Laches Bars CSX's Claims**

99.      CSX's claims seeking an injunction pursuant to Section 16 of the Clayton Act are barred by laches.  Both Defendants pled laches as an affirmative defense to CSX's claims for injunctive relief.  *See* ECF Nos. 69, at 23-24 (NS Answer); ECF No. 70, at 13 (NPBL Answer).

100.     The equitable defense of laches applies to injunctive relief claims under Section 16 of the Clayton Act. *See e.g., Steves & Sons*, 988 F.3d at 705; *Midwestern Machinery Co., Inc. v. Northwest Airlines, Inc.*, 392 F.3d 265 (8th Cir. 2004); Duty Free Americas, Inc. v. Estee Lauder

Companies, Inc., 2014 WL 1329359 (S.D. Fla. 2014) aff'd, 797 F.3d 1248 (11th Cir. 2015); *Oliver v. SD-3C LLC*, 751 F.3d 1081 (9th Cir. 2014).

101.    Under the doctrine of laches, a suit seeking equitable relief will be barred if a party has inexcusably delayed pursuing his claim and his adversary has been prejudiced as a result. *Goodman v. McDonnell Douglas Corp.*, 606 F.2d 800, 804 (8th Cir. 1979).

102.    In applying laches, courts of equity "usually act or refuse to act in analogy to[] the statute of limitations relating to actions at law of like character." *See King v. Richardson*, 136 F.2d 849, 862 (4th Cir. 1943).  *See* Areeda & Hovenkamp vol. II, ¶ 320g, at 373 & n.199 (citing more decisions holding "the four-year statutory limitation period for damage actions . . . determinative of the equity result as well").

103.    Courts in the Fourth Circuit have adopted the Ninth Circuit's ruling that "in computing the laches period," Section 4(b)'s four-year statute of limitation is used as a "guideline." *IT&T*, 518 F.2d at 928; *see Steves & Sons*, 988 F.3d at 718. If there is a presumptive deadline for Clayton Act injunctive claims, it's four years after the challenged action, tracking that statute's limitations period for damages claims. *Id*. at 717, n.13; *see, e.g., Oliver*, 751 F.3d at 1085-86; *Menominee Indian Tribe of Wisconsin v. United States*, 614 F.3d 519, 531 (D.C. Cir. 2010) (the starting presumption is that an antitrust plaintiff must file its lawsuit within four years from the accrual of the claim).

104.    "The doctrine of laches is premised upon the same principles that underlie statutes of limitation: the desire to avoid unfairness that can result from the prosecution of stale claims." *Midwestern Mach. Co.*, 392 F.3d at 277 (citation omitted); *see also IT&T*, 518 F.2d at 928; ("[W]e think that a basic linkage is present [between the Clayton Act's separate causes of action for damages and injunctions] because of the fact that the two categories of relief serve as tools of

enforcement and remedy for the same set of substantive rights.").

105.    The four-year limitation of . . . Section 4B for private antitrust actions for damages is long enough to enable potential plaintiffs to observe the actual effects and the possible antitrust violation and to calculate its potential effects. The abuses which would occur if plaintiffs were permitted to search the history of other firms and challenge at their pleasure any possible violations, no matter how old, seem apparent." *IT&T*, 518 F.2d at 929. (emphasis in original); see *Reveal Chat Holdco, LLC v. Facebook, Inc*., 471 F. Supp. 3d 981 (N.D. Ca. 2020) (holding that laches applied when the feared violations were identical to alleged past violations); *Hot Wax, Inc. v. Turtle Wax, Inc*., 191 F.3d 813, 821 (7th Cir. 1999) ("Without the availability of the application of laches to a claim arising from a continuing wrong, a party could, theoretically, delay filing suit indefinitely.").

106.    There are two types of prospective or preventive injunctive relief available under Section 16 of the Clayton Act – (1) impending violations of the substantive law, and (2) past or present violations likely to continue or recur. *IT&T*, 518 F.2d at 929 (citing *Zenith Corp.*, 395 U.S. at 130.).

107.    When the relief sought in in a § 16 suit is an injunction forbidding continuation or recurrence of the violation the laches period is measured from the time when the violation occurred. *Id.*

108.    Although laches is an affirmative defense so that the burden of proof rests with the defendant, where the conduct forming the basis for the Complaint occurs outside of the analogous statute of limitations period, the doctrine of laches presumptively bars a plaintiff's claims absent a showing that delay was excusable and caused no prejudice to the defendant. *See Conopco v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996); *IT&T*, 518 F.2d at 926.

109.    This rule shifts the burden to the plaintiff to provide evidence excusing its delay

and demonstrating a lack of prejudice to the defendant. *See PBM Prods., LLC v. Mead Johnson &*

*Co.*, 639 F.3d 111, 121 (4th Cir. 2011) (citing Jarrow Formulas v. Nutrition Now, 304 F.3d 829,

837 (9th Cir. 2002) ("We hold that the presumption of laches is triggered if any part of the claimed

wrongful conduct occurred beyond the limitations period. To hold otherwise would effectively

swallow the rule of laches, and render it a spineless defense."); *Kaiser Aluminum & Chemical*

*Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1057 (5th Cir. 1982) (holding that the

plaintiff who delays bringing suit must show his delay was excusable and that there was no

prejudice to the defendant); *Gruca v. United States Steel Corp.*, 495 F.2d 1252, 1259 (3d Cir. 1974)

("If a plaintiff sleeps on his rights for a period of time greater than the applicable statute of

limitations, then 'the plaintiff (must) . . . come forward and prove that his delay was excusable and

that it did not . . . prejudice the defendant.'") (citation omitted).

> **a.    Because CSX's Legal Claims are Barred by the Statute of Limitations, Laches Presumptively Bars its Equitable Claims.**

110.    As the Court held in its Opinion and Order on Summary Judgment, CSX is

challenging what it contends is longstanding, improper conduct.  Summ. J. Op. 14, 34, 38.  CSX

asserts that "[f]or more than two decades, NS and the Belt Line have conspired to maintain NS's

control of intermodal freight moving by rail through the Port of Virginia ("POV")."  ECF No. 324,

CSX's Opp. Summ. J., SOF ¶ 10 (emphasis added).

111.    The foundation of this alleged conspiracy is NPBL's switch rate, which for over a

decade CSX has claimed presents an economic barrier to moving international intermodal freight

in and out of NIT.  Summ J. Op. 38 (stating that CSX's lone theory is that "it was excluded as a

competitor from on-dock rail access at NIT … beginning in 2009 when its exclusion from the

market became effective."); 43 n.12 ("[E]ven assuming that NSR and NPBL conspired to prevent

CSX from accessing NIT by rail by discontinuing tracks, blocking CSX from acquiring property, and Setting a switch rate that economically foreclosed CSX from providing on-dock rail service at NIT, this scheme was a resounding success by 2009, or alternatively, by 2011.").

112.    As set forth above, CSX does not identify any "impending" violation of the antitrust laws supporting its right to a prospective injunction.  *See, e.g.*, Summ J. Op. 79-80 (rejecting CSX's attempt to rely on inferences of future conduct and resulting future harm based on long-stale misdeeds of a similar character). CSX's only claim is that the allegedly improper setting of the switch rate in 2010 is a "past or present violation[] likely to continue or recur." *IT&T*, 518 F.2d at 929.

113.    By at least 2011, CSX knew it could have sought the same injunctive relief it seeks now, but instead waited for seven years, until after the expiration of the statute of limitations.

114.    Thus, the laches period here follows the statute of limitations, and began to run by at least 2011, at which time CSX knew of the allegedly violative conduct and the threat of future harm). *Id.* (holding that, when the relief sought in in a § 16 suit is an injunction forbidding continuation or recurrence of the violation the laches period is measured from the time when the violation occurred.)

115.    Any claim for injunctive relief due to threat of harm occurring due to a power imbalance is long overdue.  Summ J. Op. 71 ("To the extent CSX suffered harm solely as a result of the contractual power imbalance, CSX's claim would have accrued in 1989 or shortly thereafter when NSR's predecessors merged.").

>    **b.**    **CSX's Delay is Inexcusable.**

116.    Unreasonable delay requires a lack of diligence by the party against whom the defense is asserted. The defense "applies to preclude relief for a plaintiff who has unreasonably 'slept' on his rights," barring "claims where a defendant is prejudiced by a plaintiff's unreasonable

delay in bringing suit after the plaintiff knew of the defendant's violation." *PBM Prods., LLC*, 639 F.3d at 121.

117.    During the period following its presentation of the 2010 rate proposal, CSX failed to pursue any alternative remedy for its alleged injury, including before the STB.  Thus, by 2011, CSX was in a position to "estimate whether" the alleged actions of NS and/or NS and NPBL threatened it with irreparable harm. *Steves & Sons*, 345 F. Supp. 3d at 682-83.

118.    CSX has failed to demonstrate any excuse for its delay. *See Corizon LLC v. Wainwright*, Case No. 3:20cv00892, 2020 U.S. Dist. LEXIS 200752, at *21-23 (M.D. Tenn. Oct. 28, 2020) (finding laches barred plaintiff's claims where there was no evidence of action taken, after plaintiff chose not to file protest, indicating that plaintiff was actively pursuing its rights).

### c.    CSX Has Failed to Rebut the Presumption of Prejudice to NS Caused by its Long and Inexcusable Delay.

119.    CSX also has failed to rebut the presumption of prejudice to NS caused by the inexcusable delay.

120.    Prejudice that supports a defense of laches include that: "(1) the delay has resulted in the loss of the evidence . . .; *or* (2) the defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed." *Goodman*, 606 F.2d at 804 (quoting *Tobacco Workers Int'l Union Local 317 v. Lorillard Corp.*, 448 F.2d 949, 958 (4th Cir. 1971)) (emphasis added).

121.    Here, the delay in seeking injunctive relief has created "surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Ord. of R.R. Telegraphers*, 321 U.S. at 348-49.  For example, the potential witnesses involved in the discontinuance of the Diamond Track have long since moved on.  The evidence also demonstrates that memories have faded; numerous witnesses

were unable to recall the events surrounding actions that took place in 2009 and 2010 – the salient time period involved in this matter.

122.    In short, CSX is unable to rebut the presumption created by the fact that, as this Court held in its Opinion and Order on Summary Judgment, the statute of limitations bars its damages claims under Section 4 of the Clayton Act.

123.    Because CSX's claims for injunctive relief are barred by laches, they must be dismissed with prejudice.

### D.    ANTITRUST CONCLUSIONS OF LAW

124.    Plaintiff CSX alleges that defendants engaged in a conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C § 1 ("Section 1"), and actual and attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 ("Section 2").  CSX claims that defendants' conduct has excluded CSX from offering on-dock rail service from NIT, and seeks injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

125.    Plaintiff CSX contends that NS, alone and in conspiracy with NPBL, has excluded CSX from the on-dock facilities at NIT.  Plaintiff contends that NS's conduct—in furtherance of both the alleged conspiracy and the alleged actual and attempted monopolization of the relevant market—includes (i) removal of the Diamond Track in 2008; (ii) rejection of CSX's offer to purchase NPBL's Port Norfolk Yard in 2009; (iii) setting the NPBL's switch rate at $210 per car in 2009; (iv) purportedly "rejecting" the 2010 Service Proposal; (v) allegedly preventing CSX from using NPBL to move intermodal freight to and from NIT in 2015; and (vi) allegedly refusing to adopt CSX's 2018 Service and Governance Proposals.  As explained below, CSX's antitrust claims fail on multiple grounds, including because CSX cannot establish the existence of any conspiracy between NS and NPBL to exclude CSX from the on-dock facilities at NIT; because CSX cannot prove a properly-defined relevant market, a critical element for all of its antitrust

claims; and because CSX cannot prove that the challenged conduct resulted in the requisite harm to competition.

### 1.    CSX Bears the Burden of Proof on Each of Its Antitrust Claims.

126.    CSX "has the burden of proof at trial on each and every element of its [Section 1 and Section 2] claims under the federal antitrust laws." *Sewell Plastics, Inc. v. Coca-Cola Co.*, 720 F. Supp. 1196, 1215 (W.D.N.C. 1989), *aff'd and remanded*, 912 F.2d 463 (4th Cir. 1990); *see also Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 702 (4th Cir. 1974) (recognizing that the plaintiff bears burden of proof on Section 1 and Section 2 Sherman Act claims); *Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284, 297 (4th Cir.) (recognizing that plaintiff bears burden of proving elements of Section 2 monopolization claim), *cert. denied*, 142 S. Ct. 483 (2021); *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 926 (4th Cir. 1990) (recognizing that the plaintiff must prove elements of Section 2 attempted monopolization claim); *Masco Contractor Servs. E., Inc. v. Beals*, 279 F. Supp. 2d 699, 708 (E.D. Va. 2003) (recognizing that plaintiff bears burden on elements of a Section 2 conspiracy to monopolize claim).

127.    To state a cause of action for injunctive relief under Section 16 of the Clayton Act, a plaintiff must prove that (1) there is a threatened loss or injury cognizable in equity; (2) the loss or injury proximately results, or would result, from the alleged antitrust violation; and (3) the threatened loss or injury qualifies as antitrust injury reflecting the anticompetitive effect of an alleged violation. See *Cargill, Inc.*, 479 U.S. at 113 ("[I]n order to seek injunctive relief under § 16, a private plaintiff must allege threatened loss or damage 'of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful,'" otherwise known as antitrust injury) *quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977))).  It is CSX's burden to show that injunctive relief is warranted.  *United States v. W.*

*T. Grant Co.*, 345 U.S. 629, 633 (1953) (observing that "the moving party must satisfy the court that [injunctive] relief is needed" and upholding district court's refusal to award injunctive relief).

128.    CSX's requests for injunctive relief to reconfigure NPBL's Board or to establish independent management are not narrowly tailored to remedy the harm it has alleged.  *See Ry. Labor Execs. Ass'n v. Wheeling & L. E. R. Co.*, 756 F.Supp. 249, 255 (E.D. Va. 1991) ("In general, injunctive relief should be narrowly tailored to remedy or guard against the specific apprehended harm.  To this end, injunctions should be carefully limited in time and scope to avoid unwarranted, nonremedial effects.") (citations omitted).

129.    The Court does not have subject matter jurisdiction to award CSX injunctive relief under 15 U.S.C. § 26.

130.    The STB has exclusive jurisdiction over the control of one rail carrier by another rail carrier, and over the control of more than one rail carrier by a non-carrier. 49 U.S.C. §§ 11323(a)(3), (4) and (5); 11323(b).  "Control" in this context is broadly defined to include "actual control, legal control, and the power to exercise control, through or by (A) common directors, officers, stockholders, a voting trust, or a holding or investment company, or (B) any other means." 49 U.S.C. § 10102(3).  The STB has explained that the "[c]ontrol of a carrier for which [49 U.S.C. §] 11323 authorization is required embraces the power or authority to manage, direct, superintend, restrict, regulate, govern, administer or oversee the day-to-day affairs of that carrier."  *Soo Line Railroad Company – Petition for Declaratory Order*, Docket No. FD 33350 (STB served Feb. 4, 1998), 1998 WL 43797, a *8 (citing *Coletti – Control – Comet Freight Lines*, 38 M.C.C. 95, 97 (1942), *aff'd sub nom. City of Ottumwa v. STB*, 153 F.3d 879 (8th Cir. 1998).

131.    The STB has broad "equitable powers to expunge" unlawful control violations that, indeed, largely mirror those possessed by courts when ordering relief in antitrust cases. *See*

*Gilbertville Trucking Co. v. U.S.*, 371 U.S. 115, 130 (1962). Thus, "[t]he power of the Commission to respond to conditions of illegal control is practically plenary under the Interstate Commerce Act." *Illinois Cent. R. Co. v. U.S.*, 263 F. Supp. 421, 428 (N.D. Ill. 1966), *aff'd*, 385 U.S. 457 (1967) (per curiam).

### 2. CSX Must Prove a Properly Defined Relevant Market for Each of Its Antitrust Claims.

132. To prevail on any of its antitrust claims, CSX must prove that NS and NBPL possessed the requisite degree of market power in a properly defined relevant antitrust market and that they used that market power to unreasonably restrain trade in that relevant market. Accordingly, and as a threshold step, CSX must prove the contours of the relevant market within which NS and NBPL allegedly restrained or monopolized competition. *See, e.g.*, *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283-85 (2018) (hereinafter "*AmEx*") (recognizing that "defining the relevant market" was a first step in the proper application of the rule of reason under Section 1 of the Sherman Act, 15 U.S.C. § 1, which requires "an accurate definition of the relevant market" even where plaintiffs were relying exclusively on direct evidence of purported anticompetitive behavior); *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 681 (4th Cir. 2016) (plaintiffs alleging monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2, must "identify[] exactly what market defendant is accused of monopolizing"); *Sun Microsystems, Inc. v. Microsoft Corp.*, 333 F.3d 517, 534 (4th Cir. 2003) (attempted monopolization "requires definition of the relevant market that the defendant is allegedly attempting to monopolize"), *abrogated on other grounds by eBay, Inc. v. MercExchange. L.L.C.*, 547 U.S. 388 (2006); *see also Dickson v. Microsoft Corp.*, 309 F.3d 193, 211 (4th Cir. 2002) (conspiracy to monopolize under Section 2 of the Sherman Act requires allegations as to "market power or share of [the alleged conspirators] in the [relevant] market").

133.    "The plaintiff in an antitrust case bears the burden of proof on the issue of the relevant . . . market[]." *Berlyn Inc. v. Gazette Newspapers, Inc.*, 73 F. App'x 576, 582 (4th Cir. 2003) (quoting *Satellite Television & Assoc. Res., Inc. v. Cont'l Cablevision of Va., Inc.*, 714 F.2d 351, 355 (4th Cir. 1983)).

134.    An antitrust relevant market is defined as the "area of effective competition," within which "significant substitution in consumption or production occurs." *AmEx*, 138 S. Ct. at 2285 (quoting *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965), and Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* § 5.02 (4th ed. 2017)).

135.    Without proof of a properly defined relevant market, "there is no way to measure [the defendant's] ability to lessen or destroy competition." *Walker Process Equip.*, 382 U.S. at 177.

136.    The relevant market consists of two dimensions:  the relevant product or service market and the relevant geographic market.  *See*, *Berlyn*, 73 F. App'x. at 582; *see also Am. Online, Inc. v. GreatDeals.Net*, 49 F. Supp. 2d 851, 857-58 (E.D. Va. 1999).  Whether differentiated services comprise a single relevant market depends on whether those services are "reasonably interchangeable" with one another, and the "extent to which consumers will change their consumption of one [service] in response to a price change in another, i.e., the 'cross-elasticity of demand.'"  *It's My Party*, 811 F.3d at 683 (quoting *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 395 (1956), and *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 469 (1992)).  "[A] market is any grouping of sales whose sellers, if unified by a hypothetical cartel or merger, could profitably raise prices significantly above the competitive level.  If the sales of other producers substantially constrain the price-increasing ability of the hypothetical cartel, these

70

others are part of the market." *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 228 (2d Cir. 1999) (quoting 2A Phillip E. Areeda *et al.*, *Antitrust Law* ¶ 533, at 169); *see also id.* at 229 (court rejected plaintiff's argument that higher-priced rush delivery services constituted a distinct market, finding instead that the relevant product market was "the market for delivery of advertisements to newspapers by any means").

137.    In its Complaint, CSX alleges that the relevant market is the market for "freight transportation by rail in and out of the Hampton Roads' ports." (Compl. ¶ 50.)  CSX's expert defines the relevant market more narrowly as the market for "on-dock rail access at NIT" for CSX. (Marvel Rep. ¶ 12.)  These proposed relevant markets are improperly defined.  As a threshold matter, CSX's expert has defined the market from the perspective of CSX as a customer of NPBL, which this Court has already ruled is improper in this case.  (Summ. J. Op. 38.)  CSX has impermissibly gerrymandered both of these proposed relevant markets solely for this litigation. Courts routinely reject markets that are gerrymandered around the plaintiff's preferences, instead of being properly defined to account for the market realities of service interchangeability and geographic substitutability.  *See It's My Party*, 811 F.3d at 683 ("No party can expect to gerrymander its way to an antitrust victory without due regard for market realities."); *Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 495 (4th Cir. 1986) ("A market drawn too tightly . . . creates the illusion of market power where none may exist.").

138.    In this regard, services within a single relevant market need not be perfect substitutes, but only "reasonable" substitutes, such that a sufficient number of customers of one service would switch to the other service in response to a small but significant increase in the price of the first service.  *See, e.g.*, *3M v. Pribyl*, 259 F.3d 587, 603 (7th Cir. 2001) ("While Accu-Tech is correct in its assertion that resin sheeting is not a perfect substitute for carrier tape, if the cost of

purchasing Accu-Tech's product and transforming it into carrier tape is comparable to the cost of purchasing 3M's finished product, then an argument that the products are reasonably interchangeable may be viable.") (citing *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962) ("[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it") and Richard A. Posner, *Antitrust Law: An Economic Perspective* 128 (1976) ("[a]t a high enough price even poor substitutes look good to the consumer"). "If consumers view the products as substitutes, the products are part of the same market." *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir. 1995).

139.    Just as services within a single relevant market need not be perfect substitutes, all customers need not be willing to switch between reasonable substitutes for those substitutes to be included in a single relevant market. The law requires that only a sufficient number of customers must be willing to switch from one service to another such that a price increase in the first service would be unprofitable. Otherwise put, if enough customers would switch from, say, rail transportation to truck transportation in response to a small but significant increase in the price of rail transportation, so that the price increase would not be profitable for the railroad, then rail and truck transportation are in the same relevant market, even if all customers would not necessarily switch. Similarly, if enough customers would switch from direct on-dock rail loading to drayage— the use of trucks at the port to transport freight to local rail terminals—in response to a small but significant increase in the price of on-dock rail loading to make the price increase unprofitable, then on-dock loading services and drayage are in the same relevant market. And if enough customers would switch from shipping through NIT to another East Coast port in response to a small but significant increase in the price of shipping through NIT, such that the price increase at

72

NIT would be unprofitable, then the other ports are in the same relevant market with NIT. CSX has failed to define a relevant market because it ignored truck transportation, drayage and other ports as reasonable substitutes for on-dock rail access at NIT.

140.   A relevant geographic market must be defined by the "area within which the defendant's customers . . . can practically turn to alternative supplies if the defendant were to raise its prices." *It's My Party*, 811 F.3d at 682 (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 441 (4th Cir. 2011)).   "[T]he area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 331-32 (1961) (expanding the relevant market from peninsular Florida to the entire "area in which respondents and the other 700 [coal] producers effectively compete" in selling "bituminous coal 'suitable for (Tampa's) requirements,' mined in parts of Pennsylvania, Virginia, West Virginia, Kentucky, Tennessee, Alabama, Ohio and Illinois").

141.   Because CSX has alleged that the harm to competition is the harm to *ocean carriers* as a result of lessened competition between NS and CSX for intermodal contracts, the service and geographic dimensions of the relevant market must include alternative options that *ocean carriers* can substitute to transport their international intermodal containers.  *See, e.g.*, *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997) ("The test for a relevant market is not commodities reasonably interchangeable by a particular plaintiff, but 'commodities reasonably interchangeable by consumers for the same purposes.'" (quoting *E.I. du Pont*, 351 U.S. at 395)); *Berlyn*, 73 F. App'x. at 583 (relevant market must identify the "proper consumer" and the products that those consumers may find reasonably interchangeable).

73

142.    CSX's proposed markets (i) improperly omit other modes of transportation that plainly compete with rail transportation for ocean carriers' business; and (ii) improperly omit from their geographic scope ports beyond the POV that provide alternative options for ocean carriers to move their intermodal containers to their ultimate destination.  CSX's proposed relevant markets do not account for the realities of competition:  other modes of transportation, like truck transportation, are reasonably interchangeable with rail transportation and other ports along the East Coast are reasonably substitutable for the Hampton Roads' ports.  CSX's failure to properly define either the service dimension or the geographic dimension is fatal to its claims.

### a.    CSX Cannot Prove Its Relevant Service Market.

143.    CSX's market definition is inadequate as a matter of law because it fails to account for truck transportation and for ocean carrier customers' ability to switch between truck transportation and rail transportation.  Failure to properly define the service dimension of a relevant market is fatal to CSX's claims.  CSX fails to include end-to-end truck transportation as a competitive alternative to rail for ocean carriers.  It also fails to account for drayage at NIT. Shippers clearly have the option of truck or rail transportation to move their goods.  Trucks dominate movements of cargo containers up to 200 miles.  Moreover, for movements of cargo containers to destinations beyond 200 miles from a given port, shippers have the option to use truck or rail, or to switch to closer port facilities.  Both CSX and NS routinely structure their rates for their international intermodal customers to be competitive with trucks on particular lanes, and CSX actively targets intermodal traffic currently moving via truck for conversation to rail.  In fact, CSX would "much prefer to grow" its international intermodal business by "converting traffic that is currently moving on the highway to intermodal rail," and some CSX contracts with ocean carriers explicitly mention trucks as a possible competitive alternative.

### b.    CSX Cannot Prove Its Relevant Geographic Market.

144.    Ports compete with one another for the movement of international intermodal discretionary cargo—cargo that by definition can be moved through more than one port to its final destination.  The primary competitor of the POV is the Port of NY/NJ, which benefits from often being the first port of call on the East Coast, providing that port with a speed-to-market advantage over the POV when serving inland destinations such as the Midwest compared to the POV.  CSX and NS serve the same major Midwest locations through the Port of NY/NJ that they serve through the POV, including Chicago, Cleveland, Cincinnati, Columbus, Detroit, Louisville, Kansas City, and St. Louis.  Further, CSX has long prioritized the Port of NY/NJ for its own international intermodal service, having had double-stack capabilities out of the Port of NY/NJ for at least 10 years, and ██████████████████████████████████████████████████████ ██████████████████████████████.  CSX also has faster transit times than NS from the Port of NY/NJ to the Midwest.  Competition between the POV and the Port of NY/NJ means that ocean carriers can choose to route traffic through either port, as demonstrated by the POV's loss of traffic to the Port of NY/NJ in 2017 when the raising of the Bayonne Bridge allowed larger ships to call on some Port of NY/NJ terminals for the first time.

145.    The POV also competes with other East Coast ports—Baltimore, Philadelphia, Savannah, Jacksonville, Charleston, and Canadian ports—for discretionary international intermodal traffic.  These East Coast ports provide ocean carriers with additional options to reach some of the same origins and destinations served by NS and CSX at the POV.  Similarly, West Coast ports compete with East Coast ports (including the POV) for discretionary cargo going to or from markets in the Midwest.  In fact, CSX evaluates how pricing at different ports affects ocean carriers' decisions about which ports to utilize to move intermodal freight.  For example, ████ ████████████████████████████████████████████████████████████████████

████████████████████████████ Both of CSX's proposed geographic markets are deficient as a matter of law because they fail to include reasonable geographic alternatives available to ocean carriers. *See, e.g.*, *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 198 (1st Cir. 1996) (rejecting San Juan as the relevant geographic market because, if the defendant raised prices for bunker fuel in San Juan, ocean-going vessels (customers) "would simply get their fuel at another port"); *accord Seabury Mgmt., Inc. v. Pro. Golfers' Ass'n of Am., Inc.*, 52 F.3d 322 (4th Cir. 1995) (unpublished table decision) (rejecting Plaintiff's proposed market definition of only the PGA Orlando and East Coast golf shows, and instead expanding the relevant market to include the West Coast Show and smaller trade shows across the country that "compete with each other for the attention of buyers"); *United States v. Carilion Health Sys.*, 892 F.2d 1042 (4th Cir. 1989) (unpublished table decision) (in evaluating antitrust implications of a hospital merger, court rejected government's proposed market definition of only the Roanoke Valley area, instead finding that "the market should include all places to which patients would go if the hospitals were to raise the price of their services," including hospitals in nearby cities and counties in Virginia and West Virginia); *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 598-99 (8th Cir. 2009) (rejecting a single city as the relevant geographic market where defendant operated and competed by offering cardiology services in several other cities); *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560-61 (8th Cir. 1998) (rejecting as too narrow a proposed geographic market consisting of unloading services at a single warehouse, finding that "the market for unloading services would seem to be more properly defined as including all warehouses within, at least, the entire Des Moines, Iowa, metropolitan area, if not an even larger area").

### 3. CSX Cannot Prove that Defendants' Conduct had an Adverse Effect on Competition in a Properly Defined Relevant Market

146. To prevail on any of its antitrust claims, CSX must prove that defendants' conduct has caused, or threatens to cause, adverse effects on competition generally within the relevant market. "[T]he reasonableness of a restraint is evaluated based on its impact on competition as a whole within the relevant market." *Oksanen*, 945 F.2d at 708. The plaintiff bears the burden of showing that the defendants' conduct has had a substantially harmful effect on competition. *See Virginia Vermiculite, Ltd. v. W.R. Grace & Co. Conn.*, 108 F. Supp. 2d 549, 575 (W.D. Va. 2000).

147. The need for CSX to prove harm to competition arises from the foundational principle that the antitrust laws protect the competitive process for the benefit of consumers, not the fortunes of any particular competitor. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) ("The antitrust laws . . . were enacted for 'the protection of competition not competitors.'" (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962))). "The anticompetitive conduct requirement reflects the essence of an antitrust violation, that of harm to competition, rather than to an individual competitor." *Loren Data Corp., v. GSX Inc.*, 501 F. App'x 275, 282 (4th Cir. 2012); *accord Dickson*, 309 F.3d at 206 ("To have an 'anticompetitive effect,' conduct 'must harm the competitive *process* and thereby harm consumers.'") (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001))). Accordingly, CSX must establish that defendants' conduct harmed competition within the properly defined relevant market generally, not simply that defendants' conduct harmed CSX.

148. CSX claims that, by economically excluding CSX from on-dock rail access at NIT, defendants caused shipping rates to ocean carriers to increase to supracompetitive levels. It proffers no actual evidence of such an increase in rates, and offers no evidence to suggest that, if faced with artificially increased rates for shipments in or out of NIT, ocean carrier customers would

not switch their shipments to other competitive ports along the East Coast.  And the absence of any testimony from ocean carriers renders the Court unable to determine whether ocean carriers, or any other actors in the market, were harmed by NS's and NPBL's alleged anticompetitive acts.

### 4.    CSX Cannot Prevail on Its Section 1 Claim

149.    "To prove a violation of section one of the Sherman Act, 15 U.S.C. § 1, a plaintiff must show [1] the existence of an agreement in the form of a contract, combination, or conspiracy that [2] imposes an unreasonable restraint on trade."  *Oksanen*, 945 F.2d at 702 (4th Cir. 1974); *see also AmEx*, 138 S. Ct. at 2283 ("This Court's precedents have thus understood § 1 'to outlaw only *unreasonable* restraints.'" (*quoting State Oil Co. v. Khan,* 522 U.S. 3, 10 (1997)).

### a.    CSX Cannot Prove a "Contract, Combination, or Conspiracy."

150.    Because Section 1 addresses collective conduct, rather than unilateral conduct, to prevail on its claim under Section 1, CSX must first prove the existence of a conspiratorial agreement between NS and NPBL.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) ("'The crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'") (alteration in original) (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 541 (1954)).

151.    A plaintiff must prove the existence of an agreement through direct or indirect evidence.  *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984) ("[T]here must be direct or circumstantial evidence that reasonably tends to prove [defendants] had a conscious commitment to a common scheme designed to achieve an unlawful objective.").

152.    Direct evidence of a conspiracy is "extremely rare" in antitrust cases and must be "explicit and require[] no inferences to establish the proposition or conclusion being asserted." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 226 (4th Cir. 2004) (citation

omitted).  CSX cannot point to any explicit agreement between NS and NPBL establishing that they conspired to exclude CSX from the on-dock facilities at NIT.

153.    CSX can therefore only rely on indirect evidence to prove the supposed conspiracy, which requires circumstantial evidence from which an agreement can be inferred and "that excludes the possibility that the alleged coconspirators acted independently or based upon a legitimate business purpose."  *Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*, 924 F.2d 539, 543 (4th Cir. 1991).  CSX has no indirect evidence that proves the existence of an agreement between NS and NPBL to exclude CSX from the on-dock facilities at NIT.

154.    As for the remaining communications that CSX contends establish such an agreement, these communications cannot provide evidence of a conspiracy because they are predominantly between NS employees only.  (NS's Proposed Findings of Fact ("PF") at ¶ 26).  As the Supreme Court has recognized, a parent and its wholly-owned subsidiary are legally incapable of conspiring for purposes of the Sherman Act. "The officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals," and because "[c]oordination within a firm is as likely to result from an effort to compete as from an effort to stifle competition," "officers or employees of the same firm do not provide the plurality of actors imperative for a § 1 conspiracy."  *Copperweld Corp.* v. *Indep. Tube Corp.*, 467 U.S. 752, 769 (1984); *see also Fox v. Deese*, 362 S.E.2d 699, 709 (Va. 1987) ("[A] single entity cannot conspire with itself.").  The *Copperweld* rationale has been applied to majority-owned subsidiaries like NPBL.  *See, e.g.*, *Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 344 (N.D. Ill. 1997); *Coast Cities Truck Sales v. Navistar Int. Transp. Co.*, 912 F. Supp. 747, 765-66 (D.N.J. 1995); *Bell Atlantic Bus. Sys. Serv. v. Hitachi Data Sys. Corp.*, 849 F. Supp. 702, 706 (N.D. Cal. 1994);

*Novatel Comm., Inc. v. Cellular Telephone Supply, Inc.*, 1986 WL 15507, *9 (N.D. Ga. 1986).  For example, as the Court recognized, the fact that NS "internally discussed [a CSX service and governance] proposal as demonstrated by NSR emails" is not evidence of collusive conduct.  Summ. J. Op. 62.  Thus, these communications are not evidence of concerted action or agreement between NS and NPBL.

155.    The fact that some NS employees involved in these communications were directors on NPBL's board (PF at ¶ 26) is irrelevant because they were not acting on behalf of NPBL during those communications.  A corporation is not bound by the statements of individual directors.  "[D]irectors of a corporation have authority to bind [the corporation] only when they act collectively as a board." *Monacan Hills, Inc. v. Page*, 122 S.E.2d 654, 658 (Va. 1961).  Even "[a] majority of [directors], in their individual names, cannot act for the board itself and bind the corporation." *Mosell Realty Corp. v. Schofield*, 33 S.E.2d 774, 779 (Va. 1945).  The only exception to this rule is if a director was communicating (1) while acting as the corporation's authorized agents with the consent of the corporation's board, and (2) within the scope of the board-approved authority. *Monacan*, 122 S.E.2d at 658.  There is no evidence that this exception applies in the context of any internal NS communications.

156.    An antitrust plaintiff must establish that the alleged co-conspirators had a "conscious commitment to a common scheme designed to achieve an unlawful purpose." *Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*, 924 F.2d 539, 543 (4th Cir. 1991) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984)).

157.    An antitrust plaintiff "must bring forward evidence that excludes the possibility that the alleged co-conspirators acted independently or based upon a legitimate business purpose." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984).   If the evidence of conspiracy

is equally consistent with unilateral action, it does not support an inference of conspiracy.  *See Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 57 F.3d 1317, 1325 (4th Cir. 1995) (rejecting conspiracy claim because alleged injury was caused by "the independent decision" of each defendant not to deal with plaintiff in its preferred manner); *accord Matsushita Elec. Ind. Co. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). .

158.    Under these well-settled principles, CSX cannot prove that any NS or NPBL conduct supports an inference of conspiracy.

159.    The setting of a switch rate based on "NPBL's actual operating costs" would constitute a rate set based on a "legitimate market factor[]."  Summ. J. Op. 69.  As to CSX's 2010 Rate Proposal, CSX never sought a vote by NPBL on that proposal.  (*Id.* at ¶ 87.)  Moreover, the 2010 Rate Proposal (like CSX's 2018 Rate Proposal) sought a private switching rate for CSX in conflict with NPBL's Operating Agreement, which requires that "a uniform rate shall be fixed for the movement of freight cars over [NPBL's] railroad."  (*Id.* at ¶ 68.)  Thus, the setting of the $210 Switch Rate and the handling of CSX's Rate Proposal are consistent with independent and legitimate business actions by NS and NPBL than an inference of conspiracy.

160.    If the rate is reasonable, as fully supported by NPBL's costs, *see supra* Findings of Fact, Part G.1., there is no antitrust violation justifying injunctive relief.  The Fourth Circuit has recognized that where the price of access is based on the cost of providing the access, the rate is reasonable as a matter of law.  *Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*, 924 F.2d 539, 544-45 (4th Cir. 1991).

161.    This Court has recognized that CSX could have challenged the reasonableness of NPBL's switch rate before the STB but has not.  *See* ECF No. 395 n.16 (acknowledging that "CSX could have pursued a legal challenge to the reasonableness of the Belt Line switching rate in a

proceeding before the STB for almost ten years").  Therefore, CSX's antitrust claims cannot, as a matter of law, be predicated on any claim that NPBL's switch rate is "unreasonable" or the like. CSX has not only sat on its rights to seek STB review of the switch rate, it has challenged the reasonableness of the rate in the improper forum.

162.    CSX's contention that NS and NPBL conduct in 2015 through 2018 gives rise to an inference of conspiracy is likewise unpersuasive.  For example, while CSX contends that NS and NPBL conspired to hamper CSX's use of NPBL to access NIT in 2015, it is undisputed that NPBL moved every train tendered by CSX.  (PF at ¶ 136.)  As to the notion that NS and NPBL coordinated to complicate or delay CSX's operations to access NIT, as the Court recognized, "the speed at which NPBL acted to secure an "operating window" to move the first train requested by CSX following CSX's years of non-use of the track to NIT arguably favors Defendants, even in the face of NSR's visceral reaction in opposition to CSX's initial request."  Summ. J. Op. 45 n.14. As to the handling of CSX's 2018 Rate Proposal, it cannot support an inference of conspiracy because, as the Court held, "CSX fails to demonstrate that its service proposal was denied, either expressly or implicitly, further failing to point to evidence capable of demonstrating that any presumed denial or implicit denial by NPBL was based on anything other than lawful business concerns or historic NPBL operating procedures."  *Id.* at 61.

**b.    CSX Cannot Prove Any Unreasonable Restraint of Trade.**

163.    Although the plain language of the Sherman Act prohibits all agreements in restraint of trade, "[the Supreme Court] has long recognized that Congress intended to outlaw only unreasonable restraints."  *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997); *see also Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 508 (4th Cir. 2002).  Therefore, to prevail on its Section 1 claim, CSX must prove not only that NS and NPBL reached an agreement, but also that the agreement restrained trade unreasonably.

164.     The "prevailing standard" for analyzing the reasonableness of Section 1 restraints is the "rule of reason." *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977); *see also Copperweld*, 467 U.S. at 768.  "A small group of restraints are unreasonable *per se*"—that is, they do not require further inquiry into their competitive effects—"because they always or almost always tend to restrict competition and decrease output." *AmEx*, 138 S. Ct. at 2283 (citations and quotations omitted).  "Typically only 'horizontal' restraints—restraints imposed by agreement between competitors—qualify as unreasonable *per se*." *Id*. at 2283-84 (citations and quotations omitted).

165.     Where, as here, the alleged agreement arises in the context of a vertical relationship, the rule of reason is the appropriate standard for evaluating the lawfulness of the agreement.  *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 907 (2007); *R.J. Reynolds Tobacco Co. v. Philip Morris USA, Inc.*, 67 F. App'x 810, 811-12 (4th Cir. 2003) (per curiam) (affirming district court's application of the rule of reason when assessing a non-price vertical restraint).

166.     As the Court recognized, NPBL is "a joint venture … now jointly owned only by CSX (43%) and NSR (57%)" that "operates to provide its owners with access to NPBL's own tracks and tracks on which NPBL has rights to operate."  Summ. J. Op. 2.  Consistent with that vertical relationship, there is no evidence in the record that NS and NPBL are horizontal competitors in any respect.  (PF at ¶ 27.)  Otherwise stated, this case is evaluated under the rule of reason analysis because NPBL is not a direct competitor of either CSX or NS.

167.     Nor is there record evidence that NS and NPBL are potential competitors.  To qualify as a potential competitor, firm must have "the 'necessary desire, intent, and capability to enter the market.'"  *Lumber Liquidators, Inc. v. Cabinets To Go, LLC*, 415 F. Supp. 3d 703, 712

(E.D. Va. 2019) (quoting *Engine Specialties, Inc. v. Bombardier, Ltd.*, 605 F.2d 1, 9 (1st Cir. 1979)).  There is no evidence that NPBL had the desire, intent or capability to compete with NS to contract with ocean carriers, or to offer access to NIT.  (PF at ¶ 27.)  Indeed, CSX proposes to prove at trial that NPBL "does not compete for ocean carrier access."  (CSX's Factual Contentions ¶ 2, ECF No. 517-7).

168.    Assuming the Court were to find an agreement, the rule of reason then requires the court to conduct a fact-specific assessment of market power and market structure to assess the restraint's actual effect on competition in a properly defined relevant market.  *See Cont'l T.V., Inc.*, 433 U.S. at 49 & n.15; *see also Copperweld*, 467 U.S. at 768.  "Market power and market structure must be assessed, regardless of whether plaintiff purports to show the agreement's effect on competition through direct or indirect evidence. *AmEx*, 138 S. Ct. at 2285 (noting that "[w]ithout a definition of the market there is no way to measure [the defendant's] ability to lessen or destroy competition").

169.    The rule of reason involves a three-step, burden-shifting framework.  *Amex*, 138 S. Ct. at 2284.  First, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market."  *Id*.  "If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint."  *Id*.  "If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means."  *Id.*

170.    Assuming it were to prove the alleged agreement, then to satisfy its initial burden to prove substantial anticompetitive effects under the rule of reason, CSX must establish that the defendants possess sufficient market power in the properly defined relevant market to be able to

adversely affect competition in that relevant market.[7] *AmEx,* 138 S. Ct. at 2285. Here, CSX cannot meet its initial burden to prove substantial anticompetitive effects because it cannot prove the existence of a properly defined relevant market, *see* COL Section D.2, *supra,* nor that any anticompetitive effect flowed from the complained-of restraint. *See* COL Section D.3, *infra.*

171.    CSX contends that the rate set by the NPBL proves an anticompetitive effect because it is too high, but it is not the responsibility of the court to evaluate the reasonableness of the rate. *Chicago Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n,* 95 F.3d 593, 597 (7th Cir. 1996) (criticizing the "district court's opinion concerning the fee" because it "read[] like the ruling of an agency exercising a power to regulate rates," and noting that "the antitrust laws do not deputize district judges as one-man regulatory agencies"). Where there is a regulatory agency designated to evaluate industry pricing, courts have long deferred to the expertise of those agencies. *See, e.g.*, *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 577 (1981) ("No court may substitute its own judgment on reasonableness for the judgment of the Commission [regarding whether rates are reasonable]."); *Bryan v. BellSouth Commc'ns, Inc.*, 377 F.3d 424, 429 (4th Cir. 2004) (recognizing that the filed-rate doctrine, which bars antitrust plaintiffs from challenging rates or tariff terms that have been filed and approved by a federal regulatory agency, was intended "to preserve the rate-making authority of federal agencies"). Here, the STB should alone evaluate the reasonableness of the switch rate.

172.    Even if courts could properly evaluate the reasonableness of the switch rate, the rate is reasonable based on NPBL's costs. *See Laurel Sand & Gravel*, 924 F.2d at 544 (finding

---

[7]    The market power sufficient to prove a Section 1 claim is a lesser degree of power than the monopoly power required to establish a violation of Section 2. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992) ("Monopoly power under §2 requires, of course, something greater than market power under § 1.").

rate set slightly over the variable costs deemed reasonable).  As explained in Paragraphs 91-92, NPBL's per car operating expenses ranged from ███████████████████████████████████ ████████████████████████ NPBL's $210 switch rate is only ██ above its average cost since that rate was set.

173.    In addition, NS and NPBL have legitimate procompetitive justifications for the complained-of conduct. A procompetitive business justification is one that benefits competition and consumers by, for example, increasing output or enhancing quality.  *See AmEx*, 138 S.Ct. at 2282 (holding that defendants had not "stifled competition" because during the period of the challenged agreements the relevant market "experienced expanding output and improved quality"); *see also Chicago Pro Sports*, 95 F.3d at 597 ("Unless a contract reduces output in some market, to the detriment of consumers, there is no antitrust problem.").  Enhancement of consumer choice is a traditional objective of the antitrust laws and has also been acknowledged as a procompetitive benefit.  *See United States v. Brown Univ. in Providence in State of R.I.*, 5 F.3d 658, 675 (3d Cir. 1993); *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1157 (9th Cir. 2003) (finding creation of "new option for purchasers of [natural gas] transportation rights . . . procompetitive"). In addition, "improvement in the quality of a product or service that enhances the public's desire for that product or service as one possible procompetitive virtue." *Brown Univ.*, 5 F.3d at 674 (citing *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 114-15 (1984)).  While CSX complains about the setting of switch rate, that conduct is ancillary to the NPBL joint venture, absent which CSX could not access NIT at all.  Thus, the setting of the switch rate—especially at a price only slightly above cost, *see* ¶ 87, *supra*—increases output by providing more options on-dock at NIT.  Similarly, NPBL's efforts in 2015 to provide CSX with access to NIT also were part of the successful procompetitive enhancement of NPBL's service

offerings, which NPBL accomplished despite complex scheduling and logistical issues that threatened to disrupt existing service.  Any operational issues were the result of NPBL's need to balance maintaining existing service while safely and efficiently running new trains from CSX into and out of NIT.

174.    Nor can CSX show that these legitimate business justifications could have been achieved through less restrictive means.  To meet this burden, plaintiffs must show that "an alternative is substantially less restrictive and is virtually as effective in serving the legitimate objective without significantly increased cost."  *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1159 (9th Cir. 2001); *see also Virgin Atl. Airways Ltd. v. Brit. Airways PLC*, 257 F.3d 256, 264 (2d Cir. 2001) (requiring plaintiff to show "same procompetitive effect could be achieved through [alternative] means").  Defendants are "not required to adopt the least restrictive alternative."  *Bruce Drug, Inc. v. Hollister, Inc.*, 688 F.2d 853, 860 (1st Cir. 1982); *see also Am. Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1248 (3d Cir. 1975) ("In a rule of reason case, the test is not whether the defendant deployed the least restrictive alternative.").

### 5.    CSX Cannot Prevail on Its Section 2 Claim.

#### a.    Monopolization

175.    To prevail on a monopolization claim under Section 2 of the Sherman Act, a plaintiff, like CSX, must prove that the defendants possess monopoly power in a properly defined relevant market and that such monopoly power was willfully acquired or maintained as distinguished from the defendant's "growth or development as a consequence of a superior product, business acumen, or historic accident."  *Oksanen,*, 945 F.2d at 710 (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 596 n.19 (1985)).

1)     <u>CSX Cannot Prove Monopoly Power in a Relevant Market.</u>

176.     As previously explained, "[p]roof of a relevant market is the threshold for a Sherman Act § 2 claim." *Consul*, 805 F.2d at 493; *see also It's My Party*, 811 F.3d at 681 (noting that "[i]n the absence of a plausible market definition, courts are hard pressed to discern the nature or extent of any anticompetitive injury that plaintiff and other similarly situated parties may be suffering) (citing *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 455–56 (1993))); *AmEx*, 138 S. Ct. at 2285 (noting that "[w]ithout a definition of the market there is no way to measure [the defendant's] ability to lessen or destroy competition"). An antitrust plaintiff "must establish the geographic and product market that was monopolized." *Consul*, 805 F.2d at 493 (citing W*alker Process Equip.*, 382 U.S.at 177 and other authority).

177.     "Monopoly power is the power to control prices or exclude competition." *Kolon Indus., Inc. v. E.I. du Pont de Nemours & Co*., 748 F.3d 160, 173 (4th Cir. 2014) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)). A party may establish monopoly power in the relevant market "'either through 'direct evidence of supracompetitive prices and restricted output' or by inference 'from the structure and composition of the relevant market.'" *Intell. Ventures I LLC v. Cap. One Fin. Corp.*, No. 1:13-cv-00740 (AJT/TRJ), 2013 WL 6682981, at *4 (E.D. Va. Dec. 18, 2013) (quoting *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007)).

178.     Direct evidence of monopoly power is "only 'rarely available,'" and even more rarely, if ever, demonstrated. *Mylan Pharmaceuticals., Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 434 (3d Cir. 2016) (*quoting Harrison Aire, Inc. v. Aerostar Int'l, Inc*., 423 F.3d 374, 381 (3d Cir. 2005)). Direct evidence of monopoly requires that the party show increased prices *and* decreased output in the relevant market. *See Intell. Ventures I LLC* , 2013 WL 6682981, at *4 (E.D. Va. Dec. 18, 2013); *see also Meijer, Inc. v. Barr Pharmaceuticals., Inc.*, 572 F. Supp. 2d 38,

55 (D.D.C. 2008) (refusing to eschew market definition requirement and also refusing to infer market power from direct evidence where higher prices were not shown to be result of restricted output).

179.    Absent direct evidence of monopoly power in a relevant market, CSX must rely on indirect evidence.  "A defendant possesses monopoly power in the relevant market if it is 'truly predominant in the market.'"  *Kolon Indus.*, 748 F.3d at 173-74 (4th Cir. 2014) (quoting *White Bag Co. v. Int'l Paper Co.*, 579 F.3d 1384, 1387 (4th Cir. 1974)).  Although there is no precise market share that conclusively constitutes monopoly power, generally seventy percent or more has been required to find that a defendant possesses monopoly power.  *See id.* at 174; *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 450 (4th Cir. 2011) (identifying 70% market share as the bottom of the range for finding monopoly power).

180.    Here, CSX's inability to prove a properly-defined relevant market, *see* COL Section D.2, *supra*, is fatal to its Section 2 monopolization claim.  Because CSX cannot define a relevant market it is unable to demonstrate monopoly power either through direct or indirect evidence and thus cannot make out a monopolization claim.

### 2)    CSX Cannot Prove Exclusionary Conduct.

181.    In addition to proving that the defendant possesses monopoly power, a plaintiff alleging monopolization must also prove that the defendant engaged in conduct not resulting from "growth or development as a consequence of a superior product, business acumen, or historic accident" and that is not explained by legitimate business justifications.  *Loren Data Corp. v. GXS Inc.*, 501 F. App'x 275, 282 (4th Cir. 2012); *see also Laurel Sand & Gravel*, 924 F.2d at 544.  This is also referred to as "exclusionary conduct."  *Masco Contractor Servs. E.*, 279 F. Supp. 2d at 706.

*182.*    "To be condemned as exclusionary, a monopolist's act must have an 'anticompetitive effect.'" *Masco Contractor Servs.*, 279 F. Supp. 2d at 706 (quoting *Microsoft*,

253 F.3d at 58); *see also Dickson*, 309 F.3d at 211 ("The offense of monopolization requires a showing of 'anticompetitive effect.'").  Thus, a plaintiff must identify conduct that "harm[s] the competitive process and thereby harm consumers . . . [h]arm to one or more competitors will not suffice."  *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001); *see also Loren Data Corp.*, 501 F. App'x at 282 ("The anticompetitive conduct requirement reflects the essence of an antitrust violation, that of harm to competition, rather than to an individual competitor."); *see also Brunswick Corp.* , 429 U.S. at  488 (recognizing that "[t]he antitrust laws … were enacted for 'the protection of competition, not competitors'") (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320 (1962))); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985) ("The question of whether [the defendant's] conduct may properly be characterized as exclusionary cannot be answered by simply considering its effect on [the plaintiff]"; rather, the court must also consider "[the conduct's] impact on consumers and whether it has impaired competition in an unnecessarily restrictive way.").

### i.   The Switch Rate

183.    CSX contends that NS engaged in exclusionary conduct by conspiring with NPBL to set the switch rate at $210.  CSX's inability to prove a conspiracy is explained in Conclusion of Law Section D.4, *supra*.  As noted at Paragraph 102, the record shows that there was never any vote on the 2010 rate proposal.

184.    Moreover, the switch rate that CSX must pay to access NIT is not excessive and was not set for an improper purpose.  The rate charged a competitor—even if not the rate the competitor prefers—generally will not be disturbed where there is a legitimate business purpose for doing so.  *See Loren Data Corp.*, 501 F. App'x at 283 ("[S]imply because GXS does not offer Loren Data the terms and conditions it desires does not mean that GXS has violated the antitrust laws. Indeed, GXS provides legitimate business justifications for the terms it offers Loren Data.");

*cf. MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1134 (9th Cir. 2004) (applying *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) and rejecting "refusal to deal" monopolization claim where the rate charged to competitor did not evidence an attempt to forego "short-term profits for long-term gain"); *see also infra* ¶ 224 (explaining how CSX's claims fail even under more stringent "essential facilities" doctrine not at issue here).  The NPBL Board set NPBL's switch rate at $210 in 2010 to cover its operating costs, and CSX has never challenged the rate before the STB.  (PF at ¶¶ 86-98).

185.    NS's internal e-mails do not establish that NS's conduct was exclusionary.  Mere hostility to competitors does not constitute exclusionary conduct.  *See Olympia Equip. Leasing Co. v. Western Union Tel. Co.*, 797 F.2d 370, 379 (7th Cir. 1986) ("[W]hat has become an antitrust commonplace, that if conduct is not objectively anticompetitive the fact that it was motivated by hostility to competitors . . .  is irrelevant. . . . That Western Union wanted to 'flush these turkeys' tells us nothing about the lawfulness of its conduct.").  Nor is the desire to "crush a competitor" sufficient to establish exclusionary conduct.  *Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*, 883 F.2d 1101, 1113 (1st Cir. 1989) ("[T]he desire to crush a competitor, standing alone, is insufficient to make out a violation of the antitrust laws.  As this court has noted, "intent to harm" without more offers too vague a standard in a world where executives may think no further than "Let's get more business," and long-term effects on consumers depend in large measure on competitors' responses.'  As long as [the defendant's] course of conduct was itself legitimate, the fact that some of its executives hoped to see [its competitor] disappear is irrelevant." (citations omitted)).  Indeed, the Court recognized in its MSJ Opinion that "NSR has a lawful right to 'compete' with CSX, and it is important to ensure that

NSR's lawful competitive conduct, even if aggressive, is not mistaken as an antitrust act[.]" Summ. J. Op. at 38.

ii.       <u>The 2015 Train Movements</u>

186.    Successful 2015 train movements are not evidence of exclusionary conduct because CSX cannot show that NS's and NPBL's actions were not taken for legitimate business reasons. *See Loren Data Corp.*, 501 F. App'x at 283 ("[S]imply because GXS does not offer Loren Data the terms and conditions it desires does not mean that GXS has violated the antitrust laws. Indeed, GXS provides legitimate business justifications for the terms it offers Loren Data.").

187.    Despite "a 'period of extreme port congestion across the East Coast'" NS and NPBL took steps to ensure that NPBL moved every train that CSX asked it to move. *See supra,* PF ¶¶ 133-136.  CSX offers no evidence that the rates charged by NPBL or the actions taken by NS during that period of "extreme port congestion" were taken for illegitimate reasons. *Loren Data Corp.*, 501 F. App'x at 283 (noting no exclusionary conduct for purported "refusal to deal" where legitimate business justifications present); *cf. MetroNet Servs. Corp.*, 383 F.3d at 1134 (applying *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) and rejecting "refusal to deal" monopolization claim where the rate charged to competitor did not evidence an attempt to forego "short-term profits for long-term gain").

188.    NS's failure to offer its competitor CSX "the terms and conditions [CSX] desires" does not constitute an antitrust violation. *Loren Data Corp.*, 501 F. App'x at 283.  Indeed, NS has no duty to aid CSX.  *See Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("[A]s a general matter the Sherman Act does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." (alteration in original) (quoting

92

*United States v. Colgate & C*o., 250 U.S. 300, 307 (1919))); *Loren Data Corp.*, 501 F. App'x at 283.

189.    Even under the more stringent "essential facilities" doctrine—which has never been adopted by the Supreme Court and CSX has disclaimed as a claim in this case—a monopolist is not required to provide access only on "the terms and conditions [plaintiff] desires." *Loren Data Corp.,* 501 F. App'x at 283-84.  And terms "are not unreasonable simply because they will reduce a competitor's profits." *Id.* at 284.

### iii.    The Diamond Track, Port Norfolk Yard, and Rejection of Service Proposals

190.    NS did remove a portion of its own track known as the "diamond track," in 2008; but only after the discontinuation was approved by the STB and without objection by the NPBL Board.  CSX also complains that NS refused to allow NPBL to use CSX locomotives, but NPBL already leases three locomotives from NS and receives operations assistance. Nor do NPBL's rejection of CSX's rate proposals constitute exclusionary conduct because (i) the CSX rate proposal would violate NPBL's Operating Agreement, and (ii) CSX Board members effectively abandoned the 2010 and 2018 proposals by failing to ask for a vote on those proposals.  Indeed, rather than press for a vote, CSX instead opted to file the instant lawsuit.  (Compl. ¶ 93(a)).

### iv.    CSX Cannot Prove Anticompetitive Effect / Harm to Consumers

191.    Moreover, NS's alleged conduct cannot be exclusionary because CSX cannot show that NS's conduct had an anticompetitive effect and harmed consumers.  *See Loren Data Corp.*, 501 F. App'x at 283 (affirming dismissal where no consumers were denied access or were unable to obtain services because of a cost).  CSX can demonstrate only that it was denied access to NIT on its preferred terms; such claims of "harm" solely to itself as a competitor—rather than harm to competition and consumers—is insufficient to amount to exclusionary conduct.

192.    CSX's expert admits he is unable to show harm to competition as a whole, nor is he able to distinguish whether price changes resulted from legitimate competition and NS's competitive advantages, as compared to flowing from any purported anticompetitive conduct.  *See* PF ¶ 52.   CSX's inability to show harm to consumers stemming from the alleged exclusionary conduct, rather than effects felt by CSX as a consequence of NS's competitive advantages, is fatal to CSX's monopolization claim.  *See Microsoft*, 253 F.3d at 58 (distinguishing "exclusionary" conduct from "superior product, business acumen, or historic accident" (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 571(1966))).

v.    <u>CSX Cannot Prove It Was Excluded From Competition</u>

193.    Nor can CSX show that it was actually excluded as a competitor.  *See, e.g.*, *Kolon Indus.*, 748 F.3d at 175.  CSX has the option to use the on-dock facilities at NIT via the NPBL or to use drayage to transport international intermodal containers to and from NIT.  Since 2009, CSX has significantly ████████████████████████████████████████ ███████████████████ (PF ¶ 144).  Between 2009-2019 CSX's international intermodal container movements ██████████████████████████████████ *Id.* CSX chose to pay NPBL the $210 switch rate to serve non-intermodal customers on other portions of NPBL's tracks—the very same switch rate it contends was "excessive" to access NIT.  (PF ¶ 119). ███████████████████████████████████████████████. (PF ¶ 144).  Except for a few instances in 2015, CSX has chosen to use drayage (subsidized by VIT) at NIT instead of using the on-dock facilities via the NPBL.

**b.    Attempted Monopolization**

194.    An attempted monopolization claim under Section 2 requires a plaintiff to prove: (1) "specific intent to monopolize the market, [(2)] the defendant engaged in anti-competitive or predatory conduct designed to further that intent; and [(3)] a dangerous probability of success."

*Abcor*, 916 F.2d at  926 (citing *White Bag Co. v. Int'l Paper Co.*, 579 F.2d 1384, 1387 (4th Cir. 1974)).

1)    <u>CSX Cannot Prove Specific Intent or Exclusionary Conduct.</u>

195.    The specific intent required for an attempted monopolization claim is the "specific intent to destroy competition or build monopoly." *Am. Online,*, 49 F. Supp. 2d at 860 (quoting *Abcor*, 916 F.2d at 927 ).  A desire to increase market share or even to drive a competitor out of business through vigorous competition on the merits is not sufficient.  *Id.*  The alleged monopolizing party must have sought to create a monopoly by circumventing the competitive process. *Id.*

196.    Nor can CSX adduce the requisite specific intent through inference from NS's conduct.   "[T]he same basic definition of exclusionary conduct should apply to both monopolization and attempt claims."  *Kolon Indus.*, 748 F.3d at 178 (alteration in original) (quoting 3B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 806a (3d ed. 2008)). Therefore, CSX's inability to prove that NS's conduct was exclusionary in the context of its monopolization claim likewise dooms CSX's attempt to monopolize claim.  *See* ¶¶ 215-235, *supra*.

2)    <u>CSX Cannot Prove Dangerous Probability of Success.</u>

197.    To determine whether there is a dangerous probability of success in monopolizing the market, "courts often consider the relevant market and a participant's ability to lessen or destroy competition in that market."  *Am. Online*, 49 F. Supp. 2d at 861 (citing *Spectrum Sports*, 506 U.S. at 456).  Because CSX cannot prove the existence of a properly-defined relevant antitrust market, it cannot demonstrate that NS has a dangerous probability of success in lessening competition in that market.  *See supra* ¶¶ 169-182 (discussing an antitrust plaintiff's obligation

to prove a relevant market and the requisite degree of power in that market for Sherman Act claims).

### c.   Conspiracy to Monopolize

198.   A Section 2 conspiracy to monopolize claim requires the plaintiff to prove:  (1) the existence of a combination or conspiracy; (2) an overt act in furtherance of the conspiracy; and (3) specific intent to monopolize.  *See Masco Contractor Servs. E.*, 279 F. Supp. 2d at 708.

#### 1)   CSX Cannot Prove a Conspiracy.

199.   Failure to prove a conspiracy for purposes of Section 1 of the Sherman Act (*see* Section D.4, *supra*) is fatal to a Section 2 conspiracy-to-monopolize claim.  *See Dickson*, 309 F.3d at 211.

#### 2)   CSX Cannot Prove Specific Intent.

200.   The specific intent required for Section 2 conspiracy to monopolize claim means "something more than willing, voluntary, and knowing participation in the illegal course of conduct that [the alleged monopolist] is alleged to have pursued.  It means participating in that course of conduct for the specific, shared purpose of maintaining [the alleged monopolist's] monopolies."  *In re Microsoft Corp. Antitrust Litig.,* 127 F. Supp. 2d 728, 731 (D. Md. 2001) (citing *SuperTurf, Inc. v. Monsanto Co.,* 660 F.2d 1275, 1283 (8th Cir. 1981) and *Northeastern Tel. Co. v. Am. Tel. & Tel. Co.,* 651 F.2d 76, 85 (2d Cir. 1981)).  In other words, to establish the requisite intent for a Section 2 conspiracy to monopolize claim, CSX must show that both the NS and NPBL "formulated [the] intent [that] maintaining [NS's alleged] monopol[y] was a goal that they themselves desired to accomplish."  *Id.*

#### 3)   CSX Cannot Prove Anticompetitive Effect.

201.   "A viable [Section] 2 conspiracy to monopolize claim must . . . establish that the [the purported conspiracy] could have had an anticompetitive effect."  *Dickson*, 309 F.3d at 211

(citing *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 1001 (11th Cir. 1993) (listing the

likelihood of an anticompetitive effect as one of the elements of a conspiracy to monopolize under

Section 2 of the Sherman Act)).  Because CSX provides no evidence showing anticompetitive

effect, *see supra* ¶¶ 216-236, its conspiracy to monopolize claim fails.


Dated: January 12, 2023

James L. Chapman, IV, Esq.
W. Ryan Snow, Esq.
Alexander R. McDaniel, Esq.
CRENSHAW, WARE &
MARTIN, P.L.C.
150 W. Main Street, Suite 1500
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
Email: jchapman@cwm-law.com
Email: wrsnow@cwm-law.com
Email: amcdaniel@cwm-law.com

*Attorneys for Norfolk and Portsmouth Belt*
*Line Railroad Company*

Respectfully submitted,

Alan D. Wingfield (VSB No. 27489)
Michael E. Lacy (VSB No. 48477)
Massie P. Cooper (VSB No. 82510)
Troutman Pepper Hamilton Sanders LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-1200
Facsimile: (804) 698-6061
Email: alan.wingfield@troutman.com
Email: michael.lacy@troutman.com
Email: massie.cooper@troutman.com

John C. Lynch (VSB No. 39267)
Kathleen M. Knudsen (VSB No. 90845)
Troutman Pepper Hamilton Sanders LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, VA  23462
Telephone: (757) 687-7500
Facsimile: (757) 687-7510
Email: john.lynch@troutman.com
Email: kathleen.knudsen@troutman.com

Tara L. Reinhart
Thomas R. Gentry
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005
Telephone: (202) 371-7000
tara.reinhart@skadden.com
thomas.gentry@skadden.com

*Attorneys for Norfolk Southern Railway Company*