**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

CSX TRANSPORTATION, INC.,
individually and on behalf of NORFOLK
& PORTSMOUTH BELT LINE
RAILROAD COMPANY,

        Plaintiff,

v.                                                       Civil Action No. 2:18-cv-530-MSD-RJK

NORFOLK SOUTHERN RAILWAY
COMPANY, *et al.*,

        Defendants.

_____/

### PLAINTIFF CSX TRANSPORTATION, INC.'S MOTION FOR INJUNCTIVE RELIEF AND PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

      Plaintiff CSX Transportation, Inc. ("CSX"), by counsel and pursuant to the Court's January 5, 2023 Order (ECF No. 560), moves the Court to enter injunctive relief on Counts I-V, VIII, and IX of its Complaint against Defendants Norfolk Southern Railway Company ("NS") and Norfolk and Portsmouth Belt Line Railway ("NPBL"), following the bench trial currently scheduled to begin on January 18, 2023.

      Specifically, CSX respectfully requests that the Court issue an injunction that:

(1) Prohibits Defendants from continuing to engage in anticompetitive conduct, both unilaterally and collectively, that excludes CSX from on-dock rail access at Norfolk International Terminal ("NIT"), the relevant market. Such prohibition would include, but not be limited to, enjoining the continuation of actions or threatened actions found to constitute a violation of the antitrust laws and/or violations of state conspiracy or breach of contract law, such as by:

1

(a) prohibiting Defendants from conspiring to set or raise CSX's costs to serve NIT by rail, thereby adversely impacting CSX's ability to access and serve NIT by rail;

(b) prohibiting NS international intermodal personnel from having input, whether direct or indirectly, into matters influencing the terms of pricing or service provided by NPBL for rail access to NIT; and

(c) prohibiting interested NS personnel from participating on NPBL rate committees or in NPBL Board decisions regarding the rate to be charged by NPBL for rail access to NIT; and

(d) prohibiting Defendants from undertaking anticompetitive actions to unreasonably delay, obstruct or limit CSX's ability to access NIT by rail; and

(2) Requires NS and NPBL to install an independent NPBL Board and senior management, to include at least the President and Vice President of NPBL. The independent Board need not exclude all Board-appointed positions by the owners—NS and CSX. Rather, there should be sufficient independent Directors such that neither NS-appointed nor CSX-appointed Board members constitute a voting majority and such that NS-appointed Board members cannot unilaterally block NPBL Board action. For example, if NS retains its three Board seats and CSX its two, then the Court should order that two new independent Board seats be created. Should the Court order that the NPBL President shall be independent of the owners, the independent NPBL President could fill one of these independent Board seats;[1] and

---

[1] If the Court does not grant CSX's requested relief regarding independent Board composition, the Court could alternatively direct a process whereby NPBL, on a timely basis, would receive, impartially consider, and approve a CSX rate and service proposal for NIT service,

(4) Awards any other injunctive relief that the Court determines appropriate.

In support of its request for injunctive relief, and as directed by the Court's January 5 Order, CSX submits the following proposed findings of fact and conclusions of law:

## **FINDINGS OF FACT**

### I.    **The Parties**

1.       CSX and NS are Class 1 railroads operating in the eastern United States.  NPBL is a terminal switching railroad (sometimes called a "short line") in Hampton Roads, Virginia.  At all relevant times, NPBL has been owned 57% by NS and 43% by CSX.

2.       NPBL was founded by eight railroads in 1896 "for the mutual benefit of each [of the railroads] in the interchange of business."  ECF No. 1-1 at 3.  NPBL's Operating Agreement provides that each railroad will have "equal representation" in the Belt Line, *see id.*, and that each must "co-operate cordially in encouraging the business of the [NPBL]," *id.* at 6.

3.       In 1980, NS's predecessors,  Norfolk and Western Railway Company ("NW") and Southern Railway Company ("SR"), petitioned the Interstate Commerce Commission ("ICC")— the predecessor to the Surface Transportation Board ("STB")—to exclude non-controlled subsidiaries like NPBL from a forthcoming regulatory control application related to NW's and SR's consolidation.

4.       In 1989, the NPBL's then-existing owners—CSX, Norfolk and Western Railway Company ("NW") and Southern Railway Company ("SR")—agreed to amend "Article Fourth" of the Operating Agreement to allow CSX to appoint two directors and NW and SR to collectively

which provides CSX with commercially reasonable rail access to NIT and supports NPBL's mission and financial status.

appoint three.[2]  This agreement expressly did not "amend, alter, or affect any other provision of the NPBL Agreement."

5.      NPBL's president is the sixth voting member of the Belt Line's Board.  Since at least 2005, the NS-controlled NPBL Board has installed a former NS employee in this position.  Past presidents have returned to work at NS following their tenures at the Belt Line.  Current NPBL President Cannon Moss intends to do the same.  Donna Coleman—NPBL's recently retired Vice President, Comptroller, and Corporate Secretary—is also a former NS employee.

6.      Under the Operating Agreement, the Belt Line's purpose is to interchange railcars for its owners, meaning that NPBL receives cars from NS or CSX and delivers them to locations on its tracks, or vice versa.

7.      One location for which NPBL provides switching services is Norfolk International Terminals ("NIT"), the largest marine terminal in the Port of Virginia ("POV") and one of the most important terminals for international intermodal cargo on the East Coast.  NIT is owned by the Virginia Port Authority ("VPA") and operated by Virginia International Terminals ("VIT").

8.      NS has access to on-dock rail at NIT over its own tracks, although it also travels over NPBL tracks, for which NS pays a nominal trackage rights fee.[3]

9.      NPBL has access to on-dock rail at NIT via trackage rights over NS's tracks.  The 1917 agreement between NS and NPBL "guarantees NPBL 50% of track time on trackage rights heading North to NIT."  Pursuant to this agreement, NPBL pays NS a fixed trackage rights fee that does not vary based on the number of cars moved.

---

[2] NW and SR subsequently finalized their merger, becoming NS.

[3] The term "on-dock" refers to a railroad's ability to move its train into a marine terminal so that containers can be loaded onto railcars either on or near the dock itself.

10.     VIT manages rail traffic at NIT and would be able to effectively manage rail traffic from both NS and NPBL at NIT.

11.     Although NPBL does not compete for ocean carrier business, NPBL and NS are the only two potential means by which CSX could access on-dock rail at NIT.

## II.     Present and Future Harm from Defendants' Ongoing Anticompetitive Conduct.

12.     CSX and NS compete vigorously for contracts with ocean carriers to move international intermodal freight by rail to and from all major ports on the East Coast, including POV.  A significant component of competitive rail service is whether a railroad can provide on-dock access at major marine terminals.

13.     As set forth in detail below, since at least 2009 and continuing to the present, NS and NPBL have conspired to maintain NS's control of international intermodal freight moving by rail through POV by blocking CSX's ability to access on-dock rail at NIT.

14.     As an NS executive succinctly explained in 2017, CSX's ability to fairly compete with NS for the international intermodal business at NIT is limited, because NS "controls" NIT access.

15.     Defendants' ongoing anticompetitive conduct in the market for on-dock rail at NIT has real, immediate, and ongoing consequences—not only for CSX, but also for international intermodal ocean carriers, the POV and consumers more broadly.

16.     NS has handled the majority of international intermodal business at the POV—and the *vast* majority at NIT—during the relevant period.  Although POV's overall container volumes—and CSX's container volumes at POV—have increased since 2009, CSX's expansion is concentrated almost entirely at Virginia International Gateway ("VIG"), a separate POV marine terminal where CSX has access to on-dock rail.

5

17.     Empirical data shows that, without any meaningful competitive constraints, NS is able to charge higher prices to ocean carriers who use NIT intensively.  Indeed, NS charges ocean carriers that send a substantial percentage of their container traffic through NIT a meaningfully higher price per container than those who do not rely significantly on NIT.

18.      Because ocean carriers contract with NS for multiple lanes (i.e., origin and destination pairs) covering multiple East Coast ports, NS's overcharge is not limited to containers shipped through NIT.  Instead, NS charges supracompetitive prices to those carriers across its entire network.

19.     CSX's lack of on-dock rail access at NIT prevents it from competing fairly on the merits for international intermodal business.  Indeed, the lack of on-dock rail at NIT has driven a number of ocean carriers to contract with NS rather than CSX.  This has remained the case since 2015 and up to and including the present.

20.     Because carriers generally align with a single railroad across all major East Coast ports, CSX's competitive disadvantage at NIT results in substantial lost business across its entire network—resulting in hundreds of millions of dollars in lost profits since 2015 alone—and, indeed, hundreds of millions in ongoing losses since CSX filed its Complaint in 2018.

21.     CSX's competitive disadvantage at NIT also affects the POV; as VPA confirmed in a letter to NPBL in 2018, CSX's lack of proper access to NIT disadvantages Virginia as a whole in the market for international intermodal container traffic.

22.     Defendants have given no indication that they have abandoned or intend to abandon this harmful anticompetitive conduct.  To the contrary, Defendants have indicated they intend to engage in future conduct to exclude CSX from the relevant market, including, for example, by entering into a new trackage rights agreement that would dramatically increase the charges NPBL

pays to NS for trackage rights, thereby further impeding CSX's ability to access on-dock rail at NIT.

## III.    NS and NPBL Conspire to Block CSX at NIT

23.    Defendants have conspired to block CSX's ability to access on-dock rail at NIT and continue to do so.  One way Defendants have blocked CSX's access to on-dock rail at NIT is through NPBL's switch rate.  The NPBL Operating Agreement states that "a uniform rate shall be fixed for the movement of freight cars . . . regardless of distance."  *See* ECF No. 1-1.  But historically NPBL has not treated that provision as requiring the same rates for different services and has charged various different rates for different services, including rates that vary by commodity type and international versus domestic business.

24.    The Operating Agreement also provides that the NPBL rate may be "adjusted from time to time as to yield a net revenue sufficient to pay . . . a dividend of six per cent" to its owners.  *See*  ECF No. 1-1 at 6.  But nothing in the Operating Agreement prohibits NPBL from earning revenues in excess of the 6% dividend, and NPBL's own documents state that profitability is one of its goals.

25.    NPBL periodically convenes rate committees, purportedly to evaluate and propose adjustments to the NPBL switch rate.  Historically, these committees have been comprised of NPBL management and NS and CSX personnel.  Rate committees are not required, however, to set rates and NPBL is capable of setting rates without a rate committee.

26.    NS has long used NPBL rate committees to monitor CSX's activities in the region and preserve its control of NIT access.

### a.   *The 2009 Rate Committee*

27.    In 2009, NPBL convened a rate committee to review tariff changes necessary to automate billing through NS's computer systems, as well as attract new business to alleviate serious cash flow concerns, which resulted in large part from a decline in switching revenues.

28.    As part of the discussion, CSX submitted a written proposal whereby NPBL would reduce its rate to allow for CSX intermodal traffic to NIT, which by increasing NPBL's revenues addressed those concerns.

29.    The NS-appointed members of the NPBL rate committee had a different goal—to maintain NS's "superior" position at POV by ensuring that CSX did not obtain access to on-dock rail at NIT via NPBL.

30.    Two days before the rate committee's July 2009 meeting, NS intermodal executives drafted a letter to the NS-appointed members of the NPBL Board, which described CSX's "incursion" into the Hampton Roads market, including by offering competitive prices to NS's "long-term" customers.  Though the rate committee had yet to meet, the letter included NS's assumption that the committee would ultimately send a "split" recommendation to the NPBL Board about whether to reduce the switch rate applicable to CSX traffic to NIT.  The letter recommended that the NS-appointed NPBL Board members exercise their "controlling vote" on the NPBL Board in NS's best interest—in other words, to limit CSX's ability to compete in the market.

31.    At the July 29, 2009 rate committee meeting, NPBL management made several proposals to the committee.  First, management recommended replacing the existing $243 domestic rate and the $148.50 import/export rate with a single $210 line-haul switch rate.  The unitary rate was not recommended by NPBL—not out of concern for any perceived violation of

the "uniform rate" provision in the NPBL Operating Agreement, but because the NS accounting systems used by the Belt Line struggled to handle the two-tiered structure.

32.     NPBL management also recommended adopting a $75 per car rate for "unit trains," i.e., trains moving more than forty cars to one destination under a single waybill.[4]  Management developed this rate by reviewing rates charged by other short lines for similar services and evaluating NPBL's costs in a "worst case" scenario.

33.     CSX expressed interest in adopting this rate to move trains of intermodal freight to and from NIT, though these moves involved multiple waybills.  NPBL management said that it was not opposed to dropping the "one waybill" requirement for this traffic.

34.     Within days of this meeting, NS's Luebbers sent NS rate committee members McLemore and Cronk his draft recommendations, including that the NPBL Board should recommend the rate committee explore a "zoned" rate structure—a proposal that would increase the rate for CSX's traffic to NIT.   Luebbers also directed the NS rate committee members to develop pretextual justifications for recommending "against the $75 unit train per car rate" proposed by NPBL management.

35.     During the next rate committee meeting, CSX committee members supported the consolidated $210 rate and the $75 per car unit train rate proposed by NPBL management. CSX also explained that it wanted to develop an operating plan to move regular volumes to NIT at the $75 per car rate.

36.     NS rate committee members opposed the $75 rate, questioning whether the analysis conducted by NPBL management that showed the $75 rate was appropriate and profitable was

---

[4] NPBL initially proposed a lower "unit train" rate because moving traffic under a single waybill (i.e., as a "unit") results in fewer administrative and operational costs than moving traffic under multiple waybills.

"sufficient."  After NS raised this issue, management suggested it would reconsider its evaluation, stating that maybe its analysis had not actually accounted for "the worst case" scenario.  NS rate committee members encouraged NPBL to negotiate "special deals" on a case-by-case basis after reviewing proposed operating plans and cost analyses, rather than incorporating the $75 rate into the tariff.

37.     Following this meeting, the CSX-appointed members of the NPBL rate committee submitted a formal recommendation to the NPBL Board, including an economic and operational analysis supporting the $75 per car unit train rate proposed by Belt Line management.  CSX also proposed adding a volume-based discount to the line-haul tariff, to increase NPBL's revenue and "sharply enhance [NPBL's] business prospects and competitive offerings."

38.     The NS-appointed rate committee members submitted a formal recommendation opposing the $75 rate.  They recommended the NPBL Board disapprove this rate because "management ha[d] not provided a detailed business, operating and financial plan outlining the benefits to NPBL . . . ."

39.     In December 2009, NPBL management presented the Board with proposed tariff changes, including the $210 line-haul rate but not the $75 per car unit train rate or the volume-based discount proposed by CSX.  The three NS-appointed NPBL directors voted to adopt the changes in the NPBL proposed tariff.  Neither CSX-appointed director voted to approve the tariff. Id.  The $210 rate became effective on January 1, 2010, and it remains in effect today.

40.     The Belt Line's $210 switching rate is substantially higher than rates charged by other terminal switching railroads for similar services.

### b.  CSX's 2010 Proposal

41.    In early 2010, in response to NS's purported desire to review a "detailed business, operating, and financial plan," CSX developed a comprehensive plan to access on-dock intermodal container service at NIT via NPBL.  *See* ECF No. 1-5 at 8-15 ("2010 Proposal").  In the 2010 Proposal, CSX proposed paying NPBL $37.50 per container for intermodal traffic to and from NIT, a rate higher than that charged it by Commonwealth Railway ("CWRY"), the short line providing switching services to NS and CSX at VIG, the terminal just across the Elizabeth River from NIT.  To reduce any risk to NPBL, CSX included a volume commitment and offered to allow NPBL to use CSX's locomotives and fuel for free.  The 2010 Proposal also included a detailed operating plan.  Given NS's recommendation that NPBL should negotiate "special deals" instead of a tariff, CSX offered in the 2010 Proposal to memorialize the proposed terms in a contract, though nothing in the proposal was inconsistent with the rate being applied to other NPBL customers.

42.    NPBL management raised questions about the 2010 Proposal, including whether it would require hiring more personnel and might conflict with the Operating Agreement's "uniform rate" provision and a prohibition on "foreign" locomotives in the NPBL by-laws.

43.    CSX promptly responded to these concerns, explaining that it was not opposed to the proposed rate being incorporated into NPBL's tariff or NPBL using its own locomotives (which are leased from NS).  This response addressed NPBL's concerns.

44.    Shortly after CSX submitted the 2010 Proposal, NS began to "review" it.  NS's Chris Luebbers—an intermodal sales and marketing manager with no operational experience and no affiliation with NPBL—took the lead.  Over the next several weeks, NS employees worked to

identify economic and operational barriers that could be used to "argue" against the proposal, including route timing and terminal congestion.

45.     At the September 8, 2010 NPBL Board meeting, NPBL management presented the 2010 Proposal to the Board.  The Board directed management "to work with NS to evaluate the operating plan" and to "perform a financial evaluation should CSXT locomotives not be used." Management was to report back "in 30 days."  Despite these statements, handwritten meeting notes from an unidentified NS-appointed NPBL director reflect that NS had no intention of fairly assessing the proposal.

46.     On October 8, 2010, NPBL President David Stinson relayed to the NPBL Board that NPBL management had met with NS operations to evaluate the 2010 Proposal, and that he would update the Board within 30 days after receiving additional information from NS.  Sixty days later, NS had still not provided Stinson the information.

47.     On December 27, 2010, the CSX-appointed members of the NPBL Board sent a memorandum to the Board, requesting that it (1) act to remove any barriers preventing fair consideration of the 2010 Proposal, and (2) direct NS to conclude its operational review of the 2010 Proposal no later than March 30, 2011.

48.     At the December 29, 2010 NPBL Board meeting, Stinson presented "a financial comparison" of the 2010 Proposal "using CSXT locomotives and NS locomotives leased by NPBL."  Management's analysis showed that the proposal would result in positive net income to NPBL under either scenario.

49.     Following discussion, a motion was made and seconded that NPBL be allowed to use CSX locomotives in service to NIT.  Before a vote could be taken, however, NS-appointed members of the NPBL Board moved to table the vote "pending receipt of the operational review

by [NS]."  The motion at first did not pass because Stinson voted against it, along with the two CSX-appointed directors.  An amended motion to table the vote, which promised that NS's review would be completed by March 1, 2011, and would "address the proposal for locomotive use," was unanimously approved.

50.     On March 1, 2011, NS's Jeff Yates rejected Stinson's request for service to NIT in connection with the 2010 Proposal.  This letter does not mention (much less "address") the CSX locomotive issue discussed at the December Board meeting.

51.     On April 11, 2011—approximately eight months after CSX's proposal was tendered to NPBL for consideration—NS-appointed NPBL director Jake Allison emailed NPBL's Donna Coleman, stating for the first time that the NS-appointed directors believed the Belt Line's by-laws "d[o] not allow the Board of Directors to make an exception to the Bylaw's provision that 'no other locomotives than those of the Company shall be allowed to use its tracks,'" and that, "[a]s a result, we do not believe this is an appropriate action item for the Board of Directors." Allison also said the NS directors did not believe the Board could override the "uniform rate" provision of the Operating Agreement, despite having done so repeatedly in the past, and contrary to NS's recommendation in October 2009 that NPBL should negotiate "special deals" rather than amend its tariff.

52.     At the April 2011 NPBL Board meeting, a vote was requested on the motion about NPBL's use of CSX's locomotives.  The motion did not pass because all NS-appointed Board members voted against it.

53.     Soon after, in 2011, NS removed Stinson as president and replaced him with current NPBL President Cannon Moss, who had been employed in a business development role at NS.

CSX proposed an alternative candidate, Tony MacDonald, but the NS-appointed members of the NPBL Board installed Moss over CSX's objections.

54.     After Moss was instated as NPBL President, NS's Jeff Heller instructed NS international intermodal personnel to establish and foster a relationship with Moss, including by taking Moss out to meals, so that they could gain information from Moss related to CSX's efforts to access NIT via NPBL and other actions in the POV area.

### c. Defendants' Logistical & Operational Obstacles to NIT Access

55.     In 2008, NS discontinued service on a segment of track located near NIT, often called the "Diamond," where NPBL had maintained trackage rights. The Diamond had allowed NPBL to access NIT via "an efficient, progressive move."  Without it, NPBL trains carrying CSX intermodal freight must travel a longer distance and move into NS's Portlock Yard, where engines have to be attached to the back of the train before proceeding along NS's track (where NPBL has trackage rights) to NIT.  As the Port of Virginia has recognized, elimination of the Diamond increased CSX's operational costs to access NIT.

56.     In 2009, NPBL rejected CSX's offer to purchase the Belt Line's Port Norfolk Yard (also known as "Pinner's Point"), despite NPBL's declining revenues and stated need to increase its cash flow.  NS identified CSX's offer to purchase this property as a threat, because it would have "provide[d] CSX with necessary capacity to build trains in the port area" near NIT.  [CITE?]

57.     Apart from one unique instance in 2010, NPBL never moved international intermodal traffic for CSX until March 2015. At that time, during a period of extreme port congestion across the East Coast, CSX paid NPBL's $210 rate to move backlogged freight at NIT, accepting that the short-term economic losses were necessary for the greater good of its customers.

58.     To move this traffic, NPBL President Cannon Moss requested that NS provide a window during which NPBL could operate a CSX train across its tracks to NIT.  Notwithstanding the near-emergency conditions at NIT, NS immediately reacted negatively to the request.  NS's VP of Transportation and NS-appointed NPBL Board member Terry Evans responded: "Cannon, What is this and what are the details and until I fully understand the answer [is] no!"

59.     Although NS eventually agreed to provide an operating window for one train, it voiced "strong concerns" about the detrimental impact of this traffic on existing NS customers.  NS outlined strict parameters restricting how and when NPBL and VIT were to move this single train.  VIT personnel viewed NS's concerns as exaggerated.

60.     After the first train in April 2015, CSX tried to use NPBL to move other international intermodal freight to and from NIT, but NS imposed serious difficulties, repeatedly refusing to provide operating windows based on vague, unexplained "proprietary issues."

61.     Moss kept NS's Chris Luebbers—an NS intermodal sales person with no operational role—apprised of CSX's attempts to use NPBL to access NIT, so that Luebbers would be aware of how CSX's attempts to move traffic via NPBL would impact NS and its customers.

62.     NPBL ultimately moved a small number of international intermodal trains for CSX over a period of several months in 2015.  Due to the onerous restrictions and inexplicable delays imposed by Defendants, CSX lost business from customers who could not be adequately and reliably serviced without on-dock access at NIT.  This experience demonstrated to customers that NPBL's service to NIT was not timely or reliable.

63.     In June 2015, NPBL's Moss emailed CSX's MacDonald to inquire whether CSX intended to continue moving intermodal freight to NIT via NPBL.  According to Moss, without

these moves, the Belt Line would struggle financially and Moss would have to lay off NPBL employees.

### d.  Defendants' Ongoing Trackage Rights "Dispute"

64.    In July 2015, shortly after CSX tried to access NIT using NPBL, NS internally worked to "develop a strategy moving forward" with respect to the trackage rights agreements between NPBL and NS.  NS's Chris Luebbers was tasked by his boss Jeff Heller to work on this trackage rights issue, despite having no prior experience working on trackage rights agreements.

65.    NS provided notice to NPBL on July 31, 2015—just a few months after CSX's efforts to use NPBL to access NIT—that NS intended to cancel NPBL's trackage rights over NS leading into NIT, which had been in existence for nearly 100 years, unless the parties could negotiate new agreements to preserve NPBL's access.

66.    Although NS stated externally that it intended for the parties' new trackage rights agreement to afford NPBL materially the same access to NS's tracks, internally it made clear that its purpose was to curtail NPBL's ability to use NS track, including by limiting times of use and inflating the rate charged to NPBL.

67.    Among other aspects of the negotiations, NS demanded a variable trackage rights fee of $70 per car; NPBL proposed $30 per car.  This "dispute"[5] between the two companies was ultimately tendered to the STB for resolution.  STB proceedings to set the amount of trackage rights typically take substantial periods of time to resolve.  During this time, the Defendants would be able to—and ultimately did—use the uncertainty of the trackage rights dispute as a basis to question and delay any rate proposal tendered by CSX.

---

[5] This "dispute" was pretextual.  NS and NPBL have since admitted in STB proceedings that NS was (unlawfully) controlling NPBL throughout this entire period.

68.     After Defendants purportedly reached an impasse in their negotiations, NS initiated a proceeding at the Surface Transportation Board ("STB"), seeking to have the STB set an appropriate trackage rights fee.

69.     Defendants' trackage rights dispute remains pending and is stayed pending resolution of this action.

### e.  CSX's 2018 Service & Governance Proposals

70.     On March 23, 2018, CSX sent NPBL management a Rate Proposal for Long Term Rail Service to NIT.  *See* ECF No. 1-5 ("2018 Proposal").  CSX proposed a switch rate of $80 per car, loaded or empty, for international intermodal containers moving to or from NIT, with a guaranteed minimum of 18,000 cars per year.

71.     NPBL Vice President Donna Coleman did a "back-of-the envelope financial evaluation" of the 2018 Proposal, which she discussed with President Cannon Moss.  Her calculations showed net revenue for NPBL per trip under the proposal would be $1,500, not including supervisor costs.  She concluded there was enough "validity" to send the proposal to a rate committee.

72.     On March 28, 2018, NS called an internal meeting to discuss CSX's proposal, including how it would be impacted by NS's ongoing trackage rights "negotiations" with NPBL.  During this internal meeting, NS recognized that NPBL's high tariff rate and NS's proposed trackage rights rate were exclusionary as to CSX's ability to access NIT via NPBL.  NS also recognized that it could control operating windows, which would additionally hinder CSX's ability to access on-dock rail at NIT on commercially reasonable terms.

73.     On April 3, 2018, NPBL personnel asked NS operations employees for permission to "get into NIT, so that they could give quotes to the CSX for moving traffic into and out of NIT." NS refused to allow such access.

74.     On April 5, 2018, NPBL's Moss sent an email to CSX's Tony DiDeo, outlining a few "thoughts" about the 2018 Proposal and noted that NPBL management "would recommend to the board for a rate committee to do a complete review of the tariff." Moss also stated that he did not believe an in-depth analysis of the proposal could occur until the trackage rights dispute with NS was resolved.

75.     On April 6, 2018, CSX sent a letter to NPBL and NS demanding remedial actions at the upcoming meetings of the NPBL Board and Shareholders, including affording CSX equal representation on the Board; adding qualified, independent directors to the Board; replacing members of NPBL management with qualified, independent individuals; and adopting a corporate compliance program independent of that adopted by NS. See ECF No. 1-6.

76.     On April 16, 2018, CSX submitted a list of qualified candidates to serve as independent members of the NPBL Board of Directors, and proposed they be considered for election at the NPBL Shareholders meeting set for April 18.

77.     At the April 18 Shareholders' meeting, CSX proposed the governance changes outlined in its April 6 letter, and recommended interim officers be installed at NPBL until the transition was completed. The proposal failed when NS voted its 57% majority shares against it.

78.     One NS-appointed NPBL Board member conceded that several of CSX's requests for corporate governance changes were reasonable, but confirmed the Board ultimately took no action in response.

79.    At its April 18, 2018 meeting, the NPBL Board did not discuss the 2018 Proposal and did not vote to form a rate committee to analyze the tariff or the proposal.  Given the prior experiences with NS majority rate committees, the CSX-appointed directors requested that the Board appoint an independent committee to review and evaluate the 2018 Proposal.  The NS-appointed directors refused, citing purported "conflicts" with NPBL's governing documents.

80.    Shortly before this Board meeting, VPA sent NPBL a letter emphasizing the importance of dual on-dock rail access to POV's competitive position in the international intermodal freight industry, and asking NPBL to offer a competitive rate for service to NIT.  The day after the NPBL Board meeting, NPBL's Moss responded by letter, indicating that NPBL would continue to offer service to NPBL at its existing $210 tariff rate.

81.    As a result, by mid-2018, both CSX and VPA had exhausted all potential alternatives that would provide CSX with commercially reasonable access to on-dock rail at NIT despite Defendants' ongoing and extensive efforts to block that access.  As a result, CSX had no choice but to seek relief from this Court by filing a Complaint seeking, among other things, injunctive relief to prevent ongoing and future harm caused by Defendants' conspiracy and monopolization.

### f.    STB Referral Proceedings

82.    In May 2021, this Court denied NS's motion for judgment on the pleadings, but granted NS's request to refer to the STB the question of whether the STB had authorized NS to "control" NPBL in connection with prior consolidation proceedings, rendering NS "immune" from CSX's antitrust claims.  *See* ECF No. 395.

83.    In the STB proceeding, NS asserted that, in approving a consolidation in 1982, the ICC (the STB's predecessor) had "authorized NSC to acquire indirect control of [NPBL]," which

"included immunity from the antitrust laws as necessary for NSC to exercise that control." NS further represented that it had, in fact, controlled NPBL since that time.

84.     In the STB proceeding, NPBL likewise asserted that NS has exercised control over NPBL since the 1982 consolidation decision, and requested, if the STB had *not* intended in that decision to authorize NS to control NPBL, that it do so now. As a result, since the institution of this lawsuit, NPBL has expressed the desire to the STB that NS be given the authority to control it.

85.     The STB rejected Defendants' control argument, finding that NS was not authorized to "control" NPBL in connection with the 1982 consolidation, or any events thereafter.

## IV.     The International Intermodal Transportation Market

86.     Ocean carriers shipping containers of goods to and from the United States enter into multi-year contracts with a single railroad, under which that railroad handles the vast majority of rail movements for that carrier across a geographic portfolio (e.g., all containers moving by rail to and from East Coast ports). Each of these contracts is worth tens—if not hundreds—of millions of dollars.[6]

87.     Ocean carriers issue Requests for Proposals ("RFPs") to CSX and NS, identifying a volume of international intermodal containers to be moved by rail in particular "lanes" (i.e., port to destination pairs).

88.     Ocean carriers' decisions about which ports to call on depend on a variety of factors, including port costs, vessel productivity, and proximity to significant local markets.

---

[6] CSX and NS also compete for *domestic* intermodal business, which involves transportation of cargo between two points within the United States. Domestic intermodal business is not at issue in this case.

89.     Vessel routing also depends in large part on ocean carrier alliances, in which multiple carriers enter into multi-year agreements under which they share a single vessel to reduce costs and increase efficiency.

90.     Rail rates and route structure are among the least important factors considered by carriers when determining at which ports to call.

91.     NS's and CSX's data confirm that ocean carriers move international intermodal containers to and from the same inland destinations through multiple ports, even when rail rates at those ports vary significantly.

92.     To be competitive for contracts with ocean carriers, CSX must offer competitive service at all major ports in a geographic region.   A significant component of competitive rail service is whether a railroad can provide on-dock access at major marine terminals.

### b.      *Drayage is Not an Adequate Substitute*

93.     Because Defendants have blocked CSX's access to on-dock rail by cost and operations, CSX truck each container arriving at NIT individually to a separate location where the container is then loaded onto a rail car—a process called "drayage."

94.     VIT coordinates drayage at NIT and other POV terminals.   The $130 drayage fee is split between VIT and the railroad.

95.     Drayage is an expensive and inefficient alternative to on-dock rail, especially at high-volume terminals.   It adds at least another day to container transit times.

96.     Drayage is a particularly problematic at NIT.   The drayage route to and from NIT follows Hampton Boulevard, a four-lane local road passing directly in front of the Old Dominion University campus.   Local regulations prohibit trucks on Hampton Blvd. "between the hours of 4:00 p.m. and 6:00 a.m."   Street congestion, gate delays, and the limited availability of truckers and chassis also limit the efficiency and reliability of drayage.

97.     Local residents do not like, and complain to their representatives about, the heavy volume of trucks traversing local surface streets to dray containers to and from NIT.

98.     Although there is no formal "cap" on the number of containers that can be drayed, in practice there is a capacity ceiling on what drayage can support. In total, VIT can handle by drayage no more than a fraction of the containers that NS moves for *a single customer* by rail through NIT each year.

99.     Ocean carriers express a strong preference for on-dock rail and view drayage as a significantly inferior option, and NS aggressively protects its reputation as the sole provider of on-dock rail access at NIT.

### c.      Other Ports and Terminals are Not Adequate Substitutes

100.    NIT is the largest and most important marine terminal at the Port of Virginia.  It has six berths, the most of any POV terminal.  It is accessible by a 50-foot navigation channel and can accommodate the largest modern Post-Panamax class vessels.

101.    A second terminal, VIG, is located across the Elizabeth River from NIT.  Although a recent expansion increased VIG's annual throughput capacity, VIG remains more constrained because it has only three berths—half the number at NIT.  Both CSX and NS access on-dock rail at VIG via the Commonwealth Railway ("CWRY").

102.    A third terminal, Portsmouth Marine Terminal ("PMT"), is smaller and cannot accommodate the largest modern container ships.  PMT was closed from 2010 to 2013, but reopened in 2014 to handle "overflow" traffic while expansion efforts were underway at VIG and NIT.  PMT was closed again in 2018, and VIT has no plans to re-open it for container cargo.  When operational, PMT could handle a small fraction of the container traffic handled at VIG or NIT.

103.    VIT determines at which terminal a vessel will call.  In making this decision, the most important factor considered is berth window, followed by the volume of containers to be

discharged and loaded. After those factors, VIT considers railroad alignment (i.e., whether containers will be moved by NS or CSX). Once VIT places a vessel string (i.e., a series of vessels traveling a defined route) at a particular terminal, all ships in that string are generally directed to that same terminal. VIT retains discretion to direct traffic to either terminal as needed, including, for example, to alleviate port congestion or address a lack of berth availability.

104.   Empirical data show that ocean carrier volumes do not shift from NIT to VIG following a change in railroad alignment from NS to CSX or vice versa.

### d.    End-to-End Trucking is Not Part of the Relevant Market

105.   Trucks carry international intermodal containers outside the Virginia area only in special circumstances, such as an urgent need or high-value product. This amounts to a very small percentage of the business, in the low single digits.

106.   Trucking is thus not a competitive alternative for the vast majority of international intermodal traffic traveling to and from destinations more than 200 to 500 miles from NIT, including Midwest destinations competitively served by NS and CSX such as Chicago, Columbus, and Detroit.

## CONCLUSIONS OF LAW

### I.    Jurisdiction and Venue

1.    This Court has subject matter jurisdiction over this action, including for the issuance of injunctive relief, under 28 U.S.C. § 1331 because CSX's claims arise under Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1, 2, and therefore present federal questions. The Court's jurisdiction to award injunctive relief on CSX's federal claims is not divested in this case by 15 U.S.C. § 26. The Court has supplemental subject matter jurisdiction over CSX's state law conspiracy and breach of contract claims, including CSX's request for injunctive relief on those claims, under 28 U.S.C. § 1367.

2.      Jurisdiction is not preempted by the Interstate Commerce Commission Termination Act of 1995 ("ICCTA").  *See* ECF No. 66 at 19-25 (holding NPBL's jurisdictional argument based on ICCTA "is meritless").

3.      This Court has personal jurisdiction over Defendants because they are residents of Virginia, regularly conduct business in Virginia, and/or caused injury by acts in Virginia.

4.      Venue is appropriate in this Court under 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to the dispute occurred within this District.

## II.    Applicable Law

### A.    Federal Law

5.      CSX has asserted claims under Sections 1 and 2 of the Sherman Act.  *See* ECF No. 1.  The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace.  The Sherman Act rests on the central premise that competition produces the best allocation of economic resources, the lowest prices, the highest quality, and the greatest material progress, "while at the same time providing an environment conducive to the preservation of our democratic political and social institutions."  *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958); *see also* 1 ABA Section of Antitrust Law, Antitrust Law Developments 1-2 (7th ed. 2012).

6.      Under Section 16 of the Clayton Act, a plaintiff "shall be entitled to sue and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws [including the Sherman Act] . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings . . . ."  15 U.S.C. § 26.

7.      CSX's claim is not barred by Section 16's provision that a plaintiff may not "bring suit for injunctive relief against any common carrier subject to the jurisdiction of the [STB],"

24

because CSX seeks through this action injunctive relief that does not tread on matters over which the STB has exclusive jurisdiction.  *See* ECF No. 559 at 83 n.33; *cf.* ECF No. 66 at 19-25.

8.      To obtain injunctive relief under Section 16 of the Clayton Act, a plaintiff must demonstrate "(1) that it [faces a significant threat of] irreparable [antitrust] injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and the defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 998 F.3d 690, 719 (4th Cir. 2021) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2016)) (alterations in original).  The plaintiff must prove each of these elements by a preponderance of the evidence.  *See Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1182 n.10 (11th Cir. 2007) ("[W]hether a permanent injunction is appropriate . . . turns on whether the plaintiff can establish by a preponderance of the evidence that this form of equitable relief is necessary.").

9.      In evaluating a claim for injunctive relief under Section 16 of the Clayton Act, the court should be guided by the overarching principle that "[t]he Act authorizes injunctive relief in private suits 'not merely to provide private relief, but to serve as well the high purpose of enforcing the antitrust laws'—i.e., protecting competition."  *Steves and Sons*, 998 F.3d at 719 (citing *California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990)).  "[P]rivate enforcement of antitrust laws is an 'integral part of the congressional plan for protecting competition,' so courts may fashion equitable remedies with that broader purpose in mind."  *Id.*

## 1.  **Significant Threat of Irreparable Antitrust Injury**

10.     Courts often consider the first two elements of equitable relief (i.e., the significant threat of antitrust injury and the inadequacy of legal remedies) together.  *See Steves and Sons*, 998

25

F.3d at 719.  To establish these elements, the plaintiff must prove (1) an existing or imminent antitrust violation and (2) existing or imminent antitrust injury—i.e., "threatened loss or damage of the type the antitrust laws were designed to prevent," which "flows from that which makes defendants' acts unlawful," *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 113 (1986), and which "damages couldn't cure."  *Steves and Sons*, 988 F.3d at 719 (citing *eBay*, 547 U.S. at 391) (finding damages for future lost profits inadequate to remedy ongoing antitrust violation, in part because "[a] remedy that helped only [the plaintiff] wouldn't promote competition in the [relevant] market, conflicting with the principle that antitrust law protects competition, not competitors").  Moreover, under the present procedural posture of this case in light of the Court's ruling on summary judgment, the unavailability of monetary damages for past and ongoing harm militates in favor of prospective injunctive relief.  *Cf. SAS Institute, Inc. v. World Programming Ltd.*, 874 F.3d 370, (4th Cir. 2017) (noting that plaintiff's receipt of monetary damages award for past and future losses "undermines its claim of irreparable injury moving forward").[7]

11.     CSX contends that Defendants' past and ongoing conduct violates Sections 1 and 2 of the Sherman Act.  *See* Compl., ECF No. 1 at ¶¶ 77-84 (Conspiracy to Restrain Trade); ¶¶ 85-90 (Conspiracy to Monopolize); ¶¶ 91-97 (Monopolization); ¶¶ 98-104 (Attempted Monopolization).

### a. Sherman Act Section 1 – Conspiracy to Restrain Trade

12.     "To prove a violation of section one of the Sherman Act, 15 U.S.C. § 1, a plaintiff must show the existence of an agreement in the form of a . . . conspiracy that imposes an

---

[7] CSX respectfully disagrees with the Court's Order to the extent it granted summary judgment, and CSX expressly preserves and does not waive its ability to challenge those adverse rulings at an appropriate time.

unreasonable restraint on trade." [8]   *Oksanen v. Page Mem. Hosp.*, 945 F.2d 696, 702 (4th Cir. 1991) (citing 15 U.S.C. § 1).

13.   ***Conspiracy.***   To prove conspiracy, a plaintiff must demonstrate that two or more legally distinct entities knowingly came to an agreement or understanding among themselves to accomplish a common unlawful purpose.[9]   *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (defendants must have made a "conscious commitment to a common scheme designed to achieve an unlawful objective").   The evidence need not show that members of the conspiracy entered into a formal or written agreement; the agreement itself may have been entirely unspoken.   *See Robertson v. Sea Pines Real Est. Cos.*, 679 F.3d 278, 289–90 (4th Cir. 2012); *see also Am. Tobacco Co. v. United States*, 328 U.S. 781, 809-10 (1946) ("No formal agreement is necessary to constitute an unlawful conspiracy.").   The plaintiff may prove the existence of an alleged conspiracy through direct or circumstantial evidence.   *See* ECF No. 559 at 93 (citing *Robertson*, 679 F.3d at 289–90 ("Conspiracies are often tacit or unwritten in an effort to escape detection, thus necessitating resort to circumstantial evidence to suggest than an agreement took place.")).

14.   The conspiracy element of Section 1 "is not negated by the fact that one or more of the co-conspirators acted unwillingly, reluctantly, or only in response to coercion."   *Dickson v.*

---

[8] Claims under the Sherman Act also require proof that the conduct at issue affects interstate or foreign commerce.  *See* 15 U.S.C. § 1.

[9] In deciding whether the defendants are legally distinct, courts "eschew[ ] . . . formalistic distinctions in favor of a functional consideration of how the parties involved in the alleged anticompetitive conduct actually operate."  *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 191 (2010).  "The relevant inquiry . . . is whether there is a [conspiracy] amongst separate economic actors pursuing separate economic interests, such that the agreement deprives the marketplace of independent centers of decision-making."  *Id.* at 195.  Here, the STB has determined on referral that NS and NPBL are separate companies as NS has no lawful authority to control NPBL.

*Microsoft Corp.*, 309 F.3d 193, 205 (4th Cir. 2002) (citation omitted); *see also Va. Vermiculite, Ltd. v. W.R. Grace & Co.,* 156 F.3d 535, 541 (4th Cir. 1998) ("It is not necessary that [one defendant] have shared [the other defendant's] alleged anticompetitive motive in entering into a proscribed restraint; it is sufficient that [the defendant], regardless of its own motive, merely acquiesced in the restraint with the knowledge that it would have anticompetitive effects"); *Duplan Corp. v. Deering Milliken Inc.*, 594 F.2d 979, 982 (4th Cir. 1979) ("Where, as here, the [defendants] were knowing participants in a scheme whose effect was to restrain trade, the fact that their motives were different from or even in conflict with those of the other conspirators is immaterial.").

15.   A corporation acts only through its agents, including its directors, officers, employees, or others acting on its behalf.  A corporation is legally bound by the acts and statements of its agents or employees done or made within the scope of the agent's employment or apparent authority.  *Am. Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 565-66 (1982). An agent may have apparent authority even when, despite these appearances, the agent is actually acting in a dishonest, fraudulent, or anticompetitive manner.  *Id.*  Moreover, a person can act as an agent for one entity for one purpose while acting as an agent of another entity for a different purpose.  *See id.*; *see also Md. Cas. Co. v. Craig*, 194 S.E.2d 729, 731-32 (Va. 1973) (analyzing an agent "acting in a dual capacity").

16.   ***Unreasonable Restraint of Trade.***  Section 1 prohibits *unreasonable* restraints of trade.  *See Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) ("Congress intended to outlaw only unreasonable restraints").  An agreement to restrain trade between or among actual or potential horizontal competitors is *per se* unreasonable.  *See Lumber Liquidators, Inc. v. Cabinets To Go, LLC*, 415 F. Supp. 3d 703, 712 (E.D. Va. 2019) ("Generally, courts consider restraints that are

'horizontal' in nature, or those 'imposed by agreement between competitors' to be 'unreasonable per se.'") (quoting *Ohio v. Am. Express*, 138 S. Ct. 2274, 2283-84 (2018)).

17.     If an agreement to restrain trade is *not* between or among horizontal competitors, it is evaluated under the "rule of reason" standard, which requires the fact-finder to examine "all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T. V, Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977).  The ultimate question is whether the challenged restraint "is such as merely regulates and thereby promotes competition or whether it is such as may suppress or even destroy competition." *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918).  A challenged restraint is unreasonable when "its anticompetitive effects outweigh its procompetitive benefits." *Atl. Richfield Co. v. USA Petrolum Co.*, 495 U.S. 328, 341 (1990); *see also Robertson*, 679 F.3d at 291.

18.     The rule of reason analysis is typically understood "in terms of shifting burdens of proof." *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1019 (10th Cir. 1998).  Under this framework, the plaintiff must initially show that the challenged restraint has or will have "a substantially adverse effect on competition." *Id.*  If the plaintiff does so, the burden shifts to the defendant(s) "to come forward with evidence of the procompetitive virtues of the alleged wrongful conduct." *Id.*  "If the defendant is able to demonstrate procompetitive effects, the plaintiff then must prove that the challenged conduct is not reasonably necessary to achieve the legitimate objectives or that those objectives can be achieved in a substantially less restrictive manner." *Id.*  The fact-finder must then weigh the harms and benefits against each other "to judge whether the challenged behavior is, on balance, reasonable." *Id.*

19.   <u>Anticompetitive Effect</u>.   At the first step, the plaintiff can prove the "anticompetitive effects" of a challenged restraint "in one of two ways—[by showing] an actual adverse effect on competition or sufficient market power to cause an adverse effect on [competition]." *United States v. Charlotte-Mecklenburg Hosp. Auth.*, 248 F. Supp. 3d 720, 728 (W.D.N.C. 2017) (citing *Tops Market, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 96 (2d Cir. 1998)). *See also Law*, 134 F.3d at 1019 ("A plaintiff may establish anticompetitive effect indirectly by proving that the defendant possessed the requisite market power within a defined market or directly by showing actual anticompetitive effects, such as control over output or price.")

20.   "To prove an unreasonable restraint through evidence of direct harm, a plaintiff must offer 'proof of actual detrimental effects," such as a reduction of output, increased prices, or decreased quality. *Id.* (citing *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986), and *W. Penn Allegheny Health Sys.*, 627 F.3d at 100); *see also Ind. Fed'n of Dentists*, 476 U.S. at 460-61 ("Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, 'proof of actual detrimental effects, such as a reduction of output,' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.'"); *Standard Oil Co. v. United States*, 221 U.S. 1, 52–60 (1911) (explaining that restrictions on price and output are paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit).

21.   To prove an unreasonable restraint indirectly, the plaintiff must show that defendant has sufficient market power in the relevant market such that the alleged restraint "has the potential for genuine adverse effects on competition." *Ind. Fed'n of Dentists*, 476 U.S. at 460.  Market power is "the power to force a purchaser to do something that he would not do in a competitive market," *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992), and is often

reflected as the ability to profitably raise prices for a sustained period of time above those that would be charged in a competitive market, *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 109 n.38 (1984).  "[M]arket power, while necessary to show adverse effect indirectly, alone is insufficient." *Tops Market*, 142 F.3d at 97.  The plaintiff must also show "some other ground for believing that the challenged behavior could harm competition in the market, such as the inherent anticompetitive nature of the defendant's behavior or the structure of the [] market." *Id.*

22.     A relevant market consists of two parts—a product or service market and a geographic market.   The product market must include products that are functionally interchangeable—i.e., "those products or services which are reasonably interchangeable by consumers for the same purposes."  *Satellite Television & Associated Res., Inc. v. Cont'l Cablevision of Virginia, Inc.*, 714 F.2d 351, 355 (4th Cir. 1983).  Identifying reasonable substitutes also requires assessment of the "extent to which consumers will change their consumption of one product in response to a price change in another, i.e., the 'cross-elasticity of demand.'"  *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016).  Potential substitutes must be assessed at the competitive price level, because "proof that substitutes will enter a market in response to a meaningful price increase does not prove that the pre-increase price was set at a competitive level."  *In re Loestrin 24 Fe Antitrust Litig.*, MDL No. 2472, 2017 WL 1491911, at *3 (D.R.I. Mar. 15, 2017); *see also United States v. Eastman Kodak Co.*, 63 F.3d 95, 105 (2d Cir. 1995) (describing the so-called "cellophane fallacy," which cautions that "a high cross-elasticity of demand may, in some cases, be the product of monopoly power rather than a belief on the part of consumers that the products are good substitutes for one another").  In deciding the appropriate product market, the fact-finder may also look to "practical indicia" such as "industry or public recognition of the market as a separate economic entity, the product's peculiar characteristics and

31

uses, unique production facilities, distinct consumers, distinct prices, sensitivity to price changes, and specialized vendors." *FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865 (E.D. Miss. 2020) (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).

23.      "The relevant geographic market is the area in which buyers or sellers of the relevant product effectively compete." *Consult, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 495 (4th Cir. 1986).  It is "defined by the 'area within which the defendant's customers . . . can practicably turn to alternative supplies if the defendant were to raise its prices." *It's My Party*, 811 F.3d at 682.  If a customer "can only turn for supplies or purchase their relevant supplies in a narrowly defined market, then that market is the geographic market." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.,* 637 F.3d 435, 442 (4th Cir. 2011).  Analysis of the geographic market should focus "on the commercial realities of the market and competition," including: "where the parties market their products; the size, cumbersomeness, and perishability of the products; regulatory requirements impeding the free flow of competing goods into or out of the area; shipping costs and limitations; the area within which the defendant and its competitors view themselves as competing; and other factors bearing upon where customers might realistically look to buy the product." *Id.*

24.      <u>Competitive Harm</u>.  "Competitive harm" refers to a reduction in competition that results in the loss of one or more benefits of competition, such as lower prices, increased output, or higher product quality.  Determining whether the challenged restraint has produced or is likely to produce competitive harm may involve considering (1) the effect of the restraint on prices, output, product quality, and service; (2) the purpose and nature of the restraint; (3) the nature and structure of the relevant market; (4) the number of competitors in the relevant market and the level of competition among them; and (5) whether one or more of the defendants possesses market

power.  *See* Instruction 3B: Rule of Reason – Proof of Competitive Harm, ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2016).  Though relevant, harm to a plaintiff's business is not enough, by itself, to demonstrate harm to competition.  *Thompson Everett, Inc. v. Nat'l Cable Advertising, L.P.*, 57 F.3d 1317, 1325 (4th Cir. 1995) ("[O]nly injury caused by damage to the competitive process may form the basis of an antitrust claim.").

25.    Once the plaintiff proves (directly or indirectly) that the challenged restraint has or will likely harm competition, the defendant(s) may proffer evidence that the restraint also benefits competition in some way.  *In re K-Dur Antitrust Litig.*, 686 F.3d 197, 209 (3d Cir. 2012); *see also Law*, 134 F.3d at 1021 ("Justifications offered under the rule of reason may be considered only to the extent that they tend to show that, on balance, the challenged restraint enhances competition."). If a defendant proffers sufficient evidence of one or more procompetitive benefits, the fact-finder must determine whether the challenged restraint was reasonably necessary to achieve those benefits.  If the same benefits could have been readily achieved by other, reasonably available alternative means that would have caused less harm to competition, the proffered competitive benefits cannot be used to justify the challenged restraint.  *See In re K-Dur*, 686 F.3d at 209.

26.    If the fact-finder determines that the challenged restraint is reasonably necessary to achieve legitimate procompetitive benefits, the fact-finder must weigh those competitive benefits against the competitive harm resulting from the challenged restraint.  If the competitive harm substantially outweighs the competitive benefits, the challenged restraint is unreasonable and violates Section 1 of the Sherman Act.  *Law*, 134 F.3d at 1019.

### b. <u>Sherman Act Section 2 – Monopolization</u>

27.    Section 2 of the Sherman Act prohibits monopolization, attempted monopolization, and conspiracies to monopolize.  15 U.S.C. § 2.

28.    *Monopolization*.  "To prove a Section 2 monopolization offense, a plaintiff must establish two elements: (1) the possession of monopoly power; and (2) willful acquisition or maintenance of that power—as opposed to simply superior products or historic accidents." *Kolon Indus.,* 637 F.3d at 441.

29.    <u>Monopoly Power.</u>  Monopoly power is ultimately "the power to control prices or exclude competition" in the relevant market.  *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391 (1956). "A company that can exert market power to set prices or exclude competition, without regard to outside market forces, has monopoly power." *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.,* 562 F. Supp. 2d 392, 399 (E.D.N.Y. 2008). "The existence of [monopoly] power ordinarily may be inferred from the predominant share of the market." *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966).  Although no specific market share percentage is determinative, *Kolon Indus., Inc. v. E.I. du Pont de Nemours and Co.*, No. 3:11cv622, 2012 WL 1155218, at *9-11 (E.D. Va. Apr. 5, 2012) (collecting cases), monopoly power has been found where "the defendant controlled seventy to one hundred percent of the relevant market," *Kolon Indus.*, 637 F.3d at 450.  In assessing monopoly power, the fact-finder may also consider other factors, including whether the defendant's market power is durable (i.e., whether it has maintained power over pricing and competition for a significant period of time); barriers to entry in the market; the strength of competition in the market; the defendant's profit margins; and whether the defendant charges supracompetitive prices and/or restricts output. *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 174 (4th Cir. 2014); *Intellectual Ventures I LLC v. Cap. One Fin'l Corp.*, No. 1:13cv740, 2013 WL 6682981, at *4 (E.D. Va. Dec. 18, 2013).

30.   <u>Anticompetitive Conduct.</u>  A plaintiff must also prove that the defendant willfully acquired or maintained monopoly power through anticompetitive means "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). Put differently, "[t]o run afoul of Section 2, a defendant must be guilty of illegal conduct 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'" *Kolon Indus.*, 637 F.3d at 441 (citing *Eastman Kodak Co.*, 504 U.S. at 482-83). "Conduct that might otherwise be lawful may be impermissibly exclusionary under antitrust law when practiced by a monopolist." *Id.* "Indeed, 'a monopolist is not free to take certain actions that a company in a competitive . . . market may take, because there is no market constraint on a monopolist's behavior.'" *Id.* (citing *LePage's, Inc. v. 3M,* 324 F.3d 141, 151–52 (3d Cir.2003) (en banc)). "In analyzing this issue, it is appropriate to examine the economic effects of the challenged conduct on consumers, competitors, and the alleged violator itself." *Adv. Health-Care Servs., Inc. v. Radford Comm. Hosp.*, 910 F.2d 139, 148 (4th Cir. 1990).

31.   "The key to distinguishing legal exclusion from improper, or predatory, exclusion is whether the exclusion was based on superior efficiency." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602-03 (1985). "In analyzing this issue, it is appropriate to examine the economic effects of the challenged conduct on consumers, competitors, and the alleged violator itself." *Adv. Health-Care Servs.*, 910 F.2d at 148. In addition, "evidence of intent" may be relevant "to the question of whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive.'" [10] *Aspen Skiing*, 472 U.S. at 602.

---

[10] Proof of predatory intent to exclude "may be in the form of statements made by the officers or agents of the company . . . or evidence that the conduct was not related to any apparent efficiency." *Id.* at 605 n.39.

32.     "Anticompetitive conduct can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." *Caribbean Broad. Sys. Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998). Courts have found a variety of conduct anticompetitive, including:

- A monopolist's arbitrary refusal to deal, i.e., its "attempt[ ] to exclude rivals on some basis other than efficiency." *Aspen Skiing*, 472 U.S. at 605 (noting that, although "even a firm with monopoly power has no general duty to . . . cooperate with its business rivals," exclusion of a competitor can be predatory and anticompetitive when not supported by legitimate business justifications);

- A monopolist's "denial to competitors of access to its 'essential' goods, services, or resources." *LePage's*, 324 F.3d at 153 (citing *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973) (finding § 2 violation where monopolist utility refused to transfer competitors' power over its lines)); and

- A monopolist's predatory sales tactics. *See, e.g.*, *Conwood Co., LP v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002) (upholding $1.5 billion total jury award on § 2 claims, based in part on evidence that monopolist's sales representatives removed or destroyed competitors' display racks in retail stores, provided misleading information to retailers regarding comparative product sales, entered into exclusive arrangements with retailers in an effort to exclude rivals' products, and trained operatives to take advantage of inattentive store clerks with various "ruses").

33.     Once the plaintiff identifies conduct that it alleges to be anticompetitive, the defendant bears the burden to prove that such conduct in fact serves a procompetitive, efficiency-based purpose. *See LePage's*, 324 F.3d at 164 ("Defendant bears the burden of persuad[ing] the jury that its conduct was justified by any normal business purpose.").  "If a firm has been 'attempting to exclude rivals on some basis other than efficiency,'" however, "it is fair to characterize its behavior as predatory" and anticompetitive. *M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 166 (4th Cir. 1992) (citing *Aspen Skiing*, 472 U.S. at 605).

36

34.    ***Attempted Monopolization.***  A defendant can also be held liable under Section 2 of the Sherman Act for attempted monopolization.  *See* 15 U.S.C. § 2.  "An attempted monopolization offense consists of: (1) the use of anticompetitive conduct; (2) with specific intent to monopolize;[11] and (3) a dangerous probability of success." *Kolon Indus.* 637 F.3d at 441; *see also Am. Tobacco*, 328 U.S.at 785 (an attempt to monopolize employs "methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it.").  To determine whether the alleged attempt to monopolize has a "dangerous probability of success," the fact-finder must evaluate "the relevant product and geographic market and the defendant's economic power in that market," to decide whether there is "a realistic probability that the defendant[] could achieve monopoly power in that market." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993).

35.    ***Conspiracy to Monopolize.***  One or more defendants can also be held liable under Section 2 of the Sherman Act for conspiracy to monopolize.  *See* 15 U.S.C. § 2.  "A Section 2 conspiracy claim has four elements: (1) an agreement to monopolize; (2) an overt act in furtherance of the conspiracy; (3) a specific intent to monopolize; and (4) a causal connection between the conspiracy and the injury alleged." *Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 253 (3d Cir. 2010).  The same general principles of conspiracy and monopolization discussed above apply with equal force to a conspiracy to monopolize claims.

## 2.  <u>Balance of Hardships</u>

36.    The third factor for injunctive relief requires the Court to "balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the

---

[11] Specific intent to monopolize "may be inferred from the defendant's anticompetitive practices." *Kolon Indus.*, 637 F.3d at 453; *see also M&M Med. Supplies*, 981 F.2d at 166.

requested relief." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Not all harms alleged by a defendant are relevant to this analysis.  For example, "loss of profits obtained through anticompetitive conduct is not a valid hardship because it is a product of doing what the antitrust laws require—that is, competing with other firms." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 345 F. Supp. 3d 614, 658 n.21 (E.D. Va. 2018), *vacated in part on other grounds*, 988 F.3d 690 (4th Cir. 2021).

### 3.  <u>Public Interest</u>

37.     The fourth factor for injunctive relief requires the Court to find "that the public interest would not be disserved by a permanent injunction." *eBay*, 547 U.S. at 391.  "The public interest inquiry primarily addresses impact on non-parties rather than parties." *Steves & Sons*, 345 F. Supp. 3d at 662 (citing *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc.*, 725 F.3d 940, 946 (9th Cir. 2013)); *see id.* (noting that courts are reluctant to enter injunctive relief that may cause "concrete harms to innocent third parties").  The Clayton Act's injunctive relief provision makes clear that Congress views "preserving competition" as in the public interest. *See id.*; *see also* 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.4 (3d ed. 1998) ("The public interest ... may be declared in the form of a statute.").   Accordingly, injunctive relief that "restore[s] competition" serves the public interest. *Id.*

### 4.  <u>Affirmative Defenses</u>

38.     Laches is an equitable defense that at times prevents a plaintiff who has "unreasonably 'slept' on his rights" from bringing a claim when the defendant would be "prejudiced by [the] plaintiff's unreasonable delay." *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 121 (4th Cir. 2011). "Laches imposes on the defendant the ultimate burden of proving '(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.'" *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990) (quoting

*Costello v. United States*, 365 U.S. 265, 282 (1961)).  By its nature, laches is inapplicable to claims seeking to enjoin "current, ongoing conduct that threatens future harm." *Id.*  "Inherently, such conduct cannot be so remote in time as to justify the application of the doctrine of laches." *Id.*

### B.  State Law Claims

39.     CSX has also asserted claims for breach of contract and civil conspiracy under Virginia common law, as well as a claim for statutory business conspiracy under Va. Code § 18.2-499, -500.  In its Complaint, CSX sought both damages and injunctive relief on these claims.  *See* ECF No. 1.

40.     The Court granted summary judgment in Defendants' favor on CSX's state law damages claims based on the statute of limitations.  *See* ECF No. 559 at 94-103.  The Court did not, however, grant summary judgment on its state law injunctive relief claims.  *See id.* at 103.  Those claims remain available to redress ongoing and threatened future harm caused by Defendants' conspiracy and breaches of contract.  *See Downey v. Verizon Virginia, LLC*, 86 Va. Cir. 526, 2013 WL 8029458 (Va. Cir. Ct., Green Cnty. July 23, 2013) (in trespass action, holding that the statute of limitations barred plaintiff's claim for damages, but explaining that the court could "consider "whether an injunction of some type should be granted" and that the statute of limitations "would not be a bar to determining whether any injunctive relief would be appropriate"); *see also Boerner v. McCallister*, 197 Va. 169, 171-72 (1955) (explaining that "[a]s a general rule, where an injury committed by one against another is being constantly repeated, so that complainant's remedy at law requires the bringing of successive actions, the legal remedy is inadequate and the trespass will be prevented in equity by an injunction, the prevention of a multiplicity of actions at law being one of the special grounds of equity jurisdiction. This is so, even though each individual act of trespass is in itself trivial, or the damage is trifling, nominal or insubstantial, and despite the fact that no single trespass causes irreparable injury.") (internal

citation omitted); *Armstrong v. Bryant*, 189 Va. 760, 769 (1949) (allowing plaintiff to proceed on equitable relief claim where defendant's conduct was likely to repeat in the future, explaining that if plaintiff "were relegated to a lawsuit it would be difficult for her to establish adequately her claim against [defendant]," as much of the historic unlawful conduct at issue "might be barred by the statute of limitations in an action at law").

41.     To prevail on a claim for civil conspiracy under Virginia law, a plaintiff must prove (1) an agreement between two or more persons (2) to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, which (3) results in damage to the plaintiff. *Borg v. Warren*, 545 F. Supp. 3d 291, 321 (E.D. Va. 2021).

42.     To prevail on a claim for statutory business conspiracy under Va. Code § 18.2-499, -500, a plaintiff must prove by clear and convincing evidence: "(1) concerted action between two or more people; (2) legal malice toward Plaintiff's business; and (3) that the conspiratorial actions caused Plaintiff's business damages." *Rogers v. Deane*, 992 F. Supp. 2d 621, 635 (E.D. Va. 2014).

43.     To prevail on a breach of contract claim under Virginia law, a plaintiff must show a "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004).   Every contract governed by Virginia law includes the implied covenant of good faith and fair dealing.   *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 450 (E.D. Va. 2009).   A defendant is also liable for breach of contract if it exercised its "contractual discretion in bad faith." *Morrison v. Wells Fargo Bank, N.A.*, 30 F. Supp. 3d 449, 456 (E.D. Va. 2014).   Courts have also held that the covenant is breached when a party has "act[ed] in such a manner as to prevent the other party from performing his

obligations under the contract." *E. Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 183 (4th Cir. 2000).

44.     Under Virginia law, injunctive relief is available when a plaintiff "show[s] irreparable harm and the lack of an adequate remedy at law." *Preferred Sys. Sols., Inc. v. GP Consulting, LLC*, 284 Va. 382, 401, 732 S.E.2d 676, 686 (2012) (quoting *Black & White Cars v. Groome Transp.*, 247 Va. 426, 431, 442 S.E.2d 391, 395 (1994)).

## III.    Analysis and Rulings

45.     For the reasons that follow, the Court will enter judgment and permanent injunctive relief in CSX's favor.

46.     As the Court has previously held, this Court has authority to issue injunctive relief on CSX's claims for relief under Section 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2), as provided by Section 16 of the Clayton Act (15 U.S.C. § 26), without treading on matters within the exclusive jurisdiction of the STB.  *See* ECF No. 66 at 19-25, ECF No. 559 at 83 n.33.  This Court also has authority to issue injunctive relief on CSX's state law claims for the reasons set forth above.

### A.     *Liability*

47.     CSX is entitled to injunctive relief under Section 16 of the Clayton Act.

48.     *First*, CSX has proven by a preponderance of the evidence that it faces a significant threat of irreparable antitrust injury—namely, lost business, profits, and reputational harm arising from Defendants' continued conspiracy and monopolization of the market for on-dock rail access at NIT in violation of Sections 1 and 2 of the Sherman Act.[12]

---

[12] Consistent with the parties' stipulation, the Court finds that the conduct at issue has an effect on interstate commerce.  *See* ECF No. 517-1 at 1.

49.     CSX has asserted claims under Sherman Act Section 1 (conspiracy to restrain trade) and Section 2 (monopolization).  Although these violations are distinct, the inquiry as to whether an agreement is an "unreasonable restraint of trade" in violation of § 1 and the inquiry as to whether conduct is exclusionary under § 2 substantially overlap.  *See United States v. Socony-Vacuum Oil Co*., 310 U.S. 150, 224 n.59 (1940).  Accordingly, the Court considers common issues together where applicable in this analysis.

50.     The Court finds that the relevant market is the market for on-dock rail at NIT.  There are no reasonable substitutes for on-dock rail at NIT.  Contrary to Defendants' contentions, the Court finds that CSX's and NS's customers (i.e., ocean carriers) do not consider drayage an adequate substitute to on-dock rail generally, and further find drayage to be a particularly inferior substitute at NIT.  This is confirmed by the evidence of many limitations on the drayage capacity— including the limited availability of drivers and chassis, the congested drayage route, and the NIT gate hours and local regulations limiting truck traffic on the drayage route—which mean that CSX can dray no more than a fraction of the containers that NS moves by rail at NIT.

51.     On-dock rail at NIT also cannot be substituted with on-dock rail at VIG.  The evidence shows that VIT ultimately controls to which ship a terminal is routed, and it makes that decision based on factors other than railroad alignment.  Nor can ocean carriers avoid on-dock rail at NIT by shifting their container traffic to other East Coast ports.  Testimony at trial shows that carriers' routing decisions depend on many factors other than rail pricing, routes, or alignment.  This is confirmed by empirical data which shows that ocean carriers consistently move containers to the same destination through multiple East Coast ports, even when prices differ significantly between those ports.

52.     Finally, end-to-end truck transportation does not compete with rail for international intermodal container traffic traveling more than 200-500 miles to its final destination.  The vast majority of lanes for which ocean carriers issue RFPs involve distances greater than 500 miles.

53.     For these reasons, the Court concludes that the relevant market is on-dock rail access at NIT.

54.     The Court finds that NS and NPBL knowingly and willfully conspired to prevent CSX from gaining access to the relevant market in order to maintain NS's monopoly over that market.  NS and NPBL are legally distinct entities, as the STB has confirmed, and NS-appointed board members and NPBL senior management owed fiduciary duties to NPBL.  The record, however, contains substantial evidence—including communications between NS personnel and NPBL management and NS-appointed members of the NPBL Board acting in that capacity— showing that Defendants specifically intended to act in concert to prevent CSX from accessing on-dock rail at NIT.

55.     Defendants have engaged in numerous acts in furtherance of this conspiratorial agreement, including but not limited to (1) raising NPBL's switch rate to a level that is preclusive and exclusionary in comparison to rates charged by other switching railroads for similar services, and which the evidence does not show is necessary to cover NPBL's costs; (2) rejecting CSX's proposals that would have allowed CSX to move traffic to NIT at a lower rate while covering NPBL's costs and generating additional revenues, consistent with NPBL's stated desire to increase revenues and avoid financial difficulties; and (3) imposing unnecessary logistical and operational barriers to prevent CSX from accessing NIT via NPBL on operationally and commercially reasonable terms.  The record contains no evidence reflecting that Defendants have abandoned this course of conspiratorial conduct or will do so in the future.  The Court finds laches is inapplicable

to the requested injunctive relief and even assuming it was properly asserted and not waived, Defendants have not carried their burden in proving its application.

56.     In addition, the record evidence supports that NS has achieved and maintained monopoly power in the relevant market through other anticompetitive means such as (1) removing critical rail infrastructure, (2) imposing unreasonable operational and logistical barriers on CSX's ability to access NIT by rail via NPBL, (3) canceling NPBL's trackage rights in order to impose further barriers on CSX's ability to access NIT, and (4) taking actions intended to and effectively precluding NPBL's full and fair consideration of CSX's 2018 service proposal.

57.     Defendants' conspiratorial and monopolistic conduct has resulted in harm to competition—which will continue to occur in the future absent intervention from this Court. Specifically, Defendants' conduct has allowed NS to obtain and maintain a monopoly in the market for on-dock rail at NIT.  NS has handled the vast majority of the international intermodal traffic at NIT for the past decade.  This monopoly permits NS to charge supracompetitive prices to ocean carriers who rely on NIT intensively.  NS's monopoly has also hindered CSX's ability to compete fairly for international intermodal business, resulting in substantial lost profits and reputational harm.  NS's monopoly also affects the VPA's ability to attract carriers to POV.

58.     For the foregoing reasons, the Court finds that CSX has demonstrated a substantial likelihood of imminent antitrust injury based on Defendants' past and ongoing and threatened violations of Sections 1 and 2 of the Sherman Act.

59.     *Second*, CSX has proven by a preponderance of the evidence that remedies available at law, such as monetary damages, would be inadequate to compensate for this prospective injury. Among other reasons, an award of future damages to CSX would not adequately remedy the harm to ocean carriers and other market participants caused by Defendants'

ongoing anticompetitive conduct. And without injunctive relief, Defendants' anticompetitive, monopolistic conduct will continue unabated, harming CSX, POV, ocean carriers, and the Commonwealth.

60. *Third,* considering the balance of hardships between CSX and Defendants, the Court finds a remedy in equity to be warranted. The hardships articulated by Defendants are primarily those arising from competition on the merits, which are not valid "hardships" under the antitrust laws. In particular, NS has no legal right to continue to profit from its anticompetitive monopoly. And, in any event, Defendants' cited hardships do not outweigh those suffered by CSX and ocean carriers as a result of Defendants' continued conspiracy and monopolization.

61. *Fourth*, the public interest would not be disserved by a permanent injunction. To the contrary, entry of injunctive relief in favor of CSX will promote competition and thereby serve the public interest as espoused in the Sherman and Clayton Acts.

62. For many of the same reasons, CSX is also entitled to injunctive relief under Virginia state law. As explained above, CSX has proven by a preponderance of the evidence that it will suffer irreparable harm as a result of NS's and NPBL's ongoing and threatened future conduct in violation of Virginia state law.

63. Specifically, as described above, CSX has proven by a preponderance of the evidence that Defendants entered into a conspiracy to unlawfully foreclose CSX's access to on-dock rail at NIT, resulting in substantial lost profits to CSX. *See Borg*, 545 F. Supp. 3d at 321.

64. Indeed, CSX has proffered clear and convincing evidence that Defendants conspired with legal malice to harm CSX's business, resulting in significant damage to CSX, as required for CSX to prevail on its claim under Va. Code § 18.2-499, -500.

45

65.     CSX has also proven by a preponderance of the evidence that NS breached its legally enforceable obligations under the NPBL Operating Agreement—including its obligation to "co-operate cordially in encouraging the business of the [NPBL]."  NS has repeatedly breached this obligation by imposing barriers to prevent CSX from using NPBL to access on-dock rail at NIT on commercially reasonable terms, thereby limiting NPBL's ability to earn additional revenue and conduct the very business for which it was originally formed. NS's breaches of the Operating Agreement have resulted in substantial damages to CSX in the form of hundreds of millions of dollars in lost profits.

66.     As described above, because Defendants have not indicated that they have abandoned or intend to abandon their conspiratorial and monopolistic conduct, CSX has demonstrated a substantial likelihood of future irreparable harm that cannot be adequately remedied through monetary damages.

### b.     Injunctive Relief

67.     Having found that CSX is entitled to injunctive relief on its federal and state law claims, the Court hereby ORDERS as follows:

68.     Defendants are enjoined from and shall not continue to violate the federal antitrust laws by engaging in anticompetitive conduct to exclude CSX from the market for on-dock rail at NIT, including but not limited to: (1) conspiring to raise CSX's costs to serve NIT by rail or otherwise impacting CSX's ability to access and serve NIT by rail; (2) allowing NS international intermodal sales personnel to have input into matters influencing the terms of pricing or service provided by NPBL for rail access to NIT; (3) allowing interested NS personnel to participate on NPBL rate committees or otherwise determine or influence the rate to be charged by NPBL for

rail access to NIT; and (4) undertaking anticompetitive actions to delay, obstruct, or limit CSX's ability to access NIT by rail.

69.    NPBL shall have two (2) independent Board members and independent senior management, not formerly employed or affiliated with NS or CSX, and any future rate or service proposal for rail access to NIT will be submitted to, evaluated, and decided by individuals without interests in either NS or CSX.


Dated:  January 12, 2023                          Respectfully submitted,


                                                  **CSX TRANSPORTATION, INC.**
                                                  *By Counsel*

                                                  */s/ Benjamin L. Hatch*
                                                  Robert W. McFarland (VSB No. 24021)
                                                  Benjamin L. Hatch (VSB No. 70116)
                                                  V. Kathleen Dougherty (VSB No. 77294)
                                                  Jeanne Noonan (VSB No. 87863)
                                                  MCGUIREWOODS LLP
                                                  World Trade Center
                                                  101 West Main Street, Suite 9000
                                                  Norfolk, Virginia  23510-1655
                                                  Tel.:  (757) 640-3716
                                                  Fax:  (757) 640-3930
                                                  rmcfarland@mcguirewoods.com
                                                  bhatch@mcguirewoods.com
                                                  vkdougherty@mcguirewoods.com
                                                  jnoonan@mcguirewoods.com

                                                  J. Brent Justus (VSB No. 45525)
                                                  Ashley P. Peterson (VSB No. 87904)
                                                  W. Cole Geddy (VSB No. 93511)
                                                  MCGUIREWOODS LLP
                                                  Gateway Plaza
                                                  800 East Canal Street
                                                  Richmond, Virginia  23219-3916
                                                  Tel.:  (804) 775-1000
                                                  Fax:  (804) 698-2026
                                                  bjustus@mcguirewoods.com

apeterson@mcguirewoods.com
cgeddy@mcguirewoods.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 12th day of January, 2023, a true and correct copy of the foregoing was served on all counsel of record via Notice of Electronic Filing by filing with the Court's CM/ECF system.

**CSX TRANSPORTATION, INC.**
*By Counsel*

<u>/s/ Benjamin L. Hatch</u>
Robert W. McFarland (VSB No. 24021)
Benjamin L. Hatch (VSB No. 70116)
V. Kathleen Dougherty (VSB No. 77294)
Jeanne Noonan (VSB No. 87863)
MCGUIREWOODS LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia  23510-1655
Tel.:  (757) 640-3716
Fax:  (757) 640-3930
rmcfarland@mcguirewoods.com
bhatch@mcguirewoods.com
vkdougherty@mcguirewoods.com
jnoonan@mcguirewoods.com

J. Brent Justus (VSB No. 45525)
Ashley P. Peterson (VSB No. 87904)
W. Cole Geddy (VSB No. 93511)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia  23219-3916
Tel.:  (804) 775-1000
Fax:  (804) 698-2026
bjustus@mcguirewoods.com
apeterson@mcguirewoods.com
cgeddy@mcguirewoods.com