# EXHIBIT F
# Filed Under Seal

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Exhibit F - CSX's Factual Contentions**

In addition to the Stipulation of Undisputed Facts submitted by the Parties, Plaintiff CSX Transportation, Inc.'s factual contentions include the following:

1. CSX and NS compete for international intermodal shipping contracts. Ocean carriers shipping containers of goods to and from the United States enter into multi-year contracts with a single railroad, under which that railroad handles the vast majority of rail movements for that carrier across a geographic portfolio (e.g., all containers moving by rail to and from East Coast ports). Each of these contracts is worth tens—if not hundreds—of millions of dollars.[1]

2. Although NPBL does not compete for ocean carrier business, NPBL and NS are the only two means to access on-dock rail at NIT.

3. For more than two decades, NS and NPBL have conspired to maintain NS's control of intermodal freight moving by rail through NIT by blocking CSX's ability to access on-dock rail at NIT.

**A. Background**

4. NPBL's Operating Agreement, dated July 8, 1897 (the "Operating Agreement") provides that each railroad will have "equal representation" in the Belt Line, *see* ECF No. 1-1, and that each must "co-operate cordially in encouraging the business of the [NPBL]," *id.* at 6.

5. On March 1, 1989, the NPBL's then-existing owners—CSX, Norfolk and Western Railway Company ("NW") and Southern Railway Company ("SR")—entered into a Supplemental Agreement amending the Operating Agreement to allow CSX to appoint two directors and NW and SR to collectively appoint three directors. The 1989 Supplemental Agreement expressly did

---

[1] CSX and NS also compete for *domestic* intermodal business, which involves transportation of cargo between two points within the United States. Domestic intermodal business is not at issue in this case.

not "amend, alter, or affect any other provision of the NPBL Agreement."

6. NW and SR subsequently finalized their merger, becoming NS.

7. NPBL's president is the sixth voting member of the NPBL Board.

8. During the relevant period, the Port of Virginia ("POV"), through its affiliate Virginia International Terminals ("VIT"), operated three marine terminals—Portsmouth Marine Terminal ("PMT"), Virginia International Gateway ("VIG"), and Norfolk International Terminal ("NIT").

9. PMT is the smallest of the POV terminals, and it cannot handle the largest modern container ships. PMT was closed from 2010 to 2013, but reopened in 2014 to handle "overflow" traffic while expansion efforts were underway at VIG and NIT. PMT was closed again in 2018, and VIT has no plans to re-open it for container cargo.

10. VIG has three berths and is the second largest marine terminal at POV. CSX and NS both access on-dock rail at VIG via the Commonwealth Railway ("CWRY"). The current line haul switch rate charged by CWRY is dramatically lower than the rate charged by NPBL for comparable services.

11. NIT, which is located directly across the Elizabeth River from VIG, is the largest marine terminal in POV. It has six berths and is accessible by a 50-foot navigation channel that can accommodate the largest modern Post-Panamax class vessels.

**B. NS and NPBL Conspire to Block CSX at NIT**

12. Since at least 2005, the NS-controlled NPBL Board has installed a former NS employee as the NPBL President. The two most recent past presidents, who served from 2005 to 2011, returned to work at NS following their tenures at the Belt Line, and current NPBL President Cannon Moss has made clear he intends to do the same. Donna Coleman—NPBL's former Vice

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

President, Comptroller, and Corporate Secretary and a non-voting member of the NPBL Board—was also a former NS employee.

13. In 2008, NS discontinued service on a segment of track located near NIT, often called the "Diamond," where NPBL had maintained trackage rights. The Diamond had allowed NPBL to access NIT via an efficient, progressive move. Without it, NPBL trains carrying CSX intermodal freight must travel a longer distance and move into NS's Portlock Yard, where engines have to be attached to the back of the train before proceeding along NS's track (where NPBL has trackage rights) to NIT. As the Port of Virginia has recognized, this raises operational barriers hindering CSX's ability to access NIT via NPBL.

14. In 2009, NPBL rejected CSX's offer to purchase the Belt Line's Port Norfolk Yard (also known as "Pinner's Point"), despite its declining revenues and stated need to increase its cash flow. Although NPBL's then-president, David Stinson, characterized CSX's opening offer as below market value, a third-party appraiser's valuation reflected that the property's value was only modestly higher—and deteriorating. NS viewed CSX's offer to purchase NPBL's Port Norfolk Yard as a threat, because it would have provided CSX with capacity to build trains in the port area near NIT. NS personnel thus directed NS-appointed NPBL directors to ███████████████

███████████████████████████████

15. Defendants have also blocked CSX's access to on-dock rail at NIT through NPBL's switch rate. The Belt Line's current $210 per railcar well switching rate—which applies whether a car is loaded or empty—is substantially higher than rates charged by other switching railroads for similar services. The most obvious comparison is Commonwealth Railway ("CWRY"), which provides terminal switching services to NS and CSX at VIG, directly across the Elizabeth River from NIT. In 2009, CWRY charged CSX $████ per container for switching services—nearly █

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

*times less* than NPBL's $210 per well rate. Today, NPBL's rate remains nearly ▮ as high as CWRY's, even when accounting for the ability to "double-stack" containers.[2] NPBL's $210 per well rate is also significantly higher than the rates charged by terminal switching railroads handling intermodal traffic at other East Coast ports, which generally range from $▮ to $▮ per container.

16. Contemporaneous analyses from both CSX and NPBL reflect that NPBL would gain revenue *and* make a profit if it charged a more competitive rate for intermodal traffic, such as the rates proposed in the 2010 Proposal and the 2018 Proposal.

17. CSX has paid NPBL's $210 tariff rate to move "carload" or "dimensional" traffic. Comparing carload or dimensional freight to intermodal container traffic is "apples to oranges," however, because the markets for these commodities are different. NPBL could offer a reduced rate for intermodal traffic without lowering the switch rate applicable to other types of traffic.

### C. The 2009 Rate Committee

18. NPBL has from time to time elected to convene rate committees to evaluate and propose adjustments to NPBL's switch rate. Historically, these committees have been comprised of NPBL management and NS and CSX personnel. NS has long used NPBL rate committees to monitor CSX's activities in the region and preserve its control of NIT.

19. In 2009, NPBL convened a rate committee to review tariff changes necessary to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ As part of this discussion, CSX recommended NPBL reduce

---

[2] "Double-stacking" refers to the ability to load more than one container on a railcar well. CSX gained "double-stack" capabilities at POV in December 2016. A variety of factors limit the number of containers that can be loaded per well, and CSX averages fewer than two per well under normal operating circumstances.

its rate to allow for CSX intermodal traffic to NIT, which would increase NPBL's revenues and profits.

20. NS rate committee members, on the other hand, internally discussed how to combat CSX's position on NPBL's rate for switching services at NIT, as well as other strategy points to limit CSX's ability to access NIT. NS intermodal executives recommended that NS-appointed NPBL Board members take action in their capacity as NPBL Board members that would protect NS's interests, without regard to the independent interests of NPBL. Specifically, they recommended that the NS-appointed board members use their "█████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████."

21. At the July 29, 2009 rate committee meeting, NPBL management made several proposals to the committee. First, management recommended replacing the existing $243 domestic rate and the $148.50 import/export rate with a single $210 line-haul switch rate—not out of concern for any perceived violation of the NPBL Operating Agreement, but because the NS accounting systems used by the Belt Line could not handle the two-tiered structure.

22. NPBL management also recommended adopting a $75 per car rate for "unit trains," i.e., trains moving more than forty cars to one destination under a single waybill. Management developed this rate by reviewing rates charged by other short lines for similar services and evaluating NPBL's costs in a "worst case" scenario.

23. CSX expressed interest in using this rate to move trains of intermodal freight to and from NIT, though these moves involved multiple waybills. NPBL management said that it was not opposed to dropping the "one waybill" requirement for this traffic.

24. Within days of this meeting, NS rate committee members took on the "█████"

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

of developing "█████████████████████████████" to reject the $75 unit train per car rate proposed by NPBL management, so that the NS-appointed members of the NPBL Board would "█████████" rejecting the rate that would allow CSX to access on-dock rail at NIT via NPBL.

25. During the next rate committee meeting, CSX committee members supported the consolidated $210 rate *and* the $75 per car unit train rate proposed by NPBL management. CSX also explained that it wanted to develop an operating plan to move regular volumes to NIT at the $75 per car rate.

26. NS rate committee members opposed the $75 rate, questioning whether the analysis conducted by NPBL management was sufficient. NS rate committee members encouraged NPBL to negotiate "████████████████████████████████████████████████████" rather than incorporating the $75 rate into the tariff.

27. Following this meeting, the CSX-appointed members of the NPBL rate committee submitted a formal recommendation to the NPBL Board, including an economic and operational analysis supporting the $75 per car unit train rate proposed by Belt Line management. CSX also proposed adding a volume-based discount to the line-haul tariff, to increase NPBL's revenue and profits and enhance NPBL's business prospects.

28. The NS-appointed rate committee members submitted a formal recommendation opposing the $75 rate. They recommended the NPBL Board disapprove this rate, purported because NPBL management had not provided a detailed business, operating, and financial plan outlining the benefits to NPBL.

29. In December 2009, NPBL management presented the Board with proposed tariff changes, including the $210 line-haul rate but *not* the $75 per car unit train rate or the volume-based discount proposed by CSX. The three NS-appointed NPBL directors voted to adopt the

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

changes in the NPBL proposed tariff "██████████████████████████████████." Neither CSX-appointed director voted to approve the tariff.

### D. CSX's 2010 Proposal

30. In early 2010, CSX submitted to NPBL a proposal to access on-dock intermodal container service at NIT via NPBL. *See* NPBL007431 ("2010 Proposal"). CSX's 2010 Proposal included a comprehensive plan to access on-dock intermodal container service at NIT via NPBL. CSX's proposed rate of $37.50 per container was higher than the rate charged by Commonwealth Railway ("CWRY"), the short line providing switching services to NS and CSX at VIG, the terminal just across the Elizabeth River from NIT. To reduce any risk to NPBL, CSX also included a volume commitment, and offered to allow NPBL to use CSX's locomotives and fuel for free. The 2010 Proposal also included a detailed operating plan. Given NS's recommendation that NPBL should negotiate "████████" instead of a tariff, CSX offered in the 2010 Proposal to memorialize the proposed terms in a contract; however, nothing in the proposal was inconsistent with the rate being applied to other NPBL customers.

31. David Stinson, then-president of the Belt Line, responded to the 2010 Proposal on August 5, 2010, questioning whether the proposal complied with the Operating Agreement's "uniform rate" provision, as well as a prohibition on "foreign" locomotives in the NPBL by-laws. CSX promptly addressed Stinson's concerns, explaining that it was not opposed to the proposed rate being incorporated into NPBL's tariff or NPBL using its own locomotives (which are leased from NS). This response addressed Stinson's concerns.

32. At the September 8, 2010 NPBL Board meeting, NPBL management presented the 2010 Proposal to the Board. The Board directed management to ████████████████████ ████████████████████████████████████. Despite these statements, internal NS

7

documents reflect that NS had no intention of fairly assessing the proposal. To the contrary, NS personnel explicitly worked to identify economic and operational barriers that could be used to deny the proposal, including route timing and terminal congestion.

33. On October 8, 2010, Stinson relayed to the NPBL Board that management had met with NS operations to evaluate the 2010 Proposal, and that he would update the Board within 30 days after receiving additional information from NS. Sixty days later, however, NS had still not produced the requested information.

34. On December 27, 2010, the CSX-appointed members of the NPBL Board sent a memorandum to the Board, requesting that it (1) act to remove any barriers preventing fair consideration of the 2010 Proposal, and (2) direct NS to conclude its operational review of the 2010 Proposal no later than March 30, 2011.

35. At the December 29, 2010 NPBL Board meeting, Stinson presented "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Management's analysis showed that the proposal would result in positive net income to NPBL under either scenario.

36. Following discussion, a motion was made and seconded that NPBL be allowed to use CSX locomotives in service to NIT. Before a vote could be taken, however, NS-appointed members of the NPBL Board moved to table the vote ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. This motion at first did not pass because Stinson voted against it, along with the two CSX-appointed directors. An amended motion to table the vote, which promised that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮," was unanimously approved.

37. On March 1, 2011, NS's Jeff Yates rejected Stinson's request for service to NIT in

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

connection with the 2010 Proposal. This letter does not address the locomotive issue discussed at the December Board meeting.

38. On April 11, 2011—approximately eight months after CSX's proposal was tendered to NPBL for consideration—NS-appointed NPBL director Jake Allison emailed NPBL's Donna Coleman, stating for the first time that the NS-appointed directors believed ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇." Allison also said the NS directors did not believe the Board could ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

39. At the April 2011 NPBL Board meeting, a vote was requested on the motion about NPBL's use of CSX's locomotives. The motion did not pass because all NS-appointed Board members voted against it.

40. Soon after the April 2011 vote, NS removed Stinson as NPBL president and replaced him with current president Cannon Moss, who had been employed in a business development role at NS.

41. When NS nominated Moss as Stinson's replacement, CSX expressed serious concerns about his qualifications based on his limited experience with rail operations. CSX proposed a candidate with significantly more relevant experience, but the NS-appointed members of the NPBL Board refused to interview him and installed Moss over CSX's objections.

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

### E.  *Defendants' Logistical and Operational Impediments*

42.  Apart from one unique instance in 2010, NPBL moved no international intermodal traffic for CSX until March 2015.  At that time, during a period of extreme port congestion across the East Coast, CSX paid NPBL's $210 rate to move backlogged freight at NIT, recognizing that doing so under these circumstances would "████████████████████████████████ ████."

43.  To move this traffic, NPBL President Cannon Moss requested that NS provide a window during which NPBL could operate a CSX train across its tracks to NIT.  This request met with a negative reaction within NS, culminating in NS's VP of Transportation and NS-appointed NPBL Board member Terry Evans responding: "████████████████████████████████ ████████████████████████████████████"

44.  After delaying unreasonably, NS eventually agreed to provide an operating window for this train, but voiced "████████████████████████████████ ██████████████████████████████."  NS outlined strict parameters restricting how and when NPBL and VIT were to move this single train.  VIT personnel viewed NS's concerns as "████████████████████████████████████████████████████.

45.  After the first train in April 2015, CSX tried to use NPBL to move other international intermodal freight to and from NIT, but NS imposed serious difficulties, repeatedly refusing to provide operating windows based on vague, unexplained "proprietary issues."

46.  CSX's efforts to use NPBL to move international intermodal traffic to and from NIT during 2015 proved unworkable.  The situation escalated to the point that CSX's Senior VP of Operations personally called NS executives to request an operating window to move a CSX train stuck at NIT.

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

47. NPBL ultimately moved a small number of international intermodal trains for CSX over a period of several months in 2015. NS moves multiple of its own trains *daily* at NIT.

48. Throughout this period, NPBL's Cannon Moss kept NS's intermodal sales personnel apprised of CSX's attempts to use NPBL to access NIT, so they would be aware of how CSX's attempts to move traffic via NPBL would impact NS's customers.

49. Due to the onerous restrictions and inexplicable delays imposed by Defendants, CSX lost business from customers who could not be adequately and reliably serviced without on-dock access at NIT.

50. In June 2015, NPBL's Moss emailed CSX's MacDonald to inquire whether CSX intended to continue moving intermodal freight to NIT via NPBL, because without revenue from these moves, Moss would have to lay off NPBL employees.

**F. Defendants' Trackage Rights "Dispute"**

51. Pursuant to a 1917 Joint Facility Agreement between NS and NPBL, NPBL has historically paid NS a fixed trackage rights fee that did not vary based on the number of cars moved, which worked out to ▮ per car, in addition to certain fixed costs.

52. NS provided notice to NPBL on July 31, 2015—not long after CSX's efforts to use NPBL to access NIT—that it intended to cancel NPBL's trackage rights over NS leading into NIT, unless the parties could negotiate new agreements to preserve NPBL's access. The trackage rights negotiation was part of NS's broader strategy to cut-off CSX's NIT access and ensure its unitary on-dock rail capacity was preserved at NIT.

53. Although NS stated externally that it intended for the parties' new trackage rights agreement to afford NPBL "materially the same access" to NS's tracks, internal NS documents make clear that NS intended to "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11

███████████████████████████████████████████████████████████████████████████████████.

54. NS ultimately demanded a trackage rights fee of $██ per car, while NPBL proposed $██ per car.

55. Having purportedly reached an impasse, on September 13, 2018, NS petitioned the Surface Transportation Board ("STB") to set the trackage rights compensation. NS and NPBL presented themselves as adverse parties in that proceeding, which has been stayed pending the outcome of this case.

### G. CSX's 2018 Proposal & Governance Demands

56. On March 23, 2018, CSX submitted to NPBL management a proposal to access on-dock intermodal container service at NIT via NPBL. *See* ECF No. 1-5 ("2018 Proposal"). In the 2018 Proposal, CSX proposed a switch rate of $80 per car, loaded or empty, for international intermodal containers moving to or from NIT, with a guaranteed minimum of 18,000 cars per year."

57. NPBL Vice President Donna Coleman projected that CSX's 2018 Proposal would produce net revenue for NPBL. Coleman concluded that the proposal had enough "validity" to go to a rate committee for review.

58. On April 3, 2018, NPBL personnel asked NS operations employees for permission to "█████████████████████████████████████████████████████████." NS reported internally: "████████████████████████████████████████████████████████████████████████."

59. On April 5, 2018, NPBL's Moss sent an email to CSX's Tony DiDeo, outlining a few "thoughts" about the 2018 Proposal. Moss noted, among other things, that the "major factor in play are the windows NS would provide for NPBL to make our run to NIT" (i.e., the request

NS denied two days earlier). Moss also noted that the proposal would "require" two NPBL locomotives (leased from NS), and that NPBL management would recommend that the NPBL Board convene a rate committee to do a complete review of the tariff. Moss also expressed concern that NPBL could not properly evaluate or act on the 2018 Proposal until Defendants' trackage rights dispute was resolved.

60. On April 6, 2018, CSX sent a letter to NPBL and NS demanding certain remedial actions at the upcoming meetings of the NPBL Board and Shareholders. *See* ECF No. 1-6. On April 16, 2018, CSX submitted a list of candidates to serve as independent members of the NPBL Board of Directors, who CSX proposed be considered for election at the NPBL Shareholders meeting set for April 18.

61. At the April 18 Shareholders' meeting, CSX proposed the governance changes outlined in its April 6 letter, and recommended interim officers be installed at NPBL until the transition was completed. The proposal failed when NS voted its 57% majority shares against it.

62. At its April 18, 2018 meeting, the NPBL Board did not discuss the 2018 Proposal and did not vote to form a rate committee to analyze the tariff or the proposal. The CSX-appointed directors requested that the Board appoint an independent committee to review and evaluate the 2018 Proposal, but the NS-appointed directors refused, based on purported "conflicts" with NPBL's governing documents.

### H. *The International Intermodal Transportation Market*

63. NIT is the largest and most important marine terminal at the Port of Virginia. Although NS and NPBL currently access on-dock rail at NIT via different traffic patterns, railroads effectively manage operational patterns much like NPBL's and NS's at NIT at other terminals.

13

64. Although a recent expansion increased VIG's annual throughput capacity to approximately 1.2 million containers, VIG remains more constrained because it has only three berths—half the number at NIT.

65. When operational, PMT could handle only between ▮▮▮▮▮▮▮▮ containers annually—a tiny fraction of VIG or NIT.

66. Ocean carriers issue Requests for Proposals ("RFPs") to CSX and NS, identifying a volume of international intermodal containers to be moved by rail in particular "lanes" (i.e., port to destination pairs).

67. Ocean carriers move international intermodal containers to and from the same inland destinations from multiple ports. When determining through which ports to move intermodal traffic, carriers evaluate a variety of significant factors, including port charges, local market density, and customer needs, not simply rail rates and route structure at each port. CSX thus has little ability to influence carriers' decisions about which ports to call. Thus, in order to be competitive for contracts with ocean carriers, CSX must offer competitive service at all major ports in a geographic region. A significant component of competitive rail service is whether a railroad can provide on-dock access at major marine terminals.

68. Because Defendants have blocked CSX's access to on-dock rail, CSX must truck each container arriving at NIT individually to its rail yard in Portsmouth, where the container is then loaded onto a rail car—a process called "drayage." For exports, the process is reversed, with containers arriving in Norfolk by rail being individually drayed from CSX's Portsmouth yard to NIT. Drayage is an expensive, inefficient, and unpopular alternative to on-dock rail, especially at high-volume terminals like NIT.

69. Drayage is a particularly problematic at NIT. The drayage route between NIT and

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

CSX's Portsmouth yard follows Hampton Boulevard, a local road passing directly in front of the Old Dominion University campus. Local regulations prohibit trucks on Hampton Blvd. "between the hours of 4:00 p.m. and 6:00 a.m." Street congestion, gate delays, and the limited availability of truckers and chassis also limit the efficiency and reliability of drayage.

70. VIT coordinates drayage at NIT and other POV terminals. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

71. Ocean carriers express a strong preference for on-dock rail and view drayage as a significantly inferior option.

72. NS aggressively protects and promotes its position as the sole provider of on-dock rail access at NIT.

73. NS has handled between ██% and ██% of international intermodal business at the Port of Virginia—and between ██% and ██% at NIT—between 2009 and 2020.

74. CSX's lack of on-dock rail access at NIT has driven multiple ocean carriers to contract with NS rather than CSX between 2009 and 2022. Ultimately, CSX's lack of on-dock access at NIT has reduced its market share across the entire East Coast during this period.

75. VIT determines at which terminal a vessel will call. In making this decision, the most important factor considered ████████████████████████████████████████████████████████████. After those factors, VIT considers railroad ████████████████████████████████████████████████████████████████████████████████,

15

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████.

76. Although VIT has expressed a desire to steer CSX-aligned containers to VIG, the empirical data show that ocean carrier volumes do not shift from NIT to VIG following a change in alignment from NS to CSX.

77. The volume of containers moved through NIT each year could not realistically be shifted to other POV terminals, or to marine terminals at other ports, like the Port of NY/NJ.

78. Trucking is a "very minor consideration" in competition for international intermodal cargo traveling more than 200 to 500 miles. The Midwest destinations competitively served by NS and CSX are farther than 500 miles from POV.

79. Trucks carry international intermodal containers from POV terminals to locations outside the Virginia area only in special circumstances, such as an urgent need or high-value product.

80. CSX vigorously competes for international intermodal business at all major ports on the East Coast, including the Port of Virginia. Although CSX's container volumes at POV have increased since 2009, this expansion is almost entirely concentrated at VIG, where CSX has access to on-dock rail.

81. As John Reinhart, the former CEO and Executive Director of the Virginia Port Authority ("VPA"), emphasized in a letter to NPBL President Cannon Moss, "████████████ ███████████████████████████████████████████████████" in the market for international intermodal container traffic. Reinhart "██████████████████████████████████," by requesting that NPBL provide "███████████████████████████████████████████ █████████████"

16

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

### I. Harm to Competition & Damage to CSX

82. Because CSX cannot effectively act as a competitive constraint on NS at NIT, NS charges higher prices to carriers who use NIT intensively. ███████████████████████████████████████████████████████████████████████████████████████. And because ocean carriers contract with NS for multiple lanes across a large geographic portfolio, the reverberations of this overcharge extend throughout the network.

83. Because ocean carrier RFPs cover multiple ports, CSX has lost substantial business across its entire network because of its lack of on-dock access at NIT. CSX's expert witness, Dr. Howard P. Marvel, opines that CSX's lost profits totaled more than $███ million between 2009 and 2021.

### J. Representations at the STB

84. On September 13, 2018, NS filed a petition with the STB, seeking to have it set "the level of compensation for NPBL's continued use of NSR tracks." In that filing, NS represented to the STB that NS and NPBL had "spent the past two years negotiating over new terms and conditions," and that "NSR and NPBL's management have reached agreement on all provisions except for the per-car compensation to be paid by NPBL to NSR for NPBL's use of NSR's tracks." In its reply to NS's trackage rights petition, NPBL challenged NS's proposed expedited schedule, explaining that NPBL would need more than the proposed sixty days to obtain and assess relevant information in NS's sole possession.

85. In referral proceedings before the STB, NS and NPBL have represented and made binding admissions that NS and NPBL have coordinated activities during all periods relevant to this case, with NS exerting control over NPBL. For example, in its filings, NS has stated:

- "Since the 1982 Transaction, NSC (either directly or indirectly) has exercised control over NPBL"

17

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

- "There was no question that NSC could, and did, exercise its control authority over N&W, SRC, Norfolk Southern, and their affiliates and subsidiaries over this time. Furthermore, since 1998, NSR has had direct control of NPBL."

- "Accordingly, NPBL does not dispute that "NSR[] exercise[s] control over NPBL.""