```
 1              IN THE UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF VIRGINIA
 2                     NORFOLK DIVISION


 3


 4   CSX TRANSPORTATION, INC.,      )
                                    )
 5              Plaintiff,          )
                                    )
 6   v.                             )    Civil Action No.
                                    )       2:18cv530
 7   NORFOLK SOUTHERN, et al.,      )
                                    )
 8              Defendants.         )


 9


10                  TRANSCRIPT OF PROCEEDINGS


11                     (Status Hearing)


12


13                    Norfolk, Virginia
                      January 18, 2023


14


15   BEFORE:   THE HONORABLE MARK S. DAVIS
                United States District Judge

16


17


18


19


20


21


22


23


24


25
```

```
 1   Appearances:

 2          McGUIRE WOODS, LLP
                 By: Benjamin Lucas Hatch
 3                    Robert William McFarland
                      Ashley Partin Peterson
 4                    Counsel for CSX Transportation, Inc.

 5          TROUTMAN PEPPER HAMILTON SANDERS LLP
                 By: Michael Edward Lacy
 6                    Alan Durrum Wingfield
                      Counsel for Norfolk Southern Railway Company
 7
            CRENSHAW, WARE & MARTIN, P.L.C.
 8                    By: W. Ryan Snow
                          James L. Chapman, IV
 9                        Alexander Ryan McDaniel
                          Counsel for Norfolk & Portsmouth Belt Line
10                        Railway Company

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2

3          (Commenced at 11:08 a.m. as follows:)

4

5          COURTROOM DEPUTY CLERK:  In Case No. 2:18cv530, CSX

6    Transportation, Inc. v. Norfolk Southern Railway Company and

7    Norfolk & Portsmouth Belt Line Railway Company.

8              Counsel, for the plaintiff, are you ready to proceed?

9          MR. HATCH:  Good morning, Your Honor, we are.  Ben

10   Hatch, Rob McFarland and Ashley Peterson on behalf of CSX.  And

11   also Erin O'Brien from CSX.  Good morning.

12             THE COURT:  All right.  Good morning to you.

13             COURTROOM DEPUTY CLERK:  Counsel for the defendants,

14   are you ready to proceed?

15             MR. LACY:  Yes, Your Honor.  Michael Lacy on behalf of

16   defendant Norfolk Southern, appearing also is Alan Wingfield and

17   John Lynch, and with me is Joe Carpenter for Norfolk Southern.

18             THE COURT:  All right.  Thank you.

19             MR. SNOW:  Good morning Ryan Snow on behalf of the

20   Belt Line.  With me is James Chapman and Alexander McDaniel.

21             THE COURT:  All right.  Thank you.

22             Well, good morning Counsel.  I appreciate you all

23   responding to the request for briefs and responding to the

24   request of the Court to come to address issues that remain

25   outstanding.

1          It is, of course, the motion filed by the Belt Line,

2   Document 572 that is Norfolk and Portsmouth Belt Line Railroad

3   Company's motion to dismiss all remaining claims for relief that

4   principally brings us here.  And I've read your briefs, and want

5   to give you the opportunity to address anything else you want to

6   that was raised.  And so Mr. Snow, I guess that means that you

7   go first.

8          MR. SNOW:  Thank you, Your Honor.  May it please the

9   Court.  Again, Ryan Snow on behalf of Norfolk & Portsmouth

10  Railway Company.

11          I appreciate Your Honor's setting this hearing.  I

12  know timing has been tight.  And I will endeavor not to repeat

13  what we've put in our briefs, I know Your Honor has read them,

14  so I'll do my best just to answer the four questions that you

15  posed in your order, and if you have questions of me of course

16  ask them, please.

17          The first topic Your Honor asked to us address was the

18  legal availability of injunctive relief under federal law and

19  state law.

20          THE COURT:  I'd like to, today, take up only the

21  federal law issue first.  So I want to have complete argument on

22  the federal law issue first.  Let's just address that.

23          MR. SNOW:  Very good.  The short answer to the federal

24  law question is that the Plain Meaning Rule requires dismissal

25  here under 15 U.S.C. Section 26.  And we provided the Court two

1   procedural vehicles to get there, they both lead to the same

2   conclusion, which is that injunctive relief against both

3   defendants here is not available because both are common

4   carriers subject to the jurisdiction of the STB.  That's the

5   plain meaning.  There's no ambiguity.  And that's what the

6   statute says.  And so when you read that statute, you're left

7   wondering, is there any way around this?  I don't think there

8   is.

9           But for CSX here, they have got to argue a few things.

10  They have got to argue not only the plain meaning doesn't mean

11  what it says, but they have to argue that that deletion that

12  happened in 1995, that is undisputed, was a meaningless

13  deletion.  That's not consistent with U.S. Supreme Court case

14  law.  We cite the <u>Lamie</u> case that's on point.  We cite the case

15  about the Judiciary Act that's on point.  Deletions mean

16  deletions.

17          But beyond that -- and this is something we didn't

18  point out in our brief -- what CSX really needs to do here, they

19  need to, they need to show you that not only was the deletion

20  meaningless, but the statute actually expanded the power of the

21  court, right?  Expanded the power of the court.  And why do I

22  say that?  Because even under the prior statute, 1994, the

23  injunctive claims here would have to be dismissed.  They have to

24  be dismissed on the current one, but even under the prior one

25  they have to be dismissed.  So CSX must take the position that

1  somehow this court's power expanded even beyond what it was in

2  1994.  And I don't think they can do that.  We point to in our

3  brief a direct overlap with STB jurisdiction with respect to all

4  of the injunctive relief they seek a and we point to and

5  importantly, two different ICCTA sections.  I call it ICCTA,

6  it's the subtitle for 49 U.S.C.  The first is 49 U.S.C. 10501.

7  That's the one that's at issue in the Edwards case that Your

8  Honor cited in the order.  That provides the general exclusive

9  jurisdiction of the STB over railroads and rail transportation,

10  including switching rates.  So for example, that would prevent

11  any remedies here where the Court were to order the 2018 service

12  proposal, for example, and the Belt Line to be forced to accept

13  the disputed switching rate.

14         But the other one we cite is 49 U.S.C. Section 11323.

15  And if you go up a couple sections from that, there's 11321.

16  That relates to control of railroads, right?  Control of one

17  railroad by another.  And 11321, the very first sentence there

18  says "The authority of the Board under this subchapter is

19  exclusive."  Right?  So it's the same analysis under 10501, it's

20  just a more specific sort of pinpoint to the exclusivity of the

21  STB's jurisdiction over control issues.

22         And we cited in our brief -- I won't repeat it -- but

23  that control authority of the STB is extremely broad, and it

24  mirrors completely, really, all of the relief that CSX wants

25  here.

 1          And the relief CSX seeks is really only two things on

 2     the control issue.  They want to be put back to it's sort of an

 3     equal shareholder footing, which certainly implicates control,

 4     or they want to essentially restructure or scramble up the

 5     governance of the Belt Line either at the board level or

 6     there's, there was an indication in one of your footnotes in the

 7     summary judgment opinion possibly even at the management level,

 8     at the president level.  Both of those are squarely within what

 9     the STB does under that exclusive jurisdiction in 11321 and 323.

10          Frankly, I think that's what the STB expects everyone

11     to go back and talk about after this case is concluded based on

12     their last opinion to us.

13          And so as we analyze this either under the plain

14     meaning or even under the version of the statute that existed

15     before the 1995 deletion, there's nothing left to do here,

16     respectfully, Your Honor, because Congress has carved that piece

17     out of 15 U.S.C. 26 because the two defendants are railroads.

18          I can go into more depth about the federal law claims

19     if there are particular questions you have.

20          THE COURT:  Let me ask you a question.  There's the

21     ongoing litigation in the D.C. District Court, *Freight Fuel*

22     *Surcharge Antitrust Litigation*, and it does not appear that this

23     issue has been squarely addressed there.  How could that

24     possibly be if that's the case?

25          MR. SNOW:  I'm, I'm probably not the person to ask

1   that question.  I'm not trying to dodge it, but I really am not

2   involved in that litigation and don't know about it.  I know

3   only that both defendants --

4            THE COURT:  Well do you have any insight?

5            MR. SNOW:  My insight is this:  I think both

6   defendants raised that as an affirmative defense.  I'm not sure

7   in what procedural vehicle it might have become ripe.  I just

8   can't answer that question.  But frankly it makes it surprising

9   that CSX would oppose here, right?  Because CSX is a Class I

10  railroad that would have the protections of this statute.

11           THE COURT:  Well, CSX's affirmative defense, Document

12  492 in that litigation was "Plaintiffs and members of the

13  putative class lack standing to bring these claims, including

14  but not limited to because plaintiffs and members of the

15  putative class lack standing to assert a claim for injunctive

16  relief under 15 U.S.C. Section 26."

17           The answer that was filed by Norfolk Southern said

18  "Plaintiff's claims for injunctive relief are barred by 15

19  U.S.C. Section 26 which provides that nothing herein contained

20  shall be construed to entitle any person, firm, corporation or

21  association except the United States to bring suit for

22  injunctive relief against any common carrier subject to the

23  jurisdiction of the Surface Transportation Board under Subtitle

24  4 of Title 49."  Those are the two affirmative defenses.

25           And if I recall correctly, there's some documents that

```
1    are filed by the American -- what is it, American Association of
2    Railroads that takes the same position that you've taken here.
3    So you don't have any particular insight into why it hasn't been
4    raised in a more direct way there?
5             MR. SNOW:  I don't, Your Honor.  The only thing I know
6    is that, here, CSX's position seems to contradict its position
7    that it took there.
8             THE COURT:  All right.  Well, thank you, Mr. Snow.
9             Mr. Lacy?
10            MR. LACY:  Good morning, Your Honor.  Michael Lacy on
11   behalf of Norfolk Southern.
12            I will start with the question posed to Mr. Snow, as
13   it relates to the Fuel Surcharge litigation.  As we put forth or
14   set forth in our reply brief, Your Honor, the reason why this
15   issue that is presented before the Court here today was not
16   dealt with squarely in the Fuel Surcharge litigation is because
17   in that litigation that matter, the indirect purchaser class
18   action, was voluntarily dismissed shortly after the answers were
19   filed and the motions to dismiss on other matters were ruled
20   upon by the D.C. court.  And so while Norfolk Southern certainly
21   raised this defense that we present to the Court here today, in
22   that case it was never the subject of litigation because of the
23   voluntary dismissal.
24            THE COURT:  What's continuing to be litigated?
25            MR. LACY:  So there's two types of cases -- and I'll
```

Paul L. McManus, RMR, FCRR Official Court Reporter

1  admit, Your Honor, I'm not involved in *Fuel Surcharge* so I'm

2  going to do my best here.  There are two types of cases.  There

3  was a direct purchaser and an indirect purchaser class action

4  matters, and I'm going to -- it's an MDL I believe, so I used,

5  you know, two cases sort of in a way to sort of separate the

6  direct from the indirect.  I think they're -- I know that there

7  are --

8          THE COURT:  Two types of claims.

9          MR. LACY:  Yeah, two types of claims.  The Court put

10 it well.

11         So in the indirect purchaser class action there was,

12 as the Court might know from reviewing that docket, which is

13 1:07mc00489, there was several motions to dismiss as it related

14 to indirect purchaser class action claims that were ruled upon

15 by the Court.  It did not -- the Court's rulings on motion, on

16 the motion to dismiss did not completely dismiss the indirect

17 purchaser claims, and thus an answer was filed by Norfolk

18 Southern and CSX and the other railroad defendant in the matter.

19 That's where the affirmative defenses were laid, and subsequent

20 to that the case was voluntarily dismissed by the indirect

21 purchaser plaintiffs.

22         THE COURT:  Okay.  And so why -- and with respect to

23 the direct purchaser claims, was injunctive relief being sought?

24 Why is it different?

25         MR. LACY:  Oh, Your Honor, I am not certain of that

```
 1   question.  Of course we could get back to the Court on that
 2   issue.  I would say though that the thrust of the direct
 3   purchaser case, of course, is money damages.  And I don't know
 4   this, Your Honor, I don't know that injunctive relief is at
 5   issue in that direct purchaser case.  It could be.  But I know
 6   for certain that the thrust is certainly the monetary damage
 7   claim.  Or the thrust of the relief sought is the monetary
 8   damages versus injunctive relief.
 9              THE COURT:  Okay.  All right.
10              MR. LACY:  As it relates to the other arguments as to
11   why injunctive relieve is not available in this case under 15
12   U.S.C. Section 26 set forth in our motion, we adopt wholly the
13   Belt Line's arguments and don't have much to add unless the
14   Court has questions.
15              THE COURT:  Is there any dispute about whether CSX is
16   a common carrier subject to the jurisdiction of the Surface
17   Transportation Board?
18              MR. LACY:  No, Your Honor.
19              THE COURT:  How do you know that?
20              MR. LACY:  Well, presently it's before the STB in the
21   trackage rights matter.  It intervened in that matter.
22              THE COURT:  They voluntarily intervened in that action
23   you all had?
24              MR. LACY:  Between the Belt Line -- yeah.  The Norfolk
25   Southern versus the Belt Line trackage rights matter.  And I
```

1    think the Court -- and we've certainly cited cases in which the

2    STB has brought actions before the STB.  And I believe Your

3    Honor in your motion to dismiss opinion you also cited the fact

4    that it is a common carrier subject to the jurisdiction of the

5    STB.

6              THE COURT:  Okay.  All right.  Thank you.

7              MR. LACY:  Thank you.

8              THE COURT:  Mr. Hatch?

9              MR. HATCH:  Good morning, Your Honor.  May it please

10   the Court.

11             It's an interesting issue, and I'll maybe start with

12   where Mr. Lacy left off, because of course the Court knows this

13   issue was presented to some degree in the supplemental briefs on

14   summary judgment.  And at that stage I understood Norfolk

15   Southern's position on the law to be the same as our position.

16   And of course Norfolk Southern and both defendants in the *Fuel*

17   *Surcharge* litigation the Court was asking about, which is that,

18   which is that under the statute Section 26 and under the <u>Georgia</u>

19   decision that has interpreted Section 26, yes, there can be

20   injunctions that are barred if they fall within the exclusive

21   jurisdiction of the STB, and then no, there are not injunctions

22   that are barred that don't fall within the exclusive

23   jurisdiction of the STB.

24             They cited the <u>Georgia</u> case just like we did, and then

25   they argue that this is within the STB's jurisdiction, we argue

 1  that it's not within the exclusive jurisdiction of the STB.  I

 2  think the Court already examined those issues at the original

 3  motion to dismiss stage, although I would note that Norfolk

 4  Southern didn't actually move on that ground at the original

 5  motion to dismiss stage.  But the Court did examine it on the

 6  Belt Line's motion and found that the very same items that we're

 7  requesting in our injunction for the bench trial are not within

 8  the, not preempted by ICCTA.

 9          And so that was Norfolk Southern's position then.  I'm

10  not sure whether it's changed, although they have adopted the

11  motion that NPBL brings which has a much broader scope.

12          THE COURT:  Well, whether they're entitled to

13  injunctive -- whether you're entitled to injunctive relief may

14  be a different issue than preemption.  I mean, what the statute

15  says is different than preemption.  You -- I certainly read with

16  interest your brief and your statutory language suggestion that

17  the modification made to the Act in 1995 somehow simply moved

18  the 'in respect of' clause up further.  But all it really says

19  in the new language is that you need to be subject to that

20  Section 4 of the Act, it doesn't really say it's in respect of a

21  certain kind of action, does it?

22          MR. HATCH:  I think it says 'under' is the word it

23  uses.  And as I read it, Your Honor, it condensed the language

24  from the pre-1995 version which had, in between those two

25  clauses, the reference to the old Act that they were replacing,

14

```
1   you know, by virtue of the other titles in ICCTA in 1995.  So
2   they took two more-verbose clauses and a reference that came in
3   between to a prior Act.  And as we tried to summarize for the
4   Court in the legislative history, these were conforming
5   amendments, is how Congress seemed to treat them.  And so it --
6              THE COURT:  So let me interrupt you for a second.
7   Excuse me.
8              If, really, the purpose was to simply substitute STB
9   or ICC, then why change that additional language?  Why do more?
10             MR. HATCH:  Well, the Congress was silent about that
11  other than saying these were conforming amendments.  But what it
12  needed to do to conform it -- and you know, as the Court knows,
13  whenever you're examining what Congress did they could always
14  have gone about it a different way and the court will use canons
15  to try to reach the best interpretation of what Congress did.
16  But they needed to change the agency, they needed to change the
17  law that was referenced there, and they needed -- and that
18  included the new title that's referenced in the new law.
19             And so as I read it, they took more concise language
20  that changed the name of the agency and then took the 'in
21  respect to' clause, and said under this new title that is what
22  is the title that's referenced that was essentially more
23  succinctly referring to the 'in respect to' clause.
24             And I think the Court looks at that language and the
25  other side says, well, that got rid of the 'in respect to'
```

1    clause.  So the Court can look, okay, was that what Congress

2    intended?  What we know is there's no indication in the

3    legislative history that that's what Congress intended.  NPBL

4    cited no actual legislative history.  We cited the legislative

5    history to the Court that I would suggest does not suggest they

6    intended a substantive change.

7             We know that antitrust immunities are construed

8    narrowly, and their position would be that Congress intended to

9    expand antitrust immunity.

10            THE COURT:  Why isn't -- you made a reference in your

11   brief suggesting that it was counter-intuitive that the purpose

12   of the ICCTA was to essentially enact deregulation; it was

13   counter-intuitive to read the statute to a change in the

14   conforming section to mean that only the government can seek an

15   injunction.  I don't follow that.  Is that what you meant?

16            MR. HATCH:  I did mean it was counter-intuitive.  And

17   let me try to explain that.

18            So prior to the 1995 ICCTA change the railroad

19   industry was subject to more regulation, and that law was trying

20   to deregulate it, subject it to competition and regular market

21   forces, et cetera.  Typically when you have a regulated industry

22   exemption, rates for example, are fixed by statute, you know,

23   utilities and that sort of thing, there's specific regulatory

24   approval.  Then you also have exemptions from other laws, right?

25   If in Virginia the State Corporation Commission sets power

```
 1   rates, those are going to be filed rates and they're not subject

 2   to private suit, typically.  That sort of thing.

 3          So when you move from a more-regulated environment to

 4   a less-regulated environment, that typically means that the

 5   Congress or the state is saying there's going to be less areas

 6   where the agency has direct express approval required.  So maybe

 7   we're opening rates up to competition in the market, we're

 8   opening up contracts to competition in the market, they don't

 9   have to be preapproved by the agency.  And the tradeoff that you

10   typically see is that because the agency isn't regulating, isn't

11   approving these things on the front end, then they're subject to

12   market forces, including the laws that typically apply to market

13   forces such as the antitrust laws.

14          So to me it is counter-intuitive to say we're giving

15   the agency less authority to regulate your conduct in 1995,

16   we're rolling that back, but we're going to expand and say no

17   one can get a private injunction against you for anything, even

18   things the agency can't regulate, just because you're under the

19   agency.  That's very counter-intuitive to me.

20          THE COURT:  Well, why isn't a different view of it

21   that it's consistent with the Congressional intent to deregulate

22   and allow regulation of the railroad industry to be essentially

23   managed by the Executive Branch through the Surface

24   Transportation Board's activity and through the determination of

25   the Department of Justice about whether to seek injunctive
```

 1   relief under the revived statute?

 2        MR. HATCH:  I -- all I can say on that, Your Honor is,

 3   again, I think when you're deregulating you're typically opening

 4   it up to normal market forces and the normal laws of it.  And so

 5   why would you -- in that scenario, the only people who are

 6   policing the area are the STB which, under this law, was getting

 7   less authority than had been the case with the ICC and then

 8   whether the Executive chooses to bring an injunction action.

 9        So could that have been a thought?  Perhaps,

10   hypothetically.  There's no indication in the Congressional

11   record.  And the effect of it -- returning to the point I was

12   making -- would be to broad antitrust immunity.

13        And so as we cited -- and I didn't think the other

14   side cited any cases -- you construe antitrust immunity

15   exemptions narrowly and sceptically, and so where is the

16   evidence they intended to broaden this antitrust exemption at

17   the time?

18        THE COURT:  Well, you do that unless the plain

19   language of the statute is clear, you know.

20        So before 1995 this is what the section read:  15

21   U.S.C. Section 26.  This is the jurisdictional carve-out,

22   provided that "Nothing herein contained shall be construed to

23   entitle any person, firm, corporation or association except the

24   United States to bring suit in equity or injunctive relief

25   against any common carrier subject to the provisions of the Act

1  to regulate commerce, approved February 4th, 1887 in respect of

2  any matter subject to the regulation, supervision or other

3  jurisdiction of the Interstate Commerce Commission."  That's the

4  old.

5          So then the new one, the new carve-out provided that

6  "Nothing herein contained shall be construed to entitle any

7  person, firm, corporation or association except the United

8  States to bring suit for injunctive relief against any common

9  carrier subject to the jurisdiction of the Surface

10 Transportation Board under Subtitle 4 of Title 49, United States

11 Code."

12         So in the new one they omitted the language, the

13 modifying language at the end of the clause as follows:  "In

14 respect of any matter subject to the regulation, supervision or

15 other jurisdiction of the Interstate Commerce Commission."  So

16 they use the word "matter".  They're specifically talking about

17 the kind of litigation.  A kind of matter.

18         And you've suggested that, if I understand correctly,

19 that they essentially collapsed that phrase in the new language,

20 the new statute, they have collapsed that into the phrase "Any

21 common carrier subject to the jurisdiction of the Surface

22 Transportation Board."  That's your argument, right?

23         MR. HATCH:  And then the "under" --

24         THE COURT:  Under Subtitle 4 --

25         MR. HATCH:  Subtitle 4.

```
1              THE COURT:  -- of Title 49.
2              MR. HATCH:  That's the back -- I don't want to
3    interrupt the Court's reading through the statute, but the
4    subject, "any common carrier subject to the provisions of the
5    Act" we do see is any, is carried over.  "Any common carrier
6    subject to the jurisdiction of the Surface Transportation
7    Board," that's what it swaps in, and then the back end that's
8    referring to the Act and the materials in the Act and the
9    regulation, supervision of the Interstate Commerce Commission,
10   of course they needed to change that conforming amendment, and
11   so they say, Under Subtitle 4 of Title 49 U.S. Code.
12             THE COURT:  And what does Subtitle 4 of Title 49 of
13   the U.S. Code provide?
14             MR. HATCH:  That's the regulation of common carriers,
15   motor carriers, that sort of thing.
16             So the things that, the things that Mr. Snow was
17   referring to would be found within that title, the things that
18   are -- and that's why --
19             THE COURT:  So in the prior statute, the modification
20   comes after a comma which provides 'in respect of'.  In the new
21   statute it's one continuous phrase.  "Subject to the
22   jurisdiction of the Surface Transportation Board under Subtitle
23   4 of Title 49."  And you believe that the plain meaning of that
24   is that it continues the 'in respect of matter subject to'
25   meaning?
```

```
1            MR. HATCH:  I think the Court, the Court refers to the

2    plain meaning, and I would just say the Court, I think, is going

3    to use all the tools of statutory construction the Court would

4    use, which would include reading the statute and comparing it to

5    the prior version, and it would include understanding of the

6    prior law, which I don't think there's any dispute before the

7    Court, which is that the statute is -- is related to, you know,

8    subject to matters that are within the exclusive jurisdiction of

9    the STB.

10            And then the Court says I do see here language that

11   Congress intended to change?  And I don't see that language

12   between the text of the statute, the legislative history that's

13   undisputed that this was just a conforming amendment, and the

14   general construction principles that if Congress is going to

15   change the prior law, it tends to speak clearly on that.  You

16   had a Supreme Court decision that it interpreted the prior law.

17   There's no, to me, clear language that says we want to get rid

18   of that -- I mean Mister -- the Belt Line's position is that

19   this literally stripped the federal courts of jurisdiction.

20            THE COURT:  Right.  Isn't that the strongest argument

21   when it simply deletes the whole phrase that is the subject of

22   the... that is the subject of the matter limitation?

23            MR. HATCH:  Respectfully, no, it doesn't.  It changes

24   and it condenses the language, but I don't think it's deleting

25   that substance from here.
```

```
 1              THE COURT:  Okay.

 2              MR. HATCH:  But again, the Court would look at the law

 3   and say is this a clear indication that Congress intended to

 4   strip jurisdiction of the courts?  Is this a clear indication

 5   that Congress intended to broaden antitrust immunity?  You would

 6   look at all those, I expect, statutory interpretation tools.

 7   And I think when you read the language in light of those, it

 8   does not reflect a substantive change in the law.

 9              And I would --

10              THE COURT:  Does -- before I forget.  I assume, but I

11   should ask this, does CSX dispute that it is a common carrier

12   subject to jurisdiction of the Surface Transportation Board?

13              MR. HATCH:  Well, Your Honor, that's a piece that they

14   asserted in their motion that frankly, as we pointed out, it is

15   not -- you know, they're bringing it under 12(c).  That's not in

16   the record.  Certainly CSX is subject to the jurisdiction of the

17   STB in various forms, but that's not something that they have

18   put forward.  And I don't think our status as a common carrier

19   bears on this issue, frankly.  Because the injunction we're

20   seeking is against the defendants.

21              In other words, Section 26 isn't a prohibition on

22   common carrier seeking an injunction, it's a prohibition on

23   injunctions by private parties, whoever they are, against common

24   carriers.

25              I do want to talk about the *Fuel Surcharge* litigation
```

1    for a moment, Your Honor.  Like other counsel, we did not have

2    any representation in that case.

3              THE COURT:  Well, let's go back to that point.  I

4    missed something, I think.

5              The prohibition...  Let's see.

6              The carve-out is that nothing there shall be construed

7    to entitle corporations except the United States to bring suit

8    against a common carrier.  So you represent a corporation,

9    right?

10             MR. HATCH:  That's correct.

11             THE COURT:  And your point then is that the question

12   is not whether you are a common carrier?  Is that what you were

13   suggesting?

14             MR. HATCH:  Correct, Your Honor.  Your Honor had asked

15   about CSX, and I don't respectfully see where that enters into

16   this analysis.  The prohibition in their position is that anyone

17   except for the United States is prohibited from seeking an

18   injunction against the common carrier.  So I don't want the

19   Court to think that their position turns on the fact that we're

20   a common -- you know, their assertion that we're a common

21   carrier, which they haven't asserted.  Theirs is that no one

22   except for the United States could seek an injunction against a

23   common carrier.

24             THE COURT:  All right.  Well, let me turn the

25   question.  Is there any dispute that they are common carriers?

```
 1              MR. HATCH:  Practically, no, Your Honor.  I think
 2   that's -- they are certainly subject in certain regards.  The
 3   dispute is about what the scope of the STB's jurisdiction is.
 4              THE COURT:  Well, that's what you say the dispute is
 5   about.
 6              MR. HATCH:  There certainly is a dispute about that, I
 7   think, in fairness, Your Honor.  But I understand.
 8              Did the Court have another question?
 9              THE COURT:  No, go ahead.
10              MR. HATCH:  Okay.  Just quickly on the Fuel Surcharge
11   litigation Your Honor -- and again, we do not represent CSX in
12   that case -- but I think it is telling, as Mr. Lacy described,
13   that there was a motion to dismiss that did not raise this
14   issue, is my understanding as well.  And then it was put in the
15   affirmative defenses of both of our -- Mr. Lacy's and my client.
16   And that's consistent, in my view, because of course you can
17   have injunctions that are barred against common carriers by
18   Section 26 if they intrude upon the authority of the STB.
19   That's our position.  And so that's an appropriate affirmative
20   defense to advance in the Fuel Surcharge case, and you would
21   assess that when such an injunction was presented that could
22   intrude upon that authority.  It was not presented, is my
23   understanding, as some basis for a lack of subject matter
24   jurisdiction in those cases, and that's why we called that to
25   the Court's attention.
```

1          THE COURT:  Did you happen to look at any of the

2   briefing on that motion to dismiss practice there?

3          I thought it was interesting, the document from the

4   American Association of Railroads Policy and Economics

5   Department, July 2007, Antitrust In Railroads, where they say

6   "The exemptions also allow railroads to work together in a

7   limited way to increase efficiency and safety."  And then it

8   goes into bullet points about the exemptions.  And it describes

9   under the heading Injunctive Relief under 15 U.S.C. Section 26,

10  "Only the federal government can, in response to an alleged

11  antitrust violation by a railroad that is subject to STB

12  jurisdiction obtain injunctive relief, (that is, have a court

13  order a railroad to take some action), against that railroad."

14          And that bullet point concludes, as the U.S. Supreme

15  Court noted in a case affirming this exemption, and that's in

16  the old case, that's Central Transfer, 1933, "The purpose of

17  this exemption is to prevent private parties from interfering

18  with a regulatory agency that oversees railroads, the STB.  The

19  STB has broad injunctive authority of its own over railroads,

20  including the authority to enforce certain provisions of the

21  antitrust laws.  Moreover, this exemption does not prevent the

22  federal government from seeking injunctive relief for alleged

23  antitrust violations involving railroads."  Just, I thought it

24  was interesting how broad that discussion was.

25          I take the point you made in your brief that it's not

```
 1   traditional legislative history analysis to look at bills that
 2   are filed in Congress and work their way through committees
 3   after a piece of legislation; in other words, looking at that
 4   and any committee report or statements made is not traditional
 5   legislative history of the Act that's being analyzed, but the
 6   backdrop of the statement from the American Association of
 7   Railroads along with the efforts made to modify this very
 8   provision and the assertions that were made when those bills
 9   were introduced, that this does provide the broad exemption that
10   is argued for by the defendants is very interesting.
11           Attached to that motion to dismiss was also the
12   statement that was made on behalf of the American Association --
13   or excuse me, the Association of American Railroads that seems
14   to take the exact same position being taken here by Norfolk
15   Southern and NPBL.  Or I should reverse that, NPBL joined by
16   Norfolk Southern.
17           So it's just very curious.  It's a separate case where
18   all that was submitted, but it causes you to scratch your head
19   for sure.
20           MR. HATCH:  To answer Your Honor's question, I did not
21   have an opportunity to read that brief, so I'm sorry, I can't
22   add to it.
23           THE COURT:  Okay.  Did I interrupt you?  Did you have
24   more?
25           MR. HATCH:  Unless the Court has any further
```

```
1   questions, I'll sit down.

2           THE COURT:  Okay.

3           MR. HATCH:  Thank you.

4           THE COURT:  Thank you, Mr. Hatch.

5           Mr. Snow?

6           MR. SNOW:  Yes, sir, Your Honor.  I'll only clarify a

7   couple of things.  One on the points about whether the parties

8   are common carriers, I'll refer to the Court to the --

9           THE COURT:  Do you agree with him that it doesn't

10  matter whether his client is a common carrier?

11          MR. SNOW:  I think that's right.  It really only

12  matters whether the defendants are common carriers.  And if you

13  refer to the complaint, Page 5 where it described the parties,

14  Paragraph 7, 8 and 9 says CSX is a Class I railroad operating in

15  the eastern United States.  NS is also a Class I railroad

16  operating in the eastern United States.  And the Belt Line is a

17  Class III terminal switching railroad.  And under 49 U.S.C.

18  10501, that's the jurisdictional statute under Subtitle 4, that

19  makes all of us common carriers subject to Subtitle 4 and

20  jurisdiction of the Surface Transportation Board.

21          THE COURT:  I take it you didn't deny that?

22          MR. SNOW:  I'm sorry?

23          THE COURT:  That was in the complaint --

24          MR. SNOW:  That's in the complaint.

25          THE COURT:  -- that you just read to me?
```

```
 1              MR. SNOW:  Yes, sir.  Paragraphs 7, 8 and 9.

 2              THE COURT:  And I take it you admitted that in your

 3   answers?

 4              MR. SNOW:  I'm sure that we did, because it's true.

 5         The original other thing I will point out, because I

 6   think that the subsequent bills we cite in 2008, 2011, 2013,

 7   while it's not traditional, it's informative nonetheless.  And

 8   for that proposition, to assist the Court, I'll point to the

 9   Georgia case.  The Georgia one is the pre-1994.  That's the

10   United States Supreme Court case, 324 U.S. 439, where the

11   Supreme Court is analyzing whether price fixing, rate fixing, is

12   something that the ICC had authority over.  And they concluded

13   it didn't.  And they say at Page 457, "None of the powers

14   acquired by the Commission since the enactment of the Sherman

15   Act relates to the regulation of rate-fixing combinations.

16   Twice Congress has been tendered proposals to legalize rate

17   fixing combinations, but it has not adopted them."

18         So the analysis that we undertook in our brief is

19   consistent with the analysis that the United States Supreme

20   Court has taken in a similar context under a similar statute,

21   although the previous version.

22         I don't really have anything further to add unless the

23   Court has questions of me.

24              THE COURT:  I don't think that I do, although you,

25   earlier in your argument, I think, said something to the effect
```

1   of there are two procedural vehicles for the Court to get here.

2   There was some briefing argument about the procedural mechanism.

3   Did you want to address that?

4          MR. SNOW:  I think both of them are viable.  The

5   12(h)(3) can be raised any time.  There are opinions of this

6   Court and from the Fourth Circuit.  Your Honor cited the

7   bankruptcy opinion, I think it was <u>Kontrick</u>.  That can be raised

8   any time.  That is what we did to raise this jurisdictional

9   carve-out, the jurisdictional hole, essentially, that's left by

10  the current version of Section 26.

11         And then we also have Rule 12(c).  And Rule 12(c) I

12  think allows the same thing.

13         I realize the timing on Rule 12(c) can be an issue,

14  but there has been case law -- and I'll cite a case from the

15  Fourth Circuit that supports this proposition -- that where

16  something could be dispositive of the whole case, there's no

17  reason to not rule on a 12(c) motion and still force everybody

18  to go to trial.  And for that proposition I cite a case called

19  <u>Reynolds Associates v. Kemp</u>.  It's 1992 U.S. App. Lexis 20727

20  where the Fourth Circuit -- I'll read that again.  1992, U.S.

21  App. Lexis 20727.  I'm reading at Page 6, Note 4.  "The Fourth

22  Circuit is addressing an argument where the appellant

23  strenuously said" -- and I quote "strenuously" -- that the

24  district court erred by considering a motion for judgment on the

25  pleadings less than two weeks before the scheduled trial."  Very

1   similar to what we have here.  The Fourth Circuit says "We

2   disagree.  The determination whether the 12(c) motion

3   constitutes a delay of trial is within the sound discretion of

4   the judge.  However --" and this is the important part -- "if it

5   seems clear that the motion may have effectively dispose of the

6   case, the court should permit it regardless of any possible

7   delay its consideration may cause."

8          And I think that is the situation.  And I want to be

9   very clear that we filed the motion in the interest of not

10  having all of us go through a trial that may be unnecessary.

11         I can answer further questions on the procedure, but I

12  think that covers it.

13         THE COURT:  All right.  Thank you.

14         Mr. Lacy?

15         MR. LACY:  Your Honor, unless the Court has any

16  questions I don't have anything to add.

17         THE COURT:  Okay.  The Court will take a brief recess.

18         (Recess taken from 11:57 a.m. to 12:36 p.m.)

19         THE COURT:  Well, Counsel, thank you for your briefing

20  and your argument today.

21         First, the Court finds that the motion that we've just

22  addressed is procedurally proper, notwithstanding its late

23  timing.  As explained by the Fourth Circuit in the Reynolds

24  Associates v. Kemp decision that was mentioned during oral

25  argument at 974 F.2d 1331, and that was 1992 Westlaw at 207747,

1    at Page 2, Note 4 from 1992 at the Fourth Circuit, "The

2    determination whether the 12(c) motion constitutes a delay of

3    trial is within the sound discretion of the judge.  However, if

4    it seems clear that the motion may effectively dispose of the

5    case, the court should permit it regardless of any possible

6    delay its consideration may cause."

7                Separately, pursuant to Rule 12(h)(2)(C), "Failure to

8    state a claim upon which relief can be granted can be raised as

9    late as trial."

10               CSX has wisely acknowledged the likely waste of

11   resources that would result if the Court were to resolve this

12   potentially dispositive matter at the conclusion of trial, and

13   has further indicate today that the dispute turns on the scope

14   of the statute and not on any disputes regarding the status of

15   defendants as common carriers.

16               Finally, contrary to CSX's arguments in its opposition

17   brief, it does not appear that the law of the case would

18   preclude the Court from reconsidering the limited comments that

19   the Court made on this issue in its summary judgment opinion.

20               After careful consideration of the parties' briefing,

21   the Court finds that, although CSX has presented a well-argued

22   position on this issue, CSX cannot maintain its remaining

23   federal antitrust claims for injunctive relief under 15 U.S.C.

24   Section 26.

25               In determining whether CSX has a cause of action under

1   the statute, the Court is required to apply traditional

2   principles of statutory interpretation.  As the Supreme Court

3   has consistently instructed, the starting point in discerning

4   Congressional intent is the existing statutory text, which they

5   noted in <u>Lamie v. U.S. Trustee</u> in 2004.  "Where the language of

6   the statute is unambiguous, the Court is required to apply its

7   plain meaning."

8           The statutory language in 15 U.S.C. Section 26 is

9   clear.  The statute provides a private cause of action to seek

10  injunctive relief for a federal antitrust violation except when

11  the defendant is a common carrier subject to the STB's

12  jurisdiction.

13          Although argued intensively by CSX, the Court declines

14  to rely on legislative history where, as here, the statutory

15  text is clear.  Precedent instructs the Court to turn to various

16  canons of statutory interpretation, including legislative

17  history, only when the statute is ambiguous as written.  Here,

18  15 U.S.C. Section 26 is unambiguous.

19          Furthermore, even if the Court considers the

20  legislative history argued by CSX, such legislative history does

21  not present a compelling basis to deviate from the statutory

22  language.  Therefore, the remaining federal antitrust claims for

23  injunctive relief against Norfolk Southern Railroad and NPBL are

24  dismissed, and defendant's motion is granted as to the federal

25  injunctive relief claims brought pursuant to 15 U.S.C.

1   Section 26.

2          A written opinion to memorialize this ruling will

3   follow.

4          Now, where does that leave us?  It leaves us with this

5   question that I posed in the order to you all about the state

6   law injunctive relief claims.  It raises the question of whether

7   defendants have moved for a dismissal of the state law

8   injunctive relief claims by virtue of the request to dismiss all

9   remaining claims for relief.  And it raises the sort of

10  overarching question of the viability of the remaining claims to

11  the extent they remain.

12         So the Court, in its summary judgment opinion, found

13  that the state law claims were time-barred with respect to all

14  claims except for the breach of contract action surrounding the

15  2015 conduct.  Everything else was determined to be time-barred,

16  as I recall.  So we're going to take a lunch break, and I want

17  you all to think about this and address it.

18         Where time-barred state law claims for injunctive

19  relief may exist, we have to consider a couple things.  One, it

20  seems clear in Virginia law that, with respect to claims being

21  time-barred, that equity follows the law.  That's a principle

22  that's oft-repeated.  And if that is the case, is there really

23  anything left to proceed on as to the time-barred state law

24  injunctive relief claims?

25         Then we have, separate from that, that 2015 breach of

contract claim which was dismissed on different grounds.  The
claim -- essentially the Court found that the claim wasn't
presented with sufficient clarity because there was no
evidence -- as I recall the way I ruled, there was no evidence
of a loss of contracts, of other contracts in the record as a
result of the 2015 actions, which I called -- for shorthand you
can call it the slow-rolling -- CSX probably called it
no-rolling, but I would define it as sort of a slow-rolling
action of the trains at NIT.  And the Court had ruled, if I
recall correctly, that the three weeks or so of alleged loss of
activity from one customer was not part of the damages expert's
opinion, nor were the -- I think nor were the damages identified
in discovery with sufficient clarity.  But I'm sort of
summarizing from memory as to what the Court ruled in the
summary judgment opinion.

          So with respect to that, if it still exists; that is,
the injunctive relief claim on the breach of contract for the
2015 matter, you have the issue of the relief.

          So the equitable relief available for breach of
contract is essentially specific performance.  That's the
equivalent of the injunctive relief in Virginia, at least as I
understand it.  And the violation alleged is a failure to
cooperate cordially -- that's the language in the contract --
failure to -- or you must cooperate cordially and you must
encourage the business of the Belt Line.  And so that is the

1   contract provision.  And if the claim still exists and we're

2   really just looking at specific performance, the question arises

3   how would the Court order specific performance of that

4   provision?  And that is an issue that needs to be addressed.

5          Part of that issue is, to the extent that CSX asks the

6   Court to order specific performance if it were to find a breach

7   of the contract on the 2015 incident, would the Court, in light

8   of the Edwards v. CSX 2020 opinion that I asked you all to look

9   at, in light of that opinion and its language, would the Court,

10  in granting some of the relief, be veering into preemptive

11  activity?

12         I suppose that another issue with respect to that 2015

13  breach of contract claim is that you generally cannot seek

14  equitable relief where damages are an equitable remedy.  And

15  maybe this is the question I should have raised first even

16  before the question about the specific performance and

17  preemption:  Damages, where sought, would ostensibly be an

18  adequate remedy, but there is a failure of damages for the

19  reasons explained in the summary judgment opinion.  And so is

20  specific performance really still available?

21         So those are the questions that I'd like to talk about

22  with you when we come back.

23         Mr. McFarland, did you have a question?

24         MR. McFARLAND:  Just, I wanted to -- good afternoon,

25  Your Honor.  Robert McFarland on behalf of CSX.

```
 1              I think when the Court is discussing or looking at the
 2    issue of injunctive relief, we think it is very much also viable
 3    under the conspiracy claims, both the statutory conspiracy and
 4    the common law conspiracy.  And we're happy to present that to
 5    Your Honor.
 6              THE COURT:  Yes.  You should argue about whether or
 7    not -- be prepared to argue about whether the Virginia doctrine
 8    of equity following law prohibits you from seeking injunctive
 9    relief on either or both the conspiracy claims, since they have
10    been deemed to be time-barred, and whether the statute of
11    limitations on those were similarly time-barred.  That's the
12    question I want you all to look at.
13              MR. McFARLAND:  Absolutely, Your Honor.
14              And with respect to the contract claim let me note,
15    the injunctive relief that we're seeking is prospective because
16    of a pattern of behavior that was exhibited over a long period
17    of time, but exhibited in a different fashion in 2015 with the
18    refusal to move the trains or to move them on a much different
19    schedule than we think was appropriate given the crisis at the
20    port.  And so that's prospective.  And what we're asking this
21    Court is to fashion injunctive relief that will preclude that
22    from continuing to happen in the future.
23              So I do think there's a big distinction.  The Court
24    was mentioning the damages aspect, but this Court does still --
25              THE COURT:  I understand.  Your position is that
```

1    there's not an adequate remedy via damages --

2          MR. McFARLAND:  For what's going to continue to

3    happen.

4          THE COURT:  -- but that's what I want to hear this

5    afternoon.

6          MR. McFARLAND:  Exactly, Your Honor.

7          THE COURT:  Okay.  So why don't we come back then at

8    2:00 and I'll hear from you on those topics.  Should you wish to

9    talk amongst yourselves, you're welcome to do that also.

10         (Recess taken from 12:53 p.m. to    :        .m.)

11         THE COURT:  All right.  Mr. Hatch or Mr. McFarland, I

12   should probably hear from you all first on this issue.  I should

13   say these issues.

14         MR. HATCH:  Thank you, Your Honor.  I'll go through

15   the Court's questions and take any other questions the Court may

16   have as we proceed.

17         I think the first question the Court asked, if I could

18   paraphrase, was about whether the summary judgment ruling had

19   resolved the state law claims for injunctive relief.  And I

20   don't presume to tell the Court the meaning of its decision, but

21   our understanding of that decision, as I think the Court

22   outlined before the lunch break, was that the state law

23   conspiracy claim, statutory conspiracy and common law conspiracy

24   were -- summary judgment was granted based on the statute of

25   limitations.

 1          And so then the, and then the Court on the issue of

 2   injunctive relief, as we quoted in our response, said the Court

 3   was not reaching the issue of injunctive relief because there

 4   was no motion for injunctive relief.  So in our view, the Court

 5   left the state injunctive relief claim.

 6          And the Court talked about breach of contract, I don't

 7   want to forget that as well.  That's also in that same analysis.

 8   So those were left in the case by the Court's summary judgment

 9   ruling.  There was no motion on them, as I think the Court's

10   order of the other day referenced, and therefore they weren't,

11   weren't a basis for grant of summary judgment.

12          So then the next question the Court has was does the

13   pending motion cover those claims?  Not in my view.  It's styled

14   as a motion to dismiss, I think, all the remaining claims, it

15   says, but the position of NPBL is that the state law claims are

16   no longer in the case, and their brief was focused exclusively

17   on the Clayton Act, which is what we responded to.  So their

18   position is that those claims were already removed from the case

19   and were not a subject of their motion, and I think that carried

20   through all the way to their reply brief as well.

21          Then the Court's next question was if they're not the

22   subject -- I believe the Court asked if they're not the subject

23   of the pending motion, can the Court take them up at this time.

24   And I would say on that one, Your Honor, as we have said, it

25   does not, we think, make sense to do a trial if the Court would

1   conclude that our claims are completely barred on purely legal

2   ground.

3           With that said, there is no pending motion to which

4   we've had the opportunity to respond that challenges the state

5   law claims.  I think that that's pertinent.  The Court before

6   the break raised the issue of equity following the law.  We

7   cited a case in our opposition from the Virginia courts about

8   where a claim was -- I think it was a Circuit Court case -- a

9   claim was time-barred under the statute of limitations but

10  allowed to go forward as to prospective relief in a trespass

11  case.  I think there's more to be said about those issues than

12  is before the Court, because frankly they didn't file a motion

13  on it and we haven't had the opportunity to respond.

14          My view of the Virginia law on this is that of course

15  Virginia, as the Court knows better than I do, for the longest

16  time, it's separate law and equity and separate doctrines for

17  those two, and statute of limitations is a defense at law to

18  historic money damages and it is not a defense in equity,

19  although, you know, as the Court asked about laches, for

20  example, which is an equitable defense that could be raised.

21  But here, because we have ongoing conduct that harms us, and

22  that was -- that's where I see, and I think there's other

23  Virginia cases, Your Honor, frankly, on this topic -- if your

24  equitable relief is historical such that it would be barred by

25  laches or even perhaps outside the statute of limitations --

1    although I don't think that's applicable here -- but if your

2    equitable relief is looking backwards, that may be one thing.

3    Our equitable relief is looking forward.  So the way we framed

4    our case is past money damages, and then seeking the injunction

5    for the Court to stop the conduct going forward.

6            And so the Court's summary judgment decision concluded

7    we had evidence to go to trial about a conspiracy and

8    monopolistic claims that occurred, and the issue the Court

9    identified was with the way we calculated damages within the

10   statutory period.  But the Court also said under the Clayton

11   Act -- and recognizing the Court's ruled on the Clayton Act for

12   a different reasoned to -- but on the Clayton Act injunctive

13   relief that we had alleged threatened harm.  Which is correct.

14   We allege that in our complaint, and that is very much our

15   perspective.  The conduct has continued.

16           THE COURT:  Let me stop you there.  Your reading of

17   the Court's opinion was that the conspiracy claims were not

18   time-barred?

19           MR. HATCH:  No.  Well, I didn't mean to say that,

20   exactly.  What I was trying to say is that the Court found that

21   our -- the way we calculated damages on our conspiracy claims --

22   on our federal -- I was talking about the federal claims, Your

23   Honor --

24           THE COURT:  Okay.

25           MR. HATCH:  -- the way we calculated damages within

the statutory period did not comport with my reading of the

Court's ruling with the statute of limitations.  But the Court

did find that we had evidence -- denied summary judgment on

conspiracy.  And if the Court is referring -- on the state law

the Court did say that there was not new evidence within the

state statutory period to go to trial, but the Court denied the

old -- I'll call it the old, from the earlier time -- on the

statute grounds.

So as I read the Court's opinion, yes, we have triable

evidence of conspiracy and anticompetitive and other conduct.

The federal damages for that went out inconsistent with the

statute of limitations, was the Court's ruling.  And then -- but

we have in the section of the Court's decision that looked at

the injunctive relief we have alleged threatened harm going

forward, we have established that in the record, they did not

move with respect to that.  And so that's why the injunctive

claims could be forward.

And the same is true of the state law claims.  In

Virginia you can either get an injunction by virtue of a

statutory grant or by virtually essentially the common law.  For

the statutory conspiracy claim there it is a specific statutory

grant for injunctive relief for the statutory conspiracy.  And

the common law criteria essentially to get injunctive relief are

threatened or irreparable harm and inadequate remedy at law.

And again, we, I believe we have presented these to the Court,

```
 1    particularly since, under the Court's ruling, which we
 2    respectfully disagree with, but under the Court's ruling we
 3    can't secure the money damages we were seeking.
 4           THE COURT:  So what's the statute of limitations that
 5    applies to that claim?
 6           MR. HATCH:  In my view, Your Honor, there are --
 7           THE COURT:  The state injunction claim.
 8           MR. HATCH:  For the state, the statute of limitations
 9    is a defense at law to an action at law, an injunction is an
10    action in equity, and therefore the statute of limitations does
11    not apply to the equitable action for injunction.  There are
12    equitable defenses that could be asserted potentially like
13    laches or that sort of thing.  But there's not -- equity, of
14    course the Court knows, is not -- it's equitable.
15           And so the more hard and fast statute of limitations
16    rules that apply to bar an action in damages don't apply to
17    equity.  And that makes sense because, as I see the policy
18    behind them, if you don't bring suit in time under the statute
19    you may be barred from recovering damages that you incurred, but
20    if the conduct is continuing and threatens to continue then you
21    can still seek an injunction to preclude that.  In other words,
22    we're not going to let defendants who are engaging in unlawful
23    behavior continue that behavior into the future for all time
24    just because it wasn't sued on within a particular period of
25    time.  You don't get license to do prospective harm.
```

 1              THE COURT:  Well, I realize that you may not have

 2      looked at this because there's no specific motion filed on it,

 3      but do you have a case that you think supports that viewpoint?

 4              MR. HATCH:  Yes, Your Honor.  I think --

 5              THE COURT:  You can consult your --

 6              MR. HATCH:  I believe we did cite --

 7              THE COURT:  You can conduct with Mr. McFarland if you

 8      want.

 9              MR. HATCH:  No, That's fine, Your Honor.  Thank you.

10      I appreciate it.

11              I think that we did cite in our brief the Downey v.

12      Verizon Virginia, LLC case.  And that was the case I believe

13      under trespass which found that, just the fact that the conduct

14      was outside the statute was not a basis for precluding

15      injunctive relief.  In fact, the fact that the plaintiff may

16      have been precluded from procuring the money damages was a basis

17      in support of injunctive relief.  In other words, it was a basis

18      that favored the lack of an adequate remedy at law.  The cite

19      for that is 86 Virginia Circuit 526, Your Honor, which was cited

20      in our responsive brief.

21              This case was also not cited, I believe this case was

22      not cited in our responsive brief, Your Honor, and I did got

23      bring copies of it, but there's an Armstrong v. Bryant case, 189

24      Virginia 760 from 1949.  On 769 of that opinion the Court talks

25      about "Its also argued that the complainant has an adequate

```
 1   remedy at law and that if she had suffered any injury she could
 2   recover damages at law.  We do not agree.  If she were relegated
 3   to a lawsuit, it would be difficult for her to establish
 4   adequately her claim against Armstrong.  They collected forty
 5   dollars per month from her and it's likely a considerable
 6   portion of these payments would be barred by the statute of
 7   limitations in an action at law."
 8                THE COURT:  All right.
 9                MR. HATCH:  So again, as I read the Virginia law --
10   and again, Your Honor, this is not comprehensive, and I want to
11   be very clear, I like to be very candid with the Court, this is
12   the type of thing you would expect someone to bring in a motion
13   and then you have an opportunity to respond to, it's an
14   important issue of Virginia law, but -- and under this analysis
15   of course the Court is looking at what Virginia law would
16   provide under Erie.  And as I read these cases -- you know, take
17   the example of trespass.  Let's say someone is trespassing on
18   your property and you don't bring a damages action within time
19   for the original trespass.  You may not be able to sue for that,
20   but if they continue to trespass on your property, you can seek
21   an injunction of course from a court barring them from
22   continuing to trespass.  They don't have license to trespass
23   forever just because they started doing it outside the statutory
24   period.  And that's how the law strikes that balance between
25   historical damages, which may be barred by a statute of
```

1  limitations, and prospective equitable relief.

2       And I think when we talked about the laches issue in

3  the supplemental briefing with the Court, laches can look at

4  some of those things, but laches is more flexible.  It's in the

5  equitable frame.  And laches might look at something like -- I

6  know the Court cited the GenWell case from the Fourth Circuit, a

7  merger that has gone through and been approved and been in

8  existence for a few years, maybe unwinding that merger that

9  might be a laches issue.  And even there they didn't find it was

10  a bar to doing it.  But laches, if you're trying to undo

11  historical conduct, whereas we have presented in our filing last

12  week to the Court, I think, an injunction that bars prospective

13  conduct, so that the Court -- and also at the same time, our

14  other guide post, Your Honor, was not to trench on the STB's

15  jurisdiction.

16       So we didn't ask the Court to separate -- we didn't

17  ask the Court to adjudicate traffic rights, we didn't ask the

18  Court to say when trains can move or not move.  We're not asking

19  for that.  What we're asking for is barring them from engaging

20  in anticompetitive conspiratorial conduct going forward, because

21  that's what led to this, and then putting an independent

22  board -- which the Court has, I think, entertained in its prior

23  rulings -- putting an independent board in and let our proposal

24  rise and fall on its merits with that independent board.  Then

25  the Court doesn't have to worry about it.  If our proposal is

```
 1  bad, then it won't be accepted.  If our proposal is good for the
 2  Belt Line, then it will be accepted.  And a independent Belt
 3  Line can make decisions that are best for the independent Belt
 4  Line.  We're not asking the Court to decide what the right rate
 5  is.  And so that's how we've presented that injunction.
 6          As the Court knows, we twice tried to go to the NPBL
 7  and get our proposal accepted, and it frankly was the exercise
 8  of Norfolk Southern's members in the conspiracy that stopped
 9  those from being considered fairly and on their merits.  And so
10  that's the injunction we're proposing, which would let the Court
11  set the Belt Line free from what Norfolk Southern has done with
12  it and decide this on its own merit, be good for the Belt Line
13  and be good for CSX, we believe.
14          I kind of got into, I think, the last question that
15  the Court had asked, which is the intersection between our
16  requested injunctive relief and ICCTA preemption.  And the Court
17  had cited, I think, the Edwards case from the Fourth Circuit,
18  called our attention to that.
19          I'll say -- and I'm happy to address specific
20  questions the Court has -- I read Edwards and I saw no
21  divergence whatsoever from the lines drawn by this Court in the
22  motion to dismiss decision, original motion to dismiss.  The
23  Edwards case said that ICCTA preemption can apply to state law
24  tort claims just the same it can apply to other claims.  And
25  this Court in its motion to dismiss decision referenced, I
```

 1  think, a district court decision within the Fourth Circuit that

 2  had applied ICCTA to state law tort claims.  So the application

 3  of ICCTA to state law tort claims, as I read the Court's ruling,

 4  that didn't have any difference from where the Fourth Circuit

 5  ended up.

 6          Then the Fourth Circuit applied, to my eyes, the same

 7  standards that this Court applied in its motion to dismiss

 8  phase.  And you know, we can talk about those very particularly,

 9  but essentially are you looking to regulate the operations of a

10  railroad as such?  The more you're trying to do that, then

11  you're more on the preemption side.  If what has happened is

12  that companies that happened to be railroads have engaged in

13  violations of otherwise applicable law, anticompetitive, state

14  law conspiracy, et cetera, then they can be ordered as remedies

15  to cease that conduct, to change the board.  That doesn't trench

16  upon the STB's authority.

17          And I think the Court put it in the motion to dismiss

18  decision.  The STB would ask a question about what the right fee

19  for trackage rights is.  The Court's asking a question about did

20  these businesses engage in a otherwise barred conspiracy.

21  They're different questions.  Could the STB -- and that applies

22  by the way, Your Honor, NPBL has raised the control authority

23  that the STB has.  And that applies to control as well.

24          Now, the first point I would make is the STB has told

25  this Court on no uncertain terms, they never authorized control

```
 1   by Norfolk Southern over NPBL.  And not only did they not
 2   authorize it, it wasn't sought.  And so I don't see where
 3   there's any conflict.  They never sought it and they never got
 4   it.
 5          So then the STB said it would be helpful to know what
 6   the Court finds as a result of these proceedings.  So there's
 7   certainly no conflict with an STB-controlled decision.  And our
 8   injunction is not seeking -- we're not asking the Court to
 9   impose CSX control over the Belt Line.  We're not asking the
10   Court to impose Norfolk Southern control over the Belt Line.
11   We're asking the Court to impose an independent board and
12   management of the Belt Line.  So that's not, that's not a
13   control action, that's a remedy for other violations.
14          If the STB were to adjudicate a control proceeding
15   they would have apply their own statutes and regulations and
16   their own standards for unlawful control.  And they can do that.
17   They can still do that if the Court went forward and issued the
18   injunction we're requesting.  In other words, they could look
19   back and say Norfolk Southern, you exercised unlawful control
20   for decades over NPBL, and here's the damages or the penalties
21   or whatever they would calculate as a result of that.  It's not
22   in any way inconsistent with what we're asking the Court to do
23   because we're not asking the Court to award control to one
24   railroad or another, we're asking for an independent board.
25          THE COURT:  Is there a case that says that?
```

1           MR. HATCH:  Well, I think that -- I was relying on

2    this Court's motion to dismiss decision which said that we could

3    go forward with our injunctive relief claims under federal and

4    state law, and that seeking --

5           THE COURT:  Is there a case other than this court that

6    you think says that?

7           MR. HATCH:  I thought that this Court's opinion,

8    Edwards and the Phosphates case that this Court looked at are

9    all, I think, very consistent with this Court's analysis.  The

10   line --

11          THE COURT:  No, I'm sorry.  I didn't ask the question

12   well.

13          MR. HATCH:  Okay.

14          THE COURT:  Is there any court that has said that

15   replacing a board is not a control action?

16          MR. HATCH:  I -- candidly as I stand here I can't say

17   one way or the other, Your Honor.  But the point, the point I

18   would -- the Court looked at this control issue at the, I'll

19   call it the second motion to dismiss stage, the Norfolk Southern

20   motion to dismiss, and the Court did talk about control in that

21   context.  And really as I see that, it's whether -- when Norfolk

22   Southern merged, they were given the authority to control the

23   Belt Line.  And I think the record is very developed as a result

24   of the referral that they received no such control.  And the

25   control that's referred to there is the control by one railroad

1    over the other railroad.  And so by virtue of what control -- I

2    don't see how you could even describe an independent board

3    structure as a form of control by one railroad over the board.

4    But candidly I don't have a specific case on that.

5              THE COURT:  Okay.

6              MR. HATCH:  The last thing I would say, Your Honor, it

7    comes back to the line that I think in the Edwards case, Edwards

8    cited I think a Fifth Circuit case and maybe a district court in

9    the Fifth Circuit as illustrative applications of ICCTA

10   preemption that cited approvingly.  And the line seemed to be

11   there are you trying to regulate a railroad in its operations

12   that are subject to the STB jurisdiction or has something that

13   is a railroad done something else that's wrong, in which case it

14   can be subject to injunction.  And the Fourth Circuit in that

15   case talked about a case where there was a accident at a

16   railroad crossing and there were two claims, one of which was

17   that the railroad stayed in the crossing too long and the other

18   that they had operated negligently in doing the crossing.  And

19   the Court said, you know, regulating how long it can stay in the

20   crossing isn't STB, it's preempted, but the fact that it was

21   operated improperly on that particular day causing you injury,

22   that's not preempted, that's not trying to regulate railroad

23   operations, it's just making them subject to otherwise

24   applicable tort duties.

25              And I think again, I'm happy to address if the Court

1    had specific questions, but <u>Edwards</u> to me, I read it several

2    times alongside the Court's motion to dismiss decision, and they

3    seem to be completely consistent.

4            THE COURT:  So your brief in which you laid out the

5    actions that you would like the Court to take, you say threads

6    the needle?

7            MR. HATCH:  I'm sorry, Your Honor?

8            THE COURT:  You say it threads the needle --

9            MR. HATCH:  Yes.

10           THE COURT:  -- and does not encroach upon preempted

11   activity.  So give me the examples of what it is you -- so the

12   new board is what you asked the Court to do injunctively if it

13   makes the finding of a breach or a violation or -- yeah, that's

14   what you're asking.

15           MR. HATCH:  Really twofold.  Yeah, new independent

16   board and management.  And I think that there's some ways the

17   Court could go about that.  But that's the bottom line of it.

18   Independent board and management.  Again, as a remedy to

19   conspiratorial conduct and breach of contract.

20           And then also a separate category that's a prohibition

21   on continuing the conduct that the Court would find to be

22   unlawful.  So a prohibition on continuing to engage.  We framed

23   it when the anticompetitive claims were still in there, but they

24   would include precluding conspiracy conduct that the Court would

25   find over the course of the trial certain types of collusion and

1    that sort of thing.

2              THE COURT:  And how would that be policed ultimately?

3    You know, if I enter an order telling them not to engage in

4    further conspiratorial conduct?  What happens then?

5              MR. HATCH:  So I think, Your Honor, the value of doing

6    both of those things is frankly that it helps the Court on

7    policing the first one.  So I think the law is clear that part

8    of an injunction can be precluding continuation of conduct found

9    to violate the law.  And that's essentially what the first

10   prohibition part is doing.  If the Court didn't give us the

11   second part, the independent board and management, then the

12   Court would be in a position of having to police whether, for

13   example, when we put a new service proposal before NPBL, that

14   that had been evaluated without conspiratorial conduct; whether

15   that had been evaluated without the prohibitions that the Court

16   would put in place.

17             And I see the value of also doing the independent

18   board as helping the Court in that one because if you have the

19   independent board, then it's going to make it very unlikely that

20   they would be able to engage in the -- it's not to say they

21   couldn't, we'll have to see what shakes out in the facts -- but

22   it would make it very hard for them to engage in that conspiracy

23   because the board becomes independent and the management is

24   independent and will be looking out for NPBL's own interests.

25   And that's where I say then we make our proposal and it rises

1  and falls on its merits.

2          Now, if we, in the course of making that proposal, of

3  course, identify conduct that seems to violate the prohibition

4  on conspiracy, we would bring that back before the Court and the

5  Court would assess whether that was, in fact, a violation of the

6  injunction or not.  But I think the independent board makes that

7  much less likely, and is also an appropriate remedy because then

8  the matter will be decided by a board that is not Norfolk

9  Southern dominated.

10         THE COURT:  And under your vision of this, if you were

11 to succeed on everything the Court would retain jurisdiction?

12         MR. HATCH:  Correct.  A court retains jurisdiction to

13 enforce its injunction.

14         THE COURT:  All right.  Anything else?

15         MR. HATCH:  No, unless the Court has any further

16 questions.  Thank you.

17         THE COURT:  No.  Thank you.

18         Mr. Snow?

19         MR. SNOW:  Do you have a preference?

20         THE COURT:  I don't.  It's up to you all.

21         MR. SNOW:  May it please the Court, Your Honor.

22         I'll do my best to address all the questions the Court

23 asked and I'll do it in a form of telling you, one, what we

24 perceive the summary judgment order to have granted and then,

25 two, a discussion of the grounds for dismissal that Mr. Hatch

```
 1    just addressed.  In preview I will say the words "time-barred"

 2    and "preemption".  And then three, I'll discuss some procedural

 3    vehicles, because I like to button things up and to provide the

 4    Court the procedural vehicles for dismissal, because I think the

 5    whole case should be dismissed.

 6            Starting with one, a reading of what the Court

 7    granted.  And I refer the Court to Pages 97 and 98 of the

 8    Court's opinion.  And I'm not, of course, telling the Court what

 9    it did, but what we perceive the Court did.  Both defendants

10    moved for summary judgment on the state law claims entirely.  We

11    moved to dismiss them entirely.

12            THE COURT:  Didn't mention injunctive relief

13    specifically though?

14            MR. SNOW:  No.  And I'll concede that.  We didn't call

15    that out because we moved to dismiss them entirely.  So when we

16    read the Court's decision on Page 94, it said "The Court finds

17    that there is no genuine dispute as to any material fact

18    regarding CSX's state law claims and that defendants are

19    entitled to judgment as a matter of law with respect to those

20    claims."

21            We read that to suggest they're all gone.

22            And then again on Page 98 when the Court stated

23    "Therefore, defendants' summary judgment motions are granted

24    with respect to the Virginia statutory and common law conspiracy

25    claims."  Again, we viewed those claims as gone.
```

```
 1              And the reason I didn't view us as even contemplating
 2   a bench trial on state law injunctive relief is because Your
 3   Honor's order is divided into sections.  And the section that
 4   Your Honor called out the need for a bench trial on injunctive
 5   relief, that falls under V in the Court's opinion, which is
 6   Federal Law Claims.  Okay.  So from our perspective, the Court's
 7   ruling was that the bench trial that could potentially still
 8   happen on injunctive relief related to the federal law claims,
 9   because that's the section that the Court called that out in.
10   And again, I'm not challenging what the Court ruled, I'm telling
11   the Court what we perceived the rulings to be so that all the
12   state law claims were gone.
13              But if I, if I indulge Mr. Hatch's arguments and I
14   talk about the specific grounds for the dismissal, those I
15   believe are found on Page 97 and 98 of the Court's opinion.  And
16   I'm talking about the conspiracy counts, because as against the
17   Belt Line there were only conspiracy counts left.  The breach of
18   contract is not against us.
19              So on the conspiracy counts, the Court held two
20   things:  "As to any potential new conspiracy" -- and I'm
21   referring to Page 97 now at the bottom -- "as to any new
22   conspiracies between 2015 and 2018 that are separate from the
23   alleged conspiracy beginning in 2009" -- this is what the Court
24   held -- "both causes of action fail based on the record evidence
25   even when viewed in the light most favorable to CSX and
```

1  regardless of the heightened evidentiary standard."

2      I believe that's a merits ruling.  And so as far as

3  our understanding of the Court's opinion was at the bottom of

4  Page 97, any conspiracy claims under state law within the

5  statute of limitations were denied on the merits.

6      The next sentence the Court wrote was "To the extent

7  that CSX's statutory and common law conspiracy claims are based

8  on allegations of a conspiracy that began in 2009 and continued

9  through 2018, both causes of action are time-barred."

10      So that's for a conspiracy that might have started

11  long ago and is outside the statute of limitations window.  And

12  then of course the Court grants the summary judgment motions.

13      So I think to the extent we're talking about -- I

14  think Mr. Hatch's argument must be referring to that second

15  sentence about a conspiracy that might have started long ago.

16  And we have briefed that, Your Honor.  Everybody briefed that on

17  the summary judgment motions.  Under Virginia law it's different

18  from federal law.  Statute of limitations runs from the first

19  overt act, not the most recent.  And that would be 2009.  So

20  under the statute of limitations it's time-barred like the Court

21  said.

22      That leads to the logic that the Court talks about

23  before lunch which is, in Virginia, equity follows the law.

24      THE COURT:  Okay.  Well, before you move on past

25  that --

```
 1              MR. SNOW:  Sure.

 2              THE COURT:  -- do you have the opinion with you?

 3              MR. SNOW:  Yes, sir.

 4              THE COURT:  All right.  And how did you read Footnote

 5     46?

 6              MR. SNOW:  Honestly, Your Honor, I viewed Footnote 46

 7     as unnecessary to the Court's holdings.  I understood what the

 8     Court was suggesting.  It was almost an even-if statement to me.

 9     Even if there was something still alive, the state law

10     injunctive relief claims don't seem viable under state law.  And

11     I agree with that.  Because equity follows the law.  And there

12     is a case I could point to to support that position, and if I

13     may, Your Honor, I'll pass it up.  I've already passed it to

14     plaintiff's counsel.

15              It is called, for the record, Manotas v. Ocwen Loan

16     Services, LLC.  This is a Fourth Circuit case.  The cite is 794

17     F. App'x 259.  It's essentially a claim against a loan servicer.

18     But I'll refer the Court to Page 6 of 8 in the handout I gave

19     Your Honor, which is Page 264 of the opinion.  And at Headnote 3

20     I highlighted the sentence that I believe is controlling on this

21     issue which says "Under Virginia law, it is well established

22     that the form of litigation does not affect the analysis of the

23     statute of limitations."  This is essentially equity follows the

24     law in Virginia.  This is a 2019 case.  And you can see the

25     Fourth Circuit's analysis of this.  Just above Headnote 7 I
```

```
 1   highlighted this also:  The Court concludes "Here, the Manotas's
 2   claim for declaratory and injunctive relief based on the first
 3   material breach doctrine recites the same allegations as the
 4   breach of contract claim and is therefore subject to the same
 5   statute of limitations for breach of contract."
 6          So here, of course, if the statute of limitations
 7   barred these state law claims, equity would bar them as well
 8   under Virginia.
 9          And it's important in this case to note -- I heard the
10   arguments about seeking prospective relief.  Just above Headnote
11   3 at the top of that page, under Subpart A it says, just like
12   here, "The Manotases argue that the statute of limitations does
13   not apply because their claim for declaratory and injunctive
14   relief is a claim for prospective relief that seeks to prevent
15   foreclosure sales."  So they also sought prospective relief.
16   Did not matter to the Fourth Circuit.  The claim was barred
17   because it was barred by the statute of limitations already.  So
18   for that reason they should be dismissed.
19          But I'll offer an additional reason that the state law
20   claims ought to be dismissed, the injunctive relief, which is
21   preemption.  It's the Edwards case.  It's actually something we
22   had previously argued.
23          Under Edwards, the previous law that the Court cited
24   on its motion to dismiss at ECF 66 I think correctly recited
25   that in the Fourth Circuit at least, the only decision coming
```

1  out of the PCS Phosphate case had been that state regulation is

2  preempted.  But it was somewhat of a, still an open question

3  about whether state tort claims like conspiracy claims and the

4  like would be preempted.

5        We cited a D.C. Circuit case.  There were some other

6  circuits that had already held that.  The Edwards case makes

7  clear that in the Fourth Circuit that's now the law too.

8        And so, for the same reasons we talked about this

9  morning under the STB's exclusive jurisdiction over rates and

10  over control, the conspiracy claims would be preempted, even if

11  they weren't time-barred.

12        And I said in the beginning I would provide the Court

13  a procedural vehicle for getting there.  I think there are at

14  least two, if not three.

15        One is the motion to dismiss that we've already filed

16  where we do seek dismissal of all remaining claims, and that is

17  the specific relief we seek.  I realize we didn't address these

18  directly because, as I said, we thought they were already gone.

19        But two is our previous motion to dismiss where the

20  Belt Line categorically sought to dismiss all state law claims

21  as preempted.  And for that, Your Honor, I'll refer the Court to

22  what our motion to dismiss said.  I'll just read it.  It's at

23  ECF 28 at Pages 9 to 10.  We say "Counts 7, 8 and 9" -- 7 is

24  gone, but 8 and 9 are the conspiracy counts -- "Count 7, 8 and

25  9 of CSXT's complaint alleges state law claim of conspiracy and

```
 1   tortious interference that are categorically preempted by

 2   ICCTA."  We go on to say, "Accordingly, all of them should be

 3   dismissed as preempted."

 4           And I mention that previous motion to dismiss because

 5   that was fully briefed with the exception of the Edwards case.

 6   And there is law, and I'll point to American Canoe out of the

 7   Fourth Circuit, 326 F.3d 505 at Page 515, this is Fourth Circuit

 8   2003, and it states a proposition we all know:  "Any time before

 9   final judgment the court can reconsider its own rulings based on

10   changes in the controlling law and change those rulings."

11           So there are two vehicles to get to dismissal of this

12   case and all remaining state law injunctive relief.  One is the

13   motion to dismiss we have pending, one is the motion to dismiss

14   we already filed, and then a third is Rule 12(h)(2) which allows

15   dismissal at any time before trial.

16           THE COURT:  So what do you say to Mr. Hatch's

17   assertion that the matters about which he would seek injunction

18   do not fall under preemption?  That is, the prohibition or

19   continuing to engage in conspiratorial activity, and second,

20   appointment of a new independent board and/or management?

21           MR. SNOW:  Yes, Your Honor.  I -- respectfully,

22   Mr. Hatch, I think he's wrong on both points.

23           On the point about control, we cited a number of cases

24   from both the U.S. Supreme Court, the other federal courts, and

25   the STB or formerly the ICC, talking about the degree of control
```

1  that the STB has power over, which includes boards and

2  management.  And frankly -- I'm not -- I'm not casting any

3  judgment about what level of control is right or wrong, but

4  reducing one party's level of control, increasing another,

5  installing an independent board, all of these things fall within

6  the jurisdiction of the STB.

7          And if you look at the Soo Line Railroad case that we

8  cite on Page 12 of our memorandum in support at ECF 573, it

9  cites the general 49 U.S.C. 10102 definition of control, and

10 under 10102 that includes actual control, legal control, the

11 power to exercise control by or through, and here's the point,

12 (a) common directors -- talks about directors -- officers,

13 stockholders, a voting trust or holding or investment company,

14 or (b), any other means.

15         And the Soo Line case went on to say that "This kind

16 of control embraces the power of authority to manage, direct,

17 superintend, restrict, regulate, govern, administer or oversee

18 the day-to-day affairs of that carrier."  So that's what we cite

19 on that page.  And there were a number of others.

20         I think there's no way to escape the conclusion that

21 the control issues that they seek to enjoin here are within the

22 STB's power.

23         We cite as well -- I know Your Honor asked about the

24 general request to not violate the law, essentially, and we

25 cited in our supplemental brief on this injunctive relief that's

 1  ECF 542 at Page 4 -- and I know Norfolk Southern has cited these

 2  too -- but I'll just point to a Wright & Miller cite.  Wright &

 3  Miller Section 2955 at Page 361 where they say "Generic 'obey

 4  the law' injunctions are uniformly found to violate the

 5  specificity requirement of Rule 65."  And the reason is because

 6  everybody has to obey the law anyway.  The courts are not in the

 7  business of creating policing obligations that just can't be

 8  enforced by anything other than the law that already exists.

 9          So I believe that under any number of ways to analyze

10  this, Your Honor, the state law injunctive claims should be

11  dismissed, and that's what we respectfully ask for.

12          I'm happy to entertain any other questions, Your

13  Honor, if you have them.

14          THE COURT:  All right.  Thank you.

15          MR. SNOW:  Thank you, Your Honor.

16          MR. LACY:  Good afternoon, Your Honor.  Again, Michael

17  Lacy for defendant Norfolk Southern.

18          Let me first start off by saying that we obviously

19  adopt the Belt Line's arguments as it relates to the control

20  issue, and in all matters, frankly.

21          The Court before the break had posed several questions

22  about the contract claim and specific performance, and so that's

23  what I want to start off on.  And I'll also circle back to some

24  of the subsidiary control issues or obstacles we think there are

25  with this particular injunctive relief that Mr. Hatch referred

1   to.

2          THE COURT:  You're the only subject of that?  Your

3   client's the only subject of that claim, right?

4          MR. LACY:  The contract claim, yes, Your Honor.

5          THE COURT:  Okay.

6          MR. LACY:  So what we have here with respect to the

7   contract claim and the ability to seek injunctive relief

8   thereunder is a failure of both pleading and proof.

9          Your Honor, I think this analysis begins and ends with

10  the Court's summary judgment order and on Page 102 where the

11  Court dismissed the contract claim on the merits because there

12  was no evidence in the record of any damages caused by the, what

13  I'll call the operational moves in 2015.  And as the Court noted

14  in its summary judgment opinion, damages are an element of any

15  breach of contract action.  So from our perspective, that is why

16  we believe the contract claim to have been dismissed on the

17  merits.  And that matters because under well-established law and

18  several cases from this court, injunctive relief is a remedy and

19  it cannot be granted without an actionable claim.  And for that

20  proposition I can cite to the Court to Senior Judge Gibney's

21  decision of a few months ago, Brainchild Surgical Devices, LLC

22  v. CPA Global Ltd., 2022, U.S. District Lexis 61759 at star 13

23  and 14.

24          Judge Gibney, in turn, relies on Judge Alston's

25  decision in Bloch v. Executive Office of the President, 164

1   F.Supp. 3d. 841 at pin cite 862.  That's a 2016 case.

2        Your Honor, that well-established, black letter of the

3   law ends the inquiry because if there's not an actionable claim,

4   you're not entitled to any relief.  And that is why we read your

5   Footnote 46 to your opinion as acknowledging -- unlike in the

6   federal anticompetitive context where you have this weird quirk

7   of procedure where if you don't have a pending claim or a claim

8   that has matured you can still seek injunctive relief in case

9   you can prove there's an antitrust violation that might reoccur

10  or you know, continue to occur or anything like that -- there is

11  no state law analogue under Virginia law.  You have to prove the

12  claim.  In this case, the breach of contract.  And only if you

13  can prove the breach of contract can you avail yourself to

14  relief, whether it be damages or injunctive relief.

15       And that principle of law is why CSX's citation to

16  that Virginia Circuit Court case that they cited in their

17  opposition to our motion to dismiss doesn't carry the day for

18  them.

19       We actually addressed this in our reply brief, this

20  case.  And in that case as the Court may recall, it was a

21  trespass case, okay?  They had brought the trespass sufficiently

22  after the trespass had first started so that the claim was

23  barred by the limitations.  But the trespass was continuing,

24  right?  There were allegations in the complaint that says as we

25  sit here today there is a potential -- as alleged in the

```
 1   complaint, there is a trespass, okay?

 2            You juxtapose that with the situation here where the

 3   Court has already ruled as we sit here today there is no

 4   actionable claim for breach of contract.  None.  It has been

 5   dismissed on the merits for failure of pleading and proof.  That

 6   is at 102 of the Court's opinion.

 7            So that ends the inquiry as to whether there is

 8   injunctive relief available under the contract law -- or under

 9   the contract claim.

10            Now, Your Honor, in the break we put together,

11   frankly, Judge, a litany of other reasons why this operational

12   injunctive relief, the specific performance as the Court

13   referred to it earlier, is unavailable as a matter of law.  And

14   I mentioned it's also a failure of pleading.  CSX never asked

15   for this type of specific performance on operational issues in

16   its complaint, in its Interrogatory Answer No. 9 to our

17   interrogatory asking for any forms of non-monetary relief which

18   is Exhibit 1 to the Belt Line's motion to dismiss on all

19   remaining claims.

20            And if you look at Paragraph 65 of CSX's proposed

21   findings of fact and conclusions of law, they don't ask for this

22   relief either.  Their position on the breach of contract claim

23   is that they will be able to prove by a preponderance of the

24   evidence that we have breached -- that Norfolk Southern has

25   breached legally enforceable obligations under the operating
```

 1   agreement, including its obligation to cooperate cordially in

 2   encouraging the business of the Belt Line.

 3          And this is the important section:  "NS has repeatedly

 4   breached this obligation by imposing barriers to prevent CSX

 5   from using NPBL to access on-dock rail at NIT on commercially

 6   reasonable terms, thereby limiting NPBL's ability to earn

 7   additional revenue and conduct the very business for which it

 8   was originally formed.  NS's breaches of the operating agreement

 9   have resulted in substantial damages to CSX in the form of

10   hundreds of millions of dollars in lost profits."

11          It says two things, Your Honor, and the Court probably

12   knows where I'm going:  It says, one, the nature of the breach,

13   the economic blocking, is what is at issue according to CSX, not

14   the operational, specific-performance-type of blocking that the

15   Court raised in its questions before lunch.

16          And secondly, it is manifest from their own writing

17   they have adequate remedy at law for any such breach, which they

18   can't prove anyway as the Court has already ruled on summary

19   judgment.

20          Next the injunctive relief on operational issues fails

21   because it's preempted under Edwards.  And again, we wholly

22   adopt the Belt Line's argument as it relates to preemption, the

23   standard of preemption or the applicability of preemption in the

24   Fourth Circuit after Edwards.  And of course we'd cite the Court

25   to 49 U.S.C. 10501(b).

```
 1          We also would cite the Court to its citation to the

 2  Verizon case on Pages 58 and 59 of its summary judgment opinion.

 3  To paraphrase, the judge -- or the Court raised concerns about

 4  it becoming a train master, if you will.  You know, the type of

 5  relief they're seeking, are you suddenly going, is the Court

 6  suddenly going to have to get involved in operations which

 7  clearly falls under 10501(b) and the exclusive jurisdiction of

 8  the STB.

 9          Next, Your Honor, I would say that clearly equity

10  follows the law.  And the Court is well aware of the laches

11  issues.  And of course Mr. Snow handed to the Court the Ocwen

12  case that my partner John Lynch argued in front of the Fourth

13  Circuit, and so that is another reason why it fails.

14          I've already touched on Paragraph 65 of CSX's proposed

15  conclusions of law which admits, frankly, that there's an

16  adequate remedy at law for any breach.

17          I'd also suggest it's not only there is an adequate

18  remedy of law Your Honor, that statement also shows there's no

19  irreparable harm, which might seem like a distinction without a

20  difference, but in this case I think the distinction is

21  highlighted.  Any operational issue is, is limited in time, and

22  of course in this case it happened now eight years ago.  I would

23  point out to the Court, point the Court to the fact -- I don't

24  think it's disputed -- since 2015 CSX has not tried to move a

25  train using the Belt Line up to NIT.
```

1      The next reason is the specific performance that the

2  Court was discussing before the break of course does not address

3  the alleged harm that is in Paragraph 65 of CSX's findings of

4  fact -- or sorry, their conclusions of law.  Again, their breach

5  of contract is now predicated on economic foreclosure, not

6  operational issues.  So again, it's a failure both of pleading

7  and proof.

8      Next, as the Court knows, under Virginia law it's well

9  established that courts don't enforce general provisions in a

10 contract.  The provision they're seeking to enforce is the

11 cordial cooperation provision, which of course is broad and

12 general.  And so any injunctive relief would be difficult to

13 fashion to enforce such a broad contractual term, assuming the

14 contractual term is enforceable in the first instance.

15     Your Honor, now I want to turn to the control issue,

16 because again, it seems like we're shifting a little bit.  The

17 Court had focused on operational specific-performance issues,

18 Mr. Hatch's presentation dealt with control.  And I just want to

19 add a couple points to Mr. Snow's well-reasoned arguments.

20     First as a matter of fact of Virginia law, it's as

21 plain as day that courts are not allowed to rewrite contracts.

22 And the equitable relief in terms of restructuring the Board --

23 and to be clear, that's what they're asking you to do.  Let

24 there be no doubt about it.  They're asking you to restructure

25 the Belt Line Board.  And in doing so, the Court would

1    effectively have to rip up the 1989 agreement.  That, the Court

2    cannot do under Virginia law.

3            And I think in closing, Your Honor, the other thing I

4    will add, the Court's summary judgment opinion focused on this

5    multiple, in multiple places, their discussion -- we just want

6    an independent board to rule on a service proposal.  This is all

7    speculation.  It's all speculative.  It's speculative harm, what

8    would happen if a service proposal was presented and there was

9    an actual vote on it.  And of course the law does not allow

10   injunctive relief to be had on speculative harm.

11           Your Honor, I know I went over probably 10 to 12

12   reasons why this simply doesn't work for the contract claim that

13   the Court dismissed on the merits at summary judgment.  Of

14   course we also adopt the Belt Line's arguments as it relates to

15   the conspiracy claims to which we are also a party.  But unless

16   the Court has any questions, I'll sit down.

17           THE COURT:  I don't have any other questions right now

18   for you.

19           MR. LACY:  Thank you.

20           THE COURT:  Mr. Hatch?

21           MR. HATCH:  I'll be very brief, Your Honor.

22           THE COURT:  Maybe you could, as an initial matter,

23   address those last points, the idea that Virginia law prohibits

24   equitable relief of restructuring a board when there's a

25   contract that governs it.  And the other point that was made

69

1  with respect to your more general requested relief that the lack

2  of specificity of any such injunction would be would doom such a

3  request.

4          MR. HATCH:  I'll do my best, Your Honor.  I have heard

5  these arguments, just as the Court has, and I'll just go back,

6  I'm not trying to inhibit the Court's consideration of these

7  issues, but I point out that none of this has been briefed to

8  the Court.  And so we're --

9          THE COURT:  Well, we'll talk about that in a minute.

10         MR. HATCH:  Okay.

11         THE COURT:  Go ahead and do your best.

12         MR. HATCH:  I'll do my best, Your Honor.

13         The Court had previously held, as I interpreted --

14  again, not trying to speak for the Court -- but as I interpreted

15  from the original motion to dismiss stage the Court stated that

16  it could award injunctive relief for both federal and state law

17  claims that could include, and the Court listed multiple things

18  that included an independent board as a remedy.  Court doesn't

19  set out to affirmatively design a board; the Court can impose a

20  new board structure as a remedy for other violations of the law.

21         And I think at the second motion to dismiss the

22  Norfolk Southern motion to dismiss stage, the Court was again

23  presented with arguments about lack of authority to do that and

24  the Court again rejected those arguments.

25         And then at the summary judgment stage the Court was,

1    in the supplemental briefing, presented with some arguments and

2    the Court, again, said that the Court could impose a new board

3    structure as part of a remedy for a violation of other law.  And

4    frankly I don't know of any Virginia cases that are

5    inconsistent, but again, I'm hearing this now and standing here

6    and addressing the Court about that.

7            To me, the key is it's a remedy for another violation.

8    Here, the violation on the breach of contract claim is a failure

9    to cordially cooperate and to build a business as the Court

10   quoted before.

11           I do want to say I'm -- quickly, Your Honor -- I

12   respectfully disagree with Mr. Lacy's statement of our

13   Paragraph 65 in our finding of fact and conclusions of law that

14   says "commercially reasonable terms", which in my mind certainly

15   includes the failure to give reasonable access through the 2015

16   moves as well as the other conduct that happened through the

17   Belt Line.  So that's not, you know, specific terminology that

18   excludes what happened in 2015 by any measure.

19           I'm sorry, Your Honor said the second question the

20   Court would like me to address?

21           THE COURT:  The generality attack.

22           MR. HATCH:  The generality attack.  Thank you, Your

23   Honor.  The generality attack is, I don't think the Court issues

24   an injunction that says don't violate the Sherman Act, don't

25   violate the Virginia Statutory Conspiracy Act.  The injunction

would specify, would prohibit conspiratorial conduct and would

have some delineation of what that conduct was that the Court

had found from the evidence at trial and prohibiting that on a

going-forward basis.  And in our proposed injunctive relief we

actually did some proposed delineations under that.

So it's not a "Don't violate the statutory conspiracy

law."  As I see it the Court would take the evidence, would hear

and determine what conduct violated the law, and then would

present an injunction that enjoined such conduct going forward.

And as the Court well knows, the core of this whole

thing is these two companies getting together to block access.

And so I think the Court can certainly craft an injunction that

is not just "obey the law"; that identifies what they did and

gives them specific guidance about what not to do going forward

in order to comply with that.  And that would be what a court

would do in fashioning the injunction after taking the evidence

in the case.

Just briefly on the Manotas case Mr. Lynch argued and

that Mr. Snow discussed with the Court, there again, to me, what

the Court's saying there -- this is the unpublished, I think,

Fourth Circuit case that discusses Virginia law -- is that the

form of the action isn't necessarily dispositive; you look at

what is being requested.  And so if what's being requested is

injunctive relief that goes back in time to reset historical

events, that may be precluded by doctrines like laches and that

72

1   sort of thing.  We're seeking prospective relief, and the Court

2   would evaluate that in light of the evidence it hears and decide

3   to issue the injunction.  So I think that's the difference from

4   the underlying cases that were being considered in that case.

5          The Court does talk -- the argument was made that

6   merely because it was prospective injunctive relief, that was an

7   exception.  And I think what the Fourth Circuit was looking at

8   in examining the Virginia cases was, well, an injunction can

9   always be called prospective, but if what it's doing is trying

10  to go back and reset things that happened in the past you can

11  look at that and decide whether it's appropriate to issue the

12  injunction.

13         Unless the Court has any further questions.

14         THE COURT:  All right.  So you have several times

15  today made the point that you didn't see the state injunctive

16  relief claim objections having been briefed, and the way that

17  the case has developed now such that it's been whittled down a

18  lot and we're scheduled to start trial tomorrow.  So if we were

19  to start trial tomorrow and go forward only on the state

20  injunction claims, because you say there's no procedural vehicle

21  that's brought them here and they haven't been briefed, and we

22  did that, and we get to the end of the trial -- I guess we

23  probably need new proposed findings of fact and conclusions of

24  law, since it's a bit of a different animal -- and the Court

25  then finds the arguments of Norfolk Southern and the Belt Line

```
 1   to prevail, then there's no relief at that point.  I'm simply

 2   trying to spin out a little bit where things are and where

 3   things go.

 4          I have significant concerns about your ability to

 5   prevail and receive the relief requested.  And I am mindful also

 6   that nobody wants to waste time where something could otherwise

 7   be resolved by way of ruling or by settlement.

 8          You all obviously can bob and weave as the structure

 9   of the case has changed.  I'm sure that you could move forward

10   with trial and present your testimony and we just deal with all

11   the objections in a little bit different way than what they were

12   dealt with at the final pretrial conference because of the

13   different structure now.  There would be some of that.  But you

14   tell me what it is that you want me to do at this point.  And I

15   guess I need to know what it is you want to do.

16          MR. HATCH:  Your Honor, could I request an opportunity

17   to confer with my client and then I will advise the Court?

18          THE COURT:  Sure.  I'm going to ask the same question

19   of the defendants; that is, if I am not ready to rule today,

20   what would they propose.  Maybe I'll be ready to rule today.  I

21   don't know.

22          We'll take a 10-minute recess.

23          MR. HATCH:  Thank you, Your Honor.

24          (Recess taken from 3:16 p.m. to 3:36 p.m.)

25          THE COURT:  Mr. Hatch, Mr. McFarland, who is going to
```

1   speak for you?

2        MR. McFARLAND:  Your Honor, first let me say that we

3   appreciate the Court's attention today and letting us take a

4   short break.  And we have had an opportunity to speak with our

5   client and the defendants' counsel.

6        The good news is that we are in agreement to a large

7   measure procedurally on how to proceed, obviously subject to the

8   Court's approval.  We have one variance.

9        The plaintiff's proposal is that the Court continue

10  the trial from starting tomorrow, and in fact I think as the

11  Court recognized there would be some significant work that would

12  need to be done by both parties if the Court were to proceed on

13  the state injunctive relief claims only, as I understand where

14  things stay now.

15       Our proposal is, Your Honor, that we continue the

16  matter and have a status conference with the Court in 10 days,

17  at which time we can advise the Court more fully about how we

18  think further proceedings could be had, whether the parties have

19  made any prospect or improvement in the settlement position, et

20  cetera.

21       So we would suggest continuing the trial for a status

22  conference with the Court in 10 days.

23       THE COURT:  That's a joint --

24       MR. McFARLAND:  We join in that.  Where we differ is

25  we would ask the Court to just hold what is left of the

1   defendant's motion to dismiss, to the extent that the dismissal

2   of the state injunctive relief claims is included in the pending

3   motions, but hold that in abeyance through the time of the

4   status conference.  I don't want to speak directly for them, but

5   I believe the defendant's position is they would like the Court

6   to rule now on whether anything can go forward on the state

7   injunctive relief claims.  We would ask that that be taken under

8   advisement for now and let the parties continue to explore

9   things.

10              Certainly there's a lot that has happened today, Your

11  Honor, and we need to discuss with our client the ramifications

12  of the Court's rulings over the past month, and particularly the

13  Court's rulings today.  And we would also like a chance to speak

14  with defendants about where things are and where they might be

15  going.  Thank you.

16              MR. LACY:  Your Honor, again, Michael Lacy for Norfolk

17  Southern.  And I agree with Mr. McFarland:  We appreciate the

18  Court's attention and its willingness to let us discuss these

19  matters.

20              We agree that the matter should be taken off the

21  docket for trial; however, we would respectfully request that

22  the Court go ahead and rule on these matters.  We do think

23  they're properly before the Court.  I know with respect to

24  Norfolk Southern we raised the very arguments -- not all of

25  them, but certainly the thrust of the argument that the

1    rewriting of the corporate structure is not available in our

2    summary judgment brief, and I'd cite the Court to Page 40 of

3    that brief, the last sentence of the paragraph where we said

4    that CSX cannot use litigation to rewrite NPBL's agreed

5    corporate structure.

6            In any event, we would ask the Court to go ahead and

7    issue a ruling.  If CSX wants to seek reconsideration of that

8    ruling it certainly can, but at that point it would have, it

9    would understand the Court's position.  Of course CSX has made

10   clear its intention, in the press at least, it's going to appeal

11   the case.

12           THE COURT:  Go ahead, finish, and then I'm going to

13   talk to you some more.

14           MR. LACY:  Sure.  Sure.

15           And so that's what we would propose to do.  And the

16   idea being, Your Honor, if the Court -- if they don't move to

17   reconsider, the case is done; if they do move to reconsider,

18   there will be briefing on issues and the Court can rule, and if

19   the Court does not reconsider, we're done, and if the Court does

20   reconsider, you know, we'll come back some other time.  So that

21   would be our proposal.

22           THE COURT:  And what is it you want me to rule on --

23           MR. LACY:  Well, Your Honor --

24           THE COURT:  -- during the pendency of the ten days?

25           MR. LACY:  Oh, no.  I wouldn't -- it's up to the Court

```
1    how quickly or not the Court wishes to rule.  I just, I think, I
2    think the matters at issue are properly before the Court.  I
3    think that both procedurally and from a substance standpoint
4    they're properly before the Court, so we'd ask for a ruling.
5    So...
6              THE COURT:  It's been a long time, but I well remember
7    how difficult it is to stand there and how difficult it is to
8    write the briefs and try to predict the course of litigation,
9    how the turns are going to be made and what's around the bend.
10   The reality is that when the Court issued its opinion,
11   Document 559, that Footnote 46 was intended to signal to all of
12   the parties that the injunction claim was outstanding.  The
13   state law injunctive claim, as I said, it's unclear if it's
14   viable.
15             Now, I can understand that one might read the opinion
16   and say, well, based on the status of Virginia law, all these
17   other claims having been dismissed, there's nothing left.  But
18   that was never said.  It was never argued.  It was the Court
19   that brought up injunction and injunctive relief and what that
20   means at a summary judgment argument.  Wasn't the subject of a
21   brief, motion, and it's just the reality.
22             So things have developed in close proximity to the
23   trial, in close proximity to lots of motions that you all were
24   litigating before the magistrate judge, in close proximity to
25   the final pretrial order and conference, and I am sympathic to
```

1  that.  But the reality is that this has -- these issues have not

2  been fully briefed.  I mean, you say that you addressed the

3  board structure, but that's not all that there is here, the

4  availability of one element of relief.  That's not all there is.

5          And so while you would like for me to rule, I don't --

6  I want you all to litigate the case.  I don't want to litigate

7  the case for you.  I expect you all to litigate the case.  And

8  I'm not being critical, because as I say, I understand it's hard

9  to predict what's around the next bend, and there was a lot of

10  stuff going on over the last few months.  But this is a matter

11  of such significance I don't I think you want me going off and

12  ruling based on the little bit that we have.

13          We have very divergent views expressed here today

14  about the effect of Virginia law on these claims.  Very

15  divergent views.  Downey is very different -- I mean, if you

16  look at the, you know, Virginia Remedies text and its discussion

17  of these issues, you know, it appears that your argument is

18  probably stronger.  But you know, I've got some case law here

19  that has to be sorted out.  And it's not fair to me or to you

20  all or to the public for me to shoot from the hip.  These issues

21  are too, too important, and you all have put too much time into

22  this and your clients have invested too much in it for us to do

23  that.  That would undermine the whole concept of what the rule

24  of law should be.

25          So those are my high-level reflections, Mr. Lacy.

1          MR. LACY:  And Your Honor, they are received.  And by

2    no means did I mean to suggest that the rule of law shouldn't be

3    followed and to otherwise, you know, put the Court in an awkward

4    position.

5          THE COURT:  You just think that I'm more on top of all

6    of this and understand it much better than maybe I do.

7          MR. LACY:  That statement has been made before, yes.

8          THE COURT:  Well, I just think -- I do, I agree we

9    need to -- I mean, look, we could start the trial tomorrow and

10   we could go through all this and then we could just have the

11   briefing and sort it all out on the back end.  But that's going

12   to be very hard for you all, very hard for your clients.

13         Yeah, I think that it's wise for you to put this off

14   and -- to put it off, No. 1.

15         MR. LACY:  We are in agreement, Your Honor.

16         THE COURT:  Okay.  No. 2, the question then becomes

17   should we have some kind of briefing on the issues that have

18   been raised in some way and, you know, do you do that based on

19   what I -- you know, you get the transcript and look at the

20   questions I outlined for you before lunch and said this is what

21   I want to hear about?  Is that -- that may be a method of doing

22   that, but -- and I think that that briefing would initiate, be

23   initiated by defendants with the normal back and forth.

24         I suppose in the meantime that we protect the Court's

25   docket, and for your plans I could ask the clerk to identify

1   some time.

2          So let me ask this:  Step back for a moment.  If this

3   case goes to trial and you're dealing with the conspiracy, two

4   conspiracy, and the fraud, I mean the breach of contract claim,

5   initially when we had more I said 25 hours each.  I assume

6   that's not what you think this case is going to take if it's

7   just those three things.  So you know, what is your best

8   estimate of how long this is going to take?  Have you all talked

9   about that?

10          MR. McFARLAND:  We have not had a chance to -- I

11  apologize, Your Honor.

12          We have not had a chance to talk about that, Your

13  Honor, but that's why I said early on when I stood up that I do

14  think it would -- we needed some time to assess where the case

15  is now given the Court's rulings up to this point.

16          So we would -- and that's part of what I was

17  suggesting:  We have a, basically a hold for 10 days.

18          I do, I do very much agree with the Court:  The motion

19  that isn't -- that's been argued but it isn't before the Court

20  in what is the normal form of a written motion, I mean, I've,

21  even in listening, I've heard several different forms it could

22  take or it could be.  It's a little amorphous.

23          I think in fairness to the Court but also in fairness

24  to my client, I mean, if we're going to be responding to the

25  absence of state court injunctive relief, I want to know exactly

```
1    what is being set forth, what the basis for it is, and that.  So
2    I do agree with the Court on that.
3            And we will certainly, Your Honor, look at -- if we're
4    going forward in that capacity, because it changes our elements,
5    you know, somewhat, obviously, we'll look at what we think would
6    be the time frame that we would need, recognizing what the Court
7    has given us, and have a proposal for Your Honor.
8            THE COURT:  So you would rather that I not try to
9    protect some time right now?
10           MR. McFARLAND:  When you say "right now", Your Honor,
11   you mean next week?
12           THE COURT:  Be looking for next month or two months or
13   whatever, looking for time to mark off.
14           MR. McFARLAND:  The only thing I've got, Your Honor,
15   is, with our client, so many of our witnesses travel extensively
16   and I would like to have a better feel.  I don't want to commit
17   to the Court -- and I know how busy the Court's schedule is -- I
18   don't want to sit here and say, yes, February 15th works for us
19   and then go back and my key witnesses would be in Tanzania.
20           THE COURT:  Got it.  All right.
21           Mr. Lacy?
22           Thank you, Mr. McFarland.
23           Mr. Lacy, that does make some sense.  I assume that
24   both of you all have witnesses that need to readjust schedules?
25           MR. LACY:  Yes, Your Honor.  Yes, it makes sense in
```

 1    light of the Court's comments.

 2              THE COURT:  Would you like me to take a short break

 3    for you?

 4              MR. LACY:  That would probably be helpful, yeah.

 5              THE COURT:  Why don't we do that and we'll talk some

 6    more.

 7              MR. LACY:  All right.  Thank you.

 8              (Recess taken from 3:52 p.m. to 4:00 p.m.)

 9              THE COURT:  Mr. McFarland, who is -- you're up?

10              MR. McFARLAND:  I think I drew the shortest straw,

11    Your Honor.

12              THE COURT:  Okay.

13              MR. McFARLAND:  I think we're going to end up pretty

14    much what I proposed before the last break, which is we would

15    like to have a status conference with the Court in 10 days.  We

16    will continue the trial.  And one of the things we'll do right

17    away with defense counsel is discuss a briefing schedule on the

18    motion to, I guess I'll call it the motion to dismiss state law

19    injunctive relief claims, and come forward with that.  And I

20    would think we could probably provide that to the Court fairly

21    soon.  But the 10 days will give us time to just kind of do an

22    assessment in the case, and if there is a trial going forward on

23    those claims, how long it would take, how many hours, and also

24    to look at trial dates from our side with our witnesses and

25    perhaps we can even inquire of Ms. Ward as to what the Court

```
 1    has, recognizing the Court's schedule is rather full.

 2              THE COURT:  All right.  Mr. Snow?

 3              MR. SNOW:  Your Honor, we'll do whatever the Court

 4    would like.

 5              THE COURT:  I mean, you're in agreement, I take it.

 6    That's what I'm asking.  Is that accurate?

 7              MR. SNOW:  Yes, Your Honor.  That is fine with us.

 8              THE COURT:  Okay.

 9              MR. LACY:  We're in agreement, Your Honor.

10              THE COURT:  Okay.  Now, I need to get the opinion out

11    that I told you I would get out.  I'll use the time to also work

12    on the opinion on Section 26.

13              And do you all have any interest in meeting with

14    the -- which magistrate judge conducted your settlement

15    conference?

16              MR. McFARLAND:  This would be Judge Leonard, Your

17    Honor, for the settlement conference.

18              THE COURT:  Is there any interest in getting a date

19    with him?

20              MR. McFARLAND:  We would certainly be interested, yes,

21    Your Honor, we would.

22              THE COURT:  I mean, I don't want to make you all do

23    something that's futile.

24              Mr. Wingfield, do you have any interest in that?

25              MR. WINGFIELD:  I'll defer to others, Your Honor.  I
```

84

1  guess I'm skeptical about the value of going back to Judge

2  Leonard.  These are very sophisticated entities with very

3  powerful lawyers in-house and out-house, so to speak, and they

4  can get -- we have the right people already involved to advance

5  settlement discussions if it can be settled.  And so I think,

6  frankly, in this posture, I think right now going to Judge

7  Leonard would be a waste of time, frankly.  Speaking the truth

8  to the Court.

9          THE COURT:  Okay.

10          MR. McFARLAND:  Can I suggest this, Your Honor?  That

11  would be one of the things that we would discuss both with our

12  client and with opposing counsel in the 10 days before the next

13  status conference.

14          And I'll also say, Your Honor, that there have been

15  some discussions between the clients directly, and there's

16  certainly -- perhaps those will pick up again.

17          THE COURT:  Well, for what it's worth it seems like

18  there's a, there would be a lot of issues to handle on appeal

19  and a lot of uncertainty about the issues and how they would

20  perhaps be decided.  And of course you've got that whole

21  separate STB issue.  But I really, I don't understand how

22  there's not a path forward on settlement here when you all have

23  all worked together to some extent within this contractual

24  relationship and you have a joint -- maybe I'm naive in saying

25  this -- but you have a joint vested interest in your clients

```
 1   having a strong port position here in Virginia.  And so it's

 2   just something to think about.

 3            MR. McFARLAND:  We agree.  And thank you, Your Honor.

 4            THE COURT:  So Madam Clerk, do I have something about

 5   10 days out?

 6            (Court and law clerk conferred.)

 7            THE COURT:  So the 8th and the 10th are available, of

 8   February.  Do you all have a preference?

 9            The 10th is a Friday?

10            COURTROOM DEPUTY CLERK:  Yes, sir.

11            THE COURT:  Okay.

12            MR. McFARLAND:  From CSX's standpoint, Your Honor,

13   we'd prefer the 8th.

14            THE COURT:  Okay.

15            MR. LACY:  Works for us, Your Honor.

16            THE COURT:  February 8th work for you, Mr. Snow?

17            MR. SNOW:  I believe so, Your Honor.

18            THE COURT:  February 8th at 11:00.  And then if

19   something gets filed before then, something gets filed before

20   then, and we --

21            COURTROOM DEPUTY CLERK:  Judge?

22            (Court and courtroom deputy conferred.)

23            THE COURT:  Counsel, I'm sorry.  We're going to need

24   to do the following week, the 14th.  Tuesday the 14th.  All

25   right?  Nobody's in Europe that week, I take it?  Traveling on
```

86

1    vacation?

2            MR. McFARLAND:  Not on our end, Your Honor, that I'm

3    aware of.  That would be the status conference though?

4            THE COURT:  That would be the status conference.

5            And if you all -- you know, in the meantime if you

6    work out a briefing schedule and everything, just get going on

7    it.

8            MR. McFARLAND:  Right.

9            THE COURT:  And then we'll work on the opinion on

10   Section 26 and await further word from you all.

11           MR. McFARLAND:  Thank you very much, Your Honor.

12           THE COURT:  All right.  Thank you all.  Have a good

13   day.

14           (Whereupon, proceedings concluded at 4:10 p.m.)

15

16

17

18

19

20

21

22

23

24

25

87

*CERTIFICATION*

*I certify that the foregoing is a true, complete and correct transcript of the proceedings held in the above-entitled matter.*

_____

Paul L. McManus, RMR, FCRR

_____

Date